## No. 15-15296

IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

GILBERT P. HYATT,

*Plaintiff-Appellant,*

v.

DIANE L. HARKEY, in her official capacity as California State
Board of Equalization member; JEROME E. HORTON, in his
official capacity as California Franchise Tax Board member and
California State Board of Equalization member; MICHAEL
COHEN, in his official capacity as California Franchise Tax Board
member; BETTY T. YEE, in her official capacity as California
Franchise Tax Board member and California State Board of
Equalization member; GEORGE RUNNER, in his official capacity
as California State Board of Equalization member; FIONA MA, in
her official capacity as California State Board of Equalization
member,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California
Case No. 2:14-cv-00849-GEB-DAD (Hon. Garland E. Burrell, Jr.)

APPELLANT GILBERT P. HYATT'S
EXCERPTS OF RECORD
VOLUME 2 of 4

Donald J. Kula, Bar No. 144342
DKula@perkinscoie.com
Oliver M. Gold, Bar No. 279033
OGold@perkinscoie.com
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Erwin Chemerinsky
EChemerinsky@law.uci.edu
UC IRVINE SCHOOL OF LAW
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000
Telephone: 949.824.8814
Facsimile: 949.824.7336

Malcolm Segal, Bar No. 075481
MSegal@segal-pc.com
SEGAL & ASSOCIATES, PC
400 Capitol Mall, Suite 2550
Sacramento, CA 95814
Telephone: 916.441.0886
Facsimile: 916.475.1231

Attorneys for Appellant Gilbert P. Hyatt

# TABLE OF CONTENTS

## Volume 1

**Page**

02/10/2015    [Doc. No. 36] Judgment …………………….………………    1

02/10/2015    [Doc. No. 35] Order Granting Defendants' Motion to
Dismiss for Lack of Jurisdiction …………………….………    2

## Volume 2

02/18/2015    [Doc. No. 37] Notice of Appeal …………………………    15

08/25/2014    [Doc. No. 22-1] Declaration of Eric J. Coffill in Support of
Plaintiff Gilbert P. Hyatt's Consolidated Opposition to
Defendants' Respective Motions to Dismiss ……………    17

08/25/2014    [Doc. No. 22-2] Declaration of Donald J. Kula in Support
of Plaintiff Gilbert P. Hyatt's Consolidated Opposition to
Defendants' Respective Motions to Dismiss …..…………    55

08/25/2014    [Doc. No. 23 - 23-2] Request for Judicial Notice in Support
of Plaintiff's Consolidated Opposition to Defendants'
Respective Motions to Dismiss ……………    64

## Volume 3

08/25/2014    (Continued) [Doc. No. 23 - 23-2] Request for Judicial
Notice in Support of Plaintiff's Consolidated Opposition to
Defendants' Respective Motions to Dismiss …………    306

08/25/2014    [Doc. No. 24] Plaintiff's Objections to Declaration of
Robert W. Dunn in Support of California Franchise Tax
Board Members Defendants' Motions to Dismiss ………    505

## TABLE OF CONTENTS

### Volume 4

**Page**

09/26/2014    [Doc. No. 25] Notice of Decision from Nevada Supreme Court ….………………………………………………   556

12/03/2014    [Doc. No. 30] Plaintiff's Supplemental Notice of Decision from Nevada Supreme Court ……………………………   631

12/03/2014    [Doc. No. 31] Notice of Errata Re Plaintiff's Supplemental Notice of Decision from Nevada Supreme Court ………   635

04/04/2014    [Doc. No. 2] Complaint for Injunctive Relief Under 42 U.S.C. § 1983 …………………………………………   738

Case Docket ……………………………….………………   784

1  Donald J. Kula, Bar No. 144342
   DKula@perkinscoie.com
2  Oliver M. Gold, Bar No. 279033
   OGold@perkinscoie.com
3  **PERKINS COIE LLP**
   1888 Century Park E., Suite 1700
4  Los Angeles, CA 90067-1721
   Telephone: 310.788.9900
5  Facsimile: 310.788.3399

6  Erwin Chemerinsky, Esq.
   EChemerinsky@law.uci.edu
7  **UC IRVINE SCHOOL OF LAW**
   401 E. Peltason Drive, Suite 1000
8  Irvine, CA 92697-8000
   Telephone: 949.824.8814
9  Facsimile: 949.824.7336

10 Malcolm Segal, Bar No. 075481
   MSegal@segal-pc.com
11 **SEGAL & ASSOCIATES, PC**
   400 Capitol Mall, Suite 2550
12 Sacramento, CA 95814
   Telephone: 916.441.0886
13 Facsimile: 916.475.1231

14 Attorneys for Plaintiff, Gilbert P. Hyatt

15          UNITED STATES DISTRICT COURT

16          EASTERN DISTRICT OF CALIFORNIA

17

18 GILBERT P. HYATT,                    Case No.2:14-CV-00849-GEB-DAD

19              Plaintiff,              HON. GARLAND E. BURRELL, JR.

20 v.

21 JOHN CHIANG, JEROME E.               **NOTICE OF APPEAL**
   HORTON, AND MICHAEL COHEN,
22 CALIFORNIA FRANCHISE TAX
   BOARD MEMBERS; BETTY T. YEE,
23 GEORGE RUNNER, MICHELLE
   STEEL, JEROME E. HORTON, AND
24 JOHN CHIANG, CALIFORNIA
   STATE BOARD OF
25 EQUALIZATION MEMBERS; AND
26 DOES 1 THROUGH 20,
27              Defendants.
28

LEGAL125022546.3                                    Notice of Appeal

ER 15

1  **TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF**

2  **RECORD:**

3

4     Notice is hereby given that Gilbert P. Hyatt, the Plaintiff in the above named

5  case, hereby appeals to the United States Court of Appeals for the Ninth Circuit

6  from the Judgment entered in this action on February 10, 2015 (Docket No. 36) and

7  the District Court's Order Granting Defendants' Motions To Dismiss For Lack Of

8  Jurisdiction also entered in this action on February 10, 2015 (Docket No. 35).

9

10  DATED:  February 18, 2015          **PERKINS COIE LLP**

11                                          By: */s/ Donald J. Kula*
                                               Donald J. Kula
12

13                                          *Erwin Chemerinsky*

14

15                                          **SEGAL & ASSOCIATES, PC.**

16                                          By: */s/ Malcolm S. Segal*
                                               Attorneys for Plaintiff
17                                             Gilbert P. Hyatt

18

19

20

21

22

23

24

25

26

27

28

LEGAL125022546.3                          -1-                      Notice of Appeal

ER 16

1 | Donald J. Kula, Bar No. 144342
DKula@perkinscoie.com
2 | PERKINS COIE LLP
1888 Century Park E., Suite 1700
3 | Los Angeles, CA 90067-1721
Telephone: 310.788.9900
4 | Facsimile: 310.788.3399

5 | Erwin Chemerinsky, Esq.,
EChemerinsky@law.uci.edu
6 | UC IRVINE SCHOOL OF LAW
401 E. Peltason Drive, Suite 1000
7 | Irvine, CA 92697-8000
Telephone: 949.824.8814
8 | Facsimile: 949.824.7336

9 | Malcolm Segal, Bar No. 075481
MSegal@segal-pc.com
10 | SEGAL & ASSOCIATES, PC
400 Capitol Mall, Suite 2550
11 | Sacramento, CA 95814
Telephone: 916.441.0886
12 | Facsimile: 916.475.1231

13 | Attorneys for Plaintiff Gilbert P. Hyatt

14 | UNITED STATES DISTRICT COURT

15 | EASTERN DISTRICT OF CALIFORNIA

16 | GILBERT P. HYATT,

17 | Plaintiff,

18 | v.

JOHN CHIANG, JEROME E.
19 | HORTON, AND MICHAEL COHEN,
CALIFORNIA FRANCHISE TAX
20 | BOARD MEMBERS; BETTY T. YEE,

21 | GEORGE RUNNER, MICHELLE
STEEL, JEROME E. HORTON, AND
22 | JOHN CHIANG, CALIFORNIA
STATE BOARD OF
23 | EQUALIZATION MEMBERS; AND
DOES 1 THROUGH 20,
24 |

25 | Defendants.

26 |

27 |

28 |

Case No. 2:14−CV−00849−GEB−DAD

**Declaration of Eric J. Coffill in Support of Plaintiff Gilbert P. Hyatt's Consolidated Opposition to Defendants' Respective Motions to Dismiss**

**Date:** **November 3, 2014**
**Time:** **9:00 a.m.**
**Courtroom: 10**
**Hon. Garland E. Burrell, Jr.**

64847-0006/LEGAL123218570.1

Declaration in Support of Plaintiff's Consolidated
Opposition to Defendants' Motions to Dismiss

1    I, Eric J. Coffill, have personal knowledge of the matters set forth in this
2    declaration unless otherwise indicated.

3       1.      I am a partner in the law firm of Morrison & Foerster LLP.  I am lead
4    counsel for Gilbert P. Hyatt in his pending administrative appeals before the
5    California State Board of Equalization, *Appeals of Gilbert P. Hyatt*, SBE Case ID
6    Nos. 446509 and 435770 (the "SBE Appeals").

7       2.      On January 22, 2008 and January 23, 2008, Mr. Hyatt filed the current
8    SBE Appeals now pending before the California State Board of Equalization (the
9    "SBE").  These appeals have therefore now been pending for over six years.

10      3.      The SBE's rules of tax appeals ("RTA") set forth the "General
11   Briefing Schedule" for appeals from FTB actions.  Under RTA 5431(b) and (c), an
12   appellant (here Mr. Hyatt) has a right to file an Opening Brief and a Reply Brief,
13   while the Franchise Tax Board of California (the " FTB") has only the right to file
14   an Opening Brief.

15      4.      In regard to the briefing history in the SBE Appeals, on December 9,
16   2008, Mr. Hyatt filed his Opening Briefs before the SBE for each of the tax years
17   1991 and 1992.

18      5.      In correspondence to the SBE dated January 27, 2009, the FTB sought
19   additional time for the filing of its Opening Briefs and cited as a basis for their
20   request that the FTB "will need time to investigate the new alleged facts, which
21   may require time for legal process."  (A true and correct copy of the FTB's January
22   27, 2009 correspondence to the SBE is attached hereto as Exhibit A.)  The FTB
23   also cited specifically to 26 newly sworn affidavits, but did not acknowledge that
24   most of these affidavits came from witnesses who had been identified to the FTB in
25   the administrative protests and thus whom the FTB could have but chose not to
26   approach or interview during the "protest phase" of the administrative process that
27   lasted from 1996-1997 through 2007.  The FTB then proceeded to issue subpoenas
28   and, in 2010, to take depositions of third party witnesses 18 years after Mr. Hyatt's

-1-         Declaration of Coffill in Support of Plaintiff's Consolidated
            Opposition to Defendants' Respective Motions to Dismiss

1  move to Nevada.

2      6.    On January 27, 2009, the FTB wrote to the SBE and asked for either a
3  "postponement" of the SBE proceeding or for Mr. Hyatt's appeals to be "removed
4  from the SBE's appeal calendar", and cited as a basis for its request that the FTB
5  "will need time to investigate the new alleged facts, which may require time for
6  legal process." (*See* Exhibit A hereto.)

7      7.    On February 6, 2009, the SBE granted the FTB an additional three
8  months (from March 9, 2009 to June 7, 2009) to file its Opening Briefs.

9      8.    After requesting and receiving an additional extension, on September
10  15, 2009, the FTB filed its Opening Briefs for the 1991 and 1992 tax years, which
11  were 100 pages and 75 pages, respectively, with two boxes of additional filings.
12  The FTB also filed declarations of its private investigator regarding "*new*"
13  interviews that it had been taking.

14      9.    On August 23, 2010, Mr. Hyatt filed his Reply Briefs for each of the
15  tax years 1991 and 1992, which were each 100 pages and with four boxes of
16  additional filings.  This was the conclusion of the SBE "general briefing" per RTA
17  5431.

18      10.    In correspondence dated August 26, 2010, the SBE notified the FTB
19  that if it wished to request permission to file Reply Briefs, the FTB had until
20  September 10, 2010, to make such a request.  The SBE had discretionary authority
21  under RTA 5431(c)(2) whether to grant the FTB permission to file Reply Briefs.
22  (A true and correct copy of the SBE's August 26, 2010 correspondence to the FTB
23  is attached hereto as Exhibit B.)

24      11.    On September 1, 2010, the FTB did request permission to file Reply
25  Briefs in the SBE Appeals, and requested a page limit not to exceed 100 pages for
26  each brief and an extension of the filing date for such briefs beyond the 30 days
27  provided by RTA 5431(c)(2)(C) to June 30, 2011. (A true and correct copy of the
28  FTB's September 1, 2010 correspondence to the FTB is attached hereto as Exhibit

-2-    Declaration of Coffill in Support of Plaintiff's Consolidated
Opposition to Defendants' Respective Motions to Dismiss

1    C.)  This seven month requested extension was a significant additional amount of

2    time beyond the 30-day Reply Briefing schedule provided under the SBE's RTA

3    5431.  In this request, the FTB acknowledged that if the SBE granted the FTB's

4    request to file a Reply Brief, Mr. Hyatt would then be entitled under RTA 5431(c)

5    to file Supplemental Briefs and expressed that it had no objection to Mr. Hyatt

6    receiving from the SBE comparable time and page number allotments for such

7    supplemental briefs.

8         12.     In correspondence dated September 20, 2010, the SBE granted the

9    FTB's request to file two Reply Briefs with due dates of June 30, 2011.  (A true and

10   correct copy of the SBE's September 20, 2010 correspondence to the FTB is

11   attached hereto as Exhibit D.)

12        13.     On June 30, 2011, nearly ten months after the FTB's September 1,

13   2013 request for permission to file Reply Briefs in the SBE Appeals, the FTB filed

14   its Reply Briefs for each of the tax years 1991 and 1992, which were each 100

15   pages and with two boxes of additional filings.  The FTB also filed declarations of

16   its private investigators regarding *"new"* investigations and interviews that the FTB

17   had conducted against Hyatt during the SBE appeal process.

18        14.     On July 25, 2012, Mr. Hyatt filed his Supplemental Briefs, which he

19   had the right to file under RTA 5431(c)(3) given the SBE's extraordinary grant to

20   the FTB for leave to file Reply Briefs in the SBE proceeding.  RTA 5431(c)(3)

21   states:  "The filing of the Appellant's Supplemental Brief concludes the briefing

22   schedule."

23        15.     On August 2, 2012, the SBE issued a letter declaring that:

24

25        Please note that ***briefing is completed*** for this appeal. ***We***

26        ***will schedule the appeal for oral hearing*** and you will

27        receive notice of the date and time of hearing at least 75

28        days in advance of the hearing date.

-3-         Declaration of Coffill in Support of Plaintiff's Consolidated
            Opposition to Defendants' Respective Motions to Dismiss

1   (A true and correct copy of the SBE's August 2, 2012 correspondence to the SBE is
2   attached hereto as Exhibit E.)
3          16.    Notwithstanding the SBE's August 8, 2012, letter, as of this date, a
4   hearing still has not been set for the appeals.  In a letter dated April 29, 2013, the
5   FTB stated it was prepared to re-brief Mr. Hyatt's previously filed evidence and to
6   rebut Mr. Hyatt's prior briefings.  (A true and correct copy of the FTB's April 29,
7   2013 correspondence to the SBE is attached hereto as Exhibit F.)  In a letter dated
8   May 7, 2013, the FTB sought to re-brief the whole administrative appeal (i.e.,
9   "existing evidence") through the evidence at issue in a New York court proceeding.
10  (A true and correct copy of the FTB's May 7, 2013 correspondence to the SBE is
11  attached hereto as Exhibit G.)
12         17.    By letter dated May 7, 2014, Mr. Hyatt wrote the SBE regarding the
13  briefing schedule set forth in the SBE's April 23, 2014 letter to the parties.  (A true
14  and correct copy of the May 7, 2014 correspondence to the SBE is attached hereto
15  as Exhibit H.)  There, Mr. Hyatt objected to the SBE allowing the FTB to file two
16  briefs addressing (1) the Philips documents which were the subject of litigation in
17  the New York Courts, and (2) declarations and other evidence submitted to the SBE
18  by Mr. Hyatt with and following Mr. Hyatt's supplemental brief; and (3) any
19  additional argument that may assist the SBE in resolving the appeals.  Mr. Hyatt's
20  May 7, 2014 letter states, as Mr. Hyatt stated in his May 16, 2013 letter to the SBE,
21  that allowing FTB such unfettered discretion to now brief "any" additional
22  argument it so choses, in appeals where briefing was completed years ago, leads to
23  no conceivable end in sight to the briefing.  By letter dated June 13, 2014, the SBE
24  denied Mr. Hyatt's requests to limit FTB's supplemental briefing.  (A true and
25         XXX
26         XXX
27         XXX
28

-4-                    Declaration of Coffill in Support of Plaintiff's Consolidated
                       Opposition to Defendants' Respective Motions to Dismiss

1  correct copy of the SBE's June 13, 2014 correspondence to the SBE is attached

2  hereto as Exhibit I.)

3       I declare under penalty of perjury under the laws of the United States that the

4  foregoing is true and correct.

5       Executed on this 21ˢᵗ day of August, 2014, at Sacramento California.

6

7       _____ Eric J. Coffill _____

8                 Eric J. Coffill

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Coffill in Support of Plaintiff's Consolidated
Opposition to Defendants' Respective Motions to Dismiss

# EXHIBIT A



State of California
Franchise Tax Board

**RECEIVED**

JAN 3 0 2009

**Morrison & Foerster LLP**



Date:     01.27.09

Case:              7150053859256143
Case Unit:         7150053859256163
In reply refer to  410:RWD

TO:     CHIEF, BOARD PROCEEDINGS DIVISION
STATE BOARD OF EQUALIZATION
450 N STREET, MIC: 81
SACRAMENTO, CA  95814

FROM:   ROBERT W. DUNN

RE:     Appeal of Gilbert P. Hyatt
Appeal Case ID No. 446509 & 435770

# MEMORANDUM

Respondent California Franchise Tax Board (FTB) received appellant Gilbert P. Hyatt's dual opening briefs in this matter on December 9, 2008. Shortly thereafter we received boxes of exhibits and attachments.

Following the filing of his appeal, your Board originally granted Mr. Hyatt an opening brief due date of July 31, 2008. Mr. Hyatt then asked for and received three successive filing extensions.[1] The final filing date was December 9, 2008, which was met.

FTB has preliminarily reviewed Mr. Hyatt's dual opening briefs and exhibits. The briefs are lengthy documents, one totaling 95 pages and the second 75 pages. Supporting exhibits are contained within four file boxes and, of import, they include documentation new to FTB. Supporting his dual briefs and the arguments therein are no less that 26 newly sworn affidavits. These affidavits were never presented to FTB's auditors or protest hearing officers in this matter, even though the audit began in mid-1993 and the protest dates to 1997. Many

---

[1] On June 30, 2008, Mr. Hyatt requested in writing an extension to file until September 29, 2008. Your Board granted this request. In an e-mail dated July 3, 2008, Mr. Hyatt requested an extension to file until November 25, 2008. That request was also granted. By telephone call on November 17, 2008, Mr. Hyatt requested a third extension.

FTB PASS 2140 (REV 05-2008)              Legal Division MS A260              Tel  (916) 845-3338
Appeals/Correspondence/FTB Postponement Request   PO Box 1720                Fax  (916) 843-6041
Page 1 of 1                               Rancho Cordova CA 95741-1720       Robert dunn@ftb.ca.gov

ER 24

Date                 : 01.27.09
Appeal Name          : Gilbert P. Hyatt
Appeal Case ID No.   : 446509 & 435770

of Mr. Hyatt's 2008 affiants are attesting to personal knowledge of events that occurred in 1991.

In the dual opening briefs Mr. Hyatt has also included considerable reference to the trial record from his collateral tort litigation against FTB in Nevada, even though that litigation is far from resolved. Mr. Hyatt advances various legal theories as to the impact of a Nevada jury verdict and Nevada trial court rulings upon this California administrative proceeding. These theories appear to present issues of first impression in this forum.

To effectively and properly address the new alleged facts and legal argument FTB requests more time than the standard 90 days allowed for an opening brief. Part of the reason for this postponement request is simply the time and work required to adequately address all the new documentation and legal issues. However, the central reason for this request is that FTB will need time to investigate the new alleged facts, which may require time for legal process. Therefore, FTB requests that your Board grant a postponement in accordance with Board of Equalization Rules for Tax Appeals, Section 5522.8(b)(5). FTB requests the matter be removed from the appeal calendar until FTB has notified your Board that its investigation is complete. FTB anticipates this will take approximately six to nine months. FTB will contact the Board promptly when complete.

FTB also requests your Board conduct a pre-hearing conference as set forth in Board of Equalization Rules for Tax Appeals, Section 5443. The stated purpose of such a hearing is "...to obtain additional facts and evidence, obtain stipulations of fact, and narrow questions of law, in order to facilitate a more efficient and productive oral hearing." As will be clear upon receipt of FTB's Opening Brief—if it is not already clear after a review of Mr. Hyatt's dual opening briefs—administrative efficiency and economy can be well served by such a hearing. There are likely to be some facts to which the parties can stipulate, some disputed facts upon which the central issues of residency, fraud and income sourcing will turn, and some questions of law that could be issues of first impression with your Board. Therefore, FTB requests a pre-hearing conference be scheduled upon completion of the briefing.

In accordance with Section 5522.8(b)(5) please forward this request to your Board's Chief Counsel.

If there are any questions please do not hesitate to contact me.

Tax Counsel IV

cc:   Eric J. Coffill

# EXHIBIT B



STATE OF CALIFORNIA

**STATE BOARD OF EQUALIZATION**
450 N STREET, SACRAMENTO, CALIFORNIA
PO BOX 942879, SACRAMENTO, CALIFORNIA 94279-0081
916-322-3084 • FAX 916-324-3984
www.boe.ca.gov

BETTY T. YEE
First District, San Francisco

MICHELLE STEEL
Third District, Rolling Hills Estates

JEROME E. HORTON
Fourth District, Los Angeles

JOHN CHIANG
State Controller

BARBARA ALBY
Acting Member
Second District, Sacramento

RAMON J. HIRSIG
Executive Director

August 26, 2010

Eric J. Coffill
Morrison & Foerster LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814-4428

Appeal of Gilbert P. Hyatt
Case ID No. 435770

Dear Mr. Coffill:

This letter acknowledges receipt on August 23, 2010, of your reply brief in the above-entitled matter. If the Franchise Tax Board wishes to request permission to file a supplemental brief, it has until **September 10, 2010** to make the request. California Code of Regulations, title 18, section 5431, subdivision (c), states:

"The Franchise Tax Board may file a Reply Brief only upon written permission from the Chief Counsel. The Respondent's Reply Brief, if filed, may only address points of disagreement with the Appellant's Reply Brief. The Franchise Tax Board has 15 days from the date the Chief of Board Proceedings acknowledges receipt of the Appellant's Reply Brief in which to file a written request to file it's Reply Brief"

If the Franchise Tax Board does not request permission to file a supplemental brief, pursuant to your request, we will schedule the above-appeal for an oral hearing and you will receive notice of the time and location at least 75 days in advance of the hearing date.

Sincerely,

Sharon King

Sharon King
Appeals Analyst
Board Proceedings Division

cc:   Gilbert P. Hyatt
      c/o Morrison & Foerster LLP
      400 Capitol Mall, Suite 2600
      Sacramento, CA 95814-4428

      Franchise Tax Board - Legal (MS A2.60)



STATE OF CALIFORNIA

**STATE BOARD OF EQUALIZATION**
450 N STREET, SACRAMENTO, CALIFORNIA
PO BOX 942879, SACRAMENTO, CALIFORNIA 94279-0081
916-322-3084 • FAX 916-324-3984
www.boe.ca.gov

BETTY T. YEE
First District, San Francisco

MICHELLE STEEL
Third District, Rolling Hills Estates

JEROME E. HORTON
Fourth District, Los Angeles

JOHN CHIANG
State Controller

BARBARA ALBY
Acting Member
Second District, Sacramento

RAMON J. HIRSIG
Executive Director

August 26, 2010

Eric J. Coffill
Morrison & Foerster LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814

Appeal of Gilbert P. Hyatt
Case ID No. 446509

Dear Mr. Coffill:

This letter acknowledges receipt on August 23, 2010, of your reply brief in the above-entitled matter. If the Franchise Tax Board wishes to request permission to file a supplemental brief, it has until **September 10, 2010** to make the request. California Code of Regulations, title 18, section 5431, subdivision (c), states:

"The Franchise Tax Board may file a Reply Brief only upon written permission from the Chief Counsel. The Respondent's Reply Brief, if filed, may only address points of disagreement with the Appellant's Reply Brief. The Franchise Tax Board has 15 days from the date the Chief of Board Proceedings acknowledges receipt of the Appellant's Reply Brief in which to file a written request to file it's Reply Brief"

If the Franchise Tax Board does not request permission to file a supplemental brief, pursuant to your request, we will schedule the above-appeal for an oral hearing and you will receive notice of the time and location at least 75 days in advance of the hearing date.

Sincerely,

Sharon King

Sharon King
Appeals Analyst
Board Proceedings Division

cc:    Gilbert P. Hyatt
       c/o Morrison & Foerster LLP
       P.O. Box 81230
       Las Vegas, NV 89180

       Franchise Tax Board - Legal (MS A2.60)

ER 28

# EXHIBIT C



State of California
**Franchise Tax Board**

Legal Division MS A260
PO Box 1720
Rancho Cordova CA 95741-1720
tel: (916) 845-3338  fax: (916) 843-6041
ftb.ca.gov

Date:  09.01.10

SUBMITTED TO

SEP - 1 2010

**BOARD OF EQUALIZATION**

**COPY**

Case:             7150053859256143
Case Unit:        7150053859256163
In reply refer to:   410:RWD

Chief Board Proceedings Division
State Board of Equalization
450 N Street, MIC
Sacramento CA 95814

Regarding:          Appeal of Gilbert P. Hyatt
Appeal Case ID No:  435770 and 446509
Taxable Year(s):    1991 and 1992

Dear Ms. Olson:

With this letter FTB requests permission to file a reply brief in accordance with Rules for Tax Appeals (RTA) 5431(c), "General Briefing Schedule." This rule states in pertinent part:

> (2)  Respondent's Reply Brief.  The Franchise Tax Board may file a Reply Brief only upon written permission from the Chief Counsel.  The Respondent's Reply Brief, if filed, may only address points of disagreement with the Appellant's Reply Brief.

> (B) Upon receipt of the Franchise Tax Board's written request, the Chief Counsel will determine whether additional briefing is necessary. Factors to be considered in determining whether additional briefing is necessary include, but are not limited to:

>> (i)  Whether the Appellant's Reply Brief raised new facts, arguments, or evidence that are essential to the resolution of the appeal;

>> (ii) Whether the briefing filed to date has provided sufficient information for the Board to resolve the appeal; and

>> (iii) Whether the facts and issues in the appeal are so complex as to require additional discussion or clarification.

Some background may assist your Board in considering this request:

The California tax issues in this appeal are residency, tax fraud, source of income, and Mr. Hyatt's request for interest abatement. All the issues can be fairly described as factually complex. Several of the income tax issues are legally complex. Further, this appeal, and in

---

FTB 2133 PASS (REV 12-2009)Appeals\ Draft Correspondence\Sur Reply and Time to Complete

09.01.10
Appeal of           : Gilbert P. Hyatt
Appeal Case ID No.      435770 and 446509
Page 2

particular the issue of interest abatement, is complicated on several levels by Mr. Hyatt's
unique collateral Nevada litigation, Gilbert P. Hyatt v. Franchise Tax Board, Clark County
District Court, Case #A382999 and Franchise Tax Board v. Gilbert P. Hyatt, Nevada
Supreme Court, Case #53264, currently ongoing.

Mr. Hyatt filed this appeal on January 22, 2008. On December 9, 2008, approximately 11
months later, Mr. Hyatt filed opening briefs totaling 175 pages. His briefs were supported by
attached "exhibits" and "annexes" that were, in substantial part, FTB's audit file and FTB's
protest file. Mr. Hyatt's 2008 opening briefs featured 26 affidavits new to this matter, most
executed in 2008.

FTB requested and received additional time to file its opening briefs. Matching Mr. Hyatt's
page limits, FTB received permission to file briefs totaling 175 pages. Coordinating with the
California Attorney General's office, FTB issued subpoenas within and without California and
deposed several of Mr. Hyatt's new affiants. (Your Board will recall that FTB made a good
faith attempt to cooperatively schedule and depose Mr. Hyatt's new affiants, but was
unsuccessful.) On September 15, 2009, FTB filed its opening briefs.

Mr. Hyatt then requested an extended page limit and several extensions of time to file his
reply briefs. When asked, FTB did not oppose Mr. Hyatt's extension requests. On Thursday
afternoon, August 26, 2010, approximately one year after FTB filed its opening briefs, FTB
received a complete copy of Mr. Hyatt's reply briefs, exhibits and annexes. As your Board
well knows, the material submitted is voluminous.

Mr. Hyatt's reply briefs total 200 pages (100 pages each) with approximately 1200
footnotes. The reply briefs, exhibits and annexes appear to be approximately 7,000 total
pages. The references and footnotes in Mr. Hyatt's reply briefs are very often to newly
submitted documentation.

Much of Mr. Hyatt's new documentation comes in the form of 34 affidavits (many
extraordinarily lengthy) and what appear to be hundreds of new documents attached to and
referenced by these affidavits. By way of example, two annexes, Annex XII and Annex XIII,
provided to purportedly support Mr. Hyatt's description of his patent licensing business,
consists of four new affidavits, three of which approach or exceed 300 pages, and reference
therein approximately 1000 pages of additional attached documentation. These annexes
are devoted to new arguments concerning Mr. Hyatt's alleged role in his patent licensing
business, how the income flowed in that business, what all the contracts related to that
business actually mean, and where the income from that business should be sourced under
California law.

In addition, Mr. Hyatt submits substantial new argument and alleged new evidence
concerning the issue of his actual physical presence and activity in California and Nevada
during 1991 and 1992. For the first time since the residency audit began over 17 years ago
Mr. Hyatt has submitted calendars and supporting narratives that allegedly reflect his
presence and activity on a day-to-day basis during the disputed residency period. Many of
the evidentiary references in Mr. Hyatt's newly submitted calendars are to the 34 newly
created affidavits.

09.01.10
Appeal of          : Gilbert P. Hyatt
Appeal Case ID No.  : 435770 and 446509
Page 3

Lastly, several of Mr. Hyatt's remaining annexes (not discussed above) are, in fact, lengthy new factual and legal argument addressing the remaining issues in this appeal. Again, much of this new argument references the newly created affidavits and newly submitted documentation.

A review of Mr. Hyatt's reply briefs reveal them to be akin to what an appellant opening brief in a complex residency/income sourcing matter should be. In his reply briefs, and for the first time, Mr. Hyatt makes comprehensive arguments regarding all his positions in this appeal. These complete arguments now stand unaddressed and without respondent's analysis.

FTB asks your Board to allow FTB to address all of Mr. Hyatt's "...new facts, arguments, or evidence that are essential to the resolution of this appeal..." FTB requests the same page limit your Board accorded Mr. Hyatt for his reply briefs, 200 total pages. However, FTB does not request the one year Mr. Hyatt used to compile his reply briefs, exhibits, annexes and affidavits. FTB hereby requests a due date of June 30, 2011.

It is very likely that FTB will be taking depositions of several of Mr. Hyatt's new affiants. It is very likely that several of these depositions will be outside of California. As we mentioned in our letter to your Board dated March 23, 2010, copied to Mr. Hyatt's counsel, FTB will be asking for cooperation in arranging these depositions. The due date requested above assumes Mr. Hyatt's cooperation in scheduling depositions.

FTB consulted with Mr. Hyatt's counsel, Mr. Coffill, before submitting this request. Mr. Hyatt's counsel has no objection to the Board granting FTB's request to file reply briefs under RTA 5431(c), or to briefs of 100 pages, or to an extension until June 30, 2011 to file those briefs.[1] FTB recognizes that Mr. Hyatt will then be entitled under RTA 5431(c)(3) to file Supplemental Briefs and, in turn, FTB has no objection to Mr. Hyatt receiving from the Board comparable time and number of pages of briefing for those Supplemental Briefs. (Please contact Mr. Coffill directly if your Board wishes to confirm the above language.)

I will be out of the office until September 13, 2010. If there is any need to discuss this request before my return, contact Scott DePeel at 845-5529 or scott.depeel@ftb.ca.gov.

Robert W. Dunn
Tax Counsel IV

cc:    Eric Coffill

---

[1] By referencing "...briefs of 100 pages..." FTB does not abandon its position that this matter should be consolidated into a single appeal, eventually.

# EXHIBIT D



STATE OF CALIFORNIA

**STATE BOARD OF EQUALIZATION**
450 N STREET, SACRAMENTO, CALIFORNIA
PO BOX 942879, SACRAMENTO, CALIFORNIA 94279-0081
916-322-2270 • FAX 916-324-3984
www.boe.ca.gov

BETTY T. YEE
First District, San Francisco

MICHELLE STEEL
Third District, Rolling Hills Estates

JEROME E. HORTON
Fourth District, Los Angeles

JOHN CHIANG
State Controller

BARBARA ALBY
Acting Member
Second District, Sacramento

RAMON J. HIRSIG
Executive Director

September 20, 2010

# RECEIVED

SEP 2 2 2010

**Morrison & Foerster LLP**

Robert W. Dunn, Tax Counsel IV
Franchise Tax Board - Legal Branch
P.O. Box 1720 - Legal (MS A2.60)
Rancho Cordova, CA 95741-1720

Appeal of Gilbert P. Hyatt
Case ID No. 435770

Dear Mr. Dunn:

This is to acknowledge your request for permission to reply to appellant's reply brief, extending the due date to June 30, 2011 to provide the response and increasing the page limit not to exceed 100 pages for each brief.

At this time, the Appeals Division is reviewing the file and submissions and anticipates providing a response by September 28, 2010.

Sincerely,

Catherine Worst, Manager

Appeals Analyst
Board Proceedings Division

cc:    Eric J. Coffill
       Morrison & Foerster LLP
       400 Capitol Mall, Suite 2600
       Sacramento, CA 95814

       Gilbert P. Hyatt
       c/o Morrison & Foerster LLP
       P.O. Box 81230
       Las Vegas, NV 89180



STATE OF CALIFORNIA

**STATE BOARD OF EQUALIZATION**
450 N STREET, SACRAMENTO, CALIFORNIA
PO BOX 942879, SACRAMENTO, CALIFORNIA 94279-0081
916-322-2270 • FAX 916-324-3984
www.boe.ca.gov

BETTY T. YEE
First District, San Francisco

MICHELLE STEEL
Third District, Rolling Hills Estates

JEROME E. HORTON
Fourth District, Los Angeles

JOHN CHIANG
State Controller

BARBARA ALBY
Acting Member
Second District, Sacramento

RAMON J. HIRSIG
Executive Director

September 20, 2010

**RECEIVED**

SEP 2 2 2010

**Morrison & Foerster LLP**

Robert W. Dunn, Tax Counsel IV
Franchise Tax Board - Legal Branch
P.O. Box 1720 - Legal (MS A2.60)
Rancho Cordova, CA 95741-1720

Appeal of Gilbert P. Hyatt
Case ID No. 446509

Dear Mr. Dunn:

    This is to acknowledge your request for permission to reply to appellant's reply brief, extending the due date to June 30, 2011 to provide the response and increasing the page limit not to exceed 100 pages for each brief.

    At this time, the Appeals Division is reviewing the file and submissions and anticipates providing a response by September 28, 2010.

Sincerely,

*Catherine Hunt, Manager*

Appeals Analyst
Board Proceedings Division

cc:    Eric J. Coffill
       Morrison & Foerster LLP
       400 Capitol Mall, Suite 2600
       Sacramento, CA 95814

       Gilbert P. Hyatt
       c/o Morrison & Foerster LLP
       P.O. Box 81230
       Las Vegas, NV 89180

# EXHIBIT E



STATE OF CALIFORNIA

**STATE BOARD OF EQUALIZATION**
450 N STREET, SACRAMENTO, CALIFORNIA
PO BOX 942879, SACRAMENTO, CALIFORNIA 94279-0081
916-322-3084 • FAX 916-324-3984
www.boe.ca.gov

BETTY T. YEE
First District, San Francisco

SEN. GEORGE RUNNER (RET.)
Second District, Lancaster

MICHELLE STEEL
Third District, Rolling Hills Estates

JEROME E. HORTON
Fourth District, Los Angeles

JOHN CHIANG
State Controller

KRISTINE CAZADD
Executive Director

August 2, 2012

**RECEIVED**

AUG 0 8 2012

**Morrison & Foerster LLP**

Eric J. Coffill
Morrison & Foerster LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814-4428

Appeals of Gilbert P. Hyatt
Case ID Nos. 435770 and 446509

Dear Mr. Coffill:

This letter acknowledges receipt on July 25, 2012, of your supplemental brief in the above-entitled matter. Please note that briefing is completed for this appeal.

We will schedule the appeal for oral hearing and you will receive notice of the date and time of hearing at least 75 days in advance of the hearing date. We note that you did not request a specific hearing location; therefore, your oral hearing will be scheduled in Sacramento. If you have any questions regarding your hearing, please call the Franchise and Income Taxes Appeals Hearing Analyst, Claudia Madrigal, at 916-324-8261.

Sincerely,

Jimisa Brown

Jimisa Brown
Appeals Analyst
Board Proceedings Division

cc:   Gilbert P. Hyatt
      c/o Morrison & Foerster LLP
      400 Capitol Mall, Suite 2600
      Sacramento, CA 95814-4428

      Franchise Tax Board - Legal (MS A2.60)

# EXHIBIT F

State of California
**Franchise Tax Board**

chair John Chiang | member Jerome E. Horton | member Ana J. Matosantos

Legal Division MS A260
PO BOX 1720
Rancho Cordova, CA 95741-1720

04.29.13

Claudia Madrigal, Appeals Analyst
Board Proceedings Division
State Board of Equalization
P.O. Box 492879, MIC: 80
Sacramento, CA  94279-0080

Regarding:    Appeal of Gilbert P. Hyatt, Case Nos.: 435770 and 446509
              Taxable years 1991 and 1992
              FTB's response to SBE Question (3) regarding the Philips documents

Dear Ms. Madrigal:

In a letter dated February 25, 2013 your Board (hereinafter "SBE") asked the parties for
additional briefing (in two stages) concerning when SBE will be able to consider the documents
subpoenaed by FTB from U.S. Philips Corporation of New York ("Philips"). The SBE set out three
questions. All relate to encouraging the parties to resolve the matter so that this appeal can
proceed. The parties responded to questions (1) and (2) on March 28, 2013.[1] This letter brief
is FTB's response to question (3):

> Each party should address each offer of compromise made by the other party or to
> which the other party indicated potential for agreement, and state whether it can agree
> to such offer(s) and, if not, why not. If the parties are able to agree on a potential
> compromise or path forward, they should make a joint submission setting forth such
> agreement and a schedule for the provision of documents.

Unfortunately, and despite the SBE's plea that the parties "compromise" and find a "path
forward," FTB regretfully reports that Mr. Hyatt's obstruction continues.

As the SBE is aware the New York Appellate Division, Second Department, decided the matter
of the Philips documents six weeks ago, on March 13, 2013.[2] The Second Department denied
Mr. Hyatt's appeal of the New York Supreme Court's July 29, 2011 order requiring Philips to
produce to FTB certain documents, and denied FTB's cross appeal concerning limits on the
scope of that production.[3] The Second Department explicitly affirmed in all respects the July
29, 2011 order of the New York Supreme Court (the "July 2011 Order").[4]

---

[1] See RESPONDENT'S ADDITIONAL BRIEFING (March 28, 2013) setting out FTB's attempts to move this appeal
forward and Mr. Hyatt's efforts to block SBE's consideration of the documents acquired from U.S. Philips.

[2] As thoroughly discussed in RESPONDENT'S ADDITIONAL BRIEFING (March 28, 2013), see Exhibit GG, Tab 2
therein.

[3] Supreme Court of the State of New York, Appellate Division: Second Department. The decision is attached as
Exhibit GG, Tab 2 to RESPONDENT'S ADDITIONAL BRIEFING (March 28, 2013).

[4] The lower court being the Supreme Court of the State of New York, County of Westchester, Index No. 52961/11.
See Exhibit GG, Tab 3 to RESPONDENT'S ADDITIONAL BRIEFING (March 28, 2013).

tel 916.845.3338          fax 916.843.6041          ftb.ca.gov

04.29.13
FTB's response to SBE Question (3) regarding the Philips documents
Page 2 of 5

As background, recall that Mr. Hyatt submitted an affidavit from a retired Philips vice president and three 300+ page affidavits (and attached exhibits) with his 2010 briefing to SBE, all attesting to issues in this appeal, including Mr. Hyatt's business activity with Philips and Mr. Hyatt's claimed California nonresidency. Seeing factual conflicts with existing evidence, FTB issued R&TC Section 19504 subpoenas to Philips to investigate the veracity and accuracy of Mr. Hyatt's 2010 submissions. Mr. Hyatt then engaged New York counsel and fought FTB's enforcement of the subpoenas at every turn. Eventually, after expensive and time consuming litigation, this resulted in the July 2011 Order from the Supreme Court requiring Philips to produce documents to FTB. It reads (in pertinent part):

> ORDERED that Hyatt's motion is granted to the extent that the subpoenas duces tecum are modified such that all demands regarding the prosecution of Hyatt's patents and the patent interference proceeding are stricken and the material relating to those topics shall not be produced; and it is further

> ORDERED that the motion is granted to the extent that the demands of the subpoenas duces tecum are limited to material relating to the 1991 and 1992 tax years with respect to the issues of Hyatt's residency and income received in 1991 and 1992, his relationship to U.S. Philips, and the licensing of his patents and any revenue generated from the licensing of his patents in 1991 and 1992

Mr. Hyatt then attempted to block Philips document production to FTB with a motion to the Second Department (filed with his appeal) to stay FTB's discovery from Philips. That motion was denied.

Order in hand, Philips' counsel, Sullivan & Cromwell, selected responsive documents from "39 boxes" Philips business files and produced 7,695 documents to FTB in August 2011. Mr. Hyatt was provided copies of the documents at that time.

Given that the Supreme Court's July 2011 Order was upheld "in all respects" by the Second Department on March 13, 2013, FTB intended to move forward with providing relevant documents to the SBE in support of FTB's positions in this appeal.

Unwilling to accept the decision, Mr. Hyatt is making yet another attempt to prevent SBE's consideration of the Philips documents. After misstating the July 2011 Order in a March 14, 2013 letter to FTB, Mr. Hyatt demanded:[5]

> that the FTB immediately return to Philips all documents that the FTB mistakenly and/or inappropriately received pursuant to the subpoenas...

> ...any effort by the FTB or its representatives to make use of those prohibited materials before the California SBE, would violate and be contumacious of the Second Department's March 13, 2013 Order, for which Mr. Hyatt would seek immediate relief."[6]

---

[5] See March 14, 2013 Letter from Mr. Hyatt's New York counsel Pryor Cashman to FTB counsel found at Exhibit GG, Tab 5 to RESPONDENT'S ADDITIONAL BRIEFING (March 28, 2013).

04.29.13
FTB's response to SBE Question (3) regarding the Philips documents
Page 3 of 5

Mr. Hyatt appears to be contemplating still more New York litigation. To be clear, FTB has reviewed all the Philips documents and they, in FTB's opinion, fall squarely within the July 2011 Order. Giving Mr. Hyatt the benefit of the doubt, FTB responded to Mr. Hyatt's claw back demand and litigation threat by asking him to identify, with specificity and legal basis, any content within the Sullivan & Cromwell production that he feels should be redacted.[7]

On March 29, 2013, April 11, 2013, and April 23, 2013 FTB received ever expanding "tables" via email listing documents that Mr. Hyatt argues FTB "...mistakenly and/or inappropriately..." has in its possession.[8] Mr. Hyatt labels them "excluded Philips documents." His "final table" is 69 single spaced pages. It appears to identify more than half of the entire Sullivan & Cromwell document production. And, of course, it includes many of the most relevant documents to the tax and fraud penalty issues in this appeal.[9]

FTB has completed a preliminary review of Mr. Hyatt's table(s), including Mr. Hyatt's stated reason for demanding that the document(s) should be clawed back and, therefore, never considered by SBE. FTB has created a version of Mr. Hyatt's table, adding a column to the right hand side with our response to Mr. Hyatt's stated "reason(s)" and more accurately describing the document(s) at issue. FTB's table is attached to this letter as **Exhibit A**.[10]

In sum, FTB disagrees with Mr. Hyatt's analysis at every level. All of the documents Mr. Hyatt identifies fall squarely under the July 2011 Order and were properly identified and produced by Sullivan & Cromwell in August 2011.

Importantly, after a careful review of Mr. Hyatt's "reason(s)" for demanding the claw back of specific Philips documents, FTB can only describe Mr. Hyatt's letter and table(s) as a bad faith attempt to, yet again, try to prevent the SBE's consideration of this highly relevant evidence. To illustrate, below are a few examples of documents Mr. Hyatt wants to claw back. The exemplary documents are attached as **Exhibit B**. Each falls squarely under the July 2011 Order, and each is clearly relevant to the tax and fraud penalty issues in this appeal. Mr. Hyatt's claw back argument, repeated below, is specious on its face:

- **FTB_Philips 0002510-33**: A fax dated September 30, 1991 from MLMC to Philips enclosing a letter to Hyatt and Greg Roth (same date) addressed to Hyatt's Jennifer

---

[6] The Second Department decision upheld the lower court's order (the July 2011 Order), which governs discovery in this case.

[7] See FTB counsel's letter dated March 18. 201 Exhibit GG, Tab 4 to RESPONDENT'S ADDITIONAL BRIEFING (March 28, 2013).

[8] Mr. Hyatt's California tax counsel in this appeal, Eric Coffill, has been copied on each of these emails which originate from Mr. Hyatt's New York counsel.

[9] Among many, many other things, the Philips documents Mr. Hyatt now seeks to claw back contain contemporaneous documentation (mostly from 1991 and 1992) that factually contradict many of the 17 to 20 year old recollections found in the dozens of affidavits Mr. Hyatt has recently solicited and submitted to SBE as support for almost all of the arguments Mr. Hyatt makes in this tax appeal.

[10] The SBE's question (3) asks the parties to discuss "...each offer of compromise..." While Mr. Hyatt's claw back attempt is hardly an offer of compromise, the SBE is now aware of Mr. Hyatt's position. Note that FTB's table is largely based off Mr. Hyatt's April 11 version with some additions from his April 23 version. FTB is working to complete the review as to all the documents, but did not have time to finish by April 29, 2013.

04.29.13
FTB's response to SBE Question (3) regarding the Philips documents
Page 4 of 5

Circle, La Palma, CA home/business location enclosing draft agreements with NEC, Matsushita, Fujitsu, Sharp and Oki showing "compensation." Hyatt argues to exclude claiming "not dated 1991/1992 involves patent prosecution (patent application)."[11]

- **FTB_Philips 0003187:** A July 24, 1991 fax memo from Hyatt to Philips (Algy Tamoshunas) copied to Greg Roth, giving detailed instructions on where to transfer Hyatt's $800,000 payment under the 1991 Hyatt/Philips agreement. Hyatt claims it should be excluded because it "involves patent interference."

- **FTB_Philips 0003276:** A January 26, 1992 fax letter authored by Hyatt and sent to Philips from Hyatt's Jennifer Circle, La Palma, CA home/business advising Philips on licensee litigation risks ("DJ" declaratory judgment) after Hyatt conducts "[a] review of my files." Hyatt wants to exclude because it is "not dated 1991/1992."

- **FTB_Philips 0003450:** A February 4, 1992 fax from Hyatt's Jennifer Circle, La Palma, CA home/business location to Philips enclosing a Wall Street Journal article, same date. Hyatt argues to exclude because it is "dated outside 1991/1992."

- **FTB_Philips 0004222-23:** A November 24, 1991 express mail letter from Hyatt's Jennifer Circle, La Palma, CA home/business location to Philips enclosing the "original Matsushita agreement." Hyatt encloses a report of his "deductable expenses." Hyatt claims it should be excluded because it is "not dated 1991/1992."

- **FTB_Philips 0004771:** An address change note found in the Philips records that shows Hyatt's Nevada addresses (including "Suite 469," a mail drop address acquired in 1992) and Grace Jeng added as a recipient in California, "Grace Jeng (Gil Hyatt)" Hyatt argues to exclude because "not dated 1991/1992."

- **FTB_Philips 0006841-47:** Importantly, this is "Exhibit A" to the July 1991 Hyatt/Philips licensing agreement. This document, originally drafted by Hyatt and his California attorney Greg Roth, is labeled "LICENSING PLAN" and details how Hyatt and Philips will conduct their licensing business. As discussed elsewhere, Hyatt failed to produce this document in the face of repeated requests.[12] Hyatt claims it should be excluded because it "involves patent interference." (Hyatt also argues to exclude the plan <u>he authored</u>, FTB_Philips 0001112-16, claiming "involves patent interference.")

- **FTB_Philips 0006938-44:** Federal express "sender activity summary(s)" showing Hyatt signing for overnight parcels at "7841 Jennifer Cir, La Palma, CA" on February 27, 1992; March 4, 1992; and March 11, 1992. Hyatt argues to exclude because the invoice(s) "involves patent interference, involves patent prosecution."

- **FTB_Philips 0007023-25:** An invoice for the services of Greg Roth dated March 31, 1992. Among other things, it memorializes a California meeting between Hyatt and Hitachi that Hyatt claims he did not attend. Hyatt argues to exclude because this invoice "involves patent interference, involves patent prosecution."

---

[11] To further highlight the bad faith of Mr. Hyatt's new attempt to claw back these agreements, Mr. Hyatt's affiant in this appeal, Algy Tamoshunas, a former vice president of Philips, has versions <u>of these same agreements</u> appended as exhibits to his affidavit, an affidavit Mr. Hyatt submitted to the SBE in 2010.

[12] See RESPONDENT'S ADDITIONAL BRIEFING (March 28, 2013) page 11, beginning at line 1. Also note that Mr. Hyatt, in one of his affidavits to SBE, misleadingly claims "Philips had the licensing expertise and Philips laid out the licensing guidelines." See Hyatt's affidavit dated August 9, 2010, page 151.

04.29.13
FTB's response to SBE Question (3) regarding the Philips documents
Page 5 of 5

- **FTB_Philips 0007123-7129:** 1992 hourly work invoices from Hyatt affiant Caroline Cosgrove for research. Hyatt argues to exclude claiming they "involves patent interference, involves patent prosecution."

- **FTB_Philips 0007159:** A "Payment Authorization" dated July 8, 1992 for Philips $200,000 annual payment to Hyatt under the 1991 Hyatt/Philips agreement. Hyatt argues exclusion because "involves patent interference, involves patent prosecution."

- **FTB_Philips 0007184-85:** An invoice from Hyatt publicist Charles McHenry dated July 18, 1992. Discusses publicist services rendered for the licensing program, memorializes Hyatt's direct involvement. Hyatt argues to exclude because it "involves patent interference, involves patent prosecution."

- **FTB_Philips 0007358-60:** An itemized list of licensing business expenses "for the period ended December 31, 1992." Among other things, this three page document itemizes Hyatt's 1992 expenses against each contract. Hyatt claims it should be excluded because it is "not dated 1991/1992."

The above documents, which Mr. Hyatt seeks to exclude, do not relate to (or indicate that they relate to) patent interference or prosecution,[13] do not include or reveal confidential or sensitive patent-related information that could cause Mr. Hyatt harm, and all relate to (or are in fact dated) 1991 or 1992. Further, they are highly relevant to Mr. Hyatt's alleged California nonresidency and income sourcing issues in 1991 and 1992. As a result of Mr. Hyatt's bad faith in this process, FTB cannot report an "offer in compromise," a "path forward," or a "joint submission," as the SBE clearly was hoping for in asking question (3).

FTB is prepared to brief the Philips documents and their application to the tax and fraud penalty issues in this appeal.[14] This will be a factually complex undertaking that involves analyzing how the Philips documents evidence issues concerning Mr. Hyatt's claimed California nonresidency, the veracity of his solicited affidavits, the veracity of his own affidavits, the application of California income sourcing laws and regulations, and the basis for the fraud penalty. FTB is also prepared to address all the new affidavit evidence submitted with (and after) Mr. Hyatt's supplemental briefing. FTB requests 60 pages and 120 days to complete this additional briefing. FTB asks the SBE to consider requiring the parties to file simultaneous additional briefing concerning the Philips documents.

Sincerely,

*Robert Dunn signature*

Digitally signed by Robert Dunn
DN: cn=Robert Dunn, o=Franchise
Tax Board, ou=FTB Legal,
email=robert.dunn@ftb.ca.gov,
c=US
Date: 2013.04.29 13:47:36 -07'00'

Robert Dunn
Tax Counsel

cc:   Eric Coffill, Counsel for Mr. Hyatt
      Grant Thompson, Counsel for SBE

---

[13] The only document that even mentions "interference" includes nothing substantive. It is an invoice.

[14] FTB also requests the SBE allow us to resubmit RESPONDENT'S ADDITIONAL BRIEFING (February 19, 2013) regarding income timing without redaction. Similarly, FTB would like to address the issue of Mr. Hyatt's Fall 1991 "supplemental agreements" (found in the Philips documents) and their importance to all the issues in this appeal.

# EXHIBIT G

State of California
**Franchise Tax Board**

chair John Chiang | member Jerome E. Horton | member Ana J. Matosantos

Legal Division MS A260
PO BOX 1720
Rancho Cordova, CA 95741-1720

05.07.13

Grant S. Thompson
Tax Counsel IV
State Board of Equalization
P.O. Box 492879, MIC: 85
Sacramento, CA  94279-0085

Regarding:   Appeal of Gilbert P. Hyatt, Case Nos.: 435770 and 446509
Taxable years 1991 and 1992
Briefing the Philips documents: FTB's response to Mr. Hyatt's May 3, 2013
letter and briefing counter-proposal

Dear Mr. Thompson:

FTB has received and reviewed Mr. Hyatt's two page letter to SBE dated May 3, 2013.

First, Mr. Hyatt requests that FTB forgo the submission to SBE of highly relevant, probative evidence in this tax appeal, the "Philips documents." This FTB cannot do.[1] For some reason Mr. Hyatt does not mention the content of FTB's April 29, 2013 letter brief which discusses this issue in detail.[2] Therein FTB discusses all the Philips documents Mr. Hyatt argues were "mistakenly and/or inappropriately" produced to FTB by Philips' counsel Sullivan & Cromwell. Also therein FTB addresses, and rejects, document by document, Mr. Hyatt's alleged reason(s) why FTB should now "return" or "destroy" those documents. As set forth in FTB's letter brief and the attached Exhibit A (Preliminary), Mr. Hyatt's reason(s) lack merit.[3] So much so that FTB concluded, after careful and time-consuming scrutiny, that this latest attempt by Mr. Hyatt to block the use of the Philips documents in this tax matter was made in bad faith. FTB's New York counsel has delivered this message to Mr. Hyatt's New York counsel. That letter is attached.

---

[1] FTB's statutory mission is set forth as follows: The Franchise Tax Board shall administer and enforce the [California Revenue and Taxation Code]. See R&TC section 19501. Mr. Hyatt's request represents nothing less than asking FTB to abrogate its duty when it comes to this tax matter.

[2] See FTB's Letter Brief dated April 29, 2013, Exhibit A (Preliminary) "PHILIPS DOCUMENTS PROPERLY PROVIDED TO FTB BY SULLIVAN & CROMWELL UNDER THE JULY 2011 ORDER" [a 147 page analysis], and attached exemplary Philips documents [64 document] that make FTB's point about Mr. Hyatt's bad faith on this issue.

[3] FTB attaches our completed Exhibit A, capturing analysis of all the Philips documents Mr. Hyatt added in his April 23, 2013 table, the same 69 page table Mr. Hyatt submitted to the SBE on April 29, 2013. This document replaces the Exhibit A (Preliminary) appended to FTB's April 29, 2013 letter brief.

tel 916.845.3338          fax 916.843.6041          ftb.ca.gov

05.07.13
Briefing the Philips documents: FTB's response to Mr. Hyatt's May 3, 2013 letter and counter-proposal
Page 2 of 2

FTB's offer to Mr. Hyatt that we will consider targeted redactions of specified content, if Mr. Hyatt can make a compelling argument that that content is unnecessary to deciding the California income tax and fraud penalty issues in this appeal, remains on the table.

Second, Mr. Hyatt proposes the SBE invite "consecutive" briefing concerning the Philips documents. If Mr. Hyatt is suggesting simultaneous additional briefing on the Philips documents followed by consecutive and simultaneous responses to the other parties briefing, FTB has no objection. This appears to be a time-efficient way to allow additional briefing while capturing each parties comprehensive analysis of the new evidence in this matter.

Third, concerning Mr. Hyatt's comments that the SBE solicit the opinions of the parties as to page length and time allowed. FTB has already offered the SBE our opinion, as set out in FTB's April 29, 2013 letter brief and repeated in Mr. Hyatt's May 3, 2013 letter. As the SBE knows, Mr. Hyatt's newly submitted affidavit evidence, with voluminous appended exhibits, many referring to recollections of 1991 and 1992 events, many referencing issues also reflected in the Philips documents, and many from previously unknown "witnesses," is voluminous, to say the least. Mr. Hyatt's newly solicited affidavits approach 100. Responding to all this new material, and applying the Philips documents to the existing evidence, is a monumental undertaking. Barring unforeseen events, to include further litigation concerning the Philips documents, FTB thinks it can accomplish this in 120 days and 60 pages, even with our limited resources.

Fourth, within Mr. Hyatt's third paragraph he refers to FTB comments regarding the Philips documents as "...bare assertions and claims regarding the relevance of those [Philips] documents." Of course, the SBE can review FTB's April 29, 2013 letter brief, Exhibit A and the appended FTB_Philips documents and decide for itself the quality of the assertions and the relevance of the documents. Mr. Hyatt then asserts "...as of this date, no Philips documents have yet been provided by FTB to your Board..." This is inaccurate. FTB provided Philips documents to the SBE with our letter brief, Philips document that were discussed in some detail within that brief and attached as exemplary of Mr. Hyatt's bad faith efforts to, yet again, obstruct consideration of the Philips documents in this matter.

Please contact me if you have any questions.


Sincerely,

Robert Dunn
Tax Counsel

Enclosures:    Carter Ledyard & Milburn letter dated May 6, 2013
               Exhibit A (final version to include Mr. Hyatt's April 23, 2013 table)

cc:            Judith Lockhart, Counsel for FTB
               Eric Coffill, Counsel for Mr. Hyatt

# EXHIBIT H

**MORRISON | FOERSTER**

SUITE 2600
SACRAMENTO
CALIFORNIA 95814-4428

TELEPHONE: 916.448.3200
FACSIMILE: 916.448.3222

WWW.MOFO.COM

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SACRAMENTO, SAN DIEGO,
DENVER, NORTHERN VIRGINIA,
WASHINGTON, D.C.

TOKYO, LONDON, BERLIN, BRUSSELS,
BEIJING, SHANGHAI, HONG KONG,
SINGAPORE

May 7, 2014

Writer's Contact
+1 (916) 325.1324
ECoffill@mofo.com

By Mail and E-Mail This Date

Grant S. Thompson
Tax Counsel IV
State Board of Equalization
450 N Street
P.O. Box 942879
Sacramento, CA 94279-0085

Re:   *Appeals of Gilbert P. Hyatt*
      Case ID Nos. 446509 and 435770
      Taxable Years 1991 and 1992
      Your Letter of May 1, 2014

Dear Grant:

I am in receipt of your letter dated May 1, 2014,[1] in the above matter. Your letter requests, in part, that we provide you with "appellant's best estimate of how much time and how many additional pages appellant believes are reasonable..." in order to reply to FTB's two briefs now due June 23, 2014.

The difficulty here, as you certainly can appreciate from the phrasing of your "best estimate" request, is that absent our actual review of FTB's briefs as filed, it is impossible to know their contents so as to determine how much time and how many additional pages will be required in order for Mr. Hyatt to fully and adequately respond to them. However, subject to

---

[1] To be clear and for peace of mind, I would like to point out that your letter to me of May 1, 2014, is dated subsequent to Mr. Hyatt's filing on April 4, 2014 of a complaint in the United States District Court, Eastern District of California, Case No. 2:14-cv-00849-GEB-DAD, which names as defendants, among others, the five members of the Board of Equalization in their official capacities. Accordingly, this letter to you is intended solely as a response to your May 1st letter to me and not as an *ex-parte* communication with named defendants, which I have been informed are currently represented by counsel (Kerr & Wagstaffe LLP) in the District Court matter. Similarly, I am copying on this letter Bob Dunn of the FTB Legal Division, although the District Court matter also names as defendants the three members of the Franchise Tax Board in their official capacities. Both you and Mr. Dunn should feel free to apprise your respective counsel in the District Court matter of my response here to your letter to me.

sa-69284

Grant S. Thompson
May 7, 2014
Page Two

that caveat, our "best estimate" at this time and under these circumstances is that it will take us twice as many pages, and twice as long, to respond to FTB's briefs. Your letter of April 23, 2014 allows FTB to file two briefs, each not to exceed 30 pages. Accordingly, Mr. Hyatt's best estimate at this time is he will need to file two briefs, each not to exceed 60 pages. Your letter of April 23, 2014 states FTB may file those two briefs, addressing (1) the Philips documents, and (2) declarations and other evidence submitted with and following Mr. Hyatt's supplement brief, and (3) any additional argument that may assist the SBE in resolving the appeals, by June 23, 2014, i.e., 60 days to file from your April 23rd letter setting briefing. Accordingly, Mr. Hyatt's best estimate at this time is he will need 120 days to file his two briefs.

Your letter references RTA 5435 as requiring a showing why our requests above are reasonable. As already explained in Mr. Hyatt's prior correspondence, your Board's April 23rd letter has now granted FTB yet another 60 days to write more briefs responding to what under the briefing schedule was to have been Mr. Hyatt's "appellant's supplemental briefs" and supplemental information that would have concluded all the briefing in this matter. Mr. Hyatt's supplemental briefs were filed on July 25, 2012, accompanied by approximately 30 boxes, so your Board's April 23, 2014 order allowing FTB to respond to those supplemental briefs on June 23rd has now given FTB nearly two years to review, analyze and respond to those briefs. Mr. Hyatt must now respond to two years of analysis by FTB. Furthermore, your Board's April 23, 2014, order allowing FTB to brief the more than 8,000 pages of Philips documents has now given FTB about two years to review, analyze and brief those Philips documents. Mr. Hyatt must now respond to FTB's analysis of Philips documents which have been in FTB's possession since at least 2011. Notwithstanding the fact that Mr. Hyatt has had the Philips documents during this time, he was not able to focus his review because he does not know exactly how the FTB will argue these documents. Furthermore, SBE has now also allowed FTB to brief "any" additional argument that may assist the Board in resolving these appeals, a scope so broad it is essentially without limitation. For example, nothing in the Board's order would prevent FTB from now raising entirely new arguments never before seen in this case since the audit began in 1993. Finally, we make the point, again, that the appellant is entitled to the "last brief." Here, Mr. Hyatt will be given the "last brief" in name only if he is not allowed a reasonable amount of time and pages to respond to arguments by FTB based on the Philips documents in their possession since at least 2011; to respond to arguments by FTB based on Mr. Hyatt's supplemental briefs in its possession since July 2012; and to "any" other information which, in its unfettered discretion, FTB unilaterally choses to put in its two June 23rd briefs.

This "best estimate" request above and made at this time is without prejudice to seek under the RTAs additional pages of briefing and additional time to respond to FTB's June 23rd briefs after we have received those briefs and reviewed their contents.

sa-69284

Grant S. Thompson
May 7, 2014
Page Three

Finally, Mr. Dunn's letter of April 30, 2014, page 2, falsely states "Mr. Hyatt has used courts
in Nevada, California and New York to avoid discovery of relevant documents in this
appeal." On the contrary, it is FTB that has "avoided" discovery. In the Nevada case, where
unlike this SBE proceeding where Mr. Hyatt has no formal discovery rights, Mr. Hyatt
successfully discovered many relevant audit documents that the FTB had withheld from Mr.
Hyatt. Further, the Nevada jury found and the Nevada court ruled that the FTB committed
intentional torts, including fraud, against Mr. Hyatt during the audit, which findings and
rulings include an award of punitive damages against the FTB. Further, we understand that
Philips itself withheld about 90% of the 30 boxes of documents that were subpoenaed by the
FTB as not being relevant, and the New York court then found that many of the documents
produced by Philips to the FTB were not relevant and not discoverable by FTB. The FTB
has deprived Mr. Hyatt of his legal rights for many years, and Mr. Dunn's comments here are
yet another example of FTB's continual criticism of Mr. Hyatt exercising his legal rights.

Very truly yours,

Eric J. Coffill

Eric J. Coffill
Counsel for Mr. Hyatt

cc:   Bob Dunn (FTB) – by mail and e-mail

sa-69284

# EXHIBIT I

STATE OF CALIFORNIA



**STATE BOARD OF EQUALIZATION**
450 N STREET, SACRAMENTO, CALIFORNIA
PO BOX 942879, SACRAMENTO, CALIFORNIA 94279-0085
916-205-1644 • FAX 916-324-2618
www.boe.ca.gov

BETTY T. YEE
First District, San Francisco

SEN. GEORGE RUNNER (RET.)
Second District, Lancaster

MICHELLE STEEL
Third District, Orange County

June 13, 2014

JEROME E. HORTON
Fourth District, Los Angeles

JOHN CHIANG
State Controller

CYNTHIA BRIDGES
Executive Director

Eric J. Coffill
Morrison & Foerster LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814-4428

Robert W. Dunn
Franchise Tax Board
Legal Department
P.O. Box 1720 (MS A260)
Rancho Cordova, CA 95741-1720

Appeals of Gilbert P. Hyatt
Case ID Nos. 446509 and 435770

Gentlemen,

This letter acknowledges recent submissions and responds to the requests of the parties for extensions of time and more pages for briefing.

To confirm, the following submissions have been received:

- Appellant's May 21, 2014 submission titled "Supplemental Affidavit of Gilbert P. Hyatt Regarding the FTB's $24 Million Income Error";

- Respondent's May 22, 2014 unredacted version of its February 19, 2013 briefing;

- Appellant's May 27, 2014 submission titled "Affidavit of Rabbi Sanford Akselrad"; and

- Respondent's June 3, 2014 submission of two DVDs of Philips documents. The first DVD replaces Philips documents submitted by respondent on May 22, 2014 and provides those documents that respondent believes can be provided pursuant to the New York court rulings. The second DVD, which respondent submitted in response to the Appeals Division's request for a joint submission of permissible Phillips documents, redacts or omits most of the documents to which appellant objected. Appellant objects that the second DVD does not redact or omit all the documents to which he objected. Respondent asserts that appellant has not provided any persuasive bases for its objections and that, in any case, the omissions and redactions on the second DVD are not required by the New York court rulings.

By way of background, the Appeals Division requested a joint submission of Philips documents in an effort to avoid repeating prior experiences in which submitted Philips documents were retracted following appellant's initiation of further litigation or threat of further litigation in the New York courts. In the absence of any further New York court order, all the submitted Philips documents, as well as the above-referenced additional evidentiary submissions, are accepted pursuant to California Code of Regulations, title 18, section (Rule) 5523.6. Respondent's submission of the unredacted version of its

February 19, 2013 briefing is accepted pursuant to Rule 5435, subdivision (a). The Appeals Division notes appellant's objections to respondent's submissions of Philips documents, and further notes that appellant has the opportunity to raise such objections again in his reply briefs and at the oral hearings. Also, if appellant believes it would clarify the record with regard to his objections to specific Philips documents, he has the right under Rule 5523.6 to make his own submission of Philips documents that he believes can be submitted pursuant to the New York court rulings. However, absent further litigation in New York, the Appeals Division views all documents in the present record to be evidence available for the Board to consider, giving each document such weight as the Board finds appropriate, in the hearings that will follow.

As noted above, the parties requested changes to the deadlines and conditions set by the Appeals Division for additional briefing. The briefing schedule provided 30 days for the parties to make a joint submission of permissible Philips documents, 30 days for respondent to submit its additional briefs (one for each appeal) and 30 days for appellant to respond to respondent's additional briefs. The foregoing schedule would have been completed on July 23, 2014, and, on that same date, each party was to submit a concluding summary for each appeal. Other than the concluding summaries, which could not exceed 20 pages, each brief was to be no longer than 30 pages.

Appellant objected that 30 days and 30 pages is not sufficient time and space for his reply briefs and estimated that he needs 60 pages and 120 pages for his reply briefs. Respondent stated that it would not object to appellant's requests, as long as it also received 60 pages for its additional briefs and received an additional 30 days to file its additional briefs. Appellant again objected, arguing that if respondent was allowed 60 pages for its brief, appellant should be allowed 120 pages, and, if respondent was allowed an additional 30 days to file its brief, appellant should be allowed 180 days to file his brief.

Having considered the arguments of the parties and the submissions made in recent weeks, the Appeals Division hereby increases the page limits for each party's briefs to 60 pages, provided, however, that the 20-page limit for the concluding summaries remains unchanged.

The Appeals Division believes that the briefing will be most helpful to the Board if each party's brief for each appeal focuses on the facts and arguments that are relevant to that appeal year. Also, given the enormous volume of the record, the Appeals Division believes that the concluding summaries will be most helpful to the Board if the concluding summary for each appeal concisely summarizes the party's arguments with regard to each of the key issues applicable to that year (e.g., residency, fraud penalty, interest abatement, sourcing).

With regard to the parties' requests for extensions of time, the Appeals Division is reluctant to grant further extensions. However, in consideration of the extraordinary volume of the record and the arguments raised, the Appeals Division hereby partially grants each party's request for extension. The revised briefing deadlines are as follows:

| Document | Revised Due Date |
|---|---|
| Respondent's Additional Briefs | July 16, 2014 |
| Appellant's Reply Briefs | December 16, 2014 |
| Concluding Summaries | December 16, 2014 |

The Appeals Division does not anticipate any further changes to these page limits or deadlines and urges the parties to focus their energies on the above briefing rather than further procedural disputes.

Following the receipt of appellant's December 16, 2014 brief and the concluding summaries due on that same day, the appeals will be scheduled for the first available Sacramento Board hearing in or after March 2015, in accordance with appellant's request that the hearings be held in Sacramento.

If you have any questions, please feel free to call me at (916) 205-1644.

Sincerely,

Grant S. Thompson
Tax Counsel IV

GT/sh

cc:   Gilbert P. Hyatt
      c/o Morrison & Foerster LLP
      400 Capitol Mall, Suite 2600
      Sacramento, CA 95814-4428

      Craig Scott, FTB Legal                              (MS A260)
      Karen Smith, FTB Legal                              (MS A260)
      Khaaliq Abd'Allah, Board Proceedings Division       (MIC: 80)

1　Donald J. Kula, Bar No. 144342
　　DKula@perkinscoie.com
2　PERKINS COIE LLP
　　1888 Century Park E., Suite 1700
3　Los Angeles, CA  90067-1721
　　Telephone:  310.788.9900
4　Facsimile:  310.788.3399

5　Erwin Chemerinsky, Esq.,
　　EChemerinsky@law.uci.edu
6　UC IRVINE SCHOOL OF LAW
　　401 E. Peltason Drive, Suite 1000
7　Irvine, CA  92697-8000
　　Telephone:  949.824.8814
8　Facsimile:  949.824.7336

9　Malcolm Segal, Bar No.  075481
　　MSegal@segal-pc.com
10　SEGAL & ASSOCIATES, PC
　　400 Capitol Mall, Suite 2550
11　Sacramento, CA  95814
　　Telephone:  916.441.0886
12　Facsimile:  916.475.1231

13　Attorneys for Plaintiff Gilbert P. Hyatt

14　　　　　UNITED STATES DISTRICT COURT

15　　　　　EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 16　GILBERT P. HYATT, | Case No.  2:14−CV−00849−GEB−DAD |
| 17　　　　　Plaintiff, | **Declaration of Donald J. Kula in** |
| 18　　　　　v. | **Support of Plaintiff Gilbert P. Hyatt's** |
| 19　JOHN CHIANG, JEROME E. | **Consolidated Opposition to** |
| 　　HORTON, AND MICHAEL COHEN, | **Defendants' Respective Motions to** |
| 20　CALIFORNIA FRANCHISE TAX | **Dismiss** |
| 21　BOARD MEMBERS; BETTY T. YEE, | |
| 　　GEORGE RUNNER, MICHELLE | **Date:　　　November 3, 2014** |
| 22　STEEL, JEROME E. HORTON, AND | **Time:　　　9:00 a.m.** |
| 23　JOHN CHIANG, CALIFORNIA | **Courtroom: 10** |
| 　　STATE BOARD OF | **Hon. Garland E. Burrell, Jr.** |
| 24　EQUALIZATION MEMBERS; AND | |
| 25　DOES 1 THROUGH 20, | |
| 26　　　　　Defendants. | |

27

28

LEGAL123245158.1

Kula Declaration ISO Plaintiff's Consolidated
Opposition to Defendants' Motions to Dismiss

1    I, Donald J. Kula, have personal knowledge of the matters set forth in this
2    declaration unless otherwise indicated.

3        1.    I am a partner in the law firm of Perkins Coie, LLP. I am lead counsel
4    for Plaintiff Gilbert P. Hyatt in this matter.

5        2.    I also was a counsel of record and one of three trial counsel for Mr.
6    Hyatt in the Nevada tort litigation that he successfully pursued against the
7    Californian Franchise Tax Board (the "FTB") entitled *Gilbert P. Hyatt v. California*
8    *State Franchise Tax Board*, Case No. A-382999 in the District Court for Clark
9    County, Nevada, in which a judgment in the amount of $388 million, plus interest,
10   was entered in Mr. Hyatt's favor and against the FTB on September 8, 2008. My
11   office has maintained a complete file from that litigation, including court
12   documents, hearing and trial transcripts, and trial exhibits.

13       3.    Attached as Exhibit 1 to the accompanying Request for Judicial Notice
14   in Support of Plaintiff's Consolidated Opposition to Defendants' Respective
15   Motions to Dismiss is a true and correct copy of relevant portions of the Reporter's
16   Transcript of Proceedings from June 11, 2008, which was Day 38 of the Jury Trial
17   in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,
18   Case No. A-382999 in the District Court for Clark County, Nevada.

19       4.    Attached as Exhibit 2 to the accompanying Request for Judicial Notice
20   in Support of Plaintiff's Consolidated Opposition to Defendants' Respective
21   Motions to Dismiss is a true and correct copy of relevant portions of the Reporter's
22   Transcript of Proceedings from June 16, 2008, which was Day 41 of the Jury Trial
23   in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,
24   Case No. A-382999 in the District Court for Clark County, Nevada.

25       5.    Attached as Exhibit 3 to the accompanying Request for Judicial Notice
26   in Support of Plaintiff's Consolidated Opposition to Defendants' Respective
27   Motions to Dismiss is a true and correct copy of Hyatt's Motion to Cure Improper
28   Statements by FTB Counsel During Opening Statements Concerning Hyatt

1    Allegedly Erecting a "Wall" Between This Case and the California Tax

2    Proceedings and Thereby Violating the Court's Order Prohibiting the Parties From

3    "Litigating the Litigation," filed May 14, 2008, in the action entitled *Gilbert P.*

4    *Hyatt v. California State Franchise Tax Board*, Case No. A-382999 in the District

5    Court for Clark County, Nevada.

6        6.     Attached as Exhibit 4 to the accompanying Request for Judicial Notice

7    in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

8    Motions to Dismiss is a true and correct copy of relevant portions of the Reporter's

9    Transcript of Proceedings from July 23, 2008, which was Day 64 of the Jury Trial

10    in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

11    Case No. A-382999 in the District Court for Clark County, Nevada.

12        7.     Attached as Exhibit 5 to the accompanying Request for Judicial Notice

13    in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

14    Motions to Dismiss is a true and correct copy of relevant portions of the Reporter's

15    Transcript of Proceedings from July 28, 2008, which was Day 67 of the Jury Trial

16    in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

17    Case No. A-382999 in the District Court for Clark County, Nevada.

18        8.     Attached as Exhibit 6 to the accompanying Request for Judicial Notice

19    in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

20    Motions to Dismiss is a true and correct copy of relevant portions of the FTB's

21    Motion for Judgment as a Matter of Law or Alternatively and Conditionally for a

22    New Trial Pursuant to NRCP 50 and FTB's Alternative Motion for New Trial and

23    Other Relief Pursuant to NRCP 59, filed September 22, 2008, in the action entitled

24    *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case No. A-382999 in

25    the District Court for Clark County, Nevada.

26        9.     Attached as Exhibit 7 to the accompanying Request for Judicial Notice

27    in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

28    Motions to Dismiss is a true and correct copy of relevant portions of the Reporter's

1   Transcript of Proceedings from July 15, 2008, which was Day 58 of the Jury Trial

2   in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

3   Case No. A-382999 in the District Court for Clark County, Nevada.

4        10.    Attached as Exhibit 8 to the accompanying Request for Judicial Notice

5   in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

6   Motions to Dismiss is a true and correct copy of relevant portions of the FTB's

7   Reply Brief in Support of FTB's Motion for Judgment as a Matter of Law or

8   Alternatively and Conditionally for a New Trial Pursuant to NRCP 50 and FTB's

9   Alternative Motion for New Trial and Other Relief Pursuant to NRCP 59, filed

10  November 12, 2008, in the action entitled *Gilbert P. Hyatt v. California State*

11  *Franchise Tax Board*, Case No. A-382999 in the District Court for Clark County,

12  Nevada.

13       11.    Attached as Exhibit 9 to the accompanying Request for Judicial Notice

14  in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

15  Motions to Dismiss is a true and correct copy of relevant portions of the FTB's

16  Motion to Set Aside Judgment and New Trial Pursuant to NRCP 60(b), filed

17  January 16, 2009, in the action entitled *Gilbert P. Hyatt v. California State*

18  *Franchise Tax Board*, Case No. A-382999 in the District Court for Clark County,

19  Nevada.

20       12.    Attached as Exhibit 10 to the accompanying Request for Judicial

21  Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

22  Motions to Dismiss is a true and correct copy of relevant portions of Hyatt's

23  Opposition to the FTB's Motion to Set Aside Judgment and New Trial Pursuant to

24  NRCP 60(b), filed February 13, 2009, in the action entitled *Gilbert P. Hyatt v.*

25  *California State Franchise Tax Board*, Case No. A-382999 in the District Court for

26  Clark County, Nevada.

27       13.    Attached as Exhibit 11 to the accompanying Request for Judicial

28  Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

1   Motions to Dismiss is a true and correct copy of relevant portions of the Reporter's

2   Transcript of Proceedings from July 30, 2008, which was Day 69 of the Jury Trial

3   in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

4   Case No. A-382999 in the District Court for Clark County, Nevada.

5          14.    Attached as Exhibit 12 to the accompanying Request for Judicial

6   Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

7   Motions to Dismiss is a true and correct copy of the Special Verdict Form, dated

8   August 6, 2008, in the action entitled *Gilbert P. Hyatt v. California State Franchise*

9   *Tax Board*, Case No. A-382999 in the District Court for Clark County, Nevada.

10         15.    Attached as Exhibit 13 to the accompanying Request for Judicial

11  Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

12  Motions to Dismiss is a true and correct copy of the Special Verdict Form Number

13  2, dated August 11, 2008, in the action entitled *Gilbert P. Hyatt v. California State*

14  *Franchise Tax Board*, Case No. A-382999 in the District Court for Clark County,

15  Nevada.

16         16.    Attached as Exhibit 14 to the accompanying Request for Judicial

17  Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

18  Motions to Dismiss is a true and correct copy of the Special Verdict Form Number

19  3, dated August 14, 2008, in the action entitled *Gilbert P. Hyatt v. California State*

20  *Franchise Tax Board*, Case No. A-382999 in the District Court for Clark County,

21  Nevada.

22         17.    Attached as Exhibit 15to the accompanying Request for Judicial

23  Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

24  Motions to Dismiss is a true and correct copy of the Judgment, entered September

25  8, 2008, in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax*

26  *Board*, Case No. A-382999 in the District Court for Clark County, Nevada.

27         18.    Attached as Exhibit 16 to the accompanying Request for Judicial

28  Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

1    Motions to Dismiss is a true and correct copy of relevant portions of Hyatt's

2    Opposition to FTB's Motion for Judgment as a Matter of Law or Alternatively and

3    Conditionally for a New Trial Pursuant to NRCP 50 and FTB's Alternative Motion

4    for New Trial and Other Relief Pursuant to NRCP 59, filed October 24, 2008, in the

5    action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case No.

6    A-382999 in the District Court for Clark County, Nevada.

7         19.    Attached as Exhibit 17 to the accompanying Request for Judicial

8    Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

9    Motions to Dismiss is a true and correct copy of relevant portions of the Reporter's

10   Transcript of Proceedings from May 7, 2008, which was Day 15 of the Jury Trial in

11   the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case

12   No. A-382999 in the District Court for Clark County, Nevada.

13        20.    Attached as Exhibit 18 to the accompanying Request for Judicial

14   Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

15   Motions to Dismiss is a true and correct copy of a Subpoena Duces Tecum issued

16   by the State of California Franchise Tax Board in the Administrative Protest of

17   Gilbert P. Hyatt on July 7, 2002.  This Subpoena was at issue in the California

18   Superior Court action described below in Paragraph 21 and for which I was a

19   counsel of record for Mr. Hyatt.

20        21.    Attached as Exhibit 19 to the accompanying Request for Judicial

21   Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

22   Motions to Dismiss is a true and correct copy of the Court's Ruling on Order to

23   Show Cause (Submitted on 12/16/02), in the action entitled *California Franchise*

24   *Tax Board v. Gilbert P. Hyatt*, Case No. 02CS01582 in the Superior Court of

25   California, County of Sacramento.  I was a counsel of record for Mr. Hyatt in this

26   action.  The Superior Court denied part of the relief sought by the FTB by limiting

27   the scope of the Subpoena referenced above in Paragraph 20.  The FTB did not

28   appeal the adverse portion of the ruling made against it.

LEGAL123245158.1                    -5-          Kula Declaration ISO Plaintiff's Consolidated
                                                 Opposition to Defendants' Motions to Dismiss

1     22.    Attached as Exhibit 20 to the accompanying Request for Judicial

2   Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

3   Motions to Dismiss is a true and correct copy of relevant portions of the Reporter's

4   Transcript of Proceedings from April 29, 2008, which was Day 10 of the Jury Trial

5   in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

6   Case No. A-382999 in the District Court for Clark County, Nevada.

7     23.    Attached as Exhibit 21 to the accompanying Request for Judicial

8   Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

9   Motions to Dismiss is a true and correct copy of relevant portions of the Reporter's

10   Transcript of Proceedings from May 1, 2008, which was Day 12 of the Jury Trial in

11   the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case

12   No. A-382999 in the District Court for Clark County, Nevada.

13     24.    Attached as Exhibit 22 to the accompanying Request for Judicial

14   Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

15   Motions to Dismiss is a true and correct copy of relevant portions of the Reporter's

16   Transcript of Proceedings from July 22, 2008, which was Day 63 of the Jury Trial

17   in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

18   Case No. A-382999 in the District Court for Clark County, Nevada.

19     25.    Attached as Exhibit 23 to the accompanying Request for Judicial

20   Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

21   Motions to Dismiss is a true and correct copy of relevant portions of the Affidavit

22   of Eugene C. Cowan in Opposition to the FTB's Motion for Summary Judgment, in

23   the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case

24   No. A-382999 in the District Court for Clark County, Nevada.

25     26.    Attached as Exhibit 24 to the accompanying Request for Judicial

26   Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

27   Motions to Dismiss is a true and correct copy of Trial Exhibits 398, 399, and 411,

28   in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

1  Case No. A-382999 in the District Court for Clark County, Nevada.

2       27.    Attached as Exhibit 25 to the accompanying Request for Judicial

3  Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

4  Motions to Dismiss is a true and correct copy of relevant portions of the

5  Respondent's Answering Brief and Opening Cross Appeal Brief, in the action

6  entitled *Franchise Tax Board of the State of California v. Gilbert P. Hyatt*, Case

7  No. 53264 in the Supreme Court of the State of Nevada.  I am a counsel of record

8  for Mr. Hyatt in this appeal.

9       28.    Attached as Exhibit 26 to the accompanying Request for Judicial

10  Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

11  Motions to Dismiss is a true and correct copy of relevant portions of the Reporter's

12  Transcript of Proceedings from April 23, 2008, which was Day 6 of the Jury Trial

13  in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

14  Case No. A-382999 in the District Court for Clark County, Nevada.

15       29.    Attached as Exhibit 27 to the accompanying Request for Judicial

16  Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

17  Motions to Dismiss is a true and correct copy of relevant portions of the Reporter's

18  Transcript of Proceedings from April 24, 2008, which was Day 7 of the Jury Trial

19  in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

20  Case No. A-382999 in the District Court for Clark County, Nevada.

21       30.    Attached as Exhibit 28 to the accompanying Request for Judicial

22  Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

23  Motions to Dismiss is a true and correct copy of the Decision and Order, entered

24  July 29, 2011, in an action entitled *In the Matter of: Out-of-state subpoenas issued*

25  *by the New York counsel for State of California Franchise Tax Board for the*

26  *depositions and production of documents from the Custodian of Records for U.S.*

27  *Phillips Corporation, from Jack Haken, and from Algy Tamoshunas, for use in an*

28  *administrative tax appeal pending before the California State Board of*

1   *Equalization entitled:  In the Matter of the Appeal of Gilbert P. Hyatt, California*

2   *Board of Equalization, Case Nos. 435770 and 446509*, New York Supreme Court,

3   County of Westchester, Index No. 52961 (2011).  I was not counsel of record for

4   Mr. Hyatt in this New York litigation, but I did assist Mr. Hyatt's New York

5   counsel in regard to this matter, and I attended the July 27, 2011 court hearing

6   which resulted in the attached Decision and Order.  The court's Decision and Order

7   granted in part the relief sought by Mr. Hyatt by limiting the scope of the Subpoena

8   described below in Paragraph 31.  The FTB appealed this portion of the ruling

9   against it, but later withdrew its appeal.

10         31.    Attached as Exhibit 29 to the accompanying Request for Judicial

11  Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective

12  Motions to Dismiss is a true and correct copy of a Subpoena Duces Tecum served

13  by the FTB on U.S. Philips Corporation on or about June 2, 2011, that is the subject

14  of the Decision and Order, entered July 29, 2011, in an action entitled *In the Matter*

15  *of: Out-of-state subpoenas issued by the New York counsel for State of California*

16  *Franchise Tax Board for the depositions and production of documents from the*

17  *Custodian of Records for U.S. Phillips Corporation, from Jack Haken, and from*

18  *Algy Tamoshunas, for use in an administrative tax appeal pending before the*

19  *California State Board of Equalization entitled:  In the Matter of the Appeal of*

20  *Gilbert P. Hyatt, California Board of Equalization, Case Nos. 435770 and 446509*,

21  New York Supreme Court, County of Westchester, Index No. 52961 (2011).

22

23         I declare under penalty of perjury under the laws of the United States that the

24  foregoing is true and correct.

25         Executed on this 25th day of August, 2014, at Los Angeles, California.

26

27

28                                              Donald J. Kula

1   Donald J. Kula, Bar No. 144342
    DKula@perkinscoie.com
2   PERKINS COIE LLP
    1888 Century Park E., Suite 1700
3   Los Angeles, CA 90067-1721
    Telephone: 310.788.9900
4   Facsimile: 310.788.3399

5   Erwin Chemerinsky, Esq.,
    EChemerinsky@law.uci.edu
6   UC IRVINE SCHOOL OF LAW
    401 E. Peltason Drive, Suite 1000
7   Irvine, CA 92697-8000
    Telephone: 949.824.8814
8   Facsimile: 949.824.7336

9   Malcolm Segal, Bar No. 075481
    MSegal@segal-pc.com
10  SEGAL & ASSOCIATES, PC
    400 Capitol Mall, Suite 2550
11  Sacramento, CA 95814
    Telephone: 916.441.0886
12  Facsimile: 916.475.1231

13  Attorneys for Plaintiff Gilbert P. Hyatt

14              UNITED STATES DISTRICT COURT

15              EASTERN DISTRICT OF CALIFORNIA

16

17  GILBERT P. HYATT,                    Case No. 2:14−CV−00849−GEB−DAD

18              Plaintiff,               **REQUEST FOR JUDICIAL NOTICE
                                         IN SUPPORT OF PLAINTIFF'S**
19              v.                       **CONSOLIDATED OPPOSITION TO
                                         DEFENDANTS' RESPECTIVE**
20  JOHN CHIANG, JEROME E.               **MOTIONS TO DISMISS**
    HORTON, AND MICHAEL COHEN,
21  CALIFORNIA FRANCHISE TAX             **Date:      November 3, 2014**
    BOARD MEMBERS; BETTY T. YEE,         **Time:      9:00 a.m.**
22  GEORGE RUNNER, MICHELLE              **Courtroom: 10**
    STEEL, JEROME E. HORTON, AND         **Hon. Garland E. Burrell, Jr.**
23  JOHN CHIANG, CALIFORNIA
    STATE BOARD OF
24  EQUALIZATION MEMBERS; AND
    DOES 1 THROUGH 20,
25
26              Defendants.
27
28

LEGAL122858466.6

Request for Judicial Notice in Support of
Plaintiff's Consolidated Opposition to Defendants'
Respective Motions to Dismiss

ER 64

1    Gilbert P. Hyatt ("Plaintiff" or "Hyatt") respectfully requests that the Court

2    take judicial notice, under Rule 201 of the Federal Rules of Evidence, of the

3    documents filed herewith as Exhibits 1 through 29 to this request.

4    The request is conditional and made in the event the Court overrules

5    Plaintiff's accompanying Objections to the Declaration of Robert Dunn. The "FTB

6    Defendants"[1] filed the Declaration of Robert Dunn [ECF, No. 17-2] on June 23,

7    2014 in support of their Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(1) &

8    12(B)(6) [ECF, No. 17, 17-1]. To the extent the Court sustains Plaintiff's

9    Objections to the Dunn Declaration and thereby disregards the declaration in its

10    entirely in determining the FTB Defendants' Motion to Dismiss, the Court need not

11    address Plaintiff's request for judicial notice.

12    But to the extent the Court overrules Plaintiff's Objections to the Dunn

13    Declaration and gives consideration to the declaration in determining the FTB

14    Defendants' Motion to Dismiss, Plaintiff offers the materials attached hereto, and

15    the accompanying declarations of Eric Coffill and Donald Kula, to rebut the

16    purported "jurisdictional" evidence from outside of the pleadings upon which the

17    FTB Defendants base their motion.

18    A Rule 12(b)(1) jurisdictional challenge, as made by the FTB Defendants,

19    may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000); *Safe*

20    *Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A Rule 12(b)(1)

21    jurisdictional challenge is factual where "the challenger disputes the truth of the

22    allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe*

23    *Air for Everyone,* 373 F.3d at 1039; *accord Savage v. Glendale Union High Sch.*,

24    343 F.3d 1036, 1039 n.2 (9th Cir. 2003)). When a defendant files a factual

25    challenge to jurisdiction under Rule 12(b)(1), and submits admissible evidence

26    outside the pleadings, the plaintiff has the burden of submitting his own admissible

27    [1] Defendants John Chiang, Jerome E. Horton, and Michael Cohen, acting in their

28    official capacities as California Franchise Tax Board Members.

-2-    Request for Judicial Notice in Support of
Plaintiff's Consolidated Opposition to Defendants'
Respective Motions to Dismiss

1   evidence to rebut the jurisdictional evidence submitted by the defendant. *Id.*

2         Where true "jurisdictional" facts are disputed, the jurisdictional

3   determination must be deferred until there is a determination of the relevant facts on

4   either a motion going to the merits or at trial. *Augustine v. United States*, 704 F.2d

5   1074, 1077 (9th Cir. 1983) (holding that where the jurisdictional issue and the

6   merits of the case "are so intertwined that the question of jurisdiction is dependent

7   on the resolution of factual issues going to the merits, the jurisdictional

8   determination should await a determination of the relevant facts on either a motion

9   going to the merits or at trial," citing *Thornhill Pub. Co. v. General Tel. &*

10  *Electronics Corp.*, 594 F.2d 730, 733-35 (9th Cir. 1979).

11        As set forth in Plaintiff's Objection to the Dunn Declaration, the FTB

12  Defendants fail to tie the purported "facts" in the Dunn Declaration to the issues

13  upon which their jurisdictional motion is based. In addition, as also specified in the

14  Objections to the Dunn Declaration, certain purported facts in the Dunn Declaration

15  are barred under the doctrine of collateral estoppel from being re-litigated by the

16  FTB Defendants.

17        For these reasons, the Dunn Declaration is improperly submitted and should

18  be disregarded. But to the extent the Court deems the purported "facts" set forth in

19  the Dunn Declaration to be "jurisdictional" facts that Hyatt must rebut, Hyatt does

20  so rebut the FTB Defendants' purported jurisdictional evidence as addressed herein,

21  the Objections to the Dunn Declaration and Plaintiff's Consolidated Memorandum

22  of Points and Authorities in Opposition to Defendants' Respective Motions.

23

24

25

26

27

28

LEGAL122858466.6

-3-

Request for Judicial Notice in Support of
Plaintiff's Consolidated Opposition to Defendants'
Respective Motions to Dismiss

## Request for Judicial Notice

Federal Rule of Evidence 201 authorizes federal courts to take judicial notice of documents that are "not subject to reasonable dispute [and] . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. "Since judicial notice can be taken of 'undisputed matters of public record, including documents on file in federal or state courts,'" the documents attached hereto as Exhibits are judicially noticeable. *See Flint v. Beneficial Fin. I Inc.*, No. 2:12-CV-01675-GEB, 2012 WL 3277109 (E.D. Cal. Aug. 9, 2012) (citing *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131–32 (9th Cir. 2012) (taking judicial notice of a party's declaration filed in other litigation).

Exhibits 1 through 17 and 20 through 27, are court documents, transcripts of proceeding or trial exhibits from the case of *Hyatt v. Franchise Tax Board*, Clark County, Nevada Case No. A-382999, for which a trial was conducted in 2008, or part of the appellate record from that case, *Franchise Tax Board v. Hyatt*, Nevada Supreme Court Case No. 53264.

Exhibits 18 and 19 are subpoena and court order from the case of *California Franchise Tax Board v, Gilbert P. Hyatt*, Case No. 02CS01582 in the Superior Court of California, County of Sacramento.

Exhibits 28 and 29 are court documents from "*In the Matter of: Out-of-state subpoenas issued by the New York counsel for State of California Franchise Tax Board for the depositions and production of documents from the Custodian of Records for U.S. Phillips Corporation, from Jack Haken, and from Algy Tamoshunas, for use in an administrative tax appeal pending before the California State Board of Equalization entitled: In the Matter of the Appeal of Gilbert P. Hyatt, California Board of Equalization, Case Nos. 435770 and 446509,*" New York Supreme Court, County of Westchester, Index No. 52961 (2011).

LEGAL122858466.6

-4-

Request for Judicial Notice in Support of
Plaintiff's Consolidated Opposition to Defendants'
Respective Motions to Dismiss

**MATERIAL FOR WHICH JUDICIAL NOTICE IS SOUGHT**

Exhibit 1.   A true and correct copy of relevant portions of the Reporter's Transcript of Proceedings from June 11, 2008, which was Day 38 of the Jury Trial in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case No. A-382999 in the District Court for Clark County, Nevada. (This exhibit is offered to rebut paragraphs 16, 17 and 18 of the Dunn Decl., ECF No. 17-2.)

Exhibit 2.   A true and correct copy of relevant portions of the Reporter's Transcript of Proceedings from June 16, 2008, which was Day 41 of the Jury Trial in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case No. A-382999 in the District Court for Clark County, Nevada. (This exhibit is offered to rebut paragraphs 16, 17 and 18 of the Dunn Decl., ECF No. 17-2.)

Exhibit 3.   A true and correct copy of Hyatt's Motion to Cure Improper Statements by FTB Counsel During Opening Statements Concerning Hyatt Allegedly Erecting a "Wall" Between This Case and the California Tax Proceedings and Thereby Violating the Court's Order Prohibiting the Parties From "Litigating the Litigation," filed May 14, 2008, in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case No. A-382999 in the District Court for Clark County, Nevada. (This exhibit is offered to rebut paragraphs 16,17 and 18 of the Dunn Decl., ECF No. 17-2.)

Exhibit 4.   A true and correct copy of relevant portions of the Reporter's Transcript of Proceedings from July 23, 2008, which was Day 64 of the Jury Trial in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case No. A-382999 in the District Court for Clark County, Nevada. (This exhibit is offered to rebut paragraphs 16, 17, and 18 of the Dunn Decl., ECF No. 17-2.)

Exhibit 5.   A true and correct copy of relevant portions of the Reporter's Transcript of Proceedings from July 28, 2008, which was Day 67 of the Jury Trial in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case No. A-382999 in the District Court for Clark County, Nevada. (This exhibit

Request for Judicial Notice in Support of
Plaintiff's Consolidated Opposition to Defendants'
Respective Motions to Dismiss

1  is offered to rebut paragraphs 16, 17, 18, 19, and 21 of the Dunn Decl., ECF

2  No. 17-2.)

3      Exhibit 6.   A true and correct copy of relevant portions of the FTB's Motion

4  for Judgment as a Matter of Law or Alternatively and Conditionally for a New Trial

5  Pursuant to NRCP 50 and FTB's Alternative Motion for New Trial and Other

6  Relief Pursuant to NRCP 59, filed September 22, 2008, in the action entitled

7  *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case No. A-382999 in

8  the District Court for Clark County, Nevada. (This exhibit is offered to rebut

9  paragraphs 16, 17, 18 and 19 of the Dunn Decl., ECF No. 17-2.)

10      Exhibit 7.   A true and correct copy of relevant portions of the Reporter's

11  Transcript of Proceedings from July 15, 2008, which was Day 58 of the Jury Trial

12  in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

13  Case No. A-382999 in the District Court for Clark County, Nevada. (This exhibit

14  is offered to rebut paragraphs 16, 17, 18, and 21 of the Dunn Decl., ECF No. 17-2.)

15      Exhibit 8.   A true and correct copy of relevant portions of the FTB's Reply

16  Brief in Support of FTB's Motion for Judgment as a Matter of Law or Alternatively

17  and Conditionally for a New Trial Pursuant to NRCP 50 and FTB's Alternative

18  Motion for New Trial and Other Relief Pursuant to NRCP 59, filed November 12,

19  2008, in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax*

20  *Board*, Case No. A-382999 in the District Court for Clark County, Nevada. (This

21  exhibit is offered to rebut paragraphs 16, 17, 18 and 19 of the Dunn Decl., ECF

22  No. 17-2.)

23      Exhibit 9.   A true and correct copy of relevant portions of the FTB's Motion

24  to Set Aside Judgment and New Trial Pursuant to NRCP 60(b), filed January 16,

25  2009, in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax*

26  *Board*, Case No. A-382999 in the District Court for Clark County, Nevada. (This

27  exhibit is offered to rebut paragraphs 16, 17, 18 and 19 of the Dunn Decl., ECF

28  No. 17-2.)

Request for Judicial Notice in Support of
Plaintiff's Consolidated Opposition to Defendants'
Respective Motions to Dismiss

1    Exhibit 10. A true and correct copy of relevant portions of Hyatt's
2    Opposition to the FTB's Motion to Set Aside Judgment and New Trial Pursuant to
3    NRCP 60(b), filed February 13, 2009, in the action entitled *Gilbert P. Hyatt v.*
4    *California State Franchise Tax Board*, Case No. A-382999 in the District Court for
5    Clark County, Nevada. (This exhibit is offered to rebut paragraphs 16, 17, 18 and
6    19 of the Dunn Decl., ECF No. 17-2.)

7    Exhibit 11. A true and correct copy of relevant portions of the Reporter's
8    Transcript of Proceedings from July 30, 2008, which was Day 69 of the Jury Trial
9    in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,
10   Case No. A-382999 in the District Court for Clark County, Nevada. (This exhibit
11   is offered to rebut paragraphs 16, 17, 18, 21, and 31 of the Dunn Decl., ECF
12   No. 17-2.)

13   Exhibit 12. A true and correct copy of the Special Verdict Form, dated
14   August 6, 2008, in the action entitled *Gilbert P. Hyatt v. California State Franchise*
15   *Tax Board*, Case No. A-382999 in the District Court for Clark County, Nevada.
16   (This exhibit is offered to rebut paragraphs 16, 17, 18, 19, 21, and 31 of the Dunn
17   Decl., ECF No. 17-2.)

18   Exhibit 13. A true and correct copy of the Special Verdict Form Number 2,
19   dated August 11, 2008, in the action entitled *Gilbert P. Hyatt v. California State*
20   *Franchise Tax Board*, Case No. A-382999 in the District Court for Clark County,
21   Nevada. (This exhibit is offered to rebut paragraphs 16, 17, 18, 19, 21, and 31 of
22   the Dunn Decl., ECF No. 17-2.)

23   Exhibit 14. A true and correct copy of the Special Verdict Form Number 3,
24   dated August 14, 2008, in the action entitled *Gilbert P. Hyatt v. California State*
25   *Franchise Tax Board*, Case No. A-382999 in the District Court for Clark County,
26   Nevada. (This exhibit is offered to rebut paragraphs 16, 17, 18, 19, 21, and 31 of
27   the Dunn Decl., ECF No. 17-2.)

28

LEGAL122858466.6                    -7-                Request for Judicial Notice in Support of
                                                       Plaintiff's Consolidated Opposition to Defendants'
                                                       Respective Motions to Dismiss

1        Exhibit 15. A true and correct copy of the Judgment, entered September 8,

2    2008, in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax*

3    *Board*, Case No. A-382999 in the District Court for Clark County, Nevada. (This

4    exhibit is offered to rebut paragraphs 16, 17, 18, 19, 21, and 31 of the Dunn Decl.,

5    ECF No. 17-2.)

6        Exhibit 16. A true and correct copy of relevant portions of Hyatt's

7    Opposition to FTB's Motion for Judgment as a Matter of Law or Alternatively and

8    Conditionally for a New Trial Pursuant to NRCP 50 and FTB's Alternative Motion

9    for New Trial and Other Relief Pursuant to NRCP 59, filed October 24, 2008, in the

10   action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case No.

11   A-382999 in the District Court for Clark County, Nevada. (This exhibit is offered

12   to rebut paragraphs 16, 17, 18 and 19 of the Dunn Decl., ECF No. 17-2.)

13       Exhibit 17. A true and correct copy of relevant portions of the Reporter's

14   Transcript of Proceedings from May 7, 2008, which was Day 15 of the Jury Trial in

15   the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case

16   No. A-382999 in the District Court for Clark County, Nevada. (This exhibit is

17   offered to rebut paragraphs 16, 17 and 18 of the Dunn Decl., ECF No. 17-2.)

18       Exhibit 18. A true and correct copy of a Subpoena Duces Tecum issued by

19   the State of California Franchise Tax Board in the Administrative Protest of Gilbert

20   P. Hyatt on July 7, 2002. (This exhibit is offered to rebut paragraph 17 of the Dunn

21   Decl., ECF No. 17-2.)

22       Exhibit 19. Atrue and correct copy of the Court's Ruling on Order to Show

23   Cause (Submitted on 12/16/02), in the action entitled *California Franchise Tax*

24   *Board v, Gilbert P. Hyatt*, Case No. 02CS01582 in the Superior Court of California,

25   County of Sacramento. (This exhibit is offered to rebut paragraph 17 of the Dunn

26   Decl., ECF No. 17-2.)

27       Exhibit 20. A true and correct copy of relevant portions of the Reporter's

28   Transcript of Proceedings from April 29, 2008, which was Day 10 of the Jury Trial

LEGAL122858466.6        -8-       Request for Judicial Notice in Support of
Plaintiff's Consolidated Opposition to Defendants'
Respective Motions to Dismiss

1  in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

2  Case No. A-382999 in the District Court for Clark County, Nevada. (This exhibit

3  is offered to rebut paragraph 21 of the Dunn Decl., ECF No. 17-2.)

4      Exhibit 21. A true and correct copy of relevant portions of the Reporter's

5  Transcript of Proceedings from May 1, 2008, which was Day 12 of the Jury Trial in

6  the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case

7  No. A-382999 in the District Court for Clark County, Nevada. (This exhibit is

8  offered to rebut paragraph 21 of the Dunn Decl., ECF No. 17-2.)

9      Exhibit 22. A true and correct copy of relevant portions of the Reporter's

10 Transcript of Proceedings from July 22, 2008, which was Day 63 of the Jury Trial

11 in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

12 Case No. A-382999 in the District Court for Clark County, Nevada. (This exhibit

13 is offered to rebut paragraphs 16, 17 and 18 of the Dunn Decl., ECF No. 17-2.)

14     Exhibit 23. A true and correct copy of relevant portions of the Affidavit of

15 Eugene C. Cowan in Opposition to the FTB's Motion for Summary Judgment, in

16 the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case

17 No. A-382999 in the District Court for Clark County, Nevada. (This exhibit is

18 offered to rebut paragraphs 16, 17 and 18 of the Dunn Decl., ECF No. 17-2.)

19     Exhibit 24. A true and correct copy of Trial Exhibits 398, 399, and 411, in

20 the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*, Case

21 No. A-382999 in the District Court for Clark County, Nevada. (This exhibit is

22 offered to rebut paragraphs 16, 17, 18, and 21 of the Dunn Decl., ECF No. 17-2.)

23     Exhibit 25. A true and correct copy of relevant portions of the Respondent's

24 Answering Brief and Opening Cross Appeal Brief, in the action entitled *Franchise

25 Tax Board of the State of California v. Gilbert P. Hyatt*, Case No. 53264 in the

26 Supreme Court of the State of Nevada. (This exhibit is offered to rebut paragraphs

27 16, 17 and 18 of the Dunn Decl., ECF No. 17-2.)

28

Request for Judicial Notice in Support of
Plaintiff's Consolidated Opposition to Defendants'
Respective Motions to Dismiss

1    Exhibit 26. A true and correct copy of relevant portions of the Reporter's

2    Transcript of Proceedings from April 23, 2008, which was Day 6 of the Jury Trial

3    in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

4    Case No. A-382999 in the District Court for Clark County, Nevada. (This exhibit

5    is offered to rebut paragraph 31 of the Dunn Decl., ECF No. 17-2.)

6    Exhibit 27. A true and correct copy of relevant portions of the Reporter's

7    Transcript of Proceedings from April 24, 2008, which was Day 7 of the Jury Trial

8    in the action entitled *Gilbert P. Hyatt v. California State Franchise Tax Board*,

9    Case No. A-382999 in the District Court for Clark County, Nevada. (This exhibit

10   is offered to rebut paragraph 31 of the Dunn Decl., ECF No. 17-2.)

11   Exhibit 28. A true and correct copy of the Decision and Order, entered July

12   29, 2011, in an action entitled *In the Matter of: Out-of-state subpoenas issued by*

13   *the New York counsel for State of California Franchise Tax Board for the*

14   *depositions and production of documents from the Custodian of Records for U.S.*

15   *Phillips Corporation, from Jack Haken, and from Algy Tamoshunas, for use in an*

16   *administrative tax appeal pending before the California State Board of*

17   *Equalization entitled:  In the Matter of the Appeal of Gilbert P. Hyatt, California*

18   *Board of Equalization, Case Nos. 435770 and 446509,* New York Supreme Court,

19   County of Westchester, Index No. 52961 (2011). (This exhibit is offered to rebut

20   paragraph 27 of the Dunn Decl., ECF No. 17-2.)

21   Exhibit 29. A true and correct copy of a Subpoena Duces Tecum served by

22   the FTB on U.S. Philips Corporation on or about June 2, 2011, that is the subject of

23   the Decision and Order, entered July 29, 2011, in an action entitled *In the Matter*

24   *of: Out-of-state subpoenas issued by the New York counsel for State of California*

25   *Franchise Tax Board for the depositions and production of documents from the*

26   *Custodian of Records for U.S. Phillips Corporation, from Jack Haken, and from*

27   *Algy Tamoshunas, for use in an administrative tax appeal pending before the*

28   *California State Board of Equalization entitled:  In the Matter of the Appeal of*

Request for Judicial Notice in Support of
Plaintiff's Consolidated Opposition to Defendants'
Respective Motions to Dismiss

1    *Gilbert P. Hyatt, California Board of Equalization, Case Nos. 435770 and 446509,*

2    New York Supreme Court, County of Westchester, Index No. 52961 (2011). (This

3    exhibit is offered to rebut paragraph 27 of the Dunn Decl., ECF No. 17-2.)

4

5    DATED: August 25, 2014                    **PERKINS COIE LLP**

6

7                                             By:/s/ Donald J. Kula

8                                                Donald J. Kula

9                                             **ERWIN CHEMERINSKY, Esq.**

10

11                                            **SEGAL & ASSOCIATES, PC.**

12                                            Attorneys for Plaintiff
                                              Gilbert P. Hyatt

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEGAL122858466.6                          -11-                Request for Judicial Notice in Support of
Plaintiff's Consolidated Opposition to Defendants'
Respective Motions to Dismiss

# EXHIBIT  1

COPY

FILED

COPY

DISTRICT COURT
CLARK COUNTY, NEVADA
* * * *

GILBERT P. HYATT,          .
                           .     CASE NO. A-382999
          Plaintiff,       .
    vs.                    .     DEPT. NO. X
                           .
CALIFORNIA STATE FRANCHISE .
TAX BOARD,                 .
                           .     **Transcript of**
          Defendant        .     **Proceedings**
. . . . . . . . . . . . . . . .


   BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

                **JURY TRIAL - DAY 38**

              WEDNESDAY, JUNE 11, 2008

APPEARANCES:

FOR THE PLAINTIFF:        PETER C. BERNHARD, ESQ.
                          MARK HUTCHISON, ESQ.
                          DONALD J. KULA, ESQ.

FOR THE DEFENDANT:        PAT LUNDVALL, ESQ.
                          CARLA B. HIGGINBOTHAM, ESQ.
                          JAMES BRADSHAW, ESQ.


COURT RECORDER:           TRANSCRIPTION BY:

VICTORIA BOYD             VERBATIM DIGITAL REPORTING, LLC
District Court            Littleton, CO 80120
                          (303) 798-0890


Proceedings recorded by audio-visual recording, transcript
produced by transcription service.

9

1   I don't think that the Court has excluded the things that

2   Ms. Lundvall may be thinking about, but we can talk about

3   that whenever.

4          MS. LUNDVALL:  It sounds like we could do that as

5   far as at the lunch break, Your Honor.

6          THE COURT:  Okay.  Mr. Kula.

7          MR. KULA:  Yes, Your Honor.  We have on file a

8   motion relating to statements made during the opening, and

9   perhaps even more importantly, testimony given by Mr.

10  Antolin, or questions, I should say, asked of Mr. Antolin

11  relating to the protective order in this case.

12          And the input of this is not just what was said in

13  opening, and not just what Mr. Antolin said, but it has

14  implications as to how this case is going to be tried

15  relative to the delay portion, the bad faith delay and the

16  protective order.

17          What the FTB has stated, implied in opening and

18  outright stated in questioning Mr. Antolin was that the

19  protective order had some requirement that made the FTB

20  forestall using California law, and California procedure;

21  they had to go to Mr. Hyatt and ask permission before they

22  could go to California and use their administrative process.

23          And that's just absolutely wrong under the history

24  of this protective order, the history of this case, what --

25  the statements made by Judge Biggar, statements made by Judge

10

1  Saitta in 2002 when they tried to overturn the protective

2  order.

3          The point is, they can't come in -- they can't come

4  in and represent to the jury that the protective order

5  required something it didn't require.  And that's not a

6  question for the jury really to decide, in any event.  That's

7  for the Court to decide.  And that's the point of our motion,

8  is that there's -- if the FTB is going to present that this

9  protective order required them to do certain things that it

10 didn't require them to do, we have to come in and rebut that.

11         And what happened in Mr. Antolin's testimony was

12 precisely that.  He was asked questions about the protective

13 order, that it required certain things, and he gave answers

14 to Ms. Lundvall.  And then Mr. Hutchison came up and

15 presented the protective order and asked him to look at other

16 sections, is this -- does it require in this section of the

17 protective order, and that's in front of the jury, and we're

18 asking Mr. Antolin to interpret it.

19         Well, if they're going to present other witnesses,

20 which we assume based on the statements, they're going to

21 come in and present witnesses that say, the protective order

22 required us to do that.  In fact, in their opposition, page

23 5, lines 8 to 11, and page 11, lines 7 to 8, they say that

24 they had to ask Mr. Hyatt, that the protective order put some

25 damper -- I'll use the word -- on their rights under

11

1   California law before they could go use the subpoena process.

2         That's what they say the protective order means.

3   It says at page 11, lines 7 to 8, they say, "The FTB was

4   required to seek Hyatt's voluntary disclosure information

5   cloaked as confidential under the protective order before it

6   could resort to the issuance of an administrative subpoena."

7         One, that's not true.  They didn't have to do that

8   and that shouldn't be debated in front of the jury.  The

9   judge should decide that or should make clear that.  But two,

10  it's not necessary for the defense.  Their idea that they

11  need this issue for the defense is simply not true.

12        If they want to present the idea that they had to

13  use an administrative subpoena and Hyatt would not -- Mr.

14  Hyatt would not voluntarily produce materials, they can say

15  that and then try to present the history of having to obtain

16  a subpoena in California.  It doesn't implicate the

17  protective order in this case.

18        In fact, they want to say that Mr. Hyatt abused the

19  protective order in this case.  They cite the example of --

20  well, there were newspaper articles designated under the

21  protective order.  Under all the many documents in this case,

22  there may have been articles attached to documents and so

23  forth.

24        But the protective order is very clear.  If the

25  document is available from another source, it's -- they can

12

1  use that however they may use it, a public source.  A

2  newspaper article can be downloaded from the Internet.

3  There's nothing that prevented them from taking a newspaper

4  article they thought was relevant for use in the protest.

5       Just because it got produced in this case somehow

6  they can't use it; that's just not true.  But for them to

7  come in and say Mr. Hyatt abused the protective order by

8  doing that, again, that's an order for the Court to decide.

9  They never came in and asked the Court for a ruling that

10 there was an abuse of the protective order.

11      Their second argument about abusing the protective

12 order they want to present is that Mr. Hyatt prevented

13 critical and necessary information from going from this case

14 to the protest.  Well, it gets back to, if they had critical

15 and necessary information they could have used the subpoena

16 process.

17      Secondly, is the jury going to decide whether or

18 not the information was critical and necessary under the

19 protective order -- or excuse me -- in the protest when in

20 fact we couldn't take discovery from the protest officer?  We

21 were precluded from asking the protest officer, for example,

22 Ms. Cinnamon, about what documents were necessary in her

23 deposition.

24      She testified to some extent that she was seeking

25 documents that she needed or she thought were needed, but we

13

1    couldn't ask her what those documents were.  So what we're

2    going to have in front of the jury is a generic debate.

3    They're going to say, we need the documents, we're going to

4    say they didn't, but we can't get into the substance of them.

5          So this protective order, the way they raise it,

6    implicates many, many issues in this case.  And the point of

7    this motion is to have guidance of the Court.  First of all,

8    we ask that the Court make it clear that they can't represent

9    the protective order meant things that it didn't mean, what's

10   clear judicial history of this order.

11         Secondly, going forward, then, I don't think it

12   affects how they have to present their case, but these

13   statements have been made to the jury concerning the

14   protective order.  So we are looking for a curative

15   instruction.  I would say that's important.

16         But most importantly is our process going forward

17   with this protective order, because they are -- there are --

18   if we have to get into debating what the protective order

19   means, there's plenty of documents we can use.  I just don't

20   know that that's proper, Your Honor, to put the jury in the

21   position of having to do that.

22         So with that, Your Honor, I'd submit.  I think our

23   papers are clear of what we're seeking, but that's why I

24   thought we needed to have some oral argument on this and

25   discussion with the Court as to where this issue goes.

14

1           THE COURT:  Okay.  Ms. Lundvall.

2           MS. HIGGINBOTHAM:  Your Honor, I'll speak to the

3   protective order.

4           THE COURT:  Oh, Ms. Higginbotham, sorry.

5           MS. HIGGINBOTHAM:  Good morning, Your Honor.

6           THE COURT:  Good morning.

7           MS. HIGGINBOTHAM:  Brian, can you please bring up

8   the protective order, bring up page 4 and page 5.  For the

9   Court's reference, this can be found at Exhibit 1 of Mr.

10  Hyatt's motion.  I think this is where we need to start.  The

11  most important fact of this entire motion has to do with the

12  idea that the FTB has somehow misrepresented the terms of the

13  protective order by stating that there was a mechanism that

14  required each party to provide the other party notice before

15  certain documents could be moved from the litigation to the

16  protest that had been designated as confidential.

17          And to back up, as the Court's well aware, under

18  the protective order each party could designate certain

19  documents as confidential.  That was the party's decision to

20  make.  Mr. Hyatt chose which documents he wanted to have as

21  confidential; we chose ours.

22          But the protective order had a particular mechanism

23  that was set up because of the unique circumstances of this

24  case, with the protest going on simultaneously with the

25  litigation.  And this is the provision.  We did not

15

1   misrepresent this provision.

2          This provision specifically states that, "If an

3   opposing party would like to use specific information that

4   has been designated as confidential in the litigation, that

5   party must give notice to the opposing party and specify the

6   precise confidential information it desires to be submitted

7   to the California tax case."

8          If the opposing party objects to the use of that

9   confidential information, then the party can go and is able

10  to use whatever mechanisms under California law that are

11  available to it.  But the most critical point is the next

12  sentence where it says, "In the event Hyatt does not agree to

13  voluntarily produce the confidential information in the

14  California tax proceeding, the FTB may seek to compel Hyatt

15  to produce the requested information through the issuance and

16  service of an administrative subpoena."

17         Now, quite frankly, Your Honor, I'm not quite clear

18  how it is that by talking about this very language in

19  paragraph 4, which incidentally, was not quoted to you in the

20  motion, it was not quoted to you in the reply, has ever been

21  in any way misrepresented.

22         And quite frankly, the Court's already decided this

23  issue.  On May 7th, right after the cross-examination of

24  Mr. Antolin, this very issue was raised.  We had a long

25  hearing outside of the presence of the jury and Mr. Hutchison

16

1   made two arguments.  And the first was, we misrepresented the

2   terms of the protective order.

3          He stated just like the motion states, that we

4   somehow indicated that we were not able to use California law

5   without Mr. Hyatt's permission.  Well, frankly, that's never

6   been what we've said.  We never said that the protective

7   order precluded us from using a subpoena.

8          We never said that the protective order precluded

9   us from using California law.  What we said is that there was

10  a mechanism set up in the protective order that required us

11  to take these steps prior to going to that particular

12  mechanism, and the Court agreed.

13         On page 10 of our motion we quote -- or of our

14  opposition we quote the Court's exact statement, and that

15  was,  "It doesn't appear to me that the FTB has

16  misrepresented the protective order."  The Court has decided.

17  The Court has interpreted.  The Court has already reached its

18  ruling on this very issue.

19         The second argument made by Mr. Hutchison was that

20  we were trying to litigate the litigation, which is the same

21  argument that we also see in the motion and what Mr. Kula is

22  talking about again today.  But again, the Court already

23  ruled on that.  The Court said, I don't believe that we're

24  litigating the litigation, and the Court's correct; we're

25  not.

17

1      We're not arguing that the protective order itself
2  somehow precluded us from using the mechanisms of the
3  subpoena.  We're not arguing that the way that the protective
4  order was created, or the mechanisms with which we use motion
5  practice and oral arguments and everything else is somehow
6  improper.
7      Simply, what we're stating is the very terms of the
8  protective order set up this system and Mr. Hyatt abused that
9  system, and there's evidence of that abuse.  And that's what
10 we're talking about.  The Court already has stated that we
11 weren't litigating the litigation.
12     And frankly, if this motion is granted and Mr.
13 Hyatt is permitted to do what he's asking the Court to do,
14 that's exactly what we'll be doing.  We'll bring in a whole
15 slew of evidence about motion practice, oral arguments,
16 transcripts, and frankly, what will end up happening is Mr.
17 Bradshaw, Mr. Hutchison, Mr. Kula will all need to become
18 trial witnesses, which is precluded under the Local Rules.
19     Moreover, Commissioner Biggar will have to come in
20 and he'll have to testify about what he was doing and what he
21 thought and what his thought process was.  Now, one of the
22 things that I'd like to make clear is that Mr. Kula makes
23 this indication that we don't need to use this as part of our
24 defense.
25     Well, in all due respect to Mr. Kula, I don't think

18

1   it's his position to tell us what defense we can put up

2   against his claims, that somehow the FTB has -- that somehow

3   the FTB in bad faith has delayed the protest.  This is his

4   issue.  He placed this in front of the Court.

5        He placed this issue of bad faith delay.  The FTB

6   is entitled to a defense to that claim, and our defense is

7   simply this.  There was a protective order.  It contained

8   this mechanism, which the Court has already interpreted.  Mr.

9   Hyatt abused that mechanism, and as a result the protest was

10  delayed.  That's our defense.

11       That's exactly what we stated in our position in

12  the opposition, and as I've already stated, the Court's

13  already ruled on both of the issues that have been presented

14  in the motion, and therefore, I don't believe that we should

15  be here relitigating this very issue again.  And with that,

16  we'll submit.

17       THE COURT:  Well, I have a couple of questions for

18  you, Ms. Higginbotham.

19       MS. HIGGINBOTHAM:  Absolutely.

20       THE COURT:  One of them is, you know, the parties

21  have been -- the attorneys have been involved in this case a

22  lot longer than this Court has.  And it's my understanding

23  that the parties negotiated this protective order, that it

24  took months to do so.

25       MS. HIGGINBOTHAM:  That may be true.  To be

19

1   perfectly frank with Your Honor, I don't think I had

2   graduated from law school at the time the protective order

3   was entered in this case.

4           MR. BRADSHAW:  I was there.  This protective order,

5   we had years of nuclear discovery by Mr. Hyatt against the

6   FTB, and the time came when the FTB started doing discovery

7   against him.  Many, many documents were withheld because they

8   were -- there were claims of confidentiality, proprietary

9   trade secrets and whatnot, and we just couldn't get a thing.

10          And we had motion practice.  Finally, I tendered

11   the first draft of the protective order to try and get this

12   thing moving along.  Much of the protective order was what I

13   proposed, but not the paragraphs that -- or requirements that

14   are at issue right now.

15          That was the plaintiff's provision that the

16   discovery commissioner allowed, that going forward gave them

17   an opportunity to mark, to designate discovery documents they

18   produced, or deposition testimony that was taken, mark it,

19   bringing it under the protection of the protective order.

20          That included most of what was produced by

21   Mr. Hyatt.  As we evolved into the discovery concerning the

22   complaint allegations, things like, I moved to Nevada on

23   September 26th, 1991, thereby changing my residency, well, we

24   wanted to test the truth of that.

25          So we got into things like the Continental Hotel

20

1   and destruction of the records and the Bankruptcy Court, and

2   we got into lots of what we've determined as after acquired

3   facts; by that I mean, what we discovered from him concerning

4   where he truly was, what he was truly doing in the State of

5   California, the substance of that contact in California or

6   Nevada.

7            Well, all of that was cloaked under the protective

8   order.  As Your Honor has seen from Ms. Woodward's December

9   30th, 1999, letter, it's lengthy and in much detail, because

10  the auditor previously had made general requests that were

11  interpreted away, avoided, construed so that things didn't

12  come forward like, where were you, where were you, where were

13  you.

14           The protest officer is a seasoned lawyer and she

15  asked very nitty-gritty questions that finally gets these --

16  aimed at finally getting these responses.  Well, meanwhile we

17  have the protective order.  Mr. Dunn in this litigation is

18  faced with knowledge of all of this after acquired evidence,

19  notes that in the protest Mr. Hyatt's tax attorney, Mr.

20  Coffill, isn't turning that stuff over to the protest

21  officer.

22           There is a Superior Court action, subpoena Superior

23  Court action, Court of Appeal action that the FTB ultimately

24  prevails on for the most part, after we go through this

25  process with the Nevada protective order, and much of that

21

1   was turned over and the after acquired evidence.

2          And if Your Honor was to look at the ultimate

3   decision in the protest you would see how crucial that

4   evidence was.  But it took years to get to and from Superior

5   Court and the Court of Appeal, and this was a multi-stage

6   process.  As more discovery was done and Mr. Dunn realizes

7   there's more of this evidence, he's duty bound to make sure

8   that gets to the protest officer.

9          So then we go through this drill again and again,

10  and this explains the delay.  But although much of the

11  protective order, which is standard, was mine and they agreed

12  -- or the discovery commissioner agreed to much of it, it's

13  not the part that's at issue today.

14         And the delay that they put in issue in this case

15  can only be explained by the FTB having to cope with that

16  process.

17         MS. HIGGINBOTHAM:  And, Your Honor, if I can just

18  add to that.  Again, we're not arguing that the way that the

19  protective order came to be is at issue.  We aren't arguing

20  that Mr. Hyatt -- we aren't going to put those kinds of facts

21  before the jury.  That's not what we're talking about.

22         What we're talking about is the fact that we have

23  this mechanism.  We were required to use it.  If we hadn't,

24  we'd be standing here under contempt of Court for not having

25  followed the protective order.  That's the reality.  We had

22

1   to give notice to the opposing party of the information that
2   we wanted to use in the protest.
3           Mr. Hyatt knew that there was evidence here in the
4   litigation that was relevant.  It had been asked for on
5   numerous occasions, not only from the auditor, but from the
6   protest hearing officer.  FTB reasonably says, this evidence
7   we want to use in the protest.
8           The sentence that is at issue, Mr. Hyatt then had
9   an opportunity, he could voluntarily agree to move that
10  evidence over to the protest hearing officer or he could
11  refuse.  And if he refused, then we had to go through the
12  subpoena process, and that's exactly what happened in this
13  case, several times.
14          I think in fact we had to get to that point three
15  times.  Two times we actually issued subpoenas.  A third time
16  we didn't quite get to that point.  But that's the issue.
17  The issue isn't how the protective order came to be.  It's
18  not what the litigation was underlying it.
19          It wasn't the arguments made by the parties.  It's
20  the fact that we have the protective order and that Mr. Hyatt
21  -- we have this mechanism and that that mechanism was abused,
22  which in part caused the delay that we see in the protest;
23  and that's our defense.
24          THE COURT:  Let me ask you this.  The second
25  question is, you said several times that Mr. Hyatt has abused

23

1   the protective order.  How has he abused the protective

2   order?

3           MS. HIGGINBOTHAM:  Just as I was just explaining,

4   Your Honor.  We have a protective order.  He has documents

5   that he needs to provide to the FTB.  We've made discovery

6   requests.  We've had depositions.  He cloaks all of that

7   under the protective order.  He says all of this is

8   confidential under the Nevada litigation.

9           Well, what happens is that kicks in this provision.

10  Now, FTB on the litigation side knows that there's evidence

11  that's relevant and the perfect examples that Mr. Bradshaw

12  just gave you, which is the Continental Hotel story, we see

13  time after time after time where the auditor had asked, where

14  are you; where are you on September 26th until October 20th.

15          This question was raised over and over and over

16  again.  It was never answered during the course of the audit.

17  Well, here we are now in December of 1999.  Protest hearing

18  officer sends a letter, the very letter Mr. Bradshaw is

19  discussing; says, again, where were you; provide me receipts;

20  provide me documents; tell me where you were living, where

21  your toothbrush was between this time frame.

22          Then we move.  We move on.  We're now in May of

23  2000.  Mr. Hyatt has still not responded to the protest.

24  He's still not responded to the auditor, and then now we have

25  evidence of where he is.  Mr. Kern testifies at his

24

1   deposition, Mr. Hyatt was at the Continental Hotel.  Guess

2   what?  He had cloaked that deposition as confidential under

3   the Nevada protective order.

4         He had not provided it to the FTB.  Now, the FTB is

5   in the position of knowing that there's certain evidence in

6   the litigation that needs to be given to the protest hearing

7   officer, but yet it can't do that until it goes through this

8   process.  And then the process undertakes.

9         Now, they -- I believe if I -- correct me if I'm

10  wrong, but there was some evidence that was then turned over,

11  not shortly thereafter, to the protest hearing officer, but

12  there were several other examples.  For example, the NEC

13  contracts and other things where they had been repeatedly

14  asked for, and then when we told Mr. Hyatt, we get this

15  documentation in litigation.

16        We know it's relevant.  We know it's absolutely

17  important to the protest hearing officer to receive that.  We

18  ask Mr. Hyatt or we tell him, look, this is evidence that we

19  want to use in the protest.  It's relevant to the protest,

20  and now, he has a decision to make.  Is he going to

21  voluntarily turn that over or is he going to force the FTB to

22  go through the administrative protest -- or the

23  administrative subpoena process.

24        Mind you, the administrative subpoena process isn't

25  one of those processes where we just go get a piece of paper

25

1  and that's the end of it.  It's just like anything.  It takes

2  time to go through that process.  And then Mr. Hyatt has the

3  right to oppose that process, which is exactly what he did.

4          So here we have evidence in the litigation.  We

5  want to move it over to the protest, but yet, he now says no,

6  I'm not willing to do that; you go get an administrative

7  subpoena.  That's what we're talking about.  That's what we

8  ended up having to do.

9          We go to get the administrative subpoena.  We then

10 go through litigation, Superior Court of California,

11 California Court of Appeals.  But without that underlying

12 understanding of why it is that the FTB went through this

13 process and how it got to that administrative proceeding in

14 the California courts, the Court has to understand and this

15 needs to be presented to the jury, why it is that the FTB

16 went through the processes it did and why there was some

17 delay that was actually as a result of this mechanism and how

18 it was being used in the course of the litigation.

19          MS. LUNDVALL:  And if I could add to that, Your

20 Honor.  One of the things that the jury will not be asked to

21 decide is whether or not that Mr. Hyatt abused this

22 protective order.  One of the things that we have done is

23 this, and we're trying to give an explanation to the jury as

24 to the length of time it took to resolve the protest.

25          And so to the extent that what the demonstration

26

1   has been already and the Court has ruled admissible is in

2   fact that there was this process in place, the FTB employed

3   this process and it took time for that process, then, to run

4   its course, rather than the allegation, then, that has been

5   placed against us that somehow we weren't doing anything,

6   that we were just sitting there, we were putting this on hold

7   and that we were trying to use this as some type of a

8   coercive tactic against Mr. Hyatt.

9           And so that's where the give and take comes with

10  this, and -- but I -- the thing that -- I guess that from my

11  perspective, that I look at it as, particularly as a trial

12  attorney, is I look at what Mr. Kula has asked the Court to

13  do.  Number one, he's asked the Court to undo two of the

14  previous rulings that you've already made.

15          And now -- and to instruct the jury contrary to

16  those two previous rulings.  That's point number one that

17  he's asking you to do.  The other thing that he's asking you

18  to do is he's asking you to admit a whole bunch of documents

19  as to how this protective order came to be.

20          He's asking you to admit transcripts concerning the

21  arguments on how the protective order came to be.  He's also

22  asking you to admit various rulings, then, by Discovery

23  Commissioner Biggar on how this protective order came to be.

24  And so that's what he is asking for.

25          And it is those two things that we are objecting

27

1  to, is that there should not be a curative instruction,

2  because in effect what the Court would be doing, then, is

3  telling the jury on the issues that I've already ruled upon

4  and have already said is admissible testimony, and there has

5  already been testimony to you, now you have to either

6  disregard it, or as far as somehow that it was wrong in the

7  first place.

8       And so that's what I have the most trouble with,

9  and as he's asking the Court, then, to reverse itself.  The

10 second thing is that by asking to put all of these materials

11 into the record, he's asking in effect for the attorneys to

12 inject themselves as witnesses, and he's also asking

13 discovery commissioner -- Discovery Commissioner Biggar to

14 inject himself, then, as a witness into this litigation, and

15 that we think is inappropriate.

16      THE COURT:  Well, I had some questions for Mr.

17 Kula, too, but I'd like to hear his response.

18      MR. KULA:  Yes, I have several responses.  First,

19 though, I'll -- regarding what Mr. Bradshaw said, I'm not

20 going to debate whether it was mostly his or mostly ours.

21 There was drafts back and forth, and at one -- we even had a

22 telephone conference with Commissioner Biggar before we had a

23 hearing on this.

24      And so some of this language was his suggestion at

25 that telephone conference, which we then put in a draft, a

28

1    final draft of ours, if you (indiscernible) presented to the
2    Court.   Then at the hearing we had a month or two later he
3    then put in more language.   So much of this language -- I
4    think all of this language that we're debating comes from
5    Commissioner Biggar himself.
6            And Ms. Higginbotham points out the language there
7    that talks about seeking Mr. Hyatt's permission.   Obviously,
8    right after that language, paragraph 4, page 5, lines 10 to
9    11, this is exactly what Commissioner Biggar was getting at.
10   This is exactly what Judge Saitta was getting at:
11           "This protective order in no way affects, limits or
12   modifies either parties' respective rights in regard to
13   seeking or opposing an administrative subpoena under
14   California law."   And then there's paragraph 11 on page 7;
15   essentially says, "Nothing in this protective order shall
16   preclude any party to the action," if you can get it in some
17   other manner, i.e., California law.
18           I'm not clear what the FTB is saying, if they're
19   saying they had to wait to go for an administrative subpoena
20   or they didn't have to wait.   But the record of the case is
21   clear, they didn't have to wait to do that.   There's a
22   document already stipulated in evidence in this case,
23   internal FTB document where they knew that.   They're saying,
24   go get the subpoena; we're not going to use this process.
25           So now, they're coming to the Court and saying

29

1  that, no, they had to go through this process.  We shouldn't

2  be debating what the protective order means.  The point --

3  the whole point of this protective order -- and getting back

4  to what Mr. Bradshaw was saying -- is you had two procedures

5  here; the tax protest proceeding and this litigation.

6          And this Court did not want to put itself in a

7  position of saying, hey, anything in this case, yeah, you can

8  go use it in that protest proceeding.  The point was,

9  California has a process.  If those documents are appropriate

10 and there's authority to obtain them for the protest officer,

11 use the California process.

12          The Court did not want to be in a position here of

13 saying what should or shouldn't be used in California.  Let

14 California decide that.  That was the point of the protective

15 order.  And that's consistent with the idea, if you have the

16 right, if Mr. Dunn, whose litigation counsel's been at most

17 proceedings, sees something in this case he thinks is

18 relevant to the protest, where he was a protest officer, they

19 have rights under California law.

20          They can go issue an administrative subpoena.  They

21 can do what they have to do under California law to get those

22 materials.  That's what the Court was trying to do and

23 separate these two proceedings.  So now, the FTB wants to

24 come in and say, well, because we have these separate

25 proceedings and Mr. Hyatt wouldn't let us -- wouldn't

30

1  voluntarily give this information, he's violating -- he's

2  abusing the protective order.

3          Now, we hear maybe they're not going to say he's

4  abusing the protective order.  They've said that in their

5  motion several times.  That was part of their defense, that

6  he's abusing the protective order.  If what they're going to

7  say is, "Well, Your Honor, we asked for his permission; he

8  didn't give it, so then we had the right to use a subpoena

9  and then we went through the subpoena process," that's fine.

10         But they can't say that they had to ask his

11  permission.  They didn't -- that's just not a true statement.

12  It's not a true statement of what was intended in this

13  protective order.  And then if we get into a debate on what

14  happened to the California subpoena, fine, we can go over

15  that -- that portion of it.

16         But -- and Ms. Higginbotham says, well, we don't

17  want to put in all the history of this.  Well, that's what we

18  have to do, then.  If they're going to represent to the

19  jury -- and I would refer the Court to our Exhibit 9 to our

20  motion, which is a transcript from the May 7th testimony of

21  Mr. Antolin, page 99, it's Ms. Lundvall is questioning

22  Mr. Antolin.

23         And the questioning is -- this is what brings this

24  issue to a head.  She starts on line 6:  "And knew that --

25  you understand there was a request" -- answer -- "that had to

31

1    go first to Mr. Hyatt.  Is that right?"  The answer is,

2    witness is putting on the spot, "Yes, or Mr. Hyatt's counsel.

3    I can't remember."  "Or Mr. Hyatt's counsel?"  Answer:

4    "Right."

5           And then the question, "And if in fact they

6    refused, then the FTB could issue, then, an administrative

7    subpoena."  That's what they want to say to this Court, and

8    that's what's wrong.  And Mr. Hutchison objected.  Now,

9    they're saying, Your Honor, you ruled on this, you know,

10   therefore, that's your ruling.  I don't think the Court --

11   your ruling was intended to reach this broad issue.

12          And that's why we're bringing it to the Court's

13   attention, because it does get into litigating the

14   litigation.  Because if they're going to get in -- be able to

15   say this, that that's what they had to do, then we have to be

16   able to cross-examine the witnesses and say, no, you didn't;

17   no, you didn't.

18          In fact, the Court record shows you didn't, and

19   Mr. Dunn was at the hearings of the protest officer -- or at

20   the protective order hearing.  So either it's not in the

21   case, or if it's in the case then we have to be able to fully

22   cross-examine the witnesses and present our side of the case.

23   That's where this issue goes.

24          So that's bottom line, Your Honor.  Our view is

25   that what they did is -- because there's internal documents

32

1    early on where they were going to go -- there was a suggest

2    -- there was a statement to go for administrative subpoena.

3    Then they don't do it for several years.

4           They didn't want to move this along.  They wanted

5    to interpret this protective order in the most cumbersome,

6    inefficient way possible.  They didn't want to go out and get

7    documents.  They could have done it.  And that goes to the

8    issue of was it done in bad faith, the delay, or was there

9    some excuse they had for delay.

10          But it goes right to the delay issue.  There's

11   internal documents that talk about a hold being placed on

12   this case.  And they're going to say, well, we had to use the

13   process here.  We're going to say no, you were intentionally

14   trying to delay it, because you could have gone out and

15   gotten documents through the California process.

16          So it implicates a lot of issues, Your Honor.  And

17   I think we brought it to a head with Mr. Antolin's testimony

18   and we do need guidance from the Court on this.

19          MS. LUNDVALL:  Your Honor --

20          MR. HUTCHISON:  Your Honor, can I just add one

21   point?  Here is the fundamental misrepresentation to the

22   jury, and that's this, that the protective order affected our

23   ability in California, our ability to proceed with the tax

24   proceeding and with the protest.

25          The problem with that statement is, Commissioner

33

1   Biggar disagreed with it, said the opposite.  Judge Saitta
2   disagreed with it, said the opposite, and the protective
3   order itself disagrees with it and says the opposite.  They
4   want to be able to take a document that specifically says,
5   this doesn't affect what the FTB can do in California, and
6   two judges who said it with Mr. Dunn and Mr. Bradshaw sitting
7   there, and then come into the jury and say, this protective
8   order affected what we could do in California.
9           That's the fundamental misrepresentation about
10  what's going on here.  And if it's going to be allowed to
11  come in, then we get to show what Commissioner Biggar said
12  about it.  We get to show what Judge Saitta said about it.
13  We get to show what the language says about it, and now the
14  jury's going to decide what should be a question of law,
15  which is whether or not the protective order affected what
16  the FTB could do in the protest in terms of doing whatever
17  investigation they wanted.
18          The concept is ludicrous, that a Nevada court can
19  order something that will affect the State of California in
20  California in terms of their proceedings, what they can do in
21  California.  Now, if they want to do something in Nevada,
22  like ask for the Nevada documents that are supposed to only
23  supposed to be used for this Nevada litigation, fine, the
24  Nevada court can stop them or put limitations on that.
25          The Nevada court can't stop them from doing

34

1   whatever they want to do in the protest in California.

2   That's the point, Your Honor.

3            MR. BRADSHAW:  Your Honor, the abuse was and the

4   problem, the passage of time was caused by this.  There's

5   this protective order.  The FTB honored it.  Mr. Hyatt

6   cloaked virtually all unfavorable discovery facts that we

7   were able to dig up, he cloaks it under the protective order.

8            When the protest officer makes her information

9   document request he says, no, I can't give you that stuff;

10  it's protected under the Nevada protective order.  When the

11  FTB issues a subpoena, same story, no, he's using the Nevada

12  protective order as a shield.

13           They go to Superior Court, to the Court of Appeal,

14  no, I can't give you that stuff, I won't give you that stuff.

15  My facts that are unfavorable to me are protected under the

16  Nevada protective order.  That's what had to be overcome at

17  great time and expense through the California subpoena

18  Superior Court, Court of Appeal action.  And when it got

19  right up to the last of their 30 days to go to the California

20  Supreme Court, finally they said, okay, here's the truckload

21  of Nevada discovery, protest officer.

22           That took years.  And the -- there were years where

23  the protective order -- where we didn't have a forum to go to

24  the Court under the protective order and that's because we

25  were at the Nevada Supreme Court on writs.  This case was

35

1  dismissed for a while.

2         They made a motion to reconsider that.  It goes

3  back to the Nevada Supreme Court.  It's reinstated except for

4  the negligence and DEC relief causes of action.  And then it

5  goes to the U.S. Supreme Court and it's stayed.  There's no

6  place we can work with the discovery commissioner or Trial

7  Court under that protective order if it's being abused.

8         But meanwhile, the litigation in the Superior

9  Court, the Court of Appeal action, that does grind on.  But

10 all of this takes years and that's how we explain the passage

11 of time or delay in resolving the protest, because of those

12 facts.

13         MR. KULA:  Your Honor, our response to that is,

14 they didn't have to wait for the Nevada protective order.

15 They had the power of subpoena.  If they saw something in

16 this case that they wanted in the -- to use in the protest,

17 they had California subpoena process and whatever process

18 they have in California.

19         So they're going to come in and say, we had to wait

20 -- this -- there are documents that show they put the case --

21 the protest on hold when the case was -- when this case was

22 stayed for periods of time.  Well, why'd they do that?  They

23 didn't want a decision in the protest.

24         They could have used the California process.  Now,

25 they're asking this Court to allow them to say to the jury

36

1  that the protective order prevented them from using the

2  California subpoena during the time the case was stayed.

3  That's just not true.

4          MS. LUNDVALL:  Your Honor, I'm going to offer just

5  one last observation on this particular point and that is

6  this.  This issue was raised during my opening statement and

7  there was no objection made to that opening statement.  Then

8  we get to Mr. Antolin and there is questions by me of

9  Mr. Antolin, and the Court resolved on those questions and

10 allowed me to continue.

11         And then Mr. Hutchison came up and he cross-

12 examined Mr. Antolin in that same topic area.  And I wrote

13 this down in quotes because Mr. Kula argues is this:  "We

14 must be able to cross-examine the FTB's witnesses on this

15 issue."  In other words, they think that our process or

16 procedure for trying to get this information from Mr. Hyatt

17 was flawed.

18         They've got that opportunity for cross-examination.

19 If they call Mr. Dunn as far as to the stand, or when we call

20 Mr. Dunn to the stand, they can ask him those questions.

21 They can make that inquiry just the same as they did with

22 Mr. Antolin.  And so these issues from a procedural process,

23 they're fully protected.

24         There's no need for a curative instruction and

25 there's no need to try to bring in all kinds of judicial

37

1  officers, as well as the proceedings, then, that led to the

2  protective order when, in fact, the only issues are what

3  happened after the protective order was put in place.

4         MR. KULA:  Your Honor, first of all, Ms. Lundvall

5  was very clear in their papers.  They said in the opening

6  statements, we didn't talk about protective order, but we did

7  make an objection right after that.  It gets back to the

8  point, Your Honor, what we would cross-examine him on is that

9  the protective order allowed them under California law to use

10 California law without delay.

11        That -- we'd be debating, then, what the protective

12 order means.  That's a cross-examination.  If that's where we

13 go, that's where we go, but I don't think it's proper.  I

14 think the Court should reaffirm what's already been stated

15 about this protective order so we don't have to go down that

16 road.

17        But if we have to go down that road, that's where

18 we do go down that road.  Mr. Dunn's at the hearing, here's

19 the transcript of Mr. Dunn.  He heard what the judge said,

20 yet I'm going to interpret to say no, I don't have the

21 authority to go right under California law and use a

22 subpoena?  That's where we go with this, Your Honor.

23        So it does get right into litigating the

24 litigation.  And it's easy for them to say, well, we're just

25 going to say this is how we could operate under the

38

1   protective order, and they're going to cross-examine.  But

2   that's the whole point.  That's what we're concerned about.

3          That's what happened to Mr. Antolin's testimony and

4   that's why we brought this to the Court's attention at this

5   time.  So with that I'd submit.  I guess we really didn't

6   need oral argument on this motion, Your Honor.

7          THE COURT:  Now, you tell me.

8          Well, here's the thing.  I think that this jury

9   should not be hearing about the protective order.  The

10  parties shouldn't be calling witnesses.  There shouldn't be

11  any documents examined as a result of this protective order.

12  The Court already addressed that issue titled as litigating

13  the litigation.

14         On the other hand, I don't see that a curative

15  instruction is appropriate at this point in time, given that

16  opening statements were three months ago, somewhere around

17  there, and that the testimony that you cited to a few minutes

18  ago was from, I think you said, a May 7 trial day.

19         I think it's a little late for the Court to try to

20  give a curative instruction.  So to that extent, the -- I

21  suppose the motion's granted in part, and denied in part.

22         MR. KULA:  Thank you, Your Honor.

23         MS. LUNDVALL:  Thank you, Your Honor.

24         THE COURT:  Anything else or should we take about a

25  five-minute break?

214

## CERTIFICATION

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE AUDIO-VISUAL RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

## AFFIRMATION

I AFFIRM THAT THIS TRANSCRIPT DOES NOT CONTAIN THE SOCIAL SECURITY OR TAX IDENTIFICATION NUMBER OF ANY PERSON OR ENTITY.

**Verbatim Digital Reporting, LLC**
**Littleton, CO 80120**
**(303) 798-0890**

_____          11-1-08
Julie Lord, Transcriber                   DATE

# EXHIBIT 2





DISTRICT COURT
CLARK COUNTY, NEVADA
* FILED *

GILBERT P. HYATT,

      Plaintiff,

    vs.

CALIFORNIA STATE FRANCHISE
TAX BOARD,

      Defendant

DEC 16  3 21 PM '08

CASE NO. A-382999

DEPT. NO. X

CLERK OF THE COURT

. . . . . . . . . . . . . . . . . .

**Transcript of Proceedings**

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 41**

MONDAY, JUNE 16, 2008

<u>APPEARANCES:</u>

FOR THE PLAINTIFF:    PETER C. BERNHARD, ESQ.
                      MARK HUTCHISON, ESQ.
                      DONALD J. KULA, ESQ.
                      JENNIFER A. CARVALHO, ESQ.

FOR THE DEFENDANT:    PAT LUNDVALL, ESQ.
                      CARLA B. HIGGINBOTHAM, ESQ.
                      JAMES BRADSHAW, ESQ.

COURT RECORDER:      TRANSCRIPTION BY:

VICTORIA BOYD        VERBATIM DIGITAL REPORTING, LLC
District Court       Littleton, CO 80120
                      (303) 798-0890

Proceedings recorded by audio-visual recording, transcript
produced by transcription service.

1   administrative subpoena.

2          There was litigation in the California courts, the

3   Superior Court.  He didn't like the result there.  Then in fact

4   that he appealed it to the California Court of Appeals.  He

5   didn't like that.

6          And then after the California Court of Appeals issued

7   their order and said he had an obligation to turn them over,

8   then she picks -- she's able to pick them up and starts going

9   through her work.

10          And so from that standpoint, that's the explanation

11   that the FTB has and must be able to offer so as to be able to

12   illustrate then why in fact this passage of time occurred if we

13   take this -- if in fact that the contention by the plaintiffs

14   that is being made at this point in time that there can be no

15   explanation as to how FTB then moved these documents from one

16   side the other side.

17          Like I said, that is directing a verdict then against

18   the FTB on this particular issue, and in my wildest dreams I

19   don't think that the Court envisioned that as part of the order

20   that you issued last week.

21          And the thing that troubles me the most on this is

22   this.  It was in the year 2006 that they raised this issue

23   regarding the delay and somehow that this was part of their

24   delay, their bad-faith (indiscernible).

25          We filed a motion for partial summary judgment on

1  that issue.  That decision was heard in this court in February

2  of '06.  And at that point in time when you denied our motion

3  and said that they could make it part of this case, you also

4  said that our defense obviously was part of this case as well

5  to that.  And that is all within the transcript.

6           Let's move forward was far as a little bit in time.

7  We had massive amounts of pretrial motion practice, and our

8  motion practice always included this explanation as to why in

9  fact that the protest took the time it did to resolve.

10          At no point in time did the plaintiffs file a motion

11  in limine.  At no point in time did they say wait a minute, you

12  can't talk about these issues; wait a minute, that that somehow

13  is foreclosed.

14          We as far as prepared our case, our defense, brought

15  -- you know, prepared witnesses, have identified exhibits.  In

16  fact, Mr. Kula and I have even worked through many of these

17  exhibits that have these references in there and have as far as

18  entered into agreement that we could put these as far as in

19  front of the jury.  All right?

20          So let's move forward then as far as my opening

21  statement that includes a discussion then as to this passage of

22  time and why the passage of time took the time that it did.

23  They did not object as far as to that.

24          During the time that Mr. Antolin was on the witness

25  stand we asked him all of these same issues.  And then in fact

1   that they introduced Mr. Jumelet.  And during the time that

2   Mr. Jumelet says yes, that they should have resolved sooner,

3   and I asked him whether or not that he's ever compared the

4   litigation documents to the protest documents, all of these

5   issues are already in front of as far as the jury.

6          And so at this late stage in the game after they're

7   into this case for almost 10 weeks of trial now to suggest that

8   the most important defense that we have is somehow just wiped

9   away with no as far as discussion as to why it is wiped away,

10  and it comes in the context of a motion that they filed but the

11  Court denied, I -- that's where I'm having a real hard time as

12  far as with this.

13         And that's in fact that why in fact that we wanted to

14  bring this to your attention as a preface then to the

15  discussions as to the objections that they have to

16  Ms. Cinnamon's testimony as it relates to her deposition

17  designations.

18         MR. KULA:  Your Honor, several points.  First of all,

19  Ms. Lundvall and I have talked about protest documents.  I'm

20  the one that's been saying (indiscernible) talk about them you

21  got to put these issues together.  We can't get ahead of

22  ourselves.  Our motion needed to be decided in order to

23  determine what documents would come in and I still feel that

24  way.

25         But let's back up.  The defense the FTB wants to make

1  and can assert and try to make is that they didn't -- they

2  couldn't get documents from Mr. Hyatt.  They're handling the

3  protest.  They think there's documents in the litigation.  They

4  can't get (indiscernible) from him.

5            What they're trying to disguise and hide is that they

6  didn't move and seek subpoenas in a timely fashion and move for

7  this document, so they're trying to blame the protective order

8  in this case.  There's nothing that prevented them from doing

9  that.

10           In fact, Ms. Lundvall mentions the protective order

11  came in late 1999, and there's internal documents showing in

12  2000 the FTB wants documents from the litigation of the

13  protest.  They didn't move for two years.  They didn't make a

14  request for two years for those documents.

15           So if they want to come in and say in 2002 we made a

16  request for those documents and Hyatt wouldn't give them to us,

17  so we had to go to the California court and California Court of

18  Appeals, they can do that.  They can do that.

19           But they're trying to explain their delays by saying

20  -- hey, stand behind the protective order when they were either

21  misinterpreting the protective order or we think even in bad

22  faith using it as a way to delay the litigation.  They did not

23  -- or delay the protest.  Excuse me.  They did not want to push

24  that -- push the protest along.  They did not want to put out a

25  decision in the protest before this jury hears this case.

1          And they've timed it perfectly.  They put a decision

2   out in late last year after we knew the trial date was set in

3   this case knowing that the appeal Mr. Hyatt has will never be

4   heard before this jury decides this case.  So they perfectly

5   timed it.

6          And they want to try to blame all that on the

7   protective order because the real issue is their failure to

8   move timely in the California process using California

9   procedure and the tools they have there because that only gets

10  them, you know, a little bit of time here to say, well,

11  Mr. Hyatt made us go to the Court of Appeal.  That took, you

12  know, X number of months to do that.  So they wanted to cover

13  these other periods by saying we couldn't do it because the

14  protective order wouldn't let us do that.

15         Well, the fact of the matter is they're wrong what

16  the protective order allowed.  And if they're allowed to say

17  that, then that gets back to the issue we brought up.

18         Well, we're going to have to come in and show that

19  they knew they were misinterpreting the protective order.  They

20  had attorneys in court hearings when judicial officers of this

21  Court said what the protective order means and said what they

22  could do in California.

23         So they don't need the protective order.  What the

24  protective order does, it allows them to cover periods of time

25  when they weren't doing anything on the protest and that way

1    they can blame this -- the protective order.  Well, they

2    shouldn't be allowed to do that, Your Honor, so that's the big

3    issue in a nutshell.

4         If we go through, they can make a defense.  It just

5    doesn't cover all the periods of time they want to cover.

6         And by the way, the Court did grant the motion and

7    denied the -- denied the curative relief but granted the motion

8    relative to this litigating litigation where we have to --

9    we're the ones that have to then get into litigating litigation

10   if they're allowed to come in and say, well, here's the

11   protective order, this is how we interpret it, and so,

12   therefore, it's our defense to this.

13        MS. LUNDVALL:  There's one allegation that Mr. Kula

14   made that I cannot let stand as far as without a -- as far as,

15   you know, making our record as far as on this.

16        He contends that somehow that we intentionally timed

17   the resolution of the protest that -- so as to foreclose then

18   any appeal rights that Mr. Hyatt had so that those issues then

19   could not be brought before the attention of this jury.

20        In 2004, Mr. Hyatt sat for the first time for

21   deposition.  He sat for deposition into the year 2005 as well.

22   In 2005, Ms. Jeng sat for the first time for deposition as well

23   as many other people as far as their depositions were taken.

24        Information that was supplied during the course of

25   those depositions was different than what Mr. Hyatt had

1  provided to the protest hearing officer in response then to the

2  protest hearing officer's continuing requests.  And so what you

3  end up with is the exact dilemma that the FTB had under the

4  protective order.

5          Here it knows in litigation and has facts over on

6  this side from them that is coming as late as 2004, 2005, that

7  is different than what he has given to them in the protest, but

8  they can't hear it with the protest hearing officer so that the

9  protest hearing officer can come to the right conclusion.

10          What we had to do was to make the request then of

11 Mr. Hyatt to be able to share and to move that stuff to the

12 other side of the house.  In that particular circumstances, but

13 not before he says fine, go ahead and move it, that was in the

14 spring of 2006.

15          And through the spring of 2006 until the resolution

16 then on this that the original -- I'm thinking it was either

17 September or October as far as that when Ms. Cinnamon then is

18 in the process -- it's July of '07 then when Ms. Cinnamon then

19 is in the process of retiring.  She looks at volumes and

20 volumes and volumes of depositions so as to be able then to

21 come to her resolution then on the protest.  So there is no

22 intentional delay by the FTB concerning this resolution on the

23 protest.

24          And so that is the issue, Your Honor, I can't let

25 stand as far as that type of an allegation for Mr. Kula to make

1  then in front of the Court.

2          MR. KULA:  Your Honor, that is -- that's the point.

3  This Court set the protective order so that the parties

4  wouldn't be using this case to take discovery for the protest.

5  They have their means to take discovery, to do what they needed

6  to do, to call -- they call it the power of examination in

7  California.  They're supposed to be doing that.

8          Now they're saying, well, we had to wait.  We wanted

9  to see what might come up in this case.  You know, we disagree

10  that there's a difference in terms of the testimony and the

11  contradictions and so forth, but then we get into litigating

12  the protest which we certainly don't want to do in terms of

13  what the evidence is there, what the evidence is here.

14          The point is they had the means to proceed in the

15  protest and whatever manner was allowed under California law,

16  and that included subpoenaing any documents that they might

17  come out in this litigation, and they could have done that.

18  They didn't do that.

19          So -- and, by the way, we're talking about there was

20  one -- (indiscernible) 2002 was the first time they raised

21  this, and that process took some time in California, and they

22  can present that.  But if we go down that road, most of the

23  material they sought in that first opinion actually weren't

24  even under the protective order, so then we end up litigating

25  that when these documents were designated under the protective

1  order that were actually produced in the litigation.  So that's

2  another defense we have to present if they're going to get to

3  present whether the protective order causes delay.

4       Then years later there was another request, if you

5  will, under the protective order because there was also a

6  request under California law, so they made these handful of

7  requests.  I think they made three of them.  My point is they

8  can present that.

9       They can say three times we had to ask Mr. Hyatt for

10  information that we wanted to use in the protest.  The first

11  time we had to go through a subpoena process and a court of

12  appeal in California.  The second time we requested X date.  He

13  agreed to give it to us a couple months later.  The third time

14  we requested he, he gave it to us a month or two later.  They

15  can present that, that's what -- that issue of not getting

16  documents from Mr. Hyatt.

17       But they want to say that this case -- they had to

18  wait around for this case, and this case caused more kinds of

19  problems in the protest.  That was exactly the point that

20  Commissioner Biggar and Judge Saitta were trying to avoid in

21  this protective order.  Do what you have to do in California,

22  and we'll do what we do in Nevada and let's move forward.  And

23  they just won't separate them.

24       MS. LUNDVALL:  But this is where --

25       MR. HUTCHISON:  And, Your Honor, that's what we argued

 1  last time.  We're going back to this -- what the representation

 2  was of counsel ten minutes ago or twenty minutes ago.  You

 3  denied our motion.  Of course, that was wrong.  You granted the

 4  motion and you denied the curative instruction.

 5           You granted the motion and said I don't want to hear

 6  anymore about the protective motion.  It shouldn't come up in

 7  front of the jury.  That's what you granted.  There was no need

 8  for a curative instruction as a result of that.

 9           As a result of that, I didn't have Mr. Jumelet

10  address that.  As a result of that we shouldn't now be arguing

11  again this motion again.

12           Counsel has misrepresented what your prior ruling

13  was.  It was not a denial.  It was a granting of the motion

14  after we've all argued these points already for probably an

15  hour at that time.  Now we're going on another hour arguing it

16  again.

17           And you found persuasive the fact that Commissioner

18  Biggar and Judge Saitta was in -- stated in a hearing where

19  half of the people on this side of the room were sitting there

20  listening that this protective order does not affect the rights

21  and remedies and powers that are available to the FTB in

22  California, period.  Now what they want to say is yes it did.

23           Well, you know what?  Then they can just go argue

24  with Commissioner Biggar and Judge Saitta, but the time for

25  arguing about that was long gone.  It shouldn't be argued again

1  here in front of the jury that yes, it did.  We don't care what

2  Saitta said, we don't care what Biggar said, it did cause

3  delay, it did cause us to have to wait for documents.

4        They're just flat-out wrong, and so it's a matter --

5  that's why we brought this to the Court's attention.  This is a

6  matter of law in terms of whether or not they can say we had to

7  wait under the protective order before we sought documents in

8  the protest.  No, they didn't.  Two judicial officers have told

9  them that.

10       And now we're spending 45 more minutes because they

11  didn't like the ruling that you got previously and characterize

12  that you actually denied it when you didn't.  You granted it,

13  and we move on.  We redact, and now we're rearguing the whole

14  issue again, Your Honor.

15       As far as Cody Cinnamon is concerned, I'm real

16  interested to have you listen carefully to the clips that are

17  played.  She said she was ready to go with her decision in 2001

18  or maybe 2002.  I can't remember.  I took her deposition.  But

19  that her bosses kept saying no, we got to wait, we got to wait,

20  we got to wait, and she said I don't know why we don't use our

21  subpoena power.

22       This is a made-up lawyer argument after the fact.

23  It's a made-up lawyer argument after the fact.  From 1996 to

24  1999 they did nothing, and the protective order wasn't in place

25  then.  Nothing, zero.  This is made-up lawyer talk, and they

1    are arguing against what Judge Saitta already ruled and which

2    Commissioner Biggar already ruled and, by the way, what

3    Your Honor has now ruled and granted out motion last week.

4           Now we're arguing all over again because they claim

5    their defense is taken out from under them.  It isn't.

6           Ms. Lundvall in answering your question about how

7    does this effect your response said a whole bunch of things and

8    one part of it was the protective order.  Then she talked about

9    subpoenas and (indiscernible) process and courts of appeals and

10   all that stuff.  Fine, bring that all in.

11          But you can't say that the protective order required

12   you to wait for documents during the course of the

13   investigation.  You had all the powers, all the abilities, all

14   the rights that you normally would have had under California

15   law even if this case didn't exist.

16          And now we're arguing that all over again in an

17   attempt now to -- this is clearly a motion to reconsider based

18   on what you had ruled previously.

19          It's a misconstruction of what you had said last

20   week.  It is absolutely ignoring what Biggar and Saitta said

21   already, and they just are so stubborn they don't want to

22   accept the fact that they got it wrong if they interpreted it

23   that way.

24          And secondly, I think what this is is -- I mean,

25   think about it.  They got to justify 11 years, Your Honor.

1    They got to justify 11 years of a delay.  And now they're just

2    scrambling around.  The lawyers get together and do what

3    lawyers do and think of creative solutions.

4           The problem with that is is it does not comport with

5    either the language of the protective order what two judicial

6    offices who took an awful long time evaluating this as you

7    said, and now we're back to arguing it all over again.

8           MS. LUNDVALL:  Two points in response, Your Honor, and

9    this is exactly the point that I was trying to illustrate.

10          They content that you ruled that we were wrong in our

11   interpretation of the protective order.  They say you ruled

12   last week, we got it wrong, and that is my point.  They take

13   your order from last week and they make it far, far too broad.

14          The Court made no ruling as it related to whose

15   interpretation of the protective order was right or wrong.  You

16   made no ruling on that.

17          The second point is this, is what they're trying to

18   suggest is that FTB should never have complied with the

19   protective order, and what they also want to try to -- they

20   tried to imply with you that we did nothing to resolve

21   Mr. Hyatt's protest through the protest hearing officer, and

22   all we did was to rely then upon the litigation information.

23   That's not accurate.

24          What is accurate is this.  Across this period of 11

25   years there were nine different information documents requests

1   that were sent to Mr. Hyatt, and they were sent at periodic

2   intervals across that period of time.

3         When the first document request response was given by

4   Mr. Hyatt, the protective -- and then it was compared to the

5   information that was being given in the litigation, and guess

6   what, Mr. Hyatt was giving different things in the litigation

7   than he was to the protest hearing officer.

8         And so one by one as each one of those IDRs was sent

9   to Mr. Hyatt and each one was responded to by Mr. Hyatt, it was

10  compared against information that had been received in the

11  litigation.

12        And when there were differences -- in other words,

13  when he tried to say here, protest hearing officer, you get one

14  set of facts, but through the litigation you guys get another

15  set of facts or a different set of facts, what in fact was

16  having to be done is to take and move those set of facts from

17  the litigation over to the protest hearing officer.  That's

18  where the difficulty came in.

19        So we we're continuing to use all of our California

20  processes but by which to determine if those California

21  processes were getting full and complete and truthful responses

22  from Mr. Hyatt we had the opportunity to compare it against

23  what was going on in the litigation.  And guess what?  He

24  wasn't moving everything from the litigation over here.  It was

25  a different set of facts.

1           And so that's why in fact then that the comparison

2    was being made.  And when the comparison was being made -- and

3    that's all as far as they want to suggest that somehow that we

4    made up this argument.

5           They took Bob Dunn's deposition, and they took

6    Mr. Dunn's deposition all the way back I believe it was in

7    2006, 2006 or 2005, and he explained everything that I'm

8    explaining to you right now with excruciating detail, and did

9    they move in limine to say no, can't do that?  No.  Absolutely

10   not.

11          What has happened now is that they got to last week

12   and now they're trying to take your order and making it broader

13   and to suggest that you made rulings that in fact that you

14   didn't make.  That's where our heartache lie with this and our

15   heartburn lies as far as with the way that they were trying to

16   expand then the scope of the Court's order.

17          MR. KULA:  Your Honor, Ms. Lundvall just explained how

18   she would defend this without the protective order.  She said

19   there were nine IDRs submitted and that nine times information

20   wasn't given.

21          Nothing prevents them from having someone come in and

22   say that if they have a witness that will say that.  Of course,

23   the record shows that they didn't issue nine subpoenas

24   afterwards.  They didn't believe that, but they can try to

25   assert that.

1          And there is evidence in the record that Mr. Coffill

2    disputes the idea he wasn't fighting responsive documents.  But

3    if they want to say we have nine IDRs and nine times you didn't

4    give us information -- but the problem is they can't get into

5    specifics because in Ms. Cinnamon's deposition and your court's

6    ruling, we can't into the substance of the protest.

7          We tried to ask Ms. Cinnamon, well, what is it that

8    -- these documents that we're not getting.  What is it?  What

9    do you need?  Well, I can't get into that.  It gets into the

10   analysis of the protest.  So they made this blanket statement.

11   I mean, that's all they can do.

12         MR. HUTCHISON:  (Indiscernible) instructed not to

13   answer.

14         MR. KULA:  Yeah.  Instructed not to answer on that and

15   then similar with this Court's ruling you don't get into

16   substance of the protest.  So if they want to come in and say

17   we sent nine IDRs, we compared nine times and said he didn't

18   produce in the litigation, they can try to present that.  I

19   don't think the record will show that, but that's how they can

20   defend this case because that's really what should be at issue.

21         Why didn't they issue nine subpoenas every time they

22   saw something (indiscernible).  He's not complying.  He won't

23   give it to us.  Let's go issue a subpoena.  That's what --

24   issue in the delay case, and they're trying to use the

25   protective order to cover the fact that they didn't issue

26

1   subpoenas.

2          And this idea of interpretation of the protective

3   order, I think the Court's ruling takes it out of the case.  If

4   we get into the protective order, then we have to get into who

5   was right in interpreting the protective order and were they

6   doing it in bad faith giving they had lawyers sitting in the

7   courtroom listening to the Court.

8          So I think the Court's ruling allows me to defend the

9   case and it takes away what shouldn't be in the case, that is

10  having the jury decide who interpreted the protective order

11  correctly and whether there was violations of it and abuses of

12  it as they were saying last week.

13         So, Your Honor, again, I don't want to keep arguing.

14  I think we're repeating ourselves now.

15         THE COURT:  I think you may be to a certain extent.  I

16  thought that the ruling last week was fairly narrow.  I thought

17  it was pretty clear and straightforward.

18         Obviously, I think the defense has to have the

19  ability to defend on the subject of delay, but I don't think

20  that clarification, if it is a clarification, alters anything

21  about the ruling last week with respect to the protective

22  order.

23         I think this jury need not hear all of the

24  particulars of a protective order that the parties negotiated

25  over months and even years probably.  I don't -- I wasn't even

1   part of that case when the parties were negotiating that

2   protective order.

3        MR. BRADSHAW:  Well, the part at issue was the

4   cramdown.  It was not a negotiation.  It was proposed by them,

5   proposed by them, vigorously opposed by us because the

6   consequence was foreseen.

7        And Biggar said this is what it is, and the Court

8   signed it, and the consequence was unknown I think at the time

9   to Commissioner Biggar and the Court, and now we're seeing it

10  now.

11       What your order was last week was parties should not

12  be calling witnesses.  Well, now they are, and they're just

13  kicking the door wide open to explain the delay, the issues.

14  Was there a bad-faith delay?

15       Well, we should be able to present -- we're following

16  a court order.  How can that be bad faith that we can haggle

17  over the interpretation of it, and I don't think Your Honor

18  wants to hear witnesses interpret it, but I think they get to

19  say the reasons why time passed.  And if it's complying with

20  the protective order and working through its procedures, then

21  that shows good faith.  To not be able to say that deprives us

22  of part of the answer.

23       The issues comes now with Charlene Woodward, a

24  protest officer, who's deposed about why it took so long and

25  whatnot, but then we really get into it with the next protest

1  officer, Cody Cinnamon, because she's working through a process

2  that's mandated by management because management knows from the

3  litigation side there's facts here that Mr. Hyatt's not

4  providing to the protest officer on the protest side.

5          And I'm trying not to repeat myself, but the point is

6  they are now calling witnesses in video deposition and there

7  are -- they want to play the parts for delay that they like or

8  that don't hurt them.

9          For instance, Your Honor saw a lengthy December 30th,

10  1999, information document request, a multipage letter from

11  Charlene Woodward to Eugene Cowan.  They asked for two- or

12  three-month extensions of time, so now we're six more months

13  into the protest because Mr. Hyatt wants more time to respond.

14  That they have in here to present or don't object to it.

15          Then there's a change of protest hearing officers as

16  the months and years go by.  We saw Ms. Jovanovich retires, and

17  then Ms. Woodward is assigned, and then she's reassigned to

18  another area and Ms. Cinnamon is put on the case, and then

19  years march by in part because of these reasons, request for

20  extension of time, change of personnel.

21          The protest hearing officers all -- you've seen it

22  from Ms. Jovanovich, you'll see it from Ms. Woodward, from

23  Ms. Cinnamon, this is not their only case.  They have a

24  workload.  There's statutes of limitations.  They do

25  litigation.  They do Board of Equalization hearings, and then

1    there's deadlines, so those cases get priority.

2            There's refusal to provide information.  It's not

3    relevant.  I don't have it.  You don't need it or they just

4    ignore it.  Meanwhile over here in litigation, we're taking

5    depositions, we're discovering documents, and we know this

6    stuff exists.  It's going to matter over there.

7            And so there's a protocol set up by FTB legal

8    management to work through the protective order and not to make

9    the decision on partial information but to work through the

10   protective order and get full information, all the facts and

11   circumstances to arrive at the (indiscernible).  Now that's the

12   part that they don't want.

13           And if we're not going to call these witnesses, we

14   don't get into the protective order.  But if we call

15   Charlene Woodward, if we call Cody Cinnamon through these video

16   depositions, the door kicked wide open and we have to show why

17   time passed, and a good part of the time passed because of the

18   effect of the protective order and the related protocol to get

19   the facts and circumstances that were relevant.

20           So if we're not going to call these witnesses like

21   the judge -- like Your Honor said, we shouldn't be calling

22   witnesses, okay.  But they want to call these witnesses, and so

23   then we have to have the truth.

24           MS. LUNDVALL:  Well, and then --

25           MR. KULA:  Your Honor --

1           MS. LUNDVALL:  -- from Your Honor, my suggestion would

2   be is I think that the Court's ruling is that we could place

3   this in proper context then when we actually go through the

4   designations that are at issue, and I think then that you will

5   see as far as where -- from that standpoint, and the Court can

6   make a ruling then upon these individual designations.

7           MR. KULA:  Well --

8           THE COURT:  I think we may have to do that, Mr. Kula.

9           MR. KULA:  Yeah.  Your Honor, I just have to address a

10  couple things Mr. Bradshaw said.  It was not a cramdown.  It's

11  language about they can request -- that was Commissioner

12  Biggar.

13          I think it made it into a draft of ours because we

14  had a telephone conference with him, and he said I think there

15  should be something like this in there.  And he's the one that

16  put a lot of this language in there, so it wasn't a cramdown.

17  I mean, it wasn't a cramdown by us.  It was something

18  Commissioner Biggar put in there.

19          But what Cody Cinnamon is going to testify to as we

20  have her designated is what she did in the protest, what was

21  she doing in the protest, not what's going on in terms of the

22  protective order.  That's the whole point.

23          Mr. Bradshaw (indiscernible) another way of trying to

24  argue that they needed the protective order, but as

25  Ms. Lundvall explained there's nine IDRs.  They have to

1   explain, if they're going to claim that he wasn't given

2   documents, why weren't there nine subpoena issued.  That's what

3   they can't answer.

4        So they want this Court to say, well, you didn't have

5   to do that, you know.  If Commissioner Biggar, even though he

6   said that, you know, you didn't have to go issue subpoenas.

7   They can't answer that question unless they have the protective

8   order.  So they're trying to use the protective order to cover

9   the fact they didn't comply with it.

10        So it gets back over to arguing what the protective

11   order is, and I just think it has to be taken out of the case.

12   They can present what happened in the protest.

13        If they want to claim nine times Mr. Hyatt didn't

14   give them documents and we had to keep getting documents from

15   him, we had to go back even in '05 and '07, they can present

16   that, and we can defend that.  We don't have to get into,

17   though, the protective order issue.

18        MS. LUNDVALL:  Well, that's where from our perspective

19   that's why we keep trying to suggest to the Court for us to

20   take a look at the specific designations then so you could

21   place this in context rather than trying to paint with too

22   broad a brush.

23        MR. HUTCHISON:  Your Honor, what they're saying is

24   we -- you know, we are following the Court order.  That's what

25   their defense is or they want it to be a defense.  And then

1    they say but Hyatt can't put on any evidence to say we're not

2    following the Court order.

3            So that's their defense.  We're following the Court

4    order, but we can't put on evidence, for example, Commissioner

5    Biggar, Judge Saitta, that says this is very clearly what the

6    order says and doesn't say.

7            And then we say you're not following the order.  Look

8    what the judges who crafted this and interpreted it has said.

9            That's when Your Honor said it ought to be out.  It's

10   not in for them and out for us.  I mean, it's one way or the

11   other.

12           You know, if it's in for them, then we have to go

13   explain it.  That's what Mr. Kula was talking about all last

14   week, and you said but I don't want to hear about this.  We

15   don't want to have us having to litigate litigation.  You can't

16   say we'll follow the Court order, but then we can't bring in

17   evidence to show that you're not based on what the judicial

18   officers and the record shows.

19           So that's why it should be out for everybody or not,

20   but they want it to be in and out for us.

21           THE COURT:  Let me ask you something.  Are we ready --

22   we have about five minutes before our jury is due.  We need to

23   review these --

24           MR. KULA:  My --

25           THE COURT:  -- transcripts before we can even begin?

1      MR. KULA:  No.  Ms. Woodward's deposition and

2  Ms. (Indiscernible) agree with me that we have designated about

3  an hour and five minutes.  There was a small section where she

4  talked about the protective order.  We've taken that out.  This

5  is really an issue in our mind from Ms. Cinnamon's deposition

6  of some of the documents that are -- would or would not be

7  presented as part of her deposition, so unless Mr. Bradshaw

8  disagrees with me.

9      MS. LUNDVALL:  I think as far as the answer to the

10  Court's question, Ms. Cinnamon's deposition is going to follow

11  the plane of Ms. Woodward's; is that correct?  At least that's

12  what we've been told.

13      MR. KULA:  Is going to -- excuse me?

14      MS. LUNDVALL:  That the plane of Ms. Cinnamon's

15  deposition transcript is going to follow Ms. Woodward's.

16      MR. KULA:  Yes.

17      MS. LUNDVALL:  All right.  So then that means we've

18  got to resolve on the Cinnamon designations, and that's where

19  we were trying to get to the Court then as far as by which to

20  take a look at these and so that you know then what basically

21  the dispute then is as it relates to (indiscernible) between

22  the parties.

23      THE COURT:  Are we ready to go with Woodward?

24      MR. KULA:  Yes.  Unless Mr. Bradshaw tells me

25  something I don't know (indiscernible).

1        MR. BRADSHAW:  No.  I think we are.  I think they

2   begin to opened the door once they are sitting these protest

3   officers one after another to get into the issue of passage of

4   time and resolving the protest.  But if they want to play it,

5   it's ready to go.  We resolved the objections except for the

6   issue of opening the door to a full explanation of the delay.

7        MR. KULA:  I have to address that, Your Honor.  When

8   the Court made a ruling last week it was very clear that the

9   delay issue was in the case.

10       It's not as if the fact that we'll present witnesses

11  -- the protest officers talking about not resolving a protest

12  if you will somewhat opening the door then to getting into the

13  protective order.  I mean, that was part of last week's motion.

14  This -- it's not a new issue here.

15       THE COURT:  I understand.

16       MS. LUNDVALL:  And I think that -- if I understand

17  what the Court's concern is probably, okay, how much do we have

18  ready to go to tee up in front of this jury.

19       THE COURT:  Exactly.

20       MS. LUNDVALL:  So we've got an hour with Ms. Woodward,

21  but no more.

22       THE COURT:  And hour is a start.  That's a good start.

23       MS. LUNDVALL:  That's right.

24       THE COURT:  Monday morning.

25       MR. KULA:  Does the FTB have a separate

1   (indiscernible)?  I don't recall.

2          THE COURT:  Plus, you know, I don't want to keep the

3   jury waiting.

4          MR. BRADSHAW:  May I confer with Mr. Kula on that one

5   issue or protective order (indiscernible)?

6          THE COURT:  Sure.

7                  (Off-record colloquy)

8          MS. LUNDVALL:  Okay.  So it looks like we've got about

9   an hour and 21 minutes then of teed up for this morning, so

10  that's going to take us 'til about 11:20, and then we're going

11  to have to do some work then before the jury would reconvene

12  then.

13         THE COURT:  So maybe we can send them to lunch, and we

14  can work for a half an hour or something, get some lunch

15  ourselves.

16         MR. KULA:  I will say, Your Honor, that the basic

17  issue is this protective order.  We took out about a half hour

18  of testimony which talks about the protective order, and that's

19  what they want to play.  They want to play where there's

20  discussion of the protective order, so it's -- I think it's a

21  singular issue in that sense.

22         MS. LUNDVALL:  Well, and that's where the Court

23  indicated that as far as trying to get into the meat of these

24  designations.  Then you'll understand as far as what we're

25  talking about.

1          MR. KULA:  But my point is that if the Court's allows

2    some of that in which again none of it should come in, then as

3    Mr. Hutchison said we can't be hamstrung.  We have to present

4    our full case in that regard.

5          So to me it's almost all or nothing on this

6    protective order, and again we think it should be nothing

7    because it's going to just go into all kinds of side issues not

8    only with this witness but probably with the other witnesses as

9    well.

10         THE COURT:  Are you talking about the Cinnamon --

11         MR. KULA:  The Cinnamon.  I'm saying that the half

12   hour or so of testimony, and there's not (indiscernible) but

13   it's pretty close in terms of what that covers.  I mean, we've

14   pulled out things that we otherwise would play.

15         If the Court's going to let them talk about the

16   protective order and use that as an excuse, as a defense,

17   because again we also have a defense to that.  It's just that

18   we don't think that's appropriate to get into that as part of

19   litigating the litigation.

20         MS. LUNDVALL:  Now Mr. Kula is trying to suggest to

21   you that let's not go to the designations.  Let's not look at

22   them.  The Court's already said we want to look at them

23   specifically rather than try to make some type of a blanket

24   statement.

25         MR. KULA:  I understand the Court's ruling.  I'm just

1  saying that if we take these piecemeal, you know, we're going

2  to have to bring up other issues.

3          Our interpretation was we're not to talk about the

4  protective order with witnesses and with documents.  That's

5  what we've done.

6          THE COURT:  I'm saying we take a five-minute break --

7          MR. HUTCHISON:  Okay.

8          THE COURT:  -- and bring our --

9          MR. HUTCHISON:  Thank you --

10         THE COURT:  -- jury in.

11         MR. HUTCHISON:  -- Your Honor.

12         MS. LUNDVALL:  Thank you.

13         (Court recessed at 9:58 a.m. until 10:15 a.m.)

14                     (Jury present)

15         THE COURT:  Please be seated, ladies and gentlemen.

16  Good morning, ladies and gentlemen of the jury.

17         THE JURORS:  Good morning.

18         THE COURT:  Still smiling.

19         Counsel stipulate to their presence?

20         MR. HUTCHISON:  Yes, Your.

21         MS. LUNDVALL:  Yes, You Honor.

22         THE COURT:  What's in store today, Mr. Kula?

23         MR. KULA:  Yes.  We call Charlene Woodward.  She'll

24  testify via videotaped deposition.  She was the third FTB

25  protest officer.

1   have done.

2       Q    Well, my question is a little different.   Were you the

3   one who decided that you should forward all of the responses

4   that Mr. Hyatt had provided to you in the protest on to a

5   supervisor of the Hyatt litigation?

6       A    Well, that's what I was directed to do.

7       Q    And Mr. McLaughlin directed you to do that?

8       A    Yes.

9             The deposition testimony of Cody Cinnamon

10                  was concluded at 1:36 p.m.)

11            MR. BRADSHAW:   Okay.   The next portions are at 120,

12   line 18, and go through to 126, line 20.   The plaintiffs have

13   designated portions on among those designations that we would

14   play as a segment to explain this process.   May we go to that

15   portion?

16            THE COURT:   Yes.

17            MR. BRADSHAW:   Okay.   Then that's page 120, line 18,

18   through 126, line 30.

19       (The following videotaped deposition testimony of

20       Cody Cinnamon was played to the Court at 1:37 p.m.)

21   BY MR. HUTCHISON:

22       Q    I think that the protest appeal --

23            THE WITNESS:   I would have been in a position if I

24   were told to go ahead and write the case up based on the

25   information I had, I would have been able to based on the

1  information available made a proposed determination for

2  management to review.

3          MR. BRADSHAW:  120, line 18, that kind of starts with

4  an answer.

5          THE WITNESS:  I would have been in position if I were

6  told to go ahead --

7          MR. BRADSHAW:  128, 18, starts at Mark's question.

8  BY MR. HUTCHISON:

9     Q    I'd like to have you turn to FTB 27972A please and

10  take a look at the entry in the middle of that page which is

11  dated March 15th, 2001.  The subject is Eric Coffill called

12  (indiscernible).  Do you see where I'm at?

13     A    Yes.

14     Q    If you take a look at about the third sentence it

15  states, "He asked me what I thought I would complete the case.

16  I told him that it would not be until after the end of April

17  since he will not be submitting his 1991 letter until then."

18  Can you tell me as you sit here today why it was that you were

19  not able to complete the case.

20          THE WITNESS:  The reason I was not able to complete

21  the case or -- was because I was told I was going to receive

22  additional documents through the protective process order and

23  that I was going to wait for those documents.

24          There were times I believe that management may have

25  thought they would close the case or wait for the additional

1    documents, but I was never told to close the case.  I was told

2    to get the case ready as best as I could to close with what I

3    had.  But in the end, I was instructed to wait for additional

4    documents.  And so I'm still waiting.

5    BY MR. HUTCHISON:

6        Q    So -- okay.  So the reason that you haven't been able

7    to close the case since March 15th, 2001, is because you've

8    been instructed that there will be additional documents coming

9    to you through the protective order process; is that correct?

10       A    Correct.

11       Q    Is there any other reason?

12       A    Well, I explained earlier that once I receive those

13   additional documents there may be some follow-up inquiries.

14       Q    Sure.

15       A    But as I sit here today, no.  I can't think of any

16   other reason.

17       Q    Okay.  Now I'd like to have you take a look at the

18   next sentence that I'll read for you.  "I also said that

19   there's still outstanding information so I could not say when

20   we would finish the case.  He denies that he had not provided

21   all the information I had requested of him.  But I told him

22   that he had not provided all of the items I had requested."

23   Let me follow up on that.

24           From this entry it appears that there was a

25   disagreement between you and Mr. Coffill about whether

1   information had been provided or not.  Is that how you read it

2   as well?

3       A    Yes.

4       Q    And as of March 15th, 2001, and thereafter, what steps

5   did you undertake to follow up to ensure that you received the

6   information that you thought was not provided?

7       A    I believe I explained that earlier.  I made a

8   recommendation to management that we need to pursue the

9   administrative subpoena or subpoena duces tecum of either

10  Mr. Hyatt or third parties, and it was decided that I would

11  wait and receive additional documents through the protective

12  order process, and at that point then I could determine whether

13  there were still additional documents that I still needed.

14      Q    All right.  Ms. Cinnamon, would it be accurate to say

15  that in the absence of somebody at FTB management telling you

16  to wait for documentation that was going to come through the

17  protective order process that you would by now, today, have

18  concluded the protest?

19          MR. BRADSHAW:  Object.  Form.

20          THE WITNESS:  Do I answer?

21          MS. LUNDVALL:  Yes.

22          THE WITNESS:  Probably.

23          (The deposition testimony of Cody Cinnamon

24                  was stopped at 1:44 p.m.)

25          MR. HUTCHISON:  Could we stop here for a second?

1  Could we stop right there for a second?  This passage gets to

2  the heart of the issue.  What is being questioned?

3       Is she saying there that I'm being told that the

4  protective order doesn't allow us to do this?  No.  She's

5  saying that she thinks she can go subpoena documents, but

6  they're telling her to hold, wait for the protective order

7  process.

8       The FTB has come to court and in opening and

9  questioning Mr. Antolin has presented the idea that they had to

10 go and ask Mr. Hyatt's permission.  They had this protective

11 order process, couldn't go subpoena.  That's what prompted our

12 motion because that's a misrepresentation of our protective

13 order and that's the issue that we don't think should be

14 debated in front of the jury.

15      And so that, you know, gets right to the heart of it

16 on this, and so this testimony (indiscernible), no.  That's

17 (indiscernible).  We designated it.  But the Court's ruling was

18 not to get into the protective order.  But if we get into the

19 protective order and we're not debating the meaning of the

20 protective order, then that's a different issue.

21      THE COURT:  I agree.  I think that's succinctly said.

22      What do you think, Ms. Lundvall?

23      MS. LUNDVALL:  This is where as far as the issue

24 becomes is this.  The protective order process -- it was an

25 interesting process because one of the things that was

1   happening was that Mr. Hyatt was producing responses to the

2   IDRs that Ms. Cinnamon was providing.  So she had one group of

3   facts from him, and then there was information that was over

4   here, and they were different facts in the other box.

5            So what do you do then?  What do you when you're a

6   government agency?  You can make decisions based upon the

7   information on one set of facts that a party is providing you

8   but you know that, in fact, there's a different set of facts in

9   the other box because that's what was happening, and so the

10  issue then became is how do we take these litigation documents,

11  and how do we move them over to the protest hearing officer.

12           The protest hearing officer had already issued her

13  IDRs for document requests to Mr. Hyatt and they had already

14  responded.  And, in fact, somebody else was doing the

15  comparison and realizing, hey, he wasn't providing everything

16  that was responsive to her.

17           But that's what we've seen over here, so how do you

18  take it from a government agency perspective then and to say,

19  all right, how do we move it over here.  And what she is saying

20  is this.  If, in fact, that I didn't know that there was

21  another set of facts out there, maybe it would have resolved it

22  by now.

23           But they knew there was another set of facts out

24  there, Your Honor.  They knew that there was additional

25  information, and they knew as far as that additional

1   information that was relevant to the inquiry that was being

2   made.  But Mr. Dunn couldn't whisper as far as in her ear.

3   Why?  Because the protective order process prohibited that.

4           THE COURT:  Let me ask you something.

5           MS. LUNDVALL:  And that's where our difficulty comes

6   into play with this, and from that standpoint we're not getting

7   into the issue as to what the interpretation is of the

8   protective order.  All we're talking about is what the impact

9   was on the FTB trying to do their job.  That's where it is.

10          We're not asking as far as the jury to interpret the

11  protective order.  We're not asking them to resolve Mr. Hyatt's

12  position or the FTB's position.

13          All we're simply asking the jury to do is to

14  recognize that there was something that was unique to this

15  case, and Ms. Cinnamon is trying to tell the jury then what it

16  was that was unique to this case that prevented her then from

17  being able to go forward.  That's all we're asking.

18          So I don't want there to be some kind of assumption

19  that we're going to give an order of the Court to the jury and

20  say here, you guys interpret it.  Absolutely not.  Absolutely

21  not.

22          But what the jury will be asked to do, though, is

23  this, is did in fact the FTB have something that it believed it

24  was supposed to comply with and did it do so in good faith.  Or

25  did, in fact, as it's been alleged and as we've been accused of

1   doing, did we just sit on our hands and do nothing?  Because

2   that's what the accusation has been is that somehow that

3   somebody made a decision don't decide this case so that it

4   won't be to the Board of Equalization then before it's tried

5   before a jury.  That's the assumption that they want to present

6   to this jury.

7          And what we are simply trying to do is to let this

8   jury know that there was something that was unique in this case

9   that prevented them from doing their normal processes.  And

10  that's where we're at, Your Honor.

11         MR. KULA:  Well, Your Honor, first the answer to Ms.

12  Lundvall's question is what is Ms. Cinnamon to do?  She's to do

13  what she wanted to do, issue subpoenas.  She was told not to do

14  that by management.  I have a problem with that.  In fact, I

15  think that's very helpful to us.

16         But what I don't want to hear, we can't hear, we keep

17  getting into this issue is that the FTB was precluded from

18  doing that.  The protective order would not let us issue

19  subpoenas.  We had to go through this process.

20         That's exactly what led to this motion that we filed,

21  Your Honor.  That's what they misrepresented in opening.

22  That's what they represented in questioning Mr. Antolin.

23         So does this witness say that?  No, I don't think she

24  says it.  She actually proves our point.  She was ready to

25  issue subpoenas.

1        THE COURT:  When we discuss the language of this

2   protective order, it was my understanding that plaintiff's

3   position was that FTB could request documents directly from Mr.

4   Hyatt.  If he didn't produce them, then the FTB could subpoena

5   documents.

6        MR. KULA:  No.  They didn't have to wait.  They didn't

7   have to.  They could go to subpoena.  The protective order and

8   the discussions with Commissioner Biggar and Judge Saitta was

9   it doesn't affect California procedure.  If they have subpoena

10  power, they can go subpoena them.

11       And in fact, there's already a document that's

12  stipulated in pretrial, Exhibit 368, where Mr. Dunn talks about

13  this process.  He talks about the fact that under the

14  protective order they can request documents.  But because this

15  is in I think October of 2000.  Because -- and we can put it up

16  if Your Honor would like.

17       Because the case was stayed, because it was being

18  reviewed by the Supreme Court so that process isn't affected so

19  (indiscernible) subpoena.  And he tells (indiscernible) Ms.

20  Cinnamon (indiscernible) to go subpoena documents.  Well, that

21  doesn't happen because internally the FTB doesn't want to do it

22  that way.

23       But they didn't have to ask Mr. Hyatt's permission.

24  That's a misstatement under the protective order.

25       THE COURT:  It was an option, though.

1           MR. KULA:  It was an option.  Absolutely.

2           THE COURT:  It was one of the options, right?

3           MR. KULA:  Absolutely it was an option.

4           THE COURT:  The other option was they could just

5   subpoena the documents on their own.

6           MR. KULA:  Correct.  Correct, Your Honor.  And if they

7   want to make a point that Mr. Hyatt didn't cooperatively give

8   us the documents, they can try to make that point.  We think we

9   have rebuttals to that.

10          It's when they're trying to say Hyatt (indiscernible)

11  the protective order and say we were doing things because the

12  time delay we can show does not relate to these requests.

13  There minimal delays from these requests.

14          In fact, the first request to Mr. Hyatt was in July

15  of 2000 -- 2002, excuse me, and there was an exchange of

16  letters between Mr. Hutchison and former FTB counsel Mr.

17  Leatherwood (phonetic).  Within a month after they issued a

18  subpoena.

19          They want to say we delayed for a month, fine.  The

20  second time (indiscernible) maybe a couple months delay, so

21  there's not that much delay from this request.  That's why they

22  want to use this protective order to sort of shield the longer

23  periods of time when they weren't doing things on the case, and

24  that's when we're saying they're misrepresenting the protective

25  order, hiding behind it.

124

1         MS. LUNDVALL:  Well, from this standpoint I think that

2    the Court has not been fully informed as to what the protective

3    order -- the options that were under the protective order.  Mr.

4    Kula wants to take the position that, well, the protective

5    order allowed them to do whatever they wanted to do under

6    standard California practice, all right?

7         But the second option, though, that was available to

8    the FTB was that if in fact that the FTB knew information from

9    the litigation and wanted to supply it to the protest hearing

10   officer, it could ask Mr. Hyatt's consent.  And if he refused

11   to issue his consent, then an administrative subpoena had to

12   have issued.

13        And, in fact, Mr. Kula is being very deceptive when

14   he suggests, well, that was just a little problem.  Well, in

15   fact that we issued an administrative subpoenas and they said

16   -- we asked for their consent and they said no.  We asked for

17   their consent a number of times.

18        The first time they said no.  And what happened then?

19   We issued administrative subpoenas.  And what did they do?

20   They filed a motion to quash then within the district court.

21   They initiated a whole new process.

22        And then by the time the district court then in

23   California resolves their issues, Mr. Hyatt doesn't like the

24   fact that they are ordered to turn these materials over, that

25   these are relevant pieces of information that is relevant to

1   the resolution of the protest (indiscernible).  And then what

2   happens?  They don't like that order, so they take it up on

3   appeal.

4         The idea that this is just a little problem that

5   consumes about three, three-and-a-half years of time, that's no

6   little problem.  That's no little explanation as far as for a

7   period of time.  And then this happened twice more.

8         And so to the extent that to suggest that somehow

9   that this process was not available to the FTB and that the FTB

10  -- the question that this jury's going to have to ask is

11  whether or not they genuinely believe that this was the process

12  that this was to be employed.  And they asked Ms. Cinnamon

13  those questions.

14        George McLaughlin is going to be here by which to

15  testify.  They can ask George McLaughlin those questions.  Bob

16  Dunn as far as who is also involved in the process, they can

17  ask him those questions.

18        But unless the jury hears what the explanation is for

19  this, then what Mr. Kula is now trying to do is to take away

20  our defense to this so that we can't demonstrate our good

21  faith, and all we're standing here is naked with an allegation

22  of bad faith against us.

23        That's where the issue lies, Your Honor, and that's

24  why that this is such an important issue to this portion of the

25  case then to the FTB.  And then how you can't artificially then

1  just strip it away, especially when we're not asking the jury

2  to make an interpretation of the protective order.

3       MR. KULA:  Your Honor, I think maybe I wasn't very

4  clear.  I've always said I think from the beginning once they

5  issue that administrative subpoena if they want to claim we

6  tried to oppose it and took them months or years, that's fine.

7  That's not part of the protective order process.

8       What I was saying is there was an option the Court

9  just mentioned where you ask for permission or you go to a

10  subpoena.  They did exercise that option the first time.  It

11  took about a month of a delay because they asked for

12  permission, it was denied, then they went to the subpoena

13  process.  So before they got the subpoena process it took an

14  extra month even though they didn't have to do that.  That's

15  what I'm saying it wasn't much delay.

16       But what Ms. Lundvall's saying is they're not

17  interpreting the protective order.  Well, if they're going to

18  come in here and say that they had to take certain steps on the

19  protective order and they couldn't go issue subpoenas because

20  the protective order prevented then from doing that which has

21  been said in this courtroom, then we do have to cross-examine

22  their witnesses, not Ms. Cinnamon because she wasn't the one

23  interpreting it, but the other witnesses.

24       Ms. Lundvall suggests that the protective order

25  didn't mean that.  Mr. Dunn was in the courtroom when

1    Commissioner Biggar made his statements.

2         I mean, is that fair game for cross-examination if

3    he's going to come in here and represent the protective order

4    meaning something other than what the Court said?  I mean,

5    that's what we're trying to avoid.

6         So I don't really have a problem with Ms. Cinnamon,

7    but based on the Court's ruling, we felt we couldn't get under

8    the protective order.  The problem is is when they start trying

9    to put a different meaning or interpretation as we've already

10   heard in opening statements and in questioning Mr. Antolin that

11   the protective order had certain requirements or meanings that

12   it didn't have, and that's what prompted our motion.

13        MS. LUNDVALL:  And, Your Honor, from this standpoint

14   one last comment because you know what, the more I listen to

15   this the more I realize that there's a huge, huge step that has

16   been missing from this whole discussion.

17        Mr. Kula keeps saying, well, they could have just

18   gone ahead and issued an administrative subpoena regardless of

19   what was going on in litigation.  Okay.  So you issue an IDR

20   and, in fact, you get responses back from that IDR, the

21   information document request.

22        And so he says, well, they should have just gone to

23   an administrative subpoena.  Why do they go to an

24   administrative subpoena?  Because they've got to know that

25   there's some kind of a different set of facts over here in the

1  litigation.  That's the step that is missing, the missing link

2  to all of this and what we have been trying to impress upon

3  both the plaintiff as far as is now where we're at with the

4  Court is the idea that we were comparing in contrast.

5        This protest hearing officer wouldn't have had any

6  clue that she didn't get everything from Mr. Hyatt unless she

7  had this litigation process ongoing over here.  And the

8  litigation process is demonstrated that when we held these

9  facts up to each other to mirror, they were not mirror images

10  of each other.

11        There were pieces of information that was shared in

12  the litigation that weren't shared in the protest.  That's

13  where the difficulty lies.  And it's no different than the

14  difficulty we've seen in this case where we've been trying to

15  confine our self to the audit file versus what was in the

16  protest file.

17        If these facts were mirror images of each other, no

18  issue, but they were not mirror images of each other, and

19  that's where in fact that this protest hearing officer never

20  could have independently gone off with this administrative

21  subpoena because she didn't know that there was any issue.

22  That's the problem, and that's the issue that we are trying to

23  be able to explain that both to this Court and ultimately then

24  to this jury.

25        MR. KULA:  Your Honor, first of all, in the opening

1    statement, there was the representation that Mr. Hyatt was

2    preventing the FTB from moving documents from one side to the

3    other side.  That's the representation, that Mr. Hyatt somehow

4    controlled the protective order.

5            But this whole issue of, well, (indiscernible) may

6    not know about the documents.  You just saw Ms. Cinnamon being

7    told there's -- she believes there's documents missing.  She --

8    that's her belief.  Mr. Coffill disagreed with her, disagreed

9    with her on that.

10           She wants to issue a subpoena, but she's being

11   prevented from doing it by management.  So I mean, the point is

12   she knew she could issue a subpoena if she wanted to.

13           And I'd also like to pull up if we could Exhibit 368

14   which has been stipulated in pretrial.  It's a memo from Mr.

15   Dunn talking about telling the protest officer here's

16   documents, you should go subpoena them.

17           I mean, this is in October 2000, so they knew they

18   could go subpoena documents if they wanted to subpoena

19   documents.  Mr. Dunn from the litigation side could tell them

20   the kinds of documents to subpoena, so they were doing that.

21   So coming to this Court and trying to say that they couldn't do

22   that or somehow the protective order didn't mean that, they

23   just can't do that.

24           MS. LUNDVALL:  See, this is where --

25           MR. HUTCHISON:  (Indiscernible).

1          MS. LUNDVALL:  This is where I nearly did chuckle is

2     that there have been documents that have already been

3     stipulated into admission on these very issues, and so why is

4     it now that we are trying to artificially then put -- you know,

5     take some of these things out, especially with the key witness,

6     the key protest hearing officer, who saw this thing through

7     completion?

8          And so to the extent that's where my point is is that

9     there's already been other documents that have made reference

10    then to this process, this procedure.  The parties have

11    stipulated in and, so, therefore, that's why I think it's such

12    an artificial line of demarcation that they're now trying to

13    take with this witness.

14         MR. KULA:  It's not this witness, Your Honor.

15    Pretrial we didn't know the FTB was going to come in and

16    misrepresent what the protective order meant, and that's why

17    the motion was filed.

18         So -- but this is Exhibit 368.  It's a memo from Mr.

19    Dunn (indiscernible) supervisor and again it's October of 2000.

20         If we can just scroll down there a little bit more,

21    John.

22         If we look in the second paragraph under line -- No.

23    2, the protective order, it talks about the protective order

24    outline (indiscernible) because the case is stayed.

25         Then it says -- you go down to the last paragraph,

1   "Please communicate (indiscernible) she needs to request

2   directly from Hyatt her demand, and that's the section they can

3   subpoena all information and documents designated as Hyatt's

4   confidential.  (Indiscernible) says demand these documents.

5          The next page is a list of what should be requested,

6   categories 1, 2, 3.  Fact 2 and 3 are categories that they

7   eventually do subpoena almost two years later.

8          So again, our point is internally is the FTB going to

9   put people on the stand and represent that the protective order

10  prevented them from doing things like just issuing subpoenas?

11  And they can't do that.

12         THE COURT:  You know that's an argument that goes a

13  little beyond what we're talking about right here with respect

14  to this examination and this testimony, and I think that this

15  testimony can come in, and counsel can argue the issues of what

16  counsel would be permitted to argue at a later point in time.

17  I hope everybody agrees that the jury is not here to determine

18  the issues and ramifications of the protective order.

19         MR. KULA:  Absolutely, Your Honor, and I don't want

20  this to be a waiver of somehow if we play Ms. Cinnamon that, oh

21  well, now we have to get into debating what the protective

22  order means because they want to put a witness on the stand to

23  say, well, this is why we told Ms. Cinnamon that because the

24  protective order meant XYZ because then (indiscernible)

25  cross-examination (indiscernible), well, no, it didn't mean

1  that and in-house counsel knew that not to be the case.  That's

2  my concern.

3         THE COURT:  That's one of the reasons why I'm

4  addressing it.  I also realize, Mr. Kula, you may have some

5  areas that you think now are permissible, but my question is

6  given that you understand now what my thought process is, are

7  we to a point where we can que up a portion of this video and

8  bring our jury back in or --

9         MR. KULA:  Well --

10         THE COURT:  Not really.

11         MR. KULA:  We can be pretty close.  We need a few

12  minutes, but there's a couple things we need to resolve because

13  there's a couple documents that Ms. Cinnamon goes over in her

14  deposition that need to be admitted or at least we need to

15  determine if they're going to be admitted that relate to this,

16  particularly now if the Court's going to allow the kind of

17  testimony that Ms. Cinnamon's giving on the protective order.

18         One of them is the protest log that was mentioned in

19  Ms. Woodward's deposition and Ms. Lundvall and I had some

20  discussions on.  With the Court's ruling I need to go back and

21  look at that, but I think the redactions we were suggesting

22  needed to be made.  We have to take a quick look at those.

23         The other exhibit is Exhibit 411, if you could bring

24  up 411.

25         It's E-mails.  The second E-mail we looked -- the

1  second page, but this is the first page.  It's an E-mail

2  (indiscernible) there from Ms. Cinnamon to Mr. McLaughlin in

3  February of 2000.

4           If you could just highlight were it says Eric Coffill

5  there, John.

6           UNIDENTIFIED SPEAKER:  The text?

7           MR. KULA:  Yeah.  The text.  Right there.  See that's

8  -- this is an internal E-mail from the FTB, and it's something

9  Ms. Cinnamon testifies to.  Again, if we're going to get into

10  this issue, then this is a portion that we want to play.  We

11  want to have this admitted and shown to the jury.

12           MS. LUNDVALL:  Matter of fact, Your Honor, I think as

13  far on this conversation that this is one of the exhibits that

14  we knew would come in, and so that there is no issue.

15           The protest log that Mr. Kula is now referencing they

16  -- he and I had resolved what our disputes were regarding

17  redactions.  He had made some suggestion to additional

18  redactions before the Court had made their ruling now, but now

19  that we know what your ruling is, then I would assume that

20  those redactions then do not need to be made.

21           MR. KULA:  No.  Not the ones I suggested, but the ones

22  that the FTB had a suggestion and I didn't agree to their

23  redaction.  I think we still have a dispute over that.

24           MS. LUNDVALL:  Okay.  If you can show me those, let's

25  try to quickly resolve those then so we can get the jury back

## CERTIFICATION

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM
THE AUDIO-VISUAL RECORDING OF THE PROCEEDINGS IN THE ABOVE-
ENTITLED MATTER.

## AFFIRMATION

I AFFIRM THAT THIS TRANSCRIPT DOES NOT CONTAIN THE SOCIAL
SECURITY OR TAX IDENTIFICATION NUMBER OF ANY PERSON OR
ENTITY.

**Verbatim Digital Reporting, LLC**
**Littleton, CO 80120**
**(303) 798-0890**

_____        _____
Michele Phelps, Transcriber                              DATE

11-13-08

# EXHIBIT 3

FILED IN OPEN COURT
_____ 7008 _____ 20 ___

CHARLES J. SHORT
CLERK OF THE COURT

BY TERI BRAEGELMANN _____
DEPUTY

1  **MOT**
Mark A. Hutchison (4639)
2  Hutchison & Steffen
10080 Alta Drive
3  Suite 200
Las Vegas, NV 89145
4  (702) 385-2500

5  Peter C. Bernhard (734)
Bullivant Houser Bailey PC
6  3883 Howard Hughes Pkwy., Ste. 550
Las Vegas, NV 89169
7  Telephone:    (702) 669-3600
Attorneys for Plaintiff Gilbert P. Hyatt

8

9                          **DISTRICT COURT**

10                     **CLARK COUNTY, NEVADA**

11

GILBERT P. HYATT,                        | Case No.: A382999
12
        Plaintiffs,                      | Dept. No.: X
13
        v.
14
FRANCHISE TAX BOARD OF THE STATE         | **MOTION TO CURE IMPROPER**
15  OF CALIFORNIA, and DOES 1-100 inclusive, | **STATEMENTS BY FTB COUNSEL DURING**
                                         | **OPENING STATEMENTS CONCERNING**
16      Defendants.                      | **HYATT ALLEGEDLY ERECTING A**
                                         | **"WALL" BETWEEN THIS CASE AND THE**
17                                       | **CALIFORNIA TAX PROCEEDINGS AND**
                                         | **THEREBY VIOLATING THE COURT'S**
18                                       | **ORDER PROHIBITING THE PARTIES**
                                         | **FROM "LITIGATING THE LITIGATION"**
19

20                                       **Date of Hearing:**
                                         **Time of Hearing:**
21
                                         **(filed under seal by order of the Discovery**
22                                       **Commissioner dated February 22, 1999)**

23

24

25

26

27

28

64847-0001/LEGAL14239552.5                      0

ER 160

## 1.    Issues presented:

This motion presents two related issues:

**Issue No. 1**: *Misrepresentation regarding the Protective Order.*  During its Opening Statement and subsequently during cross-examination of witnesses counsel for Defendant FTB has asserted that this Court's "Protective Order"[1] required the FTB to seek Hyatt's permission to obtain documents before the FTB could issue an administrative subpoena in the California tax proceedings for any of the materials designated under the Protective Order.  Hyatt vehemently disagrees with the FTB's interpretation of the Protective Order, which specifically provided that it did not "affect[], limit[], or modif[y]" the FTB's rights in regard administrative subpoenas under California law.

Should the FTB be allowed to "litigate the litigation" and argue its tortured and erroneous interpretation of this Court's Protective Order to the jury as a defense to the 11 year deal in the protests?  If so, is Hyatt entitled to introduce into evidence (i) the Protective Order, (ii) the hearing transcript during which the Discovery Commissioner crafted the Protective Order, which contradicts the FTB's interpretation, (iii) the briefings of the parties upon which the Discovery Commissioner based his ruling that further demonstrate that the FTB's interpretation is wrong, and (iv) the decision of the Nevada Supreme Court rejecting the FTB's request for writ relief relative to the Protective Order?

**Issue No. 2:** *Relief for the FTB's "wall" demonstration.*  In the FTB's Opening Statement, FTB counsel stated that Hyatt put up a "wall" between this case and the California tax proceedings and gave a physical demonstration of the asserted "wall."  The demonstration was based on the FTB's misrepresentation of the requirements of the Protective Order.

What is the appropriate remedy for the FTB's attempt to "litigate the litigation" by blaming Hyatt for the Protective Order entered in this case?

---

[1] The Protective Order in this case was entered by the Court as a formal order on December 27, 1999.  A true and correct copy of the Protective Order is attached hereto as Exhibit 1.

3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

## 2.     Summary of argument.

**Issue No. 1:** *The FTB must not be allowed to argue its erroneous misrepresentation of the terms of the Protective Order to the jury.*

It is highly improper and prejudicial to allow the FTB to argue and present to the jury its erroneous interpretation of the Protective Order.  In that regard, the Court, not the jury, interprets this Court's own orders.  The jury should not be asked whether the FTB correctly interpreted the terms of the Protective Order.

Moreover, the FTB is misrepresenting explicit terms of the Protective Order.  As is described in more detail below, in 1999 when discovery was first being conducted in this case, the FTB argued for a "California" protective order based on California law that allowed the FTB to freely share and use information obtained in this litigation for other purposes, including the California tax protest proceedings.  The Discovery Commissioner refused to allow this Court to inject itself into the California tax protest proceedings by providing any ruling, either way, as to whether information and documents obtained in this case were proper for the tax protest proceeding.  In other words, the FTB wanted to use this case to take discovery for the tax protest proceedings, and the Discovery Commissioner would not allow it.

Similarly, the Discovery Commissioner did not want this case to hinder or limit the FTB's rights in the California tax protest proceedings, nor did he believe this Court had any authority or jurisdiction to make any ruling that affected the tax protest proceedings.  In that regard, the Protective Order crafted by the Discovery Commissioner made clear that whatever rights the FTB had in the California tax protest proceeding were unaffected by the Protective Order.

In sum, the Discovery Commissioner determined that the FTB could not use material (documents, deposition transcripts, and so forth) designated as confidential under the Protective Order, for use in the tax protest proceeding.  Rather, the FTB had to employ whatever means available under California law to obtain such confidential material produced during discovery in this case.  The plain language of the Protective Order contradicts the FTB's asserted interpretation — that the FTB was *required* to ask Hyatt's permission before seeking in

3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

1   California the confidential materials from this case.  The Protective Order clearly states that it in

2   no way limited the FTB's rights under California law and in no way limited use of information

3   designated under the Protective Order that had been obtained lawfully in some other manner.

4   Indeed, the Protective Order unambiguously provides that the FTB may use whatever means

5   available under California law to obtain the same confidential material produced in this case

6   under the Protective Order.

7        The FTB attempts to use its erroneous "interpretation" of the Protective Order as a

8   defense to its 11-year bad faith delay and refusal to decide the protests.  The Protective Order in

9   this case was crafted by former Discovery Commissioner Biggar in a hearing on November 9,

10  1999, and entered by the Court as a formal order on December 27, 1999.  As described below, it

11  took the parties and the Court *over eight months* during 1999 to resolve the dispute over what

12  form the Protective Order should take.

13       The clear record from the briefings on the motion in 1999 that resulted in entry of the

14  Protective Order, and *most significantly* the transcript from the hearing on the Protective Order

15  motion on November 9, 1999, directly refutes the FTB's asserted interpretation.  There was

16  simply no limit placed on the FTB by the Protective Order relative to its rights under California

17  law, nor could there have been.  This Court had no jurisdiction to limit or affect the tax protest

18  proceedings.  The FTB must therefore not be allowed to state, suggest, or argue that Hyatt put

19  up a "wall" between this case and the tax protest proceedings as a result of the Protective Order.

20       The FTB has never accepted this Court's ruling on the Protective Order.  The FTB

21  unsuccessfully sought writ relief regarding the Protective Order in 2000.  Subsequently, former

22  FTB lead counsel, Felix Leatherwood of the California Attorney General's office, repeatedly

23  made disparaging remarks about the order even saying he had "contempt" for it.[2]

24       Now the FTB is attempting to have the jury in this case decide whether the Protective

25  Order, through Hyatt's adherence to its provisions, is a defense to the FTB's 11-year delay in the

26  protests.  More specifically, the FTB seeks to blame Hyatt for the Protective Order, claiming he

27

28  [2] *See* H. Schlindwein Depo., pp. 163-164, 173-175, attached hereto as Exhibit 2.

3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

1   used it to put up a "wall" between this case and the tax protest proceedings.  What the FTB is

2   attempting to do is have the jury find that this Court's Protective Order was wrongly decided and

3   thereby lead to the 11-plus-year delay because of the constraints found within the terms of the

4   Protective Order.

5          This is a wholly inappropriate attempt by the FTB to litigate the litigation, is highly

6   prejudicial to Hyatt, and is an attempt to mislead the jury.  The FTB must be ordered not to do

7   so.  On the other hand, if the FTB is allowed to argue its interpretation of the Protective Order to

8   the jury, Hyatt must be able to fully rebut the FTB's assertion by introducing not only the

9   Protective Order but the relevant "extrinsic" evidence, in particular the Discovery

10  Commissioner's comments during the hearing at which he crafted the terms of the protective

11  order.

12

13         **Issue No. 2:**  *To remedy the FTB's improper demonstration of a "wall" during Opening*

14  *Statement a curative instruction must be given and Hyatt must be allowed to introduce into*

15  *evidence the Protective Order as a trial exhibit and cross-examine FTB witnesses regarding its*

16  *terms, which contradict FTB assertion that Hyatt put a "wall" between this case and the tax*

17  *proceedings.*

18         Absent appropriate corrective measures by the Court, Hyatt is in the position of having

19  to rebut the FTB's claim that Hyatt put a "wall" between the two proceedings by following the

20  terms of this Court's Protective Order.  Using a court order as evidence against a party is in

21  direct violation of the Court's order and fair trial practice that forbid a party from "litigating the

22  litigation."  To rebut the FTB's statements that Hyatt put up a "wall" between the two

23  proceedings Hyatt must be allowed to admit the Protective Order, show its terms, which

24  contradict the FTB's statements, and cross-examine the FTB's witnesses on the terms of the

25  Protective Order.

26         Moreover, the Protective Order limited materials designated as confidential to use in this

27  case only.  The Court must instruct the jury that such orders are typical in litigation involving

28

3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

1   confidential material, and that Hyatt's compliance with and insistence on enforcement of the

2   Court's order is not wrongful and cannot be used against him.

3          Hyatt therefore seeks an instruction from the Court to the jury that the FTB's reference to

4   a "wall" put up by Hyatt between this case and the California tax protest proceedings was

5   inaccurate, an improper reference by the FTB that must be disregarded, and that the Court, not

6   Hyatt, put limits on the use of information obtained by the parties in this case, and the fact that

7   the Court did so is not something that can be held against either party, particularly Hyatt.

8   Further, Hyatt must be allowed to cross-examine the FTB witnesses regarding the FTB's

9   implementation of its own internal "ethical wall" (per Mr. Cowan's trial testimony) and that this

10  was an internal decision of the FTB, not something Hyatt required as FTB counsel has argued to

11  the jury.

12         Hyatt requests that the Court grant this motion forthwith and so instruct the jury and

13  allow Hyatt to begin cross-examining FTB witnesses relative to its internal decisions to erect an

14  ethical wall.

15  **3.   Argument.**

16     **A.  The FTB should not be allowed to argue to the jury the meaning, scope, and
            application of the Protective Order, and in particular that Hyatt used it to erect a
17          "wall."**

18         By seeking to excuse its 11-year delay in the protests on the Protective Order and Hyatt's

19  adherence to the Protective order, the FTB improperly seeks to litigate a pretrial procedural

20  issue from this litigation.  The specific issue the FTB wants to re-litigate with the jury is the

21  Court's decision, initially made by Discovery Commissioner Biggar and then approved by this

22  Court and not disturbed by the Nevada Supreme Court, that the parties in this case could not use

23  this case as a discovery vehicle for the California tax proceedings.  Instead, the use of

24  information obtained during discovery by either party must relate to this case only.  It is

25  completely improper and highly and very prejudicial to Hyatt for the FTB to now attempt to

26  make a trial issue the terms of the Protective Order.  Moreover, its assertion that Hyatt, through

27  the Protective Order, erected a "wall" between this case and the protest proceedings

28

3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

1   misconstrues and misrepresents the Protective Order. In fact, the explicit terms of the Protective

2   Order provides that the FTB is free to use whatever means are available to it in California to

3   obtain the same information for use in the protests. The Protective Order in no way *restricted*

4   the FTB from proceeding as it normally would in any other protest.

5        As set forth in more detail below, materials obtained in this case under the Protective

6   Order could be used only in this case (as is typical in protective orders) unless approved by the

7   opposing party *or legally obtained in some other manner, i.e., through the means available to*

8   *the FTB in the California tax protest proceedings*. The Protective Order specifically

9   recognized that the FTB had administrative subpoena powers in California and could use those

10   to obtain materials designated confidential under the Protective Order, if appropriate under

11   California law. In short, California law would determine what materials and information the

12   FTB could obtain and use in the tax protest proceedings, not this Court or its ruling on the

13   Protective Order. For the FTB now to argue that Hyatt created a "wall" is wrong. For Hyatt to

14   rebut it before the jury requires a full examination of the terms of the Protective Order, the

15   briefings and arguments of counsel leading to the Protective Order, any statements of the

16   Discovery Commissioner at the hearing during which he crafted the Protective Order and where

17   FTG counsel was present.

18
19   **B. The Protective Order did not limit, alter, or reduce the FTB's rights under California law relative to the tax proceedings.**

20        The Protective Order entered in this case, as is typical for protective orders, limits use of

21   information obtained under the Protective Order to this case. It provides:

22        The FTB and its attorneys shall not use Hyatt Confidential Information and
23        Hyatt and his attorneys shall not use FTB Confidential Information in any
24        manner whatsoever except solely for discovery and preparation of
        discovery, preparation for trial, trial, and any appeals related to this
25        Action.[3]

26
27
28   [3] Protective Order, p. 4, lns. 17-20, attached hereto as Exhibit 1.

3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

1   There are specific provisions in the Protective Order that make unambiguously clear that

2   the order was strictly neutral, not giving the FTB any more rights relative to the tax proceeding

3   nor limiting any of its rights in the tax proceeding.  The Court and Discovery Commissioner

4   tried hard, and succeeded, in keeping the two proceedings separate.  This case does not provide

5   any additional rights or limitations in regard to the California tax proceedings.  This is reflected

6   most obviously in two provisions of the Protective Order.  The first provision states:

7   *This Protective Order in no way affects, limits, or modifies either parties'*
8   *respective rights in regard to seeking or opposing an administrative*
    *Subpoena under California law.*[4]

9   The second provision states:

10  *Nothing in this Protective Order shall preclude any Party to the Action,*
11  *its attorneys, or any other person from disclosing or using, in any*
12  *manner or for any purpose, any information or documents not obtained*
13  *in discovery from the producing Party in this action, if such information*
14  *was lawfully obtained, even though the same information or documents*
    *may have been produced in discovery in this action and designated as*
15  *Confidential Information.*[5]

16      In sum, the Protective Order specifically provides that the FTB can seek and use in other

17  proceedings any information or materials designated confidential under the Protective Order if

18  that information or materials were lawfully obtained in some manner other than production in

19  discovery in this case.  In other words, nothing prevented the FTB from issuing an

20  administrative subpoena in the protest proceedings whenever it wished.  The FTB did not need

21  Hyatt's permission to pursue administrative subpoenas in California if it wanted information for

22  the tax protest proceedings.  The FTB's argument of the erection of a "wall" and that it needed to

23  get Hyatt's permission are belied by the explicit terms of the Protective Order.

24

25

26

27  [4] The Protective Order, p. 5, lns. 10-11, attached hereto as Exhibit 1.

28  [5] *Id*, at p. 7, lns. 11-15.

3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

**C. The briefings of the parties and the hearing transcript from 1999 refute the FTB's assertion that Hyatt put up a "wall" between this case and the tax proceedings.**

In the briefing for the motion in 1999 that resulted in entry of the Protective Order, the FTB explicitly argued for an order based on California law that would specifically allow the FTB to use discovery materials from this case in the tax protest proceedings.[6] Hyatt, on the other hand, requested a neutral order that would not have this Court decide what material can be used by the parties in the California tax protest proceedings and would require this case and the tax protest proceedings to proceed as if on separate tracks, which in fact was the case.[7] That motion was preceded by months of back-and-forth discussions and negotiations, during which the FTB was inflexible regarding its proposed "California" protective order, while Hyatt in turn made various proposals trying to address FTB concerns.[8]

The Discovery Commissioner decided that the protective order should be governed by Nevada law and should limit use of the materials obtained during discovery to this case, as is typical with protective orders. The Discovery Commissioner also explained that this Court does not want to determine what is and is not appropriate for use in the California tax protest proceedings, nor did this Court want to limit or interfere with the FTB's rights in the tax protest proceedings. Indeed, during the November 9, 1999 hearing, FTB counsel inquired of the Discovery Commissioner of these very terms and expressed understanding that the FTB could pursue an administrative order in the California tax protest proceedings to obtain materials designated under the Protective Order:

> MR. BRADSHAW: Okay, now, I think it does tend to restrict somehow
> flow of information from the defense team to the protest officer as to

---

[6] *See* FTB Reply re 1999 motion, at 7-9, 15-18, attached hereto as Exhibit 3; *see* FTB proposed protective order in 1999 attached to letter dated July 8, 1999, both of which are attached hereto as Exhibit 4.

[7] *See* Hyatt Opposition re 1999 motion, at 1, 8, and 11, attached hereto as Exhibit 5; *see also Second Errata*, attaching Hyatt's draft protective order, attached hereto as Exhibit 6.

[8] *See* May 17, 1999 letter from Hyatt counsel with proposed protective order, July 8, 1999 letter from FTB counsel with proposed protective order; August 24, 1999 facsimile from Hyatt's counsel with proposed revised protective order, collectively attached hereto as Exhibit 7.

3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

information designated as confidential by Hyatt without following these procedures, that's either get his agreement *or some sort of administrative order*. Perhaps it' s misunderstanding of the logistics or the system, but this protest officer a staff attorney just like the staff attorney that we all report to.

COMMISSIONER BIGGAR: What does the protest officer do? I've had this question for weeks.[9]

. . .

[*The Discovery Commissioner and Mr. Bradshaw then had a lengthy discussion regarding the role of the protest officer in which the Discovery Commissioner questioned how Ms. Jovanovich was a "bird for all seasons" and how she was judging herself given her role in the audit and then role as protest officer. But this discussion does not relate to the issue initially raised by Mr. Bradshaw and therefore returned to this issue he raised.*][10]

. . .

COMMISSIONER BIGGAR: That's not the way I understood it, Mr. Bradshaw. I always understood it that you had some lower level would make a decision on something and then if there is going to be some genuine kind of administrative review that it would go to somebody different, not the person who made the initial evaluation.

MR. BRADSHAW: They have hammered and hammered that this is not an administrative review.  Technically this is an investigation still. He gets to present more evidence. They get to gather more evidence. The protest officer, who's a lawyer, gets to make a determination, independent from the auditor or back up what the auditor did, but that's not the point. ***The point is I believe, I' m trying to understand what the constraints are on sharing information with my client, and it's not clear to me from this*** because I'm dealing with an in-house legal office with an attorney who I report to who is in the same facility as the protest officer who may have a common supervisor and chain of command.  I just want to know what the restriction

---

[9] November 9, 1999 hearing transcript, at 20:2 – 14, attached hereto as Exhibit 8.

[10] *Id.*, at 20:15 – 22:12.

3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

1   is on my client dealing with the information that we have in our

2   investigation and discovery.

3   MR. KULA: Your Honor, I think that is addressed in the order.

4   COMMISSIONER BIGGAR: Well, I think it is too. *I don't know what*

5   *more I can explain other than the language of the order.*

6   MR. BRADSHAW: Okay, we will move on from that then I guess.[11]

7                                   . . .

8

9   MR. BRADSHAW: Okay, and the last concerns I can think of at the

10   moment paragraphs 16 and 18 purports to keep the Court involved in the

11   California administrative proceeding.  Who knows if it will be wrapped up

12   before this litigation.  Paragraphs 16 and 18 purport to maintain this after

13   the conclusion of the action of the subject nature, maintains jurisdiction to

14   enforce its provisions.  *I can see where that will go, if Hyatt doesn't like*

15   *what is requested in the administrative proceedings or what is put before*

16   *the Board of Equalization Appeals that he will come running back to the*

17   *Nevada court to interfere with those processes.*

18   COMMISSIONER BIGGAR: Well, the confidentiality order that will be

19   enforced in this case applies during this case.  A breach of the

20   confidentiality order of this case would be a breach whether it's now or

21   later, it would seem to me.  *It seems to me that any information and I*

22   *think the order at least does not interfere with the fact that any*

23   *information which is allowed in the California proceeding, in the tax*

24   *proceeding in particular, you know, that is allowed by the Court in that*

25   *proceeding, that's up to them, and any arguments addressing*

26   *confidentiality can be addressed at that point in time to that Court. I'm*

27   *not pertaining to — I don't think the Court would, the judge is trying to*

28   *tie the hands of the California proceeding in any manner.* It's just that if

there is a violation of this order, just simply because this case is now settled

doesn't mean that any confidential information, truly confidential

information that you have received in this case can then be disseminated,

---

[11] *Id.*, at 22:13 – 23:11.

3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

1    and that seems to me to be perfectly sensible, *so I don I t think it's any*
2    *kind of a restriction*.

3    MR. BRADSHAW: Okay, that clarifies things.[12]

4    **D. The FTB has misrepresented the terms of the protective order to the jury and**
5    **should not be allowed to continue to do so.**

6    First, the FTB should not be permitted to blame Hyatt for the terms of the Protective

7    Order. That is "litigating the litigation."

8    But even if allowed to address the Protective Order as part of its defense, the FTB

9    certainly must not be allowed to misrepresent the terms, as it has in arguing that the Protective

10   Order required the FTB to obtain Mr. Hyatt's permission before using documents designated

11   under the Protective Order in the tax protest proceedings. What the FTB intentionally neglects

12   to explain as part of its attempt to blame Hyatt is that the plain language of the Protective Order

13   (as acknowledged by the FTB's own counsel at the hearing) and the comments of the Discovery

14   Commissioner in crafting the Protective Order provide that the FTB was free to use whatever

15   means available to it under California law to obtain that same material for the tax protest

16   proceedings. The need not wait to ask and then receive Mr. Hyatt's permission, but rather could

17   have, and would have if it really wanted to proceed with the protests, issued an administrative

18   subpoena in California for any material it sought to obtain in the tax protest proceedings.

19   The FTB now wants to blame Hyatt, at least in part, for its 11-year delay on its

20   obligation — imposed by court order — by saying it had to wait to ask Hyatt's permission for

21   material that it could and should have sought without delay via an administrative subpoena in

22   California. Ultimately, the FTB did seek and serve on Hyatt at least two administrative

23   subpoenas. It may be fair game for the FTB to assert that Hyatt opposed one of the

24   administrative subpoenas (the record will ultimately show that this caused minimal if any delay

25   in the tax protest proceedings). But it is absolutely improper and highly and unfairly prejudicial

26   to Hyatt for the FTB to argue to the jury that the Protective Order, in particular the provisions

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [12] *Id.*, at 25:22 – 27:10.

3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

1   not allowing the FTB use this case to take discovery for the tax protest proceedings, allowed

2   Hyatt to erect a "wall" because the FTB was required to seek Hyatt's permission under the

3   Protective Order to use materials designated confidential thereunder. The FTB was not required

4   to do so. Instead it could have, and did later, seek the information via an administrative

5   subpoena in the tax protest proceedings.

6        The FTB cannot blame Hyatt for the FTB's own internal decisions not to immediately

7   seek administrative subpoenas, but rather first seek permission from Hyatt. If the FTB truly was

8   intent and motivated to resolve the tax protest proceedings in a timely manner, and independent

9   of this case, it would have proceeded as it did in any other case and used means available to it

10   under California law. But the FTB was not motivated to resolve the protests. In fact, the FTB

11   never accepted this Court's ruling that this case could not be used to obtain *"free"* discovery for

12   use in the tax protest proceedings. The documentary record is clear that the FTB took every

13   opportunity to delay and put a *"hold"* on the protests anytime this case was stayed because of

14   appeals or motion practice. The FTB did not issue a decision in the tax protest proceedings

15   sufficiently in advance of this case, so Hyatt's appeal to a more neutral body, the State Board of

16   Equalization (the "SBE"), could have been heard and decided before this trial. The FTB no

17   doubt feared an adverse decision by the SBE would be difficult evidence to explain to the jury at

18   trial — just as it would have been difficult to explain to the jury in this trial why no decision had

19   been made in the tax protest proceedings.

20        The FTB therefore delayed its decision in the tax protests until November 1, 2007,

21   knowing that the Court had set the trial for April 14, 2008. This meant that Hyatt's appeal to the

22   SBE could not realistically be heard and decided before this case concluded. In this regard the

23   FTB has succeeded with its strategy. But it cannot now manufacture an excuse for the delay by

24   misrepresenting to the jury the terms of the Protective Order.

25        Indeed, the Protective Order should not be an issue at the trial. Interpreting a protective

26   order is not the province of the jury. Hyatt addresses remedies in the section below for the

27   FTB's improper injection of the Protective Order into this trial. Most significantly, the Court

28   should determine whether the FTB has misrepresented the terms of the Protective Order, from

3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

1   which the appropriate remedies can be fashioned.  But if the terms and meaning of the

2   Protective Order are issues that the Court decides are for the jury, Hyatt must be able not only to

3   present the explicit terms of the Protective Order to the jury, but also the motion practice and

4   Discovery Commissioner's comments from the hearing at which the Protective Order was

5   crafted and where the FTB's lawyers were present.

6

7   **E.   The FTB's misstatements regarding the terms and effects of the Protective Order**
8   **require a curative instruction and open the door for Hyatt to cross-examine FTB**
    **witnesses regarding the FTB application of the Protective Order.**

9   **(1)   *FTB counsel has improperly injected the Protective Order into the trial and in***
    ***so doing misrepresented the Protective Order.***

10

11  During the FTB's opening statement, FTB counsel argued that Hyatt had erected a wall

    between this case and the California tax protest proceedings, a clear reference to the Protective
12
    Order in this case.  Later, in cross-examining Hyatt expert witness Ed Antolin, FTB counsel
13
    misrepresented the Protective Order by stating that it required the FTB to seek Hyatt's
14
    permission before using materials designated there under in the tax protest proceedings.  These
15
    are false representations to the jury.
16
    Although the FTB wants to assert that the reason the tax protest proceedings were
17
    delayed was because Hyatt refused to provide discovery material from this case to the protest
18
    officer in the tax protest proceedings, in so arguing the FTB both misrepresents the terms of the
19
    Protective Order and injects the meaning and scope of the Protective Order as an issue for the
20
    jury in the trial.  In addition to making a lengthy statement about the Protective Order during
21
    opening statement, FTB counsel used props to demonstrate Hyatt's alleged erection of a "wall."
22
    FTB Counsel took a banker's box which was used to signify documents and carried it from side
23
    to side of a large board to show the jury that Hyatt built a wall that precluded the FTB from
24
    seeing the documents on both sides.  The "wall" counsel was referring to was the Protective
25
    Order.
26
    In opening statement, FTB counsel stated:
27
                What I'm going to briefly describe for you, then, is the
28              other side of the story and the impact this litigation had on the

3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

1  resolution in the protest, and I'm going to as far as give you a very
2  brief example of what I'm talking about. Mr. Hyatt now had two
   proceedings ongoing. He had the California tax proceedings
3  ongoing and he had this litigation ongoing, and what he did is *he*
   *erected a wall between the folks handling the protest at FTB and*
4  *the folks that were handling the litigation.* There's even
   communication from his own representatives to his experts
5  describing this as the wall. If I could, think of this as a wall. He
   had information on one side of the wall in the litigation. He gave
6  information to the protest folks on the other side of the wall. And
   what he began doing is giving information to the litigation folks
7  that was different than the protest folks, and before then they --
   FTB could move information from one side of this wall to the
8  other side of the wall, they had to ask Mr. Hyatt's permission to do
   so, and they had to erect procedures at FTB to move it from one
9  side to the other. One hand had some information and the other
   hand had the other, but they couldn't come to the middle without
10 seeking Mr. Hyatt's permission. They asked for his permission to
   move the information so that both sides of FTB had the same
11 information, both the litigation people had the same information
   as the protest people, and what did he say? No. He said even
12 though FTB says I know I'm on one side of this wall, I won't
   move it over here. Part of the process is they had to issue an
13 administrative subpoena to him out of California and that's where
   you begin to see in the time line – and I moved the time line out
14 further so the folks can see the bottom part. This is the
   designation as to the separation, the wall that was erected and how
15 he had to get over the wall.[13]
16

17

18      FTB counsel then further injected the Protective Order into the trial while cross-

19 examining Mr. Antolin. In particular, FTB counsel attempted to ask Mr. Antolin whether the

20 FTB was required to first seek Hyatt's permission to use the subject information in the protests

21 before seeking an administrative subpoena for the requested information. This produced

22 objections by Mr. Hyatt's counsel, then redirect on the subject by Mr. Hyatt's counsel, and then

23 re-cross by FTB counsel.[14] This debate over the meaning of the Protective Order needs to be

24 resolved by the Court or opened for a full examination at trial

25

26     **(2)**      ***The FTB is attempting to litigate the litigation by using its erroneous***

27 [13] April 22, 2008 trial transcript, at 105-07, attached hereto as part of Exhibit 9.

28 [14] May 7, 2008 trial transcript, at 98:9 – 100:3, 165:8-170:8, 189:4-190:4, attached hereto as part of Exhibit 9.

1  *interpretation of the Protective Order as a defense.*

2      It is easily discernible from the transcript of the FTB's opening statement that Hyatt was

3  acting in accordance with the Protective Order when he objected to the use of confidential

4  information in the tax protest proceedings and required that California procedures be used to

5  obtain the information for the California tax protest proceedings.  The FTB merely had to use its

6  typical and normal procedure of issuing an administrative subpoena in a tax protest proceeding

7  — something it does in any tax protest proceeding in which it seeks to compel production of

8  information.  Here, the FTB sought to short-cut its own subpoena process.  Hyatt objected in

9  accordance with the Protective Order.  Hyatt's adherence to the terms of the Protective Order

10  cannot be used against him in this trial.

11      The jury, however, is completely unaware of the terms of the Protective Order and

12  would reasonably believe — based on the FTB's misstatements — that Hyatt was being

13  uncooperative and delaying the tax protest proceedings based on the FTB's characterization of

14  the Protective Order.  Even if the jury was to become aware of the Protective Order, it cannot be

15  used against Hyatt.  It is a Court order that was properly issued after negotiations, briefing,

16  argument, and further crafting.

17      Moreover, the evidence already presented at trial via Mr. Cowan's testimony is that the

18  FTB erected an internal wall, an ethical or "Chinese" wall on its own, and Hyatt had nothing to

19  do with that wall.[15]  The jury must be so instructed by the Court to remedy the FTB's

20  misrepresentations of the Protective Order.  Additionally, Hyatt must be allowed to cross-

21  examine FTB witness by use of the terms of the Protective Order and the extrinsic evidence

22  concerning its creation.

23      **(3)**    *As FTB's counsel has acknowledged before, it is improper to litigate the*
24  *litigation.*

25      As FTB's counsel has acknowledged in pleadings filed with the court in its Motion in

26  Limine Re: Claims By Hyatt That This Court, the Nevada Supreme Court, And/Or The United

27

28    [15] Trial transcript, April 30, 2008, at 167:14 – 168:18, attached hereto as part of Exhibit 9.

3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

1   States Supreme Court Already Decided His Case and its Motion in Limine Re: Case Procedural

2   History And Post-Complain Conduct, it is improper to re-address pretrial procedural decisions

3   or rulings in this case.  As FTB Counsel argued strenuously in its MIL Re: Case Procedural

4   History and Post-Complaint Conduct, "[o]nce litigation is commenced, the actions taken in

5   defense of that litigation, are not probative of whether or not the underlying torts were

6   committed. See, *Timberlake Const. Co. v. U.S. Fidelity & Guaranty Co.*, 71 F3.d 335, 340

7   (10th Cir. 1995)."  Despite all of the parties' briefing on this issue, FTB counsel still raised the

8   issue of the administrative subpoena and Protective Order in opening statements.  This was not a

9   spur-of-the-moment or off-the-cuff comment.  It was planned and the props were laid out before

10  the arguments were made.  It now puts Hyatt in the position of having to "litigate the litigation"

11  by introducing the Protective Order to defend the FTB's argument to the jury that Hyatt erected

12  a "wall" between this case and the California tax proceedings.

> **(4)      The Court must provide a remedy that corrects the FTB's misstatement and allows Hyatt to confirm this with cross-examination of FTB witnesses relative to the Court' Protective Order.**

15          Courts have held that in opening statements counsel should exclude any reference to

16  matters that counsel knows counsel cannot prove or would be inadmissible; and, where

17  counsel's references to inadmissible or un-provable facts are so flagrant or inflammatory as to

18  affect the fairness of the trial, it is within the sound discretion of the trial judge to take such

19  remedial action as she deems proper.  *See Maxworthy v. Horn Elec. Serv.,* 452 F.2d 1141, 1143-

20  44 (4th Cir. 1972); *United States v. Taren-Palma,* 997 F.2d 525, 532 (9th Cir. 1993) cert.

21  denied, 511 U.S. 1071 (1944) (Opening statement should not refer to matters that are not to be

22  presented as evidence.)  The test is generally one of good faith; and, in the absence of

23  substantial error, if counsel's statement is made "with reasonable ground to believe" the

24  evidence is admissible, even though proof of it may be afterwards excluded, there is no

25  misconduct. *See Director of Highways v. Bennett,* 193 N.E.2d 702, 706 (Ohio App.Ct. 1962).

26          Once an improper statement is made, remedies may include an admonition by the court

27  (*Testa v. Village of Mundelein, Ill.,* 89 F.3d 443, 446 (7th Cir. 1996); an order for a mistrial

28

3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 699-3600
Facsimile: (702) 650-2995

1  (*Littlewind v. Rayl*, 839 F.Supp. 1369, 1376 (D. ND. 1993); or counsel may be cited for

2  contempt where her misconduct violates a prior court order. (*In re Gustafson*, 650 F.2d 1017,

3  1020 (9th Cir. 1981).

4      To remedy the improper argument and statement made by FTB counsel, the Court must

5  instruct the jury that Hyatt did not erect a "wall," but rather the Court itself imposed a Protective

6  Order limiting the use of information or materials obtained during this case and requiring that

7  California procedures be used for the California tax protest proceedings. Additionally, Hyatt

8  must be allowed to introduce the Protective Order into evidence and cross-examine FTB

9  witnesses regarding the order, the FTB's own internal decision to erect a wall based on its

10  erroneous interpretation of the Protective Order, and that the Protective Order in no way limited

11  or altered the FTB from using its usual and customary procedures under California law to obtain

12  whatever information or materials wanted from Hyatt in the tax protest proceedings.

13      In that regard, it was fair game for the FTB to address Hyatt's challenge of the

14  administrative subpoena in California. But it was unfair and unduly prejudicial for the FTB to

15  argue in opening statements that Hyatt erected a "wall" between this case and the tax protest

16  proceedings when in fact the Court had issued a protective order limiting the parties from using

17  this case to take discovery in the tax proceedings. The undue prejudice must be corrected by the

18  relief Hyatt seeks here.

## 4.  Conclusion.

20      As quoted and discussed below, the FTB's reference and dramatic physical

21  demonstration of an alleged "wall" between the two proceedings is a misrepresentation of the

22  Protective Order entered in this case *by the Court*, as well as Hyatt's compliance with, not

23  violation of , that order. This is not an issue that should be litigated in this case. The jury

24  should not determine the meaning of the protective order. But if the issue is litigated, it must be

25  litigate fully with not restraints. Further, to cure the inaccurate and prejudicial affects of the

26  Franchise Tax Board's misrepresentation of the Protective Order, a curative instruction is

27  needed, as well as other relief.

28

3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

1    As is typical in a protective order, it put restrictions on materials acquired by a party

2   through this litigation and designated under the protective order.  But it also specifically

3   referenced ( as this Nevada court no doubt recognized it had no authority to do otherwise) that

4   the FTB could use whatever means available under California law to obtain materials designated

5   Confidential under the protective order for use in the California tax proceedings.

6    In other words, this Court rather obviously found that California law should govern how

7   the parties conduct themselves in the California tax protest proceedings, and that confidential

8   information obtained during discovery in this Nevada tort case should only be used in this

9   Nevada tort case.  The FTB now wants to excuse its over 11-year delay in deciding the tax

10   protest proceedings on the Court's Protective Order and Hyatt's exercise of his rights under the

11   Protective Order.  The FTB now seeks to blame Hyatt for the Protective Order and have the jury

12   hold it against him.  This is in direct violation of the Court's order granting the FTB's own

13   motion in limine prohibiting the parties from litigating the litigation.  Moreover, it is highly and

14   unduly prejudicial to Hyatt for the FTB to prevent to the jury a pretrial court order and to blame

15   his for its existence and content.

16    Hyatt requests that the Court cure the prejudicial affects of the FTB's counsel's

17   argument and presentation by issuing the admonition and instruction that Hyatt did not erect a

18   wall, but rather the Court itself imposed the Protective Order limiting the use of information and

19   materials obtained during this case and requiring the FTB employ California procedures to

20   obtain materials or information for the California tax protest proceedings.  Hyatt must also be

21   allowed to cross-examine FTB witnesses regarding its own decision to erect an internal wall

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

1  based on the Protective Order.  For these reasons, Hyatt respectfully requests that the Court

2  grant this motion and administer the relief requested.

3

4  Dated this _14_ day of May, 2008.

5

6          HUTCHISON & STEFFEN, LLC
          Mark A. Hutchison, Esq. (4639)
7          10080 Alta Drive
          Suite 200
8          Las Vegas, Nevada 89145

9          BULLIVANT HOUSER BAILEY PC

10

11          Peter C. Bernhard, Esq. (734)
          3883 Howard Hughes Pkwy.
12          Suite 550
          Las Vegas, Nevada 89169
13          (702) 669-3600

14          Attorneys for Plaintiff Gilbert P. Hyatt

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to NRCP 5(b), I certify that I am an employee of BULLIVANT HOUSER

BAILEY PC and that on this ___ day of May, 2008, I caused the above and foregoing document

entitled **MOTION TO CURE IMPROPER STATEMENTS BY FTB COUNSEL DURING**

**OPENING STATEMENTS CONCERNING HYATT ALLEGEDLY ERECTING A**

**"WALL" BETWEEN THIS CASE AND THE CALIFORNIA TAX PROCEEDINGS**

**AND THEREBY VIOLATING THE COURT'S ORDER PROHIBITING THE PARTIES**

**FROM "LITIGATING THE LITIGATION"** to be served as follows:

[X]    by placing same to be deposited for mailing in the United States Mail, in a sealed
envelope upon which first class postage was prepaid in Las Vegas Nevada;
and/or

[X]    Pursuant to EDCR 7.26, to be sent via facsimile; and/or

[X]    to be hand-delivered;

to the attorney(s) listed below at the address and/or facsimile number indicated below:

**via facsimile: (775) 788-2020**
James A. Bradshaw, Esq.
McDonald Carano Wilson LLP
100 West Liberty Street
10th Floor
Reno NV 89501

**via facsimile: 873-9966**
Jeffrey Silvestri, Esq.
McDonald Carano Wilson LLP
2300 West Sahara Avenue, Suite 1000
Las Vegas, Nevada 89102

_____
An employee of Bullivant Houser Bailey PC

3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

# AFFIRMATION
### Pursuant to NRS 239B.030

The undersigned does hereby affirm that the preceding **MOTION TO CURE IMPROPER STATEMENTS BY FTB COUNSEL DURING OPENING STATEMENTS CONCERNING HYATT ALLEGEDLY ERECTING A "WALL" BETWEEN THIS CASE AND THE CALIFORNIA TAX PROCEEDINGS AND THEREBY VIOLATING THE COURT'S ORDER PROHIBITING THE PARTIES FROM "LITIGATING THE LITIGATION"** filed in District Court Case No. A 382999 does not contain the social security number of any person.

Dated this 14ᵗʰ day of May, 2008.

HUTCHISON & STEFFEN, LLC
Mark A. Hutchison, Esq. (4639)
10080 Alta Drive
Suite 200
Las Vegas, NV 89145
(702) 385-2500

BULLIVANT HOUSER BAILEY PC

_____
Peter C. Bernhard, Esq. (734)
3883 Howard Hughes Parkway, No. 550
Las Vegas, Nevada 89169
(702) 669-3600

Attorneys for Plaintiff Gilbert P. Hyatt

3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

64847-0001/LEGAL14239552.5

21

# EXHIBIT 4

 

DISTRICT COURT
CLARK COUNTY, NEVADA
* * * * *

GILBERT P. HYATT,                  .

              Plaintiff,           .        CASE NO. A-382999

        vs.                        .        DEPT. NO. X

CALIFORNIA STATE FRANCHISE         .
TAX BOARD,
                                   .        **Transcript of**
              Defendant            .        **Proceedings**

. . . . . . . . . . . . .


BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 64**

WEDNESDAY, JULY 23, 2008

APPEARANCES:

FOR THE PLAINTIFF:        PETER C. BERNHARD, ESQ.
                          MARK HUTCHISON, ESQ.
                          DONALD J. KULA, ESQ.

FOR THE DEFENDANT:        PAT LUNDVALL, ESQ.
                          CARLA B. HIGGINBOTHAM, ESQ.
                          JAMES BRADSHAW, ESQ.


COURT RECORDER:           TRANSCRIPTION BY:

VICTORIA BOYD             VERBATIM DIGITAL REPORTING, LLC
District Court            Littleton, CO 80120
                          (303) 798-0890


Proceedings recorded by audio-visual recording, transcript
produced by transcription service.

1  why didn't you impose that fraud penalty?  Or her supervisor.

2  They weren't interested in why she did or didn't.  They were

3  interested in assessing Mr. Hyatt millions and millions of

4  dollars in penalties.  Mr. McKenney, by the way, was promoted

5  shortly thereafter, similar to Ms. Cox and Ms. Ford.

6          So, please, when the Franchise Tax Board gets up

7  here and says there were layers of review and we had all

8  these people looking at this audit file, remember how many

9  hours they really spent in looking at the question of whether

10  they should impose $4.2 million in penalties for 1992.

11          Now, I want to next turn now -- so that takes us

12  through the audit, takes us through the penalties.  Now, what

13  happens?  Well, there's a protest.  And that protest, we've

14  heard repeatedly, the part of the protest that's in evidence,

15  is at issue here, is the delay.  The delay in the protest.

16          First off, though, before I get to that, I just

17  want to talk about the Franchise Tax Board perception of

18  fairness again.  And it's embodied in what they did with the

19  protest.  Remember, in opening statements, throughout the

20  trial, the protest is called the do-over, a fresh look, a new

21  set of eyes, right?  Who were the first two protest officers

22  assigned to this matter?  First, Anna Jovanovich.

23          Now, remember, this is a fair process, right?  This

24  is protecting the taxpayer's rights.  Anna Jovanovich.  Hmm,

25  is that a fresh set of eyes?  Is that a do-over?  The person

1  who actually rewrote the fraud memo.  Now, we're going to

2  have the decision-maker on the fraud memo and on the fraud,

3  imposition of the fraud, review her own decision.  That's the

4  fresh look.  That's the fair process.

5        Now, they're going to come in and say there's

6  personnel reasons for that and that's just sort of the way

7  we've always done it.  Well, guess what?  If your backhand is

8  always bad, it doesn't matter how many times you hit a

9  backhand, it's still wrong.  That can never be the excuse,

10  it's just the way we've always done it.  Just the structure

11  we've set up.  Well, you know what?  That's an unfair

12  structure, then.

13        And then who was the second person they brought in

14  after that?  That was Bob Dunn.  The man who has been living,

15  breathing, remember, this case for 10 years.  The one who at

16  the time he became a protest officer was living and breathing

17  this case here.  Now, that's -- okay, that's going to be the

18  fresh set of eyes.  That's going to be the fair review.

19        So when they get up and tell you the protest was

20  fair, think about who they started the protest with and the

21  structure within which they say is a fair shake for the

22  taxpayer.

23        Then who do they bring in?  And this, I think, is

24  particularly telling.  And actually, it was a ray of

25  sunshine.  Charlene Woodward.  Charlene Woodward came in

1    keep a couple of data points in mind.

2            The protest took 11 and a half years, 11 and a half

3    years.  Now, you can decide whether or not it was just

4    coincidental or not that it ultimately decide -- it

5    ultimately concluded in November of '07, just before this

6    case went to trial.  You can decide if that was coincidental

7    or not.  Just happened to be within several months of going

8    to trial after an 11 and half year process.  Mr. Hyatt filed

9    his protest for the '91 year back in June of '96.  June of

10   '96.  It was finally decided November of 2007.  The protest

11   for '92 was October '97.

12           Now, you've heard the whole explanation.  You know

13   what the problem was?  The problem was this litigation and a

14   protective order.  That's what they've said, right?  Come in

15   and said there was this protective order process that we were

16   forced to go through.  And we've heard, you know, so many

17   days of testimony on that.

18           So this is again is the pattern of the Franchise

19   Tax Board.  Blame Mr. Hyatt for filing the lawsuit.  They're

20   going to punish him for filing this lawsuit.  One of the ways

21   they're going to punish him for filing the lawsuit is they're

22   just going to delay the protest and they're going to blame it

23   on the litigation.  That's one of the ways they're going to

24   punish him for that.

25           But then curiously, they decide that the Court of

24

1  the Eighth Judicial District in Clark County, Nevada is to

2  blame.  This isn't a Mr. Hyatt order, this is a court order,

3  protective order.  So they're blaming the court for their

4  delay.  You heard Mr. McLaughlin say it was not unusual for

5  courts to issue protective orders and say, look, if we didn't

6  have a lawsuit here, the information that's gathered here in

7  discovery, it's got to -- it's for purposes of this lawsuit.

8  He said that was common in California, it's common in Nevada.

9  That's what this was.

10      And if you think, I guess you can, I guess the FTB

11  is going to argue that this Court interfered with what they

12  were doing in California and wouldn't let them do their job,

13  when, in fact, that is -- no evidence of that.  No evidence

14  that this Court intervened and said I'm going to interfere

15  with your process in California.

16      How many times have we read that crazy jury

17  instruction, now, that drives me crazy every time it's on the

18  screen that, you know, what are you not deciding here?  The

19  residency and all the issues that are being decided down in

20  California.  On the one hand, the FTB says this case has

21  nothing to do with the residency.  This case has nothing to

22  do with any of the issues that are going on in California.

23  On the other hand, when we've got to justify the delay, it

24  has everything to do with it and it's interfering with their

25  process.  These are made up lawyer arguments.

25

1           There is no rational reason for 11 and a half years

2   of Mr. Hyatt not getting a decision under the protest.

3   Remember, their guidelines are 33 months.  We heard that from

4   Malcolm Jumelet and others.  Double it.  Okay, it was

5   litigation or whatever excuse they want to make.  You know

6   what?  They're running around trying to get copies the audit

7   file and they're bumping into each other because they can't

8   figure out what to do and somebody files a lawsuit in Nevada.

9   Double it, make it 66 months.  Triple it, make it 99 months.

10  You're still not even close to how long it took.

11          And when you think about whether the protective

12  order process, however they want to define it, caused delay,

13  keep this point in mind.  After the protective order was

14  entered in December of '99, the FTB did not seek a single

15  document under its own protocol, didn't seek a single

16  document, for three and a half years, six and half years

17  after the protest began.  Now, that's the cause of all this

18  delay.  And yet, under their own protocol under the

19  protective order, six and a half years past before they even

20  make a request under that process, three and a half years

21  after its entered.

22          Now, I'd like to quickly touch upon two subjects

23  that you've seen evidence of during the course of this trial.

24  And what you may want to consider when you think about the

25  evidence, what is proved, what is shown, whether or not the

## CERTIFICATION

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE AUDIO-VISUAL RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

## AFFIRMATION

I AFFIRM THAT THIS TRANSCRIPT DOES NOT CONTAIN THE SOCIAL SECURITY OR TAX IDENTIFICATION NUMBER OF ANY PERSON OR ENTITY.

**Verbatim Digital Reporting, LLC**
**Littleton, CO 80120**
**(303) 798-0890**

_____            1-2-09
Julie Lord, Transcriber                DATE

# EXHIBIT 5

COPY                                                    COPY

DISTRICT COURT
CLARK COUNTY, NEVADA
* * * * *

GILBERT P. HYATT,                    .

            Plaintiff,               .        CASE NO. A-382999

      vs.                            .        DEPT. NO. X

CALIFORNIA STATE FRANCHISE           .
TAX BOARD,                           .

            Defendant.               .        **Transcript of**
                                              **Proceedings**
. . . . . . . . . . . . . . . .      .


BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 67**

MONDAY, JULY 28, 2008

<u>APPEARANCES</u>:

FOR THE PLAINTIFF:          PETER C. BERNHARD, ESQ.
                            MARK HUTCHISON, ESQ.
                            DONALD J. KULA, ESQ.

FOR THE DEFENDANT:          PAT LUNDVALL, ESQ.
                            CARLA B. HIGGINBOTHAM, ESQ.
                            JAMES BRADSHAW, ESQ.




COURT RECORDER:             TRANSCRIPTION BY:

VICTORIA BOYD               VERBATIM DIGITAL REPORTING, LLC
District Court              Littleton, CO 80120
                            (303) 798-0890



Proceedings recorded by audio-visual recording, transcript
produced by transcription service.

1          One of the things that across the course of the
2    trial, that you've heard a little bit of additional evidence
3    across the first few weeks, and that was a contention or an
4    allegation that somehow that we intentionally failed to
5    examine, or to explore, or to investigate favorable evidence
6    in support of Mr. Hyatt.

7          The second thing then that you heard as well is that
8    Mr. Hyatt has alleged that we intentionally delayed resolution
9    of the protest, both of which to extort -- or part of the
10   efforts then, by which to extort a settlement from him.  And
11   I'm going to explore those from a factual standpoint in some
12   detail, ladies and gentlemen.

13         His allegation concerning whether or not that we
14   intentionally failed to investigate favorable evidence
15   requires you, a little bit, to understand the burden of proof
16   in a residency audit.  Brian, if you could bring up that slide
17   regarding the residency audit training manual.  And if you
18   could pull up that first couple paragraphs for me.  I'd like
19   to let you sit -- have that sit there for a while.

20         One of the things that I don't know if you recall,
21   but we do.  During the first three to four weeks of trial
22   there was great ambiguity between the testimony through Mr.
23   Kern, through the testimony of Mr. Cowan.  Also, as far as
24   with some testimony from Mr. Antolin, as to who bore the
25   burden of proof during the course of a residency audit.

 1   throughout an audit until the auditor and supervisor are

 2   satisfied that a valid conclusion has been reached, and that a

 3   suitable audit report has been prepared from which the

 4   conclusion can be supported in the event that it's later

 5   challenged.

 6        In other words, come to the right decision.  Analyze

 7   the information and come to the right decision.  That's how

 8   CBR is used at the audit level, ladies and gentlemen.

 9        Now, what I'd like to do is to turn your attention

10   then to the protest facts.  As you recall, across the course

11   of the testimony you heard from many folks that were involved

12   in the protest.  And what we're doing at this point in time is

13   still examining the motive that Mr. Hyatt as attributed or

14   alleged that FTB participated in.

15        He contends that the delay, or the amount of time it

16   took to resolve the protest, was intentionally --

17   intentionally interfered with by the FTB in an effort to

18   extort a settlement from him.  That's his allegation against

19   us, that's what we're defending against.

20        One of the -- the question in this area that you're

21   going to have to take a look at, and that is this.  Whether or

22   not that the amount of time that it took to resolve the

23   protest was due to, primarily, the amount of time it took to

24   move information about Mr. Hyatt 100 feet down the hall.  Or

25   was there some type of a scheme, or some type of a plan

1    uncovered then across the course of the litigation.  But there

2    was something that separated it.

3         And that something, ladies and gentlemen, you

4    learned what that was.  And it was the protective order, the

5    Nevada protective order.  And you learned how the FTB tried to

6    honor a court order, and make sure that it honored that court

7    order.

8         Now, Mr. Hyatt has contended that somehow, that the

9    amount of time that it took had something to do with

10   extortion.  And we heard criticism during the -- during their

11   closing argument as to the fact that you heard from a bunch of

12   FTB attorneys.  Well, who handled the protest?  The litigation

13   department -- the legal department.  So who's in the legal

14   department?  Attorneys.

15        You heard from Anna Jovanovich by deposition.  You

16   heard from Cody Cinnamon, you heard from Charlene Woodward,

17   you heard from Terry Collins, Ben Miller, Bob Dunn, George

18   McLaughlin.

19        And it's going to be up to you to decide whether or

20   not that those are folks that were trying to do their job,

21   trying to honor a court order, or whether or not that somehow

22   that they were bad actors, in some fashion trying to scheme,

23   in an effort to extort a settlement from Mr. Hyatt.  That's

24   the decision that you, ladies and gentlemen, get to make.

25        You heard from these attorneys and what the reasons

1  were for the passage of time, and it's obvious that this

2  litigation had impacted the California protest.  Mr. Hyatt

3  made it the subject of that protest.

4       You heard how this protest began with Ms. Jovanovich

5  as early as 1997, still trying to obtain full and complete

6  copies of basic agreements that served as the foundation then

7  for the audit.  And Brian, at this point in time, if you'd

8  take me to 320.

9       The protest began with Anna Jovanovich, the first

10 protest did.  And why?  Because she was the person who was in

11 charge of residency at that point in time in the legal

12 department.  Once this case was filed, she also had the

13 responsibility under FTB's standard rules, standard practices

14 then by which to handle the litigation then that was related

15 to it as well.

16       And -- but when she was handling the protest, what

17 was one of the first things that she asked to do?  She asked

18 to get copies of the Phillips, Mahr-Leonard, Matsushita, and

19 the Fujitsu agreements concerning the source of his 1991

20 income.  The first exhibit that I have up here that we'd

21 suggest that you take a look at is a memorandum that came from

22 Eugene Cowan, bares a date then of December of 1997.

23       And I think it's interesting.  This is a memorandum

24 that Mr. Cowan makes to the file.  It was after he had a

25 telephone conversation with Anna Jovanovich.  And what he

1   FTB, and I am going to march through that evidence, so that

2   you can fully and fairly evaluate it when you go back then for

3   your jury deliberations.

4        We were talking about the protest, and starting as

5   far as with the beginning of the protest.  Across the course

6   of the trial, that you heard how Mr. Hyatt was inconsistent

7   with the speed with which that he wanted the protest to be

8   resolved.

9        At the front end of it, when he thought that there

10   was going to be a limited set of facts to be made available to

11   the protest hearing officer, he was trying to suggest that she

12   hurry up.  It's this kind of, "Hurry up and wait" type of

13   attitude.

14        Once in fact though that he learned that the

15   administrative subpoena process, in other words, this process

16   then through the California court system that is down here, as

17   far as in this time frame, was going to allow the FTB to move

18   the litigation information down the hall to the protest

19   hearing officer, then is when he started dragging his feet.

20   And he did everything he could by which then to stop it.

21        Let me illustrate just a little bit of what I'm

22   talking about.  Brian, if you can pull up 2344 for me, please.

23   2344, this is just the summary from Mr. Miller's affidavit

24   that was used in support then of the subpoena duces tecum

25   process.

1          When in fact that they had to go through the
2     litigation process then, by which to get the California courts
3     to allow them to move the information then down the hall to
4     the protest hearing officer's office.  He identified what
5     information it is -- it was that they wanted to obtain then
6     pursuant to that administrative subpoena.

7          And at that point in time -- Brian, if you can pull
8     up Exhibit 405 for me, please.  Exhibit 405 -- and pull out
9     the body of the letter.  This was by Mr. Hyatt's attorney that
10    was handling the protest, then.  He was making demands that
11    you immediately issue the notices of action regarding the '91
12    and the '92 protest.

13         In other words, "I want you to do it now.  I want
14    you to decide the protest now."  When, in fact, what it is at
15    that point in time, what was pending then was this
16    administrative subpoena process.  This administrative subpoena
17    process then is the process by which then that would free up
18    the litigation documents being able to go down the hall then
19    to the protest hearing officer.

20         What Mr. Hyatt wanted to do at that point in time
21    was to require the protest hearing officer to make a decision
22    based upon a limited set of facts.  Not the full and complete
23    set of facts, but a limited set of facts.

24         Now, Ms. Cinnamon had been informed that in fact,
25    that she should wait, though.  And if you'd go to the next

1   slide for me, Brian.  She had been advised though, rather than

2   to issue any protest determinations at that point in time, to

3   wait then because what was pending was in front of the

4   California Superior Court. And if he loses that appeal

5   process, he would have to produce the evidence.  In other

6   words, they'd be able to move the litigation information down

7   the hall.

8        Now, this strategy of trying to make FTB work for

9   everything it got, you've got evidence of that.  And you have

10   evidence of that through Mr. Hyatt's own attorneys.

11        Brian, if you can pull up 2326 for me, please.  This

12   is a memorandum, a fax that went from Mr. Cowan to Mr. Hyatt

13   and his litigation counsel.  And if you'd take a look, as far

14   as at that memorandum, what you will see is the strategy that

15   was developed at that point in time.  There had been a

16   subpoena, a subpoena duces tecum that had been issued, that

17   went to the bank.  And what they were looking for was bank

18   information.

19        And in this subpoena -- in response to this, Mr.

20   Cowan says, "While there are no pure tax reasons to quash the

21   motion, there may be tactical reasons to do so, such as making

22   the FTB work for its request for now, or taking this

23   opportunity to file a motion in the Nevada courts."

24        In other words, the strategy of trying to require

25   FTB to work for it was memorialized.  We believe that this

1   easier to review.  That's what I need, those last two

2   paragraphs.

3         Ms. Cinnamon, at this point in time, is making

4   reference to how she's starting to go through Mr. Hyatt's

5   responses then, to the IDR's that she had been sending, and

6   how disappointed that she was with Mr. Hyatt's responses.  And

7   how it was replete with vague, or convenient, or nonresponsive

8   answers.  And that he had no recollection, for example, of his

9   own doctor's appointments that placed him in California then

10  during the disputed period of time.

11        She also talks about the financial statements and

12  how in fact Eric was taking the position that because of the

13  litigation, those financial statements then were not being

14  turned over.  And she even makes reference to the fact that,

15  "I thought Eric," who is Eric Coffill, "Was going to proceed

16  through this process as if there was no pending litigation."

17        Now, in this case, Mr. Hyatt's taken the position,

18  "Well, the litigation had nothing to do with the protest and

19  the time it took."  But here you've got, as far as even his

20  own counsel then that is acknowledging and taking positions

21  then that the litigation does have an impact on it.

22        Now, one of the things that you'll even see is that

23  Mr. Cowan -- take me to the PASS entry, Brian, for 2353, page

24  9.  In this PASS entry what you will see is a -- contents of a

25  conversation then between Terry Collins and Eugene Cowan.  Mr.

1    Cowan, at that point in time, agreed with Terry Collins.  "He

2    agreed with me that the litigation has spill-over affect upon

3    the protest."

4          Now, you heard some evidence in this case concerning

5    FTB notice, 99-1.  And Brian, if you could take me to that.

6    That is an exhibit that's found at 626.  This is the notice

7    whereby the FTB has guidelines then where it tries to resolve

8    a protest within a 33 month period of time.

9          Across that 33 month period of time, within this

10   memorandum though, there is identification that if in fact

11   that the taxpayer and the FTB are involved in litigation, that

12   that will have -- may have a delay effect.  And therefore,

13   there is an exception then to that 33 month general rule.

14         Now, you've heard an awful lot in this case then

15   about the protective order.  You don't have an opportunity to

16   see it, but you have heard about how it was supposed to work.

17   All Mr. Hyatt had to do was to stamp documents,

18   "confidential," and those documents in this litigation could

19   not be shared then with the protest hearing officer.

20         You also heard testimony about how protective orders

21   do have valid reasons for their entry, and in fact how it is

22   is trying to limit the use of information then between

23   parties, and the uses then for purposes of their dispute.

24         But this is a dispute that had two proceedings going

25   on at the same time.  It had litigation going on and it had

1   the protest going on.  And the protective order restricted the

2   transfer then of that information from litigation to the PHO,

3   who was examining then the exact same issues.

4        And this, as you heard from both Mr. Miller, from

5   Mr. Collins and Mr. McLaughlin, was a situation that was

6   unprecedented for the FTB.  They'd never had this circumstance

7   before.

8        They had never had a circumstance whereby that they

9   had information within its own offices that was relevant then

10  to the protest hearing, the protest determinations that it

11  couldn't share with the hearing officer.

12       And so therefore, they had to cope with it.  And how

13  they coped with it was also to ensure that they honored it.

14  It's an order from this Court.  And they ensured that they

15  were going to honor it.  You heard from Mr. McLaughlin how he

16  set up a protocol to ensure that that order then was fully

17  complied with.

18       Also, it required a request to Mr. Hyatt, if there

19  was litigation information that they wanted to have shared

20  with the protest hearing officer.  And it required first, Mr.

21  Hyatt's consent.  And if he failed to give that consent, then

22  an administrative subpoena then could be had.

23       And all it takes is an examination of Mr. Hyatt's

24  own expert witness on this point as to how the protective

25  order worked.  Brian, if you can pull up that clip then from

1    Mr. Antolin's testimony.  I asked him some questions.

2        I said, "I note from your report that you had a copy

3    of the protective order that was issued in this case."

4        "Yes."

5        "And you looked at that protective order?"

6        "Yes."

7        "And particularly, there's a paragraph that deals

8    with whether or not the folks working the protest at FTB could

9    have access to the information that was being received in the

10   litigation."

11       "That's correct."

12       "Do you recall that?"

13       "Yes."

14       "Do you recall the procedural mechanism to try to

15   move information from the litigation side to the protest

16   hearing officers?"

17       "As I recall, under that protective order the FTB

18   needed to make a request to have that information transferred

19   from the litigation, through handling this, to the protest

20   people handling the California protest."

21       "And did you understand that that was a request that

22   had to go first, to Mr. Hyatt?"

23       "Yes, or Mr. Hyatt's counsel.  I can't remember.

24   And if in fact that they refused, in other words, if they

25   refused to consent, then the FTB could issue an administrative

1   subpoena."

2         This was Edwin Antolin's testimony.  He was, I

3   think, the third -- maybe the third or fourth witness that you

4   heard.  Tall gentleman who talked a little bit about

5   cooperation then across the course then of both the audit, as

6   well as the protest.  And this was Mr. Antolin's then

7   interpretation then of that Nevada protective order.  With no

8   consent from Mr. Hyatt, the FTB was forced to obtain then --

9   or to try to go through the administrative subpoena process to

10  try to move that information.

11        You also saw across the course of this case Exhibit

12  2333.  Now, this is a multi-page document, and you heard Mr.

13  McLaughlin testify about this multi-page document.  You recall

14  that there was a protocol among Mr. Kern, Mr. Cowan, and Mr.

15  Hyatt as to how they would respond to information.

16        Well, there was also a protocol established by the

17  FTB how they would comply with the Nevada protective order.

18  And if you would take a look at Exhibit 2333, those are the

19  steps that they would -- they were required to take.

20  And, in particular, if you go to page two of that what you

21  will see is -- particularly, at paragraph number 4.  Paragraph

22  number four lays out with specificity then the impact of

23  paragraph four of the Nevada protective order, and how that it

24  placed a burden upon the litigation attorneys to determine

25  what information could be valuable.  And then you had to seek

1  the consent of Mr. Hyatt to voluntarily produce it.  If Mr.

2  Hyatt refused, then to issue the administrative subpoena and

3  get it enforced.

4        And you heard from the testimony, both of Mr.

5  McLaughlin, Mr. Miller, Mr. Dunn, how in fact that they made

6  good faith efforts then of ensuring that they'd fully comply

7  then with this Court's order.  Now, this affected the protest

8  proceedings, took time by which to do that compliance.

9        Mr. McLaughlin, he summarizes as far as that impact,

10  Exhibit 404.  At Exhibit 404, you're going to see a letter

11  that went from Mr. McLaughlin to Mr. Coffill.  And I would

12  encourage you to take a look at Exhibit 404.  404 explains

13  then what the impact was on the protest process.  And in fact,

14  how the -- how the Nevada protective order then had impact on

15  the protest and the time associated with it. I'm not going to

16  take you through this multi-page document, but I would

17  encourage you and ask you to take a look at it.

18        Now, I'm going to move you forward just a little bit

19  then, in time.  Brian, if you can take me -- 496.  Do we have

20  Exhibit 496?  You see at the very top there, ladies and

21  gentlemen, you see that designation, "Confidential, Nevada

22  protective order?"

23        That was a stamp then that was applied to any of the

24  documents that wanted to be moved from the litigation side to

25  the protest side.  You're going to see very few examples of

1  those as far as across the documents.  All of these stamps

2  were supposed to be removed.

3       But this was the stamp that Mr. Hyatt, all he had to

4  do to prevent then the protest hearing officer from being able

5  to see this information is to place that stamp on any of the

6  documents that we obtained during this litigation.

7       And only then -- we -- what we had to do then was to

8  ask for his consent to move them from the litigation to the

9  protest.  And if he failed to consent, that is when we had to

10 do the administrative subpoena process.  And you heard about

11 the litigation associated with that.

12      Mr. Miller's declaration, which is the next

13 document, 2344, identified what information it was that was in

14 the litigation, that it believe that it was relevant to the

15 protest determination.  We had information concerning Mr.

16 Hyatt's move, the connections that he allegedly established

17 then here in Nevada, connections that Mr. Hyatt maintained in

18 California.  Mr. Hyatt's motive and intent for that alleged

19 move.  Information concerning the amount and the time -- and

20 the timing of the income that he may have received before,

21 during, and after 1991.  That was the information that was in

22 the litigation.  This is what was described by Mr. Miller and

23 given then to the California courts.

24      And the California courts agreed with us.  And the

25 California court says that we were entitled to that

1    information.  And that's where you get down as far as farther

2    into this process here.  The California courts then -- they

3    issued their decision, and they said that we were entitled to

4    that information, that we were entitled to move it from the

5    litigation side to the protest side.  And that happened at the

6    district court level.  In California, it's called the Superior

7    Court level.  And what happened?  Mr. Hyatt didn't like that

8    decision; he appealed it.  And that caused further delay in

9    the process.

10         Finally, there was a decision that was issued at the

11   very end of '03, of December of '03.  2352, Brian.  2352 is

12   the decision then that was issued by the California Court of

13   Appeals then saying that the FTB was entitled to move that

14   information from the litigation side to the protest side.

15         Now what you're going to see, ladies and gentlemen,

16   we're not entitled to give you the full analysis of the

17   court's decision.  That we were -- we had to redact as far as

18   from this document, so you're not going to be able to see the

19   rationale.

20         But what you will see as far as from this document

21   is that the court said, yes, we were entitled to those

22   documents.  And in fact, the court said that we were

23   entitledto reimbursement of the cost associated with trying to

24   obtain this information.

25         This takes the process then to 2004.  And as you've

122

1    learned, the discovery process in this case did not end until

2    May of 2006.  In other words, in this case the attorneys were

3    still swapping back and forth document requests, interrogatory

4    requests and taking depositions.

5        In fact, it wasn't until late as far as in '05 as

6    well as in -- in '06 that even Mr. Hyatt's depositions were

7    finalized during that period of time.  And Mr. Hyatt fought to

8    have that information moved from the litigation to the

9    protest.

10       Now, the one thing too I think that is important to

11   point out at this point in time.  You heard Mr. Miller

12   testify.  Mr. Miller was the litigation coordinator.  And you

13   heard him testify that there was not going to be any

14   cherry-picking.  In other words, whatever information that was

15   developed in the litigation was going to be shared with the

16   protest hearing officer.  They weren't going to allow the

17   litigation attorneys by which to cherry-pick.  In -- and

18   you'll see this.  Mr. Miller says, "All documents designated

19   in the litigation will be provided to the protest hearing

20   officer."

21       Now, part of why I think, ladies and gentlemen, that

22   this is interesting is this.  The accusation that was made

23   against the FTB is that somehow that we were cherry-picking

24   from the evidence during the audit.  In other words, we were

25   only talking to the people that had favorable evidence.  Mr.

1   Hyatt criticized that.

2          We disagreed as far as with that criticism.  But to

3   make sure that there was no criticism whatsoever across the

4   protest, Mr. Miller said, "No cherry-picking.  Everything goes

5   to the protest hearing officer.  You're not going to identify

6   just pieces of it, you're going to give it all as far as to

7   her."

8          And now, what happens?  We're accused of that being

9   as a foundation for an extortion allegation.  In other words,

10  it's a darned if you do, darned if you don't situation.  No

11  matter what it is that we try to implement in an effort to try

12  to be fair to Mr. Hyatt, he argues against it.

13         And this cherry-picking issue I think is probably

14  one of the most vivid, and most apparent, and most upfront

15  examples then of that -- of that darned if you do, darned if

16  you don't situation.

17         Now, you know that the Nevada litigation then

18  dragged on through various processes.  And you know that --

19  at a point in time, that in fact that there was even a stay in

20  the Nevada litigation.  And if you would bring up 2353.

21         You're going to see as far as in the reference then,

22  there was an entry from Cody Cinnamon to Mr. McLaughlin that

23  talked about how that Mr. Coffill wasn't going to provide

24  documents across that period of time.  Why?  Because the NPO

25  was not in place during that period of time.  So if you look

1   at 2353-7.  I think we also have a clip then of Mr. Dunn's

2   testimony.  And maybe I'm wrong.  And I apologize, ladies and

3   gentlemen.

4        But Mr. Dunn, he also testified then as to -- that

5   there was a period of time then that this litigation had been

6   stayed, and that's what he was making reference to.  That

7   testimony was -- oh, I don't have the clip on that.  But by

8   tomorrow, I will.  And I apologize for not having it there.

9        Now, the one thing that I think that is important is

10  that the FTB was resolved by which then to try to move this

11  information that it was gathering in the litigation, and

12  trying to make sure that the protest hearing officer had

13  access to that information.

14       In addition, what you learned is that there was also

15  -- there were IDR's.  In other words, the protest hearing

16  officer was sending out her own document requests across the

17  period of time.  The first one began on December 30th of 1999.

18  That was Ms. Woodward's.

19       And the last one -- finally, that there was

20  begrudging consent then by Mr. Kula to allow the last batch of

21  information to go to the protest hearing officer in that

22  spring of 2000 time frame.  And then, at that point, by

23  November of '07 then, Mr. Hyatt then had a determination

24  concerning the protest hearing -- concerning the protest

25  determination.

1        And you'll see that decision that is found at 2360.

2    Brian, if you'll bring that up for me, please.  2360, ladies

3    and gentlemen, is a copy then of only page 1.  Brian, if

4    you'll pull it down a little bit farther for me, please.  A

5    little -- push it back.  Thank you.

6        I think you can see by taking a look at the entirety

7    of the document that it's November of 2007.  This is page one

8    then of the protest determination.  If you look at the very

9    bottom you will see that this is page 1, I think of 55, if my

10   recollection serves me, that -- where it's -- because you're

11   not entitled as to see all of the evidence that the protest

12   hearing officer had.  In other words, all those 48 boxes of

13   documents.  And because that you're not deciding then the

14   residency, and the penalty, and the interest determinations

15   then, you're not entitled to see the full portion of the

16   analysis.

17       But after having the opportunity to take a look

18   then, and to examine, and to evaluate then all of that

19   evidence the protest hearing officer upheld the determinations

20   of the audit recommendations that were made.

21       And I think that as I start to go through a couple

22   of additional issues related to this, the one thing I want you

23   to start searching for and ask yourself, "Where is there the

24   evidence of extortion?"  Mr. Hyatt has alleged that the FTB

25   took a long time to resolve the protest in an effort to extort

126

1  a settlement from him.  Where is the evidence of that?

2       That's what he alleges; there is none.  What have we

3  offered to you in exchange?  We've offered to you what

4  happened, on a time frame, by time frame, by time frame, that

5  led then, as far as to why that this process that started had

6  a resolution then in November of 2007.

7       One of the things that I think is kind of

8  interesting along the way is the protest hearings.  As you

9  heard, that there were two protest hearings that were held by

10  the protest hearing officer.  The first one was in September

11  of 2000, and the second one was in October of 2000.

12  Mr. Hyatt requested those hearings, but he was a no-show.

13       In other words, in the audit he complained that

14  nobody ever talked to him.  But here, he requested hearing

15  with the protest hearing officer and could have come and

16  explained his side of the story.  Did he show up to give his

17  side of the story?  Nope.  He was a no-show.  What did he do?

18  He sent his attorney instead.

19       Why didn't he show up?  For speculation, but maybe

20  it had something to do with the fact that the protest hearing

21  officer had the ability by which to ask questions at that

22  point in time.  Maybe he didn't want to be subjected to any

23  questions.

24       But once again, this is another example of -- in the

25  audit, he complains that nobody talked to him when he has a

1  particular and express opportunity by which to do so, and he's

2  no-show.  This was his chance.  He could have told it straight

3  to the decision-maker.  It was his choice.  And he said, "I

4  didn't want to go talk to her."

5          He also complained, if you recall, during the course

6  of the audit that the auditors that didn't talk to people that

7  may have favorable evidence in support then of what his side

8  of the story was.

9          Well, did he bring those?  Did he bring Grace Jeng

10  to the protest hearing?  Nope.  Did he bring Carolyn Cosgrove?

11  Nope.  Did he bring Dan Hyatt, his son?  Nope.  Did he bring a

12  realtor that he claimed to be -- having been working with?

13  Nope.  Did he bring that information?  Did he bring those

14  people by which then -- to that protest hearing, that could

15  have supported him?

16          I find it, on this particular point, equally

17  notable, that they -- you had two experts, as far as in this

18  case, Mr. Jumelet and Mr. Schervish.  Both of them criticized

19  the FTB for not speaking to Mr. Hyatt.  And when I asked them,

20  "Did you?"  What did they say?  "No."  The only person, Mr.

21  Schervish had that one short telephone interview and what did

22  he say during that?  "I'm a millionaire."

23          All right.  Let's -- I want to turn your attention

24  then to this combination then regarding the 1991 and the 1992

25  years.  As you know, that there were two protests because

## CERTIFICATION

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
AUDIO-VISUAL RECORDING OF THE PROCEEDINGS IN THE ABOVE-
ENTITLED MATTER.

## AFFIRMATION

I AFFIRM THAT THIS TRANSCRIPT DOES NOT CONTAIN THE SOCIAL
SECURITY OR TAX IDENTIFICATION NUMBER OF ANY PERSON OR ENTITY.

**Verbatim Digital Reporting, LLC**
**Littleton, CO 80120**
**(303) 798-0890**

_____          1-7-09
JULIE LORD, TRANSCRIBER                          DATE

# EXHIBIT 6

1   **0031**
    JAMES W. BRADSHAW (NSBN 1638)
2   PAT LUNDVALL (NSBN 3761)
    CARLA HIGGINBOTHAM (NSBN 8495)
3   McDONALD CARANO WILSON LLP
    2300 West Sahara Avenue, Suite 1000
4   Las Vegas, Nevada 89102
    Telephone No. (702) 873-4100

5

6   Attorneys for Defendant Franchise Tax Board of the State of California

7                          **DISTRICT COURT**

8                    **CLARK COUNTY, NEVADA**

9                              * * * *

10  GILBERT P. HYATT,                    Case No.    :     A 382999
                                         Dept. No.   :     X
11              Plaintiff,

12  vs.

13  FRANCHISE TAX BOARD OF THE STATE      **FTB'S  MOTION FOR JUDGMENT AS A
    OF CALIFORNIA,                        MATTER OF LAW OR ALTERNA-
14                                        TIVELY AND CONDITIONALLY
               Defendants                 MOTION FOR NEW TRIAL PURSUANT
15                                        TO NRCP 50;**

16                                        **AND**

17                                        **FTB' S ALTERNATIVE MOTION FOR
                                          NEW TRIAL AND OTHER RELIEF
18                                        PURSUANT TO NRCP 59.**

19                                        **Hearing Date:  November  19, 2008
                                          Hearing Time:  9:00 a.m.**

20

21          Defendant Franchise Tax Board of the State of California ("FTB") respectfully renews its

22  request, pursuant to NRCP 50(b), for the entry of judgment as a matter of law in favor of FTB and

23  against plaintiff Gilbert P. Hyatt.  When the evidence is viewed in the light most favorable to

24  Hyatt there is no legally sufficient basis upon which a reasonable jury could have found in favor

25  of Hyatt on any of his claims.  Alternatively and conditionally, FTB moves for an order granting a

26  new trial pursuant to NRCP 50(c).

27          In the alternative, FTB moves for a new trial and other relief pursuant to NRCP 59.  The

28  trial of this matter was riddled with errors and irregular proceedings that, particularly, erased the

FILED

2008 SEP 22  P 4: 57

CLERK OF THE COURT

Case 2:14-cv-00849-GEB-DAD   Document 23-1   Filed 08/25/14   Page 142 of 313

F.   Compliance with NPO as Evidence of Bad Faith

Evidence of the FTB's compliance with the Nevada Protective Order (NPO) was allowed to be used by Hyatt at trial as evidence of bad faith delay, extortion and emotional distress. This was error.

At trial, Hyatt was allowed over the FTB's objections to present incomplete and misleading evidence of the FTB's interpretation and compliance with the NPO. Hyatt was allowed to argue to the jury that the passage of time primarily caused by compliance with the NPO constituted bad faith delay by the FTB Legal Department as part of a conspiracy to extort a settlement from Hyatt thus causing him emotional distress due to accruing interest on the proposed assessment. Hyatt's counsel argued that the years taken to resolve the protest was motivated by the FTB's desire to pressure Hyatt into settling, cause him emotional distress from accruing interest and to prevent the California Board of Equalization from hearing Hyatt's tax case before this litigation was resolved. See Rough Trial Tr., July 22, 2008, 54:1-56:16; Rough Trial Tr., July 23, 2008, 15:19-25:12;  Rough Trial Tr., July 30, 2008, 27:21-29:13; 90:17-93:2;102-3-15.

That this influenced the jury in its deliberations is evidenced by the fact that the jury awarded all of the attorneys fees incurred by Hyatt in the protest as well as the entire proposed tax, including penalties and accrued interest as invasion of privacy compensatory damages rounded up to $52 million. The daily accruing interest on the proposed tax was allowed by the jury as compensatory damages through the entire time the protest was pending.

During the pendency of the extraordinary writ proceedings before the Nevada Supreme Court and the U.S. Supreme Court, trial court proceedings and discovery were stayed by order of the court. Long periods of delay in both the litigation and protest were caused by stay of the litigation proceedings and the resulting delay in completion of discovery. The case was stayed by court order from June 7, 2000 through April 29, 2002 and again from June 19, 2006 through November 26, 2007. Hyatt was allowed to argue that the time which passed before completion of the protest, including the years during which the case was stayed by the court, was evidence of bad faith and extortion causing Hyatt emotional distress. Yet, the Court did not allow FTB to

ER 216

1   introduce evidence of the stay.  As a result of the Court's error in allowing Hyatt to make an issue

2   of the passage of time in the protest, the jury held the FTB responsible for this delay in

3   proceedings whether the cause was the courts, Hyatt or the FTB.

4        Although central to the allegations of bad faith delay, extortion and emotional distress

5   damages and the FTB's defenses, the NPO was not allowed into evidence and the FTB's

6   witnesses were not allowed to testify concerning the interpretation and impact of the NPO.  On

7   the other hand, Hyatt was allowed to present a speculative theory of undue delay through

8   inferences argued from incomplete testimony and heavily redacted exhibits.  This allowed Hyatt

9   to litigate the litigation and protest activity while relevant evidence providing explanation, excuse

10  and justification was barred.  This was error.

11        Hyatt filed the instant lawsuit on January 6, 1998.  At the same time, Hyatt was pursuing

12  an administrative appeal (protest) of the audit's recommendations concerning his residency status

13  and proposed taxes and penalties for 1991 (June 17, 1996 notice of protest) and 1992 (October

14  10, 1997 notice of protest).  Both Hyatt's lawsuit (in Nevada) and his protest (in California)

15  raised the same factual issue: Hyatt's residency.

16        On November 4, 2005, the FTB filed its Motion for Partial Summary Judgment re:

17  Ongoing California Administrative Process which the FTB incorporates by this reference.  The

18  Motion was argued on December 14, 2005.  It was denied by order filed March 14, 2006.  Denial

19  of the motion was error and set the stage for amendment of the complaint and inclusion at trial of

20  the California administrative proceeding.

21        The protest activity was not put at issue by Hyatt until late in this litigation and there were

22  no pleading allegations concerning tortuous activity in the protest until the Second Amended

23  Complaint was filed on April 18, 2006.  The Second Amended Complaint was allowed at the end

24  of discovery which was cut off on May 31, 2006.  The Court previously allowed Hyatt discovery

25  into the protest over FTB's objections, including discovery of FTB's protest files and

26  communications and the deposition of eight FTB Legal Department attorneys with responsibility

27  in the protest or litigation.  This was error.  FTB's Objections to the DCR&R from the August 5,

28  2005 and hearing filed on September 27, 2005 is incorporated by reference.  FTB moved to

-157-

1    discover Hyatt's protest files by counter-motion filed April 25, 2006 incorporated by this

2    reference.  This was denied by DCR&R filed January 4, 2003.  Thus, FTB was denied discovery

3    into the protest issues pled and pursued at trial by Hyatt.  This was error.

4          In this lawsuit, Hyatt alleged that his residency had changed as of September 26, 1991,

5    that FTB knew it changed, yet FTB sought to extort additional taxes from him while knowing the

6    truth of his residency status.  In the protest, Hyatt disputed the audit's finding concerning his

7    residency status, contending that he really changed his residency on September 26, 1991, not

8    April 3, 1992 as determined by the audit.  Although the First Cause of Action concerning

9    determination of Hyatt's residency and FTB's power of examination was dismissed, Hyatt

10   incorporated by reference in each surviving cause of action all of the fact allegations concerning

11   his residency.  Thus, both the lawsuit and the protest were examining the same issue:  Hyatt's

12   residency status.

13         The alleged delay in completing the protest was put at issue by Hyatt but not until his

14   Second Amended Complaint.  It was included in the Hyatt's opening statement and viciously

15   argued in closing.  The primary reason for passage of time in the protest was the delay the NPO

16   allowed Hyatt to cause in turning over relevant information to the protest hearing officer.  The

17   jury was prevented from hearing the relevant evidence underlying the delay.  Pursuant to NRS

18   48.025, relevant evidence is admissible.  Relevant evidence is that which has "any tendency to

19   make the existence of any fact that is of consequence to the determination of the action more or

20   less probable than it would be without the evidence."  NRS 48.015.  It was error to exclude the

21   relevant protest related evidence.

22         The Court had no jurisdiction over the protest proceeding, but tied the two proceedings by

23   entry of the NPO, which allowed Hyatt to cloak evidence relevant to the protest determination

24   under the NPO.  FTB's witnesses were not allowed to explain their interpretation of the NPO or

25   the effect it had in delaying the protest proceeding.  In fact, FTB was not even allowed to

26   introduce the NPO.  But Hyatt's witnesses were allowed to offer their interpretation of the NPO.

27   This resulted in omission of evidence necessary to defend against Hyatt's contention that the time

28

1  it took to complete the protest proceeding was intentional, bad faith delay employed as part of a

2  conspiracy to extort a settlement, as well as a one-sided view described only by Hyatt.

3      In sustaining Hyatt's objections to FTB's testimony concerning the interpretation and the

4  impact of the NPO, the Court repeatedly validated Hyatt's contention that the protest proceeding

5  should not have been tied to the litigation discovery and that the NPO could not be used as an

6  excuse for delay.   Ordinarily, the parties are not allowed to litigate the litigation at trial.

7  However, having erred in allowing Hyatt to try the protest process, the error should not have been

8  compounded by excluding FTB's evidence concerning the impact of the NPO.

9      In spite of the Court's pre-trial Order concerning the tax issues, Hyatt was allowed to fully

10  try the tax case under a conspiracy theory pitting the California Legislature and Executive branch

11  against the Nevada Court as a "check and balance" to be enforced by the jury.   Rough Trial Tr.,

12  July 22, 2008, 8:17-11:16.   Evidence of FTB's compliance with the NPO was used by Hyatt to

13  argue that FTB Legal Department was somehow complicit in the conspiracy to extort a settlement

14  out of Hyatt through delay calculated to pressure Hyatt through the emotional distress which

15  would be caused by accruing interest on the unpaid proposed assessment.

16      The NPO was entered on December 27, 1999.   FTB filed its objection on December 15,

17  1999 to the Discovery Commissioner's December 3, 1999 Recommendation, but the Court signed

18  the order on December 21, 1999.   Paragraph 4 of the NPO prohibited FTB from sharing any

19  evidence it gathered during discovery in the lawsuit with the protest hearing officer who was

20  responsible for deciding Hyatt's protest.   This was error.

21      FTB petitioned for relief from this ruling by way of extraordinary writ to the Nevada

22  Supreme Court.   By order filed April 4, 2002, the Nevada Supreme Court declined to review the

23  propriety of the discovery order in the writ proceeding indicating that FTB had a plain, speedy

24  and adequate remedy to challenge the order on appeal.

25      In the subsequent years of this litigation, Hyatt made much mischief of the NPO by

26  cloaking virtually all documents and information relevant to his residency and source and timing

27  of receipt of income discovered from him or his friendly witnesses under the NPO.   At the same

28  time, he used the NPO to shield from disclosure documents and information requested by the

-159-

ER 219

1   protest hearing officer. This caused great delay and expense in exchange of relevant evidence

2   between FTB litigation attorneys and the protest hearing officer who was located in the same

3   office.

4        The NPO prohibited FTB from using evidence it obtained in discovery in this case in the

5   parallel and related California administrative protest proceeding without first requesting Hyatt's

6   permission. If Hyatt's permission was refused, FTB could then go through the California

7   administrative subpoena process. Hyatt refused to consent to FTB's request for release of

8   discovery materials to the protest hearing officer, causing FTB to periodically issue an

9   administrative subpoena for documents until the close of discovery in this litigation on May 31,

10  2006.

11       FTB reasonably interpreted the NPO as requiring separation of the litigation and protest as

12  set forth in George McLaughlin's March 7, 2000 memo to Terry Collins setting forth the protocol

13  followed by FTB in coping with the NPO. Ex. 2333. Relevant information could not be shared

14  with the protest hearing officer without complying with the NPO.

15       Faced with parallel proceedings, both requiring fact discovery, FTB's management made

16  the decision to honor the NPO by separating the personnel involved in the litigation from the

17  protest hearing officer. Management also resolved not to duplicate discovery efforts and expense

18  by following the NPO protocol to request and subpoena information. It was also decided not to

19  allow FTB's litigation attorneys to select what discovery materials would go to the protest

20  hearing officer. There would be no "cherry picking" which Hyatt could later criticize. All

21  discovery material was to go to the protest hearing officer who would decide what was relevant to

22  the tax determination. The Court repeatedly instructed the jury to disregard FTB's management

23  testimony in this regard, thus discrediting FTB's compliance with the NPO in front of the jury on

24  the evidence most important to explain delay in the process put at issue by Hyatt. Rough Trial

25  Tr., July 14, 2008 (Ben Miller testimony), 54:1-58:20; 77:18-95:4.

26       Shortly after April 29, 2002, when the Nevada Supreme Court remitted the case to the

27  District Court, FTB made its first request for release of information to the protest hearing officer

28  on June 3, 2002. Ex. 2342. Hyatt refused to consent causing FTB issued an administrative

McDONALD·CARANO·WILSON℠
2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4354
PHONE (702) 873-4100 • (702) 873-9966

-160-

1   subpoena on July 7, 2002.  Ex. 2344.  Hyatt refused to comply with the subpoena, so it was

2   enforced through the California Superior court which issued its Order to Show Cause on February

3   28, 2003.  Ex. 2348.  Hyatt fought the subpoena through the California Third Circuit Court of

4   Appeal which upheld the Superior Court's order enforcing the subpoena by decision dated

5   December 31, 2003.  Ex. 2352.  A review of this decision shows how the NPO pitted the Nevada

6   litigation against the California administrative proceeding in an unprecedented manner.

7       As discovery progressed in this litigation, subsequent requests were made to Hyatt by

8   FTB to release discovery materials to the protest hearing officer.  The second request was made

9   on October 28, 2005.  Ex. 2354.  Once again, Hyatt did not consent, so an administrative

10  subpoena was issued on January 30, 2006.  Ex. 2356.  Subsequent requests for release of

11  information to the protest hearing officer were made by FTB on December 6, 2005 and January

12  19, 2007.  Exs. 2355 and 2357.  Not until February 1, 2007 did Hyatt's counsel provide

13  begrudging consent to release of such highly relevant discovery such as Hyatt's own deposition

14  and the deposition of his close associate Grace Jeng.  Ex. 782.

15      The series of requests by FTB, responses from Hyatt's counsel, administrative subpoenas

16  and the California Third Circuit Court of Appeal decision were admitted for the testimony of FTB

17  attorneys involved in the litigation and/or protest.  However, the exhibits were admitted in heavily

18  redacted form due to the Court's trial rulings concerning exclusion of evidence which was "after

19  acquired" (meaning discovered facts unfavorable to Hyatt, or in fairness excluded because of

20  exclusion of evidence unfavorable to Hyatt), relating to interpretation or compliance with the

21  NPO or "litigating the litigation."  Related testimony by the FTB attorneys was barred for the

22  same reasons, including Terry Collins, George McLaughlin, Ben Miller and Robert Dunn.  This

23  resulted in exclusion of evidence relevant to explain, excuse, or justify the passage of time in the

24  protest proceeding.

25      The Court's evidentiary rulings resulted in these witnesses testifying without benefit of

26  unredacted, relevant documents.  Examples of the heavily redacted or barred exhibits include Exs.

27  2320, 2321, 2322, 2323, 2324, 2325, 2335, 2336, 2341, 2352, 2353-105-143, 2354, 2356, 2357,

28  2359, 365, 374, 375, 391 and 401.  Since the Court decided to allow Hyatt to present evidence of

-161-

McDONALD·CARANO·WILSON⸎
2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4354
PHONE (702) 873-4100 • (702) 873-9966

1   delay in the protest, FTB should have been allowed to present any relevant evidence as to the

2   reasons, motives and causes of delay.  As points of error, FTB incorporates those rulings and

3   protest related exhibits by reference, including the argument presented on June 11, 2008 (Rough

4   Trial Tr., 8:19-40:7) and during the testimony of Terry Collins (Rough Trial Tr., July 9, 2008,

5   64:8-135:4), George McLaughlin (Rough Trial Tr., July 9, 2008, 135:5-169:14; Rough Trial Tr.,

6   July 10, 2008, 39:14-137:15; Rough Trial Tr., July 11, 2008, 28:14-148:21), Ben Miller (Rough

7   Trial Tr., July 14, 2008, 15:11-186:17) and Robert Dunn (Rough Trial Tr., July 15, 2008, 2:9-

8   203:18).

9       In order to comply with the NPO and at the same time ensure that both FTB and the

10  protest hearing officer were aware of and getting the same information from Hyatt during both the

11  Nevada litigation and the protest proceedings, a one-way system of communication was put into

12  place.  This system was intended to ensure that the answers being provided by Hyatt in the protest

13  proceedings were complete, truthful, and in accord with the information Hyatt provided in the

14  Nevada litigation.  Under the system, Mr. Dunn, FTB's Nevada litigation counsel, was tasked

15  with reviewing the information requests made by the protest hearing officer and the responses

16  provided by Hyatt in the protest proceedings to determine whether the protest hearing officer was

17  receiving the complete information that Hyatt provided in the Nevada litigation.

18      Ensuring that Hyatt provided all of the information to the protest hearing officer that he

19  provided in the Nevada litigation was a major undertaking imposed by the Court's order which

20  took FTB great time to accomplish.  For nearly eight years after the NPO was entered, as

21  documents were produced by Hyatt in the Nevada litigation, Mr. Dunn reviewed Hyatt's

22  responses to requests for information in the protest proceedings to determine if Hyatt had

23  provided the protest hearing officer with all of the documents that he provided in the Nevada

24  litigation.  Each time this review process took place, it was discovered that Hyatt gave evidence,

25  facts, and documents about his residency in the lawsuit different than he gave to the protest

26  hearing officer.  FTB, however, was precluded by the NPO from sharing all the evidence it knew

27  about Hyatt's residency with the protest hearing officer.  Practically, sharing such evidence would

28  have been a simple matter of moving that information from one office to another at FTB.

-162-

McDONALD·CARANO·WILSON℠
2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4354
PHONE (702) 873-4100 • (702) 873-9966

1    Instead of merely allowing FTB's litigation team to turn over documents to the protest

2    hearing officer, the NPO had a provision that required FTB to seek Hyatt's consent to move

3    evidence from the lawsuit to the protest hearing officer.  If Hyatt denied that consent, then FTB

4    was required to issue an administrative subpoena.  When asked for his consent, Hyatt refused.

5    Thus, FTB was left with no alternative but to seek to compel Hyatt to provide the critical

6    information and documents by resorting to the issuance of an administrative subpoena.  Hyatt

7    opposed the subpoena.  However, the California district court agreed that FTB was entitled to the

8    information and allowed it be given to the protest hearing officer.  Hyatt then appealed that

9    decision to the California Court of Appeals and lost.  FTB had to undergo that same procedure

10   twice more as additional evidence became available in the lawsuit.  All of these procedural steps

11   took great time.

12       In short, FTB expended great time and effort over an almost eight year period in

13   complying with the NPO entered by this Court to ensure that Hyatt had produced accurate and

14   truthful responses to the protest hearing officer.  Clearly, FTB's compliance with this Court order

15   substantially contributed to the delay in the resolution of the protest proceedings.

16       Notwithstanding that FTB's compliance with this Court's order was the cause of this

17   delay, at trial, Hyatt was allowed to point to the length of time it took for the protest process to

18   finalize as evidence of FTB's alleged bad faith.  However, the time or "delay" in resolving the

19   protest was the direct result of compliance with the NPO.  To make matters worse, FTB was

20   prohibited from introducing the NPO as an exhibit at trial.  Further, while Hyatt's witnesses were

21   allowed to testify to the operation of the NPO, FTB's witnesses were foreclosed from offering

22   their interpretation of what the NPO required FTB to do.  Thus, FTB was denied the opportunity

23   to explain why this "delay" occurred i.e. because of the NPO.

24       In sum, it seems inconceivable that a party's compliance with a court order can be used as

25   evidence of bad faith.  Cf. Virgin Atl. Airways Ltd. v. British Airways PLC, 872 F.Supp. 52, 62

26   (S.D.N.Y. 1994) (defendant could not be held liable for its actions taken in "[c]ompliance with a

27   federal court order").  In other words, how can the delay caused by FTB's good faith compliance

28   with a Court order be used as evidence of bad faith against FTB.  By allowing Hyatt to use the

-163-

1 delay caused by the NPO against FTB (without allowing FTB to explain the delay caused by the

2 NPO), this Court erred.  At a minimum, the NPO should have been introduced as an exhibit and

3 both sides should have been permitted to offer testimony interpreting the NPO, not just Hyatt.

4   G. <u>Tax Amnesty Legislation as Evidence of Bad Faith</u>

5     1. The Court Erred in Allowing Evidence and Argument Concerning
6       California's Tax Amnesty Program

7   At trial, Hyatt was allowed over FTB's objection to present evidence of California's Tax

8 Amnesty Program.  Hyatt's counsel contended in closing argument that this was evidence of bad

9 faith and extortion supporting a finding of liability.  The tax amnesty penalty was argued to be

10 evidence of compensatory damages and was included in the jury verdict awarding $52 million in

11 damages for invasion of privacy.  This was the amount of the proposed tax liability rounded to the

12 next highest million dollars.  This evidence was not relevant, was highly prejudicial and clearly

13 influenced the jury in its deliberations, finding of liability and calculation of damages.

14   The California Tax Amnesty Program was not a part of either FTB's audit process or

15 FTB's protest, it was irrelevant and all evidence and argument concerning the Tax Amnesty

16 Program should have been barred as irrelevant.  Pursuant to NRS 48.025, only relevant evidence

17 is admissible.  Relevant evidence is that which has "any tendency to make the existence of any

18 fact that is of consequence to the determination of the action more or less probable than it would

19 be without the evidence." NRS 48.015.  Hyatt's Second Amended Complaint is based upon the

20 Audit process directed at him, the issuance of the Notices of Proposed Assessment and his claim

21 that the Protest took too long.  The Tax Amnesty Program was created by statute several years

22 after Hyatt's audit was closed during the pendency of this litigation.

23   Prior to trial, this Court ruled that Nevada would not assert jurisdiction over Hyatt's claim

24 for declaratory relief to determine his California residency or California's right to conduct audit

25 activities in Nevada, finding a lack of subject matter jurisdiction,  thus committing the question of

26 his California residency and tax liability to the sole discretion of the State of California.  <u>See</u>

27 Order dated April 16, 1999. This ruling was deemed correct by both the Nevada Supreme Court

28 and U.S. Supreme Court.  It was therefore error to allow Hyatt to present evidence of the

McDONALD·CARANO·WILSON℠

2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4354
PHONE (702) 873-4100 • (702) 873-9966

-164-

VII.    CONCLUSION

Based upon the foregoing, FTB respectfully requests that the Court vacate the Judgment, and/or grant a new trial or the further relief described herein.

Dated this _22_ day of September, 2008.

McDONALD CARANO WILSON LLP

By: _Pat Lundvall_
JAMES W. BRADSHAW (NSBN 1638)
PAT LUNDVALL (NSBN 3761)
CARLA HIGGINBOTHAM (NSBN 8495)
2300 West Sahara Avenue, Suite 1000
Las Vegas, NV 89102
Telephone No. (702) 873-4100

Attorneys for Defendant
Franchise Tax Board of the State of California

-190-

# EXHIBIT 7

COPY    DISTRICT COURT
CLARK COUNTY, NEVADA
* * * * *
COPY

GILBERT P. HYATT,       .

         Plaintiff,     .

    vs.                 .

CALIFORNIA STATE FRANCHISE   .
TAX BOARD,               .

      Defendant.     .

. . . . . . . . . . . . . .

CASE NO. A-382999

DEPT. NO. X

**Transcript of Proceedings**

FILED

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 58**

TUESDAY, JULY 15, 2008

<u>APPEARANCES</u>:

FOR THE PLAINTIFF:      PETER C. BERNHARD, ESQ.
                          MARK HUTCHISON, ESQ.
                          DONALD J. KULA, ESQ.

FOR THE DEFENDANT:      PAT LUNDVALL, ESQ.
                          CARLA B. HIGGINBOTHAM, ESQ.
                          JAMES BRADSHAW, ESQ.

COURT RECORDER:            TRANSCRIPTION BY:

VICTORIA BOYD              VERBATIM DIGITAL REPORTING, LLC
District Court            Littleton, CO 80120
                          (303) 798-0890

Proceedings recorded by audio-visual recording, transcript
produced by transcription service.

1   the discovery activity, some of the responses under certain

2   rules to document demands.  In December of that year Mr. Hyatt

3   -- Mr. Hyatt's counsel filed a series of motions requesting

4   depositions of individuals with a lot of document production.

5           MR. KULA:  I'm going to object.  It's definitely

6   getting into the litigating -- litigation.  Getting into the

7   discovery and what happened, motions filed and so forth.  We're

8   not supposed to get into that.

9           MR. BRADSHAW:  Well, we're into his

10  responsibilities, the background, and the reason for passage of

11  time in the process.

12          MR. KULA:  To characterize motions that somehow

13  that's -- I don't want to mischaracterize it.  Both sides filed

14  a lot of discovery motions and --

15          THE COURT:  I'm going to sustain the objection.  Ask

16  you to take him maybe a point at a time.

17          MR. BRADSHAW:  Okay.

18  BY MR. BRADSHAW:

19     Q.    Let me back up.  A point in time came when as

20  litigation counsel and protest hearing officer wearing both hats

21  -- you became -- you undertook responsibilities in discovery.

22     A.    Yes, I was involved in the discovery issues from I

23  would date it to September of 1998 when we worked with the

24  attorney general's office on some of the early productions of

25  documents.

1          In December, I just -- the workload became such that

2    it was probably impossible for me to process the protest timely

3    and do the discovery work needed.  So my recollection is that I

4    asked my boss at the time, Mr. Terry Collins, to consider

5    assigning the protest to someone else because I didn't think

6    both could be worked at the same time for workload reasons.

7          Q.    And that was done?

8          A.    That was done.

9          Q.    Okay.  And that assignment was to Ms. Woodward?

10         A.    Ms. Woodward, yes.  As I recall, she was officially

11   assigned, according to the notes we have, in February of 1999.

12         Q.    At that point in time there was an open line of

13   communication, though, between litigation counsel and Ms.

14   Woodward?

15         A.    Yes, as I recall, we talked about the case, both

16   sides, the litigation activity and the protest activity freely.

17

18         Q.    Okay.  As litigation unfolded, did she have access

19   to discovery?

20         A.    Yes, she did.

21         Q.    The discovery materials?

22         A.    Yes, she did, for a period of time.

23         Q.    All right.  And that brings us to December 1999 when

24   her information and document requests went out to Mr. Cowen.

25         Now, you're aware that Mr. Hyatt has made an issue of

1  how much time the protest has taken to resolve?

2       A.    Yes, I am aware of that.

3       Q.    And you know the reasons for the passage of time in

4  resolving the protests?

5       A.    Yes, I do.

6       Q.    What's the primary one?

7       A.    The primary reason is Mr. Hyatt's filing this

8  litigation and the consequences of it; first, in the

9  implications on our resources internally, and then somewhere in

10 early 2000 his, as you've heard, erecting a wall between the

11 protest individuals and the people on the litigation side

12 through which it was difficult to pass communication.

13           Subsequent, the balance of the subsequent seven years

14 until the protest was resolved, was involved dealing with those

15 issues and moving the documents from the litigation -- the

16 documents and the information from the litigation to the protest

17 hearing officer so that she could ultimately make the correct

18 decision under our law based on all the facts and circumstances.

19

20           MR. KULA:  Your Honor, I'm going to object to the

21 reference to Mr. Hyatt building a wall.  There's not been

22 evidence of that, and it's argument of a witness.

23           MR. BRADSHAW:  Let me clarify that.

24           THE COURT:  I understand your position, and I think

25 the jury's pretty much aware what the respective positions are.

1        A.     Yes, it made sense, and that was our practice at the

2   Franchise.

3        Q.     Okay.  But what did the normal practice involve by

4   way of chronology of events?

5        A.     Normally a tax case goes through a process.   An

6   audit, maybe a protest, maybe an appeal and then litigation.

7   It's a linear process.  So you'd be dealing with each piece of

8   the process chronologically one after the other.

9        Q.     And this situation was a little different than that?

10        A.     This situation is very different.  We have a protest

11   going on.  A protest is starting, and then there's a lawsuit.

12   So they're going on simultaneously.  It's different.  It's

13   extraordinary.

14        Q.     All right.  And that became untenable for you?

15        A.     It did, especially with the volume of work related

16   to the initial wave of discovery.

17        Q.     Okay.  Couldn't do both?

18        A.     No.

19        Q.     (Indiscernible) heard from Mr. Miller yesterday, he

20   didn't want you to do both?

21        A.     I did hear him say that, yes.

22        Q.     Okay.  And that was a decision over your head?

23        A.     That apparently happened in management levels above

24   me, correct.

25        Q.     Okay.  There came a time when you reviewed Mr.

1          (Bench conference began at 10:26 a.m.)

2          MR. KULA:  Your Honor, it was submitted for a

3    limited purpose (indiscernible) the jury (indiscernible) and

4    that's not the case that's being tried necessarily

5    (indiscernible) the claims.  But (indiscernible) the jury.  This

6    was admitted for a very limited purpose.

7          MR. BRADSHAW:  It's admitted for the limited purpose

8    of showing notice.  I'm going through with this witness what

9    they had notice of.  For that limited group that we're not

10   saying what's true, what's false in the complaint.  We're not

11   arguing the issues.  I'm going through so the jury can see what

12   they were on notice of.  That's limited for that purpose,

13   notice.

14         MR. KULA:  (Indiscernible) go through the complaint

15   page by page to do that.

16         MR. BRADSHAW:  I am not going through page by page.

17   I'm going through the fact allegations that they have notice of.

18   They're very uncommon with the protest.  And then the - each

19   caption of each cause of action that shows those facts that were

20   never dismissed, that were never given up, that were always

21   pursued in both the litigation and protests are incorporated by

22   reference in each and every one.

23         MR. KULA:  Your Honor, I object to relevance, as

24   well.  The protest is what is at issue, not this case.  Not how

25   long it took to try this case, not all the discovery that was

**Verbatim Digital Reporting, LLC / 303-798-0890**

1   taken in this case.  So it's just irrelevant going through all

2   the proceedings of this case.  If they want to say what happened

3   in the protest, that's fine.  But it's -

4            MR. BRADSHAW:  Well

5            MR. KULA:  -- it's contrary to what (indiscernible)

6   protective order severed into two separate proceedings.  They're

7   trying to connect them, I understand that.  But they shouldn't

8   go out of the scope of (indiscernible) with this case and try

9   (indiscernible) the length of this case.  That's not at issue.

10  It's the protest.

11           MR. BRADSHAW:  Which we certainly (indiscernible)

12  the connection and the claim of bad faith delay, there was a

13  process that took time, and it's related to discovery in this

14  litigation and this gentleman's obligation to get what unfolded

15  in discovery that was relevant to the protest, and that took

16  time.  He's already testified that that last request was in

17  mid-2007, and his responsibility was to compare what was

18  provided by Mr. Hyatt, to what was provided in the protest.

19  That took time, year after year, after year, after year, and it

20  starts with the facts and circumstances put at issue in this

21  complaint, same as in the protest.  And I'm going through to

22  show what the agency's on notice of.

23           MR. KULA:  Your Honor, we're not allowed to get into

24  the substance of the protest.  (Indiscernible) this is the

25  backdoor into that, getting into the specifics of what's at

1    issue in this case, and therefore what was at issue in the

2    protest.  I mean, he's generally stated that he was trying to

3    get documents from this side, or that side of the

4    (indiscernible).  But, we're getting now - now we're into

5    substance.  Are we allowed to come in then and show what we did

6    produce in the protest?  No, that's not - that's not allowed.

7    So they're getting into details (indiscernible) there was some

8    delay and that they had to deal with a lot of requests.  But

9    they want to get into the specifics, the substance.  And now

10   it's a backdoor into the substance and say the same issues here

11   are in the protest.  And that's beyond what the Court's ruled in

12   this case.

13           THE COURT:  Are you intending to go into the

14   substance and into the cause of each and every cause of action?

15           MR. BRADSHAW:  No, I'm not going to touch on any of

16   those, except the caption, see what it is, and that these facts

17   are incorporated by reference in each and every one.  They've

18   argued and keep getting in that the residency case is gone, that

19   it's not relevant.  And, of course, it was relevant, the facts

20   and circumstances.  Your Honor's instruction to the jury said

21   they might hear facts relating to the audit, and they certainly

22   have.  We did nine weeks of nothing but the audit facts and

23   circumstances.  And I think I can bring out - bring this

24   document to life through some witness as to what they're on

25   notice of, and it's been admitted for that purpose.  I'm not

1   going to go through the causes of action with him, the elements,

2   the pros and cons, anything like that.

3          MR. KULA:  Well, if (indiscernible) going beyond

4   notice, Your Honor, (indiscernible) I'll have to show this is

5   something that (indiscernible) witness had to deal with.  It's

6   beyond notice (indiscernible) claims are.  (Indiscernible) in

7   this case.  That's it.  And they're taking it way beyond that.

8          THE COURT:  Well, I'm sure that --

9          MR. BRADSHAW:  And I'll be brief.

10         THE COURT:  -- I'm sure you'll be watching closely.

11  I think with respect to the issue of notice, in particular

12  (indiscernible) issue is fair game with respect to this item,

13  which was admitted for that purpose.

14         MR. KULA:  (Indiscernible).

15         MR. BRADSHAW:  I'll limit it to that.

16         MR. KULA:  Notice of the claims, though, Your Honor?

17   I mean, (indiscernible).

18         THE COURT:  I don't want to hear a lot of - I'm not

19  hearing - if I understand Mr. Bradshaw correctly, we're not

20  going to hear a lot about causes of action.

21         MR. BRADSHAW:  Nothing more than the cause of action

22  and to show that the facts are incorporated by reference.

23  They've already heard that, they just haven't seen it in this

24  exhibit through a witness.

25         THE COURT:  Very well.

1  37, eighth cause of action, lines 1 through 6.

2  BY MR. BRADSHAW:

3      Q.    Mr. Dunn, again, you read and the agency was on

4  notice of the eighth cause of action for breach of

5  confidentiality including informational privacy.  Again, you saw

6  and the agency was on notice of Mr. Hyatt's realleging and

7  incorporating by reference all fact allegations and claims and

8  the 91 paragraphs preceding this paragraph?

9      A.    Yes.

10     Q.    Did he ever give up on a single one?

11     A.    No.

12     Q.    As litigation counsel you were responsible to

13  participate in the discovery into all those matters?

14     A.    Yes.

15     Q.    And as litigation counsel you saw evidence unfold in

16  discovery that you were determined to get to the protest hearing

17  officer?

18             (Audio recording skipping)

19     A.    That's (indiscernible).

20     Q.    (Indiscernible) in that regard.

21     A.    Actually have a (indiscernible) duty (indiscernible)

22  there is a revenue and (indiscernible) section 19.501 that's -

23  that it's an affirmed (indiscernible) duty to enforce the

24  revenue and taxation (indiscernible) of California.  As an agent

25  of the State of California and the Franchise Tax Board, when I

1    became aware of information developed in this litigation that

2    answered the questions in the protest, I had an affirmative

3    statutory duty to make sure that information was considered in

4    the protest in California.  That's my duty.

5         Q.    And it took a long time to fulfill that duty?

6         A.    Yes, it did.

7         Q.    Are you satisfied that you did your best?

8         A.    I am.

9         Q.    And is your work done in that regard?

10        A.    It's done in that regard to the extent that the

11   protest has concluded, yes.  And that discovery in this

12   litigation has ended so it's unlikely that there will be other

13   evidence.

14        Q.    Mr. Dunn, I'd like to take you to Exhibit 2326.

15   This is admitted.  It's a March 17th, 1998 fax from Eugene Cowen

16   to Mark Hutchison (indiscernible) Steffen, and do you see down

17   at the bottom it's cc'd to Don Kula?  Are you familiar with this

18   document?

19        A.    Yes, I am.

20        Q.    It indicates attached is a copy of subpoena duces

21   tecum to be issued to Cal Fed Bank by the FTB regarding the

22   taxpayer's 1991 and 1992 Cal Fed Bank account information.  Did

23   this have particular significance -- well, first let me ask you,

24   when you did you become aware of this document?

25        A.    This is, as I recall, contained in the production of

1   documents submitted prior to the deposition of Mr. Hyatt's CPA

2   Michael Kern.  It's one of the early documents in the production

3   that was marked PBTK.

4        Q.    Okay.  And we see that in the lower right-hand

5   corner.

6              MR. BRADSHAW:  Brian, would you bring that up?

7   BY MR. BRADSHAW:

8        Q.    Okay, and you knew from discovery that was acronym

9   for Mr. Kern's firm, Piercy, Bowler, Taylor & Kern.

10       A.    Correct.  These were documents produced and

11  represented as Mr. Kern's files.

12             MR. BRADSHAW:  Okay, Brian, back to the document.

13  BY MR. BRADSHAW:

14       Q.    And these were received and you studied them in

15  early 2000?

16       A.    Yes.

17       Q.    And this preceded - this preceded Mr. Kern's

18  deposition in May of 2000?

19       A.    Yes, as best as I recall, that's correct.

20       Q.    Okay.  It indicates we have until Friday to file a

21  motion to quash if we so desire.  While there are no pure tax

22  reasons to quash the motion, there may be tactical reasons to do

23  so such as making the FTB work for its requests from now on or

24  taking this opportunity to file the motion in the Nevada courts

25  or otherwise.

1        And were you surprised to see this connection

2   between Mr. Cowen's protest representative and the litigation

3   attorneys?

4        A.    Not surprised.  It did indicate to me that they're

5   working together, the litigation and the protest side in Mr.

6   Hyatt's action.

7        Q.    Okay.  But this clearly tied the litigation tactics

8   to the protest?

9        A.    Yes, it --

10            MR. KULA:  Your Honor, misstates the evidence.

11            THE WITNESS:  It does in my mind.

12            MR. KULA:  Argument -- argument of counsel as well.

13            THE COURT:  Ask you to rephrase it.

14            MR. BRADSHAW:  Okay.

15  BY MR. BRADSHAW:

16       Q.    Mr. Dunn, after reviewing this, what impression did

17  you have?

18       A.    That Mr. Cowen and Mr. Hyatt's other attorneys are

19  working in concert.

20       Q.    All right.  And the subpoena duces tecum to be

21  issued to Cal Fed Bank, what did that represent to you, that

22  request?

23       A.    That request, as I recall, comes from a request by

24  Annie Jovanovich who had reviewed the file at some point as

25  protest hearing officer and had come to the same conclusion that

1   the auditor came to, that there was a missing checking account,

2   and they're in pursuit of this missing checking account.

3       Q.    All right.  You're aware that the -- during the

4   audit the issue of cooperation came up?

5       A.    Yes, it was a -- one of the central issues in the

6   application -- proposed application of the fraud penalty.

7       Q.    And you understood that was at issue in the protest?

8       A.    Yes, that's at issue in the protest.

9       Q.    And that was the subject of discovery in the

10  litigation?

11      A.    Correct.

12      Q.    What did this tell you after reviewing it about that

13  issue?

14          MR. KULA:  Objection.  Improper opinion, your Honor.

15          MR. BRADSHAW:  I'm asking for his impression of it.

16  I didn't ask for an opinion.

17          THE COURT:  Very well.

18          THE WITNESS:  The request comments on basically

19  internalized lack of cooperation, make them work for the

20  material.  I think it memorializes at some level a structural

21  lack of cooperation.

22  BY MR. BRADSHAW:

23      Q.    And the timing of production of this and Mr. Kern's

24  deposition, that had significance to you, didn't it?

25      A.    The timing of production of this and Mr. Kern's

1  deposition which occur early in 2000, yes, it did.  It did have

2  significance.

3       Q.    Why is that?

4       A.    Related to the process is ongoing at the time in

5  this litigation.  The biggest significance to this at the time

6  would be that we had a protective order imposed on December

7  27th, 1999, and we've also had at some point in this period of

8  time Mr. McLaughlin's protocol you've seen trying to --

9       Q.    Yeah.

10      A.    -- come up with a way to deal with that issue.  And

11  then subsequent to that we took the deposition of Mr. Kern, and

12  that was placed under the protective order which meant we

13  couldn't share it with the protest side.

14      Q.    Why -- what difficulty did that present?

15      A.    As I mentioned before, I have an affirmative

16  statutory duty to enforce the Revenue and Taxation Code.  At the

17  deposition of Mr. Kern I learned facts and circumstances that

18  were important, responsive, actually, to questions that had been

19  asked and were relevant to, in my opinion, the application of

20  the fraud penalty.  And that world -- that body of information

21  was now blocked from production to the protest hearing officer

22  who's trying to accurately apply the revenue and taxation code

23  and come to the right result.

24      Q.    So Mr. Hyatt designated these as confidential under

25  the Nevada protective order?

1      A.     Well, he designated the testimony of Michael Kern.

2   I believe Mr. Bernhard may have actually done that at the

3   beginning of the deposition of Michael Kern, if my memory's

4   correct.   This document, I believe, had the word "confidential"

5   on it.

6      Q.     And you took that as a designation under the

7   protective order?

8      A.     Well, at this time there was confusion over exactly

9   what mechanism was used to designate documents under the

10  protective order, so we treated this document and some of these

11  early productions as being designated under the protective

12  order, correct.

13     Q.     Okay.   This was not something Mr. Hyatt volunteered

14  to provide in the protest?

15     A.     No.

16     Q.     It's not something he consented to after the

17  request?

18     A.     No.   In fact, I think this document was included in

19  the first subpoena.   There was a letter sent by Mr. Leatherwood,

20  and the response was no.

21     Q.     Okay.   Everybody else has had a chance to testify

22  about the PASS desktop.   I'd like to give you that opportunity.

23  That's Exhibit 2353.   Do you have that up there?   I'd like to

24  take you to page 10.

25          MR. BRADSHAW:   Brian, bring that up.

1   top underneath the regarding above 1 and 2.  Yeah, let's bring

2   up those with 1 and 2.  There we go.

3   BY MR. BRADSHAW:

4        Q.    Okay.  Now this was one in a long series of requests

5   for assistance from Ms. Cinnamon to the litigation folks.

6        A.    Yes, it was -- I believe it's the first one.

7        Q.    All right.  The very first one.  And it indicates

8   this memorandum submittal will serve as a request as outlined in

9   the December 27th, 1999 protective order for assistance in the

10  above matter.  As discussed below, it is requested that you or

11  your designee -- and did at that become you?

12       A.    Yes.

13       Q.    -- review taxpayer's June 30, 2000 submittal to

14  determine whether Mr. Hyatt and his representative have provided

15  all existing relevant confidential information in response to

16  our December 30th, 1999 information and document request.

17             Now, you're familiar with that June 30, 2000

18  submittal?

19       A.    Yes, I am.  That was Mr. Hyatt's response to Ms.

20  Woodward's December 30th, 1999 IDR.

21       Q.    Okay.  And the folks have seen that before as

22  Exhibit 356.  That was Mr. Coffill's letter?

23       A.    Yes.

24       Q.    The big one?

25       A.    Yes, it -- that was a big one.

1      Q.     Okay.  And then it's referenced to the December 30th

2   information and document request.  That's Exhibit 348 that you

3   have in front of you.

4      A.     Yes, it is.

5             MR. BRADSHAW:  Let's go to the second page, Brian,

6   and have a look at the paragraph towards the top of the page,

7   the first full paragraph.

8   BY MR. BRADSHAW:

9      Q.     Now, this indicates that enclosed is a copy of our

10  December 30th, 1999 IDR and the taxpayer's response.  Hyatt's

11  June 30th, 2000 response consists of two June 30, 2000 letters,

12  and seven large binders containing documents.  The two letters

13  and their enclosures are -- is substantively identical in all

14  respects except that the subject heading for one refers to

15  income year 1991 and the other refers to income year 1992.

16             The enclosure to each letter is a 100 page document

17  entitled responses to FTB's letter dated December 30th, 1999.

18  The enclosure lists each IDR request and is immediately followed

19  by the taxpayer's response, including references to the bindered

20  materials.  To conserve paper, enclosed are copies of the

21  letters and only one copy of the enclosure.  The original

22  bindered materials have been copied, are submitted with this

23  memorandum.  I have put the bindered materials in boxes labeled,

24  and then she goes on to label it.

25             Now, Mr. Dunn, were these materials provided to you

61

1  at the time?

2       A.    Yes, they were.

3       Q.    And did you carefully review them?

4       A.    I did.

5       Q.    And did you compare what was there with what had

6  been discovered in the litigation?

7       A.    I did.

8             MR. BRADSHAW:  Brian, let's go back to the first

9  page, that paragraph number 1.

10  BY MR. BRADSHAW:

11      Q.    Okay, in paragraph numbered 1 it indicates enclosed

12  with this letter is everything Mr. Hyatt and his protest

13  representative provided in response to our IDR.  Are there

14  additional information and documents that should have been

15  provided by Mr. Hyatt that were not produced?  Please respond to

16  me indicating yes or no.  You did so?

17      A.    I did.

18      Q.    And what was your response?

19      A.    Yes, there were additional materials responsive that

20  were not provided.

21      Q.    And what was the basis of your response?

22      A.    The primary basis of my response was questions in

23  the Woodward IDR that were being answered by Mr. Hyatt in the

24  protest, and the same questions to which I had received answers

25  to or been observed -- or I observed hearing answers to at

1   depositions or seen documents to in the litigation.

2           So I knew that Mr. Coffill's package of information

3   provided to the protest hearing officer was not complete.

4       Q.   You had a different set of facts?

5       A.   I had a different set of the facts at this point,

6   yes.

7       Q.   I'd like to give an example of that.  Could you go

8   to --

9           MR. KULA:  Your Honor, may we approach on this?

10          THE COURT:  Yes.

11          (Bench conference began at 10:55 a.m.)

12          MR. KULA:  We're going to start getting into

13   (indiscernible) that's the substance of the paragraphs.  That's

14   going into, this question wasn't answered, this question was

15   answered.  How do they deal with that without getting into the

16   substance and (indiscernible) the answers?

17          MR. BRADSHAW:    Your Honor, I'm not going into

18   the substance of the response, but the fact that time has

19   passed, that s request is made, and that he's compared it with

20   what's been produced, the sets of facts were different.  And

21   that he had information on this that, given his duty

22   (indiscernible) had to go the protest officer.  That's where I'm

23   going with this.  So I'm not - not going to go through the

24   details, the actual facts, in the response.

25          MR. KULA:  It sounds like he's going to go to

1  specific questions and say, was this one answered, no, this

2  wasn't answered.  And that's what I think.  And that's getting

3  into the substance.  How do we deal with that without getting

4  into the substance?

5          THE COURT:  I agree.

6          MR. BRADSHAW:  No, that's - that's - that's not

7  where I'm going.  That's not where I'm going.

8          THE COURT:  I agree with Mr. Kula.  If that's where

9  you're headed, I don't see that we can (indiscernible).

10          MR. BRADSHAW:  No, I'm not going into the substance

11  of the response, the example of what was requested.  I mean,

12  this is a document in evidence for all purposes, over our

13  objection, and what am I going to do with it?  We have to

14  defend, and explain it to the jury, and show how it fits into

15  our defense and the passing of time.

16          MR. KULA:  But, as I understand it, you wanted to

17  show a specific question or two and ask Mr. Dunn to say, yes,

18  that's where there was not information provided, or sufficient

19  information, or something along those lines.  That's what I

20  object to, pointing out specific - pointing out a specific

21  question and then having Mr. Dunn say, oh, that's specifically

22  (indiscernible) information.  That's getting into the substance.

23          THE COURT:  I think I'm going to sustain the

24  objection.

25          MR. BRADSHAW:  Okay.

64

1   BY MR. BRADSHAW:

2        Q.    Mr. Dunn, the objection is sustained so I'm going to

3   switch gears.  Now, you did, as you indicated, compare what Ms.

4   Cinnamon had with the evidence you had from discovery in this

5   case.

6        A.    Yes, I did.

7        Q.    And you responded yes to Ms. Cinnamon through Mr.

8   Collins?

9        A.    Yes, I believe I, in this instance, sent a memo back

10  to Mr. Collins.

11       Q.    Let's go to Exhibit 368.  Tell the folks what this

12  is.

13       A.    This is my memorandum to Mr. Collins dated October

14  5th, 2000.  And in the subject line it says regarding Cody

15  Cinnamon's memorandum to you dated September 11th, 2000.

16       Q.    What was your purpose in this communication?

17       A.    It was to respond to Ms. Cinnamon's memorandum to

18  Mr. Collins.

19       Q.    And did you intend this being passed onto the

20  protest hearing officer?

21       A.    I did.  At this point we were complying with the

22  general ideas set forth in Mr. McLaughlin's protocol letter.

23       Q.    Okay.  And you reference in the caption regarding

24  Cody Cinnamon's memorandum to you dated September 11th, 2000

25  that is referenced to Exhibit 2334 that we were just talking

1   about?

2        A.    Yes.  Yes, I did.

3        Q.    All right.  And your yes is underneath paragraph 1.

4   You recite her question and indicate what you did.

5        A.    Yes, I reviewed the submittal and the answer is yes.

6    And reviewed the submittals means at some point prior to this I

7   went through the information that was provided to the protest

8   hearing officer.

9        Q.    Okay.  And you'll recall that item number two in

10   Exhibit 2334 indicated that if your answer was yes, please

11   employ the appropriate procedures.  So do you recall that?

12       A.    Yes.  Mr. McLaughlin had described procedures in the

13   event that we saw differences in the information and had

14   information in the litigation that was responsive to Mr. Hyatt's

15   answers in the protest, we were to employ the process he

16   described in his memorandum to acquire that information from the

17   litigation side and move it to the protest side.

18       Q.    Okay.  And you understood that that process could

19   ultimately involve an administrative subpoena?

20       A.    Yes, it could.

21       Q.    And why didn't you do it at this time?

22       A.    Because the December 27th, 1999 order from the

23   district court creating the protective order had been stayed.

24            MR. KULA:  Objection, your Honor.  Misstates the

25   rules of this court.  There's no such order in this court and

1    it's contrary to the actual rulings in this court.

2              MR. BRADSHAW:  Your Honor, that's argument.  A

3    speaking objection.  If we're going to debate that, I'd like to

4    approach.

5              MR. KULA:  Well, move to strike the answer and

6    correct the record on that.

7              THE COURT:  Well, the Court has to sustain the

8    objection based on the Court's understanding of both party's

9    respective positions.  Ask you to proceed with your questioning

10   on that basis.

11             MR. BRADSHAW:  All right.

12   BY MR. BRADSHAW:

13       Q.    Mr. Dunn, I don't want you to interpret the court's

14   order, or say what it meant, but did you have a good faith

15   reason for not proceeding with the subpoena at this time?

16       A.    Yes.  We felt we couldn't, and I did not make that

17   decision in a vacuum.  There was conversation about whether or

18   not we could proceed.

19       Q.    All right.  And that was ultimately a management

20   decision?

21       A.    Yes, it was.

22       Q.    And the basis for that decision you've stated here.

23       A.    Yes, I have.

24       Q.    Now, it goes on to state, to the extent that I

25   provide Cody with any litigation work product, I anticipate that

1   she will copy and produce that to Mr. Hyatt.  What was the issue

2   there?

3        A.    Well, now we are toward the end of 2000.  We're well

4   along in this litigation and discovery.  We had been working to

5   defend this litigation.  And in defending the litigation, we

6   create documents which can be attorney work product.  Documents

7   that would be our preparation for trial that we would

8   necessarily wouldn't want to share with the side that's on the

9   other side of the litigation.

10        To the extent we produced items to the protest

11   hearing officer, there's a mechanism in California for obtaining

12   files under the California Public Records Act, and we were

13   concerned about what would happen if Ms. Cinnamon were to

14   acquire information and then be required to produce that in

15   California and then, of course, it would be given to Mr. Hyatt.

16        So we have a possible interference with our ability

17   to defend ourselves in the litigation.

18        Q.    A complicating factor?

19        A.    It was complicated and unprecedented, yes.

20        Q.    So you did not provide that sort of thing to the

21   protest hearing officer?

22        A.    I believe we provided no information to the protest

23   hearing officer that we would be concerned about revealing to

24   Mr. Hyatt before this trial.

25        Q.    And how about points and authorities, briefs filed

1  these document productions were either entirely, or contained

2  designations within the -- that were under the protective order.

3       Q.    All right.  And those prior 20 document productions,

4  were those made available to the protest hearing officer?

5       A.    They were made available, yes.

6       Q.    Included among the supplemental document production

7  subpoenaed here, were there items designated under the

8  protective order that were publicly available?

9       A.    Yes, I believe in one of the productions there were

10  a newspaper article or two that were actually stamped under the

11  protective order.

12       Q.    All right.  Item number six, the general category,

13  you had some difficulty with that as you worked through the

14  process.

15       A.    Yes, ultimately Judge Gray (phonetic) said that was

16  too indefinite and denied that request.

17       Q.    Did you get more specific later on in your process?

18       A.    Yes, I believe in the next two subpoenas you'll see

19  we took a slightly different approach in identifying documents.

20       Q.    You got specific?

21       A.    Yes.

22       Q.    You learned your lesson?

23       A.    Yes.

24       Q.    Let's go to the next page, number three of this

25  exhibit.  This is Mr. Miller's affidavit in support of the

1  subpoena.  You're familiar with it?

2       A.    I am.

3       Q.    Item number six, were you involved in the drafting

4  of this for Mr. Miller?

5       A.    I was.  I certainly was.

6       Q.    And number six states the purpose for the subpoena?

7       A.    Yes, it does.

8       Q.    It indicates, I am informed and believe that the

9  documents identified by the subpoena duces tecum relate

10  primarily to factual evidence of Mr. Hyatt's alleged move out of

11  California, witnesses to Mr. Hyatt's alleged move, connections

12  Mr. Hyatt allegedly established in Nevada, connections Mr. Hyatt

13  maintained in California, Mr. Hyatt's motive and intent for the

14  alleged move, as well as information concerning the amount, type

15  and timing of the income Mr. Hyatt may have received before,

16  during and after 1991 and 1992.

17            That's why you wanted to get these documents to the

18  protest hearing officer?

19       A.    Yes, that's a description of generally what's

20  contained within the documents that are being subpoenaed.

21       Q.    You were on notice that those -- the facts were

22  alleged by Mr. Hyatt in the litigation?

23       A.    Yes.

24       Q.    And you knew those were issues in the protest?

25       A.    Yes.

1        Q.    And you had them in these documents a hundred feet
2    down the hall?
3        A.    They were a hundred feet away from the protest
4    hearing officer, correct.
5        Q.    Let's go to 2345.  Now, this is Mr. Coffill's July
6    22nd, 2002 letter to Mr. Miller.  You're familiar with this?
7        A.    Yes, I am.
8        Q.    You took this as a no from Mr. Coffill?
9        A.    Yes.  Again, it's complaining about the subpoena.
10       Q.    You referred to Mr. Hutchison's June 10th, 2002
11   letter to Mr. Leatherwood in response to his June 3rd, 2000
12   correspondence.  Do you recall that?
13       A.    I did.
14       Q.    In Mr. Hutchison's letter and Mr. Coffill's letter
15   here, there were contentions made that you reviewed?
16       A.    Yes.
17       Q.    And did you hear those arguments again later on?
18       A.    Yes, we heard this kind of argument in response to
19   our request to move the documents repeatedly.
20       Q.    And did you hear them again at a hearing?
21       A.    Yes.
22       Q.    What was Mr. Hyatt's response to service of the
23   administrative subpoena?
24       A.    He did not reply -- did not comply.
25       Q.    So what did you do?

1          A.    We filed a motion in the California Superior Court

2     to enforce the subpoena.

3          Q.    Represented by the attorney general's office in that

4     proceeding?

5          A.    Correct.

6          Q.    And this July 22nd, 2002 letter, there was no

7     response?

8          A.    Well, I don't recall if Mr. Miller sent a response.

9     I believe he said he did not.  It would have been a response

10    from the deputy attorney general, if any, but I think the fair

11    way to categorize our response is our refiling in the superior

12    court to enforce the subpoena.

13         Q.    All right.  And there you were represented by

14    counsel who was doing your talking?

15         A.    Yes.

16         Q.    That was litigation?

17         A.    That was.

18         Q.    Let's go to Exhibit 405.  This is Mr. Coffill's

19    January 29th, 2003 letter to Mr. McLaughlin.  You're familiar

20    with it?

21         A.    Yes, I am.

22         Q.    Okay.  And he's asking Mr. McLaughlin that the

23    protest officer act in a more responsive manner?

24         A.    Yes.

25         Q.    Last paragraph says accordingly, we request that you

1   immediately issue notices of action regarding the 1991 and 1992

2   protest.  What was happening at this time in the California

3   Superior Court enforcement of subpoena process?

4        A.   Our motion had been -- we had argued it, and we were

5   waiting for the court to decide whether or not they were going

6   to order Mr. Hyatt to produce the documents.  And I believe the

7   decision came from the court just days after this letter.

8        Q.   All right.  And Mr. Coffill's demanding that the

9   protest be ended without benefit of that?

10       A.   Correct.  He wants the protest closed before the

11   protest hearing officer sees the documents produced in the

12   litigation.

13            MR. BRADSHAW:  Your Honor, I'm at a logical breaking

14   point, if you'd like to take the lunch, or I can press on for

15   another 15, 20 minutes.

16            THE COURT:  I'm hungry.  Is anybody else hungry?

17   Ladies and gentlemen, remind you of your duty not to discuss

18   this case, not to form or express any opinion, not to do any

19   research.  Let's meet back here at 1:15.

20       (Court recessed at 11:55 a.m. until 1:20 p.m.)

21                  (Jury is present)

22            THE COURT:  Please be seated, ladies and gentlemen.

23   Do counsel stipulate to the presence of the jury?

24            MS. LUNDVALL:  Yes, your Honor.

25            MR. HUTCHISON:  Yes, your Honor.

1          THE COURT:  Mr. Bradshaw.

2          MR. BRADSHAW:   Thank you.

3   BY MR. BRADSHAW:

4      Q.   Good afternoon, Mr. Dunn.

5      A.   Good afternoon, Mr. Bradshaw.

6      Q.   2348, would you please turn to 2348.

7      A.   I'm there.

8      Q.   Tell the folks what they're looking at here.

9      A.   This is a ruling from the Sacramento Superior Court

10  on our hearing that we held in December of 19 -- or excuse me,

11  of 2002.

12     Q.   Okay.  It related to the administrative subpoena we

13  looked at?

14     A.   Yes, it does relate to that.

15     Q.   All right.  And there was a hearing -- briefings and

16  hearings preceding this?

17     A.   Yes, there was a hearing on the merits of the

18  subpoena duces tecum we issued held on December 16th, 2002, and

19  this is Judge Joe Gray's (phonetic) order issued, I believe, on

20  February 28th, 2003.

21     Q.   All right.  And the subpoena was enforced as to

22  those categories one through five?

23     A.   Yes, it was as to categories one through five,

24  correct.

25     Q.   And your number six category was not enforced as it

1   was too in depth?

2          A.    That's correct.

3          Q.    Okay.  Following issuance of this order, did --

4   let's go over to the second page first.  And you see who this is

5   mailed to?

6          A.    Yes, I do.

7          Q.    You received a copy of the order?

8          A.    I did.  The deputy involved, Molly did.  I'm

9   improperly indicated there as the deputy attorney general; I'm

10  not.  Mr. Coffill and Mr. Kula received order -- Mr. Coffill and

11  Mr. Kula were at the hearing in December, as I recall, and I

12  believe Mr. Kula made the argument for Mr. Hyatt.

13         Q.    All right.  And did Mr. Hyatt's representatives

14  promptly thereafter deliver to you the documents which were the

15  subject of categories one through five of the subpoena?

16         A.    No, they did not.  Judge Gray ordered that they

17  shall comply by March 21st, 2003, but they did not.

18         Q.    All right.  What happened next in the process?

19         A.    Well, as I recall --

20         Q.    Let me direct you to 2349.  That might help.

21         A.    2349.  Right, there's a -- this is a fax from Mr.

22  Kula to Molly Mosley (phonetic) who was the deputy attorney

23  general representing the Franchise Tax Board.  March 17th, 2003,

24  and attached to that was Mr. Kula's letter.  He was making an ex

25  parte application seeking an audience with the judge to, as he

1  labeled it, modify or clarify the scope and effect of the

2  court's ruling on the order to show cause.

3       Q.    Okay.  And that process occurred?

4       A.    That process occurred.  Judge Gray -- as I recall,

5  we went into chambers and Judge Gray denied it relatively out of

6  hand.

7       Q.    All right.  I'd like to refer you back to the PASS

8  log entry 2353-73.

9       A.    2353.

10       Q.    Yeah, page 73 of the log.

11       A.    Okay.

12       Q.    All right.

13            MR. BRADSHAW:  Brian, if you'd bring up the bottom

14  three entries.

15  BY MR. BRADSHAW:

16       Q.    Okay.  Mr. Dunn, the first entry is dated February

17  3rd, 2003.  The user was Mr. McLaughlin, and we see a reference

18  there to a letter dated January 29th, 2003 from Eric requesting

19  that you immediately issue notices of action regarding the 1991

20  and 1992 protests.  That was Exhibit 405 I went over with.  Do

21  you recall?

22       A.    We just looked at that before lunch, yes.

23       Q.    All right.  And then we see the next entry by user

24  Cody Cinnamon dated February 20th, 2003, and her comment is I am

25  to do nothing in the case where that was connected to this

1  subpoena process.

2              MR. KULA:  Lack of foundation.

3              MR. BRADSHAW:  The subpoena process -- I'll withdraw

4  that question and ask another one.

5              THE COURT:  Okay.

6  BY MR. BRADSHAW:

7      Q.    Mr. Dunn, the subpoena process was in progress at

8  this point in time?

9      A.    Yes, it clearly was.  And as we've just seen, it's

10 about to be decided by Judge Gray.

11     Q.    All right.  And the next entry is March 5th, 2003 by

12 Cody Cinnamon indicating a meeting with TWM or Mr. McLaughlin

13 and John Penfield (phonetic) regarding the status of the case.

14 Did you know Mr. Penfield at the time?

15     A.    Yes, and I do today.  He's an attorney -- a tax

16 counsel who works in the legal department.  He occasionally does

17 residency cases.

18     Q.    All right.  And this indicates California Superior

19 Court upheld our administrative subpoena for Hyatt to provide

20 all the discovery material from the Nevada suit.  Hyatt has 30

21 days to submit a writ to challenge the subpoena.  If he does, we

22 will have 30 days to respond.  Then the appellate court will

23 decide the matter within a short time period.  If Hyatt loses

24 the appeal, they will have to produce the evidence.  Then the

25 case will become active again, end.

1           Did that process described here, in fact, occur in

2    your experience?

3       A.    It did occur with one exception.  It was not

4    necessarily a short time period.  It took the court of appeal

5    awhile to issue a decision.

6       Q.    Okay.

7       A.    After they appealed.

8       Q.    Let's go to 2350, and let's go first to 2351, and

9    tell the folks what this is.

10      A.    2351.  This is Mr. Hyatt's notice of appeal filed

11   with the superior court essentially giving notice that he's

12   going to file an appeal of the decision of the superior court

13   with the court of appeal.

14      Q.    Okay.  And he did contesting the entire ruling?

15      A.    Yes, he did.

16      Q.    You were copied with this at the time through Molly

17   Mosley?

18      A.    Yes, I was.

19      Q.    And then 2350.

20           MR. BRADSHAW:  Let's go to that, Brian, and --

21   BY MR. BRADSHAW:

22      Q.    Mr. Dunn, would you tell us what we see here.

23      A.    This is a, what's it labeled, a combined notice of

24   designation of court's transcript and notice to prepare

25   reporter's transcript on appeal.  This is filed, I believe, by

1    Mr. Kula requesting the superior court to prepare a record that

2    they could then use to take the case up on appeal.

3        Q.    All right.  And you see on the letterhead of this

4    pleading paper is Mr. Kula and his address, and Mr. Coffill as

5    his address as well?

6        A.    Yes, I recall working with Mr. Kula and Mr. Coffill

7    during this process.

8        Q.    Okay, they were co-counsel in that process?

9        A.    Yes, they were.

10       Q.    Okay.  Go to Page 2 of that.  And item number two is

11   what I want to point out where it indicates petition for order

12   to compel compliance with administrative subpoena filed October

13   11th, 2002.  Now, is that when this court process commenced with

14   that filing?

15       A.    Yes, to enforce an administrative subpoena under our

16   Revenue and Taxation Code statute, which is a specific power to

17   the Franchise Tax Board to issue subpoenas,  If the taxpayer or

18   the -- whoever it is, the third party, whoever it is that's the

19   recipient of that subpoena does not comply, we have to actually

20   craft an order and file it in the Sacramento Superior Court and

21   ask them -- ask the judge to - to enforce it.

22       Q.    And go over to -- let's see, it's the sixth page of

23   the exhibit, item number 35.  Item 35, order determining

24   disposition of ex parte application filed March 18th, 2003.  Was

25   that the date and order that resolved what Mr. Kula's

1   correspondence said was going to be ex parte application?

2       A.   Yes, Mr. Kula's ex parte application was saying that

3   the -- arguing, among other things, that the subpoena

4   description of documents was too inspecific [sic], not specific

5   enough, and Judge Gray heard their application and denied it the

6   next day.

7       Q.   All right.  Let's go to Exhibit 2352.  Now, this is

8   captioned State of Franchise  or, State Franchise Tax Board,

9   plaintiff and respondent, versus Gilbert B. Hyatt, defendant,

10  and  appellant, Court of Appeal of California, 3rd Appellant

11  District, and it's got a citation and a date, December 31st,

12  2003.

13      This is admitted, but would you tell the folks what we're

14  looking at here?

15      A.   We're looking at the first page, partial page of a

16  opinion of the California Court of Appeal in the case in

17  California where we're trying to enforce the subpoena.  This is

18  an opinion on the subpoena enforcement itself.  And ultimately,

19  they allow the enforcement of the subpoena and the production of

20  the documents to the protest hearing officer.

21          And, in fact, state, we see no reason why --

22          MR. KULA:  Objection, your Honor.  That's -- we've

23  redacted portions of the opinion.

24          MR. BRADSHAW:  Yeah, let me stop you there.

25          THE WITNESS:  Okay.

1  BY MR. BRADSHAW:

2      Q.    Mr. Dunn, this -- did this turn out to be the end of

3  this subpoena enforcement process?

4      A.    No, it did not.

5      Q.    What happened next?

6      A.    Discovery in the case had resumed at this point, and

7  it went on for a while longer.

8      Q.    Well, let me back you up to the more near future in

9  relation to this --

10     A.    Okay.

11     Q.    -- decision.  This December 31st, 2003, you

12  received a copy of this within a few days of its issuance?

13     A.    Yes.  I would have received a copy relatively soon

14  after it was issued.

15     Q.    Okay.  And did Mr. Hyatt's folks promptly deliver

16  the items that were the subject of the subpoena?

17     A.    No, they did not.  Within -- with a court of appeal

18  decision, there's a period of time after the decision is filed

19  that you have to petition the decision to the California Supreme

20  Court.  Mr. Hyatt's counsel, I believe, ran that clock right up

21  to the day before they had to file the petition, or maybe two

22  days before and then notified us that they were not going to

23  file a petition at that point, which was a month or two after

24  this.  I don't recall the exact date.

25     Q.    All right.  Did -- thereafter were the documents

1   subpoenaed and delivered?

2        A.    The documents were ultimately compiled, photocopied,

3   bindered, packaged and delivered to the protest hearing officer.

4        Q.    All right.  Taken that hundred feet down the hall?

5        A.    Taken that hundred feet down the hall.

6        Q.    I'd like to direct you back to the PASS log, page

7   74.

8        A.    Okay.

9        Q.    All right.  This is a January 23rd, 2004 entry by

10  the bureau director to Cody Cinnamon.  Request by Hyatt's

11  counsel on the litigation case.  Was this information provided

12  through your chain of command to the protest hearing officer's

13  boss, the bureau director?

14       A.    Let me read this a second.  I became aware of this

15  request at some point.  I just don't remember exactly when.

16       Q.    All right.  It indicates, we have been advised by

17  Hyatt's counsel in the litigation case that they will be asking

18  for the complete protest file and therefore nothing should be

19  destroyed.  As is our normal practice, nothing would be

20  destroyed but we would assert the appropriate privileges.

21            Now, this information concerning advice by Hyatt's

22  counsel on the litigation case, would this have come through you

23  to the bureau director?

24       A.    Yes, now it's -- yes, something occurred here in the

25  litigation case that required the production of certain records

1   related to the protest at this time, and that was our

2   communication to the protest side of the house.

3        Q.   Okay.  At some point in time around here Mr. Hyatt

4   started taking issue with the how long the protest was taking.

5        A.   That's correct.  You, of course, saw in the

6   complaint -- the complaint was kind of limited.  It didn't

7   include the protest originally.  But at this point in time

8   somewhere in early 2004 Mr. Hyatt started to argue that the

9   protest -- the length of time the protest was taking was, in

10  fact, done in bad faith, and that became part of this litigation

11  which is why you're hearing this right now.

12       Q.   All right.  So at this point in time or at some

13  point in time you became aware that the passage of time in the

14  protest was an issue?

15       A.   Yes.

16       Q.   And Mr. -- and we saw that Mr. Coffill was demanding

17  that a notice of assessment be issued during the pendency of the

18  subpoena of litigation?

19       A.   Right, he demanded it be closed in January, 2003.

20       Q.   Now, that process of preparing the documents for

21  delivery to the protest hearing officer, did that take some time

22  and effort due to the volume?

23       A.   Yes, it did.  It was a significant amount of

24  documents, and I don't remember exactly how long, but it -- it's

25  probably a process that took a few months in total.

1        Q.    Okay.  Well, that complication added to further time

2   in the task?

3        A.    Yes, it did.

4        Q.    And now you're at May 7th, 2004 in the process?

5        A.    Correct.

6        Q.    Okay, let's go over to the next page 78, another May

7   7th, 2004 entry.  And I want to bring to your attention, Mr.

8   Dunn, down where it says subject Hyatt production of documents

9   through compelled production of the administrative subpoena.

10        First sentence there says, I had a brief discussion

11   with Bob Dunn concerning the above matter.  And again, was that

12   discussion with Ms. Cinnamon concerning the mechanics of

13   transfer of the documents?

14        A.    Yes, it would have been logistics, photocopies,

15   where to move binders, such things as that.

16        Q.    Okay.  You weren't debating or influence the outcome

17   of the issues in protest?

18        A.    No.  In fact, she was receiving the entire

19   production of documents per the direction of Mr. Miller.

20        Q.    Okay, let's go to 2354.  And this is admitted, but

21   this is an October 28th, 2005 letter by you.

22        A.    Yes, it is.

23        Q.    And it's signed by you on the last page?

24        A.    Yes, it is.

25        Q.    Addressed to Mr. Hutchison, Mr. Hyatt's litigation

1    counsel?

2         A.    Yes, I wrote a letter to Mr. Hutchison.

3         Q.    All right.  Tell the folks what this is?

4         A.    Well, this letter results from the intervening

5    period of time from the production you just saw of the documents

6    to Ms. Cinnamon.  Ms. Cinnamon went through those documents and

7    then, as I recall, had a few more IDRs that went out to the

8    other side.  She had developed more questions and there were

9    more responses.

10         There was a need, again, to move documents from the

11   litigation side to the protest hearing officer.  And there was a

12   fair amount of discovery that had taken place in the '04/'05

13   time frame, and Mr. Hyatt had elected to designate a lot of that

14   discovery under the protective order specifically.

15         And this letter is asking Mr. Hutchison, pursuant to

16   the protocol established by Mr. McLaughlin in his March 7th,

17   2000 letter, basically asking his permission for us to give this

18   documentation to the protest hearing officer so she could then

19   use the facts and circumstances here to decide the issues in the

20   tax case.

21         Q.    Okay.  So this follows the process that we're

22   familiar with that there was information document requests from

23   Ms. Cinnamon to Mr. Coffill, followed by a request for

24   assistance to the folks in litigation?

25         A.    Yes, I don't think that there was any change in Ms.

1  Cinnamon's process over the period of the protest.  I think she

2  continually sent me through my supervision the memorandum with

3  the productions that she received on the protest side, and I

4  continued to answer her.

5  　　　　And this -- it became -- there came a time when we

6  needed to engage the process described in Mr. McLaughlin's

7  protocol again.

8  　　Q.　　Okay.  And so periodically during, as discovery

9  unfolded, you did engage this process?

10  　　A.　　Right.  Only because Mr. Hyatt responded no to this

11  letter, of course.

12  　　Q.　　Okay.  Then -- but this was directed to his counsel,

13  Mr. Hutchison, and you hereby -- it indicates the Franchise Tax

14  Board hereby requests your client's consent to produce the

15  following Nevada litigation documents to California's protest

16  hearing officer for consideration in your client's pending

17  California tax matter.

18  　　　　And then you list them.  Beginning with number one,

19  tell the folks what you requested there.

20  　　A.　　Complete transcripts and the 2005 depositions of Mr.

21  Hyatt himself designated under the protective order.

22  　　Q.　　Okay.  That was 2005 deposition?

23  　　A.　　Yes, I believe the -- my memory is the first time we

24  were able to take Mr. Hyatt's deposition was 2005 for a number

25  of reasons.

1     Q.    Okay, that's when it occurred?

2     A.    That's when it occurred.

3     Q.    And that was more than one session?  You're talking

4  about more than one volume here?

5     A.    Yes, there were several volumes in 2005.

6     Q.    Then number two, complete transcripts of the 2005

7  depositions of Gregory L. Roth (phonetic).  You requested that,

8  as well?

9     A.    Yes, we did.

10    Q.    All right.  Going over onto the next page, items 3

11  through 10, you're requesting documents by reference to Bates

12  numbers.  So that we know, what the number 3GLR, what does at

13  that stand for?

14    A.    Those are the files of Mr. Greg Roth, Mr. Hyatt's

15  patent attorney, that were produced in the case.  You see

16  there's about 7,000 pages.

17    Q.    All right.  And then 4 through 8, those H designated

18  documents, those are requested from Mr. Hyatt's files?

19    A.    I believe so.  Although, it was never -- we were

20  never entirely sure that the H designation were, in fact, Mr.

21  Hyatt's files.  They were H Bate stamps produced in the

22  litigation that were under the protective order.

23    Q.    All right.  Then number 9, EC-7809, the EC what was

24  that?

25    A.    Those are continuation of the files of Mr. Eugene

1  Cowen.  You could see it's Eugene Cowen 7,809.  I imagine at

2  that point the production we had up to that point was 7,808.

3       Q.    All right, number 10, PBTK documents.  Those are Mr.

4  Kern's?

5       A.    Kern's files.  We had more of those produced to us

6  in discovery.

7       Q.    Again, Piercy Bowler, Taylor, Kern is what that

8  stands for?

9       A.    Correct.

10       Q.    Over on the next page item number 11, we have RM1

11  through 2189.  Tell us what RM is.

12       A.    That's the initials of Roger McCaffrey who's an

13  attorney for Mr. Hyatt who worked on an estate matter in

14  California for him.

15       Q.    Below it indicates, we currently have all the

16  documents described above in the Tax Franchise Board (sic)

17  Sacramento, California office.  That location is, as you

18  described before, 100 feet from the protest hearing officer?

19       A.    Yes, it's about the same distance.  At this point we

20  may have moved to another building, but it's essentially exactly

21  the same situation.  These documents are in Sacramento.  They're

22  in the legal department, and we're trying to move them over so

23  the protest hearing officer can consider them.

24       Q.    Okay.  Let's go to 2355, then.  This is your letter

25  dated December 6th, 2005.  It's admitted in evidence, Mr. Dunn.

1  Tell us what this is.

2      A.    Well, apparently, I had received a letter from Mr.

3  Hutchison on November 9th asking for more time, and as I recall,

4  the letter talked about the volume of documents I had described,

5  and they wanted time to review them -- the documents -- and make

6  argument about their production or nonproduction.

7          And I am responding back to Mr. Hutchison essentially

8  saying no, that we're not going to do that.  Reply yes or no or

9  we're going to issue is a subpoena.

10     Q.    Okay.  We're at the end of 2005.  Were you getting a

11 little impatient with that process?

12     A.    Well, yes, to be frank.

13     Q.    I see you're updating your request here.  Middle

14 paragraph indicates, please add the following recently created

15 documents to that list.  Then you describe the deposition

16 transcripts of Caroline Cosgrove, Gregory Roth, Dan Hyatt, and

17 the transcripts from the continued deposition of Gilbert Hyatt,

18 as they also contain information relevant to or information

19 potentially leading to the relevant evidence in the California

20 tax matter.  What was your purpose there?

21     A.    Well, what was going on at the time is discovery was

22 going on relatively at a rapid pace.  In other words, there may

23 have been depositions on a daily, weekly basis.  Documents were

24 being produced, as I recall, between the time I wrote my first

25 letter and this letter, these other documents had been produced

1    that correct.

2         Q.    All right.  Then over on the next page, number five,

3    again you indicate, we currently have all the documents

4    described above in the Franchise Tax Board Sacramento,

5    California office.  Again, you're trying to move them down the

6    hall?

7         A.    They're trying to be moved down the hall, yes.

8         Q.    Let's go to 781, the February 9th, 2006 letter.

9    Tell us what we see here.

10        A.    This is a February 9th, 2006 letter to me from, I

11   believe, Mr. Kula.  Let me double check.  Yes, from Mr. Kula.

12   And he -- let's see, he's responding to the administrative

13   subpoena generated -- dated January 30th, 2006.  This was the

14   subpoena we had seen just earlier.

15        Q.    All right.

16              MR. BRADSHAW:  And over on Page 2, let's go to the

17   first two paragraphs, Brian.

18   BY MR. BRADSHAW:

19        Q.    Okay.  It indicates, with that said, it would be a

20   time consuming and laborious process to seek relief from the

21   California Superior Court challenging production of the

22   requested irrelevant documents.  So this was -- how did you take

23   this?

24        A.    Well, it's more argument from the attorneys about

25   the relevance, and that was --

1    Q.    All right, then let's go to the - down to - the next

2  paragraph says for these reasons Mr. Hyatt is hereby authorizing

3  the FTB through your office to immediately release to the

4  protest hearing officer the documents described in categories 1

5  through 13 on attachment A to the FTB's January 30th, 2006

6  administrative subpoena.

7         So as to a good deal of the requested documents for

8  which you sought Mr. Hyatt's consent, you're getting

9  authorization here from Mr. Kula?

10    A.    Yes.  And recall, this is the subpoena which

11  predated the '07 letter we just saw.

12    Q.    Yes.

13    A.    And Mr. Kula is authorizing us to release all of the

14  documents described in that subpoena to the protest hearing

15  officer in 2006.

16    Q.    All right.  Let's go to 2358.  Now, this is

17  admitted, and this is a February 14th, 2007 letter.  Is this

18  from you to Mr. Kula?

19    A.    Yes, Mr. Kula and I exchanged lots of letters.  And

20  this letter essentially responding to his 2007 letter.  And let

21  me back up just a little bit.  In the 2006 letter from Mr. Kula

22  he agreed to release all of Mr. -- all of the documents

23  designated by Mr. Hyatt under the protective order, I think

24  without exception.

25         In the 2007 time frame, which turned out to be the

1    last time we went through this process, in response to my

2    letter, Mr. Kula wrote back and agreed to the release of most

3    of, as I recall, but not all of the documents that were

4    described in my letter.  So that's what this letter is.

5          I'm verifying, I believe -- yes, I am.  I'm writing a

6    document to verify so that we know for sure that we've agreed to

7    release to the protest hearing officer the documents listed on

8    Page 1 and 2 through item 18.

9          Q.    Okay.  So you're make being sure you're on the same

10   sheet of music as far as what's authorized to go down the hall

11   to the protest hearing officer?

12         A.    Right.  We are being careful here, yes.

13         Q.    All right.  And this is February 14th, 2007?

14         A.    Yes, it is.

15         Q.    Let's go to 2359.  This is admitted, but tell the

16   folks what we're looking at here.

17         A.    This is a letter dated May 17th, 2007 which

18   continues the process we just spoke of.  There were some

19   documents that Mr. Hyatt refused to release to the protest

20   hearing officer in the last list, and this is the back and forth

21   about those documents.

22         And you'll see Mr. Hyatt does not agree to produce

23   some pieces of certain deposition transcripts.  I believe the

24   names are in here.  Ms. Grace Jeng, and I believe it was Mr.

25   Barry Lee, but I don't recall for sure, and I --

1      Q.    Question, Page 41, line 16, "Okay.  Mr. Dunn, we

2    have heard a lot of testimony from FTB witnesses who have said

3    that they view in most instances their job to be impartial and

4    to be fair in the application of the laws to the taxpayers and

5    within the state of California.  I take it you likewise agree

6    with me that as a protest officer one of the things that you are

7    attempting to accomplish and one of the goals that you were

8    seeking was to be fair and impartial -- a fair and impartial

9    protest officer in terms of applying the law and applying the

10   facts for a given taxpayer; is that right?"

11          Answer, "I agree.  That is what I was trying to do.

12   But most importantly my job so to enforce the revenue and

13   taxation laws of the state of California," period.

14          Did I read that correctly, Mr. Dunn?

15     A.    You read it correctly.

16     Q.    Now I want to maybe cover first, just so we're clear

17   on some of the time line.  Mr. Bradshaw went over with you what

18   I guess I'll call the second and third request that you made

19   under the protective order, just so we have the time line right

20   on that.

21          First, I want to start with Mr. Miller was here

22   yesterday, and I'd asked him and he confirmed that there was a

23   hearing in August of 2005 at which the discovery commissioner

24   had ruled that the issue of the bad faith delay would be in the

25   case at least as long as the -- unless and until the court said

163

1    that it wasn't in the case.

2              Now, you were at that hearing, were you not, August

3    of --

4        A.   I heard you mention that, and I'm sure I was.  I was

5    at many, if not most of those hearings.

6        Q.   But let's get the time line here.

7              MR. KULA:  Exhibit 2354, John, if we could pull it

8    up.

9    BY MR. KULA:

10       Q.   This was the letter you wrote to Mr. Hutchison, and

11   I guess I've referred to it as the second request under the

12   protective order.  That's October 28th of 2005.

13       A.   Yes.

14       Q.   That's the second time you asked -- or the FTB, I

15   should say, asked for documents from the litigation to be moved

16   over to the protest via the protective order, correct?

17       A.   That's correct.

18       Q.   Okay.  And then ultimately --

19             MR. KULA:  Exhibit 2356, John, if you could bring

20   that up --

21   BY MR. KULA:

22       Q.    -- is the subpoena you issued in -- following on

23   that initial request, and that's January of 2006, correct?

24       A.   Yes, it is the subpoena, correct?

25             MR. KULA:  Down further, John.  The second half of

1   that page.   January 30th date.

2   BY MR. KULA:

3       Q.     And then if we go to Exhibit 781.   This was a letter

4   that you indicated I had wrote to you on February 9th, 2006.

5   And this was the response saying that -- agreeing that the

6   materials requested that Mr. Bradshaw went over with you via the

7   subpoena could be moved over to the protest side, correct?

8       A.     That's what I remember this to be, yes.

9       Q.     So the sequence of events was you had first asked in

10  October, late October of '05, issued the subpoena in late

11  January of '06, and then in early February of '06 there was the

12  response, correct?

13      A.     That's correct.   I don't know if there was other

14  correspondence in between those dates or not.

15      Q.     Yeah, I'm not saying there wasn't.   I'm just saying

16  that the time frame was (indiscernible).

17          MR. KULA:   If we go to the second page of this

18  letter, John.   And that middle paragraph right there, for these

19  reasons, if you could pull that out.   I'm sorry, the paragraph

20  above that, I'm sorry.

21  BY MR. KULA:

22      Q.     That last sentence says, moreover, unlike the prior

23  subpoena, all the documents requested in the current subpoena

24  have actually been designated under the protective order.   We

25  may go through this later, Mr. Dunn, but a number of the

1  documents in that first subpoena actually were not designated

2  under the protective order, correct?

3      A.   Yes, that's -- that is true.

4           MR. KULA:   Okay.   You can bring that down, John.

5  BY MR. KULA:

6      Q.   Now, let me -- the other part of the time line,

7  then, is there was what I've called the third request.   If you

8  go to Exhibit 2357.   That's your January 19th, 2007 letter to

9  Mr. Hutchison.

10     A.   Yes, it is.

11     Q.   Okay.   Mr. Bradshaw went through that with you.   I

12 just want to go, then, look at Exhibit 782.   This is a response,

13 then, given February 1st, 2007.

14     A.   Yes, that's your letter, correct.

15     Q.   And as you indicated, there were a couple of the

16 deposition transcripts, there were some -- there was an

17 objection to providing at least in an unredacted form, correct?

18     A.   My memory is yes, some transcript parts you objected

19 to produce.

20     Q.   And then except for Ms. Jeng's, that was resolved;

21 is that correct?

22     A.   My memory is that Ms. Jeng's and Mr. Lee's were

23 never resolved.   There was a third person who you did resolve,

24 and I've forgotten who that was.   It might have been Mr.

25 McCaffrey.

1      Q.    And as you recall, Ms. Jeng there were some issues

2  because there were -- she had some privacy concerns relative to

3  immigration status and other issues like that she was

4  comfortable releasing.  Do you recall that?

5      A.    I do recall generally what the various areas of

6  testimony were in her transcript, but I think it was broader

7  than that, Mr. Kula.

8      Q.    Yeah, one of the areas was her immigration status,

9  wasn't it?

10     A.    As I recall, it may have been.

11     Q.    And some other areas she had privacy concerns about,

12  correct, that's what was expressed to you anyway?

13     A.    That's what was represented.

14     Q.    Okay.  Anyway, I just wanted to cover that time

15  line.

16           MR. KULA:  You can take it down now.

17  BY MR. KULA:

18     Q.    Now, the first subpoena was issued in July of 2002.

19  We it pull it up, if you'd like.  Does at that sound correct?

20     A.    It was the -- the subpoena was issued?  Yes, it was

21  issued in July of --

22     Q.    July of 2002.

23     A.    -- 2002, as I recall from seeing it a little while

24  ago.

25     Q.    All right.  I'm not trying to test your memory.  I'm

1  just trying to go through it quickly.  But that was Exhibit 2344

2  dated in July, so.  Now that subpoena was intended to seek the

3  documents that based on your review of the IDR responses that

4  Ms. Cinnamon had provided, and what you found you felt were

5  missing up until that point in time, correct?

6      A.    That was at least part of the reason for that

7  subpoena.

8      Q.    Well, that -- but encompassed that, correct?  The

9  encompassed -- and whatever information you saw in the

10  litigation that you did not think had been provided in the

11  protest up until that time.

12      A.    It encompassed that, and it also encompassed Mr.

13  Miller's directive that we would seek all of the documentation

14  placed under the protective order by Mr. Hyatt.

15      Q.    Okay.  Okay, yeah, I didn't mean -- I understand

16  what you're saying.  But included with that would have been

17  anything that you saw -- felt was missing from the protest, so

18  to speak.  It had been provided in the litigation but had not

19  been provided in the protest.

20      A.    Missing or otherwise relevant, or in addition to.

21      Q.    But up until that time?  The review you had

22  conducted up until mid-2002, correct?

23      A.    I would assume so.  I don't remember exactly when I

24  cut off the thought process related to the subpoena.

25           MR. KULA:  And since we're at the subpoena, let's go

1  to the second page there, John.

2  BY MR. KULA:

3      Q.    You went over this with Mr. Bradshaw.  Request

4  number six, the court -- the California court denied that

5  request, and the FTB didn't appeal that, correct?

6      A.    No, and you may recall the exchange you were in the

7  courtroom when that happened with Judge Gray when he commented

8  on this.

9      Q.    Yeah, he -- you -- the question, Mr. Dunn, is the

10 FTB did not appeal this ruling, correct, number six?

11     A.    No, we did not appeal that ruling.

12     Q.    All right.

13           MR. KULA:  You can take it down, John.

14 BY MR. KULA:

15     Q.    Again, since we're on this subject, let's look at

16 the log, 2353.  We'll go to page 73.

17     A.    2353?

18     Q.    Page -- that's the log.  Page 73.

19     A.    73.

20     Q.    The bottom entry, Mr. Bradshaw asked about this.

21 That first line says California Superior Court upheld our

22 administrative subpoena for Hyatt, and it says to provide all

23 discovery material from the Nevada suit.  Now that wasn't an

24 accurate statement there.  The ruling wasn't to provide all

25 material because the court denied number six, correct?

1      A.    Well, it's Ms. Cinnamon typing in.  It's all

2  discovery material would be a tremendous world of documentation

3  at that point.  So no, it's not -- it's not precise.

4      Q.    That's all I'm asking.  I understand it was Ms.

5  Cinnamon typing it in.  Mr. Bradshaw asked you, well, at least

6  it came up in your testimony, that Mr. Jovanovich who had

7  preceded you - I'm sorry, moving down from the log -- Ms.

8  Jovanovich, who had preceded you as the protest officer, that

9  she had been telecommuting for a year or so prior to retirement;

10  is that correct?

11      A.    Something like that.  I don't remember the precise

12  time frame.

13      Q.    And when she was doing that, she had the audit file

14  with her out of state, correct, had the audit file?

15      A.    Well, I don't have firsthand knowledge of that, but

16  I recall from her -- maybe it was her deposition where she said

17  she had -- was working on the audit file.  And frankly, I don't

18  remember if she was working on the audit file or a copy of the

19  audit file.

20      Q.    Now, also there was some testimony about the typical

21  sequence of events the FTB in-house attorney who would have been

22  -- maybe assisted on the audit or answered the questions an

23  audit, and then the protest officer would continue and work on

24  the litigation if there was subsequent, say, either an appeal to

25  the state board or then even if there's litigation in court

176

1   in the protest, correct?

2        A.    No other type of invasion of privacy claim.  There's

3   no other type of tortious invasion of privacy claim, but there

4   may be an accusation in one of the letters in the protest about

5   activity of the auditor that relates to that issue, but there's

6   not a tort claim in the protest.

7        Q.    There's no tort claim for breach of confidentiality

8   in the protest, correct?

9        A.    That's true.

10       Q.    There's no tort claim for abuse of process in the

11  protest, correct?

12       A.    If you put tort claim in front of it, no, that's not

13  there.

14       Q.    I'm dealing with a lawyer.  I've got to be careful.

15  There's no tort claim for fraud or misrepresentation in the

16  protest, correct?

17       A.    No tort claim for those, correct.

18       Q.    Now, Mr. Bradshaw had showed you that particular --

19  this fax cover from Mr. Cowen to Mr. Hyatt's litigation counsel,

20  and went over that with you.  And one of the issues in that was

21  -- well, not one of the issues -- an issue was a subpoena that

22  had been issued to Cal Fed, correct?

23       A.    Yes, I do recall Mr. Cowen's fax, and that was an

24  issue.

25       Q.    And, in fact, there was no opposition or no motion

1   to quash or anything filed by Mr. Hyatt's side relative to that

2   subpoena, correct?

3        A.    Not that I've ever seen.  I have haven't seen

4   evidence of any activity to quash the subpoena.

5        Q.    Let me follow up on a loose end.  Mr. Bradshaw asked

6   you about your duties in this litigation, and you generally

7   described them, and I'm not sure I didn't hear this, or you

8   didn't say it, but I just want to follow up.  Hasn't one of your

9   duties been in this litigation witness preparation?

10        A.    I have an occasion worked with witnesses, yes.

11        Q.    So you've worked with some of the witnesses that

12   have come and testified here in court, correct?

13        A.    Yes, I have.

14        Q.    And you've worked with witnesses before their

15   depositions in this case, correct?

16        A.    Yes, I have.

17        Q.    In fact, weren't you the primary person preparing

18   witnesses in this case?

19        A.    I wouldn't call myself the primary person.  I was

20   one of a group of people.

21        Q.    Would you say you prepared more witnesses than

22   anybody else on the FTB side?

23        A.    On the FTB side? For depositions or for trial?  For

24   depositions I think we probably had more FTB employees deposed

25   in southern California in the first few years than in northern

193

1      Q.    You say that -- didn't you say that repeated times,

2    Mr. Dunn?

3      A.    I don't know how often I made that comment.

4      Q.    A three-page answer.  I'm going to spare the jury

5    having to read through that.  Mr. Dunn, you've never accepted

6    the fact that the FTB is being sued for torts in Nevada,

7    correct?

8      A.    I never accepted the fact?

9      Q.    You never accepted -- you -- the fact that the court

10   has said well, the tax proceeding is going forward independently

11   in California and a tort proceeding in Nevada.  You've never

12   accepted that.

13     A.    I think, Mr. Kula, that's a fact.  Whether I accept

14   it or not is immaterial, but it's certainly a fact.

15     Q.    And you view the -- well, let me ask you this.  You

16   ever heard the expression that the best defense is a good

17   offense?

18     A.    Yes, I have heard that.

19     Q.    So here one of the claims that came into this case,

20   as we've established, later in the case, but it's came into the

21   case, is whether or not the FTB delayed in bad faith the

22   protest.  So that's an issue in this case.  And the defense, as

23   I hear it from you, is that -- is this case.  This case is the

24   delay in the protest.  So you're using this case to defend the

25   fact that in this case you're being accused of bad faith delay

1  in the protest, correct?

2          A.    I believe what I said in response --

3                MR. BRADSHAW:  Your Honor, object.  That was too

4  long a question.  Compound --

5                THE COURT:  I agree.

6                MR. BRADSHAW:  -- argumentative.

7                THE COURT:  I agree.

8                MR. KULA:  I'll have to look at that in the

9  transcript.

10 BY MR. KULA:

11         Q.    This -- this -- let me try to break it down.  A

12 claim in this case, an issue in this case, is whether or not the

13 FTB delayed the protest in bad faith, correct?

14         A.    Yes, I would say that's correct.

15         Q.    And the defense I'm hearing is, from you, is that

16 the fact that this case was filed is a defense to the bad faith

17 delay.

18         A.    The delay -- and I think I answered this earlier --

19 is attributable to, primarily to Hyatt's fail to turn over

20 documents in protest and using the protective order in this case

21 to prevent that from happening.

22         Q.    Now, Mr. Dunn, you were here -- you've been here the

23 -- everyday at trial, correct?

24         A.    Yes, I have.

25         Q.    And you were here when Professor Solove testified,

**CERTIFICATION**

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM
THE AUDIO-VISUAL RECORDING OF THE PROCEEDINGS IN THE ABOVE-
ENTITLED MATTER.

**AFFIRMATION**

I AFFIRM THAT THIS TRANSCRIPT DOES NOT CONTAIN THE SOCIAL
SECURITY OR TAX IDENTIFICATION NUMBER OF ANY PERSON OR
ENTITY.

**Verbatim Digital Reporting, LLC**
**Littleton, CO 80120**
**(303) 798-0890**

_____          __12-20 08__
Transcriber                               Date

# EXHIBIT  8

1    **REPLY**
     PAT LUNDVALL (NSBN 3761)
2    CARLA HIGGINBOTHAM (NSBN 8495)
     McDONALD CARANO WILSON LLP
3    2300 West Sahara Avenue, Suite 1000
     Las Vegas, Nevada 89102
4    Telephone No. (702) 873-4100

5    Attorneys for Defendant Franchise Tax Board of the State of California

6

7                           **DISTRICT COURT**

8                        **CLARK COUNTY, NEVADA**

9                               * * * *

10   GILBERT P. HYATT,                    Case No.    :    A 382999
                                          Dept. No.   :    X
11              Plaintiff,

12   vs.                                  **REPLY BRIEF IN SUPPORT OF FTB'S
                                          MOTION FOR JUDGMENT AS A
13   FRANCHISE TAX BOARD OF THE           MATTER OF LAW OR ALTERNA-
     STATE OF CALIFORNIA,                 TIVELY AND CONDITIONALLY,
14                                        MOTION FOR NEW TRIAL PURSUANT
                                          TO NRCP 50;**
15              Defendant.
                                          **AND**
16
                                          **FTB'S ALTERNATIVE MOTION FOR
17                                        NEW TRIAL AND OTHER RELIEF
                                          PURSUANT TO NRCP 59.**
18
                                          Hearing Date:  November 19, 2008
19                                        Hearing Time: 9:00 a.m

20

21

22

23

24

25

26

27

28

                                    1

3)     This Court granted an order in limine on March 28, 2008 making non-admissible opinion testimony that FTB could not legally conduct its investigation or use third party "Demands to Furnish Information" in Nevada; yet

4)     Hyatt presented evidence and testimony on the lawfulness of the "Demands to Furnish Information" at trial in support of an abuse of process claim.

Rather than acknowledge these undisputed facts, Hyatt confuses Judge Saitta's deferral of jurisdiction on whether the "Demands to Furnish Information" were unlawfully used by FTB with Hyatt's abuse of process claim.  Even though Judge Saitta preserved the abuse of process claim, that does not impact her determination that Nevada would not be determining the legality of FTB's Demands to Furnish Information.  This is true even if Hyatt included an argument regarding how he believed the Demands were tied to his abuse of process claim.

Further, Hyatt completely ignores this Court's March 28, 2008 order in limine and Hyatt's continuous violation of it at trial.  Not one word is spent explaining why Hyatt believed he could violate the pre-trial order of this Court. Based on these undisputed facts, Judge Saitta's decision became law of the case.  Allowing Hyatt to present evidence in contravention of Judge Saitta's decision and this Court's own March 28, 2008 order constitutes an error of law warranting a new trial.

F.     Compliance With NPO As Evidence Of Bad Faith.

Hyatt does not deny that a primary basis upon which he successfully sought damages was FTB's alleged bad faith delay of the California Administrative Protest Process.  Even in reviewing the timetable set forth on pages 115 and 116 of the Opposition, there are substantial gaps of time where litigation proceedings were stayed.  Without repeating all of the arguments from the Post-Trial Motions that are not addressed, Hyatt was allowed to argue that the delay constituted evidence of bad faith and extortion, but FTB was prohibited from introducing any evidence pertaining to the stay.  For the reasons set forth in the motion, this constitutes reversible error.

Hyatt's representation that FTB did not use its administrative power is absurd, even from reviewing Hyatt's own timeline.  FTB made requests for documents pursuant to the NPO, yet

McDONALD·CARANO·WILSON
2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4354
PHONE (702) 873-4100 • FAX (702) 873-9966

87

1   many months went by before these documents were actually produced.  What Hyatt omits from

2   his timeline is the delay he created in California through mischief with the NPO.  This activity is

3   described in further detail on pages 159 and 160 of the Motion.  It is during these lengthy gaps

4   of time, created by Hyatt, where FTB is forced by the NPO to resort to its administrative

5   subpoena power to obtain documents that literally are down the hallway.

6       As explained in further detail in the motion, it is error to allow Hyatt to argue delay as a

7   basis for the extraordinary damages awarded in this case without allowing FTB to offer reasons

8   for the jury to accept or reject as to why there was delay and what contribution Hyatt towards

9   that delay.  Without allowing argument or evidence by FTB on these questions, how can Hyatt

10  argue with a straight face that "the jury implicitly found that the FTB delayed the protests in bad

11  faith as part of its fraudulent bad faith audits?"  Id. at 116:12-13.  This Court should order a new

12  trial, premised on this series of error under Nevada law.

13      G.    Tax Amnesty Legislation As Evidence Of Bad Faith.

14      The Post-Trial Motions address this issue, whereby evidence of a legislative program

15  created by the California Legislature (not FTB) in 2004 (well after the events at issue in this

16  case) became the basis for the jury awarding unjustifiable invasion of privacy damages against

17  FTB (not the California Legislature that passed the program).  The mere fact that the Amnesty

18  Program was not part of FTB's audit process or protest makes it irrelevant pursuant to NRS

19  48.025.  No evidence exists that the California Legislature targeted Hyatt specifically with this

20  program, rather than all taxpayers.

21      Despite that, Hyatt was allowed to fully try the tax case under a conspiracy theory pitting

22  the California Legislature and Executive branch against the Nevada court as a "check and

23  balance" to be enforced by the jury.  Only under an effort to fully try the tax case could Hyatt

24  now claim that there was a need to show the jury how and why his assessments grew.

25      Hyatt used the Amnesty Program to infer that the California Legislature was somehow

26  complicit in the conspiracy to extort a settlement out of Hyatt.  To the extent that Hyatt claims

27  that "the Amnesty program is a significant part of the emotional distress claim and damages in

28  this case," it further highlights the excessiveness of the damages awarded by this jury.  Hyatt's

88

McDONALD·CARANO·WILSON™
2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4354
PHONE (702) 873-4100 • FAX (702) 873-9966

VI.    CONCLUSION.

While trial of this case was long, and based upon the public comments made by the Court, it appears the Court may be loathe to afford FTB the relief sought in his Post-Trial Motion, either judgment in FTB's favor as a matter of law or new trial is mandated.

Respectfully submitted this _12_ day of November, 2008.

McDONALD CARANO WILSON LLP

By: _____
PAT LUNDVALL (NSBN 3761)
CARLA HIGGINBOTHAM (NSBN 8495)
2300 West Sahara Avenue, Suite 1000
Las Vegas, NV 89102
Telephone No. (702) 873-4100

Attorneys for Defendant
Franchise Tax Board of the State of California

91

# EXHIBIT  9



1  **0031**
JAMES W. BRADSHAW (NSBN 1638)
2  PAT LUNDVALL (NSBN 3761)
CARLA HIGGINBOTHAM (NSBN 8495)
3  McDONALD CARANO WILSON LLP
2300 West Sahara Avenue, Suite 1000
4  Las Vegas, Nevada 89102
Telephone No. (702) 873-4100
5  Facsimile No. (702) 873-9966
jbradshaw@mcdonaldcarano.com
6  lundvall@mcdonaldcarano.com
chigginbotham@mcdonaldcarano.com
7

8  ROBERT L. EISENBERG (NSBN 0950)
LEMONS, GRUNDY, & EISENBERG
9  6005 Plumas Street, Suite 300
Reno, Nevada 89519
10  Telephone No.: (775) 786-6868
Facsimile No.: (775) 786-9716
11  rle@lge.net

12  Attorneys for Defendant Franchise Tax Board of the State of California

13                    **DISTRICT COURT**

14                **CLARK COUNTY, NEVADA**

15                         * * * *

16  GILBERT P. HYATT,            Case No.    :   A 382999
                                 Dept. No.   :   X
17          Plaintiff,           Docket No.  :   R

18          vs.

19  FRANCHISE TAX BOARD OF THE   **FTB'S MOTION TO SET ASIDE**
    STATE OF CALIFORNIA,         **JUDGMENT AND NEW TRIAL**
20                               **PURSUANT TO NRCP 60(b)**

21          Defendant.           **Hearing Date:**
                                 **Hearing Time:**
22

23

24          Defendant Franchise Tax Board of the State of California ("FTB") moves this Court to

25  set aside the final judgment entered in this case based upon the discovery of new evidence. The

26  newly discovered evidence is directly relevant and material to issues that were presented to the

27  jury, over FTB's objection, at trial. This evidence was in Plaintiff Gilbert P. Hyatt's ("Hyatt")

28  possession throughout the pendency of this litigation. Based on the Nevada Rules of Civil

1

**POINTS AND AUTHORITIES**

I.   INTRODUCTION

As the Court is aware, this lawsuit has been pending since 1998, when Hyatt filed this action against FTB alleging that FTB and its auditors committed intentional torts while conducting a tax and residency audit of him for tax years 1991 and 1992. After over ten years of litigation, the jury trial in this case began on April 14, 2008 and concluded on August 14, 2008. The heart of Hyatt's presentation to the jury centered on his contention that FTB committed "fraud" during the course of the tax and residency audits because it failed to act "fairly and impartially" in weighing and analyzing the evidence it gathered during the audits.

The Nevada Litigation, however, was not the only proceeding ongoing between FTB and Hyatt over the last several years. Rather, while the Nevada Litigation proceeded, Hyatt continued to pursue his administrative remedies in California by filing an administrative protest of the FTB's audit conclusions and tax assessments.[1] Before trial began, FTB issued its determination in the protest proceedings, affirming the auditor's residency determinations as well as the tax and fraud penalty assessments. Hyatt then appealed FTB's conclusion to the California State Board of Equalization, or "SBE," as provided by California law. See Cal. Rev. & Tax Code §§ 19045-19048 (addressing appellate process to State Board of Equalization following conclusion of protest proceedings). Although the administrative appeal was pending while the trial in this case proceeded, Hyatt requested and received numerous extensions of time to file his opening appellate briefs.

On December 9, 2008, several months after the conclusion of the Nevada jury trial, Hyatt filed his opening briefs before the SBE. Exhibit A, Hyatt's Opening Brief, SBE Appeal, Taxable Year 1991; Exhibit B, Hyatt's Opening Brief, California State Board of Equalization Appeal, Taxable Year 1992. As exhibits to these documents, Hyatt presented numerous affidavits from witnesses, many of which were never disclosed to FTB in either the Nevada

---

[1] Although the protest proceedings were separate from the Nevada Litigation, Hyatt interjected these proceedings into the Nevada Litigation after he specifically alleged that FTB's fraudulent conduct was furthered evidenced by FTB's delay of the protest proceedings in "bad faith."

McDONALD·CARANO·WILSON℠
2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4354
PHONE (702) 873-4100 • FAX (702) 873-9966

4

1   Litigation or the protest proceedings, which provided extensive evidence directly relevant and

2   material to numerous issues and disputes between the parties in the Nevada Litigation --

3   particularly issues presented to the jury during the trial.

4          The new evidence contained in these affidavits underscores and directly establishes the

5   complete lack of cooperation exhibited by Hyatt and his representatives during the audit. Had

6   FTB known about the existence of this evidence, and of these new witnesses, FTB would have

7   presented this evidence at trial to establish the lack of cooperation of Hyatt and his

8   representatives during the audits, which supported FTB's audit conclusions and fraud penalty

9   assessments. See Exhibits C-LL. In addition, had this evidence been known to FTB prior to

10  trial, it would have been presented to show conclusively that the repeated and extensive delays

11  in the protest proceedings were attributable to Hyatt's clandestine activities and repeated and

12  purposeful concealment of evidence and witnesses – not bad faith on the part of FTB.  Finally,

13  this evidence was directly relevant to refute Hyatt's emotional distress claims. Specifically, had

14  FTB known about this evidence, FTB would have presented it to establish that the cause of

15  Hyatt's emotional distress was not FTB at all. Rather, it was Hyatt himself.

16         FTB, however, did not know about this evidence – or even the names of many of the

17  witnesses that provided these affidavits -- until long after trial concluded. Based on Hyatt's

18  concealment of this evidence, FTB did not discover this new evidence until **after both** trial and

19  the time requirements had expired for FTB to file a motion seeking a new trial based on the

20  discovery of new evidence. See NRCP 59(b)(4).  As a result, FTB was deprived of its ability to

21  properly defend itself against three of the most critical factual issues presented to the jury.

22  Without question, this concealment substantially prejudiced FTB and mandates that this Court

23  set aside the jury's verdict and order a new trial in this case.

24  II.      RELEVANT FACTUAL BACKGROUND

25         As the Court is aware, the facts of this case arise from FTB's audits of Hyatt, who was

26  a long-time resident of the State of California.   On a California income tax return, Hyatt

27  represented that he terminated his California residency in October 1991, immediately before

28  receiving multi-millions of dollars in patent-related fees.  FTB conducted an audit to verify that

McDONALD·CARANO·WILSON℠

2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4354
PHONE (702) 873-4100 • FAX (702) 873-9966

5

1   representation.   After conducting an extensive audit, FTB made a contrary finding about

2   Hyatt's residence and issued Notices of Proposed Assessments for tax years 1991 and 1992

3   seeking additional taxes, interest and civil fraud penalties. In response to FTB's conclusions,

4   Hyatt took two forms of action: (1) Hyatt filed an administrative protest in California of FTB's

5   audit conclusions; and (2) Hyatt filed the instant lawsuit.

6          A.     The Protest Proceedings

7          In response to FTB's audit conclusions Hyatt first exercised his rights under California

8   law and filed administrative protests against both the 1991 and 1992 Notice of Proposed

9   Assessments as provided by California's Revenue and Tax Code.   A "protest" is a California

10  administrative *de novo* review or appeal of a Notice of Proposed Assessment.     The

11  administrative protests were conducted by a California Administrative Protest Hearing Officer

12  charged with the public duty of making a decision as to the taxpayer's potential tax liability to

13  the State of California.

14         During the course of the protest proceedings, the Protest Hearing Officer made various

15  additional information and document requests of Hyatt – seeking additional information to

16  support Hyatt's claim that he changed his residency from California to Nevada in September

17  1991. After reviewing vast amounts of additional evidence, in November 2007 the Protest

18  Hearing Officer issued its protest determination. See Defendant's Trial Exhibit 2321. In this

19  determination, the Protest Hearing Officer upheld the conclusions made by FTB's auditors --

20  including the date of Hyatt's Nevada residency, the amount of the proposed tax assessments,

21  and the determination to assess Hyatt civil fraud penalties. Id. Shortly thereafter, Hyatt

22  exercised his rights under California law to appeal FTB's protest determinations to the SBE.

23  See Cal. Rev. & Tax Code §§ 19045-19048 (addressing appellate process to the SBE following

24  conclusion of protest proceedings).

25  ///

26  ///

27

28

McDONALD·CARANO·WILSON⸰
2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4354
PHONE (702) 873-4100 • FAX (702) 873-9966

6

1

2          B.     The Nevada Litigation

3              In addition to the protest proceedings, Hyatt filed the instant lawsuit against FTB in

4     Nevada. In the Nevada Litigation, Hyatt alleged that FTB and its auditors committed

5     intentional torts while conducting a tax and residency audit of him for tax years 1991 and 1992.

6              At the inception of the lawsuit, Hyatt's Complaint included a claim for declaratory

7     relief which sought a declaration from the Nevada court that he became a non-resident of

8     California in September 1991 – six months prior to the date fixed by FTB. This claim was

9     dismissed from this litigation in April 1999 by then-Judge Siatta. See Court's Order dated

10    April 16, 1999. Judge Siatta determined that this claim could not proceed in Nevada because

11    the question of Hyatt's residency and the propriety of FTB's audit conclusions regarding the

12    assessment of taxes and fraud penalties would be expressly resolved in the California

13    administrative proceedings. Id. As a result, all issues related to FTB's determination regarding

14    Hyatt's residency as well as the correctness of FTB's determinations to assess Hyatt taxes and

15    civil fraud penalties were dismissed from this litigation.

16             Pretrial, this Court repeatedly reaffirmed this Order. In fact, in ruling on several

17    pretrial motions, the Court clarified that, "[t]he parties are precluded from debating Mr.

18    Hyatt's residency and the validity of the assessments against him." See 2/21/2008 Tran. Hr'g

19    at 36:1-17; see also 1/24/2008 Tran. Hr'g at 60:3-19.

20             In spite of these pretrial determinations, Hyatt continued to interject FTB's audit

21    conclusions into this litigation. In particular, Hyatt specifically sought to litigate the question of

22    whether FTB had properly weighed and considered evidence concerning his residency or

23    determined that Hyatt should be assessed civil fraud penalties based on his conduct during the

24    audits. Pretrial, FTB filed several motions seeking to limit the admissibility of evidence related

25    solely to FTB's analysis in reaching its determinations to assess Hyatt taxes and fraud

26    penalties. See FTB's Motion in Limine re: Bad Faith Analysis filed 1/30/2008; FTB's Motion

27    in Limine re: Malcolm Jumelet filed 5/25/2006. In spite of the Court's general agreement that

28    Hyatt could not litigate the propriety of FTB's residency determinations or fraud penalty

McDONALD·CARANO·WILSON℠
2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4354
PHONE (702) 873-4100 • FAX (702) 873-9966

7

1   assessments, the Court denied these pretrial motions. See Court's Order Denying Motion in

2   Limine re: Bad Faith Analysis dated 3/27/2008; Court's Order Denying Motion in Limine re:

3   Malcolm Jumelet dated 3/28/2008.

4         In addition, Hyatt also sought to interject issues into this litigation related solely to the

5   protest proceedings. Specifically, Hyatt claimed that FTB had improperly delayed resolving his

6   protest proceedings in "bad faith." Based on his "bad faith delay" allegations, Hyatt began

7   making extensive inquiries and discovery requests directed at obtaining information regarding

8   FTB's conduct and processing of the administrative protests. After epic discovery battles over

9   the propriety of discovery into this area, Hyatt was permitted the requested discovery.[2] In 2005,

10  FTB brought a motion for partial summary judgment seeking the dismissal of Hyatt's "bad

11  faith delay" claims from this litigation. See FTB's Motion for Partial Summary Judgment re:

12  California Administrative Protest Process dated 11/4/2005. The Court denied FTB's motion,

13  allowing Hyatt's "bad faith delay" claim to proceed.  See Court's Order Denying Motion for

14  Partial Summary Judgment re: California Administrative Protest Proceedings dated 3/14/2006.

15        Based on these claims and FTB's alleged conduct described above, Hyatt asserted at

16  trial that FTB caused him emotional distress. To this end, Hyatt presented several witnesses

17  that testified regarding Hyatt's emotional distress, including Dr. William Thompson, Dan

18  Hyatt, Vince Turner, and even Hyatt himself. See generally, Trial Testimony Gilbert Hyatt,

19  Trial Transcripts, May 12-20, 2008; Trial Testimony Dr. William Thompson, Trial Transcripts,

20  May 19, 2008; Trial Testimony Dan Hyatt, Trial Transcripts, June 18, 2008; Trial Testimony

21  Vince Turner, Trial Transcripts June 18, 2008.

22        The trial in this case commenced in April 2008 -- over ten years after Hyatt filed his

23  lawsuit. Although trial proceeded on seven of Hyatt's claims for relief, the heart of Hyatt's

24  case was focused almost entirely upon one theory – that FTB had committed fraud because it

25  _____

26  [2] For example, several discovery motions, cross-motions, and hearings were held regarding
    these issues. See for example, FTB's Motion for Protective Order re: Protest Hearing Officers'

27  Work Files filed 2/28/2005 (several supplements, erratas, and in-camera submissions were
    filed in connection with particular motion); Hyatt's Motion to Compel Depositions Of FTB's

28  Protest Hearing Officers filed 9/23/2005.

8

1  had failed to fulfill its promise to treat him "fairly and impartially." According to Hyatt, rather

2  than treat him "fairly and impartially," FTB acted in "bad faith" in making determinations

3  adverse to him.[3] In order to further this key component of his case, Hyatt sought to introduce

4  witnesses and evidence related solely at the two issues described above.

5       The trial lasted approximately four months and ended on August 14, 2008. Ultimately,

6  the jury returned a verdict in favor of Hyatt on all claims and awarded Hyatt an astronomical

7  amount of damages, including $85 million for emotional distress, $52 million for his alleged

8  invasion of privacy, approximately $1.1 million in attorneys' fees as special damages, and

9  $250 million in punitive damages. See Court's Verdict dated 8/7/2008.

10       C.    Hyatt's Opening Briefs To California State Board Of Equalization

11       On December 8, 2008, several months after the conclusion of trial, Hyatt filed his

12  opening briefs before the SBE in his appeal of FTB's protest conclusions. See Exhibit A;

13  Exhibit B. To support the contentions raised in his appeal, Hyatt submitted several witness

14  affidavits. Although some of the witnesses providing the affidavits had been identified to FTB

15  during the Nevada Litigation, several of the witnesses had not. In fact, several of these

16  witnesses had **never** been identified or disclosed to FTB by Hyatt as individuals with

17  knowledge relevant to this case prior to December 2008 – several months after the trial

18  completed.  These witnesses included: (1) Hyman Farber; (2) Yetta Farber; (3) Irene Gorman;

19  (4) Saul Gorman; (5) Morton Farber; (6) Mel Hecht; (7) Michelina Hecht; (8) Henry Huey;[4] (9)

20  Robert Kazmaier; (10) Rosalie Traumueller; (11) Nate Warnick; and (12) Yettie Warnick. See

21

22
23  [3] Hyatt has referred to this claim as his "bad faith fraud claim." For convenience and in order to avoid any confusion, FTB will likewise refer to this claim herein as Hyatt's "bad faith fraud claim."
24

25  [4] One mention of Henry Huey was made at Hyatt's deposition when Hyatt was asked what friends he had spoken to in the six months preceding his deposition in 2005. See Vol. II, 8/16/2005, Depo. Gilbert P. Hyatt at p. 215:18-21. FTB had no reason to believe that Mr. Huey was a long-time friend of Hyatt's or that he had any relevant information about the events in this case which occurred largely between 1993 and 1997. This was affirmed by the fact that Hyatt never disclosed Mr. Huey as a witness with knowledge of this litigation on his mandatory NRCP 16.1 disclosures – either before or after Hyatt's deposition concluded.
26
27
28

9

McDONALD·CARANO·WILSON℠
2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4354
PHONE (702) 873-4100 • FAX (702) 873-9966

1   provide FTB with the substantial new evidence contained in these affidavits – all in violation

2   of Hyatt's discovery obligations.

3       In sum, based on FTB's efforts described above, there is no question that FTB used the

4   required "due diligence" to discover the identity of **all** witnesses and all information relevant

5   and material to the circumstances of this case. See Federal Mining, 85 P.2d at 1014 (1939);

6   Whise,131 P. at 970.  Moreover, it is equally clear that FTB's failure to discover the new

7   witnesses and evidence contained in the affidavits was not based on FTB's conduct. Rather, the

8   failure to discover this information is directly attributable to Hyatt and his failure to comply

9   with his discovery obligations.

10       C.    This Evidence Was Material To Critical And Dispositive Issues At Trial.

11       Finally, and most critically, the new evidence contained in these new affidavits was

12   competent evidence that was directly material to issues that were critical during the trial in this

13   case.  Whise, 131 P. 967 at 969; see Crockett, 84 Nev. at 523-524. Specifically, the new

14   evidence was directly material and relevant to three critical issues presented to the jury by

15   Hyatt, over FTB's objections:  (1) Hyatt's alleged "cooperation" during the audits; (2) FTB's

16   alleged bad faith delay in resolving the protest proceeds; and (3) Hyatt's alleged emotional

17   distress. These three issues were critical and central to the heart of Hyatt's presentation to the

18   jury, which focused exclusively upon his "bad faith fraud," i.e., FTB failed to treat Hyatt

19   "fairly and impartially" when it analyzed the evidence collected during the audits and protests.

20   In fact, the evidence provided at trial related to Hyatt's cooperation, the protest delay, and

21   Hyatt's emotional distress claims were integral in persuading the jury in Hyatt's favor – and in

22   the jury's conclusion to assess $85 million in damages against FTB.

23       The new evidence contained in these affidavits – including the new witnesses identified

24   therein – would have directly contradicted Hyatt's claims on these points. Therefore, had FTB

25   been aware of this new evidence and presented it at trial, it is highly probable that a different

26   result would have been obtained at trial. Whise, 131 P. 967 at 969; see also Crockett, 84 Nev.

27   at 523-524.

28   ///

21

1   affidavits was material to the issue of cooperation in this case and had the evidence been

2   presented, it would have had the probable effect of changing the result at trial. See Whise, 131

3   P. 967 at 969.

4            ii.    Bad Faith Delay

5         In addition, at trial Hyatt was permitted to introduce extensive evidence to support his

6   claim that FTB had improperly delayed the resolution of the protest proceedings in bad faith.

7   Hyatt presented this evidence generally through the testimony of Eugene Cowan, Michael

8   Kern, Gilbert Hyatt, and Malcolm Jumelet. See generally, Trial Testimony Michael Kern,

9   Trial Transcripts, April 24-26, 2008; Trial Testimony Eugene Cowan, Trial Transcripts, April

10   29-May, 2, 2008; Trial Testimony Gilbert Hyatt, Trial Transcripts, May 12-20, 2008; Trial

11   Testimony Malcolm Jumelet, Trial Transcripts, June 11-13, 2008. Hyatt also offered the

12   testimony of FTB's Protest Hearing Officers Cody Cinnamon and Charlene Woodward for this

13   purpose. See Trial Testimony Cody Cinnamon, Trial Transcripts, June 17, 2008; Trial

14   Testimony Charlene Woodward, Trial Transcripts, June 16, 2008.

15         FTB attempted to counter Hyatt's "bad faith delay" claim by seeking to admit evidence

16   and testimony from FTB management employees to establish that the delay in the protests was

17   not based upon FTB's conduct – but rather was directly attributable to Hyatt and his repeated

18   shenanigans in refusing to provide information specifically requested by the Protest Hearing

19   Officers. Hyatt, however, repeatedly objected to FTB's efforts to present this evidence and the

20   Court sustained Hyatt's objections. See FTB's Post Trial Motion filed 9/22/2008, pp. 156-158

21   (generally outlining Court's refusal to permit FTB to present evidence that delays in protests

22   were based upon FTB's compliance with the Nevada Protective Order and Hyatt's refusal to

23   provide evidence to FTB when requested).

24         Here again, the "new evidence" contained in the affidavits is directly relevant and

25   material to Hyatt's protest delay claim. From the outset of the protests, FTB repeatedly asked

26   Hyatt for information and evidence related to his residency claims. See Exhibit NN,

27   Information and Document Requests Protest Hearing Officer; see Section III(c), infra. The

28   Protest Hearing Officers, like the auditors, continued to ask Hyatt to provide evidence and/or

McDONALD·CARANO·WILSON⸱
2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4354
PHONE (702) 873-4100 • FAX (702) 873-9966

25

1    proof of his whereabouts between the disputed time period (i.e., September 1991 and April

2    1992), evidence or proof related to the sale of the La Palma home to Grace Jeng (including

3    proof that Jeng gave Hyatt a $15,000 down payment on the property), and other questions

4    similar to those asked during the audit and described in great detail above. Id.

5         In spite of these many requests, Hyatt never provided FTB with the evidence contained

6    in the affidavits during the course of the protests nor did he provide the names of the various

7    new witnesses provided these affidavits. This new evidence directly established that the delay

8    in the protests was not based on FTB's conduct but definitely shows that these delays were the

9    direct result of Hyatt's outright refusals to provide information requested by the protest hearing

10   officers. Therefore, the third and final element required for granting this motion is satisfied.

11   See Whise, 131 P. 967 at 969.

12           iii.    Emotional Distress

13        Finally, this "new evidence" is also highly relevant and probative to Hyatt's claims that

14   he suffered emotional distress, which was the predicate for the jury's outrageous $85 million

15   damage award. Recall at trial, Hyatt and other witnesses testified that the "cause" of the alleged

16   emotional distress Hyatt suffered was purely based on FTB's conduct – in particular its

17   conclusions in assessing him taxes and penalties. See generally, Trial Testimony Gilbert Hyatt,

18   Trial Transcripts, May 12-20, 2008 (claiming FTB caused him to suffer following ailments:

19   stomach aches, back aches, teeth grinding, and other garden variety emotional distress

20   ailments); Trial Testimony Dr. William Thompson, Trial Transcripts, May 19, 2008 (claiming

21   Hyatt was obsessed with FTB and tax audits which caused him to no longer engage in

22   activities, to drink a "jig" of Scotch before bed); Trial Testimony Dan Hyatt, Trial Transcripts,

23   June 18, 2008 (observed his father crying on a rock while complaining about FTB and its

24   conduct); Trial Testimony Vince Turner, Trial Transcripts June 18, 2008 (stating that Hyatt

25   could no longer "function," appeared to have migraine headaches, no longer wanted to roller

26   blade or hike, and stopped taking care of his physical appearance, including dying his beard –

27   all of which was due to FTB's conduct.)

28

McDONALD·CARANO·WILSON℠

2300 WEST SAHARA AVENUE • SUITE 1000 • LAS VEGAS, NEVADA 89102-4354
PHONE (702) 873-4100 • FAX (702) 873-9966

1   evidence to the jury. As a result, FTB was severely prejudiced at trial by being prohibited in its

2   ability to fully and completely defend itself. FTB respectfully requests that this Court grant this

3   motion and set aside the judgment entered in this case and order a new trial.

4       Dated this ___16___ day of ___January___, 2009.

5                     McDONALD CARANO WILSON LLP

7           By:

8               JAMES W. BRADSHAW (NSBN 1638)
                PAT LUNDVALL (NSBN 3761)
9               CARLA HIGGINBOTHAM (NSBN 8495)
                2300 West Sahara Avenue, Suite 1000
                Las Vegas, NV 89102
10              Telephone No. (702) 873-4100

11              ROBERT L. EISENBERG (NSBN 0950)
                LEMONS, GRUNDY, & EISENBERG
12              6005 Plumas Street, Suite 300
                Reno, Nevada 89519
13              Telephone No.: (775) 786-6868
                Facsimile No. (702) 873-9966
14

15              Attorneys for Defendant
                Franchise Tax Board of the State of California

16

17

18

19

20

21

22

23

24

25

26

27

28

29

## CERTIFICATE OF SERVICE

U.S. Court of Appeals Docket Number(s):  15-15296

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 29, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Signature:        s/ Yolanda Mendez