**No. 15-15296**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

GILBERT P. HYATT,

*Plaintiff-Appellant*,

v.

DIANE L. HARKEY, in her official capacity as California State Board of Equalization member; JEROME E. HORTON, in his official capacity as California Franchise Tax Board member and California State Board of Equalization member; MICHAEL COHEN, in his official capacity as California Franchise Tax Board member; BETTY T. YEE, in her official capacity as California Franchise Tax Board member and California State Board of Equalization member; GEORGE RUNNER, in his official capacity as California State Board of Equalization member; FIONA MA, in her official capacity as California State Board of Equalization member,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California
Case No. 2:14-cv-00849-GEB-DAD (Hon. Garland E. Burrell, Jr.)

APPELLANT GILBERT P. HYATT'S
EXCERPTS OF RECORD

VOLUME 3 of 4

Donald J. Kula, Bar No. 144342
DKula@perkinscoie.com
Oliver M. Gold, Bar No. 279033
OGold@perkinscoie.com
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Erwin Chemerinsky
EChemerinsky@law.uci.edu
UC IRVINE SCHOOL OF LAW
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000
Telephone: 949.824.8814
Facsimile: 949.824.7336

Malcolm Segal, Bar No. 075481
MSegal@segal-pc.com
SEGAL & ASSOCIATES, PC
400 Capitol Mall, Suite 2550
Sacramento, CA 95814
Telephone: 916.441.0886
Facsimile: 916.475.1231

Attorneys for Appellant Gilbert P. Hyatt

TABLE OF CONTENTS

**Volume 1**

| | | **Page** |
|---|---|---|
| 02/10/2015 | [Doc. No. 36] Judgment ……………………….……….… | 1 |
| 02/10/2015 | [Doc. No. 35] Order Granting Defendants' Motion to Dismiss for Lack of Jurisdiction ……………………..……… | 2 |

**Volume 2**

| | | |
|---|---|---|
| 02/18/2015 | [Doc. No. 37] Notice of Appeal ………………………… | 15 |
| 08/25/2014 | [Doc. No. 22-1] Declaration of Eric J. Coffill in Support of Plaintiff Gilbert P. Hyatt's Consolidated Opposition to Defendants' Respective Motions to Dismiss …………… | 17 |
| 08/25/2014 | [Doc. No. 22-2] Declaration of Donald J. Kula in Support of Plaintiff Gilbert P. Hyatt's Consolidated Opposition to Defendants' Respective Motions to Dismiss ….………… | 55 |
| 08/25/2014 | [Doc. No. 23 - 23-2] Request for Judicial Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective Motions to Dismiss …………… | 64 |

**Volume 3**

| | | |
|---|---|---|
| 08/25/2014 | (Continued) [Doc. No. 23 - 23-2] Request for Judicial Notice in Support of Plaintiff's Consolidated Opposition to Defendants' Respective Motions to Dismiss ………… | 306 |
| 08/25/2014 | [Doc. No. 24] Plaintiff's Objections to Declaration of Robert W. Dunn in Support of California Franchise Tax Board Members Defendants' Motions to Dismiss ……… | 505 |

TABLE OF CONTENTS

**Volume 4**

| | | **Page** |
|---|---|---|
| 09/26/2014 | [Doc. No. 25] Notice of Decision from Nevada Supreme Court ………………………………………………… | 556 |
| 12/03/2014 | [Doc. No. 30] Plaintiff's Supplemental Notice of Decision from Nevada Supreme Court …………………………… | 631 |
| 12/03/2014 | [Doc. No. 31] Notice of Errata Re Plaintiff's Supplemental Notice of Decision from Nevada Supreme Court ……… | 635 |
| 04/04/2014 | [Doc. No. 2] Complaint for Injunctive Relief Under 42 U.S.C. § 1983 ……………………………………………… | 738 |
| | Case Docket ……………………………………………… | 784 |

# EXHIBIT  10

**OPP**

Mark A. Hutchison (4639)
Hutchison & Steffen
10080 Alta Drive
Suite 200
Las Vegas, NV 89145
(702) 385-2500

Peter C. Bernhard (734)
Bullivant Houser Bailey PC
3883 Howard Hughes Pkwy., Ste. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Attorneys for Plaintiff Gilbert P. Hyatt

FILED

FEB 13 4 18 PM '09

CLERK OF THE COURT

FUS

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

GILBERT P. HYATT,

Plaintiffs,

v.

FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA, and DOES 1-100 inclusive,

Defendants.

Case No.: A382999

Dept. No.: X

**PLAINTIFF GILBERT P. HYATT'S OPPOSITION TO: FTB'S MOTION TO SET ASIDE JUDGMENT AND NEW TRIAL PURSUANT TO NRCP 60(b)**

**Date of Hearing: March 11, 2009**
**Time of Hearing: 11:00 a.m.**

**(filed under seal by order of the Discovery Commissioner dated February 22, 1999)**

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

evidence during discovery, it would have changed our audit result, so we would not have assessed Hyatt or imposed a fraud penalty." Clearly, FTB does not say this, nor does it act as if this "new" residency evidence is significant or dispositive in Hyatt's favor, because FTB continues to fight the SBE case and defend its own audit assessments and fraud penalties, consistent with Hyatt's trial position that FTB was going to get him, *no matter what residency evidence he submitted.* And, also contrary to the FTB's implied assertion, there is no evidence that Hyatt could have provided this "new" evidence during the audit, or even the protests. Except for the Haber-relative affidavits regarding a family reunion,[11] the evidence was gathered and developed after the FTB's final determination in the protest that rejected the evidence Hyatt submitted in the protest, including for example Hyatt's protest evidence in support of his stay at the Continental Hotel. Further, in pre-trial motion practice and at trial in this action, the FTB emphasized the alleged "gap" in Hyatt's early residency in Nevada, signaling its clear intent to continue making this "gap" the cornerstone of its tax case. Not surprisingly, Hyatt and his tax professionals therefore sought to submit additional evidence in his administrative appeal to address the FTB's argument against Hyatt's residency claim. But this allegedly "new" evidence, as explained below, fails to meet the three elements and high burden necessary to obtain a new trial under Rule 60(b).

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

***The FTB's Protest Delay argument***

In regard to the protest delay, the FTB fails to explain the inconsistency between its delay defense at trial and this allegedly "new" residency evidence. At trial, and throughout this litigation, the FTB has blamed the protest delay on its own efforts to move evidence from this case to the tax proceedings and its complaints about the protective order.[12] In other words, the

[11] The affidavits from Hyatt's relatives from the East Coast were sought and obtained in late 2006 and early 2007 specifically to preserve their testimony in the event that these elderly individuals, most of whom had serious health issues, would be available if and when the FTB completed the protests and Hyatt was allowed to proceed with his appeal to California State Board of Equalization. In fact, one of these relatives, Morton Haber, passed away shortly after signing his affidavit. It was Hyatt's realization that many of his East Coast relatives who could confirm residency facts were elderly and in poor health that prompted Hyatt to seek affidavits in late 2006 and early 2007. The only exception was Saul Gorman, the son of Irene Gorman. Saul was neither elderly not in poor health, but his affidavit was obtained at the same time and in conjunction with the affidavit of Irene Gorman, his mother.

[12] B. Miller Trial Testimony, July 14, 2008 at 106:8-17, attached hereto as Exhibit 10; R. Dunn Trial Testimony, July 15, 2008 at 194:18-21, attached hereto as Exhibit 11.

FTB wanted to, and did, use evidence from this case in the protests. But it claimed that compliance with this Court's protective order caused this delay.[13] The FTB never asserted at trial that the protest could not proceed due to residency evidence Hyatt was allegedly not producing. There is a *non-sequitur* between the allegedly "new" residency evidence submitted by Hyatt in the administrative appeal and the FTB's 11 year delay in the protests. As presented at trial, the FTB had various means it could have employed if Hyatt was not cooperating in the protests, including administrative subpoenas or even closing the protest and finding against Hyatt.[14] While the FTB did eventually issue subpoenas many years after the protests commenced and did close the protest and find against Hyatt 11 years after the protests commenced, the FTB did not issue a subpoena or close the protests due to any alleged failure by Hyatt to identify residency witnesses. Instead it claimed that the delay was caused because it was waiting for evidence to be "moved" from this case to the protest via its interpretation of the Court's protective order.[15] This has nothing to do with the allegedly "new" evidence the FTB now argues entitles it to a new trial.

In sum, the FTB was not waiting for this allegedly "new" evidence as it now attempts to portray. To the contrary, it was the FTB's duty to perform the investigation and to seek the information that it needed and wanted. The FTB did not argue at trial that the delays in the protests were based on FTB requests for the identities of residency witnesses nor did the protest officer even make such requests. The allegedly "new" evidence does not create any basis to

---

[13] The Court commented on this during the January 29, 2009 hearing on the FTB's post-trial motions: "With respect to the protective order. It's apparent that the FTB believes very strongly in its position the protective order was improper. That is the law of the case, however. Hyatt exercised his rights under the protective order by refusing to provide evidence. FTB cites no improper motive or action by Hyatt in that refusal, and the refusal alone is insufficient basis for arguing to the jury that Hyatt abused the protective order and caused FTB to delay the protest. Hyatt presented substantial evidence that the FTB consciously and purposefully delayed the protest and that delay had nothing to do with the protective order." January 29, 2009 Hearing Transcript, at 26:22 – 27:7, attached hereto as Exhibit 12.

[14] G. McLaughlin Trial Testimony, July 11, 2008, at 44:20-45:1, attached hereto as Exhibit 13. R. Dunn Trial Testimony, July 15, 2008, at 194:18-21, attached hereto as Exhibit 11. *See also* California Revenue & Tax Code Section 19504.

[15] B. Miller Trial Testimony, July 14, 2008 at 106:8-17, attached hereto as Exhibit 10; R. Dunn Trial Testimony, July 15, 2008 at 194:18-21, attached hereto as Exhibit 11.

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

argue that it might have affected the jury's verdict and falls well short of establishing a basis for a new trial.

***The FTB's emotional distress argument***

The third and final argument by the FTB is that the allegedly "new" residency evidence supposedly demonstrates that the emotional distress suffered by Hyatt was Hyatt's own fault. The FTB argues that if Hyatt had produced this allegedly "new" evidence earlier they might have ruled differently in the audits or protests (thereby sparing Hyatt the emotional distress), or that Hyatt's emotional distress was caused by him knowing he had not produced this allegedly "new" evidence during the audits or protests. These arguments are laughable. If the FTB is stating in good faith that it might have ruled in Hyatt's favor if it had the allegedly "new" affidavits sooner, why has it not withdrawn its assessments in the tax proceeding now that it has these affidavits? Instead, it unsuccessfully sought a stay of Hyatt's SBE appeal, but it was only granted a three month extension.[16] This thereby further delays Hyatt's opportunity to obtain an impartial decision regarding the tax and residency case.

Moreover, the fact that Hyatt developed even more exculpatory evidence in his favor would simply further demonstrate to the jury, if it were allowed to view this after-acquired residency evidence, the bad faith, one-sided, pre-determined nature of the FTB's audits.

In short, when the allegedly "new" evidence is considered in regard to any issue asserted by the FTB, the evidence fails to provide any basis for a new trial. Most significantly, the FTB cannot establish the three necessary elements for relief under Rule 60(b).

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

## 3. Response to FTB's asserted relevant background facts.

### *A.* The Protest Proceedings.

The FTB misrepresents the issue as presented at trial in regard to the FTB's 11 year delay in the protest proceeding. (FTB Motion, at 25-26.) The FTB did not argue at trial that it was delaying the protests because it had insufficient evidence or production of requested materials by Hyatt. It argued at trial that it was delaying the protests because of its alleged

[16] January 27, 2009, FTB letter copied to Hyatt tax counsel, attached hereto as Exhibit 14.

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

attempts to comply with this Court's protective order relative to using discovery from this case in the protests.[17]

In fact, there was clear evidence that the fourth protest officer (Cody Cinnamon) wanted to conclude the protests many years before the FTB actually issued its final Protest Determination Letter in November of 2007. But she testified that she was told by FTB lawyers working on or overseeing this Nevada litigation to wait for information *that had been produced by Hyatt in this Nevada tort litigation.*[18] As a result, the FTB was not delaying the protests waiting for Hyatt to produce the subject affidavits.

The FTB also references in its motion that the protest officer made additional requests for information from Hyatt during the protests. (FTB Motion, at 6:14-16) These requests, however, were not directed to residency witnesses. The FTB seems to imply that the allegedly "new" evidence at issue in this motion should therefore have been produced in the protest. But the affidavits did not exist during the protests, and most of the witnesses were known to the FTB. But again, not having this allegedly "new" evidence had nothing to do with the FTB's bad faith 11 year delay. The FTB, by its own admissions, was not waiting for more evidence from Hyatt, but rather it was waiting for evidence Hyatt had produced in this case. Again, trying to connect the allegedly "new" evidence to the FTB's 11 year delay in the protest is a *non-sequitur*.

### *B.* This Nevada Litigation.
### ***Bad faith is separate from resolution of the residency issue***

The FTB's motion recounts its successful effort to have Hyatt's claim for declaratory relief relative to Hyatt's residency dismissed from this case early in the proceedings. (FTB Motion, at 7:6-13) As a result, the determination of the residency dispute and whether Hyatt owes taxes to California was not an issue this Court would address. But, as it attempted to do in pretrial filings and arguments during the trial, the FTB again attempts to misstate the effect of that ruling by the Court. The ruling left fully intact Hyatt's intentional tort claims; including

---

[17] January 29, 2009 hearing transcript at 26:22-27:7, attached hereto as Exhibit 12. B. Miller Trial Testimony, July 14, 2008 at 106:8-17, attached hereto as Exhibit 10; R. Dunn Trial Testimony, July 15, 2008 at 194:18-21, attached hereto as Exhibit 11.

[18] C. Cinnamon Trial Testimony, June 17, 2008, at 58:9-18, 84:21-85:9, attached hereto as Exhibit 15.

bearing on the cooperation issues regarding the audits in the trial and thus would not have been admissible nor would it have been likely to change the disposition of the case.

In addition to the fact that the FTB would not have been allowed to argue that Hyatt's production of this information in the administrative appeal in December of 2008 is additional evidence that he may not have been cooperative in the audits,[107] it also falls far short of the competent, material, and sufficiently strong evidence necessary to conclude that the trial would have produced a different result. In that regard, what the FTB calls the "substantive" evidence is in reality so convincing in favor of Hyatt's position regarding the residency dispute the only reasonable assumption is that it would assist, not harm, Hyatt if presented to the jury. Again, this type of after-acquired residency evidence was excluded from the jury for the very reason that they were resolving the tort claims stemming from the audit, not the residency dispute. So even if the FTB had this evidence, the jury never would have seen it.

The FTB therefore fails to carry its heavy burden that the allegedly "new" evidence it now touts relative to Hyatt's alleged non-cooperation in the audit would have resulted in a different outcome by the jury in the case.

***FTB's protest delay argument***

The FTB's argument that the allegedly "new" evidence would have somehow assisted it in rebutting Hyatt's argument that the protests were delayed in bad faith is just as tenuous as its argument regarding cooperation in the audit. The FTB's motion references evidence the FTB submitted at trial to rebut the claim of bad faith delay. The FTB essentially argued that Hyatt would not allow material that was designated under this Court's protective order to be moved to the protest without the FTB seeking an administrative subpoena or appeal. (FTB Motion, at 25:15-23.) At trial Hyatt demonstrated that in fact, on only one occasion did the FTB have any

[107] If the Court were to allow the FTB to make this argument, unsupported by any actual evidence, Hyatt would have had to present his efforts to obtain this evidence for the administrative appeal, thereby putting this Court in the position of having to evaluate proceedings in the administrative appeal and thereby further involving the Court in the administrative action — something this Court has consistently attempted to avoid.

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

real delay due to Hyatt opposing the FTB's request to move material from this case to the protest.[108]

But the real issue here is that the FTB's argument makes no sense. It has never contended that the 11 year protest was because it was waiting for Hyatt to produce information. Rather, its position has been that *information was produced by Hyatt in this case* and the FTB wants to move it to the protest. There is no evidence that the FTB's delays and holding up the protest was that it was waiting for more information supporting Hyatt's residency position. Rather, as the FTB's Protest Determination Letter dated November 1, 2007 states, the FTB's protest officer did not accept Hyatt's evidence regarding staying at the Continental Hotel, regarding living at the Wagon Trails apartment, regarding selling his LaPalma house, etc.[109]

The November 1, 2007 Protest Determination Letter rejecting Hyatt's residency evidence and explanation for the disputed period of September 1991 to April 1992, was not a surprise given the FTB's 11 year bad faith delay.[110] None of the allegedly "new" evidence was obtained until well after discovery was closed in this case, and none of the allegedly "new" evidence (except for the affidavits from Hyatt's Haber-relatives described above recounting a family reunion) was obtained until well after the FTB issued its Protest Determination Letter, filed its pre-trial motions, and trial was concluded. The allegedly "new" evidence was sought in part to address the issues that the FTB highlighted in ruling against Hyatt in the Protest Determination Letter and in its pre-trial motions and questioning of witnesses at trial.

Most significantly, as with the issue of Hyatt's alleged non-cooperation in the audit, the allegedly "new" evidence that the FTB puts forth is all favorable to Hyatt. The idea that this evidence would have helped the FTB rebut the bad faith delay issue at trial makes no sense. The FTB is essentially asserting that a jury would find it persuasive that it was not delaying the audit in bad faith because it did not know of witnesses with evidence favorable to Hyatt. The

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

---

[108] October 24, 2008, Hyatt's Opposition to FTB's Rule 50 Motion at pp. 114-116, attached hereto as Exhibit 45.

[109] FTB's November 1, 2007 determination letter at p.24, attached hereto as Exhibit 2.

[110] Other parts of the letter were a surprise, including the assertion of a sourcing theory for which Hyatt was never given the opportunity to address during the protests.

FTB's argument is absurd. The protest officer did not request (and there is no evidence that she was waiting for) such affidavits. In fact, the protest officer gave no consideration to the initial affidavits that Hyatt produced in 2001. If she had been concerned about a lack of information, she would have requested information of Hyatt or she would have contacted the witnesses, rather than delay her decision. In fact, the protest officer notified Hyatt that she had the right to contact witnesses,[111] but she did not do so.

The FTB therefore fails to put forth competent, material, and sufficiently strong evidence necessary to conclude the trial would have produced a different result in regard to the issue of the FTB's bad faith delay in the protests.

***FTB's argument re emotional distress***

The FTB's final argument as to how this allegedly "new" evidence could have produced a different result at trial is that it supposedly rebuts Hyatt's alleged emotional distress. The FTB argues that Hyatt's alleged failure to provide the information was the cause of his distress, and the FTB might have come to a different conclusion if it had the information earlier. (FTB Motion, at 27:21-28) This case was not about what the FTB might have done, if it knew that it would be in a Nevada court trying to explain its acts to a Nevada jury. This case is about what the FTB did do to Hyatt. Speculation of what the FTB might have done under different circumstances is irrelevant and insufficient to speculate about the possibility of a different outcome. The standard for a new trial requires more than mere speculation.

Moreover, the FTB blames Hyatt for what the FTB put him through. The FTB already tried this argument at trial, unsuccessfully. Further, its statement that it might have come to a different result if it had this information earlier (something that was not possible) is disingenuous at best. It now has this information, convincingly showing Hyatt's residency in Nevada as of September 26, 1991, but it has not withdrawn its assessments in the California tax case. Nor has the FTB submitted affidavits from the auditors and protest officers saying this

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

[111] PHO letters re third party demands: P 00494 – 00500 – December 14, 2000 C. Cinnamon letter to E. Coffill; September 7, 2005, C. Cinnamon letter to E. Coffill; and January 8, 2007 C. Cinnamon letter to E. Coffill, attached hereto as Exhibit 46.

The FTB's latest and most desperate attempt to avoid the jury's damage award must be denied.

Dated this 13 day of February, 2009.

HUTCHISON & STEFFEN, LTD.
Mark A. Hutchison, Esq. (4639)
10080 Alta Drive
Suite 200
Las Vegas, Nevada 89145

BULLIVANT HOUSER BAILEY PC

Peter C. Bernhard, Esq. (734)
3883 Howard Hughes Pkwy.
Suite 550
Las Vegas, Nevada 89169
(702) 669-3600

*Attorney's for Plaintiff Gilbert P. Hyatt*

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

# EXHIBIT 11

COPY

DISTRICT COURT
CLARK COUNTY, NEVADA
* * * * *

COPY

GILBERT P. HYATT,

Plaintiff,

vs.

CALIFORNIA STATE FRANCHISE TAX BOARD,

Defendant

CASE NO. A-382999

DEPT. NO. X

**Transcript of Proceedings**

FILED
JAN 21 8 40 AM '09
CLERK OF THE COURT

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 69**

TUESDAY, JULY 30, 2008

APPEARANCES:

FOR THE PLAINTIFF: PETER C. BERNHARD, ESQ.
MARK HUTCHISON, ESQ.
DONALD J. KULA, ESQ.

FOR THE DEFENDANT: PAT LUNDVALL, ESQ.
CARLA B. HIGGINBOTHAM, ESQ.
JAMES BRADSHAW, ESQ.

COURT RECORDER:
VICTORIA BOYD
District Court

TRANSCRIPTION BY:
VERBATIM DIGITAL REPORTING, LLC
Littleton, CO 80120
(303) 798-0890

Proceedings recorded by audio-visual recording, transcript produced by transcription service.

Cause of Action, therefore, is no longer an issue in the district court.

So, did the Franchise Tax Board know that in April of 1999, the Court, at their request, dismissed the residency part of this case? Yes, they've known that since 1999. But what did the lawyers argue to you? Oh, no, no, there's a cross over here. The issues that are being decided in this case have an impact on what's being decided down in California. How many times did you hear that? Over and over again.

When the docket that they rely on tells you that hasn't been in the case since '99. And the right jury instruction 24 tells you that. Ladies and Gentlemen, don't worry about the residency case. That's being handled down in California.

But when the FTB wants to justify why it took 11 and a half years to go through the protest, what did they say? Oh, well, Ladies and Gentlemen, one thing you've got to know is this litigation dealt with the same issues that we were dealing with down in California. And we were just sort of bumping into each other because we didn't know how to deal with that and Mr. Hyatt, again, is to blame. It's his fault. He brought the lawsuit. But they tell you something that is absolutely false. Since 1999, there has been no claim or no issue in this case about residency. Now, why would they tell

dollar you gave us, we got back at least five. That was CBR. That's another motive that we've proven to show you in this trail.

What's another motive? Well, during the course of the protest, we'd better delay this thing for eleven and a half years. Why? Sure, part of it may have been to pressure Mr. Hyatt. Part of it may have been, I think, to impose emotional distress on him, rack up the interest. Another reason, though, was because they could not afford to finish the protest -- now they control the audit and the protest. They don't control the Board of Equalization, which is the next step. That's where Mr. Hyatt could be now. It took him eleven and a half years to get there. They don't control that Board, so it's a fairly neutral Board.

They could not take the chance that the protest ended before this trial started, it goes to the Board of Equalization and the Board of Equalization, finally a neutral party, says, you were wrong, Franchise Tax Board. They could not afford to take that risk. It's another motive as to why they delayed the protest. Let's keep it in our control for as long as we can, right up until November of '07. This trial starts in April of '08. And we know the Board of Equalization can't make a decision before then.

That's another motive that we've shown, or suggested. There are many motives that the Franchise Tax

she said in the affidavit. That's what it says in her narrative report. But what did Ms. Kopp say about that?

"So with respect to the affidavit that seems to have been sent to you by Sheila Cox, would you say it's an untrue statement that Grace Jeng signed the lease for Gil Hyatt?"

Answer, "She didn't according to this lease."

Question, "Would you have disclosed such private information to the Franchise Tax Board if they would have asked you for it?"

Answer, "I would have to give it to upper management."

And we know what upper management's position already is.

This is the kind of stuff we've seen throughout the course of this trial. And we keep seeing excuses as to why it took so long to complete the protest, eleven and a half years. Ladies and Gentlemen, there's nothing in the evidence that will suggest or establish that the Franchise Tax Board couldn't do what they always did in every other protest. If you want documents, ask the taxpayer for it. They won't give them to you, subpoena them. Cody Cinnamon said that. Cody Cinnamon said that was her preferred route. That's what she wanted to do. Instead, the lawyers decided, you know what, we got to come up with some excuse, we got to come up with

some argument. I know what it is, it's got to be, I don't know, the protest -- you know, the protective order.

This Court is to blame for the delay. How many times have we heard that? How many times, though, Ladies and Gentlemen, has the Court told you that these proceedings are separate, they're different. Torts, residency. But the Franchise Tax Board wants you to believe that what the Court did was interfere with a proceeding down in California that it has no jurisdiction over, that it has nothing to say about it, and has done its very best to keep separate. They want you to say an order entered by the Court disrupted that whole process. There's no evidence of that, there's no evidence of that. There's a lot of lawyer arguments about that.

Just a couple other points here. The FTB, staying with the protective order, never sought a single document, not one document, that whole big demonstration about moving documents from one side to the other, remember that whole thing? They never even asked for that to happen. The Franchise Tax Board never asked for that to happen until June of 2002, six years after the protest. Six years. When was the next time they asked? August of 2005, nine years into the protest.

Now, you can apply your common sense and decide whether or not those lawyer made-up arguments make sense to you. That this process that slowed them down so badly wasn't

even triggered for six years by them, and after that, nine years.

And if you want to believe that this one subpoena process took a while, fine. You can apply your common sense. Say it took a year, 18 months. Say it took two years. We're still talking about eleven and a half years here. And why is that -- and why is that something for your consideration? Because, Ladies and Gentlemen, that's further evidence of their bad faith. They didn't want to be here in front of you and have the risk that the State Board of Equalization could have made a decision against them. And they wanted to continue to have Mr. Hyatt incur and rack up interest payments. Put a little more pressure on him.

And Ms. Lundvall now has changed her position from opening statement. Ms. Lundvall, in opening statement, said this. Mr. Hyatt, now, had two proceedings going. He had the California tax proceeding ongoing and he had this litigation ongoing. And what he did is to erect a wall between the folks handling the protest at FTB and the folks that were handling the litigation. You now know, because she said it in her closing argument, it wasn't Mr. Hyatt. If anybody, it was the Court. It's not Mr. Hyatt's order.

I'll just mention this to you. Remember she showed a fax transmittal where Eugene Cowan had sent a fax to me and it said something about, well, you know what, there may be

tactical reasons to make the FTB go through the motions, jump through the hoops, something like that, work for their requests. Remember that? She didn't tell you that Mr. Hyatt didn't even challenge that subpoena. Didn't even challenge it. Didn't make them jump through a hoop.

Your Honor, if I could just have a quick break, I'm getting near the end.

THE COURT: Sure.

MR. HUTCHISON: I just want to make sure my notes were in order and we'll be done.

THE COURT: Five minutes?

MR. HUTCHISON: Yes, Your Honor. Five minutes will be fine.

THE COURT: Ladies and Gentlemen, I advise you of your duty not to discuss this case, not to form or express any opinion, not to do any research.

(Court recessed at 2:31 p.m. until 2:44 p.m.)

(Jury is not present)

THE COURT: Please be seated.

MS. LUNDVALL: Your Honor, we left you a gift of sorts.

THE COURT: That's what I hear.

MS. LUNDVALL: I just wanted to make sure that you are aware we shared this with opposing counsel before tendering it to you. You've got a clean copy of the verdict

**CERTIFICATION**

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE AUDIO-VISUAL RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

**AFFIRMATION**

I AFFIRM THAT THIS TRANSCRIPT DOES NOT CONTAIN THE SOCIAL SECURITY OR TAX IDENTIFICATION NUMBER OF ANY PERSON OR ENTITY.

**Verbatim Digital Reporting, LLC**
**Littleton, CO 80120**
**(303) 798-0890**

Julie Lord — 1-8-09

Julie Lord, Transcriber — DATE

# EXHIBIT 12

FILED IN OPEN COURT AUG 0 6 2008 20 CHARLES J. SHORT CLERK OF THE COURT BY TERI BRAEGELMANN DEPUTY 236pm

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

* * * *

| | |
|---|---|
| GILBERT P. HYATT,<br><br>Plaintiff,<br><br>vs.<br><br>FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA, and DOES 1-100, inclusive,<br><br>Defendants. | Case No. : A 382999<br>Dept. No. : X<br>Docket No. : R<br><br>**SPECIAL VERDICT FORM** |

We, the jury in the above entitled action, answer the questions submitted to us as follows:

1. On Gilbert P. Hyatt's second cause of action for invasion of privacy intrusion upon seclusion against Defendant California Franchise Tax Board ("FTB"), we find in favor of GILBERT P. HYATT [insert Gilbert P. Hyatt or FTB].

2. On Gilbert P. Hyatt's third cause of action for invasion of privacy publicity of private facts against FTB, we find in favor of GILBERT P. HYATT [insert Gilbert P. Hyatt or FTB].

3. On Plaintiff Gilbert P. Hyatt's fourth cause of action for invasion of privacy false light against FTB, we find in favor of GILBERT P. HYATT [insert Gilbert P. Hyatt or FTB].

4. On Gilbert P. Hyatt's fifth cause of action for intentional infliction of emotional distress against FTB, we find in favor of GILBERT P. HYATT [insert Gilbert P. Hyatt or FTB].

5. On Gilbert P. Hyatt's sixth cause of action for abuse of process against FTB, we find in favor of GILBERT P. HYATT [insert Gilbert P. Hyatt or FTB].

6. On Gilbert P. Hyatt's seventh cause of action for fraud against FTB, we find in favor of GILBERT P. HYATT [insert Gilbert P. Hyatt or FTB].

7. On Gilbert P. Hyatt's eighth cause of action for breach of confidential relationship against FTB, we find in favor of GILBERT P. HYATT [insert Gilbert P. Hyatt or FTB].

If you found in favor of FTB on all seven questions above, then proceed no further. If you found in favor of Gilbert P. Hyatt on any of the above questions, then proceed to the next question.

8. We the jury award damages in favor of Gilbert P. Hyatt, and against FTB, in the following amounts:

a. The amount of money that will fully and fairly compensate Gilbert P. Hyatt for the emotional distress he suffered is $ 85,000,000.00.

b. The amount of money that will fully and fairly compensate Gilbert P. Hyatt for the FTB's invasion of privacy interest $ 52,000,000.00

9. If you found in favor of Gilbert P. Hyatt, and against FTB on Gilbert P. Hyatt's seventh cause of action for Fraud, we the jury award damages in favor of Gilbert P. Hyatt, and against FTB, in the following amount of money that will fully and fairly compensate Gilbert P. Hyatt for attorneys fees as special damages he suffered $ 1,085,281.56.

Dated this 6 TH day of AUGUST, 2008.

[signature]

FOREPERSON

# EXHIBIT  13

FILED IN OPEN COURT
AUG 1 1 2008 20
CHARLES J. SHORT
CLERK OF THE COURT
BY
TERI BRAEGELMANN DEPUTY
11:48 AM
FUS

DISTRICT COURT

CLARK COUNTY, NEVADA

* * * *

| | |
|---|---|
| GILBERT P. HYATT,<br><br>Plaintiff,<br><br>vs.<br><br>FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA,<br><br>Defendant. | Case No. : A 382999<br>Dept. No. : X<br>Docket No. : R<br><br>**SPECIAL VERDICT FORM NUMBER 2** |

We, the jury in the above entitled action, answer the question submitted to us as follows:

Based on the evidence presented, was the Defendant Franchise Tax Board of the State of California guilty of oppression, fraud or malice, express or implied, against Plaintiff Gilbert P. Hyatt?

X YES ________ NO

Dated this 8/11/ day of August, 2008.

[signature]
FOREPERSON

# EXHIBIT  14

FILED IN OPEN COURT
AUG 14 2008 20
CHARLES J. SHORT
CLERK OF THE COURT
BY TERI BRAEGELMANN DEPUTY
2:15 pm

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

* * * *

| | |
|---|---|
| GILBERT P. HYATT,<br><br>Plaintiff,<br><br>vs.<br><br>FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA,<br><br>Defendants. | Case No. : A 382999<br>Dept. No. : X<br>Docket No. : R<br><br>**SPECIAL VERDICT FORM NUMBER 3** |

We, the jury in the above entitled action, having found that the Defendant Franchise Tax Board of the State of California ("FTB") has been guilty of oppression, fraud or malice, express or implied, against Plaintiff Gilbert P. Hyatt ("Hyatt"), award damages in favor of Hyatt and against FTB, for the sake of example and by way of punishing the defendant FTB, in the amount of $ 250 MILLION.

Dated this 14 day of AUGUST, 2008.

[signature]
FOREPERSON

# EXHIBIT  15

**JGJV**
Mark A. Hutchison (4639)
Hutchison & Steffen
10080 Alta Drive
Suite 200
Las Vegas, NV 89145
(702) 385-2500

Peter C. Bernhard (734)
Bullivant Houser Bailey PC
3883 Howard Hughes Pkwy., Ste. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Attorneys for Plaintiff Gilbert P. Hyatt

FILED

SEP 8 10 21 AM '08

[signature]
CLERK OF THE COURT

**Bullivant|Houser|Bailey PC**
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

DISTRICT COURT

CLARK COUNTY, NEVADA

| | |
|---|---|
| GILBERT P. HYATT,<br><br>Plaintiff,<br><br>v.<br><br>FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA,<br><br>Defendant. | Case No.: A382999<br><br>Dept. No.: X<br><br>**JUDGMENT**<br><br>Date of Hearing: N/A<br>Time of Hearing: N/A<br><br>**(filed under seal by order of the Discovery Commissioner dated February 22, 1999)** |

This matter came on for trial before the Court and a jury, beginning on April 14, 2008, and concluding with the verdicts of the jury on August 6, 2008 (liability for and amount of compensatory damages), on August 12, 2008 (liability for punitive damages), and on August 14, 2008 (amount of punitive damages), the Honorable Jessie Walsh, District Judge, presiding. Plaintiff Gilbert P. Hyatt appeared with his counsel Mark A. Hutchison, Esq. of Hutchison & Steffen, LLC, Peter C. Bernhard, Esq. of Bullivant Houser Bailey, PC, and Donald J. Kula Esq. of Perkins Coie. Defendant Franchise Tax Board of the State of California appeared with its

representative and its counsel, Pat Lundvall Esq., and James Bradshaw Esq., of McDonald Carano Wilson, LLP.

Testimony was taken under oath, and evidence was offered, introduced and admitted. Counsel argued the merits of their clients' cases, the issues have been duly tried, and the jury duly rendered its verdict. The jury rendered a verdict in favor of Plaintiff Gilbert P. Hyatt and against Franchise Tax Board on all causes of action presented to the jury, including Plaintiff's second cause of action for invasion of privacy intrusion upon seclusion, third cause of action for invasion of privacy publicity of private facts, fourth cause of action for invasion of privacy false light, fifth cause of action for intentional infliction of emotional distress, sixth cause of action for abuse of process, seventh cause of action for fraud and eighth cause of action for breach of confidential relationship. This Court previously dismissed Plaintiff's first cause of action for declaratory relief, and that cause of action was not presented to the jury.

The jury returned its verdict awarding Plaintiff Gilbert P. Hyatt compensatory damages of EIGHTY-FIVE MILLION DOLLARS AND NO CENTS ($85,000,000.00) for emotional distress; compensatory damages of FIFTY-TWO MILLION DOLLARS AND NO CENTS ($52,000,000.00) for invasion of privacy; attorneys' fees as special damages of ONE MILLION, EIGHTY-FIVE THOUSAND, TWO HUNDRED EIGHTY-ONE DOLLARS AND 56 CENTS ($1,085,281.56); and punitive damages of TWO HUNDRED FIFTY MILLION DOLLARS AND NO CENTS ($250,000,000.00).

At the conclusion of the verdict reached on August 6, 2008, the jury was polled, and each juror responded that the verdict as read by the Clerk of the Court was the verdict of that juror, resulting in a verdict of eight (8) in favor and zero (0) opposed, as to liability and the amount of compensatory damages awarded on each of Plaintiff's seven claims. At the conclusion of the verdict on punitive damages on August 12, 2008, the jury was polled, and

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

each juror responded that the verdict as read by the Clerk of the Court was the verdict of that juror, resulting in a verdict of eight (8) in favor and zero (0) opposed, as to whether the conduct of the Defendant warranted punitive damages. At the conclusion of the verdict on punitive damages on August 14, 2008, the jury was polled, and seven jurors responded that the verdict as read by the Clerk of the Court was the verdict of that juror, with one juror responding in the negative, resulting in a verdict of seven (7) in favor and one (1) opposed, as to the amount of punitive damages awarded against Defendant.

NOW, THEREFORE, based on the foregoing, judgment upon the jury verdicts is entered in favor of Plaintiff Gilbert P. Hyatt and against Defendant Franchise Tax Board, as follows:

IT IS ORDERED, ADJUDGED AND DECREED that Plaintiff Gilbert P. Hyatt is awarded compensatory damages in the amount of EIGHTY-FIVE MILLION DOLLARS AND NO CENTS ($85,000,000.00) for emotional distress, plus prejudgment interest at the rate of seven percent per annum (7%) (the applicable prejudgment statutory rate) in the amount of $63,184,110.12 from the date the Complaint was served (calculated through August 27, 2008, and accruing from August 27,2008 at the rate of $ 16,301.37 per day until the date of this Judgment), with interest continuing to accrue at the applicable postjudgment statutory rate from the date of this Judgment until satisfied in full;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Gilbert P. Hyatt is awarded compensatory damages in the amount of FIFTY-TWO MILLION DOLLARS AND NO CENTS ($52,000,000.00) for invasion of privacy, plus prejudgment interest at the rate of seven percent per annum (7%) (the applicable prejudgment statutory rate) in the amount of $38,653,797.60 from the date the Complaint was served (calculated through August 27, 2008, and accruing from August 27, 2008 at the rate of $ 9,972.60 per day until the date of this

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

Judgment), with interest continuing to accrue at the applicable postjudgment statutory rate from the date of this Judgment until satisfied in full;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Gilbert P. Hyatt is awarded attorneys' fees as special damages in the amount of ONE MILLION, EIGHTY-FIVE THOUSAND, TWO HUNDRED EIGHTY-ONE DOLLARS AND 56 CENTS ($1,085,281.56), plus prejudgment interest at the rate of seven percent per annum (7%) (the applicable prejudgment statutory rate) in the amount of $497,824.53 from the dates the special damages were incurred (calculated through August 27, 2008, and accruing from August 27, 2008 at the rate of $ 208.14 per day until the date of this Judgment), with interest continuing to accrue at the applicable postjudgment statutory rate from the date of this Judgment until satisfied in full; and

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Gilbert P. Hyatt is awarded punitive damages in the amount of TWO HUNDRED FIFTY MILLION DOLLARS AND NO/100 CENTS ($250,000,000.00), with interest to accrue at the applicable postjudgment statutory rate from the date of this Judgment until satisfied in full.

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Gilbert P. Hyatt is awarded costs in the amount of to be determined with interest to accrue at the applicable postjudgment statutory rate from the date of this Judgment until satisfied in full.

DATED this 5 day of ~~August~~ Sep, 2008.

JESSIE WALSH

DISTRICT JUDGE

Prepared and submitted by:

Prepared and submitted by:

HUTCHISON & STEFFEN, LLC

Mark A. Hutchison, Esq. (4639)
10080 Alta Drive
Suite 200
Las Vegas, Nevada 89145

BULLIVANT HOUSER BAILEY PC

Peter C. Bernhard, Esq. (734)
3883 Howard Hughes Pkwy.
Suite 550
Las Vegas, Nevada 89169
(702) 669-3600

*Attorneys for Plaintiff Gilbert P. Hyatt*

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

# EXHIBIT  16

**OPP**

Mark A. Hutchison (4639)
Hutchison & Steffen
10080 Alta Drive
Suite 200
Las Vegas, NV 89145
(702) 385-2500

Peter C. Bernhard (734)
Bullivant Houser Bailey PC
3883 Howard Hughes Pkwy., Ste. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Attorneys for Plaintiff Gilbert P. Hyatt

FILED
OCT 24 4 35 PM '08
CLERK OF THE COURT

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| GILBERT P. HYATT,<br><br>Plaintiffs,<br><br>v.<br><br>FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA, and DOES 1-100 inclusive,<br><br>Defendants. | Case No.: A382999<br><br>Dept. No.: X<br><br>**PLAINTIFF GILBERT P. HYATT'S OPPOSITION TO:**<br><br>**(1) FTB'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVELY, AND CONDITIONALLY MOTION FOR NEW TRIAL PURSUANT TO NRCP 50; AND**<br><br>**(2) FTB'S ALTERNATIVE MOTION FOR NEW TRIAL AND OTHER RELIEF PURSUANT TO NRCP 59**<br><br>**Date of Hearing: November 19, 2008**<br>**Time of Hearing: 9:00 a.m.**<br><br>**(filed under seal by order of the Discovery Commissioner dated February 22, 1999)** |

which declaratory relief was sought. That appears to be the assertion of the FTB in quoting from the declaratory relief claim. The Court made no ruling on the declaratory relief claim, but allowed the tort claims to proceed. The FTB also argues that the Court ruled that the FTB could conduct an investigation, but these rulings did not limit Hyatt's intentional tort claims. The issue of whether the FTB conducted its investigations in bad faith remained in the case and was tried by the jury.

***Protective order***

The FTB argues that Hyatt argued that the FTB's compliance with the Protective Order was evidence of bad faith. The FTB again completely misstates the rulings of the Court, the claims in the case, and what Hyatt presented and argued at trial. The Court is well aware of the FTB's attempts to misuse the protective order at trial. At issue at trial was the FTB's delay in processing and completing the protests. The FTB tried to blame this Court and its orders for the delay. In fact, the record in the case is clear that the protective order included provisions to keep this case from encroaching on the administrative tax proceedings in California. The FTB made internal decisions to "hold" the protests, but at trial had no explanation other than to blame this Court and the protective order. The FTB still does not get it; it was not supposed to use discovery in this case for the tax proceedings. Attempting to do so, as was obvious from internal FTB documents, confirmed rather than refuted the fact that the FTB was intentionally delaying the protests.

***Spoliation***

The FTB argues the spoliation issue claiming Hyatt rewrote the rebuttable presumption instruction to make the presumption irrebuttable. Again, not true. The Court gave, in Hyatt's view, a watered down spoliation instruction in light of the clear findings of spoliation. The record is clear on this issue. The instruction given to the jury was drastically reduced from the Court's initial ruling in February two months before the trial. Moreover, the FTB put forth no admissible evidence to rebut the presumption that the lost data was adverse to the FTB. It had every opportunity to rebut the presumption, but could not and did not.

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

**E. There is no basis to reduce the jury's damage awards or grant a new trial.**

The FTB argues that if the damages awarded by the jury are not reduced as a result of the Nevada statute limiting damages against a Nevada state agency, the Court should require that Hyatt accept a reduced amount or face a new trial. The FTB lists various other unrelated cases in arguing the damages awarded were too high. But this Court should not substitute its judgment for that of the jury. The jury sat for four months. It heard all the evidence and arguments. Its verdict should not be replaced.

In addition, the FTB argues for approximately 100 pages that the Court made errors in evidentiary rulings and jury instructions. In short, the FTB complains of every ruling made against it pretrial or during the trial. None of the FTB's arguments for a new trial have any merit. The FTB had its "day" in Court. It received a fair trial on the merits. It is not entitled to a new trial.

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

## III. The FTB misrepresents the relevant procedural history of this case.

The primary point the FTB attempts to make regarding the procedural history of the case is that whether or not the FTB fairly and impartially conducted the Hyatt audits was, according to the FTB, not at issue in this case. The FTB is absolutely wrong. Whether the FTB was right or wrong, and therefore whether Hyatt owes taxes to California, was not and is not an issue for this case. But whether the FTB carried out its 14 year investigation, audits, and protests in a fair and impartial manner, or instead sought in bad faith to predetermine the outcome and even then extort a settlement from Hyatt, was and is very much at issue in this case. That is an important part of the bad faith claim Hyatt presented and argued to the Nevada Supreme Court and over which the Court found Nevada had jurisdiction.[17]

The FTB argues that the Nevada jury was not a check on the FTB's discretionary functions. But in accord with the Nevada Supreme Court ruling in this case, this case was and is a check on whether the FTB conducted its audits and protests in bad faith, thereby committing intentional torts against Hyatt in Nevada. If resolving those tort claims has the effect of a check

[17] *Hyatt v. Franchise Tax Board*, 2002 Lexis 57, at *10-11.

on the FTB's performance of its discretionary functions, it is a proper check based on the decision of the Nevada Supreme Court. Did the FTB treat Hyatt fairly and impartially, as government agencies are supposed to treat citizens, or did it carry out its actions toward Hyatt in bad faith with a predetermined result? The jury clearly answered this question.

**A. Judge Saitta's order dismissed the declaratory relief claim, but left the intentional torts claims and bad faith allegations in the case in their entirety.**

The FTB argues that Judge Saitta's ruling dismissing the declaratory relief claim in 1999 put off limits the issue of whether the FTB was correct in its tax determination, or whether the assessed penalties were correct, etc. The FTB argues that residency was not to be decided. It was not. The FTB tries to expand this and argue that decisions made by the FTB could not even be presented or considered as evidence. This is wrong based on the language of the Nevada Supreme Court decision. The FTB has never grasped this fact. It has misunderstood or misinterpreted the decision and scope of this case since the Nevada Supreme Court decision was issued.

The ruling did not limit the issue of whether the FTB acted in bad faith and was attempting to extort a settlement. Those issues remained in the complaint. They were ultimately presented to and approved by the Nevada Supreme Court. The FTB refuses to recognize the scope of the case as reviewed and as determined by this Court and the Nevada Supreme Court. The scope of this case includes whether the FTB carried out the Hyatt audits and protests in bad faith, including whether the FTB had no belief that Hyatt actually owed taxes but assessed taxes and penalties against Mr. Hyatt without having a good faith belief that Hyatt actually owed those assessments. This aspect of the case was presented and briefed to the Nevada Supreme Court, which confirmed that bad faith "discretionary" conduct was part of the intentional tort claims that Hyatt could pursue.[18]

Indeed, the FTB knows this and admitted it. In closing arguments, the FTB argued that Hyatt had to prove extortion and that it had to prove that the FTB did not believe in good faith

[18] *Id.*

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

***a. Discretionary acts taken in bad faith are not immune, while a bad faith fraudulent audit does not determine the tax case.***

Hyatt already extensively addressed this issue in this opposition. Very much at issue in this case were and are the FTB's discretionary acts ***taken in bad faith***. The FTB has no immunity for discretionary acts taken in bad faith. That was the holding of the Nevada Supreme Court.[159] This was discussed extensively above. It is incorporated by reference here from the above discussion.

The FTB either does not understand, or more likely refuses to acknowledge, the bad faith issue in this case: Did the FTB conduct the audit in bad faith, *i.e.*, with a predetermined result such that it did not make a good faith determination? Answering this question, as the jury did, does not involve determining when Hyatt moved to Nevada or whether he owes taxes and penalties. Answering the question involves determining whether the FTB acted with an even-hand, without bias and prejudice or in bad faith. It is a difficult standard for a plaintiff to prove (as the FTB argued in closing[160]), but the jury said Hyatt proved it.

The jury need not and did not decide the tax case in determining that the FTB acted in bad faith and committed intentional torts. Indeed, the finding of bad faith, particularly the fraud claim, does not establish when Hyatt moved or if he owes taxes, but rather it demonstrates the FTB's audit determinations were carried out in a manner that does not comport with the conduct we expect of government agencies. A bogus, trumped-up, predetermined audit helps no one. It was a waste of both Hyatt's resources and the State of California's resources. Hyatt was entitled to a good faith determination, not a trumped predetermined bad faith result. In that regard, Hyatt was not asking in his fraud claim for a determination of when he moved or whether he owed taxes, but whether the manner and mode in which the FTB conducted the audit was at least fair and unbiased, as the FTB promised from the outset.

---

[159] The FTB repeatedly misstates the rulings of this Court, the Nevada Supreme Court, and the United States Supreme Court. Those decisions speak for themselves, and the Court knows them and has them for review as necessary.

[160] Trial Transcript (rough), July 24, 2008, at 16, attached hereto as Exhibit 7.

But the FTB would not even let Hyatt do that. It simply refused to complete the audit/protest phase of the proceeding, holding Hyatt in limbo for over ten years while interest compounded. The FTB had no discretion to delay and stall the completion of the protests. This is particularly true if, as Hyatt asserted and it can be presumed the jury found, the FTB did so to avoid independent review of the audits and protests before the time this case was tried to a Nevada jury and to continue to cause Mr. Hyatt further emotional distress to force him to settle. The last fact the FTB wanted a Nevada jury to hear was that the California State Board of Equalization reversed the FTB's audit and protest results.

In short, the FTB complaints about attacks by Hyatt on the discretionary decisions of the FTB during the audit and its ultimate decision to assess Hyatt taxes and penalties miss the point. Hyatt's tort claims do not argue whether the decisions were right or wrong, but rather they were made in bad faith. A discretionary decision made in bad faith, with an improper purpose, results in a decision that determines nothing relative to tax proceedings. Further, a decision by the jury in this case that the FTB conducted a bad faith fraudulent audit does not determine, either way, whether Hyatt owes taxes to California or when he moved. Those issues are still left open because (1) they are to be decided in the California tax proceedings and (2) if the process was unfair and biased the results of the process determine nothing. Again, luckily in California there is an independent appeal process, and then if necessary a de novo proceeding in California state court. Hyatt would have eagerly jumped to these more independent processes in which due process must be given. But, again, the FTB held Hyatt hostage by not allowing him to do so by refusing to give him a final determination. In a nutshell, that is an important part of the bad faith fraudulent audit claim that was presented to and approved by this Court and the Nevada Supreme Court, and then tried to the jury. It in no way conflicts with or contradicts the Court's ruling dismissing the declaratory relief claim and leaving the issue of whether taxes are owed and when Hyatt moved to Nevada to the California tax proceedings.

To be clear, even if it is determined in the California tax proceedings that Hyatt owes taxes and penalties, this does not vindicate or validate the FTB's conduct in carrying out the bad faith audit and this does not mean that it was okay for the FTB to have conducted a biased audit

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

and not treat Mr. Hyatt fairly, nor for the FTB to engage in multiple invasions of privacy and breaches of confidentiality. In sum, the FTB's intentional tortious conduct is not excused no matter what the results are in the California tax proceedings. An independent review of the evidence and determination that Hyatt owes taxes does not excuse the FTB's intentional torts.

***b. The FTB knows that the case was never limited to the FTB's actions in gathering information, but rather from the outset has included whether the audit was itself fraudulent.***

The FTB must believe that if it keeps saying that only the FTB's gathering of information was at issue in the case it will become true. But it is not true, and has never been true. The actual determinations of the FTB in regard to whether Hyatt owes taxes, the amount of taxes he owes, and when Hyatt actually moved to Nevada, were not and are not issues to be resolved in this case. But whether, as Hyatt asserted and the jury found, the FTB was not acting fairly or in good faith in making a determination of whether Hyatt owed taxes has been an issue in this case from early on.

The FTB asserts that it did not anticipate the direction of the case in regard to its bad faith analysis being at issue. FTB counsel is too smart for this to be a credible argument. Admittedly, the FTB lead trial counsel was not involved in the case until after the case was reviewed by the Nevada Supreme Court. But ignorance of the law of the case, or refusals to recognize it, does not excuse the misrepresentations the FTB make in its motion.

Contrary to its disingenuous statements, the FTB knew that the bad faith fraudulent audit claim was going to be tried, along with the claims for invasion of privacy and breach of confidentiality. What proof is there that the FTB knew this, and is now misrepresenting to the Court what case would be tried? This evidence includes this Court's explicit rulings dating from 1999 and the briefing to the Nevada Supreme Court on these precise issues. The Nevada Supreme Court ruled that discretionary acts taken in bad faith are very much a part of this case. But the FTB does not even address this in its motion.

Further, the FTB was first put on notice of Hyatt's claim that the audit was conducted in bad faith in Hyatt's initial complaint in 1998. Hyatt asserted that the FTB was attempting "to extort unlawful taxes" and had "arbitrarily, maliciously and without support in law or fact"

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

asserted that he had remained a California resident until April of 1992. Hyatt has therefore pled from the outset that the FTB had no good faith belief in its assessments and was attempting to coerce a settlement.[161] These allegations were further amplified in Hyatt's First Amended Complaint filed in June of 1998. Discovery did not commence until late in 1998. As result, from the outset of the case and commencement of discovery, the FTB has been award of the bad faith issue that was ultimately tried to the jury.

The FTB was further on notice in 1999 when it moved the Court to dismiss the case seeking a judgment on the pleadings. At that time, Judge Saitta dismissed the declaratory relief claim, but left all of Hyatt's tort claims, as alleged, in the case. In opposing the motion, Hyatt outlined the bad faith fraudulent audit claim,[162] a claim the Court did not disturb.

Later in 1999, the Court even more explicitly approved the scope of Hyatt's fraud claim in ruling on discovery disputes. Commissioner Biggar, in a DCRR approved and signed by Judge Saitta, gave the following ruling in regard to the scope of discovery:

> 4. At the November 9, 1999 hearing, the Discovery Commissioner found that *the entire process of the FTB audits of Hyatt, including the FTB assessments of taxes and the protests, is at issue in this case and a proper subject of discovery based on Judge Saitta's ruling on the FTB's Motion for Judgment on the Pleadings* leaving intact all of Hyatt's tort claims. Specifically, Hyatt is alleging fraud, among other torts by the FTB in the manner it audited him and assessed and attempted to collect taxes and penalties from him. *Hyatt's claim of fraud against the FTB entitles him to discovery on the entire audit and assessment process performed by the FTB that was and is directed at him as part of the FTB's attempt to collect taxes from Hyatt.* [163]

The FTB's repeated arguments concerning the scope of issues the Court allowed to be tried and purported violations of Judge Saitta's order and the "law of the case" are directly

---

[161] Hyatt's initial Complaint, filed January 6, 1998, para. 25 attached hereto as Exhibit 35.

[162] Hyatt Opposition to FTB Motion for Judgment on the Pleadings, at 40-42, attached hereto as Exhibit 36.

[163] November 9, 1999 DCRR (entered by the Court December 27, 1999), Para. 4, at p. 3, (emphasis added) attached hereto as Exhibit 37.

contrary to specific rulings by the Court. It is the FTB that still will not accept the fact that it was sued in Nevada for intentional torts, including for conducting a bad faith fraudulent audit.

Further, the fraud claim Hyatt briefed to the Nevada Supreme Court in 2001, and which the Court order approved holding no immunity for discretionary acts taken in bad faith, was described as follows:

> The FTB did not conduct a legitimate, bona-fide audit. Instead, the FTB conducted a biased, fraudulent investigation in which Cox destroyed key evidence that supported Hyatt (*e.g.*, her contemporaneous handwritten notes and computer records of bank account analysis). [footnote omitted] . . . After the audit was concluded and she had assessed Hyatt millions of dollars in trumped-up taxes and penalties, she *telephoned* Hyatt's bitter ex-wife from whom he had been divorced for many years and bragged about the "conviction." [footnote omitted] Cox was hardly a fair and unbiased auditor. The discovery commissioner even declared that the FTB may have committed fraud and accordingly ordered that Hyatt was entitled to further discovery on this point. [footnote omitted]
>
> The FTB disregarded, refused to investigate, ignored, and "buried" the facts favorable to Hyatt which it uncovered during its invasive "audit." For example, the FTB simply ignored:
>
> - the current neighbors in Nevada who supported Hyatt's Nevada residency claim;
> - the former neighbors in California who told of Hyatt's move to Nevada;
> - the friends and business associates who knew of Hyatt's move to Nevada;
> - the adult son who knew of Hyatt's move to Nevada;
> - Nevada rent, utilities, telephones, and insurance payments of Hyatt;
> - Nevada voter registration and driver's license of Hyatt;
> - Nevada home purchase offers and escrow papers of Hyatt;

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

- Nevada religious, professional, and social affiliations of Hyatt; and
- Hyatt's changes of address from California to Nevada address. [footnote omitted]

The FTB ultimately prepared and set forth two Narrative Reports totaling 70 pages which supposedly detail the evidence in favor of its conclusion concerning Hyatt's residency as well as asserting fraud penalties against Hyatt. [footnote omitted] The depositions conducted to date establish that the FTB ignored substantial evidence from Hyatt's neighbors, business associates, and friends favorable to Hyatt and contrary to the FTB's pre-determined conclusion. [footnote omitted] It never even interviewed Hyatt. The FTB did not even speak with Hyatt's son, Dan, with whom Hyatt had a close ongoing relationship, who loaned Hyatt his utility trailer for Hyatt's move to Las Vegas, and who visited with Hyatt in Las Vegas during April 1992. Rather than interviewing two of Hyatt's long-time business associates, the FTB proceeded to audit them, seeking through intimidation to separate them from Hyatt. [footnote omitted]

Instead, the FTB interviewed and obtained statements from estranged relatives and an ex-wife that were falsely termed "affidavits," and which formed the cornerstone of the FTB's "case" despite the complete lack of credibility and relevance of the statements. [footnote omitted] More importantly, the statements contained in the "non-affidavits" were nothing more than vague and general attacks on Hyatt and provided no specific evidence supporting the FTB's conclusions. The only specific statements in the unsworn "affidavits" were expressly disclaimed by the declarant in concluding that she could not be held to what is stated therein in a court of law. [footnote omitted] In other words, the "cornerstone" of the FTB's case was built on sand that crumbles upon even mild cross-examination.

. . .

The FTB not only assessed Hyatt taxes for a period after which he had moved to Nevada based on its trumped-up investigation, it assessed Hyatt penalties for alleged fraud in regard to his Nevada residency. The penalties amounted to an additional 75% of the alleged taxes. The FTB teaches its auditors to use the fraud penalty as a "bargaining chip" to

> obtain "agreement" from the taxpayer to pay the assessed tax. [footnote omitted] To make its point, the FTB's penalties training manual has on its cover a menacing "skull and cross-bones," [footnote omitted] an attitude of intimidation directed at Hyatt through tortious conduct.
>
> In classic extortion form, Jovanovich boldly "suggested" to Hyatt's representative that settling at the "protest stage" would avoid public revelation of Hyatt's personal and financial information. Deposition testimony has confirmed that Jovanovich, the FTB's first protest officer, told Hyatt's tax representative that if he did not settle at the outset of the protest stage, [footnote omitted] the privacy and confidentiality that Hyatt so valued would be lost. [footnote omitted].[164]

That fraud claim, as was described to the Nevada Supreme Court in 2001, was the same fraud claim presented to jury in 2008. The nature and scope of the fraud claim was again addressed in late 2007 in Hyatt's Opposition to the FTB's Motion for Summary Judgment Re: Fraud[165] and in early 2008 in Hyatt's Opposition to the FTB's Motion In Limine Re: Bad Faith Analysis.[166]

In addition, discovery during the trial made clear that whether the FTB was acting in good faith in deciding to assess Hyatt taxes and penalties was very much at issue. In particular, the FTB withheld certain documents, but the Nevada Supreme Court ordered them produced. Included with these documents eventually produced in 2002 was a memo from FTB specialist Monica Embry confirming a meeting of FTB personnel in mid 1995 discussing whether the FTB had a "sourcing" case against Hyatt. The memo definitively states the FTB did *not* have a strong residency case against Hyatt and did not have a sourcing case against Hyatt.[167] Another document, the review comments by reviewer Carol Ford, questioned whether the FTB had a tax

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

[164] Hyatt Petition for Rehearing to the Nevada Supreme Court, pp. 7-9, attached hereto as Exhibit 1.

[165] Attached hereto as Exhibit 38.

[166] Attached hereto as Exhibit 39.

[167] Trial Exhibit 250, attached hereto as Exhibit 40.

case against Hyatt for the 1991 tax year.[168] The FTB therefore also knew from the fight over these documents that the good faith of the FTB in deciding to assess Hyatt taxes and penalties for both 1991 and 1992 was very much at issue in this case.

Yet, the FTB now argues that the trial in this case was to be centered on the FTB's gathering of information, not on its analysis in deciding to assess Hyatt taxes and penalties. The FTB cannot be making this argument to the Court in good faith. It has always known that the scope of the fraud claim was not limited to "how information was gathered" and it knows that no ruling of this Court or any higher court limited the case in that fashion. As a result, the testimony offered by Hyatt questioning the FTB's bias, including the lack of basis upon which its decision was made, was highly relevant and certainly pertinent to the decision of whether the FTB was acting in bad faith during the audits and protests and in making the decision to assess Hyatt taxes and penalties. This does not mean the jury was deciding the tax case, it was not and did not. But it did evaluate whether the FTB's decisions were made in good faith.

When the FTB therefore argued in closing, based on the erroneous Jury Instruction No. 24, that its analysis was not at issue, a curative instruction correcting the misstatement was needed. In particular, based on FTB counsel's attacks on Hyatt expert Malcolm Jumelet's testimony, the Court needed to, and did, make clear that Mr. Jumelet's testimony could be considered. That is what the Court did in giving the curative instruction.

***c. The FTB's discussion of the "factual background" regarding Jury Instruction No. 24 begs the question: why did it misrepresent to the Court that the Jury Instruction No. 24 that it was offering was the same as the Introductory Statement?***

The FTB has no answer to why it misrepresented the erroneous Jury Instruction No. 24 as being the instruction that had previously been read to the jury. It says it was accidental. But as explained above, FTB counsel should have realized the mistake while preparing for her closing. While claiming it was accidental, the FTB argues in its motion that nonetheless the erroneous instruction should have been given. The FTB attitude, in this regard, mimics its attitude after the error came to light and the issue was argued to the Court. The FTB then at that

[168] Trial Exhibit 284, attached hereto as Exhibit 27.

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

alternative theories, admitting it was weak in one (residency — per internal documents[182]) and had no basis in regard to the other (sourcing — per internal memo[183]), is evidence of bad faith.

***i. The scope of the trial was limited to conduct of the audit and the delay in the protest.***

In sum, the Court properly limited the scope of the trial, relative to the FTB's bad faith conduct, to the FTB's actions in the audits and the bad faith delays in the protests. The FTB's complaint that the jury did not have all the facts makes no sense. The jury was not suppose to, and did not, determine the tax case. Hyatt's residency was not at issue in the trial. Rather, as extensively briefed above, at issue was whether the FTB conducted the audits in bad faith. The issue was whether the FTB was fair and unbiased, based on the information it had, not did it come to the right conclusion in the audits and protests based upon after acquired evidence. The FTB's after-the-fact argument that it should have been able to use protest evidence in vindicating the audits is a desperate attempt to change the issues presented and tried.

Moreover, as Hyatt's counsel asserted throughout the trial when this issue was raised, Hyatt was precluded from using substantial additional residency evidence not part of the audit file. Hyatt was also severely limited in his ability to explain and rebut evidence in the audit file. But again, Hyatt's residency was not within the scope of issues being tried to the jury.

In regard to the protests, the issue was limited to bad faith delay because the FTB did not decide the protests until the eve of trial. The only protest-related issue that was part of discovery and the pleadings was the delay in the protests. Whether the FTB conducted the protests in bad faith beyond the unexplained delays was not part of the case. This could only have helped the FTB. Hyatt very much wanted to try the issue of whether the FTB conducted the protests in bad faith with a predetermined result. But because of the FTB's bad faith delay and failure to decide the protests until the eve of trial, the larger issue of the FTB's bad faith in protests was never part of the litigation. The FTB therefore has no one to blame but itself for the trial being limited relative to the protests to the FTB's bad faith delay.

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

---

[182] Trial Exhibits 250, at 2, attached hereto as Exhibit 45 and 284, attached hereto as Exhibit 27.

[183] Trial Exhibit 250, attached hereto as Exhibit 45.

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

**F. The FTB's bad faith refusal to proceed with the protests, as presented to the jury, provides no basis for a new trial.**

The FTB still does not get it. The FTB's attempt to blame this Court and its Protective Order for delaying the protests is a rehashing of its failed arguments at trial. It was not the FTB's asserted compliance with the Nevada Protective Order that caused the delay in the protests. The evidence is clear. The FTB refused to proceed with the audit and protests once Hyatt brought this case. A ten year delay in the protests is on its face inexplicable. Issuing a decision on the protests only months before the trial, at a time when the California Board of Equalization could not possibly hear and decide Hyatt's appeal before the jury decided this case, demonstrates an improper motive.

Moreover, the FTB's internal documents confirmed that it chose to "hold" the protests. It was the FTB attorneys assigned to supervising the Nevada litigation that told the Protest Officer and her supervisor to not proceed with the protests. One protest officer, Charlene Woodward, testified that she was removed from the case against her will. She had a desire to sit down with Hyatt's tax counsel and try and resolve the matter. The next protest officer Cody Cinnamon testified that she could have brought the protests to conclusion years earlier, but she was told to wait by the FTB litigation attorneys.

Yet, the FTB makes the bogus assertion that it had to wait for discovery from the Nevada case in order to make sure it had all relevant evidence. First, the protest officers testified to the contrary. Second, the FTB had administrative subpoena power, unaffected by the Nevada Protective Order, which the FTB decided not to use. Third, the FTB did not seek to use its subpoena power or the provisions of the Nevada Protective Order until many years after the protests commenced and after the Nevada Protective Order was issued in this case.

Contrary to the FTB's trial arguments, arguments rejected by the jury, Hyatt did not put up a wall between this case and the tax proceedings. A timeline of key events from the protests demonstrates that it was not the FTB's asserted compliance with this Court's Protective Order, but rather the FTB's intentional decision not to proceed with the protests that resulted in the inexplicable, bad faith delay:



| | | |
|---|---|---|
| June 20, 1996 | 1991 Protest filed | Trial Exhibit 296 |
| October 10, 1997 | 1992 Protest filed | Trial Exhibit 319 |
| January 6, 1998 | This case filed | |
| December 27, 1999 | Protective Order entered in this case | |
| April 3, 2000 | "Protest been on hold for awhile, but is now active –and we intend to close it by March 31, 2001" | George McLaughlin – Protest Log (Trial Exhibit 2353-0020) |
| April 26, 2001 | "[W]e will not make request . . . to disclose any materials covered by the . . . protective order" | Terry Collins – Memo (Trial Exhibit 2341) |
| June15, 2001 | Eric Coffill informed FTB via letter that all requests made in the protests have been responded to by Hyatt | Trial Exhibit 397 |
| End of 2001 | Cody Cinnamon was ready to issue a decision in the protests | Cody Cinnamon trial testimony – (June 17, 2008, at 91:1 – 92:5) |
| February 20, 2002 | "I told [Coffill] that I was instructed not to work on the case due to the pending NV litigation" | Cody Cinnamon – Protest Log (Trial Exhibit 2353-0061) & e-mail (Trial Exhibit 398) |
| April 5, 2002 | "I think we should put things on hold with administrative matters, in particular the recent draft letter." | Ben Miller – e-mail (Trial Exhibit 411 |
| June 3, 2002 | **First FTB Request** for documents under the Protective Order | Trial Exhibit 2342 |
| February 28, 2003 | California court ruled subpoena too broad (Request No. 6) but ordered production re Requests Nos. 1-5. | Trial Exhibit 2348 |
| August 5, 2005 | ***Nevada Court rules that bad faith delay in protest is part of the tort case*** | B. Miller trial testimony – (July 14_ 2008, at 149 – 153) |
| October 28, 2005 | **Second FTB Request** for documents pursuant to the Protective Order | Trial Exhibit 2354 |

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

| | | |
|---|---|---|
| February 9, 2006 | Hyatt agrees to production of Second FTB Request | Trial Exhibit 781 |
| January 19, 2007 | **Third FTB Request** for documents under Protective Order | Trial Exhibit 2357 |
| February 1, 2007 | Hyatt agrees to production of Third FTB Request | Trial Exhibit 782 |
| November 1, 2007 | Protest determination was issued | Trial Exhibit 2320 |

The Protective Order should not have been an issue at the trial. Interpreting the Protective Order was not the province of the jury, and the Court did not let the jury do that. Most significantly, and contrary to the FTB's arguments, the FTB's bad faith delay in the protests was not the result of its compliance with the Court's Protective Order. The evidence demonstrated and the jury implicitly found that the FTB delayed the protests in bad faith as part of its fraudulent bad faith audits.

There is no basis to grant the FTB a new trial based on its false premise. It was not the FTB's asserted compliance with the Court's Protective Order that constituted its bad faith.

**G. The admission of the Tax Amnesty legislation does not provide any basis for a new trial.**

The FTB complains about the Court's ruling regarding evidence of the FTB's Tax "Amnesty" program. The FTB also complains how Hyatt used the evidence in argument. But the evidence was properly admitted, and during argument Hyatt's counsel was free to argue reasonable inferences from the evidence that was admitted.

The FTB suggests that the "Amnesty" program, which added a 50% penalty to the interest on Hyatt's already extraordinary large tax assessments, has nothing to do with this case. First, the amnesty demand was necessary and relevant evidence to explain why the allegedly bad faith tax, penalty, and interest assessments against Hyatt are now over $50 million. Hyatt needed to show the jury how and why his assessments grew from the original $17 million at the conclusion of the audits in 1997, to more than $50 million and are continuing to grow at an

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

***a. The Court did not allow inadmissible evidence at trial, and in any event none of the rulings cited by the FTB provide a basis for a new trial.***

- *Candace Les*: Ms. Les did not testify as an expert. She testified as a percipient witness. Some of her testimony included views that she expressed to lead auditor Sheila Cox contemporaneous with the time the audits and/or protests were being conducted, including Ms. Les' testimony of a visit to Las Vegas during which Ms. Cox insisted on an unauthorized visit to Hyatt's house. She also testified concerning her quasi-informant role with the Hyatt litigation team, including her experiences at the FTB. Her testimony concerning the audit file was relevant given her contemporaneous involvement into audits and her "insider" testimony regarding the policies and procedures of the FTB that were ignored, forgotten or simply not followed. There was no error by the Court and no basis for a new trial.

- *Illia and Bauche*: The FTB complains that FTB supervisors Steve Illia and Penny Bauche were not allowed to provide their opinions regarding the audit file. The Court properly excluded this testimony as improper expert opinion. If the FTB wanted Mr. Illia and Ms. Bauche to provide expert opinions, the FTB should have designated them as experts, had them submit expert reports, and then had them sit for expert depositions. The FTB did none of that and they were properly limited to testifying as percipient witnesses. In fact, at each of their respective percipient depositions, Mr. Illia and Ms. Bauche testified that they had not reviewed the audit file and had had little involvement in the Hyatt audits. This contrasts with Ms. Les who had participated in part of the audit activities (albeit unauthorized activities), extensively communicated with Ms. Cox during the audits regarding what was taking place, reviewed portions of the audit file, and expressed contemporaneous opinions to Ms. Cox concerning what she should and should not be doing relative to the audits. Mr. Illia and Ms. Bauche

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

Lastly, the FTB fails to assert any basis from the Court's evidentiary rulings or rulings on jury instructions to grant the FTB a new trial. The FTB had its "day" in court. It is not entitled a new trial just because it does not like the results.

The FTB's motions should be denied in their entireties.

Dated this 24 day of October, 2008.

HUTCHISON & STEFFEN, LTD.
Mark A. Hutchison, Esq. (4639)
10080 Alta Drive
Suite 200
Las Vegas, Nevada 89145

BULLIVANT HOUSER BAILEY PC

Peter C. Bernhard, Esq. (734)
3883 Howard Hughes Pkwy.
Suite 550
Las Vegas, Nevada 89169
(702) 669-3600

*Attorney's for Plaintiff Gilbert P. Hyatt*

Bullivant|Houser|Bailey PC
3883 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995

# EXHIBIT 17

FILED

SEP 4 2 31 PM '08

CLERK OF THE COURT

COPY

COPY

DISTRICT COURT
CLARK COUNTY, NEVADA
* * * * *

GILBERT P. HYATT,
Plaintiff,
vs.

CALIFORNIA STATE FRANCHISE TAX BOARD,
Defendant

CASE NO. A-382999

DEPT. NO. X

**Transcript of Proceedings**

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 15**

WEDNESDAY, MAY 7, 2008

APPEARANCES:

FOR THE PLAINTIFF: PETER C. BERNHARD, ESQ.
MARK HUTCHISON, ESQ.
DONALD J. KULA, ESQ.

FOR THE DEFENDANT: PAT LUNDVALL, ESQ.
CARLA B. HIGGINBOTHAM, ESQ.
JAMES BRADSHAW, ESQ.

COURT RECORDER: VICTORIA BOYD, District Court

TRANSCRIPTION BY: VERBATIM DIGITAL REPORTING, LLC, Littleton, CO 80120, (303) 798-0890

Proceedings recorded by audio-visual recording, transcript produced by transcription service.

wants to get into this, we can get into this, but she's misconstruing -- my objection is she's misconstruing the protective order, what the terms of the protective order, and this is also I think contrary to prior rulings by the Court pretrial.

THE COURT: Could I see counsel at the Bench, please.

(Bench conference began at 11:44 a.m.)

MS. LUNDVALL: Your Honor, this was an issue that he raised as part of direct examination. He talked about the administrative subpoenas. He talked about the protective order during the course of his direct examination. I'm simply following up as far as on that direct.

There has not been any pretrial orders from you that says that we can't make reference to these issues. In fact, that's the whole nature, then, of our explanation, then, for the time that it has taken to resolve the protest. Also, these issues were raised front and center in my opening statement, and during my opening statement Mr. Hutchison had no objection to this.

At the conclusion of my opening statement he made certain objections, but none of them made reference as far as to this discretion, then, concerning the reasons for any alleged delay.

THE COURT: Did we address specifically the issue of

the delay with respect to -- we touched on that, didn't we, in some regard? Did we touch on that?

MS. LUNDVALL: We touched on it only from the perspective of there was no order that had been issued.

THE COURT: Um-hum.

MS. LUNDVALL: It had always been discussed as to FTB's reason or explanation as to, you know, this delay that has been alleged. And so to the extent that all of these procedural issues, then, and that was fully explained, like I said, by me and in my opening statement.

And this witness, then, has identified that he's reviewed all these things, this various during his direct examination. I'm simply following through with that.

MR. HUTCHISON: Okay. First off, there's nothing that requires me to object to counsel's opening statement in reference to this. If she can't prove it during the course of the trial then I'm going to remind the jury about what she said in the course of opening statements. That's not a perquisite to me objecting now.

Secondly, this witness was asked, did you rely on -- did you review these subpoenas in -- the 2002-2006 time period. Yes, I did. Did it have any impact on your evaluation of whether the taxpayer representative in the report cooperated or not. No. Thank you. There were two questions.

There were two questions about whether this impacted upon his analysis of the taxpayer's representative's cooperation. He said no because, he said, he thought that he dealt with the litigation litigators, and that had to do with the litigation. That's why he didn't consider it as part of it. That's what I asked about.

Now, counsel -- now, my second objection is in terms of the content of the protective order. The protective doesn't say -- first of all, the protective order says that California law concerning subpoenas is not effective law. He can't by affected by it.

Ms. Lundvall's giving a misperception that the Franchise Tax Board under the protective order had to ask Mr. Hyatt first before they could get any documents in protest. That's not going to happen.

MS. LUNDVALL: Well, then, from the standpoint that maybe what you're --

MR. HUTCHISON: Can I finish?

MS. LUNDVALL: Oh, you're absolutely right.

MR. HUTCHISON: I'm sorry. I'm pausing too long. So the content now of the protective order has now become an issue. So the misconstruing the order is, well, because of this protective order, and by the way it was a protective order that was the product of litigations (indiscernible) stipulation early in the case and it's a court order.

But the idea is, now, well, because of the protective order the FTB had to ask Mr. Hyatt's permission before they could get any documents in the protest that were produced in the course of discovery.

The protective order itself says there's nothing that prevents the FTB from securing documents, just like they would in any other protest. And so to -- so the suggestion that there's some hurdle that they had to go through which counsel -- referred to, is wrong.

All I'm saying is, if this goes any farther then, I mean, I think it's already gone far enough. We have to get completely into the contents of this and we intend to bring it out in great detail in terms of this protest order to be able to tell the jury this is not some, you know, wall that Mr. Hyatt constructed.

If the FTB wanted documents in the protest, they could have asked for them with a subpoena if they didn't get them. This had to do with the Court saying, you're not going to use this case, the discovery in this case, to supplement your document requests in the protest.

If you want to put that in front of the jury, you can, and then if you want to ask for those documents during the litigation you can. If Mr. Hyatt says no, then you got to go back to California and get them through the subpoena process.

MS. LUNDVALL: That's a good point, Your Honor. The reference that I am making is on page 4, paragraph 4, and then it carries on to page 5, Your Honor.

THE COURT: Okay.

MS. LUNDVALL: My question to this particular witness, to Mr. Antolin, was asking him if he understood the procedure under this protective order, is that the FTB, which first asked for permission from Mr. Hyatt by which to use information obtained during the litigation in the protest, and if in fact that he refused, then they were obligated, then, to go through an administrative subpoena process. And Mr. Antolin indicated that that was his understanding.

And to the extent that that is the procedure that was followed each and every time, then, across the course of this case. In the event that there was information that FTB wanted to move basically from the litigation side to the protest side, it sent a letter to Mr. Hyatt and his representatives asking for permission.

If in fact that they refused that permission, then that's when the administrative subpoena was issued. And so therefore, with all due respect to Mr. Hutchison, I do not believe that I made any misrepresentations, then, of the procedure that's at issue in this case.

THE COURT: Mr. Hutchison.

MR. HUTCHISON: Here's where the misrepresentation

came in. Counsel's questions were, of course, leading and said to Mr. Antolin, are you aware that before the FTB could seek any documents that it wanted in the protest there were also litigation that it had to go through this protective order process, that they had to do that.

First of all, there's a couple of points Your Honor needs to know. First, the last sentence of -- well, I guess not the last sentence, but the last, well, lines 10 through 12 of paragraph 4 on page 5 say, "This protective order in no way affects limits or modifies either parties' respective rights in regard to seeking or opposing an administrative subpoena under California law."

Cody Cinnamon will testify through her video deposition that she preferred when she was going to ask for documents that she wanted -- as a protest officer she preferred to go through the subpoena process if she couldn't get them voluntarily from Mr. Hyatt.

She was then told, don't use that process, don't seek subpoenas, go through the protective order; we've made a decision at management level in the FTB to go through the protective order process, which was an alternative way, which was to see if Mr. Hyatt would go ahead and voluntarily produce the documents, and then if he wouldn't, then to go ahead and process with the administrative subpoena.

They were the ones who made the decision at

management level to take the extra step of going through the process in the protective order of asking Mr. Hyatt. They didn't have to do that. Cody Cinnamon understood that. The subpoena -- or the protective order itself says there's nothing that limits their rights to be able to subpoena whatever documents they want in the protest.

But the point that's being misrepresented again and again and again is that Mr. Hyatt -- you may recall opening statements -- erected a wall. He erected the wall. And if you wanted to get something from the court case you had to walk around this wall or climb over the wall or whatever it was to go get them.

And that's not the case. If they wanted to get any documents in the world that they wanted, that they had any idea that they thought would be relevant to protest, they just followed their processes. And the protest officers will testify that we would typically, you know, issue an IDR and then we would ask for a follow-up on the IDRs if we needed the IDRs.

If we worked in cooperation we had to then send out a letter like the one that was never sent that Ms. Cox wrote, before we can then do it through a subpoena process. Then we can get the subpoena process going if we want to get whatever documents we want to get and the taxpayer's not providing them.

So there's a misconstruction of the protective order itself and there's a process by which you can get whatever documents you want. The idea is, we work -- and this is their point -- the only reason that they're bringing this up is to say, Mr. Hyatt caused the delay in the protest.

And the way he caused the delay was that if we wanted documents, certain types of documents, we had to ask him. Then he would say no, and then we'd have to go through the subpoena process. That's not true. If you wanted any document, I don't care what type of document you wanted and Mr. Hyatt wouldn't give it to you, go to California and get a subpoena, just like they did with every other taxpayer.

The protective order itself says, "This protective order in no way affects, limits or modifies either party's respective rights in regards to seeking or opposing an administrative subpoena under California law." The FTB at the management level said, "We're not going to go with the subpoena route, we're going to go through the protective order route. We'll go through the protective route and ask Mr. Hyatt," and in one case he said, Yeah, go ahead, in another case he said no; we're going to have to have you, you know, go through the subpoena process because we think it's too broad.

But the point they're making with the jury is, this order requires them to go through that process, the protective order process by asking Mr. Hyatt first, and it doesn't. They

could have just ignored that protective order in terms of wanting to seek documents and used the laws of the State of California to get whatever documents they wanted. That's my first major point.

My second major point is, this is an absolute mischaracterization and it's unfair to try to blame Mr. Hyatt for enforcing a court order, enforcing a court order, not violating a court order, enforcing a court order, or requiring adherence to a court order, as though that is somehow a bad thing; that is somehow causing harm to the Franchise Tax Board.

We're talking about a court order, not something Mr. Hyatt dreamed up and said, I'm going to erect this law. This was something that a court, Commissioner Bigger, after arguments of counsel and stipulations and everything else, crafted this order.

We're getting to the point, Your Honor, where we're going to have to bring in Commissioner Bigger and have him explain why he did this, and having been a part of that process he'll tell you why he did it. We were concerned that the Franchise Tax Board was going to use this litigation and the discovery mechanisms of this litigation, particularly the depositions, to try to augment their protest proceedings and get documents and just basically use the discovery process in this case as a discovery vehicle in the protest case.

And all Bigger said was, no, you can't do that; you can't do it; you can't use this case in Nevada as a discovery mechanism for your protest proceeding. You can do whatever you want in California, however you normally do that. Proceed as though this case were not here.

Now, if you decide that you want to go through a process, I will craft a process. I will allow you to go ahead and ask Mr. Hyatt if he'll turn over the documents to you voluntarily, and if he doesn't do that then you got -- then you're back in California doing whatever you're going to do.

But if you choose not to ask Mr. Hyatt, that's fine. There's nothing in this protective order that prevents you, that limits you, that bars you from doing whatever you would normally do in California. And he didn't say anything other than that.

But the point, again, is that there's delay caused by this process that is a court order, that is litigated in litigation, which we all said we wouldn't do, and now is being misconstrued in terms of having to go through Mr. Hyatt to seek his permission first, and then having to go through this burdensome subpoena process, when in fact this subpoena process has always been available to the Franchise Tax Board and has always been -- and the additional step of going through Mr. Hyatt has never been required.

They chose to do that at the management level.

That's why I think it's being misconstrued and I think it's being held against Mr. Hyatt, when it was out of the courtroom and should not be held against him, and third, it's litigating the litigation.

As I said to you at sidebar, if we're going to litigate motion practice, which is what this was, if we're going to litigate motion practice then I want to be able to talk about the delay occasioned by the Franchise Tax Board not producing many, many documents in this case, including having to take a trip to the Supreme Court to get them, that they reluctantly produced in this case, and the delay that that caused and the bad faith that we think that represents.

But of course, we can't get into that because it's motion practice. But now, the FTB can get into the motion practice of the protective order because they want to say that this is all Mr. Hyatt's fault in terms of the delay. That's why I think that the -- it's just objectionably unfair.

THE COURT: Any response?

MS. LUNDVALL: Briefly, Your Honor. Number one, Mr. Hutchison complained because I was using leading questions with this particular witness. This is cross-examination and that is my right by which to do so.

THE COURT: That's what I thought, Mr. Hutchison.

MR. HUTCHISON: Well, Your Honor, I didn't complain. I said, of course she was using leading questions.

THE COURT: Okay.

MR. HUTCHISON: So I recognize this is cross -- I -- you know -- this isn't my first rodeo. I've been in trial before. I understand on cross-examination you can -- you can lead.

MS. LUNDVALL: Second, Your Honor, is that in this case the issue as to why it took the protest so long to be resolved is an issue that's front and center with this jury. The Court has indicated that by allowing, then, the protest to be part of this case and by Mr. Hyatt making allegations that somehow that our handling of the protest, then, was in bad faith. And so the FTB has to be able to defend itself against that.

The defense to that is not litigating this litigation. The defense to that is what FTB had to do in the State of California, then, by which to get information from Mr. Hyatt. And I'd like to address as far as two points as far as from the protective order, and to draw your attention, then, to the line 6 through 9, and 12 through 16.

THE COURT: On what page?

MS. LUNDVALL: On page 5, Your Honor.

THE COURT: Okay.

MS. LUNDVALL: That line very -- the sentence that I want to make reference to, Your Honor, is this, "In the event that Hyatt does not agree to voluntarily produce the

confidential information to the California tax case, the FTB may seek to compel Hyatt to produce the confidential -- to produce the requested confidential information in the California tax case through issuance and service of an administrative subpoena, as governed by California law."

In sum, if in fact that Mr. Hyatt objects, if he doesn't voluntarily agree, we have got to go through the administrative subpoena process in California. That's what my questions were to this particular witness, and that's what I was addressing.

That is what -- an issue that was raised during his direct examination, and in many of the documents, then, that the plaintiffs have proffered they've made reference to these administrative subpoenas. Okay. That's point number one.

Point number two is that when you get down, then, to line 12 through 16 it says, "Notwithstanding any other provision in this protective order, no FTB attorney and/or FTB assigned to the pending protest for 1991 or 1992, or assigned to the California tax case," in other words, any of the folks involved in the protest process, the tax case, "shall" -- "no attorney shall have access to any confidential information."

In other words, we couldn't move information from one side of the house to the other side of the house. So therefore, FTB has to be able to explain its compliance, then, with the court order, and that's in fact what we have been

doing. And that's what in fact that part of this case involves.

And so therefore, those are the reasons why, number one, this issue was ever raised in the first place, why in fact that we posed questions to this witness, but also, that there are many additional documents that reference as far as this process.

And as the Court has been very clear upon is that the substance of the information going on in the protest doesn't come before this jury, but the process itself is fair game. And so to that extent what we are trying to inform this jury of is the process, and that is the questions, then, that were posed to Mr. Antolin.

THE COURT: Let me ask you this, because my recollection of this question as it was posed in trial earlier was that it was a general question relating to procedure and it was not one that I thought the witness had even thought or had prepared any response to, because I understood his examination to be fairly limited.

But the question as I recall was a very general one dealing with procedure. Do you happen to have it that you could read it back to me?

MS. LUNDVALL: I can probably get it for you. I don't have it here at this point in -- you know -- immediately. I'm going to let Ms. Higginbotham, as far as

raise it, but this is what my recollection was, and let's see whether or not the transcript met with my recollection. I'm going out on a limb a little bit right now.

THE COURT: All right.

MS. LUNDVALL: My recollection is, is that I asked Mr. Antolin if he was aware that in fact that the protective order required FTB to ask Mr. Hyatt's permission, and if Mr. Hyatt's permission then was denied, if they had to go through an administrative subpoena process in California to move information from the litigation side to the protest side. That's my recollection of the question and let's see whether or not that the transcript, then, bears that out.

THE COURT: Okay.

MR. HUTCHISON: Your Honor, I would also -- I'm trying to find in my outline where I asked the questions, but you know, I don't want this premise to be that I asked about the protective order during the course of my examination. I asked about the first subpoena process and the second subpoena process and whether or not -- and there may be have been mention of, you know, under the protective order or something like that.

I didn't go into substance at all in the protective order. I asked the witness during the course of these two subpoena processes, if he was aware of those, did he take that into account as he was evaluating the cooperativeness of the

taxpayer representative.

He said no. I asked why not. He said, because I'd do that as a litigation matter, so it did not impact on the cooperativeness of the taxpayer's rep. Now, counsel wants to now bootstrap that and say -- is it -- I'm just looking on my questions from my outline.

I said, "Did you consider" -- let's see. This what I believe I said. This is what was in my notes. "Did the FTB serve two administrative subpoenas, one in 2002 and one in 2006, requesting permission under the Nevada protective order to show documents obtained through this litigation with the protest hearing officer." He answered, "Yes, I believe."

"Did you consider these subpoenas in evaluating" -- "did you consider the subpoenas in evaluating whether Mr. Hyatt's representatives during the protest were cooperative?" "I did not." "Why?" And then he went on and said, basically what I think I said -- I don't have his answer here, of course -- but where he said that that was part of the litigation process; I wasn't evaluating the litigator's cooperation; I -- and I didn't think that that had a bearing on my evaluation of the cooperation.

So now, we go from that question about whether the subpoenas process impacted his analysis of the taxpayer representative's cooperativeness, we go from that now to a detailed discussion through leading questions when the witness

didn't have specific knowledge about the contents of this protective.

Sure he reviewed it probably as part of his materials. He had to review it in order to be a consultant or an expert in the case. But then we go through leading questions, now, that the jury now has heard about the contents of the protective order.

Well, nothing that I suggested or asked about elicited any of that kind of response from the witness. But again, it goes back to what the point is. Ms. Lundvall's a very good lawyer. She knows exactly what she's doing, and she's planting in the jury's head that delaying the protest is because of the protective order that Mr. Hyatt insisted be enforced, number one, and number two, somehow erected this wall that prevented us from getting documents.

And on that point, Your Honor, the thing that -- of course, you know, and I know counsel can focus on what parts of the order support their position, but she skipped over the part that I read to you before, "This protective order in no way affects, limits or modifies either party's respective rights in regard to seeking or opposing an administrative subpoena under California law.

So if you want documents and you're a protest officer and Mr. Hyatt won't give them to you, go get them through a subpoena. But you're not going to use --

Commissioner Bigger said, you're not going to use this litigation as a means of discovery in the protest.

Then the protective order further said in paragraph 11, "Nothing in this protective order shall preclude any party to the action, its attorneys or any other person from disclosing or using in any manner or for any purpose any information or documents not obtained in discovery from the producing party in this action if such information was lawfully obtained, even though that some information or documents may have been produced in discovery in this action and designated as confidential information."

So Commissioner Bigger in fashioning this protective order was trying to separate the two proceedings. Do what you normally do in the protest proceeding and then use discovery for purposes of this litigation. Don't use discovery for purposes of your protest. That's what it gets down to.

But the idea here is, we were handcuffed, we were prevented from getting documents because of this protective order. That's clearly the indication. That is not why -- and we were delayed in doing that. They could have -- and it's going to become even more clear when Cody Cinnamon testifies through video, because I spent a lot of time with her on this.

And she said she -- if there was an issue with the documents she wanted just to issue a subpoena. I asked her, why didn't you, because George McLaughlin or Ben Miller, I

can't remember which one it was, told me not to; they told me to use this protective order process; my managers told me to do that.

And now, the implication is to this jury, Hyatt's making us do this; Hyatt's the one who wants us to do this. That's why I just think it's so -- such a misconstruction of not only the protective order, but really, what the facts and the evidence currently is or will be.

THE COURT: Okay.

MS. LUNDVALL: With all due respect, as far as to Mr. Hutchison, I think that he's overstating as far as the testimony of Ms. Cinnamon, but what he has identified is that this testimony will be presented to this jury, and therefore, he'll have ample opportunity to make this argument, whether or not that -- if in fact that it was Mr. Hyatt or if there was some other reason.

And so that is an issue that was completely -- it is a topic that's completely at issue in this case for which the jury will hear testimony about the process.

But the one thing that disappoints me a little bit is that Mr. Hutchison keeps trying to lead you to believe that they're trying to be real narrow as far as about this protective order and how that they really haven't opened up the door to this, or that in fact, the FTB did not look at this as something that needed to be complied with, and that

this was basically a hurdle by which that they had to overcome.

There is documents that they've already introduced at Exhibit 354. Their Exhibit 354 talks about this and it talks very specific. This is an exhibit as far as that they've offered, and this is the exhibit that we have stipulated to the admission of, and it talks fully about this process and how FTB believed it was constrained, then, by this particular protective order and how that it had to go through these hoops so as to get the information that it requested.

And third, Mr. Hutchison keeps referencing the fact that FTB could have used these administrative subpoenas. Well, we've already seen that they did use these administrative subpoenas, and that's what the questions were that he posed to this particular witness that prompted this whole line of inquiry.

And so I'm coming back as far as to the basic point, Your Honor. The process is what's at issue. What we have introduced is evidence of that process. If they disagree as far as with our presentation they have the opportunity to present evidence expressing that disagreement.

Whatever our disagreement is, this jury is going to decide what contributed to the delay and the resolution of the protest, and whether or not that that was a bad faith act by the FTB. It's not up -- with all due respect -- to this Court

to decide that. You have said that this is an issue then for this jury.

THE COURT: I think -- Mr. Hutchison, you have another thought?

MR. HUTCHISON: I'm just wondering when it was that you made an official ruling that this question is for the jury. I don't remember that particular ruling.

THE COURT: Well, the ultimate questions are certainly for the jury. We all agree on that.

MR. HUTCHISON: Absolutely. But again, it's one thing to allow the evidence to develop itself and draw the -- you know -- the witness is testifying, the documents come in. It's another thing to misconstrue a court order and to blame a party for enforcing the court order or for them having to adhere to a court order. That's litigating the litigation.

And you know, I don't want to get all the evidence I've made again, but you know, fundamentally, that's where we're at.

THE COURT: Okay.

MS. LUNDVALL: Your Honor, I found as far as the testimony that --

THE COURT: Go ahead.

MS. LUNDVALL: -- where the objection was. If I may approach.

THE COURT: Sure.

MS. LUNDVALL: Thank you, Your Honor.

MR. BRADSHAW: Your Honor, I might point out that the witness has been in the room through the entirety of the argument.

THE COURT: Well, and it didn't pick up, I suppose, the -- oh, well, you don't have the ability to pick up what transpires here at the Bench. That would be our internal recording system, wouldn't it. Well, there's -- that's the downside to the -- having a court reporter in the room. That's the only downside I can think of.

You know, I will tell you this. I don't think that based on what I heard that Ms. Lundvall misconstrued the protective order. I will say, and I think that the procedural issues are -- the procedural issues particularly with respect to the delay are certainly fair game for both sides.

I do think we're getting a little far afield here, and I don't know how -- I don't want to get far afield here, because it's true that the direct examination of this witness is really pretty concise. So I don't know how much more you have of this witness, Ms. Lundvall.

MS. LUNDVALL: On this particular area, not much, Your Honor, and I will take the Court's comments in mind in making the determinations, then, as to which questions to present.

THE COURT: What was that?

**CERTIFICATION**

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE AUDIO-VISUAL RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

**AFFIRMATION**

I AFFIRM THAT THIS TRANSCRIPT DOES NOT CONTAIN THE SOCIAL SECURITY OR TAX IDENTIFICATION NUMBER OF ANY PERSON OR ENTITY.

**Verbatim Digital Reporting, LLC**
**Littleton, CO 80120**
**(303) 798-0890**

Julie Lord — 7-21-08

JULIE LORD, TRANSCRIBER — DATE

# EXHIBIT  18

# SUBPOENA DUCES TECUM

*In the Matter of:*

Administrative Protest of Gilbert P. Hyatt
Taxable years 1991 and 1992
Notices of Proposed Assessment Nos.
04728236 and 04340945

*To:* Gilbert P. Hyatt,

Attn: Peter C. Bernhard
BERNHARD & BRADLEY
3980 Howard Hughes Parkway, Suite 550
Las Vegas, Nevada 89109

Attn: Mark A. Hutchison
HUTCHISON & STEFFEN
Lakes Business Park
8831 West Sahara Avenue
Las Vegas, Nevada 89117

You are hereby commanded in the above-referenced Protest of Gilbert P. Hyatt to make available to George McLaughlin, Supervising Tax Counsel, or his designee, at

FRANCHISE TAX BOARD, 9645 Butterfield Way, Sacramento, CA 95827

on the 31ST day of JULY, 2002, at 10:00 a.m., the originals or true and exact copies of the original records described in the accompanying DESCRIPTION OF RECORDS, attached hereto as Attachment 1.

This Subpoena Duces Tecum is issued under the authority of California Revenue and Taxation Code Section 19504 this 7TH day of JULY, 2002. The statutory purpose of this Subpoena Duces Tecum is to determine if Gilbert P. Hyatt has complied with the provisions of the California Personal Income Tax Law.

[signature]

FRANCHISE TAX BOARD
State of California

FTB 2580 (Modified)

000001

**ATTACHMENT 1**
**DESCRIPTION OF RECORDS**

1. The complete deposition transcript (May 23, 2000 and May 24, 2000) and related subpoena duces tecum document production of Mr. Hyatt's CPA Michael Kern.

2. The complete deposition transcript (May 16, 2000 and May 17, 2000) and related subpoena duces tecum document production of Hyatt tax attorney Eugene Cowan.

3. Volume 1 of Hyatt 22ND Supplemental Document Production, Produced on 01/18/00.

4. Volume 1 of Hyatt 21st Supplemental Document Production, Produced 01/03/00.

5. Volume 2 of Hyatt Supplemental Document Production, Produced 01/03/00.

6. Any and all other documents or deposition transcripts that was generated by or during Mr. Hyatt's Nevada lawsuit over Franchise Tax Board audit activity, including documents and deposition transcripts bearing the label "Confidential -- NV Protective Order."

# EXHIBIT  19

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SACRAMENTO

RECEIVED MAY 0 6 2003 RIORDAN & McKINZIE

| | | | |
|---|---|---|---|
| DATE/TIME | : FEBRUARY 28, 2003 | DEPT. NO | : 54 |
| JUDGE | : JOE S. GRAY | CLERK | : B. BALDY |
| REPORTER | : NONE | BAILIFF | : V. CARROLL |
| | | PRESENT: | |

CALIFORNIA FRANCHISE TAX BOARD,
Plaintiff,

VS. Case No.: 02CS01582

GILBERT P. HYATT,
Defendant.

Nature of Proceedings: COURT'S RULING ON ORDER TO SHOW CAUSE (SUBM ON 12/16/02)

The court, having considered the arguments of counsel and taken this matter under submission, now rules as follows:

The tentative ruling is modified as follows:

The petition for an order compelling respondent to comply with the subject subpena is granted in part and denied in part as set forth below.

Respondent shall produce the materials as identified in petitioner's description of documents Nos. 1, 2, 3, 4, and 5, in Attachment 1 to the subject Subpeona Duces Tecum.

However, petitioner's request to compel compliance with request No. 6 as described in Attachment 1 of the Subpeona is denied. Petitioner's request No 6 is too indefinite, and the petition fails to provide sufficient evidence to determine the relevance of, the vast universe of materials encompassed by this broad category.

Respondent shall comply with this order on or before March 21, 2003

Certificate of Service by Mailing attached.

| | |
|---|---|
| BOOK | : 54 |
| PAGE | : 351 |
| DATE | : FEBRUARY 28, 2003 |
| CASE NO. | : 02CS01582 |
| CASE TITLE | : CALIFORNIA FRANCHISE TAX BOARD VS. GILBERT P. HYATT |

SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SACRAMENTO

BY: B. BALDY,
Deputy Clerk

Z1/2.doc

CASE NUMBER: 02CS01582 DEPARTMENT: 54
CASE TITLE: CALIFORNIA FRANCHISE TAX BOARD VS. GILBERT P. HYATT
PROCEEDINGS: COURT'S RULING ON ORDER TO SHOW CAUSE (SUBM ON 12/16/02)

**CERTIFICATE OF SERVICE BY MAILING**
**C.C.P. Sec. 1013a(3))**

I, the undersigned deputy clerk of the Superior Court of California, County of Sacramento, do declare under penalty of perjury that I did this date place a copy of the above entitled notice in envelopes addressed to each of the parties, or their counsel of record as stated below, with sufficient postage affixed thereto and deposited the same in the United States Post Office at Sacramento, California.

BOB DUNN, DAG
MOLLY K. MOSLEY, DAG
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

DONALD J. KULA
RIORDAN & MCKINZIE
300 SOUTH GRAND AVE., 29TH FLOOR
LOS ANGELES, CA 90071-3109

ERIC J. COFFILL
MORRISON & FOERSTER
400 CAPITOL MALL, STE. 2600
SACRAMENTO, CA 95814

Dated: MARCH 3, 2003

Superior Court of California,
County of Sacramento

By: B BALDY,
Deputy Clerk

BOOK : 54
PAGE : 351
DATE : FEBRUARY 28, 2003
CASE NO. : 02CS01582
CASE TITLE : CALIFORNIA FRANCHISE TAX BOARD VS. GILBERT P. HYATT

SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SACRAMENTO

BY: B. BALDY,
Deputy Clerk

Z1/2 ds

# EXHIBIT  20

FILED

COPY

SEP 4 3 08 PM '08

CLERK OF THE COURT

COPY

DISTRICT COURT
CLARK COUNTY, NEVADA
* * * * *

GILBERT P. HYATT, Plaintiff,

vs.

CALIFORNIA STATE FRANCHISE TAX BOARD, Defendant

CASE NO. A-382999

DEPT. NO. X

**Transcript of Proceedings**

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 10**

TUESDAY, APRIL 29, 2008

APPEARANCES:

FOR THE PLAINTIFF: PETER C. BERNHARD, ESQ.
MARK HUTCHINSON, ESQ.
DONALD J. KULA, ESQ.

FOR THE DEFENDANT: PAT LUNDVALL, ESQ.
CARLA B. HIGGINBOTHAM, ESQ.
JAMES BRADSHAW, ESQ.

COURT RECORDER:
VICTORIA BOYD
District Court

TRANSCRIPTION BY:
VERBATIM DIGITAL REPORTING, LLC
Littleton, CO 80120
(303) 798-0890

Proceedings recorded by audio-visual recording, transcript produced by transcription service.

involvement as it is in this case something that's helpful to your tax practice?

A No, not really.

Q Has it been disruptive to your tax practice?

A That's a better way of putting it, yes.

Q But you realize that you're a witness in this case?

A I understand.

Q Mr. Cowan, would you give false testimony for Mr. Hyatt?

A Absolutely not.

Q Let me move on to something else, Mr. Cowan. Are you a member of the Hyatt litigation team, the litigation team that's presenting this case for Mr. Hyatt?

A I'm not.

Q Has your primary role in this case, if you will, has been as a witness?

A Yes, it has been.

Q Do you recall -- I think the record has been established, this case was filed in early 1998. Do you recall in that time frame having some interaction with members of the litigation team regarding an administrative subpoena that was issued in the tax proceedings?

A That's right, yes.

Q And what were the circumstances of that interaction?

A Well, I'd received a subpoena to furnish some bank account information that was served at my office from -- issued by the Franchise Tax Board. The subpoena had -- I guess it's -- well, the subpoena was served. I think it said it was personally served although it wasn't personally served, and said that we had 10 days to respond, although it was served on the last day of that 10-day period. So it was -- I think they started the litigation case, so I sent a note to the litigation team saying, you know, I don't know enough about -- not much about litigation, but do you want to do something about this?

Q So, in your mind, there was a problem with the way the subpoena had been issued?

A Yes.

Q And early in this case, you were checking with the litigators to see if they had any input on how to handle it?

A Yes.

Q And what happened in regard to that subpoena?

A Nothing. We just let them get the information.

Q You didn't file a -- you did not file a motion to quash?

A No motion.

Q Not in anyway interfere with the production of those documents?

A No, no interference.

Q So other than that, and other than acting as a witness in this case, have you had any role in regard to the Hyatt litigation team?

A No, I have not.

Q Mr. Hyatt -- or Mr. Cowan, you mentioned that you did provide a draft of Mr. Hyatt's 1991 tax returns. And the information you received on -- let's talk about the state return. The information you received -- the information you put on that return, where did you receive it?

A From Mr. Hyatt.

Q And let's look at Exhibit 83. It will be on the screen as well, Mr. Cowan.

A Would it be one of the numbers in this -- or maybe it's down here.

MR. KULA: We still have the monitor turned off here.

THE COURT: Oh, we can turn the monitor on for you, please.

THE WITNESS: Oh, I see it. Okay. Just a little easier to read it if I can.

(Pause)

THE WITNESS: Okay. I have it in front of me now.

BY MR. KULA:

Q Okay. That Exhibit 83, I just wanted you to have it so you can reference it. Does that -- as part of that

**CERTIFICATION**

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE AUDIO-VISUAL RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

**AFFIRMATION**

I AFFIRM THAT THIS TRANSCRIPT DOES NOT CONTAIN THE SOCIAL SECURITY OR TAX IDENTIFICATION NUMBER OF ANY PERSON OR ENTITY.

**Verbatim Digital Reporting, LLC**
**Littleton, CO 80120**
**(303) 798-0890**

Julie Lord — 7-7-08

JULIE LORD, TRANSCRIBER — DATE

# EXHIBIT  21

FILED
COPY
SEP 4 2 28 PM '08
COPY

DISTRICT COURT
CLARK COUNTY, NEVADA

* * * * *

GILBERT P. HYATT,

Plaintiff,

vs.

CALIFORNIA STATE FRANCHISE TAX BOARD,

Defendant

CASE NO. A-382999

DEPT. NO. X

CLERK OF THE COURT

**Transcript of Proceedings**

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 12**

THURSDAY, MAY 1, 2008

APPEARANCES:

FOR THE PLAINTIFF: PETER C. BERNHARD, ESQ.
MARK HUTCHISON, ESQ.
DONALD J. KULA, ESQ.

FOR THE DEFENDANT: PAT LUNDVALL, ESQ.
CARLA B. HIGGINBOTHAM, ESQ.
JAMES BRADSHAW, ESQ.

COURT RECORDER:

VICTORIA BOYD
District Court

TRANSCRIPTION BY:

VERBATIM DIGITAL REPORTING, LLC
Littleton, CO 80120
(303) 798-0890

Proceedings recorded by audio-visual recording, transcript produced by transcription service.

strategy.

(Pause)

MR. BRADSHAW: No, that's my notes.

THE COURT: Sorry.

MR. BRADSHAW: That's all right.

(Pause)

THE COURT: I think it's fair.

MR. BRADSHAW: Thank you.

(Bench conference concluded at 1:26 p.m.)

MR. BRADSHAW: So it's admitted?

THE COURT: Item's admitted.

(Exhibit 2326 is admitted)

MR. BRADSHAW: Could we have 2326, Brian?

BY MR. BRADSHAW:

Q Mr. Cowan, this is your March 17, 1998 fax to Mark Hutchison, Gil Hyatt and Thomas Steffan (phonetic). Folks have met Mr. Hutchison and Mr. Hyatt. Who is Thomas Steffan?

A I think he was a lawyer involved in Mr. Hyatt's litigation matter.

Q Okay. And the message indicates, "Attached is a copy of the Subpoena Duces Tecum to be issued to Cal Fed Bank by the FTB regarding the taxpayer's 1991 and 1992 Cal Fed Bank account information. We have until Friday to file a motion to quash if we so desire. While there is no pure tax reasons to quash the motion, there may be tactical reasons to

do so, such as making the FTB work for its requests from now on or taking this opportunity to file the motion in the Nevada courts or otherwise."

"Clearly one argument we may have is that information sought by the FTB is overbroad. The FTB is seeking account records through the end of 1992. However, the FTB has acknowledged that the taxpayer was a Nevada resident from April 1992. The FTB may not be entitled to request post-April 1992 records of the taxpayer."

Did I read that correctly?

A Yes.

Q Now, post-1992 records, to your knowledge, at this point in time were being sought by the FTB, right?

A Well, with respect to this subpoena, yes.

Q And other requests.

A This was in 1998? That I don't know.

Q Well, you're in protest at that point, aren't you?

A We're in protest at that point.

Q By then you'd developed a strategy to make them work?

A No. I'm sorry? I don't understand the question.

Q By then you personally had developed a strategy to make the FTB work for its information from now on, right?

A No.

Q Mr. Cowan, at this point in time, the FTB still had

not been provided with any documentation to substantiate the source of Mr. Hyatt's 1992 income; is that right?

A I don't believe so. I don't think that's right.

Q You had provided a schedule of deposits in Mr. Hyatt's investment accounts, right?

A Correct.

Q Okay. But you hadn't provided any sourcing documents such as contracts, agreements or quarterly financial reports from Phillips to Mr. Hyatt, nor evidence of that money being wire transferred around from folks who entered into patent agreements with Mr. Hyatt, or how that money got into his investment accounts. You hadn't provided any of that source information, had you?

A Maybe if you go through them one at a time, I can tell you, but I think the letter that I'm thinking of had the source where those amounts came from, but wiring transfer, you said?

Q Transfer -- wire transfer of funds information.

A Whatever was attached to that letter was, at that time, that -- was what we had provided at that point, per the request of the Franchise Tax Board.

Q Okay. We'll go through that letter in a little bit.

MR. BRADSHAW: Brian, I'm done with that one. If we could have Exhibit 37.

**CERTIFICATION**

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE AUDIO-VISUAL RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

**AFFIRMATION**

I AFFIRM THAT THIS TRANSCRIPT DOES NOT CONTAIN THE SOCIAL SECURITY OR TAX IDENTIFICATION NUMBER OF ANY PERSON OR ENTITY.

**Verbatim Digital Reporting, LLC**
**Littleton, CO 80120**
**(303) 798-0890**

Julie Lord — 7-10-08

JULIE LORD, TRANSCRIBER — DATE

# EXHIBIT  22

         DISTRICT COURT
CLARK COUNTY, NEVADA
* * * * *

GILBERT P. HYATT,

Plaintiff,

vs.

CALIFORNIA STATE FRANCHISE TAX BOARD,

Defendant

CASE NO. A-382999

DEPT. NO. X

**Transcript of Proceedings**

FILED JAN 21 8 54 AM '09 CLERK OF THE COURT

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 63**

TUESDAY, JULY 22, 2008

APPEARANCES:

FOR THE PLAINTIFF: PETER C. BERNHARD, ESQ.
MARK HUTCHISON, ESQ.
DONALD J. KULA, ESQ.

FOR THE DEFENDANT: PAT LUNDVALL, ESQ.
CARLA B. HIGGINBOTHAM, ESQ.
JAMES BRADSHAW, ESQ.

COURT RECORDER:
VICTORIA BOYD
District Court

TRANSCRIPTION BY:
VERBATIM DIGITAL REPORTING, LLC
Littleton, CO 80120
(303) 798-0890

Proceedings recorded by audio-visual recording, transcript produced by transcription service.

What were their interests, their motives, their bias, who's side of the table were they on, what did you observe, what were your impressions after listening to them and hearing the testimony. And if you decide that they've lied about one thing, you are entitled, according to the Judge's jury instructions, to disregard it all. And I think you can reasonably infer that at the very least, Ms. Cox was not being truthful very often.

Ladies and Gentlemen, if I had to kind of bullet point what the case has been about, it would be about rights and freedom, government obligations and promises, government power and abuse of power, the abuse of trust and truth, government bad faith. It's about damages and accountability and ultimately, Ladies and Gentlemen, it's about the jury making a decision based on the evidence.

But I think you can surmise from the evidence that's been presented to you that the FTB just got caught. They just got caught. In their wildest dreams, I said this a couple times, in their wildest dreams, they never, ever, ever though they'd be here. They never thought they'd have to justify what was in an audit file. It's not circulated outside the Franchise Tax Board or in memos. It's not circulated outside the Franchise Tax Board.

Remember those four review comments, do not put in the audit file. It was never even supposed to leave the

There's a big event log that talks about the protest. We see the exhibit references there. We'll go through some of those, 253 and the various pages. And then finally, there were some emails regarding the protest had to be put on hold. And those are some of those emails.

Now, there are many, many documents, Ladies and Gentlemen. That's a good grouping, though. This is a good representative sample. A lot of documents in the case. If you look at those 20 documents, we've proven our case. And we're going to look at a lot more, but we've proven our case with those 20 exhibits, coupled with the testimony.

Now as you know, this case is not about residency. It's not your job to make that determination. But it's about the way in which the FTB conducted its audit and acted toward Mr. Hyatt, the process they employed. We've made claims and you've heard the jury instructions on these claims, that we've asserted claims, Mr. Hyatt has asserted claims for an abuse of bad faith audit which actually constituted fraud when they told him that they would conduct a fair and impartial audit with neither a taxpayer nor a government standpoint of view. Those were the representations. Those were their obligations in their manuals, in their representations. They, in fact, conducted a bad faith audit and that was fraud.

They violated Mr. Hyatt's privacy rights and

to gather facts fairly. Mr. Illia said what's the job of an auditor? Gather facts. The evidence has shown that the FTB did not gather facts fairly. They chose not to follow leads. They chose not to follow people, or witnesses, or documents that could support Mr. Hyatt's Nevada residency. That was a conscious decision.

They didn't show this simply -- this goes beyond simple carelessness. The entire process, the numerous representations about fairness that a taxpayer should expect, has a right to expect, were violated along the way.

Let's take a look at what Mr. Malcolm Jumelet said about his review. "Based on your nearly four decades of experience now, can you compare the many audits, the thousands of audits that you've had with Mr. Hyatt's audit for purposes of fairness and impartiality?"

"Yes, I can."

"Please describe it for the jury."

"In my 36 years of working with the Franchise Tax Board audits, with the Franchise Tax Board. and with Price Waterhouse Cooper, I have never seen an audit that is so biased and unfair to the taxpayer."

That opinion stands undisputed. They didn't bring anybody in here to say something to the contrary who had any experience. Ms. Wright certainly couldn't do that. She never set foot in the Franchise Tax Board as an auditor or as

a reviewer.

Ms. Cox had spent over 500 hours on the 1990 [sic] residency audit. As I had mentioned before, she was simply to the point of no return. She had no choice. So what did she do? She relied heavily, by her own admission, on three affidavits. Heavily on those three affidavits. You've seen them numerous times. We've spent a lot of time and testimony in looking at them. They're from Mr. Hyatt's bitter ex-wife of 20 years, and from two estranged relatives. We call them so-called affidavits because they weren't affidavits, but they were labeled that way. And she admitted on the stand that she knew that they had an axe to grind and that they were biased. But, you remember, she's going to pull some kernels of information from those witnesses that she can use.

Priscilla Maystead had lost a lawsuit against Mr. Hyatt. She had no personal knowledge as to where he lived from '91 to '92. She said in her own testimony she didn't care what happened with Mr. Hyatt. She said in her own testimony she didn't know what was going on in his life during that particular time period.

Beth Hyatt had sided with her mother in that bitter lawsuit. You saw her testimony. It was painful, at least it was for me, to listen to her, the way she thought about her dad and treated her dad. Remember that story that Brian -- or excuse me, that Dan Hyatt told you where she had invited

**CERTIFICATION**

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE AUDIO-VISUAL RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

**AFFIRMATION**

I AFFIRM THAT THIS TRANSCRIPT DOES NOT CONTAIN THE SOCIAL SECURITY OR TAX IDENTIFICATION NUMBER OF ANY PERSON OR ENTITY.

**Verbatim Digital Reporting, LLC**
**Littleton, CO 80120**
**(303) 798-0890**

Julie Lord [signature]
Julie Lord, Transcriber

12-29-08
DATE

# EXHIBIT 23

**AFFIDAVIT**
Thomas L. Steffen
Mark A. Hutchison
John Steffen
HUTCHISON & STEFFEN
Lakes Business Park
8831 West Sahara Avenue
Las Vegas, NV 89117
(702) 385-2500

Thomas K. Bourke
One Bunker Hill, 8th Floor
Los Angeles, CA 90071-1092
(213) 623-1092

Attorneys for Plaintiff

FILED
MAR 22 2000
SHIRLEY B. PARRAGUIRRE, CLERK
BY
SHERRI JO ESTES

DISTRICT COURT

CLARK COUNTY, NEVADA

GILBERT P. HYATT,

Plaintiff,

vs.

FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA, and DOES 1-100, inclusive,

Defendants.

Case No. A382999
Dept No. XVIII

**AFFIDAVIT OF EUGENE G. COWAN IN OPPOSITION TO THE FTB'S MOTION FOR SUMMARY JUDGMENT**

FILED UNDER SEAL BY STIPULATION AND ORDER DATED FEBRUARY 1, 1999

44. My next written communication from the FTB was a letter dated February 24, 1999 stating that Mr. Hyatt's protest for 1991 and 1992-tax-years had been reassigned to Charlene Woodward.[28] The letter stated that soon as Ms. Woodward completes her review of the file, she would contact me. The letter in no way indicates that Mr. Hyatt's Protest was being delayed, stopped, or in anyway interfered with or hindered by the Nevada litigation.

**B. Isolation of protest officer from the FTB litigation team.**

45. On or about March 2, 1999 I spoke by telephone to Ms. Woodward. Ms. Woodward provided me with some background concerning her work experience and her tenure with the FTB. She informed me that her instructions were to work on the matter and to analyze it independent from "everything else going on", which I understood to mean the Nevada litigation. She further told me that a "Chinese" law (what I understood to be an "ethical wall") was being constructed around her because FTB personnel working on the Nevada litigation were not to discuss the case with her. She told me that Mr. Dunn was no longer handling the protest because he was assisting in the Nevada litigation.

46. At no point did Ms. Woodward indicate to me that the protest or her work on the Protest was in anyway being delayed, stopped, interfered with, or hindered by the Nevada litigation. To the contrary, my understanding based on with Ms. Woodward's comments was that the Protest was proceeding on its own course independent of and irrespective of the Nevada litigation.

**C. FTB recommencement of protest after Nevada court ruling.**

47. On or about July 19, 1999 I placed a call to Ms. Woodward to inquire as to the status of the Protest. My call was returned by Terry Collins, whom I understood to be Ms. Woodward's supervisor at the FTB. Mr. Collins wanted me to know that Ms. Woodward had been assigned to the protest and would soon start working on the Protest. I told Mr. Collins that

[28] *See* Exhibit 25 hereto.

HUTCHISON & STEFFEN
Lakes Business Park
8831 W. Sahara Avenue
Las Vegas, NV 89117
(702) 385-2500
FAX (702) 385-2086

I understood that Ms. Woodward had already been assigned to the case. Mr. Collins explained to me that at the outset of the Nevada litigation it appeared possible that the Nevada court would consider the residency matter and make a determination. As a result, Mr. Collins explained that the FTB did not devote resources to handling the Protest. In other words, I understood him to be saying that if the matter was going to be decided by a Nevada court, the FTB made a decision not to devote time and resources to working on Mr. Hyatt's Protest. I was surprised to hear this because it was contrary to my prior conversations and correspondence with the FTB at the commencement of the Protest and more recently wherein the FTB Protest Officers — Ms. Jovanovich, Mr. Dunn, and Ms. Woodward — all gave me the distinct impression that the Protest was proceeding and would be resolved quickly.

48. Mr. Collins further explained to me during our July 19, 1999 telephone call that because it appeared that the Nevada court would not be considering the residency issue (i.e. the court had dismissed the declaratory relief claim), the FTB would again commence the Protest. He said I could expect a letter from Ms. Woodward that week confirming that she would begin her analysis. He informed me that afterwards it would take Ms. Woodward less than six months to respond. When I asked him if he thought I would hear from her within a couple of months, he thought it would be even less time. He also indicated that he had been meaning to call me to inform me that the FTB would start working on Mr. Hyatt's protest again. My letter of July 23, 1999 letter to Mr. Collins confirms the substance of our conversation on or about July 19, 1999.[29]

**XIII. FTB failure to follow its own internal policy for processing the protest.**

49. On or about September 14, 1999, I called and spoke with Ms. Woodward to discuss FTB's Notice 99-1. This is a FTB internal document that sets forth the guidelines for processing the protest. It states that protests are typically to be handled within six months. Ms.

---

[29] *See* Exhibit 26 hereto.

HUTCHISON & STEFFEN
Lakes Business Park
8831 W. Sahara Avenue
Las Vegas, NV 89117
(702) 385-2500
FAX (702) 385-2086

57. Not only was this not true, but by not giving Mr. Hyatt the required ten day notice he was unable to correct the FTB's mistake prior to its embarrassing and false representation to the bank. If the FTB had called me first to request the "secret" account information, the matter would have been clarified without the FTB making false statements about Mr. Hyatt and without invading his privacy.

Further your affidavit sayeth naught.

DATED this 20 day of March, 2000.

EUGENE G. COWAN

SUBSCRIBED and SWORN to before me this 20th day of March, 2000.

NOTARY PUBLIC

MARY E. MC DERMOTT
Commission # 1166658
Notary Public - California
Los Angeles County
My Comm. Expires Jan 16, 2002

HUTCHISON & STEFFEN
Lakes Business Park
8831 W. Sahara Avenue
Las Vegas, NV 89117
(702) 385-2500
FAX (702) 385-2086

# EXHIBIT 24

**Hilson.Bill**

**From:** Cinnamon.Cody
**Sent:** Thursday, September 15, 2005 8:51 AM
**To:** Hilson.Bill
**Subject:** FW: Protest of Gilbert Hyatt

FYI

-----Original Message-----
**From:** McLaughlin.George
**Sent:** Wednesday, February 20, 2002 2:52 PM
**To:** Cinnamon.Cody
**Subject:** RE: Protest of Gilbert Hyatt

See me. GWM///

-----Original Message-----
**From:** Cinnamon.Cody
**Sent:** Wednesday, February 20, 2002 10:25 AM
**To:** McLaughlin.George
**Subject:** Protest of Gilbert Hyatt

Eric Coffill called me and asked what was happening with the case. I told Eric that I was instructed not to work on the case due to the pending Nevada litigation. He wanted further information so I referred Eric to you. Eric said he would be calling you.

MORRISON & FOERSTER LLP

ATTORNEYS AT LAW

SAN FRANCISCO
LOS ANGELES
DENVER
PALO ALTO
WALNUT CREEK
SACRAMENTO
CENTURY CITY
ORANGE COUNTY
SAN DIEGO

400 CAPITOL MALL, SUITE 2600
SACRAMENTO, CALIFORNIA 95814
TELEPHONE (916) 448-3200
TELEFACSIMILE (916) 448-3222

NEW YORK
WASHINGTON, D.C.
NORTHERN VIRGINIA
LONDON
BRUSSELS
BEIJING
HONG KONG
SINGAPORE
TOKYO

March 7, 2002

FILE COPY

Writer's Direct Contact
(916) 325-1324
ccoffill@mofo.com

RECEIVED
MAR 08 2002
SACRAMENTO LEGAL
FRANCHISE TAX BOARD

E.Y.H. 3/8/02
Cody -
See my e-mail.

BY CERTIFIED MAIL, NO. 7099 3220 0000 3840 0780
RETURN RECEIPT REQUESTED

Mr. George W. McLaughlin
Supervising Tax Counsel
Franchise Tax Board
Legal Branch
General Tax Law Bureau MS B-17
P.O. Box 1720
Rancho Cordova, CA 95741-1720

Re: Protests of Gilbert P. Hyatt
SSN: 06930999
Income Years Ended 1991 and 1992

Dear George:

This is to confirm the contents of our telephone conversation of February 20, 2002 in the above matters.

First of all, to briefly review the history of these protests:

| | |
|---|---|
| June 20, 1996: | Protest filed with FTB for income year 1991 |
| October 10, 1997: | Protest filed with FTB for income year 1992 |
| September 27, 2000: | Protest hearing for income year 1992 |
| October 4, 2000: | Protest hearing for income year 1991 |
| February 2, 2001: | Position letter submitted to FTB re: 1992 protest |
| May 31, 2001: | Position letter submitted to FTB re: 1991 protest |

June 15, 2001: Letter to Cody Cinnamon confirming no information or document requests were outstanding from FTB

Accordingly, our last communication with FTB regarding the 1991 and 1992 protests was by our letter to Cody dated June 15, 2001. Between June 15, 2001 and February 20, 2002, we did not receive any communications (written or oral) from anyone at FTB regarding the protests.

On February 20, 2002, I telephoned Cody Cinnamon to inquire into the status of the protests, based on the fact we had not heard from FTB for over seven months. Cody informed me during our telephone conversation of February 20, 2002 that she was still assigned the protests, but that the Hyatt protests for 1991 and 1992 were "on hold" at this time, and had been on hold for quite some time. Cody informed me that June 2001 was the last month for which she had charged time to the Hyatt protests, and that very little time had been charged to the protests in June 2001. She suggested that I call you for further information regarding the FTB delays.

You informed me during our telephone conversation of February 20th that you and Cody were under instructions from FTB management to hold the Hyatt protests for 1991 and 1992, and that neither you nor Cody were actively working on the protests at this time. You informed me the protests were not being worked on because of the pending Nevada litigation between Mr. Hyatt and FTB. While it was not clear from our conversation exactly when this "hold" was put on the protests, I told you what Cody had told me, i.e., that Cody had not charged time on the protests since June 2001. You also informed me that you believe the protests are "written up," and that you believed that FTB could issue proposed determination letters for 1991 and 1992 on relatively short notice of several weeks once the case was activated.

In light of the age of the protests - nearly six years for the 1991 protest and over four years for the 1992 protest - we urge FTB to act in a more responsive manner and make a proposed determination with respect to these protests as soon as possible. It is now March of 2002, nearly ten months after our last information and documentation submission (on May 31, 2001). In our letter to Cody dated June 15, 2001, we confirmed there was no information or document requests outstanding from FTB, and to date we have received nothing from FTB indicating its disagreement.

These protests involve the residency issue. We understand the pending Nevada litigation between FTB and Mr. Hyatt does not have a "residency" cause of action, and would not determine this residency issue. Accordingly, we fail to see any reason for FTB to delay these protests because of the pending Nevada litigation. In addition, we would like to point out that these protests already have far exceeded the 33-month protest target period set forth in FTB Notice 99-1.

Finally, as discussed during our telephone conversation, and as we also discussed at both protest hearings, we anticipate that we will require a substantial amount of time, probably two to three months, to respond to your proposed determination letters for 1991 and 1992. We will require even *more* time should your proposed determination letters raise or present new issues not previously raised by FTB at either audit or protest.

Please contact me in writing, at your earliest convenience, if you disagree with my above characterization of the contents of our telephone conversation. In addition, please feel free to contact me if you have any questions regarding the contents of this letter or wish to discuss any aspect of the protests in additional detail. Thank you for your continuing cooperation in this matter.

Very truly yours,

Eric

Eric J. Coffill

cc: Cody Cinnamon
Gilbert Hyatt
Eugene Cowan

sa-28494

P01418

**Hilson,Bill**

**From:** Cinnamon,Cody
**Sent:** Thursday, September 15, 2005 8:51 AM
**To:** Hilson,Bill
**Subject:** FW: Protest of Gilbert Hyatt

FYI

-----Original Message-----
**From:** McLaughlin,George
**Sent:** Wednesday, February 20, 2002 2:52 PM
**To:** Cinnamon,Cody
**Subject:** RE: Protest of Gilbert Hyatt

See me. GWM///

-----Original Message-----
**From:** Cinnamon,Cody
**Sent:** Wednesday, February 20, 2002 10:25 AM
**To:** McLaughlin,George
**Subject:** Protest of Gilbert Hyatt

Eric Coffill called me and asked what was happening with the case. I told Eric that I was instructed not to work on the case due to the pending Nevada litigation. He wanted further information so I referred Eric to you. Eric said he would be calling you.

**Hilson.Bill**

**From:** Cinnamon.Cody
**Sent:** Thursday, September 15, 2005 8:50 AM
**To:** Hilson.Bill
**Subject:** FW: Hyatt

FYI

-----Original Message-----
**From:** Miller.Ben
**Sent:** Friday, April 05, 2002 11:03 AM
**To:** Caglayan.Caglar; McLaughlin.George; Cinnamon.Cody
**Subject:** Hyatt

The Nevada Supreme Court has reversed itself with nary a breath about its prior decision. It simply concluded that Hyatt should be allowed to present his intentional tort case in spite of the fact that they previously ruled he had no case.

I think this means we should put things on hold with administrative matters, in particular the recent draft letter. This puts a new light on things and we may well want to proceed under the protective order to try and get documents. It is clear that the protective order is going away anytime in the near future.

P11375

0411-00002

# EXHIBIT 25

**IN THE SUPREME COURT OF THE STATE OF NEVADA**

FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA,

Appellant/Cross-respondent,

v.

GILBERT P. HYATT,

Respondent/Cross-appellant.

Supreme Court Case No. 53264

District Court Case No. A382999

**APPEAL**
from the Eighth Judicial District Court, Clark County
THE HONORABLE JESSIE WALSH, District Judge

---

**RESPONDENT'S ANSWERING BRIEF AND OPENING CROSS APPEAL BRIEF**

---

MARK A. HUTCHISON, Nevada Bar No. 4639
MICHAEL K. WALL, Nevada Bar No. 2098
HUTCHISON & STEFFEN, LLC.
10080 Alta Drive, Suite 200
Las Vegas, NV 89145
Telephone: (702) 385-2500
Facsimile: (702) 385-2086

PETER C. BERNHARD, Nevada Bar No. 734
KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO
8345 West Sunset Road, Suite 250
Las Vegas, NV 89113
Telephone: (702) 792-7000
Facsimile: (702) 796-7181

DONALD J. KULA, California Bar No. 144342
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone: (310) 788-9900
Facsimile: (310) 788-3399

*Attorneys for Respondent/Cross-Appellants Gilbert P. Hyatt*

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

for malicious, fraudulent conduct directed at or occurring in the forum state.

Finally, substantial evidence supports the jury's verdict on each claim and the award of compensatory damages. Prejudgment interest was also appropriately awarded on those damages.

The FTB has not identified any errors of the District Court that warrant reversing the verdicts and resulting judgment. The record, as reflected in the voluminous appendices, show the District Court's conscientious and complete consideration of all issues presented, both pre-trial and during trial.[11]

## IV. STATEMENT OF FACTS.

### A. The FTB's Statement of Facts does not comport with the jury's findings.

The FTB's Statement of Facts presents a benign and rose-colored version of events during the audits and protests that does not comport with the evidence presented at trial and, not surprisingly, is inconsistent with the jury's findings as evidenced by its substantial verdicts. The verdicts necessarily reflect determinations by the jury on the key disputed facts in favor of Hyatt. Substantial evidence supports each of these findings, and neither the FTB nor this Court can substitute its judgment for that of the fact-finder. These now-determined facts include that the FTB demonstrated personal animus and hostility toward Hyatt because of his religion and wealth and willfully and deliberately disregarded his rights, including repeated and unnecessary illegal disclosures of his private and confidential information. The FTB conducted the audits for over a four-year period with no intent to be fair and unbiased, and it issued proposed tax assessments that contradicted the FTB's own internal documents questioning the FTB's basis for taxing Hyatt.

The jury determined that the FTB unsuccessfully sought to extort a settlement from Hyatt, and when that failed, it intentionally delayed and refused to conclude the "protest" phase of the audits for *over 11 years,* preventing Hyatt from getting a *de novo* hearing before

---

[11] *See,* Appellant's Appendix and Respondent's Appendix. The FTB puts forth half-hearted one or two sentence statements on many purported trial court errors, without explaining why or how any of these constitute reversible error. To the extent that the FTB asserts in its Reply that Hyatt has not addressed any argument or issue put forth by the FTB, Hyatt categorically denies that the FTB has any basis for reversal or modification of the judgments under any argument it alludes to in its brief.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

an independent body. These facts are particularly outrageous because they were committed by a government agency which claims that its auditors and protest officers are oath-bound to obey and enforce the law, and duty-bound to be "fair and impartial." The FTB's bad faith permeates and provides context and evidence for each of the intentional tort claims on which the jury found in favor of Hyatt.

**B. Gil Hyatt, a genuine, new American hero, chose to move to Las Vegas, like millions of other individuals over many years.**

Hyatt was 55 years old when the FTB commenced an audit of his 1991 state-tax return in 1993. He was 69 years old when the FTB issued a final assessment at the end of 2007, and he was 70 years old when the trial began in 2008.[12] In 1993 when the audit commenced, Hyatt was beginning to enjoy the fruits of his life-long labors as an engineer and inventor. In 1990 he won a 20-year contest with the United States Patent Office, securing a patent for the single chip microprocessor that spawned the personal computer. He was called an American hero by some, the 20th Century's Thomas Edison by others.[13]

After experiencing a brief "15 minutes" of professional fame but not enjoying the limelight and attention, Hyatt testified that he moved from California to Nevada in September 1991.[14] Hyatt's reasons for moving were no different from those of millions of other people who moved to Nevada over the past several decades. And he resides in Las Vegas to this day. After moving to Nevada, Hyatt enjoyed some financial success from the licensing of his patent technology. Hyatt, after being frugal all his life, bought a five bedroom home and a new Toyota. With the help of his new CPA, Mike Kern, Hyatt developed contacts and set up his

---

[12] RT: May 8, 29:5-30:2; May 12, 112:22-23; June 5, 94:4-9; 82 RA 020278-020280; 82 RA 020471-020475; 88 RA 021826. ("RT" refers to the Reporter's Transcript from the trial conducted in the District Court. In the Statement of Facts, Hyatt places his supporting citations from the record in a single footnote after several sentences or an entire paragraph where there are related subject matters in order to avoid further lengthening the brief by inserting a footnote after each sentence).

[13] RT: May 8, 39:10-12; 128:2-131:4; 10 AA 02428-02430, 02433; 79 AA 19732-19738.

[14] RT: May 8, 39:10-40:15; May 19, 140:1-3. This is not a fact that was addressed or resolved by the jury's verdicts, per court order, and Hyatt acknowledges that the FTB disputes this date. The current tax appeal in California will determine when Hyatt moved to Nevada.

Kaempfer Crowell Renshaw Gronauer & Fiorentino

business in Nevada. Hyatt was ready to live the prime of his life, pursuing his life-long activities involving new technologies.[15]

Then in 1993, the FTB notified Hyatt he was under audit for his 1991 California state income tax return. Although Hyatt was concerned about his privacy, particularly given past experiences with industrial espionage, he was reassured by the FTB at the beginning of the audit and throughout the audit that his information would be kept confidential.[16] As the audit proceeded over two years and through three different FTB auditors, Hyatt did not have a concern how the audit would turn out, because none of the FTB auditors expressed any concern to him or his tax representatives. This changed suddenly in August, 1995. Without any warning or opportunity to address the auditor's stated position, Sheila Cox, the FTB's third auditor, not only proposed to tax Hyatt for income earned late in 1991, she deemed him a tax cheat and a fraud. From that point forward, Hyatt fought vigorously to clear his name; it has taken him 15 years, so far.[17]

## C. Chronology of the tax proceedings.

### 1. The audits (1993 to 1997).

Three different auditors worked on the 1991 audit between 1993 and 1995, including the eventual lead auditor, Sheila Cox. Cox issued a lengthy Determination Letter on August 2, 1995, informing Hyatt for the first time that the FTB intended to assess millions of dollars in taxes and penalties, including a 75% penalty for fraud.[18] In April 1996, the FTB issued its proposed assessment of taxes, penalties, and interest for the 1991 tax year of over *four million dollars*, the largest proposed assessment within the FTB's Residency Program (the unit within

---

[15] RT: April 24, 166:21-167:14; April 28, 122:1-23; May 8, 89:6-16; May 9, 177:3-6; 63 AA 15663-15667.

[16] RT: April 29, 176:4-177:3, 179:23-181:1, 182:16-184:18; April 30, 69:3-9, 162:8-14, 163:16-164:4; May 8, 134:12-135:2; 82 RA 020471-020475; 83 RA 020705-020707.

[17] RT: April 25, 59:2-60:3, 69:17-70:8, 108:17-109:11, 123:5-128:21, 169:9-16; April 28, 22:13-18; April 29, 182:16-186:4; May 8, 121:24-122:16, 153:14-154:14; 84 RA 020865-020904.

[18] RT: April 29, 175:18-185:24; 93 AA 2309-23126; 84 RA 020865-020904.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

the FTB responsible for residency audits) for its 1995 fiscal year.[19] In June 1996, Hyatt filed a formal "protest" of the proposed assessment, with detailed refutation of the FTB's audit conclusions. This officially triggered what is represented by the FTB and California law as an internal review by the Protest Division of the FTB, with a new set of "eyes" looking at the proposed assessment.[20]

In early 1996, the FTB and Cox commenced a second audit of Hyatt, this one for the 1992 tax year. Later that year, without any additional investigation, the FTB told Hyatt that it would assess him *more than six million* additional dollars in taxes and interest. But unlike the 1991 tax-year audit, Cox did not recommend a penalty for fraud. A year later, the FTB overruled Cox and added a fraud penalty for 1992, increasing Cox's initial decision by more than four million dollars, not including interest.[21]

Shortly thereafter, the FTB issued its proposed assessment of taxes, penalties, and interest for the 1992 tax year of over *fourteen million dollars*.[22] This was by far the largest proposed assessment in the FTB's Residency Program for its 1996 fiscal year, with an astronomical "CBR" (cost-benefit ratio), a measurement of the assessed amount divided by the number of hours spent on the audit, giving an amount assessed per hour of audit work. For the 1992 Hyatt audit, the CBR for the taxes and penalty assessed was $9,920,786.00 divided by 78 hours, or ***$127,190.00 per hour***, while the typical CBR for a residency audit was between $800 and $1000 per hour.[23] Hyatt filed a formal protest of the 1992 tax-year proposed assessment, just as he had for the 1991 proposed assessment.[24]

---

[19] The breakdown was: tax: $1,876,471.00; penalty $1,407,353.00; interest $1,256,580.00; total $4,540,404.00. 54 AA 13326-13329; 93 RA 023019-023025.

[20] This internal process is referred to as the "protest," in which an FTB employee acting as the protest officer examines the auditor's work, independently; however, this is not a review by an independent, non-FTB person or body.

[21] 85 RA 021033; 85 RA 021045-021061; 85 RA 021082-021085.

[22] The breakdown was: tax: $5,669,021.00; penalty $4,251,765.00; interest $4,195,154; total $14,115,941.00. 54 AA 13398-13403.

[23] 93 RA 023019-023025; RT April 24, 38:6-15.

[24] RT: April 30, 144:1-13; 54 AA 13404-13406.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

**2. The protests (1996 to 2007).**

In a protest, the FTB conducts an internal review by supposedly-independent FTB employees, and if necessary, it re-investigates the facts underlying each audit. This protest phase started in 1996, but the FTB did not decide and conclude the protests *for over 11 years* (closely approximating the time this case was pending before the trial). On November 1, 2007, less than six months before this case went to trial, the FTB issued its internal determination, finding that no changes would be made to the proposed assessments issued 11 and 10 years previously.[25]

**3. The pending de novo tax appeal (2008 to present).**

Upon receiving final determinations in the audits in 2007, Hyatt then exercised his right to appeal the FTB's determinations to the California Board of Equalization. By law, the California Board of Equalization conducts a *de novo* appeal, in which it can and does accept new evidence. Both Hyatt and the FTB submit briefs, and a hearing is held.[26] That appeal is proceeding in California. The issues of Hyatt's residency and whether he owes taxes to California will be decided in that appeal — not in this tort litigation.

**D. The FTB promised, and was obligated, to be "fair and impartial" in the audits and protests, i.e., to conduct a good faith audit.**

The FTB holds itself out to taxpayers in its Privacy Notice, Mission Statement, Strategic Plan, manuals, and in communications with the public to be fair and impartial in its dealings with taxpayers and to keep taxpayer information strictly confidential.[27] It professes not to guard the revenue, but to interpret the law evenly and fairly with neither a state nor a taxpayer point of view. The FTB's internal Audit Standards require that auditors act with objectivity and in a fair and unbiased manner.[28] Every FTB audit witness at trial testified that

---

[25] RT: May 12, 82:1-10; 88 RA 021826.

[26] RT: July 9, 142:14-20; 88 RA 021826.

[27] 82 RA 020471-020475; 93 AA 23181; 55 AA 13705; 56 AA 13939-13940; RT: May 27, 81:13-17, 104:19-105:6; June 9, 57:1-24; June 20, 158:22-159:24.

[28] 55 AA 13705, 13708.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

he or she must act in a fair and impartial manner toward each taxpayer, including Hyatt.[29] The FTB's first auditor, Marc Shayer, testified that the initial privacy notice states that the FTB will treat the taxpayer with courtesy, and this was intended to convey to Hyatt that the FTB would conduct a fair and unbiased audit.[30] Hyatt reasonably understood and believed that the FTB would conduct a fair and unbiased audit.[31]

## E. The jury heard and accepted substantial evidence of outrageous, bad faith conduct by the FTB during the audit.

### 1. The FTB audited Hyatt upon learning how much money he had made.

The FTB's initial audit of Hyatt was triggered by a newspaper article in 1993 that reported Hyatt's new wealth from patent royalties after moving to Nevada. The first auditor, Marc Shayer, testified that what "popped" into his mind in reading the article was how much money Hyatt had made. Shayer recalls that he read that Hyatt stood to make "hundreds of millions" of additional dollars from his patents.[32] This prompted Shayer to request Hyatt's state tax return records and open an audit of Hyatt's 1991 tax-year return.[33]

During the six months he worked on the audit, Shayer focused on developing possible legal theories to tax Hyatt's money, even though Hyatt had moved to Nevada years before.[34] One theory was residency: that Hyatt allegedly resided in California for some time after he said he moved to Nevada. Another theory Shayer explored was sourcing: that the "source" of Hyatt's income allegedly was work performed in California and was possibly taxable even though Hyatt was no longer a California resident.[35]

---

[29] RT: May 22, 104:8-105:10, 121:12-17, 123:1-18; May 27, 111:22-112:20; June 9, 48:5-10; June 10, 135:7-15; June 11, 43:11-15; June 20, 158:22-159:24, June 23, 73:24-74:1; June 24, 83:13-20, 86:16-23, 147:15-20; June 25, 78:18-23, 84:16-25, 88:2-20; July 7, 101:11-14, 198:18-22; July 8, 156:11-15; July 9, 116:21-24, 154:22-155:12; July 10, 171:19-21; July 15, 154:17-19, 160:4-12, 183:13-23.

[30] RT: June 20, 158:22-159:24; 82 RA 020471-020475.

[31] RT: May 9, 155:5-15; May 16, 124:5-9, 17-25.

[32] RT: June 20, 147:14-148:20; 150:14-151:2.

[33] RT: June 20, 151:3-153:5.

[34] RT: June 20, 175:15-177:13, 185:19-188:6; 63 AA 15651-15652.

[35] RT: June 20, 175:15-177:13, 185:19-188:6.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

Shayer later wrote a memo to FTB in-house attorney, Anna Jovanovich, pointing out that *if* the FTB could reclassify Hyatt's income as "sourcing" income, it would result in $1.8 million in taxes for the FTB from Hyatt.[36] From the outset of the audit, then, the FTB was searching for ways to tax Hyatt, whether or not he continued to reside in California. The FTB was not impartially gathering the facts to make a fair determination whether any tax is owed. Jovanovich, from the time she received Shayer's memo through her involvement in the audit and protest phases, therefore viewed the audits as a means to collect money from Hyatt for the FTB.

After Shayer ceased working on the Hyatt audit without reaching any decisions, a second auditor took over the audit. The second auditor retraced some of Shayer's steps, but like Shayer, he failed to reach any conclusions that the FTB had a basis to tax Hyatt.[37] A year and a half into the audit, a third auditor, Sheila Cox, took over. She was young and inexperienced in residency audits. Yet, her first act was to prepare a memo on how the FTB could tax Hyatt. She then implemented her plan, first by contacting Hyatt's ex-wife (Priscilla Maystead), who had recently been unsuccessful in attempting to set aside the 18-year-old final divorce decree. Then, Cox asked the ex-wife for other leads identifying people who might have information adverse to Hyatt, and she pursued those leads immediately, all in an attempt to grab Hyatt's new wealth for the FTB.[38]

**2. The lead auditor was openly biased against Hyatt and his religion.**

Cox would talk to her husband about "getting this taxpayer," meaning Hyatt. She made a number of anti-Semitic remarks during the audit, including suggesting to her then best friend and fellow auditor Candace Les that she would get the "Jew bastard," and that most of the large income taxpayers in California were Jewish.[39] Les hardly backtracked on this

[36] 63 AA 15651-15652.

[37] RT: April 25, 80:10-81:17, 84:11-24; 83 RA 020531-020610, 020612-020613; 93 AA 23096-23012.

[38] RT: May 27, 57:7-17; 63 AA 15553-15555; 93 AA 23103-23107; RT: June 25, 202:24-203:8, 214:20-215:24; May 20, 135:3-136:7.

[39] RT: April 24, 132:2-23, 140:11-141:25.

Kaempfer Crowell Renshaw Gronauer & Fiorentino

testimony as suggested by the FTB. Rather while disagreeing with Hyatt's characterization of her initial testimony in certain briefing, she confirmed when cross-examined by FTB counsel that she heard Cox used racial slurs "maybe 20 times" and that while Les understood "these racial slurs that Sheila made in a joking sense like to say the way [Cox] talks out of the side of her mouth, 'That Jew bastard,'" Les "knew it was intended as a joke because she was upset with him [Hyatt]" but "that she cross (sic) the line."[40]

Cox was so friendly with Les that she gave Les a portion of the draft fraud penalty narrative which Cox intended to issue against Hyatt, along with other parts of the audit file. Les concluded the narrative did not support Cox's intended issuance of a fraud penalty and that Cox needed to meet with Hyatt to get his version of the events.[41] Les believed that Cox was obsessed with Hyatt and had created a "fiction" about him.[42] Cox's obsession with Hyatt included making an unauthorized visit to Hyatt's Las Vegas home *after* she had closed the 1991 tax-year audit,[43] where she took a picture of Hyatt's house[44] as if it was a trophy of her having "gotten" the "Jew bastard." Cox also called Hyatt's ex-wife after the audit, to boast to her that Hyatt had been "convicted."[45]

Les, herself Jewish, was an experienced auditor and was offended by Cox's conduct and treatment of Hyatt.[46] Les ultimately had a falling out with Cox and asked the FTB to investigate Cox's racist attitudes. Les testified that the FTB did not adequately investigate her allegations.[47]

---

[40] RT: April 24, 136:5-22.

[41] Sharing a taxpayer's file (or an auditor's work product) was a violation of FTB's "need-to-know" policy designed to protect confidential taxpayer information. 56 AA 13913-13929; RT: April 23, 172:24-173:6; April 24, 29:1-16.

[42] RT: April 24, 42:4-43:8, 80:22-81:11, 134:1-12; 136:23-138:2.

[43] RT: April 24, 134:7-12, 65:11-16.

[44] 85 RA 021013.

[45] RT: May 20, 140:12-141:19.

[46] RT: April 23, 163:23-164:6; April 24, 27:10-28:2, 136:23-138:2.

[47] RT: April 23, 167:6-17.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

**3. The lead auditor viewed the Hyatt audits as a means to advance her career and did significantly advance her career with the audits.**

Besides personal animus toward Hyatt, his religion, or his money, Cox understood the significance of the audit to the FTB, and to her career. She openly told Les before their falling out that she was looking to advance her career with the Hyatt audit.[48] As the audit went on and the hours on the case began to mount, Cox became worried. She knew she could not return a low or no change result to her superiors in the FTB, given the large number of hours (over 600) already expended on the Hyatt audit.[49] The FTB expected a return on this enormous investment of time.

At the outset of her involvement, Cox prepared an Audit Strategy Memo, in which she told her superiors that she would look at "sourcing" as a possible basis to tax Hyatt, but if that did not pan out "*further examination of the residency issue will have to be pursued*," demonstrating that her assignment was to tax Hyatt, one way or another.[50] Cox even admitted that after she started working on the audit, she was not neutral.[51] Cox was rewarded for the large tax and fraud penalty proposed assessments for the 1991 tax year by being promoted to the special investigations unit.[52]

For the 1992 audit, Cox's initial proposed assessment did not propose a penalty on the substantial taxes already assessed, and she so informed Hyatt's representative.[53] After her short stint in the special investigations unit, Cox returned to the Residency Program, and the Hyatt 1992 audit was still pending, to her surprise. It landed on her desk, with instructions to finalize the FTB's now-larger proposed assessment (with a 75% fraud penalty). Her supervisors decided while she was away that a fraudulent failure to file penalty should be imposed, assigning another younger, inexperienced auditor to write up a fraud penalty

---

48 RT: April 24, 76:16-77:7, 129:9-15.

49 RT: April 24, 26:11-19, 74:1-75:20.

50 63 AA 15553-15555.

51 RT: May 28, 95:21-96:8.

52 RT: May 27, 48:10-13.

53 RT: April 30, 106:12-20; 85 RA 021045-021061.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

justification for the 1992 proposed assessment. That auditor had no experience with the Hyatt audit and did nothing to investigate any facts to support a 1992 fraud penalty. Cox accepted his change and included a fraud penalty with her proposed assessment for 1992.[54]

Later, Cox attended the United States Supreme Court oral argument in this case, paying her own way to the proceedings. Despite this, Cox claimed she was not obsessed with Hyatt.[55] Cox took a leave of absence from her work, to help the FTB attorneys prepare this case for trial.[56] She was hardly an unbiased auditor, nor an unbiased witness.

**4. The lead auditor did not pursue, and tried to bury, evidence that was favorable to Hyatt, claiming she did this based on her "intuition."**

One disputed fact presented to the jury was whether the FTB, and in particular Cox, had a predetermined conclusion to tax Hyatt's substantial new wealth, while publicly claiming they conducted fair and unbiased audits. On this issue, the jury heard substantial evidence.

**a. La Palma neighbors.**

When Cox conducted field interviews of Hyatt's former neighbors in La Palma, California, she intentionally avoided formally documenting exculpatory statements from neighbors, who point blank told her that Hyatt had moved to Nevada during the very time frame Hyatt claimed. For example, the FTB's audit file referred to a witness identified as "Stacy's mom" who told Cox that Hyatt had moved to Las Vegas six months after obtaining his patent and that a woman had been living in the house since he left.[57]

This evidence was not consistent with Cox's Audit Strategy Memo that the FTB "will have to pursue" residency in order to tax Hyatt. This evidence verified Hyatt's residency position. While Cox sought statements from other neighbors regarding Hyatt's move, she specifically did not seek a written statement from Stacy's mom or document what Stacy's mom told her as Hyatt-favorable evidence. Cox testified that she did not do so based on her

---

[54] RT: May 30, 145:4-146:17, 148:9-151:5; June 9, 97:9-16, 102:7-103:17, 108:2-110:10; 85 RA 021079-021081, 021082-021085.

[55] RT: May 27, 51:24-52:24.

[56] RT: May 28, 4:24-6:8.

[57] RT: May 29, 50:6-55:3, 56:4-56:18, 68:6-70:12, 73:13-25, 98:3-9; 68 AA 16804, 16815.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

"intuition" that it would not be worthwhile.[58]

Another former neighbor, Keith Kalm, returned Cox's questionnaire, also stating that Hyatt had moved to Nevada in 1991 and a woman had been living in the house since he left.[59] Again, Cox had no credible explanation as to why she did not interview, secure a written statement, or at least seek additional information from Kalm.[60] A reasonable inference is that Cox did not want to compile, and in fact wanted to avoid, any evidence corroborating Hyatt's residency position. A third neighbor named "Becky" also supported Hyatt's residency position, according to the FTB's audit file, but Cox again made no effort to document or detail this witness' information, which would further support Hyatt's residency position.[61] In fact, Cox knocked on every door in the La Palma neighborhood except Hyatt's former house where she could have spoken to Grace Jeng, to whom Hyatt had sold the house.[62]

**b. Friends and relatives.**

Cox's audit results against Hyatt were based almost exclusively on three unsworn statements from estranged relatives of Hyatt, who had lost in litigation against Hyatt or had supported the losing party against Hyatt. Cox accepted their information, which was mostly secondhand, without question, using it as the focus of her audit determinations. But she did not even speak to the one relative whom she knew had first-hand knowledge of Hyatt's move to Las Vegas. Hyatt's son, Dan, helped Hyatt move in 1991, even lending Hyatt a trailer to do so.[63] Cox was aware of this, but never sought to speak with or obtain a statement from him, and again, she had no credible explanation for not doing so.[64] Similarly, Hyatt's friend and former girlfriend Helene ("Leni") Schlindwein returned one of Cox's questionnaires,

---

[58] RT: May 29, 99:12-100:24.

[59] 84 RA 020779-020787.

[60] RT: May 29, 88:5-89:21.

[61] RT: May 29, 55:4-56:3, 93:4-18, 97:9-10, 98:3-9; 68 AA 16804.

[62] RT: May 29, 75:21-77:5.

[63] RT: June 18, 13:8-16.

[64] RT: May 27, 125:17-126:17; June 18, 28:15-29:19.

Kaempfer Crowell Renshaw Gronauer & Fiorentino

explaining that Hyatt moved to Nevada in 1991. Cox never interviewed, contacted or sought additional information from Schlindwein.[65]

Most telling, Cox never sought to or spoke with Hyatt. She did not want Hyatt's version of the events she was investigating, and she did not want him to know the extent of her actions.

**c. Other evidence submitted by Hyatt.**

Hyatt also identified for Cox numerous additional witnesses in Nevada, including real estate agents, escrow officers, insurance agents, a home inspector, a security provider, and others. Cox never pursued additional information from these sources.[66] Cox also ignored or discounted records that, under FTB policies, are considered significant indicia of residency, including Hyatt's Nevada voter's registration, Nevada driver's license, and Nevada insurance, each of which Hyatt obtained in 1991.[67]

A reasonable inference for the jury to draw based on the evidence presented was that the FTB, and Cox in particular, had no intent of conducting a fair and unbiased audit, but rather had predetermined that Hyatt's substantial new wealth must be taxed in some manner by California. Evidence supporting that determination was accepted by Cox, while contrary evidence was ignored and neither sought nor gathered.

**5. The lead auditor relied on three un-sworn statements from three estranged relatives of Hyatt, all of whom admitted they had an axe to grind.**

Cox's primary basis for assessing Hyatt millions of dollars in taxes and penalties were three un-sworn statements (she called them "affidavits" in the audit file, thereby misrepresenting them as sworn statements) from estranged relatives of Hyatt. Cox's August 2, 1995, Determination Letter touted the "affidavits" as the basis for her finding that Hyatt did not move to Nevada in the fall of

---

[65] RT: May 27, 126:24-128:21, 167:22-168:4.

[66] RT: May 27, 126:18-23; July 1, 90:15-91:8; 63 AA 15619-15627; 67 AA 16510-16511.

[67] RT: May 27, 69:22-71:21; May 28, 126:15-21; June 6, 118:13-120:6; June 12, 17: 10-22.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

1991 as he claimed.[68] Despite anchoring the FTB's tax and fraud penalty assessment, the FTB refused to let Hyatt see the so-called "affidavits" during the audit, preventing Hyatt from learning who the "affiants" were and responding to this "evidence" against him.[69] When Hyatt finally received the "affidavits" over a year later, when the FTB produced the audit file to Hyatt as part of the protest proceeding, Hyatt learned the "affidavits" were not really affidavits. They were statements, not given under oath, from estranged family members who admittedly had no personal knowledge of Hyatt's move or residency in Nevada.[70] Although Cox did not put those witnesses under oath,[71] she represented the unsworn statements as affidavits and signed the jurat on each, thereby representing that each witness had been sworn in.

In fact, the first substantive action Cox took as the newly assigned auditor was to contact and interview Hyatt's long ago divorced ex-wife, one of the unsworn affiants. Cox explained that talking to ex-spouses is a way to gather information about a taxpayer under audit. Maystead had been divorced from Hyatt for over 15 years, admitted she had no personal knowledge of Hyatt's residency for the years at issue, and had recently lost a lawsuit to Hyatt in which she had sought to re-open the divorce decree and secure a portion of his new wealth and was very bitter towards Hyatt. Yet, Cox used her "affidavit" as a primary basis for taxing Hyatt and withheld it from him during the audits.[72]

The second "affidavit" cited by Cox was that of Hyatt's estranged brother, Brian Hyatt, a convicted felon. Maystead referred Cox to Brian Hyatt. Brian Hyatt told Cox that he had no personal knowledge of Hyatt's residency for the years at issue. But again, Cox cited his "affidavit" as a primary basis for assessing Hyatt millions of dollars in taxes.[73]

---

[68] 84 RA 020865-020902.

[69] RT: April 30, 45:14-22; 83 RA 020616-020624, 020630-020635; 84 RA 020935.

[70] RT: May 27, 134:8-135:25, 166:15-167:14; 83 RA 020616-020624, 020630-020635.

[71] RT: May 27, 166:15-19.

[72] RT: May 27, 134:23-142:12; June 2, 182:22-183:4; June 4, 184:4-9; 80 RA 019993-019994; 83 RA 020616-020620; 84 RA 020896, 020900.

[73] RT: May 27, 142:3-149:16, 150:8-153:24; 83 RA 020621-020624; 84 RA 020986, 020900.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

The third "affidavit" was from Hyatt's daughter, Beth. She had supported her mother, Maystead, since her parents' divorce long-ago and in the recent failed litigation against Hyatt.[74] The jury heard testimony that although Hyatt had made attempts to repair the relationship and that he had helped support Beth Hyatt through college at UCLA and with other expenses, Beth Hyatt's estrangement from her father was exemplified by her cruelty toward him. Dan Hyatt testified that Beth deliberately gave her father the wrong day of her graduation from UCLA, then laughed about him wandering the campus looking for the graduation ceremony, and being humiliated when he was told that he had the wrong day.[75] Beth Hyatt also testified how she staked out her father to help serve process on him when Maystead attempted, without success, to re-open their 18 year old divorce decree.[76]

Beth Hyatt noted that she had visited Hyatt in Las Vegas, and suggested he may have also spent some time in California. But she printed on her "affidavit" above her signature that she could not be held to her statements.[77] Yet this was what Cox cited as the basis for assessing Hyatt millions of dollars in taxes and calling him a fraud, for purportedly not moving to Nevada when he said he did.

**6. The lead auditor intentionally deceived Hyatt's tax representatives into believing there were no issues in the audit, when in reality, she was building a one-sided case and did not want evidence that would contradict her predetermined conclusion.**

Cox commenced her work on the Hyatt audit in late 1994 by stating in her Audit Strategy Memo that if a sourcing theory could not sustain a tax assessment, then a residency theory "will have to be pursued."[78] Cox did not want evidence that contradicted the preconceived determination that Hyatt had to be taxed, one way or another. Most importantly she did not want Hyatt and his representatives to know that she was building a one-sided case.

[74] RT: May 27, 140:3-17; 83 RA 020630-020635.

[75] RT: May 14, 98:12-99:8, May 19, 97:9-98:19; June 18, 17:2-13, 19:8-20.

[76] RT: June 25, 202:24-203:8, 214:20-215:24.

[77] RT: May 14, 99:1-8; June 18:17:2-13; 83 RA 020630-020635.

[78] 63 AA 15553-15555.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

To accomplish this objective, Cox deceived Hyatt's tax representatives Mike Kern and Eugene Cowan. When they inquired if there were any issues or if she needed anything, she said no. But later Cox claimed they failed to provide information she contends that she had requested from them.[79] She even thanked them in writing for their cooperation but later claimed they were uncooperative.[80] For example, Cox stopped by Kern's office in Las Vegas unannounced. Kern was not there. He later called Cox to apologize for missing her and asked whether she needed anything. She said no. But at that very time, she was surreptitiously seeking to confirm whether Hyatt used space in Kern's office as Hyatt had represented. Cox, without ever asking Kern, concluded that Hyatt had not occupied space in Kern's office.[81] She did not want Kern to verify a fact that would be adverse to her residency position.

Cox's deception reached its zenith when she dropped her August 2, 1995, Determination Letter bombshell in which she revealed for the first time — two years into the audit — the "case" against Hyatt, based on the three "affidavits," and Hyatt's and his representatives' failure to produce information, and their failure to cooperate.[82] Cox gave Hyatt and his representatives until August 30, 1995 to respond to Cox's bombshell. After two years of audit, and no suggestion to Hyatt that the FTB or Cox had any issues or concerns, Cox gave Hyatt 28 days to respond. But she had no intention of considering any response from Hyatt. She wrote in her notes in the audit file on August 29, 1991 that she was working on "closing" the audit file,[83] not even waiting for anything that Hyatt may provide the next day, which she had set as a deadline for Hyatt's response.

In fact, Hyatt provided a substantial response by Cox's deadline and supplemented it as he gathered information. But when it came to the cornerstone of the FTB's case (the three un-sworn "affidavits"), the FTB told Hyatt he could not see them, depriving him of any reasonable way to

---

[79] 80 RA 019928-019930; 83 RA 020718; 68 AA 16799, 16802.

[80] 80 RA 019928-109930; 83 RA 020614-020615, 020627-020628, 020705-020707; 54 AA 13313-13314.

[81] RT: April 25, 125:17-128:21: 83 RA 020718; 68 AA 16799, 16802.

[82] 84 RA 020865-020904.

[83] 93 AA 23124.

respond to undisclosed accusations of unidentified persons. After an exchange of correspondence,[84] in which Hyatt provided additional information and was searching for other information, Cox announced she was closing the audit and would make the proposed assessment set forth in her August 2, 1995 Determination Letter, rejecting Hyatt's input and still refusing to provide the "affidavits".[85]

In sum, at trial, the jury heard and saw that there was evidence "above the surface," which Hyatt and his representatives knew about during the audit, and evidence "below the surface," which was the FTB's activities to build a one-sided case against Hyatt unbeknownst to Hyatt and his representatives to which they had no opportunity to respond.[86] The FTB was not seeking the truth, but rather a means and a way to reach a predetermined conclusion to tax Hyatt and collect his money. The FTB did not want Hyatt to produce rebuttal evidence.

**7. The lead auditor manufactured reasons and misstated evidence in order to assess a fraud penalty as a bargaining chip to be used to induce settlement — in accord with FTB policy.**

In her August 2, 1995, letter, Cox and the FTB not only told Hyatt that he would be assessed taxes, but that he was also being accused of fraud. For this, he would be assessed an additional 75% penalty for claiming to be a partial-year resident of California on his 1991 state income tax return.[87]

Under FTB policy, derived from case law, the FTB has to prove by clear and convincing evidence that a taxpayer engaged in fraudulent activity to warrant imposing a fraud penalty. The FTB's own manuals and policies define clear and convincing evidence as "explicit and unequivocal, leaving no substantial doubt," and "sufficiently strong to command the unhesitating assent of every reasonable mind" and require that the facts show that the taxpayer have a "specific intent to evade a

---

[84] 84 RA 020913-020933; 84 RA 020935-020939, 020946-020947, 020956-020969, 020972-020980, 020982-020993; 85 RA 021015-021016.

[85] 84 RA 020994 – 85 RA 021007.

[86] April 25, 129:1-144:9, 145:17-148:24.

[87] 84 RA 020865-020904.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

tax believed to be owed."[88]

A number of FTB witnesses, with significantly more residency audit experience than Cox, testified that they had never assessed a fraud penalty in a residency audit.[89] It was virtually, if not actually, unheard of within the FTB. Residency audits, which require determining the date someone moved and legally cut ties to California for the purpose of taxation, do not lend themselves to the exactitude required for imposing a fraud penalty.

This did not stop Cox and the FTB from assessing a fraud penalty against Hyatt. Yet, the very evidence Cox cited in her Fraud Item (i.e., supporting fraud narrative in the audit file) to justify imposing a fraud penalty demonstrated her bad faith: (i) she claimed Hyatt did not produce certain bank account records, but the account was not a bank account and had been fully disclosed to her; (ii) she claimed Hyatt and his tax representatives were uncooperative during the audit, but she had repeatedly thanked them in writing for their cooperation during the audit and told them she did not need anything and there were no issues they could address for her; (iii) she claimed Hyatt was deceptive because he had a fear of kidnapping, and he did not live in a gated community, but she made up the kidnapping claim out of whole cloth and ignored the facts that neither Hyatt's former California house nor his Nevada house were gated; (iv) she claimed Hyatt's holding title to his Nevada house in a trust (which occurred after the period in dispute) was deceptive, but Hyatt fully and freely disclosed his ownership of the house and how he held title; (v) she claimed Hyatt's sale of his former California house to his executive assistant Grace Jeng was evidence of intent to defraud because the so-called "affiants" contend that she may have lived with Hyatt, but the "affiants" admittedly had no personal knowledge of where Hyatt resided and Cox never asked Hyatt or Jeng about the subject, choosing instead to unquestioningly rely on the estranged relatives; (vi) she claimed that the fact that Hyatt had left his Las Vegas apartment clean, with no damage, and had not generated complaints from neighbors was evidence that he had not lived there.[90]

---

[88] 73 AA 18194.

[89] RT: April 24, 28:6-13, 31:24-32:1; June 11, 129:6-131:1; June 23, 148:3-11; June 24, 163:3-9.

[90] 80 RA 019921-019928; RT: April 25, 123:5-128:8, 168:19-171:9, 179:22-180:21; April 29, 185:5-186:4; April 30, 26:15-29:8, 31:1-23; May 30, 59:5-60:25; 84 RA 020898.

Kaempfer Crowell Renshaw Gronauer & Fiorentino

Cox asserting a fraud penalty in a case of dubious strength was consistent, however, with FTB training directing FTB auditors to use the assessment of a fraud penalty as a bargaining chip to be used during settlement negotiations. Indeed, the FTB hosted a seminar for auditors where the FTB instructor used large poker chip props to demonstrate how the fraud penalty can be used as a bargaining chip during settlement negotiations.[91] The FTB instructed its auditors to dangle the penalty in front of the taxpayer, and offer to remove it as part of a settlement under which the taxpayer would pay something to avoid the "fraud" label. In a similar vein, the cover to the FTB's penalty manual depicts a drawing of a menacing skull-and-crossbones,[92] seemingly suggesting that taxpayers can be frightened or intimidated by the imposition of a penalty. Cox — a young auditor in her first residency audit and looking to advance her career in an audit she knew was very important to the FTB — was doing what the FTB taught her to do and what she thought was expected of her.

**8. There was open internal dissent within the FTB which questioned whether the FTB had a case against Hyatt, let alone clear and convincing evidence to support a fraud penalty.**

**a. Embry memo.**

By mid-1995, two years into the audit, there was explicit doubt expressed within the FTB whether a residency case could be made against Hyatt. By then, two prior auditors had worked the case without concluding there was a basis to assess anything against Hyatt. On June 6, 1995, the FTB held a meeting of high level FTB personnel, including Cox. A memo dated August 21, 1995, summarizing the June 6 meeting and its conclusions, was drafted by FTB supervisor Monica Embry (the "Embry" memo) and stated that the purpose of the meeting was "to discuss the possible audit positions available" against Hyatt. The memo listed two audit issues: (1) residency, and (2) source of patent licensing payments.[93] Regarding residency, the memo plainly stated:

> [A] decision had not been made at the time of the meeting [two years into the audit and shortly before Cox began drafting the August 2 Determination Letter] as to whether *there was enough substantiation* to sustain a position the TP [taxpayer] was a California

---

[91] April 24, 46:10-49:2, 113:8-115:12; July 8, 85:16-21.

[92] 82 RA 020494 – 83 RA 020516.

[93] 54 AA 13315-13319.

Kaempfer Crowell Renshaw Gronauer & Fiorentino

> resident for all of 1991. *There does not appear to be any means* of making the TP a resident for 1992 or later.[94]

The clear intent of the meeting, as reflected in the Embry memo, was to again consider asserting a non-resident sourcing theory against Hyatt, given the weakness of the residency case. On August 24, 1995, a draft of the memo was circulated to those at the meeting, including Cox, instructing the recipients that "if anything needed to be added or changed" to let Embry know, otherwise she would assume the memo was fine and would distribute it to high level FTB management. The memo also stated that "this memo pertains to the facts of this case [the Hyatt case]."[95]

No one, including Cox as the lead residency auditor, disagreed with or offered any corrections to the Embry memo, which was therefore distributed to high ranking FTB managers in early September 1995.[96] To be clear, less than a month *after* Cox's August 2 Determination Letter labeling Hyatt a fraud and claiming he did not change his residency when he claimed, Cox approved a memo that advised senior FTB management there was not "*enough substantiation*" to sustain a tax assessment for residency for all of 1991, let alone a fraud penalty, and no means to "make" Hyatt a resident for 1992 and later.

The Embry memo also reflects the conclusion of the June 6 meeting: the FTB had no legal basis to pursue a sourcing theory (based on nonresidency) against Hyatt either. The memo, after two years of the Hyatt audit and the work of three auditors, shows that the FTB had decided that it could not pursue a sourcing theory against Hyatt. The FTB also had insufficient evidence to support a residency theory for all of 1991 or for any of 1992. Yet, as the jury heard, less than two months after the June 6 meeting and three weeks before the Embry memo was circulated, Cox issued the bombshell Determination Letter on August 2, 1995, advising Hyatt he would be assessed millions of dollars in taxes, a fraud penalty, and interest for all of the 1991 tax year as she found

---

[94] *Id.* (emphasis added).

[95] 54 AA 13315-13319 at 13315.

[96] 84 RA 020949-020953.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

him to be a California resident until April 3, 1992.[97]

**b. Paul Lou's instruction.**

What happened between June 6 and August 2, 1995? Cox received little additional audit information, but she began drafting her Determination Letter and a memo to support the imposition of a fraud penalty.[98] However, she was told on June 21, 1995, by her immediate supervisor Paul Lou to "analyze the information you have gathered thus far *to show the strength of the taxpayer's ties to California*."[99] Significantly, he did not ask her to weigh the evidence and provide an objective analysis whether a residency case could be sustained against Hyatt. Rather, Lou told Cox based on his review of the audit file (apparently accomplished that day as reflected by his single entry in the audit notes) that she should put together the information to show the strength of Hyatt's ties to California, which then formed the basis to tax Hyatt. Lou also noted that he was "pleased with [her] audit of the taxpayer."[100]

**c. Lead reviewer's notes.**

But the FTB's lead residency reviewer, Carol Ford, saw things quite differently and openly questioned whether the FTB had a case against Hyatt. She said in her Review Comments concerning the audit, "this is really a tough case" and "[w]e are assessing the FRAUD penalty – although I'm not sure it is warranted."[101] She then reiterated the uncertainty of the case and asked a critical question:

> It is difficult to determine what the facts actually are. *Do we believe the affidavits*? . . . I believe the tp may have left CA in 12/91.[102]

The FTB's lead reviewer, therefore, questioned the three un-sworn "affidavits" from Hyatt's estranged relatives, two of whom admittedly had no personal knowledge of Hyatt's residency and

[97] 84 RA 020865-020904.

[98] 93 AA 23121-23123.

[99] 93 AA 23122 (emphasis added).

[100] 93 AA 23122.

[101] 54 AA 13325.

[102] Id.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

all three of whom had been estranged and therefore had little if any relevant knowledge and an axe to grind against Hyatt. It seems that the FTB's lead reviewer saw that the cornerstone of the FTB's case crumbled, without even letting the taxpayer know who his accusers were, so he could rebut their hearsay allegations — let alone cross-examine the purported "affidavits." Her notes were consistent with the Embry memo in questioning whether the FTB had evidence to support a determination that Hyatt was a California resident for all of 1991 or any of 1992.

Ford's Review Notes were concealed by the FTB and not provided to Hyatt. The FTB stamped on some of them "NOT TO BE INCLUDED IN THE AUDIT FILE" and did not include them when the FTB initially produced the audit file to Hyatt in the protest.[103] The FTB knew at some point, once the protest started, Hyatt would get to review the audit file. The FTB did not want Hyatt and his tax representatives to see Ford's review notes. Similarly, the FTB never thought anyone would see the Embry memo — it says on page one "Not for Public Distribution."[104] Both documents were produced only after the Nevada Supreme Court denied the FTB's writ challenging the Discovery Commissioner's recommendation and District Court order requiring production.[105]

**d. Les' advice to Cox.**

Well before Cox issued her August 2, 1995, Determination Letter, she sought advice and input from her then good friend Candace Les, an experienced residency auditor with 60 residency audits under her belt. During the time Cox worked on the 1991 audit, Cox talked a great deal about

---

[103] RT: May 12, 44:12-21; 54 AA 13325, 13396-13397.

[104] 54 AA 13315-13319 at 11316.

[105] 5 AA 1183-1196. After reviewing these documents *in camera* and ordering them produced, the Discovery Commissioner, who heard dozens of discovery motions in the case, said that Hyatt was entitled to full discovery relating to what took place in the audit. He said during that hearing, although the FTB claims Hyatt committed fraud, it is the FTB that may have committed fraud. 9 RA 002077-002079. He also asked then FTB lead counsel, Felix Leatherwood of the California Attorney General's office, if hypothetically the tax examiner did not feel she had a very good case and were to "tack on a fraud penalty and that will make the taxpayer settle" should that be examined? Leatherwood said that an auditor would be subject to "significant, significant liability" and there was no evidence of this. The Discovery Commissioner having seen the Embry memo and the Ford notes, asked if FTB counsel was saying there was nothing like that in the file. Leatherwood said he had not seen any evidence like that in the file. The Discovery Commissioner asked if the evidence might be in the documents he ordered produced (*i.e.*, the Embry memo, the Ford notes). 7 RA 001629-001632; 11 RA 002679-002680.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

the Hyatt audit and showed Les portions of the audit file.[106] Les told Cox that she should not send the August 2, 1995, Determination Letter, and explained to Cox that the Determination Letter did not support the imposition of a fraud penalty. Les advised Cox to meet with Hyatt first and get his side of the story.[107] Les concluded that Cox had created a "fiction" about Hyatt and was obsessed with him. Again, Les complained to the FTB about Cox's actions towards Hyatt.[108] Cox did not heed Les' advice, nor did the FTB adequately investigate Les' claims concerning Cox's improper treatment of Hyatt.

**9. Ignoring all conclusions to the contrary, the FTB assessed Hyatt millions of dollars more in taxes, penalties and interest for the 1992 tax year, even taxing and penalizing Hyatt for income earned after the date on which the FTB concluded Hyatt had moved to Nevada.**

In early 1996, after closing the 1991 audit, Cox and the FTB notified Hyatt that the FTB had opened a formal audit for the 1992 tax year.[109] With virtually no new or individual consideration for the 1992 tax year, the FTB adopted the findings of the 1991 audit and proposed to tax Hyatt until April 3, 1992. But in fact, the FTB's 1992 tax-year Determination Letter dated April 1, 1996, included millions of dollars in income that Hyatt received after April 3, 1992, the date by which the FTB acknowledged Hyatt had moved to Nevada.[110]

Hyatt and his tax representatives assumed this was a calculation error and pointed it out to Cox in 1997, before she issued a formal proposed assessment for 1992. She responded that she could not correct the error, since it could only be corrected in protest.[111] But contemporaneous with Cox's refusal to correct the taxes on this income error that increased the proposed taxes on Hyatt by millions of dollars, the FTB corrected a calculation error that had been made in Hyatt's favor and so notified Hyatt.[112] In other words, the FTB was willing to correct its own clerical or calculation

---

[106] RT: April 23, 170:5-173:6.

[107] RT: April 24, 29:1-6.

[108] RT: April 23, 167:6-17; April 24, 42:4-43:8, 80:22-81:11, 134:1-12, 136:23-138:2.

[109] 85 RA 021033.

[110] 85 RA 021045-021061; 85 RA 021093-021096.

[111] 85 RA 021093-021096; 54 AA 13396-13397.

[112] 85 RA 021082-021085; 54 AA 13393, 13396-13397.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

error to *increase* Hyatt's assessment, but it would not do so for a similar multi-million dollar error to reduce the FTB's proposed assessment.

Cox also informed Hyatt's tax representative that the FTB was reversing its position, despite no new facts or investigation, and would impose a 75% failure to file penalty, i.e., a fraud penalty, for the 1992 tax-year assessment.[113] This added several more millions of dollars to the assessments. Cox had not recommended a fraud penalty for 1992 in her 1996 Determination Letter prior to leaving the Residency Program for approximately a year. In her absence, her supervisors decided that a fraud penalty should be imposed and recruited another young auditor, Jeff McKenney, to write up a narrative supporting the fraud penalty. McKenney, admittedly eager to assist his career advancement, spent a scant 22 hours evaluating the law regarding the fraud penalty and the facts and information in the file. He then simply reviewed Cox's comments for the imposition of the 1991 fraud penalty and assessed the multi-million dollar 1992 fraud penalty, without any investigation of any facts relating to 1992.[114]

The 1992 audit reviewer, Rhonda Marshall, explicitly disagreed with the assessment of a fraud penalty,[115] echoing the previous dissent of the 1991 audit reviewer, Ford, concerning the 1991 audit conclusions. But, as with Ford's dissent on the 1991 audit, Marshall's dissent was ignored by FTB management and a 75% penalty was imposed for the 1992 tax year. The FTB again ignored the large income error and Cox was instructed to proceed with the Proposed Assessment for the 1992 tax year, including in it the large income error and the imposition of a fraud penalty.[116]

**10. The FTB residency audit supervisors were proud of the FTB's work on the Hyatt audits.**

The manager of the FTB Residency Program, Steve Illia, who ultimately approved the largest proposed tax assessments in his unit for both 1995 and 1996, had minimal involvement in

---

[113] 85 RA 021082-021085.

[114] RT: June 9, 97:11-16, 102:21-103:7; 81 RA 020021.

[115] 85 RA 021103.

[116] May 30, 149:8-151:12; 85 RA 021082-021086.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

reviewing them.[117] The FTB used assessments (not collections) in calculating the "cost benefit ratio" of its work, so large assessments were particularly helpful even if they were never collected. He was proud of his unit's work on the audits,[118] as were other FTB supervisors and the lead auditor.[119] Given the chance, the FTB would not have changed anything in terms of how the audits were conducted. With these audits, the FTB's assessments against Hyatt were the largest proposed assessments within the Residency Program in 1995 ($4,540,404.00 for the 1991 tax year) and 1996 ($14,115,941.00 for the 1992 tax year).[120]

**11. The FTB was driven by assessments and "CBR," upon which its future budget allocations were based, regardless of whether the assessments were ever collected.**

The jury heard substantial testimony from the former California State Auditor, Kurt Sjoberg, regarding how "CBR" – the "cost benefit ratio" measuring the FTB's cost of an audit (e.g., hours put in by auditors) versus the proposed assessments returned by the audit — produced a "drive to assess," because budget allocations were determined by this CBR formula. Sjoberg officially audited the FTB and many other agencies of the State of California during the 21 years he served as State Auditor and Chief Deputy State Auditor on behalf of the California legislature. He testified that for the FTB, assessments with high CBRs were its "lifeblood." The FTB needed to produce proposed assessments with high CBRs to justify and increase its budget allocations.[121]

Sjoberg's testimony emphasized that it was assessments, not collections, on which the FTB was evaluated. The FTB needed to book assessments to justify its funding and obtain increased funding. Actual collection of the proposed assessments was not factored into the equation. It only mattered that the proposed assessment was booked.[122] As a result, the FTB had every motivation to

[117] RT: June 23, 52:23-53:2, 176:14-178:14. Illia, however, also complimented Candace Les for her effectiveness in "showing [him] the money," reflecting his active monitoring of auditor performance. RT: April 24, 88:5-89:6.

[118] RT: June 23, 25:8-24.

[119] RT: May 27, 49:15-20; June 9, 109:5-7; July 7, 185: 12-18.

[120] 54 AA 13326-13329, 13398-13403.

[121] RT: April 22, 69:8-71:3, 73:3-74:23, 84:2-86:2, 88:22-90:19; April 23, 88:1-89:22.

[122] RT: April 22, 88:22-90:19, 94:4-96:9; April 23, 88:1-89:22.

Kaempfer Crowell Renshaw Gronauer & Fiorentino

book the highest assessments without regard to collectability. If the matter settled for much less than the assessment or even produced no revenue years later, it made no difference, since the FTB had already obtained its budget for the year applicable to the erroneous assessment.

This drive to assess permeated each unit within the FTB, including the Residency Program. At the same time, the FTB was prohibited from evaluating its auditors on the basis of CBR for the audits they worked, and the FTB certified to the California state legislature that it was not doing so during the time of the Hyatt audits.[123] But there was substantial evidence presented at trial that the FTB nonetheless evaluated its auditors on this basis, and that the FTB auditors were well aware of CBR as an important measurement of their unit's work, during the time of the Hyatt audits.

First, FTB auditors testified to this. McKenney, the 1992 fraud penalty draftsman testified that he knew that the FTB tracked the CBR on audits, knew what it was and why it was important.[124] Les, an experienced residency auditor, testified that auditors needed to produce high CBRs to be promoted. Les testified that given the hours expended on the Hyatt audits Cox could not possibly issue a "no change" result and had to return a high assessment to get a high CBR, based on the number of hours she worked on the case.[125] Les knew this from first-hand experience, since her own performance review during the time of the Hyatt audits specifically addressed and evaluated her based on the CBR she was returning for her audits[126] — despite the FTB's certifications to the California state legislature to the contrary.

Moreover, internal Residency Program documents from 1997 confirm that what the FTB was telling, even certifying, to its legislature, was not true. Senior Residency Program supervisor Penny Bauche recounted in supervisor meeting notes from 1997:

> There is a huge gap in those taxpayers selected for audit and those not (*we only pick the higher revenue producing ones*). The attitude of the auditors needs to be changed. Legal

---

[123] RT: April 22, 90:9-19; April 23, 69:8-76:6, 77:20-79:9, 88:18-89:5.

[124] RT: June 9, 103:24-105:24.

[125] RT: April 24, 36:20-37:19, 39:17-19, 53:9-54:22, 74:8-75:20.

[126] 84 RA 020837-020838.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

> is a factor also. *We have been CBR driven* and now need to find other means to measurement (sic) our effectiveness/efficiencies."[127]

As a result, in 1997, while the FTB was issuing a proposed assessment against Hyatt for the 1992 tax year, which generated a record CBR of $127,190.00 per hour, the FTB was admittedly "driven" by CBR and focused on high revenue individuals, i.e., the Large Income Taxpayer program. In the same note, Bauche observes that the "no change" rate "has gone up to greater that 50%" and then chastises the other supervisors saying it "*should not have been there in the first place*" as "[o]ne hundred percent change rate is the goal. This will lead to resource adjustments."[128] To be clear, a senior FTB manager in the Residency Program was telling the other supervisors in 1997 that *no audit* should be returned with a "no change" and that this will lead to "resource adjustment" (i.e., reduced budget allocations, which could mean layoffs). Cox therefore understood, given that more than 600 hours had been spent on the Hyatt audit, that she could not return a "no change" result.

A CBR-driven FTB also explains why, when the first auditor, Marc Shayer, read a newspaper article, what popped into his head first was "how much money" Hyatt had made and why he calculated and emphasized in a memo to Jovanovich how much money could be generated by assessing Hyatt's income on a sourcing theory. The FTB had found the perfect residency audit target: high revenue earned over a short time, which could be attacked with a reasonably low number of hours, maximizing CBR. And according to Bauche's note, once Hyatt was under audit, a "no change" result was unacceptable. Shayer, and later Cox, simply had to find a theory to tax Hyatt to the max. This is a far cry from the fair, unbiased treatment the FTB promised Hyatt that he could expect.

This drive to assess was motivated by the Residency Program's need to meet its "numbers" and thereby obtain its budget allocations. Bauche testified that she had a concern throughout the 1990s about the FTB meeting its "numbers," and the pressure to meet "numbers" is also referenced

[127] 92 RA 022985-022986 at 022986 (emphasis added).

[128] *Id.*, at 022985 (emphasis in original).

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

in the residency supervisor meeting notes.[129]

Auditors were well aware of this pressure. After returning to the Residency Program in 1997, Cox was surprised to learn that a formal proposed assessment had not been issued against Hyatt for the 1992 tax year, despite her Determination Letter and closing the 1992 audit a year earlier. Cox questioned whether Residency Program managers delayed the 1992 proposed assessment so the unit could meet its "numbers." Ford recounted this accusation by Cox in an e-mail to Bauche.[130] The net effect of the FTB holding the proposed assessment against Hyatt for the 1992 tax year from 1996 to 1997 was that the FTB's Residency Program had banner years in both 1996 and 1997, instead of just 1996, because of the delayed 1992 tax-year assessment against Hyatt. Again, the Hyatt assessments led the way each year.[131]

In sum, the jury drew a reasonable inference that the FTB is CBR-driven because it was easy for it to assess and not be concerned about collections. FTB management would not question a large proposed assessment with a high CBR. It was exactly what the FTB wanted from its auditors. If there was a settlement with the taxpayer at protest, as the FTB encouraged,[132] the quality and basis for the proposed assessments would be forgotten. It is a reasonable inference that the jury found this to be substantial evidence of bad faith by a government actor.

### F. The jury heard substantial evidence of bad faith and outrageous conduct regarding the FTB's invasion of Hyatt's privacy and breach of his confidentiality during the audits and protests.

#### 1. Early and repeatedly during the audits, Hyatt's representatives informed the auditors who worked on the audit that Hyatt had a heightened sensitivity for privacy and a need for confidentiality.

Hyatt testified that he is and always has been a private person who stays out of the limelight and intentionally keeps a low profile. The short burst of publicity he received in California during the early 1990s for his patent work after receiving approval for key patents turned out to be very

---

[129] RT: July 7, 138:12-140:24; 92 RA 022985-022986.

[130] 54 AA 13395; RT: May 30, 145:4-146:17; 154:4-158:2.

[131] 93 RA 023019-023025.

[132] RT: May 22, 80:6-9, 91:5-13; June 10, 158:15-159:2.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

uncomfortable for him, interfered with his work as an inventor and engineer, and was one of the factors that motivated him to move to Nevada.[133]

In addition to being private by his nature, Hyatt also testified to confidentiality concerns regarding his technologies, due to potential industrial espionage. He testified that in 1991 when he began trying to license his microprocessor patents, he had a particular confidentiality concern regarding Asian companies that would reverse engineer products to discover the technology used.[134]

In this context, Hyatt's tax representatives repeatedly expressed to the FTB Hyatt's desire for privacy and need for strict confidentiality. Cowan, Hyatt's tax attorney during the audits, met with each of the three auditors, and in each meeting he expressed Hyatt's sensitivities for privacy and confidentiality.[135] These concerns were also expressed in writing. In a November 1, 1993, letter, Cowan emphasized to Shayer that Hyatt's Las Vegas home address was redacted, per their discussion, that the material submitted was "highly confidential," and that he and Hyatt appreciated Shayer's utmost care in maintaining confidentiality.[136] In a July 11, 1994, letter to the second auditor, Cowan confirmed a prior discussion regarding keeping the materials produced confidential.[137] In a February 18, 1995 letter, Cowan reconfirmed to Cox:

> As previously discussed with you and other Franchise Tax Board auditors, all correspondence and materials furnished to the Franchise Tax Board by the Taxpayer are highly confidential. It is our understanding that you will retain these materials in locked facilities with limited access.[138]

**2. The FTB auditors promised strict confidentiality, acknowledging Hyatt's heightened sensitivity for privacy.**

In the FTB's first communication with Hyatt, the FTB provided its Privacy Notice, which represented that Hyatt could expect "[c]onfidential treatment of any personal and financial

[133] RT: May 8, 38:23-40:15; 84 RA 020913-020933 at 020914-020915.

[134] RT: May 8, 51:7-53:2; 84 RA 020913-020933 at 020914-020915.

[135] RT: April 29, 176:4-177:6, 179:23-181:1, 182:16-184:18.

[136] 83 RA 020521-020523 at 020523.

[137] 83 RA 020552.

[138] 83 RA 020704.

Kaempfer Crowell Renshaw Gronauer & Fiorentino

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

information that you provide to us" and that the FTB would abide by both the California Information Practices Act and the Federal Privacy Act.[139]

The FTB auditors expressly acknowledged they were aware of Hyatt's heightened sensitivity for privacy and confidentiality. Shayer testified he had promised strict confidentiality in sending the initial privacy notice, and Cox noted in her work papers in the audit file and testimony that she was aware that Hyatt was a private person.[140] She also stated this in a letter to Hyatt's tax representative during the audit.[141] The FTB's first protest officer, Jovanovich, freely acknowledged her awareness of Hyatt's heightened sense of privacy.[142]

**3. By policy and law, the FTB was required to keep Hyatt's information private and confidential and to obtain information from Hyatt instead of third parties to "the greatest extent practicable."**

The FTB's Security and Disclosure Manual prohibited disclosure of confidential information obtained in an audit. California law prohibits disclosure of such taxpayer information. FTB policy, consistent with the California Information Practices Act, states that the FTB should seek information needed for the audit "to the greatest extent practicable directly from the individual."[143]

The obvious purpose of the policy is to keep the intrusiveness of the audit to a minimum, and to protect the privacy of the taxpayer and the confidentiality of taxpayer information. The FTB, however, violated this policy with impunity, knowing of Hyatt's heightened and extreme sensitivity for privacy and confidentiality.

**4. The FTB made massive disclosures to third persons of Hyatt's social security number, private home/office address, credit card numbers, and other personal information to third parties.**

The FTB, through Cox, contacted neighbors, businesses, government officials, and others within Nevada, Japan, California, and other states, either in person or by mail or telephone, and

---

139 82 RA 020471-020475 at 020473.

140 68 AA 16789-16790; May 27, 104:6-105:25; June 20, 161:19-162:23.

141 83 RA 020705-020707.

142 RT: May 22, 51:2-21, 90:15-24.

143 RT: June 9, 52:7-18; Cal. Civ. Code § 1798, *et seq.*

gave them private information such as Hyatt's private Las Vegas address, social security number, and even credit card number. The FTB led them to believe that Hyatt was under investigation in California, thereby casting doubt on Hyatt's honesty, integrity, and moral character. The very purpose and intent of the FTB's policy and the law was flaunted by the FTB.

At the same time it was providing assurances of privacy and confidentiality to Hyatt, the FTB was contacting over 100 entities including newspapers, neighbors, a professional patent licensing society, and Hyatt's Japanese licensees, creating the inference that Hyatt was under a cloud of suspicion.[144] For example, the FTB sent demand letters to several California and Nevada newspapers requesting information about Hyatt's subscriptions and about interviews conducted by reporters.[145] These included a "Demand to Furnish Information," which included Hyatt's social security number and his private home/office address.

Hyatt's social security number was also disclosed by Cox in demand letters to Sam's Club, The Sport's Authority, and Bizmart, various religious organizations such as Temple Beth Am and Congregation Ner Tamid, the Licensing Executives Society, the Association of Computer Machinery, Personal Computer Users Group, Copley Colony Cablevision, the Southwest Company Club, Great Expectations (a dating service, with the Demand sent to two different branch addresses), and the Nevada Development Authority.[146]

Hyatt's social security number and private home/office address were also disclosed in demand letters to the Las Vegas Valley Water District, Silver State Disposal Service, and Southwest Gas Corp. This was despite that fact that Hyatt had taken significant steps to protect the fact that he resided at this address by placing his utility accounts in the names of other persons and purchased the home in the name of a trust, which did not reflect his name.[147]

As Les, the experienced FTB auditor testified, Cox was bombarding third parities with these

---

[144] 83 RA 020531-020533, 020537, 020540-020546, 020548-020551, 020636-020654, 020662-020669, 020676-020703, 020719 – 84 RA 020794, 020796-020797, 020802-020836, 020839-020840, 020905-020911.

[145] 84 RA 020839-020840, 020905-020910.

[146] 83 RA 020636-020646, 020651-020652, 020662-020669, 020729-020733, 020735-020736.

[147] 83 RA 020746 – 84 RA 020751.

KARMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

requests. Les and other FTB witnesses testified that they rarely, if ever, used the "Demand to Furnish Information" forms, instead going to the taxpayer first. The FTB considered the Demands to be "pocket subpoenas" and used them only where necessary in California.[148] That is not what Cox did in Hyatt's case. She went to the other extreme and bombarded third parties with Hyatt's private information.

Other outrageous examples of Cox's overreaching and deliberate acts invading Hyatt's privacy include her sending separate requests to six different Drs. Shapiro in Southern California. She saw "Dr. Shapiro" as a payee on a Hyatt check, but did not know which Dr. Shapiro had treated Hyatt. But, instead of asking Hyatt to identify the correct Dr. Shapiro, Cox sent requests to the six Dr. Shapiros she found in the telephone book, with Hyatt's private identifying information, and without Hyatt knowing that she was making such inquiries to question his medical professionals.[149]

Other outrageous examples are Cox's requests to Hyatt's first and key patent sub-licensees in Japan. Hyatt and his representatives requested particular privacy with his sub-licensing agreements, as the agreements themselves contained confidentiality clauses, which prohibited Hyatt from disclosing to third parties the confidential license agreements.[150] The FTB, therefore, made a conscious choice to contact Hyatt's key patent sub-licensees, thereby letting them know that he was under a tax investigation and that he had disclosed their confidential license agreements, instead of first asking Hyatt for the same information.

Cox also made two visits to Las Vegas to investigate Hyatt without Hyatt's knowledge. In a first visit in March, 1995, she made unannounced visits to Las Vegas residents and businesses with questions about private details of Hyatt's life. Persons interviewed included Hyatt's current neighbors, employees of businesses and stores Hyatt frequented, and even his Las Vegas mail carrier and trash collector.[151] *The second visit was unauthorized and occurred after Cox closed the*

---

[148] RT: April 24, 41:17-42:3, 59:8-14: June 11, 208:22-211:3; June 12, 5:21-7:5.

[149] RT: May 27, 207:5-209:5; 83 RA 020676-020687.

[150] RT: May 8, 52:9-53:9, 78:17-80:4; May 16, 104:7-107:16; 81 RA 020134-020137, 020194-020207, 020234-020248, 020250- 82 RA 020272, 020283-020284, 020310-020322, 020325-020338, 020342-020355; 84 RA 020788-020789, 020791-020792.

[151] 80 RA 019883-019884, 019888.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

*audit.*[152] Cox also made two or more visits to Hyatt's previous neighborhood in La Palma, California, which included unannounced visits with La Palma neighbors and questions about private details of Hyatt's life.[153]

These disclosures of Hyatt's private information and intrusions into his life were simply not necessary, and certainly, the information could have been requested of Hyatt in the first instance, if the FTB was not intent on intrusively violating Hyatt's privacy and security. But instead of conducting a fair audit seeking accurate facts, Cox chose to make it intrusive and embarrassing. Cox acted like an undercover detective with these third-party contacts, resulting in intrusions on Hyatt's privacy and disclosure of his confidential information, embarrassing him in his eyes with his neighbors, licensees, and business associates. The obvious conclusion, as the jury's verdict reflects, is that Cox intended to do this. She had an ulterior purpose for bombarding anyone affiliated with or who did business with Hyatt. She acted deliberately and intentionally to "get" Hyatt, as she put together her predetermined case against him.

**5. At the outset of the protest, the first protest officer warned about an even more intrusive investigation and infringements on Hyatt's privacy — if he did not settle.**

Hyatt had no concept of the FTB's pervasive assault on his privacy until, at the earliest, October of 1996, when he finally received the FTB's voluminous audit file for the 1991 audit. The FTB policy kept all of this from him until the two audits were closed and the protest had commenced.[154] In other words, during the audits, the case being built was kept from Hyatt, but he was expected to defend and refute unknown accusers and accusations.

Before Hyatt understood the scope of the FTB's dissemination of his personal information and disclosures to third parties that he was under a tax investigation, the first protest officer, Jovanovich, had a telling conversation "AT LENGTH" with Hyatt's tax attorney on June 12, 1997

---

[152] RT: April 23, 175:19-181:13, 181:23-182:2; April 24, 23:16-24:5; May 30, 93:4-94:4.

[153] RT: May 29, 38:21-80:24.

[154] RT: April 25, 110:5-13;April 30, 83:13-86:19; May 9, 116:13-117:3, 118:15-18, 142:13-20; May 28, 109:21-110:11; June 2, 102:12-103:21, 108:24-109:4; 84 RA 020913-020933, 020946-020947; 85 RA 021063, 021076-021078.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

She explained to Cowan the "necessity for extensive letters in these high profile, large $, fact-intensive cases - which merit in-depth investigation and exploration of many unresolved fact questions," including a discussion about "settlement possibilities." This was a not-so-subtle promise (or threat) that Hyatt would undergo further dissection by Jovanovich of his most private matters. She concluded, "I will be sending a lengthy letter asking for info & documents."[155] Cowan testified that he fully understood what Jovanovich was suggesting. Hyatt took it as nothing less than an attempt to extort him to settle a tax obligation he did not owe.[156] The jury found these inferences to be reasonable.

**6. When Hyatt did not settle early in the protest and filed this tort case, the FTB published the Hyatt assessments on the *Litigation Roster*, including information showing that Hyatt was a tax cheat and a tax fraud.**

This case was filed in January, 1998. Starting in April, 1998, the FTB included in its *Litigation Roster* that Hyatt was assessed taxes totaling over $13,000,000.[157] This published roster identifies primarily cases in which the FTB has made a final tax determination of a protest on appeal outside the FTB, not cases like Hyatt's that were still supposed to be confidential while in protest, with only a pending proposed notice of assessment.[158] The roster, which was later posted on the FTB's website, therefore conveyed that taxpayers listed have been adjudicated as owing taxes based on a *final* FTB assessment against them.[159] This simply was not true in Hyatt's case, from *April, 1998, to November, 2007*, when the FTB's Protest Determination Letter finally issued. Hyatt's tax case and any fraud determination were still pending, supposedly confidential, and purportedly undecided throughout that previous 11 years.

The FTB's chief in-house counsel for litigation, Ben Miller, admitted that Hyatt was treated

---

[155] RT: May 22, 78:19-90:24.

[156] RT: April 30, 155:12-25; May 12, 73:23-74:23, 80:19-81:12.

[157] 83 AA 20694 – 89 AA 22050.

[158] RT: May 12, 75:3-10; June 13, 83:3-18; July 14, 176:15-178:15.

[159] RT: May 12, 75:3-78:11; June 13, 83:3-18; July 14, 177:18-178:3.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

differently from other taxpayers.[160] The *Litigation Roster* left the obvious, but false, impression that a final FTB determination had been made, that Hyatt actually owed taxes, and that Hyatt was a tax cheat. Further, the FTB initially published that Hyatt had been assessed $13,000,000 (when in fact no final decision had been made), but later published that part of the assessment was a 75% penalty (i.e., a fraud penalty) thereby publicizing that he had committed fraud regarding his tax obligations – again even though no final determination had been made.[161]

The decade-long publications by the FTB that Hyatt was a tax cheat coincided with the 11 year delay and refusal to conclude the protests for both the 1991 and 1992 proposed assessments. Hyatt filed his protest for the 1991 tax-year proposed assessment in June, 1996. He filed his protest for the 1992 tax-year proposed assessment in October, 1997. The FTB closed the protest and issued a Protest Determination Letter on November 1, *2007*.[162]

The FTB represents that the protest is an independent review of the audit, a "do-over" as FTB counsel termed it.[163] Ultimately, after 11 plus years, the FTB's protest determination made no change to the audit conclusions — except that the FTB added "sourcing" as an additional basis to justify taxing Hyatt. At that time, 11 years later, "sourcing" is used to justify, not correct, the significant income error which taxed Hyatt on income received after Cox's April 3, 1992, date that she determined as Hyatt's move to Nevada. This "sourcing" is the same legal theory that the FTB rejected in 1993 at the outset of the audits and again in the 1995 Embry memo when trying to figure out a theory to tax Hyatt's income.

---

[160] RT: July 14, 176:15-178:15.

[161] 87 AA 21572, 21587, 21603, 21618, 21635-21636, 21650-21651, 21666-21667, 21683, 21700, 21716-21717, 21732, 21748; 88 AA 21763, 21778, 21792-21793, 21807, 21834, 21865, 21879, 21894, 21924, 21940, 21955, 21970-21971, 21987, 22000; 89 AA 22001, 22015, 22030, 22045.

[162] 54 AA 13330, 13404-13406; 88 RA 021826.

[163] RT: May 21, 201:18-202:6; April 21, 150:23-151:12.

### G. The jury heard substantial evidence of bad faith and outrageous conduct of the FTB's 11-plus-year delay in the protests.

#### 1. The first protest officer appointed by the FTB to conduct a purportedly independent review was the same in-house attorney who had counseled the lead auditor during the audits and orchestrated the imposition of the fraud penalty against Hyatt.

Jovanovich was appointed as protest officer in September of 1996. Jovanovich was hardly independent, and certainly not unbiased, relative to the Hyatt audits. She was the legal advisor to the FTB's Residency Program and communicated with and counseled at least two of the three auditors while they worked on the Hyatt audits. She received a memo near the beginning of the first audit from Shayer in late 1993 regarding the possibility of pursuing a sourcing theory to tax Hyatt.[164]

Jovanovich also worked closely with Cox during the audit, and in particular in writing up the justification to assess Hyatt with a fraud penalty for the 1991 tax year. In fact, she took Cox's draft and changed specific language to make it appear that the evidence the FTB was relying on (the three unsworn statements) was stronger and more competent than it was. For example, instead of referring to Hyatt's daughter, brother and ex-wife — thereby disclosing to Hyatt the witnesses against him — she instructed Cox to simply say "several parties," disguising the identity of the witnesses and possible credibility issues.[165] Further, Jovanovich had advised residency auditors in 1995 that fraud penalties were warranted in most residency cases.[166] Even FTB management did not embrace Jovanovich's concept that fraud penalties were warranted in most cases, yet Jovanovich was advising Cox on how to impose the fraud penalty against Hyatt.[167]

Then Jovanovich was assigned to wear a different hat in the same case, as a protest officer, to "do over" the Hyatt audit with a new set of eyes. In this role, she "suggested" to Hyatt's tax counsel that high profile people often settle at the outset of the protest, to avoid further "lengthy"

---

[164] RT: June 20, 175:15-177:13, 185:19-188:6; 63 AA 15651-15652.

[165] RT: May 29, 132:21-139:16; 61 AA 15241 – 62 AA 15252; 92 RA 022971-022981. Jovanovich made additional revisions to disguise the FTB's purported evidence. *Id.*

[166] 84 RA 020970-020971.

[167] *Id.*

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

intrusions into their affairs. Cowan was not told that Jovanovich had been intimately involved in the audit and had orchestrated the imposition of the fraud penalty. He thought she was an independent protest officer, looking at the case with fresh eyes, as the FTB represented.[168]

Jovanovich also testified that she did virtually no work relative to the protest for the two years (1996 - 1998) that she was assigned to it. She was apologetic for this mere *two year* delay, but blamed it on the rush of other matters.[169] Jovanovich also took the notes relating to the Hyatt case when she retired from the FTB. She felt they were hers to take and had no remorse in having them and then destroying them.[170]

**2. The second "new set of eyes" (FTB protest officer) had served as in-house litigation counsel for the FTB *in this case.***

Bob Dunn, another in-house FTB attorney, was assigned to replace Ms. Jovanovich as the protest officer in October 1998, approximately ten months after this case was filed in Nevada. He was serving as in-house FTB litigation counsel in this case, from the time it was filed. He was replaced four months later as protest officer, not because of the inherent conflict in conducting an independent review of the audits while also litigating against Hyatt's claim of a bad faith audit, but rather because his workload was too heavy.[171] Dunn admitted that he has never accepted the fact that the Nevada courts have allowed this tort case to proceed independent of the tax proceeding.[172] Dunn was the FTB's representative during the four month trial, and his attitude exemplifies the FTB's position that it should not be held accountable for its actions in Nevada.

**3. The third FTB protest officer (1999-2000) professed neutrality and commenced working on the protest in earnest, but she was suddenly removed and replaced, over her objection.**

Charlene Woodward was the third protest officer, assigned the case in early 1999. She promptly went to work on the audit. At the end of 1999, she submitted the first substantive request

---

168 RT: April 30, 149:11-24.

169 RT: May 22, 57:20-59:6, 80:19-84:14.

170 RT: May 21, 206:11-211:21; May 22, 59:16-61:14.

171 RT: July 15, 3:13-16, 12:19-13:8.

172 RT: July 15, 193:9-14.

KARMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

for additional information to Hyatt, an extensive 40-page Information/Document Request (known as "IDRs").[173] Hyatt's tax attorney viewed this as the beginning of the more intrusive investigation that Jovanovich had threatened several years before if Hyatt did not settle.[174]

Nonetheless, Cowan and Woodward developed good rapport. Woodward, who had retired from the FTB by the time she testified, said that she desired to work with Cowan, whom she felt was cooperative, to get the case resolved. She anticipated having a protest hearing and even seeking to mediate the parties' differences. She testified that she was open to *possibly even dismissing the matter* if that was warranted. Woodward further testified that her experience as a protest officer was that she dismissed as many protests in favor of the taxpayer as she affirmed in favor of the FTB's audit position.[175]

Woodward was "shocked" at what happened next. In May, 2000, with Hyatt's responses to her IDR due at the end of June, Woodward was removed from the Hyatt protest. She strongly disagreed with her supervisor's decision to replace her. The person who replaced her, Cody Cinnamon, was considered a crony of or otherwise "close" to that supervisor, George McLaughlin. Woodward was instructed *not to talk to Cinnamon, or transfer any records to her.*[176] Woodward was off the case, and there was to be no further discussion.

**4. The fourth FTB protest officer (2000 - 2007) was told to put the protests on "hold" due to this tort case even though she was ready to issue a final determination as early as late 2001.**

Cody Cinnamon was appointed as the fourth protest officer in May of 2000. Thereafter in June of 2000, Hyatt responded to the FTB's IDR, producing a substantial volume of material and answering dozens of interrogatories. In September and October of 2000, separate formal hearings were conducted for the protests by Cinnamon. Following the hearings, additional IDRs were submitted by the FTB and responded to by Hyatt. In June of 2001, Hyatt's new tax attorney Eric Coffill wrote to Cinnamon confirming that Hyatt has responded to all requests. Cinnamon testified

---

[173] 54 AA 13412-13442.

[174] RT: May 1, 40:22-42:7.

[175] RT: June 16, 72:9-13, 75:18-77:6.

[176] RT: June 16, 56:14-57:3, 58:7-60:4, 61:14-25.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

that she was ready to issue a decision in the protests by the end of 2001.[177]

When Coffill inquired in early 2002 as to the status of a decision on the protests, as he had not heard from the FTB for seven months, he was informed that the protests were on "hold," even though Cinnamon had "written up" the protests and could complete a final Determination Letter for the protests with a few weeks notice.[178] E-mails and an internal FTB event log for the protest confirm that the FTB put the protest on "hold." Cinnamon recorded on February 20, 2002, "I told him [Coffill] I was instructed not to work on the case." Ben Miller, the FTB's highest ranking litigation counsel, wrote on April 5, 2002, "I think we should put things on hold with administrative matters, in particular the recent draft letter." Almost a year later, Cinnamon wrote on February 20, 2003, "I am to do nothing on the case."[179]

**5. The District Court allowed Hyatt to pursue, as part of his bad faith assertions, that the FTB's delay and refusal to conclude the audit was part of its bad faith fraudulent conduct directed at Hyatt.**

Coffill repeatedly implored the FTB to act in more responsible manner and conclude the protests, pointing out as early as March of 2002 that the length of the protests had already exceeded the FTB's expressed goal of 33 months.[180] Coffill's requests were made in vane as the FTB refused to conclude the protest, thereby preventing Hyatt from pursuing a true administrative appeal to the California Board of Equalization.

By 2005, the District Court, through the Discovery Commissioner assigned to the case, ruled that Hyatt could pursue discovery concerning the reason for the FTB's failure and refusal to issue a decision in the protests, and specifically whether the delay concluding the protests supported Hyatt's claim that the FTB had acted in bad faith during the audits and whether the delay constituted continuing bad faith on the part of the FTB.[181]

---

[177] 54 AA 13443-55 AA 13543; 76 AA 18957, 18960; 85 RA 021221-021223; RT: June 17, 91:1-92:5.

[178] 85 RA 021226.

[179] 76 AA 18980, 18992; 85 RA 021224, 021240.

[180] 85 RA 021226, 021233; 77 AA 19003.

[181] RT: July 14, 174:3-175:21; July 15, 162:21-163:5; 14 RA 003406-003411.

**6. The FTB, with no evidentiary support, now falsely asserts that Hyatt is to blame for the initial delay in the protests.**

The FTB claims that the first 17 months of delay in the protest was because Hyatt's tax attorney Cowan asked that the FTB put a hold on the protest for the 1991 tax year until the 1992 audit was complete.[182] This is absolutely false and not supported by anything in the record. The FTB cites to a note by auditor Cox dated June 17, 1996 from the 1992 audit file that merely states that Cowan wanted the 1992 audit closed purportedly because he wanted the protests for both audits to be heard together.[183] The note does not even state that Cowan requested that the FTB put the protests on hold, and Cowan testified that he never asked that the protest be put on hold.[184]

Further contradicting the FTB's bald assertion, when Cox returned to the residency unit a year later in 1997 she immediately questioned her supervisors why the 1992 audit had not been expedited as she had promised Hyatt's representative (Cowan). In addition to accusing her supervisors of holding the audit in order to meet their "numbers," Cox told her supervisors that she found out the 1991 protest had sat unassigned in the Protest Division, and she did not want to take "the heat" for " having the case sit around so long." She explained that Hyatt's representative had wanted the NPA issued for 1992 "right away" so the 1991 and 1992 years could proceed together.[185]

Contrary to all evidence, the FTB represents that the first protest officer Jovanovich waited to work on the protests until the 1991 and 1992 protest were consolidated, citing "evidence" that says no such thing.[186] Again, Jovanovich specifically testified at trial that she simply could not get to the Hyatt protest due to other matters that were given priority.[187]

---

[182] FTB Opening Brief, at 20:17-20.

[183] 72 AA 17967.

[184] RT: April 30, 108:22-109:18, 154:12-155:11.

[185] 54 AA 13395. In that regard, within a few days of Cowan's request to close the 1992 audit, he submitted his 1991 protest letter commencing the protest. 54 AA 13330. Yet, the FTB did not act on Cowan's request to close the 1992 audit and issue an NPA until October of 1997. 54 AA 13398-403.

[186] FTB Opening Brief, at 21:11-12.

[187] RT: May 22, 92:4 -94:11.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

**7. At trial, the FTB tried to blame Hyatt and the District Court's protective order for the 11 plus year delay in issuing a final determination in the protest.**

At trial, the FTB's defense to its 11 year delay in the audit was to blame the District Court for issuing a protective order *in this case*. The FTB argued that the protective order made it more difficult to obtain and use discovery from this case in the protest proceedings. The FTB also blamed Hyatt, telling the jury the protective order was Hyatt's fault because he designated material under the protective order.[188] But what the FTB actually attempted to do, and the District Court would not allow, was to misrepresent the terms of the protective order to the jury by seeking to present and argue its tortured interpretation of the protective order to the jury.[189]

As set forth explicitly in the protective order, materials obtained in this case under the protective order could be used only in this case (as is typical in protective orders) unless approved by the opposing party *or* legally obtained in some other manner, i.e., through the means available to the FTB in the California tax protest proceedings. The protective order therefore specifically recognized that the FTB had administrative subpoena powers in California and could use those powers to obtain materials designated confidential under the protective order, if appropriate under California law.[190]

In short, the protective order ensured that California law would determine what materials and information the FTB could obtain and use in the tax protest proceedings, not the Nevada courts. For the FTB to argue that Hyatt created a "wall" with the protective order disparages the authority of the District Court, and the time and effort the District Court and the Discovery Commissioner put into crafting a neutral order that allowed this case to proceed without it being a discovery

---

[188] RT: July 11, 114:7-119:12; July 15, 194:11-21.

[189] This issue was subject to significant argument and briefing during trial. *See* RT: May 7, 98:9-103:25, 109:7-129:3; May 27, 27:6-30:10; June 11, 9:7-38:21, June 16, 2:11-34:15 (District Court's comments at 26:15-27:2), 35:13-37:6, 117:25-132:8 (District Court's comments at 118:21-22, 132:3-8); 78 RA 091417-091500; 79 RA 019501-019565.

[190] 78 RA 19446 (lines 10-11) and 19448 (lines 11-15). The FTB had previously challenged the protective order via a writ petition to this Court, and this Court refused to consider the challenge via a writ petition expressing that an appeal would be an adequate remedy. 5 AA 1192. Now, the FTB has failed to appeal that ruling of the District Court.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

vehicle by either party for the California tax proceedings, while also deferring completely to California law and its courts in regard to what materials the FTB could obtain for and use in the tax proceedings.[191]

In other words, nothing prevented the FTB from issuing an administrative subpoena in the tax proceedings whenever it wished, which the FTB eventually did as addressed below. The FTB did not need Hyatt's permission to pursue administrative subpoenas in California if it wanted information for the tax protest proceedings. The FTB wanted to argue a contrary interpretation of the protective order to the jury, and the District Court would not let the FTB do so.[192]

Further, the FTB was allowed to present testimony from *four (4)* FTB in-house attorneys to explain how the protective order purportedly caused the long delay in the protests.[193] But these FTB attorneys also admitted to the jury that protective orders limiting the use of protected material to the current case are commonplace in litigation matters, and that the FTB had independent administrative subpoena power regardless of the protective order.[194] Moreover, testimony from the FTB in-house attorneys confirmed that the FTB had the power to assert a "failure to exhaust" penalty against a taxpayer in a protest and thereby make an adverse finding if the taxpayer was not producing documents as requested.[195] The purported inability to get documents, in the protests, could therefore not have been the reason for the 11 year delay in the protests.

The FTB's story to the jury regarding the protective order simply did not add up. The protective order was issued at the end of 1999. The FTB made no request under the terms of the protective order for Hyatt to stipulate to certain material being turned over to the protest

---

[191] The Discovery Commissioner clearly expressed his intent in crafting the protective order: "It seems to me that any information and I think the order at least does not interfere with the fact that any information which is allowed in the California proceeding, in the tax proceeding in particular, you know, that is allowed by the Court in that proceeding, that's up to them, and any arguments addressing confidentiality can be addressed at that point in time to that Court. I'm not pertaining to -- I don't think the Court would, the judge is trying to tie the hands of the California proceeding in any manner." 79 RA 019543.

[192] RT: June 11, 9:7-38:21, June 16, 2:11-34:15 (District Court's comments at 26:15-27:2), 35:13-37:6, 117:25-132:8 (District Court's comments at 118:21-22, 132:3-8).

[193] Terry Collins, George McLaughlin, Ben Miller, and Bob Dunn.

[194] RT: July 11, 41:5-42:23; 47:19-48:13; July 15, 187:3-17.

[195] RT: July 11, 138:23-139:14, 153:19-154:19.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

proceedings until June of 2002, which was shortly after this case again became active, after this Court's April 2002 ruling that this case could proceed.[196] Further, this first request which turned into an administrative subpoena included many documents that were already in the protest officer's possession, and the FTB had made no effort to determine what documents the protest officer already had when it issued the subpoena.[197]

The FTB then made no further requests under the protective order until October of 2005, which was just months after the District Court ruled that Hyatt could pursue whether the FTB was delaying the protests in bad faith. The FTB later made a third request under the protective order in 2007. These requests were promptly answered by Hyatt with no delay caused to the FTB.[198] As indicated by the dates of the FTB's requests and admitted to by FTB in-house counsel, two of the three requests the FTB made under the protective order came *after* the District Court ruled that Hyatt could assert the FTB's delay in the protests as part of his bad faith assertion.[199]

Hyatt argued, and the jury obviously agreed, that the FTB had attempted to manufacture a defense to the delay in the protests by issuing multiple requests under the protective order *after* it knew it needed an explanation for the delay in the protests. The FTB had every means to obtain material needed for the protests, including its full power to subpoena (referred to as the power or examination), and its own internal memo acknowledged it could pursue administrative subpoenas, a

[196] The FTB complains that it had to pursue enforcement of the first administrative subpoena in California. But it fails to reference that the California Superior Court denied part of its subpoena. 17 RA 004136. The FTB also makes affirmative misstatements and seeks to have this Court draw erroneous conclusions regarding the unpublished opinion by the California Court of Appeal relating to the partial enforcement of an administrative subpoena against Hyatt. The FTB wrongly states that Hyatt claimed disclosure of the documents subject to the administrative subpoena would invade his privacy and that the FTB was pursuing him in bad faith. (FTB Opening Brief, at 24:26-25:4) The FTB seeks to mislead this Court into thinking the California court addressed the same or even similar issues presented in this Court. Rather, Hyatt argued there that the breadth of the subpoena and production of documents to the FTB would violate his rights under the California Constitution. Hyatt also argued that the FTB was pursuing the particular subpoena in bad faith. These distinctions are clear from the California Court of Appeal's decision, *State Franchise Tax Bd. v. Hyatt*, 2003 WL 231002666 (Cal. Ct. App. December 31, 2003).

[197] RT: July 15, 188:9-192:11.

[198] *See* testimony and correspondence regarding the *FTB's* requests: RT: July 15, 163:7-166:13, 187:3-188:6; 76 AA 18892-18893; 77 AA 19025-19027; 93 RA 023040-023046; 17 RA 004136.

[199] *Id.;* RT: July 15, 162:21-165:14.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

fact that FTB in-house attorneys acknowledged in testimony.[200] That the FTB was prevented from proceeding with the protests due to the District Court's protective order was therefore contradicted by the FTB's own documents and testimony and not credible to the jury.

**8. Offering "amnesty," the FTB offered to withdraw the penalties it asserted, if Hyatt settled by paying the taxes assessed, plus interest, and dropping this litigation.**

In December 2004, consistent with the training given to FTB auditors in which they were taught to think of penalties as poker chips to be traded for settlement, the FTB threatened a 50% interest penalty if Hyatt did not settle by paying the assessed taxes and dropping this case. To further incentivize Hyatt to settle, the FTB informed him that failure to accept the offer would result in an additional 50% penalty on the interest that was already outstanding.[201] The offer in December, 2004, specified that Hyatt could settle by paying almost $19 million. But if he did not settle, the proposed assessment being reviewed in the protest would increase to over $33 million.

**9. The FTB held the protests over Hyatt's head for 11 years, during which time the FTB's tax bill to Hyatt grew to over $51 million, with interest accruing at more than $8,000 each day.**

At the time of the trial in the District Court, the total amount of taxes, penalties, and interest the FTB asserted against Hyatt exceeded $51 million. Interest on this amount was, and still is, accruing at over $8,000 per day. That total includes over $27 million in interest (most of which accrued during the 11 year protest) and almost $10 million of which was the "amnesty" penalty (also tacked on during the protest).[202]

## V. LEGAL ARGUMENT.

### A. Standard of review.

**1. FTB failed to apply the appropriate standard of review.**

The FTB's opening brief fails to analyze the appropriate standard of review applicable to the issues it raises. The FTB's "Standard of Review" discussion is a single sentence arguing that "[a]lmost every issue in this appeal is a legal issue, for which this Court applies a *de novo* standard

---

[200] 76 AA 18881; RT: July 15, 187:3-15.

[201] 55 AA 13567-13570.

[202] RT: June 18, 73:11-75:6.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

**CERTIFICATE OF COMPLIANCE**

I hereby certify that I have read this Respondent's Answering Brief and Opening Cross-Appeal Brief, and to the best of my knowledge, information, and belief, it is not frivolous or interposed for any improper purpose. I further certify that this brief complies with all applicable Nevada Rules of Appellate Procedure, and in particular NRAP 28(e), which requires every assertion in the brief regarding matters in the record to be supported by a reference to the page of the transcript or appendix where the matter relied on is to be found. I understand that I may be subject to sanctions in the event that the accompanying brief is not in conformity with the requirements of the Nevada Rules of Appellate Procedure.

DATED: January 5, 2010.

MARK A. HUTCHISON, Nevada Bar No. 4639
MICHAEL K. WALL, Nevada Bar No. 2098
HUTCHISON & STEFFEN, LTD.
10080 Alta Drive, Suite 200
Las Vegas, NV 89145
Telephone: (702) 385-2500
Facsimile: (702) 385-2086

PETER C. BERNHARD, Nevada Bar No. 734
KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road, Suite 250
Las Vegas, NV 89113
Telephone: (702) 792-7000
Facsimile: (702) 796-7181

DONALD J. KULA, California Bar No. 144342
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone: (310) 788-9900
Facsimile: (310) 788-3399

*Attorneys for Respondent/Cross-Appellant Gilbert P. Hyatt*

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

# EXHIBIT  26

COPY

FILED
SEP 4 2 36 PM '08
CLERK OF THE COURT

DISTRICT COURT
CLARK COUNTY, NEVADA

COPY

GILBERT P. HYATT,

Plaintiff,

vs.

CALIFORNIA STATE FRANCHISE TAX BOARD,

Defendant

CASE NO. A-382999

DEPT. NO. X

**Transcript of Proceedings**

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 6**

MONDAY, APRIL 23, 2008

APPEARANCES:

FOR THE PLAINTIFF: PETER C. BERNHARD, ESQ.
MARK HUTCHISON, ESQ.
DONALD J. KULA, ESQ.

FOR THE DEFENDANT: PAT LUNDVALL, ESQ.
CARLA B. HIGGINBOTHAM, ESQ.
JAMES BRADSHAW, ESQ.

COURT RECORDER:
VICTORIA BOYD
District Court

TRANSCRIPTION BY:
VERBATIM DIGITAL REPORTING, LLC
Littleton, CO 80120
(303) 798-0890

Proceedings recorded by audio-visual recording, transcript produced by transcription service.

seemed to buy into in your discussions with her?

A. Well, I don't know on that, you know. I mean it was just, you know, an acknowledgment of what was. There were a lot of, you know, Jewish taxpayers. What was behind her, you know -- I mean I thought so, too.

Q. Did you ever make known to people within the FTB the fact that Sheila Cox had racist tendencies and attitudes and actions?

A. Not to this extent discussed here in deposition, but yes.

Q. You did bring up the topic?

A. Yes.

Q. Did you ask the FTB to investigate?

A. Yes.

Q. And did they investigate, so far as you know?

A. As far as I know, they conducted an inadequate investigation.

Q. Who did you report this topic of racism of Sheila Cox to?

A. I spoke to Diane Lawrence.

Q. And is her job at the FTB to do investigations relating to employees?

A. I filed a formal complaint of harassment, and it was my understanding that her job was to investigate formal complaints of harassment.

**CERTIFICATION**

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE AUDIO-VISUAL RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

**AFFIRMATION**

I AFFIRM THAT THIS TRANSCRIPT DOES NOT CONTAIN THE SOCIAL SECURITY OR TAX IDENTIFICATION NUMBER OF ANY PERSON OR ENTITY.

**Verbatim Digital Reporting, LLC**
**Littleton, CO 80120**
**(303) 798-0890**

Michele Phelps — 6-30-08

Michele Phelps, Transcriber — DATE

# EXHIBIT  27

COPY

FILED

SEP 23 07 PM 08

CLERK OF THE COURT

COPY

DISTRICT COURT
CLARK COUNTY, NEVADA

GILBERT P. HYATT,

Plaintiff,

vs.

CALIFORNIA STATE FRANCHISE TAX BOARD,

Defendant

CASE NO. A-382999

DEPT. NO. X

**Transcript of Proceedings**

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 7**

THURSDAY, APRIL 24, 2008

APPEARANCES:

FOR THE PLAINTIFF: PETER C. BERNHARD, ESQ.
MARK HUTCHINSON, ESQ.
DONALD J. KULA, ESQ.

FOR THE DEFENDANT: PAT LUNDVALL, ESQ.
CARLA B. HIGGINBOTHAM, ESQ.
JAMES BRADSHAW, ESQ.

COURT RECORDER: VICTORIA BOYD, District Court

TRANSCRIPTION BY: VERBATIM DIGITAL REPORTING, LLC
Littleton, CO 80120
(303) 798-0890

Proceedings recorded by audio-visual recording, transcript produced by transcription service.

A Yes.

Q Do you recall at any time observing that Sheila Cox was talking to her husband about the Gil Hyatt case?

A Yes.

Q And what was she saying to him about the Gil Hyatt case in your presence?

A She would just talk openly on the occasions that I went about, you know, getting this taxpayer.

Q And what did she say about getting the taxpayer?

A Just like, I'm going to keep working on the case until I get him, you know. This is what I learned today, blah, blah, blah.

Q Do you recall -- you said that she openly discussed the case with him. What do you mean by the word "openly"?

A It was very clear that her husband, Steven, knew about this audit. She would talk -- you know, she would say "Gil Hyatt."

Q When she used the word "Gil Hyatt" did her husband have any questions for her about who is Gil Hyatt?

A I never heard that.

Q Did her husband -- did you hear her husband say anything about the audit, indicating knowledge?

A I didn't hear him acknowledge.

Q Do you recall any of the specific things that Sheila Cox was reporting about learning about the audit when she was

was. That was never my testimony, and that was not my characterization of what happened there. I deliberately coded it as spiritual and philosophical differences, and told those who were interested in what that was.

The brand of racism that I experienced from Sheila Cox, and I'm real clear on it, is this kind that I have seen my entire 40 years on this planet. And say I knew Sheila for five years, so that is 1,500 days. I heard her use racial slurs maybe 20 times in all those days, which is 1 percent of the time. So it's like just 1 percent of the time of the whole time I was friends with her. That's not very much at all.

Well, I can't quantify racism. When you get the feeling, when you are raised to be sensitive to it, because you are a minority and you have been the victim of it your whole life, you are aware of it when you see it. And it wasn't just these racial slurs that Sheila made in a joking sense like to say the way she talks out of the side of her mouth, "That Jew bastard," and I knew it was intended as a joke, because she was upset with him. I knew it was just her way of expressing herself, that she cross the line.

BY MR. WILSON:

Q Tell me what the fiction was with respect to the Hyatt case, if you can.

A That he was perpetrating a fraud. That was the

fiction, and all that that encompassed, that all the substantiation that Sheila was getting for her case was not fully investigated. It was not factual. It was one-sided. And it was a gross injustice, you know. So starting from the jump with the fraud penalty.

Q So the fraud penalty, you -- with respect to what is fiction in the Hyatt audit, the basis for the fraud penalty you feel was fiction?

A It was based on a fiction created by Sheila.

Q Okay.

A Similar to the fiction she created about me.

Q Okay. And can you tell us what the fiction was that she created with respect to the fraud penalty.

A That he knew he was going to get the millions of dollars, that was fictional, you know. If you talk to the taxpayer, which was my suggestion, and eventually I did talk to the taxpayer, he did not know he was going to get that amount of money.

Q Mr. Hyatt told you that?

A He didn't tell me that.

Q How did you know that?

A By looking at the case.

Q Some of the documentation in the case?

A Yes. I knew that, and it was the key element in Sheila's whole, you know, what she was predicating the fraud

penalty on was, first of all, he knew. And it's, well, right there the foundation is false.

Q Right.

A He didn't know.

Q Right, right. So this wasn't something you learned from Mr. Hyatt on the phone conversation. This is just something you knew from talking to Sheila and, I guess, seeing documents?

A I suspected the whole time, that Sheila would talk incessantly about the Gil Hyatt case to me, that there were serious issues with what she was doing. I knew that.

Q So all of it, like, you know, it was coming together. Even to this day things are still coming together with this complicated, you know, long, arduous trail of what happened.

Q I'm trying to understand because I don't have the tax-auditing background. So it's helping me understand what you mean. When you say that you've identified the fraud penalty as being -- the basis of it as being fictional. I'm trying to find out the basis for your judgment. That's all.

A And then to further that that Sheila did not really have any training in fraud. She didn't really even know what the badges of fraud were. She had as little training as there could be. What happened with Gil Hyatt was not indicative of tax fraud, you know, it was something really

special. You are talking about somebody who paid the IRS, so it's in the like he's trying to skip out on the feds and the state. He tithed to them at whatever percent. But, oh, this little arena for 10 percent, he's going to defraud the government? I mean, it wasn't, you know, your common theme, if you will.

Q Yeah. I just -- obviously you were -- is it fair to say you were providing kind of consultant services to the Hyatt team as a former auditor, somebody who had knowledge of the audit process? Was that your function?

A Yes, I think so.

Q Okay. Did you, in the course of that, did you do any analysis of the audit, that is, the determination of residency, from what was in the file that you reviewed? Did you make any review of that to opine or comment on whether it was adequate, whether it was inadequate, whether there were things that should have been done that weren't, or things that were done that shouldn't have been done?

A Well, no, it was a given that your client mishandled the whole audit. I mean, that was the fire that was there before I got introduced to these people. So mostly what we talked about were just, you know, I know this is going to sound really abstract, but how to get to the truth of the matter, you know.

Q Okay.

A And that's what it was.

Q And the matter being -- right.

A The fictionalization of who Gil Hyatt really was, as a taxpayer, or in this case, a nontaxpayer in the State of California, that -- you know, that he had the ghouls and the guy with the one arm and, you know, that he knew he was going to get the money and that, you know, he was this horrible mean asshole of a man and, you know. Those were the frauds. The same kind of frauds that were perpetrated on me that I can -- I can so relate. That's fraud.

Q The subject generally as to whether it was any kind of racial or religious bias on the part of Sheila Cox.

A On the part of Sheila Cox?

Q Yes.

A Yes, I had conversations with Gil Hyatt about that.

Q Okay. Would you relate the conversations, please?

A We were discussing my formal complaint1 of harassment, and I believe he asked me what that philosophical and spiritual difference was, and I said I thought she was a racist and these are my examples of her racist behavior. And it's subtle and, you know, if -- I felt -- my feeling was that Gil Hyatt understood it because, you know, it's pretty much what it means to be a Jew in America, and it's a common story, and I know a lot of people with the same story of what they have experienced.

And I knew that he was a Jew; although I wasn't sure that when Sheila first started talking about the case, I didn't know, you know, if he was Jewish or not. But then she got a letter from his synagogue and she showed to me, and she said, you know, "And he's a Jew." And, you know, that was nothing new because many of the wealthy taxpayers in the State of California were jews, you know. There's many taxpayers who are jews. It's the way it all works out, right? And we were both aware of it.

Q By "both" you mean you and Mr. Hyatt?

A Me and Sheila is what I meant, that being auditors, having large-income taxpayers as our audits, we knew that many of the taxpayers were Jewish people. And Sheila, like, joked about it in this way that --

MR. MOSS: He was asking about your conversations with Mr. Hyatt. Unless you told Mr. Hyatt about Sheila joking about it --

THE WITNESS: I did.

MR. MOSS: Okay.

THE WITNESS: I told him what I'm saying right now. That's how it came up. And that, you know, she made the comments like two or three times about Gil being Jewish or a Jew bastard. And, you know, I mean, it didn't matter if I knew her for 10,000 years. That's what I heard and that's what I remembered.

**CERTIFICATION**

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE AUDIO-VISUAL RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

**AFFIRMATION**

I AFFIRM THAT THIS TRANSCRIPT DOES NOT CONTAIN THE SOCIAL SECURITY OR TAX IDENTIFICATION NUMBER OF ANY PERSON OR ENTITY.

**Verbatim Digital Reporting, LLC**
**Littleton, CO 80120**
**(303) 798-0890**

Julie Lord — 6-30-08

JULIE LORD, TRANSCRIBER — DATE

# EXHIBIT  28

FILED: WESTCHESTER COUNTY CLERK 07/29/2011 INDEX NO. 52961/2011

NYSCEF DOC. NO. 17 RECEIVED NYSCEF: 07/29/2011

To commence the statutory time period for appeals as of right (CPLR 5513(a)), you are advised to serve a copy of this order, with notice of entry upon all parties

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER - COMPLIANCE PART

---------------------------------------------------------------------------x

In the Matter of:

Out-of-state subpoenas issued by the New York counsel for State of California Franchise Tax Board for the depositions and production of documents from the Custodian of Records for U.S. Philips Corporation, from Jack Haken, and from Algy Tamoshunas, for use in an administrative tax appeal pending before the California State Board of Equalization entitled: In the Matter of the Appeal of Gilbert P. Hyatt, California Board of Equalization, Case Nos. 435770 and 446509.

**DECISION & ORDER**

Index No. 52961/11
Motion Date: July 27, 2011

---------------------------------------------------------------------------x

LEFKOWITZ, J.

The following papers were read on this motion by Gilbert P. Hyatt for (1) an order quashing the subpoenas served by the State of California Franchise Tax Board, by New York counsel pursuant to CPLR 3119 (d), on nonparties, the Custodian of Records for U.S. Philips Corporation, Jack Haken, and Algy Tamoshunas, or (2) alternatively, for a protective order pursuant to CPLR 3103 that limits the scope of the subpoenas to cover only material and necessary information, condition the production of any responsive documents to allow Gilbert Hyatt to review the same to prevent disclosure of common interest privileged material, and for a confidentiality order.

Order to Show Cause-Affidavit of Gilbert P. Hyatt-Exhibits A-E
Memorandum of Law in Support of Motion
Affirmations of Good Faith and Emergency of William L. Charron, Esq.-Exhibit
Affirmation of Judith A. Lockhart, Esq. in Opposition-Exhibits A-F
Affidavit in Opposition of Robert W. Dunn-Exhibits A-D
Memorandum of Law in Opposition-Exhibits A-D
Court Exhibits 1-3 (Submitted to the court during the proceedings held on July 27, 2011)

Upon the foregoing papers and the proceedings held on July 27, 2011, it is ORDERED that the motion is decided as follows:

Factual Background

The California Franchise Tax Board (hereinafter "the FTB"), a California state agency with the responsibility of collecting income tax for the State of California, commenced audits of Gilbert P. Hyatt (hereinafter "Hyatt") in California regarding his 1991 and 1992 Nonresident or Part-Year

Resident Income Tax Returns in 1993 and 1996, respectively. In April 1996 and August 1997, the FTB issued assessments of taxes, penalties and interest against Hyatt for the underpayment of taxes for the tax years 1991 and 1992. The FTB based the tax assessments upon its finding that Hyatt did not become a resident of Nevada until April 3, 1992. Hyatt filed protests to the assessments for both years claiming that he had moved to Nevada from California on September 26, 1991, and had continued to reside in Nevada since that time. Accordingly, Hyatt asserted that he did not owe taxes to California for income received after September 26, 1991. The FTB's Protest Division reinvestigated the tax assessments from 1996 to 2007, during which time it conducted discovery. On November 1, 2007, the FTB issued its final determinations finding that no changes would be made to the assessments of taxes, penalties and interest for the underpayment of taxes for the tax years 1991 and 1992. [1]

In 2008, Hyatt filed appeals of the FTB's final determinations to the California State Board of Equalization (hereinafter "SBE"). On August 23, 2010, Hyatt filed his Appellant's Reply with numerous affidavits annexed as exhibits in support of his claim that he moved to Nevada on September 26, 1991. By letter dated September 20, 2010, the SBE granted the FTB an extension of time to file supplemental briefs until June 30, 2011. On June 30, 2011, the FTB filed a supplemental brief wherein it stated that it intended to file an additional brief in the matter. Counsel for Hyatt objected by letter to the SBE to any additional briefing by the FTB on the ground that the additional brief was unauthorized under the SBE's Rules for Tax Appeals, and requested an order prohibiting the FTB from filing the additional brief (Exhibit E to Hyatt Affidavit). By letter, the SBE responded that the briefing in the appeal was governed by the provisions of the SBE's Rules for Tax Appeals, which the SBE trusted the parties would abide by, and, if issues later arose due to untimely submissions, the SBE would address them at that time (Court exhibit 1). Hyatt's appeals are now pending before the SBE.

On March 11, 2011, the Chief Counsel for the California State Controller issued subpoenas duces tecum on nonparties, the Custodian of Records of U.S. Philips Corporation (hereinafter "U.S. Philips"), Jack Haken, and Algy Tamoshunas. Hyatt, an inventor, entered into an exclusive licensing agreement with U.S. Philips, effective July 1991 (hereinafter "1991 Agreement"), which granted U.S. Philips a license under a group of Hyatt's patents for its own use, as well as the exclusive right to license additional patents to other companies. Haken and Algy Tamoshunas were in-house counsel for U.S. Philips and worked with Hyatt on the licensing of his patents by U.S. Philips to other companies. In support of the subpoena duces tecum, William Dunn, in-house counsel for the FTB, stated in his declaration that the primary legal issues in the administrative tax appeals were Hyatt's assertion that he became a nonresident of California in 1991, Hyatt's objection to the proposed imposition of a fraud penalty, and Hyatt's contention that he did not operate a business from California through December 31, 1992, which generated "California source income."

---

[1] Hyatt commenced a tort action in Nevada against the FTB alleging the FTB had engaged in questionable conduct in pursuing the taxes. The action was litigated and resulted in a $490 million judgment, including punitive damages, in favor of Hyatt. The FTB appealed the judgment and the appeal is pending.

The subpoenas duces tecum sought, inter alia: all documents relating to or discussing the agreement between Hyatt and U.S. Philips; documents regarding any license or sub-license under any Hyatt patent; all documents reflecting money paid for a license or sub-license under any Hyatt patent; all documents discussing or reflecting any plan or agreement by Hyatt and U.S. Philips to seek revenues from the licensing or sub-licensing of any Hyatt patent; all communications sent or received as to certain patents; billing of counsel for work performed on behalf of, or relating to, Hyatt; all documents regarding negotiations; drafting and finalizing agreements between Hyatt and various corporations; and all communications between Hyatt and personnel for U.S. Philips.

In pursuit of additional discovery in the administrative tax appeals, the FTB, by the Attorney General of California, petitioned the California Superior Court for the issuance of out-of-state depositions of various nonparties, including the Custodian of Records of U.S. Philips, Jack Haken, and Algy Tamoshunas, and to compel the nonparties to comply with the previously issued subpoenas duces tecum (Exhibit B to Hyatt Affidavit). On April 14, 2011, the Clerk of the Superior Court of California, County of Sacramento, issued commissions to take the depositions on the nonparties in New York and provided that the nonparties were to produce documents set forth in "Attachment 4" at the time of the depositions (Exhibit A to Hyatt Affidavit).[2]

Motion to Quash Subpoenas or for a Protective Order

Before this court is a motion by Hyatt seeking an order quashing the subpoenas served by the FTB on U.S. Philips, Jack Haken, and Algy Tamoshunas in New York. The commissions for the subpoenas were issued by a clerk of the California Superior Court pursuant to the California Code (Cal Code Civ Proc § 2026.010[3]) and the New York subpoenas were issued by counsel pursuant to CPLR 3119 (e). Accordingly, no judicial review of the subpoenas has been conducted.

Initially, this court notes that the subpoenas were served pursuant to the newly enacted CPLR 3119, which became effective January 1, 2011. CPLR 3119 provides that out-of-state

[2] Exhibit A consists only of the subpoenas. The attachment referred to in the commission regarding the documents to be produced at the time of the deposition is not part of Exhibit A.

[3] California Code Civil Procedure § 2026.010 (f) provides as follows: "On request, the clerk of the court shall issue a commission authorizing the deposition in another state or place. The commission shall request that process issue in the place where the examination is to be held, requiring attendance and enforcing the obligations of the deponents to produce documents and answer questions. The commission shall be issued by the clerk to any party in any action pending in its venue without a noticed motion or court order. The commission may contain terms that are required by the foreign jurisdiction to initiate the process. If a court order is required by the foreign jurisdiction, an order for a commission may be obtained by ex parte application."

judicial subpoenas[4] can be submitted to either the county clerk where the discovery is to take place (CPLR 3119 [b][1]), or an attorney licensed to practice in New York (CPLR 3119 [b][4]). Judicial subpoenas include those issued by the clerk of the court (CPLR 2308 [a]). The statute does not require judicial review of the subpoena before it is served in New York. The court notes that although the legislative intent behind CPLR 3119 was to simplify the steps required for discovery in connection with an out-of-state judicial action (*see* Sponsor's Mem in Support, Bill Jacket, L 2009, ch 29, Bill No. S4256; Aloe, Outside Counsel, *New CPLR § 3119 Promises to Ease Path for Out-of-State Depositions*, NYLJ Online, Feb. 22, 2011), the statute does not explicitly state that an out-of-state action must be pending to serve a subpoena pursuant to the statute. Notably, CPLR 3102 (3), which prior to the enactment of CPLR 3119 was the only mechanism for obtaining discovery in New York pursuant to an out-of-state subpoena, specifically provides that a judicial action must be pending in another jurisdiction. The legislative history further indicates that the statute contemplated that the scope of the examination under the subpoena would be determined by the state in which the action for which the discovery sought is pending, but that discovery pursuant to the subpoena, as well as any motions to quash, enforce, or modify a subpoena would comply with the rules of New York State (Sponsor's Mem in Support, Bill Jacket, L 2009, ch 29, Bill No. S4256). Where, however, the laws of the other state permit the issuance of a commission for a subpoena by the clerk of the court, without judicial review, such as in California, the new statute has unwittingly shifted the burden of determining the propriety and scope of the subpoena to the court in New York.

The FTB asserts that this court should enforce the California Superior Court's decision to issue the commission authorizing the depositions and demand for document production pursuant to the Full Faith and Credit Clause of the United States Constitution. The FTB, however, concedes that the Full Faith and Credit Clause applies only to judgments (*Fiore v Oakwood Plaza Shopping Ctr.*, 78 NY2d 572, 578 [1991]; *In re Bennett*, 84 AD3d 1365 [2d Dept 2011]). The Full Faith and Credit Clause is, therefore, inapplicable to the enforcement of the California Superior Court's commission.

Alternatively, the FTB contends that the California Superior Court's commission should be enforced without modification under the principles of comity. The FTB asserts that the principles of comity require this court to give deference to the decision by the California Superior Court regarding discovery. In the event that the California Superior Court had reviewed the application for the commissions and made determinations with respect to the scope of disclosure, this court would be more inclined to agree with the FTB's contention. This, however, was not the case. Instead, the commission was issued by the clerk of the California court without judicial review. Moreover, CPLR 3119 specifically authorizes applications for protective orders and to quash or modify an out-of-state subpoena served in New York under the statute. Further, as noted earlier,

---

[4] CPLR 3119 (a)(4) defines "subpoena" as "a document, however denominated, issued under authority of a court of record requiring a person to: (i) attend and give testiimony at a deposition; (ii) produce and permit inspection and copying of ... documents ....; or (iii) permit inspection of premises ... "

the legislative history of CPLR 3119 contemplates that the discovery authorized by a subpoena served pursuant to the statute must comply with the rules of New York.

In view of the foregoing, this court is now required to determine the propriety of the subpoenas which are the subject of this motion. The parties raise the following issues on this motion: (1) standing of Hyatt to challenge the subpoenas; (2) the authority of the FTB to serve subpoenas in the context of the administrative tax appeals; (3) whether the subpoenas are overbroad since they are not limited in time or scope; and (4) whether the documents which are demanded in the subpoenas are privileged.

Standing

In the context of a motion to quash a subpoena, where the movant is not the person being subpoenaed, the movant must demonstrate a proprietary interest in the subject matter or a privileged communication (*38-14 Realty Corp. v New York City Dept. of Consumer Affairs*, 103 AD2d 804, 804 [2d Dept 1984], *lv dismissed* 64 NY2d 648 [1984]; *Knight Equity Markets, L.P. v McCarthy*, 2007 WL 4221623 [Sup Ct, NY County, 2007]).

Initially, the FTB contends that Hyatt has no standing to challenge the subpoenas since he cannot establish a proprietary interest in the subject matter. The FTB contends that the documents which are the subject of the subpoenas duces tecum belong to U.S. Philips, not Hyatt. Moreover, the FTB contends that Hyatt's status as a signatory of licenses and other agreements with U.S. Philips does not give him a proprietary interest in the documents. The FTB relies, inter alia, upon *38-14 Realty Corp. v New York City Dept. of Consumer Affairs* (103 AD2d 804), wherein the court held that a party to contracts did not have standing to challenge the subpoena requiring production of those contracts. The FTB also relies upon *Knight Equity Markets, L.P. v McCarthy* (2007 WL 4221623). In *Knight Equity Markets*, the court held that movant did not have standing to challenge a subpoena served on movant's stock broker, which sought a list of customers who bought certain stock, since movant failed to demonstrate a proprietary interest in the documents. Specifically, the court held that movant's conclusory allegations that the documents were confidential and related to proprietary business activities were insufficient to demonstrate a proprietary interest in the documents.

Hyatt contends that he has statutory standing to challenge the subpoenas insofar as CPLR 2303 (a) and 3120 (3) provide that a subpoena duces tecum must served on all parties so that it is received before the production of books, papers or other things. Hyatt relies upon *Morano v Slattery Skanska, Inc.* (18 Misc3d 464 [Sup Ct, Queens County, 2007]), wherein the court held that the statutory requirement of service upon all parties prior to production granted statutory standing to the parties to the action to challenge the subpoena duces tecum. Hyatt further contends that he has a proprietary interest in the subpoenaed documents. In support of this contention Hyatt relies on *Dellwood Foods v Abrams* (109 Misc2d 263 [Sup Ct, Bronx County, 1981], *affd* 84 AD2d 692 [1981], *lv dismissed* 55 NY2d 1036 [1982]). In *Dellwood Foods*, the court determined that the corporate movant, which had been indicted for restraint of trade and competition, had standing on a number of grounds to quash post-indictment subpoenas issued to movant's sales personnel. The

*Dellwood Foods* court determined, inter alia, that movant had standing as a "party affected" noting that CPLR 2304 permits a party to move to quash a subpoean served on a nonparty. The *Dellwood Foods* court also held that movant had a "[p]rotectable interest" in preventing government agents from exceeding their statutory authority since its sales personnel would have no interest in protecting movant from abuse of process.

Contrary to the contention of the FTB, Hyatt has demonstrated that he has standing to seek an order quashing the subject subpoenas. As a party to the administrative tax appeals for which the discovery is sought by the FTB, Hyatt has statutory standing under CPLR 2304. Moreover, Hyatt has demonstrated that he has a proprietary interest in certain confidential information contained in documents in U.S. Philips' possession regarding the prosecution and defense of his patents. In his affidavit, Hyatt avers that when he assisted U.S. Philips' in-house counsel prosecute his patent applications, which were subject to the 1991 Agreement, and defend the patent interference proceeding against a patent licensed to U.S. Philips, he provided confidential technical and patent information.

Authority of the FTB to Serve the Subpoenas

Hyatt contends the FTB had no authority to issue the subject subpoenas. Hyatt specifically contends that the subpoenas seeking the depositions should be quashed since the FTB did not seek leave in the underlying administrative tax action to obtain further discovery after the expiration of the June 30, 2011 deadline to make submissions to the Equalization Board. Hyatt asserts that once he commenced his administrative tax appeal, the FTB needed permission of the SBE before whom the appeals are pending since only the SBE has the authority to issue subpoenas in an appeal under its rules. Hyatt further asserts that California Revenue & Taxation Code § 19504 (d) only grants the FTB the power to subpoena during audits or protest proceedings as part of its investigation, and not on appeal. Section 21024 of the California Revenue & Taxation Code, Hyatt further contends, limits the FTB's further investigations. Finally, Hyatt contends that the issuance of a "Final Notice" by the FTB ended the investigative period and its authority to issue subpoenas.

The FTB, however, contends that it is an independent state agency with independent statutory subpoena power. Contrary to Hyatt's interpretation of § 19504 (d) of the California Revenue & Taxation Code, the FTB contends that the statute grants it broad subpoena power throughout the administrative process outlined in § 19000 et seq. of the California Revenue & Taxation Code, which sets forth the procedures relating to California personal income taxes, including appeals before the SBE. The subpoena power, the FTB asserts, includes the power to demand depositions, as well as the production of documents, in administering its statutory duties. Moreover, the FTB contends that the subpoena power of the FTB and the SBE are not mutually exclusive. Accordingly, the FTB asserts that Hyatt improperly concluded that the FTB no longer has subpoena powers when an appeal is pending before the SBE since the rules of the SBE grant it the power to issue subpoenas. Rather, the FTB contends, the subpoena powers of the FTB and the SBE exist in tandem. The FTB notes that Hyatt has failed to submit any statutory authority or case law for the argument that the SBE's subpoena authority supplants the FTB's statutory subpoena power. California Revenue & Taxation Code § 21024, the FTB asserts, has nothing to do with its

subpoena power. Rather, the FTB asserts that § 21024 only shifts the burden of proof on appeal to the FTB in certain limited circumstances, including where the FTB has relied upon information from third-parties and where the taxpayer has fully cooperated with the FTB during its audit.

A review of California Revenue & Tax Code § 19504 demonstrates that it grants the FTB broad subpoena power "for purpose of administering its duties," which includes determining and collecting income tax. Notably, this section of the code grants the FTB the power to demand "an entity of any kind" to make available for examination documents relevant to collecting income tax (Cal Rev & Tax Code § 19504 [a]), and to depose "any other person having knowledge" (Cal Rev & Tax Code § 19504 [b]). Additionally, this section of the code provides that the FTB "may issue subpoenas or subpoenas duces tecum, which subpoenas must be signed by any member of the [FTB] ..., and may be served on any person for any purpose" (Cal Rev & Tax Code § 19504 [c][1]). Notably, there is no explicit limitation of the FTB's subpoena power in this section of the code, and Hyatt does not contend that the rules of the SBE explicitly prohibit the FTB from issuing subpoenas during the pendency of the administrative tax appeal. Further, although it is uncontradicted that the SBE rules provide for a limited time for submissions of briefings, Hyatt does not challenge the FTB's contention that the SBE rules provide for the admission of evidence up to 14 days before the hearing.

Additionally, Hyatt improperly relies upon § 21024 of the code since it cannot be construed as limiting the FTB's subpoena power under the circumstances present in this matter. Section 21024 of the code provides that the FTB shall have the burden of producing reasonable and probative information on an administrative tax appeal concerning the amount of tax assessed under limited circumstances. Nothing in the section limits the subpoena power of the FTB during the pendency of the appeal. Hyatt's "Final Notice" argument is also without merit (Cal Rev & Tax Code § 19045 [a]).

Accordingly, to the extent that the defense of Hyatt's administrative tax appeal is in the furtherance of FTB's duties to collect income tax, this court finds that the FTB had the authority to issue the subject subpoenas under California Revenue & Taxation Code § 19504 (b).

Propriety of the Breadth of the Subpoenas

Hyatt contends that the subpoenas should be quashed as an improper fishing expedition since they seek information beyond the scope of the pending administrative tax appeals. As to the subpoenas duces tecum, Hyatt contends that the subpoenas are overbroad since they are not limited in time or scope. Hyatt further contends that they are overbroad since they seek "all" documents relating to certain topic. Hyatt contends that the information and materials sought have no relevance to the issue of when he became a resident of Nevada. To the extent that the FTB has argued that U.S. Philips' licensing of his patents may provide an alternative tax basis under the "sourcing" theory, Hyatt asserts that any discovery should be limited to the tax years of 1991 and 1992 since he has never received any notice of audit for any other year.

Hyatt avers in his affidavit that he has been participating in a review of the 39 boxes of documents which U.S. Philips intends to produce to the FTB to identify the documents subject to the privilege. Hyatt asserts that, to date, he has identified documents which concern matters such as: details of pending patent applications which are maintained in confidentiality by the Patent Office; requests by U.S. Philips for confidential technical and patent information and his responses; requests by Philips that he review draft license agreements and draft correspondence; and requests by U.S. Philips that he show how his patent claims are supported and how certain products infringe on the patent claims.

Alternatively, Hyatt seeks a protective order limiting the scope of the respective depositions and production of documents demanded by the subpoenas to the issues in the underlying administrative proceedings and to the years 1991 and 1992. Therefore, Hyatt seeks a protective order limiting the scope of the document production to material information and to the years 1991 and 1992. Hyatt specifically notes that the patent interference proceeding for which the FTB seeks "all" documents occurred in the mid-1990's, well after the 1991 and 1992 audit years, and is unrelated to the issues of his residency and income in 1991 and 1992.

In its opposition papers, the FTB contends that the subpoenaed documents are relevant to Hyatt's source of income and residency, which are issues in the administrative tax appeals. Further, the FTB asserts that the documents as to the following issues are relevant: nature of Hyatt's licensing business; the role of Hyatt and U.S. Philips in the licensing business; where the business activity was located; where the participants in the business were located; how payments were distributed; and communications involving solicitation of affidavits recently submitted to the SBE by Hyatt. The FTB asserts it can tax income if its "source" was California. The FTB also contends that it "routinely" seeks information for years prior to and subsequent to audit years to analyze a case. To determine the source of Hyatt's income, the FTB asserts it requires an understanding of Hyatt's relationship with U.S. Philips.

During oral argument, the FTB made the general argument that the subpoenas were not overbroad and that all of the documents related to the issues in the pending administrative tax appeals. The FTB, however, did not specifically address the fact that the subpoenas were not limited in time or in scope. Robert W. Dunn, counsel to the FTB, stated that the discovery was necessary because of the agreements executed by Hyatt and U.S. Philips were structured requiring a series of payments over a number of years.

On a motion to quash a subpoena, the movant has the burden of demonstrating the subpoena lacks relevancy or factual basis (*Hogan v Cuomo*, 67 AD3d 1144, 1145 [3d Dept 2009]). The issuer of the subpoena must then establish the relevancy of the material sought (*Technology Assocs., LLC v Special Commr. of Investigations for New York City*, 31 Misc3d 1206 [A] [Sup Ct, NY County, 2011]). It is not enough that the issuer "hopes or suspects that relevant information will develop" (*Matter of Morganthau*, 73 AD3d 415, 419 [1st Dept 2010]).

Here, Hyatt has demonstrated that the subpoenas duces tecum seek material which is irrelevant to the issues in the administrative tax appeals, namely his residency and income in 1991

and 1992. Notably, at oral argument, this court questioned the FTB as to the relevancy of the prosecution of Hyatt's patent applications and the patent interference proceeding, and the FTB failed to provide a direct response. Moreover, the FTB failed to establish a factual basis for the relevance of material created prior to or subsequent to the audit years of 1991 and 1992. The conclusory assertions of William Dunn at oral argument that the FTB needs the materials to establish the relationship between U.S. Philips and Hyatt, without more, failed to demonstrate the relevancy of the materials created prior to and subsequent to the audit years. Similarly, Mr. Dunn's assertion in his affidavit that the FTB "routinely" seeks information for years prior to and subsequent to the audit years in order to analyze the case was an insufficient explanation to establish the relevancy of the material. To the extent that Mr. Dunn, at oral argument, asserted that the material for the years outside the audit years was relevant insofar as the agreements between U.S. Philips and Hyatt contained structured payments over the years, the FTB failed to offer any explanation as to how income earned in a year other than the audit years would be attributable to the audit years.

Hyatt, however, has failed to demonstrate that the material regarding his residency or U.S. Philips' licensing of his patents for its own use and to other companies during 1991 and 1992 was irrelevant to the issues in the administrative tax appeals.

Therefore, insofar as the FTB has failed to meet its burden of demonstrating the relevancy of the materials sought in the subpoenas duces tecum for the years other than 1991 and 1991, and the relevancy of the materials regarding the prosecution of Hyatt's patents and the patent interference proceeding, Hyatt is entitled to a modification of the subpoenas duces tecum. Accordingly, the demands of the subpoenas duces tecum shall be limited to material related to tax years 1991 and 1992 with respect to the issues of Hyatt's residency and income received in those years, his relationship with U.S. Philips, and the licensing of his patents and any revenue therefrom in 1991 and 1992. The demands seeking materials relating to the prosecution of Hyatt's patents and the patent interference proceeding are stricken.

In view of the foregoing, the depositions of the nonparties upon whom the FTB served the subject subpoenas shall be limited to the issues of Hyatt's residency in 1991 and 1992, his relationship to U.S. Philips, and the licensing of his patents and any revenue generated from the licensing of his patents in 1991 and 1992.

Common Interest Privilege

Hyatt contends that he and U.S. Philips share a common interest privilege over certain matters encompassed by the subpoenas. Hyatt also seeks a protective order allowing him to inspect documents U.S. Philips intends to produce to prevent privileged documents from being disclosed. Finally, Hyatt seeks a confidentiality order. Hyatt contends that Nevada law, not New York law, applies to issue of common interest privilege. Therefore, Hyatt asserts that he needs only to demonstrate that legal services were provided to him by U.S. Philips' counsel for the common interest privilege to attach to the subpoenaed documents.

In support of his motion, Hyatt avers that he had a common interest with U.S. Philips regarding licensing the patents, defending a patent "interference" proceeding, and prosecuting patent applications for patents which were also included in the 1991 Agreement. Specifically, Hyatt avers that, in the mid-1990's, he assisted U.S. Philips in-house counsel defend a "patent interference" proceeding commenced with respect to one of his patents licensed to U.S. Philips pursuant to the 1991 Agreement. He asserts that the defense of the patent interference proceeding involved his secret technical and patent knowledge regarding the patent, which he understood was privileged. Hyatt also avers that he understood his communications with between himself and counsel for U.S. Philips were privileged under the attorney-client privilege or the common interest privilege. Accordingly, Hyatt contends that all communications with U.S. Philips counsel were privileged, as he was assured by counsel for U.S. Philips.

As noted earlier, Hyatt further asserts that he has been participating in a review of the 39 boxes of documents which U.S. Philips intends to produce to the FTB to identify the documents subject to the privilege. Hyatt avers that, to date, he has identified documents which concern matters subject to the common interest privilege, including details of pending patent applications which are maintained in confidentiality by the Patent Office, requests by U.S. Philips for confidential technical and patent information and his responses, requests by Philips that he review draft license agreements and draft correspondence, and requests by U.S. Philips that he show how his patent claims are supported and how certain products infringe on the patent claims.

As to Jack Hacken and Algy Tamoshunas, Hyatt avers that they were U.S. Philips' in-house counsel, who represented U.S. Philips in its licensing program and to whom he provided confidential knowledge concerning his patents in order to support the licensing program and defend the patent interference proceeding. Hyatt further avers that documents he provided to U.S. Philips were also shared with outside counsel for U.S. Philips, and that he was informed that the documents would be protected as attorney-client privileged documents. Hyatt also attended meetings with U.S. Philips' counsel to discuss strategy meetings regarding the licensing program and they provided him with documents he considered confidential and privileged. Hyatt contends all of these documents and information are subject to the attorney-client privilege.

The FTB contends that New York law applies to the privilege issue since the documents were created in New York and deposition are to take place in New York.[5] Under New York law, the FTB asserts, that the common interest privilege applies only to attorney-client communications shared with other counsel in joint preparation for litigation or in anticipation of litigation. The FTB argues that Hyatt cannot establish an attorney-client relationship with U.S. Philips or U.S. Philips' in-house counsel, Mr. Haken and Mr. Tamoshunas, who are also subjects of subpoenas. The FTB submits the affidavit from U.S. Philips' outside counsel that no attorney-client relationship existed.

---

[5] In support of its contention that New York law, not Nevada law, applies to the issue of common interest privilege, the FTB relies upon the order of the Nevada court in the action commenced by Hyatt against the FTB. Although the FTB contends that the Nevada court rejected Hyatt's assertion of common interest privilege, the Nevada court in its written order did not address the common interest privilege.

Initially, the court finds that New York law, not Nevada law, is applicable in the present matter to the issue of whether a common interest privilege attached to the subpoenaed documents in U.S. Philips' possession. CPLR 3119 provides that a motion to quash a subpoena served pursuant to the statute is subject to the rules and statutes of New York (CPLR 3119 [e]). Moreover, insofar as the subpoenas seek documents located in New York and seek to take depositions in New York regarding, inter alia, the licensing of Hyatt's patents by U.S. Philips, a New York company, New York has a greater interest and relationship to the discovery issue (*see First Interstate Credit Alliance v Arthur Anderson & Co.*, 150 AD2d 291, 293 [1st Dept 1989]; *cf. Lego v Stratos Lightwave*, 224 FRD 576 [SD NY 2004]).

Under New York law, the burden of establishing that certain documents are privileged and protected from discovery is on the party asserting the privilege, and the protection claimed must be narrowly construed (*Spectrum Sys. Intl. Corp. v Chemical Bank*, 78 NY2d 371, 377 [1991]; *148 Magnolia, LLC v Merrimack Mut. Fire Ins. Co.*, 62 AD3d 486, 487 [1st Dept 2009]). The burden cannot be satisfied by counsel's conclusory assertions of privilege and competent evidence establishing the privilege must be set forth by the party asserting the privilege (*Claverack Co-Op Ins. Co. v Nielson*, 296 AD2d 789 [2002]; *Agovino v Taco Bell 5083*, 225 AD2d 569, 571 [2d Dept 1996]; *Martino v Kalbacher*, 225 AD2d 862 [3d Dept 1996]; *Smith v Ford Foundation*, 231 AD2d 456 [1st Dept 1996]).

For a document to be privileged as an attorney-client communication pursuant to CPLR 4503 (a), the document must be primarily or predominantly a communication of a legal character, for the purpose of obtaining or rendering legal advice or services, and intended to be confidential (*Spectrum Sys. Intl. Corp.*, 78 NY2d at 379; *Rossi v Blue Cross & Blue Shield of Greater New York*, 73 NY2d 588, 594 [1989]; *People v Osorio*, 75 NY2d 80, 84 [1989]). "No attorney-client privilege arises unless an attorney-client relationship has been established" (*Sieger v Zak*, 60 AD3d at 662; *see Matter of Priest v Hennessy*, 51 NY2d 62, 68-69 [1980]). Communications between counsel and client which are shared with third parties are generally not privileged (*People v Osorio*, 75 NY2d at 84; *People v Harris*, 57 NY2d 335, 343 [1982]; *Sieger v Zak*, 60 AD3d 661, 662 [2d Dept 2009]).

The common interest privilege is an exception to the waiver of attorney-client privilege where information is shared with third-parties (*Liberman v Gelstein*, 80 NY2d 429, 437 [2006]). In the absence of attorney-client privilege, the common interest exception cannot apply (*Fewer v GFI Group*, 78 Ad3d 412, 413 [1st Dept 2010]). Its application is limited to communications between counsel and parties with respect to legal advice in pending or reasonably anticipated litigation in which the joint consulting parties have a common legal interest (*id.)*. It does not protect business or personal communications (Carmody-Wait 2d, Common Interest, or Joint Defense, Exception § 56:190). There must be a substantial showing by the party attempting to invoke the protections of the privilege of the need for a common defense as opposed to the mere existence of a common problem (*id.*).

In the present matter, Hyatt has not demonstrated the existence of an attorney-client relationship between himself and U.S. Philips' counsel. His mere assertions that he believed that an attorney-client relationship existed and that his communications with U.S. Philips' counsel were confidential are insufficient to demonstrate the existence of such a relationship (*SR Intl. Bus. Ins. Co. Ltd. v World Trade Center Props. LLC*, 2002 WL 1334821 at n 1 [SD NY 2005]). Moreover, in the context of U.S. Philips' licensing Hyatt's patents, it is uncontradicted that a business relationship existed. Therefore, no attorney-client privilege would attach to the communications with respect to the licensing program or the revenues generated from the licensing. Accordingly, Hyatt has failed to meet his burden of demonstrating that a privilege attached to the documents which this court has directed be produced under the subpoenas duces tecum. In the absence of an attorney-client relationship, no common interest privilege could attach to the documents.

In view of the foregoing, it is

ORDERED that Hyatt's motion is granted to the extent that the subpoenas duces tecum are modified such that all demands regarding the prosecution of Hyatt's patents and the patent interference proceeding are stricken and the material relating to those topics shall not be produced; and it is further

ORDERED that the motion is granted to the extent that the demands of the subpoenas duces tecum are limited to material relating to the 1991 and 1992 tax years with respect to the issues of Hyatt's residency and income received in 1991 and 1992, his relationship to U.S. Philips, and the licensing of his patents and any revenue generated from the licensing of his patents in 1991 and 1992; and it is further

ORDERED that the depositions of the nonparties upon whom the FTB served the subject subpoenas shall be limited to the issues of Hyatt's residency and income received in 1991 and 1992, his relationship to U.S. Philips, and the licensing of his patents and any revenue generated from the licensing of his patents in 1991 and 1992; and it is further

ORDERED that Hyatt's motion for a confidentiality order is denied.

The foregoing constitutes the decision and order of this Court.

Dated: White Plains, New York
July 27, 2011

HON. JOAN B. LEFKOWITZ, J.S.C.

TO:

Pryor Cashman LLP
William L. Charron, Esq.
Eric D. Dowell, Esq.
Attorneys for Gilbert P. Hyatt
7 Times Square
New York, NY 10036

Carter Ledyard & Milburn, LLP
By: Judith A. Lockhart, Esq.
Attorneys for the California Franchise Tax Board
2 Wall St.
New York, NY 10005

# EXHIBIT  29

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

| | |
|---|---|
| In the matter of: The Application of State of California Franchise Tax Board for the deposition and production of business records from the Custodian of Records for U.S. Philips Corporation for use in an action pending in the Superior Court of California entitled State of California Franchise Tax Board v. Neal Howard, et al. (Case No. 34-2011-00101401) | **SUBPOENA DUCES TECUM** |

**THE PEOPLE OF THE STATE OF NEW YORK**

**To: Custodian of Records**
**U.S. Philips Corporation**
**345 Scarborough Road**
**Briarcliff Manor, New York 10510**

**WE COMMAND YOU**, that all business and excuses being laid aside, produce pursuant to CPLR § 3119, at the offices of Suite Solutions, 75 South Broadway, 4th Floor, White Plains, New York 10601 on or before June 24, 2011, at 10:00 a.m., all documents and other things in your possession, custody or control described on the attached Exhibit A.

**WE FURTHER COMMAND YOU**, that all business and excuses being laid aside, appear for a deposition pursuant to CPLR § 3119 at the offices of Suite Solutions, 75 South Broadway, 4th Floor, White Plains, New York 10601 on June 28, 2011, at 10:00 a.m.

The circumstances or reasons said document production and deposition are sought or required are that the information is material, relevant and necessary for the prosecution and defense of the above-captioned action. It is believed that you have relevant information concerning, among other things, Gilbert P. Hyatt's assertion that he became a nonresident of

6773453.1

6793223.2

California in or around 1991 and Mr. Hyatt's contention that he did not operate a business from California through December 1992.

Failure to comply with this subpoena is punishable as a contempt of Court and shall make you liable to the person on whose behalf this subpoena was issued for a penalty not to exceed fifty dollars and all damages sustained by reason of your failure to comply.

Dated: May 26, 2011

CARTER LEDYARD & MILBURN LLP

By [signature]
Leonardo Trivigno
2 Wall Street
New York, NY 10005
Telephone: (212) 238-8724

*Attorneys for Plaintiff State of California Franchise Tax Board*

Case: 15-15296, 06/29/2015, ID: 9592048, DktEntry: 9-4, Page 195 of 255
JUN-02-2011 12:51 CL&M 2127323232 P.04/23

**EXHIBIT A**
**REQUEST FOR PRODUCTION OF DOCUMENTS**

-3-
6773453.1
6793223.2

ER 496

## DEFINITIONS

The following definitions and rules of construction apply to these document requests:

1. Communication. The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

2. Document. The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rules of Civil Procedure 34(a). A draft or non-identical copy is a separate document within the meaning of this term.

3. Identify (with Respect to Documents). When referring to documents, "to identify" means to give, to the extent known, (i) the type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipients(s).

4. Person. The term "person" is defined as any natural person or business, legal or governmental entity or association.

5. Hyatt Patent. The term "Hyatt Patent" means any patent issued to or owned by Gilbert P. Hyatt.

6. Concerning. The term "concerning" means relating to, referring to, describing, evidencing or constituting.

7. All/Each. The term "all" and "each" shall be construed as all and each.

8. And/Or. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all documents that might otherwise be construed to be outside its scope.

9. Number. The use of the singular form of any word includes the plural and vice versa.

**DESCRIPTION OF RECORDS**
**Exhibit A**

1. All documents (including without limitation licenses, agreements, contracts, memoranda, and letters) under which any person or entity has been licensed or sub-licensed to make, use, sell, or import any invention claimed in any Hyatt Patent.

2. All documents (including without limitation licenses, agreements, contracts, memoranda, and letters) under which any person or entity has been released from claims or liabilities for making, using, selling or importing any invention claimed in any Hyatt Patent.

3. All documents (including without limitation licenses, agreements, contracts, memoranda, and letters) under which Gilbert P. Hyatt agreed not to, or assured that he will not, assert or bring suit upon any Hyatt Patent.

4. All documents (including without limitation licenses, agreements, contracts, memoranda, and letters) under which any person or entity obtained an option to obtain a license, sub-license, or release, under any Hyatt Patent.

5. All documents reflecting any money paid by any person or entity in consideration for a license, sub-license, or release, or any option to obtain a license, sub-license, or release, under any Hyatt Patent.

6. All documents reflecting any money paid by any person or entity in consideration for any agreement or assurance not to assert or sue upon any Hyatt Patent.

7. All documents by U.S. Philips Corporation concerning money it expended or received in connection with the licensing or sub-licensing of any Hyatt Patent.

8. All documents by Mahr Leonard Management Co. concerning money it expended or received in connection with the licensing or sub-licensing of any Hyatt Patent.

9. All documents, and all files and their contents, that relate to, mention, discuss, concern or reflect efforts by U.S. Philips Corporation to negotiate any license or sub-license under any Hyatt Patent.

10. All documents, and all files and their contents, that relate to, mention, discuss, concern or reflect efforts by Mahr Leonard Management Co. to negotiate any license or sub-license under any Hyatt Patent.

11. All documents received by you and/or U.S. Philips Corporation (including any of their attorneys, agents or representatives) from any other person or entity concerning any license, sub-license, or release, or any option to obtain a license, sub-license or release, under any Hyatt Patent.

12. All documents sent by you and/or U.S. Philips Corporation (including any of their attorneys, agents or representatives) to any other person or entity concerning any license, sub-license, or release, or any option to obtain a license, sub-license or release, under any Hyatt Patent.

13. All documents discussing, relating to, or reflecting any expenses incurred by U.S. Philips Corporation, Mahr Leonard Management Co. or Gilbert P. Hyatt (including any of their attorneys, agents or representatives) in connection with discussions with any other person or entity concerning any possible or actual licensing, sub-licensing, or release, or any option to obtain a license, sub-license, or release, under any Hyatt Patent.

14. All documents discussing, relating to, or reflecting any plan or agreement by Gilbert P. Hyatt, U.S Philips Corporation, and/or Mahr Leonard Management Co. to seek revenues from the licensing or sub-licensing of any Hyatt Patent, or from the release of any liabilities for infringement for any such patent.

15. All communications sent by you and/or U.S. Philips Corporation (including any of their attorneys, agents, or representatives) to any other person or entity concerning (a) U.S. Patent Interference No. 102,598, including any ruling or document issued by the U.S. Patent and Trademark Office in that interference or (b) United States Court of Appeals for the Federal Circuit appeal no. 96-1514 or appeal no. 96-1515, including the June 17, 1998 decision in those appeals.

16. All communications received by you and/or U.S. Philips Corporation (including any of their attorneys, agents, or representatives) from any other person or entity concerning (a) U.S. Patent Interference No. 102,598, including any ruling or document issued by the U.S. Patent and Trademark Office in that interference or (b) United States Court of Appeals for the Federal Circuit appeal no. 96-1514 or appeal no. 96-1515, including the June 17, 1998 decision in those appeals.

17. All documents discussing, relating to, or reflecting any consideration by Gilbert P. Hyatt (including any of his attorneys, agents, or representatives) of the engagement of any entity to conduct negotiations on his behalf for the licensing or sub-licensing under any Hyatt Patent.

18. All documents concerning time keeping for tasks performed and time spent on tasks performed by you on behalf of or for the benefit of Gilbert P. Hyatt.

19. All documents concerning preliminary and/or draft billing statements and final statements for fee charges and worked performed on behalf of or relating to Gilbert P. Hyatt.

20. All documents, and all files and their contents, that relate to, mention, discuss, concern or reflect Gilbert P. Hyatt "retaining and directing outside patent counsel for services rendered and expenses incurred," including, but not limited to attorneys Danny Huntington, Gregory Roth, Jim Williams, John Dimatteo, and Ken Cho as referenced in

Sections 1 and 4 of the Fourth Supplemental Agreement between Gilbert P. Hyatt and U.S. Philips Corporation attached hereto as Exhibit "1".

21. All documents announcing, discussing, relating to, or reflecting any efforts by or on behalf Gilbert P. Hyatt to publicize any Hyatt Patent, plan to publicize any Hyatt Patent and publicity of any Hyatt Patent.

22. All documents, and all files and their contents, that relate to, mention, or concern negotiation, drafting and finalizing the July 1991 agreement between Gilbert P. Hyatt and U.S. Philips Corporation, including, but not limited to, any notes, faxes, letters, memos, and/or emails to or from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George Mahr of Mahr Leonard Management Company.

23. All documents, and all files and their contents, that relate to, mention, or concern specific details of any sub-licensing proposals recommended by any representative of U.S. Philips Corporation which were not approved by Gilbert P. Hyatt, in accordance with his right to approve all-sublicensing agreements, and any other evidence of rights retained by Gilbert P. Hyatt which were exercised in accordance with the July 1991 agreement between Gilbert P. Hyatt and U.S. Philips Corporation.

24. All documents, and all files and their contents, that relate to, mention, or concern U.S. Philips Corporation's compliance with the reporting requirement set forth in I.R.C. Sec. 6050N as related to the July 1991 agreement and/or supplemental agreements between Gilbert P. Hyatt and U.S. Philips Corporation.

25. All documents, and all files and their contents, that relate to, mention, or concern negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt, U.S. Philips Corporation and Mahr Leonard Management Company, dated September 24, 1991, including, but not limited to, any notes, faxes, letters, memos and/or emails to or from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George Mahr of Mahr Leonard Management Company.

26. All documents, and all files and their contents, that relate to, mention, or concern negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt and Fujitsu, dated October 24, 1991, as referenced in Exhibit "2" (H018631-H018636) attached hereto, including, but not limited to, any notes, faxes, letters, memos, and/or emails to or from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George Mahr of Mahr Leonard Management Company.

27. All documents, and all files and their contents, that relate to, mention, or concern negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt and Matsushita, dated November 14, 1991, as referenced in Exhibit "2" (H018631-H018636) attached hereto, including, but not limited to, any notes, faxes, letters, memos, and/or emails to or from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George Mahr of Mahr Leonard Management Company.

28. All documents, and all files and their contents, that relate to, mention, or concern negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt and Sharp, dated November 20, 1991, as referenced in Exhibit "2" (H018631-H018636) attached hereto, including, but not limited to, any notes, faxes, letters, memos, and/or emails to or from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George Mahr of Mahr Leonard Management Company.

29. All documents, and all files and their contents, that relate to, mention, or concern negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt and Sony, dated December 17, 1991, as referenced in Exhibit "2" (H018631-H018636) attached hereto, including, but not limited to, any notes, faxes, letters, memos, and/or emails to or from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George Mahr of Mahr Leonard Management Company.

30. All documents, and all files and their contents, that relate to, mention, or concern negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt and NEC, dated December 26, 1991, as referenced in Exhibit "2" (H018631-H018636) attached hereto, including, but not limited to, any notes, faxes, letters, memos, and/or emails to or from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George Mahr of Mahr Leonard Management Company.

31. All documents, and all files and their contents, that relate to, mention, or concern negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt and Oki, dated January 31, 1992, as referenced in Exhibit "2" (H018631-H018636) attached hereto, including, but not limited to, any notes, faxes, letters, memos and/or emails to or from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George Mahr of Mahr Leonard Management Company.

32. All documents, and all files and their contents, that relate to, mention, or concern negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt and Sanyo, dated July 23, 1992, as referenced in Exhibit "2" (H018631-H018636) attached hereto, including, but not limited to, any notes, faxes, letters, memos and/or emails to or from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George Mahr of Mahr Leonard Management Company.

33. All documents, and all files and their contents, that relate to, mention, or concern negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt and Hitachi, dated August 6, 1992, as referenced in Exhibit "2" (H018631-H018636) attached hereto, including, but not limited to, any notes, faxes, letters, memos and/or emails to or from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George Mahr of Mahr Leonard Management Company.

34. All documents, and all files and their contents, that relate to, mention, or concern negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt and Omron, dated September 30, 1992, as referenced in Exhibit "2" (H018631-H018636) attached hereto, including, but not limited to, any notes, faxes, letters, memos and/or emails to or

from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George Mahr of
Mahr Leonard Management Company.

35. All documents, and all files and their contents, that relate to, mention, or concern
negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt and Nippon
Columbia, dated December 15, 1992, as referenced in Exhibit "2" (H018631-H018636)
attached hereto, including, but not limited to, any notes, faxes, letters, memos, and/or
emails to or from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George
Mahr of Mahr Leonard Management Company.

36. All documents, and all files and their contents, that relate to, mention, or concern
negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt and
Kenwood, dated December 22, 1992, as referenced in Exhibit "2" (H018631-H018636)
attached hereto, including, but not limited to, any notes, faxes, letters, memos, and/or
emails to or from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George
Mahr of Mahr Leonard Management Company.

37. All documents, and all files and their contents, that relate to, mention, or concern
negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt and Nikon,
dated December 28, 1993, as referenced in Exhibit "2" (H018631-H018636) attached
hereto, including, but not limited to, any notes, faxes, letters, memos and/or emails to or
from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George Mahr of
Mahr Leonard Management Company.

38. All documents, and all files and their contents, that relate to, mention, or concern
negotiation, drafting and finalizing the agreement between Gilbert P. Hyatt and Canon,
dated December 30, 1993, as referenced in Exhibit "2" (H018631-H018636) attached
hereto, including, but not limited to, any notes, faxes, letters, memos, and/or emails to or
from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard and/or George Mahr of
Mahr Leonard Management Company.

39. All documents, and all files and their contents, that relate to, mention, or concern
negotiation, drafting and finalizing the four supplemental Agreements between Gilbert P.
Hyatt and U.S. Philips Corporation as referenced in Exhibit "3" (GLR 06824,
GLR06863) attached hereto, including, but not limited to, any notes, faxes, letters,
memos and/or emails to or from Gilbert P. Hyatt, Gregory L. Roth, Esq., Dave Leonard
and/or George Mahr of Mahr Leonard Management Company.

40. All documents, and all files and their contents, that relate to, mention, or concern
negotiating the "Licensing Rights Termination and Indemnification Agreement" between
Gilbert P. Hyatt and U.S. Philips Corporation signed by Gilbert Hyatt on December 2,
1997 and individuals from U.S. Philips Corporation on December 12, 1997 (the first and
signature pages of the referenced agreement attached hereto as Exhibit "3"
(GLR06284,GLR06863)).

41. All documents, and all files and their contents, that relate to, mention, discuss, concern U.S. Philips Corporation's promise and obligation to pay Digital Nutronics Corp. $400,000 as set forth in Section 3.1 (a) (Article III- Consideration for Licenses to Philips) as referenced at page 9 in the July 1991 patent licensing agreement between U.S. Philips Corporation and Gilbert Hyatt attached hereto as Exhibit "4".

42. Full and complete copies of U.S. Philips Corporation's annual report for the years 1991 through 1993.

43. All phone message slips, memos, notes, messages and any other similar writing memorializing telephone conversations or in person meetings between any representative of U.S. Philips Corporation or related entity and Gilbert P. Hyatt.

44. All documents, and all files and their contents, that relate to, mention, or concern any contract or agreement for legal representation between U.S. Philips Corporation and/or related entity and Gregory L. Roth, Esq. and/or the law firm of Pretty, Schroeder, Bergman to represent U.S. Philips Corporation or related entity on any matter at any time.

45. All documents, and all files and their contents, that relate to, mention, or concern any contract or agreement for legal representation between U.S. Philips Corporation and/or related entity and Danny Huntington and/or the Virginia law firm, Burns Doane to represent U.S. Philips Corporation or related entity on any matter at any time.

46. All documents, and all files and their contents, that relate to, mention, or concern any contract, agreement and/or memorandum of understanding between U.S. Philips Corporation and Charles Lee McHenry and/or McHenry and Associates for payment of services performed or rendered by Charles Lee McHenry and/or McHenry and Associates on behalf of U.S. Philips Corporation, related entity and/or Gilbert P. Hyatt.

47. All documents, including, but not limited to, billings, invoices, receipts, and/or travel documents, that relate to or concern any travel by Gilbert P. Hyatt, Gregory L. Roth, and/or Grace Jeng associated with licensing patents in accordance with the July 1991 patent licensing agreement between U.S. Philips Corp. and Gilbert P. Hyatt.

48. All documents, and all files and their contents, that relate to, mention, or concern any oral or written communication between any representative of U.S. Philips Corporation or related entity and Gilbert P. Hyatt.

49. All documents, and all files and their contents, that relate to, mention, or concern any oral or written communication between any representative of U.S. Philips Corporation or related entity and Grace Jeng.

50. All documents and all files and their contents, that relate to, mention, or concern any oral or written communication between any representative of U.S. Philips Corporation or related entity and Caroline Cosgrove.

51. All documents, and all files and their contents, that relate to, mention, or concern any oral or written communication between any representative of U.S. Philips Corporation or related entity and Barry Lee.

52. All documents, and all files and their contents, that relate to, mention, or concern any oral or written communication between any representative of U.S. Philips Corporation or related entity and Gregory L. Roth.

53. All documents, and all files and their contents, that relate to, mention, or concern any oral or written communication between any representative of U.S. Philips Corporation or related entity and Danny Huntington.

54. All documents, and all files and their contents, that relate to, mention, or concern any oral or written communication between any representative of U.S. Philips Corporation or related entity and Charles Lee McHenry.

Donald J. Kula, Bar No. 144342
DKula@perkinscoie.com
Oliver M. Gold, Bar No. 279033
OGold@perkinscoie.com
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Erwin Chemerinsky, Esq.,
EChemerinsky@law.uci.edu
UC IRVINE SCHOOL OF LAW
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000
Telephone: 949.824.8814
Facsimile: 949.824.7336

Malcolm Segal, Bar No. 075481
MSegal@segal-pc.com
SEGAL & ASSOCIATES, PC
400 Capitol Mall, Suite 2550
Sacramento, CA 95814
Telephone: 916.441.0886
Facsimile: 916.475.1231

Attorneys for Plaintiff Gilbert P. Hyatt

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERT P. HYATT,<br><br>Plaintiff,<br><br>v.<br><br>JOHN CHIANG, JEROME E. HORTON, AND MICHAEL COHEN, CALIFORNIA FRANCHISE TAX BOARD MEMBERS; BETTY T. YEE, GEORGE RUNNER, MICHELLE STEEL, JEROME E. HORTON, AND JOHN CHIANG, CALIFORNIA STATE BOARD OF EQUALIZATION MEMBERS; AND DOES 1 THROUGH 20,<br><br>Defendants. | Case No.2:14–CV–00849–GEB–DAD<br><br>**PLAINTIFF'S OBJECTIONS TO DECLARATION OF ROBERT W. DUNN IN SUPPORT OF CALIFORNIA FRANCHISE TAX BOARD MEMBERS DEFENDANTS' MOTION TO DISMISS**<br><br>**Date: November 3, 2014**<br>**Time: 9:00 a.m.**<br>**Courtroom: 10**<br>**Hon. Garland E. Burrell, Jr.** |

Plaintiff Gilbert P. Hyatt ("Plaintiff" or "Hyatt") hereby objects on the grounds set forth below to the Declaration of Robert W. Dunn (the "Dunn Declaration") [ECF, 17-2] submitted by defendants John Chiang, Jerome E. Horton, and Michael Cohen, as California Franchise Tax Board Members (the "FTB Defendants") in support of their Motion to Dismiss.

**OBJECTIONS TO THE DUNN DECLARATION IN ITS ENTIRETY**

The FTB Defendants submitted the Dunn Declaration in support of their Motion to Dismiss under FRCP Rule 12(b)(1) and Rule 12(b)(6). But a factual challenge to the pleadings is not appropriate at this stage of the proceedings. *al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009)); *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008).

"Jurisdictional" facts pled by the plaintiff need not be accepted as true in a motion challenging the Court's jurisdiction, so long as the defendant submits admissible evidence contesting the alleged jurisdictional fact. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

Rather than presenting and arguing "jurisdictional" facts in their Motion to Dismiss, the FTB Defendants instead have submitted the Dunn Declaration to dispute the merits of the claims alleged in the Complaint. As detailed below, the Dunn Declaration, as well as the motion itself, is riddled with argumentative, irrelevant and speculative facts, and inadmissible opinions and hearsay.

Mr. Dunn's opinions concerning the propriety of his employer's audits, actions, communications, and conduct, are entirely irrelevant to the jurisdictional issues argued by the FTB Defendants in their motion to dismiss. The declaration is replete with: (1) facts and information of which Dunn lacks personal knowledge; (2) hearsay; (3) improper lay opinion; (4) evidence lacking authentication and violating The Best Evidence Rule; and (5) irrelevant evidence only confusing the issues in this case; and (6) evidence subject to exclusion under the Doctrine of

Collateral Estoppel.

Hyatt therefore objects to the Dunn Declaration its entirety and respectfully requests that the Court disregard and not consider the declaration in determining the FTB Defendants' Motion to Dismiss. Hyatt also requests that the Court exclude all arguments in the FTB Defendants' moving papers which are dependent on the contents of the Dunn Declaration.

Further, none of the purported facts in Dunn Declaration tie to or support the FTB Defendants' jurisdictional arguments. Nonetheless, and out of an abundance of caution, to the extent the Court does consider the "facts" regarding the delay in the administrative process as set forth in the Dunn Declaration to be "jurisdictional" facts and relevant to the pending motions, Hyatt hereby has submitted sufficient evidence for the purpose of demonstrating that he can and does dispute and rebut those allegations in the Dunn Declaration. Specifically, he submits herewith: (1) a Request for Judicial Notice (attaching some of the substantial material from the Nevada litigation referenced therein that demonstrate the "facts" now asserted by the Dunn Declaration were previously decided against the FTB and are rebutted by the Nevada trial court record); (2) the Declaration of Donald J. Kula authenticating the material attached to the Request for Judicial Notice that rebut the Dunn Declaration; and (3) the Declaration of Eric Coffill that rebuts the Dunn Declaration's "facts" regarding the cause of the delay of the currently pending SBE proceedings.

As a result, at best, resolution of any disputed "jurisdictional" facts must be deferred until an evidentiary hearing or trial on the merits, to the extent the Court concludes resolution of those disputed facts is necessary to decide the jurisdictional issue. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) and *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003).1

[1] As to the assertion of the Doctrine of Collateral Estoppel for specific paragraphs of the Dunn Declaration as identified below (Paras. 16-18, 21, 31), this request for

In addition to these objections to the Dunn Declaration in its entirety, Plaintiff Hyatt specifically objects to certain portions of the declaration as follows:

## OBJECTIONS TO SPECIFIC PARAGRAPHS

**"3. This declaration is made of my own personal knowledge except where stated on information and belief, and, as to those matters, I believe them to be true, and, if called as a witness, I would competently testify thereto."**

Objection. Testimony on information and belief of truthfulness without further explanation lacks foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

Dunn begins his declaration by admitting both lack of knowledge, (Dunn Decl. at ¶¶ 3 and 4), and reassignment of all administrative protest responsibilities to other FTB counsel. (Dunn Decl. ¶6.) Primary authorship of advocacy briefing and/or involvement in discovery for FTB does not provide personal knowledge of any jurisdictional issue. (Dunn Decl. ¶ 6.) Dunn's statement that his facts and events are pertinent does not alone make them so. (Dunn Decl. ¶ 5.) *See Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255 (9th Cir. 1993), cert. denied, 512 U.S. 1236 (summary judgment affirmed; attorney declaration did not provide facts or authenticated documents to support opposition). Lacking personal knowledge, an attorney is not qualified to testify, and unauthenticated documents cannot be admitted to support his client's position. *See Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987).

---

collateral estoppel, similar to any resolution of disputed jurisdictional facts, should be deferred until an evidentiary hearing or trial on the merits.

What Dunn looked at, evaluated, was informed of, or believed, constitute out-of-court statements being introduced by FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents violate the best evidence rule. FRE 1002; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

**"4. The exhibits to this declaration are to the best of my knowledge, true and correct versions of the documents."**

Objection. Testimony that a document is a true and correct version of the document *to the best of Dunn's knowledge* without further explanation lacks foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule

and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

**"5. Outlined and summarized below is a timeline of pertinent events in the Gilbert P. Hyatt ("Hyatt") tax matter commencing with the FTB's audit and progressing through the ongoing appeal, from June 1993 to the present time."**

Objection. Testimony of outlines, summaries, or timelines which Dunn believes are pertinent lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including FTB's audit and appeal, constitute out-of-court statements being introduced by the FTB defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

**"7. The Hyatt tax matter began when Hyatt, a long-time California resident, filed a 1991 California Part-Year Resident return on April 13, 1992. That return indicated that Hyatt became a California nonresident on October 1, 1991. As the audit later revealed, this purported change of residency was contemporaneous with Hyatt receiving millions of dollars from his patent licensing business."**

Objection. After explaining he was initially assigned to this matter in mid-1998, para. 6, Dunn's testimony regarding 1991 and 1992 events or documents is inadmissible speculation, which lacks foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including returns and his employer's audit, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including returns and his employer's audit, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing what any audit revealed, describing Hyatt's change of residency as purported, or describing the nature or timing of Hyatt's performance of work for or receipt of monies from his business. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"8. Hyatt received many millions of dollars in income in 1991 and 1992 as a result of licensing agreements (essentially settlement and release agreements) concerning certain patents, the key patent being the '516 patent or for the microchip processor. The subsequent audit indicated that Hyatt performed the work that resulted in the patents and licensing fees while he resided in California."**

Objection. After explaining he was initially assigned to this matter in mid-1998, para. 6, Dunn's testimony regarding 1991 and 1992 events or documents is inadmissible speculation which lacks foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including agreements, patents, or his employer's audit, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including agreements, patents, or his employer's audit, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn's interpretations of facts and documents regarding issues already determined in previous litigation are also barred by the Doctrine of Collateral

Estoppel, irrelevant to jurisdictional issues and excludable under FRE 401 and FRE 402.

Dunn provides no factual basis for describing what any audit revealed, or describing the nature or timing of Hyatt's performance of work for or receipt of monies from his business. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"9. Although Hyatt ultimately lost his patent claims related to the microchip processor in an interference action, this was not until Hyatt had received hundreds of millions of dollars from Japanese electronics companies."**

Objection. After explaining he was initially assigned to this matter in mid-1998, para. 6, Dunn's testimony regarding earlier events or documents is inadmissible speculation which lacks foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including claims, receipts, or his employer's audit, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including claims, receipts, or his employer's audit, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344

F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing patent claims or interference actions, or describing the nature or timing of Hyatt's performance of work for or receipt of monies from his business. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"10. FTB's audit began on June 2, 1993. An FTB auditor notified Hyatt that the tax years 1989, 1990 and 1991 were being audited. On July 15, 1993, FTB sent Hyatt's representative a residency questionnaire and an initial Information/Document Request ("IDR") focused on Hyatt's Schedule C income. Over the next several months FTB accomplished the typical public record inquiries made in a residency audit (DMV, voter registration, property records, etc.) and the FTB auditor engaged Hyatt's representative in correspondence."**

Objection. After explaining he was initially assigned to this matter in mid-1998, para. 6, Dunn's testimony regarding earlier events or documents is inadmissible speculation which lacks foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including his employer's audit, his employer's notifications, his employer's correspondence, or his employer's inquiries, questions and requests, constitute out-of-court statements

being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including his employer's audit, his employer's notifications, his employer's correspondence, or his employer's inquiries, questions and requests, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing his employer's audit, correspondence, inquiries, questions or requests. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"11. The FTB continued the correspondence inquiring into Hyatt's claimed nonresidency, business activities and the source of his income. In mid-1994, an FTB auditor, Shiela Cox was assigned to the Hyatt matter. From late 1994 through early 1995 Cox continued correspondence and telephone communication with Hyatt's representatives and made third party inquiries. Cox attempted to verify specific claims Hyatt made on his residency questionnaire and she interviewed witnesses as to Hyatt's physical presence and business activity, both in California and Nevada."**

Objection. After explaining he was initially assigned to this matter in mid-1998, para. 6, Dunn's testimony regarding earlier events or documents is inadmissible speculation which lacks foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event

and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including his employer's audit, assignments, correspondence, communications, inquiries, attempts, and interviews, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including his employer's audit, assignments, correspondence, communications, inquiries, attempts, and interviews, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing his employer's audit, assignments, correspondence, communications, inquiries, attempts, and interviews. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"12. Cox issued a lengthy and detailed tentative determination letter in July 1995 that concluded Hyatt remained a California resident through April 2, 1992 and that his 1991 California return was fraudulent. Cox gave Hyatt time to respond to the tentative conclusions, answer unanswered questions, and provide documentation to support his position. There was correspondence with Hyatt through 1995 and into 1996. After a review of FTB audit's work by**

**Los Angeles supervisors, Sacramento supervisors, and FTB's Technical Resources and Review Section, a Notice of Proposed Assessment ("NPA") was issued for the 1991 year on April 23, 1996."**

Objection. After explaining he was initially assigned to this matter in mid-1998, para. 6, Dunn's testimony regarding 1995 and 1996 events or documents is inadmissible speculation which lacks foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including his employer's audit, correspondence, and various reviews, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including his employer's audit, correspondence, and various reviews, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing his employer's audit, correspondence, and various reviews. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded.

*Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"13. Based on Cox's findings, an NPA for 1992 was required. Hyatt did not file a 1992 California return. Sacramento reviewers determined that Hyatt's presence and business activity in California in 1992 (as set out in Cox's determination letter and supported by the audit file) warranted the fraud penalty. After more correspondence with Hyatt's representatives, and case development in Sacramento, FTB issued an NPA for 1992 on August 14, 1997."**

Objection. After explaining he was initially assigned to this matter in mid-1998, para. 6, Dunn's testimony regarding 1992 and 1997 events or documents is inadmissible speculation which lacks foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including his employer's findings, determinations, correspondence, developments and documents, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including his employer's findings, determinations, correspondence, developments and documents, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole

violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

**"14. Hyatt protested the 1991 NPA in 1996. Hyatt then protested the 1992 NPA in October 1997, and, in January 1998, filed a lawsuit in Nevada alleging that FTB's audit was tortuous and asking the Nevada court to make residency determinations by applying California's tax law. FTB engaged the services of Nevada counsel and the Attorney General's office in defense, and the PHO was assigned to the Nevada litigation."**

Objection. After explaining he was initially assigned to this matter in mid-1998, para. 6, Dunn's testimony regarding 1996, 1997 and 1998 events or documents is inadmissible speculation which lacks foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including his employer's engagements and assignments, and plaintiff's actions, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including his employer's engagements and assignments, and plaintiff's actions, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule

and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing his employer's engagements and assignments, and plaintiff's actions. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"15. In late 1999, FTB issued a comprehensive Information and Document Request ("IDR"). FTB asked (again) many of the questions Hyatt never answered at audit and again requested documentation. Hyatt requested six months to respond."**

Objection. After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding late 1999 events or documents, and plaintiff's alleged requests, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including his employer's issuances and questions, and plaintiff's alleged requests, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including his employer's issuances and questions, and plaintiff's alleged requests, violate the

Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing his employer's issuances and questions, and plaintiff's alleged requests. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"16. In mid-2000 (while discovery in his Nevada litigation was ongoing) Hyatt responded to the FTB's IDR. Hyatt also filed two lengthy narrative protest letters. The PHO held an oral protest hearing on two dates and informed Hyatt that his argument and documentation was insufficient and unresponsive. At approximately this time the Nevada court issued a protective order with language, requested by Hyatt, which allowed Hyatt to unilaterally designate discovery in the Nevada litigation that could not be shared with FTB's PHO. The protective order also directed how FTB could use its administrative subpoena process. Hyatt then designated discovery under the protective order that included the answer to the earlier asked (at audit and protest) question: "Where/when did you move?" Hyatt also designated details about the timing and amount of his 1991 and 1992 income under the protective order, among many other facts. This served to bar highly relevant evidence needed by the PHO and greatly delayed the protest proceedings."**

Objection. After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding mid-2000 events or documents, alleged responses, correspondence, hearings, filings, designations or orders, and their effects, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the

alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged responses, correspondence, hearings, filings, designations and orders, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including alleged responses, correspondence, hearings, filings, designations and orders, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing alleged responses, correspondence, hearings, filings, designations and orders. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

*Collateral Estoppel request*

As alleged in the Complaint, it was determined in the prior Nevada litigation that FTB officials acted in bad faith in delaying and refusing to conclude the protest phase of the administrative process and further the FTB had acted in bad faith and with fraud and malice during the administrative process in making the assessments against Mr. Hyatt. (Complaint, ¶¶ 5, 29, and 111-117.) A significant part of the

dispute in the Nevada litigation was the cause of the delay in the administrative proceedings. The FTB's position in that litigation was that the protective order issued by the Nevada court and Mr. Hyatt's actions caused the delay. Mr. Hyatt put forth significant evidence rebutting the FTB's arguments. The evidence demonstrated that the FTB intentionally and by its own volition and improper interpretation of the Nevada protective order caused the delay and actually put an internal hold on the administrative proceeding. The Nevada court and jury agreed with Mr. Hyatt. *See Request for Judicial Notice, Exhs. 1-17, 22-25.*

As a result, Dunn's interpretations of facts and documents regarding issues already determined in previous litigation, including the FTB Defendants' argument that "delays are largely the responsibility, and design, of Hyatt," (Mot. at 14:7-8), are also barred by the Doctrine of Collateral Estoppel, irrelevant to jurisdictional issues and excludable under FRE 401 and FRE 402.

Collateral estoppel, or issue preclusion, bars defendants in this second case from re-litigating issues that were determined on the merits in the underlying Nevada State Court case. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision precludes re-litigation of the issue by a party that lost on that issue in prior litigation. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980) (citing *Montana v. United States*, 440 U.S. 147, 153, 99 S. Ct. 970, 973, 59 L. Ed. 2d 210 (1979)).

It is of no consequence if, as here, the issue(s) for which collateral estoppel is asserted was decided by a state court, as "[t]he federal courts generally have . . . consistently accorded preclusive effect to issues decided by state courts." *Allen v. McCurry*, 449 U.S. at 94 (citing *Montana v. United States*, 440 U.S. 147; *Angel v. Bullington*, 330 U.S. 183, 67 S. Ct. 657, 91 L. Ed. 832 (1947)).

A collateral estoppel request in a civil rights action brought in federal court under 42 U.S.C. § 1983 is determined by the law of state in which the prior litigation took place. *See Allen v. McCurry*, 449 U.S. at 103. The preclusive effect

of a state-court judgment in Federal Court is governed by state law. *Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 914-15 (9th Cir. 1993; *see also* 28 U.S.C. § 1738 (providing "[s]uch . . . judicial proceedings . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.").

The Supreme Court has made clear that "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S. Ct. 892, 79 L. Ed. 2d 56 (1984).

As a result, to the extent the Court here seeks to make a determination, either now or a later point in this action, as to the cause of the delay in the administrative proceedings, Defendants, acting in their official capacities as representatives of the State, are barred by the Doctrine of Collateral Estoppel from re-contesting the cause of the delay in the administrative proceeding.

**"17. In 2000, FTB appealed the validity of the Nevada protective order (and other decisions of the lower court) to the Nevada Supreme Court. The Nevada Supreme Court issued an order staying the protective order pending its decision. In mid-2002 the Nevada Supreme Court decided all the issues in FTB's appeal and let the protective order stand. FTB immediately followed the procedures set forth in the protective order and asked Hyatt to release the designated information to the PHO for consideration in the California tax matter. Hyatt refused. FTB issued an administrative subpoena for the information. Hyatt filed a motion to quash in California Superior Court, lost, and then filed an appeal. Hyatt lost the appeal and FTB's PHO received the documentation in early 2004. The California appellate court held that there was no reason why FTB personnel working on the protest should not have access to evidence produced by Hyatt in his Nevada litigation. Subsequently FTB's PHO issued additional IDR's and continued to engage Hyatt's representatives in correspondence."**

Objection. After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding events or documents from the time period

between 2000 and subsequent to early 2004, including alleged PHO receipts, issuances, administrative actions and party correspondence, and their effects, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged PHO receipts, issuances, administrative actions and party correspondence, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including alleged PHO receipts, issuances, administrative actions and party correspondence, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing alleged PHO receipts, issuances, administrative actions and party correspondence. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

*Collateral Estoppel request*

As alleged in the Complaint, it was determined in the prior Nevada litigation that FTB officials acted in bad faith in delaying and refusing to conclude the protest phase of the administrative process and further the FTB had acted in bad faith and with fraud and malice during the administrative process in making the assessments against Mr. Hyatt. (Complaint, ¶¶ 5, 29, and 111-117.) A significant part of the dispute in the Nevada litigation was the cause of the delay in the administrative proceedings. The FTB's position in that litigation was that the protective order issued by the Nevada court and Mr. Hyatt's actions caused the delay. Included with the dispute over this issue was the effect of the initial administrative subpoena the FTB served on Mr. Hyatt and enforced against him in California, including the fact that Mr. Hyatt successfully reduced the scope of the subpoena in California Superior Court. Further, the FTB protest hearing officer already had virtually of the material sought via the administrative subpoena. Mr. Hyatt put forth significant evidence rebutting FTB arguments. The evidence demonstrated that the FTB intentionally and by its own volition and improper interpretation of the Nevada protective order caused the delay and actually put an internal hold on the administrative proceeding. The Nevada court and jury agreed with Mr. Hyatt. *See Request for Judicial Notice, Exhs. 1-17, 22-25.*

As result, Dunn's interpretations of facts and documents regarding issues already determined in previous litigation, including the FTB Defendants' argument that "delays are largely the responsibility, and design, of Hyatt," (Mot. at 14:7-8), are also barred by the Doctrine of Collateral Estoppel, irrelevant to jurisdictional issues and excludable under FRE 401 and FRE 402.

Collateral estoppel, or issue preclusion, bars defendants in this second case from re-litigating issues that were determined on the merits in the underlying Nevada State Court case. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision precludes re-litigation

of the issue by a party that lost on that issue in prior litigation. *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)).

It is of no consequence if, as here, the issue(s) for which collateral estoppel is asserted was decided by a state court, as "[t]he federal courts generally have . . . consistently accorded preclusive effect to issues decided by state courts." *Allen v. McCurry*, 449 U.S. at 94 (citing *Montana v. United States*, 440 U.S. 147; *Angel v. Bullington*, 330 U.S. 183 (1947)).

A collateral estoppel request in a civil rights action brought in federal court under 42 U.S.C. § 1983 is determined by the law of state in which the prior litigation took place. *See Allen v. McCurry*, 449 U.S. at 103. The preclusive effect of a state-court judgment in Federal Court is governed by state law. *Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 914-15 (9th Cir. 1993; *see also* 28 U.S.C. § 1738 (providing "[s]uch . . . judicial proceedings . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.").

The Supreme Court has made clear that "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).

As a result, to the extent the Court here seeks to make a determination, either now or a later point in this action, as to the cause of the delay in the administrative proceedings, Defendants, acting in their official capacities as representatives of the State, are barred by the Doctrine of Collateral Estoppel from re-contesting the cause of the delay in the administrative proceeding.

**"18. Toward the end of 2004, Hyatt was ordered by the Nevada court to produce documentation to FTB and FTB was allowed to continue deposition discovery. Despite the 2003 California appellate court holding, Hyatt continued to designate evidence relevant to his California tax protest under the Nevada protective order. In late 2005 FTB issued a second administrative subpoena for this information. Hyatt at first refused to produce this information, relenting only upon threat of FTB beginning California judicial enforcement of its second subpoena. Hyatt provided the PHO with documentation from the second subpoena in early 2006. Subsequently the PHO issued additional IDRs. In 2006 Hyatt designated yet more relevant information under the protective order. FTB issued a third demand. Finally, in mid-2007, the PHO had received enough information to conclude the protest. In November 2007 FTB issued NOAs upholding the audit assessments and fraud penalties in their entirety."**

Objection. After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding events or documents from the time period between 2000 and mid-2007, including alleged FTB issuances, subpoenas, threats, receipts and conclusions, and alleged party responses, and their effects, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged FTB issuances, subpoenas, threats, receipts and conclusions, and alleged party responses, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including alleged FTB issuances, subpoenas, threats, receipts and conclusions, and alleged party responses,

violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing alleged FTB issuances, subpoenas, threats, receipts and conclusions, and alleged party responses. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

*Collateral Estoppel request*

As alleged in the Complaint, it was determined in the prior Nevada litigation that FTB officials acted in bad faith in delaying and refusing to conclude the protest phase of the administrative process and further the FTB had acted in bad faith and with fraud and malice during the administrative process in making the assessments against Mr. Hyatt. (Complaint, ¶¶ 5, 29, and 111-117.) A significant part of the dispute in the Nevada litigation was the cause of the delay in the administrative proceedings. The FTB's position in that litigation was that the protective order issued by the Nevada court and Mr. Hyatt's actions caused the delay. Included with the dispute over this issue was the effect, if any, on the "delay" caused by additional administrative subpoenas the FTB served on Mr. Hyatt and to which he responded in due course with no enforcement procedure needed by the FTB. Mr. Hyatt put forth significant evidence rebutting the FTB's arguments. The evidence demonstrated that the FTB intentionally and by its own volition delayed and put an internal hold on the administrative proceeding. The Nevada court and jury agreed with Mr. Hyatt. *See Request for Judicial Notice, Exhs. 1-17, 22-25.*

As result, Dunn's interpretations of facts and documents regarding issues already determined in previous litigation, including the FTB Defendants' argument that "delays are largely the responsibility, and design, of Hyatt," (Mot. at 14:7-8), are also barred by the Doctrine of Collateral Estoppel, irrelevant to jurisdictional issues and excludable under FRE 401 and FRE 402.

Collateral estoppel, or issue preclusion, bars defendants in this second case from re-litigating issues that were determined on the merits in the underlying Nevada State Court case. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision precludes re-litigation of the issue by a party that lost on that issue in prior litigation. *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)).

It is of no consequence if, as here, the issue(s) for which collateral estoppel is asserted was decided by a state court, as "[t]he federal courts generally have . . . consistently accorded preclusive effect to issues decided by state courts." *Allen v. McCurry*, 449 U.S. at 94 (citing *Montana v. United States*, 440 U.S. 147; *Angel v. Bullington*, 330 U.S. 183 (1947)).

A collateral estoppel request in a civil rights action brought in federal court under 42 U.S.C. § 1983 is determined by the law of state in which the prior litigation took place. *See Allen v. McCurry*, 449 U.S. at 103. The preclusive effect of a state-court judgment in Federal Court is governed by state law. *Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 914-15 (9th Cir. 1993; *see also* 28 U.S.C. § 1738 (providing "[s]uch . . . judicial proceedings . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.").

The Supreme Court has made clear that "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under

the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).

As a result, to the extent the Court here seeks to make a determination, either now or a later point in this action, as to the cause of the delay in the administrative proceedings, Defendants, acting in their official capacities as representatives of the State, are barred by the Doctrine of Collateral Estoppel from re-contesting the cause of the delay in the administrative proceeding.

**"19. Throughout this tax matter, Hyatt has alternatingly complained that the tax process violates his California and US Constitution due process rights either due to too much time passing, or because he is not given enough time to submit his briefs. *See*, Exhibit 1, a November 20, 2007 letter from Hyatt's tax attorney complaining about the passage of time, but insisting that Hyatt be allowed six months to respond to the PHO's November 1, 2007 determination letter. The PHO's November 26, 2007 response, Exhibit 2 hereto, addressed Hyatt's inconsistent positions of urging the process on while at the same time impeding it."**

Objection. After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding events or documents from the time period "throughout this tax matter" and during 2007, including alleged complaints, letters, PHO responses, and their effects, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged complaints, letters, PHO responses, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are

inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including alleged complaints, letters, PHO responses, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing alleged complaints, letters, PHO responses. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"21. That Hyatt used the Nevada litigation to impede the California tax proceedings became apparent when FTB discovered a March 17, 1998 memo from his California tax attorney, Eugene Cowan, to his Nevada and California litigation attorneys of record in the Nevada case. The memo reveals that it would be the deliberate strategy of Hyatt to attempt to quash information subpoenas. *See*, Exhibit 3 ("While there are no "pure" tax reasons to quash ..., there may be tactical reasons to do so (such as making the FTB work for its requests from now on or taking this opportunity to file the motion in the Nevada courts or otherwise")."**

Objection. After explaining he was initially assigned to this matter in mid-1998, para. 6, Dunn's testimony regarding earlier events or documents, including alleged discoveries, memoranda and related interpretations, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no

personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged discoveries or memoranda, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn provides no factual basis for describing alleged discoveries or memoranda. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

*Collateral Estoppel request*

As alleged in the Complaint, it was determined in the prior Nevada litigation that FTB officials acted in bad faith in delaying and refusing to conclude the protest phase of the administrative process and further the FTB had acted in bad faith and with fraud and malice during the administrative process in making the assessments against Mr. Hyatt. (Complaint, ¶¶ 5, 29, and 111-117.) A part of the dispute in the Nevada litigation was the cause of the delay in the administrative proceedings. The FTB's position was that Mr. Hyatt used that litigation to delay the administrative proceeding, including based on the Cowan memo cited by Dunn. Mr. Hyatt put forth evidence rebutting the FTB's arguments including Mr. Cowan's own testimony regarding the memo and the lack of any attempt to delay the administrative proceeding and the fact that no attempt to quash the referenced subpoena was ever made. In addition, Mr. Hyatt put forth affirmative evidence demonstrating the FTB intentionally and by its own volition delayed and put an internal hold on the administrative proceeding. The Nevada court and jury agreed with Mr. Hyatt. *See Request for Judicial Notice, Exhs. 5,7, 12,13, 14, 15, 20, 21,*

*24, 25.*

As result, Dunn's interpretations of facts and documents regarding issues already determined in previous litigation, including the FTB Defendants' argument that "delays are largely the responsibility, and design, of Hyatt," (Mot. at 14:7-8), and Dunn's statements concerning document revelations and alleged party intentions, are also barred by the Doctrine of Collateral Estoppel, the entire paragraph 21 is not cited in the FRB Defendants' motion to dismiss, and is irrelevant to jurisdictional issues and excludable under FRE 401 and FRE 402.

Collateral estoppel, or issue preclusion, bars defendants in this second case from re-litigating issues that were determined on the merits in the underlying Nevada State Court case. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision precludes re-litigation of the issue by a party that lost on that issue in prior litigation. *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)).

It is of no consequence if, as here, the issue(s) for which collateral estoppel is asserted was decided by a state court, as "[t]he federal courts generally have . . . consistently accorded preclusive effect to issues decided by state courts." *Allen v. McCurry*, 449 U.S. at 94 (citing *Montana v. United States*, 440 U.S. 147; *Angel v. Bullington*, 330 U.S. 183 (1947)).

A collateral estoppel request in a civil rights action brought in federal court under 42 U.S.C. § 1983 is determined by the law of state in which the prior litigation took place. *See Allen v. McCurry*, 449 U.S. at 103. The preclusive effect of a state-court judgment in Federal Court is governed by state law. *Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 914-15 (9th Cir. 1993; *see also* 28 U.S.C. § 1738 (providing "[s]uch . . . judicial proceedings . . . shall have the same full faith and credit in every court within the United States and its Territories and

Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.").

The Supreme Court has made clear that "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).

As a result, to the extent the Court here seeks to make a determination, either now or a later point in this action, as to the cause of the delay in the administrative proceedings, Defendants, acting in their official capacities as representatives of the State, are barred by the Doctrine of Collateral Estoppel from re-contesting the cause of the delay in the administrative proceeding.

**"22. Hyatt timely appealed the NOAs by filing a notice of appeal with the SBE in January 2008. The SBE granted Hyatt several opening briefing extension requests throughout 2008 (the period of Hyatt's Las Vegas, Nevada trial with FTB). In delaying his briefing, Hyatt tied the administrative appeal to the Nevada litigation, indicating to SBE that relevant evidence would come from discovery and trial in the Nevada litigation. *See*, Exhibits 4 and 5, Hyatt' January 22 and 23, 2008 Notice of Appeal and June 9, 2008 Letter tying the Nevada litigation to the tax proceedings (pages SBE000024-25 and SBE000037-38). Again, Hyatt complains in this correspondence about the passage of time while at the same time demanding more time."**

Objection. After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding alleged 2008 events or documents, including alleged administrative appeals, communications, briefing, correspondence, and their effects, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus

inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged administrative appeals, communications, briefing, correspondence, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including alleged administrative appeals, communications, briefing, correspondence, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing alleged administrative appeals, communications, briefing, correspondence. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"23. After Hyatt requested and obtained from SBE multiple extensions of time he filed his opening briefs with SBE in December 2008. Hyatt's briefing totaled 175 pages, with voluminous attachments and exhibits. As support for his nonresidency claim Hyatt appended 26 new affidavits, including affidavits from witnesses never identified by Hyatt before. During the audit and protest, Hyatt elected not to provide these 26 affidavits although he had the right to do so. Even though he was obligated to do so by virtue of FTB's formal discovery requests, Nevada Court orders, and Nevada rules, Hyatt failed to identify as witnesses many of these affiants."**

Objection. After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding alleged 2008 and later events or documents, including alleged administrative requests, extensions, briefing, claims, elections, obligations and affidavits, and their effects, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged administrative requests, extensions, briefing, claims, elections, obligations and affidavits, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including alleged administrative requests, extensions, briefing, claims, elections, obligations and affidavits, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing alleged administrative requests, extensions, briefing, claims, elections, obligations and affidavits. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-

1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"24. Over Hyatt's objection, and without Hyatt's cooperation to assist locating or scheduling his affiant's depositions, FTB issued administrative subpoenas in California and Nevada and, soon thereafter, took depositions of several of Hyatt's new witnesses. FTB filed its opening briefing on September 15, 2009."**

Objection. After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding alleged later administrative events or documents, including alleged objections, subpoenas, depositions, assistance, briefing, and filings, and their effects, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged objections, subpoenas, depositions, assistance, briefing, and filings, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including alleged objections, subpoenas, depositions, assistance, briefing, and filings, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule

and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing alleged objections, subpoenas, depositions, assistance, briefing, and filings. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"25. On August 23, 2010 Hyatt filed his reply briefing, totaling 200 pages and appending 34 new affidavits. Two years later, on August 15, 2012, Hyatt filed voluminous supplemental briefing in the SBE tax appeal and appended 93 additional affidavits and declarations."**

Objection. After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding alleged 2010 and 2012 administrative events or documents, including alleged filings and briefing, and their effects, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged filings and briefing, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including alleged filings and briefing, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669

(7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing alleged filings and briefing. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"26. Among Hyatt's new 2010 affidavits was one from Algy Tamoshunas a former employee of Hyatt's licensing agent in New York, Philips. In 2010 Hyatt also submitted other lengthy and self-serving new affidavits attempting to recast the Hyatt/Philips 1991 and 1992 written agreements. In 2011, FTB issued subpoenas to obtain Hyatt/Philips licensing business documents from Philips and to take depositions of Mr. Tamoshunas and one other former Philips employee, all in New York. Philips did not object to this discovery, but Hyatt immediately began efforts to block production of this highly relevant evidence."**

Objection. After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding alleged 2010 and 2011 administrative events or documents, including alleged affidavits, submissions, subpoenas, responses and other efforts, and their effects, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged affidavits, submissions, subpoenas, responses and other efforts, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth

of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including alleged affidavits, submissions, subpoenas, responses and other efforts, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing alleged affidavits, submissions, subpoenas, responses and other efforts. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"27. In July 2011 Hyatt hired New York counsel and filed a motion to quash FTB's subpoenas, requesting a hearing on an emergency basis. FTB quickly briefed the issues and appeared in New York with New York counsel. Hyatt's motion to quash failed, but the New York court limited the scope of FTB's subpoenas. Hyatt timely appealed the decision to a New York appellate court and requested that document production be stayed. Hyatt's stay request was denied. In August 2011 FTB received, in large part, the Hyatt/Philips licensing business files from 1991 and 1992, approximately 8,000 pages. FTB deposed one New York witnesses in 2011 and (because Hyatt's motion caused a long scheduling delay) the second in 2012."**

Objection. After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding alleged 2011 administrative events or documents, including alleged hirings, filings, briefing, motions, appeals, requests, receipts, and depositions, and their effects, are inadmissible speculation which lack

foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including hirings, filings, briefing, motions, appeals, requests, receipts, and depositions, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including hirings, filings, briefing, motions, appeals, requests, receipts, and depositions, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing hirings, filings, briefing, motions, appeals, requests, receipts, and depositions. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"28.  On October 5, 2012, on Hyatt's emergency motion, the New York appellate court issued an order blocking FTB's submission of the Hyatt/Philips licensing business files to the SBE pending the outcome of Hyatt's appeal. Not until February 3, 2013 did the New York appellate court rule, upholding the trial court. Hyatt then filed a motion to suppress approximately 300 documents produced to FTB by Philips. On October 7, 2013 the trial court ruled that some documents received by FTB should be suppressed, and some should be redacted. Hyatt moved to reargue parts of the decision in December 2013. Concurrently, FTB asked the court to correct its decision as to 10 documents. On March 13, 2014 the trial court issued its final order granting most of FTB's requests, and denying Hyatt's December 2013 motion. In April 2014 (just before Hyatt filed this federal litigation) the New York court decisions became final and FTB was free to submit the Philips documents to the SBE in Hyatt's appeal."**

Objection.  After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding alleged 2012, 2013, and 2014 administrative events or documents, including alleged motions, orders, rulings, requests, and submissions, and their effects, are inadmissible speculation which lack foundation and personal knowledge.  FRE 602.  *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged motions, orders, rulings, requests, and submissions, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion.  FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including alleged motions, orders, rulings, requests, and submissions, violate the Best Evidence rule

and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing alleged motions, orders, rulings, requests, and submissions. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"29. The New York litigation over the documents resolved, the SBE requested briefing by FTB (in an April 23, 2014 letter) of the Hyatt/Philips licensing business files and the now more that 100 new affidavits and declaration Hyatt filed with and after his supplemental briefing. FTB's additional briefing was due June 23, 2013, Hyatt's responsive additional briefing was due July 23, 2014. The parties were granted 60 total pages. The SBE proposed an oral hearing date of October 14, 2014."**

Objection. After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding alleged 2012, 2013, and 2014 administrative events or documents, including alleged motions, orders, rulings, requests, and submissions, and their effects, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged motions, orders, rulings, requests, and submissions, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the

matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including alleged motions, orders, rulings, requests, and submissions, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing alleged motions, orders, rulings, requests, and submissions. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"30. In response to the SBE's briefing schedule and proposed hearing date, Hyatt objected to the time and page restraints. Hyatt requested twice the time given to FTB to brief (120 days) and twice the page limit given to FTB. *See*, Exhibit 6, Hyatt's tax attorney's May 7, 2014 letter to SBE. On June 13, 2014 the SBE responded, by requiring FTB to file its additional briefing on July 16, 2014, and Hyatt to file his responsive additional briefing on December 16, 2014. The parties were granted 120 total pages. The SBE also tentatively notified the parties that oral argument in this appeal will be scheduled in Sacramento "in or after" March 2015."**

Objection. After explaining he was reassigned in this matter in early 1999, para. 6, Dunn's testimony regarding alleged 2014 administrative events or documents, including alleged objections, requests, correspondence, responses, and notifications, and their effects, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge

of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged objections, requests, correspondence, responses, and notifications, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including alleged objections, requests, correspondence, responses, and notifications, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing alleged objections, requests, correspondence, responses, and notifications. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

**"31. Hyatt's allegations of FTB's alleged personal bias towards him have been extensively briefed and argued in multiple forums over the years. *See*, Exhibit 7. The allegations of bias and misconduct arise entirely from the testimony of one witness, Candace Les. Ms. Les is a former FTB tax auditor who was fired by FTB for cause in 1998 based upon 12 charges of misconduct, which included accepting gifts and favors, dishonesty, and intentionally misplacing audit records. Ms. Les was coached extensively by Hyatt's attorneys in the**

**Nevada litigation. She worked with Hyatt and Hyatt's attorneys for hundreds of hours under the expectation of remuneration for her assistance. Ms. Les accused her former friend and colleague Sheila Cox (the third auditor assigned to the Hyatt audit) of privately referring to Hyatt as a "Jew bastard," wanting "to get" him, rifling through his mail, and going through his trash. These allegations were vehemently denied by Ms. Cox and not corroborated by a single other witness. Ms. Cox was not a management level FTB employee or a final decision maker. Her findings and conclusions were in the nature of recommendations reviewed by many layers of supervisors, management and FTB tax attorneys before a final decision was reached concerning Hyatt's tax liability. Ms. Cox left the FTB many years ago and does not have any involvement or decision making authority in the protest or appeal processes."**

Objection. After explaining he was initially assigned to this matter in mid-1998 and reassigned in early 1999, para. 6, Dunn's testimony regarding alleged 2014 administrative events or documents, including extensive briefing, arguments, testimony, firing, coaching, working, accusations, allegations, denials, corroboration, findings, conclusions, authority and actions, and their effects, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including extensive briefing, arguments, testimony, firing, coaching, working, accusations, allegations, denials, corroboration, findings, conclusions, authority and actions, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including extensive briefing, arguments, testimony, firing, coaching, working, accusations, allegations, denials, corroboration, findings, conclusions, authority and actions, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing extensive briefing, arguments, testimony, firing, coaching, working, accusations, allegations, denials, corroboration, findings, conclusions, authority and actions. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

*Collateral Estoppel request*

As alleged in the Complaint, it was determined in the prior Nevada litigation that FTB officials acted in bad faith and with fraud and malice during the administrative process in making the assessments against Mr. Hyatt. (Complaint, ¶¶ 5, 29, and 111-117.) A significant part of this issue presented to the jury in the Nevada ligation was the conduct of the lead auditor Ms. Cox as per testimony by a fellow FTB employee Ms. Les. Ms. Les testified as to Ms. Cox's repeated anti-Semitic comments about Mr. Hyatt and other Jewish taxpayers, Ms. Cox's desire "to get" Mr. Hyatt, and the vendetta she has against Mr. Hyatt. Ms. Cox denied these allegations at trial. The Nevada court and jury agreed with Mr. Hyatt, and clearly with Ms. Les' testimony, in finding for Mr. Hyatt in regard to the FTB's bad faith conduct. *See Request for Judicial Notice, Exhs. 12-15, 27-28.*

As result, Dunn's interpretations of facts and documents regarding issues already determined in previous litigation, including the FTB Defendants' argument that "delays are largely the responsibility, and design, of Hyatt," (Mot. at 14:7-8), and Dunn's statements concerning extensive briefing, arguments, testimony, firing, coaching, working, accusations, allegations, denials, corroboration, findings, conclusions, authority and actions, are also barred by the Doctrine of Collateral Estoppel, irrelevant to jurisdictional issues and excludable under FRE 401 and FRE 402.

Collateral estoppel, or issue preclusion, bars defendants in this second case from re-litigating issues that were determined on the merits in the underlying Nevada State Court case. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision precludes re-litigation of the issue by a party that lost on that issue in prior litigation. *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)).

It is of no consequence if, as here, the issue(s) for which collateral estoppel is asserted was decided by a state court, as "[t]he federal courts generally have . . . consistently accorded preclusive effect to issues decided by state courts." *Allen v. McCurry*, 449 U.S. at 94 (citing *Montana v. United States*, 440 U.S. 147; *Angel v. Bullington*, 330 U.S. 183 (1947)).

A collateral estoppel request in a civil rights action brought in federal court under 42 U.S.C. § 1983 is determined by the law of state in which the prior litigation took place. *See Allen v. McCurry*, 449 U.S. at 103. The preclusive effect of a state-court judgment in Federal Court is governed by state law. *Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 914-15 (9th Cir. 1993; *see also* 28 U.S.C. § 1738 (providing "[s]uch . . . judicial proceedings . . . shall have the same full faith and credit in every court within the United States and its Territories and

Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.").

The Supreme Court has made clear that "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).

As a result, to the extent the Court here seeks to make a determination, either now or a later point in this action, as to the FTB's bad faith conduct in whole or in part based on whether Ms. Cox engaged in the discriminatory conduct at issue in the Nevada litigation, Defendants, acting in their official capacities as representatives of the State, are barred by the Doctrine of Collateral Estoppel from re-contesting the FTB's bad faith conduct and Ms. Cox's discriminatory misconduct as determined in the Nevada litigation.

**"32. The current litigation to enjoin the California tax proceedings is consistent with Hyatt's pattern of strategic litigation. Hyatt has used the courts to interfere with the FTB's routine processes through litigation in Nevada, California, and New York."**

Objection. After explaining he was initially assigned to this matter in mid-1998 and reassigned in early 1999, para. 6, Dunn's testimony regarding an alleged "pattern of strategic litigation" and use of the courts "to interfere with the FTB's routine processes," are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including litigation activities and records and their alleged effect on administrative proceedings, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including litigation activities and records, and their alleged effect on administrative proceedings, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

Dunn provides no factual basis for describing litigation activities and records, and their alleged effect on administrative proceedings. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

*Collateral Estoppel request*

As alleged in the Complaint, it was determined in the prior Nevada litigation that FTB officials acted in bad faith in delaying and refusing to conclude the protest phase of the administrative process and further the FTB had acted in bad faith and with fraud and malice during the administrative process in making the assessments against Mr. Hyatt. (Complaint, ¶¶ 5, 29, and 111-117.) A significant part of the dispute in the Nevada litigation was the cause of the delay in the administrative proceedings. The FTB's position was that Mr. Hyatt was allegedly using that litigation to interfere with the administrative proceeding in California. The FTB presented this position in the Nevada litigation, and Mr. Hyatt rebutted it and

presented his counter-view that the FTB was acting in bad faith towards him during the administrative process and in intentionally delaying the administrative process. The Nevada court and jury agreed with Mr. Hyatt. *See Request for Judicial Notice, Exhs. 1-17, 22-25.*

As result, Dunn's interpretations of facts and documents regarding issues already determined in previous litigation, including the FTB Defendants' argument that "delays are largely the responsibility, and design, of Hyatt," (Mot. at 14:7-8), and Dunn's statements concerning litigation activities and records, and their effect on administrative proceedings, along with this entire paragraph 32, which is not cited in the FTB Defendants' motion to dismiss, are also barred by the Doctrine of Collateral Estoppel, irrelevant to jurisdictional issues and excludable under FRE 401 and FRE 402.

Collateral estoppel, or issue preclusion, bars defendants in this second case from re-litigating issues that were determined on the merits in the underlying Nevada State Court case. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision precludes re-litigation of the issue by a party that lost on that issue in prior litigation. *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)).

It is of no consequence if, as here, the issue(s) for which collateral estoppel is asserted was decided by a state court, as "[t]he federal courts generally have . . . consistently accorded preclusive effect to issues decided by state courts." *Allen v. McCurry*, 449 U.S. at 94 (citing *Montana v. United States*, 440 U.S. 147; *Angel v. Bullington*, 330 U.S. 183 (1947)).

A collateral estoppel request in a civil rights action brought in federal court under 42 U.S.C. § 1983 is determined by the law of state in which the prior litigation took place. *See Allen v. McCurry*, 449 U.S. at 103. The preclusive effect of a state-court judgment in Federal Court is governed by state law. *Intel Corp. v.*

*Advanced Micro Devices, Inc.*, 12 F.3d 908, 914-15 (9th Cir. 1993; *see also* 28 U.S.C. § 1738 (providing "[s]uch . . . judicial proceedings . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.").

The Supreme Court has made clear that "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).

As a result, to the extent the Court here seeks to make a determination, either now or a later point in this action, as to the FTB's bad faith conduct in whole or in part based on whether Mr. Hyatt was using the Nevada litigation to interfere with the administrative proceeding in California, Defendants, acting in their official capacities as representatives of the State, are barred by the Doctrine of Collateral Estoppel from re-contesting this issue as determined in the Nevada litigation.

**"33. Even after filing his Complaint in this present action, Hyatt requested substantially more time to file his briefs beyond the October 14, 2014 hearing date SBE scheduled. This caused the hearing to be put out even further, now to some time in or after March 2015. Before this recent request Hyatt requested and received many, many extensions of time to file his briefs. This gave him years to obtain more than one hundred affidavits and declarations from witnesses more than 15 years after the fact. This activity has caused the appeal proceedings to span the years 2008 through the present date, and, as currently scheduled in response to Hyatt's most recent request, now into 2015."**

Objection. After explaining he was initially assigned to this matter in mid-1998 and reassigned in early 1999, para. 6, Dunn's testimony regarding later activities and filings, including alleged briefing, requests, extensions, filings and activities, and their alleged effects on administrative proceedings, are inadmissible speculation which lack foundation and personal knowledge. FRE 602. *Boyd v.*

*City of Oakland*, 458 F.Supp.2d 1015, 1031 (N.D. Cal. 2006)("[U]nder FRE 602, a witness must have personal knowledge of the subject matter attested to … [the declarant] was admittedly not present at the alleged event and therefore has no personal knowledge … Her assertion is thus inadmissible under FRE 602.") *See United States v. M.E. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970).

What Dunn looked at, evaluated, was informed of, or believed, including alleged briefing, requests, extensions, filings and activities, and their alleged effects on administrative proceedings, constitute out-of-court statements being introduced by the FTB Defendants to prove the truth of the matters asserted, and are inadmissible hearsay, FRE 801 and FRE 802, and any outlines, summaries, timelines or other opinions, are improper lay opinion. FRE 701 and FRE 702.

Dunn's interpretations of certain facts and documents, including alleged briefing, requests, extensions, filings and activities, and their alleged effects on administrative proceedings, violate the Best Evidence rule and the rule of completeness. FRE 1002 and FRE 106; *See Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003)(relying on snippets of evidence rather than introducing evidence as a whole violates the best evidence rule and rule of completeness, FRE 106, as it allows party to take evidence out of proper context).

///

///

///

///

///

///

///

///

///

///

Dunn provides no factual basis for describing alleged briefing, requests, extensions, filings and activities, and their alleged effects on administrative proceedings. Without such foundational facts, Dunn's evidence is pure speculation, and his opinions should be stricken or excluded. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376-1377 (9th Cir. 1978)(mere belief or understanding is insufficient to create a genuine issue of fact).

DATED: August 25, 2014

**PERKINS COIE LLP**

By: s/Donald J. Kula
Donald J. Kula

**ERWIN CHEMERINSKY, ESQ.**

**SEGAL & ASSOCIATES, PC.**

Attorneys for Plaintiff, Gilbert P. Hyatt

**CERTIFICATE OF SERVICE**

U.S. Court of Appeals Docket Number(s): 15-15296

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 29, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature: s/ Yolanda Mendez