**No. 15-15296**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

GILBERT P. HYATT,

*Plaintiff-Appellant,*

v.

DIANE L. HARKEY, in her official capacity as California State
Board of Equalization member; JEROME E. HORTON, in his
official capacity as California Franchise Tax Board member and
California State Board of Equalization member; MICHAEL
COHEN, in his official capacity as California Franchise Tax Board
member; BETTY T. YEE, in her official capacity as California
Franchise Tax Board member and California State Board of
Equalization member; GEORGE RUNNER, in his official capacity
as California State Board of Equalization member; FIONA MA, in
her official capacity as California State Board of Equalization
member,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California
Case No. 2:14-cv-00849-GEB-DAD (Hon. Garland E. Burrell, Jr.)

APPELLANT GILBERT P. HYATT'S
EXCERPTS OF RECORD
VOLUME 4 of 4

Donald J. Kula, Bar No. 144342
DKula@perkinscoie.com
Oliver M. Gold, Bar No. 279033
OGold@perkinscoie.com
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Erwin Chemerinsky
EChemerinsky@law.uci.edu
UC IRVINE SCHOOL OF LAW
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000
Telephone: 949.824.8814
Facsimile: 949.824.7336

Malcolm Segal, Bar No. 075481
MSegal@segal-pc.com
SEGAL & ASSOCIATES, PC
400 Capitol Mall, Suite 2550
Sacramento, CA 95814
Telephone: 916.441.0886
Facsimile: 916.475.1231

Attorneys for Appellant Gilbert P. Hyatt

# TABLE OF CONTENTS

## Volume 1

**Page**

02/10/2015     [Doc. No. 36] Judgment …………………….……………    1

02/10/2015     [Doc. No. 35] Order Granting Defendants' Motion to
Dismiss for Lack of Jurisdiction ………………….………    2

## Volume 2

02/18/2015     [Doc. No. 37] Notice of Appeal …………………………    15

08/25/2014     [Doc. No. 22-1] Declaration of Eric J. Coffill in Support of
Plaintiff Gilbert P. Hyatt's Consolidated Opposition to
Defendants' Respective Motions to Dismiss ……………    17

08/25/2014     [Doc. No. 22-2] Declaration of Donald J. Kula in Support
of Plaintiff Gilbert P. Hyatt's Consolidated Opposition to
Defendants' Respective Motions to Dismiss …….………    55

08/25/2014     [Doc. No. 23 - 23-2] Request for Judicial Notice in Support
of Plaintiff's Consolidated Opposition to Defendants'
Respective Motions to Dismiss ……………    64

## Volume 3

08/25/2014     (Continued) [Doc. No. 23 - 23-2] Request for Judicial
Notice in Support of Plaintiff's Consolidated Opposition to
Defendants' Respective Motions to Dismiss …………    306

08/25/2014     [Doc. No. 24] Plaintiff's Objections to Declaration of
Robert W. Dunn in Support of California Franchise Tax
Board Members Defendants' Motions to Dismiss ………    505

1

TABLE OF CONTENTS

**Volume 4**

**Page**

09/26/2014   [Doc. No. 25] Notice of Decision from Nevada Supreme
             Court .…………………………………………………   556

12/03/2014   [Doc. No. 30] Plaintiff's Supplemental Notice of Decision
             from Nevada Supreme Court ……………………………   631

12/03/2014   [Doc. No. 31] Notice of Errata Re Plaintiff's Supplemental
             Notice of Decision from Nevada Supreme Court ………   635

04/04/2014   [Doc. No. 2] Complaint for Injunctive Relief Under 42
             U.S.C. § 1983 ……………………………………………   738

             Case Docket ……………………………….……………   784

1   Donald J. Kula, Bar No. 144342
    DKula@perkinscoie.com
2   Oliver M. Gold, Bar No. 279033
    OGold@perkinscoie.com
3   PERKINS COIE LLP
    1888 Century Park E., Suite 1700
4   Los Angeles, CA 90067-1721
    Telephone: 310.788.9900
5   Facsimile: 310.788.3399

6   Erwin Chemerinsky, Esq.,
    EChemerinsky@law.uci.edu
7   UC IRVINE SCHOOL OF LAW
    401 E. Peltason Drive, Suite 1000
8   Irvine, CA 92697-8000
    Telephone: 949.824.8814
9   Facsimile: 949.824.7336

10  Malcolm Segal, Bar No. 075481
    MSegal@segal-pc.com
11  SEGAL & ASSOCIATES, PC
    400 Capitol Mall, Suite 2550
12  Sacramento, CA 95814
    Telephone: 916.441.0886
13  Facsimile: 916.475.1231

14  Attorneys for Plaintiff Gilbert P. Hyatt

15              UNITED STATES DISTRICT COURT

16             EASTERN DISTRICT OF CALIFORNIA

17

18  GILBERT P. HYATT,                Case No. : 2:14-cv-00849-GEB-DAD

19              Plaintiff,           **NOTICE OF DECISION FROM
                                     NEVADA SUPREME COURT**
20       v.
                                     **Date:        November 3, 2014**
21  JOHN CHIANG, JEROME E.           **Time:        9:00 a.m.**
    HORTON, AND MICHAEL              **Courtroom:   10**
22  COHEN, CALIFORNIA
    FRANCHISE TAX BOARD              **Hon. Garland E. Burrell, Jr.**
23  MEMBERS; BETTY T. YEE,
    GEORGE RUNNER, MICHELLE
24  STEEL, JEROME E. HORTON,
    AND JOHN CHIANG,
25  CALIFORNIA STATE BOARD OF
    EQUALIZATION MEMBERS;
26  AND DOES 1 THROUGH 20,

27              Defendants.

28

LEGAL123605998.1                              NOTICE OF DECISION

ER 556

1    **TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2         **PLEASE TAKE NOTICE THAT** on September 18, 2014 the Nevada

3    Supreme Court entered a decision in the case of *Franchise Tax Board of California*

4    *v. Hyatt*, Nevada Supreme Court Case No. 53264, September 18, 2014 (the "Nev.

5    Sup. Ct. Decision"). A true and correct copy of the Nev. Sup. Ct. Decision is

6    attached hereto as Exhibit A.

7         The Nev. Sup. Ct. Decision stems from a Nevada case and judgment that was

8    referenced by the parties in the moving and opposition papers filed in regard to the

9    Defendants two pending Motions to Dismiss. Specifically, the underlying Nevada

10   case, and its judgment, *Hyatt v. Franchise Tax Board of California*, Nevada Eighth

11   Judicial District Court, Clark County, Case No. A382999, August 14, 2008 (the

12   "Nevada Judgment"), was referenced in: (i) the Complaint (Dkt., 2, at ¶¶ 111-117);

13   (ii) the FTB Defendants' pending Motion to Dismiss (Dkt. 17-1, at 5:15-6:4, 14:13-

14   15:2) and its supporting papers (Dkt., 17-2, at ¶¶ 14, 16-18, 20-22, 31-32); and (iii)

15   Plaintiff Gilbert P. Hyatt's Combined Opposition (Dkt. 22, at 4: 12-22, 9:8-12,

16   13:11-14:15) and its supporting papers (Dkt., 23, at Exhs. 1-17, 20-27; Dkt. 24, at

17   16:11-26:7, 27:14-30:11, 41:23-45:13). The SBE Defendants did not explicitly

18   refer to the Nevada case or judgment in its moving papers.

19        In this regard, in his opposition to the two motions to dismiss Mr. Hyatt has

20   cited to the Nevada Judgment in arguing that Defendants are barred as a matter of

21   collateral estoppel from re-contesting issues decided in the Nevada action. In

22   particular, Mr. Hyatt contends that through the Nevada Judgment it has been

23   determined that the Franchise Tax Board of California (the "FTB") acted in bad

24   faith and delayed the administrative protests Mr. Hyatt had filed challenging the

25   state tax audits conducted by the FTB. Mr. Hyatt therefore contends that

26   Defendants are barred from re-contesting that the FTB acted in bad faith and caused

27   the delay in the administrative tax protests that lasted 11 years. (Dkt., 22, at 14:7-

28   15).

1    *Notice and Summary of Decision*

2        In sum, the Nev. Sup. Ct. Decision affirmed in part and reversed in part the

3    underlying Nevada Judgment, and remanded the case to the Nevada District Court

4    for a new trial as to damages only on one of the claims at issue.

5        **Affirmed:**

6        The Nev. Sup. Ct. Decision affirmed that portion of the judgment that: (i)

7    found, via a jury trial, that the FTB committed fraud against Mr. Hyatt and (ii)

8    awarded $1,085, 257.89 in special damages to Mr. Hyatt and against the FTB on

9    this claim.  In support of affirming this portion of the Nevada Judgment, the Court

10   cited and described substantial evidence, including but not limited to the following

11   from the trial record:

12              Furthermore, *Hyatt showed that FTB took 11 years to*

13              *resolve Hyatt's protests of the two audits.  Hyatt alleged*

14              *that this delay resulted in $8,000 in interest per day*

15              *accruing against him for the outstanding taxes owed to*

16              *California.*  Also at trial, Hyatt presented evidence

17              through Candace Les, a former FTB auditor and friend of

18              the main auditor on Hyatt's audit, Sheila Cox, that Cox

19              had made disparaging comments about Hyatt and his

20              religion, that Cox essentially was intent on imposing an

21              assessment against Hyatt, and that FTB promoted a

22              culture in which tax assessments were the end goal

23              whenever an audit was undertaken. . . .

24

25              *The evidence presented sufficiently showed FTB's*

26              *improper motives in conducting Hyatt's audits*, and a

27              reasonable mind could conclude that FTB made

28              fraudulent representations, that it knew the

1          representations were false, and that it intended for Hyatt

2          to rely on the representations. [footnote omitted]  What's

3          more, the jury could reasonably conclude that Hyatt relied

4          on FTB's representations to act and participate in the

5          audits in a manner different than he would have

6          otherwise, which resulted in damages.  Based on this

7          evidence, we conclude that substantial evidence supports

8          each of the fraud elements and that FTB is not entitled to

9          judgment as a matter of law on this cause of action.

10         [footnote omitted][1]

11      The Nev. Sup. Ct. Decision also affirmed that portion of the Nevada

12  Judgment finding that the FTB intentionally inflicted emotional distress upon Mr.

13  Hyatt.  In affirming this portion of the Nevada Judgment, the Court cited and

14  described substantial evidence, including but not limited to the following from the

15  trial record:

16          . . . *Hyatt suffered extreme treatment from FTB.*  As

17          explained above in discussing the fraud claim, FTB

18          disclosed personal information that it promised to keep

19          confidential *and delayed resolution of Hyatt's protests for*

20          *11 years, resulting in a daily interest charge of $8,000.*

21          Further, Hyatt presented testimony that the auditor who

22          conducted the majority of his two audits made

23          disparaging remarks about Hyatt and his religion, was

24          determined to impose tax assessments against him, and

25          that FTB fostered an environment in which the imposition

26          of tax assessments was the objective whenever an audit

27

28  [1] Nev. Sup. Ct. Decision, at 38-39 (*see* Exh. A hereto).

1    was undertaken.  These facts support the conclusion that

2    this case is at the more extreme end of the scale, and

3    therefore less in the way of proof as to emotional distress

4    suffered by Hyatt is necessary.[2]

5  The court therefore concluded that:

6    We conclude that this evidence, in connection with the

7    severe treatment experienced by Hyatt, provided

8    sufficient evidence from which a jury could reasonably

9    determine that Hyatt suffered severe emotional distress

10   [footnote omitted].  Accordingly, we affirm the judgment

11   in favor of Hyatt on this claim as to liability.[3]

12

13  **Reversed:**

14       The Nev. Sup. Ct. Decision reversed the portions of the Nevada Judgment

15  that had found the FTB was liable to Mr. Hyatt for claims of invasion of privacy,

16  breach of confidential relations, and abuse of process and reversed the award to Mr.

17  Hyatt of ¶ $52 million in damages for invasion of privacy.  The Nev. Sup. Ct.

18  Decision determined that Mr. Hyatt was not entitled to recover on those claims and

19  was not entitled to the invasion of privacy damages as a matter of law.

20       The Nev. Sup. Ct. Decision also reversed the portion of the Nevada

21  Judgment that awarded Mr. Hyatt $250 million in punitive damages against the

22  FTB.  The Nev. Sup. Ct. Decision determined that punitive damages could not be

23  recovered against the FTB, an agency of the State of California, as a matter of law.

24  **Remanded:**

25       The Nev. Sup. Ct. Decision vacated the portion of the Nevada Judgment that

26  awarded $85 million for emotional distress damages to Mr. Hyatt and against the

27  _____

28  [2] Nev. Sup. Ct. Decision, at 47 (*see* Exh. A hereto).
    [3] Nev. Sup. Ct. Decision, at 48 (*see* Exh. A hereto).

LEGAL123605998.1                    -5-                    NOTICE OF DECISION

ER 560

1   FTB and remanded the matter to the Nevada District for a new trial on damages that
2   should be awarded to Mr. Hyatt.  This ruling was based on evidentiary and jury
3   instruction mistakes made by the trial court during the underlying trial.  The Court
4   also concluded that there is no statutory cap on the amount of damages that may be
5   awarded on remand on the intentional infliction of emotional distress claim.
6
7   DATED:  September 26, 2014            **PERKINS COIE LLP**
8
9                                        By:/s/ Donald J. Kula _____
                                            Donald J. Kula
10                                       **ERWIN CHEMERINSKY, Esq.**
11                                       **SEGAL & ASSOCIATES, PC.**
12                                       Attorneys for Plaintiff, Gilbert P. Hyatt
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LEGAL123605998.1                -6-                        NOTICE OF DECISION

ER 561

# EXHIBIT  A

**130 Nev., Advance Opinion 71**

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA, Appellant/Cross-Respondent, vs. GILBERT P. HYATT, Respondent/Cross-Appellant. | No. 53264 |

**FILED**

SEP 1 8 2014

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK



Appeal and cross-appeal from a district court judgment on a jury verdict in a tort action and from a post-judgment order awarding costs. Eighth Judicial District Court, Clark County; Jessie Elizabeth Walsh, Judge.

*Affirmed in part, reversed in part, and remanded.*

Lemons, Grundy & Eisenberg and Robert L. Eisenberg, Reno; McDonald Carano Wilson LLP and Pat Lundvall, Carla Higginbotham, and Megan L. Starich, Reno,
for Appellant/Cross-Respondent.

Kaempfer Crowell Renshaw Gronauer & Fiorentino and Peter C. Bernhard, Las Vegas; Hutchison & Steffen, LLC, and Mark A. Hutchison and Michael K. Wall, Las Vegas; Lewis Roca Rothgerber LLP and Daniel F. Polsenberg, Las Vegas; Perkins Coie LLP and Donald J. Kula, Los Angeles, California,
for Respondent/Cross-Appellant.

Catherine Cortez Masto, Attorney General, and C. Wayne Howle, Solicitor General, Carson City,
for Amicus Curiae State of Nevada.

Dustin McDaniel, Attorney General, Little Rock, Arkansas,
for Amicus Curiae State of Arkansas.

SUPREME COURT
OF
NEVADA

(O) 1947A

14-30944

John V. Suthers, Attorney General, Denver, Colorado,
for Amicus Curiae State of Colorado.

Joseph R. "Beau" Biden III, Attorney General, and Richard S. Gebelein,
Chief Deputy Attorney General, Wilmington, Delaware,
for Amicus Curiae State of Delaware.

Bill McCollum, Attorney General, Tallahassee, Florida,
for Amicus Curiae State of Florida.

Lawrence G. Wasden, Attorney General, Boise, Idaho,
for Amicus Curiae State of Idaho.

Shone T. Pierre, Baton Rouge, Louisiana,
for Amicus Curiae Louisiana Secretary and the Louisiana Department of
Revenue.

Janet T. Mills, Attorney General, Augusta, Maine,
for Amicus Curiae State of Maine.

Douglas F. Gansler, Attorney General, Baltimore, Maryland,
for Amicus Curiae State of Maryland.

Chris Koster, Attorney General, Jefferson City, Missouri,
for Amicus Curiae State of Missouri.

Anne Milgram, Attorney General, Trenton, New Jersey,
for Amicus Curiae State of New Jersey.

Donnita A. Wald, General Counsel, Bismarck, North Dakota,
for Amicus Curiae North Dakota State Tax Commissioner Cory Fong.

Richard Cordray, Attorney General, Columbus, Ohio,
for Amicus Curiae State of Ohio.

W.A. Drew Edmondson, Attorney General, Oklahoma City, Oklahoma,
for Amicus Curiae State of Oklahoma.

Robert E. Cooper, Jr., Attorney General and Reporter, Nashville,
Tennessee,
for Amicus Curiae State of Tennessee.



John Swallow, Attorney General, and Clark L. Snelson, Assistant
Attorney General, Salt Lake City, Utah,
for Amicus Curiae State of Utah.

William H. Sorrell, Attorney General, Montpelier, Vermont,
for Amicus Curiae State of Vermont.

William C. Mims, Attorney General, Richmond, Virginia,
for Amicus Curiae State of Virginia.

Robert M. McKenna, Attorney General, Olympia, Washington,
for Amicus Curiae State of Washington.

Shirley Sicilian, General Counsel, Washington, District of Columbia,
for Amicus Curiae Multistate Tax Commission.

---

BEFORE THE COURT EN BANC.[1]

*OPINION*

By the Court, HARDESTY, J.:

In 1998, inventor Gilbert P. Hyatt sued the Franchise Tax
Board of the State of California (FTB) seeking damages for intentional
torts and bad-faith conduct committed by FTB auditors during tax audits
of Hyatt's 1991 and 1992 state tax returns. After years of litigation, a jury
awarded Hyatt $139 million in damages on his tort claims and $250
million in punitive damages. In this appeal, we must determine, among
other issues, whether we should revisit our exception to government

---

[1]The Honorable Nancy M. Saitta, Justice, voluntarily recused
herself from participation in the decision of this matter.



SUPREME COURT
OF
NEVADA

(0) 1947A

3

immunity for intentional torts and bad-faith conduct as a result of this court's adoption of the federal test for discretionary-function immunity, which shields a government entity or its employees from suit for discretionary acts that involve an element of individual judgment or choice and that are grounded in public policy considerations. We hold that our exception to immunity for intentional torts and bad-faith conduct survives our adoption of the federal discretionary-function immunity test because intentional torts and bad-faith conduct are not based on public policy.

Because FTB cannot invoke discretionary-function immunity to protect itself from Hyatt's intentional tort and bad-faith causes of action, we must determine whether Hyatt's claims for invasion of privacy, breach of confidential relationship, abuse of process, fraud, and intentional infliction of emotional distress survive as a matter of law, and if so, whether they are supported by substantial evidence. All of Hyatt's causes of action, except for his fraud and intentional infliction of emotion distress claims, fail as a matter of law, and thus, the judgment in his favor on these claims is reversed.

As to the fraud cause of action, sufficient evidence exists to support the jury's findings that FTB made false representations to Hyatt regarding the audits' processes and that Hyatt relied on those representations to his detriment and damages resulted. In regard to Hyatt's claim for intentional infliction of emotional distress, we conclude that medical records are not mandatory in order to establish a claim for intentional infliction of emotional distress if the acts of the defendant are sufficiently severe. As a result, substantial evidence supports the jury's findings as to liability, but evidentiary and jury instruction errors committed by the district court require reversal of the damages awarded

SUPREME COURT
OF
NEVADA

(O) 1947A

4

for emotional distress and a remand for a new trial as to the amount of damages on this claim only.

In connection with these causes of action, we must address whether FTB is entitled to a statutory cap on the amount of damages that Hyatt may recover from FTB on the fraud and intentional infliction of emotional distress claims under comity. We conclude that Nevada's policy interest in providing adequate redress to its citizens outweighs providing FTB a statutory cap on damages under comity, and therefore, we affirm the $1,085,281.56 of special damages awarded to Hyatt on his fraud cause of action and conclude that there is no statutory cap on the amount of damages that may be awarded on remand on the intentional infliction of emotional distress claim.

We also take this opportunity to address as a matter of first impression whether, based on comity, it is reasonable to provide FTB with the same protection of California law, to the extent that it does not conflict with Nevada law, to grant FTB immunity from punitive damages. Because punitive damages would not be available against a Nevada government entity, we hold, under comity principles, that FTB is immune from punitive damages. Thus, we reverse that portion of the district court's judgment awarding Hyatt punitive damages.

For the reasons discussed below, we affirm in part, reverse in part, and remand this case to the district court for further proceedings.

### FACTS AND PROCEDURAL HISTORY

*California proceedings*

In 1993, after reading a newspaper article regarding respondent/cross-appellant Hyatt's lucrative computer-chip patent and the large sums of money that Hyatt was making from the patent, a tax auditor for appellant/cross-respondent FTB decided to review Hyatt's 1991 state



income tax return. The return revealed that Hyatt did not report, as taxable income, the money that he had earned from the patent's licensing payments and that he had only reported 3.5 percent of his total taxable income for 1991. Hyatt's tax return showed that he had lived in California for nine months in 1991 before relocating to Las Vegas, Nevada, but Hyatt claimed no moving expenses on his 1991 tax return. Based on these discrepancies, FTB opened an audit on Hyatt's 1991 state income tax return.

The 1991 audit began when Hyatt was sent notice that he was being audited. This notification included an information request form that required Hyatt to provide certain information concerning his connections to California and Nevada and the facts surrounding his move to Nevada. A portion of the information request form contained a privacy notice, which stated in relevant part that "The Information Practices Act of 1977 and the federal Privacy Act require the Franchise Tax Board to tell you why we ask you for information. The Operations and Compliance Divisions ask for tax return information to carry out the Personal Income Tax Law of the State of California." Also included with the notification was a document containing a list of what the taxpayer could expect from FTB: "Courteous treatment by FTB employees[,] Clear and concise requests for information from the auditor assigned to your case[,] Confidential treatment of any personal and financial information that you provide to us[,] Completion of the audit within a reasonable amount of time[.]"

The audit involved written communications and interviews. FTB sent over 100 letters and demands for information to third parties including banks, utility companies, newspapers (to learn if Hyatt had



SUPREME COURT
OF
NEVADA

(O) 1947A

6

subscriptions), medical providers, Hyatt's attorneys, two Japanese companies that held licenses to Hyatt's patent (inquiring about payments to Hyatt), and other individuals and entities that Hyatt had identified as contacts. Many, but not all, of the letters and demands for information contained Hyatt's social security number or home address or both. FTB also requested information and documents directly from Hyatt. Interviews were conducted and signed statements were obtained from three of Hyatt's relatives—his ex-wife, his brother, and his daughter—all of whom were estranged from Hyatt during the relevant period in question, except for a short time when Hyatt and his daughter attempted to reconcile their relationship. No relatives with whom Hyatt had good relations, including his son, were ever interviewed even though Hyatt had identified them as contacts. FTB sent auditors to Hyatt's neighborhood in California and to various locations in Las Vegas in search of information.

Upon completion of the 1991 audit, FTB concluded that Hyatt did not move from California to Las Vegas in September 1991, as he had stated, but rather, that Hyatt had moved in April 1992. FTB further concluded that Hyatt had staged the earlier move to Nevada by renting an apartment, obtaining a driver's license, insurance, bank account, and registering to vote, all in an effort to avoid state income tax liability on his patent licensing. FTB further determined that the sale of Hyatt's California home to his work assistant was a sham. A detailed explanation of what factors FTB considered in reaching its conclusions was provided, which in addition to the above, included comparing contacts between Nevada and California, banking activity in the two states, evidence of Hyatt's location in the two states during the relevant period, and professionals whom he employed in the two states. Based on these

SUPREME COURT
OF
NEVADA

(0) 1947A

findings, FTB determined that Hyatt owed the state of California approximately $1.8 million in additional state income taxes and that penalties against Hyatt in the amount of $1.4 million were warranted. These amounts, coupled with $1.2 million in interest, resulted in a total assessment of $4.5 million.

The 1991 audit's finding that Hyatt did not move to Las Vegas until April 1992 prompted FTB to commence a second audit of Hyatt's 1992 California state taxes. Because he maintained that he lived in Nevada that tax year, Hyatt did not file a California tax return for 1992, and he opposed the audit. Relying in large part on the 1991 audit's findings and a single request for information sent to Hyatt regarding patent-licensing payments received in 1992, FTB found that Hyatt owed the state of California over $6 million in taxes and interest for 1992. Moreover, penalties similar to those imposed by the 1991 audit were later assessed.

Hyatt formally challenged the audits' conclusions by filing two protests with FTB that were handled concurrently. Under a protest, an audit is reviewed by FTB for accuracy, or the need for any changes, or both. The protests lasted over 11 years and involved 3 different FTB auditors. In the end, FTB upheld the audits, and Hyatt went on to challenge them in the California courts.[2]

*Nevada litigation*

During the protests, Hyatt filed the underlying Nevada lawsuit in January 1998. His complaint included a claim for declaratory

---

[2]At the time of this appeal, Hyatt was still challenging the audits' conclusions in California courts.


SUPREME COURT
OF
NEVADA

(O) 1947A

8

relief concerning the timing of his move from California to Nevada and a claim for negligence. The complaint also identified seven intentional tort causes of action allegedly committed by FTB during the 1991 and 1992 audits: invasion of privacy—intrusion upon seclusion, invasion of privacy—publicity of private facts, invasion of privacy—false light, intentional infliction of emotional distress, fraud, breach of confidential relationship, and abuse of process. Hyatt's lawsuit was grounded on his allegations that FTB conducted unfair audits that amounted to FTB "seeking to trump up a tax claim against him or attempt[ing] to extort him," that FTB's audits were "goal-oriented," that the audits were conducted to improve FTB's tax assessment numbers, and that the penalties FTB imposed against Hyatt were intended "to better bargain for and position the case to settle."

Early in the litigation, FTB filed a motion for partial summary judgment challenging the Nevada district court's jurisdiction over Hyatt's declaratory relief cause of action. The district court agreed on the basis that the timing of Hyatt's move from California to Nevada and whether FTB properly assessed taxes and penalties against Hyatt should be resolved in the ongoing California administrative process. Accordingly, the district court granted FTB partial summary judgment.[3] As a result of the district court's ruling, the parties were required to litigate the action under the restraint that any determinations as to the audits' accuracy were not part of Hyatt's tort action and the jury would not make any

---

[3]That ruling was not challenged in this court, and consequently, it is not part of this appeal.



findings as to when Hyatt moved to Nevada or whether the audits' conclusions were correct.

FTB also moved the district court for partial summary judgment to preclude Hyatt from seeking recovery for alleged economic damages. As part of its audit investigation, FTB sent letters to two Japanese companies that had licensing agreements with Hyatt requesting payment information between Hyatt and the companies. Included with the letters were copies of the licensing agreements between Hyatt and the Japanese companies. Hyatt asserted that those documents were confidential and that when FTB sent the documents to the companies, the companies were made aware that Hyatt was under investigation. Based on this disclosure, Hyatt theorized that the companies would have then notified the Japanese government, who would in turn notify other Japanese businesses that Hyatt was under investigation. Hyatt claimed that this ultimately ended Hyatt's patent-licensing business in Japan. Hyatt's evidence in support of these allegations included the fact that FTB sent the letters, that the two businesses sent responses, that Hyatt had no patent-licensing income after this occurred, and expert testimony that this chain of events would likely have occurred in the Japanese business culture. FTB argued that Hyatt's evidence was speculative and insufficient to adequately support his claim. Hyatt argued that he had sufficient circumstantial evidence to present the issue to the jury. The district court granted FTB's motion for partial summary judgment, concluding that Hyatt had offered no admissible evidence to support that the theorized chain of events actually occurred and, as a result, his evidence was too speculative to overcome the summary judgment motion.

SUPREME COURT
OF
NEVADA

(O) 1947A

10

One other relevant proceeding that bears discussion in this appeal concerns two original writ petitions filed by FTB in this court in 2000. In those petitions, FTB sought immunity from the entire underlying Nevada lawsuit, arguing that it was entitled to the complete immunity that it enjoyed under California law based on either sovereign immunity, the Full Faith and Credit Clause, or comity. This court resolved the petitions together in an unpublished order in which we concluded that FTB was not entitled to full immunity under any of these principles. But we did determine that, under comity, FTB should be granted partial immunity equal to the immunity a Nevada government agency would receive. In light of that ruling, this court held that FTB was immune from Hyatt's negligence cause of action, but not from his intentional tort causes of action. The court concluded that while Nevada provided immunity for discretionary decisions made by government agencies, such immunity did not apply to intentional torts or bad-faith conduct because to allow it to do so would "contravene Nevada's policies and interests in this case."

This court's ruling in the writ petitions was appealed to and upheld by the United States Supreme Court. *Franchise Tax Bd. of Cal. v. Hyatt*, 538 U.S. 488 (2003). In *Hyatt*, the Supreme Court focused on the issue of whether the Full Faith and Credit Clause of the federal constitution required Nevada to afford FTB the benefit of the full immunity that California provides FTB. *Id.* at 494. The Court upheld this court's determination that Nevada was not required to give FTB full immunity. *Id.* at 499. The Court further upheld this court's conclusion that FTB was entitled to partial immunity under comity principles, observing that this court "sensitively applied principles of comity with a healthy regard for California's sovereign status, relying on the contours of

Nevada's own sovereign immunity from suit as a benchmark for its analysis." *Id.* The Supreme Court's ruling affirmed this court's limitation of Hyatt's case against FTB to the intentional tort causes of action.

Ultimately, Hyatt's case went to trial before a jury. The trial lasted approximately four months. The jury found in favor of Hyatt on all intentional tort causes of action and returned special verdicts awarding him damages in the amount of $85 million for emotional distress, $52 million for invasion of privacy, $1,085,281.56 as special damages for fraud, and $250 million in punitive damages. Following the trial, Hyatt sought prejudgment interest and moved the district court for costs. The district court assigned the motion to a special master who, after 15 months of discovery and further motion practice, issued a recommendation that Hyatt be awarded approximately $2.5 million in costs. The district court adopted the master's recommendation.

FTB appeals from the district court's final judgment and the post-judgment award of costs. Hyatt cross-appeals, challenging the district court's partial summary judgment ruling that he could not seek, as part of his damages at trial, economic damages for the alleged destruction of his patent-licensing business in Japan.[4]

## DISCUSSION

We begin by addressing FTB's appeal, which raises numerous issues that it argues entitle it to either judgment as a matter of law in its

---

[4]This court granted permission for the Multistate Tax Commission and the state of Utah, which was joined by other states (Arkansas, Colorado, Delaware, Florida, Idaho, Louisiana, Maine, Maryland, Missouri, New Jersey, North Dakota, Ohio, Oklahoma, Tennessee, Vermont, Virginia, and Washington) to file amicus curiae briefs.



SUPREME COURT
OF
NEVADA

(O) 1947A

12

favor or remand for a new trial. As a threshold matter, we address discretionary-function immunity and whether Hyatt's causes of action against FTB are barred by this immunity, or whether there is an exception to the immunity for intentional torts and bad-faith conduct. Deciding that FTB is not immune from suit, we then consider FTB's arguments as to each of Hyatt's intentional tort causes of action. We conclude our consideration of FTB's appeal by discussing Nevada's statutory caps on damages and immunity from punitive damages. As for Hyatt's cross-appeal, we close this opinion by considering his challenge to the district court's partial summary judgment in FTB's favor on Hyatt's damages claim for economic loss.

*FTB is not immune from suit under comity because discretionary-function immunity in Nevada does not protect Nevada's government or its employees from intentional torts and bad-faith conduct*

Like most states, Nevada has waived traditional sovereign immunity from tort liability, with some exceptions. NRS 41.031. The relevant exception at issue in this appeal is discretionary-function immunity, which provides that no action can be brought against the state or its employee "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State . . . or of any . . . employee . . . , whether or not the discretion involved is abused." NRS 41.032(2). By adopting discretionary-function immunity, our Legislature has placed a limit on its waiver of sovereign immunity. Discretionary-function immunity is grounded in separation of powers concerns and is designed to preclude the judicial branch from "second-guessing," in a tort action, legislative and executive branch decisions that are based on "social, economic, and political policy." *Martinez v. Maruszczak*, 123 Nev. 433, 446, 168 P.3d 720, 729 (2007)

(internal quotations omitted); *see also Bailey v. United States*, 623 F.3d 855, 860 (9th Cir. 2010). FTB initially argues on appeal that immunity protects it from Hyatt's intentional tort causes of action based on the application of discretionary-function immunity and comity as recognized in Nevada.

Comity is a legal principle whereby a forum state may give effect to the laws and judicial decisions of another state based in part on deference and respect for the other state, but only so long as the other state's laws are not contrary to the policies of the forum state. *Mianecki v. Second Judicial Dist. Court*, 99 Nev. 93, 98, 658 P.2d 422, 424-25 (1983); *see also Solomon v. Supreme Court of Fla.*, 816 A.2d 788, 790 (D.C. 2002); *Schoeberlein v. Purdue Univ.*, 544 N.E.2d 283, 285 (Ill. 1989); *McDonnell v. Ill.*, 748 A.2d 1105, 1107 (N.J. 2000); *Sam v. Estate of Sam*, 134 P.3d 761, 764-66 (N.M. 2006); *Hansen v. Scott*, 687 N.W.2d 247, 250, 250 (N.D. 2004). The purpose behind comity is to "foster cooperation, promote harmony, and build good will" between states. *Hansen*, 687 N.W.2d at 250 (internal quotations omitted). But whether to invoke comity is within the forum state's discretion. *Mianecki*, 99 Nev. at 98, 658 P.2d at 425. Thus, when a lawsuit is filed against another state in Nevada, while Nevada is not required to extend immunity in its courts to the other state, Nevada will consider extending immunity under comity, so long as doing so does not violate Nevada's public policies. *Id.* at 98, 658 P.2d at 424-25. In California, FTB enjoys full immunity from tort actions arising in the context of an audit. Cal. Gov't Code § 860.2 (West 2012). FTB contends that it should receive the immunity protection provided by California statutes to the extent that such immunity does not violate Nevada's public policies under comity.



*Discretionary-function immunity in Nevada*

This court's treatment of discretionary-function immunity has changed over time. In the past, we applied different tests to determine whether to grant a government entity or its employee discretionary-function immunity. *See, e.g., Arnesano v. State ex rel. Dep't of Transp.*, 113 Nev. 815, 823-24, 942 P.2d 139, 144-45 (1997) (applying planning-versus-operational test to government action), *abrogated by Martinez*, 123 Nev. at 443-44, 168 P.3d at 726-27; *State v. Silva*, 86 Nev. 911, 913-14, 478 P.2d 591, 592-93 (1970) (applying discretionary-versus-ministerial test to government conduct), *abrogated by Martinez*, 123 Nev. at 443-44, 168 P.3d at 726-27. We also recognized an exception to discretionary-function immunity for intentional torts and bad-faith conduct. *Falline v. GNLV Corp.*, 107 Nev. 1004, 1009 & n.3, 823 P.2d 888, 892 & n.3 (1991) (plurality opinion). More recently, we adopted the federal two-part test for determining the applicability of discretionary-function immunity. *Martinez*, 123 Nev. at 444-47, 168 P.3d at 727-29 (adopting test named after two United States Supreme Court decisions: *Berkovitz v. United States*, 486 U.S. 531 (1988), and *United States v. Gaubert*, 499 U.S. 315 (1991)). Under the *Berkovitz-Gaubert* two-part test, discretionary-function immunity will apply if the government actions at issue "(1) involve an element of individual judgment or choice and (2) [are] based on considerations of social, economic, or political policy." *Martinez*, 123 Nev. at 446-47, 168 P.3d at 729. When this court adopted the federal test in *Martinez*, we expressly dispensed with the earlier tests used by this court to determine whether to grant a government entity or its employee immunity, *id.* at 444, 168 P.3d at 727, but we did not address the *Falline* exception to immunity for intentional torts or bad-faith misconduct.



In the earlier writ petitions filed by FTB in this court, we relied on *Falline* to determine that FTB was entitled to immunity from Hyatt's negligence cause of action, but not the remaining intentional-tort-based causes of action. Because the law concerning the application of discretionary-function immunity has changed in Nevada since FTB's writ petitions were resolved, we revisit the application of discretionary-function immunity to FTB in the present case as it relates to Hyatt's intentional tort causes of action. *Hsu v. Cnty. of Clark*, 123 Nev. 625, 632, 173 P.3d 724, 730 (2007) (stating that "the doctrine of the law of the case should not apply where, in the interval between two appeals of a case, there has been a change in the law by . . . a judicial ruling entitled to deference" (internal quotations omitted)).

FTB contends that when this court adopted the federal test in *Martinez*, it impliedly overruled the *Falline* exception to discretionary-function immunity for intentional torts and bad-faith misconduct. Hyatt maintains that the *Martinez* case did not alter the exception created in *Falline* and that discretionary immunity does not apply to bad-faith misconduct because an employee does not have discretion to undertake intentional torts or act in bad faith.

In *Falline*, 107 Nev. at 1009, 823 P.2d at 891-92, this court ruled that the discretionary-function immunity under NRS 41.032(2) did not apply to bad-faith misconduct. The case involved negligent processing of a workers' compensation claim. Falline injured his back at work and later required surgery. *Falline*, 107 Nev. at 1006, 823 P.2d at 890. Following the surgery, while rising from a seated position, Falline experienced severe lower-back pain. *Id.* at 1006-07, 823 P.2d at 890. Falline's doctor concluded that Falline's back pain was related to his work

injury. *Id.* at 1007, 823 P.2d at 890. The self-insured employer, however, refused to provide workers' compensation benefits beyond those awarded for the work injury because it asserted that an intervening injury had occurred. *Id.* After exhausting his administrative remedies, it was determined that Falline was entitled to workers' compensation benefits for both injuries. *Id.* He was nevertheless denied benefits. *Id.* Falline brought suit against the employer for negligence and bad faith in the processing of his workers' compensation claims. *Id.* at 1006, 823 P.2d at 889-90. The district court dismissed his causes of action, and Falline appealed, arguing that dismissal was improper.

On appeal, after concluding that a self-insured employer should be treated the same as the State Industrial Insurance System, this court concluded that Falline could maintain a lawsuit against the self-insured employer based on negligent handling of his claims. *Id.* at 1007-09, 823 P.2d at 890-92. In discussing its holding, the court addressed discretionary immunity and explained that "if failure or refusal to timely process or pay claims is attributable to bad faith, immunity does not apply whether an act is discretionary or not." *Id.* at 1009, 823 P.2d at 891. The court reasoned that the insurer did not have discretion to act in bad faith, and therefore, discretionary-function immunity did not apply to protect the insurer from suit. *Id.* at 1009, 823 P.2d at 891-92.

The *Falline* court expressly addressed NRS 41.032(2)'s language that there is immunity "whether or not the discretion involved is abused." *Falline*, 107 Nev. at 1009 n.3, 823 P.2d at 892 n.3. The court determined that bad faith is different from an abuse of discretion, in that an abuse of discretion occurs when a person acts within his or her authority but the action lacks justification, while bad faith "involves an



implemented attitude that completely transcends the circumference of authority granted" to the actor. *Id.* Thus, the *Falline* court viewed the exception to discretionary immunity broadly.

Following *Falline*, this court adopted, in *Martinez*, the federal test for determining whether discretionary-function immunity applies. 123 Nev. at 446, 168 P.3d at 729. Under the two-part federal test, the first step is to determine whether the government conduct involves judgment or choice. *Id.* at 446-47, 168 P.3d at 729. If a statute, regulation, or policy requires the government employee to follow a specific course of action for which the employee has no option but to comply with the directive, and the employee fails to follow this directive, the discretionary-immunity exception does not apply to the employee's action because the employee is not acting with individual judgment or choice. *Gaubert*, 499 U.S. at 322. On the other hand, if an employee is free to make discretionary decisions when executing the directives of a statute, regulation, or policy, the test's second step requires the court to examine the nature of the actions taken and whether they are susceptible to policy analysis. *Martinez*, 123 Nev. at 445-46, 168 P.3d at 729; *Gaubert*, 499 U.S. at 324. "[E]ven assuming the challenged conduct involves an element of judgment [or choice]," the second step requires the court to determine "whether that judgment [or choice] is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23. If "the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime," discretionary-function immunity will not bar the claim. *Id.* at 324-25. The second step focuses on whether the conduct undertaken is a policymaking decision regardless of the

employee's subjective intent when he or she acted. *Martinez*, 123 Nev. at
445, 168 P.3d at 728.

FTB argues that the federal test abolished the *Falline*
intentional tort or bad-faith misconduct exception to discretionary-
function immunity because the federal test is objective, not subjective.
Hyatt asserts that an intentional or bad-faith tort will not meet the two-
part discretionary-immunity test because such conduct cannot be
discretionary or policy-based.

Other courts addressing similar questions have reached
differing results, depending on whether the court views the restriction
against considering subjective intent to apply broadly or is limited to
determining if the decision is a policymaking decision. Some courts
conclude that allegations of intentional or bad-faith misconduct are not
relevant to determining if the immunity applies because courts should not
consider the employee's subjective intent at all. *Reynolds v. United States*,
549 F.3d 1108, 1112 (7th Cir. 2008); *Franklin Sav. Corp. v. United States*,
180 F.3d 1124, 1135 (10th Cir. 1999); *see also Sydnes v. United States*, 523
F.3d 1179, 1185 (10th Cir. 2008). But other courts focus on whether the
employee's conduct can be viewed as a policy-based decision and hold that
intentional torts or bad-faith misconduct are not policy-based acts.
*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006);
*Palay v. United States*, 349 F.3d 418, 431-32 (7th Cir. 2003); *Coulthurst v.
United States*, 214 F.3d 106, 109 (2d Cir. 2000).[5] These courts bar the

---

[5]*Coulthurst* is affirmatively cited by the Seventh Circuit Court of
Appeals in *Palay v. United States*, 349 F.3d 418, 431-32 (7th Cir. 2003).
Although the Seventh Circuit in *Reynolds*, 549 F.3d at 1112, stated the
*continued on next page . . .*

SUPREME COURT
OF
NEVADA

(O) 1947A 

19

application of discretionary-function immunity in intentional tort and bad-faith misconduct cases when the government action involved is "unrelated to any plausible policy objective[ ]." *Coulthurst*, 214 F.3d at 111. A closer look at these courts' decisions is useful for our analysis.

> *Courts that decline to recognize bad-faith conduct that calls for an inquiry into an employee's subjective intent*

In *Franklin Savings Corp. v. United States*, 180 F.3d at 1127, 1134-42, the Tenth Circuit Court of Appeals addressed the specific issue of whether a claim for bad faith precludes the application of discretionary-function immunity. In that case, following the determination that the Franklin Savings Association was not safe or sound to conduct business, a conservator was appointed. *Id.* at 1127. Thereafter, plaintiffs Franklin Savings Association and its parent company filed suit against defendants the United States government and the conservator to have the conservatorship removed. *Id.* Plaintiffs alleged that the conservator intentionally and in bad faith liquidated the company instead of preserving the company and eventually returning it to plaintiffs to transact business. *Id.* at 1128.

---

... *continued*

proposition that claims of malicious and bad-faith conduct were not relevant in determining discretionary immunity because the courts do not look at subjective intent, the *Palay* court specifically held that discretionary immunity can be avoided if the actions were the result of laziness or carelessness because such actions are not policy-based decisions. *Palay*, 349 F.3d at 431-32. *Reynolds* was published after *Palay*, and while it cites to *Palay* for other unrelated issues, it does not address its holding in connection with the holding in *Palay*.


SUPREME COURT
OF
NEVADA

(O) 1947A

On appeal, the *Franklin Savings* court explained that plaintiffs did not dispute that the conservator had the authority and discretion to sell assets, but the argument was whether immunity for decisions that were discretionary could be avoided because plaintiffs alleged that the conduct was intentionally done to achieve an improper purpose—to deplete capital and retroactively exculpate the conservator's appointment. *Id.* at 1134. Thus, the court focused on the second part of the federal test. In considering whether the alleged intentional misconduct barred the application of discretionary-function immunity under the federal test, the *Franklin Savings* court first noted that the United States Supreme Court had "repeatedly insisted . . . that [tort] claims are not vehicles to second-guess policymaking." *Id.* The court further observed that the Supreme Court's modification to *Berkovitz*, in *Gaubert*, to include a query of whether the nature of the challenged conduct was "susceptible to policy analysis[,] . . . served to emphasize that courts should not inquire into the actual state of mind or decisionmaking process of federal officials charged with performing discretionary functions." *Id.* at 1135 (internal quotations omitted). The *Franklin Savings* court ultimately concluded that discretionary-function immunity attaches to bar claims that "depend[ ] on an employee's bad faith or state of mind in performing facially authorized acts," *id.* at 1140, and to conclude otherwise would mean that the immunity could not effectively function. *Id.* at 1140-41.

Notwithstanding its conclusion, the *Franklin Savings* court noted that such a holding had "one potentially troubling effect"; it created an "irrebuttable presumption" that government employees try to perform all discretionary functions in good faith and that the court's holding would


SUPREME COURT
OF
NEVADA

(O) 1947A

21

preclude relief in cases where an official committed intentional or bad-faith conduct. *Id.* at 1141. Such a result was necessary, the court reasoned, because providing immunity for employees, so that they do not have to live and act in constant fear of litigation in response to their decisions, outweighs providing relief in the few instances of intentionally wrongful conduct. *Id.* at 1141-42. Thus, the *Franklin Savings* court broadly applied the Supreme Court rule that an actor's subjective intent should not be considered. This broad application led the court to conclude that a bad-faith claim was not sufficient to overcome discretionary-function immunity's application.

*Courts that consider whether an employee subjectively intended to further policy by his or her conduct*

Other courts have come to a different conclusion. Most significant is *Coulthurst v. United States*, 214 F.3d 106, in which the Second Circuit Court of Appeals addressed the issue of whether the inspection of weightlifting equipment by prison officials was grounded in policy considerations. In *Coulthurst*, an inmate in a federal prison was injured while using the prison's exercise equipment. *Id.* at 107. The inmate filed suit against the United States government, alleging "'negligence and carelessness'" and a "'fail[ure] to diligently and periodically inspect'" the exercise equipment. *Id.* at 108. The lower court dismissed the complaint, reasoning that the decisions that established the procedures and timing for inspection involved "elements of judgment or choice and a balancing of policy considerations," such that discretionary-function immunity attached to bar liability. *Id.* at 109. Coulthurst appealed.

In resolving the appeal, the Court of Appeals concluded that the complaint could be read to mean different types of negligent or


SUPREME COURT
OF
NEVADA

(O) 1947A

22

careless conduct. *Id.* The court explained that the complaint asserting negligence or carelessness could legitimately be read to refer to how frequently inspections should occur, which might fall under discretionary-function immunity. *Id.* But the same complaint, the court noted, could also be read to assert negligence and carelessness in the failure to carry out prescribed responsibilities, such as prison officials failing to inspect the equipment out of laziness, haste, or inattentiveness. *Id.* Under the latter reading, the court stated that

> the official assigned to inspect the machine may in laziness or haste have failed to do the inspection he claimed (by his initials in the log) to have performed; the official may have been distracted or inattentive, and thus failed to notice the frayed cable; or he may have seen the frayed cable but been too lazy to make the repairs or deal with the paperwork involved in reporting the damage.

*Id.* The court concluded that such conduct did not involve an element of judgment or choice nor was it based on policy considerations, and in such an instance, discretionary-function immunity does not attach to shield the government from suit. *Id.* at 109-11. In the end, the *Coulthurst* court held that the inmate's complaint sufficiently alleged conduct by prison officials that was not immunized by the discretionary-function immunity exception, and the court vacated the lower court's dismissal and remanded the case for further proceedings. *Id.*

The difference in the *Franklin Savings* and *Coulthurst* approaches emanates from how broadly those courts apply the statement in *Gaubert* that "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred . . . , but on the nature of the actions taken and on whether they are susceptible to policy analysis." 499 U.S. at 325. *Franklin Savings* interpreted this requirement expansively to

SUPREME COURT
OF
NEVADA

(O) 1947A 

23

preclude any consideration of whether an actor's conduct was done maliciously or in bad faith, whereas *Coulthurst* applied a narrower view of subjective intent, concluding that a complaint alleging a nondiscretionary decision that caused the injury was not grounded in public policy. Our approach in *Falline* concerning immunity for bad-faith conduct is consistent with the reasoning in *Coulthurst* that intentional torts and bad-faith conduct are acts "unrelated to any plausible policy objective[ ]" and that such acts do not involve the kind of judgment that is intended to be shielded from "judicial second-guessing." 214 F.3d at 111 (internal quotations omitted). We therefore affirm our holding in *Falline* that NRS 41.032 does not protect a government employee for intentional torts or bad-faith misconduct, as such misconduct, "by definition, [cannot] be within the actor's discretion." *Falline*, 107 Nev. at 1009, 823 P.2d at 891-92.

In light of our conclusion, we must now determine whether to grant, under comity principles, FTB immunity from Hyatt's claims. Because we conclude that discretionary-function immunity under NRS 41.032 does not include intentional torts and bad-faith conduct, a Nevada government agency would not receive immunity under these circumstances, and thus, we do not extend such immunity to FTB under comity principles, as to do so would be contrary to the policy of this state.

*Hyatt's intentional tort causes of action*

Given that FTB may not invoke immunity, we turn next to FTB's various arguments contesting the judgment in favor of Hyatt on



each of his causes of action.[6]  Hyatt brought three invasion of privacy causes of action—intrusion upon seclusion, publicity of private facts, and false light—and additional causes of action for breach of confidential relationship, abuse of process, fraud, and intentional infliction of emotional distress.  We discuss each of these causes of action below.

This court reviews questions of law de novo.  *Martinez*, 123 Nev. at 438, 168 P.3d at 724.  A jury's verdict will be upheld if it is supported by substantial evidence.  *Prabhu v. Levine*, 112 Nev. 1538, 1543, 930 P.2d 103, 107 (1996).  Additionally, we "will not reverse an order or judgment unless error is affirmatively shown."  *Schwartz v. Estate of Greenspun*, 110 Nev. 1042, 1051, 881 P.2d 638, 644 (1994).

*Invasion of privacy causes of action*

The tort of invasion of privacy embraces four different tort actions: "(a) unreasonable intrusion upon the seclusion of another; or (b) appropriation of the other's name or likeness; or (c) unreasonable publicity given to the other's private life; or (d) publicity that unreasonably places the other in a false light before the public."  Restatement (Second) of Torts § 652A (1977) (citations omitted); *PETA v. Bobby Berosini, Ltd.*, 111 Nev. 615, 629, 895 P.2d 1269, 1278 (1995), *overruled on other grounds by City of Las Vegas Downtown Redev. Agency v. Hecht*, 113 Nev. 644, 650, 940 P.2d 134, 138 (1997).  At issue in this appeal are the intrusion, disclosure, and false light aspects of the invasion of privacy tort.  The jury found in

---

[6]We reject Hyatt's contention that this court previously determined that each of his causes of action were valid as a matter of law based on the facts of the case in resolving the prior writ petitions.  To the contrary, this court limited its holding to whether FTB was entitled to immunity, and thus, we did not address the merits of Hyatt's claims.



Hyatt's favor on those claims and awarded him $52 million for invasion of privacy damages. Because the parties' arguments regarding intrusion and disclosure overlap, we discuss those privacy torts together, and we follow that discussion by addressing the false light invasion of privacy tort.

*Intrusion upon seclusion and public disclosure of private facts*

On appeal, Hyatt focuses his invasion of privacy claims on FTB's disclosures of his name, address, and social security number to various individuals and entities. FTB contends that Hyatt's claims fail because the information disclosed had been disseminated in prior public records, and thus, could not form the basis of an invasion of privacy claim.

Intrusion upon seclusion and public disclosure of private facts are torts grounded in a plaintiff's objective expectation of privacy. *PETA*, 111 Nev. at 630, 631, 895 P.2d at 1279 (recognizing that the plaintiff must actually expect solitude or seclusion, and the plaintiff's expectation of privacy must be objectively reasonable); *Montesano v. Donrey Media Grp.*, 99 Nev. 644, 649, 668 P.2d 1081, 1084 (1983) (stating that the public disclosure of a private fact must be "offensive and objectionable to a reasonable person of ordinary sensibilities"); *see also* Restatement (Second) of Torts § 652B, 652D (1977). One defense to invasion of privacy torts, referred to as the public records defense, arises when a defendant can show that the disclosed information is contained in a court's official records. *Montesano*, 99 Nev. at 649, 668 P.2d at 1085. Such materials are public facts, *id.*, and a defendant cannot be liable for disclosing information about a plaintiff that was already public. Restatement (Second) of Torts § 652D cmt. b (1977).

Here, the record shows that Hyatt's name, address, and social security number had been publicly disclosed on several occasions, before FTB's disclosures occurred, in old court documents from his divorce



proceedings and in a probate case. Hyatt also disclosed the information himself when he made the information available in various business license applications completed by Hyatt. Hyatt maintains that these earlier public disclosures were from long ago, and that the disclosures were only in a limited number of documents, and therefore, the information should not be considered as part of the public domain. Hyatt asserts that this results in his objective expectation of privacy in the information being preserved.

This court has never limited the application of the public records defense based on the length of time between the public disclosure and the alleged invasion of privacy. In fact, in *Montesano*, 99 Nev. 644, 668 P.2d 1081, we addressed disclosed information contained in a public record from 20 years before the disclosure at issue there and held that the protection still applied. Therefore, under the public records defense, as delineated in *Montesano*, Hyatt is precluded from recovering for invasion of privacy based on the disclosure of his name, address, and social security number, as the information was already publicly available, and he thus lacked an objective expectation of privacy in the information.[7]

_____

[7]Beyond his name, address, and social security number, Hyatt also alleged improper disclosures related to the publication of his credit card number on one occasion and his licensing contracts on another occasion. But this information was only disclosed to one or two third parties, and it was information that the third parties already had in their possession from prior dealings with Hyatt. Thus, we likewise conclude that Hyatt lacked an objective expectation of privacy as a matter of law. *PETA*, 111 Nev. at 631, 895 P.2d at 1279; *Montesano*, 99 Nev. at 649, 668 P.2d at 1084.



Because Hyatt cannot meet the necessary requirements to establish his invasion of privacy causes of action for intrusion upon seclusion and public disclosure of private facts, we reverse the district court's judgment based on the jury verdict as to these causes of action.[8]

### *False light invasion of privacy*

Regarding Hyatt's false light claim, he argues that FTB portrayed him in a false light throughout its investigation because FTB's various disclosures portrayed Hyatt as a "tax cheat." FTB asserts that Hyatt failed to provide any evidence to support his claim. Before reaching the parties' arguments as to Hyatt's false light claim, we must first determine whether to adopt this cause of action in Nevada, as this court has only impliedly recognized the false light invasion of privacy tort. *See PETA*, 111 Nev. at 622 n.4, 629, 895 P.2d at 1273 n.4, 1278. "Whether to adopt [this tort] as [a] viable tort claim[ ] is a question of state law." *Denver Publ'g Co. v. Bueno*, 54 P.3d 893, 896 (Colo. 2002).

### *Adopting the false light invasion of privacy tort*

Under the Restatement, an action for false light arises when

> [o]ne who gives publicity to a matter concerning another that places the other before the public in a false light . . . if

---

[8]Hyatt also argues that FTB violated his right to privacy when its agents looked through his trash, looked at a package on his doorstep, and spoke with neighbors, a postal carrier, and a trash collector. Hyatt does not provide any authority to support his assertion that he had a legally recognized objective expectation of privacy with regard to FTB's conduct in these instances, and thus, we decline to consider this contention. *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (explaining that this court need not consider claims that are not cogently argued or supported by relevant authority).



> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E (1977). The greatest constraint on the tort of false light is its similarity to the tort of defamation.

A majority of the courts that have adopted the false light privacy tort have done so after concluding that false light and defamation are distinct torts.[9] *See Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007) (explaining the competing views); *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640 (Tenn. 2001) (same). For these courts, defamation law seeks to protect an objective interest in one's reputation, "either economic, political, or personal, in the outside world." *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 83 (W. Va. 1984) (internal quotations omitted). By contrast, false light invasion of privacy protects one's subjective interest in freedom from injury to the person's right to be left alone. *Id.* Therefore, according to these courts there are situations (being falsely portrayed as a victim of a crime, such as sexual assault, or being falsely identified as having a serious illness, or being portrayed as destitute) in which a person may be placed in a harmful false light even though it does not rise to the

---

[9]This court, in *PETA*, while not reaching the false light issue, observed that "'[t]he false light privacy action differs from a defamation action in that the injury in privacy actions is mental distress from having been exposed to public view, while the injury in defamation actions is damage to reputation.'" 111 Nev. at 622 n.4, 895 P.2d at 1274 n.4 (quoting *Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir. 1983)).

level of defamation. *Welling*, 866 N.E.2d at 1055-57; *West*, 53 S.W.3d at 646. Without recognizing the separate false light privacy tort, such an individual would be left without a remedy. *West*, 53 S.W.3d at 646.

On the other hand, those courts that have declined to adopt the false light tort have done so based on its similarity to defamation. *See, e.g.*, *Sullivan v. Pulitzer Broad. Co.*, 709 S.W.2d 475 (Mo. 1986); *Renwick v. News & Observer Publ'g Co.*, 312 S.E.2d 405 (N.C. 1984); *Cain v. Hearst Corp.*, 878 S.W.2d 577 (Tex. 1994). "The primary objection courts level at false light is that it substantially overlaps with defamation, both in conduct alleged and interests protected." *Denver Publ'g Co.*, 54 P.3d at 898. For these courts, tort law serves to deter "socially wrongful conduct," and thus, it needs "clarity and certainty." *Id.* And because the parameters defining the difference between false light and defamation are blurred, these courts conclude that "such an amorphous tort risks chilling fundamental First Amendment freedoms." *Id.* In such a case, a media defendant would have to "anticipate whether statements are 'highly offensive' to a reasonable person of ordinary sensibilities even though their publication does no harm to the individual's reputation." *Id.* at 903. Ultimately, for these courts, defamation, appropriation, and intentional infliction of emotional distress provide plaintiffs with adequate remedies. *Id.* at 903.

Considering the different approaches detailed above, we, like the majority of courts, conclude that a false light cause of action is necessary to fully protect privacy interests, and we now officially recognize false light invasion of privacy as a valid cause of action in connection with the other three privacy causes of action that this court has adopted. Because we now recognize the false light invasion of privacy cause of



action, we address FTB's substantive arguments regarding Hyatt's false
light claim.

*Hyatt's false light claim*

The crux of Hyatt's false light invasion of privacy claim is that
FTB's demand-for-information letters, its other contact with third parties
through neighborhood visits and questioning, and the inclusion of his case
on FTB's litigation roster suggested that he was a "tax cheat," and
therefore, portrayed him in a false light. On appeal, FTB argues that
Hyatt presented no evidence that anyone thought that he was a "tax
cheat" based on the litigation roster or third-party contacts.

FTB's litigation roster was an ongoing monthly litigation list
that identified the cases that FTB was involved in. The list was available
to the public and generally contained audit cases in which the protest and
appeal process had been completed and the cases were being litigated in
court. After Hyatt initiated this litigation, FTB began including the case
on its roster, which Hyatt asserts was improper because the protests in his
audits had not yet been completed. FTB, however, argues that because
the lawsuit was ongoing, it did not place Hyatt in a false light by including
him on the roster. Further, FTB argues that the litigation roster that
Hyatt relied on was not false. When FTB began including Hyatt on the
litigation roster, he was not falsely portrayed because he was indeed
involved in litigation with FTB in this case. Hyatt did not demonstrate
that the litigation roster contained any false information. Rather, he only
argued that his inclusion on the list was improper because his audit cases
had not reached the final challenge stage like other cases on the roster.

FTB's contacts with third parties' through letters, demands for
information, or in person was not highly offensive to a reasonable person



SUPREME COURT
OF
NEVADA

(O) 1947A

31

ER 593

and did not falsely portray Hyatt as a "tax cheat." In contacting third parties, FTB was merely conducting its routine audit investigations.

The record before us reveals that no evidence presented by Hyatt in the underlying suit supported the jury's conclusion that FTB portrayed Hyatt in a false light. *See Prabhu*, 112 Nev. at 1543, 930 P.2d at 107. Because Hyatt has failed to establish a false light claim, we reverse the district court's judgment on this claim.[10]

Having addressed Hyatt's invasion of privacy causes of action, we now consider FTB's challenges to Hyatt's remaining causes of action for breach of confidential relationship, abuse of process, fraud, and intentional infliction of emotional distress.

*Breach of confidential relationship*

A breach of confidential relationship cause of action arises "by reason of kinship or professional, business, or social relationships between the parties." *Perry v. Jordan*, 111 Nev. 943, 947, 900 P.2d 335, 337 (1995). On appeal, FTB contends that Hyatt could not prevail as a matter of law on his claim for breach of a confidential relationship because he cannot establish the requisite confidential relationship. In the underlying case, the district court denied FTB's motion for summary judgment and its motion for judgment as a matter of law, which presented similar arguments, and at trial the jury found FTB liable on this cause of action. Hyatt argues that his claim for breach of confidentiality falls within the parameters of *Perry* because FTB promised to protect his confidential

---

[10]Based on this resolution, we need not address the parties' remaining arguments involving this cause of action.



information and its position over Hyatt during the audits established the necessary confidential relationship.[11]

In *Perry*, this court recognized that a confidential relationship exists when a party gains the confidence of another party and purports to advise or act consistently with the other party's interest. *Id.* at 947, 900 P.2d at 338. In that case, store owner Perry sold her store to her neighbor and friend, Jordan, knowing that Jordan had no business knowledge, that Jordan was buying the store for her daughters, not for herself, and that Jordan would rely on Perry to run the store for a contracted one-year period after the sale was complete. *Id.* at 945-46, 900 P.2d at 336-37. Not long after the sale, Perry stopped running the store, and the store eventually closed. *Id.* at 946, 900 P.2d at 337. Jordan filed suit against Perry for, among other things, breach of a confidential relationship. *Id.* A jury found in Jordan's favor and awarded damages. *Id.* Perry appealed, arguing that this court had not recognized a claim for breach of a confidential relationship. *Id.*

On appeal, this court ruled that a breach of confidential relationship claim was available under the facts of the case. *Id.* at 947, 900 P.2d at 338. The court noted that Perry "held a duty to act with the utmost good faith, based on her confidential relationship with Jordan[, and that the] duty requires affirmative disclosure and avoidance of self dealing." *Id.* at 948, 900 P.2d at 338. The court explained that "[w]hen a

---

[11]FTB initially argues that Hyatt attempts to blend the cause of action recognized in *Perry* with a separate breach of confidentiality cause of action that, while recognized in other jurisdictions, has not been recognized by this court. We reject this contention, as the jury was instructed based on the cause of action outlined in *Perry*.



confidential relationship exists, the person in whom the special trust is placed owes a duty to the other party similar to the duty of a fiduciary, requiring the person to act in good faith and with due regard to the interests of the other party." *Id.* at 947, 900 P.2d at 338.

FTB contends that the relationship between a tax auditor and the person being audited does not create the necessary relationship articulated in *Perry* to establish a breach of confidential relationship cause of action. In support of this proposition, FTB cites to *Johnson v. Sawyer*, which was heard by the Fifth Circuit Court of Appeals. 47 F.3d 716 (5th Cir. 1995) (en banc). In *Johnson*, the plaintiff sought damages from press releases by the Internal Revenue Service (IRS) based on a conviction for filing a fraudulent tax return. *Id.* at 718. Johnson was criminally charged based on erroneous tax returns. *Id.* at 718-19. He eventually pleaded guilty to a reduced charge as part of a plea bargain. *Id.* at 718-20. Following the plea agreement, two press releases were issued that contained improper and private information about Johnson. *Id.* at 720-21. Johnson filed suit against the IRS based on these press releases, arguing that they cost him his job and asserting several causes of action, one being breach of a confidential relationship. *Id.* at 718, 725, 738. On appeal, the Fifth Circuit Court of Appeals affirmed the district court's ruling that a breach of a confidential relationship could not be maintained based on the relationship between Johnson and the IRS, as it was clear that the two parties "stood in an adversarial relationship." *Id.* at 738 n.47.

Hyatt rejects FTB's reliance on this case, arguing that the *Johnson* ruling is inapposite to the present case because, here, FTB made express promises regarding protecting Hyatt's confidential information but then failed to keep those promises. Hyatt maintains that although


SUPREME COURT
OF
NEVADA

(O) 1947A

34

FTB may not have acted in his best interest in every aspect of the audits, as to keeping his information confidential, FTB affirmatively undertook that responsibility and breached that duty by revealing confidential information.

But in conducting the audits, FTB was not required to act with Hyatt's interests in mind; rather, it had a duty to proceed on behalf of the state of California's interest. *Johnson*, 47 F.3d at 738 n.47. Moreover, the parties' relationship was not akin to a family or business relationship. *Perry*, 111 Nev. at 947, 900 P.2d at 337-38. Hyatt argues for a broad range of relationships that can meet the requirement under *Perry*, but we reject this contention. *Perry* does not provide for so expansive a relationship as Hyatt asks us to recognize as sufficient to establish a claim for a breach of confidential relationship.[12] Thus, FTB and Hyatt's relationship cannot form the basis for a breach of a confidential relationship cause of action, and this cause of action fails as a matter of law. The district court judgment in Hyatt's favor on this claim is reversed.

*Abuse of process*

A successful abuse of process claim requires "'(1) an ulterior purpose by the defendants other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding.'" *LaMantia v. Redisi*, 118 Nev. 27, 30, 38 P.3d 877, 879

---

[12]Further, we note that the majority of cases that Hyatt cites as authority for a more expansive viewpoint of a confidential relationship involve claims arising from a doctor-patient confidentiality privilege, which does not apply here. *See, e.g., Doe v. Medlantic Health Care Grp., Inc.*, 814 A.2d 939, 950-51 (D.C. 2003); *Humphers v. First Interstate Bank of Or.*, 696 P.2d 527, 533-35 (Or. 1985).



SUPREME COURT
OF
NEVADA

(O) 1947A

35

(2002) (quoting *Posadas v. City of Reno*, 109 Nev. 448, 457, 851 P.2d 438, 444-45 (1993)). Put another way, a plaintiff must show that the defendant "willfully and improperly *used the legal process* to accomplish" an ulterior purpose other than resolving a legal dispute. *Id.* at 31, 38 P.3d at 880 (emphasis added).

FTB asserts that it was entitled to judgment as a matter of law on Hyatt's abuse of process cause of action because it did not actually use the judicial process, as it never sought to judicially enforce compliance with the demand-for-information forms and did not otherwise use the judicial process in conducting its audits of Hyatt. In response, Hyatt argues that FTB committed abuse of process by sending demand-for-information forms to individuals and companies in Nevada that are not subject to the California law cited in the form.

Because FTB did not use any legal enforcement process, such as filing a court action, in relation to its demands for information or otherwise during the audits, Hyatt cannot meet the requirements for establishing an abuse of process claim. *LaMantia*, 118 Nev. at 31, 38 P.3d at 880; *ComputerXpress, Inc. v. Jackson*, 113 Cal. Rptr. 2d 625, 644 (Ct. App. 2001) (explaining that abuse of process only arises when there is actual "use of *the machinery of the legal system* for an ulterior motive" (internal quotations omitted)); *see also Tuck Beckstoffer Wines L.L.C. v. Ultimate Distribs., Inc.*, 682 F. Supp. 2d 1003, 1020 (N.D. Cal. 2010). On this cause of action, then, FTB is entitled to judgment as a matter of law, and we reverse the district court's judgment.

### Fraud

To prove a fraud claim, the plaintiff must show that the defendant made a false representation that the defendant knew or believed was false, that the defendant intended to persuade the plaintiff to


SUPREME COURT
OF
NEVADA

(O) 1947A

act or not act based on the representation, and that the plaintiff had reason to rely on the representation and suffered damages. *Bulbman, Inc. v. Nev. Bell*, 108 Nev. 105, 111, 825 P.2d 588, 592 (1992). It is the jury's role to make findings on the factors necessary to establish a fraud claim. *Powers v. United Servs. Auto. Ass'n*, 114 Nev. 690, 697-98, 962 P.2d 596, 600-01 (1998). This court will generally not disturb a jury's verdict that is supported by substantial evidence. *Taylor v. Thunder*, 116 Nev. 968, 974, 13 P.3d 43, 46 (2000). Substantial evidence is defined as "evidence that a reasonable mind might accept as adequate to support a conclusion." *Winchell v. Schiff*, 124 Nev. 938, 944, 193 P.3d 946, 950 (2008) (internal quotations omitted).

When Hyatt's 1991 audit began, FTB informed him that during the audit process Hyatt could expect FTB employees to treat him with courtesy, that the auditor assigned to his case would clearly and concisely request information from him, that any personal and financial information that he provided to FTB would be treated confidentially, and that the audit would be completed within a reasonable time. FTB contends that its statements in documents to Hyatt, that it would provide him with courteous treatment and keep his information confidential, were insufficient representations to form a basis for a fraud claim, and even if the representations were sufficient, there was no evidence that FTB knew that they were false when made. In any case, FTB argues that Hyatt did not prove any reliance because he was required to participate in the audits whether he relied on these statements or not. Hyatt asserts that FTB knowingly misrepresented its promise to treat him fairly and impartially and to protect his private information. For the reasons discussed below,

we reject FTB's argument that it was entitled to judgment as a matter of law on Hyatt's fraud claim.

The record before us shows that a reasonable mind could conclude that FTB made specific representations to Hyatt that it intended for Hyatt to rely on, but which it did not intend to fully meet. FTB represented to Hyatt that it would protect his confidential information and treat him courteously. At trial, Hyatt presented evidence that FTB disclosed his social security number and home address to numerous people and entities and that FTB revealed to third parties that Hyatt was being audited. In addition, FTB sent letters concerning the 1991 audit to several doctors with the same last name, based on its belief that one of those doctors provided Hyatt treatment, but without first determining which doctor actually treated Hyatt before sending the correspondence. Furthermore, Hyatt showed that FTB took 11 years to resolve Hyatt's protests of the two audits. Hyatt alleged that this delay resulted in $8,000 in interest per day accruing against him for the outstanding taxes owed to California. Also at trial, Hyatt presented evidence through Candace Les, a former FTB auditor and friend of the main auditor on Hyatt's audit, Sheila Cox, that Cox had made disparaging comments about Hyatt and his religion, that Cox essentially was intent on imposing an assessment against Hyatt, and that FTB promoted a culture in which tax assessments were the end goal whenever an audit was undertaken. Hyatt also testified that he would not have hired legal and accounting professionals to assist in the audits had he known how he would be treated. Moreover, Hyatt stated that he incurred substantial costs that he would not otherwise have incurred by paying for professional representatives to assist him during the audits.

The evidence presented sufficiently showed FTB's improper motives in conducting Hyatt's audits, and a reasonable mind could conclude that FTB made fraudulent representations, that it knew the representations were false, and that it intended for Hyatt to rely on the representations.[13] What's more, the jury could reasonably conclude that Hyatt relied on FTB's representations to act and participate in the audits in a manner different than he would have otherwise, which resulted in damages. Based on this evidence, we conclude that substantial evidence supports each of the fraud elements and that FTB is not entitled to judgment as a matter of law on this cause of action.[14]

---

[13]FTB's argument concerning government agents making representations beyond the scope of law is without merit.

[14]FTB further argues that several evidentiary errors by the district court warrant a new trial. These errors include admitting evidence concerning whether the audit conclusions were correct and excluding FTB's evidence seeking to rebut an adverse inference for spoliation of evidence. FTB also asserts that the district court improperly instructed the jury by permitting it to consider the audit determinations. Although we agree with FTB that the district court abused its discretion in these evidentiary rulings and in its jury instruction number 24, as discussed more fully below in regard to Hyatt's intentional infliction of emotional distress claim, we conclude that these errors were harmless as to Hyatt's fraud claim because sufficient evidence of fraud existed for the jury to find in Hyatt's favor on each required element for fraud. *See Cook v. Sunrise Hosp. & Med. Ctr., L.L.C.*, 124 Nev. 997, 1006, 194 P.3d 1214, 1219 (2008) (holding that when there is error in a jury instruction, "prejudice must be established in order to reverse a district court judgment," and this is done by "showing that, but for the error, a different result might have been reached"); *El Cortez Hotel, Inc. v. Coburn*, 87 Nev. 209, 213, 484 P.2d 1089, 1091 (1971) (stating that an evidentiary error must be prejudicial in order to warrant reversal and remand).

SUPREME COURT
OF
NEVADA

(O) 1947A

39

*Fraud damages*

Given our affirmance of the district court's judgment on the jury verdict in Hyatt's favor on his fraud claim, we turn to FTB's challenge as to the special damages awarded Hyatt on his fraud claim.[15] In doing so, we address whether FTB is entitled to statutory caps on the amount of damages recoverable to the same extent that a Nevada government agency would receive statutory caps under principles of comity.[16] NRS 41.035 provides a statutory cap on liability damages in tort actions "against a present or former officer or employee of the State or any political subdivision." FTB argues that because it is immune from liability under California law, and Nevada provides a statutory cap on liability damages, it is entitled to the statutory cap on its liability to the extent that the law does not conflict with Nevada policy. Hyatt asserts that applying the statutory caps would in fact violate Nevada policy because doing so would not sufficiently protect Nevada residents. According to Hyatt, limitless compensatory damages are necessary as a means to

---

[15]The jury verdict form included a separate damage award for Hyatt's fraud claim. We limit our discussion of Hyatt's fraud damages to these special damages that were awarded. To the extent that Hyatt argues that he is entitled to other damages for his fraud claim beyond the special damages specified in the jury verdict form, we reject this argument and limit any emotional distress damages to his recovery under his intentional infliction of emotional distress claim, as addressed below.

[16]FTB argues that under the law-of-the-case doctrine, comity applies to afford it a statutory cap on damages and immunity from punitive damages based on this court's conclusions in the earlier writ petitions. But this court did not previously address these issues and the issues are different, thus, law of the case does not apply. *Dictor v. Creative Mgmt. Servs.*, 126 Nev. 41, 44-45, 223 P.3d 332, 334-35 (2010).

control non-Nevada government actions. Hyatt claims that statutory caps for Nevada government actions work because Nevada can control its government entities and employees through other means, such as dismissal or other discipline, that are not available to control an out-of-state government entity. Additionally, Hyatt points out that there are other reasons for the statutory caps that are specific only to Nevada, such as attracting state employees by limiting potential liability. Therefore, Hyatt argues that FTB is not entitled to statutory caps under comity because it would violate Nevada's superior policy of protecting its residents from injury.

The parties base their arguments on precedent from other courts that have taken different approaches to the issue. FTB primarily relies on a New Mexico Supreme Court case, *Sam v. Estate of Sam*, 134 P.3d 761 (N.M. 2006), and Hyatt supports his arguments by mainly relying on *Faulkner v. University of Tennessee*, 627 So. 2d 362 (Ala. 1992).

In *Sam*, an employee of an Arizona government entity accidentally backed over his child while driving his employer's vehicle at his home in New Mexico. 134 P.3d at 763. In a lawsuit arising out of this accident, the issue before the *Sam* court was whether Arizona's one-year statute of limitation for government employees, or New Mexico's two-year statute of limitation for government employees or three-year general tort statute of limitation law should apply. *Id.* at 764. The court discussed the comity doctrine and concluded that New Mexico's two-year statute of limitations for government employees applied because by doing so it was recognizing Arizona's law to the extent that it did not conflict with New Mexico's law. *Id.* at 764-68.



In reaching this conclusion, the *Sam* court relied on the United States Supreme Court's holdings in *Nevada v. Hall*, 440 U.S. 410 (1979), and *Franchise Tax Board of California v. Hyatt*, 538 U.S. 488 (2003). *Sam*, 134 P.3d at 765-66. The *Sam* court stated that "[b]oth these cases stand for the principle that a forum state is not required to extend immunity to other states sued in its courts, but the forum state should extend immunity as a matter of comity if doing so will not violate the forum state's public policies." *Id.* at 765. Based on this framework for comity, the *Sam* court concluded that Arizona should be entitled to the statute of limitations for government agencies that New Mexico would provide to its government agencies. Most courts appear to follow FTB's argument regarding how comity applies and that a state should recognize another state's laws to the extent that they do not conflict with its own. *See generally Solomon v. Supreme Court of Fla.*, 816 A.2d 788, 790 (D.C. 2002); *Schoeberlein v. Purdue Univ.*, 544 N.E.2d 283, 285 (Ill. 1989); *McDonnell v. Illinois*, 748 A.2d 1105, 1107 (N.J. 2000); *Sam*, 134 P.3d at 765; *Hansen v. Scott*, 687 N.W.2d 247, 250 (N.D. 2004).

In *Faulkner*, the plaintiff filed a lawsuit against the University of Tennessee after it threatened to revoke plaintiff's doctoral degree. 627 So. 2d at 363-64. The issue in *Faulkner* was whether the University of Tennessee (UT) was entitled to discretionary immunity under comity, when both Tennessee and Alabama had similar discretionary-immunity provisions for their states' government entities. *Id.* at 366. Considering the policy of allowing residents legal redress, compared to the immunity policies that both states had, the *Faulkner* court observed that

> [w]e cannot, absent some overriding policy, leave
> Alabama residents without redress within this



> State, relating to alleged acts of wrongdoing by an
> agency of another State, where those alleged acts
> are associated with substantial commercial
> activities in Alabama. We conclude that comity is
> not such an overriding policy in this instance.

*Id.* The court rejected the argument that granting comity would not violate Alabama policy because its residents were used to Alabama government entities receiving immunity:

> Agencies of the State of Alabama are subject to
> legislative control, administrative oversight, and
> public accountability in Alabama; UT is not.
> Actions taken by an agency or instrumentality of
> this state are subject always to the will of the
> democratic process in Alabama. UT, as an
> instrumentality of the State of Tennessee,
> operates outside such controls in this State.

*Id.* The *Faulkner* court ultimately declined to grant UT immunity under comity. We are persuaded by the *Faulkner* court's reasoning.

This state's policy interest in providing adequate redress to Nevada citizens is paramount to providing FTB a statutory cap on damages under comity. Therefore, as we conclude that allowing FTB a statutory cap would violate this state's public policy in this area, comity does not require this court to grant FTB such relief. *Id.*; *Sam*, 134 P.3d at 765 (recognizing that a state is not required to extend immunity and comity only dictates doing so if it does not contradict the forum state's public policy). As this is the only argument FTB raised in regard to the special damages awarded under the fraud cause of action, we affirm the amount of damages awarded for fraud. The prejudgment interest awarded is vacated and remanded to the district court for a recalculation based on the damages for fraud that we uphold. In light of our ruling that only the special award of damages for fraud is affirmed, FTB's argument that



prejudgment interest is not allowed because future damages were interwoven with past damages is moot.

*Intentional infliction of emotional distress*

During discovery in the underlying case, Hyatt refused to disclose his medical records. As a result, he was precluded at trial from presenting any medical evidence of severe emotional distress. Nevertheless, at trial, Hyatt presented evidence designed to demonstrate his emotional distress in the form of his own testimony regarding the emotional distress he experienced, along with testimony from his son and friends detailing their observation of changes in Hyatt's behavior and health during the audits. Based on this testimony, the jury found in Hyatt's favor on his intentional infliction of emotional distress (IIED) claim and awarded him $82 million for emotional distress damages.

To recover on a claim for IIED, a plaintiff must prove "(1) extreme and outrageous conduct on the part of the defendant; (2) intent to cause emotional distress or reckless disregard for causing emotional distress; (3) that the plaintiff actually suffered extreme or severe emotional distress; and (4) causation." *Miller v. Jones*, 114 Nev. 1291, 1299-1300, 970 P.2d 571, 577 (1998); *see also Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 447, 956 P.2d 1382, 1386 (1998). A plaintiff must set forth "objectively verifiable indicia" to establish that the plaintiff "actually suffered extreme or severe emotional distress." *Miller*, 114 Nev. at 1300, 970 P.2d at 577.

On appeal, FTB argues that Hyatt failed to establish that he actually suffered severe emotional distress because he failed to provide any medical evidence or other objectively verifiable evidence to establish such a claim. In response, Hyatt contends that the testimony provided by his family and other acquaintances sufficiently established objective proof



SUPREME COURT
OF
NEVADA

(O) 1947A

44

of the severe and extreme emotional distress he suffered, particularly in light of the facts of this case demonstrating the intentional harmful treatment he endured from FTB. Hyatt asserts that the more severe the harm, the lower the amount of proof necessary to establish that he suffered severe emotional distress. While this court has held that objectively verifiable evidence is necessary in order to establish an IIED claim, *id.*, we have not specifically addressed whether this necessarily requires medical evidence or if other objective evidence is sufficient.

The Restatement (Second) of Torts § 46 (1977), in comments j and k, provide for a sliding-scale approach in which the increased severity of the conduct will require less in the way of proof that emotional distress was suffered in order to establish an IIED claim. Restatement (Second) of Torts § 46 cmt. j (1977) ("The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed."); Restatement (Second) of Torts § 46 cmt. k (1977) (stating that "if the enormity of the outrage carries conviction that there has in fact been severe emotional distress, bodily harm is not required"). This court has also impliedly recognized this sliding-scale approach, although stated in the reverse. *Nelson v. City of Las Vegas*, 99 Nev. 548, 665 P.2d 1141 (1983). In *Nelson*, this court explained that "[t]he less extreme the outrage, the more appropriate it is to require evidence of physical injury or illness from the emotional distress." *Id.* at 555, 665 P.2d at 1145.

Further, other jurisdictions that require objectively verifiable evidence have determined that such a mandate does not always require medical evidence. *See Lyman v. Huber*, 10 A.3d 707 (Me. 2010) (stating


SUPREME COURT
OF
NEVADA

(O) 1947A

45

that medical testimony is not mandatory to establish an IIED claim, although only in rare, extreme circumstances); *Buckman-Peirson v. Brannon*, 822 N.E.2d 830, 840-41 (Ohio Ct. App. 2004) (stating that medical evidence is not required, but also holding that something more than just the plaintiff's own testimony was necessary); *see also Dixon v. Denny's, Inc.*, 957 F. Supp. 792, 796 (E.D. Va. 1996) (stating that plaintiff failed to establish an IIED claim because plaintiff did not provide objective evidence, such as medical bills "or even the testimony of friends or family"). Additionally, in *Farmers Home Mutual Insurance Co. v. Fiscus*, 102 Nev. 371, 725 P.2d 234 (1986), this court upheld an award for mental and emotional distress even though the plaintiffs' evidence did not include medical evidence or testimony. *Id.* at 374-75, 725 P.2d at 236. While not specifically addressing an IIED claim, the *Fiscus* court addressed the recovery of damages for mental and emotional distress that arose from an insurance company's unfair settlement practices when the insurance company denied plaintiffs' insurance claim after their home had flooded. *Id.* at 373, 725 P.2d at 235. In support of the claim for emotional and mental distress damages, the husband plaintiff testified that he and his wife lost the majority of their personal possessions and that their house was uninhabitable, that because the claim had been rejected they lacked the money needed to repair their home and the house was condemned, and after meeting with the insurance company's representative the wife had an emotional breakdown. *Id.* at 374, 725 P.2d at 236. This court upheld the award of damages, concluding that the above evidence was sufficient to prove that plaintiffs had suffered mental and emotional distress. *Id.* at 374-75, 725 P.2d at 236. In so holding, this court rejected the insurance company's argument that there was insufficient proof of mental and



emotional distress because there was no medical evidence or independent witness testimony. *Id.*

Based on the foregoing, we now specifically adopt the sliding-scale approach to proving a claim for IIED. Under this sliding-scale approach, while medical evidence is one acceptable manner in establishing that severe emotional distress was suffered for purposes of an IIED claim, other objectively verifiable evidence may suffice to establish a claim when the defendant's conduct is more extreme, and thus, requires less evidence of the physical injury suffered.

Turning to the facts in the present case, Hyatt suffered extreme treatment from FTB. As explained above in discussing the fraud claim, FTB disclosed personal information that it promised to keep confidential and delayed resolution of Hyatt's protests for 11 years, resulting in a daily interest charge of $8,000. Further, Hyatt presented testimony that the auditor who conducted the majority of his two audits made disparaging remarks about Hyatt and his religion, was determined to impose tax assessments against him, and that FTB fostered an environment in which the imposition of tax assessments was the objective whenever an audit was undertaken. These facts support the conclusion that this case is at the more extreme end of the scale, and therefore less in the way of proof as to emotional distress suffered by Hyatt is necessary.

In support of his IIED claim, Hyatt presented testimony from three different people as to the how the treatment from FTB caused Hyatt emotional distress and physically affected him. This included testimony of how Hyatt's mood changed dramatically, that he became distant and much less involved in various activities, started drinking heavily, suffered severe migraines and had stomach problems, and became obsessed with

the legal issues involving FTB. We conclude that this evidence, in connection with the severe treatment experienced by Hyatt, provided sufficient evidence from which a jury could reasonably determine that Hyatt suffered severe emotional distress.[17] Accordingly, we affirm the judgment in favor of Hyatt on this claim as to liability. As discussed below, however, we reverse the award of damages on this claim and remand for a new trial as to damages on this claim only.

> *A new trial is warranted based on evidentiary and jury instruction errors*[18]

Early in this case, the district court granted FTB partial summary judgment and dismissed Hyatt's declaratory relief cause of action concerning when he moved from California to Nevada. The district court reached this conclusion because the audits were still under review in California, and therefore, the Nevada court lacked jurisdiction to address whether the audits' conclusions were accurate. The partial summary judgment was not challenged by Hyatt at any point to this court, and thus, the district court's ruling was in effect throughout the trial. Consequently, whether the audits' determinations were correct was not an issue in the Nevada litigation.

---

[17]To the extent FTB argues that it was prejudiced by its inability to obtain Hyatt's medical records, we reject this argument as the rulings below on this issue specifically allowed FTB to argue to the jury the lack of any medical treatment or evidence by Hyatt.

[18]While we conclude, as discussed below, that evidentiary and jury instruction errors require a new trial as to damages on Hyatt's IIED claim, we hold that sufficient evidence supports the jury's finding as to liability on this claim regardless of these errors. Thus, these errors do not alter our affirmance as to liability on this claim.


Supreme Court
of
Nevada

(O) 1947A

48

On appeal, FTB argues that the district court erroneously allowed evidence and a jury instruction that went directly to whether the audits were properly determined. FTB frames this issue as whether the district court exceeded the case's jurisdictional boundaries, but the issue more accurately involves the admissibility of evidence and whether a jury instruction given by the district court was proper in light of the jurisdictional ruling. We review both the admissibility of evidence and the propriety of jury instructions for an abuse of discretion. *See Hansen v. Universal Health Servs.*, 115 Nev. 24, 27, 974 P.2d 1158, 1160 (1999) (evidence); *Allstate Ins. Co. v. Miller*, 125 Nev. 300, 319, 212 P.3d 318, 331 (2009) (jury instruction).

### Evidence improperly permitted challenging audits' conclusions

FTB argues that the district court violated its jurisdictional restriction governing this case, because by allowing Hyatt's claims to go forward based on the evidence presented at trial, the jury was in effect required to make findings on Hyatt's residency and whether he owed taxes. FTB points to the testimony of a number of Hyatt's witnesses that focused on whether the audits' results were correct: (1) Hyatt's tax accountant and tax attorney, who were his representatives during the audits, testified to their cooperation with FTB and that they did not attempt to intimidate the auditor to refute two bases for the imposition of penalties by FTB for lack of cooperation and intimidation; (2) an expert tax attorney witness testified about Hyatt's representatives' cooperation during the audits to refute the lack of cooperation allegation; (3) an expert witness testified as to the lifestyles of wealthy people to refute the allegation that Hyatt's actions of living in a low-income apartment building in Las Vegas and having no security were "implausible

behaviors"; and especially, (4) expert testimony of former FTB agent Malcom Jumulet regarding audit procedures, and Jumulet's testimony as to how FTB analyzed and weighed the information obtained throughout the audits as challenging the results of the audits reached by FTB. Further, FTB points to Hyatt's arguments regarding an alleged calculation error as to the amount of taxable income, which FTB argues is an explicit example of Hyatt challenging the conclusions of the audits. Hyatt argues that all the evidence he presented did not challenge the audits, but was proffered to demonstrate that the audits were conducted in bad faith and in an attempt to "trump up a case against Hyatt and extort a settlement."

While much of the evidence presented at trial would not violate the restriction against considering the audits' conclusions, there are several instances in which the evidence does violate this ruling. These instances included evidence challenging whether FTB made a mathematical error in the amount of income that it taxed, whether an auditor improperly gave credibility to certain interviews of estranged family members, whether an auditor appropriately determined that certain information was not credible or not relevant, as well as the testimony outlined above that Hyatt presented, which challenged various aspects of the fraud penalties.

The expert testimony regarding the fraud penalties went to the audits' determinations and had no utility in showing any intentional torts unless it was first concluded that the audits' determinations were incorrect. For example, the expert testimony concerning typical lifestyles of wealthy individuals had relevance only to show that FTB erroneously concluded that Hyatt's conduct, such as renting an apartment in a low-

income complex, was fraudulent because he was wealthy and allegedly only rented the apartment to give the appearance of living in Nevada. Whether such a conclusion was a correct determination by FTB is precisely what this case was not allowed to address. The testimony does not show wrongful intent or bad faith without first concluding that the decisions were wrong, unless it was proven that FTB knew wealthy individuals' tendencies, that they applied to all wealthy individuals, and that FTB ignored them. None of this was established, and thus, the testimony only went to the audits' correctness, which was not allowed. These are instances where the evidence went solely to challenging whether FTB made the right decisions in its audits. As such, it was an abuse of discretion for the district court to permit this evidence to be admitted. *Hansen*, 115 Nev. at 27, 974 P.2d at 1160.

> *Jury instruction permitting consideration of audits' determinations*

FTB also argues that the district court wrongly instructed the jury. Specifically, it asserts that the jury instruction given at the end of trial demonstrates that the district court allowed the jury to improperly consider FTB's audit determinations. Hyatt counters FTB's argument by relying on an earlier instruction that was given to the jury that he argues shows that the district court did not allow the jury to determine the appropriateness of the audits' results, as it specifically instructed the jury not to consider the audits' conclusions.

As background, before trial began, and at various times during the trial, the district court read an instruction to the jury that it was not to consider whether the audits' conclusions were correct:

> Although this case arises from the residency tax audit conducted by FTB, it is important for you to understand that you will not be asked, nor

SUPREME COURT
OF
NEVADA

(O) 1947A 

51

will you be permitted to make any determinations
related to Mr. Hyatt's residency or the correctness
of the tax assessments, penalties and interest
assessed by FTB against Mr. Hyatt. Thus,
although you may hear evidence during the course
of this trial that may be related to the
determinations and conclusions reached by FTB
regarding Mr. Hyatt's residency and tax
assessments, you are not permitted to make any
determinations regarding Mr. Hyatt's residency
such as when he became or did not become a
resident of Nevada.

When jury instructions were given, this instruction was intended to be
part of the jury instructions, but somehow the instruction was altered and
a different version of this instruction was read as Jury Instruction 24. To
correct the error, the district court read a revised Jury Instruction 24:

You have heard evidence during the course
of this trial that may be related to the
determinations and conclusions reached by FTB
regarding Mr. Hyatt's residency and tax
assessments. You are not permitted to make any
determinations regarding Mr. Hyatt's residency,
such as when he became or did not become a
resident of Nevada. Likewise, you are not
permitted to make any determinations related to
the propriety of the tax assessments issued by
FTB against Mr. Hyatt, including but not limited
to, the correctness or incorrectness of the amount
of taxes assessed, or the determinations of FTB to
assess Mr. Hyatt penalties and/or interest on
those tax assessments.

The residency and tax assessment
determinations, and all factual and legal issues
related thereto, are the subject matter of a
separate administrative process between Mr.
Hyatt and FTB in the State of California and will
be resolved in that administrative process. You
are not to concern yourself with those issues.

SUPREME COURT
OF
NEVADA

(O) 1947A

52

ER 614

> Counsel for the FTB read and presented argument from the inaccurate Jury Instruction No. 24. To the extent FTB's counsel's arguments cited and relied on statements that are not contained in the correct Jury Instruction No. 24, they are stricken and you must disregard them. You are not to consider the stricken statements and arguments in your deliberations. *There is nothing in the correct Jury Instruction No. 24 that would prevent you during your deliberations from considering the appropriateness or correctness of the analysis conducted by the FTB employees in reaching its residency determination and conclusion. There is nothing in Jury Instruction No. 24 that would prevent Malcolm Jumulet from rendering an opinion about the appropriateness or correctness of the analysis conducted by FTB employees in reaching its residency determinations and conclusions.*

(Emphasis added.) Based on the italicized language, FTB argues that the district court not only allowed, but invited the jury to consider whether the FTB's audit conclusions were correct.

Jury Instruction 24 violated the jurisdictional limit that the district court imposed on this case. The instruction specifically allowed the jury to consider the "appropriateness or correctness of the analysis conducted by the FTB employees in reaching its residency determination and conclusion." As a result, the district court abused its discretion in giving this jury instruction. *Allstate Ins. Co.*, 125 Nev. at 319, 212 P.3d at 331.

### Exclusion of evidence to rebut adverse inference

FTB also challenges the district court's exclusion of evidence that it sought to introduce in an effort to rebut an adverse inference sanction for spoliation of evidence. The evidentiary spoliation arose when FTB changed its e-mail server in 1999, and it subsequently destroyed



backup tapes from the old server. Because the server change occurred during the pendency of this litigation, FTB sent multiple e-mails to its employees, before the change, requesting that they print or otherwise save any e-mails related to Hyatt's case. Backup tapes containing several weeks' worth of e-mails were made from the old system to be used in the event that FTB needed to recover the old system. FTB, at some point, overwrote these tapes, however, and Hyatt eventually discovered the change in e-mail servers and requested discovery of the backup tapes, which had already been deleted. Because FTB had deleted the backup tapes, Hyatt filed a pretrial motion requesting sanctions against FTB. The district court ruled in Hyatt's favor and determined that it would give an adverse inference jury instruction. An adverse inference allows, but does not require, the jury to infer that evidence negligently destroyed by a party would have been harmful to that party. *See, e.g., Bass-Davis v. Davis*, 122 Nev. 442, 446, 452, 134 P.3d 103, 106, 109 (2006).

At trial, FTB sought to introduce evidence explaining the steps it had taken to preserve any relevant e-mails before the server change. Hyatt challenged this evidence, arguing that it was merely an attempt to reargue the evidence spoliation. The district court agreed with Hyatt and excluded the evidence. FTB does not challenge the jury instruction, but it does challenge the district court's exclusion of evidence that it sought to present at trial to rebut the adverse inference.

On this point, FTB argues that it was entitled to rebut the adverse inference, and therefore, the district court abused its discretion in excluding the rebuttal evidence. Hyatt counters that it is not proper evidence because in order to rebut the inference FTB had to show that the



destroyed evidence was not harmful and FTB's excluded evidence did not demonstrate that the destroyed e-mails did not contain anything harmful.

This court has recognized that a district court may impose a rebuttable presumption, under NRS 47.250(3), when evidence was willfully destroyed, or the court may impose a permissible adverse inference when the evidence was negligently destroyed. *Bass-Davis*, 122 Nev. at 447-48, 134 P.3d at 106-07. Under a rebuttable presumption, the burden shifts to the spoliating party to rebut the presumption by showing that the evidence that was destroyed was not unfavorable. 122 Nev. at 448, 134 P.3d at 107. If the party fails to rebut the presumption, then the jury or district court may presume that the evidence was adverse to the party that destroyed the evidence. *Id.* A lesser adverse inference, that does not shift the burden of proof, is permissible. *Id.* at 449, 134 P.3d at 107. The lesser inference merely allows the fact-finder to determine, based on other evidence, that a fact exists. *Id.*

In the present case, the district court concluded that FTB's conduct was negligent, not willful, and therefore the lesser adverse inference applied, and the burden did not shift to FTB. But the district court nonetheless excluded the proposed evidence that FTB sought to admit to rebut the adverse inference. The district court should have permitted FTB to explain the steps that it took to collect the relevant e-mails in an effort to demonstrate that none of the destroyed information contained in the e-mails was damaging to FTB. Because the district court did not allow FTB to explain the steps taken, we are not persuaded by Hyatt's contention that FTB's evidence was actually only an attempt to reargue the spoliation issue. To the contrary, FTB could use the proposed evidence related to its efforts to collect all relevant e-mails to explain why

SUPREME COURT
OF
NEVADA

(O) 1947A

55

nothing harmful was destroyed. Therefore, we conclude that the district court abused its discretion in excluding the evidence, and we reverse the district court's ruling in this regard.

### Other evidentiary errors

FTB additionally challenges the district court's exclusion of evidence regarding Hyatt's loss of his patent through a legal challenge to the validity of his patent and his being audited for his federal taxes by the IRS, both of which occurred during the relevant period associated with Hyatt's IIED claim. Hyatt asserts that the district court properly excluded the evidence because it was more prejudicial than probative.

Under NRS 48.035(1), "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Hyatt argues that this provides a basis for the district court's exclusion of this evidence. We conclude, however, that the district court abused its discretion in excluding the evidence of Hyatt's patent loss and federal tax audit on this basis. Although the evidence may be prejudicial, it is doubtful that it is *unfairly* prejudicial as required under the statute. And in any event, the probative value of this evidence as to Hyatt's IIED claim, in particular in regard to damages caused by FTB as opposed to other events in his life, is more probative than unfairly prejudicial. Accordingly, the district court abused its discretion in excluding this evidence.

### Evidentiary and jury instruction errors warrant reversal and remand for a new trial on damages only on the IIED claim

Because the district court abused its discretion in making the evidentiary and jury instruction rulings outlined above, the question becomes whether these errors warrant reversal and remand for a new trial



on the IIED claim, or whether the errors were harmless such that the judgment on the IIED claim should be upheld. *See Cook v. Sunrise Hosp. & Med. Ctr., L.L.C.*, 124 Nev. 997, 1006, 194 P.3d 1214, 1219 (2008) (holding that when there is error in a jury instruction "prejudice must be established in order to reverse a district court judgment," which can be done by "showing that, but for the error, a different result might have been reached"); *El Cortez Hotel, Inc. v. Coburn*, 87 Nev. 209, 213, 484 P.2d 1089, 1091 (1971) (stating that an evidentiary error must be prejudicial in order to warrant reversal and remand). We hold that substantial evidence exists to support the jury's finding as to liability against FTB on Hyatt's IIED claim regardless of these errors, but we conclude that the errors significantly affected the jury's determination of appropriate damages, and therefore, these errors were prejudicial and require reversal and remand for a new trial as to damages.

In particular, the record shows that at trial Hyatt argued that FTB promised fairness and impartiality in its auditing processes but then, according to Hyatt, proceeded to conduct unfair audits that amounted to FTB "seeking to trump up a tax claim against him or attempt to extort him." In connection with this argument, Hyatt asserted that the penalties FTB imposed against Hyatt were done "to better bargain for and position the case to settle." Hyatt also argued that FTB unfairly refused to correct a mathematical error in the amount assessed against him when FTB asserted that there was no error.

None of these assertions could be made without contesting the audits' conclusions and determining that they were incorrect, which Hyatt was precluded from doing. Further, excluding FTB's evidence to rebut the adverse inference was prejudicial because Hyatt relied heavily on the


SUPREME COURT
OF
NEVADA

(O) 1947A

57

adverse inference, and it is unknown how much weight the jury gave the inference in making its damages findings.  The exclusion of evidence concerning Hyatt's loss of his patent and his federal tax audit, both occurring during the relevant period, relate to whether Hyatt's emotional distress was caused by FTB's conduct or one of these other events.  As for the jury instruction, Instruction 24 gave the jury permission to consider the audits' determinations, which the district court had previously precluded it from reaching.  As such, all of these errors resulted in prejudice to FTB directly related to the amount of damages Hyatt may be entitled to on his IIED claim.  Therefore, a new trial as to the IIED damages is warranted.

### Recoverable damages on remand

As addressed above in regard to damages for Hyatt's fraud claim, we reject FTB's argument that it should be entitled to Nevada's statutory cap on damages for government entities under comity principles. Based on our above analysis on this issue, we conclude that providing statutory caps on damages under comity would conflict with our state's policy interest in providing adequate redress to Nevada citizens.  Thus, comity does not require this court to grant FTB such relief. *Faulkner v. Univ. of Tenn.*, 627 So. 2d 362, 366 (Ala. 1992); *see also Sam v. Estate of Sam*, 134 P.3d 761, 765 (N.M. 2006) (recognizing that a state is not required to extend immunity and comity, and only dictating doing so if it does not contradict the forum state's public policy).  As a result, any damages awarded on remand for Hyatt's IIED claim are not subject to any statutory cap on the amount awarded. As to FTB's challenges concerning prejudgment interest in connection with Hyatt's emotional distress damages, these arguments are rendered moot by our reversal of the

SUPREME COURT
OF
NEVADA

(0) 1947A

58

damages awarded for a new trial and our vacating the prejudgment interest award.

*Punitive damages*

The final issue that we must address in FTB's appeal is whether Hyatt can recover punitive damages from FTB. The district court allowed the issue of punitive damages to go to the jury, and the jury found in Hyatt's favor and awarded him $250 million.

Punitive damages are damages that are intended to punish a defendant's wrongful conduct rather than to compensate a plaintiff for his or her injuries. *Bongiovi v. Sullivan*, 122 Nev. 556, 580, 138 P.3d 433, 450 (2006). But "[t]he general rule is that no punitive damages are allowed against a [government entity] unless *expressly* authorized by statute." *Long v. City of Charlotte*, 293 S.E.2d 101, 114 (N.C. 1982) (emphasis added). In Nevada, NRS 41.035(1) provides that "[a]n award for damages [against a government entity] in an action sounding in tort . . . may not include any amount as exemplary or punitive." Thus, Nevada has not waived its sovereign immunity from suit for such damages.

FTB argues that it is entitled to immunity from punitive damages based on comity because, like Nevada, California law has expressly waived such damages against its government entities. California law provides full immunity from punitive damages for its government agencies. Cal. Gov't Code § 818 (West 2012). Hyatt maintains that punitive damages are available against an out-of-state



government entity, if provided for by statute, and Nevada has a statute authorizing such damages—NRS 42.005.[19]

NRS 42.005(1) provides that punitive damages may be awarded when a defendant "has been guilty of oppression, fraud or malice, express or implied." Hyatt acknowledges that punitive damages under NRS 42.005 are not applicable to a Nevada government entity based on NRS 41.035(1), but he contends that because FTB is not a Nevada government agency, the protection against punitive damages for Nevada agencies under NRS 41.035(1) does not apply, and thus, FTB comes within NRS 42.005's purview. FTB counters by citing a federal district court holding, *Georgia v. City of East Ridge, Tennessee*, 949 F. Supp. 1571, 1581 (N.D. Ga. 1996), in which the court concluded that a Tennessee government entity could not be held liable for punitive damages under Georgia state law (which applied to the case) because, even though Georgia law had a statute allowing punitive damages, Georgia did not allow such damages against government entities. Therefore, the court gave the Tennessee government entity the protection of this law. *Id.*

---

[19]Hyatt also argues that punitive damages are proper because the IRS is subject to punitive damages for conduct similar to that alleged here under the IRS code, 26 U.S.C. § 7431(c)(1)(B)(ii) (2012), which allows for punitive damages for intentional or grossly negligent disclosure of a private taxpayer's information. Thus, Hyatt maintains that it is reasonable to impose punitive damages against FTB when the federal law permits punitive damages against the IRS for similar conduct. *Id.* But as FTB points out, this argument fails because there is a statute that expressly allows punitive damages against the IRS, and such a statute does not exist here.

SUPREME COURT
OF
NEVADA

(O) 1947A

The broad allowance for punitive damages under NRS 42.005 does not authorize punitive damages against a government entity. Further, under comity principles, we afford FTB the protections of California immunity to the same degree as we would provide immunity to a Nevada government entity as outlined in NRS 41.035(1). Thus, Hyatt's argument that Nevada law provides for the award of punitive damages against FTB is unpersuasive. Because punitive damages would not be available against a Nevada government entity, we hold that under comity principles FTB is immune from punitive damages. We therefore reverse the portion of the district court's judgment awarding punitive damages against FTB.

*Costs*

Since we reverse Hyatt's judgments on several of his tort causes of action, we must reverse the district court's costs award and remand the costs issue for the district court to determine which party, if any, is the prevailing party based on our rulings. *See Bower v. Harrah's Laughlin, Inc.*, 125 Nev. 470, 494-95, 215 P.3d 709, 726 (2009) (stating that the reversal of costs award is required when this court reverses the underlying judgment); *Glenbrook Homeowners Ass'n v. Glenbrook Co.*, 111 Nev. 909, 922, 901 P.2d 132, 141 (1995) (upholding the district court's determination that neither party was a prevailing party because each party won some issues and lost some issues). On remand, if costs are awarded, the district court should consider the proper amount of costs to award, including allocation of costs as to each cause of action and recovery for only the successful causes of action, if possible. *Cf. Mayfield v. Koroghli*, 124 Nev. 343, 353, 184 P.3d 362, 369 (2008) (holding that the district court should apportion costs award when there are multiple defendants, unless it is "rendered impracticable by the interrelationship of

the claims"); *Bergmann v. Boyce*, 109 Nev. 670, 675-76, 856 P.2d 560, 563 (1993) (holding that the district court should apportion attorney fees between causes of action that were colorable and those that were groundless and award attorney fees for the groundless claims).

Because this issue is remanded to the district court, we also address FTB's challenges on appeal to the procedure used by the district court in awarding costs. Hyatt moved for costs after trial, which FTB opposed. FTB's opposition revolved in part around its contention that Hyatt failed to properly support his request for costs with necessary documentation as to the costs incurred. The district court assigned the costs issue to a special master. During the process, Hyatt supplemented his request for costs on more than one occasion to provide additional documentation to support his claimed costs. After approximately 15 months of discovery, the special master issued a recommendation to award Hyatt approximately $2.5 million in costs. FTB sought to challenge the special master's recommendation, but the district court concluded that FTB could not challenge the recommendation under the process used, and the court ultimately adopted the special master's recommendation.

FTB argues that Hyatt was improperly allowed to submit, under NRS 18.110, documentation to support the costs he sought after the deadline. This court has previously held that the five-day time limit established for filing a memorandum for costs is not jurisdictional because the statute specifically allows for "such further time as the court or judge may grant" to file the costs memorandum. *Eberle v. State ex rel. Nell J. Redfield Trust*, 108 Nev. 587, 590, 836 P.2d 67, 69 (1992). In *Eberle*, this court stated that even if no extension of time was granted by the district court, the fact that it favorably awarded the costs requested demonstrated

that it impliedly granted additional time. *Id.* The *Eberle* court ruled that this was within the district court's discretion and would not be disturbed on appeal. *Id.* Based on the *Eberle* holding, we reject FTB's contention that Hyatt was improperly allowed to supplement his costs memorandum.

  FTB also contends that the district court erred when it refused to let FTB file an objection to the master's report and recommendation. The district court concluded that, under NRCP 53(e)(3), no challenge was permitted because there was a jury trial. While the district court could refer the matter to a special master, the district court erroneously determined that FTB was not entitled to file an objection to the special master's recommendation. Although this case was a jury trial, the costs issue was not placed before the jury. Therefore, NRCP 53(e)(2) applied to the costs issue, not NRCP 53(e)(3). NRCP 53(e)(2) specifically provides that "any party may serve written objections" to the master's report. Accordingly, the district court erred when it precluded FTB from filing its objections. On remand, if the district court concludes that Hyatt is still entitled to costs, the court must allow FTB to file its objections to the report before the court enters a cost award. Based on our reversal and remand of the costs award, and our ruling in this appeal, we do not address FTB's specific challenges to the costs awarded to Hyatt, as those issues should be addressed by the district court, if necessary, in the first instance.

*Hyatt's cross-appeal*

  The final issues that we must resolve concern Hyatt's cross-appeal. In his cross-appeal, Hyatt challenges the district court's summary judgment ruling that prevented him from seeking economic damages as part of his recovery for his intentional tort claims.

As background, during the first audit, FTB sent letters to two Japanese companies with whom Hyatt had patent-licensing agreements asking the companies for specific dates when any payments were sent to Hyatt. Both companies responded to the letters and provided the requested information. In the district court, Hyatt argued that sending these letters to the Japanese companies was improper because they revealed that Hyatt was being audited by FTB and that he had disclosed the licensing agreements to FTB. Hyatt theorized that he suffered economic damages by losing millions of dollars of potential licensing revenue because he alleges that the Japanese market effectively abandoned him based on the disclosures. FTB moved the district court for summary judgment to preclude Hyatt from seeking economic loss damages, arguing that Hyatt did not have sufficient evidence to present this claim for damages to the jury. The district court agreed and granted FTB summary judgment.

Damages "cannot be based solely upon possibilities and speculative testimony." *United Exposition Serv. Co. v. State Indus. Ins. Sys.*, 109 Nev. 421, 424, 851 P.2d 423, 425 (1993). This is true regardless of "'whether the testimony comes from the mouth of a lay witness or an expert.'" *Gramanz v. T-Shirts & Souvenirs, Inc.*, 111 Nev. 478, 485, 894 P.2d 342, 347 (1995) (quoting *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 682 (3d Cir. 1991)). When circumstantial evidence is used to prove a fact, "the circumstances must be proved, and not themselves be presumed." *Horgan v. Indart*, 41 Nev. 228, 231, 168 P. 953, 953 (1917); *see also Frantz v. Johnson*, 116 Nev. 455, 468, 999 P.2d 351, 359 (2000). A party cannot use one inference to support another inference; only the ultimate fact can be presumed based on actual proof of the other facts in

SUPREME COURT
OF
NEVADA

(0) 1947A

64

the chain of proof. *Horgan*, 41 Nev. at 231, 168 P. at 953. Thus, "a complete chain of circumstances must be proven, and not left to inference, from which the ultimate fact may be presumed." *Id.*

Here, Hyatt argued that as a result of FTB sending letters to the two Japanese companies inquiring about licensing payments, the companies in turn would have notified the Japanese government about FTB investigating Hyatt. Hyatt theorized that the Japanese government would then notify other Japanese businesses about Hyatt being under investigation, with the end result being that the companies would not conduct any further licensing business with Hyatt. Hyatt's evidence to support this alleged chain of events consisted of the two letters FTB sent to the two companies and the fact that the companies responded to the letters, the fact that his licensing business did not obtain any other licensing agreements after the letters were sent, and expert testimony regarding Japanese business culture that was proffered to establish this potential series of events.

Hyatt claims that the district court erroneously ruled that he had to present direct evidence to support his claim for damages, *e.g.*, evidence that the alleged chain of events actually occurred and that other companies in fact refused to do business with Hyatt as a result. Hyatt insists that he had sufficient circumstantial evidence to support his damages, and in any case, asserts that circumstantial evidence alone is sufficient and that causation requirements are less stringent and can be met through expert testimony under the circumstances at issue here. FTB responds that the district court did not rule that direct evidence was

required, but instead concluded that Hyatt's evidence was speculative and insufficient. FTB does not contest that damages can be proven through circumstantial evidence, but argues that Hyatt did not provide such evidence. It also argues that there is no different causation standard under the facts of this case.

The issue we must decide is whether Hyatt set forth sufficient circumstantial evidence to support his economic damages claim, or if the evidence he presented was instead either too speculative or failed to create a sufficient question of material fact as to his economic damages. To begin with, we reject Hyatt's contention that reversal is necessary because the district court improperly ruled that direct evidence was mandatory. Hyatt's limited view of the district court's ruling is unavailing.

The ultimate fact that Hyatt seeks to establish through circumstantial evidence, that the downfall of his licensing business in Japan resulted from FTB contacting the two Japanese companies, however, cannot be proven through reliance on multiple inferences—the other facts in the chain must be proven. Here, Hyatt only set forth expert testimony detailing what his experts believed would happen based on the Japanese business culture. No evidence established that any of the hypothetical steps actually occurred. Hyatt provided no proof that the two businesses that received FTB's letters contacted the Japanese government, nor did Hyatt prove that the Japanese government in turn contacted other businesses regarding the investigation of Hyatt. Therefore, Hyatt did not properly support his claim for economic damages with circumstantial evidence. *Wood v. Safeway, Inc.*, 121 Nev. 724, 731, 121 P.3d 1026, 1030-31 (2005) (recognizing that to avoid summary judgment once the movant has properly supported the summary judgment

motion, the nonmoving party may not rest upon general allegations and conclusions, but must instead set forth by affidavit or otherwise specific facts demonstrating the existence of a genuine issue of material fact for trial); *see* NRCP 56(e). Accordingly, summary judgment was proper and we affirm the district court's summary judgment on this issue.

### CONCLUSION

Discretionary-function immunity does not apply to intentional and bad-faith tort claims. But while FTB is not entitled to immunity, it is entitled to judgment as a matter of law on each of Hyatt's causes of action except for his fraud and IIED claims. As to the fraud claim, we affirm the district court's judgment in Hyatt's favor, and we conclude that the district court's evidentiary and jury instruction errors were harmless. We also uphold the amount of damages awarded, as we have determined that FTB is not entitled to a statutory cap on damages under comity principles because this state's interest in providing adequate relief to its citizens outweighs providing FTB with the benefit of a damage cap under comity. In regard to the IIED claim, we affirm the judgment in favor of Hyatt as to liability, but conclude that evidentiary and jury instruction errors require a new trial as to damages. Any damages awarded on remand are not subject to a statutory cap under comity. We nevertheless hold that Hyatt is precluded from recovering punitive damages against FTB. The district court's judgment is therefore affirmed in part and reversed and remanded in part. We also remand the prejudgment interest and the costs awards to the district court for a new determination in light of this opinion. Finally, we affirm the district court's prior summary judgment as to Hyatt's claim

for economic damages on Hyatt's cross-appeal.  Given our resolution of this appeal, we do not need to address the remaining arguments raised by the parties on appeal or cross-appeal.

_____ , J.
Hardesty

We concur:

_____ , C.J.
Gibbons

_____ , J.
Pickering

_____ , J.
Parraguirre

_____ , J.
Douglas

_____ , J.
Cherry

1 | Donald J. Kula, Bar No. 144342
  | DKula@perkinscoie.com
2 | Oliver M. Gold, Bar No. 279033
  | OGold@perkinscoie.com
3 | **PERKINS COIE LLP**
  | 1888 Century Park E., Suite 1700
4 | Los Angeles, CA  90067-1721
  | Telephone:  310.788.9900
5 | Facsimile:  310.788.3399

6 | Erwin Chemerinsky, Esq.
  | EChemerinsky@law.uci.edu
7 | **UC IRVINE SCHOOL OF LAW**
  | 401 E. Peltason Drive, Suite 1000
8 | Irvine, CA  92697-8000
  | Telephone:  949.824.8814
9 | Facsimile:  949.824.7336

10 | Malcolm Segal, Bar No. 075481
   | MSegal@segal-pc.com
11 | **SEGAL & ASSOCIATES, PC**
   | 400 Capitol Mall, Suite 2550
12 | Sacramento, CA  95814
   | Telephone:  916.441.0886
13 | Facsimile:  916.475.1231

14 | Attorneys for Plaintiff, Gilbert P.  Hyatt

15 | UNITED STATES DISTRICT COURT

16 | EASTERN DISTRICT OF CALIFORNIA

17 |

18 | GILBERT P. HYATT,                                 Case No.2:14−CV−00849−GEB−DAD

19 |                     Plaintiff,                   **PLAINTIFF'S SUPPLEMENTAL**
                                                      **NOTICE OF DECISION OF**
20 | v.                                               **NEVADA SUPREME COURT**

21 | JOHN CHIANG, JEROME E.
   | HORTON, AND MICHAEL COHEN,
22 | CALIFORNIA FRANCHISE TAX             **DATE: MOTIONS UNDER**
   | BOARD MEMBERS; BETTY T. YEE,        **SUBMISSION**
23 | GEORGE RUNNER, MICHELLE
   | STEEL, JEROME E. HORTON, AND        **HON. GARLAND E. BURRELL, JR.**
24 | JOHN CHIANG, CALIFORNIA
25 | STATE BOARD OF
   | EQUALIZATION MEMBERS; AND
26 | DOES 1 THROUGH 20,
27 |
28 |                     Defendants.

1    **TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF**

2    **RECORD:**

3        **PLEASE TAKE NOTICE THAT** on November 25, 2014 the Nevada

4    Supreme Court entered an Order in the case of Franchise Tax Board of California v.

5    Hyatt, Nevada Supreme Court No. 53264 (the "Order"), unanimously denying the

6    parties' petitions for rehearing from its Decision of September 18, 2014 (the "Nev.

7    Sup. Ct. Decision"). A true and correct copy of the Order is attached as Exhibit A.[1]

8        Plaintiff Gilbert Hyatt previously filed a Notice of Decision (Dkt. No. 25) of

9    the Nev. Sup. Ct. Decision, noting that the underlying Nevada case and its

10   judgment were referenced in the Complaint on file in this case (Dkt. 2, at ¶¶ 111-

11   117), in the Franchise Tax Board's pending Motion to Dismiss the Complaint and

12   its supporting papers (Dkt. 17-1, at 5:15-6:4, 14:13-15:2; Dkt. 17-2, at ¶¶ 14, 16-18,

13   20-22, 31-32), and in Hyatt's Combined Opposition to that motion and its

14   supporting papers (Dkt. 22, at 4: 12-22, 9:8-12, 13:11-14:15; Dkt. 23, at Exhs. 1-17,

15   20-27; Dkt. 24, at 16:11-26:7, 27:14-30:11, 41:23-45:13).  The prior Notice of

16   Decision noted that the Nevada case and judgment entered therein were cited in

17   support of Hyatt's argument for collateral estoppel in opposing the pending motions

18   to dismiss (Dkt. 25, at 2, citing Dkt. 22, at 1:7-15).

19       The Nevada Supreme Court's most recent determination, which rejected the

20   arguments raised by the Franchise Tax Board's petition for rehearing, also bears

21   directly on the collateral estoppel issue presently before this Court in pending

22   motions.  In sum, the Franchise Tax Board had sought a rehearing of the Nev. Sup.

23   Ct. Decision, including that section confirming that the Franchise Tax Board had

24   delayed resolution of the protest portion of the administrative tax process for 11

25   years and that the lead auditor had made disparaging remarks about Hyatt and his

26   religion during the initial audit phase.  (*See* Exhibit B, at 4-5.)  The Franchise Tax

27

28   ---

[1] The petitions for rehearing and answers of both parties are attached as Exhibits B, C, D and E to provide sufficient context for this Notice.

1    Board argued in seeking rehearing that the evidence showed that Hyatt and his
2    attorneys, not the Franchise Tax Board, caused the delay and that the lead auditor
3    denied making racist and anti-Semitic remarks about Hyatt.  *Id.*

4          Hyatt's answer to the FTB's petition demonstrated that evidence in the
5    record supported the Nevada Supreme Court's decision confirming the judgment
6    and jury verdict, including substantial evidence of the Franchise Tax Board's 11
7    year delay of the protest and of the anti-Semitic remarks of the lead auditor.  (*See*
8    Exhibit C, at 1-2, 6-7, 7-9.)  Hyatt pointed to the trial record which "demonstrat[ed]
9    that FTB's internal documents and its own witnesses' testimony confirmed an
10   intentional hold by FTB" on the protests."  *Id.* at 7.  Hyatt also directed the Court to
11   witness testimony concerning the lead auditor's disparaging remarks in which the
12   key witness "confirmed when cross-examined by FTB counsel that she heard Ms.
13   Cox use racial slurs 'maybe 20 times' and that while the witness understood 'these
14   racial slurs that Sheila [Ms. Cox] made in a joking sense like to say the way [Ms.
15   Cox] talks out of the side of her mouth, 'That Jew bastard,'  the witness 'knew it
16   was intended as a joke because she [Ms. Cox] was upset with him [Hyatt]' but felt
17   'that she [Ms. Cox] cross (sic) the line.'"  *Id.* at 8.

18         The new Order from the Nevada Supreme Court denying the Franchise Tax
19   Board's petition for rehearing reaffirms the basis for Hyatt's request in his
20   opposition to the pending motions to dismiss in this case that the Franchise Tax
21   Board be barred as a matter of collateral estoppel from contesting (i) Hyatt's
22   allegations in this proceeding in support of his Due Process claim that the Franchise
23   Tax Board, not Hyatt, caused the 11 year delay in the administrative tax process
24   (Dkt. 22, at 14; Dkt. 24, at 16-26),  and (ii) Hyatt's allegations in this proceeding in
25   support of his Equal Protection claim that the lead auditor made disparaging
26   remarks about Hyatt and his religion (Dkt. 22, at 14; Dkt. 24, at 41-44).

27         The Plaintiff wishes to point out that the Order of the Nevada Supreme Court
28   also denied Hyatt's petition for rehearing on issues which have no bearing on this

1    litigation.  Hyatt had argued that the Nevada Supreme Court had overlooked or

2    misapprehended evidence of Hyatt's social security number and private Nevada

3    address having been improperly publicly disclosed by the Franchise Tax Board, as

4    further support of the jury verdict in Hyatt's favor.  (*See* Exhibit D.)  The Franchise

5    Tax Board argued in its answer to the contrary.  (*See* Exhibit E.)  The Nevada

6    Supreme Court ruled in favor of the Franchise Tax Board on this point.

7          Hyatt is prepared to submit such additional pleadings as the Court may deem

8    necessary to explain the relevancy of the Decision and Order to the pending

9    Motions should the Court determine to offer the parties the opportunity to do so.

10

11   DATED: December 2, 2014              **PERKINS COIE LLP**

12                                        By: */s/ Donald J. Kula*
                                          Donald J. Kula
13

14                                        *Erwin Chemerinsky*

15
                                          **SEGAL & ASSOCIATES, PC.**
16

17                                        By: */s/ Malcolm S. Segal*
                                          Attorneys for Plaintiff
18                                        Gilbert P. Hyatt

19

20

21

22

23

24

25

26

27

28

-3-                                      Plaintiff's Supplemental Notice of
                                         Decision From Nevada Supreme Court

1 | Donald J. Kula, Bar No. 144342
DKula@perkinscoie.com
2 | Oliver M. Gold, Bar No. 279033
OGold@perkinscoie.com
3 | **PERKINS COIE LLP**
1888 Century Park E., Suite 1700
4 | Los Angeles, CA  90067-1721
Telephone:  310.788.9900
5 | Facsimile:  310.788.3399

6 | Erwin Chemerinsky, Esq.
EChemerinsky@law.uci.edu
7 | **UC IRVINE SCHOOL OF LAW**
401 E. Peltason Drive, Suite 1000
8 | Irvine, CA  92697-8000
Telephone:  949.824.8814
9 | Facsimile:  949.824.7336

10 | Malcolm Segal, Bar No. 075481
MSegal@segal-pc.com
11 | **SEGAL & ASSOCIATES, PC**
400 Capitol Mall, Suite 2550
12 | Sacramento, CA  95814
Telephone:  916.441.0886
13 | Facsimile:  916.475.1231

14 | Attorneys for Plaintiff, Gilbert P.  Hyatt

15 | UNITED STATES DISTRICT COURT

16 | EASTERN DISTRICT OF CALIFORNIA

17 |

18 | GILBERT P. HYATT,                          Case No.2:14−CV−00849−GEB−DAD

19 |                     Plaintiff,            **NOTICE OF ERRATA RE
PLAINTIFF'S SUPPLEMENTAL
20 | v.                                        NOTICE OF DECISION OF
NEVADA SUPREME COURT**

21 | JOHN CHIANG, JEROME E.
HORTON, AND MICHAEL COHEN,
22 | CALIFORNIA FRANCHISE TAX              **DATE: MOTIONS UNDER
BOARD MEMBERS; BETTY T. YEE,          SUBMISSION**
23 | GEORGE RUNNER, MICHELLE
24 | STEEL, JEROME E. HORTON, AND          **HON. GARLAND E. BURRELL, JR.**
JOHN CHIANG, CALIFORNIA
25 | STATE BOARD OF
26 | EQUALIZATION MEMBERS; AND
DOES 1 THROUGH 20,
27 |
28 |                     Defendants.

64847-0006/LEGAL124366614.1 | Notice of Errata Re Plaintiff's
Supplemental Notice of Decision From
Nevada Supreme Court

1    **TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF**

2    **RECORD:**

3        **PLEASE TAKE NOTICE THAT** on December 3, 2014, Plaintiff Gilbert

4    Hyatt mistakenly filed Plaintiff's Supplemental Notice of Decision of Nevada

5    Supreme Court (Dkt. No. 30) without the referenced Exhibits A through E.

6    Attached hereto please find attached as Exhibit 1, Plaintiff's entire Supplemental

7    Notice of Decision of Nevada Supreme Court with referenced Exhibits A through E

8    attached thereto.

9

10   DATED: December 3, 2014          **PERKINS COIE LLP**

11                                    By: */s/ Donald J. Kula*
                                      Donald J. Kula
12

13                                    *Erwin Chemerinsky*

14
                                      **SEGAL & ASSOCIATES, PC.**
15

16                                    By: */s/ Malcolm S. Segal*
                                      Attorneys for Plaintiff
17                                    Gilbert P. Hyatt

18

19

20

21

22

23

24

25

26

27

28

64847-0006/LEGAL124366614.1          -1-          Notice of Errata Re Plaintiff's
                                                  Supplemental Notice of Decision From
                                                  Nevada Supreme Court

# EXHIBIT  1

1  Donald J. Kula, Bar No. 144342
   DKula@perkinscoie.com
2  Oliver M. Gold, Bar No. 279033
   OGold@perkinscoie.com
3  **PERKINS COIE LLP**
   1888 Century Park E., Suite 1700
4  Los Angeles, CA  90067-1721
   Telephone:  310.788.9900
5  Facsimile:  310.788.3399

6  Erwin Chemerinsky, Esq.
   EChemerinsky@law.uci.edu
7  **UC IRVINE SCHOOL OF LAW**
   401 E. Peltason Drive, Suite 1000
8  Irvine, CA  92697-8000
   Telephone:  949.824.8814
9  Facsimile:  949.824.7336

10 Malcolm Segal, Bar No. 075481
   MSegal@segal-pc.com
11 **SEGAL & ASSOCIATES, PC**
   400 Capitol Mall, Suite 2550
12 Sacramento, CA  95814
   Telephone:  916.441.0886
13 Facsimile:  916.475.1231

14 Attorneys for Plaintiff, Gilbert P.  Hyatt

15              UNITED STATES DISTRICT COURT

16             EASTERN DISTRICT OF CALIFORNIA

17

18 GILBERT P. HYATT,                    Case No.2:14−CV−00849−GEB−DAD

19                  Plaintiff,          **PLAINTIFF'S SUPPLEMENTAL
                                        NOTICE OF DECISION OF**
20 v.                                   **NEVADA SUPREME COURT**

21 JOHN CHIANG, JEROME E.
   HORTON, AND MICHAEL COHEN,
22 CALIFORNIA FRANCHISE TAX             **DATE: MOTIONS UNDER
   BOARD MEMBERS; BETTY T. YEE,         SUBMISSION**
23 GEORGE RUNNER, MICHELLE
   STEEL, JEROME E. HORTON, AND         **HON. GARLAND E. BURRELL, JR.**
24 JOHN CHIANG, CALIFORNIA
   STATE BOARD OF
25 EQUALIZATION MEMBERS; AND
26 DOES 1 THROUGH 20,

27                  Defendants.

28

                                        Plaintiff's Supplemental Notice of
                                        Decision From Nevada Supreme Court

1    **TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF**

2    **RECORD:**

3        **PLEASE TAKE NOTICE THAT** on November 25, 2014 the Nevada

4    Supreme Court entered an Order in the case of Franchise Tax Board of California v.

5    Hyatt, Nevada Supreme Court No. 53264 (the "Order"), unanimously denying the

6    parties' petitions for rehearing from its Decision of September 18, 2014 (the "Nev.

7    Sup. Ct. Decision"). A true and correct copy of the Order is attached as Exhibit A.[1]

8        Plaintiff Gilbert Hyatt previously filed a Notice of Decision (Dkt. No. 25) of

9    the Nev. Sup. Ct. Decision, noting that the underlying Nevada case and its

10   judgment were referenced in the Complaint on file in this case (Dkt. 2, at ¶¶ 111-

11   117), in the Franchise Tax Board's pending Motion to Dismiss the Complaint and

12   its supporting papers (Dkt. 17-1, at 5:15-6:4, 14:13-15:2; Dkt. 17-2, at ¶¶ 14, 16-18,

13   20-22, 31-32), and in Hyatt's Combined Opposition to that motion and its

14   supporting papers (Dkt. 22, at 4: 12-22, 9:8-12, 13:11-14:15; Dkt. 23, at Exhs. 1-17,

15   20-27; Dkt. 24, at 16:11-26:7, 27:14-30:11, 41:23-45:13).  The prior Notice of

16   Decision noted that the Nevada case and judgment entered therein were cited in

17   support of Hyatt's argument for collateral estoppel in opposing the pending motions

18   to dismiss (Dkt. 25, at 2, citing Dkt. 22, at 1:7-15).

19       The Nevada Supreme Court's most recent determination, which rejected the

20   arguments raised by the Franchise Tax Board's petition for rehearing, also bears

21   directly on the collateral estoppel issue presently before this Court in pending

22   motions.  In sum, the Franchise Tax Board had sought a rehearing of the Nev. Sup.

23   Ct. Decision, including that section confirming that the Franchise Tax Board had

24   delayed resolution of the protest portion of the administrative tax process for 11

25   years and that the lead auditor had made disparaging remarks about Hyatt and his

26   religion during the initial audit phase. (*See* Exhibit B, at 4-5.) The Franchise Tax

27   
28   [1] The petitions for rehearing and answers of both parties are attached as Exhibits B,
     C, D and E to provide sufficient context for this Notice.

1    Board argued in seeking rehearing that the evidence showed that Hyatt and his

2    attorneys, not the Franchise Tax Board, caused the delay and that the lead auditor

3    denied making racist and anti-Semitic remarks about Hyatt. *Id.*

4         Hyatt's answer to the FTB's petition demonstrated that evidence in the

5    record supported the Nevada Supreme Court's decision confirming the judgment

6    and jury verdict, including substantial evidence of the Franchise Tax Board's 11

7    year delay of the protest and of the anti-Semitic remarks of the lead auditor. (*See*

8    Exhibit C, at 1-2, 6-7, 7-9.) Hyatt pointed to the trial record which "demonstrat[ed]

9    that FTB's internal documents and its own witnesses' testimony confirmed an

10   intentional hold by FTB" on the protests." *Id.* at 7. Hyatt also directed the Court to

11   witness testimony concerning the lead auditor's disparaging remarks in which the

12   key witness "confirmed when cross-examined by FTB counsel that she heard Ms.

13   Cox use racial slurs 'maybe 20 times' and that while the witness understood 'these

14   racial slurs that Sheila [Ms. Cox] made in a joking sense like to say the way [Ms.

15   Cox] talks out of the side of her mouth, 'That Jew bastard,' the witness 'knew it

16   was intended as a joke because she [Ms. Cox] was upset with him [Hyatt]' but felt

17   'that she [Ms. Cox] cross (sic) the line.'" *Id.* at 8.

18        The new Order from the Nevada Supreme Court denying the Franchise Tax

19   Board's petition for rehearing reaffirms the basis for Hyatt's request in his

20   opposition to the pending motions to dismiss in this case that the Franchise Tax

21   Board be barred as a matter of collateral estoppel from contesting (i) Hyatt's

22   allegations in this proceeding in support of his Due Process claim that the Franchise

23   Tax Board, not Hyatt, caused the 11 year delay in the administrative tax process

24   (Dkt. 22, at 14; Dkt. 24, at 16-26), and (ii) Hyatt's allegations in this proceeding in

25   support of his Equal Protection claim that the lead auditor made disparaging

26   remarks about Hyatt and his religion (Dkt. 22, at 14; Dkt. 24, at 41-44).

27        The Plaintiff wishes to point out that the Order of the Nevada Supreme Court

28   also denied Hyatt's petition for rehearing on issues which have no bearing on this

-2-                    Plaintiff's Supplemental Notice of
                       Decision From Nevada Supreme Court

1    litigation.  Hyatt had argued that the Nevada Supreme Court had overlooked or

2    misapprehended evidence of Hyatt's social security number and private Nevada

3    address having been improperly publicly disclosed by the Franchise Tax Board, as

4    further support of the jury verdict in Hyatt's favor.  (*See* Exhibit D.)  The Franchise

5    Tax Board argued in its answer to the contrary.  (*See* Exhibit E.)  The Nevada

6    Supreme Court ruled in favor of the Franchise Tax Board on this point.

7         Hyatt is prepared to submit such additional pleadings as the Court may deem

8    necessary to explain the relevancy of the Decision and Order to the pending

9    Motions should the Court determine to offer the parties the opportunity to do so.

10

11   DATED: December 2, 2014          **PERKINS COIE LLP**

12                                    By: */s/ Donald J. Kula*
                                      Donald J. Kula
13

14                                    *Erwin Chemerinsky*

15

16                                    **SEGAL & ASSOCIATES, PC.**

17                                    By: */s/ Malcolm S. Segal*
                                      Attorneys for Plaintiff
18                                    Gilbert P. Hyatt

19

20

21

22

23

24

25

26

27

28

                              -3-        Plaintiff's Supplemental Notice of
                                         Decision From Nevada Supreme Court

# EXHIBIT  A

## IN THE SUPREME COURT OF THE STATE OF NEVADA

FRANCHISE TAX BOARD OF THE
STATE OF CALIFORNIA,
Appellant/Cross-Respondent,
vs.
GILBERT P. HYATT,
Respondent/Cross-Appellant.

No. 53264

# FILED

NOV 2 5 2014


TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY _____
DEPUTY CLERK

### *ORDER DENYING PETITIONS FOR REHEARING*

Having considered the parties' petitions for rehearing and the answers thereto, we deny both petitions. NRAP 40(c).

It is so ORDERED.[1]

_____, C.J.
Gibbons

_____, J.
Pickering

_____, J.
Hardesty

_____, J.
Parraguirre

_____, J.
Douglas

_____, J.
Cherry

_____

[1]The Honorable Nancy M. Saitta, Justice, voluntarily recused herself from participation in the decision of this matter.

SUPREME COURT
OF
NEVADA

(O) 1947A

14-38932

cc:    McDonald Carano Wilson LLP/Reno
        Lemons, Grundy & Eisenberg
        Lewis Roca Rothgerber LLP/Las Vegas
        Perkins Coie
        Hutchison & Steffen, LLC
        Kaempfer Crowell/Las Vegas
        Attorney General/Carson City
        Utah Attorney General's Office
        Eighth District Court Clerk

SUPREME COURT
OF
NEVADA

(O) 1947A

# EXHIBIT  B

1            **IN THE SUPREME COURT OF THE STATE OF NEVADA**

2

3 FRANCHISE TAX BOARD OF THE
STATE OF CALIFORNIA,            Supreme Court Case No. 53264

4      Appellant/Cross-respondent,      District Court Case Electronically Filed

5      v.                    Notice of Cross-Appeal filed Minderman
                                     2009           Clerk of Supreme Court

Oct 07 2014 08:35 a.m.

6 GILBERT P. HYATT,

7      Respondent/Cross-appellant.

8

9                            **APPEAL**

10        from the Eighth Judicial District Court, Clark County

11       THE HONORABLE JESSIE WALSH, District Judge

12

13 **RESPONDENT GILBERT P. HYATT'S PETITION FOR REHEARING**

14

15                   MARK A. HUTCHISON, Nev. Bar No. 4639
MICHAEL K. WALL, Nevada Bar No. 2098

16                   HUTCHISON & STEFFEN, LLC.
10080 Alta Drive, Suite 200

17                   Las Vegas, NV 89145
Telephone: (702) 385-2500

18                   Facsimile: (702) 385-2086

19                   PETER C. BERNHARD, Nev. Bar No. 734
KAEMPFER CROWELL RENSHAW

20                   GRONAUER & FIORENTINO

21                   8345 West Sunset Road, Suite 250

                  Las Vegas, NV 89113

22                   Telephone: (702) 792-7000
Facsimile: (702) 796-7181

23

24                   DONALD J. KULA, Cal. Bar No. 144342
PERKINS COIE LLP

25                   1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721

26                   Telephone: (310) 788-9900
Facsimile: (310) 788-3399

27                    *Attorneys for Respondent/Cross-*
*Appellant Gilbert P. Hyatt*

28

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

Docket 53264   Document 2014-33200

# PETITION FOR REHEARING

Pursuant to NRAP 40, Respondent Gilbert P. Hyatt ("Respondent" or "Hyatt") submits this Petition for Rehearing in response to the Court's September 18, 2014, Opinion that affirmed in part and reversed in part the underlying district court judgment and remanded the matter to the district court for further proceedings.

I.   **Issues presented:**

    A.   **Did the Court overlook or misapprehend the evidentiary record from the underlying trial when it concluded that Hyatt's *Nevada address* had been disclosed in public records and was publicly available prior to the FTB's public dissemination of the address?**

    B.   **Did the Court overlook or misapprehend the law when it concluded that the FTB's mass public dissemination of Hyatt's social security number was not actionable because it was contained in decades-old court records?**

    C.   **Should the Court therefore grant a rehearing on the issue of whether Hyatt established the necessary requirements for his invasion of privacy claims of intrusion upon seclusion and public disclosure of private facts?**

II.   **Summary of argument and relief requested.**

    *Nevada "address" not in the public record.*

The Court reversed the jury verdict and resulting judgment in Hyatt's favor on his claims for intrusion upon seclusion and public disclosure of private facts on the basis that Hyatt's "address" was part of the public record from long-ago California divorce and probate cases and one business license application. But the Court referenced evidence pertaining to Hyatt's *California address* before he moved to Nevada (identified in the decades-old court records) and his accountant's office address in Nevada on Charleston Blvd. (identified in a business license application) that was used by Hyatt for meetings and for the business license application. The

1  FTB wrongly cited this evidence in arguing Hyatt's "address" was in the public

2  record. (FTB Opening Brief, at 74-75, 81.)[1]  The Court then referenced this evidence

3  in its Opinion finding that Hyatt's "address" was in the public record. (Opinion, at 6-

4  27.)

5       The Court did not reference evidence pertaining to Hyatt's private and

6  confidential home/office *Nevada address* on Tara that he purchased in April of 1992

7  specifically for privacy and security.  But it was Hyatt's private *Nevada address* on

8  Tara that was the subject of his claims for intrusion upon seclusion and public

9  disclosure of private facts.  Hyatt's briefing and the evidence cited therein addressed

10  this point. (Hyatt's Answering Brief, at 10-11, 36, 38, 94-95, 105.)  The Court

11  therefore overlooked or misapprehended the evidence regarding Hyatt's private and

12  confidential Nevada address on Tara, which was not publicly available prior to the

13  FTB's disclosures thereof.

14       In this regard, at trial it was demonstrated that upon moving to Nevada in 1991

15  and purchasing his first house there on Tara in April 1992, Hyatt took significant

16  steps to maintain the privacy and confidentiality of that address.  The evidence

17  demonstrated that Hyatt purchased the Nevada property on Tara through a trust so

18  that he could not be identified with that Nevada address in the County Recorder and

19  County Assessor's offices.  Similarly, utilities for the Nevada property were opened

20  by and put in the names of third parties, further concealing the fact of his ownership

21  and use of the premises.  This was important because Hyatt was an independent

22  inventor who did his research and development work in this Nevada property, which

23  was his home/office.  The evidence also demonstrated that Hyatt's Nevada property

24  had three security systems and that Hyatt had significant concerns about industrial

25

26  [1] The documents cited in the FTB's briefing and the addresses listed therein are self-
27  evident.  The purpose and use of the Charleston Blvd. address was clearly explained
28  by Hyatt with no contradiction by the FTB at trial. (RT: April 28, 88:17-93:21.)

2

1  espionage, as he maintained highly confidential and valuable information relating to
2  his research and development work, his patents and his pending patent applications at
3  that private and confidential Nevada property.

4      It was Hyatt's private Nevada address on Tara therefore that he asked the FTB
5  at the outset of the audit to keep confidential.  The FTB agreed but failed to keep its
6  promise.  This private and confidential Tara address was the issue in regard to
7  Hyatt's "address" in the two invasion of privacy causes of action.

8      The Court therefore overlooked or misapprehended the evidence when it held
9  that Hyatt failed to establish the requirements for his intrusion upon seclusion and
10 public disclosure of private facts claims.  In fact, the Nevada address on Tara was not
11 connected to Hyatt in the public record, and Hyatt had every expectation of privacy
12 in this address when it was publically disclosed by the FTB.

13      *Mass dissemination of social security number*

14      The Court also overlooked or misapprehended the legal authority that holds
15 when private information such as a social security number is widely disseminated,
16 even if this private information is "publicly" available in decades-old court records or
17 by narrow and discreet searches of public records, the mass publication is still an
18 invasion of privacy.  A person has a reasonable expectation of privacy in his or her
19 social security number even though it may have been disclosed in certain
20 circumstances, because almost everyone's social security number is in some kind of
21 public record.  Courts therefore have consistently held that social security numbers
22 are private information and that the mass dissemination of them is actionable.

23      The Court's ruling on this point is to the contrary and implicates serious public
24 policy issues, since it means that virtually no Nevada citizen has an expectation of
25 privacy in his or her social security number.  Almost everyone's social security
26 number is contained somewhere in a "public" record, but according to the Court's
27 ruling, a third party can engage in mass re-publication of anyone's social security
28

3

1  number with impunity, since no one can have an objective expectation of privacy in
2  his or her social security number. This is wrong, and it cannot and should not be the
3  law in Nevada.[2]

4      The Court therefore overlooked or misapprehended the law when it held that
5  Hyatt failed to establish the requirements for his intrusion upon seclusion and public
6  disclosure of private facts claims simply because, like almost every Nevada citizen,
7  his social security number was contained in decades-old government records.

8      *Relief requested*

9      Two separate grounds exist to grant this petition for rehearing on the issue of
10  whether the jury's verdict and the resulting judgment in favor of Hyatt on his claims
11  for intrusion upon seclusion and public disclosure of private facts should be affirmed
12  instead of reversed, as this Court ruled in its September 18, 2014 Opinion. Hyatt
13  therefore seeks a rehearing on the issue of whether he established at trial, as the jury
14  determined, the requirements for his claims for intrusion upon seclusion and public
15  disclosure of private facts. Further, if a rehearing is granted, after which it is
16  determined that in fact Hyatt did establish the requirements for these two invasion of
17  privacy claims, the jury's award of damages for invasion of privacy should be
18  reinstated or, at a minimum, a new trial on damages for these invasion of privacy
19  claims should be ordered — similar to the Court's ruling ordering a new trial on
20  damages for Hyatt's intentional infliction of emotional distress claim.

21
22
23

24  [2] This Court held *in this case* in 2002 that "We believe that greater weight is to be
25  accorded Nevada's interest in protecting its citizens from injurious intentional torts
    and bad faith acts committed by sister states' government employees . . ." in
26  allowing Hyatt's intentional tort claims to proceed to trial. (5 AA 01190.) For that
27  same reason, the Court should grant this Petition for Rehearing on the issue of the
28  FTB's mass dissemination of Hyatt's social security number.

4

**III.    The Court overlooked or misapprehended the evidence in regard to whether Hyatt's "Nevada" address was in the public record prior to disclosures by the FTB.**

      **A.    The Court's ruling relative to Hyatt's "address" was based on the FTB's inaccurate citation to evidence of Hyatt's prior California address being in the public record.**

In its September 18, 2014 Opinion, the Court concluded that Hyatt's "name, address, and social security number" had been publicly disclosed in decades-old California court records before being disclosed by the FTB, and his address had been disclosed in a business license application by Hyatt. (Opinion, at 26-27.)[3] The Court therefore held that this information, including Hyatt's "address," was in the public record and Hyatt lacked an objective expectation of privacy in that information. *Id.* As a result, the Court found that Hyatt "cannot meet the necessary requirements to establish his invasion of privacy causes of action for intrusion upon seclusion and public disclosure of private facts" and reversed the judgment in Hyatt's favor on those two claims.

The premise of the Court's reversal of the judgment on the two privacy claims is wrong. As the evidence from the trial established, it was Hyatt's new address *in Nevada* on Tara, after moving from California, for which Hyatt took painstaking measures to protect and did not publicly disclose. It was the FTB's disclosures of Hyatt's private address *in Nevada* on Tara, *not* his old address in California or his accountant's office on Charleston Blvd. used by Hyatt for meetings and for his business license, upon which Hyatt based his claims for intrusion upon seclusion and public disclosure of private facts. The Court has overlooked or misapprehended the evidence on this point.

---

[3] The FTB made these arguments on pages 74-75 and 81 of its Opening Brief (citing 78AA19346-48, 19369-78, 19393, 1940, 19425 and then 78 AA19429).

**B.   Hyatt's "Nevada" address on Tara was not in the public records, until the FTB directly and publicly disclosed it, and he therefore had a reasonable expectation of privacy in the Tara address at the time the FTB disclosed it.**

At trial and in the briefing that was submitted to this Court on the issue of whether Hyatt established the requirements for his claim of intrusion upon seclusion and public disclosure of private facts, Hyatt was precise and consistent in asserting and establishing that it was his private *Nevada* address on Tara that was at issue and in which he had a reasonable expectation of privacy, until it was improperly disseminated by the FTB. (Hyatt's Answering Brief, at 36, 38, 100-101.)[4]

Yet, the FTB, in its briefing to this Court, confused and conflated these facts arguing that Hyatt's "address" was contained in old California court records and a business license application. (FTB Opening Brief, at 74-75, 81.)  But the FTB failed to cite evidence that Hyatt's Nevada address on Tara was in the public record.  Citing evidence that *other* addresses were in the public record is not relevant to and does not support a position that Hyatt's Nevada address on Tara, the address at issue, was in the public record.  It was not.

The FTB made other arguments regarding Hyatt's address being in the public record that were correctly not adopted by the Court.  (FTB Opening Brief, at 74-75.) For example, the FTB cited Hyatt's voter registration in November 1991 (before Hyatt had purchased the Tara property) and in 1994, but neither listed the Tara property address.  (RA 77 AA19100 - 02.)  The FTB also cited a 1999 voter registration, but this was years after the FTB disclosures during the audits between 1993 and 1995.  The FTB also referenced a visit to Hyatt's *California* home by reporters before Hyatt moved to Nevada.  The FTB wrongly implied that the

---

[4] Indeed, during the audit the FTB could not find any connection between Hyatt and the Tara property address.  The FTB knew Hyatt kept it confidential and out of the public record. (*See* 68 AA16796.)

1  reporters disclosed in the press Hyatt's address, and that this put the address in the

2  public record. (FTB Opening Brief, at 81-82.) But the cited evidence again

3  addressed Hyatt's California address,[5] not Hyatt's Nevada address on Tara, which is

4  the one at issue in regard to Hyatt's privacy claims.

5       There was substantial evidence from which the jury could have concluded, and

6  did conclude, that Hyatt's private Nevada address on Tara, which he took great effort

7  to keep private and confidential, was not available in the public record before its

8  direct and public disclosure by the FTB. (Hyatt's Answering Brief, at 36, 38; 83RA

9  020746 - 751; RT: April 24, 180:24-182:8; May 14, 163:8-17.)

10       There was also clear, unrefuted evidence that the FTB disclosed Hyatt's

11  confidential Nevada address on Tara multiple times in violation of its commitments

12  to Hyatt to keep it confidential. Hyatt's private Nevada address on Tara was

13  disclosed in demand letters sent by the FTB to third parties. (RA 020746 - 84 RA

14  020751.) This was despite the fact that Hyatt had taken significant steps to protect

15  the secrecy of this address and the FTB had promised to keep it private and

16  confidential.

17       For example, the evidence demonstrated that Hyatt purchased his Nevada

18  house on Tara through a trust so that his name was not on the property records and he

19  could not be identified with the Nevada address on Tara. (RT: April 24, 180:24-

20  182:8; May 14, 163:8-17.) Similarly, utilities for the Nevada house were *not put in*

21  *his name*, further protecting his ownership and use of the premises from the public

22

23  [5] The only document cited by the FTB that even remotely linked Hyatt to the Tara
property was a copy of a check from Hyatt paying the property taxes, but this is a
24  check deep in the County Treasurer's files that the FTB obtained during the
25  litigation. It is hardly readily accessible to the public. (63 AA 25717-21.) And even
that check did not list, state or identify the Tara address as Hyatt's address.
26  Furthermore, the check could not be found by searching the public record per se, it
27  was only found by FTB because FTB knew the address and accessed the files
already knowing Hyatt had purchased the property in a trust.
28

1  eye. (RT: May 13, 58:19-59:15, May 15, 162:10-13.)  The evidence further

2  demonstrated that Hyatt's Nevada address on Tara had three security systems and

3  that Hyatt had concerns about industrial espionage, and it was also his office in

4  which he maintained highly confidential and valuable information relating to his

5  research and development work, his patents and his pending patent applications.

6  (RT: April 24, 180:24-182:8; May 14, 163:8-17.)

7      The jury found that the FTB, after promising to keep Hyatt's information, such

8  as his Nevada address on Tara, private and confidential, and knowing that Hyatt did

9  not expect or intend to have his private information disseminated, then intentionally

10  widely published Hyatt's personal identifying information — information the FTB

11  had explicitly agreed (RT: April 29, 176:4-177:3, 179:23-181:1, 182:16-184:18;

12  April 30, 69:3-9, 162:8-14, 163:16-164:4), and was bound by law, to keep private

13  and confidential.  (82 RA 020473; 56 AA 13913-13929; 60 AA 14975-14976)  Hyatt

14  therefore established a reasonable expectation of privacy in his Nevada Tara address.

15      The Court therefore overlooked or misapprehended the evidence in regard to

16  Hyatt's Nevada address.

17

18  **IV.    The Court overlooked or misapprehended the law when it concluded
19          that the FTB's mass public dissemination of Hyatt's social security
            number was not actionable because it was contained in decades-old court
20          records.**

21      In its September 18, 2014 Opinion, the Court concluded that Hyatt's "name,

22  address, and social security number" had been publicly disclosed in old California

23  court records before being disclosed by the FTB. (Opinion, at 26-27.)  Relative to

24  Hyatt's evidence of a mass dissemination of his social security number by the FTB,

25  the Court reversed the judgment in Hyatt's favor on his claims of intrusion upon

26  seclusion and public disclosure of private facts, holding that the Court had "never

27  limited the application of the public records defense based on the length of time

28  between the public disclosure and the alleged invasion of privacy." *Id.*

8

1    In so ruling, the Court overlooked or misapprehended the authority finding a

2   reasonable expectation of privacy does exist in an individual's social security number

3   even if there was a prior limited or isolated disclosure.  Privacy of a social security

4   number "is so obvious as to be hardly open to debate." *Thomas v. Smith*, 882 So. 2d

5   1037, 1045 (Fla. Dist. Ct. App. 2d Dist. 2004).

6    Courts consistently hold that a person has a reasonable expectation of privacy

7   in her social security number even though it may have been disclosed in certain

8   circumstances. *Remsburg v. Docusearch, Inc.*, 816 A.2d 1001, 1008 (N.H. 2003)

9   (explicitly recognizing SSNs as private, notwithstanding the court's recognition that

10  "SSNs are available in a wide variety of contexts" . . .Thus, while a SSN must be

11  disclosed in certain circumstances, a person may reasonably expect that the number

12  will remain private."); *see also Burnett v. County of Bergen*, 198 N.J. 408, 968 A.2d

13  1151 (2009) (holding that balancing analysis applies in determining if privacy

14  interests exist to prevent further disclosure of social security data contained on public

15  real estate records, one such factor being potential harm from subsequent disclosure);

16  *see cf. Benz v. Washington Newspaper Publ. Co.*, 2006 U.S. Dist. LEXIS 71827, *26

17  (D. D.C. 2006) ("Although plaintiff's phone numbers and addresses may be available

18  to the public on the internet and in phone books, that does not negate the fact that the

19  information are nonetheless private facts.  Individuals have a privacy interest in their

20  home addresses and phone numbers. . . .").[6]

21   In this regard, almost everyone's social security number is in some kind of

22  public record.  In Nevada social security numbers were on individual driver's

23  licenses for a long time until the federal government, based on concerns of privacy,

24  required the State to end that practice.  Nevertheless, and consistent with the law as

25  presented in Hyatt's Answering Brief, Nevada citizens have an expectation of

26

27  ─────────────────────

28  [6] *Remsburg* and *Benz* are cited on pages 99 and 100 of Hyatt's Answering Brief.

1   privacy with respect to their social security numbers, as courts have repeatedly,

2   consistently and increasingly held that social security numbers are private

3   information. *See Greidinger v. Davis*, 988 F.2d 1344, 1353-54 (4th Cir. 1993)(" an

4   individual's concern over his [social security number's] confidentiality and misuse

5   has become significantly more compelling. . . . armed with one's [social security

6   number], an unscrupulous individual could obtain a person's welfare benefits or

7   Social Security benefits, order new checks at a new address on that person's checking

8   account, obtain credit cards, or even obtain a person's paycheck... . the harm that can

9   be inflicted from the disclosure of a [social security number] to an unscrupulous

10  individual is alarming and potentially financially ruinous"); *Data Tree, LLC v. Meek*,

11  279 Kan. 445, 109 P.3d 1226 (2005) (disclosure of mothers' maiden names, social

12  security numbers and birth dates "would constitute a clearly unwarranted invasion of

13  personal privacy"); *Sherman v. U.S. Dept. of Army*, 244 F.3d 357, 365 (5th Cir. 2001)

14  ("The privacy concern at issue is not, of course, that an individual will be

15  embarrassed or compromised by the particular SSN... the concern is that the

16  simultaneous disclosure of an individual's name and confidential SSN exposes that

17  individual to a heightened risk of identity theft").

18      In this age of identity theft, old conceptions of when it is okay to disclose an

19  individual's social security number must be revised for a modern age.  This evidence

20  was presented to the jury at trial (RT May 21, 42:24 - 49:18), and the jury determined

21  that Hyatt had a reasonable expectation of privacy in his social security number as

22  evidenced by its verdict awarding $52 million in damages for invasion of privacy.

23  The Court's holding that the FTB's mass dissemination of Hyatt's social security

24  number was not actionable because the number was contained in decades-old court

25  records therefore overlooked or misapprehended the law.

26

27

28

10

1   Further, the Court's Opinion is bad public policy.[7]  The Court's ruling on this

2   point means that Nevadans do not have any privacy rights in the confidentiality of

3   addresses and social security numbers.  It gives carte blanche to government

4   agencies, businesses and individuals to intentionally and widely distribute any and

5   every social security number that can be found *anywhere* in the public record.

6   Indeed, in this case the disclosure was willful, with the FTB expressly aware that

7   Hyatt had great sensitivity to disclosure of his private facts.

8       The Court therefore overlooked or misapprehended the law on the FTB's mass

9   dissemination of Hyatt's social security number.

10

**V.   Because the Court overlooked or misapprehended the evidence and the**
11  **law on Hyatt's invasion of privacy claims for intrusion upon seclusion**
    **and public disclosure of private facts, this petition should be granted as to**
12  **those claims.**
13
    The Court's Opinion reversed the judgment and jury verdict in Hyatt's favor
14
    on the invasion of privacy claims for intrusion upon seclusion and public disclosure
15
    of private facts.  This Court should rehear the arguments on these claims in light of
16
    the evidence in the record regarding Hyatt's private Nevada address on Tara not
17
    being in the public records and in light of the authorities that protect an individual
18
    from mass disclosure of his or her private information, such as his or her social
19
    security number.  Upon rehearing these arguments, the jury's award of damages for
20

21

22

23

24  [7] Nevada, as a matter of policy, should recognize what other courts and legislatures
25  have done to recognize and protect the confidentiality of social security numbers,
    See, *e.g.*, Cal. Civil Code § 1798.81.15 (it was recently passed and provides
26  additional protections for social security numbers and other personal information).
    Other states are therefore increasing protection for social security numbers, while
27  Nevada here is acting to the contrary.
28

1   invasion of privacy should be reinstated or, at a minimum, a new trial on damages for

2   these claims should be ordered.

3         DATED:  October 6, 2014.

4                                    MARK A. HUTCHISON, Nev. Bar No.
5                                    4639
                                     MICHAEL K. WALL, Nev. Bar No. 2098
6                                    HUTCHISON & STEFFEN, LTD.

7

8                                    PETER C. BERNHARD, Nev. Bar No. 734
9                                    KAEMPFER CROWELL RENSHAW
                                     GRONAUER & FIORENTINO
10

11                                   DONALD J. KULA, Cal. Bar No. 144342
                                     PERKINS COIE LLP
12

13                                   *Attorneys for Respondent/Cross-Appellant*
                                     *Gilbert P. Hyatt*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          12

1

**CERTIFICATE OF COMPLIANCE PURSUANT TO NRAP 40(b)(3)**

2

3

**I certify that:**

4

**Pursuant to NRAP 40(b)(3), the attached Petition for Rehearing is**

5

**proportionately spaced, has a typeface of 14 points or more and contains 4,087**

6

**words.**

7

8

**DATED this 6th day of October, 2014.**

9

10          MARK A. HUTCHISON, Nev. Bar No.
11          4639
            MICHAEL K. WALL, Nev. Bar No. 2098
12          HUTCHISON & STEFFEN, LTD.

13

14          PETER C. BERNHARD, Nev. Bar No. 734
15          KAEMPFER CROWELL RENSHAW
            GRONAUER & FIORENTINO
16

17          DONALD J. KULA, Cal. Bar No. 144342
            PERKINS COIE LLP
18

19          *Attorneys for Respondent/Cross-Appellant*
            *Gilbert P. Hyatt*
20

21

22

23

24

25

26

27

28

13

**CERTIFICATE OF SERVICE**

Pursuant to NRAP 25, I certify that I am an employee of KAEMPFER

CROWELL RENSHAW GRONAUER& FIORENTINO and that on this 6th day of

October, I caused the above and foregoing document entitled **RESPONDENT**

**GILBERT P. HYATT'S PETITION FOR REHEARING** to be served by the

method(s) indicated below:

       _____     via U.S. mail, postage prepaid;

       \_\_\_\_X\_\_\_\_\_     via Federal Express;

       _____     via hand-delivery;

       _____     via Facsimile;

upon the following person(s):

James A. Bradshaw, Esq.
MCDONALD CARANO WILSON
LLP
100 West Liberty Street, 10th Floor
Reno, NV 89501

*Attorneys for Appellant*
*Franchise Tax Board of the State of*
*California*

Robert L. Eisenberg, Esq.
LEMONS, GRUNDY & EISENBERG
6005 Plumas Street, Suite 300
Reno, NV 89519

*Attorneys for Appellant*
*Franchise Tax Board of the State of*
*California*

Patricia K. Lundvall, Esq.
MCDONALD CARANO WILSON
LLP
2300 West Sahara Avenue, Suite 1000
Las Vegas, NV 89102

*Attorneys for Appellant*
*Franchise Tax Board of the State of*
*California*

C. Wayne Howle, Solicitor General,
State of Nevada
Local Counsel
100 North Carson Street
Carson City, NV 89701

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Clark L. Snelson
Utah Assistant Attorney General
160 East 300 South 5th Floor
Salt Lake City, Utah 84114

Bruce J. Fort, Counsel
Multistate Tax Commission
444 N. Capitol Street, N.W.
Suite 425
Washington, D.C. 20001-8699

An employee of KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO

15

# EXHIBIT C

IN THE SUPREME COURT OF THE STATE OF NEVADA

* * * * *

FRANCHISE TAX BOARD OF THE
STATE OF CALIFORNIA,

    Appellant/Cross-Respondent,

        vs.

GILBERT P. HYATT,

    Respondent/Cross-Appellant.

_____/

No. 53264

Electronically Filed
Oct 07 2014 12:00 p.m.
Tracie K. Lindeman
Clerk of Supreme Court

## APPELLANT'S PETITION FOR REHEARING

ROBERT L. EISENBERG
Nevada Bar No. 0950
Lemons, Grundy & Eisenberg
6005 Plumas Street, Third Floor
Reno, Nevada 89519
775-786-6868
Email: rle@lge.net

PAT LUNDVALL
Nevada Bar No. 3761
McDonald Carano Wilson, LLP
100 W. Liberty Street, 10th Floor
Reno, Nevada 89501
775-788-2000
Email: plundvall@mcdonaldcarano.com

Attorneys for Franchise Tax Board of the State of
California

Docket 53264   Document 2014-33272

ER 663

## PETITION FOR REHEARING

Pursuant to NRAP 40, appellant FTB hereby petitions for rehearing of portions of the court's opinion issued on September 18, 2014.

I

### General grounds for rehearing

Pursuant to NRAP 40(c)(2) the grounds for rehearing are: (1) the court overlooked or misapprehended a material fact or a material question of law; or (2) the court overlooked, misapplied or failed to consider a statute, rule or decision.

FTB contends that the court's opinion overlooks parts of its own decision. For example, as found by this court, Hyatt did not have an objectively reasonable expectation of privacy in his name, address and social security number since he had made them public facts. Yet, at another place in the opinion this court found disclosure of that same information by FTB was outrageous or extreme giving rise to an IIED claim, and had been a breach of a promise to maintain that information as confidential upholding the fraud claim. Compare Op. 26 -27 with Op. 38 and 47.

Similarly, the court's opinion reaches the conclusion that the district court's erroneous evidentiary and jury instruction rulings were prejudicial for one element of Hyatt's claims, but harmless for other elements. This court, however, expressly acknowledged that "it is unknown how much weight the jury gave" to these erroneous rulings. Op. 58. By so doing, the court did not correctly apply the standard for prejudicial error: "might" the result have been different absent the district court's errors. Had FTB been allowed to present evidence that the court acknowledges was improperly excluded, and had the jury been properly instructed, the jury might have reached a different verdict on the IIED and fraud claims, both liability therefor and damages.

1

As set forth herein, because the opinion overlooks or misapprehends that (1) there are irreconcilable inconsistencies in the opinion; (2) there was no evidence to support essential elements of Hyatt's IIED and fraud claims; (3) the district court's evidentiary and jury instruction errors were prejudicial; and (4) Hyatt's IIED claim was time barred, rehearing is warranted.

II

### Rehearing on IIED portions of opinion

#### A. No IIED as a matter of law

The court's opinion reversed the judgment against FTB as to damages for intentional infliction of emotional distress (IIED), but affirmed on liability. In affirming on liability, the court misapprehended or overlooked conclusions found in its own opinion, evidence in the record and FTB's arguments, as explained below. Rehearing should be granted regarding this court's determination on liability. The IIED claim should be dismissed, or at a minimum a retrial on both liability and damages is required.

##### 1. Alleged extreme conduct by FTB

Certain findings in the court's opinion demonstrate that FTB did not engage in extreme conduct sufficient to give rise to liability for IIED. By affirming the jury verdict of liability for IIED, the court's opinion overlooked conclusions from its own opinion, critical evidence and arguments.

The opinion held: "FTB's contacts with third parties through letters, demands for information, or in person was not highly offensive to a reasonable person and did not falsely portray Hyatt as a 'tax cheat.' In contacting third parties, FTB was merely conducting its routine audit investigations." Op. 31-32 (emphasis added). Additionally, the opinion held Hyatt "lacked an objective expectation of privacy in the information" at issue, his name, address, and social security number since he had made the information "public facts." Op. 26-27.

2

Despite these holdings in one part of the opinion, another part affirmed the jury's liability determination on Hyatt's IIED claim using the same evidence but now against FTB. Op. 47. We respectfully contend that these different positions in the opinion cannot be reconciled.

### a. Disclosure of information

The opinion stated that FTB disclosed personal information that it promised to keep confidential, i.e., name, address and social security number, which the court deemed evidence of extreme and severe conduct. Op. 47. Earlier in the opinion, however, the court specifically recognized that the information was already public. Op. 26-27. As the opinion correctly noted, "the record shows that Hyatt's name, address, and social security number had been publicly disclosed on several occasions, before FTB's disclosures occurred, in old court documents from his divorce proceedings and in a probate case." Op. 26-27. "Hyatt also disclosed the information himself when he made the information available in various business license applications completed by Hyatt." Op. 27. The court concluded, therefore, that Hyatt "lacked an objective expectation of privacy in the information" and therefore could not as a matter of law prevail on his tort claims for invasion of privacy. Op. 27.

Finding error on the false light claim, this court also held that "FTB's contacts with third parties through letters, demands for information, or in person was not highly offensive to a reasonable person and did not falsely portray Hyatt as a 'tax cheat.' In contacting third parties, FTB was merely conducting its routine audit investigations." Op. 31-32 (emphasis added). The court also held that Hyatt "did not demonstrate that the litigation roster contained any false information." Op. 31. The court concluded: "The record before us reveals that no evidence presented by Hyatt in the underlying suit supported the jury's conclusion that FTB portrayed Hyatt in a false light." Op. 32. For the same reasons, the disclosure of

3

ER 666

this public information that did not either portray Hyatt in a false light or invade his privacy, it cannot be considered extreme and severe conduct.

### b. Protest delay

The court held that FTB delayed resolution of Hyatt's protests for 11 years, which the court deemed to be evidence of extreme and severe conduct. Op. 47. This overlooks the fact that the district court erroneously precluded FTB from presenting evidence explaining numerous reasons for the delay. The district court did so as an attempt to prevent FTB from presenting evidence of Hyatt's residency and tax liability (28AA 6509-10), at the same time erroneously allowing Hyatt to challenge those same findings and instructing the jury that it could consider the appropriateness of the residency conclusions. Op. 48-53. Delay tactics by Hyatt's own lawyers and accountants were largely responsible for the delay. See detailed facts at AOB 20-21, 23-27. Yet the jury was never allowed to hear the entire story. See also, discussions and facts at AOB 46, 64-65, 66; ARB 21-26.

### c. Alleged disparaging remarks

To support its conclusion for liability for IIED, the court pointed to evidence that an auditor who worked on the case made disparaging remarks about Hyatt and his religion. Op. 47. But this was testimony by only one witness, who had been fired by FTB for misconduct, who had a grudge against the auditor in question, who testified about an alleged isolated disparaging comment, and who later back-tracked on that testimony once she learned that Hyatt had taken it out of context. ARB 8-10. The alleged comment was vehemently denied by the auditor and by FTB's other witnesses, who testified that they never heard the auditor use such language, and such language would have been completely out of character for her. *Id.* The auditor alleged to have made the comment was but one of 37 FTB employees who were involved with the audit and protest. *Id.* The work of that auditor was reviewed at four separate levels. *Id.* Also, the alleged comment did

4

ER 667

not come to light until long after Hyatt's lawsuit was filed, and Hyatt therefore could not have suffered any extreme emotional distress from the comment before he filed his lawsuit and asserted his IIED cause of action.[1] *Id.*

### d. Environment at FTB

The court found extreme and severe conduct, claiming FTB fostered an environment in which the imposition of tax assessments was the objective of audits. Op. 47. But at an earlier point in the opinion the court concluded that "in conducting the audits, FTB was not required to act with Hyatt's interests in mind; rather it had a duty to proceed on behalf of the State of California's interests." Op. 35. Hyatt's audit became adversarial, because he and his lawyers and accountants made it adversarial. The auditors had dozens of red flags, from the very beginning, showing that Hyatt had not moved to Nevada when he claimed, and that he was guilty of tax fraud under California law. (See plethora of evidence discussed at AOB 26, 64, and ARB 11-16.) With a mass of evidence showing that Hyatt lied about the date he moved to Nevada—in order to avoid millions of dollars in California tax liability on his $350 million income from his patent—FTB

---

[1] FTB respectfully requests the court to modify the opinion, to delete the name of the auditor identified at page 38. During the litigation, Hyatt hired a consultant for the Nevada litigation, Candace Les, a former FTB employee who had been terminated. 33 AA 8234 (46); 34 AA 8257. Hyatt's consultant, Ms. Les, was the only witness who testified as to the disparaging comment allegedly made by the other auditor. Initially, Les claimed that the other auditor made the comment, but in subsequent testimony, Les backtracked on her allegations after she read some of Hyatt's briefs that made Les and her original testimony the centerpiece of those submissions. 34 AA 8256 (135-36). The other auditor vehemently denied making any such disparaging remarks (41 AA 10151 (128-29)), and her friends and co-workers testified that they never heard her make any such remarks. 46 AA 11390 (138); 11461 (78). The jury never made a factual finding as to the truth or accuracy of Les's testimony on this point. We respectfully contend that it is unfair for the other auditor's identity to be included in this court's published opinion in such a personal and negative context.

5

employees were fully justified in having a goal of collecting unpaid taxes.[2]
Moreover, the court overlooked the fact that Hyatt's own experts testified that they
found no evidence of extortion (the goal of FTB's audits as alleged by Hyatt) or
fraud. AOB 19, 22.

The court's opinion recognized that IIED requires "extreme and outrageous
conduct on the part of the defendant." Op. 44. The opinion also correctly held that
much of the conduct about which Hyatt complained "was not highly offensive to a
reasonable person." Op. 31 (emphasis added). FTB respectfully contends that, in
affirming the jury's liability determination on IIED, the court misapprehended the
record, and that Hyatt's evidence failed to establish extreme and outrageous
conduct, as a matter of law. As such, the liability determinations on IIED must be
reversed. Notably, the court relied upon the same determinations in upholding the
fraud claim. Op. 47. For the same reasons that the IIED claim fails as a matter of
law, as discussed *infra*, so too does the fraud claim.

### 2. The "garden variety" emotional distress limitation

As the court correctly recognized, another essential element of the IIED tort
is the requirement of extreme or severe emotional distress suffered by the plaintiff.

---

[2] Much of the evidence showing Hyatt's efforts to hide the true date of his move to
Nevada (if he moved here at all) was learned by FTB during the protest stage,
which, as described further below, involved further de novo investigation and
gathering of evidence by the protest officer. Actually, this was evidence that was
in addition to—and essentially confirmed—the volumes of other evidence FTB
had already gathered in the earlier audit stage. The district court adopted Hyatt's
characterization of this new additional evidence as "after acquired" evidence, and
the district court precluded the jury from hearing such evidence. E.g., 28 AA
6509-10. Thus, the jury only heard a half-truth regarding evidence showing
Hyatt's manipulation of the date of his move, and the jury heard only a half-truth
regarding FTB's Herculean efforts to obtain accurate information during the
protest proceedings, in the face of obstructive efforts by Hyatt's team of attorneys
and accountants.

6

Op. 44. The opinion states that as a result of Hyatt's refusal to disclose medical records, he "was precluded at trial from presenting any medical evidence of severe emotional distress." Op. 44. This is not entirely correct. Rather, as the record shows, the discovery consequence imposed on Hyatt by the discovery commissioner and the district court was that Hyatt was prohibited from claiming anything more than "garden variety" emotional distress at trial.

Hyatt's medical records could have shown prior emotional distress, alternative sources of emotional distress, the absence of any complaints to his doctors, and other similar evidence establishing the lack of any severe or extreme emotional distress caused by FTB.[3] 15 AA 3507-08 (summarizing discovery commissioner's stated concerns regarding fact that Hyatt's medical records could contain information for the defense on the IIED claim). When Hyatt refused to disclose his medical records, the discovery commissioner gave Hyatt a choice: disclose your medical records, or if you do not, you will be limited to recovery of only "garden variety" emotional distress damages at trial. 15 AA 3536-47.

Hyatt did not object to the discovery commissioner's ruling, and the ruling became the order of the court. 15 AA 3549. Hyatt chose not to produce the records; thus, he was limited to proving "garden variety" emotional distress. With this significant limitation on Hyatt's damages, which was a consequence of his own choice not to disclose his medical records, FTB sought dismissal of the IIED claim, because Hyatt was barred from proving extreme or severe emotional distress. 15 AA 3504-63. The district court denied the motion. 45 AA 11207.

FTB's opening and reply briefs in this appeal established that the IIED claim failed as a matter of law, and that the district court should have dismissed the

---

[3] Hyatt's medical records likely also contained his California/Nevada home addresses, which he would have provided to medical providers during key time frames. This information might have helped determine the residency issue.

7

ER 670

claim. Hyatt made a discovery choice not to disclose his medical records, precluding him from proving anything other than "garden variety" emotional distress. AOB 93-96; ARB 94-99. "Garden variety" emotional distress, by its name and its very nature, cannot possibly be considered "extreme or severe." See cases cited at AOB 94-95.

This court's opinion overlooked FTB's arguments regarding the "garden variety" limitation, and the impact of that limitation on Hyatt's ability to recover on an IIED cause of action. Rehearing should be granted on this issue. The IIED claim should be dismissed as a matter of law, based on Hyatt's choice not to disclose medical records, thereby depriving Hyatt from claiming he suffered severe and extreme emotional distress.

## B. Harmless error analysis regarding IIED liability claim

The court's opinion identified numerous evidentiary and jury instruction errors committed by the district court. The court determined that the errors were prejudicial on the issue of damages on the IIED claim, but harmless on the question of liability. Op. 56-58. In finding harmless error on liability, the opinion overlooked or misapprehended controlling law, material facts in the record, and arguments in FTB's briefs. E.g. AOB 67, 99; ARB 77. The opinion also overlooks another part of the opinion which expressly acknowledged that "it is unknown how much weight the jury gave" to the erroneous rulings. Op. 58.

When a district court has committed error in a jury trial, the appellant is not required to prove that the jury definitely (or even most likely) would have reached a different result without the error. Rather, as the opinion in this case recognizes, prejudice is demonstrated where the record reflects that, but for the error, "a different result might have been reached." Op. 57 (emphasis added). This "might have" standard is a reflection of the need for confidence in jury verdicts, i.e., the

8

public's need for confidence that litigants will not be subjected to jury verdicts that are based upon incomplete or inaccurate evidence and wrong jury instructions.

This court has repeatedly used the "might have" standard for evaluating whether error at a jury trial necessitates a new trial. See e.g., *Nevada Power Co. v. 3 Kids, L.L.C.*, 129 Nev. __, __, 302 P.3d 1155, 1157 (2013); *Wyeth v. Rowatt*, 126 Nev. __, __, 244 P.3d 765, 778 (2010); *Cook v. Sunrise Hosp. & Med. Ctr., L.L.C.*, 124 Nev. 997, 1006, 194 P.3d 1214, 1219 (2008) (cited at Op. 57 in the present case). Alternatively, this court has occasionally held that a new trial is required where, but for the error, the jury "may have" reached a different result. See e.g., *Posas v. Horton*, 126 Nev. __, __, 228 P.3d 457, 459 (2010).

Initially, there can be no serious dispute over the fact that the district court's multiple cumulative errors permeated the trial in this case. The district court allowed the jury to hear inadmissible evidence favoring Hyatt, prevented the jury from hearing admissible evidence favoring FTB, and, through erroneous jury instructions, failed to give the jury correct legal guidance for the verdict. Consequently, the jury did not hear a complete and a fair story of FTB's conduct, to satisfy the factual predicate of IIED liability, or fraud for that matter. And the jury did not hear correct jury instructions to establish the legal predicate for liability.

As the opinion recognizes, there are four essential elements for liability on the IIED tort: (1) the defendant's extreme and outrageous conduct; (2) the defendant's intent to cause emotional distress, or reckless disregard for causing emotional distress; (3) the plaintiff suffered extreme or severe emotional distress; and (4) causation (i.e., the defendant's conduct caused the emotional distress). Op. 44. Those elements are similar to the elements for establishing liability for fraud: (1) the defendant made a false representation that the defendant knew or believed to be false; (2) that the defendant intended to persuade the plaintiff to act or not act

9

based upon the representation; and (3) that the plaintiff had reason to rely on the representation and suffered damages.  Op. 36-37.  The district court's errors went to the very heart of these elements.

For example, the opinion found evidence of IIED and fraud based upon things such as FTB's alleged delay of Hyatt's administrative protest for 11 years. The alleged 11-year delay was important in this court's evaluation, and the opinion emphasized it three times.  Op. 8 ("The protests lasted over 11 years"); Op. 38 ("FTB took 11 years to resolve Hyatt's protests" as evidence of IIED); Op. 47 (FTB "delayed resolution of Hyatt's protests for 11 years" as evidence of fraud). But the district court's evidentiary rulings prevented FTB from admitting exhibits or providing testimony to <u>explain</u> reasons for the delay; to show that much of the delay was not <u>caused by</u> FTB, but was actually caused by Hyatt and his attorneys and accountants; and to <u>explain</u> why the delay did not reflect any intent by FTB to cause Hyatt emotional distress. (See evidence catalogued at AOB 63-67 and ARB 23.) This excluded evidence was directly relevant on the first, second and fourth essential elements of the IIED tort.[4]  The opinion identified other multiple significant errors committed by the district court, all of which certainly might have impacted jurors in evaluating whether FTB employees were guilty of committing the IIED tort.

---

[4] The opinion states that a protest is a review of an audit for accuracy or changes. Op. 8. This suggests review analogous to appellate review.  Actually, a protest hearing officer's review is a "fresh look" de novo review.  The hearing officer is not limited to evidence already existing in the audit files, and the officer is free to consider new evidence.  AOB 20.  Here, the protest delay was caused by myriad factors, including Hyatt's slow and incomplete responses to the protest officer's requests for evidence, FTB's need to deal with complexities involving a protective order Hyatt had obtained, and Hyatt's unsuccessful but time-consuming California judicial challenges regarding procedures and information FTB was requesting. E.g. AOB 20-21, 23-25.

10

### 1. Evidence challenging audit conclusions

The opinion held that the district court erred by admitting extensive evidence that challenged FTB's audit conclusions. Op. 49-51. This evidence included testimony by multiple experts (Op. 49-50), and "several instances" in which the evidence violated a prior ruling against Hyatt's ability to challenge audit conclusions. Op. 50.

The opinion recognized multiple instances of improperly admitted evidence that the jury heard and saw on this topic, including: (1) "evidence challenging whether FTB made a mathematical error [$24 million] in the amount of income that it taxed"; (2) "whether an auditor improperly gave credibility to certain interviews of estranged family members"; (3) whether an auditor "appropriately determined that certain information was not credible or not relevant"; and (4) other evidence identified by the opinion that "challenged various aspects of the fraud penalties." Op. 50.

On this same inadmissible topic, the opinion held that the district court erred by improperly admitting Hyatt's expert testimony, which "went to the audits' determinations and had no utility in showing any intentional torts ...." Op. 50 (emphasis added). The inadmissible expert testimony "is precisely what this case was not allowed to address." Op. 51. The opinion recognized FTB's accurate argument regarding four different experts that the district court erroneously allowed Hyatt to use at trial. Op. 49-50.

For example, the court's opinion identified Hyatt's primary expert witness, Malcolm Jumelet [spelled "Jumulet" in the opinion], as a witness who was erroneously allowed to express expert opinions critical of how FTB analyzed and weighed information obtained in the audits. Op. 50; 44 AA 10943(165). Hyatt's expert testimony, including Jumelet's testimony, violated the restriction against the

11

ER 674

jury considering accuracy of audit conclusions. Op. 50. As such, the opinion held that the district court abused its discretion by admitting this evidence. Op. 51.

The jury heard nearly two full days of testimony from Jumelet. 44 AA 10814-10946. Hyatt's trial attorneys then relied heavily on Jumelet's testimony in their closing arguments. In his initial closing argument, Hyatt's counsel referred the jury to Jumelet's testimony dozens of times. E.g., 52 AA 12835-36, 12853, 12893, 12894, 12901, 12905, 12910, 12912, 12915, 12923. Hyatt's counsel expressly asked the jury to tie Jumelet's testimony to the IIED claim. 52 AA 12894(28-29) (counsel discusses Jumelet's testimony, immediately followed by: "The FTB certainly knew how to inflict the emotional distress on Mr. Hyatt.") Hyatt's counsel also tied Jumelet's testimony to the fraud claim. 52 AA 12915-14. In the rebuttal closing argument, Hyatt's counsel again referred the jury to Jumelet's testimony numerous times. E.g. 53 AA 13166-67, 13169, 13172, 13176.

With "a number of Hyatt's witnesses" that were erroneously allowed to focus on whether the audit results were correct—including four expert witnesses (Jumelet and three others) on this topic—the improper evidence surely "might have" impacted jury deliberations on the first two essential elements of the IIED tort (whether FTB's conduct was extreme and outrageous, and whether FTB employees intended to cause emotional distress) and the first two elements of the fraud tort. It was therefore not harmless error. See *Nevada Power*, 129 Nev. at__, 302 P.3d at 1157.

### 2. Improper jury instruction regarding audit conclusions

In addition to holding that the district court committed numerous evidentiary rulings, this court also held that the district court erred by giving a jury instruction that improperly allowed the jury to consider the "appropriateness and correctness of the analysis conducted by the FTB employees in reaching its residency determination and conclusion." Op. 53. This instruction "violated the

12

ER 675

jurisdictional limit that the district court [a prior judge in the case] imposed in this case." *Id.*

The opinion quoted the erroneous instruction, giving italics emphasis to the part in which the district court told jurors they were <u>not</u> prohibited from considering whether FTB was correct in its residency determination and conclusion. The opinion also gave italics emphasis to a sentence in the instruction singling out Jumelet's opinions. Op. 53; see 53 AA 1324-43 (district court erroneously instructs jurors: "There is nothing in Jury Instruction No. 24 that would prevent Malcolm Jumelet from rendering an opinion about the appropriateness or correctness of the analysis conducted by FTB employees in reaching its residency determinations and conclusions.").

In his rebuttal closing argument, Hyatt's counsel specifically drew this instruction to the jury's attention. 53 AA 13166(21)-13167(23). Hyatt's counsel quoted both of the two sentences that this court's opinion highlighted as erroneous. *Id.* at (22-23). After reading the erroneous instruction, he immediately followed with: "And, Ladies and Gentlemen, that's exactly what we've been talking about through the entire trial." *Id.* at (23).

The observation by Hyatt's counsel was correct: Hyatt and his attorneys had been focusing on the appropriateness and correctness of FTB's audit conclusions "through the entire trial," which lasted four months. This court held that such a focus—which included expert testimony, and which culminated in the erroneous jury instruction—was error. Accordingly, there was (1) error in the extensive evidence devoted to Hyatt's improper efforts to impeach the audit conclusions; (2) error in a jury instruction on this same evidence; and (3) extensive emphasis on the evidence and the erroneous jury instruction when Hyatt's attorneys gave their closing arguments to the jury. In these circumstances, it is impossible to conclude that the errors might not have influenced the jury's evaluation of liability for the

13

IIED tort or the fraud tort. The error cannot be deemed harmless. See *Nevada Power*, 129 Nev. at__, 302 P.3d at 1157.

### 3. Adverse inference instruction

The district court allowed the jury to draw an adverse inference against FTB based upon spoliation of evidence, but erroneously prohibited FTB from presenting evidence against the inference. Op. 54-56. This error was monumental, because in closing arguments, Hyatt's attorneys were allowed to argue that the jury could use the adverse spoliation inference to fill important gaps in evidence, in Hyatt's favor, particularly on the liability elements. 55 AA 12915. In arguing for a liability finding on IIED and fraud, Hyatt's counsel specifically, and prejudicially, pointed to the adverse inference instruction:

> "Where is it most likely that the FTB's true intent could be ascertained?" 52 AA 12915 (110) (emphasis added).

> "So the most honest, the most legitimate, the most accurate reflection of the FTB's intent may have been in the electronic evidence that was destroyed after the FTB was put on notice of this litigation and after it had been requested." *Id.* (emphasis added).

> "We don't know what those electronic documents said. But you're entitled to infer that whatever was in them was adverse, unfavorable to the Franchise Tax Board. So we think this fills in any gap you may otherwise have in wondering whether or not the FTB acted intentionally, what their motives were, what their conduct was. *Id.* (110-111)(emphasis added).

> There should be no doubt about the intentional nature of the FTB's actions inflicting emotional distress on Mr. Hyatt. If you need the inference, use it." *Id.* (emphasis added).

Evidence regarding FTB's intent—an essential element of liability for both the IIED and fraud tort—was hotly contested throughout the trial. The district court allowed Hyatt's counsel to convince the jury to use the spoliation adverse

14

ER 677

inference that "fills in any gap you may otherwise have in wondering whether or not FTB acted intentionally, what their motives were, what their conduct was" regarding "FTB's actions inflicting emotional distress on Mr. Hyatt." 55 AA 12915. Yet FTB had been erroneously precluded from presenting evidence "to explain why nothing harmful was destroyed." Op. 55-56. In these circumstances, it is impossible to conclude that the error could not have had an impact on the verdict.

### 4. Loss of patent, and federal tax audit

The opinion held that the district court erred by excluding evidence concerning Hyatt's loss of his patent and his federal tax audit. Op. 58. His patent was the genesis of his $350 million income; and the federal tax audit, which was occurring during the same time as FTB's audit, resulted in Hyatt paying a multi-million dollar settlement to the IRS. 34 AA 8467-69. The opinion recognized that such evidence related to "whether Hyatt's emotional distress was caused by FTB's conduct or one of these other events." Op. 58. Causation is the fourth essential element to establish liability for an IIED claim. Op. 44. Exclusion of this critical relevant evidence went directly to the issue of causation—an essential element to establish IIED liability—and cannot possibly have been harmless.

### 5. Conclusion regarding harmless error contention

Each of the district court's errors, considered alone, could have easily influenced the verdict. See e.g., *Posas*, 126 Nev. at __, 228 P.3d at 459 (single error regarding jury instruction required new trial); *Carver v. El-Sabawi*, 121 Nev. 11, 107 P.3d 1283 (2005) (same); *Driscoll v. Erreguible*, 87 Nev. 97, 482 P.2d 291 (1971) (erroneous use of two words in jury instruction required reversal). Moreover, this court expressly adopted the sliding scale approach to the evidence required to demonstrate the severe emotional distress element under IIED. Op. 47.

15

That approach intertwines the liability facts with the damage facts in determining recovery for severe emotional distress damages.  *Id.*

The district court's multiple cumulative errors compounded the prejudice, almost surely influencing the jury's decision.  Because these multiple errors went to the fundamental underpinnings of the IIED claim and the fraud claim, FTB was denied a fair trial on liability for both the IIED and fraud claims.  This court's opinion overlooked or misapprehended the record, or misapplied case law dealing with harmless error.  But for the errors—individually or collectively—the verdict "might have" been different.

### C.   Statute of limitations defense regarding IIED

The court's opinion affirmed FTB's liability for IIED, but remanded for a new trial limited to damages.  Op. 67.  In doing so, the court overlooked FTB's argument that the claim was time barred, and that the district court erred by granting judgment as a matter of law to Hyatt on FTB's affirmative defense based on the statute of limitations.  This was raised in FTB's opening brief at AOB 96-98, and the reply brief at ARB 101-107 (and in FTB's supplement filed June 22, 2012).  FTB was entitled to present its defense to the jury, and a new trial should be granted on liability for the IIED claim.

The two-year time limit starts when "the injured party discovers or reasonably should have discovered facts supporting a cause of action."  *Petersen v. Bruen*, 106 Nev. 271, 274, 792 P.2d 18, 20 (1990).  The focus is on the injured party's knowledge of or access to facts.  *Massey v. Litton*, 99 Nev. 723, 728, 669 P.2d 248 (1983).  The time limit is triggered when the plaintiff has enough facts from which a reasonable person would be on inquiry notice of a possible cause of action.  *Massey,* 99 Nev. at 727-28.

The statute of limitations is triggered even if the plaintiff does not know all the facts, as long as the plaintiff knows enough facts to constitute an appreciable

16

manifestation of the cause of action. Cf. *Libby v. District Court*, 130 Nev. __, __, 325 P.3d 1276, 1280-81 (2014) (medical malpractice statute of limitations was triggered upon appreciable manifestation of injury, even though plaintiff was not aware of cause of injury or full extent of defendant's negligence).

At trial, the district court erroneously granted Hyatt's motion for judgment as a matter of law on this affirmative defense. Undisputed evidence established that Hyatt discovered, or reasonably should have discovered, his cause of action more than two years before he filed his lawsuit:

- March 6, 1995: Hyatt's bank sent him an FTB letter the bank had received, showing Hyatt's social security number. 77 AA 19073-74.

- March 8, 1995: Hyatt sent a memo to his accountant regarding FTB's letter to the bank. 77 AA 19072.

- April 5, 1995: Hyatt sent a memo to his accountant and one of his attorneys, stating: "The FTB appears to be sending out demand letters to many entities to whom I wrote checks in late 1991 and 1992," and he attached copies of letters, which contained his social security number. 77 AA 19119-21.

- August 2, 1995: FTB sent Hyatt's accountant and attorneys a 39-page letter fully describing the entire scope of FTB's investigation, and detailing information gathered from all third-party sources contacted by FTB as of that time. 66 AA 16388-427.

- August 30, 1995: Hyatt's representative responded to the FTB's letter, acknowledging the numerous contacts and activities of FTB, and even expressing suspicions that FTB had failed to maintain confidentiality. 66 AA 16433-454. (Hyatt is concerned that "confidentiality may have been compromised").

17

Therefore, from March through August of 1995, at the latest, Hyatt was fully aware of the scope of the audit, the fact that FTB had contacted numerous third parties (disclosing the fact that Hyatt was being audited/investigated), and the fact that FTB sent numerous letters with demands, containing information such as his name, address and social security number. His representatives had received the lengthy FTB letter fully describing FTB's audit activities, and his representatives had even voiced suspicion that FTB breached confidentiality. This was all more than two years before Hyatt filed his complaint.

This evidence established that the non-fraud tort claims, such as the IIED claim, were barred by the statute of limitations. But when the district court granted JMOL to Hyatt at trial, dismissing FTB's affirmative defense, the district court erred by not viewing the evidence and all inferences in favor of FTB, rather than Hyatt. See *Nelson v. Heer*, 123 Nev. 217, 222, 163 P.3d 420, 424 (2007). Accordingly, a new trial is necessary on liability for IIED, based on the statute of limitations defense, in addition to the damages trial this court ordered. See *Bemis v. Estate of Bemis*, 114 Nev. 1021, 1025, 967 P.2d 437, 440 (1998) (where factual question exists regarding plaintiff's discovery of claim, statute of limitations is a question of fact to be determined by the jury); *Day v. Zubel*, 112 Nev. 972, 977, 922 P.2d 536, 539 (1996) (stating that "[t]he appropriate accrual date for the statute of limitations is a question of law only if the facts are uncontroverted"). Because the court's opinion overlooked this issue, rehearing should be granted.

### III

### Rehearing on the fraud judgment

#### A.    No fraud as a matter of law

The court's affirmance of the district court's fraud ruling likewise warrants rehearing because of internal inconsistencies within the opinion related to FTB's audit process that overlook the appropriate standard of review and critical evidence

18

ER 681

presented by FTB.  In the opinion, the court held that the district court did not err
by refusing to grant FTB's request for judgment as a matter of law on the fraud
claim because substantial evidence supported each fraud element.  Op. 37-39.
Hyatt was required to prove his fraud claim, however, <u>by clear and convincing
evidence</u>. *Clark Sanitation v. Sun Valley Disposal*, 87 Nev. 338, 341, 487 P.2d
337, 339 (1971).  On appeal, this court was required to use the same exacting
standard and to "consider the sufficiency of the evidence in light of that [clear and
convincing] standard." *Id.*  The opinion, however, overlooked or misapplied this
case law and, indeed, did not once mention the clear and convincing standard in its
fraud analysis.  Op. 36-38 (only reviewing jury's fraud verdict for "substantial
evidence" when question on de novo review was whether the district court
improperly denied FTB's motion for judgment as a matter of law); see AOB 73.

As the opinion recognized, fraud requires a representation that the defendant
knew or believed was false; the defendant intended to persuade the plaintiff to rely
on the false statement; and the plaintiff relied on the statement to his detriment.
Op. 36-37.  The court noted that the fraud claim was based upon representations
made to Hyatt about the audits' processes.  Op. 4.  To support its fraud analysis,
the opinion identified four alleged representations FTB made to Hyatt at the onset
of the audit:  FTB employees would treat Hyatt with courtesy; requests for
information would be clear and concise; personal and financial information would
be treated confidentially; and the audit would be completed within a reasonable
time.[5]  Op. 6.  In affirming the district court, the court overlooked conclusions

___

[5] Hyatt argued that his fraud claim was also based upon statements in other FTB
documents, such as FTB's mission statement, which contained a statement that
taxpayers would be treated "fairly and impartially."  Op. 37; AOB 70-71.  But as
FTB established, Hyatt never received or relied on these other documents.  *Id.*
FTB's initial notice to Hyatt contained the only representations on which this
court's opinion relied in the fraud analysis.  Op. 37.  Yet, Hyatt's entire

found in its own opinion, evidence in the record and FTB's arguments, as explained below.

### 1.    No fraudulent intent

There was not a shred of evidence—let alone clear and convincing evidence—that at the time FTB sent Hyatt the initial audit notice, FTB really did not intend to treat him with courtesy, request information in a clear and concise manner, keep financial and personal information confidential, or complete the audit in a reasonable time.  These representations by FTB, sent in a letter from auditor Marc Shayer who began Hyatt's audit, were what this court deemed the factual predicate for FTB's purported fraudulent intent.  Op. 37.  Without evidence of FTB's fraudulent intent and beliefs at the time these statements were made, the fraud claim must fail as a matter of law.  See Op. 36-37, *citing Bulbman, Inc. v. Nevada Bell*, 108 Nev. 105, 825 P.2d 588 (1992); *Tail-Si Kim v. Kearney*, 838 F.Supp.2d 1077, 1097-98 (D. Nev. 2012) (holding that representation from real estate agent that buyers could place "trust and confidence" in him "is a promise of future performance that is not actionable unless made without intent to perform") (emphasis added).

Where a plaintiff, like Hyatt, bases his claim for fraud on a statement of future promises, the plaintiff must provide evidence that, at the time the statement was made, the defendant never intended to honor his statement.  *Tallman v. First National Bank of Nev.*, 66 Nev. 248, 261, 208 P.2d 302 308 (1949).  Hyatt offered no such evidence.  Fraudulent intent may not be inferred from a subsequent failure to perform a promise.  *Id; Bulbman,* 108 Nev. at 112.  Yet, all of the evidence cited by the court as evidence of FTB's intent in 1993, were subsequent failures to

---

(continued) presentation on his fraud claim to the jury was based upon this non-existent "fairly and impartially" representation. AOB 70-77.

20

perform. Op. 38. And none of those failures were attributable to the auditor who began Hyatt's audit.

### a. No evidence of intent not to satisfy representations made in 1993 Privacy Notice

None of the evidence offered by Hyatt suggested (much less proved by clear and convincing evidence) that the FTB auditor who made these representations at the outset of the audit did not intend <u>at that time</u> to adhere to them. Marc Shayer was the auditor who made those representations to Hyatt. As FTB pointed out in its reply brief, nothing in Shayer's testimony indicated that he did not intend to satisfy these aspirational goals. (ARB 62, *citing* 45 AA 11221 (159:6-11)). And, Hyatt never offered any evidence that Shayer did not live up to the representations of courtesy, clear and concise information, confidentiality or completion of the audit in a reasonable time. Indeed, Hyatt later tried to enlist Shayer to work on Hyatt's behalf as an expert in this litigation, which obviously Hyatt would not have done if Shayer sought to perpetuate a fraud against him. 45AA11209 (110-111), 11227 (184). Absent evidence that Shayer had fraudulent intent or that FTB had a policy or practice imposed upon all employees when the FTB's privacy notice was sent to Hyatt in 1993, Hyatt's fraud claim necessarily failed as a matter of law. <u>See</u> *Clark Sanitation*, 87 Nev. at 341, 487 P.2d at 339.

### b. Temporal disconnect between 1993 Privacy Notice and alleged evidence of fraud

The facts to which the court cites as alleged evidence of fraudulent intent are not attributable to Shayer, post-date his sending of the 1993 Privacy Notice and cannot retroactively demonstrate that Shayer had fraudulent intent. Op. 38. For example, the opinion states that "Hyatt presented evidence that FTB disclosed his social security number and home address to numerous people and entities and that FTB revealed to third parties that Hyatt was being audited." Op. 38. As FTB

21

ER 684

pointed out in its reply brief, FTB did not promise Hyatt to keep his name, address, social security number or the fact that he was under audit confidential. ARB 63. Moreover, the court's conclusion that disclosure of Hyatt's social security number and home address could give rise to fraud contradicts the court's finding elsewhere in the opinion that Hyatt could not recover for invasion of privacy because he "lacked an objective expectation of privacy" in his name, address and social security number and that disclosure of the fact he was under audit did not portray him in a false light. Op. 27-28, 31-32. If disclosure of this information failed to meet the preponderance of evidence standard for a privacy tort, or a false light tort, it certainly does not constitute clear and convincing evidence of fraudulent intent.

The other facts on which this court based its fraud finding likewise fail this standard. Op. 38. Hyatt did not establish that Shayer sent letters to Hyatt's doctors or was responsible for the duration of Hyatt's protests. Likewise, alleged disparaging comments made by Sheila Cox in 1995 cannot be attributable to Shayer in 1993, nor be indicative of his intent at the time the representations were made. ARB 64-65. The court overlooked these insurmountable factual and legal barriers to Hyatt's fraud claim.

### c. Hyatt's expert testimony undermines fraud allegation

To support his allegation of fraudulent intent, Hyatt advanced a theory that FTB purportedly had a "culture" that drove auditors to make assessments. Hyatt relied upon expert testimony from Jumelet and Sjoberg regarding imposition of fraud penalties to support that theory. This court held that "the expert testimony regarding the fraud penalties went to the audits' determinations and had no utility in showing any intentional torts unless it was first concluded that the audits' determinations were incorrect." Op. 50 (emphasis added). Yet in the opinion, to support upholding the fraud verdict, the court cited to alleged evidence presented

22

by Hyatt at trial that "that FTB promoted a culture in which tax assessments were the end goal whenever an audit was undertaken." Op. 38.

In addition to overlooking its own decision, the court also overlooked key evidence, that Hyatt's very own experts, conceded at trial. See AOB, p. 19 ("Notably Jumelet, who was Hyatt's lead expert, acknowledged he found no evidence of Hyatt's extortion allegations (which were the foundation to Hyatt's bad faith allegations). 44 AA 10846 (130)"); AOB at p. 22, fn. 18 ("In the sampling of audits he reviewed during these years, [Hyatt's expert] Sjoberg specifically testified that he saw 'no instances' in which the 'auditors artificially inflated assessments, fabricated assessments, made bogus or phony assessments.' 33 AA 8161 (95-96) (emphasis added)."). In upholding the district court's denial of FTB's motion for judgment as a matter of law on fraud, this court overlooked this evidence from Hyatt's own experts, which was echoed by FTB's witnesses. It also contradicts the court's own opinion in discussing the invasion of privacy torts. Op. 31-32.

### 2.   No actionable representation

Additionally, the opinion overlooked and failed to consider FTB's arguments and extensive legal citations to case law from Nevada and other jurisdictions holding that fraud claims are only actionable for statements that are clear, specific, unambiguous and measurable statements of fact. AOB 71-73. Fraud claims cannot be based upon general statements or aspirational goals or opinions. *Id.* They must be based upon objective, measurable statements of fact. *Id.*

In *Bulbman*, for example, the defendant allegedly made general representations regarding the cost, performance and reliability of a proposed phone system for the plaintiff's business. This court held that the representations were not actionable in fraud, as a matter of law, because the representations merely

23

ER 686

constituted "commendatory sales talk about the product ('puffing'), also not actionable in fraud."  108 Nev. at 111, 825 P.2d at 592.  Similarly, in *Minehan v. United States*, 75 Fed. Cl. 249, 260-62 (2007), an IRS mission statement stated that taxpayers would receive "top quality service," and they would be treated with "integrity and fairness."  The court held that the statements were merely aspirational in nature, containing no specific promises that could be the basis of a fraud claim.[6]  *Id.* at 260; see also *Knelman v. Middlebury College*, 898 F.Supp.2d 697, 709 (D. Vt. 2012) (holding that "[l]anguage in a college handbook or other official statement that is merely aspirational in nature, or that articulates a general statement of a school's ideals, goals, or mission is not enforceable" (internal quotations omitted)).

Preliminarily, Hyatt never contended that he was not treated with courtesy.  Moreover, courtesy consists of showing good manners or being polite (www.dictionary.com), which is a purely subjective concept that is entirely in the eye of the beholder.  Conduct that is courteous to one person might seem rude to another person.  If a defendant can be held liable in fraud for making broad general statements, such as a statement that the plaintiff will be treated "courteously," floodgates of litigation and claims will be opened.  For example, Las Vegas Metro police cars show the slogan "To Protect and To Serve."  If Metro fails to protect someone, can a fraud claim against Metro be premised on this slogan?  This court's opinion would seem to allow such an absurd consequence.

The court should also consider public policy consequences of the opinion's holding that a statement promising future courteous treatment by a government agency (or, for that matter, a private business) can form the basis of a fraud action.

---

[6] Similar cases are provided at AOB 72-73 and ARB 40-41. E.g., *Smith v. Allstate Ins. Co.*, 160 F.Supp.2d 1150, 1154 (S.D. Cal. 2001) ("good hands" slogan not actionable).

24

The opinion would deter governments and businesses from telling people they will be treated fairly and courteously. Such statements of aspirational goals and ideals should be encouraged, not discouraged by the threat of a fraud lawsuit.

Similarly, the statement that requests for information would be stated clearly and concisely is equally subjective, and Hyatt never contended that FTB's requests lacked clarity. The statement that the audit will be completed in a "reasonable time." is likewise too vague to form the basis of a fraud claim. Reasonableness, like courtesy, is a purely subjective concept, open to widely differing views of whether a time frame was reasonable or unreasonable.

It is noteworthy that FTB's initial audit notice only stated that "the audit" would be completed in a reasonable time. Op. 6. The notice did not say that the entire process, including taxpayer protest proceedings, were included in that statement. Indeed, FTB could not have made such a representation at that time regarding the protest stage, because, as this case so clearly illustrates, the protest stage can be subjected to numerous delays caused by the taxpayer or other outside influences over which FTB has no control. Here, the court's opinion perceived an unreasonable delay in the 10-year time frame for the protest stage. Op. 8, 38, 47. But in reality, the audit only took two years, and it was the audit that was the focus of FTB's initial notice contemplating a "reasonable time" for completion.

Furthermore, FTB's statement that Hyatt's personal and financial information would be treated confidentially was satisfied or was otherwise not actionable in fraud. As the opinion itself correctly noted, "the record shows that Hyatt's name, address, and social security number had been publicly disclosed on several occasions, before FTB's disclosures occurred, in old court documents from his divorce proceedings and in a probate case." Op. 26-27. "Hyatt also disclosed the information himself when he made the information available in various business license applications completed by Hyatt." Op. 27. Hyatt "lacked an

25

objective expectation of privacy in the information." Op. 27. Yet despite these correct observations, the opinion nevertheless held that FTB could be liable for fraud in disclosing essentially the same information. There was no clear and convincing evidence of fraud based upon this part of FTB's initial notice letter to Hyatt.

Accordingly, Hyatt's fraud claim failed as a matter of law, and rehearing should be granted on this issue. Or at a minimum a new trial on both liability and damages should be ordered for the same reasons described at pages 8-15.

## IV

## Conclusion

For the foregoing reasons, the court overlooked or misapprehended material facts and arguments. As such, the court should grant rehearing on the limited issues discussed above.

Dated: _October 3, 2014_

ROBERT L. EISENBERG (NSBN 0950)
Lemons, Grundy & Eisenberg
6005 Plumas Street, Third Floor
Reno, Nevada 89519
Telephone No.: (775) 786-6868

PAT LUNDVALL (NSBN 3761)
McDonald Carano Wilson LLP
100 West Liberty Street, 10th Floor
Reno, Nevada 89501
Telephone No. (775) 788-2000

Attorneys for Appellant
Franchise Tax Board of the State of
California

26

## CERTIFICATE OF COMPLIANCE FOR
## PETITION FOR REHEARING

1. I hereby certify that this petition for rehearing complies with the formatting requirements of NRAP 32(a)(4), the typeface requirements of NRAP 32(a)(5) and the type style requirements of NRAP 32(a)(6) because this petition has been prepared in a proportionally spaced typeface using in 14 point Times New Roman type style.

2. The petitioning party has filed a motion seeking permission to file this petition for rehearing containing 8,132 words. If the motion is granted, this petition will comply with the page or type-volume limitations of NRAP 40(b)(3) because it will contain the number of words allowed by the court.

DATED: _Oct. 3, 2014_

ROBERT L. EISENBERG (NSBN 0950)
Lemons, Grundy & Eisenberg
6005 Plumas Street, Third Floor
Reno, Nevada 89519
Telephone No.: (775) 786-6868

Attorneys for Appellant
Franchise Tax Board of the State of
California

ER 690

1

**CERTIFICATE OF MAILING**

2          I certify that I am an employee of Lemons, Grundy & Eisenberg and that on this date

3    Appellant's petition for rehearing was filed electronically with the Clerk of the Nevada Supreme

4    Court, and therefore electronic service was made in accordance with the master list as follows:

5    Peter Bernhard
     Mark Hutchison
6    Pat Lundvall
     Michael Wall
7    Daniel Polsenberg

8          I further certify that on this date I served a copy, postage prepaid, by U.S. Mail to:

9    Donald J. Kula
     Perkins Coie
10   1888 Century Park East, Suite 1700
     Los Angeles, California  90067-1721

11

12   DATED: _October 3, 2014_

13
                         _Margie Nan_
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEMONS, GRUNDY
& EISENBERG
6005 Plumas Street
Third Floor,
Reno, Nevada 89510
(775) 786-6868
Fax (775) 786-9716

# EXHIBIT  D

# IN THE SUPREME COURT OF THE STATE OF NEVADA

FRANCHISE TAX BOARD OF THE
STATE OF CALIFORNIA,

    Appellant/Cross-respondent,

    v.

GILBERT P. HYATT,

    Respondent/Cross-appellant.

Supreme Court Case No. 53264

District Court Case No. A382999

Notice of Cross-Appeal Filed March 4, 2009

Electronically Filed
Oct 23 2014 10:44 a.m.
Tracie K. Lindeman
Clerk of Supreme Court

## APPEAL

from the Eighth Judicial District Court, Clark County
THE HONORABLE JESSIE WALSH, District Judge

## RESPONDENT GILBERT P. HYATT'S ANSWER TO APPELLANT FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA'S PETITION FOR REHEARING

MARK A. HUTCHISON, Nev. Bar No. 4639
MICHAEL K. WALL, Nevada Bar No. 2098
HUTCHISON & STEFFEN, LLC.
10080 Alta Drive, Suite 200
Las Vegas, NV 89145
Telephone: (702) 385-2500
Facsimile: (702) 385-2086

PETER C. BERNHARD, Nev. Bar No. 734
KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road, Suite 250
Las Vegas, NV 89113
Telephone: (702) 792-7000
Facsimile: (702) 796-7181

DONALD J. KULA, Cal. Bar No. 144342
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone: (310) 788-9900
Facsimile: (310) 788-3399

*Attorneys for Respondent/Cross-
Appellant Gilbert P. Hyatt*

LEGAL123883971.5

Docket 53264   Document 2014-35358

**ANSWER TO PETITION FOR REHEARING**

Pursuant to this Court's order of October 7, 2014, Respondent Gilbert P. Hyatt ("Respondent" or "Hyatt") submits this Answer to the Petition for Rehearing filed by Appellant Franchise Tax Board of California seeking a rehearing in regard to this Court's September 18, 2014, Opinion.

**I.     Issues presented:**

1. Did this Court overlook or misapprehend the facts or law in affirming the judgment as to liability on the Intentional Infliction of Emotional Distress (IIED) claim and remanding the claim to the district court for a retrial on damages?

2. Did this Court overlook or misapprehend the facts or law in affirming the judgment as to the fraud claim, including the damages awarded?

**II.    Summary of Answer.**

No. Substantial evidence supports the jury's finding that FTB intentionally inflicted emotional distress on Hyatt and made actionable misrepresentations to Hyatt. This Court accurately listed multiple examples of this evidence, which is different from and independent of the evidence this Court ruled was improperly admitted.

After adopting the "sliding-scale" approach to proving a claim for IIED, this Court concluded there was sufficient evidence from which a jury could reasonably find Hyatt suffered severe emotional distress. (Opinion, 48.) In so doing, this Court specifically cited to (1) evidence of FTB's disclosure of personal information, despite promises to keep it confidential and knowing Hyatt' unique need for confidentiality; (2) the 11-year delay in the protests caused by FTB and the resulting $8,000 a day interest assessed to Hyatt; (3) the disparaging remarks made about Hyatt and his religion by the main auditor, as well as her determination to impose

1

LEGAL123883971.5

1   tax assessments on Hyatt; and (4) FTB fostering an environment in which imposing

2   taxes was the objective in audits.  (Opinion, 47.)

3       This Court cited almost identical evidence in affirming the fraud claim.

4   (Opinion, 38.)  This substantial evidence cited by this Court supports the jury's

5   finding of FTB's fraudulent intent from the outset, thereby rebutting the FTB

6   temporal argument on the fraud claim.  Intent is a jury issue and is determined based

7   on the totality of the evidence of fraud.  The jury in this case found the FTB's

8   actions fraudulent, and this Court correctly affirmed based on the evidence cited.

9       Rarely does the perpetrator explicitly acknowledge its fraudulent intent.

10  Contrary to FTB arguments, an explicit admission of intent is not needed nor

11  expected.  Yet, in this case there was explicit evidence of fraudulent intent from the

12  outset as the first auditor testified that the only issue that "popped" in his mind  upon

13  first reading the newspaper article about Hyatt that started the audit was  the amount

14  of money he made.  This along with the evidence that FTB promoted a culture in

15  which a tax assessment was the end goal of an audit is further substantial evidence of

16  fraudulent intent from the outset.

17      The evidence from trial therefore for both the IIED claim and the fraud claim

18  cited by this Court is "substantial evidence," meaning sufficient that a reasonable

19  jury could so find.  (*See* Opinion, 25 (*citing Prabhu v. Levine*, 112 Nev. 1538, 1543,

20  930 P.2d 103, 107 (1996)).  This Court did not overlook or misapprehend any facts

21  or the law in affirming the judgment as to Hyatt's IIED claim on liability and fraud

22  claim on both liability and damages.

23      Regarding FTB's harmless error argument in which FTB complains of this

24  Court's ruling in ordering a new trial on damages but not liability for the IIED claim,

25  FTB fails to recognize this Court's reasoning in limiting the new trial to damages:

26  the evidence found to be admitted in error may have affected the amount of damages

27  awarded by the jury for emotional distress but not the fact that Hyatt did suffer

28

2

1  severe emotional distress based on FTB's conduct. The issue for retrial is what

2  amount of emotional distress did Hyatt suffer due to the conduct of FTB, and

3  whether events close in time caused additional distress for which Hyatt should not

4  recover from FTB.

5       But the improperly admitted evidence does not change or affect the fact that

6  the record contains more than sufficient evidence that Hyatt suffered severe

7  emotional distress, resulting directly from the conduct of FTB as cited in this Court's

8  Opinion.[1] This Court clearly segregated the conduct that supported the two

9  sustained claims from the conduct/evidence it found inadmissible.

10      FTB also attempts to emphasize the dismissal of the invasion of privacy

11  claims. But the fact that Hyatt was found not to have a claim for invasion of privacy,

12  because some of the personal information at issue was long ago placed in one or

13  more court records, does not mean that dissemination of personal information after

14  promising to keep it confidential was not otherwise actionable. FTB's act of

15  publishing and re-publishing the personal information on a massive scale after

16  promising to keep it confidential was extreme and outrageous. This publication of

17  personal information, in direct violation of representations made to and relied on by

18  Hyatt was outrageous and fraudulent.

19      Finally, FTB's repeated, erroneous legal arguments on "garden variety"

20  emotional distress, the statute of limitations for the IIED claim, the specificity of the

21  fraud representations, and every other repeated legal argument raised by FTB's

22  petition, fail to demonstrate that this Court overlooked or misapprehended the facts

23  or law on Hyatt's IIED claim on liability or fraud claim. FTB's petition for rehearing

24  should therefore be denied in its entirety.

25

26

27  _____

    [1]*See* Respondent's Answering Brief (RAB), 128-32.

28

3

**III.    This Court correctly affirmed the judgment as to FTB's liability on the IIED claim.**

**A.    The evidence cited by this Court established that FTB's conduct was extreme and outrageous.**

FTB's arguments to the contrary fail to show that this Court overlooked or misapprehended the facts, the law or its own Opinion on this point.

**1.    FTB's wide ranging dissemination of Hyatt's personal information, despite promises to keep it confidential, was extreme and outrageous.**

A principal theme of FTB's petition is that, because this Court reversed the judgment as to the invasion of privacy claims on the basis Hyatt did not have an objective expectation of privacy in the information disclosed, FTB's disclosures cannot be considered extreme and outrageous. FTB is wrong.

Even if a party cannot recover for invasion of privacy because some of the personal information could, with great effort, be found in the public records, the underlying disclosures still can, and here do, establish other torts. For example, Hyatt sought and obtained assurances that FTB would keep and treat his personal information as confidential. FTB then acted directly contrary to its promises and stated policies. FTB's engagement in wide-ranging disclosures of Hyatt's personal information can be, and was here, independently wrongful regardless of the determination of this Court that some of the personal information is in the public record and there can be no objective expectation of privacy in that information.

But providing assurance that a party will not disclose personal information in order to gain the trust and confidence of another party, only to turn around and publish and re-publish that information on a wide scale, is evidence of extreme and outrageous conduct by the first party.[2] The jury found it outrageous (and fraudulent)

_____

[2] As Hyatt presented in his Petition for Rehearing, FTB disseminated Hyatt's confidential Nevada address on Tara Avenue that was not in the public records until

4

LEGAL123883971.5

ER 697

1    that FTB would do such a thing.  This Court has not overlooked or misapprehended

2    anything on this point.

3           As the jury found, FTB made disclosures with the intent not to comply with

4    past promises, policies and procedures, knowing that the disclosures would be highly

5    sensitive and distressful to Hyatt.  This established something much worse than

6    invasion of privacy.  And that is what the jury found, and this Court then affirmed as

7    to both the fraud claim and the IIED claim as to liability, even though it found that

8    the invasion of privacy claim could not be affirmed.  *See, e.g., Tarka v. Filipovic*, 45

9    Conn. App. 46, 54 (Conn. App. Ct. 1997)(affirming judgment for IIED claim based

10   on disclosure of private facts but not invasion of privacy); *Crain v. Krehbiel*, 443 F.

11   Supp. 202, 2124-15 (N.D. Cal. 1977)(holding that claim for IIED based on

12   threatened disclosure of private information should be tried even though invasion of

13   privacy claim not stated).

14          On pages 2 and 3 of its petition, FTB argues confusingly that the Opinion

15   shows that FTB did not engage in extreme conduct because this Court found in

16   regard to the false light claim that FTB's contacts with third parties were not highly

17   offensive to a reasonable person.  (FTB Petition, 2, 3.)  But this Court did not cite

18   such conduct in support of the IIED claim (or the fraud claim).  There is nothing

19   inconsistent with finding insufficient evidence to support the elements of one claim,

20   while at the same time relying on the same and different evidence as sufficient to

21   support a different claim.

22          This Court did not overlook or misapprehend the facts or law by, on the one

23   hand, reversing the invasion of privacy claims, and on the other hand, affirming the

24

25

26

27   FTB's disclosures.  This too supports the finding that FTB engaged in extreme and
     outrageous conduct.

28

5

LEGAL123883971.5

1   IIED claim on liability (and the fraud claim).[3]  This Court clearly concluded that the

2   facts regarding FTB's knowing and intentional disclosure of Hyatt's personal

3   information helped establish certain claims, but failed to establish other claims.

4   There is nothing novel about this result, and it certainly does not establish that this

5   Court overlooked or misapprehended any facts or law on the IIED claim (or the

6   fraud claim).

7          **2.    FTB's 11-year bad faith delay of the protests while Hyatt was
               assessed $8,000 a day in interest was extreme and outrageous.**

8

9          This Court's Opinion cited FTB's 11-year delay in the protests and the $8,000

10  a day interest as part of the substantial evidence Hyatt put forth to establish the IIED

11  claim (and the fraud claim).  (Opinion, 47.)  FTB attacks this finding, arguing that

12  the district court made erroneous evidentiary rulings and that Hyatt and his attorneys

13  caused the 11-year delay, citing its prior arguments.  (FTB Petition, 4.)

14         FTB makes no attempt to explain what this Court allegedly overlooked or

15  misapprehended in regard to the evidentiary ruling, but rather merely cites the

16  district court order and tries to reargue it.  Nor does FTB cite to where it argued this

17  issue in its briefing.

18         FTB's petition suggests that at trial it did not have the opportunity to present

19  its view that Hyatt and his attorneys caused the delay.  FTB most assuredly did have

20  this opportunity and took advantage of it, including having *four* of its in-house

21  attorneys testify as to why FTB put a hold on the protests and how this was allegedly

22  Hyatt's fault.  (RAB, 48-51.)  FTB was allowed to fully present evidence that the

23  delay was allegedly caused by the district court's protective order that it claimed

24  delayed it from obtaining discovery materials from this case for use in the tax

25  [3] The same conduct that may not establish one tort, may establish a different tort.

26  *See Falline v. GNLV Corp.*, 107 Nev. 1004, 1007-08, 823 P.2d 888, 890 (Nev.

27  1991)(finding one claim properly supported by facts, but other related torts not
    established by same facts).

28

LEGAL123883971.5

6

1  proceedings. *Id.* But the jury rejected those arguments as to the cause of delay in

2  the tax proceedings.[4]

3       Indeed, Hyatt also presented evidence as to the cause of the 11-year delay,

4  demonstrating that FTB's internal documents and its own witnesses' testimony

5  confirmed an intentional hold by FTB. (RAB, 43-46.) The jury then heard from

6  Hyatt and others as to what the delay did to him, how he reacted to it, and how he

7  became obsessed with the proceeding being pursued against him. (RAB, 128-32.)

8  This evidence directly tied FTB's actions to Hyatt's emotional distress.

9       The cause of the 11-year delay, not the merits or correctness of the protests,

10  was therefore a major issue at trial, and each side put on a great deal of evidence on

11  the issue. It was a classic jury issue that needed to be and was decided by the jury.

12  There was substantial evidence as cited above supporting Hyatt's position, and the

13  jury's verdict demonstrates it decided the delay issue in favor of Hyatt. Hyatt

14  demonstrated this in his briefing to this Court. (*See* RAB, 43-51.)

15       This Court therefore did not overlook or misstate any facts or law in finding

16  that the 11-year delay and $8,000 in interest per day supported the finding that FTB

17  engaged in outrageous conduct.

18       **3.    The main auditor's disparaging remarks and obsession to "get"**
19               **Hyatt was extreme and outrageous.**

20       As part of the substantial evidence Hyatt put forth to establish the IIED claim

21  (and the fraud claim), this Court also cited the disparaging remarks about Hyatt's

22  religion by the main auditor, Ms. Cox, and the evidence of her determination

23

24

    [4] The evidence the trial court disallowed and of which the FTB now complains was
25  not on the issue of delay in the protest. Rather, the trial court did not allow evidence
26  from either side on the merits of the protest decision, *i.e.,* neither side could present
    evidence and argue whether the protest decision was correct. Hyatt briefed this
27  issue. (RAB, 79-80.)

28

7

LEGAL123883971.5

1    (obsession per the trial testimony) to impose tax assessments on Hyatt. (Opinion,

2    47.)

3           On this point, FTB reargues the evidence asserting its position. But

4    substantial evidence supports Hyatt's contrary position, and the jury found for Hyatt.

5    Evidence supporting Hyatt's claims must be accepted in this appeal based on the

6    jury's verdict and its finding in favor of Hyatt. Indeed, FTB does not argue that this

7    Court overlooked or misapprehended any facts or law on this point, nor does FTB

8    argue there is no evidence supporting Hyatt's position. FTB simply reargues its

9    position. (FTB Petition, 4-5.) This is improper in a petition for rehearing, and no

10   further consideration should be given to the argument by FTB.

11          Nonetheless, there is substantial evidence of Ms. Cox's disparaging remarks

12   and obsession with "getting" Hyatt that cannot be ignored. Hyatt briefed this in

13   detail. In sum, the witness, Ms. Les, confirmed when cross-examined by FTB

14   counsel that she heard Ms. Cox use racial slurs "maybe 20 times" and that while the

15   witness understood "these racial slurs that Sheila [Ms. Cox] made in a joking sense

16   like to say the way [Ms. Cox] talks out of the side of her mouth, 'That Jew bastard,'"

17   the witness "knew it was intended as a joke because she [Ms. Cox] was upset with

18   him [Hyatt]" but felt "that she [Ms. Cox] cross (sic) the line." (RAB, 15-16.)

19          And to be clear, Ms. Les, a co-worker at FTB with Ms. Cox, never

20   backtracked and had unique access to the private and unvarnished views Ms. Cox

21   expressed during their frequent time together outside of the office. Ms. Cox even

22   gave this witness access off premises to the confidential Hyatt audit file. (RAB, 16

23   (*See* testimony cited therein).) FTB's request in footnote 1 of its petition asking that

24   Ms. Cox's name be redacted from the Opinion further flies in the face of the jury's

25   unmistakable findings against FTB and Ms. Cox on this point and in favor of Hyatt.

26   FTB's argument on this point should be disregarded, as well as its request to redact

27   Ms. Cox's name.

28

LEGAL123883971.5

8

1      Lastly, FTB argues that Hyatt did not learn of Ms. Cox's disparaging remarks

2  until after the case was filed.  Nevertheless, the emotional distress Mr. Hyatt

3  suffered did not stop when he filed suit in 1998.  In fact, the protests were not

4  decided until 2007 and, as this Court noted in its Opinion, part of the extreme

5  conduct by FTB and severe emotional distress suffered by Hyatt was the 11-year

6  delay in the protests (1996 to 2007).  In this regard, Ms. Les first testified to Ms.

7  Cox's disparaging remarks and obsession to get Hyatt in deposition in 2000.[5]  It was

8  therefore early during that long protest period in which Hyatt suffered increasingly

9  severe emotional distress that he also learned of Ms. Cox's disparaging remarks and

10  experienced severe distress from that as well.  (RAB, 129, FN 483.)

11      Hyatt therefore first experienced emotional distress after receiving FTB's

12  audit file in the fall of 1996, and the distress continued and grew during the very

13  period he learned of the disparaging remarks.  (RAB, 124-127.)  FTB's reference to

14  the timing of Hyatt's knowledge of the disparaging remarks is therefore of no

15  consequence and certainly provides no basis for a rehearing on any issue in this

16  Court's Opinion.

17          **4.    The environment fostered by FTB making the imposition of tax
                assessments the objective of audits was extreme and outrageous.**
18

19      This Court's conclusion that FTB fostered an environment in which imposing

20  taxes was the objective (Opinion, 47) — as opposed to acting in a fair and impartial

21  manner in determining if in fact taxes are owed — did not contradict other portions

22  of the Opinion, is supported by substantial evidence and was properly cited by this

23  Court in finding that FTB engaged in extreme and outrageous conduct.  FTB's

24  argument on this point misses the mark by a wide margin.

25      FTB argues that under the breach of confidentiality claim this Court found

26  that the FTB was not required to act with Hyatt's interest in mind.  (FTB Petition, 5.)

27  _____
    [5] *See* 27 RA 006623 (showing date of Les deposition, January 11, 2000).

28

9

LEGAL123883971.5

1 But that is quite different from FTB making representations and promises of

2 fairness, courteous treatment, confidentiality, *etc.*, but then acting directly contrary

3 and asserting it cannot be held to its representations FTB made these representations,

4 and Hyatt relied on them. (RAB, 89-90, 92-93.)

5    There was substantial evidence, as Hyatt briefed in detail, that despite its

6 repeated professions of fairness, courteous treatment, confidentiality, *etc.*, FTB was

7 "numbers driven" and auditors were motivated to over-assess.  There was evidence

8 that FTB employed a Cost-Benefit Ratio (referred to as "CBR") in a manner that

9 required certain returns from audits consuming large amounts of time and resources.

10 (RAB, 32-35.)  Indeed, the lead auditor sought to use the Hyatt audit to advance her

11 career, and she succeeded.  (RAB, 17-18.)  This conduct is very different from the

12 courteous treatment FTB promised to Hyatt, treatment that FTB auditors understood

13 required it to treat taxpayers fairly.  (RAB, 89-90.)  Substantial evidence therefore

14 supports this Court's finding that the environment fostered by FTB amongst auditors

15 in which assessments were expected when an audit was undertaken was extreme and

16 outrageous.  This supports this Court's affirmance of Hyatt's IIED claim on liability.

17    And contrary to FTB's representation, this Court did not say "much of the

18 conduct" complained of by Hyatt "was not highly offensive to a reasonable person."

19 (FTB Petition, 6.)  These are FTB's words interpreting a portion of the Opinion

20 relating to the false light claim and referring to FTB's conduct with third parties via

21 letters, demands, or in-person visits.  This Court's language cited by FTB has no

22 relation to this Court's ruling on the IIED claim.  (*See* Opinion, 35 (cited by FTB).)

23 In this manner FTB's petition consistently tries to mix and match, or mismatch,

24 portions of this Court's Opinion with unrelated other issues to falsely claim the

25 Court's Opinion is contradictory.

26    FTB in this section also attacks Hyatt's position on the residency dispute in

27 the tax proceedings arguing FTB was justified in having a goal to collect unpaid

28

10

LEGAL123883971.5

ER 703

1  taxes from Hyatt. (FTB Petition, 5-6.)[6] FTB misses the point.  The extreme and

2  outrageous conduct was in fostering an environment in which auditors are expected

3  upon opening an audit to make an assessment in order to ensure FTB meets its

4  numbers, as opposed to acting in accord with FTB's stated goals and representations

5  that promise that FTB will act fairly and with an even hand in deciding whether

6  taxes are owed (something every citizen would expect of their government).  FTB is

7  essentially saying it is okay to have had a goal oriented audit process with the intent

8  to impose assessments, as long as the audit results in an assessment.  This is the very

9  attitude the jury found abhorrent and provides substantial support that FTB acted in

10  an extreme and outrageous manner.

### 5.  Substantial evidence therefore supports this Court's finding that FTB engaged in extreme and outrageous conduct.

13  FTB's petition fails to demonstrate that this Court overlooked or

14  misapprehended the facts or law in regard to its affirmance of the district court

15  judgment in favor of Hyatt on the IIED claim as to liability.  Each example cited by

16  this Court of extreme and outrageous conduct by FTB is supported by substantial

17  evidence that was presented to the jury.  That evidence was summarized and/or cited

18  in Hyatt's briefing to this Court.

19  FTB's petition therefore failed to establish that this Court in its Opinion

20  overlooked or misapprehended the facts or law in finding against FTB on the IIED

21  claim as to liability.

22

23

24

25  [6] In footnote 2, FTB argues again that it should have been allowed to present its protest evidence on the merits of the tax question.  This is a blunt admission as to the

26  lack of supporting evidence in the audits wherein FTB assessed Hyatt millions of dollars in taxes and penalties despite not having "much" of the evidence.  But that

27  issue is not before this Court.

28

LEGAL123883971.5

**B.**   **FTB's re-argument of the "garden variety" issue again fails and was squarely rejected in this Court's Opinion finding that medical evidence is not necessary to establish severe emotional distress.**

FTB reargues that "garden variety" emotional distress cannot be substantial as a matter of law. FTB raises no issue in terms of this Court overlooking or misapprehending the facts or law on this issue.

According to FTB's argument, neither Hyatt nor any other plaintiff can establish severe emotional distress when seeking recovery for garden variety emotional distress. That is not the law, nor was it the intent of the district court's ruling. The "garden-variety" cases FTB cited use the phrase as a term of art and have no application to the district court's use of the term. Hyatt extensively briefed this issue. (RAB, 122-24, *citing* 15 AA 3538-39.)[7]

At trial, Hyatt was required to show he suffered severe emotional distress, as any IIED plaintiff must. This Court ruled that medical evidence is not necessary to recover for severe emotional distress. (Opinion, 44-46.) This Court also referenced the extensive trial evidence of Hyatt's severe emotional distress, including specific testimony of friends and family that both document Hyatt's severe emotional distress that was caused by the long-running tax proceeding. (Opinion, 47-48; *see* RAB, 128-31.)

FTB's petition therefore does not establish that this Court overlooked or misapprehended the facts or law in regard to Hyatt suffering severe emotional distress or the district court's ruling that used the term "garden variety" emotional distress.

---

[7] The district court's ruling protecting Hyatt's privacy in his medical records is consistent with the law. (RAB, 127-28.) While FTB now argues these records may contain evidence of residency, this unproven assertion is of no consequence in this case. FTB could have pursued such evidence in the tax proceedings, if appropriate there. Moreover, the fact that Hyatt traveled to California for cancer treatment, including surgery, after moving to Nevada was well known to FTB. (*See* 50 RA 012278.)

**C.    The district court's evidentiary and jury instruction errors were harmless in regard to the jury's finding on liability for the IIED claim.**

This Court held that the district court's evidentiary and jury instruction errors were harmless as to FTB's liability for the IIED claim.  However, this Court concluded that these errors were prejudicial only as to damages for the IIED claim, which warranted a new trial as to damages.

The erroneous district court rulings as found by this Court were not prejudicial to the finding of liability for the IIED claim because the evidence and instructions subject to those rulings are unrelated to the evidence supporting the liability finding. Based on consideration of the entire record, it is not probable that a different result might have been reached on the liability question even if the correct evidentiary jury rulings had been made by the district court.  *Cook v. Sunrise Hospital and Medical Center, LLC*, 124 Nev. 997, 1008, 194 P.3d 1214, 1220 (2008)

The evidence is overwhelming that the FTB's extreme and outrageous conduct did cause Hyatt to suffer severe emotional distress.  For this reason, the jury's liability finding on the IIED claims was properly affirmed by this Court.

**1.    The evidence cited by this Court in affirming the liability finding on the IIED claim was substantial and unrelated to the erroneous evidentiary and jury instruction rulings.**

**a.    Evidence challenging audit conclusions.**

This Court's Opinion was careful and precise in identifying and listing the substantial admissible evidence that demonstrated support for the IIED liability finding, including the extreme and outrageous conduct of FTB (Opinion, 47) and the severe emotional distress suffered by Hyatt (Opinion, 47-48).  In contrast, this Court discussed separately the inadmissible evidence on the issue of whether FTB's conclusions in the audit were correct (Opinion, 49-51).  There was nothing contradictory in doing so.

This Court supported its liability finding on the IIED claim with reference to (i) FTB's breaches of its promises of confidentiality of Hyatt's personal information

13

1  despite repeated assurances to Hyatt and Hyatt's sensitivity and need for
2  confidentiality, (ii) FTB's 11-year delay in the protests and the $8,000 a day in
3  interest suffered by Hyatt, (iii) the disparaging remarks of the main auditor and that
4  she was determined to impose taxes on Hyatt, and (iv) the environment fostered by
5  the FTB in which auditors were expected to make assessments in their audits.  This
6  evidence is independent of any evidence or argument presented by Hyatt that
7  addressed directly or indirectly the audit conclusions.

8      This Court therefore acted well within its discretion in affirming the finding on
9  liability for the IIED, as FTB suffered no prejudice on this issue from the
10 inadmissible evidence related to the correctness of the audit conclusion.

11          **b.     Jury instruction on audit conclusions.**

12      FTB argues the related issue of Jury Instruction No. 24 and its reference to Mr.
13 Jumelet's testimony as to correctness of the audit conclusions.  For the same reason
14 discussed in the above section on evidence as to the audit conclusions, there was no
15 prejudice to FTB in regard to the jury's finding on liability for the IIED claim.  The
16 substantial evidence supporting that claim was outlined by this Court and is wholly
17 unrelated to the issue of the correctness of the audit conclusions or Hyatt's arguments
18 related to the audit conclusions.  FTB therefore was not, and could not have been,
19 prejudiced by this jury instruction.

20      This Court therefore also acted well within its discretion in affirming the
21 finding on liability for the IIED, as FTB suffered no prejudice on this issue from the
22 jury instruction on the correctness of the audit conclusion.

23          **c.     Adverse inference instruction.**

24      This Court ruled that FTB should have been allowed, and will be allowed at
25 the retrial on damages for the IIED claim, to offer evidence on steps it took to collect
26 the lost evidence to try and show that the lost evidence was not adverse to FTB.  But
27 evidence of FTB efforts to collect emails during a time period after the litigation was

14

LEGAL123883971.5

ER 707

1   filed does not relate to, nor could it even arguably rebut or contradict, the substantial

2   evidence outlined above and referenced by this Court as supporting the finding on

3   liability for the IIED claim.  As outlined above, there was substantial evidence

4   supporting the elements of the IIED claims.  The adverse inference was not needed to

5   find or sustain the finding of liability for the IIED claim.

6     Further, while FTB argues that Hyatt argued at trial that the adverse inference

7   could specifically be used to establish intent, Hyatt in fact presented substantial

8   evidence to the jury on the issue of intent.  Specifically as to intent, and as addressed

9   in more detail below regarding the fraud claim, Hyatt pointed the jury to substantial

10  evidence of FTB's bad faith intent from the outset of the audit.  *Infra*, 18.  In

11  particular, this included the testimony from FTB's first auditor, Mr. Shayer and how,

12  on reading the newspaper article about Hyatt before the audit commenced, the first

13  thing that "popped in his head" was how much money Hyatt made and will make.

14    This Court acted well within its discretion in affirming the finding on liability

15  for the IIED as FTB suffered no prejudice on the finding of liability for the IIED

16  claim due to the adverse inference instruction.

17     **d.** **Patent interference proceeding and federal tax audit.**

18    FTB makes a brief argument regarding the exclusion of evidence of a patent

19  interference proceeding and Hyatt's federal tax audit.  This evidence would not and

20  does not change, rebut or refute the substantial evidence that establishes that FTB

21  engaged in extreme and outrageous conduct that caused Hyatt severe emotional

22  distress.  The evidence outlined above is specific as to FTB being the cause of the

23  severe emotional distress.

24    This Court therefore correctly ruled that these other events, even if, as FTB

25  argues, they may also have caused Hyatt further emotional distress, go only to the

26  amount of damages caused by FTB and whether any of the distress can be attributed

27  to these other events.  These events do not change the fact that FTB's conduct did

28

15

1   cause severe emotional distress to Hyatt.  Hyatt is entitled to some recovery from

2   FTB for that severe emotional distress.  The issue is how much, *i.e.*, whether other

3   events contributed to the distress such that FTB is not liable for all of the distress.

4       This Court acted well within its discretion in affirming the finding on liability

5   for the IIED but remanding the case for a new trial on damages as to that claim.

6       **2.    FTB's argument as to excluded evidence that it refers to as delay**
        **evidence lacks merit because this Court did not conclude that the**
7       **evidence had been erroneously excluded.**

8       FTB again claims prejudice because certain evidence was excluded related to

9   the 11-year delay.  (FTB Petition, 10.)  But the excluded evidence referenced by the

10  FTB does not relate to the delay in the protests, but rather addresses the merits of the

11  protests and tax proceedings.  Neither party was allowed at trial to address the

12  correctness of the protest results.  FTB could not have been prejudiced by the

13  exclusion of this evidence.

14      Further, and most on point here, the protest evidence about which FTB argues

15  has not been ruled by this Court to have been improperly excluded.  In other words,

16  FTB claims prejudice from excluded evidence that is still inadmissible.  FTB

17  therefore fails to establish this Court overlooked or misapprehended the facts or law,

18  and in fact makes no discernible point in addressing this excluded evidence.

19

20  **D.    FTB's repeated erroneous argument on the statute of limitations for the**
        **IIED claim must again be rejected.**
21

22      FTB's petition raises no new issues as to its argument on the statute of

23  limitations.  FTB is wrong on the issue, and its position if accepted would require a

24  proliferation of premature lawsuits.  Hyatt substantially briefed this issue.  (RAB,

25  137-44.)

26      The key fact as to the statute of limitations issue is that Hyatt filed his lawsuit

27  within two years of receiving FTB's audit file.  Hyatt's first notice of FTB's repeated

28  and unnecessary disclosures of Hyatt's private and confidential information to third

LEGAL123883971.5

1  parties was not until, at the earliest, his receipt of FTB audit file in late 1996.  The

2  audit file revealed for the first time that FTB was widely disclosing Hyatt's private

3  and confidential information.  Under FTB's theory for the statute of limitations,

4  every citizen with mere notice of an ongoing government investigation would need to

5  file a precautionary lawsuit from the two year notice of the investigation.  That is not

6  the law, and it would be bad public policy.

7  **IV.   This Court correctly affirmed the judgment as to the fraud claim.**

8  **A.      This Court did not overlook or misapprehend the clear and convincing

9           standard for fraud.**

10         As to this Court's ruling on the fraud claim, FTB's petition first complains

11 that this Court did not reference the clear and convincing standard for a fraud claim.

12 But this Court cited *Bulbman, Inc. v. Nev. Bell,* 108 Nev. 105, 111, 825 P.2d 588,

13 592 (1992), in addressing the elements of a fraud claim and cited *Powers v. United

14 Servs. Auto. Ass'n*, 114 Nev. 690, 697-98, 962 P.2d 596, 600-01 (1998), in

15 addressing the jury's role in making findings necessary to establish a fraud claim.

16 (Opinion, 37.)  *Bulbman* notes the clear and convincing standard for fraud.  This

17 Court is familiar with these cases and with the clear and convincing standard for a

18 fraud claim.

19         Indeed, the jury was correctly instructed on the need to find the fraud elements

20 by clear and convincing evidence.[8]  FTB does not question this.  The findings

21 affirmed by this Court were therefore based on clear and convincing evidence.

22 Further, having found substantial evidence to support the fraud claim there was no

23 reason for this Court to also specifically address FTB's related argument as to the

24 district court's denial of FTB's motion for judgment as a matter of law.  The district

25 court properly let the jury answer the disputed facts as to the fraud claim and

26 properly instructed the jury as to the clear and convincing standard.

27 [8] RT: July 21, 2008, 137:5-17.

28

17

1    This Court did not overlook or misapprehend the law in regard to the clear and
2  convincing standard for a fraud claim.

3  **B.    The FTB's fraudulent intent is established by the trial record.**

4        **1.    FTB's fraudulent intent was established by the jury's finding.**

5        Clear and convincing evidence of FTB's fraudulent intent was presented at
6  trial. Hyatt briefed this issue demonstrating the evidence of intent. (RAB, 14-15,
7  32-35, 56-60, and 91-92.) FTB does not even address this evidence in its petition.

8        However, the jury clearly found fraudulent intent in rendering its verdict.
9  Intent is not a legal question, it is a disputed factual issue to be resolved by the fact
10 finder. *See Epperson v. Roloff,* 102 Nev. 206, 212-13 (1986)(holding intent element
11 of fraud claim is a jury question and no express misrepresentation need be made);
12 *Albert H. Wohlers & Co. v. Bartgis*, 114 Nev. 1249, 1260-61 (Nev. 1998) (holding
13 jury could have concluded deliberate misrepresentation by drawing reasonable
14 inference from evidence presented). Rarely is there a smoking gun in which a
15 perpetrator of fraud says "I intend to defraud you." Rather, the jury determines
16 based on the actions of the perpetrator whether there was a fraudulent intent. *See*
17 *Tognini v. Kyle*, 15 Nev. 464, 468-69 (Nev. 1880)("An intent to defraud is not
18 published to the world . . . hence fraud can generally be shown only by facts and
19 circumstances which tend directly or indirectly to establish it.") The evidence at
20 trial supported the finding of the jury that FTB acted with fraudulent intent from the
21 outset.

22       Moreover, in this case there was clear affirmative evidence of fraudulent
23 intent from the outset of the first audit, akin to the proverbial smoking gun. FTB's
24 initial audit of Hyatt was triggered by a newspaper article that reported Hyatt's new
25 wealth from patent royalties after moving to Nevada. The first auditor, Mr. Shayer,
26 testified that what "popped" into his mind in reading the article was how much
27 money Hyatt had made. Mr. Shayer recalls that he read that Hyatt stood to make
28

18

LEGAL123883971.5

1  "hundreds of millions" of additional dollars from his patents. This prompted Mr.

2  Shayer to request Hyatt's state tax return records and open an audit of Hyatt's 1991

3  tax-year return. (RAB, 14.)

4      Mr. Shayer later wrote a memo very early in the audit pointing out that if FTB

5  could reclassify Hyatt's income as "sourcing" income instead of "residency"

6  income, it would result in $1.8 million in more taxes for FTB from Hyatt. From the

7  outset of the audit, therefore, the jury could and did conclude that FTB was not

8  impartially gathering the facts to make a fair determination of whether any tax was

9  owed. Rather, operating in an environment in which auditors understood

10  assessments were supposed to be imposed, FTB viewed the audit as a means to

11  assess and collect taxes from Hyatt. (RAB, 15.) This is directly contrary to FTB's

12  representations to Hyatt upon commencing the audit. Mr. Shayer himself sent the

13  representations to Hyatt, and he testified that he was therein promising to conduct a

14  fair and unbiased audit and that his first communication to Hyatt was intended to

15  convey that FTB would be fair and impartial. (RAB, 89; Opinion, 37-38.)

16      The jury's finding on the fraud claim, under the evidence presented,

17  established the fraudulent intent of FTB at the outset and throughout the audit.

18          **2.    FTB's temporal argument misses the point that the evidence cited by this Court and other evidence supports the jury's finding that FTB had fraudulent intent from the outset.**

19

20      FTB argues that the evidence this Court cited in support of affirming the fraud

21  claim fails to establish FTB's fraudulent intent at the outset of the audit as the

22  evidence cited is from later in the audit. No plaintiff could ever prove fraud if he/she

23  needed an email or recorded admission from the defendant confessing to the intent to

24  do wrong before he/she undertook the wrongful act. That is not how intent is

25  established. Intent is established when the jury views all the evidence of the actions

26  of the defendant and concludes the defendant never intended to fulfill the

27

28

19

1   representations made. *Albert H. Wohlers & Co.*, 114 Nev. at 1260-61; *Tognini*, 15

2   Nev. at 468-69.

3       Here, the evidence cited by this Court is more than sufficient for a jury to

4   conclude that FTB had a fraudulent intent from the outset. That evidence is nearly

5   identical to the evidence detailed above supporting the liability finding for the IIED

6   claim: (i) FTB's breaches of its promises of confidentiality of Hyatt's personal

7   information despite repeated assurances to Hyatt the information would be kept

8   confidential; (ii) FTB's 11-year delay in the protests and the $8,000 a day in interest

9   suffered by Hyatt; (iii) the disparaging remarks of the main auditor and her obsession

10  to get Hyatt; and (iv) FTB's promotion of a culture in which tax assessments were

11  the end goal. (Opinion, 38.) This evidence, along with additional evidence, such as

12  the testimony of the first auditor Mr. Shayer concerning his thoughts and actions at

13  the outset of the audit, constituted substantial evidence of FTB's fraudulent intent.

14      FTB's violation of its promises of confidentiality support the jury's finding of

15  fraudulent intent. Similarly, the other evidence referenced by this Court, including

16  the letters to multiple doctors with the same last name and the main auditor's

17  disparaging comments, evidence fraudulent intent throughout the audit. The fact that

18  the bad faith actions of FTB were carried out by more than one auditor makes FTB's

19  action that much more egregious. There was not just one rogue employee, but a

20  culture at FTB that made assessing taxes the end goal of an audit. The evidence put

21  forth from the outset of the audit and continuing through the audit and protest as

22  identified by this Court is more than sufficient to sustain the jury's finding of

23  fraudulent intent.

24      **3.    This Court's Opinion does not contain any internal inconsistencies
25          relative to its treatment and reliance on expert testimony presented
            by Hyatt at trial.**

26      FTB's petition misstates the holdings from this Court's Opinion on Hyatt's

27  expert testimony regarding the budgeting process in California used by the state and

28

                                    20

1   FTB, in particular its improper use of CBR, to evaluate auditors and the culture this

2   fostered at FTB (RAB, 32-34).  This evidence supports Hyatt's fraud and IIED

3   claims.

4         Specifically, in support of those two claims, this Court referenced that FTB

5   had fostered an environment in which auditors were expected to return audits with

6   assessments (Opinion, 47 (IIED claim)) and promoted a culture in which tax

7   assessments were the end goal of an audit (Opinion, 38 (fraud claim)).  This is

8   directly contrary to encouraging auditors to act in a fair and impartial manner in

9   determining if in fact taxes are owed.

10        There was no inconsistency therefore in this Court affirming the fraud claim

11  in part on the basis of the culture promoted by FTB as demonstrated by Mr.

12  Sjoberg's expert testimony and other evidence (RAB, 32-35), while also holding

13  inadmissible other expert evidence as to the correctness of the actual audit

14  conclusions.[9]

15  **C.   This Court did not overlook or misapprehend the law in regard to**
     **actionable representations.**
16

17        FTB reargues its losing position on actionable misrepresentations.  It argues

18  that it need not stand behind what it promises and no one should claim reliance on its

19  representations.  That is not the law, particularly in this case with the evidentiary

20  record established by Hyatt at trial.  Hyatt again extensively briefed this issue.

21  (RAB, 86-91.)

22        In particular, the first communication by FTB to Hyatt giving notice of the

23  audit included what was at that time termed the "Taxpayer's Bill of Rights" as well

24  _____

25  [9] The fact that Mr. Sjoberg testified that in the limited "sampling" of audits he
    reviewed, he saw no instances in which FTB made bogus or phony assessments, is in
26  no way inconsistent with his testimony on FTB's budgeting, improper use of CBR,
    and FTB's false certifications to the state legislature regarding CBR. (*See, e.g.,* RT:
27  April 22, 2008, 89:3-90:19, 95:21-98:11.)

28  _____

                                         21

LEGAL123883971.5

1   as a "Privacy Notice." FTB's first auditor, Mr. Shayer, who sent the notice and

2   accompanying attachments, testified that he promised to conduct a fair and unbiased

3   audit and that this very first communication by FTB to Hyatt was intended to convey

4   that FTB would be fair and impartial. (RAB, 89.)

5       These were not vague and ambiguous statements. These were clear

6   representations on which Hyatt relied. As briefed, where there has been deceptive

7   conduct by a government actor using its position of authority, courts do not find

8   themselves powerless to provide relief.[10] *See SEC v. ESM Government Securities,*

9   *Inc.*, 645 F.2d 310, 316 (5th Cir. 1981) ("We believe that a private person has the

10  right to expect that the government, when acting in its own name, will behave

11  honorably. When a government agent presents himself to a private individual, and

12  seeks that individual's cooperation based on his status as a government agent, the

13  individual should be able to rely on the agent's representations.")[11]

14      FTB also argues here that Hyatt never contended that FTB did not act with

15  courtesy. FTB's statement ignores the record in the case. Again, the first auditor,

16  Mr. Shayer, acknowledged that he intended to convey that FTB would be fair and

17  impartial, as he understood FTB was obligated to be. (RAB, 89-90.) But substantial

18  evidence supports the jury's finding of FTB's fraudulent intent.

19

20  [10] FTB makes an argument that as a matter of public policy it should not be held to
    its representations. Any considerations of public policy favor Hyatt's position and
21  holding a government agency accountable for it actions, not allowing it to make
22  representations of fairness and unbiased treatment with no recourse if those
    representations prove false.
23  [11] The *Bulbman* case cited by FTB had nothing to do with government misconduct
24  and misrepresentations. The FTB also cites *Minehan v. United States*, 75 Fed. Cl.
    249 (2007), but that case was in fact a tax refund case against the IRS that was
25  untimely filed. The *pro per* plaintiff attempted to convert it to a tort case, and the
26  Court of Federal Claims found in any event it had no jurisdiction over the late
    asserted tort claims. The language cited by FTB is therefore at best *dicta* and
27  without application to this case.

28

LEGAL123883971.5

1    Hyatt most assuredly did contend, and prove, that FTB did not act in accord

2    with its representations, as to courtesy and otherwise.  This Court's Opinion ruled

3    that "a reasonable mind could conclude that FTB made fraudulent representations."

4    (Opinion, 39.)[12]  This Court did not therefore overlook or misapprehend the facts or

5    law on this point.

6    **V.    Conclusion.**

7         This Court sustained the jury's verdict and resulting entry of judgment on

8    Hyatt fraud claim and on his IIED claim as to liability.  Substantial evidence

9    supports this Court's Opinion on these two points.  FTB has failed to establish that

10   this Court overlooked or misapprehended the facts or law in affirming the jury on

11   those two claims and ordering a new trial on damages for the IIED claim.

12   \ \ \

13   \ \ \

14   \ \ \

15   \ \ \

16   \ \ \

17   \ \ \

18   \ \ \

19   \ \ \

20   \ \ \

21

22   [12] FTB notes that its representation of the audit being completed in a reasonable time
     should only apply to the audit, not the protest which lasted 11 years.  But the protest
23   is an extension of the audit, and most significantly, a taxpayer is at the will and
24   whim of FTB during the audit and protest as no "final" assessment is issued and no
     administrative appeal can be pursued to the California State Board of Equalization
25   until the protest is complete. *See* Cal. Rev. & Tax Code § 19045.  This was one of
26   the bad faith delay facts that Hyatt argued to the jury:  FTB was sitting on the protest
     for 11 years so that Hyatt could not pursue his administrative appeal. (RT: July 30,
27   2008, 31:4-23.)

28

23

1   FTB's petition is nothing more than re-argument of issues already lost and should be

2   denied in its entirety.

3

4          DATED:  October 22, 2014.

5                                              MARK A. HUTCHISON, Nev. Bar No.
                                               4639
6                                              MICHAEL K. WALL, Nev. Bar No. 2098
7                                              HUTCHISON & STEFFEN, LTD.

8

9                                              PETER C. BERNHARD, Nev. Bar No. 734
                                               KAEMPFER CROWELL RENSHAW
10                                             GRONAUER & FIORENTINO

11
                                               DONALD J. KULA, Cal. Bar No. 144342
12                                             PERKINS COIE LLP

13                                             *Attorneys for Respondent/Cross-Appellant
14                                             Gilbert P. Hyatt*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          24

LEGAL123883971.5

ER 717

**CERTIFICATE OF COMPLIANCE PURSUANT TO NRAP 40(b)(3)**

I certify that:

Pursuant to NRAP 40(b)(3), the attached *Respondent Gilbert P. Hyatt's Answer to Appellant Franchise Tax Board of the State of California's Petition for Rehearing* is proportionately spaced, has a typeface of 14 points or more and contains 8,072 words as determined by the Word Count feature of the Microsoft Word software program used to create this document.

DATED this 22nd day of October, 2014.

MARK A. HUTCHISON, Nev. Bar No. 4639
MICHAEL K. WALL, Nev. Bar No. 2098
HUTCHISON & STEFFEN, LTD.

PETER C. BERNHARD, Nev. Bar No. 734
KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO

DONALD J. KULA, Cal. Bar No. 144342
PERKINS COIE LLP

*Attorneys for Respondent/Cross-Appellant Gilbert P. Hyatt*

LEGAL123883971.5

25

ER 718

**CERTIFICATE OF SERVICE**

Pursuant to NRAP 25, I certify that I am an employee of KAEMPFER

CROWELL RENSHAW GRONAUER& FIORENTINO and that on this _____ day

of _____, I caused the above and foregoing document entitled

**RESPONDENT GILBERT P. HYATT'S ANSWER TO APPELLANT**

**FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA'S PETITION**

**FOR REHEARING** to be served by the method(s) indicated below:

| | |
|---|---|
| _____ | via U.S. mail, postage prepaid; |
| ___X___ | via Federal Express; |
| _____ | via hand-delivery; |
| _____ | via Facsimile; |

upon the following person(s):

James A. Bradshaw, Esq.
MCDONALD CARANO WILSON
LLP
100 West Liberty Street, 10th Floor
Reno, NV 89501

*Attorneys for Appellant*
*Franchise Tax Board of the State of*
*California*

Robert L. Eisenberg, Esq.
LEMONS, GRUNDY & EISENBERG
6005 Plumas Street, Suite 300
Reno, NV 89519

*Attorneys for Appellant*
*Franchise Tax Board of the State of*
*California*

Patricia K. Lundvall, Esq.
MCDONALD CARANO WILSON
LLP
2300 West Sahara Avenue, Suite 1000
Las Vegas, NV 89102

*Attorneys for Appellant*
*Franchise Tax Board of the State of*
*California*

C. Wayne Howle, Solicitor General,
State of Nevada
Local Counsel
100 North Carson Street
Carson City, NV 89701

26

LEGAL123883971.5

1

Clark L. Snelson
Utah Assistant Attorney General
160 East 300 South 5th Floor
Salt Lake City, Utah 84114

2

3

4

5

6



An employee of KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEGAL123883971.5

27

ER 720

# EXHIBIT  E

IN THE SUPREME COURT OF THE STATE OF NEVADA

\* \* \* \* \*

FRANCHISE TAX BOARD OF THE
STATE OF CALIFORNIA,

    Appellant/Cross-Respondent,

       vs.

GILBERT P. HYATT,

    Respondent/Cross-Appellant.

_____/

Electronically Filed
Oct 21 2014 02:04 p.m.
No. 53264 Tracie K. Lindeman
Clerk of Supreme Court

## **APPELLANT'S ANSWER TO RESPONDENT'S PETITION FOR REHEARING**

ROBERT L. EISENBERG
Nevada Bar No. 0950
Lemons, Grundy & Eisenberg
6005 Plumas Street, Third Floor
Reno, Nevada 89519
775-786-6868
Email: rle@lge.net

PAT LUNDVALL
Nevada Bar No. 3761
McDonald Carano Wilson, LLP
100 W. Liberty Street, 10th Floor
Reno, Nevada 89501
775-788-2000
Email: plundvall@mcdonaldcarano.com

Attorneys for Appellant Franchise Tax Board
of the State of California

Docket 53264   Document 2014-35087

Appellant FTB hereby answers respondent Hyatt's petition for rehearing.

## I

## INTRODUCTION

A petition for rehearing is appropriate where the court misapprehended or overlooked material facts or law; a petition for rehearing may not be used to reargue matters considered and decided in the court's initial opinion. NRAP 40; see *Gordon v. District Court*, 114 Nev. 744, 745, 961 P.2d 142, 143 (1998). Rehearings are not granted to review matters that are of no practical consequence. *In re Hermann*, 100 Nev. 149, 151, 679 P.2d 246, 247 (1984).

In the present case, Hyatt's petition reargues matters that were briefed by the parties and fully considered in the court's opinion. Further, the petition raises technical contentions that are of no practical consequence to the court's ultimate decision on the issues to which Hyatt's contentions relate. Finally, the petition's factual contentions are not accurate and do not demonstrate any material misapprehension by this court. The petition is without merit and should be denied.

## II

## HYATT'S ADDRESSES

### A.  California and Nevada addresses

Regarding Hyatt's invasion of privacy causes of action, Hyatt's petition contends that this court erroneously focused on his California address, not his Nevada address on Tara Avenue. Pet. 1-2. Hyatt's entire premise for this part of his petition is that his invasion of privacy claims were based upon FTB's disclosures of his Tara address, not his California address.

First, this court's opinion does not indicate that its analysis of the invasion of privacy claims was limited to consideration of FTB's disclosure of Hyatt's California address. Second, Hyatt's privacy claims at trial were vague and generic

1

as to which addresses were involved.  For example, Hyatt's opening statement to the jury made only general references to disclosure of Hyatt's "address" (32 AA 7942-75) or his "addresses" (plural) (32 AA 7974(132) (line 4)).  Third, Hyatt's Tara Avenue address was also a matter of public record and Hyatt himself made it public knowledge.

Therefore, although Hyatt now contends that his privacy claims were clearly limited to disclosure of his Tara address, not his California address, the record on this point is not nearly as clear as Hyatt contends.  Even if this court focuses solely on FTB's disclosure of the Tara address, Hyatt's privacy claims still fail as a matter of law, for the reasons discussed in the next section of this answer.

### B.   No expectation of privacy regarding Tara address

This court's opinion observed that Hyatt lacked an objective expectation of privacy regarding his address.  Op. 26-27.  Hyatt's petition criticizes the opinion, asserting that he did have a reasonable expectation of privacy in the Tara address at the time FTB disclosed that address.  Pet. 6-8.  He contends there were no public records or public disclosures linking him to the Tara address before FTB's disclosures, and "he took great effort to keep [his Tara address] private and confidential."  Pet. 7 (lines 6-8).  He also contends that he "had taken significant steps to protect the secrecy of this address."  Pet. 7 (lines 14-15).

In challenging the opinion, Hyatt's petition repeatedly refers to FTB's briefs, contending that the briefs provided incorrect information and arguments regarding Hyatt's addresses.  E.g., Pet. 1-2, 6.  The petition asserts that this court relied on inaccurate information in FTB's briefs in the court's analysis of Hyatt's privacy claims.  Pet. 5 (Heading IIIA: "The Court's ruling relative to Hyatt's 'address' was based on the FTB's inaccurate citation to evidence of Hyatt's prior California address being in the public record.").  The time for Hyatt to assert alleged

2

inaccuracies in FTB's briefs was in Hyatt's own briefs, not in a petition for rehearing. In any event, facts in FTB's briefs were accurate. And although the opinion summarized both parties' contentions regarding various issues, the opinion did not blindly rely on factual information in the briefs. The court relied on its own independent review of the record. E.g., Op. 26 ("Here, the record shows that Hyatt's name, address, and social security number had been publicly disclosed on several occasions, . . ."; emphasis added).

In evaluating the public records defense to invasion of privacy torts, this court's opinion properly relied on *Montesano v. Donrey Media Grp.,* 99 Nev. 644, 668 P.2d 1081 (1983) and Restatement (Second) of Torts §652D cmt. b (1977). Op. 26. These authorities hold that a defendant cannot be held liable for disclosing information about a plaintiff that was already public. *Id.* The public records defense is not limited to court-filed documents. Rather, the defense is available to any public records or information that the plaintiff has publicly disclosed. As indicated in Comment b of the Restatement, "there is no liability for giving publicity to facts about the plaintiff's life that are matters of public record, such as the date of his birth, the fact of his marriage, his military record, the fact that he is admitted to the practice of medicine or is licensed to drive a taxicab, or the pleadings that he has filed in a lawsuit."

Contrary to Hyatt's contentions, the record clearly shows that Hyatt himself disclosed his Tara address to many members of the public. For example, Hyatt purchased a washer and dryer from Sears; the sales document shows that Hyatt gave the people at Sears his personal information linking him to the Tara address, including "Gilbert P. Hyatt" at 7335 Tara, Las Vegas, Nevada, with his phone number. 79 AA 19742. Hyatt made several purchases from All State Sand & Gravel, each time providing his Tara address to the people at that company. 79

3

AA 19743-48. He obtained a cost estimate from We Can Do It Construction, providing his Tara address, his phone number and his fax number to employees of that company. 38 ARA 9464-69.

Hyatt also gave his Tara address to people who worked for BNC Maintenance & Repair, for work on his air conditioner. 79 AA 19750. He twice provided his Tara address to employees of CAL AIR, for air conditioning work, and he personally signed and accepted the charges for work performed by employees of that company at his Tara home. 80 AA 19751-52; 31 ARA 7630-33. He gave his Tara address to Paul M. Watkins, for appliance repairs. 80 AA 19753. When he purchased a piano from Southern Nevada Music, he provided his 7335 Tara home address to employees of that store, for delivery of the piano; and when the piano was delivered to his Tara home by the music store's employees, Hyatt signed for the delivery. 38 ARA 9482-83.

Despite having disclosed his Tara address to all of these people, Hyatt's petition now contends that the only document "that even remotely linked Hyatt to the Tara property" was a check for his payment of property taxes. Pet. 7, fn 5. He contends that this was "a check deep in the County Treasurer's files," and that the check was "hardly readily accessible to the public." *Id.* Actually, testimony at trial showed the opposite. The Assistant Director for the Clark County Treasurer's Office testified as follows:

> Q    Okay. Now once a person makes a property tax payment on a particular piece of real property, is that record a matter of public record?
>
> A    The receipt is a matter of public record as to who paid it and in some cases, the instrument that paid it.

4

Q    Okay.  And do you ever have occasion where someone will call the Treasurer's Office and ask who paid for the real property taxes on a particular piece of property?

A    Yeah, that happens every day.

47 AA 11626 (74-75)

Q    Okay.  And so could anybody call the Treasurer's Office and receive this information about a property tax payment on a particular piece of property?

A    Yes.

47 AA 11626 (75)

Q    Now, just to make sure that I'm clear, once a person makes a property tax payment on a particular piece of property, that becomes a matter of public record.  Is that correct?

A    Correct.

47 AA 11626 (76)

Q    When somebody makes a property – a request for information about a property tax payment, could they get a copy of the check that was used to make that payment with?

A    Yes.  We – depending on the request, we provide the bill itself and any payment copies of that if that's requested. . . .

47 AA 11626 (77)

Q    Okay.  But in 1993 to 1995, would a check copy have been provided?

A    Yes.  It was standard office practice to provide any check copies that were requested.

5

     Q    And just to make clear, this is any member of the public that would call and ask for that information, they could receive that?

     A    Yes, yes.

47 AA 11627 (78)

     Thus, there is no basis for Hyatt's contention (Pet. 7, fn 5) that his address information was buried "deep in the County Treasurer's files," and that the information was "hardly readily accessible to the public."

     Hyatt's petition also complains that his "private Nevada address on Tara" was disclosed in FTB letters to third parties, "despite the fact that Hyatt had taken significant steps to protect the secrecy of this address." Pet. 7 (lines 12-15). Hyatt cites to three FTB letters in his appendix at 83 RA 20746 - 84 RA 20751. These were letters to two public utilities and a garbage company, who would have already known the information. As this court's opinion observed, Hyatt had no objective expectation of privacy regarding FTB's disclosures of information to third parties who already had the information in their possession, as a matter of law. Op. 27, fn 7.

     Hyatt's petition would have this court believe he took great efforts to keep his address private and confidential. Pet. 6-8. His answering brief contended that he "strives hard to maintain a private, low key, and unassuming lifestyle." RAB 134. Yet the record shows that Hyatt and his publicist actively sought publicity regarding his computer chip patent. 48 AA 11984-92. Representatives of the media went to Hyatt's home and conducted extensive personal interviews; there were hundreds of magazine and newspaper articles published about Hyatt; and he was the subject of an episode on the nationally syndicated television show "Hard Copy." 39 AA 9726 (114); 79 AA 19732-38; 89 AA 22068-137; 28 ARA 6993. "Hard Copy" displayed numerous pictures of Hyatt's Tara house and his

neighborhood, and Hyatt conceded that his Tara home was shown on "Hard Copy." 28 ARA 6993-99; 38 AA 9332(132).

Accordingly, despite Hyatt's present contention that he took great efforts to hide the fact that he owned and lived at the Tara home, undisputed evidence shows that he disclosed his Tara address to numerous members of the public, and that the public had access to this information. This court's opinion was correct in concluding that Hyatt lacked an objective expectation of privacy. This court did not overlook or misapprehend anything regarding Hyatt's Nevada address, and the opinion correctly determined that FTB's disclosure of that address did not invade Hyatt's privacy.

### C. Independent grounds for rejecting Hyatt's privacy claim regarding disclosure of his Tara address

#### 1. No damages

Even if the court gives some credence to Hyatt's arguments regarding the Tara address, Hyatt's lack of damages provides an independent ground for this court's rejection of Hyatt's privacy claim based upon disclosure of his Tara address. As FTB noted in its opening and reply briefs (AOB 102-03; ARB 121-24), although Hyatt may have had concerns about industrial espionage and maintaining secrecy regarding his patent work (Pet. 8 (lines 1-5)), there was absolutely no evidence that in all of the years since FTB's disclosures of Hyatt's Tara address, he was ever the target of industrial espionage, theft of his patent work, or any other actual damage whatsoever resulting from the disclosure of his

Tara address.  There was no evidence of any damages whatsoever caused by FTB's limited disclosure of Hyatt's Tara address.[1]

### 2. Statute of limitations

FTB's defense based upon the statute of limitations also provides an independent ground for rejecting Hyatt's privacy claim based upon disclosure of the Tara address.  As FTB argued in its opening and reply briefs, Hyatt's invasion of privacy claim was barred by the two-year statute of limitations.  AOB 96-98; ARB 101-107.  FTB sent Hyatt (through his CPA) a detailed 39-page letter on August 2, 1995, thoroughly disclosing all of the details of FTB's audit investigation.  66 AA 16388-427.  This letter made clear that FTB had obtained information related to Hyatt's Tara home that could only have been obtained by disclosing his address to third parties.  FTB's letter disclosed that "Southwest Gas Corporation has provided information that Gilbert Hyatt is not the customer of record for 7335 Tara."  66 AA 16396.  The letter disclosed that "The Las Vegas Valley Water District has provided information that the account for 7335 Tara was established on 4/1/92."  *Id.*  The letter also stated that "Silver State Disposal Service in Las Vegas has provided information that the account at 7335 Tara was opened on 4/1/92 in the name of Michael Kern [Hyatt's CPA]."  *Id.*

The statute of limitations commences when a party discovers, or reasonably should have discovered, facts supporting a cause of action.  "Inquiry notice" is sufficient.  *Massey v. Litton*, 99 Nev. 723, 728, 669 P.2d 248, 251 (1983).  Hyatt

---

[1] As Hyatt conceded, the $52 million jury award for invasion of privacy damages did not include emotional distress damages, which were "different and separate from" the invasion of privacy damages.  RAB 132.  The jury awarded emotional distress damages ($85 million) separately.  54 AA 13309.

8

filed his lawsuit more than two years after receiving FTB's disclosures regarding dissemination of his Tara address. His invasion of privacy claim, based upon disclosure of that address, was clearly barred by the statute of limitations.

### III

### HYATT'S SOCIAL SECURITY NUMBER

Hyatt contends that this court overlooked or misapprehended the law when it concluded that FTB's dissemination of his social security number was not actionable, "because it was contained in decades-old court records." Pet. 8. Specifically, Hyatt contends that this court overlooked or misapprehended case law establishing an expectation of privacy in a person's social security number. Pet. 9-10. Hyatt made the identical argument in his answering brief. RAB 97-103. He specifically argued that this court should reject FTB's references to Hyatt's social security number "buried in decades old court files," and "buried in old government records, not easily accessible." RAB 97. Hyatt's petition cites many of the same cases he cited in his answering brief. RAB 99-101. As such, his petition violates NRAP 40(c)(1), which prohibits a party from rearguing matters already presented in the briefs.

This court obviously did not overlook Hyatt's arguments and legal authorities in the answering brief. The opinion discusses and analyzes the public records defense, under which a defendant cannot be liable for disclosing information that was already public. Op. 26. The opinion refers to "old court documents" that contain Hyatt's information. Op. 26. The opinion then specifically addresses the contention that Hyatt is now again making in his rehearing petition: "Hyatt maintains that these earlier public disclosures were from long ago, and that the disclosures were only in a limited number of documents, and therefore, the information should not be considered as part of the public domain."

9

Op. 27.   The court rejected Hyatt's contention, citing established Nevada precedent, and holding that there is no time limit on the application of the public records defense. Op. 27.

In essence, Hyatt's rehearing petition is indirectly asking this court to overrule *Montesano*, on which this court relied.   Op. 26.   The *Montesano* court rejected the idea that isolated or stale public records cannot be the bases of the public records defense. *Montesano* involved dissemination of information relating to an arrest of the plaintiff that occurred when the plaintiff was a minor.   The publication occurred 24 years later. The *Montesano* court held that, despite the old age of the public records, "materials property contained in a court's official records are public facts." *Id.* At 649.

Hyatt's answering brief did not ask this court to overrule *Montesano* regarding old public records.   To the extent that Hyatt is now attempting to use his rehearing petition as an avenue to overrule *Montesano,* Hyatt's effort should be flatly rejected.   See NRAP 40(c)(1)(no point may be raised for the first time on rehearing). In any event, *Montesano* is still good law and should not be discarded.

Accordingly, Hyatt is absolutely wrong in his contention that this court overlooked or misapprehended his argument that "decades old" public records can be ignored.

It is noteworthy that at the time of FTB's audit activities in the early 1990s, many of Hyatt's public disclosures of his social security number were not "old" at all.   For example:

1.   Hyatt disclosed his social security number in his divorce filings in 1975 (80 AA 19811), but the case was re-opened and it was still ongoing in the early 1990s.  82 AA 20308; 83 AA 20599.

10

2. In 1991, Hyatt was embroiled in probate litigation involving his mother's estate. On September 25, 1991, he filed a probate court declaration with two attached exhibits showing that in November of 1990 he had disclosed his social security number to his three adversaries in the case. The exhibits attached to Hyatt's court-filed declaration contained his social security number. 78 AA 19387(Affid. ¶20), 19393 (exhibits containing social security number).

3. In December of 1992, Hyatt disclosed his social security number in a business license application with the State of Nevada. 78 AA 19426.

4. Also in December of 1992, he disclosed his social security number in a business license application with the City of Las Vegas. 78 AA 19429.

5. In July of 1994, he disclosed his social security number in his Nevada voter registration form. 78 AA 19441.

As part of his argument, Hyatt also contends: "In this age of identity theft, old conceptions of when it is okay to disclose an individual's social security number must be revised for a modern age." Pet. 10 (lines 18-19). This ignores the fact that FTB's conduct occurred in the early 1990s, when social security numbers were commonly used as a means of identification. E.g., 77 AA 19100-02 (voter registration form); 78 AA 19429 (business license application). For example, social security numbers were used by the Nevada DMV as drivers' license numbers; and when people cashed checks, they were typically asked to provide their drivers' license numbers (which were their social security numbers).[2] 48 AA 11801(94-97).

---

[2] Until 1995, a county clerk in Nevada could provide a voter's social security number in response to an inquiry, because such information was a matter of public record. In 1995, NRS 293.558 was amended to preclude the county clerk from providing a registered voter's social security number, driver's (continued)

11

In the early 1990s, identify theft concerns were not nearly as prevalent as they are today.  Hyatt recognizes that "almost everyone's social security number is in some kind of public record," and that in Nevada, "social security numbers were on individual driver's licenses for a long time."  Pet. 9 (lines 21-23).  Hyatt cites a California statute that protects confidentiality of social security numbers, but he concedes that this statute "was recently passed."  Pet. 11 (lines 25-26).

Despite modern views regarding privacy of social security numbers, FTB's conduct must be evaluated by standards that existed at the time of the conduct, i.e., the early 1990s.  Individuals should have an opportunity to know what the law is and to conform their conduct accordingly.  *Landgraf v. USI Film Products,* 511 U.S. 244, 265, 114 S.Ct. 1483, 1497 (1994).  For that reason, "the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal."  *Id.*  In the present case, FTB's conduct occurred more than 20 years ago, when prevailing standards were different from today's standards.  It would be grossly unfair for this court to accept Hyatt's proposal to hold FTB liable for violating modern privacy standards regarding social security numbers, when those standards did not exist at the time of FTB's activities.

This court was absolutely correct in determining that Hyatt's social security number had been publicly disclosed on several occasions before FTB's disclosures

---

(continued) license number or identification number under any circumstance. NRS 293.558(2). Under the amended statute, however, a voter's address and telephone number are part of the public record open to public disclosure unless the voter specifically requests that such information is withheld from public access. NRS 293.558(3). There was no evidence that Hyatt made such a request.

12

occurred. Op. 26. The court was also correct in observing that Hyatt had disclosed the information himself. Op. 27. Hyatt's reliance on the fact that some of the public disclosures were "old" does not change the result. As Hyatt's attorney correctly observed in his closing argument to the jury: "Once your privacy has been gone, you can't get it back." 52 AA 12907 (80) (lines 4-5). Here, once Hyatt himself disclosed his social security number to members of the public and in his public court-filed papers, his privacy in that information was gone, and he could not get it back.

## IV

## CONCLUSION

For the foregoing reasons, Hyatt's petition for rehearing lacks merit and should be denied.

Dated: *Oct. 21, 2014*

*Robert L. Eisenberg*

ROBERT L. EISENBERG (NSBN 0950)
Lemons, Grundy & Eisenberg
6005 Plumas Street, Third Floor
Reno, Nevada 89519
Telephone No.: (775) 786-6868


PAT LUNDVALL (NSBN 3761)
McDonald Carano Wilson LLP
100 West Liberty Street, 10th Floor
Reno, Nevada 89501
Telephone No. (775) 788-2000


Attorneys for Appellant
Franchise Tax Board of the State of
California


13

## CERTIFICATE OF COMPLIANCE FOR
## ANSWER TO HYATT'S PETITION FOR REHEARING

1.  I hereby certify that this answer to Hyatt's petition for rehearing complies with the formatting requirements of NRAP 32(a)(4), the typeface requirements of NRAP 32(a)(5) and the type style requirements of NRAP 32(a)(6) because this answer has been prepared in a proportionally spaced typeface using in 14 point Times New Roman type style.  This answer also complies with the word limitation of NRAP 40(b)(3) because it contains 3,579 words.

DATED: _Oct. 21, 2014_

ROBERT L. EISENBERG (NSBN 0950)
Lemons, Grundy & Eisenberg
6005 Plumas Street, Third Floor
Reno, Nevada 89519
Telephone No.: (775) 786-6868

Attorneys for Appellant
Franchise Tax Board of the State of
California

## CERTIFICATE OF MAILING

I certify that I am an employee of Lemons, Grundy & Eisenberg and that on this date Appellant's Answer to Respondent's Petition for Rehearing was filed electronically with the Clerk of the Nevada Supreme Court, and therefore electronic service was made in accordance with the master list as follows:

Peter Bernhard
Mark Hutchison
Pat Lundvall
Michael Wall
Daniel Polsenberg

I further certify that on this date I served a copy, postage prepaid, by U.S. Mail to:

Donald J. Kula
Perkins Coie
1888 Century Park East, Suite 1700
Los Angeles, California  90067-1721

DATED: _10/21/14_

_[signature]_

1  Donald J. Kula, Bar No. 144342
   DKula@perkinscoie.com
2  PERKINS COIE LLP
   1888 Century Park E., Suite 1700
3  Los Angeles, CA  90067-1721
   Telephone:  310.788.9900
4  Facsimile:  310.788.3399

5  Erwin Chemerinsky, Esq.,
   EChemerinsky@law.uci.edu
6  UC IRVINE SCHOOL OF LAW
   401 E. Peltason Drive, Suite 1000
7  Irvine, CA  92697-8000
   Telephone:  949.824.8814
8  Facsimile:  949.824.7336

9  Malcolm Segal, Bar No.  075481
   MSegal@segal-pc.com
10 SEGAL & ASSOCIATES, PC
   400 Capitol Mall, Suite 2550
11 Sacramento, CA  95814
   Telephone:  916.441.0886
12 Facsimile:  916.475.1231

13 Attorneys for Plaintiff  Gilbert P.  Hyatt

14            UNITED STATES DISTRICT COURT

15          EASTERN DISTRICT OF CALIFORNIA

16

17 GILBERT P. HYATT,                  | Case No.

18            Plaintiff,              | **COMPLAINT FOR INJUNCTIVE RELIEF UNDER 42 U.S.C. § 1983 BASED ON:**

19            v.

20 JOHN CHIANG, JEROME E.             | **1.  VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION; AND**

21 HORTON, AND MICHAEL COHEN,
   CALIFORNIA FRANCHISE TAX

22 BOARD MEMBERS; BETTY T. YEE,

23 GEORGE RUNNER, MICHELLE            | **2.  VIOLATIONS OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**

24 STEEL, JEROME E. HORTON, AND
   JOHN CHIANG, CALIFORNIA

25 STATE BOARD OF
   EQUALIZATION MEMBERS; AND

26 DOES 1 THROUGH 20,

27            Defendants.

28

1     Gilbert P. Hyatt ("Plaintiff" or "Hyatt") files this Complaint in the United
2  States District Court for the Eastern District of California ("Court") seeking
3  injunctive relief against John Chiang, Jerome E. Horton, and Michael Cohen, in
4  their official capacities as California Franchise Tax Board members, and Betty T.
5  Yee, George Runner, Michelle Steel, Jerome E. Horton, and John Chiang, in their
6  official capacities as California State Board of Equalization members, (collectively
7  "Defendants" or "Defendant government actors"), and respectfully alleges and
8  states as follows:

**NATURE OF ACTION**

10     1.    This is a civil action under 42 U.S.C § 1983 seeking injunctive relief
11  against the Defendant government actors to prevent further acts by Defendants,
12  under the color of law, depriving Plaintiff of rights secured by the United States
13  Constitution under both the Due Process and the Equal Protection Clauses,
14  respectively, of the Fourteenth Amendment.  The injunction sought would enjoin
15  and put an end to a pending state government administrative process that has now
16  taken *over 20 years*, is not complete, and for which the Plaintiff Hyatt can no longer
17  receive a full and fair adjudication on the merits due to the extreme passage of time
18  and resulting loss of material evidence.

19     2.    Specifically, more than 22 years ago in 1991 Hyatt moved from
20  California to Nevada and more than 20 years ago *in 1993* the California Franchise
21  Tax Board (the "FTB") commenced an audit and an investigation of Hyatt to
22  determine whether he owed additional state income tax for the *1991 tax year*.  As of
23  today, this administrative process is still ongoing.  Similarly, a second audit and
24  investigation commenced by the FTB in 1996 and directed at Hyatt for the *1992 tax*
25  *year* continues and is also in administrative limbo.

26     3.    For the last six years, this administrative process has been stalled in an
27  administrative appeal before the California State Board of Equalization (the
28  "SBE").  There is no functional independence between the FTB and the SBE as two

1  of the five board members of the SBE also constitute two of the three board

2  members of the FTB.

3        4.     The *20 year delay* and failure and refusal to complete the

4  administrative process has irreparably prejudiced Hyatt and is so egregious that it

5  now denies Hyatt his right to due process under the law.  Specifically, because of

6  the *20 year delay* Hyatt can no longer obtain a fair and full adjudication of whether

7  he owes state taxes to California.  During this time, material witnesses have passed

8  away, memories of witnesses have faded, and documents relevant and important to

9  Hyatt are no longer available.  Moreover, during this time the FTB has changed and

10 added theories to tax Hyatt and asserted new "facts" in the administrative process

11 for which it has a presumption of correctness in its favor, while Hyatt has the

12 burden to rebut the FTB's asserted new "facts" more than 22 years after-the-fact.

13 Without this Court's grant of the relief that Hyatt seeks, the egregious and unlawful

14 state government conduct that has irreparably prejudiced Hyatt will continue

15 unabated in violation of Hyatt's due process rights as Hyatt may be assessed taxes,

16 penalties and interest for the 1991 and 1992 tax years — a period from more than 22

17 years ago — but due to this long delay Hyatt has no plain, speedy and efficient

18 remedy in state court in which he can obtain a full and fair hearing challenging any

19 final administrative action and adjudicating whether any taxes, penalties or interest

20 are actually owed for those years.

21       5.     Further, Hyatt has been singled out by these government actors who in

22 bad faith have engaged in conduct, or failed to stop conduct, unlike that directed at

23 any other citizen and in direct violation of Hyatt's right to equal protection under

24 the law.  Without this Court's grant of the relief that Hyatt seeks, the FTB's 20 plus

25 year vendetta to "get" Hyatt will continue indefinitely and unabated in violation of

26 Hyatt's equal protection rights.

27       6.     The named Defendant government actors have allowed this conduct to

28 occur, despite their responsibility to bring the administrative process to an end.  By

-3-                          COMPLAINT FOR INJUNCTIVE RELIEF

1   the FTB's own internal guidelines, audits are to be completed by the FTB in two

2   years.  Then an administrative protest filed by a taxpayer challenging the audit

3   results is to be completed in 1 to 2 years.  In this case the FTB took over 14 years to

4   complete the audit and protest, and the FTB is now six years and counting into

5   administrative appeal, being heard by the SBE.  The FTB has done everything in its

6   power to delay and extend this appeal preventing its conclusion such that now

7   Hyatt has been irreparably prejudiced by this delay of over 20 years.

8          7.     After more than 20 years of waiting for the FTB and the SBE to

9   complete this administrative process, Hyatt has no plain, speedy and efficient

10  remedy under California state law that will provide him a full and fair hearing on

11  whether state taxes are owed, thereby negating any prohibition of federal court

12  injunctive relief against Defendants and differentiating Hyatt's case from any prior

13  case that has sought this type of injunctive relief.  The appropriate remedy therefore

14  is to enjoin the individual Defendant government actors from continuing to

15  investigate and audit or otherwise proceed with the administrative process against

16  Mr. Hyatt for the 1991 and 1992 tax years, or any subsequent years based on the

17  claims and the assertions the FTB has made in the current pending administrative

18  proceeding for which relief is sought.

19         8.     Defendants acting in their official capacities, have threatened, and

20  continue to threaten, Hyatt with *$55 million plus* of unconstitutional exactions,

21  specifically the assessment of state income taxes, penalties, and more than 22 years

22  of interest on the assessed taxes and penalties, for tax years 1991 and 1992.

23  Without the injunctive relief sought by Hyatt, and specifically because of the loss of

24  evidence that has occurred during the extreme delay in completing the

25  administrative process, Hyatt will suffer irreversible and irreparable harm including

26  continued and ongoing deprivations of his federal constitutional rights if the FTB is

27  now allowed to assess and collect state taxes, penalties, and interest thereon, despite

28  the 20 plus year delay in completing the administrative process.

                                    -4-                COMPLAINT FOR INJUNCTIVE RELIEF

**THE PARTIES**

9.    Hyatt is a resident of the State of Nevada.

10.    In 1990, while residing in California, the United States Patent Office issued to Hyatt a patent for the single chip microcomputer that spawned the personal computer revolution.  At least one publication referred to him as the 20th Century's Thomas Edison.

11.    Hyatt permanently moved from California to Nevada in September 1991.  He has continuously resided in Nevada since September 1991, he still resides in Nevada to this day more than 22 years later, and he intends to reside in Nevada for the rest of his life.  The FTB asserts, however, that Hyatt became a Nevada resident on April 3, 1992.  Thus, the disputed residency period covers a mere six month period.

12.    The FTB, by and through Defendants John Chiang, Jerome E. Horton, and Michael Cohen, acting in their official capacities as FTB Board members, is the California state agency responsible for administering and enforcing California's personal income tax laws, including the taxation of individuals on the basis of their alleged residency in California.

13.    The SBE, by and through Defendants Betty T. Yee, George Runner, Michelle Steel, Jerome E. Horton, and John Chiang, in their official capacities as SBE Board members, is the California state agency responsible for hearing and deciding administrative appeals filed by taxpayers (including individuals alleged by the FTB to owe taxes, and therefore collectively referred to herein as "taxpayers" whether or not taxes are actually owing to the FTB) who have been audited and assessed taxes by the FTB.  This includes individuals assessed taxes on the basis of their alleged residency in California or on the basis of alleged California "source" income from rights in intellectual property that was allegedly sourced in California.

14.    Upon completion of the administrative appeal to the SBE and denial or partial denial of the appeal, a taxpayer assessed taxes, penalties, and/or fines on the

1  basis of alleged residency in California for the year(s) in question may file a

2  declaratory relief action in California Superior Court seeking a *de novo*

3  determination as to whether the assessed taxes are owed to the State of California

4  *without having to pay the assessed taxes, penalties and interest*.  (*See* Cal. Rev. &

5  Tax Code § 19381; Cal. Civ. Proc. Code § 1060.5.)

6       15.    On the other hand, upon completion of the administrative appeal to the

7  SBE and denial or partial denial of the appeal, a taxpayer assessed taxes, penalties,

8  and/or fines on the basis of alleged California "source" income, or any basis other

9  than residence, may challenge the assessment in California Superior Court but must

10  pay the outstanding assessment and seek a refund by filing an action for a refund in

11  California Superior Court.

12       16.    But as set forth in detail below, the manner in which Defendants have

13  acted over the last 20 plus years has deprived Hyatt of his due process rights and

14  equal protection rights under the United States Constitution if Defendants are

15  allowed to continue to assess and collect, or threaten to assess and collect, state

16  income taxes from Hyatt for the 1991 and 1992 tax years.  The 20 plus year process

17  has now already reached the point that Hyatt cannot obtain a full and fair *de novo*

18  trial in California Superior Court on the issue of his residency or any other basis for

19  which the FTB seeks to tax Hyatt for the 1991 and 1992 tax years due to the loss of

20  evidence that has occurred during the 20 year delay in completing the

21  administrative process.  Hyatt therefore seeks injunctive relief in this action

22  prohibiting Defendants from continuing to assess or collect, or threaten to assess or

23  collect, state income taxes from Hyatt for the 1991 and 1992 tax years.

24                 **SUMMARY OF CLAIMS AND RELIEF SOUGHT**

25       17.    More than *22 years* after Hyatt's move to Nevada and more than *20*

26  *years* after the start of the 1991 tax-year audit, the state administrative process

27  stemming from the FTB's audits is still far from complete.  The FTB, under the

28  control and direction of Defendants Chiang, Horton, and Cohen, in their official

1    capacities as FTB board members, continues to investigate, issue subpoenas, take

2    depositions, and otherwise seek evidence against Hyatt, during the appeal before

3    the SBE, for events that occurred between the disputed period of September 1991

4    and April 1992, some *22 years ago*.  In the FTB's never ceasing attempts to assess

5    new taxes, interest and penalties, it has as late as 2013 extended the taxable periods

6    at issue and introduced new theories for its assessments against Hyatt.  This is

7    despite California law that mandates that *"[a]s soon as practicable after the return*

8    *is filed*, the [FTB] shall examine it and shall determine the correct amount of the

9    tax." (*See* Cal. Rev & Tax Code § 19032.)

10       18.    Hyatt as a private citizen lacks adequate recourse in California state

11   forums to bring the FTB's 20 plus year administrative process to a conclusion.

12   Moreover, the FTB, with the SBE's approval, continues to investigate, gather

13   evidence, and prolong the never-ending administrative process and without regard

14   to the requirements of the Constitution.

15       19.    Hyatt is now 76 years old, and every indication is that the FTB ─ with

16   the SBE's sanction ─ has been simply waiting for the ultimate prejudice to occur to

17   Hyatt and leave it for his estate to try and fend off the FTB's claims, old and new,

18   without the benefit of Hyatt.  In so waiting, Defendants have now caused Hyatt

19   irreparable prejudice in regard to any future *de novo* action Hyatt may be entitled to

20   file in California Superior Court once the administrative process is complete.

21   Without Hyatt, his estate will be even more severely prejudiced in any *de novo*

22   court action that must be brought to challenge the FTB's assessments, whether

23   based on "residency", "source income" or any new theory the FTB attempts to

24   craft.  But already at this point it is too late.  Too much evidence has already been

25   lost over the last 20 years for there to be a full and fair adjudication of these issues.

26       20.    Hyatt has therefore already been irreparably prejudiced by the 20 plus

27   year delay.  The Defendants' abject delay and refusal to conclude this government

28   investigation and administrative process now violates Hyatt's constitutional rights

1   because he can no longer obtain a fair adjudication on the issue of whether state

2   taxes, penalties or interest are owed from over *22 years ago*. The administrative

3   process is currently stalled in an administrative appeal before the SBE, under the

4   control and direction of Defendants Yee, Runner, Steel, Horton, and Chiang, in

5   their official capacities as SBE board members. As stated above, Hyatt has a

6   theoretical right under California law *if and when* the State completes its now over

7   *20 year* investigation and administrative process to challenge the State's findings

8   and any assessments against him in California Superior Court in a *de novo* litigation

9   that itself will take many more years to complete. But already due to the passing of

10  material witnesses, the fading of memories, and the unavailability of documentary

11  evidence from more than *22 years ago*, Hyatt has been irreparably prejudiced in his

12  ability to demonstrate in a court of law that no taxes are owed to the State of

13  California for the 1991 and 1992 tax years. Relevant evidence has now been

14  altered and diminished to the point that any assessment against Hyatt for the 1991

15  and 1992 tax years would amount to an unlawful government taking in violation of

16  the Due Process Clause, including the requirement that Hyatt be afforded a

17  meaningful opportunity to be heard.

18        21.    To put in context the 20 year delay and how it has prejudiced Hyatt,

19  the actual tax assessment the FTB asserted against Hyatt for the 1991 tax year was

20  $1.8 million and for the 1992 tax year was $5.6 million. Both significant sums and

21  vigorously disputed by Hyatt. But now with the passage of time and the FTB's

22  delay and refusal to conclude the administrative process, again with the permission

23  and approval of the SBE, with penalties and interest, the total assessment against

24  Hyatt now sought by the FTB exceeds ***$55 million*** (about 800% more than the tax

25  assessments) and continues to grow with 3% interest compounded daily. Because

26  of the 20 year delay, Hyatt does not have a plain, speedy and efficient remedy in a

27  state forum.

28        22.    Defendants have simply taken too long to complete the investigation

-8-                              COMPLAINT FOR INJUNCTIVE RELIEF

1   and administrative process, and too much material evidence is no longer available.

2   Prejudicial delay in the extreme has occurred.  A fair adjudication within the

3   requirements of the Constitution including the requirements of the Due Process

4   Clause is no longer possible.  The investigation and administrative process directed

5   against Hyatt for over *20 years* has been under the unilateral control of the

6   Defendant government actors who have failed and refused to complete the

7   investigation and administrative process against Hyatt in violation of his

8   constitutional rights.

9         23.   The delays in completing the administrative process fall squarely and

10  primarily at the feet of the FTB.  While the FTB has at times attempted to assert

11  that Hyatt was a cause of the delays, the FTB was entirely in control of the process

12  from commencement of the first audit in 1993 until the process reached the

13  administrative appeal before the SBE in 2008.  It was the FTB that for 11 years

14  (from 1996 until 2007) refused to process and complete the protests thereby

15  preventing Hyatt from filing the administrative appeal until 2008.  Further, the FTB

16  has various options it can invoke by statute and regulation if a taxpayer is causing

17  delays.  These include failure to furnish penalty assessments and terminating the

18  audit and making assessments.  Indeed, terminating the audit and issuing a

19  proposed assessment is the FTB's strongest option where a taxpayer is the cause of

20  delays in the process.  The FTB never assessed a failure to furnish penalty against

21  Hyatt during the audit.  Nor did the FTB invoke or even threaten to terminate the

22  Hyatt audit.  Instead as detailed below the FTB internally put a hold on the protest

23  and disregarded Hyatt's repeated requests to conclude the protests and to issue a

24  final decision in the protests, which stretched to 11 years.

25        24.   Indeed, this long and continuing delay, which is in direct contradiction

26  to FTB internal guidelines, significantly benefits the FTB.  First, the assessments

27  incur interest, compounded daily, plus penalties.  Second, the FTB's new residency

28  positions, determinations, and proposed tax assessments are presumed to be correct

1   in the now pending administrative appeal without the FTB having the burden to

2   provide evidence in support of its new residency positions, determinations, and

3   proposed tax assessments.  But Hyatt has the burden to provide evidence to rebut

4   the FTB's new residency positions which are presumably correct.

5          25.    The SBE for its part has failed to set a date for a hearing in Hyatt's

6   case despite years of proceedings.  In the pending administrative appeal, the burden

7   will be on Hyatt to prove that the FTB's residency determinations and proposed tax

8   assessments are erroneous.  But material witnesses have passed away, memories of

9   witnesses have faded, and documents relevant and important to Hyatt are no longer

10  available.  Thus, the FTB's long delay coupled with its changes in position by

11  introducing new issues, new assessment theories and new discovery requests

12  against Hyatt is self-serving and beneficial to the FTB.  And the FTB is

13  unabashedly adding new positions and new theories 20 years after the proceedings

14  started.  Conversely, the long delay significantly prejudices Hyatt by imposing an

15  overwhelming burden on him to rebut the FTB's alleged new and changing

16  positions and "determinations" with documentary and testimonial evidence more

17  than *22 years* after the disputed period of September 1991 to April 1992.  Hyatt,

18  now more than 22 years after the fact, must attempt to rebut these "new" alleged

19  facts and arguments with credible evidence that is in many cases no longer

20  available or accessible.

21         26.    The SBE for its part approvingly allows the FTB to create the uneven

22  and unfair playing field by permitting and approving the unprecedented delay of the

23  administrative process and by permitting the FTB to introduce new assessment

24  theories and investigations against Hyatt with no end in sight.  In addition, the SBE

25  lacks any meaningful independence from the FTB and *vice versa*.  The FTB's

26  requests for extensions and further briefing have been freely and routinely granted

27  by the SBE.  Furthermore, the FTB's subpoenas, deposition notices, and

28  investigations are made outside of the SBE and do not have and do not need SBE

1  approval.  The FTB is therefore able to continue to introduce new issues and new

2  evidence and take new positions against Hyatt and is seeking to re-brief issues that

3  had been previously briefed.

4       27.    Due to the presumption of correctness under the California law

5  underlying the FTB's determination and tax assessments, any residency evidence

6  presented or briefing submitted by the FTB in the administrative appeal puts the

7  burden on Hyatt, now more than 22 years after the fact, to rebut these alleged facts

8  and arguments with credible evidence that is in many cases no longer available or

9  accessible.  The FTB is thereby able to make self-serving claims which are

10  presumed by the SBE to be correct, and Hyatt has to attempt to obtain credible

11  evidence on 22 year old events to rebut the FTB's presumption of correctness.

12       28.    The FTB has every incentive to delay the administrative process to

13  benefit itself.  Indeed, the longer the delay the more it potentially benefits the FTB

14  and irreparably prejudices Hyatt.  The FTB attempts to use the presumption of

15  correctness to assert new facts and take different positions against Hyatt over 20

16  years after the events at issue leaving Hyatt to have to seek evidence that no longer

17  exists but is needed to overcome the FTB's grossly tardy assertions and

18  presumption of correctness.  The more new briefing the FTB is given by the SBE,

19  the more the FTB can and does assert new facts and take different positions for

20  which Hyatt must overcome the presumption of correctness, thereby escalating the

21  deprivation of due process.  A line has long since been crossed by the FTB and due

22  process can no longer be had by Hyatt.  A prime example is the FTB's new

23  assessments for tens of millions of dollars in taxes, penalties, and interest in 2013

24  for the time period extending beyond the 1992 disputed period and the prejudice to

25  Hyatt based upon the massive loss of documents and witness memories due to the

26  passage of time.

27       29.    The over 20 year campaign against Hyatt by the FTB is also

28  unprecedented as the FTB has, in bad faith, singled him out as a "class of one" and

1    is intent on "getting him" and having him pay taxes for the 1991 and 1992 tax

2    years, despite internal FTB documents from the time of the audits almost *20 years*

3    ago which show key FTB personnel openly questioned the FTB's case against

4    Hyatt.  As described in more detail below in paragraphs 111 through 116 in Hyatt's

5    Second Claim for Relief under the Equal Protection Clause of the Fourteenth

6    Amendment:  (i) the lead FTB auditor openly stated that she was "going to get this

7    [taxpayer]" referring to Hyatt;  (ii) she made specific anti-Semitic remarks about

8    Hyatt who is Jewish;  (iii) she refused to document and instead "buried"

9    exculpatory evidence in Hyatt's favor;  (iv) a more experienced FTB auditor

10   familiar with the Hyatt audit file concluded that the lead auditor was obsessed with

11   Hyatt and failed to obtain his side of the story, and this experienced FTB auditor

12   complained internally to FTB management of the lead auditor's conduct;  (v) the

13   FTB reviewer of the audits, and others at the FTB, expressed internal dissent

14   regarding many of the lead auditor's conclusions and expressed doubt as to the case

15   against Hyatt, and (vi) the FTB nonetheless rubber-stamped the record setting

16   assessments against Hyatt and used these assessments to justify its budget

17   allocations for the state legislature.  Accordingly, under a "class of one" doctrine,

18   Hyatt is being denied equal protection under the law as alleged in his Second Claim

19   for Relief.

20         30.    The relief requested herein by Hyatt is not barred by the Eleventh

21   Amendment of the U.S. Constitution because Hyatt seeks injunctive relief under

22   Section 1983 against individual Defendants acting in their official capacities and

23   who are depriving Hyatt of rights protected by the U.S. Constitution.  The

24   continuing deprivation of Hyatt's constitutional rights has caused him irreparable

25   harm.

26         31.    The relief requested herein is not barred by the Tax Injunction Act (28

27   U.S.C. 1341) or by comity.  Defendants, acting in their official capacities, have

28   caused, and continue to cause, abject delays and have refused, and continue to

1    refuse, to conclude the investigation and administrative process that has been in

2    progress for *over 20 years,* and has deprived Hyatt of a plain, speedy and efficient

3    remedy in a state forum.  In particular, Defendants' 20 year delay, and counting, in

4    completing the administrative process far exceeds the typical and customary time

5    for such process, and in fact is unprecedented, and thereby has resulted in the very

6    antithesis of a speedy remedy.  Defendants' 20 year delay, and counting, has also

7    caused Hyatt undue hardship, required him to engage in ineffective activity and

8    required him to expend unnecessary costs, time, and energy, and thereby has also

9    resulted in the very antithesis of a plain and efficient remedy.  Further, Hyatt has

10   already been significantly harmed and prejudiced by the Defendants' abusive

11   delays because, among other reasons, material witnesses have passed away,

12   memories of witnesses have faded, and documents relevant and important to Hyatt

13   are no longer available.  Prior to this prejudice occurring, Hyatt could not pursue

14   the statutory process in California state court that taxpayers are otherwise accorded

15   by law (*see* Cal. Rev. & Tax Code § 19381; Cal. Civ. Proc. Code § 1060.5) because

16   the FTB along with the SBE failed to conclude the ongoing 20 year administrative

17   process.  It is now too late and due process cannot be had in any such state court

18   proceeding.  Indeed, the law requires, and Hyatt or anyone in his position is entitled

19   to, an exhaustion of the administrative process, including the still pending

20   administrative appeal, at which time all of the taxpayer's positions are reviewed and

21   considered before having to resort to state court for a *de novo* proceeding on the

22   issue of whether taxes are owed.

23         32.    While Hyatt could choose to forgo this administrative process by

24   electing to pay the assessed taxes, penalties and interest to the FTB and file a refund

25   claim, to do so he would have to (i) waive his statutory right to the administrative

26   process, a process designed and intended to hear his version of events and his

27   counter-arguments and thereby seek correction of FTB's errors and which if

28   successful ends the tax assessment process against him and (ii) pay the very

-13-                          COMPLAINT FOR INJUNCTIVE RELIEF

1    assessments he contests and which have already been found by one court to have

2    been made in bad faith by the FTB.  Hyatt, or anyone in his position, is not required

3    to voluntarily waive his statutory rights to administrative review simply because the

4    process is taking too long.  In fact, to suggest otherwise would create the perverse

5    incentive for the FTB and the SBE to simply delay and delay the administrative

6    process such that a taxpayer was required to waive his rights under that process and

7    pay the assessment in order to go directly to state court to obtain review of the

8    contested assessment before material evidence is lost when, as here, the FTB

9    refused to complete the administrative process even after 20 plus years.  That is

10    neither the design nor intent of California law, nor would it be consistent with due

11    process and equal protection as afforded by the United States Constitution.

12    Unfortunately in this case, the FTB and the SBE have acted in a manner that

13    deprived the law of accomplishing its purpose, resulting in Hyatt not having a plain,

14    speedy and efficient remedy in a state forum.  Hyatt's claim in this regard is not

15    prospective, but rather he has already been irreparably prejudiced leaving him no

16    plain, speedy and efficient remedy in state court. The Tax Injunction Act therefore

17    does not apply, and Hyatt is entitled to the requested injunctive relief from this

18    Court.

19         33.    Accordingly, Defendants must now be enjoined from further violations

20    of Hyatt's constitutional rights, from pursuing this investigation and administrative

21    process and barred from making any assessment of taxes or attempted collection of

22    taxes against Hyatt for the 1991 and 1992 tax years based on the "residency" and

23    "sourcing" theories and any other theories asserted by the FTB against Hyatt in the

24    administrative process.

25                        **JURISDICTION AND VENUE**

26         34.    This action is based upon, and seeks to redress violations of 42 U.S.C.

27    § 1983, the Due Process Clause and the Equal Protection Clause of the Fourteenth

28    Amendment of the U.S. Constitution, caused by Defendants acting under the color

1   of law, enforcing their practices, policies, customs, and usage of regulations

2   adopted, employed and ratified by their supervisors.  Accordingly, this Court has

3   jurisdiction over this action pursuant to 28 U.S.C. §1331 & 1343, in that this action

4   arises under the Constitution and laws of the United States.

5      35. Venue is proper in this Judicial District pursuant to 28 U.S.C. §

6   1391(b)(2) because a "substantial part of the events or omissions giving rise" to the

7   claims in this civil action occurred within the territorial limits of this Judicial

8   District.  Moreover, Sacramento is where the Defendants perform their official

9   duties, the place where they most frequently meet as a Board for the FTB and SBE,

10   respectively, and the location from which directives, rules and regulations are

11   issued to employees under their control and direction.

12   **FIRST CLAIM FOR RELIEF**

13   **(Violation and Continuing Violation of Hyatt's Due Process Rights**

14   **Under the Fourteenth Amendment of the United States Constitution**

15   **Warranting Injunctive Relief Under 42 U.S.C. § 1983 ─ against all**

16   **Defendants)**

17      36. Hyatt realleges and incorporates by reference herein paragraphs 1

18   through 35 above.

19      37. Section 1 of the Fourteenth Amendment of the United States

20   Constitution (the "Due Process Clause") provides that no State "shall deprive any

21   person of life, liberty, or property, without due process of law."

22      38. The Due Process Clause requires that state officials provide

23   individuals whose fundamental rights may be affected by state actions, including

24   property rights, with a meaningful opportunity to be heard with respect to the

25   governmental actions at issue.

26

27

28

**A.** **The 20 year (and counting) administrative process.**

*(i)* *The FTB's three year audit during which three different auditors worked the file (1993 to 1996).*

39.     In April 1992, Hyatt filed a 1991 *part-year* California income tax return putting the FTB on notice that he had moved away from California in 1991. In 1993, shortly after an FTB employee read an article in a local Los Angeles newspaper describing Hyatt's purported receipt of a significant sum of patent royalty payments, the FTB notified Hyatt that he was under audit for his 1991 part-year California state income tax return. Three different auditors worked on the 1991 audit between 1993 and 1996, including the third and eventual lead auditor, discussed in more detail below. But it was the first auditor who candidly admitted under oath to the FTB's interest in Hyatt. This first auditor acknowledged that what "popped" into his mind in reading the article about Hyatt was how much money he had made, recalling that Hyatt stood to make "hundreds of millions" of additional dollars from his patents. This was long after Hyatt had moved away from California. This prompted the first auditor to request Hyatt's state tax return records and open an audit of Hyatt's 1991 tax-year return.

40.     As the audit proceeded, none of the FTB auditors expressed any concern to Hyatt or his tax representatives regarding his 1991 *part-year* tax return. Two years later in August 1995, without warning or opportunity to address the assertions made against him, the FTB issued a lengthy Determination Letter informing Hyatt for the first time that the FTB intended to assess millions of dollars in taxes and penalties. For the first time the FTB asserted that Hyatt did not move to Nevada in September 1991, but rather asserted that he moved to Nevada in April 1992. A 75% penalty was assessed on the amount of assessed taxes for alleged fraud in regard to Hyatt's 1991 state income tax return.

41.     In April 1996, the FTB issued its formal proposed assessment of taxes, penalties, and interest against Hyatt for the 1991 tax year then totaling

-16-                                              COMPLAINT FOR INJUNCTIVE RELIEF

1    *$4,540,404.00*.

2           42.    In June 1996, Hyatt filed a formal "protest" (an internal FTB appeal

3    process) of the proposed assessment for the 1991 tax year, with a detailed refutation

4    of the FTB's audit conclusions.  The formal protest officially triggered what is

5    described by the FTB and under California law as an internal review by the FTB's

6    Protest Division which is supposed to consist of an independent arms-length fresh

7    look at the audit.

8           43.    Also in 1996, the FTB commenced a second tax audit of Hyatt, this

9    one for the 1992 tax year.  Later that year, without any additional investigation, the

10   FTB informed Hyatt that it would assess him *more than six million* additional

11   dollars in taxes and interest.  A year later, in 1997, the FTB added a 75% fraud

12   penalty for the 1992 tax year, increasing the total assessment against Hyatt by an

13   additional *four million dollars*, not including interest.

14          44.    In September 1997, the FTB issued its formal proposed assessment of

15   taxes, penalties, and interest against Hyatt for the 1992 tax year then totaling

16   *$14,115,941.00*.  Hyatt filed a formal and timely protest of the 1992 tax-year

17   proposed assessment, just as he had for the 1991 proposed assessment.

18                    ***(ii)    The 11 year protest during which the FTB assigned at least***
19                    ***four different protest officers (1996 to 2007).***

20          45.    The FTB refused to conclude Hyatt's protests of the audit results for

21   11 years.

22          46.    For the formal "protests" filed by Hyatt for both the 1991 and 1992 tax

23   years in 1996 and 1997, respectively, the FTB was required by law and its own

24   internal procedures to conduct an internal review by supposedly "independent"

25   FTB employees, and if necessary, re-investigate the facts underlying each audit.

26   Although Hyatt timely started the protest in 1996, the FTB dragged out the protest

27   period *for over 11 years*.  During the protest period, Hyatt's representatives

28   repeatedly asked the FTB to bring the protest proceedings to a close, as Hyatt could

-17-                                    COMPLAINT FOR INJUNCTIVE RELIEF

1  not proceed with a *de novo* administrative appeal to the SBE until the FTB's protest
2  officer formally closed the protests and issued its final protest determination.

3      47.    Between 1996 and 1998, the FTB's first protest officer was an FTB in-
4  house attorney who had actually counseled with the FTB auditors during the audit
5  and even re-wrote the fraud penalty narrative used by the FTB to assess Hyatt a
6  fraud penalty.  This protest officer was far from the "independent" FTB employee
7  required to administer a protest.  She admitted under sworn testimony that virtually
8  no work was done relative to the protests for the two years that she was assigned to
9  the protest.  Hyatt's administrative protests simply were not processed during this
10  time.  The FTB blamed it on the rush of other matters.

11      48.    In October 1998, the FTB replaced the first protest officer with a
12  second protest officer.  The second protest officer acknowledged under oath that he
13  did virtually no work on the protests during the four months he was assigned to
14  Hyatt's protest, blaming his workload on other matters as being too heavy.

15      49.    From 1999 to May 2000, a third protest officer was assigned to Hyatt's
16  protests.  Unlike the first two protest officers, the third protest officer did start
17  working on the protests.  She submitted the first substantive request for additional
18  information to Hyatt's tax attorney at the end of 1999, eight years after Hyatt
19  moved to Nevada, consisting of a 40-page Information/Document Request (known
20  as an "IDR").

21      50.    The third protest officer testified under oath in another proceeding that
22  she anticipated conducting a protest hearing relatively quickly and even sought to
23  mediate the parties' differences, and was even open to *possibly dismissing the*
24  *FTB's assessments* against Hyatt if her investigation warranted it.

25      51.    But in May 2000, the third protest officer was abruptly removed by
26  FTB management from further presiding over Hyatt's protests.  She testified under
27  oath that she was shocked and that she strongly disagreed with her supervisor's
28  decision to remove her as protest officer.  She was instructed *not to talk to or*

1    *transfer any records to* her replacement, the fourth protest officer.  In turn, the
2    fourth protest officer was considered a crony of or otherwise very "close" to the
3    FTB protest division supervisor.

4         52.    Thereafter in June of 2000, Hyatt responded to the FTB's IDRs,
5    producing a substantial volume of material and answering dozens of interrogatories.
6    In September and October of 2000, the fourth protest officer conducted separate
7    formal hearings for the 1991 tax-year and 1992 tax-year protests.  Following the
8    hearings, additional IDRs were issued by the FTB and responded to by Hyatt.  In
9    June of 2001, Hyatt's tax attorney wrote to the fourth protest officer confirming that
10   Hyatt has responded to all requests.  This was not disputed by the fourth protest
11   officer.

12        53.    The fourth protest officer testified under oath, again in another
13   proceeding, that she was ready to issue a decision on Hyatt's protests by the end of
14   2001.  But 2001 came and went and no decision was issued.

15        54.    In early 2002, with no decision having been issued by the FTB on the
16   protests, Hyatt's tax attorney again inquired as to the status of a decision on the
17   protests.  Hyatt's tax attorney was informed that the protests were on "hold," even
18   though the fourth protest officer had "written up" a decision on the protests and
19   could have completed a final Determination Letter for the protests with a few
20   weeks' notice in 2001.

21        55.    E-mails and an internal FTB event log for the protests confirm that the
22   FTB put Hyatt's protests on "hold."  The fourth protest officer recorded in the FTB
23   event log on February 20, 2002, "I told him [Hyatt's tax counsel] I was instructed
24   not to work on the case."  The FTB's highest ranking litigation counsel, wrote in an
25   email on April 5, 2002, "I think we should put things on hold with administrative
26   matters, in particular the recent draft letter."  Almost a year later, the fourth protest
27   officer wrote on February 20, 2003, "I am to do nothing on the case."

28        56.    On November 1, 2007, *11 years after the protests commenced,* the

1   FTB finally issued its internal determination of the protests, rubber stamping the

2   audit conclusions from 1995 and 1996, respectively, on the residency issue and

3   finding that no changes would be made to the proposed assessments.

4        57.    Indeed, the FTB went far beyond rubber stamping the audit results on

5   the residency issue.  In 2007, sixteen years after his move to Nevada, the FTB

6   added an additional and new legal theory for investigating and assessing Hyatt, a

7   legal theory premised on "sourcing" Hyatt's patent royalty income to California.

8   The FTB auditors had not asserted a sourcing theory against Hyatt during the

9   audits, and the FTB protest officers did not require briefing on or any other

10  response from Hyatt regarding the "sourcing" theory for taxing Hyatt.  In making

11  the determination to assess Hyatt under a "sourcing" theory for the 1991 and 1992

12  tax years, the FTB accepted the fact that Hyatt *was not* a California resident during

13  that disputed period, but rather was a resident of Nevada.  Moreover, the FTB

14  pursued the sourcing theory for assessing Hyatt despite the fact that an FTB team of

15  experts, which included the lead auditor, had determined that the FTB could not tax

16  Hyatt for "sourcing" and had reported this conclusion to top level FTB *management*

17  *in 1995*.

18       58.    In this regard, the FTB was so determined to tax Hyatt that it

19  determined a basis to tax Hyatt *if he was* a California resident during the disputed

20  period and a basis to tax Hyatt *if he was not* a California resident during the

21  disputed period.  The FTB, therefore, had effectively determined that whether or

22  not Hyatt was a resident of California during the disputed period he must pay

23  California tens of millions of dollars in state income taxes, penalties, and interest.

24       59.    On December 26, 2007, the FTB issued to Hyatt final assessments

25  called Notices of Action purportedly affirming the FTB's residency-based

26  assessment for the 1991 tax year and the 1992 tax year.  The Notice of Action for

27  the 1991 tax year asserted residency-based liabilities against Hyatt (including

28  accrued interest) in the amount of *$10,524,771.06*.  The Notice of Action for the

-20-                                    COMPLAINT FOR INJUNCTIVE RELIEF

1992 tax year asserted residency-based liabilities against Hyatt (including accrued interest) in the amount of *$29,088,458.29*.  The Notices of Action also included as another basis for taxing Hyatt, a *non-residency* "sourcing" assessment for the same 1991 tax year and 1992 tax year.  The FTB refused to take a definitive position as to whether Hyatt was a resident or a non-resident of California for the disputed period, instead the FTB held that Hyatt was a resident of California for a residency assessment of tens of millions of dollars and the FTB held that Hyatt was *not* a resident of California for a sourcing assessment of tens of millions of dollars for the same disputed period.

60.    The FTB has also conveyed its intentions to assess new taxes for future tax periods, including threats during the administrative appeal as discussed further below to audit the years 1993, 1994, and 1995.  But the FTB continues to hold this Sword of Damocles over Hyatt's head without making an assessment after much of his evidence for 1993, 1994, and 1995 is no longer available.  The FTB contends that there is no statute of limitations for the 1992 tax year and thereafter because Hyatt has not filed a California state income tax return for 1992 or any year thereafter.  The FTB therefore continues to investigate and introduce new issues regarding the 1992 tax year and beyond.  Hyatt of course did not file tax returns for 1992 and beyond because he has been a Nevada resident since September of 1991, and even the FTB took the position early in the administrative process that Hyatt moved to Nevada by April 1992.  Very recently, in 2013, the FTB has changed positions, assessing Hyatt tens of millions of dollars on income received after April 1992.  This requires Hyatt to seek new evidence for the post-April 1992 period more than 20 years after that period of time.

### (iii)    *The continuing administrative appeal before the SBE for which there is no end in sight for the briefing and for which no hearing date has ever been set.*

61.    On January 22, 2008, Hyatt exercised his right to appeal the FTB's determinations to the SBE.  By law, the SBE must conduct a *de novo* administrative

1    review of the FTB's audit determinations, in which it accepts limited briefing by

2    each party.  Thereafter, the SBE conducts a hearing on the appeal.  As described

3    above, after this administrative appeal is completed and if the final decision

4    rendered by the SBE is adverse to Hyatt, he may file a *de novo* action in California

5    Superior Court for a determination of when he changed his residency and/or if any

6    of his income was sourced to California, thereby challenging any adverse decision

7    in the administrative appeal conducted by the SBE.

8        62.    Hyatt's administrative appeal before the SBE has now been pending

9    for over six years, and the SBE, through Defendants Yee, Runner, Steel, Horton,

10   and Chiang, in their official capacities as Board Members of the SBE, have failed to

11   render a decision, and, in fact, the SBE has failed to even set a schedule for a

12   hearing.  As a result of daily compounding interest caused by the FTB's and SBE's

13   long and abusive delays, the combined total assessments of taxes, penalties, and

14   interest against Hyatt exceed *$55 million*.

15       63.    Indeed, the SBE is allowing continuing briefing.  The open-ended and

16   continuing nature of the FTB's investigations and of the SBE's proceeding not only

17   violate the Constitution but also directly violate the FTB's and the SBE's own

18   administrative rules and procedures including, for example, the SBE's rules of tax

19   appeals ("RTA"), which set forth the "General Briefing Schedule" for appeals from

20   FTB actions. Under RTA 5431(b) and (c), an appellant has a right to file an

21   Opening Brief and a Reply Brief, while the FTB has only the right to file an

22   Opening Brief.  Yet, the SBE has far exceeded the agency's own internal rules

23   governing administrative appeals.  As detailed below, after the briefing was

24   formerly closed by the SBE over a year ago, the FTB sought and was given leave to

25   re-brief the appeal and to brief new evidence that it recently subpoenaed.

26       64.    In regard to the briefing history, on December 9, 2008, Hyatt filed

27   Opening Briefs before the SBE for each of the tax years 1991 and 1992, which

28   were 95 pages and 75 pages, respectively, and accompanied by four boxes of

-22-                          COMPLAINT FOR INJUNCTIVE RELIEF

1   additional filings.

2      65.    In correspondence to the SBE dated January 27, 2009, the FTB sought

3   additional time for the filing of their Opening Briefs and cited as a basis for their

4   request that the FTB "will need time to investigate the new alleged facts, which

5   may require time for legal process." The FTB also cited specifically to 26 newly

6   sworn affidavits (but failed to acknowledge that most of these affidavits came from

7   witnesses who had been identified to the FTB in the administrative protests and

8   thus the FTB had ample time during the protest phase to investigate such

9   witnesses). The FTB then proceeded to issue subpoenas and take depositions of

10  third party witnesses 18 years after Hyatt's move to Nevada.

11     66.    On January 30, 2009, the FTB separately wrote to the SBE and asked

12  for either a "postponement" of the SBE proceeding or for Hyatt's appeals to be

13  "removed from the SBE's appeal calendar" and citing as a basis for their request

14  that the FTB "will need time to investigate alleged facts, which may require time

15  for legal process."

16     67.    On February 6, 2009, the SBE denied the FTB's request for

17  postponement and deferral and instead granted the FTB an additional three months

18  (from March 9, 2009 to June 7, 2009) to file their Opening Briefs.

19     68.    After requesting and receiving an additional extension, on September

20  15, 2009, the FTB filed their Opening Briefs for the 1991 and 1992 tax years,

21  which were 100 pages and 75 pages, respectively, with two boxes of additional

22  filings. The FTB also filed declarations of its private investigator regarding *new*

23  interviews that it had been taking.

24     69.    On August 23, 2010, Hyatt filed his Reply Briefs for each of the tax

25  years 1991 and 1992, which were each 100 pages and with four boxes of additional

26  filings. This was the conclusion of the SBE briefing as matter of right.

27     70.    In correspondence dated August 26, 2010, the SBE notified the FTB

28  that if they wished to request permission to file Reply Briefs, the FTB had until

-23-                          COMPLAINT FOR INJUNCTIVE RELIEF

1   September 10, 2010, to make such request.  The SBE had discretionary authority
2   whether to grant the FTB permission to file Reply Briefs and, not surprisingly, the
3   SBE granted the FTB permission to file such Reply Briefs.

4          71.    On September 1, 2010, the FTB did request permission to file Reply
5   Briefs in the SBE Appeals, and requested a page limit not to exceed 100 pages for
6   each brief and an extension of the filing date for such briefs beyond the 30 days
7   provided by RTA 5431(c)( 2)(C) to June 30, 2011, a significant additional amount
8   of time beyond the Reply Briefing schedule required under the SBE's own rules
9   and procedures.

10         72.    In their September 1, 2010 request, the FTB acknowledged that if the
11  SBE granted the FTB's request to file a Reply Brief Hyatt would then be entitled
12  under RTA 5431(c) to file Supplemental Briefs and expressed that it had no
13  objection to Hyatt receiving from the SBE comparable time and page number
14  allotments for such supplemental briefs.

15         73.    In correspondence dated September 20, 2010, the SBE granted the
16  FTB's request to file Reply Briefs with due dates of June 30, 2011.

17         74.    On June 30, 2011, nearly ten months after the FTB's request for
18  permission to file Reply Briefs in the SBE Appeals, the FTB filed their Reply
19  Briefs for each of the tax years 1991 and 1992, which were each 100 pages and
20  with two boxes of additional filings.  The FTB also filed declarations of its private
21  investigators regarding "*new*" investigations and interviews that the FTB had been
22  surreptitiously conducting against Hyatt during the SBE appeal process.

23         75.    On July 25, 2012, Hyatt filed his Supplemental Briefs, which he had
24  the right to file under RTA 5431(c) given the SBE's extraordinary grant to the FTB
25  for leave to file Reply Briefs in the SBE proceeding.

26         76.    On August 8, 2012, the SBE issued a letter declaring that:

27         Please note that **briefing is completed** for this appeal.  **We**
28

-24-                          COMPLAINT FOR INJUNCTIVE RELIEF

1
2
3

*will schedule the appeal for oral hearing* and you will

receive notice of the date and time of hearing at least 75

days in advance of the hearing date.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

77.     Notwithstanding the SBE's August 8, 2012, letter, a hearing has not been set.  In a letter dated April 29, 2013, the FTB requested to re-brief Hyatt's previously filed evidence and to rebut Hyatt's prior briefings notwithstanding the fact that briefing in the proceeding had already been extended and notwithstanding that the SBE had closed briefing in the case in the correspondence issued by the SBE on August 8, 2012.  It is understood that the FTB will re-brief the whole administrative appeal from the evidence in the Opening Briefs through the purported new evidence at issue in a New York court proceeding.  The FTB's "additional briefing" is likely to be delayed at least another 18 months pending the result of the FTB's appeal in a New York court of a subpoena (the "New York Appeal") for which the FTB seeks, and was denied, new discovery of wide ranging documents well outside the disputed tax period at issue in Hyatt's appeal.  When the FTB's additional briefing commences, this "additional briefing" is likely to take several more years given past rounds of briefing.

19
20
21
22
23
24
25

78.     The FTB referenced in its SBE opening appeal briefs in 2009 that it may expand the audit against Hyatt to include the years 1993, 1994, and 1995.  The FTB has never disclaimed this threat, nor has it taken any formal action to pursue an audit against Hyatt for those additional years.  The FTB is apparently keeping its options open, particularly the option of expanding the time period for which it will seek to assess Hyatt decades after the tax years at issue.  Again, this is the FTB's never ending administrative process to "get" Hyatt.

26
27
28

79.     In sum, the California tax proceeding is far from over.  But the California administrative delay has already unduly and irrevocably prejudiced Hyatt.

-25-                    COMPLAINT FOR INJUNCTIVE RELIEF

**B.     Extreme prejudicial delay: the loss of witnesses, memories and documents over the last 22 years.**

80.     The primary basis upon which the FTB asserts onerous taxes, interest and penalties are owed by Hyatt is that, the FTB contends, Hyatt moved to Nevada in April of 1992, while Hyatt contends he moved to Nevada in September of 1991 and has remained a resident of Nevada since that time (a residency theory).  This six month disputed period — September 1991 to April 1992 — is the time-frame upon which the FTB is assessing Hyatt tens of millions of dollars in taxes, penalties and interest since commencing its audit in 1993.  Again, the amount now sought by the FTB for this disputed six-month period is in excess of *$55 million*, mostly due to large interest components that continue to compound daily due to the FTB's and the SBE's long delays.

81.     In 2007, as described above, more than 14 years after commencing its audit, for the first time, the FTB asserted an additional and a new legal theory, *i.e.*, California "source income," to tax Hyatt for his patent royalty income.  This is a legal theory different from and incompatible with the FTB's residency theory.  In this sourcing legal theory, the FTB regards Hyatt as a California *non-resident*.  Thus, the FTB is assessing Hyatt both as a California resident and as a California non-resident for the same disputed period of time.  The FTB contends that its assessments of tens of millions of taxes, penalties and interest against Hyatt should also be affirmed on this "sourcing" basis because Hyatt's patents had allegedly acquired a business *situs* in California and his alleged business activities in California continued through the disputed period.  The amount sought by the FTB under this "sourcing" basis is also in excess of *$55 million*, also mostly composed of interest due to the long FTB delays.

82.     By the FTB's own acknowledgement, California residency determinations, *i.e.,* determining the date upon which an individual moved from California to a different state and ceased being a resident of California, is a fact

1   intensive determination.  Therefore, determining precisely when Hyatt moved to

2   Nevada, more than 22 years ago, which ultimately is Hyatt's burden in a *de novo*

3   action in California Superior Court, will require that Hyatt put forth witnesses and

4   documentary evidence sufficient to establish the date of his residence in Nevada.

5   But the FTB's now 20 year delay in completing the administrative process and

6   appeal described above, by and through the Defendants acting in the official

7   capacities for the FTB and SBE, respectively, has now prejudiced Hyatt with the

8   inevitable loss of witnesses, loss of witness recollection and inability to find

9   applicable documents due to the passage of time.

10          83.    More than 100 witnesses have passed away or are not healthy enough

11  or do not have clear memories to now provide competent testimony.  These include

12  individuals who would have been in a position to competently testify to facts

13  relevant to Hyatt's move away from California or his residency in Nevada during

14  the disputed period of September 1991 to April 1992 and/or to otherwise rebut the

15  FTB's assertions regarding Hyatt's residency during the disputed period.  Many of

16  these witnesses have suffered severe medical problems including heart attacks,

17  cancer, or Parkinson's disease, or have undergone severe medical procedures

18  including open heart surgery, implanted pacemakers, radiation treatment, surgery,

19  and in one case an implanted brain stimulation device.  Hyatt is unduly prejudiced

20  by not having these witnesses available in the ongoing administrative appeal or in

21  any subsequent Superior Court action.

22          84.    Another example of how Defendants have improperly used the passage

23  of time against Hyatt is that during the audits the FTB requested from Hyatt

24  information on his non-California professionals (*e.g.*, accountants, attorneys, and

25  engineers) as use of these professionals is at least a factor in determining residency,

26  and Hyatt provided in 1995 a list of 40 of his non-California professionals during

27  1991 and 1992.  But the FTB disregarded this list and failed to contact the

28  professionals on this list as part of its audit of Hyatt.  Hyatt also provided an

1    additional list in 2001 and briefed the FTB on more than 100 of his non-California

2    professionals, but the FTB similarly disregarded this list and failed to contact the

3    professionals on this list at that time.  Now, many of these non-California

4    professionals are deceased, have poor health, cannot be located, or have faded

5    memories.

6         85.    A substantial amount of documents has been lost or destroyed because

7    of the FTB's and the SBE's continuous and never-ending delays and the FTB's

8    continual introduction of new positions.  Moreover, it was not possible for Hyatt to

9    know during the audits that he would have needed many or most of these

10   documents because the FTB has continued to investigate and raise new issues.  For

11   example, in 2011, two decades after the tax year in dispute, the FTB first pursued

12   production of documents known as the "Philips documents," which are at issue in

13   the pending discovery dispute in a New York State Court.  But other documentary

14   evidence that would assist Hyatt to rebut, explain or address the Philips documents

15   has been lost, destroyed, or is otherwise unavailable.  In particular, all of the crucial

16   documents of Mahr Leonard, a company engaged by Philips in its licensing

17   program in the early 1990s and the entity that closed all of the licenses for Hyatt's

18   patents during the disputed period, were destroyed in about 1999 pursuant to a

19   document preservation program that has documents purged after a period of time.

20        86.    A second example of the prejudicial impact to Hyatt of lost documents

21   or otherwise unavailable documents is the evidence regarding alleged payments of

22   $100,000 from Pioneer and $400,000 from Philips in 1991.  The FTB disregarded

23   Hyatt's disclosures on his 1991 tax return regarding his income from Pioneer and

24   Philips in which Hyatt paid taxes on his income.  Then, in 2007, 16 years after the

25   tax year at issue, the FTB alleged that Hyatt underreported his income from Pioneer

26   and Philips and committed fraud related to the alleged underreported income.  By

27   that time, evidence relative to the payments by Pioneer and Philips was no longer

28   available to Hyatt.

COMPLAINT FOR INJUNCTIVE RELIEF

87.    A third example of lost or unavailable documents is the payment records on a promissory note from the sale of Hyatt's former California residence. During the audit, FTB did not request from Hyatt payment records on this promissory note. *But* in its 2009 briefing before the SBE, more than 16 years after it commenced its audit of Hyatt, the FTB alleged for the first time that Hyatt did not produce all the records of a third party regarding the payments on this note and that he committed fraud, in part, because of this alleged lack of evidence. Again, by 2009, this evidence regarding the payments on this note was no longer available.

88.    A fourth example of lost documents is the files related to Hyatt's lease of an apartment at the Wagon Trails apartments in Las Vegas beginning in October of 1991. During the audit in 1995, the FTB contends that it was told by a Wagon Trails representative to obtain Hyatt's consent in order to obtain the renter's file on his apartment. But no action was taken by the FTB. In 1999 Hyatt first learned that the renter's file was no longer available. In its briefings to the SBE in 2009 and thereafter, the FTB relies heavily on documents that it alleges were in the renter's file but which no longer exist.

89.    A fifth example of the prejudicial impact of lost or unavailable documents regards bank records from a former corporation operated by Hyatt. The FTB first raised the issue regarding these alleged missing bank records in its 2009 briefing before the SBE, more than 18 years after the corporation went inactive, and alleged that Hyatt committed fraud because the corporation's bank records were no longer available. However, the FTB did not request the corporation's bank records during the audits, despite the FTB being fully aware of the corporation as a result of its undisclosed investigation of the corporation.

90.    A sixth example of the prejudicial impact of lost or unavailable documents regards documents related to the post April 1992 time period. After two decades of taking the consistent position that Hyatt was no longer a California resident after April 2, 1992 and not assessing Hyatt taxes for any period thereafter,

1    the FTB changed its position in 2013 to now assess tens of millions of dollars in

2    taxes, penalties, and interest on Hyatt's income received after April 2, 1992, based

3    on the sourcing theory.  Obtaining evidence after more than 20 years regarding this

4    post April 1992 time period is particularly difficult.  For example, more than 50 Las

5    Vegas businesses that Hyatt had contacts with during this period have either closed

6    down or have not kept records going back 22 years to 1992.  Furthermore,

7    witnesses have died or do not remember what happened more than 20 years ago and

8    witnesses no longer have records for this newly extended 1992 time period.

9          91.    A seventh example of the prejudicial impact of lost or unavailable

10    documents regards documents related to a fraud penalty — regarding abuse of

11    corporate form — first asserted by the FTB in the final decision in the protests in

12    2007, 11 years after the close of the audits in 1996.  The FTB's recent allegation is

13    that Hyatt used corporate funds for personal expenses in the mid-1980s.  To make

14    this new allegation, the FTB misinterprets documents from the mid-1980s, almost

15    30 years ago.  Corporate documents that would assist Hyatt in countering the FTB's

16    new allegation based on the misinterpretation are unavailable, again almost 30

17    years after the fact.  Moreover, this new allegation by the FTB has no relation to the

18    fraud penalties in the 1991 and 1992 tax years for which the FTB audited Hyatt and

19    which are still at issue in the pending administrative appeal.  The only motive for

20    the new allegation could be to again attempt to attack Hyatt and require him to

21    spend precious time and resources rebutting misconstrued facts from almost 30

22    years ago to protect his credibility.

23          92.    Instead of concluding the investigation and the administrative process,

24    the FTB, by and through named Defendants Chiang, Horton, and Cohen, in their

25    official capacities as FTB board members, as permitted by the SBE, by and through

26    named Defendants Yee, Runner, Steel, Horton, and Chiang, in their official

27    capacities as SBE board members, continue to investigate Hyatt and delay

28    resolution of the 20 year administrative proceeding against Hyatt.  Defendants'

refusal to complete the investigative and the administrative process, including the SBE proceeding described above, has exacerbated the prejudice to Hyatt resulting from the loss of witnesses, loss of witness recollections and the unavailability of material documents.

**C.    Further irreparable prejudice to Hyatt due to the FTB's changes of position and assertion of new issues over the last 20 years.**

93.    The FTB has significantly changed its positions and asserted new issues in its protest determination letter (November 1, 2007) and in its briefings before the SBE (2009 to the present).  Because the FTB's positions have a presumption of correctness before the SBE, the FTB can change its position at will and Hyatt has the burden to prove that each new FTB position and assertion is erroneous.  Hyatt has been irreparably prejudiced by these FTB change of positions and assertion of new issues in the FTB protest determination letter and in its briefings before the SBE.  Specifically, the FTB delayed many years before bringing up these change of positions and assertion of new issues, yet it now complains that Hyatt does not have evidence to rebut the FTB's "new" positions. The FTB, however, has virtually unlimited discovery power during the audit, the protest and even the administrative appeal before the SBE, including issuing third party subpoenas.  The FTB has been aggressively using this discovery power even now during the SBE appeal, some 20 years after the audits commenced, to try and create a one-sided record.  Hyatt therefore faces a near impossible burden to overcome the one-sided record.  As a lay person, Hyatt has virtually no discovery power during the audit and protest and now in the SBE appeal.  The FTB by delaying and further delaying the administrative process, while continuing to change its positions and assert new issues, is able to set forth its one-sided record that Hyatt cannot fairly rebut due to the passage of time and loss of rebuttal evidence.

94.    One of the most obvious and egregious examples of the FTB's

COMPLAINT FOR INJUNCTIVE RELIEF

1   changes of position and assertion of new issues in its briefings before the SBE is

2   the "day by day" analysis and calendars presented in the FTB's Opening briefs filed

3   with the SBE in 2009.  In so doing, the FTB added hundreds of new allegations for

4   the disputed residency period of September 1991 to April 1992, which have a

5   presumption of correctness in the SBE appeal.  These new allegations are

6   adamantly disputed by Hyatt, but the evidence that rebuts these new FTB

7   allegations is difficult and in many cases impossible to locate.  It is just too late to

8   litigate the truth and accuracy of these new FTB allegations, now 22 years after-the-

9   fact.  Hyatt is not only prejudiced by these new and grossly tardy allegations in the

10  SBE appeal but also will be prejudiced in any future state court action.

11      95.    Another example of an FTB change in position in briefs filed with the

12  SBE that prejudices Hyatt in both the SBE appeal and any future state court action

13  relates to the FTB's change of position regarding the sale of Hyatt's California

14  home in 1991.  In 1995 the lead FTB auditor determined during the audit that Hyatt

15  had sold his California house on October 1, 1991, and did not request further

16  evidence regarding the sale of the house.  But now, *18 years* later, the FTB

17  contends that Hyatt did not sell his California house, ever.  Because material

18  witnesses have passed away, witnesses' memories have faded, and documents have

19  been lost, Hyatt is severely prejudiced in rebutting the FTB's new position

20  regarding the sale of his California house.

21      96.    Hyatt is similarly prejudiced in rebutting the FTB's recent newly

22  asserted position regarding Hyatt's alleged California source income, *i.e.*, the

23  FTB's new theory for taxing Hyatt. This is particularly difficult because Mahr

24  Leonard, the company that did the licensing work for all of the patent license

25  agreements that were entered into during the disputed six month period in 1991 and

26  1992, purged its licensing documents from that period in 1999 in accord with its

27  document retention policy years before the FTB subpoenaed the Philips licensing

28  document starting in 2011.  The Mahr Leonard documents would likely counter and

1   rebut positions the FTB is now attempting to assert by use of the recently

2   subpoenaed Philips documents.  Thus, the FTB has benefited significantly from the

3   long and never-ending delays in the proceeding before the SBE and from its

4   continuous investigations while Hyatt has been irreparably prejudiced by the

5   foregoing delays and investigations.

6          97.    Moreover, as referenced above, the FTB is currently engaged in an

7   effort to further delay the administrative appeal by attempting to obtain the more

8   than 8,000 pages of documents from the Philips Corporation through a New York

9   court proceeding and by requesting a new round of comprehensive briefings before

10  the SBE.  In 1993, shortly after the audit was commenced, Hyatt disclosed his

11  relationship with the Philips corporation and the FTB was well aware of the Philips

12  Corporation's involvement in the licensing of Hyatt's patents.  But the FTB waited

13  almost 20 years before it issued subpoenas to Philips for documents and

14  depositions.  By that time, other documentary evidence, in particular the Mahr

15  Leonard documents described above, that would assist Hyatt to rebut, explain or

16  address the licensing documents from the Philips Corporation had been lost or

17  purged.  Using this advantage, on September 14, 2012, more than 20 years after the

18  disputed period, the FTB submitted a letter to the SBE with an attached chart listing

19  hundreds of new allegations ostensibly based on the Philips documents subpoenaed

20  in 2011.  Hyatt therefore is again left with attempting to address and rebut new

21  allegations 22 plus years after the fact but is prejudiced by other related

22  documentary evidence no longer being available.

23         98.    Further to this point, in 2011 and 2012, respectively, the FTB took the

24  depositions of two former Philips employees questioning them regarding the Philips

25  documents first subpoenaed in 2011.  One witness answered under oath that he did

26  not remember or did not recall over 100 times and that he did not know over 50

27  times.  The other witness answered under oath that that he did not remember or did

28  not recall over 500 times.  Again, therefore, the severe delay has worked to the

-33-                    COMPLAINT FOR INJUNCTIVE RELIEF

1    FTB's great benefit, while severely prejudicing Hyatt.

2         99.   As a fourth example, the FTB contends that many of the affidavits and

3    declarations of Hyatt's witnesses submitted in the SBE appeal are not credible

4    *because the witnesses were recalling events from a long time ago*.  The FTB

5    similarly contends that there is insufficient contemporaneous documentation of the

6    events described by these witnesses in their affidavits and declarations, which

7    describe events that occurred many years prior.  But as detailed above, given the

8    long delay and extreme passage of time much of the documentation Hyatt sought

9    during the SBE appeals is no longer available.  And it is the FTB that has caused

10   the long delays in the investigative and administrative process against Hyatt, yet the

11   FTB now relies on the significant passage of time caused by the FTB's extreme

12   delays in order to attempt to discredit Hyatt's witnesses.  Hyatt is therefore the one

13   prejudiced by the loss of contemporaneous documentation.  Again, the FTB

14   benefits significantly from the long delay in the administrative process, its own

15   changes of position, and its presumption of correctness, while Hyatt has been

16   irreparably prejudiced by the long delay, the FTB's changes of position, and its

17   presumption of correctness.

18        100.   To be clear, the benefit to the FTB and prejudice to Hyatt from the

19   FTB's assertion of new facts and changes of position during the long delay infects

20   the *de novo* trial Hyatt is otherwise entitled to in a California Superior Court.  The

21   FTB can be expected to continue to change positions and assert new facts in the *de*

22   *novo* California Superior Court proceeding.  Hyatt then will be required to submit

23   rebuttal evidence for such new positions stemming from 25 or possibly 30 years in

24   the past.  Thus, the irreparable prejudice to Hyatt caused by the delays will only be

25   exacerbated in a *de novo* proceeding in the California Superior Court.

26   **D.    Relief sought to remedy loss of due process resulting from 20 year plus**
27   **      delay.**

28        101.   Defendants' failure and refusal, or even inability, for over *20 years* to

-34-                              COMPLAINT FOR INJUNCTIVE RELIEF

complete the investigation and administrative process directed at whether Hyatt owes the State of California income taxes for the 1991 and 1992 tax years, based on whether he was a resident of California for the disputed six month period from September 1991 to April 1992, has deprived Hyatt of his due process rights. Specifically, his right to a *de novo* adjudication of his residency in a declaratory relief action in the California Superior Court can no longer by fairly and fully presented to a California court because of the loss of evidence over the last 20 years.

102.   Similarly, Defendants' failure and refusal, and/or inability to complete the investigation and administrative process based on its "sourcing" theory, directed at whether Hyatt's patents had allegedly acquired a business *situs* in California through alleged "substantial use and value" and alleged business activities in California, has also deprived Hyatt of his due process rights.  Again, specifically, his right to a *de novo* adjudication of the FTB's sourcing claim through a refund relief action in the California Superior Court can no longer be fairly and fully presented to a California court because of the loss of evidence of the last 20 years.

103.   In sum, now, *22 years* after the six month disputed period, and over *20 years* after the FTB commenced an audit of Hyatt directed at determining his residency for that six month disputed period, too much supporting documentary evidence has been lost and too many supporting material witnesses are no longer available to Hyatt.  This irreparable prejudice prevents Hyatt from obtaining due process even if he is someday allowed to seek relief in a California court.

104.   If Defendants had acted with even a modicum of efficiency in bringing the investigation to an end and completing the administrative proceeding within a reasonable time, something substantially less than two decades, Hyatt would have been able to present this missing evidence in a *de novo* California Superior Court action at which time his residency during the disputed period could have and would

COMPLAINT FOR INJUNCTIVE RELIEF

have been adjudicated in a court proceeding.  Without this evidence, Hyatt has been prejudiced in his ability to establish his residency from *22 years ago*.  Defendants' conduct in refusing to act and complete the administrative process after more than *20 years* and continual changes in position has therefore resulted in an extreme case of prejudicial delay to Hyatt's great detriment.

105.   The prejudicial delay resulting from Defendants' failure, refusal, and/or inability to conclude the administrative process against Hyatt after more than *20 years* will result in a violation of Hyatt's rights under the Due Process Clause if the Defendants, on behalf of the State of California, now or at any time in the future issue a final determination in the pending administrative appeals that is adverse to Hyatt.  Hyatt's ability to pursue and obtain a favorable outcome in a *de novo* proceeding in California Superior Court as to his residency during the disputed period (as is his right under California law) has now *after more than 22 years* been materially diminished and therefore irreparably prejudiced by Defendants' delay, changes in position and new issues, and failure to conclude its investigation and administrative process over the last 20 years.  For the State of California by and through the Defendant government actors to now assess and seek to collect from Hyatt taxes, penalties and interest for the 1991 and 1992 tax years after depriving Hyatt the ability to obtain a full and fair *de novo* adjudication of this issue in a California court is and would be an illegal taking of his property in violation of the Due Process Clause.  The threat of this unconstitutional taking from Hyatt warrants the injunctive relief requested, and Hyatt has no adequate remedy at law.

106.   Defendants' deprivations and threatened deprivations of Hyatt's rights secured by the Constitution and by the Due Process Clause were carried out and continue to be carried out 'under color of state law.'

107.   Pursuant to 42 U.S.C. § 1983, Hyatt seeks equitable relief from the Court to enjoin Defendants, in their official capacities, from allowing the FTB to

-36-                              COMPLAINT FOR INJUNCTIVE RELIEF

continue to violate his due process rights under the Due Process Clause, specifically preventing Defendants, acting in their respective official capacities from continuing the investigation and administrative proceedings against Hyatt that seek to assess California state income taxes, or adjudicate the assessment and collection of California state income taxes, against Hyatt for the 1991 and 1992 tax years in light of the extreme case of prejudicial delay resulting from Defendants' conduct over the last 20 years.  Hyatt therefore specifically seeks equitable relief from the Court to enjoin Defendants from continuing to assess or threaten to assess, or collect or threaten to collect, taxes, penalties and interest from Hyatt for the 1991 and 1992 tax years.  The requested relief is not barred by the Tax Injunction Act as Hyatt has no plain, speedy, and efficient remedy in a state forum due to the irreparable prejudice he has suffered over the last 20 years that would deprive him of due process under the law if Defendants were to continue to assess and collect taxes, penalties and interest from Hyatt for the 1991 and 1992 tax years.

108.   Without the Court's grant of the injunctive relief that Hyatt seeks, Hyatt will suffer irreversible and irreparable harm.

**SECOND CLAIM FOR RELIEF**

**(Violations of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution Resulting from Defendants' Hostile Animus and Ill Will Towards Hyatt, Defendants' Desire "to get" Hyatt, Defendants' Vindictive, Irrational and Wholly Arbitrary Actions Towards Hyatt, and Related Abusive and Differential Treatment by Defendants of Hyatt Warranting Injunctive Relief Under 42 U.S.C. § 1983 ─ against all Defendants)**

109.   Hyatt realleges and incorporates by reference herein paragraphs 1 through 108 above.

110.   The FTB, by and through named Defendants Chiang, Horton, and

-37-                           COMPLAINT FOR INJUNCTIVE RELIEF

Cohen, in their official capacities as FTB board members, acting under the color of law and in violation of 42 U.S.C. § 1983, have violated Hyatt's rights to equal protection by knowing or they should have known of the intentional and bad faith conduct of FTB personnel who have singled out Hyatt and sought to "get him," but have allowed FTB personnel to continue this conduct and failed to allow a full, fair, and timely adjudication of whether Hyatt owes any taxes, penalties or interest to the State of California for the 1991 and 1992 tax years. Similarly, the SBE, by and through named Defendants Yee, Runner, Steel, Horton, and Chiang, in their official capacities as SBE board members, have allowed the FTB to continue its actions by not concluding the pending administrative process and in particular not timely deciding the current administrative appeal.

A.    **The FTB in bad faith set out "to get" Hyatt in pursuing the audits, singling him out and treating him like no one else.**

111.   From the inception of the FTB's audit in 1993, Hyatt was the subject of repeated oppressive, fraudulent, tortious and unlawful conduct by FTB auditors. This fact has already been determined by a court of law and a judgment has been entered to this effect. Specifically, in January 1998, Hyatt filed a lawsuit against the FTB in Nevada in Clark County District Court. In his suit against the FTB, Hyatt demonstrated that the FTB committed numerous torts against him during the FTB's audit including fraud (*i.e.*, conducting a bad faith fraudulent audit and delaying the protest in bad faith for 11 years), invasion of privacy, intentional infliction of emotional distress, abuse of process, and breach of confidential relationship.

112.   After a lengthy litigation process, including pretrial review of the case by both the United States Supreme Court, *Franchise Tax Board v. Hyatt*, 538 U.S. 488 (2003), and twice by the Nevada Supreme Court, and a four month trial conducted by the Nevada State District Court (the "Nevada tort case"), a large judgment was entered against the FTB and in favor of Hyatt in August 2008 in the

-38-                                          COMPLAINT FOR INJUNCTIVE RELIEF

1  amount of $138 million in compensatory damages and $250 million in punitive
2  damages.  The judgment included a finding by the Nevada jury that the FTB acted
3  with malice, fraud and oppression during its audit of Hyatt, as Hyatt specifically
4  asserted in support of the request for punitive damages that the FTB had conducted
5  the audits in bad faith and then delayed and refused to issue decisions in the
6  administrative protests for 11 years in bad faith so as to not allow Hyatt to pursue a
7  *de novo* administrative appeal before the SBE.  The FTB has appealed this
8  judgment to the Nevada Supreme Court, and a decision is pending on the FTB's
9  appeal.

10      113.   The misconduct engaged in by the FTB as presented at the trial in the
11  Nevada tort case, and which forms at least in part the basis of his equal protection
12  claims, includes the following:

- The lead FTB auditor talked openly about "getting this taxpayer," meaning Hyatt.
- The lead FTB auditor made a number of anti-Semitic remarks during the audit about Hyatt, who is Jewish, including referring to Hyatt as a "Jew bastard" while talking to another FTB auditor and joking with this other auditor that most of the large income taxpayers in California were Jewish.
- This other more experienced FTB auditor believed that the lead FTB auditor was obsessed with Hyatt and had created a "fiction" about him.
- The lead FTB auditor also made an unauthorized visit to Hyatt's Las Vegas home *after she had closed the 1991 tax-year audit*, where she took a picture of Hyatt's house as if it was a trophy of her having "gotten" the "Jew bastard."
- The lead FTB auditor also called Hyatt's ex-wife after the audit, to

1    boast to her that Hyatt had been "convicted."*

2    • The lead FTB auditor attended the United States Supreme Court

3      oral argument in the Nevada tort case, paying her own way to the

4      proceedings, yet she claimed she was not obsessed with Hyatt.

5    • From the outset of the audits, even before the lead FTB auditor's

6      involvement, evidence demonstrated the FTB actively searched for

7      ways to tax Hyatt, whether or not he continued to reside in

8      California.

9    • The evidence demonstrated that FTB was not impartially gathering

10     the facts to make a fair determination whether any tax is owed,

11     rather viewed the audits as a means to collect money from Hyatt for

12     the FTB because, as the first auditor confirmed, Hyatt had made so

13     much money.

14   • In particular, the lead FTB auditor did not pursue, and she tried to

15     bury evidence that was favorable to Hyatt's position that he had

16     moved to Nevada in September 1991, such as:

17     ➤ The lead FTB auditor intentionally did not document

18        exculpatory statements from neighbors, who point blank

19        told her that Hyatt had moved to Nevada during the very

20        time frame Hyatt claimed;

21     ➤ The lead FTB auditor did not pursue information from

22        numerous witnesses in Nevada provided by Hyatt,

23        including real estate agents, escrow officers, insurance

24        agents, a home inspector, a security provider, and others

25        that supported Hyatt's version of events;

26     ➤ The lead FTB auditor did not acquire important documents

27        that would have resolved a significant disputed set of facts,

28        but the FTB had a presumption of correctness and it was

-40-                                    COMPLAINT FOR INJUNCTIVE RELIEF

Hyatt that had the burden of proof;

> The lead FTB auditor ignored or discounted records that,
  under FTB policies, are considered significant indicia of
  residency, including Hyatt's Nevada voter's registration,
  Nevada driver's license, and Nevada insurance, each of
  which Hyatt obtained in 1991.

• Instead the audit results against Hyatt were based primarily on three
  unsworn statements from estranged relatives of Hyatt, who had lost
  in litigation against Hyatt or had supported the losing party against
  Hyatt, yet the lead FTB auditor accepted their mostly secondhand
  information without question and made it the focus of her audit
  determinations.

• The lead FTB auditor manufactured reasons and misstated evidence
  in order to assess a fraud penalty against Hyatt as a "bargaining
  chip" to be used to induce him into a settlement.

• There was open internal dissent within the FTB which questioned
  whether the FTB had a case against Hyatt, let alone clear and
  convincing evidence to support a fraud penalty, but the FTB let the
  audit results stand and assessed Hyatt millions of dollars in taxes,
  penalties and interest.

• Evidence demonstrated that the FTB was driven by assessments, not
  collections, such that its future budget allocations and auditor
  promotions were based on what they assessed (or over-assessed)
  regardless of whether the assessments were ever collected.

• After the audits, and at the start of the "protests" that required the
  FTB to conduct an independent review of the audit results, the first
  FTB protest officer informed Hyatt's tax counsel that if Hyatt did
  not settle the matter he would be subjected to an even more

-41-

COMPLAINT FOR INJUNCTIVE RELIEF

intrusive and lengthy investigation and infringement on his privacy.

- Then Hyatt was subjected to an *11 year* protest process as described above and again below, with the threatened even more intrusive and lengthy investigation and infringement on his privacy, which the FTB ended only on the eve of the jury trial in the Nevada tort case described above.

114.   This conduct by the FTB that was directed at Hyatt was specific to him and singled him out in a manner in which the FTB sought to extract taxes and penalties from him, regardless of whether they were owed under the law.  Indeed, as addressed above, the FTB now takes the additional position that Hyatt must pay taxes to California for the same six-month disputed period as a non-resident of California.  Specifically, the FTB has taken the position since the audit in 1995 that Hyatt was a resident of California during the disputed period, and therefore the FTB contends that Hyatt owes tens of millions of dollars based on a residency assessment.  But the FTB now also contends that Hyatt was a non-resident of California during the same disputed period and that he owes tens of millions of dollars based on a "sourcing" assessment.  The FTB's position towards Hyatt is therefore "heads the FTB wins, and tales Hyatt loses."  Either way, the FTB "gets" Hyatt.

115.   Additionally, over the 20 years since the FTB commenced the audit for the 1991 tax year, including through the protest, and the pending administrative appeal before the SBE, the FTB has continuously changed the asserted factual basis for the fraud penalty that it still maintains against Hyatt.  The FTB asserts new facts trying to find new support for the fraud penalty when its assertions are rebutted or disproven.  Indeed, the facts that the FTB is now relying on to continue to assert the fraud penalty, bear little resemblance to the facts that the FTB was relying upon when it first asserted the fraud penalty in 1995.  The FTB is intent on not only

COMPLAINT FOR INJUNCTIVE RELIEF

1    getting Hyatt, but asserting the maximum financial pressure on him through an
2    unprecedented use of the fraud penalty.
3    **B.    The FTB in bad faith delayed the protests for 11 years, singling Hyatt**
     **out and treating him like no one else.**
4
5        116.    By 2005, *nine years into the protests*, the Nevada court in the Nevada
6    tort case ruled that Hyatt could pursue discovery concerning the reason for the
7    FTB's failure and refusal to issue a decision in the protests, and specifically whether
8    the delay in concluding the protests supported Hyatt's claim that the FTB had acted
9    in bad faith during the audits and whether the delay constituted continuing bad faith
10   on the part of the FTB.
11       117.    As alleged in paragraphs 45 to 60 above, discovery in the Nevada tort
12   case uncovered the FTB's intentional "hold" on the protests from 2001 until 2007.
13   This conduct by the FTB that was directed at Hyatt was specific to him and singled
14   him out in a manner in which the FTB sought to extract taxes and penalties from
15   him, regardless of whether they were owed under the law.
16   **C.    The FTB's conduct is not rationally related to any legitimate state**
     **interest.**
17       118.    The reason for Hyatt's differential treatment from the similarly-
18   situated citizens under audit from the FTB was not rationally related to any
19   legitimate state interest but, rather, was based upon the FTB's malicious, irrational
20   and arbitrary intention to assess and collect taxes and penalties from Hyatt because
21   he has made so much money, regardless of whether any taxes were owed by Hyatt
22   under the law.
23       119.    The Equal Protection Clause applies to state governmental action and
24   restrains state government officials from differential treatment of an individual
25   based upon the spiteful, vindictive and irrational motivations of the state
26   government officials towards the individual.  The purpose of the Equal Protection
27   Clause is to protect every person subject to actions of state government officials
28

from arbitrary discrimination including intentional and hostile discriminatory actions carried out by a state's duly constituted agents. The Equal Protection Clause prohibits state governmental officials from intentionally or recklessly depriving individuals of their rights.

120. FTB's abusive and oppressive actions towards Hyatt for more than 20 years and the extensive record of the same demonstrate that the FTB has singled out Hyatt because of, in addition to other unconstitutional reasons, the FTB's ill will, hostile animus, and desire to "get" Hyatt. As described above, the FTB has carried out a vendetta for now 20 years seeking to "get" Hyatt because of his purported high net worth obtained after moving from California to Nevada, because he is Jewish, and because he had the temerity to refuse to settle with the FTB early during the protest process and not give up his rights under California law — despite FTB threats that a failure to settle would result in a more intrusive investigation into his finances, which the FTB then proceeded to engage in for the next 11 years.

121. The FTB's violations and continuing violations of the Equal Protection Clause, and the FTB's continuing threat to investigate Hyatt because of its hostile animus and ill will towards Hyatt, warrant the injunctive relief that Hyatt seeks, and Hyatt has no adequate remedy at law.

122. Pursuant to 42 U.S.C. § 1983, Hyatt seeks equitable relief from the Court to enjoin Defendants, in their official capacities, from allowing the FTB to continue to violate the equal protection rights of Hyatt under the Equal Protection Clause from continuing the investigation and administrative proceedings against Hyatt that seek to assess California state income taxes against Hyatt for the 1991 and 1992 tax years. Hyatt therefore specifically seeks equitable relief from the Court to enjoin the FTB from continuing to assess or threaten to assess, or collect or threaten to collect, taxes, penalties and interest for the 1991 and 1992 tax years. The requested relief is not barred by the Tax Injunction Act as Hyatt has no plain,

speedy, and efficient remedy in a state forum due to the irreparable prejudice he has suffered over the last 20 years that would deprive Hyatt of equal protection under the law if Defendants were to continue to assess or collect taxes, penalties and interest for the 1991 and 1992 tax years.

123.   Without the Court's grant of the injunctive relief that Hyatt seeks, Hyatt will suffer irreversible and irreparable harm.

**WHEREFORE,** Hyatt prays for judgment as follows:

1.   For a permanent injunction forbidding Defendants as members of the FTB and SBE from continuing the investigation and administrative proceedings against Hyatt that seek to assess California state income taxes, penalties or interest or adjudicate the assessment of California state income taxes, penalties or interest against Hyatt for the 1991 and 1992 tax years, or any subsequent years based on the same claims and the assertions the FTB has made in the current pending administrative proceeding;

2.   For a permanent injunction forbidding Defendants as members of the FTB and SBE from continuing to assess or threaten to assess Hyatt, or collect or threaten to collect from Hyatt, taxes, penalties or interest for the 1991 and 1992 tax years, or any subsequent years based on the same claims and the assertions the FTB has made in the current pending administrative proceeding;

3.   For attorneys' fees and costs in accord with Section 1983;

4.   For such other and further relief as the Court deems just and proper.

COMPLAINT FOR INJUNCTIVE RELIEF

1   DATED:  April 4 , 2014                    **PERKINS COIE LLP**

2

3                                            By:/s/ Donald J. Kula _____

4                                                Donald J. Kula

5

6                                            **ERWIN CHEMERINSKY, Esq.**

7                                            **SEGAL & ASSOCIATES, PC.**

8                                            Attorneys for Plaintiff
                                             Gilbert P. Hyatt
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-46-                    COMPLAINT FOR INJUNCTIVE RELIEF

CIVIL,APPEAL,CLOSED

# U.S. District Court
## Eastern District of California - Live System (Sacramento)
## CIVIL DOCKET FOR CASE #: 2:14-cv-00849-GEB-DAD

| | |
|---|---|
| Hyatt v. Chiang et al | Date Filed: 04/04/2014 |
| Assigned to: Judge Garland E. Burrell, Jr | Date Terminated: 02/10/2015 |
| Referred to: Magistrate Judge Dale A. Drozd | Jury Demand: None |
| Case in other court: USCA, 15-15296 | Nature of Suit: 440 Civil Rights: Other |
| Cause: 28:1331 Federal Question: Other Civil Rights | Jurisdiction: Federal Question |

**Plaintiff**

**Gilbert P. Hyatt**                    represented by   **Donald J. Kula**
Perkins Coie LLP
1888 Century Park East
Suite 1700
Los Angeles, CA 90067
310-788-9900
Fax: 310-788-3399
Email: DKula@perkinscoie.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Malcolm S. Segal**
Segal & Associates, PC
400 Capitol Mall, Suite 2550
Sacramento, CA 95814
916-441-0886
Fax: 916-475-1231
Email: msegal@segal-pc.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**John Chiang**                    represented by   **Cynthia J. Larsen**
*in his official capacity as California*            Orrick, Herrington & Sutcliffe LLP
*Franchise Tax Board member and*                    400 Capitol Mall, Suite 3000
*California State Board of Equalization*             Sacramento, CA 95814
*member*                                            (916) 329-7970
Fax: (916) 329-4900
Email: clarsen@orrick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Wayne Bradshaw**
Mcdonald Carano Wilson Llp

100 W. Liberty Street, Tenth Floor
Reno, NV 89501
775-788-2000
Fax: 775-788-2020
Email:
jbradshaw@mcdonaldcarano.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael John von Loewenfeldt**
Kerr and Wagstaffe
101 Mission Street
18th Floor
San Francisco, CA 94104
415-371-8500
Fax: 415-371-0500
Email: mvl@kerrwagstaffe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Debbie Ariell Leonard**
McDonald Carano Wilson LLP
100 W. Liberty Street, 10th Floor
Reno, NV 89501
775-788-2000
Fax: 775-788-2020
Email: dleonard@mcdonaldcarano.com
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Jerome E. Horton**
*in his official capacity as California
Franchise Tax Board member and
California State Board of Equalization
member*

represented by **Cynthia J. Larsen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Wayne Bradshaw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael John von Loewenfeldt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Debbie Ariell Leonard**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

| | |
|---|---|
| **Michael Cohen**<br>*in his official capacity as California*<br>*Franchise Tax Board member* | represented by **Cynthia J. Larsen**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | **James Wayne Bradshaw**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | **Debbie Ariell Leonard**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | |
|---|---|
| **Betty T. Yee**<br>*in her official capacity as California*<br>*State Board of Equalization member* | represented by **Michael John von Loewenfeldt**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | |
|---|---|
| **George Runner**<br>*in his official capacity as California*<br>*State Board of Equalization member* | represented by **Michael John von Loewenfeldt**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | |
|---|---|
| **Michelle Steel**<br>*in her official capacity as California*<br>*State Board of Equalization member* | represented by **Michael John von Loewenfeldt**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 04/04/2014 | 1 | CIVIL COVER SHEET by Gilbert P Hyatt (Segal, Malcolm) (Entered: 04/04/2014) |
| 04/04/2014 | 2 | COMPLAINT *for Injunctive Relief Under 42 U.S.C. Section 1983 based on: 1. Violations of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution; and 2. Violations of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution* against Gilbert P Hyatt by Gilbert P Hyatt. Attorney Segal, Malcolm S added. (Filing fee $ 400, receipt number 0972-5265306) (Segal, Malcolm) (Entered: 04/04/2014) |
| 04/04/2014 | 3 | SUMMONS ISSUED as to *John Chiang, Michael Cohen, Jerome E Horton, George Runner, Michelle Steel, Betty T Yee* with answer to complaint due within *21* days. Attorney *Malcolm S Segal* *Segal & Associates, PC* *400 Capitol Mall, Suite 2550* *Sacramento, CA 95814*. (Kastilahn, A) (Entered: 04/04/2014) |
| | | |

| | | |
|---|---|---|
| 04/04/2014 | 4 | CIVIL NEW CASE DOCUMENTS ISSUED; Initial Scheduling Conference set for 7/21/2014 at 09:00 AM in Courtroom 10 (GEB) before Judge Garland E. Burrell, Jr.. (Attachments: # 1 Consent Form, # 2 VDRP) (Kastilahn, A) (Entered: 04/04/2014) |
| 04/21/2014 | 5 | WAIVER of SERVICE RETURNED EXECUTED: Betty T Yee Waiver sent on 4/14/2014. (Kula, Donald) Modified on 4/23/2014 (Meuleman, A). (Entered: 04/21/2014) |
| 04/21/2014 | 6 | WAIVER of SERVICE RETURNED EXECUTED: George Runner Waiver sent on 4/14/2014. (Kula, Donald) Modified on 4/23/2014 (Meuleman, A). (Entered: 04/21/2014) |
| 04/21/2014 | 7 | WAIVER of SERVICE RETURNED EXECUTED: Jerome E Horton Waiver sent on 4/14/2014. (Kula, Donald) Modified on 4/23/2014 (Meuleman, A). (Entered: 04/21/2014) |
| 04/21/2014 | 8 | WAIVER of SERVICE RETURNED EXECUTED: John Chiang Waiver sent on 4/14/2014. (Kula, Donald) Modified on 4/23/2014 (Meuleman, A). (Entered: 04/21/2014) |
| 04/21/2014 | 9 | WAIVER of SERVICE RETURNED EXECUTED: Michelle Steel Waiver sent on 4/14/2014. (Kula, Donald) Modified on 4/23/2014 (Meuleman, A). (Entered: 04/21/2014) |
| 04/25/2014 | 10 | WAIVER of SERVICE RETURNED EXECUTED: John Chiang Waiver sent on 4/22/2014, answer due 6/23/2014. (Kula, Donald) (Entered: 04/25/2014) |
| 04/25/2014 | 11 | WAIVER of SERVICE RETURNED EXECUTED: Michael Cohen Waiver sent on 4/22/2014, answer due 6/23/2014. (Kula, Donald) (Entered: 04/25/2014) |
| 04/25/2014 | 12 | WAIVER of SERVICE RETURNED EXECUTED: Jerome E. Horton Waiver sent on 4/22/2014, answer due 6/23/2014. (Kula, Donald) (Entered: 04/25/2014) |
| 06/06/2014 | 13 | STIPULATION and PROPOSED ORDER for Briefing and Hearing Schedule for Defendants' Motions to Dismiss and Initial Case Management Conference by John Chiang, Jerome E. Horton, George Runner, Michelle Steel, Betty T. Yee. Attorney von Loewenfeldt, Michael John added. (von Loewenfeldt, Michael) (Entered: 06/06/2014) |
| 06/09/2014 | 14 | STIPULATION and ORDER signed by Judge Garland E. Burrell, Jr. on 6/9/2014 ORDERING that Defendants shall file motions to dismiss or other pleadings in response to Plaintiff's Complaint on or before 6/20/2014. Plaintiff shall file briefs in opposition to any motion to dismiss filed by Defendants on or before 7/25/2014. Defendants shall file reply briefs in support of their motions to dismiss, if any, on or before 8/25/2014. A hearing on any motion to dismiss filed by Defendants shall be scheduled for 9/22/2014 at 9 a.m. The initial case management conference currently scheduled for 7/21/2014 at 9 a.m. is be continued until 10/24/2014 at 9 a.m. A joint status report shall be filed fourteen days prior to the hearing. (Zignago, K.) (Entered: 06/09/2014) |
| 06/09/2014 | | [DISREGARD - Service by mail done in error] SERVICE BY MAIL: 14 |

| | | |
|---|---|---|
| | | Stipulation and Order served on Robert Lambert NCAED. (Zignago, K.) Modified on 6/9/2014 (Zignago, K.). (Entered: 06/09/2014) |
| 06/20/2014 | 15 | MOTION to DISMISS by John Chiang, Jerome E. Horton, George Runner, Michelle Steel, and Betty T. Yee. Motion Hearing set for 9/22/2014 at 09:00 AM in Courtroom 10 (GEB) before Judge Garland E. Burrell, Jr.. (Attachments: # 1Memorandum of Points and Authorities )(von Loewenfeldt, Michael) Modified on 6/23/2014 (Kastilahn, A). (Entered: 06/20/2014) |
| 06/20/2014 | 16 | REQUEST for JUDICIAL NOTICE by John Chiang, Jerome E. Horton, George Runner, Michelle Steel, Betty T. Yee re 15 Motion to Dismiss. (Attachments: # 1 Declaration of Amalia Vingua )(von Loewenfeldt, Michael) Modified on 6/23/2014 (Kastilahn, A). (Entered: 06/20/2014) |
| 06/20/2014 | 17 | MOTION to DISMISS for LACK of JURISDICTION And For Failure To State A Claim by John Chiang, Michael Cohen, Jerome E. Horton. Attorney Larsen, Cynthia J. added. Motion Hearing set for 9/22/2014 at 09:00 AM in Courtroom 10 (GEB) before Judge Garland E. Burrell Jr.. (Attachments: # 1 Memorandum In Support, # 2 Declaration of Robert W. Dunn)(Larsen, Cynthia) Modified on 10/6/2014 (Becknal, R). (Entered: 06/20/2014) |
| 06/23/2014 | 18 | NOTICE of CHANGE of ADDRESS by Michael John von Loewenfeldt. (von Loewenfeldt, Michael) (Entered: 06/23/2014) |
| 07/15/2014 | 19 | NOTICE of APPEARANCE by attorney James Wayne Bradshaw on behalf of defendants John Chiang, Michael Cohen, and Jerome E. Horton. Attorney Bradshaw, James Wayne added. (Bradshaw, James) Modified on 7/16/2014 (Marciel, M) (Entered: 07/15/2014) |
| 07/18/2014 | 20 | STIPULATION and PROPOSED ORDER for Briefing and Hearing Schedule for Defendants' Motions to Dismiss and Initial Case Management Conference by Gilbert P. Hyatt. (Kula, Donald) (Entered: 07/18/2014) |
| 07/21/2014 | 21 | STIPULATION and ORDER signed by Judge Garland E. Burrell, Jr. on 7/21/2014 ORDERING 20 Plaintiff shall file briefs in opposition to the two motions 15 and 17 due by 8/25/2014; Defendants reply briefs in support of their motions due by 10/3/2014; A hearing on the motions shall be scheduled for 11/3/2014 at 09:00 AM in Courtroom 10 (GEB) before Judge Garland E. Burrell Jr.; the Initial case management conference is Reset for 1/26/2015 at 09:00 AM in Courtroom 10 (GEB) before Judge Garland E. Burrell Jr.(Reader, L) (Entered: 07/21/2014) |
| 08/25/2014 | 22 | OPPOSITION by Gilbert P. Hyatt to 17 MOTION to DISMISS for LACK of JURISDICTION And For Failure To State A Claim, 15 MOTION to DISMISS. (Attachments: # 1 Declaration of Eric J. Coffill, # 2 Declaration of Donald J. Kula)(Kula, Donald) (Entered: 08/25/2014) |
| 08/25/2014 | 23 | REQUEST for JUDICIAL NOTICE by Gilbert P. Hyatt in re 22 Opposition to Motion,. (Attachments: # 1 Exhibit Part I of II to RJN [Exhibits 1-19], # 2 Exhibit Par II of II to RJN [Exhibits 20-29])(Kula, Donald) (Entered: 08/25/2014) |
| 08/25/2014 | 24 | OBJECTIONS by Plaintiff Gilbert P. Hyatt to 22 Opposition to Motion, 23 |

| | | Request for Judicial Notice. (Kula, Donald) (Entered: 08/25/2014) |
|---|---|---|
| 09/26/2014 | 25 | NOTICE *of Decision from Nevada Supreme Court* by Gilbert P. Hyatt re 22 Opposition to Motion,. (Kula, Donald) (Entered: 09/26/2014) |
| 10/03/2014 | 26 | REPLY by John Chiang, Jerome E. Horton, George Runner, Michelle Steel, Betty T. Yee re 17 Motion to Dismiss. (von Loewenfeldt, Michael) Modified on 10/6/2014 (Becknal, R). (Entered: 10/03/2014) |
| 10/03/2014 | 27 | REPLY by John Chiang, Michael Cohen, Jerome E. Horton re 17 Motion to Dismiss. (Attachments: # 1 Supplemental Decl. of Robert Dunn, # 2 Declaration of James Bradshaw)(Larsen, Cynthia) Modified on 10/6/2014 (Becknal, R). (Entered: 10/03/2014) |
| 10/03/2014 | 28 | OPPOSITION by Defendants John Chiang, Michael Cohen, Jerome E. Horton to 22 Opposition to Motion, 24 Objections, 23 Request for Judicial Notice. (Larsen, Cynthia) (Entered: 10/03/2014) |
| 10/28/2014 | 29 | MINUTE ORDER: The Motions to Dismiss, scheduled for hearing on 11/3/14, are submitted without oral argument. There will not be a hearing on 11/3/14, and no appearance is necessary. re 17 Motion to Dismiss/Lack of Jurisdiction, 15 Motion to Dismiss, Ordered by Judge Garland E. Burrell, Jr on 10/28/14. (Furstenau, S) (Entered: 10/28/2014) |
| 12/03/2014 | 30 | Plaintiff's Supplemental Notice of Decision of Nevada Supreme Court by All Plaintiffs re 25 Notice. (Kula, Donald) Modified on 12/4/2014 (Kaminski, H). (Entered: 12/03/2014) |
| 12/03/2014 | 31 | NOTICE *of Errata Re 30 Plaintiff's Supplemental Notice of Decision of Nevada Supreme Court* by All Plaintiffs re 30 Notice. (Kula, Donald) Modified on 12/4/2014 (Kaminski, H). (Entered: 12/03/2014) |
| 12/04/2014 | 32 | OBJECTIONS by Defendants John Chiang, Michael Cohen, Jerome E. Horton to 30 Notice, 31 Notice. (Larsen, Cynthia) Modified on 12/5/2014 (Kaminski, H). (Entered: 12/04/2014) |
| 01/08/2015 | 33 | JOINT REQUEST to Continue Case Management Conference by Defendants John Chiang, Jerome E. Horton, George Runner, Michelle Steel, Betty T. Yee. (von Loewenfeldt, Michael) Modified on 1/9/2015 (Kaminski, H). (Entered: 01/08/2015) |
| 01/13/2015 | 34 | MINUTE ORDER: The pretrial scheduling conference, currently set for 1/26/15, is rescheduled for 4/6/15 at 9:00 a.m. A joint status report shall be filed fourteen days prior to the hearing. Ordered by Judge Garland E. Burrell, Jr on 1/13/15. (Furstenau, S) (Entered: 01/13/2015) |
| 02/10/2015 | 35 | ORDER signed by Judge Garland E. Burrell, Jr on 2/9/15 GRANTING 17 Motion to Dismiss for Lack of Jurisdiction. Plaintiff's Complaint is DISMISSED for lack of subject matter jurisdiction without leave to amend. Further, the Clerk of Court shall CLOSE this action. CASE CLOSED. (Meuleman, A) (Entered: 02/10/2015) |
| 02/10/2015 | 36 | JUDGMENT dated *2/10/15* pursuant to order signed by Judge Garland E. Burrell, Jr on 2/9/15. (Meuleman, A) (Entered: 02/10/2015) |

| 02/18/2015 | 37 | NOTICE of APPEAL by Gilbert P. Hyatt as to 35 Order on Motion to Dismiss,, Order on Motion to Dismiss/Lack of Jurisdiction, 36 Judgment. (Filing fee $ 505, receipt number 0972-5750262) (Attachments: # 1 Statement Circuit Rule 3-2 Representation Statement)(Kula, Donald) (Entered: 02/18/2015) |
| 02/18/2015 | 38 | APPEAL PROCESSED to Ninth Circuit re 37 Notice of Appeal, filed by Gilbert P. Hyatt. Notice of Appeal filed *2/18/2015*, Complaint filed *4/4/2014* and Appealed Order / Judgment filed *2/10/2015*. ** *Fee Status: Paid on 2/18/2015 in the amount of $505.00* (Attachments: # 1 Appeal Information) (Becknal, R) (Entered: 02/18/2015) |
| 02/27/2015 | 39 | USCA CASE NUMBER 15-5296 for 37 Notice of Appeal, filed by Gilbert P. Hyatt. (Zignago, K.) (Entered: 02/27/2015) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/16/2015 12:43:12 | | | |
| **PACER Login:** | pc0070:2611822:0 | **Client Code:** | 064847.0006.0000 mcdem |
| **Description:** | Docket Report | **Search Criteria:** | 2:14-cv-00849-GEB-DAD |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

## CERTIFICATE OF SERVICE

U.S. Court of Appeals Docket Number(s):  15-15296

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 29, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature:     s/ Yolanda Mendez