**No. 15-15296**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GILBERT P. HYATT

*Plaintiff-Appellant,*

*v.*

BETTY T. YEE, ET AL.

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California, No. 2:14-cv-00849-GEB-DAD (Burrell, J.)

## APPELLEE CALIFORNIA FRANCHISE TAX BOARD'S
## JUDICIAL NOTICE DOCUMENTS

## VOLUME 1 OF 12

## RJN 0001 – RJN 0166

JAMES BRADSHAW
DEBBIE LEONARD
ADAM HOSMER-HENNER
MCDONALD CARANO WILSON LLP
100 West Liberty Street, 10th Floor
Reno, NV  89501
(775) 788-2000

CYNTHIA J. LARSEN
KATIE DEWITT
DAVID W. SPENCER
ORRICK, HERRINGTON & SUTCLIFFE
400 Capitol Mall, Suite 3000
Sacramento, CA 95814
(916) 329-7970

SETH P. WAXMAN
PAUL R.Q. WOLFSON
DANIEL WINIK
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C.  20006
(202) 663-6000

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|-----------|---------------|---------------------------------------|----------|
| | | **VOLUME ONE** | | | | |
| 1 | 6/17/1993 | Letter from Marc Shayer to Gilbert Hyatt | 10 | 1 - 5 | NV Trial Ex. 0112* | 1, 3 |
| 2 | 7/15/1993 | Letter from Marc Shayer to Michael Kern, and response - Information Concerning Resident Status (Form FTB 3805F) | 10 | 6 - 14 | NV Trial Ex. 2174 | 1, 3 |
| 3 | 8/4/1993 | Letter from Michael Kern to Marc Shayer | 10 | 15 - 16 | NV Trial Ex. 2173 | 1, 3 |
| 4 | 5/24/1994 | Letter from Soriano to Michael Kern | 10 | 17 - 20 | NV Trial Ex. 2503 | 1, 3 |
| 5 | 8/2/1995 | Letter from Sheila Cox to Michael Kern - determination letter | 12 | 21 - 48 | NV Trial Ex. 2821 | 1, 3 |
| 6 | 8/29/1995 | Fraud Penalty | 13 | 49 - 62 | NV Trial Ex. 2199 | 1, 3 |
| 7 | 4/23/1996 | Fax from Michael Kern to Hyatt re 1991 NPA, and from Michael Kern to Cowan | 12 | 63 - 74 | NV Trial Ex. 2592 | 1, 3 |
| 8 | 6/20/1996 | Letter from Cowan to FTB re 1991 Protest Letter | 14 | 75 - 136 | NV Trial Ex. 296 | 2, 3 |
| 9 | 8/18/1997 | Fax from Hyatt to Eugene Cowan with Notice of Proposed Assessment 1992 | 13 | 137 - 141 | NV Trial Ex. 2609 | 1, 3 |
| 10 | 10/10/1997 | Letter from Cowan to FTB re 1992 Protest Letter 10-10-97 | 14 | 142 - 144 | NV Trial Ex. 319 | 2, 3 |
| 11 | 1/6/1998 | Complaint, *Gilbert P. Hyatt v. Franchise Tax Board of California* | 14 | 145 - 166 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |

\* All references to "NV Trial Ex." are documents that were submitted into evidence at the jury trial in Hyatt's Nevada litigation, Case No. 98A382999, Eighth Judicial District Court, Clark County, Nevada.

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|----------------------------------------|----------|
| | | **VOLUME TWO** | | | | |
| 12 | 1/6/1998 | Case docket - *Gilbert P. Hyatt v. Franchise Tax Board of California* | 32 | 167 - 257 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |
| 13 | 3/17/1998 | Fax from Donald Kula to Hutchison and Hyatt re response tactics to Subpoena Duces Tecum to be issued to Cal Fed Bank | 21 | 258 | Ex. 3 to Dunn Decl., SER 23; NV Trial Ex. 2326 | 2, 3 |
| 14 | 5/28/1998 | Letter from Sheila Cox to Eugene Cowan attaching 4/24/98 Declaration for Subpoena Duces Tecum signed by Sheila Cox, Subpoena Duces Tecum to Cal Fed Bank | 21 | 259 - 262 | Ex. 3 to Dunn Decl., SER 24-27; NV Trial Ex. 2326 | 2 |
| 15 | 12/27/1999 | Protective Order on Report and Recommendation from Discovery Commissioner Biggar | 16 | 263 - 274 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |
| 16 | 12/30/1999 | Letter from Woodward to Cowan re document request letter | 15 | 275 - 305 | NV Trial Ex. 2330 | 2, 3 |
| 17 | 1/27/2000 | Docket | 17, 32 | 306 - 315 | Nevada Supreme Court, Case No. 35549 | 3 |
| 18 | 3/7/2000 | Memo from McLaughlin to Terry Collins | 16 | 316 - 319 | NV Trial Ex. 2333 | 2, 3 |
| 19 | 4/16/2000 | Letter from FTB to Cowan and Eric Coffill re request for delay | 15, 16 | 320 - 322 | NV Trial Ex. 2332 | 2, 3 |
| 20 | 6/7/2000 | Order Staying District Court Proceedings | 17 | 323 - 324 | Nevada Supreme Court, Case No. 35549 | 3 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| | | **VOLUME THREE** | | | | |
| 21 | 6/30/2000 | Letter to Cody Cinnamon from Coffill responding to IDR | 16 | 325 - 425 | NV Trial Ex. 356 | 2, 3 |
| 22 | 7/7/2000 | Docket | 17, 32 | 426 - 434 | Nevada Supreme Court, Case No. 36390 | 3 |
| 23 | 10/3/2000 | Hearing Officer Report | 16 | 435 - 437 | NV Trial Ex. 2335 | 2, 3 |
| 24 | 6/13/2001 | Order Granting Petition (Docket No. 36390), and Dismissing Petition (Docket No. 35549) | 17 | 438 - 443 | Nevada Supreme Court, Case No. 36390, 35549 | 3 |
| 25 | 3/4/2002 | Docket | 32 | 444 - 445 | Nevada Supreme Court, Case No. 39274 | 3 |
| 26 | 3/8/2002 | Docket | 32 | 446 - 447 | Nevada Supreme Court, Case No. 39312 | 3 |
| 27 | 4/4/2002 | Order Denying Petition for Writ of Mandamus or Prohibition and Dismissing Appeal | 17 | 448 - 450 | Nevada Supreme Court, Case No. 39312, 39274 | 3 |
| 28 | 4/4/2002 | Order Granting Petition for Rehearing, Vacating Previous Order, Granting Petition for a Writ of Mandamus in Part in Docket no. 36390, and Granting Petition for a Writ of Prohibition in Part in Docket No. 35549 | 17 | 451 - 464 | Nevada Supreme Court, Case No. 35549, 36390 | 3 |
| 29 | 6/3/2002 | Letter from Felix Leatherwood to Mark Hutchison requesting documents and deposition testimony stamped "Confidential-NV Protective Order" | 17 | 465 - 466 | NV Trial Ex. 2342 | 2, 3 |
| 30 | 7/7/2002 | FTB Administrative Subpoena Duces Tecum | 17 | 467 - 470 | NV Trial Ex. 2344 | 2, 3 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|---------------------------------------|----------|
| 31 | 2/28/2003 | Court's Ruling on Order to Show Cause filed in Superior Court of California, Sacramento County , Case No. 02CS01582 | 17 | 471 - 472 | NV Trial Ex. 2348 | 3, 5 |
| 32 | 3/17/2003 | Fax Cover and letter from Donald Kula to Molly Mosley, DAG | 17 | 473 - 475 | NV Trial Ex. 2349 | 2, 3, 5 |
| 33 | 12/31/2003 | *State Franchise Tax Board v Gilbert P. Hyatt* , Decision (unpublished) | 17 | 476 - 500 | California Court of Appeal, Third Appellate District - Sacramento, Case No. C043627 | 2, 3, 5 |
| **VOLUME FOUR** | | | | | | |
| 34 | 9/7/2005 | Protest Event Log for Case Unit: Hyatt, Gilbert - 1992 | | 501 - 604 | NV Trial Ex. 2353 | 2, 3 |
| 35 | 10/28/2005 | Letter from Robert Dunn to Mark Hutchison re: request consent to release deposition transcripts and documents to FTB's protest hearing officer | 18 | 605 - 607 | NV Trial Ex. 2354 | 2, 3 |
| 36 | 12/6/2005 | Letter from Robert Dunn to Mark Hutchison re: second request | 18 | 608 | NV Trial Ex. 2355 | 2, 3 |
| 37 | 1/30/2006 | FTB Administrative Subpoena Duces Tecum and Exhibits A, C-E | 18 | 609 - 627 | NV Trial Ex. 2356 | 2, 3 |
| 38 | 1/19/2007 | Letter from Robert Dunn to Mark Hutchison requests production of documents and testimony from 2006 | 18 | 628 - 632 | NV Trial Ex. 2357 | 2, 3 |
| 39 | 2/14/2007 | Letter from Donald Kula to Robert Dunn | 18 | 633 - 638 | NV Trial Ex. 2358 | 2, 3 |
| 40 | 5/17/2007 | Letter from Donald Kula to Robert Dunn | 18 | 639 - 640 | NV Trial Ex. 2359 | 2, 3 |

# INDEX
## FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 41 | 11/1/2007 | Determination Letter from George W. McLaughlin to Eric Coffill | 18 | 641 - 690 | NV Trial Ex. 2320 | 2, 3 |
| 42 | 11/20/2007 | Letter from Eric Coffill to George W. McLaughlin | 19 | 691 - 695 | Ex. 1 to Dunn Decl., SER 13-17 | 6 |
| 43 | 11/26/2007 | Letter from George W. McLaughlin to Eric Coffill | 19 | 696 - 698 | Ex. 2 to Dunn Decl., SER 19-21 | 2 |
| 44 | 1/22/2008 | Letter from Eric Coffill to SBE enclosing Notice of Appeal for 1991, Request for Abatement of Interest | 22 | 699 - 711 | Ex. 4 to Dunn Decl., SER 29-41 | 6 |
| 45 | 1/23/2008 | Letter from Eric Coffill to SBE enclosing Notice of Appeal for 1992, Request for Abatement of Interest | 22 | 712 - 724 | Ex. 5 to Dunn Decl., SER 43-55 | 6 |
| 46 | 7/1/2008 | Letter from SBE to Eric Coffill re extension | 23 | 725 - 726 | SBE | 6 |
| 47 | 7/3/2008 | Letter from SBE to Eric Coffill re extension | 23 | 727 | SBE | 6 |
| 48 | 11/18/2008 | Letter from SBE to Eric Coffill re extension | 23 | 728 - 729 | SBE | 6 |
| **VOLUME FIVE** | | | | | | |
| 49 | 12/9/2008 | Hyatt Opening Brief 1991 | 23 | 730 - 836 | SBE | 6 |
| 50 | 12/9/2008 | Hyatt Opening Brief 1992 | 23 | 837 - 922 | SBE | 6 |
| 51 | 1/27/2009 | Letter from Robert Dunn to SBE re Hyatt's filing | 23 | 923 - 924 | SBE | 6 |
| 52 | 2/13/2009 | Docket | 32 | 925 - 928 | Nevada Supreme Court, Case No. 53264 | 3 |
| 53 | 3/16/2009 | Letter from Robert Dunn to Eric Coffill re scheduling depositions of affiants | 23 | 929 - 930 | SBE | 3 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 54 | 6/26/2009 | Request for Foreign Deposition Subpoena - Melvin R. Hecht | | 931 - 953 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-09-593462-C | 3, 5, 6 |
| **VOLUME SIX** | | | | | | |
| 55 | 6/26/2009 | Request for Foreign Deposition Subpoena - Michelina Hecht | | 954 - 975 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-09-593462-C | 3, 5, 6 |
| 56 | 9/15/2009 | FTB Opening Brief 1991 | 24 | 976 - 1081 | SBE | 6 |
| 57 | 9/15/2009 | FTB Opening Brief 1992 | 24, 31 | 1082 - 1160 | SBE; Ex. 7 to Dunn Decl., SER 61 -70 | 6 |
| 58 | 9/29/2009 | Letter from Eric Coffill to SBE requesting extension of time for filing | 25 | 1161 - 1172 | SBE | 6 |
| 59 | 10/1/2009 | Letter from Robert Dunn to SBE replying to Hyatt's request for time | 25 | 1173 - 1176 | SBE | 6 |
| 60 | 5/20/2010 | Letter from SBE to Eric Coffill re extension and new due date | 25 | 1177 | SBE | 6 |
| 61 | 8/11/2010 | Letter from SBE to Eric Coffill granting extension and email exchange | 25 | 1178 - 1180 | SBE | 6 |
| **VOLUME SEVEN** | | | | | | |
| 62 | 8/23/2010 | Hyatt 1991 Reply Brief | 25 | 1181 - 1289 | SBE | 6 |
| 63 | 8/23/2010 | Hyatt 1992 Reply Brief | 25 | 1290 - 1398 | SBE | 6 |
| 64 | 8/23/2010 | Hyatt Index of Affidavits | 25 | 1399 - 1403 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|-----------|---------------|----------------------------------------|----------|
| 65 | 2/4/2011 | *State of California Franchise Tax Board v. Mary Troter Stratton, et al.,* Petition by FTB for Issuance of Out-of-State Deposition Commissions (for Stratton depositions) | 24 | 1404 - 1410 | Superior Court of California, Sacramento, Case No. 34-2011-00096505 | 5, 6 |
| 66 | 5/3/2011 | *State of California Franchise Tax Board v. Gilbert P. Hyatt,* Nevada District Court Order Denying Strattons' Motion to Quash Subpoenas for a Pending Administrative Tax Appeal in California | 24 | 1411 - 1413 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-II-635345-C | 3, 5, 6 |
| **VOLUME EIGHT** | | | | | | |
| 67 | 6/30/2011 | FTB Reply Brief 1992 (Excerpts re Delays in Protest and Nevada litigation) | | 1414 - 1426 | SBE | 6 |
| 68 | 7/20/2011 | Dkt. No. 1 - Hyatt's Petition for Protective Order or Quash subpoenas | 27 | 1427 - 1429 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 6, 7 |
| 69 | 7/20/2011 | Docket | 32 | 1430 - 1431 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 7 |
| 70 | 7/29/2011 | Dkt. No. 17 - Decision & Order re Philips discovery | 27 | 1432 - 1444 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 6, 7 |

## INDEX

## FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|----------------------------------------|----------|
| 71 | 8/1/2011 | Docket | 32 | 1445 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 72 | 8/2/2011 | Dkt. No. 19 - Hyatt's Notice of Appeal | 27 | 1446 - 1465 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 7 |
| 73 | 8/15/2012 | Hyatt 1991 Supplemental Brief | 25 | 1466 - 1570 | SBE | 6 |
| **VOLUME NINE** | | | | | | |
| 74 | 8/15/2012 | Hyatt 1992 Supplemental Brief | 25 | 1571 - 1678 | SBE | 6 |
| 75 | 8/15/2012 | Exh A Hyatt 1991 Supplemental Brief | 25 | 1679 - 1680 | SBE | 6 |
| 76 | 8/15/2012 | Exh B Hyatt 1991 Supplemental Brief | 25 | 1681 - 1683 | SBE | 6 |
| 77 | 10/5/2012 | Dkt. No. 24 - Order to Show Cause | 28 | 1684 - 1687 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 78 | 2/19/2013 | FTB Supplemental Briefing re Tax Year 1991 and 1992, Exhibit H Tab 1-47_Protest and Litigation timeline (Tab 36) | | 1688 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|---------------------------------------|----------|
| 79 | 3/13/2013 | Dkt. No. 29 - Opinion and Order | 28 | 1689 - 1705 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 80 | 3/28/2013 | FTB Additional Brief Philips Documents and NY litigation | | 1706 - 1721 | SBE | 6, 7 |
| 81 | 4/29/2013 | FTB Additional Brief re Philips documents to SBE | | 1722 - 1726 | SBE | 6, 7 |
| 82 | 5/14/2013 | Docket | 32 | 1727 - 1730 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 83 | 10/7/2013 | Dkt. No. 23- Decision and Order | 28 | 1731 - 1747 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 84 | 3/13/2014 | Dkt. No. 74 - Decision and Order | 28 | 1748 - 1758 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 85 | 4/23/2014 | Letter from SBE to Eric Coffill and Robert Dunn requesting additional briefing | 29 | 1759 - 1761 | SBE | 6 |
| 86 | 5/7/2014 | Letter from Eric Coffill to SBE | 30 | 1762 - 1764 | Ex. 6 to Dunn Decl., SER 57-59 | 6 |
| 87 | 6/13/2014 | Letter from SBE to Eric Coffill and Robert Dunn re due dates and reluctance to grant more extensions | 30, 33 | 1765 - 1767 | SBE | 6 |
| 88 | 9/26/2014 | Letter from Eric Coffill to SBE re Request to Vacate | 33 | 1768 - 1769 | SBE | 6 |

# INDEX
## FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 89 | 10/13/2014 | Letter from Eric Coffill to SBE responding to FTB letter (enclosing letter from Hyatt's New York counsel to FTB's New York counsel re U.S. Philips documents dispute) | 33 | 1770 - 1778 | SBE | 6, 7 |
| 90 | 11/3/2014 | Letter from Eric Coffill to SBE requesting, *inter alia*, that SBE vacate briefing deadline | 33 | 1779 - 1780 | SBE | 6 |
| **VOLUME TEN** | | | | | | |
| 91 | 2/4/2015 | Letter from Eric Coffill to SBE submitting motions and requesting, *inter alia,* delay in briefing ending decision on motions | 33 | 1781 - 1847 | SBE | 6 |
| 92 | 2/23/2015 | Letter from Eric Coffill to SBE requesting, *inter alia,* delay on briefing until SBE rules on motions to strike | 33 | 1848 - 1849 | SBE | 6 |
| 93 | 3/11/2015 | Docket | 32 | 1850 - 1852 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 94 | 4/6/2015 | Affidavit of Robert Dunn in Opposition to Gilbert Hyatt's Motion Seeking an Order of Civil Contempt and Permanent Injunctive Relief | 32 | 1853 - 2000 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 95 | 6/3/2015 | Letter from Eric Coffill to the SBE requesting extension of time to file reply briefs | 33 | 2001 - 2003 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|----------------------------------------|----------|
| 96 | 9/10/2015 | Amended Judgment Decision & Order | 32 | 2004 - 2016 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 97 | 9/19/2016 | Letter from Edwin Antolin to SBE requesting extension for filing additional briefs | 33 | 2017 - 2018 | SBE | 6 |
| **VOLUME ELEVEN** | | | | | | |
| 98 | 9/28/2016 | Appellant's Concluding Summary (1991); Errata filed 11/4/16 | 33 | 2019 - 2057 | SBE | 6 |
| 99 | 9/28/2016 | Appellant's Concluding Summary (1992); Errata filed 11/4/16 | 33 | 2058 - 2092 | SBE | 6 |
| 100 | 9/28/2016 | Appellant's Second Additional Briefing (1991); Errata filed 11/4/16 | 33 | 2093 - 2165 | SBE | 6 |
| 101 | 9/28/2016 | Appellant's Second Additional Briefing (1992); Errata filed 11/4/16 | 33 | 2166 - 2236 | SBE | 6 |
| **VOLUME TWELVE** | | | | | | |
| 102 | 9/28/2016 | Attachment 1, Appellant's Second Additional Briefing (1992); Errata filed 11/4/16 | 33 | 2237 - 2278 | SBE | 6 |
| 103 | 10/20/2016 | Letter from SBE to Edwin Antolin re, *inter alia,* delays | 33 | 2279 - 2282 | SBE | 6 |
| 104 | 11/4/2016 | Letter from Edwin Antolin to Joann Richmond with errata table | 33 | 2283 - 2297 | SBE | 6 |
| 105 | 11/16/2016 | Letter from FTB to SBE re Hyatt's request for additional time | 33 | 2298 - 2299 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 106 | 1/6/2017 | Letter from SBE to Edwin Antolin re rescheduing the hearing from March 2017 to May 2017 | 33 | 2300 | SBE | 6 |
| 107 | 3/3/2017 | Notice of Board Hearing for Case No. 446509 on 5/23/17 | 33 | 2301 - 2302 | SBE | 6 |
| 108 | 3/3/2017 | Notice of Board Hearing for Case No. 435770 on 5/23/17 | 33 | 2303 - 2304 | SBE | 6 |



STATE OF CALIFORNIA

**FRANCHISE TAX BOARD**
6150 VAN NUYS BLVD., ROOM 100
VAN NUYS, CA 91401-3381
TELEPHONE: (818) 901-5225

For Privacy Act Notice, See Form FTB 1131

Date: June 17, 1993

Gilbert P. Hyatt
P.O. Box 60028
Las Vegas, NV 89160

Years: 1989 & 1990 & 1991

Your returns have been assigned to this office for examination. We hope to complete the examination as soon as possible, but our workload sometimes requires that our audits be delayed for some time. Answers to the questionnaire on the reverse side will assist us in scheduling an appointment on a mutually convenient date, and in expediting the examination of your returns.

Please complete the questionnaire and return it to our office within 10 days. If additional information is needed, you or your designated representative will be contacted.

Your cooperation is appreciated.

*Marc Shayer*
Marc Shayer
Tax Auditor

H 014905

FTB 4891-39 (REV 12-86) PAGE 1

0112-00001
RJN0001

MS

## AUDIT SCHEDULING INFORMATION

☐ Personal Income Tax
☐ Franchise Tax

| INCOME YEARS |
|---|

| TAXPAYER |
|---|

| TAXPAYER ADDRESS | ADDRESS LOCATION WHERE RECORDS CAN BE EXAMINED |
|---|---|
| _____ | ☐ Same as Taxpayer address |
| _____ | ☐ _____ |

Individual to contact to conduct this audit

| NAME | TITLE | TELEPHONE & EXTENSION |
|---|---|---|
| ADDRESS | | |

Have you signed a consent to extend the federal statute of limitations for any of the years involved or any prior year?  ☐ Yes   ☐ No   If Yes, list each year and application expiration date:

| Year | | | | | | | |
|---|---|---|---|---|---|---|---|
| Expiration Date | | | | | | | |

Has the Federal Government examined any of the returns for the year(s) involved? . . . . . . . . .  ☐ Yes   ☐ No
Is an examination in progress? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☐ Yes   ☐ No
    If Yes, years under examination: _____
To your knowledge, is an examination planned? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☐ Yes   ☐ No

*If an examination has been completed, a copy of the report should be forwarded to this office in accordance with Section 25432 of the Bank and Corporation Law or Section 18451 of the Personal Income Tax Law. This may make our independent examination unnecessary.*

| CORPORATE TAXPAYERS COMPLETE THE FOLLOWING | | | | |
|---|---|---|---|---|
| Name of corporate affiliates (subsidiary or parent) | Percent of Ownership | Files California Returns | | If Yes, California Identification No. |
| | | Yes | No | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*Please enclose reports to stockholders for each reference year (if available) in order that we may study them beforehand.*

| This questionnaire completed by: | SIGNATURE | TITLE | DATE |
|---|---|---|---|

FTB 4891-39 (REV 12-86) PAGE 2



STATE OF CALIFORNIA

## FRANCHISE TAX BOARD

Your tax return has been selected for audit by the California Franchise Tax Board (FTB).

What should you expect from a Franchise Tax Board audit?

- Courteous treatment by FTB employees
- Clear and concise requests for information from the auditor assigned to your case
- Confidential treatment of any personal and financial information that you provide to us
- Completion of the audit within a reasonable amount of time

FTB 1015 (REV 3-89) PAGE 1

At the close of the audit, you will be told in writing that:

- We are accepting the return as you filed it, or
- You have additional tax due, or
- You have overpaid your tax and are entitled to a refund, or -
- We have not changed your tax amount, but you may be entitled to a refund if you correctly recompute your tax and file a claim for a refund before the Statute of Limitation expires

*Please see reverse side for additional information.*

---

### PRIVACY NOTICE

The Information Practices Act of 1977 and the federal Privacy Act require the Franchise Tax Board to tell you why we ask you for information. The Operations and Compliance Divisions ask for tax return information to carry out the Personal Income Tax Law of the State of California. We may request additional information if we audit your return or take collection action.

If you meet the income requirements, the Revenue and Taxation Code requires you to file a return or statement in the form we prescribe (Sections 18401 and 18431). When you file these or other documents, you must include your social security number for identification and return processing (Section 18934).

1131 (REV 5-89/6-91)

It is mandatory to furnish all information requested when you are required to file a return or statement. If you do not file a return, or do not provide the information we ask for, or provide fraudulent information, the law says you may be charged penalties and interest and, in certain cases, you may be subject to criminal prosecution. We also may disallow claimed exemptions, exclusions, credits, deductions or adjustments. This could make the tax higher or delay or reduce any refund.

We may give the information you furnish us to the United States Internal Revenue Service, the proper official of any state imposing an income tax or a tax measured by income, the Multistate Tax Commission and to California government agencies and officials, as provided by law. If you owe any monies, we may disclose the amount due to employers, financial institutions, County Recorders, vacation trust funds, process agents and other payers.

You have a right to access records containing your personal information maintained by the Franchise Tax Board. The officials responsible for maintaining the information are: 1) Filing of returns – Director, Document Processing Bureau; 2) Auditing of returns – Director, Personal Income Tax Audit Bureau; and 3) Collection of monies – Director, Enforcement Bureau. The address is: Franchise Tax Board, P.O. Box 942840, Sacramento, CA 94240-1040; telephone: (800) 852-5711.

H 014907

0112-00003
RJN0003

H 014908 

Place stamp here.
Post Office will
not deliver mail
without postage.

FRANCHISE TAX BOARD
6150 VAN NUYS BLVD  ROOM 100
VAN NUYS CA  91401-3381
ATTN: MARC SHAYER

1741

0112-00004
RJN0004

1721

STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**
6150 VAN NUYS BLVD., ROOM 100
VAN NUYS, CA 91401-3381

FORWARDING AND
ADDRESS CORRECTION REQUESTED

JUN 17 '93

VAN NUYS CA 914
PM
17 JUN
1993

HYAT028    891L02019 1498 06/21/93
                              FORM 3547
HYATT
4012 S RAINBOW BLVD #H59
LAS VEGAS NV 89103-2010

89166-8024

H 014909



STATE OF CALIFORNIA

## FRANCHISE TAX BOARD
8150 VAN NUYS BOULEVARD, ROOM 100
VAN NUYS, CA 91401
Tel: (818) 901-5225

July 15, 1993

In reply refer
to VN:MS

Attn: Michael W. Kern, CPA
Piercy, Bowler, Taylor & Kern
6600 W. Charleston Blvd., Suite #118
Las Vegas, NV 89102

Re: Gilbert P. Hyatt
CA Personal Resident/Non Resident Income Tax Audit
For Years 1989 & 1990 & 1991
Taxpayer ID # ███████████

Dear Mr. Kern:

The State of California resident/non-resident tax returns of
Gilbert P. Hyatt for 1989 & 1990 & 1991 have been forwarded to
this office for examination. To assist in clarifying the
taxpayer's residency status, please provide the following:

1. A completed copy of Form FTB 3805F(both sides) by the
taxpayer for tax years 1986 through 1991.

2. A workpaper schedule showing how the figures listed on the
California Schedule SI in 1991 were calculated.

3. The 1991 California Schedule SI indicates that the taxpayer
left California on 10/01/91. Please identify what
significant event took place on that day to support it as
the taxpayer's date of departure from California.

4. The 1991 Federal Schedule C lists a business address at
3225 S. Pecos Road, Apt. 237, Las Vegas. Please indicate
if the taxpayer lived at this address? If he did, then
please list the exact dates that the taxpayer lived at this
address.

5. One of the 1991 Federal Schedule C's reports $42,266,667 in
gross receipts from several entities. Please explain what
these payments made to the taxpayer were for.

**A00218**

Please submit the requested information to the above address
by August 12, 1993.

Gilbert P. Hyatt
July 15, 1993
Page 2 Of 2

To ensure proper handling, attach a copy of this letter to
your reply.

Thank you for your cooperation.

*Marc Shayer*
Marc Shayer
Tax Auditor

Enclosure

A00219

2174-0002
RJN0007



STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**
P.O. BOX 942840
SACRAMENTO, CA 94240-5540

**INFORMATION CONCERNING RESIDENT STATUS**

**Please Type or Print**

| Last Name | First Name(s) and Initial(s) | Your Social Security No. | Spouse's Social Security No. |
|---|---|---|---|
| HYATT | GILBERT P. | ██████████ | |

| Present Home Address (Number and Street or Rural Route) | City, Town or Post Office | State | County | ZIP Code |
|---|---|---|---|---|
| P.O. BOX 81230 | LAS VEGAS | NV | CLARK | 89180 |

Prior California Address

7841 JENNIFER CIRCLE, LA PALMA, CALIFORNIA 90623

Out of State Address

P.O. BOX 81230, LAS VEGAS, NEVADA 89180

**PLEASE PROVIDE THE FOLLOWING INFORMATION FOR YOU AND YOUR SPOUSE (if married) FOR EACH YEAR SHOWN BELOW:**  H = Husband  W = Wife

| TAXABLE YEARS: | 19___ | | 19___ | | 19___ | | 19___ | | 19 86 | | 19 87 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | H | W | H | W | H | W | H | W | H | W | H | W |
| 1 Exact date you (and your spouse, if married) first entered California: H: ___ W: ___ | | | | | | | | | | | | |
| 2 Number of months spent each year in California .................... | | | | | | | | | 12 | | 12 | |
| 3 Number of months spent each year in other states or countries: a Location _____ | | | | | | | | | | | | |
| b Location _____ | | | | | | | | | | | | |
| 4 Where were you registered to vote? .......................... | | | | | | | | | NONE | | NONE | |
| 5 State(s) or country(ies) in which you held valid driver's license(s) ....... | | | | | | | | | CA | | CA | |
| 6 State(s) or country(ies) in which your automobile(s) were registered ...... | | | | | | | | | CA | | CA | |
| 7 Where did your children attend school (if applicable)? ................ | | | | | | | | | GROWN | CHILDREN | | |
| 8 a In which state(s) or country(ies) did you maintain your (1) checking accounts .......... | | | | | | | | | CA | | CA | |
| (2) savings accounts ........... | | | | | | | | | CA | | CA | |
| b In which state were the majority of banking activities transacted?..... | | | | | | | | | CA | | CA | |
| 9 Number of months you owned a personal dwelling (House, Trailer, etc.) in California .................... | | | | | | | | | 6 | | 12 | |
| 10 Number of months you rented a personal dwelling or apartment in California for your own use........ | | | | | | | | | 6 | | 0 | |

**ALSO PROVIDE THE INFORMATION REQUESTED ON THE REVERSE SIDE**

FTB 3805F (REV 9-90) PAGE 1

A00225



STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**
P.O. BOX 942840
SACRAMENTO, CA 94240-5540

**INFORMATION CONCERNING RESIDENT STATUS**

| Please Type or Print | Last Name | First Name(s) and Initial(s) | Your Social Security No. | Spouse's Social Security No. |
|---|---|---|---|---|
| | HYATT | GILBERT P. | ■■■■ | |

| Present Home Address (Number and Street or Rural Route) | City, Town or Post Office | State | County | ZIP Code |
|---|---|---|---|---|
| P.O. BOX 81230 | LAS VEGAS | NV | CLARK | 89180 |

Prior California Address

7841 JENNIFER CIRCLE, LA PALMA, CALIFORNIA 90623

Out of State Address

P.O. BOX 81230, LAS VEGAS, NEVADA 89180

**PLEASE PROVIDE THE FOLLOWING INFORMATION FOR YOU AND YOUR SPOUSE (if married) FOR EACH YEAR SHOWN BELOW:   H = Husband   W = Wife**

| TAXABLE YEARS: | 19 88 H | W | 19 89 H | W | 19 90 H | W | 19 91 H | W | 19 92 H | W | 19 93 H | W |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Exact date you (and your spouse, if married) first entered California: H: 1954 W: | | | | | | | | | | | | |
| 2 Number of months spent each year in California | 12 | | 12 | | 12 | | 8.9 | | 0 | | 0 | |
| 3 Number of months spent each year in other states or countries: a Location LAS VEGAS, NV | | | | | | | 3.1 | | 12 | | 12 | |
| b Location _____ | | | | | | | | | | | | |
| 4 Where were you registered to vote? | NONE | | NONE | | NONE | | NV | | NV | | NV | |
| 5 State(s) or country(ies) in which you held valid driver's license(s) | CA | | CA | | CA | | CA NV | | NV | | NV | |
| 6 State(s) or country(ies) in which your automobile(s) were registered | CA | | CA | | CA | | CA | | CA NV | | NV | |
| 7 Where did your children attend school (if applicable)? | GROWN CHILDREN | | | | | | | | | | | |
| 8 a In which state(s) or country(ies) did you maintain your (1) checking accounts | CA | | CA | | CA | | CA NV | | NV | | NV | |
| (2) savings accounts | CA | | CA | | CA | | CA NV | | NV | | NV | |
| b In which state were the majority of banking activities transacted? | CA | | CA | | CA | | CA NV | | NV | | NV | |
| 9 Number of months you owned a personal dwelling (House, Trailer, etc.) in California | 12 | | 12 | | 12 | | 8.9 | | 0 | | 0 | |
| 10 Number of months you rented a personal dwelling or apartment in California for your own use | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | |

**ALSO PROVIDE THE INFORMATION REQUESTED ON THE REVERSE SIDE**

FTB 3805F (REV 9-90) PAGE 1

A00226

2174-0004

RJN0009

Name __GILBERT P. HYATT__ Social Security Number._____ Taxable Years_____

**IF MORE SPACE IS NEEDED, PLEASE ATTACH AN ADDITIONAL SHEET.**

11 For the years in question, provide a brief summary of your business activities including type, address, and the nature of your involvement.

PURSUED PATENT APPLICATIONS WITH U.S. PATENT OFFICE IN WASHINGTON

D.C. FULL TIME.

12 For the years in question, provide a brief summary of your civic and social activities such as club memberships, professional associations, etc. The summary should provide the name and address of the organization, explain the type of activity and the nature of your involvement.

(SEE ATTACHED LETTER)

13 List all real property holdings you had in California during the years in question. Indicate which properties you or your family occupied during these years and the specific dates.

| Location of Property | Dates occupied by you or family |
|---|---|
| 7841 JENNIFER CIRCLE | JUNE 1986 TO SEPTEMBER 24, 1991 |
| LA PALMA, CALIFORNIA | (SOLD OCTOBER 1, 1991) |

14 List all real property holdings you had outside California during the years in question. Provide the address and type of use of the property; i.e. business, personal.

| Location of Property | Type of use |
|---|---|
| (SEE ATTACHED) | |

15 During what time period did you consider yourself to be a California resident?
H: THROUGH SEPTEMBER 24, 1991          W:

**PRIVACY NOTICE**

The Information Practices Act of 1977 and the federal Privacy Act require the Franchise Tax Board to tell you why we ask you for information. The Operations and Compliance Divisions ask for tax return information to carry out the Personal Income Tax Law of the State of California. We may request additional information if we audit your return or take collection action.

If you meet the income requirements, the Revenue and Taxation Code requires you to file a return or statement in the form we prescribe (Sections 18401 and 18431). When you file these or other documents, you must include your social security number for identification and return processing (Section 18934).

It is mandatory to furnish all information requested when you are required to file a return or statement. If you do not file a return, or do not provide the information we ask for, or provide fraudulent information, the law says you may be charged penalties and interest and, in certain cases, you may be subject to criminal prosecution. We also may disallow claimed exemptions, exclusions, credits, deductions or adjustments. This could make the tax higher or delay or reduce any refund.

We may give the information you furnish us to the United States Internal Revenue Service, the proper official of any state imposing an income tax or a tax measured by income, the Multistate Tax Commission and to California government

agencies and officials, as provided by law. If you owe any monies, we may disclose the amount due to employers, financial institutions, County Recorders, vacation trust funds, process agents and other payers.

You have a right to access records containing your personal information maintained by the Franchise Tax Board. The officials responsible for maintaining the information are: 1) Filing of returns – Director, Document Processing Bureau; 2) Auditing of returns – Director, Personal Income Tax Audit Bureau; and 3) Collection of monies – Director, Enforcement Bureau. The address is: Franchise Tax Board, P.O. Box 942840, Sacramento, CA 94240-1040; telephone: (916) 369-0500.

FTB 3805F (REV 9-90) PAGE 2

A00227

356034-K382    04/11/92 3:20:41  V150 

**FT**
**TAXABLE YEAR**
**1991**

# Nonresident or Part-Year Resident
# California Adjusted Gross Income

CALIFORNIA SCHEDULE
**SI**

Attach this schedule if you were a full-year nonresident or part-year resident of California in 1991. Attach to Form 540NR. See Schedule SI instructions.

Name(s) as shown on your return                                    Your social security number

GILBERT HYATT

**STEP 1 – California Income** - Enter all of your income earned while you were a California resident and your income received from sources within California while you were a nonresident.

| | | | |
|---|---|---|---|
| 1 | Wages, salaries, tips, etc. | 1 | |
| 2 | Taxable interest income | 2 | 14,872. |
| 3 | Dividend income | 3 | 4,750. |
| 4 | Alimony received | 4 | |
| 5 | Business income or (loss) | 5 | 613,606. |
| 6 | Capital gain or (loss) | 6 | |
| 7 | Capital gain distributions not reported on line 6 | 7 | |
| 8 | Other gains or (losses) | 8 | |
| 9 | a Total IRA distributions | 9a | |
| | b Taxable amount | 9b | |
| 10 | a Total pensions and annuities | 10a | |
| | b Taxable amount | 10b | |
| 11 | Rents, royalties, partnerships, S corporations, estates, trusts, etc. | 11 | |
| 12 | Farm income or (loss) | 12 | |
| 13 | Other income (list type and amount) | 13 | |
| 14 | **California income.** Add lines 1 through 13 in the far right column | 14 | 633,228. |

**STEP 2 – California Adjusted Gross Income** - Enter adjustments that are directly related to income reported above.

| | | | |
|---|---|---|---|
| 15 | IRA deduction: You _____ Spouse _____ | 15 | |
| 16 | Deduction for self-employment tax | 16 | |
| 17 | Self-employed health insurance deduction | 17 | |
| 18 | Keogh retirement plan and self-employed SEP deduction | 18 | |
| 19 | Penalty on early withdrawal of savings | 19 | |
| 20 | Alimony paid. Recipient's last name: _____ Recipient's social security number _____ | 20 | |
| 21 | Total adjustments. Add lines 15 through 20 | 21 | |
| 22 | **California adjusted gross income.** Subtract line 21 from line 14. Enter the amount here and on Form 540NR, line 20 | 22 | 633,228. |

Note: Be sure to complete Step 3.

**STEP 3 – Important:** Check the appropriate boxes below and enter the appropriate information that applies to you and your spouse.

| | | You Yes | You No | Spouse Yes | Spouse No |
|---|---|---|---|---|---|
| 1 | I changed my legal residence from California during 1991 and have not moved back to California | X | | | |
| 2 | I changed my legal residence from California during or before 1991 and moved back to California during 1991 | | X | | |
| 3 | I changed my legal residence to California during 1991. I was not previously a California resident | | X | | |
| 4 | I was a nonresident of California for all of 1991 | | X | | |
| | I was a resident of  NEVADA | | | | |
| | My spouse was a resident of _____ | | | | |
| 5 | I was a military nonresident stationed in California in 1991 | | X | | |
| 6 | I was a California military resident stationed outside California in 1991 | | X | | |
| 7 | I owned a home in California while not living in California | | X | | |
| | If yes, enter the address of the home _____ | | | | |

| | | You | Spouse |
|---|---|---|---|
| 8 | I lived in California during 1991 for (enter the number of days) | 273 | |
| 9 | I left California on (enter date) | 10/01/91 | |
| 10 | I returned to California on (enter date) | | |
| 11 | I became a California resident during 1991 on (enter date) | 01/01/91 | |

## ATTACH THIS SCHEDULE TO FORM 540NR

180584  3.000

Schedule SI 1991  Side 1

A00228

2174-0006
RJN0011

Gilbert P. Hyatt ▉▉▉▉▉

1991 California Schedule SI

Line 2    Taxable interest income

   Fidelity Thrift & Loan        $   3,596
   California Federal Bank        5,751
   Irvine City Bank          3,292
   Note from sale of residence      2,233
    Total Line 2        * $ 14,872

Line 3    Dividend income

   Franklin Federal Money       $  2,928
    Total Line 3        * $  4,750

Line 5    California Business Income

   Pioneer            $200,000.00
   Philips Corp.          400,000.00
   Nikkei Electronics Magazine (speaking)  12,500.00
   CMP Publications (speaking)     1,105.65
    Total Line 5       $613,605.65

*  Inadvertantly this amount was overstated.

A00229

2174-0007

RJN0012

Attachment to Number 14

| Location of Property | Type of Use |
|---|---|
| 3225 S. Pecos, Apt. 237<br>Las Vegas, Nevada | Residence, Personal<br>Business Office<br>(October of 1991 - April 1992) |
| 6600 W. Charleston, Suite 118<br>Las Vegas, Nevada | Business Lease<br>April 1992 through Present |
| Las Vegas, Nevada<br>(Home address is confidential, but can<br>be given to you in confidence upon<br>your request.) | Residence, Personal<br>Business Office<br>April 1992 to Present |

A00230

Supplemental Answer
to Question 12 of the FTB Information Form

Institute of Electrical and Electronic Engineers (IEEE)
    345 East 47 Street; New York, New York 10017
    Professional society, no activity
    Period: about 1957 to present

Association of Computing Machinery (ACM)
    P.O. Box 12115 Church Street Station,
     New York New York 10249
    Professional society, no activity
    Period: about 1980 to present

Licensing Executives Society (LES)
    71 East Avenue; Norwalk, Connecticut 06851
    Professional society, no activity
    Period: about 1988 to present

Sam's Club
    Las Vegas, Nevada
    Membership department store, purchasing activity
    Period: April 4, 1992 to present

The Sports Authority
    2620 Decatur Boulevard, Las Vegas, Nevada 89102
    Sports equipment, sports activity
    Period: April 4, 1992 to present

Bizmart
    2640 Decatur Boulevard, Las Vegas, Nevada 89102
    Membership department store, purchasing activity
    Period: June 12, 1992 to present

Personal Computer Users Group
    316 Bridger Avenue, Las Vegas, Nevada 89101
    Computer club, hobby activity
    Period: about November 1991 to present

Temple Beth Am
    4180 Pecos Road, Las Vegas, Nevada
    Jewish temple, religious activity
    Period: October 1991 to present

Mount Charleston Ski Resort
    Mount Charleston, Nevada
    Ski resort, ski activity
    Period: October 1991 to present

Comdex
    Las Vegas Convention Center
    Computer conference, professional activity
    Comdex speaker in 1990
    Periodic:    November 1990
                October 1991
                November 1992

Clark County School District
    Las Vegas, Nevada
    Elementary through high school, civic activity
    Volunteer consulting with Clark County School
    District regarding computer training for
    quality of education and motivation of
    entrepreneurs
    Period: about April 1992 to present

Nevada Governor Robert Miller
Nevada Senator Richard Bryan
    Las Vegas, Nevada
    International trade activity
    Period: 1992 to present

Nevada Development Authority (NDA)
    Las Vegas, Nevada
    International trade activity
    Period: October 1991 to present

**A00231**

Officers and Founding Directors
Richard H. Bowler
Michael W. Kern
L. Ralph Piercy
Revelle B. Taylor

**PIERCY, BOWLER, TAYLOR & KERN**
*CERTIFIED PUBLIC ACCOUNTANTS, LTD.*
A Professional Corporation
A Member of the AICPA
SEC Practice Section

6600 West Charleston Blvd., Suite 118
Las Vegas, Nevada 89102

Telephone (702) 384-1120
Fax (702) 870-2474

VN AUG - 9 1993 REC'D

<u>CERTIFIED/RETURN RECEIPT REQUESTED</u>

August 4, 1993

Mr. Marc Shayer
Tax Auditor
Franchise Tax Board
6150 Van Nuys Boulevard
Room 100
Van Nuys, California 91401

Dear Mr. Shayer:

Pursuant to your request of July 15, 1993 (copy enclosed) I am submitting the following information:

1.   A completed copy of Form FTB 3805F (both sides) for Mr. Gilbert Hyatt for tax years 1986 through 1993.

2.   A workpaper schedule summarizing the figures listed on the California Schedule SI in 1991.

3.   The 1991 California Schedule SI indicated that the taxpayer left California on October 1, 1991.  Taxpayer actually left California on September 25, 1991 and became a resident of Nevada on September 25, 1991.  The significant event that took place on September 25, 1991 to support the taxpayer's date of departure from California was his traveling to Las Vegas, Nevada from California to start setting up his residence and business.  The significant event that took place on October 1, 1991 was his return to California to sign a Grant Deed and a Deed of Trust to complete the sale of his house in California and then he immediately returned to Las Vegas, Nevada on the same day.

4.   The 1991 Federal Schedule C lists the business address at 3225 S. Pecos Road, Apt. 237, Las Vegas.  Mr. Hyatt lived and worked out of 3225 S. Pecos Road, Apt. 237 in Las Vegas until he acquired his home in Las Vegas in April of 1992.  Mr. Hyatt has worked out of his home as well as his business address at 6600 W. Charleston, Suite 118, Las Vegas.

FTB-100880

2173-0001
RJN0015

2

Mr. Marc Shayer
Tax Auditor
Franchise Tax Board
Van Nuys, California

August 4, 1993

5.   The 1991 Federal Schedule C reports $42,266,667 in gross
     receipts from several entities.   The payments were for
     licenses from major Japanese and European companies for
     patented technology to be incorporated into future products.

If you have any questions, please do not hesitate to call.

Yours truly,

PIERCY, BOWLER, TAYLOR & KERN

*Michael Kern*

Michael W. Kern

MWK:mlp
Enclosures

cc:  Mr. Gilbert P. Hyatt

FTB-100881

2173-0002
RJN0016

# PIERCY, BOWLER, TAYLOR & KERN

*CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS ADVISORS*

A PROFESSIONAL CORPORATION
6100 ELTON AVENUE
SUITE 1000
LAS VEGAS, NEVADA 89107
TELEPHONE (702) 384-1120
FAX (702) 870-2474

DATE: MAY 27, 1994

CLIENT NAME: GIL HYATT

TO: GIL HYATT

FROM: MICHAEL KERN

FAX NUMBER: 310-809-1087

TOTAL NUMBER OF PAGES
<u>INCLUDING COVER SHEET</u>: 3

MESSAGE:
GIL,

ATTACHED IS CORRESPONDENCE I RECEIVED TODAY FROM THE FRANCHISE TAX BOARD. I HAVE ALSO PROVIDED A COPY THIS DAY BY FAX TO EUGENE COWAN.

THANKS

PBTK 02180

2503-0001

RJN0017

05/27/94    11:45 FAX    3702474          P B T K                                    ☒001

```
*******************************
***   ERROR TX REPORT   ***
*******************************
```

TX FUNCTION WAS NOT COMPLETED

TX/RX NO.              4516
CONNECTION TEL              13108091087
CONNECTION ID
START TIME            05/27 11:43
USAGE TIME            02'27
PAGES                 3
RESULT               NG  OK          Gil DID not
                         3     ##104     all pages

PBTK 02181

2503-0002

RJN0018

**State of California** 

Franchise Tax Board
333 N. Glenoaks Blvd., Ste. 200
Burbank, CA  91502-1170



STATE OF CALIFORNIA

**FRANCHISE TAX BOARD**
333 N. GLENOAKS BLVD., SUITE 200
BURBANK, CA 91502-1170
TELEPHONE: (818)  556-2909

F. P. Soriano
Tax Auditor                                    (818) 556-2909

May 24, 1994                                    In reply refer
                                               to BUR:FS

Attn:  Michael W. Kern, CPA
       Piercy, Bowler, Taylor & Kern
       6600 W. Charleston Blvd., Suite #118
       Las Vegas, NV 89102

Re  :  Gilbert P. Hyatt
       CA Personal Resident/Non Resident Income Tax
       Audit For Years 1989 & 1990 & 1991
       Taxpayer ID # ████████████

Dear Mr. Kern:

The above audit case was transferred to me following the
departure of Marc Shayer from the Board.  I have reviewed the
files and found that the following were requested (among
others) on August 17, 1993.

1)  Copies of all contracts/agreements between:

     A)  Hyatt and Fujitsu
     B)  Hyatt and Matsushita
     C)  Hyatt and Philips
     D)  Hyatt and Pioneer

2)  Copy of the escrow closing statement for the purchase of
the home in Las Vegas, Nevada.

Only the agreement between Hyatt and U.S. Philips Corporation
have been received.  I would appreciate it if you provide
copies of like agreement with Fujitsu, Matsushita and Pioneer
as well.  Please include correspondences between the above
corporations and Hyatt subsequent to the signing of the
agreements one of which is a letter from Pioneer to Hyatt
regarding its decision not to exercise its option (referred to
as "lapse of option" in Statement 7 of the 1991 Tax Return.)

I would like a copy of the escrow statement itself and not the
Escrow Instructions.  In addition, please provide copies of
the following:

                                               PBTK 02182

                                               2503-0003
                                               RJN0019

Gilbert P. Hyatt
May 24, 1994
Page 2 of 2

1.   Cancelled checks in payment of Property Taxes for the Las
     Vegas house along with the paid Property Tax Bills in 1992
     and 1993.

2.   Cancelled checks for the Security Deposit on 10/08/91 and
     monthly lease/rental payments on 3225 S. Pecos Rd., Las Vegas,
     Nevada, beginning 11/01/91.

Please submit the requested information to the above address
by June 15, 1994.

To ensure proper handling, attach a copy of this letter to
your reply.

Thank you for your cooperation.

Felix P. Soriano
Tax Auditor

PBTK 02183

2503-0004

RJN0020

STATE OF CALIFORNIA

**FRANCHISE TAX BOARD**
333 N. GLENOAKS BLVD., SUITE 200
BURBANK, CA 91502-1170
TELEPHONE: (818)     556-2942

8/2/95

Mr. Michael W. Kern CPA
c/o Piercy, Bowler, Taylor, & Kern
6100 Elton Ave. #1000
Las Vegas, Nevada 89107

Re:  FTB audit of Gilbert P. Hyatt for 1991

Dear Mr. Kern:

We have reviewed the information provided and gathered regarding
the taxpayer's residency status.   The purpose of this letter is
to explain our understanding of the facts and to inform you of
our determination.

I. INFORMATION/FACTS
A review of department records indicate that Mr. Hyatt filed a
Non-Resident or Part-Year Resident tax return for 1991 and did
not file California tax returns after 1991.    In response to our
questionnaire, Information Concerning Resident Status, Mr. Hyatt
left California on September 24, 1991 for Nevada.

During the year under examination the taxpayer had the following
connections with California:

1.   The taxpayer owned a home at 7841 Jennifer Circle in La
     Palma, CA.    According to the taxpayer this home was sold on
     October 1, 1991 to Grace Jeng.   Grace Jeng is the taxpayer's
     assistant, who works and resides with the taxpayer.    The
     title on the house did not pass to Grace Jeng until June of
     1993.   The taxpayer paid the property tax on this house from
     1988-1992.   Grace Jeng paid the property tax from 1992-1994.
     Grace Jeng still owns the house in La Palma.

2.   The taxpayer maintained bank accounts in California.    The
     taxpayer had a Franklin Fund Account through Investment
     Financial Corp. of California Federal Bank in Long Beach.
     The taxpayer's address on the 12/31/91 and 12/31/92 account
     statements was 7841 Jennifer Circle in La Palma California
     (the residence that he claimed that he had sold).    This
     account is where the  taxpayer transferred the licensing fees
     that he had received from the Japanese companies
     (approximately $40 Million).

                                           H 015014

                                              2821-0001
                                              RJN0021

3.  The taxpayer maintained two safe deposit boxes in California.
    Information was obtained from the bank that the taxpayer did
    have safe deposit boxes in California and they provided the
    dates that he visited these boxes.  The taxpayer did not
    change the address on the safe deposit box accounts to his
    Las Vegas P.O Box until 7/21/92, even though he visited the
    boxes on 12/5/91 and 12/10/91 (after the date of the
    taxpayer's alleged change to Nevada residency).  He also
    visited the boxes on 7/13/92.


4.  The taxpayer had a 1977 Toyota (vehicle license 886 SLP)
    registered in the State of California through 3/18/93.
    The taxpayer registered a 1977 Toyota in Nevada in March of
    1992 (vehicle license number 557 EMR).


5.  The taxpayer had a California driver's license (F0566131),
    which was valid through 3/26/93.

H 015015

Page 2

2821-0002

RJN0022

6. The taxpayer used the services of California professionals.
i.e. accountants, attorneys, doctors, and investment
advisors, based upon examination of his banking information
and other correspondence.

Attorneys

    Law Office of Gerard Tramwell    - Los Angeles
    (Date of Check - 12/18/91)

    Law Office of Loeb and Loeb    - Los Angeles
    (Date of Check - 12/18/91)

    Riordan and McKenzie    - Los Angeles
    (Dates of checks - 12/18/91, 2/10/92, 7/28/92)

    Roger McCaffrey, Attorney    - Anaheim
    (Dates of checks - 3/30/92, 6/23/92)

    LAIPLA-LA Patent Law Association    - Los Angeles
    (Date of check - 7/2/92)

    Dale Fiola    - Los Angeles
    (Date of check - 7/1/92)

    Pretty, Schroeder, Brueggemann & Clark - Los Angeles

    Goldberg and Andrus    - Studio City
    (Engaged December of 1992 through summer of 1993)

    Law Offices of Gregory Roth    -La Palma
    (provided patent services for the past 25 years)

Accountant

    Block, Plant, Egler    - Sherman Oaks
    (Dates of checks - 5/10/92, 10/24/92)

Investment Services

    Shearson Lehman    - Los Angeles
    (Dates of checks - 3/6/92, 8/24/92)

    Portfolio Advisory Services    - Los Angeles
    (Dates of checks -8/26/92, 9/2/92, 10/18/92, 10/30/92)

H 015016

2821-0003
RJN0023

Doctors

1.  Dr. Myatt - La Palma (Dentist)

2.  Dr. William H. Peloquin - Fullerton (Opthamologist)
    (dates visited - 9/13/91, 10/31/91, 2/4/93)

3.  Dr. Gerald M. Isenberg - Long Beach (Internist)
    Association of Colo-Rectal Surgeons
    (dates visited - 10/9/91, 1/23/92, 1/24/92, 1/30/92,
    2/12/92, 2/21/92, 3/5/92, 4/9/92, 7/6/92)

4.  Dr. Edgar Hamer - Los Alamitos (Dermatologist)
    (date visited - 9/26/91)

5.  Los Alamitos Medical Center - Los Alamitos (Hospital)
    (dates of treatment - 1/24/92, 2/4/92, 2/11/92-2/21/92,
    9/3/92, 9/23/92)

6.  Dr. Melvin Shapiro - 5400 Balboa Encino, CA -
    (dates visited - 2/3/92, 3/17/93)

7.  Los Alamitos Imaging Clinic - Los Alamitos, CA
    (dates of treatment - 1/23/92, 2/4/92, 2/11/92-2/21/92,
    9/3/92, 9/23/92)

H 015017

2821-0004

RJN0024

7.  The taxpayer continued (and continues) to maintain at least
    two P.O. boxes in California.   The P.O box application (Form
    1093) shows that Gilbert P. Hyatt and Grace Jeng were listed
    as the box users of P.O. box 3357 in Cerritos, CA.    This box
    was renewed on 4/16/92, after the date of the taxpayer's
    alleged change to Nevada residency.  The taxpayer sent a
    letter to the Postmaster on 2/2/92 requesting to add Grace
    Jeng and Barry Lee to P.O. Box 3357 in Cerritos.

8.  The taxpayer signed an agreement to receive payments from
    Matsushita Co. Ltd. of Osaka Japan on November 14, 1991 for
    the use of his patent for the microchip.   Although the
    agreement was signed <u>after</u> the taxpayer's alleged change to
    Nevada residency, the agreement had his California address.
    The agreement stated that it was to be in accordance with the
    laws of the State of California.    On November 15, 1991
    $25,000,000 was wire transferred to Gilbert Hyatt through a
    trust account at Union Bank in Los Angeles.

8.  The taxpayer signed an agreement to receive payments from
    Fujitsu Ltd. of Tokyo Japan on October 24, 1991 for
    the use of his patent for the microchip.   Although the
    agreement was signed <u>after</u> the taxpayer's alleged change to
    Nevada residency, the agreement had his California address.
    The agreement stated that it was to be in accordance with the
    laws of the State of California.    On October 31, 1991
    $15,000,000 was wire transferred to Gilbert Hyatt through a
    trust account at Union Bank in Los Angeles.

9.  The taxpayer did not turn off the La Palma City Water
    Services at the La Palma residence until 11/26/91, when Grace
    Jeng had the water service turned on in her name, even though
    he claimed that he had sold the home on 10/1/91.

H 015018

Page 5

2821-0005

RJN0025

The taxpayer claims he was a resident of Nevada from September 24, 1991 to the present   This claim is based on the following connections with Nevada:

1.  The taxpayer rented an apartment at 3225 Pecos Avenue Apartment 237  in Las Vegas from November 1, 1991 thru April of 1992.   He claimed to have left California on September 24, 1991.   We do not know where he resided from September 24, 1991 through November 1, 1991.

    During March of 1995, I and another representative of FTB visited the Wagon Trails Apartments at 3225 Pecos in Las Vegas.  We interviewed the managers and they provided the rental file for examination.   The manager had stated that Gilbert Hyatt had rented the apartment, but Grace Jeng had come in and made the rental arrangements for him.   She had signed the lease for him and did the initial walkthrough of the apartment.   He later came back and signed for himself. He had faxed the initial application to her.

    The taxpayer had stated on the rental application that his employer was D&C Corporation of P.O. Box 846 Cypress, California (213) 809-1087.   He had listed that his closest relative or contact was his associate Grace Jeng at 13337 E. South Street Cerritos, California 90071.

    When I asked if the apartment 237 appeared to have been regularly occupied, the manager had stated that she didn't see the taxpayer too often.   She stated that the taxpayer had told her that he travelled a lot for business.   The taxpayer had reported on the California Form 3805F that he had worked out of this apartment.

    Based upon examination of the letter of 30 day notice in the rental file, the taxpayer had stated that he had bought a house and that he was moving back to California.   Grace Jeng had signed the move-out notice.   He had listed as a forwarding address P.O. Box 60028 Las Vegas, Nevada.

    I asked the managers if they had any record of how the rent had been paid, whether through the mail, in person, etc. They indicated that they have no record of it.   They stated that the taxpayer did pay by check each month, often paying ahead of time with a postdated check.   We saw in the file an envelope which Mr. Hyatt had used to pay the rent.   The envelope had a return address of P.O. Box 60028 Las Vegas. The envelope was postmarked from Long Beach, California and was date stamped 12/8/91.

H 015019


2821-0006

RJN0026

2. The taxpayer purchased a house in Las Vegas in April of 1992 at 7335 Tara Avenue. The escrow instructions stated that the purchaser could change the name on the title when escrow closed. Information obtained from the Clark County Treasurer's office showed that this parcel of land is in the name of Kern Trust; Mike Kern is the trustee. Mike Kern is the taxpayer's accountant and representative in Las Vegas.

3. The taxpayer rented at least two P.O. boxes in Las Vegas. One of the boxes was forwarded to Mail Room Plus at 4012 S. Rainbow Blvd. in Las Vegas.

4. The taxpayer registered to vote in Nevada on November 27, 1991. The address listed was 3225 S. Pecos Rd. in Las Vegas. The Clark County Department of Elections informed us that the taxpayer voted once in the 11/92 election, but they did not indicate whether he had voted in person or using an absentee ballot. On 7/5/94, the taxpayer re-registered claiming to be residing at 5441 Sand Piper Lane in Las Vegas. The Clark County assessor's office verified ownership of 5441 Sandpiper Lane Las Vegas. The property is in the name of <u>Michael W. and La Don Kern</u> since 12/14/82. Michael Kern is Gilbert Hyatt's accountant. This house was sold by the Kerns on 10/27/94.

5. The taxpayer got a Nevada driver license in November of 1991.

6. The taxpayer maintained several bank accounts in Las Vegas. These accounts were established on 11/22/91, 12/12/91, 1/27/92, 8/13/92. Three of the accounts were opened at California Federal Bank, the same bank where the taxpayer had accounts in California.

7. The taxpayer began using the services of a dentist in Las Vegas in April of 1992. The taxpayer visited Dr. Steven Hall's office on the following dates:
4/6/92, 4/7/92, 6/9/92, 6/18/92, 11/3/92, 11/12/92, 12/21/93.

8. The taxpayer purchased a 1992 Toyota Celica hatchback in Las Vegas, Nevada in March of 1992. The vehicle was purchased from Toyota West of Las Vegas. The vehicle registration was not obtained from the Nevada Department of Motor Vehicles, so it is not known if this car is registered in the taxpayer's name.

H 015020

2821-0007

RJN0027

## II. CALIFORNIA TIES VS. NEVADA TIES

1. TIME SPENT IN CALIFORNIA AS OPPOSED TO TIME SPENT IN NEVADA.

Based on the schedules provided by the taxpayer, he admits to
spending 8.9 months in California and 3.1 months in Nevada in
1991.  He admits that he spent 12 months in Las Vegas in 1992
and 1993.

### Analysis

The taxpayer claimed that he left California on 9/24/91.  He did
not rent an apartment in Las Vegas until November 1, 1991.
The taxpayer does not state where he resided from 9/24/91 through
11/1/91.  The taxpayer has provided no documentation of moving
expenses, other than a registration of a trailer owned by someone
in his family.

The taxpayer claimed that he spent 12 months in Las Vegas in
1992.  Based upon documentation received, the taxpayer had
surgery in California during 1992 and hospitalized for most of
February 1992.  The taxpayer was treated at the following
facilities and saw the following doctors:

Los Alamitos Medical Center in Los Alamitos -
1/24/92, 2/4/92, 2/11/92-2/21/92, 9/3/92, and 9/23/92.

Los Alamitos Imaging Clinic of Los Alamitos -
1/23/92, 2/4/92, 2/11/92-2/21/92, 9/3/92, and 9/23/92.

Dr. Gerald M. Isenberg of the Association of Colo-Rectal Surgeons
in Long Beach -
10/9/91, 1/23/92, 1/24/92, 1/30/92, 2/12/92, 2/21/92, 3/5/92,
4/9/92, and 7/6/92

Dr. Melvin Shapiro of Encino, CA  -
2/3/92, 3/17/93

### Conclusion:

Although the taxpayer stated on the Form 3805F that he was in
Nevada for 12 months during 1992, the taxpayer was in California
for most of February 1992 and throughout the rest of the year he
spent time in California.  It is not known whether the taxpayer
recuperated from his surgery in California.

H 015021

Page 8

2821-0008

RJN0028

## 2. OWNERSHIP OF REAL PROPERTY

The taxpayer owned a home at 7841 Jennifer Circle in La Palma, CA. According to the taxpayer this home was sold on October 1, 1991 to Grace Jeng. Grace Jeng is the taxpayer's assistant, who works and resides with the taxpayer. The title on the house did not pass to Grace Jeng until June of 1993. The taxpayer paid the property tax on this house from 1988-1992. Grace Jeng paid the property tax from 1992-1994. The water services at this house was in the taxpayer's name until 11/26/91, when it was transferred to Grace Jeng's name. Grace Jeng still owns the house in La Palma.

The taxpayer rented an apartment at 3225 Pecos Avenue Apartment 237 in Las Vegas from November 1, 1991 thru April of 1992. He claimed to have left California on September 24, 1991. We do not know where he resided from September 24, 1991 through November 1, 1991.

The taxpayer purchased a house in Las Vegas in April of 1992 at 7335 Tara Avenue. The escrow instructions stated that the purchaser could change the name on the title when escrow closed. Information obtained from the Clark County Treasurer's office showed that this parcel of land is in the name of Kern Trust; Mike Kern is the trustee. Mike Kern is the taxpayer's accountant and representative in Las Vegas.

The Las Vegas Valley Water District has provided information that the account for 7335 Tara was established on 4/1/92. The customer name is G. Julia Jeng and the mailing address is P.O. Box 81230 Las Vegas.

Southwest Gas Corporation of Las Vegas has provided information that Gilbert Hyatt is not the customer of record at 7335 Tara. The account for that address is in the name of G. Julia Jeng.

Silver State Disposal Service in Las Vegas has provided information that the account at 7335 Tara was opened on 4/1/92 in the name for Michael Kern. (The taxpayer's representative) There is a notation on the account that payments have been made by Gilbert Hyatt. When we were in Las Vegas on 3/7/95, we saw the Silver State Disposal Service coming up Tara street. We asked the trashman if they got much trash at 7335 Tara. He said that they got a bag every once in a while. He said that he had always wondered if anyone lived there.

Statistics (size, cost, etc.) comparing the taxpayer's La Palma home to his Las Vegas home will not be weighed in the determination, as the taxpayer sold the La Palma house on 10/1/91 before he purchased the house in Las Vegas during April of 1992.

H 015022

2821-0009

RJN0029

When we observed the house at 7335 Tara in Las Vegas during March of 1995 we noted that the house was not landscaped at all and that the driveway was unfinished.   We noted that all of the other homes in the neighborhood were landscaped.   In observation of this house, we also noted that there were no gates or apparent security systems.   This is in spite of the taxpayer's representatives repeated statements that the taxpayer is afraid of being kidnapped.


Analysis
If the house in Las Vegas is the taxpayer's primary residence, why wouldn't he invest in landscaping the house and paving the driveway?


Conclusion:
It does not make sense that a person such as the taxpayer who was a millionaire would want to live in a low income (HUD) apartment, such as the Wagon Trails.   Clara Kopp had told us that most of the residents were low income and many were receiving subsidies from HUD.

The taxpayer did not close his account with the City of La Palma Water Services until 11/26/91, when Grace Jeng had the account opened in her name.   Most people have the utilities turned off when they sell a house.   The taxpayer retained access to the house in La Palma through his assistant Grace Jeng.

The house in Las Vegas and the utilities for this house are in Mike Kern's (Trust) name or Grace Jeng's name.   The taxpayer apparently did not want his name associated with this residence.

The house had been owned by the taxpayer for nearly 3 years when we observed it in March of 1995, but the taxpayer had not landscaped the yard nor had he paved the driveway.

H 015023

2821-0010

RJN0030

## 3. BANKING ACTIVITIES

A list of all the taxpayer's bank accounts which were active
during years 1990, 1991, and 1992 had been requested from the
taxpayer.   The taxpayer had been unable to find the statements
for his Southern California bank accounts from 1990 to 1992.
When he finally provided the documentation the account statements
did not cover 1990 and there were not many checks written on the
accounts for 1991.   The taxpayer's representative had stated in
his letter the taxpayer had supplied all of the information which
had been requested.   Information provided for the later years
1991 and 1992 indicate that the taxpayer is a check writer.

In reviewing the taxpayer's banking information, such as
cancelled checks from California Federal Bank account 177-
0514457-7 (Las Vegas Branch), California Federal Bank account
179-0512056-2 (Las Vegas Branch), Valley Bank of Nevada account
210173019 (Las Vegas), Bank of America account 210173019 (Las
Vegas Branch), and other information, it was noted that many of
the checks are written in handwriting which is quite different
from the taxpayer's handwriting.

The taxpayer's representative had stated in a letter that the
taxpayer has not authorized any other individuals to sign checks
on his bank accounts.   He had also stated that the taxpayer may
have authorized other to use the credit cards, but he does not
maintain records of such authorizations.   This financial
information is relevant to this residency determination; this
information was requested for analysis to determine the
taxpayer's whereabouts during the year.   If the taxpayer
authorized other individuals to use his account, then the
information is not necessarily indicative of the taxpayer's
location.

It is also noted that the taxpayer opened three Las Vegas bank
accounts at California Federal Bank, where he already had
accounts in California.   The statements show that transactions
were made in Las Vegas and in California.

Page 11                                          H 015024

2821-0011

RJN0031

Supporting Statistics:

A.  Total CA Bank Accounts        7

1. Franklin Federal Money Fund  (checking account 11300991158)
   (Invest Financial Corp. California Federal Long Beach, CA)
        account closed 5/18/92

2. Irvine City Bank -savings account 11105172-8 -
        account closed 1/8/91

3. First Fidelity Thrift and Loan Association-(savings) -
        account closed 12/17/91

4. California Federal Bank  (checking account 004-0513797-3)
        account closed 8/13/92

5. California Federal Bank (checking account 082-0522494-6)
        account closed 8/13/92

6. California Federal Bank (checking account 004-0513065-8)
        account closed 8/13/92

7. California Federal Bank (checking account 004-0513798-2)
        account closed 6/11/91


Total Nevada Bank Accounts   4

1. Valley Bank of Nevada  210173019 (checking account)
        account opened on 12/20/91

   Bank of America 210173019      (checking account)
        B of A took over Valley Bank in 8/92

2. California Federal Bank 177-0016768-7 (checking account)
        account opened on 1/27/92

3. California Federal Bank 177-0514457-7 (checking account)
        account opened on 10/25/91

4. California Federal Bank 179-0512056-2  (checking account)
        account opened on 8/13/92

H 015025

2821-0012

RJN0032

B.  <u>Total Ending Balances 1991</u>:

```
Franklin Federal Money Fund  (11300991158)        $10,179,147
Irvine City Bank                                            0
First Fidelity Thrift and Loan Association                  0
California Federal Bank  (004-0513797-3)               12,426
California Federal Bank (082-0522494-6)                   453
California Federal Bank (004-0513065-8)                16,377
California Federal Bank (004-0513798-2)                     0
                                                  ------------
                    California                    $10,208,403 **


Valley Bank of Nevada  210173019                         200
Bank of America 210173019                                  0
California Federal Bank 177-0016768-7                      0
California Federal Bank 177-0514457-7                  13,132
California Federal Bank 179-0512056-2                       0
                                                     -------
                       Nevada                         13,332
```

**Many of these funds were used to pay licensing fees to Phillips
and the rest was invested in various money markets and mutual
fund accounts.    The Franklin Fund Account was closed in May
of 1992.

<u>Total Ending Balances 1992</u>:

```
Franklin Federal Money Fund  (11300991158)                 0
Irvine City Bank                                           0
First Fidelity Thrift and Loan Association                 0
California Federal Bank  (004-0513797-3)                   0
California Federal Bank (082-0522494-6)                    0
California Federal Bank (004-0513065-8)                    0
California Federal Bank (004-0513798-2)                    0
                                                     -------
                    California                           $0


Valley Bank of Nevada  210173019                          0
Bank of America 210173019                             9,891
California Federal Bank 177-0016768-7                     0
California Federal Bank 177-0514457-7                   831
California Federal Bank 179-0512056-2                 2,917
                                                     -------
                       Nevada                        13,639
```

Page 13

H 015026

2821-0013

RJN0033

C.  Total # of checks written on CA Bank Accounts:

```
    7/91        1
   10/91        4
   11/91        8
   12/91       10
    1/92        4
    2/92        2
    3/92        2
    4/92        2
```

Total # of checks written on Nevada Bank Accounts:

```
   11/91        3
   12/91       11
    1/92       21
    2/92       22
    3/92       10
    4/92       43
    5/92       33
    6/92       50
    7/92       55
    8/92       36
    9/92       23
   10/92       15
   11/92       39
   12/92       26
```

Analysis

In reviewing the banking activities of the taxpayer, it is not determinable to what extent his banking activities were transacted in California versus Nevada.  For example, with the three California Federal Accounts opened in Las Vegas, deposits were made at the following branches in California:

| Account | Date | Location of Branch | Amount |
|---|---|---|---|
| 177-0514457-7 | 12/14/91 | Los Cerritos, CA | $15,000 |
| 177-0514457-7 | 12/28/91 | Los Cerritos, CA | 623 |
| 177-0514457-7 | 12/31/91 | Los Cerritos, CA | 2,200 |
| 177-0514457-7 | 1/8/92 | Los Cerritos, CA | 5,137 |
| 179-0512056-2 | 9/11/92 | Los Cerritos, CA | 10,000 |
| 179-0512056-2 | 9/19/92 | Los Cerritos, CA | 2,200 |
| 179-0512056-2 | 9/25/92 | Anaheim, CA | 166 |

H 015027

2821-0014

RJN0034

Although the taxpayer wrote the majority of the checks on Nevada
bank accounts, many of the checks had been cashed in California.
It was noted that the taxpayer does have grown children who are
California residents and he wrote checks to them, usually on a
monthly basis.  It was also noted in examination of the
taxpayer's checks that the taxpayer had used various businesses
located in California such as copier Services, typing services,
etc. after the date he allegedly became a resident of Nevada.

| Date | Payee | Amount | Location |
|------|-------|--------|----------|
| 11/9/91 | Linda Wetsch | $10,000.00 | San Diego |
| 12/22/91 | Leni Schlindwein | $50.00 | Northridge |
| 1/18/92 | Ron R. Hoffman | $200.00 | Los Angeles |
| 1/18/92 | Copley/Colony Cable | 27.50 | Santa Ana |
| 1/31/92 | KCET | 100.00 | Los Angeles |
| 1/20/92 | Bill Sherman | 20.00 | Manhattan Beach |
| 2/11/92 | Black Angus | 66.00 | Cerritos |
| 3/1/92 | Harry Widdifield | 1,000.00 | Los Angeles |
| 3/11/92 | Copy Us, Inc. | 164.81 | Fullerton |
| 3/12/92 | John Heller | 10.00 | Los Angeles |
| 4/9/92 | John Herman | 121.75 | Los Angeles |
| 4/13/92 | Ron Schuchord | 390.00 | El Monte |
| 7/11/92 | Leni's Typing | 500.00 | Northridge |
| 7/27/92 | Xerographic Copier | 377.10 | California |
| 7/27/92 | Xerographic " | 3,900.00 | California |
| 7/28/92 | Copy Tech | 740.99 | Long Beach |
| 8/12/92 | Leni's Typing | 500.00 | El Monte |
| 9/2/92 | John Harmon | 151.30 | California |
| 9/3/92 | Chasen's | 500.00 | California |
| 9/21/92 | Chasen's | 1,926.48 | California |
| 10/2/92 | Majordomo | 593.31 | Santa Monica |
| 10/2/92 | Leni's Typing | 400.00 | El Monte |
| 10/20/92 | Youngmart Travel | 1,700.00 | California |
| 10/30/92 | John Harmon | 167.20 | California |
| 11/15/92 | John Harmon | 300.00 | Pasadena |
| 12/6/92 | Leni's Typing | 1,267.00 | California |
| 12/6/92 | Adella Bormentos | 300.00 | Los Angeles |

H 015028

2821-0015

RJN0035

Based upon examination of the taxpayer's checks and bank
statements provided to date, it was noted that there were a
number of checks which the taxpayer had made out to "CASH".  He
endorsed the check and the check was then endorsed by Grace Jeng.
Most of these checks had been cashed at California Banks.  It is
unusual that the taxpayer would be giving money to Grace Jeng
every month, if he had sold his house to her and she paid
mortgage payments to him (as the taxpayer's Schedule B shows
interest income from the sale of residence).

| Bank Account | Check | Date | Amount |
|---|---|---|---|
| California Federal | 99 | 1/8/92 | $   200 |
| California Federal | 173 | 2/5/92 | 1,000 |
| California Federal | 229 | 3/30/92 | 1,000 |
| Valley Bank of Nevada | 324 | 6/1/92 | 1,000 |
| Valley Bank of Nevada | 395 | 7/17/92 | 1,000 |
| Valley Bank of Nevada | 452 | 9/14/92 | 1,000 |
| California Federal | 116 | 10/16/92 | 1,000 |
| Valley Bank of Nevada | 503 | 12/7/92 | 200 |
| Valley Bank of Nevada | 512 | 12/7/92 | 500 |

Also, as mentioned above, it is not known if another individual
was writing checks on these accounts, as the handwriting differs
dramatically.  It is also unusual that the taxpayer provided no
checks for 1990, unless other account information has not been
disclosed.  This information had been requested and the
taxpayer's representative had sent a statement that they had
given us all information requested.

As the banking information does not appear to be complete for all
years requested and that another individual was writing checks on
these accounts, the banking information will not be weighed
heavily in making the determination of the taxpayer's residency.

Conclusion:
The banking information provided by the taxpayer is not
conclusive, but the information indicates that the taxpayer did
still have many ties with the state of California throughout
1992.   The taxpayer was still present in California throughout
the year 1992, in contradiction to his assertion that he spent 12
months in Nevada.

H 015029

2821-0016
RJN0036

4. MEDICAL PROFESSIONALS USED DURING 1991-1992

California:    Dr. Edgar Hamer (Los Alamitos, CA) - 9/26/91

              Dr. William Peloquin (Fullerton, CA) -
              9/13/91, 10/31/91, 2/4/93

              Los Alamitos Medical Center (Los Alamitos, CA) -
              1/24/92, 2/4/92, 2/11/92-2/21/92, 9/3/92, 9/23/92

              Dr. Melvin Shapiro (Encino, CA) -
              2/3/92, 3/17/93

              Los Alamitos Imaging (Los Alamitos, CA)  -
              1/23/92, 2/4/92, 2/11/92-2/21/92, 9/3/92, 9/23/92

              Association of Colo-Rectal Surgeons (Long Beach)
              10/9/91, 1/23/92, 1/24/92, 1/30/92, 2/12/92,
              2/21/92, 3/5/92, 4/9/92, 7/6/92

              Dr. Myatt DDS (La Palma)
              (could not be located)

Nevada:       Dr. Steven Hall DDS (Las Vegas) -
              4/6/92, 4/7/92, 6/9/92, 6/18/92, 11/3/92, 11/12/92,
              12/21/93.


Analysis
This is a clear connection to California.   If the taxpayer truly
intended to become a Nevada resident he would have sought out
Nevada doctors.    He did see a dentist in Nevada beginning in
April of 1992.

Conclusion
The medical information indicates that the taxpayer did still
have many ties with the state of California throughout 1992.
The taxpayer was still present in California throughout the year
1992, in contradiction to his assertion that he spent 12 months
in Nevada.

H 015030

2821-0017
RJN0037

5. OTHER PROFESSIONALS USED DURING 1991-1992

<u>Attorneys</u> -

| | | |
|---|---|---|
| 1. | Gerard Tramwell | - Los Angeles |
| 2. | Loeb and Loeb | - Los Angeles |
| 3. | Riordan and McKenzie | - Los Angeles |
| 4. | Roger McCaffrey, Attorney | - Anaheim |
| 5. | LAIPLA-LA Patent Law Association | - Los Angeles |
| 6. | Dale Fiola | - Los Angeles |
| 7. | Pretty, Schroeder, Brueggemann & Clark | - Los Angeles |
| 8. | Goldberg and Andrus | - Studio City |
| 9. | Gregory Roth | - La Palma |

<u>Accountant</u> -

| | | |
|---|---|---|
| 1. | Block, Plant, Egler | - Sherman Oaks |
| 2. | Michael Kern | - Las Vegas, Nevada |

<u>Investment Services</u>

| | | |
|---|---|---|
| 1. | Shearson Lehman | - Los Angeles |
| 2. | Portfolio Advisory Services | - Los Angeles |

<u>Analysis</u> -
The taxpayer utilized California professionals exclusively, with
the exception of his Nevada accountant.  The taxpayer had
several lawsuits in California during this time period, but he
did not retain any legal counsel in Nevada.  The taxpayer was
present at the house in La Palma in December of 1992, when legal
papers were served regarding one of these lawsuits.

Dates that the taxpayer had meetings with these professionals is
not known, but checks were written throughout 1991 and 1992 to
these professionals.  See page 3 of this letter for schedule of
dates checks were written.

This is a clear connection to California.  If the taxpayer truly
intended to become a Nevada resident he would have sought out
Nevada professionals.

<u>Conclusion</u>
This information indicates that the taxpayer did still have many
ties with the state of California throughout 1992.  It is not
known how many meetings the taxpayer had in California throughout
the year 1992, but it is evident that he still was conducting
business and investment activities in California.

H 015031

2821-0018

RJN0038

## 6. DRIVER'S LICENSES AND VEHICLE REGISTRATIONS

The taxpayer obtained a Nevada driver's license during November of 1991.   The taxpayer had a California driver's license which expired in March of 1993.

The taxpayer registered a 1977 Toyota in Nevada in March of 1992 (vehicle license number 557 EMR).  This car had been registered in California.

The taxpayer purchased a 1992 Toyota Celica hatchback in Las Vegas, Nevada in March of 1992.   The vehicle was purchased from Toyota West of Las Vegas.  The vehicle registration was not obtained from the Nevada Department of Motor Vehicles, so it is not known if this car is registered in the taxpayer's name.

Analysis
The taxpayer's Nevada driver's license is a connection to Nevada, but the information obtained from the Nevada Department of Motor Vehicles did not indicate whether or not the taxpayer had surrendered his California driver license, which was valid until 3/93.

It is not known why the taxpayer did not register his car in the State of Nevada until March of 1992.   The Nevada Department of Motor Vehicles requires that new residents of Nevada register their cars in the state of Nevada within 45 days of establishing residency in Nevada.

Conclusion:
The taxpayer's Nevada driver license is a connection to Nevada, but the taxpayer did not register his car with the Nevada DMV until 1992.   It is unusual that he would not have done both acts at the same time.   If the taxpayer moved to Nevada in November of 1991 as he claims, then he was in violation of the Nevada Department of Motor Vehicle law regarding vehicle registration.

H 015032

Page 19

2821-0019

RJN0039

7. VOTER REGISTRATION

a. There was no record of the taxpayer being registered to vote in California

b. The taxpayer registered to vote in Nevada in November of 1991. The Clark County Department of Elections informed us that the taxpayer voted once in the 11/92 election, but they did not indicate whether he had voted in person or using an absentee ballot.

On 7/5/94, the taxpayer re-registered in Nevada claiming to be residing at 5441 Sand Piper Lane in Las Vegas. The Clark County assessor's office verified ownership of 5441 Sandpiper Lane Las Vegas. The property is in the name of Michael W. and La Don Kern since 12/14/82. Michael Kern is Gilbert Hyatt's accountant. This house was sold by the Kerns on 10/27/94.

Note: When looking at voter registration as an indication of domicile we must consider how the courts have viewed voting as a test of domicile. In rejecting voting as a test of domicile the United States Supreme Court said in District of Columbia v. Murphy, 314 S. 441, pages 456 and 457 [62 S. Ct. 303, 86 L. ed 329]: "Whether or not one votes where he claims domicile is highly relevant but by no means controlling. Each state prescribes for itself the qualification of its voters, and each has its own machinery for determining compliance with such qualifications. A vote cast without challenge and adjudication may indicate only laxity of the state officials."

Analysis:
Voter registration is a minor area, and very easy to establish. This area is not given much weight. It is not known why the taxpayer registered to vote using Michael Kern's address.

H 015033

2821-0020

RJN0040

8. Travel

Little information was obtained about the taxpayer's travels.
The credit card statements provided by the taxpayer show that the
taxpayer took a few trips during the years under examination, but
the statements do not show where the taxpayer's air travel began
or ended.    No information was provided about the taxpayer's
travel between California and Nevada.    The taxpayer claims to
have spent 12 months in Nevada and 0 months in California during
1992 and 1993.

The area of travel will not be given much weight.

H 015034

2821-0021

RJN0041

9.  Business Activities

a.  The taxpayer was an electronics engineer and aerospace consultant who was granted a patent for the single-chip integrated circuit (Microprocessor chip) for computers on 7/17/90.   In 1968, he formed a closely held company with which he developed the microprocessor chip.   He filed a patent application on the microprocessor chip on 12/28/70. The U.S. patents office heavily scrutinized his application, and did not issue the patent for almost 20 years.   During this 20 year period, the taxpayer's closely held corporation went out of business, and he formed another closely held corporation, Digital Nutronics (a California corporation).

b.  In addition to the taxpayer's corporation Digital Nutronics, the taxpayer has filed a Schedule C as a "Patent Agent" on his 1989, 1990, and 1991 California tax returns.   The addresses listed for the business on the Schedule C and for his corporation Digital Nutronics were both the same as the taxpayer's  P.O. Box in California.   It is not determinable where the taxpayer was conducting his business nor was any significant event identified which would cause the businesses to relocate to Nevada, other than the taxpayer's supposed change of residence.

c.  It was noted in examination of the taxpayer's checks that the taxpayer had used various businesses located in California such as copier Services, typing services, etc. after the date he allegedly became a resident of Nevada

d.  The only professional hired by the taxpayer in Nevada was his accountant, Michael Kern.

e.  The taxpayer claimed on the Form 3805F that he was working out of an office in Las Vegas and that he was working out of the same office as his accountant Michael Kern and Michael Kern had confirmed this statement during a telephone conversation in January of 1995.   When we went to this office in March of 1995, the receptionist did not know who the taxpayer was when we asked to see him.


Analysis
As the main activity of the taxpayer's business pursuits had been the pursuit of the patent, there is not sufficient information to use the taxpayer's business activities in determination of residency, other than the fact that the attorneys who represented the taxpayer and the corporation were California professionals and this is a significant California tie.

Conclusion
The taxpayer had significant California ties, as seen through his business activities during 1991 and 1992, such as patent agreements and the use of California professionals.

Page 22

H 015035

2821-0022
RJN0042

9. Other Information

    a.   The taxpayer had listed the following items as civic and social activities in response to question 12 of the FTB Form 3805F to show his social, professional, and other ties:

        1.  <u>Institute of Electrical and Electronic Engineers</u>
           (New York, New York)
           Professional Society

A letter was sent to this organization, but no response was received.

        2.  <u>Association of Computing Machinery (ACM)</u>
           (New York, New York)
           Professional Society

A letter was sent to this organization.  The taxpayer joined this association in May of 1992.  He had changed his address to a Las Vegas P.O. Box on 5/29/92.

        3.  <u>Licensing Executives Society (LES)</u>
           (Norwalk, Connecticut)
           Professional Society

A letter was sent to this organization.  The address given by the taxpayer was incorrect.  No listing could be found for this organization in Norwalk Connecticut.

        4.  <u>Sam's Club</u>
           (Las Vegas, Nevada)
           Retail Store

A letter was sent to this store.  No response was received. This is a retail store and is not verifiable.  This would not be considered a Nevada tie.

        5.  <u>Bizmart</u>
           (Las Vegas, Nevada)
           Retail Store

A letter was sent to this store.  No response was received. This is a retail store and is not verifiable.  This would not be considered a Nevada tie.

H 015036

2821-0023

RJN0043

6. <u>Personal Computer User's Group</u>
   (Las Vegas, Nevada)
   Computer Club

A letter was sent to this club.  The letter was sent back from
the post office, as the address was incorrect.  No listing could
be found in Las Vegas for this club.  This would not be
considered a Nevada tie.


7. <u>Temple Beth Am</u>
   (Las Vegas, Nevada)
   Religious activity

A letter was sent to this temple.  The letter came back from the
post office, as the address had been forwarded and the forwarding
order had expired.  A letter was sent to the new address and no
response was received.


8. <u>Mount Charleston Ski Resort</u>
   (Mount Charleston, Nevada)
   Ski activity

This is a ski resort and is not verifiable.  This would not
necessarily be considered a Nevada tie.


9. <u>Comdex</u>
   (Las Vegas, Nevada)
   Computer Conference

This is a computer conference held in Las Vegas each year.  It
is attended by people from all over the country, and would not
necessarily be considered a Nevada tie.


10. <u>Clark County School District</u>
    (Las Vegas, Nevada)
    Volunteer activities

A letter was sent to the Clark County School District.  They
have no record of any volunteer activities performed by the
taxpayer.


11. <u>Nevada Governor Robert Miller</u>
    (Las Vegas, Nevada)
    International Trade Activity

A letter was sent to Governor Miller's office.  The Governor's
office responded to our letter that they have never heard of the
taxpayer and have no record of him meeting with the Governor.


Page 24

H 015037


2821-0024

RJN0044

12. <u>Nevada Senator Richard Bryan</u>
    (Las Vegas, Nevada)
    International Trade Activity

A letter was sent to Senator Bryan's office.   No response was
received.

13. <u>Nevada Development Authority</u>
    (Las Vegas, Nevada)
    International Trade Activity

A letter was sent to this organization and they could not find
any record of either Gilbert Hyatt or Digital Nutronics.


<u>Analysis</u>:
The items listed by the taxpayer as Nevada ties were self-serving
statements with no documentary proof.   A person may shop in
Nevada, attend a convention, go skiing, etc. but this is not
indicative of a person's residence.   A person may join an
organization, but this does not mean that the person is an active
member.   The documentation obtained from third party sources
does not support the taxpayer's alleged ties to Nevada.

<u>Conclusion</u>:
The above items will not be considered Nevada ties.


H 015038

Page 25

2821-0025

RJN0045

## III. APPLICABLE STATUTORY REFERENCES

### A. Law

California Revenue and Taxation Code section 17041 imposes a personal income tax upon the entire taxable income of every resident of this state.

California Revenue and Taxation Code section 17014 defines a resident as:

1) Every Individual who is in this state for other than a temporary or transitory purpose; and

2) Every individual domiciled in this state who is outside the state for a temporary or transitory purpose.

### B. Regulations

The regulation provides that the underlying theory of California's definition of "resident" is the state where the taxpayer has his closest connections (Cal. Adm. Code Tit. 18 Reg. 17014, Subd. (b)). The purpose of this definition is to define a class of individuals who should contribute to the support of the state because they receive substantial benefits and protections from its laws and government (Cal Adm. Code Tit. 18 Reg. 17014). An individual may claim only one domicile at a time (Cal Adm. Code Tit. 18, Reg. 17014 Subd. (c)).

When it is determined that a taxpayer was domiciled in this state, he will be considered a resident if his absence was for a temporary or transitory purpose. The determination of whether a taxpayer's purposes in leaving California are temporary or transitory in character is essentially a question of fact to be determined by examining all the circumstances of each particular case (Cal Adm. Code tit. 18, Reg. 17014 Subd. (b)).

Consistently, in light of these regulation, it has been held that the connections which a taxpayer maintains in this and other states are important indication of whether an individual's presence in or absence from California is temporary or transitory.

H 015039

Page 26

2821-0026

RJN0046

## C. Court Rulings

A person may have only one domicile at a time (Whittel v.
Franchise Tax Board, 231 Cal. App. 2d 278, 284 (41 Cal Rptr
673)(1964)) and he retains that domicile until he acquires
one elsewhere (Marriage of Leff, 25 Cal App. 3d 630, 642
(102, Cal. Rptr. 195)(1972)).   The establishment of a new
domicile requires actual residence in a new place with the
intention to remain permanently or indefinitely (Estate of
Phillips, 269 Cal. App. 2d 656, 659 (75 Cal Rptr.
301)(1969)).

One does not lose a former domicile by going to and stopping
at another place for a limited time with no intention to
reside there permanently through the absence may continue for
a number of years (Chapman v. Superior Court, 162 Cal. App.
2d 421, 426--427 (238 P. 2d. 23)(1958).   The courts have
gone on to further define domicile as a person's true, fixed
permanent home, the place where he or she has no intention of
permanently leaving and whenever absent he or she has the
intention of returning there (Whittel, supra).

The Whittel case emphasizes that mere formalisms such as
changing voter registration or statements to the effect that
the taxpayer intended to be a resident of another state
are transparent and cannot control the issue.   The taxpayer
attempted to emphasize his Nevada property holdings by
deprecating his California interests because they were held
in corporate form.   The taxpayer in this case devoted
much effort to his attempt to show that he was closely
connected with Nevada, while minimizing the significance of
the amount of time he spent in California.   The brevity of
the taxpayer's stays in Nevada considerably detracts from his
claim of extensive activities there.   The time element is
one of the most important factors in determining residency.

H 015040

2821-0027
RJN0047

## IV. CONCLUSION

Based on the taxpayer's extensive ties to California, it is our conclusion that the taxpayer was a resident of California for the year 1991. As such, he is taxable on all income, regardless of its source.

Refer to the enclosed Schedule for the computation of the proposed tax assessment. If the taxpayer would like to make a payment on the deficiency, the interest can be calculated.

If you have any further information you wish to provide regarding the taxpayer's residency status or can demonstrate our understanding of the facts presented is incorrect, please do so in writing by August 31, 1995. If you need additional time, a waiver on the Statute of Limitations will be needed to extend the Statute. All cases must be submitted to review seven months prior to expiration of the Statute. For this reason, a waiver is enclosed, which should be signed by the taxpayer and sent to my office by August 31, 1995.

Please note, the determination reached in the audit is subject to further review.

If you have any additional questions concerning the audit, you can contact me at (818) 556-2942

Sheila Cox
Tax Auditor

cc: Eugene Cowan

H 015041

Page 29

2821-0028

RJN0048

PROGRAM ITEM  Fraud Penalty                    INITIAL  Sc

TAXPAYER  Gilbert P. Hyatt                      DATE  8/29/95

YEARS  1991                                     APPROVED

| DATE | SUMMARY EXPLANATION OF ITEM AS REPORTED | W/P REFERENCE |
|------|------------------------------------------|---------------|
| 8/29/95 | The taxpayer has been found to be a resident for | 5/1 - 13 |
| | 1991 - | |
| | Should the civil fraud penalty under PITG A114 | |
| | be assessed? | |

Continued on page ____ of ____

| DATE | VERIFICATION PROCEDURES AND SOURCES (REFER TO TAXPAYER'S DOCUMENT TITLE) | |
|------|------|------|
| | See analysis of issue — | 5/1 - 13 |

Continued on page ____ of ____

| DATE | CONCLUSION, FACTS SUPPORTING CONCLUSIONS AND ADJUSTMENTS PROPOSED |  |
|------|------|------|
| | Fraud penalty shall be assessed — | |
| | (See Eugene Cowan's letter of | |
| | response dated 10/16/95) | |

Continued on page ____ of ____

Section of the Section of law, case law, or regulations supporting adjustment          19165

Tax change from this adjustment $ _____

Discussed with taxpayer on (Eugene Cowan) 8/14/95 (See letter dated 10/16/95)

Taxpayer:  ☐ Agreed   ☐ Disagreed   ☒ Withheld statement

☐ Statement enclosed

COVER TO WORKPAPER SECTION #  5                    Page ____ of ____

A01517

GILBERT P. HYATT

TYE 1991
FRAUD PENALTY

ISSUE: Should the civil fraud penalty under PITL 19164 be assessed in the following case?

LAW: PITL 19164 shall be determined in accordance with the provisions of IRC Section 6663.

Under the federal IRC section, if any underpayment of tax required to be shown on the return is due to fraud, addition to tax will be made in amount equal to sum of 75% of the portion of the underpayment attributable to fraud. If FTB establishes any part of underpayment is attributable to fraud, the entire underpayment will be treated as so attributable, except for any portion taxpayer established not attributable.

(NOTE: There is information being collected from audits in progress of two other entities, which may have information relevant to this case. This information will not be disclosed at this time in accordance with PITL 19545, but may be used at a later date if it is necessary to disclose in court for the purpose of enforcement of the tax laws.)

FACTS:
The taxpayer claimed to be a California resident until 10/1/91, when he became a Nevada resident. He was an electronics engineer and aerospace consultant who was granted a patent for the single-chip integrated circuit (Microprocessor chip) for computers on 7/17/90. In 1968, he formed a closely held company with which he developed the microprocessor chip. He filed a patent application on the microprocessor chip on 12/28/70. The U.S. patents office heavily scrutinized his application, and did not issue the patent for almost 20 years. During this 20 year period, the taxpayer's closely held corporation went out of business, and he formed another closely held corporation.

When the patent was issued in July 1990, the taxpayer had a home in La Palma CA. The taxpayer signed licensing agreements with a few Japanese companies in July, October, and November 1991. These contracts indicated that the companies would pay the taxpayer a one time fee for future use of the microprocessor chip until the patent license held by the taxpayer expires.

In his 1991 return, the taxpayer received $42 million for the use of his invented product and he paid $24 million in commissions and fees during that year. The taxpayer filed as a part-year resident in 1991 and reported only $600,000 of the money received as California source income. The taxpayer claims that the sale of his California home on 10/1/91 was the significant event that changed his residency status.

5/1

A01518

2199-0002

RJN0050

GILBERT P. HYATT

TYE 1991
FRAUD PENALTY

## ANALYSIS OF ISSUE:

In order to impose the fraud penalty, FTB has the burden of proof to establish by clear and convincing evidence that:

1) There was an underpayment, and

2) That the underpayment is attributable to fraud.

The FTB burden to prove fraud by clear and convincing evidence is a lesser standard than the burden to establish tax evasion in a criminal proceeding, which must be established beyond a reasonable doubt.

Civil fraud is often defined as an intentional wrongdoing on the part of the taxpayer, with the specific purpose of evading a tax known or believed to be owing. For the fraud penalty to apply, there must be an intentional wrongdoing; the intent required is the specific purpose to evade a tax believe to be owing. The taxpayer must have intended to mislead, conceal, or otherwise prevent collection of such taxes. Mere carelessness is not sufficient.

Since intent is difficult to establish directly, courts have inferred fraudulent intent from various kinds of circumstantial evidence. Among the factors that courts have cited as indications of fraud are:

1) Understatement of income

2) Inadequate records

3) Implausible or inconsistent explanations of behavior

4) concealment of assets

5) failure to cooperate with tax authorities

6) engaging in illegal activities

7) dealing in cash

8) failure to made estimated tax payments.

5/2

A01519

2199-0003

RJN0051



**GILBERT P. HYATT**

TYE 1991
**FRAUD PENALTY**

In examination of these factors with respect to the taxpayer, the following observations are made:

IMPLAUSIBLE OR INCONSISTENT EXPLANATIONS OF BEHAVIOR -

The taxpayer signed agreements to receive payments from Matsushita and Fujitsu, both of Japan, for the use of his patent for the microchip. Although both agreements were signed after the taxpayer supposedly left California, both agreements had his California address.   The money was to be wire transferred to a trust account in Los Angeles. The agreements state that they are to be in accordance with the laws of the State of California.

The taxpayer transferred the licensing fees that he had received from the Japanese companies (approximately $40 Million) into a Franklin Fund Account in Palo Alto, California.    The taxpayer's address on the account statements was the La Palma California residence of the house that he had supposedly sold.

5/3

A01520

2199-0004

RJN0052

GILBERT P. HYATT

**TYE 1991**
**FRAUD PENALTY**

INTENTIONAL EVIDENCE OF INTENT TO DEFRAUD

The taxpayer provided documentation stating that he had sold his home in La Palma on 10/1/91 to Grace Julia Jeng. We have gotten affidavits from several parties stating that Grace Jeng lives with the taxpayer and serves as his assistant, and that Grace and the taxpayer are always together. The title on the house did not pass to Grace Jeng until 6/93.

Based upon examination of the taxpayer's checks and bank statements provided to date, it was noted that there were a number of checks which the taxpayer had made out to "CASH". He then endorsed the check and the check was then endorsed by Grace Jeng. Most of these checks were cashed at California Banks. It is unusual that the taxpayer would be giving money to Grace Jeng every month if he had sold his house to her.

The statements made that the taxpayer lives with Grace Jeng (who the taxpayer supposedly sold the California house to), along with transfers of cash to Grace Jeng indicate that the house was still beneficially owned by the taxpayer. The transfer of the house was a sham transaction rather than a bona fide sale. The transaction was set up solely to avoid payment of California Income taxes.

Additionally, in examination of the checks, it was also noted that many of the checks are written in handwriting which is quite different from the taxpayer's handwriting. The signatures appear to be that of the taxpayer. One individual has given an affidavit that they had seen Grace Jeng use the taxpayer's credit card.

We received a letter from the La Palma City Water Services stating that Grace Jeng turned on water service 11/26/91 and that her mailing address was P.O. Box 3357 Cerritos. The owner was listed as Gilbert P. Hyatt. It does not make sense that the taxpayer would have sold his home on 10/1/91 and did not turn off the water service until 11/26/91, when Grace Jeng had the water service turned on in her name. People usually turn off the utilities when they sell their homes and move.

Based upon examination of the taxpayer's checks, it was noted that there was a check dated 4/13/92 to Ron's Repair and Remodelling. This check was cashed in California. I called Ron Schuchord of Ron's Repair and Remodelling and interviewed him on 3/28/95. He stated that he had done work for Mr. Hyatt at the house in La Palma. Ron stated that it is customary for him to receive a check from his customers on the date that the work is completed. He said that if the check was dated 4/13/92, then he was there on that date, but he no longer has invoices.

5/4

A01521

2199-0005

RJN0053

GILBERT P. HYATT

TYE 1991
FRAUD PENALTY

The taxpayer continued (and continues) to maintain at least two P.O. boxes in California. A letter from the U.S. Postmaster dated 5/12/94 included a copy of Form 1093 (P.O. Box application). Gilbert P. Hyatt and Grace Jeng were listed as the P.O. Box users and the renewal dated 4/16/92 was in Grace Jeng's name. Also included was a copy of a letter from Gilbert Hyatt to the Postmaster dated 2/2/92 requesting to add Grace Jeng and Barry Lee to P.O. Box 3357 in Cerritos. The fact that the taxpayer shares a post office box with Grace Jeng provides evidence that the taxpayer lives with her.

The taxpayer rented at least two P.O. boxes in Las Vegas, he registered to vote, and he got a Nevada driver license in November of 1991. These items are considered minor areas, which are very easy to establish. Voter registration, P.O. boxes, and driver licenses are not given much weight.

The taxpayer rented an apartment in Las Vegas Nevada beginning on November 1, 1991. The taxpayer claimed that he left California on October 1, 1991. Based upon this information we do not know where the taxpayer lived from October 1 through November 1 of 1991. He rented this apartment in Las Vegas from November 1991 through April of 1992 and paid $540 per month for rent.

During March of 1995, Sheila Semana and I visited this apartment in Las Vegas. The apartments did not have any security gates or doors. (Despite statements by the representative that the taxpayer is afraid of being kidnapped).

We went to the apartment management office and interviewed the managers Sherri Lewis and Clara Kopp. Sherri had only worked there for a few years, but Clara had worked there for a long time. They indicated to us that many of the apartments were occupied by people of low income and many of the tenants were subsidized by HUD. It does not make sense that a person such as the taxpayer who was a millionaire would want to live in a low income (HUD) apartment. We asked Clara Kopp if she remembered who had rented apartment 237 during the period from October of 1991 to April of 1992. She provided the rental file for examination.

Ms. Kopp said that Gilbert Hyatt had rented the apartment. Grace Jeng had come in and made the rental arrangements for him. She signed the lease for him and did the initial walkthrough of the apartment. He later came back and signed for himself. Clara stated that she didn't see him too often. He had faxed the initial application to her.

5/5                                                    A01522

2199-0006

RJN0054

GILBERT P. HYATT

████████
TYE 1991
FRAUD PENALTY

The taxpayer had stated on the application that his employer was D&C Corporation of P.O. Box 846 Cypress, California (213) 809-1087. He had listed that his closest relative or contact was his associate Grace Jeng at 13337 E. South Street Cerritos, California 90071. His automobile was a Toyota Celica with a California license 886 SLP. His previous address was listed as P.O. Box 3357 Cerritos, California.

When I asked Clara if the apartment 237 appeared to be regularly occupied, she stated that the taxpayer had told her that he travelled a lot for business. (The taxpayer had stated on the FTB Form 3805F that he had been working out of this apartment.)

Clara Kopp had said that there had been no complaints about the taxpayer from the other tenants. She indicated that this was somewhat unusual. She checked the maintenance report from when the apartment was vacated in April of 1992. She said that the apartment was very clean when the taxpayer vacated the apartment and that there were no damages to the apartment. The apartment maintenance people only had to do minimal maintenance before renting it out again. The manager was surprised that the taxpayer had not damaged the apartment, as the apartments were often damaged by the tenants.

Based upon examination of the letter of 30 day notice in the rental file, Mr. Hyatt had stated that he had bought a house and that he was moving back to California. Grace Jeng had signed the move-out notice. He had listed as a forwarding address P.O. Box 60028 Las Vegas, Nevada.

I asked the managers if they had any record of how the rent had been paid, whether through the mail, in person, etc. They indicated that they have no record of it. They stated that the taxpayer did pay by check each month. We saw in the file an envelope which Mr. Hyatt had used to pay the rent. The envelope had a return address of P.O. Box 60028 Las Vegas. The envelope was postmarked from Long Beach, California and was date stamped 12/8/91. Clara stated that he would pay the rent ahead of time with a post dated check. They would keep the check until the rent was due.

Based upon our interview at the apartment in Las Vegas and examination of the rental file, the taxpayer rented this apartment in attempt to give the appearance of a Nevada residency. The fact that he had someone else rent the apartment for him, that he was paying the rent with postdated checks and mailing them from California, along with the appearance that he was not occupying the apartment are all evidence of this fact.

5/6

A01523

GILBERT P. HYATT

TYE 1991
FRAUD PENALTY

In April of 1992, the taxpayer purchased a house in Las Vegas.   The taxpayer's representative provided a copy of the escrow instructions for the purchase of the house with the address deleted.   (The taxpayer's representative stated that the reason for the deletion was the taxpayer's concern about confidentiality).    The escrow instructions state that the purchaser may change the name on the title when escrow closes.    The Clark County Treasurer's office was called and they stated that this parcel of land is in the name of Kern Trust. Mike Kern is the trustee.   He is the taxpayer's representative in Las Vegas.

We received a letter from the Las Vegas Valley Water District. The account for 7335 Tara was established on 4/1/92.    The customer name is G. Julia Jeng and the mailing address is P.O. Box 81230 Las Vegas.

We received a letter from Southwest Gas Corporation of Las Vegas which stated that Gilbert Hyatt is not the customer of record at 7335 Tara. I called Southwest Gas and spoke to Georgia Heki.   She confirmed that account is in the name of G. Julia Jeng.

We received a letter from Silver State Disposal Service in Las Vegas. The account was opened on 4/1/92 in the name of Michael Kern.    (The taxpayer's representative)   There is a notation on the account that payments have been made by Gilbert Hyatt.   When we were in Las Vegas on 3/7/95, we saw the Silver State Disposal Service coming up Tara street.   We asked the trashman if they got much trash at 7335 Tara.   He said that they got a bag every once in a while.    He said that he had always wondered if anyone lived there.

When the taxpayer submitted the FTB Form 3805F, he also submitted a list of civic and social activities in response to question 12 on the form.   The items listed as Nevada civic and social ties were checked. Several of the items were for retail stores in Nevada (not verifiable) and several were for clubs and religious organizations but the addresses given were not correct.

The taxpayer had stated on the 3805F that he had volunteered for the Clark County school district.    We checked on this and the Clark County School District had no record of this.   The taxpayer had listed the Senator from Nevada and the Governor of Nevada as Nevada ties.   The Governor's office responded to our letter that they have never heard of the taxpayer and have no record of him meeting with the Governor.   The items listed by the taxpayer as Nevada ties were self-serving statements with no documentary proof.

5/7                          A01524

2199-0008

RJN0056

GILBERT P. HYATT
████████
TYE 1991
FRAUD PENALTY

The taxpayer had stated on the FTB Form 3805F that he worked out of an office at the same address as the taxpayer's representative Mike Kern. The taxpayer's representative Mike Kern of Las Vegas had stated that he saw the taxpayer on a frequent basis because he subleased office space and worked out of Mike Kern's office. When we were in Las Vegas, we went to the representative Mike Kern's office and asked for the taxpayer. The receptionist did not know who we were talking about. This is an indication that the the taxpayer and his representative had made false statements with an intent to deceive.

It is not readily determinable if the taxpayer's records are inadequate, or if he is attempting to conceal them from FTB. The taxpayer does not have many of the documents requested, such as telephone bills. It is not determinable whether these items had been intentionally destroyed.

When the taxpayer's moving expenses were requested, the taxpayer's representative stated that the taxpayer had moved himself to Las Vegas using his son's trailer. As evidence of this, they gave me a copy of the trailer registration, which was registered in the state of Nevada in 1992. This does not provide any documentation or proof of the taxpayer's moving expenses.

The taxpayer's representative has sent the requested financial information piecemeal and also has sent some of the bank statements more than once, to give the appearance of compliance with the document requests. He has sent copies of letters from the taxpayer to the credit card companies, showing that the taxpayer has requested the statements more than once. If the taxpayer really wanted to obtain this information from the credit card companies, he would have called them and followed up on this.

Also, as evidence of the taxpayer's specific intent to defraud the government, we have gotten affidavits from several individuals that the taxpayer may have cheated on his taxes in the past. They stated that he would collect bills and receipts from various family members, friends, etc. and use those for business writeoffs.

A01525

5/8

2199-0009
RJN0057

GILBERT P. HYATT
████████
TYE 1991
FRAUD PENALTY

We were told in affidavits that the taxpayer always wanted to pay
expenses for family members and friends with checks .  He wanted
friends and family members to  give him receipts from restaurants,
bills, etc.   He wanted receipts for anything.  He would pay with a
check with a stamp which said "private contractor."    (In examination
of the taxpayer's checks we saw checks with this stamp imprinted on
the back.)   He would use other people's receipts for business expense
writeoffs, so he wouldn't have to pay income taxes.    This is
indication that the taxpayer has used tax avoidance schemes in the
past.

In addition to the taxpayer's corporation Digital Nutronics, the
taxpayer has filed a Schedule C as a "Patent Agent" on his 1989, 1990,
and 1991 California tax returns.   The taxpayer has deducted items
such as office expense, utilities, etc.    The addresses listed for
the business on the Schedule C and for his corporation Digital
Nutronics are both a P.O. Box.   It is not determinable whether the
taxpayer is deducting expenses for a home office or whether these
items are personal expenses, as there is no indication of where the
taxpayer carried on these businesses.

A01526

5/9

2199-0010

RJN0058

GILBERT P. HYATT

TYE 1991
FRAUD PENALTY

## Concealment of Assets

In April of 1992, the taxpayer purchased a house in Las Vegas. The taxpayer's representative provided a copy of the escrow instructions for the purchase of the house with the address deleted. (The taxpayer's representative stated that the reason for the deletion was the taxpayer's concern about confidentiality). The escrow instructions state that the purchaser may change the name on the title when escrow closes. The Clark County Treasurer's office was called and they stated that this parcel of land is in the name of Kern Trust. Mike Kern is the trustee. He is the taxpayer's representative in Las Vegas. The taxpayer may have put this house into a trust account to make it difficult to trace his property.

When the taxpayer was asked to provide a list of all bank accounts, cancelled checks, etc. he provided a list of bank accounts at the representatives office. The representative stated that they had been unable to get any of the California account information. For one of the accounts, they did not even have the account number. They later provided this information after I told them that I would request it from the bank directly if they did not.

There was one account which had not been included on the taxpayer's list. This account was for a Franklin Fund Account in Palo Alto, California. We knew that this account existed, because the taxpayer had provided copies of checks from this account. We requested this account information from the taxpayer and they eventually provided it to us. The taxpayer's address on the account statements was the La Palma California residence of the house that he had sold. This account is where the taxpayer transferred the licensing fees that he had received from the Japanese companies (approximately $40 Million).

From examination of the licensing agreements with the Japanese, the funds were to be wire transferred to a trust account in care of a Los Angeles attorney. When I asked the taxpayer's representative for copies of the account statements, he said that they did not have them because the trust fund had been mutually agreed upon and that the taxpayer did not have any control over it. Letters were sent to Matsushita and Fujitsu in Japan and we received confirmation of the exact dates of the wire transfers.

5/10

A01527

GILBERT P. HYATT

TYE 1991
FRAUD PENALTY

From examination of the taxpayer's checks, it was noticed that there was one check to Capital Bank in Cerritos, California. The back of the check said that it was for safe deposit boxes. Information was obtained from the bank that the taxpayer did have safe deposit boxes in California and they provided the dates that he visited these boxes. The taxpayer did not change the address on the safe deposit box accounts to his Las Vegas P.O Box until 7/21/92, even though he visited the boxes on 12/5/91 and 12/10/91 (after the date that he supposedly left California). He also visited the the boxes on 7/13/92.

Failure to cooperate with tax authorities

Throughout the course of the audit, the taxpayer's attorney and accountant have been reluctant to provide copies of the taxpayer's documents requested by the auditors. They both had stated that the documents could only be examined at the attorney's office. They said that the reason for this was the taxpayer's fear that he would be kidnapped. This reason is irrational and is an evasive tactic used by the taxpayer.

The apartment that the taxpayer had rented in Las Vegas and the house that he bought were both observed during a field visit to Las Vegas. The apartment had no security system and the house did not have a fence or any visible security system. It is not logical that someone who was worried about being kidnapped would not have his home enclosed or live in a gated community. We did note that there was a gated community several blocks from the taxpayer's home.

(The taxpayer's representatives began providing copies of documentation requested after a copy of the Firestone case was provided to them.)

The taxpayer's accountant has used delaying tactics, such as calling on the due date of a document request to state that he would not have the requested documentation on time. He had also stated that he felt that they had provided enough documentation to support the taxpayer's residency. He felt that we were being unreasonable to request the taxpayer's financial information. The taxpayer's representative tried to use intimidation techniques to get us to back off on document requests.

5/11                                     A01528

GILBERT P. HYATT

TYE 1991
FRAUD PENALTY

The taxpayer's representative has sent the requested financial information piecemeal and also has sent some of the bank statements more than once, to give the appearance of compliance with the document requests. He has sent copies of letters from the taxpayer to the credit card companies, showing that the taxpayer has requested the statements more than once. If the taxpayer really wanted to obtain this information from the credit card companies, he would have called them and followed up on this matter.

The taxpayer does not have many of the documents requested, such as telephone bills. It is not determinable whether these items had been intentionally destroyed.

Failure to cooperate with the FTB can be an indication of fraud. Thus, lying or giving evasive answers to FTB personnel, delaying tactics, and other actions designed to mislead FTB auditors are all indicia of fraud. These and other indicia or badges of fraud (including acts of concealment, the use of dummy business entities and bank accounts opened under assumed names or in the names of relatives or nominees) can be found in numerous criminal and civil fraud cases.

In evaluating the evidence, courts also consider the education level and sophistication of the taxpayer. Each case is decided on its own particular facts, and often no single factor is decisive. There is no exclusive list of factors to be considered in determining whether fraud has occurred.

The taxpayer in this case is an intelligent person with degrees from Berkeley and USC. He has owned businesses in California, he has dealt with the U.S. Patent Office, and negotiated licensing agreements, so he has shown a high degree of business knowledge and sophistication. Based upon examination of evidence, the taxpayer is a businessman of above-average education, considerable ability and experience.

The taxpayer's knowledge of the tax law is an important factor in determining whether fraud has been committed. The fact that the taxpayer is intelligent and sophisticated in tax matters will be taken into account even if the taxpayer is not a tax specialist. The taxpayer cannot escape the penalty by delegation of the tax return preparation to his accountant.

5/12

A01529

2199-0013

RJN0061

GILBERT P. HYATT

TYE 1991
FRAUD PENALTY

It is likely that the taxpayer has a knowledge of tax law, as it appears that he prepared his own tax returns and that of his corporation (Digital Nutronics) prior to 1991. (These earlier year tax returns did not have a preparer sign.)

If the taxpayer relied on a third part to keep his books and records, to prepare and file his returns, or for tax advice generally, such reliance may indicate the absence of fraudulent intent, even if an understatement of income occurs. When the taxpayer in good faith turns over all of his books and records or otherwise makes a full and complete disclosure of all of the facts to a third party to whom he has given the tax of preparing his return, the court generally do not find fraudulent intent. If however, the taxpayer did not supply his bookkeeper or tax return preparer with all of the relevant and necessary information, fraud has been found.

In this case, the taxpayer may have not revealed all of the facts regarding his residency to the taxpayer's representative. We do not know what the representatives know, but it is apparent that they are using delaying tactics and evasive tactics in an attempt to protect their client. We do not know to what extent they advised the taxpayer on the perpetration of this scheme to defraud.

CONCLUSION:
The fraud penalty shall be applied for 1991, as there is evidence that the taxpayer intended to defraud, as seen through his implausible or inconsistent behavior, concealment of assets, failure to cooperate with tax authorities, and other evidence of intent to defraud.

NOTE: The taxpayer's representative Eugene Cowan responded to the fraud penalty issue in a letter faxed to the FTB on 10/17/95. See w/p ————.

5/13

A01530

2199-0014

RJN0062

# PIERCY, BOWLER, TAYLOR & KERN

*CERTIFIED PUBLIC ACCOUNTANTS, LTD*

A PROFESSIONAL CORPORATION
95 JONES PLAZA
6100 ELTON AVENUE
SUITE 1000
LAS VEGAS, NEVADA 89107
TELEPHONE (702) 384-1120
FAX (702) 870-2474

**DATE:** April 29, 1996

**CLIENT NAME: GIL HYATT**

**TO: GIL HYATT**

**FROM: MICHAEL KERN**

**FAX NUMBER: 871-9397**

**TOTAL NUMBER OF PAGES
INCLUDING COVER SHEET: 5**

**MESSAGE:**
GIL,

I RECEIVED THE ATTACHED FROM THE FRANCHISE TAX BOARD OVER THE
WEEKEND. A COPY HAS ALSO BEEN FAX'D TO EUGENE COWAN, ESQ.

NOTE THAT THE FRANCHISE TAX BOARD DID NOT COPY HIM ON THE NOTICE.

THANKS

PBTK 00373

2592-0001

RJN0063

04/29/96   07:43   FAX 7028702474        P B T K                    ☑001

```
                    *****************************
                    ***   ACTIVITY REPORT   ***
                    *****************************
```

TRANSMISSION OK

TX/RX NO.              4054
CONNECTION TEL                    8719397
CONNECTION ID
START TIME           04/29 07:38
USAGE TIME           05'03
PAGES                  5
RESULT               OK

PBTK 00374

2592-0002

RJN0064



STATE OF CALIFORNIA
# FRANCHISE TAX BOARD
P.O. BOX 942867
SACRAMENTO, CA 94267-0041
(800) 852-2753

## NOTICE OF
## PROPOSED ASSESSMENT

2

In accordance with the provisions of the California Revenue and Taxation Code, notice is hereby given that we propose to assess a deficiency for the taxable year shown below. Details of the proposed assessment are explained below. See the reverse side for more information and an explanation of your rights and responsibilities.

GILBERT P HYATT
PO BX 60028
LAS VEGAS NV 89160

MIKE KERN, CPA
6100 ELTON
LAS VEGAS NV 89107

| | |
|---|---|
| Date | 04/23/96 |
| D.L.N. | 9261139901 |
| Taxable Year | 1991 |
| NPA No. | 04728256 |
| Account No. | ▇▇▇▇▇ |
| Rev. Code | 3671399CSF041901 |

INCOME AS REPORTED OR REVISED
FILING STATUS - SINGLE
TAX - TABLE

| | |
|---|---|
| | $ 17,727,743.00 |
| TOTAL EXEMPTION CREDITS (AS ADJUSTED) | 1,945,940.00 |
| TOTAL TAX LIABILITY | 0.00 |
| LESS PREVIOUSLY ASSESSED | 1,945,940.00 |
| ADDITIONAL TAX | 69,469.00 |
| PENALTY ACCURACY RELATED (FRAUD) | 1,876,471.00 |
| INTEREST TO 04/23/96 | 1,407,353.25 |
| TOTAL ADDITIONAL TAX, PENALTY AND INTEREST | 1,256,580.52 |
| | $ 4,540,404.77 |

SECTION 17014 OF THE CALIFORNIA REVENUE AND TAXATION CODE DEFINES A RESIDENT AS

1. EVERY INDIVIDUAL WHO IS IN THIS STATE FOR OTHER THAN A TEMPORARY OR TRANSITORY PURPOSE AND

2. EVERY INDIVIDUAL DOMICILED IN THIS STATE WHO IS OUTSIDE THE STATE FOR A TEMPORARY OR TRANSITORY PURPOSE.

ANY INDIVIDUAL WHO IS A RESIDENT OF THIS STATE CONTINUES TO BE A RESIDENT EVEN THOUGH TEMPORARILY ABSENT FROM THE STATE.

CONTINUED ON PAGE 2

FTB S830-M-PIT (REV 4-95) SIDE 1        ORIG—TAXPAYERS COPY          DUP—REMITTANCE COPY

PBTK 00375

FRANCHISE TAX BOARD          PAGE 2 NPA  1991          04728236 04/23/96

GILBERT P HYATT

WHETHER A TAXPAYER'S PURPOSE IN ENTERING OR LEAVING CALIFORNIA IS TEMPORARY
OR TRANSITORY IN CHARACTER IS ESSENTIALLY A QUESTION OF FACT TO BE DETER-
MINED BY EXAMINING ALL THE CIRCUMSTANCES OF EACH PARTICULAR CASE.  (APPEAL
OF ANTHONY V. AND BEVERLY ZUPANOVICH, CAL. ST. BD. OF EQUAL., JAN.6, 1976.)
THE CONNECTIONS WHICH A TAXPAYER MAINTAINS WITH THIS AND OTHER STATES ARE
AN IMPORTANT INDICATION OF WHETHER HIS/HER PRESENCE IN OR ABSENCE FROM
CALIFORNIA IS TEMPORARY OR TRANSITORY IN CHARACTER.  (APPEAL OF RICHARD L.
AND KATHLEEN K. HARDMAN, CAL. ST. BD. OF EQUAL., AUG. 19, 1975.)  SOME OF
THE MANY CONTACTS CONSIDERED RELEVENT ARE THE MAINTENANCE OF A FAMILY HOME,
BANK ACCOUNTS, BUSINESS RELATIONSHIPS, VOTING REGISTRATION, POSSESSION OF A
LOCAL DRIVER'S LICENSE, AND OWNERSHIP OF REAL PROPERTY.  (APPEAL OF BERNARD
AND HELEN FERNANDEZ, CAL. ST. BD. OF EQUAL., JUNE 2, 1971.)

WE ASSESSED THE FRAUD PENALTY AS PROVIDED BY CALIFORNIA REVENUE AND
TAXATION CODE SECTION 19164(B), FORMERLY SECTION 18685(B).  THIS PENALTY
CONFORMS TO INTERNAL REVENUE CODE SECTION 6663, WHICH STATES THAT IF ANY
PART OF ANY UNDERPAYMENT OF TAX REQUIRED TO BE SHOWN ON A RETURN IS DUE TO
FRAUD, THERE SHALL BE ADDED TO THE TAX AN AMOUNT EQUAL TO 75 PERCENT OF
THE PORTION OF THE UNDERPAYMENT WHICH IS ATTRIBUTABLE TO FRAUD.  WE
DETERMINED THAT THE ENTIRE UNDERPAYMENT IS DUE TO FRAUD.

PBTK 00376

2592-0004

RJN0066

# General Information

This Notice of Proposed Assessment advises you that we intend to assess additional tax and/or penalties. To allow you time to review and respond to our notice, we will take no further action for 60 days from the date of the notice.

### Agree

IF YOU AGREE with this proposed assessment, please pay the amount of additional tax and penalties, plus interest. Prompt payment will ensure that no additional interest is assessed.

### Disagree

IF YOU DO NOT AGREE with this proposed assessment, you may file a protest with the Franchise Tax Board within 60 days of the date of this notice. Otherwise, this proposed assessment will become final at the expiration of the 60-day period and you will be billed for the amount due.

Filing a protest will not stop the accrual of interest.

### Payment Procedure

To receive proper credit for your payment:

1 Make a check or money order to: Franchise Tax Board.
2 Write your social security number on your check or money order.
3 Attach a copy of this notice.
4 Mail to:

    Franchise Tax Board
    P.O. Box 942867
    Sacramento, CA 94267-0041

### Taxpayers' Rights Advocate

The Franchise Tax Board has a Taxpayer's Rights Advocate who reviews those cases where taxpayers have been unable to resolve their problems with the Franchise Tax Board through normal channels. Contacting the Taxpayers' Rights Advocate does not preserve your right of protest. You may exercise your protest rights only by following the procedures explained under "Protest Procedure."

To contact the Taxpayers' Rights Advocate, write to:

    Taxpayer Advocate Bureau
    P.O. Box 1468
    Sacramento, CA 95812-1468

or: FAX (916) 845-6614

For Privacy Notice, see form FTB 1131.

### Protest Procedure

A protest must be in writing and should clearly state that a protest is being made. The protest must be filed within 60 days of the date of this notice and should include the following information:

1 Your name and address.
2 Your social security number.
3 Amounts and years involved.
4 Statement of facts.
5 Points in support of your position.
6 Your signature or your authorized representative's signature.
7 Your daytime telephone number or your authorized representative's telephone number.
8 A copy of this notice or the date and number of this Notice of Proposed Assessment.

The protest should be mailed to:

    Franchise Tax Board
    Attention: Protest Section
    P.O. Box 942867
    Sacramento, CA 94267-5540

The Franchise Tax Board will reconsider the proposed adjustments and, if requested, in the letter of protest, grant you or your authorized representative an oral hearing. You have the right to have your designated agent represent you at the hearing. You will be notified of our decision on your protest as soon as a determination is made.

---

### TELEPHONE ASSISTANCE

Our regular toll-free telephone service is available from 7:00 a.m. until 8:00 p.m. Monday - Friday from the first working day in January through April 15. The best times to call are between 7:00 a.m. and 10:00 a.m. and between 6:00 p.m. and 8:00 p.m. Service is also available from 8:00 a.m. until 5:00 p.m. on the two Saturdays prior to April 15. After April 15, service is available Monday through Friday between 8:00 a.m. and 5:00 p.m.

| | |
|---|---|
| From within the United States, call . . . . . . . . . . . . . . . . . . . | 1-800-852-2753 |
| From outside the United States, call (not toll-free) . . . . . . . . . . . . . . . . . | 1-916-845-6500 |
| For hearing impaired with TDD, call . . . . . . . . . . . . . . . . . . . . . . . | 1-800-822-6268 |

FTB 5830-N-PIT (REV 4-93) SIDE 2

PBTK 00377



U.S POSTAGE = 0 3 2 =

SACRAMENTO CA
APR 21 '98

4720A
STATE OF CALIFORNIA
FRANCHISE TAX BOARD
PO BOX 1673
SACRAMENTO CA 95812-1673

PBTK 00378

2592-0006

RJN0068

# PIERCY, BOWLER, TAYLOR & KERN

*CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS ADVISORS*

A PROFESSIONAL CORPORATION
6100 ELTON AVENUE
SUITE 1000
LAS VEGAS, NEVADA 89107
TELEPHONE (702) 384-1120
FAX (702) 870-2474

DATE: April 29, 1996

CLIENT NAME: GIL HYATT

TO: EUGENE COWAN, ESQ.

FROM: MICHAEL KERN

FAX NUMBER: 213-229-8550

TOTAL NUMBER OF PAGES
<u>INCLUDING COVER SHEET</u>: 5


MESSAGE:
EUGENE,

I HAVE FAX'D A COPY OF THE ATTACHED TO GIL HYATT.

DID YOU RECEIVE A COPY.  YOU ARE NOT COPIED ON THIS NOTICE.

THANKS

PBTK 00379

2592-0007
RJN0069

·04/29/96   07:49   FAX 7028702474        P B T K                              ⌀001

```
                        *************************
                        ***  ACTIVITY REPORT  ***
                        *************************

        TRANSMISSION OK

        TX/RX NO.              4056
        CONNECTION TEL              12132298550
        CONNECTION ID
        START TIME            04/29 07:44
        USAGE TIME           04'31
        PAGES                     5
        RESULT               OK
```

PBTK 00380

2592-0008

RJN0070



STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**
P.O. BOX 942867
SACRAMENTO, CA 94267-0041
(800) 852-2753

**NOTICE OF**
**PROPOSED ASSESSMENT**                2

'n accordance with the provisions of the California Revenue and Taxation Code, notice is hereby given that we propose to assess a
deficiency for the taxable year shown below. Details of the proposed assessment are explained below.
See the reverse side for more information and an explanation of your rights and responsibilities.

GILBERT P HYATT
PO BX 60028
LAS VEGAS NV 89160

| | |
|---|---|
| Date | 04/23/96 |
| D.L.N. | 9261139901 |
| Taxable Year | 1991 |
| NPA No. | 04728256 |
| Account No. | ███████ |
| Rev. Code | 3671399CSF041901 |

MIKE KERN, CPA
6100 ELTON
LAS VEGAS NV 89107

| | |
|---|---|
| INCOME AS REPORTED OR REVISED | |
| FILING STATUS - SINGLE | $ 17,727,743.00 |
| TAX - TABLE | |
| TOTAL EXEMPTION CREDITS (AS ADJUSTED) | 1,945,940.00 |
| TOTAL TAX LIABILITY | 0.00 |
| LESS PREVIOUSLY ASSESSED | 1,945,940.00 |
| ADDITIONAL TAX | 69,469.00 |
| PENALTY  ACCURACY RELATED (FRAUD) | 1,876,471.00 |
| INTEREST TO 04/23/96 | 1,407,353.25 |
| TOTAL ADDITIONAL TAX, PENALTY AND INTEREST | 1,256,580.52 |
| | $ 4,540,404.77 |

SECTION 17014 OF THE CALIFORNIA REVENUE AND TAXATION CODE DEFINES A
RESIDENT AS

1. EVERY INDIVIDUAL WHO IS IN THIS STATE FOR OTHER THAN A
   TEMPORARY OR TRANSITORY PURPOSE  AND

2. EVERY INDIVIDUAL DOMICILED IN THIS STATE WHO IS OUTSIDE
   THE STATE FOR A TEMPORARY OR TRANSITORY PURPOSE.

ANY INDIVIDUAL WHO IS A RESIDENT OF THIS STATE CONTINUES TO BE A RESIDENT
EVEN THOUGH TEMPORARILY ABSENT FROM THE STATE.

CONTINUED ON PAGE 2

FTB 5830-M-PIT (REV 4-95) SIDE 1          ORIG—TAXPAYERS COPY          DUP—REMITTANCE COPY

PBTK 00381

2592-0009
RJN0071

F   \CHISE TAX BOARD          PAGE 2  NPA  1991          04728236 04/23/96

GILBERT P HYATT                                    ███████

WHETHER A TAXPAYER'S PURPOSE IN ENTERING OR LEAVING CALIFORNIA IS TEMPORARY
OR TRANSITORY IN CHARACTER IS ESSENTIALLY A QUESTION OF FACT TO BE DETER-
MINED BY EXAMINING ALL THE CIRCUMSTANCES OF EACH PARTICULAR CASE.  (APPEAL
OF ANTHONY V. AND BEVERLY ZUPANOVICH, CAL. ST. BD. OF EQUAL., JAN.6, 1976.)
THE CONNECTIONS WHICH A TAXPAYER MAINTAINS WITH THIS AND OTHER STATES ARE
AN IMPORTANT INDICATION OF WHETHER HIS/HER PRESENCE IN OR ABSENCE FROM
CALIFORNIA IS TEMPORARY OR TRANSITORY IN CHARACTER.  (APPEAL OF RICHARD L.
AND KATHLEEN K. HARDMAN, CAL. ST. BD. OF EQUAL., AUG. 19, 1975.)  SOME OF
THE MANY CONTACTS CONSIDERED RELEVENT ARE THE MAINTENANCE OF A FAMILY HOME,
BANK ACCOUNTS, BUSINESS RELATIONSHIPS, VOTING REGISTRATION, POSSESSION OF A
LOCAL DRIVER'S LICENSE, AND OWNERSHIP OF REAL PROPERTY.  (APPEAL OF BERNARD
AND HELEN FERNANDEZ, CAL. ST. BD. OF EQUAL., JUNE 2, 1971.)

WE ASSESSED THE FRAUD PENALTY AS PROVIDED BY CALIFORNIA REVENUE AND
TAXATION CODE SECTION 19164(B), FORMERLY SECTION 18685(B).  THIS PENALTY
CONFORMS TO INTERNAL REVENUE CODE SECTION 6663, WHICH STATES THAT IF ANY
PART OF ANY UNDERPAYMENT OF TAX REQUIRED TO BE SHOWN ON A RETURN IS DUE TO
FRAUD, THERE SHALL BE ADDED TO THE TAX AN AMOUNT EQUAL TO 75 PERCENT OF
THE PORTION OF THE UNDERPAYMENT WHICH IS ATTRIBUTABLE TO FRAUD.  WE
DETERMINED THAT THE ENTIRE UNDERPAYMENT IS DUE TO FRAUD.

PBTK 00382

2592-0010

RJN0072

# General Information

This Notice of Proposed Assessment advises you that we intend to assess additional tax and/or penalties. To allow you time to review and respond to our notice, we will take no further action for 60 days from the date of the notice.

### Agree

IF YOU AGREE with this proposed assessment, please pay the amount of additional tax and penalties, plus interest. Prompt payment will ensure that no additional interest is assessed.

### Disagree

IF YOU DO NOT AGREE with this proposed assessment, you may file a protest with the Franchise Tax Board within 60 days of the date of this notice. Otherwise, this proposed assessment will become final at the expiration of the 60-day period and you will be billed for the amount due.

Filing a protest will not stop the accrual of interest.

### Payment Procedure

To receive proper credit for your payment:

1  Make a check or money order to: Franchise Tax Board.
2  Write your social security number on your check or money order.
3  Attach a copy of this notice.
4  Mail to:

> Franchise Tax Board
> P.O. Box 942867
> Sacramento, CA 94267-0041

### Taxpayers' Rights Advocate

The Franchise Tax Board has a Taxpayer's Rights Advocate who reviews those cases where taxpayers have been unable to resolve their problems with the Franchise Tax Board through normal channels. Contacting the Taxpayers' Rights Advocate does not preserve your right of protest. You may exercise your protest rights only by following the procedures explained under "Protest Procedure."

To contact the Taxpayers' Rights Advocate, write to:

> Taxpayer Advocate Bureau
> P.O. Box 1468
> Sacramento, CA 95812-1468

or:  FAX (916) 845-6614

For Privacy Notice, see form FTB 1131.

### Protest Procedure

A protest must be in writing and should clearly state that a protest is being made. The protest must be filed within 60 days of the date of this notice and should include the following information:

1  Your name and address.
2  Your social security number.
3  Amounts and years involved.
4  Statement of facts.
5  Points in support of your position.
6  Your signature or your authorized representative's signature.
7  Your daytime telephone number or your authorized representative's telephone number.
8  A copy of this notice or the date and number of this Notice of Proposed Assessment.

The protest should be mailed to:

> Franchise Tax Board
> Attention: Protest Section
> P.O. Box 942867
> Sacramento, CA 94267-5540

The Franchise Tax Board will reconsider the proposed adjustments and, if requested, in the letter of protest, grant you or your authorized representative an oral hearing. You have the right to have your designated agent represent you at the hearing. You will be notified of our decision on your protest as soon as a determination is made.

---

## TELEPHONE ASSISTANCE

Our regular toll-free telephone service is available from 7:00 a.m. until 8:00 p.m. Monday - Friday from the first working day in January through April 15. The best times to call are between 7:00 a.m. and 10:00 a.m. and between 6:00 p.m. and 8:00 p.m. Service is also available from 8:00 a.m. until 5:00 p.m. on the two Saturdays prior to April 15. After April 15, service is available Monday through Friday between 8:00 a.m. and 5:00 p.m.

| | |
|---|---|
| From within the United States, call . . . . . . . . . . . . . . . . . . . . . . . . | 1-800-852-2753 |
| From outside the United States, call (not toll-free) . . . . . . . . . . . . . . . | 1-916-845-6500 |
| For hearing impaired with TDD, call . . . . . . . . . . . . . . . . . . . . . . . | 1-800-822-6268 |

FTB 5830-44-PIT (REV 4-95) SIDE 2

PBTK 00383

2592-0011

RJN0073



U.S.POSTAGE
≡ 0.3 2 ≡

APR 24 '96
SACRAMENTO
CA

1720A
STATE OF CALIFORNIA
FRANCHISE TAX BOARD
PO BOX 1673
SACRAMENTO CA 95812-1673

PBTK 00384

2592-0012

RJN0074

# RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

ORANGE COUNTY OFFICE

695 TOWN CENTER DRIVE
SUITE 1500
COSTA MESA, CALIFORNIA 92626
(714) 433-2900
FAX (714) 549-3244

EUGENE G. COWAN
DIRECT DIAL
(213) 229-8515

CALIFORNIA PLAZA
300 SOUTH GRAND AVENUE
TWENTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90071
TELEPHONE (213) 620-4824
FAX (213) 229-8550

WESTLAKE OFFICE

5743 CORSA AVENUE, SUITE 118
WESTLAKE VILLAGE, CA 91362
(818) 706-1800   (805) 496-4588
FAX (818) 706-2956

RICHARD J. RIORDAN
(RETIRED)

FILE NO.

June 20, 1996

08-160-002

Franchise Tax Board
P.O. Box 942867
Sacramento, CA 94267-0041

    Re:   Gilbert Hyatt -- S.S.N. ███████
           Protest of Notice of Proposed Assessment
           for 1991 Taxable Year

Dear Franchise Tax Board:

    The taxpayer, Mr. Gilbert Hyatt, protests the Notice of Proposed Assessment dated April 23, 1996 (NPA No. 04728236) and the corresponding final audit report dated December 26, 1995 concerning his 1991 taxable year. Mr. Hyatt contends that no additional amount of tax is owed to the Franchise Tax Board ("FTB") for his 1991 taxable year and that the accuracy related penalty for fraud or any penalty cannot properly be imposed.

H 08699

0296-00001
RJN0075

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

## TABLE OF CONTENTS

Page

I.  Brief Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

II.  The Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

    A.  Domicile. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
    B.  Residency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
        (1)  Physical Presence . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
        (2)  Self-Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
        (3)  Business Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
        (4)  Bank Accounts and Investments . . . . . . . . . . . . . . . . . . .   10
        (5)  Rental Quarters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
        (6)  Cancelling the Homeowner's Exemption . . . . . . . . . . . . . . .   11
        (7)  Hiring of Professionals . . . . . . . . . . . . . . . . . . . . . . . . . .   11
        (8)  Miscellaneous Contacts . . . . . . . . . . . . . . . . . . . . . . . . . .   11
    C.  Preview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

III.  Mr. Hyatt was a Nevada Domiciliary and Resident From September 26, 1991 . . . .   13

    A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
    B.  Mr. Hyatt Decided to Move Out of California Well Before His September
        1991 Move to Las Vegas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
    C.  Mr. Hyatt Chose Las Vegas as his Permanent Home . . . . . . . . . . . . . . . . . .   15
    D.  Mr. Hyatt Was Free to Move to Las Vegas . . . . . . . . . . . . . . . . . . . . . . . .   15
    E.  Mr. Hyatt Prepared to Move to Las Vegas Permanently . . . . . . . . . . . . . . . .   16
    F.  Mr. Hyatt Moved to Las Vegas Permanently . . . . . . . . . . . . . . . . . . . . . . .   19
    G.  Mr. Hyatt has Enjoyed His Life in Las Vegas Since his Move There in
        September, 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25
    H.  Mr. Hyatt Made Only Short Trips to California For Specific Purposes . . . . . .   26
    I.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

IV.  Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

    A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
    B.  Mr. Hyatt was a Nevada Domiciliary as of September 26, 1991 . . . . . . . . . .   30
    C.  Mr. Hyatt's Visits to California Were Short and Temporary or Transitory
        Only . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
    D.  Mr. Hyatt was a Resident of Las Vegas From September 26, 1991 . . . . . . . .   37

i.

H 08700

0296-00002
RJN0076

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

TABLE OF CONTENTS (cont'd)

| | | Page |
|---|---|---|
| V. | Mr. Hyatt's Nevada Residency From September 26, 1991 Cannot Be Controverted By The FTB's Bad Faith Claim of Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 44 |
| | A. The FTB has Provided No Basis On Which It Asserts Fraud . . . . . . . . . . . . | 44 |
| | B. The FTB Makes Unsupported Assertions to Support Its Erroneous Claim of Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 46 |
| | C. The FTB Ignores or Mischaracterizes Mr. Hyatt's Connections In Order to Assert Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47 |
| | D. The FTB Asserts Fraud Based Upon Misstatements and Inaccuracies . . . . . . . | 49 |
| | E. The FTB Fails to Establish Continued California Residency . . . . . . . . . . . . | 55 |
| VI. | Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 56 |
| VII. | Procedural Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 56 |

109677.1

ii.

H 08701

0296-00003
RJN0077

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 2

I.      Brief Summary.

         The legal issue to be decided in the matter is relatively straightforward -- whether Mr. Hyatt was a California resident from the period of September 26, 1991 through April 2, 1992 for California income tax purposes.  The FTB has admitted that on April 3, 1992, the date Mr. Hyatt closed his purchase and moved into his house in Las Vegas, Nevada, he became a California nonresident.[1]

         Contrary to the findings and proposed findings of the FTB auditor for 1991 (and for 1992), Mr. Hyatt ceased to be a resident of California on September 26, 1991 for California income tax purposes and became a domiciliary and resident of Nevada.  The overwhelming factual documentation provided to the FTB shows, as discussed in more detail later in this letter, that Mr. Hyatt left California and moved to Las Vegas on September 26, 1991 with the intent to reside in Las Vegas permanently and never to return to California except on temporary or transitory visits for identifiable and definite purposes.

         An individual domiciled in California, and who leaves California, loses his California domicile the moment he abandons any intention of returning to California and locates elsewhere with the intention of remaining there indefinitely.[2]  Mr. Hyatt left California on September 26, 1991 with no intention of returning, except for isolated, temporary or transitory visits.  Mr. Hyatt left California in September 1991 with the intention of moving on a permanent basis to Las Vegas, Nevada.  The fact that he still resides in Las Vegas today -- and has continually lived there for almost five years after his original move in September 1991 -- unequivocally confirms Mr. Hyatt's intent to leave California and never to return.

         The FTB has now admitted that on April 3, 1992 Mr. Hyatt became a **nonresident** of California for income tax purposes because he completed the purchase of his house in Las Vegas on that date.  It is the FTB's position that the six-month lease of an apartment entered into by Mr. Hyatt in October 1991, along with other substantial evidence of his Nevada presence and continuing ongoing relationships with persons and entities in Las Vegas (which are described in great detail below) was insufficient evidence of his intent to relocate from California to Las Vegas until such time as Mr. Hyatt actually purchased his house.

---

[1]     See the April 1, 1996 FTB letter concerning Mr. Hyatt's 1992 taxable year, which determines that Mr. Hyatt was a resident of California only through April 2, 1992.

[2]     18 Cal. Code Reg. §17014(c).

H 08702

0296-00004
RJN0078

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 3

Given the time spent by Mr. Hyatt in Las Vegas, his activities in establishing his new personal and business life in Las Vegas and in searching for a house to purchase in Las Vegas in October, November and December of 1991, as well as in January, February and March of 1992, it seems that the FTB is inappropriately ignoring facts and is therefore drawing an insupportable conclusion as to Mr. Hyatt's California residency status in 1991 (and 1992).

The December 26, 1995 FTB letter (as well as the April 1, 1996 FTB letter which considers Mr. Hyatt's residency in 1992) cite numerous ties that Mr. Hyatt purportedly maintained with California, such as California bank accounts, California doctors, California lawyers and accountants, California credit card invoices and checks to persons in California. As explained in detail below and as already described in voluminous correspondence with the FTB, the FTB's analysis of these alleged California contacts conveniently ignores the fact that most of these contacts were terminated or became inactive before or about the time Mr. Hyatt moved to Las Vegas in September 1991. Those contacts that remained clearly involved temporary or transitory contacts which were completely consistent with Mr. Hyatt's Las Vegas domicile and residency and inconsistent with California residency.

Further, the December 26, 1995 FTB letter and the April 1, 1996 FTB letter (the "FTB letters") gloss over or refuse to acknowledge Mr. Hyatt's extensive Nevada activities and connections during this period. In most instances, the FTB letters do not even discuss the voluminous evidence presented by Mr. Hyatt which overwhelmingly shows his intent to become and remain a resident of Las Vegas from the time he first moved there on September 26, 1991.

The FTB's legal support for its position that Mr. Hyatt was a resident of California through April 2, 1992 is so weak (both as to the facts and as to the application of well-established legal principles) that the FTB has had to resort to relying on alleged undisclosed information and unnamed sources to support its assertions. The FTB has refused to provide its alleged information to Mr. Hyatt so that he can examine it for factual accuracy and for the credibility of the declarants. Obviously, this refusal violates all notions of fairness and due process and highlights that the real goal of the FTB is not to truthfully determine Mr. Hyatt's residency, but to intimidate Mr. Hyatt into paying taxes he does not legally owe to the State of California.

As an attempt to further intimidate Mr. Hyatt into paying and not contesting the FTB's assertion of California residency, the FTB asserts that Mr. Hyatt acted fraudulently. The FTB letters provide no basis on which to properly assert fraud. However, the voluminous documentary and legal evidence presented by Mr. Hyatt in support of his legal

H 08703

0296-00005
RJN0079

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 4

position clearly shows that whatever the merits of his position (and we believe that his position is correct), there is unequivocally no fraud involved.

As will be shown in more detail later in this letter, the FTB also (1) misstated and mischaracterized a significant number of alleged 'facts' as well as the holdings of legal authorities cited in support of the FTB's legal conclusions; (2) relied on undisclosed information and unsupported speculation to reach conclusions, and (3) omitted material information in the FTB's possession in order to make its case for Mr. Hyatt's California residency. For example, the FTB relies on Mr. Hyatt's retention of a California driver's license as an important factor leading to the conclusion that Mr. Hyatt remained a California resident. The April 1, 1996 FTB letter states that the California driver's license "was valid through March 26, 1993." What the FTB letter fails to state -- which Mr. Hyatt's representatives made known to the FTB during the course of the 1991 audit -- was that Mr. Hyatt's California driver's license was, in fact, surrendered to the Nevada Department of Motor Vehicles in November 1991, when Mr. Hyatt received his Nevada driver's license. The surrender of Mr. Hyatt's California drivers license in November, 1991 is evidence of a Nevada contact -- not a California contact. However, as with other inconvenient facts or facts contrary to the FTB's desired determination, the FTB either ignores or mischaracterizes the evidence.

The facts, which are described in much more detail below, clearly and overwhelming show that Mr. Hyatt ceased to be a California domiciliary when he moved to Las Vegas in September 1991 with the intent of residing there on a permanent (not temporary or transitory) basis and where Mr. Hyatt has, in fact, continually lived through today's date and intends to continue to live permanently.

H 08704

0296-00006
RJN0080

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 5

II.    The Applicable Law.

A "resident" for California income tax purposes is (a) every individual who is in California for other than a temporary or transitory purpose; and (b) every individual who is domiciled in California who is outside California for a temporary or transitory purpose.[3]  All other individuals are California nonresidents.

An individual is present in California for a temporary or transitory purpose if (a) he is passing through California in transit to another state or country; (b) he is visiting California for a brief rest or vacation; or (c) he is present in California to complete a particular transaction, to perform a particular contract, or to fulfill a particular engagement that requires presence in California for a brief period.[4]  An individual will not be considered a resident of California when he is present in California by virtue of these types of contacts.[5]  The purpose for which an individual is in California depends to a large extent upon the facts and circumstances of the particular case.[6]

A.    Domicile.

An individual's domicile is the place where he has his true, fixed, permanent home and principal establishment, and to which place he has, whenever he is absent, the intention of returning.[7]  The notion of what is a taxpayer's "home" is not limited to houses, but includes apartments, rented rooms, or other permanent places of abode.[8]  An individual has only one domicile at any one time, and if he has acquired a domicile at one place, he retains that domicile until he acquires another elsewhere.[9]  **An individual domiciled in**

---

[3]    See Section 17014 of the Cal. Rev. & Tax. Code.

[4]    18 Cal Code Reg. § 17014(b).

[5]    Id.

[6]    Id.

[7]    18 Cal Code Reg. § 17014(c).

[8]    Appeal of Posada, German A. (7/27/87); see FTB Pub. 1031, Ex. 5.

[9]    Id

H 08705

0296-00007
RJN0081

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 6

California, who leaves California, loses his California domicile the moment he abandons any intention of returning to California and locates elsewhere with the intention of remaining there indefinitely.[10]

Domicile requires both physical presence in a particular place and the intention to make that place one's home.[11] The taxpayer's intent is the most important factor in determining domicile and the taxpayer's acts are examined to determine if the taxpayer's action reflects the taxpayer's intent.[12]

Of the acts scrutinized in ascertaining a taxpayer's domicile, the most important is registering to vote and voting. The place of the taxpayer's voting is highly persuasive in establishing the taxpayer's domicile, especially if other contacts with the location are established.[13] Also, where a taxpayer maintains a permanent home is another critical factor in determining domicile.[14]

The following factors also are indicative of the domicile chosen by the taxpayer:

    (1)    Where the taxpayer is domiciled after the tax years in issue.[15]

---

[10]  Id. See, also, FTB Pub. 1031 -- Guidelines For Determining Resident Status.

[11]  Whittell v. FTB, 231 Cal. App. 2d. 278 (1964); Appeal of Dobbs, Odis L (Deceased) and Lois N., 4 SBE 889 (6/17/87).

[12]  Appeal of Haring, John (8/19/75); Estate of Phillips, 269 Cal. App. 2d 656, 659 (1969).

[13]  Taff v. Goodman, 41 Cal. App. 2d 771 (1940); Appeal of May, Richard H. and Doris J., 4 SBE 859 (4/7/87).

[14]  Appeal of Dobbs (supra); Appeal of Dreiling, Charles and Penny, 4 SBE 1070 (11/29/89).

[15]  Appeal of Steinman, Alfred L. and Jean M. (4/5/83).

H 08706

0296-00008
RJN0082

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 7

   (2) Where the taxpayer files federal income tax returns[16], as well as statements on tax returns or other documents of a home address in a particular state.[17]

   (3) The comparative size of homes maintained in different states.[18]

   (4) The comparative time spent in different states.[19]

   (5) Whether the taxpayer has cancelled the California homeowner's property tax exemption for a house located in California.[20]

   (6) Miscellaneous contacts with a state, including membership in social clubs, bank accounts, driver's licenses, automobile registrations and business associations.[21]

   (7) Where a self-employed taxpayer establishes his own business, particularly if the business is successful.[22]

---

[16] Appeal of Meadows, Nancy B (10/28/90).

[17] Appeal of Resnick, Myron A, 4 SBE 879 (5/7/87), reh. denied (7/28/87).

[18] Appeal of Resnick, supra; Appeals of Young, John R., 4 SBE 800 (11/19/86).

[19] Id.

[20] Appeals of Young, supra.

[21] Appeal of D'Eustachio, Anthony J. and Ann S. (5/8/85); Appeals of Young, supra; Appeal of Meadows, supra.

[22] Appeal of Misskelley, Roy L. and Patricia A (5/8/84).

H 08707

0296-00009
RJN0083

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 8

B.    Residency.

In a residency case, the issue of domicile is determined first. For a California domiciliary, the focus is on whether the taxpayer is absent from California for a temporary or transitory purpose. If not, the taxpayer is a California nonresident.[23] For a California non-domiciliary, the focus is on whether the taxpayer is in California for other than a temporary or transitory purpose.[24] If not, the taxpayer is a California nonresident.

"Domicile" denotes the one location with which a person has the most settled and permanent connections and where the person intends to remain. "Residence" denotes any factual place of abode of some permanency; that is, any place a person resides for more than a mere temporary sojourn.[25] While a domicile cannot be lost until a new one is acquired,[26] sustained absence from California can be sufficient to establish nonresidency, even if another residence is not acquired elsewhere.[27]

Residency is thus determined by evaluating the taxpayer's presence in or absence from California in order to determine if his presence in or absence from California is temporary or transitory. Whether a person is inside or outside California for a temporary or transitory purpose depends on his subjective purpose in being inside or outside California. The determination of intent "will depend to a large extent upon the facts and circumstances of each particular case."[28] Two tests are provided for determining this intent: the identifiable purpose test and the close connection test.

If an individual is in California (or out of California) for an identifiable purpose (e.g. to begin new employment or to commence studies), whether the purpose is

---

[23]   18 Cal Code Reg. § 17014(b); Appeal of Broadhurst, David J. and Amanda (4/5/67); Appeal of Resnick, supra.

[24]   Appeal of Pritzlaff, Herbert F. (2/26/93); 18 Cal Code Reg. § 17014(a).

[25]   Whittell v. FTB, 231 Cal. App. 2d. 278 (1964).

[26]   Estate of Phillips, supra.

[27]   Appeal of Vohs, Richard W. (9/17/73).

[28]   18 Cal. Code Reg. § 17014(b).

H 08708

0296-00010
RJN0084

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 9

temporary or transitory depends on the length of time necessary to fulfill the purpose.
Individuals in transit, in California for a brief rest or vacation, or in California to complete a
particular transaction, to perform a particular contract or to fulfill a particular engagement are
considered to be in California for temporary or transitory purposes.[29]  When an individual is
in California for an indefinite period of time with no definite intention of leaving, the
individual is considered in California for other than temporary or transitory purposes.[30]
Similarly, a California resident who leaves the state for an indefinite or extended period of
time is no longer considered a resident.[31]

      Absent the ability to specify that an individual's presence in or out of
California is temporary or transitory based upon the identifiable purpose, the state with which
the taxpayer has the closest connections or contacts is generally the state of residency.[32]  It is
particularly relevant to determine whether the taxpayer substantially severed his California
connections upon and subsequent to his departure and took steps to establish significant
connections with his new place of abode, or whether he retained his California connections in
readiness for his return.[33]

      A number of contacts are evaluated in determining an individual's connections
with a state.  The more important contacts are:

---

[29]    18 Cal Code Reg. § 17014(b).

[30]   In Appeals of Posada, supra, the taxpayer claimed he came to California only to
investigate a business opportunity but was delayed because of his wife's illness.  The SBE
disagreed, citing the indefinite nature of the taxpayer's stay in California and the contacts
maintained in California.  The taxpayer had prepaid six months rent, obtained a California
driver's license, and registered his car and boat.

[31]   Appeal of Crozier, William G. and Susan G. (4/23/92) (taxpayers expected to be out of
California for more than two years and their early return was not anticipated; SBE concluded
that they were not absent for temporary or transitory purposes and, therefore, they were
California nonresidents).

[32]   Id.; Appeal of Dobbs, supra; Appeal of Hardman, Richards L. and Kathleen K.
(8/19/75).  See, also, FTB Pub. 1031.

[33]   Appeal of Stevenson, David A. and Frances W. (3/2/77).

H 08709

0296-00011
RJN0085

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 10


(1)    Physical Presence.  The physical presence of an individual in a state for other than a temporary or transitory purpose is persuasive evidence of the individual's residency in the state.[34]  However, time spent in California compared with time spent outside California is just one of the factors to be evaluated.[35]

(2)    Self-Employment.  Establishment of a successful business outside California by a self-employed taxpayer is strong evidence of nonresidency.  This factor, alone, can outweigh other connections retained with California and result in a finding of nonresidency.[36]

(3)    Business Interests.  Business ties can be a factor showing that a taxpayer's presence is temporary or transitory.  Actively seeking a business outside of California[37], presence in another state for preliminary negotiations or planning of a long-term business project[38], or incorporating a business or operating a sole proprietorship outside of California can lead to a finding of California nonresidency[39].  Extensive business interests in another state and active participation by the taxpayer in such interests strongly indicate that the taxpayer is a California nonresident.[40]

(4)    Bank Accounts and Investments.  The maintenance of bank accounts, stocks and similar investments in California, absent other contacts with California, ordinarily does not result in a finding of California residency.[41]  In fact, California banking

---

[34]    Whittell, supra; Appeal of Pritzlaff, supra.

[35]    Appeals of Young, supra.

[36]    Appeal of Misskelley, supra.

[37]    Appeal of Jenkins, Jack E. (6/6/73).

[38]    Appeal of Katleman, Jerald L. and Joan (12/15/76).

[39]    Appeal of Yaron, George D. (12/15/76).

[40]    Appeal of May, supra.

[41]    Appeal of Stevenson, David A. and Frances W. (3/2/77); Appeal of Vohs, supra; see Appeal of Veteto, James R. and Wanda J. (4/1/88).

H 08710

0296-00012
RJN0086

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 11

activity as a factor indicating residency is given <u>little</u> weight when the taxpayer's primary banking activity is in another state.[42]

(5) <u>Rental Quarters</u>. Renting living quarters is considered a significant connection with the state in which the quarters are rented.[43] The relinquishment of property on leaving California can be a factor indicating California nonresidency, especially when tied to other evidence that the move out of California was for other than a temporary or transitory purpose.[44]

(6) <u>Cancelling the Homeowner's Exemption</u>. Cancelling the California homeowner's exemption for property taxes is evidence of California nonresidency.[45]

(7) <u>Hiring of Professionals</u>. A taxpayer who uses non-California professionals is more likely to be considered a California nonresident.[46]

(8) <u>Miscellaneous Contacts</u>. The following contacts are also considered in determining residency:

(a) Automobile registration and driver's license;[47]

---

[42] Appeal of May, supra.

[43] Appeals of Posada, German A., supra. See, FTB Pub. 1031, Ex. 5.

[44] See Appeal of Wensley, supra.

[45] Appeal of Fox, Basil K. and Floy C. 4 SBE 584 (4/9/86).

[46] Appeal of May, supra.

[47] See, FTB Pub. 1031; Appeal of Berry, Brent L. (3/22/71); Appeals of Posada, supra; Appeal of Fox, supra; but see, however, Appeal of Pritzlaff, supra; Appeal of Fox, supra (registering an auto and obtaining a driver's license is indicative of domicile).

H 08711

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 12

         (b)    Membership in social, athletic and religious organizations in California compared to similar associations outside California (with the extent of activity also taken into account).[48]

         (c)    Maintenance of California charge accounts.[49]

         (d)    Voting registration.[50]

C.    <u>Preview</u>.

    The facts surrounding Mr. Hyatt's relocation to Las Vegas in September 1991 described in Section III below make it clear that, under the law on domicile, Mr. Hyatt became a Nevada domiciliary on the date of his move from California on September 26, 1991. It also is clear that Mr. Hyatt's occasional return visits to California after his move were for temporary or transitory purposes, as each of his return visits were for purposes specifically identified in the regulations governing domicile and residency as being temporary or transitory (e.g. business trips using Los Angeles International Airport, or a trip to host Russian scientists or a trip to receive medical attention) and he immediately returned to his house in Las Vegas. Finally, even if Mr. Hyatt's Nevada domicile and the specific purposes of Mr. Hyatt's California visits were ignored, Mr. Hyatt's connections to and contacts with Nevada after the date of his move clearly outweighed any minimal and waning connections to and contacts with California.

---

[48]    See, FTB Pub. 1031; Appeals of Young, supra; Appeal of Zupanovich, Anthony V. and Beverly (1/6/76).

[49]    Appeal of Chambers, Mortimer and Catherine, 4 SBE 805 (1/6/87); Appeals of Young, supra.

[50]    See, FTB Pub. 1031; Appeals of Posada, supra; Appeal of May, supra.

H 08712

0296-00014
RJN0088

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 13

III.    Mr. Hyatt was a Nevada Domiciliary and Resident From September 26, 1991.

The following narrative sets forth the circumstances and facts surrounding Mr. Hyatt's permanent move to Las Vegas in September 1991. A substantial amount of supporting documentation has already been submitted to the FTB and additional supporting documentation is enclosed herewith.

A.    Introduction.

After more than one year in preparation and months of implementation, Mr. Hyatt left California and moved to Las Vegas on September 26, 1991, intending to reside and residing in Las Vegas permanently. He was a resident of California for less than nine months in 1991; he was a **full year permanent resident of Las Vegas** for each of 1992, 1993, 1994 and 1995 and he continues to be a **full year permanent resident of Las Vegas** for 1996. His trips away from Nevada in 1991 and 1992 (to various states) were for short periods of time, were of a temporary or transitory nature and were for specifically defined reasons. Mr. Hyatt intended to return and he did return to his home in Las Vegas after each trip. Hence, these trips have no bearing on determining if he was a resident. In conjunction with this move, Mr. Hyatt made extensive new Las Vegas connections and severed numerous California connections. The facts clearly show that Mr. Hyatt originally intended to and in fact did permanently move from California to Las Vegas. For almost five years after Mr. Hyatt left California to relocate to Las Vegas, Mr. Hyatt continues uninterrupted to reside in Las Vegas, conducts a successful business in Las Vegas, and still intends to reside in Las Vegas permanently.

The facts are indisputable. Mr. Hyatt prepared for his move to Las Vegas well in advance of his move in September 1991. Immediately after moving to Las Vegas, Mr. Hyatt sold his California house, got a Las Vegas apartment, and started looking for a house to purchase and move into in Las Vegas. In about six months, he had purchased and moved into a house in Las Vegas and he continues to live in his Las Vegas house to the present with no intention of leaving Las Vegas. This is typical of what a person does when he permanently moves into a new area.

The FTB admits that Mr. Hyatt became a Las Vegas resident when he moved into his Las Vegas house on April 3, 1992.[51] Certainly, the six-month period (from

---

[51]    See April 1, 1996 FTB letter.

H 08713

0296-00015
RJN0089

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 14

September 26, 1991 to April 3, 1992) that Mr. Hyatt took is a reasonable period to look for, negotiate on, proceed through escrow, purchase and move into his Las Vegas house. These activities alone show Mr. Hyatt's intent to permanently locate in Las Vegas as of September 26, 1991 and his relocation to Las Vegas as of that date. As noted in Part II above, intent establishes residency and domicile, not the final activity in a series of activities.

      B.      <u>Mr. Hyatt Decided to Move Out of California Well Before His September 1991 Move to Las Vegas.</u>

Mr. Hyatt decided to move out of California to enjoy a better quality of life and business (significantly before his actual move). He intended to get away from distractions by the media and the public and from harassment by his siblings and certain family members. He intended to get a more private and secure place to work and to live. He intended to live away from the earthquakes, civil tension, crowds, smog, and traffic of California. He was having respiratory problems (which resulted in a case of pneumonia about August 1992), thus he intended to get away from the smog and other pollution in California and to relocate to a drier, healthier climate. He intended to get regularly involved in outdoor activities, skiing, horseback riding, water sports, hiking and climbing; without the large crowds or long drives as in California.

Mr. Hyatt intended to build his new business in a faster-growing, more supportive business environment, away from the faltering California economy with its continuing aerospace layoffs. As a budding businessman and inventor, Mr. Hyatt intended to be particularly close to the site of national electronic trade shows and conventions (such as the Comdex trade show with which he had a special relationship) and close to entertainment to host his guests and colleagues. It was important to Mr. Hyatt's business that he take advantage of the benefits from trade and incentive zones offered by certain cities around the country. To grow his business, Mr. Hyatt wanted a location that would help attract professional employees by offering a better quality of life, including more affordable housing, than that offered in Southern California.

Mr. Hyatt was and remains a very private person. He worked through the 1970s and 1980s in private. Then, between mid-1990 to mid-1991, he was subjected to a flurry of media and public attention. He was forced into three frivolous litigations with certain family members (he was awarded sanctions in two of these litigations and the third litigation was thrown out of court) and he had to deal with considerable harassment from them. Mr. Hyatt intended to move to reestablish his privacy and to maintain substantial distance from these family members. In moving, Mr. Hyatt intended to keep a "low profile."

H 08714

0296-00016
RJN0090

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 15

He intended to have his colleagues shield his name from public records (utilities, property records and the like) so that his street address would remain private. Mr. Hyatt also intended to minimize his personal interactions with neighbors, apartment managers and local trades people.

C.    Mr. Hyatt Chose Las Vegas as his Permanent Home.

Since 1990, Mr. Hyatt intended to leave California. In October - November 1990, he visited Las Vegas to attend the Comdex trade show, to explore the area regarding a permanent move, and to determine the possibility of establishing his long term business project there. About that time, Mr. Hyatt acquired a detailed business picture book entitled "Nevada, Golden Challenge in a Silver State," containing over 300 pages with over 100 color pictures about the past, present and future of Nevada. He was taken with the beauty of the high desert, the extensive outdoor activities and old western environment. The section of the book entitled "Quality of Life," was quite informative and persuasive. He determined that the Las Vegas area had the characteristics he was looking for: e.g. dry, unpolluted climate; convenient, uncrowded outdoor activities; a better quality of life; unique entertainment; a free trade zone; a supportive business climate; an affordable life style; substantial distance from certain family members; and easy access to the electronic trade shows and conventions. At that time, Mr. Hyatt decided to move to Las Vegas permanently as soon as it was practical. Mr. Hyatt returned to California in November 1990 and began preparing for his move to Las Vegas.

D.    Mr. Hyatt Was Free to Move to Las Vegas.

Mr. Hyatt had no California ties or connections that would inhibit his move to Las Vegas. He had no wife or minor children. He did not belong to any social, athletic, or religious organizations connected with California. He had no employment to connect him with California and he allowed his California business to become inactive. He had long since let his California voter registration expire. He closed or essentially deactivated all of his California bank accounts and California charge accounts prior to his move to Las Vegas. Law firms in New York, Virginia and Texas were already doing the majority of Mr. Hyatt's legal work. He had sufficient funds to finance his move and his expected purchase of a house in Las Vegas as a result of his July 1991 license of his patents to Philips.

H 08715

0296-00017
RJN0091

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 16

E.    Mr. Hyatt Prepared to Move to Las Vegas Permanently.

          Mr. Hyatt prepared well in advance for his permanent move to Las Vegas.  In
1990 and 1991 and thereafter, Mr. Hyatt's business activities and contacts focused outside of
California, with the U.S. Patent Office in Virginia, with North American Philips Corp. in
New York, with N.V. Philips in Europe, and with various foreign companies in Japan and
Taiwan.  His then current income was derived and he expected that his future income would
be derived from sources outside of California; particularly New York, Europe and Japan.
Mr. Hyatt intended to choose the professionals and advisors that would serve him in the long
term for his business endeavors.  Since he was no longer going to be living in California,
there was no need (except for convenience, familiarity with California law and old
relationships) to choose or continue with California counsel, accountants and the like.

          Mr. Hyatt continued significant relationships with law firms in New York,
Virginia, and Texas that were doing the majority of his legal work before his move to
Las Vegas.  He continues to this day to use law firms nationwide.  He proceeded to phase out
connections with law firms in California and to create additional connections with law firms
nationwide, maintaining only a few California law firm connections that involved California
related legal issues and that included some long term legal associations.

          About July 1991, shortly before his move to Las Vegas, Mr. Hyatt established
a relationship with NV Philips in The Netherlands and its two US subsidiaries, US Philips and
North American Philips, both in Tarrytown, New York.  Philips took responsibility for
licensing and litigating Mr. Hyatt's patents.  Shortly before his move to Las Vegas, about
June 1991, Mr. Hyatt established a relationship with a Washington DC law firm (Burns Doane
et al) and in July 1991 he established a relationship with a New York litigation attorney (Jim
Williams), both of which continue to do the majority of his patent litigation work to this day.
Burns Doane charged over $60,000 in 1991 and over $45,000 in 1992 for services rendered
regarding Mr. Hyatt's patents.  Jim Williams' law firm (EGLI International) charged over
$80,000 in 1991 and over $400,000 in 1992 for services rendered regarding Mr. Hyatt's
patents.  This is more than Mr. Hyatt had ever paid to California lawyers in his lifetime.
Also prior to his move to Las Vegas, Mr. Hyatt established a relationship with a Washington
DC patent search firm (Express Search Inc.).  About contemporaneous with his move to
Las Vegas, Mr. Hyatt severed connections with two other California law firms (Loeb and
Loeb and the law offices of Gerard Traumueller) and with two California CPA firms (Ron

H 08716

0296-00018
RJN0092

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 17

Hoffman CPA and Block, Plant & Eglin).[52] Then, shortly after his move to Las Vegas, Mr. Hyatt replaced the California CPA firms with a Las Vegas CPA firm, as discussed below.

In 1991, in preparation for his move to Las Vegas, Mr. Hyatt proceeded to close or to deactivate his accounts at California Federal Bank ("Cal. Fed.") (a banking relationship that he had used for more than 15 years), to deactivate all of his California credit card accounts, to deactivate his former California corporation that he had formed 20 years before (in 1971), and to schedule final checkups with his doctors.

In mid-1991, before his move, Mr. Hyatt confided to family members, friends, and business associates about his intended move to Las Vegas and about his intent to sell his California house. Mr. Hyatt's business associates helped to plan his move to Las Vegas. In preparation for his planned move to Las Vegas on September 26, 1991, he paid off half of his home loan early in September 1991. He had agreed to sell his California house to his associate (Grace Jeng) early in September 1991 (in fact, he sold the house to Ms. Jeng on October 1, 1991), and he closed out or deactivated all of his California credit card accounts and all of his California bank accounts. The California bank accounts were replaced by Las Vegas bank accounts, opened shortly after his move to Las Vegas and thereafter. Mr. Hyatt let his membership in the Orange County Patent Law Association expire. Mr. Hyatt did not open any new accounts or activate any inactive accounts in California after his move to Las Vegas in September 1991. Mr. Hyatt did not maintain any California connections in readiness for his return[53]; Mr. Hyatt did not plan to and did not return.

Mr. Hyatt's California bank account activity and Las Vegas bank account activity provide a clear example of his preparation to move to Las Vegas and his intent to establish his permanent home and business in Las Vegas. He closed or deactivated all of his California bank accounts before moving to Las Vegas in September 1991. His newly opened

---

[52] Attached hereto is a letter from Block, Plant, and Eglin addressed to Mr. Hyatt's Las Vegas address proposing to provide additional financial services for Mr. Hyatt. However, Mr. Hyatt had previously intended to terminate the Block, Plant, and Eglin CPA account in favor of a Las Vegas CPA. Mr. Hyatt did in fact interview two Las Vegas CPA firms in March 1992, and Mr. Hyatt did in fact establish a permanent and continuing relationship with a Las Vegas CPA firm (PBTK) in March 1992.

[53] See Appeal of Stevenson, supra.

H 08717

0296-00019
RJN0093

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 18

Las Vegas bank accounts became extensively active. He closed five of his California bank
accounts at Cal. Fed. in June 1991 (about 3 months prior to his move to Las Vegas) and he
closed a sixth California bank account at Cal. Fed. in August 1991 (about one month prior to
his move to Las Vegas) in preparation for his move to Las Vegas. Of the remaining six of
Mr. Hyatt's California bank accounts, one account at Cal. Fed. held a de minimis amount
(less than $500) and was essentially inactive; a second account at Cal. Fed. (reflecting his son
as beneficiary) was essentially inactive; two other accounts at Cal. Fed. were totally inactive;
and the remaining two accounts were certificate of deposit (CD) accounts at Irvine City Bank
and at First Fidelity that were emptied when the CDs matured shortly after Mr. Hyatt's move
to Las Vegas.[54] All six of these accounts remained essentially inactive after Mr. Hyatt's
move to Las Vegas.[55]

Mr. Hyatt's credit account activity provides another clear example of his
preparation to move to Las Vegas and his intent to establish a permanent home in Las Vegas.
He deactivated all of his California charge accounts (three California Federal Bank -
Household accounts) before moving to Las Vegas and he wrote change of address letters to
all three of his national credit card companies (Bank of New York, Chase Manhattan Visa,
and Maryland Bank -- MBNA) changing his address to his new Las Vegas address
immediately after renting a Las Vegas post office box. Subsequent to his move, he made no
charges to his deactivated California credit card accounts. His only credit card charges in

---

[54]   Attached hereto is a copy of Mr. Hyatt's investment certificate of deposit (CD) from
       First Fidelity that matured and that he closed out in early December 1991. The note
       written thereon, "Canceled - Closed out", is in Mr. Hyatt's hand and was written by
       Mr. Hyatt in early December 1991. Also attached hereto are copies of Mr. Hyatt's
       Irvine City Bank materials for a certificate of deposit (CD) from Irvine City Bank
       that matured and that he closed out in early January 1992. These materials establish
       that the account was closed on January 8, 1992 and that the funds were deposited
       into Mr. Hyatt's Las Vegas bank account.

[55]   A copy of additional 1991 Cal. Fed. account information is enclosed. Most of the
       Cal. Fed. bank account information was previously provided to the FTB. Because
       these newly submitted accounts were either closed or inactive by 1991, Mr. Hyatt has
       just obtained 1991 information for some of these accounts (1991 information for
       others of these accounts have been furnished previously). Note that six of the
       accounts were opened at Empire Bank and were then transferred to Cal. Fed. Bank
       (without Mr. Hyatt's approval) when Empire Bank closed in September 1990.

H 08718

0296-00020
RJN0094

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 19

California were a few charges on his national credit cards that were related to temporary and transitory California visits (e.g., motel, hotel, and restaurant charges) and that were paid with checks drawn on his Las Vegas checking account. In contrast, his credit card charges in Las Vegas became significant.

Mr. Hyatt received significant income in July 1991 and he paid California taxes on this income. Because of his intended permanent move to Las Vegas, he did not deposit these funds into his California bank accounts, which were either closed or were essentially inactive by this time. Instead, early in August 1991, he opened a money market account with the Franklin mutual fund family through an investment broker and securities dealer, Rick Kneisley at Invest Financial Corporation. This is the first mutual fund account that Mr. Hyatt had ever had.

F. Mr. Hyatt Moved to Las Vegas Permanently.

Contemporaneous with and shortly after his move to Las Vegas, Mr. Hyatt continued to break his few remaining California connections and to form permanent connections with Las Vegas. Mr. Hyatt's only real property in California was a house in La Palma, California, which he sold on October 1, 1991, immediately after his move to Las Vegas. He had previously deactivated all of his California based credit card accounts and he sent changes of address to his national credit card companies. He also sent changes of addresses to his bank, insurance company and others. He paid off the loan that he had on his former California house; he terminated his California Homeowner's Property Tax Exemption on his former California house; he terminated his gardening service at his former California house and he stopped paying for utilities, telephone, insurance and newspaper delivery at his former California house. Mr. Hyatt reported the sale of his former California house on his 1991 IRS and California income tax returns and he deferred the profit made on his former California house on his 1992 IRS income tax return as a result of purchasing a significantly more expensive Las Vegas house.

As of the time of his move to Las Vegas, Mr. Hyatt had established a network of many professionals nationwide and worldwide who assisted him with his technical, legal, financial, patent prosecution and patent licensing activities. The professionals that Mr. Hyatt used outside of California as of the time of his move to Las Vegas in September 1991 far exceeded the professionals that he used in California. As of his move to Las Vegas, the large number of professionals that he used outside of California proceeded to increase to a very large number and the smaller number of professionals that he used inside of California proceeded to decline to a very small number.

H 08719

0296-00021
RJN0095

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 20

After a doctor appointment on September 26, 1991, Mr. Hyatt drove to Las Vegas. He immediately began looking for an apartment to rent and a house to purchase. He intended to take a short lease on a Las Vegas apartment and then to carefully investigate Las Vegas to determine where in Las Vegas he should purchase his house. He took a six month lease on an apartment at the Wagon Trails apartments in Las Vegas. Consistent with his desire for privacy and his intensive business and house-hunting activities, he did not associate with neighbors or Wagon Trails employees.

Mr. Hyatt began his search for a house to purchase and continued to work long hours at his personal computer at his home in his Las Vegas apartment. He immediately opened utility, telephone, and bank accounts; he rented a post office box and he joined a religious organization (Congregation Ner Tamid) in Las Vegas. Mr. Hyatt continues to maintain utility, telephone and bank accounts in Las Vegas, and a post office box for mail, and he continues to worship at the same religious organization to the present, almost five years after his move. He had two California safe deposit boxes which remained essentially inactive prior to and subsequent to his move. Sometime after his move, he got a Las Vegas safe deposit box and eventually closed the inactive California safe deposit boxes.[56]

Contemporaneous with his move to Las Vegas, Mr. Hyatt filed changes of address to his Las Vegas address for his California post office box and for his former California house; he sent numerous changes of address letters (such as to his national credit card companies) to change to his Las Vegas address; he transferred one of his two California post office boxes to business associates, and then he let both of the California post office box rentals expire without paying another rental fee. Mr. Hyatt engaged a Las Vegas insurance agent; he canceled his California insurance policies and he took out auto, renter's, and umbrella liability insurance policies in Las Vegas contemporaneous with his move to Las Vegas.[57] Mr. Hyatt got a Las Vegas driver's license contemporaneous with his move (simultaneously surrendering his California driver's license to the Nevada DMV in order to

---

[56]  Attached hereto is a copy of additional representative correspondence Mr. Hyatt received at his Las Vegas address: a copy of an envelope postmarked January 23, 1992 that was sent to his Las Vegas address by the Pierpoint Fund with whom he had an account and a copy of a letter dated December 16, 1991 from Congregation Ner Tamid sent to his Las Vegas address.

[57]  His renters insurance on his apartment provided $20,000 of coverage on his personal property (furniture, computers, etc.).

H 08720

0296-00022
RJN0096

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 21

get his Nevada driver's license) and he renewed his Nevada driver's license when it expired four and one-half years later, in March 1996. He registered to vote in Las Vegas contemporaneous with his move and he voted in person in Las Vegas in every major election since his move. He registered his old auto in Las Vegas before his California registration expired and he purchased a new auto in Las Vegas contemporaneous with his move, which he also registered in Las Vegas. Since his move, he has had his cars serviced in Las Vegas, not in California. He purchased his groceries, office supplies, and other items in Las Vegas. He did not purchase any such items in California since his move to Las Vegas. He did purchase a copy machine and copy toner by telephone from California companies, all of which were delivered directly to him in Las Vegas. He has extensive receipts, canceled checks, and credit card charges of purchases made in Las Vegas, which have been submitted or offered to the FTB.

Immediately after Mr. Hyatt moved to Las Vegas and established a Las Vegas post office address, Mr. Hyatt's legal documents (e.g., the license agreements with NEC and Sony that were signed on December 10, 1991) reflected his Las Vegas addresses. As a business expedient, previously typed license agreements were permitted to retain his prior California post office box address. He immediately had business cards printed with his Las Vegas post office box address thereon. Mr. Hyatt was in Las Vegas to establish (and actually did establish) his long term business project and he did establish and operate a sole proprietorship in Las Vegas as of September 1991.

After his move, Mr. Hyatt continuously communicated with and continues to communicate with family, friends and business associates by telephone and by mail from/to Las Vegas. His family, friends and business associates received mail and telephone calls from Mr. Hyatt in Las Vegas and sent mail and placed telephone calls to him in Las Vegas from the latter part of September 1991 through the present. His family, friends, and business associates have visited him on numerous occasions in Las Vegas, but have not visited him on a single occasion in his former California house since his move to Las Vegas.

Early in 1992, Mr. Hyatt interviewed two Las Vegas CPA firms (Percy, Bowler, Taylor and Kern (PBTK) and McBride & Noback) and he established a permanent relationship with one of these Las Vegas CPA firms (PBTK), which continues to do substantially all of his CPA work to this day. PBTK has filed all of Mr. Hyatt's tax returns for 1991, 1992, 1993, 1994 and 1995. Mr. Hyatt worked extensively from early 1992 to the present with Michael Kern, a named partner at PBTK. Mr. Kern became a close friend of Mr. Hyatt and served as trustee of the trust Mr. Hyatt formed to purchase his Las Vegas house in March 1992.

H 08721

0296-00023
RJN0097

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 22

  Mr. Hyatt was interviewed by various American and Japanese newspaper reporters beginning shortly after his move to Las Vegas and through 1992 and 1993, who reported in the press that he resided in Las Vegas, Nevada. In order to preserve his privacy, he has kept his street address confidential from all but a few family members, a few friends, and a few close business associates.

  Shortly after his move to Las Vegas, Mr. Hyatt established relationships with health care providers in Las Vegas. When he got pneumonia about August 1992, he was treated for months by Las Vegas medical providers (doctors, hospitals, X-ray providers, pharmacies, etc.). Additionally, he used (and continues to use) professionals nationally and internationally as the needs arose. He used (and continues to use) a Las Vegas CPA firm (PBTK), Las Vegas home inspectors, Las Vegas construction personnel, and Las Vegas law firms (John Graves, Jim Jimmerson, George Morse, Ecker & Standish and Schreck Jones) as the needs arose. He also proceed to establish relationships with other patent attorneys nationally, the Law Firm of Richard Winter in New Jersey, and internationally, the Law Firm of Lee and Li in Taiwan, for example.

  Shortly after his move to Las Vegas, he opened various accounts with mutual fund families (e.g.; Benham, Federated, Janus, and JP Morgan) and investment companies (e.g. JP Morgan in New York and others). These mutual fund and investment accounts were opened using his Las Vegas address. He continued (and still continues) to open accounts with investment managers nationwide. His advisers worked with him (and continue to work with him) through his Las Vegas apartment, house or office.

  Immediately after Mr. Hyatt moved to Las Vegas, he proceeded to look for a large house to purchase in Las Vegas in which to live permanently. He started working with realtors within weeks of his move to Las Vegas (by October 1991). He picked up a copy of the November 1991 Multiple Listing Service book which he used as a basis for his house hunting. He scouted dozens and dozens of houses between October 1991 and March 1992. He made the first of approximately ten bona fide offers (with large cash deposits) on Las Vegas houses in December 1991, about 2-1/2 months after his move. He purchased and moved into his current Las Vegas house about six months after his move to Las Vegas. He has continued to live in his Las Vegas house, his only home, since his purchase, and expects to own this Las Vegas house permanently. Because of his desire for privacy, he formed a Las Vegas trust to purchase his Las Vegas house. Mr. Hyatt's accountant, Mike Kern, is the trustee. Mr. Hyatt's name does not appear in the public records.

H 08722

0296-00024
RJN0098

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 23

Mr. Hyatt's Las Vegas house is a lavish custom home, nearly brand new, that cost more than twice the selling price and that has more than twice the square footage and about five times the lot size as the 35 year old tract house that he sold in California. His Las Vegas house has a large roof-mounted, satellite TV antenna. He immediately opened service with a Las Vegas satellite TV company and he proceeded to explore the more than ten satellites and the nearly 500 TV channels that were available to him. He had never previously lived in a home that had satellite TV. Further, his Las Vegas home has three separate security systems, particularly secure outer doors, and double pained windows. He immediately hired a home security service to remotely monitor his built in security systems, which security service he continues to use to the present. His Las Vegas house is the only secure home in which he has ever resided. He has never lived in a home that had security gates or that was totally enclosed by walls and he does not have a need for such measures.

On April 24-25, 1992, shortly after his move from his Las Vegas apartment to his newly purchased Las Vegas house, Mr. Hyatt sent by facsimile numerous changes of address (from his earlier Las Vegas post office box address) to his new Las Vegas post office box address. He sent these facsimile changes of address to associates and firms nationwide. This was in addition to the changes of address that he had mailed nationwide, such as to his credit card companies.

Immediately after moving into his Las Vegas house, Mr. Hyatt proceeded to plan landscaping and construction of out-buildings (e.g., garages). He had over 500 cubic yards of top soil and fill dirt trucked in and he hired a backhoe and crew for three weeks of work to level and fill the property for privacy, for landscaping, for foundations of out-buildings, and to dig trenches for planting an orchard of fruit trees.[58] He got various written construction estimates to construct the out-buildings. Contemporaneous therewith, Mr. Hyatt received a notice from the Clark County Planning Commission dated May 5, 1992 (copy attached hereto) concerning grant back of rights-of-way along the curb. Mr. Hyatt proceeded to have his backhoe crew build a berm out to the curb and Mr. Hyatt then deferred final landscaping until his right-of-way was officially granted back to him. He began using handyman services in Las Vegas and he continues to use handyman services in Las Vegas to

---

[58]  Attached hereto is a receipt (including a description) from the backhoe crew chief dated June 17, 1992 for the backhoe related work performed during May-June 1992. Attached to the receipt is a brief description of work that was performed and a hand drawn layout of the work.

H 08723

0296-00025
RJN0099

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 24

the present. He purchased and installed a large, secure, curbside mail box in place of the original family-type curbside mailbox.[59]

Immediately after moving into his Las Vegas house, Mr. Hyatt's son visited him from California and stayed with him for a short visit. His son and other relatives have continued to visit with him and to stay with him for short visits in his Las Vegas home. His friends, relatives, and business associates visit him in Las Vegas from all over America and from Japan, Taiwan, and Europe. These visits began shortly after his move to Las Vegas and continue to the present.

At his final medical check up before leaving permanently for Las Vegas in September 1991, Mr. Hyatt's doctor (Dr. Peloquin) detected broken blood vessels in Mr. Hyatt's eye. The treatment turned up other symptoms for which Mr. Hyatt was referred to a dermatologist (Dr. Hamer) and to an internist (Dr. Isenberg). Dr. Hamer found no problems, but Dr. Isenberg was concerned about cancer. Dr. Isenberg scheduled more examinations and finally operated in February 1992 to remove a malignancy. Mr. Hyatt was referred to a cancer specialist (Dr. Shapiro) for a second opinion before the operation. This scenario began innocently, but unexpectedly developed into a crisis. All of Mr. Hyatt's medically related trips to California shortly after his move were to receive examinations and an operation for this medical scenario that began just before Mr. Hyatt moved to Las Vegas.

Mr. Hyatt pays property taxes in Las Vegas and he filed his IRS tax returns for 1991 through 1995 from Las Vegas using his Las Vegas mailing addresses. He started efforts to obtain a business license in mid-1992, and he received his business license in March 1993 which he continues to keep current. A California court decided early in 1993 that Mr. Hyatt was a Las Vegas resident.

---

[59]     The mail box sales brochure (copy enclosed) confirms Mr. Hyatt's intent on privacy; it says that the mailbox is "secure", "protects your privacy", and is "locked and tamper resistant."

H 08724

0296-00026
RJN0100

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 25


G.   Mr. Hyatt has Enjoyed His Life in Las Vegas Since his Move There in September, 1991.

Mr. Hyatt immediately became well established in the Las Vegas community. He actively worshipped at Congregation New Tamid, paid property taxes in Las Vegas, used Las Vegas tradesmen (e.g.; Cal Air - Air Conditioning, All Appliance Repair, A-Able Lock and Alarm, Inc., Wright Painting, and Sun Office Systems), paid for utilities in Las Vegas, hired a home security service in Las Vegas, started a satellite TV service in Las Vegas, subscribed to Public Television in Las Vegas, had his magazine subscriptions delivered to his Las Vegas addresses, shopped for his groceries in Las Vegas, and registered at professional conferences using his Las Vegas address. He got a Las Vegas library card, had his professional membership (Institute of Electrical and Electronic Engineers) transferred to a Las Vegas chapter, helped found the University of Southern California (USC) Alumni Club of Southern Nevada, did research at the University of Nevada technical library, got a Las Vegas safe deposit box, joined a Las Vegas warehouse shopping club (Sam's Club), got a discount card for The Sports Authority in Las Vegas, and joined the Las Vegas Mini Gran Prix. Mr. Hyatt protected his privacy by using a post office box for mail and by keeping his activities away from his home. He maintains his Las Vegas connections to this day and intends to continue to maintain his Las Vegas connections permanently.

In contrast to his inactive California life style, Mr. Hyatt has participated in many social, personal, recreational, and athletic activities in Las Vegas. In November 1991, he joined a religious organization. In May 1992, he joined the Las Vegas PC User's Group as a card carrying member. He belongs to a health club in Las Vegas. He goes skiing, horseback riding, roping, hiking, climbing, rock hunting, and exploring in or near Las Vegas. He goes SCUBA diving and got SCUBA certified through a Las Vegas SCUBA instructor at the SCUBA park in Lake Mead near Las Vegas. He was selected for jury duty in Las Vegas, but he was excused because he was a sole proprietor. He has attended many events in Nevada including a black tie affair, stage shows on the Las Vegas strip, rodeo events, a Super Bowl party, professional meetings at the University of Las Vegas, and events of the USC Alumni Club of Southern Nevada. He is a founding member and a participant in the activities of the USC Alumni Club of Southern Nevada. He has been and continues to be visited in Las Vegas by Dr. Silverman, Dean of the USC School of Engineering, and other USC personnel. He had dinner with Dr. Sample, president of USC, and a select group of Nevada residents on April 7, 1996 near Las Vegas. His Las Vegas mailing address is listed in the USC alumni directory.


H 08725


0296-00027
RJN0101

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 26

Sometime after Mr. Hyatt moved to Las Vegas, his marginal business started to blossom, and now, almost five years later, his Las Vegas business is a significant success. Mr. Hyatt personally ran and actively participated in his Las Vegas business, which at its start, was a one person business. He has since formed a Nevada corporation, is actively interviewing professionals for employment, has hired three patent attorneys to move to Las Vegas and work with him in his Las Vegas office, is looking to lease or purchase an interim office building in Las Vegas, is actively searching for a plot of land to purchase in Las Vegas, and plans to construct an office building in Las Vegas to house his permanent worldwide business operations. This Nevada corporation was formed by and is represented by a Las Vegas law firm (Schreck, Jones) and Mr. Hyatt's long standing Las Vegas CPA firm (PBTK).

Mr. Hyatt has personally met in Nevada and in Washington D.C. on numerous occasions with Nevada Senator Bryan, Nevada Senator Reid, Nevada Congresswoman Vacanovich, Nevada Congressman Bilbray, Nevada Governor Miller, Brian Cram, Superintendent, Clark County Schools, and Dennis Stein, president of the Nevada Development Agency (NDA), starting less than a year of his move to Las Vegas.

After his move to Las Vegas, Mr. Hyatt was involved in two California court actions. Mr. Hyatt was deposed twice in Las Vegas, once on August 19, 1992 and again about March 1993, and Mr. Hyatt signed a Declaration dated August 7, 1992; all of which confirm that Mr. Hyatt was, as of that time, a Las Vegas residence. His California attorneys and his adversaries' California attorneys (these were both California actions) traveled from California for the two depositions. The court decided that Mr. Hyatt was a Las Vegas residence and awarded him travel expenses from Las Vegas and living expenses in Southern California for a subsequent deposition in Los Angeles. These two California court actions were resolved with about five court appearances in 1992 and in 1993. Mr. Hyatt did not attend a single one of these court appearances; he was hard at work in his Las Vegas office.

H.  Mr. Hyatt Made Only Short Trips to California For Specific Purposes.

Since his move to Las Vegas, Mr. Hyatt has visited California only for short periods of time and only for specific purposes. All of these short visits to California were temporary or transitory. These short visits were, for example, to have medical examinations, to have a medical operation, to have business meetings, to attend a professional conference, to host Russian dignitaries, to sign papers for the sale of his California house and to use California airports to fly to and from out of state locations. He intended to and he did return to his home in Las Vegas after each short visit and business trip. When a visit to California

H 08726

0296-00028
RJN0102

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 27

lasted more than one day, he stayed in a motel or a hotel[60] and in one case he stayed in a hospital. He has never rented or leased an apartment or other abode in California since his September 1991 move to Las Vegas, only an occasional motel or hotel accommodation for a temporary or transitory stay overnight in California.

Mr. Hyatt hosted Dr. Yuri Koptev, head of the Russian Space Agency, and Dr. Koptev's entourage in Southern California from November 28 to December 5, 1992. Mr. Hyatt stayed at the Crescent Motel in Buena Park, California during this trip.

Mr. Hyatt often has been and continues to be required to travel between his Las Vegas home and Washington D.C. through Washington Dulles Airport. Before direct service between Las Vegas International Airport and Washington Dulles Airport was available, he would drive between his home in Las Vegas and Los Angeles International Airport ("LAX") to get a direct nonstop flight from/to Washington Dulles Airport. This was an established practice with Mr. Hyatt, which continued for years after he moved to Las Vegas (e.g., he took Washington flights from/to LAX in September 1993, July 1994, March 1995, and May 1995). In March 1996, he learned that direct service had been initiated between Las Vegas International Airport and Washington Dulles Airport. Mr. Hyatt now can and now does fly directly between Las Vegas International Airport and Washington Dulles Airport without driving to/from LAX for a direct flight.

Mr. Hyatt would take a direct flight that departed from and returned to Las Vegas when available. For example, he traveled from Las Vegas, Nevada to San Francisco, California and back to Las Vegas, Nevada for professional meetings in April 1992; he traveled from Las Vegas, Nevada to Dallas, Texas and back to Las Vegas, Nevada for

---

[60]   Attached hereto is a copy of a conference badge issued to Mr. Hyatt for a conference he attended in California on March 9, 1992. This badge identifies Mr. Hyatt as a Las Vegas resident for all of his colleagues to see. He drove from his Las Vegas home to Southern California on March 8, 1992; he stayed at the Crescent Motel in Buena Park, California overnight; he attended the conference on March 9, 1992; and then he drove back to his home in Las Vegas on March 9, 1992. This is typical of Mr. Hyatt's trips to California; being temporary or transitory, for a specific purpose, for a short period of time, and staying at a motel or a hotel when the trip was an overnight trip.

H 08727

0296-00029
RJN0103

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 28

business meetings in May 1992; and he traveled from Las Vegas, Nevada to Denver, Colorado and back to Las Vegas, Nevada for depositions in December 1992.

I.    Conclusion.

Mr. Hyatt prepared for and made his move to Las Vegas. As is typical of a person leaving one place and moving to another, he acted as rapidly as reasonable to break old connections in California and to create new connections in Las Vegas and nationwide. He was a single person and sole proprietor who had not as yet built up a support staff to assist him in all of the details of relocating, such as arranging for final billings from old connections.

The FTB has conceded that Mr. Hyatt became a Las Vegas resident and domiciliary on April 3, 1992.[61] This concession when considered together with Mr. Hyatt's preparation, moving, getting settled, and then becoming more and more established as time progressed can only lead to one conclusion -- that Mr. Hyatt intended to permanently move out of California well before he did move; that Mr. Hyatt did move from California to Nevada in September 1991; and that Mr. Hyatt became progressively more and more established in Las Vegas, continually and without interruption to the present day. Mr. Hyatt was a resident and domiciliary of Las Vegas since September 26, 1991.

---

[61]    See April 1, 1996 FTB letter.

H 08728

0296-00030
RJN0104

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 29

IV.    Analysis.

A.    Introduction.

Mr. Hyatt is a nonresident of California from September 26, 1991 to April 3, 1992 (and to the present) because he was domiciled outside of California from that period and his visits to California during that period were temporary or transitory.[62]  Even if Mr. Hyatt had been domiciled in California during the six month period between September 1991 and April 1992 (and there is neither factual nor legal support for such a finding), Mr. Hyatt would still be considered a nonresident of California because his absence from California for that period was permanent, not temporary or transitory.[63]  Mr. Hyatt's severance of his California connections, his establishment of significant connections with his Las Vegas abode and his continued Las Vegas residency after almost five years establishes his intent to permanently move to, and his permanent presence in, Las Vegas and rebuts the FTB's assertion of Mr. Hyatt's fraudulent Nevada residency and domicile.

As analyzed below, under the law governing domicile as identified in Part II of this letter, the facts and circumstances surrounding Mr. Hyatt's move to Las Vegas in September 1991, his continuing (and permanent) presence there from September 1991 to the present and the FTB's concession that he was a Las Vegas resident as of April 1992 clearly require a finding that Mr. Hyatt was domiciled in Nevada from September 26, 1991 to the present.  Further, because Mr. Hyatt's brief visits to California in 1991 and 1992 after his move to Las Vegas were made for specific and identifiable purposes (with the intent to return to his home in Las Vegas) as noted in Part III of this letter, such visits to California were temporary or transitory.  Thus, Mr. Hyatt's short and sporadic presence in California in late 1991 and early 1992 have no weight in assigning a connection to California from the date of his September 1991 move.  Finally, even if Mr. Hyatt had been domiciled in California until early April 1992 (as erroneously suggested in the FTB letters), Mr. Hyatt's presence in Nevada during that period was not temporary or transitory, and hence, Mr. Hyatt was a Nevada resident from September 1991 to April 1992 (and thereafter).  As described in Part III of this letter and analyzed below, Mr. Hyatt's Nevada connections far outweighed his

---

[62]    Cal. Rev. & Tax. Code § 17014.

[63]    18 Cal. Code Reg. § 17014(b); Appeal of Pritzlaff, supra.

H 08729

0296-00031
RJN0105

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 30

California connections in late 1991 and early 1992, thus independently requiring a finding that Mr. Hyatt was a Nevada resident from September 26, 1991 to the present.

    B.    <u>Mr. Hyatt was a Nevada Domiciliary as of September 26, 1991</u>.

        An individual domiciled in California, who leaves California, loses his California domicile the moment he abandons any intention of returning to California and locates elsewhere with no intention of returning to live in California.[64] Mr. Hyatt left California on September 26, 1991 with no intention of returning to California to live. Mr. Hyatt left California with the intention of making a permanent home in Las Vegas. He arrived in Las Vegas on the same day and has lived there ever since. Under the FTB guidelines and regulations, Mr. Hyatt became a domiciliary of Nevada on the day he left California, September 26, 1991.

        As noted in Part III of this letter, Mr. Hyatt took out a six month lease on an apartment shortly after he moved to Las Vegas because he needed a permanent place to live until he could locate, negotiate for and purchase a house acceptable to him. He did indeed purchase a house within that six month lease period and he still resides in his Las Vegas house more than four years after its purchase. The six month lease on the apartment and his early search for a house to purchase confirm that Mr. Hyatt's initial intent was to reside in Las Vegas permanently. The fact that he is still residing in Las Vegas without any intent to leave confirms his original intent to reside permanently in Las Vegas. Mr. Hyatt would not have wound up his affairs in California if he did not intend to move to and to live in Las Vegas permanently.

        The FTB admits in its April 1, 1996 letter that Mr. Hyatt was a Las Vegas resident and domiciliary as of April 3, 1992 when he purchased and moved into his Las Vegas house. Mr. Hyatt's intention to purchase a house in Las Vegas and his substantial house hunting and purchase activities in Las Vegas significantly preceded Mr. Hyatt's actual purchase and move into his Las Vegas house. Clearly, Mr. Hyatt's making of bona fide offers to purchase Las Vegas houses from his Las Vegas apartment in 1991 and early 1992 started the house purchase process that culminated in his actually purchasing his Las Vegas house. Mr. Hyatt's intention to purchase a house in Las Vegas is clearly established in 1991. By conceding that Mr. Hyatt was a resident and domiciliary of Las Vegas by April 3, 1992, when Mr. Hyatt purchased and moved into his Las Vegas house, the FTB must also concur

---

[64]    18 Cal. Code Reg. § 17014(c); FTB Pub. 1031.

H 08730

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 31

that the activities connected with Mr. Hyatt's house purchase establish his residency and domiciliary at the point when those activities were initiated. As noted in Part III of this letter, Mr. Hyatt started his house hunting activity as soon as he moved to Las Vegas in September 1991. Mr. Hyatt's intention to domicile and reside in Las Vegas and his domicile and residence in Las Vegas is clearly established by that date.

As noted in Part II of this letter, Mr. Hyatt's <u>intent</u> to domicile in Nevada is the most important factor in determining his domicile.[65] Mr. Hyatt's <u>intent</u> to leave California and move permanently to Nevada is clearly shown in the sequence of events leading up to Mr. Hyatt's departure to Nevada and in the preparations Mr Hyatt made for his move. In late 1990, Mr. Hyatt found a locale, Las Vegas, that satisfied his needs. In mid-1991, he was able to move the responsibility for his patent licensing program to Philips and had received significant capital from Philips. He closed out long-time bank accounts, he arranged to sell his only house, he established substantial relationships with out-of-state professionals, he had final medical and dental checkups, etc. Mr. Hyatt's family and colleagues knew well in advance of Mr. Hyatt's intention to move to Las Vegas. Mr. Hyatt's intention to domicile in Nevada is clearly established by his pre-departure activities and preparation.

In determining domicile, the acts of a taxpayer are considered to reflect the taxpayer's intent.[66] Mr. Hyatt's acts indisputably confirm his Nevada domicile as of September 1991. As discussed in Part II of this letter, voter registration and the place of voting are the most important acts that confirm a taxpayer's domicile.[67] Soon after his arrival in Las Vegas, Mr. Hyatt registered to vote and has voted in person in each major election held in Las Vegas since his move. This most important factor demonstrates Mr. Hyatt's Nevada domicile from September 1991.

Where the taxpayer maintains a permanent home is a significant factor in determining domicile.[68] Mr. Hyatt concluded the sale of his former California house within days of his move. Shortly upon his arrival in Las Vegas, Mr. Hyatt entered into a six month

---

[65]   Appeal of Haring, supra.

[66]   Appeal of Haring, supra; Estate of Phillips, supra.

[67]   Taff v. Goodman, supra; Appeal of May, supra.

[68]   Appeal of Dobbs, supra; Appeal of Dreiling, supra.

H 08731

0296-00033
RJN0107

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 32

lease for his new home in Las Vegas, an apartment at the Wagon Trails apartments. Mr. Hyatt spent substantial hours weekly working at home in his Las Vegas apartment. Using his apartment as a base, he also spent substantial time searching for a house to purchase. See, for example, the Declaration of Robert Schulman, which indicates Mr. Hyatt's use of professionals and colleagues in Las Vegas to help him find a home (as well as to better understand the Las Vegas business environment).[69] After making numerous house purchase offers, Mr. Hyatt purchased his new home in March 1992 and moved in on April 3, 1992. Mr. Hyatt did not have any home in California after he sold his California house on October 1, 1991. This most important factor further confirms Mr. Hyatt's Nevada domicile from September 1991.

The FTB in its correspondence implies that through March 1992, Mr. Hyatt was beneficial owner of his former house in California and resided there. There is no evidence for this position; in fact, the purchaser of Mr. Hyatt's California house immediately moved in, proceeded to live in the house, proceeded to make payments on the new trust deed on the house, and paid for utilities, telephone, newspaper and gardening. The new owner then redecorated the house throughout, installing new carpeting, drapes, curtains and wallpaper, and completely repainted the house. All of these activities contradict any implication that Mr. Hyatt beneficially owned his former California house after he sold it.

Part II of this letter describes the additional factors that can be considered in confirming a taxpayer's domicile. Each of these factors, discussed below, strongly supports Mr. Hyatt's Nevada domicile as of September 1991.

(1) Where a taxpayer is domiciled after the period in issue under consideration.[70] As confirmed in the April 1, 1996 FTB letter, there is no question that Mr. Hyatt was domiciled in Nevada since April 1992. The California courts recognized

---

[69] Attached hereto is a copy of a business card of Mr. Schulman that he personally gave to Mr. Hyatt on November 27, 1991. Also attached hereto is a copy of a Nevada Foreign Trade Zone brochure and a brochure entitled The Schulman Group, both of which were personally given to Mr. Hyatt by Mr. Schulman. Mr. Hyatt also met with John Kuminecz, Director of Industrial Development and Marketing for the Schulman Group. Mr. Kuminecz further guided Mr. Hyatt regarding setting up his business in Las Vegas and regarding a house purchase in Las Vegas.

[70] Appeal of Steinman, supra.

H 08732

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 33


Mr. Hyatt's Nevadan residency for 1992 and 1993 (1991 was not before the court).
Mr. Hyatt continues to live in the same house he purchased in March/April 1992 in
Las Vegas.

(2)     Where a taxpayer files tax returns.[71]  Mr. Hyatt has filed his federal
income tax returns at the return center for Las Vegas returns (Ogden, Utah) and has used his
Las Vegas addresses for all IRS tax matters since he moved to Las Vegas in 1991.

(3)     Where the taxpayer's documents reflect his home.[72]  Mr. Hyatt's
documents prepared after his move in September 1991 reflect Las Vegas as his home.

(4)     The comparative size of homes maintained in different states at the
same time.[73]  Mr. Hyatt has never owned homes in different states at the same time.
Nevertheless, the Las Vegas house he purchased (and lives in) is substantially larger, more
elaborate, and more expensive than the house he lived in and sold in California.

(5)     Whether the taxpayer has maintained or canceled the California
homeowner's property tax exemption.[74]   Shortly after Mr. Hyatt moved to Las Vegas, he
cancelled the California homeowner's property tax exemption.

(6)     Miscellaneous contacts with a state.[75]  Shortly after his move,
Mr. Hyatt opened bank accounts in Las Vegas and continues to maintain and use them; he
acquired a Nevada driver's license (simultaneously turning in his California driver's license);
he registered his car in Nevada (before the California registration expired); he joined a
religious organization in Las Vegas; he socialized with colleagues in Las Vegas (see
Mr. Schulman's declaration); etc.

---

[71]    Appeal of Meadows, supra.

[72]    Appeal of Resnick, supra.

[73]    Id.

[74]    Appeal of Young, supra.

[75]    Appeal of D'Eustachio, supra; Appeals of Young.


H 08733

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 34

(7)     Where a self employed taxpayer establishes his own business.[76]
Mr. Hyatt started a new business when he moved to Las Vegas.  He deactivated his California corporation and established a sole proprietorship in Las Vegas.  He is currently growing his patent prosecution business and his technology research business.[77]

The above factors, which are typically cited as additional important factors in confirming and reflecting a taxpayer's domicile, confirm and reflect Mr. Hyatt's domicile in Nevada since September 1991.

Mr. Hyatt's actions regarding his change in domicile and residency is typical of the actions of any person who has relocated to establish a new life.  Such a person eliminates many basic ties with his former location prior to and at the beginning of his move, allows additional ties to fade over time, establishes basic new ties with his new location and allows his ties to grow at his new location over time.  Such a person is a domicile and resident of his new location as of the date he moves.  Mr. Hyatt's actions fit this scenario precisely.  He left California and moved to Nevada.  As noted in Part III of this letter, Mr. Hyatt severed most of his California ties prior to and as of his move, he allowed most other California ties to fade, and he immediately established basic ties with Nevada.  As his business and personal life became more established in Nevada, Mr. Hyatt's Nevada ties grew steadily through today.

There was no legal basis for the FTB's contention that Mr. Hyatt was a resident of California through April 2, 1992 as expressed in the December 26, 1995 FTB letter (which gave rise to the Notice of Proposed Assessment for Mr. Hyatt's 1991 taxable year).  The FTB's contention that Mr. Hyatt was not domiciled in Nevada for the period of late September 1991 to early April 1992 appears to be based upon its analysis contained in its April 1, 1996 FTB letter, which asserts that the facts and circumstances in the Appeal of Dobbs were similar to those of Mr. Hyatt.  The facts and circumstances in Dobbs are actually highly supportive of Mr. Hyatt's Nevada domicile from September 1991.

---

[76]   See Appeal of Misskelley, supra.

[77]   See, also, Appeal of Katleman, supra and Appeal of Yaron, supra (a taxpayer's presence outside of California to establish a long term business project or to establish a sole proprietorship is supportive of California nonresidency).

H 08734

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 35

In <u>Dobbs</u>, the taxpayers decided to move to California from Colorado for health reasons. The State Board of Equalization ("SBE") determined that the taxpayers abandoned their Colorado domicile when they wound up their Colorado affairs and acquired their California domicile on May 1, 1980 as they moved into their California home. The fact that the Dobbs' home was a purchased house was irrelevant to the SBE's decision, a California apartment would have sufficed.

Mr. Hyatt's circumstances are quite similar to those of the Dobbs, except in reverse -- Mr. Hyatt left California establishing a new domicile in Nevada; the Dobbs left Colorado establishing a new domicile in California. Mr. Hyatt sold his California house within one week of his move to Las Vegas. The SBE determined that the Dobbs' California domicile began when they wound up their Colorado affairs and moved into their California home. Under <u>Dobbs</u>, the SBE would have to determine, at the latest, that Mr. Hyatt became a Nevada domiciliary when he wound up his California activities, by September 26, 1991, and rented his new home in Las Vegas, his apartment at the Wagon Trails apartments (by early October 1991).

The FTB reads <u>Dobbs</u> as withholding domicile until the taxpayer actually purchases and moves into a purchased **house**. <u>Dobbs</u> does not focus on the type of residence acquired and moved into (purchased house vs. leased apartment unit or rented room). The FTB and the SBE have long recognized that permanence can be established by renting or leasing and moving into an apartment as well.[78] Otherwise, those who are unable to afford to purchase a house would not be considered domiciliaries of the state in which they are renting or leasing. The FTB's interpretation of <u>Dobbs</u> is misplaced. <u>Dobbs</u> confirms that Mr. Hyatt was domiciled in Nevada from September 1991 (or at the latest, from October 1991).

The FTB's position with respect to Mr. Hyatt's domicile is clearly erroneous. The FTB unreasonably asserts Mr. Hyatt's domicile and residence changed as of April 3, 1992 when he moved into his Las Vegas house that he purchased in March 1992. The FTB completely ignores Mr. Hyatt's activities that led up to the purchase of his Las Vegas house. The FTB ignores the house hunting, the purchase offers, and even the execution of the

---

[78]    See, e.g, FTB Pub. 1031, Ex. 5; Appeals of Posada, supra; Appeal of Maurice and Rose Amada (4/20/55) (husband and wife became residents of California when they gave up their abode in another state and **rented an apartment** in California with the intention of staying if the climate proved healthful).

H 08735

0296-00037
RJN0111

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 36

purchase agreement, all of which were conducted in Las Vegas, and asserts that Mr. Hyatt's Nevada domicile did not begin until April 3, 1992. The SBE and a court would look at Mr. Hyatt's activities from September 1991 to April 1992 and to the present to determine that Mr. Hyatt was a domicile and resident of Nevada from the date he moved to Nevada in September 1991.

      The FTB has failed to cite any authority that could lead to a conclusion that Mr. Hyatt is a California domicile or resident after September 1991. The FTB was unable to cite an authority favoring its position with respect to Mr. Hyatt because there is no reason to believe that a taxpayer with circumstances similar to Mr. Hyatt would be considered anything other than a domiciliary and resident of the state in which he is newly located.

     C.    Mr. Hyatt's Visits to California Were Short and Temporary or Transitory Only.

      Having established Mr. Hyatt's continuing domicile in Nevada from September 1991, he will not be considered a resident for California income tax purposes for that period so long as he was not in California during that period for other than a temporary or transitory purpose.[79] As both the FTB guidelines (Pub. 1031) and the regulations provide: an individual in transit, in California for a brief rest or vacation, or in California to complete a transaction, fulfill an engagement or perform a contract is considered to be in California for a temporary or transitory purpose.[80]

      After Mr. Hyatt moved to Las Vegas, each visit he made to California was brief (generally for a day) and for a specific purpose. As noted in the FTB letters, Mr. Hyatt had doctor appointments, was hospitalized, and took several business trips in California during the period under consideration.[81]

      From October 1991 until recently, Mr. Hyatt would drive into Los Angeles to take direct, non-stop flights to the East for business (such as his January 8 to 17, 1992 trip to New York and Washington, D.C.). In accordance with the FTB guidelines, Mr. Hyatt was "in

---

[79]    Appeal of Pritzlaff, supra; 18 Cal Code Reg. § 17014(a).

[80]    18 Cal Code Reg. § 17014(b); FTB Pub. 1031.

[81]    April 1, 1996 FTB letter, pg. 2. See also December 26, 1995 FTB letter, pgs. 9, 12.

H 08736

0296-00038
RJN0112

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 37

transit" with respect to these activities and therefore his presence in California was only transitory.

Mr. Hyatt's various trips to California for medical appointments during this period (in January and February, 1992, for example) were specifically for treatment of a medical condition detected just before the time he moved to Las Vegas. These visits to California were specifically made for medical treatment of a particular malady.

Mr. Hyatt also visited California occasionally for specific short-term events. He was in California in March 1992 to host Russian scientists and he returned once again in November-December 1992 to host Russian space program personnel for a week. He drove from Las Vegas, hosted the Russians[82], and then drove back to Las Vegas. Likewise, Mr. Hyatt returned to California on a one-day trip on October 1, 1991 to sign the sale documents for his California house. Each such visit to California was made to fulfill a particular engagement or to complete a specific transaction.

In summary, while Mr. Hyatt did occasionally return to Southern California during the period October 1991 to March 1992, each trip was to fulfill a specific engagement or to complete a transaction. In accordance with the FTB guidelines and the regulations, Mr. Hyatt's visits to California were for temporary or transitory purposes. Therefore, Mr. Hyatt must be considered a domiciliary of Las Vegas and a nonresident of California since his move on September 26, 1991.

D.  Mr. Hyatt was a Resident of Las Vegas From September 26, 1991.

There is no support for the FTB's contention that Mr. Hyatt was domiciled in California until April 3, 1992. However, such a contention still does not affect Mr. Hyatt's Nevada residency from September 1991 to the present. If the SBE or a court were to determine Mr. Hyatt's residency as if he were a California domiciliary from September 26, 1991 to April 2, 1992, (as asserted by the FTB), the SBE or the court would focus on whether Mr. Hyatt was absent from California for a temporary or transitory purpose during

---

[82]   See, for example, the March 16 and March 20 charges on his BNY Mastercard Account for food and Mr. Hyatt's lodging, partially cited at page 6 of the April 1, 1996 FTB letter. Of course, the dates on the charge card receipt do not precisely match the actual date of the expenditure. The 3/20/92 charge was for a breakfast meeting on 3/17/92.

H 08737

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 38

that period.[83]  The same examples cited in the regulations and the FTB guidelines for determining whether or not an individual's presence in California is for a "temporary or transitory purpose" are considered in determining the purpose of a domiciliary's absence from California.[84]  Mr. Hyatt's continuing and permanent residence in Las Vegas to this day and into the foreseeable future contradicts the FTB's contention; Mr. Hyatt would still be judged to be a Nevada resident.

As discussed in the previous section, each of Mr. Hyatt's visits to California during the period under examination were covered under one of the examples cited in the regulations and FTB guidelines.  Thus, Mr. Hyatt's presence in California during the period was for temporary or transitory purposes.  None of Mr. Hyatt's activities in Nevada are described in the examples set forth in the regulations or the FTB guidelines as temporary or transitory.  On the contrary, they are indicative of what a person does in the place where he lives.  Hence, Mr. Hyatt's activities in Nevada clearly establish permanent Nevada residency.  Mr. Hyatt did not use Las Vegas solely as a stopover in transit to another location; his out-of-state trips began and ended in Las Vegas.  He did not travel specifically to Las Vegas for a brief vacation or rest;  he regularly took advantage of Las Vegas area recreational activities after work and on weekends.  He was in Las Vegas permanently and indefinitely, not merely to complete a transaction, to fulfill a particular engagement or to perform a contract.  He moved to Las Vegas to establish himself, to conduct a new business and to obtain a better quality of life.  There was no particular engagement, transaction or contract to complete as part of his move.  There was no other place to return to because he lived and worked in Las Vegas.  Thus, Mr. Hyatt's "absence" from California during the period under examination would not be considered absence for a temporary or transitory purpose.[85]

---

[83]  Appeal of Broadhurst, supra; 18 Cal Code Reg. § 17014(b).

[84]  Appeal of Hardman, supra; Appeal of Fernandez, supra.

[85]  An individual absent from California under an employment-related contract for an uninterrupted period of at least 18 consecutive months, except for returns not exceeding an aggregate of 45 days in a tax year, is outside California for other than a temporary or transitory purpose.  Cal. Rev. & Tax. Code § 17014.  Although this provision is not directly applicable to Mr. Hyatt's circumstances, the provision clearly reflects the intent of the California legislature that a taxpayer's absence for an extended period from California establishes that taxpayer's California nonresidency from the beginning of his absence.  **Mr. Hyatt has been absent from California for almost five years.**

H 08738

0296-00040
RJN0114

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 39

If the SBE chose not to apply the examples in the regulations and FTB guidelines, the SBE would be relegated to evaluating the contacts of Mr. Hyatt during the period under examination to determine Mr. Hyatt's residency. Mr. Hyatt's closest connections and contacts would establish the state of his residency during the period.[86] The results of the SBE's analysis would be the same: Mr. Hyatt severed most and was severing essentially all other relevant California connections and was making extensive new connections and contacts in Las Vegas; hence he was a Nevada resident for the period of September 26, 1991 to April 3, 1992. The scenario of breaking California connections and making Las Vegas connections during this period (and during his earlier preparation for the move) is irrefutable.

In viewing Mr. Hyatt's connections, Mr. Hyatt's pre-move and post-move activities will necessitate a finding that Mr. Hyatt was a resident of Nevada from September 26, 1991 to the present. Mr. Hyatt's severance of California ties and establishment of Nevada ties is highly relevant evidence of Mr. Hyatt's Nevada residence. Mr. Hyatt did not retain California connections in anticipation of returning. Mr. Hyatt did not expect to return to live in California, he has never returned to live in California, and he has no intention of ever returning to live in California.

Mr. Hyatt prepared to move to Las Vegas and to sever his California ties. He closed many of his California bank accounts and essentially deactivated the others. He closed all of his California charge accounts. He sold his former California house, he canceled the homeowner's exemption and he ceased paying utilities, phone, and other services on his former house. He sent out changes of address letters with his new Las Vegas address and he sent a change of address to the post office to forward mail from his former California house. He let his California post office boxes expire (he let business colleagues acquire one post office box). He terminated the services of most California professionals and phased out the services of others where it was impractical to terminate their services immediately. He surrendered his California driver's license to the Nevada DMV in return for a Nevada driver's license. He made no further purchases in California of groceries, office supplies and other day-to-day items. He severed ties with his California professional organization membership. Mr. Hyatt's severance of California ties, both immediately prior to his move and after his

---

[86]   Appeal of Dobbs, supra; Appeal of Hardman, supra; FTB Pub. 1031; 18 Cal Code Reg. § 17014(b).

H 08739

0296-00041
RJN0115

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 40

move, will be considered irrefutable evidence of Mr. Hyatt's Las Vegas residency from
September 26, 1991.[87]

Mr. Hyatt's establishment of substantial day-to-day Las Vegas contacts and
connections and nationwide connections will overwhelmingly convince the SBE (or a court)
that Mr. Hyatt was a resident of Las Vegas since September 1991. He took a six month lease
at Wagon Trails apartments, moved in and conducted his personal affairs and his business
activities. He took a Las Vegas post office box. He joined a religious organization (where he
continues to worship to this day). He opened Las Vegas bank accounts, which he used (and
continues to use) extensively. He engaged a Las Vegas insurance agent, through whom he
acquired auto, umbrella liability, and renter's insurance, and ultimately, homeowner's
insurance. He obtained a Nevada driver's license. He registered to vote in Las Vegas (and
he did vote in person in every major election). He established a permanent relationship with
Las Vegas accountants, PBTK (and a close day-to-day friendship with Michael Kern of
PBTK), which he maintains to this day. He engaged real estate professionals to assist him in
the purchase of a house (they showed him dozens of homes in the Las Vegas area). He used
Nevada medical professionals for his medical needs (with the exception of completing
diagnosis and treatment of medical problems discovered prior to his departure from California
in September 1991). He undertook his day to day activities from his Las Vegas apartment
(until he moved into his Las Vegas house): he serviced his cars in Las Vegas; he purchased
his groceries and sundry items in Las Vegas; he laundered and dry cleaned his clothes in
Las Vegas; he communicated with family, friends and business colleagues from Las Vegas; he
established his computer system in his Las Vegas apartment (and subsequently in his
Las Vegas house); he socialized with new friends and colleagues in Las Vegas (e.g, he
watched the January 1992 Super Bowl at an acquaintance's home) and he opened up mutual
fund accounts and engaged investment advisers, lawyers and other professionals world wide

---

[87] See, e.g., Appeal of Hardman, supra; Appeal of Rand, Christopher T. and
Hoda A. (4/5/76) (in both appeals, the SBE considered the severance of
California ties (similar to those severed by Mr. Hyatt) significant in finding
the taxpayers to be California nonresidents for the period under examination.
Further, in the Appeal of Vohs, supra, the taxpayer did not even need to
establish residency in another state to prove he was not a California resident.
The taxpayer presented evidence that he had no wife nor minor dependents
living in California, maintained no permanent residence in California, owned
no real property in California, kept neither a car nor personal property in
California and was away from California a substantial portion of the time.

H 08740

0296-00042
RJN0116

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 41

from Las Vegas. The sheer volume of Mr. Hyatt's Nevada contacts and connections, let alone the type of contacts and connections, demonstrate Mr. Hyatt's Nevadan residency from September 1991.

Mr. Hyatt maintained few contacts or connections with California once he moved. He worked with business colleagues throughout the country by phone, fax, modem and mail from Las Vegas and his colleagues visited him in Las Vegas. He returned to California for medical treatment during the period under audit to complete the treatment initiated by a California doctor prior to his move to Las Vegas. He drove to Los Angeles on occasion for a special event, such as hosting Russian scientists, attending a professional conference or signing home sale documents, but he always returned home to Las Vegas immediately after the event. On the occasions that Mr. Hyatt stayed over night in California, he stayed in motels or hotels and on one occasion he was hospitalized for 10 days. Given the specific purpose of each of the contacts Mr. Hyatt made in California from September 1991 to early April 1992, the SBE (and a court) would consider each California contact to be temporary or transitory and would not give these contacts any weight in determining Mr. Hyatt's connections with California. Even if these brief California contacts were given some weight, Mr. Hyatt's activities leading up to his move to Nevada and the active life he established in Las Vegas thereafter lead to the clear cut conclusion that Mr. Hyatt was a Nevadan resident from September 26, 1991.

The FTB letters cite only a few miscellaneous California ties for Mr. Hyatt after his move to Las Vegas. The FTB asserts that Mr. Hyatt (1) remained beneficial owner of the house he sold to a business colleague (with the FTB asserting that title passed in June 1993), (2) maintained California bank accounts, (3) maintained two safe deposit boxes, (4) had a 1977 Toyota registered in California, (5) had a California driver's license, (6) used California professionals (four law firms (two attorneys were from the same office), one accountant and two investment brokers) (7) used California doctors, and (8) maintained two California P.O. boxes. The FTB letters make no other assertions and provide no further information or arguments to establish Mr. Hyatt's California ties. The FTB letters (and previous correspondence) disregard the lack of active or continuing relationships with these alleged California ties and ignore the severing of such ties.[88]

---

[88]    The FTB letters ignore case law. For example, in the Appeal of Susie Lyon, (5/17/50), a wife who resided in Mexico maintained a home in California for the convenience of two sons in the military and used the home as a mailing address for personal correspondence. She also maintained a checking account and safe deposit

H 08741

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 42

      The FTB letters either do not consider Mr. Hyatt's extensive Nevada ties and activities or dismiss his Nevada ties and activities during the same period. In most cases, the FTB neglects the additional evidence which made the asserted California ties irrelevant in determining Mr. Hyatt's residency. For example, the April 1, 1996 FTB letter fails to note that Mr. Hyatt registered his auto in Nevada before its California registration expired and he surrendered his California driver's license to the Nevada DMV as a requirement to receive his Nevada driver's license.[89] Both FTB letters fail to note, for example, that Mr. Hyatt closed all of his California charge accounts and most of his California bank accounts and he essentially deactivated all of the rest of his California bank accounts and his California safe deposit boxes by the time of his move. The FTB letters fail to note that Mr. Hyatt used California lawyers for specific California matters and that he used a substantially greater amount of out-of-state legal services after his move. The FTB letters fail to note that Mr. Hyatt allowed his California post office boxes to expire after his move. The April 1, 1996 FTB letter erroneously states that title to Mr. Hyatt's former California house passed in June, 1993; title to the house passed on October 1, 1991. The FTB letters assert that Mr. Hyatt remained beneficial owner of the California house that he sold on October 1, 1991; but, as discussed above, the letters fail to note that the purchaser of his former California house immediately proceeded to pay utilities, telephone, newspaper, insurance and gardening and then significantly redecorated the house, installing carpeting, drapes, curtains and wallpaper and completely repainting the house. The FTB's asserted California connections are not connections at all; they are isolated, irrelevant activities that establish either the breaking of California ties or temporary or transitory events.

      Mr. Hyatt's connections and contacts with Las Vegas during September 1991 to the present are overwhelming. Notwithstanding the fact that Mr. Hyatt was domiciled in Las Vegas in late 1991 to early 1992, even if he were to be considered to be domiciled in California for that period (for the sake of discussion), he would still be found to be a resident

---

      box in California. These ties were insufficient to establish the wife's residence in California. (The wife's husband sold his business in California and moved to Mexico, establishing a new business.)

[89]  A car whose California registration lapses or a California driver's license which is retained until expiration (Mr. Hyatt turned his California driver's license in to the Nevada DMV before expiration) are not factors indicating California ties. See Appeal of Weaver, Robert C. and Grace L. (4/9/85).

H 08742

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 43

of Nevada during that period. Mr. Hyatt's presence in California during the period was temporary or transitory and he had only a few waning California connections and contacts during that period.

H 08743

0296-00045
RJN0119

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 44

V.  Mr. Hyatt's Nevada Residency From September 26, 1991 Cannot Be Controverted
By The FTB's Bad Faith Claim of Fraud.

The FTB letters are so disingenuous that we question the FTB's motives in
continuing to assert that Mr. Hyatt fraudulently considered himself a Nevada resident from
September 26, 1991. Our discussion here addresses representative irrelevancies, inaccuracies
and inconsistencies contained in the FTB letters. We find it unconscionable that the FTB has
disregarded reason, fairness, the evidence as a whole, the relevant law and the FTB's own
guidelines in asserting its fraud claim.

A.  The FTB has Provided No Basis On Which It Asserts Fraud.

The FTB has asserted in the 1991 audit that Mr. Hyatt's Nevada residency
was fraudulent. This is absolutely contradicted by the FTB's admission in the 1992 audit that
Mr. Hyatt was a Las Vegas resident as of April 3, 1992.

During the course of the 1991 audit, the FTB even implied that Mr. Hyatt
was a California resident through the end of 1992 and even to the present. For example, in
the December 26, 1995 FTB letter, the FTB alleges that Mr. Hyatt has a California mailing
address even in 1995 (at page 6), that Mr. Hyatt was present in California on April 13, 1992
(at page 7) and again in December, 1992 (at page 8). The FTB made these allegations
apparently to contend that Mr. Hyatt remained a California resident through at least the end of
1992 and perhaps through 1995. Remarkably, throughout the 1991 audit, the FTB has
insinuated that Mr. Hyatt has never been a Nevada resident. While the FTB has asserted
fraud, it has not provided the basis for its assertion. The December 26, 1995 FTB letter,
which gave rise to the Notice of Proposed Assessment, imposes the fraud penalty on
Mr. Hyatt, but does not contain any discussion of why the fraud penalty should be imposed.

By its own admission, the FTB is clearly asserting fraud in bad faith. In its
audit report for 1992 (the April 1, 1996 FTB letter), the FTB completely changes its position
even though the FTB did not have the benefit of any additional information from the date of
its December 26, 1995 letter. The FTB now admits that Mr. Hyatt was a Nevada resident
from April 3, 1992. The FTB knew that its implication of fraudulent Nevada residency for
1991 was not supportable, given the FTB's admission of Nevada residency as of April 3,
1992; nevertheless, the FTB, in bad faith, continues to assert the fraud claim.

The FTB appears to base its claim of fraud on undisclosed affidavits and
other undisclosed third party verbal and written responses. There is certainly no evidence or

H 08744

0296-00046
RJN0120

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 45

information in the FTB letters (or in earlier FTB correspondence concerning Mr. Hyatt's 1991 taxable year) leading to such a preposterous claim. As Mr. Hyatt has provided the FTB with extensive information that would permit a reasonable evaluation of his residency, so he should have similar information that is in the hands of the FTB provided to him. He repeatedly requested copies of affidavits and the other undisclosed written information gathered by the FTB, but the FTB has denied his requests. The FTB has kept secret the information on which it bases its fraud claim. This is an additional example of the FTB's bad faith attempt to prevent Mr. Hyatt from contesting the fraud claim.

When Mr. Hyatt received a copy of the 1991 Notice of Proposed Assessment, he requested in writing the same undisclosed information from the FTB.[90] The FTB's Disclosure Officer orally stated that the FTB will provide copies of that portion of Mr. Hyatt's 1991 file information that it deems non-confidential, but that the FTB would most likely not provide the copies before the required filing date for this protest.

Based upon information alleged to be contained in the undisclosed affidavits and other undisclosed written materials, the FTB has forced Mr. Hyatt to undertake an extensive and expensive effort to demonstrate the frivolous nature of the FTB's claim of fraud. Mr. Hyatt's efforts have been hampered to date because the FTB has refused to identify the basis of its fraud claim. Any evidence ultimately must be provided by the FTB, but until the alleged evidence is provided, it places the FTB in the position of being able to arbitrarily and capriciously extend administrative control over Mr. Hyatt's case.

We understand that the FTB had performed an extensive letter writing and interviewing program, such as to Mr. Hyatt's former California neighbors and former California contacts. However, the FTB has not cited this information in any of its correspondence. The FTB has made a practice of ignoring information that is favorable to Mr. Hyatt's Las Vegas residency and over-emphasizing information that is alleged to be favorable to the FTB's contention of California residency. Thus, it is presumed that the results of the FTB's letter writing and interviewing program is favorable to Mr. Hyatt's Las Vegas residency. In view of the above, Mr. Hyatt hereby requests copies of the materials related thereto in the FTB's files. Further, Mr. Hyatt requests that the FTB provide a fair summary of the results of this letter writing and interviewing program.

---

[90] The FTB sent Mr. Hyatt's Notice of Proposed Assessment to the wrong address.

H 08745

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 46

Given the FTB's withholding of favorable information concerning Mr. Hyatt's Nevada residency and its admission that Mr. Hyatt was a resident of Nevada from April 3, 1992, there is no grounds for the FTB to assert fraud. Therefore, the FTB must withdraw its imposition of the fraud penalty.

B.    The FTB Makes Unsupported Assertions to Support Its Erroneous Claim of Fraud.

The FTB takes isolated incidents out of context and mischaracterizes them to attempt to develop a fraud theory that is just not true. When taken as a whole, the facts relevant to Mr. Hyatt's preparing, moving to Las Vegas, getting settled and then becoming more and more established as time progressed can only lead to one conclusion -- that Mr. Hyatt intended to permanently move from California well before he did move in September 1991 and that Mr. Hyatt became progressively more and more established in Las Vegas, continually and without interruption from September 1991 to the present.

The FTB alleges that the sale of Mr. Hyatt's California house on October 1, 1991 was a sham sale; improperly ignoring Mr. Hyatt's evidence and improperly relying on speculation and on information contained in alleged undisclosed affidavits. Notwithstanding the bona fide nature of the home sale (see Section III above), Mr. Hyatt had no motive to undertake a sham sale. The decisions by the SBE establish that a California resident does not have to sell his California property to become a California nonresident.[91]

In its December 26, 1995 letter, the FTB makes unsupported and self serving allegations about Mr. Hyatt's relationship with his colleague, Ms. Jeng. Ms. Jeng is a mathematician with a masters degree who has helped Mr. Hyatt with his technical work and with his business. Mr. Hyatt's relationship with Ms. Jeng is irrelevant to the issue of Mr. Hyatt's residency.

The FTB also makes unsupported and self serving allegations about Mr. Hyatt's Las Vegas apartment. The FTB alleges that Mr. Hyatt was not seen at the apartment, and, based upon one unidentified envelope, that Mr. Hyatt paid rent from California. Such allegations, even if they were supportable, cannot rebut Mr. Hyatt's bona fide apartment lease and residence, bona fide house hunting activities in Las Vegas and his permanent move to Las Vegas. Of course, the FTB must concoct a challenge to Mr. Hyatt's

---

[91]    See, e.g. Appeal of Hardman, supra.

H 08746

0296-00048
RJN0122

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 47

residence at his Las Vegas apartment, otherwise there would be absolutely no basis for the FTB's residency determination.

Mr. Hyatt's intent and actions to move to Las Vegas are impliedly acknowledged by the FTB's admission that Mr. Hyatt did in fact make a bona fide home purchase in Las Vegas and did in fact become a bona fide Las Vegas residence at least by April 3, 1992. This admission is significantly supportive of the whole scenario of Mr. Hyatt's pre-move preparation and Mr. Hyatt's post-move activities that consequently culminated in this admission.

C.    The FTB Ignores or Mischaracterizes Mr. Hyatt's Connections In Order to Assert Fraud.

The FTB improperly ignores Mr. Hyatt's connections to other states. This creates the fiction that Mr. Hyatt has a large percentage of his connections with California when in fact his connections with California were a small percentage and waning. Connections to other states coordinated from Las Vegas or paid with checks drawn on a Las Vegas checking account are Las Vegas connections and will not be ignored by the SBE or by the courts.

Many events are alleged by the FTB to be California connections, but in fact represent just the opposite -- the severing of California connections and the making of Las Vegas connections. Other events that are alleged to be California connections or California residency events are in fact classical temporary or transitory events, such as motel and restaurant transactions and passing through a California airport on a business trip. The FTB also disregards normal delays and the time when a California connection is actually severed and instead focuses on the time when a delayed final bill is finally paid. The FTB also disregards the time that a Las Vegas connection is actually initiated (e.g., searching for a Las Vegas house and making purchase offers on Las Vegas houses) and instead focuses on the time that the Las Vegas connection is finally completed (e.g., moving into the purchased Las Vegas house). In addition, multitudes of Las Vegas connections are either improperly dismissed by the FTB or are improperly given no weight by the FTB. Although the FTB has significant latitude to mischaracterize the facts for its own analysis, neither the SBE nor the courts will accept such distortions.

A prime example of the FTB's mischaracterizations is Exhibit B to the April 1, 1996 FTB letter, which ostensibly claims to assign Mr. Hyatt's checking account

H 08747

0296-00049
RJN0123

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 48

activity to California or Nevada. Most of the California connections erroneously alleged in Exhibit B are grossly misleading and are blatantly erroneous.

In Exhibit B, the FTB assigned check activity to California without any attempt to evaluate the connection. The assignments create false California connections and improperly deny Mr. Hyatt the benefit of the Las Vegas connections that are clearly represented by these checks. This further discredits the whole FTB analysis. For example, the FTB assigns checks to California that were written for services that were contracted for in and that were performed in Las Vegas and that were drawn on Mr. Hyatt's Las Vegas checking account. Further, most of these checks were dated after April 3, 1992 when the FTB admits that Mr. Hyatt was a Las Vegas resident.

The FTB's methodology is illustrated by the three checks dated April 17-18, 1992 to the Strattons, from which checks the FTB auditor tries to show a California connection. The Strattons were young men who lived with their family in Las Vegas and who were personally paid by check by Mr. Hyatt in Las Vegas with checks drawn on Mr. Hyatt's Las Vegas checking account for services performed for Mr. Hyatt in Las Vegas.

The arbitrary and inaccurate FTB methodology is further illustrated by the check dated August 31, 1992 to Satellite TV, which was for satellite TV service contracted for in Las Vegas for use in Mr. Hyatt's Las Vegas home and paid for with a check drawn on Mr. Hyatt's Las Vegas checking account. The Satellite TV billing office for Las Vegas services may be in California, but the FTB cannot assign this check to California. There can be no doubt that this is a Las Vegas connection.

There is no mention of the fact that the checks were drawn on Mr. Hyatt's Las Vegas checking accounts and hence represent Las Vegas connections. There is no mention that certain checks are written to relatives who do not reside with Mr. Hyatt, and in all but one case, have never resided with Mr. Hyatt. For example, many of these checks were for support of Mr. Hyatt's adult son (a college student) who has not lived with Mr. Hyatt since before 1984. There is no mention that certain checks that are assigned to California are donations to charitable institutions and to universities (e.g., Mr. Hyatt's alma mater) which do not establish California connections. There is no mention that certain checks that are assigned to California are written as final payments for work performed prior to Mr. Hyatt's move to Las Vegas, which constitute the severing of California connections. Such a listing that erroneously assigns checks to California (implying California connections) in complete disregard for the true facts and for the established case law has no place in the record of this case.

H 08748

0296-00050
RJN0124

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 49

The FTB mischaracterizes some of Mr. Hyatt's checks to California professionals and to California businesses as being California connections when in fact they represent previously broken California connections and hence are supportive of Mr. Hyatt's move to Las Vegas in September 1991. The checks written to California entities prior to and shortly after Mr. Hyatt's move to Las Vegas that do not have any subsequent checks written to those California entities cannot be reasonably counted as California connections. Simple reason would characterize such checks as broken California connections. It is to be expected that the payment of final bills for broken California connections could take six months (and sometimes longer) from Mr. Hyatt's September 1991 move date. This includes the normal time periods for California entities to send final bills concerning closed accounts and includes Mr. Hyatt's delay in paying the final bills during the very busy period following his move to Las Vegas.

The misleading and unsupportable assignment of checks to California even goes so far as to list (in Exhibit B) a check dated May 7, 1992 that was written to the FTB for payment of 1991 FTB taxes associated with Mr. Hyatt's former California corporation (which was inactive at that time). The Notice of Balance Due from the FTB was sent directly to Mr. Hyatt's original Las Vegas post office box (associated with his apartment) and Mr. Hyatt included with this payment a change of address to his second Las Vegas post office box (associated with his house). This is clearly a Las Vegas connection, not a California connection.

D. The FTB Asserts Fraud Based Upon Misstatements and Inaccuracies.

The FTB letters contain a multitude of inaccuracies and misstatements. Both FTB letters state that Mr. Hyatt's Franklin Federal Money Fund was a California bank account, and thus a California tie. Although both letters acknowledge our prior attempts to inform the FTB on the law concerning mutual fund accounts, the FTB continues with its insupportable position. Enclosed is a letter from the Franklin Fund's tax counsel to R. Douglas Bramhall, Tax Counsel IV, FTB Legal Branch and a reply letter from Mr. Bramhall. These letters confirm that there is absolutely no merit to nor support under the law for the FTB's position that the Franklin Fund mutual fund account was a California bank account.

The April 1, 1996 FTB letter sets forth a calendar of days in which it had determined, based upon specific guidelines, when Mr. Hyatt was inside or outside of California for 1992. The letter states that checks to pay bills are not considered as connections. In preparing the calendar, the FTB ignores this guideline. The calendar

H 08749

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 50

erroneously ascribes days to Mr. Hyatt's California presence based upon checks written by Mr. Hyatt to pay his bills; e.g., Mr. Hyatt mailed a check for Ron Schuchord (sic) for services previously contracted for with the purchaser of Mr. Hyatt's former California house.[92] The check written to Ron Schuchord was in payment of a bill; hence ascribing California presence to this payment is in contradiction to the FTB's own guidelines.

The FTB's calendar of days is inherently faulty. The calendar ascribes days of California presence based upon credit card statements using the location of the charge on the statement, but the location on the statement is not intended by the credit card company to be the location of the transaction and in many cases the location on the statement is definitely not the location of the transaction. Further, the calendar ascribes days of California presence based upon charge card statements using the dates of posting of charges, which, of course, are not necessarily the dates on which the charges were incurred.[93]

The FTB's use of credit card statements produces absurd conclusions of where Mr. Hyatt was located. A date and a location recited on a credit card statement are not intended by the credit card company to be an accurate statement of the date of the charge, or the location at which the charge was made, or the person who made the charge. In fact, the credit card statements are accurate only to the amount of the charge and are prima facie not intended to provide accurate information as to the date, location, and person associated with the charge. This is obvious and the FTB knows this. However, this does not prevent the auditor from using this inaccurate information against Mr. Hyatt. For example, Mr. Hyatt's credit card statement from the Bank of New York lists numerous charges made by FedEx as having a Memphis, TN location. However, Mr. Hyatt has never been in Memphis, TN let alone on the dates citing Memphis, TN on his credit card statements. The FTB recognizes the inaccuracy of the credit card statements because the FTB ignores these Memphis, TN locations.

---

[92] This check was written after April 3, 1992; the date that the FTB concedes Mr. Hyatt was a Nevada resident.

[93] E.g., Mr. Hyatt is ascribed California presence on 3/16/92 and 3/20/92 (with Nevada presence ascribed in between) apparently based upon charge card statements. The 3/20/92 posted charge was actually a 3/16/92 expenditure. Both FTB letters make the same assertion.

H 08750

0296-00052
RJN0126

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 51

The credit card statement from the Bank of New York lists an April 8, 1992 charge made by the American Hair Force as having an Anaheim, California location. However, the American Hair Force is Mr. Hyatt's barber in Las Vegas. Mr. Hyatt has never visited an American Hair Force Shop in Anaheim, California, if one exists. The Anaheim, California location is probably the location of the billing office of the American Hair Force, not the location frequented by Mr. Hyatt. Here too, the FTB recognizes the inaccuracy of the credit card statements because the FTB fails to list this April 8, 1992 date as assigned to a California location.

The credit card statement from the Bank of New York lists a May 26, 1992 charge for Mr. Hyatt's stay-over of a week before, on May 21, 1992. However, Exhibit A to the April 1, 1996 FTB letter alleges a verified California location on May 26, 1992 without explanation on Exhibit B, presumably from the Bank of New York credit card statement. Notwithstanding the challenge to the FTB allegation of a May 19, 1992 verified California location, discussed below, it is clearly improper to allege two different verified California locations for both the actual stopover (May 19, 1992) and for the credit card charge date one week later (May 26, 1992). This is another example of the undependability of the dates on the charge card statements and the grossly misleading nature of the FTB analysis.

Many of the FTB's credit card charge assignments to California support Mr. Hyatt's Nevada residency. The FTB has assigned to California transactions for California motels, hotels, and restaurants that are listed on the credit card statements. However, such transactions are clearly for temporary or transitory trips to California and hence further establish California nonresidency, not California residency. It is well recognized that motels, hotels, and restaurants are used when one is away from home.

The calendar produced by the FTB in its April 1, 1996 letter is of little relevance. It ascribes days of California presence to days in which Mr. Hyatt's presence was temporary or transitory, such as days where he sought medical treatment and days where he used LAX to make direct flights. Further, the SBE has long recognized the fallibility of FTB schedules, even noting that "unknown" time (i.e, unascribed time) can well represent time spent at the taxpayer's home (in Mr. Hyatt's case, in Las Vegas), where the taxpayer is less likely to have incurred expenditures identifying his presence.[94] Given the Form 3805F filed by Mr. Hyatt (as clarified in subsequent materials provided to the FTB) and the facts set forth in this letter, the FTB schedule will be given little consideration by the SBE.

---

[94]    See, e.g., Appeal of Bright, David E. and Dolly D. (7/22/58).

H 08751

0296-00053
RJN0127

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 52

Other errors abound in the FTB letters. For example, the April 1, 1996 FTB letter states (at page 2) that "Mr. Hyatt does not have a business license on file with the City of Las Vegas." Enclosed is a copy of Mr. Hyatt's business license. The same FTB letter states that Mr. Hyatt had a California driver's license valid through March 26, 1993. As the FTB was previously informed (and ignored), Mr. Hyatt had to surrender his California driver's license to the Nevada DMV in November 1991 in order to get his Nevada driver's license. The April 1, 1996 FTB letter notes that Mr. Hyatt changed voter registration after his move. Mr. Hyatt did not change voter registration when he moved; Mr. Hyatt was not registered to vote in California immediately prior to his move.

The April 1, 1996 FTB letter states that title on the La Palma property did not pass to Grace Jeng until 1993. However, title passed to Grace Jeng on Oct. 1, 1991, the date that the grant deed to Mr. Hyatt's former house was executed and delivered to Ms. Jeng.[95]

The same FTB letter states that Mr. Hyatt was hospitalized for most of February 1992. However, he was hospitalized for only 10 days in February 1992. As addressed in Section III, this hospitalization was for a temporary or transitory reason, he immediately returned home to Las Vegas.

The December 26, 1995 FTB letter states that Mr. Hyatt provided information to the press about his new residence. This is erroneous. Mr. Hyatt never gave any information to the press about the location of his residence, only that he lived in Las Vegas. Almost five years later, Mr. Hyatt still carefully protects the confidentiality of his residence address.

The same letter (at page 4) states that Mr. Hyatt "began looking" for a house to purchase in Las Vegas in December of 1991. This also is erroneous. Mr. Hyatt made his first formal purchase offer on a house in Las Vegas in December 1991, but Mr. Hyatt "began looking" for a house to purchase in Las Vegas immediately after he moved to Las Vegas in September 1991, about two and one-half months prior to his first purchase offer.

The December 26, 1995 FTB letter then asserts that the fact that Mr. Hyatt began looking for a house to purchase in Las Vegas in December of 1991 does not support his residency for 1991. Such an assertion is without merit. As previously noted, the FTB has admitted that Mr. Hyatt became a resident of Las Vegas on April 3, 1992 when he purchased

---

[95]  See California Civil Code § 1054.

H 08752

0296-00054
RJN0128

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 53

and moved into his Las Vegas house. The FTB's asserted irrelevance of Mr. Hyatt's house-hunting activity is contradictory to the admission of Mr. Hyatt's residency as of April 3, 1992. The FTB's admission of April 3, 1992 Las Vegas residency is based upon its recognition of Mr. Hyatt's intent to permanently live in Las Vegas. But, of course, Mr. Hyatt had his intent at least as of the date he made an offer to purchase his Las Vegas house, one month earlier than the house's purchase. In fact, Mr. Hyatt had his intent to live in Las Vegas at least as of the date he started making purchase offers on Las Vegas houses in December 1991. Further, Mr. Hyatt had his intent to live in Las Vegas as of September 1991 when he moved to Las Vegas and started to look for a house to purchase.

A taxpayer does not make house purchase offers without looking at houses to purchase and Mr. Hyatt began looking at Las Vegas houses to purchase as soon as he moved to Las Vegas in September, 1991. Clearly, Mr. Hyatt's house-hunting activities which culminated in the purchase of the Las Vegas house were highly relevant in determining his intent, which is the critical factor in establishing a taxpayer's domicile. The FTB is wrong to assert that Mr. Hyatt's house-hunting activities did not support his residency for 1991.

The December 26, 1995 FTB letter erroneously asserts that many of the Cal. Fed. accounts listed on page 8 of the letter are joint accounts. These accounts are not joint accounts; Mr. Hyatt is the account holder; the other persons named on the accounts are the designated beneficiaries of the accounts in case of Mr. Hyatt's death. The same letter notes the substantial balance in the Cal. Fed. Bank account #004-0513837-4 and complains that Mr. Hyatt had not reported this account when he had provided copies of the bank statements for 1991. The letter fails to note that the account was closed out in June 1991 in preparation for Mr. Hyatt's move to Las Vegas.

The December 26, 1995 FTB letter (at page 8) questions whether Mr. Hyatt had driven into California from Las Vegas to host a tour of the U.S. Aerospace Industry for the head of the Russian Space Agency. The FTB already has extensive credit card bills for hotel expenses, restaurant expenses, etc., confirming Mr. Hyatt's host activities. Enclosed is a copy of the guest list for the dinner Mr. Hyatt hosted in honor of the Director-General of the Russian Space Agency. Further, this event occurred in November - December 1992, eight months after Mr. Hyatt became a Las Vegas resident, according to the FTB.

The December 26, 1995 FTB letter (at page 9) states that the Matsushita Agreement and the Fujitsu Agreement must be California ties because they rely on California law. Both agreements refer to California law to resolve disputes between the parties, because, as noted in prior correspondence (and in the FTB letter), California has a greater body of law

H 08753

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 54

in the area of contracts. The reliance on California law is not indicative of California residency.

The December 26, 1995 FTB letter complains (at page 11) that there is no documentation of when Mr. Hyatt joined Congregation Ner Tamid in Las Vegas. The FTB has long had a copy of Mr. Hyatt's November 1991 check made out to the Temple for his 1991 membership fees.

As with the April 1, 1996 FTB letter, the December 26, 1995 FTB letter lists a number of dates on which the FTB alleges that Mr. Hyatt was present in California. As previously addressed for the April 1, 1996 FTB letter, all of the items listed are consistent with brief temporary or transitory visits to California to the extent that the items truly reflect Mr. Hyatt's presence in California. As demonstrated above, the credit card dates and places shown do not reliably indicate Mr. Hyatt was present in California and also do not reliably indicate the dates on which he may have been present.

The same April 1, 1996 FTB letter lists only a small sampling of Mr. Hyatt's Nevada activities during the same period (at page 13). It conveniently ignores critical evidence such as payments for utilities, telephone, rent, etc.

Both FTB letters contend that a post office box was renewed on April 16, 1992. Although the FTB letters do not expressly state by whom the renewal was made, the context of the contention strongly implies that the renewal was made by Mr. Hyatt. This is erroneous; the FTB knows (because the FTB was provided with a receipt) that the post office box was renewed by its new owner, not by Mr. Hyatt.

Exhibit A to the April 1, 1996 FTB letter alleges a California verified location on May 19, 1992 but fails to explain that this was a business trip originating with a flight from Las Vegas and terminating with a flight to Las Vegas. This is a clear Las Vegas connection, not a California connection. Assignment of this as a California connection defies established case law and shows the unreasonable latitude taken in the FTB letter.

Exhibit A to the April 1, 1996 FTB letter alleges a verified California location on May 26, 1992 without explanation on Exhibit B. This is probably derived from a credit card charge for a San Francisco stopover (on a flight originating in Las Vegas) on May 19-21, 1992 not on May 26, 1992. It is clearly improper to allege two different verified California locations for the same event, both for the actual stopover on May 19, 1992 and for the credit card charge date one week later on May 26, 1992.

H 08754

0296-00056
RJN0130

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 55

The December 26, 1995 FTB letter implies (at page 8) that Mr. Hyatt failed to report one of his Cal. Fed. accounts to the FTB when he provided copies of bank statements. This implication is mistaken. The December 26, 1995 FTB letter lists seven Cal. Fed. accounts which it implies were not disclosed to the FTB until October 17, 1995. These accounts were listed on a letter dated March 7, 1995 written by Mr. Hyatt to Cal. Fed. requesting account information. Mr. Hyatt's March 7, 1995 letter was included as an attachment to the September 22, 1995 response to the FTB. The FTB knew before October 17, 1995 about Mr. Hyatt's Cal. Fed. accounts and, in fact, Cal. Fed. account numbers 004-0513797-3 and 004-0513798-2 were even identified by the FTB in its May 31, 1995 letter. Further, Cal. Fed. provided only 1991-1992 account information for the two accounts described in the March 7, 1995 letter. Cal. Fed. account numbers 0513796-4, 0513799-1, 0513800-7, 0513837-4, and 0500874-3 all were closed out by Mr. Hyatt by June, 1991 (Account No. 044-0513799-1 was closed out in November, 1990). Cal. Fed. account No. 044-0513796-4 account was rolled into Cal. Fed. account No. 004-0513065-8. This account was totally inactive except for a de minimis deposit on September 4, 1991.

E. The FTB Fails to Establish Continued California Residency for Mr. Hyatt.

There is no discussion in the December 26, 1995 FTB letter that supports continuous California residency for Mr. Hyatt after his move to Las Vegas. The letter is replete with unsupported assertions. The April 1, 1996 FTB letter contains only the briefest analysis of Mr. Hyatt's residency (based upon Dobbs), which this protest has definitively refuted. The letter fails to establish a case of continuing California residency after Mr. Hyatt's move to Las Vegas in September 1991. The FTB ignores most of Mr. Hyatt's Nevada activities, such as his religious affiliation and his looking at and making offers on Las Vegas houses. The FTB completely ignores his pre-move activities undertaken in preparation for his move from California, such as closing or essentially deactivating all of his California bank accounts and California charge accounts. The FTB takes a few isolated events (e.g, a post office box that was allowed to expire, a few visits to California doctors for specific treatment of a malady, a few inactive California bank accounts), layers upon them sheer, unsupported speculation (e.g., that Mr. Hyatt paid rent on his Las Vegas apartment by mail from California) and conveniently labels Mr. Hyatt's Nevadan activities as formalisms (such as hunting for houses and making significant deposits on Las Vegas houses to purchase). The FTB has not established even a prima facie California residency case let alone a case of fraud. The FTB must withdraw its Notice of Proposed Assessment and may not impose any penalty on Mr. Hyatt for properly reporting his Nevada residency for the latter part of 1991 and all of 1992.

H 08755

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
June 20, 1996
Page 56

VI.     Conclusion.

The facts overwhelmingly demonstrate that Mr. Hyatt was domiciled in Nevada from September 26, 1991 until the present time. Even without regard to Mr. Hyatt's Nevada domicile, Mr. Hyatt has established that he has been a Nevada resident from September 26, 1991 until the present time. The FTB has not provided any credible argument or any credible evidence that Mr. Hyatt was a resident of California at any time from September 26, 1991 to the present. Thus, Mr. Hyatt is not taxable in California on any of his income earned from September 26, 1991 and is certainly not subject to any penalty for fraud or otherwise in connection with any income he earned from September 26, 1991.

VII.    Procedural Matters.

If this matter is not resolved by the submission of this letter, Mr. Hyatt requests an oral hearing to reconsider the proposed adjustments.

Further, Mr. Hyatt reserves the right and opportunity to supplement this protest with additional information and analysis including, but not limited to, affidavits from Mr. Hyatt's friends, family and business colleagues once Mr. Hyatt is given the opportunity to examine the FTB's audit files for the 1991 and 1992 taxable years and to determine the basis for the FTB's fraud claim. It is inefficient and burdensome to provide such information and analysis at this time given that we are unable to determine the basis of the FTB's assertions without the information the FTB alleges it has but to date has failed to provide to us.

Very truly yours,

Eugene G. Cowan
of RIORDAN & McKINZIE

cc:   Gil Hyatt
      Michael Kern, CPA

109677.1

H 08756

ATTACHMENTS

H 08757

0296-00059
RJN0133

Notice of Proposed Assessment

H 08758

0296-00060
RJN0134

04/29/96 ✏️002



STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**
P.O. BOX 942857
SACRAMENTO, CA 94267-0041
(800) 852-2753

**NOTICE OF
PROPOSED ASSESSMENT**

2

In accordance with the provisions of the California Revenue and Taxation Code, notice is hereby given that we propose to assess a deficiency for the taxable year shown below. Details of the proposed assessment are explained below.
See the reverse side for more information and an explanation of your rights and responsibilities.

GILBERT P HYATT
PO BX 60028
LAS VEGAS NV 89160

MIKE KERN, CPA
6100 ELTON
LAS VEGAS NV 89107

Date 04/23/96
D.L.N. 9261139901
Taxable Year 1991
NPA No. 0472825A
Account No.
Rev. Code 3671399CSF041901

| | |
|---|---|
| INCOME AS REPORTED OR REVISED | $ 17,727,743.00 |
| FILING STATUS - SINGLE | |
| TAX - TABLE | |
| TOTAL EXEMPTION CREDITS (AS ADJUSTED) | 1,945,940.00 |
| TOTAL TAX LIABILITY | 0.00 |
| LESS PREVIOUSLY ASSESSED | 1,945,940.00 |
| ADDITIONAL TAX | 69,469.00 |
| PENALTY: ACCURACY RELATED (FRAUD) | 1,876,471.00 |
| INTEREST TO 04/23/96 | 1,407,353.25 |
| TOTAL ADDITIONAL TAX, PENALTY AND INTEREST | $ 1,256,580.52 |
| | 4,540,404.77 |

SECTION 17014 OF THE CALIFORNIA REVENUE AND TAXATION CODE DEFINES A
RESIDENT AS

1. EVERY INDIVIDUAL WHO IS IN THIS STATE FOR OTHER THAN A
TEMPORARY OR TRANSITORY PURPOSE AND

2. EVERY INDIVIDUAL DOMICILED IN THIS STATE WHO IS OUTSIDE
THE STATE FOR A TEMPORARY OR TRANSITORY PURPOSE.

ANY INDIVIDUAL WHO IS A RESIDENT OF THIS STATE CONTINUES TO BE A RESIDENT
EVEN THOUGH TEMPORARILY ABSENT FROM THE STATE.

CONTINUED ON PAGE 2

ORIG—TAXPAYERS COPY          DUP—REMITTANCE COPY

FTB 5830-M-PIT (REV 4-95) SIDE 1

H 08759

0296-00061
RJN0135

04/29/96   07:45   FAX 7028702474          P B T K                    ☒003

FRANCHISE TAX BOARD          PAGE 2  NPA  1991        04728236 04/23/96

GILBERT P HYATT                                      ▮▮▮▮▮▮▮▮

WHETHER A TAXPAYER'S PURPOSE IN ENTERING OR LEAVING CALIFORNIA IS TEMPORARY
OR TRANSITORY IN CHARACTER IS ESSENTIALLY A QUESTION OF FACT TO BE DETER-
MINED BY EXAMINING ALL THE CIRCUMSTANCES OF EACH PARTICULAR CASE.  (APPEAL
OF ANTHONY V. AND BEVERLY ZUPANOVICH, CAL. ST. BD. OF EQUAL., JAN.6, 1976.)
THE CONNECTIONS WHICH A TAXPAYER MAINTAINS WITH THIS AND OTHER STATES ARE
AN IMPORTANT INDICATION OF WHETHER HIS/HER PRESENCE IN OR ABSENCE FROM
CALIFORNIA IS TEMPORARY OR TRANSITORY IN CHARACTER.  (APPEAL OF RICHARD L.
AND KATHLEEN K. HARDMAN, CAL. ST. BD. OF EQUAL., AUG. 19, 1975.)  SOME OF
THE MANY CONTACTS CONSIDERED RELEVENT ARE THE MAINTENANCE OF A FAMILY HOME,
BANK ACCOUNTS, BUSINESS RELATIONSHIPS, VOTING REGISTRATION, POSSESSION OF A
LOCAL DRIVER'S LICENSE, AND OWNERSHIP OF REAL PROPERTY.  (APPEAL OF BERNARD
AND HELEN FERNANDEZ, CAL. ST. BD. OF EQUAL., JUNE 2, 1971.)

WE ASSESSED THE FRAUD PENALTY AS PROVIDED BY CALIFORNIA REVENUE AND
TAXATION CODE SECTION 19164(B), FORMERLY SECTION 18685(B).  THIS PENALTY
CONFORMS TO INTERNAL REVENUE CODE SECTION 6663, WHICH STATES THAT IF ANY
PART OF ANY UNDERPAYMENT OF TAX REQUIRED TO BE SHOWN ON A RETURN IS DUE TO
FRAUD, THERE SHALL BE ADDED TO THE TAX AN AMOUNT EQUAL TO 75 PERCENT OF
THE PORTION OF THE UNDERPAYMENT WHICH IS ATTRIBUTABLE TO FRAUD.  WE
DETERMINED THAT THE ENTIRE UNDERPAYMENT IS DUE TO FRAUD.

H 08760

0296-00062
RJN0136

Aug-18-97 06:21P WILL~~MS                               71  468-9043        P.01

PRIVALEGED COMMUNICATION **FILE COPY**

GIL HYATT
P.O. BOX 81230
LAS VEGAS, NV 89180-1230
PHONE: (702) 871-9899

## TELECOPIER COVER SHEET

DATE: August 18, 1997

TO:   Eugene Cowan, Esq.; Riordan and McKenzie       (213) 229-8550

SUBJECT:  Hyatt v. FTB

NUMBER OF PAGES (INCLUDING THIS COVER SHEET): 5.

PRIVALEGED COMMUNICATION          -1-

EC 07678

2609-0001

RJN0137

Aug-18-97 06:21P WILL MS                    7? 468-9043           P.02



STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**          **NOTICE OF**
PO BOX 942867                    **PROPOSED ASSESSMENT**          2
SACRAMENTO CA 94267-0041
TELEPHONE: (800) 852-2753

In accordance with the provisions of the Revenue and Taxation Code, notice is hereby given that we propose to assess a deficiency
for the taxable year shown below. Details of the proposed assessment are explained below.
SEE SIDE 2 FOR MORE INFORMATION AND AN EXPLANATION OF YOUR RIGHTS AND RESPONSIBILITIES.

|  |  |
|---|---|
| Date | 08/14/97 |
| D.L.N. | 0000000000 |
| Taxable Year | 1992 |
| NPA No. | 04340945 |
| Account No. | |
| Rev. Code | 3671397CLE080601 |

GILBERT P HYATT
PO BX 81230
LAS VEGAS NV 89180-1230

MR. EUGENE G. COWAN
RIORDAN & MCKINZIE
300 S GRAND AV 29TH
LOS ANGELES CA 90071

INCOME AS REPORTED OR REVISED
  FEDERAL ADJUSTED GROSS INCOME                          $        0.00
  ITEMIZED DEDUCTIONS ALLOWED            84,973,440.00
REVISED TAXABLE INCOME                      -58,968.00        84,914,472.00
FILING STATUS - SINGLE                                       84,914,472.00
TAX - TABLE
TOTAL EXEMPTION CREDITS (AS ADJUSTED)                         9,336,332.00
TAX TO BE APPORTIONED                                             0.00
APPORTIONMENT FACTOR                                         9,336,332.00
APPORTIONED TAX                                                 0.6072
TOTAL TAX LIABILITY                                          5,669,021.00
LESS PREVIOUSLY ASSESSED                                     5,669,021.00
ADDITIONAL TAX                                                    0.00
PENALTY: FRAUDULENT FAILURE TO FILE                         5,669,021.00
INTEREST TO 08/14/97                                        4,251,765.75
TOTAL ADDITIONAL TAX, PENALTY AND INTEREST           $     14,115,941.51
                                                            4,195,154.76

SECTION 17014 OF THE CALIFORNIA REVENUE AND TAXATION CODE DEFINES A
RESIDENT AS:

    1.  EVERY INDIVIDUAL WHO IS IN THIS STATE FOR OTHER THAN A
       TEMPORARY OR TRANSITORY PURPOSE; AND

    2.  EVERY INDIVIDUAL DOMICILED IN THIS STATE WHO IS OUTSIDE
       THE STATE FOR A TEMPORARY OR TRANSITORY PURPOSE.

ANY INDIVIDUAL WHO IS A RESIDENT OF THIS STATE CONTINUES TO BE A RESIDENT
EVEN THOUGH TEMPORARILY ABSENT FROM THE STATE.

CONTINUED ON PAGE 2

WHITE - ORIGINAL - KEEP THIS COPY FOR YOUR RECORDS
BLUE — RETURN THIS COPY WITH YOUR PAYMENT

FTB 9430-N-PIT (REV 2-96) SIDE 1

EC 07679

2609-0002

RJN0138

Aug-18-97 06:21P WILLI  1S                    71  168-9043         P.03

# General Information

This Notice of Proposed Assessment advises you that we intend to assess additional tax and/or penalties. To allow you time to review and respond to this notice, we will take no further action for 60 days from the date of this notice.

### Agree

IF YOU AGREE with this proposed assessment, please pay the amount of additional tax, penalties, and interest shown on Side 1. Full payment received within 10 days from the date of this notice will ensure that no additional interest will be charged.

### Disagree

IF YOU DO NOT AGREE with this proposed assessment, you may file a protest with the Franchise Tax Board WITHIN 60 DAYS FROM THE DATE THIS NOTICE WAS MAILED. Otherwise, this proposed assessment will become final at the end of the 60-day period and you will be billed for the amount due.

FILING A PROTEST WILL NOT STOP THE COMPOUNDING OF INTEREST. If you file a timely protest, you may pay the additional tax, penalties, and interest to stop the further compounding of interest without your right to contest the disputed amount.

### Payment Procedure

To receive proper credit for your payment, do the following:

1. Write a check or have a money order issued payable to Franchise Tax Board.
2. On the check or money order write your social security number and the taxable year shown on Side 1 of this notice.
3. Attach the check or money order to the blue copy of this notice.
4. Mail the blue copy of this notice and the check or money order to

    FRANCHISE TAX BOARD
    PO BOX 942867
    SACRAMENTO CA 94267-0041

### Taxpayers' Rights Advocate

The Franchise Tax Board has a Taxpayers' Rights Advocate who reviews those cases where taxpayers are unable to resolve their problems with the Franchise Tax Board through normal channels. Contacting the Taxpayers' Rights Advocate does not constitute a protest and does not extend the period of time for you to protest. You may exercise your protest rights only by following the statutory protest procedure, as summarized in this notice.

To contact the Taxpayers' Rights Advocate, do one of the following:

1. Mail your correspondence to

    ATTENTION: TAXPAYER ADVOCATE BUREAU
    FRANCHISE TAX BOARD
    PO BOX 1468
    SACRAMENTO CA 95812-1468; OR

2. FAX your correspondence to

    (916) 845-6614.

For Privacy Notice, see form FTB 1131.

### Protest Procedure

Your protest must be in writing and clearly state that a protest is being made. It must also state the specific grounds for the protest. The protest must be filed WITHIN 60 DAYS FROM THE DATE THIS NOTICE WAS MAILED and include the following information:

1. Your name and address.
2. Your social security number.
3. Amount(s) and taxable year you are protesting.
4. Statement of facts.
5. Points in support of your position.
6. An explanation of why the Franchise Tax Board's action is wrong.
7. Your signature or your authorized representative's signature.
8. Your daytime telephone number or your authorized representative's daytime telephone number.
9. A copy of this Notice of Proposed Assessment.

If a representative is used at any time with respect to the protest process, a power of attorney appointing the representative must be provided.

Mail the protest to

    ATTENTION: PROTEST SECTION
    FRANCHISE TAX BOARD
    PO BOX 942867
    SACRAMENTO CA 94267-5540.

The Franchise Tax Board will reconsider the proposed adjustments and, if requested in the protest, grant an oral hearing. You have the right to have your authorized representative represent you at the hearing. We will notify you of the decision on your protest when a determination is made.

---

## TELEPHONE ASSISTANCE

Our regular toll-free telephone service is available from 7:00 a.m. until 8:00 p.m. Monday - Friday from the first working day in January through April 15. The best times to call are between 7:00 a.m. and 10:00 a.m. and between 6:00 p.m. and 8:00 p.m. Service is also available from 8:00 a.m. until 5:00 p.m. on the two Saturdays prior to April 15. After April 15, service is available Monday through Friday between 8:00 a.m. and 5:00 p.m.

| | |
|---|---|
| From within the United States, call | 1-800-852-5711 |
| From outside the United States, call (not toll-free) | 1-916-845-6500 |
| For hearing impaired with TDD, call | 1-800-822-6268 |

FTB 5830-M-PIT (REV 2 96) SIDE 2

EC 07680

Aug-18-97 06:22P WILLIAMS                    71  468-9043          P.04

FRANCHISE TAX BOARD             PAGE 2  NPA  1992           04340945 08/14/97

GILBERT P HYATT

THE TERM "DOMICILE" HAS BEEN DEFINED AS THE ONE LOCATION WITH WHICH FOR
LEGAL PURPOSES A PERSON IS CONSIDERED TO HAVE THE MOST SETTLED AND
PERMANENT CONNECTION, THE PLACE WHERE HE/SHE INTENDS TO REMAIN AND TO
WHICH, WHENEVER HE/SHE IS ABSENT, HE/SHE HAS THE INTENTION OF RETURNING.
(WHITTELL V. FRANCHISE TAX BOARD, 231 CAL. APP. 2D 278, 284  41 CAL. RPTR.
673  (1964).)  A PERSON MAY HAVE ONLY ONE DOMICILE AT A TIME, (WHITTELL V.
FRANCHISE TAX BOARD, SUPRA), AND HE/SHE RETAINS THAT DOMICILE UNTIL HE/SHE
ACQUIRES ANOTHER ELSEWHERE (IN RE: MARRIAGE OF LEFF, 25 CAL. APP. 3D 630,
642  102 CAL. RPTR. 195  (1972).  THE ESTABLISHMENT OF A NEW DOMICILE
REQUIRES ACTUAL RESIDENCE IN A NEW PLACE AND THE INTENTION TO REMAIN THERE
PERMANENTLY OR INDEFINITELY. (ESTATE OF PHILLIPS, 269 CAL. APP. 2D 656,
659  75 CAL. RPTR. 301 (1969).)  ONE'S ACTS MUST GIVE CLEAR PROOF OF A
CONCURRENT INTENTION TO ABANDON THE OLD DOMICILE AND ESTABLISH A NEW ONE.
(CHAPMAN V. SUPERIOR COURT, 162 CAL. APP. 2D 421, 426-427 (328 P.2D)
(1958).)

WHETHER A TAXPAYER'S PURPOSE IN ENTERING OR LEAVING CALIFORNIA IS TEMPORARY
OR TRANSITORY IN CHARACTER IS ESSENTIALLY A QUESTION OF FACT TO BE DETER-
MINED BY EXAMINING ALL THE CIRCUMSTANCES OF EACH PARTICULAR CASE.  (APPEAL
OF ANTHONY V. AND BEVERLY ZUPANOVICH, CAL. ST. BD. OF EQUAL., JAN.6, 1976.)
THE CONNECTIONS WHICH A TAXPAYER MAINTAINS WITH THIS AND OTHER STATES ARE
AN IMPORTANT INDICATION OF WHETHER HIS/HER PRESENCE IN OR ABSENCE FROM
CALIFORNIA IS TEMPORARY OR TRANSITORY IN CHARACTER.  (APPEAL OF RICHARD L.
AND KATHLEEN K. HARDMAN, CAL. ST. BD. OF EQUAL., AUG. 19, 1975.)  SOME OF
THE MANY CONTACTS CONSIDERED RELEVENT ARE THE MAINTENANCE OF A FAMILY HOME,
BANK ACCOUNTS, BUSINESS RELATIONSHIPS, VOTING REGISTRATION, POSSESSION OF A
LOCAL DRIVER'S LICENSE, AND OWNERSHIP OF REAL PROPERTY.  (APPEAL OF BERNARD
AND HELEN FERNANDEZ, CAL. ST. BD. OF EQUAL., JUNE 2, 1971.)

WE CONSIDER YOU TO BE A RESIDENT OF THIS STATE THROUGH APRIL 2, 1992 AND,
AS SUCH, YOU ARE TAXABLE ON INCOME FROM ALL SOURCES THROUGH THAT DATE.

WE HAVE NO RECORD OF RECEIVING YOUR PERSONAL INCOME TAX RETURN FOR THE
YEAR LISTED ABOVE.  WE HAVE COMPUTED YOUR LIABILITY BASED ON INFORMATION
AVAILABLE FROM EMPLOYERS, FEDERAL RETURNS UNDER AUTHORIZATION OF SECTION
6103(D) OF THE INTERNAL REVENUE CODE, OR OTHER AVAILABLE SOURCES.

THE FRAUDULENT FAILURE TO FILE A RETURN PENALTY IS ASSESSED IN ACCORDANCE
WITH CALIFORNIA REVENUE AND TAXATION CODE SECTION 18681(D), RENUMBERED AS
SECTION 19131(D).  THIS PENALTY IS CALCULATED AS 75% OF THE UNDERPAID TAX.

SEE THE ENCLOSED N/R EXHIBIT.

ENCLOSURE(S)

EC 07681

Aug-18-97 06:22P WILLI^MS                71' 468-9043          P.05

STATE OF CALIFORNIA                                        H/R EXHIBI
FRANCHISE TAX BOARD                                        08/04/9'
                                                           CLM

                    NONRESIDENT / PART-YEAR RESIDENT
                    ADJUSTED GROSS INCOME (AGI)
                              AND
                    APPORTIONMENT FACTOR
                         COMPUTATIONS
                            FOR
                 TAXABLE YEAR ENDING : 12 / 92

GILBERT P HYATT                               ACCOUNT NO. : ███████

ADJUSTED GROSS INCOME COMPUTATION :

                                         TOTAL AGI      CALIFORNIA AGI

AMOUNTS AS REPORTED OR REVISED             $.00              $.00
PROPOSED CHANGES :
   FEDERAL ADJUSTED GROSS INCOME      84,973,440.00          0.00
   PHILIPS PAYMENT 1/15/92                  0.00        48,780,951.00
   CKI PAYMENT 2/3/92                       0.00         2,975,787.00
   PRORATION OF SCH C EXP. ALLOWED          0.00          -161,552.00

AMOUNTS AS REVISED BY THIS NOTICE     $84,973,440.00    $51,595,186.00


APPORTIONMENT FACTOR COMPUTATION :

   CALIFORNIA AGI    DIVIDED BY    TOTAL AGI    =    APPORTIONMENT FACTOR
   $51,595,186.00        /      $84,973,440.00  =         0.6072


NOTE :     TOTAL ADJUSTED GROSS INCOME IS DETERMINED AS THOUGH YOU WERE A
           CALIFORNIA RESIDENT FOR THE ENTIRE YEAR.


                                                EC 07682


                                                        2609-0005
                                                        RJN0141

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

ORANGE COUNTY OFFICE

605 TOWN CENTER DRIVE
SUITE 1500
COSTA MESA, CALIFORNIA 92626
(714) 433-2900
FAX (714) 549-3244

EUGENE G. COWAN
DIRECT DIAL
(213) 229-8515

CALIFORNIA PLAZA
300 SOUTH GRAND AVENUE
TWENTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90071
TELEPHONE (213) 629-4824
FAX (213) 229-8550

WESTLAKE OFFICE

5743 CORSA AVENUE, SUITE 116
WESTLAKE VILLAGE, CA 91362
(818) 706-1800   (805) 496-4688
FAX (818) 706-2956

RICHARD J. RIORDAN
(RETIRED)

FILE NO.

October 10, 1997

08-160-002

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

UNDOCKETED
OCT 20 1997
PROTEST

Franchise Tax Board
Attention: Protest Section
P.O. Box 942867
Sacramento, California 94267-5540

Re:   Gilbert Hyatt -- SSN: ███████
      Protest of Notice of Proposed Assessment for 1992 Taxable Year

Dear Franchise Tax Board:

The taxpayer, Gilbert Hyatt, protests the Notice of Proposed Assessment dated August 14, 1997 (NPA No. 04340945) ("1992 NPA") and the corresponding final audit report dated April 10, 1997 ("1992 Report") concerning his 1992 taxable year. Mr. Hyatt contends that no amount of tax is owed to the Franchise Tax Board ("FTB") for his 1992 taxable year and that the fraudulent failure to file penalty or any penalty cannot properly be imposed.

The legal issue to be decided in this matter is the same as that arising from the Notice of Proposed Assessment dated April 23, 1996 (and corresponding audit report dated December 26, 1995) concerning Mr. Hyatt's 1991 taxable year. The issue to be decided is whether Mr. Hyatt was a California resident from the period of September 26, 1991 through April 2, 1992 for California income tax purposes. The FTB has admitted that on April 3, 1992, the date Mr. Hyatt closed his purchase and moved into his house in Las Vegas, Nevada, he became a California nonresident.[1]

---

[1]       See the 1992 Report.

FTB-103952

RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
October 10, 1997
Page 2

Mr. Hyatt protested the Notice of Proposed Assessment for his 1991 year pursuant to a letter and attachments dated June 20, 1996 (the "1991 Protest Letter"). The 1991 Protest Letter establishes fully that Mr. Hyatt was a Nevada domiciliary and resident from September 26, 1991 to the present. The issues addressed in the 1991 Protest Letter are the same as those raised for Mr. Hyatt's 1992 taxable year by the FTB. Therefore, Mr. Hyatt incorporates his 1991 Protest Letter into this letter protesting the 1992 NPA, and along with the information contained in this letter, the 1991 Protest Letter shall serve as Mr. Hyatt's protest to the 1992 NPA. A copy of the 1991 Protest Letter is enclosed.

Despite correspondence to the FTB dated July 17, 1997 (a copy of which is enclosed) notifying the FTB of an additional error regarding Mr. Hyatt's 1992 income in the computation of Mr. Hyatt's tax liability for 1992 contained in the 1992 Report, such error has been repeated in the 1992 NPA. The computation of Mr. Hyatt's 1992 alleged tax liability is inherently inconsistent with the position taken with respect to Mr. Hyatt's residency in the 1992 Report and 1992 NPA. The 1992 Report and the 1992 NPA allege that Mr. Hyatt was a resident of California until April 3, 1992. Therefore, the 1992 Report and the 1992 NPA should have calculated the alleged 1992 California income tax liability by including income received by Mr. Hyatt through April 2, 1992 in the apportionment formula attached to the 1992 Report and 1992 NPA. Mr. Hyatt requests that the FTB make an immediate correction in its computation of the alleged 1992 tax liability such that it is consistent with the 1992 Report and the 1992 NPA.

Mr. Hyatt received $26,895,114 in income from January 1, 1992 to April 2, 1992 ($2,975,787 from Oki and $23,919,327 from Philips[2]). The 1992 Report and 1992 NPA compute the apportionment factor assuming Mr. Hyatt received one payment of $48,780,951 from Philips on January 15, 1992. This is an error. The $48,780,951 amount actually reflects the entire amount Mr. Hyatt received in all of 1992 from Philips. As noted above, he only received $23,919,327 through April 2, 1992 from Philips. Based upon the 1992 Report and 1992 NPA

---

[2]   $13,866,465.55 received on January 14, 1992, $10,000,000 received on January 15, 1992, and $52,861.40 received on February 12, 1992.

FTB-103953

0319-00002
RJN0143




RIORDAN & McKINZIE
A PROFESSIONAL LAW CORPORATION

Franchise Tax Board
October 10, 1997
Page 3

(notwithstanding Mr. Hyatt's contention that no amount is owed for 1992), the alleged 1992 apportionment factor and tax liability should have been determined as follows:

| | |
|---|---:|
| Philips Payment 1/14/92 | $13,866,465.55 |
| Philips Payment 1/15/92 | 10,000,000.00 |
| Philips Payment 2/12/92 | 52,861.40 |
| Oki Payment 2/3/92 | 2,975,787.00 |
| Less proration of Schedule C Expenses (25%) | < 161,552.00 > |
| Revised Adjusted Gross Income | $ 26,895,113.95 |

Revised California adjusted gross income divided by revised total adjusted gross income

| | | | |
|---|:---:|---|---:|
| $ 26,895,113.95 | / | $84,973,440.00 | .3165 |

| | |
|---|---:|
| Tax to be apportioned | $ 9,336,332.00 |
| Apportionment factor | .3165 |
| Net tax | $2,955,061.00 |
| Penalties: Fraudulent Failure to File | $2,216,296.00 |
| FTB Alleged Total Tax Liability | $5,171,357.00 |

Please revise the 1992 NPA accordingly.

If the 1992 NPA is not resolved by the submission of this written protest, Mr. Hyatt requests an oral hearing to reconsider the proposed adjustments.

Very truly yours,

Eugene G. Cowan
of RIORDAN & McKINZIE

EGC:pam
Enclosures
cc:    Gilbert P. Hyatt (w/o encls.)
       Michael Kern, CPA (w/o encls.)
186523.3

FTB-103954

0319-00003
RJN0144

01/21/98 WED 11:16 FAX [TX/RX NO 6143] TH 10:50 01/22/98 A Bus & Tax B @006
01/20/98, 11:19 FTB-LEGAL → 86478134 NO. 107 084

1  COMP
   Thomas L. Steffen (1300)
2  Mark A. Hutchison (4639)
   HUTCHISON & STEFFEN
3  530 South Fourth Street
   Las Vegas, NV 89101
4  (702) 385-2500

5  Attorneys for Plaintiff

6

**FILED**

JUN 6  4 03 PM '93

*[signature]*
CLERK

7                      DISTRICT COURT

8                  CLARK COUNTY, NEVADA

9
   GILBERT P. HYATT,                    Case No.  A382999
10                                        Dept. No.      XII
          Plaintiff,                      Docket No.     R
11
       v.
12                                        **COMPLAINT**
   FRANCHISE TAX BOARD OF THE
13  STATE OF CALIFORNIA, and DOES         **Jury Trial Demanded**
   1-100, inclusive,
14                                        **Exempt from Arbitration:**
          Defendants.                     **Declaratory Relief, Significant**
15                                        **Public Policy and Amount in Excess**
                                          **Of $40,000**
16

17       Plaintiff, Gilbert P. Hyatt, complains against defendants, and each of them, as follows:

18                                   **PARTIES**

19       1.  Plaintiff resides in Clark County, Nevada and has done so since September 26, 1991.

20       2.  Defendant Franchise Tax Board of the State of California (hereinafter "FTB") is a

21  governmental agency of the State of California with its principal office located in Sacramento,

22  California, and a district office located in Los Angeles, California. The FTB's function is to ensure

23  the collection of state income taxes from California residents and from income earned in California

24  by non-residents.

25       3.  The identity and capacities of the defendants designated as Does 1 through 100 are so

26  designated by plaintiff because of his intent by this complaint to include as named defendants every

27  individual or entity who, in concert with the FTB as an employee, representative, agent or

28  independent contractor, committed the tortious acts described in this complaint. The true names

HUTCHISON
& STEFFEN
530 S. FOURTH STREET
LAS VEGAS, NV 89101
(702) 385-2500
FAX (702) 385-2086

01/21/98 WED 11:16 FAX [TX/RX NO 6143]  007
01/20/98  11:20  FTB-LEGAL → 86478134  NO.107  D05

1   and capacities of these Doe defendants are presently known only to the FTB, who committed the

2   tortious acts in Nevada with the assistance of said Doe defendants who are designated by fictitious

3   names only until plaintiff is able, through discovery, to obtain their true identities and capacities;

4   upon ascertaining the true names and capacities of these Doe defendants, plaintiff shall promptly

5   amend this complaint to properly name them by their actual identities and capacities. For pleading

6   purposes, whenever this complaint refers to "defendants," it shall refer to these Doe defendants,

7   whether individuals, corporations or other forms of associations or entities, until their true names

8   are added by amendment along with particularized facts concerning their conduct in the

9   commission of the tortious acts alleged herein.

10      4. Plaintiff is informed and believes, and on that basis alleges, that defendants, in acting

11  or omitting to act as alleged, acted or omitted to act within the course and scope of their

12  employment or agency, and in furtherance of their employer's or principal's business, whether the

13  employer or principal be FTB or some other governmental agency or employer or principal whose

14  identity is not yet known; and that FTB and defendants were otherwise responsible and liable for

15  the acts and omissions alleged herein.

16      5. This action is exempt from the court-annexed arbitration program, pursuant to Rule 3,

17  because: (1) this is an action for, inter alia, declaratory relief; (2) substantial issues of public policy

18  are implicated concerning the sovereignty of the State of Nevada and the integrity of its territorial

19  boundaries as opposed to governmental agencies of another state who enter Nevada in an effort to

20  extraterritorially, arbitrarily and deceptively enforce their policies, rules and regulations on

21  residents of Nevada in general, and plaintiff Gilbert P. Hyatt in particular; and (3) the sums of

22  money and damages involved herein far exceed the $40,000.00 jurisdictional limit of the arbitration

23  program.

24      6. Plaintiff hereby requests a jury trial for his Second, Third, Fourth, and Fifth Causes of

25  Action.

26                          <u>SUMMARY OF CLAIMS</u>

27      7. Plaintiff, by this action, seeks: (1) declaratory relief under NRS 30.010 et seq. to

28  confirm plaintiff's status as a Nevada resident effective as of September 26, 1991 and continuing


HUTCHISON
& STEFFEN

- 2 -

RJN0146

[TX/RX NO 6143]
01/21/98  WED 11:17 FAX          A    Bus & Tax        B              @008
01/20/98     11:20    FTB-LEGAL → 86478134                    NO. 107    006

1  to the present and, correspondingly, his non-residency during said period in California; (2) recovery

2  of compensatory and punitive damages against the FTB and the defendants for invasion of

3  plaintiff's right of privacy resulting from their investigation in Nevada of plaintiff's residency,

4  domicile and place of abode and causing (a) an unreasonable intrusion upon plaintiff's seclusion,

5  (b) an unreasonable publicity given to private facts, and (c) casting plaintiff in a false light; and (3)

6  recovery of compensatory and punitive damages against the FTB and the defendants for their

7  outrageous conduct in regard to their investigation in Nevada of plaintiff's residency, domicile and

8  place of abode. The claims specified in this paragraph constitute five separate causes of action as

9  hereinafter set forth in this complaint.

10                     **FACTUAL BACKGROUND**

11                   **Plaintiff's Residency in Nevada**

12        8.  Plaintiff moved to the State of Nevada, County of Clark, and established full-time

13  residency here on September 26, 1991 and has remained a full-time, permanent resident since that

14  time. Prior to his relocation to Nevada, plaintiff resided in Southern California. Plaintiff is a

15  highly successful inventor. Specifically, plaintiff has been granted numerous important patents for

16  a wide range of inventions relating to computer technology. Plaintiff primarily works alone in the

17  creation and development of his inventions and greatly values his privacy both in his personal life

18  and business affairs. After certain of his important inventions were granted patents in 1990,

19  plaintiff began receiving a great deal of unwanted and unsolicited publicity, notoriety and attention.

20  To greater protect his privacy, to enjoy the social, recreational, and financial advantages Nevada

21  has to offer, and to generally enhance the quality of his life and environment, plaintiff relocated

22  to Nevada on September 26, 1991. This move took place after much consideration and almost an

23  entire year of planning.

24        9.  The following events are indicative of the fact that on September 26, 1991, plaintiff

25  commenced both his residency and intent to remain in Nevada, and a continuation of both down

26  to the present: (1) the sale of plaintiff's California home in October 1991; (2) his renting and

27  residing at an apartment in Las Vegas commencing in October 1991 and continuing until April

28  1992 when plaintiff closed the purchase of a home in Las Vegas; (3) in November 1991, plaintiff

HUTCHISON
& STEFFEN
530 E. FOURTH STREET
LAS VEGAS, NV 89101
(702) 385-2500
FAX (702) 385-2086

- 3 -

[TX/RX NO 0143]   09:0   THU 86/22/10
01/21/98   WED 11:18 FAX         A   Bus & Tax   B                    NO. 107   007
01/20/98   11:21   FTB-LEGAL → 86478134

1    registered to vote in Nevada, obtained a Nevada driver's license, and joined a religious

2    organization in Las Vegas; (4) plaintiffs' extensive search, commencing in December 1991, for a

3    new home in Las Vegas, and in the process utilizing the services of various real estate brokers; (5)

4    during the process of finding a home to purchase, plaintiff made numerous offers to buy; (6)

5    plaintiff's purchase of a new home in Las Vegas on April 3, 1992; (7) plaintiff maintained and

6    expanded his business interests from Las Vegas; and (8) plaintiff has, through the years from

7    September 26, 1991 and down to the present, contacted persons in high political office, in the

8    professions, and other walks of life, as a true Nevada resident of some renown would, not

9    concealing the fact of his Nevada residency.  In sum, plaintiff has substantial evidence, both

10   testimonial and documentary, in support of the fact of his full-time residency, domicile and place

11   of abode in Nevada commencing on September 26, 1991 and continuing to the present.

12   <u>The FTB and Defendants' Investigation of Plaintiff in Nevada</u>

13       10.  Because plaintiff was a resident of California for part of 1991, plaintiff filed a Part-

14   Year state income tax return with the State of California for 1991 (the "1991 Return").  Said return

15   reflects plaintiff's payment of state income taxes to California for income earned during the period

16   of January 1 through September 26, 1991.

17       11.  In or about June of 1993 — 21 months after plaintiff moved to Nevada — for reasons

18   that have never been specified, but are otherwise apparent, the FTB began an audit of the 1991

19   Return.  In or about July of 1993, as part of its audit, the FTB began to investigate plaintiff by

20   making or causing to be made numerous and continuous contacts directed at Nevada.  Initially, the

21   FTB sent requests to Nevada government agencies for information concerning plaintiff — a paper

22   foray that continued for the next several years.

23       12.  In or about January of 1995, FTB auditors began planning a trip to Las Vegas, the

24   purpose of which was to enhance and expand the scope of their investigation of plaintiff.  In March

25   of 1995, the FTB and defendants commenced a "hands on" investigation of plaintiff that included

26   unannounced confrontations and questioning about private details of plaintiff's life.  These

27   intrusive activities were directed at numerous residents of Nevada, including plaintiff's current and

28   former neighbors, employees of businesses and stores frequented by plaintiff, and alas, even his

HUTCHISON
& STEFFEN
430 S. FOURTH STREET
LAS VEGAS, NV 10101
(702) 385-2500
FAX (702) 385-2086

- 4 -

RJN0148

01/22/98  THU  09:50  [TX/RX NO 6143]
01/21/98  WED 11:18 FAX          A     Bus & Tax      B          ☑010
                                                        NO. 107    008
01/20/98    11:22    FTB-LEGAL → 86478134

1  trash collector!

2      13. Both prior and subsequent to the intrusive, "hands on" investigations described in

3  paragraph 12, above, the FTB propounded to numerous Nevada business and professional entities

4  and individual residents of Nevada "quasi-subpoenas" entitled "Demand to Furnish Information"

5  which cited the FTB's authority under California law to issue subpoenas and demanded that the

6  recipients thereof produce the requested information concerning plaintiff. Plaintiff is informed and

7  believes, and therefore alleges, that the FTB never sought permission from a Nevada court or any

8  Nevada government agency to send such "quasi-subpoenas" into Nevada where, induced by the

9  authoritative appearance of the inquisitions, many Nevada residents and business entities did

10  respond with answers and information concerning plaintiff.

11      14. Subsequent to the documentary and "hands on" forays into Nevada by the FTB and

12  defendants, the FTB also sent correspondence, rather than "quasi-subpoenas," to Nevada Governor

13  Bob Miller, Nevada Senator Richard Bryan and other government officials and agencies seeking

14  information regarding plaintiff and his residency in Nevada. Plaintiff is further informed and

15  believes, and therefore alleges, that the FTB intentionally sent unauthorized "quasi-subpoenas"

16  (i.e., "Demand to Furnish Information") to private individuals and businesses in a successful

17  attempt to coerce their cooperation through deception and the pretense of an authoritative demand,

18  while on the other hand, sending respectful letter requests for information to Nevada governmental

19  agencies and officials who undoubtedly would have recoiled at the attempt by the FTB to exercise

20  extraterritorial authority in Nevada through the outrageous means of the bogus subpoenas.

21      15. Plaintiff neither authorized the FTB's aforementioned documentary and pretentious

22  forays into Nevada, nor was plaintiff ever aware that such information was being sought in such

23  a manner until well after the "quasi-subpoenas" had been issued and the responses received.

24  Similarly, plaintiff had no knowledge of the FTB and defendants' excursions to Las Vegas to

25  investigate plaintiff or the FTB's correspondence with Nevada government agencies and officials

26  until well after such contacts had taken place. Upon information and belief, plaintiff alleges that

27  all of the above-described activities were calculated to enable the FTB to develop a colorable basis

28  for assessing a huge tax against plaintiff despite the obvious fact that the FTB was proceeding

Jetfax #594;Page 9/22          RJN0149

01/22/98  THU 10:50  [TX/RX NO 6143]

01/21/98  WED 11:19 FAX                    Bus & Tax

01/20/98    11:22    FTB-LEGAL → 86478134                           NO. 107   011
                                                                              009

against a bona fide resident of Nevada.

## Assessment for 1991

16. On April 23, 1996, after the FTB had completed its audit and investigation of the 1991 Return, the FTB sent a Notice of Proposed Assessment (i.e., a formal notice that taxes are owed) to plaintiff in which the FTB claimed plaintiff was a resident of California — not Nevada — until April 3, 1992. The FTB therefore assessed plaintiff California state income tax for the period of September 26 through December 31 of 1991 in a substantial amount. Moreover, the FTB also assessed a penalty against plaintiff in an amount almost equal to the assessed tax after summarily concluding that plaintiff's non-payment of the assessed tax, based upon his asserted residency in Nevada and non-residency in California, was fraudulent.

17. Plaintiff, who demonstrably is and was at all times pertinent hereto, a bona fide resident of Nevada should not be forced into a California forum to seek relief from the unjust and tortious attempts by the FTB to extort unlawful taxes from this Nevada resident. Plaintiff avers that the manufactured issue of his residency in Nevada for the period of September 26 through December 31 of 1991 should be determined in Nevada, the state of plaintiff's residence. The FTB is in effect attempting to impose an "exit tax" on plaintiff by coercing him into administrative procedures and possible future court action in California. The FTB has arbitrarily, maliciously and without support in law or fact, asserted that plaintiff remained a California resident until he purchased and closed escrow on a new home in Las Vegas on April 3, 1992. In a word, the FTB's prolonged and monumental efforts to find a way — any way — to effectively assess additional income taxes against plaintiff after he changed his residency from California to Nevada is based upon governmental greed arising from the FTB's eventual awareness of the financial success plaintiff has realized since leaving California and becoming a bona fide resident of the State of Nevada. The aforesaid date of Nevada residency accepted by the FTB with respect to the 1991 Report is over six months after plaintiff moved to Nevada with the intent to stay and began, he thought, to enjoy all the privileges and advantages of residency in his new state.

## The FTB's Continuing Pursuit of Plaintiff in Nevada

18. On or about April 1, 1996, plaintiff received formal notice that the FTB had

HUTCHISON
& STEFFEN
330 S. FOURTH STREET
LAS VEGAS, NV 89101
(702) 385-2800
FAX (702) 385-2086

-6-

RJN0150

[TX/RX NO 6143]
01/21/98  WED 11:20 FAX
01/20/98    11:23        FTB-LEGAL → 96478134
A    Bus & Tax    B
NO. 107    P10

1  commenced an investigation into the 1992 tax year and that its tentative determination was that

2  plaintiff would also be assessed California state income taxes for the period of January 1 through

3  April 3 of 1992.

4     19. On or about April 10, 1997 and May 12, 1997 respectively, plaintiff received notices

5  from the FTB that it would be issuing a formal "Notice of Proposed Assessment" in regard to the

6  1992 tax year in which it will seek back taxes from plaintiff for income earned during the period

7  of January 1 through April 2, 1992 and in addition would seek penalties for plaintiff's failure to

8  file a state income tax return for 1992.

9     20. Prior to the FTB sending the formal Notice of Proposed Assessment for the 1992 tax

10  year, a representative of the FTB stated to one of plaintiff's representatives that disputes over such

11  assessments by the FTB always settle at this stage as taxpayers do not want to risk their personal

12  financial information being made public. Plaintiff understood this statement to be a strong

13  suggestion by the FTB that he settle the dispute by payment of some portion of the assessed taxes

14  and penalties. Plaintiff refused, and continues to refuse to do so, as he has not been a resident of

15  California since his move to Nevada on September 26, 1991, and it remains clear to him that the

16  FTB is engaging in its highhanded tactics to extort "taxes and penalties" from him that he does not

17  legally or morally owe.

18     21. On or about August 14, 1997, plaintiff received a formal Notice of Proposed

19  Assessment for 1992. Despite the FTB's earlier written statements and findings that plaintiff

20  became a Nevada resident at least as of April 3, 1992 and its statement in such Notice of Proposed

21  Assessment that "We [the FTB] consider you to be a resident of this state [California] through

22  April 2, 1992," such notice proceeded to assess California state income taxes on plaintiff's income

23  for the entire year of 1992. Specifically, the FTB assessed plaintiff state income taxes for 1992

24  in an amount five times greater than that for 1991, assessed plaintiff a penalty almost as great as

25  the assessed tax for alleged fraud in claiming he was a Nevada resident during 1992, and stated that

26  interest accrued through August 14, 1997 (roughly the equivalent of the penalty) was also owed

27  on the assessed tax and penalty. In short, the State of California, through the FTB, sent plaintiff

28  a bill for the entire 1992 tax year, which was fourteen times the amount of tax it initially assessed

HUTCHISON
& STEFFEN
330 S. FOURTH STREET
LAS VEGAS, NV 89101
(702) 385-2500
FAX (702) 385-2086

- 7 -

Sent by: DOJ ATTY GEN OFC SAC 16TH FL    916 3224483;

RJN0151

[[TX/RX NO 0143]   09:00   THU 01/22/98
01/21/98  WED 11:20 FAX                           A    Bus & Tax         B                    013
01/20/98     11:23       FTB-LEGAL → 86478134                                    NO. 107   P11

1   for 1991, and in so doing asserted that plaintiff was "a California resident for the entire year."

2   Without explanation the FTB ignored its earlier finding and written acknowledgment that plaintiff

3   was a Nevada resident at least as of April 3, 1992. This outrage is a transparent effort to extort

4   substantial sums of money from a Nevada resident.

5      22. Plaintiff is informed and believes, and therefore alleges, that the FTB intends to engage

6   in a repeat of the "hands on," extraterritorial investigations directed at plaintiff within the State of

7   Nevada in an effort to conjure up a colorable basis for justifying its frivolous, extortionate Noticed

8   of Proposed Assessment for the 1992 tax year.

9      23. Plaintiff is informed and believes, and therefore alleges, that the FTB may continue to

10  assess plaintiff California state income taxes for the years 1993, 1994, 1995, 1996 and beyond

11  since the FTB has now disregarded its own conclusion regarding plaintiff's residency in Nevada

12  as of April 3, 1992, and is bent on charging him with a staggering amount of taxes, penalties and

13  interest irrespective of his status as a bona fide resident of Nevada. It appears from its actions

14  concerning plaintiff, that the FTB has embraced a new theory of liability that in effect declares

15  "once a California resident always a California resident" as long as the victim continues to generate

16  significant amounts of income. Thus, the FTB has raised an invisible equivalent of the iron curtain

17  that prohibits such residents from ever leaving the taxing jurisdiction of the FTB.

18                                   **The FTB's Motive**

19     24. Plaintiff is informed and believes, and therefore alleges, that the FTB has no credible,

20  admissible evidence that plaintiff was a California resident at anytime after September of 1991,

21  despite the FTB's exhaustive extraterritorial investigations in Nevada. The FTB has acknowledged

22  in its own reports that plaintiff sold his California home on October 1, 1991, that plaintiff rented

23  an apartment in Las Vegas from November 1991 until April 1992 and that plaintiff purchased a

24  home in Las Vegas in April 1992.

25     25. Plaintiff is informed and believes, and therefore alleges, that the assessments by the

26  FTB against plaintiff for 1991 and 1992 result from the fact that almost two years after plaintiff

27  moved from California to Nevada an FTB investigator read a magazine article about plaintiff's

28  wealth and the FTB thereafter launched its investigation in the hope of extracting a significant

HUTCHISON
& STEFFEN
930 S. FOURTH STREET
LAS VEGAS, NV 89101
(702) 385-2500
FAX (702) 385-2086

- 8 -

RJN0152

01/22/98 THU 09:50 [TX/RX NO 6143]
01/21/98 WED 11:21 FAX                    A     Bus & Tax     B                    ☑014
01/20/98    11:24   FTB-LEGAL → 86478134                              NO. 107   P1

1  settlement from plaintiff. Plaintiff is further informed and believes, and therefore alleges, that the

2  FTB has assessed a fraud penalty against plaintiff for the 1991 tax year and issued a Notice of

3  Proposed Assessment assessing plaintiff for the entire 1992 tax year and a fraud penalty for the

4  same year to intimidate plaintiff and coerce him into paying some significant amount of tax for

5  income earned after September 26, 1991, despite its awareness that plaintiff actually became a

6  Nevada resident at that time. Plaintiff alleges that the FTB's efforts to coerce plaintiff into sharing

7  his hard-earned wealth despite having no lawful basis for doing so, constitutes malice and

8  oppression.

9                                      **Jurisdiction**

10      26. This Court has personal jurisdiction over the FTB pursuant to Nevada's "long-arm"

11  statute, NRS 14.065 et seq., because of the FTB's tortious extraterritorial contacts and investigatory

12  conduct within the State of Nevada ostensibly as part of its auditing efforts to undermine plaintiff's

13  status as a Nevada resident, but in reality to create a colorable basis for maintaining that plaintiff

14  continued his residency in California during the period September 26, 1991 to December 31, 1991

15  and beyond.

16      27. Plaintiff is informed and believes, and therefore alleges, that the FTB has a pattern and

17  practice of entering into Nevada to investigate Nevada residents who were formerly residents of

18  California, and then assessing such residents California state income taxes for time periods

19  subsequent to the date when such individuals moved to and established residency in Nevada.

20                              **FIRST CAUSE OF ACTION**

21                                **(For Declaratory Relief)**

22      28. Plaintiff realleges and incorporates herein by reference each and every allegation

23  contained in paragraphs 1 through 27 above, as though set forth herein verbatim.

24      29. Pursuant to California law, in determining whether an individual was a resident of

25  California for a certain time period thereby making such individual's income subject to California

26  state income tax during such period, the individual must have been either domiciled in California

27  during such period for "other than a temporary or transitory purpose." See Cal. Rev. & Tax Code

28  § 17014. The FTB's own regulations and precedents require that it apply certain factors in

HUTCHISON
& STEFFEN
930 S. FOURTH STREET
LAS VEGAS, NV 89101
(702) 385-2500
FAX (702) 385-2086

- 9 -

RJN0153

01/22/98 THU 09:0_ [TX/RX NO 6143]
01/21/98 WED 11:22 FAX                    ^   Bus & Tax        B                    NO. 187   Ø015
01/20/98   13:25   FTB-LEGAL → 86478134                                                       P13

1  determining an individual's domicile and/or whether the individual's presence in California (or

2  outside of California) was more than temporary or transitory.

3       (a)   <u>Domicile</u>.

4          Domicile is determined by the individual's physical presence in California with

5  intent to stay or if absent temporarily from California an intent to return. Such intent is

6  determined by the acts and conduct of the individual such as: (1) where the individual is

7  registered to vote and votes; (2) location of the individual's permanent home; (3)

8  comparative size of homes maintained by the individual in different states; (4) where the

9  individual files federal income tax returns; (5) comparative time spent by the individual in

10  different states; (6) cancellation of the individual's California homeowner's property tax

11  exemption; (7) obtaining a driver's license from another state; (8) registering a car in

12  another state; (9) joining religious, business and/or social organizations in another state;

13  and (10) establishment of a successful business in another state by an individual who is self

14  employed.

15       (b)   <u>Temporary or Transitory Purpose</u>.

16          The following contacts which are similar although not identical to those used to

17  determine domicile are important in determining whether an individual was in California

18  (or left California) for a temporary or transitory purpose: (1) physical presence of the

19  individual in California in comparison to the other state or states; (2) establishment of a

20  successful business in another state by an individual who is self employed; (3) extensive

21  business interest outside of California and active participation in such business by the

22  individual; (4) banking activity in California by the individual is given some, although not

23  a great deal of, weight; (5) rental of property in another state by the individual; (6)

24  cancellation of the individual's California homeowner's property tax exemption; (7) hiring

25  professionals by the individual located in another state; (8) obtaining a driver's license from

26  another state; (9) registering a car in another state; (10) joining religious, business and/or

27  social organizations in another state; and (11) where the individual is registered to vote and

28  votes.

HUTCHISON
& STEFFEN
830 S. FOURTH STREET
LAS VEGAS, NV 89101
(702) 364-3000

- 10 -

[ITX/RX NO 6143]
01/21/98  WED 11:22 FAX    01/22/98 TH 10:50    A   Bus & Tax   B       Ø016
NO. 107  Ø14
01/20/98    11:25    FTB-LEGAL → 8647B134

30. The FTB's assessment of taxes and a penalty for 1991 is based upon the FTB's conclusion in the first instance that plaintiff did not become a resident of Nevada until April 3, 1992, the date on which plaintiff closed escrow on a new home in Las Vegas. In coming to such a conclusion, the FTB discounted or refused to consider a multitude of evidentiary facts which contradicted the FTB's conclusion, and were the type of facts the FTB's own regulations and precedents require it to consider. Such facts include, but are not limited to, the following: (1) plaintiff sold his California home on October 1, 1991; (2) plaintiff rented and resided at an apartment in Las Vegas from October 1, 1991 until April of 1992; (3) plaintiff registered to vote, obtained a Nevada's driver's license (thereby relinquishing his California driver's license), and joined a Las Vegas religious organization in November of 1991; (4) plaintiff terminated his California home owner's exemption effective October 1, 1991; (5) plaintiff began actively searching for a house to buy in Las Vegas, and submitted numerous offers on houses in Las Vegas, commencing in December of 1991; (6) plaintiff's offer to purchase a home in Las Vegas was accepted in March of 1992 and escrow closed on such purchase on April 3, 1992; and (7) plaintiff's new home in Las Vegas was substantially larger than the home in Southern California, which he sold in October of 1991.

31. An actual controversy exists as to whether plaintiff was a full-time resident of Nevada — not California — commencing on September 26, 1991 through December 31, 1991 and continuing thereafter through the year 1992 and beyond. Plaintiff contends that under either Nevada or California law, or both, he was a full-time, bona fide resident of Nevada throughout the referenced periods and down to the present, and that the FTB ignored its own regulations and precedents in finding to the contrary, and that the FTB has no jurisdiction to impose a tax obligation on plaintiff during the contested periods. Plaintiff also contends that the FTB had no authority to conduct an extraterritorial investigation of plaintiff in Nevada and no authority to propound "quasi-subpoenas" to Nevada residents and businesses, thereby seeking to coerce the cooperation of said Nevada residents and businesses through an unlawful and tortious deception, to reveal information about plaintiff. Plaintiff is informed and believes, and therefore alleges, that the FTB contends in all respects to the contrary.

HUTCHISON
& STEFFEN
150 S. FOURTH STREET
LAS VEGAS, NV 89101
(702) 385-2580
FAX (702) 385-2086

Sent by: DDJ ATTY GEN OFC SAC 16TH FL    916 3224483;    01/22/98 10:55AM;JetFax #594;Page 15/22

RJN0155

01/22/98 WED 10:50 TL [TX/RX NO 6143]
01/21/98 WED 11:23 FAX          A   Bus & Tax          B          @017
01/20/98    11:26    FTB-LEGAL → 86478134                   NO. 107  D15

32. Plaintiff therefore requests judgment of this Court declaring and confirming plaintiff's status as a full-time, bona fide resident of the State of Nevada effective from September 26, 1991 to the present; and for judgment declaring the FTB's extraterritorial investigatory excursions into Nevada, and the submission of "quasi-subpoenas" to Nevada residents without approval from a Nevada court or governmental agency, as alleged above, to be without authority and violative of Nevada's sovereignty and territorial integrity.

## SECOND CAUSE OF ACTION

### (For Invasion of Privacy — Unreasonable Intrusion Upon The Seclusion of Another)

33. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 27, and 29 through 31, above, as though set forth herein verbatim.

34. Plaintiff is informed and believes, and therefore alleges, that neighbors, businesses, government officials and others within Nevada with whom plaintiff has had and would reasonably expect in the future to have social or business interactions, were approached and questioned by the FTB and defendants who disclosed or implied that plaintiff was under investigation in California, and otherwise acted in such a manner as to cause doubts to arise concerning plaintiff's integrity and moral character. Moreover, as part of the audit/investigation in regard to the 1991 Return, plaintiff turned over to the FTB highly personal and confidential information with the understanding that it would remain confidential. The FTB even noted in its own internal documentation that plaintiff had a significant concern in regard to the protection of his privacy in turning over such information. At the time this occurred, plaintiff was still hopeful that the FTB was actually operating in good faith, a proposition that, as noted throughout this complaint, proved to be utterly false.

35. Plaintiff is informed and believes, and therefore alleges, that the FTB and defendants nevertheless violated plaintiff's right to privacy in regard to such information by revealing it to third parties and otherwise conducting an investigation in Nevada through which the FTB and defendants revealed to third parties personal and confidential information, which plaintiff had every right to expect would not be revealed to such parties.

HUTCHISON
& STEFFEN
500 S. FOURTH STREET
LAS VEGAS, NV 89101
(702) 385-2500
FAX (702) 385-2086

ent by: 502 Atty Gen OFC SAC 16TH FL     916 3224483;    01/22/98 10:55AM;Jetfax #594;Page 16/22

RJN0156

36. Plaintiff is informed and believes, and therefore alleges, that the FTB and defendants' extensive probing and investigation of plaintiff, including their actions both occurring within Nevada and directed to Nevada from California, were performed with the intent to harass, annoy, vex, embarrass and intimidate plaintiff such that he would eventually enter into a settlement with the FTB concerning his residency during the disputed time periods and the taxes and penalties allegedly owed. Such conduct by the FTB and defendants did in fact harass, annoy, vex and embarrass Hyatt, and syphon his time and energies from the productive work in which he is engaged.

37. Plaintiff is informed and believes, and therefore alleges, that the FTB and defendants through their investigative actions, and in particular the manner in which they were carried out in Nevada, intentionally intruded into the solitude and seclusion which plaintiff had specifically sought by moving to Nevada. The intrusion by the FTB and defendants was such that any reasonable person, including plaintiff, would find highly offensive.

38. As a direct, proximate, and foreseeable result of the FTB and defendants' aforementioned invasion of plaintiff's privacy, plaintiff has suffered actual and consequential damages in a total amount in excess of $10,000.

39. Plaintiff is informed and believes, and therefore alleges, that said invasion of plaintiff's privacy was intentional, malicious, and oppressive in that such invasion was despicable conduct by the FTB and defendants entered into with a willful and conscious disregard of plaintiff's rights, and the efficacious intent to cause him injury. Plaintiff is therefore entitled to an award of punitive damages against the FTB and defendants in an amount sufficient to satisfy the purposes for which such damages are awarded.

## THIRD CAUSE OF ACTION

### (For Invasion of Privacy — Unreasonable Publicity Given To Private Facts)

40. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 27, 29 through 31, and 34 through 37, above, as though set forth herein verbatim.

41. As set forth above, plaintiff revealed to the FTB highly personal and confidential

HUTCHISON
& STEFFEN
370 S. POWER STREET
LAS VEGAS, NV 89101
(702) 385-2900
Fax (702) 385-2086

RJN0157

1  information at the request of the FTB as an ostensible part of its audit and investigation into

2  plaintiff's residency during the disputed time periods. Plaintiff had a reasonable expectation that

3  said information would be kept confidential and not revealed to third parties and the FTB and

4  defendants knew and understood that said information was to be kept confidential and not revealed

5  to third parties.

6      42. The FTB and defendants, without necessity or justification, nevertheless disclosed to

7  third parties in Nevada certain of plaintiff's personal and confidential information which had been

8  cooperatively disclosed to the FTB by plaintiff only for the purposes of facilitating the FTB's

9  legitimate auditing and investigative efforts.

10      43. As a direct, proximate, and foreseeable result of the FTB's aforementioned invasion

11  of plaintiff's privacy, plaintiff has suffered actual and consequential damages in a total amount in

12  excess of $10,000.

13      44. Plaintiff is informed and believes, and therefore alleges, that said invasion of plaintiff's

14  privacy was intentional, malicious, and oppressive in that such invasion constituted despicable

15  conduct by the FTB and defendants entered into with a willful and conscious disregard of the rights

16  of plaintiff. Plaintiff is therefore entitled to an award of punitive or exemplary damages in an

17  amount sufficient to satisfy the purposes for which such damages are awarded.

18                          **FOURTH CAUSE OF ACTION**

19              **(For Invasion of Privacy — Casting Plaintiff in a False Light)**

20      45. Plaintiff realleges and incorporates herein by reference each and every allegation

21  contained in paragraphs 1 through 27, 29 through 31, 34 through 37, and 41 and 42, above, as if

22  set forth herein verbatim.

23      46. By conducting interviews and interrogations of Nevada residents and by issuing

24  unauthorized "Demands to Furnish Information" as part of their investigation in Nevada of

25  plaintiff's residency, the FTB and defendants invaded plaintiff's right to privacy by stating or

26  insinuating to said Nevada residents that plaintiff was under investigation in California, thereby

27  falsely portraying plaintiff as having engaged in illegal and immoral conduct, and decidedly casting

28  plaintiff's character in a false light.

HUTCHISON
& STEFFEN
330 S. FOURTH STREET
LAS VEGAS, NV 89101
(702) 385-2500
FAX (702) 385-2086

- 14 -

[LTX/RN ON LL] 09:01 LL 86/22/10
01/21/98 WED 11:25 FAX          A     Bus & Tax      B                    ⓦ020
01/20/98    11:27    FTB-LEGAL → 86478134                        NO. 107   018

1    47.  The FTB and defendants' conduct in publicizing its investigation of plaintiff cast

2    plaintiff in a false light in the public eye, thereby adversely compromising the attitude of those who

3    know or would, in reasonable likelihood, come to know Gil Hyatt because of the nature and scope

4    of his work.  Such publicity of the investigation was offensive and objectionable to plaintiff and

5    was carried out for other than honorable, lawful, or reasonable purposes.  Said conduct by the FTB

6    and the defendants was calculated to harm, vex, annoy and intimidate plaintiff, and was not only

7    offensive and embarrassing to plaintiff, but would have been equally so to any reasonable person

8    of ordinary sensibilities similarly situated, as the conduct could only serve to damage plaintiff's

9    reputation.

10    48.  As a direct, proximate, and foreseeable result of the FTB and defendants'

11    aforementioned invasion of plaintiff's privacy, plaintiff has suffered actual and consequential

12    damages in a total amount in excess of $10,000.

13    49.  Plaintiff is informed and believes, and therefore alleges, that said invasion of plaintiff's

14    privacy was intentional, malicious, and oppressive in that such invasion of privacy was despicable

15    conduct by the FTB and defendants, entered into with a willful and conscious disregard of the

16    rights of plaintiff.  Plaintiff is therefore entitled to an award of exemplary or punitive damages in

17    an amount sufficient to satisfy the purposes for which such damages are awarded.

18                                    **FIFTH CAUSE OF ACTION**

19                                       **(For the Tort of Outrage)**

20    50.  Plaintiff realleges and incorporates herein by reference each and every allegation

21    contained in paragraphs 1 through 27, 29 through 31, 34 through 37, 41 and 42, and 46 and 47,

22    above, as if set forth herein verbatim.

23    51.  The clandestine and reprehensible manner in which the FTB and defendants carried out

24    their investigation in Nevada of plaintiff's Nevada residency under the cloak of authority from the

25    State of California, but without permission from the State of Nevada, and the FTB and defendants'

26    apparent intent to continue to investigate and assess plaintiff staggeringly high California state

27    income taxes, interest, and penalties for the entire year of 1992 — and possibly continuing into

28    future years — despite the FTB's own finding that plaintiff was a Nevada resident at least as of

HUTCHISON
& STEFFEN
·8C B. FOURTH STREET
LAS VEGAS, NV 89101
(702) 385-2500
FAX (702) 385-2086

-15-

[TX/RX NO 6143]    01/22/98 TH 10:50 08:01ID

01/21/98  WED 11:26 FAX          A    Bus & Tax    B                    Ⓐ021

01/20/98    11:28    FTB-LEGAL → 86478134                    NO. 107    P19

1  April of 1992, was, and continues to be, extreme, oppressive and outrageous conduct. The FTB

2  has, in every sense, sought to hold plaintiff hostage in California, disdaining and abandoning all

3  reason in its reprehensible, all-out effort to extort significant amounts of plaintiff's income without

4  a basis in law or fact. Plaintiff is informed and believes, and therefore alleges, that the FTB and

5  defendants carried out their investigation in Nevada for the ostensible purpose of seeking truth

6  concerning his place of residency, but the true purpose of which was to so harass, annoy,

7  embarrass, and intimidate plaintiff, and to cause him such severe emotional distress and worry as

8  to coerce him into paying significant sums to the FTB irrespective of his demonstrably bona fide

9  residence in Nevada throughout the disputed periods. As a result of such extremely outrageous and

10  oppressive conduct on the part of the FTB and defendants, plaintiff has indeed suffered fear, grief,

11  humiliation, embarrassment, anger, and a strong sense of outrage that any honest and reasonably

12  sensitive person would feel if subjected to equivalent unrelenting, outrageous personal threats and

13  insults by such powerful and determined adversaries.

14      52.  As a direct, proximate, and foreseeable result of the FTB and defendants'

15  aforementioned extreme, unrelenting, and outrageous conduct, plaintiff has suffered actual and

16  consequential damages in a total amount in excess of $10,000.

17      53. Plaintiff is informed and believes, and therefore alleges, that said extreme, unrelenting,

18  and outrageous conduct was intentional, malicious, and oppressive in that it was despicable

19  conduct by the FTB and defendants, entered into with a willful and conscious disregard of

20  plaintiff's rights. Plaintiff is therefore entitled to an award of exemplary or punitive damages in

21  an amount sufficient to satisfy the purposes for which such damages are awarded.

22      WHEREFORE, plaintiff respectfully prays for judgment against the FTB and defendants

23  as follows:

24  **FIRST CAUSE OF ACTION**

25      1. For judgment declaring and confirming that plaintiff is a bona fide resident of the State

26  of Nevada effective as of September 26, 1991 to the present;

27      2. For judgment declaring that the FTB has no lawful basis for continuing to investigate

28  plaintiff in Nevada concerning his residency between September 26, 1991 through December 31,

HUTCHISON
& STEFFEN
150 S. FOURTH STREET
LAS VEGAS, NV 89101
(702) 385-2500
FAX (702) 385-2086

- 16 -

Sent by: DOJ ATTY GEN OFC SAC 16TH FL    916 3224483;    01/22/98 10:57AM;JetFax #594;Page 20/22

[TX/RX NO 6143]    09:01 L 86/22/10
01/21/98  WED 11:28 FAX        A    Bus & Tax    B                    NO. 107    001
08/20/98    11:28    FTB-LEGAL → B647B134                                        020

1991 or any other subsequent period down to the present, and declaring that the FTB had no right

or authority to propound or otherwise issue a "Demand to Furnish Information" or other quasi

subpoenas to Nevada residents and businesses seeking information concerning plaintiff;

    3. For costs of suit;

    4. For reasonable attorneys' fees; and

    5. For such other and further relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION

    1. For actual and consequential damages in a total amount in excess of $10,000;

    2. For punitive damages in an amount sufficient to satisfy the purposes for which such damages are awarded;

    3. For costs of suit;

    4. For reasonable attorneys' fees; and

    5. For such other and further relief as the Court deems just and proper.

## THIRD CAUSE OF ACTION

    1. For actual and consequential damages in a total amount in excess of $10,000;

    2. For punitive damages in an amount sufficient to satisfy the purposes for which such damages are awarded;

    3. For costs of suit;

    4. For reasonable attorneys fees; and

    5. For such other and further relief as the Court deems just and proper.

## FOURTH CAUSE OF ACTION

    1. For actual and consequential damages in a total amount in excess of $10,000;

    2. For punitive damages in an amount sufficient to satisfy the purposes for which such damages are awarded;

    3. For costs of suit;

    4. For reasonable attorneys fees; and

    5. For such other and further relief as the Court deems just and proper.

. . .

HUTCHISON
& STEFFEN
830 S. FOURTH STREET
LAS VEGAS, NV 89101
(702) 385-2500
FAX (702) 385-2086

- 17 -

RJN0161

[TX/RX NO 6143]

01/20/98    11:29    FTB-LEGAL → 8647B0134                                    NO. 107   P21

## FIFTH CAUSE OF ACTION

1. For actual and consequential damages in a total amount in excess of $10,000;

2. For punitive damages in an amount sufficient to satisfy the purposes for which such damages are awarded;

3. For costs of suit;

4. For reasonable attorneys' fees; and

5. For such other and further relief as the Court deems just and proper.

DATED this 6th day of January, 1998.

HUTCHISON & STEFFEN

By: _____
Thomas L. Steffen
Mark A. Hutchison
530 South 4th Street
Las Vegas, Nevada 89101

Attorneys for Plaintiff

HUTCHISON
& STEFFEN
14 S. FOURTH STREET
LAS VEGAS, NV 89101
(702) 385-2500
FAX (702) 385-2086

RJN0162

*Served on me*
*1/16/98   1434  ©*

**SUMM**
Thomas L. Steffen (1300)
Mark A. Hutchison (4639)
HUTCHISON & STEFFEN
530 South Fourth Street
Las Vegas, Nevada 89101
(702) 385-2500 - Office
(702) 385-3059 - Facsimile

Attorneys for Plaintiff

DISTRICT COURT

CLARK COUNTY, NEVADA

| | | |
|---|---|---|
| GILBERT P. HYATT, | ) | Case No. *A382999* |
| | ) | Dept. No. *XII* |
| Plaintiff, | ) | Docket No. *R* |
| | ) | |
| v. | ) | |
| | ) | **SUMMONS** |
| FRANCHISE TAX BOARD OF THE | ) | |
| STATE OF CALIFORNIA, and DOES | ) | |
| 1-100, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**NOTICE! YOU HAVE BEEN SUED. THE COURT MAY DECIDE AGAINST YOU WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 20 DAYS. READ THE INFORMATION BELOW.**

**TO THE DEFENDANT:** A civil Complaint has been filed by the plaintiff against you for the relief set forth in the Complaint.

FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA

1.    If you intend to defend this lawsuit, within 20 days after this Summons is

1

RJN0163

served on you exclusive of the day of service, you must do the following:

    2.    File with the Clerk of this court, whose address is shown below, a formal written response to the Complaint in accordance with the rules of the Court.

    a.    Serve a copy of your response upon the attorney whose name and address is shown below.

    3.    Unless you respond, your default will be entered upon application for the plaintiff and this Court may enter a judgment against you for the relief demanded in the Complaint, which could result in the taking of money or property or other relief requested in the Complaint.

    4.    If you intend to seek the advise of an attorney in this matter, you should do so promptly so that your response may be filed on time.

Issued at the direction of:
Mark A. Hutchison
Hutchison & Steffen
530 South Fourth Street
Las Vegas, NV 89101

By: _____
Attorneys for Plaintiff

LORETTA BOWMAN,
CLERK OF COURT

By:_____ ELAINE YORK    JAN 0 6 1997
DEPUTY CLERK
County Courthouse
200 South Third Street
Las Vegas, Nevada 89155

2

01/22/98 THU 10:50 [TX/RX NO 6143]
01/21/98 WED 11:15 FAX                              A   Bus & Tax        B          NO. 107   004
                                                                                             002
01/20/98 :   11:19   FTB-LEGAL → 66476134                      SERVED ON ME
                                                               1/21/98   1454

**SUMM**
Thomas L. Steffen (1300)
Mark A. Hutchison (4639)
HUTCHISON & STEFFEN
530 South Fourth Street
Las Vegas, Nevada 89101
(702) 385-2500 - Office
(702) 385-3059 - Facsimile

Attorneys for Plaintiff

### DISTRICT COURT

### CLARK COUNTY, NEVADA

| | |
|---|---|
| GILBERT P. HYATT, | ) Case No. A382999 |
| | ) Dept. No. XII |
| Plaintiff, | ) Docket No. R |
| | ) |
| v. | ) |
| | ) **SUMMONS** |
| FRANCHISE TAX BOARD OF THE | ) |
| STATE OF CALIFORNIA, and DOES | ) |
| 1-100, inclusive, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**NOTICE! YOU HAVE BEEN SUED. THE COURT MAY DECIDE AGAINST YOU WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 20 DAYS. READ THE INFORMATION BELOW.**

**TO THE DEFENDANT:** A civil Complaint has been filed by the plaintiff against you for the relief set forth in the Complaint.

### FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA

1.     If you intend to defend this lawsuit, within 20 days after this Summons is

1

RJN0165

01/22/98 THU 10:50 [TX/RX NO 6143]
01/21/98 WED 11:15 FAX                    A       Bus & Tax        B                         @005
01/20/98    11:19    FTB-LEGAL → 86478134                                              NO. 107   003

served on you exclusive of the day of service, you must do the following:

      2.    File with the Clerk of this court, whose address is shown below, a formal written response to the Complaint in accordance with the rules of the Court.

      a.    Serve a copy of your response upon the attorney whose name and address is shown below.

      3.    Unless you respond, your default will be entered upon application for the plaintiff and this Court may enter a judgment against you for the relief demanded in the Complaint, which could result in the taking of money or property or other relief requested in the Complaint.

      4.    If you intend to seek the advise of an attorney in this matter, you should do so promptly so that your response may be filed on time.

Issued at the direction of:                         **LORETTA BOWMAN,**
**Mark A. Hutchison**                          **CLERK OF COURT**
Hutchison & Steffen
530 South Fourth Street
Las Vegas, NV 89101

By: _____         By:   ELAINE **YORK**   JAN 0 6 1997
Attorneys for Plaintiff                **DEPUTY CLERK**
                                   County Courthouse
                                   200 South Third Street
                                   Las Vegas, Nevada 89155

2

RJN0166

Dated this 17TH day of March, 2017.

/s/ Debbie Leonard

JAMES BRADSHAW
DEBBIE LEONARD
ADAM HOSMER-HENNER
MCDONALD CARANO WILSON LLP
100 West Liberty Street, 10th Floor
P.O. Box 2670
Reno, NV 89505
(775) 788-2000

SETH P. WAXMAN
PAUL R.Q. WOLFSON
DANIEL WINIK
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
(202) 663-6000

CYNTHIA J. LARSEN
KATIE DEWITT
DAVID W. SPENCER
ORRICK, HERRINGTON & SUTCLIFFE
400 Capitol Mall, Suite 3000
Sacramento, CA 95814
(916) 329-7970

*Attorneys for Appellees Betty T. Yee,*
*Diane L. Harkey, and Michael Cohen in*
*their official capacities as members of the*
*California Franchise Tax Board*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of March, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

 /s/Pam Miller
An Employee of McDonald Carano Wilson LLP