No. 15-15296

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GILBERT P. HYATT

*Plaintiff-Appellant*,

*v.*

BETTY T. YEE, ET AL.

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California, No. 2:14-cv-00849-GEB-DAD (Burrell, J.)

## APPELLEE CALIFORNIA FRANCHISE TAX BOARD'S
## JUDICIAL NOTICE DOCUMENTS
## VOLUME 5 OF 12
## RJN 0730 – RJN 0953

JAMES BRADSHAW
DEBBIE LEONARD
ADAM HOSMER-HENNER
MCDONALD CARANO WILSON LLP
100 West Liberty Street, 10th Floor
Reno, NV  89501
(775) 788-2000

CYNTHIA J. LARSEN
KATIE DEWITT
DAVID W. SPENCER
ORRICK, HERRINGTON & SUTCLIFFE
400 Capitol Mall, Suite 3000
Sacramento, CA 95814
(916) 329-7970

SETH P. WAXMAN
PAUL R.Q. WOLFSON
DANIEL WINIK
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C.  20006
(202) 663-6000

# INDEX

# FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|----------------------------------------|----------|
| | | **VOLUME ONE** | | | | |
| 1 | 6/17/1993 | Letter from Marc Shayer to Gilbert Hyatt | 10 | 1 - 5 | NV Trial Ex. 0112* | 1, 3 |
| 2 | 7/15/1993 | Letter from Marc Shayer to Michael Kern, and response - Information Concerning Resident Status (Form FTB 3805F) | 10 | 6 - 14 | NV Trial Ex. 2174 | 1, 3 |
| 3 | 8/4/1993 | Letter from Michael Kern to Marc Shayer | 10 | 15 - 16 | NV Trial Ex. 2173 | 1, 3 |
| 4 | 5/24/1994 | Letter from Soriano to Michael Kern | 10 | 17 - 20 | NV Trial Ex. 2503 | 1, 3 |
| 5 | 8/2/1995 | Letter from Sheila Cox to Michael Kern - determination letter | 12 | 21 - 48 | NV Trial Ex. 2821 | 1, 3 |
| 6 | 8/29/1995 | Fraud Penalty | 13 | 49 - 62 | NV Trial Ex. 2199 | 1, 3 |
| 7 | 4/23/1996 | Fax from Michael Kern to Hyatt re 1991 NPA, and from Michael Kern to Cowan | 12 | 63 - 74 | NV Trial Ex. 2592 | 1, 3 |
| 8 | 6/20/1996 | Letter from Cowan to FTB re 1991 Protest Letter | 14 | 75 - 136 | NV Trial Ex. 296 | 2, 3 |
| 9 | 8/18/1997 | Fax from Hyatt to Eugene Cowan with Notice of Proposed Assessment 1992 | 13 | 137 - 141 | NV Trial Ex. 2609 | 1, 3 |
| 10 | 10/10/1997 | Letter from Cowan to FTB re 1992 Protest Letter 10-10-97 | 14 | 142 - 144 | NV Trial Ex. 319 | 2, 3 |
| 11 | 1/6/1998 | Complaint, *Gilbert P. Hyatt v. Franchise Tax Board of California* | 14 | 145 - 166 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |

\* All references to "NV Trial Ex." are documents that were submitted into evidence at the jury trial in Hyatt's Nevada litigation, Case No. 98A382999, Eighth Judicial District Court, Clark County, Nevada.

# INDEX

## FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|-----------|---------------|----------------------------------------|----------|
| | | **VOLUME TWO** | | | | |
| 12 | 1/6/1998 | Case docket - *Gilbert P. Hyatt v. Franchise Tax Board of California* | 32 | 167 - 257 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |
| 13 | 3/17/1998 | Fax from Donald Kula to Hutchison and Hyatt re response tactics to Subpoena Duces Tecum to be issued to Cal Fed Bank | 21 | 258 | Ex. 3 to Dunn Decl., SER 23; NV Trial Ex. 2326 | 2, 3 |
| 14 | 5/28/1998 | Letter from Sheila Cox to Eugene Cowan attaching 4/24/98 Declaration for Subpoena Duces Tecum signed by Sheila Cox, Subpoena Duces Tecum to Cal Fed Bank | 21 | 259 - 262 | Ex. 3 to Dunn Decl., SER 24-27; NV Trial Ex. 2326 | 2 |
| 15 | 12/27/1999 | Protective Order on Report and Recommendation from Discovery Commissioner Biggar | 16 | 263 - 274 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |
| 16 | 12/30/1999 | Letter from Woodward to Cowan re document request letter | 15 | 275 - 305 | NV Trial Ex. 2330 | 2, 3 |
| 17 | 1/27/2000 | Docket | 17, 32 | 306 - 315 | Nevada Supreme Court, Case No. 35549 | 3 |
| 18 | 3/7/2000 | Memo from McLaughlin to Terry Collins | 16 | 316 - 319 | NV Trial Ex. 2333 | 2, 3 |
| 19 | 4/16/2000 | Letter from FTB to Cowan and Eric Coffill re request for delay | 15, 16 | 320 - 322 | NV Trial Ex. 2332 | 2, 3 |
| 20 | 6/7/2000 | Order Staying District Court Proceedings | 17 | 323 - 324 | Nevada Supreme Court, Case No. 35549 | 3 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | **VOLUME THREE** | | | | |
| 21 | 6/30/2000 | Letter to Cody Cinnamon from Coffill responding to IDR | 16 | 325 - 425 | NV Trial Ex. 356 | 2, 3 |
| 22 | 7/7/2000 | Docket | 17, 32 | 426 - 434 | Nevada Supreme Court, Case No. 36390 | 3 |
| 23 | 10/3/2000 | Hearing Officer Report | 16 | 435 - 437 | NV Trial Ex. 2335 | 2, 3 |
| 24 | 6/13/2001 | Order Granting Petition (Docket No. 36390), and Dismissing Petition (Docket No. 35549) | 17 | 438 - 443 | Nevada Supreme Court, Case No. 36390, 35549 | 3 |
| 25 | 3/4/2002 | Docket | 32 | 444 - 445 | Nevada Supreme Court, Case No. 39274 | 3 |
| 26 | 3/8/2002 | Docket | 32 | 446 - 447 | Nevada Supreme Court, Case No. 39312 | 3 |
| 27 | 4/4/2002 | Order Denying Petition for Writ of Mandamus or Prohibition and Dismissing Appeal | 17 | 448 - 450 | Nevada Supreme Court, Case No. 39312, 39274 | 3 |
| 28 | 4/4/2002 | Order Granting Petition for Rehearing, Vacating Previous Order, Granting Petition for a Writ of Mandamus in Part in Docket no. 36390, and Granting Petition for a Writ of Prohibition in Part in Docket No. 35549 | 17 | 451 - 464 | Nevada Supreme Court, Case No. 35549, 36390 | 3 |
| 29 | 6/3/2002 | Letter from Felix Leatherwood to Mark Hutchison requesting documents and deposition testimony stamped "Confidential-NV Protective Order" | 17 | 465 - 466 | NV Trial Ex. 2342 | 2, 3 |
| 30 | 7/7/2002 | FTB Administrative Subpoena Duces Tecum | 17 | 467 - 470 | NV Trial Ex. 2344 | 2, 3 |

# INDEX

## FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|-----------|---------------|--------------------------------------|----------|
| 31 | 2/28/2003 | Court's Ruling on Order to Show Cause filed in Superior Court of California, Sacramento County , Case No. 02CS01582 | 17 | 471 - 472 | NV Trial Ex. 2348 | 3, 5 |
| 32 | 3/17/2003 | Fax Cover and letter from Donald Kula to Molly Mosley, DAG | 17 | 473 - 475 | NV Trial Ex. 2349 | 2, 3, 5 |
| 33 | 12/31/2003 | *State Franchise Tax Board v Gilbert P. Hyatt* , Decision (unpublished) | 17 | 476 - 500 | California Court of Appeal, Third Appellate District - Sacramento, Case No. C043627 | 2, 3, 5 |
| **VOLUME FOUR** | | | | | | |
| 34 | 9/7/2005 | Protest Event Log for Case Unit: Hyatt, Gilbert - 1992 | | 501 - 604 | NV Trial Ex. 2353 | 2, 3 |
| 35 | 10/28/2005 | Letter from Robert Dunn to Mark Hutchison re: request consent to release deposition transcripts and documents to FTB's protest hearing officer | 18 | 605 - 607 | NV Trial Ex. 2354 | 2, 3 |
| 36 | 12/6/2005 | Letter from Robert Dunn to Mark Hutchison re: second request | 18 | 608 | NV Trial Ex. 2355 | 2, 3 |
| 37 | 1/30/2006 | FTB Administrative Subpoena Duces Tecum and Exhibits A, C-E | 18 | 609 - 627 | NV Trial Ex. 2356 | 2, 3 |
| 38 | 1/19/2007 | Letter from Robert Dunn to Mark Hutchison requests production of documents and testimony from 2006 | 18 | 628 - 632 | NV Trial Ex. 2357 | 2, 3 |
| 39 | 2/14/2007 | Letter from Donald Kula to Robert Dunn | 18 | 633 - 638 | NV Trial Ex. 2358 | 2, 3 |
| 40 | 5/17/2007 | Letter from Donald Kula to Robert Dunn | 18 | 639 - 640 | NV Trial Ex. 2359 | 2, 3 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|----------------------------------------|----------|
| 41 | 11/1/2007 | Determination Letter from George W. McLaughlin to Eric Coffill | 18 | 641 - 690 | NV Trial Ex. 2320 | 2, 3 |
| 42 | 11/20/2007 | Letter from Eric Coffill to George W. McLaughlin | 19 | 691 - 695 | Ex. 1 to Dunn Decl., SER 13-17 | 6 |
| 43 | 11/26/2007 | Letter from George W. McLaughlin to Eric Coffill | 19 | 696 - 698 | Ex. 2 to Dunn Decl., SER 19-21 | 2 |
| 44 | 1/22/2008 | Letter from Eric Coffill to SBE enclosing Notice of Appeal for 1991, Request for Abatement of Interest | 22 | 699 - 711 | Ex. 4 to Dunn Decl., SER 29-41 | 6 |
| 45 | 1/23/2008 | Letter from Eric Coffill to SBE enclosing Notice of Appeal for 1992, Request for Abatement of Interest | 22 | 712 - 724 | Ex. 5 to Dunn Decl., SER 43-55 | 6 |
| 46 | 7/1/2008 | Letter from SBE to Eric Coffill re extension | 23 | 725 - 726 | SBE | 6 |
| 47 | 7/3/2008 | Letter from SBE to Eric Coffill re extension | 23 | 727 | SBE | 6 |
| 48 | 11/18/2008 | Letter from SBE to Eric Coffill re extension | 23 | 728 - 729 | SBE | 6 |
| **VOLUME FIVE** | | | | | | |
| 49 | 12/9/2008 | Hyatt Opening Brief 1991 | 23 | 730 - 836 | SBE | 6 |
| 50 | 12/9/2008 | Hyatt Opening Brief 1992 | 23 | 837 - 922 | SBE | 6 |
| 51 | 1/27/2009 | Letter from Robert Dunn to SBE re Hyatt's filing | 23 | 923 - 924 | SBE | 6 |
| 52 | 2/13/2009 | Docket | 32 | 925 - 928 | Nevada Supreme Court, Case No. 53264 | 3 |
| 53 | 3/16/2009 | Letter from Robert Dunn to Eric Coffill re scheduling depositions of affiants | 23 | 929 - 930 | SBE | 3 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|----------------------------------------|----------|
| 54 | 6/26/2009 | Request for Foreign Deposition Subpoena - Melvin R. Hecht | | 931 - 953 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-09-593462-C | 3, 5, 6 |
| | | **VOLUME SIX** | | | | |
| 55 | 6/26/2009 | Request for Foreign Deposition Subpoena - Michelina Hecht | | 954 - 975 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-09-593462-C | 3, 5, 6 |
| 56 | 9/15/2009 | FTB Opening Brief 1991 | 24 | 976 - 1081 | SBE | 6 |
| 57 | 9/15/2009 | FTB Opening Brief 1992 | 24, 31 | 1082 - 1160 | SBE; Ex. 7 to Dunn Decl., SER 61 -70 | 6 |
| 58 | 9/29/2009 | Letter from Eric Coffill to SBE requesting extension of time for filing | 25 | 1161 - 1172 | SBE | 6 |
| 59 | 10/1/2009 | Letter from Robert Dunn to SBE replying to Hyatt's request for time | 25 | 1173 - 1176 | SBE | 6 |
| 60 | 5/20/2010 | Letter from SBE to Eric Coffill re extension and new due date | 25 | 1177 | SBE | 6 |
| 61 | 8/11/2010 | Letter from SBE to Eric Coffill granting extension and email exchange | 25 | 1178 - 1180 | SBE | 6 |
| | | **VOLUME SEVEN** | | | | |
| 62 | 8/23/2010 | Hyatt 1991 Reply Brief | 25 | 1181 - 1289 | SBE | 6 |
| 63 | 8/23/2010 | Hyatt 1992 Reply Brief | 25 | 1290 - 1398 | SBE | 6 |
| 64 | 8/23/2010 | Hyatt Index of Affidavits | 25 | 1399 - 1403 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|----------------|--------------------------------------|----------|
| 65 | 2/4/2011 | *State of California Franchise Tax Board v. Mary Troter Stratton, et al.,* Petition by FTB for Issuance of Out-of-State Deposition Commissions (for Stratton depositions) | 24 | 1404 - 1410 | Superior Court of California, Sacramento, Case No. 34-2011-00096505 | 5, 6 |
| 66 | 5/3/2011 | *State of California Franchise Tax Board v. Gilbert P. Hyatt,* Nevada District Court Order Denying Strattons' Motion to Quash Subpoenas for a Pending Administrative Tax Appeal in California | 24 | 1411 - 1413 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-II-635345-C | 3, 5, 6 |
| **VOLUME EIGHT** | | | | | | |
| 67 | 6/30/2011 | FTB Reply Brief 1992 (Excerpts re Delays in Protest and Nevada litigation) | | 1414 - 1426 | SBE | 6 |
| 68 | 7/20/2011 | Dkt. No. 1 - Hyatt's Petition for Protective Order or Quash subpoenas | 27 | 1427 - 1429 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 6, 7 |
| 69 | 7/20/2011 | Docket | 32 | 1430 - 1431 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 7 |
| 70 | 7/29/2011 | Dkt. No. 17 - Decision & Order re Philips discovery | 27 | 1432 - 1444 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 6, 7 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 71 | 8/1/2011 | Docket | 32 | 1445 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 72 | 8/2/2011 | Dkt. No. 19 - Hyatt's Notice of Appeal | 27 | 1446 - 1465 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 7 |
| 73 | 8/15/2012 | Hyatt 1991 Supplemental Brief | 25 | 1466 - 1570 | SBE | 6 |
| **VOLUME NINE** | | | | | | |
| 74 | 8/15/2012 | Hyatt 1992 Supplemental Brief | 25 | 1571 - 1678 | SBE | 6 |
| 75 | 8/15/2012 | Exh A Hyatt 1991 Supplemental Brief | 25 | 1679 - 1680 | SBE | 6 |
| 76 | 8/15/2012 | Exh B Hyatt 1991 Supplemental Brief | 25 | 1681 - 1683 | SBE | 6 |
| 77 | 10/5/2012 | Dkt. No. 24 - Order to Show Cause | 28 | 1684 - 1687 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 78 | 2/19/2013 | FTB Supplemental Briefing re Tax Year 1991 and 1992, Exhibit H Tab 1-47_Protest and Litigation timeline (Tab 36) | | 1688 | SBE | 6 |

# INDEX
## FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 79 | 3/13/2013 | Dkt. No. 29 - Opinion and Order | 28 | 1689 - 1705 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 80 | 3/28/2013 | FTB Additional Brief Philips Documents and NY litigation | | 1706 - 1721 | SBE | 6, 7 |
| 81 | 4/29/2013 | FTB Additional Brief re Philips documents to SBE | | 1722 - 1726 | SBE | 6, 7 |
| 82 | 5/14/2013 | Docket | 32 | 1727 - 1730 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 83 | 10/7/2013 | Dkt. No. 23- Decision and Order | 28 | 1731 - 1747 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 84 | 3/13/2014 | Dkt. No. 74 - Decision and Order | 28 | 1748 - 1758 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 85 | 4/23/2014 | Letter from SBE to Eric Coffill and Robert Dunn requesting additional briefing | 29 | 1759 - 1761 | SBE | 6 |
| 86 | 5/7/2014 | Letter from Eric Coffill to SBE | 30 | 1762 - 1764 | Ex. 6 to Dunn Decl., SER 57-59 | 6 |
| 87 | 6/13/2014 | Letter from SBE to Eric Coffill and Robert Dunn re due dates and reluctance to grant more extensions | 30, 33 | 1765 - 1767 | SBE | 6 |
| 88 | 9/26/2014 | Letter from Eric Coffill to SBE re Request to Vacate | 33 | 1768 - 1769 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|---------------------------------------|----------|
| 89 | 10/13/2014 | Letter from Eric Coffill to SBE responding to FTB letter (enclosing letter from Hyatt's New York counsel to FTB's New York counsel re U.S. Philips documents dispute) | 33 | 1770 - 1778 | SBE | 6, 7 |
| 90 | 11/3/2014 | Letter from Eric Coffill to SBE requesting, *inter alia* , that SBE vacate briefing deadline | 33 | 1779 - 1780 | SBE | 6 |
| **VOLUME TEN** | | | | | | |
| 91 | 2/4/2015 | Letter from Eric Coffill to SBE submitting motions and requesting, *inter alia,* delay in briefing ending decision on motions | 33 | 1781 - 1847 | SBE | 6 |
| 92 | 2/23/2015 | Letter from Eric Coffill to SBE requesting, *inter alia,* delay on briefing until SBE rules on motions to strike | 33 | 1848 - 1849 | SBE | 6 |
| 93 | 3/11/2015 | Docket | 32 | 1850 - 1852 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 94 | 4/6/2015 | Affidavit of Robert Dunn in Opposition to Gilbert Hyatt's Motion Seeking an Order of Civil Contempt and Permanent Injunctive Relief | 32 | 1853 - 2000 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 95 | 6/3/2015 | Letter from Eric Coffill to the SBE requesting extension of time to file reply briefs | 33 | 2001 - 2003 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|-----------|---------------|---------------------------------------|----------|
| 96 | 9/10/2015 | Amended Judgment Decision & Order | 32 | 2004 - 2016 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 97 | 9/19/2016 | Letter from Edwin Antolin to SBE requesting extension for filing additional briefs | 33 | 2017 - 2018 | SBE | 6 |
| **VOLUME ELEVEN** | | | | | | |
| 98 | 9/28/2016 | Appellant's Concluding Summary (1991); Errata filed 11/4/16 | 33 | 2019 - 2057 | SBE | 6 |
| 99 | 9/28/2016 | Appellant's Concluding Summary (1992); Errata filed 11/4/16 | 33 | 2058 - 2092 | SBE | 6 |
| 100 | 9/28/2016 | Appellant's Second Additional Briefing (1991); Errata filed 11/4/16 | 33 | 2093 - 2165 | SBE | 6 |
| 101 | 9/28/2016 | Appellant's Second Additional Briefing (1992); Errata filed 11/4/16 | 33 | 2166 - 2236 | SBE | 6 |
| **VOLUME TWELVE** | | | | | | |
| 102 | 9/28/2016 | Attachment 1, Appellant's Second Additional Briefing (1992); Errata filed 11/4/16 | 33 | 2237 - 2278 | SBE | 6 |
| 103 | 10/20/2016 | Letter from SBE to Edwin Antolin re, *inter alia,* delays | 33 | 2279 - 2282 | SBE | 6 |
| 104 | 11/4/2016 | Letter from Edwin Antolin to Joann Richmond with errata table | 33 | 2283 - 2297 | SBE | 6 |
| 105 | 11/16/2016 | Letter from FTB to SBE re Hyatt's request for additional time | 33 | 2298 - 2299 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 106 | 1/6/2017 | Letter from SBE to Edwin Antolin re rescheduing the hearing from March 2017 to May 2017 | 33 | 2300 | SBE | 6 |
| 107 | 3/3/2017 | Notice of Board Hearing for Case No. 446509 on 5/23/17 | 33 | 2301 - 2302 | SBE | 6 |
| 108 | 3/3/2017 | Notice of Board Hearing for Case No. 435770 on 5/23/17 | 33 | 2303 - 2304 | SBE | 6 |

ERIC J. COFFILL
ecoffill@mofo.com
CARLEY A. ROBERTS
croberts@mofo.com
MORRISON & FOERSTER LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814
Telephone: (916) 325-1324
Fax: (916) 448-3222

Attorneys for Appellant

BEFORE THE STATE BOARD OF EQUALIZATION

OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Appeal of | Case No. 435770 |
| GILBERT P. HYATT | |

# APPELLANT'S OPENING BRIEF

# Taxable Year 1991

RJN000730

ERIC J. COFFILL
ecoffill@mofo.com
CARLEY A. ROBERTS
croberts@mofo.com
MORRISON & FOERSTER LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814
Telephone: (916) 325-1324
Fax: (916) 448-3222

Attorneys for Appellant

BEFORE THE STATE BOARD OF EQUALIZATION

OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Appeal of | Case No.  435770 |
| GILBERT P. HYATT | |

# APPELLANT'S OPENING BRIEF

# Taxable Year 1991

RJN000731

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 2

ARGUMENT ....................................................................................................... 4

I.     FTB DID NOT CARRY ITS INITIAL BURDEN OF PROOF TO SUSTAIN THE ASSESSMENT ................................................................................... 4

II.     MR. HYATT WAS A NEVADA RESIDENT COMMENCING IN SEPTEMBER 1991 ................................................................................... 11

    A.     Mr. Hyatt Was Domiciled in Nevada Commencing in September 1991 ........ 11

    B.     Mr. Hyatt Left California in September 1991 for Other Than Temporary or Transitory Purposes.................................................. 15

    C.     Mr. Hyatt's Contacts with Nevada Satisfy the Close Connections Test......... 15

        1.     The location of all of the taxpayer's residential real property, and the approximate sizes and values of each of the residences........ 17

        2.     The state wherein the taxpayer's spouse and children reside ............ 21

        3.     The state wherein the taxpayer's children attend school ................... 21

        4.     The state wherein the taxpayer claims the homeowner's property tax exemption on a residence.................................................. 21

        5.     The taxpayer's telephone records (*i.e.*, the origination point of taxpayer's telephone calls)................................................................. 22

        6.     The number of days the taxpayer spends in California versus the number of days the taxpayer spends in other states, and the general purpose of such days (*i.e.*, vacation, business, etc.).............. 22

        7.     The location where the taxpayer files his tax returns, both federal and state, and the state of residence claimed by the taxpayer on such returns.................................................................... 24

        8.     The location of the taxpayer's bank and savings accounts ................. 25

        9.     The origination point of the taxpayer's checking account transactions and credit card transactions............................................ 27

        10.     The state wherein the taxpayer maintains memberships in social, religious, and professional organizations................................. 31

        11.     The state wherein the taxpayer registers his automobiles................... 32

        12.     The state wherein the taxpayer maintains a driver's license.............. 32

        13.     The state wherein the taxpayer maintains voter registration, and the taxpayer's voting participation history......................................... 33

        14.     The state wherein the taxpayer obtains professional services, such as doctors, dentists, accountants, and attorneys.......................... 33

RJN000732

|  |  | a. | Mr. Hyatt used few California professionals | 33 |
|  |  | b. | Mr. Hyatt had relationships with many Nevada professionals | 35 |
|  |  | c. | Mr. Hyatt had relationships with many non-California (non-Nevada) professionals | 35 |
|  | 15. | | The state wherein the taxpayer is employed | 36 |
|  | 16. | | The state wherein the taxpayer maintains or owns business interests | 36 |
|  | 17. | | The state wherein the taxpayer holds a professional license or licenses | 37 |
|  | 18. | | The state wherein the taxpayer owns investment real property | 37 |
|  | 19. | | The indications in affidavits from various individuals discussing the taxpayer's residency | 37 |
|  | 20. | | *Bragg* close connections conclusion | 38 |
| D. | | | Under the Identifiable Purpose Test, Mr. Hyatt Was a Nevada Resident for All of the 1991 Disputed Period | 39 |
| E. | | | FTB's Protest Findings Do Not Detract From the Conclusion that Mr. Hyatt Became a Nevada Resident in September 1991 | 39 |
|  | 1. | | FTB's "Facts" | 40 |
|  | 2. | | Mr. Hyatt's Facts | 41 |
|  | 3. | | "Issue: Residency" | 41 |
|  |  | a. | Sale of the La Palma house | 41 |
|  |  | b. | Homeowner's exemption termination | 47 |
|  |  | c. | Continental Hotel stay | 48 |
|  |  | d. | Credit card and banking information | 54 |
|  |  | e. | Mr. Hyatt's apartment rental at Wagon Trails | 54 |
|  |  | f. | Voter registration | 55 |
|  |  | g. | Las Vegas home shopping | 55 |
| III. | THE ACCURACY RELATED FRAUD PENALTY FOR 1991 WAS IMPROPERLY IMPOSED AND SHOULD BE REMOVED | | | 56 |
| A. | Introduction | | | 56 |
| B. | The Burden of Proof Is Upon FTB to Show Fraud by Clear and Convincing Evidence | | | 57 |
| C. | FTB Has Not Met Its Burden to Prove Fraud | | | 58 |
| D. | FTB Never Responds to Our May 31, 2001 Protest Supplement on FTB Fraud Allegations | | | 62 |

IV.   NONE OF THE PATENT LICENSING INCOME RECEIVED BY MR.
      HYATT IS CALIFORNIA SOURCE INCOME ............................................. 63

      A.   Introduction ............................................................................... 63

      B.   The Burden of Proof Is Upon FTB on Both of Its New Sourcing
           Arguments .................................................................................. 65

      C.   FTB's "The La Palma, California Home Was Mr. Hyatt's Business
           Office" Theory of Business Situs Is Without Merit ...................... 67

           1.   The theory fails as a matter of law ...................................... 67

           2.   The theory also fails for lack of evidence ............................ 71

      D.   FTB's "Commercial Exploitation" Business Situs Theory is Without
           Merit ........................................................................................... 75

           1.   The Theory Fails As a Matter of law ................................... 75

           2.   The Theory Fails for Lack of Evidence ................................ 77

      E.   These Same Sourcing Arguments Were Already Rejected by FTB at
           Audit in 1995 .............................................................................. 82

      F.   Conclusion .................................................................................. 86

V.    FTB'S PROPOSED IMPOSITION OF AN AMNESTY PENALTY UNDER
      SECTION 19777.5 IS IN ERROR ........................................................... 86

VI.   INTEREST ABATEMENT IS APPROPRIATE UNDER SECTION 19104 ........... 87

      A.   There Have Been Many Unreasonable Delays Attributable to
           Ministerial and Managerial Acts Performed by FTB Staff During the
           Processing of the Protest ............................................................ 88

      B.   The Unreasonable Delays Occurred After FTB Contacted Mr. Hyatt in
           Writing ........................................................................................ 93

      C.   The Delays Are Not Significantly Attributable to Mr. Hyatt ........... 93

      D.   The Delays Are Numerous and Successive ................................... 93

      E.   Conclusion .................................................................................. 94

VII.  CONCLUSION ..................................................................................... 95

RJN000734

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Page(s)

CASES

*Aldabe v. Aldabe*
(1962) 209 Cal.App.2d 453 ......................................................................... 12

*Bonn v. California State University, Chico*
(1979) 88 Cal.App.3d 985 ........................................................................... 64

*Camara v. Municipal Court of San Francisco*
(1967) 387 U.S. 523 ...................................................................................... 7

*Chapman v. Superior Court of Los Angeles County*
(1958) 162 Cal.App.2d 421 ......................................................................... 12

*DeMiglio v. Mashore*
(1992) 4 Cal.App.4th 1260 .......................................................................... 12

*Desert Valley Constr. & Employers Ins. Co. of Nevada v. Hurley*
(2004) 120 Nev. 499, 96 P.3d 739 ............................................................... 6

*Devereaux v. Frazier Mountain Park & Fisheries Co.*
(1967) 248 Cal.App.2d 323 ......................................................................... 59

*Douglas v. State of California*
(1942) 48 Cal.App.2d 835 ........................................................................... 88

*Estate of Phillips*
(1969) 269 Cal.App.2d 656 ......................................................................... 12

*Ferris v. Albright's Courtesy Elec. Co.*
(1954) 70 Nev. 528, 275 P.2d 755 ............................................................... 6

*Giddio v. Comm'r*
(1970) 54 T.C. 1530 ...................................................................................... 9

*Holly Sugar Corp. v. Johnson*
(1941) 18 Cal.2d 218 ............................................................................. 69, 86

*Hyatt v. Franchise Tax Bd.*
(Aug. 6, 2008) Case No. A382999, Clark County Dist. Ct. Nev .................... *passim*

*Ker v. California*
(1963) 374 U.S. 23 ........................................................................................ 7

*Murphy v. Travelers Ins. Co.*
(1949) 92 Cal.App.2d 582 ........................................................................... 12

RJN000735

*Noble v. Franchise Tax Bd.*
    (2004) 118 Cal.App.4th 560 ........................................................................ 13

*Nursing Home Bldg. Corp. v. DeHart*
    (Wash. Ct. App. 1975) 13 Wash. App. 489 ............................................... 61

*Payton v. New York*
    (1980) 445 U.S. 573 .................................................................................... 7

*People v. Camacho*
    (2000) 23 Cal.4th 824 .................................................................................. 7

*People v. O'Neil*
    (2008) 165 Cal.App.4th 1351 .................................................................... 60

*People v. Privett*
    (1961) 55 Cal.2d 698 ................................................................................... 7

*Pomper v. Behnke*
    (1929) 97 Cal.App. 628 .............................................................................. 59

*Rainier Brewing Co. v. McColgan*
    (1949) 94 Cal.App.2d 118 .......................................................................... 68

*Rocky Mountain Product Trucking Co. v. Johnson*
    (1962) 78 Nev. 44, 369 P.2d 198 ................................................................ 6

*Rowland v. Pepire*
    (1983) 99 Nev. 308, 662 P.2d 1332 ............................................................ 6

*Scholes v. Lehmann*
    (7th Cir. Ill. 1995) 56 F.3d 750 ................................................................ 61

*Silverman v. United States*
    (1961) 365 U.S. 505 .................................................................................... 7

*Smith v. Smith*
    (1955) 45 Cal.2d 235 ................................................................................. 12

*Steinberg v. Buczynski*
    (7th Cir. Ill. 1994) 40 F.3d 890 ................................................................ 61

*Taff v. Goodman*
    (1940) 41 Cal.App.2d 771 ......................................................................... 33

*Todd v. McColgan*
    (1949) 89 Cal.App.2d 509 ........................................................................... 4

*United States v. Karo*
    (1984) 468 U.S. 705 .................................................................................... 7

RJN000736

*Valetti v. Comm'r*
  (1958) 260 F.2d 185 ............................................................... 57, 63

*Whittell v. Franchise Tax Bd.*
  (1964) 231 Cal.App.2d 278 ...................................................... 11, 12

*Wolf v. Colorado*
  (1949) 338 U.S. 25 ..................................................................... 7


**CONSTITUTION, STATUTES AND REGULATIONS**

Cal. Const. Art. I, § 13 ................................................................... 7

U.S.C.
  Title 35 § 102 .......................................................................... 77
  Title 18 § 1708 .......................................................................... 7

Cal. Civ. Code
  § 1217 ...................................................................................... 59

Cal. Code Regs.
  Title 18 § 5523.6 ...................................................................... 37
  Title 18 § 17014 ............................................................... *passim*
  Title 18 § 17952 ............................................................... *passim*

Cal. Rev. & Tax. Code
  § 17015 ................................................................................... 11
  § 17041 ................................................................................... 34
  §§ 17951 et seq. ...................................................................... 71
  § 17952 ........................................................................... *passim*
  § 19104 ........................................................................... *passim*
  § 19164 ............................................................................. 56, 61

Internal Rev. Code
  § 6404 ..................................................................................... 88
  § 6663 ..................................................................................... 56

Nev. Rev. Stat.
  § 483.230 ................................................................................ 33
  § 206.140 .................................................................................. 7
  § 207.200 .................................................................................. 7

Treas. Reg.
  § 301.6404.2 ................................................................... 89, 90, 92

RJN000737

STATE BD. OF EQUALIZATION DECISIONS

*Appeal of Robert F. and Helen R. Adickes*
    90-SBE-012, Nov. 27, 1990 ........................................................................ 57, 63

*Appeal of Allied Properties*
    64-SBE-026, Mar. 17, 1964 ................................................................................ 70

*Appeals of Amyas and Evelyn P. Ames, et al.*
    87-SBE-042, June 17, 1987 ................................................................. 68, 69, 86

*Appeal of Gary O. Armstrong*
    81-SBE-177, Dec. 10, 1981 ................................................................................ 57

*Appeal of James and Jean A. Bagley*
    SBE 217274, Feb. 1, 2006 .................................................................................. 15

*Appeal of Kenneth Banks*
    SBE 327922, Apr. 9, 2008 .................................................................................. 15

*Appeals of George and Linda Barry, et al.*
    93-SBE-006, Apr. 22, 1993 ................................................................................ 65

*Appeal of Robert M. and Ann T. Bass, et al.*
    89-SBE-004, Jan. 25, 1989 ................................................................................ 70

*Appeal of Stephen Bellamy*
    85-SBE-002, Jan. 8, 1985 .................................................................................. 58

*Appeal of Matthew Berman*
    65-SBE-021, June 28, 1965 ...................................................................... 27, 31, 36

*Appeal of Raymond H. and Margaret R. Berner*
    2001-SBE-006-A, Aug. 1, 2002 ............................................... 12, 17, 37, 50

*Appeal of Frederick R. Bigony*
    SBE 92R-0005, 93A-0840, June 29, 1995 ...................................................... 70

*Appeal of Stephen D. Bragg*
    2003-SBE-002, May 28, 2003 ................................................... 12, 15, 17, 38

*Appeal of Theo and Audrey Christman*
    73-SBE-069, Dec. 11, 1973 .......................................................................... 69, 86

*Appeal of Don A. Cookston*
    83-SBE-048, Jan. 3, 1983 .................................................................................... 9

*Appeal of Robert E. Wesley and Jerry J. Couchman*
    2005-SBE-002, Nov. 15, 2005 ............................................................................ 4

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1991

RJN000738

*Appeal of William G. and Susan G. Crozier*
  92-SBE-005, Apr. 23, 1992.................................................................39

*Appeal of Odis L. and Lois N. Dobbs*
  87-SBE-044, June 17, 1987.............................................................17

*Appeal of Gregory B. Duro*
  SBE 354992, Feb. 28, 2008 ............................................................15

*Appeal of Robert V. Erilane*
  74-SBE-050, Nov. 12, 1974.............................................................57

*Appeal of Robert and Maureen Fouts*
  SBE 383284, May 19, 2008 .............................................................15

*Appeal of Larry and Rhoda Geisel*
  SBE 358724, June 25, 2007 ............................................................15

*Appeal of William F. and Susan J. Grun*
  SBE 337066, June 25, 2007 ............................................................15

*Appeal of Robert E. Harding*
  86-SBE-017, Feb. 4, 1986...............................................................21

*Appeal of Richards L. & Kathleen K. Hardman*
  75-SBE-052, Aug. 19, 1975.............................................................35

*Appeal of Terance and Brenda Harrison*
  85-SBE-059, June 25, 1985 ............................................................12

*Appeal of Barbara P. Hutchinson*
  82-SBE-121, June 29, 1982.............................................................57

*Appeal of Duane H. Laude*
  76-SBE-096, Oct. 6, 1976...............................................................70

*Appeal of Larry Mazur*
  SBE 377123, Sept. 16, 2008 ...........................................................86

*Appeal of David G. and Helen Mendelsohn*
  85-SBE-141, Nov. 6, 1985.........................................................65, 67

*Appeal of Merry Mary Fabrics, Inc., et al.*
  93-SBE-007, Apr. 22, 1993 ..............................................................1

*Appeal of James F. and Diane Montgomery*
  SBE 309423, Aug. 21, 2008 ............................................................15

*Appeal of Joe and Gloria Morgan*
  85-SBE-078, July 30, 1985 ........................................................12, 14

RJN000739

*Appeal of Michael E. Myers*
    2001-SBE-001, May 31, 2001 ........................................................................ 4

*Appeal of Robert and Patricia Neuschotz*
    68-SBE-017, Mar. 25, 1968 .................................................................. 69, 86

*Appeal of Charles L. and Phyllis R. Owen*
    76-SBE-025, Mar. 8, 1976 ........................................................................ 57

*Appeal of German A. Posada*
    87-SBE-058, July 28, 1987 ...................................................................... 27

*Appeal of Janice Rule*
    76-SBE-099, Oct. 6, 1976 ........................................................................ 67

*Appeal of David W. Sanders, et al.*
    SBE 400374, Aug. 19, 2008 ...................................................................... 15

*Appeal of Pierre E. G. and Nicole Salinger*
    80-SBE-080, June 30, 1980 ...................................................................... 17

*Appeal of Brian K. Shaw*
    SBE 341954, Mar. 1, 2007 ........................................................................ 15

*Appeal of Alan F. and Rita K. Shugart*
    2005-SBE-001, July 1, 2005 .................................................................... 93

*Appeal of Sierra Production Service, Inc.*
    90-SBE-010, Sept. 12, 1990 ...................................................................... 1

*Appeal of James M. Smith*
    61-SBE-048, July 19, 1961 ...................................................................... 35

*Appeal of Swift & Company*
    70-SBE-013, Apr. 7, 1970 ........................................................................ 70

*Appeal of Robert C. Thomas and Marian Thomas*
    55-SBE-006, Apr. 20, 1955 ...................................................................... 76

*Appeal of Tommy H. and Leila J. Thomas*
    83-SBE-096, Apr. 5, 1983 ...................................................... 21, 27, 31, 36

*Appeal of Richard W. Vohs*
    73-SBE-055, Sept. 17, 1973 .............................................................. 21, 35

*Appeal of David C. and Livia P. Wensley*
    81-SBE-147, Oct. 27, 1981 ...................................................................... 17

*Appeal of Hubbard D. and Cleo M. Wickman*
    81-SBE-014, Feb. 2, 1981 .................................................................. 57, 58

RJN000740

*Appeal of William G., Jr. and Mary D. Wilt*
  76-SBE-030, Mar. 8, 1976 ........................................................................ 57

*Appeal of Stanley K. and Beatrice L. Wong*
  78-SBE-037, May 4, 1978 .................................................................. 69, 86


**OTHER AUTHORITIES**

9 WITKIN, CALIFORNIA PROCEDURE § 365 at 421-24 (5th ed. 2008)................................. 6

FTB Notice 2006-6 (Oct. 27, 2006) ........................................................... 66

FTB Notice 89-277 (May 10, 1989) ............................................................ 88

FTB Notice 99-1 (Mar. 3, 1999) .............................................................. 66

RJN000741

## **INTRODUCTION**

By Notice of Appeal dated January 22, 2008, Gilbert P. Hyatt ("Mr. Hyatt" or "the taxpayer") appealed from the Notice of Action ("Notice") issued by the Franchise Tax Board ("FTB") that affirmed FTB's Notice of Proposed Assessment ("NPA") of tax, penalty and interest in the amount of $10,524,771.06[1] for the tax year 1991.  This opening brief supplements that Notice of Appeal and addresses FTB's November 1, 2007 Protest Determination Letter[2] (hereinafter "Determination Letter").

The 1991 tax year involves only a three month disputed period:  September 26, 1991 through December 31, 1991 (hereinafter the "1991 disputed period").  The primary issues presented in this case are (1) whether Mr. Hyatt was a California resident through April 2, 1992; (2) whether FTB's assessment of a fraud penalty was in error; (3) whether FTB's alternative California "source" income argument, which was not a basis for the issuance of the NPA, should be rejected as an alternative basis for sustaining the assessment; (4) whether FTB's decision, as indicated on the Notice, to impose an amnesty penalty under Revenue and Taxation Code section[3] 19777.5, is in error; and (5) whether the taxpayer's request for interest abatement under section 19104(b)(4) should be granted.  This brief is structured around these five issues.

This brief is accompanied by a large volume of supporting documentation which is being provided under RTA 5523.6.[4]  Logistically, that documentation has been organized into two

---

[1] Tax of $1,876,471.00, penalty (accuracy related - fraud) of $1,407,353.25 and interest to December 26, 2007 of $7,240,946.81.

[2] Ex. 1, FTB 11/1/07 Determination Letter.

[3] All statutory references herein are to the California Revenue and Taxation Code, unless otherwise noted.

[4] As will be seen from a review of this brief and the accompanying documentation, defending against FTB's audit and assessment has required extensive work on the part of Mr. Hyatt for well over a decade.  In *Appeal of Sierra Production Service, Inc., et al.*, 90-SBE-010, Sept. 12, 1990, this Board stated, "...a taxpayer who appeals to this board *should always submit to us each item of evidence that will support its case*, even though that evidence has already been submitted to (and rejected by) the Franchise Tax Board." (Emphasis added.) (*See also Appeal of Merry Mary Fabrics, Inc., et al.*, 93-SBE-007, Apr. 22, 1993, stating: "We are a separate state agency and *unless the taxpayer submits the evidence to us*, or respondent chooses to submit it in support of its own position, we will never see it," emphasis added.)  Mindful of *Sierra Production*, we have attempted to provide herein the most complete record possible within the parameters of this Board's RTAs and keeping in mind the available resources of the Board in this matter.  However, we have not at this time provided your Board with *all* the documentation compiled in this matter.  As two examples, we are not providing your Board at this time either with a complete copy of 100% of our correspondence and documentation provided to the FTB during the protest or with copies of full transcripts of all deposition and trial testimony from the *Hyatt v. FTB* tort litigation. (*See* fn. 18, *infra*.)  Instead, we have attempted to identify the most relevant documentation, *e.g.*, by attaching as exhibits only the relevant pages from deposition and trial testimony.  However, we remain willing and able at all times
(Footnote continues on next page.)

RJN000742

1  categories. These categories are: (1) separate Exhibits, which are sequentially numbered in Arabic

2  numerals; and (2) Annexes, which are sequentially numbered in Roman numerals and which may

3  themselves have multiple exhibits. "Annexes" are documents or separate exhibits which we have

4  grouped collectively for the convenience of the Board.[5]

5  **STATEMENT OF FACTS**

6  Residency cases are intensively "factual" in nature, and the facts of this case were developed

7  extensively prior to and during the protest period. Set forth below is a summary statement of facts.

8  A Chronological Statement of Facts for this case, including citations to the evidence being submitted

9  to support such facts, is set forth separately in Annex I.

10  In mid-November of 1990, Mr. Hyatt was a guest speaker at the Comdex computer trade

11  show in Las Vegas, Nevada. While in Las Vegas, he began exploring the Las Vegas area, looking at

12  potential houses and researching the business environment in the city. During the visit, Mr. Hyatt

13  made the decision to move to Las Vegas permanently.

14  In the months following his return to California in November 1990, Mr. Hyatt prepared for his

15  move to Las Vegas. He made frequent trips to Las Vegas and continued to explore the city and its

16  neighborhoods. In spring and summer of 1991, Mr. Hyatt began packing up the possessions he

17  wished to keep and gave away or disposed of items he did not wish to take with him. In preparation

18  for his move, Mr. Hyatt closed out a number of California bank accounts.

19  Mr. Hyatt told various friends, colleagues and family members about his plans to move to Las

20  Vegas. He even attempted to convince his son, Dan Hyatt, and colleague, Barry Lee, to move with

21  him, but they both declined his offer, choosing instead to remain in California. Mr. Hyatt also told

22  his business colleague, Grace Jeng, about his plans to move and list his house in La Palma, California

23

24

25

26

27

28

---

(Footnote continued from previous page.)

throughout these proceedings to provide additional information to your Board, *e.g.*, full copies of multi-day deposition and trial testimony, should your Board so request.

[5] There are eight Annexes. They are (I) 1991 Chronological Statement of Facts; (II) 1992 Chronological Statement of Facts; (III) Mr. Hyatt's 190-page, 1991 Protest Supplement Letter, dated May 31, 2001; (IV) Mr. Hyatt's 132-page, 1992 Protest Supplement Letter, dated Feb. 2, 2001; (V) the "H BATES" Documents, which were produced in the course of discovery in the *Hyatt v. FTB* Nevada tort litigation (*see* fn. 18, *infra*); (VI) the "CCC BATES" Documents, which are from FTB's audit of Mr. Hyatt as produced by FTB to Mr. Hyatt during the protest proceedings; (VII) the Affidavits obtained by Mr. Hyatt; and (VIII) Mr. Hyatt's Rebuttal to Facts Alleged by FTB in the Protest Determination Letter.

---

2

RJN000743

1    with a realtor. Ms. Jeng saw Mr. Hyatt's plans as an opportunity to buy a house in a very desirable,

2    affluent Chinese community. She discussed with Mr. Hyatt the possibility of buying his house. Mr.

3    Hyatt was in favor of selling to Ms. Jeng because she was willing to purchase the house during a

4    housing slump, "as is" without any repairs and at a reduced price because Mr. Hyatt would not have

5    to pay a realtor fee.

6          In July 1991, Mr. Hyatt signed an agreement with Philips wherein Philips took on a fiduciary

7    responsibility to license a patent portfolio consisting of 23 of Mr. Hyatt's patents and to manage the

8    enforcement of this portfolio.

9          In September of 1991, Mr. Hyatt searched for a home to purchase in Las Vegas and he moved

10   to Las Vegas. He stayed first at a Las Vegas hotel for about three weeks while locating and leasing

11   an apartment and continuing to look for a home to purchase.

12         On October 1, 1991, Mr. Hyatt sold his California home to his colleague, Ms. Jeng. With the

13   guidance of two attorneys, one of whom was a real estate broker, they did not use an escrow and did

14   not record the deed at the time of the sale in order to protect Ms. Jeng's privacy. Both Mr. Hyatt and

15   Ms. Jeng signed the deed and trust agreement that had been prepared by Mr. Hyatt's attorney, making

16   Ms. Jeng the owner of the property, and Mr. Hyatt gave her the keys to the house. Mr. Hyatt did not

17   reside in this house after October 1, 1991.

18         In October 1991, Mr. Hyatt leased a Las Vegas apartment in which he resided until he

19   purchased a home, attended services at a Las Vegas synagogue, and continued to look for a home to

20   purchase in Las Vegas.

21         In November of 1991, Mr. Hyatt obtained a Nevada driver's license, registered to vote, joined

22   a Las Vegas synagogue, and continued to look for a home to purchase in Las Vegas.

23         Mr. Hyatt worked with several real estate agents in Las Vegas, walking through a large

24   number of residences between September of 1991 and March of 1992. He made offers, including

25   large earnest money deposits for nine different houses, including an offer he placed on December 16,

26   1991, for a home located at 7335 Tara Avenue, in Las Vegas. After a series of offers and counter-

27   offers in December through March of 1992, an offer was accepted and escrow was opened on this

28   Tara Avenue property. Escrow closed on April 3, 1992 and Mr. Hyatt moved in that day. It has been

RJN000744

1   more than 17 years since Mr. Hyatt moved to Las Vegas, where he still resides to this very day at his

2   Tara Avenue home.

<u>**ARGUMENT**</u>

**I.    FTB DID NOT CARRY ITS INITIAL BURDEN OF PROOF TO SUSTAIN THE ASSESSMENT**

As a general principle, FTB's determination of an assessment is presumed correct and the taxpayer has the burden of proving it to be wrong.[6] However, this Board recognizes that with respect to any assessment determination, FTB's "initial burden is to show why its assessment is reasonable and rational."[7] FTB's conduct during the course of the audit, which generated the assessment, and its conduct during the protest that sustained the assessment, fall far short of "reasonable and rational." Therefore FTB did not carry its initial burden of proof.

FTB's auditor engaged in many reprehensible activities during the course of the audit that call into question bad faith motives and raise doubt with regard to not only the reasonable and rational nature of the FTB's assessment, but the legitimacy of the assessment for the 1991 disputed period. In short, FTB's auditor performed a one-sided investigation, collecting evidence she could twist to appear unfavorable to the taxpayer while ignoring and not collecting evidence that was favorable to the taxpayer. Similarly, FTB personnel intentionally delayed Mr. Hyatt's protest proceeding without keeping Mr. Hyatt informed or responding to Mr. Hyatt's evidence and arguments. There were a multitude of unreasonable and irrational acts by FTB, a few of which are discussed below.

First, the auditor's actions were fueled by personal bias and prejudice against the taxpayer. FTB's auditor openly expressed her racial bias against Mr. Hyatt and his business associates, making racial epithets to a fellow FTB auditor including "I'm going to get that Jew bastard" in reference to Mr. Hyatt and "Gook" in reference to Mr. Hyatt's Asian business associate, Ms. Jeng.[8]

---

[6] *See, e.g., Todd v. McColgan* (1949) 89 Cal.App.2d 509, 514; *Appeal of Michael E. Myers*, 2001-SBE-001, May 31, 2001.

[7] *Appeal of Robert E. Wesley & Jerry J. Couchman*, 2005-SBE-002, Nov. 15, 2005; *Todd, supra*, 89 Cal.App.2d at 514; *Appeal of Myers, supra.*

[8] Ex. 2, *Hyatt v. Franchise Tax Bd.*, Dist. Ct. of Clark Cty., Nevada, Case No. A382999 (hereinafter cited as "*Hyatt v. FTB*"), Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/23/08, p. 165; *see also* Ex. 3, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, p. 56; Ex. 4, Partial Transcript, Depo. of Candace Les, 1/11/00, Vol. 1, p. 10.

RJN000745

1        Second, FTB's auditor took it upon herself to make an undocumented "stealth visit" to Mr.

2    Hyatt's home in Las Vegas after she had closed the 1991 audit.[9] Between November 27, 1995 and

3    November 30, 1995, Mr. Hyatt's auditor, Sheila Cox, and another FTB auditor, Candace Les,

4    traveled to Las Vegas.[10] Ms. Les needed to work on five cases.[11] Approximately ten days prior to

5    the trip, Mr. Hyatt's auditor faxed to Ms. Les a one-page sheet of "Activities Needed to be Done in

6    Las Vegas," including an extensive list of nine activities to be performed regarding Mr. Hyatt during

7    the November 1995 Las Vegas visit.[12] The auditor planned to investigate Mr. Hyatt's former Wagon

8    Trails apartment and his Tara home. She marked up maps of Las Vegas plotting out in her own

9    handwriting the routes to these places.[13]

10       During the November 1995 trip to Las Vegas, the auditor indeed visited Mr. Hyatt's Tara

11    home. In describing the auditor's activities at Mr. Hyatt's home, Ms. Les testified the auditor went

12    through a gated portion of the backyard, peered in a window of the home, opened the mailbox and

13    "look[ed] through it" and examined the contents of his garbage can.[14] The auditor also took a

14    "trophy picture" of Ms. Les in front of Mr. Hyatt's Nevada home.[15]

15       Despite the fact the November 1995 trip was pre-planned, nowhere in the 1991 or 1992 audit

16    files is this visit by the auditor even mentioned, much less discussed. Why not? The audit narratives

17    and progress reports for both audits are devoid of any discussion of a November 1995 trip to Las

18    Vegas by the auditor, and do not contain any "Activities Needed to be Done in Las Vegas" list

---

19    [9] Ex. 5, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/30/08, pp. 82-83 (Mr. Hyatt's

20    auditor, Sheila Cox, confirms the November 1995 trip to Las Vegas with FTB auditor Candace Les was after she had closed the 1991 audit of Mr. Hyatt).

    [10] Ex. 6, *Appeal by Candace Les*, California State Personnel Board Case No. 98-1691, Partial Transcript of 11/16/98 hearing,

21    pp. 27, 28, 34.

22    [11] *Id.* at p. 27.

23    [12] *See* Ex. 7, fax of "Activities Needed to be Done in Las Vegas," from S. Cox to C. Les, dated 11/17/95.

    [13] *See* Ex. 2, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/23/08, pp. 176-178; *see*

24    *also* Ex. 8, copy of auditor's map.

    [14] Ex. 3, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, pp. 62-65, 85-87; *see*

25    *also* Ex. 6, *Appeal by Candace Les*, *supra*, Partial Transcript of 11/16/98 hearing, p. 35, stating "We went to the house and she was, like, acting inappropriately ...." and p. 135, stating the auditor "went through the taxpayer's trash, she went to his

26    mailbox, she opened his mailbox, she went around to the back, she went up to the windows."

    [15] Ex. 9, picture of Candace Les in front of Mr. Hyatt's Las Vegas home; *see also* Ex. 2, *Hyatt v. FTB*, Partial Transcript

27    of Trial Proceedings, Testimony of Candace Les, 4/23/08, pp. 179:21 - 180:21; Ex. 3, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, pp. 44:3-14; 62:25 - 63:5; 84:24 - 85:2; 131:12-21; 132:24 -

28    133:3.

---

1   generated by the auditor in preparation for the visit.[16]  Nor do the audit files contain the picture of

2   Ms. Les in front of Mr. Hyatt's Tara home.  Both audit narratives (1991 and 1992) discuss and rely

3   heavily upon an earlier March 1995 visit to Las Vegas by the auditor and her activities during such

4   visit.[17]  But there is no mention of the November 1995 Las Vegas visit with Ms. Les eight months

5   later.  Given the auditor's extensive list of "activities needed to be done in Las Vegas," coupled with

6   the activities described by Ms. Les,[18] it is unbelievable for this November 1995 visit to Las Vegas by

7   the auditor in pursuit of information pertaining specifically to the Hyatt audit to *not* show up in either

8   of the audit files for the 1991 or 1992 audits of Mr. Hyatt.  The absence of any references in the audit

9   files to this Las Vegas visit is suspect.

10          Moreover, the impropriety of the auditor's behavior during the November 1995 Las Vegas

11  visit is inexcusable.  The auditor makes a "stealth visit" to Las Vegas for a specific, pre-planned

12  "Hyatt" agenda.  She looks in a citizen's mailbox, goes into his gated yard, goes through his garbage,

13  and looks in his windows.  There is no conceivable basis for arguing this sort of conduct by a

14  representative of FTB is appropriate, or necessary, or rational, or reasonable in the scope of a

15  residency audit.  The auditor was never given permission by Mr. Hyatt, whatsoever, to engage in any

16  [16] *See* Ex. 7, fax of "Activities Needed to be Done in Las Vegas," from S. Cox to C. Les.

17  [17] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, pp. 3, 28, 43-44 (CCC 00966, 00991, 01006 - 01007) and FTB 1992 Narrative Report, pp. 6-8 (CCC 00008 - 00010)).

18  [18] FTB may claim the auditor testified in *Hyatt v. FTB* that she did not engage in any of the activities testified to by Ms. Les.  However, on August 6, 2008, a jury in the District Court of Clark County, Nevada, in *Hyatt v. FTB*, Case No.

19  A382999, rendered a verdict in favor of Mr. Hyatt.  Damages were awarded in Mr. Hyatt's favor in the amount of $85 million for intentional infliction of emotional distress, $52 million for invasion of privacy, $1.1 million for attorneys' fees

20  expended in the administrative process ongoing in California and $250 million for punitive damages. (*See* August 31, 2008 Franchise Tax Board Public Litigation Roster, p. 7, http://www.ftb.ca.gov/law/litrstr/index.shtml.)  This verdict

21  controls how (seemingly) conflicting evidence from trial must be interpreted.  Under Nevada law, the truth or falsity of the testimony of witnesses is for the jury, "it being the exclusive judge of the credibility" of witnesses. (*Ferris v.*

22  *Albright's Courtesy Elec. Co.* (1954) 70 Nev. 528, 531, 275 P.2d 755, 756.) "It is the prerogative of the trier of fact to evaluate the credibility of witnesses and determine the weight of their testimony.  Where there is substantial evidence to

23  support the findings of the trial court, [an appellate court] will affirm the judgment even though the evidence is conflicting." (*Rowland v. Pepire* (1983) 99 Nev. 308, 312, 662 P.2d 1332, 1334.) (Citations omitted.)  It is for this reason

24  that even an appellate court is "not in a position to overturn a decision based upon the credibility of live witnesses." (*Desert Valley Const. & Employers Ins. Co. of Nevada v. Hurley* (2004) 120 Nev. 499, 504, 96 P.3d 739, 743.)  The case

25  is reviewed by referring "only to the testimony most favorable to the plaintiff's theory of the case" (*Rocky Mountain Product Trucking Co. v. Johnson* (1962) 78 Nev. 44, 50, 369 P.2d 198, 201) based on the judgment in the district court in

26  favor of Mr. Hyatt.  Comparable rules exist under California law. (*See* 9 WITKIN, CALIFORNIA PROCEDURE § 365 at 421-24 (5th ed. 2008).)  Accordingly, to the extent FTB introduces in this SBE appeal proceeding testimony evidence

27  by Ms. Cox or other FTB witnesses in *Hyatt v. FTB* to rebut testimony evidence in *Hyatt v. FTB* presented by Mr. Hyatt in this SBE appeal proceeding, we contend this Board in making its determination must refer only to the testimony most

28  favorable to Mr. Hyatt based on the judgment in the Nevada district court in his favor.

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1991

RJN000747

1  activities on his property.[19]  In addition, the auditor's conduct, as described by Ms. Les, is a clear

2  violation of Mr. Hyatt's State and Federal Constitutional rights and of the sanctity of his home.[20]  "At

3  the risk of belaboring the obvious, private residences are places in which the individual normally

4  expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is

5  plainly one that society is prepared to recognize as justifiable."[21]  Indeed, "the 'physical entry of the

6  home is the chief evil against which the wording of the Fourth Amendment is directed.'"[22]  A central

7  principle of the Fourth Amendment is that a person may "retreat into his own home and there be free

8  from unreasonable governmental intrusion."[23]  On August 19, 2008, a Nevada jury found in favor of

9  the taxpayer in *Hyatt v. FTB* for tortious conduct, including Mr. Hyatt's invasion of privacy cause of

10  action, and awarded substantial damages, including $52 million for invasion of privacy.[24]

11

12

13  [19] The "Mission" of the FTB is to "perform in a manner warranting the highest degree of public confidence in our integrity,

14  efficiency and fairness."  Indeed, the auditor's conduct borders on being criminal.  As stated by Ms. Les, the auditor "went to the mailbox [and] [s]he was looking through it" and the auditor took "mail out of it and [had] mail in her hand."  (Ex. 3, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, pp. 62, 155.)  The auditor's

15  actions may well constitute a federal offense, in violation of section 1708 of Title 18 of the United States Code.  In pertinent part, section 1708 provides that "[w]hoever ... attempts so to obtain, from out of any mail, ... letter box, mail

16  receptacle, ... or other authorized depository for mail matter ... any article or thing contained therein ... [s]hall be fined under this title or imprisoned not more than five years, or both."  (18 U.S.C. § 1708.)  In addition, the auditor appears to

17  have violated Nevada state law by trespassing on Mr. Hyatt's property when "she was at his window."  (Ex. 3, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, p. 62.)  Section 206.140 of the Nevada

18  Revised Statutes provides, in pertinent part, that "[e]very person who ... [c]ommits any trespass upon the grounds attached thereto [(of any building)], or any fixtures placed thereon, or any enclosure or sidewalk about the building ... shall be

19  guilty of a public offense ... [and] in no event less than a misdemeanor."  (Nev. Rev. Stat. § 206.140.)  In addition, the auditor might have also been in violation of section 207.200 of the Nevada Revised Statutes which provides in pertinent

20  part that "[a]ny person who, under circumstances not amounting to a burglary ... [g]oes upon the land or into any building of another with intent to vex or annoy the owner or occupant thereof ... is guilty of a misdemeanor."  (Nev. Rev. Stat. §

21  207.200.)

     [20] The Fourth Amendment gives concrete expression to a right of the people which "is basic to a free society." (*Wolf v.*

22  *Colorado* (1949) 338 U.S. 25, 27.)  As such, the Fourth Amendment is enforceable against the States through the Fourteenth Amendment.  (*Ker v. California* (1963) 374 U.S. 23, 30.)  A similar guarantee against unreasonable

23  government searches is set forth in Article I, § 13, of the California Constitution.  (*People v. Camacho* (2000) 23 Cal. 4th 824, 830.)  "The sanctity of a private home is not only guaranteed by the Constitutions of the United States and of our

24  own state, but it is traditional in our Anglo-Saxon heritage.  'A man's home is his castle' is, and should be, more than an empty phrase.  The Constitutions themselves point to the proper procedure to be followed in invading this precious

25  sanctity...." (*People v. Privett* (1961) 55 Cal. 2d 698, 703.)  The protection of the Fourth Amendment is not limited to a situation in which an individual is suspected of criminal behavior.  (*Camara v. Mun. Ct.* (1967) 387 U.S. 523, 530.)

26  [21] *United States v. Karo* (1984) 468 U.S. 705, 714.

     [22] *Payton v. New York* (1980) 445 U.S. 573, 585, *quoting United States v. United States Dist. Ct.* (1972) 407 U.S. 297, 313.

27  [23] *Silverman v. United States* (1961) 365 U.S. 505, 511.

28  [24] *See* fn. 18, *supra*.

RJN000748

1    Third, the auditor relied heavily on "secret" interview notes that were erroneously designated

2    as "affidavits" and subsequently withheld from Mr. Hyatt.[25]  These related to three estranged persons

3    (including Mr. Hyatt's ex-wife), none of whom had any actual knowledge of Mr. Hyatt's move to

4    Nevada.[26]  Mr. Hyatt made a thorough and complete response to the auditor's reliance on these

5    alleged "affidavits" during the course of the protest,[27] but FTB has made no attempt to rebut such

6    arguments.  Moreover, neither the auditor, nor the protest officer, attempted to contact for affidavits

7    or interviews any of Mr. Hyatt's many non-California (including Nevada) professionals, friends,

8    colleagues or business associates that he identified during the audit.

9        Fourth, the auditor's assessment was sustained with no regard to the written comments made

10   by the assigned case reviewer.  The reviewer spotted the very weak foundation of the assessment.

11   The reviewer directly questioned the audit findings, stating Mr. Hyatt may have moved in December

12   1991 and questioned the fraud penalty.[28]  The reviewer's comments were summarily ignored and

13   overridden by the reviewer's supervisor who signed off on the audit and assessment without ever

14   looking at the audit file.[29]  The NPA was issued five days later.

15       Fifth, FTB violated a court order when one of its audit reviewers intentionally erased the

16   electronic data on a computer hard drive with information pertinent to Mr. Hyatt's case.  On March 3,

17   1999, an Order was issued by a Nevada District Court in *Hyatt v. FTB* cautioning counsel "that there

18   is an obligation on both sides to preserve documents."[30]  Shortly after this Order was issued, one of

19   FTB's reviewers involved with Mr. Hyatt's audit intentionally erased the files on her computer hard

20   drive pertaining to Mr. Hyatt, at the request of one of her superiors within FTB.[31]  Regarding a

21   party's failure to preserve evidence, the jury in *Hyatt v. FTB* was specifically instructed as follows:

> Where relevant evidence that would properly be part of the case is within the control of the party whose interest it would naturally be to produce it, and that

---

[25] *See* Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 106-117.

[26] *Id.*

[27] *Id.*

[28] Ex. 10, Review Comments, 4/18/96 (FTB 104118).

[29] Ex. 11, Partial Transcript of Trial Proceedings, Testimony of Penny Bauche, 7/7/08, pp. 122-128.

[30] Ex. 12, *Hyatt v. FTB*, Order on Plaintiff's Motion to Reconsider Stay of Discovery, 3/3/99.

[31] Partial Transcript, Depo. of Carol Ford, Vol. II, 5/5/99, pp. 262-263, 347-350 and *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Carol Ford, 7/8/00, pp. 58-72, collectively Ex. 13.

---

RJN000749

party fails to produce the evidence because it failed to preserve the evidence after having been put on notice of the litigation and after the evidence had been requested, the jury may draw an inference that such evidence would have been unfavorable to that party. In this action, it has been established that FTB failed to preserve electronic evidence of back up tapes for the EMC system after the litigation was commenced and the evidence had been formally requested. Under the law, you may infer that this evidence would have been unfavorable to FTB.[32]

This Board has also similarly held "that the failure of a party to introduce evidence which is within [a party's] control gives rise to the presumption that, if provided, it would be unfavorable."[33] The reviewer's hard drive was in FTB's exclusive control and FTB failed to preserve that evidence. By failing to produce the electronic data contained therein and by instead destroying it, FTB triggered the presumption that the information on the hard drive was unfavorable to FTB's position in this case and thus favorable to Mr. Hyatt's.

Sixth, FTB again, and subsequent to the Nevada court's March 3, 1999 Order, destroyed in approximately December 2002 a large amount of backup tape data from its EMC system.[34] Jury Instruction No. 58 in *Hyatt v. FTB*, set forth above, specifically instructed the jury on FTB's spoliation of this data. This was information exclusively within FTB's control that it failed to preserve. By destroying this data, we must presume the information was unfavorable to FTB's position in this case and thus favorable to Mr. Hyatt's.[35]

Seventh, the auditor did not take adequate steps to secure the renter's file from Mr. Hyatt's Las Vegas Wagon Trails apartment. The auditor was told what the landlord required in order to obtain Mr. Hyatt's renter's file, but failed to obtain the file and withheld her furtive efforts to acquire that file from Mr. Hyatt even though the file was central to her case.[36]

---

[32] Ex. 14, *Hyatt v. FTB*, Jury Instruction No. 58.

[33] *Appeal of Don A. Cookston*, 83-SBE-048, Jan. 3, 1983; *see also Giddio v. Comm'r* (1970) 54 T.C. 1530, 1535 (internal citations omitted).

[34] Ex. 97, Partial Transcript, Depo. of Bruce Radov, 9/9/05, pp. 40-43, and Depo. Ex. 1050 attached thereto.

[35] *Appeal of Cookston, supra.*

[36] After asserting in the Narrative Report that the Wagon Trails Apartments manager "provided the rental file for examination" during the auditor's visit to Nevada in March of 1995 (Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 3 (CCC 00966)), the auditor testified at trial in *Hyatt v. FTB* that the manager of the Wagon Trails Apartments had informed her that the auditor would need to obtain Mr. Hyatt's consent *before* the manager would release Mr. Hyatt's file to her. (*See* Ex. 5, *Hyatt v. FTB*, Partial Transcript of Proceedings, Testimony of Sheila Cox, 5/30/08, pp. 63-64.) However, the auditor did not obtain Mr. Hyatt's consent, nor did she "ask [Mr. Hyatt's] tax representative to provide consent," nor did she even "indicate to [Mr. Hyatt and his tax representative] [she] was interested in obtaining

(Footnote continues on next page.)

RJN000750

1    Eighth, aside from FTB's indefensible audit conduct, FTB took over *eleven years* to act on the

2    taxpayer's protest for the 1991 disputed period. There were literally *years at a time* that the taxpayer

3    received no correspondence from FTB, no indication FTB was actively working the protest and no

4    response to Mr. Hyatt's evidence and arguments. Despite specific and repeated requests by the

5    taxpayer to act on the protest so the taxpayer could proceed with his administrative appeal, FTB took

6    no action and continued to let the protest languish, leaving the taxpayer at FTB's mercy to move the

7    case forward.[37] All the while, interest has continued to accrue and compound at an exponential rate.

8    When FTB finally acted on the taxpayer's protest after an eleven year delay, it gave the

9    taxpayer 30 days to respond to its 50-page Determination Letter with "[n]o extension to the thirty day

10   response period [to] be granted." FTB's issuance of a 50-page, single-spaced Determination Letter,

11   after having eleven years to consider the documentation and information submitted by the taxpayer,

12   with a 30-day response period, is particularly flagrant because of the fraud penalties, the issues of

13   significant FTB errors, and the substantial amounts of the assessments of taxes, penalties and interest.

14   Moreover, FTB made a substantive determination against the taxpayer on a California source income

15   theory, for the *first* time in the history of this case, in the Determination Letter. Indeed, as discussed

16   in more detail below, the source income issue was long ago disposed of within FTB at audit. In

17   particular, the record is replete with evidence that FTB, during the audit phase of this case,

18   specifically considered and rejected an assessment based on a California source income theory. In

19   fact, the source income issue by itself consumed 19 pages of the 50-page Determination Letter, yet

20   FTB limited Mr. Hyatt to 30 days to respond to this new issue as well as all other issues.

21   Tenth, FTB alleges facts in the Determination Letter[38] in support of its residency assessment

22   that were rebutted years ago by Mr. Hyatt at protest.[39] FTB never responded at protest to this

23

24   (Footnote continued from previous page.)

25   [Mr. Hyatt's] file." (*Id.*) This same file is where the auditor claims to have found and reviewed Mr. Hyatt's termination notice with its alleged statement that he was moving back to California (discussed *infra*) and to have found an envelope of Mr. Hyatt's that was postmarked in California and dated 12/8/91. (*See* Annex VI, CCC BATES Documents (FTB 1991

26   Narrative Report, p. 3 (CCC 00966)).

27   [37] *See* Argument VI below.

     [38] *See* Ex. 1, FTB 11/1/07 Determination Letter, pp. 2-3.

28   [39] *See* Annex III, 1991 Protest Supplement Letter.

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1991

RJN000751

1   rebuttal. Aside from what was already provided (and ignored) during the protest, a complete rebuttal

2   to FTB's alleged facts in the Determination Letter is set forth separately in Annex VIII.

3       These activities engaged in by the auditor and the protest hearing personnel — the very audit

4   activities that led to the assessment and the very protest activities that led to sustaining the assessment

5   — cannot be condoned, let alone be considered "reasonable and rational." For over ten years FTB

6   has defended the reprehensible conduct of its employees toward Mr. Hyatt, both during the audit and

7   protest and in the Nevada courts in a lawsuit brought by Mr. Hyatt against FTB for tortious conduct.

8   On August 19, 2008, a Nevada jury found in favor of the taxpayer in *Hyatt v. FTB* for tortious

9   conduct, including Mr. Hyatt's fraud cause of action, and awarded substantial damages, including

10  $250 million in *punitive* damages, with a total award of $388 million to the taxpayer.[40]

11      Accordingly, FTB did not carry its initial burden in this case to show why its assessment is

12  reasonable and rational.

13  **II.   MR. HYATT WAS A NEVADA RESIDENT COMMENCING IN SEPTEMBER 1991**

14      While residency cases are intensively factual in nature, there are several legal standards under

15  which those facts are to be evaluated. The legal analysis begins with the statute. Section 17014(a)

16  defines "resident" to include: (1) Every individual who is in California for other than a temporary or

17  transitory purpose; or (2) Every individual who is domiciled in California who is outside the state for

18  a temporary or transitory purpose.[41] Any individual who is not a resident is, by process of

19  elimination, a nonresident.[42]

20      **A.   Mr. Hyatt Was Domiciled in Nevada Commencing in September 1991**

21      Domicile has been defined as the "one location with which for legal purposes a person is

22  considered to have the most settled and permanent connection, the place where he intends to remain

23  and to which, whenever he is absent, he has the intention of returning...."[43] "Residence" and

24

---

25  [40] *See* fn. 18, *supra*.

26  [41] *See also* 18 Cal. Code of Regs. § 17014(a).

    [42] Cal. Rev. & Tax. Code § 17015; 18 Cal. Code of Regs. § 17014(a).

27  [43] *Whittell v. Franchise Tax Bd.* (1964) 231 Cal.App.2d 278, 284; *see also* 18 Cal. Code Regs. § 17014(c) (stating
    "[a]nother definition of 'domicile' consistent with the [foregoing] is the place where an individual has fixed his habitation and

28  has permanent residence without any present intention of permanently removing therefrom").

---

sa-57710                                    11

RJN000752

1  "domicile" are distinct concepts for California tax purposes. "Domicile" denotes the one location

2  with which a person has the most settled and permanent connections and where the person intends to

3  remain.

4     "Residence" denotes any factual place of abode of some permanency, that is, "more than a

5  mere temporary sojourn."[44]  A taxpayer may have several residences simultaneously for different

6  purposes, as well as more than one residence for tax purposes.  However, a taxpayer may have only

7  one domicile at any given time.[45]  A domicile cannot be lost until a new one is acquired.[46]  When

8  domicile is an issue in a residency case, domicile is always decided first.  For California

9  domiciliaries, the focus is upon whether the taxpayer is absent from California for a temporary or

10  transitory purpose.  If so, the taxpayer is a California resident.[47]  For non-California domiciliaries, the

11  focus is upon whether he/she is in California for other than a temporary or transitory purpose.[48]  What

12  constitutes a "temporary or transitory purpose" under California tax law is the same in either

13  instance.

14     Once acquired, a domicile is presumed to continue until it is shown to have changed.[49]  In

15  order to change domicile, this Board has required a showing that a taxpayer (1) left the state without

16  any intention of returning, and (2) was located elsewhere with the intention of remaining there

17  indefinitely.[50]  In determining the taxpayer's intent, "the 'acts and declarations of the party must be

18  taken into consideration.'"[51]  The burden of proof is on the party asserting the change in domicile,

19  which can be met by declarations and acts of the taxpayer.[52]

20

21  [44] *Whittell, supra* at 284; *Smith v. Smith* (1955) 45 Cal.2d 235, 239-240.

   [45] *Whittell, supra* at 284.

22  [46] *Estate of Phillips* (1969) 269 Cal.App.2d 656, 659; *Aldabe v. Aldabe* (1962) 209 Cal.App.2d 453, 466.

23  [47] 18 Cal. Code of Regs. § 17014(a).

   [48] *Id.*

24  [49] 18 Cal. Code of Regs. § 17014(c); *Murphy v. Travelers Ins. Co.* (1949) 92 Cal.App.2d 582, 587.

25  [50] *See Appeal of Terance and Brenda Harrison*, 85-SBE-059, June 25, 1985; *Appeal of Stephen D. Bragg*, 2003-SBE-002,
   May 28, 2003; *DeMiglio v. Mashore* (1992) 4 Cal.App.4th 1260, 1268 (holding that domicile was changed when taxpayer

26  moved to new residence).

   [51] *Appeal of Joe and Gloria Morgan*, 85-SBE-078, July 30, 1985; *see also Appeal of Harrison, supra*, (stating "[i]t is the

27  'intent' of the person that determines domicile"); *Chapman v. Super. Ct.* (1958) 162 Cal.App.2d 421, 426; *Estate of
   Phillips* (1969) 269 Cal.App.2d 656, 659.

28  [52] *Appeal of Raymond H. and Margaret R. Berner*, 2001-SBE-006-A, Aug. 1, 2002.

RJN000753

1    The California Court of Appeal recently confirmed the importance of the physical acts of the

2    taxpayer, holding: "To the extent residence and domicile depend upon intent, 'that intention is to be

3    gathered from one's acts.'"[53]  The Court further stated that when "'a person actually removes to

4    another place with an intention of remaining there for an indefinite time, and as a place of present

5    domicile, it becomes his place of residence or domicile.'"[54]  With specific regard to domicile, the

6    Court stated that "'our courts have held that two elements are indispensable to accomplishing a

7    change of domicile:  actual residence in the new locality plus the intent to remain there.'"[55]

8    Thus, a taxpayer's intent is the most important factor in determining domicile.  After several

9    visits to Las Vegas and nearly a year of preparation, Mr. Hyatt moved to Nevada on September 26,

10   1991 with the intent to remain there indefinitely and he has resided in Las Vegas since then (more

11   than 17 years) with no intent to leave.  Mr. Hyatt's acts reflect this intent, including lease of an

12   apartment in Las Vegas;[56] intense efforts to purchase a home in Las Vegas;[57] arrangements to sell his

13   only California residence;[58] the sale of his only California residence;[59] many discussions with friends,

14   family members and colleagues regarding his move to Nevada and becoming established there;[60]

15   [53] *Noble v. Franchise Tax Bd.* (2004) 118 Cal.App.4th 560, 567-568, quoting *Chapman, supra*, 162 Cal.App.2d at 426.

16   [54] *Id.* at 568, quoting *Estate of Weed* (1898) 120 Cal. 634, 639.

     [55] *Id.*, quoting *DeMiglio v. Mashore, supra*, 4 Cal.App.4th at 1268.

17   [56] Annex I, 1991 Chronological Statement of Facts, p. 22; Annex V, H Bates Documents (Wagon Trails Rental
     Agreement (H 01249 – 01252)); Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 19, Affidavit of Gilbert P. Hyatt,
18   5/18/01, ¶ 6; Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶ 12; Ex. 26, Affidavit of Barry Lee, 4/26/01, ¶ 7).

     [57] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 19, Affidavit of Gilbert P. Hyatt, 5/18/01, ¶¶ 3, 6, 25; Ex. 30,
19   Declaration of Robert Schulman, 3/16/96, ¶ 3); Annex V, H BATES Documents (Multiple Listing Service printout dated
     12/10/91 (H 013696 - 013698); notes by Mr. Hyatt dated 12/11/91 (H 013694)); Annexes V and VI, H BATES and CCC
20   BATES Documents (Check No. 111 dated 12/12/91 (CCC 02246); Purchase Agreement and Earnest Money Receipt
     dated 12/12/91 (H 020249 - 020253); Check no. 113 dated 12/12/91 (CCC 02248); Purchase Agreement and Earnest
21   Money Receipt dated 12/12/91 (H 020245 – 020248)); Ex. 15, Offer and Acceptance Agreement and Earnest Money
     Receipt dated 2/3/92 (P05653-P05475).

22   [58] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 19, Affidavit of Gilbert P. Hyatt, 5/18/01, ¶¶ 20, 21, 23, 24; Ex. 27,
     Affidavit of Roger McCaffrey, 1/22/01, ¶¶ 3, 4, 7-11; Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶ 4-13; Ex. 21,
23   Affidavit of Grace J. Jeng, 5/18/01, ¶¶ 3-7).

24   [59] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 19, Affidavit of Gilbert P. Hyatt, 5/18/01, ¶¶ 20, 21, 23, 24; Ex. 27,
     Affidavit of Roger McCaffrey, 1/22/01, ¶¶ 3, 4, 7-11; Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶ 4-13; Ex. 21,
25   Affidavit of Grace J. Jeng, 5/18/01, ¶¶ 3-7; Ex. 26, Affidavit of Barry Lee, 4/26/01, ¶¶ 5, 8; Ex. 1, Affidavit of Caroline
     Cosgrove, 1/2/01, ¶ 9); and Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, pp. 17, 65 (CCC 00980,
26   CCC 01029)).

     [60] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 3; Ex. 21, Affidavit
27   of Grace J. Jeng, 5/18/01, ¶¶ 3, 11, 12; Ex. 26, Affidavit of Barry Lee, 4/26/01, ¶¶ 3, 4; Ex. 1, Affidavit of Caroline
     Cosgrove, 1/2/01, ¶ 3; Ex. 17, Affidavit of Daniel J. Hyatt, 5/1/01, ¶ 5; Ex. 9, Affidavit of Irene Gorman, 12/29/06, ¶¶ 3,
28   5; Ex. 6, Affidavit of Hyman Farber, 12/28/06, ¶¶ 5, 6, 9; Ex. 10, Affidavit of Saul Gorman, 12/29/06, ¶¶ 4, 5; Ex. 7,

                                                                        (Footnote continues on next page.)

sa-57710                                    13

RJN000754

1    Nevada voter registration;[61] obtaining a Nevada driver's license;[62] joining a Las Vegas synagogue;[63]

2    business trips that originated and terminated in Las Vegas;[64] purchasing furniture in Las Vegas for his

3    apartment;[65] completing change of address forms with the US Postal Service to reflect his new Las

4    Vegas address;[66] opening multiple Nevada utility accounts;[67] and creating Las Vegas bank

5    relationships.[68]

6         Mr. Hyatt had the intent not to return to his former place of domicile (California) for any

7    permanent purpose. That intent was coupled with the intent to remain indefinitely in the new location

8    (Nevada). The notion of intent is satisfied not only by Mr. Hyatt's own "acts and declarations",[69] but

9    also by the corroborating statements and acts of others and by the fact that he remains a Nevada

10    resident today – over 17 years later.

11

12

13

---

(Footnote continued from previous page.)

14   Affidavit of Yetta Farber, 12/28/06, ¶¶ 5, 7, 9; Ex. 33, Affidavit of Nate Warnick, 2/27/07, ¶¶ 5, 6; Ex. 34, Affidavit of

15   Yettie Warnick, 2/27/07, ¶¶ 5, 6; Ex. 11, Affidavit of Morton Haber, 3/13/07, ¶¶ 3, 5; Ex. 32, Affidavit of Rosalie Traumueller, 8/30/08, ¶ 3; Ex. 35, Affidavit of Harry Widdifield, 9/25/08, ¶¶ 7-9; Ex. 24, Affidavit of John Keller,

16   10/24/08, ¶ 4-10; Ex. 14, Affidavit of Henry Huey, 11/23/08, ¶¶ 6, 8, 10-15; Ex. 16, Affidavit of R. Danny Huntington, 10/14/08, ¶¶ 5, 10, 11).

17   [61] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 5 (CCC 00968)); Annex V, H BATES Documents (Clark County Voter Information (H 01272)).

18   [62] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 6 (CCC 00969)); Annexes V and VI, H BATES and CCC BATES Documents (Nevada driver's license records (CCC 01255); (H 013620 - 013622, H 013625)).

19   [63] Annex I, 1991 Chronological Statement of Facts, p. 38; Annex VI, CCC BATES Documents (Canceled Check No. 108

20   dated 11/15/91 (CCC 02623 - 02624)); Annex V, H BATES Documents (Congregation Ner Tamid envelope (H 09679)); Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 16).

21   [64] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, pp. 56-63 (CCC 01020 - 01027); E. Cowan 9/22/95 letter to FTB, p. 5 (CCC 02200); travel documentation (CCC 02276 - 02286)).

22   [65] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶ 12).

23   [66] Annex VI, CCC BATES Documents (Change of Address Order dated 10/21/91 (CCC 02418; Change of Address Order dated 10/21/91 (CCC 02419)).

24   [67] Annex VI, CCC BATES Documents (FTB Analysis of Utilities (CCC 03164-03166)); Annex V, H BATES Documents (payment for service made subsequent to 10/22/91 opening of account by Canceled Check Nos. 88 dated

25   11/1/91 and 103 dated 11/27/91 (H 013632, H 013635); Mr. Hyatt's Las Vegas mailing address imprinted on the checks (H 013632, H 013635); payment for service made subsequent to 10/21/91 opening of account by Canceled Check No. 87

26   dated 11/1/91 (H 013635)).

  [68] Annex V, H BATES Documents (CalFed Bank Statements beginning at (H 013362); Application at (H 012348); and

27   The Benham Group Statements beginning at (H 012393)); Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, pp. 6 – 30 (CCC 00969, 00993)).

28   [69] *Morgan, supra.*

RJN000755

1    **B.    Mr. Hyatt Left California in September 1991 for Other Than Temporary or**
2         **Transitory Purposes**

3         Another aspect of California's definition of residency is whether the taxpayer left his/her state

4    of domicile for "other than a temporary or transitory purpose."[70]  Although in every instance the

5    determination of this purpose "will depend to a large extent upon the facts and circumstances of each

6    particular case,"[71] this Board has articulated two tests to apply to such determinations:  the "close

7    connections" test, and the "identifiable purpose" test.  Throughout the 1991 disputed period, Mr.

8    Hyatt consistently returned to Nevada following his business trips, vacation trips and health-related

9    trips to Virginia, Washington, D.C., Texas, New York and California.  He has shown, through

10   affidavits and documentary evidence, that he intended to and did make Nevada his permanent home

11   with no intention of returning to California, except for temporary and transitory purposes.

12   **C.    Mr. Hyatt's Contacts with Nevada Satisfy the Close Connections Test**

13

14        FTB Regulation 17014(b) states that "[t]he underlying theory of sections 17014-17016 is that

15   the state with which the person has the closest connection during the taxable year is the state of his

16   residence."  This test focuses upon the contacts that the taxpayer has with his/her new place of abode.

17   While the facts and circumstances peculiar to each case must be taken into consideration, there are a

18   number of factors traditionally examined by this Board in the "close connections" analysis.[72]  In

19   *Appeal of Stephen D. Bragg*, 2003-SBE-002, May 28, 2000 (hereafter *Bragg*), this Board compiled

20   the following list of objective factors that identifies the type and nature of connections this Board

21   commonly finds informative when determining residency:[73]

22   _____

23   [70] 18 Cal. Code of Regs. § 17014(a).

     [71] *Id.* at § 17014(b).

24   [72] This Board has issued nearly 200 memorandum opinions since 1942 in cases where residency was at issue. (*See*
     http://boe.ca.gov/legal/legalindexR.htm#residency.)

25   [73] Since *Bragg*, this Board has issued at least nine Letter Decisions in which this Board referenced the *Bragg* factors in
     the "Applicable Law" section of the corresponding Hearing Summary. (*See, e.g., Appeal of David W. Sanders, et al.*,
26   SBE 400374, Aug. 19, 2008; *Appeal of James F. and Diane Montgomery*, SBE 309423, Aug. 21, 2008; *Appeal of Robert
     and Maureen Fouts*, SBE 383284, May 19, 2008; *Appeal of Kenneth Banks*, SBE 327922, Apr. 9, 2008; *Appeal of
27   Gregory B. Duro*, SBE 354992, Feb. 28, 2008; *Appeal of Larry and Rhoda Geisel*, SBE 358724, June 25, 2007; *Appeal of
     William F. and Susan J. Grun*, SBE 337066, June 25, 2007; *Appeal of Brian K. Shaw*, SBE 341954, Mar. 1, 2007; *Appeal
28   of James and Jean A. Bagley*, SBE 217274; Feb. 1, 2006.)

RJN000756

- The location of all of the taxpayer's residential real property, and the approximate sizes and values of each of the residences;
- The state wherein the taxpayer's spouse and children reside;
- The state wherein the taxpayer's children attend school;
- The state wherein the taxpayer claims the homeowner's property tax exemption on a residence;
- The taxpayer's telephone records (*i.e.*, the origination point of taxpayer's telephone calls);
- The number of days the taxpayer spends in California versus the number of days the taxpayer spends in other states, and the general purpose of such days (*i.e.*, vacation, business, etc.);
- The location where the taxpayer files his tax returns, both federal and state, and the state of residence claimed by the taxpayer on such returns;
- The location of the taxpayer's bank and savings accounts;
- The origination point of the taxpayer's checking account transactions and credit card transactions;
- The state wherein the taxpayer maintains memberships in social, religious, and professional organizations;
- The state wherein the taxpayer registers his automobiles;
- The state wherein the taxpayer maintains a driver's license;
- The state wherein the taxpayer maintains voter registration, and the taxpayer's voting participation history;
- The state wherein the taxpayer obtains professional services, such as doctors, dentists, accountants, and attorneys;
- The state wherein the taxpayer is employed;
- The state wherein the taxpayer maintains or owns business interests;
- The state wherein the taxpayer holds a professional license or licenses;
- The state wherein the taxpayer owns investment real property; and
- The indications in affidavits from various individuals discussing the taxpayer's residency.

RJN000757

1    The weight given to any particular factor "depends upon the totality of the circumstances" and

2  the focus of the examination is "to determine where an individual is present for other than a

3  temporary or transitory purpose, not whether or not an individual satisfies a majority, or even a

4  significant number, of the factors."[74]  Based on an analysis of the *Bragg* factors, Mr. Hyatt's closest

5  connections were with Nevada during the 1991 disputed period and his visits to California were

6  clearly for temporary and transitory purposes.

### 1.    The location of all of the taxpayer's residential real property, and the approximate sizes and values of each of the residences

9    The location of a taxpayer's principal residence is perhaps the most important factor in

10  determining the residency of such taxpayer.[75]  Ownership of a family home in California during an

11  absence from the State is usually treated as a significant indication that the taxpayer intends to return

12  to California and that the purpose of the taxpayer's absence is temporary or transitory.  A taxpayer's

13  failure to purchase a home in another location outside the state gives retention of the California home

14  even greater importance as an indicator of California residency.[76]  Here, Mr. Hyatt owned his prior

15  home in California for only five days (September 26, 1991 to September 30, 1991) of the 1991

16  disputed period; he actively shopped for a home to purchase in Las Vegas prior to and while living in

17  a hotel and an apartment in Las Vegas (both of which served as his home) during all of the 1991

18  disputed period; and he then purchased a home in Las Vegas in April 1992 which he still owns more

19  than 16 years later.  Mr. Hyatt's only residence has been in Las Vegas since September 1991 and

20  continues to be in Las Vegas to this very day more than 17 years later.

21    Prior to 1991, and while a resident of California, Mr. Hyatt purchased a home located at 7841

22  Jennifer Circle, La Palma, California.  This La Palma house remained Mr. Hyatt's principal residence

23  prior to his move to Nevada in September 1991.  Mr. Hyatt owned no other houses in California

24

25

---

26  [74] *Appeal of Bragg, supra.*

27  [75] *See Appeal of Odis L. and Lois N. Dobbs,* 87-SBE-044, June 17, 1987; *Appeal of Berner, supra.*

28  [76] *Appeal of Pierre E. G. and Nicole Salinger,* 80-SBE-080, June 30, 1980; *Appeal of David C. and Livia P. Wensley,* 81-SBE-147, Oct. 7, 1981.

1   during the 1980's and 1990's or thereafter. After much planning and preparation,[77] on October 1,

2   1991 Mr. Hyatt sold his former La Palma house to his colleague, Ms. Jeng.[78]

3        Ms. Jeng confirms the sale on October 1, 1991, and confirms Mr. Hyatt no longer lived there

4   after that date. In July 1991, Mr. Hyatt told Ms. Jeng that he was going to list his La Palma house

5   with a realtor. Ms. Jeng saw this as an opportunity to buy a house in a very desirable, affluent

6   Chinese community. She asked her friend and colleague, Barry Lee, to assist her, and together they

7   convinced Mr. Hyatt to sell his La Palma house to her.[79] About August 1991, Ms. Jeng suggested to

8   Mr. Hyatt that he sell her his La Palma house as-is with a reduction in price, and he agreed.[80] The La

9   Palma house needed a lot of work. The basement had a flooding problem, the carpet had holes in it

10  and the house needed a new roof, drapes, painting and other work.[81] Ms. Jeng called the house a

11  fixer-upper. Many of Mr. Hyatt's friends and colleagues agreed with Ms. Jeng's assessment of the

12  La Palma house.[82] Ms. Jeng suggested to Mr. Hyatt that he make a direct sale to her without a realtor

13  with a reduction in price and he agreed.[83]

14        On October 1, 1991, Ms. Jeng bought Mr. Hyatt's La Palma house, and she has continuously

15  owned this house to the present. She had learned that the public records would identify the owner of

16  the house as a single woman and would list her address. She requested that Mr. Hyatt not record the

17  house sale to protect her privacy. Mr. Hyatt consulted with two attorneys, Roger McCaffrey and Del

18  Bailey (Mr. Bailey was also a real estate broker), and agreed not to record the sale.[84] Mr. Hyatt and

19  Ms. Jeng signed the house sale papers on October 1, 1991. Mr. Bailey prepared the papers. They

20

---

21  [77] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶ 3-11).

22  [78] *See* Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, pp. 17, 65 (CCC 00980, CCC 01029)).

23  [79] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶ 3; Ex. 26, Affidavit of Barry Lee, 4/26/01, ¶ 5).

     [80] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶ 4).

24  [81] *Id.*

25  [82] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 16, Affidavit of R. Danny Huntington, 10/14/08, ¶ 5, stating that during one of his visits to Mr. Hyatt's house that he observed the house "was in poor condition with shabby furnishings, holes

26  in the carpet, and in need of paint and repair"; Ex. 14, Affidavit of Henry Huey, 11/23/08, ¶ 10, stating "Gil had let the La Palma house deteriorate").

27  [83] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶ 4).

     [84] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶ 5; Ex. 28, Affidavit of Roger

28  McCaffrey, 11/17/08, ¶¶ 3-9).

---

RJN000759

1    signed the papers in duplicate and they each took a signed copy.[85] Mr. Hyatt delivered the deed to

2    Ms. Jeng and gave her the keys to the house.[86] Ms. Jeng started to move in that day and occupied her

3    new home that evening.[87] Mr. Hyatt had already vacated the house prior to Ms. Jeng's move-in.[88]

4    Mr. Hyatt did not have access to the La Palma house after he sold it to Ms. Jeng on October 1,

5    1991.[89] Ms. Jeng lived alone in her La Palma house.[90] On occasion, Ms. Jeng's parents, her

6    relatives, and her Chinese friends visited her and stayed with her overnight.[91] Neither Mr. Hyatt nor

7    any other person other than Ms. Jeng's parents, relatives, and Chinese friends, stayed overnight with

8    her at her La Palma house.[92] Ms. Jeng still owns the La Palma house to this day.[93]

9           After moving to Las Vegas on September 26, 1991, Mr. Hyatt first stayed for a short period of

10   time at the Continental Hotel in Las Vegas and then subsequently leased an apartment at the Wagon

11   Trails Apartments. A complete discussion of Mr. Hyatt's stay at the Continental Hotel starting on

12   September 26, 1991 is set forth below in Argument II.E, and will not be repeated here. On October

13   8, 1991, Mr. Hyatt executed a Rental Agreement to secure the rental and lease of apartment #237 at

14   3225 South Pecos Road in Las Vegas.[94] Beginning October 21, 1991, Mr. Hyatt lived in apartment

15   #237, while he continued to shop for a home to purchase in Las Vegas.[95]

16

17

_____

18   [85] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶ 7).

19   [86] *Id.*

     [87] *Id.*

20   [88] *Id.*

     [89] *Id.*

21   [90] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶ 8; Ex. 14, Affidavit of Henry

22   Huey, 11/23/08, ¶ 10, stating "Shortly after Gil's move to Las Vegas, I visited Grace at the La Palma house [and] [s]he was
     living alone … and she was fixing it up to suit her preferences.").

23   [91] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶ 8).

     [92] *Id.*

24   [93] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 16).

25   [94] *See* Annex I, 1991 Chronological Statement of Facts, p. 22; Annex V, H Bates Documents (Wagon Trails Rental
     Agreement (H 01249 – 01252)).

26   [95] *See* Annex I, 1991 Chronological Statement of Facts, p. 25 (Ex. 25, Wagon Trails Apartment Security
     Acknowledgement and Release dated 10/21/91); *see also* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20,

27   Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 42; Ex. 14, Affidavit of Henry Huey, 11/23/08, ¶ 12, stating "[n]ear the end of
     October 1991, I traveled to Las Vegas to attend the 1991 Comdex show [and] I visited Gil at his apartment a few days

28   after the Comdex show opened…").

_____

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1991

RJN000760

1    Even prior to his move to Nevada, Mr. Hyatt had made plans to lease a Las Vegas apartment

2    and to carefully investigate Las Vegas to purchase a home.[96]  Prior to and after his move to Las

3    Vegas in September 1991, Mr. Hyatt met with various Las Vegas realtors to assist him in purchasing

4    a home in Nevada.[97]  Mr. Hyatt toured many Nevada homes that were for sale before and after his

5    move to Las Vegas.  He made various formal offers on Nevada homes with large cash deposits

6    beginning in December 1991.[98]  On December 16, 1991, Mr. Hyatt made his first offer to purchase a

7    residence located at 7335 Tara Avenue in Las Vegas.[99]  After counter offers and counter counter

8    offers, on March 16, 1992, Mr. Hyatt made a successful offer to purchase this same Tara Avenue

9    property and opened a short escrow with Minnesota Title, located in Las Vegas, on that same date.[100]

10   On April 3, 1992, Mr. Hyatt closed escrow on the Tara Avenue residence,[101] and on April 3, 1992, he

11   moved in.

12        In summary, by September 26, 1991, Mr. Hyatt permanently resided in Nevada.  He first

13   stayed at the Continental Hotel starting September 26 and subsequently lived in a leased apartment in

14   Las Vegas starting October 21 and continuously searched for a home to purchase.  He made his first

15   offer to purchase the Tara Avenue property on December 16, 1991, and he did purchase and still

16   owns this home.  Nothing in the record below disproves the fact that Mr. Hyatt's Nevada apartment

17   was his primary residence during most of the 1991 disputed period and nothing in the record below

18   disproves the fact that the La Palma house was *not* his residence during any part of the disputed

19   period.  Accordingly, we contend the fact Mr. Hyatt's principal residence was in Nevada during the

20   disputed period, and the fact Mr. Hyatt had no residence at all, certainly not a principal residence, and

21

22   [96] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 2, Affidavit of Caroline Cosgrove, 11/24/08, ¶ 1).

23   [97] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 31, Affidavit of Walter Shoemaker, 7/22/98, ¶¶ 4, 5, 8, 10); *see also* Annex V, H BATES Documents (Home flyer and Multiple Listing Service printout dated 9/25/91 for the Viking property (H 016665 - 016666)).

24   [98] FTB does not dispute the fact that Mr. Hyatt made offers to buy at least eight different Las Vegas properties starting in

25   December 1991.  (Ex. 1, FTB 11/1/07 Determination Letter, p. 17.)  For the convenience of the Board, we have created a table with citations to the record with each of Mr. Hyatt's home offers on Las Vegas properties during the 1991 (and 1992) disputed period.  (*See* Ex. 20.)

26   [99] *See* Annex I, 1991 Chronological Statement of Facts, p. 50 (Ex. 46, 12/16/91 Tara Property Offer and Acceptance

27   Agreement and Earnest Money Receipt).

     [100] *See* Ex. 16, Documentation relating to Mr. Hyatt's purchase of the Tara Avenue Property.

28   [101] Ex. 17, Tara escrow closing statement.

RJN000761

1    owned no real property in California during the disputed period (except for the five-day period prior

2    to the October 1, 1991 sale of the La Palma house), shows a substantial connection to Nevada.

3            **2.    The state wherein the taxpayer's spouse and children reside**
4            **3.    The state wherein the taxpayer's children attend school**

5            For years prior to Mr. Hyatt's move to Nevada and for all years since his move to Nevada,

6    Mr. Hyatt was and is divorced and lived and still lives alone.  His home was and is his personal home

7    without a family living with him.  At the time of Mr. Hyatt's move to Nevada in September 1991,

8    Mr. Hyatt had no minor children and neither of his two adult children lived with him for many years

9    prior to or after his move to Nevada.  A proper analysis focuses upon "dependents",[102] which in this

10   case would mean any minor children located in California for which Mr. Hyatt had custody or

11   control.[103]  Indeed, the FTB Residency Audit Training Manual states: "The auditor should determine

12   where the *minor* children lived, whether they accompanied the taxpayer, and where they are enrolled

13   in school."[104]  Mr. Hyatt lived alone and had no dependents to care for.  Therefore, these two factors

14   do not apply.

15           **4.    The state wherein the taxpayer claims the homeowner's property tax**
             **exemption on a residence**
16

17           Mr. Hyatt terminated the homeowner's exemption on his former California house

18   approximately four months after he sold the house to Ms. Jeng.  On the termination notice submitted

19   to the Orange County Assessor's office, Mr. Hyatt specifically noted the La Palma house was not his

20   principal place of residence, and therefore he did not qualify for the homeowner's property tax

21   exemption, because he had moved from the house in "Oct. 1991."[105]  The Notice stated that Mr.

22   Hyatt "did not occupy the property as my principal place of residence as of 12:01 A.M., March 1,

23   1992" because he had moved from the La Palma house in "Oct. 1991."[106]

24

25   [102] *Appeal of Richard W. Vohs,* 73-SBE-055, Sept. 17, 1973.
     [103] *See Appeal of Robert E. Harding,* 86-SBE-017, Feb. 4, 1986; and *Appeal of Tommy H. and Leila J. Thomas,* 83-SBE-
26   096, Apr. 5, 1983.
     [104] Ex. 18, FTB Residency Audit Training Manual (Rev. 10/93), pp. 47-48, emphasis added.
27   [105] *See* Annex II, 1992 Chronological Statement of Facts, p. 6  (Ex. 11, Homeowners' Exemption Termination Notice).
     [106] *Id.*
28

RJN000762

1        Mr. Hyatt's termination of the homeowner's exemption was timely. In the early part of

2    February 1992, Mr. Hyatt was notified by his real estate attorney, Del Bailey, that he should

3    terminate the homeowner's exemption on his former La Palma property. Mr. Bailey told Mr. Hyatt

4    that Mr. Hyatt had until December 10, 1992 to terminate the homeowner's exemption, but that Mr.

5    Hyatt should do it sooner than later. Mr. Bailey provided Mr. Hyatt with a form to fill out. Mr. Hyatt

6    was scheduled to check into the hospital on February 11, 1992 for major surgery for colon cancer the

7    following day, so he hastily filled out the form.[107]

8             **5.**       **The taxpayer's telephone records (*i.e.*, the origination point of taxpayer's**

9                     **telephone calls)**

10       Mr. Hyatt's only personal telephone service during the 1991 disputed period was a land line at

11   his apartment in Las Vegas.[108] On October 22, 1991, Mr. Hyatt opened an account with Centel for

12   telephone service at his apartment at 3225 South Pecos Road, #237, Las Vegas, Nevada.[109] FTB

13   found that during the 1991 disputed period, Mr. Hyatt regularly paid Nevada telephone and utility

14   bills (but did not pay a single California utility bill or telephone bill).[110] Accordingly, the origination

15   point of Mr. Hyatt's telephone calls was always Nevada.

16             **6.**       **The number of days the taxpayer spends in California versus the number**

17                     **of days the taxpayer spends in other states, and the general purpose of**
                            **such days (*i.e.*, vacation, business, etc.)**

18       Mr. Hyatt spent the majority of his days during the 1991 disputed period in Nevada and

19   additional days traveling outside Nevada (and California). The taxpayer's May 31, 2001 Protest

20   Supplement Letter provides a thorough physical presence analysis based on the auditor's original

21   physical presence findings,[111] and that analysis will not be repeated here. However, based on that

22   analysis, the "Nevada" versus "California" day count shows Mr. Hyatt spent more time in Nevada

23   than California. The day count, exclusive of temporary or transitory visits, reads:[112]

---

24   [107] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 34).

25   [108] Mr. Hyatt did not own a cell phone during the 1991 disputed period.

26   [109] *See, e.g.*, Annex V, H BATES Documents (payment for service made subsequent to 10/22/91 opening of account by canceled check numbers 88 dated 11/1/91 and 103 dated 11/27/91 (H 013632, H 013635)).

27   [110] *See* Annex VI, CCC BATES Documents (FTB Analysis of Utilities (CCC 03164-03166)).

     [111] *See* Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 35-47.

28   [112] Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 35-47.

RJN000763

- September 1991:  0 California days
  0 Nevada days
  0 Other days

- October 1991:  0 California days
  9 Nevada days
  8 Other days

- November 1991:  0 California days
  6 Nevada days
  3 Other days

- December, 1991:  0 California days
  15 Nevada days
  0 Other days

FTB's Determination Letter makes no attempt to refute or address the taxpayer's physical presence. Accordingly, we contend the above day counts, which show a greater physical presence in Nevada during the disputed period, are not disputed by FTB.[113]

In addition to the foregoing, the Nevada day counts above can now be increased based on new evidence gathered in direct response to the Determination Letter. Mr. Hyatt has obtained numerous new affidavits to rebut the assertions and allegations made in the Determination Letter. Based on these affidavits, the Nevada day counts for specific days have increased as follows:

- September 1991:   0 Nevada days

- October 1991:    14 Nevada days[114]

---

[113] Subsequent to the submission of the 1991 Protest Supplement Letter on May 31, 2001, Mr. Hyatt located additional information to verify the above Nevada day counts. However, in view of the fact FTB never disputed these days at protest, we will defer providing this additional information. We can provide this information upon request.

[114] The 14 Nevada days in October consist of the 9 days already established in the 1991 Protest Supplement Letter (*see* fn. 112, *supra*) and 5 additional days. The additional 5 days are as follows: (1) On October 2, 1991, Mr. McCaffrey received a telephone call from Mr. Hyatt while Mr. Hyatt was in Las Vegas (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 14)); (2) on October 3, 1991, Mr. Hyatt met with Rabbi Hecht and his wife at the Rabbi's office in Las Vegas (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶¶ 4-6)); (3) on October 4, 1991, Mr. Hyatt attended the Friday evening service at Temple Beth Am in Las Vegas (*id.* at ¶ 7); (4) on October 11, 1991, Mr. McCaffrey received a telephone call from Mr. Hyatt while Mr. Hyatt was in Las Vegas (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 15)); and (5) on October 29, 1991, Mr. Cowan telephoned Mr. Hyatt at Mr. Hyatt's home in Las Vegas and spoke with him about foreign tax credits; Mssrs. Roth and Durocher were also on the telephone call (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 4, Affidavit of Eugene Cowan, 11/14/08, ¶ 18)).

---

RJN000764

1    • November 1991:   16 Nevada days[115]

2    • December, 1991:   18 Nevada days[116]

3        In addition to the above specific days, the affidavits further establish large ranges of

4    continuous and systematic contacts that Mr. Hyatt had in Nevada.  These contacts elaborate and

5    expand upon the specified day counts discussed above.  These contacts are significant, including

6    approximately 24 contacts in October, 69 contacts in November and 70 contacts in December.  For

7    example, Mr. Hyatt's girlfriend, Ms. Cosgrove, testified that she telephoned him several times a week

8    at his Las Vegas apartment for three months of the 1991 disputed period.[117]  The support for these

9    Nevada contacts is provided in the summary table entitled "Table of Contacts with Mr. Hyatt in

10   Nevada."[118]

### 7. The location where the taxpayer files his tax returns, both federal and state, and the state of residence claimed by the taxpayer on such returns

13       Mr. Hyatt filed a California Nonresident or Part-Year Resident return and a federal Form

14   1040 for the 1991 tax year.  At the time the state and federal returns were filed on April 13, 1992, Mr.

---

[115] The 16 Nevada days in November consist of the 6 days already established in the 1991 Protest Supplement Letter (*see* fn. 112, *supra*) and 10 additional days.  The additional 10 days are as follows:  (1) on November 2, 3, 4, 5, and 6, 1991, Mr. Kazmaier stayed with Mr. Hyatt at Mr. Hyatt's Las Vegas apartment (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 23, Affidavit of Robert Kazmaier, 10/29/08, ¶ 12)); (2) on November 5, 1991, Mr. McCaffrey telephoned Mr. Hyatt at Mr. Hyatt's Las Vegas apartment and spoke with him about an estate matter (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 20)); (3) on November 11, 1991, Mr. McCaffrey telephoned Mr. Hyatt at Mr. Hyatt's Las Vegas apartment and spoke with him about a matter involving the execution of a court order (*id.* at ¶ 21)); on November 13, 1991, Mr. McCaffrey telephoned Mr. Hyatt at Mr. Hyatt's Las Vegas apartment and spoke with him about a matter involving objections to a court order (*id.* at ¶ 22)); (4) on November 25, 1991, Mr. McCaffrey telephoned Mr. Hyatt at Mr. Hyatt's Las Vegas apartment and spoke with him about an estate matter (*id.* at ¶ 23)); (5) on November 26, 1991, Mr. Hyatt's son, Daniel Hyatt, visited his father in Las Vegas (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 18, Affidavit of Daniel J. Hyatt, 11/11/08, ¶ 7)); and (6) on November 29, 1991, Daniel Hyatt attended Friday evening services at Temple Beth Am in Las Vegas (*id.* at ¶ 11; *see also* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 18)).

[116] The 18 Nevada days in December consist of the 15 days already established in the 1991 Protest Supplement Letter (*see* fn. 112, *supra*) and 3 additional days.  The additional 3 days are as follows:  (1) on December 5, 1991, Mr. Cowan telephoned Mr. Hyatt at Mr. Hyatt's Las Vegas apartment and spoke with him about preparation of Mr. Hyatt's federal and California income tax returns (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 4, Affidavit of Eugene Cowan, 11/14/08, ¶ 20)); (2) on December 18, 1991, Mr. McCaffrey telephoned Mr. Hyatt at Mr. Hyatt's Las Vegas apartment and spoke with him about documentation and orders relating to an estate matter (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 28)); and (3) on December 30, 1991, Mr. Cowan telephoned Mr. Hyatt at Mr. Hyatt's Las Vegas apartment and spoke with him about Mr. Hyatt's estimated taxes (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 4, Affidavit of Eugene Cowan, 11/14/08, ¶ 25)).

[117] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 2, Affidavit of Caroline Cosgrove, 11/24/08, ¶ 10).

[118] *See* Ex. 19, Table of Contacts with Mr. Hyatt in Nevada.

---

1　Hyatt had recently moved from his Wagon Trails apartment to his new home on Tara Avenue in Las

2　Vegas. Both the state and federal returns reflected Mr. Hyatt's post office box mailing address in Las

3　Vegas. The California Schedule SI attached to Mr. Hyatt's 1991 California return reflected the fact

4　he lived in California during 1991 for the first 273 days of the year and that he was a resident of

5　"Nevada" for the balance of 1991.

6　　　　Not only was Nevada the location where Mr. Hyatt filed his tax returns and the state of

7　residence claimed by Mr. Hyatt on his 1991 part-year resident return, but Nevada is also the location

8　where Mr. Hyatt routinely received his mail. Between October 1991 and December 31, 1991, and

9　thereafter, Mr. Hyatt routinely received his correspondence at either his Nevada apartment or P.O.

10　box addresses.[119] The taxpayer's May 31, 2001 Protest Supplement Letter provides a thorough

11　mailing address analysis for the 1991 disputed period,[120] and that analysis will not be repeated here.

12　FTB's Determination Letter makes no attempt to refute Mr. Hyatt's use of his Nevada mailing

13　addresses. Accordingly, Mr. Hyatt's use of Nevada mailing addresses shows a stronger connection to

14　Nevada during the disputed period.

15　　　　**8.　　The location of the taxpayer's bank and savings accounts**

16　　　　Consistent with the intention to live permanently in Nevada, Mr. Hyatt acquired multiple

17　financial accounts in Nevada and notified his California bank that he had changed his address to Las

18　Vegas. On October 25, 1991, Mr. Hyatt opened a checking account in Las Vegas and maintained it

19　throughout the disputed period.[121] In addition, Mr. Hyatt opened and maintained three additional

20　bank accounts in Las Vegas which he opened on or about November 22, 1991, December 12, 1991,

21　and January 27, 1992, respectively.[122] In contrast, Mr. Hyatt did not open any California bank

22　accounts during the 1991 disputed period and he closed multiple California bank accounts *prior* to

23　the disputed period in anticipation of his move to Nevada.[123] FTB's Determination Letter states that

24
25
[119] *See* Annex V, H BATES Documents (collection of envelopes addressed to Mr. Hyatt in Nevada (H 04735 - 04747); *see also* collection of envelopes addressed to Mr. Hyatt in Nevada (H 07405 - 07478)).

26　[120] *See* Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 59-60.

[121] *See* Annex V, H BATES Documents (bank statements beginning at (H 013362)).

27　[122] *See* Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 6 (CCC 00969)).

[123] In June 1991, Mr. Hyatt closed *five* California bank accounts in preparation for his move to Las Vegas. (Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 48-49.)

28

1   Mr. Hyatt "closed his California checking account on June 11, 1991 [before his move] and opened a

2   Nevada checking account on October 25, 1991 [shortly after his move.]"[124]

3         FTB states the only California accounts that remained open after "October 1991 were

4   investment accounts" and Mr. Hyatt "did not use them except for the Franklin Federal Money Fund

5   account."[125]   FTB contends that while the Franklin account is "an investment account and is not a

6   checking account, Hyatt drew drafts on the account to pay for some of his living expenses and for

7   some major business expenses."[126]  We fail to understand the legal significance of this contention.

8   As explained in great detail in the taxpayer's May 31, 2001 Protest Supplement Letter for 1991,[127]

9   the Franklin account is not an indicia of California residency.  Briefly, Mr. Hyatt's maintenance of

10  this investment account does not represent the traditional bank-customer relationship, where an

11  individual deposits money in a bank branch, which is FDIC insured, and which the individual can

12  withdraw, without restriction, with interest.  The Franklin Federal Money Fund is a "no-load, open-

13  end, diversified management investment company" commonly known as a mutual fund,

14  "incorporated under the laws of the state of California on April 8, 1980."[128]  It is not insured like a

15  bank, and there is no guarantee the principal is safe or returnable.[129]  There are no "checks," like a

16  bank.[130]  There was no reason for Mr. Hyatt to "be" in California because of this account.  The

17  prospectus states that shares of the fund may be purchased "in any of the following ways:" -  (1) by

18  mail; (2) by wire; (3) through brokers; or (4) under an automatic check plan.  The prospectus states

19  that cash may be withdrawn by redeeming shares under the following methods: (1) by check; (2) by

20  telephone or wire with preauthorized payment to a bank or brokerage firm account; or (3) by mail.[131]

21  There is no provision for "in-person" transactions taking place in California.

22  [124] *See also* Ex. 1, FTB 11/1/07 Determination Letter, p. 15.

23  [125] *Id.*
    [126] *Id.*

24  [127] *See* Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 49-53.

25  [128] Annex V, H BATES Documents (Franklin Federal Money Fund Prospectus, p. 4 (H 04708)).
    [129] "An investment in the Fund is not a deposit insured by the FDIC and is not an obligation of or guaranteed by the U.S.

26  government or any bank." (Annex V, H BATES Documents (Franklin Federal Money Fund Prospectus, p. 17 (H 04721)).
    [130] While a shareholder may write "redemption drafts" against the account, "the purchase of shares of the Fund does not

27  create a checking or other bank account." (Annex V, H BATES Documents (Franklin Federal Money Fund Prospectus, p.
    4 (H 04708)).

28  [131] Annex V, H BATES Documents (Franklin Federal Money Fund Prospectus, pp. 8-11 (H 04712 - 04715)).

RJN000767

1    So, what is the conceivable California "indicia" of residency connected with Mr. Hyatt having

2    the Franklin account?  It cannot be because the Franklin account is a "bank" account, because FTB

3    has already admitted it is not a bank or even a financial institution.[132]  It cannot be because the

4    Franklin account is somehow "like" a bank account, because it is nothing like a bank account – it is a

5    mutual fund.  There are no checks; the account is not insured and there is no safety or guarantee of

6    principal; there are no deposits; and there are no withdrawals.  It cannot be because of the Fund's

7    "presence" in California.  There is not even a method identified in the Prospectus for an "in-person"

8    transaction to take place in California.  It is not as if Mr. Hyatt could walk into a Franklin fund

9    "branch" in California in late 1991 and make transactions.  It cannot be that the fund is headquartered

10   in California, or else every Franklin customer in the world with any Franklin account would have a

11   California residency "tie" by virtue of this investment decision.  And, finally, it cannot be for any

12   policy reason underlying the residency law, because Mr. Hyatt, by having this mutual fund account,

13   was not in any way making use of "the benefits accorded by the laws and Government of this

14   State."[133]

15   Accordingly, the fact Mr. Hyatt opened multiple new bank accounts in Nevada and closed

16   multiple California bank accounts exhibits a stronger connection to Nevada.  Moreover, as of the end

17   of September 1991, Mr. Hyatt's minimal bank ties with California were "no more than remnants of

18   past attachments"[134] that are perfectly consistent with nonresidency.

19   
20   **9.    The origination point of the taxpayer's checking account transactions and
          credit card transactions**

21   Mr. Hyatt had no California-situs credit card accounts during the 1991 disputed period, those

22   accounts having been rendered inactive long before.  He *did* have active Nevada-situs credit card

23   accounts during the 1991 disputed period.  Based on Mr. Hyatt's credit card charges during the

---

[132] *See* Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 49-50.

[133] 18 Cal. Code Regs. § 17014(a); *see also Appeal of German A. Posada,* 87-SBE-058, July 28, 1987.

[134] *Appeal of Matthew Berman,* 65-SBE-021, June 28, 1965 (finding that a taxpayer's voter registration and legal practice in Illinois were insufficient to overcome a determination of residency in California); *see also Appeal of Tommy H. and Leila J. Thomas,* 83-SBE-096, April 5, 1983 (finding that taxpayers' California driver's licenses and voter registrations were "primarily a legacy of past action rather than an indication of current intent and expectations" even though taxpayers' house and children remained in California).

RJN000768

month of October 1991, FTB concluded the "financial documentary evidence simply does not corroborate the affidavits" by Mr. Hyatt's colleagues, friends and relatives who confirmed Mr. Hyatt moved to Las Vegas in late September 1991.[135]  We disagree.

FTB lists 18 "credit card transactions" during October 1991 that "simply do not place Hyatt in Las Vegas during the period October 2, 1991 through October 28, 1991."[136]  We disagree.

First, 4 of the 18 included "credit card transactions" are "payment[s] on his account."[137]  To begin, Mr. Hyatt paid his credit card bills by mail.  In addition, there were two credit card accounts (Bank of New York and Chase) and only a single "payment" (by mail) to each credit card account in October 1991.[138]  The other two "payments" were actually credits for previous charges.  The $15.00 "payment" on October 31, 1991[139] was a credit for an improper "late charge"[140] on the Bank of New York credit card account.  The $34.95 "payment" on October 9, 1991[141] was a credit for an improper charge[142] on the Bank of New York credit card account.

Second, 2 of the 18 credit card transactions are to airline companies to purchase airline tickets – one to Continental Airlines in Artesia, California and one to American Airlines in Dallas, Texas.[143]  As common sense would dictate, these purchases were made by phone.

Third, 7 of the 18 credit card transactions are for purchases made in Virginia, New York and Dallas while Mr. Hyatt was on a business trip.[144]  On October 14, 1991, Mr. Hyatt left on a business

---

[135] Ex. 1, FTB 11/1/07 Determination Letter, p. 16.

[136] *Id.* at pp. 15-16.

[137] "October 5, 1991 - a $93.20 payment on his account" (Ex. 1, FTB 11/1/07 Determination Letter, p. 15); "October 8, 1991 - a $515.00 payment on his account" (*id.*); "October 9, 1991 - a $34.95 payment on his account" (*id.*); and "October 31, 1991 - a $15.00 payment on his account" (*id.* at p. 16).

[138] *See*, Annex VI, CCC BATES Documents (10/5/91 $93.20 payment on the Bank of New York credit card account (CCC 02978); 10/8/91 $515.00 payment on the Chase credit card account (CCC 03002)).

[139] *See* Annex VI, CCC BATES Documents (CCC 02979).

[140] *Id.* at CCC 02976.

[141] *Id.* at CCC 02978.

[142] *Id.* at CCC 02978.

[143] "October 5, 1991 - a $92.00 payment to Continental Airlines in Artesia, CA" (Ex. 1, FTB 11/1/07 Determination Letter, p. 15); and "October 9, 1991 - a $50.00 payment to American Airlines in Dallas, Texas" (*id.*).

[144] "October 14, 1991 - a $95.11 payment to Alamo Rent-a-Car, Sterling, VA" (Ex. 1, FTB 11/1/07 Determination Letter, p. 15); "October 16, 1991 - a $31.81 payment to Alamo Rent-a-Car, Sterling, VA" (*id.*); "October 17, 1991 - a $249.74 payment to Sheraton Crystal City in Arlington, VA" (*id.* at p. 16); "October 19, 1991 - a $7.30 payment to Bobs Big Boy in Tarrytown, NY" (*id.*); "October 21, 1991 - a $26.71 payment to Marriott Hotel in Dallas, TX" (*id.*); "October 22, 1991
(Footnote continues on next page.)

RJN000769

1  trip and traveled to Washington, D.C., Virginia, Dallas, and New York.[145]  This business trip

2  originated and terminated in Las Vegas.  Mr. Hyatt was in Nevada immediately prior to that trip, on

3  October 13, 1991, signing the supplemental Agreement for his Wagon Trails apartment.[146]  Mr. Hyatt

4  was also in Nevada immediately after that trip.  On October 21, 1991, Mr. Hyatt met with manager

5  Clara Kopp at the Wagon Trails Apartments office and signed an "APARTMENT SECURITY

6  ACKNOWLEDGEMENT AND RELEASE," dated October 21, 1991, which was witnessed by Ms.

7  Kopp.[147]  FTB contends the October 22, 1991 payment to Hilton Hotels in Tarrytown, NY "is

8  inconsistent with [Mr. Hyatt's] claim that he moved into the Wagon Trails apartment in Las Vegas on

9  October 21, 1991."[148]  As explained during the protest, on October 22, 1991, Philips personnel closed

10 out Mr. Hyatt's account at the Tarrytown Hilton Inn in Tarrytown, NY[149] and returned Mr. Hyatt's

11 rental car at the West Chester Airport (near Tarrytown, NY).[150]  Thus, the October 22, 1991 payment

12 to Hilton Hotels is not inconsistent with Mr. Hyatt's move into his Wagon Trails apartment on

13 October 21, 1991.  We do not understand how these 7 "credit card transactions" for a business trip

14 that originated and ended in Las Vegas are inconsistent with Mr. Hyatt's move to Las Vegas.

15         After removing the above 13 "credit card transactions," we are left with the following 5

16 transactions:  October 2, 1991 $29.79 payment to Mr. Stox restaurant in Anaheim, CA; October 7,

17 1991 $32.12 payment to Mr. Stox restaurant in Anaheim, CA; October 10, 1991 $15.70 payment to

18 China Best Restaurant in Cypress, CA; October 13, 1991 $29.06 payment to Drug Emporium in La

19 Palma, CA; and October 26, 1991 $26.22 payment to King Dragon Restaurant in Cerritos, CA.  To

20 the best of Mr. Hyatt's knowledge, none of these charges were made by him.

21

22

(Footnote continued from previous page.)

23 - a $396.63 payment to Hilton Hotels in Tarrytown, NY" (*id.*); and "October 22, 1991 - a $110.98 payment to National
   Rent-a-Car, Newark, NJ" (*id.*).

24 [145] *See* Annex V, CCC BATES Documents (FTB 1991 Narrative Report, pp. 56-63 (CCC 01020 - 01027); *see also* E.
   Cowan 9/22/95 letter to FTB, p. 5 (CCC 02200); travel documentation (CCC 02276 - 02286)).

25 [146] *See* Annex I, 1991 Chronological Statement of Facts, p. 22 (Wagon Trails Rental Agreement (H 01249 – 01252)).

26 [147] *See* Annex I, 1991 Chronological Statement of Facts, p. 25 (Ex. 25, Apartment Security Acknowledgement and Release).

27 [148] Ex. 1, FTB 11/1/07 Determination Letter, p. 16.

   [149] Annex VI, CCC BATES Documents (Tarrytown Hilton Inn receipt (CCC 02286)).

28 [150] *See* Annex VI, CCC BATES Documents ("RETURN: 10/22/91 1107 W CHESTER ARPT" (CCC 02284)).

RJN000770

1    Mr. Hyatt had to be present in California on October 1, 1991 when he completed the sale of

2  his La Palma house to Ms. Jeng.  Mr. Hyatt was also present for a court hearing that he was required

3  to attend.[151]  Clearly, his presence in California on October 1st was for a temporary or transitory

4  purpose.  Mr. Hyatt left California for Nevada late in the day on October 1, 1991, after signing over

5  the deed to the La Palma house to Ms. Jeng.[152]  Ms. Jeng, who remained in California after

6  completing the La Palma house purchase, did not see Mr. Hyatt after October 1, 1991 until she

7  visited him in Las Vegas in mid-October 1991.[153]  During that period, Ms. Jeng made multiple

8  telephone calls from California to Mr. Hyatt at the Continental Hotel in Las Vegas.[154]  On October 8,

9  1991, Mr. Hyatt paid a deposit and secured the lease of Wagon Trails apartment #237 in Las

10  Vegas.[155]  Mr. Hyatt did travel from Las Vegas to California about October 11, 1991, to visit

11  Caroline Cosgrove on her birthday, but Mr. Hyatt was back in Las Vegas by October 13, when he

12  signed a supplement agreement at the Wagon Trails apartment complex.[156]  Ms. Jeng testified that

13  she traveled from California to Las Vegas before October 14, 1991, and stated that she may have

14  traveled on October 13, 1991.[157]  Ms. Jeng returned to California after attending the Las Vegas

15  Comdex show from October 23-25, 1991.[158]

16    It is undisputed that Ms. Jeng used Mr. Hyatt's credit cards.[159]  With Mr. Hyatt in Las Vegas

17  from October 1, 1991 through October 13, 1991, with the exception of October 11, 1991, the

18  evidence suggests that Ms. Jeng made the purchases using Mr. Hyatt's credit card during that time

19  period.  Notably, the October 13 charge is at a drug store, rather than a restaurant.  Ms. Jeng stated

---

[151] Mr. Hyatt attended a court hearing involving his mother's estate.  (*See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 12).)

[152] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 7; Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 35).

[153] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 7).

[154] *Id.* at pp. 570-71.

[155] Annex I, 1991 Chronological Statement of Facts, p. 22.

[156] *See* Annex I, 1991 Chronological Statement of Facts, p. 22 (Wagon Trails Rental Agreement (H 01249 - 01252)).  *See also* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 39; and Ex. 1, Affidavit of Caroline Cosgrove, 1/2/01, ¶ 4).

[157] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 10).

[158] *Id.* at pp. 674-675; *see also* Annex V, H BATES DOCUMENTS (Comdex Program & Exhibits Guide and Addendum (H 05977 - 05979)).

[159] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶ 17).

---

RJN000771

1  that she may have traveled from her home in La Palma to Las Vegas on October 13, 1991 and arrived

2  around noontime.[160]  A drug store in La Palma certainly would have been open in the morning early

3  enough for Ms. Jeng to purchase items for her trip (she stayed in Las Vegas until after October 21,

4  1991[161]) and still make it to Las Vegas around noontime.  That leaves the charge on October 26,

5  1991.  Ms. Jeng was back in California by the 25th of October, suggesting that Ms. Jeng made the

6  purchases on the 26th using Mr. Hyatt's credit card.  Moreover, credit card charges are unreliable and

7  must be authenticated before they are credible.  It is undisputed that these credit card statement dates

8  are unreliable and hence must be independently determined.[162]

9          Accordingly, Mr. Hyatt's credit card transactions are consistent with his move to Nevada and

10  show a stronger connection to Nevada.  As of the end of September 1991, Mr. Hyatt's minimal credit

11  card ties with California were "no more than remnants of past attachments"[163] that are perfectly

12  consistent with nonresidency.

13          **10.    The state wherein the taxpayer maintains memberships in social,
                    religious, and professional organizations**

14

15          On October 4, 1991, Mr. Hyatt began attending services at Temple Beth Am in Las Vegas.[164]

16  On November 15, 1991, Mr. Hyatt joined Congregation Ner Tamid in Las Vegas.[165]  Mr. Hyatt filled

17  out a "member Application" in person on November 15th.[166]  He is a member of both Congregation

18  Ner Tamid and Temple Beth Am (renamed Temple Sinai) to this day, more than 17 years later.  In

19  contrast, Mr. Hyatt was not a member of any religious organizations based in California.  Mr. Hyatt

20  had no California social or professional organization memberships during the 1991 disputed period,

21

22  _____

   [160] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 10).

23  [161] *Id.*

24  [162] *See* Ex. 22, 1991 Protest, 6/20/96, pp. 50-51.

   [163] *See Appeal of Berman, supra; Appeal of Thomas, supra.*

25  [164] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 7; Ex. 13,
   Affidavit of Michelina Hecht, 11/16/08, ¶ 7).

26  [165] Mr. Hyatt made a payment that same day to Congregation Ner Tamid by check drawn on his Las Vegas bank account,
   with his Las Vegas mailing address imprinted on the check.  (*See* Annex VI, CCC BATES Documents (canceled check

27  No. 108 dated 11/15/91 (CCC 02623 - 02624)); *see also, e.g.,* Annex V, H BATES Documents (Congregation Ner Tamid
   envelope (H 09679)).

28  [166] *See* Annex I, 1991 Chronological Statement of Facts, p. 38 (Ex. 32, Member Application).

RJN000772

1   only memberships in national professional organizations that had their headquarters outside of

2   California. Thus, this factor shows a greater connection to Nevada.

### 11. The state wherein the taxpayer registers his automobiles

4       Mr. Hyatt did not re-register his old automobile or register his new automobile in California

5   after his move to Las Vegas. Mr. Hyatt's only automobile during the 1991 disputed period was a

6   1977 Toyota, which was registered in Nevada in approximately May 1992.[167] This Nevada

7   registration terminated the California registration. The 1977 Toyota was not registered in Nevada

8   earlier because it could not pass the Nevada smog test to get a smog certificate.[168] It was 14 years

9   old, operating poorly, and about to be replaced by a new car. Mr. Hyatt purchased a new 1992

10  Toyota in Nevada in March 1992, which was registered with the Nevada DMV from its purchase date

11  to the present.[169] In fact, what happened was that Mr. Hyatt's son took charge of the old 1977 Toyota

12  during an April 1992 visit with his father in Nevada; had it fixed[170]; obtained a smog certificate[171];

13  and subsequently registered it in Nevada.[172]

### 12. The state wherein the taxpayer maintains a driver's license

15      On November 27, 1991, Mr. Hyatt applied for and obtained a Nevada's driver's license.[173]

16  Mr. Hyatt's driver's license application identifies his "Residence Address" as 3225 S. Pecos Rd., Las

17  Vegas, Nevada 89121.[174] He paid the DMV fee with a check drawn on his Nevada bank account

18  with Mr. Hyatt's Las Vegas mailing address imprinted on the check.[175] At the time of obtaining his

19  Nevada driver's license, Mr. Hyatt signed a declaration of Nevada residency, and Mr. Hyatt was

20  required by Nevada law to physically surrender to the Nevada DMV possession of his California

21

---

22  [167] *See* Annex V, H BATES Documents (Nevada vehicle registration records (H 07072 - 07073)).

23  [168] *See* Annex V, H BATES Documents (Chet's Discount Auto Service Invoice, dated 4/17/92, stating "fix car to pass smog" (H 07068 – 07070)).

24  [169] *See* Annex II, 1992 Chronological Statement of Facts, p. 15 (Ex. 24, Nevada Vehicle Registration Certificate dated 3/20/92).

25  [170] *See* Annex V, H BATES Documents (Chet's Discount Auto Service Invoice (H 07070)).

26  [171] *See* Annex V, H BATES Documents (Smog Certificate (H 07068 - 07069)).

    [172] *See* Annex V, H BATES Documents (Nevada Vehicle Registration Certificate (H 07072 - 07073)).

27  [173] *See* Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 6 (CCC 00969)).

    [174] Annex VI, CCC BATES Documents (Nevada DMV driver's license application (CCC 01255)).

28  [175] *See* Annex V, H BATES Documents (canceled check (H 013625)).

RJN000773

1  driver's license, and he did surrender it.[176] Dan Hyatt accompanied his father to the Nevada DMV in

2  Las Vegas to get Mr. Hyatt's Nevada driver's license.[177]

### 13. The state wherein the taxpayer maintains voter registration, and the taxpayer's voting participation history

5  An important consideration in determining domicile is the place where the taxpayer registered

6  to vote and actually voted. "Of all the formal acts to be scrutinized in ascertaining a person's

7  domicile, undoubtedly the act of registering and voting is the most important, and while not

8  necessarily conclusive, it is usually most convincing and persuasive."[178] After moving to Nevada,

9  Mr. Hyatt did *not* vote in any election in California, nor did the auditor find to the contrary.[179]  On

10  November 27 1991, Mr. Hyatt registered to vote in Nevada.[180]  There were no major elections in

11  Nevada between September 26, 1991 and December 31, 1991.  Mr. Hyatt did in fact vote in person

12  for the first major elections to occur (September and November 1992) after his move to Nevada.[181]

### 14. The state wherein the taxpayer obtains professional services, such as doctors, dentists, accountants, and attorneys

#### a. Mr. Hyatt used few California professionals

16  Mr. Hyatt's use of California professionals during the 1991 disputed period was minimal and

17  such use is not evidence of California residency.  His use of professionals was limited to one law firm

18  and a few medical professionals.

19  Mr. Hyatt used one law firm in California during the disputed period, Riordan and McKenzie,

20  which was primarily for the preparation of the 1991 income tax returns involving Mr. Hyatt's move

---

[176] *See* Nev. Rev. Stat. § 483.230(4), stating:  a "person shall not receive a driver's license until he surrenders all valid licenses in his possession issued to him by this or any another jurisdiction"; *see also* Annex III, 1991 Protest Supplement Letter, 5/31/01, p. 61.

[177] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 16; Ex. 18, Affidavit of Daniel E. Hyatt, 11/11/08, ¶¶ 8)).

[178] *Taff v. Goodman* (1940) 41 Cal.App.2d 771, 775.

[179] *See* Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 5 (CCC 00968)).

[180] *See* Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 5 (CCC 00968)); *see also* Annex V, H BATES Documents (Clark County Voter Information (H 01272)).

[181] *See* Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 5 (CCC 00968)); *see also* Annex V, H BATES Documents (11/3/92 Voter Stub and related records (H 06921 – 06923)).

---

RJN000774

1     from California and the California part year tax return issues.[182] Mr. Hyatt's use of a California law

2     firm to advise regarding legal issues involving California law cannot be faulted. Indeed, despite the

3     fact Mr. Hyatt has lived in Nevada for over 17 years, he has employed the services of our (California

4     based) law firm for many years to represent him in this matter before FTB and now this Board. This

5     is certainly not a California residency "connection."

6            Mr. Hyatt used a few medical professionals during the 1991 disputed period. The reason for

7     Mr. Hyatt's medical visits to California was explained in Mr. Hyatt's protest for 1991.[183] There he

8     explained that at his final medical check up before permanently leaving California for Nevada in

9     September 1991, his doctor, William H. Peloquin, detected broken blood vessels in Mr. Hyatt's eye.

10     That appointment led to subsequent appointments and referrals to other California medical

11     professionals. Mr. Hyatt was ultimately diagnosed with cancer and underwent surgery at the Los

12     Alamitos Medical Center in February 1992.[184] Mr. Hyatt received advice that Las Vegas was

13     unsuitable for such an operation from his Las Vegas Rabbi and the Rabbi's wife, and other friends

14     and associates.[185] After surgery, he returned to Nevada.[186]

15            An individual who is in California for only a "temporary or transitory purpose" is *not* a

16     California resident. (Cal. Rev. & Tax. Code § 17041(1).) FTB's regulations go on to define

17     "temporary or transitory purpose" as follows:

> 18-22     Whether or not the purpose for which an individual is in this State will be considered temporary or transitory in character will depend to a large extent upon the facts and circumstances of each particular case. It can be stated generally ... that an individual is simply passing through this State on his way to another state ..., or is here for a brief rest ... or to *complete a particular transaction ...* or *fulfill a particular engagement*, which will require his presence in this State *for but a short period*, he is in this State for temporary or transitory purposes, and will not be a resident by virtue of his presence here.[[187]]

---

[182] *See* Annex III, 1991 Protest Supplement Letter, 5/31/01, p. 62.

[183] *See* Ex. 22, 1991 Protest, 6/20/96, p. 24.

[184] *See id.*

[185] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 21; Ex. 13, Affidavit of Michelina Hecht, 11/16/08, ¶ 21; Ex. 15, Affidavit of Robert Huddleston, 11/4/08, ¶ 9; Ex. 36, Affidavit of Kenneth Woloson, 11/21/08, ¶ 17; Ex. 5, Affidavit of Trent Eyler, 11/13/08, ¶ 13).

[186] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 22; Exhibit 13, Affidavit of Michelina Hecht, 11/16/08, ¶ 22; Ex. 36, Affidavit of Kenneth Woloson, 11/21/08, ¶ 17; Ex. 5, Affidavit of Trent Eyler, 11/13/08, ¶ 13).

[187] 18 Cal. Code of Regs. § 17014(b), *emphasis added.*

RJN000775

1         In the words of Regulation 17014(b), Mr. Hyatt's few medical appointments in 1991 (and his

2    return to California in early 1992 followed by his return to Nevada) for his medical course of

3    treatment was "to complete" that "particular transaction," or to "fulfill" that "particular engagement,"

4    *i.e.*, the course of treatment, which was for "but a short period."

5              **b.**     **Mr. Hyatt had relationships with many Nevada professionals**

6         In contrast with California professionals, Mr. Hyatt established relationships with a myriad of

7    Nevada professionals that were situated in Las Vegas and that represented or were involved with Mr.

8    Hyatt in Las Vegas at various times during the 1991 disputed period. The taxpayer's May 31, 2001

9    Protest Supplement Letter provides a thorough listing of these Nevada professionals, including real

10   estate agents, business associates, escrow agents, insurance agents, his two rabbis and many others.[188]

11   FTB's Determination Letter makes no attempt to refute or address the use of these Nevada

12   professionals. Accordingly, Mr. Hyatt's use of Nevada professionals presents a very strong

13   connection to Nevada during the 1991 disputed period.

14             **c.**     **Mr. Hyatt had relationships with many non-California (non-**
15                       **Nevada) professionals**

16        Mr. Hyatt also maintained connections with many other non-California professionals (in

17   addition to the Nevada professionals identified above) prior to and subsequent to his move to Las

18   Vegas. This Board has long recognized in residency cases that the correct legal analysis focuses only

19   upon California vs. "everywhere" connections. As summarized by this Board:

20           In determining whether a California domiciliary is a resident of this state, we are
        not concerned with whether or not he may be treated as a resident of some other
21           place by the laws of a foreign jurisdiction, but rather with his proper classification
        under California law. *To establish nonresidence under the California law, the*
22           *taxpayer need not prove that he became a resident of some other state or country.*
        *His burden is satisfied when he shows that his absence from California was for*
23           *other than a temporary or transitory purpose.*[189]

24

25

26

---

27   [188] *See* Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 64-66.

28   [189] *Appeal of Richards L. & Kathleen K. Hardman*, 75-SBE-052, Aug. 19, 1975, emph. added; *see also Appeal of Richard W. Vohs*, *supra*; *Appeal of James M. Smith*, 61-SBE-048, July 19, 1961.

RJN000776

1   The taxpayer's May 31, 2001 Protest Supplement Letter provides a thorough listing of the

2   non-California professionals used by Mr. Hyatt during the disputed period.[190] FTB's Determination

3   Letter makes no attempt to refute or address the use of these non-California professionals.

4   Accordingly, Mr. Hyatt's relationships with professionals out of California heavily outweigh

5   the very few lingering connections to California professionals during the disputed period. Moreover,

6   as of the end of September 1991, Mr. Hyatt's professional ties with California were "no more than

7   remnants of past attachments"[191] that are perfectly consistent with nonresidency.

8   **15.   The state wherein the taxpayer is employed**

9   **16.   The state wherein the taxpayer maintains or owns business interests**

10  Mr. Hyatt had no employment or business interests that involved "presence" in California.

11  He was self-employed as a consultant for several decades prior to his move to Nevada in September

12  1991, but terminated his consulting business before he moved to Las Vegas. During the disputed

13  period, he worked on his personal and technical activities, not for others; he had no clients,

14  customers, employees, salary, or employer. Immediately prior to his move to Nevada and for the

15  whole disputed period, he pursued his patents and patent applications with the Patent and Trademark

16  Office ("PTO") in Virginia; and Mr. Hyatt assisted Philips with the conduct of an interference and the

17  licensing of some of his patents.

18  Mr. Hyatt was an aerospace consultant prior to his move to Nevada. He discontinued his

19  aerospace consultant business long before moving to Nevada and concentrated on his personal

20  activities prior to his move to Nevada, subsequent to that move and to the present day. His personal

21  activities included research and development and patent activities regarding his own inventions,

22  assisting Philips in sublicensing his patents and investing his own finances.

23  Mr. Hyatt performed his personal activities from his former home in California before his

24  move to Nevada in September 1991 and from his residences in Nevada after his move to Nevada. He

25  performed his personal activities for his own benefit without customers, clients, or employees. He

26  used professionals nationwide in his personal activities before and after his move to Nevada.

27  ───────────────
[190] *See* Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 66-72.

28  [191] *See* Berman, *supra; Thomas, supra.*

---

sa-57710                                        36

RJN000777

1    Mr. Hyatt's activities were outside of California during the 1991 disputed period. This is an

2  important indicia of non-California residency and non-California domicile. Further, Mr. Hyatt's

3  income immediately prior to and during the 1991 disputed period was derived from Japanese and

4  European companies. The companies licensing his patents were located in New York and in Texas.

5  Mr. Hyatt had no business connections in California.

6       **17.    The state wherein the taxpayer holds a professional license or licenses**

7    Mr. Hyatt did not need and did not use a professional license during the 1991 disputed period.

8  He worked on his own projects for himself.

9       **18.    The state wherein the taxpayer owns investment real property**

10    Mr. Hyatt owned no investment real property in California during the 1991 disputed period.

11  This fact is not disputed by FTB. He initiated activities to sell his California home well before he

12  moved and he sold it about one week after he moved.

13      **19.    The indications in affidavits from various individuals discussing the
14              taxpayer's residency**

15    Mr. Hyatt's move to Nevada and his sale of the La Palma house is fully corroborated by the

16  statements of others. This Board has unequivocally confirmed the importance of third party

17  affidavits and declarations in support of a taxpayer's claim of nonresidency. In the *Berner* decision

18  involving the issue of residency, this Board stated:

19      [R]espondent [FTB] should ordinarily follow the evidence guideline of
        Regulation 17014(d), which it adopted pursuant to Revenue and Taxation Code,
20      former section 9253, and current section 19503. In this case, *respondent
        improperly refused to reasonably consider the declarations and evidence
21      provided by appellants.*[192]

22    This Board held in *Berner* that the taxpayers "established through affidavits and declarations

23  of friends, family, and professionals (sufficient proof under Regulation 17014(d)) that they changed

24  their domicile from California to Nevada ..."[193] A multitude of affidavits and declarations by friends,

25  family, and professionals were submitted by the taxpayer in this matter while pending with the FTB,

26  ---
   [192] *Berner, supra, emphasis added.*

27  [193] *See Berner, supra.* The Board's new 2008 Rules for Tax Appeals also emphasize the use of affidavits and declarations
    as forms of admissible evidence: "Any relevant evidence, including affidavits, declarations under penalty of perjury, and
28  hearsay evidence, may be presented to the Board at a hearing." (18 Cal. Code Regs. § 5523.6.)

RJN000778

1   all of which support the taxpayer's nonresidency during the disputed period. A summary of those

2   corroborating statements is set forth in full at pages 75-81 of Mr. Hyatt's May 31, 2001 Protest

3   Supplement Letter,[194] and will not be repeated here. In response to FTB's Determination Letter, 25

4   additional affidavits have been obtained to rebut FTB's allegations and assertions. In total, Mr. Hyatt

5   has obtained 35 affidavits to support his position in this matter, in addition to his own sworn

6   affidavits.[195]

### 20. *Bragg* close connections conclusion

8       Based on the factors in *Bragg*, Mr. Hyatt's closest connections were clearly to Nevada during

9   the 1991 disputed period (which only covers September 26, 1991 through December 31, 1991). Mr.

10   Hyatt sold his only California residence on October 1, 1991. Mr. Hyatt requested termination of the

11   homeowner's exemption on his former California property. Mr. Hyatt did not own any other real

12   property in California. Mr. Hyatt was leasing and occupying an apartment in Nevada. Mr. Hyatt was

13   actively searching for a Nevada house with the help of Nevada realtors and was repeatedly making

14   good-faith offers on houses with large deposits. Mr. Hyatt's only telephone service was based from

15   his Nevada home. Mr. Hyatt never spent more time in California than Nevada, and all his days in

16   California were for temporary or transitory purposes. Mr. Hyatt's federal and state returns for the

17   year in issue reflect his Nevada address and support his claimed residency starting by at least October

18   1, 1991. Mr. Hyatt held a Nevada driver's license. Mr. Hyatt registered to vote in Nevada. Mr.

19   Hyatt belonged to a Nevada synagogue. Mr. Hyatt's increasing Nevada financial activity was

20   significantly greater than his decreasing California financial activity in every month. Mr. Hyatt's use

21   of non-California professionals greatly outweighed his *de minimis* use of California professionals.

22   Mr. Hyatt had no business office or activities in California. Mr. Hyatt conducted his personal

23   activities from Nevada. The affidavits and declarations of Mr. Hyatt's colleagues, associates, friends

24   and family members all corroborate Mr. Hyatt's Nevada residency starting in late September 1991.

---

[194] *See* Annex III.

[195] *See* Annex VII, Affidavits in Support of Mr. Hyatt.

RJN000779

1

    **D.**    **Under the Identifiable Purpose Test, Mr. Hyatt Was a Nevada Resident for All of the 1991 Disputed Period**

2

3         The second test applied by this Board to determine whether a taxpayer is out of the State for

4    "other than a temporary or transitory purpose" examines whether the taxpayer is out of California for

5    an identifiable purpose and the length of time necessary to fulfill that purpose. "[W]here an

6    individual expects to be out of California for an indefinite period of time which is expected to last

7    more than two years, such individual will be expected to be out of the state for an indefinite period of

8    substantial duration" and therefore is no longer considered a resident of California.[196]

9         The second test is also satisfied in this case. Mr. Hyatt's primary purpose in permanently

10    leaving California in September 1991 and moving to Nevada was to enjoy a better quality of life and

11    business, where he intended to get away from distractions by the media, the public, and from

12    harassment by his siblings and certain family members. Mr. Hyatt intended to find a more private

13    and secure place to work and to live by relocating to Nevada. Mr. Hyatt also hoped to alleviate his

14    respiratory problems (which resulted in a case of pneumonia in July 1992) by getting away from the

15    smog and other pollution in California and to relocate to a drier, healthier climate in Nevada. Mr.

16    Hyatt's purpose, then, was readily identifiable. The length of time to fulfill his purpose was

17    indefinite. Mr. Hyatt made it plain, both by his acts and statements, that he intended at the time of his

18    move in September 1991 to make Nevada his permanent home and the center of his life. Certainly

19    his move to Nevada was intended to last more than "two years"[197] as evidenced by the fact Mr. Hyatt

20    still resides in Nevada — over 17 years after his move in September 1991.

21

    **E.**    **FTB's Protest Findings Do Not Detract From the Conclusion that Mr. Hyatt Became a Nevada Resident in September 1991**

22

23         After eleven years, FTB informed Mr. Hyatt by the Determination Letter that his protest was

24    being denied and the proposed assessment was being affirmed. FTB gave Mr. Hyatt "thirty days

25    from the date of [the] determination letter to respond," and such response was "limited to producing

26    new information and documentation," and "[n]o extensions to the thirty day response period will be

27

[196] *Appeal of William G. and Susan G. Crozier*, 92-SBE-005, April 23, 1992.

28

[197] *Id.*

RJN000780

1    granted."[198]  Despite the passage of over a decade since the filing of the protest, and despite the fact

2    FTB had over six years to respond to the taxpayer's 190-page position letter, FTB limited the

3    taxpayer to 30 days, with no possibility of an extension of time, to respond to its 50-page, single-

4    spaced Determination Letter.[199]  Accordingly, this opening brief before this Board is the taxpayer's

5    first opportunity to meaningfully respond to FTB's findings in its Determination Letter.

6         The organization and analysis in the Determination Letter are extremely difficult to follow.

7    The residency discussion and conclusions appear to be limited to pages 2-24 of the letter.[200]  There

8    are very few headings, no citations to the records to support FTB's list of "facts," no substantive

9    analysis between the alleged facts and cited California residency legal standards, and no rebuttal to

10   any of the information provided in either Mr. Hyatt's June 20, 1996 protest letter or his 190-page

11   May 31, 2001 Protest Supplement Letter.[201]  Notwithstanding the foregoing, we have endeavored to

12   address FTB's more salient points below.  We contend none of those points are persuasive or

13   supported by the record in this case.

14        1.    FTB's "Facts"

15        The Determination Letter lists FTB's alleged facts,[202] but fails to inform Mr. Hyatt of the

16   reasons why the FTB focuses on these alleged facts or explain the relevance of these alleged facts,

17   particularly in view of the evidence that was before the protest officer.  The vast majority of these

18   alleged facts are erroneous and have been extensively rebutted with significant evidence and

19   arguments in Mr. Hyatt's May 31, 2001 Protest Supplement Letter for 1991.[203]  FTB has never

20   responded to this significant evidence and arguments.  Due to briefing page restrictions under this

21   Board's RTAs, we hereby incorporate by reference that Protest Supplement.  Moreover, for the

22   convenience of the Board, we have also prepared a complete recitation of FTB's alleged "facts" and

---

[198] Ex. 1, FTB 11/1/07 Determination Letter, pp. 49-50.

[199] We contend this position violates the taxpayer's due process rights under the California and U.S. Constitutions, is a violation of the taxpayer's rights under the California Taxpayers' Bill of Rights, offends FTB's own Mission and Statement of Principles of Tax Administration, and stands in direct contradiction to what the FTB's protest officer represented during the course of these proceedings. (See Ex. 23, Letter from E. Coffill to G. McLaughlin dated 11/20/07.)

[200] Ex. 1, FTB 11/1/07 Determination Letter.

[201] See Ex. 22 and Annex III.

[202] Id. at pp. 2-3.

[203] See Annex III.

RJN000781

1    Mr. Hyatt's response to each alleged fact, with appropriate citations to the record, which is set forth

2    in Annex VIII.

### 2.    Mr. Hyatt's Facts

4         The Determination Letter purports to list Mr. Hyatt's facts[204], but it disregards many of Mr.

5    Hyatt's very important facts and fails to indicate why these facts are unpersuasive.  For example, the

6    protest officer, in total disregard of California law and precedent established by this Board, discards

7    Mr. Hyatt's sworn affidavits as unpersuasive without any reasons, and wholly disregards the

8    depositions of the affiants testifying to these and other significant facts.  Certainly, the protest officer

9    does not allege that the deposition testimony is not in the protest file.  We contend our 1991

10   Chronological Statement of Facts[205] is the correct recitation of the facts in this case.

### 3.    "Issue:  Residency"

12        The Determination Letter has a section labeled "Issue:  Residency"[206] and a separate section

13   labeled "Determination:  Residency.[207]  The latter appears to be the thrust of FTB's protest findings

14   on the residency issue.  However, there is no discussion or analysis of how these findings lead to a

15   residency determination under California residency law.  We contend none of FTB's protest findings

16   are supported by the record in this case or lead to California residency during the 1991 disputed

17   period.  Each of FTB's findings is addressed below.

#### a.    Sale of the La Palma house

19        FTB contends Mr. Hyatt did not sell his La Palma house to Ms. Jeng on October 1, 1991.

20   FTB alleges Mr. Hyatt (1) could not have sold the La Palma house on October 1, 1991 because of an

21   "acceleration clause" in the Home Savings Deed of Trust and the loan was not paid in full until

22   December 21, 1991; (2) Mr. Hyatt "has not provided any documents directly related to the sale, the

23   contractual relationship between him and Grace Jeng, other than the deeds and the promissory note"

24   and Ms. Jeng's bank records "suggest she made the monthly payments for January 1992 and

---

[204] Ex. 1, FTB 11/1/07 Determination Letter, pp. 4-11.

[205] See Annex I.

[206] Ex. 1, FTB 11/1/07 Determination Letter, pp. 11-19.

[207] Id. at p. 24.

RJN000782

1  thereafter" but not before that time; and (3) the grant deed produced by Mr. Hyatt which is dated

2  October 1, 1991 was "actually notarized on June 10, 1993, with the notary public dating the

3  notarization as having taken place on October 1, 1991."[208]  None of these points have merit and are

4  contradicted by the evidence in this case.

5        First, FTB bases its residency conclusion in part on the contention that Mr. Hyatt could not

6  have sold his house to Ms. Jeng on October 1, 1991 because he did not pay off his mortgage on the

7  La Palma house until December of 1991.[209]  The Home Savings Deed of Trust pertaining to the La

8  Palma house contained an acceleration clause that stated the lender had the option to declare any

9  indebtedness and obligations secured by the deed of trust due and payable within 30 days if the

10  debtor engaged in certain acts, including selling the property or entering into a contract of sale.[210]

11  FTB agrees that an acceleration clause does not prevent a sale of property and cannot automatically

12  be enforced upon an outright sale of property under California case law.[211]  However, FTB

13  nonetheless appears to contend Mr. Hyatt somehow made a technical violation of the acceleration

14  clause when Mr. Hyatt either did not pay off the loan upon the sale of the property to Ms. Jeng on

15  October 1, 1991 or did not notify the lender of such sale.[212]  Based on this contention, FTB concluded

16  "it is reasonable to assume that Hyatt could not and did not sell the La Palma home at least until he

17  paid off the loan on December 21, 1991."[213]  Mr. Hyatt does not in any way concede he violated any

18  terms of the loan agreement with Home Savings.  However, to the extent there were any technical

19  violations, no penalties or defaults were ever asserted by Home Savings.[214]

20        On September 4, 1991, Mr. Hyatt discussed the sale of his La Palma house with an officer of

21  Home Savings and arranged for the payoff of the first trust deed on the La Palma house.  Mr. Hyatt

22

23

---

24  [208] *Id.* at p. 12.

25  [209] *Id.* at pp. 11-12.

26  [210] *Id.* at p. 11.

     [211] *Id.* at p. 12.

27  [212] *Id.*

     [213] *Id.*

28  [214] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 33).

RJN000783

1  paid off nearly half of the first trust deed on the La Palma house with Home Savings ($51,100) on

2  September 4, 1991 in preparation for his sale of the house and his move to Las Vegas.[215]

3        On September 30, 1991, Mr. Hyatt discussed the payoff of the first trust deed on the La Palma

4  house held by Home Savings with his attorneys, Mr. McCaffrey and Mr. Bailey.[216]  Mr. Bailey

5  advised Mr. Hyatt that there was no legal requirement for Mr. Hyatt to payoff the first trust deed, that

6  a buyer would often assume the first trust deed, and that, in the worst case, Home Savings would

7  merely demand payment upon sale under a "due on sale" option.[217]  Moreover, Mr. Bailey advised

8  Mr. Hyatt about a "wrap-around" deed of trust, but this vehicle was not used.[218]  Mr. Bailey said that

9  he would contact Home Savings and discuss with them how they wished to proceed.[219]

10        The balance of the Home Savings loan was paid by Mr. Hyatt in December 1991, shortly after

11  he sold the house to Ms. Jeng.[220]  Home Savings confirmed its approval by notarizing a full

12  reconveyance shortly after Mr. Hyatt's December 1991 pay off of the loan and then recording the

13  reconveyance.[221]  Irrespective of the technical terms of the loan agreement with Home Savings, they

14  in no way support FTB's residency conclusions set forth in the Determination Letter.

15        Second, FTB contends that "despite repeated requests," Mr. Hyatt "has not provided any

16  documents directly related to the sale [of the La Palma house]" or "the contractual relationship

17  between [Mr. Hyatt] and Grace Jeng, other than the deeds and the promissory note."[222]  The

18

---

19  [215] *See* Annex V, H BATES Documents (Homes Savings of America receipt noting $51,100.00 payment on 9/4/91 for
Loan No. 665853 (H 025544)); Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt,

20  12/5/08, ¶ 27; Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 9).

   [216] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶ 8, 9).

21  [217] *Id.* at ¶ 9.

22  [218] *Id.*

23  [219] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt,12/5/08, ¶ 29; Ex. 28, Affidavit of
Roger McCaffrey, 11/17/08, ¶ 9); *see also* Home Savings loan payoff events dated September 4 and December 21, 1991

24  (*see* fn. 215, *supra* and fn. 220, *infra*) and Ex. 24, Full Reconveyance dated 1/21/92 and recorded 2/6/92 (P01403,
P01404).

25  [220] Annex VI, CCC BATES Documents (Check No. 20 in the amount of $57,399.28 to Home Savings of America, dated
12/20/91 (CCC 02748-02749)); *see also* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P.

26  Hyatt, 12/5/08, ¶ 31; Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 12).

   [221] Ex. 24, Full Reconveyance dated 1/21/92 and recorded 2/6/92 (P01403, P01404); *see also* Annex VII, Affidavits in

27  Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 31; Ex. 28, Affidavit of Roger McCaffrey,
11/17/08, ¶ 12).

28  [222] Ex. 1, FTB 11/1/07 Determination Letter, p. 12.

---

RJN000784

1    statement belies FTB's motive here: the evidence at hand, sufficient though it may be in proving Mr.

2    Hyatt's position, does not help FTB prove its own and is therefore disregarded.  No other

3    documentation is necessary to prove the October 1, 1991 sale of the La Palma house *other than* the

4    deed and the promissory note.[223]  Title passed to Ms. Jeng in exchange for $175,000.[224]  Offer,

5    acceptance, consideration: that is a contract.  Mr. Hyatt had a longstanding professional relationship

6    with Ms. Jeng; why would he require any additional documentation beyond what the law requires?

7         Mr. Hyatt produced a grant deed near the commencement of the audit.[225]  FTB requested and

8    received a *second* copy directly from the Orange County Recorder nearly a year later.[226]  Mr. Hyatt

9    provided a copy of a Promissory Note secured by a Deed of Trust at the outset of the case.[227]  Mr.

10   Hyatt produced a copy of his 1991 tax return, including Form 2119 (Sale of Home), which listed the

11   date of the sale as October 1, 1991, and April 3, 1992 as the date Mr. Hyatt moved into his new home

12   in Las Vegas, and Schedule B interest income for 1991 reported from the Promissory Note on the La

13   Palma house.[228]  Mr. Hyatt provided documentation proving that Ms. Jeng paid the property taxes on

14   the La Palma house for 1992, 1993, and 1994, with the exception of 1991/1992 taxes paid by Mr.

15   Hyatt shortly after the sale, on October 15, 1991.[229]  Mr. Hyatt gave FTB documentation to prove that

16   prior to the sale of the La Palma house on October 1, 1991, he paid for a gardener, but after the sale

17   in November 1991, Ms. Jeng hired and paid for a gardener at her La Palma home.[230]  As discussed

18   above, Mr. Hyatt also produced documentation to FTB to prove that he had paid off almost half of

19   the loan on September 4, 1991 – nearly an entire month before the sale – and that he paid off the

---

[223] *See* Ex. 25, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. III, 8/17/05, pp. 567-68; and Ex. 26, Partial Transcript, Depo. of Michael Kern, Vol. II, 5/24/00, pp. 337-338.

[224] Ex. 25, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. III, 8/17/05, p. 566.

[225] Annex VI, CCC BATES Documents (M. Kern Sept. 8, 1993 letter to M. Shayer (CCC 01269 - 01271)).

[226] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 17 (CCC 00980); 8/10/94 letter to Recorder (CCC 01552); Grant Deed (CCC 01556)).

[227] Annex VI, CCC BATES Documents (M. Kern Sept. 8, 1993 letter to M. Shayer (CCC 01269 - 01271); Deed of Trust (CCC 01279)); Annex V, H BATES Documents (Promissory Note (H 01247)).

[228] *See* Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 17 (CCC 00980)).

[229] Annex VI, CCC BATES Documents (June 27, 1994 letter from Orange County Treasurer - Tax Collector (CCC 01349); *see also* FTB 1991 Narrative Report, p. 17 (CCC 00980)).

[230] Annex V, H BATES Documents (receipts dated 1/91, 2/91, and 5/91 (H 09078 - 09080); copy of 11/27/91 and 1/8/92 Jimmy Kim statement (H 09081 - 09082)).

RJN000785

1   balance of the loan shortly after the sale.[231]  In addition to the documentation of the sale itself, Mr.

2   Hyatt provided numerous affidavits and statements verifying the sale of the La Palma house to Ms.

3   Jeng on October 1, 1991.[232]

4          After alleging that Mr. Hyatt did not provide "any documents directly related to the sale" of

5   the La Palma house, FTB itself references (1) Ms. Jeng's bank records "[suggesting] that she made

6   the monthly payments for January 1992 and thereafter" on the Promissory Note; (2) a wire transfer

7   instruction from Ms. Jeng for a final payoff of the Note in the amount of $157,600.11 to Federated

8   Investors of Pittsburgh, Pennsylvania; and (3) Mr. Hyatt's Fidelity bank statement entry showing that

9   the $157,600.11 was deposited into his account.[233]  These documents were provided by Mr. Hyatt!

10  FTB disproves its own allegations.

11         Not surprisingly, though, considering the tenor of this case, FTB now raises questions about

12  matters *conceded* by the auditor to be resolved in the Narrative Report:  the sale of the La Palma

13  house on October 1, 1991; the execution of a grant deed to Ms. Jeng on October 1, 1991 for the La

14  Palma house; Mr. Hyatt's reported sale of the La Palma house on his 1991 tax return; Mr. Hyatt's

15  reported interest income received from the Promissory Note on his 1991 tax return; Ms. Jeng's

16  opened account in her name with the City of La Palma Water Service by November 26, 1991 for the

17  La Palma house; and the fact Mr. Hyatt did not pay a single California utility bill or telephone bill

18  (but regularly paid Nevada utility and telephone bills) during the 1991 dispute period.[234]  Further, the

19  auditor expressly determined that Mr. Hyatt had sold the La Palma house on October 1, 1991.[235]

---

[231] Annex V, H BATES Documents (Homes Savings of America receipt noting $51,100.00 payment on 9/4/91 for Loan No. 665853 (H 025544)); Annex VI, CCC BATES Documents (Check No. 20 in the amount of $57,399.28 to Home Savings of America, dated 12/20/91 (CCC 02748-02749)).

[232] Annex VI, CCC BATES Documents (M. Kern Sept. 8, 1993 letter to M. Shayer (CCC 01269 - 01271)); Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶ 6; Ex. 1, Affidavit of Caroline Cosgrove, 1/2/01, ¶ 9; Ex. 26, Affidavit of Barry T. Lee, 4/26/01, ¶¶ 7-8; Ex. 17, Affidavit of Daniel J. Hyatt, 5/1/01, ¶¶ 9, 13; Ex. 27, Affidavit of Roger McCaffrey, 1/22/01, ¶¶ 3, 10-11; Ex. 19, Affidavit of Gilbert P. Hyatt, 5/18/01, ¶¶ 21, 23-24; *see also* Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶¶ 5, 6; Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶ 4-9; and Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 32).

[233] Ex. 1, FTB 11/1/07 Determination Letter, p. 12.

[234] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 17 (CCC 00967, 00980, 00985); FTB Analysis of Utilities (CCC 03164-03166)).

[235] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 4 (CCC 00967), conceding "the taxpayer sold the La Palma house on 10/1/91 ...."); *see also* Annex V, H BATES Documents (FTB 1992 initial audit determination letter, p. 2 (H 02192); FTB 1992 Narrative Report, p. 33 (H 02412)).

---

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1991

RJN000786

1    Moreover, FTB improperly ignores the statements by others, in sworn affidavits no less,

2    regarding Mr. Hyatt's many efforts to secure appropriate legal advice in advance regarding the sale of

3    the La Palma house to Ms. Jeng.  On September 5, 1991, Mr. Hyatt had a telephone conversation

4    with his attorney, Roger McCaffrey, regarding the sale of his La Palma house to Ms. Jeng.  During

5    that call, Mr. Hyatt advised Mr. McCaffrey that he intended to sell his La Palma house to Ms. Jeng

6    and that Ms. Jeng was concerned with protecting her privacy and did not want her name, address and

7    status as a single lady recorded in the public records.  Mr. McCaffrey advised Mr. Hyatt there was no

8    legal requirement that he record the sale of his house to Ms. Jeng and her privacy could be protected

9    simply by not recording the sale of the house and by not going through escrow.  Mr. McCaffrey also

10   referred Mr. Hyatt to Del Bailey, a real estate attorney in McCaffrey's office, and McCaffrey

11   discussed this matter with Mr. Bailey.[236]  Mr. Hyatt, Mr. McCaffrey and Mr. Bailey then met on

12   September 30, 1991 and discussed the sale further, including the payoff of the first trust deed held by

13   Home Savings on the La Palma house.[237]

14        Ms. Jeng owned the La Palma house for three full months during the 1991 disputed period.

15   By the terms of the loan, Ms. Jeng was to pay $1,100 to Mr. Hyatt on the first of the month, every

16   month, beginning on November 1, 1991; thus, there was no payment due for October.[238]  Mr. Hyatt's

17   CalFed bank account statement for the period December 20, 1991, through January 22, 1992, shows a

18   deposit in the amount of $2,200 made on December 31, 1991, which Mr. Hyatt believes to be Ms.

19   Jeng's first two monthly payments.[239]  This is consistent with the amortization schedule for the 60-

20   month loan note between Ms. Jeng and Mr. Hyatt relating to the sale of the La Palma house.[240]

21

22

23

---

24   [236] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶ 4-6).

25   [237] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶ 7-9).

     [238] See Annex V, H BATES Documents (Note Secured by Deed of Trust (H 01247)); see also Ex. 98, Letter from E.
26   Coffill to C. Cinnamon dated 5/8/07 and documents attached thereto.  The records produced by Ms. Jeng reflect regular
     payments of $1,100 to Mr. Hyatt; however, the earliest documents she was able to produce were dated early 1992.  (See
27   Annex V, H BATES Documents (three early-1992 Note payments (H 03712 – 03714)).

     [239] See Annex V, H BATES Documents (CalFed statement for period beginning 12/20/91 (H 00658)).

28   [240] See amortization schedule attached to Ex. 98, Letter from E. Coffill to C. Cinnamon dated 5/8/07.

RJN000787

1    Mr. Hyatt provided to FTB the information regarding his sale of the La Palma house to Ms.

2    Jeng on October 1, 1991.  This evidence overwhelmingly supports Mr. Hyatt's sale of the La Palma

3    house to Ms. Jeng and Mr. Hyatt's severance of his most significant California connection.

4    Third, FTB contends Mr. Hyatt backdated the October 1, 1991 grant deed.  "The grant deed

5    produced by Hyatt is dated October 1, 1991 and was allegedly notarized by a notary public on that

6    same date.  The truth of the matter is that the document was actually notarized on June 10, 1993, with

7    the notary public dating the notarization as having taken place on October 1, 1991."[241]  FTB also lists

8    this alleged false notarization issue in support of the assessed fraud penalty.[242]  This is an

9    unsupported allegation that ignores the evidence in the record.  Beyond the testimony of Mr. Hyatt

10   and Ms. Jeng,[243] the notary, Ms. Darlene Beer, testified that *she* erred in showing the notarization

11   took place on October 1, 1991, and she was *never* asked by Mr. Hyatt or anyone else to backdate

12   anything when she simply notarized the deed on June 10, 1993.[244]  FTB had access to Ms. Beer's

13   deposition testimony from *Hyatt v. FTB*, but clearly has chosen to ignore Ms. Beer's sworn testimony

14   to the detriment of Mr. Hyatt.  FTB goes so far as to falsely conclude "the subornation of the

15   backdating of the notarization of the grant deed in June 1993 substantially damages the taxpayer's

16   credibility in all respects."[245]  Having absolutely no evidence of "subornation," FTB simply attacks

17   Mr. Hyatt's character and credibility.  A further discussion of this issue is set forth at Argument

18   III.C., *infra*, and will not be repeated here.

19                          **b.    Homeowner's exemption termination**

20   Mr. Hyatt terminated the homeowner's exemption on his former California house approximately

21   four months after he sold the house to Ms. Jeng.[246]  FTB contends this "suggests that [Mr.] Hyatt had not

22   sold the La Palma home as of February 10, 1992."[247]  On the termination notice submitted to the Orange

---

[241] Ex. 1, FTB 11/1/07 Determination Letter, p. 12.

[242] *Id.* at p. 28.

[243] Ex. 25, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. III, 8/17/05, p. 566-568; Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 11).

[244] Ex. 27, Partial Transcript, Depo. of Darlene Beer, 4/9/04, pp. 83-86, 116-120.

[245] Ex. 1, FTB 11/1/07 Determination Letter, p. 24.

[246] *See* Annex II, 1992 Chronological Statement of Facts, p. 6  (Ex. 11, Homeowner's Exemption Termination Notice).

[247] Ex. 1, FTB 11/1/07 Determination Letter, p. 12.

RJN000788

1    County Assessor's office, Mr. Hyatt checked the first of two correct boxes, which stated Mr. Hyatt "did

2    not occupy the property as my principal place of residence as of 12:01 A.M., March 1, [1992]" and he

3    also hand wrote beneath the pre-printed text of the box he checked that the reason he did not occupy the

4    property as his "principal place of residence as of 12:01 A.M., March 1, [1992]" was because he had

5    moved from the La Palma house in "Oct. 1991."[248]

6          FTB's strained interpretation and conclusion as to Mr. Hyatt's checking of the first box on the

7    homeowner's exemption termination notice sent to the Orange County recorder's office in February of

8    1992 is wrong.  To imply more meaning into that form than Mr. Hyatt simply checked the first listed

9    correct box, *i.e.* he no longer occupied the property, demonstrates FTB's continued effort to interpret all

10   evidence against Hyatt, no matter how strained the FTB's interpretation.  To the contrary, this is a near-

11   contemporaneous document that confirms Mr. Hyatt's sale of the La Palma house.  The form offered

12   two correct responses for Mr. Hyatt.[249]  After checking the first box, there was no need to continue with

13   the form.  As explained above, Mr. Hyatt's real estate attorney, Mr. Bailey, told Mr. Hyatt that Mr.

14   Hyatt had until December 10, 1992 to terminate the homeowner's exemption, but that Mr. Hyatt

15   should do it sooner than later.  Mr. Bailey provided Mr. Hyatt with a form to fill out.  Mr. Hyatt was

16   scheduled to check into the hospital on February 11, 1992 for major surgery for colon cancer the

17   following day, so he hastily filled out the form.   The fact the FTB has cited to this termination

18   document as evidence in the FTB's favor demonstrates the weakness of the evidence in support of its

19   residency position.

20                    **c.      Continental Hotel stay**

21          FTB contends Mr. Hyatt's stay at the Continental Hotel from September 26, 1991 through

22   October 14, 1991 is "unsubstantiated" and "is neither plausible or [sic] credible."[250]  FTB has no

23   evidence to rebut Mr. Hyatt's stay at the Continental Hotel.  Rather, FTB claims that Mr. Hyatt lacks

24   credibility so the FTB should not believe him.

25

26   _____

27   [248] Annex II, 1992 Chronological Statement of Facts, p. 6  (Ex. 11, Homeowners' Exemption Termination Notice).
     [249] *See* Annex II, 1992 Chronological Statement of Facts, p. 6  (Ex. 11, Homeowners' Exemption Termination Notice).

28   [250] Ex. 1, FTB 11/1/07 Determination Letter, pp. 13-14.

1    The ongoing Continental Hotel "dispute" between Mr. Hyatt and FTB is one of many examples

2  of a problem Mr. Hyatt has encountered repeatedly throughout the course of these extended proceedings.

3  The problem here, and throughout the audit, is that FTB is simply unwilling to believe as true anything

4  which does not conform to FTB's subjective world view.  Other examples abound, *e.g.*, a wealthy

5  successful person should not be driving an old car, or living in an apartment of something less than a

6  luxury standard, so the truth simply cannot be that Mr. Hyatt owned an old car in need of repair or rented

7  and occupied an apartment at Wagon Trails.  Other examples aside, the Continental Hotel is the prime

8  example of how "truth" to be accepted must conform to FTB's concept of truth.

9    It is a true fact that from September 26, 1991, to October 14, 1991, when Mr. Hyatt was in Las

10  Vegas, he stayed at the Continental Hotel.[251]  Both Mr. Hyatt and Ms. Jeng had acquired rooms at the

11  Continental Hotel through a van tour company beginning on September 24, 1991.[252]  Mr. Hyatt gave his

12  telephone number at the Continental Hotel to numerous individuals, who called him there multiple times

13  during the course of his stay.[253]  In October 1991, Ms. Jeng visited Mr. Hyatt at the Continental Hotel.[254]

14  Finally, prior to October 21, 1991, Ms. Jeng arranged to move Mr. Hyatt's possessions from the

15  Continental Hotel to his Wagon Trails apartment while he was on a week-long business trip to the East

16  Coast.[255]

17    FTB rejects Mr. Hyatt's testimony that he stayed at the Continental Hotel from September 24,

18  1991, through mid-October 1991, as "neither plausible or [sic] credible" and "unsubstantiated with any

19  contemporaneous documentary evidence."[256]  FTB, however, fails to explain what is neither plausible

20  nor credible about the following evidence:  reservations for Mr. Hyatt at the Continental Hotel were

21  

22  [251] Ex. 28, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. I, 08/15/05, p. 36; *see also* Annex VII, Affidavits in Support

23  of Mr. Hyatt (Ex. 16, Affidavit of R. Danny Huntington, 10/14/08, ¶ 10; Ex. 35, Affidavit of Harry Widdifield, 9/25/08, ¶

24  8; Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 5; Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 13); *see also* Annex I, 1991 Chronological Statement of Facts, pp. 14 - 24 for specific entries during this time period that show Mr. Hyatt's stay at the Continental Hotel.

[252] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 12).

25  [253] Ex. 29, Partial Transcript, Depo. of Daniel Hyatt, Vol. II, 2/8/06, p. 366; Ex. 30, Partial Transcript, Depo. of Barry

26  Lee, 2/06/06, pp. 219, 220; Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 16, Affidavit of R. Danny Huntington, 10/14/08, ¶ 11; Ex. 14, Affidavit of Henry Huey, 11/23/08, ¶ 1); Ex. 2, Affidavit of Caroline Cosgrove, 11/24/08, ¶ 7)).

27  [254] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 13).

[255] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 13).

28  [256] Ex. 1, FTB 11/1/07 Determination Letter, p. 14.

RJN000790

1    made by a tour bus driver, Mr. David Lau, as was his business;[257] there is no evidence to suggest that

2    Mr. Lau ever made a reservation in Mr. Hyatt's name or that the Continental Hotel knew the names of

3    all of the guests staying as part of Mr. Lau's tour group;[258] Mr. Hyatt and Grace Jeng paid Mr. Lau in

4    cash for the hotel room and transportation;[259] and Mr. Kern's firm, Piercy, Bowler, Taylor and Kern,

5    made inquiries at the Continental Hotel for the records of either Mr. Hyatt or Ms. Jeng (and had Mr.

6    Kern known to ask for records involving the tour operator, he would have asked).[260]

7          Undeterred, FTB presses forward, apparently doubting that it is possible for an individual to have

8    stayed at a hotel unless that person can produce a copy of a hotel bill in their name for the stay. As set

9    forth above, Mr. Hyatt did not produce any contemporaneous documentary evidence because there is

10   none to produce. There is no requirement under California residency law that contemporaneous

11   documentary evidence is the only form of proof that can sustain the taxpayer's burden of proof, and FTB

12   cannot unilaterally create such a requirement to suit its own purpose. Mr. Hyatt has provided sworn

13   testimony and affidavits to support his stay at the Continental Hotel,[261] but FTB has repeatedly chosen to

14   ignore such third party evidentiary statements despite this Board's admonition to the contrary.[262]

15         Given FTB's *continued* insistence that Mr. Hyatt's stay at the Continental Hotel was

16   "unsubstantiated," Mr. Hyatt's Rabbi, Rabbi Hecht, and his wife, Michelina Hecht, have *now also*

17   provided affidavits regarding their recollections of meeting Mr. Hyatt and their interaction with him

18   during the 1991 disputed period. Rabbi Hecht was Rabbi for Temple Beth Am in Las Vegas.[263] Rabbi

19   Hecht and his wife first met Mr. Hyatt at the Rabbi's office in Las Vegas on or about October 3, 1991.

---

[257] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 12).

[258] Ex. 28, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. I, 8/15/05, p. 39; Ex. 31, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. IV, 12/05/05, p. 744; Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 12).

[259] Ex. 31, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. IV, 12/05/05, p. 744; Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 12).

[260] Ex. 32, Partial Transcript, Depo. of Michael Kern, 1/19/06, p. 55.

[261] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 16, Affidavit of R. Danny Huntington, 10/14/08, ¶¶ 10, 11; Ex. 35, Affidavit of Harry Widdifield, 9/25/08, ¶ 8; Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 5; Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶¶ 12, 13; Ex. 14, Affidavit of Henry Huey, 11/23/08, ¶ 11; Ex. 13, Affidavit of Michelina Hecht, 11/16/08, ¶ 5.)

[262] *See Appeal of Berner, supra.*

[263] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 2; Ex. 13, Affidavit of Michelina Hecht, 11/16/08, ¶ 2).

RJN000791

1   At that meeting, Mr. Hyatt told Rabbi Hecht and the Rabbi's wife that he had just moved from

2   California, that he had just sold his house in California, and that he was looking for an apartment to lease

3   and a house to purchase in Las Vegas.[264]  In this early October 1991 meeting, Mr. Hyatt told Rabbi

4   Hecht and his wife that he was staying at the Continental Hotel in Las Vegas until he could lease an

5   apartment.[265]  The Rabbi and his wife both specifically remember the name of the Continental Hotel not

6   only because it was a prominent landmark, but because they would occasionally dine there and regularly

7   passed the Continental Hotel while traveling on Flamingo Road to and from Temple Beth Am's office

8   when it was located on Pecos Road near Flamingo Road.[266]  Rabbi Hecht and his wife also recall that the

9   Continental Hotel was well known for its tours where buses and vans would pick up Asian vacationers

10  in Southern California and take them to the Continental Hotel.[267]

11          In addition to the Rabbi Hecht and wife, Mr. Hyatt has now also obtained an affidavit from his

12  long-term girlfriend, Ms. Cosgrove, regarding her recollection of his stay at the Continental Hotel during

13  the 1991 disputed period.  Ms. Cosgrove specifically recalls that in late September 1991, Mr. Hyatt told

14  her that he was staying at the Continental Hotel, and gave her the telephone number of the hotel and his

15  room number.  She then telephoned Mr. Hyatt about every evening at the hotel.[268]

16          FTB also attacks Mr. Kern's testimony that his firm made inquiries into Mr. Hyatt's stay at the

17  Continental Hotel.[269]  FTB states that Mr. Kern "alleges that he first tried to obtain the documentation …

18  shortly after the protest letter was filed for taxable year 1991 in April 1995."[270]  FTB's statement is false.

19  First, the protest letter for taxable year 1991 was filed on June 20, *1996*, which FTB admits in the

20

21  [264] *Id.*, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 4; Affidavit of Michelina Hecht, 11/16/08, ¶ 4.

    [265] *Id.*, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 5; Affidavit of Michelina Hecht, 11/16/08, ¶ 5.

22  [266] *Id.*

23  [267] *Id.*, also stating: "By October 1991, [we] had observed tours at the Continental Hotel for several years, [we] had
    spoken with persons who had taken the tours, and [we] had observed advertisements for the tours.  [We] understood from
24  these observations that, in the 1991 time frame, the tour packages included hotel accommodations, ticket books, and other
    benefits and that the hotel set aside blocks of rooms for the tours."

25  [268] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 2, Affidavit of Caroline Cosgrove, 11/24/08, ¶ 7, further stating: "I
    would call the hotel and ask the hotel operator to connect me with his room number.  The hotel operator connected me with his
26  room and we talked.  I would place the calls to Gil because it was more economical for me to call him.  The cost savings was
    because I would direct dial from my home telephone at relatively low telephone rates while he had to pay much higher hotel
27  telephone rates").

28  [269] Ex. 1, FTB 11/1/07 Determination Letter, p. 14.

    [270] *Id.* at p. 13.

RJN000792

1    sentence preceding the one quoted above[271] and FTB, oblivious to its own mistake, continues to refer to

2    "the alleged April 1995 contact."[272] Second, and of more importance, Mr. Kern testified that his firm

3    first requested documents from the Continental Hotel around April of 1996, which is before the filing of

4    the protest.[273] In his sworn deposition testimony, Mr. Kern states that his firm contacted Ira Levy,

5    president and general manager of the Continental Hotel in 1996 and inquired as to documentation or

6    records concerning Mr. Hyatt's stay.[274] In response to his firm's inquiries into Mr. Hyatt's stay at the

7    Continental Hotel from late September 1991 through mid-October 1991, representatives at the

8    Continental Hotel replied that the Continental Hotel was "under investigation by the Gaming Control

9    Board for inadequate documentation and records," that the hotel "had a high turnover of employees" and

10    had "serious write-ups" by the Gaming Control Board, and that the hotel's "records were in

11    shambles."[275] Needless to say, no records were available.[276] As an aside, subsequently, Mr. Kern's

12    firm, after a meeting, declined to work for the Continental Hotel involving a gambling audit because

13    their records were in such shambles.[277] During this meeting, one problem raised concerning the

14    Continental Hotel was that it "*couldn't find the records.*"[278]

15       Changing tactics, FTB concludes that Mr. Hyatt and his representatives only "alleged" Mr. Hyatt

16    stayed at the Continental Hotel after the hotel's records had been destroyed per order of a Bankruptcy

17    Judge, implying a nefarious motive to the actions of Mr. Hyatt and his representatives.[279] Again, the

18    facts refute FTB's conclusion. Mr. Kern testified why Mr. Hyatt and his representatives chose not to

19    immediately notify FTB as to the particular hotel Mr. Hyatt remembered staying in.[280] Mr. Kern states

20

21    [271] Ex. 22, 1991 Protest, 6/20/96; and Ex. 1, FTB 11/1/07 Determination Letter, p. 13.

     [272] Ex. 1, FTB 11/1/07 Determination Letter, p. 14.

22    [273] Ex. 26, Partial Transcript, Depo. of Michael Kern, Vol. II, 5/24/00, p. 278.

23    [274] *Id.* at pp. 277, 292.

     [275] *Id.* at pp. 276, 280.

24    [276] *Id.*

     [277] Mr. Kern's firm was subsequently asked to *work for* the Continental Hotel in the audit it faced. But after Mr. Kern and

25    his partner, Ralph Piercy, attended a meeting with the Continental Hotel, Mr. Kern's firm determined that it "could not

     accept the engagement on the Continental Hotel due to the poor condition of their records, due to the Gaming Control

26    Board violations, … [and due] to the fact that their accounting records were in shambles." (*Id.* at p. 281.)

     [278] *Id.*, emphasis added.

27    [279] Ex. 1, FTB 11/1/07 Determination Letter, p. 14.

28    [280] Ex. 26, Partial Transcript, Depo. of Michael Kern, Vol. II, 5/24/00, pp. 277-278.

RJN000793

1   – and with good cause in hindsight – their concern that FTB would accept nothing short of documentary

2   proof of the hotel stay,[281] and those concerns were recently validated in a Nevada court of law.[282]

3       FTB relies on an affidavit from a former Comptroller of the Continental Hotel to "prove" that the

4   documents from Mr. Hyatt's stay in 1991 would have been readily available in 1996 and 1997.[283] FTB's

5   reliance is misplaced. First, instead of contacting the Nevada Gaming Control Board to ascertain the

6   status of the Continental Hotel's records for 1996 in light of Mr. Kern's testimony in 2000, FTB chose in

7   2002 – two years later – to contact an individual and ask her for an assessment of her own job

8   performance. Not surprisingly, the assessment is glowing, and includes an absolute assertion that the

9   records "were never disorganized or unavailable."[284] Second, after deposing Mr. Kern in 2000 and

10  learning that Mr. Kern contacted Ira Levy (president and general manager of the Continental Hotel in

11  1996), we are not aware of any attempt by the FTB to contact Mr. Levy to confirm Mr. Kern's

12  inquiry.[285] Third, the Comptroller states she does not recall any inquiry into the records by Mr. Kern's

13  accounting firm or by Mr. Hyatt, but she *never* states that she personally handled all such inquiries.

14  Rather, the Comptroller says that "her *office* received all such requests."[286] We know this to be false

15  because Mr. Kern's firm contacted the Hotel's General Manager directly to request records of Mr.

16  Hyatt's stay.[287] FTB simply disregards the affidavits and sworn testimony of multiple individuals who

17  testified to calling Mr. Hyatt at the Continental Hotel on numerous occasions during the time in

18  question[288] because such evidence does not conform to FTB's theory of the case. In sum, various

19  affiants have testified they telephoned Mr. Hyatt at the Continental Hotel or that Mr. Hyatt told them

20

21  ────────────────────────

22  [281] Mr. Kern testified to "concern [about] the misstatements and misrepresentations that [they] saw in the notice of proposed assessments; the lack of willingness by the auditor to provide [them] the documentation the auditor was relying on" and the fact that "the auditor had relied on third-party sources that [Mr. Hyatt and his representatives] felt were inaccurate"; Mr. Hyatt's representatives therefore "wanted a confirming document to hand to …the protest officer" to prevent "more of [the] misrepresentations and misallegations [from] being directed at Mr. Hyatt." (*Id.*)

23

24  [282] *See* fn. 18, *infra.*

25  [283] Ex. 1, FTB 11/1/07 Determination Letter, fn. 4.

    [284] Ex. 33, Affidavit of Lisa Krasn, 3/14/02, ¶ 3.

26  [285] Ex. 26, Partial Transcript, Depo. of Michael Kern, Vol. II, 5/24/00, pp. 277, 292.

    [286] *Id.* at ¶ 5, emphasis added.

27  [287] Ex. 26, Partial Transcript, Depo. of Michael Kern, Vol. II, 5/24/00, pp. 277, 292.

28  [288] *See* fns. 253 and 261, *supra.*

RJN000794

1   shortly thereafter in late 1991 that he had stayed at the Continental Hotel.[289]  The fact Mr. Hyatt cannot

2   produce a receipt in his name for this hotel stay does not make it untrue that he stayed there.

3               **d.     Credit card and banking information**

4        FTB contends Mr. Hyatt's "credit card transactions ... beginning October 2, 1991 simply do not

5   place Hyatt in Las Vegas during the period October 2, 1991 through October 28, 1991" and that this

6   "financial documentary evidence simply does not corroborate the affidavits" attesting to Mr. Hyatt's

7   move in late September 1991.[290]  The 18 alleged credit card transactions from October 1991 are

8   addressed in full above.  Our arguments will not be repeated here.

9               **e.     Mr. Hyatt's apartment rental at Wagon Trails**

10       FTB determined Mr. Hyatt's rental of the Wagon Trails apartment "from October 21, 1991 until

11  on or after November 1, 1991" is not "credible" because there was allegedly no "electricity or phone

12  services."[291]  We do not understand FTB's logic.  November 1, 1991 is the date on the checks Mr. Hyatt

13  wrote to pay for his initial telephone and electricity service at his apartment.  We are not aware of, nor

14  does FTB cite to evidence that somehow the electricity service and telephone service did not start the

15  day he opened the accounts, which was October 21, 1991 for the electric service and October 22, 1991

16  for the telephone service.[292]

17       Moreover, FTB ignores the multitude of documentary and testimonial evidence supporting Mr.

18  Hyatt's rental of the Wagon Trails apartment starting October 21, 1991.  These facts are laid out in detail

19  at pages 94-105 of the May 31, 2001 Protest Supplement Letter for 1991.[293]  FTB has made no attempt

20  whatsoever to refute this weighty evidence in support of Mr. Hyatt's rental of the Wagon Trails

21  apartment starting October 21, 1991.

22       Finally, several recent affiants have testified that they telephoned Mr. Hyatt at his Las Vegas

23  apartment or that Mr. Hyatt had electric power in late October 1991.[294]

---

[289] See fns. 253 and 261, supra.
[290] Ex. 1, FTB 11/1/07 Determination Letter, pp. 15-16.
[291] Id. at p. 16.
[292] See Annex I, 1991 Chronological Statement of Facts, pp. 26-27.
[293] See Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 94-105.
[294] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 2, Affidavit of Caroline Cosgrove, 11/24/08, ¶ 9, 10; Ex. 4, Affidavit of Eugene Cowan, 11/14/08, ¶ 6; Ex. 8, Affidavit of Jeffrey Glassman, 11/18/08, ¶ 7; Ex. 12, Affidavit of Dr.

(Footnote continues on next page.)

RJN000795

1

####  f.     Voter registration

2  FTB states Mr. Hyatt "alleges that he registered to vote in Nevada in November 1991" "but did

3  not vote in Nevada during the disputed period … for the specified reason that there were no major

4  elections during that time."[295]  The fact Mr. Hyatt registered to vote is substantiated by the evidence in

5  this case[296] – this is not an "alleged" fact.  Mr. Hyatt did in fact vote in person for the first major

6  elections to occur (September and November 1992) after his move to Nevada, and never voted in

7  California after September 1991.[297]

8

####  g.     Las Vegas home shopping

9  FTB spends two pages of its Determination Letter discussing Mr. Hyatt's efforts to purchase a

10  home in Nevada starting in October 1991 and continuing through April 1992.[298]  FTB then concludes

11  that "[b]ased upon the information and documentation available it appears that Hyatt made offers to buy

12  at least eight different Las Vegas properties during this time [*i.e.*, between October 1991 and March

13  1992]."[299]  FTB, not surprisingly, underplays the strength of these Nevada connections.  Mr. Hyatt's

14  truly extensive Nevada home shopping activities are strong facts supporting Mr. Hyatt's Nevada

15  residency during the disputed period.  We encourage the Board to review the 1991 Chronological

16  Statement of Facts for the complete listing of Mr. Hyatt's Nevada house shopping activities.[300]

17

18

19

20

---

21  (Footnote continued from previous page.)

22  Mel Hecht, 11/12/08, ¶¶ 12, 13; Ex. 14, Affidavit of Henry Huey, 11/23/08, ¶ 12; Ex. 16, Affidavit of R. Danny Huntington, 10/14/08, ¶ 11; Ex. 18, Affidavit of Daniel J. Hyatt, 11/11/08, ¶ 16; Ex. 23, Affidavit of Robert Kazmaier, 10/29/08, ¶¶ 13, 15; Ex. 24, Affidavit of John Keller, 10/24/08, ¶ 10; Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶ 16-26, 28-34, 37-38; Ex. 31, Affidavit of Walter Shoemaker, 7/22/98, ¶ 4; Ex. 35, Affidavit of Harry Widdifield, 9/25/08, ¶ 9).

23

24  [295] Ex. 1, FTB 11/1/07 Determination Letter, p. 17.

25  [296] *See* Annex V, H BATES Documents (Clark County Voter Information (H 01272)).

26  [297] *See* Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 5 (CCC 00968)).

26  [298] Ex. 1, FTB 11/1/07 Determination Letter, pp. 17-19.

27  [299] *Id.*

28  [300] *See* Annex I.  For the convenience of the Board, we have created a table with citations to the record with each of Mr. Hyatt's home offers on Las Vegas properties during the 1991 (and 1992) disputed period.  (*See* Ex. 20.)

RJN000796

### III. THE ACCURACY RELATED FRAUD PENALTY FOR 1991 WAS IMPROPERLY IMPOSED AND SHOULD BE REMOVED

#### A. Introduction

FTB's 50-page Determination Letter devotes a mere four pages to the fraud penalties it imposed upon Mr. Hyatt at audit for both years.[301] For 1991, FTB imposed an accuracy related fraud penalty in the amount of $1,407,353.25. (For 1992, FTB imposed a fraudulent failure to file a return penalty in the amount of $4,251,765.75.) On protest, FTB affirmed both penalties in full.[302]

After reciting the applicable statutes,[303] FTB states in its Determination Letter:

> The protest hearing officer has determined that the fraud penalties should be sustained, because the actions of the taxpayer support finding that he misrepresented facts and events in order to create the impression that he left California around September 24, 1991 when in fact he remained a resident well after that date. In addition to the general lack of credibility that proceeds from the actions and allegations of Hyatt, the protest hearing officer *has identified a number of specific acts and events that clearly support a finding of intent to work fraud* on the state by the taxpayer.[304]

FTB then proceeds to identify five "specific acts and events" alleged to show fraud, each of which is addressed below. None were relied on at audit, and all have been raised as new grounds in the Determination Letter.[305] Arguably, only two have anything to do with residency during the disputed period. None are persuasive.

---

[301] Ex. 1, FTB 11/1/07 Determination Letter, pp. 26-29.

[302] *See* Notices of Action, attached to SBE Notices of Appeal for 1991 and 1992.

[303] With respect to the accuracy-related penalty for 1991, section 19164(c) states: "A fraud penalty shall be imposed under this part and shall be determined in accordance with the provisions of Section 6663 of the Internal Revenue Code, relating to imposition of fraud penalty." (Cal. Rev. & Tax. Code § 19164(c).) Section 6663 of the Internal Revenue Code states: "If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." (IRC § 6663(a).)

[304] Ex. 1, FTB 11/1/07 Determination Letter, p. 27, emphasis added.

[305] We address the penalty only as a potential penalty on a "residency" assessment and not on a "sourcing income" assessment. That is because the penalty was imposed as part of the NPA which was based solely on the residency issue, and which was issued after FTB had considered, and rejected, any alternative sourcing income argument. (*See* Argument IV, *infra*.) In addition, none of the five "specific acts and events" alleged by FTB has anything to do with sourcing, even under FTB's new section/regulation 17952 sourcing argument raised by FTB for the first time in its Determination Letter.

RJN000797

**B.      The Burden of Proof Is Upon FTB to Show Fraud by Clear and Convincing Evidence**

Before reviewing each of the five items, we first point out that nowhere in its Determination Letter does FTB acknowledge *it* bears the burden of proof regarding allegations of fraud.  To the contrary, FTB states in its letter, "The burden of proof in tax disputes is on the taxpayer..."[306]

This Board has stated that because the California statute involved is substantively identical to the federal counterpart, "federal case law is persuasive authority in the interpretation and application of the California statute."[307]  To this end, this Board frequently has cited federal cases regarding fraud-related issues.[308]

California case law refers to the clear and convincing standard when addressing fraud-related penalties assessed by FTB.[309]  This Board has "defined [the standard] as 'explicit and unequivocal,' leaving 'no substantial doubt,' and 'sufficiently strong to command the unhesitating assent of every reasonable mind.'"[310]  In *Appeal of Robert V. Erilane*, this Board stated that "[f]raud implies bad faith, intentional wrongdoing and a sinister motive."  Further, this Board stated in fraud cases that the "taxpayer must have 'the specific intent to evade a tax believed to be owing.'"[311]  Because "intent is rarely susceptible of direct proof ..."[it] must usually be inferred from the totality of facts and circumstances in a case."[312]  Although the government can turn to circumstantial evidence to carry its burden of proof, fraud is "never presumed or imputed, and it will not be sustained upon circumstances which, at most, create only suspicion."[313]

---

[306] Ex. 1, FTB 11/1/07 Determination Letter, p. 48, fn. 25.

[307] *Appeal of Gary O. Armstrong*, 81-SBE-177, Dec. 10, 1981.

[308] *See, e.g., Valetti v. Comm'r* (1958) 260 F.2d 185, 188 (holding that "fraud must be clearly and convincingly established" and "the piling of inference upon inference hardly qualifies as the ... evidence by which fraud must be proved"); *see also Appeal of Robert V. Erilane*, 74-SBE-050, Nov. 12, 1974; *Appeal of Charles L. and Phyllis R. Owen*, 76-SBE-025, March 8, 1976; *Appeal of Hubbard D. and Cleo M. Wickman*, 81-SBE-014, Feb. 2, 1981; and *Appeal of Barbara P. Hutchinson*, 82-SBE-121, June 29, 1982.

[309] *See, e.g., Appeal of Robert V. Erilane, supra; Appeal of Gary O. Armstrong, supra;* and *Appeal of William G., Jr. and Mary D. Wilt*, 76-SBE-030, Mar. 8, 1976.

[310] *See Appeal of Robert F. and Helen R. Adickes*, 90-SBE-012, Nov. 27, 1990, quoting *In re Jost* (1953) 117 Cal.App.2d 379, 383.

[311] *Adickes, supra,* quoting *Appeal of George W. Fairchild*, 71-SBE-030, Oct. 27, 1971.

[312] *Adickes, supra,* quoting *People v. Kuykendall* (1955) 134 Cal.App.2d 642.

[313] *Erilane, supra,* quoting *Jones v. Commissioner* (5th Cir. 1958) 259 F.2d 300, 303.

---

1    This Board also has stated that what is needed for the government to carry its burden of proof

2    with respect to fraud-related penalties is "evidence of affirmative acts of concealment,

3    misrepresentation or subterfuge" on the part of the taxpayer.[314] *Wickman* also states that neither

4    "ignorance, bad advice, honest mistake, negligence, [nor] misinterpretation of law" in itself would

5    constitute fraud."[315]

6    **C.    FTB Has Not Met Its Burden to Prove Fraud**

7    Against this legal background, and bearing the burden of proof, the first "specific act and

8    event" FTB alleges in support of fraud is "The Grant Deed for the Alleged La Palma Property

9    Sale."[316] Here, FTB alleges: "The department is informed and believes that Darlene Louise Beer, the

10   notary public who notarized the Hyatt Grant Deed, *has admitted* that the Grant Deed dated October 1,

11   1991 was actually notarized on June 10, 1993 and was backdated to October 1, 1991."[317]

12   FTB's allegation can be read in either of two ways, neither of which is evidence of fraud.

13   First, the allegation can be read as Ms. Beer "admitting" the *grant deed* was "backdated" to

14   October 1, 1991. Second, the allegation can be read as Ms. Beer "admitting" the *notarization* was

15   "backdated" to October 1, 1991. Both readings are false.

16   Ms. Beer, the notary, was deposed on April 9, 2004 in connection with the Nevada litigation.

17   Ms. Beer testified that she erred in showing the notarization took place on October 1, 1991, and she

18   was *never* asked by Mr. Hyatt or anyone else to backdate anything when she simply notarized the

19   deed on June 10, 1993.[318] Ms. Beer did not know Mr. Hyatt.[319] The notarization was "nothing

20   unusual," and it was done at a bank where Ms. Beer worked.[320] Yet over *three* years after that

21   deposition was taken, FTB now claims, based only on undocumented "information and belief," that

22   Ms. Beer's self-admitted notarization date error is a "specific act or event" showing fraud by Mr.

23   Hyatt. Ms. Beer's testimony shows FTB's claim is false.

---

24   [314] *See Appeal of Stephen Bellamy*, 85-SBE-002, Jan. 8, 1985; *Appeal of Hubbard D. & Cleo M. Wickman, supra.*

25   [315] *Appeal of Hubbard D. & Cleo M. Wickman, supra.*

     [316] Ex. 1, FTB 11/1/07 Determination Letter, p. 28.

26   [317] *Id.* Emphasis added.

27   [318] Ex. 27, Partial Transcript, Depo. of Darlene Beer, 4/9/04, pp. 83-86, 116-120.

     [319] *Id.* at p. 12.

28   [320] *Id.* at pp. 14, 30.

RJN000799

1    This false notarization issue has a long, and relevant, history. During the course of Mr.

2    Hyatt's audit, Mr. Hyatt produced to the auditor a copy of the La Palma grant deed dated October 1,

3    1991.[321] The copy produced by Mr. Hyatt was not notarized and, indeed, notarization was *never* an

4    issue at audit or protest because notarization and recordation are irrelevant to the validity of that

5    deed.[322] FTB on its own obtained a copy of the recorded grant deed; this (recorded) grant deed was

6    similar to the (unrecorded) grant deed produced by Mr. Hyatt at audit, but the recorded copy states

7    (mistakenly) it was notarized on October 1, 1991 by Ms. Beer. The FTB's and Attorney General's

8    investigators then located Ms. Beer and took a statement from her, during which she was shown

9    photographs of Mr. Hyatt with Hillary Clinton and President Clinton and told that Mr. Hyatt "is a

10   very powerful man and he doesn't like to have anybody say anything against him."[323] As a result of

11   those statements by FTB and having been shown the photographs by FTB, Ms. Beer became afraid of

12   testifying because she was "scared for [her] life and my family, and [she] wasn't going to do it."[324]

13   After interviewing Ms. Beer, FTB then claimed in September 2003 in the Nevada litigation that "FTB

14   discovered that Hyatt used a false notary to back date the deed conveying title to his California

15   house," a charge which Ms. Beer categorically denied when she was deposed.[325]

16       Based upon this extreme conduct by FTB, and based on Ms. Beer's deposition, it is

17   remarkable that FTB now in its Determination Letter would have the audacity to continue to make

18   this allegation of fraud simply on "information and belief." Indeed, if this Board was acting in the

19

20

21   ───────────────────────

[321] Ex. 34, copy of La Palma Grant Deed produced by Mr. Hyatt.

22   [322] In its mission to verify notarization, the point FTB ignores in the Determination Letter is that the *deed itself* transferred

23   ownership of the La Palma house to Ms. Jeng on October 1, 1991. The fact that the deed was "actually notarized on June 10, 1993" does not contradict the fact that Mr. Hyatt *sold* the La Palma house to Ms. Jeng on October 1, 1991 and that

24   title passed on October 1, 1991. (Ex. 1, FTB 11/1/07 Determination Letter, p. 28.) It has been the law in California since 1872 that an "unrecorded instrument is valid as between the parties thereto and those who have notice thereof." (Cal. Civ.

25   Code § 1217; *see also Pomper v. Behnke* (1929) 97 Cal. App. 628, 637.) "[R]ecordation is not a prerequisite to the validity of a deed." (*Devereaux v. Frazier Mountain Park & Fisheries Co.* (1967) 248 Cal.App. 2d 323, 328.) Auditor

26   Cox was not aware of either Civil Code section 1217 or this case law. (Ex. 35, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/28/08, pp. 151-152.)

27   [323] Ex. 27, Partial Transcript, Depo. of Darlene Beer, 4/9/04, pp. 33:18-21, 84:18 – 85:5.

[324] *Id.* at pp. 33:15 – 35:25.

28   [325] *Id.* at pp. 92:8 – 94:13.

RJN000800

1    role of an appellate court, FTB's fraud claim would be deemed waived for lack of evidentiary support

2    and would not even require discussion.[326]

3       The second "specific act and event" FTB alleges in support of fraud is "Down Payment on the

4    La Palma Property by Grace Jeng."[327] Here, FTB alleges that Ms. Jeng did not make the $15,000

5    down payment on the La Palma property to Mr. Hyatt "as he alleged;" that "the front of the check

6    shows that Hyatt wrote himself a $15,000 check from his own account;" and that "the back of the

7    check shows that Hyatt endorsed it for deposit only into his California Federal Bank account."[328]

8       Whether or not the check in question was for the down payment is not the issue. Ms. Jeng

9    testified that she paid the down payment to Mr. Hyatt; she also testified that in addition to the down

10    payment, she paid the interest on the note and ultimately paid off the note in a final payment.[329] FTB

11    even admits that (1) Ms. Jeng's own bank records show proof that she made payments on the

12    Promissory Note beginning in January 1992; (2) a wire transfer instruction from Ms. Jeng shows a

13    final payoff of the Note in the amount of $157,600.11 to Federated Investors of Pittsburgh,

14    Pennsylvania; and (3) Mr. Hyatt's Fidelity bank statement entry shows that the $157,600.11 was

15    deposited into his account.[330]

16       The third "specific act and event" alleged is that Mr. Hyatt "misused his corporation, Digital

17    Nutronics Corporation (DNC), to pay expenses that were not legitimate business expenses," and that

18    Mr. Hyatt "admits that he paid his elderly mother's personal expenses out of DNC's bank

19    account."[331] Because Mr. Hyatt's mother passed away in 1988, FTB thus concludes that Mr. Hyatt's

20    "acts contributed to DNC's NOL carry forward to 1991."[332] This claim is patently false. First, Mr.

21    Hyatt did not admit to paying his mother's personal expenses out of DNC's bank account.[333] Mr.

22

---

[326] "Where a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to
23    be without foundation and requires no discussion." (*People v. O'Neil* (2008) 165 Cal. App. 4th 1351, 1355, fn. 2 quoting
*People v. Callegri* (1984) 154 Cal. App. 3d 856, 865.)

24    [327] Ex. 1, FTB 11/1/07 Determination Letter, p. 28.

25    [328] *Id.* at p. 29.

[329] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 6).

26    [330] Ex. 1, FTB 11/1/07 Determination Letter, p. 12, fn. 3.

27    [331] *Id.* at p. 29.

[332] *Id.*

28    [333] Ex. 37, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. II, 8/16/05, p. 256.

---

RJN000801

1    Hyatt stated in his deposition only that he "may have" written checks to pay for his mother's personal

2    expenses from the DNC account.[334] Second, FTB offers no evidence linking Mr. Hyatt's alleged

3    payments to his mother with DNC's NOL carry forward in 1991. Third, California suspended the

4    "net operating loss carry forward" deduction in 1991 and 1992 and DNC did not take such a

5    deduction on either its 1991 or 1992 California income tax return. Finally, FTB fails to mention that

6    Mr. Hyatt was a creditor of DNC and that Mr. Hyatt wrote checks from DNC's account as payments

7    of a debt owed.[335] In any event, corporate officers, with the consent of the shareholders, may use

8    corporate assets for noncorporate purposes, provided the rights of creditors are not prejudiced.[336]

9    FTB loses sight of the fact this case is about residency and complaints about DNC are not relevant to

10    residency.

11          FTB's fourth alleged "specific act and event" is that Mr. Hyatt did not report $400,000 out of

12    the $800,000 of income received from Philips as of July 15, 1991 on his 1991 income tax return, but

13    assigned the money to DNC, "which had a questionable net operating loss carry forward" and used

14    DNC "to shelter that income."[337] FTB's conclusion is wrong. The $800,000 payment by Philips

15    under the Philips agreement was properly paid to Mr. Hyatt and to DNC. Moreover, DNC never had

16    any ownership in Mr. Hyatt's patents.[338] DNC was in the consulting business and DNC did

17    consulting work for Philips in the late 1980s and in 1990.[339] As mentioned above, DNC did not take

18    a deduction for its NOL carry forward on either its 1991 or 1992 California income tax returns. FTB

19    ignores the facts and relies solely upon bare allegations in making its conclusion.

20          Moreover, it makes no sense for FTB to look to DNC as a basis for imposing a fraud penalty

21    on Mr. Hyatt in this matter. As set forth above,[340] a fraud penalty is computed under section

22    19164(c) based on the "underpayment of tax required to be shown on a return" that is due to fraud.

23

---

24  [334] *Id.*

25  [335] Ex. 38, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. V, 12/6/05, p. 819.

26  [336] *See, e.g., Steinberg v. Buczynski* (7th Cir. Ill. 1994) 40 F.3d 890, 892; *Scholes v. Lehmann* (7th Cir. Ill. 1995) 56 F.3d 750, 754; and *Nursing Home Bldg. Corp. v. DeHart* (Wash. Ct. App. 1975) 13 Wn. App. 489, 497.

  [337] Ex. 1, FTB 11/1/07 Determination Letter, p. 29.

27  [338] *See* Ex. 39, Letter from E. Cowan to Internal Revenue Service dated 5/28/96.

  [339] *Id.*

28  [340] *See* fn. 303, *supra.*

RJN000802

1    Here, FTB, in both the NPA and the Notice of Action, imposed a fraud penalty upon the full amount

2    of the tax deficiency based on residency.  In other words, FTB has always tied the penalty to the

3    residency assessment.  FTB never based the penalty in the NPA or the Notice of Action on any

4    purported amount of business expenses *involving DNC*.  Further, no assessment against DNC – a

5    separate taxpayer – was ever issued by FTB in connection with this claim.

6           FTB alleges as its fifth and final "specific act and event" of fraud that "it appears [Mr. Hyatt]

7    deliberately failed to report $100,000 in gross receipts paid to him under the Pioneer Licensing

8    Agreement … as income for California tax purposes."[341]  This claim too is wrong.  Without

9    providing any evidence in support of its assertion, FTB merely concludes that because the agreement

10   was for $300,000, all of that money must have been paid to Mr. Hyatt, and because Mr. Hyatt only

11   reported $200,000 on his income tax return, Mr. Hyatt must have intentionally failed to report the

12   remainder for the purpose of defrauding the State of California.  Such specious reasoning does not

13   prove fraud.  FTB has never documented a payment to Mr. Hyatt in the amount of $300,000.  On the

14   contrary, Mr. Hyatt correctly reported his income in 1991 for the Pioneer Option Agreement as

15   $200,000.  Mr. Hyatt's best recollection is that of the $300,000 paid by Pioneer under the Option

16   Agreement, only $200,000 was actually paid to him.[342]

17
     **D.    FTB Never Responds to Our May 31, 2001 Protest Supplement on FTB Fraud
             Allegations**
18

19          It is also telling what FTB did *not* allege in its Determination Letter regarding fraud.  Mr.

20   Hyatt's May 31, 2001 Protest Supplement for 1991 devoted 26-pages to FTB's allegations of fraud

21   made as a result of the audit.[343]  There Mr. Hyatt reviewed the history of the imposition of the fraud

22   penalty, item-by-item, as well as each of FTB's reasons for imposing the penalty, and raised eight

23   arguments why the penalty was improper.  We respectfully urge the Board to review the discussion

24   and arguments made in May 2001 at pages 161-187 of that Protest Supplement,[344] and we urge this

25

---

26   [341] Ex. 1, FTB 11/1/07 Determination Letter, p. 29.

27   [342] *See* Ex. 40, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. VIII, 4/26/06, pp. 1470-1471.

     [343] Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 161-187.

28   [344] Annex III.

RJN000803

1   Board to look for FTB's response to our discussion and arguments in FTB's Determination Letter.

2   Even over seven years later, no such response will be found – an omission especially conspicuous in

3   its absence where, as here, FTB bears the burden of proof on this issue.

4           Finally, FTB Auditor Sheila Cox's trial testimony and exhibits in the Nevada proceedings

5   provided new information regarding imposition of the 1991 fraud penalty, which was not known to

6   Mr. Hyatt at the time of the May 31, 2001 Protest Supplement. Ms. Cox testified that FTB attorney

7   Anna Jovanovich told Ms. Cox to make changes to the fraud penalty portion of Ms. Cox's draft 1991

8   narrative report, and Ms. Cox made them.[345] As memorialized in an October 12, 1995 e-mail to FTB

9   audit staff, Ms. Jovanovich previously had spoken at a residency meeting conference and has

10  "*strongly advocated to the residency auditors that they should be assessing the fraud penalty on*

11  *residency cases. She gave the impression that this penalty should be assessed on a majority of our*

12  *cases…*"[346] Ms. Cox was a recipient of this e-mail.[347] Moreover, Ms. Jovanovich was the residency

13  consultant to the auditors and she consulted to the auditors in the 1991 audit of Mr. Hyatt from near

14  the very start of the audit.

15          FTB's burden is clear, and it has failed to meet that burden. "Fraud must be clearly and

16  convincingly established."[348] FTB's evidence is hardly "explicit and unequivocal" or "sufficiently

17  strong to command the unhesitating assent of every reasonable mind."[349] FTB has failed to meet its

18  burden of proof in order to impose a fraud penalty.

19
20  **IV.     NONE OF THE PATENT LICENSING INCOME RECEIVED BY MR. HYATT IS
            CALIFORNIA SOURCE INCOME**

21          **A.      Introduction**

22          FTB contends in its Determination Letter:

23

24  ---
    [345] Ex. 35, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/28/08, p. 127; *see also* Ex.
25  41, Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 6/2/08, pp. 54-67, where Ms. Cox testified to some
    of the sentences added and other changes made.
26  [346] Ex. 42, 10/12/95 e-mail to FTB audit staff, emphasis added.
    [347] Ex. 35, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/28/08, pp. 132-133.
27  [348] *Valetti, supra* at 188.
28  [349] *Adickes, supra*, quoting *In re Jost* (1953) 117 Cal.App.2d 379, 383.

RJN000804

1    [t]he department would allege as an additional and an alternative basis for the
2    [1991 and 1992] assessments that the patent licensing income received by the
     taxpayer is, in whole or in large part, California source income taxable by
3    California. The protest hearing officer has determined that the assessments
     should be affirmed on the *alternative* basis of California source income, *because*
4    *the patents that formed the basis for the licensing agreements and income in issue*
     *had acquired a business situs in California* and the actions of the taxpayer do not
5    support finding that he terminated his business activity in California anytime
     during 1991 or 1992.[350]

6        The headings in FTB's Determination Letter set forth two separate sourcing arguments: (1)

7    "The La Palma, California Home was Mr. Hyatt's Business Office"; and (2) "Commercial

8    Exploitation."[351] For the reasons which follow, both arguments are without merit.

9        During the relevant period, section 17952 provided in pertinent part, "Income of nonresidents

10   from stocks, bonds, notes, or other intangible personal property is *not* income from sources within

11   this state *unless the property has acquired a business situs in this state*." (Emphasis added.) Section

12   17952 of Title 18 of the California Code of Regulations states:

13       (a) Income of nonresidents from rentals or royalties for the use of or for the
         privilege of using in this State, *patents*, copyrights, secret processes and formulas,
14       good will, trade-marks, trade brands, franchises, and other like property is taxable,
         *if such intangible property has a business situs in this state within the meaning of*
15       *(c) below*.

16       . . .

17       (c) Intangible personal property has a business situs in this State *if it is employed*
         *as capital in this State or the possession and control of the property has been*
18       *localized in connection with a business, trade or profession in this State so that its*
         *substantial use and value attach to and become an asset of the business, trade or*
19       *profession in this State.* For example, if a nonresident pledges stocks, bonds or
         other intangible personal property in California as security for the payment of
20       indebtedness, taxes, etc., incurred in connection with a business in this State, the
         property has a business situs here. Again, if a nonresident maintains a branch
21       office here and a bank account on which the agent in charge of the branch office
         may draw for the payment of expenses in connection with the activities in this
22       State, the bank account has a business situs here.

23   (Emphasis added.) FTB has no quarrel with these applicable rules and cites to both section and

24   regulation 17952.[352] Accordingly, the only dispute lies in the application of that law to the facts of

25   this case.

---

26   [350] Ex. 1, FTB 11/1/07 Determination Letter, p. 30, emphasis added.

27   [351] *Id.* at pp. 31-41.

28   [352] *Id.* at pp. 42-43. Indeed, "it is fixed law that an administrative agency is bound by its own regulations." (*Bonn v. California State University, Chico* (1979) 88 Cal.App.3d 985, 990.)

RJN000805

**B.  The Burden of Proof Is Upon FTB on Both of Its New Sourcing Arguments**

Prior to its Determination Letter, FTB had never advanced any "sourcing" argument as the basis for any proposed deficiency assessments.  Accordingly, FTB (not Mr. Hyatt) bears the initial burden of proving the income in question had a California source because FTB's sourcing arguments constitute a new matter.[353]

This Board has made clear that the burden of proof is shifted to FTB to prove its position if the "position on appeal either alters the original deficiency or requires the presentation of different evidence."[354]  "[T]he assertion of a new theory which merely clarifies or develops the original determination" does not constitute a new matter.  However, when the new theory is based on an entirely new "factual basis and rationale," different evidence is required to prove the theory, and "it is respondent's burden to present new evidence to support its position on appeal."[355]

FTB's sourcing "position on appeal either alters the original deficiency or requires the presentation of different evidence" under *Mendelsohn*.

First, the NPAs for both 1991 and 1992 make no mention of sourcing.

Second, FTB asserts sourcing "as an additional and an alternative basis" for the *first time* in late 2007 in its Determination Letter.  The new sourcing issue consumed nearly half (20 of 50 pages) of FTB's single-spaced Determination Letter, which provided a 30 day response time on all issues.[356]  Mr. Hyatt responded to the Determination Letter and pointed out the history of the sourcing issue and the need for additional time to address this new issue.[357]  FTB responded, in part, that "*the taxpayer will have the opportunity to address the source of income and other issues in detail, should he elect to pursue his dispute of the assessments through the State Board of Equalization and the court*," and FTB denied Mr. Hyatt's request for additional time to respond.[358]

---

[353] FTB errs in simplistically stating, "The burden of proof in tax disputes is on the taxpayer..." (Ex. 1, FTB 11/1/07 Determination Letter, p. 48, fn. 25.)  Certainly FTB's raising of a new issue, or FTB's imposition of fraud penalties, do not fit within that simplistic approach.

[354] *Appeal of David G. and Helen Mendelsohn*, 85-SBE-141, Nov. 6, 1985.

[355] *Id*; *see also In re Appeals of Barry, et al.*, 93-SBE-006, Apr. 22, 1993.

[356] Ex. 1, FTB 11/1/07 Determination Letter, pp. 30-50.

[357] *See* Ex. 23, Letter from E. Coffill to G. McLaughlin dated 11/20/07.

[358] *See* Ex. 43, Letter from G. McLaughlin to E. Coffill dated 11/26/07, emphasis added.

RJN000806

1    Third, when FTB attorneys mentioned *during* the protests in this matter that FTB might raise

2    sourcing on its own at protest, Mr. Hyatt requested 2-3 months to respond to any such sourcing

3    arguments.[359]  FTB protest officer Cody Cinnamon assured Mr. Hyatt that "you will have ample time

4    to review and respond to our position letter prior to the issuance of notices of action" regarding "our

5    proposed determination with regard to the geographic sourcing issue relating to Mr. Hyatt's Schedule

6    C patent/license fee income."[360]

7        It is not as if FTB lacked either the time[361] or the opportunity at protest to consider and

8    develop any sourcing issue and then to provide Mr. Hyatt with a meaningful opportunity to respond,

9    especially since FTB had already considered and rejected the issue in 1995 during the audit.[362]

10   Regarding 1991, the NPA was issued on April 23, 1996; the protest was filed on June 20, 1996; and

11   the protest hearing was held on October 4, 2000.  FTB then issued its Determination Letter on

12   November 1, 2007 – over *eleven* years after the protest was filed, and over *seven* years after the

13   protest hearing was held.[363]  Regarding 1992, the NPA was issued on August 14, 1997; the protest

14   was filed on October 10, 1997; and the protest hearing was held on September 27, 2000.  FTB then

15   issued its Determination Letter on November 1, 2007 – over *ten* years after the protest was filed, and

16   over *seven* years after the protest hearing was held.[364]

17       Fourth, as discussed *infra*, sourcing was specifically considered by FTB in 1995 during the

18   course of the audit in this matter, and FTB rejected three sourcing theories, including the theories

19   FTB now raises, before closing the audit and issuing the NPAs without mention of sourcing.

20

21

---

22   [359] *See* Ex. 44, Letter from E. Coffill to G. McLaughlin dated 3/7/02.

23   [360] *See* Ex. 45, Letter from C. Cinnamon to E. Coffill dated 6/7/05, p. 2.

[361] FTB Notice 99-1 (March 3, 1999) states, in part: "The goal of the internal procedures is to have the department's staff

24   evaluate the merits of the Protest of the deficiency (and any included Claims for Refund), conduct a hearing if requested, and issue a notice of action within 33 months or less of the filing date of the Protest."  FTB Notice 2006-6 (Oct. 27,

25   2006), which superseded FTB Notice 99-1, states in part: "The goal of the internal procedures is to have the department's legal staff evaluate the merits of the protest of the proposed deficiency (and any included claims for refund), conduct a

26   hearing if requested, and issue a Notice of Action within 24 months or less of the filing date of the protest for those docketed protests filed on or after July 1, 2006."  FTB certainly exceeded these targets.

27   [362] *See, infra,* Argument IV.E.

[363] *See* 1/22/08 SBE Notice of Appeal for 1991.

28   [364] *See* 1/23/08 SBE Notice of Appeal for 1992.

---

RJN000807

1    Fifth, the sourcing issue involves the presentation of new and different evidence.[365] FTB's

2    sourcing argument relies upon and cites to new evidence, *e.g.*, deposition transcripts dated February

3    12, 2006 and February 8, 2006 from the *Hyatt v. FTB* Nevada tort litigation, and documents from the

4    Nevada litigation.[366]

5        Accordingly, Mr. Hyatt will be heard, on appeal before this Board, for the *first time*, on the

6    sourcing issue which FTB considered and abandoned at audit; which FTB mentioned, but then did

7    not raise during protest, and which FTB represented to Mr. Hyatt during protest that he would have

8    "ample time" to respond to should such issue be raised; and which FTB then raised for the first time

9    in its Determination Letter and then refused Mr. Hyatt's request for time beyond 30 days to respond.

10   For the above stated reasons, the burden of proof is upon FTB with respect to any and all sourcing

11   issues and arguments before this Board.[367]

12   **C.    FTB's "The La Palma, California Home Was Mr. Hyatt's Business Office"**
13   **       Theory of Business Situs Is Without Merit**

14       **1.    The theory fails as a matter of law**

15       FTB's first "business situs" argument is that Mr. Hyatt's former La Palma home in California

16   ("La Palma") was his "business office." Here FTB cites to deposition testimony by Daniel Hyatt and

17   by Helene Schlindwein from *Hyatt v. FTB*, and cites to invoices regarding a photocopier allegedly to

18   "demonstrate that Mr. Hyatt conducted business from his La Palma, California home and …

19   continued to conduct business from that location well after April 1992…" and that "[o]n the

20   foregoing facts alone, Mr. Hyatt and his patents had a business situs in California."[368]

21

22   _____

23   [365] *See Mendelsohn, supra.*

     [366] Ex. 1, FTB 11/1/07 Determination Letter, p. 31 text and fns. 14 & 15.

24   [367] Even if the burden is upon Mr. Hyatt and not FTB, FTB's arguments still fail. As summarized in *Appeal of Janice
     Rule*, 76-SBE-099, Oct. 6, 1976, "[w]e recognize the well established rule that respondent's determination is presumed to

25   be correct and the burden is on the taxpayer to prove that it is erroneous. However, the presumption is a rebuttable one
     and will only support a finding in the absence of sufficient evidence to the contrary. Respondent's determination is not

26   evidence to be weighed against evidence produced by the taxpayer. The presumption of correctness disappears once
     evidence which would support a contrary finding has been submitted." (Citations omitted.)

27   [368] Ex. 1, FTB 11/1/07 Determination Letter, pp. 33-34. We will overlook FTB's claim that "Mr. Hyatt" himself has a
     "business situs" in California for the reason Mr. Hyatt is not an intangible within the meaning of section 17952 and

28   regulation 17952.

RJN000808

1        In order for FTB to tax the "patent licensing income received by the taxpayer"[369] it seeks to

2    reach as source income, the patents must have a business situs in California under regulation

3    17952(c).  As discussed above, such income can *only* have a business situs in California under

4    regulation 17952(c) if either (1) the intangible "is employed as capital in this State", or (2) "the

5    possession and control of the property has been localized in connection with a business, trade or

6    profession in this State so that its substantial use and value attach to and become an asset of the

7    business, trade or profession in this State."  FTB makes no such showing.

8        Query, what precisely is FTB's "business situs" argument based on regarding the alleged La

9    Palma "Business Office?"  FTB makes *no* argument that an intangible "is employed as capital in this

10   State,"[370] so that leaves only that the intangible "has been localized in connection with a business,

11   trade or profession in this State so that its substantial use and value attach to and become an asset of

12   the business, trade or profession in this State."[371]  However, FTB also fails to make *that* argument.

13   The *only* argument FTB makes is that Mr. Hyatt had a "business office" in California.  Nowhere does

14   FTB even allege, much less prove, the requirement of the regulation that the intangible was

15   "localized in connection with a business" in California.[372]  Nowhere does FTB even allege, much less

16   prove, the requirement of the regulation that any intangible was so localized in connection with a

17   business in California "so that its substantial use and value attach to and become an asset of the

18   business, trade or profession in this State."[373]

19        The general rule is that movables follow the person, *i.e.*, "*mobilia sequuntur personam*."[374]

20   The judicial "business situs" exception to this general rule was "succinctly revealed"[375] by the

21   California Supreme Court in *Holly Sugar*:

22        [I]ntangible property may acquire a situs for taxation other than at the domicil of
            the owner *if it has become an integral part of some local business.* [Citations.]
23        Business situs arises from the act of the owner of the intangibles in employing the

---

24   [369] Ex. 1, FTB 11/1/07 Determination Letter, p. 30.

25   [370] 18 Cal. Code Regs. § 17952(c).

     [371] *Id.*

26   [372] *Id.*

     [373] *Id.*

27   [374] *See Rainier Brewing Company v. McColgan* (1949) 94 Cal.App.2d 118, 123.

28   [375] *Appeals of Amyas and Evelyn P. Ames, et al.*, 87-SBE-042, June 17, 1987.

---

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1991

RJN000809

wealth represented thereby, as an *integral portion of the business activity* of the particular place, so that it becomes *identified with the economic structure* of that place....[376]

*Holly Sugar* goes on to add, "[t]here must be 'something like a general, or more or less continuous, course of business or series of transactions within the state where the property is physically located, as distinguished from mere sporadic and isolated transactions.'"[377]

This Board has long followed these rules. For example, in *Appeal of Ames,* this Board ruled the taxpayers "made no attempt to localize their limited partnership interests to California."[378] In *Appeal of Neuschotz*, this Board stated that "[t]he concept of business situs involves localization of the intangible property itself in the business situs state as an asset of a business there," and ruled there was no evidence of localization of stock in the state.[379] In *Appeal of Wong,* this Board stated that intangibles must be "so tied in with the business activities" of an individual in a state that they have become "integral parts of the local business."[380] In *Appeal of Christman,* this Board stated the intangibles "must be definitely connected with the local business as an integral part of its activity."[381]

FTB has made *no* claim here under decisional law, and there is *no* evidence the patents in issue became "an integral part of some local business," or were "an integral portion of the business activity" or "identified with the economic structure" in California;[382] or that the patents were part of a "more or less continuous course of business or series of transactions" in California;[383] or that the patents were "tied in"[384] or "definitely connected"[385] with a California business; or that Mr. Hyatt took steps to "localize" the patents in California.[386]

---

[376] *Holly Sugar Corp. v. Johnson* (1941) 18 Cal.2d 218, 223-224, emphasis added.
[377] *Id.* at 224.
[378] *Appeals of Ames, supra.*
[379] *Appeal of Robert and Patricia Neuschotz,* 68-SBE-017, March 25, 1968.
[380] *Appeal of Stanley K. and Beatrice L. Wong,* 78-SBE-037, May 4, 1978.
[381] *Appeal of Theo and Audrey Christman,* 73-SBE-069, Dec. 11, 1973.
[382] *Holly, supra.*
[383] *Id.*
[384] *Wong, supra.*
[385] *Christman, supra.*
[386] *Ames, supra; Neuschotz, supra.*

RJN000810

1    Consider the two examples in regulation 17952(c) of an intangible having a business situs in

2    California.  First, if a nonresident pledges stock or other intangibles as security for indebtedness in

3    connection with a business in California, the property has a California business situs.  Second, if a

4    nonresident maintains a branch office and a bank account in California in connection with activities

5    in California, the bank account has a California business situs.  FTB cites to neither example and for

6    good reason.  Both examples should be compared to the facts of Mr. Hyatt's case where there is no

7    showing of a business in California, much less a showing of an intangible that has been so connected

8    with a business so as to create a California business situs under the regulation.

9        Consider also the facts of *Appeal of Bass,* where even the presence of a headquarters office in

10   California of a limited partnership, staffed by four employees, which had "many of the trappings of a

11   business operation (leased office space, a number of full-time employees, and significant amounts of

12   furniture, fixtures, transportation equipment and business expenses)" was not sufficient for the

13   income from the partnership's investment securities to have a California source.[387]  Compare these

14   "trappings of a business operation" in *Bass* to the facts of Mr. Hyatt's case where there were no

15   employees, no leased office space, and no significant amounts of furniture, fixtures, transportation

16   equipment or business expenses.

17       Moreover, it goes without saying[388] that because income taxes are reported on an annual

18   basis, the "business situs" of an intangible must be determined annually.  Income tax cases are to be

19   decided, year by year, on their own merits and their own facts, without regard to other years.[389]  The

20   "business situs" of the patents must be determined on a year-by-year basis.

21       In sum, even if FTB's factual allegations are correct (which they are *not*, see below), FTB's

22   argument fails as a matter of law under section 17952 and regulation 17952, and also fails as a matter

23   of law under California case law and this Board's decisional law.  Even having a "business office" in

24

25   _____

[387] *Appeal of Robert M. and Ann T. Bass,* 89-SBE-004, Jan. 25, 1989.

26   [388] *See Appeal of Frederick R. Bigony,* SBE 92R-0005, 93A-0840, June 29, 1995, a Summary Decision, which we do not
     "cite as precedent" (RTA 5451(d)), but merely to show the issue is so clear no precedent is needed on the point.

27   [389] *See Appeal of Duane H. Laude,* 76-SBE-096, Oct. 6, 1976; *Appeal of Swift & Company,* 70-SBE-013, Apr. 7, 1970;

28   *Appeal of Allied Properties,* 64-SBE-026, Mar. 17, 1964.

RJN000811

California (which Mr. Hyatt did *not* have – see below) is not the same as an intangible having a "business situs" in California.

### 2. The theory also fails for lack of evidence

In addition to the legal failure of its argument, FTB's underlying factual allegations regarding a La Palma "business office" also must fail. Initially, it is necessary to consider precisely what FTB means by now raising source income "as an additional and an alternative basis for the assessments…"[390] Sourcing, as a matter of law, cannot be an "additional" argument in a residency case because sourcing under the Code is a doctrine applicable only to income of *non*residents.[391] Therefore, it can only be an "alternative" argument to residency.[392] As an "alternative" argument, sourcing becomes an issue in this case only *after* this Board determines that Mr. Hyatt was a resident of Nevada as of September 26, 1991. (Recall FTB at audit found Mr. Hyatt to be a Nevada resident as of April 3, 1992.) Consider the impact of a *non*resident finding – a legally indispensable prerequisite of FTB's sourcing argument - upon that sourcing argument. For example, FTB's sourcing argument begins, "[t]he La Palma, California Home was Hyatt's Business Office."[393] Query, how can FTB premise its source income argument on Mr. Hyatt's "home" being at La Palma if it must be found – before even getting to "alternative" sourcing – that Mr. Hyatt did *not* live at La Palma, but in Nevada, after September 26, 1991? We now have an argument by FTB that even though Mr. Hyatt was a Nevada resident as of September 26, 1991, the La Palma "home" in California was still his business office after September 26, 1991. For this reason alone, the entire La Palma "Home" Business Office premise is quite absurd.

---

[390] Ex. 1, FTB 11/1/07 Determination Letter, p. 30.

[391] Cal. Rev. & Tax. Code §§ 17951 et seq.

[392] Here FTB's "alternative" source argument becomes even more confusing because FTB also states it "is informed and believes" – by whom is not stated – that payments received by Mr. Hyatt on, for example, December 29, 1992, are California source income. (Ex. 1, FTB 11/1/07 Determination Letter, p. 42, fn. 23.) Again, we note FTB has not shown any business situs during the "alternative" period, *i.e.*, the 1991-1992 audit period before FTB concedes Mr. Hyatt became a Nevada resident as of April 3, 1992. Moreover, FTB also has most certainly not presented any evidence for this new claim that "business situs" existed in California even *after* April 3, 1992 when it concedes Mr. Hyatt had moved to Nevada.

[393] Ex. 1, FTB 11/1/07 Determination Letter, p. 31.

RJN000812

1    In any event, FTB makes three factual claims regarding a La Palma "business office." The

2 first of these claims is based on citations to deposition testimony of Helene Schlindwein for the

3 propositions (1) there was an office in the basement of the La Palma "home;" and (2) she sometimes

4 used a photocopier located in the La Palma "home."[394] The purpose of these citations is not clear,

5 nor is their probative value clear. Again, FTB must reconcile its nonresident "home" claim to the fact

6 sourcing is only an issue after it has been found that La Palma was *not* Mr. Hyatt's home. In any

7 event, Ms. Schlindwein simply performed part-time clerical work, typing and editing for Mr. Hyatt,

8 and worked out of *her* home; she did not "know anything about" Mr. Hyatt's licensing business; and

9 she worked as an independent contractor with respect to her relationship with Mr. Hyatt.[395]

10    Second, FTB cites to deposition testimony of Daniel Hyatt for the propositions that the

11 taxpayer at La Palma (1) "had a room that was his workplace in the La Palma home;" (2) "had an

12 office or laboratory in the basement;" and (3) "sometimes worked at the kitchen counter."[396] Again,

13 the purpose of these citations is not clear, and again, FTB has the "home" problem to overcome. In

14 any event, when asked if Mr. Hyatt had "a laboratory," Daniel Hyatt responded "I call it an office;"

15 stated that Mr. Hyatt did the bulk of his work "downstairs in the kitchen;" and stated that "I don't like

16 the description of 'laboratory.' It was a work area...."[397] Note also that all of the deposition

17 testimony cited by FTB, both of Daniel Hyatt and Ms. Schlindwein, relates only to activity at the La

18 Palma house *before* September 1991. Both Daniel Hyatt and Ms. Schlindwein testified that Mr.

19 Hyatt moved to Nevada in 1991,[398] and Ms. Schlindwein also testified that her description of Mr.

20 Hyatt's business activities was not applicable to years after 1990.[399]

21    That leaves only FTB's third factual basis for a claim of a La Palma office, which is that Mr.

22 Hyatt "maintained a commercial grade photocopy machine in his La Palma home." Again, FTB has

---

23 [394] *Id.*

24 [395] Ex. 46, Partial Transcript, Depo. of Helene Schlindwein, 2/12/00, pp. 78-79; Ex. 47, Partial Transcript, Depo. of H. Schlindwein, 2/19/00, pp. 251, 279.

25 [396] Ex. 1, FTB 11/1/07 Determination Letter, p. 31.

26 [397] Ex. 48, Partial Transcript, Depo. of Daniel Hyatt, Vol. I, 11/18/05, pp. 283-284; Ex. 29, Partial Transcript, Depo. of Daniel Hyatt, Vol. II, 2/8/06, pp. 377-378.

27 [398] Ex. 46, Partial Transcript, Depo. of Helene Schlindwein, 2/12/00, pp. 14, 118; Ex. 29, Partial Transcript, Depo. of Daniel Hyatt, Vol. II, 2/8/06, p. 362.

28 [399] Ex. 46, Partial Transcript, Depo. of Helene Schlindwein, 2/12/00, p. 16.

1   the "home" problem to overcome, but nevertheless contends the presence of a photocopier at the La

2   Palma address creates a business situs there for the patents in issue.

3       FTB mischaracterizes the evidence and the testimony it cites in its 15 "bullet points" on this

4   subject.[400] Remember that FTB on audit found that Mr. Hyatt became a resident of Nevada on

5   April 2, 1992. Seven of the fifteen items cited by FTB are dated *after* April 2, 1992, making them

6   irrelevant to an "alternative" California sourcing argument for an assessment made through April 2,

7   1992. In addition, of these seven items, only one could possibly infer Mr. Hyatt's presence in

8   California, while two of the seven items (1) allege that a copier was moved from La Palma to Las

9   Vegas, and (2) show a copier purchased by Mr. Hyatt using a Nevada address and telephone

10  number.[401] In addition, all signatures on the other invoices dated after April 2, 1992 are by persons

11  other than Mr. Hyatt,[402] and particularly by Ms. Jeng who had purchased the La Palma house from

12  Mr. Hyatt by an October 1, 1991 deed.[403]

13      Of the remaining eight (of FTB's fifteen) items, recall there is no dispute that Mr. Hyatt was a

14  California resident until September 26, 1991, and all except *one* of these remaining eight items are

15  before that date when residency is even in issue. The one exception is a November 4, 1991 invoice[404]

16  where FTB claims "Mr. Hyatt telephoned" for service on a copier and then paid with a DNC

17  check.[405] FTB is incorrect. While the invoice states the service was the result of a "call," it does *not*

18  state Mr. Hyatt was the one who telephoned, nor is there anything to show Mr. Hyatt was even

19

20

21

---

22  [400] Ex. 1, FTB 11/1/07 Determination Letter. pp. 32-33.

23  [401] Mr. Hyatt purchased a copier which was invoiced to him in Las Vegas (*see* Ex. 49, XCS Inc. Invoice dated 7/27/92), and it is unsupported speculation by FTB to claim that "it appears this new copier was delivered to his La Palma home" despite the invoice listing Mr. Hyatt's Las Vegas address and telephone number. (Ex. 1, FTB 11/1/07 Determination

24  Letter, p. 33.) Another invoice shows a copier set up in Las Vegas that was "moved from California." (*See* Ex. 50, Sun Office Systems Invoice dated 7/28/92.)

25  [402] In addition, we point out FTB errs in stating the May 7, 1992 invoice was paid by a DNC check. (Ex. 1, FTB 11/1/07 Determination Letter, p 33.) It was paid by Grace Jeng by her check #3233, dated May 7, 1992. (Ex. 51, G. Jeng Check

26  No. 3233, 5/7/92.)

27  [403] Ex. 1, FTB 11/1/07 Determination Letter, pp. 32-33.

    [404] Ex. 52, XCS Inc. Invoice dated 11/4/91.

28  [405] Ex. 1, FTB 11/1/07 Determination Letter, p. 33.

---

RJN000814

1    present that day at La Palma.[406]  There was no payment made that day and payment was instead made

2    fifteen days later.[407]

3        Note also that nine of the invoices referenced by FTB,[408] including the November 4, 1991

4    invoice, are in the name of Digital Nutronics.[409]  FTB admits "DNC held no interest in any of Hyatt's

5    patents before or after Hyatt licensed his patent rights to Philips," and that "DNC undertook no

6    activities for which it would have acquired any rights (such as licenses) under Hyatt's patents."[410]

7    DNC activities can *never* give rise to source income from the patent licensing in issue because DNC

8    never had any interest in the patents in issue.

9        Finally, as FTB points out,[411] Ms. Jeng testified that *after* returning to La Palma after

10   unloading the trailer at the Hotel Continental in Las Vegas in September 1991, a "copier" was still at

11   La Palma (along with a small seat, bed, dining room stuff, dining room table, and desk).[412]

12       In review, nothing in the Helene Schlindwein deposition, the Daniel Hyatt deposition, or in

13   FTB's photocopy items shows a "business office"[413] at the La Palma house.  The fact Mr. Hyatt had a

14   copier in his California home prior to his move to Las Vegas, or that he left a copier after his move,

15   does not convert the La Palma house into some sort of business location or connect the patents to any

16   business such that the patents have been "so localized in connection with a business, trade or

17   profession in this State so that its substantial use and value attach to and become an asset of the

18   business, trade or profession in this State."[414]

19       The fact Mr. Hyatt did not have a "business office" at his former La Palma residence is also

20   confirmed by the fact that, as FTB admits, Mr. Hyatt did not have a business license from the City of

---

21   [406] Mr. Hyatt was present in his Las Vegas apartment from November 2-6 working and visiting with his friend and
22   colleague, Bob Kazmaier.  (*See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 23, Affidavit of Robert Kazmaier, 10/29/08, ¶ 12).)

23   [407] FTB states the November 4, 1991 invoice was paid with a DNC check.  We disagree.  It was paid by Ms. Jeng with her check.  In any event, the point here is that FTB does not even claim Mr. Hyatt paid the invoice with his own check.

24   [408] Ex. 1, FTB 11/1/07 Determination Letter, pp. 32-33.

25   [409] Ex. 53, attaching copies of the nine invoices.

     [410] Ex. 1, FTB 11/1/07 Determination Letter, p. 30, fn. 10.

26   [411] *Id.* at p. 33.

27   [412] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 4).

     [413] Ex. 1, FTB 11/1/07 Determination Letter, p. 31.

28   [414] Regulation 17952(c).

---

RJN000815

1   La Palma for that location.[415]  *Had* Mr. Hyatt obtained a La Palma business license, we would expect

2   FTB to be the first to parade that fact in front of this Board as an admission by Mr. Hyatt that he was

3   operating, conducting, or managing a business out of his former La Palma house.[416]  However,

4   undaunted by the fact Mr. Hyatt did *not* have such a business license, FTB apparently has taken it

5   upon itself to conclude that Mr. Hyatt *should* have had a business license. This seems a particularly

6   untenable conclusion considering the fact that FTB's auditor took the time to contact the City of La

7   Palma and was informed the City had contacted Mr. Hyatt, and that Mr. Hyatt responded he did not

8   have a business license because he was not conducting a business.[417] One would think the City of La

9   Palma, examining the circumstances as they occurred, is a better judge than FTB, which reviewed the

10  matter sixteen years later, of whether Mr. Hyatt needed a La Palma City business license.

11       In sum, FTB's La Palma "business office" argument is without merit.  At best, FTB has

12  shown that Mr. Hyatt had a home office (complete with copier) in his La Palma home while he lived

13  there before moving to Nevada.  It has shown nothing more.  There is no evidence of any contact at

14  that "office" with the public.  There were no employees, no products, and no sales.  The City of La

15  Palma concluded Mr. Hyatt did not even require a business license for his home activities.  In

16  addition, note that FTB does not allege Mr. Hyatt even took a "home office" deduction for his former

17  La Palma residence – and that is because Mr. Hyatt *never* took a home office deduction on either his

18  California or federal income tax return for the La Palma home.

19       **D.**    **FTB's "Commercial Exploitation" Business Situs Theory is Without Merit**

20           **1.**    **The theory fails as a matter of law**

21       FTB's only other argument for nonresident source income is that "the *commercial*

22  *exploitation* of the patents produced California source income pursuant to California law, most

23  particularly Revenue & Taxation Code section 17952."[418]  What is missing from this argument is any

24  explanation of FTB's legal basis under the presented facts.  As best we can glean from the

25

26  [415] Ex. 1, FTB 11/1/07 Determination Letter, p. 32.

27  [416] *See id.* at p. 32, fn. 16, quoting the relevant La Palma Municipal Code section.
     [417] *Id.*

28  [418] *Id.* at p. 34, emphasis added.

RJN000816

1  Determination Letter, FTB contends the income from twenty-four patents is California source income

2  because "the subject of these agreements were for intellectual property Hyatt developed, filed for and

3  received patents for during the period Hyatt resided and worked in California."[419]  Similarly, FTB

4  states elsewhere that Mr. Hyatt's "work that developed the inventions and technology that gave rise

5  to the patents was performed in California," and "the patents were the product of the work Hyatt

6  performed in California and no work was done in Nevada that generated any income under the

7  license agreements."[420]

8          Remember that FTB makes its new California source income argument under the claim of

9  business situs and section/regulation 17952.[421]  This, of course, is the proper analysis because all the

10  income in issue is royalties from licensing an intangible, *i.e.*, the patents.  However, FTB's

11  "commercial exploitation"[422] sourcing argument here does not have anything whatsoever to do with

12  business situs.  Business situs is decided under regulation (and section) 17952 by looking to whether

13  (1) the intangible "is employed as capital in this State", or (2) "the possession and control of the

14  property has been localized in connection with a business, trade or profession in this State so that its

15  substantial use and value attach to and become an asset of the business, trade or profession in this

16  State."  But instead of arguing the controlling language of regulation 17952, FTB argues under its

17  commercial exploitation theory that work related to the patents was "performed" in California.  The

18  place of performance is not a part of a business situs analysis under section 17952, regulation 17952,

19  or the decisional law.  To repeat, what FTB must show under a business situs analysis, on an annual

20  basis, is satisfaction of the two prongs of regulation 17952, and it does not even attempt to do so.

21          Instead, like a wolf in sheep's clothing, we have a service income argument disguised as a

22  business situs argument.  Section 17951 and regulation 17951-5 provide that income for personal

23  services performed in California is considered income from a California source.  This is a

24  longstanding principle.[423]  Is FTB arguing under section 17951 that, *because* the patents were

---

[419] *Id.* at p. 39.

[420] *Id.* at p. 41.

[421] *Id.* at pp. 30, 42.

[422] *Id.* at p. 34.

[423] *See Appeal of Robert C. Thomas and Marian Thomas,* 55-SBE-006, Apr. 20, 1955.

RJN000817

1   developed by Mr. Hyatt's labor in California, all the licensing income – *forever* – which is generated

2   by those patents, is California source income, even if those patents do *not* acquire a business situs in

3   California?  We think not, because FTB never cites to 17951 – only to 17952; because FTB's

4   Determination Letter speaks only in terms of "business situs;" because FTB would have to argue the

5   patent royalty income was not the result of the patent licensing agreements, but instead was the result

6   of Mr. Hyatt's "services" in California of developing the patents ("services" not performed on behalf

7   of any other party); and because there is absolutely no California law to support such a radical

8   position.

9        Accordingly, we return to the proper question, which is whether FTB's so-called "commercial

10  exploitation" theory creates business situs in California.

11        A fundamental problem here is that "commercial exploitation"[424] is not a term found in either

12  regulation 17952, or section 17952 or any of the case law on "business situs."[425]  Nor is the term

13  defined by FTB, which apparently uses it in some generic fashion.  In any event, the more important

14  point here is that *nowhere* does FTB allege in its Determination Letter that this so-called "commercial

15  exploitation" results under regulation 17952 in the patents being "localized in connection with a

16  business/trade/profession" in California, much less that the patents' "substantial use and value

17  attached to and become an asset of the business/trade/profession in California."  "Commercial

18  exploitation," whatever FTB believes the term to mean, is not a legal basis for business situs under

19  the applicable regulation or statute.

20       **2.**    **The theory fails for lack of evidence**

21        In addition to the legal failure of FTB's commercial exploitation argument, the argument also

22  fails because FTB has not established the facts upon which its argument is based.  As with the La

23

24

---

25  [424] Ex. 1, FTB 11/1/07 Determination Letter, p. 34.

26  [425] However, "commercial exploitation" is a term that has been used to refer to public use or sale of an invention more than one year prior to applying for a patent on the invention.  (*See* Manual of Patent Examining Procedure (MPEP), § 2133.03(e)(1); *see generally* 35 U.S.C. §102(b).)  If FTB wishes to attempt to argue commercial exploitation under patent

27  law, (1) this certainly is not the proper venue; and (2) in any event, the argument will fail because the twenty-four patents in issue were all applied for and granted well before the 1991-1992 tax period in issue. (*See* Ex. 1, FTB 11/1/07

28  Determination Letter, p. 40.)

RJN000818

1  Palma office, it is difficult to determine precisely what FTB is arguing.  FTB states as follows "in

2  summary":

   - Under the licensing agreements Hyatt did not transfer any technology; the payments were made to him in return for his agreement not to sue for patent infringement;
   - The assets that give rise to this income were Hyatt's patents;
   - Hyatt had been a California resident since the 1950's, and his work that developed the inventions and technology that gave rise to the patents was performed in California;
   - Hyatt's trade or business in California was inventing, obtaining patents for his inventions and then commercially exploiting the patents.
   - The patents were the product of the work Hyatt performed in California and no work was done in Nevada that generated any income under the license agreements.[426]

10  FTB is factually wrong in claiming above that the payments were made to Mr. Hyatt "in

11  return for his agreement not to sue for patent infringement"[427] and is factually wrong in its conclusion

12  elsewhere that "the Hyatt/Phillips licensing program was in reality a patent infringement dispute

13  settlement program."[428]  It is not clear why FTB makes these claims or what facts it relies upon in

14  support of these claims.  No citations are provided, and no evidence is cited.  All FTB alleges on

15  these claims is, "between 1990 and 1996, while the interference action was pending, Hyatt sought as

16  many patent infringement litigation settlement agreements (that he labeled as either license or patent

17  agreements for 'paid-up royalties' from Philips and Japanese electronics companies) as he could

18  negotiate either directly or indirectly.  *This is the income that is in question*."[429]

19  In order to understand the falsity of FTB's allegations, it is necessary to understand the

20  background of the patents in issue.

21

22

23  [426] Ex. 1, FTB 11/1/07 Determination Letter, p. 41.

   [427] Likewise, FTB cites nothing to support its allegation that after US Patent 4,942,516 (the 516 patent) was granted in
24  July 1990, Mr. Hyatt "immediately started contacting Japanese electronic companies alleging patent infringement and
   soliciting payment to avoid litigation." (Ex. 1, FTB 11/1/07 Determination Letter, p. 30.)  As discussed above, that
25  allegation is not true.

   [428] Ex. 1, FTB 11/1/07 Determination Letter, p. 41.

26  [429] FTB goes on to state that, "This income appears to be primarily derived form the '516 patent, the application process
   for which was begun around 1969 and pursued thereafter, all from California." (Ex. 1, FTB 11/1/07 Determination
27  Letter, p. 31.)  No documentation is provided for this statement, which is false.  The '516 patent was one of a portfolio of
   24 patents being licensed by Philips.  There were no separate licenses for the '516 patent.  In addition, we do not
28  understand what FTB means by "pursued thereafter, all from California."

RJN000819

1    Beginning in 1969, Mr. Hyatt began filing applications on his own behalf for U.S. patents for

2  inventions and technologies that he developed.  Mr. Hyatt first applied in 1988 for a patent for the

3  "Single-Chip Integrated Circuit Computer Architecture," and US Patent number 4,942,516 (the '516

4  patent) was issued on July 17, 1990.[430]

5    In December 1990, Mr. Hyatt entered into a representation agreement with Mahr Leonard

6  Management Company (MLMC) for a six-month period for MLMC to negotiate, for a 15%

7  commission, a patent license agreement with Toshiba with respect to 14 patents owned by Mr.

8  Hyatt.[431]

9    Effective July 15, 1991, Mr. Hyatt entered into a patent licensing agreement with Philips

10  Corporation regarding the nonexclusive licensing for Philips' own use, and the exclusive right and

11  "fiduciary responsibility" to sublicense 23 of Mr. Hyatt's patents.[432]  Subsequently, Mr. Hyatt

12  executed patent licensing/sublicensing agreements with a number of other companies (Fujitsu,

13  Matsushita, Sharp, NEC, Sony, Hitachi), on behalf of Philips, in accordance with the July 15, 1991

14  Philips agreement under an October 30, 1991 First Supplement Agreement between Hyatt and

15  Philips;[433] an October 30, 1991 Second Supplemental Agreement between Hyatt and Philips;[434] and a

16  July 22, 1992 Third Supplemental Agreement between Hyatt and Philips.[435]  Philips received the

17  funds in accordance with the July 15, 1991 agreement and then allocated a portion of the funds to Mr.

18  Hyatt pursuant to the various agreements.[436]

19

20  [430] FTB's recitation of the patents in the Determination Letter is filled with errors.  Rather than distract your Board at this time from the residency case with a complete discussion of the history of the patents, we will respond to whatever recitation of the patents FTB relies upon in its FTB Respondent's Brief as being relevant to its residency arguments.

21  [431] Ex. 54, MLMC Representation Agreement, 12/90.

22  [432] Ex. 55, Philips Agreement, 7/91.  Should this Board wish to know the terms of any of the Philips Agreements or other licensing agreements referred to by FTB in its Determination Letter, we strongly urge the Board to consult the agreements themselves instead of relying upon FTB's summary of them.  For example, FTB is wrong in stating that under Section 4.6, the July 1991 Philips Agreement was for a 12-month period only and then terminated unless renewed and paid up annually by Philips. (Ex. 1, FTB 11/1/07 Determination Letter, p. 38.)  Certain payments were required under Section 4.6, but the Agreement did not automatically terminate if Philips missed a payment.  Except for certain specified conditions, the Philips Agreement was to terminate under Section 7.1 at "the end of the last to expire of the patents licensed" therein, more than 15 years later.

26  [433] Ex. 56, 10/30/91 First Supplemental Agreement between Hyatt and Philips.

27  [434] Ex. 57, 10/30/91 Second Supplemental Agreement between Hyatt and Philips.

[435] Ex. 58, 7/22/92 Third Supplemental Agreement between Hyatt and Philips.

28  [436] See Exs. 55-58.

RJN000820

1          On September 24, 1991, Philips entered into another representation agreement with MLMC

2    for the purpose of negotiating patent license agreements with other companies (Fujitsu, Matsushita,

3    NEC, Oki, Sharp, Sony & Toshiba).[437]

4          Contrary to FTB's undocumented allegations, licenses were offered by Philips and by MLMC

5    on behalf of Philips without *any* mention of litigation or infringement or "commercial exploitation."

6    Likewise, FTB is wrong in claiming, without citations to authority,[438] that "Hyatt immediately started

7    contracting Japanese companies alleging patent infringement and soliciting payments to avoid

8    litigation."[439] The license agreements were *not* for settlement of past infringements or to "avoid

9    litigation," as is quite clear from their terms. While not so stated, FTB may be drawing its factual

10    basis for its "past infringement" argument from a general "Settlement and Release" section found in

11    the agreements.[440] However, the subject of these licensor/sublicensor agreements is a general

12    forgiveness of past infringement (past damages) without admitting to or charging infringement, and

13    such sections are common in patent licensing agreements. The cited Section 2 of the Agreements

14    certainly does not establish, as FTB contends, that the license agreements were, in effect, payments

15    for past infringement at a time when Mr. Hyatt was a resident of California. On the contrary, the

16    express terms of the agreements establishes that nothing in the agreement can be construed as

17    admitting to "validity" or "infringement" of the patents.[441]

18          In sum, FTB's "commercial exploitation" argument is factually premised on past

19    infringement, but there has been no showing of any such past infringement. A blanket forgiveness of

---

20   [437] Ex. 59, MLMC Agreement, 9/24/91.

21   [438] FTB's allegation here cites to a footnote which states that, "[p]rior to issuance of the '516 patent, Hyatt had been issued patents for a number of other inventions and he made repeated attempts to get patent infringement payments from

22   many of these same companies that paid him for the '516 patent, but was not able to get any company to pay him for any of his other patents." (Ex. 1, FTB 11/1/07 Determination Letter, p. 30, fn. 11.) Not only are these statements

23   undocumented, they are wrong. If FTB wishes to continue to make these allegations, it must document them (and we will respond).

24   [439] Ex. 1, FTB 11/1/07 Determination Letter, p. 30. Likewise, FTB is wrong in alleging that between 1990 and 1999,

25   "Hyatt had been able to obtain substantial income from the patent infringement licensing/settlements he pursued." (*Id.* at p. 31.) There were no patent infringement licensing settlements at *any* time.

26   [440] Ex. 1, FTB 11/1/07 Determination Letter, p. 39.

27   [441] *See, e.g.,* Section 6.2(a) of the October 24, 1991 Fujitsu Patent Agreement; Section 6.2(a) of the December 26, 1991 NEC Patent Agreement; Section 6.2(a) of the November 20, 1991 Sharp Patent Agreement; Section 6.2(a) of the December 17, 1991 Sony Patent Agreement; Section 6.2(a) of the November 14, 1991 Matsushita Patent Agreement;

28   Section 6.2(a) of the January 31, 1992 Oki Agreement; collectively Ex. 60.

---

RJN000821

1   past damages as found in the agreement section cited above by FTB has no infringement basis. Such

2   a conclusion is unsupported by fact or law. There was no identification of infringing products,

3   periods of infringement, or amounts of infringement. Similarly, there is no identification of patents

4   or claims which were infringed.

5        FTB is also wrong in claiming that "the assets that give rise to this income were Hyatt's

6   patents."[442] FTB is confusing the *granting* of a patent with the *licensing* of a patent. The obtaining

7   of a patent or the application for a patent is not taxable by FTB because the patent itself does not

8   generate any income and is not itself a taxable asset. Likewise, the research and development that

9   goes into a patent is not taxable by FTB because such R&D itself does not generate any income. The

10   subject income is the result only of *licensing* a patent. FTB's discussion of the issuance of the

11   patents, or the development of the patents, is irrelevant to the issue of sourcing of income from the

12   *licensing* of those patents.

13        FTB is also wrong in claiming "no work was done in Nevada that generated any income

14   under the license agreements."[443] But the more important point here is that it does not matter whether

15   or not the patents "were the product of work Hyatt performed in California," because "performing

16   work" in California is not the test for nonresident source income from intangibles. The test is

17   "business situs" under section 17952 and regulation 17952. Simply performing work in California

18   that results in the creation of an intangible does not mean that intangible somehow automatically

19   develops a California "business situs." Regulation 17952 states that an intangible acquires a

20   California business situs *only* if (1) the intangible is employed as capital in California, or (2) the

21   possession and control of the property has been localized in connection with a business, trade or

22   profession in California so that its substantial use and value attach to and become an asset of the

23   business, trade or profession in California. Neither condition has been satisfied.

24

25

26   [442] Ex. 1, FTB 11/1/07 Determination Letter, p. 41. For the same reason, FTB is wrong in stating that it is the "'516

27   patent from which the income now in issue was generated." (*Id.* at p. 30, fn. 9.) A patent does not "generate" income. Further, the '516 patent was only one in a portfolio of 24 patents licensed by Philips.

28   [443] Ex. 1, FTB 11/1/07 Determination Letter, p. 41.

RJN000822

**E.    These Same Sourcing Arguments Were Already Rejected by FTB at Audit in 1995**

No sourcing argument was raised by FTB in the NPAs for either 1991 or 1992, and only in its Determination Letter did FTB assert section/regulation 17952 sourcing as a basis for an assessment. One would never know from reading the Determination Letter that FTB legal and audit staff thoroughly considered and rejected these sourcing arguments in 1995 while Mr. Hyatt's case was under audit.

FTB auditor Sheila Cox alone spent approximately 500 hours on Mr. Hyatt's 1991 audit and the running total of hours show FTB auditors collectively spent 624 hours on the 1991 audit.[444] Sourcing "was another issue that was looked at during the audit."[445] During the audit, FTB looked "at the possibility of sourcing to California based on the fact he [Mr. Hyatt] developed the work in California."[446] Indeed, source income was the very first theory considered by Cox – even before residency. In a November 18, 1994 memorandum, when the case was "just assigned" to her, Cox proposed as her audit strategy: "[m]ake a determination whether the income from the patents can be sourced to California citing prior tax law. *Otherwise*, further examination of the residency issue will have to be pursued."[447]

The possibility of a sourcing issue even predated Ms. Cox's involvement in the audit. The two previous auditors (Marc Shayer and Felix Soriano) also looked at the issue.[448] As early as August 1993, auditor Marc Shayer stated in his audit file notes that one issue to be "determined" was, "is this income California source income regardless of when and where he received it because the work on the invention was done in California…"[449] In October 1993, Shayer wrote a memo to Anna Jovanovich, "Lead Technical Counsel – Residency Central Office," regarding the 1991 Hyatt audit, which states in pertinent part: "[t]he taxpayer claims that the sale of his California home on October

---

[444] Ex. 61, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/27/08, pp. 68-69.
[445] Ex. 35, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/28/08, pp. 122:24-25; 123:1-4.
[446] Ex. 62, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 6/5/08, p. 73:23-25.
[447] Ex. 63, S. Cox memorandum dated 11/18/94.
[448] Ex. 35, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/28/08, pp. 143:23-145:9.
[449] Ex. 64, 8/10/93 Hyatt Audit Program Item by auditor Marc Shayer.

RJN000823

1    1, 1991 was the significant event that changed his residency status. The tax effect that would be

2    generated from reclassifying this income as all CA source is $1,876,470. My questions regarding this

3    case concern one primary issue," and this primary issue was the sourcing issue.[450]

4          The sourcing argument was not pursued during the audit after FTB legal and management

5    departments determined that sourcing should not be pursued.[451] In May 1995, Allan Shigemitsu of

6    FTB suggested a meeting of audit and legal staff on a potential sourcing issue in Mr. Hyatt's audit.[452]

7    Monica Embry of FTB was assigned to handle Mr. Shigemitsu's request regarding where patent

8    royalties were sourced.[453] According to Embry, it was a process "to try to get everybody on board"

9    and to "just step back and bring Legal in now and see what the opinion is."[454] In an August 24, 1995

10   FTB cover memo, and an underlying August 21, 1995 FTB memo from Monica Embry, FTB

11   considered in Mr. Hyatt's audit three "possible positions to source patent payments to California."[455]

12   Those positions were: "(1) [t]he royalty income was derived from a trade or business conducted

13   within California; (2) [t]he patent acquired a business situs in California; and (3) [t]he royalty income

14   was compensation for services and sourced to California because the personal efforts of the taxpayer

15   in creating the product were expended in California."[456] All three positions were rejected by FTB in

16   the August 21, 1995 memo, and sourcing was dropped from the audit.[457]

17         The sourcing theories rejected in the August 21, 1995 memo[458] were thoroughly vetted within

18   FTB. The proposal for a meeting on the subject arose on May 30, 1995 "to obtain legal's

19   support..."[459] The meeting took place on June 6, 1995 and lasted approximately two hours.[460] FTB

---

[450] Ex. 65, Memorandum from M. Shayer to A. Jovanovich.

[451] Sourcing "was not pursued during the course of the audit." (Ex. 35, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/28/08, p. 123:5-9.) "Monica Embry an [sic] those assigned to determine that determined that [sourcing argument] was not an Avenue to pursue." (*Id.* at p. 123:10-13.) "[T]hey decided they did not want to pursue the sourcing issue." (Ex. 62, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 6/5/08, p. 74:10-15.)

[452] Ex. 66, E-mail from A. Shigemitsu, 5/13/95.

[453] Ex. 67, Partial Transcript, Depo. of Monica Embry, 5/20/99, pp. 61-62.

[454] Ex. 68, Partial Transcript, Depo. of Monica Embry, 7/12/05, pp. 320-321.

[455] Ex. 69, Memorandum from M. Embry to FTB auditors, 8/24/95, p. 3.

[456] *Id.*.

[457] *Id.*.

[458] Ex. 69, Memorandum from M. Embry to FTB auditors, 8/24/95.

[459] Ex. 70, E-mail from M. Embry, 5/30/95.

RJN000824

1   attorney Richard Gould, who attended the meeting, followed up with a memo.[461] Gould was the

2   expert in FTB's Legal Department on sourcing issues.[462] Sourcing was "one of the areas of [Gould's]

3   expertise," and "everything dealing with sourcing" "would come through him" under the subject

4   matter division that existed in FTB Legal.[463] Embry brought Gould, as well as Becky Medina of FTB

5   audit, into the process because "they knew the most about sourcing."[464] Medina was an "expert on

6   sourcing issues" from the FTB audit side.[465] Ms. Cox herself discussed the sourcing issue with

7   Embry, who was working on the memo.[466] Multiple "Post-it" stickers show the extensive routing of

8   and the comments sought on the draft memo.[467] The August 21, 1995 memo was then widely routed

9   within FTB for review "if anything needs to be added or changed…"[468] Finally, the memo was more

10  widely distributed within FTB under a September 8, 1995 cover memo[469] which explained, "the

11  auditor requested technical support on a position contrary to what is stipulated in our

12  regulations.…This memo was the result." That memo reflected the consensus of the meeting, and

13  there were no dissenting views.[470] It was the group's recommendation *not* to pursue sourcing.[471]

14          Note the August 21, 1995 memo makes findings and conclusions directly inconsistent with

15  what FTB now argues in its Determination Letter. That FTB memo states, "TP started negotiations

16  with North American Philips ("Philips") sometime prior to November 1991. Philips became the

17  licensing agent for the TP and signed a licensing agreement on November 7, 1991."[472] This point

18  (Footnote continued from previous page.)

19  [460] Ex. 67, Partial Transcript, Depo. of M. Embry, 5/20/99, pp. 78, 101.

    [461] *See* Ex. 71, Memorandum from R. Gould to M. Embry, 7/17/95.

20  [462] Ex. 72, Partial Transcript, Depo. of Anna Jovanovich, 5/26/99, p. 460.

21  [463] Ex. 73, Partial Transcript, Depo. of Richard Gould, 4/26/04, pp. 47:6-8, 68, 69.

22  [464] Ex. 68, Partial Transcript, Depo. of Monica Embry, 7/12/05, pp. 308, 309.

    [465] Ex. 74, Partial Transcript, Depo. of Rebekah Medina, 6/30/99, p. 28.

23  [466] Ex. 75, 1991 Audit Workpapers, entry for 7/25/95.

    [467] Ex. 76, M. Embry draft memorandum (FTB 28175).

24  [468] Ex. 69, Memorandum from M. Embry to FTB auditors, 8/24/95.

25  [469] Ex. 77, Memorandum from M. Embry, Sourcing of Nonresident Patent Royalties, 9/8/95 (FTB 16559).

    [470] Ex. 67, Partial Transcript, Depo. of Monica Embry, 5/20/99, p. 85.

26  [471] Ex. 68, Partial Transcript, Depo. of Monica Embry, 7/12/05, p. 293.

    [472] Ex. 77, Memorandum from M. Embry, Sourcing of Nonresident Patent Royalties, 9/8/95 (FTB 16559), p. 1. Actually,

27  the date in the memo is wrong. The Philips agreement was signed on July 12, 1991 by Philips, and it was signed on July
    24, 1991 by Hyatt. (*See* Ex. 55.) Ms. Embry acknowledged this error in her deposition, and a copy of the relevant

28  portion of that deposition can be provided upon request.

1   made here by FTB is precisely the point we make above, *i.e.*, that Mr. Hyatt earned royalties from

2   *Philips' licensing* of the patents, and not by Mr. Hyatt "commercially exploiting" them. That FTB

3   memo goes on to state, "[a]lthough the TP may have developed the patents, *we found very few facts*

4   *to support a position the TP was in the trade or business of developing patents. Additionally, since a*

5   *licensing agent handled the patent after the rights were obtained, the TP was not involved in any*

6   *further localization of the patent, if any, in California.*"[473] Again, this is precisely our point above,

7   *i.e.*, there was *no* trade or business of developing patents; and there was *no* localization of the patent

8   in California such as to create business situs because Philips, as exclusive sublicensor with a

9   fiduciary obligation to sublicense the patents, handled the patent licensing as of July 1991.

10         In sum, sourcing was considered by all three FTB auditors on the Hyatt case – Cox, Shayer

11  and Soriano; it was considered by two FTB attorneys – Jovanovich ("Lead Counsel Technical –

12  Residency"), and Gould (Legal's "expert" on sourcing); and it was the subject of extensive

13  discussions and a meeting involving Audit and Legal which led up to the September 1995 memo

14  rejecting sourcing.

15         It is no wonder why sourcing was not a ground for the issuance of the NPAs. All that is

16  known regarding FTB's decision to resurrect the sourcing issue at protest is that protest officer Cody

17  Cinnamon was "told to do it now," most likely by her supervisor George McLaughlin (who authored

18  the Determination Letter) or by Caglar Caglayan.[474] However, FTB's Determination Letter cites no

19  new or changed law regarding sourcing since the time sourcing was considered and rejected in 1995

20  during the course of the audit. Indeed, FTB's discussion of sourcing law in the Determination Letter

21  does not contain a single legal citation dated after 1995.[475] One must wonder, in light of this history,

22  why FTB now chooses to raise before this Board an argument it rejected twelve years ago.

23

24

25

---

26  [473] Ex. 77, Memorandum from M. Embry, Sourcing of Nonresident Patent Royalties, 9/8/95 (FTB 16559), p. 2, emphasis added.

27  [474] Ex. 78, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Cody Cinnamon, 6/17/08, pp. 104-105.

28  [475] Ex. 1, FTB 11/1/07 Determination Letter, pp. 42-48.

RJN000826

F.    **Conclusion**

The theory underpinning business situs is to tax the income of intangible property owned by a non-resident in return "for the advantages enjoyed by the owner in that state."[476] The intangibles must be "tied in with the activities of their owner carried on in the foreign state and under the protection of the law and government provided by the foreign state."[477] The income in question here, from the licensing of Mr. Hyatt's patents, does not come as a result of the "advantages enjoyed" by Mr. Hyatt or "under the protection of the law and government provided" in California. The patents in issue did not become "an integral portion of the business activity" nor "identified with the economic structure" in California.[478] They were not part of a "more or less continuous course of business or series of transactions" in California;[479] or "tied in"[480] or "definitely connected"[481] with a California business. There is no evidence that Mr. Hyatt took steps to "localize" the patents in California.[482] FTB's sourcing argument fails.

V.    **FTB'S PROPOSED IMPOSITION OF AN AMNESTY PENALTY UNDER SECTION 19777.5 IS IN ERROR**

Section 19777.5 provides for a penalty equal to 50 percent of the interest that accrued on an assessment from the original due date of the return to March 31, 1995. Section 19777.5 is cited in the Notice of Action in this matter. Although this Board has frequently gone on record as stating it does not have jurisdiction to review FTB's imposition of such penalty,[483] Mr. Hyatt nevertheless contends this penalty should not be imposed on the grounds it is contrary to the Code, FTB's regulations, judicial and SBE case law, and the United States and California Constitutions. Should the Board be

---

[476] *Appeal of Christman, supra.*
[477] *Appeal of Christman, supra.*
[478] *See Holly, supra.*
[479] *Id.*
[480] *Wong, supra.*
[481] *Christman, supra.*
[482] *Ames, supra; Neuschotz, supra.*
[483] The most recent expression of this position by this Board in its numerous decisions is in *Appeal of Larry Mazur*, SBE 377123, Sept. 16, 2008, a Summary Decision, which we do not "cite as precedent" (RTA 5451(d)), but merely to show the Board is publicly on record that it will not address the issue.

RJN000827

1　willing to consider this issue on its merits at this time, we would be pleased to provide full,

2　supplemental briefing at the Board's request.

3　**VI.　INTEREST ABATEMENT IS APPROPRIATE UNDER SECTION 19104**

4　　　　On January 22, 2008, concurrent with the filing of this appeal, Mr. Hyatt made a request for

5　abatement of interest with FTB pursuant to section 19104 for the tax year 1991. A "request for

6　abatement of interest related to a proposed deficiency may be made … with an appeal to [this Board]

7　under Section 19045…."[484] In the event FTB denies the taxpayer's request, jurisdiction is vested in

8　this Board to determine whether FTB's "failure to abate interest under [section 19104] was an abuse

9　of discretion, and may order an abatement."[485] We contend that from the time the NPA was issued to

10　Mr. Hyatt on April 23, 1996 through the date FTB issued the Notice of Action on December 26, 2007

11　(hereinafter "abatement period in dispute"), there were significant administrative delays that support

12　abatement of interest under section 19104.

13　　　　FTB "may abate all or any part of … [a]ny interest on a deficiency or related to a proposed

14　deficiency to the extent that interest is attributable in whole or in part to any *unreasonable error or*

15　*delay by an officer or employee of the Franchise Tax Board* (acting in his or her official capacity) *in*

16　*performing a ministerial or managerial act*."[486] Further, "an error or delay shall be taken into

17　account only if no significant aspect of that error or delay can be attributed to the taxpayer involved

18　and after the Franchise Tax Board has contacted the taxpayer in writing with respect to that

19　deficiency or payment."[487] Accordingly, interest may be abated if there is an error or delay that (1) is

20　attributable to a ministerial or managerial act performed by FTB; (2) occurred after FTB contacted

21　the taxpayer in writing about the particular deficiency; and (3) is not significantly attributable to the

22　taxpayer.

23

24

25

---

26　[484] Cal. Rev. & Tax. Code § 19104(b)(4).

27　[485] Cal. Rev. & Tax. Code § 19104(b)(2)(B).

　　[486] Cal. Rev. & Tax. Code § 19104(a)(1), emphasis added.

28　[487] Cal. Rev. & Tax. Code § 19104(b)(1).

RJN000828

A.    **There Have Been Many Unreasonable Delays Attributable to Ministerial and Managerial Acts Performed by FTB Staff During the Processing of the Protest**

When a California statute is substantively identical to a federal statue,[488] it is well settled that federal authority interpreting the federal statute is highly persuasive in interpreting the California statute.[489]  Treasury Regulation section 301.6404.2(b)(1) defines "managerial act," in relevant part, as follows:

> an administrative act that occurs during the processing of a taxpayer's case involving the temporary or permanent loss of records or the exercise of judgment or discretion relating to management of personnel.  A decision concerning the proper application of federal tax law (or other federal or state law) is not a managerial act....

Treasury Regulation section 301.6404.2(b)(2) defines "ministerial act" as follows:

> a procedural or mechanical act that does not involve the exercise of judgment or discretion, and that occurs during the processing of a taxpayer's case after all prerequisites to the act, such as conferences and review by supervisors, have taken place.  A decision concerning the proper application of federal tax law (or other federal or state law) is not a ministerial act.

The abatement period in dispute includes several acts of a "managerial" or "ministerial" nature by FTB staff that caused unreasonable delays.

First, FTB intentionally placed a "hold" on Mr. Hyatt's protest after the protest hearing.  The protest hearing for tax year 1991 was held on October 4, 2000, over *seven* years prior to the issuance of the Notice of Action on Mr. Hyatt's protest.  At the protest hearing, we were informed by the protest officer that a decision would be rendered by the end of the first quarter 2001, *i.e.*, within six months.[490]  No such decision was rendered.  When we inquired as to the status of a decision, we were informed in 2002 that the protest was on "hold," but that the protest officer had a draft protest letter prepared and could work up a final determination for the protest upon a few weeks notice.[491]  While

---

[488] Cal. Rev. & Tax. Code § 19104(a) is substantially identical to Internal Revenue Code § 6404(e).

[489] *Douglas v. State of California* (1942) 48 Cal.App.2d 835, 838; *see also* FTB Notice 89-277 (5/10/89).

[490] *See* Ex. 79, Letter from E. Coffill to C. Cinnamon dated 2/28/01, pp. 9-10; *see also* Ex. 80, FTB PASS Event Log, User G. McLaughlin, event date 4/3/00, stating: "This is the 'high profile' residency case - the companion to the 'high profile' federal litigation case in Nevada. *The protest has been on hold for awhile, but is now active - and we intend to close it by March 31, 2001.*" (Emphasis added.)

[491] *See* Ex. 81, Letter from E. Coffill to G. McLaughlin dated 3/7/02, stating: "You [George McLaughlin] *informed me the protests were not being worked on because of the pending Nevada litigation between Mr. Hyatt and FTB.* While it was not clear from our conversation exactly when this 'hold' was put on the protests, I told you what Cody [Cinnamon]

(Footnote continues on next page.)

RJN000829

1    FTB's attorney, in open court, argued to the contrary,[492] FTB knew it had placed a hold on the protest

2    proceedings. In a February 20, 2002 e-mail from the protest officer, Cody Cinnamon, to her

3    supervisor, George McLaughlin, Ms. Cinnamon stated:

> Eric Coffill called me and asked what was happening with the case. *I told Eric*
> *that I was instructed not to work on the case due to the pending Nevada litigation.*
> He wanted further information so I referred Eric to you. Eric said he would be
> calling you.[493]

7    (Emphasis added.) FTB's intentional "hold" placed on the protest, and the fact it had already drafted

8    the Determination Letter, is also evidenced in an e-mail from FTB counsel Ben Miller, dated April 5,

9    2002, stating "we should put things on hold with administrative matters, in particular the recent draft

10   letter."[494] As this Board, and FTB, is now aware, the "recent draft letter," i.e., the Determination

11   Letter, was not issued until November 1, 2007.[495]

12       FTB's placement of a "hold" on the protest proceedings for *over six years* constitutes an

13   unreasonable delay based on ministerial *and* managerial acts by FTB staff. The delay constitutes a

14   managerial act because it involved the "exercise of judgment or discretion relating to management of

15   personnel."[496] The protest officer was specifically instructed by her management to "hold" the

16   protest indefinitely, despite the fact she had already drafted the protest determination letter, pending

17   the Nevada litigation involving Mr. Hyatt and FTB. There is no conceivable reason for this delay.

18   The issue of residency was *not* a cause of action in *Hyatt v. FTB*. In fact, in February 1998, a month

19   after Mr. Hyatt filed the lawsuit against FTB in Nevada, FTB counsel Terry Collins, provided an

20   affidavit under oath declaring that "FTB intends to continue processing, and continues to process, Mr.

---

(Footnote continued from previous page.)

had told me, *i.e.*, that Cody had not charged time on the protests since June 2001. You also informed me that you believe the protests are 'written up,' and that you believed that the FTB could issue proposed determination letters for 1991 and 1992 on relatively short notice of several weeks once the case was activated." (Emphasis added.)

[492] *See* Ex. 82, *Hyatt v. FTB*, Partial Transcript of Proceedings, 8/5/05, p. 56, lines 6-13: "Mr. Giudici: No, your Honor, and in fact I want to raise an objection. There is no evidence that the protest has been put on hold. They are referring to a hearsay statement by Mr. Coffill, the attorney in the protest, who wrote a self-serving letter, and that letter was in, I believe, March of 2002, where he is saying, 'You told me you've put the protest on hold.'"

[493] Ex. 83, E-mail from C. Cinnamon to G. McLaughlin, 2/20/02.

[494] Ex. 84, E-mail from B. Miller to C. Cinnamon, G. McLaughlin and C. Caglayan, 4/5/02.

[495] *See* Ex. 1, FTB 11/1/07 Determination Letter.

[496] Treas. Reg. § 301.6404.2(b)(1).

---

RJN000830

1    Hyatt's Protests within the administrative procedure set forth under California law for both tax years

2    (1991 and 1992) despite his filing of this legal action in Nevada."[497]  Notwithstanding this sworn

3    statement to the contrary and the fact residency was not an issue in the Nevada case, FTB

4    management directed the protest officer to indefinitely place a hold on the case, unreasonably

5    delaying the issuance of the already drafted protest determination letter and the Notice of Action.

6        The unreasonable delay due to the protest "hold" also constitutes a ministerial act because it

7    involves "a procedural or mechanical act that does not involve the exercise of judgment or discretion,

8    and that occurs during the processing of a taxpayer's case after all prerequisites to the act, such as

9    conferences and review by supervisors, have taken place."[498]  By the time the protest officer was

10   instructed to place the protest on "hold" (*i.e.*, some time prior to February 2002), the protest had been

11   "in process" well *over five years* (the protest was filed on June 20, 1996), the protest hearing had

12   been held and the protest determination letter had already been drafted.  It did not take "an exercise of

13   judgment" or "discretion" to choose to not move forward with the taxpayer's protest.  This delay by

14   FTB unnecessarily prolonged the taxpayer's protest with no apparent justification.  Accordingly,

15   FTB's failure to issue the determination letter and instead place the case on hold is the result of a

16   ministerial act that resulted in an unreasonable delay.

17       Second, FTB has lost, destroyed, or withheld numerous documents from the audit files that

18   would have aided in a more timely resolution of the protest.  The poor state of the audit files used by

19   the protest officers during the protest proceedings in the matter is particularly evidenced in an

20   October 10, 2000 memorandum from Mr. McLaughlin, supervisor to at least two of the protest

21   officers assigned to Mr. Hyatt's protest.  In that regard Mr. McLaughlin stated:[499]

22       As I discussed with you earlier, *the audit files in the above-captioned matter have
         been and continue to be a significant problem.  You are well aware of our*
23       *concerns over the condition of the files, particularly certain portions of them.*

24

25   [497] Ex. 85, T. Collins affidavit, 3/18/98, ¶ 7, submitted with FTB's Motion for Judgment on the Pleadings filed in 1999 in
     *Hyatt v. FTB.*
26   [498] Treas. Reg. § 301.6404.2(b)(1).

27   [499] Ex. 86, Memorandum from G. McLaughlin to C. Caglayan, 10/10/00, emphasis added; *see also* Ex. 87, Memorandum
     from C. Cinnamon to B. Miller, 9/11/00, stating:  "This will serve as a request that any and all audit records currently
28   missing from my copy/facsimile of the audit files be provided to me."

RJN000831

1  .... With the Herculean effort by Cody Cinnamon, we were able to determine that
we have some semblance of the complete audit file - recognizing that *there are*
2  *still gaps that can't fully be accounted for* and redactions/omissions that are
related to confidential/privilege issue. We know that management is still working
3  on filling those gaps for us. We are also now aware that Mr. Coffill does not have
a copy of the files that matches ours - something that led to some embarrassment
4  for us at the protest hearing.

5  For over four years (*i.e.*, from June 1996 when the protest was filed to October 2000 when

6  Mr. McLaughlin wrote the above quote memo) the FTB's protest officers were operating with a

7  partial audit record. The incomplete state of the audit files is also memorialized in two earlier

8  memorandums by Mr. McLaughlin. In a March 7, 2000 memorandum to Terry Collins, Mr.

9  McLaughlin stated:[500]

10  I have not had an opportunity to review the parts of the audit file that have been
made available to Charlene Woodward [i.e., the protest officer assigned to the
11  protest prior to Ms. Cinnamon], and by her to me; *we do not have a complete
audit file and we do not have the original protest files.*

12  * * *

13  DOCUMENTS NEEDED

14
*We do not have a complete copy of the audit record − only portions of it.*
15  Therefore, please have a complete hard copy of the audit records (1991 and 1992)
prepared, including all sections of the audit workpapers (sections 1 through x,
16  however many there are), narratives, reviews, etc....

17  In a March 7, 2000 memorandum to Charlene Woodward, Mr. McLaughlin stated:

18  "...*without having a complete copy of the audit files, we cannot effectively organize the working file.*

19  *Therefore, we can take no further action, until we get the complete audit files.*"[501] The FTB's protest

20  event log further underscore the incomplete state of the protest files:[502]

21  I don't have the original protest record, including the protest letter! Anna
Jovanovich was the original hearing officer assigned to the case. As you might
22  imagine, the structure of a protest record is much less predictable especially since
the case was not worked in PASS. When I am done with the audit record
23  construction I will pursue constructing a facsimile of the historical protest record
if GWM [Mr. McLaughlin] thinks that is needed.

24

25

26
---
27  [500] Ex. 88, Memorandum from G. McLaughlin to T. Collins, 3/7/00, emphasis added.

[501] Ex. 89, Memorandum from G. McLaughlin to C. Woodward, 3/7/00, emphasis added.

28  [502] Ex. 90, FTB PASS Event Log by User C. Cinnamon, event date 5/30/00.

RJN000832

1    In addition to the protest officer's lost and incomplete audit files, there have been numerous

2    admissions by the auditor that she destroyed documents directly relevant to the residency issue in this

3    matter. For example, the auditor did not take adequate steps to secure the renter's file from Mr.

4    Hyatt's Las Vegas Wagon Trails apartment[503] and she consistently destroyed all of her handwritten

5    notes.[504]

6    We contend FTB's lost, destroyed and incomplete audit files caused an unreasonable error or

7    delay with the processing of the protest. A "temporary or permanent loss of records" is listed

8    specifically as a "managerial act" for which interest may be abated.[505]

9    Third, FTB unreasonably delayed the protest by failing to expeditiously assign the protest. In

10    a memorandum by FTB audit reviewer Carol Ford to audit supervisor Penelope Bauche, Ms. Ford

11    stated "the 1991 protest sat on Terry's desk for over 6 months before being assigned to [Anna

12    Jovanovich]." We contend FTB management's inaction and decision to not assign the protest

13    constitutes an unreasonable delay due to a managerial or ministerial act.

14    Finally, FTB unreasonably delayed the protest by assigning the protest officer to other cases

15    and failing to reassign Mr. Hyatt's case to another protest officer. On November 21, 1997,

16    approximately 15 months after Mr. Hyatt filed his protest, the protest officer, then Anna Jovanovich,

17    told Mr. Hyatt's protest counsel that she "continued to be delayed in completing the review of Mr.

18    Hyatt's 1991 protest and file because her supervisor had been assigning her to other cases that were

19    going to trial."[506] We contend Ms. Jovanovich's supervisor's decision to assign other cases to Ms.

20    Jovanovich − to the exclusion of Mr. Hyatt's case − and the decision not to reassign Mr. Hyatt's

21    protest to another hearing officer constitutes an unreasonable delay due to a managerial or ministerial

22    act.

---

23    [503] *See* fn. 36, *supra.*

24    [504] *See* Ex. 61, *Hyatt v. FTB,* Partial Trial Transcript, Testimony of Sheila Cox, 5/27/08, pp. 127-128, 197-198; Ex. 35, *Hyatt v. FTB,* Partial Trial Transcript, Testimony of Sheila Cox, 5/28/08, pp. 105-107; Ex. 91, *Hyatt v. FTB,* Partial Trial Transcript, Testimony of Sheila Cox, 5/29/08, pp. 72-73; Ex. 41, *Hyatt v. FTB,* Partial Trial Transcript, Testimony of Sheila Cox, 6/2/08, p. 63; Ex. 92, *Hyatt v. FTB,* Partial Trial Transcript, Testimony of Sheila Cox, 6/6/08, p. 46.

26    [505] Treas. Reg. § 301.6404.2(b)(1).

27    [506] *See* Ex. 93, Memorandum to file from E. Cowan, 12/3/97; *see also* Ex. 36, Partial Transcript, Depo. of Anna Jovanovich, Vol. II, 5/26/99, pp. 292-297, stating "I had never had a case go as slow as this one had"; "[i]t just kept being interrupted continually by different things that were happening" including a "big case that went to protest of which [Ms. Jovanovich] became a protest officer ...." that she was feeling "political pressure" to work on over her other assignments.

RJN000833

**B. The Unreasonable Delays Occurred After FTB Contacted Mr. Hyatt in Writing**

The initial audit contact letter by FTB was sent on June 17, 1993.[507] All of the foregoing acts occurred after FTB contacted the taxpayer in writing about the 1991 tax year.

**C. The Delays Are Not Significantly Attributable to Mr. Hyatt**

The foregoing delays were in no way attributable to Mr. Hyatt. Each involved acts solely attributable to FTB staff.

**D. The Delays Are Numerous and Successive**

Mr. Hyatt is entitled to interest abatement for the entire abatement period in dispute. This Board has held that, under certain circumstances it will consider the cumulative effect of multiple errors and delays when determining the period for interest abatement.[508] Ordinarily a taxpayer is entitled to abatement of interest during the discrete periods attributable to specified errors or delays. However, when FTB errors and delays are "chronic, repetitive, and occur in close proximity," it can be difficult or impossible to identify the periods attributable to each error or delay. Also, under these circumstances, the effect of each error on delay on subsequent events is also not readily predictable. As a result, this Board has held that the cumulative effect of all errors and delays must be examined.[509] If the cumulative effect is an unreasonably long delay in processing the case, the Board will grant interest abatement for the entire period.

FTB's delays and errors in this matter have been "numerous and successive."[510] Due to the far-reaching effects of FTB's actions, it is impossible to identify the period of abatement for each error or delay. It is similarly impossible to determine the effect of each delay or error on subsequent events. The "residual consequences of early errors," compounded by later events, have resulted in what has been an "unreasonably long period for an audit and protest to last."[511] Because the cumulative effect of FTB's errors and delays resulted in an unreasonably long delay, Mr. Hyatt is

---

[507] *See* Ex. 94, FTB 1991 Progress Report (FTB 03441), entry for 6/17/93.

[508] *Appeal of Shugart,* 2005-SBE-001, July 1, 2005.

[509] *See id.*

[510] *Id.*

[511] *Id.* Compare *Shugart,* where the audit and protest lasted nearly nine years, with the nearly fifteen years that have passed thus far since FTB began its audit of Mr. Hyatt.

---

sa-57710

93

RJN000834

1  entitled to interest abatement for the entire delay period from the time the NPA was issued on

2  April 23, 1996 through the date FTB issued the Notice of Action on December 26, 2007.

3      **E.    Conclusion**

4        Mr. Hyatt has been dealing with this intrusion by FTB in his life for nearly 15 years. Over

5  eleven years passed between the time Mr. Hyatt received the NPA on April 23, 1996 and FTB's

6  issuance of the Notice of Action on December 26, 2007. A protest hearing was not held until

7  October 4, 2000, more than four years after the filing of the protest on June 20, 1996. Mr. Hyatt

8  wanted nothing more than to bring closure to the protest proceedings and move forward with his case,

9  and he steadfastly requested that the FTB issue a final determination throughout the protest

10  proceedings.[512] Despite these requests, the protest determination letter for the year in issue was not

11  received until November 1, 2007, more than seven years after the protest hearing for the 1991 taxable

12  year was held, and more than eleven years after the protest was initially filed.

13        We understand how pending litigation in *Hyatt v. FTB* would make attention to this matter

14  more challenging. However, Mr. Hyatt, who simply (and successfully) fought for his rights, is not

15  responsible for FTB's intentional and unilateral decision to unreasonably delay the processing of his

16  protest, amongst the many other ministerial and managerial acts that significantly delayed the

17  administrative proceedings.

18        For these reasons, the taxpayer respectfully requests that FTB abate interest in this matter with

19  respect to the entire abatement period in dispute.

20  //

21  //

22  //

23

24

25

26

---

27  [512] *See, e.g.*, Ex. 44, Letter from E. Coffill to G. McLaughlin dated 3/7/02; Ex. 95, Letter from E. Coffill to G. McLaughlin dated 1/29/03; Ex. 96, FTB Telephone Call Memo - Legal Division by A. Jovanovich, 1/8/98, stating Mr.

28  Hyatt's counsel "wants to do whatever is quickest for his client in terms of proceeding [with the] protest."

1

**VII.    CONCLUSION**

2

   For the above stated reasons, we respectfully request that the actions of FTB on appellant's

3

protest against the proposed assessment be reversed.

4

5

   Dated: December 9, 2008                Respectfully submitted,

6

7                                          ERIC J. COFFILL
                                           CARLEY A. ROBERTS
                                           MORRISON & FOERSTER LLP
8

9

                                           By: _____
10                                             ERIC J. COFFILL

11                                             Attorneys for Appellant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RJN000836

ERIC J. COFFILL
ecoffill@mofo.com
CARLEY A. ROBERTS
croberts@mofo.com
MORRISON & FOERSTER LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814
Telephone: (916) 325-1324
Fax: (916) 448-3222

Attorneys for Appellant

BEFORE THE STATE BOARD OF EQUALIZATION

OF THE STATE OF CALIFORNIA

In the Matter of the Appeal of

GILBERT P. HYATT

Case No.    446509

# APPELLANT'S OPENING BRIEF

# Taxable Year 1992

sa-57742

RJN000837

ERIC J. COFFILL
ecoffill@mofo.com
CARLEY A. ROBERTS
croberts@mofo.com
MORRISON & FOERSTER LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814
Telephone: (916) 325-1324
Fax: (916) 448-3222

Attorneys for Appellant

BEFORE THE STATE BOARD OF EQUALIZATION

OF THE STATE OF CALIFORNIA

In the Matter of the Appeal of

GILBERT P. HYATT

Case No.  446509

# APPELLANT'S OPENING BRIEF

# Taxable Year 1992

sa-57742

RJN000838

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 2

ARGUMENT ......................................................................................................... 4

I.    FTB DID NOT CARRY ITS INITIAL BURDEN OF PROOF TO SUSTAIN THE ASSESSMENT ......................................................................................... 4

II.   MR. HYATT WAS A NEVADA RESIDENT COMMENCING IN SEPTEMBER 1991 AND CONTINUING THROUGHOUT 1992 .................................. 12

    A.    Mr. Hyatt Was Domiciled in Nevada Commencing in September 1991 .............. 12

    B.    Mr. Hyatt Left California in September 1991 for Other Than Temporary or Transitory Purposes ................................................. 16

    C.    Mr. Hyatt's Contacts with Nevada Satisfy the Close Connections Test ................ 16

        1.    The location of all of the taxpayer's residential real property, and the approximate sizes and values of each of the residences ............... 18

        2.    The state wherein the taxpayer's spouse and children reside ................... 20

        3.    The state wherein the taxpayer's children attend school ........................... 20

        4.    The state wherein the taxpayer claims the homeowner's property tax exemption on a residence ...................................................... 21

        5.    The taxpayer's telephone records (*i.e.*, the origination point of taxpayer's telephone calls) ........................................................... 22

        6.    The number of days the taxpayer spends in California versus the number of days the taxpayer spends in other states, and the general purpose of such days (*i.e.*, vacation, business, etc.) ..................... 22

        7.    The location where the taxpayer files his tax returns, both federal and state, and the state of residence claimed by the taxpayer on such returns .......................................................... 24

        8.    The location of the taxpayer's bank and savings accounts ........................ 25

        9.    The origination point of the taxpayer's checking account transactions and credit card transactions ...................................................... 26

       10.   The state wherein the taxpayer maintains memberships in social, religious, and professional organizations .......................................... 27

       11.   The state wherein the taxpayer registers his automobiles ........................... 28

       12.   The state wherein the taxpayer maintains a driver's license ...................... 28

RJN000839

13. The state wherein the taxpayer maintains voter registration, and the taxpayer's voting participation history................................. 29

14. The state wherein the taxpayer obtains professional services, such as doctors, dentists, accountants, and attorneys.............................. 29

    a. Mr. Hyatt used few California professionals.......................................................................... 29

    b. Mr. Hyatt had relationships with many Nevada professionals ........................................................ 31

    c. Mr. Hyatt had relationships with many non-California (non-Nevada) professionals.......................................................................... 32

15. The state wherein the taxpayer is employed ............................................. 32

16. The state wherein the taxpayer maintains or owns business interests ...................................................................................... 32

17. The state wherein the taxpayer holds a professional license or licenses ............................................................................ 33

18. The state wherein the taxpayer owns investment real property ................. 33

19. The indications in affidavits from various individuals discussing the taxpayer's residency ....................................................... 34

20. *Bragg* close connections conclusion ........................................... 34

D. Under the Identifiable Purpose Test, Mr. Hyatt Was a Nevada Resident for All of the 1992 Disputed Period ...................................................... 35

E. FTB's Protest Findings Do Not Detract From the Conclusion that Mr. Hyatt Became a Nevada Resident in September 1991 ................................. 36

    1. FTB's "Facts" ................................................................................. 37

    2. Mr. Hyatt's Facts.............................................................................. 38

    3. "Issue: Residency" ........................................................................ 38

        a. Sale of the La Palma house .......................................... 38

        b. Homeowner's exemption termination.............................................. 44

        c. Continental Hotel stay ................................................. 45

        d. Credit card and banking information ............................. 50

        e. Mr. Hyatt's apartment rental at Wagon Trails .......................................................................... 51

        f. Voter registration ........................................................ 52

        g. Las Vegas home shopping .......................................... 52

ii

RJN000840

III.    THE 1992 NOTICE OF ACTION CONTAINS A $24 MILLION INCOME ERROR ............................................................................................... 52

IV.    THE FRAUDULENT FAILURE TO FILE PENALTY FOR 1992 WAS IMPROPERLY IMPOSED AND SHOULD BE REMOVED .......................... 56

      A.     Introduction ..................................................................................... 56

      B.     The Burden of Proof Is Upon FTB to Show Fraud by Clear and Convincing Evidence ....................................................................... 57

      C.     FTB Has Not Met Its Burden to Prove Fraud ....................................... 58

      D.     FTB Never Responds to Our February 2, 2001 Protest Supplement on FTB Fraud Allegations ..................................................................... 63

V.     NONE OF THE PATENT LICENSING INCOME RECEIVED BY MR. HYATT IS CALIFORNIA SOURCE INCOME ....................................... 65

VI.    FTB'S PROPOSED IMPOSITION OF AN AMNESTY PENALTY UNDER SECTION 19777.5 IS IN ERROR ................................................ 66

VII.   INTEREST ABATEMENT IS APPROPRIATE UNDER SECTION 19104 ................. 67

      A.     There Have Been Many Unreasonable Delays Attributable to Ministerial and Managerial Acts Performed by FTB Staff During the Processing of the Protest ................................................................. 68

      B.     The Unreasonable Delays Occurred After FTB Contacted Mr. Hyatt in Writing ............................................................................................ 73

      C.     The Delays Are Not Significantly Attributable to Mr. Hyatt ................. 73

      D.     The Delays Are Numerous and Successive .......................................... 73

      E.     Conclusion ...................................................................................... 74

VIII.   CONCLUSION ............................................................................... 74

RJN000841

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aldabe v. Aldabe*
    (1962) 209 Cal.App.2d 453 ................................................................. 13

*Camara v. Municipal Court of San Francisco*
    (1967) 387 U.S. 523 ........................................................................... 8

*Chapman v. Superior Court of Los Angeles County*
    (1958) 162 Cal.App.2d 421 ................................................................. 13

*DeMiglio v. Mashore*
    (1992) 4 Cal.App.4th 1260 ............................................................ 13, 14

*Desert Valley Const. & Employees Ins. Co. of Nevada v. Hurley*
    (2004) 120 Nev. 499, 96 P.3d 739 ...................................................... 7

*Devereaux v. Frazier Mountain Park & Fisheries Co.*
    (1967) 248 Cal.App. 2d 323 ............................................................... 59

*Douglas v. State of California*
    (1942) 48 Cal.App.2d 835 .................................................................. 68

*Estate of Phillips*
    (1969) 269 Cal.App.2d 656 ............................................................... 13

*Ferris v. Albright's Courtesy Elec. Co.*
    (1954) 70 Nev. 528, 275 P.2d 755 ...................................................... 7

*Giddio v. Comm'r*
    (1970) 54 T.C.1530 ........................................................................... 10

*Hyatt v. Franchise Tax Bd.*
    (Aug. 6, 2008) Case No. A382999, Clark County Dist. Ct. Nev. ................. *passim*

*Ker v. California*
    (1963) 374 U.S. 23 ............................................................................ 8

*Murphy v. Travelers Ins. Co.*
    (1949) 92 Cal.App.2d 582 .................................................................. 13

*Noble v. Franchise Tax Bd.*
    (2004) 118 Cal.App.4th 560 ............................................................... 13

*Nursing Home Bldg. Corp. v. DeHart*
    (Wash. Ct. App. 1975) 13 Wn. App. 489 ............................................... 61

*Payton v. New York*
    (1980) 445 U.S. 573 ........................................................................... 8

*People v. Camacho*
  (2000) 23 Cal.4th 824 ................................................................ 8

*People v. O'Neil*
  (2008) 165 Cal.App.4th 1351 ...................................................... 60

*People v. Privett*
  (1961) 55 Cal.2d 689 ................................................................. 8

*Pomper v. Behnke*
  (1929) 97 Cal.App. 628 ............................................................. 59

*Rocky Mountain Product Trucking Co. et al. v. Johnson et al.*
  (1962) 78 Nev. 44, 369 P.2d 198 ................................................. 7

*Rowland v. Pepire*
  (1983) 99 Nev. 308, 662 P.2d 1332 .............................................. 7

*Scholes v. Lehmann*
  (7th Cir. Ill. 1995) 56 F.3d 750 .................................................. 61

*Silverman v. United States*
  (1961) 365 U.S. 505 ................................................................. 8

*Smith v. Smith*
  (1955) 45 Cal.2d 235 ................................................................ 12

*Steinberg v. Buczynski*
  (7th Cir. Ill. 1994) 40 F.3d 890 .................................................. 61

*Taff v. Goodman*
  (1940) 41 Cal.App.2d 771 .......................................................... 29

*Todd v. McColgan*
  (1949) 89 Cal.App.2d 509 ........................................................... 4

*United States v. Karo*
  (1984) 468 U.S. 705 ................................................................. 8

*Valetti v. Comm'r of Internal Rev.*
  (1958) 260 F.2d 185 ............................................................ 57, 65

*Whittell v. Franchise Tax Bd.*
  (1964) 231 Cal.App.2d 278 .................................................... 12, 13

*Wolf v. Colorado*
  (1949) 338 U.S. 25 .................................................................. 8

1

**CONSTITUTION, STATUTES AND REGULATIONS**

2

Cal. Const. Art. I, § 13 .................................................................................... 8

3

U.S.C.
    Title 18 § 1708 ......................................................................................... 8

4

Cal. Civ. Code
    § 1217 ....................................................................................................... 59

5

6

Cal. Code Regs., Title 18
    § 5523.6 ................................................................................................ 1, 34
    § 17014 ...................................................................... 12, 13, 16, 31, 34

7

    § 17952 ................................................................................................... 66

8

9

Cal. Rev. & Tax. Code
    § 17015 ................................................................................................... 12

10

    § 17041 ................................................................................................... 30
    § 19104 ......................................................................................... 1, 67, 68

11

    § 19777 ......................................................................................... 1, 66

12

Internal Revenue Code
    § 6404 ..................................................................................................... 68

13

14

Nev. Rev. Stat.
    § 206.140 .................................................................................................. 8

15

    § 207.200 .................................................................................................. 8
    § 483.230 ................................................................................................. 29

16

17

Treasury Regulation
    § 301.6404.2 ............................................................................. 68, 69, 70, 72

18

19

20

**STATE BD. OF EQUALIZATION DECISIONS**

21

*Appeal of Robert F. and Helen R. Adickes*
    90-SBE-012, Nov. 27, 1990 .................................................... 57, 58, 65

22

*Appeal of Allied Properties*
    64-SBE-026, Mar. 17, 1964 ............................................................. 5

23

24

*Appeal of Gary O. Armstrong*
    81-SBE-177, Dec. 10, 1981 .............................................................. 57

25

26

*Appeal of James and Jean A. Bagley*
    SBE 217274, Feb. 1, 2006 ............................................................... 16

27

*Appeal of Kenneth Banks*
    SBE 327922, Apr. 9, 2008 ............................................................... 16

28

RJN000844

*Appeal of Stephen Bellamy*
    85-SBE-002, Jan. 8, 1985 ................................................................ 58

*Appeal of Raymond H. and Margaret R. Berner*
    2001-SBE-006-A, Aug. 1, 2002 ...................................... 13, 18, 34, 47

*Appeal of Stephen D. Bragg*
    2003-SBE-002, May 28, 2003 ......................................... 13, 16, 18, 34

*Appeal of Don A. Cookston*
    83-SBE-048, Jan. 3, 1983 ................................................................ 10

*Appeal of William G. and Susan G. Crozier*
    92-SBE-005, Apr. 23, 1992 ........................................................ 35, 36

*Appeal of Odis L. and Lois N. Dobbs*
    87-SBE-044, June 17, 1987 .............................................................. 18

*Appeal of Gregory B. Duro*
    SBE 354992, Feb. 28, 2008 .............................................................. 16

*Appeal of Robert V. Erilane*
    74-SBE-050, Nov. 12, 1974 ................................................. 57, 58, 63

*Appeal of Robert and Maureen Fouts*
    SBE 383284, May 19, 2008 .............................................................. 16

*Appeal of Larry and Rhoda Geisel*
    SBE 358724, June 25, 2007 .............................................................. 16

*Appeal of William F. and Susan J. Grun*
    SBE 337066, June 25, 2007 .............................................................. 16

*Appeal of Robert E. Harding*
    86-SBE-017, Feb. 4, 1986 ................................................................ 21

*Appeal of Richards L. & Kathleen K. Hardman*
    75-SBE-052, Aug. 19, 1975 .............................................................. 32

*Appeal of Terance and Brenda Harrison*
    85-SBE-059, June 25, 1985 .............................................................. 13

*Appeal of Barbara P. Hutchinson*
    82-SBE-121, June 29, 1982 .............................................................. 57

*Appeal of Duane H. Laude*
    76-SBE-096, Oct. 6, 1976 .................................................................. 5

*Appeal of Merry Mary Fabrics, Inc., et al.*
    93-SBE-007, Apr. 22, 1993 ................................................................ 1

*Appeal of James F. and Diane Montgomery*
    SBE 309423, Aug. 21, 2008 ........................................................ 16

*Appeal of Joe and Gloria Morgan*
    85-SBE-078, July 30, 1985 .................................................... 13, 15

*Appeal of Michael E. Myers*
    2001-SBE-001, May 31, 2001 ...................................................... 4

*Appeal of Charles L. and Phyllis R. Owen*
    76-SBE-025, Mar. 8, 1976 ........................................................ 57

*Appeal of Piere E. G. and Nicole Salinger*
    80-SBE-080, June 30, 1980 ....................................................... 18

*Appeal of David W. Sanders, et al.*
    SBE 400374, Aug. 19, 2008 ....................................................... 16

*Appeal of Brian K. Shaw*
    SBE 341954, Mar. 1, 2007 ........................................................ 16

*Appeal of Alan F. and Rita K. Shugart*
    2005-SBE-001, July 1, 2005 ...................................................... 73

*Appeal of Sierra Production Service, Inc., et al.*
    90-SBE-010, Sept. 12, 1990 ....................................................... 1

*Appeal of James M. Smith*
    61-SBE-048, July 19, 1961 ....................................................... 32

*Appeal of Swift & Co.*
    70-SBE-013, Apr. 7, 1970 ......................................................... 5

*Appeal of Tommy H. and Leila J. Thomas*
    83-SBE-096, Apr. 5, 1983 ........................................................ 21

*Appeal of Richard W. Vohs*
    73-SBE-055, Sept. 17, 1973 ................................................... 20, 32

*Appeal of David C. and Livia P. Wensley*
    81-SBE-147, Oct. 27, 1981 ....................................................... 18

*Appeal of Robert E. Wesley, et al.*
    2005-SBE-02, Nov. 15, 2005 ....................................................... 4

*Appeal of Hubbard D. and Cleo M. Wickman*
    81-SBE-014, Feb. 2, 1981 .................................................... 57, 58

*Appeal of William G., Jr. and Mary D. Wilt*
    76-SBE-030, Mar. 8, 1976 ........................................................ 57

1

**OTHER AUTHORITIES**

2

9 WITKIN, CALIFORNIA PROCEDURE § 365 (5th ed. 2008) ................................................... 7

3

FTB Notice 89-277, May 10, 1989 ............................................................................. 68

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RJN000847

## **INTRODUCTION**

By Notice of Appeal dated January 23, 2008, Gilbert P. Hyatt ("Mr. Hyatt" or "the taxpayer") appealed from the Notice of Action ("Notice") issued by the Franchise Tax Board ("FTB") that affirmed FTB's Notice of Proposed Assessment ("NPA") of tax, penalty and interest in the amount of $29,088,458.29[1] for the tax year 1992. This opening brief supplements that Notice of Appeal and addresses FTB's November 1, 2007 Protest Determination Letter[2] (hereinafter "Determination Letter").

The 1992 tax year involves only a three month disputed period: January 1, 1992 through April 2, 1992 (hereinafter the "1992 disputed period"), concluding the day before escrow closed on Mr. Hyatt's Tara Avenue home in Las Vegas. The primary issues presented in this case are (1) whether Mr. Hyatt was a California resident through April 2, 1992; (2) whether FTB's assessment of a fraud penalty was in error; (3) whether FTB made a $24 million income error on the 1992 Notice of Action; (4) whether FTB's alternative California "source" income argument, which was not a basis for the issuance of the NPA, should be rejected as an alternative basis for sustaining the assessment; (5) whether FTB's decision, as indicated on the Notice, to impose an amnesty penalty under Revenue and Taxation Code section[3] 19777.5 is in error; and (6) whether the taxpayer's request for interest abatement under section 19104(b)(4) should be granted. This brief is structured around these six issues.

This brief is accompanied by a large volume of supporting documentation which is being provided under RTA 5523.6.[4] Logistically, that documentation has been organized into two

---

[1] Tax of $5,669,021.00, penalty (failure to file return - fraud) of $4,251,765.75, and interest to December 26, 2007 of $19,167,671.54.

[2] Ex. 1, FTB 11/1/07 Determination Letter.

[3] All statutory references herein are to the California Revenue and Taxation Code, unless otherwise noted.

[4] As will be seen from a review of this brief and the accompanying documentation, defending against FTB's audit and assessment has required extensive work on the part of Mr. Hyatt for well over a decade. In *Appeal of Sierra Production Service, Inc., et al.*, 90-SBE-010, Sept. 12, 1990, this Board stated, "...a taxpayer who appeals to this board *should always submit to us each item of evidence that will support its case*, even though that evidence has already been submitted to (and rejected by) the Franchise Tax Board." (Emphasis added.) (*See also Appeal of Merry Mary Fabrics, Inc., et al.*, 93-SBE-007, Apr. 22, 1993, stating: "We are a separate state agency and *unless the taxpayer submits the evidence to us*, or respondent chooses to submit it in support of its own position, we will never see it," emphasis added.) Mindful of *Sierra Production*, we have attempted to provide herein the most complete record possible within the parameters of this Board's RTAs and keeping in mind the available resources of the Board in this matter. However, we have not at this time provided your Board with *all* the documentation compiled in this matter. As two examples, we are not providing your

(Footnote continues on next page.)

RJN000848

1   categories.  These categories are: (1) separate Exhibits, which are sequentially numbered in Arabic

2   numerals; and (2) Annexes, which are sequentially numbered in Roman numerals and which may

3   themselves have multiple exhibits.  "Annexes" are documents or separate exhibits which we have

4   grouped collectively for the convenience of the Board.[5]

5   ## STATEMENT OF FACTS

6       Residency cases are intensively "factual" in nature, and the facts of this case were developed

7   extensively prior to and during the protest period.  Set forth below is a summary statement of facts.

8   A Chronological Statement of Facts for 1992, including citations to the evidence being submitted to

9   support such facts, is set forth separately in Annex II.

10      In mid-November of 1990, Mr. Hyatt was a guest speaker at the Comdex computer trade

11  show in Las Vegas, Nevada.  While in Las Vegas, he began exploring the Las Vegas area, looking at

12  potential houses and researching the business environment in the city.  During the visit, Mr. Hyatt

13  made the decision to move to Las Vegas permanently.

14      In the months following his return to California in November 1990, Mr. Hyatt prepared for his

15  move to Las Vegas.  He made frequent trips to Las Vegas and continued to explore the city and its

16  neighborhoods.  In spring and summer of 1991, Mr. Hyatt began packing up the possessions he

---

(Footnote continued from previous page.)

Board at this time either with a complete copy of 100% of our correspondence and documentation provided to FTB during the protest or with copies of full transcripts of all deposition and trial testimony from the *Hyatt v. FTB* tort litigation. (*See* fn. 22, *infra*.)  Instead, we have attempted to identify the most relevant documentation, *e.g.*, by attaching as exhibits only the relevant pages from deposition and trial testimony.  However, we remain willing and able at all times throughout these proceedings to provide additional information to your Board, *e.g.*, full copies of multi-day deposition and trial testimony, should your Board so request.

For several reasons, we are not providing your Board with a *separate* set of all Annexes and Exhibits for each of the 1991 and 1992 appeals, and we hereby incorporate all such exhibits and Annexes by reference into this appeal.  First, FTB's determination letter addressed the 1991 and 1992 protests together, thus blurring the facts between the two years.  While we are filing separate briefs in the 1991 appeal (Case No. 435770) and this 1992 appeal, it was necessary for us to build a "common" record for both cases for briefing purposes.  Second, these items are voluminous, and we are mindful of this Board's resources (and limited storage space).  However, should this Board wish a separate set of these items for each appeal, please let us know and we will be happy to provide additional copies.

[5] There are eight Annexes.  They are (I) 1991 Chronological Statement of Facts; (II) 1992 Chronological Statement of Facts; (III) Mr. Hyatt's 190-page, 1991 Protest Supplement Letter, dated May 31, 2001; (IV) Mr. Hyatt's 132-page, 1992 Protest Supplement Letter, dated Feb. 2, 2001; (V) The "H BATES" Documents, which were produced in the course of discovery in the *Hyatt v. FTB* tort litigation (*see* fn. 22, *infra*); (VI) the "CCC BATES" Documents, which are from the FTB audit of Mr. Hyatt; (VII) the Affidavits obtained by Mr. Hyatt; and (VIII) Mr. Hyatt's Rebuttal to the Facts presented by FTB in its Determination Letter.

---

RJN000849

1    wished to keep and gave away or disposed of items he did not wish to take with him. In preparation

2    for his move, Mr. Hyatt closed out a number of California bank accounts.

3        Mr. Hyatt told various friends, colleagues and family members about his plans to move to Las

4    Vegas. He even attempted to convince his son, Dan Hyatt, and colleague, Barry Lee, to move with

5    him, but they both declined his offer, choosing instead to remain in California. Mr. Hyatt also told

6    his colleague, Grace Jeng, about his plans to move and list his house in La Palma, California with a

7    realtor. Ms. Jeng saw Mr. Hyatt's plans as an opportunity to buy a house in a very desirable, affluent

8    Chinese community. She discussed with Mr. Hyatt the possibility of buying his house. Mr. Hyatt

9    was in favor of selling to Ms. Jeng because she was willing to purchase the house during a housing

10   slump, "as is" without any repairs and at a reduced price because Mr. Hyatt would not have to pay a

11   realtor fee.

12       In July 1991, Mr. Hyatt signed an agreement with Philips wherein Philips took on a fiduciary

13   responsibility to license a patent portfolio consisting of 23 of Mr. Hyatt's patents and to manage the

14   enforcement of this portfolio.

15       In September of 1991, Mr. Hyatt searched for a home to purchase in Las Vegas and he moved

16   to Las Vegas. He stayed first at a Las Vegas hotel for about three weeks while locating and leasing

17   an apartment and continuing to look for a home to purchase.

18       On October 1, 1991, Mr. Hyatt sold his California home to his colleague, Ms. Jeng. With the

19   guidance of two attorneys, one of whom was a real estate broker, they did not use an escrow and did

20   not record the deed at the time of the sale in order to protect Ms. Jeng's privacy. Both Mr. Hyatt and

21   Ms. Jeng signed the deed and trust agreement that had been prepared by Mr. Hyatt's attorney, making

22   Ms. Jeng the owner of the property, and Mr. Hyatt gave her the keys to the house. Mr. Hyatt did not

23   reside in this house after October 1, 1991.

24       In October 1991, Mr. Hyatt leased a Las Vegas apartment in which he resided until he

25   purchased a home, attended services at a Las Vegas synagogue, and continued to look for a home to

26   purchase in Las Vegas.

27       In November of 1991, Mr. Hyatt obtained a Nevada driver's license, registered to vote, joined

28   a Las Vegas synagogue, and continued to look for a home to purchase in Las Vegas.

RJN000850

1   Mr. Hyatt worked with several real estate agents in Las Vegas, walking through a large

2   number of residences between September of 1991 and March of 1992. He made offers, including

3   large earnest money deposits for nine different houses, including an offer he placed on December 16,

4   1991, for a home located at 7335 Tara Avenue, in Las Vegas. After a series of offers and counter-

5   offers in December through March of 1992, an offer was accepted and escrow was opened on this

6   Tara Avenue property. Escrow closed on April 3, 1992 and Mr. Hyatt moved in that day. It has been

7   more than 17 years since Mr. Hyatt moved to Las Vegas, where he still resides to this very day at his

8   Tara Avenue home.

9   <u>**ARGUMENT**</u>

10  **I.     FTB DID NOT CARRY ITS INITIAL BURDEN OF PROOF TO SUSTAIN THE**

11  **ASSESSMENT**

12  As a general principle, FTB's determination of an assessment is presumed correct and the

13  taxpayer has the burden of proving it to be wrong.[6] However, this Board recognizes that with respect

14  to any assessment determination, FTB's "initial burden is to show why its assessment is reasonable

15  and rational."[7] FTB's conduct during the course of the audit, which generated the assessment, and its

16  conduct during the protest that sustained the assessment, fall far short of "reasonable and rational."

17  Therefore FTB did not carry its initial burden of proof.

18  *The key to understanding the 1992 audit is in realizing there really was no 1992 audit.*

19  Having just concluded in the 1991 audit that Mr. Hyatt remained a California resident throughout

20  1991, FTB invested minimal resources in the 1992 audit. Auditor Cox – who was also the auditor for

21  the 1991 audit – testified she spent only 32 hours on the 1992 audit.[8] Indeed, the grand total of FTB

22  time spent on the 1992 audit of Mr. Hyatt was only 78 hours.[9] Those 78 hours of audit activity are

23  responsible for what ultimately became the December 26, 2007 Notice of Action in the total amount

24  _____

25  [6] *See, e.g., Todd v. McColgan* (1949) 89 Cal.App.2d 509, 514; *Appeal of Michael E. Myers,* 2001-SBE-001, May 31, 2001.

26  [7] *Appeal of Robert E. Wesley, et al.,* 2005-SBE-02, Nov. 15, 2005; *Todd, supra,* 89 Cal.App.2d at 514; *Appeal of Myers, supra.*

27  [8] Ex. 2, *Hyatt v. FTB,* Dist. Ct. of Clark Cty., Nevada, Case No. A382999 (hereinafter cited as "*Hyatt v. FTB*"), Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/28/08, pp. 125-126.

28  [9] Ex. 3, *Hyatt v. FTB,* Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/29/08, p. 35.

1    of $29,088,458.29 (with interest continuing to accrue after December 26, 2007[10]).  Accordingly, with

2    a few exceptions, the 1992 audit findings were merely a repetition of the 1991 findings with minimal

3    additional factual investigation or legal analysis.  As will be discussed below, where FTB *did* look at

4    the facts for 1992, they were significantly different from the facts in 1991.  Yet, in its zeal to close

5    out the 1992 audit with minimal effort, FTB then proceeded to ignore these factual differences.

6    Income tax cases are to be decided, year by year, on their own merits and their own facts, without

7    regard to other years.[11]  Clearly, this is a prime example of a situation where FTB cannot carry its

8    initial burden to show its actions in issuing the NPA for 1992 were "reasonable and rational."

9            FTB's auditor engaged in many reprehensible activities during the course of the audit that call

10   into question bad faith motives and raise doubt with regard to not only the reasonable and rational

11   nature of FTB's assessment, but the legitimacy of the assessment for the 1992 disputed period.  In

12   short, FTB's auditor performed a one-sided investigation, collecting evidence she could twist to

13   appear unfavorable to the taxpayer while ignoring and not collecting evidence that was favorable to

14   the taxpayer.  Similarly, FTB personnel intentionally delayed Mr. Hyatt's protest proceeding without

15   keeping Mr. Hyatt informed or responding to Mr. Hyatt's evidence and arguments.  There were a

16   multitude of unreasonable and irrational acts by FTB, a few of which are discussed below.

17           First, the auditor's actions were fueled by personal bias and prejudice against the taxpayer.

18   FTB's auditor openly expressed her racial bias against Mr. Hyatt and his business associates, making

19   racial epithets to a fellow FTB auditor including "I'm going to get that Jew bastard" in reference to

20   Mr. Hyatt and "Gook" in reference to Mr. Hyatt's Asian business associate, Ms. Jeng.[12]

21           Second, FTB's auditor took it upon herself to make an undocumented "stealth visit" to Mr.

22   Hyatt's home in Las Vegas *after* she had closed the 1991 audit but prior to formal commencement of

23

24

25   [10] *See* fn. 1, *supra.*

26   [11] *See Appeal of Duane H. Laude*, 76-SBE-096, Oct. 6, 1976; *Appeal of Swift & Co.*, 70-SBE-013, Apr. 7, 1970;  *Appeal of Allied Properties*, 64-SBE-026, Mar. 17, 1964.

27   [12] Ex. 4, *Hyatt v. Franchise Tax Bd.*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/23/08, p. 165; *see also* Ex. 5, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, p. 56; Ex. 6, Partial Transcript, Depo. of Candace Les, Vol. I, 1/11/00, p. 10.

28

1    the 1992 audit.[13]  Between November 27, 1995 and November 30, 1995, Mr. Hyatt's auditor, Sheila

2    Cox, and another FTB auditor, Candace Les, traveled to Las Vegas.[14]  Ms. Les needed to work on

3    five cases.[15]  Approximately ten days prior to the trip, Mr. Hyatt's auditor faxed to Ms. Les a one-

4    page sheet of "Activities Needed to be Done in Las Vegas," including an extensive list of nine

5    activities to be performed regarding Mr. Hyatt during the November 1995 Las Vegas visit.[16]  The

6    auditor planned to investigate Mr. Hyatt's former Wagon Trails apartment and his Tara home.  She

7    marked up maps of Las Vegas plotting out in her own handwriting the routes to these places.[17]

8            During the November 1995 trip to Las Vegas, the auditor indeed visited Mr. Hyatt's Tara

9    home.  In describing the auditor's activities at Mr. Hyatt's home, Ms. Les testified the auditor went

10   through a gated portion of the backyard, peered in a window of the home, opened the mailbox and

11   "look[ed] through it" and examined the contents of his garbage can.[18]  The auditor also took a

12   "trophy picture" of Ms. Les in front of Mr. Hyatt's Nevada home.[19]

13           Despite the fact the November 1995 trip was pre-planned, nowhere in the 1991 or 1992 audit

14   files is this visit by the auditor even mentioned, much less discussed.  Why not?  The audit narratives

15   and progress reports for both audits (1991 and 1992) are devoid of any discussion of a November

16   1995 trip to Las Vegas by the auditor, and do not contain any "Activities Needed to be Done in Las

17   Vegas" list generated by the auditor in preparation for the visit.[20]  Nor do the audit files contain the

18

---

19   [13] Ex. 7, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/30/08, pp. 82-83 (Mr. Hyatt's auditor, Sheila Cox, confirms the November 1995 trip to Las Vegas with FTB auditor Candace Less was after she had closed the 1991 audit of Mr. Hyatt).

20   [14] Ex. 8, *Appeal by Candace Les*, California State Personnel Board Case No. 98-1691, Partial Transcript of 11/16/98 hearing, pp. 27, 28, 34.

21   [15] *Id.* at p. 27.

22   [16] *See* Ex. 9, fax of "Activities Needed to be Done in Las Vegas," from S. Cox to C. Les, dated 11/17/95.

23   [17] *See* Ex. 4, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/23/08, pp. 176-178; *see also* Ex. 10, copy of auditor's map.

24   [18] Ex. 5, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, pp. 62-65, 85-87; *see also* Ex. 8, *Appeal by Candace Les, supra*, Partial Transcript of 11/16/98 hearing, Testimony of Candace Les, p. 35, stating "We went to the house and she was, like, acting inappropriately ...." and p. 135, stating the auditor "went through the taxpayer's trash, she went to his mailbox, she opened his mailbox, she went around to the back, she went up to the windows."

25

26   [19] Ex. 11, picture of Candace Les in front of Mr. Hyatt's Las Vegas home; *see also* Ex. 4, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/23/08, pp. 179:21 – 180: 21; Ex. 5, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, pp. 44:3-14; 62:25 – 63:5; 84:24 – 85:2; 131:12-21; 132:24 – 133:3.

27

28   [20] *See* Ex. 9, fax of "Activities Needed to be Done in Las Vegas," from S. Cox to C. Les.

---

RJN000853

1    picture of Ms. Les in front of Mr. Hyatt's Tara home. Both audit narratives (1991 and 1992) discuss

2    and rely heavily upon an earlier March 1995 visit to Las Vegas by the auditor and her activities

3    during such visit.[21] But there is no mention of the November 1995 Las Vegas visit with Ms. Les

4    eight months later. Given the auditor's extensive list of "activities needed to be done in Las Vegas,"

5    coupled with the activities described by Ms. Les,[22] it is unbelievable for this November 1995 visit to

6    Las Vegas by the auditor in pursuit of information pertaining specifically to the Hyatt audit to *not*

7    show up in either of the audit files for the 1991 or 1992 audits of Mr. Hyatt. The absence of any

8    references in the audit files to this Las Vegas visit is suspect.

9           Moreover, the impropriety of the auditor's behavior during the November 1995 Las Vegas

10   visit is inexcusable. The auditor makes a "stealth visit" to Las Vegas for a specific, pre-planned

11   "Hyatt" agenda. She looks in a citizen's mailbox, goes into his yard, goes through his garbage, and

12   looks in his windows. There is no conceivable basis for arguing this sort of conduct by a

13   representative of FTB is appropriate, or necessary, or rational, or reasonable in the scope of a

14   residency audit. The auditor was never given permission by Mr. Hyatt, whatsoever, to engage in any

15

16

17   [21] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, pp. 3, 28, 43-44 (CCC 00966, 00991, 01006 – 01007); FTB 1992 Narrative Report, pp. 6-8 (CCC 00008 – 00010)).

18   [22] FTB may claim the auditor testified in *Hyatt v. FTB* that she did not engage in any of the activities testified to by Ms.

19   Les. However, on August 6, 2008, a jury in the District Court of Clark County, Nevada, in *Hyatt v. FTB*, Case No. A382999, rendered a verdict in favor of Mr. Hyatt. Damages were awarded in Mr. Hyatt's favor in the amount of $85

20   million for intentional infliction of emotional distress, $52 million for invasion of privacy, $1.1 million for attorneys' fees expended in the administrative process ongoing in California and $250 million for punitive damages. (*See* August 31,

21   2008 Franchise Tax Board Public Litigation Roster, p. 7, http://www.ftb.ca.gov/law/litrstr/index.shtml.) This verdict controls how (seemingly) conflicting evidence from trial must be interpreted. Under Nevada law, the truth or falsity of

22   the testimony of witnesses is for the jury, "it being the exclusive judge of the credibility" of witnesses. (*Ferris v. Albrights's Courtesy Elec. Co.* (1954) 70 Nev. 528, 531, 275 P.2d 755, 756.) "It is the prerogative of the trier of fact to

23   evaluate the credibility of witnesses and determine the weight of their testimony. Where there is substantial evidence to support the findings of the trial court, [an appellate court] will affirm the judgment even though the evidence is

24   conflicting." (*Rowland v. Pepire* (1983) 99 Nev. 308, 312, 662 P.2d 1332, 1334.) (citations omitted) It is for this reason that even an appellate court is "not in a position to overturn a decision based upon the credibility of live witnesses."

25   (*Desert Valley Const. & Employees Ins. Co. of Nevada v. Hurley* (2004) 120 Nev. 499, 504, 96 P.3d 739, 743.) The case is reviewed by referring "only to the testimony most favorable to the plaintiff's theory of the case" (*Rocky Mountain*

26   *Product Trucking Co. et al. v. Johnson et al.* (1962) 78 Nev. 44, 50, 369 P.2d 198, 201) based on the judgment in the district court in favor of Mr. Hyatt. Comparable rules exist under California law. (*See* 9 WITKIN, CALIFORNIA

27   PROCEDURE § 365 at 421-24 (5th ed. 2008).) Accordingly, to the extent FTB introduces in this SBE appeal proceeding testimony evidence by Ms. Cox or other FTB witnesses in *Hyatt v. FTB* to rebut testimony evidence in *Hyatt v. FTB*

28   presented by Mr. Hyatt in this SBE appeal proceeding, we contend this Board in making its determination must refer only to the testimony most favorable to Mr. Hyatt based on the judgment in the Nevada district court in his favor.

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1992

RJN000854

1  activities on his property.[23]  In addition, the auditor's conduct, as described by Ms. Les, is a clear

2  violation of Mr. Hyatt's State and Federal Constitutional rights and of the sanctity of his home.[24]  "At

3  the risk of belaboring the obvious, private residences are places in which the individual normally

4  expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is

5  plainly one that society is prepared to recognize as justifiable."[25]  Indeed, "the 'physical entry of the

6  home is the chief evil against which the wording of the Fourth Amendment is directed.'"[26]  A central

7  principle of the Fourth Amendment is that a person may "retreat into his own home and there be free

8  from unreasonable governmental intrusion."[27]  On August 19, 2008, a Nevada jury found in favor of

9  the taxpayer in *Hyatt v. FTB* for tortious conduct, including Mr. Hyatt's invasion of privacy cause of

10  action, and awarded substantial damages, including $52 million for invasion of privacy.[28]

---

[23] The "Mission" of the FTB is to "perform in a manner warranting the highest degree of public confidence in our integrity, efficiency and fairness."  Indeed, the auditor's conduct borders on being criminal.  As stated by Ms. Les, the auditor "went to the mailbox [and] [s]he was looking through it" and the auditor took "mail out of it and [had] mail in her hand." (Ex. 5, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, pp. 62, 155.)  The auditor's actions may well constitute a federal offense, in violation of section 1708 of Title 18 of the United States Code.  In pertinent part, section 1708 provides that "[w]hoever ... attempts so to obtain, from out of any mail, ... letter box, mail receptacle, ... or other authorized depository for mail matter ... any article or thing contained therein ... [s]hall be fined under this title or imprisoned not more than five years, or both." (18 U.S.C. § 1708.)  In addition, the auditor appears to have violated Nevada state law by trespassing on Mr. Hyatt's property when "she was at his window." (Ex. 5, *Hyatt v. FTB*, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, p. 62.)  Section 206.140 of the Nevada Revised Statutes provides, in pertinent part, that "[e]very person who ... any trespass upon the grounds attached thereto [(of any building)], or any fixtures placed thereon, or any enclosure or sidewalk about the building ... shall be guilty of a public offense ... [and] in no event higher than a misdemeanor." (Nev. Rev. Stat. § 206.140.)  In addition, the auditor might have also been in violation of section 207.200 of the Nevada Revised Statutes which provides in pertinent part that "[a]ny person who, under circumstances not amounting to a burglary ... [g]oes upon the land or into any building of another with intent to vex or annoy the owner or occupant thereof ... is guilty of a misdemeanor." (Nev. Rev. Stat. § 207.200.)

[24] The Fourth Amendment gives concrete expression to a right of the people which "is basic to a free society." (*Wolf v. Colorado* (1949) 338 U.S. 25, 27.)  As such, the Fourth Amendment is enforceable against the States through the Fourteenth Amendment. (*Ker v. California* (1963) 374 U.S. 23, 30.)  A similar guarantee against unreasonable government searches is set forth in Article I, section 13, of the California Constitution. (*People v. Camacho* (2000) 23 Cal.4th 824, 830.)  "The sanctity of a private home is not only guaranteed by the Constitutions of the United States and of our own state, but it is traditional in our Anglo-Saxon heritage.  'A man's home is his castle' is, and should be, more than an empty phrase.  The Constitutions themselves point to the proper procedure to be followed in invading this precious sanctity...." (*People v. Privett* (1961) 55 Cal.2d 689, 703.)  The protection of the Fourth Amendment is not limited to a situation in which an individual is suspected of criminal behavior. (*Camara v. Mun. Ct.* (1967) 387 U.S. 523, 530.)

[25] *United States v. Karo* (1984) 468 U.S. 705, 714.

[26] *Payton v. New York* (1980) 445 U.S. 573, 585, quoting *United States v. United States Dist. Ct.* (1972) 407 U.S. 297, 313.

[27] *Silverman v. United States* (1961) 365 U.S. 505, 511.

[28] *See* fn. 22, *supra.*

---

RJN000855

1    Third, the auditor relied heavily on "secret" interview notes that were erroneously designated

2    as "affidavits" and subsequently withheld from Mr. Hyatt.[29]  These related to three estranged persons

3    (including Mr. Hyatt's ex-wife), none of whom had any actual knowledge of Mr. Hyatt's move to

4    Nevada.[30]  Mr. Hyatt made a thorough and complete response to the auditor's reliance on these

5    alleged "affidavits" during the course of the protest,[31] but FTB has made no attempt to rebut such

6    arguments.  Moreover, neither the auditor, nor the protest officer, attempted to contact for affidavits

7    or interview any of Mr. Hyatt's many non-California (including Nevada) professionals, friends,

8    colleagues or associates that he identified during the audit.

9    Fourth, FTB violated a court order when one of its audit reviewers intentionally erased the

10   electronic data on a computer hard drive with information pertinent to Mr. Hyatt's case.  On March 3,

11   1999, an Order was issued by a Nevada District Court in *Hyatt v. FTB* cautioning counsel "that there

12   is an obligation on both sides to preserve documents."[32]  Shortly after this Order was issued, one of

13   FTB's reviewers involved with Mr. Hyatt's audit intentionally erased the files on her computer hard

14   drive pertaining to Mr. Hyatt, at the request of one of her superiors within FTB.[33]  Regarding a

15   party's failure to preserve evidence, the jury in *Hyatt v. FTB* was specifically instructed as follows:

16   > Where relevant evidence that would properly be part of the case is within the
   > control of the party whose interest it would naturally be to produce it, and that
17   > party fails to produce the evidence because it failed to preserve the evidence after
   > having been put on notice of the litigation and after the evidence had been
18   > requested, the jury may draw an inference that such evidence would have been
   > unfavorable to that party.  In this action, it has been established that FTB failed to
19   > preserve electronic evidence of backup tapes for the EMC system after the
   > litigation was commenced and the evidence had been formally requested.  Under
20   > the law, you may infer that this evidence would have been unfavorable to
   > FTB.[[34]]

21

22

23

24   [29] *See* Annex IV, 1992 Protest Supplement Letter, 2/1/01, pp. 97-110.

25   [30] *Id*

26   [31] *Id*

     [32] Ex. 12, *Hyatt v. FTB*, Order on Plaintiff's Motion to Reconsider Stay of Discovery, 3/3/99.

27   [33] Partial Transcript, Depo. of Carol Ford, Vol. II, 5/5/99, pp. 262-263, 347-350, and *Hyatt v. FTB*, Partial Transcript of
     Trial Proceedings, Testimony of Carol Ford, 7/8/00, pp. 58-72, collectively Ex. 13.

28   [34] Ex. 14, *Hyatt v. FTB*, Jury Instruction No. 58.

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1992

RJN000856

1    This Board has also similarly held "that the failure of a party to introduce evidence which is

2    within [a party's] control gives rise to the presumption that, if provided, it would be unfavorable."[35]

3    The reviewer's hard drive was in FTB's exclusive control and FTB failed to preserve that evidence.

4    By failing to produce the electronic data contained therein and by instead destroying it, FTB triggered

5    the presumption that the information on the hard drive was unfavorable to FTB's position in this case

6    and thus favorable to Mr. Hyatt's.

7    Fifth, FTB again, and subsequent to the Nevada court's March 3, 1999 Order, destroyed in

8    approximately December 2002 a large amount of backup tape data from its EMC system.[36]  Jury

9    Instruction No. 58 in *Hyatt v. FTB*, set forth above, specifically instructed the jury on FTB's

10   spoliation of this data.  This was information exclusively within FTB's control that it failed to

11   preserve.  By destroying this data, we must presume the information was unfavorable to FTB's

12   position in this case and thus favorable to Mr. Hyatt's.[37]

13   Sixth, the auditor did not take adequate steps to secure the renter's file from Mr. Hyatt's Las

14   Vegas Wagon Trails apartment.  The auditor was told what the landlord required in order to obtain

15   Mr. Hyatt's renter's file, but failed to obtain the file and withheld her furtive efforts to acquire that

16   file from Mr. Hyatt even though the file was central to her case.[38]

17   Seventh, aside from FTB's indefensible audit conduct, FTB took over *ten years* to act on the

18   taxpayer's protest (filed October 10, 1997) for the 1992 disputed period.  There were literally *years at*

19   *a time* that the taxpayer received no correspondence from FTB, no indication FTB was actively

---

[35] *Appeal of Don A. Cookston*, 83-SBE-048, Jan. 3, 1983; *see also Giddio v. Comm'r* (1970) 54 T.C.1530, 1535 (internal citations omitted).

[36] Ex. 15, Partial Transcript, Depo. of Bruce Radov, 9/9/05, pp. 40-43, & Ex. 1050 to that Depo.

[37] *Appeal of Cookston, supra.*

[38] After asserting in the Narrative Report that the Wagon Trails Apartments manager "provided the rental file for examination" during the auditor's visit to Nevada in March of 1995 (Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 3 (CCC 00966)), the auditor testified at trial in *Hyatt v. FTB* that the manager of the Wagon Trails Apartments had informed her that the auditor would need to obtain Mr. Hyatt's consent *before* the manager would release Mr. Hyatt's file to her. (*See Ex. 7, Hyatt v. FTB*, Partial Transcript of Proceedings, Testimony of Sheila Cox, 5/30/08, pp. 63-64.)  However, the auditor did not obtain Mr. Hyatt's consent, nor did she "ask [Mr. Hyatt's] tax representative to provide consent," nor did she even "indicate to [Mr. Hyatt and his tax representative] [she] was interested in obtaining [Mr. Hyatt's] file." (*Id.*)  This same file is where the auditor claims to have found and reviewed Mr. Hyatt's termination notice with its alleged statement that he was moving back to California and to have found an envelope of Mr. Hyatt's that was postmarked in California and dated 12/8/91. (*See* Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 3 (CCC 00966)).

RJN000857

1    working the protest and no response to Mr. Hyatt's evidence and arguments. Despite specific and

2    repeated requests by the taxpayer to act on the protest so the taxpayer could proceed with his

3    administrative appeal, FTB took no action and continued to let the protest languish, leaving the

4    taxpayer at FTB's mercy to move the case forward. All the while, interest has continued to accrue

5    and compound at an exponential rate.

6        When FTB finally acted on the taxpayer's protest after a ten year delay, it gave the taxpayer

7    30 days to respond to its 50-page Determination Letter with "[n]o extension to the thirty day response

8    period [to] be granted." FTB's issuance of a 50-page, single-spaced Determination Letter, after

9    having ten years to consider the documentation and information submitted by the taxpayer, with a 30-

10   day response period, is particularly flagrant because of the fraud penalties, the issues of significant

11   FTB errors, and the substantial amounts of the assessments of taxes, penalties and interest.

12   Moreover, FTB made a substantive determination against the taxpayer on a California source income

13   theory, for the *first* time in the history of this case, in the Determination Letter. Indeed, as discussed

14   in more detail below, the source income issue was long ago disposed of within FTB at audit. In

15   particular, the record is replete with evidence that FTB, during the audit phase of this case,

16   specifically considered and rejected an assessment based on a California source income theory. In

17   fact, the source income issue by itself consumed 19 pages of the 50-page Determination Letter, yet

18   FTB limited Mr. Hyatt to 30 days to respond to this new issue as well as all other issues.

19       Eighth, FTB alleges facts in the Determination Letter[39] in support of its residency assessment

20   which were rebutted years ago by Mr. Hyatt at protest.[40] FTB never responded at protest to this

21   rebuttal. Aside from what was already provided (and ignored) during the protest, a complete rebuttal

22   to FTB's alleged facts in the Determination Letter is set forth separately in Annex VIII.

23       These activities engaged in by the auditor and the protest hearing personnel — the very audit

24   activities that led to the assessment and the very protest activities that led to sustaining the assessment

25   — cannot be condoned, let alone be considered "reasonable and rational." For over ten years FTB

26   has defended the reprehensible conduct of its employees toward Mr. Hyatt, both during the audit and

27   [39] *See* Ex. 1, FTB 11/1/07 Determination Letter, pp. 2-3.

28   [40] *See* Annex IV, 1992 Protest Supplement Letter, 2/2/01.

RJN000858

1  protest and in the Nevada courts in a lawsuit brought by Mr. Hyatt against FTB for tortious conduct.

2  On August 19, 2008, a Nevada jury found in favor of the taxpayer in *Hyatt v. FTB* for tortious

3  conduct, including Mr. Hyatt's fraud cause of action, and awarded substantial damages, including

4  $250 million in *punitive* damages, with a total award of $388 million to the taxpayer.[41]

5  Accordingly, FTB did not carry its initial burden in this case to show why its assessment is

6  reasonable and rational.

7  **II.   MR. HYATT WAS A NEVADA RESIDENT COMMENCING IN SEPTEMBER 1991**

8  **AND CONTINUING THROUGHOUT 1992**

9  While residency cases are intensively factual in nature, there are several legal standards under

10  which those facts are to be evaluated.  The legal analysis begins with the statute.  Section 17014(a)

11  defines "resident" to include:  (1) Every individual who is in California for other than a temporary or

12  transitory purpose; or (2) Every individual who is domiciled in California who is outside the state for

13  a temporary or transitory purpose.[42]  Any individual who is not a resident is, by process of

14  elimination, a nonresident.[43]

15  **A.   Mr. Hyatt Was Domiciled in Nevada Commencing in September 1991**

16  Domicile has been defined as the "one location with which for legal purposes a person is

17  considered to have the most settled and permanent connection, the place where he intends to remain

18  and to which, whenever he is absent, he has the intention of returning...."[44]  "Residence" and

19  "domicile" are distinct concepts for California tax purposes.  "Domicile" denotes the one location

20  with which a person has the most settled and permanent connections and where the person intends to

21  remain.

22  "Residence" denotes any factual place of abode of some permanency, that is, "more than a

23  mere temporary sojourn."[45]  A taxpayer may have several residences simultaneously for different

24

---

25  [41] *See* fn. 22, *supra.*

    [42] *See also* 18 Cal. Code of Regs. § 17014(a).

26  [43] Cal. Rev. & Tax. Code § 17015; 18 Cal. Code of Regs. § 17014(a).

    [44] *Whittell v. Franchise Tax Bd.* (1964) 231 Cal.App.2d 278, 284; *see also* 18 Cal. Code Regs. § 17014(c) (stating

27  "[a]nother definition of 'domicile' consistent with the [foregoing] is the place where an individual has fixed his habitation and

    has permanent residence without any present intention of permanently removing therefrom").

28  [45] *Whittell, supra* at 284; *Smith v. Smith* (1955) 45 Cal.2d 235, 239-240.

---

sa-57742                                    12

RJN000859

1  purposes, as well as more than one residence for tax purposes. However, a taxpayer may have only

2  one domicile at any given time.[46] A domicile cannot be lost until a new one is acquired.[47] When

3  domicile is an issue in a residency case, domicile is always decided first. For California

4  domiciliaries, the focus is upon whether the taxpayer is absent from California for a temporary or

5  transitory purpose. If so, the taxpayer is a California resident.[48] For non-California domiciliaries, the

6  focus is upon whether he/she is in California for other than a temporary or transitory purpose.[49] What

7  constitutes a "temporary or transitory purpose" under California tax law is the same in either

8  instance.

9      Once acquired, a domicile is presumed to continue until it is shown to have changed.[50] In

10  order to change domicile, this Board has required a showing that a taxpayer (1) left the state without

11  any intention of returning, and (2) was located elsewhere with the intention of remaining there

12  indefinitely.[51] In determining the taxpayer's intent, "the 'acts and declarations of the party must be

13  taken into consideration.'"[52] The burden of proof is on the party asserting the change in domicile,

14  which can be met by declarations and acts of the taxpayer.[53]

15      The California Court of Appeal recently confirmed the importance of the physical acts of the

16  taxpayer, holding: "To the extent residence and domicile depend upon intent, 'that intention is to be

17  gathered from one's acts.'"[54] The Court further stated that when "'a person actually removes to

18  another place with an intention of remaining there for an indefinite time, and as a place of present

19  domicile, it becomes his place of residence or domicile.'"[55] With specific regard to domicile, the

---

[46] *Whittell, supra* at 284.

[47] *Estate of Phillips* (1969) 269 Cal.App.2d 656, 659; *Aldabe v. Aldabe* (1962) 209 Cal.App.2d 453, 466.

[48] 18 Cal. Code of Regs. § 17014(a).

[49] 18 Cal. Code of Regs. § 17014(a).

[50] 18 Cal. Code of Regs. § 17014(c); *Murphy v. Travelers Ins. Co.* (1949) 92 Cal.App.2d 582, 587.

[51] *See Appeal of Terance and Brenda Harrison*, 85-SBE-059, June 25, 1985; *Appeal of Stephen D. Bragg*, 2003-SBE-002, May 28, 2003; *DeMiglio v. Mashore* (1992) 4 Cal.App.4th 1260, 1268 (holding that domicile was changed when taxpayer moved to new residence).

[52] *Appeal of Joe and Gloria Morgan*, 85-SBE-078, July 30, 1985; *see also Appeal of Harrison, supra*, (stating "[i]t is the 'intent' of the person that determines domicile"); *Chapman v. Superior Court* (1958) 162 Cal.App.2d 421, 426; *Estate of Phillips* (1969) 269 Cal.App.2d 656, 659.

[53] *Appeal of Raymond H. and Margaret R. Berner*, 2001-SBE-006-A, Aug. 1, 2002.

[54] *Noble v. Franchise Tax Bd.* (2004) 118 Cal.App.4th 560, 567-568, quoting *Chapman, supra*, 162 Cal.App.2d at 426.

[55] *Id.* at 568, quoting *Estate of Weed* (1898) 120 Cal. 634, 639.

---

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1992

RJN000860

1    Court stated that "'our courts have held that two elements are indispensable to accomplishing a

2    change of domicile: actual residence in the new locality plus the intent to remain there.'"[56]

3          Thus, a taxpayer's intent is the most important factor in determining domicile. After several

4    visits to Las Vegas and nearly a year of preparation, Mr. Hyatt moved to Nevada on September 26,

5    1991 with the intent to remain there indefinitely and he has resided in Las Vegas since then (more

6    than 17 years) with no intent to leave. Mr. Hyatt's acts reflect this intent, including lease of an

7    apartment in Las Vegas;[57] intense efforts to purchase a home in Las Vegas;[58] arrangements to sell his

8    only California residence;[59] the sale of his only California residence;[60] many discussions with friends,

9    family members and colleagues regarding his move to Nevada and becoming established there;[61]

10    Nevada voter registration;[62] obtaining a Nevada driver's license;[63] joining a Las Vegas synagogue;[64]

---

[56] *Id.*, quoting *DeMiglio v. Mashore*, *supra*, 4 Cal.App.4th at 1268.

[57] Annex I, 1991 Chronological Statement of Facts, p. 22; Annex V, H Bates Documents (Wagon Trails Rental Agreement (H 01249 – 01252)); Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 19, Affidavit of Gilbert P. Hyatt, 5/18/01, ¶ 6; Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶ 12; Ex. 26, Affidavit of Barry Lee, 4/26/01, ¶ 7).

[58] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 19, Affidavit of Gilbert P. Hyatt, 5/18/01, ¶¶ 3, 6, 25; Ex. 30, Declaration of Robert Schulman, 3/16/96, ¶ 3); Annex V, H BATES Documents (Multiple Listing Service printout dated 12/10/91 (H 013696 – 013698); notes by Mr. Hyatt dated 12/11/91 (H 013694)); Annexes V and VI, H BATES and CCC BATES Documents (Check No. 111 dated 12/12/91 (CCC 02246); Purchase Agreement and Earnest Money Receipt dated 12/12/91 (H 020249 – 020253); Check no. 113 dated 12/12/91 (CCC 02248); Purchase Agreement and Earnest Money Receipt dated 2/3/92 (P05653-P05475).

[59] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 19, Affidavit of Gilbert P. Hyatt, 5/18/01, ¶¶ 20, 21, 23, 24; Ex. 27, Affidavit of Roger McCaffrey, 1/22/01, ¶¶ 3, 4, 7-11; Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶ 4-13; Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶¶ 3-7).

[60] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 19, Affidavit of Gilbert P. Hyatt, 5/18/01, ¶¶ 20, 21, 23, 24; Ex. 27, Affidavit of Roger McCaffrey, 1/22/01, ¶¶ 3, 4, 7-11; Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶ 4-13; Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶¶ 3-7; Ex. 26, Affidavit of Barry Lee, 4/26/01, ¶¶ 5, 8; Ex. 1, Affidavit of Caroline Cosgrove, 1/2/01, ¶ 9); and Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, pp. 17, 65 (CCC 00980, CCC 01029)).

[61] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 3; Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶¶ 3, 11, 12; Ex. 26, Affidavit of Barry Lee, 4/26/01, ¶¶ 3, 4; Ex. 1, Affidavit of Caroline Cosgrove, 1/2/01, ¶ 3; Ex. 17, Affidavit of Daniel J. Hyatt, 5/1/01, ¶ 5; Ex. 9, Affidavit of Irene Gorman, 12/29/06, ¶¶ 3, 5; Ex. 6, Affidavit of Hyman Farber, 12/28/06, ¶¶ 5, 6, 9; Ex. 10, Affidavit of Saul Gorman, 12/29/06, ¶¶ 4, 5; Ex. 7, Affidavit of Yetta Farber, 12/28/06, ¶¶ 5, 7, 9; Ex. 33, Affidavit of Nate Warnick, 2/27/07, ¶¶ 5, 6; Ex. 34, Affidavit of Yettie Warnick, 2/27/07, ¶¶ 5, 6; Ex. 11, Affidavit of Morton Haber, 3/13/07, ¶¶ 3, 5; Ex. 32, Affidavit of Rosalie Traumueller, 8/30/08, ¶ 3; Ex. 35, Affidavit of Harry Widdifield, 9/25/08, ¶¶ 7-9; Ex. 24, Affidavit of John Keller, 10/24/08, ¶ 4-10; Ex. 14, Affidavit of Henry Huey, 11/23/08, ¶¶ 6, 8, 10-15; Ex. 16, Affidavit of R. Danny Huntington, 10/14/08, ¶¶ 5, 10, 11).

[62] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 5 (CCC 00968)); Annex V, H BATES Documents (Clark County Voter Information (H 01272)).

[63] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 6 (CCC 00969)); Annexes V and VI, H BATES and CCC BATES Documents (Nevada driver's license records (CCC 01255); (H 013620 – 013622, H 013625)).

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1992

RJN000861

1  business trips that originated and terminated in Las Vegas;[65] purchasing furniture in Las Vegas for his

2  apartment;[66] completing change of address forms with the US Postal Service to reflect his new Las

3  Vegas address;[67] opening multiple Nevada utility accounts;[68] creating Las Vegas bank relationships;[69]

4  purchasing a new car from a Las Vegas dealer;[70] employing Las Vegas professionals;[71] purchasing a

5  Nevada home;[72] and insuring the new car and the Nevada home with a Las Vegas insurance agent.[73]

6      Mr. Hyatt had the intent not to return to his former place of domicile (California) for any

7  permanent purpose. That intent was coupled with the intent to remain indefinitely in the new location

8  (Nevada). The notion of intent is satisfied not only by Mr. Hyatt's own "acts and declarations",[74] but

9  also by the corroborating statements and acts of others and by the fact that he remains a Nevada

10 resident today − over 17 years later.

11

12

13 (Footnote continued from previous page.)

14 [64] Annex I, 1991 Chronological Statement of Facts, p. 38; Annex VI, CCC BATES Documents (Canceled Check No. 108 dated 11/15/91 (CCC 02623 − 02624)); Annex V, H BATES Documents (Congregation Ner Tamid envelope (H 09679)); Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 16).

15 [65] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, pp. 56-63 (CCC 01020 − 01027); E. Cowan 9/22/95

16 letter to FTB, p. 5 (CCC 02200); travel documentation (CCC 02276 − 02286)).

   [66] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 21, Affidavit of Grace J. Jeng, 5/18/01, ¶ 12).

17 [67] Annex VI, CCC BATES Documents (Change of Address Order dated 10/21/91 (CCC 02418; Change of Address

18 Order dated 10/21/91 (CCC 02419)).

   [68] Annex VI, CCC BATES Documents (FTB Analysis of Utilities (CCC 03164 − 03166)); Annex V, H BATES

19 Documents (payment for service made subsequent to 10/22/91 opening of account by Canceled Check Nos. 88 dated

20 11/1/91 and 103 dated 11/27/91 (H 013632, H 013635); Mr. Hyatt's Las Vegas mailing address imprinted on the checks (H 013632, H 013635); payment for service made subsequent to 10/21/91 opening of account by Canceled Check No. 87 dated 11/1/91 (H 013635)).

21 [69] Annex V, H BATES Documents (CalFed Bank Statements beginning at (H 013362); Application at (H 012348); and

22 The Benham Group Statements beginning at (H 012393)); Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, pp. 6 − 30 (CCC 00969, 00993)).

23 [70] See Annex VI, CCC BATES Documents (FTB 1992 Narrative Report, p. 10 (CCC 00012)).

   [71] See Annex IV, 1992 Protest Supplement Letter, 2/2/01, pp. 51-57.

24 [72] See Annex VI, CCC BATES Documents (FTB 1992 Narrative Report, p. 7 (CCC 00009); S. Cox Ltr. to E. Cowan

   dated 4/1/96, p. 1 (CCC 00094)).

25 [73] See Annex V, H BATES Documents (State Farm Insurance Application (H 013593); Temporary Motor Vehicle

26 Liability Card dated 3/20/92 (H 07067); State Farm Insurance quotes (H 09724 − 09729); State Farm Insurance Declarations Page and Renewal Notice (H 013599 − 013600); State Farm Insurance refund check due to rating information received (H 013597); Insurance Declaration Page (H 09749)); Ex. 17, State Farm insurance form dated

27 3/31/92; see also Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 15, Affidavit of Robert Huddleston, 11/4/08, ¶¶ 7, 18, 20).

28 [74] Morgan, supra.

RJN000862

1    **B.    Mr. Hyatt Left California in September 1991 for Other Than Temporary or Transitory Purposes**

2

3    Another aspect of California's definition of residency is whether the taxpayer left his/her state

4    of domicile for "other than a temporary or transitory purpose."[75]  Although in every instance the

5    determination of this purpose "will depend to a large extent upon the facts and circumstances of each

6    particular case,"[76] this Board has articulated two tests to apply to such determinations:  the "close

7    connections" test, and the "identifiable purpose" test.  Throughout the 1992 disputed period, Mr.

8    Hyatt consistently returned to Nevada following his business trips, vacation trips and health-related

9    trips to Virginia, New York and California.  He has shown, through affidavits and documentary

10   evidence, that he intended to and did make Nevada his permanent home with no intention of

11   returning to California, except for temporary and transitory purposes.

12   **C.    Mr. Hyatt's Contacts with Nevada Satisfy the Close Connections Test**

13   FTB Regulation 17014(b) states that "[t]he underlying theory of sections 17014-17016 is that

14   the state with which the person has the closest connection during the taxable year is the state of his

15   residence."  This test focuses upon the contacts that the taxpayer has with his/her new place of abode.

16   While the facts and circumstances peculiar to each case must be taken into consideration, there are a

17   number of factors traditionally examined by this Board in the "close connections" analysis.[77]  In

18   *Appeal of Stephen D. Bragg*, 2003-SBE-002, May 28, 2000 (hereafter *Bragg*), this Board compiled

19   the following list of objective factors that identifies the type and nature of connections this Board

20   commonly finds informative when determining residency:[78]

21

22   ───────────────

[75] 18 Cal. Code of Regs. § 17014(a).

23   [76] *Id.* at § 17014(b).

24   [77] This Board has issued nearly 200 memorandum opinions since 1942 in cases where residency was at issue. (*See* http://boe.ca.gov/legal/legalindexR.htm#residency.)

25   [78] Since *Bragg*, this Board has issued at least nine Letter Decisions in which this Board referenced the *Bragg* factors in the "Applicable Law" section of the corresponding Hearing Summary.  (*See e.g.*, *Appeal of David W. Sanders, et al.*, SBE

26   400374, Aug. 19, 2008; *Appeal of James F. and Diane Montgomery*, SBE 309423, Aug. 21, 2008; *Appeal of Robert and Maureen Fouts*, SBE 383284, May 19, 2008; *Appeal of Kenneth Banks*, SBE 327922, Apr. 9, 2008; *Appeal of Gregory B.*

27   *Duro*, SBE 354992, Feb. 28, 2008; *Appeal of Larry and Rhoda Geisel*, SBE 358724, June 25, 2007; *Appeal of William F. and Susan J. Grun*, SBE 337066, June 25, 2007; *Appeal of Brian K. Shaw*, SBE 341954, Mar. 1, 2007; *Appeal of James*

28   *and Jean A. Bagley*, SBE 217274; Feb. 1, 2006.)

RJN000863

- The location of all of the taxpayer's residential real property, and the approximate sizes and values of each of the residences;
- The state wherein the taxpayer's spouse and children reside;
- The state wherein the taxpayer's children attend school;
- The state wherein the taxpayer claims the homeowner's property tax exemption on a residence;
- The taxpayer's telephone records (i.e., the origination point of taxpayer's telephone calls);
- The number of days the taxpayer spends in California versus the number of days the taxpayer spends in other states, and the general purpose of such days (i.e., vacation, business, etc.);
- The location where the taxpayer files his tax returns, both federal and state, and the state of residence claimed by the taxpayer on such returns;
- The location of the taxpayer's bank and savings accounts;
- The origination point of the taxpayer's checking account transactions and credit card transactions;
- The state wherein the taxpayer maintains memberships in social, religious, and professional organizations;
- The state wherein the taxpayer registers his automobiles;
- The state wherein the taxpayer maintains a driver's license;
- The state wherein the taxpayer maintains voter registration, and the taxpayer's voting participation history;
- The state wherein the taxpayer obtains professional services, such as doctors, dentists, accountants, and attorneys;
- The state wherein the taxpayer is employed;
- The state wherein the taxpayer maintains or owns business interests;
- The state wherein the taxpayer holds a professional license or licenses;
- The state wherein the taxpayer owns investment real property; and
- The indications in affidavits from various individuals discussing the taxpayer's residency.

The weight given to any particular factor "depends upon the totality of the circumstances" and the focus of the examination is "to determine where an individual is present for other than a temporary or transitory purpose, not whether or not an individual satisfies a majority, or even a significant number, of the factors."[79] Based on an analysis of the *Bragg* factors, Mr. Hyatt's closest connections were with Nevada during the 1992 disputed period and his visits to California were clearly for temporary and transitory purposes.

**1. The location of all of the taxpayer's residential real property, and the approximate sizes and values of each of the residences**

The location of a taxpayer's principal residence is perhaps the most important factor in determining the residency of such taxpayer.[80] Ownership of a family home in California during an absence from the State is usually treated as a significant indication that the taxpayer intends to return to California and that the purpose of the taxpayer's absence is temporary or transitory. A taxpayer's failure to purchase a home in another location outside the state gives retention of the California home even greater importance as an indicator of California residency.[81] Here, Mr. Hyatt did not own a home in California for any portion of the 1992 disputed period (and for only five days of the 1991 disputed period); he actively shopped for a home to purchase in Las Vegas prior to and while living in a hotel and an apartment in Las Vegas (both of which served as his home) during all of the 1991 and 1992 disputed periods; and he purchased a home in Las Vegas in April 1992 which he still owns more than 16 years later. Mr. Hyatt's only residence has been in Las Vegas since September 1991 and continues to be in Las Vegas to this very day more than 17 years later.

Prior to 1991, and while a resident of California, Mr. Hyatt purchased a home located at 7841 Jennifer Circle, La Palma, California. This La Palma house remained Mr. Hyatt's principal residence prior to his move to Nevada in September 1991. Mr. Hyatt owned no other houses in California during the 1980's and 1990's or thereafter. After much planning and preparation,[82] on October 1,

---

[79] *Bragg, supra.*

[80] *See Appeal of Odis L. and Lois N. Dobbs*, 87-SBE-044, June 17, 1987; *Appeal of Berner, supra.*

[81] *Appeal of Pierre E. G. and Nicole Salinger*, 80-SBE-080, June 30, 1980; *Appeal of David C. and Livia P. Wensley*, 81-SBE-147, Oct. 7, 1981.

[82] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶ 3-11).

RJN000865

1  1991 Mr. Hyatt sold his former La Palma house to his business colleague, Ms. Jeng.[83]  Ms. Jeng still

2  owns the La Palma house to this day.[84]  Mr. Hyatt's sale of the La Palma house in October 1991 has

3  been well documented at pages 41-47 of Appellant's Opening Brief for Taxable Year 1991 (Case No.

4  435770); that discussion will not be repeated here and is incorporated by reference as if set forth fully

5  herein.

6      As also documented at pages 48-54 of Appellant's Opening Brief for Taxable Year 1991

7  (Case No. 435770), after moving to Las Vegas on September 26, 1991, Mr. Hyatt first stayed for a

8  short period of time at the Continental Hotel in Las Vegas and then subsequently leased an apartment

9  at the Wagon Trails Apartments.  On October 8, 1991, Mr. Hyatt executed a Rental Agreement to

10  secure the rental and lease of apartment #237 at 3225 South Pecos Road in Las Vegas.[85]  Beginning

11  October 21, 1991, Mr. Hyatt lived in apartment #237, while he continued to shop for a home to

12  purchase in Las Vegas.[86]

13      Even prior to his move to Nevada, Mr. Hyatt had made plans to lease a Las Vegas apartment

14  and to carefully investigate Las Vegas to purchase a home.[87]  Prior to and after his move to Las

15  Vegas in September 1991, Mr. Hyatt met with various Las Vegas realtors to assist him in purchasing

16  a home in Nevada.[88]  Mr. Hyatt toured many Nevada homes that were for sale before and after his

17  move to Las Vegas.  He made various formal offers on Nevada homes with large cash deposits

18  beginning in December 1991.[89]  On December 16, 1991, Mr. Hyatt made his first offer to purchase a

---

19  [83] See Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, pp. 17, 65 (CCC 00980, CCC 01029)).

20  [84] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 2, Affidavit of Grace J. Jeng, 12/4/08, ¶ 16).

21  [85] See Annex I, 1991 Chronological Statement of Facts, p. 22; Annex V, H Bates Documents (Wagon Trails Rental Agreement (H 01249 – 01252)).

22  [86] See Annex I, 1991 Chronological Statement of Facts, p. 25 (Ex. 25, Wagon Trails Apartment Security Acknowledgement and Release dated 10/21/91); see also Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 42; Ex. 14, Affidavit of Henry Huey, 11/23/08, ¶ 12, stating "[n]ear the end of October 1991, I traveled to Las Vegas to attend the 1991 Comdex show [and] I visited Gil at his apartment a few days after the Comdex show opened…").

24  [87] See Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 2, Affidavit of Caroline Cosgrove, 11/24/08, ¶ 1).

25  [88] See Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 31, Affidavit of Walter Shoemaker, 7/22/98, ¶¶ 4, 5, 8, 10); see also Annex V, H BATES Documents (Home flyer and Multiple Listing Service printout dated 9/25/91 for the Viking property (H 016665 – 016666)).

27  [89] FTB does not dispute the fact that Mr. Hyatt made offers to buy at least eight different Las Vegas properties starting in December 1991. (Ex. 1, FTB 11/1/07 Determination Letter, p. 17.)  For the convenience of the Board, we have created a table with citations to the record with each of Mr. Hyatt's home offers on Las Vegas properties during the 1991 (and 1992) disputed period.  (See Ex. 18.)

RJN000866

1  residence located at 7335 Tara Avenue in Las Vegas.[90]  After counter offers and counter counter

2  offers, on March 16, 1992, Mr. Hyatt made a successful offer to purchase this same Tara Avenue

3  property and opened a short escrow with Minnesota Title, located in Las Vegas, on that same date.[91]

4  On April 3, 1992, Mr. Hyatt closed escrow on the Tara Avenue residence, [92] and on April 3, 1992, he

5  moved in.

6       In summary, by September 26, 1991, Mr. Hyatt permanently resided in Nevada.  He first

7  stayed at the Continental Hotel starting September 26 and subsequently lived in a leased apartment in

8  Las Vegas starting October 21, 1991 and continuously searched for a home to purchase.  He made his

9  first offer to purchase the Tara Avenue property on December 16, 1991, and he did purchase and still

10  owns this home.  Nothing in the record below disproves the fact that Mr. Hyatt's Nevada apartment

11  was his primary residence during the 1992 disputed period prior to his April 3, 1992 purchase of his

12  Tara Avenue residence in Las Vegas.  The fact Mr. Hyatt's principal residence was in Nevada during

13  the disputed period, and the fact Mr. Hyatt had no residence at all, certainly not a principal residence,

14  and owned no real property in California during the disputed period, shows a substantial connection

15  to Nevada.

16          **2.     The state wherein the taxpayer's spouse and children reside**

17          **3.     The state wherein the taxpayer's children attend school**

18       For years prior to Mr. Hyatt's move to Nevada and for all years since his move to Nevada,

19  Mr. Hyatt was and is divorced and lived and still lives alone.  His home was and is his personal home,

20  without a family living with him.  At the time of Mr. Hyatt's move to Nevada in September 1991,

21  Mr. Hyatt had no minor children and neither of his two adult children lived with him for many years

22  prior to or after his move to Nevada.  A proper analysis focuses upon "dependents",[93] which in this

23  case would mean any minor children located in California for which Mr. Hyatt had custody or

24

25  ---

26  [90] *See* Annex I, 1991 Chronological Statement of Facts, p. 50 (Ex. 46, 12/16/91 Tara Property Offer and Acceptance Agreement and Earnest Money Receipt).

27  [91] *See* Ex. 20, Documentation relating to Mr. Hyatt's purchase of the Tara Avenue Property.

   [92] Ex. 21, Tara escrow closing statement.

28  [93] *Appeal of Richard W. Vohs*, 73-SBE-055, Sept. 17, 1973.

RJN000867

1  control.[94]  Indeed, the FTB Residency Audit Training Manual states: "The auditor should determine

2  where the *minor* children lived, whether they accompanied the taxpayer, and where they are enrolled

3  in school."[95]  Mr. Hyatt lived alone and had no dependents to care for.  Therefore, these two factors

4  do not apply.

5           **4.       The state wherein the taxpayer claims the homeowner's property tax
                        exemption on a residence**

7           Mr. Hyatt terminated the homeowner's exemption on his former California house

8  approximately four months after he sold the house to Ms. Jeng.  However, on the termination notice

9  submitted to the Orange County Assessor's office, Mr. Hyatt specifically noted the La Palma house

10 was not his principal place of residence, and therefore he did not qualify for the homeowner's

11 property tax exemption because he had moved from the house in "Oct. 1991."[96]  The Notice stated

12 that Mr. Hyatt "did not occupy the property as my principal place of residence as of 12:01 A.M.,

13 March 1, 1992" because he had moved from the La Palma house in "Oct. 1991."[97]

14         Mr. Hyatt's termination of the homeowner's exemption was timely.  In the early part of

15 February 1992, Mr. Hyatt was notified by his real estate attorney, Del Bailey, that he should

16 terminate the homeowner's exemption on his former La Palma property.  Mr. Bailey told Mr. Hyatt

17 that Mr. Hyatt had until December 10, 1992 to terminate the homeowner's exemption, but that Mr.

18 Hyatt should do it sooner than later.  Mr. Bailey provided Mr. Hyatt with a form to fill out.  Mr. Hyatt

19 was scheduled to check into the hospital on February 11, 1992 for major surgery for colon cancer the

20 following day, so he hastily filled out the form.[98]

---

25 [94] *See Appeal of Robert E. Harding,* 86-SBE-017, Feb. 4, 1986; and *Appeal of Tommy H. and Leila J. Thomas,* 83-SBE-096, Apr. 5, 1983.

26 [95] Ex. 22, FTB Residency Audit Training Manual (Rev. 10/93), pp. 47-48, emphasis added.

27 [96] *See* Annex II, 1992 Chronological Statement of Facts, p. 6  (Ex. 11, Homeowners' Exemption Termination Notice).
   [97] *Id.*

28 [98] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 34).

RJN000868

1  **5.    The taxpayer's telephone records (*i.e.*, the origination point of taxpayer's
2         telephone calls)**

3      Mr. Hyatt's only personal telephone service during the 1992 disputed period was a land line at

4  his apartment in Las Vegas.[99]  On October 22, 1991, Mr. Hyatt opened an account with Centel for

5  telephone service at his apartment at 3225 South Pecos Road, #237, Las Vegas, Nevada.[100]  FTB

6  found that during the 1992 disputed period, Mr. Hyatt regularly paid Nevada telephone and utility

7  bills (but did not pay a single California utility bill or telephone bill).[101]  Accordingly, the origination

8  point of Mr. Hyatt's telephone calls was always Nevada.

9  **6.    The number of days the taxpayer spends in California versus the number
         of days the taxpayer spends in other states, and the general purpose of
10        such days (*i.e.*, vacation, business, etc.)**

11     Mr. Hyatt spent the VAST majority of his days during the 1992 disputed period in Nevada

12 and additional days traveling outside Nevada (and California).  The taxpayer's February 2, 2001

13 Protest Supplement Letter provides a thorough physical presence analysis based on the auditor's

14 original physical presence findings,[102] and that analysis will not be repeated here.  Based on that

15 analysis, the "Nevada" versus "California" day count shows Mr. Hyatt spent more time in Nevada

16 than California.  The day count, exclusive of temporary or transitory visits, reads:[103]

17      •    January 1992:      0 California days
18                            9 Nevada days

19      •    February 1992:     0 California days
20                            7 Nevada days

21      •    March 1992:        0 California days
                              20 Nevada days
22

23

24

---

25 [99] Mr. Hyatt did not own a cell phone during the 1992 disputed period.

26 [100] *See, e.g.,* Annex V, H BATES Documents (payment for service made subsequent to 10/22/91 opening of account by
   canceled check numbers 88 dated 11/1/91 and 103 dated 11/27/91 (H 013632, H 013635)).

27 [101] *See* Annex VI, CCC BATES Documents (FTB Analysis of Utilities (CCC 03164 – 03166)).

   [102] *See* Annex IV, 1992 Protest Supplement Letter, 2/2/01, pp. 31-39.

28 [103] Annex IV, 1992 Protest Supplement Letter, 2/2/01, p. 39.

1    • April 1-2, 1992:[104]  0 California days
2                                      2 Nevada days

3    FTB's Determination Letter makes no attempt to refute or address the taxpayer's physical

4    presence analysis. Accordingly, we contend the above day counts are not disputed by FTB.[105]

5    In addition to the foregoing, the Nevada day counts above can now be increased based on new

6    evidence gathered in direct response to the Determination Letter. Mr. Hyatt has obtained numerous

7    new affidavits to rebut the assertions and allegations made in the Determination Letter. Based on

8    these affidavits, the Nevada day counts for specific days have increased as follows:

9    • January 1992:     13 Nevada days[106]

10   • February 1992:     7 Nevada days

11   • March 1992:       24 Nevada days[107]

12

---

13   [104] FTB concedes Mr. Hyatt was a Nevada resident as of April 3, 1992. (*See* Annex VI, CCC BATES Documents (Letter from S. Cox to E. Cowan dated 4/1/96, p. 1 (CCC 00094); FTB 1992 Narrative Report, p. 7 (CCC 00009)).) Accordingly, we have revised the April day count analysis to only include the first two days of April.

15   [105] Subsequent to the submission of the 1992 Protest Supplement Letter on February 2, 2001, Mr. Hyatt located additional information to verify the above Nevada day counts. However, in view of the fact FTB never disputed these days at protest, we will defer providing this additional information. We can provide this information upon request.

16   [106] The 13 Nevada days in January consist of the 9 days already established in the 1992 Protest Supplement Letter (*see* fn. 102, *supra*) and 4 additional days. The additional 4 days are as follows: (1) on January 2, 1992, Mr. McCaffrey telephoned Mr. Hyatt at Mr. Hyatt's home in Las Vegas and spoke with him regarding Mr. Hyatt's declaration of extraordinary services (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 31)); (2) on January 3, 1992, Mr. McCaffrey telephoned Mr. Hyatt at Mr. Hyatt's home in Las Vegas and spoke with him regarding an estate matter (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 32)); (3) on January 5, 1992, Mr. McCaffrey telephoned Mr. Hyatt at Mr. Hyatt's home in Las Vegas and spoke with him regarding a draft petition for sanctions (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 33)); and (4) on January 18, 1992, Mr. Hyatt visited Mr. Huddleston at Mr. Huddleston's office and Mr. Hyatt dropped off a couple of checks for his insurance policies (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 15, Affidavit of Robert Huddleston, 11/4/08, ¶ 2).

22   [107] The 24 Nevada days in March consist of the 20 days already established in the 1992 Protest Supplement Letter (*see* fn. 102, *supra*) and 4 additional days. The additional 4 days are as follows: (1) on March 11, 1992, Mr. Cowan telephoned Mr. Hyatt at Mr. Hyatt's home in Las Vegas and spoke with him regarding the preparation of Mr. Hyatt's 1991 tax returns (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 4, Affidavit of Eugene Cowan, 11/14/08, ¶ 28)); (2) on March 22, 1992, Mr. Hyatt visited Mr. Huddleston at Mr. Huddleston's office and paid for an insurance policy by a check to State Farm Insurance Company (Annex V, H BATES Documents (canceled check No. 228 dated 03/22/92 (H 00630 – 00631)); Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 15, Affidavit of Robert Huddleston, 11/4/08, ¶ 19)); (3) on March 23, 1992, Mr. McCaffrey telephoned Mr. Hyatt at Mr. Hyatt's home in Las Vegas and spoke with him regarding a patent matter and Mr. Cowan telephoned Mr. Hyatt at Mr. Hyatt's home in Las Vegas and spoke with him regarding Mr. Hyatt's 1991 tax returns (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 37); Ex. 4, Affidavit of Eugene Cowan, 11/14/08, ¶ 31)); and (4) on March 27, 1992, Mr. Glassman telephoned Mr. Hyatt at Mr. Hyatt's home in Las Vegas and spoke with him regarding a trust agreement (Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 8, Affidavit of Jeffrey Glassman, 11/18/08, ¶ 12)).

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1992

RJN000870

- April 1-2, 1992:     2 Nevada days

In addition to the above specific days, the affidavits further establish large ranges of continuous and systematic contacts that Mr. Hyatt had in Nevada. These contacts elaborate and expand upon the specified day counts discussed above. These contacts are significant, including approximately 33 contacts in January, 33 contacts in February, and 64 contacts in March. For example, Mr. Hyatt's girlfriend, Ms. Cosgrove, testified that she telephoned him several times a week at his Las Vegas apartment for two months of the 1992 disputed period.[108] The support for these Nevada contacts is provided in the summary table entitled "Table of Contacts with Mr. Hyatt in Nevada."[109]

### 7. The location where the taxpayer files his tax returns, both federal and state, and the state of residence claimed by the taxpayer on such returns

As a nonresident for all of 1992, and not having any California source income, Mr. Hyatt did not file a California personal income tax return for 1992. At the time his 1991 state and federal returns were filed on April 13, 1992, Mr. Hyatt had recently moved from his Wagon Trails apartment to his new home on Tara Avenue in Las Vegas. Both the 1991 state and federal returns filed in 1992 reflected Mr. Hyatt's post office box mailing address in Las Vegas. The California Schedule SI attached to Mr. Hyatt's 1991 California return reflected the fact he lived in California during 1991 for the first 273 days of the year and that he was a resident of "Nevada" for the balance of 1991.

Not only was Nevada the location where Mr. Hyatt filed his tax returns and the state of residence claimed by Mr. Hyatt on his 1991 part-year resident return filed on April 13, 1992, Nevada is also the location where Mr. Hyatt routinely received his mail. Between January 1992 and April 3, 1992, and thereafter, Mr. Hyatt routinely received his correspondence at either his Nevada apartment or his Nevada P.O. box address.[110] The taxpayer's February 2, 2001 Protest Supplement Letter provides a thorough mailing address analysis for the disputed period,[111] and that analysis will not be

---

[108] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 2, Affidavit of Caroline Cosgrove, 11/24/08, ¶ 10).

[109] See Ex. 23, Table of Contacts with Mr. Hyatt in Nevada.

[110] See Annex IV, 1992 Protest Supplement Letter, 2/2/01, pp. 48-51; see also Annex V, H BATES Documents (correspondence (H 04735 – 04747, 06891-06907, 07405-07478)).

[111] See Annex IV, 1992 Protest Supplement Letter, 2/2/01, pp. 48-51.

RJN000871

repeated here. FTB's Determination Letter makes no attempt to refute or address Mr. Hyatt's use of his Nevada mailing addresses. Accordingly, Mr. Hyatt's use of Nevada mailing addresses shows a stronger connection to Nevada during the disputed period.

### 8. The location of the taxpayer's bank and savings accounts

Consistent with the intention to live permanently in Nevada, Mr. Hyatt acquired multiple financial accounts in Nevada and notified his California bank that he had changed his address to Las Vegas. On October 25, 1991, Mr. Hyatt opened a checking account in Las Vegas and maintained it throughout the 1992 disputed period.[112] In addition, Mr. Hyatt opened and maintained three additional bank accounts in Las Vegas which he opened on or about November 22, 1991, December 12, 1991, and January 27, 1992, respectively.[113] In contrast, Mr. Hyatt did not open any California bank accounts during the 1992 disputed period, and he closed multiple California bank accounts in 1991 in anticipation of his move to Nevada and well before the 1992 disputed period.[114] FTB's Determination Letter states that Mr. Hyatt "closed his California checking account on June 11, 1991 [before his move] and opened a Nevada checking account on October 25, 1991 [shortly after his move]".[115]

FTB states in the Determination Letter the only California accounts that remained opened were the "October 1991 were investment accounts" and Mr. Hyatt "did not use them except for the Franklin Federal Money Fund account."[116] FTB contends that while the Franklin account is "an investment account and is not a checking account, Hyatt drew drafts on the account to pay for some of his living expenses and for some major business expenses."[117]

As explained in great detail in Appellant's Opening Brief for Taxable Year 1991 (Case No. 435770) at pages 25-27, as well as in great detail in the taxpayer's May 31, 2001 Protest Supplement

---

[112] *See* Annex V, H BATES Documents (bank statements beginning at (H 013362)).

[113] *See* Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 6 (CCC 00969)).

[114] In June 1991, Mr. Hyatt closed *five* California bank accounts in preparation for his move to Las Vegas. (Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 48-49.)

[115] *See also* Ex. 1, FTB 11/1/07 Determination Letter, p. 15.

[116] *Id.*

[117] *Id.*

RJN000872

1   Letter for 1991,[118] the Franklin account is not an indicia of California residency. It is not a bank

2   account. The Franklin Federal Money Fund is a "no-load, open-end, diversified management

3   investment company" commonly known as a mutual fund, "incorporated under the laws of the state

4   of California on April 8, 1980."[119] FTB makes no specific claims in the Determination Letter

5   regarding the importance to Mr. Hyatt of the Franklin account, but infers it was significant. Any such

6   inference is unwarranted. The account was virtually inactive, the only activity was withdrawals – no

7   deposits – and the withdrawals were dominated by transfers to Mr. Hyatt's Federated account, which

8   was opened from Nevada using his Las Vegas residence and address.[120]

9       Accordingly, the fact Mr. Hyatt opened multiple new bank accounts in Nevada in 1991 and

10   closed multiple California bank accounts in 1991, and opened no new accounts in California during

11   the 1992 disputed period, shows a stronger connection to Nevada.

     **9.    The origination point of the taxpayer's checking account transactions and credit card transactions**

14       While FTB did perform an analysis of credit card transactions for the 1991 disputed period,

15   no such analysis was performed by FTB for the 1992 disputed period.[121]

16       Regarding checking account transactions, even FTB's *own* "relativity analysis" of the number

17   of checks written on Nevada versus California bank accounts during the disputed period shows

18   Nevada bank activity overwhelmed California bank activity in every month:[122]

---

[118] *See* Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 49-53.

[119] Annex V, H BATES Documents (Franklin Federal Money Fund Prospectus, p. 4 (H 04708)).

[120] *See* Annex II, 1992 Chronological Statement of Facts, p. 9 (Ex. 13, Federated Account Application and Statements). We note Federated is headquartered in Pittsburgh, Pennsylvania and his account was through the Federated Tax Free Income Fund located in Boston, Massachusetts.

[121] Recall that Mr. Hyatt had no California-situs credit card accounts during the 1992 disputed period, those accounts having been rendered inactive long before. He *did* have active Nevada-situs credit card accounts during the 1992 disputed period, which are consistent with his move to Nevada and show a stronger connection to Nevada. (*See* Annex IV, 1992 Protest Supplement Letter, 2/2/01, pp. 41-42.)

[122] Annex VI, CCC BATES Documents (1991 FTB Narrative Report, p. 32 (CCC 00995)); *see also* Annex IV, 1992 Protest Supplement Letter, 2/2/01, pp. 42-46.

RJN000873

| | # NV Account Checks | # CA Account Checks |
|---|---|---|
| January 1992 | 21 | 4 |
| February 1992 | 22 | 2 |
| March 1992 | 10 | 2 |
| April 1992 | 43 | 2 |

However, the comparison becomes even more favorable for Mr. Hyatt when the following correction is made to the above computation: the total of 10 California checks above drops to 7 California checks (compared to 96 for Nevada) when limited to the 1992 disputed period because three checks counted by the auditor as "January" were written in December 1991.[123]

Moreover, the absurdity of FTB's audit analysis of checks is illustrated by the following – a payment to a Las Vegas escrow company, for an escrow in Las Vegas, regarding the purchase of Mr. Hyatt's Las Vegas house was counted by FTB as a California residency connection.[124] In addition, FTB overlooks the fact that check No. 20 to Home Savings (which FTB assigned to California), was for the full payment of the loan on Mr. Hyatt's former La Palma home, which is evidence of *severing* California connections (not maintaining them).[125]

**10.     The state wherein the taxpayer maintains memberships in social, religious, and professional organizations**

On October 4, 1991, Mr. Hyatt began attending services at Temple Beth Am in Las Vegas.[126] On November 15, 1991, Mr. Hyatt joined Congregation Ner Tamid in Las Vegas.[127] Mr. Hyatt filled out a "member Application" in person on November 15th.[128] He is a member of both Congregation Ner Tamid and Temple Beth Am (renamed Temple Sinai) to this day, more than 17 years later. In contrast, Mr. Hyatt was not a member of any religious organizations based in California in 1992. Mr.

---

[123] Annex IV, 1992 Protest Supplement Letter, 2/2/01, p. 43.

[124] *See* Annex VI, CCC BATES Documents (Franklin Check No. 25 dated 3/19/92 (CCC 02756) to Minnesota Title); *see also* Annex IV, 1992 Protest Supplement Letter, 2/2/01, p. 43.

[125] Annex V, H BATES Documents (FTB Table of Transactions (H 002283)).

[126] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 7; Ex. 13, Affidavit of Michelina Hecht, 11/16/08, ¶ 7).

[127] Mr. Hyatt made a payment that same day to Congregation Ner Tamid by check drawn on his Las Vegas bank account, with his Las Vegas mailing address imprinted on the check. (*See* Annex VI, CCC BATES Documents (canceled check No. 108 dated 11/15/91 (CCC 02623 – 02624)); *see also, e.g.,* Annex V, H BATES Documents (Congregation Ner Tamid envelope (H 09679)).

[128] *See* Annex I, 1991 Chronological Statement of Facts, p. 38 (Ex. 32, Member Application).

---

1    Hyatt had no California social or professional organization memberships during the 1992 disputed

2    period, only memberships in national professional organizations that had their headquarters outside of

3    California. Thus, this factor shows a greater connection to Nevada (and no connection to California).

4    **11.**    **The state wherein the taxpayer registers his automobiles**

5    Mr. Hyatt purchased a new automobile in March 1992 in Las Vegas from a dealer, and then

6    registered this new vehicle in Nevada.[129] His old 1977 Toyota was registered in Nevada in

7    approximately May 1992.[130] This Nevada registration terminated the California registration. The

8    1977 Toyota was not registered in Nevada earlier because it could not pass the Nevada smog test to

9    get a smog certificate[131] and because Mr. Hyatt was planning to and did purchase a new automobile

10    to drive in its place. The 1977 Toyota was 14 years old, operating poorly, and was about to be

11    replaced by a new car. In fact, what happened was that Mr. Hyatt's son took charge of the old 1977

12    Toyota during an April 1992 visit with his father in Nevada; he had it fixed,[132] obtained a smog

13    certificate,[133] and subsequently registered it in Nevada.[134]

14    **12.**    **The state wherein the taxpayer maintains a driver's license**

15    On November 27, 1991, Mr. Hyatt applied for and obtained a Nevada's driver's license.[135]

16    Mr. Hyatt's driver's license application identifies his "Residence Address" as 3225 S. Pecos Rd., Las

17    Vegas, Nevada 89121.[136] He paid the DMV fee with a check drawn on his Nevada bank account

18    with Mr. Hyatt's Las Vegas mailing address imprinted on the check.[137] At the time of obtaining his

19    Nevada driver's license in 1991, Mr. Hyatt signed a declaration of Nevada residency, and Mr. Hyatt

20    was required by Nevada law to physically surrender to the Nevada DMV possession of his California

21

---

22    [129] *See* Annex II, 1992 Chronological Statement of Facts, p.15 (Ex. 24, Nevada Vehicle Registration Certificate and Receipt dated 3/20/92).

23    [130] *See* Annex V, H BATES Documents (Nevada vehicle registration records (H 07072 – 07073)).

24    [131] *See* Annex V, H BATES Documents (Chet's Discount Auto Service Invoice, dated 4/17/92, stating "fix car to pass smog" (H 07068 – 07070)).

25    [132] *See* Annex V, H BATES Documents (Chet's Discount Auto Service Invoice (H 07070)).

       [133] *See* Annex V, H BATES Documents (Smog Certificate (H 07068 – 07069)).

26    [134] *See* Annex V, H BATES Documents (Nevada Vehicle Registration Certificate (H 07072 – 07073)).

       [135] *See* Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 6 (CCC 00969)).

27    [136] Annex VI, CCC BATES Documents (Nevada DMV driver's license application (CCC 01255)).

28    [137] *See* Annex V, H BATES Documents (canceled check (H 013625)).

---

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1992

RJN000875

1  driver's license, and he did surrender it.[138] Dan Hyatt accompanied his father to the Nevada DMV in

2  Las Vegas to obtain Mr. Hyatt's Nevada driver's license.[139]

**13.   The state wherein the taxpayer maintains voter registration, and the taxpayer's voting participation history**

5  An important consideration in determining domicile is the place where the taxpayer registered

6  to vote and actually voted. "Of all the formal acts to be scrutinized in ascertaining a person's

7  domicile, undoubtedly the act of registering and voting is the most important, and while not

8  necessarily conclusive, it is usually most convincing and persuasive."[140] After moving to Nevada,

9  Mr. Hyatt did *not* vote in any election in California, nor did the auditor find to the contrary.[141] On

10 November 27 1991, Mr. Hyatt registered to vote in Nevada.[142] There were no major elections in

11 Nevada between January 1, 1992 and April 2, 1992. Mr. Hyatt did in fact vote in person for the first

12 major elections to occur (September and November 1992) after his move to Nevada.[143]

**14.   The state wherein the taxpayer obtains professional services, such as doctors, dentists, accountants, and attorneys**

**a.   Mr. Hyatt used few California professionals**

16 Mr. Hyatt's use of California professionals during the 1992 disputed period was minimal and

17 such use is not evidence of California residency. Mr. Hyatt used the California law firm of Riordan

18 and McKenzie during the disputed period, which was primarily for the preparation of the 1991

19 income tax returns involving Mr. Hyatt's move from California and the California part year tax return

20 issues.[144] Mr. Hyatt's use of a California law firm to advise on legal issues involving California law

---

[138] *See* Nev. Rev. Stat. § 483.230(4), stating: a "person shall not receive a driver's license until he surrenders all valid licenses in his possession issued to him by this or any another jurisdiction"; *see also* Annex III, 1991 Protest Supplement Letter, 5/31/01, p. 61.

[139] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 16; Ex.18, Affidavit of Daniel E. Hyatt, 11/11/08, ¶ 8)).

[140] *Taff v. Goodman* (1940) 41 Cal.App.2d 771, 775.

[141] *See* Annex VI, CCC BATES Documents (FTB 1992 Narrative Report, p. 8 (CCC 00010)).

[142] *See* Annex VI, CCC BATES Documents (FTB 1992 Narrative Report, p. 8 (CCC 00010)); *see also* Annex V, H BATES Documents (Clark County Voter Information (H 01272)).

[143] *See* Annex VI, CCC BATES Documents (FTB 1992 Narrative Report, p. 8 (CCC 00010)); *see also* Annex V, H BATES Documents (11/3/92 Voter Stub and related records (H 06921 – 06923)).

[144] *See* Annex III, 1991 Protest Supplement Letter, 5/31/01, p. 62.

1    cannot be faulted. Indeed, despite the fact that Mr. Hyatt has lived in Nevada for over 17 years, he

2    has employed the services of our (California based) law firm for many years to represent him in this

3    matter before FTB and now this Board. This is certainly not a California residency "connection."

4         Similarly, Mr. Hyatt used California attorneys Mr. McCaffrey and Mr. Bailey for a California

5    estate litigation matter where Mr. Hyatt was the executor, and for the sale of his former California

6    home, respectively. Again, Mr. Hyatt's use of California attorneys for California legal matters

7    cannot be faulted.

8         Mr. Hyatt used medical professionals only for a single medical event – his colon cancer –

9    during the 1992 disputed period. The reason for Mr. Hyatt's medical visits to California was

10   explained in Mr. Hyatt's protest for 1991[145] and at pages 33-35 of Mr. Hyatt's Appellant's Opening

11   Brief for 1991 (Case. No. 435770). That appointment led to subsequent appointments and referrals to

12   other California medical professionals. Mr. Hyatt was ultimately diagnosed with cancer and

13   underwent surgery at the Los Alamitos Medical Center in February 1992.[146] Mr. Hyatt received

14   advice that Las Vegas was unsuitable for such an operation from his Las Vegas Rabbi, the Rabbi's

15   wife, and other friends and associates.[147] After surgery, he returned to Nevada.[148]

16        An individual who is in California for only a "temporary or transitory purpose" is *not* a

17   California resident.[149] FTB's regulations go on to define "temporary or transitory purpose" as

18   follows:

19          Whether or not the purpose for which an individual is in this State will be
20        considered temporary or transitory in character will depend to a large extent upon
             the facts and circumstances of each particular case. It can be stated generally ...
21        that an individual is simply passing through this State on his way to another state
             ..., or is here for a brief rest ... or to *complete a particular transaction ... or fulfill a*
22        *particular engagement*, which will require his presence in this State *for but a*

23

---

[145] *See* Ex. 24, 1991 Protest Letter dated 6/20/96, p. 24.

24   [146] *See id.*

[147] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 21; Ex. 13, Affidavit of
25   Michelina Hecht, 11/16/08, ¶ 21; Ex. 15, Affidavit of Robert Huddleston, 11/4/08, ¶ 9; Ex. 36, Affidavit of Kenneth
     Woloson, 11/21/08, ¶ 17; Ex. 5, Affidavit of Trent Eyler, 11/13/08, ¶ 13).

26   [148] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 22; Ex. 13, Affidavit of
     Michelina Hecht, 11/16/08, ¶ 22; Ex. 36, Affidavit of Kenneth Woloson, 11/21/08, ¶ 17; Ex. 5, Affidavit of Trent Eyler,
27   11/13/08, ¶ 13).

[149] Cal. Rev. & Tax. Code § 17041(1).

28

RJN000877

1    *short period*, he is in this State for temporary or transitory purposes, and will not
2    be a resident by virtue of his presence here.[150]

3       In the words of Regulation 17014(b), Mr. Hyatt's few California medical appointments in

4    1992 for his medical course of treatment, followed by his return to Nevada, was "to complete" that

5    "particular transaction," or to "fulfill" that "particular engagement," *i.e.*, the course of treatment,

6    which was for "but a short period."

7       The auditor made much of the fact that Mr. Hyatt returned to California in early 1992 for

8    surgery and related medical visits. Indeed, of the total of 23 days for which the auditor found Mr.

9    Hyatt present in California during the disputed period, 16 of them related to Mr. Hyatt being in

10    California for medical reasons, and principally for a hospital stay related to surgery at Los Alamitos

11    Medical Center.[151] As explained above and during the protest,[152] one cannot think of a more classic

12    example of entering California for a "temporary or transitory purpose" under Regulation 17014(b)

13    than to enter California from another state (Nevada) to take advantage of California's world class

14    medical facilities (Los Alamitos), and then exit to another state (Nevada) upon completion of a

15    course of treatment. Apparently, FTB has now abandoned its California "medical professionals"

16    argument, because that argument is not mentioned anywhere in the Determination Letter.

17          **b.    Mr. Hyatt had relationships with many Nevada professionals**

18       In contrast with California professionals, Mr. Hyatt established relationships with a myriad of

19    Nevada professionals that were situated in Las Vegas and that represented or were involved with Mr.

20    Hyatt in Las Vegas at various times during the 1992 disputed period. The taxpayer's February 2,

21    2001 Protest Supplement Letter provides a thorough listing of these Nevada professionals, including

22    real estate agents, business associates, escrow agents, insurance agents, his two rabbis and many

23    others.[153] FTB's Determination Letter makes *no attempt* to refute or address the use of these Nevada

24    professionals.

25

26   

[150] 18 Cal. Code of Regs. § 17014(b), *emphasis added.*

27 [151] *See* discussion at Annex IV, 1992 Protest Supplement Letter, 2/2/01, pp. 91-93.

[152] *See* discussion at Annex IV, 1992 Protest Supplement Letter, 2/2/01, pp. 91-93.

28 [153] *See* Annex IV, 1992 Protest Supplement Letter, 2/2/01, pp. 51-57.

RJN000878

1    Accordingly, Mr. Hyatt's use of Nevada professionals presents a very strong connection to

2    Nevada during the 1992 disputed period.

3                    c.    **Mr. Hyatt had relationships with many non-California (non-**
4                          **Nevada) professionals**

5    Mr. Hyatt also maintained connections with many other non-California professionals (in

6    addition to the Nevada professionals identified above) prior to and subsequent to his move to Las

7    Vegas. This Board has long recognized in residency cases that the correct legal analysis focuses only

8    upon California vs. "everywhere" connections. As summarized by this Board:

9         In determining whether a California domiciliary is a resident of this state, we are
          not concerned with whether or not he may be treated as a resident of some other
10        place by the laws of a foreign jurisdiction, but rather with his proper classification
          under California law. *To establish nonresidence under the California law, the*
11        *taxpayer need not prove that he became a resident of some other state or country.*
          *His burden is satisfied when he shows that his absence from California was for*
12        *other than a temporary or transitory purpose.*[154]

13   The taxpayer's February 2, 2001 Protest Supplement Letter provides a thorough listing of the

14   non-California professionals used by Mr. Hyatt during the disputed period.[155]   FTB's Determination

15   Letter makes *no attempt* to refute or address the use of these non-California professionals. Mr.

16   Hyatt's extensive use of non-California professionals during the 1992 disputed period is also

17   addressed in more detail in his most recent Affidavit.[156]

18   Accordingly, Mr. Hyatt's relationships with professionals out of California heavily outweigh

19   the very few lingering connections to California professionals during the disputed period.

20                   **15.    The state wherein the taxpayer is employed**
21                   **16.    The state wherein the taxpayer maintains or owns business interests**

22   Mr. Hyatt had no employment or business interests that involved "presence" in California.

23   He was self-employed as a consultant for several decades prior to his move to Nevada in September

24   1991, but terminated his consulting business before he moved to Las Vegas in 1991. During the 1992

25   disputed period, he worked on his personal and technical activities, not for others; he had no clients,

26   ---

[154] *Appeal of Richards L. & Kathleen K. Hardman,* 75-SBE-052, Aug. 19, 1975, emph. added; *see also Appeal of Richard W. Vohs, supra; Appeal of James M. Smith,* 61-SBE-048, July 19, 1961.

27   [155] *See* Annex IV, 1992 Protest Supplement Letter, 2/2/01, pp. 51-57.

28   [156] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶¶ 22-25).

RJN000879

1    customers, employees, salary, or employer.  Immediately prior to his move to Nevada and for the

2    whole disputed period, he pursued his patents and patent applications with the Patent and Trademark

3    Office ("PTO") in Virginia; and Mr. Hyatt assisted Philips with the conduct of an interference and the

4    licensing of some of his patents.

5            Mr. Hyatt was an aerospace consultant prior to his move to Nevada.  He discontinued his

6    aerospace consultant business long before moving to Nevada and concentrated on his personal

7    activities prior to his move to Nevada, subsequent to that move and to the present day.  His personal

8    activities included research and development and patent activities regarding his own inventions,

9    assisting Philips in sublicensing his patents and investing his own finances.

10           Mr. Hyatt performed his personal activities from his former home in California before his

11   move to Nevada in September 1991 and from his residences in Nevada after his move to Nevada.  He

12   performed his personal activities for his own benefit without customers, clients, or employees.  He

13   used professionals nationwide in his personal activities before and after his move to Nevada.

14           Mr. Hyatt's activities were outside of California during the 1992 disputed period.  This is an

15   important indicia of non-California residency and non-California domicile.  Further, Mr. Hyatt's

16   income immediately prior to and during the 1992 disputed period was derived from Japanese and

17   European companies.  The companies licensing his patents were located in New York and in Texas.

18   Mr. Hyatt had no business connections in California.

19           **17.    The state wherein the taxpayer holds a professional license or licenses**

20           Mr. Hyatt did not need and did not use a professional license during the 1992 disputed period.

21   He worked on his own projects for himself.

22           **18.    The state wherein the taxpayer owns investment real property**

23           Mr. Hyatt owned no investment real property in California during the 1992 disputed period.

24   This fact is not disputed by FTB.  He initiated activities to sell his only California real property – his

25   former home – well before he moved and he sold it five days after he moved in 1991.

26

27

28

RJN000880

1  **19.    The indications in affidavits from various individuals discussing the taxpayer's residency**

3  Mr. Hyatt's move to Nevada and his sale of the La Palma house is fully corroborated by the

4  statements of others. This Board has unequivocally confirmed the importance of third party

5  affidavits and declarations in support of a taxpayer's claim of nonresidency. In the *Berner* decision

6  involving the issue of residency, this Board stated:

7  [R]espondent [FTB] should ordinarily follow the evidence guideline of
   Regulation 17014(d), which it adopted pursuant to Revenue and Taxation Code,

8  former section 9253, and current section 19503. In this case, *respondent improperly refused to reasonably consider the declarations and evidence*

9  *provided by appellants.*[157]

10  This Board held in *Berner* that the taxpayers "established through affidavits and declarations

11  of friends, family, and professionals (sufficient proof under Regulation 17014(d)) that they changed

12  their domicile from California to Nevada ..."[158] A multitude of affidavits and declarations by friends,

13  family, and professionals were submitted by the taxpayer in this matter while pending with FTB, all

14  of which support the taxpayer's nonresidency during the disputed period. Moreover, in response to

15  FTB's Determination Letter, 25 additional affidavits have been obtained to rebut FTB's allegations

16  and assertions. In total, Mr. Hyatt has obtained 35 affidavits to support his position in this matter, in

17  addition to his own sworn affidavits.[159]

18  **20.    *Bragg* close connections conclusion**

19  Based on the factors in *Bragg*, Mr. Hyatt's closest connections were clearly to Nevada during

20  the 1992 disputed period (which only covers January 1, 1992 through April 2, 1992). Mr. Hyatt had

21  sold his only California residence the prior year (October 1, 1991). Mr. Hyatt requested termination

22  of the homeowner's exemption on his former California property more than nine months before it

23  was due. Mr. Hyatt did not own any other real property in California. Mr. Hyatt was leasing and

24  occupying an apartment in Nevada. Mr. Hyatt was actively searching for a Nevada house with the

---

25  [157] *Berner, supra, emphasis added.*

26  [158] *See Berner, supra.* The Board's new 2008 Rules for Tax Appeals also emphasize the use of affidavits and declarations

27  as forms of admissible evidence: "Any relevant evidence, including affidavits, declarations under penalty of perjury, and
   hearsay evidence, may be presented to the Board at a hearing." (18 Cal. Code Regs. § 5523.6.)

28  [159] *See* Annex VII, Affidavits in Support of Mr. Hyatt.

1   help of Nevada realtors and was repeatedly making good-faith offers on houses with large deposits.

2   On April 3, 1992, he purchased a home in Las Vegas.  Mr. Hyatt's only telephone service was based

3   from his Nevada home.  Mr. Hyatt never spent more time in California than Nevada, and all his

4   minimal days in California were for temporary or transitory purposes.  Mr. Hyatt's relevant federal

5   and state returns reflect his Nevada address and support his residency.  Mr. Hyatt held a Nevada

6   driver's license.  Mr. Hyatt registered to vote in Nevada.  Mr. Hyatt belonged to a Nevada synagogue.

7   Mr. Hyatt's increasing Nevada financial activity was significantly greater than his decreasing

8   California financial activity in every month.  Mr. Hyatt's use of non-California professionals greatly

9   outweighed his *de minimis* use of California professionals – which primarily were associated with

10  medical treatment in California for a single medical event.  Mr. Hyatt had no business office or

11  activities in California.  Mr. Hyatt conducted his personal activities from Nevada.  The affidavits and

12  declarations of Mr. Hyatt's colleagues, associates, friends and family members all corroborate Mr.

13  Hyatt's Nevada residency starting in late September 1991 and throughout the 1992 disputed period.

14
15
    **D.    Under the Identifiable Purpose Test, Mr. Hyatt Was a Nevada Resident for All of
           the 1992 Disputed Period**

16          The second test applied by this Board to determine whether a taxpayer is out of the State for

17  "other than a temporary or transitory purpose" examines whether the taxpayer is out of California for

18  an identifiable purpose and the length of time necessary to fulfill that purpose.  "[W]here an

19  individual expects to be out of California for an indefinite period of time which is expected to last

20  more than two years, such individual will be expected to be out of the state for an indefinite period of

21  substantial duration" and therefore is no longer considered a resident of California.[160]

22          The second test is also satisfied in this case.  Mr. Hyatt's primary purpose in permanently

23  leaving California in September 1991 and moving to Nevada was to enjoy a better quality of life and

24  business, where he intended to get away from distractions by the media, the public, and from

25  harassment by his siblings and certain family members.  Mr. Hyatt intended to find a more private

26  and secure place to work and to live by relocating to Nevada.  Mr. Hyatt also hoped to alleviate his

27

28  _____
    [160] *Appeal of William G. and Susan G. Crozier*, 92-SBE-005, April 23, 1992.

RJN000882

1   respiratory problems (which resulted in a case of pneumonia in July 1992) by getting away from the

2   smog and other pollution in California and to relocate to a drier, healthier climate in Nevada. Mr.

3   Hyatt's purpose, then, was readily identifiable. The length of time to fulfill his purpose was

4   indefinite. Mr. Hyatt made it plain, both by his acts and statements, that he intended at the time of his

5   move in September 1991 to make Nevada his permanent home and the center of his life. Certainly

6   his move to Nevada was intended to last more than "two years"[161] as evidenced by the fact Mr. Hyatt

7   still resides in Nevada — over 17 years after his move in September 1991.

 

**E.    FTB's Protest Findings Do Not Detract From the Conclusion that Mr. Hyatt Became a Nevada Resident in September 1991**

10        After ten years, FTB informed Mr. Hyatt by the Determination Letter that his protest was

11  being denied and the proposed assessment was being affirmed. FTB gave Mr. Hyatt "thirty days

12  from the date of [the] determination letter to respond," and such response was "limited to producing

13  new information and documentation," and "[n]o extensions to the thirty day response period will be

14  granted."[162] Despite the passage of over a decade since the filing of the protest, and despite the fact

15  FTB had over six years to respond to the taxpayer's 132-page position letter, FTB limited the

16  taxpayer to 30 days, with no possibility of an extension of time, to respond to its 50-page, single-

17  spaced Determination Letter.[163] Accordingly, this opening brief before this Board is the taxpayer's

18  first opportunity to meaningfully respond to FTB's findings in its Determination Letter.

19        The organization and analysis in the Determination Letter is extremely difficult to follow.

20  The residency discussion and conclusions appear to be limited to pages 2-24 of the letter.[164] There

21  are very few headings, no citations to the records to support FTB's list of "facts," no substantive

22  analysis between the alleged facts and cited California residency legal standards, and no rebuttal to

23  any of the information provided in either Mr. Hyatt's October 10, 1997 protest letter or his 132-page

---

[161] *Id.*

[162] Ex. 1, FTB 11/1/07 Determination Letter, pp. 49-50.

[163] We contend this position violates the taxpayer's due process rights under the California and U.S. Constitutions, is a violation of the taxpayer's rights under the California Taxpayers' Bill of Rights, offends FTB's own Mission and Statement of Principles of Tax Administration, and stands in direct contradiction to what the FTB's protest officer represented during the course of these proceedings. (*See* Ex. 25, 11/20/07 Letter from E. Coffill to G. McLaughlin.)

[164] Ex. 1, FTB 11/1/07 Determination Letter.

1  February 2, 2001 Protest Supplement Letter. We contend none of those points are persuasive or

2  supported by the record in this case.

3       Also note here how few of FTB's points in its "combination" Determination Letter for 1991

4  and 1992 *actually relate to 1992*. To repeat here one of our initial points made above, *the key to*

5  *understanding the 1992 audit is in realizing there really was no 1992 audit*. Having just concluded

6  in the 1991 audit that Mr. Hyatt remained a California resident throughout 1991, FTB invested

7  minimal resources in the 1992 audit. Auditor Cox – who was also the auditor for the 1991 audit –

8  spent only 32 hours on the 1992 audit.[165] Indeed, the grand total of FTB time spent on the 1992 audit

9  of Mr. Hyatt was only 78 hours.[166] Accordingly, with a few exceptions, the 1992 audit findings were

10  merely a repetition of the 1991 findings with minimal additional factual investigation.

11       **1.    FTB's "Facts"**

12       The Determination Letter lists FTB's alleged facts,[167] but fails to inform Mr. Hyatt of the

13  reasons why FTB focuses on these alleged facts or explain the relevance of these alleged facts,

14  particularly in view of the evidence that was before the protest officer. The vast majority of these

15  alleged facts are erroneous and have been extensively rebutted with significant evidence and

16  arguments in both Mr. Hyatt's May 31, 2001 Protest Supplement Letter for 1991[168] and his February

17  2, 2001 Protest Supplement Letter for 1992.[169] FTB has never responded to this significant evidence

18  and arguments. Due to briefing page restrictions under this Board's RTAs, we hereby incorporate by

19  reference herein those two Protest Supplements. Moreover, for the convenience of the Board, we

20  have also prepared a complete recitation of FTB's alleged "facts" and Mr. Hyatt's response to each

21  alleged fact, with appropriate citations to the record, which is set forth in Annex VIII.

22

23

24

---

25  [165] Ex. 2, *Hyatt v. FTB,* Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/28/08, pp. 125-126.

    [166] Ex. 3, *Hyatt v. FTB,* Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/29/08, p. 35.

26  [167] Ex. 1, FTB 11/1/07 Determination Letter, pp. 2-3.

    [168] *See* Annex III, 1991 Protest Supplement Letter, 5/31/01.

27  [169] *See* Annex IV, 1992 Protest Supplement Letter, 2/2/01.

28

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1992

RJN000884

### 2. Mr. Hyatt's Facts

The Determination Letter purports to list Mr. Hyatt's facts,[170] but it disregards many of Mr. Hyatt's very important facts and fails to indicate why these facts are unpersuasive. For example, the protest officer, in total disregard of California law and precedent established by this Board, discards Mr. Hyatt's sworn affidavits as unpersuasive without any reasons, and wholly disregards the depositions of the affiants testifying to these and other significant facts. We contend our 1992 Chronological Statement of Facts[171] (and the exhibits cited therein) is the correct recitation of the facts in this case.

### 3. "Issue: Residency"

The Determination Letter has a section labeled "Issue: Residency"[172] and a separate section labeled "Determination: Residency."[173] The latter appears to be the thrust of FTB's protest findings on the residency issue. However, there is no discussion or analysis of how these findings lead to a residency determination under California residency law. We contend none of FTB's protest findings are supported by the record in this case or lead to California residency during the 1992 disputed period. Each of FTB's findings is addressed below.

#### a. Sale of the La Palma house

FTB contends Mr. Hyatt did not sell his La Palma house to Ms. Jeng on October 1, 1991. FTB alleges Mr. Hyatt (1) could not have sold the La Palma house on October 1, 1991 because of an "acceleration clause" in the Home Savings Deed of Trust and the loan was not paid in full until December 21, 1991; (2) Mr. Hyatt "has not provided any documents directly related to the sale, the contractual relationship between him and Grace Jeng, other than the deeds and the promissory note" and Ms. Jeng's bank records "suggest she made the monthly payments for January 1992 and thereafter" but not before that time; and (3) the grant deed produced by Mr. Hyatt which is dated October 1, 1991 was "actually notarized on June 10, 1993, with the notary public dating the

---

[170] Ex. 1, FTB 11/1/07 Determination Letter, pp. 4-11.
[171] *See* Annex II, 1992 Chronological Statement of Facts.
[172] Ex. 1, FTB 11/1/07 Determination Letter, pp. 11-19.
[173] *Id.* at p. 24.

RJN000885

1  notarization as having taken place on October 1, 1991."[174] None of these points have merit and are

2  contradicted by the evidence in this case.

3      First, FTB appears in part to base its residency conclusion on the contention that Mr. Hyatt

4  could not have sold his house to Ms. Jeng on October 1, 1991 because he did not pay off his

5  mortgage on the La Palma house until December of 1991.[175] We disagree.

6      The Home Savings Deed of Trust pertaining to the La Palma house contained an acceleration

7  clause that stated the lender had the option to declare any indebtedness and obligations secured by the

8  deed of trust due and payable within 30 days if the debtor engaged in certain acts, including selling

9  the property or entering into a contract of sale.[176] FTB agrees that an acceleration clause does not

10  prevent a sale of property and cannot automatically be enforced upon an outright sale of property

11  under California case law.[177] However, FTB nonetheless appears to contend Mr. Hyatt somehow

12  made a technical violation of the acceleration clause when Mr. Hyatt either did not pay off the loan

13  upon the sale of the property to Ms. Jeng on October 1, 1991 or did not notify the lender of such

14  sale.[178] Based on this contention, FTB concluded "it is reasonable to assume that Hyatt could not and

15  did not sell the La Palma home at least until he paid off the loan on December 21, 1991."[179] Mr.

16  Hyatt does not in any way concede he violated any terms of the loan agreement with Home Savings.

17  However, to the extent there were any technical violations, no penalties or defaults were ever asserted

18  by Home Savings.[180]

19      In any event, FTB's argument is nonsensical with respect to *residency for 1992*. If FTB's

20  argument is that the house could not have been "sold" – an argument which we disagree with – until

21  the La Palma mortgage was paid off, FTB has just agreed to the sale of La Palma as of December 21,

22  1991 (*i.e.*, the day that Mr. Hyatt fully paid off the loan on that house), meaning FTB has conceded

23  Mr. Hyatt did not own a home in California for any portion of the 1992 disputed period.

---

24  [174] *Id.* at p. 12.

25  [175] *Id.* at pp. 11-12.

26  [176] *Id.* at p. 11.

    [177] *Id.* at p. 12.

27  [178] *Id.*

    [179] *Id.*

28  [180] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 33).

RJN000886

1    But there is an even simpler reason why Mr. Hyatt did not own a home in California for any

2    portion of the 1992 disputed period – that reason is because he sold his La Palma home on October 1,

3    1991.  On September 4, 1991, Mr. Hyatt discussed the sale of his La Palma house with an officer of

4    Home Savings and arranged for the payoff of the first trust deed on the La Palma house.  Mr. Hyatt

5    paid off nearly half of the first trust deed on the La Palma house with Home Savings ($51,100) on

6    September 4, 1991 in preparation for his sale of the house and his move to Las Vegas.[181]

7    On September 30, 1991, Mr. Hyatt discussed the payoff of the first trust deed on the La Palma

8    house held by Home Savings with his attorneys Mr. McCaffrey and Mr. Bailey.[182]  Mr. Bailey

9    advised Mr. Hyatt that there was no legal requirement for Mr. Hyatt to pay off the first trust deed,

10   that a buyer would often assume the first trust deed, and that, in the worst case, Home Savings would

11   merely demand payment upon sale under a "due on sale" option.[183]  Moreover, Mr. Bailey advised

12   Mr. Hyatt about a "wrap-around" deed of trust, but this vehicle was not used.[184]  Mr. Bailey said that

13   he would contact Home Savings and discuss with them how they wished to proceed.[185]

14   The balance of the Home Savings loan was paid by Mr. Hyatt in December 1991, shortly after

15   he sold the house to Ms. Jeng.[186]  Home Savings confirmed its approval by notarizing a full

16   reconveyance shortly after Mr. Hyatt's December 1991 pay off of the loan and then recording the

17   reconveyance.[187]  Irrespective of the technical terms of the loan agreement with Home Savings, they

18   in no way support FTB's residency conclusions set forth in the Determination Letter.

19

20   [181] *See* Annex V, H BATES Documents (Homes Savings of America receipt noting $51,100.00 payment on 9/4/91 for
     Loan No. 665853 (H 025544)); Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt,

21   12/5/08, ¶ 27; Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 9).

     [182] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶ 8, 9).

22   [183] *Id.* at ¶ 9.

23   [184] *Id.*

     [185] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 29; Ex. 28, Affidavit

24   of Roger McCaffrey, 11/17/08, ¶ 9); *see also* Home Savings loan payoff events dated 9/4/91 and 12/21/91 (*see* fn. 181,
     *supra* and fn. 186 , *infra*) and Ex. 26, Full Reconveyance dated 1/21/92 and recorded 2/6/92 (P01403, P01404).

25   [186] Annex VI, CCC BATES Documents (Check No. 20 in the amount of $57,399.28 to Home Savings of America, dated

26   12/20/91 (CCC 02748 - 02749)); *see also* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P.
     Hyatt, 12/5/08, ¶ 31; Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 12).

27   [187] Ex. 26, Full Reconveyance dated 1/21/92 and recorded 2/6/92 (P01403, P01404); *see also* Annex VII, Affidavits in
     Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 31; Ex. 28, Affidavit of Roger McCaffrey,

28   11/17/08, ¶ 12).

RJN000887

1    Second, FTB contends that "despite repeated requests," Mr. Hyatt "has not provided any

2    documents directly related to the sale [of the La Palma house]" or "the contractual relationship

3    between [Mr. Hyatt] and Grace Jeng, other than the deeds and the promissory note."[188] The

4    statement belies FTB's motive here: the evidence at hand, sufficient though it may be in proving Mr.

5    Hyatt's position, does not help FTB prove its own and is therefore disregarded. No other

6    documentation is necessary to prove the October 1, 1991 sale of the La Palma house *other than* the

7    deed and the promissory note.[189] Title passed to Ms. Jeng in exchange for $175,000.[190]

8        Mr. Hyatt produced a grant deed near the commencement of the audit.[191] FTB requested and

9    received a *second* copy directly from the Orange County Recorder nearly a year later.[192] Mr. Hyatt

10   provided a copy of a Promissory Note secured by a Deed of Trust at the outset of the case.[193] FTB's

11   audit file contains a copy of his 1991 tax return, including Form 2119 (Sale of Home), which listed

12   the date of the sale as October 1, 1991, and April 3, 1992 as the date Mr. Hyatt moved into his new

13   home in Las Vegas, and Schedule B interest income for 1991 reported from the Promissory Note on

14   the La Palma house.[194] Mr. Hyatt provided documentation proving that Ms. Jeng paid the property

15   taxes on the La Palma house for 1992, 1993, and 1994, with the exception of 1991/1992 taxes paid by

16   Mr. Hyatt shortly after the sale, on October 15, 1991.[195] Mr. Hyatt gave FTB documentation to prove

17   that prior to the sale of the La Palma house on October 1, 1991, he paid for a gardener but after the

18   sale, in November 1991, Ms. Jeng hired and paid for a gardener at her La Palma home.[196] As

19   discussed above, Mr. Hyatt also produced documentation to FTB to prove that he had paid off almost

---

[188] Ex. 1, FTB 11/1/07 Determination Letter, p. 12.

[189] *See* Ex. 27, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. III, 8/17/05, pp. 567-68; and Ex. 28, Partial Transcript, Depo. of Michael Kern, Vol. II, 5/24/00, pp. 337-338.

[190] Ex. 27, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. III, 8/17/05, p. 566.

[191] Annex VI, CCC BATES Documents (M. Kern Sept. 8, 1993 letter to M. Shayer (CCC 01269 – 01271)).

[192] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 17 (CCC 00980); 8/10/94 letter to Recorder (CCC 01552); Grant Deed (CCC 01556)).

[193] Annex VI, CCC BATES Documents (M. Kern Sept. 8, 1993 letter to M. Shayer (CCC 01269 – 01271); Deed of Trust (CCC 01279)); Annex V, H BATES Documents (Promissory Note (H 01247)).

[194] *See* Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 17 (CCC 00980)).

[195] Annex VI, CCC BATES Documents (Letter from Orange County Treasurer - Tax Collector, dated 6/27/94 (CCC 01349); *see also* FTB 1991 Narrative Report, p. 17 (CCC 00980)).

[196] Annex V, H BATES Documents (receipts dated 1/91, 2/91, and 5/91 (H 09078 – 09080); copy of 11/27/91 and 1/8/92 Jimmy Kim statement (H 09081 – 09082)).

RJN000888

1    half of the loan on September 4, 1991 – nearly an entire month before the sale – and that he paid off

2    the balance of the loan shortly after the sale.[197]  In addition to the documentation of the sale itself,

3    Mr. Hyatt provided numerous affidavits and statements verifying the sale of the La Palma house to

4    Ms. Jeng on October 1, 1991.[198]

5         After alleging that Mr. Hyatt did not provide "any documents directly related to the sale" of

6    the La Palma house, FTB itself references (1) Ms. Jeng's bank records "[suggesting] that she made

7    the monthly payments for January 1992 and thereafter" on the Promissory Note; (2) a wire transfer

8    instruction from Ms. Jeng for a final payoff of the Note in the amount of $157,600.11 to Federated

9    Investors of Pittsburgh, Pennsylvania; and (3) Mr. Hyatt's Fidelity bank statement entry showing that

10   the $157,600.11 was deposited into his account.[199]  These documents were provided by Mr. Hyatt!

11   FTB disproves its own allegations.

12        Not surprisingly, though, considering the tenor of this case, FTB now raises questions about

13   matters *conceded* by the auditor in the (1991) Narrative Report:  the sale of the La Palma house on

14   October 1, 1991; the execution of a grant deed to Ms. Jeng on October 1, 1991 for the La Palma

15   house; Mr. Hyatt's reported sale of the La Palma house on his 1991 tax return; Mr. Hyatt's reported

16   interest income received from the Promissory Note on his 1991 tax return; Ms. Jeng's opened

17   account in her name with the City of La Palma Water Service by November 26, 1991 for the La

18   Palma house; and the fact Mr. Hyatt did not pay a single California utility bill or telephone bill (but

19   regularly paid Nevada utility and telephone bills) during the 1991 dispute period.[200]  Further, the

20   auditor expressly determined that Mr. Hyatt had sold the La Palma house on October 1, 1991.[201]

---

[197] Annex V, H BATES Documents (Homes Savings of America receipt noting $51,100.00 payment on 9/4/91 for Loan No. 665853 (H 025544)); Annex VI, CCC BATES Documents (Check No. 20 in the amount of $57,399.28 to Home Savings of America, dated 12/20/91 (CCC 02748 - 02749)).

[198] Annex VI, CCC BATES Documents (M. Kern Sept. 8, 1993 letter to M. Shayer (CCC 01269 – 01271)); Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶¶ 5, 6; Ex. 27, Affidavit of Roger McCaffrey, 1/22/01, ¶ 11; Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶ 4-9; and Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 32).

[199] Ex. 1, FTB 11/1/07 Determination Letter, p. 12.

[200] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 17 (CCC 00967, 00980, 00985); FTB Analysis of Utilities (CCC 03164 - 03166)).

[201] Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 4  (CCC 00967), conceding "the taxpayer sold the La Palma house on 10/1/91 ...."); *see also* Annex V, H BATES Documents (FTB 1992 initial audit determination letter, p. 2 (H 02192); FTB 1992 Narrative Report, p. 33 (H 02412)).

RJN000889

1  Moreover, FTB improperly ignores the statements by others, in sworn affidavits no less,

2  regarding Mr. Hyatt's many efforts to secure appropriate legal advice in advance regarding the sale of

3  the La Palma house to Ms. Jeng.  On September 5, 1991, Mr. Hyatt had a telephone conversation

4  with his attorney, Roger McCaffrey, regarding the sale of his La Palma house to Ms. Jeng.  During

5  that call, Mr. Hyatt advised Mr. McCaffrey that he intended to sell his La Palma house to Ms. Jeng

6  and that Ms. Jeng was concerned with protecting her privacy and did not want her name, address and

7  status as a single lady recorded in the public records.  Mr. McCaffrey advised Mr. Hyatt there was no

8  legal requirement that he record the sale of his house to Ms. Jeng and her privacy could be protected

9  simply by not recording the sale of the house and by not going through escrow.  Mr. McCaffrey also

10  referred Mr. Hyatt to Del Bailey, a real estate attorney in McCaffrey's office, and McCaffrey

11  discussed this matter with Mr. Bailey.[202]  Mr. Hyatt, Mr. McCaffrey and Mr. Bailey then met on

12  September 30, 1991 and discussed the sale further, including the payoff of the first trust deed held by

13  Home Savings on the La Palma house.[203]

14  Ms. Jeng owned the La Palma house for three full months during the 1991 disputed period

15  and during the entire 1992 disputed period.  By the terms of the loan, Ms. Jeng was to pay $1,100 to

16  Mr. Hyatt on the first of the month, every month, beginning on November 1, 1991; thus, there was no

17  payment due for October.[204]  Mr. Hyatt's CalFed bank account statement for the period December 20,

18  1991, through January 22, 1992, shows a deposit in the amount of $2,200 made on December 31,

19  1991, which Mr. Hyatt believes to be Ms. Jeng's first two monthly payments.[205]  This is consistent

20  with the amortization schedule for the 60-month loan note between Ms. Jeng and Mr. Hyatt relating

21  to the sale of the La Palma house.[206]

22

23

24  [202] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 4-6).

25  [203] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶ 7-9).

   [204] *See* Annex V, H BATES Documents (Note Secured by Deed of Trust (H 01247)); *see also* Ex. 29, Letter from E.
26  Coffill to C. Cinnamon dated 5/8/07 and documents attached thereto.  The records produced by Ms. Jeng reflect regular
   payments of $1,100 to Mr. Hyatt; however, the earliest documents she was able to produce were dated early 1992. (*See*
27  Annex V, H BATES Documents (three early-1992 Note payments (H 03712 – 03714)).

   [205] *See* Annex V, H BATES Documents (CalFed statement for period beginning 12/20/91 (H 00658)).

28  [206] *See* amortization schedule attached to Ex. 29, Letter from E. Coffill to C. Cinnamon dated 5/8/07.

1    Third, FTB contends Mr. Hyatt backdated the October 1, 1991 grant deed. "The grant deed

2    produced by Hyatt is dated October 1, 1991 and was allegedly notarized by a notary public on that

3    same date. The truth of the matter is that the document was actually notarized on June 10, 1993, with

4    the notary public dating the notarization as having taken place on October 1, 1991."[207] FTB also lists

5    this alleged false notarization issue in support of the assessed fraud penalty.[208] This is an

6    unsupported allegation that ignores the evidence in the record. Beyond the testimony of Mr. Hyatt

7    and Ms. Jeng,[209] the notary, Ms. Darlene Beer, testified that *she* erred in showing the notarization

8    took place on October 1, 1991, and she was *never* asked by Mr. Hyatt or anyone else to backdate

9    anything when she simply notarized the deed on June 10, 1993.[210] FTB had access to Ms. Beer's

10   deposition testimony from *Hyatt v. FTB*, but clearly has chosen to ignore Ms. Beer's sworn testimony

11   to the detriment of Mr. Hyatt. FTB goes so far as to falsely conclude "the subornation of the

12   backdating of the notarization of the grant deed in June 1993 substantially damages the taxpayer's

13   credibility in all respects."[211] Having absolutely no evidence of "subornation," FTB simply attacks

14   Mr. Hyatt's character and credibility. A further discussion of this issue is set forth at Argument IV,

15   *infra*, and will not be repeated here.

16           **b.    Homeowner's exemption termination**

17           Mr. Hyatt terminated the homeowner's exemption on his former California house approximately

18   four months after he sold the house to Ms. Jeng.[212] FTB contends this "suggests that [Mr.] Hyatt had not

19   sold the La Palma home as of February 10, 1992."[213] On the termination notice submitted to the Orange

20   County Assessor's office, Mr. Hyatt checked the first of two correct boxes, which stated Mr. Hyatt "did

21   not occupy the property as my principal place of residence as of 12:01 A.M., March 1, [1992]" and he

22   also hand wrote beneath the pre-printed text of the box he checked that the reason he did not occupy the

---

[207] Ex. 1, FTB 11/1/07 Determination Letter, p. 12.

[208] *Id.* at p. 28.

[209] Ex. 27, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. III, 8/17/05, p. 566-568; Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 11; Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 37).

[210] Ex. 30, Partial Transcript, Depo. of Darlene Beer, 4/9/04, pp. 83-86, 116-120.

[211] Ex. 1, FTB 11/1/07 Determination Letter, p. 24.

[212] *See* Annex II, 1992 Chronological Statement of Facts, p. 6 (Ex. 11, Homeowners' Exemption Termination Notice).

[213] Ex. 1, FTB 11/1/07 Determination Letter, p. 12.

RJN000891

1   property as his "principal place of residence as of 12:01 A.M., March 1, [1992]" was because he had

2   moved from the La Palma house in "Oct. 1991."[214]

3          FTB's strained interpretation and conclusion as to Mr. Hyatt's checking of the first box on the

4   homeowner's exemption termination notice sent to the Orange County recorder's office in February of

5   1992 is wrong. To imply more meaning into that form than Mr. Hyatt simply checked the first listed

6   correct box, *i.e.* he no longer occupied the property, demonstrates FTB's continued effort to interpret all

7   evidence against Hyatt, no matter how strained FTB's interpretation. To the contrary, this is a near-

8   contemporaneous document that confirms Mr. Hyatt's sale of the La Palma house. The form offered

9   two correct responses for Mr. Hyatt.[215] After checking the first box, there was no need to continue with

10   the form. As explained above, Mr. Hyatt's real estate attorney, Mr. Bailey, told Mr. Hyatt that Mr.

11   Hyatt had until December 10, 1992 to determinate the homeowner's exemption, but that Mr. Hyatt

12   should do it sooner than later. Mr. Bailey provided Mr. Hyatt with a form to fill out. Mr. Hyatt was

13   scheduled to check into the hospital on February 11, 1992 for major surgery for colon cancer the

14   following day, so he hastily filled out the form. The fact FTB has cited to this termination document as

15   evidence in FTB's favor demonstrates the weakness of the evidence in support of its residency position.

16            **c.    Continental Hotel stay**

17          FTB contends Mr. Hyatt's stay at the Continental Hotel from September 26, 1991 through

18   October 14, 1991 is "unsubstantiated" and "is neither plausible or [sic] credible."[216] FTB has no

19   evidence to rebut Mr. Hyatt's stay at the Continental Hotel. Rather, FTB claims that Mr. Hyatt lacks

20   credibility so FTB should not believe him.

21          The ongoing Continental Hotel "dispute" between Mr. Hyatt and FTB is one of many examples

22   of a problem Mr. Hyatt has encountered repeatedly throughout the course of these extended proceedings.

23   The problem here, and throughout the audit, is that FTB is simply unwilling to believe as true anything

24   which does not conform to FTB's subjective world view. Other examples abound, *e.g.*, a wealthy

25   successful person should not be driving an old car, or living in an apartment of something less than a

---

[214] Annex II, 1992 Chronological Statement of Facts, p. 6 (Ex. 11, Homeowners' Exemption Termination Notice).

[215] *See* Annex II, 1992 Chronological Statement of Facts, p. 6 (Ex. 11, Homeowners' Exemption Termination Notice).

[216] Ex. 1, FTB 11/1/07 Determination Letter, pp. 13-14.

RJN000892

1   luxury standard, so the truth simply cannot be that Mr. Hyatt owned an old car in need of repair or rented

2   and occupied an apartment at Wagon Trails. Other examples aside, the Continental Hotel is the prime

3   example of how "truth" to be accepted must conform to FTB's concept of truth.

4        It is a true fact that from September 26, 1991, to October 14, 1991, when Mr. Hyatt was in Las

5   Vegas, he stayed at the Continental Hotel.[217] Both Mr. Hyatt and Ms. Jeng had acquired rooms at the

6   Continental Hotel through a van tour company beginning on September 24, 1991.[218] Mr. Hyatt gave his

7   telephone number at the Continental Hotel to numerous individuals, who called him there multiple times

8   during the course of his stay.[219] In October 1991, Ms. Jeng visited Mr. Hyatt at the Continental Hotel.[220]

9   Finally, prior to October 21, 1991, Ms. Jeng arranged to move Mr. Hyatt's possessions from the

10  Continental Hotel to his Wagon Trails apartment while he was on a week-long business trip to the East

11  Coast.[221]

12       FTB rejects Mr. Hyatt's testimony that he stayed at the Continental Hotel from September 26,

13  1991, through mid-October 1991, as "neither plausible or [sic] credible" and "unsubstantiated with any

14  contemporaneous documentary evidence."[222] FTB, however, fails to explain what is neither plausible

15  nor credible about the following evidence: reservations for Mr. Hyatt at the Continental Hotel were

16  made by a tour bus driver, Mr. David Lau, as was his business;[223] there is no evidence to suggest that

17  Mr. Lau ever made a reservation in Mr. Hyatt's name or that the Continental Hotel knew the names of

18  all of the guests staying as part of Mr. Lau's tour group;[224] Mr. Hyatt and Grace Jeng paid Mr. Lau in

19  [217] Ex. 31, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. I, 08/15/05, p. 36; *see also* Annex VII, Affidavits in Support

20  of Mr. Hyatt (Ex. 16, Affidavit of R. Danny Huntington, 10/14/08, ¶ 10; Ex. 35, Affidavit of Harry Widdifield, 9/25/08, ¶ 8; Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 5; Ex. 22, Affidavit of Grace Jeng, 12/4/08, ¶ 13; *see also* Annex I,

21  1991 Chronological Statement of Facts, pp. 14-24 for specific entries during this time period that show Mr. Hyatt's stay at the Continental Hotel.

22  [218] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace Jeng, 12/4/08, ¶ 12).

    [219] Ex. 32, Partial Transcript, Depo. of Daniel Hyatt, Vol. II, 2/8/06, p. 366; Ex. 33, Depo. of Barry Lee, 2/06/06, pp. 219,

23  220; Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace Jeng, 12/4/08, ¶ 13; Ex. 16, Affidavit of R. Danny Huntington, 10/14/08, ¶ 11; Ex. 14, Affidavit of Henry Huey, 11/23/08, ¶ 1); Ex. 2, Affidavit of Caroline

24  Cosgrove, 11/24/08, ¶ 7)).

    [220] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace Jeng, 12/4/08, ¶ 12).

25  [221] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace Jeng, 12/4/08, ¶ 13).

26  [222] Ex. 1, FTB 11/1/07 Determination Letter, p. 14.

    [223] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace Jeng, 12/4/08, ¶ 12).

27  [224] Ex. 31, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. I, 8/15/05, p. 39; Ex. 34, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. IV, 12/05/05, p. 744; Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace Jeng,

28  12/4/08, ¶ 12).

RJN000893

1    cash for the hotel room and transportation;[225] and Mr. Kern's firm, Piercy, Bowler, Taylor and Kern,

2    made inquiries at the Continental Hotel for the records of either Mr. Hyatt or Ms. Jeng (and had Mr.

3    Kern known to ask for records involving the tour operator, he would have asked).[226]

4         Undeterred, FTB presses forward, apparently doubting that it is impossible for an individual to

5    have stayed at a hotel unless that person can produce a copy of a hotel bill in their name for the stay.  As

6    set forth above, Mr. Hyatt did not produce any contemporaneous documentary evidence because there is

7    none to produce.  There is no requirement under California residency law that contemporaneous

8    documentary evidence is the only form of proof that can sustain the taxpayer's burden of proof, and FTB

9    cannot unilaterally create such a requirement to suit its own purpose.  Mr. Hyatt has provided sworn

10   testimony and affidavits to support his stay at the Continental Hotel,[227] but FTB has repeatedly chosen to

11   ignore such third party evidentiary statements despite this Board's admonition to the contrary.[228]

12        Given FTB's *continued* insistence that Mr. Hyatt's stay at the Continental Hotel was

13   "unsubstantiated," Mr. Hyatt's Rabbi, Rabbi Hecht, and his wife, Michelina Hecht, have *now also*

14   provided affidavits regarding their recollections of meeting Mr. Hyatt and their interaction with him.

15   Rabbi Hecht was Rabbi for Temple Beth Am in Las Vegas.[229]  Rabbi Hecht and his wife first met Mr.

16   Hyatt at the Rabbi's office in Las Vegas on or about October 3, 1991.  At that meeting, Mr. Hyatt told

17   Rabbi Hecht and the Rabbi's wife that he had just moved from California, that he had just sold his house

18   in California, and that he was looking for an apartment to lease and a house to purchase in Las Vegas.[230]

19   In this early October 1991 meeting, Mr. Hyatt told Rabbi Hecht and his wife that he was staying at the

20   Continental Hotel in Las Vegas until he could lease an apartment.[231]  The Rabbi and his wife both

21

22   [225] Ex. 34, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. IV, 12/05/05, p. 744; Annex VII, Affidavits in Support of
     Mr. Hyatt (Ex. 22, Affidavit of Grace Jeng, ¶ 12).

23   [226] Ex. 35, Partial Transcript, Depo. of Michael Kern, Vol. III, 1/19/06, p. 55.

24   [227] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 16, Affidavit of R. Danny Huntington, 10/14/08, ¶¶ 10, 11;
     Ex. 35, Affidavit of Harry Widdifield, 9/25/08, ¶ 8; Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 5; Ex. 22, Affidavit of

25   Grace Jeng, 12/4/08, ¶ 12; Ex. 14, Affidavit of Henry Huey, 11/23/08, ¶ 11; Ex. 13, Affidavit of Michelina Hecht,
     11/16/08, ¶ 5.)

     [228] *See Appeal of Berner, supra.*

26   [229] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 12, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 2; Ex. 13, Affidavit of

27   Michelina Hecht, 11/16/08, ¶ 2)).

     [230] *Id.*, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 4; Affidavit of Michelina Hecht, 11/16/08, ¶ 4.

28   [231] *Id.*, Affidavit of Dr. Mel Hecht, 11/12/08, ¶ 5; Affidavit of Michelina Hecht, 11/16/08, ¶ 5.

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1992

1  specifically remember the name of the Continental Hotel not only because it was a prominent landmark,

2  but because they would occasionally dine there and regularly passed the Continental Hotel while

3  traveling on Flamingo Road to and from Temple Beth Am's office when it was located on Pecos Road

4  near Flamingo Road.[232]  Rabbi Hecht and his wife also recall that the Continental Hotel was well known

5  for its tours where buses and vans would pick up Asian vacationers in Southern California and take them

6  to the Continental Hotel.[233]

7         In addition to Rabbi Hecht and his wife, Mr. Hyatt has now also obtained an affidavit from his

8  long-term girlfriend, Ms. Cosgrove, regarding her recollection of his stay at the Continental Hotel during

9  the 1991 disputed period.  Ms. Cosgrove specifically recalls that in late September 1991, Mr. Hyatt told

10  her that he was staying at the Continental Hotel, and gave her the telephone number of the hotel and his

11  room number.  She then telephoned Mr. Hyatt about every evening at the hotel.[234]

12         FTB also attacks Mr. Kern's testimony that his firm made inquiries into Mr. Hyatt's stay at the

13  Continental Hotel.[235]  FTB states that Mr. Kern "alleges that he first tried to obtain the documentation …

14  shortly after the protest letter was filed for taxable year 1991 in April 1995."[236]  FTB's statement is false.

15  First, the protest letter for taxable year 1991 was filed on June 20, *1996*, which FTB admits in the

16  sentence preceding the one quoted above[237] and FTB, oblivious to its own mistake, continues to refer to

17  "the alleged April 1995 contact."[238]  Second, and of more importance, Mr. Kern testified that his firm

18  first requested documents from the Continental Hotel around April of 1996, which is before the filing of

19  the protest.[239]  In his sworn deposition testimony, Mr. Kern states that his firm contacted Ira Levy,

20  [232] *Id.*

21  [233] *Id.*, also stating: "By October 1991, [we] had observed tours at the Continental Hotel for several years, [we] had
    spoken with persons who had taken the tours, and [we] had observed advertisements for the tours.  [We] understood from
22  these observations that, in the 1991 time frame, the tour packages included hotel accommodations, ticket books, and other
    benefits and that the hotel set aside blocks of rooms for the tours."

23  [234] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 2, Affidavit of Caroline Cosgrove, 11/24/08, ¶ 7, further stating: "I
    would call the hotel and ask the hotel operator to connect me with his room number.  The hotel operator connected me with his
24  room and we talked.  I would place the calls to Gil because it was more economical for me to call him.  The cost savings was
    because I would direct dial from my home telephone at relatively low telephone rates while he had to pay much higher hotel
25  telephone rates").

    [235] Ex. 1, FTB 11/1/07 Determination Letter, p. 14.

26  [236] *Id.* at p. 13.

27  [237] Ex. 24, 1991 Protest, 6/20/96; Ex. 1, FTB 11/1/07 Determination Letter, p. 13.

    [238] Ex. 1, FTB 11/1/07 Determination Letter, p. 14.

28  [239] Ex. 28, Partial Transcript, Depo. of Michael Kern, Vol. II, 5/24/00, p. 278.

RJN000895

1  president and general manager of the Continental Hotel in 1996 and inquired as to documentation or

2  records concerning Mr. Hyatt's stay.[240] In response to his firm's inquiries into Mr. Hyatt's stay at the

3  Continental Hotel from late September 1991 through mid-October 1991, representatives at the

4  Continental Hotel replied that the Continental Hotel was "under investigation by the Gaming Control

5  Board for inadequate documentation and records," that the hotel "had a high turnover of employees" and

6  had "serious write-ups" by the Gaming Control Board, and that the hotel's "records were in

7  shambles."[241] Needless to say, no records were available.[242] As an aside, subsequently, Mr. Kern's

8  firm, after a meeting, declined to work for the Continental Hotel involving a gambling audit because

9  their records were in such shambles.[243] During this meeting, one problem raised concerning the

10  Continental Hotel was that it "*couldn't find the records.*"[244]

11       Changing tactics, FTB concludes that Mr. Hyatt and his representatives only "alleged" Mr. Hyatt

12  stayed at the Continental Hotel after the hotel's records had been destroyed per order of a Bankruptcy

13  Judge, implying a nefarious motive to the actions of Mr. Hyatt and his representatives.[245] Again, the

14  facts refute FTB's conclusion. Mr. Kern testified why Mr. Hyatt and his representatives chose not to

15  immediately notify FTB as to the particular hotel Mr. Hyatt remembered staying in.[246] Mr. Kern stated

16  – and with good cause in hindsight – their concern was that FTB would accept nothing short of

17  documentary proof the hotel stay,[247] and those concerns were recently validated in a Nevada court of

18  law.[248]

---

19  [240] *Id.* at pp. 277, 292.

20  [241] *Id.* at pp. 276, 280.

  [242] *Id.*

21  [243] Mr. Kern's firm was subsequently asked to *work for* the Continental Hotel in the audit it faced. But after Mr. Kern and

22  his partner, Ralph Piercy, attended a meeting with the Continental Hotel, Mr. Kern's firm determined that it "could not accept the engagement on the Continental Hotel due to the poor condition of their records, due to the Gaming Control

23  Board violations, ... [and due] to the fact that their accounting records were in shambles." (*Id.* at p. 281.)

  [244] *Id*, emphasis added.

24  [245] Ex. 1, FTB 11/1/07 Determination Letter, p. 14.

25  [246] Ex. 28, Partial Transcript, Depo. of Michael Kern, Vol. II, 5/24/00, pp. 277-278.

  [247] Mr. Kern testified to "concern was the misstatements and misrepresentations that [they] saw in the notice of proposed

26  assessments; the lack of willingness by the auditor to provide [them] the documentation the auditor was relying on" and the fact that "the auditor had relied on third-party sources that [Mr. Hyatt and his representatives] felt were inaccurate";

27  Mr. Hyatt's representatives therefore "wanted a confirming document to hand to ...the protest officer" to prevent "more of [the] misrepresentations and misallegations [from] being directed at Mr. Hyatt." (*Id.*)

28  [248] *See* fn. 22, *infra.*

RJN000896

1    FTB relies on an affidavit from a former Comptroller of the Continental Hotel to "prove" that the

2    documents from Mr. Hyatt's stay in 1991 would have been readily available in 1996 and 1997.[249]  FTB's

3    reliance is misplaced.  First, instead of contacting the Nevada Gaming Control Board to ascertain the

4    status of the Continental Hotel's records for 1996 in light of Mr. Kern's testimony in 2000, FTB chooses

5    in 2002 – two years later – to contact an individual and ask her for an assessment of her own job

6    performance.  Not surprisingly, the assessment is glowing, and includes an absolute assertion that the

7    records "were never disorganized or unavailable."[250]  Second, after deposing Mr. Kern in 2000 and

8    learning that Mr. Kern contacted Ira Levy (president and general manager of the Continental Hotel in

9    1996) we are not aware of any attempt by FTB to contact Mr. Levy to confirm Mr. Kern's inquiry.[251]

10   Third, the Comptroller states she does not recall any inquiry into the records by Mr. Kern's accounting

11   firm or by Mr. Hyatt, but she *never* states that she personally handled all such inquiries.  Rather, the

12   Comptroller says that "her *office* received all such requests."[252]  We know this to be false because Mr.

13   Kern's firm contacted the Hotel's General Manager directly to request records of Mr. Hyatt's stay.[253]

14   FTB simply disregards the affidavits and sworn testimony of multiple individuals who testified to calling

15   Mr. Hyatt at the Continental Hotel on numerous occasions during the time in question[254] because such

16   evidence does not conform to FTB's theory of the case.  In sum, various affiants have testified they

17   telephoned Mr. Hyatt at the Continental Hotel or that Mr. Hyatt told them shortly thereafter in late 1991

18   that he had stayed at the Continental Hotel.[255]  The fact Mr. Hyatt cannot produce a receipt in his name

19   for this hotel stay does not make it untrue that he stayed there.

20               **d.    Credit card and banking information**

21   FTB contends Mr. Hyatt's "credit card transactions ... beginning October 2, 1991 simply do not

22   place Hyatt in Las Vegas during the period October 2, 1991 through October 28, 1991" and that this

23   "financial documentary evidence simply does not corroborate the affidavits" attesting to Mr. Hyatt's

24   ───────────────
     [249] Ex. 1, FTB 11/1/07 Determination Letter, fn. 4.

25   [250] Ex. 36, Affidavit of Lisa Krasn, 3/14/02, ¶ 3.

     [251] Ex. 28, Partial Transcript, Depo. of Michael Kern, Vol. II, 5/24/00, pp. 277, 292.
26   [252] *Id.* at ¶ 5, emphasis added.

     [253] Ex. 28, Partial Transcript, Depo. of Michael Kern, Vol. II, 5/24/00, pp. 277, 292.
27   [254] *See* fns. 217, 219 and 227, *supra.*

28   [255] *See* fns. 217, 219 and 227, *supra.*

RJN000897

1   move in late September 1991.[256]  The 18 alleged credit card transactions from October 1991 are

2   addressed in full at pages 27-31 of Mr. Hyatt's Appellant's Opening Brief for 1991 (Case No. 435770),

3   and is incorporated herein by reference.  Those arguments will not be repeated here.

4                    **e.      Mr. Hyatt's apartment rental at Wagon Trails**

5           FTB determined Mr. Hyatt's rental of the Wagon Trails apartment "from October 21, 1991 until

6   on or after November 1, 1991" is not "credible" because there was allegedly no "electricity or phone

7   services."[257]  We do not understand FTB's logic.  November 1, 1991 is the date on the checks Mr. Hyatt

8   wrote to pay for his initial telephone and electricity service at his apartment.  We are not aware of, nor

9   does FTB cite to evidence that somehow the electricity service and telephone service did not start the

10  day he opened the accounts, which was October 21, 1991 for the electric service and October 22, 1991

11  for the telephone service.[258]

12          Moreover, FTB ignores the multitude of documentary and testimonial evidence supporting Mr.

13  Hyatt's rental of the Wagon Trails apartment starting October 21, 1991.  These facts are laid out in detail

14  at pages 94-105 of the May 31, 2001 Protest Supplement Letter for 1991.[259]  FTB has made no attempt

15  whatsoever to refute this weighty evidence in support of Mr. Hyatt's rental of the Wagon Trails

16  apartment starting October 21, 1991.

17          Finally, several recent affiants have testified that they telephoned Mr. Hyatt at his Las Vegas

18  apartment or that Mr. Hyatt had electric power in late October 1991.[260]

---

22  [256] Ex. 1, FTB 11/1/07 Determination Letter, pp. 15-16.

23  [257] *Id.* at p. 16.

    [258] *See* Annex I, 1991 Chronological Statement of Facts, pp. 26-27; *see also* Annex VII, Affidavits in Support of Mr.
24  Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶¶ 44-45).

    [259] *See* Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 94-105.

25  [260] Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 2, Affidavit of Caroline Cosgrove, 11/24/08, ¶ 9, 10; Ex. 4,
    Affidavit of Eugene Cowan, 11/14/08, ¶ 6; Ex. 8, Affidavit of Jeffrey Glassman, 11/18/08, ¶ 7; Ex. 12, Affidavit of Dr.
26  Mel Hecht, 11/12/08, ¶¶ 12, 13; Ex. 14, Affidavit of Henry Huey, 11/23/08, ¶ 12; Ex. 16, Affidavit of R. Danny
    Huntington, 10/14/08, ¶ 11; Ex. 18, Affidavit of Daniel J. Hyatt, 11/11/08, ¶ 16; Ex. 23, Affidavit of Robert Kazmaier,
27  10/29/08, ¶¶ 13, 15; Ex. 24, Affidavit of John Keller, 10/24/08, ¶ 10; Ex. 28, Affidavit of Roger McCaffrey, 11/17/08, ¶¶
    16-26, 28-34, 37-38; Ex. 31, Affidavit of Walter Shoemaker, 7/22/98, ¶ 4; Ex. 35, Affidavit of Harry Widdifield, 9/25/08,
28  ¶ 9).

#### f.    Voter registration

FTB states Mr. Hyatt "alleges that he registered to vote in Nevada in November 1991" "but did not vote in Nevada during the disputed period … for the specified reason that there were no major elections during that time."[261] The fact Mr. Hyatt registered to vote is substantiated by the evidence in this case[262] – this is not an "alleged" fact. Mr. Hyatt did in fact vote in person for the first major elections to occur (September and November 1992) after his move to Nevada, and never voted in California after September 1991.[263]

#### g.    Las Vegas home shopping

FTB spends two pages of its Determination Letter discussing Mr. Hyatt's efforts to purchase a home in Nevada starting in October 1991 and continuing through April 1992.[264] FTB then concludes that "[b]ased upon the information and documentation available it appears that Hyatt made offers to buy at least eight different Las Vegas properties during this time [*i.e.*, between October 1991 and March 1992]."[265] FTB, not surprisingly, underplays the strength of these Nevada connections. Mr. Hyatt's truly extensive Nevada home shopping activities are strong facts supporting Mr. Hyatt's Nevada residency during the 1991 and 1992 disputed periods. We encourage the Board to review the 1991 and 1992    Chronological Statement of Facts for the complete listing of Mr. Hyatt's Nevada house shopping activities.[266]

### III.    THE 1992 NOTICE OF ACTION CONTAINS A $24 MILLION INCOME ERROR

The $24 million income error in the 1992 Notice of Action issued by FTB on December 26, 2007 is based on a longstanding $24 million income error in the 1992 NPA. The auditor determined Mr. Hyatt received over $48 million of income on January 15, 1992.[267] However, as detailed below, this figure includes over $24 million of income that Mr. Hyatt did not receive during the 1992

---

[261] Ex. 1, FTB 11/1/07 Determination Letter, p. 17.

[262] *See* Annex V, H BATES Documents (Clark County Voter Information (H 01272)).

[263] *See* Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 5 (CCC 00968)).

[264] Ex. 1, FTB 11/1/07 Determination Letter, pp. 17-19.

[265] *Id.*

[266] *See* Annexes I and II. For the convenience of the Board, we have created a table with citations to the record with each of Mr. Hyatt's home offers on Las Vegas properties during the 1991 (and 1992) disputed period. (*See* Ex. 18.)

[267] *See* Annex VI, CCC BATES Documents (FTB 1992 Narrative Report at page 2 (CCC 00004)); *see also* Annex V, H BATES Documents (1992 Revised Proposed Adjustment Schedule II (H 02265)).

RJN000899

1    disputed period.  FTB erroneously attributed significant income earned by Mr. Hyatt *long after* the

2    April 3, 1992 date by which FTB concedes Mr. Hyatt became a Nevada resident to the period before

3    April 3, 1992.  Specifically, FTB issued an NPA for the tax year 1992 that included tax and penalty

4    on more than $24 million of income earned well after the time FTB concedes that Mr. Hyatt became

5    a Nevada resident and that is not taxable by FTB.

6          An FTB schedule attached to the 1992 NPA shows $84,973,440 of "proposed changes" of

7    "federal adjusted gross income."[268]  That figure includes, according to FTB's auditor, the following

8    amount of income purportedly received by Mr. Hyatt from Philips during the 1992 disputed period:

9    "1/15/92 Philips $48,780,951.20."[269]  As previously brought to FTB's attention on many prior

10   occasions, this amount lacks evidentiary support and is erroneous.

11         As has been stated *many* times before, the actual amount of income received by Mr. Hyatt

12   from Phillips in the 1992 disputed period was $23,919,327 — not $48,780,951.20 as alleged by

13   FTB.[270]  This represents an error by FTB of $24,861,625.20.  This error was then compounded by

14   FTB's imposition of a fraud penalty (discussed *infra*) on its own error and then interest on the tax and

15   penalty amounts.

16         FTB's error results from the auditor erroneously reporting the timing of the income received

17   by Mr. Hyatt.  In a letter dated February 7, 1996, Mr. Hyatt responded to FTB's request for

18   documentation supporting Mr. Hyatt's 1992 receipts by providing a table along with supporting

19   documentation that listed his 1992 income from Hitachi, Oki, and Philips, and the dates Mr. Hyatt

20   received the income.[271]  According to the table, Mr. Hyatt received from Philips $13,866,465.55 on

21   January 14, 1992, $10,000,000 on January 15, 1992, and $52,861.40 on February 12, 1992.[272]

22   Instead of aligning the table's "Date of Deposit" column with its "Deposit" column in calculating Mr.

23

---

24   [268] *See* Annex V, H BATES Documents (1992 NPA Schedule (H 02250)).

25   [269] *See* Annex VI, CCC BATES Documents (FTB 1992 Narrative Report at page 2 (CCC 00004)); *see also* Annex V, H BATES Documents (1992 Revised Proposed Adjustment Schedule II (H 02265)).

26   [270] *See* Annex VI, CCC BATES Documents (FTB 1992 Narrative Report at page 2 (CCC 00004); Form 2210 (CCC 00901 – 00903)); *see also* Ex. 37, the 9/5/92 and the 1/8/93 facsimiles, regarding 1992 estimated tax payment requirements.

27   [271] *See* Ex. 38, Letter from E. Cowan to FTB dated 2/7/96 and attachments thereto.

28   [272] *Id.*

RJN000900

1    Hyatt's income for the 1992 disputed period on her Revised Proposed Adjustment Schedule II, the

2    auditor incorrectly aligned the "Date of Deposit" column with the "Aggregate Amount" column and

3    wrongfully attributed income received by Mr. Hyatt long after April 2, 1992 (*i.e.*, the end of the 1992

4    disputed period).[273]

5        Mr. Hyatt brought the error to FTB's attention in a letter dated July 17, 1997.[274] Although the

6    auditor acknowledged receipt of Mr. Hyatt's supporting documentation, including Mr. Hyatt's 1992

7    Federal Income Tax Return (setting forth Mr. Hyatt's income received by quarter), and fully

8    understood the implications of the error, she did nothing about it.[275] FTB's auditor did not respond to

9    Mr. Hyatt and refused to correct this mistake during the audit, claiming that the mistake could be

10   corrected at protest, although the NPA had not yet been issued. However, FTB did not correct this

11   mistake at protest in spite of the specific, detailed information FTB received from Mr. Hyatt during

12   the more than ten years that the protest was pending, which confirmed the auditor had made a

13   significant income error. Rather, in its Determination Letter, FTB erroneously claims that the auditor

14   asked for detailed information that she did not receive.[276] This is not true.

15       Mr. Hyatt provided detailed income information immediately after FTB's auditor requested it

16   in a February 7, 1996 letter along with itemized and supported statements from Mr. Hyatt's financial

17   institutions.[277] The auditor never requested additional information regarding the 1992 income. On

18   July 17, 1997, October 10, 1997, and January 19, 1999, Mr. Hyatt again provided detailed 1992

19   income information with a request to correct the auditor's error.[278] On February 2, 2001, Mr. Hyatt

20   alerted FTB's protest hearing officer to the fact that the 1992 NPA still contained at least a $24

21

22   [273] *Id.; see also* Annex V, H BATES Documents (1992 Revised Proposed Adjustment Schedule II (H 02265)); Ex. 39, Depo. of Sheila G. Cox, Vol. VII, 3/25/99, pp. 1688:15 – 1693:23.

23   [274] Annex V, H BATES Documents (Letter. from E. Cowan to FTB dated 7/17/97 (H 02257 – 02259)).

24   [275] *See* Annex V, H BATES Documents (Auditor progress report, program worksheet and correspondence log (H 02315 – 02317); 1992 Federal Income Tax Return (H 02603 – 02651)); Ex. 40, Depo. of Sheila G. Cox, Vol. V, 2/15/99, pp. 1273:5-12; 1273:22 – 1274:6.

25   [276] Ex. 1, FTB 11/1/07 Determination Letter, p. 25.

26   [277] *See* Ex. 38, Letter from E. Cowan to FTB dated 2/7/96 and attachments thereto; *see also* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶¶ 65, 66 and Ex. 19 attached thereto.)

27   [278] *See* Annex V, H BATES Documents (Letter from E. Cowan to FTB dated 7/17/97 (H 02257 – 02259); letter from E. Cowan to FTB dated 10/10/97 (H 02245 – 02247)); and Ex. 41, 1/19/99 Letter from M. Kern to FTB; *see also* Annex VII,

28   Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 65 and Ex. 19 attached thereto.)

RJN000901

1  million income error.[279]  Mr. Hyatt additionally provided FTB with detailed account statements

2  confirming the auditor's income error.[280]  FTB also had Mr. Hyatt's 1992 federal income tax return,

3  which identified Mr. Hyatt's 1992 income on a quarterly basis.[281]  Even the most cursory review of

4  Mr. Hyatt's 1992 federal income tax return would have revealed and confirmed the auditor's $24+

5  million income error.[282]  Turning a blind eye to all of this evidence, FTB concludes in its

6  Determination Letter, "[c]learly, the taxpayer has this information and it can only be assumed that

7  providing the information would not be in his interest."[283]

8      FTB extends an olive branch by suggesting a "Possible Reconciliation" of Mr. Hyatt's income

9  for the 1992 disputed period.[284]  It is an empty gesture, however, as the branch bears little fruit.

10  FTB's reconciliation considers income received outside of the 1992 disputed period, including a July

11  9, 1992 payment on a July 1991 contract and a payment received on December 16, 1991.[285]  FTB's

12  calculations suggest that Mr. Hyatt only received $1,700,787 of income from Oki during the 1992

13  disputed period and that his Philips income was far less than the $48,780,951.20 originally assessed

14  by the auditor and included in the 1992 NPA that has been affirmed by FTB.[286]  While stopping short

15  of admitting (and correcting) its mistake, FTB now says it will "gladly make an adjustment" if "a

16  quasi-judicial or judicial body determines based on credible evidence that there is an overassessment

17  for taxable year 1992."[287]

18      Clearly FTB does not want to admit to and correct its auditor's significant error that greatly

19  reduces the 1992 assessment imposed on Mr. Hyatt.  Even worse, FTB has imposed a 75% fraud

20  penalty and a 50% interest penalty on the interest on the taxes and the fraud penalty upon Mr. Hyatt

21  for *FTB's own* $24 million income error.  Most distressing is the fact that FTB wasted no time in

22

---

23  [279] *See* Annex IV, 1992 Protest Supplement Letter, 2/2/01, p. 111.

24  [280] *See* Ex. 42, Letter from E. Coffill to FTB dated 6/8/01; and Ex. 43, Letter from E. Coffill to FTB dated 9/12/05.

     [281] *See* Annex V, H BATES Documents (Mr. Hyatt's 1992 federal income tax return (H 20603-02651)).

25  [282] *Id.*; *see also* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶ 67).

     [283] Ex. 1, FTB 11/1/07 Determination Letter, p. 25, emphasis added.

26  [284] *Id.*

27  [285] *Id.*

     [286] *Id.*

28  [287] *Id.*

RJN000902

1   correcting a mistake made by the same auditor at audit that would have *reduced* Mr. Hyatt's tax

2   liability by over $2.2 million![288]  FTB's rationale for refusing to correct an obvious error for which

3   detailed information has been repeatedly provided is incomprehensible.  Mr. Hyatt still, years later,

4   awaits a response and explanation – with appropriate documentation – from FTB, regarding (1) why

5   FTB maintains its calculation is correct, and (2) why FTB maintains Mr. Hyatt's calculation is not

6   correct.

7   **IV.    THE FRAUDULENT FAILURE TO FILE PENALTY FOR 1992 WAS IMPROPERLY
8          IMPOSED AND SHOULD BE REMOVED**

9       **A.    Introduction**

10          FTB's 50-page Determination Letter devotes a mere four pages to the fraud penalties it

11  imposed upon Mr. Hyatt at audit for both years,[289] despite the fact that it has the burden to establish

12  fraud by clear and convincing evidence.  This is a heavy burden for FTB to shoulder, so it

13  erroneously attempts to shift the burden to Mr. Hyatt.  This it cannot do.

14          For 1992, FTB imposed a fraudulent failure to file a return penalty in the amount of

15  $4,251,765.75. (For 1991, FTB imposed an accuracy related fraud penalty in the amount of

16  $1,407,353.25.)  On protest, FTB affirmed both penalties in full.[290]

17          After reciting the applicable statutes,[291] FTB states in its Determination Letter:

18          The protest hearing officer has determined that the fraud penalties should be
            sustained, because the actions of the taxpayer support finding that he
19          misrepresented facts and events in order to create the impression that he left
            California around September 24, 1991 when in fact he remained a resident well
20          after that date.  In addition to the general lack of credibility that proceeds from the

---

[288] *See* Ex. 44, Review Comments dated 12/12/96 (FTB 104-117); Ex. 45, Review Comments dated 8/4/97 (FTB 104-119). *See also* Ex. 39, Depo. of Sheila G. Cox, Vol. VII, 3/25/99, pp. 1680:3 – 1681:14; Ex. 46, Partial Transcript, Depo. of Rebekah Medina, Vol. II, 4/12/04, p.450:1-22; Ex. 47, Partial Transcript, Depo. of Rhonda Marshall, 5/10/00, p. 102:5-24.

[289] Ex. 1, FTB 11/1/07 Determination Letter, pp. 26-29.

[290] *See* Notices of Action, attached to SBE Notices of Appeal for 1991 and 1992.

[291] With respect to the fraudulent failure to file a return penalty for 1992, section 19131(a) states in pertinent part: "if any taxpayer fails to make and file a return required by this part on or before the due date of the return or the due dated as extended by the Franchise Tax Board, then, unless it is shown that the failure is due to reasonable cause and not due to willful neglect, 5 percent of the tax shall be added to the tax for each month or fraction thereof elapsing between the due date of the return…and the date on which filed, but the total penalty shall not exceed 25 percent of the tax."  Further, section 19131(d) states that if "any failure to file any return is fraudulent, subdivision (a) shall be applied by: (1) Substituting '15 percent' for '5 percent,' and (2) Substituting '75 percent' for '25 percent.'"

RJN000903

actions and allegations of Hyatt, the protest hearing officer *has identified a number of specific acts and events that clearly support a finding of intent to work fraud* on the state by the taxpayer.[292]

FTB then proceeds to identify five "specific acts and events" alleged to show fraud, each of which is addressed below. None were relied on at audit, and all have been raised as new grounds in the Determination Letter.[293] None are persuasive.

### B. The Burden of Proof Is Upon FTB to Show Fraud by Clear and Convincing Evidence

Before reviewing each of the five items, we first point out that nowhere in its Determination Letter does FTB acknowledge *it* bears the burden of proof regarding allegations of fraud. To the contrary, FTB states in its letter, "The burden of proof in tax disputes is on the taxpayer..."[294]

This Board has stated that because the California statute involved is substantively identical to the federal counterpart, "federal case law is persuasive authority in the interpretation and application of the California statute."[295] To this end, this Board frequently has cited federal cases regarding fraud-related issues.[296]

California case law refers to the clear and convincing standard when addressing fraud-related penalties assessed by FTB.[297] This Board has "defined [the standard] as 'explicit and unequivocal,' leaving 'no substantial doubt,' and 'sufficiently strong to command the unhesitating assent of every reasonable mind.'"[298] In *Appeal of Robert V. Erilane*, this Board stated that "[f]raud implies bad

---

[292] Ex. 1, FTB 11/1/07 Determination Letter, p. 27, emphasis added.

[293] We address the penalty only as a potential penalty on a "residency" assessment and not on a "sourcing income" assessment. That is because the penalty was imposed as part of the NPA which was based solely on the residency issue, and which was issued after FTB had considered, and rejected, any alternative sourcing income argument. (*See* Argument V, *infra*.) In addition, none of the five "specific acts and events" alleged by FTB has anything to do with sourcing, even under FTB's new section/regulation 17952 sourcing argument raised by FTB for the first time in its Determination Letter.

[294] Ex. 1, FTB 11/1/07 Determination Letter, p. 48, fn. 25.

[295] *Appeal of Gary O. Armstrong*, 81-SBE-177, Dec. 10, 1981.

[296] *See, e.g., Valetti v. Comm'r of Internal Rev.* (1958) 260 F.2d 185, 188 (holding that "fraud must be clearly and convincingly established" and "the piling of inference upon inference hardly qualifies as the ... evidence by which fraud must be proved"); *see also Appeal of Robert V. Erilane*, 74-SBE-050, Nov. 12, 1974; *Appeal of Charles L. and Phyllis R. Owen*, 76-SBE-025, March 8, 1976; *Appeal of Hubbard D. and Cleo M. Wickman*, 81-SBE-014, Feb. 2, 1981; and *Appeal of Barbara P. Hutchinson*, 82-SBE-121, June 29, 1982.

[297] *See, e.g., Appeal of Robert V. Erilane, supra; Appeal of Gary O. Armstrong, supra;* and *Appeal of William G., Jr. and Mary D. Wilt*, 76-SBE-030, Mar. 8, 1976.

[298] *See Appeal of Robert F. and Helen R. Adickes*, 90-SBE-012, Nov. 27, 1990, quoting *In re Jost* (1953) 117 Cal.App.2d 379, 383.

1  faith, intentional wrongdoing and a sinister motive." Further, this Board stated in fraud cases that the

2  "taxpayer must have 'the specific intent to evade a tax believed to be owing.'"[299] Because "intent is

3  rarely susceptible of direct proof ..."[it] must usually be inferred from the totality of facts and

4  circumstances in a case."[300] Although the government can turn to circumstantial evidence to carry its

5  burden of proof, fraud is "never presumed or imputed, and it will not be sustained upon

6  circumstances which, at most, create only suspicion."[301]

7      This Board also has stated that what is needed for the government to carry its burden of proof

8  with respect to fraud-related penalties is "evidence of affirmative acts of concealment,

9  misrepresentation or subterfuge" on the part of the taxpayer.[302] *Wickman* also states that neither

10  "ignorance, bad advice, honest mistake, negligence, [nor] misinterpretation of law" in itself would

11  constitute fraud."[303]

12  **C.  FTB Has Not Met Its Burden to Prove Fraud**

13      Against this legal background, and bearing the burden of proof, the first "specific act and

14  event" FTB alleges in support of fraud is "The Grant Deed for the Alleged La Palma Property

15  Sale."[304] Here, FTB alleges: "The department is informed and believes that Darlene Louise Beer, the

16  notary public who notarized the Hyatt Grant Deed, *has admitted* that the Grant Deed dated October 1,

17  1991 was actually notarized on June 10, 1993 and was backdated to October 1, 1991."[305] FTB's

18  allegation can be read in either of two ways, neither of which is evidence of fraud. First, the

19  allegation can be read as Ms. Beer "admitting" the *grant deed* was "backdated" to October 1, 1991.

20  Second, the allegation can be read as Ms. Beer "admitting" the *notarization* was "backdated" to

21  October 1, 1991. Both readings are false.

22      Ms. Beer, the notary, was deposed on April 9, 2004 in connection with the Nevada litigation.

23  Ms. Beer testified that *she* erred in showing the notarization took place on October 1, 1991, and she

---

24  [299] *Adickes, supra,* quoting *Appeal of George W. Fairchild,* 71-SBE-030, Oct. 27, 1971.

25  [300] *Adickes, supra,* quoting *People v. Kuykendall* (1955) 134 Cal.App.2d 642.

[301] *Erilane, supra,* quoting *Jones v. Commissioner* (5th Cir. 1958) 259 F.2d 300, 303.

26  [302] *See Appeal of Stephen Bellamy,* 85-SBE-002, Jan. 8, 1985; *Appeal of Hubbard D. & Cleo M. Wickman, supra.*

27  [303] *Appeal of Hubbard D. & Cleo M. Wickman, supra.*

[304] Ex. 1, FTB 11/1/07 Determination Letter, p. 28.

28  [305] *Id.* Emphasis added.

1   was *never* asked by Mr. Hyatt or anyone else to backdate anything when she simply notarized the

2   deed on June 10, 1993.[306] Ms. Beer did not know Mr. Hyatt.[307] The notarization was "nothing

3   unusual," and it was done at a bank where Ms. Beer worked.[308] Yet over *three* years after that

4   deposition was taken, FTB now claims, based only on undocumented "information and belief," that

5   Ms. Beer's self-admitted notarization date error is a "specific act or event" showing fraud by Mr.

6   Hyatt. Ms. Beer's testimony shows FTB's claim is false.

7         This false notarization issue has a long, and relevant, history. During the course of Mr.

8   Hyatt's audit, Mr. Hyatt produced to the auditor a copy of the La Palma grant deed dated October 1,

9   1991.[309] The copy produced by Mr. Hyatt was not notarized and, indeed, notarization was *never* an

10   issue at audit or protest because notarization and recordation are irrelevant to the validity of that

11   deed.[310] FTB on its own obtained a copy of the recorded grant deed; this (recorded) grant deed was

12   similar to the (unrecorded) grant deed produced by Mr. Hyatt at audit, but the recorded copy states

13   (mistakenly) it was notarized on October 1, 1991 by Ms. Beer. FTB's and the Attorney General's

14   investigators then located Ms. Beer and took a statement from her, during which she was shown

15   photographs of Mr. Hyatt with Hillary Clinton and President Clinton and told that Mr. Hyatt "is a

16   very powerful man and he doesn't like to have anybody say anything against him."[311] As a result of

17   those statements by FTB and having been shown the photographs by FTB, Ms. Beer became afraid of

18   testifying because she was "scared for [her] life and my family, and [she] wasn't going to do it."[312]

---

19  [306] Ex. 30, Partial Transcript, Depo. of Darlene Beer, 4/9/04, pp. 83-86, 116-120; *see also* Annex VII, Affidavits in
20  Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 11; Ex. 20, Affidavit of Gilbert P. Hyatt, 12/5/08, ¶¶ 37-38).

21  [307] *Id.* at p. 12.

22  [308] *Id.* at pp. 14, 30.

[309] Ex. 48, copy of La Palma Grant Deed produced by Mr. Hyatt.

23  [310] In its mission to verify notarization, the point FTB ignores in the Determination Letter is that the *deed itself* transferred
24  ownership of the La Palma house to Ms. Jeng on October 1, 1991. The fact that the deed was "actually notarized on June
10, 1993" does not contradict the fact that Mr. Hyatt *sold* the La Palma house to Ms. Jeng on October 1, 1991 and that
title passed on October 1, 1991. (Ex. 1, FTB 11/1/07 Determination Letter, p. 28.) It has been the law in California since
25  1872 that an "unrecorded instrument is valid as between the parties thereto and those who have notice thereof." (Cal. Civ.
Code § 1217; *see also Pomper v. Behnke* (1929) 97 Cal.App. 628, 637.) "[R]ecordation is not a prerequisite to the
26  validity of a deed." (*Devereaux v. Frazier Mountain Park & Fisheries Co.* (1967) 248 Cal.App. 2d 323, 328.) Auditor
Cox was not aware of either Civil Code section 1217 or this case law. (Ex. 2, *Hyatt v. FTB*, Partial Transcript of Trial
27  Proceedings, Testimony of Sheila Cox, 5/28/08, pp. 151-152.)

[311] Ex. 30, Partial Transcript, Depo. of Darlene Beer, 4/9/04, pp. 33:18-21, 84:18 – 85:5.

28  [312] *Id.* at pp. 33:15 – 35:25.

---

1    After interviewing Ms. Beer, FTB then claimed in September 2003 in the Nevada litigation that "FTB

2    discovered that Hyatt used a false notary to back date the deed conveying title to his California

3    house," a charge which Ms. Beer categorically denied when she was deposed.[313]

4         Based upon this extreme conduct by FTB, and based on Ms. Beer's deposition, it is

5    remarkable that FTB now in its Determination Letter would have the audacity to continue to make

6    this allegation of fraud simply on "information and belief." Indeed, if this Board was acting in the

7    role of an appellate court, FTB's fraud claim would be deemed waived for lack of evidentiary support

8    and would not even require discussion.[314]

9         The second "specific act and event" FTB alleges in support of fraud is "Down Payment on the

10   La Palma Property by Grace Jeng."[315] Here, FTB alleges that Ms. Jeng did not make the $15,000

11   down payment on the La Palma property to Mr. Hyatt "as he alleged;" that "the front of the check

12   shows that Hyatt wrote himself a $15,000 check from his own account;" and that "the back of the

13   check shows that Hyatt endorsed it for deposit only into his California Federal Bank account."[316]

14        Whether or not the check in question was for the down payment is not the issue. Ms. Jeng

15   testified that she paid the down payment to Mr. Hyatt; she also testified that in addition to the down

16   payment, she paid the interest on the note and ultimately paid off the note in a final payment.[317] FTB

17   even admits that (1) Ms. Jeng's own bank records show proof that she made payments on the

18   Promissory Note beginning in January 1992; (2) a wire transfer instruction from Ms. Jeng shows a

19   final payoff of the Note in the amount of $157,600.11 to Federated Investors of Pittsburgh,

20   Pennsylvania; and (3) Mr. Hyatt's Fidelity bank statement entry shows that the $157,600.11 was

21   deposited into his account.[318]

---

[313] *Id.* at pp. 92:8 – 94:13.

[314] "Where a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion." (*People v. O'Neil* (2008) 165 Cal.App.4th 1351, 1355, fn. 2 quoting *People v. Callegri* (1984) 154 CalApp.3d 856, 865.)

[315] Ex. 1, FTB 11/1/07 Determination Letter, p. 28.

[316] *Id.* at p. 29.

[317] *See* Annex VII, Affidavits in Support of Mr. Hyatt (Ex. 22, Affidavit of Grace J. Jeng, 12/4/08, ¶ 6).

[318] Ex. 1, FTB 11/1/07 Determination Letter, p. 12, fn. 3.

RJN000907

1   The third "specific act and event" alleged is that Mr. Hyatt "misused his corporation, Digital

2   Nutronics Corporation (DNC), to pay expenses that were not legitimate business expenses," and that

3   Mr. Hyatt "admits that he paid his elderly mother's personal expenses out of DNC's bank

4   account."[319]  Because Mr. Hyatt's mother passed away in 1988, FTB thus concludes that Mr. Hyatt's

5   "acts contributed to DNC's NOL carry forward to 1991."[320]  This claim is patently false.  First, Mr.

6   Hyatt did not admit to paying his mother's personal expenses out of DNC's bank account.[321]  Mr.

7   Hyatt stated in his deposition only that he "may have" written checks to pay for his mother's personal

8   expenses from the DNC account.[322]  Second, FTB offers no evidence linking Mr. Hyatt's alleged

9   payments to his mother with DNC's NOL carry forward in 1991.  Third, California suspended the

10  "net operating loss carry forward" deduction in 1991 and 1992 and DNC did not take such a

11  deduction on either its 1991 or 1992 California income tax return.  Finally, FTB fails to mention that

12  Mr. Hyatt was a creditor of DNC and that Mr. Hyatt wrote checks from DNC's account as payments

13  of a debt owed.[323]  In any event, corporate officers, with the consent of the shareholders, may use

14  corporate assets to noncorporate purposes, provided the rights of creditors are not prejudiced.[324]  FTB

15  loses sight of the fact this case is about residency and complaints about DNC are not relevant to

16  residency.

17      FTB's fourth alleged "specific act and event" is that Mr. Hyatt did not report $400,000 out of

18  the $800,000 of income received from Philips as of July 15, 1991 on his 1991 income tax return, but

19  assigned the money to DNC, "which had a questionable net operating loss carry forward" and used

20  DNC "to shelter that income."[325]  FTB's conclusion is wrong.  The $800,000 payment by Philips

21  under the Philips agreement was properly paid to Mr. Hyatt and to DNC.  Moreover, DNC never had

22  any ownership in Mr. Hyatt's patents.[326]  DNC was in the consulting business and DNC did

---

23  [319] *Id.* at p. 29.

24  [320] *Id.*

    [321] Ex. 49, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. II, 8/16/05, p. 256.

25  [322] *Id.*

    [323] Ex. 50, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. V, 12/6/05, p. 819.

26  [324] *See, e.g., Steinberg v. Buczynski* (7th Cir. Ill. 1994) 40 F.3d 890, 892; *Scholes v. Lehmann* (7th Cir. Ill. 1995) 56 F.3d

27  750, 754; and *Nursing Home Bldg. Corp. v. DeHart* (Wash. Ct. App. 1975) 13 Wn. App. 489, 497.

    [325] Ex. 1, FTB 11/1/07 Determination Letter, p. 29.

28  [326] *See* Ex. 51, letter from E. Cowan to Internal Revenue Service dated 5/28/96.

RJN000908

1   consulting work for Philips in the late 1980s and in 1990.[327] As mentioned above, DNC did not take

2   a deduction for its NOL carry forward on either its 1991 or 1992 California income tax returns. FTB

3   ignores the facts and relies solely upon bare allegations in making its conclusion.

4        Moreover, it makes no sense for FTB to look to DNC as a basis for imposing a fraud penalty

5   on Mr. Hyatt in this matter. As set forth above,[328] a fraudulent failure to file penalty is computed

6   under section 19131 based on the "tax for each month or fraction thereof elapsing between the due

7   date of the return … and the date on which filed…." Here, FTB, in both the NPA and the Notice of

8   Action, imposed a fraud penalty upon the full amount of the tax deficiency based on residency. In

9   other words, FTB has always tied the penalty to the residency assessment. FTB never based the

10  penalty in the NPA or the Notice of Action on any purported amount of business expenses *involving*

11  *DNC*. Further, no assessment against DNC – a separate taxpayer – was ever issued by FTB in

12  connection with this claim.

13       FTB alleges as its fifth and final "specific act and event" of fraud that "it appears [Mr. Hyatt]

14  deliberately failed to report $100,000 in gross receipts paid to him under the Pioneer Licensing

15  Agreement … as income for California tax purposes."[329] This claim too is wrong. Without

16  providing any evidence in support of its assertion, FTB merely concludes that because the agreement

17  was for $300,000, all of that money must have been paid to Mr. Hyatt, and because Mr. Hyatt only

18  reported $200,000 on his income tax return, Mr. Hyatt must have intentionally failed to report the

19  remainder for the purpose of defrauding the State of California. Such specious reasoning does not

20  prove fraud. FTB has never documented a payment to Mr. Hyatt in the amount of $300,000. On the

21  contrary, Mr. Hyatt correctly reported his income in 1991 for the Pioneer Option Agreement as

22  $200,000. Mr. Hyatt's best recollection is that of the $300,000 paid by Pioneer under the Option

23  Agreement, only $200,000 was actually paid to him.[330]

24

25

---

26   [327] *Id.*
     [328] *See* fn. 291, *supra.*
27   [329] Ex. 1, FTB 11/1/07 Determination Letter, p. 29.
28   [330] *See* Ex. 52, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. VIII, 4/26/06, pp. 1470-1471.

1    In sum, FTB is asking this Board to find that it – FTB – has carried *its* burden of proof under

2    *Erilane* and other decisions, *supra,* of showing fraud which under the law must be "explicit and

3    unequivocal," that leaves "no substantial doubt," that is "sufficiently strong to command the

4    unhesitating assent of every reasonable mind," and that "implies bad faith, intentional wrongdoing

5    and a sinister motive." On what basis? *None of FTB's five "identified acts and events" even has*

6    *anything to do with the 1992 disputed residency period.*[331]

7
8    **D.    FTB Never Responds to Our February 2, 2001 Protest Supplement on FTB Fraud Allegations**

9    It is also telling what FTB did *not* allege in its Determination Letter regarding fraud. Mr.

10   Hyatt's February 2, 2001 132-page Protest Supplement for 1992 devoted 17 pages to FTB's

11   allegations of fraud made as a result of the audit.[332] We respectfully urge the Board to review the

12   discussion and arguments made at pages 112-128 of that Protest Supplement,[333] and we urge this

13   Board to look for FTB's response to our discussion and arguments in FTB's Determination Letter.

14   Even over seven years later, no such response will be found – an omission especially conspicuous in

15   its absence where, as here, FTB bears the burden of proof on this issue.

16   Finally, a key point to keep in mind with respect to the 1992 penalty is that it was imposed

17   entirely as an afterthought to a very quick audit, and was not even initially suggested by Auditor Cox.

18   As discussed and substantiated in great detail in the 1992 Protest Supplement Letter, Auditor Cox

19   completed the audit by June 21, 1996 without any penalty, but she then informed Mr. Hyatt's audit

20   representative on April 10, 1997 that a fraud penalty was being imposed.[334] Recent trial testimony

21   reinforces this point. Auditor Cox testified she spent only 32 hours on the 1992 audit before FTB

22   ultimately issued the determination letter which included the $4,251,765.75 penalty.[335] Indeed, the

23

24   _____

25   [331] (1) The La Palma sale was in 1991; (2) the down payment by Grace Jeng on La Palma was in 1991; (3) the DNC expenses were not taken as a California NOL by DNC in 1992; (4) the Philips payment was in 1991; and (5) the Pioneer payment was in 1991.

26   [332] Annex IV, 1992 Protest Supplement Letter, 2/2/01, pp. 112-128.

27   [333] Annex IV, 1992 Protest Supplement Letter, 2/2/01.

     [334] Annex IV, 1992 Protest Supplement Letter, 2/2/01, p. 114.

28   [335] Ex. 2, *Hyatt v. FTB,* Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/28/08, pp. 125-126.

APPELLANT'S OPENING BRIEF - TAXABLE YEAR 1992

RJN000910

1    grand total of FTB time spent on the 1992 audit of Mr. Hyatt was only 78 hours.[336] Cox did not

2    initially suggest a fraud penalty for 1992.[337] Ultimately, the fraud penalty was applied, but Cox "did

3    not make that decision" and, indeed, even as of the date she testified in the Nevada litigation in June

4    2008, she was "not sure who made that decision."[338] Recall this is the same auditor that when

5    considering a fraud penalty for 1991, was told by FTB attorney Anna Jovanovich to make changes to

6    the fraud penalty portion of Ms. Cox's draft 1991 narrative report, and Ms. Cox simply made them.[339]

7    Recall Ms. Jovanovich previously had spoken at a residency meeting conference and has "*strongly*

8    *advocated to the residency auditors that they should be assessing the fraud penalty on residency*

9    *cases. She gave the impression that this penalty should be assessed on a majority of our cases…*"[340]

10    Again, as discussed above, the 1992 "audit" was essentially built upon the 1991 audit with minimal

11    additional factual or legal investigation. Indeed, in FTB's own words, "[w]e determined the 1992

12    fraud penalty should be assessed for 1992, since the facts and circumstances were the same as

13    1991."[341] In fact, Jeff McKenney, who "determined that the fraudulent failure to file penalty is

14    warranted"[342] for 1992, took the material from the auditor's 1991 fraud penalty write-up.[343] There is

15    nothing in the record showing any independent grounds for imposing the fraud penalty for 1992,

16    other than this "me too" attitude that a fraud penalty should be imposed for 1992 simply because FTB

17    had imposed a fraud penalty for 1991. Nothing in the record shows any *1992* facts which were

18    looked to for – much less supported – the imposition of a 1992 fraud penalty. Certainly there was

19    internal disagreement over imposition of the penalty for 1992, despite the fact the penalty already had

20    been imposed in the 1991 audit. For example, Rhonda Marshall of FTB disagreed with issuing a

21

22

[336] Ex. 3, *Hyatt v. FTB,* Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/29/08, p. 35

[337] Ex. 2, *Hyatt v. FTB,* Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/28/08, p. 81.

[338] Ex. 53, *Hyatt v. FTB,* Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 6/5/08, pp. 116-117.

[339] Ex. 2, *Hyatt v. FTB,* Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 5/28/08, p. 127; *see also* Ex. 54, Partial Transcript of Trial Proceedings, Testimony of Sheila Cox, 6/2/08, pp. 54-67, where Ms. Cox testified to some of the sentences added and other changes made.

[340] Ex. 55, E-mail to FTB audit staff dated 10/12/95, emphasis added.

[341] Ex. 45, FTB Audit Review Comments by Carol S. Ford, dated 8/4/97 (FTB 104119).

[342] *Id.*

[343] Ex. 56, Partial Transcript, Depo. of Jeffrey McKenney, Vol. III, 8/10/04, p. 600.

RJN000911

1  fraud penalty because "[s]he doesn't think the penalty should be issued for failure to file a return

2  where the taxpayer feels he was essentially a nonresident."[344]

3      "Fraud must be clearly and convincingly established."[345] FTB's evidence is hardly "explicit

4  and unequivocal" or "sufficiently strong to command the unhesitating assent of every reasonable

5  mind."[346] FTB has most certainly failed to meet its burden of proof in order to impose this fraud

6  penalty.

7  **V.  NONE OF THE PATENT LICENSING INCOME RECEIVED BY MR. HYATT IS**

8  **CALIFORNIA SOURCE INCOME**

9      FTB contends in its Determination Letter:

10      [t]he department would allege as an additional and an alternative basis for the
   [1991 and 1992] assessments that the patent licensing income received by the

11  taxpayer is, in whole or in large part, California source income taxable by
   California.  The protest hearing officer has determined that the assessments

12  should be affirmed on the *alternative* basis of California source income, *because
   the patents that formed the basis for the licensing agreements and income in issue*

13  *had acquired a business situs in California* and the actions of the taxpayer do not
   support finding that he terminated his business activity in California anytime

14  during 1991 or 1992.[347]

15      The headings in FTB's Determination Letter set forth two separate sourcing arguments: (1)

16  "The La Palma, California Home was Mr. Hyatt's Business Office"; and (2) "Commercial

17  Exploitation."[348]

18      To the extent it can be understood, FTB's argument is not specific to the 1992 tax year as

19  opposed to the 1991 tax year.  Accordingly, Board staff graciously granted Mr. Hyatt additional

20  pages of briefing in the *1991* Appeal (Case ID. No. 435770), upon his request that FTB's new

21  sourcing argument be addressed at one point in the briefing of both cases and made applicable to both

22  the 1991 and 1992 cases.[349]

23

---

24  [344] Ex. 57, FTB Memorandum dated 8/12/97, p. 2; Ex. 58, Partial Transcript of Proceeding, Depo. of Penny Bauche, Vol.

25  5, p. 1168.

   [345] *Valetti, supra* at 188.

26  [346] *Adickes, supra,* quoting *In re Jost* (1953) 117 Cal.App.2d 379, 383.

   [347] Ex. 1, FTB 11/1/07 Determination Letter, p. 30, emphasis added.

27  [348] *Id.* at pp. 31-41.

28  [349] *See* Letter from SBE Board Proceedings to E. Coffill, Case Nos. 435770 & 446509, dated 11/10/08.

RJN000912

1    Mr. Hyatt's response to FTB's sourcing argument in its Determination Letter is set forth at

2    pages 63-86 of Appellant's Opening Brief for Taxable Year 1991 (Case No. 435770), and that

3    response is incorporated by reference as if set forth fully herein.  There, Mr. Hyatt makes a series of

4    arguments.  First, the burden of proof on this issue is upon FTB because sourcing is a *new* argument

5    raised for the *first time* by FTB in its November 2007 Determination Letter, and which was not an

6    issue raised by FTB at protest.  Second, FTB's La Palma home "Business Office" argument fails both

7    as a matter of law and for a lack of evidentiary support.  Third, FTB's Commercial Exploitation"

8    argument fails both as a matter of law and for lack of evidentiary support.  Fourth and last, Mr. Hyatt

9    points out – a point omitted by FTB in its Determination Letter – that these same sourcing arguments

10   were thoroughly considered and rejected by FTB legal and audit staff in 1995 while Mr. Hyatt was

11   under audit (which is why sourcing was not an issue raised in the NPA or at protest).

12   As explained in detail in Appellant's Opening Brief for Taxable Year 1991, the "patent

13   licensing income received by the taxpayer"[350] which FTB now seeks to tax as source income can only

14   be taxed if the patents have a business situs in California under Regulation 17952(c).  Such income

15   can *only* have a business situs in California under Regulation 17952(c) if either (1) the intangible "is

16   employed as capital in this State", or (2) "the possession and control of the property has been

17   localized in connection with a business, trade or profession in this State so that its substantial use and

18   value attach to and become an asset of the business, trade or profession in this State."  FTB makes no

19   such showing.  Accordingly, FTB's sourcing income fails.

20   **VI.  FTB'S PROPOSED IMPOSITION OF AN AMNESTY PENALTY UNDER SECTION
21   19777.5 IS IN ERROR**

22   Section 19777.5 provides for a penalty equal to 50 percent of the interest that accrued on an

23   assessment from the original due date of the return to March 31, 1995.  Section 19777.5 is cited in the

24   Notice of Action in this matter.  Although this Board has frequently gone on record as stating it does

25   not have jurisdiction to review FTB's imposition of such penalty,[351] Mr. Hyatt nevertheless contends

26   ────────────────
[350] Ex. 1, FTB 11/1/07 Determination Letter, p. 30.

27   [351] The most recent expression of this position by this Board in its numerous decisions is in *Appeal of Larry Mazur*, SBE
377123, Sept. 16, 2008, a Summary Decision, which we do not "cite as precedent" (RTA 5451(d)), but merely to show

28   the Board is publicly on record that it will not address the issue.

RJN000913

1  this penalty should not be imposed on the grounds it is contrary to the Code, FTB's regulations,

2  judicial and SBE case law, and the United States and California Constitutions. Should the Board be

3  willing to consider this issue on its merits at this time, we would be pleased to provide full,

4  supplemental briefing at the Board's request.

5  **VII.  INTEREST ABATEMENT IS APPROPRIATE UNDER SECTION 19104**

6  On January 22, 2008, concurrent with the filing of this appeal, Mr. Hyatt made a request for

7  abatement of interest with FTB pursuant to section 19104 for the tax year 1992. A "request for

8  abatement of interest related to a proposed deficiency may be made … with an appeal to [this Board]

9  under Section 19045…."[352] In the event FTB denies the taxpayer's request, jurisdiction is vested in

10  this Board to determine whether FTB's "failure to abate interest under [section 19104] was an abuse

11  of discretion, and may order an abatement."[353] We contend that from the time the NPA was issued to

12  Mr. Hyatt on August 14, 1997 through the date FTB issued the Notice of Action on December 26,

13  2007 (hereinafter "abatement period in dispute"), there were significant administrative delays that

14  support abatement of interest under section 19104.

15  FTB "may abate all or any part of … [a]ny interest on a deficiency or related to a proposed

16  deficiency to the extent that interest is attributable in whole or in part to any *unreasonable error or*

17  *delay by an officer or employee of the Franchise Tax Board* (acting in his or her official capacity) *in*

18  *performing a ministerial or managerial act*."[354] Further, "an error or delay shall be taken into

19  account only if no significant aspect of that error or delay can be attributed to the taxpayer involved

20  and after the Franchise Tax Board has contacted the taxpayer in writing with respect to that

21  deficiency or payment."[355] Accordingly, interest may be abated if there is an error or delay that (1) is

22  attributable to a ministerial or managerial act performed by FTB; (2) occurred after FTB contacted

23  the taxpayer in writing about the particular deficiency; and (3) is not significantly attributable to the

24  taxpayer.

25

26  [352] Cal. Rev. & Tax. Code § 19104(b)(4).

   [353] Cal. Rev. & Tax. Code § 19104(b)(2)(B).

27  [354] Cal. Rev. & Tax. Code § 19104(a)(1), emphasis added.

28  [355] Cal. Rev. & Tax. Code § 19104(b)(1).

RJN000914

**A.      There Have Been Many Unreasonable Delays Attributable to Ministerial and Managerial Acts Performed by FTB Staff During the Processing of the Protest**

When a California statute is substantively identical to a federal statue,[356] it is well settled that federal authority interpreting the federal statute is highly persuasive in interpreting the California statute.[357] Treasury Regulation section 301.6404.2(b)(1) defines "managerial act," in relevant part, as follows:

> an administrative act that occurs during the processing of a taxpayer's case involving the temporary or permanent loss of records or the exercise of judgment or discretion relating to management of personnel. A decision concerning the proper application of federal tax law (or other federal or state law) is not a managerial act....

Treasury Regulation section 301.6404.2(b)(2) defines "ministerial act" as follows:

> a procedural or mechanical act that does not involve the exercise of judgment or discretion, and that occurs during the processing of a taxpayer's case after all prerequisites to the act, such as conferences and review by supervisors, have taken place. A decision concerning the proper application of federal tax law (or other federal or state law) is not a ministerial act.

The abatement period in dispute includes several acts of a "managerial" or "ministerial" nature by FTB staff that caused unreasonable delays.

First, FTB intentionally placed a "hold" on Mr. Hyatt's protest after the protest hearing. The protest hearing for tax year 1992 was held on September 27, 2000, over *seven* years prior to the issuance of the Notice of Action on Mr. Hyatt's protest. At the protest hearing, we were informed by the protest officer that a decision would be rendered by the end of the first quarter 2001, *i.e.*, within six months.[358] No such decision was rendered. When we inquired as to the status of a decision, we were informed in 2002 that the protest was on "hold," but that the protest officer had a draft protest letter prepared and could work up a final determination for the protest upon a few weeks notice.[359]

---

[356] Cal. Rev. & Tax. Code § 19104(a) is substantially identical to Internal Revenue Code § 6404(e).

[357] *Douglas v. State of California* (1942) 48 Cal.App.2d 835, 838; *see also* FTB Notice 89-277 (5/10/89).

[358] *See* Ex. 59, Letter from E. Coffill to C. Cinnamon, 2/28/01, pp. 9-10; *see also* Ex. 60, FTB PASS Event Log, User G. McLaughlin, event date 4/3/00, stating: "This is the 'high profile' residency case - the companion to the 'high profile' federal litigation case in Nevada. *The protest has been on hold for awhile, but is now active - and we intend to close it by March 31, 2001.*" (Emphasis added.)

[359] *See* Ex. 61, Letter from E. Coffill to G. McLaughlin, 3/7/02, stating: "You [George McLaughlin] *informed me the protests were not being worked on because of the pending Nevada litigation between Mr. Hyatt and FTB.* While it was not clear from our conversation exactly when this 'hold' was put on the protests, I told you what Cody [Cinnamon] had told me, *i.e.*, that Cody had not charged time on the protests since June 2001. You also informed me that you believe the

(Footnote continues on next page.)

RJN000915

1    While FTB's attorney, in open court, argued to the contrary,[360] FTB knew it had placed a hold on the

2    protest proceedings. In a February 20, 2002 e-mail from the protest officer, Cody Cinnamon, to her

3    supervisor, George McLaughlin, Ms. Cinnamon stated:

4         Eric Coffill called me and asked what was happening with the case. *I told Eric*

5         *that I was instructed not to work on the case due to the pending Nevada litigation.*
        He wanted further information so I referred Eric to you. Eric said he would be

6         calling you.[361]

7    (Emphasis added.) FTB's intentional "hold" placed on the protest, and the fact it had already drafted

8    the Determination Letter, is also evidenced in an e-mail from FTB counsel Ben Miller, dated April 5,

9    2002, stating "we should put things on hold with administrative matters, in particular the recent draft

10    letter."[362] As this Board, and FTB, is now aware, the "recent draft letter," i.e., the Determination

11    Letter, was not issued until November 1, 2007.[363]

12       FTB's placement of a "hold" on the protest proceedings for *over six years* constitutes an

13    unreasonable delay based on ministerial *and* managerial acts by FTB staff. The delay constitutes a

14    managerial act because it involved the "exercise of judgment or discretion relating to management of

15    personnel."[364] The protest officer was specifically instructed by her management to "hold" the

16    protest indefinitely, despite the fact she had already drafted the protest determination letter, pending

17    the Nevada litigation involving Mr. Hyatt and FTB. There is no conceivable reason for this delay.

18    The issue of residency was *not* a cause of action in *Hyatt v. FTB*. In fact, in February 1998, a month

19    after Mr. Hyatt filed the lawsuit against FTB in Nevada, FTB counsel Terry Collins, provided an

20    affidavit under oath declaring that "FTB intends to continue processing, and continues to process, Mr.

21    Hyatt's Protests within the administrative procedure set forth under California law for both tax years

22    (Footnote continued from previous page.)

23    protests are 'written up,' and that you believed that the FTB could issue proposed determination letters for 1991 and 1992
on relatively short notice of several weeks once the case was activated." (Emphasis added.)

24    [360] *See* Ex. 62, *Hyatt v. FTB*, Partial Transcript of Proceedings, 8/5/2005, p. 56, lines 6-13: "Mr. Giudici: No, your
Honor, and in fact I want to raise an objection. There is no evidence that the protest has been put on hold. They are

25    referring to a hearsay statement by Mr. Coffill, the attorney in the protest, who wrote a self-serving letter, and that letter
was in, I believe, March of 2002, where he is saying, 'You told me you've put the protest on hold.'"

26    [361] Ex. 63, E-mail from C. Cinnamon to G. McLaughlin, 2/20/02.

27    [362] Ex. 64, E-mail from B. Miller to C. Cinnamon, G. McLaughlin and C. Caglayan, 4/5/02.

     [363] *See* Ex. 1, FTB 11/1/07 Determination Letter.

28    [364] Treas. Reg. § 301.6404.2(b)(1).

1   (1991 and 1992) despite his filing of this legal action in Nevada."[365]  Notwithstanding this sworn

2   statement to the contrary and the fact residency was not an issue in the Nevada case, FTB

3   management directed the protest officer to indefinitely place a hold on the case, unreasonably

4   delaying the issuance of the already drafted protest determination letter and the Notice of Action.

5       The unreasonable delay due to the protest "hold" also constitutes a ministerial act because it

6   involves "a procedural or mechanical act that does not involve the exercise of judgment or discretion,

7   and that occurs during the processing of a taxpayer's case after all prerequisites to the act, such as

8   conferences and review by supervisors, have taken place."[366]  By the time the protest officer was

9   instructed to place the protest on "hold" (*i.e.*, some time prior to February 2002), the protest had been

10  "in process" well *over four years* (the protest was filed on October 10, 1997), the protest hearing had

11  been held and the protest determination letter had already been drafted.  It did not take "an exercise of

12  judgment" or "discretion" to choose to not move forward with the taxpayer's protest.  This delay by

13  FTB unnecessarily prolonged the taxpayer's protest with no apparent justification.  Accordingly,

14  FTB's failure to issue the determination letter and instead place the case on hold is the result of a

15  ministerial act that resulted in an unreasonable delay.

16      Second, FTB has lost, destroyed, or withheld numerous documents from the audit files that

17  would have aided in a more timely resolution of the protest.  The poor state of the audit files used by

18  the protest officers during the protest proceedings in the matter is particularly evidenced in an

19  October 10, 2000 memorandum from Mr. McLaughlin, supervisor to at least two of the protest

20  officers assigned to Mr. Hyatt's protest.  In that regard Mr. McLaughlin stated:[367]

21          As I discussed with you earlier, *the audit files in the above-captioned matter have
            been and continue to be a significant problem.  You are well aware of our*
22          *concerns over the condition of the files, particularly certain portions of them.*

23          .... With the Herculean effort by Cody Cinnamon, we were able to determine that
            we have some semblance of the complete audit file - recognizing that *there are*
24          *still gaps that can't fully be accounted for* and redactions/omissions that are

25  ───────────────────
    [365] Ex. 65, T. Collins affidavit, 3/18/98, ¶ 7, submitted with FTB's Motion for Judgment on the Pleadings filed in 1999 in
26  *Hyatt v. FTB*.
    [366] Treas. Reg. § 301.6404.2(b)(1).
27  [367] Ex. 66, Memorandum from G. McLaughlin to C. Caglayan, 10/10/00, emphasis added; *see also* Ex. 67, Memorandum
    from C. Cinnamon to B. Miller, 9/11/00, stating:  "This will serve as a request that any and all audit records currently
28  missing from my copy/facsimile of the audit files be provided to me."

RJN000917

related to confidential/privilege issue. We know that management is still working on filling those gaps for us. We are also now aware that Mr. Coffill does not have a copy of the files that matches ours - something that led to some embarrassment for us at the protest hearing.

For three years (*i.e.*, from October 1997 when the protest was filed to October 2000 when Mr. McLaughlin wrote the above quoted memo) FTB's protest officers were operating with a partial audit record. The incomplete state of the audit files is also memorialized in two earlier memorandums by Mr. McLaughlin. In a March 7, 2000 memorandum to Terry Collins, Mr. McLaughlin stated:[368]

> I have not had an opportunity to review the parts of the audit file that have been made available to Charlene Woodward [i.e., the protest officer assigned to the protest prior to Ms. Cinnamon], and by her to me; *we do not have a complete audit file and we do not have the original protest files.*
>
> * * *
>
> DOCUMENTS NEEDED
>
> *We do not have a complete copy of the audit record − only portions of it.* Therefore, please have a complete hard copy of the audit records (1991 and 1992) prepared, including all sections of the audit workpapers (sections 1 through x, however many there are), narratives, reviews, etc....

In a March 7, 2000 memorandum to Charlene Woodward, Mr. McLaughlin stated: "...*without having a complete copy of the audit files, we cannot effectively organize the working file.* Therefore, we can take no further action, until we get the complete audit files."[369] FTB's protest event log further underscore the incomplete state of the protest files:[370]

> I don't have the original protest record, including the protest letter! Anna Jovanovich was the original hearing officer assigned to the case. As you might imagine, the structure of a protest record is much less predictable especially since the case was not worked in PASS. When I am done with the audit record construction I will pursue constructing a facsimile of the historical protest record if GWM [Mr. McLaughlin] thinks that is needed.

In addition to the protest officer's lost and incomplete audit files, there have been numerous admissions by the auditor that she destroyed documents directly relevant to the residency issue in this matter. For example, the auditor did not take adequate steps to secure the renter's file from Mr.

---

[368] Ex. 68, Memorandum from G. McLaughlin to T. Collins, 3/7/00, emphasis added.

[369] Ex. 69, Memorandum from G. McLaughlin to C. Woodward, 3/7/00, emphasis added.

[370] Ex. 70, FTB PASS Event Log by User C. Cinnamon, event date 5/30/00.

RJN000918

1    Hyatt's Las Vegas Wagon Trails apartment[371] and she consistently destroyed all of her handwritten

2    notes.[372] We contend FTB's lost, destroyed and incomplete audit files caused an unreasonable error

3    or delay with the processing of the protest. A "temporary or permanent loss of records" is listed

4    specifically as a "managerial act" for which interest may be abated.[373]

5         Third, FTB unreasonably delayed the start of the protest by failing to expeditiously issue the

6    NPA. The auditor "closed [the] case and submitted to supervisor for approval" on June 18, 1996.[374]

7    Despite having closed the case in June 18, 1996, FTB did not issue the NPA until August 14, 1997 –

8    approximately 14 months later. Based on an April 4, 1997 e-mail from FTB audit reviewer Carol

9    Ford to audit supervisor Penelope Bauche, it appears as though the final review of the case was

10   delayed until December 12, 1996 or shortly thereafter.[375] Even with the delayed review, FTB still did

11   not issue the NPA until nine months later. Ironically, the auditor herself raised concerns about this

12   delay, asking her reviewer if the delay had to do with the guidance she had received to "sit on cases"

13   in order to meet fiscal year goals.[376] We contend this was an unreasonable delay due to a ministerial

14   act because it involved the simplistic (and mechanical) issuance of an NPA that no longer involved

15   the exercise of judgment or discretion.

16        Finally, we contend FTB's $24 million income error in calculating the 1992 NPA constitutes

17   an unreasonable error. As discussed in detail above in Argument III, the taxpayer has repeatedly

18   brought to FTB's attention the income error relating to the 1992 NPA. We contend FTB's failure to

19   make this correction constitutes an unreasonable ministerial error, justifying interest abatement.

20

21

22

23   [371] See fn. 38, supra.

24   [372] See Ex. 71, Hyatt v. FTB, Partial Trial Transcript, Testimony of Sheila Cox, 5/27/08, pp. 127-128, 197-198; Ex. 2,
     Hyatt v. FTB, Partial Trial Transcript, Testimony of Sheila Cox, 5/28/08, pp. 105-107; Ex. 3, Hyatt v. FTB, Partial Trial

25   Transcript, Testimony of Sheila Cox, 5/29/08, pp. 72-73; Ex. 54, Hyatt v. FTB, Partial Trial Transcript, Testimony of
     Sheila Cox, 6/2/08, p. 63; Ex. 72, Hyatt v. FTB, Partial Trial Transcript, Testimony of Sheila Cox, 6/6/08, p. 46.

26   [373] Treas. Reg. § 301.6404.2(b)(1).

     [374] Annex V, H BATES Documents (1992 FTB Progress Report, p. 1/4 (H02377)).

27   [375] Ex. 73, E-mail from C. Ford to P. Bauche dated 4/4/97 (FTB 16222).

28   [376] Id. The reviewer in turn asked her supervisor if the case had "anything to do with our 'meeting our numbers'?" (Id.)

RJN000919

**B.  The Unreasonable Delays Occurred After FTB Contacted Mr. Hyatt in Writing**

The initial audit contact letter by FTB was sent on November 2, 1995.[377]  All of the foregoing acts occurred after FTB contacted the taxpayer in writing about the 1992 tax year.

**C.  The Delays Are Not Significantly Attributable to Mr. Hyatt**

The foregoing delays were in no way attributable to Mr. Hyatt.  Each involved acts solely attributable to FTB staff.

**D.  The Delays Are Numerous and Successive**

Mr. Hyatt is entitled to interest abatement for the entire abatement period in dispute.  This Board has held that, under certain circumstances it will consider the cumulative effect of multiple errors and delays when determining the period for interest abatement.[378]  Ordinarily a taxpayer is entitled to abatement of interest during the discrete periods attributable to specified errors or delays.  However, when FTB errors and delays are "chronic, repetitive, and occur in close proximity," it can be difficult or impossible to identify the periods attributable to each error or delay.  Also, under these circumstances, the effect of each error on delay on subsequent events is also not readily predictable.  As a result, this Board has held that the cumulative effect of all errors and delays must be examined.[379]  If the cumulative effect is an unreasonably long delay in processing the case, the Board will grant interest abatement for the entire period.

FTB's delays and errors in this matter have been "numerous and successive."[380]  Due to the far-reaching effects of FTB's actions, it is impossible to identify the period of abatement for each error or delay.  It is similarly impossible to determine the effect of each delay or error on subsequent events.  The "residual consequences of early errors," compounded by later events, have resulted in what has been an "unreasonably long period for an audit and protest to last."[381]  Because the cumulative effect of FTB's errors and delays resulted in an unreasonably long delay, Mr. Hyatt is

---

[377] *See* Annex V, H BATES Documents (1992 Progress Report, p. 1/1 (H02375), entry for 11/2/95).
[378] *Appeal of Shugart*, 2005-SBE-001, July 1, 2005.
[379] *See id.*
[380] *Id.*
[381] *Id.* Compare *Shugart*, where the audit and protest lasted nearly nine years, with the nearly fifteen years that have passed thus far since FTB began its audit of Mr. Hyatt.

RJN000920

1  entitled to interest abatement for the entire delay period from the time the audit was closed on June

2  18, 1996 through the date FTB issued the Notice of Action on December 26, 2007.

3       **E.     Conclusion**

4       Mr. Hyatt has been dealing with this intrusion by FTB in his life for nearly 15 years. Over ten

5  years passed between the time Mr. Hyatt received the NPA on October 10, 1997 and FTB's issuance

6  of the Notice of Action on December 26, 2007. A protest hearing was not held until September 27,

7  2000, nearly three years after the filing of the protest on October 10, 1997. Mr. Hyatt wanted nothing

8  more than to bring closure to the protest proceedings and move forward with his case, and he

9  steadfastly requested that FTB issue a final determination throughout the protest proceedings.[382]

10 Despite these requests, the protest determination letter for the year in issue was not received until

11 November 1, 2007, more than seven years after the protest hearing for the 1992 taxable year was

12 held, and more than ten years after the protest was initially filed.

13      We understand how pending litigation in *Hyatt v. FTB* would make attention to this matter

14 more challenging. However, Mr. Hyatt, who simply (and successfully) fought for his rights, is not

15 responsible for FTB's intentional and unilateral decision to unreasonably delay the processing of his

16 protest, amongst the many other ministerial and managerial acts that significantly delayed the

17 administrative proceedings.

18      For these reasons, the taxpayer respectfully requests that FTB abate interest in this matter with

19 respect to the entire abatement period in dispute.

20 **VIII.  CONCLUSION**

21      For the above stated reasons, we respectfully request that the actions of FTB on appellant's

22 protest against the proposed assessment be reversed.

23

24

25

26

27 [382] *See, e.g.*, Ex. 61, Letter from E. Coffill to G. McLaughlin, 3/7/02; Ex. 74, Letter from E. Coffill to G. McLaughlin, 1/29/03; Ex. 75, FTB Telephone Call Memo - Legal Division by A. Jovanovich, 1/8/98, stating Mr. Hyatt's counsel

28 "wants to do whatever is quickest for his client in terms of proceeding [with the] protest."

RJN000921

1    Dated: December 9, 2008                Respectfully submitted,

2                                           ERIC J. COFFILL
                                            CARLEY A. ROBERTS
3                                           MORRISON & FOERSTER LLP

4

5                                           By: _____
                                                ERIC J. COFFILL
6
                                            Attorneys for Appellant
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RJN000922



State of California
Franchise Tax Board

Date:    01.27.09                          Case:            7150053859256143
                                           Case Unit:       7150053859256163
                                           In reply refer to   410:RWD

TO:      CHIEF, BOARD PROCEEDINGS DIVISION
         STATE BOARD OF EQUALIZATION
         450 N STREET, MIC: 81
         SACRAMENTO, CA  95814

FROM:    ROBERT W. DUNN

RE:      Appeal of Gilbert P. Hyatt
         Appeal Case ID No. 446509 & 435770

# MEMORANDUM

Respondent California Franchise Tax Board (FTB) received appellant Gilbert P. Hyatt's dual opening briefs in this matter on December 9, 2008. Shortly thereafter we received boxes of exhibits and attachments.

Following the filing of his appeal, your Board originally granted Mr. Hyatt an opening brief due date of July 31, 2008. Mr. Hyatt then asked for and received three successive filing extensions.[1] The final filing date was December 9, 2008, which was met.

FTB has preliminarily reviewed Mr. Hyatt's dual opening briefs and exhibits. The briefs are lengthy documents, one totaling 95 pages and the second 75 pages. Supporting exhibits are contained within four file boxes and, of import, they include documentation new to FTB. Supporting his dual briefs and the arguments therein are no less that 26 newly sworn affidavits. These affidavits were never presented to FTB's auditors or protest hearing officers in this matter, even though the audit began in mid-1993 and the protest dates to 1997. Many

---

[1] On June 30, 2008, Mr. Hyatt requested in writing an extension to file until September 29, 2008. Your Board granted this request. In an e-mail dated July 3, 2008, Mr. Hyatt requested an extension to file until November 25, 2008. That request was also granted. By telephone call on November 17, 2008, Mr. Hyatt requested a third extension.

FTB PASS 2140 (REV 05-2008)
Appeals/Correspondence/FTB Postponement Request
Page 1 of 2

Legal Division MS A260
PO Box 1720
Rancho Cordova CA 95741-1720

Tel  (916) 845-3338
Fax  (916) 843-6041
Robert.dunn@ftb.ca.gov

RJN000923

Date                    : 01.2⁷.09
Appeal Name             : Gilbє  .P. Hyatt
Appeal Case ID No.      : 446509 & 435770

of Mr. Hyatt's 2008 affiants are attesting to personal knowledge of events that occurred in 1991.

In the dual opening briefs Mr. Hyatt has also included considerable reference to the trial record from his collateral tort litigation against FTB in Nevada, even though that litigation is far from resolved. Mr. Hyatt advances various legal theories as to the impact of a Nevada jury verdict and Nevada trial court rulings upon this California administrative proceeding. These theories appear to present issues of first impression in this forum.

To effectively and properly address the new alleged facts and legal argument FTB requests more time than the standard 90 days allowed for an opening brief. Part of the reason for this postponement request is simply the time and work required to adequately address all the new documentation and legal issues. However, the central reason for this request is that FTB will need time to investigate the new alleged facts, which may require time for legal process. Therefore, FTB requests that your Board grant a postponement in accordance with Board of Equalization Rules for Tax Appeals, Section 5522.8(b)(5). FTB requests the matter be removed from the appeal calendar until FTB has notified your Board that its investigation is complete. FTB anticipates this will take approximately six to nine months. FTB will contact the Board promptly when complete.

FTB also requests your Board conduct a pre-hearing conference as set forth in Board of Equalization Rules for Tax Appeals, Section 5443. The stated purpose of such a hearing is "...to obtain additional facts and evidence, obtain stipulations of fact, and narrow questions of law, in order to facilitate a more efficient and productive oral hearing." As will be clear upon receipt of FTB's Opening Brief—if it is not already clear after a review of Mr. Hyatt's dual opening briefs—administrative efficiency and economy can be well served by such a hearing. There are likely to be some facts to which the parties can stipulate, some disputed facts upon which the central issues of residency, fraud and income sourcing will turn, and some questions of law that could be issues of first impression with your Board. Therefore, FTB requests a pre-hearing conference be scheduled upon completion of the briefing.

In accordance with Section 5522.8(b)(5) please forward this request to your Board's Chief Counsel.

If there are any questions please do not hesitate to contact me.

Tax Counsel IV

cc:    Eric J. Coffill

---

RJN000924

2/17/2017             53264: Case View



Appellate Case Management System
C-Track, the browser based CMS for Appellate Courts

The Supreme Court
of Nevada

Find Case...

**Cases**
Case Search
Participant Search

> Disclaimer: The information and documents available here should not be relied upon as an official record of action.
> Only filed documents can be viewed. Some documents received in a case may not be available for viewing.
> Some documents received from a lower court, including records and appendices, may not be available for viewing.
> For official records, please contact the Clerk of the Supreme Court of Nevada at (775) 684-1600.

**Case Information: 53264**

| | | | |
|---|---|---|---|
| Short Caption: | FRANCHISE TAX BD. VS. HYATT | Classification: | Civil Appeal - General - Other |
| Lower Court Case(s): | Clark Co. - Eighth Judicial District - A382999 | Related Case(s): | 35549, 36390, 39274, 39312, 47141 |
| | | Case Status: | Screening Completed |
| Disqualifications: | Saitta | Panel Assigned: | En Banc |
| Replacement: | | | |
| To SP/Judge: | | SP Status: | |
| Oral Argument: | 06/18/2012 at 10:00 AM | Oral Argument Location: | Carson City |
| Submission Date: | 06/18/2012 | How Submitted: | After Oral Argument |

**+ Party Information**

**Docket Entries**

| Date | Type | Description | Pending? | Document |
|---|---|---|---|---|
| 02/13/2009 | Filing Fee | Received Filing Fee Paid on Filing. $250.00 from McDonald firm - check no. 17292. | | |
| 02/13/2009 | Notice of Appeal Documents | Filed Certified Copy of Notice of Appeal/Settlement. --SEALED--Notice Re Settlement Conference Program and Suspension of Rules mailed to all counsel. (The requesting of transcripts and briefing are stayed pursuant to NRAP 16(a)(1). Docketing Statement Form mailed to counsel for appellant(s).) | | |
| 02/18/2009 | Motion | Filed Motion for Stay. Motion for Stay Pending Appeal Without Bond. | | 09-04175 |
| 02/18/2009 | Appendix | Filed Appendix. Volume 1. Appendix to Motion for Stay Pending Appeal Without Bond. | | 09-04177 |
| 02/18/2009 | Appendix | Filed Appendix. Volume 2. Appendix to Motion for Stay Pending Appeal Without Bond. | | 09-04178 |
| 02/18/2009 | Appendix | Filed Appendix. Volume 3. Appendix for Motion for Stay Pending Appeal Without Bond. | | 09-04179 |
| 02/18/2009 | Notice/Outgoing | Issued Notice to File Documents. It has been determined that this appeal will not be scheduled for settlement conference. Transcript request form due: 15 days. Opening Brief due: 120 days. | | 09-04262 |
| 02/19/2009 | Other | Disqualification of Justice Saitta. Sat in district court proceedings. | | |
| 02/19/2009 | Notice/Outgoing | Issued Notice of Justice Disqualification. Justice Saitta sat in district court proceedings. | | 09-04346 |
| 02/23/2009 | Docketing Statement | Filed Docketing Statement. | | 09-04703 |
| 02/24/2009 | Motion | Filed Motion to Extend Time. Respondent Gilbert P. Hyatt's Motion for Extension of Time Within Which to Serve and File Opposition to Appellant's Motion for Stay Pending Appeal Without Bond. | | 09-04736 |
| 02/26/2009 | Transcript Request | Filed Certificate of No Transcript Request. Certificate Pursuant to NRAP 9(a). | | 09-05063 |
| 02/26/2009 | Order/Procedural | Filed Order Granting Motion. for an Extension of Time to File Opposition. Respondent shall file and serve his opposition by March 12, 2009. | | 09-05068 |
| 03/11/2009 | Filing Fee | Received Filing Fee Paid on Filing. $250.00 from Hutchison & Steffen, LLC--check no. 4820. | | |
| 03/11/2009 | Notice of Appeal Documents | Filed Certified Copy of Notice of Cross-Appeal. --FILED UNDER SEAL--(Docketing statement mailed to counsel for cross-appellant.) | | 09-06209 |
| 03/12/2009 | Motion | Filed Response to Motion. Respondents Gilbert P. Hyatt's Opposition to Appellant's Motion for Stay Pending Appeal Without Bond. | | 09-06362 |
| 03/12/2009 | Appendix | Filed Appendix. Volume 1 Hyatt's Appendix of Exhibits in Support of Respondent Gilbert P. Hyatt's Motion for Stay Pending Appeal Without Bond. | | 09-06365 |
| 03/13/2009 | Order/Incoming | Filed District Court Order. Copy of Discovery Commissioner's Report and Recommendation filed March 18, 1999, stating, "The court file in this case is sealed. All documents filed with the Court shall be done so under seal." | | 09-06549 |
| 03/17/2009 | Notice/Outgoing | Issued Notice to Confirm as Counsel. Issued to all counsel. Due Date: 10 days | | 09-06710 |
| 03/18/2009 | Notice of Appeal Documents | Filed Case Appeal Statement. Amended Case Appeal Statement. | | 09-06887 |
| 03/20/2009 | Docketing Statement | Filed Docketing Statement. Respondent/Cross-Appellant Gilbert Hyatt. | | 09-07129 |
| 03/20/2009 | Transcript Request | Filed Certificate of No Transcript Request. Submitted by counsel for respondent/cross-appellant. | | 09-07130 |
| 03/20/2009 | Letter/Incoming | Filed Letter. from attorney Robert L. Eisenberg confirming as counsel of record for appellant Franchise Tax Board. | | 09-07151 |
| 03/24/2009 | Letter/Incoming | Filed Letter. from attorney Carla B. Higginbotham of McDonald Carano Wilson confirming as counsel for Appellant/Cross-Respondent. | | 09-07408 |
| 03/27/2009 | Motion | Filed Motion for Permission to File Document. Request for Permission to File Reply in Support of Motion for Stay Pending Appeal Without Bond. | | 09-07680 |
| 03/27/2009 | Motion | Received Reply to Response. Reply in Support of Motion for Stay Pending Appeal Without Bond. FILED PER ORDER OF 4/8/09. | | 09-07683 |
| 04/02/2009 | Motion | Filed Response to Motion. Objection by Respondent Gilbert P. Hyatt to Appellant's Request to File Reply in Support of Motion for Stay Pending Appeal Without Bond. | | 09-08293 |
| 04/02/2009 | Appendix | Filed Appendix. Volume 1 Hyatt's Supplemental Appendix of Exhibits in Support of Respondent Gilbert P. Hyatt's Objection to Appellant's Request to File reply in Support of Motion for Stay Pending Appeal Without Bond. | | 09-08296 |
| 04/03/2009 | Notice/Incoming | Filed Notice. Errata to Appellant's Request for Permission to File Reply, and to Proposed Reply, Regarding Motion for a Stay Without a Bond. | | 09-08444 |
| 04/08/2009 | Order/Procedural | Filed Order Granting Motion. for Stay without Bond. We grant the motion for stay and direct the clerk of this court to file her reply provisionally received on March 27, 2009. | | 09-08787 |
| 04/08/2009 | Motion | Filed Reply to Response. in Support of Motion for Stay Pending Appeal without Bond. | | 09-07683 |
| 05/15/2009 | Filing Fee | Returned Filing Fee. Check No. 17661 returned to McDonald Carano Wilson. | | |
| 05/15/2009 | Notice of Appeal Documents | Filed Certified Copy of Notice of Appeal/Amended/Supplemental. | | 12-12079 |
| 05/18/2009 | Motion | Filed Motion. Motion for Leave to File Brief as Amicus Curiae Pursuant to NRAP 33. | | 09-12287 |
| 05/18/2009 | Motion | Filed Motion. Motion to Suspend Briefing Schedule Pending Determination of Motion for Prehearing Conference Pursuant to NRAP 33. | | 09-12288 |
| 05/21/2009 | Motion | Filed Response to Motion. Response by Respondent Gilbert P. Hyatt to Appellant's Motion for Prehearing Conference Pursuant to NRAP 33. | | 09-12636 |
| 05/28/2009 | Letter/Incoming | Filed Letter. from Peter C. Bernhard confirming as counsel for Respondent/Cross-Respondent. (Filed via fax.) | | 09-13340 |
| 06/02/2009 | Order/Procedural | Filed Order Denying Motion. Requesting an NRAP 33 Prehearing Conference. Fn1 [In light of our resolution, we deny as moot appellant/cross-respondent's motion to suspend briefing pending resolution of the motion for a prehearing conference.] | | 09-13659 |
| 06/08/2009 | Motion | Filed Motion and Order Extending Time. (Appellant/Cross-Respondent). Brief due: July 20, 2009. | | 09-14286 |
| 06/26/2009 | Notice/Incoming | Filed Notice of Change of Address. Notice of Change of Firm and Address (Peter C. Bernhard). | | 09-15842 |
| 06/30/2009 | Notice/Incoming | Filed Notice of Change of Address. Notice of Change of Firm Address (Donald J. Kula of Perkins Coie). | | 09-16164 |
| 07/20/2009 | Motion | Filed Motion for Excess Pages. Motion for Permission to File an Opening Brief in Excess of Thirty Pages. (118 pages). | | 09-17722 |
| 07/20/2009 | Brief | Filed Amicus Brief. Amicus Curiae Brief of the State of Utah. (Joined in by the States of Arkansas, Colorado, Delaware, Florida, Idaho, Maine, Maryland, Missouri, Ohio, Oklahoma, North Dakota, Tennessee, Vermont, Virginia and Washington). | | 09-17734 |
| 07/20/2009 | Notice/Incoming | Filed Notice. Notice of Concurrence. | | 09-17739 |
| 07/20/2009 | Motion | Filed Motion. Filed Motion to Allow Association of Counsel for Purpose of Permitting Filing of Brief by States as Amici Curiae in Support of Appellant/Cross-Respondent Franchise Tax Board of the State of California. (Clark Len Snelson, Esq.) | | 09-17747 |
| 07/20/2009 | Motion | Filed Motion. Filed Motion to Allow Association of Counsel for Purpose of Permitting Filing of Brief by Multistate Tax Commission as Amici Curiae in Support of Appellant/Cross-Respondent Franchise Tax Board of the State of California. (Bruce J. Fort, Esq.) | | 09-17750 |
| 07/20/2009 | Motion | Filed Motion. Motion for Leave to File Brief as Amicus Curiae in Support of Appellant/Cross-Respondent Franchise Tax Board of the State of California. (Multistate Tax Commission) | | 09-17753 |
| 07/22/2009 | Motion | Filed Motion. Motion for Leave to File Brief as Amicus Curiae in Support of Appellant/Cross-Respondent Franchise Tax Board of the State of California. (Multistate Tax Commission (MTC)) | | 09-17943 |
| 07/22/2009 | Motion | Filed Motion. (STRICKEN PER ORDER 08/07/09). Motion to Strike Motion for Leave to File Brief as Amicus Curiae in Support of Appellant/Cross-Respondent Franchise Tax Board of the State of California. | | 09-17947 |
| 07/29/2009 | Motion | Filed Motion. Respondent Gilbert P. Hyatt's: (1) Opposition to Motion by Multistate Tax Commission for Leave to File Amicus Curiae Brief; (2) Motion to Strike Amicus Curiae Brief of the State of Utah; (3) Motion to Strike Notice of Concurrence. | | 09-18503 |

RJN000925

| Date | Type | Description | Entry |
|------|------|-------------|-------|
| 07/31/2009 | Notice/Incoming | Filed Joinder. Joinder to Amicus Curiae Brief of the State of Utah. (States of Louisiana and New Jersey). | 09-18734 |
| 08/06/2009 | Motion | Filed Response to Motion. Response to Hyatt's Motion to Strike Amicus Curiae Brief and Notice of Concurrence. | 09-19209 |
| 08/06/2009 | Motion | Filed Motion. Motion to Extend and Permit Expanded Briefing for Respondent's Answering Brief. (Respondent/Cross-Appellant) | 09-19221 |
| 08/06/2009 | Motion | Filed Response to Motion. Opposition to Respondent Gilbert P. Hyatt's (1) Opposition to Motion by Multistate Tax Commission for Leave to File Amicus Curiae Brief; (2) Motion to Strike Amicus Curiae Brief of the State of Utah; (3) Motion to Strike Notice of Concurrence. | 09-19246 |
| 08/06/2009 | Motion | Filed Response to Motion. Opposition to Respondent Gilbert P. Hyatt's Motion to Strike Amicus Curiae of the State of Utah and Motion to Strike Notice of Concurrence. | 09-19247 |
| 08/07/2009 | Order/Procedural | Filed Order. Resolving Motions. We direct the clerk of this court to file the opening brief and appendices received on July 20, 2009. Two motions for association of counsel for purposes of filing amicus curiae briefs have been filed by the Solicitor General for the State of Nevada, one for association of Clark Len Snelson, Esq., for filing an amicus curiae brief on behalf of the state of Utah and 15 other states, and one for association of Bruce J. Fort, Esq., for filing an amicus curiae brief on behalf of the Multistate Tax Commission. Having reviewed the motions, we grant both. The Nevada Solicitor General also filed a motion on behalf of the Nevada Department of Taxation requesting leave to file an amicus curiae brief. Then, the Nevada Solicitor General filed a motion to strike the previous motion because the Multistate Tax Commission filed its own motion requesting leave to file an amicus curiae brief. We grant the motion to strike the motion to file an amicus curiae brief filed by the Nevada Solicitor General. We grant the motion by the Multistate Tax Commission to file an amicus curiae brief and deny Hyatt's motions to strike. We direct the clerk of this court to file the amicus curiae brief of the Multistate Tax Commission that was provisionally received on July 22, 2009. | 09-19313 |
| 08/07/2009 | Brief | Filed Opening Brief. Appellant/Cross-Respondent. | 09-17730 |
| 08/07/2009 | Appendix | Filed Appendix to Opening Brief. Vols. 1 through 93. | 09-17732 |
| 08/07/2009 | Brief | Filed Amicus Brief. Brief of Amicus Curiae Multistate Tax Commission in Support of Appellant/Cross-Respondent Franchise Tax Board of the State of California. | 09-17945 |
| 08/10/2009 | Motion | Filed Response to Motion. Notice of Non-Opposition. | 09-19437 |
| 08/17/2009 | Motion | Filed Response to Motion. Amicus Curiae Multistate Tax Commission's Notice of Non-Opposition. | 09-19932 |
| 08/21/2009 | Order/Procedural | Filed Order. Granting in Part Requests for Extension of Time and to File Brief with Excess Pages. Respondent/Cross-Appellant shall have 90 days from the date of our August 7, 2009, order, which directed the filing of appellant/cross-respondent's opening brief.Respondent/Cross-Appellant may file a brief with excess pages, however, he is limited to 20 pages longer than appellant/cross-respondent's opening brief. | 09-20456 |
| 08/21/2009 | Notice/Incoming | Filed Notice. Notice of Firm Name (Kaempfer Crowell Renshaw Gronauer & Fiorentino). | 09-20467 |
| 09/14/2009 | Letter/Incoming | Filed Letter. - copy of letter from attorney Pat Lundval to opposing counsel providing corrections to the opening brief. | 09-22290 |
| 09/29/2009 | Motion | Filed Motion for Permission to File Document. Motion for Leave to File a Supplemental Appendix. (Appellant/Cross-Respondent) (DETACHED AND FILED SUPPLEMENTAL APPENDIX PER ORDER 10/06/09). | 09-23725 |
| 09/29/2009 | Notice/Incoming | Filed Errata. To Appellant/Cross-Respondent's Opening Brief. | 09-23726 |
| 09/30/2009 | Motion | Filed Response to Motion. Notice of Non-Opposition. | 09-23849 |
| 10/06/2009 | Order/Procedural | Filed Order. Granting Motion to File Supplemental Appendix. We grant appellant/cross-respondent Franchise Tax Board of the State of California's motion to file a supplemental appendix. We direct the clerk of this court to detach and file the supplemental appendix attached to the motion. | 09-24429 |
| 10/06/2009 | Appendix | Filed Appendix. Supplemental Appellant's Appendix. | 09-24437 |
| 10/14/2009 | Motion | Filed Motion to Extend Time. Respondent/Cross-Appellant. | 09-25108 |
| 10/19/2009 | Motion | Filed Response to Motion. Limited opposition to Hyatt's motion for an extension of time for respondent's answering brief. | 09-25506 |
| 10/22/2009 | Motion | Filed Motion for Permission to File Document. Motion for Leave to File Limited Reply in Support of Motion to Extend Time for Respondent's Answering Brief. PER ORDER OF 10/06/09 DETACHED AND FILED REPLY. | 09-25904 |
| 11/06/2009 | Order/Procedural | Filed Order Granting Motion, for extension of time. Combined answering brief and opening brief due: January 5, 2010. We will not consider another extension of time for Hyatt to file his brief. If Hyatt fails to file his brief in this court by January 5, the case shall stand submitted without this motion to file a reply to the opposition to this motion. We direct the clerk of this court to detach and file the reply attached to the motion.] | 09-27138 |
| 11/06/2009 | Motion | Filed Reply to Response. Limited Reply in Support of Motion to Extend Time for Respondent's Answering Brief. | 09-27148 |
| 11/23/2009 | Notice/Incoming | Filed Notice of Change of Address. Kaempfer Crowell Renshaw Gronauer & Fiorentino. | 09-28559 |
| 12/04/2009 | Notice/Incoming | Filed Notice. Notice of Related Case and Request for Notification to the Panel in Xtreme Faith Academy v. Landry, Case No. 52044 of This Matter. | 09-29363 |
| 12/14/2009 | Notice/Incoming | Filed Notice. Hyatt's Response to FTB's Notice of Related Case and Request for Notification to Panel in Xtreme Faith Academy v. Landry, Case No. 52044 of this Matter. | 09-30190 |
| 12/21/2009 | Appendix | Filed Appendix to Answering Brief. Volumes 1-101. (Responsent/Cross-Appellant) | 09-30822 |
| 12/21/2009 | Notice/Incoming | Filed Proof of Service. -Respondent's Appendix. | 09-30851 |
| 12/21/2009 | Motion | Filed Motion to Extend Time. (15) days. | 09-30869 |
| 12/22/2009 | Motion | Filed Response to Motion. Response to Hyatt's Third Motion for an Extension of Time to File Respondent's Answering Brief | 09-31043 |
| 12/28/2009 | Order/Procedural | Filed Order. Granting Motion in Part. Respondent/cross-appellant Gilbert P. Hyatt's combined answering brief and opening brief due: January 5, 2010. We will not consider another extension of time for Hyatt to file his brief. If Hyatt fails to file his brief in this court by January 5, the case shall stand submitted without this brief. | 09-31289 |
| 01/05/2010 | Motion | Filed Motion for Excess Pages. Motion to Permit Expanded Briefing for Respondent's Answering Brief and Opening Cross Appeal Brief. (Respondent/Cross-Appellant) | 10-00251 |
| 01/06/2010 | Notice/Incoming | Filed Notice. Submission of Responsent's Appendix in Electronic Format (CD). (Respondent/Cross-Appellant) | 10-00273 |
| 01/07/2010 | Motion | Filed Response to Motion. Opposition to Motion to Permit Expanded Briefing for Respondent's Brief | 10-00532 |
| 01/11/2010 | Motion | Filed Motion for Permission to File Document. Motion for leave to File Reply in Support of Motion to Permit Expanded Briefing For Respondent's Answering Brief And Opening Cross Appeal Brief. (DETACHED AND FILED SEPARATELY PER ORDER 01/26/10 Reply in Support of Motion to Permit Expanded Briefing for Respondent's Answering Brief and Opening Cross Appeal Brief). | 10-00734 |
| 01/26/2010 | Order/Procedural | Filed Order. Granting Motion to file Brief with Excess Pages. We direct the clerk of this court to file the Hyatt's proposed brief received on January 6, 2010. In \We grant Hyatt's motion for permission to file a reply to the opposition to the motion for permission to file a brief with excess pages. We direct the clerk of this court to detach and file the proposed reply attached to Hyatt's motion.] | 10-02103 |
| 01/26/2010 | Brief | Filed Answering Brief. Respondent/Cross-Appellant. | 10-00270 |
| 01/26/2010 | Motion | Filed Reply to Response. Reply in Support of Motion to Permit Expanded Briefing for Respondent's Answering Brief and Opening Cross Appeal Brief. | 10-02116 |
| 01/27/2010 | Notice of Appeal Documents | Filed Certified Copy of Notice of Appeal/Amended/Supplemental. Second Supplemental and/or Amended Notice of Appeal. | 10-02266 |
| 02/01/2010 | Motion | Filed Motion to Extend Time. Appellant/Cross-Respondent FTB's Motion to Extend Time to File Appellant's Reply Brief. | 10-02696 |
| 02/04/2010 | Motion | Filed Response to Motion. Notice of Non-Opposition to FTB's Motion to Extend Time to File Appellant's Reply Brief. (Respondent/Cross-Appellant) | 10-03171 |
| 02/19/2010 | Order/Procedural | Filed Order. Granting Motion for Extension of Time. Appellant/Cross-Respondent: Combined Reply Brief and Answering Brief on Cross-Appeal due on or before April 30, 2010. | 10-04588 |
| 03/12/2010 | Order/Procedural | Filed Order. Regarding Second Supplement to Notice of Appeal. Supplemental Opening Brief due: 75 days. Supplemental Answering Brief due: 30 days from service of Supp. Obl; and Supplemental Reply Brief due: 30 days from service of Supp. AB. | 10-06609 |
| 04/08/2010 | Motion | Filed Motion to Extend Time. Franchise Tax Board's Second Motion to Extend Time for Reply Brief on Appeal and Answering Brief on Cross-Appeal. | 10-09144 |
| 04/09/2010 | Motion | Filed Response to Motion. Non-Opposition to FTB's Second Motion to Extend Time for Reply Brief on Appeal and Answering Brief on Cross-Appeal. | 10-09324 |
| 04/16/2010 | Order/Procedural | Filed Order Granting Motion. for extention of time. Franchise Tax Board combined brief due May 31, 2010. | 10-09949 |
| 05/06/2010 | Order/Procedural | Filed Order to Extend Time. FTB's Motion to Extend Time to File Appellant's Supplemental Opening Brief Regarding Award of Costs. (14) days. | 10-11773 |
| 05/07/2010 | Motion | Filed Response to Motion. Non-Opposition to FTB's Motion to Extend Time to File Appellant's Supplemental Opening Brief Regarding Award of Costs. | 10-11899 |
| 05/21/2010 | Order/Procedural | Filed Order. Granting Extension of Time. Appellant/cross-respondent's Supplemental Opening Brief due: June 8, 2010. The supplemental briefing shall then proceed as outlined in our March 12, 2010, order. | 10-13279 |
| 06/01/2010 | Motion | Filed Motion for Excess Pages. Motion for Permission to File Reply Brief in Excess of 30 Pages. | 10-14030 |
| 06/01/2010 | Appendix | Filed Appendix to Reply Brief. Vols. 1 through 48. CD-ROM included. (Appellant/Cross-Respondent). | 10-14032 |
| 06/08/2010 | Brief | Filed Supplemental Brief. Appellant's Supplemental Opening Brief Regarding Costs. (Appellant/Cross-Respondent) | 10-14617 |
| 06/08/2010 | Appendix | Filed Appendix. Appellant's Supplemental Opening Brief Regarding Costs Appendix Vols 1-26. (Appellant/Cross-Respondent) | 10-14619 |
| 06/11/2010 | Order/Procedural | Filed Order. Granting Motion. We direct the clerk of this court to file the combined reply brief received on June 1, 2010. | 10-15139 |
| 06/11/2010 | Brief | Filed Reply Brief. Appellant/Cross-Respondent. | 10-14031 |
| 06/28/2010 | Motion | Filed Motion to Extend Time. Motion to Extend Time for Respondent's Answering Brief Regarding Costs. (67) days. (Respondent/Cross-Appellant) | 10-16851 |
| 06/28/2010 | Motion | Filed Motion to Extend Time. Motion to Extend Time for Respondent's Reply Brief in Cross-Appeal. (75) days. (Respondent/Cross-Appellant) | 10-16852 |
| 07/19/2010 | Order/Procedural | Filed Order. Granting in Part Motions for Extensions of Time. Hyatt's Reply Brief due: August 16, 2010. Hyatt's Supplemental Answering Brief due: September 13, 2010. | 10-18312 |
| 08/11/2010 | Notice/Incoming | Filed Notice. Notice of Submission of FTB's Embedded Appeal Briefs. | 10-20725 |
| 08/13/2010 | Motion | Filed Motion. Motion for Leave to file Sur-reply of 30 pages in Partial Response to the FTB's 145 page Reply Brief. (DETACHED AND RETURNED UNFILED RESPONDENTS SUR-REPLY PER ORDER 10/04/10). | 10-21058 |
| 08/13/2010 | Brief | Filed Reply Brief on Cross-Appeal. Respondent's Reply Cross-Appeal Brief. | 10-21059 |
| 08/16/2010 | Appendix | Filed Appendix to Reply Brief. Appendix of Exhibits for Respondent's Proposed Sur-Reply. Vols. 1 through 3. (STRICKEN PER ORDER 10/04/10). | 10-21659 |
| 08/24/2010 | Motion | Filed Notice of FTB's Opposition to Hyatt's Motion for Leave to File Sur-Reply | 10-22570 |

RJN000926

| | | | |
|---|---|---|---|
| 09/13/2010 | Brief | Filed Supplemental Brief-Respondent's Supplemental Answering Brief Regarding Costs. | 10-23579 |
| 09/14/2010 | Appendix | Filed Appendix of Exhibits for Respondent's Supplemental Answering Brief Regarding Costs. | 10-23581 |
| 09/14/2010 | Notice/Incoming | Filed Certificate of Service of Appendix in Support of Respondent's Supplemental Answering Brief Regarding Costs. | 10-23582 |
| 10/04/2010 | Order/Procedural | Filed Order Denying Motion to File Sur-Reply. We deny the motion for leave to file a sur-reply and direct the clerk of this court to return, unfiled, the proposed sur-reply submitted by Hyatt on August 13, 2010, and to strike the appendix to the sur-reply filed on August 16, 2010. | 10-25521 |
| 10/12/2010 | Brief | Filed Appellant's Supplemental Reply Brief Regarding Costs. | 10-26724 |
| 12/09/2010 | Notice/Incoming | Filed Notice of Submission of FTB's Embedded Supplemental Briefs Regarding Costs. | 10-32154 |
| 01/20/2011 | Notice/Incoming | FTB'S Notice of Submission of Respondent's Embedded Briefs. | 11-02055 |
| 01/21/2011 | Notice/Incoming | Filed Hyatt's Notice of Intent to Submit Embedded (i) Respondent's Answering and Opening Cross Appeal Brief; (ii) Respondent's Reply Cross-Appeal Brief; and (iii) Respondent's Supplemental Answering Brief Regarding Costs. | 11-02177 |
| 02/04/2011 | Notice/Incoming | Filed Notice of Submission of Hyatt's Embedded (i) Answering Brief and Opening Cross Appeal Brief; (ii) Reply Brief on Cross Appeal; and (iii) Answering Brief on Cost Appeal. | 11-03559 |
| 02/24/2012 | Order/Procedural | Filed Order Setting Oral Argument. We direct the clerk of this court to schedule oral argument on the next available calendar before the full court. Argument shall be one hour. | 12-05946 |
| 02/27/2012 | Notice/Outgoing | Issued Notice Scheduling Oral Argument. Argument is scheduled for Tuesday, April, 3, 2012, @ 10:00 a.m.. Argument shall be limited 60 minutes. | 12-06127 |
| 03/05/2012 | Motion | Filed Motion to Postpone Oral Argument for 30 Days. | 12-06887 |
| 03/06/2012 | Motion | Filed Opposition to Motion to Postpone Oral Argument. | 12-07091 |
| 03/06/2012 | Motion | Filed Reply in Support of Motion to Postpone Oral Argument for 30 Days. | 12-07226 |
| 03/07/2012 | Order/Clerk's | Filed Order Granting Motion. Oral argument presently scheduled for April 3, 2012, at 10:00 a.m., is hereby vacated. The clerk of this court is directed to schedule this appeal for oral argument before the en banc court on May 7, 2012. Argument shall be limited to 60 minutes | 12-07339 |
| 04/02/2012 | Notice/Outgoing | Issued Notice Scheduling Oral Argument. Oral argument is scheduled for Monday, May 7, 2012, at 1:30 p.m. in Carson City. Argument shall be limited to one hour. | 12-10235 |
| 04/13/2012 | Brief | Filed Appellant's Supplemental Authorities (Oral Argument: May 7, 2012). | 12-11889 |
| 04/17/2012 | Notice/Incoming | Filed Notice of Appearance (Daniel Polsenberg of Lewis and Roca appearing on behalf of respondent/cross-appellant Gilbert P. Hyatt). | 12-12204 |
| 04/23/2012 | Notice/Outgoing | Issued Oral Argument Reminder Notice. | 12-12897 |
| 04/26/2012 | Brief | Filed Respondent's Supplemental Authorities and Response to Appellant's Supplemental Authorities. | 12-13229 |
| 05/07/2012 | Case Status Update | Oral argument held this day. Case submitted for decision before the En Banc Court. | |
| 05/11/2012 | Order/Procedural | Filed Order Scheduling Additional Oral Argument. The clerk of this court shall schedule this matter for oral argument on Monday, June 18, 2012, at 10:00 a.m., at the courtroom in Carson City. Argument shall be limited to 60 minutes. | 12-15172 |
| 05/14/2012 | Notice/Outgoing | Issued Notice Scheduling Additional Oral Argument. Oral argument is scheduled for Monday, June 18, 2012, at 10: a.m. in Carson City. Argument shall be limited to 60 minutes. | 12-15226 |
| 05/21/2012 | Notice/Outgoing | Issued Oral Argument Reminder Notice. | 12-15960 |
| 06/18/2012 | Case Status Update | Oral argument held this day. Case submitted for decision before the En Banc Court. | |
| 06/22/2012 | Motion | Filed Appellant's Supplement Provided at the Request of the Court. | 12-19658 |
| 06/26/2012 | Notice/Incoming | Filed Respondent's/Cross-Appellant's Supplement Provided at the Request of the Court. | 12-19965 |
| 06/27/2012 | Motion | Filed Appellant's Motion for Permission to Reply to Respondent's Supplement. | 12-20186 |
| 06/27/2012 | Motion | Filed Respondent's Opposition to Appellant's Motion for Permission to Reply to Respondent's Supplement (Oral Argument: June 18, 2012) | 12-20260 |
| 06/28/2012 | Motion | Filed FTB's Reply in Support of Motion for Permission to Reply to Respondent's Supplement. | 12-20417 |
| 07/16/2012 | Order/Procedural | Filed Order Denying Motion for Leave to File Reply. Fn1[The Honorable Nancy M. Saitta, Justice, voluntarily recused herself from participation in the decision of this matter.] | 12-22276 |
| 07/01/2014 | Motion | Filed Motion to Allow Withdrawal of Counsel for Amicus Curiae Multistate Tax Commission. | 14-21407 |
| 07/17/2014 | Order/Procedural | Filed Order Allowing Withdrawal as Counsel. The clerk of this court shall remove Bruce J. Fort as counsel of record for amicus curiae Multistate Tax Commission in this appeal. | 14-23249 |
| 09/18/2014 | Opinion/Dispositional | Filed Authored Opinion. "Affirmed in part, reversed in part, and remanded." Fn1[The Honorable Nancy M. Saitta, Justice, voluntarily recused herself from participation in the decision of this matter.] Before the Court En Banc. Author: Hardesty, J. Majority: Hardesty/Gibbons/Pickering/Parraguirre/Douglas/Cherry. 130 Nev. Adv. Opn. No. 71. EN BANC | 14-30944 |
| 10/06/2014 | Motion | Filed Motion for Permission to File Petition for Rehearing in Excess of Word Limit. | 14-33049 |
| 10/07/2014 | Post-Judgment Petition | Filed Respondent/Cross-Appellant Gilbert P. Hyatt's Petition for Rehearing. | 14-33200 |
| 10/07/2014 | Filing Fee | Filing fee paid. E-Payment $150.00 from Peter C. Bernhard | |
| 10/07/2014 | Order/Procedural | Filed Order Granting Motion for Leave to File Oversized Rehearing Petition and Directing Answers. The clerk of this court is directed to file Franchise Tax Board's rehearing petition which was provisionally received on October 6, 2014. FTB's answer to Gilbert P. Hyatt's petition for rehearing due: 15 days. Mr. Hyatt's answer to FTB's petition for rehearing due: 15 days. | 14-33271 |
| 10/07/2014 | Post-Judgment Petition | Filed Petition for Rehearing - Appellant/Cross-Respondent's Petition for Rehearing | 14-33272 |
| 10/07/2014 | Filing Fee | Filing fee paid. E-Payment $150.00 from Robert L. Eisenberg | |
| 10/21/2014 | Post-Judgment Petition | Filed Appellant/Cross-Respondent Franchise Tax Board's Answer to Respondent's Petition for Rehearing. | 14-35087 |
| 10/22/2014 | Motion | Filed Respondent Gilbert P. Hyatt's Motion for Permission to File Answer in Excess of Word Limit. | 14-35256 |
| 10/23/2014 | Order/Procedural | Filed Order Granting Motion. The clerk of this court shall file respondent/cross-appellant's answer to the petition for rehearing received on October 22, 2014. | 14-35357 |
| 10/23/2014 | Post-Judgment Petition | Filed Respondent Gilbert P. Hyatt's Answer to Appellant Franchise Tax Board of the State of California's Petition for Rehearing. | 14-35358 |
| 11/25/2014 | Post-Judgment Order | Filed Order Denying Petitions for Rehearing. "We deny both petitions.." NRAP 40(c).Fn1[The Honorable Nancy M. Saitta, Justice, voluntarily recused herself from participation in the decision of this matter.] | 14-38932 |
| 12/15/2014 | Motion | Filed Motion to Stay Remittitur Pending Application to U.S. Supreme Court for a Writ of Certiorari, or to Enlarge Time for Issuance of Remittitur. | 14-40739 |
| 12/23/2014 | Notice/Outgoing | Issued Letter dated December 17, 2014 to Publishers with corrections to recently filed opinions. Nos. 59976/60091/60622/59630/56091/60598/61038/61655/61681/61082/62890/59210/62768/62944/62160/63871/58530/59162/61820/63444/53264/60050/63078. (Letter entered in 59976 as document no. 14-41986) | |
| 01/02/2015 | Order/Procedural | Filed Order Staying Remittitur. We hereby stay issuance of the remittitur until April 22, 2015. If the clerk of this court receives written notice by April 22, 2015, from the clerk of the United States Supreme Court that appellant/cross-respondent has filed a petition for a writ of certiorari, the stay shall continue in effect until final disposition of the certiorari proceedings. If such notice is not received by April 22, 2015, the remittitur shall issue on April 23, 2015. | 15-00017 |
| 01/21/2015 | Notice/Incoming | Filed Notice from the U. S. Supreme Court extending the time within which to file a petition for writ of certiorari to March 23, 2015. | 15-02203 |
| 03/31/2015 | Notice/Incoming | Filed Notice from US Supreme Court/Certiorari Filed. A petition for a writ of certiorari was filed 3/25/15 and placed on the docket as Case No. 14-1175. | 15-09679 |
| 07/07/2015 | Notice/Incoming | Filed Notice from US Supreme Court. The Petition for Writ of Certiorari is Granted Limited to Question 2 and 3 Presented by the Petition. | 15-20652 |
| 09/24/2015 | Notice/Incoming | Filed Notice of Change of Address. (Kaempfer Crowell) | 15-28936 |
| 04/25/2016 | Notice/Incoming | Filed Notice from the Supreme Court of the United States, Office of the Clerk regarding an opinion that was announced. | 16-12978 |
| 05/23/2016 | Motion | Filed Appellant's Motion for Permission to File Motion in Excess of 10 Pages (Appellant's Motion for Supplemental Briefing Following Mandate from the Supreme Court of the United States). | 16-16068 |
| 05/24/2016 | Notice/Incoming | Filed Mandate and Judgment from Supreme Court of the United States. | 16-16184 |
| 06/01/2016 | Motion | Filed Respondent Gilbert P. Hyatt's Response to Appellant's Motion for Permission to File Motion in Excess of 10 Pages. | 16-17074 |
| 06/06/2016 | Motion | Filed Appellant's Reply in Support for Motion for Permission to File Motion in Excess of 10 Pages. | 16-17504 |
| 06/24/2016 | Order/Procedural | Filed Order Directing Supplemental Briefing. Appellant/cross-respondent Franchise Tax Board has filed a motion requesting leave to file a motion for supplemental briefing with excess pages. We grant the motion and direct the clerk of this court to file the proposed motion for supplemental briefing received in this court on May 23, 2016. Franchise Tax Board shall have 30 days from the date of this order to file and serve an opening supplemental brief. Gilbert Hyatt shall have 30 days from service of the supplemental opening brief to file and serve a supplemental answering brief. Franchise Tax Board shall then have 15 days following service of the supplemental answering brief to file and serve any supplemental reply brief. | 16-19810 |
| 06/24/2016 | Motion | Filed Appellant's Motion for Supplemental Briefing Following Mandate from the Supreme Court of the United States. | 16-19812 |
| 06/28/2016 | Motion | Filed Appellant's Unopposed Motion to Extend Briefing Deadlines Regarding Supplemental Briefs. | 16-20281 |
| 06/29/2016 | Motion | Filed Notice of Non-Opposition. | 16-20371 |
| 07/12/2016 | Order/Procedural | Filed Order Granting Motion. Appellant/cross-respondent shall have until August 24, 2016, to file and serve the supplemental opening brief. Respondent/cross-appellant shall have 30 days from service of the supplemental opening brief to file and serve the supplemental answering brief. Appellant/cross-respondent shall then have 15 days from service of the supplemental answering brief to file and serve a supplemental reply brief, if deemed necessary. | 16-21608 |
| 08/22/2016 | Brief | Filed Appellant's Supplemental Opening Brief Following Mandate from the Supreme Court of the United States. | 16-25990 |
| 08/25/2016 | Motion | Filed Respondent's Motion for an Extension of Time to File Supplemental Answering Brief (First Request). | 16-26536 |
| 08/29/2016 | Order/Procedural | Filed Order Granting Motion. Respondent/Cross-Appellant shall have until October 21, 2016, to file and serve the supplemental answering brief. Appellant/cross-respondent shall have 15 days from service of the supplemental answering brief to file and serve a supplemental reply brief, if deemed necessary. | 16-26867 |
| 10/24/2016 | Appendix | Filed Respondent/Cross-Appellant Gilbert P. Hyatt's Supplemental Appendix, Vol. 1. | 16-33134 |

RJN000927

2/17/2017

53264: Case View

| | | | |
|---|---|---|---|
| | | | |
| 10/24/2016 | Appendix | Filed Respondent/Cross-Appellant Gilbert P. Hyatt's Supplemental Appendix, Vol. 2. | 16-33135 |
| 10/25/2016 | Brief | Filed Respondent/Cross-Appellant's Gilbert P. Hyatt's Supplemental Answering Brief Following Mandate From the Supreme Court of the United States. | 16-33305 |
| 11/01/2016 | Motion | Filed Appellant/Cross-Respondent's Motion for an Extension of Time to File Supplemental Reply Brief. | 16-33948 |
| 11/07/2016 | Order/Procedural | Filed Order Granting Motion. Appellant/Cross-Respondent's Supplemental Reply Brief due: December 2, 2016. | 16-34744 |
| 12/05/2016 | Brief | Filed Appellant's Supplemental Reply Brief Following Mandate From the Supreme Court of the United States. | 16-37452 |
| 12/05/2016 | Appendix | Filed Appendix to Reply Brief Appellant's Supplemental Appendix in Support of Supplemental Briefs Following Mandate From the Supreme Court of the United States | 16-37458 |
| 12/05/2016 | Notice/Incoming | Filed Appellant's Request for Judicial Notice. | 16-37459 |
| 12/13/2016 | Motion | Filed Respondent/Cross-Appellant's Gilbert P. Hyatt's Response to Appellant Franchise Tax Board of California's Request for Judicial Notice. | 16-38551 |
| 12/20/2016 | Motion | Filed Appellant/Cross-Respondent's Reply in Support of Appellant's Request for Judicial Notice. | 16-39478 |
| 01/12/2017 | Order/Procedural | Filed Order Granting Motion. Appellant/cross-respondent Franchise Tax Board of the State of California has filed a request that this court take judicial notice of certain publicly available documents from the ongoing companion case to this appeal in respondent/cross-appellant Gilbert Hyatt's administrative appeal against the FTB. Hyatt disputes the FTB's characterization of the import of the documents but supports the request for judicial notice. Although this court will not generally take judicial notice of records in another and different case, an exception exists where there is a "close relationship" between the cases. Cause appearing, the motion is granted. | 17-01197 |

RJN000928



chair John Chiang
member Betty T. Yee
member Michael C. Genest

State of California
Franchise Tax Board

# FILE COPY

Date: 03.17.09

Case: 7150053859256143
Case Unit: 7150053859256163
In reply refer to: 410:RWD

ERIC J. COFFILL
MORRISON & FOERSTER LLP
400 CAPITOL MALL, SUITE 2600
SACRAMENTO CA 95814-4428

Regarding: Appeal of Gilbert P. Hyatt
Appeal Case ID No: 446509 & 435770
Taxable Year(s): 1991 and 1992

Dear Mr. Coffill:

Enclosed please find a version of the letter I mailed to you yesterday with the corrected month and year "April 2009."

Robert W. Dunn
Tax Counsel IV

Enclosure

FTB PASS 2133 (REV 02-2009)
Appeals/Correspondence/Correction to March 16
Letter

Legal Division MS A260
PO Box 1720
Rancho Cordova CA 95741-1720

Tel (916) 845-3338
Fax (916) 843-6041
ftb.ca.gov

RJN000929



chair John Chiang
member Betty T. Yee
member Michael C. Genest

State of California
**Franchise Tax Board**

Date: 03.16.2009

Case: 7150053859256143
Case Unit: 7150053859256163
In reply refer to: 410:RWD

ERIC J. COFFILL
MORRISON & FOERSTER LLP
400 CAPITOL MALL, SUITE 2600
SACRAMENTO CA 95814-4428

Regarding:          Appeal of Gilbert P. Hyatt
Appeal Case ID No:  446509 & 435770
Taxable Year(s):    1991 and 1992

Dear Mr. Coffill:

We would like your assistance in scheduling the examination of several of the affiants
identified in Mr. Hyatt's opening brief to the California Board of Equalization. We intend to
question Mr. Hyatt's affiants under oath utilizing the services of a court reporter. The affiants
include:

    Mr. Trent Eyler
    Dr. Mel Hecht
    Ms. Michelina Hecht
    Mr. Henry Huey
    Mr. Robert Kazmier
    Mr. John Keller

The examination of each individual will be done by an FTB attorney and should be completed
within one day or less. The scope of the examination will involve that witnesses' affidavit and
issues related to Mr. Hyatt's appeal to the Board. We would appreciate coordinating with you
on dates anytime in April 2009, and locations convenient to all the parties, where possible.

A written response with proposed dates, times and location would be much appreciated.
Please respond within ten days of the date of this letter. If you have any questions please
feel free to contact me. Thank you for your assistance in this matter.

Robert W. Dunn
Tax Counsel IV

---

FTB PASS 2133 (REV 02-2009)          Legal Division MS A260          Tel (916) 845-3338
Appeals/Correspondence/Examination Request.   P.O. Box 1720          Fax (916) 843-6041

RJN000930

1   **REQT**
JAMES W. BRADSHAW (1638)

2   MCDONALD CARANO WILSON LLP
2300 West Sahara Avenue, Suite 1000

3   Las Vegas, Nevada 89102
Telephone Number: (702) 873-4100

4   Facsimile Number: (702) 873-9966
E-mail Address: jbradshaw@mcdonaldcarano.com

5   *Local Counsel for California Franchise Tax Board*

**FILED**

Jun 26  12 39 PM '09

CLERK OF THE COURT

6                   **DISTRICT COURT**

7              **CLARK COUNTY, NEVADA**

8   STATE OF CALIFORNIA FRANCHISE TAX      Case No.: A-09-593462-C
  BOARD

9                             Dept. No.: 11

                   Plaintiff,

10                                 **REQUEST FOR FOREIGN**
                                **DEPOSITION SUBPOENA**

11   v.

12   MICHELINA HECHT, et al.

13                   Defendants.

14                      __FACTUAL BACKGROUND__

15       The following facts are reflected in the declarations of Robert W. Dunn, which

16   declarations accompany each of the California Franchise Tax Board (hereinafter "FTB")

17   administrative subpoenas appended hereto as Exhibit 1.

18       Gilbert P. Hyatt, a former long time California resident, filed an administrative tax appeal

19   challenging California FTB's issuance of Notices of Proposed Assessment for tax years 1991 and

20   1992 and FTB's subsequently issued Notices of Action for the same taxable years. These notices,

21   which include proposed California income tax and fraud penalty assessments, are based on the

22   FTB's determination at audit and protest that Mr. Hyatt remained a California resident through

23   part of 1992. The audit and protest findings contradict the assertion of California nonresidency

24   Mr. Hyatt made on his 1991 California part-year income tax return, the tax return at issue in an

25   administrative proceeding now pending before the California State Board of Equalization (aka

26   "SBE"). (Dunn dec.'s, ¶¶ 2.)

27       The primary legal issues in Mr. Hyatt's California administrative tax appeal are: (1) Mr.

28   Hyatt's assertion that he became a nonresident of California (as defined by California Revenue and

RJN000931

1  Taxation Code section 17014) on various dates in 1991; (2) Mr. Hyatt's objection to the proposed

2  imposition of a fraud penalty (under California Revenue and Taxation Code sections 19164 and

3  19131); and (3) Mr. Hyatt's contention that he did not operate a business from California through

4  December 31, 1992 that generated California source income (under California Revenue and

5  Taxation Code sections 17951 and 17952). (Dunn dec.'s, ¶¶ 3)

6       Mr. Hyatt has appealed the Notices of Action in accordance with Revenue and Taxation

7  Code sections 19045 and 19046. On December 9, 2008, Mr. Hyatt filed his Opening Brief in this

8  matter with the SBE. That brief has attached 26 affidavits (19 signed by affiants just prior to the

9  filing date) that have never been produced to FTB prior, even though the audit of Mr. Hyatt's

10  claimed change of residency commenced 16 years ago, in June 1993. Two (2) of Mr. Hyatt's new

11  affiants, Dr. Mel Hecht and Michelina Hecht, as separately stated in their affidavits, currently

12  reside in Nevada, and attest to personal knowledge of specific facts and events from the

13  September 1991 through April 1992 period. And the assertions of Dr. Mel Hecht and Michelina

14  Hecht relate to the legal issues set forth above. (Dunn dec.'s, ¶¶4 , 5 and 6)

15       The testimony that would be provided by Dr. Melvin R. Hecht at deposition would clearly

16  be relevant to the legal issues described above and is reasonably calculated to lead to the

17  discovery of admissible evidence.

18       Given the foregoing, the FTB respectfully requests that the Court issue a Civil Subpoena

19  requiring Dr. Melvin R. Hecht, whose address is 9234 Red Twig Drive, Apt. N, Las Vegas,

20  Nevada 89134-1810 to appear for a deposition and produce documents as set forth in the attached

21  proposed Nevada subpoena duces tecum (Exhibit 2). This request is supported by the California

22  Commission to Take Deposition of Dr. Melvin R. Hecht Outside the State of California issued by

23  the Clerk of Court for Superior Court of California, County of Sacramento, 720 9th Street,

24  ///

25  ///

26  ///

27  ///

28  ///

-2-

Sacramento, CA 95814, and all attachments thereto, including attachment 4, authorizing FTB

leave to conduct the deposition and require production of documents from Dr. Melvin R. Hecht.

DATED this 26th of June, 2009.

McDONALD CARANO WILSON LLP

By: _____

JAMES W. BRADSHAW (1638)
2300 West Sahara Avenue, Suite 1000
Las Vegas, Nevada 89102
Telephone Number: (702) 873-4100
Facsimile Number: (702) 873-9966
E-mail Address: jbradshaw@mcdonaldcarano.com
*Local Counsel for California Franchise Tax Board*

- 3 -

RJN000933

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of McDonald Carano Wilson LLP, and that I served true and correct copies of the foregoing copy of **REQUEST FOR FOREIGN DEPOSITION SUBPOENA** on this 26th day of June, 2009 by depositing said copies in the United States Mail, postage prepaid thereon, upon the following:

> Eric J. Coffill, Esq.
> MORRISON & FOERSTER LLP
> 400 Capitol Mall, Suite 2600
> Sacramento, CA 95814-3923
>
> Joseph R. Ganley, Esq.
> HUTCHISON & STEFFEN
> Peccole Professional Park
> 10080 West Alta drive, Suite 200
> Las Vegas, NV 89145

An Employee of McDonald Carano Wilson LLP

- 4 -

RJN000934

Exhibit 1

RJN000935

DISC-030

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Steven J. Green-SBN: 73705<br>Office of Attorney General<br>1300 I Street, Suite 125, Sacramento, CA 94244-2550<br>TELEPHONE NO.: (916) 324-5157   FAX NO. *(Optional):* (916) 327-2247<br>E-MAIL ADDRESS *(Optional):* Steven.Green@doj.ca.gov<br>ATTORNEY FOR *(Name):* State of California Franchise Tax Board, Petitioner | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Sacramento
STREET ADDRESS: 720 9th Street
MAILING ADDRESS: 720 9th Street
CITY AND ZIP CODE: Sacramento 95814
BRANCH NAME: Civil

SHORT TITLE:
State of California Franchise Tax Board v. Michelina Hecht, et al.

| COMMISSION TO TAKE DEPOSITION OUTSIDE CALIFORNIA<br>☐ ORDERED BY COURT   ☑ ISSUED BY THE CLERK OF THE COURT | CASE NUMBER:<br>34-2009-00047634 |
|---|---|

1. The Superior Court of California hereby authorizes the deposition, upon oral examination, of *(identity of deponent):*
   Melvin R. Hecht

2. The deposition is to be taken in *(state of the United States, territory, or insular possession subject to its jurisdiction):*
   Nevada

3. The deposition will be conducted *(check one):*
   a. ☑ Under the supervision of a person who is authorized to administer oaths by the laws of the United States or those of the place where the examination is to be held, and who is not otherwise disqualified under California Code of Civil Procedure sections 2025.320 and 2025.340(b)–(f); or
   b. ☐ Before *(name of appointee):*
      who is appointed to administer oaths and to take testimony.

4. The documents or things to be produced at the time and place of the deposition are
   ☑ described in Attachment 4     ☐ none.

5. Additional terms required by the foreign jurisdiction to initiate the process are contained in Attachment 5. Number of pages attached: __0__ .

6. Under California Code of Civil Procedure section 2026.010, California authorizes that a commission to take an out-of-state deposition may be issued by the clerk of the court or, if the foreign jurisdiction requires it, by order of the court.

7. The Superior Court of the State of California hereby requests that process issue in the above-referenced place where the examination is to be held, requiring the attendance and enforcing the obligations of the deponent to produce documents and answer questions.

Date: JUN 2 4 2009 _____

☐ Judge
   OR
☐ Clerk, by _____ , Deputy

**Court Seal**

Form Approved for Optional Use
Judicial Council of California
DISC-030 [New January 1, 2008]

**COMMISSION TO TAKE
DEPOSITION OUTSIDE CALIFORNIA**

Code Civ. Proc., § 2026.010(f)
www.courtinfo.ca.gov

Page 1 of 1

American LegalNet, Inc.
www.FormsWorkflow.com

RJN000936

# ATTACHMENT 4

**ATTACHMENT FOUR**

RJN000937



STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**

**SUBPOENA DUCES TECUM**

*In the Matter of:*     Administrative Appeal of Gilbert P. Hyatt
Taxable years 1991 and 1992
FTB Notice of Proposed Assessment Nos. 04728236 and 04340945
Board of Equalization case Nos. 446509 and 435770

*To:*     **Dr. Melvin R. Hecht**

Address:     9234 Red Twig Drive, Apt. N
Las Vegas, Nevada 89134-1810

You are hereby required to appear in person and give testimony related to the above named matter. Your examination under oath by counsel for Franchise Tax Board will take place at

_____

_____

on the _____ day of _____, 2009, at _____ a.m.

You are required to bring to your examination and present to counsel for Franchise Tax Board at the location, date and time written above the originals or true and exact copies of the original records described in the accompanying DESCRIPTION OF RECORDS, attached hereto as Attachment A. Please bring any electronically stored documents described in Attachment A in printed form.

This Subpoena Duces Tecum is issued under the authority of California Revenue and Taxation Code Section 19504 this ___5___ day of ___June___, 2009. The statutory purpose of this Subpoena Duces Tecum is to determine if Gilbert P. Hyatt has complied with the provisions of the California Personal Income Tax Law.

FRANCHISE TAX BOARD
State of California
Michael C. Genest, Member

WITNESS FEES: You are entitled to receive witness fees and mileage actually traveled, as provided by law, if you request them before your scheduled appearance. Please contact ___Scott DePeel___ at (916) _____ prior to the date of your scheduled appearance.     845-5529

FTB Form 2580 (Modified)

RJN000938

## DESCRIPTION OF RECORDS

**Attachment A**

1. Any and all documents or writings relating to your affidavit, attached hereto as Attachment B, in the above mentioned administrative tax matter including, but not limited to; any and all communication with Mr. Hyatt, his attorneys, his staff, or any person, agent or entity working on my Hyatt's behalf ; any and all drafts or copies of the affidavit you provided, or you received; any and all documents containing or referencing draft language of the affidavit; documents or notes containing hand written or type written annotations and/or edits to the affidavit or draft affidavits or draft affidavit language; any and all envelopes or mail parcels used in sending or receiving the above described documents.

2. Any and all documents or writings that show or reflect any payment(s) of money or any other form of compensation made to you, or any person or entity with a relationship to you, by Gilbert P. Hyatt, his attorneys, his staff, or any other person or entity with a relationship to Gilbert P. Hyatt from January 1, 1991 through the present day.

3. As to your affidavit signed on about November 12, 2008, and attached hereto as Attachment B, any and all documents or writings concerning, reflecting, referring or relating to averments or contentions made in paragraph 2, page 1; paragraph 4, page 2; paragraph 5, pages 2-3; paragraph 6, page 3; paragraph 7, page 3; paragraph 8, page 4; paragraph 9, page 4; paragraph 10, pages 4-5; paragraph 11, page 5; paragraph 12, pages 5 and 6; paragraph 13, page 6; paragraph 14, pages 6-7; paragraph 15, page 7; paragraph 16, page 7; paragraph 17, pages 7-8; paragraph 18, page 8; paragraph 19, page 8; paragraph 20, pages 8-9; paragraph 21, page 9; paragraph 22, page 9; paragraph 23, page 10; paragraph 24, page 10; paragraph 25, page 10; and paragraph 26, page 11.

4. Any and all copies of newsletters, announcements and/or published articles from Temple Beth Am from January 1, 1991 to December 31, 1995 including, but not limited to, the "Highlights" and "The Shofar" and/or other weekly or monthly publications circulated to members or congregants of Temple Beth Am during the referenced period.

5. Any and all calendars, date or appointment books, personal address/phone books, correspondence or other writings reflecting Gilbert P. Hyatt's alleged meetings with yourself and Gilbert P. Hyatt at the office of Rabbi Melving Hecht from 1991 to present.

6. Any and all documents and/or writings concerning reflecting, referring or relating to Gilbert P. Hyatt's Temple Beth Am membership, applications for membership, presence on Temple Beth Am mailing list(s), presence on Temple Beth Am data base list(s), telephone or email contact list(s), attendance or participation at Temple Beth Am events.

7. Any and all documents and/or writings concerning reflecting, referring or relating to Gilbert P. Hyatt's payment of dues to Temple Beth Am , and/or contributions to its building fund or other payments by Gilbert P. Hyatt to Temple Beth Am from 1991 to 2007.

RJN000939

8. Any and all documents or writings in your possession provided to you by Mr. Gilbert P. Hyatt or his attorneys or agents or any attorney representing you in regards to your capacity as an affiant or to assist you in refreshing your memory as to averments or statements made in your affidavit attached hereto as Attachment B.

9. "Document(s)" or "writings" mentioned above are defined broadly by California Code of Civil Procedure § 2016.020 (c) and California Evidence Code § 250 as : "... handwriting, typewriting, printing, Photostatting, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored." This includes, but is not limited to, original paper documents, true and exact copies of paper documents, electronically traded documents such as emails, email attachments of any form or file type, facsimiles and facsimile confirmation printouts, typed or hand written notes, documents stored on electronic media, documents related to exchanging communications and draft documents such as envelopes and mailing containers, etc.

RJN000940



STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**

**DECLARATION IN SUPPORT OF SUBPOENA DUCES TECUM**

I, Robert W. Dunn, declare:

1.  I am an attorney at law duly licensed to practice before the courts of the State of California. I am an employee of the California Franchise Tax Board. I currently hold the position of Tax Counsel IV and am assigned to the General Tax Law Bureau of the Legal Department. I am familiar with Mr. Hyatt's administrative tax appeal to the California Board of Equalization and the legal and factual issues therein. Except as specified below, I make the following statements based upon personal knowledge.

2.  Gilbert P. Hyatt, a former long time California resident, filed an administrative tax appeal challenging California Franchise Tax Board's issuance of Notices of Proposed Assessment for tax years 1991 and 1992 and Franchise Tax Board's subsequently issued Notices of Action for the same taxable years. These notices, which include proposed California income tax and fraud penalty assessments, are based on the Franchise Tax Board's determination at audit and protest that Mr. Hyatt remained a California resident through part of 1992. The audit and protest findings contradict the assertion of California nonresidency Mr. Hyatt made on his 1991 California part-year income tax return, the tax return at issue in this proceeding.

3.  The primary legal issues in Mr. Hyatt's California administrative tax appeal are: (1) Mr. Hyatt's assertion that he became a nonresident of California (as defined by Revenue and Taxation Code section 17014) on various dates in 1991; (2) Mr. Hyatt's objection to the proposed imposition of a fraud penalty (under Revenue and Taxation Code sections 19164 and 19131); and (3) Mr. Hyatt's contention that he did not operate a business from California through December 31, 1992 that generated California source income (under Revenue and Taxation Code sections 17951 and 17952).

4.  Mr. Hyatt has appealed the Notices of Action in accordance with Revenue and Taxation Code sections 19045 and 19046. On December 9, 2008, Mr. Hyatt filed his Opening Brief with the California Board of Equalization. Attached are 26 affidavits that have never been previously produced to Franchise Tax Board although the administrative proceedings began 16 years ago. Several of Mr. Hyatt's new affiants attest to personal knowledge of specific facts and events from the September 1991 through April 1992 period. Assertions made by the affiants relate to the legal issues set forth in Paragraph 3 above.

5. Dr. Melvin R. Hecht, named in the Subpoena Duces Tecum to which this declaration is attached, has provided an affidavit on behalf of Mr. Hyatt. A copy of that affidavit is attached as Attachment B. Dr. Hecht has made assertions that relate to the legal issues described in Paragraph 3 above.

6. I am informed and believe that Dr. Hecht's spouse, Ms. Michelina Hecht, same address, represented to an agent for FTB that Dr. Hecht is represented by counsel. I am informed and believe that Ms. Hecht, when approached by FTB's agent, produced a business card "Attorney Joseph R. Ganley, Hutchison & Steffen, 10080 West Alta Drive, #200, Las Vegas, Nevada. The law firm Hutchison & Stephen are known to represent Mr. Hyatt.

7. Franchise Tax Board will "require by demand" the examination of Dr. Melvin R. Hecht and require he produce documentation as per the attached Subpoena Duces Tecum in accordance with, and under the authority of, Revenue and Taxation Code section 19504. The purpose for this action is to administer the duties of the Franchise Tax Board which include ascertaining the correctness of any California tax return. The enforcement duty of the Franchise Tax Board with respect to California's Personal Income Tax Law is set forth in Revenue and Taxation Code section 19501.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _19 June 2009_ at _Sacramento, CA_

Robert W. Dunn

**AFFIDAVIT OF DR. MEL HECHT**

STATE OF NEVADA                           )
                                          ) ss:
COUNTY OF CLARK                           )

**DR. MEL HECHT**, being duly sworn, according to oath, deposes and states:

1.      I am a resident of the State of Nevada.  I am above the age of majority and competent to testify to the following facts of my own personal knowledge.

2.      I am a Rabbi and I have been a Rabbi for over 35 years.  My wife, Rebbetzen Micki Hecht, and I formed Temple Beth Am in Las Vegas in about 1984.  In the early 1990s, Temple Beth Am was located at the east side of Las Vegas.  About the end of 1992, we moved Temple Beth Am to its present location at the west side of Las Vegas.  I retired as the Rabbi for Temple Beth Am in 2007.

3.      I hold a Bachelor of Arts degree from the University of Miami and a Bachelor of Hebrew Letters degree, a Master of Hebrew Letters degree, and a Doctorate of Divinity degree from the Hebrew Union College/Jewish Institute of Religion.  I also studied at the Hebrew University in Jerusalem.  In early 1991, I received a gubernatorial appointment as Chairman of the Board of the State Industrial Insurance System (SIIS) (Nevada's Workmen's Compensation System) in which capacity I served for several years.  I was honored as Man of the Year at Temple Beth Am in December 1992.  Governor Bob Miller designated me as "Nevada's Senior

ATTACHMENT  B

1

RJN000943

1   Rabbi" at that 1992 event. Mayor Oscar Goodman confirmed my status as "Nevada's Senior

2   Rabbi" when celebrating Temple Beth Am's 20th birthday about 2004.

3         4.    On or about October 3, 1991, my wife and I first met Gil Hyatt at my office. He

4   telephoned for an appointment and I told him to come on over. At this meeting, Gil told us that

5   he had just moved from California, that he had just sold his house in California, and that he was

6   looking for an apartment to lease and a house to purchase in Las Vegas. I remember the date

7   because it was a couple of days after my wife had an MRI examination on October 1, 1991. I

8   also remember this October 3, 1991 date because it was a couple of weeks after Yom Kippur

9   which occurred on September 18, 1991 and about three weeks before the 1991 Comdex show. I

10   remember thinking that the Jewish New Year was a good time to make a move and that it was a

11   shame that Gil could not have spent the High Holy Days with us. The Jewish New Year, Rosh

12   Hashanah, occurred on September 9, 1991. The 1991 Comdex documents attached hereto as

13   Exhibit 1 refresh my recollection that the 1991 Comdex show ran from October 21 to 25.

14         5.    In this October 3, 1991 meeting, Gil also told us that he was staying at the

15   Continental Hotel until he could lease an apartment. I remember the name of the Continental

16   Hotel because to me it was a prominent landmark, my wife and I would occasionally dine there,

17   and I would regularly pass the Continental Hotel while traveling down Flamingo Road on my

18   way to and from my office when it was located on Pecos Road near Flamingo Road. The

19   Continental Hotel was well known for its tours where buses and vans would pick up Asian

20   vacationers in Southern California and take them to the Continental Hotel. By October 1991, I

21   had observed tours at the Continental Hotel for several years, I had spoken with persons who

22   had taken the tours, and I had observed advertisements for the tours. I understood from these

23

24

2

RJN000944

1    observations that, in the 1991 time frame, the tour packages included hotel accommodations,

2    ticket books, and other benefits and that the hotel set aside blocks of rooms for the tours.

3        6.    In the October 3, 1991 meeting, Gil told us that he had been invited to be a guest

4    speaker at the 1990 Comdex show about a year earlier and that Sheldon Adelson had invited

5    him to move to Las Vegas and work with the Interface Group on Comdex shows. He said that

6    Sheldon arranged for life sized posters of him to be hung at the 1990 Comdex show. I told Gil

7    that I had worked with Sheldon and that I knew him well. Sheldon was and still is an important

8    figure in Las Vegas. A short while later, Gil showed me and my wife a copy of a 1990 Comdex

9    press release that included flattering statements by Sheldon about Gil and Gil showed me

10    photographs that were taken of him at the 1990 Comdex show. The copy of the 1990 Comdex

11    press release attached hereto as Exhibit 2 refreshes my recollection of this press release and of

12    our conversation about Sheldon. The photographs of Gil with the poster and giving his speech

13    attached hereto as Exhibit 3 refresh my recollection of these photographs and of our

14    conversations about the 1990 Comdex show. Several months later, Gil showed me and my wife

15    a copy of a letter from the Interface Group. The copy of the letter from the Interface Group

16    attached hereto as Exhibit 4 refreshes my recollection of this letter and of our conversation

17    about the Interface Group.

18        7.    On October 4, 1991, Gil began attending Friday evening services at Temple Beth

19    Am and he started making friends in the congregation. I introduced him to my mother-in-law,

20    Esther Levoff, and to my young daughter at the October 4, 1991 Friday evening services. Gil

21    and Esther were each private pilots and, in the months that followed, they spoke a lot about

22    flying.

23

24

3

8.    I also recall that we had a number of special blessings for anniversaries, marriages, and birthdays at this October 4, 1991 services. In the birthday blessing, I included the name of my wife's deceased father , which is highly unusual. After the services, Gil asked me why I had included the name of a deceased person in the birthday blessing. I remember telling him that life is bittersweet and that joyous occasions often remind us of loved ones that are no longer physically part of our lives. I also recall Esther' talking to Gil about her deceased husband after the services.

9.    In the next several weeks, my wife and I had several meetings with Gil at my office. Gil was interested in our stories about the early days in Las Vegas and we were interested in his stories about inventions and technology. We were hopeful that he would continue to attend services and he did, but we were disappointed when he missed the next couple of Friday evening services because of his travels. Then he continued attending services during the Comdex show week on October 25, 1991 and during the following weeks. I remember this clearly because my wife and Gil discussed the exhibits at the show at length. My wife had a business assisting Comdex exhibitors and Gil was interested in the exhibits at the show.

10.    During one of the early October 1991 meetings, Gil confided in my wife and me that he had turned over some of his patents to a large multi-national company (Philips) to license, that they expected years of litigation before they would be able to license his patents, but that they would pay him annual fees which would support him and his research until they were able to generate license payments. Then, less than a month later, Gil made an appointment and excitedly told my wife and me that Philips had unexpectedly succeeded in licensing his patents to a Japanese company. I remember my wife telling Gil that this was a coincidence

4

RJN000946

1  because she spoke Japanese and that she was involved in the Japanese arts of ikebana (flower

2  arranging) and origami (paper folding). I remember that she made a folded paper bird and gave

3  it to him. Gil told us that he had just traveled to Japan about 6-months earlier. Shortly

4  thereafter, Gil showed us a couple of articles about him from Japanese magazines.

5      11.    Gil met with me alone or with both me and my wife at my office about once a

6  week through the rest of 1991, in addition to attending Friday evening services, and we found

7  areas of common interest. We occasionally had lunch and dinner together, sometimes with and

8  sometimes without my wife. We told Gil that we had taken a trip to Russia and some of our

9  experiences. For example, the Russians loved our daughter who had accompanied us on our

10  trip. Gil told us that his father was born in Russia and that he was looking forward to visiting

11  Russia sometime in the future. We occasionally discussed our mutual interests in Japanese

12  subjects (*see* above). Gil told me and my wife that he was interested in horseback riding,

13  roping, shooting, hiking, exploring, and skiing in and near Las Vegas. In the months and years

14  that followed, he told me and my wife about his involvement in these activities and that he, his

15  son, his grandchildren, and his friends participated in these activities with him in or near Las

16  Vegas. I told him that I too was interested in horseback riding as I had owned five horses and

17  rode regularly when I lived in Florida in the 1970s.

18      12.    A short while after our early October 1991 meeting, Gil told us that he had

19  leased an apartment on Pecos Road and that he was continuing to look for a house to purchase.

20  His apartment lease documents attached hereto as Exhibit 5 refresh my recollection of this time

21  frame and the location of his apartment. It was fortunate that Gil left the Continental Hotel

22  before the 1991 Comdex show started because the Continental Hotel was particularly busy

23  during the time of the Comdex shows because the hotel was close to the Convention Center and

5

1   was inexpensive. Exhibitors at the show would often use the hotel rooms as staging areas for

2   their exhibits, storing boxes and equipment in the hotel rooms. It was common to see exhibitors

3   moving exhibit materials into and out of the Continental Hotel while a Comdex show was in

4   progress.

5         13.    A short while after our early October 1991 meeting, Gil asked me to recommend

6   Las Vegas professionals. I did not need to make introductions as Gil told me that he took care

7   of that by himself. I remember suggesting that he contact a Las Vegas realtor that I knew, a Las

8   Vegas insurance agent (Bob Huddleson), and Las Vegas homebuilders (Bob Schulman, John

9   Kuminecz, and Frank Nielson). I told Gil that I had married Bob and his wife about the mid-

10   1980s and I asked Gil to say hello to Bob for me and my wife. Later in 1991, Gil told me that

11   he had met with Bob, John, and Frank at their offices, that they had discussed the Las Vegas

12   business and living environment and the International Trade Zones in Nevada, and that John

13   and Frank were going to show him some houses that were for sale.

14         14.    Later in 1991, Gil told me that he wanted to get involved in Las Vegas

15   professional activities so I suggested that he meet with Governor Miller and I told him that I

16   could make the introduction. I told Gil that Governor Miller had appointed me as Chairman of

17   the Board of the Nevada State Industrial Insurance System (SIIS), which was the Nevada

18   workmen's compensation system, a position that I held at that time in late 1991. I remember

19   postponing an appointment with Gil because I had to go to Carson City on SIIS business.

20   About a year later, Gil told me that he had met with and was working with Governor Miller

21   regarding a project to bring Asian factories to Nevada based in part upon the International Trade

22   Zones in Nevada. He told me that he had been introduced to Governor Miller by one of his

23

24

6

RJN000948

1   friends.  The appointment and commission document attached hereto as Exhibit 6 refreshes my

2   recollection that the appointment and commission ran from January 24, 1991 to June 30, 1995.

3          15.    Early in November 1991, Gil got very busy as a result of the unexpected

4   licensing of the Japanese company.  Then, later in the year, Gil got very sick.  He told me and

5   my wife that he had cancer and that his doctor suggested that he have an operation (discussed

6   below).  My wife and I prayed for him regarding his cancer condition and his operation.  He

7   continued to attend to Friday evening services but he became less active toward the end of

8   1991.

9          16.    In November 1991, Gil told me and my wife that he was planning to join

10  Congregation Ner Tamid and shortly thereafter he did join Congregation Ner Tamid.  *See* the

11  documents attached hereto as Exhibit 7.  He told me that he decided to join Congregation Ner

12  Tamid because it was nearer to his apartment and because he liked the facilities.  Gil continued

13  to attend services at Temple Beth Am after he had joined Congregation Ner Tamid, but less

14  frequently.

15         17.    In November 1991, during one of our meetings at my office, Gil confided in me

16  and my wife that his oldest son had been murdered in 1990 and that he was estranged from his

17  daughter and had been for over a year because his ex-wife had put her up against him.  We

18  advised him to attempt to reconcile with his daughter and, about mid-1992, he told me and my

19  wife that he was working on a reconciliation.  My wife and I prayed that his reconciliation with

20  his daughter would be successful.  But he told me afterwards that it did not work out.  I

21  particularly remember these conversations because I too experienced problems with my ex-wife

22  interfering with my relationship with my children in this same time frame.  Despite his

23  unfortunate experience regarding the relationship with his daughter, Gil confided in me and my

24

7

RJN000949

1  wife that he had a very good relationship with his son, Dan Hyatt, and with his three

2  grandchildren.

3      18.    On November 29, 1991, during the Thanksgiving holidays, Gil brought his son,

4  Dan, to Friday evening services.  These were family services including a special Chanukah

5  service for the young children.  My wife and I spoke with Gil and Dan after the services.  Gil

6  said that his son was visiting him for the Thanksgiving holidays.  Dan was a nice bright college

7  student.  He was considering moving to Las Vegas and attending UNLV in the future but at that

8  time he was living in California and attending a university in California.

9      19.    About December 1991, Gil told me and my wife that he was going to make

10  purchase offers on Las Vegas houses.  We told him that we were moving Temple Beth Am to

11  the west side of Las Vegas and we suggested that he look for a house to purchase on the west

12  side of Las Vegas.  We suggested to him that the west side of Las Vegas was a newer

13  community that was likely to be more suitable for him.  Soon afterwards, Gil told me and my

14  wife that he was purchasing a house near Rainbow Boulevard, which is much further west than

15  the location of his apartment, and that he was moving there.  He continued to attend services

16  occasionally at Temple Beth Am.  Later, when Temple Beth Am moved to the west side of Las

17  Vegas, Gil again regularly attended services at Temple Beth Am.  When we were seeking

18  donations for the building fund to build a new temple, Gil contributed to the building fund and

19  formally joined the temple.  *See* the documents attached hereto as Exhibit 8.

20      20.    About December 1991, Gil told me and my wife that he was having trouble with

21  the old car that he was driving.  He was a frugal inventor who was trying to make his old car

22  last.  My wife and I suggested that he consider getting a newer, more reliable car and in a few

23  months he followed our advice and bought a new 1992 Toyota.  He told us that he had bought it

24

8

1   from a Las Vegas new car dealer. My wife and I have observed that he still drives this 1992

2   Toyota to this day and we have again suggested that he consider getting a newer car.

3        21.    Regarding Gil's cancer operation, my wife and I strongly suggested that he go to

4   a California hospital rather that have the operation performed in Las Vegas. We told him that

5   Las Vegas medical services were far less developed than California medical services, California

6   medical providers cater to out of state patients, and Las Vegas residents traditionally go to

7   California for serious medical services. I told him that I have advised other congregants to have

8   their serious medical needs taken care of in California. My wife told him that she had gone to

9   the Santa Barbara Sansum Clinic in California and that other prominent Nevadans also went to

10  this clinic for their medical needs. Later, Gil told me and my wife that he had arranged to have

11  his surgery done in a California hospital by a California surgeon.

12       22.    In late February 1992, Gil telephoned me and told me that he had just had his

13  surgery performed in a California hospital and that he had returned to his Las Vegas apartment.

14  My wife and I visited him at his Las Vegas apartment a couple of days later, he seemed well,

15  and he appeared to be taking good care of himself. He told us that he no longer had cancer, that

16  he was returning to his normal life style, and that he was going to look at other Las Vegas

17  houses that his realtors wanted to show him. My wife brought him a container of chicken soup

18  as she occasionally did with sick congregants. She jokingly told him that chicken soup was

19  called Jewish penicillin. Gil's apartment was a nice second floor two bedroom apartment in a

20  nice well kept apartment complex. He had furniture and he had a lot of boxes stored in his

21  apartment.

22

23

24

9

RJN000951

23.      Gil has lived in Las Vegas for over 17 years since 1991. I have often seen him at temple services and at social occasions over the last 17 years since our early October 1991 meeting.

24.      The California Franchise Tax Board (the "FTB") apparently wrote letters about Gil to Temple Beth Am at both the Pecos address and a "Hill Point" address in the January and February 1995 time frame, respectively. I am informed that the FTB letter addressed to the Pecos address was returned to the FTB and that the FTB did not receive a response to the FTB letter it addressed to a "Hill Point" address. *See* the documents attached hereto as Exhibit 9. Neither my wife nor I recall receiving the letter addressed to the "Hill Point" address. I note that this letter misspells the name of the street on which Temple Beth Am is located. The temple is on "Hillpointe Road" but the letter was addressed to "Hill Point Road." I also note that the postmark of "Jan 24, '95" is before the date on the letter which states "1/26/95." To the best of my knowledge and my wife's knowledge, this letter was never received by Temple Beth Am.

25.      Although the change of address that we filed with the Post Office for the Pecos address may have expired by January 1995, a diligent person would have been able to easily find our new Hillpointe address and our telephone number. Even more important, the Hillpointe address was a valid address long before the February 1995 time frame and to the present time so that it would have been easy to contact the temple if a person wanted to do so. In other words, if someone really wanted to contact Temple Beth Am in the 1995 timeframe, they could have done so with a modicum of diligence. If the temple had received the February 1995 letter from the FTB, my wife or I would have responded to it.

10

26.     I have recently been informed that my name was before the FTB as a possible witness regarding Gil's residence in Las Vegas.  However, I was never contacted by the FTB.  If I had been contacted by the FTB, I would have given the FTB the evidence that I state in this affidavit and attached to this affidavit.

Further your affiant sayeth naught.


DR. MEL HECHT

Subscribed and sworn to before me

this 12th day of November 2008.


Notary Public

JOHN V. LUTES
NOTARY PUBLIC - STATE OF NEVADA
COUNTY OF CLARK
APPT. No. 08-5469-1
MY APPT. EXPIRES OCTOBER 22, 2011

11

RJN000953

Dated this 17TH day of March, 2017.

/s/  Debbie Leonard

JAMES BRADSHAW                          SETH P. WAXMAN
DEBBIE LEONARD                          PAUL R.Q. WOLFSON
ADAM HOSMER-HENNER                      DANIEL WINIK
MCDONALD CARANO WILSON LLP              WILMER CUTLER PICKERING
100 West Liberty Street, 10th Floor        HALE AND DORR LLP
P.O. Box 2670                           1875 Pennsylvania Ave. NW
Reno, NV  89505                         Washington, D.C.  20006
(775) 788-2000                          (202) 663-6000


CYNTHIA J. LARSEN
KATIE DEWITT
DAVID W. SPENCER
ORRICK, HERRINGTON & SUTCLIFFE
400 Capitol Mall, Suite 3000
Sacramento, CA 95814
(916) 329-7970


*Attorneys for Appellees Betty T. Yee,*
*Diane L. Harkey, and Michael Cohen in*
*their official capacities as members of the*
*California Franchise Tax Board*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of March, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

 /s/Pam Miller
An Employee of McDonald Carano Wilson LLP