No. 15-15296

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GILBERT P. HYATT

*Plaintiff-Appellant*,

*v.*

BETTY T. YEE, ET AL.

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California, No. 2:14-cv-00849-GEB-DAD (Burrell, J.)

## APPELLEE CALIFORNIA FRANCHISE TAX BOARD'S JUDICIAL NOTICE DOCUMENTS

### VOLUME 11 OF 12
### RJN 2019 – RJN 2236

JAMES BRADSHAW
DEBBIE LEONARD
ADAM HOSMER-HENNER
MCDONALD CARANO WILSON LLP
100 West Liberty Street, 10th Floor
Reno, NV  89501
(775) 788-2000

CYNTHIA J. LARSEN
KATIE DEWITT
DAVID W. SPENCER
ORRICK, HERRINGTON & SUTCLIFFE
400 Capitol Mall, Suite 3000
Sacramento, CA 95814
(916) 329-7970

SETH P. WAXMAN
PAUL R.Q. WOLFSON
DANIEL WINIK
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C.  20006
(202) 663-6000

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|---------------------------------------|----------|
| | | **VOLUME ONE** | | | | |
| 1 | 6/17/1993 | Letter from Marc Shayer to Gilbert Hyatt | 10 | 1 - 5 | NV Trial Ex. 0112* | 1, 3 |
| 2 | 7/15/1993 | Letter from Marc Shayer to Michael Kern, and response - Information Concerning Resident Status (Form FTB 3805F) | 10 | 6 - 14 | NV Trial Ex. 2174 | 1, 3 |
| 3 | 8/4/1993 | Letter from Michael Kern to Marc Shayer | 10 | 15 - 16 | NV Trial Ex. 2173 | 1, 3 |
| 4 | 5/24/1994 | Letter from Soriano to Michael Kern | 10 | 17 - 20 | NV Trial Ex. 2503 | 1, 3 |
| 5 | 8/2/1995 | Letter from Sheila Cox to Michael Kern - determination letter | 12 | 21 - 48 | NV Trial Ex. 2821 | 1, 3 |
| 6 | 8/29/1995 | Fraud Penalty | 13 | 49 - 62 | NV Trial Ex. 2199 | 1, 3 |
| 7 | 4/23/1996 | Fax from Michael Kern to Hyatt re 1991 NPA, and from Michael Kern to Cowan | 12 | 63 - 74 | NV Trial Ex. 2592 | 1, 3 |
| 8 | 6/20/1996 | Letter from Cowan to FTB re 1991 Protest Letter | 14 | 75 - 136 | NV Trial Ex. 296 | 2, 3 |
| 9 | 8/18/1997 | Fax from Hyatt to Eugene Cowan with Notice of Proposed Assessment 1992 | 13 | 137 - 141 | NV Trial Ex. 2609 | 1, 3 |
| 10 | 10/10/1997 | Letter from Cowan to FTB re 1992 Protest Letter 10-10-97 | 14 | 142 - 144 | NV Trial Ex. 319 | 2, 3 |
| 11 | 1/6/1998 | Complaint, *Gilbert P. Hyatt v. Franchise Tax Board of California* | 14 | 145 - 166 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |

\* All references to "NV Trial Ex." are documents that were submitted into evidence at the jury trial in Hyatt's Nevada litigation, Case No. 98A382999, Eighth Judicial District Court, Clark County, Nevada.

# INDEX

# FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| | | **VOLUME TWO** | | | | |
| 12 | 1/6/1998 | Case docket - *Gilbert P. Hyatt v. Franchise Tax Board of California* | 32 | 167 - 257 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |
| 13 | 3/17/1998 | Fax from Donald Kula to Hutchison and Hyatt re response tactics to Subpoena Duces Tecum to be issued to Cal Fed Bank | 21 | 258 | Ex. 3 to Dunn Decl., SER 23; NV Trial Ex. 2326 | 2, 3 |
| 14 | 5/28/1998 | Letter from Sheila Cox to Eugene Cowan attaching 4/24/98 Declaration for Subpoena Duces Tecum signed by Sheila Cox, Subpoena Duces Tecum to Cal Fed Bank | 21 | 259 - 262 | Ex. 3 to Dunn Decl., SER 24-27; NV Trial Ex. 2326 | 2 |
| 15 | 12/27/1999 | Protective Order on Report and Recommendation from Discovery Commissioner Biggar | 16 | 263 - 274 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |
| 16 | 12/30/1999 | Letter from Woodward to Cowan re document request letter | 15 | 275 - 305 | NV Trial Ex. 2330 | 2, 3 |
| 17 | 1/27/2000 | Docket | 17, 32 | 306 - 315 | Nevada Supreme Court, Case No. 35549 | 3 |
| 18 | 3/7/2000 | Memo from McLaughlin to Terry Collins | 16 | 316 - 319 | NV Trial Ex. 2333 | 2, 3 |
| 19 | 4/16/2000 | Letter from FTB to Cowan and Eric Coffill re request for delay | 15, 16 | 320 - 322 | NV Trial Ex. 2332 | 2, 3 |
| 20 | 6/7/2000 | Order Staying District Court Proceedings | 17 | 323 - 324 | Nevada Supreme Court, Case No. 35549 | 3 |

# INDEX

# FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|----------------------------------------|----------|
| | | **VOLUME THREE** | | | | |
| 21 | 6/30/2000 | Letter to Cody Cinnamon from Coffill responding to IDR | 16 | 325 - 425 | NV Trial Ex. 356 | 2, 3 |
| 22 | 7/7/2000 | Docket | 17, 32 | 426 - 434 | Nevada Supreme Court, Case No. 36390 | 3 |
| 23 | 10/3/2000 | Hearing Officer Report | 16 | 435 - 437 | NV Trial Ex. 2335 | 2, 3 |
| 24 | 6/13/2001 | Order Granting Petition (Docket No. 36390), and Dismissing Petition (Docket No. 35549) | 17 | 438 - 443 | Nevada Supreme Court, Case No. 36390, 35549 | 3 |
| 25 | 3/4/2002 | Docket | 32 | 444 - 445 | Nevada Supreme Court, Case No. 39274 | 3 |
| 26 | 3/8/2002 | Docket | 32 | 446 - 447 | Nevada Supreme Court, Case No. 39312 | 3 |
| 27 | 4/4/2002 | Order Denying Petition for Writ of Mandamus or Prohibition and Dismissing Appeal | 17 | 448 - 450 | Nevada Supreme Court, Case No. 39312, 39274 | 3 |
| 28 | 4/4/2002 | Order Granting Petition for Rehearing, Vacating Previous Order, Granting Petition for a Writ of Mandamus in Part in Docket no. 36390, and Granting Petition for a Writ of Prohibition in Part in Docket No. 35549 | 17 | 451 - 464 | Nevada Supreme Court, Case No. 35549, 36390 | 3 |
| 29 | 6/3/2002 | Letter from Felix Leatherwood to Mark Hutchison requesting documents and deposition testimony stamped "Confidential-NV Protective Order" | 17 | 465 - 466 | NV Trial Ex. 2342 | 2, 3 |
| 30 | 7/7/2002 | FTB Administrative Subpoena Duces Tecum | 17 | 467 - 470 | NV Trial Ex. 2344 | 2, 3 |

# INDEX

# FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|----------------------------------------|----------|
| 31 | 2/28/2003 | Court's Ruling on Order to Show Cause filed in Superior Court of California, Sacramento County , Case No. 02CS01582 | 17 | 471 - 472 | NV Trial Ex. 2348 | 3, 5 |
| 32 | 3/17/2003 | Fax Cover and letter from Donald Kula to Molly Mosley, DAG | 17 | 473 - 475 | NV Trial Ex. 2349 | 2, 3, 5 |
| 33 | 12/31/2003 | *State Franchise Tax Board v Gilbert P. Hyatt* , Decision (unpublished) | 17 | 476 - 500 | California Court of Appeal, Third Appellate District - Sacramento, Case No. C043627 | 2, 3, 5 |
| **VOLUME FOUR** | | | | | | |
| 34 | 9/7/2005 | Protest Event Log for Case Unit: Hyatt, Gilbert - 1992 | | 501 - 604 | NV Trial Ex. 2353 | 2, 3 |
| 35 | 10/28/2005 | Letter from Robert Dunn to Mark Hutchison re: request consent to release deposition transcripts and documents to FTB's protest hearing officer | 18 | 605 - 607 | NV Trial Ex. 2354 | 2, 3 |
| 36 | 12/6/2005 | Letter from Robert Dunn to Mark Hutchison re: second request | 18 | 608 | NV Trial Ex. 2355 | 2, 3 |
| 37 | 1/30/2006 | FTB Administrative Subpoena Duces Tecum and Exhibits A, C-E | 18 | 609 - 627 | NV Trial Ex. 2356 | 2, 3 |
| 38 | 1/19/2007 | Letter from Robert Dunn to Mark Hutchison requests production of documents and testimony from 2006 | 18 | 628 - 632 | NV Trial Ex. 2357 | 2, 3 |
| 39 | 2/14/2007 | Letter from Donald Kula to Robert Dunn | 18 | 633 - 638 | NV Trial Ex. 2358 | 2, 3 |
| 40 | 5/17/2007 | Letter from Donald Kula to Robert Dunn | 18 | 639 - 640 | NV Trial Ex. 2359 | 2, 3 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|-----------|---------------|---------------------------------------|----------|
| 41 | 11/1/2007 | Determination Letter from George W. McLaughlin to Eric Coffill | 18 | 641 - 690 | NV Trial Ex. 2320 | 2, 3 |
| 42 | 11/20/2007 | Letter from Eric Coffill to George W. McLaughlin | 19 | 691 - 695 | Ex. 1 to Dunn Decl., SER 13-17 | 6 |
| 43 | 11/26/2007 | Letter from George W. McLaughlin to Eric Coffill | 19 | 696 - 698 | Ex. 2 to Dunn Decl., SER 19-21 | 2 |
| 44 | 1/22/2008 | Letter from Eric Coffill to SBE enclosing Notice of Appeal for 1991, Request for Abatement of Interest | 22 | 699 - 711 | Ex. 4 to Dunn Decl., SER 29-41 | 6 |
| 45 | 1/23/2008 | Letter from Eric Coffill to SBE enclosing Notice of Appeal for 1992, Request for Abatement of Interest | 22 | 712 - 724 | Ex. 5 to Dunn Decl., SER 43-55 | 6 |
| 46 | 7/1/2008 | Letter from SBE to Eric Coffill re extension | 23 | 725 - 726 | SBE | 6 |
| 47 | 7/3/2008 | Letter from SBE to Eric Coffill re extension | 23 | 727 | SBE | 6 |
| 48 | 11/18/2008 | Letter from SBE to Eric Coffill re extension | 23 | 728 - 729 | SBE | 6 |
| **VOLUME FIVE** | | | | | | |
| 49 | 12/9/2008 | Hyatt Opening Brief 1991 | 23 | 730 - 836 | SBE | 6 |
| 50 | 12/9/2008 | Hyatt Opening Brief 1992 | 23 | 837 - 922 | SBE | 6 |
| 51 | 1/27/2009 | Letter from Robert Dunn to SBE re Hyatt's filing | 23 | 923 - 924 | SBE | 6 |
| 52 | 2/13/2009 | Docket | 32 | 925 - 928 | Nevada Supreme Court, Case No. 53264 | 3 |
| 53 | 3/16/2009 | Letter from Robert Dunn to Eric Coffill re scheduling depositions of affiants | 23 | 929 - 930 | SBE | 3 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 54 | 6/26/2009 | Request for Foreign Deposition Subpoena - Melvin R. Hecht | | 931 - 953 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-09-593462-C | 3, 5, 6 |
| **VOLUME SIX** | | | | | | |
| 55 | 6/26/2009 | Request for Foreign Deposition Subpoena - Michelina Hecht | | 954 - 975 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-09-593462-C | 3, 5, 6 |
| 56 | 9/15/2009 | FTB Opening Brief 1991 | 24 | 976 - 1081 | SBE | 6 |
| 57 | 9/15/2009 | FTB Opening Brief 1992 | 24, 31 | 1082 - 1160 | SBE; Ex. 7 to Dunn Decl., SER 61 -70 | 6 |
| 58 | 9/29/2009 | Letter from Eric Coffill to SBE requesting extension of time for filing | 25 | 1161 - 1172 | SBE | 6 |
| 59 | 10/1/2009 | Letter from Robert Dunn to SBE replying to Hyatt's request for time | 25 | 1173 - 1176 | SBE | 6 |
| 60 | 5/20/2010 | Letter from SBE to Eric Coffill re extension and new due date | 25 | 1177 | SBE | 6 |
| 61 | 8/11/2010 | Letter from SBE to Eric Coffill granting extension and email exchange | 25 | 1178 - 1180 | SBE | 6 |
| **VOLUME SEVEN** | | | | | | |
| 62 | 8/23/2010 | Hyatt 1991 Reply Brief | 25 | 1181 - 1289 | SBE | 6 |
| 63 | 8/23/2010 | Hyatt 1992 Reply Brief | 25 | 1290 - 1398 | SBE | 6 |
| 64 | 8/23/2010 | Hyatt Index of Affidavits | 25 | 1399 - 1403 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 65 | 2/4/2011 | *State of California Franchise Tax Board v. Mary Troter Stratton, et al.,* Petition by FTB for Issuance of Out-of-State Deposition Commissions (for Stratton depositions) | 24 | 1404 - 1410 | Superior Court of California, Sacramento, Case No. 34-2011-00096505 | 5, 6 |
| 66 | 5/3/2011 | *State of California Franchise Tax Board v. Gilbert P. Hyatt,* Nevada District Court Order Denying Strattons' Motion to Quash Subpoenas for a Pending Administrative Tax Appeal in California | 24 | 1411 - 1413 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-II-635345-C | 3, 5, 6 |
| | | **VOLUME EIGHT** | | | | |
| 67 | 6/30/2011 | FTB Reply Brief 1992 (Excerpts re Delays in Protest and Nevada litigation) | | 1414 - 1426 | SBE | 6 |
| 68 | 7/20/2011 | Dkt. No. 1 - Hyatt's Petition for Protective Order or Quash subpoenas | 27 | 1427 - 1429 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 6, 7 |
| 69 | 7/20/2011 | Docket | 32 | 1430 - 1431 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 7 |
| 70 | 7/29/2011 | Dkt. No. 17 - Decision & Order re Philips discovery | 27 | 1432 - 1444 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 6, 7 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 71 | 8/1/2011 | Docket | 32 | 1445 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 72 | 8/2/2011 | Dkt. No. 19 - Hyatt's Notice of Appeal | 27 | 1446 - 1465 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 7 |
| 73 | 8/15/2012 | Hyatt 1991 Supplemental Brief | 25 | 1466 - 1570 | SBE | 6 |
| **VOLUME NINE** | | | | | | |
| 74 | 8/15/2012 | Hyatt 1992 Supplemental Brief | 25 | 1571 - 1678 | SBE | 6 |
| 75 | 8/15/2012 | Exh A Hyatt 1991 Supplemental Brief | 25 | 1679 - 1680 | SBE | 6 |
| 76 | 8/15/2012 | Exh B Hyatt 1991 Supplemental Brief | 25 | 1681 - 1683 | SBE | 6 |
| 77 | 10/5/2012 | Dkt. No. 24 - Order to Show Cause | 28 | 1684 - 1687 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 78 | 2/19/2013 | FTB Supplemental Briefing re Tax Year 1991 and 1992, Exhibit H Tab 1-47_Protest and Litigation timeline (Tab 36) | | 1688 | SBE | 6 |

# INDEX

## FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 79 | 3/13/2013 | Dkt. No. 29 - Opinion and Order | 28 | 1689 - 1705 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 80 | 3/28/2013 | FTB Additional Brief Philips Documents and NY litigation | | 1706 - 1721 | SBE | 6, 7 |
| 81 | 4/29/2013 | FTB Additional Brief re Philips documents to SBE | | 1722 - 1726 | SBE | 6, 7 |
| 82 | 5/14/2013 | Docket | 32 | 1727 - 1730 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 83 | 10/7/2013 | Dkt. No. 23- Decision and Order | 28 | 1731 - 1747 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 84 | 3/13/2014 | Dkt. No. 74 - Decision and Order | 28 | 1748 - 1758 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 85 | 4/23/2014 | Letter from SBE to Eric Coffill and Robert Dunn requesting additional briefing | 29 | 1759 - 1761 | SBE | 6 |
| 86 | 5/7/2014 | Letter from Eric Coffill to SBE | 30 | 1762 - 1764 | Ex. 6 to Dunn Decl.,  SER 57-59 | 6 |
| 87 | 6/13/2014 | Letter from SBE to Eric Coffill and Robert Dunn re due dates and reluctance to grant more extensions | 30, 33 | 1765 - 1767 | SBE | 6 |
| 88 | 9/26/2014 | Letter from Eric Coffill to SBE re Request to Vacate | 33 | 1768 - 1769 | SBE | 6 |

# INDEX

## FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|----------------------------------------|----------|
| 89 | 10/13/2014 | Letter from Eric Coffill to SBE responding to FTB letter (enclosing letter from Hyatt's New York counsel to FTB's New York counsel re U.S. Philips documents dispute) | 33 | 1770 - 1778 | SBE | 6, 7 |
| 90 | 11/3/2014 | Letter from Eric Coffill to SBE requesting, *inter alia* , that SBE vacate briefing deadline | 33 | 1779 - 1780 | SBE | 6 |
| **VOLUME TEN** | | | | | | |
| 91 | 2/4/2015 | Letter from Eric Coffill to SBE submitting motions and requesting, *inter alia,* delay in briefing ending decision on motions | 33 | 1781 - 1847 | SBE | 6 |
| 92 | 2/23/2015 | Letter from Eric Coffill to SBE requesting, *inter alia,* delay on briefing until SBE rules on motions to strike | 33 | 1848 - 1849 | SBE | 6 |
| 93 | 3/11/2015 | Docket | 32 | 1850 - 1852 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 94 | 4/6/2015 | Affidavit of Robert Dunn in Opposition to Gilbert Hyatt's Motion Seeking an Order of Civil Contempt and Permanent Injunctive Relief | 32 | 1853 - 2000 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 95 | 6/3/2015 | Letter from Eric Coffill to the SBE requesting extension of time to file reply briefs | 33 | 2001 - 2003 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 96 | 9/10/2015 | Amended Judgment Decision & Order | 32 | 2004 - 2016 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 97 | 9/19/2016 | Letter from Edwin Antolin to SBE requesting extension for filing additional briefs | 33 | 2017 - 2018 | SBE | 6 |
| **VOLUME ELEVEN** | | | | | | |
| 98 | 9/28/2016 | Appellant's Concluding Summary (1991); Errata filed 11/4/16 | 33 | 2019 - 2057 | SBE | 6 |
| 99 | 9/28/2016 | Appellant's Concluding Summary (1992); Errata filed 11/4/16 | 33 | 2058 - 2092 | SBE | 6 |
| 100 | 9/28/2016 | Appellant's Second Additional Briefing (1991); Errata filed 11/4/16 | 33 | 2093 - 2165 | SBE | 6 |
| 101 | 9/28/2016 | Appellant's Second Additional Briefing (1992); Errata filed 11/4/16 | 33 | 2166 - 2236 | SBE | 6 |
| **VOLUME TWELVE** | | | | | | |
| 102 | 9/28/2016 | Attachment 1, Appellant's Second Additional Briefing (1992); Errata filed 11/4/16 | 33 | 2237 - 2278 | SBE | 6 |
| 103 | 10/20/2016 | Letter from SBE to Edwin Antolin re, *inter alia,* delays | 33 | 2279 - 2282 | SBE | 6 |
| 104 | 11/4/2016 | Letter from Edwin Antolin to Joann Richmond with errata table | 33 | 2283 - 2297 | SBE | 6 |
| 105 | 11/16/2016 | Letter from FTB to SBE re Hyatt's request for additional time | 33 | 2298 - 2299 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|----------------------------------------|----------|
| 106 | 1/6/2017 | Letter from SBE to Edwin Antolin re rescheduing the hearing from March 2017 to May 2017 | 33 | 2300 | SBE | 6 |
| 107 | 3/3/2017 | Notice of Board Hearing for Case No. 446509 on 5/23/17 | 33 | 2301 - 2302 | SBE | 6 |
| 108 | 3/3/2017 | Notice of Board Hearing for Case No. 435770 on 5/23/17 | 33 | 2303 - 2304 | SBE | 6 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EDWIN P. ANTOLIN
Edwin.antolinlawgroup.com
ANTOLIN LAW GROUP
2175 N. California Blvd., Suite 775
Walnut Creek, CA 94596
Telephone: (925) 262-4187
Fax: (925) 262-4269

BRIAN TOMAN
btoman@reedsmith.com
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone: (415) 543-8700
Fax: (415) 415-391-8269

AMY L. SILVERSTEIN
asilverstein@sptaxlaw.com
SILVERSTEIN & POMERANTZ LLP
12 Gough Street, 2nd Floor
San Francisco, CA 94103
Telephone: (415) 593-3502
Fax: (415) 593-3501
Attorneys for Appellant

BEFORE THE STATE BOARD OF
EQUALIZATION
OF THE STATE OF CALIFORNIA

In the Matter of the Appeals of


GILBERT P. HYATT

Case Nos.   435770 & 446509

## APPELLANT'S CONCLUDING SUMMARY (1991)

**TABLE OF CONTENTS**

1.1   TABLE OF ABBREVIATIONS AND DEFINITIONS. ................................. V
1.2   TABLE OF AUTHORITIES............................................................VII
1.3   TABLE OF CITATIONS AND LINKS TO EXAMPLES OF MR. HYATT'S
      EVIDENCE. ...................................................................................... X
      1.3.1   Updated Testimonial Topics Table And Exhibits Summarizing The
              Eyewitness Testimonial Subject Matters And The Reinforcement Of
              Testimony Between Eyewitnesses (E.G., 72-Witnesses Testified About
              Mr. Hyatt's Move Away In 1991) Under Oath Or Penalty Of Perjury....... x
      1.3.2   Updated Chronological Statements Of Facts (The "Chronologies"), A
              Chronology Of Mr. Hyatt's Overwhelming Eyewitness And
              Documentary Evidence. ................................................................ x
      1.3.3   The More Than 220 Affidavits And Declarations Sworn To Or Signed
              Under Penalty Of Perjury By More Than 150 Eyewitnesses In Support
              Of Mr. Hyatt's Facts. ................................................................... x
      1.3.4   "Testimonial Responses" Tables And Excerpts Regarding
              Eyewitnesses' Overwhelming Testimony To Identify And Correct
              FTB's False Arguments And False Facts................................................ x
      1.3.5   Philips Document Tables Providing Examples Of More Than 5,000
              Pages Of Philips Documents That Support Mr. Hyatt's Cases. ................ xi
      1.3.6   Witness Deposition Tables Providing Examples Of More Than 20
              Depositions That FTB Took Of Mr. Hyatt's Eyewitnesses And Philips
              Licensing Attorneys That Support Mr. Hyatt's Appeals. ......................... xi
      1.3.7   Tables Of False Statements Made In The FTB Audit File And
              Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses. ............... xi
      1.3.8   Tables Of False Statements Made Under Penalty Of Perjury By FTB
              Private Investigators And Rebutted Under Oath Or Penalty Of Perjury
              By Eyewitnesses............................................................................ xi
      1.3.9   Objection And Rebuttal To FTB's Calendar And Attachments A
              (Revised) And F ("Rebuttal To FTB Att. A/F"). ...................................... xi
      1.3.10  Objection And Rebuttal To FTB's Attachment E ("Rebuttal To FTB
              Att. E"). ..................................................................................... xi
      1.3.11  Tables Of Misrepresentations In FTB's ROBs And RRBs....................... xi
      1.3.12  Tables Of Mr. Hyatt's Presence Based Upon Direct Testimonial and
              Documentary Evidence ................................................................. xi
1.4   INTRODUCTION TO MR. HYATT'S 1991 CONCLUDING SUMMARY. .............. 1
1.5   MR. HYATT'S EVIDENCE IS SO EXTENSIVE THAT IT IS VIRTUALLY
      IMMEASURABLE. .................................................................................. 8
1.6   MR. HYATT WAS A NEVADA RESIDENT COMMENCING ON SEPTEMBER
      26, 1991. ............................................................................................... 9
      1.6.1   The *Bragg* Factors Overwhelmingly Establish Mr. Hyatt's Nevada
              Residency And Domicile. .......................................................... 10
              1.6.1.1   Mr. Hyatt did not own any residential real property in
                        California, he sold his California house and he shopped
                        for and purchased residential property in Nevada............. 10
              1.6.1.2   Mr. Hyatt did not live with his family, his children were
                        grown, he was divorced, he terminated his California

-ii-

homeowner's property tax exemption, he was not employed, he did not have business interests, he did not use professional licenses, and he had no investment real property. ...................................................................... 11

1.6.1.3 Mr. Hyatt's only telephone was located in his Las Vegas apartment and he used a Las Vegas service provider. .............................................................. 12

1.6.1.4 Mr. Hyatt spent all of his time during the disputed period in Nevada except for short temporary and transitory trips to other states. .......................... 12

1.6.1.5 Mr. Hyatt filed his 1991 California tax return as a part year resident from Las Vegas and he filed all subsequent tax returns from Las Vegas. ...................... 13

1.6.1.6 Mr. Hyatt had only Nevada bank accounts and Nevada situs investment accounts during the disputed period....... 13

1.6.1.7 The origination point of Mr. Hyatt's checking account transactions and credit card transactions was Las Vegas.. 13

1.6.1.8 Mr. Hyatt's social, religious, and professional memberships and activities during the disputed period and thereafter were and are in Las Vegas. ...................... 14

1.6.1.9 Mr. Hyatt registered his automobiles in Nevada, he had a Nevada driver's license, and he registered to vote and did vote in Nevada. .......................................... 14

1.6.1.10 Mr. Hyatt had relationships with many Nevada professionals, he had relationships with more than 40 non-California professionals, and he used only a few California professionals. .................................... 15

1.6.2 FTB's Protest Findings Do Not Detract From The Conclusion That Mr. Hyatt Became A Nevada Resident In September 1991...................... 15

1.7 MR. HYATT NOTIFIED MANY PERSONS AND ENTITIES OF HIS MOVE TO AND LOCATION IN LAS VEGAS AND HE RECEIVED VIRTUALLY ALL OF HIS MAIL IN LAS VEGAS DURING THE DISPUTED PERIOD AND THEREAFTER. ........................................................................ 15

1.8 FTB'S RESIDENCY AND SOURCING CASES ARE BOTH BASED ON *INDISPUTEDLY MIS-ADDRESSED DOCUMENTS* AND ON FTB'S DISREGARD OR MISREPRESENTATION OF MR. HYATT'S OVERWHELMING EYEWITNESS AND DOCUMENTARY EVIDENCE. ........... 16

1.9 FTB MAKES THOUSANDS OF FALSE STATEMENTS IN ITS RSABS, CALENDAR, ATTACHMENT A-R, AND ATTACHMENT F. .............................. 18

1.9.1 FTB's Calendar, Attachment A-R, And Attachment F Should Be Disregarded Because They Are Based Upon Thousands Of False Representations And Disregard Overwhelming Eyewitness And Documentary Evidence. ........................................................ 19

1.9.2 FTB's Residency And Sourcing Cases Are Both Based On The Bad Faith Premise That *Undisputed Mis-Addressed Correspondence* Establishes That Mr. Hyatt Was Present To Receive It At The Jennifer Circle House.............................................................. 19

-iii-

1.9.2.1  The licensing executives testimony is devastating to FTB's Jennifer Circle presence falsehood. .......................................................................... 21

1.10  MR. HYATT DID NOT HAVE CALIFORNIA SOURCE INCOME ...................... 21

1.10.1  The License Payments Received By Mr. Hyatt Were Not California Source Income.................................................................................. 21

1.10.2  FTB's Sourcing Assessments Were Not Properly Raised In The NPAs Or NOAs. ...................................................................................... 24

1.11  FTB'S PROPOSED IMPOSITION OF AN AMNESTY PENALTY IS IN ERROR............................................................................................................ 26

1.12  INTEREST SHOULD BE ABATED FOR THE ADDITIONAL REASON THAT THE NEVADA SUPREME COURT FOUND THAT FTB COMMITTED FRAUD AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IN PART *BECAUSE OF ITS DELAYS*. ............................................................. 26

1.13  INCORPORATION BY REFERENCE. .................................................... 27

1.14  CONCLUSION ................................................................................ 27

RJN002022

## 1.1     TABLE OF ABBREVIATIONS AND DEFINITIONS.

| | |
|---|---|
| 1991 AOB | 1991 Appellant's Opening Brief, |
| 1992 AOB | 1992 Appellant's Opening Brief, |
| 1991 ARB | 1991 Appellant's Reply Brief, |
| 1992 ARB | 1992 Appellant's Reply Brief, |
| 1991 ASB | 1991 Appellant's Supplemental Brief, |
| 1992 ASB | 1992 Appellant's Supplemental Brief, |
| AAB | Appellant's Additional Brief, |
| 1991 ASAB | 1991 Appellant's Second Additional Brief, |
| 1992 ASAB | 1992 Appellant's Second Additional Brief, |
| 1991 ROB | 1991 Respondent's Opening Brief, |
| 1992 ROB | 1992 Respondent's Opening Brief, |
| 1991 RRB | 1991 Respondent's Reply Brief, |
| 1992 RRB | 1992 Respondent's Reply Brief, |
| RAB | Respondent's Additional Brief, |
| 1991 RSAB | 1991 Respondent's Second Additional Brief, |
| 1992 RSAB | 1992 Respondent's Second Additional Brief, |
| | |
| Disputed period | FTB's name for the period in dispute, September 26, 1991 to April 2, 1992 |
| CDE | FTB's name for Contemporaneous Documentary Evidence |
| Rebuttal to FTB Att. A/F | Rebuttal and Objection to FTB Calendar, Attachment A (Revised), and Attachment F |
| Rebuttal to FTB Att. E | Rebuttal and Objection to FTB Attachment E |
| Attachment A-R | FTB Attachment A (Revised) |
| Jennifer Circle house | 7841 Jennifer Circle, La Palma house |
| La Palma house | 7841 Jennifer Circle, La Palma house |

RJN002023

1 | NPA | FTB's Audit Notice Of Proposed Assessment

2 | NOA | FTB's Protest Notice Of Action

RJN002024

## 1.2   <u>TABLE OF AUTHORITIES.</u>

**CASES**

*Achiro v. Commissioner*,
77 T.C. 881 (1981)

*Falese v. Commissioner*,
58 T.C. 895 (1972)

*Fitch v. Comm'r*,
T.C. Memo 2012-358, P25 (T.C. 2012)

*Fox v. Erickson*,
99 C.A.2d 740, 742 (1950)

*Hale v. Comm'r*,
T.C. Memo 2010-229 (T.C. 2010)

*Franchise Tax Bd. of Cal. v. Hyatt*,
335 P.3d 125, 144-145, 148-149 (Nev. 2014)

*Jones v. Commissioner*,
259 F.2d 300 (5th Cir. 1958)

*In re Jost*,
117 Cal.App.2d 379, 383 (1953)

*Mansell v. Board of Administration*,
30 Cal. App. 4th 539, 545 (1994)

*Marchica v. State Board of Equalization*,
107 Cal.App.2d 501, 509 (1951)

*Mattel v. Gilbert Hyatt*,
1979 U.S. Dist. LEXIS 8812 (December 6, 1979)

*Padgett Coventry Price v. Commissioner of Internal Revenue Service*,
T.C. Memo 2004-103

*Powell v. Granquist*,
252 F.2d 56 (9th Cir. 1958)

*Professional Services v. Commissioner*,
79 T.C. 888, 930 (1982)

*Rowlee v. Commissioner*,
80 T.C. 1111, 1123 (1983)84

*Stoltzfus v. United States*,
398 F.2d 1002, 1004 (3d Cir. 1968)

*Title Ins. Co. of Minnesota v. State Bd. of Equalization*
4 Cal.4th 715 (1992)

RJN002025

**Statutes**

Tit.18, Cal. Rev. & Tax. Code

§ 17014(a)
§ 17951-4(a).
§ 17951-4(c)
§ 17952
§ 17952(a)
§ 17952(c)
§ 19033
§ 19034
§ 19044
§ 19045
§ 19057
§ 19036

Revenue and Taxation Code sections 12421 through 12435

**STATE BD. OF EQUALIZATION DECISIONS**

*Appeal of Robert F. and Helen R. Adickes*,
St. Bd. of Equaliz., 1990 Cal. Tax LEXIS 24, 90-SBE 012 (Nov. 27, 1990)

*Appeal of Eli A. and Virginia W. Allen*,
Cal. St. Bd. of Equal., Jan. 7, 1975)

*Appeal of Armstrong*,
St. Bd. of Equaliz. 1985 Cal. Tax LEXIS 2 December 3, 1985

*Appeal of Stephen D. Bragg*,
2003-SBE-002 (May 28, 2003)

*Appeal of Castillo*,
No. 90A-0227-ES, St. Bd. of Equaliz. 1992 Cal. Tax LEXIS 28;
92-SBE-020 July 30, 1992

*Appeals of Robert E. Wesley and Jerry J. Couchman*,
2005-SBE-002, (2005) Cal. Tax LEXIS 358,

*Appeal of Duncan*
1993 Cal. Tax LEXIS 147, 3-4 (1993)

*Appeal of Robert V. Erilane*,
Cal. St. Bd. of Equal., Nov. 12, 1974

*Appeal of Lasher*,
St. Bd. of Equaliz. 2005 Cal. Tax. Lexis 22 (Case No. 260933) (Jan. 25. 2005)

*Appeal of David G. and Helen Mendelsohn*,
85-SBE-141, Nov. 6, 1985

*Appeal of Sierra Pacific Industries*,
Cal. St. Bd. of Equal., Jan. 5, 1994, 94-SBE-0024

RJN002026

*Appeal of Hubbard D. & Cleo M. Wickman*,
81-SBE-014, Feb. 2, 1981

**Other Authorities**

Law Review Commission Comments for Evid. Code § 600

Uniform Division of Income for Tax Purposes Act,
Sections 25120 to 25139

RJN002027

**1.3**     **TABLE OF CITATIONS AND LINKS TO EXAMPLES OF MR. HYATT'S EVIDENCE.**

1.3.1    **Updated Testimonial Topics Table And Exhibits Summarizing The Eyewitness Testimonial Subject Matters And The Reinforcement Of Testimony Between Eyewitnesses (E.G., 72-Witnesses Testified About Mr. Hyatt's Move Away In 1991) Under Oath Or Penalty Of Perjury.**

1.3.2    **Updated Chronological Statements Of Facts (The "Chronologies"), A Chronology Of Mr. Hyatt's Overwhelming Eyewitness And Documentary Evidence.**

     Updated 1991 Pre-Disputed Period Chronological Statements Of Facts.

     Updated 1991 Disputed Period Chronological Statements Of Facts.

     Updated 1992 Disputed Period Chronological Statements Of Facts.

     Updated 1992 Post-Disputed Period Chronological Statements Of Facts.

1.3.3    **The More Than 220 Affidavits And Declarations Sworn To Or Signed Under Penalty Of Perjury By More Than 150 Eyewitnesses In Support Of Mr. Hyatt's Facts.**

     Updated Index of Affidavits.

     Affidavits and Declarations with Exhibits filed with the AOBs.

     Affidavits and Declarations with Exhibits filed with the ARBs.

     Affidavits and Declarations with Exhibits filed with the ASBs.

     Post-Briefing Evidence (post-ASBs Affidavits and Declarations with Exhibits).

     Mr. Hyatt's Contemporaneous Documentary Evidence (CDE) Affidavits Describing And Authenticating Thousands of Pages of Documentary Evidence.

        Mr. Hyatt's 2012 Disputed Period CDE Affidavit.

        Mr. Hyatt's 2016 Supplemental Disputed Period CDE Affidavit.

        Mr. Hyatt's 2016 Post-Disputed Period CDE Affidavit.

     Sourcing Affidavits With Exhibits.

1.3.4    **"Testimonial Responses" Tables And Excerpts Regarding Eyewitnesses' Overwhelming Testimony To Identify And Correct FTB's False Arguments And False Facts.**

     Testimonial Responses To FTB's 1991 ROB

     Testimonial Responses To FTB's 1992 ROB

     Testimonial Responses To FTB's 1991 RRB

     Testimonial Responses To FTB's 1992 RRB

     Testimonial Responses To FTB's 1991 Attachment A

RJN002028

Testimonial Responses To FTB's 1992 Attachment A

Testimonial Responses To FTB's Attachment D

**1.3.5** **Philips Document Tables Providing Examples Of More Than 5,000 Pages Of Philips Documents That Support Mr. Hyatt's Cases.**

**1.3.6** **Witness Deposition Tables Providing Examples Of More Than 20 Depositions That FTB Took Of Mr. Hyatt's Eyewitnesses And Philips Licensing Attorneys That Support Mr. Hyatt's Appeals.**

**1.3.7** **Tables Of False Statements Made In The FTB Audit File And Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses.**

**1.3.8** **Tables Of False Statements Made Under Penalty Of Perjury By FTB Private Investigators And Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses.**

**1.3.9** **Objection And Rebuttal To FTB's Calendar And Attachments A (Revised) And F ("Rebuttal To FTB Att. A/F").**

/02/06B1 Introduction to Rebuttal To FTB Att. A/F

/02/06B2 September 1991 Rebuttal To FTB Att. A/F

/02/06B3 October 1991 Rebuttal To FTB Att. A/F

/02/06B4 November 1991 Rebuttal To FTB Att. A/F

/02/06B5 December 1991 Rebuttal To FTB Att. A/F

/02/06B6 January 1992 Rebuttal To FTB Att. A/F

/02/06B7 February 1992 Rebuttal To FTB Att. A/F

/02/06B8 March 1992 Rebuttal To FTB Att. A/F

/02/06B9 April 1992 Rebuttal To FTB Att. A/F

**1.3.10** **Objection And Rebuttal To FTB's Attachment E ("Rebuttal To FTB Att. E").**

**1.3.11** **Tables Of Misrepresentations In FTB's ROBs And RRBs.**

**1.3.12** **Tables Of Mr. Hyatt's Presence Based Upon Direct Testimonial and Documentary Evidence**

ASAB Exhibit 02

ASAB Exhibit 03

CDE Affidavit Exhibit CDE-ST002

CDE Affidavit Exhibit CDE- ST003

RJN002029

**1.4**     **INTRODUCTION TO MR. HYATT'S 1991 CONCLUDING SUMMARY.**

Mr. Hyatt decided to move to Las Vegas in 1990, he prepared for his move for over nine (9) months, including preparing to sell his California house, and he moved on September 26, 1991.[1]

The year 1990 was a difficult year for Mr. Hyatt. He had lost his mother a short while before, his oldest son was murdered in March 1990, he was being harassed by three estranged relatives (his ex-wife, his daughter who was close to his ex-wife, and his brother). The aerospace industry, where he earned his living as a consultant, was in a depression as a result of the demise of the former Soviet Union. He needed a major change in his life.

Sheldon Adelson in 1990 offered Mr. Hyatt the change that he needed. He invited Mr. Hyatt to speak at the Comdex trade show in Las Vegas in mid-November 1990 and he offered Mr. Hyatt a job if he moved to Las Vegas. In November 1990 when he was present at the Comdex trade show, Mr. Hyatt explored Las Vegas and decided to move to Las Vegas. He returned to California and prepared to move to Las Vegas and in about nine months, on September 26, 1991, he permanently moved to Las Vegas. In preparation for his move, he visited Las Vegas several times during 1991 to shop for an apartment and for a house. He fixed up his California house, he gave away, stored, threw away, and packed up his possessions in preparation for the sale of the house and he sold the house on October 1, 1991, shortly after he moved. He stayed in a Las Vegas hotel for several weeks, he leased a Las Vegas apartment for six months, and he purchased a Las Vegas house where he still resides today.[2]

In December 1990, shortly after his decision to move, Mr. Hyatt engaged Mahr Leonard to license his patents but Mahr Leonard failed to get any licenses. In July 1991 Mr. Hyatt licensed Philips with exclusive authority to sublicense his patents. Philips told him that it could take years of patent litigation before his patents were licensed and thus Philips agreed to pay Mr. Hyatt a minimum annual license fee for up to 10 years to sustain him until Philips could license his patents. Mr. Hyatt's finances were very uncertain at the time he moved to Las Vegas and sold his California house.

Mr. Hyatt did not know that the Philips Licensing Program would be a rapid success, Mahr Leonard's attempts to license his patents had failed and Philips told him that it could take years before Philips could license the patents.[3]

Well into October 1991, the Mahr Leonard negotiations with Fujitsu and Oki were continuing and changes were being made to the patent agreements in mid-October 1991.[4] However, Philips unexpectedly started to license his patents. This permitted Mr. Hyatt to concentrate more of his time on his research and development and building his life in Las Vegas.[5]

---

[1] Hyatt's 2001 Affidavit ¶¶ 2-8, 16-25, 29-31; Hyatt's 2008 Affidavit ¶¶ 2-11; Hyatt's 2010 Affidavit Sections 1.2, 1.2.1, 1.2.2, 1.2.3; 1991 AOB, pp. 2-3.
[2] Updated Testimonial Topics, Exs. T001, T002, T003, T004, T005, T116, T117, T007, T006, T102, T118, T119, T123, T124, T127, T008, T009, T018, T021, T128, *et seq*.
[3] Hyatt's 2001 Affidavit ¶¶ 9-15; Hyatt's 2008 Affidavit ¶¶ 47-49.

-1-

RJN002030

There are many eyewitnesses to the above events:[6]

26-witnesses testified about Mr. Hyatt's decision to move to Las Vegas,

32-witnesses testified about Mr. Hyatt's preparations to move to Las Vegas in 1991,

21-witnesses testified that Mr. Hyatt lived alone at his former Jennifer Circle house before he moved to Las Vegas in 1991,

17-witnesses testified about Mr. Hyatt's former Jennifer Circle house having little furniture and/or having packed boxes before he moved to Las Vegas in 1991,

14-witnesses testified about Mr. Hyatt's former Jennifer Circle house being nearly empty of furniture and furnishings before he moved to Las Vegas in 1991,

15-witnesses testified about Mr. Hyatt's possessions being carted off for storage or being given away, or disposed of, or donated to charity,

3-witnesses testified that they helped Mr. Hyatt move his belongings to storage prior to his move to Las Vegas in 1991,

4-witnesses testified that they helped Mr. Hyatt pack his belongings for his move to Las Vegas in 1991,

72-witnesses testified about Mr. Hyatt's move away in 1991,

28-witnesses testified about Mr. Hyatt's move away in September 1991,

22-Jennifer Circle neighbors testified about Mr. Hyatt moving away in 1991.

Mr. Hyatt moved to Las Vegas on September 26, 1991, and sold his only California house five days later on October 1, 1991. During the disputed period (September 26, 1991, to April 2, 1992) Mr. Hyatt had 125 full days in Nevada as a resident, zero full days in California as a resident, and 37 days partly in Nevada as a resident and partly in California for temporary or transitory purposes.[7] All of the 1991 and 1992 disputed licensing payments Mr. Hyatt received came from Philips licensing his Nevada situs patents through the Philips Licensing Program. He had no "California source income".

Mr. Hyatt has produced overwhelming *eyewitness and documentary* evidence in support of his appeals. Mr. Hyatt filed more than 220 declarations and affidavits from more than 150 witnesses from many walks of life[8] in support of his

---

[4] FTB_Philips 0002478-0002509, FTB_Philips 0005640-0005671.
[5] Hyatt's 2012 CDE Affidavit, his 2016 Supp. CDE Affidavit, and his 2016 Post-DP CDE Affidavit ("Mr. Hyatt's CDE Affidavits"). See also the Updated 1991 Pre-Disputed Period Chronological Statement Of Facts, the Updated 1991 Disputed Period Chronological Statement Of Facts, the Updated 1992 Disputed Period Chronological Statement Of Facts, and the Updated 1992 Post-Disputed Period Chronological Statement Of Facts (the "Chrons").
[6] Updated Testimonial Topics, Exs. T001, T002, T115, T003, T004, T005, T116, T117, T007, T006, and T102, respectively.
[7] Day by day analysis in Rebuttal to FTB Att. A/F, Section I. A. Mr. Hyatt also had 9 full days in a California hospital for cancer surgery, February 12-20, 1992. Mr. Hyatt was admitted to the California hospital on February 11 for cancer surgery, was discharged from the California hospital on February 21, and returned to his Las Vegas apartment that same day.
[8] See Updated Testimonial Topics Table.

position in these appeals and he filed thousands of pages of very relevant contemporaneous documentary evidence ("CDE").[9]
This ***overwhelming eyewitness and documentary evidence*** establishes that (1) Mr. Hyatt moved away from the Jennifer Circle
house in 1991, (2) he moved to Las Vegas and became a Nevada resident on September 26, 1991, (3) he sold his California
house on October 1, 1991, and had no other abode in California, (4) his occasional presence in California was for temporary or
transitory purposes, and (5) he did not receive California source income during the disputed period or thereafter.[10]

The ***Bragg* factors** confirm that Mr. Hyatt's closest connections were with Nevada *infra*. Not one of the *Bragg*
factors shows a close or substantial connection to California.

---

[9] Affidavit of Gilbert P. Hyatt Regarding Contemporaneous Documentary Evidence (CDE), July 24, 2012 ("Hyatt's
2012 CDE Aff."); Supplemental Disputed Period CDE Affidavit of Gilbert P. Hyatt, September 6, 2016 ("Hyatt's 2016 Supp.
CDE Aff."); Post-Disputed Period CDE Affidavit of Gilbert P. Hyatt, September 8, 2016 ("Hyatt's 2016 Post-DP CDE Aff.").
[10] 1991 AOB, pp. 15-38, 63-86; 1992 AOB, pp. 16-35; 1991 ARB pp. 21-68; 1992 ARB pp. 2-26, 27-81; 1992 ASB,
pp. 41-52, 53-99.

-3-

RJN002032



Figure 1
Jennifer Circle Neighborhood

RJN002033

| Neighbor Family Last Name | Number of Declarants | Jennifer Circle Address | Comments |
|---|---|---|---|
| Kim | 4 | 7831 | Husband, wife, & two children testified |
| Amador | 4 | 7861 | Mother & three children testified |
| Redmond | 2 | 7842 | Husband & wife testified |
| Rohrig | 2 | 7802 | Husband & wife testified |
| Neuner | 3 | 7851 | Husband, wife, & son testified Divorced, wife remarried as Ruth |
| Wilson | 2 | 7832 | Husband & wife testified |
| Washle | 2 | 7811 | Husband & wife testified |
| Zuzak | 1 | 7862 | Husband testified, wife deceased |
| Fritzsche | 1 | 7821 | Wife testified, husband deceased |
| Smith | 1 | 7812 | Husband testified |
| Fisher | 1 | 7852 | Husband testified, wife deceased |

**Figure 2. La Palma Neighbors Table**

*A total of twenty two* **Jennifer Circle neighbors testified** about Mr. Hyatt moving away in 1991 and *23-witnesses testified* that they did not ever again see Mr. Hyatt at Jennifer Circle after he moved away in 1991.[11] As shown by the photograph of Jennifer Circle immediately below, Jennifer Circle is a short, compact cul-de-sac with only 16 houses.

Seven of these 22 eyewitness neighbors (members of the Kim family and the Neuner family) lived right next door to Mr. Hyatt. They all knew Mr. Hyatt and they all testified -- that **Mr. Hyatt moved away from Jennifer Circle in 1991**. Indeed, Mr. Neuner expressly testified that he saw Mr. Hyatt leave for Las Vegas in his old brown Toyota pulling a trailer.[12] Twenty three eyewitnesses also testified that **Mr. Hyatt was not seen again at Jennifer Circle after he moved away in 1991**. This *eyewitness testimony* corroborates Mr. Hyatt's testimony that he moved away from the Jennifer Circle house and was not present at the Jennifer Circle house during the disputed period or thereafter.

The testimony of Mr. Hyatt's former Jennifer Circle neighbors alone defeats the FTB's residency case and sourcing case. FTB bases both the residency and sourcing cases upon the same false premise – that Mr. Hyatt lived, worked and operated a California licensing business at the Jennifer Circle house. However, the testimony of Mr. Hyatt's **22 neighbors** and dozens of other eyewitnesses proves that Mr. Hyatt moved away in 1991 and was not present at the Jennifer Circle house before late 1992. Mr. Hyatt's absence from the Jennifer Circle neighborhood disproves FTB's premise for its entire residency and sourcing cases. FTB's claim that it can infer from an address on a correspondence that Mr. Hyatt was physically present at the Jennifer Circle house must be rejected when eyewitnesses with personal knowledge establish that Mr. Hyatt's moved away from the Jennifer Circle house and did not return. Because Mr. Hyatt was not at the Jennifer Circle house, he could not and he did not live, work, or operate a California licensing business at the Jennifer Circle house.

---

[11] Updated Testimonial Topics, Exs. T102 and T127, respectively.
[12] Affidavit of Richard Neuner, January 2, 2010, ¶ 7.

RJN002034

The testimony of Mr. Hyatt's neighbors is just one part of his overwhelming documentary and testimonial evidence. *Seventy-two eyewitnesses[13] testified* about Mr. Hyatt's move away in 1991, *28 eyewitnesses testified* about Mr. Hyatt's move away in September 1991, and *15 eyewitnesses testified* that an Asian woman (or Ms. Jeng) moved into the Jennifer Circle house after Mr. Hyatt moved away in 1991.[14]  In addition, *32-witnesses testified* about Mr. Hyatt's preparations to move to Las Vegas in 1991, *17-witnesses testified* about Mr. Hyatt's former Jennifer Circle house having little furniture and/or having packed boxes before he moved to Las Vegas in 1991, *15-witnesses testified* about Mr. Hyatt's possessions being carted off for storage or being given away, or disposed of, or donated to charity, and *3-witnesses testified* that they helped Mr. Hyatt move his belongings to storage prior to his move to Las Vegas in 1991.[15]

Similarly, *dozens of additional witnesses* testified to Mr. Hyatt's presence in Las Vegas, visiting him and telephoning him at his Las Vegas apartment, worshiping with him at their Las Vegas synagogue, house hunting with him in Las Vegas, and much more.[16]  *Thirty-seven-witnesses testified* about Mr. Hyatt's stay at a Las Vegas hotel when he first moved to Las Vegas in 1991, *28-witnesses testified* about being informed in October 1991 that Mr. Hyatt had moved into his Las Vegas apartment, *39-witnesses testified* about telephoning Mr. Hyatt at his Las Vegas apartment, and *20-witnesses testified* about Mr. Hyatt's move into his Las Vegas house in April 1992.[17]

Mr. Hyatt sold the Jennifer Circle house on October 1, 1991.  After signing and delivering a Grant Deed to the purchaser and after receiving a down payment from the purchaser, he moved his remaining belongings out of the Jennifer Circle house and returned to Las Vegas.[18]  The lead FTB auditor determined "[Mr. Hyatt] sold [his] La Palma house on 10/1/91".[19]  FTB has never even alleged or produced any evidence that Mr. Hyatt had any abode outside of Las Vegas thereafter other than the Jennifer Circle house.  A total of 16 witnesses testified about the sale of Mr. Hyatt's California house in October 1991 and two former Orange County Assessors testified that the documentation for the sale of Mr. Hyatt's California house satisfied the requirements of the Orange County Assessor's Office for sale of a house in 1991.[20]  Thus, *overwhelming eyewitness and documentary evidence* confirms that Mr. Hyatt sold his Las Palma house five days after moving to Las Vegas.

---

[13] Including the testimony of the 22 *neighbors*.

[14] Updated Testimonial Topics, Exs. T007, T006, and T120, respectively.

[15] Updated Testimonial Topics, Exs. T002, T003, T005, and T116, respectively.

[16] See, e.g., Updated Testimonial Topics, Exs. T008, T009, T018, T019, T041, T042, and T044.

[17] Updated Testimonial Topics, Exs. T008, T128, T019, and T049, respectively.

[18] Affidavit of Gilbert P. Hyatt, May 18, 2001, ¶ 24; Affidavit of Gilbert P. Hyatt, December 4, 2008, ¶ 35.

[19] FTB's 1991 Narrative Report, p. 4, CCC 00967 ("Statistics (size, cost, etc.) comparing the taxpayer's La Palma home to his Las Vegas home will not be weighed in the determination, as the taxpayer sold the La Palma house on 10/1/91 before he purchased the house in Las Vegas during April of 1992.") (Emphasis in original.)

[20] Updated Testimonial Topics, Exs. T124 and, T123.  A former employee of the Orange County Assessor's Office also confirmed the adequacy of the sales documents.

RJN002035

Mr. Hyatt's closest connections were with Nevada after September 26, 1991. He stayed at a hotel for a few weeks, he leased an apartment for six months, he looked for and purchased a beautiful Las Vegas house, he opened Las Vegas bank accounts and Las Vegas situs investment accounts, he joined a Las Vegas synagogue, he obtained a Nevada driver's license and voter registration, he insured his cars, his apartment, and his house through a Las Vegas insurance agent, he hired Nevada professionals, and he did hundreds of other things that established his permanent residence in Las Vegas.[21] Mr. Hyatt provided numerous written changes of address to persons, entities, and the U.S. Postal Service, he informed more than 100 persons of his move to Las Vegas, and he provided his Las Vegas contact information to his family, friends, neighbors, licensing associates, service providers, and many others. He even worked with the Governor of Nevada to bring international businesses to Nevada.[22] He continues to reside in Las Vegas today, a quarter of a century later. Even FTB agrees Mr. Hyatt became a Nevada resident, but FTB disputes when that occurred. FTB's 1992 Notice of Proposed Assessments holds that he became a Nevada resident and domiciliary on April 3, 1992.[23]

FTB has no credible evidence to support the critical issue for its entire case – whether Mr. Hyatt lived and worked at the Jennifer Circle house after September 26, 1991. FTB resorts to fabricating fantastic stories, mischaracterizing and misquoting documents, relying on an address on correspondence as "proof" of Mr. Hyatt's location, calling Mr. Hyatt's witnesses perjurers, drawing illogical inferences, and disregarding overwhelming evidence produced by Mr. Hyatt. A Nevada jury found that FTB engaged in gross misconduct and fraud, including bad faith acts, referring to Mr. Hyatt in derogatory terms, and much more. FTB's bad faith continues in these appeals.

As one example of FTB's bad faith, FTB's auditor made a $24 million income overstatement error in the 1992 audit. Even though Mr. Hyatt produced significant evidence in 1997 that established FTB's $24 million income error, FTB assessed tax on its $24 million income error, it assessed a fraud penalty on this amount, and it attempted to extort a settlement from Mr. Hyatt with it. FTB refused to correct the FTB $24 million income error or even consider Mr. Hyatt's evidence demonstrating the error until your Board required FTB to provide its evidence in an additional briefing. Then, thanks to your Board, FTB finally admitted to its $24 million income error.[24] However, FTB refuses to reduce the assessment to correct its $24 million error; instead, FTB still continues to assess tens of millions of dollars in taxes, penalties, and interest on its $24 million error even though the income is not taxable by California (1992 Concluding Summary, Section 1.6; 1991 ASAB, Section 1.7.2).

---

[21] Hyatt's 2012 CDE Aff.; Hyatt's 2016 Supp. CDE Aff.; Hyatt's 2016 Post-DP CDE Aff.
[22] Hyatt's 2016 Post-DP CDE Aff., ¶¶ 168, 174-179.
[23] FTB's 1992 Notice of Proposed Assessment (H 02248-02250).
[24] Mr. Hyatt's AAB, pp. 2-5.

RJN002036

The overwhelming evidence demonstrates that Mr. Hyatt moved to Las Vegas, sold his only California house and had no California sourced income.

**1.5**    **MR. HYATT'S EVIDENCE IS SO EXTENSIVE THAT IT IS VIRTUALLY IMMEASURABLE.**

Examples of Mr. Hyatt's evidence is described below.

Mr. Hyatt produced more than 220 affidavits and declarations signed under oath or penalty of perjury by more than 150 eyewitnesses with 2,000 citations to actual testimony (many with excerpts) and summarized in more than 150 Testimonial Topics (e.g., 72-witnesses testified about Mr. Hyatt moving away in 1991) [25] each linked to the actual testimony for the convenience of your Board.

Mr. Hyatt produced more than 10,000 pages of exhibits to the more than 220 affidavits and declarations that support the witnesses' testimony but that has been completely disregarded by FTB in its false inferences and speculations and its attacks on the witnesses. FTB challenged the integrity of dozens of eyewitnesses without considering the enormous amount of documentary support relied on by the witnesses and disregarding the large number of eyewitness testimony supporting each witness. (1991 ASAB Sections 1.8.6, 1.8.6.1 to 1.8.6.5).

FTB took formal depositions of more than 20 witnesses and did not use that evidence to support its cases. However, Mr. Hyatt created 27 deposition tables with an enormous number of significant excerpts from the transcripts (more than 800 excerpts) to support his appeals (1991 ASAB Section 1.8.6.5).

Mr. Hyatt produced more than 15 Philips document tables of having excerpts and citations from more than 5,000 pages of Philips documents (some duplicates) supporting Mr. Hyatt's appeals. (1991 ASAB, Section 1.7.1). This is in addition to the more than one thousand pages of agreements in Philips documents that support Mr. Hyatt's appeals.

Mr. Hyatt produced more than 15,000 pages of licensing documents to FTB about a decade before FTB subpoenaed the so-called Philips documents [26] and Mr. Hyatt produced sourcing affidavits from three eyewitnesses to the Philips Licensing Program each with more than 1,500 of these licensing documents attached as exhibits, authenticated, and explained under oath. [27]

FTB produced its Attachment A (Revised) to support its calendar, but this document contains ***more than 2,000 false statements*** that are identified, explained, and corrected with eyewitness and documentary evidence (1991 ASAB Section 1.8.4; 1991 ARB, Section III, pp. 15-16).

---

[25] Updated Testimonial Topics, Ex. T007.
[26] Hyatt's 2012 CDE Aff., ¶ 5.
[27] Affidavit of Algy Tamoshunas, August 4, 2010; Affidavit of Gregory L. Roth, August 9, 2010; Affidavit of Gilbert P. Hyatt, August 15, 2010.

RJN002037

FTB made $24 million in now admitted income error in its NPAs and NOAs which devastate the 1992 assessments. (1991 ASAB Sections 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10; 1992 ASAB, Section 1.7.5).

Mr. Hyatt provided numerous written changes of address to people, entities, and the U.S. Postal Service.[28]  He informed more than 100 people that he had moved to Las Vegas and he provided his Las Vegas contact information to his family, friends, neighbors, Philips, Mahr Leonard, service providers and many others.  (1992 ASAB Sections 1.5.6, 1.5.6.1 to 1.5.6.3).

Mr. Hyatt produced thousands of pages of contemporaneous documentary evidence (CDE) with authentication and descriptions of the relevance in his three CDE Affidavits.[29]

**1.6    MR. HYATT WAS A NEVADA RESIDENT COMMENCING ON SEPTEMBER 26, 1991.**

Mr. Hyatt was a Nevada resident and domiciliary commencing on September 26, 1991, and continuing through 1992[30] to the present.  Mr. Hyatt fully met the statutory requirements for Nevada residency on September 26, 1991 – he was not domiciled in California and he was only in California for temporary or transitory purposes.[31]

The presumption of California residency under Rev & Tax, Section 17016 does not apply to Mr. Hyatt; FTB bears the burden of proof on its new presumption of California residency argument and the presumption has been thoroughly rebutted.[32]

Overwhelming eyewitness and documentary evidence supports Mr. Hyatt's change to Nevada domicile and Nevada residency (1992 ASAB Section 1.5).

The *direct eyewitness testimony* is so compelling that it should be taken as dispositive of Mr. Hyatt's move to Las Vegas (Lynetta Ruth, Mr. Hyatt's former Jennifer Circle neighbor, testified that near the end of September 1991, Mr. Hyatt said goodbye and pulled a trailer load of possessions with his old brown car to Las Vegas).[33]  Even move compelling is the fact that this was testimony from one of FTB's many depositions of Mr. Hyatt's witnesses (1991 ASAB Section 1.8.6.5).

---

[28] Hyatt's 2012 CDE Aff., ¶¶ 17, 34; Hyatt's 2016 Supp. CDE Aff., ¶¶ 143, 144, 159.
[29] See the Tables of Contents in Hyatt's 2012 CDE Aff.; Hyatt's 2016 Supp. CDE Aff.; Hyatt's 2016 Post-DP CDE Aff.
[30] 1991 AOB, Section II, pp. 11-55; 1991 ARB, Section II, pp. 21-73; 1991 AOB, Section II.A, pp. 11-14; 1992 ASB, Section I, p. 1.
[31] 1991 AOB, Section II, p. 11; 1991 AOB, Section II.B, p. 15; 1992 ASAB, Section 1.5.5.  Updated Testimonial Topics, Exs. T007, T006, T102, T114, T119, T127, T008, T009, T018, T021, T128, T019, T022-T025, T135, T136, T040, T138, T140-T143, T045, T044, T046, T047, and T049.
[32] 1991 ARB, Section II.C, pp. 68-73.
[33] Deposition Table 15, Witness Testimony Regarding Mr. Hyatt's Move to Las Vegas.

RJN002038

Mr. Hyatt's contacts with Nevada fully satisfy the *Bragg* factors and the close connections test. Not one *Bragg* factor favors a California connection.[34]

### 1.6.1    The *Bragg* Factors Overwhelmingly Establish Mr. Hyatt's Nevada Residency And Domicile.

The *Bragg* factors overwhelmingly establish Mr. Hyatt's Nevada residency during the disputed period and thereafter.[35] Not one *Bragg* factor favors a California connection.[36]

The *Bragg* factors show that Mr. Hyatt's closest connections during the disputed period were clearly in Nevada. Mr. Hyatt moved to Las Vegas on September 26, 1991. He then began settling and residing in Las Vegas and conducted all his personal and professional activities from Las Vegas.[37]

Under the identifiable purpose test, Mr. Hyatt was a Nevada resident for all of the 1991 disputed period.[38] Mr. Hyatt moved to Las Vegas on September 26, 1991, intending to permanently live in Las Vegas and start a new life in Las Vegas. He has resided in Las Vegas for the past 25 years. Among the more significant events during the disputed period, Mr. Hyatt sold his only California residence five days after he moved, purchased is Las Vegas Tara house on April 3, 1992, terminated his California homeowner's property tax exemption, moved his telephone to his Las Vegas apartment, filed his tax returns from Las Vegas, opened four bank accounts in Las Vegas, had most checking account and credit card transactions in Las Vegas, attended worship services in Las Vegas, registered his 1977 Toyota in Las Vegas after it passed a smog check, bought a new Toyota in Las Vegas, surrendered his California driver's license and obtained a Nevada driver's license, registered to vote in Nevada and used many Nevada professionals.[39]

#### 1.6.1.1    Mr. Hyatt did not own any residential real property in California, he sold his California house and he shopped for and purchased residential property in Nevada.

Mr. Hyatt did not own any residential real property in California after he sold his California house on October 1, 1991. He shopped for a Nevada house throughout the disputed period, he made purchase offers on ten Las Vegas houses, escrow opened on his Las Vegas Tara home on March 16, 1992, and escrow closed on this home and he moved in on April 3, 1992.[40] Mr. Hyatt shopped for his Las Vegas house in-person.[41]

---

[34] 1991 AOB, Section II.C, pp. 15-38; see rebuttal to FTB's false statements at 1991 ARB, Section II.A, pp. 21- 68.
[35] 1991 AOB, pp. 15-38; 1992 AOB, pp. 16-35; 1991 ARB, pp. 21-68; 1992 ARB, pp. 4-26; 1992 ASB, pp. 42-52; *Appeal of Stephen Bragg*, 2003-SBE-002 (May 28, 2003) (setting forth a non-exhaustive list of objective factors helpful in the determination with which state an individual maintains his closest connections).
[36] 1991 AOB, Section II.C, pp. 15-38; see rebuttal to FTB's false statements at 1991 ARB, Section II.A, pp. 21- 68.
[37] 1991 AOB, Section II.C.20, p. 38; see rebuttal to FTB's false statements at 1991 ARB, Section II.A.20, pp. 67-68.
[38] 1991 AOB, Section II.D, p. 39; see rebuttal to FTB's false statements at 1991 ARB, Section II.B, p. 68.
[39] 1991 AOB, Section II.C, pp. 15-38; see rebuttal to FTB's false statements at 1991 ARB, Section II.A, pp. 21- 68.
[40] 1991 AOB, Section II.C.1, pp. 17-21, 55; 1992 ARB, Section II.B.1, pp. 4-13; Hyatt's 2012 CDE Aff., ¶¶ 7-11, 45-51; Hyatt's 2016 Supp. CDE Aff., ¶¶ 7-8, 63-74. Hyatt's 2001 Affidavit, ¶ 6; See Mr. Hyatt's response to FTB's false statements regarding this Bragg factor, 1992 ASB, Section I.E.1, p. 42. Updated Testimonial Topics, Exs. T045, T141, T044,

RJN002039

The audit file states that "Mr. Hyatt sold his Jennifer Circle house on October 1, 1991". On October 1, 1991, he signed and delivered a grant deed to the purchaser. On June 10, 1993, he properly notarized the grand deed with an acknowledgement of his prior signature.[42] Mr. Hyatt had no California abode after October 1, 1991. Former Orange County elected assessors Bradley Jacobs and Webster Guillory confirmed the validity of the sale and FTB has offered no evidence Mr. Hyatt's former La Palma house was not sold on October 1, 1991 (1992 ASAB, Section 1.5.1).

Mr. Hyatt took a note from the purchaser of his former La Palma house, he received a $15,000 down payment, monthly payments for six years, and a balloon payment to pay off the loan in full in six years.[43]

Mr. Hyatt initially resided in a Las Vegas hotel, leased and resided in a Las Vegas apartment, purchased and moved into Las Vegas Tara home on April 3, 1992. He has resided there to the present. Each time he moved he gave his friends and family his new Las Vegas contact information.[44]

Mr. Hyatt made a significant effort to locate and purchase a Las Vegas house. Starting before September 26, 1991, when he moved to Las Vegas, Mr. Hyatt personally walked through many Las Vegas houses and made many purchase offers.[45]

FTB in bad faith disregarded the eyewitness testimony of Mr. McGuire, Mr. Shoemaker and Mr. Hyatt about house hunting in Las Vegas and fabricated a story about shopping for houses by telephone. However, Mr. Hyatt did his extensive La Vegas house shopping in person.[46]

### 1.6.1.2 Mr. Hyatt did not live with his family, his children were grown, he was divorced, he terminated his California homeowner's property tax exemption, he was not employed, he did not have business interests, he did not use professional licenses, and he had no investment real property.

Mr. Hyatt lived alone, he did not have a spouse, he had long been divorced, and his children were adults that did not live with him;[47] thus he was free to move to Las Vegas without any family commitments.

---

T046, T047. See also Updated Testimonial Topics, Exs. T049, T050, T051, T052, T053, T054, T055, T056, T143, T144, T145, T146.

[41] 1992 ARB, Section II.B.1,c, pp. 10-13. See also Hyatt's 2012 CDE Aff., ¶¶ 45-51.

[42] See, e.g., Hyatt's 2008 Affidavit, ¶¶ 26-39; Hyatt's August 15, 2010, Affidavit Section 1.3.

[43] Hyatt's 2012 CDE Aff., ¶¶ 35-36; Hyatt's 2016 Supp. CDE Aff., ¶ 91.

[44] 1991 ARB, Section II.A.1, d, pp. 29-33; 1992 ARB, Section II.B.1,b, d, pp. 6-10. See Hyatt's 2012 CDE Aff., ¶¶ 13, 20-25. Hyatt's 2008 Affidavit, ¶¶ 12-21, 81; Hyatt's August 15, 2010, Affidavit Sections 1.4, 1.19.2, 1.19.3. See also Hyatt's 2016 Post-DP CDE Aff., ¶¶ 58-134. Updated Testimonial Topics, Exs. T018, T021, T128, T019, T095, T096, T129, T026, T022, TO23, T024, T025, T100, T057. See also testimony about FTB's incorrect statements regarding Wagon Trails Apartments, Updated Testimonial Topics, Exs. T020, T089, T130, T027, T087, T088, T028, T029, T131, T132, T133. Hyatt's 2008 Affidavit ¶¶ 12-21, 81; Hyatt's 2010 Affidavit Sections 1.4, 1.19.2, 1.19.3

[45] Hyatt's August 15, 2010 Affidavit, Sections 1.8-1.9.

[46] Hyatt's August 15, 2010 Affidavit, Section 1.9; Mr. McGuire's March 31, 2012, Affidavit ¶¶ 4-6, 19, 38-39, 48-59, 69-82, 95-111; Affidavit of Walter Shoemaker, December 8, 2009, ¶¶ 52-61.

[47] 1991 AOB, Section II.C.2, p. 21; see rebuttal to FTB's false statements at 1991 ARB, Section II.A.2, pp. 33-34.

RJN002040

Mr. Hyatt terminated his California homeowner's property tax exemption on his former California residence because he sold it on October 1, 1991.[48]

Mr. Hyatt was not employed, did not have business interests, and did not use professional licenses during the disputed period.[49]

Mr. Hyatt had no investment real property during the disputed period.[50]

### 1.6.1.3 Mr. Hyatt's only telephone was located in his Las Vegas apartment and he used a Las Vegas service provider.

Mr. Hyatt's only telephone was located in his Las Vegas apartment and his account was with the Centel telephone company in Las Vegas. Therefore, all of Mr. Hyatt's calls originated from Las Vegas.[51] Many eyewitnesses testified about the telephone in Mr. Hyatt's Las Vegas apartment and telephone calls with Mr. Hyatt.[52]

### 1.6.1.4 Mr. Hyatt spent all of his time during the disputed period in Nevada except for short temporary and transitory trips to other states.

Mr. Hyatt spent all of his time during the disputed period in Nevada except for short temporary and transitory trips to other states. He always intended to and did return to Nevada after each trip. He was only present in California for temporary and transitory purposes (e.g., a stay in a hospital for cancer surgery) and they do not count as California residency days.[53] After October 1, 1991, Mr. Hyatt stayed at motels, not at his former La Palma house, when he visited California.[54]

Mr. Hyatt's calendar (1992 ASAB) is supported by eyewitness and documentary evidence and confirms his overwhelming presence in Las Vegas. Mr. Hyatt had 166 full and part days in Las Vegas as a resident out of 190 days in the disputed period. Mr. Hyatt's evidence based calendar demonstrates his overwhelming presence in Nevada. (1992 ASAB, Section 1.5.8).

---

[48] 1991 AOB, Section II.C.4, pp. 21-22; Hyatt's 2016 Supp. CDE Aff., ¶ 7;Declaration of Bradley Jacobs, November 2, 2012, ¶¶ 12-17; Declaration of Webster Guillory, October 8, 2015, ¶¶ 22-25; see rebuttal to FTB's false statements at 1991 ARB, Section II.A.4, p. 34. See Mr. Hyatt's response to FTB's false statements regarding this Bragg factor, 1992 ASB, Section I.E.2, p. 42.

[49] 1991 AOB, Section II.C.15, pp. 36-37; see rebuttal to FTB's false statements at 1991 ARB, Section II.A.15, p. 57. See Mr. Hyatt's response to FTB's false statements regarding these Bragg factors, 1992 ASB, Section I.E.4, p. 44.

[50] 1991 AOB, Section II.C.18, p. 37; see rebuttal to FTB's false statements at 1991 ARB, Section II.A.18, pp. 57- 58. See Mr. Hyatt's response to FTB's false statements regarding this Bragg factor, 1992 ASB, Section I.E.16, pp. 50-51.

[51] 1991 AOB, Section II.C.5, p. 22; 1992 ASAB, Section 1.5.6.2; Hyatt's 2012 CDE Aff., ¶ 24; see rebuttal to FTB's false statements at 1991 ARB, Section II.A.5, pp. 34-36. See also Mr. Hyatt's response to FTB's false statements regarding this Bragg factor, 1992 ASB, Section I.E.3, pp. 43-44.

[52] Updated Testimonial Topics, Exs. T019, T095, T096, T129, T026.

[53] 1991 AOB, Section II.C.6, pp. 22-23; 1992 ARB, Section II.B.6, pp. 13-18; 1992 ASAB, Section 1.5.5; see rebuttal to FTB's false statements at 1991 ARB, Section II.A.6, pp. 36-42. See Mr. Hyatt's response to FTB's false statements regarding this Bragg factor, 1992 ASB, Section I.E.4, p. 44; Rebuttal to FTB Att. A/F, Section I. A., September 26, 1991 to April 2, 1992; Hyatt's 2016 Supp. CDE Aff., ¶¶ 9-48, 153-243.

[54] Hyatt's 2010 Affidavit, Sections 1.11-1.12.

RJN002041

Mr. Hyatt's limited presence in California during the disputed period was only for temporary or transitory purposes. Mr. Hyatt has demonstrated that on the 46 days he was partly in Nevada and partly in California or in California his trips to California were for a temporary or transitory purpose. He had only 9 full days in California during which he was in a California hospital recovering from cancer surgery. (1992 ASAB, Section 1.5.5; Table in ASAB, Exhibit 04).

October 1991 was an active month for Mr. Hyatt regarding his Las Vegas residency.[55]

### 1.6.1.5 Mr. Hyatt filed his 1991 California tax return as a part year resident from Las Vegas and he filed all subsequent tax returns from Las Vegas.

Mr. Hyatt filed his 1991 California tax return as a part year resident, he filed his 1991 California and federal tax returns with his Las Vegas address thereon, and he filed his 1991 tax returns from Las Vegas. Mr. Hyatt filed tax returns for all subsequent years with his Las Vegas address thereon and he filed them from Las Vegas.[56]

### 1.6.1.6 Mr. Hyatt had only Nevada bank accounts and Nevada situs investment accounts during the disputed period.

Mr. Hyatt had only Nevada bank accounts and Nevada situs investment accounts during the disputed period. Mr. Hyatt opened a checking account at his Las Vegas bank on October 25, 1991, he opened several other Las Vegas bank accounts shortly thereafter, and he opened many investment accounts using his Nevada address shortly thereafter.[57]

FTB disregards or misrepresents Mr. Hyatt's documentary evidence of his three Las Vegas bank accounts and his many Nevada situs investment accounts (1992 ASAB, Section 1.5.4).

### 1.6.1.7 The origination point of Mr. Hyatt's checking account transactions and credit card transactions was Las Vegas.

The origination point of Mr. Hyatt's checking account transactions and credit card transactions was Las Vegas. He opened new Las Vegas checking accounts and he entered changes of address to his Las Vegas address with his national credit account companies.[58] He signed more than 80 checks in Las Vegas with his Las Vegas address printed thereon and with his

---

[55] See, e.g., Hyatt's 2008 Affidavit, ¶¶ 40-46; Hyatt's August 15, 2010, Affidavit Section 1.3, 1.4, 1.5, 1.18.

[56] 1991 AOB, Section II.C.7, pp. 24-25; 1992 ARB, Section II.B.7, p. 18; Hyatt's 2012 CDE Aff., ¶ 51; Hyatt's 2016 Supp. CDE Aff., ¶¶ 81, 88-94; Hyatt's 2016 Post-DP CDE Aff., ¶¶ 313-315; see rebuttal to FTB's false statements at 1991 ARB, Section II.B.7, p. 46. See Mr. Hyatt's response to FTB's false statements regarding this Bragg factor, 1992 ASB, Section I.E.5, pp. 44-45.

[57] 1991 AOB, Section II.C.8, pp. 25-27; 1992 ARB, Section II.B.8, pp. 18-19; Hyatt's 2012 CDE Aff., ¶¶ 60 to 74; Hyatt's 2016 Post-DP CDE Aff., ¶¶ 396 to 406, 409 to 455; see rebuttal to FTB's false statements at 1991 ARB, Section II.A.8, pp. 42-46. See Mr. Hyatt's response to FTB's false statements regarding this Bragg factor, 1992 ASB, Section I.E.6, p. 46.

[58] 1991 AOB, Section II.C.9, pp. 27-31; Hyatt's 2012 CDE Aff., ¶¶ 34, 64-65; Hyatt's 2016 Supp. CDE Aff., ¶¶ 27, 159; Hyatt's 2016 Post-DP CDE Aff., ¶¶ 144, 395-404. See Mr. Hyatt's response to FTB's false statements regarding this *Bragg* factor, 1992 ASB, Section I.E.7, p. 46.

-13-

RJN002042

banks' Las Vegas addresses printed thereon during the disputed period.[59] Virtually all of these transactions took place in Las Vegas.[60]

### 1.6.1.8 Mr. Hyatt's social, religious, and professional memberships and activities during the disputed period and thereafter were and are in Las Vegas.

Mr. Hyatt's social, religious, and professional memberships and activities during the disputed period and thereafter were and are in Las Vegas. Mr. Hyatt joined and regularly attended worship services at a Las Vegas synagogue. He joined the Las Vegas Personal Computer Users Group and was associated with the Office of the Nevada Governor, Nevada Development Authority and Clark County School District. His memberships in social, religious, and professional organizations during the disputed period and thereafter were and are in states other than California.[61]

Mr. Hyatt was active in religious activities in Las Vegas during the disputed period.[62]

Mr. Hyatt used more than 100 non-California professionals. FTB disregards Mr. Hyatt's documentary evidence that he used more than 100 non-California professionals and FTB falsely alleges that Philips' California professionals are Hyatt's professionals (1992 ASAB, Section 1.5.3).

### 1.6.1.9 Mr. Hyatt registered his automobiles in Nevada, he had a Nevada driver's license, and he registered to vote and did vote in Nevada.

Mr. Hyatt registered his automobiles in Nevada. He had a Nevada driver's license and he registered to vote and did vote in Nevada. Mr. Hyatt purchased and registered his new automobile in Nevada and he insured his two automobiles and his home with his Las Vegas insurance agent whom he has used for over 25 years.[63]

Mr. Hyatt's 1977 Toyota was located in Las Vegas during the disputed period and thereafter.[64]

---

[59] 1991 AOB, Section II.C.8, pp. 27-31; 1992 ARB, Section II.B.9, pp. 19-20; Hyatt's 2016 Supp. CDE Aff., ¶¶ 153 to 243; Hyatt's 2016 Post-DP CDE Aff., ¶¶ 546 to 949; Hyatt's 2016 Post-DP CDE Aff., ¶ 403 and Exhibit CDE-T006 attached thereto; see rebuttal to FTB's false statements at 1991 ARB, Section II.A.9, pp. 46-47.

[60] Hyatt's 2016 Supp. CDE Aff., ¶¶ 153 to 243, Exhibits CDE-ST002 and ST003; Hyatt's 2016 Post-DP CDE Aff., ¶¶ 546 to 949 and Exhibit CDE-T006 attached thereto; ASAB Exhibits 02 and 03.

[61] 1991 AOB, Section II.C.10, pp. 31-32; 1992 ARB, Section II.B.10, pp. 20-21: Hyatt's 2012 CDE Aff., ¶ 18; Hyatt's 2016 Supp. CDE Aff., ¶¶ 9-17, 104-106; Hyatt's 2016 Post-DP CDE Aff., ¶¶ 167-172; see rebuttal to FTB's false statements at 1991 ARB, Section II.A.10, pp. 48-50. See Mr. Hyatt's response to FTB's false statements regarding this Bragg factor, 1992 ASB, Section I.E.8, pp. 46-47.

[62] Updated Testimonial Topics, Exs. T040, T138, T139, T041, T042, T043, T140, T134 (17-witnesses testified about Mr. Hyatt's religious activities in Las Vegas.).

[63] 1991 AOB, Section II.C.11, pp. 32-33, 55; 1992 ARB, Section II.B.11, pp. 21-22; Hyatt's 2012 CDE Aff., ¶¶ 26-29; Hyatt's 2016 Supp. CDE Aff., ¶ 84; Hyatt's 2016 Post-DP CDE Aff., ¶¶ 24, 226-228, 306-307; Updated Testimonial Topics, Exs. T034, T035, T030, T031, T032, T134, T033. See rebuttal to FTB's false statements at 1991 ARB, Section II.A.11, pp. 50-53; 1992 AOB, Section II.C.11, p. 28. See Mr. Hyatt's response to FTB's false statements regarding these Bragg factors, 1992 ASB, Sections I.E.9 to I.E.11, pp. 48-49. Updated Testimonial Topics, Exs. T030, T031, T032, T134, T033, T034, T035.

[64] Hyatt's 2010 Affidavit, Section 1.19.4. Updated Testimonial Topics, Exs. T030, T031, T032, T134.

-14-

**1.6.1.10** **Mr. Hyatt had relationships with many Nevada professionals, he had relationships with more than 40 non-California professionals, and he used only a few California professionals.**

Mr. Hyatt had relationships with many Nevada professionals including doctors, dentists, accountants, and attorneys, he had relationships with many non-California professionals, and he used few California professionals. He used the services of more than 40 **non**-California professionals during the disputed period, and he continued to use these services thereafter.[65]

**1.6.2** **FTB's Protest Findings Do Not Detract From The Conclusion That Mr. Hyatt Became A Nevada Resident In September 1991.[66]**

Mr. Hyatt sold the La Palma house on October 1, 1991.[67]

Mr. Hyatt properly filed a homeowner's exemption termination.[68]

Mr. Hyatt resided at the Continental Hotel for about 3 weeks while he was looking for and leasing a Las Vegas apartment.[69]

Mr. Hyatt leased and resided at Wagon Trails Apartments through April 3, 1992.[70]

Mr. Hyatt registered to vote in November 1991 and voted in person in Nevada in September and November 1992.[71]

Mr. Hyatt engaged in extensive house hunting in Las Vegas during the disputed period.[72]

**1.7** **MR. HYATT NOTIFIED MANY PERSONS AND ENTITIES OF HIS MOVE TO AND LOCATION IN LAS VEGAS AND HE RECEIVED VIRTUALLY ALL OF HIS MAIL IN LAS VEGAS DURING THE DISPUTED PERIOD AND THEREAFTER.[73]**

Mr. Hyatt's notification of more than 100 persons and entities of his move to Las Vegas and his location in Las Vegas is significant evidence of his intent to move, his actual move, and his intent to remain in Las Vegas indefinitely.

Mr. Hyatt gave numerous changes of address to his Las Vegas location shortly after he moved to Las Vegas. Mr. Hyatt told many of his family and friends that he was going to move and 72-witnesses testified about Mr. Hyatt moving away in 1991. He informed more than 20 professionals he had moved and gave them his Nevada contact information. He gave changes of address to Philips and Mahr Leonard. (1992 ASAB Section 1.5.6.1).

---

[65] 1991 AOB, Section II.C.14, pp. 33-36; 1992 AOB, Section II.C.14, pp. 29-32; Hyatt's 2012 CDE Aff., ¶¶ 52-58; Hyatt's 2016 Supp. CDE Aff., ¶¶ 75-87; 146-166; 1992 ASAB, Section 1.5.3; see rebuttal to FTB's false statements at 1991 ARB, Section II.A.14, pp. 53-57. See Mr. Hyatt's response to FTB's false statements regarding this Bragg factor, 1992 ASB, Section I.E.12, p. 50. Updated Testimonial Topics, Ex. T048 (24-witnesses testified about Mr. Hyatt using Las Vegas professionals (a lawyer, Realtors, a home inspector, escrow agents, computer professionals, conference professionals, leasing agents, or other professionals) during the disputed period).

[66] 1991 AOB, Section II.E, pp. 39-55.

[67] 1991 AOB, Section II.E.3.a, pp. 41-47.

[68] 1991 AOB, Section II.E.3.b, pp. 47-48.

[69] 1991 AOB, Section II.E.3.c, pp. 48-54.

[70] 1991 AOB, Section II.E.3.e, p. 54.

[71] 1991 AOB, Section II.E.3.e, p. 55.

[72] 1991 AOB, Section II.E.3.e, p. 55.

[73] 1992 ASAB Section 1.5.6.

RJN002044

Immediately after Mr. Hyatt moved into his Las Vegas apartment on October 21, 1991, he notified many people and entities of his change of address and gave them his Las Vegas contact information.  For example, 28-witnesses testified about being informed Mr. Hyatt had moved into his Las Vegas apartment and 27-witnesses testified about telephoning Mr. Hyatt at his Las Vegas apartment.  (1992 ASAB Section 1.5.6.2).

Mr. Hyatt gave Philips a change of address to Las Vegas in October 1991 and the preambles of the Sony and NEC agreements stated that Mr. Hyatt was a resident of Las Vegas.[74]

The U.S. Postal Service forwarded Philips and Mahr Leonard mis-addressed correspondence and much other correspondence to Mr. Hyatt's Las Vegas address because of his change of address.  On October 21, 1991, Mr. Hyatt submitted a changes of address from his La Palma house and Cypress P.O. Box to his Las Vegas address.  (1992 ASAB Section 1.5.6.3).

Mr. Hyatt received virtually all of his mail in Las Vegas during the disputed period and thereafter.  Mr. Hyatt received his Las Vegas bank statements and statements for his new investment accounts in Las Vegas.  Mr. Hyatt gave Philips and Mahr Leonard a change of address to Las Vegas in October 1991.  (1992 ASAB Section 1.5.7).

**1.8    FTB'S RESIDENCY AND SOURCING CASES ARE BOTH BASED ON *INDISPUTABLY MIS-ADDRESSED DOCUMENTS* AND ON FTB'S DISREGARD OR MISREPRESENTATION OF MR. HYATT'S OVERWHELMING EYEWITNESS AND DOCUMENTARY EVIDENCE.**

FTB's residency and sourcing cases must fall together because they are built on the same similar bad faith rationale - relying on indisputably mis-addressed documents to falsely establish presence of Mr. Hyatt.  Even worse, FTB disregards or misrepresents Mr. Hyatt's overwhelming eyewitness and documentary evidence of his Las Vegas presence (1992 ASAB, Sections 1.5.1 to 1.5.8; 1.7.4).

FTB in bad faith misrepresents or disregards overwhelming eyewitness testimony and documentary evidence of Mr. Hyatt's Las Vegas presence.  The correspondence sent by Philips to Mr. Hyatt's former California addresses and fax numbers is undisputed mis-addressed correspondence.  Mr. Hyatt informed Philips and Mahr Leonard in early October 1991 that he had moved to Las Vegas and later in October 1991 Mr. Hyatt gave Philips and Mahr Leonard changes of address to his Las Vegas locations.  Mr. Hyatt gave Philips further notice by marking up a November 5, 1991, draft supplemental agreement with Philips by inserting his Las Vegas apartment address.[75]  Mr. Tamoshunas testified that he was given a change of address and that the subsequent sending of correspondence to Mr. Hyatt's former California addresses was inadvertent error by Philips personnel.  The eyewitness testimony is clear, Philips and Mahr Leonard inadvertently mailed and faxed documents to Mr.

---

[74] Hyatt's 2008 Affidavit, ¶¶ 53-59.
[75] HL 00095A.

RJN002045

Hyatt's former California addresses and fax number after he provided them with his new Las Vegas address. Mr. Hyatt provided eyewitness testimony of his presence in Las Vegas on many of the days that FTB falsely alleges that he was in California based on false inferences from undisputedly mis-addressed correspondence. (1991 ASAB Section 1.8.1).

FTB in bad faith disregards or misrepresents Mr. Hyatt's overwhelming eyewitness and documentary evidence demonstrating a lack of California source income; the testimony of key licensing eyewitnesses; thousands of pages of relevant documentary evidence, and extensive evidence that he was not present at the Jennifer Circle house from which FTB alleges he operated a worldwide licensing program that would have competed with the Philips Licensing Program. (1991 ASAB Section 1.8.3).

Mr. Hyatt's eyewitness and documentary evidence rebutting FTB's bad faith calendar, Attachment A-R, and Attachment E are summarized in Tabular form (1991 ASAB Section 1.8.2).

ASAB Exhibits 1 and 2 provide links to overwhelming testimonial and documentary evidence that illustrates the true facts. ASAB Exhibit 1 is a copy of FTB's calendar and ASAB Exhibit 2 is a table summarizing Mr. Hyatt's presence for each day during the disputed period that is linked day by day to Mr. Hyatt's Rebuttal to FTB Att. A/F. (1991 ASAB Section 1.8.4).

FTB's attempt to establish Mr. Hyatt's presence based on false inferences and speculation is in bad faith. A document containing an incorrect address does not establish Mr. Hyatt's location on a given day and is certainly not evidence of residency. Mr. Hyatt produced eyewitness and documentary evidence that establishes his presence in Las Vegas on many of the disputed days. (1991 ASAB Section 1.8.7).

FTB's calendar is based on false illogical inferences and speculation and is not credible. Instead of evidence of actual presence FTB bases its calendars on incorrect inferences drawn from mis-addressed correspondence as summarized in Exhibits CDE-ST002 and –ST003. (1992 ASAB Section 1.5.9).

FTB disregarded Mr. Hyatt's eyewitness and documentary evidence of Nevada presence and falsely alleged California presence based on incorrect inferences drawn from mis-addressed correspondence. FTB's calendars identify 61 "inferred" days in California when in fact testimonial and documentary evidence confirms that Mr. Hyatt spent the entire day in Nevada. FTB's so called inference days and the true facts are summarized in ASAB Exhibit 2 (1992 ASAB Section 1.5.10.1).

FTB in bad faith disregards Mr. Hyatt's documentary evidence of Nevada presence and then falsely alleges California presence because there is allegedly no documentation. FTB has "inferred" California presence because of an alleged lack of documentation when the extensive documentation confirms Mr. Hyatt's presence in Nevada. Days on which

-17-

FTB incorrectly infers California presence based an alleged absence of documentation are summarized in ASAB Exhibit 3. (1992 ASAB Section1.5.10.2).

FTB falsely alleges California presence because of logical inferences when a good faith analysis shows that logical inferences place Mr. Hyatt in Nevada. Given that Mr. Hyatt sold his Las Palma house, moved to Las Vegas, resided in a Las Vegas Hotel and then a Las Vegas apartment, any inference must lead to a Las Vegas presence. Mr. Hyatt moved his computer, fax machine, active files and telephone to Las Vegas. Dozens of witnesses have testified that he left the Jennifer Circle neighborhood in 1991 and was living in Las Vegas thereafter. (1992 ASAB Section 1.5.10.3).

FTB's Calendar and Attachment A-R are based in large part on false allegations of "inferred" California presence and must be disregarded. FTB "inferred" California presence on 61 days when Mr. Hyatt has eyewitness and documentary evidence he was present in Nevada. FTB often uses double incorrect inferences. It incorrectly infers Mr. Hyatt's presence in California based on an address on mis-addressed correspondence and then further infers his presence on a difference day based on the first incorrect inference. (1992 ASAB Section 1.5.10.4). Mr. Hyatt's Rebuttal to FTB Att. A/F, Section I. A. provides actual evidence of Mr. Hyatt's location on a day by day basis.

FTB's Calendar and Attachment A-R are based in large part on false allegations of "established" California presence and must be disregarded. FTB's allegations of "established" are actually incorrect inferences that must be disregarded in view of Mr. Hyatt's eyewitness and documentary evidence that Mr. Hyatt was actually present in Nevada. FTB falsely refers to Mr. Hyatt's presence in California as "established" based on an inference drawn from a mis-addressed correspondence even when eyewitness and documentary evidence places Mr. Hyatt in Nevada. (1992 ASAB Section 1.5.10.5).

There was no attraction to Jennifer Circle and no reason for Mr. Hyatt to live or work there after he moved to Las Vegas. It is absurd to suggest that Mr. Hyatt would establish Nevada residency but operate a home business in California, 270 miles away. (1992 ASAB Section 1.5.11).

**1.9    FTB MAKES THOUSANDS OF FALSE STATEMENTS IN ITS RSABS, CALENDAR, ATTACHMENT A-R, AND ATTACHMENT F.**

FTB's bad faith acts are further illustrated with the six false statement tables and with the seven Testimonial Response tables. (Sections 1.3.4, 1.3.7, 1.3.8) These tables excerpt or cite to thousands of eyewitnesses statements made under oath or penalty of perjury that rebut the multitude of false FTB statements made in its briefings and attachments.

FTB's case is based on many false statements, examples of which are rebutted by Mr. Hyatt's eyewitness testimony and his contemporaneous documentation.[76]

---

[76] Hyatt's 2012 Supp. Aff., ¶¶ 2 to 45; Hyatt's August 15, 2010 Affidavit, Sections 1.10-1.11, 1.13-1.14, 1.17-1.20.

-18-

RJN002047

**1.9.1 FTB's Calendar, Attachment A-R, And Attachment F Should Be Disregarded Because They Are Based Upon Thousands Of False Representations And Disregard Overwhelming Eyewitness And Documentary Evidence.**

FTB makes thousands of false statements in its RSABs, calendar, Attachment A-R, and attachment F. FTB relies on false inferences and misrepresentations. (1991 ASAB Section 1.8.4; Sections 1.9.2, 1.8 herein).

FTB misrepresents the PSB&C invoices, which FTB misrepresentation is established by *eyewitness and documentary evidence*. (1991 ASAB Section 1.8.4.9).

The Philips documents establish that FTB's calendar and Attachment A-R lack credibility and should be disregarded. FTB's calendar and Attachment A-R have over 2,000 false statements based upon false inferences and speculation and mischaracterization of documents. FTB has disregarded the substantial testimony of Mr. Tamoshunas, Mr. Roth and Mr. Hyatt explaining the 15,000 pages of licensing documents Mr. Hyatt produced during the protest. (1992 ASAB Section 1.4.1.4).

**1.9.2 FTB's Residency And Sourcing Cases Are Both Based On The Bad Faith Premise That *Undisputed Mis-Addressed Correspondence* Establishes That Mr. Hyatt Was Present To Receive It At The Jennifer Circle House.**

FTB falsely claims that Mr. Hyatt was present at the La Palma house based upon inferences, speculation, and misrepresentation of the evidence while disregarding or misrepresenting Mr. Hyatt's overwhelming eyewitness and documentary evidence of his actual location. FTB has no credible evidence placing Mr. Hyatt at his former La Palma house during the disputed period after October 1, 1991.[77] In contrast to FTB's inferences and speculation, Mr. Hyatt's presence in Las Vegas is demonstrated by eyewitness and documentary evidence. (1991 ASAB Section 1.8.4.1).

The correspondence sent by Philips to Mr. Hyatt's former California addresses and fax numbers is undisputed mis-addressed correspondence. Mr. Hyatt informed Philips and Mahr Leonard in early October 1991 that he had moved to Las Vegas and later in October 1991 Mr. Hyatt gave Philips and Mahr Leonard changes of address to his Las Vegas locations. The eyewitness testimony is clear. Philips and Mahr Leonard inadvertently mailed and faxed documents to Mr. Hyatt's former California addresses and fax number after he provided them with his new Las Vegas address. (1991 ASAB Section 1.8.1).

FTB falsely claims that Philips documents, which were undisputedly mis-addressed to Mr. Hyatt's former California addresses or former fax number, "establish" his presence at the Jennifer Circle House. Mr. Hyatt's overwhelming eyewitness and documentary evidence demonstrates that he was not at the Jennifer Circle House. (1991 ASAB Section 1.8.4.2).

---

[77] Hyatt's 2010 Affidavit, Sections 1.11-1.12, 1.19.1.

RJN002048

FTB falsely claims that Philips documents that were undisputedly mis-addressed to Mr. Hyatt's former California addresses or fax number even establish his presence on a specific date (1991 ASAB Section 1.8.4.3). They do not.

Undisputed mis-addressed Philips documents FedExed to the Jennifer Circle house do not establish that Mr. Hyatt was present at the Jennifer Circle house. Mr. Hyatt's name typed in a "Signed" location on a FedEx Summary does not established that he signed it. The name of a Philips secretary working in New York was also typed in a "Signed" location on a FedEx Summary for a package delivered to Mr. Hyatt's former La Palma house.[78] FTB has not produced any copies of delivery receipts that were signed by Mr. Hyatt because there were none. Eyewitness testimony confirms that FedEx drivers left packages at the Jennifer Circle house after Mr. Hyatt had moved away. Mr. Hyatt had inadvertently neglected to cancel his years old authorization for FedEx drivers to leave packages without a signature. (1991 ASAB Section 1.8.4.4).

Mr. Hyatt sent his faxes from and received his faxes at his Las Vegas apartment where his only fax machine was located during the disputed period.[79] Overwhelming eyewitness testimony confirms that Mr. Hyatt's fax machine was located at his Las Vegas apartment during the disputed period. Thus, a fax sent by Mr. Hyatt is evidence of Mr. Hyatt's presence at his Las Vegas apartment. (1991 ASAB Section 1.8.4.5). Mr. Hyatt did not send faxes from the La Palma House after October 1, 1991, as FTB falsely claims (1991 ASAB Section 1.8.4.6).

FTB makes hundreds of false allegations about an alleged Jennifer Circle home/business, FTB misrepresents evidence to make its case, and FTB disregards overwhelming eyewitness and documentary evidence that Mr. Hyatt did not have a "home/business" or a licensing business. In its attempt to create a Hyatt California licensing business that did not exist FTB goes so far as to mischaracterize the deposition testimony of Helene Schlindwein as referring to Mr. Hyatt's "home/business". She made no such statement and there was no California licensing business. (1991 ASAB Section 1.8.4.7).

Mis-addressed Philips correspondence inadvertently sent to Mr. Hyatt's former California addresses or fax number does not establish that Mr. Hyatt was present at the former house. Undisputed testimonial evidence establishes that those documents were mis-addressed. (1992 ASAB Section 1.4.1.1).

Philips documents containing a legacy P.O. Box return address do not establish that they were faxed from the Jennifer Circle house or that Mr. Hyatt was present at the Jennifer Circle house. Extensive eyewitness evidence places Mr. Hyatt's only fax machine in his Las Vegas apartment during the disputed period.[80] A fax received by or sent by Mr. Hyatt during the disputed period and thereafter is evidence of Mr. Hyatt's presence in Las Vegas where his fax machine was located. (1992 ASAB Section 1.4.1.2).

---

[78] FTB_Philips 0005188.
[79] Hyatt's 2010 Affidavit, Sections 1.16, 1.20; Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.
[80] Hyatt's 2010 Affidavit, Sections 1.16, 1.20; Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.

RJN002049

**1.9.2.1     The licensing executives testimony is devastating to FTB's Jennifer Circle presence falsehood.**

The correspondence sent by Philips to Mr. Hyatt's former California addresses and fax numbers is undisputed mis-addressed correspondence.  A mis-addressed document does not establish actual presence at the location of the address (1991 ASAB Sections 1.8.1, 1.8.4.2 to 1.8.4.4; 1992 ASAB, Sections 1.4.1.1 and 1.5.6.3).[81]  Mr. Hyatt gave Philips a change of address in October 1991.  Mr. Tamoshunas, the lead licensing attorney at Philips, testified he was given this change of address and testified that the subsequent sending of correspondence addressed to Mr. Hyatt's former California addresses was inadvertent error by Philips personnel.[82]  FTB has not rebutted Mr. Tamoshunas' testimony regarding this mis-addressed correspondence.  Thus, ***Mr. Tamoshunas' testimony is undisputed***.

Mr. Hyatt informed Philips and Mahr Leonard in early October 1991 that he had moved to Las Vegas and later in October 1991 Mr. Hyatt gave Philips and Mahr Leonard changes of address to his Las Vegas locations.  The eyewitness testimony is clear.  Philips and Mahr Leonard inadvertently mailed and faxed documents to Mr. Hyatt's former California addresses and fax number after he provided them with his new Las Vegas address.[83]  However, FTB disregarded or misrepresented this evidence in bad faith – the Philips correspondence was mis-addressed to the California addresses.  Furthermore, Mr. Hyatt provided eyewitness and documentary evidence that he was in Las Vegas when FTB falsely inferred that he was in California based upon false inferences drawn from the mis-addressed correspondence (1991 ASAB Sections 1.8.1, 1.8.4.2 to 1.8.4.4; 1992 ASAB, Sections 1.4.1.1, 1.5.6.3).[84]

**1.10     MR. HYATT DID NOT HAVE CALIFORNIA SOURCE INCOME**

1.10.1     **The License Payments Received By Mr. Hyatt Were Not California Source Income**.

The license payments received by Mr. Hyatt was not California source income.[85]

The burden of proof is upon FTB on both of its new sourcing arguments, but FTB did not and can not carry its burden and thus the sourcing assessments should be reversed.[86]

---

[81] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.

[82] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25 ("Mr. Hyatt gave Philips a change of address from California to Las Vegas in the latter part of October 1991 and I understood that he moved to Las Vegas before the latter part of October 1991.  Any mailings from Philips' personnel to Mr. Hyatt at his former California addresses as of October 1991 and thereafter were inadvertent errors by Philips' support personnel."); A. Tamoshunas Deposition Transcript, 10/27/2011, at 648:19-649:16 (affirming his affidavit testimony), 548:10-18 (testifying that Mr. Hyatt notified Mr. Tamoshunas that correspondence was mistakenly sent to his former California addresses and asking that correspondence be sent to his Las Vegas address.)

[83] Affidavit of Algy Tamoshunas, August 4, 2010; Affidavit of David Leonard, May 2, 2012; Affidavit of Gregory L. Roth, August 9, 2010; Declaration of Vicki Weart, May 21, 2012 ¶¶ 5-6; Affidavit of Gilbert P. Hyatt, August 15, 2010.

[84] Hyatt's 2016 Supp. CDE Aff., ¶¶ 153-243, CDE Exhibits CDE-ST002 and ST003; ASAB Exhibits 02 and 03.

[85] 1991 AOB, Section IV, pp. 63-86; 1991 ARB, Section IV, p. 99; 1992 ARB, Section V, pp. 27-67.

[86] 1991 AOB, Section IV.B, pp. 65-67; 1992 ARB, Section V.B, pp. 30-34; 1992 ARB, Section V.F, p. 81.

-21-

RJN002050

FTB's Embry audit task force in 1995 determined that FTB did not have a sourcing case against Mr. Hyatt.[87]

Philips created and managed the Philips Licensing Program. Mr. Hyatt did not have a California licensing business and none of the license payments from Philips sublicensing Mr. Hyatt's patents went to a California business.[88]

FTB's "The La Palma, California home was Mr. Hyatt's business office" theory and "Commercial Exploitation" business situs theory fail as a matter of law and for lack of evidence.[89]

FTB's sourcing arguments were rejected by FTB at audit in 1995 (the Embry audit task force) (1991 ASAB, Section 1.8.5.1, 1.9.3).[90] FTB's Embry audit task force in 1995 determined that there was explicit doubt about FTB's 1991 residency case against Mr. Hyatt and that FTB did not have a 1992 residency case against Mr. Hyatt.[91]

All of the disputed 1991 and 1992 payments came from licensing Mr. Hyatt's Nevada situs patents and are thus not taxable by California. The disputed income came from the ordinary course of licensing Mr. Hyatt's **Nevada situs patents** and is therefore not taxable by California (1992 ASAB Section 1.7.1.1).

Mr. Hyatt did not have California source income under regulation 17951-4 because he did not engage in a patent licensing business in California or anyplace else. Under Rev. & Tax § 17952, the mere licensing of Mr. Hyatt's own patents does not create California source income. (1992 ASAB Section 1.7.1.2).

Mr. Hyatt did not have California source income under Section 17952 because his patents did not have a California business situs. The patents were not "employed as capital in this State" and the "possession and control" of Mr. Hyatt's patents have never been localized with a California business so that their substantial use and value attach to and become an asset of the business. After the July 1991 Agreement Mr. Hyatt no longer possessed the substantial use and value of his own patents, Philips was the only entity that had the substantial use and value of Mr. Hyatt's patents. (1992 ASAB Section 1.7.1.3).

Tracing license payments to Mr. Hyatt confirms that he did not have California source income. The license payments from licensing Mr. Hyatt's patents were transferred to Mr. Hyatt's Nevada situs investment accounts, not to a California business. Mr. Hyatt did not receive compensation for his assistance to the Philips Licensing Program and no California business received income from the licensing of Mr. Hyatt's patents. (1992 ASAB Section 1.7.1.4).

---

[87] Hyatt's 2014 Supp. Aff., Section 2.6.10.
[88] Hyatt's 2008 Affidavit, ¶¶ 47-52, 60, 63; Hyatt's 2010 Affidavit, Section 1.15; Hyatt's 2014 Supp. Aff. Section 2.5, 2.5.1-2.5.14.
[89] 1991 AOB, Section IV.C, pp. 67- 75 and 1991 AOB, Section IV.D, pp. 75- 81, respectively.
[90] 1991 AOB, Section IV.E, pp. 82-86.
[91] Hyatt's 2014 Supp. Aff., Section 2.6.10.

RJN002051

Mr. Hyatt did not have an ownership interest in the Philips licensing program as FTB incorrectly implies.  Mr. Tamoshunas testified that "Philips by itself and through its attorneys created and managed the Licensing Program." (1992 ASAB Section 1.7.1.5).

The evidence that Mr. Hyatt did not have a licensing business is clear and overwhelming and is not overcome by FTB's unsupported conclusions and inferences.  Philips had the *exclusive* licensing authority to license Mr. Hyatt's licensable patents (1992 ASAB Section 1.7.2); "Philips by itself and through its attorneys created and managed the Licensing Program" (1992 ASAB Section 1.7.1.5); and the license payments from licensing Mr. Hyatt's patents were transferred to Mr. Hyatt's Nevada situs investment accounts (1992 ASAB Section 1.7.1.4).

There could not be and there was no Hyatt licensing business because a Hyatt licensing business would have been in breach of the July 1991 Philips Agreement and in violation of Mr. Hyatt's representations and warranties to Philips (1992 ASAB Section 1.7.3).

FTB's sourcing case must fall with its residency case.  FTB's sourcing and residency cases *both* rely on the false premise that Mr. Hyatt lived and worked at the Jennifer Circle house.  (1992 ASAB Section 1.7.4).

FTB's bad faith attempt to continue to tax Mr. Hyatt for FTB's $24 million error must fail.  The license payments were received after the disputed period and the licenses had no involvement with California.  (1992 ASAB Section 1.7.5).

Mr. Hyatt would not and did not breach the July 1991 Philips agreement by negotiating with prospective licensees or by operating a licensing business, as falsely contended by FTB.  Philips had *exclusive* licensing authority and Mahr Leonard had *exclusive* negotiating rights. Mr. Hyatt did not have any licensing rights or negotiating rights as FTB falsely contends, he did not have the rights to license his own patents.  (1992 ASAB Section 1.7.3).

Philips wanted Mr. Hyatt to sign several patent agreements because of Philips' *cross licensing relationships*.  Mr. Hyatt wanted to be cooperative with Philips so he agreed to sign patent agreements for Philips.[92] (1991 ASAB Section 1.7.7).

Philips and Mahr Leonard promised to correct Mr. Hyatt's address in the preamble of the patent agreements and after several of Mr. Hyatt's complaints they did correct it.[93]  In December 1991, Philips and Mahr Leonard put Mr. Hyatt's Las Vegas apartment address on the Sony and NEC Patent Agreements.  (1991 ASAB Section 1.7.8).

Mr. Hyatt had very limited involvement in the Philips Licensing Program.[94] (1991 ASAB Section 1.7.9).

Mr. Hyatt did not operate a California business giving rise to source income under Rev. & Tax Code Section 17951 and Regulation 17951-4C.[95]

---

[92] See, e.g., Hyatt's 2001 Affidavit, ¶ 13.
[93] Hyatt's 2001 Affidavit, ¶¶ 13-14.
[94] Hyatt's 2001 Affidavit, ¶ 12.

RJN002052

FTB failed to respond to Mr. Hyatt's AOB arguments on the lack of a Jennifer Circle/La Palma business office.[96]

FTB's "California business" Jennifer Circle sourcing argument continues to fail for lack of evidence.[97]

Mr. Hyatt did not have a "patent application and licensing business" in California.[98]

Mr. Hyatt's former consulting business and DNC are irrelevant to FTB's "California business" argument.[99]

FTB's claim that Mr. Hyatt used "California independent contractors" does not establish a California business.[100]

Mr. Hyatt did not play a "role" in any "California business," nor did Mr. Hyatt "control" the "business income" at issue.[101]

"Mr. Hyatt's relevant tax information" does not establish a California business.[102]

Mr. Hyatt's temporary presence in California post April 1992.[103]

FTB's Section 17951 and Regulation 17951-4 Sourcing Argument Fails as a Matter of Law.[104]

FTB's Rev. & Tax. Code Section 17952 and Regulation 17952 theories of business situs are without merit and fail as a matter of law.[105]  FTB's "patent portfolio" argument is without merit.[106]  What remains of FTB's so-called "Commercial Exploitation" argument is without merit.[107]

FTB's new "Philips" sourcing argument is without merit.[108]

Conclusion Regarding Sourcing Arguments:  Sourcing was rejected at audit, only to be resurrected by FTB in its Determination Letter in November 2007 at the conclusion of the protests. Yet, prior to the 2007 Determination Letter, FTB had never advanced any sourcing arguments as the basis for any proposed deficiency assessments. Sourcing is truly a new argument, upon which FTB bears the burden. FTB has not and cannot meet that burden.[109]

### 1.10.2    **FTB's Sourcing Assessments Were Not Properly Raised In The NPAs Or NOAs**.

***FTB in bad faith never audited or protested the sourcing cases***, thereby unlawfully depriving Mr. Hyatt of his statutory rights to audits and protests and to proper notice on the NPAs and NOAs (1991 ASAB Section 1.7.10).

FTB's sourcing assessments must be reversed Mr. Hyatt did not have California source income in 1991 or 1992 (1992 ASAB Section 1.7).

---

[95] 1992 ARB, Section V.C, pp. 34-35.
[96] 1992 ARB, Section V.C.2, pp. 36-37.
[97] 1992 ARB, Section V.C.3, pp. 37-44.
[98] 1992 ARB, Section V.C.4, pp. 44-46.
[99] 1992 ARB, Section V.C.5, p. 46.
[100] 1992 ARB, Section V.C.6, pp. 46-53.
[101] 1992 ARB, Section V.C.7, pp. 54-62.
[102] 1992 ARB, Section V.C.8, pp. 62-66.
[103] 1992 ARB, Section V.C.9, pp. 66-67.
[104] 1992 ARB, Section V.C.10, pp. 67-73.
[105] 1992 ARB, Section V.D, p. 73.
[106] 1992 ARB, Section V.D.1, pp. 73-77.
[107] 1992 ARB, Section V.D.2, pp. 77-79.
[108] 1992 ARB, Section V.E, pp. 79-81.
[109] 1992 ARB, Section V.F, p. 81.

RJN002053

FTB's sourcing assessments must be reversed for the additional reason that they were not properly raised in the NPAs or NOAs (1991 ASAB Section 1.8.5). FTB has the burden of proof on the sourcing issue (1992 ASAB Section 1.7.1)[110] but it has failed to prove sourcing.

FTB refused to address the sourcing issue and the $24 million FTB error issue during the audits and protests, significantly changing its theory for the sourcing assessments during these appeals, and severely prejudicing Mr. Hyatt. During the audit, FTB secretly examined the sourcing issue with a special task force, which held that FTB did not have a sourcing case. FTB removed the final task force report from the audit file. FTB finally acknowledged that it made a $24 million error, FTB partially corrected that error by withdrawing its decades long holding that these $24 million licensing payments were received on January 15, 1992, and admitted that these $24 million licensing payments were not received until well after the disputed period. However, FTB let stand in the 1992 disputed period taxes, interest and penalties on its $24 million error (it was in the NPA as disputed income residency income) even though there no licensing income in the 1992 disputed period to support these assessments on FTB's $24 million error. (1991 ASAB Section 1.8.5.1)

FTB is barred from raising the sourcing assessments because it has not properly raised the issues (1991 ASAB Section 1.8.5.2).

FTB is barred from raising the sourcing issues because they were not raised in the NPA. Current California law and the Rules for Tax Appeals do not permit FTB to introduce new issues during an appeal before your Board. FTB did not comply with California law by setting forth sourcing as a reason for its assessments in its 1991 and 1992 NPAs. FTB is thus barred from asserting its sourcing assessments (1991 ASAB Section 1.8.5.2.1).

FTB is barred from assessing income after April 2, 1992, because it has not issued an NPA for that period. Furthermore, Mr. Hyatt had no California source income after April 2, 1992 (1991 ASAB, Section 1.8.5.2.2).

Placing the sourcing assessments for the first time in the NOAs does not satisfy the statutory procedure for issuing an assessment. FTB's 10 year plus delay has significantly prejudiced Mr. Hyatt. (1991 ASAB Section 1.8.5.3). Furthermore, FTB's 1991 and 1992 NOAs assert sourcing based only on a California business situs for Mr. Hyatt's patents, not on the different theory of income from a California business (1992 ASAB Section 1.7.1.1).

Principles of justice and fairness bar FTB from raising the sourcing issues after audit and issuance of the NPAs and NOAs (1991 ASAB Section 1.8.5.4).

Neither the NPAs nor the NOAs support a sourcing assessment. FTB's sourcing assessments are unlawful, unfair, and unjust. The NOAs and NPAs do not give Mr. Hyatt the required notice of FTB's sourcing assessments. Neither the NPAs

---

[110] 1992 ARB, Section V.F, p. 81.

RJN002054

nor the NOAs give Mr. Hyatt notice of the reasons and factual basis for asserting the sourcing assessments. FTB's

determinations that Mr. Hyatt is a Nevada resident for sourcing and a California resident for residency are inconsistent

allegations, not alternative determinations and do not comply with California law (1991 ASAB Sections 1.8.5.4.1, 1.8.5.4.2;

1992 ASAB Section 1.7.1.1).

FTB cannot raise a new California-based **license business theory** at this time because the issue was not raised in the

NPAs or NOAs. FTB's **new** sourcing theories are highly prejudicial to Mr. Hyatt. (1991 ASAB Section 1.8.5.4.3; 1992

ASAB Section 1.7.1.1).

FTB cannot sustain a fraud penalty on its $24 million error because the payments were received during a significantly

different time period than the original assessment and were not audited, protested, or raised in the NPAs or NOAs

(1991 ASAB Section 1.8.5.4.5).

FTB has not met its burden of proving that Mr. Hyatt had California source income in 1991 or in 1992.[111] FTB is

prohibited from raising the sourcing issue because it did not raise the issue in its 1991 and 1992 NPAs.

**1.11**     <u>**FTB'S PROPOSED IMPOSITION OF AN AMNESTY PENALTY IS IN ERROR.**</u>

FTB's proposed imposition of an amnesty penalty under section 19777.5 is in error.[112]

**1.12**     <u>**INTEREST SHOULD BE ABATED FOR THE ADDITIONAL REASON THAT THE NEVADA SUPREME COURT FOUND THAT FTB COMMITTED FRAUD AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IN PART *BECAUSE OF ITS DELAYS*.**</u>

Mr. Hyatt is entitled to interest abatement for FTB's delays. The Nevada Supreme Court (NSC) found that FTB

committed fraud and intentional infliction of emotional distress in part because of its delays. (1992 ASAB Section 1.8).

Interest abatement is appropriate under section 19104.[113] There have been many unreasonable delays attributable to

ministerial and managerial acts performed by FTB staff during the processing of the protest.[114] FTB's unreasonable delays

occurred after FTB contacted Mr. Hyatt in writing.[115] The delays are not significantly attributable to Mr. Hyatt.[116] FTB's

delays are numerous and successive.[117] Several examples are listed below.

---

[111] 1992 ARB, Section V.F, p. 81.
[112] 1991 AOB, Section V, pp. 86-87.
[113] 1991 AOB, Section VI, pp. 87-94; 1992 ARB, Section VII, p. 82.
[114] 1991 AOB, Section VI.A, pp. 88-93; 1992 AOB, Section VII.A, p. 68; 1992 ARB, Section VII.C, p. 82; 1992 ASB, Section I.C, pp. 37-38.
[115] 1992 ARB, Section VII.D, p. 95; 1991 AOB, Section VI.B, p. 93.
[116] 1992 ARB, Section VII.E, pp. 95-99; 1991 AOB, Section VI.C, p. 93.
[117] 1992 ARB, Section VII.F, pp. 99-100; 1991 AOB, Section VI.D, pp. 93-94.

-26-

FTB intentionally placed a "hold" on Mr. Hyatt's protest, constituting an unreasonable delay based on ministerial and managerial acts.[118]

FTB has lost, destroyed, or withheld numerous documents from audit files, constituting unreasonable error or delay based on a managerial act.[119]

FTB delayed the protest by assigning the protest officer to other cases and failing to reassign Mr. Hyatt's case to another protest officer, constituting an unreasonable delay due to a managerial or ministerial act.[120]

FTB failed to expeditiously issue the 1992 NPA, constituting an unreasonable delay due to a ministerial act.[121]

FTB's $24 million income error in calculating the 1992 NPA constitutes an unreasonable error caused by a ministerial act.[122]

**1.13    INCORPORATION BY REFERENCE.**

Mr. Hyatt hereby incorporates by reference the following sections from the 1992 Concluding Summary.

1.5      The Bragg Factors Overwhelmingly Establish Mr. Hyatt's Nevada Residency And Domicile.

1.6      FTB's $24 Million Fraud On Mr. Hyatt.

1.7      FTB Fails To Carry Its Burdens; Its Initial Burden, Its Sourcing Burden And Its Fraud Burden.

1.8      FTB Must Not Be Allowed To Violate The Established Law And Regulations For Conducting Audits.

1.9      FTB's Fraudulent Fraud Penalties.

1.10    The Philips Documents Significantly Support Mr. Hyatt's Residency And Sourcing Appeals.

1.11    FTB's Bad Faith Attacks On Eyewitness Testimony Based On FTBs Unsupported Speculation Of The Meaning Of Documentation.

1.12    Responses To Representative False Statements In FTB's ROBs And RRBs.

**1.14    CONCLUSION**

Mr. Hyatt moved to Nevada and became a California nonresident on September 26, 1991.  Mr. Hyatt sold his California house, resided in a Las Vegas hotel for a few weeks, resided in his Las Vegas leased apartment for about five months, and then resided in his Las Vegas Tara home for the last 25 years.  Mr. Hyatt had no California source income during the disputed period or thereafter.  The situs of Mr. Hyatt's patents followed Mr. Hyatt to Nevada and no California business had the substantial use and value of Mr. Hyatt's patents.  Mr. Hyatt did not have a California licensing business and FTB's NPAs and NOAs did not give Mr. Hyatt notice of taxation based on a California business.  FTB has not established by clear

---

[118] 1992 ARB, Section VII.C.1, pp. 83-89.
[119] 1992 ARB, Section VII.C.2, pp. 89-90.
[120] 1992 ARB, Section VII.C.3, pp. 90-92.
[121] 1992 ARB, Section VII.C.4, pp. 92-93.
[122] 1992 ARB, Section VII.C.5, pp. 93-95.

RJN002056

1  and convincing evidence that Mr. Hyatt intended to defraud FTB. Any interest assessments should be abated because they

2  resulted from the intentional delay of FTB.

3     FTB's bad faith calendar, Attachment A-R, and Attachment E should be disregarded because of the thousands of

4  false statements and the disregard or misrepresentation of Mr. Hyatt's overwhelming eyewitness and documentary evidence.

5  (1991 ASAB Section 1.8).

6

7  Dated: September 28, 2016          Respectfully submitted,

8                                      ANTOLIN LAW GROUP

9                                      By: _____
                                       EDWIN P. ANTOLIN

10                                     REED SMITH LLP
                                       BRIAN TOMAN
11
                                       SILVERSTEIN & POMERANTZ LLP
12                                     AMY L. SILVERSTEIN

13                                     *Attorneys for Appellant Gilbert P. Hyatt*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

-28-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EDWIN P. ANTOLIN
Edwin.antolinlawgroup.com
ANTOLIN LAW GROUP
2175 N. California Blvd., Suite 775
Walnut Creek, CA 94596
Telephone: (925) 262-4187
Fax: (925) 262-4269

BRIAN TOMAN
btoman@reedsmith.com
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone: (415) 543-8700
Fax: (415) 415-391-8269

AMY L. SILVERSTEIN
asilverstein@sptaxlaw.com
SILVERSTEIN & POMERANTZ LLP
12 Gough Street, 2nd Floor
San Francisco, CA 94103
Telephone: (415) 593-3502
Fax: (415) 593-3501
Attorneys for Appellant

BEFORE THE STATE BOARD OF
EQUALIZATION
OF THE STATE OF CALIFORNIA

In the Matter of the Appeals of

GILBERT P. HYATT

Case Nos.   435770 & 446509

**APPELLANT'S CONCLUDING SUMMARY (1992)**

RJN002058

# TABLE OF CONTENTS

1.1   TABLE OF ABBREVIATIONS AND DEFINITIONS. ...............................IV

1.2   TABLE OF AUTHORITIES.................................................................VI

1.3   TABLE OF CITATIONS AND LINKS TO EXAMPLES OF MR. HYATT'S EVIDENCE. ...........................................................................IX

    1.3.1   Updated Testimonial Topics Table And Exhibits Summarizing The Eyewitness Testimonial Subject Matters And The Reinforcement Of Testimony Between Eyewitnesses (E.G., 72-Witnesses Testified About Mr. Hyatt's Move Away In 1991) Under Oath Or Penalty Of Perjury...... ix

    1.3.2   Updated Chronological Statements Of Facts (The "Chronologies"), A Chronology Of Mr. Hyatt's Overwhelming Eyewitness And Documentary Evidence. ............................................................... ix

    1.3.3   The More Than 220 Affidavits And Declarations Sworn To Or Signed Under Penalty Of Perjury By More Than 150 Eyewitnesses In Support Of Mr. Hyatt's Facts. ................................................................... ix

    1.3.4   "Testimonial Responses" Tables And Excerpts Regarding Eyewitnesses' Overwhelming Testimony To Identify And Correct FTB's False Arguments And False Facts.................................................. ix

    1.3.5   Philips Document Tables Providing Examples Of More Than 5,000 Pages Of Philips Documents That Support Mr. Hyatt's Cases. .................. x

    1.3.6   Witness Deposition Tables Providing Examples Of More Than 20 Depositions That FTB Took Of Mr. Hyatt's Eyewitnesses And Philips Licensing Attorneys That Support Mr. Hyatt's Appeals. .......................... x

    1.3.7   Tables Of False Statements Made In The FTB Audit File And Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses. ................. x

    1.3.8   Tables Of False Statements Made Under Penalty Of Perjury By FTB Private Investigators And Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses.................................................................................. x

    1.3.9   Objection And Rebuttal To FTB's Calendar And Attachments A (Revised) And F ("Rebuttal To FTB Att. A/F"). ......................................... x

    1.3.10   Objection And Rebuttal To FTB's Attachment E ("Rebuttal To FTB Att. E"). ................................................................................................... x

    1.3.11   Tables Of Misrepresentations In FTB's ROBs And RRBs........................ x

    1.3.12   Tables Of Mr. Hyatt's Presence Based Upon Direct Testimonial and Documentary Evidence ................................................................... x

1.4   INTRODUCTION TO MR. HYATT'S 1992 CONCLUDING SUMMARY............... 1

1.5   THE *BRAGG* FACTORS OVERWHELMINGLY ESTABLISH MR. HYATT'S NEVADA RESIDENCY AND DOMICILE. ........................................................ 1

1.6   FTB'S $24 MILLION FRAUD ON MR. HYATT. ........................................ 1

1.7   FTB FAILS TO CARRY ITS BURDENS; ITS INITIAL BURDEN, ITS SOURCING BURDEN AND ITS FRAUD BURDEN. ............................................... 3

1.8   FTB MUST NOT BE ALLOWED TO VIOLATE THE ESTABLISHED LAW AND REGULATIONS FOR CONDUCTING AUDITS. ............................................ 5

1.9   FTB'S FRAUDULENT FRAUD PENALTIES. ............................................... 5

    1.9.1   FTB Used Fraud Penalties And Other Methods To Coerce Settlements. ... 5

    1.9.2   FTB Has Failed To Carry Its Burden Of Proving Fraud............................. 6

    1.9.3   The Ten Factors Cited By FTB Do Not Establish Fraud. ........................... 9

RJN002059

1.10    THE PHILIPS DOCUMENTS SIGNIFICANTLY SUPPORT MR. HYATT'S RESIDENCY AND SOURCING APPEALS. ............................................................ 12

1.11    FTB'S BAD FAITH ATTACKS ON EYEWITNESS TESTIMONY BASED ON FTB'S UNSUPPORTED SPECULATION OF THE MEANING OF DOCUMENTATION. ................................................................................................ 13

       1.11.1    Mr. Hyatt Has Provided More Than 220 Sworn Affidavits And Declarations Signed By More Than 150 Witnesses That All Support Mr. Hyatt's Facts. ...................................................................................... 13

       1.11.2    FTB's Attacks On Eyewitness Testimony Are Made In Bad Faith. ......... 13

       1.11.3    FTB's Attack On The Credibility Of Witness Testimony Provided In Support Of Mr. Hyatt Are Baseless. ........................................................... 14

       1.11.4    FTB Continues It's Bad Faith Attacks On Mr. Hyatt Questioning The True And Correct Statements In His Affidavits. ........................................ 16

       1.11.5    The Testimony Of Mr. Hyatt's Eyewitnesses Is True And Correct. ......... 18

1.12    RESPONSES TO REPRESENTATIVE FALSE STATEMENTS IN FTB'S ROBS AND RRBS. ..................................................................................................... 19

       1.12.1    FTB's Physical Presence Arguments In Its RRBs Are Without Merit. .... 19

       1.12.2    FTB's Sourcing Arguments In Its RRBs Are Without Merit. ................. 20

1.13    INCORPORATION BY REFERENCE ....................................................... 24

1.14    CONCLUSION ........................................................................................ 24

RJN002060

**1.1**  **TABLE OF ABBREVIATIONS AND DEFINITIONS.**

| | |
|---|---|
| 1991 AOB | 1991 Appellant's Opening Brief, |
| 1992 AOB | 1992 Appellant's Opening Brief, |
| 1991 ARB | 1991 Appellant's Reply Brief, |
| 1992 ARB | 1992 Appellant's Reply Brief, |
| 1991 ASB | 1991 Appellant's Supplemental Brief, |
| 1992 ASB | 1992 Appellant's Supplemental Brief, |
| AAB | Appellant's Additional Brief, |
| 1991 ASAB | 1991 Appellant's Second Additional Brief, |
| 1992 ASAB | 1992 Appellant's Second Additional Brief, |
| 1991 ROB | 1991 Respondent's Opening Brief, |
| 1992 ROB | 1992 Respondent's Opening Brief, |
| 1991 RRB | 1991 Respondent's Reply Brief, |
| 1992 RRB | 1992 Respondent's Reply Brief, |
| RAB | Respondent's Additional Brief, |
| 1991 RSAB | 1991 Respondent's Second Additional Brief, |
| 1992 RSAB | 1992 Respondent's Second Additional Brief, |

Disputed period  FTB's name for the period in dispute, September 26, 1991 to April 2, 1992

CDE  FTB's name for Contemporaneous Documentary Evidence

Rebuttal to FTB Att. A/F
  Rebuttal and Objection to FTB Calendar, Attachment A (Revised),
  and Attachment F

Rebuttal to FTB Att. E
  Rebuttal and Objection to FTB Attachment E

Attachment A-R  FTB Attachment A (Revised)

Jennifer Circle house
  7841 Jennifer Circle, La Palma house

La Palma house  7841 Jennifer Circle, La Palma house

-iv-

RJN002061

1    NPA                    FTB's Audit Notice Of Proposed Assessment

2    NOA                    FTB's Protest Notice Of Action

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RJN002062

1  **1.2    TABLE OF AUTHORITIES.**

2  **CASES**

3
4  *Achiro v. Commissioner*,
   77 T.C. 881 (1981)

5  *Falese v. Commissioner*,
   58 T.C. 895 (1972)

6
7  *Fitch v. Comm'r*,
   T.C. Memo 2012-358, P25 (T.C. 2012)

8  *Fox v. Erickson*,
   99 C.A.2d 740, 742 (1950)

9
10  *Hale v. Comm'r*,
    T.C. Memo 2010-229 (T.C. 2010)

11  *Franchise Tax Bd. of Cal. v. Hyatt*,
    335 P.3d 125, 144-145, 148-149 (Nev. 2014)

12
13  *Jones v. Commissioner*,
    259 F.2d 300 (5th Cir. 1958)

14  *In re Jost*,
    117 Cal.App.2d 379, 383 (1953)

15
16  *Mansell v. Board of Administration*,
    30 Cal. App. 4th 539, 545 (1994)

17  *Marchica v. State Board of Equalization*,
    107 Cal.App.2d 501, 509 (1951)

18
19  *Mattel v. Gilbert Hyatt*,
    1979 U.S. Dist. LEXIS 8812 (December 6, 1979)

20  *Padgett Coventry Price v. Commissioner of Internal Revenue Service*,
    T.C. Memo 2004-103

21
22  *Powell v. Granquist*,
    252 F.2d 56 (9th Cir. 1958)

23  *Professional Services v. Commissioner*,
    79 T.C. 888, 930 (1982)

24
25  *Rowlee v. Commissioner*,
    80 T.C. 1111, 1123 (1983)84

26  *Stoltzfus v. United States*,
    398 F.2d 1002, 1004 (3d Cir. 1968)

27
28  *Title Ins. Co. of Minnesota v. State Bd. of Equalization*
    4 Cal.4th 715 (1992)

RJN002063

**Statutes**

Tit.18, Cal. Rev. & Tax. Code

§ 17014(a)
§ 17951-4(a).
§ 17951-4(c)
§ 17952
§ 17952(a)
§ 17952(c)
§ 19033
§ 19034
§ 19044
§ 19045
§ 19057
§ 19036

Revenue and Taxation Code sections 12421 through 12435

**STATE BD. OF EQUALIZATION DECISIONS**

*Appeal of Robert F. and Helen R. Adickes*,
St. Bd. of Equaliz., 1990 Cal. Tax LEXIS 24, 90-SBE 012 (Nov. 27, 1990)

*Appeal of Eli A. and Virginia W. Allen*,
Cal. St. Bd. of Equal., Jan. 7, 1975)

*Appeal of Armstrong*,
St. Bd. of Equaliz. 1985 Cal. Tax LEXIS 2 December 3, 1985

*Appeal of Stephen D. Bragg*,
2003-SBE-002 (May 28, 2003)

*Appeal of Castillo*,
No. 90A-0227-ES, St. Bd. of Equaliz. 1992 Cal. Tax LEXIS 28;
92-SBE-020 July 30, 1992

*Appeals of Robert E. Wesley and Jerry J. Couchman*,
2005-SBE-002, (2005) Cal. Tax LEXIS 358,

*Appeal of Duncan*
1993 Cal. Tax LEXIS 147, 3-4 (1993)

*Appeal of Robert V. Erilane*,
Cal. St. Bd. of Equal., Nov. 12, 1974

*Appeal of Lasher*,
St. Bd. of Equaliz. 2005 Cal. Tax. Lexis 22 (Case No. 260933) (Jan. 25. 2005)

*Appeal of David G. and Helen Mendelsohn*,
85-SBE-141, Nov. 6, 1985

*Appeal of Sierra Pacific Industries*,
Cal. St. Bd. of Equal., Jan. 5, 1994, 94-SBE-0024

RJN002064

*Appeal of Hubbard D. & Cleo M. Wickman*,
81-SBE-014, Feb. 2, 1981

**Other Authorities**

Law Review Commission Comments for Evid. Code § 600

Uniform Division of Income for Tax Purposes Act,
Sections 25120 to 25139

RJN002065

**1.3    TABLE OF CITATIONS AND LINKS TO EXAMPLES OF MR. HYATT'S EVIDENCE.**

1.3.1    **Updated Testimonial Topics Table And Exhibits Summarizing The Eyewitness Testimonial Subject Matters And The Reinforcement Of Testimony Between Eyewitnesses (E.G., 72-Witnesses Testified About Mr. Hyatt's Move Away In 1991) Under Oath Or Penalty Of Perjury.**

1.3.2    **Updated Chronological Statements Of Facts (The "Chronologies"), A Chronology Of Mr. Hyatt's Overwhelming Eyewitness And Documentary Evidence.**

Updated 1991 Pre-Disputed Period Chronological Statements Of Facts.

Updated 1991 Disputed Period Chronological Statements Of Facts.

Updated 1992 Disputed Period Chronological Statements Of Facts.

Updated 1992 Post-Disputed Period Chronological Statements Of Facts.

1.3.3    **The More Than 220 Affidavits And Declarations Sworn To Or Signed Under Penalty Of Perjury By More Than 150 Eyewitnesses In Support Of Mr. Hyatt's Facts.**

Updated Index of Affidavits.

Affidavits and Declarations with Exhibits filed with the AOBs.

Affidavits and Declarations with Exhibits filed with the ARBs.

Affidavits and Declarations with Exhibits filed with the ASBs.

Post-Briefing Evidence (post-ASBs Affidavits and Declarations with Exhibits).

Mr. Hyatt's Contemporaneous Documentary Evidence (CDE) Affidavits Describing And Authenticating Thousands of Pages of Documentary Evidence.

Mr. Hyatt's 2012 Disputed Period CDE Affidavit.

Mr. Hyatt's 2016 Supplemental Disputed Period CDE Affidavit.

Mr. Hyatt's 2016 Post-Disputed Period CDE Affidavit.

Sourcing Affidavits With Exhibits.

1.3.4    **"Testimonial Responses" Tables And Excerpts Regarding Eyewitnesses' Overwhelming Testimony To Identify And Correct FTB's False Arguments And False Facts.**

Testimonial Responses To FTB's 1991 ROB

Testimonial Responses To FTB's 1992 ROB

Testimonial Responses To FTB's 1991 RRB

Testimonial Responses To FTB's 1992 RRB

Testimonial Responses To FTB's 1991 Attachment A

-ix-

Testimonial Responses To FTB's 1992 Attachment A

Testimonial Responses To FTB's Attachment D

**1.3.5** **Philips Document Tables Providing Examples Of More Than 5,000 Pages Of Philips Documents That Support Mr. Hyatt's Cases.**

**1.3.6** **Witness Deposition Tables Providing Examples Of More Than 20 Depositions That FTB Took Of Mr. Hyatt's Eyewitnesses And Philips Licensing Attorneys That Support Mr. Hyatt's Appeals.**

**1.3.7** **Tables Of False Statements Made In The FTB Audit File And Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses.**

**1.3.8** **Tables Of False Statements Made Under Penalty Of Perjury By FTB Private Investigators And Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses.**

**1.3.9** **Objection And Rebuttal To FTB's Calendar And Attachments A (Revised) And F ("Rebuttal To FTB Att. A/F").**

/02/06B1 Introduction to Rebuttal To FTB Att. A/F

/02/06B2 September 1991 Rebuttal To FTB Att. A/F

/02/06B3 October 1991 Rebuttal To FTB Att. A/F

/02/06B4 November 1991 Rebuttal To FTB Att. A/F

/02/06B5 December 1991 Rebuttal To FTB Att. A/F

/02/06B6 January 1992 Rebuttal To FTB Att. A/F

/02/06B7 February 1992 Rebuttal To FTB Att. A/F

/02/06B8 March 1992 Rebuttal To FTB Att. A/F

/02/06B9 April 1992 Rebuttal To FTB Att. A/F

**1.3.10** **Objection And Rebuttal To FTB's Attachment E ("Rebuttal To FTB Att. E").**

**1.3.11** **Tables Of Misrepresentations In FTB's ROBs And RRBs.**

**1.3.12** **Tables Of Mr. Hyatt's Presence Based Upon Direct Testimonial and Documentary Evidence**

ASAB Exhibit 02

ASAB Exhibit 03

CDE Affidavit Exhibit CDE-ST002

CDE Affidavit Exhibit CDE- ST003

RJN002067

**1.4    INTRODUCTION TO MR. HYATT'S 1992 CONCLUDING SUMMARY.**

Mr. Hyatt hereby incorporates by reference Section 1.4, the Introduction, from Appellant's 1991 Concluding Summary.

**1.5    THE *BRAGG* FACTORS OVERWHELMINGLY ESTABLISH MR. HYATT'S NEVADA RESIDENCY AND DOMICILE.**

The *Bragg* factors overwhelmingly establish Mr. Hyatt's Nevada residency during the disputed period and thereafter.[1]  Not one *Bragg* factor favors a California connection.[2]

The summary of the *Bragg* factors is incorporated by reference from Sections 1.6.1, 1.6.1.1 to 1.6.1.10 of Appellant's 1991 Concluding Summary.

**1.6    FTB'S $24 MILLION FRAUD ON MR. HYATT.**

FTB refused to correct or even to substantively respond to Mr. Hyatt's evidence about its $24 million error,[3] persisting in the tens of millions of dollars of taxes, interest, and penalties until your Board required it to respond in its RAB.[4] But even then, after admitting to its $24 million error, FTB in bad faith still misrepresents the license payments to your Board[5] and still persists in the tens of millions of dollars of taxes, interest, and penalties that it fraudulently assessed (Section 1.9.1, 1991 ASAB Sections 1.7.2, 1.7.5, 1.8.5.1, 1.8.5.4 1, 1.8.5.4.4, 1.8.5.4.5, 1.9.10; 1992 ASAB Section 1.7.5).  Neither the 1992 NPA nor the 1992  NOA correct the FTB $24 million income error.[6]

FTB fraud penalties are made in bad faith, FTB currently maintains its fraud penalty on its $24 million error.[7]  FTB has now been forced to admit that the license payments comprising the $24 million error were not received until well after the 1992 disputed period.  Nevertheless, FTB still holds to its tens of millions of dollars of NPA residency assessments (including penalty and interest).  FTB did not reduce the NPA assessments for the 1992 disputed period by the FTB's $24 million error. (1991 ASAB Section 1.7.2).

---

[1] 1991 AOB, pp. 15-38; 1992 AOB, pp. 16-35; 1991 ARB, pp. 21-68; 1992 ARB, pp. 4-26; 1992 ASB, pp. 42-52; *Appeal of Stephen Bragg*, 2003-SBE-002 (May 28, 2003) (setting forth a non-exhaustive list of objective factors helpful in the determination with which state an individual maintains his closest connections).

[2] 1991 AOB, Section II.C, pp. 15-38; see rebuttal to FTB's false statements at 1991 ARB, Section II.A, pp. 21- 68.

[3] See, e.g., Hyatt's 2008 Affidavit, ¶¶ 65-68; Hyatt's 2013 Affidavit, Sections 2-5; Hyatt's 2014 Supp. Aff., Sections 2.2-2.4, 2.5.11-2.5.13.

[4] AAB, p. 1; AAB, Section I, pp. 2-5.

[5] AAB, Section II, pp. 5-9.

[6] 1992 AOB, Section III, pp. 52-56; 1992 ARB, Section III, p. 27.

[7] 1991 ASAB, Sections 1.7.2, 1.8.5.4.4, 1.8.5.4.5.5, 1.8.10; 1992 ASAB, Section 1.7.5.

-1-

In its 1992 RSAB, FTB makes a nonspecific allegation that Mr. Hyatt's 1991 and 1992 income is "sourced" to California through the end of 1992 without even mentioning the $24 million error,[8] and without auditing or addressing the relevant facts of this post-disputed period income. This post-disputed period has not been audited or protested by FTB.

FTB knew for more than 16 years about the $24 million error and made no attempts to correct it.[9] It would be unlawful for FTB to maintain the 1992 assessments that include the $24 million income error.[10] FTB has agreed that the $24 million residency assessment was not correct because the license payments were not received during the 1992 disputed period. Therefore, the 1992 NPA was not properly computed and should not have included the $24 million payments. FTB has no authority to increase the amount that was improperly computed in 1997. California law does not allow FTB to now change the basis for the $24 million assessment because FTB was required to set forth the reasons for any proposed deficiency assessment and the computation thereof in the NPA. The NPA must be based on a determination that is not "arbitrary or without foundation". (AAB, III.B, pp. 12-16).

FTB fails to carry its "initial burden" of establishing "reasonable and rational" assessments. FTB's assessments were imposed in bad faith (FTB's $24 million error), FTB's gross misconduct and extreme bad faith treatment of Mr. Hyatt, FTB's calendar and Attachment A-R are made in bad faith (more than 2,000 false statements), and there was no 1992 audit.[11] (1991 ASAB Section 1.5.1). FTB had an abusive policy of using the fraud penalty as leverage to coerce individuals into improper settlements, FTB cannot meet the clear and convincing standard (1991 ASAB Section 1.5.3).

Mr. Hyatt has carried his burden of proof in proving FTB's assessment is wrong, while FTB has failed to carry any of its burdens of proof.[12] (1991 ASAB Sections 1.5., 1.5.1 to 1.5.3).

Inclusion of the auditor's $24 million income error is barred by equitable principles.[13] Equitable estoppel bars FTB from assessing tax on the $24 million error under a sourcing theory.[14] The equitable doctrine of laches bars FTB from assessing tax on the $24 million error under a sourcing theory.[15]

The Philips documents detail FTB's bad faith $24 million income error. Although FTB has now acknowledged that the $24 in license payments were received after the 1992 disputed period when Mr. Hyatt is recognized by FTB to be a

---

[8] 1992 RSAB, p. 29:21-24.
[9] AAB, Section III.A, pp. 9-12.
[10] AAB, Section III.B, pp. 12-16.
[11] 1992 ARB, Section I.; 1992 AOB, Section II.C.9, Section II.E.; 1992 ARB, Section II.A,.
[12] 1991 ARB, Section I, pp. 16, 17-21.
[13] AAB, Section III.C, pp. 17-21.
[14] AAB, Section III.C.1, pp. 17-19.
[15] AAB, Section III.C.2, pp. 19-21.

RJN002069

Nevada resident, FTB still holds to its NPA residency assessment of its $24 million error plus penalties and interest. (1991 ASAB Section 1.7.2).

Your Board should disregard FTB's attempts to advance its sourcing arguments in the RAB.[16]  FTB was requested by your Board to "provide briefing that is narrowly focused on the factual issues" outlined in three items.  However, FTB used the additional briefing to explain income related to its new sourcing argument after April 2, 1992.  Long after the 1992 NPA and NOA were issued, FTB cannot create a new "source" theory that had previously been rejected for payments received outside the audit period.  To attempt to read the 1992 NPA to capture income that is outside the 1992 disputed period would be to render the 1992 NPA unlawful under Sections 19033 and 19034.  Further, the fraud penalties were imposed as part of the NPAs, which were based solely on the residency issue.  Thus, FTB cannot argue that the fraud penalty should remain under the new sourcing theory.  (AAB, Section IV., pp. 12-16).

FTB does not now contend that its $24 million error is taxable in the post-disputed period and FTB has not provided evidence that its $24 million error is taxable in the post-disputed period (1991 ASAB Sections 1.8.5.4.4, 1.8.5.4.5), but FTB has not withdrawn the tens of millions of dollars in taxes, interest, and penalties that were assessed on its $24 million income error that it now admits was not received until the post-disputed period.  Thus, your Board should correct FTB's oversight and withdraw *the remnant taxes, interest, and penalties* that were falsely assessed on its $24 million error which are no longer relevant in view of FTB's admission that the $24 million error payments were not received on January 15, 1992, on which the audit and protest were based.

**1.7   FTB FAILS TO CARRY ITS BURDENS; ITS INITIAL BURDEN, ITS SOURCING BURDEN AND ITS FRAUD BURDEN.**

FTB fails to carry its burdens; its initial burden, its sourcing burden and its fraud burden (1991 ASAB Sections 1.5, 1.5.1, 1.5.2, 1.5.3).[17]

FTB fails to carry its "initial burden" of establishing "reasonable and rational" assessments for the additional reasons that FTB's assessments were imposed in bad faith (e.g., FTB's $24 million error), FTB's gross misconduct and extreme bad faith treatment of Mr. Hyatt, FTB's calendar and Attachment A-R are made in bad faith (more than 2,000 false statements), and there was no 1992 audit.  (1991 ASAB Section 1.5.1).

Both residency assessments (1991 and 1992) must be overturned because FTB did not carry its "initial burden [] to show why its assessment[s] [are] reasonable and rational."[18]  Both residency assessments were imposed in bad faith by a rogue

---

[16] AAB, Section IV.A, pp. 21-24.
[17] 1991 AOB, Section I, pp. 4-11; 1991 ARB, Section I.A, pp. 16-17.
[18] *Appeal of Wesley et al*, 2005-SBE-02, Nov. 15, 2005.

RJN002070

auditor and supported by other FTB personnel who were intent on issuing assessments against Mr. Hyatt and imposing enormous fraud penalties to coerce an unjustified settlement.[19] It has been conclusively determined that FTB committed fraud, intentionally inflicted emotional distress, and acted in bad faith in its audits and protests of Mr. Hyatt.[20] The record in these appeals establishes that FTB committed grievous torts against Mr. Hyatt and that Mr. Hyatt suffered "extreme treatment from FTB,"[21] discussed in detail in ASAB Attachment 1. See also 1991 ASAB Section 1.5.1.

For example, FTB in bad faith overstated the 1992 NPA income by $24 million and now attempts to continue with its outrageous assessment of taxes, interest, and penalties on income that is not taxable by California. (1991 ASAB Sections 1.7.2, 1.8.4.4, 1.8.4.5, 1.9.10; 1992 ASAB, Section 1.7.5).[22] In light of FTB's gross misconduct and extreme bad faith treatment of Mr. Hyatt during the audits and protests, there can be no presumption that FTB's assessments were correct. Given its actions, FTB should have, but did not, produce affirmative evidence to satisfy its initial burden of showing the two assessments were reasonable and rational. Specifically, FTB had to establish that the assessments were not tainted by its gross misconduct. FTB has not done so. Nowhere in its briefing has FTB addressed the fraud, intentional infliction of emotional distress, and bad faith found by the Nevada jury; nor has it addressed the numerous additional acts of misconduct detailed in Appellant's 1991 and 1992 Opening Briefs. Accordingly, your Board must find that FTB has not met its initial burden and that the assessments are invalid as not reasonable or rational. (1991 ASAB Section 1.5.1).

FTB fails to carry its burden of establishing that Mr. Hyatt had California source income. FTB's sourcing assessments are not in the NPAs or NOAs, were not audited or protested, and FTB has the burden but has not carried that burden on the facts or the law. (1991 ASAB Section 1.5.2).

No assessment was made by FTB beyond April 2, 1992, and with no assessment there can be no appeal of an assessment. The 1992 NOA alleges that Mr. Hyatt was a California resident through April 2, 1992, and as such, taxable on income from all sources through that date. No tax has been assessed beyond April 2, 1992. Thus, beyond April 2, 1992, *sourcing is not an alternative theory*. It is a completely new assessment for 1992 that is not made in either the 1992 NPA or

---

[19] 1991 AOB, pp. 4-11; 1992 AOB, pp. 4-12; Updated Testimonial Topics, Exs. T180 and T181; Declaration of Thomas Rodrigue, February 11, 2015, ¶¶ 5, 9, 11, 12; Declaration of Diane Truly, February 13, 2015, ¶¶ 8, 25; Declaration of Candace Les, February 9, 2015, ¶¶ 19, 20, 23.

[20] *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125 (Nev. 2014); ASAB Exhibit 11, Clark County District Court Judgment Order dated September 5, 2008 and ASAB Exhibit 10, Clark County District Court Special Verdict Form dated August 6, 2008. ASAB Attachment 1; Section V of the Second Supplemental Motion To Strike. See also 1991 ASAB, Sections 1.5.1,1. 8, and 1.9.

[21] *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 149 (Nev. 2014). FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.

[22] AAB. See also 1992 AOB, pp. 52-56; 1992 ARB, pp. 93-95.

RJN002071

1992 NOA from which this appeal was taken. Your Board must reverse the assessments that have not been made by FTB and are not found in the NPA and NOA. (1992 AAB, Section II.B, pp. 56-58).

FTB has never assessed a fraud penalty on the sourcing assessments of Mr. Hyatt. (1991 ASAB Section 1.9.1).

FTB fails to carry its burden on the fraud penalties. FTB fraud penalties are made in bad faith, FTB maintains its fraud penalty on its $24 million error, FTB had an abusive policy of using the fraud penalty as leverage to coerce individuals into improper settlements, many senior FTB audit persons did not believe in the residency or fraud assessments, FTB cannot meet the clear and convincing standard. (1991 ASAB Section 1.5.3).

FTB's 1992 fraud penalty is arbitrary for the addition reason that ***FTB improperly based the 1992 fraud penalty on 1991 facts***. (1991 ASAB Sections 1.5.3, 1.8.5.4.2, 1.9.7).

**1.8      FTB MUST NOT BE ALLOWED TO VIOLATE THE ESTABLISHED LAW AND REGULATIONS FOR CONDUCTING AUDITS.**

FTB must not be allowed to violate the established law and regulations for conducting audits, assessing taxes, and appealing tax assessments as it is attempting to do. FTB's audits of Mr. Hyatt have lasted over 20 years and have continued into 2016, FTB has intentionally delayed the administrative process into 2016. Most of the current assessments are not in the NPAs or NOAs, have not been audited or protested, are in large part based on an admitted $24 million FTB error, are tainted by FTB's abusive policy of using the fraud penalty to coerce individuals into improper settlements, and were sprung on Mr. Hyatt during these appeals. (1991 ASAB Section 1.6).

**1.9      FTB'S FRAUDULENT FRAUD PENALTIES.**

    **1.9.1      FTB Used Fraud Penalties And Other Methods To Coerce Settlements.[23]**

The FTB fraud penalties were assessed in bad faith.[24] The fraud penalties are based on 10 trumped up factors that are based on false inferences, speculation and false statements that ignore Mr. Hyatt's eyewitness testimony and documentary evidence. Some of FTB's false statements are rebutted by Mr. Hyatt in his affidavits.[25] FTB has the burden to prove fraud by clear and convincing evidence but each of its factors has been rebutted as to the facts and the law. (1991 ASAB Sections 1.9 to 1.9.10). Further, the FTB audit file misrepresents its document requests to support its fraudulent fraud penalty.[26]

FTB fails to carry its burden on the fraud penalties. FTB fraud penalties are made in bad faith, FTB maintains its fraud penalty on its $24 million error,[27] FTB had an abusive policy of using the fraud penalty as leverage to coerce individuals

---

[23] 1992 RSAB, pp. 24:18-25:3. 1991 ARB, Section III.B, pp. 76-96.
[24] Hyatt's 2008 Affidavit, ¶¶ 69-80; Hyatt's 2014 Supp. Aff. Sections 2.6.4, 2.6.5, 2.6.8, 2.6.9. 1991 ARB, Section III, pp. 14-15; Hyatt's 2016 Supp. CDE Aff., ¶¶ 107-123.
[25] Hyatt's 2012 Supp. Aff. ¶¶ 2 to 45; Hyatt's August 15, 2010 Affidavit Sections 1.10-1.11, 1.13-1.14, 1.17-1.20.
[26] Hyatt's 2014 Supp. Aff., Section 2.6.8.
[27] 1991 ASAB, Sections 1.7.2, 1.8.5.4.4, 1.8.5.4.5.5, 1.8.10; 1992 ASAB, Section 1.7.5.

RJN002072

into improper settlements and FTB cannot meet the clear and convincing standard (1991 ASAB Section 1.5.3). FTB's taxes and penalties on its $24 million error, in addition to the abusive fraud penalties, were assessed by FTB to coerce a settlement. FTB still maintains the taxes and penalties on its $24 million error after your Board ordered an additional briefing that forced FTB to admit to the $24 million error. (1991 ASAB, Section 1.5.3, AAB, Section IV., pp. 12-16).

FTB must not be allowed to violate the established law and regulations for conducting audits, assessing taxes, and appealing tax assessments as it is attempting to do here. FTB's audits of Mr. Hyatt have lasted over 20 years into 2016,[28] and FTB has intentionally delayed the administrative process into 2016 (1992 ASAB, Section 1.8). Most of the current assessments are not in the NPAs or NOAs, have not been audited or protested, are in large part based on an admitted $24 million FTB error that FTB has admitted to but has still not corrected. The fraud assessments are tainted by FTB's abusive policy of using the fraud penalty to coerce individuals into improper settlements even though he FTB audit reviewers were not convinced of fraud. The fraud assessments were not subject to audit or protest but were sprung on Mr. Hyatt during these appeals. (1991 ASAB Section 1.6).

FTB's 1992 fraud penalty is particularly arbitrary because FTB improperly based the 1992 fraud penalty on 1991 facts and because FTB did not audit for 1992 (1991 ASAB, Sections 1.8.4.10, 1.9.7). There was no taxpayer fraud, Mr. Hyatt sold his California house, he packed up, said goodbye, and drove away, and he continues to live in Las Vegas.[29]

FTB in bad faith mischaracterizes Mr. Hyatt's desire for privacy as fraudulent intent (e.g., FTB characterizes the purchase of his Las Vegas Tara home in a trust as fraudulently concealing assets despite the fact that the home was disclosed in his tax return and in the audit file).[30] FTB has no right to dictate how home purchasers take title to their homes.

FTB issued the fraud penalties in bad faith. A significant basis for issuing fraud penalties puts the blame on Mr. Hyatt for FTB's failure to gather evidence. A fraud penalty was assessed for 1992 even though there was no separate audit for 1992. FTB accuses Mr. Hyatt of concealing documents disclosed in his 1991 part year tax return. FTB rubber stamped the 1992 fraud audit to coerce a settlement by Mr. Hyatt.[31]

### 1.9.2    FTB Has Failed To Carry Its Burden Of Proving Fraud.

The burden of proof is upon FTB to show fraud by clear and convincing evidence but FTB has not met its burden to prove fraud.[32] (1991 ASAB Sections 1.5.1, 1.5.3). Overwhelming documentary and testimonial evidence establishes that Mr.

---

[28] In these appeals, FTB has engaged in endless audits that have lasted over 20 years and are continuing even now; e.g., FTB conducted its most recent deposition less than six months ago in April 2016 (Deposition of Charles Cameron, April 7, 2016).
[29] See, e.g., Hyatt's 2012 CDE Aff., ¶¶ 7-51; Hyatt's 2016 Supp. CDE Aff., ¶¶ 7-74.
[30] 1991 ARB, Section III, pp. 14-15; Hyatt's 2016 Supp. CDE Aff., ¶¶ 114-116.
[31] See, e.g., Hyatt's 2008 Affidavit, ¶¶ 69-80; Hyatt's 2014 Supp. Aff. Sections 2.6.4, 2.6.9.
[32] 1991 AOB, Section III.B, pp. 57-62.

RJN002073

Hyatt moved to Las Vegas and that he believed that he was a Nevada resident and he was a Nevada resident (1992 ASAB, Sections 1.5.1 to 1.5.8). FTB did not and cannot produce clear and convincing evidence of intent to defraud. (1991 ASAB Section 1.9.4).

Your Board should make note that FTB has never assessed a fraud penalty on the sourcing assessments. (1991 ASAB Section 1.9.1).

The accuracy related fraud penalty for 1991 was improperly imposed and should be removed,[33] and the failure to file fraud penalty for 1992 was improperly imposed and should be removed.[34] The 1991 fraud penalty and 1992 fraud penalty are significantly different fraud penalties.

Mr. Hyatt had a reasonable cause and good faith belief that he satisfied the legal requirements for Nevada residency for the 1991 disputed period and all of 1992,[35] he did satisfy the requirements and he is still a resident of Nevada now 25 years later.

FTB did not respond in its ROBs to Mr. Hyatt's February 2, 2001 protest supplement on FTB fraud allegations.[36] FTB imposed the 1992 fraud penalty as an afterthought to a quick audit and the penalty was not even initially suggested by Auditor Cox. As of June 2008, Ms. Cox did not know who made the determination to assess a 1992 fraud penalty. Carol Ford stated ""[w]e determined the 1992 fraud penalty should be assessed for 1992, since the facts and circumstances were the same as 1991." The material for the 1992 fraud penalty was taken from the 1991 fraud penalty write-up. There is nothing in the record showing any independent grounds for imposing the fraud penalty for 1992. FTB has not met its burden of proving the 1992 fraud penalty by clear and convincing evidence.[37]

FTB's burden to prove fraud by clear and convincing evidence is undisputed. However, FTB failed to prove that Mr. Hyatt had "the specific intent to evade a tax believed to be owing." Mr. Hyatt believed that he did not owe any tax to California after he filed his 1991 California tax return. In addition, Mr. Hyatt did not have the intent to evade any taxes, and particularly, a tax that he did not owe to California.[38]

FTB's argument that Mr. Hyatt was a nonresident for the purpose of sourcing precludes proof by clear and convincing evidence that Mr. Hyatt was a California resident (1991 ASAB Section 1.9.3).

The FTB fraud penalties were assessed in bad faith (1991 ASAB Section 1.9).

---

[33] 1991 AOB, Section III, pp. 56-63; 1991 ARB, Section III, pp. 73-76.
[34] 1992 AOB, Section IV, pp. 56-65.
[35] Hyatt's 2008 Affidavit, ¶¶ 69-80; Hyatt's 2014 Supp. Aff. Sections 2.6.4.6, 2.6.5.
[36] 1992 AOB, Section IV.D, pp. 63-65.
[37] 1992 AOB, Section IV.D, pp. 63-65.
[38] 1991 ARB, Section III.C, pp. 96-99.

RJN002074

This case is not about taxpayer fraud, it is a case of FTB fraud. The fraud assessments are based upon a litany of facts distorted by FTB to create fraud assessments when it is FTB that has committed fraud. (1991 ASAB, Section 1.9.1).

The simple fact that the FTB audit reviewers were not convinced of fraud should be dispositive of the fraud penalties. The fact that FTB audit reviewers, Ms. Ford and Ms. Marshall-Morgan, disagreed with assessment of the fraud penalty precludes a finding that FTB has provided clear and convincing evidence of fraud. (1991 ASAB, Section 1.9.2).

The simple fact that FTB does not have confidence in its assessments against Mr. Hyatt is critical; all of FTB's experts on its audit task force, including the lead auditor, were doubtful about FTB's residency cases and FTB made a sourcing assessment that is inconsistent with its residency assessment. (1991 ASAB, Section 1.9.3).

FTB has disregarded Mr. Hyatt's eyewitness testimony regarding the 10 factors of fraud. (Hyatt's 2014 Supp. Aff., Sections 2.6.4.1 to 2.6.4.15).

FTB has not satisfied its overall burden to establish that the fraud penalties apply with the required clear and convincing evidence. FTB has not shown by clear and convincing evidence that Mr. Hyatt intended to evade taxes known to be owing. Overwhelming eyewitness and documentary evidence establishes that Mr. Hyatt moved to Las Vegas, that he believed he was a Nevada resident and that he was a Nevada resident, that he registered to vote in Nevada and that he carried out many other Nevada activities,[39] FTB cannot produce clear and convincing evidence of intent to defraud. (1991 ASAB Section 1.9.4).

FTB first asserted its bad faith fraud penalties with a whole litany of false fraud factors in the audit determination letter that were patently absurd and have subsequently been dropped by FTB. The initial assertions of fraud have been abandoned by FTB. (1991 ASAB Section 1.9.5).

The fraud penalties must be reversed for the additional reason that FTB failed to follow the statutory requirements for assessing the fraud penalties; e.g., FTB failed to set forth the reasons for assessing the fraud penalty in the NPA as required by California law. The 1991 and 1992 NPAs both recite only the fraud penalty statute with a statement that the penalty is 75% of the underpayment. They do not recite the reasons for assessing the fraud penalty as required by Section 19034. Furthermore, FTB no longer relies on most of the fraud factors cited by the auditors in their determination. For example, Mr. Hyatt did not conceal assets. He disclosed his Las Vegas Tara Avenue home and his Nevada situs Franklin Fund investment account in his California 1991 part year tax return. (1991 ASAB Section 1.9.6)

---

[39] Hyatt's 2012 CDE Aff., Hyatt's 2016 Supp. CDE Aff., Hyatt's 2016 Post-DP CDE Aff.; Updated Testimonial Topics Exs. T008, T009, T018, T021, T128, T019, T095, T096, T129, T030, T031, T032, T134, T034, T035, T135, T097, T136, T040, T138, T139, T041, T042, T043, T140, T045, T141, T044, T046, T047, T147, T048, T103, T160, and T161. Hyatt's 2008 Affidavit, ¶¶ 12-21, 81; Hyatt's August 15, 2010, Affidavit, Sections 1.5-1.7.

RJN002075

FTB has not satisfied its initial burden to establish the fraud penalties are not arbitrary. FTB assess the 1992 fraud penalty based on 1991 facts even though the facts for 1992 are completely different. Proof of fraud in one year will not establish fraud for another year. FTB has not proven that the 1991 and 1992 fraud penalty assessments were not tainted by FTB's highly improper policy of imposing fraud penalties to coerce settlements. (1991 ASAB Section 1.9.7).

FTB failed to establish by clear and convincing evidence that any alleged underpayment is due to fraud by Mr. Hyatt. Mr. Hyatt did not believe he owed California taxes and FTB has not established that he believed otherwise. (1991 ASAB Section 1.9.8).

FTB's factors of fraud and FTB's attacks on other witnesses are disingenuous and disregard the facts, the law, and the seriousness of the fraud issue. FTB provides only generalized argument instead of clear and convincing evidence. The *Appeal of Adickes* is not relevant. Mr. Hyatt actually moved to Nevada. There is no issue of fabricated documents and Mr. Hyatt's three CDE affidavits authenticate and explain thousands of documents. The testimony of 150 eyewitnesses that is reinforced over and over again by similar testimony of other eyewitnesses cannot be overcome by FTB's false inferences and speculation. (1991 ASAB, Section 1.9.9).

The 1992 fraud penalties are a continuing bad faith act by FTB. FTB has removed the $24 million payments caused by FTB's income error from the disputed period but FTB left the fraud penalties in place. FTB should have dropped the associated fraud penalty when it acknowledged the $24 million was not received during the disputed period (1991 ASAB Section 1.9.10).

### 1.9.3 The Ten Factors Cited By FTB Do Not Establish Fraud.[40]

Because Mr. Hyatt is charged with fraud, he must be heard. Your Board is requested to review his testimony under oath about the ten factors in Hyatt's 2014 Supp. Aff., Sections 2.6.4.1 to 2.6.4.15 and his more detailed discussion in ASAB Attachment 2. Furthermore, your Board is requested to review FTB's bad faith acts regarding the fraud penalty that is further testified to under oath in Hyatt's 2014 Supp. Aff., Sections 2.6.1 to 2.6.3 and 2.6.5 to 2.6.10.

First factor: Reliance on the identical alleged "physical presence" residency findings does not support a fraud penalty.[41] Mr. Hyatt's overwhelming presence was in Las Vegas not in California as falsely alleged by FTB (1992 ASAB, Sections 1.5, 1.5.1 to 1.5.8). A total of 72-witnesses testified about Mr. Hyatt moving away in 1991. (ASAB Attachment 2, Section 2; Hyatt's 2014 Supp. Aff., Section 2.6.4.6). Out of 190 days in the disputed period, Mr. Hyatt had 125 full days in Nevada, 37 days partly in Nevada and partly in California (each time for a temporary or transitory purpose) and 9 full days in

---

[40] 1992 RSAB, pp. 24:18-25:3. 1991 ARB, Section III.B, pp. 76-96.
[41] 1991 ARB, Section III.B.1, pp. 76-77.

RJN002076

a California hospital as he recovered from cancer surgery.[42] (1992 ASAB Section 1.5.8). This overwhelming physical presence in Nevada establishes that Mr. Hyatt did in fact move to Nevada and overrides any FTB inference that he did not have a good faith belief that he had moved to Nevada.

Exhibits CDE-ST002 and CDE-ST003[43] are tables summarizing Mr. Hyatt's presence for many days in the disputed period with citations to Mr. Hyatt's eyewitness and documentary evidence that rebuts FTB's false inferences. See also the Testimonial Topics table.[44]

Second factor: The sale of Mr. Hyatt's former California house on October 1, 1991 was a bona fide sale, not a sham as falsely alleged by FTB (Section 1.6.1.1 in Appellant's 1991 Concluding Summary).[45] For example, two former elected Orange County assessors, Bradley Jacobs and Webster Guillory, have confirmed that the sale of Mr. Hyatt's former La Palma house on October 1, 1991, was a bona fide sale. (1992 ASAB, Section 1.5.1; ASAB Attachment 2, Section 3; Hyatt's 2014 Supp. Aff., Section 2.6.4.7). Furthermore, dozens of witnesses stated that Mr. Hyatt sold the Jennifer Circle house and moved away: 16-witnesses testified about the sale of Mr. Hyatt's California house in October 1991, 4-witnesses testified that Ms. Jeng paid the deposit or Mr. Hyatt received the deposit on the purchase of the Jennifer Circle house, 26-witnesses testified about Mr. Hyatt's decision to move to Las Vegas, 32-witnesses testified about Mr. Hyatt's preparation to move to Las Vegas in 1991, 72-witnesses testified about Mr. Hyatt moving away in 1991, 28-witnesses testified about Mr. Hyatt moving away in September 1991, 22-Jennifer Circle neighbors testified about Mr. Hyatt moving away in 1991, 15-witnesses testified that an Asian woman (or Ms. Jeng) moved into the Jennifer Circle house after Mr. Hyatt moved away in 1991, 16-witnesses testified that an Asian woman (or Ms. Jeng) lived alone at the Jennifer Circle house, and 23-witnesses testified that they did not ever again see Mr. Hyatt at Jennifer Circle after he moved away in 1991.[46]

Third factor: Mr. Hyatt did not suppress evidence of his stay at the Continental Hotel as falsely alleged by FTB.[47] Because he was part of a van tour the Continental Hotel did not register van tour guests and made no record of Mr. Hyatt's stay at the hotel. Continental Hotel President Ira Levy, Director of Operations Michael C. Fox and other former hotel employees all testified that tour guests did not register at the Continental Hotel in late 1991 and thus the hotel did not maintain

---

[42] Rebuttal to FTB Att. A/F, Section I. A., day by day analysis.
[43] Exhibits attached to Hyatt's 2016 Supp. CDE Aff.
[44] Testimonial Topics, Ex. T008, T009, T018, T021, T128, T019, T095, T096, T129, T026, T022, T023, T024, T025, T100, T057, T030, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047, T147, and T048.
[45] 1991 ARB, Section III.B.2, pp. 77-83.
[46] Updated Testimonial Topics, Exs. T124, T125, T001, T002, T007, T006, T102, T120, T121, and T127, respectively.
[47] 1991 ARB, Section III.B.3, pp. 83-86.

RJN002077

records of tour guests. There were no records of Mr. Hyatt's stay at the Continental Hotel to suppress. (ASAB Attachment 2, Section 4; Hyatt's 2014 Supp. Aff., Section 2.6.4.8; Rebuttal to FTB Att. A/F, Section I. F., September 29, 1991).

Fourth factor: Mr. Hyatt did not "conceal/destroy" DNC Corporate records as falsely alleged by FTB.[48] DNC was known to all three auditors who worked on Mr. Hyatt's 1991 and 1992 audits and DNC was secretly audited by FTB. (ASAB Attachment 2, Section 5; Hyatt's 2014 Supp. Aff., Section 2.6.4.9; Rebuttal to FTB Att. A/F, Section I. C., August 9, 1991).

Fifth factor: Mr. Hyatt and his representatives cooperated during audit and protest and did not fail to cooperate as falsely alleged by FTB.[49] All three auditors as well as three protest hearing officers all concurred that Mr. Hyatt cooperated at audit. (ASAB Attachment 2, Section 6; Hyatt's 2014 Supp. Aff., Section 2.6.4.10).

Sixth factor: Mr. Hyatt produced extensive records to support his 1991 tax return and did not produce inadequate records as falsely alleged by FTB. However, FTB in bad faith disregarded much of the records that Mr. Hyatt produced during the audit and then assessed a fraud penalty in large part because it claimed that records that were in the audit file were not produced.[50] Mr. Hyatt kept adequate records of his moving expenses because he moved himself by pulling a trailer to Las Vegas and thus had no records of moving expenses. (ASAB Attachment 2, Section 7; Hyatt's 2014 Supp. Aff., Section 2.6.4.11).

Seventh factor: Mr. Hyatt did not abuse corporate form as falsely alleged by FTB.[51] Neither Mr. Hyatt nor DNC deducted personal expenses as business expenses and FTB's false statements to that effect do not constitute clear and convincing evidence of fraud. (ASAB Attachment 2, Section 8; Hyatt's 2014 Supp. Aff., Section 2.6.4.12).

Eighth factor: The California income Mr. Hyatt received in 1991 was properly reported on his 1991 part-year tax return and Mr. Hyatt did not fail to report income as falsely alleged by FTB.[52] Mr. Hyatt properly reported the $200,000 and $400,000 payments he received from Pioneer and Philips during 1991 on his 1991 part year tax return. (ASAB Attachment 2, Section 9; Hyatt's 2014 Supp. Aff., Section 2.6.4.13).

Ninth factor: Mr. Hyatt provided truthful and accurate statements to the government and does not have a propensity to make false statements to government as falsely alleged by FTB.[53] Mr. Hyatt properly registered to vote in Nevada and Mr. Zuzak has refuted Mr. Dameron's false hearsay statement that Mr. Zuzak told him Mr. Hyatt was on Jennifer Circle in October 1991. (ASAB Attachment 2, Section10; Hyatt's 2014 Supp. Aff., Section 2.6.4.14).

---

[48] 1991 ARB, Section III.B.4, pp. 86-87.
[49] 1991 ARB, Section III.B.5, pp. 87-89.
[50] 1991 ARB, Section III.B.6, pp. 89-90.
[51] 1991 ARB, Section III.B.7, pp. 91-93.
[52] 1991 ARB, Section III.B.8, pp. 93-94. Hyatt's 2008 Affidavit, ¶¶ 61-62.
[53] 1991 ARB, Section III.B.9, pp. 94-96.

RJN002078

<u>Tenth factor</u>: Mr. Hyatt did not solicit false testimony as falsely alleged by FTB. Mr. Hyatt's witnesses did not offer false testimony. (ASAB Attachment 2, Section 11; Hyatt's 2014 Supp. Aff., Section 2.6.4.15). FTB offered no evidence that Mr. Hyatt was even present at any witness interviews.

**1.10 THE PHILIPS DOCUMENTS SIGNIFICANTLY SUPPORT MR. HYATT'S RESIDENCY AND SOURCING APPEALS.**

The Philips documents significantly support Mr. Hyatt's residency and sourcing appeals; e.g., the Philips documents confirm that Philips alone created, managed, and financed the Philips Licensing Program, that Philips used its worldwide licensing team to license Mr. Hyatt's patents under the Philips Licensing Program, and that the Philips documents contain Mr. Hyatt's Las Vegas contact information (1991 ASAB Section 1.7, ASAB Philips document tables (Ex. 1-15)).

The Philips documents significantly support Mr. Hyatt's appeals, illustrated by 15 tables of excerpts from and cites to more than 5,000 pages of Philips documents, which were disregarded by FTB (1991 ASAB Section 1.7.1).

The Philips documents detail FTB's bad faith $24 million income error (1991 ASAB Section 1.7.2).

The Philips documents confirm that Philips created, managed, and operated the Philips licensing program as testified to by highly credible eyewitnesses (1991 ASAB Section 1.7.3).

The Philips documents confirm that Mr. Hyatt had only limited involvement in the large worldwide Philips licensing program (1991 ASAB Section 1.7.9).

FTB's overbroad Philips subpoenas forced Mr. Hyatt to obtain New York court orders and temporary restraining orders to protect his confidential information and to avoid an overbroad production (1991 ASAB Section 1.7.4).

"Philips by itself and through its attorneys created and managed the Licensing Program," "Philips managed the licensing program from its offices in New York and the Netherlands," Mr. Hyatt did not have the rights to license his own patents (1991 ASAB Section 1.7.3).

The Philips documents refute FTB's claim that Mr. Hyatt operated a licensing business at the Jennifer Circle house. Mr. Hyatt was contractually prohibited from operating a licensing business. (1992 ASAB Sections 1.4.1.3, 1.7.3).

FTB attempts to misrepresent to your Board that Mr. Hyatt had a California licensing business by quoting statements Mr. Hyatt made in a radio interview with Mike Malone in May 1991.[54] During the interview Mr. Hyatt indicated that his people had been approached by a group of companies and were negotiating with them. (Malone Transcript, p. 2). At this time Mahr Leonard had exclusive rights to negotiate with four companies pursuant to a First Amendment (GLR 04064) to the December 18, 1990, Mahr Leonard Agreement.[55] Mahr Leonard was doing the negotiating. In addition, the July 1991 Philips Agreement (FTB_Philips 0000596-0000635) was proceeding. Under the July 1991 Philips Agreement, Philips had the

---

[54] KTEH San Jose Public Television, May 20, 1991 (FTB Exhibit P, Tab 27); FTB Attachment A-R, pp. 12-13.
[55] Mahr Leonard Representation Agreement, December 18, 1990, GLR 094055-04062.

RJN002079

responsibility to sublicense Mr. Hyatt's patents. Mr. Hyatt did not personally negotiate sublicenses that were signed under the Phillips Licensing Program.

As another example of FTB's misrepresentations, in its Attachment A-R, p. 13, FTB falsely accuses Mr. Hyatt of misstating his former employment during the Malone interview. According to FTB, Mr. Hyatt described his former employment at Teledyne as "research scientist" while Barry Lee stated Mr. Hyatt worked in marketing. However, both statements were correct. Mr. Hyatt testified that his job title at Teledyne was "research scientist" and that he was an engineer in the Advanced Systems Division which was under the marketing department.[56] Thus the statements of Mr. Hyatt and Mr. Lee were both correct.

### 1.11    FTB'S BAD FAITH ATTACKS ON EYEWITNESS TESTIMONY BASED ON FTB'S UNSUPPORTED SPECULATION OF THE MEANING OF DOCUMENTATION.

Mr. Hyatt and his eyewitnesses testified under oath or penalty of perjury. However, FTB attacks this ***direct eyewitness testimony*** based upon fabricated stories and incorrect speculation about various documents. FTB's speculation should be disregarded in view of this ***eyewitness testimony*** (Sections 1.11.4, 1.11.5).

#### 1.11.1    Mr. Hyatt Has Provided More Than 220 Sworn Affidavits And Declarations Signed By More Than 150 Witnesses That All Support Mr. Hyatt's Facts.

More than 150 witnesses signed more than 220 sworn affidavits or declarations under oath or penalty of perjury that all support Mr. Hyatt's facts.[57] See Updated Index of Affidavits and Updated Testimonial Topics table, Sections 1.3.1 and 1.3.3. Many witnesses testified about Mr. Hyatt's decision to move to Las Vegas, about his preparation to move to Las Vegas, that he permanently moved away from his former residence in La Palma, California in September 1991, that he sold his La Palma house in October 1991, that he moved into his Las Vegas Tara home in April 1992, and that he permanently resided in Las Vegas, Nevada.[58]

#### 1.11.2    FTB's Attacks On Eyewitness Testimony Are Made In Bad Faith.[59]

FTB's attempt to discredit the testimony of more than 100 witnesses by using false inferences and speculation must be rejected. Mr. Hyatt's eyewitness and documentary evidence confirms that the testimony of the eyewitnesses was correct

---

[56] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.18, p. 75, Annex XI, Ex. 13.

[57] 1991 AOB, Section II.C.19, pp. 37-38; see rebuttal to FTB's false statements at 1991 ARB, Section II.A.19, pp. 58-67. See Mr. Hyatt's response to FTB's false statements regarding this *Bragg* factor, 1992 ASB, Section I.E.17, pp. 51-52; 1991 ASAB, Section 1.8.6.

[58] Updated Testimonial Topics, Exs. T001, T002, T003, T005, T006, T007, T124, T018, T128, and T049. See also Updated Testimonial Topics, Exs. T008, T009, T021, T019, T095, T096, T129, T026, T022, T023, T024, T025, T100, T057, T030, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047, T147, and T048.

[59] 1991 ASAB Section 1.8.6.

-13-

RJN002080

and FTB was wrong. No inference about Mr. Hyatt's location can be drawn from *mis-addressed documents* (1991 ASAB, Section 1.8.6.1).

FTB makes hundreds of false allegations about eyewitness testimony based on FTB's bad faith acts and false inferences. FTB disregards or misrepresents overwhelming eyewitness testimony and documentation that disprove its false inferences and that is reinforced by numerous eyewitnesses. (1991 ASAB, Section 1.8.6.2).

FTB's attacks on the true and correct statements in Mr. Hyatt's affidavits are based on FTB's bad faith acts and false inferences. FTB disregards or misrepresents overwhelming eyewitness testimony and documentation that disprove its false inferences and that is reinforced by numerous eyewitnesses. (1991 ASAB, Section 1.8.6.3).

FTB's attacks on credible third party eyewitnesses must be disregarded for the additional reason that the eyewitness statements do not stand alone. Eyewitness statements are reinforced by consistent testimony from dozens of other eyewitnesses: 72-witnesses testified about Mr. Hyatt moving away in 1991. (1991 ASAB, Section 1.8.6.4).

FTB took numerous depositions of the Hyatt witnesses and Philips witnesses but FTB did not brief the deposition testimony because the testimony supported Mr. Hyatt (1991 ASAB, Section 1.8.6.5).

### 1.11.3 FTB's Attack On The Credibility Of Witness Testimony Provided In Support Of Mr. Hyatt Are Baseless.[60]

FTB's arguments about witness credibility are unsupported.[61] Who "penned" the sworn statements does not determine credibility of a sworn statement.[62] FTB's "scripted" allegations are meaningless.[63] Asking a witness to submit testimony in the form of an affidavit or declaration has no bearing on the credibility of such testimony.[64] Refreshing a witness' memory is entirely proper and has no bearing on the credibility of the affidavits or declarations.[65] Extra-statutory compensation does not undermine the credibility of affidavits or declarations.[66] Mr. Hyatt's relationships with witnesses do not undermine the credibility of the affidavits or declarations.[67]

FTB's specific "objections" to the affidavits provided in support of Mr. Hyatt are without merit. Affidavits are an approved form of presenting evidence to your Board.[68]

---

[60] 1991 ASB, Section III, pp. 15-99.
[61] 1991 ASB, Section VI, pp. 98-99; 1991 ASB, Section III.A, pp. 16-25.
[62] 1991 ASB, Section III.A.1, pp. 17-20.
[63] 1991 ASB, Section III.A.2, pp. 20-21.
[64] 1991 ASB, Section III.A.3, pp. 21-22.
[65] 1991 ASB, Section III.A.4, p. 23.
[66] 1991 ASB, Section III.A.5, pp. 23-24.
[67] 1991 ASB, Section III.A.6, p. 24.
[68] 1991 ASB, Section III.B, pp. 25-98.

RJN002081

Mr. Hyatt's eyewitnesses testified that FTB private investigators provided false testimony about them (1991 ASAB Section 1.8.4.8). The declarations by FTB's private investigators should be afforded no weight in these appeals.[69]

Dozens of eyewitnesses made over one thousand statements under oath or penalty of perjury identifying and correcting false statements that FTB made about them or about events that they had witnessed. This overwhelming testimony is provided in six tables of Testimonial Responses (Testimonial Responses to FTB's statements made in its 1991 ROB, 1992 ROB, 1991 RRB, 1992 RRB, 1991 Attachment A and 1992 Attachment A) (See Section 1.3.4). This overwhelming testimony is further provided in six tables of FTB false responses (two tables of false statements made in the FTB audit file, two tables of false statements made by FTB private investigator Jake Dameron, and two tables of false statements made by FTB private investigator William Savage) (See Sections 1.3.7, 1.3.8).

FTB's misrepresentations and false statements are further illustrated with its treatment of Thomas McGuire, Mr. Hyatt's Las Vegas real estate agent and Mr. Hyatt's house hunting activities with Mr. McGuire in Las Vegas.

FTB has made many false statements concerning Mr. McGuire. At FTB Attachment A-R, p. 70, FTB fabricates a ridiculous story that handwritten notes that Mr. Hyatt made while walking through houses (relative to purchasing) with Mr. McGuire on December 11, 1991, (H 013694), were made during a telephone conversation. Mr. Hyatt's handwritten notes comment on several different Las Vegas houses that Mr. Hyatt and Mr. McGuire walked through on December 11, 1991. They have both provided their eyewitness testimony that they personally walked through on December 11, 1991. Mary Stratton, owner of the Tara house which Mr. Hyatt bought on April 3, 199, also confirmed that she and her husband gave Mr. Hyatt and Mr. McGuire a tour of the Tara house and grounds on December 11, 1991.[70]

At FTB Attachment A-R, p. 70, FTB falsely states that Mr. Hyatt frequently deals with Mr. McGuire by facsimile and telephone from his Jennifer Circle "home/business". The eyewitness testimony of Mr. McGuire and Mr. Hyatt confirms that Mr. McGuire dealt with Mr. Hyatt in person and not by telephone.[71] Furthermore, Mr. Hyatt did not have a "home/business" at his former La Palma house. He left the La Palma house when he sold it on October 1, 1991, and he returned for a visit late 1992.[72] Mr. McGuire stated in a December 16, 1991, purchase offer for the Las Vegas Tara house that he "has counciled [sic] buyer [Mr. Hyatt] on many propertys" (P 05649-5650).

---

[69] 1991 ASB, Section I, pp. 6-12.
[70] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 48, 50; Hyatt's August 15, 2010, Aff., § 1.9; Affidavit of Mary Trotter Stratton, June 21, 2010, ¶ 27; Rebuttal to FTB Att. A/F, Section I. C., December 11, 1991.
[71] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 6, 54, 58, 69-73; Hyatt's August 15, 2010, Aff., § 1.9; Rebuttal to FTB Att. A/F, Section I. D., December 11, 1991.
[72] Hyatt's August 15, 2010, Aff., § 1.19.1.

RJN002082

At FTB Attachment A-R, p. 70, FTB falsely states that Mr. Hyatt and Mr. McGuire did not meet personally until about a month before the April 1992 closing on the Las Vegas Tara Avenue home. This statement is belied by the Hyatt notes (H 013694) and related eyewitness testimony of Mr. McGuire, Mr. Hyatt, and Ms. Stratton as discussed above, which show that Mr. McGuire had been showing Mr. Hyatt houses in Las Vegas in December 11, 1991. Mr. McGuire further testified that he met Mr. Hyatt one or two months prior to the December 16, 1991, purchase offer on the Las Vegas Tara house (P05649-5650), not one or two months prior to the April 1992 closing on the Tara Avenue house.[73]

FTB falsely states that Mr. McGuire stated he represented the Strattons and "recalled it was Grace Jeng who was house hunting and he did not meet Mr. Hyatt until about a month before the offer on the Tara house was accepted.[74] Mr. McGuire categorically denies he represented the Strattons and states that he personally showed houses to Mr. Hyatt and does not remember taking Mr. Hyatt and Ms. Jeng house hunting together.[75]

FTB sent Mr. McGuire a proposed declaration for his signature that contained many false statements. Mr. McGuire marked up the proposed declaration by crossing out and marking many of the false statements.[76] Mr. McGuire states that the proposed declaration was drafted without his knowledge, misrepresents what he told Mr. Savage and Ms. Lundvall, is not correct, and he did not sign it.[77] The declaration misstates what Mr. McGuire purportedly told Ms. Lundvall in a telephone conversation. He crossed out many of the statements in the proposed declaration and refused to sign it.[78] Mr. Savage also made false statements in a Memorandum of Interview dated August 9, 2009, that mischaracterized a telephone conversation with Mr. McGuire.[79]

### 1.11.4  FTB Continues It's Bad Faith Attacks On Mr. Hyatt Questioning The True And Correct Statements In His Affidavits.

FTB continues it's bad faith attacks on Mr. Hyatt by questioning the true and correct statements in his affidavits. FTB's inferences and speculation cannot overcome Mr. Hyatt's eyewitness testimony provided under oath in his affidavits. (ASAB Attachment 3).

Mr. Hyatt was not present at his former La Palma house between October 1, 1991, when he sold the house, and late 1992 as falsely contended by FTB (1991 ASAB, Sections 1.8.4.1 to 1.8.4.7). A total of 72-witnesses testified about Mr. Hyatt moving away in 1991. (ASAB Attachment 3, Section 2).

---

[73] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 6, 8-9, 58, 69-73; Rebuttal to FTB Att. A/F, Section I. E., December 11, 1991.
[74] FTB 1991 Reply Brief, pp. 10:23-11:3.
[75] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 4-6.
[76] Exhibit 1 to Mr. McGuire's 2012 Affidavit, March 31, 2012, Annex XXV, Ex. 55.
[77] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 7-9, 15-47, Annex XXV, Ex. 55.
[78] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 16-42, Annex XXV, Ex. 55.
[79] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 43-47, Annex XXV, Ex. 55.

Mr. Hyatt did not send faxes from his former La Palma house after October 1, 1991, as falsely contended by FTB. Mr. Hyatt's only fax machine was located in Las Vegas. (1991 ASAB, Sections 1.8.4.5, 1.8.4.6; ASAB Attachment 3, Section 3; Mr. Hyatt's August 15, 2010 Affidavit, Sections 1.16, 1.20; Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991).

Mr. Hyatt did not attend the meetings at Mr. Roth's office on September 24, 1991, as falsely contended by FTB. Mr. McHenry, Mr. Roth and Mr. Hyatt all confirm that that Mr. Hyatt did not attend the meetings at Mr. Roth's office. (ASAB Attachment 3, Section 4; Rebuttal to FTB Att. A/F, Section I. A., September 24, 1991).

Mr. Hyatt returned from the East Coast to Las Vegas on October 21, 1991 (1991 ASAB, Section 1.5.6.2), not October 23, 1991, as falsely contended by FTB. Mr. Hyatt signed a Security Acknowledgment and Release in Las Vegas that was witnessed by Ms. Kopp and opened a Las Vegas P.O. Box on October 21, 1991, after returning to Las Vegas from New York. (ASAB Attachment 3, Section 5; Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991).

Mr. Hyatt did not remain in New York on October 22-23, 1991, as falsely contended by FTB. (ASAB Attachment 3, Section 6; Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991).

Mr. Hyatt did not negotiate with Hitachi and did not negotiate any patent agreements during the disputed period as falsely contended by FTB. Mr. Hyatt would have breached the July 1991 Philips Agreement if he had negotiated with Hitachi or negotiated any patent agreement. (1992 ASAB, Section 1.7.3; ASAB Attachment 3, Section 7; Rebuttal to FTB Att. A/F, Section I. C., November 30, 1991).

Mr. Hyatt resided in the Continental Hotel from September 26, 1991, and then resided in the Wagon Trails apartments from October 21, 1991. A total of 37-witnesses testified about Mr. Hyatt's stay at a Las Vegas hotel and 15-witnesses testified about visiting Mr. Hyatt at his Las Vegas apartment. (ASAB Attachment 3, Section 8).

Mr. Hyatt did not have an expectation that potential licensees would sign license agreements. Matsushita and Fujitsu had not tendered current offers by September 25, 1991, as falsely contended by FTB. (ASAB Attachment 3, Section 9).

Mr. Hyatt had no discretion over distribution of the license payments from Fujitsu, Matsushita and Oki. Mr. Hyatt promptly distributed the license payments as required by the [First] Supplemental Agreement. (ASAB Attachment 3, Section 10).

Mr. Hyatt was in Las Vegas on November 7, 1991, when he wrote the drafts to distribute the Fujitsu license payment to Philips and Mahr Leonard. Testimony by Messrs. Connell, Moreno, Salzer and Hyatt all place Mr. Hyatt in Las Vegas on November 7, 1991. (ASAB Attachment 3, Section 11).

Mr. Hyatt did not send a "markup" draft letter to Philips on November 22, 1991. (ASAB Attachment 3 Section 12).

RJN002084

Philips drafted and approved the February 3, 1992, letter to Toshiba. (ASAB Attachment 3, Section 13).

On February 27, 1992, Mr. Hyatt was in Las Vegas, not in California as alleged by FTB. A mis-addressed FedEx delivery does not mean Mr. Hyatt was in California. (1991 ASAB, Section 1.8.4.4; ASAB Attachment 3, Section 14; Rebuttal to FTB Att. A/F, Section I. A., February 27, 1992).

Mr. Hyatt drove from Las Vegas to California On March 30, 1992, and returned to Las Vegas on March 31, 1992, contrary to what is alleged by FTB. Mr. Hyatt met with Mr. Hudson for an inspection of the Las Vegas Tara house on March 31, 1991. (ASAB Attachment 3, Section 15; Rebuttal to FTB Att. A/F, Section I. A., March 31, 1992).

### 1.11.5  The Testimony Of Mr. Hyatt's Eyewitnesses Is True And Correct.

Mr. Roth accurately testified that Mr. Hyatt did not meet with Mr. McHenry, Mr. Rudestam, Mr. Tamoshunas, Mr. Haken, Mr. Mahr or Mr. Leonard at Mr. Roth's office on September 24, 1991. (ASAB Attachment 4, Section 2; Rebuttal to FTB Att. A/F, Section I. A., September 24, 1991).

Mr. Roth accurately testified that Mr. Hyatt did not negotiate with Hitachi. Mr. Hyatt's only meetings with Hitachi were a 45 minute "get acquainted" meeting on December 16, 1991, and a meeting in Texas on May 26, 1992. Mr. Hyatt did not negotiate with Hitachi at these meetings or at any other time. (1992 ASAB, Section 1.7.3; ASAB Attachment 4, Section 3).

Mr. Roth accurately testified that he met with Mr. Hyatt on March 31, 1992, but Mr. Hyatt did not negotiate with Hitachi on March 31, 1992 or May 26, 1992. (1992 ASAB, Section 1.7.3; ASAB Attachment 4, Section 4).

Mr. Roth accurately testified that Mr. Hyatt did not attend the dinner show with Hitachi on January 28, 1992. (ASAB Attachment 4, Section 5).

Mr. Roth accurately testified that the licensing correspondence was primarily between Philips, Mahr Leonard, PSB&C and the licensees and Mr. Hyatt was outside the mainstream of the licensing correspondence as shown by the licensing correspondence set forth in Exhibit 67.to Mr. Roth's Sourcing Affidavit (1991 ASAB, Section 1.7.1 and Exhibits 9-11; ASAB Attachment 4, Section 6).

Mr. Hyatt's family members accurately testified that Mr. Hyatt was in Las Vegas on October 21, 1991. (1992 ASAB, Section 1.5.6.2). (ASAB Attachment 4, Section 7).

FTB seeks to deceive your Board by implying Mr. Rudestam testified about photographs from a non-existing portrait photoshoot on October 6, 1991, when he did not. (ASAB Attachment 4, Section 8)

FTB seeks to deceive your Board by implying Mr. McHenry testified about "all" photographs when he only denied involvement with specific photographs. (ASAB Attachment 4, Section 9).

RJN002085

XCS witnesses testified accurately and no false testimony was solicited. XCS witnesses Maldonado and Tran submitted accurate affidavits. (ASAB Attachment 4, Section 10).

Dr. Peloquin testified accurately and no false testimony was solicited. Dr. Peloquin accurately testified that three handwritten dates on a letter produced by established fraud perpetrator Sheila Cox were of unknown authorship and not official information from his office. (ASAB Attachment 4, Section 11).

**1.12** **RESPONSES TO REPRESENTATIVE FALSE STATEMENTS IN FTB'S ROBs AND RRBs.**

    **1.12.1** **FTB's Physical Presence Arguments In Its RRBs Are Without Merit.**

FTB's physical presence arguments in its RRBs are without merit.[80] Mr. Hyatt responded to FTB's incorrect statements regarding (a) his relevancy argument and his knowledge of future income;[81] (b) 'direct evidence', xerographic copy services (XCS) invoices, and his 1977 Toyota;[82] (c) his credit card charges that are not made by him;[83] (d) 'direct evidence' and medical visits;[84] (e) 'direct evidence,' credit card charges, and his checking account;[85] (f) his statement that FTB provides no evidence to support its assertion;[86] (g) "arguments that FTB's residency evidence is 'not credible'";[87] (h) contemporaneous documents; missing contemporaneous documents; and his affidavit evidence;[88] (i) contemporaneous documents vs. the Continental Hotel Casino issue;[89] (j) the allegations that someone else rented the Wagon Trails Apartment for him and FTB's destruction of evidence;[90] (k) his claims that FTB forged documents;[91] (l) his personal credit cards allegedly in use in California by someone else;[92] (m) XCS copier maintenance invoices and La Palma, California press releases;[93] (n) FTB's allegation of his intentionally bad memory;[94] (o) missing telephone records;[95] and (p) references to known erroneous evidentiary support.[96]

---

[80] 1992 ASB, Section I.A, pp. 1-24.
[81] 1992 ASB, Section I.A.1, p. 2.
[82] 1992 ASB, Section I.A.2, pp. 2-3.
[83] 1992 ASB, Section I.A.3, pp. 3-4.
[84] 1992 ASB, Section I.A.4, pp. 4-5.
[85] 1992 ASB, Section I.A.5, p. 5.
[86] 1992 ASB, Section I.A.6, pp. 5-6.
[87] 1992 ASB, Section I.A.7, p. 6.
[88] 1992 ASB, Section I.A.8, pp. 6-7.
[89] 1992 ASB, Section I.A.9, pp. 7-13.
[90] 1992 ASB, Section I.A.10, pp. 13-17.
[91] 1992 ASB, Section I.A.11, pp. 17-18.
[92] 1992 ASB, Section I.A.12, pp. 18-19.
[93] 1992 ASB, Section I.A.13, pp. 19-21.
[94] 1992 ASB, Section I.A.15, p. 21.
[95] 1992 ASB, Section I.A.16, pp. 22-23.
[96] 1992 ASB, Section I.A.17, p. 24.

RJN002086

1  The two fraud penalties were improperly imposed and must be removed.[97]  Mr. Hyatt responded to FTB's false

2  statements regarding (a) the alleged overwhelming physical presence in California;[98]  (b) the alleged sham sale of his

3  California house;[99]  (c) the alleged suppression of evidence (Continental Hotel Casino);[100]  (d) the alleged concealment and

4  destruction of checks and account records;[101]  (e) the alleged failure to cooperate at audit and protest;[102]  (f) the alleged

5  inadequate records to support his tax return;[103]  (g) the alleged abuse of corporate form;[104]  (h) the alleged failure to report

6  income;[105]  (i)  his alleged propensity to make false statements to government;[106]  and (j) the alleged solicitation of false

7  testimony.[107]

8  FTB's other miscellaneous arguments are unpersuasive.[108]  Mr. Hyatt responded to FTB's incorrect statements

9  regarding (a) "the accusations and misstatements in Mr. Hyatt's introduction";[109]  (b) "misrepresentations concerning the

10  protest process";[110]  (c) alleged delay by Mr. Hyatt;[111]  (d)  when source of income was raised;[112]  (e) misrepresentation of

11  Board rule 5523.6;[113] and (f) R&TC Section 17016, the presumption of full year California residency.[114]

12  ### 1.12.2  **FTB's Sourcing Arguments In Its RRBs Are Without Merit**.

13  FTB's sourcing arguments fail because the license payments received by Mr. Hyatt did not have a California

14  source.[115]

15  Sourcing applies only to nonresidents of California so FTB must concede Mr. Hyatt is a resident of Nevada for its

16  sourcing argument.  Mr. Hyatt did not have a California business.  FTB has never argued the first sourcing position, that Mr.

17  Hyatt's patents were employed as capital within California.  Furthermore FTB cannot establish that possession and control of

18  the patents has been localized in connection with a business so that their "substantial use and value" attach to and become an

19

20  [97] 1992 ASB, Section I.B, pp. 24-37.
21  [98] 1992 ASB, Section I.B.1, pp. 25-26.
   [99] 1992 ASB, Section I.B.2, pp. 26-27.
22  [100] 1992 ASB, Section I.B.3, pp. 27-28.
   [101] 1992 ASB, Section I.B.4, pp. 28-31.
23  [102] 1992 ASB, Section I.B.5, pp. 31-32.
   [103] 1992 ASB, Section I.B.6, pp. 32-33.
24  [104] 1992 ASB, Section I.B.7, pp. 33-35.
   [105] 1992 ASB, Section I.B.8, pp. 35-36.
25  [106] 1992 ASB, Section I.B.9, pp. 36-37.
   [107] 1992 ASB, Section I.B.10, p. 37.
26  [108] 1992 ASB, Section I.D, pp. 38-41.
   [109] 1992 ASB, Section I.D.1, pp. 39.
27  [110] 1992 ASB, Section I.D.2, p. 39.
   [111] 1992 ASB, Section I.D.3, p. 40.
28  [112] 1992 ASB, Section I.D.4, p. 40.
   [113] 1992 ASB, Section I.D.6, p. 41.
29  [114] 1992 ASB, Section I.D.7, p. 41.
   [115] 1992 ASB, Section II, pp. 53-99

-20-

RJN002087

asset of the business in California. After the July 1991 Philips Agreement granted Philips exclusive licensing rights not "substantial use and value" remained to be transferred to a California business.[116]

Sourcing – at best – is only before your Board for the period September 26, 1991 through April 2, 1992 because there has never been an assessment made against Mr. Hyatt regarding the post-disputed period.[117]

All of the evidence in the record shows FTB cannot meet its burden of proof to show that Mr. Hyatt had California source income during the disputed period or thereafter.[118]

The Philips Licensing Program Agreements show that Mr. Hyatt did not have California source income.[119] Specifically, the July 1991 Philips Agreement[120] did not put Mr. Hyatt in control of the Philips Licensing Program.[121] Philips by itself created and managed the Philips Licensing Program. (Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10, Annex XII.) The July 1991 Philips Agreement also did not create an agency relationship between Philips and Mr. Hyatt. Philips was obligated to license Mr. Hyatt's patents, not to act as his agent.[122] Further, neither the July 1991 Philips Agreement nor any other Philips documents support the existence of a "Jennifer Circle, La Palma, California home business".[123] FTB incorrectly contends Ms. Jeng worked out of the Jennifer Circle location"[124] and that ""Ms. Jeng is paid for services performed on behalf of Mr. Hyatt".[125] FTB also incorrectly contends that Mr. Hyatt left office equipment at the 7481 Jennifer Circle property and used them during the disputed period.[126]

The July 1991 Philips Agreement confirms that Philips had the exclusive authority to license Mr. Hyatt's patents to Toshiba and Omron.[127] The fact that Philips Licensing Program correspondence was misdirected to Mr. Hyatt's former California addresses after he moved to Las Vegas does not establish he was in control of the Philips Licensing Program.[128] Further, neither the IRS audit nor the Philips/Hyatt termination agreement undermine the fact that Philips was in control of the Philips Licensing Program under the July 1991 Philips Agreement.[129]

---

[116] 1992 ASB, Section II.A, pp. 53-56.
[117] 1992 ASB, Section II.B, pp. 56-58.
[118] 1992 ASB, Section II.C, pp. 58-91.
[119] 1992 ASB, Section II.C.1, pp. 58-80.
[120] 1992 ASB, Section II.C.1.a, pp. 58-76.
[121] 1992 ASB, Section II.C.1.a.i, pp. 59-64.
[122] 1992 ASB, Section II.C.1.a.ii, pp. 65-66.
[123] 1992 ASB, Section II.C.1.a.iii, pp. 67-72.
[124] 1992 ASB, Section II.C.1.a.iii.(a), pp. 68-70.
[125] 1992 ASB, Section II.C.1.a.iii.(b), pp. 70-71.
[126] 1992 ASB, Section II.C.1.a.iii.(c), pp. 71-72.
[127] 1992 ASB, Section II.C.1.a.iv, pp. 72-73.
[128] 1992 ASB, Section II.C.1.a.v, p. 73.
[129] 1992 ASB, Section II.C.1.a.vi, pp. 74-75.

RJN002088

FTB's claims regarding DNC in its RRB is without merit.  Mr. Hyatt has never contended that DNC participated in the Philips Licensing Program.[130]

- o September 1991 Mahr Leonard Agreement and the [First], Second and Third Supplemental Agreements with Philips.[131]

    - ▪ The exclusive negotiating rights Mahr Leonard received through the September 1991 Mahr Leonard Agreement came from Philips, not Mr. Hyatt.[132]

    - ▪ The September 1991 Mahr Leonard Agreement and Philips Supplemental Agreements establish Mr. Hyatt signed the seven patent agreements at Philips' request and pursuant to the three supplemental agreements.[133]

    - ▪ Nothing in the September 1991 Mahr Leonard Agreement or Philips Supplemental Agreements undermine the fact that PSB&C and Mahr Leonard negotiated with Hitachi, not Mr. Hyatt.[134]

- o Other miscellaneous contemporaneous licensing documents – the June 5, 1991 Pioneer Option Agreement.[135]

- • The testimony cited in support of the Philips Licensing Program cannot be discredited.[136]

    - o General allegations.[137]

        Each of the witnesses testifying about the Philips Licensing Program has personal firsthand knowledge of the Philips Licensing Program.[138]

        The Philips Licensing Program affidavits do not violate the parole evidence rule.[139]

    - o Specific witness allegations – Algy Tamoshunas.[140]

    - o Specific witness allegations – Gregory L. Roth, R. Danny Huntington and Gilbert P. Hyatt.[141]

        - ▪ FTB's claims regarding the attorney-client relationship between Mr. Hyatt and Mr. Roth.[142]  Mr. Roth represented Philips, not Mr. Hyatt after July 1991 with respect to the *Hyatt v. Boone* interference and the Philips Licensing Program.  (Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991).

        - ▪ Philips was the real party in interest with regard to the Hyatt v. Boone interference.[143]

        - ▪ FTB's specific claims regarding "R. Danny Huntington's" sourcing affidavit.[144]

---

[130] 1992 ASB, Section II.C.1.a.vii, pp. 75-76.
[131] 1992 ASB, Section II.C.1.b, pp. 76-80.
[132] 1992 ASB, Section II.C.1.b.i, pp. 76-77.
[133] 1992 ASB, Section II.C.1.b.ii, pp. 77-79.
[134] 1992 ASB, Section II.C.1.b.iii, pp. 79-80.
[135] 1992 ASB, Section II.C.1.c, p. 80.
[136] 1992 ASB, Section II.C.2, pp. 80-91.
[137] 1992 ASB, Section II.C.2.a, pp. 81-83.
[138] 1992 ASB, Section II.C.2.a.i, pp. 81-82.
[139] 1992 ASB, Section II.C.2.a.ii, pp. 82-83.
[140] 1992 ASB, Section II.C.2.b, pp. 83-85.
[141] 1992 ASB, Section II.C.2.c, pp. 85-91.
[142] 1992 ASB, Section II.C.2.c.i, p. 86.
[143] 1992 ASB, Section II.C.2.c.ii, pp. 86-90.
[144] 1992 ASB, Section II.C.2.c.iii, pp. 90-91.

RJN002089

- FTB's sourcing legal theories continue to fail.[145]

  - The relevant legal inquiry is not whether Mr. Hyatt had business activities in California prior to moving to Las Vegas in September 1991.[146]

  - Any business expense deductions were for Mr. Hyatt's work as an inventor and any related activities would have been performed at Mr. Hyatt's home in Las Vegas.[147]

  - FTB's arguments continue to fail as a matter of law under rev. & tax. Code section 17952 and regulation 17952.[148]

  - Income tax cases are to be decided year by year on their own merits and facts, contrary to FTB's assertions.[149]

- FTB's even newer sourcing arguments fail.[150]

  - There were no "$33.5 million in guaranteed payments".[151] Under Section 4.6 the minimum annual payments were a condition precedent "[i]n order to retain the sublicensing rights". There was no guaranteed payment. (July 1991 Philips Agreement, Section 4.6).

  - There was no "$3 million in guaranteed payments".[152] Under Section 3.1 the annual payments were simply an obligation of Philips, "Philips shall make payments to Hyatt". There was no guarantee. (July 1991 Philips Agreement, Section 3.1).

---

[145] 1992 ASB, Section II.D, pp. 91-97.
[146] 1992 ASB, Section II.D.1, pp. 91-92.
[147] 1992 ASB, Section II.D.2, p. 93.
[148] 1992 ASB, Section II.D.3, pp. 94-96.
[149] 1992 ASB, Section II.D.4, pp. 96-97.
[150] 1992 ASB, Section II.E, pp. 97-99.
[151] 1992 ASB, Section II.E.1, pp. 97-99.
[152] 1992 ASB, Section II.E.2, p. 99.

-23-

1                                    o

2       **1.13      INCORPORATION BY REFERENCE**

3               Mr. Hyatt hereby incorporates by reference the following sections from the 1991 Concluding Summary.

4                       Section 1.5        Mr. Hyatt's Evidence Is So Extensive That It Is Virtually Immeasurable.

5                       Section 1.6        Mr. Hyatt Was A Nevada Resident Commencing On September 26, 1991.

6                       Section 1.7        Mr. Hyatt Notified Many Persons And Entities Of His Move To And Location In Las
                        Vegas And He Received Virtually All Of His Mail In Las Vegas During The Disputed Period And
7                       Thereafter.

8                       Section 1.8        FTB's Residency And Sourcing Cases Are Both Based On Indisputedly Mis-Addressed
                        Documents And On FTB's Disregard Or Misrepresentation Of Mr. Hyatt's Overwhelming Eyewitness And
9                       Documentary Evidence.

10                      Section 1.9        FTB Makes Thousands Of False Statements In Its RSABs, Calendar, Attachment A-R,
                        And Attachment F.

11                      Section 1.10       Mr. Hyatt Did Not Have California Source Income.

12                      Section 1.11       FTB's Proposed Imposition Of An Amnesty Penalty Is In Error.

13                      Section 1.12       Interest Should Be Abated For The Additional Reason That The Nevada Supreme Court
                        Found That FTB Committed Fraud And Intentional Infliction Of Emotional Distress In Part Because Of Its
14                      Delays.

15      **1.14      CONCLUSION**

16              Mr. Hyatt moved to Nevada and became a California nonresident on September 26, 1991.  Mr. Hyatt sold his

17      California house, resided in a Las Vegas hotel for a few weeks, resided in his Las Vegas leased apartment for about five

18      months, and then resided in his Las Vegas Tara home for the last 25 years.  Mr. Hyatt had no California source income during

19      the disputed period or thereafter.  The situs of Mr. Hyatt's patents followed Mr. Hyatt to Nevada and no California business

20      had the substantial use and value of Mr. Hyatt's patents.  Mr. Hyatt did not have a California licensing business and FTB's

21      NPAs and NOAs did not give Mr. Hyatt notice of taxation based on a California business.  FTB has not established by clear

22      and convincing evidence that Mr. Hyatt intended to defraud FTB.  Any interest assessments should be abated because they

23      resulted from the intentional delay of FTB.

24              FTB's bad faith calendar, Attachment A-R, and Attachment E should be disregarded because of the thousands of

25      false statements and the disregard or misrepresentation of Mr. Hyatt's overwhelming eyewitness and documentary evidence.

26      (1991 ASAB Section 1.8).

27

28

29

RJN002091

1   Dated: September 28, 2016                 Respectfully submitted,

2                                             ANTOLIN LAW GROUP

3                                             By: _____
                                              EDWIN P. ANTOLIN
4
                                              REED SMITH LLP
5                                             BRIAN TOMAN

6                                             SILVERSTEIN & POMERANTZ LLP
                                              AMY L. SILVERSTEIN
7
                                              *Attorneys for Appellant Gilbert P. Hyatt*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

RJN002092

1    EDWIN P. ANTOLIN
       Edwin.antolinlawgroup.com
2    ANTOLIN LAW GROUP
       2175 N. California Blvd., Suite 775
3    Walnut Creek, CA 94596
       Telephone: (925) 262-4187
4    Fax: (925) 262-4269

5

6    BRIAN TOMAN
       btoman@reedsmith.com
7    REED SMITH LLP
       101 Second Street, Suite 1800
8    San Francisco, CA 94105-3659
       Telephone: (415) 543-8700
9    Fax: (415) 415-391-8269

10

11    AMY L. SILVERSTEIN
      asilverstein@sptaxlaw.com
      SILVERSTEIN & POMERANTZ LLP
12   12 Gough Street, 2nd Floor
      San Francisco, CA 94103
13   Telephone: (415) 593-3502
      Fax: (415) 593-3501
14   Attorneys for Appellant

15

16   BEFORE THE STATE BOARD OF
      EQUALIZATION            Case Nos.  435770 & 446509
      OF THE STATE OF CALIFORNIA
17

18   In the Matter of the Appeals of

19   GILBERT P. HYATT

20

21

22        **APPELLANT'S SECOND ADDITIONAL BRIEFING (1991)**

23

24

25

26

27

28

RJN002093

## **TABLE OF CONTENTS**

1.1 TABLE OF ABBREVIATIONS AND DEFINITIONS. ............................................ VII

1.2 TABLE OF AUTHORITIES............................................................................ IX

1.3 TABLE OF CITATIONS AND LINKS TO EXAMPLES OF MR. HYATT'S EVIDENCE. ......................................................................................... XII

    1.3.1 Updated Testimonial Topics Table And Exhibits Summarizing The Eyewitness Testimonial Subject Matters And The Reinforcement Of Testimony Between Eyewitnesses (E.G., 72-Witnesses Testified About Mr. Hyatt's Move Away In 1991) Under Oath Or Penalty Of Perjury..... xii

    1.3.2 Updated Chronological Statements Of Facts (The "Chronologies"), A Chronology Of Mr. Hyatt's Overwhelming Eyewitness And Documentary Evidence. ............................................................... xii

    1.3.3 The More Than 220 Affidavits And Declarations Sworn To Or Signed Under Penalty Of Perjury By More Than 150 Eyewitnesses In Support Of Mr. Hyatt's Facts. .................................................................. xii

    1.3.4 "Testimonial Responses" Tables And Excerpts Regarding Eyewitnesses' Overwhelming Testimony To Identify And Correct FTB's False Arguments And False Facts.............................................. xii

    1.3.5 Philips Document Tables Providing Examples Of More Than 5,000 Pages Of Philips Documents That Support Mr. Hyatt's Cases.............. xiii

    1.3.6 Witness Deposition Tables Providing Examples Of More Than 20 Depositions That FTB Took Of Mr. Hyatt's Eyewitnesses And Philips Licensing Attorneys That Support Mr. Hyatt's Appeals. ..................... xiii

    1.3.7 Tables Of False Statements Made In The FTB Audit File And Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses. ............. xiii

    1.3.8 Tables Of False Statements Made Under Penalty Of Perjury By FTB Private Investigators And Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses.................................................................... xiii

    1.3.9 Objection And Rebuttal To FTB's Calendar And Attachments A (Revised) And F ("Rebuttal To FTB Att. A/F"). ................................. xiii

    1.3.10 Objection And Rebuttal To FTB's Attachment E ("Rebuttal To FTB Att. E"). ............................................................................... xiii

    1.3.11 Tables Of Misrepresentations In FTB's ROBs And RRBs.................... xiii

    1.3.12 Tables Of Mr. Hyatt's Presence Based Upon Direct Testimonial and Documentary Evidence ....................................................... xiii

1.4 INTRODUCTION. .................................................................................... 1

1.5 FTB FAILS TO CARRY ITS BURDENS...................................................... 2

    1.5.1 FTB Fails To Carry Its "Initial Burden" Of Establishing "Reasonable And Rational" Assessments. ...................................................... 2

    1.5.2 FTB Fails To Carry Its Burden Of Establishing That Mr. Hyatt Had California Source Income. .......................................................... 4

    1.5.3 FTB Fails To Carry Its Burden On The Fraud Penalties. ..................... 5

1.6 FTB VIOLATES THE STATUTES AND REGULATIONS FOR CONDUCTING AUDITS, ASSESSING TAXES, AND APPEALING TAX ASSESSMENTS. .......... 6

1.7 THE PHILIPS DOCUMENTS SIGNIFICANTLY SUPPORT MR. HYATT'S RESIDENCY AND SOURCING APPEALS. ................................................... 9

RJN002094

1.7.1     The Philips Documents Significantly Support Mr. Hyatt's Appeals, Illustrated By 15 Tables Of Excerpts From And Citation To More Than 5,000 Pages Of Philips Documents, Which Were Disregarded By FTB. ........................................................................................... 9

1.7.2     The Philips Documents Detail FTB's Bad Faith $24 Million Income Error. ......................................................................................... 9

1.7.3     The Philips Documents Confirm That Philips Created, Managed, And Operated The Philips Licensing Program As Testified To By Highly Credible Licensing Eyewitnesses. ...................................................... 10

1.7.4     FTB's Overbroad Philips Subpoenas Forced Mr. Hyatt To Obtain New York Court Orders And Temporary Restraining Orders To Protect His Confidential Information And To Avoid An Overbroad Production. ....... 12

1.7.5     Philips Had *Exclusive* Licensing Authority To License Mr. Hyatt's Licensable Patents. ................................................................... 12

1.7.6     Mr. Hyatt Would Not And Did Not Breach The July 1991 Philips Agreement By Negotiating With Prospective Licensees Or By Operating A Licensing Business, As Falsely Contended By FTB. ........... 13

1.7.7     The Philips Documents Support Mr. Hyatt's Understanding That Philips Wanted Mr. Hyatt To Sign Several Patent Agreements Because Of Philips' Cross Licensing Relationships. ............................................... 13

1.7.8     Philips And Mahr Leonard Promised To Correct Mr. Hyatt's Address In The Preamble Of The Patent Agreements And After Several Of His Complaints They Did Correct It, As The Philips Documents Confirm. ... 14

1.7.9     The Philips Documents Confirm That Mr. Hyatt Had Very Limited Involvement In The Large Worldwide Philips Licensing Program. ......... 14

1.7.10     FTB Acted In Bad Faith By Depriving Mr. Hyatt Of His Statutory Rights To Audits And Protests On The Sourcing Assessment Before Receiving A Final Agency Action. ........................................................... 15

1.8     FTB'S CONTINUING BAD FAITH ACTS ........................................... 16

    1.8.1     FTB In Bad Faith Misrepresents Or Disregards Overwhelming Eyewitness Testimony And Documentary Evidence Of Mr. Hyatt's Las Vegas Presence. ................................................................... 16

        1.8.1.1     FTB In Bad Faith Disregards Mr. Hyatt's Overwhelming Contemporaneous Documentary Evidence (CDE) And Then Disingenuously Builds Its Case On An Alleged Lack Of CDE. ................................ 18

    1.8.2     Mr. Hyatt's Eyewitness And Documentary Evidence In Rebuttal To FTB's Calendar, Attachment A-R, And Attachment E Are Summarized In Tabular Form. ................................................................... 18

    1.8.3     FTB In Bad Faith Disregards Or Misrepresents Mr. Hyatt's Overwhelming Eyewitness And Documentary Evidence Demonstrating There Was NO California Source Income. ..................... 19

    1.8.4     FTB Makes Thousands Of False Statements In Its RSABs, Calendar, Attachment A-R, And Attachment F. ......................................................... 20

        1.8.4.1     FTB Falsely Claims That Mr. Hyatt Was Present At The La Palma House Based On Inferences, Speculation, And Misrepresentation Of The Evidence While Disregarding Or Misrepresenting Mr. Hyatt's

RJN002095

Eyewitness And Documentary Evidence Of His Actual Location.......................................................................... 20

1.8.4.2    FTB Falsely Claims That Philips Documents, Which Were Undisputedly Mis-Addressed To Mr. Hyatt's Former California Addresses Or Former Fax Number, "Establish" His Presence At The Jennifer Circle House... 21

1.8.4.3    FTB Falsely Claims That Philips Documents, Which Were Undisputedly Mis-addressed To Mr. Hyatt's Former California Addresses Or Fax Number, Establish His Presence *On A Specific Date.* .................................... 21

1.8.4.4    Undisputed Mis-Addressed Philips Documents FedExed To The Jennifer Circle House Do Not Establish That Mr. Hyatt Was Present At The Jennifer Circle House, He Was Not. ............................................... 22

1.8.4.5    Mr. Hyatt Sent His Faxes From And Received His Faxes At His Las Vegas Apartment Where His Only Fax Machine Was Located.................................................. 24

1.8.4.6    Mr. Hyatt Did Not Send Faxes From the La Palma House after October 1, 1991, As FTB Falsely Claims...... 24

1.8.4.7    FTB Makes Hundreds Of False Allegations About An Alleged Jennifer Circle Home/Business. ......................... 26

1.8.4.8    Dozens Of Eyewitnesses Testified That FTB Private Investigators Provided False Testimony About Them...... 27

1.8.4.9    Eyewitness And Documentary Evidence Establish That FTB Misrepresents the PSB&C Invoices........................ 28

1.8.4.10    FTB In Bad Faith Deprived Mr. Hyatt Of A Full, Fair, And Lawful 1992 Audit. ............................................... 28

1.8.5    FTB's Sourcing Assessments Must Be Reversed For The Additional Reason That They Were Not Properly Raised In The NPAs Or NOAs.... 30

1.8.5.1    FTB Did Not Raise The Sourcing Issue During The Audits, But Raised It For The First Time At The End Of The Protests And Then Made a Major Change In Its Position On Sourcing During These Appeals. ................. 30

1.8.5.2    FTB Is Barred From Raising The Sourcing Assessments Because FTB Has Not Properly Raised The Issues. ......... 33

1.8.5.2.1    FTB is barred from raising the sourcing issues because they were not raised in the NPA................................................... 33

1.8.5.2.2    FTB is barred from assessing any income after April 2, 1992, because it has not issued an NPA for that post-disputed period. ................................ 34

1.8.5.3    Making The Sourcing Assessments For The First Time In The NOAs Violates The Statutory Procedure For Issuing An Assessment And Significantly Prejudices Mr. Hyatt. ......................................................... 34

-iv-

1.8.5.4    Principles Of Justice And Fairness Bar FTB From Raising New Sourcing Issues Without An Audit And After Issuance of the NPAs And NOAs............................ 35

     1.8.5.4.1    The NPAs do not support the sourcing assessments and the sourcing assessments have not been audited or protested. ...................................................... 35

     1.8.5.4.2    The NOAs do not support the sourcing assessments. ................................. 36

     1.8.5.4.3    FTB cannot raise a new license business theory in these appeals because the issue was not raised in the NPAs or NOAs......... 38

     1.8.5.4.4    FTB cannot tax the $24 million received after the disputed period because payments received during the post-disputed period were not audited, protested, or raised in the NPAs or NOAs........................................................ 38

     1.8.5.4.5    FTB cannot sustain a fraud penalty on its $24 million error because the payments were received during a significantly different time period than the original assessment and were not audited, protested, or raised in the NPAs or NOAs........................................................ 40

1.8.6    FTB's Attacks On Eyewitness Testimony Are Made In Bad Faith. .......... 41

   1.8.6.1    FTB's Attempt To Discredit The Testimony Of More Than 100 Witnesses By Using False Inferences And Speculation Must Be Rejected. ......................................... 41

   1.8.6.2    FTB Makes Hundreds Of False Allegations About Eyewitness Testimony Based On FTB's Bad Faith Acts And False Inferences............................................ 42

   1.8.6.3    FTB's Attacks On The True And Correct Statements In Mr. Hyatt's Affidavits Are Based On FTB's Bad Faith Acts And False Inferences. ................................. 44

   1.8.6.4    FTB's Attacks On Credible Third Party Eyewitnesses Must Be Disregarded for The Additional Reason That The Eyewitness Statements Do Not Stand Alone; Eyewitness Statements Are Reinforced By Consistent Testimony From Dozens Of Other Eyewitnesses And By More than 10,000 Pages Of Exhibits To The Declarations.......................................................... 45

   1.8.6.5    FTB Took More Than 20 Depositions Of Mr. Hyatt's Witnesses And Philips Witnesses Which Are So Supportive Of Mr. Hyatt That FTB Ignored Them In It's Briefs................................................................ 46

1.8.7    FTB's Attempts To Establish Mr. Hyatt's Presence Based On False Inferences And Speculation Is In Bad Faith. ............................................. 46

RJN002097

1.9     FTB'S BAD FAITH FRAUD ASSESSMENTS CONTINUE IN ITS RSABS. ......... 47
        1.9.1    This Case Is Not Taxpayer Fraud, It Is A Case Of FTB Fraud................. 47
        1.9.2    The Simple Fact That The Two FTB Audit Reviewers Were Not
                 Convinced Of Fraud Should Be Dispositive Of The Fraud Penalties....... 48
        1.9.3    The Simple Fact That FTB Does Not Have Confidence In Its
                 Assessments Against Mr. Hyatt Is Critical; All Of FTB's Experts On
                 Its Audit Task Force, Including The Lead Auditor, Were Doubtful
                 About FTB's Residency Cases And FTB Made A Sourcing
                 Assessment That Is Inconsistent With Its Residency Assessment........... 50
        1.9.4    FTB Has Not Satisfied Its Burden To Establish That The Fraud
                 Penalties Are Supported With Clear And Convincing Evidence............. 51
        1.9.5    FTB's Bad Faith Fraud Penalties Began In The Audit Determination
                 Letter With A Whole Litany Of Utterly False Fraud Factors That Were
                 Patently Absurd And Have Subsequently Been Dropped By FTB........... 53
        1.9.6    FTB Failed To Follow The Statutory Requirements For Assessing The
                 Fraud Penalties. ................................................................................. 53
        1.9.7    FTB Has Not Satisfied Its Initial Burden To Establish That The Fraud
                 Penalties Are Not Arbitrary. ................................................................ 55
        1.9.8    FTB Failed To Establish By Clear And Convincing Evidence That
                 Any Alleged Underpayment Is Due To Fraud. ........................................ 56
        1.9.9    FTB's Factors Of Fraud And FTB's Attacks On Other Witnesses Are
                 Disingenuous And Disregard The Facts, The Law, And The
                 Seriousness Of The Fraud Issue. .......................................................... 57
        1.9.10   The 1992 Fraud Penalties Are A Continuing Bad Faith Act By FTB
                 Because FTB Acknowledged That It Made a $24 Million Income Error
                 In Its 1992 Assessments But Failed To Reduce The Tax, Interest, And
                 Penalties That Are Based On The $24 Million Income Error.................. 58
1.10    CONCLUSION ...................................................................................... 59

RJN002098

**1.1     TABLE OF ABBREVIATIONS AND DEFINITIONS.**

| | |
|---|---|
| 1991 AOB | 1991 Appellant's Opening Brief, |
| 1992 AOB | 1992 Appellant's Opening Brief, |
| 1991 ARB | 1991 Appellant's Reply Brief, |
| 1992 ARB | 1992 Appellant's Reply Brief, |
| 1991 ASB | 1991 Appellant's Supplemental Brief, |
| 1992 ASB | 1992 Appellant's Supplemental Brief, |
| AAB | Appellant's Additional Brief, |
| 1991 ASAB | 1991 Appellant's Second Additional Brief, |
| 1992 ASAB | 1992 Appellant's Second Additional Brief, |
| 1991 ROB | 1991 Respondent's Opening Brief, |
| 1992 ROB | 1992 Respondent's Opening Brief, |
| 1991 RRB | 1991 Respondent's Reply Brief, |
| 1992 RRB | 1992 Respondent's Reply Brief, |
| RAB | Respondent's Additional Brief, |
| 1991 RSAB | 1991 Respondent's Second Additional Brief, |
| 1992 RSAB | 1992 Respondent's Second Additional Brief, |
| | |
| Disputed period | FTB's name for the period in dispute, September 26, 1991 to April 2, 1992 |
| CDE | FTB's name for Contemporaneous Documentary Evidence |
| Rebuttal to FTB Att. A/F | |
| | Rebuttal and Objection to FTB Calendar, Attachment A (Revised), and Attachment F |
| Rebuttal to FTB Att. E | |
| | Rebuttal and Objection to FTB Attachment E |
| Attachment A-R | FTB Attachment A (Revised) |
| Jennifer Circle house | |
| | 7841 Jennifer Circle, La Palma house |
| La Palma house | 7841 Jennifer Circle, La Palma house |

-vii-

NPA            FTB's Audit Notice Of Proposed Assessment

NOA            FTB's Protest Notice Of Action

RJN002100

**1.2 <u>TABLE OF AUTHORITIES.</u>**

CASES

*Achiro v. Commissioner*,
77 T.C. 881 (1981)

*Falese v. Commissioner*,
58 T.C. 895 (1972)

*Fitch v. Comm'r*,
T.C. Memo 2012-358, P25 (T.C. 2012)

*Fox v. Erickson*,
99 C.A.2d 740, 742 (1950)

*Hale v. Comm'r*,
T.C. Memo 2010-229 (T.C. 2010)

*Franchise Tax Bd. of Cal. v. Hyatt*,
335 P.3d 125, 144-145, 148-149 (Nev. 2014)

*Jones v. Commissioner*,
259 F.2d 300 (5th Cir. 1958)

*In re Jost*,
117 Cal.App.2d 379, 383 (1953)

*Mansell v. Board of Administration*,
30 Cal. App. 4th 539, 545 (1994)

*Marchica v. State Board of Equalization*,
107 Cal.App.2d 501, 509 (1951)

*Mattel v. Gilbert Hyatt*,
1979 U.S. Dist. LEXIS 8812 (December 6, 1979)

*Padgett Coventry Price v. Commissioner of Internal Revenue Service*,
T.C. Memo 2004-103

*Powell v. Granquist*,
252 F.2d 56 (9th Cir. 1958)

*Professional Services v. Commissioner*,
79 T.C. 888, 930 (1982)

*Rowlee v. Commissioner*,
80 T.C. 1111, 1123 (1983)84

*Stoltzfus v. United States*,
398 F.2d 1002, 1004 (3d Cir. 1968)

*Title Ins. Co. of Minnesota v. State Bd. of Equalization*
4 Cal.4th 715 (1992)

RJN002101

**Statutes**

Tit.18, Cal. Rev. & Tax. Code

§ 17014(a)
§ 17951-4(a).
§ 17951-4(c)
§ 17952
§ 17952(a)
§ 17952(c)
§ 19033
§ 19034
§ 19044
§ 19045
§ 19057
§ 19036

Revenue and Taxation Code sections 12421 through 12435

**STATE BD. OF EQUALIZATION DECISIONS**

*Appeal of Robert F. and Helen R. Adickes,*
St. Bd. of Equaliz., 1990 Cal. Tax LEXIS 24, 90-SBE 012 (Nov. 27, 1990)

*Appeal of Eli A. and Virginia W. Allen,*
Cal. St. Bd. of Equal., Jan. 7, 1975)

*Appeal of Armstrong,*
St. Bd. of Equaliz. 1985 Cal. Tax LEXIS 2 December 3, 1985

*Appeal of Stephen D. Bragg,*
2003-SBE-002 (May 28, 2003)

*Appeal of Castillo,*
No. 90A-0227-ES, St. Bd. of Equaliz. 1992 Cal. Tax LEXIS 28;
92-SBE-020 July 30, 1992

*Appeals of Robert E. Wesley and Jerry J. Couchman,*
2005-SBE-002, (2005) Cal. Tax LEXIS 358,

*Appeal of Duncan*
1993 Cal. Tax LEXIS 147, 3-4 (1993)

*Appeal of Robert V. Erilane,*
Cal. St. Bd. of Equal., Nov. 12, 1974

*Appeal of Lasher,*
St. Bd. of Equaliz. 2005 Cal. Tax. Lexis 22 (Case No. 260933) (Jan. 25. 2005)

*Appeal of David G. and Helen Mendelsohn,*
85-SBE-141, Nov. 6, 1985

*Appeal of Sierra Pacific Industries,*
Cal. St. Bd. of Equal., Jan. 5, 1994, 94-SBE-0024

RJN002102

*Appeal of Hubbard D. & Cleo M. Wickman*,
81-SBE-014, Feb. 2, 1981

**Other Authorities**

Law Review Commission Comments for Evid. Code § 600

Uniform Division of Income for Tax Purposes Act,
Sections 25120 to 25139

RJN002103

**1.3     TABLE OF CITATIONS AND LINKS TO EXAMPLES OF MR. HYATT'S EVIDENCE.**

1.3.1    **Updated Testimonial Topics Table And Exhibits Summarizing The Eyewitness Testimonial Subject Matters And The Reinforcement Of Testimony Between Eyewitnesses (E.G., 72-Witnesses Testified About Mr. Hyatt's Move Away In 1991) Under Oath Or Penalty Of Perjury.**

1.3.2    **Updated Chronological Statements Of Facts (The "Chronologies"), A Chronology Of Mr. Hyatt's Overwhelming Eyewitness And Documentary Evidence.**

Updated 1991 Pre-Disputed Period Chronological Statements Of Facts.

Updated 1991 Disputed Period Chronological Statements Of Facts.

Updated 1992 Disputed Period Chronological Statements Of Facts.

Updated 1992 Post-Disputed Period Chronological Statements Of Facts.

1.3.3    **The More Than 220 Affidavits And Declarations Sworn To Or Signed Under Penalty Of Perjury By More Than 150 Eyewitnesses In Support Of Mr. Hyatt's Facts.**

Updated Index of Affidavits.

Affidavits and Declarations with Exhibits filed with the AOBs.

Affidavits and Declarations with Exhibits filed with the ARBs.

Affidavits and Declarations with Exhibits filed with the ASBs.

Post-Briefing Evidence (Affidavits and Declarations with Exhibits).

Mr. Hyatt's Contemporaneous Documentary Evidence (CDE) Affidavits Describing And Authenticating Thousands of Pages of Documentary Evidence.

Mr. Hyatt's 2012 Disputed Period CDE Affidavit.

Mr. Hyatt's 2016 Supplemental Disputed Period CDE Affidavit.

Mr. Hyatt's 2016 Post-Disputed Period CDE Affidavit.

Sourcing Affidavits With Exhibits.

1.3.4    **"Testimonial Responses" Tables And Excerpts Regarding Eyewitnesses' Overwhelming Testimony To Identify And Correct FTB's False Arguments And False Facts.**

Testimonial Responses To FTB's 1991 ROB

Testimonial Responses To FTB's 1992 ROB

Testimonial Responses To FTB's 1991 RRB

Testimonial Responses To FTB's 1992 RRB

Testimonial Responses To FTB's 1991 Attachment A

RJN002104

Testimonial Responses To FTB's 1992 Attachment A

**1.3.5** **Philips Document Tables Providing Examples Of More Than 5,000 Pages Of Philips Documents That Support Mr. Hyatt's Cases.**

**1.3.6** **Witness Deposition Tables Providing Examples Of More Than 20 Depositions That FTB Took Of Mr. Hyatt's Eyewitnesses And Philips Licensing Attorneys That Support Mr. Hyatt's Appeals.**

**1.3.7** **Tables Of False Statements Made In The FTB Audit File And Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses.**

**1.3.8** **Tables Of False Statements Made Under Penalty Of Perjury By FTB Private Investigators And Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses.**

**1.3.9** **Objection And Rebuttal To FTB's Calendar And Attachments A (Revised) And F ("Rebuttal To FTB Att. A/F").**

/02/06B1 Introduction to Rebuttal To FTB Att. A/F

/02/06B2 September 1991 Rebuttal To FTB Att. A/F

/02/06B3 October 1991 Rebuttal To FTB Att. A/F

/02/06B4 November 1991 Rebuttal To FTB Att. A/F

/02/06B5 December 1991 Rebuttal To FTB Att. A/F

/02/06B6 January 1992 Rebuttal To FTB Att. A/F

/02/06B7 February 1992 Rebuttal To FTB Att. A/F

/02/06B8 March 1992 Rebuttal To FTB Att. A/F

/02/06B9 April 1992 Rebuttal To FTB Att. A/F

**1.3.10** **Objection And Rebuttal To FTB's Attachment E ("Rebuttal To FTB Att. E").**

**1.3.11** **Tables Of Misrepresentations In FTB's ROBs And RRBs.**

**1.3.12** **Tables Of Mr. Hyatt's Presence Based Upon Direct Testimonial and Documentary Evidence**

ASAB Exhibit 02

ASAB Exhibit 03

CDE Affidavit Exhibit CDE-ST002

CDE Affidavit Exhibit CDE- ST003

RJN002105

**1.4**     **INTRODUCTION.**

Mr. Hyatt moved to Las Vegas on September 26, 1991, and sold his only California house five days later on October 1, 1991.[1]  Upon moving to Las Vegas Mr. Hyatt stayed at a Las Vegas hotel for a short time, moved into his Las Vegas apartment on October 21, 1991, and moved into his 5,400 square foot Las Vegas Tara home on April 3, 1992.[2]  After he moved, Mr. Hyatt's overwhelming physical presence was in Nevada.  During the 190 day disputed period (September 26, 1991, to April 2, 1992) Mr. Hyatt had 125 full days in Nevada as a resident, zero full days in California as a resident, and 37 days partly in Nevada as a resident and partly in California for temporary or transitory purposes.[3]  All of the 1991 and 1992 disputed licensing payments Mr. Hyatt received came from Philips sublicensing his Nevada situs patents through the Philips Licensing Program wire transferred into his Nevada situs investment accounts.  He had no California source income.

Mr. Hyatt has produced overwhelming *eyewitness and documentary* evidence in support of his appeals.  Mr. Hyatt filed more than 220 declarations and affidavits from more than 150 witnesses from many walks of life[4] in support of his position in these appeals and he filed thousands of pages of very relevant contemporaneous documentary evidence ("CDE").[5]  This eyewitness and documentary evidence establishes (1) that Mr. Hyatt moved away from the Jennifer Circle house in 1991, (2) that he moved to Las Vegas and became a Nevada resident on September 26, 1991, (3) that he sold his California house on October 1, 1991, and had no other abode in California, (4) that his occasional presence in California was for temporary or transitory purposes, and (5) that he did not receive California source income during the disputed period or thereafter.[6]  The *Bragg* factors overwhelming confirm that his closest connections were with Nevada.  None of the *Bragg* factors shows a close or substantial connection to California.[7]

A total of 72 eyewitnesses testified about Mr. Hyatt moving away in 1991, 28 eyewitnesses testified about Mr. Hyatt moving away in September 1991, and 15 eyewitnesses testified that an Asian woman (or Ms. Jeng) moved into the Jennifer Circle house after Mr. Hyatt moved away in 1991.[8]  A total of *22 Jennifer Circle neighbors* testified about Mr. Hyatt moving

---

[1] Affidavit of Gilbert P. Hyatt Regarding Contemporaneous Documentary Evidence (CDE), July 24, 2012 ("Hyatt's 2012 CDE Aff."), ¶¶ 7-11; Supplemental Disputed Period CDE Affidavit of Gilbert P. Hyatt, September 6, 2016 ("Hyatt's 2016 Supp. CDE Aff."), ¶¶ 7-8; Rebuttal to FTB Att. A/F, Section I. A., September 26, 1991, and Section I. A., October 1, 1991.

[2] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991, and Section I. A., April 3, 1992.

[3] Day by day analysis in Rebuttal to FTB Att. A/F, Section I. A.  Mr. Hyatt also had 9 full days in a California hospital for cancer surgery, February 12-20, 1992.  Mr. Hyatt was admitted to the California hospital on February 11 for cancer surgery, was discharged from the California hospital on February 21, and returned to his Las Vegas apartment that same day.

[4] See Updated Testimonial Topics Table.

[5] Hyatt's 2012 CDE Aff.; Hyatt's 2016 Supp. CDE Aff.; Hyatt's 2016 Post-DP CDE Aff.

[6] 1991 AOB, pp. 15-38, 63-86; 1992 AOB, pp. 16-35; 1991 ARB pp. 21-68; 1992 ARB pp. 2-26, 27-81; 1992 ASB, pp. 41-52, 53-99.

[7] 1991 Concluding Summary Brief.

[8] Updated Testimonial Topics, Exs. T007, T006, and T120, respectively.

RJN002106

away in 1991 and 23 witnesses testified that they did not ever again see Mr. Hyatt at Jennifer Circle after he moved away in 1991.[9] In addition, 32 witnesses testified about Mr. Hyatt's preparations to move to Las Vegas in 1991, 17 witnesses testified about Mr. Hyatt's former Jennifer Circle house having little furniture and/or having packed boxes before he moved to Las Vegas in 1991, 15 witnesses testified about Mr. Hyatt's possessions being carted off for storage, given away, disposed of or donated to charity, and 3-witnesses testified that they helped Mr. Hyatt move his belongings to storage before he moved to Las Vegas in 1991.[10]

Dozens of additional witnesses testified to Mr. Hyatt's presence in Las Vegas, visiting him and telephoning him at his Las Vegas apartment, worshiping with him at their Las Vegas synagogue, house hunting with him in Las Vegas, and much more.[11] A total of 37 witnesses testified about Mr. Hyatt's stay at a Las Vegas hotel when he first moved to Las Vegas in 1991, 28 witnesses testified about being informed in October 1991 that Mr. Hyatt had moved into his Las Vegas apartment, 39 witnesses testified about telephoning Mr. Hyatt at his Las Vegas apartment, and 20 witnesses testified about Mr. Hyatt's move into his Las Vegas house in April 1992.[12] Mr. Hyatt provided numerous written changes of address to people, entities, and the U.S. Postal Service.[13] He informed more than 100 people that he had moved to Las Vegas and he provided his Las Vegas contact information to his family, friends, neighbors, Philips, Mahr Leonard, service providers and many others. He even worked with the Governor of Nevada to bring international businesses to Nevada.[14] There can be no doubt that Mr. Hyatt permanently moved to Las Vegas on September 26, 1991, and had no California source income thereafter.

The Introduction to the 1991 Concluding Summary is very relevant hereto and is incorporated herein by reference.

## 1.5    FTB FAILS TO CARRY ITS BURDENS.

### 1.5.1    FTB Fails To Carry Its "Initial Burden" Of Establishing "Reasonable And Rational" Assessments.

Both residency assessments (1991 and 1992) must be overturned because FTB did not carry its "initial burden [] to show why its assessment[s] [are] reasonable and rational."[15] Both residency assessments were imposed in bad faith by a rogue auditor and supported by other FTB personnel who were intent on issuing assessments against Mr. Hyatt and imposing enormous fraud penalties to coerce an unjustified settlement.[16] It has been conclusively determined that FTB committed

---

[9] Updated Testimonial Topics, Exs. T102 and T127, respectively.
[10] Updated Testimonial Topics, Exs. T002, T003, T005, and T116, respectively.
[11] See, e.g., Updated Testimonial Topics, Exs. T008, T009, T018, T019, T041, T042, and T044.
[12] Updated Testimonial Topics, Exs. T008, T128, T019, and T049, respectively.
[13] Hyatt's 2012 CDE Aff., ¶¶ 17, 34; Hyatt's 2016 Supp. CDE Aff., ¶¶ 143, 144, 159.
[14] Hyatt's 2016 Post-DP CDE Aff., ¶¶ 168, 174-179.
[15] *Appeal of Wesley et al*, 2005-SBE-02, Nov. 15, 2005.
[16] 1991 AOB, pp. 4-11; 1992 AOB, pp. 4-12; Updated Testimonial Topics, Exs. T180 and T181; Declaration of Thomas Rodrigue, February 11, 2015, ¶¶ 5, 9, 11, 12; Declaration of Diane Truly, February 13, 2015, ¶¶ 8, 25; Declaration of Candace Les, February 9, 2015, ¶¶ 19, 20, 23.

RJN002107

fraud, intentionally inflicted emotional distress, and acted in bad faith in its audits and protests of Mr. Hyatt.[17] The record in these appeals establishes that FTB committed grievous torts against Mr. Hyatt and that Mr. Hyatt suffered "extreme treatment from FTB,"[18] discussed in detail in ASAB Attachment 1. See also 1992 ASAB, Section 1.5.

For example, FTB in bad faith overstated the 1992 NPA income by $24 million and now attempts to continue with its outrageous assessment of taxes, interest, and penalties on income that is not taxable by California. (Sections 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10; 1992 ASAB, Section 1.7.5).[19] In light of FTB's gross misconduct and extreme bad faith treatment of Mr. Hyatt during the audits and protests, there can be no presumption that FTB's assessments were correct. Given its actions, FTB must be required to produce affirmative evidence to satisfy its initial burden of showing the two assessments were reasonable and rational. Specifically, FTB had to establish that assessments were not tainted by its gross misconduct. FTB has not done so. Nowhere in its briefing has it addressed the fraud, intentional infliction of emotional distress, and bad faith found by the Nevada jury; nor has it addressed the numerous additional acts of misconduct detailed in Appellant's 1991 and 1992 Opening Briefs. Accordingly, your Board must find that FTB has not met its initial burden and that the assessments are invalid as not reasonable or rational.

For other examples, FTB's calendar and Attachment A-R, FTB's primary residency arguments, are made in bad faith (Sections 1.8.2, 1.8.4) and disregard or misrepresent *overwhelming eyewitness and documentary evidence* of Mr. Hyatt's presence in Nevada; e.g., see ASAB Exhibit 2. Exhibit 2 is a table summarizing Mr. Hyatt's presence for each day in the disputed period. Exhibit 2 is linked day by day to the rebuttal for each day in Mr. Hyatt's Rebuttal to FTB Att. A/F. Exhibits CDE-ST002 and CDE-ST003[20] are tables summarizing Mr. Hyatt's presence for many days during the disputed period and Mr. Hyatt's eyewitness and documentary evidence that rebuts FTB's false inferences. See also the Testimonial Topics table.[21]

Both sourcing assessments (1991 and 1992) must be overturned because FTB has failed to meet its burden of proof and for the additional reasons discussed in Section 1.5.2.

Both fraud assessments (1991 and 1992) must be overturned because FTB has failed to meet its burden of proof by clear and convincing evidence and for the additional reasons discussed in Section 1.5.3.

---

[17] *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125 (Nev. 2014); ASAB Exhibit 11, Clark County District Court Judgment Order dated September 5, 2008 and ASAB Exhibit 10, Clark County District Court Special Verdict Form dated August 6, 2008.

[18] *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 149 (Nev. 2014). FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.

[19] AAB. See also 1992 AOB, pp. 52-56; 1992 ARB, pp. 93-95.

[20] Exhibits attached to Hyatt's 2016 Supp. CDE Aff.

[21] Testimonial Topics, Ex. T008, T009, T018, T021, T128, T019, T095, T096, T129, T026, T022, T023, T024, T025, T100, T057, T030, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047, T147, and T048.

-3-

The 1992 assessments must be overturned for the additional reason that there was no 1992 audit (1992 AOB, § I, pp. 4-6; 1992 ARB, § II, pp. 2-3, Section 1.8.4.10).

### 1.5.2     FTB Fails To Carry Its Burden Of Establishing That Mr. Hyatt Had California Source Income.

Both sourcing assessments (1991 and 1992) must be overturned for the reasons discussed in Section 1.5.1 and for the additional reasons set forth below.

The sourcing issue has not been audited by FTB and thus Mr. Hyatt was denied his right to protest the sourcing issue (Section 1.8.5.4.2). Thus, FTB has no record on which to base a sourcing assessment. The sourcing assessments in the NOAs are based on unsupported conclusory statements without a record to rely on. It is unlawful for FTB to make major assessments at the end of the FTB administrative process without an audit or protest record to rely on (Section 1.8.5.4.2). Your Board must not condone issuing tax assessments without adequate notice and without an adequate FTB record.

The California source income assessments for 1991 and 1992 are new assessments asserted for the first time by FTB after the protest. FTB did not include these new sourcing assessments in the NPAs and did not set forth reasons in the NPAs, as required by California law.[22] Accordingly, FTB may not raise new assessments without formally complying with the statutory requirements for issuing a proposed assessment notice.[23]

Furthermore, FTB has not satisfied its burden of establishing that Mr. Hyatt had income from California sources in the disputed period or thereafter.[24] FTB cannot meet its burden because overwhelming eyewitness and documentary evidence establishes that Mr. Hyatt did not derive any income from California sources during the disputed period or thereafter (Sections 1.7, 1.8.5; 1992 ASAB, Sections 1.6, 1.7, 1.7.1, 1.7.1.1 to 1.7.1.5, 1.7.2, 1.7.3, 1.7.4).

Furthermore, in these appeals, FTB cannot satisfy its burden on the sourcing issue when it is also asserting residency at the same time. To carry its burden on the sourcing issue, FTB must affirmatively establish *that Mr. Hyatt was not a California resident*, and FTB has made no attempt to do so. To the contrary, FTB has made every effort, many of which are in bad faith, to try to establish that Mr. Hyatt was a California resident. Accordingly, FTB has not satisfied its burden on the sourcing issue, and therefore the sourcing issue must be dismissed.

---

[22] Rev. & Tax. Code § 19033, § 19034; *see Title Ins. Co. of Minn. v. St. Bd. of Equal.*, 4 Cal.4th 715 (1992) (providing that a "set off," *i.e.*, an assessment applied against refund, must be "formally pursued under Revenue and Taxation Code . . . .").

[23] Despite the procedures for FTB to issue an NPA, this Board has stated that it may decide issues raised by FTB for the first time in an appeal or after the NPA is issued. *See, e.g. Appeal of David G. and Helen Mendelsohn*, 85-SBE-141, Nov. 6, 1985; *Appeal of Sierra Pacific Industries*, 94-SBE-002, Jan. 5, 1994; *Appeal of Duncan*, *supra.* However, these Board decisions are in direct conflict with the carefully reasoned decision of the California Supreme Court in *Title Ins.*, and therefore *Title Ins.* must control.

[24] 1991 AOB, Section IV.B., pp. 65-67.

RJN002109

### 1.5.3 FTB Fails To Carry Its Burden On The Fraud Penalties.

Both fraud assessments (1991 and 1992) must be overturned for the reasons discussed in Section 1.5.1 and for the additional reasons set forth below and in Sections 1.9, 1.9.1 to 1.9.10.

The fraud penalties in these cases apply only to the residency assessments, *there has never been a fraud penalty assessed for the sourcing issue against Mr. Hyatt*.

The 1992 fraud penalties are a continuing bad faith act by FTB. [25] This is because FTB has acknowledged in its RAB that it made a $24 million income error in its 1992 assessments, but it failed to reduce the tax, interest, and penalties for the 1992 disputed period by its $24 million income error (Section 1.9.10). The FTB's 1991 and 1992 fraud penalty assessments are also tainted by FTB's abusive policy of using the fraud penalty as leverage in residency cases to coerce individuals into improper settlements. [26] See also Sections 1.9, 1.9.1 to 1.9.10.

FTB has the burden to establish that the fraud penalty applies by clear and convincing evidence. [27] First, FTB has not carried its initial burden to show the fraud penalty assessments attributable to the residency issue was not arbitrary. Rev. & Tax. Code § 19033 ("In no case shall the determination of the deficiency be arbitrary or without foundation."). In this case, the 1991 and the 1992 fraud penalty assessments were tainted by FTB's highly improper policy of using the fraud penalty as leverage in residency cases to coerce individuals into improper settlements. The 1992 fraud penalty is further arbitrary because *FTB improperly based the 1992 fraud penalty on 1991 facts* (Section 1.8.4.10). FTB has not addressed these points in its briefing. Furthermore, FTB cannot meet the clear and convincing standard (Section 1.9.4). Indeed, the record in these appeals establishes just the opposite – that Mr. Hyatt did not underpay any California taxes. Accordingly, because FTB has not shown that the fraud penalty assessments were reasonable and rational and not tainted by FTB's extreme misconduct, the fraud penalties must be dismissed.

Furthermore, FTB cannot meet its burden because overwhelming evidence establishes that Mr. Hyatt did not commit fraud (Sections 1.9, 1.9.1 to 1.9.10). Mr. Hyatt was overwhelming present in Las Vegas during the disputed period. [28]

---

[25] *Franchise Tax Bd. of Cal. v. Hyatt,* 335 P.3d 125, 149 (Nev. 2014). FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.

[26] *See* 1991 ARB at 75 fn 455-456, citing Ex.44, *Hyatt* v. *FTB,* Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, pp. 46-49; 113-115; Ex. 45, *Hyatt* v. *FTB,* Partial Transcript of Trial Proceedings, Testimony of Carol Ford, 7/8/08, p. 84; Declaration of Thomas Rodrigue, Feb. 11, 2015, ¶¶ 21-26; Declaration of Diane Truly, Feb. 13, 2015, ¶¶ 5, 23-25; Declaration of Candace Les, Feb.9, 2015, ¶ 32.

[27] 1991 AOB, Section III.B., pp. 57-58.

[28] Testimonial Topics, Ex. T008, T009, T018, T021, T128, T019, T095, T096, T129, T026, T022, T023, T024, T025, T100, T057, T030, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047, T147, and T048.

RJN002110

In sum, the 1991 and 1992 fraud penalties should be reversed because FTB has not carried its burden in these appeals.

### 1.6 FTB VIOLATES THE STATUTES AND REGULATIONS FOR CONDUCTING AUDITS, ASSESSING TAXES, AND APPEALING TAX ASSESSMENTS.

In these appeals FTB flaunts the statutory procedures for conducting audits, assessing taxes, and appealing tax assessments, as well as your Board's clear rules for hearing taxpayer appeals. In these appeals, FTB has engaged in endless audits that have lasted over 20 years and are continuing even now; e.g., FTB conducted its most recent deposition less than six months ago in April 2016[29] and FTB subpoenaed the Philips documents just four years ago, after all formal briefing was completed, thereby necessitating the current Second Additional Briefing.

FTB now asserts new theories in its 2013 additional briefing for its assessments and penalties that were not included in its NPAs or NOAs[30] – over 20 years after the 1992 tax year ended (Section 1.8.5.1). In both the 1991 and 1992 NOAs, FTB cited the 2007 Protest Determination Letter where the alternative sourcing basis was discussed. However, the 1991 and 1992 NOAs fail to provide any reasons for the sourcing based deficiency assessment as required by California law.[31] They merely recite an ultimate conclusion that Mr. Hyatt's patents had a business situs in California. They do not give any reason for that conclusion, they do not allege that the assessments are based on any California licensing business and they do not allege that Mr. Hyatt's "income" was derived from sources within California. The NOAs only allege that Mr. Hyatt's "intellectual property" was derived from sources within California.[32] There is no assertion that Mr. Hyatt's "income" was derived from sources in California as would be the case with a California licensing business. Thus FTB did not give proper notice in the NOAs that it alleges there was a California licensing business.

The "intellectual property" (the patents) have a "situs" that follows the residence of the owner[33] which FTB admits for the sourcing issue is Nevada. To establish a "business situs" in California separate from the Nevada situs of the patents,

---

[29] Deposition of Charles Cameron, April 7, 2016.

[30] Notice of Proposed Assessment (NPA). Notice of Action (NOA). After being ordered by your Board to admit to its $24 million error in assessing license payments from Philips, FTB now maintains the disputed period residency assessments and accompanying fraud penalties on post-disputed period licensing income with no established basis in the NPAs or NOAs.

[31] Rev. & Tax. Code § 19033 (providing for the issuance of an NPA when FTB determines a tax deficiency on audit); § 19034 (providing that in each NPA FTB "shall set forth the reasons for the proposed deficiency assessment and the computation thereof").

[32] The FTB Notices of Action for 1991 and 1992, December 26, 2007, both state: "Consistent therewith and predicated upon all of the facts and evidence that we have developed as a result of your contest of the assessment, the assessment is further a alternatively sustained on the basis that **your intellectual property**, from which your income was generated, had a business situs in California for the entire taxable year and **was therefore derived from sources within California**" (emphasis added).

[33] California law provides "income of nonresidents from stocks, bonds, notes, or *other intangible personal property* is not income from sources within this state unless the property has acquired a business situs in this state. . . ." Rev. & Tax § 17952 (emphasis added).

RJN002111

FTB must allege and prove that "possession and control" of the patents has been localized in a California business so that the "substantial use and value" attach to and become an asset of the business.[34] FTB has provided neither the required notice of such allegations in the NPAs and NOAs nor the required proof. Further, the sourcing issue has not been audited by FTB and thus Mr. Hyatt was denied his right to protest the sourcing issue (Section 1.8.5.4.2). FTB has no record on which to base a sourcing assessment. The sourcing assessments in the NOAs are based on unsupported conclusory statements without a record to rely on. It is unlawful for FTB to make major assessments at the end of the FTB administrative process without an audit or protest record to rely on (Section 1.8.5.4.2). Your Board must not affirm tax assessments made without adequate notice and without an adequate record.

Assertion of the 1992 fraud penalties is a continuing bad faith act by FTB. This is because FTB has acknowledged in its RAB that it made a $24 million income error in its 1992 assessments, but it failed to reduce the tax, interest, and penalties for the 1992 disputed period by its $24 million income error (Section 1.9.10). In addition, the FTB's 1991 and 1992 fraud penalty assessments are tainted by FTB's abusive policy of using the fraud penalty as leverage in residency cases to coerce individuals into improper settlements.[35] See also Sections 1.9, 1.9.1 to 1.9.10. See Section 1.5.3.

FTB disregards California law regarding the NPAs and NOAs (Section 1.8.5). FTB's actions fly in the face of the statutory procedure for issuing assessments. FTB has delayed these proceedings by many years and has prejudiced Mr. Hyatt by forcing him to rebut these many new issues after evidence is no longer available (e.g., witnesses have died and multitudes of documents have been destroyed), thus severely prejudicing Mr. Hyatt and forcing him to incur substantial additional expenses during these appeals.

FTB has significantly prejudiced Mr. Hyatt by violating the statutory assessment procedures[36] by depriving Mr. Hyatt of a *bona fide* audit and protest consideration of the sourcing issues.

> FTB did not audit the sourcing issues during the audits and did not determine a deficiency. Rev. & Tax. Code § 19032.

> FTB did not audit the post-disputed period to determine a deficiency. Rev. & Tax. Code § 19032. FTB now admits that the license payments on which the FTB $24 million error are based were received well after the disputed period, during the second half of 1992.

---

[34] Cal. Code Regs., tit. 18, § 17952(c).

[35] *See* 1991 ARB at 75 fn 455-456, citing Ex.44, *Hyatt* v. *FTB,* Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, pp. 46-49; 113-115; Ex. 45, *Hyatt* v. *FTB,* Partial Transcript of Trial Proceedings, Testimony of Carol Ford, 7/8/08, p. 84; Declaration of Thomas Rodrigue, Feb. 11, 2015, ¶¶ 21-26; Declaration of Diane Truly, Feb. 13, 2015, ¶¶ 5, 23-25; Declaration of Candace Les, Feb.9, 2015, ¶ 32.

[36] Rev. & Tax. Code § 19032 (requiring FTB to examine and determine the correct amount of tax in an audit); Rev. & Tax. Code § 19033 (requiring FTB to set forth its determination in an NPA); Rev. & Tax. Code § 19034 (requiring FTB to "set forth the reasons for the proposed deficiency assessment and the computation thereof" in the NPA); Rev. & Tax. Code § 19044 (after a taxpayer files a protest to the NPA, requiring FTB to "reconsider *the assessment* of *the deficiency*," not issue a new assessment) (emphasis added).

RJN002112

FTB did not determine the correct amount of taxes in the 1992 audit. FTB now admits that the 1992 audit and NPA contain a $24 million error. Rev. & Tax. Code § 19032.

FTB did not correct its erroneous 1992 assessments. FTB persists in its assessments on its $24 million error. Rev. & Tax. Code § 19044.

FTB did not determine that the fraud penalties were proven by clear and convincing evidence; e.g., the two audit reviewers questioned whether the fraud penalties were appropriate. Rev. & Tax. Code § 19032; Rev. & Tax. Code § 19036.

FTB did not set forth in the NPA the post-disputed period assessments. Rev. & Tax. Code § 19033.

FTB did not set forth in the NPA the sourcing assessments. Rev. & Tax. Code § 19033.

FTB did not set forth in the NPA the reasons for or computation of the sourcing assessments. Rev. & Tax. Code § 19034.

FTB did not set forth in the NPA the reasons for or computation of the post-disputed period assessments. Rev. & Tax. Code § 19034.

FTB did not provide an NPA upon which to protest the sourcing assessments. Rev. & Tax. Code §§ 19041, 19044.

FTB did not provide an NPA upon which to protest the post-disputed period assessments. Rev. & Tax. Code §§ 19041, 19044.

FTB did not reconsider "the assessment" during the protests; instead, FTB asserted new sourcing assessments. Rev. & Tax. Code § 19044.

FTB's NOAs are FTB's final actions on Mr. Hyatt's protests. Rev. & Tax. Code § 19045. FTB lacked authority to raise a new sourcing theory (a California licensing business) during these appeals.

If FTB's abusive tactics are not stopped by your Board, FTB will turn your Board's appeal process into a forum for it to develop a whole new case with continued investigations and discovery, new theories of taxation, and new assessments (Section 1.8.5.1). FTB will be free to disregard the statutory procedures for NPAs and NOAs enacted by the Legislature (Rev. & Tax. Code §§ 19033 and 19034) and spring a complete new case on a taxpayer at any time; and FTB will be able to file brief after brief with your Board as it continues to subpoena new evidence without limit.

Your Board must put a stop to FTB's illegal and abusive post-NPA determinations, discovery, new theories of taxation, new assessments, and disregard for the regulations and restore the rule of law in California's tax administration process.

RJN002113

**1.7** **THE PHILIPS DOCUMENTS SIGNIFICANTLY SUPPORT MR. HYATT'S RESIDENCY AND SOURCING APPEALS.** The Philips documents are very helpful to Mr. Hyatt's case and do not support FTB's case. FTB's claims regarding the Philips documents are based upon its misrepresentations of the evidence, outright false statements, and total disregard of Mr. Hyatt's overwhelming *eyewitness and documentary evidence*. Sections 1.7, 1.7.1 to 1.7.10, 1.8, 1.8.1 to 1.8.7; 1992 ASAB, Sections, 1.4, 1.4.1, 1.4.1.1 to 1.4.1.4, 1.5.1 to 1.5.11, 1.6, 1.6.1, 1.6.2, 1.7, 1.7.1 to 1.7.5.

The Philips documents relate to many subjects. First and foremost, they show Philips' extraordinary efforts to create and manage the Philips Licensing Program and the small role of Mr. Hyatt in supporting Philips' efforts. The Philips documents include, for example, Philips correspondence related to the Philips Licensing Program, invoices received and paid by Philips, documents related to Philips' financial responsibilities, multitudes of draft and final licensing agreements, and documents showing the many Philips Licensing Program activities.

**1.7.1** **The Philips Documents Significantly Support Mr. Hyatt's Appeals, Illustrated By 15 Tables Of Excerpts From And Citation To More Than 5,000 Pages Of Philips Documents, Which Were Disregarded By FTB.**

Mr. Hyatt's 15 tables have excerpts of Philips documents and cites to more than 5,000 pages of Philips documents (some duplicates) that illustrate the significant support the Philips documents give to Mr. Hyatt's appeals, illustrate Philips' control and operation of the Philips Licensing Program, and illustrate many of Mr. Hyatt's facts in these appeals. A list of the subject matter contained in these Philips documents is provided in 1992 ASAB, Section 1.6.3.[37]

To put this into perspective, FTB produced more than 8,000 pages of unauthenticated alleged Philips documents, which include *Mr. Hyatt's more than 5,000 pages of Philips documents* (some duplicates) that support his cases and include several thousand pages of documents that are neutral such as drafts of agreements.

**1.7.2** **The Philips Documents Detail FTB's Bad Faith $24 Million Income Error.**

The Philips documents establish that FTB in bad faith overstated the 1992 NPA income by $24 million[38] and now attempts to continue with its outrageous assessment of taxes, interest, and penalties on income that is not taxable by California (Sections 1.8.5.4.4, 1.8.5.4.5, 1.9.10, 1992 ASAB, Section 1.7.5).[39] Mr. Hyatt argued these outrageous facts in his AAB. However, FTB did not address the AAB in the FTB RSABs, thus the positions developed in the AAB are undisputed.[40]

---

[37] See the Philips Document Tables, Exhibits 1 to 15.
[38] Sanyo (FTB_Philips 0003514, 0003502, 0003483, 0003468 – 0003469), Nippon Columbia (FTB_Philips 0001448, 0001430, 0001428, 0001415), Omron (FTB_Philips 0003355, 0003334), Kenwood (FTB_Philips 0002016- 0002017, 0002001 – 0002003, 0001990 – 0001993, 0001997 – 0001998, 0001967, 0001963, 0001962).
[39] AAB. See also 1992 AOB, pp. 52-56; 1992 ARB, pp. 93-95.
[40] FTB knew for more than 16 years about the $24 million error and made no attempts to correct it, AAB, § III.A, pp. 9-12; It is unlawful for FTB to now increase the now-corrected 1992 NPA to include an additional $24 million of income, AAB, § III.B, pp. 12-16; Inclusion of the auditor's $24 million income error is barred by equitable principles, AAB, § III.C, pp. 17-21; Equitable estoppel bars FTB from assessing tax on the $24 million error under a sourcing theory, AAB, § III.C.1,

-9-

Originally, FTB included $24 million of Mr. Hyatt's disputed licensing payments in the NPA on the ground they were received between January 1, 1992, and April 2, 1992 (the 1992 disputed period) while Mr. Hyatt was allegedly a California resident. However, these payments were received from Philips during the second half of 1992 and well after the disputed period. For years FTB illegally persisted in assessing taxes on these license payments and falsely contended that these license payments were received by Mr. Hyatt on January 15, 1992, despite Mr. Hyatt's indisputable evidence to the contrary. After your Board's staff ordered FTB to file a brief explaining its position that Mr. Hyatt received such income during the 1992 disputed period, FTB was forced to admit that the $24 million in license payments (from Sanyo, Omron, Kenwood and Nippon Columbia) were not received until well after the disputed period.[41] Although FTB finally acknowledged that Mr. Hyatt did not receive the $24 million license payments until well after the disputed period, amazingly FTB did not reduce the NPA assessments for the disputed period by the FTB's $24 million error. Essentially, the record now stands that FTB reluctantly corrected its $24 million error *in form but not in substance*. It still holds to its NPA residency assessment of its $24 million error plus penalties and interest as if FTB did not make this $24 million error at all. FTB in bad faith is attempting to make your Board's milestone Additional Briefing into a hollow gesture. Essentially, as the record now stands, the disputed income for the 1992 disputed period is $26,981,988 but FTB has unlawfully assessed taxes, interest, and penalties on a total of $51,595,186 in disputed income. Mr. Hyatt has explained this in his AAB but FTB has not responded thereto in its RSABs and *thus Mr. Hyatt's position is undisputed*.

Your Board must not allow FTB to perpetrate this fraud on Mr. Hyatt and to disregard your Board's order. The taxes, interest, and penalties on the FTB's $24 million error must be reversed.

### 1.7.3 The Philips Documents Confirm That Philips Created, Managed, And Operated The Philips Licensing Program As Testified To By Highly Credible Licensing Eyewitnesses.

The Philips documents confirm that Philips created, managed, and operated the Philips Licensing Program (Section 1.7.1), corroborate the declarations and affidavits of Mr. Tamoshunas, Mr. Leonard, Mr. Roth, and Mr. Hyatt, which explain that Mr. Hyatt did not engage in a licensing business (1992 ASAB, Section 1.7.3), and confirm that Philips had the *exclusive* licensing authority to license Mr. Hyatt's licensable patents (Section 1.7.5). See Mr. Tamoshunas' testimony *infra*. Specifically, the Philips documents confirm that Philips created, managed, and financed the Philips licensing program; Philips oversaw and managed the collection of the licensing income; Philips distributed or arranged to have distributed all of the licensing income; Philips put its worldwide licensing organization to work to license the Hyatt patents; Philips managed and

---

pp. 17-19; and the equitable doctrine of laches bars FTB from assessing tax on the $24 million error under a sourcing theory, AAB, § III.C.2, pp. 19-21.

[41] RAB, pp. 25, 27-29.

RJN002115

operated the Philips Licensing Program; Philips formally authorized and directed Mahr Leonard, PSB&C, and Mr. Hyatt to assist its licensing program; and much more.[42]  Moreover, ***Mr. Hyatt produced more than fifteen thousand pages of licensing documents to FTB*** during the protests and produced affidavits or declarations sworn to by eyewitnesses Mr. Tamoshunas, Mr. Leonard, Mr. Roth, and Mr. Hyatt explaining the Philips Licensing Program and providing context for the Philips documents. FTB disregarded this testimony on the merits and only discusses Mr. Hyatt's and Mr. Roth's testimony in the context of attempting to discredit them.

The Philips documents establish that Philips made arrangements to take control of licensing of the patents even before the July 1991 Philips Agreement was signed:  "We confirm that Consumer Electronics desires to proceed with the arrangement with Mr. Gilbert Hyatt . . . . We also further confirm that . . .  Consumer Electronics shall bear the costs of the program for Sublicensing the Hyatt patents, including litigation expenses incurred and payments to be made by Philips to Hyatt under the proposed agreement."[43]

The Philips documents overwhelmingly support the testimony of Mr. Tamoshunas who managed the Philips Licensing Program that generated these documents and the licensing income at Philips.  The following are examples of Mr. Tamoshunas' testimony (many are direct quotations) which are reinforced by the Philips documents (Section 1.7.1).[44]

- Mr. Tamoshunas, a Philips Vice President, was a registered patent attorney with extensive experience in patent licensing and litigation.
- "Philips had the responsibility to license the 'licensable patents' under Sections 4.1 and 4.3 of the July 1991 Philips Agreement."
- Philips took on significant responsibility and financial exposure up to $36.5 million.
- "Philips by itself and through its attorneys created and managed the Licensing Program."
- "Philips managed the licensing program from its offices in New York and the Netherlands."
- "Philips used its worldwide licensing organization to license the 'licensable patents.'"
- "Licensing professionals from Philips in New York and in the Netherlands made numerous trips to Japan and to other Asian countries to negotiate license agreements."
- "Philips formed a team of licensing professionals to license the 'licensable patents.'"
- "Philips negotiated with other prospective licensees and obtained four additional patent agreements in 1992."
- "Philips selected the patent claims that were to be presented to the prospective licensees."
- "While Philips obtained assistance from Mahr Leonard, Mr. Hyatt and others during the course of the Licensing Program, Philips managed the Licensing Program."
- "All of the licensing income from the Seven Patent Agreements was received by the client trust account maintained by PSB&C for the benefit of Philips at Union Bank."

---

[42] See the 15 tables of Philips documents in Folder 12 titled "Philips Tables".
[43] Letter from Huijser (Philips The Netherlands) to Tamoshunas (Philips Tarrytown) dated June 25, 1991. FTB_Philips 0005027.
[44] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 2, 11, 10, 10, 11, 11, 14, 13, 13, 12, 28, 18, 23, 13, respectively.

-11-

RJN002116

- "Philips accounted for all of the licensing income and for all expenses charged to the Licensing Program with "quarterly reports" to Mr. Hyatt in accordance with Section 4.9 of the July 1991 Philip Agreement."

- "To the best of my knowledge Mr. Hyatt did not conduct any licensing business after signing the July 1991 Philips Agreement with regard to the Eleven 1991-1992 Patent Agreements."

- "To the best of my knowledge, Mr. Hyatt did not negotiate the Eleven 1991-1992 Patent Agreements."

### 1.7.4 FTB's Overbroad Philips Subpoenas Forced Mr. Hyatt To Obtain New York Court Orders And Temporary Restraining Orders To Protect His Confidential Information And To Avoid An Overbroad Production.

Mr. Hyatt was compelled to seek New York court orders to protect his confidential information, to avoid being overburdened by FTB's unduly broad subpoenas, and to avoid an overbroad production by Philips. Mr. Hyatt was successful in limiting the overbroad FTB subpoenas and to limit the overbroad production by Philips. During the New York court proceedings, the court severely criticized FTB regarding its subpoenas and issued two temporary restraining orders and court orders regarding the Philips documents, including documents irrelevant to these proceedings because they were outside the relevant time frame or did not set forth relevant information. In addition, FTB has spent almost two years to generate three rounds of DVDs containing its RSABs to falsely attempt to comply with the court orders, and some dispute still exists. Mr. Hyatt did not know the full scope of the material that would be in the FTB's RSABs that he had to deal with until about April 21, 2016, just five (5) months ago, when your Board's staff burdened itself with redacting FTB's RSABs to comply with the court order.

FTB continues its discovery into the appeal process without leave to do so by your Board, with FTB taking a deposition of a witness on April 7, 2016, just five (5) months ago.[45]

By continuing its discovery for years into this appeal process, FTB has caused additional years of delay, but it has also reinforced Mr. Hyatt's case with the Philips documents and it has greatly aided your Board's resolution of a very significant issue with the first Additional Briefing in which FTB confirmed that it overstated the 1992 NPA by $24 million (Section 1.7.2; RAB).

### 1.7.5 Philips Had *Exclusive* Licensing Authority To License Mr. Hyatt's Licensable Patents.

Philips had the *exclusive* licensing authority to license Mr. Hyatt's licensable patents.[46] Thus, Mr. Hyatt could not take any action with respect to his licensable patents without authorization from Philips. Philips drafted three supplemental

---

[45] Deposition of Charles Cameron, April 7, 2016.

[46] See the letter to Omron dated August 4, 1992, HL 02021, FTB_Philips 0003335 – 0003336; the letter to Toshiba dated February 3, 1992, FTB_Philips 0002663, 0002782; the letter to Asahi, HL 00307; the letter to Seiko, HL 00308; Sections 4.1 and 6.1 of the July 1991 Philips Agreement, H 01378, H 01388-01389; and the 2010 Tamoshunas Affidavit, ¶ 5; the 2010 Roth Sourcing Affidavit, §§ 4.2.1.8, 5.1.4.

RJN002117

agreements that granted Mr. Hyatt the rights to sign patent agreements with seven specific licensees after approval by Philips.[47]

Furthermore, Philips granted Mahr Leonard *exclusive negotiating rights* with certain prospective licensees.[48] Philips also authorized Mahr Leonard and Mr. Roth to negotiate with Hitachi.[49] Mr. Hyatt was not authorized to negotiate with prospective licensees and Mr. Hyatt did not negotiate with prospective licensees. With Mahr Leonard having *exclusive negotiating rights* it is absurd to think that Mahr Leonard would permit an inventor to get in the way of the professionals.

With two world class licensing organizations, Philips and Mahr Leonard, putting significant licensing efforts into licensing the patents, it is absurd to think that Philips would permit an inventor to get in the way of its professional licensing activities.

### 1.7.6   Mr. Hyatt Would Not And Did Not Breach The July 1991 Philips Agreement By Negotiating With Prospective Licensees Or By Operating A Licensing Business, As Falsely Contended By FTB.

This issue is explained in 1992 ASAB, Section 1.7.3.

### 1.7.7   The Philips Documents Support Mr. Hyatt's Understanding That Philips Wanted Mr. Hyatt To Sign Several Patent Agreements Because Of Philips' Cross Licensing Relationships.

In early October 1991, Mr. Tamoshunas asked Mr. Hyatt to sign some of the patent agreements that were being negotiated by Mahr Leonard. Mr. Hyatt was reluctant to take on this responsibility because of a perception that he had about it causing liability. Mr. Tamoshunas told Mr. Hyatt that Philips would indemnify him and hold him harmless for such liability. Mr. Hyatt wanted to be cooperative with Philips and he thought that the indemnification and hold harmless provisions in Philips' authorization would protect him so he agreed to sign patent agreements for Philips.[50]

Mr. Hyatt understood that certain prospective licensees (e.g., Hitachi) were interested in taking licenses for his patents but that they did not want to work directly with Philips because of other relationships that they had with Philips.[51]

Mr. Hyatt found out that Philips had cross licenses with some of the prospective licensees and that Philips might have to waive its licensing payments if a cross license was invoked by a cross licensee.[52] Thus, Mr. Hyatt understands that Philips'

---

[47] The [First] Supplemental Agreement, FTB_Philips 0000666-0000673; the Second Supplemental Agreement, FTB_Philips 0000674-677 and the Third Supplemental Agreement, FTB_Philips 0000679-0000682.
[48] September 1991 Mahr Leonard Agreement, FTB_Philips 0000145-0000151.
[49] Letter from Philips to Mahr Leonard dated January 17, 1992, GLR 00940.
[50] Hyatt's 2016 Supp. Aff., ¶ 135.
[51] Hyatt's 2016 Supp. Aff., ¶ 136.
[52] Fax dated February 10, 1992, from Haken to Beckers and Tamoshunas, FTB_Philips 0006278; fax dated February 17, 1992, from Haken to Kulkarni, FTB_Philips 0006274 – 0006276; and fax dated February 11, 1992, from Beckers to Haken, FTB_Philips 0006277.

RJN002118

cross licenses were a reason Philips wanted Mr. Hyatt to sign the patent agreements even though Philips had exclusive authority to license his computer patents.[53]

### 1.7.8 Philips And Mahr Leonard Promised To Correct Mr. Hyatt's Address In The Preamble Of The Patent Agreements And After Several Of His Complaints They Did Correct It, As The Philips Documents Confirm.

In early October 1991, shortly after moving to Las Vegas, Mr. Hyatt telephoned Philips and Mahr Leonard and told them that he had moved to Las Vegas. Shortly after leasing his Las Vegas apartment on October 8, 1991, Mr. Hyatt telephoned Philips and Mahr Leonard and gave them the address of his Las Vegas apartment. Mahr Leonard did in fact put his Las Vegas apartment address in the preambles of the Sony and NEC Patent Licenses ("Gilbert P. Hyatt, an individual having his residence at 3225 South Pecos Road, Apt. 237, Las Vegas, Nevada 89121").[54]

Mr. Hyatt received four patent agreements (Fujitsu, Oki, Sharp, Matsushita) for his signature[55] that had his Cerritos P. O. Box address, not his Las Vegas apartment address, in the preambles of the patent agreements. He telephoned Mr. Tamoshunas and Mr. Leonard on several occasions and complained that the patent agreements recited an old address. Mr. Tamoshunas and Mr. Leonard told Mr. Hyatt that the address in the preamble did not matter because the correct correspondence address was in the patent agreements. Mr. Hyatt was told that this address would be corrected on subsequent patent agreements. Mr. Hyatt signed the patent agreements as requested by Philips[56] and forwarded them to Mahr Leonard as directed.

Mr. Hyatt then received the Sony and NEC Patent Agreements and noticed that the preamble stated his correct Las Vegas address and also correctly identified the address as his Las Vegas residence. Mr. Hyatt signed the Sony and NEC draft patent agreements as requested by Philips[57] while present in Las Vegas and Mr. Hyatt sent them to Mahr Leonard as directed.

### 1.7.9 The Philips Documents Confirm That Mr. Hyatt Had Very Limited Involvement In The Large Worldwide Philips Licensing Program.

Philips had the *exclusive* licensing authority to license Mr. Hyatt's licensable patents (Section 1.7.5). Mahr Leonard had exclusive negotiation rights regarding license agreements and Mahr Leonard exclusively negotiated with seven companies and obtained six license agreements (Section 1.7.5, 1992 ASAB, Section 1.7.3). Philips with its exclusive licensing

---

[53] Hyatt's 2016 Supp. Aff., ¶ 137.

[54] Hyatt's 2016 Supp. Aff., ¶ 138. See Sony Patent Agreement, p. 1, FTB_Philips 0000531; NEC Patent Agreement, p. 1, FTB_Philips 0000545.

[55] Mr. Hyatt signed several patent agreements at the request of Philips and to be cooperative with Philips. Hyatt's 2016 Supp. Aff., ¶¶ 135-137.

[56] Mr. Hyatt signed several patent agreements at the request of Philips and to be cooperative with Philips. Hyatt's 2016 Supp. Aff., ¶¶ 135-137.

[57] Mr. Hyatt signed several patent agreements at the request of Philips and to be cooperative with Philips. Hyatt's 2016 Supp. Aff., ¶¶ 135-137.

RJN002119

authorization, negotiated with many other companies without any coordination with Mr. Hyatt, as was its right under the July 1991 Philips Agreement. Mr. Hyatt had no authority to negotiate with prospective licensees or to have a licensing business as alleged by FTB.

For example, the Philips documents establish that Philips was pursuing many companies *without Mr. Hyatt's knowledge or assistance* (Mr. Hyatt was not included on letters, faxes, or memoranda), which was Philips' right under the July 1991 Philips Agreement. Philips was planning a significant trip to several Asian countries at least as early as January 1992.[58] Philips was pursuing Acer, ADI, Alps, Cal-Comp, Chuan Hup, Clarion, Daewoo, Dennon, Fuji Photo, Goldstar, Great Electric, Honda, Hyundai, Kenwood, Kyocera, Microtec, Minolta, Mitac, Motor, Nikon, Nintendo, Nippon Columbia, Olympus, Omron, Onkyo, Samsung, Sanyo, Seiko, Toshiba, Wearne Bros., and Yamaha. In fact, Philips prepared for a January 1992 licensing trip to Asia with a list of 19 of these companies.[59]

Mr. Hyatt had no part in this plan. Mr. Hyatt had very limited involvement in the large worldwide Philips Licensing Program.

### 1.7.10  FTB Acted In Bad Faith By Depriving Mr. Hyatt Of His Statutory Rights To Audits And Protests On The Sourcing Assessment Before Receiving A Final Agency Action.

FTB acted in bad faith in assessing the sourcing assessments. California law requires that, at the conclusion of the audit, FTB "set forth the reasons for the proposed deficiency assessment" in an NPA; and that it allow the taxpayer to protest any proposed assessment.[60] However, FTB's current sourcing issue is not in the NPAs, NOAs, audits, or protests and is thus a violation of California law.

In 1995, during the 1991 audit, FTB's senior and most knowledgeable personnel on sourcing issues reviewed Mr. Hyatt's audit and determined not to pursue the sourcing issue.[61] However, years later during the protests, FTB reversed course and decided to pursue sourcing assessments. Mr. Hyatt first found out about this substantial new issue in writing through FTB's November 2007 protest determination letter after delaying 10 years in the protests.[62] During the protests FTB's counsel indicated that sourcing would be an issue but assured Mr. Hyatt's representative that he would have "ample time" during the protest to respond to the sourcing issue.[63] FTB reneged on this promise. FTB gave Mr. Hyatt only 30 days to provide a

[58] FTB_Philips 0000273-0000275, 0006800, 0006827, 0001038, 0001455, 0002033, 0000271, 0001037, 0002658, 0003377, 0003589, 0001453-1454, 0002031-2032.
[59] FTB_Philips 0000273-0000275.
[60] Rev. & Tax. Code §§ 19034, 19034, 19044.
[61] Ex. 69, Memorandum of M. Embry to FTB auditors, 8/24/95;1991 AOB pp. 83-85 (a full discussion of FTB's decision.
[62] FTB Protest Determination Letter, 11/7/2007, pp. 30-49.
[63] Letter from C. Cinnamon to E. Coffill, 6/7/05 ("Please be assured that you will have ample time to review and respond to our position letter prior to the issuance of notices of action on the protested notices of proposed assessments for taxable years 1991 and1992.).

RJN002120

complete response to the Protest Determination Letter and refused to grant Mr. Hyatt's request for a reasonable extension of time to allow consideration of the substantial new issue in his protests.[64]  FTB's sourcing assessments are a bad faith attempt to ram through the unlawful sourcing assessments and deny Mr. Hyatt's statutory right to respond to the assessments during the audit and in a protest hearing.  Your Board should reject FTB's unlawful sourcing assessments because they were issued in bad faith and outside the statutory assessment procedures.

## 1.8    FTB'S CONTINUING BAD FAITH ACTS.

### 1.8.1    FTB In Bad Faith Misrepresents Or Disregards Overwhelming Eyewitness Testimony And Documentary Evidence Of Mr. Hyatt's Las Vegas Presence.

The correspondence sent by Philips to Mr. Hyatt's former California addresses and fax numbers is undisputed mis-addressed correspondence (Sections 1.8.4.2 to 1.8.4.4; 1992 ASAB, Sections 1.4.1.1 and 1.5.6.3).[65]  Mr. Hyatt gave Philips a change of address in October 1991.  Mr. Tamoshunas, the lead licensing attorney at Philips, testified he was given this change of address and testified that the subsequent sending of correspondence addressed to Mr. Hyatt's former California addresses was inadvertent error by Philips personnel.[66]  FTB has not rebutted Mr. Tamoshunas' testimony regarding this mis-addressed correspondence.  Thus, ***Mr. Tamoshunas' testimony is undisputed***.

Mr. Hyatt informed Philips and Mahr Leonard in early October 1991 that he had moved to Las Vegas and later in October 1991 Mr. Hyatt gave Philips and Mahr Leonard changes of address to his Las Vegas locations.  The eyewitness testimony is clear.  Philips and Mahr Leonard inadvertently mailed and faxed documents to Mr. Hyatt's former California addresses and fax number after he provided them with his new Las Vegas address.[67]  However, FTB disregarded or misrepresented this evidence in bad faith – the Philips correspondence was mis-addressed to the California addresses.  Furthermore, Mr. Hyatt provided eyewitness and documentary evidence that he was in Las Vegas when FTB falsely inferred that he was in California based upon false inferences drawn from the mis-addressed correspondence (Sections 1.8.4.2 to 1.8.4.4; 1992 ASAB, Sections 1.4.1.1, 1.5.6.3).[68]

---

[64] FTB Protest Determination Letter, 11/7/2007, p. 49; FTB Letter from G. McLaughlin to E. Coffill, 11/26/07, p. 2.
[65] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.
[66] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25 ("Mr. Hyatt gave Philips a change of address from California to Las Vegas in the latter part of October 1991 and I understood that he moved to Las Vegas before the latter part of October 1991.  Any mailings from Philips' personnel to Mr. Hyatt at his former California addresses as of October 1991 and thereafter were inadvertent errors by Philips' support personnel."); A. Tamoshunas Deposition Transcript, 10/27/2011, at 648:19-649:16 (affirming his affidavit testimony), 548:10-18 (testifying that Mr. Hyatt notified Mr. Tamoshunas that correspondence was mistakenly sent to his former California addresses and asking that correspondence be sent to his Las Vegas address.)
[67]Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25; Affidavit of David Leonard, May 2, 2012, ¶ 26; Affidavit of Gregory L. Roth, August 9, 2010, § 4.6.1; Declaration of Vicki Weart, May 21, 2012 ¶¶ 5-6; Affidavit of Gilbert P. Hyatt, August 15, 2010, § 4.6.1.
[68] Mr. Hyatt's 2016 Supp. CDE Aff., ¶¶ 153-243, CDE Exhibits CDE-ST002 and ST003; ASAB Exhibits 2 and 3.

RJN002121

Further, Mr. Hyatt provided eyewitness testimony of his presence in Las Vegas on many of the days[69] that FTB falsely alleges that he was in California (Sections 1.8.4.2 to 1.8.4.4). FTB falsely attacks the credibility of Mr. Hyatt and his eyewitnesses based upon FTB's false inferences despite the eyewitness and documentary evidence that supports their testimony (Sections 1.8.6, 1.8.6.1 to 1.8.6.4; 1992 ASAB, Section 1.4.1.1). The eyewitness testimony is summarized in the Updated Testimonial Topics Table in subject matter form (72 eyewitnesses testified about Mr. Hyatt moving away in 1991) and excerpted in the exhibits thereto (Section 1.3.1). Furthermore, FTB disregards the enormous amount of reinforcement from similar eyewitness testimony (Section 1.8.6.4).

Mr. Hyatt has provided documentary evidence of his presence in Las Vegas on many of the days that FTB falsely alleges that he was in California based on false inferences from undisputedly mis-addressed correspondence (Sections 1.8.4.2 to 1.8.4.4). Mr. Hyatt's hundreds of pages of CDE affidavits provide detailed testimonial evidence authenticating and describing thousands of pages of very relevant documentary evidence.[70] The overwhelming documentary evidence is summarized in several tables,[71] linked to the actual documents, and authenticated and described in CDE affidavits.[72] The following excerpt from Mr. Hyatt's affidavit is one of many hundreds of testimonial statements about actual documents.

> FTB falsely states that I was in California on March 7, 1992, that my presence in California was "inferred", and that my presence in California was supported by "logical inference" (FTB's Attachment A (Revised), p. 110, March 7, 1992). However, on March 7, 1992, I was present in Las Vegas all day, I was not present in California that day. I signed a check while present at my Las Vegas apartment that day, as was my practice (see ¶ 27 herein), drawn on my Las Vegas checking account to pay MBNA. This check had my Las Vegas address and my bank's Las Vegas address imprinted thereon. A copy of check number 193 payable to MBNA is located in Exhibit CDE-T003 (H 00643) to my 2016 Post-Disputed Period CDE Affidavit. On March 7, 1992, I also sent Eugene Cowan of Riordan and McKinzie a FedEx package from Las Vegas with a Las Vegas return address. A copy of a FedEx receipt for the FedEx package is located in Exhibit CDE-T006 (H 015977) to my 2016 Post-Disputed Period CDE Affidavit.

Hyatt's 2016 Supp. CDE Aff., ¶ 222.

Mr. Hyatt has provided eyewitness and documentary evidence of his presence in Las Vegas on many of the days that FTB falsely alleges that he was in California based on false inferences from undisputedly mis-addressed correspondence. This evidence includes eyewitness testimony and documentary evidence and numerous tables excerpting and summarizing the evidence for the convenience of your Board.[73]

---

[69] Updated Testimonial Topics, Exs. T007, T006, T102, T114, T119, T127, T008, T009, T018, T021, T128, T019, T022-T025, T135, T136, T040, T138, T140-T143, T045, T044, T046, T047, and T049.

[70] Hyatt's 2012 CDE Aff. and the exhibits therein; Hyatt's 2016 Supp. CDE Aff. and the exhibits therein; Hyatt's 2016 Post-DP CDE Aff. and the exhibits therein.

[71] See e.g., Table of Mr. Hyatt's 1991-1992 Documents Having His Nevada Contact Information, Nevada Mail Table, Nevada Checks Table, Hyatt's 2016 Post-DP CDE Aff., Exhibits CDE-T006, CDE-T005, and CDE-T003, respectively. See also Sections 1.3.1, 1.3.5, 1.3.7, 1.3.8, 1.3.9, 1.3.10, 1.3.11, 1.3.12, and 1.3.13.

[72] Hyatt's 2016 Supp. CDE Aff. and the exhibits therein; Hyatt's 2016 Post-DP CDE Aff. and the exhibits therein.

[73] See Sections 1.3.1, 1.3.5, 1.3.7, 1.3.8, 1.3.9, 1.3.10, 1.3.11, 1.3.12, and 1.3.13.

-17-

### 1.8.1.1  FTB In Bad Faith Disregards Mr. Hyatt's Overwhelming Contemporaneous Documentary Evidence (CDE) And Then Disingenuously Builds Its Case On An Alleged Lack Of CDE.

FTB makes many bad faith statements[74] misrepresenting that Mr. Hyatt had little if any CDE[75] when in fact Mr. Hyatt has an overwhelming amount of CDE.  For example, with no citation to any such statement FTB disingenuously states "Recall that Mr. Hyatt explains the complete absence of documentary evidence reflecting any Nevada activity during this period . . . ."[76]  However, Mr. Hyatt produced thousands of pages of CDE reflecting extensive Nevada activity during the disputed period,[77] including obtaining a Nevada driver's license and voters registration, extensive house hunting in Las Vegas, obtaining Nevada insurance, purchasing a house in Las Vegas, purchasing a new car in Las Vegas, opening bank accounts, signing hundreds of checks while present in Las Vegas and making numerous credit card transactions in Las Vegas.[78]  FTB has demonstrated extreme bad faith by ignoring the contemporaneous documents that evidence these activities.  FTB's arguments and inferences cannot be trusted.

See also Sections 1.8.1, 1.8.2, 1.8.3, 1992 ASAB, Sections 1.5.3, 1.5.4, 1.5.8, 1.5.10, 1.5.10.1 to 1.5.10.5.

### 1.8.2  Mr. Hyatt's Eyewitness And Documentary Evidence In Rebuttal To FTB's Calendar, Attachment A-R, And Attachment E Are Summarized In Tabular Form.

Various tables summarizing Mr. Hyatt's rebuttal to FTB's calendar, Attachment A-R and Attachment E are provided for the convenience of your Board.  In its RSABs and related attachments FTB in bad faith relies in large part on false inferences ("inferred") and misrepresentations (inferences misrepresented as "established") (1992 ASAB, Sections 1.5.10, 1.5.10.1 to 1.5.10.5) as well as attacks on third party witnesses and on Mr. Hyatt (Sections 1.8.6, 1.8.6.1 to 1.8.6.5)[79] to falsely claim that Mr. Hyatt was present in California on many days during the disputed period when he was not.

ASAB Exhibit 1 is a copy of FTB's calendar and ASAB Exhibit 2 is a table summarizing Mr. Hyatt's presence for each day of the disputed period, each of which are linked to the rebuttal for each day in the Rebuttal to FTB Att. A/F.

ASAB Exhibit 3 is a table summarizing the many false FTB statements alleging California presence because there is no documentation when in fact Mr. Hyatt has produced documentation and other evidence confirming that he was present in Nevada on those days (1992 ASAB, Section 1.5.10.2).

---

[74] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.

[75] Hyatt's 2012 CDE Aff., ¶¶ 3-5.

[76] FTB 1991 Reply Brief, p. 12:1-3 (emphasis added).  See also Mr. Hyatt's 2012 CDE Affidavit, Section titled "Overview Regarding The FTB's Misrepresentation Of My Tens Of Thousands Of Page Of "Contemporaneous Documentary Evidence", ¶¶ 3 to 5.

[77] Hyatt's 2012 CDE Aff.; Hyatt's 2016 Supp. CDE Aff.; and Hyatt's 2016 Post-DP CDE Aff.

[78] Mr. Hyatt produced this CDE to FTB more than a decade ago and he filed the initial Disputed Period CDE affidavit in 2012, but FTB still persists in its false positions regarding his documents in its RSABs.

[79] See also Mr. Hyatt's 2016 Supp. CDE Aff., ¶¶ 153-243, CDE Exhibits CDE-ST002 and ST003; ASAB Exhibits 2 and 3.

-18-

ASAB Exhibit 4 is a table analyzing Mr. Hyatt's temporary or transitory presence in California and other states when in fact FTB has failed to provide a temporary or transitory analysis (1992 ASAB, Section 1.5.5).

ASAB Exhibit 5 and ASAB Exhibit 8 are tables summarizing FTB's disingenuous attacks on third party witnesses in its Attachment E and ASAB Exhibit 6 and ASAB Exhibit 9 are tables summarizing FTB's disingenuous attacks on Mr. Hyatt in its Attachment E. Each table links to significant evidence that establishes that the witness statements are correct.

Exhibits CDE-ST002 and CDE-ST003[80] are tables summarizing FTB's false inferences ("inferred") and misrepresentations (inferences misrepresented as "established") and they cite and link to Mr. Hyatt's eyewitness and documentary evidence that establishes that FTB is wrong.

Exhibit CDE-ST004[81] is a table summarizing Mr. Hyatt's more than 100 non-California professionals that were disclosed to FTB and that FTB disregarded.

### 1.8.3 FTB In Bad Faith Disregards Or Misrepresents Mr. Hyatt's Overwhelming Eyewitness And Documentary Evidence Demonstrating There Was NO California Source Income.

FTB bases its sourcing case on its bad faith allegations of Mr. Hyatt's alleged presence and licensing business at the former Jennifer Circle house.[82] Mr. Hyatt has clearly established that he was not present at the Jennifer Circle house during the disputed period and thereafter (1992 ASAB, Sections 1.5.1, 1.5.2, 1.5.5, 1.5.8)[83] and that he did not have a licensing business (Sections 1.7.3, 1.7.5, 1.7.9, 1992 ASAB, Section 1.7.3).

Mr. Hyatt has produced overwhelming eyewitness and documentary evidence that has been disregarded or misrepresented by FTB that demonstrates Mr. Hyatt did not have sourcing income. For example, this evidence includes the testimony of the key licensing eyewitnesses;[84] the testimony of more than 150 third party witnesses, [85] thousands of pages of documentary evidence. [86] This evidence demonstrates that Mr. Hyatt was not present at the Jennifer Circle house from which FTB alleges he operated a worldwide licensing program which would have competed with the Philips Licensing Program.

---

[80] Exhibits attached to Hyatt's 2016 Supp. CDE Aff.
[81] Exhibit attached to Hyatt's 2016 Supp. CDE Aff.
[82] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.
[83] See also Mr. Hyatt's 2016 Supp. CDE Aff., ¶¶ 153-243, CDE Exhibits CDE-ST002 and ST003; ASAB Exhibits 2 and 3.
[84] Affidavit of Algy Tamoshunas, August 4, 2010; Affidavit of David Leonard, May 2, 2012; Affidavit of Gregory Roth, August 9, 2010.
[85] Updated Testimonial Topics, Exs. T007, T006, T102, T114, T119, T127, T008, T009, T018, T021, T128, T019, T022-T025, T135, T136, T040, T138, T140-T143, T045, T044, T046, T047, and T049.
[86] See the exhibits attached to Mr. Hyatt's 2010 Sourcing Affidavit, his 2012 CDE Aff., his 2016 Supp. CDE Aff., and his 2016 Post-DP CDE Aff.

-19-

#### 1.8.4 FTB Makes Thousands Of False Statements In Its RSABs, Calendar, Attachment A-R, And Attachment F.

FTB's RSABs, calendar, and attachments are rife with false statements about the evidence.[87] The Rebuttal to FTB Att. A/F establishes that FTB has made over two thousand false statements misrepresenting evidence and falsely arguing to your Board that its inferences and speculations support its assessments while disregarding or misrepresenting Mr. Hyatt's extensive eyewitness testimony and undisputed documentary evidence (Sections 1.7, 1.7.1 to 1.7.9, 1.8, 1.8.1 to 1.8.7; 1992 ASAB, Sections 1.4, 1.4.1, 1.4.1.1 to 1.4.1.4, 1.5.1 to 1.5.11, 1.6, 1.6.1, 1.6.2, 1.7, 1.7.1 to 1.7.5).[88] Your Board can easily find and review the more than 2,000 false FTB statements by searching for the word "false" in Mr. Hyatt's Rebuttal to FTB Att. A/F.

FTB's calendar and Attachment A-R are made in bad faith (Section 1.8.2); e.g., see ASAB Exhibits 1 and 2. ASAB Exhibit 1 is a copy of FTB's calendar and ASAB Exhibit 2 is a table summarizing Mr. Hyatt's presence for each day in the disputed period, FTB's calendar and the ASAB Exhibit 2 table are linked to the rebuttal for each day in Mr. Hyatt's Rebuttal to FTB Att. A/F.

#### 1.8.4.1 FTB Falsely Claims That Mr. Hyatt Was Present At The La Palma House Based On Inferences, Speculation, And Misrepresentation Of The Evidence While Disregarding Or Misrepresenting Mr. Hyatt's Eyewitness And Documentary Evidence Of His Actual Location.

FTB falsely claims Mr. Hyatt's presence in California during the disputed period based upon inferences ("inferred") and a litany of speculative reasons.[89] FTB does not have any credible evidence of Mr. Hyatt's presence at the La Palma house during the disputed period. However, Mr. Hyatt has eyewitness and undisputed documentary evidence of his presence in Las Vegas (Sections 1.8.1, 1992 ASAB, Section 1.5.8).[90]

FTB relies in large part on assertions of "inferred" days based upon self-serving statements and pure speculation without any credible evidence (Sections 1.8.1, 1.8.4.2 to 1.8.4.4; 1992 ASAB, Sections 1.4.1.1, 1.5.6.3). FTB also relies in large part on assertions of so called "established" days based in large part on undisputed mis-addressed documents (e.g., mail, FedExs, and faxes) that do not indicate Mr. Hyatt's location (1992 ASAB, Section, 1.5.10.5). In contrast, Mr. Hyatt's presence in Las Vegas is established by eyewitness and documentary evidence (Sections 1.8.1, 1992 ASAB, Section 1.5.8).

---

[87] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.

[88] See also Mr. Hyatt's 2016 Supp. CDE Aff., ¶¶ 153-243, CDE Exhibits CDE-ST002 and ST003; ASAB Exhibits 2 and 3.

[89] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.

[90] Updated Testimonial Topics, Exs. T007, T006, T102, T114, T119, T127, T008, T009, T018, T021, T128, T019, T022-T025, T135, T136, T040, T138, T140-T143, T045, T044, T046, T047, and T049. Mr. Hyatt's 2016 Supp. CDE Aff., ¶¶ 153-243, CDE Exhibits CDE-ST002 and ST003; ASAB Exhibits 2 and 3.

RJN002125

### 1.8.4.2   FTB Falsely Claims That Philips Documents, Which Were Undisputedly Mis-Addressed To Mr. Hyatt's Former California Addresses Or Former Fax Number, "Establish" His Presence At The Jennifer Circle House.

A cornerstone of FTB's calendar and Attachment A-R is to repeatedly claim that Philips documents, which were *undisputedly mis-addressed* to the former California addresses or fax number, "establish" Mr. Hyatt's presence at the Jennifer Circle house.  However, Philips acknowledged that it had inadvertently mailed or faxed documents to the former California addresses or fax number after Mr. Hyatt provided Philips with his new Las Vegas address.[91]  These Philips documents are undisputedly mis-addressed (Sections 1.8.1, 1.8.4.1 to 1.8.4.4; 1992 ASAB, Sections 1.4.1.1, 1.5.6.3).  Mr. Hyatt also gave numerous other changes of address (1992 ASAB, Sections 1.5.6, 1.5.6.1 to 1.5.6.3, 1.5.7).  An incorrect address or a fax number on a document does not establish Mr. Hyatt's physical presence at that address, particularly when there is eyewitness and documentary evidence of his extensive presence in Las Vegas during the disputed period.[92]

A mis-addressed document is not evidence of the physical location of the addressee.  Nevertheless, FTB repeatedly argues that Mr. Hyatt's presence was "established" by this undisputedly mis-addressed Philips correspondence.  See Sections 1.8.4, 1.8.4.1 to 1.8.4.4, 1.8.7 for a discussion of FTB's false statements about the Philips documents.

### 1.8.4.3   FTB Falsely Claims That Philips Documents, Which Were Undisputedly Mis-addressed To Mr. Hyatt's Former California Addresses Or Fax Number, Establish His Presence *On A Specific Date.*

As discussed in Section 1.8.4.2, a cornerstone of FTB's calendar is to repeatedly claim that Philips documents mis-addressed to Mr. Hyatt's former California addresses or fax number not only "establish" Mr. Hyatt's presence at the Jennifer Circle house, but also establish his presence *on a specific date*.  Undisputed eyewitness evidence establishes that Philips inadvertently mailed or faxed documents to Mr. Hyatt's former California addresses or fax number after he provided them with his Las Vegas address (Sections 1.8.1, 1.8.4.1 to 1.8.4.4; 1992 ASAB, Sections 1.4.1.1, 1.5.6.3).[93]  However, an address or a fax number on a document does not establish physical presence of the addressee at that address and it certainly does not establish physical presence on a specific date as FTB alleges.  A mis-addressed document is only evidence that the document was mis-addressed.  It is not evidence of the date of receipt and it is not evidence that the addressee was present on the day of delivery.  Nevertheless, FTB repeatedly argues that Mr. Hyatt's presence on a particular date was established by undisputedly mis-addressed correspondence.

---

[91] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25; Affidavit of David Leonard, May 2, 2012, ¶ 26; Declaration of Vicki Weart, May 21, 2012 ¶¶ 5-6.

[92] Mr. Hyatt's 2016 Supp. CDE Aff., ¶¶ 153-243, CDE Exhibits CDE-ST002 and ST003; ASAB Exhibits 2 and 3; Rebuttal to FTB Att. A/F, Section I. A., days by day.

[93] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25; Affidavit of David Leonard, May 2, 2012, ¶ 26; Declaration of Vicki Weart, May 21, 2012 ¶¶ 5-6.

RJN002126

#### 1.8.4.4 Undisputed Mis-Addressed Philips Documents FedExed To The Jennifer Circle House Do Not Establish That Mr. Hyatt Was Present At The Jennifer Circle House, He Was Not.

FTB's falsely claims that undisputed mis-addressed documents FedExed to the Jennifer Circle house establish Mr. Hyatt's presence at the house; they do not (Sections 1.8.1, 1.8.4.1 to 1.8.4.4; 1992 ASAB, Sections 1.4.1.1, 1.5.6.3).[94] Mr. Hyatt was not at the Jennifer Circle house after he sold it on October 1, 1991, (1992 ASAB, Section 1.5.1). FedEx provides an address-to-address delivery service, it does not provide a delivery service to a specific person.[95] FedEx drivers would leave a package with anyone at the destination address or with a neighbor. It is undisputed that Mr. Hyatt gave Philips a change of address in October 1991 and it is undisputed that Philips personnel mis-addressed documents to Mr. Hyatt's former California addresses (1992 ASAB, Section 1.4.1.1). Furthermore, eyewitness and documentary evidence establishes that Mr. Hyatt was in Las Vegas when most mis-addressed deliveries were made (1992 ASAB, Sections 1.4, 1.5.8).[96]

Some FedEx documents had Mr. Hyatt's name in the "Signed" location but that does not mean that the named person actually received and signed for the FedEx package. As one example the name "Elise Smith" appears in the "Signed" location of the FedEx Sender Activity Summary for a FedEx package delivered on April 1, 1992.[97] Ms. Smith was Mr. Tamoshunas' secretary at Philips in New York. Clearly, Ms. Smith was not present at the Jennifer Circle house to receive this FedEx package. She was living and working in New York. Similarly, FTB is wrong when it represents that Mr. Hyatt was physically present at the Jennifer Circle house on days that FedEx delivered mis-addressed packages. A name typed in the "Signed" location of a FedEx Sender Activity Summary does not mean that the person actually signed for the FedEx package. FTB has not produced any copies of delivery receipts that were actually signed by Mr. Hyatt because there were none.

This April 1, 1992, example is particularly compelling because FTB knows that Mr. Hyatt was physically present in Las Vegas on April 1, 1992.[98] On April 1, 1992, Mr. Hyatt received a telephone call from Mr. Cowan at his Las Vegas apartment, received a telephone call from Ms. Stratton at his Las Vegas apartment, made a purchase at McFrugal's in Las Vegas, made two purchases at a Las Vegas Albertson's grocery store, purchased a meal at a Las Vegas restaurant, and spent the night in his Las Vegas apartment.

---

[94] Updated Testimonial Topics, Exs. T007, T006, T102, T114, T119, T127, T008, T009, T018, T021, T128, T019, T022-T025, T135, T136, T040, T138, T140-T143, T045, T044, T046, T047, and T049. Mr. Hyatt's 2016 Supp. CDE Aff., ¶¶ 153-243, CDE Exhibits CDE-ST002 and ST003; ASAB Exhibits 2 and 3.

[95] Affidavit of Steve Foster, February 17, 2015, ¶¶ 5-12.

[96] See Rebuttal to FTB Att. A/F, Section I. A., for delivery dates. See also Updated Testimonial Topics T008, T009, T018, T021, T128, T019, T095, T096, T129, T026, T022, T023, T024, T025, T100, T057, T030, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047, T147, and T048.

[97] FTB_Philips 0005188.

[98] Rebuttal to FTB Att. A/F, Section I. A., April 1, 1992; Hyatt's 2016 Supp. CDE Aff., ¶ 242.

-22-

In another example, Mr. Hyatt was in Las Vegas walking through a house at 2735 South Miller Lane in Las Vegas with real estate agent Ron Stephenson and spent the night in his Las Vegas apartment on December 21, 1991,[99] but FTB nevertheless falsely alleges that Mr. Hyatt's presence in California is "established" because a FedEx package was delivered to Mr. Hyatt's former La Palma house.[100] A house offer prepared by Mr. Stephenson on December 21, 1991 confirms that Mr. Hyatt walked through the South Miller Lane house on that date.[101] FTB itself also acknowledged that Mr. Stephenson prepared a house offer on the South Miller Lane house for Mr. Hyatt on December 21, 1991.[102] It is thus clear that Mr. Hyatt was in Las Vegas on December 21, 1991.

Even though Mr. Hyatt was present in Las Vegas on December 21, 1991, FTB alleges "Hyatt's presence established, California".[103] FTB alleges that Mr. Hyatt received the FedEx delivery. However, FTB has produced no signature. What FTB produced is another unsigned FedEx Sender Activity Summary with the typed word "Elise Smith", FTB_Philips 0005180, that was inadvertently mis-addressed to Mr. Hyatt's former California address.[104] Elise Smith was Mr. Tamoshunas' secretary in New York, she was not at the Jennifer Circle house. FTB mischaracterizes this unsigned FedEx Sender Activity Summary. FTB's "established" representation is actually an illogical inference that, because a package addressed to Mr. Hyatt was dropped off at his former La Palma house, he was physically present there to receive it on the date of delivery. This is false. Mr. Hyatt was present in Las Vegas on that day and delivery of a FedEx package does not establish presence of the addressee, particularly when the FedEx package is mis-addressed.

A FedEx Sender Activity Summary does not establish physical presence. Mr. Hyatt's former next door neighbor, Richard Neuner, testified that both before and after September 1991, which is when Mr. Hyatt moved to Las Vegas, Mr. Neuner saw FedEx drivers leave packages behind the gate to the backyard of Mr. Hyatt's former La Palma house.[105] Mr. Hyatt filed an authorization for FedEx drivers to leave packages without a signature which he inadvertently did not cancel when he moved to Las Vegas.[106] Steve Foster, a senior paralegal at FedEx Corporation who is familiar with FedEx procedures in 1991 and 1992 testified that FedEx did not provide a person-to-person service, it provided only a door-to-door service and that the typed name in the "signed" block of a FedEx package does not mean that person actually provided a

---

[99] Rebuttal to FTB Att. A/F, Section I. A., December 21, 1991.
[100] FTB Attachment A-R, p. 77.
[101] Rebuttal to FTB Att. A/F, Section I. A., December 21, 1991.
[102] FTB Attachment A-R, p. 77.
[103] FTB Attachment A-R, p. 60.
[104] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25.
[105] Declaration of Richard Neuner, May 28, 2015, ¶¶ 3-4.
[106] Hyatt's 2016 Supp. Aff., ¶ 98.

RJN002128

signature or that the package was actually delivered to that person.[107]  A detailed discussion of FedEx deliveries is provided in the Rebuttal to FTB Att. A/F, Section II.D., July 12, 1991.

FedEx Sender Activity Summaries do not establish that Mr. Hyatt was at the Jennifer Circle house to receive deliveries.  They only mean that FedEx packages were left at the Jennifer Circle house.

### 1.8.4.5  Mr. Hyatt Sent His Faxes From And Received His Faxes At His Las Vegas Apartment Where His Only Fax Machine Was Located.

Mr. Hyatt sent his faxes from and received his faxes at his Las Vegas apartment where his only fax machine was located during the disputed period.  Overwhelming eyewitness testimony confirmed that Mr. Hyatt's fax machine was located at his Las Vegas apartment during the disputed period:  *19 witnesses testified* about a fax machine in Mr. Hyatt's Las Vegas apartment; *11 witnesses testified* about seeing a fax machine in Mr. Hyatt's Las Vegas apartment; *12 witnesses testified* about sending faxes to or receiving faxes from Mr. Hyatt's Las Vegas apartment.[108]

Thus, *a fax sent by Mr. Hyatt during the disputed period is evidence of Mr. Hyatt's presence at his Las Vegas apartment*.[109]

### 1.8.4.6  Mr. Hyatt Did Not Send Faxes From the La Palma House after October 1, 1991, As FTB Falsely Claims.

Mr. Hyatt did not send any faxes from or receive any faxes at the La Palma house after October 1, 1991, which is the date that Mr. Hyatt sold the house.  As of October 1, 1991, Mr. Hyatt's only fax machine was located in Las Vegas (Section 1.8.4.5).  However, FTB falsely states that Mr. Hyatt sent 13 faxes from the La Palma house after October 1, 1991, in its Attachment A-R, p. 36 and in its 1991 RSAB, pp. 16-17.[110]  Each of these documents is discussed in Mr. Hyatt's 2016 Supp. Aff., ¶¶ 101-115.  Not one of these faxes was sent from the La Palma house.

Mr. Hyatt established by overwhelming eyewitness evidence that he moved his fax machine, computer and active files to Las Vegas and that he faxed his documents from his Las Vegas apartment, not from his former California house:  14 witnesses testified about Mr. Hyatt's former Jennifer Circle house being nearly empty of furniture and furnishings before he moved to Las Vegas in 1991; 19 witnesses testified about a fax machine in Mr. Hyatt's Las Vegas apartment; 11 witnesses

---

[107] Affidavit of Steve Foster, February 17, 2015, ¶¶ 5-12.  Further demonstration that a typed name on a FedEx document cannot be relied on to establish personal presence is provided at Rebuttal to FTB Att. A/F, Section I. B., November 22, 1991.

[108] Updated Testimonial Topics, Exs. T025, T100, and T057, respectively; see also Hyatt's 2016 Post-DP CDE Aff., ¶ 295; Updated Testimonial Topics, Ex. T004.

[109] Hyatt's 2016 Post-DP CDE Aff., ¶¶ 295-304; Section 1.8.4.6; Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.

[110] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.

RJN002129

testified about seeing a fax machine in Mr. Hyatt's Las Vegas apartment; and 12 witnesses testified about sending faxes to or receiving faxes from Mr. Hyatt's Las Vegas apartment.[111]

Mr. Hyatt sent his faxes from and received his faxes at his Las Vegas apartment where his only fax machine was located during the disputed period (Section 1.8.4.5).

FTB falsely claims Mr. Hyatt faxed 13 documents from the La Palma house on twelve dates, but it only refers to its calendar.[112] The calendar links to faxes that contain Mr. Hyatt's Cerritos P.O. Box return address. Nothing in these faxes establishes Mr. Hyatt's former La Palma house as the source of the faxes and nothing in these faxes establishes his presence at the La Palma house. In fact, FTB fails to mention that Mr. Hyatt has testified that, after he moved to Las Vegas, he continued to use legacy templates stored on his computer that had the Cerritos P.O. Box return address even though he was sending faxes from his fax machine in Las Vegas.[113] This testimony explains why some faxes contained his old California address and supports Mr. Hyatt's earlier statement that he did not send faxes from the La Palma house after October 1, 1991.

A fax document which the FTB brief links to under the date of March 28, 1992,[114] is an example of a form with no date and no signature. After Mr. Hyatt moved to Las Vegas he continued to use preprinted fax cover sheets that had the Cerritos P.O. Box return address even though he was sending the faxes from his fax machine in Las Vegas.[115]

FTB did not link either its Attachment A-R, p. 36 or its 1991 RSAB, pp. 16-17 to 13 fax documents and the ones that it did link either were not faxed at all, or were faxed by Mr. Hyatt from his Las Vegas apartment where his fax machine was located, or were faxed by Mr. Hyatt's girlfriend from her home, or were received at an unknown location and apparently re-faxed.[116]

When Mr. Hyatt was initially in Las Vegas, he used old fax cover pages and old templates that he had stored on his computer that had his old Cerritos P.O. Box return address. Thus, the P. O. Box return address on the documents does not indicate where he faxed these documents from. However, Mr. Hyatt testified that the documents he faxed were faxed from his Las Vegas apartment with his fax machine that was located at his Las Vegas apartment (Section 1.8.4.5).[117]

Mr. Hyatt testified that he has examined each of the 12 (not 13) documents linked in FTB's calendar and they do not show that they were faxed from a California location. None of these documents contain a fax header or any other information

---

[111] Updated Testimonial Topics, Exs. T004, T025, T100, and T057, respectively; Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.
[112] 1991 RSAB p. 17:13-14.
[113] Affidavit of Gilbert P. Hyatt, August 9, 2010, § 5.1.2, p.182; Hyatt's 2016 Supp. Aff., ¶ 94.
[114] 1991 RSAB, p. 17:13; March 28, 1992, FTB_Philips 0001844.
[115] Hyatt's 2016 Supp. Aff., ¶¶ 114, 64.
[116] Hyatt's 2016 Supp. Aff., ¶¶ 101-115.
[117] Hyatt's 2016 Supp. Aff., ¶ 101.

-25-

indicating that they were faxed from a California fax number and Mr. Hyatt testified that he did not fax any of these documents from the La Palma house. [118]

Mr. Hyatt testified that the documents linked to the above dates listed by FTB do not show that a fax was sent from a California fax machine. He testified that he used letter templates which contained the Cerritos P.O. Box address and his former California fax number for a period of time after he moved to Las Vegas. He testified that he did not immediately update the letter and fax templates after he moved to Las Vegas and that he did not mail or fax correspondence from his former La Palma house after he sold the former La Palma house on October 1, 1991. Mr. Hyatt testified that he did not fax any of these documents from the La Palma house and he testified that he was not present at the La Palma house on the dates of these documents or at any other time between October 1, 1991, and late 1992 when he returned for a visit. [119] Mr. Hyatt testified that his fax machine, computer, and active files were located in his Las Vegas apartment as of October 21, 1991. [120]

### 1.8.4.7    FTB Makes Hundreds Of False Allegations About An Alleged Jennifer Circle Home/Business.

FTB's false mantra of a Jennifer Circle "home/business" is used throughout its Attachment A-R, Attachment E, and its RSABs. FTB made up the false mantra – Jennifer Circle "home/business" –and FTB repeats "home/business" over 300 times in its RSABs and attachments as if repetition would make it true, but it is still false. To the contrary, ***overwhelming eyewitness and documentary evidence*** has established that Mr. Hyatt did not have a "home/business" (1992 ASAB, Sections, 1.5.1, 1.5.5). FTB has gone so far as to falsify the evidence in its attempt to place a "home/business" at the Jennifer Circle house.

In one of many examples of ***FTB mischaracterizing evidence***, FTB falsely claims that Helene Schlindwein "testified" in her "deposition" about working at Mr. Hyatt's "home/business*"*:

> "Schlindwein testified … when she no longer worked at Hyatt's 7841 Jennifer Circle ***home/business*** (see deposition of Helene Schlindwein pages 00081 through 00083)"). [121]

However, ***Ms. Schlindwein did not even mention a "home/business" in her deposition or anywhere else***. [122] This FTB statement about Ms. Schlindwein is another one of thousands of FTB falsehoods. FTB's hundreds of references to a "home/business" do not establish that Mr. Hyatt was present at his Jennifer Circle house or that he had any business, let alone a California licensing business. Making a false statement hundreds of times does not make it true. [123]

---

[118] Hyatt's 2016 Supp. Aff., ¶ 113.
[119] Hyatt's 2016 Supp. Aff., ¶ 114.
[120] Hyatt's 2016 Supp. Aff., ¶ 115.
[121] FTB Attachment A-R, August 31, 1991, p. 23, Footnote 38 (emphasis added).
[122] Deposition of Helene Schlindwein pages 00081 through 00083.
[123] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.

RJN002131

FTB uses this "home/business" mantra in the context of a licensing business for its sourcing case. However, there was no licensing business or else Mr. Hyatt would have been in breach of the July 1991 Philips Agreement and would have jeopardized the very lucrative Philips relationship (1992 ASAB, Sections 1.7.1.2, 1.7.1.3, 1.7.3). Philips had the *exclusive* licensing authority to license Mr. Hyatt's licensable patents (Section 1.7.5). Mr. Hyatt did not have a licensing business and did not have a home/business.

### 1.8.4.8 Dozens Of Eyewitnesses Testified That FTB Private Investigators Provided False Testimony About Them.

FTB relies heavily on declarations by its private investigators ("FTB PIs"). However, dozens of witnesses testified under penalty of perjury that the FTB PIs either falsely stated that the witnesses were interviewed when they were not interviewed or falsely stated what the witnesses said in their interviews.[124]

FTB's private investigators, Mr. Savage and Mr. Dameron, provided several long declarations with extensive false testimony about people they purportedly interviewed. However, this FTB PI testimony is vigorously disputed by the actual testimony of the people that were purportedly interviewed. Twelve witnesses testified that they had not been interviewed about Mr. Hyatt in response to FTB's misrepresentations about their alleged statements about Mr. Hyatt.[125] In addition, 18 witnesses testified that FTB investigators did not ask questions or show photographs that FTB investigators incorrectly testified that they had done, 15 witnesses testified that FTB investigator Mr. Savage misrepresented in his declaration the answers to his questions that he had received from them, 14 witnesses testified that they did not make statements to FTB investigator Mr. Savage that Mr. Savage testified that the witnesses had made, 18 witnesses testified about FTB investigator declarations misrepresenting their statements; and 31 witnesses testified that they did not make statements to FTB investigators that the FTB stated that the witnesses had made.[126]

This overwhelming and mutually supportive testimony conclusively establishes that Mr. Savage and Mr. Dameron signed false declarations under penalty of perjury. Mr. Savage responded by calling one of the witnesses a liar and accused others of providing false information in their declarations or affidavits.[127] Mr. Dameron testified that he did not have any memory of the interviews he conducted with the witnesses,[128] yet he signed long declarations under penalty of perjury about what the witnesses alleged told him. See the Motion to Strike FTB Investigators' Declarations.

---

[124] Motion To Strike FTB Investigators' Declarations; Table of False Declaration Statements Made By Jake Dameron; Supplemental Table of False Declaration Statements Made By Jake Dameron; Table of False Declaration Statements Made By William; Supplemental Table of False Declaration Statements Made By William Savage.
[125] Updated Testimonial Topics, Ex. T073.
[126] Updated Testimonial Topics, Exs. T075, T076, T081, T077, and T080, respectively.
[127] For example, FTB PI William Savage, in Declaration of William Savage, November 20, 2012, p.1, accused Clara Kopp of lying and Frank Amador and Ira Levy of providing false information.
[128] Declaration of Jake Dameron, January 31, 2013, p. 42.

RJN002132

In view of the above, your Board should strike the testimony of the FTB PIs and should give full credibility to the testimony of Mr. Hyatt's witnesses.

### 1.8.4.9   Eyewitness And Documentary Evidence Establish That FTB Misrepresents the PSB&C Invoices.

FTB misrepresents the PSB&C invoices to falsely attempt to show that Mr. Hyatt had a patent licensing business, which he did not have.  For example, referring to a Philips Quarterly Report listing PSB&C invoices to Philips for the *Hyatt v. Boone* interference, FTB falsely claims that Mr. Roth billed Mr. Hyatt for, among other things, "patent licensing activity" ("Showing a significant amount of work performed, patent attorney Greg Roth bills Hyatt's [sic] for patent licensing activity and Boone (Texas Instruments) interference expenses and fees").[129]  This is false.  The PSB&C invoices are listed under the heading "TI Interference", not "patent licensing activity," ***the "TI Interference" was a Patent Office proceeding; it was not a licensing activity***.  Furthermore, PSB&C billed Philips, not Mr. Hyatt.  PSB&C represented Philips with respect to the Philips Licensing Program and the *Hyatt v Boone* interference after July 1991[130] and PSB&C billed Philips.[131]  Philips paid PSB&C for these five invoices.[132]  Philips was responsible for managing and operating the Philips Licensing program including paying all expenses for the licensing program.

This is another example of FTB misrepresenting the evidence in its attempt to falsely involve Mr. Hyatt in the Philips Licensing Program and to falsely argue that Mr. Roth was working for Mr. Hyatt on the Philips Licensing Program.

### 1.8.4.10   FTB In Bad Faith Deprived Mr. Hyatt Of A Full, Fair, And Lawful 1992 Audit.

FTB did not conduct a true audit for the 1992 tax year, which further evidences FTB's bad faith to deprive Mr. Hyatt of his right to a full, fair, and lawful audit (1992 AOB, § I, pp. 4-6; 1992 ARB, § II, pp. 2-3; Sections 1.5, 1.5.1 to 1.5.3).[133]  Because FTB failed to conduct a true audit for the 1992 tax year, FTB did not carry its initial burden, its sourcing burden, or its fraud penalty burden for 1992.  Thus, for this reason alone, the 1992 assessments should be reversed.

Furthermore, it is now undisputed that FTB made a $24 million income error in its 1992 assessments and refused to acknowledge it until your Board ordered an Additional Briefing directed thereto.  However, despite recently acknowledging

---

[129] FTB Attachment A-R, August 31, 1991, p. 23, Footnote 38; referring to an excerpted page from the November 27, 1991, Philips Quarterly Report, FTB_Philips 0004740-0004741 (EC 01384).

[130] PSB&C's new client form filled out for Philips and dated August 30, 1991 (GLR 02073); Affidavit of Gregory L. Roth, August 9, 2010, p. 17.

[131] Five PSB&C invoices to Philips for the *Hyatt v. Boone* interference dated:  (1) May 31, 1991, FTB_Philips 0006692-0006699; (2) June 30, 1991, FTB_Philips 0006673-0006683; (3) July 31, 1991, FTB_Philips 0006662-0006667; (4) August 31, 1991, FTB_Philips 0006639; and (5) September 30, 1991, FTB_Philips 0006630.

[132] Philips quarterly report, November 27, 1991, FTB_Philips 0004740-0004741 (EC 01384).

[133] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.

RJN002133

that it made a $24 million income error in its RAB, FTB still has not corrected its 1992 assessments to correct for the error. Thus, for this additional reason, the 1992 assessments should be reversed.

FTB also failed to meet its initial burden of establishing "reasonable and rational" assessments and its burden for establishing the sourcing assessments (Sections 1.5.1, 1.5.2). Even though residency is an intensely factual issue, the full extent of FTB's 1992 residency audit was a single letter requesting information about the timing of income received for 1992.[134] Mr. Hyatt's representative provided the requested financial information by letter dated February 7, 1996.[135] Then, without any further inquiry and less than two months later, the auditor issued a 17-page tentative determination letter, which in large part recycled facts from the 1991 audit, even though the residency facts were significantly different in each year.[136] Amazingly, auditor Cox declared "Mr. Hyatt has not shown that his ties to Nevada outweighed his tied [sic] to California prior to April 3, 1992"[137] when, in fact, she never asked Mr. Hyatt to provide any information regarding his 1992 residency during the so called "audit." Plainly the auditor had predetermined to assess Mr. Hyatt an enormous amount for 1992 (including the now infamous $24 million error (Sections 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10, 1992 ASAB, Section 1.7.5). The "audit" letter was merely a formality.

FTB also acted in bad faith in imposing the 1992 fraud penalty (Sections 1.9, 1.9.1 to 1.9.10). Auditor Cox did not assess the fraud penalty in her residency audit. However, FTB manager Mr. Steve Illia "determined the fraudulent failure to file penalty should be applied to the 1992 year."[138] Mr. Illia "determined" to impose the fraud penalty *before* any audit of the fraud penalty had been conducted and then another auditor, Jeff McKenney, was assigned to write up a narrative purportedly supporting a fraud penalty against Mr. Hyatt for the 1992 tax year.[139] Mr. McKenney did not conduct an audit. He simply reviewed the 1991 fraud penalty write-up and the audit file as the basis for the fraud penalty for the 1992 tax year.[140] FTB reviewer for the 1992 audit, Rhonda Marshall, expressly concluded that the fraud penalty should not be imposed for 1992 (Section 1.9.2).[141] FTB "determined" to impose the 1992 fraud penalty without an audit on the fraud penalty issue in addition to FTB's failure to perform a proper audit on the 1992 residency issue. The subsequent write up of the 1992 fraud penalty was a complete sham to justify the pre-determined fraud penalty.

---

[134] FTB letter, January 19, 1996 (FTB-100567).
[135] Cowan letter, February 7, 1996 (FTB 100568-100569).
[136] FTB letter, April 1, 1996 (FTB 100598-100614).
[137] FTB letter, April 1, 1996, p. 16 (FTB 100613).
[138] RAB, p. 13.
[139] Exhibits to Supplemental Brief Tables (Ex. 8, Partial Transcript, Depo. of Penny Bauche, 7/29/04, pp. 599-600; *see also* Ex. 9, Partial Transcript, Depo. of Jeffrey McKenney, 8/9/04, pp. 314:1-5, 317:10-21, and 321:15-19).
[140] *See* Exhibits to Supplemental Brief Tables (Ex. 10, Partial Transcript, Depo. of Jeffrey McKenney, 7/1/99, p. 8:14-20).
[141] FTB Memorandum (Aug. 12, 1997) (FTB 19023A-19024A) ("Rhonda [Marshall-Morgan] has reviewed the case and disagrees with issuing the-fraud penalty [for the 1992 year]."

-29-

The predetermined residency audit for 1992 is another example of the extreme FTB bad faith and misconduct that Mr. Hyatt has had to endure for the past 20 years. FTB's 1992 proposed assessment of over $14 million in taxes, interest and fraud penalty is based on no actual audit – FTB's residency assessment and fraud penalty were predetermined at the outset. Moreover, FTB in bad faith refused to correct the clear overstatement of the payments to Mr. Hyatt by $24 million despite being informed of the error during the audit until your Board ordered the first Additional Briefing to resolve this issue. Thus, because Mr. Hyatt was deprived of a full, fair, and lawful 1992 audit and because of FTB's failure to meet its burdens (Sections 1.5.1, 1.8.4.10, 1992 AOB, § I, pp. 4-6; 1992 ARB, § II, pp. 2-3), your Board should reverse the 1992 assessments in their entirety.

### 1.8.5 FTB's Sourcing Assessments Must Be Reversed For The Additional Reason That They Were Not Properly Raised In The NPAs Or NOAs.

#### 1.8.5.1 FTB Did Not Raise The Sourcing Issue During The Audits, But Raised It For The First Time At The End Of The Protests And Then Made a Major Change In Its Position On Sourcing During These Appeals.

FTB is barred from asserting that Mr. Hyatt is taxable as a nonresident on California source income because the Notices of Proposed Assessment ("NPAs") did not state sourcing as a reason for the assessments. FTB's internal documents relating to the FTB's Embry task force, including the auditor, which was convened to evaluate a sourcing assessment during the audit, show that the task force determined that FTB did not have a sourcing case.[142] FTB's sourcing theory was not included in the 1991 and 1992 NPAs and Mr. Hyatt therefore did not have the required notice to permit him to protest a sourcing assessment.

In addition, FTB improperly placed the burden of "auditing" the sourcing issue on your Board because FTB raised the issue at the end of the protests and refused to give Mr. Hyatt a meaningful opportunity to provide a response to the newly raised issue. After delaying Mr. Hyatt's protests for over a decade FTB raised the sourcing issue for the first time in its 50-page protest determination letter[143] but FTB denied Mr. Hyatt a proper response."[144] Mr. Hyatt requested an opportunity to have a full response[145] but FTB refused Mr. Hyatt's response.[146] Bedrock principles of due process require FTB to provide Mr. Hyatt formal *notice* of assessments asserted against him; he cannot be required to guess as to the grounds for a proposed assessment and then prepare a response. Furthermore, FTB told Mr. Hyatt he would have "the opportunity to address the

---

[142] Memorandum from M. Embry to FTB auditors, 8/21/95, attached to cover Memorandum from M. Embry, 8/24/95 (FTB 100288-100292).
[143] FTB protest determination letter, pp. 30-49.
[144] FTB protest determination letter, pp. 49-50.
[145] Letter from Eric Coffill to FTB, Nov. 20, 2007.
[146] Letter from George McLaughlin, Nov. 26, 2007.

RJN002135

source of income and the other issues in detail" on appeal to your Board[147] thereby placing the burden on your Board to do what FTB was required to do during Mr. Hyatt's audits and protests. On December 26, 2007, without responding to Mr. Hyatt's submission, FTB issued the NOAs for each year. Thus, because FTB sprung the sourcing issue on Mr. Hyatt at the end of the protest and refused to allow time to provide a meaningful response, FTB necessitated that Mr. Hyatt develop his response to the sourcing issue during these appeals. FTB's tactics have placed an enormous burden on your Board. The sourcing issue is being presented for the first time before your Board, thus your Board is tasked with essentially "auditing" the sourcing issue, and there has been no earlier opportunity for narrowing of issues or clarification of errors. In addition, FTB compounded the burden on your Board by significantly changing its theory for the sourcing assessments while these appeals have been pending (Section 1.8.5.4.3). This has resulted in voluminous additional briefing and delays in these appeals and prejudice to Mr. Hyatt.

FTB's denial of Mr. Hyatt's legal rights, shifting legal theories, and shifting assessments are directly contrary to the statutory assessment scheme enacted by the Legislature, which requires FTB to issue an NPA when it determines a deficiency,[148] and requires that the NPA "*shall* set forth *the reasons* for the proposed deficiency assessment and the computation thereof."[149] These statutes give a taxpayer an opportunity to protest the assessments (unlawfully denied to Mr. Hyatt) and do not permit FTB to change its reasons for an assessment after it has issued an NPA to the taxpayer as FTB has done here. FTB cannot deviate from the reason given in its NPAs after a taxpayer has prepared a defense to the NPAs, presented his defense in a protest hearing and appealed the matter to your Board. Thus, because the sourcing issue was not raised in the NPAs and Mr. Hyatt was denied his rights, your Board should reject the sourcing assessments.

Your Board also should reject FTB's sourcing assessment because of its extreme delay in raising the issues. Allowing a tax agency to raise new assessment issues after great delay violates principles of fair play and justice. In *Achiro v. Commissioner*, 77 T.C. 881 (1981), which your Board cited in *Appeal of David G. and Helen Mendelsohn*, 85-SBE-141, Nov. 6, 1985, the Tax Court declared: "if respondent raises [a new issue] at such a late date that the principles of fair play and justice would be abrogated by permitting him to rely on [the new issue], then he will not be allowed to rely on [the new issue] at all."[150]

Further, the sourcing arguments raised in FTB's NOAs was limited to a claim that Mr. Hyatt's patents had a business situs in California.[151] After Mr. Hyatt filed his appeals and his 1991 and 1992 opening briefs, FTB discarded this claim and

---

[147] Letter from George McLaughlin, Nov. 26, 2007.
[148] Rev. & Tax. Code § 19033.
[149] Rev. & Tax. Code § 19034 (emphasis added).
[150] *Achiro*, *supra* at 24-25.
[151] FTB's 1991 Notice of Action (FTB 28804-28806); FTB's 1992 Notice of Action (FTB 28811-28813).

RJN002136

raised a new and completely different sourcing issue in these appeals –that Mr. Hyatt operated a California-based licensing business.[152] FTB did not raise this new sourcing issue in the audits, NPAs, or NOAs. Therefore, FTB must be barred from raising this issue here.[153]

After Mr. Hyatt filed his AOBs, ARBs, and ASBs in these appeals, and after FTB filed its ROBs and RRBs in these appeals, FTB raised another completely new tax issue regarding its $24 million error in its first additional briefing (Sections 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10, 1992 ASAB, Section 1.7.5). FTB acknowledged that it made a $24 million error. FTB partially corrected that error by withdrawing its decades long holding that this income was received on January 15, 1992, and admitted that the income was not received until after the disputed period, but FTB let stand in the 1992 disputed period the taxes, interest and penalties on its $24 million error. FTB did not raise this new issue in the audit, NPAs, NOAs, ROBs, or RRBs. Indeed, FTB only raised this new issue of taxation of income that does not exist in the relevant time period after FTB acknowledged it overstated the 1992 NPA by $24 million.[154] Therefore, FTB must be barred from raising this issue here.[155] This may be the most absurd residency assessment ever heard by your Board, i.e., FTB assessed taxes under ***a residency statute*** for a time period when the income ***had not been received*** or even contemplated; Mr. Hyatt received the $24 million in license payments at issue during the second half of 1992 when there was no question as to Mr. Hyatt's Nevada residency. It is undisputed that Mr. Hyatt was a Las Vegas resident during the second half of 1992 when he received the $24 million in license payments, a fact that FTB acknowledged in its RAB.

Allowing FTB to violate the mandatory statutory scheme for assessing taxes enacted by the Legislature will open the door for widespread abuse of taxpayers and increased burdens on your Board. Instead of doing careful and complete audits that narrow the issues for protests and appeals to your Board, FTB is attempting to get away with incomplete or sloppy audits because it believes that it is no longer be bound by its audit determinations and NPAs. As these appeals illustrate, FTB will be free to conduct never-ending audits resulting in great expense to taxpayers and great delay in the protests and appeals. FTB will be able to withhold evidence and its assessment theories until the taxpayer files an appeal with your Board. Then, while the appeal is pending, FTB will spring new evidence and assessment theories to blindside taxpayers decades after the relevant time period. These abusive tactics are contrary to the tax administration procedures enacted by the Legislature[156] and grossly

---

[152] 1992 RSAB, p. 22:9-12.
[153] See *Achiro, supra.*
[154] RAB, pp. 28-29 and fn. 152.
[155] See *Achiro, supra.*
[156] Rev. & Tax. Code §§ 19033 and 19034.

RJN002137

unfair. Moreover, FTB's tactics completely eviscerate the statute of limitations imposed by the Legislature, which generally requires that FTB issue an NPA containing a statement of reasons for the assessment within four years of the tax year.[157]

FTB's tactics also will greatly prejudice taxpayers and overburden your Board. In these appeals FTB's bad faith and underhanded tactics greatly prejudiced Mr. Hyatt – he has had to gather new evidence and prepare new briefs to rebut FTB's new sourcing claims at great expense and in addition there has been an enormous loss of evidence due to the long delay in these appeals. Witnesses have become unavailable and a large number of documents have been lost or destroyed because of the FTB delay. FTB's tactics also place enormous burdens on your Board because factual and legal issues are evolving during the appeal and there has been no opportunity for the taxpayer and FTB to narrow the issues through a normal audit and protest. Instead of an initial determination at audit, here all issues have to be briefed by the parties and presented to your Board for initial determination. The tax appeal procedures were never intended to have your Board preside over the audit, protest and appeal all at the same time. Thus, FTB's new and evolving sourcing assessments must be reversed.

Accordingly, FTB's sourcing issue should be rejected entirely.[158]

### 1.8.5.2    FTB Is Barred From Raising The Sourcing Assessments Because FTB Has Not Properly Raised The Issues.

#### 1.8.5.2.1    FTB is barred from raising the sourcing issues because they were not raised in the NPA.

FTB is barred from raising the sourcing issue in these appeals. The statutory assessment scheme enacted by the Legislature prescribes clear, mandatory requirements for FTB to issue an assessment. If FTB determines a tax deficiency, it must mail an NPA to the taxpayer,[159] and the NPA "*shall* set forth *the reasons* for the proposed deficiency assessment and the computation thereof."[160] In these appeals, FTB did not state sourcing as a reason for the proposed assessments in the 1991 and 1992 NPAs,[161] FTB is barred from raising the theory now in these appeals.

We recognize that your Board stated in *Appeal of David G. and Helen Mendelsohn*, 85-SBE-141, Nov. 6, 1985, that it may decide issues raised by FTB after issuance of an NPA. However, the analysis in *Mendelsohn* does not reflect current California law. First, *Mendelsohn* is in direct conflict with the California Supreme Court's decision in *Title Ins. Co. of Minn.*

---

[157] Rev. & Tax. Code § 19057.
[158] During the pending appeals, the California-based business sourcing theory apparently has morphed into FTB's *only* sourcing theory as declared in FTB's 1992 RSAB, where FTB now argues that Mr. Hyatt "operated a California business." 1992 RSAB p. 22:9-12. Accordingly, FTB should be barred from raising any sourcing theory for the additional reason that the sole theory it is advancing was raised too late in these proceedings, in its RSBs in 2014.
[159] Rev. & Tax. Code § 19033 ("it *shall* mail notice to the taxpayer of the deficiency proposed to be assessed") (emphasis added).
[160] Rev. & Tax. Code § 19034 (emphasis added).
[161] FTB's 1991 Notice of Proposed Assessment (H 08759-08762); 1992 Notice of Proposed Assessment (H 02248-02250)

-33-

*v. St. Bd. of Equal.*, 4 Cal.4th 715 (1992), which declared that tax assessments may only be issued in accordance with the statutory procedures enacted by the Legislature.[162]  Thus, a tax assessment not issued in accordance with the statutory assessment procedure could not be raised as an offset to a refund claim.[163]  In this case, as noted, the sourcing theory has never been raised by FTB in an NPA.  In addition, *Mendelsohn* is not applicable because it relied on federal law that differs from current California law.[164]  The federal tax cases cited in *Mendelsohn* cited an express U.S. Tax Court rule that provided for the shifting of the burden of proof to the IRS on new issues raised by the IRS during a trial.[165]  However, current California law and the Rules for Tax Appeals do not permit FTB to introduce new issues during an appeal before your Board.  Accordingly, because *Mendelsohn* does not reflect current California law, it should not be followed.

### 1.8.5.2.2   FTB is barred from assessing any income after April 2, 1992, because it has not issued an NPA for that post-disputed period.

FTB is barred from assessing income received after April 2, 1992, (the post-disputed period) because the 1992 NPA proposed an assessment only through April 2, 1992.[166]  See Section 1.8.5.2.1.  Thus, FTB cannot assess income received after April 2, 1992.  Yet, that is exactly what FTB is attempting to do regarding its $24 million income error, assessing taxes on income received after April 2, 1992.  Sections 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10, 1992 ASAB, Section 1.7.5.  This notwithstanding the fact that FTB did not audit this post-disputed period, FTB did not develop a "reasonable and rational" basis for the assessments for this post-disputed period, and Mr. Hyatt's facts of no California source income during this post-disputed period are overwhelming (e.g., that the payments originated in Japan, were paid to Philips in New York, and were wire transferred to Mr. Hyatt's Nevada situs investment accounts without touching California) (Sections 1.5.1, 1992 ASAB, Section 1.7.5).

### 1.8.5.3   Making The Sourcing Assessments For The First Time In The NOAs Violates The Statutory Procedure For Issuing An Assessment And Significantly Prejudices Mr. Hyatt.

FTB's invalid sourcing argument is not saved by FTB's NOAs.  California's statutory scheme for assessing taxes does not allow for FTB to introduce new assessments into an NOA.  Under California law, FTB must first set forth a proposed

---

[162] *Title Ins. supra*, ("By claiming that the title insurers should not receive a refund because they should have paid taxes on the total premiums paid by their insureds to the title companies, the Board is essentially assessing a deficiency against the title insurers.  However, the Board is charging such a deficiency without following the above mentioned statutorily required administrative procedures.  Just as the taxpayer is limited to the claims it may assert in the superior court to those pursued in the administrative proceedings, the Board should be limited in its assertion of setoffs in the superior court action to those deficiency assessments formally pursued under Revenue and Taxation Code sections 12421 through 12435: " 'Men must turn square corners when they deal with the Government,' it is hard to see why the government should not be held to a like standard of rectangular rectitude when dealing with its citizens.").

[163] *Title Ins. supra.*

[164] *Mendelsohn*, *supra* citing *Achiro v. Commissioner*, 77 T.C. 881 (1981), and *Falese v. Commissioner*, 58 T.C. 895 (1972).

[165] *See* Tax Court Rule 142.

[166] 1992 NPA p. 2 ("We consider you to be a resident of this state through April 2, 1992 and, as such, you are taxable on income from all sources *through that date*.") (emphasis added).

RJN002139

assessment in an NPA.[167]  The taxpayer then has the opportunity to review the NPA and decide whether to file a protest.  "If a protest is filed, the Franchise Tax Board shall *reconsider the assessment* of the deficiency. . . ."[168]  After FTB's reconsideration of the assessment, FTB's action on the protest must be set forth in an NOA.[169]  Thus, under this statutory scheme, when it receives a protest, FTB may only "reconsider the assessment" that was issued in the NPA.  Accordingly, the sourcing issue must be rejected as unlawfully raised for the first time in the NOAs.

Furthermore, the NOAs only raise the issue that the patents have a "business situs" in California.  Thus, FTB must prove that the patents have a California "business situs" in California in view of the fact that the situs of the patents based on ownership is Nevada because the sourcing statute applies only to nonresidents.  The NOAs do not provide notice of FTB's new "California licensing business" theory.

In addition, by waiting to raise the sourcing issue for the first time in the NOAs in 2007, FTB significantly prejudiced Mr. Hyatt.  FTB waited *11 years* after the 1991 NPA and *10 years* after the 1992 NPA before notifying Mr. Hyatt that sourcing was an issue.  FTB's decade delay in raising this complex factual and legal issue was (and still is) extremely prejudicial to Mr. Hyatt because witnesses' memories have faded, important witnesses have passed away (e.g., Philips director Mr. Hamersma), and enormous amounts of very relevant documents have been lost (e.g., almost all of the Mahr Leonard documents were destroyed).[170] Mr. Hyatt has been further prejudiced because he spent considerable resources preparing to rebut only a residency assessment.  If FTB had raised the issue in a timely manner in the NPAs as required by Section 19034, Mr. Hyatt could have efficiently prepared both the residency and sourcing cases at the same time.

Accordingly, your Board also should reject the sourcing issue on the ground it results in great prejudice to Mr. Hyatt and violates his right to timely notice of the legal reasons for the tax assessments.

### 1.8.5.4    Principles Of Justice And Fairness Bar FTB From Raising New Sourcing Issues Without An Audit And After Issuance of the NPAs And NOAs.

#### 1.8.5.4.1    The NPAs do not support the sourcing assessments and the sourcing assessments have not been audited or protested.

Your Board should reject FTB's new sourcing issues because they are untimely, unlawful, unfair, and unjust.  The sourcing issues were first raised more than a decade after issuance of the NPAs.  In *Achiro*, *supra*, the Tax Court declared "if respondent raises [a new issue] at such a late date that the principles of fair play and justice would be abrogated by permitting

---

[167] Rev. & Tax. Code § 19033.
[168] Rev. & Tax. Code § 19044 (emphasis added).
[169] Rev. & Tax. Code § 19045 ("The Franchise Tax Board's action upon the protest, whether in whole or in part, is final upon the expiration of 30 days from the date when it mails notice of its action to the taxpayer . . . .").
[170] Declaration of Mr. Leonard, June 8, 2015, ¶ 3.

RJN002140

him to rely on [the new issue], then he will not be allowed to rely on [the new issue] at all."[171]  FTB's sourcing issues were not audited, were not in the NPAs, and thus were not protested.  Mr. Hyatt was not given his statutory required notice.

Thus, FTB's new sourcing issues are asserted in violation of California law and must be rejected.

### 1.8.5.4.2    The NOAs do not support the sourcing assessments.

FTB's sourcing assessments are unlawful, unfair, and unjust (Section 1.8.5.4.1).  The NPAs and NOAs do not give Mr. Hyatt the required notice of FTB's sourcing theories and are insufficient as a matter of law to support FTB's sourcing assessments.  The sourcing issue has not been audited or included in the NPAs and thus Mr. Hyatt was denied his statutory right to protest the sourcing issue.  The sourcing assessments in the NOAs are based on unsupported conclusory statements without a taxpayer rebuttal.  It is unlawful for FTB to make major assessments at the end of the FTB administrative process without the taxpayer having a chance to respond in the audit and protest (Sections 1.5.1, 0, 1.6).[172]  Your Board must not condone issuing tax assessments without adequate notice and without an adequate record as required by law.

The NPAs do not provide Mr. Hyatt the required notice of sourcing issues and the NOAs do not provide Mr. Hyatt the required notice of FTB's brand new alleged California licensing business issue or even a California business issue.  The NOAs allege an assessment based on residency and then purport to issue an "alternative" assessment based on "a business situs in California" of Mr. Hyatt's "intellectual property."  The sourcing issue has not been audited by FTB and Mr. Hyatt has been denied his right to protest the sourcing issue.  Thus there is no legitimate record that FTB can rely on to support underlying facts of FTB's conclusory statement that the intellectual property had "a business situs in California".  In effect, FTB has created an arbitrary and secretive "star chamber" type proceeding -- making up false self serving rulings without the victim having an opportunity to rebut them.

FTB fails to identify any factual basis for its sourcing issue and cannot rely on its 2007 Protest Determination Letter to support an alleged notice of the sourcing issue in the NOAs.[173]  The letter is mentioned in the third paragraph of the NOA's in connection with sustaining the NPAs.  However, the NPAs deal only with residency issues and do not relate to any sourcing issue.  The NOA's do not mention the 2007 Protest Determination Letter in connection with the sourcing issue.  When addressing the new sourcing issue the NOA's state that the assessment is "predicated upon all of the facts and evidence that we have developed" but identify no "facts or evidence" and do not mention the 2007 Protest Determination Letter.  A

---

[171] *Achiro*, *supra* at 24-25.
[172] Rev. & Tax. Code § 19044 (after a taxpayer files a protest to the NPA, requiring FTB to "reconsider *the assessment* of *the deficiency*," not issue a new assessment) (emphasis added).
[173] Letter dated November1, 2007, from George McLaughlin to Morrison & Foerster.

RJN002141

generalized statement that an assessment is based on "all of the facts and evidence" does not give Mr. Hyatt adequate notice of the basis for the assessment or what "facts and evidence" are being relied upon by FTB.

FTB apparently recognizes its statutory requirement to make "consistent" determinations which are not "arbitrary or without foundation".[174] The NOAs falsely assert that the sourcing assessment is "consistent" with and "alternative" to the residency assessment. However, the business situs assessment in the NOAs is neither "consistent" with nor an "alternative" to the residency assessment because the two assessments are mutually exclusive. For the § 17952 "business situs" exception to apply Mr. Hyatt must be a nonresident of California, i.e., a resident of Nevada, and the patents must have a "business situs" in California while the law of intangibles requires the situs of the patents to follow Mr. Hyatt's Nevada residency. However, since the NOAs state that we "consider you to be a resident of this state through April 2, 1992", FTB cannot inconsistently determine Mr. Hyatt to be a resident of both California and Nevada at the same time. The sourcing determination is an unlawful, inconsistent determination, not an alternative determination, and it cannot provide the basis for an assessment. By making an inconsistent sourcing determination, FTB has failed to comply with the requirements of Rev. & Tax. Code §§ 19033 and 19034 that FTB make a "determination" that is neither "arbitrary" nor "without foundation".

Furthermore, the NOAs do not give notice of the California licensing business issue that FTB appears to now rely on for its sourcing theory. The NOAs contend that Mr. Hyatt's "**intellectual property**" "was therefore derived from sources within California". A business situs of intellectual property within the state is a completely different concept from operating a California licensing business within the state. The allegation in the NOAs that the "intellectual property" had a business situs in California does not provide notice of an alleged California licensing business within the state. Furthermore, Mr. Hyatt could not have operated a California licensing business in California or anyplace else because Mr. Hyatt did not have the right to license his own patents according to the July 1991 Philips Agreement -- Mr. Hyatt's Section 8.1 representations and warranties in the July 1991 Philips Agreement "that he has not made and will not make any commitments to others inconsistent with or in derogation of the rights and licenses granted to PHILIPS".[175] Philips had the *exclusive* licensing authority to license Mr. Hyatt's licensable patents (Section 1.7.5).[176]

Further, FTBs NOAs have not satisfied the statutory requirements for taxation by demonstrating that the patents had a "business situs within the state" by showing that Mr. Hyatt's patents were employed as capital within the state or that the

---

[174] Rev. & Tax. Code § 19033 (FTB "shall determine the correct amount of the tax"); Rev. & Tax. Code § 19034 ("In no case shall the determination of the deficiency be arbitrary or without foundation").

[175] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10.

[176] See the letter to Omron dated August 4, 1992, HL 02021, FTB_Philips 0003335 – 0003336; the letter to Toshiba dated February 3, 1992, FTB_Philips 0002663, 0002782; the letter to Asahi, HL 00307; the letter to Seiko, HL 00308; Sections 4.1 and 6.1 of the July 1991 Philips Agreement, H 01378, H 01388-01389; and the 2010 Tamoshunas Affidavit, ¶ 5; the 2010 Roth Sourcing Affidavit, §§ 4.2.1.8, 5.1.4.

RJN002142

"possession and control of the patents has been localized in connection with a business" "so that its substantial use and value" has "become an asset of the business". Cal. Code Regs., tit. 18, §17952(c). FTB has not even attempted to show that while the patent had a Nevada situs they were localized in connection with a business within California such that "the substantial use and value" of the patents became "an asset of the business". Furthermore, FTB cannot make such a showing because the July 1991 Philips Agreement transferred the "substantial use and value" of the patents to Philips.

### 1.8.5.4.3    FTB cannot raise a new license business theory in these appeals because the issue was not raised in the NPAs or NOAs.

It is unfair and unjust to allow FTB to raise any sourcing issues at all in these appeals (Sections 1.8.5.4.1, 1.8.5.4.2). This unfairness and injustice is compounded by FTB's new sourcing theory that Mr. Hyatt operated a licensing business in California. This new sourcing theory is particularly egregious because Philips had the *exclusive* licensing authority to license Mr. Hyatt's licensable patents (Section 1.7.5)[177] and Mr. Hyatt had signed away the right to license his own patents (1992 ASAB, Section 1.7.3).

FTB did not raise this licensing business sourcing issue in any notice. FTB first asserted that Mr. Hyatt operated a California based licensing business in its 1991 ROB, p. 17, in 2009 – 18 years after the first year at issue, 16 years after the commencement of the audit, 2 years after FTB first asserted sourcing based on the patents having a California business situs, and almost one year after Mr. Hyatt filed his opening briefs in these appeals.

It is unfair and unjust, prejudicial to Mr. Hyatt, and contrary to California law for FTB to notify Mr. Hyatt in the NOAs that the sourcing issue is based solely on the business situs of his patents and then, after Mr. Hyatt filed two opening briefs addressing this claim, to raise a completely different sourcing theory in its 1991 ROB in 2009.

Notwithstanding the above, the facts establish that Mr. Hyatt did not have a licensing business in California or anyplace else (Sections 1.8.4.7, 1992 ASAB, Section 1.7.3). See also 1992 ASAB, Sections 1.4.1.3, 1.7.1.2, 1.7.1.3, 1.7.2.

### 1.8.5.4.4    FTB cannot tax the $24 million received after the disputed period because payments received during the post-disputed period *were not audited, protested, or raised in the NPAs or NOAs.*

FTB in bad faith made a 1992 residency assessment on $24 million in license payments that were allegedly received on January 15, 1992, but now acknowledges that it was received in the second half of 1992,[178] long after the April 3, 1992, date that FTB acknowledged Mr. Hyatt's Nevada residency. After many years of bad faith refusals to correct the $24 million

---

[177] See the letter to Omron dated August 4, 1992, HL 02021, FTB_Philips 0003335 – 0003336; the letter to Toshiba dated February 3, 1992, FTB_Philips 0002663, 0002782; the letter to Asahi, HL 00307; the letter to Seiko, HL 00308; Sections 4.1 and 6.1 of the July 1991 Philips Agreement, H 01378, H 01388-01389; and the 2010 Tamoshunas Affidavit, ¶ 5; the 2010 Roth Sourcing Affidavit, §§ 4.2.1.8, 5.1.4.
[178] RAB, pp. 25, 27-28.

RJN002143

FTB error despite multiple requests to do so (Sections 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10, 1992 ASAB, Section 1.7.5), FTB finally acknowledged its error but continues its bad faith and blatant animosity toward Mr. Hyatt by refusing to correct its erroneous assessments on its $24 million error. FTB has failed to remove this residency assessment from its audit determinations and 1992 NPA.

FTB now makes a nonspecific allegation that Mr. Hyatt's 1991 and 1992 income is "sourced" to California through the end of 1992 without even mentioning the $24 million error,[179] and without auditing or addressing the relevant facts of this post-disputed period income. The absurdity of FTB's position is shown by its very broad and general claim (Mr. Hyatt's 1991 and 1992 income is "sourced" to California) because this general statement includes many types of income; e.g., Mr. Hyatt's interest income from his Las Vegas bank account and his investment income from his mutual fund accounts that are Nevada situs investment accounts. FTB cannot be permitted such absurd overreaching. FTB cannot be permitted to maintain tens of millions of dollars of assessments just because the income was received in 1992. Among other things, FTB cannot carry its initial burden of establishing a "reasonable and rational" basis for its assessments (Section 1.5.1), and FTB cannot carry its souring burden (Section 1.5.2) with such a position – e.g., this post-disputed period income was not audited and was not addressed in the 1992 NPA.

FTB has not conducted a proper audit of the second half of 1992, has not made an assessment of the $24 million in license payments based on the second half of 1992, and has not included the $24 million second half license payments in either the NPAs or the NOAs. FTB has failed to respond to Appellants assertions that FTB cannot now assess the $24 million error[180] and legal and equitable principles now **preclude assessment** of the $24 million in license payments that occurred in the second half of 1992. See also Sections 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10, 1992 ASAB, Section, 1.7.5.

FTB implies that it can tax **all** of Mr. Hyatt's income received in 1992 regardless of other consideration and without an audit or even a factual showing that the income is taxable by California. FTB cannot tax income that was not received – the taxation of license payments, interest, and penalties assessed as being received in January 1992 when the license payments were not received for many months thereafter is not sensible. FTB cannot assess taxes on January 1992 license payments that FTB now acknowledges were not received until the second half of 1992, a time period in which FTB has acknowledged Mr. Hyatt to be a Nevada resident. FTB has never made an assessment based on receipt of the $24 million in license payments during the second half of 1992. FTB has not audited and does not even contend that it audited the post-disputed period and FTB has not addressed the post-disputed period in its NPAs. Further, the facts that FTB relied on during the disputed period

---

[179] 1992 RSAB, p. 29:21-24.
[180] AAB. See also 1992 AOB, pp. 52-56; 1992 ARB, pp. 93-95.

RJN002144

are to a very large extent not applicable (if at all) to the post-disputed period. By any measure it would be unfair and unjust to allow FTB to wait 20 years to assess this $24 million in license payments on a completely new ground, yet FTB remains silent on correction of this $24 million assessment, holding Mr. Hyatt in bondage for the tens of millions of dollars in taxes, interest, and penalties that it fraudulently assessed as January 15, 1992, income.

FTB was first informed of its $24 million error in 1997 (and repeatedly thereafter). FTB refused to acknowledge its error until 2013 when your Board ordered an additional briefing to resolve this issue. However, instead of removing the $24 million from the 1992 residency assessment after admitting that $24 million was not received by Mr. Hyatt on January 15, 1992, FTB has arbitrarily and capriciously maintained these assessments.

The unfairness and injustice arising from FTB's $24 million income error would be compounded if a fraud penalty were to be imposed on FTB's $24 million error. Because FTB has conceded that the $24 million in license payments was not received while Mr. Hyatt was a California resident, no fraud penalty can be assessed on the FTB's $24 million error. The taxes, interest, and penalties on the ghost $24 million January 15, 1992, license payments remain assessed for no reason at all other than the obvious one, FTB wants Mr. Hyatt's money at any cost. FTB's delay and refusal to remove the tax, interest, and penalty assessments on FTB's $24 million error is unlawful and in bad faith and must be rejected by your Board.

### 1.8.5.4.5  FTB cannot sustain a fraud penalty on its $24 million error because the payments were received during a significantly different time period than the original assessment and were not audited, protested, or raised in the NPAs or NOAs.

FTB cannot sustain the fraud assessment based on its $24 million error after your Board caught it in one of its bad faith acts of maintaining the unlawful assessment long after the error was explained to FTB (Sections 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10, 1992 ASAB, Section, 1.7.5). [181] It is now undisputed that the $24 million in license payments was not received until *well after the disputed period* at a time when FTB agrees that Mr. Hyatt was a Nevada resident.

FTB cannot carry its burden of proof for the fraud penalties on its $24 million income error by *clear and convincing evidence* (Sections 1.5.3, 1.9.4). FTB's continued assertion of a fraud assessment demonstrates FTB's continuing bad faith conduct (Sections 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10, 1992 ASAB, Section 1.7.5). FTB has never attempted to audit or protest or even brief assessing a fraud penalty for the post-disputed period. Any FTB representation to your Board that it has clear and convincing evidence of fraud for the post-disputed period would be made in bad faith.

---

[181] FTB knew for more than 16 years about the $24 million error and made no attempts to correct it, AAB, § III.A, pp. 9-12; It is unlawful for FTB to now increase the now-corrected 1992 NPA to include an additional $24 million of income, AAB, § III.B, pp. 12-16; Inclusion of the auditor's $24 million income error is barred by equitable principles, AAB, § III.C, pp. 17-21; Equitable estoppel bars FTB from assessing tax on the $24 million error under a sourcing theory, AAB, § III.C.1, pp. 17-19; and The equitable doctrine of laches bars FTB from assessing tax on the $24 million error under a sourcing theory, AAB, § III.C.2, pp. 19-21.

RJN002145

The unfairness and injustice arising from FTB's $24 million income error would be compounded if a fraud penalty were to be imposed on FTB's $24 million error. Because FTB has conceded that the $24 million in license payments was not received while Mr. Hyatt was a California resident, no fraud penalty can be assessed on the FTB's $24 million error.

Your Board should not decide an issue of fraud for income that has never been audited, protested, or briefed by FTB. This fact pattern by itself illustrates that there is no clear and convincing evidence of fraud, just FTB's continuing bad faith attempts to get Mr. Hyatt at all costs.

It is the height of bad faith for FTB to assess a California residency-related fraud penalty based on residency-related allegations on income that it now admits was received when he was undisputedly a Nevada resident.

Your Board should reject any assessment of a fraud penalty on the $24 million FTB error in license payments that were received in the last half of 1992 and after the date of FTB's acknowledged Nevada residency. It would be unjust and unfair to assess fraud based upon a residency assessment when FTB acknowledges Mr. Hyatt was a Nevada resident at the time the license payments were received.

### 1.8.6    FTB's Attacks On Eyewitness Testimony Are Made In Bad Faith.

#### 1.8.6.1    FTB's Attempt To Discredit The Testimony Of More Than 100 Witnesses By Using False Inferences And Speculation Must Be Rejected.

FTB's attempt to discredit the testimony of more than 100 witnesses in its 1992 RSAB and in its Attachment E (and its sister-Attachment D) by using false inferences, speculation, and misrepresentations must be rejected. ASAB Exhibit 5 provides numerous examples where FTB attempts to discredit the testimony of eyewitnesses when the eyewitness and documentary evidence confirm that the testimony of the eyewitness was correct and FTB was wrong (Section 1.8.6.2). Mr. Hyatt has an enormous amount of eyewitness testimony and documentary evidence that establishes his presence in Las Vegas (Sections 1.8.1, 1992 ASAB, Section 1.5.8) and defeats FTB's mantra of falsely inferring California presence from mis-addressed correspondence (Sections 1.8.1, 1.8.4.2 to 1.8.4.4; 1992 ASAB, Sections 1.4.1.1, 1.5.6.3).

Throughout its briefings FTB argues that Philips documents containing Mr. Hyatt's former California addresses or fax number establish Mr. Hyatt's presence at his former Jennifer Circle house and fail to recognize eyewitness testimony to the contrary. FTB produces no credible witness or other evidence that places Mr. Hyatt at his former Jennifer Circle house on the date of a document or at any other time after he sold the Jennifer Circle house on October 1, 1991, until he returned for a visit more than a year later. Instead, FTB's attorneys, who have no personal knowledge of any relevant fact, falsely infer that a California address or a California fax number on a piece of correspondence places Mr. Hyatt at the Jennifer Circle house. No inference about Mr. Hyatt's location can be drawn from mis-addressed documents (Sections 1.8.1, 1.8.4.2 to 1.8.4.4; 1992

-41-

ASAB, Section, 1.4.1.1, 1.5.6.3). FTB's briefings and attachments contain more than 2,000 other examples of FTB's misrepresentations, mischaracterizations, speculation and outright fabrications.[182]

In contrast to FTB's arguments that are based on false inferences and speculation, Mr. Hyatt has numerous eyewitnesses who were actually present at the events that they are testifying about and have personal knowledge of such events. These eyewitnesses have testified under oath or penalty of perjury based on their personal knowledge of events that they witnessed and their testimony is corroborated by the testimony of many other witnesses and by thousands of pages of contemporaneous documentary evidence.

FTB's inferences are made in bad faith (Section 1.8.2); e.g., see ASAB Exhibits 1 and 2. ASAB Exhibit 1 is a copy of FTB's calendar and ASAB Exhibit 2 is a table summarizing Mr. Hyatt's presence for each day in the disputed period, FTB's calendar and the ASAB Exhibit 2 table are linked day by day to the rebuttal for each day in Mr. Hyatt's Rebuttal to FTB Att. A/F.

FTB has raised no credible argument for disregarding such eyewitness testimonial evidence.[183]

### 1.8.6.2 FTB Makes Hundreds Of False Allegations About Eyewitness Testimony Based On FTB's Bad Faith Acts And False Inferences.

FTB questions the credibility of Mr. Hyatt's eyewitnesses (primarily through its Attachment E), but it is FTB's own credibility that is questionable.[184] In contrast to FTB's private investigators who falsely report what other witnesses supposedly told then, Mr. Hyatt provides the actual eyewitness testimony. Mr. Hyatt's witnesses have testified based on their personal knowledge. Conversely, FTB admits that its arguments are in large part only inferences (Section 1.8.4.1). Even when FTB argues that a fact is "established," it is actually making an illogical inference of Mr. Hyatt's location based on an address from *mis-addressed correspondence* (Sections 1.8.1, 1.8.4.2 to 1.8.4.4; 1992 ASAB, Sections 1.4.1.1, 1.5.6.3).[185] In contrast Mr. Hyatt provides overwhelming eyewitness testimony and documentation (Section 1.8.1; 1992 ASAB, Section 1.5.8) that is reinforced by numerous eyewitnesses (Section 1.8.6.4). FTB disregards enormous amounts of Mr. Hyatt's contemporaneous documentation and the testimony of many eyewitnesses that reinforce each other – demonstrating that Mr. Hyatt was in Las Vegas for the large majority of the disputed period and that FTB's inferences are not correct.

---

[182] Rebuttal to FTB Att. A/F.

[183] See the rebuttal to FTB's false allegations against Mr. Hyatt's eyewitnesses in the Rebuttal to FTB's Attachment E.

[184] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.

[185] See for example, FTB Attachment A-R, p. 60, November 23, 1991. FTB falsely states "presence established, California" based on an inference from a mis-addressed FedEx delivery. FTB falsely alleges "Hyatt signs for a FedEx delivery". There is no Hyatt signature and two eyewitnesses, Ms. Stratton and Mr. Eyler, place Mr. Hyatt in Las Vegas, Rebuttal to FTB Att. A/F, Section I. A., November 23, 1991.

RJN002147

ASAB Exhibit 5 provides numerous examples where FTB attempts to discredit the testimony of eyewitnesses when the eyewitness and documentary evidence confirms that the testimony of the eyewitnesses was correct and FTB is wrong. In particular, ASAB Exhibit 5 provides 16 examples where FTB falsely claims on the basis of incorrect inferences that Mr. Hyatt was in California while eyewitnesses testifying from personal knowledge place Mr. Hyatt in Las Vegas. The table cites to and links to eyewitness and documentary evidence that confirms the witnesses were correct and that FTB was wrong – Mr. Hyatt was present in Las Vegas on those particular days.

ASAB Exhibit 8 provides several examples where FTB falsely claims that the eyewitnesses were wrong in testifying that Mr. Hyatt was present in Las Vegas on particular days when FTB itself admits that Mr. Hyatt was present in Las Vegas on those particular days. ASAB Exhibit 8 cites to and links eyewitness and documentary evidence that confirms the witnesses were correct and that FTB was wrong -- Mr. Hyatt was present in Las Vegas on those particular days.

FTB's Attachment E disregards Mr. Hyatt's eyewitness and documentary evidence and instead relies on false inferences and speculation to discredit the witnesses. A complete rebuttal to FTB's false claims attacking the testimony of Mr. Hyatt and the eyewitnesses in FTB's Attachment E is set forth in Mr. Hyatt's Rebuttal to FTB's Attachment E.

FTB refers to the declarations and affidavits of the eyewitnesses as being "solicited" or being "scripted" as if there was something improper about these terms. There is nothing improper about asking a witness to give true and accurate testimony and there is nothing improper about the formatting of a declaration or affidavit. FTB implies that "scripted" testimony is something to be abhorred. Presumably "scripted" just means the testimony is in a written format, but a written format is the proper way to present testimony in this proceeding.

FTB also refers to the declarations and affidavits of the eyewitnesses as being "solicited" and FTB often "accuses" Mr. Hyatt of personally soliciting the testimony even though it has no evidence whatsoever to support its assertion that Mr. Hyatt personally solicited any testimony. Regardless of who makes the request, there is nothing wrong with asking a witness to provide testimony. How else is a witness to know that his or her testimony would be helpful?

FTB's Attachment E (and its predecessor-Attachment D) disregards the fact that many of the witnesses had their own attorney who assisted them with the drafting of their affidavits and declarations. A total of 27 witnesses testified about working with their attorneys to draft affidavits/declarations in response to FTB's criticism of their affidavits/declarations being "scripted"; 30 witnesses testified about FTB briefs misrepresenting the facts regarding the preparation of the witnesses' affidavits/declarations; 21 witnesses testified about the FTB misrepresenting the witnesses' deposition testimony; and 26 witnesses testified that the FTB misrepresented the witnesses' affidavits, declarations, testimony, or responses.[186]

---

[186] Updated Testimonial Topics, Exs. T067, T068, T084, and T148, respectively.

RJN002148

FTB has taken more than 20 depositions in this proceeding and all of the witnesses have stood by their written testimony (Section 1.8.6.5). The eyewitnesses testified in deposition that their written testimony is true and correct. FTB's attempt to discredit Mr. Hyatt's eyewitnesses has failed and FTB's Attachment E should be disregarded because it is not credible.

### 1.8.6.3    FTB's Attacks On The True And Correct Statements In Mr. Hyatt's Affidavits Are Based On FTB's Bad Faith Acts And False Inferences.

FTB questions the credibility of Mr. Hyatt's affidavit testimony (primarily in its 1992 RSAB and in its Attachment E), but it is FTB that is not credible.[187] Mr. Hyatt's testimony is under oath, it is based on his personal knowledge, and it is supported by direct eyewitness testimony and documentary evidence. FTB admits that its arguments are in large part only inferences while Mr. Hyatt provides eyewitness testimony and documentary evidence (Sections 1.8.1, 1992 ASAB, Section 1.5.8). FTB's false inference based arguments and Mr. Hyatt's eyewitness and documentary evidence are compared in tabular form in ASAB Exhibit 6 and ASAB Exhibit 9.

ASAB Exhibit 6 provides numerous examples when Mr. Hyatt's eyewitness and documentary evidence confirms that he was correct about his presence in Las Vegas and that FTB was wrong. The table of Exhibit 6 provides 19 examples where FTB argues on the basis of false inferences that Mr. Hyatt was wrong when he testified that he was present in Las Vegas on particular days. However, the table cites and links to eyewitness and documentary evidence that confirms that Mr. Hyatt was correct and that FTB was wrong – Mr. Hyatt was present in Las Vegas on those particular days.

ASAB Exhibit 9 provides several examples where FTB falsely claims that Mr. Hyatt was wrong in testifying that he was present in Las Vegas on particular days when FTB itself admits that Mr. Hyatt was present in Las Vegas on those particular days. Exhibit 9 also provides cites and links to eyewitness and documentary evidence that confirms that Mr. Hyatt was present in Las Vegas on those particular days.

A more detailed rebuttal to FTB's false claims about the testimony of Mr. Hyatt and his witnesses in FTB's Attachment E is set forth in Mr. Hyatt's Rebuttal to Attachment E. FTB's attempt to discredit Mr. Hyatt has failed. FTB's Attachment E is not credible and should be disregarded.

---

[187] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.

RJN002149

**1.8.6.4** **FTB's Attacks On Credible Third Party Eyewitnesses Must Be Disregarded for The Additional Reason That The Eyewitness Statements Do Not Stand Alone; Eyewitness Statements Are Reinforced By Consistent Testimony From Dozens Of Other Eyewitnesses And By More than 10,000 Pages Of Exhibits To The Declarations.**

More than 150 eyewitnesses testified in these appeals and their testimony is reinforced by the testimony of many other eyewitnesses, in some cases dozens of other witnesses (e.g., 72 witnesses testified about Mr. Hyatt moving away in 1991) [188] and by significant documentary evidence. [189] However, FTB attacks these credible eyewitnesses individually while disregarding the fact that their testimony is reinforced by the testimony of other eyewitnesses and by documentary evidence. Further, the testimony of the eyewitnesses is supported by more than 10,000 pages of exhibits to their declarations and affidavits. FTB has never addressed the fact that the eyewitnesses are supported by many other eyewitnesses and by attached exhibits. For these two reasons alone FTB's attacks on the witnesses should be disregarded and the testimony of Mr. Hyatt's witnesses should be given full credibility.

For example, FTB criticizes the personal knowledge based affidavits and declarations of many eyewitnesses based on false inferences. FTB infers from addresses on correspondence that Mr. Hyatt was present in California even when multiple eyewitnesses testify that they personally met with or talked to Mr. Hyatt in Las Vegas that day. However, multiple corroborating eyewitness and documentary evidence establishes that FTB's inferences are wrong and that these eyewitnesses are correct, Mr. Hyatt was present in Las Vegas on those days. [190]

The fact that so many witnesses testified to similar facts is very compelling. The fact that FTB is rebutting so much consistent testimony and criticizing so many eyewitnesses should make your Board very suspicious of FTB. FTB is out to get Mr. Hyatt at any cost (Section 1.8), even if it destroys its own credibility before your Board. FTB's attacks on these eyewitnesses in its briefs and particularly in its attachments should be rejected.

A total of 22 of the eyewitnesses were Mr. Hyatt's close neighbors on Jennifer Circle (1991 Concluding Summary) that testified about Mr. Hyatt moving away in 1991, 28-witnesses testified about Mr. Hyatt moving away in September 1991, and 72-witnesses testified about Mr. Hyatt moving away in 1991. [191] However, FTB disregards the confirmation resulting from the same testimony by multiple eyewitness and attacks the eyewitnesses individually based on alleged inferences rather

---

[188] Updated Testimonial Topics, Ex. T007.
[189] Hyatt's 2012 CDE Aff.; Hyatt's 2016 CDE Aff.; Hyatt's Calendar, 1992 ASAB; Table of FTB's False California "Established" Days, Hyatt's 2016 Supp. CDE Aff., Exhibit CDE-ST002; Table of FTB's False California "Inferred" Days, Hyatt's 2016 Supp. CDE Aff., Exhibit CDE-ST003; and the more than 5,000 pages of witness exhibits attached to the witnesses' declarations and affidavits.
[190] Hyatt's 2016 Supp. CDE Aff., ¶¶ 153-243; Hyatt's Calendar, 1992 ASAB; Table of FTB's False California "Established" Days, Hyatt's 2016 Supp. CDE Aff., Exhibit CDE-ST002; and Table of FTB's False California "Inferred" Days, Hyatt's 2016 Supp. CDE Aff., Exhibit CDE-ST003; Updated Testimonial Topics Table; Rebuttal to FTB Att. A/F, Section I. A., September 26, 1991 to April 2, 1992.
[191] Updated Testimonial Topics, Exs. T102, T006, and T007, respectively.

RJN002150

than actual evidence. After reading the testimony of the 22 neighbors the only possible conclusion is that Mr. Hyatt moved away from the Jennifer Circle neighborhood in 1991 and did not return during the disputed period. These 72 eyewitnesses are third party witnesses, many of whom do not know each other, and none of them have an interest in these appeals. It is clear that Mr. Hyatt moved away from Jennifer Circle in September 1991 and did not return.

### 1.8.6.5 FTB Took More Than 20 Depositions Of Mr. Hyatt's Witnesses And Philips Witnesses Which Are So Supportive Of Mr. Hyatt That FTB Ignored Them In It's Briefs.

FTB took more than 20 depositions of Mr. Hyatt's witnesses and Philips' witnesses. These depositions are very supportive of Mr. Hyatt's facts and demonstrated that the statements that witnesses had made in their affidavits and declarations were true and correct. Twenty-seven tables having more than 800 testimonial excerpts that are very supportive of Mr. Hyatt's facts are listed and briefly described in ASAB Exhibit 17 (Index of Deposition Excerpts Tables). The tables listed in this Index are linked to the tables having the described subject matter. The witnesses and depositions are listed in ASAB Exhibit 7.

The deposition testimony is very compelling. A few of the many hundreds of examples excerpted in the deposition tables are provided below.

> Lynetta Ruth, Mr. Hyatt's former Jennifer Circle neighbor, testified that near the end of September 1991, Mr. Hyatt said goodbye and pulled a trailer load of possessions with his old brown car to Las Vegas.[192]

> Ms. Ruth also testified to seeing Mr. Hyatt remove boxes and his belongings from his Jennifer Circle house and garage in preparation for moving.[193]

> Dr. Henry Huey testified to helping Mr. Hyatt pack boxes in preparation for moving and that the packed boxes were gone when he visited the Jennifer Circle house about a month after Mr. Hyatt moved.[194]

> Dr. Huey, Rebbetzin Hecht, Mr. Robert Kazmaier, Mr. Gregory Panos, Ms. Mary Stratton, and Mr. Trent Eyler testified that they visited Mr. Hyatt at his Las Vegas apartment.[195]

In view of the above and the more than 800 other excerpts in the 27 deposition tables, it is no surprise that FTB did not use the deposition testimony in its briefs.

### 1.8.7 FTB's Attempts To Establish Mr. Hyatt's Presence Based On False Inferences And Speculation Is In Bad Faith.

FTB's attempt to establish Mr. Hyatt's presence on a specific date based on mis-addressed Philips documents (Section 1.8.4.3).[196] Philips and Mahr Leonard witnesses testified that, as of October 1991, documents sent to Mr. Hyatt's

---

[192] Deposition Table 3, Witness Testimony Regarding Mr. Hyatt's Move to Las Vegas.
[193] Deposition Table 2, Witness Testimony Regarding Seeing Packed Boxes At The La Palma House Prior to Mr. Hyatt's Move.
[194] Deposition Table 2, Witness Testimony Regarding Seeing Packed Boxes At The La Palma House Prior to Mr. Hyatt's Move.
[195] Deposition Table 7, Witness Testimony Regarding Mr. Hyatt's Las Vegas Apartment.

RJN002151

former California addresses or fax number were not correctly addressed. [197]  Mr. Hyatt has an enormous amount of eyewitness and documentary evidence that establishes his presence in Las Vegas on many of the disputed days (Sections 1.8.1, 1992 ASAB Section 1.5.8).[198]

FTB's argument fails for the additional reason that a document containing Mr. Hyatt's former California address or former fax number shows, at most, what the sender believed to be Mr. Hyatt's address or fax number.  It does not establish Mr. Hyatt's actual physical presence on any day as FTB falsely infers, nor does it show whether or not the alleged presence was for temporary or transitory purposes.

For example, FTB's bad faith inferences are addressed in Section 1.8.2; e.g., see ASAB Exhibits 1 and 2.  ASAB Exhibit 1 is a copy of FTB's calendar and ASAB Exhibit 2 is a table summarizing Mr. Hyatt's presence for each day in the disputed period, FTB's calendar and the ASAB Exhibit 2 table are linked day by day to the rebuttal for each day in Mr. Hyatt's Rebuttal to FTB Att. A/F.  Your Board should reject FTB's attempt to establish Mr. Hyatt's presence based on FTB's disingenuous reading of the Philips documents.

**1.9**    **FTB'S BAD FAITH FRAUD ASSESSMENTS CONTINUE IN ITS RSABS.**

**1.9.1**    **This Case Is Not Taxpayer Fraud, It Is A Case Of FTB Fraud.**

The fraud assessments are based upon a litany of facts distorted by FTB to create a fraud assessment when in fact it is FTB who is guilty of fraud (Sections 1.5.1, 1.5.3, ASAB Attachment 1).[199]  FTB trumped up ten factors to continue its bad faith fraudulent conduct against Mr. Hyatt.[200]  However, these ten factors are at best no more than inferences and speculation and at worst false statements misrepresenting the facts.  Mr. Hyatt's eyewitness testimony under oath explains and rebuts these ten factors.  FTB's false inferences and speculation cannot stand against Mr. Hyatt's eyewitness testimony.  For this reason alone, the fraud penalties should be reversed.

FTB's failure to prove the fraud penalty by the required clear and convincing evidence is established by Mr. Hyatt's prior briefings; 1991 AOB, pp. 56-63; 1992 AOB, pp. 56-65; 1991 ARB, pp. 73-99; 1992 ARB, pp. 24-37; and his current briefings.

---

[196] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.
[197] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25; Affidavit of David Leonard, May 2, 2012, ¶ 26; Declaration of Vicki Weart, May 21, 2012, ¶¶ 5-6.
[198] Testimonial Topics, Ex. T008, T009, T018, T021, T128, T019, T095, T096, T129, T026, T022, T023, T024, T025, T100, T057, T030, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047, T147, and T048.
[199] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.
[200] ASAB Attachment 2, "The Ten Factors Fabricated by FTB Do Not Establish Fraud."

RJN002152

Each of FTB's fraud assertions has been rebutted as to both the facts and the law by this prior briefing, by Mr. Hyatt's Rebuttal to FTB Att. A/F, on a day by day basis, by Mr. Hyatt's Rebuttal to FTB Attachment E, by the 1991 ASAB and 1992 ASAB, and by Mr. Hyatt's 2014 Supplemental Affidavit, §§ 2.6, 2.6.1 to 2.6.10 and his testimony on FTB's ten fraud factors at §§ 2.6.4.6 to 2.6.4.15.

FTB, not Mr. Hyatt, has the burden in regard to the fraud penalties and must establish both a tax deficiency and fraud with clear and convincing evidence. FTB has failed to carry its burden on both counts (Sections 1.5.3, 1.9.2 to 1.9.10).

Mr. Hyatt has testified in his own behalf regarding each of the ten factors. Thus, FTB's inferences and speculations regarding the ten factors are rebutted by eyewitness testimony and documentary evidence.[201] Mr. Hyatt provided thousands of pages of contemporaneous documentary evidence (CDE) authenticated and explained by his eyewitness testimony in his three CDE affidavits.[202] Furthermore, FTB cannot be believed because it extensively misrepresents the evidence (Sections 1.7.2, 1.8, 1.9.2 to 1.9.10; 1992 ASAB, Section, 1.4).

FTB's own audit reviewers determined that the fraud penalties should not be assessed, its own senior staff specialists and the auditor determined that FTB's residency case was doubtful, and FTB has taken the position that Mr. Hyatt was a non-resident of California with California source income (Sections 1.9.2, 1.9.3). Having concluded that Mr. Hyatt was a resident of Nevada for its sourcing argument, FTB cannot meet the burden of clear and convincing evidence for a residency based fraud assessment. FTB has failed to follow the statutory procedures for assessing the penalties (Sections 1.9.6). FTB has not satisfied its overall burden to establish with clear and convincing evidence that Mr. Hyatt underpaid California taxes, that any such underpayment was due to fraud, and that the assessments are not arbitrary (Sections 1.9.4, 1.9.7, 1.9.8). FTB in bad faith assessed taxes on $24 million in the 1992 residency audit and has admitted to its error, but has not corrected the tax assessments or the fraud penalty assessments.

FTB has not assessed a fraud penalty based on sourcing.

**1.9.2    The Simple Fact That The Two FTB Audit Reviewers Were Not Convinced Of Fraud Should Be Dispositive Of The Fraud Penalties.**

The 1991 and 1992 fraud penalties cannot stand when FTB's own audit reviewers determined that the fraud penalties should not be assessed. This fact alone should be dispositive of the fraud penalties. FTB has the burden to establish by clear and convincing evidence that the fraud penalties apply. Clear and convincing evidence means evidence that is "sufficiently strong to command the unhesitating assent of every reasonable mind."[203] It is impossible for FTB to satisfy this high burden

---

[201] Hyatt's 2014 Supplemental Affidavit, §§ 2.6.4, 2.6.4.1 to 2.6.4.15. See also Hyatt's 2014 Supplemental Affidavit, §§ 2.6, 2.6.1 to 2.6.10. See also ASAB Attachment 2.

[202] Hyatt's 2012 CDE Aff.; Hyatt's 2016 Supp. CDE Aff.; and Hyatt's 2016 Post-DP CDE Aff.

[203] *Appeal of Robert F. and Helen R. Adickes*, 90-8BE-012, Nov. 27, 1990.

-48-

1    when both FTB audit reviewers, the 1991 and the 1992 audit reviewers, concluded that the fraud penalty should not be

2    imposed.

3        For the 1991 fraud penalty, the audit reviewer Carol Ford expressly questioned the fraud penalty:

4            We are assessing the FRAUD penalty - although I'm not sure it is warranted.
             . . .
5            I believe the tp may have left CA in 12/91.[204]

6        By questioning whether the fraud penalty was "warranted," Ms. Ford expressed substantial doubt about imposing the

7    1991 fraud penalty.  That is undisputed proof that the 1991 fraud penalty was not supported by clear and convincing evidence.

8    Moreover, Ms. Ford's belief that Mr. Hyatt became a nonresident in December 1991 also completely undermines the fraud

9    penalty for both 1991 and 1992.  A residency disagreement over a narrow period of a few months is no more than a small

10   factual disagreement, it is not clear and convincing evidence of fraud.

11       Audit reviewer Rhonda Marshall-Morgan, disagreed with imposing the 1992 fraud penalty:

12           Rhonda [Marshall-Morgan] has reviewed the case and disagrees with issuing the fraud penalty.  She doesn't
             think the penalty should be issued for failure to file a return where the taxpayer feels he was essentially a
13           nonresident.[205]

14   Ms. Marshall-Morgan's statement is proof of the absence of clear and convincing evidence of fraud.

15       The evidence that the two FTB auditors relied on clearly was ***not*** "sufficiently strong to command the unhesitating

16   assent of every reasonable mind" within the FTB audit review staff, much less among "every reasonable mind."  The two

17   reviewers clearly had reasonable minds but did not unhesitatingly assent to the assessment of the fraud penalty.  This dissent

18   within the FTB itself clearly establishes there was no "clear and convincing evidence" of fraud as there was no "unhesitating

19   assent of every reasonable mind."[206]  Thus, for this reason alone, the 1991 and 1992 fraud penalties cannot stand.

20       In addition, FTB has disregarded or misrepresented Mr. Hyatt's overwhelming evidence that he moved to Nevada,

21   that he believed he was a Nevada resident, and that he believed he did not underpay any California taxes.  FTB fraud penalty

22   arguments completely disregard dispositive evidence that establishes no clear and convincing evidence of fraud and instead

23   focus on trumped up "factors" of fraud that, in fact, also do not evidence fraud.

24       Indeed, in light of the determinations by the FTB audit reviewers, the penalties should never have been assessed in

25   the first place.  This evidence shows a serious failure within FTB's audit group – it ignored internal dissent that required a

26   decision not to impose the fraud penalties and it failed to apply fraud penalties in accordance with California law.  It is truly

27   astonishing that in these appeals FTB fails to address this dispositive evidence of its own audit reviewers expressly dissenting

28
     ---
29       [204] 1991 audit review notes (FTB 104118).
         [205] FTB Memorandum (Aug. 12, 1997) (FTB 19023A-19024A).
         [206] *Appeal of Robert F. and Helen R. Adickes*, 90-8BE-012, Nov. 27, 1990.

-49-

against the fraud penalties. These fraud penalties are even more egregious because FTB removed the documents that recited the reviewers' comments from the audit files and did not produced them to Mr. Hyatt with the audit files. He learned of this dissent through court ordered discovery in the Nevada litigation. FTB's withholding of evidence that destroys the fraud penalties can only be viewed as a continuation of FTB's bad faith that has plagued Mr. Hyatt's audits from the start.

Furthermore, FTB has ignored Mr. Hyatt's testimony disputing its 10 factors of fraud.[207] FTB has also ignored Mr. Hyatt's testimony regarding his good faith belief that he satisfied the legal requirements for Nevada residency, that the FTB's 1991 audit determination letter falsely accused him of fraud and other fraud issues.[208] Your Board is requested to give special consideration to the testimony of Mr. Hyatt[209] regarding this very serious fraud issue and to the fact that FTB has disregarded all of Mr. Hyatt's substantial evidence countering the fraud penalties.

In view of the above, the 1991 and 1992 fraud penalties cannot stand.

**1.9.3** **The Simple Fact That FTB Does Not Have Confidence In Its Assessments Against Mr. Hyatt Is Critical; All Of FTB's Experts On Its Audit Task Force, Including The Lead Auditor, Were Doubtful About FTB's Residency Cases And FTB Made A Sourcing Assessment That Is Inconsistent With Its Residency Assessment.**

The 1991 and 1992 fraud penalties cannot stand when FTB's own senior staff specialists and the auditor determined that FTB's residency case was doubtful. This fact alone should be dispositive of the fraud penalties.

The lack of clear and convincing evidence of the residency case against Mr. Hyatt is demonstrated by the fact that FTB's own audit staff expressly doubted whether Mr. Hyatt was a California resident for the disputed period. An FTB task force headed by Monica Embry and including senior FTB specialists and the lead auditor, Sheila Cox, prepared a memo dated August 21, 1995, that held:

> "[A] decision had not been made at the time of the meeting [June 1995, two years into the audit and shortly before Cox began drafting the August 2, 1995, Determination Letter] as to whether *there was enough substantiation* to sustain a position the TP [Mr. Hyatt] was a California resident for all of 1991. There does not appear to be any means of making the TP a resident for 1992 or later."[210]

Thus, because the FTB lead auditor and FTB's senior specialists were doubtful about FTB's residency case against Mr. Hyatt, FTB cannot credibly argue that its position that Mr. Hyatt was a California resident is "unequivocal," "leaving no substantial doubt," and "sufficiently strong to command the unhesitating assent of every reasonable mind."[211] Thus, FTB's fraud

---

[207] Hyatt's 2014 Supplemental Affidavit, ¶¶ 275-418.
[208] Hyatt's 2014 Supplemental Affidavit, ¶¶ 419-424.
[209] Hyatt's 2014 Supplemental Affidavit, §§ 2.6.4, 2.6.4.1 to 2.6.4.15. See also ASAB Attachment 2.
[210] 1991 AOB, Ex. 69, Memorandum from M. Embry to FTB auditors, 8/21/95, attached to cover Memorandum from M. Embry, 8/24/95, p. 1.
[211] *Appeal of Adickes*, St. Bd. of Equaliz., 1990 Cal. Tax LEXIS 24, 90-SBE 012 (Nov. 27, 1990) (emphasis added), quoting *In re Jost*, 117 Cal.App.2d 379, 383 (1953).

RJN002155

assessments on the residency audit must fall. It is important to note that FTB has never assessed a fraud penalty against Mr. Hyatt based on sourcing.

To be clear, FTB's Determination Letter labeling Mr. Hyatt a fraud and claiming he was a California resident for all of 1991 was issued on August 2, 1995, and less than one month later, the Embry memo (with Ms. Cox on the Embry task force and a recipient of the Embry memo) stated, without any objections, no decision had been made on whether there was "enough substantiation to sustain a position the TP was a California resident for all of 1991."[212]

FTB further demonstrates its doubt about its residency assessment by taking the position that Mr. Hyatt was a non-resident with California source income.[213] This is confirmation that even FTB does not have confidence in its residency case. Thus, FTB cannot have clear and convincing evidence of California residency, which by itself defeats the fraud penalties (Section 1.9.4). FTB cannot credibly argue that its position that Mr. Hyatt was a California resident is "unequivocal," "leaving no substantial doubt," and "sufficiently strong to command the unhesitating assent of every reasonable mind"[214] when FTB itself asserts just the opposite in an inconsistent assessment on sourcing, *i.e.*, that Mr. Hyatt was a non-resident.

### 1.9.4 FTB Has Not Satisfied Its Burden To Establish That The Fraud Penalties Are Supported With Clear And Convincing Evidence.

The fraud penalties should be dismissed for the additional reason that FTB has not satisfied its overall burden to establish that the fraud penalties apply. FTB must prove, by clear and convincing evidence, that Mr. Hyatt underpaid California taxes and that any such underpayment was due to fraud. FTB has not met its burden on either point. On the tax issue, FTB has not established by clear and convincing evidence that Mr. Hyatt underpaid California taxes. Indeed, the record in these appeals establishes just the opposite -- that Mr. Hyatt did not underpay any California taxes. Moreover, even FTB takes the position that Mr. Hyatt was a non-resident of California (with source income). Further, Mr. Hyatt has provided overwhelming eyewitness evidence and documentary evidence of his Las Vegas residency and domicile (1992 ASAB, Sections 1.4, 1.5.1, 1.5.2, 1.5.3, 1.5.5, 1.5.8). Thus, there cannot be clear and convincing evidence that Mr. Hyatt was a resident of California during the disputed period and beyond. A thorough discussion of Mr. Hyatt's rebuttal to FTB's fraud penalties is provided in 1991 AOB pp. 56-63; 1992 AOB pp. 56-65; 1991 ARB pp. 73-96; 1992 ARB p. 27; 1992 ASB pp. 24-38. See also Sections 1.9.1, 1.9.3.

---

[212] 1991 AOB, Ex. 69, Memorandum from M. Embry to FTB auditors, 8/21/95, attached to cover Memorandum from M. Embry, 8/24/95, p. 1.

[213] 1991 ROB, p. 93:11-12.

[214] *Appeal of Adickes*, St. Bd. of Equaliz., 1990 Cal. Tax LEXIS 24, 90-SBE 012 (Nov. 27, 1990) (emphasis added), quoting *In re Jost*, 117 Cal.App.2d 379, 383 (1953).

RJN002156

The record in these appeals eliminates any possibility of "clear and convincing evidence" of fraudulent intent. Overwhelming documentary and testimonial evidence establishes that (1) Mr. Hyatt did, in fact, move to Las Vegas; (2) he believed he was a Nevada resident (evidence shows he notified family, friends, colleagues, and various business of his new Las Vegas address; he registered to vote in Nevada; he registered his cars in Nevada and obtained a Nevada driver's license; he joined a Las Vegas synagogue; he opened bank accounts in Las Vegas; he filed changes of address with the US Postal Service for his former Jennifer Circle address and his Cypress P.O. Box); (3) he believed he did not underpay any California taxes (he filed in California as a part-year resident for 1991); and (4) he is still living in Las Vegas now 25 years later.[215]

Mr. Hyatt's eyewitness testimony is so compelling that it should be taken as dispositive of the fraud issues (e.g.; Lynetta Ruth, Mr. Hyatt's former Jennifer Circle neighbor, testified that near the end of September 1991, Mr. Hyatt said goodbye and pulled a trailer load of possessions with his old brown car to Las Vegas).[216] And this is only one of more than 800 supportive excerpts in 27 excerpt tables of testimony from FTB's more than 20 depositions of Mr. Hyatt's witnesses (Section 1.8.6.5). Further, it is reinforced by the testimony of many other witnesses.[217]

Furthermore, Mr. Hyatt made numerous changes of address, notified over 100 persons he was moving, and received virtually all of his mail in Las Vegas during the disputed period (1992 ASAB, Sections 1.5.6, 1.5.6.1 to 1.5.6.3, 1.5.7). There can be no question that Mr. Hyatt intended to move, that he intended to reside in Las Vegas, that he did reside in Las Vegas and that he continues to reside in Las Vegas to this day.

Further, in making its fraud penalty argument FTB ignored Mr. Hyatt's overwhelming evidence that he moved to Nevada, that he made only a few visits to California during the disputed period, each time for a temporary or transitory purpose, that he reasonably believed he was a Nevada resident, and that he reasonably believed he did not underpay any California taxes, which by itself is a full defense to the fraud penalties.

Furthermore, Mr. Hyatt under oath has fully rebutted each alleged fraud factor cited by FTB.[218] Therefore, for this additional reason FTB cannot establish clear and convincing evidence of fraud.

The 1992 fraud penalty must be overturned for the additional reason there was no 1992 audit (1992 AOB, § I, pp. 4-6; 1992 ARB, § II, pp. 2-3; Section 1.8.4.10). The 1992 fraud penalties are a continuing bad faith act by FTB. FTB has acknowledged in its RAB that it made a $24 million income error in its 1992 assessments, but it failed to reduce the tax, interest, and penalties for the 1992 disputed period by its $24 million income error (Section 1.9.10). In addition, the FTB's

---

[215] Hyatt's 2014 Supplemental Affidavit, ¶¶ 419-518. Hyatt's 2012 CDE Aff.; Hyatt's 2016 Supp. CDE Aff.
[216] Deposition Table 15, Witness Testimony Regarding Mr. Hyatt's Move to Las Vegas.
[217] Updated Testimonial Topics, Exs. T007, T006, T102, T114, T119, T127, T008, T009, T018, T021, T128, T019, T022-T025, T135, T136, T040, T138, T140-T143, T045, T044, T046, T047, and T049.
[218] Hyatt's 2014 Supplemental Affidavit, ¶¶ 275-418. See also ASAB Attachment 2.

RJN002157

1991 and 1992 fraud penalty assessments are tainted by FTB's abusive policy of using the fraud penalty as leverage in residency cases to coerce individuals into improper settlements.[219]

The fraud penalties should be reversed because FTB has not carried its burden in these appeals and because there was no fraud.  Mr. Hyatt moved to Las Vegas on September 26, 1991, and has resided in Las Vegas ever since.

### 1.9.5    FTB's Bad Faith Fraud Penalties Began In The Audit Determination Letter With A Whole Litany Of Utterly False Fraud Factors That Were Patently Absurd And Have Subsequently Been Dropped By FTB.

FTB first asserted its bad faith fraud penalties with a whole litany of false fraud factors in the audit determination letter that were patently absurd and have subsequently been dropped by FTB.[220]  For example, the factors included alleged concealment of assets, but these assets were disclosed in the audit file and in Mr. Hyatt's 1991 part year tax return at the time of the fraud penalty assessment.  FTB's bad faith fraud penalties are testified to by Mr. Hyatt in his Supplemental Disputed period CDE Affidavit, ¶¶ 46-64 under the title of the main section:

> FTB Attempted To Shift The Blame To Me And Assessed A Fraud Penalty In Part For An Alleged Failure To Produce Documentation Which Was Either Never Requested Or Which Was Produced And Is Included In The Audit File

### 1.9.6    FTB Failed To Follow The Statutory Requirements For Assessing The Fraud Penalties.

The fraud penalties should be reversed for the additional reason that FTB failed to follow the statutory procedures for assessing the penalties.  FTB must state the reasons for its assessments of tax <u>and</u> penalties in the NPA – the NPA "*shall* set forth *the reasons* for the proposed deficiency assessment and the computation thereof."[221]  Thus, in addition to the argument above that the fraud penalties are not supported by credible evidence much less the required clear and convincing evidence (Sections 1.9.1 to 1.9.4), the fraud penalties should be dismissed because they were not properly assessed.  A fraud assessment is a very serious issue for a taxpayer and thus it is particularly important for FTB to satisfy all of the legal and factual requirements and not play fast and loose with a taxpayer's reputation.

The fraud penalties were not properly assessed in accordance with Section 19034 because the NPAs did not "set forth the reasons" as required to assess fraud penalties.[222]  Both the 1991 and 1992 NPAs recite only the fraud penalty statute with a

---

[219] *See* ARB (1991) at 75 fn 455-456, citing Ex.44, *Hyatt* v. *FTB,* Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, pp. 46-49; 113-115; Ex. 45, *Hyatt* v. *FTB,* Partial Transcript of Trial Proceedings, Testimony of Carol Ford, 7/8/08, p. 84; Declaration of Thomas Rodrigue, Feb. 11, 2015, ¶¶ 21-26; Declaration of Diane Truly, Feb. 13, 2015, ¶¶ 5, 23-25; Declaration of Candace Les, Feb.9, 2015, ¶ 32. See also ASAB Attachment 1.

[220] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1; and in Section V of the Second Supplemental Motion To Strike.

[221] Rev. & Tax. Code § 19034 (emphasis added).  Penalties must be assessed in the same manner as a tax deficiency. Rev. & Tax. Code § 19036 ("Notwithstanding any provision to the contrary, any interest, penalty or addition to tax, imposed under Part 10 (commencing with Section 17001), Part 11 (commencing with Section 23001), or this part may be assessed and collected in the same manner as if it were a deficiency.").

[222] Rev. & Tax. Code § 19034.

RJN002158

statement that the penalty is 75% of the underpayment.[223]  Nowhere on the NPAs did FTB "set forth the reasons" as required to assess fraud penalties.  Merely citing the statute number and the amount of the penalty is not a statement of the "reasons" required for the penalty.  Accordingly, the fraud penalties must be rejected because they were not properly assessed in accordance with the Section 19034.[224]

In the alternative, FTB's fraud penalties must be rejected because FTB no longer relies on most of the fraud factors cited by the auditors in their audit determination.  Mr. Hyatt's Supplemental Affidavit Regarding FTB's $24 Million Income Error, ¶¶ 268-274, establishes that the original fraud factors cited by the auditor were incorrect.  For example, the auditor's claim that Mr. Hyatt concealed assets was wrong.  Mr. Hyatt disclosed those assets (the Franklin investment account and his Las Vegas house) in his California 1991 part-year tax return and he also produced extensive documentation on these assets to the auditor and that documentation is in the audit file.  Furthermore, Mr. Hyatt did not have a Las Vegas house until the post disputed period in 1992 so this factor could not apply to a 1991 fraud allegation or to residency in 1992 which is limited to the disputed period.  Given that Mr. Hyatt established the fraud factors cited by the auditors lacked merit, it is no surprise that these fraud factors have been withdrawn by FTB in its RSABs.  Thus, in addition to the fact that the 1991 and 1992 NPAs do not state the reasons for the fraud penalties, the fraud penalty assessments must be rejected because FTB has continuously changed its arguments for the fraud penalty assessments.

Section 19034 necessitates that the NPAs expressly state the specific reasons that are the basis for the assessment so that the taxpayer can rebut the specific reasons in the protest and appeal.  By abandoning the original fraud factors cited by the auditors (but not set forth in the NPAs) FTB violated the purpose of Section 19034 and now FTB impliedly admits the original grounds for the fraud penalties were wrong by abandoning these original fraud factors.  That admission should be the end of the fraud issue, but in this case FTB clings to the penalties and improperly advances new arguments and new fraud factors for the penalties.  This is a clear admission that the FTB does not have clear and convincing evidence of fraud but is searching for reasons.  Furthermore, there is no statutory authority that allows FTB to change the reasons for an assessment after the NPA is issued and FTB's attempt to do so must be rejected.

---

[223] 1991 NPA (H 08759-008762); 1992 NPA (H02248-02250).

[224] See Title Ins. Co. of Minn. v. St. Bd. of Equal., 4 Cal.4th 715 (1992) (declaring that assessments must be issued in accordance with the Legislatively enacted statutory procedures: "By claiming that the title insurers should not receive a refund because they should have paid taxes on the total premiums paid by their insureds to the title companies, the Board is essentially assessing a deficiency against the title insurers.  However, the Board is charging such a deficiency without following the above mentioned statutorily required administrative procedures.  Just as the taxpayer is limited to the claims it may assert in the superior court to those pursued in the administrative proceedings, the Board should be limited in its assertion of setoffs in the superior court action to those deficiency assessments formally pursued under Revenue and Taxation Code sections 12421 through 12435: " 'Men must turn square corners when they deal with the Government,' it is hard to see why the government should not be held to a like standard of rectangular rectitude when dealing with its citizens.").

RJN002159

Furthermore, FTB's changing fraud penalty analysis is unfair and greatly prejudices Mr. Hyatt. Each time Mr. Hyatt has successfully rebutted the FTB's fraud penalty claims FTB changed the grounds. FTB has done this during the protests and during these appeals so that FTB's arguments are constantly changing. This reveals the fraud penalty assessments for what they really are – false assessments in search of a viable theory. FTB's bad faith and underhanded tactics greatly prejudiced Mr. Hyatt. He has had to gather new evidence and prepare new arguments while in appeal before your Board to rebut FTB's new fraud claims at great expense, enormous loss of evidence (e.g., documents have been lost and witnesses have died), and delay in these appeals. FTB's tactics also place enormous burdens on your Board because factual and legal issues are evolving during the appeal and there has been no opportunity for the taxpayer and FTB to narrow the issues through a normal audit and protest. Instead, all new issues have to be briefed by the parties and considered by your Board.

For the additional reasons that FTB has not properly assessed the fraud penalty in accordance with the requirements of Section 19034, the fraud penalties must be rejected.

### 1.9.7 FTB Has Not Satisfied Its Initial Burden To Establish That The Fraud Penalties Are Not Arbitrary.

The fraud penalties are arbitrary.[225] Rev. & Tax. Code § 19033 ("In no case shall the determination of the deficiency be arbitrary or without foundation."). See for example, the fraud penalty assessed on FTB's bad faith $24 million error (Section 1.9.10).

The 1992 fraud penalty is arbitrary for the additional reason that FTB admitted "[w]e determined the 1992 fraud penalty should be assessed for 1992, since the facts and circumstances were the same as 1991."[226] In fact, there was no audit for 1992 (Section 1.8.4.10) much less an audit for fraud penalties. Your Board has consistently "held that proof of fraud in one year will not sustain the taxing authority's burden of proving fraud in another year."[227] In this case, the facts in 1991 are significantly different from the facts in 1992.[228] In light of the foregoing evidence and admission, Mr. Hyatt has established a *prima facie* case that FTB's fraud penalty assessments were arbitrary.

The 1991 and 1992 fraud penalties are arbitrary for the additional reason that FTB has not carried its initial burden to prove that the 1991 and 1992 fraud penalty assessments were not tainted by FTB's highly improper policy of imposing fraud penalties to coerce settlements (they were so tainted) (Section 1.5.3). Your Board should thus rule the fraud penalty assessments are arbitrary and should be reversed.

---

[225] Issues are raised when they have merit, and are never raised arbitrarily.
[226] FTB Audit Review Comments by Carol S. Ford, dated 8/4/97 (FTB 104119).
[227] *Appeal of Castillo*, 1992 Cal. Tax LEXIS 28, 92-SBE-020, 92-SBE-020 (1992).
[228] Hyatt's 2014 Supplemental Affidavit, ¶¶ 262-267.

-55-

FTB also has not established by clear and convincing evidence that any alleged underpayment was due to fraud.[229] Clear and convincing evidence means the "unhesitating assent of every reasonable mind."[230] In these appeals, undisputed evidence establishes that two FTB audit reviewers (Carol Ford and Rhonda Marshall) had substantial doubt about imposing the fraud penalties, with one reviewer (Ms. Marshall) expressly concluding that the fraud penalty should not be imposed for 1992 (Section 1.9.1)[231] and FTB's task force of FTB specialists and the auditor had substantial doubt about FTB's residency case upon which the fraud penalties are based (Sections 1.9.2, 1.9.3).

This doubt clearly establishes there was no "clear and convincing evidence" of fraud because there was no "unhesitating assent of *every* reasonable mind."[232] The two reviewers clearly had reasonable minds but did not unhesitatingly assent to the assessment of the fraud penalty. This alone should be dispositive of the 1991 and 1992 fraud penalties.

### 1.9.8    FTB Failed To Establish By Clear And Convincing Evidence That Any Alleged Underpayment Is Due To Fraud.

Because FTB failed to establish a tax underpayment by clear and convincing evidence, your Board need not reach the second prong of the fraud penalty analysis. FTB also has not established that any alleged underpayment was due to fraud.

First, FTB must establish by clear and convincing evidence that Mr. Hyatt believed he owed California tax as a resident.[233] However, the overwhelming evidence shows that Mr. Hyatt absolutely does not believe he was a California resident during the disputed period and he has corroborated his position with substantial and unrebutted documentary evidence and third party testimony.[234] In addition, Mr. Hyatt clearly had reasonable cause and a good faith belief that he was a Nevada resident as of September 26, 1991, because he relied on the advice of an experienced tax attorney.[235]

Further, FTB's shifting fraud analysis destroys any claim that there is clear and convincing evidence of fraud because FTB cannot agree on the facts allegedly indicating fraud. Over the past 23 years FTB has shifted its arguments regarding the fraud penalties. In the audit, FTB cited 70 alleged facts in support of the fraud penalties but in FTB's most recent 1992

[229] *Appeal of Wickman*, St. Bd. of Equaliz. 1981 Cal. Tax LEXIS 170 February 2, 1981 ("Mere failure to report income received is not sufficient proof of fraud.").

[230] *Appeal of Robert F. and Helen R. Adickes*, 90-8BE-012, Nov. 27, 1990.

[231] Carol Ford 1991 audit review notes (FTB 104118) ("We are assessing the FRAUD penalty - although I'm not sure it is warranted."); FTB Memorandum (Aug. 12, 1997) (FTB 19023A-19024A) ("Rhonda [Marshall-Morgan] has reviewed the case and disagrees with issuing the-fraud penalty [for the 1992 year]."

[232] *Appeal of Robert F. and Helen R. Adickes*, 90-8BE-012, Nov. 27, 1990.

[233] "The clear and convincing standard applies not merely to whether an underpayment is attributable to fraud, but also to whether an underpayment exists." *Plotkin v. Comm'r*, T.C. Memo 2011-260 (T.C. 2011); *May v. Comm'r*, 137 T.C. 147, 151 (T.C. 2011) ("Respondent has the burden of proving fraud by clear and convincing evidence. . . . To satisfy the burden of proof, respondent must show by clear and convincing evidence: (1) An underpayment of tax exists for each year; and (2) [the taxpayer] intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.").

[234] See the contemporaneous documentary evidence attached as exhibits in the Hyatt's 2012 CDE Aff.; Hyatt's 2016 Supp. CDE Aff.; and Hyatt's 2016 Post-DP CDE Aff; see also

[235] Updated Testimonial Topics, Exs. T007, T006, T102, T114, T119, T127, T008, T009, T018, T021, T128, T019, T022-T025, T135, T136, T040, T138, T140-T143, T045, T044, T046, T047, and T049.

-56-

RSAB, FTB cited many completely new alleged facts. There can be no clear and convincing evidence of fraud when FTB's own auditors, protest hearing officers and attorneys cannot agree what facts support imposition of a fraud penalty.

The fraud penalties imposed by FTB for 1991 and 1992 should therefore be abated.

### 1.9.9 FTB's Factors Of Fraud And FTB's Attacks On Other Witnesses Are Disingenuous And Disregard The Facts, The Law, And The Seriousness Of The Fraud Issue.

FTB's factors of fraud (FTB 1992 RSAB, pp. 24-29) are disingenuous (ASAB Attachment 2). FTB's attacks on Mr. Hyatt and on other eyewitnesses are in bad faith and disregard the facts (Sections 1.8; 1992 ASAB, Section 1.4), the law (Sections 1.5.1, 1.5.3, 1.9.6), and the seriousness of the fraud issue. FTB's use of fraud assessments to coerce taxpayers (Sections 1.5.1, 1.5.3) by over assessment (Section 1.9.10) and falsifying or misrepresenting the evidence (Sections 1.5.3, 1.7.10, 1.8; 1992 ASAB, Section 1.4) is unconscionable.

FTB addresses only four fraud factors in RSABs, factors 1, 2, 5, and 10. However, FTB fails to address these factors in the manner that a fraud penalty requires. FTB provides only generalized argument instead of clear and convincing evidence. FTB does not address factors 3, 4, 6, 7, 8, and 9. FTB cites to its attacks on Mr. Hyatt and on other witnesses, but these attacks are disingenuous and far from clear and convincing evidence. Mr. Hyatt provides a detailed rebuttal to FTB's short unsupported arguments in ASAB Attachments 2, 3, and 4 and Mr. Hyatt provides extensive eyewitness testimony under oath in his 2014 Supplemental Affidavit, § 2.6.4, pp. 141-205.

FTB refers to its Attachment E and to other attacks that it made on Mr. Hyatt and other eyewitnesses. FTB's fraud factors are rebutted below and rebutted in more detail in ASAB Attachment 2; FTB's attacks on Mr. Hyatt's sworn eyewitness statements are rebutted in ASAB Attachment 3; FTB's attacks on other eyewitnesses are rebutted in ASAB Attachment 4; and FTB's attacks in FTB Attachment E on numerous other eyewitnesses are rebutted in Mr. Hyatt's Rebuttal to Attachment E (attached hereto).

FTB in very large part relies on unsupported conclusory statements and mentions a morass of false inferences and speculation masquerading as facts (Section 1.8; 1992 ASAB, Section 1.4). FTB disregards Mr. Hyatt's overwhelming testimonial and documentary evidence (Sections 1.8.1, 1.8.2, 1.8.3, 1992 ASAB, Section 1.4).

FTB discusses the Appeal of Adickes as if it is relevant here; it is not. Mr. Hyatt moved to Nevada (1992 ASAB, Sections 1.4, 1.5.1 to 1.5.8). There is no issue of fabricated documents and Mr. Hyatt's three CDE affidavits authenticate and explain thousands of documents under oath. FTB misrepresents the issue. There is no issue of a fabricated document here. FTB attempts to discredit Mr. Hyatt and more than 150 eyewitnesses with false inferences and speculation. Mr. Hyatt provides eyewitness testimony that is reinforced over and over again by multiple consistent witness testimony (Sections 1.8.6,

1.8.6.1 to 1.8.6.5) that overcomes the false inferences and speculation of FTB that is not supported by credible witness testimony.

Factor 1:  FTB in bad faith disregards Mr. Hyatt's overwhelming testimonial and documentary evidence of Nevada presence and instead relies on false inferences and speculation (Sections 1.8.4, 1.8.6; 1992 ASAB, Sections 1.4, 1.4.1, 1.5.5).

Factor 2:  FTB in bad faith disregards Mr. Hyatt's overwhelming testimonial and documentary evidence of the sale of his former California house and relies on false inferences and speculation (1992 ASAB, Section 1.5.1).  Mr. Hyatt was not present at the La Palma house after he sold it on October 1, 1991, during the disputed period (Sections 1.7.8, 1.8.1, 1.8.4, 1.8.6; 1992 ASAB, Section 1.4) as FTB falsely alleges.  Mr. Hyatt did not have a patent licensing business (Section 1.8.4.7; 1992 ASAB, Sections 1.4.1.3, 1.7.1.2, 1.7.2, 1.7.3) as FTB falsely alleges.

Factor 5:  FTB disingenuously attempts to mislead your Board by stating that "microprocessor chip" contracts/agreements meant the same as supplemental agreements when it requested documents.  It did not.  There were no "microprocessor chip" contracts/agreements.  None of the supplemental agreements mentioned a "microprocessor chip".  FTB falsely states that Mr. Hyatt did not provide any supplemental agreements.  However, the auditor did not request any supplemental agreements.  FTB withholds the true story of the issue about producing Attachment A to the July 1991 Philips Agreement.  Mr. Hyatt did produce an Attachment A to that Agreement, the only Attachment A that he had in his possession.

Factor 10:  FTB lists excerpts, events, and conclusory statements but does not explain why they are evidence of fraud.  FTB refers to other arguments but these too do not explain why they are evidence of fraud.  For example, FTB alleges that "Hyatt did not show Peloquin certain documents."  However, Dr. Peloquin selected the exhibits that he wanted to use to document his declaration and, without testimony from Dr. Peloquin, FTB does not know what documents Dr. Peloquin saw.  Furthermore, Mr. Hyatt could not show Dr. Peloquin anything, Mr. Hyatt did not meet with Dr. Peloquin.

**1.9.10   The 1992 Fraud Penalties Are A Continuing Bad Faith Act By FTB Because FTB Acknowledged That It Made a $24 Million Income Error In Its 1992 Assessments But Failed To Reduce The Tax, Interest, And Penalties That Are Based On The $24 Million Income Error.**

FTB is effectively carrying a fraud penalty on $24 million in a residency assessment on income that was not received during the disputed period.  FTB falsely assessed taxes on $24 million in a 1992 residency audit for the disputed period when residency was in dispute (see the 1992 NPA) and Mr. Hyatt protested these erroneous assessments (Sections 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10, 1992 ASAB, Section 1.7.5). [236]  Then, FTB admitted that it had made an error and that the income had not been received until well after the disputed period and well after FTB's acknowledged Nevada residency.  But FTB left the

---

[236] AAB.  See also 1992 AOB, pp. 52-56; 1992 ARB, pp. 93-95.

fraud penalty in place on a residency assessment during the disputed period (according to the NPA) while removing the $24 million income that was assessed in error.

When FTB acknowledged its $24 million error, FTB should have removed the residency and fraud assessments relative to its $24 million error because these assessments were based upon the residency audit and residency assessment reflected in the NPA *for the 1992 disputed period*. FTB's 1992 NPA contained no other ground for assessing the $24 million. FTB cannot change the 1992 assessment[237] and FTB has not attempted to do so. However, the taxes and penalties on FTB's $24 million error based on the disputed period residency assessment, now with the $24 million income removed from that period, still stands and should be removed.

Once FTB took final action on Mr. Hyatt's 1992 protest and Mr. Hyatt appealed to your Board, FTB surrendered legal jurisdiction to change or otherwise act on the NPAs and NOAs.[238] Accordingly, Mr. Hyatt is entitled to a final administrative determination by your Board on FTB's final action despite whatever second thoughts that FTB may have about taxing its $24 million income error.

**1.10    CONCLUSION**

Mr. Hyatt moved to Nevada and became a California nonresident on September 26, 1991. Mr. Hyatt sold his California house, resided in a Las Vegas hotel for a few weeks, resided in his Las Vegas leased apartment for about five months, and then resided in his Las Vegas Tara home for the last 25 years. Mr. Hyatt had no California source income during the disputed period or thereafter. The situs of Mr. Hyatt's patents followed Mr. Hyatt to Nevada and no California business had the substantial use and value of Mr. Hyatt's patents. Mr. Hyatt did not have a California licensing business and FTB's NPAs and NOAs did not give Mr. Hyatt notice of taxation based on a California business. FTB has not established by clear and convincing evidence that Mr. Hyatt intended to defraud FTB. Any interest assessments should be abated because they resulted from the intentional delay of FTB.

FTB's bad faith calendar, Attachment A-R, and Attachment E should be disregarded because of the thousands of false statements and FTB's disregard or misrepresentation of Mr. Hyatt's overwhelming eyewitness and documentary evidence. (1991 ASAB § 1.8).

---

[237] *See Title Ins. Co. v. State Bd. of Equalization*, 4 Cal. 4th 715 (1992) (declaring that just as a taxpayer is limited to the claims it may assert in the superior court to those pursued in the administrative proceedings, a state tax agency is also limited in its claims to those deficiency assessments formally pursued under Revenue and Taxation Code).

[238] Section 5522.8(a) of the Rules for Tax Appeal provides that once an appeal is filed, the appeal can only be dismissed if (1) the taxpayer requests dismissal, (2) FTB concedes the entire amount in dispute, or (3) the parties submit a stipulation in which all parties agree to dismissal. Thus, FTB cannot alter a pending appeal, except to concede the disputed amounts.

RJN002164

1    Dated: September  , 2016        Respectfully submitted,

2                                        ANTOLIN LAW GROUP

3                                        By:

4                                        EDWIN P. ANTOLIN

5                                        REED SMITH LLP

6                                        By:
                                        BRIAN TOMAN

7                                        SILVERSTEIN & POMERANTZ LLP

8                                        AMY L. SILVERSTEIN

9                                        *Attorneys for Appellant Gilbert P. Hyatt*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

RJN002165

1  EDWIN P. ANTOLIN
   Edwin.antolinlawgroup.com
2  ANTOLIN LAW GROUP
3  2175 N. California Blvd., Suite 775
   Walnut Creek, CA 94596
4  Telephone: (925) 262-4187
   Fax: (925) 262-4269
5
6  BRIAN TOMAN
   btoman@reedsmith.com
7  REED SMITH LLP
   101 Second Street, Suite 1800
8  San Francisco, CA 94105-3659
   Telephone: (415) 543-8700
9  Fax: (415) 415-391-8269
10
   AMY L. SILVERSTEIN
11 asilverstein@sptaxlaw.com
   SILVERSTEIN & POMERANTZ LLP
12 12 Gough Street, 2nd Floor
   San Francisco, CA 94103
13 Telephone: (415) 593-3502
   Fax: (415) 593-3501
14 Attorneys for Appellant
15
   BEFORE THE STATE BOARD OF
16 EQUALIZATION                          Case Nos.   435770 & 446509
   OF THE STATE OF CALIFORNIA
17
   In the Matter of the Appeals of
18
19 GILBERT P. HYATT
20
21         **APPELLANT'S SECOND ADDITIONAL BRIEFING (1992)**
22
23
24
25
26
27
28

RJN002166

## TABLE OF CONTENTS

1.1    TABLE OF ABBREVIATIONS AND DEFINITIONS. ........................................... VI

1.2    TABLE OF AUTHORITIES.................................................................. VIII

1.3    TABLE OF CITATIONS AND LINKS TO EXAMPLES OF MR. HYATT'S
       EVIDENCE. .................................................................................... XI

    1.3.1    Updated Testimonial Topics Table And Exhibits Summarizing The
                 Eyewitness Testimonial Subject Matters And The Reinforcement Of
                 Testimony Between Eyewitnesses (E.G., 72-Witnesses Testified About
                 Mr. Hyatt's Move Away In 1991) Under Oath Or Penalty Of Perjury...... xi

    1.3.2    Updated Chronological Statements Of Facts (The "Chronologies"), A
                 Chronology Of Mr. Hyatt's Overwhelming Eyewitness And
                 Documentary Evidence. ............................................................... xi

    1.3.3    The More Than 220 Affidavits And Declarations Sworn To Or Signed
                 Under Penalty Of Perjury By More Than 150 Eyewitnesses In Support
                 Of Mr. Hyatt's Facts. .................................................................. xi

    1.3.4    "Testimonial Responses" Tables And Excerpts Regarding
                 Eyewitnesses' Overwhelming Testimony To Identify And Correct
                 FTB's False Arguments And False Facts................................................. xi

    1.3.5    Philips Document Tables Providing Examples Of More Than 5,000
                 Pages Of Philips Documents That Support Mr. Hyatt's Cases................. xii

    1.3.6    Witness Deposition Tables Providing Examples Of More Than 20
                 Depositions That FTB Took Of Mr. Hyatt's Eyewitnesses And Philips
                 Licensing Attorneys That Support Mr. Hyatt's Appeals. ........................ xii

    1.3.7    Tables Of False Statements Made In The FTB Audit File And
                 Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses. ............... xii

    1.3.8    Tables Of False Statements Made Under Penalty Of Perjury By FTB
                 Private Investigators And Rebutted Under Oath Or Penalty Of Perjury
                 By Eyewitnesses.......................................................................... xii

    1.3.9    Objection And Rebuttal To FTB's Calendar And Attachments A
                 (Revised) And F ("Rebuttal To FTB Att. A/F"). ................................. xii

    1.3.10   Objection And Rebuttal To FTB's Attachment E ("Rebuttal To FTB
                 Att. E"). .................................................................................. xii

    1.3.11   Tables Of Misrepresentations In FTB's ROBs And RRBs...................... xii

    1.3.12   Tables Of Mr. Hyatt's Presence Based Upon Direct Testimonial and
                 Documentary Evidence ................................................................. xii

1.4    FTB USED FALSE INFERENCES TO MISLEAD YOUR BOARD. ........................ 1

    1.4.1    Philips Documents Highlight How FTB Has Misrepresented The
                 Evidence And Concealed Evidence That Undermines FTB Arguments. ... 1

        1.4.1.1    *Mis-addressed* Philips Correspondence Inadvertently
                            Sent To Mr. Hyatt's Former California Addresses Or
                            Fax Number Does Not Establish That Mr. Hyatt Was
                            Present At His Former House. ............................................ 1

        1.4.1.2    Philips Documents Containing A Legacy P.O. Box
                            Return Address Does Not Establish That They Were
                            Faxed From The Jennifer Circle House Or That Mr.
                            Hyatt Was Present At The Jennifer Circle House. .............. 1

RJN002167

1.4.1.3    Philips Documents Refute FTB's Claim That Mr. Hyatt Operated A Licensing Business At The Jennifer Circle House. ................................................................................ 2

1.4.1.4    Philips Documents Establish That FTB's Calendar And Attachment A-R Lack Credibility And Should Be Disregarded. ...................................................................... 3

1.5    OVERWHELMING EYEWITNESS AND DOCUMENTARY EVIDENCE SUPPORTS MR. HYATT'S CHANGE TO NEVADA DOMICILE AND NEVADA RESIDENCY. ................................................................... 3

1.5.1    The Audit File And Significant Direct Evidence Confirms Mr. Hyatt Sold the La Palma House On October 1, 1991 And He Had No California Abode Thereafter. ......................................... 3

1.5.2    The Bragg Factors Overwhelmingly Establish Mr. Hyatt's Nevada Residency and Domicile. ............................................... 7

1.5.3    FTB Disregards Mr. Hyatt's Undisputed Documentary Evidence Of More Than 100 Non-California Professionals And FTB Falsely Alleges That Philips' California Professionals Are Hyatt's Professionals. ................................................................. 7

1.5.4    FTB Disregards Or Misrepresents Mr. Hyatt's Documentary Evidence Of His Three Las Vegas Bank Accounts And His Many Nevada Situs Investment Accounts. ........................................... 8

1.5.5    Mr. Hyatt's Limited Presence In California Was Only For Temporary Or Transitory Purposes. .................................................. 9

1.5.6    Mr. Hyatt Notified Many People And Entities That He Moved To Las Vegas And Gave Them His Las Vegas Contact Information, Which Is Strong Evidence That He Moved To And Intended To Remain In Las Vegas Indefinitely. ........................................................... 11

1.5.6.1    Mr. Hyatt Gave Numerous Changes Of Address To His Las Vegas Location And He Gave Numerous People His Las Vegas Contact Information Shortly After He Moved To Las Vegas. ........................................... 11

1.5.6.2    Immediately After Mr. Hyatt Moved Into His Las Vegas Apartment On October 21, 1991, He Notified Many People And Entities Of His Change Of Address And Las Vegas Contact Information. ............................... 13

1.5.6.3    The U.S. Postal Service Forwarded Philips And Mahr Leonard Misaddressed U.S. Mail And Much Other Correspondence To Mr. Hyatt's Las Vegas Address Because Of His Change Of Address. ............................... 14

1.5.7    Mr. Hyatt Received Virtually All of His Mail In Las Vegas During The Disputed Period And Thereafter. ....................................... 14

1.5.8    Mr. Hyatt's Calendar Is Supported By Eyewitness And Documentary Evidence And Confirms His Overwhelming Presence In Las Vegas. ...... 15

1.5.9    FTB's Calendar And Attachment A-R Are Based On Thousands Of False And Illogical Inferences And Speculation And Is Not Credible. .... 26

1.5.10    FTB's Calendar And Attachments Must Be Rejected Because They Are Based In Large Part On False Inferences And False Statements Of California Presence While Disregarding Mr. Hyatt's Overwhelming

RJN002168

Eyewitness And Documentary Evidence That Places Him In Las Vegas. ........................................................................ 28

    1.5.10.1    FTB Disregarded Mr. Hyatt's Eyewitness And Documentary Evidence Of Nevada Presence And Falsely Alleged California Presence Based On False Inferences. ........................................................... 29

    1.5.10.2    FTB In Bad Faith Disregards Mr. Hyatt's Documentary Evidence Of Nevada Presence And Then Falsely Alleges California Presence Because There Is No Documentation. .................................................. 31

    1.5.10.3    FTB Falsely Alleges California Presence Based On Alleged Logical Inferences When A Good Faith Analysis Shows That Logical Inferences Place Mr. Hyatt In Nevada. ........................................... 32

    1.5.10.4    FTB's Calendar And Attachment A-R Are Based In Large Part On False Allegations Of "Inferred" California Presence And Must Be Disregarded. .............. 33

    1.5.10.5    FTB's Calendar And Attachment A-R Are Based In Large Part On False Allegations Of So Called "Established" California Presence And Should Be Disregarded. ......................................................... 34

  1.5.11    There Was No Attraction To Jennifer Circle And No Reason For Mr. Hyatt To Live Or Work There After He Moved To Las Vegas. .............. 35

1.6    THE PHILIPS DOCUMENTS ESTABLISH THAT MR. HYATT HAD VERY LITTLE INVOLVEMENT IN THE PHILIPS LICENSING PROGRAM DURING THE 1992 DISPUTED AND POST-DISPUTED PERIODS. ................................. 36

  1.6.1    Mr. Hyatt Provided Very Little Assistance to the Philips Licensing Program During The 1992 Disputed Period. ............................... 36

  1.6.2    Mr. Hyatt Provided Very Little Assistance To The Philips Licensing Program During The 1992 Post-Disputed Period. ....................... 37

  1.6.3    The Philips Documents Illustrate Many Of Mr. Hyatt's Facts In These Appeals. ......................................................................... 38

1.7    MR. HYATT DID NOT HAVE CALIFORNIA SOURCE INCOME IN 1991 OR 1992. ...................................................................................... 40

  1.7.1    FTB Has Not Met Its Burden Of Proving That Mr. Hyatt Had California Source Income In 1991 Or In 1992. ............................. 40

    1.7.1.1    All Of The Disputed 1991 And 1992 Payments Came From Philips Licensing Mr. Hyatt's Nevada-Situs Patents And Are Thus Not Taxable By California. ........... 41

    1.7.1.2    Mr. Hyatt Did Not Have California Source Income Under Regulation 17951-4 Because He Did Not Engage In A Patent Licensing Business In California Or Anyplace Else. ............................................... 42

    1.7.1.3    Mr. Hyatt Did Not Have California Source Income Under Section 17952 Because His Patents Did Not Have A California Business Situs. ...................... 44

    1.7.1.4    Tracing License Payments To Mr. Hyatt Confirms He Did Not Have California Source Income. ....................... 46

-iv-

1.7.1.5    Mr. Hyatt Did Not Have An Ownership Interest In the Philips Licensing Program As FTB Incorrectly Implies... 49

1.7.2    The Evidence That Mr. Hyatt Did Not Have A Licensing Business Is Not Overcome By FTB's Unsupported Conclusions And Inferences. ..... 49

1.7.3    There Could Not Be And There Was No Hyatt Licensing Business Or Licensing Negotiations Because A Hyatt Licensing Business Or Licensing Negotiations Would Have Been In Breach Of The July 1991 Philips Agreement And In Violation Of Mr. Hyatt's Representations And Warranties To Philips. ........................................................................ 51

1.7.4    FTB's Sourcing Case Must Fall With Its Residency Case. .................... 53

1.7.5    FTB In Bad Faith Maintains The Tax On FTB's $24 Million Error. ....... 54

1.8    MR. HYATT IS ENTITLED TO INTEREST ABATEMENT, AMONG OTHER THINGS, FOR FTB'S BAD FAITH DELAYS THROUGHOUT THE ADMINISTRATIVE PROCESS. ................................................................ 57

1.9    CONCLUSION. ............................................................................................ 59

RJN002170

**1.1     TABLE OF ABBREVIATIONS AND DEFINITIONS.**

1991 AOB              1991 Appellant's Opening Brief,

1992 AOB              1992 Appellant's Opening Brief,

1991 ARB              1991 Appellant's Reply Brief,

1992 ARB              1992 Appellant's Reply Brief,

1991 ASB              1991 Appellant's Supplemental Brief,

1992 ASB              1992 Appellant's Supplemental Brief,

AAB                   Appellant's Additional Brief,

1991 ASAB             1991 Appellant's Second Additional Brief,

1992 ASAB             1992 Appellant's Second Additional Brief,

1991 ROB              1991 Respondent's Opening Brief,

1992 ROB              1992 Respondent's Opening Brief,

1991 RRB              1991 Respondent's Reply Brief,

1992 RRB              1992 Respondent's Reply Brief,

RAB                   Respondent's Additional Brief,

1991 RSAB             1991 Respondent's Second Additional Brief,

1992 RSAB             1992 Respondent's Second Additional Brief,


Disputed period       FTB's name for the period in dispute, September 26, 1991 to April 2, 1992

CDE                    FTB's name for Contemporaneous Documentary Evidence

Rebuttal to FTB Att. A/F
                      Rebuttal and Objection to FTB Calendar, Attachment A (Revised),
                      and Attachment F

Rebuttal to FTB Att. E
                      Rebuttal and Objection to FTB Attachment E

Attachment A-R        FTB Attachment A (Revised)

Jennifer Circle house
                      7841 Jennifer Circle, La Palma house

La Palma house        7841 Jennifer Circle, La Palma house

RJN002171

1     NPA                 FTB's Audit Notice Of Proposed Assessment

2     NOA                 FTB's Protest Notice Of Action

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RJN002172

1

2   **1.2     <u>TABLE OF AUTHORITIES</u>**

3   Cᴀsᴇs

4   *Achiro v. Commissioner*,
    77 T.C. 881 (1981)
5

6   *Falese v. Commissioner*,
    58 T.C. 895 (1972)
7

    *Fitch v. Comm'r*,
8   T.C. Memo 2012-358, P25 (T.C. 2012)

9   *Fox v. Erickson*,
    99 C.A.2d 740, 742 (1950)
10

11  *Hale v. Comm'r*,
    T.C. Memo 2010-229 (T.C. 2010)

12  *Franchise Tax Bd. of Cal. v. Hyatt*,
    335 P.3d 125, 144-145, 148-149 (Nev. 2014)

13  *Jones v. Commissioner*,
    259 F.2d 300 (5th Cir. 1958)
14

15  *In re Jost*,
    117 Cal.App.2d 379, 383 (1953)

16  *Mansell v. Board of Administration*,
    30 Cal. App. 4th 539, 545 (1994)
17

18  *Marchica v. State Board of Equalization*,
    107 Cal.App.2d 501, 509 (1951)

19  *Mattel v. Gilbert Hyatt*,
    1979 U.S. Dist. LEXIS 8812 (December 6, 1979)
20

21  *Padgett Coventry Price v. Commissioner of Internal Revenue Service*,
    T.C. Memo 2004-103

22  *Powell v. Granquist*,
    252 F.2d 56 (9th Cir. 1958)
23

24  *Professional Services v. Commissioner*,
    79 T.C. 888, 930 (1982)

25  *Rowlee v. Commissioner*,
    80 T.C. 1111, 1123 (1983)84
26

27  *Stoltzfus v. United States*,
    398 F.2d 1002, 1004 (3d Cir. 1968)

28

RJN002173

*Title Ins. Co. of Minnesota v. State Bd. of Equalization*
4 Cal.4th 715 (1992)

**Statutes**

Tit.18, Cal. Rev. & Tax. Code

§ 17014(a)
§ 17951-4(a).
§ 17951-4(c)
§ 17952
§ 17952(a)
§ 17952(c)
§ 19033
§ 19034
§ 19044
§ 19045
§ 19057
§ 19036

Revenue and Taxation Code sections 12421 through 12435

**STATE BD. OF EQUALIZATION DECISIONS**

*Appeal of Robert F. and Helen R. Adickes*,
St. Bd. of Equaliz., 1990 Cal. Tax LEXIS 24, 90-SBE 012 (Nov. 27, 1990)

*Appeal of Eli A. and Virginia W. Allen*,
Cal. St. Bd. of Equal., Jan. 7, 1975)

*Appeal of Armstrong*,
St. Bd. of Equaliz. 1985 Cal. Tax LEXIS 2 December 3, 1985

*Appeal of Stephen D. Bragg*,
2003-SBE-002 (May 28, 2003)

*Appeal of Castillo*,
No. 90A-0227-ES, St. Bd. of Equaliz. 1992 Cal. Tax LEXIS 28;
92-SBE-020 July 30, 1992

*Appeals of Robert E. Wesley and Jerry J. Couchman*,
2005-SBE-002, (2005) Cal. Tax LEXIS 358,

*Appeal of Duncan*
1993 Cal. Tax LEXIS 147, 3-4 (1993)

*Appeal of Robert V. Erilane*,
Cal. St. Bd. of Equal., Nov. 12, 1974

*Appeal of Lasher*,
St. Bd. of Equaliz. 2005 Cal. Tax. Lexis 22 (Case No. 260933) (Jan. 25. 2005)

*Appeal of David G. and Helen Mendelsohn*,
85-SBE-141, Nov. 6, 1985

RJN002174

*Appeal of Sierra Pacific Industries*,
Cal. St. Bd. of Equal., Jan. 5, 1994, 94-SBE-0024

*Appeal of Hubbard D. & Cleo M. Wickman*,
81-SBE-014, Feb. 2, 1981

**Other Authorities**

Law Review Commission Comments for Evid. Code § 600

Uniform Division of Income for Tax Purposes Act,
Sections 25120 to 25139

RJN002175

**1.3    TABLE OF CITATIONS AND LINKS TO EXAMPLES OF MR. HYATT'S EVIDENCE.**

**1.3.1    Updated Testimonial Topics Table And Exhibits Summarizing The Eyewitness Testimonial Subject Matters And The Reinforcement Of Testimony Between Eyewitnesses (E.G., 72-Witnesses Testified About Mr. Hyatt's Move Away In 1991) Under Oath Or Penalty Of Perjury.**

**1.3.2    Updated Chronological Statements Of Facts (The "Chronologies"), A Chronology Of Mr. Hyatt's Overwhelming Eyewitness And Documentary Evidence.**

Updated 1991 Pre-Disputed Period Chronological Statements Of Facts.

Updated 1991 Disputed Period Chronological Statements Of Facts.

Updated 1992 Disputed Period Chronological Statements Of Facts.

Updated 1992 Post-Disputed Period Chronological Statements Of Facts.

**1.3.3    The More Than 220 Affidavits And Declarations Sworn To Or Signed Under Penalty Of Perjury By More Than 150 Eyewitnesses In Support Of Mr. Hyatt's Facts.**

Updated Index of Affidavits.

Affidavits and Declarations with Exhibits filed with the AOBs.

Affidavits and Declarations with Exhibits filed with the ARBs.

Affidavits and Declarations with Exhibits filed with the ASBs.

Post-Briefing Evidence (post-ASBs Affidavits and Declarations with Exhibits).

Mr. Hyatt's Contemporaneous Documentary Evidence (CDE) Affidavits Describing And Authenticating Thousands of Pages of Documentary Evidence.

Mr. Hyatt's 2012 Disputed Period CDE Affidavit.

Mr. Hyatt's 2016 Supplemental Disputed Period CDE Affidavit.

Mr. Hyatt's 2016 Post-Disputed Period CDE Affidavit.

Sourcing Affidavits With Exhibits.

**1.3.4    "Testimonial Responses" Tables And Excerpts Regarding Eyewitnesses' Overwhelming Testimony To Identify And Correct FTB's False Arguments And False Facts.**

Testimonial Responses To FTB's 1991 ROB

Testimonial Responses To FTB's 1992 ROB

Testimonial Responses To FTB's 1991 RRB

Testimonial Responses To FTB's 1992 RRB

RJN002176

Testimonial Responses To FTB's 1991 Attachment A

Testimonial Responses To FTB's 1992 Attachment A

Testimonial Responses To FTB's Attachment D

**1.3.5** **Philips Document Tables Providing Examples Of More Than 5,000 Pages Of Philips Documents That Support Mr. Hyatt's Cases.**

**1.3.6** **Witness Deposition Tables Providing Examples Of More Than 20 Depositions That FTB Took Of Mr. Hyatt's Eyewitnesses And Philips Licensing Attorneys That Support Mr. Hyatt's Appeals.**

**1.3.7** **Tables Of False Statements Made In The FTB Audit File And Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses.**

**1.3.8** **Tables Of False Statements Made Under Penalty Of Perjury By FTB Private Investigators And Rebutted Under Oath Or Penalty Of Perjury By Eyewitnesses.**

**1.3.9** **Objection And Rebuttal To FTB's Calendar And Attachments A (Revised) And F ("Rebuttal To FTB Att. A/F").**

/02/06B1 Introduction to Rebuttal To FTB Att. A/F

/02/06B2 September 1991 Rebuttal To FTB Att. A/F

/02/06B3 October 1991 Rebuttal To FTB Att. A/F

/02/06B4 November 1991 Rebuttal To FTB Att. A/F

/02/06B5 December 1991 Rebuttal To FTB Att. A/F

/02/06B6 January 1992 Rebuttal To FTB Att. A/F

/02/06B7 February 1992 Rebuttal To FTB Att. A/F

/02/06B8 March 1992 Rebuttal To FTB Att. A/F

/02/06B9 April 1992 Rebuttal To FTB Att. A/F

**1.3.10** **Objection And Rebuttal To FTB's Attachment E ("Rebuttal To FTB Att. E").**

**1.3.11** **Tables Of Misrepresentations In FTB's ROBs And RRBs.**

**1.3.12** **Tables Of Mr. Hyatt's Presence Based Upon Direct Testimonial and Documentary Evidence**

ASAB Exhibit 02

ASAB Exhibit 03

CDE Affidavit Exhibit CDE-ST002

CDE Affidavit Exhibit CDE- ST003

RJN002177

**1.4**     **FTB USED FALSE INFERENCES TO MISLEAD YOUR BOARD.**

      **1.4.1**     **Philips Documents Highlight How FTB Has Misrepresented The Evidence And Concealed Evidence That Undermines FTB Arguments.**

The Philips documents illustrate FTB's disingenuous arguments and disregard of highly relevant evidence to mislead your Board. See Sections 1.4.1.1, 1.4.1.2, 1.4.1.3, 1.4.1.4. Exhibits CDE-ST002 and CDE-ST003[1] are tables summarizing Mr. Hyatt's Nevada presence for many days during the disputed period where Mr. Hyatt's eyewitness and documentary evidence rebuts FTB's false inferences and speculation. See also the Testimonial Topics table.[2]

      **1.4.1.1**     ***Mis-addressed* Philips Correspondence Inadvertently Sent To Mr. Hyatt's Former California Addresses Or Fax Number Does Not Establish That Mr. Hyatt Was Present At His Former House.**

FTB's false inference that the Philips documents addressed to Mr. Hyatt's former California addresses or fax number establish his presence at his former Jennifer Circle house is rebutted with highly credible ***undisputed eyewitness evidence*** (the testimony of the lead Philips attorney, Mr. Tamoshunas)[3] which establishes that those documents were misaddressed (Section 1.5.6.3; 1991 ASAB, Sections 1.8.1, 1.8.4.1 to 1.8.4.4). Mr. Hyatt's overwhelming eyewitness evidence and documentary evidence establishes his Las Vegas presence (Section 1.5.8).[4] A more detailed discussion of FTB's false claim of California presence is set forth in 1991 ASAB, Sections 1.8.4.1 to 1.8.4.4.

FTB draws incorrect inferences from Philips correspondence that was undisputedly misaddressed to Mr. Hyatt's former California addresses or fax number. These documents are not evidence that Mr. Hyatt was present in California; rather, they are evidence that FTB disregarded Mr. Tamoshunas' affidavit and that FTB drew incorrect inferences from the Philips documents in the face of ***contrary direct evidence***.

      **1.4.1.2**     **Philips Documents Containing A Legacy P.O. Box Return Address Does Not Establish That They Were Faxed From The Jennifer Circle House Or That Mr. Hyatt Was Present At The Jennifer Circle House.**

FTB's claim that faxed documents with a Cerritos P.O. Box return address create an inference of presence at the Jennifer Circle house is not correct. After Mr. Hyatt sold the Jennifer Circle house on October 1, 1991, he did not return to the

---

[1] Exhibits attached to Hyatt's 2016 Supp. CDE Aff. See also ¶¶ 153 to 243 in Hyatt's 2016 Supp. CDE Aff. and ¶¶ 546 to 949 in Hyatt's 2016 Post-DP CDE Aff.

[2] Testimonial Topics, Ex. T008, T009, T018, T021, T128, T019, T095, T096, T129, T026, T022, T023, T024, T025, T100, T057, T030, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047, T147, and T048.

[3] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25 ("Mr. Hyatt gave Philips a change of address from California to Las Vegas in the latter part of October 1991 and I understood that he moved to Las Vegas before the latter part of October 1991. Any mailings from Philips' personnel to Mr. Hyatt at his former California addresses as of October 1991 and thereafter were inadvertent errors by Philips' support personnel."); A. Tamoshunas Deposition Transcript, 10/27/2011, at 648:19-649:16 (affirming his affidavit testimony), 548:10-18 (testifying that Mr. Hyatt notified Mr. Tamoshunas that correspondence was mistakenly sent to his former California addresses and asking that correspondence be sent to his Las Vegas address.)

[4] Hyatt's 2016 Supp. CDE Aff., Exhibits CDE-ST002 and CDE-ST003, ¶¶ 153 to 243; Hyatt's 2016 Post-DP CDE Aff, ¶¶ 546 to 949.

RJN002178

neighborhood until late 1992. However, after Mr. Hyatt moved he generated faxes from an old fax template that had a Cerritos P.O. Box return address (1991 ASAB, Sections 1.8.4.5, 1.8.4.6). The Cerritos P. O. Box return address was a legacy address and does not establish presence anywhere. Nevertheless, FTB makes the illogical inference that the legacy use of the old Cerritos fax template means Mr. Hyatt was at his former La Palma house. Mr. Hyatt did not send any faxes from his former La Palma house after he sold the house on October 1, 1991 (1991 ASAB, Sections 1.8.4.5, 1.8.4.6).

When Mr. Hyatt moved to Las Vegas he moved his computer and his fax machine with him (1991 ASAB, Section 1.8.4.5).[5] The computer had a fax template thereon with a legacy return address to a Cerritos P. O. Box. Mr. Hyatt continued to use this legacy fax template after he moved to Las Vegas. None of the faxes cited to by FTB were faxed from the Jennifer Circle house (1991 ASAB, Section 1.8.4.6). Mr. Hyatt was in Las Vegas during most of the disputed period and thereafter.[6]

FTB falsely claims that template faxes with legacy return addresses to a P. O. Box that was located in Cerritos establish physical presence at the Jennifer Circle house which was located in La Palma. FTB's argument fails because it does not follow that a person would be at the location on an out-of-date, legacy fax form, particularly a P.O. Box located in another city.

FTB's argument also fails because extensive eyewitness evidence places Mr. Hyatt's only fax machine in his Las Vegas apartment during the disputed period (1991 ASAB, Sections 1.8.4.5, 1.8.4.6.). A fax received by or sent by Mr. Hyatt during the disputed period and thereafter is evidence of Mr. Hyatt's presence in Las Vegas where his fax machine was located.

### 1.4.1.3 Philips Documents Refute FTB's Claim That Mr. Hyatt Operated A Licensing Business At The Jennifer Circle House.

The Philips documents refute FTB's claim that Mr. Hyatt operated a licensing business at the Jennifer Circle house. FTB's arguments are based on cherry-picked documents, on disregarding many Philips documents, on disregarding or misrepresenting the testimony of eyewitnesses who managed and worked on the Philips Licensing Program (*e.g.*, Mr. Tamoshunas, Mr. Roth, Mr. Hyatt, Mr. Leonard, and Ms. Weart), and on disregarding other eyewitness and contemporaneous documentary evidence that overwhelmingly establish that Mr. Hyatt did not have a California licensing business, that Philips managed and operated the Philips Licensing Program, and that Mr. Hyatt was in Las Vegas during most of the disputed period and thereafter.[7] Many of the Philips documents that FTB disregarded are discussed and excerpted in the Philips Document Tables (1991 ASAB, Section 1.7.1). Furthermore, Mr. Hyatt was contractually prohibited from operating a licensing business

---

[5] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991. Mr. Hyatt's 2010 Affidavit, §§ 1.16, 1.20.
[6] Hyatt's 2016 Supp. CDE Aff., Exhibits CDE-ST002 and CDE-ST003, ¶¶ 153 to 243; Hyatt's 2016 Post-DP CDE Aff, ¶¶ 546 to 949.
[7] Hyatt's 2016 Supp. CDE Aff., Exhibits CDE-ST002 and CDE-ST003, ¶¶ 153 to 243; Hyatt's 2016 Post-DP CDE Aff, ¶¶ 546 to 949.

RJN002179

(Section 1.7.3). In fact, Philips had the *exclusive* licensing authority to license Mr. Hyatt's licensable patents (1991 ASAB, Section 1.7.5).

### 1.4.1.4 Philips Documents Establish That FTB's Calendar And Attachment A-R Lack Credibility And Should Be Disregarded.

The Philips documents do not support FTB's calendar or Attachment A-R. Before FTB had the Philips documents, FTB argued California days based on false inferences or speculation. Now that FTB has the Philips documents, FTB continues to argue California days based on false inferences and speculation (Sections 1.5.10.1 to 1.5.10.5) based on Philips' undisputed misaddressed documents (1991 ASAB, Sections 1.8.4.1 to 1.8.4.4), and based on documents that FTB alleges were faxed from the Jennifer Circle house but were faxed from Las Vegas (1991 ASAB, Sections 1.8.4.5, 1.8.4.6).

FTB's calendar and Attachment A-R have over 2,000 false statements based upon false inferences and speculation and mischaracterization of documents (1991 ASAB, Section 1.8.4).[8] Mr. Hyatt was in Las Vegas during most of the disputed period and thereafter.[9]

Mr. Hyatt had previously produced more than 15,000 pages of licensing documents during the protests and eyewitnesses Mr. Tamoshunas, Mr. Leonard, Mr. Roth, and Mr. Hyatt had previously explained these documents with detailed affidavits or declarations.[10] The FTB disregarded the substance of this testimony and instead misrepresented many of the same documents produced by Philips.

FTB's calendar and Attachment A-R should be disregarded because FTB misrepresented the Philips documents and other documents. FTB also disregarded the testimony of eyewitnesses who testified in detail to the Philips Licensing Program and the licensing documents, and misrepresented the evidence.

## 1.5 OVERWHELMING EYEWITNESS AND DOCUMENTARY EVIDENCE SUPPORTS MR. HYATT'S CHANGE TO NEVADA DOMICILE AND NEVADA RESIDENCY.

### 1.5.1 The Audit File And Significant Direct Evidence Confirms Mr. Hyatt Sold the La Palma House On October 1, 1991 And He Had No California Abode Thereafter.

The FTB auditor determined "[Mr. Hyatt] sold the La Palma house on 10/1/91",[11] and he had no other California abode. This alone should justify reversing the residency and sourcing assessments.

---

[8] Rebuttal to FTB Att. A/F. ASAB Exhibit 1 and Exhibit 2.
[9] Hyatt's 2016 Supp. CDE Aff., Exhibits CDE-ST002 and CDE-ST003, ¶¶ 153 to 243; Hyatt's 2016 Post-CDE Aff, ¶¶ 546 to 949.
[10] Affidavit of Algy Tamoshunas, August 4, 2010; Affidavit of David Leonard, May 2, 2012; Affidavit of Gregory L. Roth, August 9, 2010; Affidavit of Gilbert P. Hyatt, August 15, 2010.
[11] FTB's 1991 Narrative Report, p. 4, CCC 00967 ("Statistics (size, cost, etc.) comparing the taxpayer's La Palma home to his Las Vegas home will not be weighed in the determination, as the taxpayer sold the La Palma house on 10/1/91 before he purchased the house in Las Vegas during April of 1992.") (Emphasis in original.)

-3-

RJN002180

FTB relies on inferences and speculation while Mr. Hyatt has significant eyewitness and documentary evidence to establish the legal sale of the house (discussed below). FTB has no evidence that the Jennifer Circle house was not sold so it argues instead presence at the house. First, there is a significant difference between sale of a property and presence at the property (the fact that Mr. Hyatt did visit the property about a year after he sold it does not detract from the fact that he sold the house). Second, Mr. Hyatt has provided overwhelming eyewitness and documentary evidence confirming the sale of the house.

FTB confuses the sale of the Jennifer Circle house with its multitudes of false arguments about presence at the house. ***Presence at a former house is not a reason to undo a legally valid sale***, this notwithstanding Mr. Hyatt's overwhelming evidence that he was not present at the Jennifer Circle house after he sold it on October 1, 1991, until more than a year later (Sections 1.4.1.1 to 1.4.1.4, 1.5.8, 1.5.10, 1.5.10.1 to 1.5.10.5, 1.5.11).

Mr. Hyatt sold the house on October 1, 1991, for $175,000, and had a small gain. Mr. Hyatt signed and delivered the grant deed on October 1, 1991. He received a down payment of $15,000 and he took a note for $160,000. He received full payment on the loan and he timely terminated his homeowners tax exemption.[12] In addition, he reported a gain on the sale of the house and interest on the installment note on his 1991 federal and California income tax returns.[13] Consistent with the sale of the house, the purchaser (Ms. Jeng) paid the down payment for the purchase of the house, made monthly installment payments, paid off the loan with a balloon payment as provided in the note, paid property taxes on the house in 1992 and each year thereafter, and paid for utilities for the house. From October 1, 1991 to the present, Ms. Jeng has been the owner of the La Palma house.

Mr. Hyatt's sale of the Jennifer Circle, La Palma house is also confirmed by the testimony of dozens of witnesses who stated that Mr. Hyatt sold the Jennifer Circle house and moved away: 16 witnesses testified about the sale of Mr. Hyatt's California house in October 1991, 4 witnesses testified that Ms. Jeng paid the deposit or Mr. Hyatt received the deposit on the purchase of the Jennifer Circle house, 26 witnesses testified about Mr. Hyatt's decision to move to Las Vegas, 32 witnesses testified about Mr. Hyatt's preparation to move to Las Vegas in 1991, 72 witnesses testified about Mr. Hyatt moving away in 1991, 28 witnesses testified about Mr. Hyatt moving away in September 1991, 22 Jennifer Circle neighbors testified about Mr. Hyatt moving away in 1991, 15-witnesses testified that an Asian woman (or Ms. Jeng) moved into the Jennifer Circle house after Mr. Hyatt moved away in 1991, 16 witnesses testified that an Asian woman (or Ms. Jeng) lived alone at the Jennifer

---

[12] Hyatt's 2012 CDE Aff., ¶¶ 7-10 and Exhibits CDE-G1, CDE-G2, CDE-G3, and CDE-G4 attached therein; Hyatt's 2016 Supp. CDE Aff., ¶ 7 and Exhibit CDE-S001 attached therein.

[13] Hyatt's 2012 CDE Aff., ¶ 11 and Exhibit CDE-G35 attached therein.

RJN002181

Circle house, 23 witnesses testified that they did not ever again see Mr. Hyatt at Jennifer Circle after he moved away in 1991.[14]

Mr. Hyatt's sale of the Jennifer Circle house is established by documentation (e.g.; a grant deed, a note and full payment on the note) that is authenticated and explained by testimony under oath.[15]

Mr. Hyatt's sale of the Jennifer Circle house is also confirmed by the declarations of Bradley L. Jacobs and Webster J. Guillory. They are both former elected Orange County Assessors with vast experience with real estate transactions. Mr. Jacobs served as the Orange County Assessor, an elected office, for about 23 years from about December 1975 through his retirement in about January 1999. Mr. Guillory served as the Orange County Assessor for about 15 years from January 1999 through 2014. Mr. Guillory was employed by the Orange County Assessor office for more than 38 years. Mr. Jacobs and Mr. Guillory each determined that Mr. Hyatt's sale of the Jennifer Circle house was a bona fide sale.[16] These two witnesses served a combined 38 years as the Orange County Assessors and the Jennifer Circle house is located in Orange County. They each analyzed the house sale documents in detail and confirmed that, as far as the tax assessors were concerned, Mr. Hyatt sold the Jennifer Circle house to Ms. Jeng on October 1, 1991.[17] Mr. Jacobs' and Mr. Guillory's declarations each contains all of the house sale documents as exhibits and contains their thorough analysis of the documents. There can be no question that Mr. Hyatt's sale of the Jennifer Circle house on October 1, 1991, was legal.

Despite all this evidence FTB alleges that the sale of the Jennifer Circle house was not a real sale and cites it as a fraud factor. But FTB's allegations are based upon false inferences and speculation that cannot overcome Mr. Hyatt's eyewitness and documentary evidence that he sold the house in 1991, that he moved away in 1991, and that he was not seen at Jennifer Circle until late 1992.

As FTB has done with other issues, it has shifted the grounds as Mr. Hyatt has rebutted each FTB argument. FTB's initial and most adamant argument for not recognizing the sale of the Jennifer Circle house was its assertion that Mr. Hyatt was living with Ms. Jeng, the purchaser of the Jennifer Circle house.[18] FTB later abandoned this position as it has become silent on this issue since it learned through testimony and documentation that Mr. Hyatt had, instead, a very close, intimate,

---

[14] Updated Testimonial Topics, Exs. T124, T125, T001, T002, T007, T006, T102, T120, T121, and T127, respectively.

[15] Hyatt's 2012 CDE Aff., ¶¶ 7-11 and Exhibits CDE-G1, CDE-G2, CDE-G3, CDE-G4 and CDE-G35 attached therein; Hyatt's 2016 Supp. CDE Aff., ¶ 7 and Exhibit CDE-S001 attached therein.

[16] Declaration of Webster J. Guillory, October 8, 2015, ¶¶ 9-12; Declaration of Bradley Jacobs, November 2, 2012, ¶¶ 5-7.

[17] Declaration of Webster J. Guillory, October 8, 2015, ¶¶ 9-12; Declaration of Bradley Jacobs, November 2, 2012, ¶¶ 5-7.

[18] FTB 1991 Narrative Report, p. 41 (CCC 01004).

-5-

long time relationship with Caroline Cosgrove, his girlfriend of many years.[19]  Twenty-five witnesses testified that Caroline Cosgrove was Mr. Hyatt's girlfriend.[20]

FTB now contends (in discussing the fraud penalties) that the Philips documents "prove, beyond any reasonable doubt, that Hyatt was present at 7841 Jennifer Circle after October 1, 199[1]."[21]  However, presence at the house (which is strongly disputed (1991 ASAB, Sections 1.8.4.1 to 1.8.4.4) cannot nullify a legally binding sale of the house and FTB does not claim the Philips documents show that the Jennifer Circle house was not sold.  This is no surprise.  FTB does not cite to a single Philips document that even addresses the sale of the house or indicates that Philips knew about the sale of the house.  It is a blatant misrepresentation for FTB to allege that Philips documents have any bearing on the sale of the house.  With this final argument FTB has in essence dropped the sham sale argument by substituting an argument of presence at the house.  Your Board should review Mr. Hyatt's rebuttal to FTB's false arguments about presence at the house.  (See 1991 ASAB, Sections 1.8.4.1 to 1.8.4.4.)

FTB's claim that Mr. Hyatt was present at the Jennifer Circle house during the disputed period is rebutted in 1991 ASAB, Sections 1.8.4.1 to 1.8.4.4, which establishes that correspondence from Philips (sent after Mr. Hyatt provided notice of his new Las Vegas address) does not show Mr. Hyatt's presence.  Undisputed testimony establishes that such correspondence was sent to the wrong address (Sections 1.4.1.1, 1.5.6.3; 1991 ASAB, Sections 1.8.4.1 to 1.8.4.4) and eyewitness and documentary evidence establishes Mr. Hyatt's presence in Las Vegas (Sections 1.1, 1.5.1 to 1.5.5, 1.5.8).  FTB has no credible evidence of Mr. Hyatt's actual presence at the Jennifer Circle house between October 1, 1991, and late 1992.  Mr. Hyatt was not at that house at that time.  See Section 1.5.8; 1991 ASAB, Sections 1.8.4.1 to 1.8.4.4.

Mr. Hyatt's ***overwhelming eyewitness and documentary evidence*** establishes that he legally sold the Jennifer Circle house on October 1, 1991, and he is entitled to a determination of that fact.  Your Board should reject FTB's claim that an alleged presence at a house can nullify a legal, bona fide sale.  It cannot.

The evidence establishes that Mr. Hyatt moved to Las Vegas on September 26, 1991, resided at the Continental Hotel until he moved into his Las Vegas apartment on October 21, 1991, and sold his only California house on October 1, 1991.  FTB has alleged no California abode except the La Palma house, but after he sold the La Palma house Mr. Hyatt had no California abode and FTB has no basis for asserting California residency.  Even FTB, in its sourcing argument, claims Mr. Hyatt was a California ***non-resident***.  Since FTB's residency argument and sourcing argument both require Mr. Hyatt to be living and working at the La Palma house (while a resident of Nevada for sourcing) (Section 1.7.4), the sale of the La Palma

---

[19] 1991 ROB, pp. 13-14.
[20] Updated Testimonial Topics, Ex. T064.
[21] 1992 RSAB p. 25.

RJN002183

house and the absence of any credible evidence actually placing Mr. Hyatt at the La Palma house thereafter destroy both the residency and sourcing arguments of FTB.

A determination that Mr. Hyatt sold the La Palma house and leased a Las Vegas apartment (as the facts clearly establish) justifies reversing the residency and sourcing assessments. Mr. Hyatt did not have an abode in California after he sold his former La Palma house and the absence of a California abode precludes a finding of California residency. FTB admits to Mr. Hyatt's Nevada residency for sourcing and uses essentially the same facts to allege both residency and sourcing -- the sourcing assessments fall with the residency assessments (Section 1.7.4).

### 1.5.2 The Bragg Factors Overwhelmingly Establish Mr. Hyatt's Nevada Residency and Domicile.

The *Bragg* factors overwhelmingly establish Mr. Hyatt's Nevada residency during the disputed period and thereafter.[22] Not one Bragg factor favors a California connection.[23] See the section titled "Introduction To Mr. Hyatt's 1991 Concluding Summary" in the 1991 Concluding Summary.

### 1.5.3 FTB Disregards Mr. Hyatt's Undisputed Documentary Evidence Of More Than 100 Non-California Professionals And FTB Falsely Alleges That Philips' California Professionals Are Hyatt's Professionals.

FTB in bad faith misrepresents to your Board that Mr. Roth and Mr. Rudestam are Mr. Hyatt's California professionals[24] in its desperate attempt to establish that Mr. Hyatt is a California resident or that he has a California business. [25] Even worse, FTB disregards Mr. Hyatt's undisputed documentary evidence of his non-California professionals to promote its false facts. This is particularly important because the location of the taxpayer's professionals is a *Bragg* factor, all of which favor Mr. Hyatt.[26]

Philips (not Mr. Hyatt) retained both Mr. Roth through his law firm PSB&C for the Philips licensing program and *Hyatt v. Boone* interference.[27] Mr. Rudestam and McHenry & Associates were retained by Philips for the Philips Licensing Program.[28] Invoices for Mr. Roth's and Mr. Rudestam's time were submitted to Philips, and Philips paid these invoices.[29] Mr. Roth and Mr. Rudestam were Philips' professionals with respect to the Philips Licensing Program.

---

[22] 1991 AOB, pp. 15-38; 1992 AOB, pp. 16-35; 1991 ARB, pp. 21-68; 1992 ARB, pp. 4-26; 1992 ASB, pp. 42-52; *Appeal of Stephen Bragg*, 2003-SBE-002 (May 28, 2003) (setting forth a non-exhaustive list of objective factors helpful in the determination with which state an individual maintains his closest connections).

[23] 1991 AOB, § II.C, pp. 15-38; see rebuttal to FTB's false statements at 1991 ARB, § II.A, pp. 21- 68.

[24] 1991 RSAB, p. 27; 1992 RSAB, p. 5.

[25] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1, and in Section V of the Second Supplemental Motion To Strike.

[26] 1991 Concluding Summary, section titled "The Bragg Factors Overwhelmingly Establish Mr. Hyatt's Nevada Residency And Domicile"; 1991 AOB, pp. 15-38; 1992 AOB, pp. 16-35; 1991 ARB, pp. 21-68; 1992 ARB, pp. 4-26; 1992 ASB, pp. 42-52.

[27] Affidavit of Gregory L. Roth, August 9, 2010, p. 17.

[28] Declaration of Charles McHenry, October 13, 2014, ¶¶ 27, 73.

RJN002184

Mr. Hyatt produced documentary evidence that he had 40 non-California professionals during the audits[30] and documentary evidence that he had more than 100 non-California professionals during the protests.[31] FTB did not even interview Mr. Hyatt's non-California professionals during the audits and protests much less challenge them. Thus, they are undisputed. These non-California professionals include Mr. Hyatt's two Las Vegas rabbis, his Las Vegas CPA, his Las Vegas real estate agents, his Las Vegas escrow officers, his Las Vegas banker, his Las Vegas insurance agent, his Las Vegas home security expert, and many more. These non-California professionals are described in detail in Mr. Hyatt's 2016 Supplemental Disputed Period CDE Affidavit at ¶¶ 75-87 and are summarized in the Table of Mr. Hyatt's Non-California Professionals.[32] For example, Mr. Hyatt testified:

> I had relationships with more than 100 Nevada and other non-California professionals from Las Vegas during the disputed period and thereafter and my representatives notified FTB of these professionals. See the excerpts from my 1992 Supplemental Protest Letter in Exhibit CDE-P037 to my 2016 Post-Disputed Period CDE Affidavit and the excerpts from my 1991 Supplemental Protest Letter in Exhibit CDE-P038 to my 2016 Post-Disputed Period CDE Affidavit. These more than 100 non-California professionals include real estate, legal, banking, accounting, intellectual property, medical and religious professionals. However, FTB disregarded these non-California professionals, there is no record that the Protest Hearing Officer interviewed or otherwise obtained information from even one of these professionals. In fact, the Protest Hearing Officer totally ignored this information and my significant number of non-California professionals. Then, when I obtained affidavits and declarations from some of these professionals, FTB complained about these affidavits and declarations.

Hyatt's 2016 Supp. CDE Aff., ¶ 75.

Thus, Mr. Roth and Mr. Rudestam were Philips' professionals, not Mr. Hyatt's professionals, and FTB is disingenuous in citing to them and ignoring Mr. Hyatt's over 100 non-California professionals.

### 1.5.4 FTB Disregards Or Misrepresents Mr. Hyatt's Documentary Evidence Of His Three Las Vegas Bank Accounts And His Many Nevada Situs Investment Accounts.

FTB falsely represents to your Board that Mr. Hyatt was present at and working from his former La Palma house during the disputed period[33] in its desperate attempt to try to establish that Mr. Hyatt was a California resident or that he had a California business. Even worse, FTB disregards or misrepresents Mr. Hyatt's significant non-California bank accounts and investment accounts to promote its false allegations. This is particularly important because the location of the taxpayer's bank and savings accounts is one of the *Bragg* factors, all of which favor Mr. Hyatt.[34]

---

29 See; e.g., the PSB&C February 29, 1992 invoice (FTB_Philips 0006582) including Mr. Roth's time charges and the McHenry Associates October 31, 1991 invoice (FTB_Philips 0007470-0007471) including Mr. Rudestam's time charges.
30 Hyatt's 2012 CDE Aff., ¶ 56 and Exhibit CDE-G23 attached therein.
31 Hyatt's 2012 CDE Aff., ¶ 56 and Exhibit CDE-G24 attached therein; Hyatt's 2016 Post-DP CDE Aff., Exhibits CDE-P037 and CDE-P038 attached therein.
32 Exhibit CDE-ST004 attached to the Hyatt's 2016 Supp. CDE Aff.
33 1991 RSAB, p. 3.
34 1991 AOB, pp. 25-27; 1992 AOB, pp. 25-26; 1991 ARB, pp. 42-46; 1992 ARB, pp. 18-19; 1992 ASB, pp. 46.

RJN002185

Mr. Hyatt produced documentary evidence that he had Las Vegas bank accounts and Las Vegas situs investment accounts.[35] Mr. Hyatt opened a checking account with a Las Vegas bank immediately after he moved into his Las Vegas apartment, he opened a second checking account and a savings account with Las Vegas banks a couple of months later, and he opened numerous investment accounts with Nevada situs financial institutions during the disputed period. These bank accounts and investment accounts are described in detail in Mr. Hyatt's 2012 Disputed Period CDE Affidavit at ¶¶ 64-74 and Mr. Hyatt's 2016 Post-Disputed Period CDE Affidavit at ¶¶ 409-459.

FTB is disingenuous in disregarding or misrepresenting Mr. Hyatt's many Nevada bank accounts and investment accounts.

### 1.5.5    Mr. Hyatt's Limited Presence In California Was Only For Temporary Or Transitory Purposes.

Mr. Hyatt has produced overwhelming evidence that he was a domiciliary and resident of Nevada during the disputed period and that his occasional presence in California after he moved was only for temporary and transitory purposes. A detailed discussion of each of Mr. Hyatt's California visits on a day by day basis is set forth in his calendar and the Rebuttal to FTB Att. A/F. A cumulative summary is provided by tables at the beginning of each day in the Rebuttal to FTB Att. A/F. The temporary and transitory purposes for Mr. Hyatt's trips outside of Nevada are summarized in a table, ASAB Exhibit 4.

The evidence confirms that, out of 190 days in the 1991 and 1992 disputed periods, Mr. Hyatt was present in California for only 46 days or part days with each of those days being for *a specific temporary or transitory purpose*. For example, Mr. Hyatt was in a California hospital for 9 days and two part days in February 1992 recovering from cancer surgery, he travelled from his home in Nevada to California to enter the hospital and he travelled from the hospital in California to his home in Nevada when he was released from the hospital. See Mr. Hyatt's calendar and his Rebuttal to FTB Att. A/F. Except for the nine days he was hospitalized Mr. Hyatt had no full days in California during the disputed period. Mr. Hyatt confirmed that his occasional California trips were temporary or transitory: "I made trips from Las Vegas, but I always intended to return and I always did return to my Las Vegas residence where I was living at the time; either my hotel, my apartment, or my Tara Avenue house."[36]

FTB has not established that Mr. Hyatt's presence in California was for other than temporary or transitory purposes. In lieu of actual evidence of physical presence, FTB draws incorrect inferences from faxes, mail, and FedEx shipments that were undisputedly mis-addressed to Mr. Hyatt's former California addresses or fax number to attempt to equate this

---

[35] Hyatt's 2012 CDE Aff., ¶¶ 64-74 and Exhibits CDE-F5, CDE-F6, CDE-F7, CDE-F9, CDE-F10, CDE-F11, CDE-F13, CDE-F14, CDE-F15, CDE-F17, CDE-F18, CDE-F19 attached therein; Hyatt's 2016 Post-DP CDE Aff., ¶¶ 409-459 and the exhibits attached therein.
[36] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.11. See also Mr. Hyatt's 2016 Supplemental Affidavit, ¶ 144.

RJN002186

mis-addressed correspondence to California presence (Sections 1.4.1.1, 1.5.6.3; 1991 ASAB, Sections 1.8.4.1 to 1.8.4.4). FTB avoids the issue of temporary or transitory purposes. FTB allegations fail on several levels. Misaddressed correspondence is not evidence of California presence. For the times that there was a California presence FTB did not perform a temporary or transitory analysis as to the reason for the presence (*e.g.*, a court hearing or a stay in a hospital is presence but is not related to residency).[37] FTB has no objective evidence of Mr. Hyatt's California presence other than for a temporary or transitory purpose. In particular, FTB has no eyewitness testimony that Mr. Hyatt's occasional presence in California was for other than a temporary or transitory purpose and FTB has not provided the temporary or transitory analysis required by California law. FTB makes inferences, assumptions, and unsupported conclusions about Mr. Hyatt receiving correspondence related to the Philips Licensing Program. However, this correspondence was sent to an address that has many changes of address filed with the U.S. Postal Service, provided to Philips and Mahr Leonard, and to many others. The many changes of address and the many notifications that Mr. Hyatt moved to Las Vegas are discussed in Sections 1.5.6, 1.5.6.1 to 1.5.6.3, 1.5.7. In contrast, Mr. Hyatt has established that each of his visits to California was for a temporary or transitory purpose. The purpose for each of Mr. Hyatt's visits is summarized in ASAB Exhibit 4. In addition, FTB has not even attempted to make a *prima facie* showing that Mr. Hyatt's presence in California was for other than a non-temporary or transitory purpose. Mr. Hyatt's visits to California were all for temporary or transitory purposes (e.g., a required presence in a court hearing on his mother's estate). Mr. Hyatt confirmed that the California trips were for temporary or transitory purposes: "I made trips from Las Vegas, but I always intended to return and I always did return to my Las Vegas residence where I was living at the time; either my hotel, my apartment, or my Tara Avenue house."[38]

Mr. Hyatt has fully complied with the residency statute and fully addressed the temporary or transitory purposes of his occasional presence in California during the disputed period.[39] FTB's disregard of the residency statute[40] and FTB's failure to adequately address the temporary or transitory purposes of Mr. Hyatt's occasional presence in California is sufficient reason by itself for your Board to decide these appeals against FTB.

---

[37] *See* Rev. & Tax. Code § 17014(a) (providing that presence alone is not determinative of residency; the purpose for a person's presence **must be analyzed** to determine residency).

[38] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.11.

[39] See Exhibit 4 attached hereto; Hyatt's 2012 CDE Aff.; and Hyatt's 2016 Supp. CDE Aff.

[40] *See* Rev. & Tax. Code § 17014(a) (providing that presence alone is not determinative of residency; the purpose for a person's presence must be analyzed to determine residency).

RJN002187

**1.5.6** **Mr. Hyatt Notified Many People And Entities That He Moved To Las Vegas And Gave Them His Las Vegas Contact Information, Which Is Strong Evidence That He Moved To And Intended To Remain In Las Vegas Indefinitely.**

**1.5.6.1** **Mr. Hyatt Gave Numerous Changes Of Address To His Las Vegas Location And He Gave Numerous People His Las Vegas Contact Information Shortly After He Moved To Las Vegas.**

As clear evidence of his change of domicile and residency, Mr. Hyatt provided notice of his new Las Vegas location to family, friends, and colleagues. Mr. Hyatt was very open about his move to Las Vegas and his Las Vegas contact information with those who had a need to know. ***This is important evidence that Mr. Hyatt intended to move, that he did move, and that he intended to remain in Las Vegas indefinitely.*** He provided numerous changes of address and informed numerous people that he had moved to Las Vegas. He provided his Las Vegas contact information to his family, friends, neighbors, Philips, Mahr Leonard, service providers and many others.[41] This notification of Nevada contact information is further described by Mr. Hyatt in his 2016 Supplemental Disputed Period CDE Affidavit, ¶¶ 143-144, 159.

Prior to moving to Las Vegas, Mr. Hyatt told his family, friends and neighbors that he was moving to Las Vegas. After moving to Las Vegas he established contacts with and interacted with people in and from Las Vegas. Many witnesses have testified about Mr. Hyatt moving to and living in Las Vegas: 72 witnesses testified about Mr. Hyatt moving away in 1991, 22 Jennifer Circle neighbors testified about Mr. Hyatt moving away in 1991, 26 witnesses testified about Mr. Hyatt's decision to move to Las Vegas, 32 witnesses testified about Mr. Hyatt's preparations to move to Las Vegas in 1991, 17 witnesses testified about Mr. Hyatt's former Jennifer Circle house having little furniture and/or having packed boxes before he moved to Las Vegas in 1991, 15 witnesses testified about Mr. Hyatt's possessions being carted off for storage or being given away, or disposed of, or donated to charity, 3 witnesses testified that they helped Mr. Hyatt move his belongings to storage prior to his move to Las Vegas in 1991, 16 witnesses testified about the sale of Mr. Hyatt's California house in October 1991, 37 witnesses testified about Mr. Hyatt's stay at a Las Vegas hotel in 1991, 20 witnesses testified about telephoning Mr. Hyatt at a Las Vegas hotel in September or October 1991, 28 witnesses testified about being informed in October 1991 that Mr. Hyatt had moved into his Las Vegas apartment, 2 witnesses testified about staying overnight at Mr. Hyatt's Las Vegas apartment, 15 witnesses testified about visiting Mr. Hyatt at his Las Vegas apartment, 39 witnesses testified about telephoning Mr. Hyatt at his Las Vegas apartment, 17 witnesses testified about Mr. Hyatt's religious activities in Las Vegas, 41 witnesses

---

[41] Hyatt's 2012 CDE Aff., ¶ 34 and Exhibit CDE-G21 attached thereto; 16 witnesses testified about Mr. Hyatt's changes of address to Las Vegas addresses and 5 witnesses testified that Mr. Hyatt provided notice of his change of address to his Las Vegas addresses in October 1991 to Philips and to Mahr Leonard, Updated Testimonial Topics, Exs. T103 and T160. See also Hyatt's Chronologies.

RJN002188

testified about Mr. Hyatt house hunting in Las Vegas, 21 witnesses testified about furniture and furnishings in Mr. Hyatt's Las Vegas apartment, and 20 witnesses testified about Mr. Hyatt moving into his Las Vegas house in April 1992.[42]

Immediately after he moved into his Las Vegas apartment on October 21, 1991, Mr. Hyatt notified many people and entities of his change of address and his Las Vegas contact information (Section 1.5.6.2).

On October 21, 1991, the day Mr. Hyatt moved into his Las Vegas apartment, he submitted changes of address to the U.S. Post Office in Las Vegas to have his mail that was addressed to his former Jennifer Circle house address and to his former Cypress P. O. Box address forwarded to his new Las Vegas address.[43]

Soon after moving into his Las Vegas apartment, Mr. Hyatt also sent formal written changes of address letters to about 30 organizations and people. The changes of address to the following nine organizations are all that have survived the passage of time: IEEE Group Insurance, United Mileage Plus, Nevada Power Company, US Air Frequent Travelers Program, American Airlines, MBNA America, Chase Bank, California Federal Bank FSB, and The Bank of New York.[44]

Furthermore, Mr. Hyatt informed more than 20 of his more than 100 professionals (Section 1.5.3) that he moved to Las Vegas and he provided them with his Las Vegas contact information.[45] These non-California professionals are described in detail in Mr. Hyatt's 2016 Supplemental Disputed Period CDE Affidavit at ¶¶ 75-87 and are summarized in the Table of Mr. Hyatt's Non-California Professionals.[46] This is in addition to informing more than 100 family, friends, neighbors, licensing associates, service providers, and many others in California and Nevada that he intended to move or that he had moved to Las Vegas.

The U.S. Postal Service forwarded Philips and Mahr Leonard misaddressed U.S. mail to Mr. Hyatt's Las Vegas address because of his changes of address (Section 1.5.6.3).

Mr. Hyatt also gave changes of address to Philips and Mahr Leonard in October 1991.[47] Mr. Tamoshunas, the lead licensing attorney at Philips, testified "Mr. Hyatt gave Philips a change of address from California to Las Vegas in the latter part of October 1991 and I understood that he moved to Las Vegas before the latter part of October 1991. Any mailings from

---

[42] Updated Testimonial Topics, Exs. T007, T102, T001, T002, T003, T005, T116, T124, T008, T009, T128, T021, T018, T019, T040, T045, T022, and T049, respectively. See also Testimonial Topics, Ex. T128, T095, T096, T129, T026, T023, T024, T025, T100, T057, T030, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047, T147, and T048.

[43] Hyatt's 2012 CDE Aff., ¶ 34 and Exhibit CDE-G21 attached therein.

[44] Copies of the nine formal change of address notification letters are attached to Mr. Hyatt's Disputed Period CDE Affidavit, ¶ 34 and Exhibit CDE-G21.

[45] Hyatt's 2016 Supp. Aff., ¶ 154.

[46] Exhibit CDE-ST004 attached to the Hyatt's 2016 Supp. CDE Aff.

[47] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25; Affidavit of David Leonard, May 2, 2012, ¶ 26; Declaration of Vicki Weart, May 21, 2012 ¶¶ 5-6.

RJN002189

Philips' personnel to Mr. Hyatt at his former California addresses as of October 1991 and thereafter were inadvertent errors by Philips' support personnel."[48]

On October 25, 1991, shortly after moving into his Las Vegas apartment on October 21, 1991, Mr. Hyatt opened a new checking account at a Las Vegas bank near his Las Vegas apartment. He obtained checks with his Las Vegas contact information printed thereon and he proceeded to pay his personal expenses with hundreds of checks he wrote while present in Las Vegas that had his Las Vegas contact information printed thereon.[49]

Mr. Hyatt put his Las Vegas contact information on many of documents; e.g., his Nevada drivers' license application, on his Nevada voter's registration application, on his Affidavit of Nevada Domicile as executor for his mother's estate, on his Las Vegas renter's insurance application, on his Las Vegas auto insurance application, on his Las Vegas synagogue membership application, on his home purchase offers and his escrow papers, and much more.[50]

It was no secret to those around him that Mr. Hyatt moved to Las Vegas: 72 witnesses testified about Mr. Hyatt moving away in 1991, 28 witnesses testified about Mr. Hyatt moving away in September 1991, 22 Jennifer Circle neighbors testified about Mr. Hyatt moving away in 1991, and 23 witnesses testified that they did not ever again see Mr. Hyatt at Jennifer Circle after he moved away in 1991.[51] Mr. Hyatt went to great lengths to notify his family, friends, colleagues, service providers, and others that he had moved and provided them with his Las Vegas contact information. There can be no question that Mr. Hyatt intended to remain in Las Vegas indefinitely.

### 1.5.6.2 Immediately After Mr. Hyatt Moved Into His Las Vegas Apartment On October 21, 1991, He Notified Many People And Entities Of His Change Of Address And Las Vegas Contact Information.

As clear evidence of his change of domicile and residency, immediately after moving into his Las Vegas apartment, Mr. Hyatt provided notice of his new Las Vegas address to family, friends, and colleagues and he provided formal written notice of his new address to nine organizations that he used and the U.S. Post Office (Section 1.5.6.1). For example, 28 witnesses testified about being informed in October 1991 that Mr. Hyatt had moved into his Las Vegas apartment, *27 witnesses testified* about telephoning Mr. Hyatt at his Las Vegas apartment or receiving telephone calls from Mr. Hyatt from his Vegas apartment in October 1991, and 27 witnesses testified about Mr. Hyatt giving them the telephone number of

---

[48] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25; Affidavit of David Leonard, May 2, 2012, ¶ 26; Declaration of Vicki Weart, May 21, 2012 ¶¶ 5-6.

[49] Hyatt's 2012 CDE Aff., ¶ 64 and Exhibit CDE-F5 attached therein.

[50] Hyatt's 2012 CDE Aff., ¶ 28 and Exhibit CDE-G18 attached therein; ¶ 29 and Exhibit CDE-G19 attached therein; ¶ 13 and Exhibit CDE-G5 attached therein; ¶ 26 and Exhibit CDE-G16 attached therein; ¶ 27 and Exhibit CDE-G17 attached therein; ¶ 18 and Affidavit of Gilbert P. Hyatt, December 5, 2008, Exhibit 7 (P07288-07290); and ¶ 39 and Exhibit CDE-G34 attached therein, respectively.

[51] Updated Testimonial Topics, Exs. T007, T006, T102, and T127, respectively.

-13-

RJN002190

his Las Vegas apartment in October 1991.[52] **This is important evidence that Mr. Hyatt intended to reside in his apartment, that he did reside in his apartment, and that he intended to remain in his apartment for a period of time until he purchased a Las Vegas house**.

On October 21, 1991, the day Mr. Hyatt moved into his Las Vegas apartment, he submitted changes of address to the U.S. Post Office in Las Vegas to have his mail that was addressed to his former Jennifer Circle house address and to his former Cypress P. O. Box address forwarded to his new Las Vegas address.[53]

### 1.5.6.3    The U.S. Postal Service Forwarded Philips And Mahr Leonard Misaddressed U.S. Mail And Much Other Correspondence To Mr. Hyatt's Las Vegas Address Because Of His Change Of Address.

U.S. Mail that Philips and Mahr Leonard misaddressed to California (Sections 1.4.1.1, 1.5.6.3;) was forwarded to Mr. Hyatt's Las Vegas address and received by Mr. Hyatt in Las Vegas (Section 1.5.7). Mr. Hyatt submitted changes of address to the U.S. Post Office in Las Vegas on October 21, 1991, the date that Mr. Hyatt moved into his Las Vegas apartment, to have his mail that was addressed to his former Jennifer Circle house address and to his former Cypress P. O. Box address forwarded to his new Las Vegas address.[54] Mr. Hyatt started keeping the forwarded mail after his Las Vegas CPA, Mr. Kern, advised him to do so in March 1992.[55] See copies of the forwarded envelopes with the U.S. Postal Service forwarding notations in Exhibit CDE-P009 attached to Mr. Hyatt's 2016 Post Disputed Period CDE Affidavit.

Accordingly, even U.S. mail sent to Mr. Hyatt's former California house or Cypress P.O. Box was not delivered in California – Mr. Hyatt received all of this U.S. mail in Las Vegas.

### 1.5.7    Mr. Hyatt Received Virtually All of His Mail In Las Vegas During The Disputed Period And Thereafter.

Mr. Hyatt received virtually all of his U.S. mail at his Las Vegas mailing address during the disputed period and thereafter. On October 21, 1991, immediately upon moving into his Las Vegas apartment, Mr. Hyatt submitted changes of address to the U.S. Postal Service[56] directing that his mail addressed to his former Jennifer Circle address and his Cypress P.O. Box be forwarded to his new Las Vegas mailing address.[57] Mr. Hyatt also proceeded to use his new Las Vegas mailing address for his Las Vegas connections (e.g., his new Las Vegas checking account). Beginning soon after October 21, 1991,

---

[52] Updated Testimonial Topics, Ex. T128, T095, and T096, respectively.
[53] Hyatt's 2012 CDE Aff., ¶ 34 and Exhibit CDE-G21 attached therein.
[54] Hyatt's 2012 CDE Aff., ¶ 34 and Exhibit CDE-G21 attached therein.
[55] Hyatt's 2016 Post-DP CDE Aff., ¶ 283.
[56] Hyatt's 2012 CDE Aff., ¶ 17 and Exhibit CDE-G9 attached therein.
[57] See the envelopes with the U.P. Postal Service forwarding information; Hyatt's 2016 CDE Aff. ¶ 71 and Exhibit CDE-P009 attached therein.

RJN002191

Mr. Hyatt received all of his important mail (*e.g.*, bank statements and investment account statements) and virtually all other U.S. mail at his mailing address in Las Vegas.[58]

In addition, Mr. Hyatt gave Philips and Mahr Leonard changes of address to his Las Vegas apartment address in October 1991[59] so that important mail from Philips and Mahr Leonard would be sent to his Las Vegas address. Philips and Mahr Leonard personnel stated that they inadvertently used Mr. Hyatt's former California address on some correspondence.[60] However, U.S. mail misaddressed to Mr. Hyatt's former Jennifer Circle address or Cypress P.O. Box was forwarded to Mr. Hyatt's Las Vegas address. Mr. Hyatt also sent written notification of his new Las Vegas address to various businesses and other entities[61] immediately after moving into his Las Vegas apartment (Sections 1.5.6.1, 1.5.6.2). Mr. Hyatt also used his Las Vegas addresses directly for other very important mail such as bank checking account statements shortly after moving to Las Vegas (Sections 1.5.6, 1.5.6.1 to 1.5.6.3, 1.5.7).

FTB falsely claims without any support that Mr. Hyatt received only his "least important mail"[62] in Las Vegas. This claim is demonstrably false because Mr. Hyatt arranged for virtually all of his mail to be delivered to his Las Vegas mailing address during the disputed period, including his most important mail (Sections 1.5.6, 1.5.6.1 to 1.5.6.3, 1.5.7). [63]

Because of Mr. Hyatt's request for mail forwarding and because Mr. Hyatt expressly advised third parties of his new Las Vegas mailing address, Mr. Hyatt received virtually all of his U.S. mail at his Las Vegas mailing address beginning in October 1991, including very important personal mail, such as financial statements from his investment accounts involving tens of millions of dollars of investments.[64]

### 1.5.8 Mr. Hyatt's Calendar Is Supported By Eyewitness And Documentary Evidence And Confirms His Overwhelming Presence In Las Vegas.

Mr. Hyatt's updated calendar is supported by documentary and testimonial evidence, shows that Mr. Hyatt was present in Las Vegas for 166 full and part days as a permanent resident and present in California for only temporary or

---

[58] Mr. Hyatt picked up mail delivered at the Jennifer Circle house between September 26 and October 1, 1991, because he traveled to California during this period to pack up, clean the Jennifer Circle house, sign documents for the sale of the house, and attend a probate court hearing. Mail delivered at his former California addresses between October 2, 1991, and October 21, 1991, was provided to Mr. Hyatt by the purchaser of the Jennifer Circle house.

[59] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25; Affidavit of David Leonard, May 2, 2012, ¶ 26; Declaration of Vicki Weart, May 21, 2012 ¶¶ 5-6.

[60] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25; Affidavit of David Leonard, May 2, 2012, ¶ 26; Declaration of Vicki Weart, May 21, 2012 ¶¶ 5-6.

[61] Hyatt's 2012 CDE Aff., ¶ 34 and Exhibit CDE-G21 attached therein.

[62] 1991 ROB, p. 80:17 (emphasis added).

[63] FTB's bad faith acts against Mr. Hyatt are discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1, and in Section V of the Second Supplemental Motion To Strike.

[64] See Table of Mr. Hyatt's 1991-1992 Documents Having His Nevada Contact Information and Nevada Mail Table, Hyatt's 2016 Post-DP CDE Aff., Exhibits CDE-T006 and CDE-T005, respectively.

RJN002192

transitory purposes during the 190 days of the disputed period (Section 1.5.5). [65]  Mr. Hyatt provides this updated calendar

below in rebuttal to FTB's calendar in its 1991 RSAB, pp. 5-12.

Mr. Hyatt's location for each and every day in the disputed period is summarized in his calendar, is detailed in the

Rebuttal to FTB Att. A/F on a day by day basis, and is totaled in the table on the following page *infra* (1991 ASAB, Section

1.8.2).  ASAB Exhibit 2 is a table summarizing Mr. Hyatt's presence for each day in the disputed period and is linked day by

day to the rebuttal for each day in Mr. Hyatt's Rebuttal to FTB Att. A/F and ASAB Exhibit 4 is a table summarizing Mr.

Hyatt's reasons for his occasional temporary and transitory presence in California and in other states.

Mr. Hyatt did not have a single day in California for the purpose of residency during the disputed period.  Details of

Mr. Hyatt's location are provided in the calendar and in the Rebuttal to FTB Att. A/F attached hereto for each particular day.

Section 1.5.5 describes the temporary or transitory purposes for Mr. Hyatt's presence in California.

This table *infra* illustrates that Mr. Hyatt's only residency time in California during the disputed period is a part day

on the day that he moved to Las Vegas (September 26, 1991).  He had some part days in Nevada and California and some full

days in California while he was hospitalized for cancer surgery, but the time in California was for temporary or transitory

purposes (e.g., a required court hearing or time in a hospital) and does not count for a day of California residency.  Part days in

Nevada and California usually represent travel from Mr. Hyatt's home in Las Vegas to California for a particular purpose and

return that same day to Las Vegas.  For days outside of Nevada, Mr. Hyatt always intended to return and always did return to

Nevada after the short trips.

| CUMULATIVE DAYS OF MR. HYATT'S PRESENCE DURING THE 190 DAY DISPUTED PERIOD | |
|---|---|
| 1.  Full day in Nevada—Resident | 125 |
| 2.  Part day in Nevada—Resident<br>Part day in California—Temporary or Transitory Purpose | 37 |
| 3.  Full day in California—Temporary or Transitory Purpose | 9 |
| 4.  Full day in California—Resident | 0 |
| 5.  Part day in Nevada—Resident<br>Part day in 3d State—Temporary or Transitory Purpose | 3 |
| 6.  Full day in 3d State—Temporary or Transitory Purpose | 15 |
| 7.  Part day in Nevada—Resident<br>Part day in California—Resident | 1 |

In contrast, FTB's new calendar in its 1991 RSAB is based on false inferences, mischaracterization of documents and

speculation about Mr. Hyatt's location (e.g., misaddressed mail, misrepresenting where faxes were sent from, and just plain

---

[65] Testimonial Topics, Exs. T008, T009, T018, T021, T128, T019, T095, T096, T129, T026, T022, T023, T024, T025, T100, T057, T030, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047, T147, and T048.  See also Hyatt's Chronologies.

RJN002193

1   false inferences and speculation) (1991 ASAB, Sections 1.8.4.1 to 1.8.4.4). FTB disregarded Mr. Hyatt's eyewitness and

2   documentary evidence when it compiled its calendar (Sections 1.1, 1.5.1, 1.5.2, 1.5.8; 1991 ASAB, Sections 1.8.1, 1.8.4.1 to

3   1.8.4.4).[66] FTB's assertions of California presence are based on fabricated stories, illogical inferences (Sections 1.5.9, 1.5.10,

4   1.5.10.1 to 1.5.10.5) and speculation. For example, FTB relies on boilerplate fax cover sheets with blank dates that use a

5   Cerritos P.O. Box as a return address and misaddressed correspondence sent to Mr. Hyatt's former California addresses or fax

6   number. This correspondence does not establish Mr. Hyatt's presence at his former Jennifer Circle house (1991 ASAB,

7   Sections 1.8.4.1 to 1.8.4.4). Your Board should disregard FTB's calendar and Attachment A-R as being based upon thousands

8   of false statements (Sections 1.5.9, 1.5.10, 1.5.10.1 to 1.5.10.5).

---

[66] Hyatt's 2016 Supp. CDE Aff., Exhibits CDE-ST002 and CDE-ST003, ¶¶ 153 to 243; Hyatt's 2016 Post-CDE Aff, ¶¶ 546 to 949.

RJN002194

| September 1991 | | | | | | |
|---|---|---|---|---|---|---|
| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26,<br>**CA,**<br>**NV established**<br>CA: visited Dr. Hamer<br>Faxed Roth<br>Drove to LV with trailer<br>CA→LV<br><br>**[Overnight in NV hotel]** | 27<br>**NV, CA**<br>**temp/transit, NV**<br>**established**<br>LV→CA→LV round trip<br>NV evidence: Cosgrove called<br><br>**[Overnight in NV hotel]** | 28<br>**NV established**<br>NV evidence: Cosgrove called<br><br>**[Overnight in NV hotel]** |
| 29<br>**NV established**<br>NV evidence: Cosgrove called; Called McCaffrey<br><br>**[Overnight in NV hotel]** | 30<br>**NV established,**<br>**CA temp/transit**<br>LV→CA<br>Traveled to CA for court hearing<br>Met McCaffrey & Bailey<br><br>**[Overnight in CA house]** | | | | | |

-18-

RJN002195

**October 1991**

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| | | **1**<br>**CA temp/transit, NV established**<br>CA: court hearing Met with McCaffrey & Bailey<br>Sold CA house<br>CA→LV<br>Returned to LV.<br>NV evidence: Cosgrove called<br><br>**[Overnight in NV hotel]** | **2**<br>**NV established**<br>NV evidence: Called McCaffrey; McCaffrey & Cosgrove called<br><br>**[Overnight in NV hotel]** | **3**<br>**NV established**<br>NV evidence: Met Hechts; Cosgrove & McHenry called<br><br>**[Overnight in NV hotel]** | **4**<br>**NV established**<br>NV evidence: Met with Hechts & Levoff & Howard; Temple Beth Am service; Cosgrove called<br><br>**[Overnight in NV hotel]** | **5**<br>**NV established**<br>NV evidence: Cosgrove called<br><br>**[Overnight in NV hotel]** |
| **6**<br>**NV established**<br>NV evidence: Hiked Red Rock with Howard; Cosgrove called<br><br>**[Overnight in NV hotel]** | **7**<br>**NV established**<br>NV evidence: Cosgrove called<br><br>**[Overnight in NV hotel]** | **8**<br>**NV established**<br>NV evidence: Leased LV apt., Paid cash deposit; Cosgrove called<br><br>**[Overnight in NV hotel]** | **9**<br>**NV established**<br>NV evidence: Cosgrove called<br><br>**[Overnight in NV hotel]** | **10**<br>**NV established**<br>NV evidence: Howard & Cosgrove called<br><br>**[Overnight in NV hotel]** | **11**<br>**NV established, CA temp/transit**<br>NV evidence: Faxed & called McCaffrey; McCaffrey called<br>LV→CA<br>CA: Cosgrove's birthday<br><br>**[Overnight at Cosgrove's house]** | **12**<br>**CA temp/transit, NV established**<br>CA→LV<br>NV evidence: Met with Howard; Cosgrove called<br><br>**[Overnight in NV hotel]** |
| **13**<br>**NV established**<br>NV evidence: Signed apt. rental agreement; Cosgrove called<br><br>**[Overnight in NV hotel]** | **14**<br>**NV established, VA temp/transit**<br>NV evidence: Mailed property tax; Paid LV apt. pro-rated rent<br>Left on trip from LV<br><br>**[Overnight in VA hotel]** | **15**<br>**VA temp/transit (undisputed)**<br>VA<br><br>**[Overnight in VA hotel]** | **16**<br>**VA temp/transit (undisputed)**<br>VA: met with Thompson & Turner & Huntington<br><br>**[Overnight in VA hotel]** | **17**<br>**VA temp/transit, TX temp/transit (undisputed)**<br>VA→TX<br><br>**[Overnight in TX hotel]** | **18**<br>**TX temp/transit**<br>TX: Met with Mahr & Leonard & Roth<br><br>**[Overnight in TX hotel]** | **19**<br>**TX temp/transit, NY temp/transit**<br>TX→NY<br>NY: Met with Philips personnel<br><br>**[Overnight in NY hotel]** |
| **20**<br>**NY temp/transit (undisputed)**<br>NY: Traveled to NJ family reunion<br>NY→NV: Flew to LV early AM flight<br><br>**[Overnight in NY hotel]** | **21**<br>**NY temp/transit , NV established**<br>NY→LV flight<br>NV evidence: Signed apt. doc; Rented PO box; Change of addr.; NV Power; Centel; Called friends/colleagues; Comdex<br><br>**[Overnight in NV apt.]** | **22**<br>**NV established**<br>NV evidence: Comdex; Met with Panos; Called Eyler<br><br>**[Overnight in NV apt.]** | **23**<br>**NV, CA temp/transit, NV established**<br>LV→CA→LV round trip<br>NV evidence: Comdex; Bought gas; Called Cosgrove & Hollingsworth; Eyler called; Panos visited apartment<br>**[Overnight in NV apt.]** | **24**<br>**NV established**<br>NV evidence: Comdex; Met with Eyler; Called McHenry & Rudestam<br><br>**[Overnight in NV apt.]** | **25**<br>**NV established (undisputed)**<br>NV evidence: Comdex; Met with Hechts & Howard; Opened LV checking acct.; Temple Beth Am service<br><br>**[Overnight in NV apt.]** | **26**<br>**NV, CA temp/transit, NV established**<br>LV→CA→LV round trip<br>NV evidence: Met with Howard<br><br>**[Overnight in NV apt.]** |
| **27**<br>**NV established**<br>NV evidence: Wrote and faxed letter to Tamoshunas<br><br>**[Overnight in NV apt.]** | **28**<br>**NV established**<br>NV evidence: Called Durocher; Cowan & Kazmaier called; Met with Strattons; Exchanged rent check; Signed Sharp agreement in LV; Signed check<br><br>**[Overnight in NV apt.]** | **29**<br>**NV established**<br>NV evidence: Cowan & Kazmaier called<br><br>**[Overnight in NV apt.]** | **30**<br>**NV established**<br>NV evidence: Kazmaier called<br><br>**[Overnight in NV apt.]** | **31**<br>**NV established**<br><br>**[Overnight in NV apt.]** | | |

RJN002196

**November 1991**

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| | | | | | **1** <br><br> NV established <br> NV evidence: Paid Centel & NV Power; Changes of address; Kazmaier & Connell called; Met with Howard; Temple Beth Am service <br><br> **[Overnight in NV apt.]** | **2** <br><br> NV established <br> NV evidence: Kazmaier (house guest); Connell called <br><br> **[Overnight in NV apt.]** |
| **3** <br><br> NV established <br> NV evidence: Kazmaier (house guest); McHenry & Connell called <br><br> **[Overnight in NV apt.]** | **4** <br><br> NV established <br> NV evidence: Kazmaier (house guest); Hammer & Jeng visited apartment; Dinner with Kazmaier; Signed draft Matsushita agreement & XCS invoice in LV; etc. <br><br> **[Overnight in NV apt.]** | **5** <br><br> NV established <br> NV evidence: Kazmaier (house guest); Hiked with Kazmaier; McCaffrey & Connell called <br><br> **[Overnight in NV apt.]** | **6** <br><br> NV established <br> NV evidence: Kazmaier (house guest); Rudestam & Connell called <br><br> **[Overnight in NV apt.]** | **7** <br><br> NV established <br> NV evidence: Moreno & Connell & Salzer called; Paid local NV newspaper bill <br><br> **[Overnight in NV apt.]** | **8** <br><br> NV established <br> NV evidence: Met with Howard and Rabbi Akselrad; met with LV realtor; Connell called; Congregation Ner Tamid service <br><br> **[Overnight in NV apt.]** | **9** <br><br> **NV, CA temp/transit, NV established** <br> LV→CA→LV round trip <br> NV evidence: Connell called <br><br> **[Overnight in NV apt.]** |
| **10** <br><br> NV established <br> NV evidence: Howard & Connell called <br><br> **[Overnight in NV apt.]** | **11** <br><br> NV established <br> NV evidence: McCaffrey & Connell called <br><br> **[Overnight in NV apt.]** | **12** <br><br> NV established <br> NV evidence: Connell called; Prepared letter to Tamoshunas <br><br> **[Overnight in NV apt.]** | **13** <br><br> **NV, CA temp/transit, NV established** <br> LV→CA→LV round trip <br> NV evidence: McCaffrey & Connell called; Faxed letter to Tamoshunas <br><br> **[Overnight in NV apt.]** | **14** <br><br> NV established <br> NV evidence: Bank deposit in LV <br><br> **[Overnight in NV apt.]** | **15** <br><br> NV established <br> NV evidence: Met with Staley & Eyler & Howard; McHenry & Cowan called; Shopped at Indoor Swap Meet, dinner with Howard; Joined Congregation Ner Tamid <br><br> **[Overnight in NV apt.]** | **16** <br><br> NV established <br> NV evidence: Shopped at Indoor Swap Meet with Howard <br><br> **[Overnight in NV apt.]** |
| **17** <br><br> NV established <br> NV evidence: Met with Strattons <br><br> **[Overnight in NV apt.]** | **18** <br><br> **NV established, CA temp/transit, NY temp/transit** <br> LV→NY <br> Trip to NY with Roth via LAX <br><br> **[Overnight in NY hotel]** | **19** <br><br> **NY temp/transit (undisputed)** <br> NY <br><br> **[Overnight in NY hotel]** | **20** <br><br> **NY temp/transit, CA temp/transit, NV established** <br> NY→LV: return via LAX <br><br> **[Overnight in NV apt.]** | **21** <br><br> **NV, CA temp/transit, NV established** <br> LV→CA→LV round trip <br> NV evidence: Met with Strattons; Lunch with Howard <br><br> **[Overnight in NV apt.]** | **22** <br><br> NV established <br> NV evidence: Opened bank account in LV; Met with Howard & Eyler & Staley & Strattons; Shopped at Indoor Swap Meet; Congregation Ner Tamid service; etc. <br><br> **[Overnight in NV apt.]** | **23** <br><br> NV established <br> NV evidence: Car shopping with Eyler; met with Strattons; McCaffrey faxed court order <br><br> **[Overnight in NV apt.]** |
| **24** <br><br> NV established <br> NV evidence: Faxed letter to Tamoshunas and Haken; wrote letters to Tamoshunas and Haken and Mahr and Leonard <br><br> **[Overnight in NV apt.]** | **25** <br><br> NV established <br> NV evidence: Met with Hammer; McCaffrey called <br><br> **[Overnight in NV apt.]** | **26** <br><br> **NV, CA temp/transit, NV established** <br> LV→CA→LV round trip <br><br> **[Overnight in NV apt.]** | **27** <br><br> NV established <br> NV evidence: NV DMV, got driver's license & signed affidavit of residency; Paid apt. rent in person; Dan Hyatt visit, Paid Centel bill <br><br> **[Overnight in NV apt.]** | **28** <br><br> NV established <br> NV evidence: Bought gas; shopped at Von's; Kazmaier called; Thanksgiving dinner with Dan Hyatt <br><br> **[Overnight in NV apt.]** | **29** <br><br> **NV, CA temp/transit, NV established** <br> LV→CA→LV round trip <br> NV evidence: Met with Huddleston & Howards; Lunch with Eyler and Dan Hyatt; Temple Beth Am service; etc. <br><br> **[Overnight in NV apt.]** | **30** <br><br> NV established <br> NV evidence: Hiked Red Rock with Dan Hyatt & Howard & his son; Kazmaier & Rudestam called <br><br> **[Overnight in NV apt.]** |

-20-

RJN002197

## December 1991

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| **1**<br>**NV established**<br>NV evidence: Kazmaier (house guest); letter to Jeng on loan payments<br><br>**[Overnight in NV apt.]** | **2**<br>**NV established (undisputed)**<br>NV evidence: Met with Huddleston; rented a car; Rudestam & Salzer called; Kazmaier (house guest); Signed check; Sent FedEx package<br><br>**[Overnight in NV apt.]** | **3**<br>**NV established**<br>NV evidence: Kazmaier (house guest)<br><br>**[Overnight in NV apt.]** | **4**<br>**NV established**<br>NV evidence: Met with Strattons; Howard & Kazmaier called; Dinner with Howard<br><br>**[Overnight in NV apt.]** | **5**<br>**NV established**<br>NV evidence: Met with Huddleston; Cowan & Kazmaier called<br><br>**[Overnight in NV apt.]** | **6**<br>**NV established**<br>NV evidence: Met with Shoemaker & Howard; walked through a house in LV; Cowan & Lee & Kazmaier called; Congregation Ner Tamid service<br><br>**[Overnight in NV apt.]** | **7**<br>**NV established**<br>NV evidence: Met with Howard; Shopped at Indoor Swap Meet; Lee called; Signed check<br><br>**[Overnight in NV apt.]** |
| **8**<br>**NV established**<br>NV evidence: Lee (house guest); Met with Shoemaker; Walked through two houses in LV<br><br>**[Overnight in NV apt.]** | **9**<br>**NV established (undisputed)**<br>NV evidence: Lee (house guest); met with Strattons & Shoemaker; Rudestam & Cowan called; fax from Rudestam; walked through two houses in LV<br><br>**[Overnight in NV apt.]** | **10**<br>**NV established**<br>NV evidence: Lee (house guest); signed NEC & Sony agreements (LV addresses); met McGuire & Shoemaker; had meal with Stephenson; walked through houses in LV; etc.<br><br>**[Overnight in NV apt.]** | **11**<br>**NV established**<br>NV evidence: Met with McGuire & Shoemaker & Strattons; Lee called; walked through houses in LV; Signed check<br><br>**[Overnight in NV apt.]** | **12**<br>**NV established**<br>NV evidence: Opened bank account; met with Stephenson & Shoemaker & Huddleston; bought insurance; McCaffrey & Lee called; made offers on LV houses<br><br>**[Overnight in NV apt.]** | **13**<br>**NV established**<br>NV evidence: Bought gas; shopped at K-Mart; met with Shoemaker & JoAnn Frank & Howard; McCaffrey & Lee called; Congregation Ner Tamid service; etc.<br><br>**[Overnight in NV apt.]** | **14**<br>**NV established**<br>NV evidence: Shopped at Indoor Swap Meet with Howard; Met with McGuire & Strattons<br><br>**[Overnight in NV apt.]** |
| **15**<br>**NV established**<br>NV evidence: Met with JoAnn Frank; Signed check<br><br>**[Overnight in NV apt.]** | **16**<br>**NV established, CA temp/transit**<br>NV evidence: Met with McGuire; Made home offers; Japanese tax application (LV address); McCaffrey called, faxed; rented car; etc<br>LV→CA<br><br>**[Overnight in CA.]** | **17**<br>**CA temp/transit**<br>**NV established**<br>CA→LV<br>CA: court hearing<br>NV evidence: Rudestam & McCaffrey called<br><br>**[Overnight in NV apt.]** | **18**<br>**NV established**<br>NV evidence: Car shopping with Eyler; met with JoAnn Frank; Lunch with Howard; McCaffrey called; Signed checks<br><br>**[Overnight in NV apt.]** | **19**<br>**NV established**<br>NV evidence: Met with Huddleston; exchanged offers on Tara; FedEx from MLMC; McCaffrey called<br><br>**[Overnight in NV apt.]** | **20**<br>**NV established**<br>NV evidence: Met with JoAnn Frank; paid off first trust deed; McCaffrey & Cowan & Rudestam called<br><br>**[Overnight in NV apt.]** | **21**<br>**NV established**<br>NV evidence: Met with Stephenson; walked through a house in LV; shopped at Indoor Swap Meet with Howard<br><br>**[Overnight in NV apt.]** |
| **22**<br>**NV established**<br>NV evidence: Made home offer; paid NV Power, paid apt. rent in person; Signed checks<br><br>**[Overnight in NV apt.]** | **23**<br>**NV established**<br>NV evidence: Met with JoAnn Frank & Strattons; Howard called; received counter offer on a house<br><br>**[Overnight in NV apt.]** | **24**<br>**NV established**<br>NV evidence: Met with JoAnn Frank; lunch with Howard; Rudestam called<br><br>**[Overnight in NV apt.]** | **25**<br>**NV established**<br>NV evidence: Visited Howards<br><br>**[Overnight in NV apt.]** | **26**<br>**NV established**<br>NV evidence: signed and submitted Benham Group account application (LV address)<br><br>**[Overnight in NV apt.]** | **27**<br>**NV established**<br>NV evidence: Received counter offer on a house<br><br>**[Overnight in NV apt.]** | **28**<br>**NV established**<br>NV evidence: Signed check<br><br>**[Overnight in NV apt.]** |
| **29**<br>**NV established**<br><br><br>**[Overnight in NV apt.]** | **30**<br>**NV established**<br>NV evidence: Car shopping with Eyler; met with JoAnn Frank; Cowan called; Signed check<br><br>**[Overnight in NV apt.]** | **31**<br>**NV established**<br>NV evidence: Watched fireworks with Howard; Connell & Rudestam called; McCaffrey faxed<br><br>**[Overnight in NV apt.]** | | | | |

-21-

RJN002198

## January 1992

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| | | | **1**<br><br>**NV established**<br><br><br>[Overnight in NV apt.] | **2**<br><br>NV evidence: McCaffrey & Hollingsworth called<br><br>[Overnight in NV apt.] | **3**<br><br>**NV established**<br>NV evidence: McCaffrey called and faxed; Signed check<br><br>[Overnight in NV apt.] | **4**<br><br>**NV established**<br>NV evidence: Made house counter offer<br><br>[Overnight in NV apt.] |
| **5**<br><br>**NV established**<br>NV evidence: Met with Shoemaker; McCaffrey called and faxed; Signed checks<br><br>[Overnight in NV apt.] | **6**<br><br>**NV established, CA temp/transit**<br>NV evidence: Met with Shoemaker; got counter offer on a house; walked through a house in LV; Signed check LV→CA, CA: Signed court document<br>[Overnight in CA ] | **7**<br><br>**CA temp/transit, NV established**<br>Returned to LV<br>NV evidence: Met with Shoemaker & JoAnn Frank; made offer on a house; Panos visited; applied for investment account with LV address<br>[Overnight in NV apt.] | **8**<br><br>**NV established, NY temp/transit**<br>NV evidence: Shoemaker called; made counter offer; Signed check LV→NY<br>Left on trip to NY from LV<br>[Overnight in NY hotel] | **9**<br><br>**NY temp/transit (undisputed)**<br>NY<br><br>[Overnight in NY hotel] | **10**<br><br>**NY temp/transit (undisputed)**<br>NY<br><br>[Overnight in NY hotel] | **11**<br><br>**NY temp/transit, VA temp/transit (undisputed)**<br>NY→VA<br><br>[Overnight in VA hotel] |
| **12**<br><br>**VA temp/transit (undisputed)**<br>VA<br><br>[Overnight in VA hotel] | **13**<br><br>**VA temp/transit (undisputed)**<br>VA<br><br>[Overnight in VA hotel] | **14**<br><br>**VA temp/transit (undisputed)**<br>VA<br>NV evidence: Philips sent letter to Las Vegas<br><br>[Overnight in VA hotel] | **15**<br><br>**VA temp/transit (undisputed)**<br>VA<br><br>[Overnight in VA hotel] | **16**<br><br>**VA temp/transit (undisputed)**<br>VA<br><br>[Overnight in VA hotel] | **17**<br><br>**VA temp/transit, NV established**<br>VA→LV<br>Returned to LV<br><br>[Overnight in NV apt.] | **18**<br><br>**NV established**<br>NV evidence: Met with Howard & Huddleston; Howard called; paid Centel; Signed checks<br><br>[Overnight in NV apt.] |
| **19**<br><br>**NV established**<br><br><br>[Overnight in NV apt.] | **20**<br><br>**NV, CA temp/transit, NV established**<br>LV→CA→LV: round trip<br>CA: Signed court documents;<br>NV evidence: Called Shoemaker; Lee faxed; Signed check<br>[Overnight in NV apt.] | **21**<br><br>**NV established**<br>NV evidence: Conference in LV; met with Shoemaker; first trust deed reconveyed; applied for investment account with LV address<br>[Overnight in NV apt.] | **22**<br><br>**NV established**<br>NV evidence: Conference in LV; met with Shoemaker; walked through a house in LV; made house offer; called UNLV Dean; Signed check<br>[Overnight in NV apt.] | **23**<br><br>**NV, CA temp/transit, NV established**<br>NV evidence: Conference in LV; met with Shoemaker; made house offer LV→CA→LV: round trip<br>CA: Los Alamitos Medical Center visit<br>[Overnight in NV apt.] | **24**<br><br>**NV established**<br>NV evidence: Met with Howard & JoAnn Frank; received counter offer; Shoemaker called; Congregation Ner Tamid service<br>[Overnight in NV apt.] | **25**<br><br>**NV, CA temp/transit, NV established**<br>LV→CA→LV round trip<br>NV evidence: Met with Shoemaker & Strattons; shopped at Indoor Swap Meet with Howard<br>[Overnight in NV apt.] |
| **26**<br><br>**NV established (undisputed)**<br>NV evidence: Faxed letter to Tamoshunas and Haken; Superbowl party at Schulman's LV house<br><br>[Overnight in NV apt.] | **27**<br><br>**NV established**<br>NV evidence: Opened savings account; Howard called; Received fax from Circle Realty<br><br>[Overnight in NV apt.] | **28**<br><br>**NV, CA temp/transit, NV established**<br>LV→CA<br>CA: Met with McCaffrey; Court hearing CA→LV<br>NV evidence: Dinner w/ Howard<br>[Overnight in NV apt.] | **29**<br><br>**NV established**<br>NV evidence: Paid apt. rent in person; Car shopping with Eyler; Signed check<br><br>[Overnight in NV apt.] | **30**<br><br>**NV established**<br><br><br>[Overnight in NV apt.] | **31**<br><br>**NV established**<br>NV evidence: Met with Howard; Hammer called, faxed; Temple Beth Am service; Signed check<br><br>[Overnight in NV apt.] | |

-22-

RJN002199

## February 1992

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| | | | | | | **1**<br>**NV established**<br>NV evidence: Shopped at Indoor Swap Meet with Howard; Signed Checks<br><br>**[Overnight in NV apt.]** |
| **2**<br>NV established<br><br><br>**[Overnight in NV apt.]** | **3**<br>**NV established, CA temp/transit**<br>LV→CA<br>NV evidence: Made second Tara offer; investment account doc. with LV address; Met with Mr. McGuire; Signed check | **4**<br>**CA temp/transit, NV established**<br>CA→LV<br>CA: Los Alamitos Med Ctr. visit<br>NV evidence: Tara counter offer; Sent FedEx packages<br><br>**[Overnight in NV apt.]** | **5**<br>**NV established**<br>NV evidence: Letter from Congregation Ner Tamid; met with JoAnn Frank & Strattons; mutual fund appl. with LV address; Lee called; Signed check<br><br>**[Overnight in NV apt.]** | **6**<br>**NV, CA temp/transit, NV established**<br>LV→CA→LV round trip<br>NV evidence: Hammer called<br>CA: Attended San Francisco conference with Lee<br><br>**[Overnight in NV apt.]** | **7**<br>**NV, CA temp/transit, NV established**<br>LV→CA→LV round trip<br>CA: CA notary<br>NV evidence: Met with Howard; Lee called; Temple Beth Am service; Signed check, etc.<br><br>**[Overnight in NV apt.]** | **8**<br>**NV established**<br>NV evidence: Received Tara appraisal; Shopped at Indoor Swap Meet with Howard; Signed check; Faxed letter to Tamoshunas |
| **9**<br>NV established<br><br><br>**[Overnight in NV apt.]** | **10**<br>NV established<br>NV evidence: Ner Tamid conference with Rabbi Hecht & Howard; mailed two checks for deposit in LV; submitted Homeowner's Exemption Termination Notice; etc.<br><br>**[Overnight in NV apt.]** | **11**<br>**NV established, CA temp/transit**<br>LV→CA for surgery<br>CA: Notarized document; admitted to CA hospital; Cosgrove visited at hospital<br><br>**[Overnight in CA hospital]** | **12**<br>**CA temp/transit (undisputed)**<br>CA: Cosgrove visited at hospital<br><br>**[Overnight in CA hospital]** | **13**<br>**CA temp/transit (undisputed)**<br>CA: Cosgrove visited at hospital<br><br>**[Overnight in CA hospital]** | **14**<br>**CA temp/transit (undisputed)**<br>CA: Cosgrove visited at hospital<br><br>**[Overnight in CA hospital]** | **15**<br>**CA temp/transit (undisputed)**<br>CA: Cosgrove visited at hospital<br><br>**[Overnight in CA hospital]** |
| **16**<br>**CA temp/transit (undisputed)**<br>CA: Cosgrove visited at hospital<br><br>**[Overnight in CA hospital]** | **17**<br>**CA temp/transit (undisputed)**<br>CA: Cosgrove visited at hospital<br><br>**[Overnight in CA hospital]** | **18**<br>**CA temp/transit (undisputed)**<br>CA: Cosgrove visited at hospital<br><br>**[Overnight in CA hospital]** | **19**<br>**CA temp/transit (undisputed)**<br>CA: Cosgrove visited at hospital<br><br>**[Overnight in CA hospital]** | **20**<br>**CA temp/transit (undisputed)**<br>CA: Cosgrove visited at hospital<br><br>**[Overnight in CA hospital]** | **21**<br>**CA temp/transit, NV established**<br>CA: Dan Hyatt & Cosgrove visited at hospital<br>CA→LV<br>NV evidence: Met with Howard; Congregation Ner Tamid service; etc.<br><br>**[Overnight in NV apt.]** | **22**<br>**NV established**<br>NV evidence: Lee (house guest); Eyler visited; Dan Hyatt & Cosgrove & Rudestam called; called Strattons<br><br>**[Overnight in NV apt.]** |
| **23**<br>**NV established**<br>NV evidence: Paid apt. rent in person; Lee (house guest); Strattons called then visited; Dan Hyatt & Cosgrove & Connell & McHenry called; Signed checks<br><br>**[Overnight in NV apt.]** | **24**<br>**NV established**<br>NV evidence: Lee (house guest); car shopping with Eyler; Dan Hyatt & McHenry & Mary Stratton & Rudestam & Cosgrove & Connell called<br><br>**[Overnight in NV apt.]** | **25**<br>**NV established**<br>NV evidence: Dan Hyatt & Mary Stratton & Cosgrove & Connell called<br><br><br>**[Overnight in NV apt.]** | **26**<br>**NV established**<br>NV evidence: Eyler visited; Dan Hyatt & Mary Stratton & Cosgrove & Connell called<br><br><br>**[Overnight in NV apt.]** | **27**<br>**NV established**<br>NV evidence: Met with Stephenson; Dan Hyatt & Mary Stratton & Cosgrove & Connell called; signed Fujitsu amendment in LV; walked through a house in LV<br><br>**[Overnight in NV apt.]** | **28**<br>**NV established (undisputed)**<br>NV evidence: Eyler visited; met with Stephenson & JoAnn Frank & Howard; Dan Hyatt & Mary Stratton & Cosgrove & Connell called; Temple Beth Am service; etc.<br>**[Overnight in NV apt.]** | **29**<br>**NV established**<br>NV evidence: Met with Shoemaker & Strattons; shopped at Indoor Swap Meet with Howard; Dan Hyatt & Cosgrove & Connell called<br><br>**[Overnight in NV apt.]** |

RJN002200

## March 1992

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| **1**<br>**NV established**<br>NV evidence: Met with Shoemaker; walked through a house in LV; purchased 1992 Guide to Casino Vacations in LV; Signed checks<br><br>**[Overnight in NV apt.]** | **2**<br>**NV established**<br>NV evidence: Met with Shoemaker; made house offer; signed investment account application (LV address)<br><br>**[Overnight in NV apt.]** | **3**<br>**NV established**<br>NV evidence: Met with JoAnn Frank; got house counter offer; lunch with Howard; Shoemaker called; Signed checks<br><br>**[Overnight in NV apt.]** | **4**<br>**NV established (undisputed)**<br>NV evidence: Met with Hudson & Shoemaker; deposited check in LV bank account; thank you letter from Wagon Trails<br><br>**[Overnight in NV apt.]** | **5**<br>**NV established**<br>NV evidence: Met with Shoemaker; walked through a house in LV; Kazmaier called; Sent FedEx package<br><br>**[Overnight in NV apt.]** | **6**<br>**NV established (undisputed)**<br>NV evidence: Kazmaier (house guest); met with Shoemaker & Huddleston & Howard; made house offer; Cowan called; Congregation Ner Tamid service, etc.<br>**[Overnight in NV apt.]** | **7**<br>**NV established**<br>NV evidence: Kazmaier (house guest); met with Shoemaker & JoAnn Frank; FedEx to Cowan; shopped at Indoor Swap Meet with Howard; Signed check<br><br>**[Overnight in NV apt.]** |
| **8**<br>**NV established, CA temp/transit**<br>LV→CA<br>Stayed at CA motel<br><br>**[Overnight in CA motel]** | **9**<br>**CA temp/transit, NV established**<br>CA: Keynote speaker at conference; met with McCaffrey & Panos<br>CA→ LV<br>NV evidence: Dinner with Howard<br><br>**[Overnight in NV apt.]** | **10**<br>**NV established**<br>NV evidence: Met with Shoemaker & Strattons; Cowan called; called Eyler<br><br>**[Overnight in NV apt.]** | **11**<br>**NV established**<br>NV evidence: Car shopping with Eyler; Cowan called<br><br>**[Overnight in NV apt.]** | **12**<br>**NV established**<br>NV evidence: Met with Shoemaker & McGuire; signed Tara counter offer<br><br>**[Overnight in NV apt.]** | **13**<br>**NV established**<br>NV evidence: Got Tara counter offer; met with Strattons & JoAnn Frank & Howard; Congregation Ner Tamid service<br><br>**[Overnight in NV apt.]** | **14**<br>**NV established**<br>NV evidence: Shopped at Indoor Swap Meet with Howard; met with Shoemaker; signed Tara counter offer; Strattons accepted offer<br><br>**[Overnight in NV apt.]** |
| **15**<br>**NV established**<br>NV evidence: Met with Shoemaker; made house offer<br><br>**[Overnight in NV apt.]** | **16**<br>**NV established, CA temp/transit**<br>NV evidence: Met with Huddleston; lunch with Strattons; opened Tara escrow; Cowan called<br>LV→CA<br>CA: Hosted Russian scientists<br><br>**[Overnight in CA motel]** | **17**<br>**CA temp/transit, NV established**<br>CA→ LV<br>NV evidence: Met with McGuire & Strattons; got sample house warranty; dinner with Howard<br><br>**[Overnight in NV apt.]** | **18**<br>**NV established**<br>NV evidence: Met with Kern; notarized document in LV; LV restaurant meals<br><br>**[Overnight in NV apt.]** | **19**<br>**NV established (undisputed)**<br>NV evidence: Bought gas; met with Huddleston & JoAnn Frank & Strattons & Hudson; bought new Toyota; Signed check<br><br>**[Overnight in NV apt.]** | **20**<br>**NV established**<br>NV evidence: Met with Huddleston & JoAnn Frank & Howard; called Eyler; registered new car; incurred credit card charge for car rental; Congregation Ner Tamid service<br>**[Overnight in NV apt.]** | **21**<br>**NV established**<br>NV evidence: Shopped at Indoor Swap Meet with Howard; met with Strattons<br><br>**[Overnight in NV apt.]** |
| **22**<br>**NV established**<br>NV evidence: Paid apt. rent in person; written 30 day notice to end lease; met with Huddleston; paid insurance premium in LV; Signed checks<br><br>**[Overnight in NV apt.]** | **23**<br>**NV established**<br>NV evidence: Eyler visited; met with JoAnn Frank & Strattons; Cowan & McCaffrey called; Cowan faxed<br><br>**[Overnight in NV apt.]** | **24**<br>**NV established, CA temp/transit**<br>NV evidence: Met with Strattons<br>LV→CA<br>CA: Met with Philips personnel; stayed in CA motel<br><br>**[Overnight in CA motel** | **25**<br>**CA temp/transit, NV established**<br>CA →LV<br>NV evidence: Met with JoAnn Frank & McGuire & Hudson & Stratton; submitted IRA application (LV address); Cowan called; faxed to Hammer<br>**[Overnight in NV apt.]** | **26**<br>**NV established**<br>NV evidence: Met with McGuire; Cowan & Howard & Ron Salzer called; lunch with Howard<br><br>**[Overnight in NV apt.]** | **27**<br>**NV established**<br>NV evidence: Met with Strattons & McGuire & Howard; Glassman & McCaffrey called; faxed to Tamoshunas & Haken; Congregation Ner Tamid service<br><br>**[Overnight in NV apt.]** | **28**<br>**NV established**<br>NV evidence: Faxed to Tamoshunas & Haken; Received FedEx from Cowan<br><br>**[Overnight in NV apt.]** |
| **29**<br>**NV established**<br>NV evidence: Shopped at Indoor Swap Meet with Howard<br><br>**[Overnight in NV apt.]** | **30**<br>**NV established, CA temp/transit**<br>NV evidence: Bank deposit in LV; met with JoAnn Frank & Strattons & McGuire; Glassman called; signed checks<br>LV→CA<br>CA: Stayed at motel<br><br>**[Overnight in CA motel]** | **31**<br>**CA temp/transit, NV established**<br>CA → LV<br>NV evidence: Met with Huddleston & JoAnn Frank & Hudson & Stratton; bought insurance; Cowan called; letters to NV and CA CPAs, etc.<br>**[Overnight in NV apt.]** | | | | |

RJN002201

| April 1992 | | | | | | |
|---|---|---|---|---|---|---|
| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
| | | | **1**<br><br>**NV established**<br>NV evidence: Set up Tara water & trash accounts; shopped at McFrugal's, Albertson's; lunch with Howard; Mary Stratton & Cowan called<br><br>**[Overnight in NV apt.]** | **2**<br><br>**NV established**<br>NV evidence: Shopped in LV; met with Strattons & McGuire; paid for Tara repairs; notarized document in LV; Signed checks<br><br>**[Overnight in NV apt.]** | **3**<br><br>**NV established (undisputed)**<br>NV evidence: Tara escrow closed; shopped in LV; moved into Tara; Lee and Jeng visited; Lee (Tara house guest); met with Howard, LV dinner; etc.<br><br>**[Overnight in NV house]** | **4** |
| **5** | **6** | **7** | **8** | **9** | **10** | **11** |
| **12** | **13** | **14** | **15** | **16** | **17** | **18** |
| **19** | **20** | **21** | **22** | **23** | **24** | **25** |
| **26** | **27** | **28** | **29** | **30** | | |

RJN002202

### 1.5.9 FTB's Calendar And Attachment A-R Are Based On Thousands Of False And Illogical Inferences And Speculation And Is Not Credible.

FTB's calendar[67] is not correct and cannot be trusted because, in very large part, it is based on illogical inferences, misrepresentations of the evidence, fabricated stories and speculation from FTB's misrepresentation of the Philips documents while FTB disregards or misrepresents Mr. Hyatt's eyewitness and documentary evidence (Sections 1.5.10, 1.5.10.1 to 1.5.10.5).[68]

For example, FTB's calendar disregards Mr. Hyatt's presence in Las Vegas when he signed checks at his Las Vegas apartment[69] and at his Las Vegas Tara home.[70] The checks and Mr. Hyatt's CDE affidavits provide eyewitness and documentary evidence of 80 days in Las Vegas in rebuttal to FTB's inferences and speculations.[71] The checks have the contact information of Mr. Hyatt's Las Vegas bank printed thereon and all but a few counter checks have Mr. Hyatt's Las Vegas contact information printed thereon. All of the checks have Mr. Hyatt's signature on them. FTB has had copies of these checks for more than a decade. Mr. Hyatt's CDE affidavits have his sworn testimony as an eyewitness explaining the purpose of each check, his location when he signed each check and provide authentication for each check.[72]

As another example, FTB's calendar falsely represents that a misaddressed Philips document containing Mr. Hyatt's former California address or fax number means that Mr. Hyatt was present at the Jennifer Circle house on the date of the document. However, the undisputed evidence destroys that assumption because Philips acknowledged that Mr. Hyatt notified it in October 1991 that he moved to Las Vegas and he provided his new Las Vegas address. Mr. Tamoshunas testified that Philips personnel inadvertently sent documents to Mr. Hyatt's old address after receiving the change of address to Mr. Hyatt's new address.[73] By disregarding eyewitness evidence that explains the Philips documents FTB misrepresents the Philips documents and offers a false story to your Board (Section 1.5.6.3; 1991 ASAB, Sections 1.8.4.1 to 1.8.4.4). Furthermore, Mahr Leonard administrative assistant, Ms. Weart, testified that Mr. Hyatt had given Mahr Leonard a change of address to Las Vegas in mid-October 1991 and Mahr Leonard partner, David Leonard, also confirmed that Mr. Hyatt gave Mahr Leonard a

---

[67] 1991 RSAB, pp. 5-12. ASAB Exhibit 1 provides a link for each day in the disputed period from FTB's calendar to Mr. Hyatt's Rebuttal to FTB Att. A/F.
[68] Hyatt's 2016 Supp. CDE Aff., Exhibits CDE-ST002 and CDE-ST003, ¶¶ 153 to 243; Hyatt's 2016 Post-CDE Aff, ¶¶ 546 to 949.
[69] Hyatt's 2016 Supp. CDE Aff., ¶¶ 152-243.
[70] Hyatt's 2016 Post-DP CDE Aff., ¶¶ 545-949.
[71] Hyatt's 2016 Supp. CDE Aff., Exhibits CDE-ST002 and CDE-ST003.
[72] Hyatt's 2016 Supp. CDE Aff., ¶¶ 152-243; Hyatt's 2016 Post-DP CDE Aff., ¶¶ 545-949.
[73] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25.

RJN002203

change of address from California to Las Vegas.[74]  This corroborating evidence contradicts FTB's fabrication that an address on correspondence means that the addressee was present at the address when the correspondence was sent.

As another example, FTB argues that a legacy Cerritos P.O. Box return address on a template fax is evidence that Mr. Hyatt was present at his former La Palma house, which he sold on October 1, 1991.  However, FTB does not explain how a Cerritos P.O. Box return address establishes presence at all, much less presence at a different location in a different city on a particular day (Section 1.4.1.2).

Other examples of FTB's calendar, Attachment A-R and residency arguments being made in bad faith are discussed in 1991 ASAB, Sections 1.8.2, 1.8.4 and ASAB Exhibits 1 and 2.  Exhibit 1 is a copy of FTB's calendar and Exhibit 2 is a table summarizing Mr. Hyatt's presence for each day in the disputed period.  FTB's calendar and the Exhibit 2 table are linked day by day to the rebuttal for each day in Mr. Hyatt's Rebuttal to FTB Att. A/F.  When your Board reviews a day in FTB's calendar or a day in FTB's Attachment A-R, your Board can also see the actual evidence of Mr. Hyatt's location for that day in Mr. Hyatt's calendar and in his Rebuttal to FTB Att. A/F.  This is easily done by clicking on this link to Mr. Hyatt's ASAB Exhibit 1 or ASAB Exhibit 2 here, then clicking on the day therein.  This will access that day in Mr. Hyatt's Rebuttal to FTB Att. A/F which will provide the evidence of Mr. Hyatt's location as opposed to the illogical inferences, misrepresentations, fabricated stories, and speculation in FTB's calendar.

FTB's calendar also disregards the fact that Mr. Hyatt submitted changes of address to the U.S. Postal Service on October 21, 1991, to have his mail forwarded from his former Cypress, California P.O. Box and from his former California house to his new Las Vegas address.  Clearly, mail addressed to a California address that the U.S. Post Office forwards to a Nevada address is not evidence of California presence.[75]  Sections 1.5.6, 1.5.6.1 to 1.5.6.3, 1.5.7 discuss many changes of address and notifications that Mr. Hyatt provided to friends and associates.

Based in large part on its misrepresentation of the Philips documents, FTB alleges 169 days of California presence when an actual evidence based analysis establishes that there were only 37 part days of California presence plus 9 full days of hospitalization for cancer surgery during the disputed period and Mr. Hyatt's presence in California on these days was for a temporary or transitory purpose (except for the one day that Mr. Hyatt moved to Las Vegas).[76]  In contrast to FTB's "inference" based calendar Mr. Hyatt's calendar is fully supported by extensive documentation[77] and by eyewitness testimony

---

[74] Declaration of Vicki Weart, May 21, 2012, ¶¶ 5-6; Declaration of David Leonard, May 2, 2012, ¶ 26.

[75] Section 1.5.7.  Hyatt's 2012 CDE Aff., ¶ 34 and Exhibit CDE-G21 attached therein.

[76] 1991 RSAB, p. 5; Rebuttal to FTB Att. A/F, Section I. A., September 26, 1991 - April 2, 1992.

[77] See the testimonial and documentary evidence linked to each day in Mr. Hyatt's calendar, 1991 ASAB; see also the contemporaneous documentary evidence attached as exhibits in the Hyatt's 2012 CDE Aff.; Hyatt's 2016 Supp. CDE Aff.; and Hyatt's 2016 Post-DP CDE Aff.

RJN002204

of people who saw or talked to Mr. Hyatt on a given day. Dozens of eyewitnesses testified that Mr. Hyatt moved to Las Vegas in 1991,[78] that they met with Mr. Hyatt in Nevada, or that they spoke to Mr. Hyatt at his Las Vegas telephone number.[79]

FTB has a long history of bad faith actions and in particular attempting to mislead your Board (1991 ASAB Sections 1.5, 1.8, 1.9). Furthermore, dozens of eyewitnesses made thousands of statements under oath or penalty of perjury identifying and correcting multitudes of false statements that FTB made about them or about events that they had witnessed. This overwhelming testimony is provided in six tables of Testimonial Responses (Testimonial Responses to FTB's statements made in its 1991 ROB, 1992 ROB, 1991 RRB, 1992 RRB, 1991 Attachment A and 1992 Attachment A). This overwhelming testimony is further provided in six tables of FTB false responses (two tables of false statements made in the FTB audit file, two tables of false statements made by FTB private investigator Jake Dameron, and two tables of false statements made by FTB private investigator William Savage). Thus, your Board cannot believe FTB.

Mr. Hyatt's Rebuttal to FTB Att. A/F provides a thorough analysis of each day during the disputed period supported by overwhelming testimonial and documentary evidence, not illogical "inferences" as relied on by FTB. In view of the above, FTB's calendar and Attachment A-R should be disregarded.

### 1.5.10 FTB's Calendar And Attachments Must Be Rejected Because They Are Based In Large Part On False Inferences And False Statements Of California Presence While Disregarding Mr. Hyatt's Overwhelming Eyewitness And Documentary Evidence That Places Him In Las Vegas.

FTB's calendar and Attachment A-R, which provide FTB's primary residency arguments, are made in bad faith because they ignore evidence of Mr. Hyatt's actual location while drawing incorrect inferences from addresses on correspondence (1991 ASAB, Section 1.8.2, 1.8.4; ASAB Exhibits 1 and 2).[80] Exhibit 1 is a copy of FTB's calendar and Exhibit 2 is a table summarizing Mr. Hyatt's presence for each day in the disputed period. FTB's calendar and the Exhibit 2 table are linked day by day to the rebuttal for each day in Mr. Hyatt's Rebuttal to FTB Att. A/F.

---

[78] 72 witnesses testified about Mr. Hyatt moving away in 1991, 28 witnesses testified about Mr. Hyatt moving away in September 1991, 22 Jennifer Circle neighbors testified about Mr. Hyatt moving away in 1991, 23 witnesses testified that Mr. Hyatt moved away within about a year of press or media attention that occurred during the middle of 1990, and 23 witnesses testified that they did not ever again see Mr. Hyatt at Jennifer Circle after he moved away in 1991 (Updated Testimonial Topics, Exs. T007, T006, T102, T119, and T127, respectively). See also T008, T009, T018, T021, T128, T095, T096, T129, T026, T022, T023, T024, T025, T100, T057, T030, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047 and T048.

[79] 37 witnesses testified about Mr. Hyatt's stay at a Las Vegas hotel in 1991, 15 witnesses testified about visiting Mr. Hyatt at his Las Vegas apartment, 28 witnesses testified about being informed in October 1991 that Mr. Hyatt had moved into his Las Vegas apartment, and 39 witnesses testified about telephoning Mr. Hyatt at his Las Vegas apartment (Updated Testimonial Topics, Exs. T008, T018, T128, and T019, respectively).

[80] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1, and in Section V of the Second Supplemental Motion To Strike.

-28-

Exhibits CDE-ST002 and CDE-ST003[81] are tables summarizing FTB's false inferences ("inferred") and misrepresentations (inferences misrepresented as "established") and they cite and link to Mr. Hyatt's eyewitness and documentary evidence that establishes that FTB's inferences are wrong.[82]

FTB's more than 20 depositions are very supportive of and corroborate Mr. Hyatt's evidence. Relevant excerpts that corroborate the testimony of Mr. Hyatt's witness is located in the 27 deposition tables (1991 ASAB, Section 1.8.6.5).

### 1.5.10.1   FTB Disregarded Mr. Hyatt's Eyewitness And Documentary Evidence Of Nevada Presence And Falsely Alleged California Presence Based On False Inferences.

Mr. Hyatt has provided eyewitness and documentary evidence establishing his Nevada presence.[83] However, FTB disregarded Mr. Hyatt's evidence and based its calendar and attachments in large part on false inferences and false "established" statements which are in effect another form of false inferences (Sections 1.5.10.2 to 1.5.10.5).

FTB's conclusions in its calendar and attachments are based in large part on "inferred" days while ignoring eyewitness and documentary evidence that Mr. Hyatt was actually in Nevada.[84] "Under the Evidence Code, an inference is not itself evidence; it is the result of reasoning from evidence."[85] However, FTB disregards Mr. Hyatt's overwhelming eyewitness and documentary evidence that Mr. Hyatt was in Las Vegas for the whole day on each of 61 inferred days during the disputed period and asserts California presence for these 61 days based on unsupportable illogical inferences.[86]

FTB's calendar and attachments falsely infer that Mr. Hyatt had 61 days in California when in fact he spent these entire days in Nevada. FTB also infers two days in California when the evidence shows that Mr. Hyatt was partly in Nevada and partly in California on each of the two days.[87] These days and the facts related thereto are summarized in Table of FTB's False Inferences attached as ASAB Exhibit 2. The unreliability of the FTB briefing is demonstrated by FTB's use of so-called "inferred" and "established" days in the face of contrary eyewitness and documentary evidence and also the absence of reasonable logic to support the FTB's asserted inferences.

---

[81] Exhibits attached to Hyatt's 2016 Supp. CDE Aff.

[82] See also Hyatt's 2016 Supp. CDE Aff., ¶¶ 153 to 243; Hyatt's 2016 Post-CDE Aff, ¶¶ 546 to 949.

[83] Hyatt's 2012 CDE Aff.; Hyatt's 2016 Supp. CDE Aff., Exhibits CDE-ST002 and CDE-ST003, ¶¶ 153 to 243; Hyatt's 2016 Post-DP CDE Aff., ¶¶ 546 to 949; Rebuttal to FTB Att. A/F, Section I. A., September 26, 1991 to April 2, 1992. See also Testimonial Topics, Ex. T008, T009, T018, T021, T128, T019, T095, T096, T129, T026, T022, T023, T024, T025, T100, T057, T030, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047 and T048. See also Hyatt's Chronologies.

[84] Mr. Hyatt's calendar, 1991 ASAB; Rebuttal to FTB Att. A/F, Section I. A., September 26, 1991 to April 2, 1992. FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1, and in Section V of the Second Supplemental Motion To Strike.

[85] Law Review Commission Comments for Evid. Code § 600 ("(b) An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.").

[86] ASAB Exhibit 2.

[87] Rebuttal to FTB Att. A/F, Section I. A., November 21, 1991, and March 25, 1992.

-29-

Mr. Hyatt's eyewitness and documentary evidence, including his CDE affidavits establishes that he was actually in Nevada on the 61 days that FTB infers he was present in California. Two examples will serve to illustrate the absence of FTB credibility.

On December 11, 1991, Mr. Hyatt was unquestionably in Las Vegas. As part of his efforts to purchase a Las Vegas house, Mr. Hyatt walked through houses with two different real estate agents on this day and made hand written notes as he walked through multiple houses with Mr. McGuire.[88] Mr. Hyatt also received a telephone call from Mr. Lee and signed check number 115 payable to Chase, while present in his Las Vegas apartment. [89]

In its Attachment A-R, p. 70, FTB acknowledges and links to the handwritten notes that Mr. Hyatt personally made while walking through several houses with Mr. McGuire on December 11, 1991. FTB then disingenuously suggests (with no evidence whatsoever) that the handwritten notes could have been made during a telephone conversation. However, Mr. McGuire, Mr. Hyatt, and Mary Stratton (who owned the Las Vegas house that Mr. Hyatt purchased), testified that Mr. Hyatt actually walked through houses in Las Vegas on December 11, 1991, and made the handwritten notes as he did so.[90]

FTB made these false statements completely ignoring *the direct evidence of Mr. Hyatt's presence in Las Vegas on December 11, 1991*. FTB asserted an illogical "inference" that Mr. Hyatt was in California on December 11, 1991, even though Mr. Hyatt had documentary and testimonial evidence (e.g.; he made notes while personally walking through Las Vegas houses he was looking at to purchase and he had testimony of witnesses related thereto). Even though Mr. Hyatt was in Las Vegas on every day from December 10, 1991, through December 13, 1991,[91] FTB inferred that because Mr. Hyatt was in California on December 10, 1991 (Mr. Hyatt was actually in Las Vegas on December 10, 1991) and because Mr. Hyatt was in California three days later on December 13, 1991 (Mr. Hyatt was actually in Las Vegas December 13, 1991), Mr. Hyatt must have been in California on December 11, 1991. Following its typical pattern, FTB thus ignored the *direct evidence* of Mr. Hyatt's actual physical presence in Nevada and created an illogical inference based on a false location of his presence two days later.

Mr. Hyatt's presence in Las Vegas on December 11, 1991, is further supported by his testimony and documents.

> FTB falsely states that I was in California on December 11, 1991, that my presence in California was "inferred", and that my presence in California was supported by "logical inference" (FTB's Attachment A (Revised), p. 70, December 11, 1991). However, on December 11, 1991, I was present in Las Vegas all day, I was not present in California that day. I met with my Las Vegas real estate agent, Mr. McGuire and walked through multiple Las Vegas houses that day and personally made hand written notes as I walked through those houses, including the Las Vegas

---

[88] H 013694
[89] Rebuttal to FTB Att. A/F, Section I. A., December 11, 1991.
[90] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 48, 50; Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.9; Affidavit of Mary Trotter Stratton, June 21, 2010, ¶ 27; Rebuttal to FTB Att. A/F, Section I. A., December 11, 1991.
[91] Rebuttal to FTB Att. A/F, Section I. A., December 10-13, 1991.

RJN002207

Tara home that I purchased. A copy of my handwritten notes is attached hereto in Exhibit CDE-S017 (H 013694). On December 11, 1991, I also signed checks while present at my Las Vegas apartment, as was my practice (see ¶ 27 herein), drawn on my Las Vegas checking account to pay Chase Visa, MBNA and MCI. These checks had my Las Vegas address and my bank's Las Vegas address imprinted thereon. Copies of checks 114 to Chase, 115 to MBNA and 117 to MCI are located in Exhibit CDE-T003 (H 00665) to my 2016 Post-Disputed Period CDE Affidavit.

Hyatt's 2016 Supp. CDE Aff., ¶ 174.

As a second example, FTB infers Mr. Hyatt's presence in California and then Nevada on April 2, 1992, the day before he closed escrow on, and moved into, his Las Vegas Tara home. However, Mr. Hyatt was in Las Vegas on April 1, 1992, and remained in Las Vegas on April 2, 1992.[92] FTB cites to multiple documents and activities that demonstrate Mr. Hyatt's presence in Nevada on this day, including **an appearance before a Las Vegas notary**. Nevertheless, with absolutely no mention of a California contact, FTB falsely contends that Mr. Hyatt's presence in California is "inferred" on April 2, 1992. See also Mr. Hyatt's documentary evidence and testimony thereto in his 2016 Supplemental Disputed Period CDE Affidavit, ¶ 243. This is just one more of the thousands of examples of FTB fabricated stories and unsupported allegations that FTB has made throughout its briefing.

FTB's calendar and attachments must be rejected because they blatantly ignore Mr. Hyatt's eyewitness and documentary evidence showing Mr. Hyatt's presence in Las Vegas while FTB relies on thousands of false statements and illogical inferences rather than evidence.

### 1.5.10.2    FTB In Bad Faith Disregards Mr. Hyatt's Documentary Evidence Of Nevada Presence And Then Falsely Alleges California Presence Because There Is No Documentation.

Mr. Hyatt provided an enormous amount of eyewitness and documentary evidence of his Nevada presence.[93] However, FTB has disregarded this evidence and based its calendar on the illogical contention, among others, that California presence was inferred because Mr. Hyatt had no documentary evidence. Aside from the fact that FTB disregarded existing evidence, an absence of documentary evidence does not create an inference of California presence, particularly when overwhelming evidence has established that Mr. Hyatt moved to Las Vegas (Section 1.5.10.3). FTB disregarded Mr. Hyatt's documentary evidence and in bad faith inferred California presence because there is no documentary evidence.[94] FTB is out to get Mr. Hyatt at any cost (1991 ASAB, Section 1.8), even if it destroys its own credibility before your Board.

---

[92] Rebuttal to FTB Att. A/F, Section I. A. See also Hyatt's 2016 Supp. CDE Aff., Exhibits CDE-ST002 and CDE-ST003, ¶¶ 153 to 243; Hyatt's 2016 Post-CDE Aff, ¶¶ 546 to 949.

[93] See Hyatt's 2012 CDE Aff.; Hyatt's 2016 Supp. CDE Aff.; Hyatt's 2016 Post-DP CDE Aff.; Rebuttal to FTB Att. A/F, Section I. A., September 26, 1991 to April 2, 1992.

[94] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1, and in Section V of the Second Supplemental Motion To Strike.

RJN002208

For example, FTB has falsely inferred California presence based on allegedly "no documentation" for 34 days of its calendar when there is clear documentation of Nevada presence. See the Table of FTB's False Statements of "No Documentation" and the evidence cited to and linked to therein (ASAB Exhibit 3). However, this is only the tip of the iceberg. FTB has falsely "inferred" or "established" California presence on more than 130 other days (a total of more than 164 days) while disregarding Mr. Hyatt's eyewitness and documentary evidence related thereto (ASAB Exhibit 2). See also Sections 1.5.1, 1.5.2, 1.5.8.

FTB's calendar and Attachment A-R must be rejected because they blatantly disregard eyewitness and documentary evidence showing Mr. Hyatt's presence in Las Vegas. Further, because FTB cannot be believed and because Mr. Hyatt's day count is based on actual evidence rather than on FTB's illogical inferences, Mr. Hyatt's day count should be accepted as correct and FTB's day count should be rejected as false.

### 1.5.10.3 FTB Falsely Alleges California Presence Based On Alleged Logical Inferences When A Good Faith Analysis Shows That Logical Inferences Place Mr. Hyatt In Nevada.

Mr. Hyatt provided overwhelming eyewitness and documentary evidence of his Nevada residency and domicile (Section 1.5.8; 1991 ASAB, Section 1.8.1, 1.8.2).[95] However FTB disregards this compelling evidence and bases its calendar and attachments in large part on illogical inferences of California presence. Mr. Hyatt moved to Las Vegas, sold his California house, resided in a Las Vegas hotel for a few weeks, resided in his Las Vegas leased apartment for about five months, and then resided in his Las Vegas Tara home for the last 25 years. Sections 1.5.1, 1.5.2; 1991 ASAB, Section 1.4. Thus, any inference must lead to Las Vegas presence where Mr. Hyatt moved to and resided, not to California presence where he sold his former house and moved away.

For example, FTB falsely states for 52 days during the disputed period that "Mr. Hyatt has provided no documentation to show he is elsewhere than California" or words to that effect and then makes an incorrect illogical inference that he was in California.[96] However, FTB disregards Mr. Hyatt's evidence of Las Vegas presence and then with no evidence of its own, alleges a "logical" inference of presence in California even though Mr. Hyatt sold his former La Palma house on October 1, 1991, and had no other abode in California.

Mr. Hyatt moved to Las Vegas on September 26, 1991, sold his only California house on October 1, 1991, and leased a Las Vegas apartment on October 8, 1991, for six months,[97] thus making Las Vegas the only place where he had an abode.

---

[95] Hyatt's 2012 CDE Aff. and the exhibits attached therein; Hyatt's 2016 Supp. CDE Aff., ¶¶ 153 to 243, and the exhibits attached therein; Hyatt's 2016 Post-DP CDE Aff., ¶¶ 546 to 949, and the exhibits attached therein; Updated Testimonial Topics, Exs. T007, T006, T102, T114, T119, T127, T008, T009, T018, T021, T128, T019, T022-T025, T135, T136, T040, T138, T140-T143, T045, T044, T046, T047, and T049. See also Hyatt's Chronologies.
[96] ASAB Exhibit 2.
[97] Rebuttal to FTB Att. A/F, Section I. A., September 26, 1991, October 1, 8, 1991.

RJN002209

Thus, any lack of evidence should result in a strong inference that Mr. Hyatt was present in Las Vegas. Mr. Hyatt moved his computer, fax machine, active files and telephone to Las Vegas.[98] Dozens of eyewitnesses have testified that Mr. Hyatt left his former Jennifer Circle neighborhood in 1991, that he was present in Las Vegas thereafter, and that he was living in his Las Vegas apartment.[99] Thus, any "logical" inference" must place Mr. Hyatt in his Las Vegas apartment during the disputed period.

Because FTB cannot be believed, and because Mr. Hyatt's day count is based on actual evidence while FTB relies on illogical inferences, Mr. Hyatt's day count must be accepted as correct and FTB's day count should be rejected as not correct.

### 1.5.10.4    FTB's Calendar And Attachment A-R Are Based In Large Part On False Allegations Of "Inferred" California Presence And Must Be Disregarded.

Mr. Hyatt provided eyewitness and documentary evidence of his Nevada presence.[100] However, FTB disregarded Mr. Hyatt's evidence and based its calendar and Attachment A-R in large part on false inferences, often referred to by FTB as "inferred". Such inferences are not credible particularly in view of Mr. Hyatt's eyewitness and documentary evidence of his actual Nevada presence. Thus, FTB's calendar and Attachment A-R should be disregarded by your Board.[101]

FTB falsely labels 61 of its disputed days "inferred" California presence when Mr. Hyatt was actually in Las Vegas. In doing so FTB disregards Mr. Hyatt's actual evidence. For example, Mr. Hyatt has provided eyewitness documentary evidence of Nevada presence on those days.[102] Thus, Mr. Hyatt's calendar days in Nevada must be accepted as true and correct and FTB's calendar days in California must be rejected as false.

Further, to be inferred, evidence must be inferred from true facts. Drawing one false inference from other false inferences should be disregarded by your Board. For example, FTB relies on correspondence sent to the Jennifer Circle house to "infer" Mr. Hyatt's physical presence at that location on a particular day. However, this correspondence was misaddressed to Mr. Hyatt's former La Palma house after he filed a change of address to Las Vegas with the U.S. Postal Service and gave

---

[98] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991, Section I. F., October 28, 1991.

[99] 72-witnesses testified about Mr. Hyatt's move away in 1991, 22-Jennifer Circle neighbors testified about Mr. Hyatt moving away in 1991, 37-witnesses testified about Mr. Hyatt's stay at a Las Vegas hotel in 1991, 28-witnesses testified about being informed in October 1991 that Mr. Hyatt had moved into his Las Vegas apartment, 18-witnesses testified about Mr. Hyatt's Toyota or brown car being in Las Vegas during the disputed period, and 15-witnesses testified about visiting Mr. Hyatt at his Las Vegas apartment (Updated Testimonial Topics, Exs. T007, T102, T008, T128, T030, and T018, respectively). See also Testimonial Topics, Ex. T009, T021, T019, T095, T096, T129, T026, T022, T023, T024, T025, T100, T057, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047 and T048.

[100] Sections 1.5.1 to 1.5.8; Hyatt's 2016 Supp. CDE Aff., ¶¶ 153-243, Exhibit CDE-ST002 and Exhibit CDE-ST003; Hyatt's 2016 Post-DP CDE Aff., ¶¶ 546-949. See also Hyatt's Chronologies.

[101] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1, and in Section V of the Second Supplemental Motion To Strike.

[102] Hyatt's 2016 Supp. CDE Aff., Exhibit CDE-ST003.

-33-

RJN002210

changes of address to Philips and Mahr Leonard (Sections 1.5.6, 1.5.6.1 to 1.5.6.3, 1.5.7).  No inference of physical presence can be drawn from such misaddressed correspondence.

FTB turns common sense on its ear by first making false inferences and then drawing a second false inference from its first false inferences.  For example, FTB draws inferences that Mr. Hyatt was present in California on November 15, 1991, and November 17, 1991, but these are false inferences based upon undisputed misaddressed correspondence and while FTB disregards Mr. Hyatt's eyewitness evidence and his documentary evidence of Nevada presence on those days (eyewitness testimony and documentation establish that Mr. Hyatt was in Las Vegas on November 15, 1991;[103] Section 1.5.6.3; 1991 ASAB, Sections 1.8.1, 1.8.4.1 to 1.8.4.4).  Then FTB falsely infers that Mr. Hyatt was present in California on November 16, 1991, based upon the false inferences of California presence on November 15, 1991, and November 17, 1991.  The FTB calendars and Attachment A-R are based on unreliable and illogical inferences and should be disregarded by your Board.

### 1.5.10.5   FTB's Calendar And Attachment A-R Are Based In Large Part On False Allegations Of So Called "Established" California Presence And Should Be Disregarded.

Mr. Hyatt provided eyewitness and documentary evidence of his Nevada presence.[104]  However, FTB disregarded Mr. Hyatt's evidence and based its calendar and Attachment A-R in large part on false inferences that are often referred to as "established".  Such inferences are not credible particularly in view of Mr. Hyatt's eyewitness and documentary evidence of his Nevada presence.[105]  Thus, FTB's calendar and Attachment A-R should be disregarded by your Board.

FTB alleges that California presence is "established" even though FTB has no evidence of California presence.  FTB instead relies on illogical inferences such as falsely inferring that a California address on a misaddressed correspondence means Mr. Hyatt was at the Jennifer Circle house on a given day associated with the misaddressed correspondence.[106]  Meanwhile, FTB ignores eyewitness testimony and documentary evidence placing Mr. Hyatt in Nevada on the given day (Section 1.5.8).  Alternatively, FTB falsely alleges it has "established" that Mr. Hyatt spent an entire day in California when he had a part day in Nevada and a part day in California.  Very compelling examples confirm that days of delivery of FedEx packages cannot and do not establish physical presence (1991 ASAB, Section 1.8.4.4).  For example, FTB relies on correspondence sent to the Jennifer Circle house as "established" physical presence of the addressee at that location on a

---

[103] Exhibit CDE-ST003, Hyatt's 2016 Supp. CDE Aff.

[104] Sections 1.5.1 to 1.5.8; Hyatt's 2016 Supp. CDE Aff., Exhibit CDE-ST002 and Exhibit CDE-ST003; ¶¶ 153-243; Hyatt's 2016 Post-DP CDE Aff., ¶¶ 546-949.  See also Testimonial Topics, Ex. T008, T009, T018, T021, T128, T019, T095, T096, T129, T026, T022, T023, T024, T025, T100, T057, T030, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047 and T048.

[105] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1, and in Section V of the Second Supplemental Motion To Strike.

[106] See Sections 1.5.10.1 to 1.5.10.5 regarding FTB's reliance on mis-addressed correspondence to establish physical presence on a particular day.

RJN002211

particular day. However, this correspondence is undisputed misaddressed correspondence, sent to an address for which changes of address were filed with the U.S. Postal Service and changes of address were given to Philips and Mahr Leonard (Sections 1.5.6, 1.5.6.1 to 1.5.6.3, 1.5.7). Sending correspondence to a wrong address is not even a basis for an inference of presence, let alone "established" presence.

FTB's false "established" allegations are illustrated by a compelling example. Mr. Hyatt has produced eyewitness and documentary evidence of Nevada presence for November 7, 1991, which is disregarded by FTB. On November 7, 1991, Mr. Hyatt received telephone calls from Will Connell, Danny Moreno, and Ronald Salzer at his Las Vegas apartment, wrote two letters using his Las Vegas computer, signed check number 102 payable to Las Vegas Sun while present in his Las Vegas apartment, and spent the night in his Las Vegas apartment.[107] However, FTB falsely alleges that Mr. Hyatt's presence in California is "established". Mr. Hyatt wrote a letter dated November 7, 1991, to Philips[108] and another letter dated November 7, 1991, to Mahr Leonard[109] using his Las Vegas computer. These letters confirm Mr. Hyatt's presence in Las Vegas because it has been established by overwhelming eyewitness testimony that Mr. Hyatt's computer was moved to Las Vegas.[110] Mr. Hyatt also paid his newspaper bill and signed check number 102 payable to Las Vegas Sun while present in his Las Vegas apartment.[111] Mr. Hyatt's presence in Las Vegas on November 7, 1991, is also supported by the eyewitness testimony of Ronald Salzer, Danny Moreno and Will Connell, who called Mr. Hyatt at his Las Vegas apartment.[112] There should be no question that this was not a California "established" day. Mr. Hyatt was in Las Vegas on November 7, 1991.

The only facts established by FTB's many false assertions of "established" California presence are that (a) FTB made dozens of bad faith representations that California presence is "established" and (b) FTB has disregarded Mr. Hyatt's eyewitness evidence and documentary evidence establishing Nevada presence for those days (Section 1.5.8).

### 1.5.11 There Was No Attraction To Jennifer Circle And No Reason For Mr. Hyatt To Live Or Work There After He Moved To Las Vegas.

FTB's residency and sourcing positions inconsistently require that Mr. Hyatt reside at the Jennifer Circle house (residency) or reside in Las Vegas and work at the Jennifer Circle house (sourcing). FTB contends that Mr. Hyatt remained closely connected to the Jennifer Circle house. This contention is a complete fallacy. First, Mr. Hyatt absolutely did not live at the Jennifer Circle house during the disputed period or thereafter and overwhelming eyewitness and documentary evidence

---

[107] Rebuttal to FTB Att. A/F, Section I. A., November 7, 1991.
[108] FTB_Philips 0004853.
[109] FTB_Philips 0004857.
[110] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.
[111] Hyatt's 2016 Supp. CDE Aff., ¶ 161.
[112] Affidavit of Ronald Salzer, September 11, 2011, ¶ 18; Affidavit of Danny Moreno, January 26, 2010, ¶ 11; Affidavit of Will Connell, July 10, 2012, ¶ 38.

RJN002212

1    establishes that Mr. Hyatt sold the Jennifer Circle house on October 1, 1991 (Section 1.5.1). Second, overwhelming

2    eyewitness and documentary evidence also establishes that Mr. Hyatt did not have California source income from working in

3    California. He lived in Las Vegas[113] and did not engage in any business activities in California or elsewhere.

4         It is absurd to suggest that Mr. Hyatt would move to Nevada, but operate a "home" business 270 miles away in

5    California. FTB contends that Mr. Hyatt personally and actively operated a California licensing business at the Jennifer Circle

6    house, not that he was merely an owner of an entity operating in California. Mr. Hyatt did not need the Jennifer Circle house

7    to continue his personal patent activities. He had no family ties; his children were grown and he was long divorced. He was

8    completely mobile and could live anywhere because the equipment he needed for his personal patent activities (a computer

9    and fax machine) was also mobile and he easily moved these items to his Las Vegas apartment.[114]

10        As a Nevada resident, Mr. Hyatt had no need to use the Jennifer Circle house for any purpose because anything he

11   could do there, he could do much more conveniently at his home in Las Vegas. FTB's residency and sourcing positions are

12   not supported by the evidence or by common sense.

13   **1.6    THE PHILIPS DOCUMENTS ESTABLISH THAT MR. HYATT HAD VERY LITTLE INVOLVEMENT IN**
     **THE PHILIPS LICENSING PROGRAM DURING THE 1992 DISPUTED AND POST-DISPUTED PERIODS.**

14

15        **1.6.1    Mr. Hyatt Provided Very Little Assistance to the Philips Licensing Program During The 1992**
          **Disputed Period.**

16        Mr. Hyatt had some meetings, correspondence and telephone calls, but provided very little assistance to the Philips

17   Licensing Program during the 1992 disputed period. The September 1991 Mahr Leonard Agreement had expired. Philips was

18   continuing to manage and operate the Philips Licensing Program (1991 ASAB, Sections 1.7.3, 1.7.9). Mr. Hyatt entered

19   escrow on his Las Vegas house and was preparing to move in and start landscaping. No patent agreements were executed

20   during the 1992 disputed period.

21        On January 14, 1992, Philips notified Mr. Hyatt of the distribution of his license payments due under the July 1991

22   Philips Agreement attributable to the Sharp, NEC and Sony license payments which Philips had received during 1991.[115]

23   Philips distributed Mr. Hyatt's license payments to four of Mr. Hyatt's Nevada situs investment accounts.[116] Mr. Hyatt

24   received notice of these payments on his fax machine in his Las Vegas apartment addressed to his Las Vegas apartment.[117]

25

26   [113] Testimonial Topics, Ex. T008, T009, T018, T021, T128, T019, T095, T096, T129, T026, T022, T023, T024,
     T025, T100, T057, T030, T135, T097, T146, T040, T138, T139, T041, T042, T043, T140, T045, T041, T044, T046, T047,
     T147, and T048.

27   [114] Indeed, 12-witnesses testified about a computer in Mr. Hyatt's Las Vegas apartment, 19-witnesses testified about a
     fax machine in Mr. Hyatt's Las Vegas apartment, and 22-Jennifer Circle neighbors testified about Mr. Hyatt moving away in

28   1991. Updated Testimonial Topics, Exs. T024, T025, and T102, respectively.
     [115] FTB_Philips 0005414.

29   [116] FTB_Philips 0007410-0007413.
     [117] FTB_Philips 0005414.

RJN002213

Oki made the first of three license payments to the PSB&C client trust account maintained for the benefit of Philips on January 31, 1992.[118] At the direction of Philips, this payment was then transferred to Mr. Hyatt's Nevada situs investment account[119] and, at the request of Philips, Mr. Hyatt distributed the Oki license payment to Philips and Mahr Leonard by writing two drafts, one to Philips and one to Mahr Leonard with no compensation for doing so.[120]

Sharp made its license payment for the Sharp PCT Patent Agreement to the PSB&C client trust account maintained for the benefit of Philips on January 24, 1992.[121] PSB&C distributed the Mahr Leonard payment[122] and transferred the balance of the Sharp PCT license payment to Philips.[123] On February 10, 1992, Philips distributed the Sharp PCT license payment to Mr. Hyatt's Las Vegas situs investment accounts.[124]

FTB has no legitimate basis for taxing license payments that Mr. Hyatt received under the July 1991 Philips Agreement during the 1992 disputed period. At the request of Philips, Mr. Hyatt gave minimal assistance to the Philips Licensing Program but received no compensation for doing so. He only received license payments Philips distributed to him through the Philips Licensing Program under the July 1991 Philips Agreement.

### 1.6.2 Mr. Hyatt Provided Very Little Assistance To The Philips Licensing Program During The 1992 Post-Disputed Period.

FTB cannot tax the license payments received by Mr. Hyatt *after* the disputed period. The second Oki payment was received into the PSB&C client trust account maintained for the benefit of Philips on November 13, 1992.[125] At the request of Philips the Oki license payment was distributed to Philips, Mahr Leonard and Mr. Hyatt's Nevada situs Janus Group Mutual Fund on November 17, 1992.[126]

Hitachi made a first license payment to the PSB&C client trust account maintained for the benefit of Philips on September 4, 1992.[127] At the request of Philips the first Hitachi license payment was distributed from the PSB&C client trust account maintained for the benefit of Philips to Philips, Mahr Leonard and Mr. Hyatt's Scudder and Fidelity Nevada situs investment accounts on September 4, 1992.[128] The second Hitachi license payment was received into the PSB&C client trust

---

[118] GLR 03838.
[119] GLR 03839.
[120] On February 4, 1992, Mr. Hyatt distributed the Philips share of the first Oki license payment (GLR 03822-03824) as well as the Mahr Leonard share of the first Oki license payment (GLR 03821, H 018048).
[121] GLR 03844.
[122] GLR 03841
[123] GLR 03842, 03844.
[124] FTB_Philips 0004715.
[125] Letter dated November 17, 1992, from Mr. Roth to Mr. Nakajima of Oki, GLR 03811.
[126] GLR 03812.
[127] Letter dated September 8, 992, from Mr. Roth to Mr. Akaki of Hitachi, GLR 00807.
[128] GLR 00810-00811.

-37-

RJN002214

account maintained for the benefit of Philips on December 28, 1992.[129] At the request of Philips the second Hitachi license payment was distributed on December 28, 1992, from the PSB&C trust account maintained for the benefit of Philips to Philips, Mahr Leonard and Mr. Hyatt's Janus Group and Benham Nevada situs investment accounts.[130]

Philips licensed four companies (Sanyo, Omron, Kenwood and Nippon Columbia) pursuant to the July 1991 Philips Agreement during the 1992 post-disputed period. Philips negotiated and signed the four patent agreements and distributed license payments to Mr. Hyatt's Nevada situs investment accounts without contact with California. Mr. Hyatt's only meaningful connection with these license agreements was to receive the license payments from Philips into his Nevada situs investment accounts while he was undisputedly a resident of Nevada, *i.e.*, after April 3, 1992. The Philips licensing activities had no relevant connection with California. The license payments from Philips to Mr. Hyatt based on these four licenses had no connection whatsoever to a California business and were not included in an NPA by FTB. FTB has no basis for taxing these four license payments (Section 1.7.5).

Aside from the FTB's failure to properly include the post-disputed period license payments from these four companies in the 1992 NPA, FTB's contention that the license payments distributed by Philips and paid to Mr. Hyatt went to a California business is also factually wrong. Philips by itself negotiated the Patent Agreements with these four companies. Mr. Tamoshunas and Mr. Haken, who were located in New York, signed these four Patent Agreements on behalf of Philips. Neither Mr. Hyatt nor any California entity signed these four Patent Agreements.[131] Each or the four Patent Agreements identifies Mr. Hyatt as having an address in Las Vegas. All four Patent Agreements required the license payment to be wire transferred to a Philips' account at Bank of New York. Mr. Hyatt's license payments from the four Patent Agreements were distributed by Philips to Nevada situs investment accounts owned by Mr. Hyatt.[132]

There is no legal or factual basis for taxation of these post-disputed period license payments by California.

### 1.6.3   The Philips Documents Illustrate Many Of Mr. Hyatt's Facts In These Appeals.

Mr. Hyatt's 15 tables have excerpts of Philips documents and cites to more than 5,000 pages of Philips documents (some duplicates) that illustrate the significant support the Philips documents give to Mr. Hyatt's appeals, illustrate Philips'

---

[129] Letter dated December 28, 1992, from Mr. Roth to Mr. Akaki of Hitachi, GLR 03674.
[130] FTB_Philips 0000984, GLR 03702-03703, 03705.
[131] Copies of the four Patent Agreements were produced to FTB by Mr. Hyatt's representatives and are attached to Mr. Hyatt's 2010 Sourcing Affidavit: (1) Omron, Exhibit 26, H 018844-018853; (2) Nippon Columbia, Exhibit 27, H 019093-019102; (3) Kenwood, Exhibit 28, H 019083-019092; and (4) Sanyo, Exhibit 24, H 018813-018822.
[132] The license payments from the four 1992 Post-Disputed Period Patent Agreements was distributed and transferred by Philips to Mr. Hyatt's Nevada situs investment accounts: (1) Omron, Benham, FTB_Philips 0004589-0004591 (2) Nippon Columbia, Fidelity, FTB_Philips 0000979-0000980 (3) Kenwood, Fidelity, FTB_Philips 0000979-0000980 (4) Sanyo, Benham, Federated and Fidelity, FTB_Philips 0004634-0003638.

RJN002215

control and operation of the Philips Licensing Program, and illustrate many of Mr. Hyatt's facts in these appeals (1991 ASAB Section 1.7.1).

- Exhibit 1 - Philips Used Its Worldwide Licensing Team To License Mr. Hyatt's Patents
- Exhibit 2 - Philips And MLMC Traveled Worldwide To License Mr. Hyatt's Patents
- Exhibit 3 - Philips Was Responsible For All Expenses Of Licensing Mr. Hyatt's Patents
- Exhibit 4 - Philips Controlled The Licensing Income
- Exhibit 5 - Philips Managed The Accounting And Finances Regarding The Philips Licensing Program
- Exhibit 6 - Philips Alone Was Responsible For Generating The Quarterly Financial Reports For The Philips Licensing Program
- Exhibit 7 - Licensing Documents Signed Only By Philips Or Drafted By MLMC Or Philips For Hyatt's Signature
- Exhibit 8 - Philips Had Possession Of The Original Signed Agreements
- Exhibit 9 - Philips Communications With Others
- Exhibit 10 - Examples Of Philips' Unilateral Actions/Decisions On The Licensing Program
- Exhibit 11 - Philips Communications That Are Not Addressed Or CCed To Mr. Hyatt Or Sent By Mr. Hyatt
- Exhibit 12 - Use Of "Draft" And "Proposed" Terminology In The Philips Licensing Program
- Exhibit 13 - Examples Of Philips' Faulty Fax Related Recordkeeping
- Exhibit 14 - Post-Disputed Period Fax Transmission Reports Re Las Vegas
- Exhibit 15 - Post-Disputed Period Correspondence And Documents

Index of Philips Document Tables.

Mr. Hyatt's 15 tables of Philips documents are described in 1991 ASAB, Section 1.7.1. FTB produced more than 8,000 pages of unauthenticated alleged Philips documents, which include *Mr. Hyatt's more than 5,000 pages of Philips documents* (some duplicates) that support his cases.

A list of the subject matter contained in these Philips documents is provided below.[133]

- The Philips documents contain Mr. Hyatt's Las Vegas contact information.
- The Philips documents confirm that license agreements signed by Mr. Hyatt were at the request of Philips, were authorized by Philips, and were draft agreements.
- The Philips documents confirm that Philips was responsible for all expenses of the Philips Licensing Program.
- The Philips documents confirm that Philips alone created and managed the Philips Licensing Program.
- The Philips documents confirm that Philips licensing attorneys travelled worldwide to license Mr. Hyatt's patents under the Philips Licensing Program.
- The Philips documents confirm that Philips used its worldwide licensing team to license Mr. Hyatt's patents under the Philips Licensing Program.
- The Philips documents confirm that Philips made unilateral actions and decisions on the Philips Licensing Program without involvement by Mr. Hyatt.

---

[133] See the Philips Document Tables, Exhibits 1 to 15.

RJN002216

- The Philips documents confirm that Philips did not address to or copy (cc) Mr. Hyatt on many communications of the Philips Licensing Program.

- The Philips documents confirm that documents were signed only by Philips or were drafted by Mahr Leonard or Philips for Mr. Hyatt's signature and that Philips authorized and requested Mr. Hyatt to sign the documents.

- Philips communications with others demonstrate Philips control and management of the Philips Licensing Program.

- The Philips documents confirm that Philips managed the accounting, finances, and expenses for the Philips Licensing Program.

- The Philips documents confirm that Philips kept possession of the signed patent agreements.

- The Philips documents confirm that Philips alone was responsible for generating the quarterly financial reports for the Philips Licensing Program.

- The Philips documents confirm that Philips's fax recordkeeping was faulty.

**1.7 MR. HYATT DID NOT HAVE CALIFORNIA SOURCE INCOME IN 1991 OR 1992.**

### 1.7.1 FTB Has Not Met Its Burden Of Proving That Mr. Hyatt Had California Source Income In 1991 Or In 1992.

FTB is prohibited by the Rev. & Tax. Code from asserting the sourcing issue for failure to raise the issue in its 1991 and 1992 NPAs as discussed in Section 5 in Appellant's initial Motion to Strike, which is re-filed with this brief. Furthermore, FTB has not met its burden of proof in establishing that Mr. Hyatt had California source income.[134] FTB must prove each element of the sourcing claim and failure to establish any element means that FTB has not established that Mr. Hyatt had California source income. In addition to FTB being legally barred from raising the issue and failing to meet its burden of proof, the evidence establishes that Mr. Hyatt did not have California source income in the 1991 and 1992 disputed periods or thereafter.

The 1992 assessments must be overturned for the additional reason there was no 1992 audit (1992 AOB, § I, pp. 4-6; 1992 ARB, § II, pp. 2-3).

In addition, there are five factual roadblocks that prevent FTB from assessing Mr. Hyatt as a nonresident with California source income:

- All of the disputed 1991 and 1992 payments came from the licensing of Mr. Hyatt's patents, which had a taxable situs in Nevada. The general rule is that intangible property is sitused at the residence of its owner, which in this case was Nevada. FTB must admit that Mr. Hyatt was a Nevada resident for purposes of its sourcing argument.

- No California business licensed Mr. Hyatt's patents.

- No California business had the "substantial use and value" of the Hyatt patents; under Sections 4.1 and 4.3 of the July 1991 Philips Agreement,[135] Philips had the "substantial use and value", including an exclusive license as to the computer patents.

---

[134] *Appeal of David G. and Helen Mendelsohn,* 85-SBE-141, Nov. 6, 1985.
[135] FTB_Philips 0000595-0000635.

- Follow the Money: Mr. Hyatt's disputed license payments were transferred to personal investment accounts having a Nevada situs, the residence attributable to Mr. Hyatt under the sourcing statutes; no payment was made to any Hyatt California business.

- Mr. Hyatt did not own any part of the Philips Licensing Program.

Each point is discussed in turn below (Sections 1.7.1.1, 1.7.1.2, 1.7.1.3, 1.7.1.4, 1.7.1.5).

### 1.7.1.1 All Of The Disputed 1991 And 1992 Payments Came From Philips Licensing Mr. Hyatt's Nevada-Situs Patents And Are Thus Not Taxable By California.

Because patents are intangible personal property, disputed license payments are sourced to the state of the residence of the owner of the intangible asset, which for Mr. Hyatt was Nevada as of September 26, 1991. California law provides "income of nonresidents from stocks, bonds, notes, or *other intangible personal property* is not income from sources within this state unless the property has acquired a business situs in this state. . . ."[136]

Thus, when Mr. Hyatt moved to Las Vegas the situs of his patents moved with him and the disputed license payments, all of which came from licensing his patents, are not taxable by California. FTB has not established that Mr. Hyatt received any of the disputed license payments except through the ordinary licensing of his Nevada situs patents through the Philips Licensing Program. The disputed license payments are therefore not taxable in California under Rev. & Tax § 17952.

FTB attempts to avoid the general rule that a nonresident's income derived from intangible property is sourced to the nonresident's state of residence by raising various sourcing arguments. However, even FTB itself cannot agree on a sourcing theory. FTB's 1991 NOA and 1992 NOA asserted that Mr. Hyatt had California source income based on his patents having a California business situs: "The assessment is further and alternatively sustained on the basis that **your intellectual property**, from which your income was generated, had a business situs in California for the entire taxable year and was therefore derived from sources within California."[137] Thus, at the conclusion of the protest, not even FTB's protest hearing officer believed Mr. Hyatt had California source income because he operated a licensing business in the state. The assessment was based on the "intellectual property", *i.e.*, the patents, having a business situs in California, ***not from Mr. Hyatt operating a licensing business in California***. However, during these pending appeals FTB presented no evidence that Mr. Hyatt's patents had a business situs in California, but instead argued that Mr. Hyatt had a California based licensing business. In FTB's most recent brief (1992 RSAB) FTB's *only* sourcing argument is based on a California based licensing business: "FTB's earlier briefing addresses why, under California law, Hyatt's income for 1991 and 1992 has a California source for income taxation independent of FTB's residency determination. The answer: *Hyatt operated a California business in 1991 and 1992 and, therefore, the income generated is taxable under R&TC § 17951.*"[138] FTB cannot issue an NPA and then later raise legal

---

[136] Rev. & Tax § 17952 (emphasis added).
[137] FTB's 1991 NOA (FTB 28804-28806); FTB's 1992 NOA (FTB 28811-28813).
[138] 1992 RSAB, p. 22:9-12 (emphasis added).

RJN002218

theory after legal theory in the hope that one will eventually stick. That is directly contrary to the statutory assessment scheme enacted by the Legislature, which requires FTB to issue an NPA when it determines a deficiency[139] and requires that the NPA "shall set forth the reasons for the proposed deficiency assessment and the computation thereof."[140] These statutes do not permit FTB to change its reasons for an assessment. Accordingly, not only should your Board reject FTB's entire sourcing claim in both years, at a minimum it should reject FTB's late attempt to raise the "California business" sourcing theory. The FTB's "California business" theory is a completely different concept from the theory of the patents having a "California business situs" that was included in the NOAs. Mr. Hyatt was not given notice of the "California business theory" in either the NPAs or the NOAs.

FTB's new sourcing theories – (1) that the licensing income was derived from a trade or business operating within California under Regulation 17951-4, and (2) that Mr. Hyatt's patents had a business situs located in California under Section 17952 -- must fail. As discussed below, FTB has not established that Mr. Hyatt operated a business licensing patents within California or that his patents had a California business situs.

### 1.7.1.2 Mr. Hyatt Did Not Have California Source Income Under Regulation 17951-4 Because He Did Not Engage In A Patent Licensing Business In California Or Anyplace Else.

Mr. Hyatt did not engage in a business of licensing his patents in California or any other location. Thus the California regulations which provide that a nonresident is taxable on income derived from "a business trade or profession" that is conducted within the state does not apply.[141] Under Rev. & Tax § 17952, the mere licensing of Mr. Hyatt's own patents does not create California source income. To make the license payment taxable in California, FTB must establish that while Mr. Hyatt was residing in Nevada he was conducting a California business for the purpose of licensing his patents. The FTB has not and cannot establish such a California licensing business ever existed. Philips had the *exclusive* licensing authority to license Mr. Hyatt's licensable patents (1991 ASAB, Section 1.7.5).[142] Mr. Hyatt was not a professional negotiator, he was not skilled in licensing, and professional negotiators and licensing executives were operating Philips' Licensing Program and negotiating with the prospective licensees to license Mr. Hyatt's patents. It is absurd to suggest that Mr. Hyatt negotiated with prospective licensees or operated a licensing business in competition with Philips, which would be in breach of the Philips Agreement. See Section 1.7.3; 1991 ASAB, Section 1.8.4.7. See also Sections 1.4.1.3, 1.7.1.3, 1.7.2, 1.7.3.

---

[139] Rev. & Tax. Code § 19033.
[140] Rev. & Tax. Code § 19034.
[141] Cal. Code Reg. tit.18, § 17951-4(a).
[142] See the letter to Omron dated August 4, 1992, HL 02021, FTB_Philips 0003335 – 0003336; the letter to Toshiba dated February 3, 1992, FTB_Philips 0002663, 0002782; the letter to Asahi, HL 00307; the letter to Seiko, HL 00308; Sections 4.1 and 6.1 of the July 1991 Philips Agreement, H 01378, H 01388-01389; and the 2010 Tamoshunas Affidavit, ¶ 5; the 2010 Roth Sourcing Affidavit, §§ 4.2.1.8, 5.1.4.

RJN002219

Mr. Hyatt granted Philips the exclusive rights and responsibility to license his computer patents. The license payments at issue came from the licensing of Mr. Hyatt's patents by Philips, not from any "business, trade or profession" of Mr. Hyatt in California. Philips had the exclusive right to license those patents. All of the license payments at issue resulted from the normal course of sublicensing by Philips. Mr. Hyatt's disputed license payments were income received in Nevada, which was the situs of the patents under California law.

The signing of patent agreements with seven companies by Mr. Hyatt does not establish that Mr. Hyatt had a patent licensing business. Mr. Hyatt signed the agreements under an express grant of authority from Philips and only after the agreements were approved by Philips[143] (1991 ASAB, Section 1.7.7). Mr. Hyatt received no compensation for signing the patent agreements. He received only the license payments provided by the July 1991 Philips Agreement. The patent licensing agreements were signed under a grant of authority from Philips, who had the exclusive right to sublicense the computer patents. In addition, the patent agreements Mr. Hyatt signed in 1991 were negotiated by Mahr Leonard under an exclusive grant of authority from Philips[144] and the patent agreement Mr. Hyatt signed in 1992 was negotiated by Mr. Roth and Mahr Leonard as authorized by a letter from Philips dated January 17, 1992.[145]

As further evidence that the Philips Licensing Program was not a California business, all of the sublicensees were headquartered in Japan and Philips was headquartered in New York and the Netherlands. No sublicense was signed in California. All of the 1991 licenses were negotiated by Mahr Leonard, a Texas partnership, under a delegation of authority by Philips.[146] Similarly, the 1992 Hitachi license was negotiated by Mr. Roth and Mahr Leonard at the request of Philips and under a grant of authority from Philips.[147] The four remaining 1992 licenses were negotiated solely by Philips and were signed by Philips executives. In sum, the licenses were not part of any "business trade or profession carried on within" the State of California. Thus, the overwhelming evidence establishes there was no California licensing business operated by Mr. Hyatt. As stated above, it is absurd to suggest that Mr. Hyatt negotiated with prospective licensees or operated a licensing business in competition with Philips and in breach of the July 1991 Philips Agreement (Section 1.7.3).

FTB's California licensing business argument is flawed for the additional reason that FTB claims that 100 percent of the license payments in dispute are sourced to California. That can only be true if the alleged "business" operated wholly

---

[143] Philips authorized Mr. Hyatt to sign Patent Agreements with seven companies through the [First] Supplemental Agreement (FTB_Philips 0000666-0000673), the Second Supplemental Agreement (FTB_Philips 0000675-0000677), and the Third Supplemental Agreement (FTB_Philips 0000679-0000682).
[144] FTB_Philips 0000145-0000151.
[145] GLR 00940.
[146] FTB_Philips 0000145-0000151.
[147] GLR 00940.

RJN002220

within California, which FTB has never argued or established despite it having the burden on the sourcing issue.[148]  However, the Philips Licensing Program was a worldwide operation.  It was wholly owned and managed by Philips, which was based in New York and The Netherlands.  Philips granted Mahr Leonard, a Texas partnership, the exclusive right to negotiate with seven companies; and all of the sublicensees were headquartered in Japan.  FTB itself noted that Mr. Hyatt attended meetings with Philips and Mahr Leonard outside California and FTB has acknowledge that Mr. Hyatt was a resident of Nevada for purposes of its sourcing theory.  Accordingly, for this additional reason, even under FTB's sourcing theory, California cannot tax 100 percent of the alleged licensing business because FTB has not established that the alleged licensing business operated wholly within California.[149]  However, that is exactly what FTB is doing in violation of Cal. Code Reg. tit. 18, § 17951-4, unlawfully attempting to tax 100 percent of an alleged licensing business.  Mr. Hyatt did not have California source income under Regulation 17951-4, and FTB has not met and cannot meet its burden of proving otherwise.

### 1.7.1.3    Mr. Hyatt Did Not Have California Source Income Under Section 17952 Because His Patents Did Not Have A California Business Situs.

Mr. Hyatt's patents did not acquire a business situs in California.  Under the sourcing statute, Mr. Hyatt must be a resident of Nevada, and as his intellectual property his patents also had a situs in Nevada.  Thus, for the § 17952 "business situs" exception to apply, Mr. Hyatt's patents must have acquired a business situs in California separate from Mr. Hyatt's residence in Nevada.  FTB ignores this requirement that the "patents" must have acquired a "business situs" in California separate from Mr. Hyatt's residence in Nevada likely.  Thus, it is undisputed that the "patents" have not acquired a "business situs" in California.

The Regulations further define the statutory requirement that the patents must have a "business situs" in California for the license payments to be taxable:

> (a) Income of nonresidents from rentals or royalties for the use of or for the privilege of using in this State, patents . . . is taxable, if such intangible property has a business situs in this state within the meaning of (c) below.[150]

Subsection (c) of Regulation 17952 defines what is meant by "business situs" in California.

> (c) Intangible personal property has a business situs in this State if it is employed as capital in this State or the possession and control of the property has been localized in connection with a business, trade or profession in this State **so that its substantial use and value attach to and become an asset of the business**, trade or profession in this State.  For example, if a nonresident pledges stocks, bonds or other intangible personal property in California as security for the payment of indebtedness, taxes, etc., incurred in connection with a business in this State, the property has a business situs here.  Again, if a nonresident maintains a branch office here and a bank account on which the agent in charge of the branch office may draw for the payment of

---

[148] Cal. Code Reg. tit. 18, § 17951-4(a).
[149] Cal. Code Reg. tit. 18, § 17951-4(c) ("The amount of such business income derived from sources within this state shall be determined in accordance with the provisions of the apportionment rules of the Uniform Division of Income for Tax Purposes Act, Sections 25120 to 25139, inclusive, Revenue and Taxation Code, and the regulations thereunder . . . .").
[150] Cal. Code Reg. tit. 18, § 17952(a).

RJN002221

expenses in connection with the activities in this State, the bank account has a business situs here.[151]

Under this regulation, Mr. Hyatt's patents plainly did not acquire a business situs in California. First, the patents were not "employed as capital in this State." The patents were never pledged to a California business to secure a loan and FTB has never asserted that they were.

Second, the "possession and control" of Mr. Hyatt's patents have never been localized with a California business; indeed, Mr. Hyatt did not even have "possession and control" over his own patents after he entered into the July 1991 Philips Agreement. Pursuant to Sections 4.1 and 4.3 of that agreement Mr. Hyatt granted to U.S. Philips Corporation, a Delaware corporation headquartered in New York, the "possession and control" of his patents. Further, Philips had the **exclusive** licensing authority to license Mr. Hyatt's licensable patents (1991 ASAB, Section 1.7.5). As a result, Mr. Hyatt's alleged presence in California could not have created a business situs in California for the patents, and he could not have transferred "possession and control" to any California business. In addition, Mr. Hyatt was not present at the La Palma house between October 1, 1991, and late 1992.[152] After September 26, 1991, Mr. Hyatt resided in Nevada, he was not present in California except for visits for temporary and transitory purposes (Section 1.5.5) and he was not present at his former Jennifer Circle house from October 1, 1991 to late 1992 (Sections 1.5.1, 1.5.8); 72-witnesses testified about Mr. Hyatt moving away in 1991, 28-witnesses testified about Mr. Hyatt moving away in September 1991, and 22-Jennifer Circle neighbors testified about Mr. Hyatt moving away in 1991.[153] Thus, Mr. Hyatt did not transfer "possession and control" of his patents to any California business at any time.

Third, the patents have never "been localized in connection with a business, trade or profession in this State so that their **substantial use and value** attach to and become an asset of the business, trade or profession in this State."[154] After the July 1991 Philips Agreement, Mr. Hyatt no longer possessed the substantial use and value of his own patents and FTB has never identified a contract or other mechanism transferring the substantial use and value of Mr. Hyatt's patents to any entity other than Philips.

Fourth, FTB contends that Philips documents, which were misaddressed to Mr. Hyatt's former California addresses or fax number, evidence a business at his former Jennifer Circle house. However, undisputed evidence establishes that those documents were inadvertently sent to the wrong address or fax number after Mr. Hyatt provided a change of address (Sections

---

[151] Cal. Code Reg. tit. 18, § 17952(c) (emphasis added).

[152] In late 1992, Mr. Hyatt went to his former La Palma house to pick up Grace Jeng for a meeting with the head of the Russian Space Agency, Uri Koptev. This was the first time Mr. Hyatt had been to his former La Palma house since he sold it to Grace Jeng on October 1, 1991. See Affidavit of Gilbert P. Hyatt, August 15, 2010, p. 120.

[153] See Updated Testimonial Topics, Exs. T007, T006, and T102, respectively,

[154] Cal. Code Reg. tit.18 §17952(a) (emphasis added).

-45-

RJN002222

1.5.6, 1.5.6.1 to 1.5.6.3, 1.5.7; 1991 ASAB, Sections 1.8.1, 1.8.4.1 to 1.8.4.4).[155] Furthermore, the documents do not establish a Hyatt licensing business. To the extent the documents relate to licensing, they show that Mr. Hyatt was merely providing assistance to the Philips Licensing Program without being compensated for doing so (Section 1.7.1.2). In short, neither misaddressed correspondence nor Mr. Hyatt's use of a legacy Cerritos P.O. Box return address on correspondence establishes a California business. This is particularly so because it has been established by eyewitness testimony and contemporaneous documents that Mr. Hyatt was predominantly in Nevada on the dates of correspondence using these addresses (Sections 1.5.8, 1.4.1.1, 1.4.1.2). Therefore, for this additional reason, the Philips documents do not show that the patents were localized in connection with a California trade or business.

Fifth, Mr. Hyatt's alleged presence in California is not sufficient to establish California sourcing. FTB must show the "patents" have a business situs in California. California only taxes "intellectual property having a taxable or business situs in this State."[156] FTB has identified no contract or other document localizing the possession and control of the patent in a business in California so that the substantial use and value attach to and become an asset of the business.

Finally, FTB's sourcing argument must be rejected because FTB also must establish that Mr. Hyatt was a nonresident. FTB cannot simply *assume* that Mr. Hyatt was a nonresident for purposes of the sourcing issue because FTB has the burden of proof. To prevail, FTB must *establish* that Mr. Hyatt was a Nevada resident. Its failure to do so – in fact it has argued at length just the opposite, that Mr. Hyatt was a California resident – dooms FTB's sourcing argument. While Mr. Hyatt has clearly established that he was and remains a resident of Nevada, FTB's continuing argument that he was a resident of California defeats the FTB assertion of California sourcing income under Rev. & Tax § 17952, which requires California nonresidency.

FTB has not established that Mr. Hyatt was a nonresident or that he had California source income and FTB has not established that Mr. Hyatt any rights to have a licensing business in view of the July 1991 Philips Agreement and his representations and warranties to Philips (Section 1.7.3). Thus, the sourcing assessments must be reversed.

#### 1.7.1.4    Tracing License Payments To Mr. Hyatt Confirms He Did Not Have California Source Income.

The license payments from the seven patent agreements Mr. Hyatt signed (at the request of Philips and after approval by Philips) were first transferred by the licensees to the PSB&C client trust account maintained for the benefit of Philips. The license payments for the first three licenses (Fujitsu, Oki and Matsushita) were then transferred from the PSB&C client trust

---

[155] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25; Affidavit of David Leonard, May 2, 2012, ¶ 26; Declaration of Vicki Weart, May 21, 2012 ¶¶ 5-6.
[156] Cal. Code Reg. tit. 18 § 17952; Rev. & Tax. Code § 17952 ("income of **nonresidents** from . . . intangible personal property is not income from sources within this state unless the property has acquired a business situs in this state") (emphasis added).

RJN002223

account maintained for the benefit of Philips to one of Mr. Hyatt's Nevada situs investment accounts for distribution by Mr. Hyatt.[157] Mr. Hyatt signed these first three Patent Agreements and distributed the license payments pursuant to a delegation of authority by Philips under the [First] Supplemental Agreement because he had relinquished to Philips his right to license his own patents.[158] Although Mr. Hyatt received these initial license payments, he had absolutely no discretion in distribution of the funds to Philips and Mahr Leonard and he was required by Philips to promptly to do so. The distribution of the three license payments was a minor task that Mr. Hyatt assisted Philips with; it was accomplished by writing eight drafts, five to Philips and three to Mahr Leonard.[159] Mr. Hyatt's role was simply as an intermediary to disburse the funds for Philips. Indeed, the July 1991 Philips Agreement did not anticipate that Mr. Hyatt would receive the license payments from the licensees and after these three initial licenses Mr. Hyatt did not distribute any additional license payments for Philips.

In any event, the transfer of funds to Mr. Hyatt's Nevada investment accounts is not a California connection. Under California law Mr. Hyatt's investment accounts are intangible property having a situs that follows the owner,[160] which situs must be Nevada under the California sourcing statute because the sourcing statute applies only to California nonresidents.[161] The license payments from these initial three licensees thus passed from a client trust account maintained by PSB&C for the benefit of Philips to Hyatt's investment accounts having a Nevada situs. Thus, no California business received any taxable income from these first three licenses. Moreover, Mr. Hyatt received no extra compensation for assisting Philips by signing the Patent Agreements and distributing some of the license payments and Mr. Hyatt did not assist Philips as part of any California business.

As with the first three Patent Agreements, the next three agreements (Sharp, NEC and Sony) were signed by Mr. Hyatt at the request of Philips,[162] who granted authority for Mr. Hyatt to sign through the Second Supplemental Agreement.[163] Except for the Mahr Leonard commissions,[164] the Philips license payments from these three Patent Agreements were transferred from the PSB&C client trust account maintained for the benefit of Philips directly to Philips according to the July 1991 Philips Agreement[165] and Mr. Hyatt's disputed license payments were distributed to Mr. Hyatt by Philips on January 14,

---

[157] The license payments were transferred to Mr. Hyatt's investment accounts: Fujitsu, Franklin Funds (October 31, 1991), GLR 03668-03669; Oki, Benham Group Account (January 31, 1992), GLR 03837-03839; Matsushita, Franklin Funds (November 15, 1991), GLR 03786-03788.
[158] First Supplemental Agreement, FTB_Philips 0000666-0000673.
[159] FTB_Philips 0000616, 0000067, 0004856, 0004858 and H 018048.
[160] 1992 ARB, pp. 18-19.
[161] 1992 ARB, pp. 29, 35; 1992 ASB, pp. 94-97.
[162] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 17.
[163] FTB_Philips 0000675-0000677.
[164] Letter dated December 18, 1991, from Mr. Haken to Mr. Roth, FTB_Philips 0000523, authorizing payment of the Mahr Leonard commissions from the client trust account maintained by PSB&C for the benefit of Philips.
[165] FTB_Philips 0000595-0000635.

1992, not in 1991, to several of Mr. Hyatt's investment accounts having a Nevada situs as designated by Mr. Hyatt.[166]  As with

the first three Patent Agreements, no California licensing business received any taxable income from these second three Patent

Agreements.  The Philips license payments to Mr. Hyatt went directly from Philips to Mr. Hyatt personally and were paid

pursuant to the July 1991 Philips Agreement.[167]  Mr. Haken's letter to Mr. Hyatt providing notice of the transfers referenced

"PATENT AGREEMENT PAYMENTS" and expressly stated the payments were authorized "in accordance with our

Agreement."[168]

The Hitachi license payments were distributed by PSB&C as authorized by Philips in Section 4 of the Third

Supplemental Agreement.[169]  The license payments to Mr. Hyatt based on the Hitachi license payments were transferred from

the PSB&C client trust account maintained for the benefit of Philips to Mr. Hyatt's Nevada situs investment accounts.[170]

Philips also negotiated, signed and distributed the license payments from four Patent Agreements in the second half of 1992

(Sanyo, Omron, Nippon Columbia and Kenwood) to Mr. Hyatt's Nevada situs investment accounts maintained by Mr.

Hyatt.[171]

Thus, the disputed license payments to Mr. Hyatt from every single one of the patent sublicenses signed in 1991 and

1992 were transferred from a Philips controlled account to Mr. Hyatt's Nevada situs personal investment accounts.  There was

no transfer of funds to any entity that might be termed a California business.  There was therefore no taxable income to any

California business that could be attributable to Mr. Hyatt.  The disputed license payments to Mr. Hyatt from all of the 1991

and 1992 licenses resulted from the sublicensing of Mr. Hyatt's patents through the Philips Licensing Program as a result of

the right of Philips to sublicense Mr. Hyatt's patents under Sections 4.1 and 4.3 of the July 1991 Philips Agreement.  The situs

of the disputed license payments to Mr. Hyatt was the situs of the Hyatt patents, which was Nevada where Mr. Hyatt resided.

---

[166] Letter dated January 14, 1992, from Mr. Haken to Mr. Hyatt, FTB_Philips 0005414, FTB_Philips 0006151, FTB_Philips 0006152 (State Street), FTB_Philips 0006155 (Janus Group), FTB_Philips 0006158 (Fidelity Group), FTB_Philips 0006161 (JP Morgan).  PSB&C was authorized to distribute the Mahr Leonard share in a letter dated December 18, 1991, from Mr. Haken to PSB&C, GLR 02453.
[167] FTB_Philips 0000595-0000635.
[168] FTB_Philips 0006323.
[169] FTB_Philips 0000679-0000682.
[170] Letter from Mr. Hyatt to PSB&C dated September 2, 1992, GLR 00814; letter from Mr. Brueggemann of PSB&C to Union Bank dated September 4, 1992, GLR 00810-00811.  Letters from Mr. Brueggemann of PSB&C to Union Bank, GLR 03702-03704.
[171] The Philips license payment to Mr. Hyatt derived from the Sanyo Patent Agreement was distributed by Philips on July 31, 1992, to Mr. Hyatt's Benham Group, Federated Funds and Fidelity Funds investment accounts, letter dated July 31, 1992, from Philips to Mr. Hyatt, FTB_Philips 0004633-0004638.
    The Philips license payment to Mr. Hyatt derived from the Omron Patent Agreement was distributed by Philips on October 1, 1992, to Mr. Hyatt's BNF Capital Preservation investment account, letter dated October 1, 1992, from Philips to Mr. Hyatt, H 018065-018066.
    The Philips license payment to Mr. Hyatt derived from the Nippon Columbia and Kenwood Patent Agreements was distributed by Philips on December 29, 1992, to Mr. Hyatt's Fidelity Group investment account, letter dated December 29, 1992, from Anthony Hermann to Philips, FTB_Philips 0007361; Letter dated December 29, 1992, from Mr. Haken to Mr. Hyatt, FTB_Philips 0007362-0007363.

RJN002225

**1.7.1.5**    **Mr. Hyatt Did Not Have An Ownership Interest In the Philips Licensing Program As FTB Incorrectly Implies.**

Mr. Hyatt did not have an ownership interest in the Philips Licensing Program and FTB has not provided any evidence of such an ownership interest. The July 1991 Philips Agreement was a licensing agreement. It did not create a joint "Hyatt/Philips patent licensing business." The undisputed testimony of Mr. Tamoshunas states that the "July 1991 Philips Agreement did not create either a joint venture or partnership with Mr. Hyatt" and that "Philips by itself and through its attorneys created and managed the Licensing Program".[172]

FTB attempts to avoid the undisputed evidence that Mr. Hyatt and Philips did not engage in any business together by repeatedly referring to Mr. Hyatt's "JC/CA home/business"[173] and "Hyatt/Philips patent licensing business that began in 1991."[174] Merely saying something over and over does make it so. FTB has provided no evidence of a "Hyatt/Philips patent licensing business," and there was no such business.

**1.7.2**    **The Evidence That Mr. Hyatt Did Not Have A Licensing Business Is Not Overcome By FTB's Unsupported Conclusions And Inferences.**

The July 1991 Philips Agreement itself and the corroborating testimony of the licensing executives establish that Philips, not Mr. Hyatt, created, financed, and operated the Philips Licensing Program.[175] There was never an intent to create a joint business and in fact, there was no joint business.[176] Philips simply licensed Mr. Hyatt's patents. Philips had the *exclusive* licensing authority to license Mr. Hyatt's licensable patents (1991 ASAB, Section 1.7.5). Mr. Hyatt did not have a licensing business. See Section 1.7.3. See also Sections 1.4.1.3, 1.7.1.2, 1.7.1.3. FTB however attempts to draw unsupported conclusions while relying on inferences and speculation.

The July 1991 Philips Agreement[177] set forth the foundation for the Philips Licensing Program. The July 1991 Philips Agreement includes the following provisions:

- Philips was granted the rights to license all LICENSABLE PATENTS and the exclusive rights to license computer patents;[178]
- Philips assumed the "responsibility" to license the patents;[179]
- Philips incurred obligations up to $36 million as a condition for retaining its rights to license Mr. Hyatt's patents;[180]
- Philips was required to account for income and expenses and provide quarterly financial reports to Mr. Hyatt;[181]

---

[172] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 7, 10.
[173] E.g., "his JC/CA home/business", 1991 RSAB, p. 16:5.
[174] 1991 RSAB, p. 1:19.
[175] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10.
[176] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 6, 7.
[177] FTB_Philips 0000595-0000635.
[178] Section 4.1, FTB_Philips 0000608.
[179] Section 4.3, FTB_Philips 0000510.
[180] Sections 3.1 and 4.6, FTB_Philips 0000603, 0000611-0000612.
[181] Section 4.9, FTB_Philips 0000614.

RJN002226

- Philips was required to enforce and to defend the patents;[182]
- Philips was required to distribute NET PROCEEDS one-half to Philips and one-half to Hyatt.[183]

FTB has not established essential facts necessary for it to meet its burden of proving a taxable California licensing business. FTB has not proven: (a) that the license payments at issue came from other than the ordinary licensing of Mr. Hyatt's patents through the Philips Licensing Program; (b) that some California business (unidentified) had the substantial use and value of Mr. Hyatt's patents; (c) that the license payments went to a California business; (d) that Mr. Hyatt had an ownership interest in the Philips Licensing Program as it licensed Mr. Hyatt's patents; and (e) that Mr. Hyatt or any taxable California entity received compensation for the assistance Mr. Hyatt provided the Philips Licensing Program. However, it is necessary for FTB to show these things to carry its sourcing burden. Thus, the sourcing assessments must be reversed.

Instead of attempting to demonstrate that a California licensing business rather than Philips had the substantial use and value of Mr. Hyatt's patents and attempting to demonstrate the other factors needed to establish California tax liability, FTB merely lists 50 short phrases with no explanation or evidentiary support as its "evidence" of a California licensing business.[184] The lack of any explanation or any cited evidence demonstrates this is frivolous argument.[185] These 50 phrases do not address the statutory requirement – that a California licensing business rather than Philips had the "possession and control" and "substantial use and value" of Mr. Hyatt's patents. FTB cannot meet its burden on the sourcing issue by merely listing phrases without citation to evidence or any explanation.[186]

Furthermore, the phrases cited by FTB fail to establish any Hyatt California licensing business and they fail to establish that the alleged business was compensated or even sought compensation for any activity associated with even a single one of these 50 phrases. FTB in bad faith lists 50 irrelevant alleged events without explanation of even one of them. A list of 50 frivolous facts *prima facie* does not establish a licensing business, it establishes that FTB's position is frivolous and that FTB does not carry its sourcing burden (Sections 1.7.1, 1.7.1.1 to 1.7.1.5; 1991 ASAB, Section 1.5.2). Thus, for this reason alone the sourcing assessments should be reversed. For example:

- **1. Patent licensing strategy and planning meetings:** FTB does not explain how a Philips licensing strategy and planning meeting creates a Hyatt California business. FTB does not identify any meeting, the location of any meeting, or even contend Mr. Hyatt was present.

---

[182] Section 5.3, FTB_Philips 0000616.
[183] Section 4.5, FTB_Philips 0000610.
[184] 1991 RSAB, p. 13:8-21.
[185] *See Appeals of Robert E. Wesley and Jerry J. Couchman*, 2005-SBE-002, 2005 Cal. Tax LEXIS 358, 2005-SBE-002 (2005) (imposing frivolous appeal penalty on taxpayers, in part, because they "fail[ed] to produce any substantial evidence to meet their respective burdens").
[186] 1991 RSAB, p. 13:8-21.

RJN002227

- **6. publicity photography:** FTB does not explain how Philips' publicity photographs of an inventor creates a licensing business for the inventor; they do not.

FTB fails to explain or provide evidence of any of the listed phrases. A list of alleged facts unsupported by evidence does not establish that Mr. Hyatt had a California licensing business. FTB has the burden of proof on the sourcing issue (Sections 1.7.1, 1.7.1.1 to 1.7.1.5; 1991 ASAB, Section 1.5.2) but has not provided any credible evidence that Mr. Hyatt had a California licensing business. FTB has also failed to show how such an alleged business obtained the substantial use and value of Mr. Hyatt's patents (Section 1.7.1.3), how there was any substantial use and value left for any alleged Hyatt licensing business after the exclusive grant of rights to Philips by the July 1991 Philips Agreement (1991 ASAB, Section 1.7.5), where any taxable income was paid to the alleged Hyatt California licensing business as compensation for any of the listed 50 phrases, or how the non-existing compensation went into any account that was taxable by California.

### 1.7.3 There Could Not Be And There Was No Hyatt Licensing Business Or Licensing Negotiations Because A Hyatt Licensing Business Or Licensing Negotiations Would Have Been In Breach Of The July 1991 Philips Agreement And In Violation Of Mr. Hyatt's Representations And Warranties To Philips.

*Philips had the exclusive licensing authority* to license Mr. Hyatt's licensable patents (1991 ASAB, Section 1.7.5).[187] Philips granted to *Mahr Leonard exclusive negotiation rights* for all six of the 1991 patent licenses. Mr. Hyatt was not authorized to negotiate with prospective licensees or to operate a licensing business and if he had done so, he would have breached Section 8.1 of the July 1991 Philips Agreement.[188] See Sections 1.7.1.2, 1.4.1.3, 1.7.2.

The July 1991 Philips Agreement granted Philips the rights to license Mr. Hyatt's licensable patents. Mr. Hyatt did not have the rights to license his own patents and did not license his patents to others except through grants of authority from Philips through the three supplemental agreements (1991 ASAB, Section 1.7.5).

Nevertheless, FTB falsely accuses Mr. Hyatt of negotiating with prospective licensees and FTB falsely accuses him of operating a licensing business. However, FTB has not even contended that Philips authorized Mr. Hyatt to negotiate with any prospective licensee or to operate a licensing business and he did not do so. Mr. Tamoshunas testified, "To the best of my knowledge, Mr. Hyatt did not negotiate the Eleven 1991-1992 Patent Agreements."[189] Moreover, FTB's argument is truly absurd. With professional negotiators from Philips and Mahr Leonard licensing his patents, Mr. Hyatt would not and did not

---

[187] See the letter to Omron dated August 4, 1992, HL 02021, FTB_Philips 0003335 – 0003336; the letter to Toshiba dated February 3, 1992, FTB_Philips 0002663, 0002782; the letter to Asahi, HL 00307; the letter to Seiko, HL 00308; Sections 4.1 and 6.1 of the July 1991 Philips Agreement, H 01378, H 01388-01389; and the 2010 Tamoshunas Affidavit, ¶ 5; the 2010 Roth Sourcing Affidavit, §§ 4.2.1.8, 5.1.4.

[188] July 1991 Philips Agreement, FTB_Philips 0000595-0000635.

[189] Affidavit of Algy Tamoshunas, August 4, 2010, ¶13.

breach Section 8.1 of the July 1991 Philips Agreement by negotiating with prospective licensees or by engaging in a California licensing business.

Philips was a large world class multinational multidiscipline company with international relationships with other world class companies. Philips created and managed the Philips Licensing Program and used its enormous licensing experience to license Mr. Hyatt's patents.[190] Philips "took on significant responsibility with significant financial exposure" and relied on Mr. Hyatt's Section 8.1 representations and warranties in the July 1991 Philips Agreement "that he has not made and will not make any commitments to others inconsistent with or in derogation of the rights and licenses granted to PHILIPS".[191] As further explained by Mr. Tamoshunas,

> Philips had the responsibility to license the "licensable patents" under Sections 4.1 and 4.3 of the July 1991 Philips Agreement. Philips used its worldwide licensing organization to license the "licensable patents" and Philips managed the licensing from its offices in New York and in the Netherlands.[192]

If Mr. Hyatt had been conducting a licensing business as asserted by FTB, he would have been in breach of the July 1991 Philips Agreement and in breach of the trust relied upon by Philip that he would not do anything "in derogation of the rights and licenses granted to PHILIPS". See Sections 1.7.3, 1.7.1.2 1991 ASAB, Section 1.8.4.7. See also Sections 1.4.1.3, 1.7.1.3, 1.7.2. With Philips and Mahr Leonard applying their world class licensing expertise to the licensing of his patents,[193] it would be absurd for an inventor to jeopardize his relationship with Philips by engaging in his own licensing business in breach of the July 1991 Philips Agreement as alleged by FTB. Mr. Hyatt signed patent agreements with only seven licensees and in each case he did so at the express request of Philips subject to approval of the patent agreement by Philips as set forth in the three supplemental agreements[194] (1991 ASAB, Section 1.7.7).

Furthermore, Philips would have certainly complained about Mr. Hyatt interfering with the Philips Licensing Program if Mr. Hyatt had been operating a licensing business or negotiating with prospective licensees and Mahr Leonard would have complained about Mr. Hyatt interfering with it exclusive negotiating rights if Mr. Hyatt had been negotiating with prospective licensees. No such complaint exists. In addition, FTB has never shown where its alleged California licensing business received any income, let alone taxable California income. All of the licensing payments that Mr. Hyatt received as a result of Philips' sublicensing were received from Philips in the ordinary course of licensing Mr. Hyatt's Nevada situs patents were deposited into his Nevada situs investment accounts.

---

[190] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10.
[191] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10.
[192] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 11.
[193] See Index of Philips Documents Tables, Exhibit 1, Philips Used Its Worldwide Licensing Team To License Mr. Hyatt's Patents; Exhibit 2, Philips And MLMC Traveled Worldwide To License Mr. Hyatt's Patents.
[194] (1) FTB_Philips 000666-000673; (2) FTB_Philips 000675-682; and (3) FTB_Philips 000679-000682.

RJN002229

Eyewitness testimony confirms that Mr. Hyatt was in Las Vegas, not at Jennifer Circle during the disputed period. [195]

A total of 72 eyewitnesses testified that Mr. Hyatt moved away from Jennifer Circle in 1991.[196]  However, FTB in bad faith misrepresents this eyewitness evidence (1991 ASAB, Sections 1.8.4, 1.8.4.1 to 1.8.4.4) and falsely alleges that Mr. Hyatt operated a licensing business at Jennifer Circle in 1991 and thereafter based only on inferences and speculation.  A total of 22-neighbors from the small Jennifer Circle cul-de-sac testified that Mr. Hyatt moved away from Jennifer Circle in 1991 (1991 ASAB, Section 1.4). [197]

FTB has not shown why Mr. Hyatt would breach Section 8.1 of the July 1991 Philips Agreement and jeopardize his relationship with Philips by operating a California licensing business.[198]  Mr. Hyatt did not have a licensing business in violation of the July 1991 Philips Agreement at the former Jennifer Circle house or anyplace else.

### 1.7.4    FTB's Sourcing Case Must Fall With Its Residency Case.

FTB's sourcing case must fall with its residency case.  FTB's residency and sourcing positions rely on the same essential premise – that Mr. Hyatt lived and worked at the Jennifer Circle house during the disputed period.  For residency, FTB argues that Mr. Hyatt did not move to Las Vegas and that he resided at the Jennifer Circle house.  For sourcing, FTB argues that Mr. Hyatt was not a California resident but that he operated a business from the Jennifer Circle house.  FTB has the burden of proof on the sourcing issue,[199] but FTB has not explained how Mr. Hyatt could have been a Nevada resident (FTB conceded that he was a Nevada resident during the disputed period and thereafter for sourcing) and operate a licensing business at the Jennifer Circle house.  Further, FTB has not explained how or why Mr. Hyatt would operate a licensing business in breach of the July 1991 Philips Agreement (Section 1.7.3).  FTB has not argued that Mr. Hyatt commuted back and forth between Las Vegas and La Palma, which would not have been feasible given the 540 mile round trip.  Nor has FTB explained why Mr. Hyatt, after moving to Las Vegas and establishing residency in Nevada, would operate an alleged "home" business 270 miles away from his new home in Las Vegas in breach of the July 1991 Philips Agreement.  Nor has FTB provided any evidence of income derived from any activities allegedly performed at the Jennifer Circle house.  FTB provides a list of 50 phrases that it relies on to establish a licensing business,[200] but it has not established that a single one of these 50 phrases generated any taxable income (Section 1.7.2).  FTB's sourcing position is premised on Mr. Hyatt living and working

---

[195] Updated Testimonial Topics, Exs. T007, T006, T102, T114, T119, T127, T008, T009, T018, T021, T128, T019, T022-T025, T135, T136, T040, T138, T140-T143, T045, T044, T046, T047, and T049.  Mr. Hyatt's 2016 Supp. CDE Aff., ¶¶ 153-243, CDE Exhibits CDE-ST002 and ST003; ASAB Exhibits 2 and 3.
[196] Updated Testimonial Topics, Ex. T007.
[197] Updated Testimonial Topics, Ex. T102.
[198] FTB's bad faith acts against Mr. Hyatt are discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1, and in Section V of the Second Supplemental Motion To Strike.
[199] 1991 AOB, pp. 65:1-67:11; 1992 AOB, p. 66:1-6.
[200] 1991 RSAB, p. 13.

RJN002230

at the Jennifer Circle house, which is contradictory to FTB's concession that he was a Nevada resident for sourcing. Furthermore, FTB has failed to provide credible evidence of Mr. Hyatt's presence at the Jennifer Circle house after October 1, 1991[201] and FTB has failed to produce any evidence of income generating activities at the Jennifer Circle house. Yet, it is FTB's burden to prove its absurd theory.

Accordingly, in addition to the overwhelming evidence establishing that Mr. Hyatt was not a California resident after September 26, 1991, (Section 1.5), there is no evidence that he resided at the Jennifer Circle house or operated a business at that house because FTB conceded that he was a Nevada resident for sourcing. In short, because FTB's sourcing position is essentially the same as, and relies on the same facts and arguments as, its residency position, FTB's sourcing position must fall with its residency position.

### 1.7.5    FTB In Bad Faith Maintains The Tax On FTB's $24 Million Error.

FTB in bad faith assessed taxes, penalties, and interest on Mr. Hyatt by falsely stating in the 1992 audit determination that $24 million in license payments were received on January 15, 1992, thereby placing them within the disputed period and subject to its residency assessments. FTB finally admitted the $24 million in license payments were not received until well after the disputed period (1991 ASAB, Sections 1.7.2, 1.8.5.4.4, 1.8.5.4.5) but has refused to reduce the taxes, interest, and penalties assessments accordingly. FTB now in bad faith attempts to extend the assessment period past the "disputed period" until the end of 1992.[202]

FTB cannot tax Mr. Hyatt on the $24 million because, *inter al.,* (a) the licenses had no involvement whatsoever with California and therefore they could not and did not generate California source income, and (b) the license payments were received after the disputed period and have no basis in the 1992 NPA which is expressly limited to the disputed period.

Philips licensed four companies in mid-1992 and late 1992[203] (well after the disputed period) that had no relevant connection whatsoever with California and only minor involvement with Mr. Hyatt.

1. The licensing and financial transactions were between Philips in New York and four companies in Japan.[204]

2. These Philips licensing activities had no relevant connection with California.[205]

3. These license payments to Mr. Hyatt had no connection whatsoever with any California business.[206]

---

[201] Section 1.5.

[202] FTB's bad faith acts against Mr. Hyatt are further discussed in 1991 ASAB, Sections 1.5.1, 1.8, 1.9; 1992 ASAB, Section 1.5; ASAB Attachment 1, and in Section V of the Second Supplemental Motion To Strike.

[203] Sanyo, Omron, Kenwood and Nippon Columbia.

[204] See the four Patent Agreements attached to Mr. Hyatt's 2010 Sourcing Affidavit: (1) Omron, Exhibit 26, H 018844-018853; (2) Nippon Columbia, Exhibit 27, H 019093-019102; (3) Kenwood, Exhibit 28, H 019083-019092; and (4) Sanyo, Exhibit 24, H 018813-018822.

[205] See the four Patent Agreements attached to Mr. Hyatt's 2010 Sourcing Affidavit: (1) Omron, Exhibit 26, H 018844-018853; (2) Nippon Columbia, Exhibit 27, H 019093-019102; (3) Kenwood, Exhibit 28, H 019083-019092; and (4) Sanyo, Exhibit 24, H 018813-018822.

RJN002231

4.   Mr. Hyatt's primary connection with these licenses was the payment by Philips of license payments to his Nevada situs investment accounts in the second half of 1992 when he is acknowledged by FTB to be a resident of Nevada.[207]

5.   The 1992 post-disputed period was not included in the 1992 NPA.[208]

FTB did not address any of the above five issues and thus these five statements must be determined to be true and correct. These statements are true and correct and thus the post-disputed period assessments must be reversed.

FTB argued in bad faith during its audits, protests, and appeals that the income was received on January 15, 1992, and thus assessed the license payments on the basis of residency during the disputed period. Then, when FTB was required by your Board to finally admit that these license payments to Mr. Hyatt were received well after the disputed period, FTB essentially went silent on its $24 million error. Thus, in addition to FTB's maintaining its bad faith $24 million error throughout the protests and appeals, it has not corrected its tax assessments for its now admitted error. Nor has FTB developed a sourcing or residency position based on the facts that it finally admitted to in its first Additional Briefing. Thus Mr. Hyatt stated facts and arguments regarding FTB's $24 million error are undisputed and the assessments based on FTB's $24 million error must be reversed.

Although FTB has acknowledged that the $24 million in license payments was received in the last half of 1992, long after the disputed period, FTB has failed to withdraw the tax and fraud assessments based on the $24 million error. This is a continuation of the fraudulent tactics and absence of fairness that FTB has exercised in its attempt to "get" Mr. Hyatt at all costs.

As stated in fact number 5 above, the license payments to Mr. Hyatt for these four licenses cannot be assessed and taxed as California source income because it was not included in FTB's 1992 NPA. California law mandates that an FTB proposed assessment must be set forth in a notice of proposed deficiency[209] and that each notice shall set forth the reasons for the proposed assessment.[210] The 1992 NPA asserted only *residency* assessments for income received during the disputed

---

[206] The license payments to Mr. Hyatt from the four 1992 Post-Disputed Period Patent Agreements were transferred by Philips to Mr. Hyatt's Nevada situs investment accounts: (1) Omron, Benham, FTB_Philips 0004589-0004591 (2) Nippon Columbia, Fidelity, FTB_Philips 0000979-0000980 (3) Kenwood, Fidelity, FTB_Philips 0000979-0000980 (4) Sanyo, Benham, Federated and Fidelity, FTB_Philips 0004634-0003638.

[207] The license payments to Mr. Hyatt from the four 1992 Post-Disputed Period Patent Agreements were transferred by Philips to Mr. Hyatt's Nevada situs investment accounts: (1) Omron, Benham, FTB_Philips 0004589-0004591 (2) Nippon Columbia, Fidelity, FTB_Philips 0000979-0000980 (3) Kenwood, Fidelity, FTB_Philips 0000979-0000980 (4) Sanyo, Benham, Federated and Fidelity, FTB_Philips 0004634-0003638.

[208] FTB's 1992 Notice of Proposed Assessment (H 02248-02250).

[209] Rev. & Tax. Code § 19033.

[210] Rev. & Tax. Code § 19034.

RJN002232

period which ended April 2, 1992. FTB's failure to comply with this statutory assessment procedure bars it from asserting a deficiency for income received *after* the disputed period.[211]

Aside from the FTB's failure to include the license payments from these four companies in the 1992 NPA, FTB did not argue and did not present any evidence that these license payments to Mr. Hyatt went to a California business. FTB cannot establish payment to a California business because the license payments were wire transferred from licensees in Japan to Philips in New York and then from Philips to Mr. Hyatt's personal Nevada situs investment accounts. The facts established by the licensing documents produced by Mr. Hyatt to FTB in 2004 and by the Philips documents in 2011 demonstrate the following.

1. Philips by itself negotiated the Patent Agreements with these four companies.[212]

2. Philips licensing attorneys, Mr. Tamoshunas and Mr. Haken, who were employed by Philips in New York, signed these four Patent Agreements on behalf of Philips.[213]

3. Neither Mr. Hyatt nor any California entity signed these four Patent Agreements.[214]

4. Each of the four Patent Agreements identifies Mr. Hyatt as having an address in Las Vegas, not in California.[215]

5. All four Patent Agreements required the license payment to be wire transferred from the Japanese companies to a Philips' account at Bank of New York.[216]

6. These license payments to Mr. Hyatt were wire transferred by Philips to Nevada situs investment accounts owned by Mr. Hyatt.[217]

There is no legal or factual basis for taxation of these license payments by California.

---

[211] *See Title Ins. Co. of Minn. v. St. Bd. of Equal.*, 4 Cal.4th 715 (1992) (providing that this Board could not reduce a refund claim by a "set off," *i.e.*, a new assessment, because the Board had not followed the strict statutory procedures for issuing an assessment – "Just as the taxpayer is limited to the claims it may assert in the superior court to those pursued in the administrative proceedings, the Board should be limited in its assertion of setoffs in the superior court action to those deficiency assessments formally pursued under Revenue and Taxation Code . . . ."). Despite the procedures outlined above for FTB to issue an NPA, this Board has stated that it may decide issues raised by FTB for the first time in an appeal or after the NPA is issued. *See, e.g. Appeal of David G. and Helen Mendelsohn*, 85-SBE-141, Nov. 6, 1985; *Appeal of Sierra Pacific Industries*, 94-SBE-002, Jan. 5, 1994; *Appeal of Duncan, supra*. However, these Board decisions are in direct conflict with the carefully reasoned decision of the California Supreme Court in *Title Ins.*, and therefore *Title Ins.* must control.

[212] Affidavit of Gilbert P. Hyatt, August 9, 2010, § 4.2.6.8, p.102.

[213] See the four Patent Agreements attached to Mr. Hyatt's 2010 Sourcing Affidavit: (1) Omron, Exhibit 26, H 018844-018853; (2) Nippon Columbia, Exhibit 27, H 019093-019102; (3) Kenwood, Exhibit 28, H 019083-019092; and (4) Sanyo, Exhibit 24, H 018813-018822.

[214] See the four Patent Agreements attached to Mr. Hyatt's 2010 Sourcing Affidavit: (1) Omron, Exhibit 26, H 018844-018853; (2) Nippon Columbia, Exhibit 27, H 019093-019102; (3) Kenwood, Exhibit 28, H 019083-019092; and (4) Sanyo, Exhibit 24, H 018813-018822.

[215] See the first page of the four Patent Agreements attached to Mr. Hyatt's 2010 Sourcing Affidavit: (1) Omron, Exhibit 26, H 018844; (2) Nippon Columbia, Exhibit 27, H 019093; (3) Kenwood, Exhibit 28, H 019083; and (4) Sanyo, Exhibit 24, H 018813.

[216] See Section 3.2 of the four Patent Agreements attached to Mr. Hyatt's 2010 Sourcing Affidavit: (1) Omron, Exhibit 26, H 018846-018847; (2) Nippon Columbia, Exhibit 27, H 019095; (3) Kenwood, Exhibit 28, H 019085; and (4) Sanyo, Exhibit 24, H 018815.

[217] The license payments to Mr. Hyatt from the four 1992 Post-Disputed Period Patent Agreements were transferred by Philips to Mr. Hyatt's Nevada situs investment accounts: (1) Omron, Benham, FTB_Philips 0004589-0004591 (2) Nippon Columbia, Fidelity, FTB_Philips 0000979-0000980 (3) Kenwood, Fidelity, FTB_Philips 0000979-0000980 (4) Sanyo, Benham, Federated and Fidelity, FTB_Philips 0004634-0003638.

-56-

**1.8    MR. HYATT IS ENTITLED TO INTEREST ABATEMENT, AMONG OTHER THINGS, FOR FTB'S BAD FAITH DELAYS THROUGHOUT THE ADMINISTRATIVE PROCESS.**

The Nevada Supreme Court (NSC) found that FTB committed fraud and intentional infliction of emotional distress in part because of its delays.[218]  Because of FTB's fraudulent delaying tactics all interest should be abated as arbitrary.[219]  However, if your Board will not abate all interest, it should at a minimum abate pursuant to Rev. & Tax. Code Section 19104.

Interest abatement is required for the additional reason of FTB's extraordinary 11-year delay in processing the two protests.  In upholding the Nevada jury finding that FTB personnel committed fraud in Mr. Hyatt's audits and protests, the Nevada Supreme Court expressly highlighted FTB's extreme delay in processing Mr. Hyatt's two protests.[220]  Accordingly, pursuant to Section 19104, Mr. Hyatt is entitled to interest abatement for 1991 and 1992 because the delay was caused by FTB personnel performing a ministerial or managerial act, the delay occurred after FTB contacted Mr. Hyatt, and the delay was not in any way attributable to the taxpayer.[221]  A complete discussion of the interest abatement issue is set forth in prior briefing and will not be repeated here.[222]

Interest abatement is required for the additional reason that FTB continues to delay into 2016.  For example, FTB continues to take discovery into 2016 (FTB took the deposition of Charles Cameron on April 7, 2016) and FTB caused long delays in your Board's appeals by generating the Philips subpoenas in 2011 which were not resolved until April 2016 when your Board had to burden itself to redact prohibited information from FTB's RSABs.[223]

Here, we briefly summarize FTB's misconduct that resulted in the extreme delays in Mr. Hyatt's protests.  First, FTB expressly admitted that its personnel intentionally placed a "hold" on Mr. Hyatt's protest *for over seven years* after the protest hearing had been completed for no valid reason.[224]  Second, FTB lost, destroyed, or withheld numerous documents from the audit that would have sped up the protest process immeasurably as multiple FTB protest officers complained in internal writings that they worked without the entire audit file.  Because of FTB's incomplete and sloppy audit file, one protest officer undertook a "Herculean effort" to compile a mere "semblance of the complete audit file."[225]  Third, FTB unreasonably held

---

[218] *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 144-145, 148-149 (Nev. 2014), aff'd in part and rev'd in part on other issues 136 S. Ct. 1277 (2016).  See also ASAB Attachment 1 and Section 1991 ASAB, Section 1.5.1.

[219] Rev. & Tax. Code § 19033 ("In no case shall the determination of the deficiency be arbitrary or without foundation.").  See 1991 ASAB, Section 1.5.1 and ASAB Attachment 1.

[220] *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 145 (Nev. 2014), aff'd in part and rev'd in part on other issues 136 S. Ct. 1277 (2016) ("Furthermore, Hyatt showed that FTB took 11 years to resolve Hyatt's protests of the two audits. Hyatt alleged that this delay resulted in $8,000 in interest per day accruing against him for the outstanding taxes owed to California.").

[221] 1991 AOB, pp. 87-88; 1992 AOB, pp., 67-68.

[222] 1991 AOB, pp. 87-94; 1992 AOB, pp., 67-74; 1991 ARB, p. 100; 1992 ARB, pp.82-100; 1992 ASB, p. 100.

[223] ASAB Exhibit 18, Letter dated April 21, 2016.

[224] 1991 AOB, pp. 88-90; 1992 AOB, pp. 68-70; 1992 ARB, pp. 83-89; Note, Mr. Hyatt's pending Nevada tort litigation was not a valid basis for putting a 7-year hold on Mr. Hyatt's protests.  That court proceeding was completely separate from Mr. Hyatt's tax protests.

[225] 1991 AOB, pp. 90-92; 1992 AOB, pp., 70-72; 1992 ARB, pp. 89-90.

RJN002234

Mr. Hyatt's protests for over six months before assigning the initial protest officer.[226] Fourth, FTB overburdened the initial protest officer with other cases and unreasonably delayed in re-assigning the case to another protest officer.[227] Fifth, for the 1992 tax year the $24 million error caused unreasonable delay as FTB refused to correct a simple ministerial error despite a complete explanation of the error with evidence provided by Mr. Hyatt's representatives and repeated requests to make the correction.[228] This necessitated your Board's first additional briefing to correct FTB's $24 million error.[229] Nevertheless, even after confirming that it made this $24 million error, FTB still persists in not only the taxes on its $24 million error but also in the fraud penalty on its $24 million error. Sixth, the record in these appeals establishes that FTB committed grievous torts against Mr. Hyatt and that Mr. Hyatt suffered "extreme treatment from FTB."[230] This extreme treatment is discussed in detail in ASAB Attachment 1, and in Section V of the Second Supplemental Motion To Strike (1991 ASAB, Sections 1.5.1, 1. 8, and 1.9).

Furthermore, FTB has caused many additional years of unnecessary delay before your Board. FTB subpoenaed Philips in 2006, over a decade after the commencement of the 1991 tax year audit, but then cancelled the subpoenas. FTB then delayed five years, until the formal briefing in these appeals was near completion, to issue new, overbroad subpoenas for the Phillips documents.[231] Mr. Hyatt was compelled to protect his privacy rights and successfully litigated the overbroad and improper subpoenas and obtained New York court orders blocking the disclosure of protected Philips documents.[232] In addition, even after FTB obtained Philips documents and was ordered not to disclose protected documents, FTB violated the court orders with its 2014 RSABs, requiring Mr. Hyatt to go back to the New York court to request enforcement of its orders.[233] Mr. Hyatt obtained a temporary restraining order that forced FTB to refile its RSABs to comply with the New York court's orders.[234] The many years of delay in these appeals related to the Philips subpoenas and the Second Additional Briefings thus are due solely to FTB's intentional actions.

These intentional acts by the FTB occurred well after Mr. Hyatt had first been contacted by FTB (June 17, 1993) and were in no way attributable to Mr. Hyatt.[235] Further, FTB's contention that the managerial acts provision of Section 19104

---

[226] 1991 AOB, pp. 92; 1992 AOB, pp., 72; 1992 ARB, pp. 90-92.
[227] 1991 AOB, pp. 92; 1992 AOB, pp., 72; 1992 ARB, pp. 92-93.
[228] 1992 AOB, pp., 72; 1992 ARB, pp. 93-95.
[229] RAB, p. 1.
[230] *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 149 (Nev. 2014)
[231] ASAB Exhibit 14, 2011 Subpoena to Jack Haken; ASAB Exhibit 15, 2011 Subpoena to Algy Tamoshunas; ASAB Exhibit 16, 2011 Subpoena to Custodian of Records, U.S. Philips Corporation.
[232] See October 7, 2013 and March 13, 2014 Orders, Supreme Court of the State of New York, County of Westchester.
[233] ASAB Exhibit 12, Mr. Hyatt's Motion for an Order of Civil Contempt and Injunctive Relief dated March 11, 2015 filed with Supreme Court of the State of New York, County of Westchester.
[234] ASAB Exhibit 13, Temporary Restraining Order of Supreme Court of the State of New York, Appellate Division.
[235] 1992 ARB, pp. 95-99.

-58-

RJN002235

1   does not apply to tax years before 1998 should be rejected.  FTB delays included both ministerial acts and managerial acts,

2   and the managerial acts issue took place, in large part, after 1998.

3        The 1992 interest must be abated for the additional reason there was no 1992 audit (1992 AOB, § I, pp. 4-6; 1992

4   ARB, § II, pp. 2-3).

5        Accordingly, interest abatement is proper in this case.[236]

6   **1.9   CONCLUSION.**

7        Mr. Hyatt moved to Nevada and became a California nonresident on September 26, 1991.  Mr. Hyatt sold his

8   California house, resided in a Las Vegas hotel for a few weeks, resided in his Las Vegas leased apartment for about five

9   months, and then resided in his Las Vegas Tara home for the last 25 years.  Mr. Hyatt had no California source income during

10  the disputed period or thereafter.  The situs of Mr. Hyatt's patents followed Mr. Hyatt to Nevada and no California business

11  had the substantial use and value of Mr. Hyatt's patents.  Mr. Hyatt did not have a California licensing business and FTB's

12  NPAs and NOAs did not give Mr. Hyatt notice of taxation based on a California business.  FTB has not established by clear

13  and convincing evidence that Mr. Hyatt intended to defraud FTB.  All interest assessments should be abated because they

14  resulted from the bad faith intentional delays of FTB.

15       FTB's bad faith calendar, Attachment A-R, and Attachment E should be disregarded because of the thousands of

16  false statements and FTB's disregard or misrepresentation of Mr. Hyatt's overwhelming eyewitness and documentary

17  evidence.

18

19  Dated: September 28, 2016                    Respectfully submitted,

20                                              ANTOLIN LAW GROUP

21                                              By: _____
                                                EDWIN P. ANTOLIN

22                                              REED SMITH LLP

23                                              By: _____
                                                BRIAN TOMAN
24

25                                              SILVERSTEIN & POMERANTZ LLP
                                                AMY L. SILVERSTEIN
26
                                                *Attorneys for Appellant Gilbert P. Hyatt*
27

28

29
    ──────────────────
    [236] 1992 ASB, pp. 37-38.

                                              -59-

RJN002236

Dated this 17TH day of March, 2017.

/s/ Debbie Leonard

JAMES BRADSHAW
DEBBIE LEONARD
ADAM HOSMER-HENNER
MCDONALD CARANO WILSON LLP
100 West Liberty Street, 10th Floor
P.O. Box 2670
Reno, NV 89505
(775) 788-2000

SETH P. WAXMAN
PAUL R.Q. WOLFSON
DANIEL WINIK
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
(202) 663-6000

CYNTHIA J. LARSEN
KATIE DEWITT
DAVID W. SPENCER
ORRICK, HERRINGTON & SUTCLIFFE
400 Capitol Mall, Suite 3000
Sacramento, CA 95814
(916) 329-7970

*Attorneys for Appellees Betty T. Yee,*
*Diane L. Harkey, and Michael Cohen in*
*their official capacities as members of the*
*California Franchise Tax Board*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of March, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

 /s/Pam Miller
An Employee of McDonald Carano Wilson LLP