**No. 15-15296**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

GILBERT P. HYATT,

*Plaintiff-Appellant,*

v.

BETTY T. YEE, in her official capacity as California Franchise Tax
Board member and California State Board of Equalization member
DIANE L. HARKEY, in her official capacity as California State
Board of Equalization member; JEROME E. HORTON, in his
official capacity as California State Board of Equalization member;
MICHAEL COHEN, in his official capacity as California Franchise
Tax Board member; GEORGE RUNNER, in his official capacity as
California State Board of Equalization member; FIONA MA, in her
official capacity as California State Board of Equalization member
and California Franchise Tax Board member,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California
Case No. 2:14-cv-00849-GEB-DAD (Hon. Garland E. Burrell, Jr.)

APPELLANT
GILBERT P. HYATT'S
COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
VOLUME 1 OF 7
RJN0001 - RJN0264

Donald J. Kula
Oliver M. Gold
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Erwin Chemerinsky
EChemerinsky@law.uci.edu
UC IRVINE SCHOOL OF LAW
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000
Telephone: 949.824.8814
Facsimile: 949.824.7336

Malcolm Segal, Bar No. 075481
MSegal@segal-pc.com
SEGAL & ASSOCIATES, PC
400 Capitol Mall, Suite 2550
Sacramento, CA 95814
Telephone: 916.441.0886
Facsimile: 916.475.1231

Attorneys for Appellant Gilbert P. Hyatt

# APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
## INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| | **VOLUME 1** | |
| 1 | Decision issued by the Nevada Supreme Court dated September 18, 2014 | RJN0001-0035 |
| 2 | Respondent Gilbert P. Hyatt's Answering Brief filed January 5, 2010 | RJN0036-0256 |
| 3 | FTB Notice of Opening Audit for 1991 tax year dated June 17, 1993 | RJN0257-0262 |
| 4 | FTB Notice of Opening Audit for 1992 tax year dated January 19, 1996 | RJN0263-0264 |
| | **VOLUME 2** | |
| 5 | FTB Notice of Preliminary Determination for 1991 tax year dated August 2, 1995 | RJN0265-0305 |
| 6 | FTB Notice of Preliminary Determination for 1992 tax year dated April 1, 1996 | RJN0306-0323 |
| 7 | FTB Notice of Proposed Assessment for 1991 tax year dated April 23, 1996 | RJN0324-0328 |
| 8 | FTB Notice of Penalty Adjustment for 1992 tax year dated April 10, 1997 | RJN0329-0333 |
| 9 | FTB Notice of Proposed Assessment for 1992 tax year dated August 14, 1997 | RJN0334-0340 |

## APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR
## JUDICIAL NOTICE DOCUMENTS
## INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 10 | Nevada Tort Case Trial Transcript (RT: June 20, 147:14-148:20; 150:14-151:2; 151:3-153:5) | RJN0341-0347 |
| 11 | Nevada Tort Case Trial Transcript (RT: June 20, 175:15-177:13, 185:19-188:6) | RJN0348-0355 |
| 12 | Nevada Tort Case Trial Transcript (RT: April 25, 80:10-81:17, 84:11-24) | RJN0359-0362 |
| 13 | FTB Audit Strategy Memo dated November 18, 1994 | RJN0454-0457 |
| 14 | Nevada Tort Case Trial Transcript (RT: April 24, 132:2-23, 140:11-141:25) | RJN0458-0461 |
| 15 | Nevada Tort Case Trial Transcript (RT: April 24, 42:4-43:8, 80:22-81:11, 134:1-12; 136:23-138:2) | RJN0462-0470 |
| 16 | Nevada Tort Case Trial Transcript (RT: April 24, 76:16-77:7, 129:9-15) | RJN0471-0474 |
| 17 | Nevada Tort Case Trial Transcript (RT: April 24, 26:11-19, 74:1-75:20) | RJN0475-0478 |
| 18 | FTB internal memo dated August 21, 1995 | RJN0479-0484 |
| 19 | FTB audit reviewer's notes dated April 18, 1996 | RJN0485-0486 |
| 20 | Unsworn witness statements dated December 6, 1994, December 19, 1994, and January 18, 1995 | RJN0487-0502 |
| 21 | FTB Interrogatory Response | RJN0503-0510 |

# APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
## INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 22 | Nevada Tort Case Trial Transcript (RT: June 9, 97:9-16, 102:7-103:17, 108:2-110:10) | RJN0511-0517 |
| 23 | Nevada Tort Case Trial Transcript (RT: May 30, 145:4-146:17, 148:9-151:5) | RJN0518-0524 |
| 24 | FTB auditor notes dated August 14, 1995 | RJN0525-0528 |
| 25 | Letters from Hyatt tax counsel to FTB dated April 29, 1996, May 1, 1996, December 11, 1997, and March 10, 1998 | RJN0529-0535 |
| 26 | FTB audit manual excerpt | RJN0536-0537 |
| 27 | Letter from Hyatt tax counsel to FTB dated July 17, 1997 | RJN0538-0542 |
| 28 | FTB reviewer comments dated August 4, 1997 | RJN0543-0545 |
| 29 | Letter from Hyatt tax counsel to FTB protest section, dated October 10, 1997 | RJN0546-0549 |
| 30 | Email internal among FTB supervisors dated April 4, 1997 | RJN0550-0551 |
| | **VOLUME 3** | |
| 31 | Nevada Tort Case Trial Transcript (RT: April 22, 69:8-71:3, 73:3-74:23, 84:2-86:2, 88:22-90:19; RT: April 23, 88:1-89:22) | RJN0552-0566 |

# APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
## INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 32 | Hyatt Protest Letter for 1991 tax year dated June 20, 1996 | RJN0567-0629 |
| 33 | Hyatt Protest Letter for 1992 tax year dated October 10, 1997 | RJN0630-0633 |
| 34 | FTB Protest Determination Letter for both 1991 and 1992 dated November 1, 2007 | RJN0634-0635 |
| 35 | Nevada Tort Case Trial Transcript (RT: May 22, 2008, 57:20-59:6, 80:19-84:14) | RJN0636-0644 |
| 36 | Nevada Tort Case Trial Transcript (RT: May 22, 2008, 92:4 -94:11) | RJN0645-0648 |
| 37 | Nevada Tort Case Trial Transcript (RT: April 30, 2008, 149:11-24) | RJN0649-0650 |
| 38 | Nevada Tort Case Trial Transcript (RT: July 15, 2008, 3:13-16, 12:19-13:8) | RJN0651-0654 |
| 39 | Information/Document Requests (IDRs) from FTB protest officer to Hyatt tax counsel dated December 30, 1999 | RJN0655-0686 |
| 40 | Nevada Tort Case Trial Transcript (RT: May 1, 2008, 40:22-42:7) | RJN0687-0690 |
| 41 | Nevada Tort Case Trial Transcript (RT: June 16, 2008, 56:14-57:3, 58:7-60:4, 61:14-25; 72:9-13, 75:18-77:6) | RJN0691-0701 |
| 42 | Letters from former Hyatt tax counsel Eric Coffill dated June 30, 2000, July 31, 2001 and June 15, 2001 | RJN0702-0810 |

4

## APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
## INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 43 | FTB Protest Log (excerpts) dated September 27, 2000 and October 4, 2000 | RJN0811-0813 |
| **VOLUME 4** | | |
| 44 | FTB Protest Log (excerpt) dated February 20, 2002 | RJN0814-0815 |
| 45 | Email from FTB protest officer dated February 20, 2002 | RJN0816-0817 |
| 46 | Letter from former Hyatt tax counsel Eric Coffill dated March 7, 2002 | RJN0818-0819 |
| 47 | Email from FTB counsel Ben Miller dated April 5, 2002 | RJN0820-0821 |
| 48 | Letter from former Hyatt tax counsel Eric Coffill to FTB dated April 25, 2002 | RJN0822-0826 |
| 49 | FTB Protest Log (excerpt) dated April 25, 2005 | RJN0827-0828 |
| 50 | Nevada Discovery Commissioner Reports and Recommendations filed October 5, 2005 and November 10, 2005 | RJN0829-0850 |
| 51 | Nevada Tort Case Transcript of Nevada Discovery Commissioner ruling dated November 9, 1999 | RJN0851-0852 |
| 52 | Nevada Protective Order filed December 27, 1999 | RJN0853-0865 |
| 53 | Briefing filed in Nevada trial court during trial conducted in 2008 | RJN0866-1016 |

5

**APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR
JUDICIAL NOTICE DOCUMENTS
INDEX**

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 54 | Nevada Tort Case Trial Transcript (RT: May 7, 2008, 98:9-103:25, 109:7-129:3; RT: May 27, 2008, 27:6-30:10; RT: June 11, 9:7-38:21) | RJN1017-1080 |
| | **VOLUME 5** | |
| 55 | Nevada Tort Case Trial Transcript (RT: June 16, 2008, 2:11-34:15, 35:13-37:6, 117:25-132:8 | RJN1081-1133 |
| 56 | Nevada Tort Case Trial Transcript (RT: July 11, 2008, 41:5-42:23; 47:19-48:13; RT: July 15, 2008,187:3-17) | RJN1134-1140 |
| 57 | Nevada Tort Case Trial Transcript (RT: July 11, 2008, 138:23-139:14, 153:19-154:19) | RJN1141-1145 |
| 58 | Nevada Tort Case Trial Transcript (RT: July 15, 2008, 187:3-15) | RJN1146-1147 |
| 59 | Nevada Tort Case Trial Transcript (RT: July 15, 2008, 188:9-192:11) | RJN1148-1153 |
| 60 | FTB Demand Letter under the Nevada Protective Order dated June 3, 2002 | RJN1154-1156 |
| 61 | Nevada Tort Case Trial Transcript (RT: July 15, 2008, 162:21-163:5, 163:7-166:13, 187:3-188:6; RT: July 14, 2008, 174:3-175:21) | RJN1157-1167 |
| 62 | SBE Rules for Tax Appeals, Rules 5431(b)(3) and 5435 | RJN1168-1172 |

## APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
### INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 63 | Email from former Hyatt tax counsel Eric Coffill to the SBE dated June 3, 2009 | RJN1173-1175 |
| 64 | SBE letter to the Franchise Tax Board ("FTB") dated July 8, 2009 | RJN1176 |
| 65 | SBE letter to FTB dated August 21, 2009 | RJN1177 |
| 66 | Letter from former Hyatt tax counsel Eric Coffill to the SBE dated September 2, 2009 | RJN1178-1180 |
| 67 | SBE letter to FTB dated September 14, 2009 | RJN1181 |
| 68 | SBE letter to both FTB and former Hyatt tax counsel Eric Coffill dated August 2, 2012 | RJN1182 |
| 69 | Letter from SBE to both FTB and former Hyatt tax counsel Eric Coffill dated February 20, 2013 | RJN1183 |
| 70 | FTB letter to the SBE dated July 16, 2014 | RJN1184 |
| 71 | FTB letter to SBE dated August 13, 2014 | RJN1185 |
| 72 | SBE letter to the FTB and former Hyatt tax counsel Eric Coffill dated December 9, 2014 | RJN1186-1187 |
| 73 | FTB letter to the SBE dated March 17, 2015 | RJN1188-1194 |
| 74 | FTB Additional Brief, pp. 1:24-2:1; 28, fn. 152, (FTB's $24 Million Error) filed in the SBE Appeals on February 19, 2013 | RJN1195-1199 |

# APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
## INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 75 | Hyatt Additional Supplemental Briefing, Attachments 1, 3, and 4 filed in the SBE Appeals on September 28, 2016 | RJN1200-1269 |
| 76 | Hyatt Third Additional Briefing, pp. 22-23, (1991 Tax-Year Appeal) filed in the SBE Appeals on December 12, 2016 | RJN1270-1271 |
| 77 | Hyatt Third Additional Briefing, pp. 13-19, (1992 Tax-Year Appeal) filed in the SBE Appeals on December 12, 2016 | RJN1272-1278 |
| **VOLUME 6** | | |
| 78 | Hyatt Affidavit filed in the SBE Appeals on December 12, 2016 | RJN1279-1610 |
| **VOLUME 7** | | |
| 79 | Subpoenas issued by Supreme Court of the State of New York, County of Westchester, to FTB in conjunction with the SBE Appeals and dated May 26, 2011 | RJN1611-1732 |
| 80 | Temporary Restraining Order (TRO) Ruling issued by Supreme Court of the State of New York, County of Westchester, in conjunction with the SBE Appeals and dated March 16, 2015 | RJN1733-1735 |

8

**Franchise Tax Bd. of Cal. v. Hyatt, 335 P.3d 125 (2014)**

130 Nev. Adv. Op. 71

KeyCite Yellow Flag - Negative Treatment
**Certiorari Granted in Part by** California Franchise Tax Bd. v.
Hyatt, U.S.Nev., June 30, 2015

**335 P.3d 125**
**Supreme Court of Nevada.**

FRANCHISE TAX BOARD OF the STATE of
California, Appellant/Cross–Respondent,
v.
Gilbert P. HYATT, Respondent/Cross–Appellant.

No. 53264. | Sept. 18, 2014.

**Synopsis**
**Background:** Taxpayer brought action against
out-of-state franchise tax board, alleging intentional torts
and bad-faith conduct during audits. After grant of partial
summary judgment to board and jury trial on remaining
claims, the District Court, Clark County, Jessie Elizabeth
Walsh, J., entered judgment in favor of taxpayer and
awarded damages. Board appealed and taxpayer
cross-appealed.

**Holdings:** The Supreme Court, Hardesty, J., held that:

[1] discretionary-function immunity under state statute
does not include intentional torts and bad faith conduct;

[2] taxpayer did not have objective expectation of privacy
in his name, address, and social security number, as
would be required to support invasion of privacy claim
against board arising out of disclosure of such
information;

[3] Supreme Court would officially adopt cause of action
for false light invasion of privacy;

[4] whether board made specific representations to
taxpayer, regarding treatment of taxpayer's confidential
information during audit, that board intended for taxpayer
to rely on but which board did not intend to meet was jury
question in fraud claim;

[5] extension of state's statutory cap on liability to board
would have violated state public policy, and thus
principles of comity did not require such extension; and

[6] as a matter of first impression, under comity principles,
board was immune from punitive damages.

Affirmed in part, reversed in part, and remanded.

See also 538 U.S. 488, 123 S.Ct. 1683.

West Headnotes (45)

[1] **Courts**
⬧Comity between courts of different states
**States**
⬧Relations Among States Under Constitution
of United States

106 Courts
106VII Concurrent and Conflicting Jurisdiction
106VII(C) Courts of Different States or Countries
106k511 Comity between courts of different states
360 States
360I Political Status and Relations
360I(A) In General
360k5 Relations Among States Under Constitution of
United States
360k5(1) In general

Comity is a legal principle whereby a forum
state may give effect to the laws and judicial
decisions of another state based in part on
deference and respect for the other state, but
only so long as the other state's laws are not
contrary to the policies of the forum state.

Cases that cite this headnote

[2] **States**
⬧Relations Among States Under Constitution
of United States

360 States
360I Political Status and Relations
360I(A) In General
360k5 Relations Among States Under Constitution of
United States
360k5(1) In general

Whether to invoke comity is within the forum
state's discretion.

RJN0001

Cases that cite this headnote

**[3]    States**
🔑 Full faith and credit in each state to the public acts, records, etc. of other states

360 States
360I Political Status and Relations
360I(A) In General
360k5 Relations Among States Under Constitution of United States
360k5(2) Full faith and credit in each state to the public acts, records, etc. of other states

When a lawsuit is filed against another state in Nevada, while Nevada is not required to extend immunity in its courts to the other state, Nevada will consider extending immunity under comity, so long as doing so does not violate Nevada's public policies.

Cases that cite this headnote

**[4]    Municipal Corporations**
🔑 Discretionary powers and duties

268 Municipal Corporations
268XII Torts
268XII(A) Exercise of Governmental and Corporate Powers in General
268k728 Discretionary powers and duties

Discretionary-function immunity under state statute does not include intentional torts and bad faith conduct. West's NRSA 41.032.

2 Cases that cite this headnote

**[5]    Appeal and Error**
🔑 Cases Triable in Appellate Court

30 Appeal and Error
30XVI Review
30XVI(F) Trial De Novo
30k892 Trial De Novo

30k893 Cases Triable in Appellate Court
30k893(1) In general

The Supreme Court reviews questions of law de novo.

Cases that cite this headnote

**[6]    Appeal and Error**
🔑 Sufficiency of Evidence in Support

30 Appeal and Error
30XVI Review
30XVI(I) Questions of Fact, Verdicts, and Findings
30XVI(I)2 Verdicts
30k1001 Sufficiency of Evidence in Support
30k1001(1) In general

A jury's verdict will be upheld on appeal if the verdict is supported by substantial evidence.

Cases that cite this headnote

**[7]    Appeal and Error**
🔑 Burden of showing error

30 Appeal and Error
30XVI Review
30XVI(G) Presumptions
30k901 Burden of showing error

Supreme Court will not reverse an order or judgment unless error is affirmatively shown.

Cases that cite this headnote

**[8]    Torts**
🔑 Types of invasions or wrongs recognized

379 Torts
379IV Privacy and Publicity
379IV(A) In General
379k329 Types of invasions or wrongs recognized

The tort of invasion of privacy embraces four different tort actions: (1) unreasonable intrusion

RJN0002

upon the seclusion of another; (2) appropriation of the other's name or likeness; (3) unreasonable publicity given to the other's private life; or (4) publicity that unreasonably places the other in a false light before the public. Restatement (Second) of Torts § 652A.

Cases that cite this headnote

**[9]** **Torts**
👉Matters of Public Interest or Public Record; Newsworthiness

379Torts
379IVPrivacy and Publicity
379IV(B)Privacy
379IV(B)3Publications or Communications in General
379k356Matters of Public Interest or Public Record; Newsworthiness
379k357In general

Under public records defense, taxpayer did not have objective expectation of privacy in his name, address, and social security number, as would be required to support invasion of privacy claim against other state's franchise tax board alleging intrusion upon seclusion and public disclosure of private facts, arising out of board's disclosure of taxpayer information during audit process, where information had been publicly disclosed on several prior occasions, including in court documents from taxpayer's divorce proceedings and by taxpayer himself through various business license applications. Restatement (Second) of Torts § 652D comment.

Cases that cite this headnote

**[10]** **Torts**
👉Matters of Public Interest or Public Record; Newsworthiness

379Torts
379IVPrivacy and Publicity
379IV(B)Privacy
379IV(B)3Publications or Communications in General

379k356Matters of Public Interest or Public Record; Newsworthiness
379k357In general

One defense to invasion of privacy torts, referred to as the public records defense, arises when a defendant can show that the disclosed information is contained in a court's official records; such materials are public facts, and a defendant cannot be liable for disclosing information about a plaintiff that was already public. Restatement (Second) of Torts § 652D comment.

Cases that cite this headnote

**[11]** **Torts**
👉Miscellaneous particular cases

379Torts
379IVPrivacy and Publicity
379IV(B)Privacy
379IV(B)3Publications or Communications in General
379k351Miscellaneous particular cases

Taxpayer did not have objective expectation of privacy in his credit card number, as would be required to support invasion of privacy claim against other state's franchise tax board alleging intrusion upon seclusion and public disclosure of private facts, arising out of board's disclosure of taxpayer information during audit process, where parties to which credit card number was disclosed already had the number in their possession from prior dealings with taxpayer. Restatement (Second) of Torts § 652D comment.

Cases that cite this headnote

**[12]** **Torts**
👉Miscellaneous particular cases

379Torts
379IVPrivacy and Publicity
379IV(B)Privacy
379IV(B)3Publications or Communications in General

RJN0003

379k351Miscellaneous particular cases

Taxpayer did not have objective expectation of privacy in licensing contracts of taxpayer's business, as would be required to support invasion of privacy claim against other state's franchise tax board alleging intrusion upon seclusion and public disclosure of private facts, arising out of board's disclosure of taxpayer information during audit process, where parties to which licensing contracts were disclosed already had the information in their possession from prior dealings with taxpayer. Restatement (Second) of Torts § 652D comment.

Cases that cite this headnote

[13]  **Torts**
 **False Light**

379Torts
379IVPrivacy and Publicity
379IV(B)Privacy
379IV(B)3Publications or Communications in General
379k352False Light
379k353In general

Supreme Court would officially adopt cause of action for false light invasion of privacy.

2 Cases that cite this headnote

[14]  **Torts**
 **Questions of law or fact**

379Torts
379IIn General
379k148Questions of law or fact

Whether to adopt a tort as a viable tort claim is a question of state law.

Cases that cite this headnote

[15]  **Torts**
 **Particular cases in general**

379Torts
379IVPrivacy and Publicity
379IV(B)Privacy
379IV(B)3Publications or Communications in General
379k352False Light
379k354Particular cases in general

Other state's franchise tax board did not portray taxpayer in false light by including taxpayer's audit case on publicly-available litigation roster, despite argument that inclusion of case suggested taxpayer was a "tax cheat" and that taxpayer's case, unlike other cases on roster, was not yet completed, where taxpayer was indeed involved in litigation with board, and roster did not contain any false information.

Cases that cite this headnote

[16]  **Fraud**
 **Fiduciary or confidential relations**

184Fraud
184IDeception Constituting Fraud, and Liability Therefor
184k5Elements of Constructive Fraud
184k7Fiduciary or confidential relations

A breach of confidential relationship cause of action arises by reason of kinship or professional, business, or social relationships between the parties.

Cases that cite this headnote

[17]  **Fraud**
 **Fiduciary or confidential relations**

184Fraud
184IDeception Constituting Fraud, and Liability Therefor
184k5Elements of Constructive Fraud
184k7Fiduciary or confidential relations

Taxpayer did not have confidential relationship

RJN0004

with other state's franchise tax board, as would be required for taxpayer to assert an action for breach of confidential relationship against board arising out of board's disclosure to third parties of certain information during audit of taxpayer; in conducting audits, board was not required to act with taxpayer's interest in mind but rather had duty to proceed on behalf of state's interest.

Cases that cite this headnote

[18]   **Process**
⚷ Nature and elements in general

313 Process
313IV Abuse of Process
313IV(A) In General
313k173 Nature and elements in general

A successful abuse of process claim requires: (1) an ulterior purpose by the defendants other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding.

1 Cases that cite this headnote

[19]   **Process**
⚷ Particular cases

313 Process
313IV Abuse of Process
313IV(A) In General
313k192 Particular cases

Other state's franchise tax board did not use legal process in audit dispute with taxpayer, as would be required to support taxpayer's abuse of process claim arising out of board's actions during audit, where board never filed a court action in relation to its demands for information or otherwise during audit.

1 Cases that cite this headnote

[20]   **Fraud**
⚷ Elements of Actual Fraud

184 Fraud
184I Deception Constituting Fraud, and Liability Therefor
184k2 Elements of Actual Fraud
184k3 In general

To prove a fraud claim, the plaintiff must show that the defendant made a false representation that the defendant knew or believed was false, that the defendant intended to persuade the plaintiff to act or not act based on the representation, and that the plaintiff had reason to rely on the representation and suffered damages.

3 Cases that cite this headnote

[21]   **Fraud**
⚷ Questions for Jury

184 Fraud
184II Actions
184II(F) Trial
184k64 Questions for Jury
184k64(1) In general

It is the jury's role to make findings on the factors necessary to establish a fraud claim.

Cases that cite this headnote

[22]   **Appeal and Error**
⚷ Sufficiency of Evidence in Support

30 Appeal and Error
30XVI Review
30XVI(I) Questions of Fact, Verdicts, and Findings
30XVI(I)2 Verdicts
30k1001 Sufficiency of Evidence in Support
30k1001(1) In general

Supreme Court will generally not disturb a jury's verdict that is supported by substantial evidence.

RJN0005

Cases that cite this headnote

[23] **Appeal and Error**
⊸Sufficiency of Evidence in Support

30Appeal and Error
30XVIReview
30XVI(I)Questions of Fact, Verdicts, and Findings
30XVI(I)2Verdicts
30k1001Sufficiency of Evidence in Support
30k1001(1)In general

Substantial evidence, as would support jury verdict on appeal, is defined as evidence that a reasonable mind might accept as adequate to support a conclusion.

1 Cases that cite this headnote

[24] **Fraud**
⊸Intent
**Fraud**
⊸Reliance on representations and inducement to act

184Fraud
184IIActions
184II(F)Trial
184k64Questions for Jury
184k64(2)Intent
184Fraud
184IIActions
184II(F)Trial
184k64Questions for Jury
184k64(5)Reliance on representations and inducement to act

Whether other state's franchise tax board made specific representations to taxpayer, regarding treatment of taxpayer's confidential information during audit, that board intended for taxpayer to rely on but which board did not intend to meet was jury question, in taxpayer's fraud action against board.

Cases that cite this headnote

[25] **States**
⊸Relations Among States Under Constitution of United States

360States
360IPolitical Status and Relations
360I(A)In General
360k5Relations Among States Under Constitution of United States
360k5(1)In general

Extension of statutory cap on liability, applicable to government agencies in the state, to out-of-state franchise tax board would have violated state public policy, and thus principles of comity did not require such extension; board operated outside the controls of the state, and state's policy interest in providing adequate redress to its citizens was paramount to providing board with statutory cap on damages. West's NRSA 41.035.

Cases that cite this headnote

[26] **Damages**
⊸Elements in general

115Damages
115IIIGrounds and Subjects of Compensatory Damages
115III(A)Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)2Mental Suffering and Emotional Distress
115k57.19Intentional or Reckless Infliction of Emotional Distress;  Outrage
115k57.21Elements in general

To recover on a claim for intentional infliction of emotional distress, a plaintiff must prove: (1) extreme and outrageous conduct on the part of the defendant; (2) intent to cause emotional distress or reckless disregard for causing emotional distress; (3) that the plaintiff actually suffered extreme or severe emotional distress; and (4) causation.

4 Cases that cite this headnote

RJN0006

Franchise Tax Bd. of Cal. v. Hyatt, 335 P.3d 125 (2014)

130 Nev. Adv. Op. 71

**[27]** **Damages**
🔑 Nature of Injury or Threat

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)2 Mental Suffering and Emotional Distress
115k57.19 Intentional or Reckless Infliction of Emotional Distress; Outrage
115k57.23 Nature of Injury or Threat
115k57.23(1) In general

In an intentional infliction of emotional distress claim, the plaintiff must set forth objectively verifiable indicia to establish that the plaintiff actually suffered extreme or severe emotional distress.

4 Cases that cite this headnote

**[28]** **Damages**
🔑 Mental suffering and emotional distress

115 Damages
115IX Evidence
115k183 Weight and Sufficiency
115k192 Mental suffering and emotional distress

While medical evidence is one acceptable manner in establishing that severe emotional distress was suffered for purposes of a claim for intentional infliction of emotional distress, other objectively verifiable evidence may suffice to establish a claim when the defendant's conduct is more extreme, and thus, requires less evidence of the physical injury suffered.

4 Cases that cite this headnote

**[29]** **Damages**
🔑 Mental suffering and emotional distress

115 Damages
115IX Evidence
115k183 Weight and Sufficiency
115k192 Mental suffering and emotional distress

Evidence was sufficient to support verdict that taxpayer suffered severe emotional distress, as would support taxpayer's claim for intentional infliction of emotional distress against other state's franchise tax board arising out of board's conduct during audits, which included release of confidential information, delayed resolution of taxpayer's protests, and allegedly making disparaging remarks about taxpayer and his religion, where three witnesses testified that taxpayer's mood changed dramatically, that he became distant and much less involved in various activities, that he started drinking heavily, and that he suffered severe migraines and had stomach problems.

Cases that cite this headnote

**[30]** **Appeal and Error**
🔑 Conduct of trial or hearing in general
**Appeal and Error**
🔑 Rulings on admissibility of evidence in general

30 Appeal and Error
30XVI Review
30XVI(H) Discretion of Lower Court
30k969 Conduct of trial or hearing in general
30 Appeal and Error
30XVI Review
30XVI(H) Discretion of Lower Court
30k970 Reception of Evidence
30k970(2) Rulings on admissibility of evidence in general

Supreme Court reviews both the admissibility of evidence and the propriety of jury instructions for an abuse of discretion.

Cases that cite this headnote

**[31]** **Evidence**
🔑 Tendency to mislead or confuse

157 Evidence
157IV Admissibility in General
157IV(D) Materiality
157k146 Tendency to mislead or confuse

RJN0007

Franchise Tax Bd. of Cal. v. Hyatt, 335 P.3d 125 (2014)

130 Nev. Adv. Op. 71

Trial court abused its discretion in admitting evidence of fraud penalties imposed on taxpayer pursuant to outcome of audits, in taxpayer's action against out-of-state franchise tax board alleging intentional torts arising out of board's conduct during audit; trial court had already determined that it lacked jurisdiction to address whether the audits' conclusions were accurate, and evidence had no utility in showing any intentional torts unless it was first concluded that audits' determinations were incorrect.

Cases that cite this headnote

[32]   **Damages**
🔑 Mental suffering and emotional distress
**Fraud**
🔑 Falsity of representations and knowledge thereof
**Process**
🔑 Instructions
**Torts**
🔑 Publications or communications in general

115 Damages
115X Proceedings for Assessment
115k209 Instructions
115k216 Measure of Damages for Injuries to the Person
115k216(10) Mental suffering and emotional distress
184 Fraud
184II Actions
184II(F) Trial
184k65 Instructions
184k65(3) Falsity of representations and knowledge thereof
313 Process
313IV Abuse of Process
313IV(B) Actions and Proceedings
313k213 Instructions
379 Torts
379IV Privacy and Publicity
379IV(B) Privacy
379IV(B)6 Instructions
379k381 Publications or communications in general

Jury instruction stating that nothing prevented jury from considering the appropriateness or correctness of analysis conducted by out-of-state franchise tax board in reaching its determination of taxpayer's residency was error, in taxpayer's action against board alleging invasion of privacy, breach of confidential relationship, abuse of process, fraud, and intentional infliction of emotional distress, arising out of board's conduct during audit process; trial court had already determined that it lacked jurisdiction to address whether the audit's conclusions were accurate, and instruction invited jury to consider whether audit conclusions regarding taxpayer's residency were correct.

Cases that cite this headnote

[33]   **Evidence**
🔑 Suppression or spoliation of evidence

157 Evidence
157II Presumptions
157k74 Evidence Withheld or Falsified
157k78 Suppression or spoliation of evidence

Trial court abused its discretion in precluding out-of-state franchise tax board from presenting evidence explaining steps it had taken to preserve e-mails which were subsequently destroyed in server change, in taxpayer's action against board alleging intentional torts arising out of board's conduct during audits, where taxpayer argued evidence spoliation based on destruction of emails, and jury was given an adverse inference instruction.

Cases that cite this headnote

[34]   **Evidence**
🔑 Suppression or spoliation of evidence

157 Evidence
157II Presumptions
157k74 Evidence Withheld or Falsified
157k78 Suppression or spoliation of evidence

Under a rebuttable presumption that may be imposed when evidence is willfully destroyed, the burden shifts to the spoliating party to rebut the presumption by showing that the evidence that was destroyed was not unfavorable; if the party fails to rebut the presumption, then the

RJN0008

jury or district court may presume that the evidence was adverse to the party that destroyed the evidence. West's NRSA 47.250(3).

Cases that cite this headnote

[35] **Evidence**
🔑 Suppression or spoliation of evidence

157 Evidence
157II Presumptions
157k74 Evidence Withheld or Falsified
157k78 Suppression or spoliation of evidence

A lesser adverse inference, that does not shift the burden of proof, is permissible when evidence is negligently destroyed. West's NRSA 47.250(3).

Cases that cite this headnote

[36] **Evidence**
🔑 Tendency to mislead or confuse

157 Evidence
157IV Admissibility in General
157IV(D) Materiality
157k146 Tendency to mislead or confuse

Trial court abused its discretion in excluding evidence regarding taxpayer's loss of a patent through an unrelated legal challenge, in taxpayer's action for intentional infliction of emotional distress against out-of-state franchise tax board arising out of board's conduct during audit, including disclosure of taxpayer's confidential business information; evidence was probative as to damages, and although evidence may have been prejudicial, it was not unfairly prejudicial. West's NRSA 48.035(1).

Cases that cite this headnote

[37] **Evidence**
🔑 Tendency to mislead or confuse

157 Evidence
157IV Admissibility in General
157IV(D) Materiality
157k146 Tendency to mislead or confuse

Trial court abused its discretion in excluding evidence regarding additional audit of taxpayer by federal Internal Revenue Service, in taxpayer's action for intentional infliction of emotional distress against out-of-state franchise tax board arising out of board's conduct during audit; evidence was probative as to damages, and although evidence may have been prejudicial, it was not unfairly prejudicial.

Cases that cite this headnote

[38] **Appeal and Error**
🔑 Particular Actions or Issues

30 Appeal and Error
30XVI Review
30XVI(J) Harmless Error
30XVI(J)11 Exclusion of Evidence
30k1056 Prejudicial Effect
30k1056.1 In General
30k1056.1(4) Particular Actions or Issues
30k1056.1(4.1) In general

Trial court's evidentiary and jury instruction error warranted reversal as to damages element of taxpayer's intentional infliction of emotional distress claim against out-of-state franchise tax board, arising out of board's conduct during audits; several assertions made by taxpayer as to board's conduct could only have been made through contesting audits' conclusions, which taxpayer should have been precluded from doing, and board was prejudiced by erroneous exclusion of evidence to rebut adverse inference from negligent destruction of certain e-mail evidence.

Cases that cite this headnote

[39] **States**
🔑 Relations Among States Under Constitution of United States

RJN0009

360States
360I Political Status and Relations
360I(A) In General
360k5 Relations Among States Under Constitution of United States
360k5(1) In general

Under comity principles, other state's franchise tax board was immune from punitive damages for taxpayer's Nevada state law tort claims against board arising out of board's conduct during audits; punitive damages would not have been available against a Nevada government entity. West's NRSA 41.035(1).

Cases that cite this headnote

[40]    **Damages**
        👉 Nature and Theory of Damages Additional to Compensation

115 Damages
115V Exemplary Damages
115k87 Nature and Theory of Damages Additional to Compensation
115k87(1) In general

Punitive damages are damages that are intended to punish a defendant's wrongful conduct rather than to compensate a plaintiff for his or her injuries.

Cases that cite this headnote

[41]    **Municipal Corporations**
        👉 Damages

268 Municipal Corporations
268XII Torts
268XII(A) Exercise of Governmental and Corporate Powers in General
268k743 Damages

The general rule is that no punitive damages are allowed against a government entity unless expressly authorized by statute.

[42]    **Costs**
        👉 Form and requisites

102 Costs
102IX Taxation
102k202 Bill of Costs, Statement, or Memorandum
102k204 Form and requisites

Statutory time limit for filing memorandum of costs by prevailing party is not a jurisdictional requirement, and thus trial court had discretion to allow documentation for costs sought after deadline. West's NRSA 18.110.

Cases that cite this headnote

[43]    **Damages**
        👉 Mental suffering and emotional distress
        **Evidence**
        👉 Damages
        **Fraud**
        👉 Weight and Sufficiency

115 Damages
115IX Evidence
115k183 Weight and Sufficiency
115k192 Mental suffering and emotional distress
157 Evidence
157XII Opinion Evidence
157XII(D) Examination of Experts
157k555 Basis of Opinion
157k555.9 Damages
184 Fraud
184II Actions
184II(D) Evidence
184k58 Weight and Sufficiency
184k58(1) In general

Taxpayer's evidence was too speculative to support award of economic damages, in taxpayer's action against franchise tax board for intentional infliction of emotional distress and fraud, in which taxpayer alleged that board's contacting of two Japanese companies, and thus revealing that taxpayer was under investigation, was cause of decline in taxpayer's patent licensing business in Japan, where taxpayer only

RJN0010

Franchise Tax Bd. of Cal. v. Hyatt, 335 P.3d 125 (2014)

130 Nev. Adv. Op. 71

set forth expert testimony detailing what experts believed would happen, following contact with board, based on Japanese business culture, and no evidence established that any of the hypothetical steps of Japanese business culture actually occurred.

Cases that cite this headnote

[44] **Damages**
 👉 **Weight and Sufficiency**

 115 Damages
 115IX Evidence
 115k183 Weight and Sufficiency
 115k184 In general

 Damages cannot be based solely upon possibilities and speculative testimony; this is true regardless of whether the testimony comes from the mouth of a lay witness or an expert.

 1 Cases that cite this headnote

[45] **Evidence**
 👉 **Circumstantial evidence**

 157 Evidence
 157XIV Weight and Sufficiency
 157k587 Circumstantial evidence

 When circumstantial evidence is used to prove a fact, the circumstances must be proved, and not themselves be presumed.

 Cases that cite this headnote

**Attorneys and Law Firms**

**\*129** Lemons, Grundy & Eisenberg and Robert L. Eisenberg, Reno; McDonald Carano Wilson LLP and Pat Lundvall, Carla Higginbotham, and Megan L. Starich, Reno, for Appellant/Cross–Respondent.

Kaempfer Crowell Renshaw Gronauer & Fiorentino and Peter C. Bernhard, Las Vegas; Hutchison & Steffen, LLC, and Mark A. Hutchison and Michael K. Wall, Las Vegas; Lewis Roca Rothgerber LLP and Daniel F. Polsenberg, Las Vegas; Perkins Coie LLP and Donald J. Kula, Los Angeles, CA, for Respondent/Cross–Appellant.

Catherine Cortez Masto, Attorney General, and C. Wayne Howle, Solicitor General, Carson City, for Amicus Curiae State of Nevada.

Dustin McDaniel, Attorney General, Little Rock, AR, for Amicus Curiae State of Arkansas.

John V. Suthers, Attorney General, Denver, CO, for Amicus Curiae State of Colorado.

Joseph R. "Beau" Biden III, Attorney General, and Richard S. Gebelein, Chief Deputy Attorney General, Wilmington, DE, for Amicus Curiae State of Delaware.

Bill McCollum, Attorney General, Tallahassee, FL, for Amicus Curiae State of Florida.

Lawrence G. Wasden, Attorney General, Boise, ID, for Amicus Curiae State of Idaho.

Shone T. Pierre, Baton Rouge, LA, for Amicus Curiae Louisiana Secretary and the Louisiana Department of Revenue.

**\*130** Janet T. Mills, Attorney General, Augusta, ME, for Amicus Curiae State of Maine.

Douglas F. Gansler, Attorney General, Baltimore, MD, for Amicus Curiae State of Maryland.

Chris Koster, Attorney General, Jefferson City, MO, for Amicus Curiae State of Missouri.

Anne Milgram, Attorney General, Trenton, NJ, for Amicus Curiae State of New Jersey.

Donnita A. Wald, General Counsel, Bismarck, ND, for Amicus Curiae North Dakota State Tax Commissioner Cory Fong.

Richard Cordray, Attorney General, Columbus, OH, for Amicus Curiae State of Ohio.

W.A. Drew Edmondson, Attorney General, Oklahoma City, OK, for Amicus Curiae State of Oklahoma.

Robert E. Cooper, Jr., Attorney General and Reporter, Nashville, TN, for Amicus Curiae State of Tennessee.

John Swallow, Attorney General, and

RJN0011

Assistant Attorney General, Salt Lake City, UT, for Amicus Curiae State of Utah.

William H. Sorrell, Attorney General, Montpelier, VT, for Amicus Curiae State of Vermont.

William C. Mims, Attorney General, Richmond, VA, for Amicus Curiae State of Virginia.

Robert M. McKenna, Attorney General, Olympia, WA, for Amicus Curiae State of Washington.

Shirley Sicilian, General Counsel, Washington, DC, for Amicus Curiae Multistate Tax Commission.
BEFORE THE COURT EN BANC.[1]

[1]    The Honorable Nancy M. Saitta, Justice, voluntarily recused herself from participation in the decision of this matter.

## OPINION

By the Court, HARDESTY, J.:

In 1998, inventor Gilbert P. Hyatt sued the Franchise Tax Board of the State of California (FTB) seeking damages for intentional torts and bad-faith conduct committed by FTB auditors during tax audits of Hyatt's 1991 and 1992 state tax returns. After years of litigation, a jury awarded Hyatt $139 million in damages on his tort claims and $250 million in punitive damages. In this appeal, we must determine, among other issues, whether we should revisit our exception to government immunity for intentional torts and bad-faith conduct as a result of this court's adoption of the federal test for discretionary-function immunity, which shields a government entity or its employees from suit for discretionary acts that involve an element of individual judgment or choice and that are grounded in public policy considerations. We hold that our exception to immunity for intentional torts and bad-faith conduct survives our adoption of the federal discretionary-function immunity test because intentional torts and bad-faith conduct are not based on public policy.

Because FTB cannot invoke discretionary-function immunity to protect itself from Hyatt's intentional tort and bad-faith causes of action, we must determine whether Hyatt's claims for invasion of privacy, breach of confidential relationship, abuse of process, fraud, and intentional infliction of emotional distress survive as a matter of law, and if so, whether they are supported by substantial evidence. All of Hyatt's causes of action, except for his fraud and intentional infliction of emotion distress claims, fail as a matter of law, and thus, the judgment in his favor on these claims is reversed.

As to the fraud cause of action, sufficient evidence exists to support the jury's findings that FTB made false representations to Hyatt regarding the audits' processes and that Hyatt relied on those representations to his detriment and damages resulted. In regard to Hyatt's claim for intentional infliction of emotional distress, we conclude that medical records are not mandatory in order to establish a claim for intentional infliction of emotional distress if the acts of the defendant are sufficiently severe. As a result, **131** substantial evidence supports the jury's findings as to liability, but evidentiary and jury instruction errors committed by the district court require reversal of the damages awarded for emotional distress and a remand for a new trial as to the amount of damages on this claim only.

In connection with these causes of action, we must address whether FTB is entitled to a statutory cap on the amount of damages that Hyatt may recover from FTB on the fraud and intentional infliction of emotional distress claims under comity. We conclude that Nevada's policy interest in providing adequate redress to its citizens outweighs providing FTB a statutory cap on damages under comity, and therefore, we affirm the $1,085,281.56 of special damages awarded to Hyatt on his fraud cause of action and conclude that there is no statutory cap on the amount of damages that may be awarded on remand on the intentional infliction of emotional distress claim.

We also take this opportunity to address as a matter of first impression whether, based on comity, it is reasonable to provide FTB with the same protection of California law, to the extent that it does not conflict with Nevada law, to grant FTB immunity from punitive damages. Because punitive damages would not be available against a Nevada government entity, we hold, under comity principles, that FTB is immune from punitive damages. Thus, we reverse that portion of the district court's judgment awarding Hyatt punitive damages.

For the reasons discussed below, we affirm in part, reverse in part, and remand this case to the district court for further proceedings.

## FACTS AND PROCEDURAL HISTORY

RJN0012

*California proceedings*

In 1993, after reading a newspaper article regarding respondent/cross-appellant Hyatt's lucrative computer-chip patent and the large sums of money that Hyatt was making from the patent, a tax auditor for appellant/cross-respondent FTB decided to review Hyatt's 1991 state income tax return. The return revealed that Hyatt did not report, as taxable income, the money that he had earned from the patent's licensing payments and that he had only reported 3.5 percent of his total taxable income for 1991. Hyatt's tax return showed that he had lived in California for nine months in 1991 before relocating to Las Vegas, Nevada, but Hyatt claimed no moving expenses on his 1991 tax return. Based on these discrepancies, FTB opened an audit on Hyatt's 1991 state income tax return.

The 1991 audit began when Hyatt was sent notice that he was being audited. This notification included an information request form that required Hyatt to provide certain information concerning his connections to California and Nevada and the facts surrounding his move to Nevada. A portion of the information request form contained a privacy notice, which stated in relevant part that "The Information Practices Act of 1977 and the federal Privacy Act require the Franchise Tax Board to tell you why we ask you for information. The Operations and Compliance Divisions ask for tax return information to carry out the Personal Income Tax Law of the State of California." Also included with the notification was a document containing a list of what the taxpayer could expect from FTB: "Courteous treatment by FTB employees[,] Clear and concise requests for information from the auditor assigned to your case[,] Confidential treatment of any personal and financial information that you provide to us [,] Completion of the audit within a reasonable amount of time[.]"

The audit involved written communications and interviews. FTB sent over 100 letters and demands for information to third parties including banks, utility companies, newspapers (to learn if Hyatt had subscriptions), medical providers, Hyatt's attorneys, two Japanese companies that held licenses to Hyatt's patent (inquiring about payments to Hyatt), and other individuals and entities that Hyatt had identified as contacts. Many, but not all, of the letters and demands for information contained Hyatt's social security number or home address or both. FTB also requested information and documents directly from Hyatt. Interviews were conducted and signed statements were obtained from three of Hyatt's relatives—his ex-wife, his brother, and his daughter—all of whom were **132 estranged from Hyatt during the relevant period in question, except for a short time when

Hyatt and his daughter attempted to reconcile their relationship. No relatives with whom Hyatt had good relations, including his son, were ever interviewed even though Hyatt had identified them as contacts. FTB sent auditors to Hyatt's neighborhood in California and to various locations in Las Vegas in search of information.

Upon completion of the 1991 audit, FTB concluded that Hyatt did not move from California to Las Vegas in September 1991, as he had stated, but rather, that Hyatt had moved in April 1992. FTB further concluded that Hyatt had staged the earlier move to Nevada by renting an apartment, obtaining a driver's license, insurance, bank account, and registering to vote, all in an effort to avoid state income tax liability on his patent licensing. FTB further determined that the sale of Hyatt's California home to his work assistant was a sham. A detailed explanation of what factors FTB considered in reaching its conclusions was provided, which in addition to the above, included comparing contacts between Nevada and California, banking activity in the two states, evidence of Hyatt's location in the two states during the relevant period, and professionals whom he employed in the two states. Based on these findings, FTB determined that Hyatt owed the state of California approximately $1.8 million in additional state income taxes and that penalties against Hyatt in the amount of $1.4 million were warranted. These amounts, coupled with $1.2 million in interest, resulted in a total assessment of $4.5 million.

The 1991 audit's finding that Hyatt did not move to Las Vegas until April 1992 prompted FTB to commence a second audit of Hyatt's 1992 California state taxes. Because he maintained that he lived in Nevada that tax year, Hyatt did not file a California tax return for 1992, and he opposed the audit. Relying in large part on the 1991 audit's findings and a single request for information sent to Hyatt regarding patent-licensing payments received in 1992, FTB found that Hyatt owed the state of California over $6 million in taxes and interest for 1992. Moreover, penalties similar to those imposed by the 1991 audit were later assessed.

Hyatt formally challenged the audits' conclusions by filing two protests with FTB that were handled concurrently. Under a protest, an audit is reviewed by FTB for accuracy, or the need for any changes, or both. The protests lasted over 11 years and involved 3 different FTB auditors. In the end, FTB upheld the audits, and Hyatt went on to challenge them in the California courts.[2]

---

[2]    At the time of this appeal, Hyatt was still challenging the audits' conclusions in California courts.

RJN0013

*Nevada litigation*

During the protests, Hyatt filed the underlying Nevada lawsuit in January 1998. His complaint included a claim for declaratory relief concerning the timing of his move from California to Nevada and a claim for negligence. The complaint also identified seven intentional tort causes of action allegedly committed by FTB during the 1991 and 1992 audits: invasion of privacy—intrusion upon seclusion, invasion of privacy—publicity of private facts, invasion of privacy—false light, intentional infliction of emotional distress, fraud, breach of confidential relationship, and abuse of process. Hyatt's lawsuit was grounded on his allegations that FTB conducted unfair audits that amounted to FTB "seeking to trump up a tax claim against him or attempt[ing] to extort him," that FTB's audits were "goal-oriented," that the audits were conducted to improve FTB's tax assessment numbers, and that the penalties FTB imposed against Hyatt were intended "to better bargain for and position the case to settle."

Early in the litigation, FTB filed a motion for partial summary judgment challenging the Nevada district court's jurisdiction over Hyatt's declaratory relief cause of action. The district court agreed on the basis that the timing of Hyatt's move from California to Nevada and whether FTB properly assessed taxes and penalties against Hyatt should be resolved in the ongoing California administrative process. Accordingly, the district **\*133** court granted FTB partial summary judgment.[3] As a result of the district court's ruling, the parties were required to litigate the action under the restraint that any determinations as to the audits' accuracy were not part of Hyatt's tort action and the jury would not make any findings as to when Hyatt moved to Nevada or whether the audits' conclusions were correct.

[3]     That ruling was not challenged in this court, and consequently, it is not part of this appeal.

FTB also moved the district court for partial summary judgment to preclude Hyatt from seeking recovery for alleged economic damages. As part of its audit investigation, FTB sent letters to two Japanese companies that had licensing agreements with Hyatt requesting payment information between Hyatt and the companies. Included with the letters were copies of the licensing agreements between Hyatt and the Japanese companies. Hyatt asserted that those documents were confidential and that when FTB sent the documents to the companies, the

companies were made aware that Hyatt was under investigation. Based on this disclosure, Hyatt theorized that the companies would have then notified the Japanese government, who would in turn notify other Japanese businesses that Hyatt was under investigation. Hyatt claimed that this ultimately ended Hyatt's patent-licensing business in Japan. Hyatt's evidence in support of these allegations included the fact that FTB sent the letters, that the two businesses sent responses, that Hyatt had no patent-licensing income after this occurred, and expert testimony that this chain of events would likely have occurred in the Japanese business culture. FTB argued that Hyatt's evidence was speculative and insufficient to adequately support his claim. Hyatt argued that he had sufficient circumstantial evidence to present the issue to the jury. The district court granted FTB's motion for partial summary judgment, concluding that Hyatt had offered no admissible evidence to support that the theorized chain of events actually occurred and, as a result, his evidence was too speculative to overcome the summary judgment motion.

One other relevant proceeding that bears discussion in this appeal concerns two original writ petitions filed by FTB in this court in 2000. In those petitions, FTB sought immunity from the entire underlying Nevada lawsuit, arguing that it was entitled to the complete immunity that it enjoyed under California law based on either sovereign immunity, the Full Faith and Credit Clause, or comity. This court resolved the petitions together in an unpublished order in which we concluded that FTB was not entitled to full immunity under any of these principles. But we did determine that, under comity, FTB should be granted partial immunity equal to the immunity a Nevada government agency would receive. In light of that ruling, this court held that FTB was immune from Hyatt's negligence cause of action, but not from his intentional tort causes of action. The court concluded that while Nevada provided immunity for discretionary decisions made by government agencies, such immunity did not apply to intentional torts or bad-faith conduct because to allow it to do so would "contravene Nevada's policies and interests in this case."

This court's ruling in the writ petitions was appealed to and upheld by the United States Supreme Court. *Franchise Tax Bd. of Cal. v. Hyatt,* 538 U.S. 488, 123 S.Ct. 1683, 155 L.Ed.2d 702 (2003). In *Hyatt,* the Supreme Court focused on the issue of whether the Full Faith and Credit Clause of the federal constitution required Nevada to afford FTB the benefit of the full immunity that California provides FTB. *Id.* at 494, 123 S.Ct. 1683. The Court upheld this court's determination that Nevada was not required to give FTB full immunity.

RJN0014

*Id.* at 499, 123 S.Ct. 1683. The Court further upheld this court's conclusion that FTB was entitled to partial immunity under comity principles, observing that this court "sensitively applied principles of comity with a healthy regard for California's sovereign status, relying on the contours of Nevada's own sovereign immunity from suit as a benchmark for its analysis." *Id.* The Supreme Court's ruling affirmed this court's limitation of Hyatt's case against FTB to the intentional tort causes of action.

Ultimately, Hyatt's case went to trial before a jury. The trial lasted approximately **\*134** four months. The jury found in favor of Hyatt on all intentional tort causes of action and returned special verdicts awarding him damages in the amount of $85 million for emotional distress, $52 million for invasion of privacy, $1,085,281.56 as special damages for fraud, and $250 million in punitive damages. Following the trial, Hyatt sought prejudgment interest and moved the district court for costs. The district court assigned the motion to a special master who, after 15 months of discovery and further motion practice, issued a recommendation that Hyatt be awarded approximately $2.5 million in costs. The district court adopted the master's recommendation.

FTB appeals from the district court's final judgment and the post-judgment award of costs. Hyatt cross-appeals, challenging the district court's partial summary judgment ruling that he could not seek, as part of his damages at trial, economic damages for the alleged destruction of his patent-licensing business in Japan.[4]

---

[4]     This court granted permission for the Multistate Tax Commission and the state of Utah, which was joined by other states (Arkansas, Colorado, Delaware, Florida, Idaho, Louisiana, Maine, Maryland, Missouri, New Jersey, North Dakota, Ohio, Oklahoma, Tennessee, Vermont, Virginia, and Washington) to file amicus curiae briefs.

## *DISCUSSION*

We begin by addressing FTB's appeal, which raises numerous issues that it argues entitle it to either judgment as a matter of law in its favor or remand for a new trial. As a threshold matter, we address discretionary-function immunity and whether Hyatt's causes of action against PTB are barred by this immunity, or whether there is an exception to the immunity for intentional torts and bad-faith conduct. Deciding that FTB is not immune from suit, we then consider FTB's arguments as to each of Hyatt's intentional tort causes of action. We conclude our consideration of FTB's appeal by discussing Nevada's statutory caps on damages and immunity from punitive damages. As for Hyatt's cross-appeal, we close this opinion by considering his challenge to the district court's partial summary judgment in FTB's favor on Hyatt's damages claim for economic loss.

### *FTB is not immune from suit under comity because discretionary-function immunity in Nevada does not protect Nevada's government or its employees from intentional torts and bad-faith conduct*

Like most states, Nevada has waived traditional sovereign immunity from tort liability, with some exceptions. NRS 41.031. The relevant exception at issue in this appeal is discretionary-function immunity, which provides that no action can be brought against the state or its employee "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State ... or of any ... employee ..., whether or not the discretion involved is abused." NRS 41.032(2). By adopting discretionary-function immunity, our Legislature has placed a limit on its waiver of sovereign immunity. Discretionary-function immunity is grounded in separation of powers concerns and is designed to preclude the judicial branch from "second-guessing," in a tort action, legislative and executive branch decisions that are based on "social, economic, and political policy." *Martinez v. Maruszczak,* 123 Nev. 433, 446, 168 P.3d 720, 729 (2007) (internal quotations omitted); *see also Bailey v. United States,* 623 F.3d 855, 860 (9th Cir.2010). FTB initially argues on appeal that immunity protects it from Hyatt's intentional tort causes of action based on the application of discretionary-function immunity and comity as recognized in Nevada.

[1] [2] [3] Comity is a legal principle whereby a forum state may give effect to the laws and judicial decisions of another state based in part on deference and respect for the other state, but only so long as the other state's laws are not contrary to the policies of the forum state. *Mianecki v. Second Judicial Dist. Court,* 99 Nev. 93, 98, 658 P.2d 422, 424–25 (1983); *see also Solomon v. Supreme Court of Fla.,* 816 A.2d 788, 790 (D.C.2002); *Schoeberlein v. Purdue Univ.,* 129 Ill.2d 372, 135 Ill.Dec. 787, 544 N.E.2d 283, 285 (1989); **\*135** *McDonnell v. Ill.,* 163 N.J. 298, 748 A.2d 1105, 1107 (2000); *Sam v. Estate of Sam,* 139 N.M. 474, 134 P.3d 761, 764–66 (2006); *Hansen v. Scott,* 687 N.W.2d 247, 250, 250 (N.D.2004). The purpose behind comity is to "foster cooperation, promote harmony, and build good will" between states. *Hansen,* 687 N.W.2d at 250 (internal quotations omitted).

RJN0015

But whether to invoke comity is within the forum state's discretion. *Mianecki,* 99 Nev. at 98, 658 P.2d at 425. Thus, when a lawsuit is filed against another state in Nevada, while Nevada is not required to extend immunity in its courts to the other state, Nevada will consider extending immunity under comity, so long as doing so does not violate Nevada's public policies. *Id.* at 98, 658 P.2d at 424–25. In California, FTB enjoys full immunity from tort actions arising in the context of an audit. Cal. Gov't Code § 860.2 (West 2012). FTB contends that it should receive the immunity protection provided by California statutes to the extent that such immunity does not violate Nevada's public policies under comity.

*Discretionary-function immunity in Nevada*

This court's treatment of discretionary-function immunity has changed over time. In the past, we applied different tests to determine whether to grant a government entity or its employee discretionary-function immunity. *See, e.g., Arnesano v. State ex rel. Dep't of Transp.,* 113 Nev. 815, 823–24, 942 P.2d 139, 144–45 (1997) (applying planning-versus-operational test to government action), *abrogated by Martinez,* 123 Nev. at 443–44, 168 P.3d at 726–27; *State v. Silva,* 86 Nev. 911, 913–14, 478 P.2d 591, 592–93 (1970) (applying discretionary-versus-ministerial test to government conduct), *abrogated by Martinez,* 123 Nev. at 443–44, 168 P.3d at 726–27. We also recognized an exception to discretionary-function immunity for intentional torts and bad-faith conduct. *Falline v. GNLV Corp.,* 107 Nev. 1004, 1009 & n. 3, 823 P.2d 888, 892 & n. 3 (1991) (plurality opinion). More recently, we adopted the federal two-part test for determining the applicability of discretionary-function immunity. *Martinez,* 123 Nev. at 444–47, 168 P.3d at 727–29 (adopting test named after two United States Supreme Court decisions: *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), and *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)). Under the *Berkovitz–Gaubert* two-part test, discretionary-function immunity will apply if the government actions at issue "(1) involve an element of individual judgment or choice and (2) [are] based on considerations of social, economic, or political policy." *Martinez,* 123 Nev. at 446–47, 168 P.3d at 729. When this court adopted the federal test in *Martinez,* we expressly dispensed with the earlier tests used by this court to determine whether to grant a government entity or its employee immunity, *id.* at 444, 168 P.3d at 727, but we did not address the *Falline* exception to immunity for intentional torts or bad-faith misconduct.

In the earlier writ petitions filed by FTB in this court, we relied on *Falline* to determine that FTB was entitled to immunity from Hyatt's negligence cause of action, but not the remaining intentional-tort-based causes of action. Because the law concerning the application of discretionary-function immunity has changed in Nevada since FTB's writ petitions were resolved, we revisit the application of discretionary-function immunity to FTB in the present case as it relates to Hyatt's intentional tort causes of action. *Hsu v. Cnty. of Clark,* 123 Nev. 625, 632, 173 P.3d 724, 730 (2007) (stating that "the doctrine of the law of the case should not apply where, in the interval between two appeals of a case, there has been a change in the law by ... a judicial ruling entitled to deference" (internal quotations omitted)).

FTB contends that when this court adopted the federal test in *Martinez,* it impliedly overruled the *Falline* exception to discretionary-function immunity for intentional torts and bad-faith misconduct. Hyatt maintains that the *Martinez* case did not alter the exception created in *Falline* and that discretionary immunity does not apply to bad-faith misconduct because an employee does not have discretion to undertake intentional torts or act in bad faith.

In *Falline,* 107 Nev. at 1009, 823 P.2d at 891–92, this court ruled that the discretionary-function immunity under NRS 41.032(2) did not apply to bad-faith misconduct. The **136** case involved negligent processing of a workers' compensation claim. Falline injured his back at work and later required surgery. *Falline,* 107 Nev. at 1006, 823 P.2d at 890. Following the surgery, while rising from a seated position, Falline experienced severe lower-back pain. *Id.* at 1006–07, 823 P.2d at 890. Falline's doctor concluded that Falline's back pain was related to his work injury. *Id.* at 1007, 823 P.2d at 890. The self-insured employer, however, refused to provide workers' compensation benefits beyond those awarded for the work injury because it asserted that an intervening injury had occurred. *Id.* After exhausting his administrative remedies, it was determined that Falline was entitled to workers' compensation benefits for both injuries. *Id.* He was nevertheless denied benefits. *Id.* Falline brought suit against the employer for negligence and bad faith in the processing of his workers' compensation claims. *Id.* at 1006, 823 P.2d at 889–90. The district court dismissed his causes of action, and Falline appealed, arguing that dismissal was improper.

On appeal, after concluding that a self-insured employer should be treated the same as the State Industrial Insurance System, this court concluded that Falline could maintain a lawsuit against the self-insured employer based on negligent handling of his claims. *Id.* at 1007–09, 823 P.2d at 890–92. In discussing its holding, the court

Franchise Tax Bd. of Cal. v. Hyatt, 335 P.3d 125 (2014)

130 Nev. Adv. Op. 71

addressed discretionary immunity and explained that "if failure or refusal to timely process or pay claims is attributable to bad faith, immunity does not apply whether an act is discretionary or not." *Id.* at 1009, 823 P.2d at 891. The court reasoned that the insurer did not have discretion to act in bad faith, and therefore, discretionary-function immunity did not apply to protect the insurer from suit. *Id.* at 1009, 823 P.2d at 891–92.

The *Falline* court expressly addressed NRS 41.032(2)'s language that there is immunity "whether or not the discretion involved is abused." *Falline,* 107 Nev. at 1009 n. 3, 823 P.2d at 892 n. 3. The court determined that bad faith is different from an abuse of discretion, in that an abuse of discretion occurs when a person acts within his or her authority but the action lacks justification, while bad faith "involves an implemented attitude that completely transcends the circumference of authority granted" to the actor. *Id.* Thus, the *Falline* court viewed the exception to discretionary immunity broadly.

Following *Falline,* this court adopted, in *Martinez,* the federal test for determining whether discretionary-function immunity applies. 123 Nev. at 446, 168 P.3d at 729. Under the two-part federal test, the first step is to determine whether the government conduct involves judgment or choice. *Id.* at 446–47, 168 P.3d at 729. If a statute, regulation, or policy requires the government employee to follow a specific course of action for which the employee has no option but to comply with the directive, and the employee fails to follow this directive, the discretionary-immunity exception does not apply to the employee's action because the employee is not acting with individual judgment or choice. *Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267. On the other hand, if an employee is free to make discretionary decisions when executing the directives of a statute, regulation, or policy, the test's second step requires the court to examine the nature of the actions taken and whether they are susceptible to policy analysis. *Martinez,* 123 Nev. at 445–46, 168 P.3d at 729; *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267. "[E]ven assuming the challenged conduct involves an element of judgment [or choice]," the second step requires the court to determine "whether that judgment [or choice] is of the kind that the discretionary function exception was designed to shield." *Gaubert,* 499 U.S. at 322–23, 111 S.Ct. 1267. If "the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime," discretionary-function immunity will not bar the claim. *Id.* at 324–25, 111 S.Ct. 1267. The second step focuses on whether the conduct undertaken is a policymaking decision regardless of the employee's subjective intent when he or she acted. *Martinez,* 123

Nev. at 445, 168 P.3d at 728.

FTB argues that the federal test abolished the *Falline* intentional tort or bad-faith misconduct exception to discretionary-function immunity because the federal test is objective, not subjective. Hyatt asserts that an **\*137** intentional or bad-faith tort will not meet the two-part discretionary-immunity test because such conduct cannot be discretionary or policy-based.

Other courts addressing similar questions have reached differing results, depending on whether the court views the restriction against considering subjective intent to apply broadly or is limited to determining if the decision is a policymaking decision. Some courts conclude that allegations of intentional or bad-faith misconduct are not relevant to determining if the immunity applies because courts should not consider the employee's subjective intent at all. *Reynolds v. United States,* 549 F.3d 1108, 1112 (7th Cir.2008); *Franklin Sav. Corp. v. United States,* 180 F.3d 1124, 1135 (10th Cir.1999); *see also Sydney v. United States,* 523 F.3d 1179, 1185 (10th Cir.2008). But other courts focus on whether the employee's conduct can be viewed as a policy-based decision and hold that intentional torts or bad-faith misconduct are not policy-based acts. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 475 (2d Cir.2006); *Palay v. United States,* 349 F.3d 418, 431–32 (7th Cir.2003); *Coulthurst v. United States,* 214 F.3d 106, 109 (2d Cir.2000).[5] These courts bar the application of discretionary-function immunity in intentional tort and bad-faith misconduct cases when the government action involved is "unrelated to any plausible policy objective [ ]." *Coulthurst,* 214 F.3d at 111. A closer look at these courts' decisions is useful for our analysis.

---

5    *Coulthurst* is affirmatively cited by the Seventh Circuit Court of Appeals in *Palay v. United States,* 349 F.3d 418, 431–32 (7th Cir.2003). Although the Seventh Circuit in *Reynolds,* 549 F.3d at 1112, stated the proposition that claims of malicious and bad-faith conduct were not relevant in determining discretionary immunity because the courts do not look at subjective intent, the *Palay* court specifically held that discretionary immunity can be avoided if the actions were the result of laziness or carelessness because such actions are not policy-based decisions. *Palay,* 349 F.3d at 431–32. *Reynolds* was published after *Palay,* and while it cites *Palay* for other unrelated issues, it does not address its holding in connection with the holding in *Palay.*

RJN0017

***Courts that decline to recognize bad-faith conduct that calls for an inquiry into an employee's subjective intent***
In *Franklin Savings Corp. v. United States,* 180 F.3d at 1127, 1134–42, the Tenth Circuit Court of Appeals addressed the specific issue of whether a claim for bad faith precludes the application of discretionary-function immunity. In that case, following the determination that the Franklin Savings Association was not safe or sound to conduct business, a conservator was appointed. *Id.* at 1127. Thereafter, plaintiffs Franklin Savings Association and its parent company filed suit against defendants the United States government and the conservator to have the conservatorship removed. *Id.* Plaintiffs alleged that the conservator intentionally and in bad faith liquidated the company instead of preserving the company and eventually returning it to plaintiffs to transact business. *Id.* at 1128.

On appeal, the *Franklin Savings* court explained that plaintiffs did not dispute that the conservator had the authority and discretion to sell assets, but the argument was whether immunity for decisions that were discretionary could be avoided because plaintiffs alleged that the conduct was intentionally done to achieve an improper purpose—to deplete capital and retroactively exculpate the conservator's appointment. *Id.* at 1134. Thus, the court focused on the second part of the federal test. In considering whether the alleged intentional misconduct barred the application of discretionary-function immunity under the federal test, the *Franklin Savings* court first noted that the United States Supreme Court had "repeatedly insisted ... that [tort] claims are not vehicles to second-guess policymaking." *Id.* The court further observed that the Supreme Court's modification to *Berkovitz,* in *Gaubert,* to include a query of whether the nature of the challenged conduct was "susceptible to policy analysis [,] ... served to emphasize that courts should not inquire into the actual state of mind or decisionmaking process of federal officials charged with performing discretionary functions." *Id.* at 1135 (internal quotations omitted). The *Franklin Savings* court ultimately concluded that discretionary-function immunity attaches to bar claims that "depend[ ] on an employee's bad faith or **\*138** state of mind in performing facially authorized acts," *id.* at 1140, and to conclude otherwise would mean that the immunity could not effectively function. *Id.* at 1140–41.

Notwithstanding its conclusion, the *Franklin Savings* court noted that such a holding had "one potentially troubling effect"; it created an "irrebuttable presumption" that government employees try to perform all discretionary functions in good faith and that the court's holding would preclude relief in cases where an official

committed intentional or bad-faith conduct. *Id.* at 1141. Such a result was necessary, the court reasoned, because providing immunity for employees, so that they do not have to live and act in constant fear of litigation in response to their decisions, outweighs providing relief in the few instances of intentionally wrongful conduct. *Id.* at 1141–42. Thus, the *Franklin Savings* court broadly applied the Supreme Court rule that an actor's subjective intent should not be considered. This broad application led the court to conclude that a bad-faith claim was not sufficient to overcome discretionary-function immunity's application.

***Courts that consider whether an employee subjectively intended to further policy by his or her conduct***
Other courts have come to a different conclusion. Most significant is *Coulthurst v. United States,* 214 F.3d 106, in which the Second Circuit Court of Appeals addressed the issue of whether the inspection of weightlifting equipment by prison officials was grounded in policy considerations. In *Coulthurst,* an inmate in a federal prison was injured while using the prison's exercise equipment. *Id.* at 107. The inmate filed suit against the United States government, alleging " 'negligence and carelessness' " and a " 'fail[ure] to diligently and periodically inspect' " the exercise equipment. *Id.* at 108. The lower court dismissed the complaint, reasoning that the decisions that established the procedures and timing for inspection involved "elements of judgment or choice and a balancing of policy considerations," such that discretionary-function immunity attached to bar liability. *Id.* at 109. Coulthurst appealed.

In resolving the appeal, the Court of Appeals concluded that the complaint could be read to mean different types of negligent or careless conduct. *Id.* The court explained that the complaint asserting negligence or carelessness could legitimately be read to refer to how frequently inspections should occur, which might fall under discretionary-function immunity. *Id.* But the same complaint, the court noted, could also be read to assert negligence and carelessness in the failure to carry out prescribed responsibilities, such as prison officials failing to inspect the equipment out of laziness, haste, or inattentiveness. *Id.* Under the latter reading, the court stated that

> the official assigned to inspect the machine may in laziness or haste have failed to do the inspection he claimed (by his initials in the log) to have performed; the official may have been distracted or inattentive,

RJN0018

and thus failed to notice the frayed
cable; or he may have seen the
frayed cable but been too lazy to
make the repairs or deal with the
paperwork involved in reporting
the damage.

*Id.* The court concluded that such conduct did not involve
an element of judgment or choice nor was it based on
policy considerations, and in such an instance,
discretionary-function immunity does not attach to shield
the government from suit. *Id.* at 109–11. In the end, the
*Coulthurst* court held that the inmate's complaint
sufficiently alleged conduct by prison officials that was
not immunized by the discretionary-function immunity
exception, and the court vacated the lower court's
dismissal and remanded the case for further proceedings.
*Id.*

[4] The difference in the *Franklin Savings* and *Coulthurst*
approaches emanates from how broadly those courts
apply the statement in *Gaubert* that "[t]he focus of the
inquiry is not on the agent's subjective intent in
exercising the discretion conferred ..., but on the nature of
the actions taken and on whether they are susceptible to
policy analysis." *499 U.S. at 325, 111 S.Ct. 1267.*
*Franklin Savings* interpreted this requirement expansively
to preclude any consideration of whether an actor's
conduct was done maliciously or in bad faith, whereas
*Coulthurst* *139 applied a narrower view of subjective
intent, concluding that a complaint alleging a
nondiscretionary decision that caused the injury was not
grounded in public policy. Our approach in *Falline*
concerning immunity for bad-faith conduct is consistent
with the reasoning in *Coulthurst* that intentional torts and
bad-faith conduct are acts "unrelated to any plausible
policy objective[ ]" and that such acts do not involve the
kind of judgment that is intended to be shielded from
"judicial second-guessing." *214 F.3d at 111* (internal
quotations omitted). We therefore affirm our holding in
*Falline* that NRS 41.032 does not protect a government
employee for intentional torts or bad-faith misconduct, as
such misconduct, "by definition, [cannot] be within the
actor's discretion." *Falline,* 107 Nev. at 1009, 823 P.2d at
891–92.

In light of our conclusion, we must now determine
whether to grant, under comity principles, FTB immunity
from Hyatt's claims. Because we conclude that
discretionary-function immunity under NRS 41.032 does
not include intentional torts and bad-faith conduct, a
Nevada government agency would not receive immunity
under these circumstances, and thus, we do not extend
such immunity to FTB under comity principles, as to do

so would be contrary to the policy of this state.

### *Hyatt's intentional tort causes of action*
Given that FTB may not invoke immunity, we turn next
to FTB's various arguments contesting the judgment in
favor of Hyatt on each of his causes of action.[6] Hyatt
brought three invasion of privacy causes of
action—intrusion upon seclusion, publicity of private
facts, and false light—and additional causes of action for
breach of confidential relationship, abuse of process,
fraud, and intentional infliction of emotional distress. We
discuss each of these causes of action below.

[6]  We reject Hyatt's contention that this court previously
determined that each of his causes of action were valid
as a matter of law based on the facts of the case in
resolving the prior writ petitions. To the contrary, this
court limited its holding to whether FTB was entitled to
immunity, and thus, we did not address the merits of
Hyatt's claims.

[5] [6] [7]  This court reviews questions of law de novo.
*Martinez,* 123 Nev. at 438, 168 P.3d at 724. A jury's
verdict will be upheld if it is supported by substantial
evidence. *Prabhu v. Levine,* 112 Nev. 1538, 1543, 930
P.2d 103, 107 (1996). Additionally, we "will not reverse
an order or judgment unless error is affirmatively shown."
*Schwartz v. Estate of Greenspun,* 110 Nev. 1042, 1051,
881 P.2d 638, 644 (1994).

### *Invasion of privacy causes of action*
[8]  The tort of invasion of privacy embraces four different
tort actions: "(a) unreasonable intrusion upon the
seclusion of another; or (b) appropriation of the other's
name or likeness; or (c) unreasonable publicity given to
the other's private life; or (d) publicity that unreasonably
places the other in a false light before the public."
Restatement (Second) of Torts § 652A (1977) (citations
omitted); *PETA v. Bobby Berosini, Ltd.,* 111 Nev. 615,
629, 895 P.2d 1269, 1278 (1995), *overruled on other
grounds by City of Las Vegas Downtown Redev. Agency
v. Hecht,* 113 Nev. 644, 650, 940 P.2d 134, 138 (1997).
At issue in this appeal are the intrusion, disclosure, and
false light aspects of the invasion of privacy tort. The jury
found in Hyatt's favor on those claims and awarded him
$52 million for invasion of privacy damages. Because the
parties' arguments regarding intrusion and disclosure
overlap, we discuss those privacy torts together, and we
follow that discussion by addressing the false light
invasion of privacy tort.

### Intrusion upon seclusion and public disclosure of private facts

[9] On appeal, Hyatt focuses his invasion of privacy claims on FTB's disclosures of his name, address, and social security number to various individuals and entities. FTB contends that Hyatt's claims fail because the information disclosed had been disseminated in prior public records, and thus, could not form the basis of an invasion of privacy claim.

[10] Intrusion upon seclusion and public disclosure of private facts are torts grounded in a plaintiff's objective expectation of privacy. *140 *PETA,* 111 Nev. at 630, 631, 895 P.2d at 1279 (recognizing that the plaintiff must actually expect solitude or seclusion, and the plaintiff's expectation of privacy must be objectively reasonable); *Montesano v. Donrey Media Grp.,* 99 Nev. 644, 649, 668 P.2d 1081, 1084 (1983) (stating that the public disclosure of a private fact must be "offensive and objectionable to a reasonable person of ordinary sensibilities"); *see also* Restatement (Second) of Torts § 652B, 652D (1977). One defense to invasion of privacy torts, referred to as the public records defense, arises when a defendant can show that the disclosed information is contained in a court's official records. *Montesano,* 99 Nev. at 649, 668 P.2d at 1085. Such materials are public facts, *id.,* and a defendant cannot be liable for disclosing information about a plaintiff that was already public. Restatement (Second) of Torts § 652D cmt. b (1977).

Here, the record shows that Hyatt's name, address, and social security number had been publicly disclosed on several occasions, before FTB's disclosures occurred, in old court documents from his divorce proceedings and in a probate case. Hyatt also disclosed the information himself when he made the information available in various business license applications completed by Hyatt. Hyatt maintains that these earlier public disclosures were from long ago, and that the disclosures were only in a limited number of documents, and therefore, the information should not be considered as part of the public domain. Hyatt asserts that this results in his objective expectation of privacy in the information being preserved.

[11] [12] This court has never limited the application of the public records defense based on the length of time between the public disclosure and the alleged invasion of privacy. In fact, in *Montesano,* 99 Nev. 644, 668 P.2d 1081, we addressed disclosed information contained in a public record from 20 years before the disclosure at issue

there and held that the protection still applied. Therefore, under the public records defense, as delineated in *Montesano,* Hyatt is precluded from recovering for invasion of privacy based on the disclosure of his name, address, and social security number, as the information was already publicly available, and he thus lacked an objective expectation of privacy in the information.[7]

[7] Beyond his name, address, and social security number, Hyatt also alleged improper disclosures related to the publication of his credit card number on one occasion and his licensing contracts on another occasion. But this information was only disclosed to one or two third parties, and it was information that the third parties already had in their possession from prior dealings with Hyatt. Thus, we likewise conclude that Hyatt lacked an objective expectation of privacy as a matter of law. *PETA,* 111 Nev. at 631, 895 P.2d at 1279; *Montesano,* 99 Nev. at 649, 668 P.2d at 1084.

Because Hyatt cannot meet the necessary requirements to establish his invasion of privacy causes of action for intrusion upon seclusion and public disclosure of private facts, we reverse the district court's judgment based on the jury verdict as to these causes of action.[8]

[8] Hyatt also argues that FTB violated his right to privacy when its agents looked through his trash, looked at a package on his doorstep, and spoke with neighbors, a postal carrier, and a trash collector. Hyatt does not provide any authority to support his assertion that he had a legally recognized objective expectation of privacy with regard to FTB's conduct in these instances, and thus, we decline to consider this contention. *See Edwards v. Emperor's Garden Rest.,* 122 Nev. 317, 330 n. 38, 130 P.3d 1280, 1288 n. 38 (2006) (explaining that this court need not consider claims that are not cogently argued or supported by relevant authority).

### False light invasion of privacy

[13] [14] Regarding Hyatt's false light claim, he argues that FTB portrayed him in a false light throughout its investigation because FTB's various disclosures portrayed Hyatt as a "tax cheat." FTB asserts that Hyatt failed to provide any evidence to support his claim. Before reaching the parties' arguments as to Hyatt's false light claim, we must first determine whether to adopt this cause of action in Nevada, as this court has only impliedly recognized the false light invasion of privacy tort. *See*

RJN0020

*PETA,* 111 Nev. at 622 n. 4, 629, 895 P.2d at 1273 n. 4, 1278. "Whether to adopt [this tort] as [a] viable tort claim[ ] is a question of state law." *Denver* **\*141** *Publ'g Co. v. Bueno,* 54 P.3d 893, 896 (Colo.2002).

#### *Adopting the false light invasion of privacy tort*

Under the Restatement, an action for false light arises when

[o]ne who gives publicity to a matter concerning another that places the other before the public in a false light ... if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E (1977). The greatest constraint on the tort of false light is its similarity to the tort of defamation.

A majority of the courts that have adopted the false light privacy tort have done so after concluding that false light and defamation are distinct torts.[9] *See Welling v.Weinfeld,* 113 Ohio St.3d 464, 866 N.E.2d 1051 (2007) (explaining the competing views); *West v. Media Gen. Convergence, Inc.,* 53 S.W.3d 640 (Tenn.2001) (same). For these courts, defamation law seeks to protect an objective interest in one's reputation, "either economic, political, or personal, in the outside world." *Crump v. Beckley Newspapers, Inc.,* 173 W.Va. 699, 320 S.E.2d 70, 83 (1984) (internal quotations omitted). By contrast, false light invasion of privacy protects one's subjective interest in freedom from injury to the person's right to be left alone. *Id.* Therefore, according to these courts there are situations (being falsely portrayed as a victim of a crime, such as sexual assault, or being falsely identified as having a serious illness, or being portrayed as destitute) in which a person may be placed in a harmful false light even though it does not rise to the level of defamation. *Welling,* 866 N.E.2d at 1055–57; *West,* 53 S.W.3d at 646. Without recognizing the separate false light privacy tort, such an individual would be left without a remedy. *West,* 53 S.W.3d at 646.

[9]   This court, in *PETA,* while not reaching the false light issue, observed that " '[t]he false light privacy action differs from a defamation action in that the injury in privacy actions is mental distress from having been exposed to public view, while the injury in defamation actions is damage to reputation.' " 111 Nev. at 622 n. 4, 895 P.2d at 1274 n. 4 (quoting *Rinsley v. Brandt,* 700 F.2d 1304, 1307 (10th Cir.1983)).

On the other hand, those courts that have declined to adopt the false light tort have done so based on its similarity to defamation. *See, e.g., Sullivan v. Pulitzer Broad. Co.,* 709 S.W.2d 475 (Mo.1986); *Renwick v. News & Observer Publ'g Co.,* 310 N.C. 312, 312 S.E.2d 405 (1984); *Cain v. Hearst Corp.,* 878 S.W.2d 577 (Tex.1994). "The primary objection courts level at false light is that it substantially overlaps with defamation, both in conduct alleged and interests protected." *Denver Publ'g Co.,* 54 P.3d at 898. For these courts, tort law serves to deter "socially wrongful conduct," and thus, it needs "clarity and certainty." *Id.* And because the parameters defining the difference between false light and defamation are blurred, these courts conclude that "such an amorphous tort risks chilling fundamental First Amendment freedoms." *Id.* In such a case, a media defendant would have to "anticipate whether statements are 'highly offensive' to a reasonable person of ordinary sensibilities even though their publication does no harm to the individual's reputation." *Id.* at 903. Ultimately, for these courts, defamation, appropriation, and intentional infliction of emotional distress provide plaintiffs with adequate remedies. *Id.* at 903.

Considering the different approaches detailed above, we, like the majority of courts, conclude that a false light cause of action is necessary to fully protect privacy interests, and we now officially recognize false light invasion of privacy as a valid cause of action in connection with the other three privacy causes of action that this court has adopted. Because we now recognize the false light invasion of privacy cause of action, we address FTB's substantive arguments regarding Hyatt's false light claim.

#### *Hyatt's false light claim*

[15]   The crux of Hyatt's false light invasion of privacy claim is that FTB's demand- **\*142** for-information letters, its other contact with third parties through neighborhood visits and questioning, and the inclusion of his case on FTB's litigation roster suggested that he was a "tax cheat," and therefore, portrayed him in a false light. On appeal, FTB argues that Hyatt presented no evidence that anyone thought that he was a "tax cheat" based on the litigation roster or third-party contacts.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

RJN0021

FTB's litigation roster was an ongoing monthly litigation list that identified the cases that FTB was involved in. The list was available to the public and generally contained audit cases in which the protest and appeal process had been completed and the cases were being litigated in court. After Hyatt initiated this litigation, FTB began including the case on its roster, which Hyatt asserts was improper because the protests in his audits had not yet been completed. FTB, however, argues that because the lawsuit was ongoing, it did not place Hyatt in a false light by including him on the roster. Further, FTB argues that the litigation roster that Hyatt relied on was not false. When FTB began including Hyatt on the litigation roster, he was not falsely portrayed because he was indeed involved in litigation with FTB in this case. Hyatt did not demonstrate that the litigation roster contained any false information. Rather, he only argued that his inclusion on the list was improper because his audit cases had not reached the final challenge stage like other cases on the roster.

FTB's contacts with third parties' through letters, demands for information, or in person was not highly offensive to a reasonable person and did not falsely portray Hyatt as a "tax cheat." In contacting third parties, FTB was merely conducting its routine audit investigations.

The record before us reveals that no evidence presented by Hyatt in the underlying suit supported the jury's conclusion that FTB portrayed Hyatt in a false light. *See Prabhu*, 112 Nev. at 1543, 930 P.2d at 107. Because Hyatt has failed to establish a false light claim, we reverse the district court's judgment on this claim.[10]

[10] Based on this resolution, we need not address the parties' remaining arguments involving this cause of action.

Having addressed Hyatt's invasion of privacy causes of action, we now consider FTB's challenges to Hyatt's remaining causes of action for breach of confidential relationship, abuse of process, fraud, and intentional infliction of emotional distress.

### Breach of confidential relationship

[16] [17] A breach of confidential relationship cause of action arises "by reason of kinship or professional, business, or social relationships between the parties." *Perry v. Jordan,* 111 Nev. 943, 947, 900 P.2d 335, 337

(1995). On appeal, FTB contends that Hyatt could not prevail as a matter of law on his claim for breach of a confidential relationship because he cannot establish the requisite confidential relationship. In the underlying case, the district court denied FTB's motion for summary judgment and its motion for judgment as a matter of law, which presented similar arguments, and at trial the jury found FTB liable on this cause of action. Hyatt argues that his claim for breach of confidentiality falls within the parameters of *Perry* because FTB promised to protect his confidential information and its position over Hyatt during the audits established the necessary confidential relationship.[11]

[11] FTB initially argues that Hyatt attempts to blend the cause of action recognized in *Perry* with a separate breach of confidentiality cause of action that, while recognized in other jurisdictions, has not been recognized by this court. We reject this contention, as the jury was instructed based on the cause of action outlined in *Perry*.

In *Perry,* this court recognized that a confidential relationship exists when a party gains the confidence of another party and purports to advise or act consistently with the other party's interest. *Id.* at 947, 900 P.2d at 338. In that case, store owner Perry sold her store to her neighbor and friend, Jordan, knowing that Jordan had no business knowledge, that Jordan was buying the store for her daughters, not for herself, and that Jordan would rely on Perry to run the store for a contracted one-year period after the sale was complete. *Id.* at 945–46, 900 P.2d at 336–37. Not long after the sale, Perry **\*143** stopped running the store, and the store eventually closed. *Id.* at 946, 900 P.2d at 337. Jordan filed suit against Perry for, among other things, breach of a confidential relationship. *Id.* A jury found in Jordan's favor and awarded damages. *Id.* Perry appealed, arguing that this court had not recognized a claim for breach of a confidential relationship. *Id.*

On appeal, this court ruled that a breach of confidential relationship claim was available under the facts of the case. *Id.* at 947, 900 P.2d at 338. The court noted that Perry "held a duty to act with the utmost good faith, based on her confidential relationship with Jordan[, and that the] duty requires affirmative disclosure and avoidance of self dealing." *Id.* at 948, 900 P.2d at 338. The court explained that "[w]hen a confidential relationship exists, the person in whom the special trust is placed owes a duty to the other party similar to the duty of a fiduciary, requiring the person to act in good faith and with due regard to the interests of the other party." *Id.* at 947, 900 P.2d at 338.

RJN0022

FTB contends that the relationship between a tax auditor and the person being audited does not create the necessary relationship articulated in *Perry* to establish a breach of confidential relationship cause of action. In support of this proposition, FTB cites to *Johnson v. Sawyer,* which was heard by the Fifth Circuit Court of Appeals. *47 F.3d 716 (5th Cir.1995)* (en banc). In *Johnson,* the plaintiff sought damages from press releases by the Internal Revenue Service (IRS) based on a conviction for filing a fraudulent tax return. *Id.* at 718. Johnson was criminally charged based on erroneous tax returns. *Id.* at 718–19. He eventually pleaded guilty to a reduced charge as part of a plea bargain. *Id.* at 718–20. Following the plea agreement, two press releases were issued that contained improper and private information about Johnson. *Id.* at 720–21. Johnson filed suit against the IRS based on these press releases, arguing that they cost him his job and asserting several causes of action, one being breach of a confidential relationship. *Id.* at 718, 725, 738. On appeal, the Fifth Circuit Court of Appeals affirmed the district court's ruling that a breach of a confidential relationship could not be maintained based on the relationship between Johnson and the IRS, as it was clear that the two parties "stood in an adversarial relationship." *Id.* at 738 n. 47.

Hyatt rejects FTB's reliance on this case, arguing that the *Johnson* ruling is inapposite to the present case because, here, FTB made express promises regarding protecting Hyatt's confidential information but then failed to keep those promises. Hyatt maintains that although FTB may not have acted in his best interest in every aspect of the audits, as to keeping his information confidential, FTB affirmatively undertook that responsibility and breached that duty by revealing confidential information.

But in conducting the audits, FTB was not required to act with Hyatt's interests in mind; rather, it had a duty to proceed on behalf of the state of California's interest. *Johnson,* 47 F.3d at 738 n. 47. Moreover, the parties' relationship was not akin to a family or business relationship. *Perry,* 111 Nev. at 947, 900 P.2d at 337–38. Hyatt argues for a broad range of relationships that can meet the requirement under *Perry,* but we reject this contention. *Perry* does not provide for so expansive a relationship as Hyatt asks us to recognize as sufficient to establish a claim for a breach of confidential relationship.[12] Thus, FTB and Hyatt's relationship cannot form the basis for a breach of a confidential relationship cause of action, and this cause of action fails as a matter of law. The district court judgment in Hyatt's favor on this claim is reversed.

[12] Further, we note that the majority of cases that Hyatt cites as authority for a more expansive viewpoint of a confidential relationship involve claims arising from a doctor-patient confidentiality privilege, which does not apply here. *See, e.g., Doe v. Medlantic Health Care Grp., Inc.,* 814 A.2d 939, 950–51 (D.C.2003); *Humphers v. First Interstate Bank of Or.,* 696 P.2d 527, 533–35 (1985).

### Abuse of process

[18] [19] A successful abuse of process claim requires " '(1) an ulterior purpose by the defendants other than resolving a legal dispute, and (2) a willful act in the use of the *144 legal process not proper in the regular conduct of the proceeding.' " *LaMantia v. Redisi,* 118 Nev. 27, 30, 38 P.3d 877, 879 (2002) (quoting *Posadas v. City of Reno,* 109 Nev. 448, 457, 851 P.2d 438, 444–45 (1993)). Put another way, a plaintiff must show that the defendant "willfully and improperly *used the legal process* to accomplish" an ulterior purpose other than resolving a legal dispute. *Id.* at 31, 38 P.3d at 880 (emphasis added).

FTB asserts that it was entitled to judgment as a matter of law on Hyatt's abuse of process cause of action because it did not actually use the judicial process, as it never sought to judicially enforce compliance with the demand-for-information forms and did not otherwise use the judicial process in conducting its audits of Hyatt. In response, Hyatt argues that FTB committed abuse of process by sending demand-for-information forms to individuals and companies in Nevada that are not subject to the California law cited in the form.

Because FTB did not use any legal enforcement process, such as filing a court action, in relation to its demands for information or otherwise during the audits, Hyatt cannot meet the requirements for establishing an abuse of process claim. *LaMantia,* 118 Nev. at 31, 38 P.3d at 880; *ComputerXpress, Inc. v. Jackson,* 93 Cal.App.4th 993, 113 Cal.Rptr.2d 625, 644 (2001) (explaining that abuse of process only arises when there is actual "use of *the machinery of the legal system* for an ulterior motive" (internal quotations omitted)); *see also Tuck Beckstoffer Wines L.L.C. v. Ultimate Distribs., Inc.,* 682 F.Supp.2d 1003, 1020 (N.D.Cal.2010). On this cause of action, then, FTB is entitled to judgment as a matter of law, and we reverse the district court's judgment.

### Fraud

[20] [21] [22] [23] [24] To prove a fraud claim, the plaintiff must

RJN0023

show that the defendant made a false representation that the defendant knew or believed was false, that the defendant intended to persuade the plaintiff to act or not act based on the representation, and that the plaintiff had reason to rely on the representation and suffered damages. *Bulbman, Inc. v. Nev. Bell,* 108 Nev. 105, 111, 825 P.2d 588, 592 (1992). It is the jury's role to make findings on the factors necessary to establish a fraud claim. *Powers v. United Servs. Auto. Ass'n,* 114 Nev. 690, 697–98, 962 P.2d 596, 600–01 (1998). This court will generally not disturb a jury's verdict that is supported by substantial evidence. *Taylor v. Thunder,* 116 Nev. 968, 974, 13 P.3d 43, 46 (2000). Substantial evidence is defined as "evidence that a reasonable mind might accept as adequate to support a conclusion." *Winchell v. Schiff,* 124 Nev. 938, 944, 193 P.3d 946, 950 (2008) (internal quotations omitted).

When Hyatt's 1991 audit began, FTB informed him that during the audit process Hyatt could expect FTB employees to treat him with courtesy, that the auditor assigned to his case would clearly and concisely request information from him, that any personal and financial information that he provided to FTB would be treated confidentially, and that the audit would be completed within a reasonable time. FTB contends that its statements in documents to Hyatt, that it would provide him with courteous treatment and keep his information confidential, were insufficient representations to form a basis for a fraud claim, and even if the representations were sufficient, there was no evidence that FTB knew that they were false when made. In any case, FTB argues that Hyatt did not prove any reliance because he was required to participate in the audits whether he relied on these statements or not. Hyatt asserts that FTB knowingly misrepresented its promise to treat him fairly and impartially and to protect his private information. For the reasons discussed below, we reject FTB's argument that it was entitled to judgment as a matter of law on Hyatt's fraud claim.

The record before us shows that a reasonable mind could conclude that FTB made specific representations to Hyatt that it intended for Hyatt to rely on, but which it did not intend to fully meet. FTB represented to Hyatt that it would protect his confidential information and treat him courteously. At trial, Hyatt presented evidence that FTB disclosed his social security number and home address to numerous people and entities and that FTB revealed to third parties that Hyatt was being audited. In addition, **\*145** FTB sent letters concerning the 1991 audit to several doctors with the same last name, based on its belief that one of those doctors provided Hyatt treatment, but without first determining which doctor actually

treated Hyatt before sending the correspondence. Furthermore, Hyatt showed that FTB took 11 years to resolve Hyatt's protests of the two audits. Hyatt alleged that this delay resulted in $8,000 in interest per day accruing against him for the outstanding taxes owed to California. Also at trial, Hyatt presented evidence through Candace Les, a former FTB auditor and friend of the main auditor on Hyatt's audit, Sheila Cox, that Cox had made disparaging comments about Hyatt and his religion, that Cox essentially was intent on imposing an assessment against Hyatt, and that FTB promoted a culture in which tax assessments were the end goal whenever an audit was undertaken. Hyatt also testified that he would not have hired legal and accounting professionals to assist in the audits had he known how he would be treated. Moreover, Hyatt stated that he incurred substantial costs that he would not otherwise have incurred by paying for professional representatives to assist him during the audits.

The evidence presented sufficiently showed FTB's improper motives in conducting Hyatt's audits, and a reasonable mind could conclude that FTB made fraudulent representations, that it knew the representations were false, and that it intended for Hyatt to rely on the representations.[13] What's more, the jury could reasonably conclude that Hyatt relied on FTB's representations to act and participate in the audits in a manner different than he would have otherwise, which resulted in damages. Based on this evidence, we conclude that substantial evidence supports each of the fraud elements and that FTB is not entitled to judgment as a matter of law on this cause of action.[14]

[13]   FTB's argument concerning government agents making representations beyond the scope of law is without merit.

[14]   FTB further argues that several evidentiary errors by the district court warrant a new trial. These errors include admitting evidence concerning whether the audit conclusions were correct and excluding FTB's evidence seeking to rebut an adverse inference for spoliation of evidence. FTB also asserts that the district court improperly instructed the jury by permitting it to consider the audit determinations. Although we agree with FTB that the district court abused its discretion in these evidentiary rulings and in its jury instruction number 24, as discussed more fully below in regard to Hyatt's intentional infliction of emotional distress claim, we conclude that these errors were harmless as to Hyatt's fraud claim because sufficient evidence of fraud existed for the jury to find in Hyatt's favor on each required element for fraud. *See*

RJN0024

Franchise Tax Bd. of Cal. v. Hyatt, 335 P.3d 125 (2014)

130 Nev. Adv. Op. 71

*Hosp. & Med. Ctr., L.L.C.,* 124 Nev. 997, 1006, 194 P.3d 1214, 1219 (2008) (holding that when there is error in a jury instruction, "prejudice must be established in order to reverse a district court judgment," and this is done by "showing that, but for the error, a different result might have been reached"); *El Cortez Hotel, Inc. v. Coburn,* 87 Nev. 209, 213, 484 P.2d 1089, 1091 (1971) (stating that an evidentiary error must be prejudicial in order to warrant reversal and remand).

### Fraud damages

[25] Given our affirmance of the district court's judgment on the jury verdict in Hyatt's favor on his fraud claim, we turn to FTB's challenge as to the special damages awarded Hyatt on his fraud claim.[15] In doing so, we address whether FTB is entitled to statutory caps on the amount of damages recoverable to the same extent that a Nevada government agency would receive statutory caps under principles of comity.[16] NRS 41.035 provides a statutory cap on liability damages in tort actions "against a present or **146** former officer or employee of the State or any political subdivision." FTB argues that because it is immune from liability under California law, and Nevada provides a statutory cap on liability damages, it is entitled to the statutory cap on its liability to the extent that the law does not conflict with Nevada policy. Hyatt asserts that applying the statutory caps would in fact violate Nevada policy because doing so would not sufficiently protect Nevada residents. According to Hyatt, limitless compensatory damages are necessary as a means to control non-Nevada government actions. Hyatt claims that statutory caps for Nevada government actions work because Nevada can control its government entities and employees through other means, such as dismissal or other discipline, that are not available to control an out-of-state government entity. Additionally, Hyatt points out that there are other reasons for the statutory caps that are specific only to Nevada, such as attracting state employees by limiting potential liability. Therefore, Hyatt argues that FTB is not entitled to statutory caps under comity because it would violate Nevada's superior policy of protecting its residents from injury.

[15] The jury verdict form included a separate damage award for Hyatt's fraud claim. We limit our discussion of Hyatt's fraud damages to these special damages that were awarded. To the extent that Hyatt argues that he is entitled to other damages for his fraud claim beyond the special damages specified in the jury verdict form, we reject this argument and limit any emotional distress damages to his recovery under his intentional infliction

of emotional distress claim, as addressed below.

[16] FTB argues that under the law-of-the-case doctrine, comity applies to afford it a statutory cap on damages and immunity from punitive damages based on this court's conclusions in the earlier writ petitions. But this court did not previously address these issues and the issues are different, thus, law of the case does not apply. *Dictor v. Creative Mgmt. Servs.,* 126 Nev. 41, 44–45, 223 P.3d 332, 334–35 (2010).

The parties base their arguments on precedent from other courts that have taken different approaches to the issue. FTB primarily relies on a New Mexico Supreme Court case, *Sam v. Estate of Sam,* 139 N.M. 474, 134 P.3d 761 (2006), and Hyatt supports his arguments by mainly relying on *Faulkner v. University of Tennessee,* 627 So.2d 362 (Ala.1992).

In *Sam,* an employee of an Arizona government entity accidentally backed over his child while driving his employer's vehicle at his home in New Mexico. 134 P.3d at 763. In a lawsuit arising out of this accident, the issue before the *Sam* court was whether Arizona's one-year statute of limitation for government employees, or New Mexico's two-year statute of limitation for government employees or three-year general tort statute of limitation law should apply. *Id.* at 764. The court discussed the comity doctrine and concluded that New Mexico's two-year statute of limitations for government employees applied because by doing so it was recognizing Arizona's law to the extent that it did not conflict with New Mexico's law. *Id.* at 764–68.

In reaching this conclusion, the *Sam* court relied on the United States Supreme Court's holdings in *Nevada v. Hall,* 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979), and *Franchise Tax Board of California v. Hyatt,* 538 U.S. 488, 123 S.Ct. 1683, 155 L.Ed.2d 702 (2003). *Sam,* 134 P.3d at 765–66. The *Sam* court stated that "[b]oth these cases stand for the principle that a forum state is not required to extend immunity to other states sued in its courts, but the forum state should extend immunity as a matter of comity if doing so will not violate the forum state's public policies." *Id.* at 765. Based on this framework for comity, the *Sam* court concluded that Arizona should be entitled to the statute of limitations for government agencies that New Mexico would provide to its government agencies. Most courts appear to follow FTB's argument regarding how comity applies and that a state should recognize another state's laws to the extent that they do not conflict with its own.

RJN0025

*See generally Solomon v. Supreme Court of Fla.,* 816 A.2d 788, 790 (D.C.2002); *Schoeberlein v. Purdue Univ.,* 129 Ill.2d 372, 135 Ill.Dec. 787, 544 N.E.2d 283, 285 (1989); *McDonnell v. Illinois,* 163 N.J. 298, 748 A.2d 1105, 1107 (2000); *Sam,* 134 P.3d at 765; *Hansen v. Scott,* 687 N.W.2d 247, 250 (N.D.2004).

In *Faulkner,* the plaintiff filed a lawsuit against the University of Tennessee after it threatened to revoke plaintiff's doctoral degree. *627 So.2d at 363–64.* The issue in *Faulkner* was whether the University of Tennessee (UT) was entitled to discretionary immunity under comity, when both Tennessee and Alabama had similar discretionary-immunity provisions for their states' government entities. *Id.* at 366. Considering the policy of allowing residents legal redress, compared to the immunity policies that both states had, the *Faulkner* court observed that

> [w]e cannot, absent some overriding policy, leave Alabama residents without redress within this State, relating to alleged acts of wrongdoing by an agency of another State, where those alleged acts are associated with substantial commercial activities in **\*147** Alabama, We conclude that comity is not such an overriding policy in this instance.

*Id.* The court rejected the argument that granting comity would not violate Alabama policy because its residents were used to Alabama government entities receiving immunity:

> Agencies of the State of Alabama are subject to legislative control, administrative oversight, and public accountability in Alabama; UT is not. Actions taken by an agency or instrumentality of this state are subject always to the will of the democratic process in Alabama. UT, as an instrumentality of the State of Tennessee, operates outside such controls in this State.

*Id.* The *Faulkner* court ultimately declined to grant UT immunity under comity. We are persuaded by the *Faulkner* court's reasoning.

This state's policy interest in providing adequate redress to Nevada citizens is paramount to providing FTB a

statutory cap on damages under comity. Therefore, as we conclude that allowing FTB a statutory cap would violate this state's public policy in this area, comity does not require this court to grant FTB such relief. *Id.; Sam,* 134 P.3d at 765 (recognizing that a state is not required to extend immunity and comity only dictates doing so if it does not contradict the forum state's public policy). As this is the only argument FTB raised in regard to the special damages awarded under the fraud cause of action, we affirm the amount of damages awarded for fraud. The prejudgment interest awarded is vacated and remanded to the district court for a recalculation based on the damages for fraud that we uphold. In light of our ruling that only the special award of damages for fraud is affirmed, FTB's argument that prejudgment interest is not allowed because future damages were interwoven with past damages is moot.

### Intentional infliction of emotional distress

During discovery in the underlying case, Hyatt refused to disclose his medical records. As a result, he was precluded at trial from presenting any medical evidence of severe emotional distress. Nevertheless, at trial, Hyatt presented evidence designed to demonstrate his emotional distress in the form of his own testimony regarding the emotional distress he experienced, along with testimony from his son and friends detailing their observation of changes in Hyatt's behavior and health during the audits. Based on this testimony, the jury found in Hyatt's favor on his intentional infliction of emotional distress (IIED) claim and awarded him $82 million for emotional distress damages.

[26] [27] To recover on a claim for IIED, a plaintiff must prove "(1) extreme and outrageous conduct on the part of the defendant; (2) intent to cause emotional distress or reckless disregard for causing emotional distress; (3) that the plaintiff actually suffered extreme or severe emotional distress; and (4) causation," *Miller v. Jones,* 114 Nev. 1291, 1299–1300, 970 P.2d 571, 577 (1998); *see also Barmettler v. Reno Air, Inc.,* 114 Nev. 441, 447, 956 P.2d 1382, 1386 (1998). A plaintiff must set forth "objectively verifiable indicia" to establish that the plaintiff "actually suffered extreme or severe emotional distress." *Miller,* 114 Nev. at 1300, 970 P.2d at 577.

On appeal, FTB argues that Hyatt failed to establish that he actually suffered severe emotional distress because he failed to provide any medical evidence or other objectively verifiable evidence to establish such a claim. In response, Hyatt contends that the testimony provided by his family and other acquaintances sufficiently established objective proof of the severe and extreme

RJN0026

emotional distress he suffered, particularly in light of the facts of this case demonstrating the intentional harmful treatment he endured from FTB. Hyatt asserts that the more severe the harm, the lower the amount of proof necessary to establish that he suffered severe emotional distress. While this court has held that objectively verifiable evidence is necessary in order to establish an IIED claim, *id.,* we have not specifically addressed whether this necessarily requires medical evidence or if other objective evidence is sufficient.

The Restatement (Second) of Torts § 46 (1977), in comments j and k, provide for a sliding-scale approach in which the increased **\*148** severity of the conduct will require less in the way of proof that emotional distress was suffered in order to establish an IIED claim. Restatement (Second) of Torts § 46 cmt. j (1977) ("The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed."); Restatement (Second) of Torts § 46 cmt. k (1977) (stating that "if the enormity of the outrage carries conviction that there has in fact been severe emotional distress, bodily harm is not required"). This court has also impliedly recognized this sliding-scale approach, although stated in the reverse. *Nelson v. City of Las Vegas,* 99 Nev. 548, 665 P.2d 1141 (1983). In *Nelson,* this court explained that "[t]he less extreme the outrage, the more appropriate it is to require evidence of physical injury or illness from emotional distress," *Id.* at 555, 665 P.2d at 1145.

Further, other jurisdictions that require objectively verifiable evidence have determined that such a mandate does not always require medical evidence. *See Lyman v. Huber,* 10 A.3d 707 (Me.2010) (stating that medical testimony is not mandatory to establish an IIED claim, although only in rare, extreme circumstances); *Buckman–Peirson v. Brannon,* 159 Ohio App.3d 12, 822 N.E.2d 830, 840–41 (2004) (stating that medical evidence is not required, but also holding that something more than just the plaintiff's own testimony was necessary); *see also Dixon v. Denny's, Inc.,* 957 F.Supp. 792, 796 (E.D.Va.1996) (stating that plaintiff failed to establish an IIED claim because plaintiff did not provide objective evidence, such as medical bills "or even the testimony of friends or family"). Additionally, in *Farmers Home Mutual Insurance Co. v. Fiscus,* 102 Nev. 371, 725 P.2d 234 (1986), this court upheld an award for mental and emotional distress even though the plaintiffs' evidence did not include medical evidence or testimony. *Id.* at 374–75, 725 P.2d at 236. While not specifically addressing an IIED claim, the *Fiscus* court addressed the

recovery of damages for mental and emotional distress that arose from an insurance company's unfair settlement practices when the insurance company denied plaintiffs' insurance claim after their home had flooded. *Id.* at 373, 725 P.2d at 235. In support of the claim for emotional and mental distress damages, the husband plaintiff testified that he and his wife lost the majority of their personal possessions and that their house was uninhabitable, that because the claim had been rejected they lacked the money needed to repair their home and the house was condemned, and after meeting with the insurance company's representative the wife had an emotional breakdown. *Id.* at 374, 725 P.2d at 236. This court upheld the award of damages, concluding that the above evidence was sufficient to prove that plaintiffs had suffered mental and emotional distress. *Id.* at 374–75, 725 P.2d at 236. In so holding, this court rejected the insurance company's argument that there was insufficient proof of mental and emotional distress because there was no medical evidence or independent witness testimony. *Id.*

[28] Based on the foregoing, we now specifically adopt the sliding-scale approach to proving a claim for IIED. Under this sliding-scale approach, while medical evidence is one acceptable manner in establishing that severe emotional distress was suffered for purposes of an IIED claim, other objectively verifiable evidence may suffice to establish a claim when the defendant's conduct is more extreme, and thus, requires less evidence of the physical injury suffered.

[29] Turning to the facts in the present case, Hyatt suffered extreme treatment from FTB. As explained above in discussing the fraud claim, FTB disclosed personal information that it promised to keep confidential and delayed resolution of Hyatt's protests for 11 years, resulting in a daily interest charge of $8,000. Further, Hyatt presented testimony that the auditor who conducted the majority of his two audits made disparaging remarks about Hyatt and his religion, was determined to impose tax assessments against him, and that FTB fostered an environment in which the imposition of tax assessments was the objective whenever an audit was undertaken. These facts support the conclusion that this case is at the more extreme end of the scale, **\*149** and therefore less in the way of proof as to emotional distress suffered by Hyatt is necessary.

In support of his IIED claim, Hyatt presented testimony from three different people as to the how the treatment from FTB caused Hyatt emotional distress and physically affected him. This included testimony of how Hyatt's mood changed dramatically, that he became distant and

RJN0027

much less involved in various activities, started drinking heavily, suffered severe migraines and had stomach problems, and became obsessed with the legal issues involving FTB. We conclude that this evidence, in connection with the severe treatment experienced by Hyatt, provided sufficient evidence from which a jury could reasonably determine that Hyatt suffered severe emotional distress.[17] Accordingly, we affirm the judgment in favor of Hyatt on this claim as to liability. As discussed below, however, we reverse the award of damages on this claim and remand for a new trial as to damages on this claim only.

[17]  To the extent FTB argues that it was prejudiced by its inability to obtain Hyatt's medical records, we reject this argument as the rulings below on this issue specifically allowed FTB to argue to the jury the lack of any medical treatment or evidence by Hyatt.

### *A new trial is warranted based on evidentiary and jury instruction errors*[18]

[18]  While we conclude, as discussed below, that evidentiary and jury instruction errors require a new trial as to damages on Hyatt's IIED claim, we hold that sufficient evidence supports the jury's finding as to liability on this claim regardless of these errors. Thus, these errors do not alter our affirmance as to liability on this claim.

Early in this case, the district court granted FTB partial summary judgment and dismissed Hyatt's declaratory relief cause of action concerning when he moved from California to Nevada. The district court reached this conclusion because the audits were still under review in California, and therefore, the Nevada court lacked jurisdiction to address whether the audits' conclusions were accurate. The partial summary judgment was not challenged by Hyatt at any point to this court, and thus, the district court's ruling was in effect throughout the trial. Consequently, whether the audits' determinations were correct was not an issue in the Nevada litigation.

[30]  On appeal, FTB argues that the district court erroneously allowed evidence and a jury instruction that went directly to whether the audits were properly determined. FTB frames this issue as whether the district court exceeded the case's jurisdictional boundaries, but the issue more accurately involves the admissibility of evidence and whether a jury instruction given by the

district court was proper in light of the jurisdictional ruling. We review both the admissibility of evidence and the propriety of jury instructions for an abuse of discretion. *See Hansen v. Universal Health Servs., 115 Nev. 24, 27, 974 P.2d 1158, 1160 (1999)* (evidence); *Allstate Ins. Co. v. Miller, 125 Nev. 300, 319, 212 P.3d 318, 331 (2009)* (jury instruction).

### *Evidence improperly permitted challenging audits' conclusions*

[31]  FTB argues that the district court violated its jurisdictional restriction governing this case, because by allowing Hyatt's claims to go forward based on the evidence presented at trial, the jury was in effect required to make findings on Hyatt's residency and whether he owed taxes. FTB points to the testimony of a number of Hyatt's witnesses that focused on whether the audits' results were correct: (1) Hyatt's tax accountant and tax attorney, who were his representatives during the audits, testified to their cooperation with FTB and that they did not attempt to intimidate the auditor to refute two bases for the imposition of penalties by FTB for lack of cooperation and intimidation; (2) an expert tax attorney witness testified about Hyatt's representatives' cooperation during the audits to refute the lack of cooperation allegation; (3) an expert witness testified as to the lifestyles of wealthy people to refute the allegation that Hyatt's actions of living in a low-income apartment building in Las Vegas and having no security were "implausible behaviors"; *150 and especially, (4) expert testimony of former FTB agent Malcom Jumulet regarding audit procedures, and Jumulet's testimony as to how FTB analyzed and weighed the information obtained throughout the audits as challenging the results of the audits reached by FTB. Further, FTB points to Hyatt's arguments regarding an alleged calculation error as to the amount of taxable income, which FTB argues is an explicit example of Hyatt challenging the conclusions of the audits. Hyatt argues that all the evidence he presented did not challenge the audits, but was proffered to demonstrate that the audits were conducted in bad faith and in an attempt to "trump up a case against Hyatt and extort a settlement."

While much of the evidence presented at trial would not violate the restriction against considering the audits' conclusions, there are several instances in which the evidence does violate this ruling. These instances included evidence challenging whether FTB made a mathematical error in the amount of income that it taxed, whether an auditor improperly gave credibility to certain

RJN0028

interviews of estranged family members, whether an auditor appropriately determined that certain information was not credible or not relevant, as well as the testimony outlined above that Hyatt presented, which challenged various aspects of the fraud penalties.

The expert testimony regarding the fraud penalties went to the audits' determinations and had no utility in showing any intentional torts unless it was first concluded that the audits' determinations were incorrect. For example, the expert testimony concerning typical lifestyles of wealthy individuals had relevance only to show that FTB erroneously concluded that Hyatt's conduct, such as renting an apartment in a low-income complex, was fraudulent because he was wealthy and allegedly only rented the apartment to give the appearance of living in Nevada. Whether such a conclusion was a correct determination by PTB is precisely what this case was not allowed to address. The testimony does not show wrongful intent or bad faith without first concluding that the decisions were wrong, unless it was proven that FTB knew wealthy individuals' tendencies, that they applied to all wealthy individuals, and that FTB ignored them. None of this was established, and thus, the testimony only went to the audits' correctness, which was not allowed. These are instances where the evidence went solely to challenging whether FTB made the right decisions in its audits. As such, it was an abuse of discretion for the district court to permit this evidence to be admitted. *Hansen*, 115 Nev. at 27, 974 P.2d at 1160.

### *Jury instruction permitting consideration of audits' determinations*

[32] FTB also argues that the district court wrongly instructed the jury. Specifically, it asserts that the jury instruction given at the end of trial demonstrates that the district court allowed the jury to improperly consider FTB's audit determinations. Hyatt counters FTB's argument by relying on an earlier instruction that was given to the jury that he argues shows that the district court did not allow the jury to determine the appropriateness of the audits' results, as it specifically instructed the jury not to consider the audits' conclusions.

As background, before trial began, and at various times during the trial, the district court read an instruction to the jury that it was not to consider whether the audits' conclusions were correct:

> Although this case arises from the residency tax audit conducted by FTB, it is important for you to understand that you will not be asked, nor will you be permitted to make any determinations related to Mr. Hyatt's residency or the correctness of the tax assessments, penalties and interest assessed by FTB against Mr. Hyatt. Thus, although you may hear evidence during the course of this trial that may be related to the determinations and conclusions reached by FTB regarding Mr. Hyatt's residency and tax assessments, you are not permitted to make any determinations regarding Mr. Hyatt's residency such as when he became or did not become a resident of Nevada.

When jury instructions were given, this instruction was intended to be part of the jury instructions, but somehow the instruction was altered and a different version of this *151 instruction was read as Jury Instruction 24. To correct the error, the district court read a revised Jury Instruction 24:

> You have heard evidence during the course of this trial that may be related to the determinations and conclusions reached by FTB regarding Mr. Hyatt's residency and tax assessments. You are not permitted to make any determinations regarding Mr. Hyatt's residency, such as when he became or did not become a resident of Nevada. Likewise, you are not permitted to make any determinations related to the propriety of the tax assessments issued by FTB against Mr. Hyatt, including but not limited to, the correctness or incorrectness of the amount of taxes assessed, or the determinations of FTB to assess Mr. Hyatt penalties and/or interest on those tax assessments.

> The residency and tax assessment determinations, and all factual and legal issues related thereto, are the subject matter of a separate administrative process between Mr. Hyatt and FTB in the State of California and will be resolved in that administrative process. You are not to concern yourself with those issues.

> Counsel for the FTB read and presented argument from the inaccurate Jury Instruction No. 24. To the extent FTB's counsel's arguments cited and relied on statements that are not contained in the correct Jury Instruction No. 24, they are stricken and you must disregard them. You are not to consider the stricken statements and arguments in your deliberations. *There*

RJN0029

*is nothing in the correct Jury Instruction No. 24 that would prevent you during your deliberations from considering the appropriateness or correctness of the analysis conducted by the FTB employees in reaching its residency determination and conclusion. There is nothing in Jury Instruction No. 24 that would prevent Malcolm Jumulet from rendering an opinion about the appropriateness or correctness of the analysis conducted by FTB employees in reaching its residency determinations and conclusions.*

(Emphasis added.) Based on the italicized language, FTB argues that the district court not only allowed, but invited the jury to consider whether the FTB's audit conclusions were correct.

Jury Instruction 24 violated the jurisdictional limit that the district court imposed on this case. The instruction specifically allowed the jury to consider the "appropriateness or correctness of the analysis conducted by the FTB employees in reaching its residency determination and conclusion." As a result, the district court abused its discretion in giving this jury instruction. *Allstate Ins. Co.,* 125 Nev. at 319, 212 P.3d at 331.

### Exclusion of evidence to rebut adverse inference

[33] FTB also challenges the district court's exclusion of evidence that it sought to introduce in an effort to rebut an adverse inference sanction for spoliation of evidence. The evidentiary spoliation arose when FTB changed its e-mail server in 1999, and it subsequently destroyed backup tapes from the old server. Because the server change occurred during the pendency of this litigation, FTB sent multiple e-mails to its employees, before the change, requesting that they print or otherwise save any e-mails related to Hyatt's case. Backup tapes containing several weeks' worth of e-mails were made from the old system to be used in the event that FTB needed to recover the old system. FTB, at some point, overwrote these tapes, however, and Hyatt eventually discovered the change in e-mail servers and requested discovery of the backup tapes, which had already been deleted. Because FTB had deleted the backup tapes, Hyatt filed a pretrial motion requesting sanctions against FTB. The district court ruled in Hyatt's favor and determined that it would give an adverse inference jury instruction. An adverse inference allows, but does not require, the jury to infer that evidence negligently destroyed by a party would have been harmful to that party. *See, e.g., Bass–Davis v. Davis,* 122 Nev. 442, 446, 452, 134 P.3d 103, 106, 109 (2006).

At trial, FTB sought to introduce evidence explaining the steps it had taken to preserve any relevant e-mails before the server change. Hyatt challenged this evidence, arguing **\*152** that it was merely an attempt to reargue the evidence spoliation. The district court agreed with Hyatt and excluded the evidence. FTB does not challenge the jury instruction, but it does challenge the district court's exclusion of evidence that it sought to present at trial to rebut the adverse inference.

On this point, FTB argues that it was entitled to rebut the adverse inference, and therefore, the district court abused its discretion in excluding the rebuttal evidence. Hyatt counters that it is not proper evidence because in order to rebut the inference FTB had to show that the destroyed evidence was not harmful and FTB's excluded evidence did not demonstrate that the destroyed e-mails did not contain anything harmful.

[34] [35] This court has recognized that a district court may impose a rebuttable presumption, under NRS 47.250(3), when evidence was willfully destroyed, or the court may impose a permissible adverse inference when the evidence was negligently destroyed. *Bass–Davis,* 122 Nev. at 447–48, 134 P.3d at 106–07. Under a rebuttable presumption, the burden shifts to the spoliating party to rebut the presumption by showing that the evidence that was destroyed was not unfavorable. 122 Nev. at 448, 134 P.3d at 107. If the party fails to rebut the presumption, then the jury or district court may presume that the evidence was adverse to the party that destroyed the evidence. *Id.* A lesser adverse inference, that does not shift the burden of proof, is permissible. *Id.* at 449, 134 P.3d at 107. The lesser inference merely allows the fact-finder to determine, based on other evidence, that a fact exists. *Id.*

In the present case, the district court concluded that FTB's conduct was negligent, not willful, and therefore the lesser adverse inference applied, and the burden did not shift to FTB. But the district court nonetheless excluded the proposed evidence that FTB sought to admit to rebut the adverse inference. The district court should have permitted FTB to explain the steps that it took to collect the relevant e-mails in an effort to demonstrate that none of the destroyed information contained in the e-mails was damaging to FTB. Because the district court did not allow FTB to explain the steps taken, we are not persuaded by Hyatt's contention that FTB's evidence was actually only an attempt to reargue the spoliation issue. To the contrary, FTB could use the proposed evidence related to its efforts to collect all relevant e-mails to explain why nothing harmful was destroyed. Therefore, we conclude that the district court abused its discretion in excluding the

RJN0030

evidence, and we reverse the district court's ruling in this regard.

### Other evidentiary errors

[36] [37] FTB additionally challenges the district court's exclusion of evidence regarding Hyatt's loss of his patent through a legal challenge to the validity of his patent and his being audited for his federal taxes by the IRS, both of which occurred during the relevant period associated with Hyatt's IIED claim. Hyatt asserts that the district court properly excluded the evidence because it was more prejudicial than probative.

Under NRS 48.035(1), "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice...." Hyatt argues that this provides a basis for the district court's exclusion of this evidence. We conclude, however, that the district court abused its discretion in excluding the evidence of Hyatt's patent loss and federal tax audit on this basis. Although the evidence may be prejudicial, it is doubtful that it is *unfairly* prejudicial as required under the statute. And in any event, the probative value of this evidence as to Hyatt's IIED claim, in particular in regard to damages caused by FTB as opposed to other events in his life, is more probative than unfairly prejudicial. Accordingly, the district court abused its discretion in excluding this evidence.

### Evidentiary and jury instruction errors warrant reversal and remand for a new trial on damages only on the IIED claim

[38] Because the district court abused its discretion in making the evidentiary and jury instruction rulings outlined above, the question **\*153** becomes whether these errors warrant reversal and remand for a new trial on the IIED claim, or whether the errors were harmless such that the judgment on the IIED claim should be upheld. *See Cook v. Sunrise Hosp. & Med. Ctr., L.L.C.,* 124 Nev. 997, 1006, 194 P.3d 1214, 1219 (2008) (holding that when there is error in a jury instruction "prejudice must be established in order to reverse a district court judgment," which can be done by "showing that, but for the error, a different result might have been reached"); *El Cortez Hotel, Inc. v. Coburn,* 87 Nev. 209, 213, 484 P.2d 1089, 1091 (1971) (stating that an evidentiary error must be prejudicial in order to warrant reversal and remand). We

hold that substantial evidence exists to support the jury's finding as to liability against FTB on Hyatt's IIED claim regardless of these errors, but we conclude that the errors significantly affected the jury's determination of appropriate damages, and, therefore, these errors were prejudicial and require reversal and remand for a new trial as to damages.

In particular, the record shows that at trial Hyatt argued that FTB promised fairness and impartiality in its auditing processes but then, according to Hyatt, proceeded to conduct unfair audits that amounted to FTB "seeking to trump up a tax claim against him or attempt to extort him." In connection with this argument, Hyatt asserted that the penalties FTB imposed against Hyatt were done "to better bargain for and position the case to settle." Hyatt also argued that FTB unfairly refused to correct a mathematical error in the amount assessed against him when FTB asserted that there was no error.

None of these assertions could be made without contesting the audits' conclusions and determining that they were incorrect, which Hyatt was precluded from doing. Further, excluding FTB's evidence to rebut the adverse inference was prejudicial because Hyatt relied heavily on the adverse inference, and it is unknown how much weight the jury gave the inference in making its damages findings. The exclusion of evidence concerning Hyatt's loss of his patent and his federal tax audit, both occurring during the relevant period, relate to whether Hyatt's emotional distress was caused by FTB's conduct or one of these other events. As for the jury instruction, Instruction 24 gave the jury permission to consider the audits' determinations, which the district court had previously precluded it from reaching. As such, all of these errors resulted in prejudice to FTB directly related to the amount of damages Hyatt may be entitled to on his IIED claim. Therefore, a new trial as to the IIED damages is warranted.

### Recoverable damages on remand

As addressed above in regard to damages for Hyatt's fraud claim, we reject FTB's argument that it should be entitled to Nevada's statutory cap on damages for government entities under comity principles. Based on our above analysis on this issue, we conclude that providing statutory caps on damages under comity would conflict with our state's policy interest in providing adequate redress to Nevada citizens. Thus, comity does not require this court to grant FTB such relief. *Faulkner v. Univ. of Tenn.,* 627 So.2d 362, 366 (Ala.1992); *see also*

RJN0031

*Sam v. Estate of Sam,* 139 N.M. 474, 134 P.3d 761, 765 (2006) (recognizing that a state is not required to extend immunity and comity, and only dictating doing so if it does not contradict the forum state's public policy). As a result, any damages awarded on remand for Hyatt's IIED claim are not subject to any statutory cap on the amount awarded. As to FTB's challenges concerning prejudgment interest in connection with Hyatt's emotional distress damages, these arguments are rendered moot by our reversal of the damages awarded for a new trial and our vacating the prejudgment interest award.

### Punitive damages

[39] The final issue that we must address in FTB's appeal is whether Hyatt can recover punitive damages from FTB. The district court allowed the issue of punitive damages to go to the jury, and the jury found in Hyatt's favor and awarded him $250 million.

[40] [41] Punitive damages are damages that are intended to punish a defendant's wrongful conduct rather than to compensate a plaintiff for his or her injuries. **\*154** *Bongiovi v. Sullivan,* 122 Nev. 556, 580, 138 P.3d 433, 450 (2006). But "[t]he general rule is that no punitive damages are allowed against a [government entity] unless *expressly* authorized by statute." *Long v. City of Charlotte,* 306 N.C. 187, 293 S.E.2d 101, 114 (1982) (emphasis added). In Nevada, NRS 41.035(1) provides that "[a]n award for damages [against a government entity] in an action sounding in tort ... may not include any amount as exemplary or punitive." Thus, Nevada has not waived its sovereign immunity from suit for such damages.

FTB argues that it is entitled to immunity from punitive damages based on comity because, like Nevada, California law has expressly waived such damages against its government entities. California law provides full immunity from punitive damages for its government agencies. Cal. Gov't Code § 818 (West 2012). Hyatt maintains that punitive damages are available against an out-of-state government entity, if provided for by statute, and Nevada has a statute authorizing such damages—NRS 42.005.[19]

[19] Hyatt also argues that punitive damages are proper because the IRS is subject to punitive damages for conduct similar to that alleged here under the IRS code, 26 U.S.C. § 7431(c)(1)(B)(ii) (2012), which allows for punitive damages for intentional or grossly negligent disclosure of a private taxpayer's information. Thus, Hyatt maintains that it is reasonable to impose punitive damages against FTB when the federal law permits

punitive damages against the IRS for similar conduct. *Id.* But as FTB points out, this argument fails because there is a statute that expressly allows punitive damages against the IRS, and such a statute does not exist here.

NRS 42.005(1) provides that punitive damages may be awarded when a defendant "has been guilty of oppression, fraud or malice, express or implied." Hyatt acknowledges that punitive damages under NRS 42.005 are not applicable to a Nevada government entity based on NRS 41.035(1), but he contends that because FTB is not a Nevada government agency, the protection against punitive damages for Nevada agencies under NRS 41.035(1) does not apply, and thus, FTB comes within NRS 42.005's purview. FTB counters by citing a federal district court holding, *Georgia v. City of East Ridge, Tennessee,* 949 F.Supp. 1571, 1581 (N.D.Ga.1996), in which the court concluded that a Tennessee government entity could not be held liable for punitive damages under Georgia state law (which applied to the case) because, even though Georgia law had a statute allowing punitive damages, Georgia did not allow such damages against government entities. Therefore, the court gave the Tennessee government entity the protection of this law. *Id.*

The broad allowance for punitive damages under NRS 42.005 does not authorize punitive damages against a government entity. Further, under comity principles, we afford FTB the protections of California immunity to the same degree as we would provide immunity to a Nevada government entity as outlined in NRS 41.035(1). Thus, Hyatt's argument that Nevada law provides for the award of punitive damages against FTB is unpersuasive. Because punitive damages would not be available against a Nevada government entity, we hold that under comity principles FTB is immune from punitive damages. We therefore reverse the portion of the district court's judgment awarding punitive damages against FTB.

### Costs

Since we reverse Hyatt's judgments on several of his tort causes of action, we must reverse the district court's costs award and remand the costs issue for the district court to determine which party, if any, is the prevailing party based on our rulings. *See Bower v. Harrah's Laughlin, Inc.,* 125 Nev. 470, 494–95, 215 P.3d 709, 726 (2009) (stating that the reversal of costs award is required when this court reverses the underlying judgment); *Glenbrook Homeowners Ass'n v. Glenbrook Co.,* 111 Nev. 909, 922, 901 P.2d 132, 141 (1995) (upholding the district court's

RJN0032

determination that neither party was a prevailing party because each party won some issues and lost some issues). On remand, if costs are awarded, the district court should consider the proper amount of costs to award, including allocation of costs as to each cause of action and recovery for only the successful causes of action, if possible. Cf. *Mayfield v. Koroghli*, 124 Nev. 343, 353, 184 P.3d 362, 369 (2008) (holding that the district court should apportion costs award when there are **\*155** multiple defendants, unless it is "rendered impracticable by the interrelationship of the claims"); *Bergmann v. Boyce*, 109 Nev. 670, 675–76, 856 P.2d 560, 563 (1993) (holding that the district court should apportion attorney fees between causes of action that were colorable and those that were groundless and award attorney fees for the groundless claims).

Because this issue is remanded to the district court, we also address FTB's challenges on appeal to the procedure used by the district court in awarding costs. Hyatt moved for costs after trial, which FTB opposed. FTB's opposition revolved in part around its contention that Hyatt failed to properly support his request for costs with necessary documentation as to the costs incurred. The district court assigned the costs issue to a special master. During the process, Hyatt supplemented his request for costs on more than one occasion to provide additional documentation to support his claimed costs. After approximately 15 months of discovery, the special master issued a recommendation to award Hyatt approximately $2.5 million in costs. FTB sought to challenge the special master's recommendation, but the district court concluded that FTB could not challenge the recommendation under the process used, and the court ultimately adopted the special master's recommendation.

[42] FTB argues that Hyatt was improperly allowed to submit, under NRS 18.110, documentation to support the costs he sought after the deadline. This court has previously held that the five-day time limit established for filing a memorandum for costs is not jurisdictional because the statute specifically allows for "such further time as the court or judge may grant" to file the costs memorandum. *Eberle v. State ex rel. Nell J. Redfield Trust*, 108 Nev. 587, 590, 836 P.2d 67, 69 (1992). In *Eberle*, this court stated that even if no extension of time was granted by the district court, the fact that it favorably awarded the costs requested demonstrated that it impliedly granted additional time. *Id.* The *Eberle* court ruled that this was within the district court's discretion and would not be disturbed on appeal. *Id.* Based on the *Eberle* holding, we reject FTB's contention that Hyatt was improperly allowed to supplement his costs memorandum.

FTB also contends that the district court erred when it refused to let FTB file an objection to the master's report and recommendation. The district court concluded that, under NRCP 53(e)(3), no challenge was permitted because there was a jury trial. While the district court could refer the matter to a special master, the district court erroneously determined that FTB was not entitled to file an objection to the special master's recommendation. Although this case was a jury trial, the costs issue was not placed before the jury. Therefore, NRCP 53(e)(2) applied to the costs issue, not NRCP 53(e)(3). NRCP 53(e)(2) specifically provides that "any party may serve written objections" to the master's report. Accordingly, the district court erred when it precluded FTB from filing its objections. On remand, if the district court concludes that Hyatt is still entitled to costs, the court must allow FTB to file its objections to the report before the court enters a cost award. Based on our reversal and remand of the costs award, and our ruling in this appeal, we do not address FTB's specific challenges to the costs awarded to Hyatt, as those issues should be addressed by the district court, if necessary, in the first instance.

### Hyatt's cross-appeal

[43] The final issues that we must resolve concern Hyatt's cross-appeal. In his cross-appeal, Hyatt challenges the district court's summary judgment ruling that prevented him from seeking economic damages as part of his recovery for his intentional tort claims.

As background, during the first audit, FTB sent letters to two Japanese companies with whom Hyatt had patent-licensing agreements asking the companies for specific dates when any payments were sent to Hyatt. Both companies responded to the letters and provided the requested information. In the district court, Hyatt argued that sending these letters to the Japanese companies was improper because they revealed that Hyatt was being audited by FTB and that he had disclosed the licensing agreements to FTB. Hyatt theorized that he suffered economic **\*156** damages by losing millions of dollars of potential licensing revenue because he alleges that the Japanese market effectively abandoned him based on the disclosures. FTB moved the district court for summary judgment to preclude Hyatt from seeking economic loss damages, arguing that Hyatt did not have sufficient evidence to present this claim for damages to the jury. The district court agreed and granted FTB summary judgment.

[44] [45] Damages "cannot be based solely upon possibilities and speculative testimony."

RJN0033

*v. State Indus. Ins. Sys.,* 109 Nev. 421, 424, 851 P.2d 423, 425 (1993). This is true regardless of " 'whether the testimony comes from the mouth of a lay witness or an expert.' " *Gramanz v. T–Shirts & Souvenirs, Inc.,* 111 Nev. 478, 485, 894 P.2d 342, 347 (1995) (quoting *Advent Sys. Ltd. v. Unisys Corp.,* 925 F.2d 670, 682 (3d Cir.1991)). When circumstantial evidence is used to prove a fact, "the circumstances must be proved, and not themselves be presumed." *Horgan v. Indart,* 41 Nev. 228, 231, 168 P. 953, 953 (1917); *see also Frantz v. Johnson,* 116 Nev. 455, 468, 999 P.2d 351, 359 (2000). A party cannot use one inference to support another inference; only the ultimate fact can be presumed based on actual proof of the other facts in the chain of proof. *Horgan,* 41 Nev. at 231, 168 P. at 953. Thus, "a complete chain of circumstances must be proven, and not left to inference, from which the ultimate fact may be presumed." *Id.*

Here, Hyatt argued that as a result of FTB sending letters to the two Japanese companies inquiring about licensing payments, the companies in turn would have notified the Japanese government about FTB investigating Hyatt. Hyatt theorized that the Japanese government would then notify other Japanese businesses about Hyatt being under investigation, with the end result being that the companies would not conduct any further licensing business with Hyatt. Hyatt's evidence to support this alleged chain of events consisted of the two letters FTB sent to the two companies and the fact that the companies responded to the letters, the fact that his licensing business did not obtain any other licensing agreements after the letters were sent, and expert testimony regarding Japanese business culture that was proffered to establish this potential series of events.

Hyatt claims that the district court erroneously ruled that he had to present direct evidence to support his claim for damages, *e.g.,* evidence that the alleged chain of events actually occurred and that other companies in fact refused to do business with Hyatt as a result. Hyatt insists that he had sufficient circumstantial evidence to support his damages, and in any case, asserts that circumstantial evidence alone is sufficient and that causation requirements are less stringent and can be met through expert testimony under the circumstances at issue here. FTB responds that the district court did not rule that direct evidence was required, but instead concluded that Hyatt's evidence was speculative and insufficient. FTB does not contest that damages can be proven through circumstantial evidence, but argues that Hyatt did not provide such evidence. It also argues that there is no different causation standard under the facts of this case.

The issue we must decide is whether Hyatt set forth

sufficient circumstantial evidence to support his economic damages claim, or if the evidence he presented was instead either too speculative or failed to create a sufficient question of material fact as to his economic damages. To begin with, we reject Hyatt's contention that reversal is necessary because the district court improperly ruled that direct evidence was mandatory. Hyatt's limited view of the district court's ruling is unavailing.

The ultimate fact that Hyatt seeks to establish through circumstantial evidence, that the downfall of his licensing business in Japan resulted from FTB contacting the two Japanese companies, however, cannot be proven through reliance on multiple inferences—the other facts in the chain must be proven. Here, Hyatt only set forth expert testimony detailing what his experts believed would happen based on the Japanese business culture. No evidence established that any of the hypothetical steps actually occurred. Hyatt provided no proof that the **\*157** two businesses that received FTB's letters contacted the Japanese government, nor did Hyatt prove that the Japanese government in turn contacted other businesses regarding the investigation of Hyatt. Therefore, Hyatt did not properly support his claim for economic damages with circumstantial evidence. *Wood v. Safeway, Inc.,* 121 Nev. 724, 731, 121 P.3d 1026, 1030–31 (2005) (recognizing that to avoid summary judgment once the movant has properly supported the summary judgment motion, the nonmoving party may not rest upon general allegations and conclusions, but must instead set forth by affidavit or otherwise specific facts demonstrating the existence of a genuine issue of material fact for trial); *see* NRCP 56(e). Accordingly, summary judgment was proper and we affirm the district court's summary judgment on this issue.

### *CONCLUSION*

Discretionary-function immunity does not apply to intentional and bad-faith tort claims. But while FTB is not entitled to immunity, it is entitled to judgment as a matter of law on each of Hyatt's causes of action except for his fraud and IIED claims. As to the fraud claim, we affirm the district court's judgment in Hyatt's favor, and we conclude that the district court's evidentiary and jury instruction errors were harmless. We also uphold the amount of damages awarded, as we have determined that FTB is not entitled to a statutory cap on damages under comity principles because this state's interest in providing adequate relief to its citizens outweighs providing FTB with the benefit of a damage cap under comity. In regard to the IIED claim, we affirm the judgment in favor of

RJN0034

**Franchise Tax Bd. of Cal. v. Hyatt, 335 P.3d 125 (2014)**

130 Nev. Adv. Op. 71

Hyatt as to liability, but conclude that evidentiary and jury instruction errors require a new trial as to damages. Any damages awarded on remand are not subject to a statutory cap under comity. We nevertheless hold that Hyatt is precluded from recovering punitive damages against FTB. The district court's judgment is therefore affirmed in part and reversed and remanded in part. We also remand the prejudgment interest and the costs awards to the district court for a new determination in light of this opinion. Finally, we affirm the district court's prior summary judgment as to Hyatt's claim for economic damages on Hyatt's cross-appeal. Given our resolution of this appeal, we do not need to address the remaining arguments raised by the parties on appeal or cross-appeal.

We concur: GIBBONS, C.J., PICKERING, PARRAGUIRRE, DOUGLAS and CHERRY, JJ.

**All Citations**

335 P.3d 125, 130 Nev. Adv. Op. 71

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

RJN0035

**IN THE SUPREME COURT OF THE STATE OF NEVADA**

FRANCHISE TAX BOARD OF THE STATE
OF CALIFORNIA,

     Appellant/Cross-respondent,

     v.

GILBERT P. HYATT,

     Respondent/Cross-appellant.

Supreme Court Case No. 53264

District Court Case No. A382999

**APPEAL**

from the Eighth Judicial District Court, Clark County
THE HONORABLE JESSIE WALSH, District Judge

---

**RESPONDENT'S ANSWERING BRIEF AND
OPENING CROSS APPEAL BRIEF**

---

MARK A. HUTCHISON, Nevada Bar No. 4639
MICHAEL K. WALL, Nevada Bar No. 2098
HUTCHISON & STEFFEN, LLC.
10080 Alta Drive, Suite 200
Las Vegas, NV 89145
Telephone: (702) 385-2500
Facsimile: (702) 385-2086

PETER C. BERNHARD, Nevada Bar No. 734
KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road, Suite 250
Las Vegas, NV 89113
Telephone: (702) 792-7000
Facsimile: (702) 796-7181

DONALD J. KULA, California Bar No. 144342
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone: (310) 788-9900
Facsimile: (310) 788-3399

*Attorneys for Respondent/Cross-Appellants
Gilbert P. Hyatt*

TABLE OF CONTENTS

## RESPONDENT'S ANSWERING BRIEF

Page

I.   STATEMENT OF THE ISSUES. ...................................................................... 1

II.  STATEMENT OF THE CASE. ...................................................................... 3

III. SUMMARY OF ARGUMENT. ..................................................................... 3

IV.  STATEMENT OF FACTS. ............................................................................ 9

    A.    The FTB's Statement of Facts does not comport with the jury's findings. ......... 9

    B.    Gil Hyatt, a genuine, new American hero, chose to move to Las Vegas, like millions of other individuals over many years. ................................ 10

    C.    Chronology of the tax proceedings. .......................................................... 11

        1.    The audits (1993 to 1997). .......................................................... 11

        2.    The protests (1996 to 2007). ....................................................... 13

        3.    The pending de novo tax appeal (2008 to present). ....................... 13

    D.    The FTB promised, and was obligated, to be "fair and impartial" in the audits and protests, i.e., to conduct a good faith audit. ............................ 13

    E.    The jury heard and accepted substantial evidence of outrageous, bad faith conduct by the FTB during the audit. .............................................. 14

        1.    The FTB audited Hyatt upon learning how much money he had made. ............................................................................................. 14

        2.    The lead auditor was openly biased against Hyatt and his religion. .......................................................................................... 15

        3.    The lead auditor viewed the Hyatt audits as a means to advance her career and did significantly advance her career with the audits. ............................................................................................ 17

        4.    The lead auditor did not pursue, and tried to bury, evidence that was favorable to Hyatt, claiming she did this based on her "intuition." ................................................................................... 18

            a.    La Palma neighbors. ....................................................... 18

            b.    Friends and relatives. ...................................................... 19

            c.    Other evidence submitted by Hyatt. ................................. 20

i

KLAMPFER CROWELL, RENSHAW GRONAUER & FIORENTINO

RJN0037

5.    The lead auditor relied on three un-sworn statements from three estranged relatives of Hyatt, all of whom admitted they had an axe to grind. ...................................................................... 20

6.    The lead auditor intentionally deceived Hyatt's tax representatives into believing there were no issues in the audit, when in reality, she was building a one-sided case and did not want evidence that would contradict her predetermined conclusion. ................................................................................ 22

7.    The lead auditor manufactured reasons and misstated evidence in order to assess a fraud penalty as a bargaining chip to be used to induce settlement — in accord with FTB policy. ................................ 24

8.    There was open internal dissent within the FTB which questioned whether the FTB had a case against Hyatt, let alone clear and convincing evidence to support a fraud penalty. .................... 26

     a.    Embry memo. ...................................................................... 26

     b.    Paul Lou's instruction. ..................................................... 28

     c.    Lead reviewer's notes. ...................................................... 28

     d.    Les' advice to Cox. ............................................................ 29

9.    Ignoring all conclusions to the contrary, the FTB assessed Hyatt millions of dollars more in taxes, penalties and interest for the 1992 tax year, even taxing and penalizing Hyatt for income earned after the date on which the FTB concluded Hyatt had moved to Nevada. ................................................................. 30

10.    The FTB residency audit supervisors were proud of the FTB's work on the Hyatt audits. ..................................................... 31

11.    The FTB was driven by assessments and "CBR," upon which its future budget allocations were based, regardless of whether the assessments were ever collected. ...................................... 32

F.    The jury heard substantial evidence of bad faith and outrageous conduct regarding the FTB's invasion of Hyatt's privacy and breach of his confidentiality during the audits and protests. ........................ 35

    1.    Early and repeatedly during the audits, Hyatt's representatives informed the auditors who worked on the audit that Hyatt had a heightened sensitivity for privacy and a need for confidentiality. ........ 35

    2.    The FTB auditors promised strict confidentiality, acknowledging Hyatt's heightened sensitivity for privacy. ........................... 36

    3.    By policy and law, the FTB was required to keep Hyatt's information private and confidential and to obtain information from Hyatt instead of third parties to "the greatest extent practicable." ....................................................................... 37

ii

KAMPPER CROWELL RENSHAW GRONAUER & FIORENTINO

4.    The FTB made massive disclosures to third persons of Hyatt's social security number, private home/office address, credit card numbers, and other personal information to third parties. ...................37

5.    At the outset of the protest, the first protest officer warned about an even more intrusive investigation and infringements on Hyatt's privacy — if he did not settle. .....................................40

6.    When Hyatt did not settle early in the protest and filed this tort case, the FTB published the Hyatt assessments on the *Litigation Roster*, including information showing that Hyatt was a tax cheat and a tax fraud.............................................................41

G.    The jury heard substantial evidence of bad faith and outrageous conduct of the FTB's 11-plus-year delay in the protests......................43

    1.    The first protest officer appointed by the FTB to conduct a purportedly independent review was the same in-house attorney who had counseled the lead auditor during the audits and orchestrated the imposition of the fraud penalty against Hyatt. ...........43

    2.    The second "new set of eyes" (FTB protest officer) had served as in-house litigation counsel for the FTB *in this case*..............................44

    3.    The third FTB protest officer (1999-2000) professed neutrality and commenced working on the protest in earnest, but she was suddenly removed and replaced, over her objection. ..........................44

    4.    The fourth FTB protest officer (2000 - 2007) was told to put the protests on "hold" due to this tort case even though she was ready to issue a final determination as early as late 2001......................45

    5.    The District Court allowed Hyatt to pursue, as part of his bad faith assertions, that the FTB's delay and refusal to conclude the audit was part of its bad faith fraudulent conduct directed at Hyatt. ...............................................................................46

    6.    The FTB, with no evidentiary support, now falsely asserts that Hyatt is to blame for the initial delay in the protests. ...........................47

    7.    At trial, the FTB tried to blame Hyatt and the District Court's protective order for the 11 plus year delay in issuing a final determination in the protest.................................................................48

    8.    Offering "amnesty," the FTB offered to withdraw the penalties it asserted, if Hyatt settled by paying the taxes assessed, plus interest, and dropping this litigation. .........................................51

    9.    The FTB held the protests over Hyatt's head for 11 years, during which time the FTB's tax bill to Hyatt grew to over $51 million, with interest accruing at more than $8,000 each day..............................51

V.    LEGAL ARGUMENT. ............................................................51

    A.    Standard of review. ...................................................51

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

iii

RJN0039

1. FTB failed to apply the appropriate standard of review. ....................... 51

2. The appropriate standard of review in this appeal for most issues is the substantial evidence standard. ......................................... 52

3. FTB's Statement of Facts is deficient and thereby waives any challenge to the sufficiency of the evidence. ................................. 53

B. Discretionary function immunity does not apply to the FTB's bad faith acts and intentional torts. ................................................. 54

   1. *Martinez v. Maruszczak* is a negligence case that did not change the law relative to bad faith acts and intentional torts. .......................... 55

   2. *Falline* and its progeny: Nevada does not immunize government agencies and employees for bad faith acts and intentional torts............ 56

   3. Post-*Martinez* cases confirm that government agencies in Nevada are liable for acts taken in bad faith and for intentional torts. ............... 57

   4. Other jurisdictions also do not immunize bad faith acts and intentional torts. ............................................................. 60

   5. Even if applied to the facts of this case, neither prong of the *Martinez* test can be met............................................................ 61

      a. The first prong of *Martinez* — individual judgment or choice — is not met in this case. ........................................ 61

      b. The second prong of *Martinez* — plausible policy objective — is also not met in this case............................... 62

      c. The FTB misstates the purpose for which much of the evidence at trial was offered and misleads the Court as to the issues presented to the jury. ......................................... 64

         (i) Gathering evidence.......................................... 64

         (ii) Analysis of the evidence. ................................ 65

         (iii) Evidence of delay in the Protest. ...................... 66

         (iv) Organizational misconduct................................ 66

      d. The additional cases cited by the FTB do not immunize bad faith conduct and have no application to the claims in this case. ......................................................... 67

C. The District Court consistently followed and applied this Court's "jurisdictional" ruling from 2002........................................... 69

   1. Evidence of the FTB's course of conduct directed at Hyatt was relevant to, probative of, and offered to establish the FTB's wrongful intent. .............................................................. 70

iv

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0040

2. The District Court's rulings conformed to this Court's 2002 decision that specifically approved Hyatt's bad faith fraud claim very early in the proceedings................................................................... 72

    a. From the outset, Hyatt pled and District Judge Saitta allowed Hyatt to proceed with his claim that the FTB conducted a fraudulent audit in bad faith. ............................... 73

    b. Judge Saitta later denied the FTB's summary judgment motion, including refusing to dismiss the bad-faith, governmental-fraud claim. ................................................ 73

    c. This Court also considered and approved the bad faith governmental fraud claim. ............................................. 73

D. The District Court consistently followed and applied District Judge Saitta's ruling dismissing determination of the tax and residency issues from this case. ............................................................................................ 75

    1. The District Court did not permit the jury to act as an appellate court for the FTB's audit conclusions. ....................................... 75

    2. The District Court properly excluded residency evidence developed in the protest proceedings.......................................... 79

    3. Contrary to the FTB's argument, the evidence at trial established that Hyatt's location between September 26 to October 20, 1991, was not a focus of the audit, insignificant to the auditor's conclusions, and not a defense to the FTB's wrongful conduct. ................................................................................. 81

E. The District Court properly allowed Hyatt's intentional tort claims to be tried to the jury, and substantial evidence supports the verdict rendered on each claim. ......................................................................... 82

    1. The FTB misrepresents this Court's 2002 ruling and Hyatt's successful petition for rehearing. .................................................. 83

    2. The verdict and resulting judgment on Hyatt's bad faith fraud claim should be affirmed. ............................................................ 84

        a. Early in this case, the bad faith fraud claim was presented to, reviewed and approved by both Judge Saitta and this Court....................................................................................... 84

        b. The FTB's representations of fair and impartial treatment were not vague and ambiguous but obvious and undeniable tenets of any government investigation............. 86

        c. Substantial evidence supports the jury's verdict on Hyatt's bad faith governmental fraud claim................................. 89

            (i) FTB representations as a government actor.................... 89

                (a) Fairness and impartiality ......................................... 89

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

v

RJN0041

|  |  | (b) | Confidentiality | 91 |
|  |  | (ii) | The FTB's fraudulent intent in making the false representations. | 91 |
|  | d. |  | Hyatt reasonably relied on the FTB's misrepresentations, causing him specific damage. | 92 |
|  | e. |  | The FTB's promises were properly within the scope of the FTB's authority, and the authority of individuals communicating the promises. | 93 |
| 3. |  |  | The verdicts and resulting judgment on Hyatt's invasion of privacy, false light, and breach of confidentiality claims should be affirmed. | 93 |
|  | a. |  | "Information privacy" was properly presented to the jury as part of Hyatt's common law invasion of privacy claims— consistent with this Court's prior ruling in this case. | 95 |
|  | b. |  | The cases cited by the FTB regarding statutory remedies and "altering" common law rights have no application to this case. | 96 |
|  | c. |  | The FTB's widespread publication, and republication, of Hyatt's private information was not protected by the "Public Records Defense," consistent with the jury's verdicts. | 97 |
|  | d. |  | Hyatt's invasion of privacy claims were not based on violations of "foreign" laws. | 103 |
|  | e. |  | There was substantial evidence at trial supporting Hyatt's two invasion of privacy claims. | 104 |
|  | f. |  | There was substantial evidence at trial supporting the jury's verdict on Hyatt's false light claim. | 106 |
|  |  | (i) | The *Litigation Roster* was not protected by any privilege. | 107 |
|  |  |  | (a) Litigation privilege | 108 |
|  |  |  | (b) Fair reporting privilege | 108 |
|  | g. |  | Hyatt's breach of confidentiality claim. | 110 |
|  |  | (i) | The jury was properly instructed on Hyatt's breach of confidentiality claim. | 110 |
|  |  | (ii) | Hyatt's breach of confidentiality claim fits squarely within *Perry*. | 111 |

vi

KAMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0042

h.      There was a special relationship between the FTB and Hyatt limited to protecting Hyatt's private and confidential information. .......................................... 112

4.      The jury's verdict and resulting judgment on Hyatt's abuse of process claim should be affirmed.................................. 114

5.      The jury's verdict and resulting judgment on Hyatt's intentional infliction of emotional distress claim should be affirmed. 118

a.      The more extreme and outrageous the conduct, the lesser the standard of proof for demonstrating severe emotional distress. ................................................................... 119

b.      The FTB misconstrues the Discovery Commissioner's ruling regarding garden-variety emotional distress. ................ 122

c.      Hyatt's emotional distress was severe and occurred over a long period of time. .............................................. 124

d.      Lack of medical treatment does not bar Hyatt's claim, as other evidence provides objectively verifiable indicia of severity of the emotional distress. ................................. 127

(i)      Dr. Thompson. ............................................. 128

(ii)      Dan Hyatt. ................................................... 130

(iii)      Vince Turner. ............................................... 131

6.      The jury's awards to Hyatt for loss of privacy damages and emotional distress damages were appropriate, supported by substantial evidence, and should be upheld. ....................... 132

a.      The damages for loss of privacy were not excessive. ................ 132

b.      The emotional distress damages were not excessive. ................ 134

(i)      Hyatt's emotional distress damages were not limited by the Discovery Commissioner's ruling........... 134

(ii)      The District Court did not err in not allowing prejudicial evidence offered by the FTB. ...................... 136

7.      The District Court did not err in rejecting the FTB's statute of limitations defense. ....................................................... 137

a.      The FTB does not accurately state the law relative to the triggering of the statute of limitations. ................................... 138

b.      The statute of limitations did not begin to run, at the earliest, until Hyatt received the FTB's audit file in late 1996 ......................................................................... 139

KARMPER CHROWELL RENSHAW GRONAUER & FIORENTINO

vii

RJN0043

c. The FTB's statute of limitations defense was correctly dismissed as a matter of law after the close of evidence at trial ................................................................ 143

8. The District Court properly sanctioned the FTB for its spoliation of electronic data. .................................................. 144

F. Nevada's statutory cap on damages does not apply to the FTB ...................... 146

1. This Court need not, and should not, grant "equal immunity" to California officials who commit intentional torts against Nevada citizens. ............................................................. 146

2. This Court is not obliged to grant special immunity to the FTB. ........ 147

3. Substantial damages are necessary to sanction and deter deliberate misconduct by officials from other states .......................... 149

4. A sovereign is not required to give "equal treatment" to other sovereigns. .......................................................... 154

5. The FTB's other immunity arguments are without merit ................... 158

a. Full Faith and Credit. ................................................ 158

b. Law of the Case. .................................................... 160

c. Judicial Estoppel. ................................................... 162

G. Punitive damages were properly allowed ................................................. 162

1. The federal common law cited by the FTB does not govern this case nor address Nevada's public policy interests in assessing punitive damages in this case. ................................................ 165

2. Other states do not limit damages against out of state agencies. ......... 166

3. Federal law provides for an award of punitive damages under the circumstances of this case ............................................. 166

H. The jury's award of punitive damages was not excessive and should not be reduced. ............................................................. 167

1. Reprehensibility ................................................................ 167

a. The offending conduct lasted over a decade. .......................... 168

b. The offending conduct was deceitful bad faith. ....................... 169

2. Ratio to compensatory damages. .......................................... 171

3. Comparison to other penalties. ............................................ 174

I. Prejudgment interest was properly allowed. ........................................ 174

RJN0044



**VI.      CONCLUSION**.................................................................................**180**

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

64847-0001/LEGAL17496776.4

RJN0045

1
2

# OPENING BRIEF ON CROSS APPEAL

3    I.    STATEMENT OF ISSUE................................................................ 183
4
5    II.   SUMMARY OF ARGUMENT. ..................................................... 183
6    III.  STATEMENT OF THE CASE. .................................................... 184
7    IV.   STATEMENT OF FACTS. ........................................................... 185
8          A.    Hyatt's invasion of privacy and breach of confidentiality claims
9                included improper disclosures by the FTB to Hyatt's key sublicensees in
                 Japan. .................................................................................... 185
10         B.    Hyatt incurred economic damages in Japan resulting from the FTB's
11               disclosures. .......................................................................... 188
12   V.    ARGUMENT. ............................................................................... 189
13         A.    Standard of Review. ............................................................. 189
14         B.    Contrary to the District Court's ruling, causation may be proved by
                 circumstantial and expert evidence. ................................... 190
15         C.    "Causation" in the context of intentional tort claims is different from
16               the standard applicable generally for negligence claims. ............... 192
17         D.    Expert testimony is appropriate and not uncommon in establishing
                 causation.............................................................................. 194
18   VI.   CONCLUSION. ............................................................................ 196
19
20
21
22
23
24
25
26
27
28

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

x

**TABLE OF AUTHORITIES**

Page

**Cases**

*Ace Truck & Equip. Rentals, Inc. v. Kahn*, 103 Nev. 503, 746 P.2d 132 (1987) ......................... 163

*Alam v. Reno Hilton Corp*, 819 F. Supp. 905 (D. Nev. 1993) ...................................................... 124

*Alaska Packers Ass'n v. Industrial Accident Comm'n*, 294 U.S. 532 (1935) ................................ 159

*Albert H. Wohlers v. Bartgis*, 114 Nev. 1249, 969 P.2d 949 (1998)............................... 52, 121, 135

*Albios v. Horizon Communities,* 122 Nev. 409, 132 P.3d 1022 (2006) ........................................ 179

*Alden v. Maine*, 527 U.S. 706 (1999).................................................................................... 147, 148

*Alderson v. Bonner*, 142 Idaho 733, 132 P.3d 1261 (App. 2006) .................................................. 132

*Appeal of CPY Sports, Inc.*, Cal. St. Bd. of Equal., July 1, 1999 ..................................................... 77

*ASAP Storage, Inc. v. City of Sparks*, 123 Nev. 639, 173 P.3d 734 (2007) .............................. 58, 59

*Ashford v. United States*, 511 F.3d 501 (5th Cir. 2007)................................................................... 61

*Austin v. Specialty Transportation Services, Inc.*, 358 S.C. 298, 594 S.E.2d 867 (1999) .............. 65

*Baker v. General Motors Corp.*, 522 U.S. 222 (1998) ................................................................... 159

*Bally's Employees' Credit Union v. Wallen*, 105 Nev. 553, 779 P.2d 956 (1989) .......................... 52

*Banks ex rel. Banks v. Sunrise Hosp.*, 120 Nev. 822, 102 P.3d 52 (2004).................................... 195

*Barmettler v. Reno Air, Inc.,* 114 Nev. 441, 956 P.2d 1382 (1998) ...................................... 119, 127

*Bass-Davis v. Davis,* 122 Nev. 442, 134 P.3d 103 (2006) ..................................................... 145, 146

*Bemis v. Estate of Bemis*, 114 Nev. 1021, 967 P.2d 437 (1998) .................................................... 138

*Benz v. Washington Newspaper Publ. Co.,* 2006 U.S. Dist. LEXIS 71827, 23 (D. D.C. 2006)............................................................................................................................... 99

*Berger v. United States*, 295 U.S. 88 (1935) ................................................................................... 92

*Berkovitz v. United States*, 486 U.S. 531 (1988)....................................................... 55, 61, 63, 67

*Bigney v. Blanchard*, 430 A.2d 839 (Me. 1982) ........................................................................... 83

*Birdsall v. City of Hartford*, 249 F. Supp.2d 163 (D. Conn., 2003)............................................ 121

*Black v. J.I.Case Co.*, 22 F.3d 568 (5th Cir. 1994) ........................................................................ 83

*Blair v. Union Free School District*, 67 Misc.2d 248, 324 N.Y.S.2d 222 (N.Y. Dist. 1971) ........ 114

xi

RJN0047

KAEMPFER CROWELL RENSLAW GRONAUER & FIORENTINO

*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) .......................................... 163, 164, 167

*Boeken v. Philip Morris Inc.*, 127 Cal.App.4th 1640, 26 Cal.Rptr.3d 638 (Cal. Ct. App. 2005) ................................................................................................................................. 53

*Bolen v. Dengel,* 2004 WL 2984330, at *8 (E.D. La. 2004) ......................................... 68

*Bolt v. United States*, 509 F. 3d 1028 (9th Cir. 2007) ................................................... 61

*Bongiovi v. Sullivan*, 122 Nev. 556, 138 P.3d 433 (2006) ...................................... passim

*Boston Public Health Com'n v. Massachusetts Com'n Against Discrimination*, 67 Mass. App. Ct. 404, 854 N.E.2d 111 (2006) ............................................................ 122

*Bowden v. Lincoln County Health System*, 2009 WL 323082 (11th Cir. 2009) .................. 157, 166

*Breliant v. Preferred Equities Corp.*, 112 Nev. 663, 918 P.2d 314 (1996)..................................... 160

*Brooks v. Celeste*, 39 F.3d 125 (6th Cir. 1995) .............................................................. 71

*Bulbman Inc. v. Nevada Bell*, 108 Nev. 105, 825 P.2d 588 (1992) ............................... 71

*Butler ex rel. Biller v. Bayer*, 123 Nev. 450, 168 P.3d 1055 (2007) .............................. 68

*Carey v. Piphus*, 435 U.S. 247 (1978) ......................................................................... 128

*Catalina v. Crawford*, 19 Ohio App. 3d 150, 483 N.E.2d 486 (Ohio Ct. App. 1984) ..................... 60

*Chowdhry v. NLVH, Inc.*, 109 Nev. 478, 851 P.2d 459 (1993)..................................... 119

*City of Boulder City v. Boulder Excavating, Inc.*, 124 Nev. ___, 191 P.3d 1175 (2008) .......... 57, 58

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) .............................. 165, 166

*Clark County School District v. Virtual Educ. Software, Inc.*, 213 P.3d 496 (Nev. 2009) ............. 52

*Conner v. United States*, 434 F.3d 676 (4th Cir. 2006).................................................. 65

*Coulthurst v. United States*, 214 F. 3d 106 (2d Cir. 2000)...................................... 62, 63

*Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243 (Nev. 2008) .................. 153, 163

*Cox Broadcasting Corp. v Cohn*, 420 U.S. 469 (1975) ................................................ 101

*Davis v. City of Las Vegas*, 478 F.3d 1048 (9th Cir. 2007) .......................................... 56

*Day v. Zubel*, 112 Nev. 972, 922 P.2d 536 (1996) ...................................................... 143

*Department of Revenue of Kentucky v. Davis*, 128 S. Ct. 1802 (2008) .................. 154, 155

*Diaz v. Oakland Tribune, LLC*, 139 Cal.App.3d 118, 188 Cal.Rptr. 762 (Cal. Ct. App. 1983)..................................................................................................................... 99

*Dixon v. Denny's, Inc.*, 957 F. Supp. 792 (E.D. Va. 1996) ........................................ 128

KALMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

1  *Doe v. Chao*, 540 U.S. 614 (2004) ................................................................... 132

2  *Doe v. City of New York*, 15 F.3d 264 (2d Cir.1994) ..................................... 95

3  *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939 (D.C. 2003)............ 112

4  *Dow Chem. Co. v. Mahlum*, 114 Nev. 1468, 970 P.2d 98 (1988)................ 193, 195

5  *Eikelberger v. Tolotti*, 96 Nev. 525, 611 P.2d 1086 (1980) ........................... 110

6  *Ex Parte City of Montgomery*, 758 So. 2d 565 (Ala. 1999) ........................... 59

7  *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605 (2008) ........................... 172, 173

8  *Falline v. GNLV Corp.*, 107 Nev. 1004, 823 P.2d 888 (1991)................... passim

9  *Farmers Home Mut. Ins. Co. v. Fiscus*, 102 Nev. 371, 725 P.2d 234 (1986) ............... 122

10  *Faulkner v. University of Tennessee*, 627 So.2d 362 (Ala. 1992), *cert. denied*, 510 U.S.
11      1101 (1994) ................................................................... 156, 157, 166

12  *Fethkenher v. Truong*, 2003 Iowa App. LEXIS 996 (Iowa Ct. App. 2003)................ 61

13  *Fink v. Oshins*, 118 Nev. 428, 49 P.3d 640 (2002) ....................................... 108

14  *Flones v. Dalman*, 199 Mich. App. 396, 502 N.W.2d 725 (Mich. Ct. App. 1993)............ 61

15  *Flowers v. Carville*, 310 F.3d 1118 (9th Cir. 2002) ..................................... 139

16  *Foreman & Clark Corp. v. Fallon*, 3 Cal.3d 875, 92 Cal.Rptr. 162, 479 P.2d 362 (Cal. Ct.
        App. 1971)................................................................... 53

17  *Forster v. Manchester*, 189 A.2d 147 (Pa. 1963)....................................... 105

18  *Franchise Tax Board v. Hyatt*, 538 U.S. 488 (2003) ........................... 3, 161, 167

19  *Franklin Savings Corp. v. United States*, 180 F.3d 1124 (10th Cir. 1999) ............... 69

20  *Frantz v. Johnson*, 116 Nev. 455, 999 P.2d 415 (1999)..................... 190, 191, 193

21  *Greidinger v. Davis*, 988 F.2d 1344 (4th Cir. 1993) ..................................... 100

22  *Groder v. United States*, 816 F.2d 139 (4th Cir. 1987).................................. 65

23  *Grotts v. Zahner*, 115 Nev. 339, 989 P.2d 415 (1999)................................... 178

24  *Guaranty Nat. Ins. Co. v. Potter*, 112 Nev. 199, 912 P.2d 267 (1996) ............... 122, 135

25  *Hall v. Nevada*, 8 Cal.3d 522, 105 Cal. Rptr. 355 (Cal. Ct. App. 1972)............. 155

26  *Hansen v. Scott*, 687 N.W.2d 247 (N.D. 2004).......................................... 156

27  *Hansen v. Universal Health Services of Nevada, Inc.*, 115 Nev. 24, 974 P.2d 1158 (1999)........... 54

28  *Hawkins v. Holloway*, 316 F.3d 777 (8th Cir. 2003) ..................................... 60

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

xiii

RJN0049

*Hazelwood v. Harrah's,* 109 Nev. 1005, 862 P.2d 1189 (1993) ..................................... 176

*Heights Community Congress v. Veterans Administration,* 732 F.2d 526 (6th Cir. ), *cert. denied,* 469 U.S. 1034 (1984) ......................................................................... 99

*Hershenson v. Lake Champlain Motors, Inc.,* 139 Vt. 219, 424 A.2d 1075 (1981) ..................... 192

*Hetter v. Eighth Judicial Dist. Court,* 110 Nev. 513, 874 P.2d 762 (1994) ................................. 133

*Hirschhorn v. Sizzler Restaurants Intern, Inc.,* 913 F. Supp. 1393 (D. Nev. 1995) ..................... 119

*Honaker v. Smith,* 256 F.3d 477 (7th Cir. 2001) ...................................................... 119, 120

*Humphers v. First Interstate Bank,* 298 Or. 706, 696 P.2d 527 (Or. 1985).................................. 112

*HWCC-Tunica, Inc. v Jenkins,* 907 So.2d 941 (Miss. 2005) ....................................................... 110

*In re Baker,* 18 B.R. 243 (Bankr. D.N.Y. 1982) ....................................................................... 120

*In re Crawford,* 194 F.3d 954 (9th Cir. 1999), *cert. denied,* 528 U.S. 1189 (2000) ...................... 95

*In re Delta Warehouse Company,* 31SBE 030, 136 Cal. St. Bd. of Equal., December 1, 1931 ..................................................................................................................... 77

*In re Sheffield,* 465 So.2d 350 (Ala. 1984)............................................................................... 60

*In re Sierra Production Service, Inc.,* 1990 Cal. Tax LEXIS 17,  90 SBE 010 (Cal. St. Bd. Equal. 1990)........................................................................................................ 77

*In re TPI International Airway,* 141 B.R. 512 (S.D. Ga. Bankr. 1992) .......................................... 68

*J.J. Industries, LLC v. Bennett,* 119 Nev. 269,  71 P.3d 1264 (2003)......................................... 52

*Jessamy v. Ehren,* 153 F. Supp.2d 398 (S.D.N.Y. 2001) ............................................................ 124

*Johnson v. Greer,* 477 F.2d 101 (5th Cir. 1973) ...................................................................... 194

*Johnson v. Sawyer,* 760 F. Supp. 1216 (S.D. Tex. 1991), *reversed and remanded,* 47 F. 3d 716 (5th Cir. 1995)........................................................................................... 113

*Jones v. United States,* 9 F. Supp.2d 1119 (D.Nev. 1998).......................................................... 195

*Jordan v. State ex rel. DMV & Pub. Safety,* 121 Nev. 44, 110 P.3d 30 (2005) ............................. 59

*Kalantar v. Lufthansa German Airlines,* 402 F. Supp.2d 130 (D. D.C. 2005) .............................. 128

*Kloepfel v. Bokor,* 149 Wash.2d 192, 66 P.3d 630 (Wash. 2003)............................................... 120

*Kolegas v. Heftel Broad. Corp.,* 607 N.E.2d 201 (Ill. 1992) ...................................................... 120

*LaMantia v.Redisi,* 118 Nev. 27, 38 P.3d 877 (2002).............................................................. 116

*Larson v. Benediktsson,* 152 P. 3d 1159 (Ak. 2007) ................................................................. 82

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

xiv

RJN0050

*Las Vegas-Tonopah-Reno Stage Line, Inc. v. Gray Line*, 106 Nev. 283, 792 P.2d 386 (1990) .................................................................................... 176, 177, 179

*Lee v. Ball*, 121 Nev. 391, 116 P.3d 64 (2005) ........................................... 178

*Limone v. United* States, 336 F. Supp.2d 18 (D.Mass. 2004) ...................... 120

*Limone v. United States*, 497 F. Supp.2d 143 (D. Mass. 2007) ...................... 63

*Lubin v. Kunin*, 117 Nev. 107, 17 P.3d 422 (2001) .................................... 109

*Macsenti v. Becker*, 237 F.3d 1223 (10th Cir. 2001) ................................... 120

*Malis v. United States*, 87-1 USTC § 9212 (C.D. Cal. 1986) ........................ 167

*Mallas v. United States*, 993 F.2d 1111 (4th Cir. 1993) .............................. 167

*Martinez v. Maruszczak*, 123 Nev. 433, 168 P.3d 720 (2007) ................... passim

*Mayer v. Town of Hampton*, 497 A.2d 1206 (N.H. 1985) ........................... 194

*McCray v. City of Dothan*, 169 F. Supp. 2d 1260 (M.D. Ala. 2001) ................ 60

*McDonnell v. State of Illinois*, 748 A.2d 1105 (N.J. 2000) ........................... 156

*McKinney v. Keumper*, 2005 WL 2046003 (D.S.D. 2005) ........................... 196

*McLain v. Boise Cascade Corp.*, 533 P. 2d 343 (Or. 1975) .......................... 105

*Meacham v. Knolls Atomic Power Lab.*, 185 F. Supp.2d 193 (N.D.N.Y. 2002) ........... 124

*Med. Informatics Eng'g, Inc. v. Orthopaedics Ne.*, 458 F. Supp.2d 716 (N.D. Ind. 2006)........... 108

*Memphis Community School Dist. v. Stachura*, 477 U.S. 299 (1986) ............ 153

*Merlo v. Standard Life & Acc. Ins. Co.*, 59 Cal.App.3d 5, 130 Cal.Rptr. 416 (Cal. Ct. App. 1976)........................................................................................ 122

*Mianecki v. Second Judicial District Court*, 99 Nev. 93, 658 P.2d 422 (1983)............. 148

*Miller v. Jones*, 114 Nev. 1291, 970 P.2d 571 (1998) ......................... 127, 128

*Montesano v. Donrey Media Group*, 99 Nev. 644, 668 P.2d 1081 (1983), *cert. denied*, 466 U.S. 959 (1984) .................................................................. 101

*Moody v. Maine Cent. R.R. Co.*, 823 F.2d 693 (1st Cir. 1987) ..................... 196

*Multimedia WMAZ, Inc. v. Kubach*, 443 S.E.2d 491 (Ga. 1994) .................. 102

*Muniz-Rivera v. United States*, 326 F.3d 8 (1st Cir. 2003) ............................ 63

*Nelson v. City of Las Vegas*, 99 Nev. 548, 665 P. 2d 1141 (1983) .......... 119, 124

*Nesovic v. U.S.*, 71 F.3d 776 (9th Cir. 1995) .............................................. 139

xv

KILPATRICK CRINWELL, RENSHAW GRONAUER & FORRETTINO

RJN0051

*Nevada Contract Services, Inc. v. Squirrel Companies, Inc.*, 119 Nev. 157, 68 P.3d 896
 (2003) .......................................................................................................................... 192

*Nevada v. Hall*, 440 U.S. 410 (1979) ........................................................................... passim

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ................................................................ 158

*Oberson v. Federated Mut. Ins. Co.*, 126 P.3d 459 (Mont. 2005) ................................... 148

*Olivero v. Lowe*, 116 Nev. 395, 995 P.2d 1023 (2000) ..................................................... 119

*Olmstead v. United States,* 277 U.S. 438 (1928) ........................................................ 87, 88

*Pacific Employers Ins. Co. Industrial Accident Comm'n*, 306 U.S. 493 (1939) ............... 159

*Parker v. Dayton Metro. Hous. Auth.*, 1996 Ohio App. LEXIS 2556 (Ohio Ct. App. 1996) .......... 60

*Patton v. Ballam*, 115 Vt.308, 58 A.2d 817 (1948) .......................................................... 192

*Pearson ex rel. Latta v. Interstate Power and Light Co.*, 700 N.W.2d 333 (Iowa 2005) ............. 122

*People for the Ethical Treatment of Animals v. Berosini, Ltd.*, 111 Nev. 615, 895 P.2d 1269
 (1995) .................................................................................................................... 96, 132

*Perry v. Jordan*, 111 Nev. 943, 900 P.2d 335 (1995) ............................................. 110, 111

*Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 23 Cal.Rptr.3d 335 (Cal. Ct.
 App. 2005) ............................................................................................................... 112

*Pina v. Commonwealth,* 510 N.E.2d 253 (Mass. 1987) ................................................... 68

*Potter v. W. Side Transp., Inc.*, 188 F.R.D. 362 (D. Nev. 1999) ...................................... 121

*Powell v. Nevada, C. & O. Ry.*, 28 Nev. 40, 78 P. 978 (1904), *aff'd.*, 28 Nev. 305, 82 P. 96
 (1905) ................................................................................................................... 122, 134

*Prabhu v. Levine*, 112 Nev. 1538, 930 P.2d 103 (1996) .................................................. 195

*Printz v. United States*, 527 U.S. 898 (1997) .................................................................. 149

*Ransdell v. Clark County,* 124 Nev. ___, 192 P.3d 756 (2008) ................................. 52, 68

*Remsburg v. Docusearch, Inc.*, 816 A.2d 1001 (N.H. 2003) ......................................... 100

*Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657 (1838) ....................................... 152

*Rocky Mountain Produce Trucking Co. v. Johnson*, 78 Nev. 44, 369 P.2d 198 (1962) ............. 71

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989) ............. 148

*Rogers v. United States,* 187 F. Supp. 2d 626 (N.D. Miss 2001) .................................... 68

*Rothman v. Jackson*, 49 Cal.App.4th 1134, 57 Cal.Rptr.2d 284 (Cal. Ct.App. 1996) .......... 108

*Ruhlmann v. Ulster County Depts. of Soc. Services*, 194 F.R.D. 445 (N.D. N.Y. 2000) .......... 124

xvi

RJN0052

1  *Sahara Gaming v. Culinary Workers*, 115 Nev. 212, 984 P.2d 164 (1999) .................................. 109

2  *Sam v. Sam*, 134 P.3d 761 (N.M. 2006) .................................................................... 156

3  *Sandy Valley Assocs. v. Sky Ranch Estates Owners Ass'n.*, 117 Nev. 948, 35 P.3d 964

4     (2001) ......................................................................................................... 93

5  *Sawyer v. Southwest Airlines Co.*, 243 F.Supp.2d 125 (D. Kan., 2003) ........................... 121

6  *Schlatter v. Eight Judicial District*, 93 Nev. 189, 561 P.2d 1342 (1977) ............................ 105, 121

7  *Schoeberlein v. Purdue University*, 544 N.E.2d 283 (Ill. 1989) ....................................... 156

8  *SEC v. ESM Government Securities, Inc.*, 645 F.2d 310 (5th Cir. 1981) .............................. 88, 116

9  *Seidel v. Greenberg*, 108 N.J. Super. 248, 260 A. 2d 863 (1969) ................................... 194

10  *Sellers v. Henman*, 41 F.3d 1100 (7th Cir. 1994) .................................................... 71

11  *Shades Ridge Holding Co., Inc. v. Cobbs, Allen & Hall Mortg. Co., Inc.*, 390 So. 2d 601

      (Ala. 1980) .................................................................................................. 193, 194

12  *Sheehan & Sheehan v. Nelson Malley and Co.*, 121 Nev. 481, 117 P.3d 219 (2005) .................... 54

13  *Sheets v. Salt Lake County*, 45 F.3d 1383 (10th Cir.), *cert. denied*, 516 U.S. 817 (1995) ............. 102

14  *Sherman Gardens Co. v. Longley*, 87 Nev. 558, 491 P.2d 48 (1971) ................................. 160, 161

15  *Shuette v. Beazer Homes Holdings Corp.*, 121 Nev. 837, 124 P.3d 530 (2005) ......................... 174

16  *Siggelkow v. Phoenix Ins. Co.*, 109 Nev. 42, 846 P.2d 303 (1993) .................................. 163

17  *Solomon v. Supreme Court of Florida*, 816 A.2d 788 (D.C. 2002) ................................... 156

18  *State ex rel. Dep't Hwys. v. Nev. Aggregates*, 92 Nev. 370, 551 P.2d 1095 (1976) ................... 54

19  *State ex rel. DOT v. Hill*, 114 Nev. 810, 963 P.2d 480 (1998) ...................................... 178

20  *State ex rel. Speer v. Haynes*, 392 So.2d 1187 (Ala. 1980) ......................................... 148

21  *State Farm Mutual Automobile Insur. Co. v. Campbell*, 538 U.S. 408 (2003) ............. 135, 167, 168

22  *State v. City of Hudson*, 42 N.W. 2d 546 (Minn. 1950) ............................................ 155

23  *State v. Eaton*, 101 Nev. 705, 710 P.2d 1370 (1985) ............................................... 178

24  *State v. Holcomb*, 116 P. 251 (Kan. 1911) ......................................................... 155

25  *Sun Oil v. Wortman*, 486 U.S. 717 (1988) ......................................................... 159

26  *Tallman v. First Nat. Bank of Nevada*, 66 Nev. 248, 208 P.2d 302 (1949) ........................... 71

27  *Taylor v. Thunder*, 116 Nev. 968, 13 P.3d 43 (2000) ............................................... 53

28  *Tenet v. Doe*, 544 U.S. 1 (2005) .................................................................. 148

xvii

RJN0053

*Terbush v. United States,* 516 F.3d 1125 (9th Cir. 2008) ............................................... 68

*The Libertatia Associates v. United States,* 46 Fed.Cl. 702 (Fed.Cl. 2000) ...................... 60

*The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116 (1812) ........................... 147

*Tiberi v. Cigna Corp.,* 89 F.3d 1423 (10th Cir. 1996) .................................................. 139

*Times Mirror v. Superior Court,* 198 Cal. App.3d 1420, 244 Cal. Rptr. 556 (Cal. Ct. App. 1988), *cert. denied,* 489 U.S. 1094 (1989) .............................................................. 102

*Tobias v. Phelps,* 144 Mich. App. 272, 375 N.W.2d 365 (1985) ..................................... 60

*Tower v. Hirschhorn,* 397 Mass. 581, 492 N.E.2d 728 (Mass. 1986) .............................. 112

*Turner v. County of Washoe,* 759 F. Supp. 630 (Nev. 1991) .......................................... 138

*U.S. v. Dahlstrum,* 493 F. Supp. 966 (C.D. Cal. 1980) .................................................. 65

*UFCW v. Philip Morris, Inc.,* 223 F.3d 1271 (11th Cir 2000) ......................................... 194

*United States v. Gaubert,* 499 U.S. 315 (1991) ....................................... 55, 61, 63, 67

*United States v. LaSalle National Bank,* 437 U.S. 298 (1978) ...................................... 115

*United States v. Powell,* 379 U.S. 48 (1964) ............................................................. 115

*United States v. Tweel,* 550 F.2d 297 (5th Cir. 1977) .................................................. 116

*United States v. Varig Airlines,* 467 U.S. 797 (1984) ................................................... 63

*Verlinden B.V. v. Central Bank of Nigeria,* 460 U.S. 480 (1983) ................................... 147

*Vickers v. United States,* 228 F.3d 944 (9th Cir. 2000) ................................................ 61

*Wailua Associates v. Aetna Casualty & Surety Co.,* 27 F. Supp.2d 1211 (D. Hawaii 1998) ........... 65

*Wall v. Pecaro,* 204 Ill.App.3d 362, 561 N.E.2d 1084 (Ill. App. Ct. 1990) ...................... 120

*Ward v. United States,* 973 F. Supp. 996 (D. Colo. 1997) ............................................. 167

*Warren County, Miss. v. Hester,* 54 So.2d 12 (La.1951) ............................................... 155

*Watson v. Amedco Steel, Inc.,* 29 F.3d 274 (7th Cir. 1994) ............................................ 82

*Western Aggregates, Inc. v. County of Yuba,* 101 Cal.App.4th 278, 130 Cal. Rptr. 2d 436 (Cal. Ct. App. 2002) .................................................................................... 53

*Wheeler Springs Plaza, LLC v. Beemon,* 119 Nev. 260, 71 P.3d 1258 (2008) .................. 160

*Wills v. Amerada Hess Corp.,* 379 F.3d 32 (2d Cir. 2004), *cert. denied,* 546 U.S. 822 (2005) ..................................................................................................... 196

*Wood v. Safeway,* 121 Nev. 724, 121 P.3d 1026 (2005) ............................................... 185

xviii

RJN0054

| | | |
|---|---|---|
| *Wynn v. Smith,* 117 Nev. 6, 16 P.3d 424 (2001) | .................... | 109 |
| *Y.G. v. Jewish Hospital,* 795 S.W.2d 488 (Mo. Ct. App. 1990) | .................... | 102 |
| *Yamaha Motor Co., U.S.A. v. Arnoult,* 114 Nev. 233, 955 P.2d 661 (1998) | .......... | 195 |
| *Yeager v. Harrah's Club, Inc.* 111 Nev. 830, 897 P.2d 1093 (1995) | .......... | 189 |
| *Yerington Ford, Inc. v. General Motors Acceptance Corp.,* 359 F. Supp. 2d 1095 (D. Nev. 2004), *reversed on other grounds,* 494 F.3d 865 (9th Cir. 2007) | .......... | 112, 113 |

**Statutes**

| | | |
|---|---|---|
| 42 U.S.C. § 1983 | .................... | 165 |
| 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 359 | .................... | 52 |
| Ala. Code § 6-11-26 | .................... | 164 |
| Cal Civ. Code § 1798, *et seq.* | .................... | 37, 104 |
| Cal. Govt. Code § 11189 | .................... | 117 |
| Cal. Govt. Code § 860.2 | .................... | 153, 158 |
| Cal. Tax & Rev. Code § 19381 | .................... | 136 |
| Cal. Tax & Rev. Code § 19382 | .................... | 136 |
| IRS Code § 7431(c)(1)(B)(ii) | .................... | 167 |
| Mont. Code Ann. § 2-9- | .................... | 164 |
| N.J. Stat. Ann. § 59:9-2(c) | .................... | 164 |
| Nev. Admin. Code § 284.650 | .................... | 151 |
| NRCP 56(c) | .................... | 189 |
| NRS 17.130(2) | .................... | 174 |
| NRS 284.383 | .................... | 150 |
| NRS 284.385 | .................... | 150 |
| NRS 361.055 | .................... | 155 |
| NRS 41.032(2) | .................... | 59 |
| NRS 41.035(1) | .................... | 164 |
| NRS 414.110(1) | .................... | 59 |
| NRS 42.005 | .................... | 164, 171, 173 |

RJN0055

1  NRS 50.275 ......................................................................................... 194

2  Texas Code Ann. § 101.024 ................................................................. 164

3  **Other Authorities**

4  Alan Vickery, Note, *Breach of Confidence: An Emerging Tort*, 82 Colum. L. Rev. 1426
5     (1982) ............................................................................................ 112

6  Francis S. Chlapowski, Note, *The Constitutional Protection of Informational Privacy*, 71
      B.U. L. Rev. 133 (1991) ................................................................ 95

7  G. Michael Harvey, Comment, *Confidentiality: A Measured Response to the Failure of
8     Privacy*, 140 U. PA. L. Rev. 2385 (1992) .................................... 111

9  Prosser & Keeton on the Law of Torts, § 8 at 37 n. 27 (5th ed.1984) .......................................... 194

   Prosser, *Handbook of the Law of Torts,* § 12 at 60 (4th ed. 1971) ................................................ 119
10
   *Restatement (Second) of Torts* ........................................................ 119, 121
11
   *Restatement (Second) of Torts* § 46, cmt. j .................................. 120
12
   *Restatement (Second) of Torts* § 46, cmt. k .................................. 121
13
   *Restatement (Second) of Torts* § 652H (1977) .............................. 132
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KEMPPER CROWELL RENSHAW GRONAUER & FIORENTINO

xx

RJN0056

# RESPONDENT'S ANSWERING BRIEF

Respondent Gilbert P. Hyatt ("Respondent" or "Hyatt") files his answering brief.

## I.     STATEMENT OF THE ISSUES.

Appellant Franchise Tax Board of the State of California ("Appellant" or "FTB") raises innumerable issues in this appeal all directed at avoiding the judgment entered against it for its bad faith and intentional misconduct. The judgment is the result of a four-month jury trial in which the jury found for Hyatt on every conceivable factual issue. The three central factual disputes each side argued vigorously to the jury were:

(1) Whether the FTB conducted bad faith audits of Hyatt over a four-year period in the mid 1990s;

(2) Whether for an 11 year period thereafter the FTB delayed, *i.e.* put on "hold," and thereby refused in bad faith to issue a final determination in the audits under the guise of conducting a purported independent internal review of its audit determinations, in the hope of pressuring Hyatt to settle while preventing Hyatt from seeking an actual independent, *de novo* review of the FTB's assessments by the California State Board of Equalization (the "California Board of Equalization"); and

(3) Whether the FTB intentionally and in bad faith disclosed private and confidential information about Hyatt, and threatened that additional information would be disclosed through an even more thorough investigation, if Hyatt did not settle the matter and forego his *de novo* appeal to the California Board of Equalization.

The jury found overwhelmingly for Hyatt on all points. In so doing, the jury rejected the FTB's assertion that its conduct, both during the four years of the audits and the next eleven years of its purported independent internal review, amounted to the FTB simply "doing its job." The evidence supporting the jury's findings was substantial and is set forth in detail below with specific cites to the trial record. The issues in this appeal must therefore be framed in the context of the jury's findings on the disputed factual issues presented to it. Namely, the

1

RJN0057

FTB acted in bad faith and committed intentional torts during the 15 years it investigated and audited Hyatt, significantly delaying Hyatt from obtaining a *de novo* review of the FTB's determination — a process now pending in California.

Further, the four-month trial and resulting jury verdicts and judgment in this case were the product of a ten-year litigation, during which this Court reviewed and resolved multiple writ petitions, including issuing a ruling early in the proceeding that indelibly shaped the form and substance of the intentional tort claims ultimately presented to the jury. That early ruling by this Court was reviewed and unanimously affirmed by the United States Supreme Court. The FTB's appeal must be viewed in the context of the actual law of the case as determined by this Court.

By listing seven items in its Statement of Issues, the FTB tries to frame the issues in this appeal by its own asserted version of the "facts" (i.e., it was simply "doing its job"), but the FTB's version was soundly rejected by the jury. The issues in this appeal must therefore be restated as follows:

1.  Whether the jury's verdicts should be overturned, based on the voluntary doctrine of comity, on discretionary function immunity, or on principles embodied in the United States Constitution;

2.  Whether the District Court appropriately refused to interfere in the California administrative proceeding, which will decide Hyatt's residency and tax issues;

3.  Whether the factual determinations of the jury, satisfying each element of the intentional torts, are supported by substantial evidence;

4.  Whether the FTB's general assertion that the District Court committed error in "evidentiary and procedural" rulings, with little or no specification of any error, presents an appellate issue, when any such non-specific rulings, even if erroneous, were harmless in light of the evidence;

5.  Whether this Court should overturn the jury's conscientious analysis of the compensatory damage claims that encompass more than 15 years of Hyatt's suffering;

6.  Whether Nevada's public policy to protect Nevadans from tortious injuries should be eliminated in favor of a policy protecting the financial resources of California;

7.  Whether Nevada precedent allowing prejudgment interest on past damages should be overruled, replaced with a new legal concept that tort damages cease when a lawsuit is filed; and

2

RJN0058

8.  Whether the District Court erred in granting summary judgment dismissing Hyatt's claim for economic damages caused by the FTB's same breaches of privacy and confidentiality (Hyatt's cross-appeal).

## II. STATEMENT OF THE CASE.

This Court issued a decision in this case on April 4, 2002, affirming the decision of the District Court that the FTB was not entitled to immunity under California law for the bad faith conduct and intentional torts at issue in this Nevada tort action.[1]  The United States Supreme Court then granted the FTB's petition for certiorari, but unanimously affirmed this Court's decision.[2]

A four-month trial presented the jury with seven claims for resolution: (i) invasion of privacy (intrusion upon seclusion); (ii) invasion of privacy (publicity of private facts); (iii) invasion of privacy (false light); (iv) intentional infliction of emotional distress; (v) abuse of process; (vi) fraud stemming from the FTB's bad faith audit; and (vii) breach of confidential relationship.  The jury returned a verdict finding in favor of Hyatt on all seven claims.  The jury awarded Hyatt compensatory damages of $85 million for emotional distress, $52 million for the loss of his privacy interests, and $1,085,281.56 in special damages on Hyatt's fraud claim for professional fees Hyatt expended in defending the FTB's 4 year bad faith audit and subsequent 11 year purported independent review.[3]  The jury then determined that punitive damages were warranted, awarding $250 million in punitive damages.[4]  The District Court later awarded $102 million in prejudgment interest, the case having been filed in 1998.[5]

## III. SUMMARY OF ARGUMENT.

The FTB and the *amici* do not like the idea of government agents being held accountable for their bad faith, intentional acts.  But this Court and the United States Supreme Court have already decided that the FTB should be held accountable if it engaged in bad faith,

---

[1] 5 AA 1183-93. The Court did order that Hyatt's single negligence claim be dismissed. (Appellant's Appendix is referred to herein as "AA," and Respondent's Appendix is referred to herein as "RA.")

[2] *Franchise Tax Board v. Hyatt*, 538 U.S. 488 (2003).

[3] 54 AA 13308-09.

[4] 89 AA 22224 and 90 AA 22352.

[5] 90 AA 22362-22366.

RJN0059

1    intentional misconduct.  Now, after a four-month trial in which a jury considered evidence of

2    such intentional government misconduct occurring for over 15 years, was properly instructed

3    under the law, and returned verdicts supported by the evidence, the legal system has performed

4    as it should.  The jurors found that the FTB's egregious conduct in pursuit of Hyatt's wealth

5    caused Hyatt tremendous damage, holding the FTB accountable for its intentional, bad faith

6    conduct.  Again, a detailed discussion of the evidence presented supporting the jury's findings

7    is set forth below.  In that regard, the FTB's stated version of facts relies on inaccurate,

8    sometimes non-existent, citations to the trial record and citations to evidence not in the trial

9    record.

10       The jury determined that the FTB abused its enormous power in bad faith and

11   essentially destroyed a man.  The jury verdicts represent appropriate compensation for the 15

12   plus years of governmental abuse and misconduct.  The jury verdicts represent a determination

13   that punitive damages are warranted to deter the FTB from further despicable conduct.  Absent

14   a punitive damage award, Nevada has no means to deter the FTB — an out-of-state

15   government agency — that unlike Nevada agencies is not under the control or jurisdiction of

16   the Nevada legislative or executive branches.

17       The FTB was given every opportunity to raise (and it did raise) every conceivable

18   defense to being held accountable in a Nevada court.  After contentious and voluminous

19   pretrial proceedings, and after a four-month trial in which the District Court granted the FTB

20   broad leeway to present its version of the facts, eight attentive, conscientious citizens

21   performed their duties as a jury and resolved the factual issues in favor of Hyatt.  Consistent

22   with the pretrial decisions of this Court and the United States Supreme Court, the District

23   Court's fair and correct rulings on matters of law, and the trial evidence establishing each

24   element of each intentional tort asserted by Hyatt, Hyatt submits the jury verdicts must be

25   sustained.

26       A fundamental premise of the FTB's seven listed issues is that the District Court

27

28

4

permitted the jury to interfere with the sovereign taxing power of the State of California.[6] This premise fails. The law of the case *prohibited* Hyatt from trying the residency issue and the tax case — and the jury was expressly instructed on numerous occasions that it was not permitted to decide the tax dispute over Hyatt's residency, or the fact or amount of Hyatt's tax liability. Neither the jury nor the District Court made any judgment on where Hyatt lived, or on whether he owes taxes to California. No interference with California's taxing power occurred.

This case was pled as a tort case, litigated as a tort case, tried as a tort case, and decided by the jury as a tort case, under well-established tort law concepts consistent with this Court's prior ruling in this case and the unanimous opinion of the United States Supreme Court. Regardless of the results of the separate "tax case" in California, the FTB was not entitled to conduct itself in the manner it did in carrying out the audits of Hyatt.

The FTB's legal arguments depend on accepting its version of the "facts," i.e., its agents' innocuous and innocent conduct in the routine investigation, audits, and administrative protests involving Hyatt, lasting over 15 years. In other words, the FTB argues that because its agents did no wrong in "doing its job," it cannot be held liable for its conduct.

However, after more than four months of trial, and after hearing all of the evidence, including FTB's witnesses who claimed that its agents' conduct was innocent, the jury did not accept the FTB's premise that its agents did no wrong. Therefore, on appeal this Court must view the facts as presented by Hyatt and as determined and accepted by the jury, based on the substantial evidence presented at trial, supporting each element of Hyatt's tort claims.

In regard to the FTB's legal arguments, the FTB seeks first and foremost outright dismissal of his claims, regardless of the egregious conduct of its agents. Although this argument was considered and resolved against the FTB in decisions by both this Court and the United States Supreme Court, the FTB suggests that a recent Nevada case resuscitates its argument that the FTB is immune for its bad-faith acts and resulting intentional torts directed

---

[6] For example, FTB's second issue asserts that the District Court "effectively allowed the jury to sit as a 'court of appeal' for FTB's tax assessments... "

5

RJN0061

1   at a Nevada citizen.

2       The FTB is wrong. Bad-faith intentional torts are not protected by the discretionary

3   function immunity doctrine. Bad faith intentional torts cannot be discretionary. Neither the

4   Nevada cases nor the federal cases to which the FTB cites grant immunity for intentionally

5   tortious conduct by government actors. And, even if the discretionary function immunity

6   doctrine applies to acts other than negligent government conduct, the FTB has not satisfied the

7   two factors triggering this immunity as set forth in *Martinez v. Maruszczak*.[7] As this Court has

8   stated consistently in addressing the issue since its 2002 decision in this case, the FTB's

9   intentional misconduct is simply not protected by the discretionary function immunity

10  doctrine.

11      Bad faith intentionally tortious conduct by a government agency is not a common

12  occurrence and is very difficult to prove. But when it does occur — particularly in the context

13  in which the forum state's executive and legislative branches have no authority to stop it or

14  rectify it — the specter of tort damages can and does serve this purpose. The FTB's immunity

15  claims must therefore again be rejected, just as they were by this Court in 2002 and by the

16  United States Supreme Court in 2003.

17      In addition, a cornerstone of the FTB's appeal is that the District Court did not follow

18  the law of the case and instead allowed Hyatt to attack the FTB's discretionary decisions made

19  during the tax audits. The FTB argues that Hyatt was allowed to challenge the FTB's tax audit

20  conclusions and have those conclusions re-determined by the jury. In every respect, the record

21  unflinchingly contradicts the FTB's assertion. The District Court, this Court, and the United

22  States Supreme Court all concluded that the FTB's *conduct* could be examined under

23  principles of tort law in Nevada, without interfering with the FTB's audit, protest, and appeal

24  processes in California.

25      The FTB's arguments on this point simply have no merit. If this Court affirms the

26  generally-accepted legal principle that intentionally-tortious conduct of government agents can

27

28  _____

[7] 123 Nev. 433, 168 P. 3d 720 (2007).

KAMMERER CROWELL RENSHAW GRONAUER & FIORENTINO

6

be evaluated under state tort law concepts, then the verdicts must stand. If this Court decides to accept the FTB's novel legal theory that intentional misconduct of its agents is never subject to the restraint of tort laws of sister states, then there is no limit to government misconduct. Government agents wearing an executive branch cloak — from outside the state — could then act with impunity to destroy private citizens without accountability. This Court, as confirmed by the United States Supreme Court, established that California does not have such absolute immunity in Nevada. That is not the law, nor should it be.

At the outset of the trial, repeatedly throughout the trial, and during formal jury instructions, the District Court told the jury that it was not to decide the residency or the "tax case," because the issue of whether taxes are owed (and the amount, if any) was for California to decide. The jury was repeatedly instructed that it was to evaluate the FTB's *conduct* during its audits, and specifically whether, among other things, the FTB conducted the audits in bad faith to support a predetermined conclusion that Hyatt owed taxes, which even FTB's own employees questioned during the audits. Additionally, the jury was asked if the FTB intentionally, and in bad faith, disclosed private and confidential information about Hyatt, violating Hyatt's confidentiality and privacy rights, and abused legal process to get Hyatt's money.

Hyatt had to prove a high standard of FTB misconduct (i.e., bad faith and intentional misconduct). The jury was appropriately instructed,[8] and determined that Hyatt met this high standard. The jury concluded that the FTB's conduct during the audits of Hyatt — not the FTB's determination of residency and whether to assess taxes — was extreme, outrageous, and unacceptable in the State of Nevada. As addressed below, substantial evidence supports the jury's conclusions.

Further, the FTB misstates this Court's prior ruling and its application of the comity doctrine. In denying the FTB's first summary judgment motion in 2000, then-District Court Judge Saitta understood the parties' respective positions and limited the case that Hyatt could

---

[8] 5 AA 1183-1196; 53 AA 13244-13245.

7

1  try to the jury; namely, Hyatt could assert and attempt to prove that the FTB conducted the

2  audits in bad faith.  This was the bad-faith, intentional tort case that Hyatt initially pled and

3  then briefed with supporting evidence to Judge Saitta, and subsequently briefed with

4  supporting evidence to this Court.  Hyatt was not permitted to try a case establishing the date

5  he changed residency to Nevada or determining whether or how much he owed California.[9]

6       When the FTB petitioned this Court to review Judge Saitta's decision, Hyatt briefed the

7  same issues presented in the FTB's first summary judgment motion, citing the same evidence, to

8  this Court.  This Court ruled that Hyatt was entitled to pursue his claims against the FTB for bad-

9  faith and intentional torts, rejecting the FTB's request for comity.[10]  The FTB now argues under the

10  guise of comity something well beyond what this Court ruled and what the doctrine of comity

11  encompasses.

12       Hyatt addresses the comity issue extensively below in rebutting the FTB's arguments

13  for application of a damages cap under Nevada law.  In short, this Court did not rule, and

14  Hyatt did not argue, that the FTB must be treated in every respect like a Nevada government

15  agency.  That is not how comity works.  This Court's comity ruling in 2002 was limited to the

16  FTB's assertion of absolute immunity under California law.  Besides the FTB's erroneous

17  application of the doctrine of comity, sound public policy reasons require that the Court reject

18  the FTB's request for application Nevada's damages cap statute to the FTB.  Most specifically,

19  unlike a Nevada agency that must be responsive to Nevada's legislature and executive branch,

20  those branches of government in Nevada have no authority or control over the FTB, or any

21  other out of state agency.  The reasons for imposing a damage cap on a Nevada agency in a

22  Nevada court proceeding therefore do not apply to the FTB.

23       Similar public policy arguments rebut the FTB's arguments, as well as those set forth in

24  the amicus briefs, in regard to punitive damages.  The FTB is also wrong on the law.  There is

25  no federal common law prohibiting one state from imposing punitive damages on another state

26

27  _____
   [9] 2 AA 420-421.

28  [10] 5 AA 1183-1196.

8

KARMENTER CROWELL RENSHAW GROSNADER & FIORENTINO

RJN0064

1  for malicious, fraudulent conduct directed at or occurring in the forum state.

2         Finally, substantial evidence supports the jury's verdict on each claim and the award of

3  compensatory damages.  Prejudgment interest was also appropriately awarded on those damages.

4         The FTB has not identified any errors of the District Court that warrant reversing the

5  verdicts and resulting judgment.  The record, as reflected in the voluminous appendices, show the

6  District Court's conscientious and complete consideration of all issues presented, both pre-trial and

7  during trial.[11]

8  **IV.    STATEMENT OF FACTS.**

9  **A.    The FTB's Statement of Facts does not comport with the jury's findings.**

10        The FTB's Statement of Facts presents a benign and rose-colored version of events

11  during the audits and protests that does not comport with the evidence presented at trial and,

12  not surprisingly, is inconsistent with the jury's findings as evidenced by its substantial verdicts.

13  The verdicts necessarily reflect determinations by the jury on the key disputed facts in favor of

14  Hyatt.  Substantial evidence supports each of these findings, and neither the FTB nor this

15  Court can substitute its judgment for that of the fact-finder.  These now-determined facts

16  include that the FTB demonstrated personal animus and hostility toward Hyatt because of his

17  religion and wealth and willfully and deliberately disregarded his rights, including repeated

18  and unnecessary illegal disclosures of his private and confidential information.  The FTB

19  conducted the audits for over a four-year period with no intent to be fair and unbiased, and it

20  issued proposed tax assessments that contradicted the FTB's own internal documents

21  questioning the FTB's basis for taxing Hyatt.

22        The jury determined that the FTB unsuccessfully sought to extort a settlement from

23  Hyatt, and when that failed, it intentionally delayed and refused to conclude the "protest"

24  phase of the audits for *over 11 years,* preventing Hyatt from getting a *de novo* hearing before

---

26  [11] *See,* Appellant's Appendix and Respondent's Appendix.  The FTB puts forth half-hearted one or two
27  sentence statements on many purported trial court errors, without explaining why or how any of these
constitute reversible error.  To the extent that the FTB asserts in its Reply that Hyatt has not addressed any
28  argument or issue put forth by the FTB, Hyatt categorically denies that the FTB has any basis for reversal or
modification of the judgments under any argument it alludes to in its brief.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

1    an independent body.  These facts are particularly outrageous because they were committed by

2    a government agency which claims that its auditors and protest officers are oath-bound to obey

3    and enforce the law, and duty-bound to be "fair and impartial."  The FTB's bad faith permeates

4    and provides context and evidence for each of the intentional tort claims on which the jury

5    found in favor of Hyatt.

6    **B.    Gil Hyatt, a genuine, new American hero, chose to move to Las Vegas,**

7    **like millions of other individuals over many years.**

8         Hyatt was 55 years old when the FTB commenced an audit of his 1991 state-tax return

9    in 1993.  He was 69 years old when the FTB issued a final assessment at the end of 2007, and

10   he was 70 years old when the trial began in 2008.[12]  In 1993 when the audit commenced, Hyatt

11   was beginning to enjoy the fruits of his life-long labors as an engineer and inventor.  In 1990

12   he won a 20-year contest with the United States Patent Office, securing a patent for the single

13   chip microprocessor that spawned the personal computer.  He was called an American hero by

14   some, the 20th Century's Thomas Edison by others.[13]

15        After experiencing a brief "15 minutes" of professional fame but not enjoying the

16   limelight and attention, Hyatt testified that he moved from California to Nevada in September

17   1991.[14]  Hyatt's reasons for moving were no different from those of millions of other people

18   who moved to Nevada over the past several decades.  And he resides in Las Vegas to this day.

19   After moving to Nevada, Hyatt enjoyed some financial success from the licensing of his patent

20   technology.  Hyatt, after being frugal all his life, bought a five bedroom home and a new

21   Toyota.  With the help of his new CPA, Mike Kern, Hyatt developed contacts and set up his

22

23   _____

24   [12] RT: May 8, 29:5-30:2; May 12, 112:22-23; June 5, 94:4-9; 82 RA 020278-020280; 82 RA 020471-
     020475; 88 RA 021826.  ("RT" refers to the Reporter's Transcript from the trial conducted in the District

25   Court.  In the Statement of Facts, Hyatt places his supporting citations from the record in a single footnote
     after several sentences or an entire paragraph where there are related subject matters in order to avoid

26   further lengthening the brief by inserting a footnote after each sentence).

     [13] RT: May 8, 39:10-12; 128:2-131:4; 10 AA 02428-02430, 02433; 79 AA 19732-19738.

27   [14] RT: May 8, 39:10-40:15; May 19, 140:1-3.  This is not a fact that was addressed or resolved by the jury's

28   verdicts, per court order, and Hyatt acknowledges that the FTB disputes this date.  The current tax appeal in
     California will determine when Hyatt moved to Nevada.

                                                        10

KADISFER CROWELL RENHLAW CROMAKER & FIORENTINO

1 business in Nevada. Hyatt was ready to live the prime of his life, pursuing his life-long

2 activities involving new technologies.[15]

3      Then in 1993, the FTB notified Hyatt he was under audit for his 1991 California state

4 income tax return. Although Hyatt was concerned about his privacy, particularly given past

5 experiences with industrial espionage, he was reassured by the FTB at the beginning of the

6 audit and throughout the audit that his information would be kept confidential.[16] As the audit

7 proceeded over two years and through three different FTB auditors, Hyatt did not have a

8 concern how the audit would turn out, because none of the FTB auditors expressed any

9 concern to him or his tax representatives. This changed suddenly in August, 1995. Without

10 any warning or opportunity to address the auditor's stated position, Sheila Cox, the FTB's third

11 auditor, not only proposed to tax Hyatt for income earned late in 1991, she deemed him a tax

12 cheat and a fraud. From that point forward, Hyatt fought vigorously to clear his name; it has

13 taken him 15 years, so far.[17]

14 **C.    Chronology of the tax proceedings.**

15     **1.    The audits (1993 to 1997).**

16      Three different auditors worked on the 1991 audit between 1993 and 1995, including

17 the eventual lead auditor, Sheila Cox. Cox issued a lengthy Determination Letter on August 2,

18 1995, informing Hyatt for the first time that the FTB intended to assess millions of dollars in

19 taxes and penalties, including a 75% penalty for fraud.[18] In April 1996, the FTB issued its

20 proposed assessment of taxes, penalties, and interest for the 1991 tax year of over *four million*

21 *dollars*, the largest proposed assessment within the FTB's Residency Program (the unit within

22

23

24

_____

25 [15] RT: April 24, 166:21-167:14; April 28, 122:1-23; May 8, 89:6-16; May 9, 177:3-6; 63 AA 15663-15667.

26 [16] RT: April 29, 176:4-177:3, 179:23-181:1, 182:16-184:18; April 30, 69:3-9, 162:8-14, 163:16-164:4; May 8, 134:12-135:2; 82 RA 020471-020475; 83 RA 020705-020707.

27 [17] RT: April 25, 59:2-60:3, 69:17-70:8, 108:17-109:11, 123:5-128:21, 169:9-16; April 28, 22:13-18; April 29, 182:16-186:4; May 8, 121:24-122:16, 153:14-154:14; 84 RA 020865-020904.

28 [18] RT: April 29, 175:18-185:24; 93 AA 2309-23126; 84 RA 020865-020904.

KAMMPTER CROWELL, RENSLAW CROSAKER & FIORENTINO

RJN0067

1  the FTB responsible for residency audits) for its 1995 fiscal year.[19]  In June 1996, Hyatt filed a

2  formal "protest" of the proposed assessment, with detailed refutation of the FTB's audit

3  conclusions.  This officially triggered what is represented by the FTB and California law as an

4  internal review by the Protest Division of the FTB, with a new set of "eyes" looking at the

5  proposed assessment.[20]

6  In early 1996, the FTB and Cox commenced a second audit of Hyatt, this one for the

7  1992 tax year.  Later that year, without any additional investigation, the FTB told Hyatt that it

8  would assess him *more than six million* additional dollars in taxes and interest.  But unlike the

9  1991 tax-year audit, Cox did not recommend a penalty for fraud.  A year later, the FTB

10  overruled Cox and added a fraud penalty for 1992, increasing Cox's initial decision by more

11  than four million dollars, not including interest.[21]

12  Shortly thereafter, the FTB issued its proposed assessment of taxes, penalties, and

13  interest for the 1992 tax year of over *fourteen million dollars*.[22]  This was by far the largest

14  proposed assessment in the FTB's Residency Program for its 1996 fiscal year, with an

15  astronomical "CBR" (cost-benefit ratio), a measurement of the assessed amount divided by the

16  number of hours spent on the audit, giving an amount assessed per hour of audit work.  For the

17  1992 Hyatt audit, the CBR for the taxes and penalty assessed was $9,920,786.00 divided by 78

18  hours, or *$127,190.00 per hour*, while the typical CBR for a residency audit was between

19  $800 and $1000 per hour.[23]  Hyatt filed a formal protest of the 1992 tax-year proposed

20  assessment, just as he had for the 1991 proposed assessment.[24]

21

22  [19] The breakdown was: tax: $1,876,471.00; penalty $1,407,353.00; interest $1,256,580.00; total
23  $4,540,404.00.  54 AA 13326-13329; 93 RA 023019-023025.

24  [20] This internal process is referred to as the "protest," in which an FTB employee acting as the protest officer examines the auditor's work, independently; however, this is not a review by an independent, non-
25  FTB person or body.

26  [21] 85 RA 021033; 85 RA 021045-021061; 85 RA 021082-021085.

[22] The breakdown was: tax: $5,669,021.00; penalty $4,251,765.00; interest $4,195,154; total
27  $14,115,941.00.  54 AA 13398-13403.

[23] 93 RA 023019-023025; RT April 24, 38:6-15.
28  [24] RT: April 30, 144:1-13; 54 AA 13404-13406.

12

RJN0068

1   **2.  The protests (1996 to 2007).**

2   In a protest, the FTB conducts an internal review by supposedly-independent FTB

3   employees, and if necessary, it re-investigates the facts underlying each audit. This protest

4   phase started in 1996, but the FTB did not decide and conclude the protests *for over 11 years*

5   (closely approximating the time this case was pending before the trial). On November 1,

6   2007, less than six months before this case went to trial, the FTB issued its internal

7   determination, finding that no changes would be made to the proposed assessments issued 11

8   and 10 years previously.[25]

9   **3.  The pending de novo tax appeal (2008 to present).**

10  Upon receiving final determinations in the audits in 2007, Hyatt then exercised his

11  right to appeal the FTB's determinations to the California Board of Equalization. By law, the

12  California Board of Equalization conducts a *de novo* appeal, in which it can and does accept

13  new evidence. Both Hyatt and the FTB submit briefs, and a hearing is held.[26] That appeal is

14  proceeding in California. The issues of Hyatt's residency and whether he owes taxes to

15  California will be decided in that appeal — not in this tort litigation.

16  **D.  The FTB promised, and was obligated, to be "fair and impartial" in the**
    **audits and protests, i.e., to conduct a good faith audit.**

17  The FTB holds itself out to taxpayers in its Privacy Notice, Mission Statement,

18  Strategic Plan, manuals, and in communications with the public to be fair and impartial in its

19  dealings with taxpayers and to keep taxpayer information strictly confidential.[27] It professes

20  not to guard the revenue, but to interpret the law evenly and fairly with neither a state nor a

21  taxpayer point of view. The FTB's internal Audit Standards require that auditors act with

22  objectivity and in a fair and unbiased manner.[28] Every FTB audit witness at trial testified that

23

24

25  [25] RT: May 12, 82:1-10; 88 RA 021826.

26  [26] RT: July 9, 142:14-20; 88 RA 021826.

27  [27] 82 RA 020471-020475; 93 AA 23181; 55 AA 13705; 56 AA 13939-13940; RT: May 27, 81:13-17, 104:19-105:6; June 9, 57:1-24; June 20, 158:22-159:24.

28  [28] 55 AA 13705, 13708.

13

1   he or she must act in a fair and impartial manner toward each taxpayer, including Hyatt.[29]  The

2   FTB's first auditor, Marc Shayer, testified that the initial privacy notice states that the FTB will

3   treat the taxpayer with courtesy, and this was intended to convey to Hyatt that the FTB would

4   conduct a fair and unbiased audit.[30]  Hyatt reasonably understood and believed that the FTB

5   would conduct a fair and unbiased audit.[31]

6   **E.     The jury heard and accepted substantial evidence of outrageous, bad
7           faith conduct by the FTB during the audit.**

8       **1.     The FTB audited Hyatt upon learning how much money he had made.**

9           The FTB's initial audit of Hyatt was triggered by a newspaper article in 1993 that

10  reported Hyatt's new wealth from patent royalties after moving to Nevada.  The first auditor,

11  Marc Shayer, testified that what "popped" into his mind in reading the article was how much

12  money Hyatt had made.  Shayer recalls that he read that Hyatt stood to make "hundreds of

13  millions" of additional dollars from his patents.[32]  This prompted Shayer to request Hyatt's

14  state tax return records and open an audit of Hyatt's 1991 tax-year return.[33]

15          During the six months he worked on the audit, Shayer focused on developing possible

16  legal theories to tax Hyatt's money, even though Hyatt had moved to Nevada years before.[34]

17  One theory was residency:  that Hyatt allegedly resided in California for some time after he

18  said he moved to Nevada.  Another theory Shayer explored was sourcing:  that the "source" of

19  Hyatt's income allegedly was work performed in California and was possibly taxable even

20  though Hyatt was no longer a California resident.[35]

21

22  [29] RT: May 22, 104:8-105:10, 121:12-17, 123:1-18; May 27, 111:22-112:20; June 9, 48:5-10; June 10,
    135:7-15; June 11, 43:11-15; June 20, 158:22-159:24, June 23, 73:24-74:1; June 24, 83:13-20, 86:16-23,
23  147:15-20; June 25, 78:18-23, 84:16-25, 88:2-20; July 7, 101:11-14, 198:18-22; July 8, 156:11-15; July 9,
    116:21-24, 154:22-155:12; July 10, 171:19-21; July 15, 154:17-19, 160:4-12, 183:13-23.
24
    [30] RT: June 20, 158:22-159:24; 82 RA 020471-020475.
25
    [31] RT: May 9, 155:5-15; May 16, 124:5-9, 17-25.
26
    [32] RT: June 20, 147:14-148:20; 150:14-151:2.
27
    [33] RT: June 20, 151:3-153:5.
28  [34] RT: June 20, 175:15-177:13, 185:19-188:6; 63 AA 15651-15652.

    [35] RT: June 20, 175:15-177:13, 185:19-188:6.

14

1  Shayer later wrote a memo to FTB in-house attorney, Anna Jovanovich, pointing out

2  that *if* the FTB could reclassify Hyatt's income as "sourcing" income, it would result in $1.8

3  million in taxes for the FTB from Hyatt.[36] From the outset of the audit, then, the FTB was

4  searching for ways to tax Hyatt, whether or not he continued to reside in California. The FTB

5  was not impartially gathering the facts to make a fair determination whether any tax is owed.

6  Jovanovich, from the time she received Shayer's memo through her involvement in the audit

7  and protest phases, therefore viewed the audits as a means to collect money from Hyatt for the

8  FTB.

9  After Shayer ceased working on the Hyatt audit without reaching any decisions, a

10  second auditor took over the audit. The second auditor retraced some of Shayer's steps, but

11  like Shayer, he failed to reach any conclusions that the FTB had a basis to tax Hyatt.[37] A year

12  and a half into the audit, a third auditor, Sheila Cox, took over. She was young and

13  inexperienced in residency audits. Yet, her first act was to prepare a memo on how the FTB

14  could tax Hyatt. She then implemented her plan, first by contacting Hyatt's ex-wife (Priscilla

15  Maystead), who had recently been unsuccessful in attempting to set aside the 18-year-old final

16  divorce decree. Then, Cox asked the ex-wife for other leads identifying people who might

17  have information adverse to Hyatt, and she pursued those leads immediately, all in an attempt

18  to grab Hyatt's new wealth for the FTB.[38]

19  **2.  The lead auditor was openly biased against Hyatt and his religion.**

20  Cox would talk to her husband about "getting this taxpayer," meaning Hyatt. She

21  made a number of anti-Semitic remarks during the audit, including suggesting to her then best

22  friend and fellow auditor Candace Les that she would get the "Jew bastard," and that most of

23  the large income taxpayers in California were Jewish.[39] Les hardly backtracked on this

24

25  [36] 63 AA 15651-15652.

26  [37] RT: April 25, 80:10-81:17, 84:11-24; 83 RA 020531-020610, 020612-020613; 93 AA 23096-23012.

27  [38] RT: May 27, 57:7-17; 63 AA 15553-15555; 93 AA 23103-23107; RT: June 25, 202:24-203:8, 214:20-
215:24; May 20, 135:3-136:7.

28  [39] RT: April 24, 132:2-23, 140:11-141:25.

15

KAMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0071

testimony as suggested by the FTB. Rather while disagreeing with Hyatt's characterization of her initial testimony in certain briefing, she confirmed when cross-examined by FTB counsel that she heard Cox used racial slurs "maybe 20 times" and that while Les understood "these racial slurs that Sheila made in a joking sense like to say the way [Cox] talks out of the side of her mouth, 'That Jew bastard,'" Les "knew it was intended as a joke because she was upset with him [Hyatt]" but "that she cross (sic) the line."[40]

Cox was so friendly with Les that she gave Les a portion of the draft fraud penalty narrative which Cox intended to issue against Hyatt, along with other parts of the audit file. Les concluded the narrative did not support Cox's intended issuance of a fraud penalty and that Cox needed to meet with Hyatt to get his version of the events.[41] Les believed that Cox was obsessed with Hyatt and had created a "fiction" about him.[42] Cox's obsession with Hyatt included making an unauthorized visit to Hyatt's Las Vegas home *after* she had closed the 1991 tax-year audit,[43] where she took a picture of Hyatt's house[44] as if it was a trophy of her having "gotten" the "Jew bastard." Cox also called Hyatt's ex-wife after the audit, to boast to her that Hyatt had been "convicted."[45]

Les, herself Jewish, was an experienced auditor and was offended by Cox's conduct and treatment of Hyatt.[46] Les ultimately had a falling out with Cox and asked the FTB to investigate Cox's racist attitudes. Les testified that the FTB did not adequately investigate her allegations.[47]

---

[40] RT: April 24, 136:5-22.

[41] Sharing a taxpayer's file (or an auditor's work product) was a violation of FTB's "need-to-know" policy designed to protect confidential taxpayer information. 56 AA 13913-13929; RT: April 23, 172:24-173:6; April 24, 29:1-16.

[42] RT: April 24, 42:4-43:8, 80:22-81:11, 134:1-12; 136:23-138:2.

[43] RT: April 24, 134:7-12, 65:11-16.

[44] 85 RA 021013.

[45] RT: May 20, 140:12-141:19.

[46] RT: April 23, 163:23-164:6; April 24, 27:10-28:2, 136:23-138:2.

[47] RT: April 23, 167:6-17.

16

RJN0072

### 3. The lead auditor viewed the Hyatt audits as a means to advance her career and did significantly advance her career with the audits.

Besides personal animus toward Hyatt, his religion, or his money, Cox understood the significance of the audit to the FTB, and to her career. She openly told Les before their falling out that she was looking to advance her career with the Hyatt audit.[48] As the audit went on and the hours on the case began to mount, Cox became worried. She knew she could not return a low or no change result to her superiors in the FTB, given the large number of hours (over 600) already expended on the Hyatt audit.[49] The FTB expected a return on this enormous investment of time.

At the outset of her involvement, Cox prepared an Audit Strategy Memo, in which she told her superiors that she would look at "sourcing" as a possible basis to tax Hyatt, but if that did not pan out "*further examination of the residency issue will have to be pursued*," demonstrating that her assignment was to tax Hyatt, one way or another.[50] Cox even admitted that after she started working on the audit, she was not neutral.[51] Cox was rewarded for the large tax and fraud penalty proposed assessments for the 1991 tax year by being promoted to the special investigations unit.[52]

For the 1992 audit, Cox's initial proposed assessment did not propose a penalty on the substantial taxes already assessed, and she so informed Hyatt's representative.[53] After her short stint in the special investigations unit, Cox returned to the Residency Program, and the Hyatt 1992 audit was still pending, to her surprise. It landed on her desk, with instructions to finalize the FTB's now-larger proposed assessment (with a 75% fraud penalty). Her supervisors decided while she was away that a fraudulent failure to file penalty should be imposed, assigning another younger, inexperienced auditor to write up a fraud penalty

---

[48] RT: April 24, 76:16-77:7, 129:9-15.

[49] RT: April 24, 26:11-19, 74:1-75:20.

[50] 63 AA 15553-15555.

[51] RT: May 28, 95:21-96:8.

[52] RT: May 27, 48:10-13.

[53] RT: April 30, 106:12-20; 85 RA 021045-021061.

17

KAMRANI, CROWELL, RENSHAW, GRONAUER & FIORENTINO

justification for the 1992 proposed assessment. That auditor had no experience with the Hyatt audit and did nothing to investigate any facts to support a 1992 fraud penalty. Cox accepted his change and included a fraud penalty with her proposed assessment for 1992.[54]

Later, Cox attended the United States Supreme Court oral argument in this case, paying her own way to the proceedings. Despite this, Cox claimed she was not obsessed with Hyatt.[55] Cox took a leave of absence from her work, to help the FTB attorneys prepare this case for trial.[56] She was hardly an unbiased auditor, nor an unbiased witness.

**4. The lead auditor did not pursue, and tried to bury, evidence that was favorable to Hyatt, claiming she did this based on her "intuition."**

One disputed fact presented to the jury was whether the FTB, and in particular Cox, had a predetermined conclusion to tax Hyatt's substantial new wealth, while publicly claiming they conducted fair and unbiased audits. On this issue, the jury heard substantial evidence.

**a. La Palma neighbors.**

When Cox conducted field interviews of Hyatt's former neighbors in La Palma, California, she intentionally avoided formally documenting exculpatory statements from neighbors, who point blank told her that Hyatt had moved to Nevada during the very time frame Hyatt claimed. For example, the FTB's audit file referred to a witness identified as "Stacy's mom" who told Cox that Hyatt had moved to Las Vegas six months after obtaining his patent and that a woman had been living in the house since he left.[57]

This evidence was not consistent with Cox's Audit Strategy Memo that the FTB "will have to pursue" residency in order to tax Hyatt. This evidence verified Hyatt's residency position. While Cox sought statements from other neighbors regarding Hyatt's move, she specifically did not seek a written statement from Stacy's mom or document what Stacy's mom told her as Hyatt-favorable evidence. Cox testified that she did not do so based on her

---

[54] RT: May 30, 145:4-146:17, 148:9-151:5; June 9, 97:9-16, 102:7-103:17, 108:2-110:10; 85 RA 021079-021081, 021082-021085.

[55] RT: May 27, 51:24-52:24.

[56] RT: May 28, 4:24-6:8.

[57] RT: May 29, 50:6-55:3, 56:4-56:18, 68:6-70:12, 73:13-25, 98:3-9; 68 AA 16804, 16815.

18

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

1    "intuition" that it would not be worthwhile.[58]

2        Another former neighbor, Keith Kalm, returned Cox's questionnaire, also stating that

3    Hyatt had moved to Nevada in 1991 and a woman had been living in the house since he left.[59]

4    Again, Cox had no credible explanation as to why she did not interview, secure a written

5    statement, or at least seek additional information from Kalm.[60]  A reasonable inference is that

6    Cox did not want to compile, and in fact wanted to avoid, any evidence corroborating Hyatt's

7    residency position.  A third neighbor named "Becky" also supported Hyatt's residency

8    position, according to the FTB's audit file, but Cox again made no effort to document or detail

9    this witness' information, which would further support Hyatt's residency position.[61]  In fact,

10   Cox knocked on every door in the La Palma neighborhood except Hyatt's former house where

11   she could have spoken to Grace Jeng, to whom Hyatt had sold the house.[62]

12       **b.    Friends and relatives.**

13       Cox's audit results against Hyatt were based almost exclusively on three unsworn

14   statements from estranged relatives of Hyatt, who had lost in litigation against Hyatt or had

15   supported the losing party against Hyatt.  Cox accepted their information, which was mostly

16   secondhand, without question, using it as the focus of her audit determinations.  But she did

17   not even speak to the one relative whom she knew had first-hand knowledge of Hyatt's move

18   to Las Vegas.  Hyatt's son, Dan, helped Hyatt move in 1991, even lending Hyatt a trailer to do

19   so.[63]  Cox was aware of this, but never sought to speak with or obtain a statement from him,

20   and again, she had no credible explanation for not doing so.[64]  Similarly, Hyatt's friend and

21   former girlfriend Helene ("Leni") Schlindwein returned one of Cox's questionnaires,

22

23   _____

24   [58] RT: May 29, 99:12-100:24.

25   [59] 84 RA 020779-020787.

     [60] RT: May 29, 88:5-89:21.

26   [61] RT: May 29, 55:4-56:3, 93:4-18, 97:9-10, 98:3-9; 68 AA 16804.

27   [62] RT: May 29, 75:21-77:5.

     [63] RT: June 18, 13:8-16.

28   [64] RT: May 27, 125:17-126:17; June 18, 28:15-29:19.

RJN0075

1  explaining that Hyatt moved to Nevada in 1991. Cox never interviewed, contacted or sought
2  additional information from Schlindwein.[65]

3      Most telling, Cox never sought to or spoke with Hyatt. She did not want Hyatt's
4  version of the events she was investigating, and she did not want him to know the extent of her
5  actions.

6          **c.    Other evidence submitted by Hyatt.**

7      Hyatt also identified for Cox numerous additional witnesses in Nevada, including real
8  estate agents, escrow officers, insurance agents, a home inspector, a security provider, and
9  others. Cox never pursued additional information from these sources.[66] Cox also ignored or
10 discounted records that, under FTB policies, are considered significant indicia of residency,
11 including Hyatt's Nevada voter's registration, Nevada driver's license, and Nevada insurance,
12 each of which Hyatt obtained in 1991.[67]

13     A reasonable inference for the jury to draw based on the evidence presented was that the
14 FTB, and Cox in particular, had no intent of conducting a fair and unbiased audit, but rather had
15 predetermined that Hyatt's substantial new wealth must be taxed in some manner by California.
16 Evidence supporting that determination was accepted by Cox, while contrary evidence was ignored
17 and neither sought nor gathered.

18     **5.    The lead auditor relied on three un-sworn statements from three
19          estranged relatives of Hyatt, all of whom admitted they had an axe to
20          grind.**

21     Cox's primary basis for assessing Hyatt millions of dollars in taxes and penalties were three
22 un-sworn statements (she called them "affidavits" in the audit file, thereby misrepresenting them as
23 sworn statements) from estranged relatives of Hyatt. Cox's August 2, 1995, Determination Letter
24 touted the "affidavits" as the basis for her finding that Hyatt did not move to Nevada in the fall of

25

26  ―――――――――――
27 [65] RT: May 27, 126:24-128:21; 167:22-168:4.

[66] RT: May 27, 126:18-23; July 1, 90:15-91:8; 63 AA 15619-15627; 67 AA 16510-16511.

28 [67] RT: May 27, 69:22-71:21; May 28, 126:15-21; June 6, 118:13-120:6; June 12, 17: 10-22.

RJN0076

1991 as he claimed.[68] Despite anchoring the FTB's tax and fraud penalty assessment, the FTB refused to let Hyatt see the so-called "affidavits" during the audit, preventing Hyatt from learning who the "affiants" were and responding to this "evidence" against him.[69] When Hyatt finally received the "affidavits" over a year later, when the FTB produced the audit file to Hyatt as part of the protest proceeding, Hyatt learned the "affidavits" were not really affidavits. They were statements, not given under oath, from estranged family members who admittedly had no personal knowledge of Hyatt's move or residency in Nevada.[70] Although Cox did not put those witnesses under oath,[71] she represented the unsworn statements as affidavits and signed the jurat on each, thereby representing that each witness had been sworn in.

     In fact, the first substantive action Cox took as the newly assigned auditor was to contact and interview Hyatt's long ago divorced ex-wife, one of the unsworn affiants. Cox explained that talking to ex-spouses is a way to gather information about a taxpayer under audit. Maystead had been divorced from Hyatt for over 15 years, admitted she had no personal knowledge of Hyatt's residency for the years at issue, and had recently lost a lawsuit to Hyatt in which she had sought to re-open the divorce decree and secure a portion of his new wealth and was very bitter towards Hyatt. Yet, Cox used her "affidavit" as a primary basis for taxing Hyatt and withheld it from him during the audits.[72]

     The second "affidavit" cited by Cox was that of Hyatt's estranged brother, Brian Hyatt, a convicted felon. Maystead referred Cox to Brian Hyatt. Brian Hyatt told Cox that he had no personal knowledge of Hyatt's residency for the years at issue. But again, Cox cited his "affidavit" as a primary basis for assessing Hyatt millions of dollars in taxes.[73]

---

[68] 84 RA 020865-020902.

[69] RT: April 30, 45:14-22; 83 RA 020616-020624, 020630-020635; 84 RA 020935.

[70] RT: May 27, 134:8-135:25, 166:15-167:14; 83 RA 020616-020624, 020630-020635.

[71] RT: May 27, 166:15-19.

[72] RT: May 27, 134:23-142:12; June 2, 182:22-183:4; June 4, 184:4-9; 80 RA 019993-019994; 83 RA 020616-020620; 84 RA 020896, 020900.

[73] RT: May 27, 142:3-149:16, 150:8-153:24; 83 RA 020621-020624; 84 RA 020986, 020900.

KARNATZER CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0077

1　　　　The third "affidavit" was from Hyatt's daughter, Beth. She had supported her mother,

2　Maystead, since her parents' divorce long-ago and in the recent failed litigation against Hyatt.[74]

3　The jury heard testimony that although Hyatt had made attempts to repair the relationship and that

4　he had helped support Beth Hyatt through college at UCLA and with other expenses, Beth Hyatt's

5　estrangement from her father was exemplified by her cruelty toward him. Dan Hyatt testified that

6　Beth deliberately gave her father the wrong day of her graduation from UCLA, then laughed about

7　him wandering the campus looking for the graduation ceremony, and being humiliated when he

8　was told that he had the wrong day.[75] Beth Hyatt also testified how she staked out her father to

9　help serve process on him when Maystead attempted, without success, to re-open their 18 year old

10　divorce decree.[76]

11　　　　Beth Hyatt noted that she had visited Hyatt in Las Vegas, and suggested he may have also

12　spent some time in California. But she printed on her "affidavit" above her signature that she could

13　not be held to her statements.[77] Yet this was what Cox cited as the basis for assessing Hyatt

14　millions of dollars in taxes and calling him a fraud, for purportedly not moving to Nevada when he

15　said he did.

16　　　**6.　　The lead auditor intentionally deceived Hyatt's tax representatives into**

17　　　　　**believing there were no issues in the audit, when in reality, she was**
　　　　　　**building a one-sided case and did not want evidence that would**

18　　　　　**contradict her predetermined conclusion.**

19　　　　Cox commenced her work on the Hyatt audit in late 1994 by stating in her Audit Strategy

20　Memo that if a sourcing theory could not sustain a tax assessment, then a residency theory "will

21　have to be pursued."[78] Cox did not want evidence that contradicted the preconceived determination

22　that Hyatt had to be taxed, one way or another. Most importantly she did not want Hyatt and his

23　representatives to know that she was building a one-sided case.

24

25　[74] RT: May 27, 140:3-17; 83 RA 020630-020635.

26　[75] RT: May 14, 98:12-99:8, May 19, 97:9-98:19; June 18, 17:2-13, 19:8-20.

27　[76] RT: June 25, 202:24-203:8, 214:20-215:24.
　　[77] RT: May 14, 99:1-8; June 18:17:2-13; 83 RA 020630-020635.

28　[78] 63 AA 15553-15555.

1    To accomplish this objective, Cox deceived Hyatt's tax representatives Mike Kern and

2  Eugene Cowan. When they inquired if there were any issues or if she needed anything, she said no.

3  But later Cox claimed they failed to provide information she contends that she had requested from

4  them.[79] She even thanked them in writing for their cooperation but later claimed they were

5  uncooperative.[80] For example, Cox stopped by Kern's office in Las Vegas unannounced. Kern was

6  not there. He later called Cox to apologize for missing her and asked whether she needed anything.

7  She said no. But at that very time, she was surreptitiously seeking to confirm whether Hyatt used

8  space in Kern's office as Hyatt had represented. Cox, without ever asking Kern, concluded that

9  Hyatt had not occupied space in Kern's office.[81] She did not want Kern to verify a fact that would

10  be adverse to her residency position.

11    Cox's deception reached its zenith when she dropped her August 2, 1995, Determination

12  Letter bombshell in which she revealed for the first time — two years into the audit — the "case"

13  against Hyatt, based on the three "affidavits," and Hyatt's and his representatives' failure to produce

14  information, and their failure to cooperate.[82] Cox gave Hyatt and his representatives until August

15  30, 1995 to respond to Cox's bombshell. After two years of audit, and no suggestion to Hyatt that

16  the FTB or Cox had any issues or concerns, Cox gave Hyatt 28 days to respond. But she had no

17  intention of considering any response from Hyatt. She wrote in her notes in the audit file on

18  August 29, 1991 that she was working on "closing" the audit file,[83] not even waiting for anything

19  that Hyatt may provide the next day, which she had set as a deadline for Hyatt's response.

20    In fact, Hyatt provided a substantial response by Cox's deadline and supplemented it as he

21  gathered information. But when it came to the cornerstone of the FTB's case (the three un-sworn

22  "affidavits"), the FTB told Hyatt he could not see them, depriving him of any reasonable way to

23

24

_____

25  [79] 80 RA 019928-019930; 83 RA 020718; 68 AA 16799, 16802.

26  [80] 80 RA 019928-109930; 83 RA 020614-020615, 020627-020628, 020705-020707; 54 AA 13313-13314.

27  [81] RT: April 25, 125:17-128:21; 83 RA 020718; 68 AA 16799, 16802.

    [82] 84 RA 020865-020904.

28  [83] 93 AA 23124.

KAMMEFER CROWELL RENSHAW GRONHALTER & FIORENTINO

RJN0079

1  respond to undisclosed accusations of unidentified persons. After an exchange of correspondence,[84]

2  in which Hyatt provided additional information and was searching for other information, Cox

3  announced she was closing the audit and would make the proposed assessment set forth in her

4  August 2, 1995 Determination Letter, rejecting Hyatt's input and still refusing to provide the

5  "affidavits".[85]

6       In sum, at trial, the jury heard and saw that there was evidence "above the surface," which

7  Hyatt and his representatives knew about during the audit, and evidence "below the surface," which

8  was the FTB's activities to build a one-sided case against Hyatt unbeknownst to Hyatt and his

9  representatives to which they had no opportunity to respond.[86]  The FTB was not seeking the truth,

10  but rather a means and a way to reach a predetermined conclusion to tax Hyatt and collect his

11  money.  The FTB did not want Hyatt to produce rebuttal evidence.

12      **7.**    **The lead auditor manufactured reasons and misstated evidence in order**

13              **to assess a fraud penalty as a bargaining chip to be used to induce**
            **settlement — in accord with FTB policy.**

14       In her August 2, 1995, letter, Cox and the FTB not only told Hyatt that he would be

15  assessed taxes, but that he was also being accused of fraud.  For this, he would be assessed an

16  additional 75% penalty for claiming to be a partial-year resident of California on his 1991 state

17  income tax return.[87]

18       Under FTB policy, derived from case law, the FTB has to prove by clear and convincing

19  evidence that a taxpayer engaged in fraudulent activity to warrant imposing a fraud penalty.  The

20  FTB's own manuals and policies define clear and convincing evidence as "explicit and unequivocal,

21  leaving no substantial doubt," and "sufficiently strong to command the unhesitating assent of every

22  reasonable mind" and require that the facts show that the taxpayer have a "specific intent to evade a

23

24

25  [84] 84 RA 020913-020933; 84 RA 020935-020939, 020946-020947, 020956-020969, 020972-020980,

26  020982-020993; 85 RA 021015-021016.

27  [85] 84 RA 020994 – 85 RA 021007.

   [86] April 25, 129:1-144:9, 145:17-148:24.

28  [87] 84 RA 020865-020904.

KADNER CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0080

1  tax believed to be owed."[88]

2       A number of FTB witnesses, with significantly more residency audit experience than Cox,

3  testified that they had never assessed a fraud penalty in a residency audit.[89]  It was virtually, if not

4  actually, unheard of within the FTB.  Residency audits, which require determining the date

5  someone moved and legally cut ties to California for the purpose of taxation, do not lend

6  themselves to the exactitude required for imposing a fraud penalty.

7       This did not stop Cox and the FTB from assessing a fraud penalty against Hyatt.  Yet, the

8  very evidence Cox cited in her Fraud Item (i.e., supporting fraud narrative in the audit file) to

9  justify imposing a fraud penalty demonstrated her bad faith: (i) she claimed Hyatt did not produce

10 certain bank account records, but the account was not a bank account and had been fully disclosed

11 to her; (ii) she claimed Hyatt and his tax representatives were uncooperative during the audit, but

12 she had repeatedly thanked them in writing for their cooperation during the audit and told them she

13 did not need anything and there were no issues they could address for her; (iii) she claimed Hyatt

14 was deceptive because he had a fear of kidnapping, and he did not live in a gated community, but

15 she made up the kidnapping claim out of whole cloth and ignored the facts that neither Hyatt's

16 former California house nor his Nevada house were gated; (iv) she claimed Hyatt's holding title to

17 his Nevada house in a trust (which occurred after the period in dispute) was deceptive, but Hyatt

18 fully and freely disclosed his ownership of the house and how he held title; (v) she claimed Hyatt's

19 sale of his former California house to his executive assistant Grace Jeng was evidence of intent to

20 defraud because the so-called "affiants" contend that she may have lived with Hyatt, but the

21 "affiants" admittedly had no personal knowledge of where Hyatt resided and Cox never asked Hyatt

22 or Jeng about the subject, choosing instead to unquestioningly rely on the estranged relatives;

23 (vi) she claimed that the fact that Hyatt had left his Las Vegas apartment clean, with no damage,

24 and had not generated complaints from neighbors was evidence that he had not lived there.[90]

25

_____

26 [88] 73 AA 18194.

27 [89] RT: April 24, 28:6-13, 31:24-32:1; June 11, 129:6-131:1; June 23, 148:3-11; June 24, 163:3-9.

28 [90] 80 RA 019921-019928; RT: April 25, 123:5-128:8, 168:19-171:9, 179:22-180:21; April 29, 185:5-186:4;
     April 30, 26:15-29:8, 31:1-23; May 30, 59:5-60:25; 84 RA 020898.

25

1    Cox asserting a fraud penalty in a case of dubious strength was consistent, however, with

2  FTB training directing FTB auditors to use the assessment of a fraud penalty as a bargaining chip to

3  be used during settlement negotiations.  Indeed, the FTB hosted a seminar for auditors where the

4  FTB instructor used large poker chip props to demonstrate how the fraud penalty can be used as a

5  bargaining chip during settlement negotiations.[91]  The FTB instructed its auditors to dangle the

6  penalty in front of the taxpayer, and offer to remove it as part of a settlement under which the

7  taxpayer would pay something to avoid the "fraud" label.  In a similar vein, the cover to the FTB's

8  penalty manual depicts a drawing of a menacing skull-and-crossbones,[92] seemingly suggesting that

9  taxpayers can be frightened or intimidated by the imposition of a penalty.  Cox — a young auditor

10 in her first residency audit and looking to advance her career in an audit she knew was very

11 important to the FTB — was doing what the FTB taught her to do and what she thought was

12 expected of her.

13       **8.      There was open internal dissent within the FTB which questioned
               whether the FTB had a case against Hyatt, let alone clear and
14             convincing evidence to support a fraud penalty.**

15            **a.      Embry memo.**

16    By mid-1995, two years into the audit, there was explicit doubt expressed within the FTB

17 whether a residency case could be made against Hyatt.  By then, two prior auditors had worked the

18 case without concluding there was a basis to assess anything against Hyatt.  On June 6, 1995, the

19 FTB held a meeting of high level FTB personnel, including Cox.  A memo dated August 21, 1995,

20 summarizing the June 6 meeting and its conclusions, was drafted by FTB supervisor Monica Embry

21 (the "Embry" memo) and stated that the purpose of the meeting was "to discuss the possible audit

22 positions available" against Hyatt.  The memo listed two audit issues: (1) residency, and (2) source

23 of patent licensing payments.[93]  Regarding residency, the memo plainly stated:

24          [A] decision had not been made at the time of the meeting [two years into the audit and
            shortly before Cox began drafting the August 2 Determination Letter] as to whether *there*
25          *was enough substantiation* to sustain a position the TP [taxpayer] was a California

26  _____

27  [91] April 24, 46:10-49:2, 113:8-115:12; July 8, 85:16-21.

    [92] 82 RA 020494 – 83 RA 020516.
28  [93] 54 AA 13315-13319.

                                    26

KAMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

resident for all of 1991. *There does not appear to be any means* of making the TP a resident for 1992 or later.[94]

The clear intent of the meeting, as reflected in the Embry memo, was to again consider asserting a non-resident sourcing theory against Hyatt, given the weakness of the residency case. On August 24, 1995, a draft of the memo was circulated to those at the meeting, including Cox, instructing the recipients that "if anything needed to be added or changed" to let Embry know, otherwise she would assume the memo was fine and would distribute it to high level FTB management. The memo also stated that "this memo pertains to the facts of this case [the Hyatt case]."[95]

No one, including Cox as the lead residency auditor, disagreed with or offered any corrections to the Embry memo, which was therefore distributed to high ranking FTB managers in early September 1995.[96] To be clear, less than a month *after* Cox's August 2 Determination Letter labeling Hyatt a fraud and claiming he did not change his residency when he claimed, Cox approved a memo that advised senior FTB management there was not "*enough substantiation*" to sustain a tax assessment for residency for all of 1991, let alone a fraud penalty, and no means to "make" Hyatt a resident for 1992 and later.

The Embry memo also reflects the conclusion of the June 6 meeting: the FTB had no legal basis to pursue a sourcing theory (based on nonresidency) against Hyatt either. The memo, after two years of the Hyatt audit and the work of three auditors, shows that the FTB had decided that it could not pursue a sourcing theory against Hyatt. The FTB also had insufficient evidence to support a residency theory for all of 1991 or for any of 1992. Yet, as the jury heard, less than two months after the June 6 meeting and three weeks before the Embry memo was circulated, Cox issued the bombshell Determination Letter on August 2, 1995, advising Hyatt he would be assessed millions of dollars in taxes, a fraud penalty, and interest for all of the 1991 tax year as she found

---

[94] *Id.* (emphasis added).

[95] 54 AA 13315-13319 at 13315.

[96] 84 RA 020949-020953.

27

1   him to be a California resident until April 3, 1992.[97]

2         **b.**     **Paul Lou's instruction.**

3         What happened between June 6 and August 2, 1995? Cox received little additional audit

4   information, but she began drafting her Determination Letter and a memo to support the imposition

5   of a fraud penalty.[98] However, she was told on June 21, 1995, by her immediate supervisor Paul

6   Lou to "analyze the information you have gathered thus far *to show the strength of the taxpayer's*

7   *ties to California.*"[99] Significantly, he did not ask her to weigh the evidence and provide an

8   objective analysis whether a residency case could be sustained against Hyatt. Rather, Lou told Cox

9   based on his review of the audit file (apparently accomplished that day as reflected by his single

10   entry in the audit notes) that she should put together the information to show the strength of Hyatt's

11   ties to California, which then formed the basis to tax Hyatt. Lou also noted that he was "pleased

12   with [her] audit of the taxpayer."[100]

13         **c.**     **Lead reviewer's notes.**

14         But the FTB's lead residency reviewer, Carol Ford, saw things quite differently and openly

15   questioned whether the FTB had a case against Hyatt. She said in her Review Comments

16   concerning the audit, "this is really a tough case" and "[w]e are assessing the FRAUD penalty –

17   although I'm not sure it is warranted."[101] She then reiterated the uncertainty of the case and asked a

18   critical question:

19         It is difficult to determine what the facts actually are. *Do we believe the affidavits?* . . .

20         I believe the tp may have left CA in 12/91.[102]

21         The FTB's lead reviewer, therefore, questioned the three un-sworn "affidavits" from Hyatt's

22   estranged relatives, two of whom admittedly had no personal knowledge of Hyatt's residency and

23

24   ------------------------------

  [97] 84 RA 020865-020904.

25   [98] 93 AA 23121-23123.

26   [99] 93 AA 23122 (emphasis added).

  [100] 93 AA 23122.

27   [101] 54 AA 13325.

28   [102] Id.

KARMEYER CROWELL RENSHAW GRONFAKER & FIORENTINO

1  all three of whom had been estranged and therefore had little if any relevant knowledge and an axe

2  to grind against Hyatt.  It seems that the FTB's lead reviewer saw that the cornerstone of the FTB's

3  case crumbled, without even letting the taxpayer know who his accusers were, so he could rebut

4  their hearsay allegations — let alone cross-examine the purported "affidavits."  Her notes were

5  consistent with the Embry memo in questioning whether the FTB had evidence to support a

6  determination that Hyatt was a California resident for all of 1991 or any of 1992.

7       Ford's Review Notes were concealed by the FTB and not provided to Hyatt.  The FTB

8  stamped on some of them "NOT TO BE INCLUDED IN THE AUDIT FILE" and did not include

9  them when the FTB initially produced the audit file to Hyatt in the protest.[103]  The FTB knew at

10  some point, once the protest started, Hyatt would get to review the audit file.  The FTB did not

11  want Hyatt and his tax representatives to see Ford's review notes.  Similarly, the FTB never thought

12  anyone would see the Embry memo — it says on page one "Not for Public Distribution."[104]  Both

13  documents were produced only after the Nevada Supreme Court denied the FTB's writ challenging

14  the Discovery Commissioner's recommendation and District Court order requiring production.[105]

15      **d.**    **Les' advice to Cox.**

16       Well before Cox issued her August 2, 1995, Determination Letter, she sought advice and

17  input from her then good friend Candace Les, an experienced residency auditor with 60 residency

18  audits under her belt.  During the time Cox worked on the 1991 audit, Cox talked a great deal about

19

20

---

21  [103] RT: May 12, 44:12-21; 54 AA 13325, 13396-13397.

22  [104] 54 AA 13315-13319 at 11316.

23  [105] 5 AA 1183-1196.  After reviewing these documents *in camera* and ordering them produced, the
Discovery Commissioner, who heard dozens of discovery motions in the case, said that Hyatt was entitled
24  to full discovery relating to what took place in the audit.  He said during that hearing, although the FTB
claims Hyatt committed fraud, it is the FTB that may have committed fraud.  9 RA 002077-002079.  He
25  also asked then FTB lead counsel, Felix Leatherwood of the California Attorney General's office, if
hypothetically the tax examiner did not feel she had a very good case and were to "tack on a fraud penalty
26  and that will make the taxpayer settle" should that be examined?  Leatherwood said that an auditor would be
subject to "significant, significant liability" and there was no evidence of this.  The Discovery
27  Commissioner having seen the Embry memo and the Ford notes, asked if FTB counsel was saying there
was nothing like that in the file.  Leatherwood said he had not seen any evidence like that in the file.  The
28  Discovery Commissioner asked if the evidence might be in the documents he ordered produced (*i.e.*, the
Embry memo, the Ford notes).  7 RA 001629-001632; 11 RA 002679-002680.

1  the Hyatt audit and showed Les portions of the audit file.[106]  Les told Cox that she should not send

2  the August 2, 1995, Determination Letter, and explained to Cox that the Determination Letter did

3  not support the imposition of a fraud penalty.  Les advised Cox to meet with Hyatt first and get his

4  side of the story.[107]  Les concluded that Cox had created a "fiction" about Hyatt and was obsessed

5  with him.  Again, Les complained to the FTB about Cox's actions towards Hyatt.[108]  Cox did not

6  heed Les' advice, nor did the FTB adequately investigate Les' claims concerning Cox's improper

7  treatment of Hyatt.

8         **9.     Ignoring all conclusions to the contrary, the FTB assessed Hyatt**
               **millions of dollars more in taxes, penalties and interest for the 1992 tax**
9              **year, even taxing and penalizing Hyatt for income earned after the date**
               **on which the FTB concluded Hyatt had moved to Nevada.**
10

11          In early 1996, after closing the 1991 audit, Cox and the FTB notified Hyatt that the FTB had

12  opened a formal audit for the 1992 tax year.[109]  With virtually no new or individual consideration

13  for the 1992 tax year, the FTB adopted the findings of the 1991 audit and proposed to tax Hyatt

14  until April 3, 1992.  But in fact, the FTB's 1992 tax-year Determination Letter dated April 1, 1996,

15  included millions of dollars in income that Hyatt received after April 3, 1992, the date by which the

16  FTB acknowledged Hyatt had moved to Nevada.[110]

17          Hyatt and his tax representatives assumed this was a calculation error and pointed it out to

18  Cox in 1997, before she issued a formal proposed assessment for 1992.  She responded that she

19  could not correct the error, since it could only be corrected in protest.[111]  But contemporaneous with

20  Cox's refusal to correct the taxes on this income error that increased the proposed taxes on Hyatt by

21  millions of dollars, the FTB corrected a calculation error that had been made in Hyatt's favor and so

22  notified Hyatt.[112]  In other words, the FTB was willing to correct its own clerical or calculation

23

24  [106] RT: April 23, 170:5-173:6.

    [107] RT: April 24, 29:1-6.

25  [108] RT: April 23, 167:6-17; April 24, 42:4-43:8, 80:22-81:11, 134:1-12, 136:23-138:2.

26  [109] 85 RA 021033.

27  [110] 85 RA 021045-021061; 85 RA 021093-021096.

    [111] 85 RA 021093-021096; 54 AA 13396-13397.

28  [112] 85 RA 021082-021085; 54 AA 13393, 13396-13397.

RJN0086

1  error to *increase* Hyatt's assessment, but it would not do so for a similar multi-million dollar error

2  to reduce the FTB's proposed assessment.

3      Cox also informed Hyatt's tax representative that the FTB was reversing its position, despite

4  no new facts or investigation, and would impose a 75% failure to file penalty, i.e., a fraud penalty,

5  for the 1992 tax-year assessment.[113] This added several more millions of dollars to the

6  assessments. Cox had not recommended a fraud penalty for 1992 in her 1996 Determination Letter

7  prior to leaving the Residency Program for approximately a year. In her absence, her supervisors

8  decided that a fraud penalty should be imposed and recruited another young auditor, Jeff

9  McKenney, to write up a narrative supporting the fraud penalty. McKenney, admittedly eager to

10  assist his career advancement, spent a scant 22 hours evaluating the law regarding the fraud penalty

11  and the facts and information in the file. He then simply reviewed Cox's comments for the

12  imposition of the 1991 fraud penalty and assessed the multi-million dollar 1992 fraud penalty,

13  without any investigation of any facts relating to 1992.[114]

14      The 1992 audit reviewer, Rhonda Marshall, explicitly disagreed with the assessment of a

15  fraud penalty,[115] echoing the previous dissent of the 1991 audit reviewer, Ford, concerning the 1991

16  audit conclusions. But, as with Ford's dissent on the 1991 audit, Marshall's dissent was ignored by

17  FTB management and a 75% penalty was imposed for the 1992 tax year. The FTB again ignored

18  the large income error and Cox was instructed to proceed with the Proposed Assessment for the

19  1992 tax year, including in it the large income error and the imposition of a fraud penalty.[116]

20      **10.   The FTB residency audit supervisors were proud of the FTB's work on
21          the Hyatt audits.**

22      The manager of the FTB Residency Program, Steve Illia, who ultimately approved the

23  largest proposed tax assessments in his unit for both 1995 and 1996, had minimal involvement in

24

25

26  [113] 85 RA 021082-021085.

27  [114] RT: June 9, 97:11-16, 102:21-103:7; 81 RA 020021.

    [115] 85 RA 021103.

28  [116] May 30, 149:8-151:12; 85 RA 021082-021086.

31

RJN0087

1  reviewing them.[117]  The FTB used assessments (not collections) in calculating the "cost benefit

2  ratio" of its work, so large assessments were particularly helpful even if they were never collected.

3  He was proud of his unit's work on the audits,[118] as were other FTB supervisors and the lead

4  auditor.[119]  Given the chance, the FTB would not have changed anything in terms of how the audits

5  were conducted.  With these audits, the FTB's assessments against Hyatt were the largest proposed

6  assessments within the Residency Program in 1995 ($4,540,404.00 for the 1991 tax year) and 1996

7  ($14,115,941.00 for the 1992 tax year).[120]

8         **11.**      **The FTB was driven by assessments and "CBR," upon which its future**

9                  **budget allocations were based, regardless of whether the assessments were ever collected.**

10        The jury heard substantial testimony from the former California State Auditor, Kurt

11  Sjoberg, regarding how "CBR" – the "cost benefit ratio" measuring the FTB's cost of an audit (e.g.,

12  hours put in by auditors) versus the proposed assessments returned by the audit — produced a

13  "drive to assess," because budget allocations were determined by this CBR formula.  Sjoberg

14  officially audited the FTB and many other agencies of the State of California during the 21 years he

15  served as State Auditor and Chief Deputy State Auditor on behalf of the California legislature.  He

16  testified that for the FTB, assessments with high CBRs were its "lifeblood."  The FTB needed to

17  produce proposed assessments with high CBRs to justify and increase its budget allocations.[121]

18        Sjoberg's testimony emphasized that it was assessments, not collections, on which the FTB

19  was evaluated.  The FTB needed to book assessments to justify its funding and obtain increased

20  funding.  Actual collection of the proposed assessments was not factored into the equation.  It only

21  mattered that the proposed assessment was booked.[122]  As a result, the FTB had every motivation to

22

23  ───────────────

24  [117] RT: June 23, 52:23-53:2, 176:14-178:14.  Illia, however, also complimented Candace Les for her effectiveness in "showing [him] the money," reflecting his active monitoring of auditor performance.  RT: April 24, 88:5-89:6.

25  [118] RT: June 23, 25:8-24.

26  [119] RT: May 27, 49:15-20; June 9, 109:5-7; July 7, 185: 12-18.

27  [120] 54 AA 13326-13329, 13398-13403.

  [121] RT: April 22, 69:8-71:3, 73:3-74:23, 84:2-86:2, 88:22-90:19; April 23, 88:1-89:22.

28  [122] RT: April 22, 88:22-90:19, 94:4-96:9; April 23, 88:1-89:22.

32

1  book the highest assessments without regard to collectability. If the matter settled for much less

2  than the assessment or even produced no revenue years later, it made no difference, since the FTB

3  had already obtained its budget for the year applicable to the erroneous assessment.

4    This drive to assess permeated each unit within the FTB, including the Residency Program.

5  At the same time, the FTB was prohibited from evaluating its auditors on the basis of CBR for the

6  audits they worked, and the FTB certified to the California state legislature that it was not doing so

7  during the time of the Hyatt audits.[123] But there was substantial evidence presented at trial that the

8  FTB nonetheless evaluated its auditors on this basis, and that the FTB auditors were well aware of

9  CBR as an important measurement of their unit's work, during the time of the Hyatt audits.

10    First, FTB auditors testified to this. McKenney, the 1992 fraud penalty draftsman testified

11  that he knew that the FTB tracked the CBR on audits, knew what it was and why it was

12  important.[124] Les, an experienced residency auditor, testified that auditors needed to produce high

13  CBRs to be promoted. Les testified that given the hours expended on the Hyatt audits Cox could

14  not possibly issue a "no change" result and had to return a high assessment to get a high CBR,

15  based on the number of hours she worked on the case.[125] Les knew this from first-hand experience,

16  since her own performance review during the time of the Hyatt audits specifically addressed and

17  evaluated her based on the CBR she was returning for her audits[126] — despite the FTB's

18  certifications to the California state legislature to the contrary.

19    Moreover, internal Residency Program documents from 1997 confirm that what the FTB

20  was telling, even certifying, to its legislature, was not true. Senior Residency Program supervisor

21  Penny Bauche recounted in supervisor meeting notes from 1997:

22    There is a huge gap in those taxpayers selected for audit and those not (*we only pick the
    higher revenue producing ones*). The attitude of the auditors needs to be changed. Legal

23

24

25

---

26  [123] RT: April 22, 90:9-19; April 23, 69:8-76:6, 77:20-79:9, 88:18-89:5.

27  [124] RT: June 9, 103:24-105:24.

28  [125] RT: April 24, 36:20-37:19, 39:17-19, 53:9-54:22, 74:8-75:20.

    [126] 84 RA 020837-020838.

33

is a factor also. *We have been CBR driven* and now need to find other means to measurement (sic) our effectiveness/efficiencies."[127]

As a result, in 1997, while the FTB was issuing a proposed assessment against Hyatt for the 1992 tax year, which generated a record CBR of $127,190.00 per hour, the FTB was admittedly "driven" by CBR and focused on high revenue individuals, i.e., the Large Income Taxpayer program. In the same note, Bauche observes that the "no change" rate "has gone up to greater that 50%" and then chastises the other supervisors saying it "*should not have been there in the first place*" as "[o]ne hundred percent change rate is the goal. This will lead to resource adjustments."[128] To be clear, a senior FTB manager in the Residency Program was telling the other supervisors in 1997 that *no audit* should be returned with a "no change" and that this will lead to "resource adjustment" (i.e., reduced budget allocations, which could mean layoffs). Cox therefore understood, given that more than 600 hours had been spent on the Hyatt audit, that she could not return a "no change" result.

A CBR-driven FTB also explains why, when the first auditor, Marc Shayer, read a newspaper article, what popped into his head first was "how much money" Hyatt had made and why he calculated and emphasized in a memo to Jovanovich how much money could be generated by assessing Hyatt's income on a sourcing theory. The FTB had found the perfect residency audit target: high revenue earned over a short time, which could be attacked with a reasonably low number of hours, maximizing CBR. And according to Bauche's note, once Hyatt was under audit, a "no change" result was unacceptable. Shayer, and later Cox, simply had to find a theory to tax Hyatt to the max. This is a far cry from the fair, unbiased treatment the FTB promised Hyatt that he could expect.

This drive to assess was motivated by the Residency Program's need to meet its "numbers" and thereby obtain its budget allocations. Bauche testified that she had a concern throughout the 1990s about the FTB meeting its "numbers," and the pressure to meet "numbers" is also referenced

---

[127] 92 RA 022985-022986 at 022986 (emphasis added).

[128] *Id.*, at 022985 (emphasis in original).

34

RJN0090

1  in the residency supervisor meeting notes.[129]

2      Auditors were well aware of this pressure. After returning to the Residency Program in

3  1997, Cox was surprised to learn that a formal proposed assessment had not been issued against

4  Hyatt for the 1992 tax year, despite her Determination Letter and closing the 1992 audit a year

5  earlier. Cox questioned whether Residency Program managers delayed the 1992 proposed

6  assessment so the unit could meet its "numbers." Ford recounted this accusation by Cox in an e-

7  mail to Bauche.[130] The net effect of the FTB holding the proposed assessment against Hyatt for the

8  1992 tax year from 1996 to 1997 was that the FTB's Residency Program had banner years in both

9  1996 and 1997, instead of just 1996, because of the delayed 1992 tax-year assessment against

10  Hyatt. Again, the Hyatt assessments led the way each year.[131]

11      In sum, the jury drew a reasonable inference that the FTB is CBR-driven because it was

12  easy for it to assess and not be concerned about collections. FTB management would not question

13  a large proposed assessment with a high CBR. It was exactly what the FTB wanted from its

14  auditors. If there was a settlement with the taxpayer at protest, as the FTB encouraged,[132] the

15  quality and basis for the proposed assessments would be forgotten. It is a reasonable inference that

16  the jury found this to be substantial evidence of bad faith by a government actor.

**F.**    **The jury heard substantial evidence of bad faith and outrageous conduct regarding the FTB's invasion of Hyatt's privacy and breach of his confidentiality during the audits and protests.**

    **1.**    **Early and repeatedly during the audits, Hyatt's representatives informed the auditors who worked on the audit that Hyatt had a heightened sensitivity for privacy and a need for confidentiality.**

    Hyatt testified that he is and always has been a private person who stays out of the limelight

and intentionally keeps a low profile. The short burst of publicity he received in California during

the early 1990s for his patent work after receiving approval for key patents turned out to be very

---

[129] RT: July 7, 138:12-140:24; 92 RA 022985-022986.

[130] 54 AA 13395; RT: May 30, 145:4-146:17; 154:4-158:2.

[131] 93 RA 023019-023025.

[132] RT: May 22, 80:6-9, 91:5-13; June 10, 158:15-159:2.

KARPSTER CROWELL RENSHAW GRONAUER & FIORENTINO

1   uncomfortable for him, interfered with his work as an inventor and engineer, and was one of the

2   factors that motivated him to move to Nevada.[133]

3       In addition to being private by his nature, Hyatt also testified to confidentiality concerns

4   regarding his technologies, due to potential industrial espionage. He testified that in 1991 when he

5   began trying to license his microprocessor patents, he had a particular confidentiality concern

6   regarding Asian companies that would reverse engineer products to discover the technology

7   used.[134]

8       In this context, Hyatt's tax representatives repeatedly expressed to the FTB Hyatt's desire for

9   privacy and need for strict confidentiality. Cowan, Hyatt's tax attorney during the audits, met with

10  each of the three auditors, and in each meeting he expressed Hyatt's sensitivities for privacy and

11  confidentiality.[135] These concerns were also expressed in writing. In a November 1, 1993, letter,

12  Cowan emphasized to Shayer that Hyatt's Las Vegas home address was redacted, per their

13  discussion, that the material submitted was "highly confidential," and that he and Hyatt appreciated

14  Shayer's utmost care in maintaining confidentiality.[136] In a July 11, 1994, letter to the second

15  auditor, Cowan confirmed a prior discussion regarding keeping the materials produced

16  confidential.[137] In a February 18, 1995 letter, Cowan reconfirmed to Cox:

17      As previously discussed with you and other Franchise Tax Board auditors, all
       correspondence and materials furnished to the Franchise Tax Board by the Taxpayer are
18      highly confidential. It is our understanding that you will retain these materials in locked
       facilities with limited access.[138]
19

20  **2.    The FTB auditors promised strict confidentiality, acknowledging
       Hyatt's heightened sensitivity for privacy.**

21      In the FTB's first communication with Hyatt, the FTB provided its Privacy Notice, which

22  represented that Hyatt could expect "[c]onfidential treatment of any personal and financial

23

24  ───────────────

   [133] RT: May 8, 38:23-40:15; 84 RA 020913-020933 at 020914-020915.

25  [134] RT: May 8, 51:7-53:2; 84 RA 020913-020933 at 020914-020915.

26  [135] RT: April 29, 176:4-177:6, 179:23-181:1, 182:16-184:18.

27  [136] 83 RA 020521-020523 at 020523.

   [137] 83 RA 020552.

28  [138] 83 RA 020704.

1  information that you provide to us" and that the FTB would abide by both the California

2  Information Practices Act and the Federal Privacy Act.[139]

3      The FTB auditors expressly acknowledged they were aware of Hyatt's heightened

4  sensitivity for privacy and confidentiality. Shayer testified he had promised strict confidentiality in

5  sending the initial privacy notice, and Cox noted in her work papers in the audit file and testimony

6  that she was aware that Hyatt was a private person.[140] She also stated this in a letter to Hyatt's tax

7  representative during the audit.[141] The FTB's first protest officer, Jovanovich, freely acknowledged

8  her awareness of Hyatt's heightened sense of privacy.[142]

9
10  **3.    By policy and law, the FTB was required to keep Hyatt's information private and confidential and to obtain information from Hyatt instead of third parties to "the greatest extent practicable."**

11      The FTB's Security and Disclosure Manual prohibited disclosure of confidential

12  information obtained in an audit. California law prohibits disclosure of such taxpayer information.

13  FTB policy, consistent with the California Information Practices Act, states that the FTB should

14  seek information needed for the audit "to the greatest extent practicable directly from the

15  individual."[143]

16      The obvious purpose of the policy is to keep the intrusiveness of the audit to a minimum,

17  and to protect the privacy of the taxpayer and the confidentiality of taxpayer information. The

18  FTB, however, violated this policy with impunity, knowing of Hyatt's heightened and extreme

19  sensitivity for privacy and confidentiality.

20
21  **4.    The FTB made massive disclosures to third persons of Hyatt's social security number, private home/office address, credit card numbers, and other personal information to third parties.**

22      The FTB, through Cox, contacted neighbors, businesses, government officials, and others

23  within Nevada, Japan, California, and other states, either in person or by mail or telephone, and

24

25  [139] 82 RA 020471-020475 at 020473.

26  [140] 68 AA 16789-16790; May 27, 104:6-105:25; June 20, 161:19-162:23.

27  [141] 83 RA 020705-020707.

28  [142] RT: May 22, 51:2-21, 90:15-24.
[143] RT: June 9, 52:7-18; Cal. Civ. Code § 1798, *et seq.*

37

1  gave them private information such as Hyatt's private Las Vegas address, social security number,

2  and even credit card number.  The FTB led them to believe that Hyatt was under investigation in

3  California, thereby casting doubt on Hyatt's honesty, integrity, and moral character.  The very

4  purpose and intent of the FTB's policy and the law was flaunted by the FTB.

5         At the same time it was providing assurances of privacy and confidentiality to Hyatt, the

6  FTB was contacting over 100 entities including newspapers, neighbors, a professional patent

7  licensing society, and Hyatt's Japanese licensees, creating the inference that Hyatt was under a

8  cloud of suspicion.[144]  For example, the FTB sent demand letters to several California and Nevada

9  newspapers requesting information about Hyatt's subscriptions and about interviews conducted by

10 reporters.[145]  These included a "Demand to Furnish Information," which included Hyatt's social

11 security number and his private home/office address.

12        Hyatt's social security number was also disclosed by Cox in demand letters to Sam's Club,

13 The Sport's Authority, and Bizmart, various religious organizations such as Temple Beth Am and

14 Congregation Ner Tamid, the Licensing Executives Society, the Association of Computer

15 Machinery, Personal Computer Users Group, Copley Colony Cablevision, the Southwest Company

16 Club, Great Expectations (a dating service, with the Demand sent to two different branch

17 addresses), and the Nevada Development Authority.[146]

18        Hyatt's social security number and private home/office address were also disclosed in

19 demand letters to the Las Vegas Valley Water District, Silver State Disposal Service, and

20 Southwest Gas Corp.  This was despite that fact that Hyatt had taken significant steps to protect the

21 fact that he resided at this address by placing his utility accounts in the names of other persons and

22 purchased the home in the name of a trust, which did not reflect his name.[147]

23        As Les, the experienced FTB auditor testified, Cox was bombarding third parities with these

24

---

25 [144] 83 RA 020531-020533, 020537, 020540-020546, 020548-020551, 020636-020654, 020662-020669,
26 020676-020703, 020719 – 84 RA 020794, 020796-020797, 020802-020836, 020839-020840, 020905-
   020911.

27 [145] 84 RA 020839-020840, 020905-020910.

   [146] 83 RA 020636-020646, 020651-020652, 020662-020669, 020729-020733, 020735-020736.

28 [147] 83 RA 020746 – 84 RA 020751.

requests. Les and other FTB witnesses testified that they rarely, if ever, used the "Demand to Furnish Information" forms, instead going to the taxpayer first. The FTB considered the Demands to be "pocket subpoenas" and used them only where necessary in California.[148] That is not what Cox did in Hyatt's case. She went to the other extreme and bombarded third parties with Hyatt's private information.

Other outrageous examples of Cox's overreaching and deliberate acts invading Hyatt's privacy include her sending separate requests to six different Drs. Shapiro in Southern California. She saw "Dr. Shapiro" as a payee on a Hyatt check, but did not know which Dr. Shapiro had treated Hyatt. But, instead of asking Hyatt to identify the correct Dr. Shapiro, Cox sent requests to the six Dr. Shapiros she found in the telephone book, with Hyatt's private identifying information, and without Hyatt knowing that she was making such inquiries to question his medical professionals.[149]

Other outrageous examples are Cox's requests to Hyatt's first and key patent sub-licensees in Japan. Hyatt and his representatives requested particular privacy with his sub-licensing agreements, as the agreements themselves contained confidentiality clauses, which prohibited Hyatt from disclosing to third parties the confidential license agreements.[150] The FTB, therefore, made a conscious choice to contact Hyatt's key patent sub-licensees, thereby letting them know that he was under a tax investigation and that he had disclosed their confidential license agreements, instead of first asking Hyatt for the same information.

Cox also made two visits to Las Vegas to investigate Hyatt without Hyatt's knowledge. In a first visit in March, 1995, she made unannounced visits to Las Vegas residents and businesses with questions about private details of Hyatt's life. Persons interviewed included Hyatt's current neighbors, employees of businesses and stores Hyatt frequented, and even his Las Vegas mail carrier and trash collector.[151] *The second visit was unauthorized and occurred after Cox closed the*

---

[148] RT: April 24, 41:17-42:3, 59:8-14: June 11, 208:22-211:3; June 12, 5:21-7:5.

[149] RT: May 27, 207:5-209:5; 83 RA 020676-020687.

[150] RT: May 8, 52:9-53:9, 78:17-80:4; May 16, 104:7-107:16; 81 RA 020134-020137, 020194-020207, 020234-020248, 020250- 82 RA 020272, 020283-020284, 020310-020322, 020325-020338, 020342-020355; 84 RA 020788-020789, 020791-020792.

[151] 80 RA 019883-019884, 019888.

39

RJN0095

1  *audit*.[152]  Cox also made two or more visits to Hyatt's previous neighborhood in La Palma,

2  California, which included unannounced visits with La Palma neighbors and questions about

3  private details of Hyatt's life.[153]

4  These disclosures of Hyatt's private information and intrusions into his life were simply not

5  necessary, and certainly, the information could have been requested of Hyatt in the first instance, if

6  the FTB was not intent on intrusively violating Hyatt's privacy and security.  But instead of

7  conducting a fair audit seeking accurate facts, Cox chose to make it intrusive and embarrassing.

8  Cox acted like an undercover detective with these third-party contacts, resulting in intrusions on

9  Hyatt's privacy and disclosure of his confidential information, embarrassing him in his eyes with

10  his neighbors, licensees, and business associates.  The obvious conclusion, as the jury's verdict

11  reflects, is that Cox intended to do this.  She had an ulterior purpose for bombarding anyone

12  affiliated with or who did business with Hyatt.  She acted deliberately and intentionally to "get"

13  Hyatt, as she put together her predetermined case against him.

14       **5.    At the outset of the protest, the first protest officer warned about an**
15                 **even more intrusive investigation and infringements on Hyatt's privacy**
               **— if he did not settle.**

16  Hyatt had no concept of the FTB's pervasive assault on his privacy until, at the earliest,

17  October of 1996, when he finally received the FTB's voluminous audit file for the 1991 audit.  The

18  FTB policy kept all of this from him until the two audits were closed and the protest had

19  commenced.[154]  In other words, during the audits, the case being built was kept from Hyatt, but he

20  was expected to defend and refute unknown accusers and accusations.

21  Before Hyatt understood the scope of the FTB's dissemination of his personal information

22  and disclosures to third parties that he was under a tax investigation, the first protest officer,

23  Jovanovich, had a telling conversation "AT LENGTH" with Hyatt's tax attorney on June 12, 1997

24

25  ───────────────

26  [152] RT: April 23, 175:19-181:13, 181:23-182:2; April 24, 23:16-24:5; May 30, 93:4-94:4.

  [153] RT: May 29, 38:21-80:24.

27  [154] RT: April 25, 110:5-13;April 30, 83:13-86:19; May 9, 116:13-117:3, 118:15-18, 142:13-20; May 28,

28  109:21-110:11; June 2, 102:12-103:21, 108:24-109:4; 84 RA 020913-020933, 020946-020947; 85 RA
021063, 021076-021078.

RJN0096

1    She explained to Cowan the "necessity for extensive letters in these high profile, large $, fact-

2    intensive cases - which merit in-depth investigation and exploration of many unresolved fact

3    questions," including a discussion about "settlement possibilities." This was a not-so-subtle

4    promise (or threat) that Hyatt would undergo further dissection by Jovanovich of his most private

5    matters. She concluded, "I will be sending a lengthy letter asking for info & documents."[155]

6    Cowan testified that he fully understood what Jovanovich was suggesting. Hyatt took it as nothing

7    less than an attempt to extort him to settle a tax obligation he did not owe.[156] The jury found these

8    inferences to be reasonable.

9    **6.    When Hyatt did not settle early in the protest and filed this tort case,**
        **the FTB published the Hyatt assessments on the *Litigation Roster*,**
10       **including information showing that Hyatt was a tax cheat and a tax**
        **fraud.**
11

12    This case was filed in January, 1998. Starting in April, 1998, the FTB included in its

13    *Litigation Roster* that Hyatt was assessed taxes totaling over $13,000,000.[157] This published roster

14    identifies primarily cases in which the FTB has made a final tax determination of a protest on

15    appeal outside the FTB, not cases like Hyatt's that were still supposed to be confidential while in

16    protest, with only a pending proposed notice of assessment.[158] The roster, which was later posted

17    on the FTB's website, therefore conveyed that taxpayers listed have been adjudicated as owing

18    taxes based on a *final* FTB assessment against them.[159] This simply was not true in Hyatt's case,

19    from *April, 1998, to November, 2007*, when the FTB's Protest Determination Letter finally issued.

20    Hyatt's tax case and any fraud determination were still pending, supposedly confidential, and

21    purportedly undecided throughout that previous 11 years.

22        The FTB's chief in-house counsel for litigation, Ben Miller, admitted that Hyatt was treated

23

24

25    [155] RT: May 22, 78:19-90:24.

26    [156] RT: April 30, 155:12-25; May 12, 73:23-74:23, 80:19-81:12.

27    [157] 83 AA 20694 – 89 AA 22050.

28    [158] RT: May 12, 75:3-10; June 13, 83:3-18; July 14, 176:15-178:15.

     [159] RT: May 12, 75:3-78:11; June 13, 83:3-18; July 14, 177:18-178:3.

                                             41

KАМEЛ PER CROWELL RENSHAW GRONAUER & FIORENTINO

1  differently from other taxpayers.[160] The *Litigation Roster* left the obvious, but false, impression

2  that a final FTB determination had been made, that Hyatt actually owed taxes, and that Hyatt was a

3  tax cheat. Further, the FTB initially published that Hyatt had been assessed $13,000,000 (when in

4  fact no final decision had been made), but later published that part of the assessment was a 75%

5  penalty (i.e., a fraud penalty) thereby publicizing that he had committed fraud regarding his tax

6  obligations – again even though no final determination had been made.[161]

7      The decade-long publications by the FTB that Hyatt was a tax cheat coincided with the

8  11 year delay and refusal to conclude the protests for both the 1991 and 1992 proposed

9  assessments. Hyatt filed his protest for the 1991 tax-year proposed assessment in June, 1996. He

10  filed his protest for the 1992 tax-year proposed assessment in October, 1997. The FTB closed the

11  protest and issued a Protest Determination Letter on November 1, *2007*.[162]

12      The FTB represents that the protest is an independent review of the audit, a "do-over" as

13  FTB counsel termed it.[163] Ultimately, after 11 plus years, the FTB's protest determination made no

14  change to the audit conclusions — except that the FTB added "sourcing" as an additional basis to

15  justify taxing Hyatt. At that time, 11 years later, "sourcing" is used to justify, not correct, the

16  significant income error which taxed Hyatt on income received after Cox's April 3, 1992, date that

17  she determined as Hyatt's move to Nevada. This "sourcing" is the same legal theory that the FTB

18  rejected in 1993 at the outset of the audits and again in the 1995 Embry memo when trying to figure

19  out a theory to tax Hyatt's income.

20

21

22

23

24

---

25  [160] RT: July 14, 176:15-178:15.

26  [161] 87 AA 21572, 21587, 21603, 21618, 21635-21636, 21650-21651, 21666-21667, 21683, 21700, 21716-21717, 21732, 21748; 88 AA 21763, 21778, 21792-21793, 21807, 21834, 21865, 21879, 21894, 21924, 21940, 21955, 21970-21971, 21987, 22000; 89 AA 22001, 22015, 22030, 22045.

27  [162] 54 AA 13330, 13404-13406; 88 RA 021826.

28  [163] RT: May 21, 201:18-202:6; April 21, 150:23-151:12.

RJN0098

**G.    The jury heard substantial evidence of bad faith and outrageous conduct of the FTB's 11-plus-year delay in the protests.**

     **1.    The first protest officer appointed by the FTB to conduct a purportedly independent review was the same in-house attorney who had counseled the lead auditor during the audits and orchestrated the imposition of the fraud penalty against Hyatt.**

Jovanovich was appointed as protest officer in September of 1996. Jovanovich was hardly independent, and certainly not unbiased, relative to the Hyatt audits. She was the legal advisor to the FTB's Residency Program and communicated with and counseled at least two of the three auditors while they worked on the Hyatt audits. She received a memo near the beginning of the first audit from Shayer in late 1993 regarding the possibility of pursuing a sourcing theory to tax Hyatt.[164]

Jovanovich also worked closely with Cox during the audit, and in particular in writing up the justification to assess Hyatt with a fraud penalty for the 1991 tax year. In fact, she took Cox's draft and changed specific language to make it appear that the evidence the FTB was relying on (the three unsworn statements) was stronger and more competent than it was. For example, instead of referring to Hyatt's daughter, brother and ex-wife — thereby disclosing to Hyatt the witnesses against him — she instructed Cox to simply say "several parties," disguising the identity of the witnesses and possible credibility issues.[165] Further, Jovanovich had advised residency auditors in 1995 that fraud penalties were warranted in most residency cases.[166] Even FTB management did not embrace Jovanovich's concept that fraud penalties were warranted in most cases, yet Jovanovich was advising Cox on how to impose the fraud penalty against Hyatt.[167]

Then Jovanovich was assigned to wear a different hat in the same case, as a protest officer, to "do over" the Hyatt audit with a new set of eyes. In this role, she "suggested" to Hyatt's tax counsel that high profile people often settle at the outset of the protest, to avoid further "lengthy"

---

[164] RT: June 20, 175:15-177:13, 185:19-188:6; 63 AA 15651-15652.

[165] RT: May 29, 132:21-139:16; 61 AA 15241 – 62 AA 15252; 92 RA 022971-022981. Jovanovich made additional revisions to disguise the FTB's purported evidence. *Id.*

[166] 84 RA 020970-020971.

[167] *Id.*

43

intrusions into their affairs. Cowan was not told that Jovanovich had been intimately involved in the audit and had orchestrated the imposition of the fraud penalty. He thought she was an independent protest officer, looking at the case with fresh eyes, as the FTB represented.[168]

Jovanovich also testified that she did virtually no work relative to the protest for the two years (1996 - 1998) that she was assigned to it. She was apologetic for this mere *two year* delay, but blamed it on the rush of other matters.[169] Jovanovich also took the notes relating to the Hyatt case when she retired from the FTB. She felt they were hers to take and had no remorse in having them and then destroying them.[170]

### 2. The second "new set of eyes" (FTB protest officer) had served as in-house litigation counsel for the FTB *in this case.*

Bob Dunn, another in-house FTB attorney, was assigned to replace Ms. Jovanovich as the protest officer in October 1998, approximately ten months after this case was filed in Nevada. He was serving as in-house FTB litigation counsel in this case, from the time it was filed. He was replaced four months later as protest officer, not because of the inherent conflict in conducting an independent review of the audits while also litigating against Hyatt's claim of a bad faith audit, but rather because his workload was too heavy.[171] Dunn admitted that he has never accepted the fact that the Nevada courts have allowed this tort case to proceed independent of the tax proceeding.[172] Dunn was the FTB's representative during the four month trial, and his attitude exemplifies the FTB's position that it should not be held accountable for its actions in Nevada.

### 3. The third FTB protest officer (1999-2000) professed neutrality and commenced working on the protest in earnest, but she was suddenly removed and replaced, over her objection.

Charlene Woodward was the third protest officer, assigned the case in early 1999. She promptly went to work on the audit. At the end of 1999, she submitted the first substantive request

---

[168] RT: April 30, 149:11-24.

[169] RT: May 22, 57:20-59:6, 80:19-84:14.

[170] RT: May 21, 206:11-211:21; May 22, 59:16-61:14.

[171] RT: July 15, 3:13-16, 12:19-13:8.

[172] RT: July 15, 193:9-14.

44

RJN0100

1  for additional information to Hyatt, an extensive 40-page Information/Document Request (known
2  as "IDRs").[173]  Hyatt's tax attorney viewed this as the beginning of the more intrusive investigation
3  that Jovanovich had threatened several years before if Hyatt did not settle.[174]

4       Nonetheless, Cowan and Woodward developed good rapport.  Woodward, who had retired
5  from the FTB by the time she testified, said that she desired to work with Cowan, whom she felt
6  was cooperative, to get the case resolved.  She anticipated having a protest hearing and even
7  seeking to mediate the parties' differences.  She testified that she was open to *possibly even*
8  *dismissing the matter* if that was warranted.  Woodward further testified that her experience as a
9  protest officer was that she dismissed as many protests in favor of the taxpayer as she affirmed in
10  favor of the FTB's audit position.[175]

11       Woodward was "shocked" at what happened next.  In May, 2000, with Hyatt's responses to
12  her IDR due at the end of June, Woodward was removed from the Hyatt protest.  She strongly
13  disagreed with her supervisor's decision to replace her.  The person who replaced her, Cody
14  Cinnamon, was considered a crony of or otherwise "close" to that supervisor, George McLaughlin.
15  Woodward was instructed *not to talk to Cinnamon, or transfer any records to her.*[176]  Woodward
16  was off the case, and there was to be no further discussion.

17      **4.**    **The fourth FTB protest officer (2000 – 2007) was told to put the protests**
18             **on "hold" due to this tort case even though she was ready to issue a**
           **final determination as early as late 2001.**

19       Cody Cinnamon was appointed as the fourth protest officer in May of 2000.  Thereafter in
20  June of 2000, Hyatt responded to the FTB's IDR, producing a substantial volume of material and
21  answering dozens of interrogatories.  In September and October of 2000, separate formal hearings
22  were conducted for the protests by Cinnamon.  Following the hearings, additional IDRs were
23  submitted by the FTB and responded to by Hyatt.  In June of 2001, Hyatt's new tax attorney Eric
24  Coffill wrote to Cinnamon confirming that Hyatt has responded to all requests.  Cinnamon testified

25  _____

26  [173] 54 AA 13412-13442.
27  [174] RT: May 1, 40:22-42:7.
    [175] RT: June 16, 72:9-13, 75:18-77:6.
28  [176] RT: June 16, 56:14-57:3, 58:7-60:4, 61:14-25.

45

RJN0101

1    that she was ready to issue a decision in the protests by the end of 2001.[177]

2         When Coffill inquired in early 2002 as to the status of a decision on the protests, as he had

3    not heard from the FTB for seven months, he was informed that the protests were on "hold," even

4    though Cinnamon had "written up" the protests and could complete a final Determination Letter for

5    the protests with a few weeks notice.[178] E-mails and an internal FTB event log for the protest

6    confirm that the FTB put the protest on "hold." Cinnamon recorded on February 20, 2002, "I told

7    him [Coffill] I was instructed not to work on the case." Ben Miller, the FTB's highest ranking

8    litigation counsel, wrote on April 5, 2002, "I think we should put things on hold with administrative

9    matters, in particular the recent draft letter." Almost a year later, Cinnamon wrote on February 20,

10   2003, "I am to do nothing on the case."[179]

11   **5.    The District Court allowed Hyatt to pursue, as part of his bad faith
12            assertions, that the FTB's delay and refusal to conclude the audit was
         part of its bad faith fraudulent conduct directed at Hyatt.**

13        Coffill repeatedly implored the FTB to act in more responsible manner and conclude the

14   protests, pointing out as early as March of 2002 that the length of the protests had already exceeded

15   the FTB's expressed goal of 33 months.[180] Coffill's requests were made in vane as the FTB refused

16   to conclude the protest, thereby preventing Hyatt from pursuing a true administrative appeal to the

17   California Board of Equalization.

18        By 2005, the District Court, through the Discovery Commissioner assigned to the case,

19   ruled that Hyatt could pursue discovery concerning the reason for the FTB's failure and refusal to

20   issue a decision in the protests, and specifically whether the delay concluding the protests supported

21   Hyatt's claim that the FTB had acted in bad faith during the audits and whether the delay

22   constituted continuing bad faith on the part of the FTB.[181]

23

24

_____

25   [177] 54 AA 13443-55 AA 13543; 76 AA 18957, 18960; 85 RA 021221-021223; RT: June 17, 91:1-92:5.
     [178] 85 RA 021226.
26   [179] 76 AA 18980, 18992; 85 RA 021224, 021240.
27   [180] 85 RA 021226, 021233; 77 AA 19003.
28   [181] RT: July 14, 174:3-175:21; July 15, 162:21-163:5; 14 AA 003406-003411.

46

**6.     The FTB, with no evidentiary support, now falsely asserts that Hyatt is to blame for the initial delay in the protests.**

The FTB claims that the first 17 months of delay in the protest was because Hyatt's tax attorney Cowan asked that the FTB put a hold on the protest for the 1991 tax year until the 1992 audit was complete.[182] This is absolutely false and not supported by anything in the record. The FTB cites to a note by auditor Cox dated June 17, 1996 from the 1992 audit file that merely states that Cowan wanted the 1992 audit closed purportedly because he wanted the protests for both audits to be heard together.[183] The note does not even state that Cowan requested that the FTB put the protests on hold, and Cowan testified that he never asked that the protest be put on hold.[184]

Further contradicting the FTB's bald assertion, when Cox returned to the residency unit a year later in 1997 she immediately questioned her supervisors why the 1992 audit had not been expedited as she had promised Hyatt's representative (Cowan). In addition to accusing her supervisors of holding the audit in order to meet their "numbers," Cox told her supervisors that she found out the 1991 protest had sat unassigned in the Protest Division, and she did not want to take "the heat" for " having the case sit around so long." She explained that Hyatt's representative had wanted the NPA issued for 1992 "right away" so the 1991 and 1992 years could proceed together.[185]

Contrary to all evidence, the FTB represents that the first protest officer Jovanovich waited to work on the protests until the 1991 and 1992 protest were consolidated, citing "evidence" that says no such thing.[186] Again, Jovanovich specifically testified at trial that she simply could not get to the Hyatt protest due to other matters that were given priority.[187]

---

[182] FTB Opening Brief, at 20:17-20.

[183] 72 AA 17967.

[184] RT: April 30, 108:22-109:18, 154:12-155:11.

[185] 54 AA 13395. In that regard, within a few days of Cowan's request to close the 1992 audit, he submitted his 1991 protest letter commencing the protest. 54 AA 13330. Yet, the FTB did not act on Cowan's request to close the 1992 audit and issue an NPA until October of 1997. 54 AA 13398-403.

[186] FTB Opening Brief, at 21:11-12.

[187] RT: May 22, 92:4 -94:11.

KAMMÜPÆR CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0103

**7.    At trial, the FTB tried to blame Hyatt and the District Court's protective order for the 11 plus year delay in issuing a final determination in the protest.**

At trial, the FTB's defense to its 11 year delay in the audit was to blame the District Court for issuing a protective order *in this case*. The FTB argued that the protective order made it more difficult to obtain and use discovery from this case in the protest proceedings. The FTB also blamed Hyatt, telling the jury the protective order was Hyatt's fault because he designated material under the protective order.[188] But what the FTB actually attempted to do, and the District Court would not allow, was to misrepresent the terms of the protective order to the jury by seeking to present and argue its tortured interpretation of the protective order to the jury.[189]

As set forth explicitly in the protective order, materials obtained in this case under the protective order could be used only in this case (as is typical in protective orders) unless approved by the opposing party *or* legally obtained in some other manner, i.e., through the means available to the FTB in the California tax protest proceedings. The protective order therefore specifically recognized that the FTB had administrative subpoena powers in California and could use those powers to obtain materials designated confidential under the protective order, if appropriate under California law.[190]

In short, the protective order ensured that California law would determine what materials and information the FTB could obtain and use in the tax protest proceedings, not the Nevada courts. For the FTB to argue that Hyatt created a "wall" with the protective order disparages the authority of the District Court, and the time and effort the District Court and the Discovery Commissioner put into crafting a neutral order that allowed this case to proceed without it being a discovery

---

[188] RT: July 11, 114:7-119:12; July 15, 194:11-21.

[189] This issue was subject to significant argument and briefing during trial. *See* RT: May 7, 98:9-103:25, 109:7-129:3; May 27, 27:6-30:10; June 11, 9:7-38:21, June 16, 2:11-34:15 (District Court's comments at 26:15-27:2), 35:13-37:6, 117:25-132:8 (District Court's comments at 118:21-22, 132:3-8); 78 RA 091417-091500; 79 RA 019501-019565.

[190] 78 RA 19446 (lines 10-11) and 19448 (lines 11-15). The FTB had previously challenged the protective order via a writ petition to this Court, and this Court refused to consider the challenge via a writ petition expressing that an appeal would be an adequate remedy. 5 AA 1192. Now, the FTB has failed to appeal that ruling of the District Court.

48

1  vehicle by either party for the California tax proceedings, while also deferring completely to

2  California law and its courts in regard to what materials the FTB could obtain for and use in the tax

3  proceedings.[191]

4       In other words, nothing prevented the FTB from issuing an administrative subpoena in the

5  tax proceedings whenever it wished, which the FTB eventually did as addressed below.  The FTB

6  did not need Hyatt's permission to pursue administrative subpoenas in California if it wanted

7  information for the tax protest proceedings.  The FTB wanted to argue a contrary interpretation of

8  the protective order to the jury, and the District Court would not let the FTB do so.[192]

9       Further, the FTB was allowed to present testimony from *four (4)* FTB in-house attorneys to

10  explain how the protective order purportedly caused the long delay in the protests.[193]  But these

11  FTB attorneys also admitted to the jury that protective orders limiting the use of protected material

12  to the current case are commonplace in litigation matters, and that the FTB had independent

13  administrative subpoena power regardless of the protective order.[194]  Moreover, testimony from the

14  FTB in-house attorneys confirmed that the FTB had the power to assert a "failure to exhaust"

15  penalty against a taxpayer in a protest and thereby make an adverse finding if the taxpayer was not

16  producing documents as requested.[195]  The purported inability to get documents, in the protests,

17  could therefore not have been the reason for the 11 year delay in the protests.

18       The FTB's story to the jury regarding the protective order simply did not add up.  The

19  protective order was issued at the end of 1999.  The FTB made no request under the terms of the

20  protective order for Hyatt to stipulate to certain material being turned over to the protest

21  _____

22  [191] The Discovery Commissioner clearly expressed his intent in crafting the protective order:  "It seems to me that any information and I think the order at least does not interfere with the fact that any information

23  which is allowed in the California proceeding, in the tax proceeding in particular, you know, that is allowed by the Court in that proceeding, that's up to them, and any arguments addressing confidentiality can be

24  addressed at that point in time to that Court. I'm not pertaining to – I don't think the Court would, the judge is trying to tie the hands of the California proceeding in any manner." 79 RA 019543.

25  [192] RT: June 11, 9:7-38:21, June 16, 2:11-34:15 (District Court's comments at 26:15-27:2), 35:13-37:6,

26  117:25-132:8 (District Court's comments at 118:21-22, 132:3-8).

27  [193] Terry Collins, George McLaughlin, Ben Miller, and Bob Dunn.

     [194] RT: July 11, 41:5-42:23; 47:19-48:13; July 15, 187:3-17.

28  [195] RT: July 11, 138:23-139:14, 153:19-154:19.

49

RJN0105

1  proceedings until June of 2002, which was shortly after this case again became active, after this

2  Court's April 2002 ruling that this case could proceed.[196]  Further, this first request which turned

3  into an administrative subpoena included many documents that were already in the protest officer's

4  possession, and the FTB had made no effort to determine what documents the protest officer

5  already had when it issued the subpoena.[197]

6       The FTB then made no further requests under the protective order until October of 2005,

7  which was just months after the District Court ruled that Hyatt could pursue whether the FTB was

8  delaying the protests in bad faith.  The FTB later made a third request under the protective order in

9  2007.  These requests were promptly answered by Hyatt with no delay caused to the FTB.[198]  As

10  indicated by the dates of the FTB's requests and admitted to by FTB in-house counsel, two of the

11  three requests the FTB made under the protective order came *after* the District Court ruled that

12  Hyatt could assert the FTB's delay in the protests as part of his bad faith assertion.[199]

13       Hyatt argued, and the jury obviously agreed, that the FTB had attempted to manufacture a

14  defense to the delay in the protests by issuing multiple requests under the protective order *after* it

15  knew it needed an explanation for the delay in the protests.  The FTB had every means to obtain

16  material needed for the protests, including its full power to subpoena (referred to as the power or

17  examination), and its own internal memo acknowledged it could pursue administrative subpoenas, a

18

19

20  [196] The FTB complains that it had to pursue enforcement of the first administrative subpoena in California.
But it fails to reference that the California Superior Court denied part of its subpoena.  17 RA 004136.  The

21  FTB also makes affirmative misstatements and seeks to have this Court draw erroneous conclusions
regarding the unpublished opinion by the California Court of Appeal relating to the partial enforcement of

22  an administrative subpoena against Hyatt.  The FTB wrongly states that Hyatt claimed disclosure of the
documents subject to the administrative subpoena would invade his privacy and that the FTB was pursuing

23  him in bad faith.  (FTB Opening Brief, at 24:26-25:4)  The FTB seeks to mislead this Court into thinking
the California court addressed the same or even similar issues presented in this Court.  Rather, Hyatt argued

24  there that the breadth of the subpoena and production of documents to the FTB would violate his rights
under the California Constitution.  Hyatt also argued that the FTB was pursuing the particular subpoena in

25  bad faith.  These distinctions are clear from the California Court of Appeal's decision, *State Franchise Tax
Bd. v. Hyatt*, 2003 WL 231002666 (Cal. Ct. App. December 31, 2003).

26  [197] RT: July 15, 188:9-192:11.

27  [198] *See* testimony and correspondence regarding the *FTB's* requests: RT: July 15, 163:7-166:13, 187:3-
188:6; 76 AA 18892-18893; 77 AA 19025-19027; 93 RA 023040-023046; 17 RA 004136.

28  [199] *Id.;* RT: July 15, 162:21-165:14.

KARNHEER CROWELL RENSHAW GRONAUER & FIORENTINO

1    fact that FTB in-house attorneys acknowledged in testimony.[200] That the FTB was prevented from

2    proceeding with the protests due to the District Court's protective order was therefore contradicted

3    by the FTB's own documents and testimony and not credible to the jury.

4            **8.**      **Offering "amnesty," the FTB offered to withdraw the penalties it**

5                     **asserted, if Hyatt settled by paying the taxes assessed, plus interest, and dropping this litigation.**

6        In December 2004, consistent with the training given to FTB auditors in which they were

7    taught to think of penalties as poker chips to be traded for settlement, the FTB threatened a 50%

8    interest penalty if Hyatt did not settle by paying the assessed taxes and dropping this case. To

9    further incentivize Hyatt to settle, the FTB informed him that failure to accept the offer would

10    result in an additional 50% penalty on the interest that was already outstanding.[201] The offer in

11    December, 2004, specified that Hyatt could settle by paying almost $19 million. But if he did not

12    settle, the proposed assessment being reviewed in the protest would increase to over $33 million.

13            **9.**      **The FTB held the protests over Hyatt's head for 11 years, during which**

14                     **time the FTB's tax bill to Hyatt grew to over $51 million, with interest accruing at more than $8,000 each day.**

15        At the time of the trial in the District Court, the total amount of taxes, penalties, and interest

16    the FTB asserted against Hyatt exceeded $51 million. Interest on this amount was, and still is,

17    accruing at over $8,000 per day. That total includes over $27 million in interest (most of which

18    accrued during the 11 year protest) and almost $10 million of which was the "amnesty" penalty

19    (also tacked on during the protest).[202]

20    **V.      LEGAL ARGUMENT.**

21    **A.    Standard of review.**

22        **1.      FTB failed to apply the appropriate standard of review.**

23        The FTB's opening brief fails to analyze the appropriate standard of review applicable to the

24    issues it raises. The FTB's "Standard of Review" discussion is a single sentence arguing that

25    "[a]lmost every issue in this appeal is a legal issue, for which this Court applies a *de novo* standard

26

27    [200] 76 AA 18881; RT: July 15, 187:3-15.

     [201] 55 AA 13567-13570.

28    [202] RT: June 18, 73:11-75:6.

KAMMEYER CROWELL RENSHAW GRONAUER & FIORENTINO

1   of review."[203]  However, legal and factual issues are pervasively intertwined in the FTB's appeal.

2   The jury's determination on disputed issues of fact must be accepted, unless no substantial evidence

3   supports facts and inferences consistent with its verdicts.

4        The FTB characterizes all of its arguments as legal arguments.  However, its legal

5   arguments require acceptance of its version of the facts, i.e., that since it did nothing wrong, it

6   cannot be liable for intentional torts.  But the jury verdicts represent a rejection of the FTB's view

7   of the facts.  Virtually all of the FTB issues in this appeal involve questions of fact or mixed

8   questions of fact and law.  For example, as this Court recently underscored: "Issues of sovereign

9   immunity under NRS Chapter 41 present mixed questions of law and fact.  We review questions of

10  statutory construction *de novo*, and we will not disturb the lower court's findings of fact when those

11  findings are supported by substantial evidence."[204]

### 2. The appropriate standard of review in this appeal for most issues is the substantial evidence standard.

12  When "the sufficiency of evidence is challenged on appeal, this Court determines whether,

13

14  after viewing all inferences in favor of the prevailing party, substantial evidence supports the jury's

15  verdict; [and] [i]n doing so, the court is not at liberty to weigh conflicting evidence."[205]  Most

16  recently, this Court stated that "on appeal, this Court views all facts from the viewpoint of the

17  prevailing party and assumes that the jury believed all evidence favorable to the prevailing

18  party."[206]  "This court will not overturn a jury's verdict if the verdict is supported by substantial

19  evidence, unless, [considering] all the evidence . . . the verdict was clearly wrong."[207]

20       Further, when the issue is one of fact and law, as are most issues in this appeal, this Court

21

22  _____

23  [203] FTB Opening Brief, at 29.

24  [204] *See, e.g., Ransdell v. Clark County,* 124 Nev. ___, 192 P.3d 756, 759, 761 (2008)

25  [205] *J.J. Industries, LLC v. Bennett,* 119 Nev. 269, 273, 71 P.3d 1264, 1267 (2003).

26  [206] *Clark County School District v. Virtual Educ. Software, Inc.,* 213 P.3d 496, 503 (Nev. 2009).  In summarizing the facts on appeal a reviewing court "must consider the evidence in the light *most favorable to the prevailing party,* giving him the benefit of *every reasonable inference,* and *resolving conflicts* in support of the judgment." 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 359, p. 408.

27

28  [207] *Id.*(citing *Albert H. Wohlers v. Bartgis,* 114 Nev. 1249, 1261, 969 P.2d 949, 958 (1998) and *Bally's Employees' Credit Union v. Wallen,* 105 Nev. 553, 555-56, 779 P.2d 956, 957 (1989)).

52

1  will give deference to the jury's version of the facts before addressing the questions of law.[208]  The

2  FTB challenges the sufficiency of the evidence regarding Hyatt's bad faith fraud claim and invasion

3  of privacy claims, as well as at least indirectly the sufficiency of the evidence on Hyatt's intentional

4  infliction of emotional distress claim.  For these highly-infused-with-facts challenges, the Court

5  must apply the substantial evidence standard of review.

6      The Court therefore does not reweigh the evidence presented for Hyatt's claims.  Rather the

7  verdict must be sustained if there is sufficient evidence in support of the claims, regardless of

8  whether the FTB would have decided the facts differently, and regardless of what evidence the FTB

9  cites to support what it wished the jury had found.

10  **3.  FTB's Statement of Facts is deficient and thereby waives any challenge to the sufficiency of the evidence.**

11

12      In every appeal, the appellant has the duty to fairly summarize all of the facts in the light

13  most favorable to the judgment, and failure to do so waives any challenge to the sufficiency of the

14  evidence of the jury's findings.[209]  Further, the burden to provide a fair summary of the evidence

15  "grows with the complexity of the record."[210]  After exhaustive discovery and motion practice

16  spanning a period of more than 10 years, including proceedings before the United States Supreme

17  Court, this appeal involves a more voluminous and complex record than the vast majority of cases.

18      Here, the FTB has failed in its burden to fairly summarize all the facts in the light most

19  favorable to the judgment.  The statement of facts in FTB's opening brief gives the impression that

20  FTB simply went about its business, innocently and respectfully, investigating whether Hyatt owed

21  taxes in California.  It gives the impression that if any conduct was wrongful, it was simply by

22  mistake — falling into the category of negligent conduct — and not intentional.  That is not a fair

23  characterization of the evidence, given the jury's verdicts on each intentional tort claim and award

24

25  [208] *Taylor v. Thunder*, 116 Nev. 968, 974, 13 P.3d 43, 46 (2000).

26  [209] *Foreman & Clark Corp. v. Fallon*, 3 Cal.3d 875, 881, 92 Cal.Rptr. 162, 479 P.2d 362 (Cal. Ct. App. 1971).

27  [210] *Western Aggregates, Inc. v. County of Yuba*, 101 Cal.App.4th 278, 290, 130 Cal. Rptr. 2d 436 (Cal. Ct.

28  App. 2002); *Boeken v. Philip Morris Inc.*, 127 Cal.App.4th 1640, 1658, 26 Cal.Rptr.3d 638, 652 (Cal. Ct. App. 2005).

53

RJN0109

1  of damages. The extensive relevant documentary and testimonial evidence presented through

2  numerous witnesses — evidence the jury believed — demonstrated the FTB's intentional plan to

3  falsify evidence, suppress and destroy exculpatory evidence, cut off Hyatt in his defense, extort an

4  enormous amount of money from him, and intentionally delay and hold up completion of the

5  protest review process for over 11 years, to prevent Hyatt from obtaining a *de novo*, independent

6  appeal. These are some of the facts this Court must apply on this appeal. The FTB has now

7  waived its right to challenge these factual findings by the jury.

8       Additionally, the FTB argues that many of the evidentiary decisions of the District Court

9  were erroneous because the District Court purportedly allowed the jury to try the residency issue

10  and the tax case. This is not correct. The jury was not allowed to try, consider, or decide the

11  residency issue or the tax case. The District Court repeatedly instructed the jury that it was not to

12  do so. The District Court has broad discretion to admit or exclude evidence based on weighing a

13  party's need for the evidence and whether its admission will prejudice either party. "The trial court

14  is vested with broad discretion in determining the admissibility of evidence. The exercise of such

15  discretion will not be interfered with on appeal in the absence of a showing of palpable abuse."[211]

16  The FTB has made no showing that the District Court abused its discretion in any respect.

17  **B.**   **Discretionary function immunity does not apply to the FTB's bad faith**
18         **acts and intentional torts.**

19       In 2002, this Court ruled in this case that the FTB does not have immunity for

20  "*discretionary acts taken in bad faith*, or for *intentional* torts committed in the course and scope of

21  employment."[212] This "law of the case" is entirely consistent with the current state of the law.

22  Since 2002, the decisional law from this Court has reconfirmed, not changed or contradicted, its

23  previous ruling in this case — that a government agency in Nevada does not have immunity for

---

25  [211] *See Sheehan & Sheehan v. Nelson Malley and Co.*, 121 Nev. 481, 492, 117 P.3d 219, 226 (2005)
(quoting *State ex rel. Dep't Hwys. v. Nev. Aggregates*, 92 Nev. 370, 376, 551 P.2d 1095, 1098 (1976));
26  *Hansen v. Universal Health Services of Nevada, Inc.*, 115 Nev. 24, 27, 974 P.2d 1158, 1160 (1999)
(upholding exclusion of evidence as within the discretion of the District Court, "[e]ven though a contrary
27  finding would also have been within the court's discretion," stating: "This court will not overturn the
District Court's exclusion of relevant evidence absent an abuse of discretion.").

28  [212] 5 AA 1190 (emphasis added).

54

KARCHER CROWELL RENSHAW GRONAUER & FIORENTINO

1  discretionary acts taken in bad faith or for intentional torts committed because of bad faith conduct.

2  The FTB also asserts erroneously that comity requires this Court to treat it just like Nevada

3  agencies are treated in all respects.[213]

4        **1.**      ***Martinez v. Maruszczak* is a negligence case that did not change the law**

5                **relative to bad faith acts and intentional torts.**

      The FTB argues that its intentional, bad faith fraudulent conduct, *as found by the jury*, is

6  immune from tort liability under the "new" test for discretionary-function immunity adopted by this

7  Court in *Martinez v. Maruszczak*.[214] *Martinez* adopted the federal test for discretionary-function

8  immunity — the *Berkovitz-Gaubert* test— but this test does not grant immunity for intentional tort

9  claims involving bad faith conduct by the government or its agents.  The very language of *Martinez*

10  demonstrates that it was a negligence case:

11      Under this two-part test, state-employed physicians enjoy immunity from medical

12      malpractice liability only when *their allegedly negligent acts* involve elements of
    judgment or choice, and the judgment or choice made is of the kind that the

13      discretionary-function exception was designed to shield, that is, a judgment or choice
    involving social, economic, or political policy considerations.

14
    . . .

15
    Next, we discuss discretionary-act immunity under NRS 41.032(2) and clarify that

16      actions against medical providers *for allegedly negligent* medical diagnosis or treatment
    decisions are not barred under NRS 41.032(2)'s discretionary-function exception to the

17      state's general waiver of immunity, unless those decisions were grounded on public
    policy considerations.

18
    . . .

19
    The purpose of . . . Nevada's waiver of sovereign immunity is "to *compensate victims of*

20      *government negligence* in circumstances like those in which victims of private
    negligence would be compensated."[215]

21        The United States Supreme Court cases on which *Martinez* is based and to which the FTB

22  cites are also negligence cases.[216] *Martinez* did not address and did not change the law regarding a

23  government agency's liability for bad faith, intentional conduct.

24

25  _____

[213] *See* the discussion of comity, *infra*, at 146-162.

26  [214] 123 Nev. 433, 168 P. 3d 720 (2007).

27  [215] 168 P.3d. at 722, 724, and 727 (emphasis added).

28  [216] *See* FTB Opening Brief, at 34-35, *citing Berkovitz v. United States*, 486 U.S. 531 (1988) and *United States v. Gaubert*, 499 U.S. 315 (1991).

KARNUTTER CROWELL RENSHAW GRONAUER & FIORENTINO

### 2. *Falline* and its progeny: Nevada does not immunize government agencies and employees for bad faith acts and intentional torts.

Bad faith conduct by a government agency is not in and of itself a civil tort.  However, when a government agency acts in bad faith in discharging its duties and responsibilities, the bad faith conduct can satisfy either the necessary intent element of an underlying tort claim or provide the basis for not extending immunity to the government agency for the alleged misconduct.  In *Falline v. GNLV Corp.,*[217] this Court defined "bad faith" in the context of a government agency as involving "*an implemented attitude that completely transcends the circumference of authority granted the individual or entity.*"[218]

The Court explained in *Falline* that "an act or omission of bad faith occurs outside the circumference of authority[,]" and that "an act of bad faith has no relationship to a rightful prerogative even if the result is ostensibly within the actor's ambit of authority."  As an example, the Court explained that "if an administrator decides to delay or deny a claimant's benefits because of a personal dislike for the claimant, the delay or denial would be attributable to an unauthorized act of bad faith despite the fact that a denial or delay could be otherwise among the rightful prerogatives of the administrator."[219]  *Falline,* then, defines bad faith in the context of intentional government actors, consistent with the second *Martinez* test in that such bad faith acts cannot be within the ambit of acceptable public policy.  Notably, this Court did not distinguish or overrule *Falline* in the *Martinez* case, and the two cases are clearly consistent with one another in distinguishing intentional, bad faith conduct (which, by definition, cannot be furthering a public policy) from negligent acts that are within the scope of public policy.

In *Davis v. City of Las Vegas,*[220] the Ninth Circuit relied on the definition of "bad faith" acts in *Falline,* in reversing summary judgment on a state-law intentional tort claim.  The Court held that where a peace officer treated a citizen "in an *abusive manner . . .* because of *hostility*

---

[217] 107 Nev. 1004, 1009 n. 3, 823 P.2d 888 (1991).

[218] 107 Nev. at 1009 n. 3 (emphasis added).

[219] *Id.*

[220] 478 F.3d 1048, 1051 (9th Cir. 2007).

56

RJN0112

*toward a suspect or a particular class of suspects* (such as members of racial minority groups) or because of a *willful or deliberate disregard for the rights* of a particular citizen or citizens, the officer's actions are the result of bad faith and he is not immune from suit."[221]

The FTB described to the jury that its auditors are "peace officers" who carry badges. The FTB submitted expert testimony regarding acceptable conduct for peace officers conducting an investigation.[222] Yet, the evidence at trial demonstrated that FTB's "peace officers" openly demonstrated hostility towards Hyatt because of his religion, willfully and deliberately disregarded his rights, including illegal disclosures of his private and confidential information, when the FTB knew Hyatt needed to protect his privacy and security,[223] conducted the audits in bad faith, issued proposed tax assessments and fraud penalties that were contrary to the FTB's own conclusions established in their own internal documents and review notes, and then — after unsuccessfully seeking to extort a settlement from Hyatt — delayed and refused to conclude the protests for over 11 years while interest was accruing against Hyatt at the rate of thousands of dollars a day.[224] These are some of the facts Hyatt presented to the jury. These are facts that the jury accepted as true. And these are facts — supported by substantial evidence — demonstrating that the FTB acted in bad faith in conducting the audit.

### 3. Post-*Martinez* cases confirm that government agencies in Nevada are liable for acts taken in bad faith and for intentional torts.

In the context of bad faith, intentional misconduct by a government agency or its employees, this Court has been clear, specific, and consistent in its rulings since its 2002 decision in this case that government agencies are not immune for bad faith acts and are liable for resulting intentional torts.

In *City of Boulder City v. Boulder Excavating, Inc.*,[225] the Court applied discretionary-

---

[221] *Id.*, at 1060 (internal citations omitted) (emphasis added).

[222] RT: July 1, 147:21-148:20, 151:23-156:12.

[223] RT: April 23, 165: 12-20; *see* discussion, *supra*, at 35-42.

[224] RT: July 14, 181:13-182:18; 88 RA 021826.

[225] 191 P.3d 1175 (Nev. 2008).

57

1  function immunity only *after* noting that the record provided no basis to find that the government

2  actor failed to follow procedural requirements and no basis to find he had "an implemented attitude

3  that completely transcend[ed] the circumference of authority granted to [[him]] or [the City of

4  Boulder]."[226]  The Court went so far as to state, "*we can find no evidence in the record that Hansen*

5  [the government employee] *acted with bad faith*."[227]

6       Specifically, *Boulder City* examined whether the city could be held liable for intentional

7  interference with a contract.  The plaintiff contended that the action should not have been dismissed

8  by the District Court, because the action involved an intentional tort and the government was not

9  entitled to immunity for illegal, intentional acts or acts taken in bad faith.[228]  This Court did not

10  renounce or contradict that legal principle of law.  Rather, the Court responded that the record

11  *presented no facts of intentional or bad faith misconduct* to support the intentional tort claim.[229]

12       In this case, the record is very much to the contrary.  The jury's verdicts were based on

13  substantial evidence of fraud, malice, oppression, and bad faith, intentional misconduct by the FTB.

14       Further, this Court in *Boulder City* cited and quoted *Falline*.[230]  Thus, contrary to the FTB's

15  argument that the bad-faith exception recognized by the Court in *Falline* (and cited in the Court's

16  2002 decision in this case) is no longer good law,[231] *Boulder City* reaffirmed that intentional torts

17  committed in bad faith by a government agent are not immune from tort liability, if the facts show

18  such conduct.  Put another way, discretionary-function immunity applies where no facts show bad

19  faith, intentional misconduct by the government agency.

20       Additionally, in *ASAP Storage, Inc. v. City of Sparks*,[232] the City of Sparks argued it could

21  not be held vicariously liable for the gross negligence, willful misconduct, or bad faith conduct of

22

23  [226] 191 P.3d at 1182.

24  [227] *Id.* at 1181, n. 22 (emphasis added).

    [228] *Id.*

25
    [229] *Id.* at 1181.

26  [230] 107 Nev. at 1009, n. 3.

27  [231] *See* FTB Opening Brief, at 52, n. 48, ln. 26-28, in which the FTB elevates a comment from former
    Justice Maupin at oral argument into an implied overruling of *Falline*.

28  [232] 123 Nev. 639, 173 P. 3d 734 (2007).

58

its employees, based on the absolute immunity accorded political subdivisions under NRS 414.110(1) for "emergency procedures." The City also argued it was entitled to discretionary function immunity for the acts of its employees under NRS 41.032(2). NRS 414.110(1), however, does not immunize government employees for gross negligence, willful misconduct, or bad faith conduct.

This Court remanded the matter to the District Court, ordering that it "must examine, in the context of the City's handling of the flood emergency, its NRS 41.032(2) immunity from suit for any alleged gross negligence, willful misconduct, or bad faith conduct by its employees, for which the City could otherwise be vicariously liable."[233] In other words, the City could be held liable for its employees' intentional and bad faith acts.

In 2005, this Court addressed an analogous point in *Jordan v. State ex rel. DMV & Pub. Safety*.[234] The plaintiff alleged that a peace officer committed perjury in obtaining a declaration of probable cause from the justice of peace for plaintiff's arrest and thereby unlawfully arrested and detained him for trespassing. This Court stated that bad faith conduct by the state would not be considered discretionary under discretionary-function immunity:

> We note that, to the extent that the State asserts immunity under *NRS 41.032*, there exist unresolved questions as to whether Officer Jones' acts were made in bad faith and, accordingly, whether the State is entitled to immunity.[235]

Finally, a Nevada federal district court reached the same conclusion regarding the distinction between bad faith, intentional misconduct and negligence relative to the application of discretionary function immunity. The court held:

> Plaintiffs' sixth cause of action asserts various intentional torts . . . Defendants claim immunity under Nev.Rev.Stat. § 41.032(2), which provides an exception to Nevada's waiver of sovereign immunity for discretionary acts "whether or not the discretion involved was abused." *The Court finds that this statute does not extend to intentional torts.* . . . Because the Nevada Supreme Court interprets § 41.032(2) to compensate

---

[233] 173 P.3d at 746.

[234] 121 Nev. 44, 69-71, 110 P.3d 30 (2005).

[235] *Id.* at 71. (*citing Ex Parte City of Montgomery,* 758 So. 2d 565, 569 (Ala. 1999) holding that discretionary function immunity does not apply to an officer who acted in bad faith because bad faith conduct would not be considered discretionary).

59

RJN0115

KARNUTZEN CROWELL RENSHAW GRONAUER & FIORENTINO

negligence victims, *the Court finds the discretionary acts statute inapplicable to the intentional torts asserted here.*[236]

Neither *Martinez* nor any of the later cases change this Court's holding in *Falline* and its earlier ruling in this case that the FTB was not entitled to immunity as a matter of law and would have to defend its conduct before a Nevada jury. That jury determined that the FTB's conduct was intentional and in bad faith, and the FTB is therefore liable for its bad faith, intentional torts.

**4.    Other jurisdictions also do not immunize bad faith acts and intentional torts.**

The Ohio Court of Appeal equated governmental "bad faith," with particular application here, to fraud:

> Bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will *partaking of the nature of fraud.* It also embraces actual intent to mislead or deceive another.[237]

Also, with particular application in this case, the Michigan Court of Appeal held that a government agent "*deliberately ignored exculpatory evidence produced during his investigation*" and the "jury could infer *that* [defendant] was *deliberately indifferent* to [plaintiff husband's] liberty interest" and this was "sufficient evidence of bad faith to avoid the bar of immunity."[238]

Contrary therefore to the FTB's arguments, *Martinez* and the federal cases on which it was based have not altered the substantial body of law denying government actors immunity for bad faith acts and intentional torts.[239]

---

[236] *Roe v. Nevada*, 621 F. Supp. 2d. 1039, 1051 (D. Nev. 2007) (emphasis added).

[237] *Catalina v. Crawford*, 19 Ohio App. 3d 150, 483 N.E.2d 486, 490 (Ohio Ct. App. 1984) (emphasis added); *see also Parker v. Dayton Metro. Hous. Auth.*, 1996 Ohio App. LEXIS 2556 (Ohio Ct. App. 1996).

[238] *Flones v. Dalman*, 199 Mich. App. 396, 399-400, 402, 502 N.W.2d 725 (Mich. Ct. App. 1993) (emphasis added) ("the 'deliberate indifference' standard of conduct necessary for liability under 42 USC 1983 has been held to be equivalent to bad faith under *Ross*. *See Tobias v. Phelps*, 144 Mich. App. 272, 282, 375 N.W.2d 365 (1985).").

[239] *See also Hawkins v. Holloway*, 316 F.3d 777, 789 (8th Cir. 2003)(holding that under Missouri law a government agent's falsification and trumping up of evidence to support his decision against the plaintiffs was sufficient evidence of bad faith to allow the tort claims to proceed); *The Libertatia Associates v. United States*, 46 Fed.Cl. 702 (Fed.Cl. 2000)(finding bad faith against the federal government agency where the government agent expressed personal animosity" towards the plaintiff and used "intimidation and coercion in the course of administering government" duties); *McCray v. City of Dothan*, 169 F. Supp. 2d 1260, 1299 n.141 (M.D. Ala. 2001)(*citing In re Sheffield*, 465 So.2d 350, 359 (Ala. 1984)(finding that the government

60

1
2

**5.** **Even if applied to the facts of this case, neither prong of the *Martinez* test can be met.**

3

The FTB argues that the new two-part test in *Martinez* applies to bad faith action because

4

the subjective intent of government action is no longer relevant. The FTB misconstrues the

5

discussion in *Martinez* and misstates the claims Hyatt presented to the jury. Attempting to apply

6

the two-part *Martinez* test to the bad faith acts and intentional torts at issue here underscores the

7

failings of the FTB's argument.

8

**a.** **The first prong of *Martinez* — individual judgment or choice — is not met in this case.**

9

The first element of the *Berkovitz-Gaubert* test requires that the disputed conduct involve an

10

element of individual judgment or choice.[240] The FTB argues that "an investigation is generally a

11

discretionary function" and cites state and federal case law. But once the FTB has determined to

12

conduct an investigation, it has no discretion to conduct the investigation in an unfair and partial

13

manner or to unlawfully disclose confidential information given to it during the investigation.

14

Indeed, FTB policies and procedures, and California and Federal law, require the FTB to conduct

15

residency investigations in a fair and impartial manner and to maintain the confidentiality of

16

confidential information disclosed during the investigations.[241] FTB has "no rightful option but to

17

adhere to the directive."[242] The FTB therefore does not have discretion to act in bad faith in

18

conducting the audit.

19

Courts from other jurisdictions have held that when a government agency's policies or

20

guidelines impose a set course of action for its employees to follow, the policies or guidelines

21

constrain the employees' discretion, so discretionary-function immunity does not apply (because the

22

employees' conduct would not meet the first element of the *Berkovitz-Gaubert* test).[243]

23
24

defendants "acted in bad faith, or with malice, or willfulness . . .that they deliberately misstated that [the plaintiff] resisted arrest and assaulted [others] for the purpose of having a warrant issued.").

25

[240] *Berkovitz*, 486 U.S. at 536; *see also Gaubert*, 499 U.S. at 322.

26

[241] *See* discussion, *supra*, at 13-14, 35-37, and *infra*, at 89-91, 103-105.

[242] *Berkovitz*, 486 U.S. at 536.

27
28

[243] *See Ashford v. United States*, 511 F.3d 501, 505 (5th Cir. 2007); *Bolt v. United States*, 509 F. 3d 1028, 1033 (9th Cir. 2007); *Vickers v. United States,* 228 F.3d 944, 953 (9th Cir. 2000); *Fethkenher v. Truong,* 2003 Iowa App. LEXIS 996, 4-5 (Iowa Ct. App. 2003) (unpublished);

61

RJN0117

The concept is simple and straight-forward: government actors do not have discretion to commit intentional torts and engage in bad faith conduct. If the law were as the FTB suggests, government actors would have discretion to engage in intentionally tortious conduct and act in bad faith with impunity. That is not the law — particularly when it comes to establishing or executing public policy. Even the FTB would probably agree that a government agency in conducting its public functions and establishing public policy cannot affirmatively choose to discriminate on the basis of race or religion, or try to extort payments from a particular citizen simply because the citizen is wealthy and may want to avoid adverse publicity.

**b.** **The second prong of *Martinez* — plausible policy objective — is also not met in this case.**

Not every purportedly discretionary act of an FTB auditor, protest officer, reviewer, or supervisor, occurring within the broad backdrop of California's Revenue and Tax Code, is automatically in furtherance of plausible policy objectives and therefore susceptible to policy analysis. And as we have seen previously, acts that fall outside the circumference of authority granted to the FTB are not protected by any form of immunity. Here, a government agency's (i) trumping up a tax case, (ii) attempting to extort payment of tens of millions of dollars, (iii) disclosing private and confidential information, and (iv) refusing to allow a meaningful administrative appeal for over a decade, constitute acts that fall outside the ambit of "plausible policy objectives." Acts that fall outside the circumference of authority granted to the FTB are not protected by any form of immunity.

In *Martinez*, citing the Court of Appeals for the Second Circuit, this Court reasoned that "certain acts, although discretionary, do not fall within the discretionary-function exception's ambit because they involve 'negligence unrelated to any plausible policy objectives.'"[244] The Second Circuit case held that if an inspector failed "to perform a diligent inspection out of laziness or was carelessly inattentive, the DFE [discretionary-function exception] does not shield the United States from liability." The Court further held that such actions do not reflect the kind of considered

---

[244] *Martinez*, 168 P. 3d at 728 (*citing Coulthurst v. United States*, 214 F. 3d 106, 110-11 (2d Cir. 2000).

62

1  judgment "grounded in social, economic, and political policy which the [discretionary-function

2  exception] is intended to shield from judicial 'second guessing."[245]  As a result, not even every

3  negligent act that might be discretionary is protected by this immunity

4        Intentional misconduct and bad faith acts, then, do not fall within the discretionary function

5  immunity exception, because they are not grounded in policy considerations.  Even if the FTB's

6  investigation is considered discretionary, the FTB's willful, tortious misconduct and bad faith

7  conduct throughout the investigation cannot be grounded in considerations of public policy.  A

8  most obvious example of this concept is that peace officers cannot manufacture a false case against

9  a citizen.[246]  Peace officers (as the FTB auditors are designated under California law) do not have

10  immunity when they act with an intent to harm a citizen, whether through physical abuse, economic

11  pressure, or any other means.  Consequently, simply stating that conduct is somehow related to a

12  broad policy objective of the agency, i.e., attempting to collect taxes, does not alone protect bad

13  faith and intentional torts, since the commission of such acts is not in furtherance of *any* public

14  policy.

15        For example, employees of the Federal Bureau of Investigation were denied immunity

16  when, during the course of an investigation, they acted outside their discretion.  "No government

17  actor has 'discretion' to violate the Constitution, statutes, regulations or rules that bind them. . .

18  Where government agents took illegal actions, as when they suborned perjury, they acted outside

19  their discretion.  Where their actions violated their constitutional obligations . . . as when they

20  framed innocent men, they acted outside of their discretion.  Where their actions were in violation

21  of FBI or Department of Justice ("DOJ") rules and regulations, they acted outside of their

22  discretion."[247]

23        This type of conduct does not meet the second element of the *Berkovitz-Gaubert* test.  What

24

---

25

26  [245] *Coulthurst*, 214 F. 3d at 110-11) (quoting *United States v. Varig Airlines,* 467 U.S. 797, 814 (1984) (some internal quotation omitted).

27  [246] *Limone v. United States*, 497 F. Supp.2d 143, 202-04 (D. Mass. 2007),.

28  [247] *See Limone v. United States*, 497 F. Supp.2d 143, 202-03 (D. Mass. 2007) (citing *Muniz-Rivera v. United States*, 326 F.3d 8, 15 (1st Cir. 2003)).

RJN0119

1  the FTB espouses under *Martinez* makes no sense and is contrary to the very language of the

2  decision. *Martinez* states that not every discretionary act falls within a plausible policy

3  objective.[248]  A government actor has no discretion to act in bad faith with the intent to harm a

4  citizen.  That is simply not a recognized policy objective.

5
6
   c. **The FTB misstates the purpose for which much of the evidence at trial was offered and misleads the Court as to the issues presented to the jury.**

7       In trying to satisfy the first prong of the *Martinez* test, the FTB argues that the District Court

8  improperly allowed Hyatt to present evidence to the jury that questioned the FTB's discretionary

9  conduct during the audits.  The FTB argues that the gathering of evidence, the analysis of evidence,

10 the delay in processing Hyatt's protests, and the organizational conduct of the FTB were all

11 protected by the discretionary-function-immunity doctrine.  Therefore, the FTB argues evidence of

12 these activities was inadmissible at trial.

13      Contrary to its argument, the FTB was not sued for its discretionary conduct.  Rather, the

14 evidence was admitted and considered properly in the context of whether the FTB acted in bad faith

15 in conducting the audits and delaying the protest proceeding.  Similarly, evidence concerning

16 whether the FTB violated its own policies and procedures, and even the law, while conducting the

17 audits was not offered to recover damages for the violations themselves.  Rather Hyatt offered that

18 evidence to prove that the FTB had no intent to conduct — and was not conducting — a fair,

19 impartial and good faith audit, but rather sought to exert pressure on Hyatt to settle before any

20 independent review of the FTB's actions and assessments.

21      (i)  **Gathering evidence.**

22      The FTB complains that Hyatt presented evidence at trial regarding the manner in which it

23 gathered evidence during the Hyatt audit, asserting that its auditors had discretion to gather

24 whatever evidence it chose and use it however it chose.  However, Hyatt demonstrated to the jury

25 that the FTB was not looking to conduct a fair and unbiased audit.  Cox wanted only evidence

26 consistent with the FTB's predetermined goal to get Hyatt's money, one way or another.  Hyatt

27

28
   ---
   [248] 168 P.3d at 728-729.

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0120

1  presented this evidence as part of his bad faith claim, not to challenge the FTB's right to audit him,

2  but to show that his audit was not fair and impartial and conducted in bad faith.

3             **(ii)**      **Analysis of the evidence.**

4        The FTB also complains about the admission of evidence showing how the FTB arrived at

5  its decision to tax Hyatt and impose multi-million dollar fraud penalties against him. This evidence

6  included contemporaneous FTB documents (kept from Hyatt during the audit and in this litigation

7  until a ruling from this Court requiring disclosure) that reached conclusions directly contrary to

8  what Cox and the FTB told Hyatt. This contrary evidence and the FTB's continued public

9  skewering of Hyatt was properly admitted as relevant evidence of the FTB's bad faith in conducting

10  the audit.

11        Further, a government agency's violations of its policies, procedures and manuals are

12  evidence from which bad faith can be inferred.[249] Similarly, a government agency's violation of a

13  statute can also be evidence of bad faith.[250] In short, violations of policies, practices, procedures

14  and legal requirements are admissible to establish bad faith, and the jury is entitled to find such bad

15  faith based on this evidence.

16        Hyatt presented expert testimony from former FTB senior manager Malcolm Jumelet. His

17  testimony went directly to the FTB's bad-faith motive and actions, and supported elements of the

18  intentional torts before the jury. Because of the complexity of the issues involved in a residency

19  tax audit and assessing a tax fraud penalty, Jumelet's 27 years of professional experience and

20

---

21  [249] *See Conner v. United States*, 434 F.3d 676, 678 (4th Cir. 2006); *Groder v. United States*, 816 F.2d 139,
22  142 (4th Cir. 1987) ("A Manual violation may be relevant to this showing [of bad faith] but it is not
    conclusive."); *U.S. v. Dahlstrum*, 493 F. Supp. 966, 973 (C.D. Cal. 1980) (finding that the IRS did act in
23  "institutional bad faith" by, *inter alia*, conducting its investigations with "deviations from normal operating
    procedure.")

24  [250] *Wailua Associates v. Aetna Casualty & Surety Co.*, 27 F. Supp.2d 1211, 1221 (D. Hawaii 1998) (holding
    that in the context of insurance coverage bad faith claim violations of unfair settlement statute "may be best
25  evidence to indicate bad faith . . ."); *Austin v. Specialty Transportation Services, Inc.*, 358 S.C. 298, 314,
    594 S.E.2d 867, 875-76 (1999) (holding in the context of a punitive damages claim that "[v]iolation of a
26  statute does not constitute recklessness, willfulness, and wantonness *per se*, but is some evidence the
    defendant acted recklessly, willfully, and wantonly. The jury determines whether a party has been reckless,
27  willful, and wanton. However, even in cases involving disputed liability, *punitive damages* are sustainable
    if there is any *evidence* supporting a *violation* of a *statute* (*evidence* of a *violation* of an applicable *statute* is
28  a proper basis for submitting *punitive damages* to the trial jury)"(emphasis in original; citation omitted).

65

KAMPFFER CROWELL RENSHAW GRONAUER & FIORENTINO

1  knowledge within the FTB provided context to the evidence before the jury. Jumelet explained

2  why the conduct of the auditors did not meet either reasonable professional standards or the FTB's

3  own policies and procedures.

4  Jumelet testified about the FTB's consistent and repeated disregard of its own rules,

5  regulations, and even state laws during the audits and in the protests.[251] He explained how unusual

6  and far from the norm the FTB's conduct was during the Hyatt audits and continuing into the

7  protest proceedings. Jumelet did not opine about whether the FTB's conduct was negligent during

8  the Hyatt audits. Nor for that matter did he opine on the ultimate fact about whether the FTB's

9  conduct was intentionally tortious. That was for the jury to decide. But Jumelet demonstrated that

10 the FTB treated Hyatt differently from the way the FTB treated other taxpayers based on reasonable

11 professional standards and the FTB's own policies, procedures, rules, and regulations.[252]

12  Jumelet specifically testified that "*there was bias in the audit*." In fact, he testified that the

13 Hyatt audit was the most biased audit he had ever seen during his professional career.[253] Bias is a

14 factor the jury considered and weighed in determining whether Hyatt proved that the FTB engaged

15 in intentional, bad faith conduct. This was proper expert testimony for the jury to consider.

### (iii)    Evidence of delay in the protest.

17  The FTB argues that it had discretion to take as long as it wanted to decide the protest. But

18 it did not have discretion to refuse to process and complete the protest as a means of further

19 pressuring Hyatt to settle, as his tax bill grew larger with interest mounting and his emotional

20 distress grew more severe. Nor could the FTB take as long as it desired, to avoid Hyatt obtaining

21 an independent decision-maker's determination of his case. Evidence of the FTB's 11-year delay in

22 handling the protest was highly relevant to these trial issues.

### (iv)    Organizational misconduct.

24  The FTB also argues that evidence concerning its *Litigation Roster*, its amnesty offer, and

25 the FTB's use of CBR should not have been allowed at trial. Again, each of these pieces of

---

[251] RT: June 13, 167:4-169:15.

[252] RT: June 11, 148:3-20.

[253] RT: June 12, 82:24-83:8.

66

RJN0122

1  evidence was for the jury to weigh and consider as evidence of the FTB's bad faith conduct.  The

2  FTB listed Hyatt's case and assessment on the *Litigation Roster* in a manner different from any

3  other taxpayer, including publishing Hyatt's private information as a way to "get" Hyatt.  The jury

4  could consider this different treatment as evidence of the FTB's bad faith conduct.  The FTB's

5  imposition of an amnesty penalty of nearly $10 million was offered as additional evidence of the

6  FTB's bad faith conduct, as well as evidence supportive of Hyatt's reaction to this as part of his

7  emotional distress.  The FTB's use of CBR — and the incentive to assess taxes and penalties —

8  was presented also as evidence for the jury to consider and weigh relative to the FTB's motivation.

9       Such conduct is not immune if carried out in bad faith and as part of an intentional tort.

10  Judge Walsh correctly allowed the jury to consider and weigh this evidence relative to Hyatt's

11  intentional tort claims.  The FTB's actions can be considered and weighed in determining if its

12  conduct established "*an implemented attitude that completely transcends the circumference of*

13  *authority granted the individual or entity.*"[254]

### d.  The additional cases cited by the FTB do not immunize bad faith conduct and have no application to the claims in this case.

14

15       The FTB claims that "in order to make a determination of bad faith or intentional

16  misconduct, the courts would be required to consider the government actor's subjective intent –

17  which [the FTB wrongly contends] is prohibited by the *Berkovitz-Gaubert* test."[255]  The FTB

18  concludes, then, that under *Martinez* whether a government actor acted in bad faith is not even

19  relevant.

20       The cases cited by the FTB do not support its assertion.  In those cases, the plaintiff was

21  suing for recovery of damages stemming from a discretionary decision of the government, typically

22  a regulatory action, which the plaintiff claimed caused economic loss or damage.  Here, Hyatt sued

23  because of the FTB's intentional tortious conduct during the audit and sought damages.  Hyatt did

24  not sue as a means of overriding or changing a government decision.  Whether taxes and penalties

25  are owed was not before the jury.  Indeed, Hyatt continued to battle the FTB about those issues

26

27  _____

28  [254] *Falline*, 107 Nev. at 1009.

[255] FTB Opening Brief, at 53:13-16.

67

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0123

1  before the State Board of Equalization.

2  In *Ransdell v. Clark County*,[256] the plaintiff challenged a Clark County official's decision to

3  abate a nuisance created by his property, seeking a ruling contrary to the government's decision on

4  the subject.[257] The plaintiff did not allege any tortious conduct outside the circumference of the

5  county's authority to make decisions regarding the abatement of a nuisance.

6  In *Butler ex rel. Biller v. Bayer*,[258] the alleged negligent conduct of prison officials *was not

7  protected by discretionary function immunity* because "as we explained in *Martinez*, certain acts,

8  although discretionary, do not involve bad faith intentional torts and do not fall within the ambit of

9  discretionary-act immunity 'because they involve negligence unrelated to any plausible policy

10  objectives.'" The *Bayer* case clearly provides that bad faith intentional torts are not protected by

11  discretionary-function immunity.

12  The other cited case also involved overt challenges to decisions by the government: *Pina v.*

13  *Commonwealth*[259] (the plaintiff challenged the Office of Disability Determination Service's

14  decision to terminate her disability benefits claiming that the decision was made negligently);

15  *Terbush v. United States*[260] (the plaintiff alleged only negligence claims and challenged the

16  National Parks Service's decisions on public access to trails); *In re TPI International Airway*[261] (the

17  plaintiff challenged a government agency's decision not to investigate a third party, and did not

18  allege intentional torts); *Rogers v. United States*[262] (the suit challenged solely an administrative

19  decision "by HUD to issue a 'Limited Denial of Participation' in HUD programs and, subsequently,

20  to initiate debarment proceedings" against the plaintiff); *Bolen v. Dengel*,[263] (the plaintiff's claims

21

22  _____

23  [256] 124 Nev. ___, 192 P.3d 756, 759, 762-63 (2008).

24  [257] *Id.* at 759.
    [258] 123 Nev. 450, 168 P.3d 1055, 1066 (2007).

25  [259] 510 N.E.2d 253, 255 (Mass. 1987).

26  [260] 516 F.3d 1125 (9th Cir. 2008).

27  [261] 141 B.R. 512, 513 (S.D. Ga. Bankr. 1992).
    [262] 187 F. Supp. 2d 626, 628-29, 631 (N.D. Miss. 2001).

28  [263] 2004 WL 2984330, at *8 (E.D. La. 2004).

68

KATTEN CROWELL RENSHAW GRISWOLDER & FEDERTINO

RJN0124

1   arose out of United States Trustee's decisions to pursue claims and no intentional torts were

2   alleged).

3       In *Franklin Savings Corp. v. United States*,[264] the government's decisions at issue were

4   those made by the Resolution Trust Corporation ("RTC") in managing the assets of a company over

5   which the RTC had been appointed conservator, decisions that fell squarely within the

6   circumference of the RTC's authority.[265]  The case is limited to those situations when a complaint

7   alleges that a government agency's "facially authorized acts" were completed with the intent to

8   violate an administrative order or statutory and regulatory scheme under which the agency

9   operated.  In other words, the court addressed whether facially authorized discretionary acts of a

10  government agency are subject to suit if a plaintiff alleges that those facially authorized acts were

11  committed with illegal intent.

12      Notably, unlike the acts on which plaintiffs attempted to base their claims in *Franklin*,

13  Hyatt's case was not, and is not, based solely on allegations of subjective bad faith.  Rather, Hyatt's

14  case was and is based firmly on specific allegations, and actual proof, of the elements of common

15  law intentional torts, coupled with bad faith.  The policies driving the *Franklin* decision are not

16  present where, as here, there are complete and detailed allegations that satisfy the specific elements

17  of common law intentional torts claims.

18      The *Franklin* court did not hold that allegedly discretionary acts that are tortious, are not

19  facially or objectively authorized, and which are taken in bad faith are immune from suit.  Such a

20  holding would stand in stark contrast to the extensive case law authorizing a suit when a

21  government agency steps outside of its circumference of authority and commits specific intentional

22  torts in bad faith, as Hyatt has both alleged and proved here.

**C.   The District Court consistently followed and applied this Court's "jurisdictional" ruling from 2002.**

25      The FTB's claim that the evidence established "at the very worst" negligence is devoid of

_____

[264] 180 F.3d 1124 (10th Cir. 1999).

[265] *Id.* at 1127.

69

1  any citation to the record that even supports, let alone establishes, the FTB's assertion.[266] The

2  District Court specifically instructed the jury regarding the seven intentional torts presented to it, as

3  well as the intent element of each tort.[267] The jury obviously found that Hyatt's evidence

4  established the intent element for each tort claim when the jury found in favor of Hyatt on all seven

5  claims. The evidence supporting the jury's verdict far surpasses the legal standard of substantial

6  evidence. In that regard, the Statement of Facts, and the evidence cited therein, constitutes

7  substantial evidence sufficient to uphold the verdicts.

8         **1.    Evidence of the FTB's course of conduct directed at Hyatt was relevant
9                 to, probative of, and offered to establish the FTB's wrongful intent.**

       The FTB claims that its conduct reflect acts of negligence for which it cannot be held liable

10  (*e.g.*, issuing multi-million dollar tax assessments to enhance "CBR" regardless of whether the

11  assessments are accurate or sustainable on appeal, discarding, discounting or intentionally ignoring

12  evidence contrary to the FTB's preconceived conclusion, manufacturing reasons to assert multi-

13  million dollar fraud penalty). Hyatt did not argue, and the evidence did not establish, that there

14  were merely many acts of negligence equating to intentional wrong-doing. The FTB nonetheless

15  generally attacks a number of evidentiary rulings made by Judge Walsh by asserting that Hyatt was

16  able to present "negligence" evidence to the jury. The FTB argues that this "negligence" evidence

17  should not have been presented because this Court's ruling in this case in 2002 dismissed Hyatt's

18  single negligence claim.

19         The FTB labels certain trial evidence as evidence of "negligence." It was the FTB's view at

20  trial, and here now, that the only evidence allowed in an intentional tort case are proverbial

21  smoking gun admissions by perpetrators stating that they knowingly and intentionally engaged in

22  the alleged wrongful conduct. Intentional misconduct is rarely proven in that manner. Rather,

23  circumstantial evidence is pieced together, and the trier of fact must determine if the plaintiff has

24  met its very high burden of proving intentional misconduct.

25         Although the FTB insists that negligent acts cannot be intentional, the FTB's case law

26

27  ------------------------------

28  [266] FTB Opening Brief, at 56.
   [267] 53 AA 13246-54 AA 13270.

1  recognizes that the line between negligent and intentional acts is often unclear.[268]  An act in itself is

2  rarely negligent or intentional, and the evidence taken as a whole establishes negligence or

3  intentional torts.  Further, none of the case law cited by the FTB holds that negligent acts, even

4  when repeated, can never be evidence that those acts were intentional or committed in bad faith.

5  Indeed, the cases cited by the FTB do not support their claim that cumulative acts of negligence do

6  not prove bad faith or intentional conduct.  The cases cited actually say just the opposite.[269]

7  Although each of these courts recognized that repeated negligent acts are insufficient in themselves

8  to prove intentional conduct — nor in these cases, deliberate acts of indifference — [270] both cases

9  clearly note that multiple acts of negligence can be evidence of deliberate or intentional acts.

10      In *Sellers v. Henman*, the court explained that the "significance of multiple acts of

11  negligence is that they may be evidence of the magnitude of the risk created by the defendants'

12  conduct and the knowledge of the risk by the defendants."[271]  The court further reasoned that

13  although multiple acts of negligence are not a separate theory of liability, such facts are

14  evidentiary.[272]

15      Similarly, in *Brooks v. Celeste*, the court explained that:

16      *[O]ne way to prove* that an official acted with deliberate indifference [or intentionally] is
       to show that he repeatedly acted in a certain manner.  In such cases, the repeated acts,
17      viewed singly and in isolation, would appear to be mere negligence; however, viewed
       together and as a pattern of acts helps prove that *each act* was committed with deliberate
18      indifference [or intentionally].[273]

19

20  ────────────────

21  [268] *See Rocky Mountain Produce Trucking Co. v. Johnson*, 78 Nev. 44, 51, 369 P.2d 198, 201 (1962).

    [269] *See Brooks v. Celeste*, 39 F.3d 125, 127-28 (6th Cir. 1995); *Sellers v. Henman*, 41 F.3d 1100, 1102-03
22  (7th Cir. 1994).

23  [270] Both *Brooks* and *Sellers* address the Eighth Amendment standard of deliberate acts of indifference.

    [271] Sellers, 41 F.3d at 1103.
24
    [272] *Id.*

25  [273] *Brooks*, 39 F.3d at 128 (emphasis in original).  Similarly, the Nevada case law referenced by the FTB
    holds that the mere fact that a contract was breached or a promise was not performed is not, in itself
26  sufficient to infer fraudulent intent.  *See Bulbman Inc. v. Nevada Bell*, 108 Nev. 105, 112, 825 P.2d 588,
    592 (1992) (noting that a mere failure to perform a promise is not enough to show fraudulent intent);
27  *Tallman v. First Nat. Bank of Nevada*, 66 Nev. 248, 259, 208 P.2d 302, 307 (1949) (noting that without
    other evidence the "mere fact that a promise made is subsequently not performed" does not infer fraudulent
28  intent.

                                                71

RJN0127

Contrary to FTB's contention, Hyatt has never asserted that his claims are based on a string of negligent acts by the FTB. However, Hyatt was entitled to present a course of conduct to demonstrate he was singled out and/or that there was express ill-will directed at him, thereby demonstrating that those acts were intentional.[274] Hyatt has presented significant evidence, both qualitatively and quantitatively, to show that some of the acts of the FTB, though arguably negligent in isolation, were in fact intentional. Most significantly, the evidence taken as a whole was weighed by the jury, which then found that the FTB had engaged in bad faith and committed intentional torts. The presentation of this evidence was well within the "jurisdictional limits" set by this Court.

2.    **The District Court's rulings conformed to this Court's 2002 decision that specifically approved Hyatt's bad faith fraud claim very early in the proceedings.**

Even in this appeal, the FTB does not accept that the jury determined that it acted in bad faith in conducting the Hyatt audit, which subjected the FTB to liability. But this Court decided the issue in 2002 when Hyatt briefed this specific claim in opposing the FTB's dismissal writ. Hyatt's briefing then explicitly presented the very claim the District Court allowed to be tried to the jury, and of which the FTB now complains.

The FTB's jurisdictional arguments are based on an erroneous and incomplete description of the law of the case. In addition to Hyatt's invasion of privacy, abuse of process, and outrage claims, and his fraud claim, based on the FTB's bad faith in conducting the audits and protests, was pled from the beginning of this case and has withstood FTB's challenges in the District Court, this Court, and the United States Supreme Court. The District Court's pretrial and evidentiary rulings fell well within the prior rulings of this Court and District Court Judge Saitta.

---

[274] In particular, the FTB again attacks the evidence presented by Hyatt expert and former FTB high-level manager, Malcolm Jumelet, as negligence evidence because Jumelet testified how different, how far from the norm, the FTB acted relative to Hyatt. He had never seen an audit "so biased" in 27 years at the FTB and 10 years in private practice. RT: June 12, 82:24-83:8. It was certainly appropriate for the jury to hear this evidence and give it whatever weight the jury deemed appropriate in determining whether the FTB engaged in bad faith. Jumelet's evidence was not presented to establish a negligence claim.

72

RJN0128

**a. From the outset, Hyatt pled and District Judge Saitta allowed Hyatt to proceed with his claim that the FTB conducted a fraudulent audit in bad faith.**

From the outset of this case in 1998, Hyatt pled that the FTB acted in bad faith in conducting the audits and in assessing Hyatt millions of dollars in taxes and imposing millions of dollars in penalties, with the bad faith intent to coerce a settlement from Hyatt. The FTB's bad faith conduct in the audits has been a leading issue in this case since 1998.[275]

In 1999,[276] the FTB filed a motion for judgment on the pleadings challenging Hyatt's declaratory relief claim and his tort claims. District Judge Saitta ruled that Hyatt had appropriately alleged his tort claims.[277] In fact, the FTB made no challenge to the bad-faith, government-fraud allegations and unsuccessfully attacked the fraud claim on other grounds.[278]

**b. Judge Saitta later denied the FTB's summary judgment motion, including refusing to dismiss the bad-faith, governmental-fraud claim.**

In 2000, the FTB filed its first summary judgment motion seeking to dismiss every tort claim, including the fraud claim. Although the FTB argued that Hyatt did not have sufficient evidence to satisfy the five elements of fraud,[279] it did not argue that the bad-faith, government-fraud claim was improper or barred, as a matter of law. Indeed, in opposing the motion, Hyatt described the claim in the same fashion he later described it to this Court, and then ultimately to the jury, emphasizing that the FTB conducted the audit in bad faith, seeking to trump up a multi-million dollar assessment and extort a settlement.[280]

**c. This Court also considered and approved the bad faith governmental fraud claim.**

In response to the FTB's writ petition seeking review of the District Court's denial of its

---

[275] 1 AA 114-143.

[276] The FTB initially removed the case to the Federal District Court. But Hyatt filed a motion to remand the case based on the Eleventh Amendment. The federal District Court granted the motion and remanded the case to state court. As a result, the case did not commence in earnest in state court until early 1999.

[277] 2 AA 408-412.

[278] 1 AA 188-189.

[279] 2 AA 495-496.

[280] 3 AA 565-574.

KAMPFFER CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0129

1   summary judgment motion, between 2000 and 2002, this Court reviewed all of Hyatt's claims,

2   including his bad-faith, government-fraud claim.  Although the Court initially considered the FTB's

3   writ petition on only a jurisdictional issue, it ultimately reviewed the entire record of the case and

4   held that the intentional tort claims could proceed to trial.[281]

5        In his briefing, Hyatt presented and addressed the significant factual record supporting

6   Hyatt's common-law tort claims, which had been presented in the District Court in opposing the

7   FTB's motion for summary judgment.[282]  The FTB opposed Hyatt's petition for rehearing, arguing

8   that Hyatt failed to establish the elements for each of his tort claims — including the bad faith,

9   government-fraud claim.[283]  The initial focus of Hyatt's briefing to this Court in 2001 on this issue

10  was the evidence Hyatt had compiled even at that early date supporting the bad-faith,

11  governmental-fraud claim.  For example, arguing that the claim should survive and be tried, Hyatt

12  described the claim and identified supporting evidence, including evidence that the FTB conducted

13  a biased, fraudulent investigation and audit.  This is the same evidence Hyatt presented to the jury

14  at trial.[284]

15       On reviewing Hyatt's arguments and proffered evidence, this Court reversed its prior order

16  and returned the bad-faith, government-fraud claim, and all of the other pending intentional tort

17  claims, to the district court, while dismissing Hyatt's single negligence claim on the basis of

18  comity.[285]  Regarding Hyatt's fraud claim, this Court's order reasoned that:

19          Nevada does not allow its agencies to claim immunity for discretionary acts taken in bad
            faith, or for intentional torts committed in the course and scope of employment. Hyatt's
20          complaint alleges that Franchise Tax Board *employees* conducted the audit in bad faith,
            and committed intentional torts during their investigation.[286]
21

22       This Court's decision in 2002 therefore approved and even materially shaped Hyatt's bad

23  faith governmental fraud claim.  This is the "jurisdictional limit" of the case, and the district court's

---

24  [281] 5 AA 1184.

25  [282] 5 AA 1070-1080; 5 AA 1092-1114.

26  [283] 5 AA 1123.

27  [284] 5 AA 1070-1082, 1092-1114.

28  [285] 5 AA 1183-1196.

[286] *Id.*, at 5 AA 1190 (emphasis added).

74

KAMER CROWELL RENSHAW GRIMALDI & FIORENTINO

RJN0130

1  rulings fell well within this limit.

2
**D.  The District Court consistently followed and applied District Judge**
3  **Saitta's ruling dismissing determination of the tax and residency issues**
**from this case.**
4
District Judge Saitta dismissed Hyatt's declaratory relief claim in 1999 on the basis that it
5
sought a determination of when Hyatt became a Nevada resident.  District Judge Saitta ruled that
6
the court should defer the residency issue to the pending California tax proceedings.[287]  In making
7
this ruling, District Judge Saitta *did not rule* that the court could not entertain or resolve the bad
8
faith, governmental fraud claim, which Hyatt has now proven before the jury.  Indeed, District
9
Judge Saitta's ruling (and later this Court's holding) left the bad-faith, government-fraud claim
10
completely intact.
11
At trial, the District Court specifically instructed the jury that it was not and could not
12
address whether Hyatt owed taxes or when his residency changed, because those issues would be
13
determined in a California administrative tax proceeding.
14
**1.  The District Court did not permit the jury to act as an appellate court**
15  **for the FTB's audit conclusions.**

16  The District Court explicitly, and repeatedly, instructed the jury what the jury was deciding

17  and not deciding.  In fact, the language employed by the District Court to instruct the jury was

18  stipulated to by the parties.[288]  At the outset of the trial, the District Court instructed that the jury

19  was not evaluating the results of the audit and was not making a determination about Hyatt's

20  residency.  The District Court read the following stipulated statement to the jury prior to opening

21  statements:

22          Although this case arises from the residency tax audit conducted by FTB, it is important
for you to understand that you will not be asked, nor will you be permitted to make any
23          determinations related to Mr. Hyatt's residency or the correctness of the tax assessments,
penalties and interest assessed by FTB against Mr. Hyatt.  Thus, although you may hear
24          evidence during the course of this trial that may be related to the determinations and
conclusions reached by FTB regarding Mr. Hyatt's residency and tax assessments, you
25          are not permitted to make any determinations regarding Mr. Hyatt's residency such as
when he became or did not become a resident of Nevada.
26

27  _____
[287] 2 AA 408-412.
28  [288] RT: April 21, 14:18-22, 41:6-43:13.

KARNEITER CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0131

Likewise, you are not permitted to make any determinations related to the propriety of the tax assessments issued by the FTB against Mr. Hyatt, including but not limited to the correctness or incorrectness of the amount of taxes assessed or the determinations of FTB to assess Mr. Hyatt penalties and/or interest on those tax assessments.

The residency and tax assessment determination and all factual and legal issues related thereto are the subject matter of a separate, administrative process between Mr. Hyatt and FTB in the State of California and will be resolved in that administrative process. You are not to concern yourself with those issues.[289]

During the course of the trial, the District Court read or showed the jury this same instruction *four additional times*, three of which were at the specific request of the FTB.[290] Then again at the conclusion of evidence, the District Court instructed the jury that it was not deciding the tax issues or Mr. Hyatt's residency, but rather the intentional tort claims asserted by Hyatt.

The District Court gave the jury Instruction No. 24, which directed that evidence regarding the FTB's determinations and conclusions in the tax audit was not offered for the purpose of determining the correctness of the audits:

Jury Instruction No. 24

You have heard evidence during the course of this trial that may be related to the determinations and conclusions reached by FTB regarding Mr. Hyatt's residency and tax assessments. You are not permitted to make any determinations regarding Mr. Hyatt's residency, such as when he became, or did not become a resident of Nevada. Likewise, *you are not permitted to make any determinations related to the propriety of the tax assessments issued by FTB against Mr. Hyatt, including but not limited to, the correctness or incorrectness of the amount of taxes assessed, or the determinations of FTB to assess Mr. Hyatt penalties, and or interest on those tax assessments.*

The residency and tax assessment determinations, and all factual and legal issues related thereto, are the subject matter of a separate administrative process between Mr. Hyatt and FTB in the State of California and will be resolved in that administrative process. You are not to concern yourself with those issues.[291]

The FTB therefore incorrectly argues that the jury was tasked with determining whether the results of the audit were correct and that Hyatt presented evidence to the jury supporting this task. That was not the case presented to the jury, and the jury was strictly and repeatedly instructed that it

---

[289] RT: April 21, 42:11-43:9 (emphasis added).

[290] RT: June 2, 113:20-115:14, June 12, 154:14–156:1, June 23, 61:3-64:8; July 14, 116:7-118:5.

[291] RT: July 28, 21:8-22:1.

76

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

1    was not to do so.[292]

2        The fact that the jury in this tort case heard and saw some of the evidence relating to the tax

3    controversy is not inconsistent with District Judge Saitta's dismissal in 1999 of Hyatt's declaratory

4    relief claim because there was an ongoing tax proceeding in California. That dismissal was

5    premised on the ground that the tax controversy — essentially the dispute over Hyatt's residency —

6    must be decided in California. Indeed, the results of the FTB's audits are at issue in the California

7    tax proceedings now before the Board of Equalization. The FTB no longer has jurisdiction to

8    determine Hyatt's residency, tax assessments, or fraud penalties. Jurisdiction now rests with the

9    same Board of Equalization in a *de novo* review and *is not limited to the evidence gathered in the*

10   *audit.*[293]

11       The FTB presumes, with no legal analysis, that evidence relating to the tax controversy in

12   California has no place in the tort case tried in Nevada. The FTB is wrong. The same evidence can

13   and does prove the elements of Hyatt's tort claims. The FTB cites to evidence regarding the FTB's

14   gathering of information during the audit and the FTB's analysis of that information at the

15   conclusion of the audit. The FTB attacks the expert testimony of Malcolm Jumelet. But that

16   evidence related strictly to — and Hyatt offered it only for the purpose of — proving that the FTB

17

18   [292] The *Amicus Curiae* brief filed by the Multistate Tax Commission argues on page 4 that in deciding Hyatt
19   suffered emotional distress damages, the jury must have been determining the tax issue, because a person
     could not have suffered emotional distress if he really did owe the taxes assessed. The Multistate Tax
20   Commission misconstrues or misunderstands the basis of the emotional distress as well as the fundamental
     issue tried to the jury. Its argument, essentially, is that if a tax is owed, then anything a tax collector does is
21   ok: the end (collecting taxes) justifies the means (intentionally destroying a man's life). As discussed
     below on pages 124-131, 134-137, Hyatt's emotional distress did not stem from an audit notice or the
22   proposed assessment of taxes. Rather, it stemmed from learning of the massive and repeated disclosures of
     his private information, the one-sided, predetermined nature of the audit (in Hyatt's words he did not get a
23   "fair shake") and there was nothing he could do as the FTB refused for over a decade to issue a final
     determination and allow an actual appeal to an independent board. It has always been a precept of this case
24   that the tax question is separate, and regardless of whether an independent board determines taxes are owed
     or not, the FTB can not engage in the bad faith conduct directed at Hyatt. The issue of Hyatt's emotional
25   distress is therefore quite different from the tax question.

26   [293] *In re Sierra Production Service, Inc.,* 1990 Cal. Tax LEXIS 17, *8 n. 4, 90 SBE 010 (Cal. St. Bd. Equal.
     1990); *In re Delta Warehouse Company,* 31 SBE 030, 136 Cal. St. Bd. of Equal., December 1, 1931
27   (published); *see also Appeal of CPY Sports, Inc.,* Cal. St. Bd. of Equal., July 1, 1999 (unpublished) ("The
     review of a determination of the Franchise Tax Board by this Board is *'de novo'* (i.e., not based upon prior
28   decisions, determinations or findings), and is decided based on the evidence and arguments submitted by
     both parties.").

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0133

1  conducted the audits in bad faith.  Indeed, Jumelet's ultimate opinion was that the FTB conducted

2  the most biased audit he had ever seen during his 36 years as an FTB auditor and supervisor, as

3  well as a private practitioner.[294]  The jury could, and did, decide whether Jumelet's testimony

4  supported his opinion, taking into account as well the FTB's extensive cross-examination.[295]

5  Jumelet did not opine to, and the jury did not decide, whether Hyatt owed taxes or when he became

6  a Nevada resident.

7  　　　　All the evidence the FTB cites was relevant and admissible to prove the tort claims.  Hyatt

8  did not argue that the evidence would determine the residency dispute or whether Hyatt owed taxes

9  — or whether the FTB's decisions on the merits were right or wrong.  Those issues, as directed

10  expressly and repeatedly by the District Court, are to be decided in California.

11  　　　　The pending administrative proceeding before the California Board of Equalization is an

12  adjudicative proceeding requiring due process, while the FTB's audits and protests were

13  investigative actions in which no due process rights are accorded.[296]  The FTB's argument that "an

14  existing controversy" regarding the residency issue limits Hyatt's evidence in this separate tort case

15  makes no sense.  There is an existing tax controversy, and that will be decided in a California

16  administrative proceeding.  But a jury determined that the FTB conducted its audits in bad faith and

17  tortiously and thus is liable to Hyatt in this tort case.

18  　　　　In other words, *the conduct of the auditors and protest officers were at issue here based on*

19  *the record of the audits and protests*.  The California administrative tax proceedings will resolve

20  the residency and tax issues based on the universe of evidence concerning those issues in the *de*

21  *novo* administrative tax proceeding.

22  　　　　District Judge Saitta's ruling early in the case dismissing the declaratory relief claim

23  regarding Hyatt's residency, but authorizing all of Hyatt's intentional tort claims to proceed, is

24  entirely consistent with the manner in which the case was tried to the jury.  There was a full

26  [294] RT: June 11, 116:19-117:3; June 12, 82:24-83:8.

27  [295] RT: June 12, 84:22-218:14; June 13, 3:2-144:4, 170:15-175:2.

28  [296] *See* cases cited in fn. 293, *supra*, at 77; *see* FTB Brief, at 39, citing sections in the California Revenue and Taxation Code regarding FTB authority to investigate.

78

RJN0134

adjudication of Hyatt's tort claims here without any impact on or interference with the *de novo* administrative tax proceedings in California.

### 2. The District Court properly excluded residency evidence developed in the protest proceedings.

The FTB argues that it should have been allowed to present "residency evidence" gathered during the 11-year protest to defend against Hyatt's tort claims. Contrary to the FTB's assertion, the jury was not presented the question of whether the decision by the protest officer, after 11 years, was in bad faith. That was definitively not an issue presented at trial. The protest officer's decision was never an issue during the litigation, because the FTB did not make a decision in the protest proceedings until the eve of trial. There were therefore no pleadings or discovery directed at the merits of this 11th hour decision by the FTB.

Rather, the sole issue from the protest before the jury was the delay: Was the FTB's 11-year delay in completing the protest further evidence of its bad faith? The District Court's pretrial and trial rulings limited the jury's consideration of the protest to whether the protest delay was part of the FTB's bad faith audit. Put another way: was the protest delay a continuation or cover-up of the FTB's bad faith audit?[297] Because the FTB issued its final determination in the protest shortly before trial, the Court allowed the FTB to inform the jury that the protest had been decided (i.e., the delay is over), and the first page of the formal decision was admitted showing the FTB had upheld the auditor's conclusions and added sourcing as an additional theory for taxing Hyatt).[298]

But neither side was allowed to argue whether the protest officer acted in good or bad faith in issuing the decision. The FTB therefore makes a blatant misstatement in arguing that this "expanded theory was a critical difference."[299] The protest "issue" litigated at trial did not go beyond whether the 11-year protest delay was evidence of the FTB's bad faith. The FTB misrepresents that Hyatt's counsel had referred to the protest decision as a "rubber-stamp" of the

---

[297] RT: April 25, 29:4-9, 32:17-20; May 1, 19:23-20:1; 14 RA 003262-003276; 12 AA 02937-02943; 18 RA 004495-004496.

[298] 88 RA 021826.

[299] FTB Opening Brief, at 65:10-11.

79

RJN0135

1   auditor's work. This is not true. The FTB's citation to the record to support this assertion refers to

2   Hyatt's counsel, in closing argument, quoting Cox's testimony admitting that her supervisors

3   "rubber-stamped" her audit conclusions. The record citation does not even refer to the protest

4   decision, let alone any comment by counsel that the protest officer "rubber-stamped" the auditor.[300]

5         The FTB sought to use evidence it gathered "after-the-fact" to justify what it did during the

6   audit. First, whatever evidence was discovered after the fact does not excuse the bad faith and

7   intentional torts committed during the audits or the cover up by delaying the protest proceedings.

8   Second, the FTB's attempt to introduce new residency evidence would have resulted in nothing

9   short of a full-blown trial and determination of the residency and tax issues, something not

10   permitted by the very "jurisdictional limits" set by this Court and District Judge Saitta and

11   emphasized by the FTB on appeal. The FTB cannot have it both ways. Finally, this new residency

12   evidence in fairness would invite Hyatt also to present his additional residency evidence, including

13   multiple witnesses who fully supported his move to Nevada in September 1991, and his position

14   during the audit.[301] But the District Court was not to try the residency issue and it was not

15   submitted to the jury.

16

17

18

19

20   [300] *See* FTB Opening Brief, at 65:8-10, citing 52 AA 12834 (80-81).

21   [301] The FTB drops several footnotes in its brief (*i.e.*, footnotes 58 through 63) summarily characterizing certain residency evidence. Mischaracterizing is a better term. The FTB still claims it did not make a mathematical or clerical error in taxing Hyatt on income earned after the day the FTB acknowledges Hyatt

22   moved in 1992. This is akin to a child continuing to assert two plus two is five. They will not admit a simple mistake because doing so requires an enormous adjustment in Hyatt's favor. The only reasonable

23   inference is the FTB is not acting in good faith. *See* correspondence on this issue. 54 AA 13396-13397; 85 RA 021082-021085, 021093; RT: April 30, 136:13-140:7. The statements in the other footnotes have been

24   repeatedly rebutted and explained in the protests and now in the administrative tax appeal. Some of the statements by the FTB are downright outlandish. None of the statements in these footnotes are accurate and

25   some misstatements go well beyond what could be forgiven as FTB "spin." For example, Hyatt never backdated a deed; the IRS did not raise similar issues as the FTB (*e.g.*, Hyatt sought a refund and obtained

26   partial relief; he was not audited); equipment repair documents do not place Hyatt at the La Palma house; etc. Judge Walsh correctly left these residency issues that were "developed" in the protest by the FTB for

27   the California tax proceeding. The issues at trial were the FTB auditors' attempts to trump up a case against Hyatt and extort a settlement, invasion of Hyatt's privacy, and then the delay in the protests in an attempt to

28   cover up the audit and avoid an actual appeal by Hyatt where he would have due process rights.

RJN0136

**3.      Contrary to the FTB's argument, the evidence at trial established that Hyatt's location between September 26 to October 20, 1991, was not a focus of the audit, insignificant to the auditor's conclusions, and not a defense to the FTB's wrongful conduct.**

In attempting to convince this Court of the merits of its current residency case, the FTB argues that its protest evidence, if admitted, would have cast doubt on Hyatt's position that he moved to Nevada in late September 1991.  Again, if the residency dispute was at issue, and post-audit evidence admissible, Hyatt has his own evidence.  He has witnesses who confirm his move from California to Nevada in late September 1991, his stay initially at a Las Vegas hotel for several weeks, and then his leasing and residing in a Las Vegas apartment for a number of months before purchasing a Las Vegas house in April 1992.  But that is not at issue in this case.  The District Court properly excluded evidence that was intended solely to address the residency issue.

At trial, the FTB emphasized the short period of time between late September, 1991 through October 20, 1991.  It attempted to convince the jury that much of its audit conduct was justified because the FTB received little information from Hyatt concerning where he resided in Nevada during this time.  The FTB argued to the jury that Hyatt essentially deserved what he got during the audit because he did not tell the FTB where he was during those first several weeks.[302]

Hyatt presented evidence of at least one enormous hole in the FTB's argument:  prior to the FTB's August 2, 1995 Determination Letter, *the FTB never asked Hyatt for this information.* During the trial, auditor Cox was cross-examined about this subject.  She admitted that she never sent an Information Document Request or other request asking for this information.  Rather, she claimed that she asked for it indirectly when she asked for bank account information, and therefore Hyatt and his representatives should have known she wanted specific information about where he was during this short period of time.[303]  Yet, as auditor Cox admitted, this short period of time was completely irrelevant to the tax issue, because Hyatt earned no income during this period.  It was not until late October, 1991, that Hyatt first received patent income, which the FTB sought to

---

[302] RT: May 28, 73:1-74:4; July 24, 47:5-51:4.

[303] RT: May 30, 134:6-140:7.

81

KAMMERER CROWELL RENSLAW CROSSAKER & FIORENTINO

1  tax.[304]

2      At trial, grasping for something to attack Hyatt and "justify" its own conduct, the FTB

3  blamed Hyatt for not producing information never requested during the audit about an irrelevant

4  time period as to any potential tax liability.  It is clear that the jury saw through the FTB's attempted

5  after-the-fact justification for its misconduct.  The District Court properly excluded from trial

6  residency evidence developed in the protest, which would have further delved into this irrelevant

7  tax issue.

8  **E.  The District Court properly allowed Hyatt's intentional tort claims to be**
9  **tried to the jury, and substantial evidence supports the verdict rendered**
      **on each claim.**
10      The FTB more than subtly suggests that Judge Walsh erred in denying the FTB's numerous

11  summary judgment motions because Hyatt failed to establish facts supporting one or more elements

12  of each claim.  Several points refute this argument.  First, Judge Walsh properly denied the FTB's

13  numerous pretrial motions after due consideration of each motion on its own merits.  Contrary to

14  the FTB's suggestion, Judge Walsh did not summarily deny all of the FTB's motions simply

15  because of this Court's prior decision in 2002.[305]

16      Second, after a lengthy trial, the question on appeal is whether substantial evidence supports

17  each verdict.  Courts do not look back after a verdict and decide whether the summary judgment

18  record supported the claims asserted.  Rather, "[a]fter trial, the merits should be judged in relation

19  to the fully-developed record emerging from that trial . . . not at that point step back in time to

20  determine whether a different judgment may have been warranted on the record at summary

21  judgment."[306]  "It makes no sense whatsoever to reverse a judgment on the verdict where the trial

22

23  _____

24  [304] RT: April 29, 115:20-116:11; May 28, 114:12-18.

25  [305] The FTB cites one comment from one hearing by Judge Walsh.  The record overwhelmingly
    demonstrates that Judge Walsh gave individual consideration to each motion, and she resolved each motion
    on its own merits.  Respondent's Appendix includes the massive pleadings presented to the District Court,
26  and one can only conclude that Judge Walsh was extremely conscientious in giving both sides leeway to
    argue each and every point in each and every motion.  The FTB simply fails to meet its burden to establish
27  otherwise.

28  [306] *Watson v. Amedco Steel, Inc.*, 29 F.3d 274, 278 (7th Cir. 1994) (citation omitted); *see also Larson v.
    Benediktsson*, 152 P. 3d 1159, 1169 (Ak. 2007) (explaining two variants of the rule and applying a narrower

82

KAIMPFER CROWELL RENSHAW & FORENZING

1    evidence was sufficient merely because at summary judgment it was not."[307]

2        The FTB's brief appears to avoid challenging the sufficiency of the evidence at trial to

3    support Hyatt's seven claims, recognizing that the substantial evidence standard of review requires

4    upholding the jury's verdicts. Instead, the FTB argues a failure of proof on one or more elements of

5    each of Hyatt claims, without acknowledging the full scope of evidence presented to the jury for

6    each element of each claim. Hyatt therefore shows how the FTB's legal arguments fail, and then

7    demonstrates the substantial evidence to support each element of each claim.

8        **1.      The FTB misrepresents this Court's 2002 ruling and Hyatt's successful**
          **petition for rehearing.**

9
10       The FTB argues that this Court's ruling in 2002 did not recognize that genuine issues of

     material fact existed, precluding summary judgment. This Court initially decided in 2001 that
11
     summary judgment should be granted to FTB, without the benefit of the evidentiary record that was
12
     before Judge Saitta.[308] Hyatt's petition for rehearing directed the Court to that substantial factual
13
     record that was before Judge Saitta when she denied FTB's summary judgment motion because of
14
     disputed issues of fact. This Court then granted Hyatt's petition for rehearing, explicitly stating
15
     "[h]aving considered the parties documents and the entire record before us, we grant Hyatt's
16
     petition for rehearing."[309] The Court vacated its 2001 decision, effectively upholding Judge Saitta's
17
     denial of summary judgment based on genuine issues as to material facts, by ordering the case
18
     remanded for further discovery and trial.
19
         The issue in Hyatt's petition for rehearing was whether this Court misapprehended the
20
     evidence regarding the asserted tort claims and whether there was sufficient evidence to create a
21
     material issue of fact for each claim asserted.[310] Indeed, this Court's granted Hyatt's request for
22

23   rule that disallows review of summary judgment motions that were denied based on disputed facts when the
     case goes to trial and a full evidentiary record is developed).

24   [307] *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994); *see also Bigney v. Blanchard*, 430 A.2d 839,
25   842-43 (Me. 1982) (holding it would be absurd if a party were to win at trial upon a full presentation of
     evidence, but then lose on appeal because its case was not fully developed at the time of the summary
26   judgment motion).

27   [308] 5 AA 1063-1068.

     [309] 5 AA 1184.
28
     [310] 5 AA 1070-1080.

                                              83

1  additional pages to more fully brief the issue of whether any material issues of fact existed.  The

2  additional pages allowed Hyatt to address the new issue raised by the Court —whether Hyatt's

3  claims were supported by sufficient evidence to create disputed issues of fact.[311]

4  **2.  The verdict and resulting judgment on Hyatt's bad faith fraud claim**
   **should be affirmed.**

5  The FTB argues that Hyatt's fraud claim should not have been presented to the jury.  But the

6  argument that the FTB now makes — that no actionable representations were made by the FTB —

7  was never presented by the FTB in a pretrial motion.  Moreover, at trial, Hyatt established that the

8  FTB made actionable representations; *e.g.*, that it would conduct a fair and unbiased audit and that

9  it would preserve Hyatt's privacy.  Further, the bad faith fraud claim tried to the jury was the very

10 claim outlined to Judge Saitta early in the case and reviewed by this Court as part of its decision in

11 2002 on Hyatt's petition for rehearing.  Virtually the identical evidence Hyatt cited in opposing the

12 FTB's summary judgment motion before Judge Saitta in 2000 and in successfully bringing his

13 petition for rehearing in 2002 was presented at trial — and even more evidence was presented at

14 trial.

15 **a.  Early in this case, the bad faith fraud claim was presented to,**
      **reviewed and approved by both Judge Saitta and this Court.**

16

17 The fraud claim Hyatt tried to the jury is the identical fraud claim Hyatt outlined and

18 supported with probative evidence in successfully opposing the FTB's first motion for summary

19 judgment in 2000 before Judge Saitta.[312]  In that first motion for summary judgment, the FTB

20 unsuccessfully attacked the fraud claim on the ground that the FTB's promises of "objectivity" were

21 too vague, and Hyatt had a duty regardless of the FTB's representations to cooperate in the audit.[313]

22 The FTB did not argue that statements of fair and impartial treatment are not actionable

23 representations.

24 Further, the FTB also argued in its 2000 summary judgment motion and its answer to

25 Hyatt's petition for rehearing before this Court that Hyatt's fraud claim should be dismissed because

---

26

27 [311] *Id.* at 1092-1108.

   [312] 3 AA 565-574.

28 [313] 2 AA 496-497.

84

1    it was "a thinly disguised" attempt to litigate the tax and residency issues that the District Court had

2    dismissed in 1999.[314]  Judge Saitta rejected this argument, finding the fraud claim could proceed,[315]

3    just as this Court did in granting Hyatt's petition for rehearing in 2002 (thereby denying the FTB's

4    writ petition).[316]

5        The *results* of the FTB audits, then, were not at issue in the bad-faith fraud claim, but rather

6    the conduct of the audits and whether the FTB acted in bad faith and tried to take advantage of its

7    authority in a manner well outside the "circumference of authority granted to it" or allowed under

8    Nevada law.  The jury found that the FTB acted in bad faith in carrying out the audits at issue and

9    assessing Hyatt taxes and penalties, *based on an ulterior purpose and motive.*

10       This distinction was made clear to this Court when it first reviewed this case.  The fraud

11   claim presented to the jury was the identical fraud claim Hyatt outlined and supported with

12   probative evidence in successfully pursuing his petition for rehearing before this Court in 2001, and

13   which this Court granted in 2002.[317]  In particular, Hyatt argued to this Court in 2001:

14       The FTB made two types of false promises to induce Hyatt's cooperation with the audit:
         (i) that the FTB would keep Hyatt's information confidential, and (ii) that the FTB would

15       conduct a fair, unbiased review.  The FTB not only breached its promises, but it sought
         an extorted settlement from Hyatt by overtly threatening further disclosure and publicity.

16       ...

17       Hyatt has established that the lead auditor created false evidence – which is a criminal
         offense under California law [footnote omitted]– and used it to try to extort a settlement

18       from Hyatt.

19       . . . .

20       The FTB publicly claims to be fair and impartial in its dealings with taxpayers.  It
         professes to interpret the law evenly and fairly with neither a state nor a taxpayer point of

21       view.  FTB personnel have testified to this in depositions.[footnoted omitted]  Hyatt's
         first auditor, Marc Shayer, even testified that he promised to conduct a fair and unbiased

22       audit. [footnote omitted]

23       Yet, the record shows that the FTB's methods at that time targeted high-income, former
         California residents, rewarded its own auditors based on the amount they could assess

24       (measured by a cost-benefit ratio), penalized auditors who found "no change" in their

25   _____

26   [314] 2 AA 497.

27   [315] *See* 2 AA 357-419; 2 AA 420-421; 3 AA 653-654.

     [316] 5 AA 1183-1196.

28   [317] 5 AA 1077-1080.

                                85

audits, and used penalties as "bargaining chips" to induce settlements, making the Hyatt audit the biggest potential boost to any auditor's career. [footnote omitted]

The FTB did not conduct a legitimate, bona-fide audit. Instead, the FTB conducted a biased, fraudulent . . . The Discovery Commissioner even declared that the FTB may have committed fraud and accordingly ordered that Hyatt was entitled to further discovery on this point. [footnote omitted]

The FTB disregarded, refused to investigate, ignored, and "buried" the facts favorable to Hyatt which it uncovered during its invasive "audit." [footnote omitted][318]

Moreover, in opposing Hyatt's petition for rehearing in this Court, the FTB made no argument that the FTB's representations regarding conducting a fair and impartial audit were legally insufficient to state a claim, but rather unsuccessfully argued that Hyatt had "no specific evidence to prove" the allegation.[319] But Hyatt did have such admissible, probative evidence, as this Court recognized in granting the petition for rehearing.

The FTB argues that Hyatt did not bring a "bad faith" claim per se. The term by itself is not a claim, but must be accompanied with the tortious conduct at issue. For example, in the insurance context, bad faith denial of coverage is a bad faith breach of contract. When bad faith governmental conduct is alleged, and proven as it was here, it is actionable. The government cannot avoid liability by suggesting it never promised good faith. The only real issue is damages, which Hyatt established as discussed below.

### b.    The FTB's representations of fair and impartial treatment were not vague and ambiguous but obvious and undeniable tenets of any government investigation.

The FTB cites fraud cases involving private parties in arguing that implied representations of fair and impartial treatment cannot be the basis of a fraud claim. In those cases, the representations were found to be too vague or general.[320] There was nothing implied or uncertain about the FTB's representations in this case.

Moreover, when the government sends a notice that a citizen is under investigation, it is not a vague and ambiguous implied promise that it will act in good faith and conduct a legitimate

---

[318] 5 AA 1077-1078.

[319] 5 AA 1131.

[320] *See* cases cited in FTB Opening Brief, at 71-72.

86

1  investigation. A government agency cannot use the imprimatur of its official authority to

2  unilaterally impose an investigation on a citizen, but carry out the investigation in utter bad faith

3  and then deny it ever represented it would act in good faith. But that is the position the FTB now

4  takes in asserting that "there was *no evidence* that FTB ever *promised* Hyatt or his agents that it

5  would treat him fairly and impartially."[321]

6      The vague and ambiguous defense that a party may assert to an alleged representation in a

7  fraud claim between private parties must be viewed in the proper context when a government

8  agency is accused of bad faith conduct, in this case a bad faith fraudulent investigation. It is a basic

9  tenet of our system of government, in which citizens understand they have equal protection and due

10  process rights guaranteed by the federal and state constitutions, that they are not to be singled out

11  by the government. Every citizen would understand that the government was intending to represent

12  it would be fair and impartial, and would not act in bad faith, upon notice of an investigation or any

13  other government action. Indeed, virtually every FTB witness that testified in this case confirmed

14  this principle in testifying that the FTB must act in a fair and impartial manner in conducting an

15  audit,[322] and an individual under audit has every reason to understand and believe the government

16  will do so.

17      Holding government actors to a high standard is not a new concept. In *Olmstead v. United*

18  *States*,[323] Justice Brandeis encapsulated this concept in a scathing dissent, in which Justice Holmes

19  joined, and which history later vindicated as the correct position on the legal issue presented:

20      The maxim of unclean hands comes from courts of equity. But the principle prevails
        also in courts of law. Its common application is in civil actions between private parties.
21      *Where the government is the actor, the reasons for applying it are even more persuasive.*

22      . . .

23      Decency, security, and liberty alike demand that government officials shall be subjected
        to the same rules of conduct that are commands to the citizen. In a government of laws,
24

---

25  [321] FTB Opening Brief, at 71:21-22 (emphasis in original).

26  [322] RT: May 22, 104:8-105:10, 121:12-17, 123:1-18; May 27, 111:22-112:20; June 9, 48:5-10; June 10,
    135:7-15; June 11, 43:11-15; June 20, 158:22-159:24, June 23, 73:24-74:1; June 24, 83:13-20, 86:16-23,
27  147:15-20; June 25, 78:18-23, 84:16-25, 88:2-20; July 7, 101:11-14, 198:18-22; July 8, 156:11-15; July 9,
    116:21-24, 154:22-155:12; July 10, 171:19-21; July 15, 154:17-19, 160:4-12, 183:13-23.

28  [323] 277 U.S. 438 (1928).

87

existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. . . . *If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.*[324]

Moreover, where there has been deceptive conduct by a government actor using its position of authority, courts do not find themselves powerless to provide relief. In *SEC v. ESM Government Securities, Inc.*,[325] the Fifth Circuit issued a strong rebuke in fashioning a remedy for unprecedented abusive conduct by a government agent:

Although we agree that courts generally must defer to the agencies and that the scope of judicial inquiry is not expansive, we disagree with the Commission's premise that the Supreme Court has foreclosed incremental development of the law by the courts *when we are faced with allegations of egregious abuses.*

....

... (B)ecause *the Supreme Court has never confronted allegations like the ones* before us does not mean that the federal judiciary is powerless to structure relief when necessary.

. . .

We believe that *a private person has the right to expect that the government, when acting in its own name, will behave honorably.* When a government agent presents himself to a private individual, and seeks that individual's cooperation *based on his status as a government agent, the individual should be able to rely on the agent's representations.*[326]

Here, the Nevada judiciary is not powerless to provide relief, as this Court has already ruled. In the context of this case, Hyatt established that he understood the FTB, a government agency, represented to him from the outset of the first audit that it would be fair and impartial and conduct the audit in good faith. The FTB cannot now in good faith deny that Hyatt rightfully had this expectation.

---

[324] *Id.*, at 484-85 (dissenting opinion, footnote omitted and emphasis added). In *Olmstead*, the Court held that the Fourth and Fifth Amendments did not apply to the government's wiretapping of telephones of private citizens. The majority's holding obviously is no longer good law as the government cannot place wiretaps on telephone lines without a warrant.

[325] 645 F.2d 310 (5th Cir. 1981).

[326] *Id.*, at 314, 316 (emphasis added).

88

RJN0144

c.   **Substantial evidence supports the jury's verdict on Hyatt's bad faith governmental fraud claim.**

(i)   **FTB representations as a government actor.**

The FTB's representations of fairness and impartiality, as well as confidentiality, were summarized above.[327]  The representations are further addressed here to rebut the FTB's arguments that its representations of fairness and impartiality, and even confidentiality, are not actionable.

(a)   **Fairness and impartiality.**

From the outset of the audit in 1993 through the trial in this matter, the FTB never disputed that it promises taxpayers, and is obligated, to treat them in a fair and impartial manner and interpret the law evenly and fairly with neither a state nor a taxpayer point of view.  For example, the first communication by the FTB to Hyatt giving notice of the audit included what was at that time termed the "Taxpayer's Bill of Rights" as well as a "Privacy Notice."[328]  The FTB's first auditor, Marc Shayer, who sent the notice and accompanying attachments, testified that he promised to conduct a fair and unbiased audit and that this very first communication by the FTB to Hyatt was intended to convey that the FTB would be fair and impartial.

> Q:   Now, your interpretation at the time you worked with the FTB and at the time you sent this to Mr. Hyatt was that the FTB would be fair, impartial, act professionally during the audit, correct?
>
> A:   Yes.  I mean that was the mission statement.
>
> Q:   And you understood from your training and your review of FTB manuals that the FTB had to live up to certain specified audit standards. . . . You understood that from your general training and your manuals that specified audit standards you had to live up to, correct?
>
> A:   Yes.
>
> Q:   And those included standards of legality, objectivity, timeliness and supportability, correct?
>
> A:   Yes.[329]

The lead auditor, Sheila Cox, also testified that she understood that it was her duty to

---

[327] *See* discussion, *supra*, at 13-14, 35-37.

[328] 82 RA 020473.  Hyatt did not receive the first notice sent by the FTB dated June 16, 1993 because it was sent to the wrong address.  82 RA 020475.  Hyatt did receive the second copy of the notice with the same attachments sent on July 1, 1993.  82 RA 020476-020479.

[329] RT: June 20, 159:20-160:8.

1   conduct the audit in a fair and impartial manner with neither a government nor a taxpayer point of

2   view and understood that Hyatt would expect that.[330]

3       Indeed, the FTB's Field Audit training manual mandated objectivity and a fair and unbiased

4   examination of "all relevant, available factual data."[331] The FTB's internal Audit Standards require

5   that auditors act with objectivity and in a fair and unbiased manner.[332] Again, witness after witness

6   FTB personnel from high-level supervisors to in-house attorneys and auditors, testified to the strict

7   requirements of fairness and impartiality.[333] Further, the FTB employs a "taxpayer advocate"

8   whose job it is to ensure the FTB acts appropriately toward taxpayers. At trial, the taxpayer

9   advocate, Anne Smith, testified as to the fairness and impartially that is conveyed by the FTB's

10   Mission Statement and Taxpayer Bill of Rights.[334]

11       The record from trial, therefore, established substantial evidence that the FTB represented

12   that it would treat Hyatt fairly and impartially, i.e., not act in bad faith by seeking to trump up a tax

13   claim against him or attempt to extort him. This is particularly true in light of the fact that the FTB

14   was a government actor from whom every citizen has every right to assume any investigation will

15   be conducted in a fair and impartial manner.

16       Viewed another way, if and when a government agency does not intend to treat the subject

17   of an official investigation fairly and impartially, the agency should have to disclose its intent,

18   which is otherwise fairly understood by the subject of the investigation. The government's lack of

19   disclosure in this context would be a fraudulent concealment, as any reasonable person would

20   rightly presume, rely on, and expect fair and impartial treatment.

21       The record from trial, therefore, established substantial evidence that the FTB represented

22   that it would treat Hyatt fairly and impartially, i.e., not act in bad faith by seeking to trump up a tax

23   claim against him or attempt to extort him.

24

---

25   [330] RT: May 27, 78:19-24, 102:23-104:5, 111:16-114:16.

26   [331] 55 AA 13705.

27   [332] 55 AA 13705, 13708.

  [333] *See* citations in fn. 29, *supra*, at 14.

28   [334] RT: June 9, 45:10-12, 48:5-17, 49:2-23, 58:17-59:8.

RJN0146

1

### (b) Confidentiality.

2

Also, the FTB's initial notice to Hyatt included a "privacy notice" that represented that Hyatt

3

could expect the FTB to keep his information confidential.[335] Multiple letters exchanged between

4

FTB auditors and Hyatt's tax representatives confirm the FTB's representations of privacy and

5

confidentiality. In addition, notations in the auditor's and protest officer's files confirm FTB

6

representations and commitments of confidentiality.[336]

7

### (ii) The FTB's fraudulent intent in making the false representations.

8

The intent element of Hyatt's fraud claim was established when it was determined that the

9

FTB acted in bad faith. The following shows the substantial evidence of the FTB's intent to not

10

fulfill its representation. As discussed extensively above, the FTB conducted a goal-oriented audit,

11

driven by the need to maximize its CBR, which was known within the Residency Program to be

12

used to evaluate auditors. It assessed a fraud penalty against Hyatt to better bargain for and

13

position the case to settle, knowing internally there was dissent to even taxing Hyatt. Then the FTB

14

delayed and refused to conclude its protest for *over a decade*.

15

Regarding confidentiality, the FTB knew and repeatedly mentioned it was aware of Hyatt's

16

sensitivity for privacy and confidentiality, yet sought to take advantage of it. It bombarded third

17

parties with Hyatt's private information and later threatened it would engage in an even more

18

intrusive investigation if Hyatt did not settle.

19

Instead of discussing the facts in light of the jury's findings, the FTB cites cases involving

20

commercial business or employment transactions in which one party fails to live up to a promise

21

relative to future business dealings or employment and is sued for fraud for failing to honor the

22

promise. In those cases, the respective courts held that the plaintiff failed to establish that there was

23

evidence of intent to defraud when the promise was made. Those cases have no application to this

24

bad faith governmental fraud claim.

25

26

27

[335] 82 RA 020471-020479.

28

[336] 83 RA 020521-020523, 020705-020707; 84 RA 020935-020939; 68 AA 16789; 93 AA 23019; RT: May 21, 214:15-215:23; May 22, 49:5-51:21; May 27, 97:11-99:20.

RJN0147

Instead, on point are the cases discussed above[337] in which the critical allegation and issue is whether a government agency acted in bad faith in discharging its otherwise discretionary function. The FTB, in seeking to "convict" Hyatt (per Cox's boast to Maystead), failed to heed the words of the United States Supreme Court in describing a wayward prosecutor in *Berger v. United States*.[338] To paraphrase that Court,

> [the FTB] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a [tax audit] is not that it shall win a case, but that justice shall be done. As such, [it] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. [It] may prosecute with earnestness and vigor-indeed, [it] should do so. But, while [it] may strike hard blows, [it] is not at liberty to strike foul ones. It is as much [its] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.[339]

> **d.    Hyatt reasonably relied on the FTB's misrepresentations, causing him specific damage.**

Hyatt and his representatives reasonably relied on the FTB's representations, and all testified that they cooperated in the audit and produced the material sought because they believed that Hyatt would be treated fairly and impartially, and that Hyatt's privacy and confidentiality would be protected.[340]   Again, a citizen should be able to rely on the government being fair and impartial.  A citizen has the right to expect that the government will not seek to use an individual's known sensitivity for privacy and confidentiality against him.

But the most glaring and obvious reliance, and specific damage to Hyatt, is demonstrated by

---

[337] *See* discussion, *supra*, at 55-60.

[338] 295 U.S. 78 (1935).

[339] *Id.*, at 88.  The Supreme Court's words are eerily similar to those of Discovery Commissioner in this case, the judicial officer who over an almost ten year period heard numerous motions and reviewed substantially all of the evidence in the case.  Discovery Commissioner Biggar, in a hearing conducted September 30, 2005, found that Hyatt was entitled to discovery into whether the then nine year delay and failure to conclude the protests was in furtherance of its alleged bad faith conduct from the audits.  He commented to the FTB that "Isn't the state supposed to be doing the right thing . . ." and that "[t]he state, it seems to me, has a little higher obligation to conduct the – on the one hand, conduct their tax audit and reach a decision, and on the other hand, defend the allegations in this case. . . . this is not supposed to be a contest.  It's supposed to be a search for the truth and that kind of thing."  17 RA 004058 (quoting pp. 53:17-54:5 of the hearing transcript).

[340] RT: April 29, 176:4-177:6, 179:23-181:1, 182:16-184:18; May 12, 95:10-14.

92

KAMSFER CROWELL RENSHAW GRONAUER & FIORENTINO

1   the cost he incurred in retaining professionals to first cooperate in the audit based on his reliance on

2   the FTB acting in a fair and impartial manner and protecting his privacy, and then the additional

3   fees incurred in defending himself in the protest and trying to bring the protest to a conclusion.

4   Hyatt established at trial that he incurred $1,085,281.56 for professional fees from the audit and

5   protest, and the jury specifically awarded this amount as special damages in regard to Hyatt's fraud

6   claim.[341]  While Hyatt's fraud claim also supports the damages awarded for emotional distress and

7   invasion of privacy, the additional special damages awarded only on the fraud claim stem from his

8   reliance on the FTB's false representations.

9      **e.**  **The FTB's promises were properly within the scope of the FTB's**
    **authority, and the authority of individuals communicating the**
10        **promises.**

11     The FTB lastly argues that it cannot be liable for promises its agents make that bind the

12  FTB to something beyond what the law allows.  Hyatt is not asserting that the FTB promised and

13  represented it would do something beyond what the law allows.  Rather, what the FTB promised

14  and represented to Hyatt was fully within the FTB's statutory power; in fact, it was obligated to do

15  it.  Again, every FTB witness confirmed that they were to treat taxpayers objectively, i.e., fairly and

16  impartially.  When the first auditor, Marc Shayer, represented he would be fair and impartial, he

17  was not acting beyond the authority of the FTB, but rather very much within it.  The same is true in

18  regard to the FTB's representations of confidentiality.  The auditors were not acting beyond the

19  FTB's statutory powers, but rather very much within them.

20     **3.**  **The verdicts and resulting judgment on Hyatt's invasion of privacy,**
    **false light, and breach of confidentiality claims should be affirmed.**
21

22     The FTB commences its attack of Hyatt's invasion of privacy claims by implying that Hyatt

    is a public figure under First Amendment law, that he is famous, and that he injected himself into
23
    the public realm.[342]  That is not the record from the trial, and no such ruling was ever made.
24
       First, the public figure issue was irrelevant, because it only relates to whether Hyatt was
25

26
    ---
    [341] RT: May 12, 92:23-95:9; August 6, 5:3-9; 90 AA 22362-22366.  *Sandy Valley Assocs. v. Sky Ranch*
27  *Estates Owners Ass'n.*, 117 Nev. 948, 955-56, 35 P.3d 964 (2001).  Hyatt's entitlement to these damages
    was extensively briefed in the District Court.  *See* 17 AA 04132-04151.
28  [342] FTB Opening Brief, at 78.

1  required to prove malice in order to prevail on his false light claim. Hyatt agreed that he must do

2  so, not because he was a public figure, but because the elements of is intentional torts required him

3  to meet the malice standard on his false light claim.[343] This mooted the public figure issue, since

4  the outcome would be the same: a requirement that Hyatt prove malice to sustain his claim.[344]

5  Hyatt did not stipulate to, and vigorously disputed, that he was a public figure. The FTB

6  improperly sought to have the jury consider this issue, so as to downplay its repeated disclosures of

7  Hyatt private information. As Judge Walsh concluded, in any event, whether a person is a public

8  figure is a legal issue for the judge, not the jury, and she stated outside the presence of the jury,

9  after the issue was mooted by Hyatt's agreement, that her ruling would have been that Hyatt was

10 not a public figure.[345] The FTB's own witness, Hyatt's former publicist, Charles McHenry, even

11 said Hyatt was not a public figure, as Hyatt had only a brief, fleeting moment in the public spotlight

12 after his key patents issued in the early 1990s.[346]

13          Now on appeal, the FTB again attempts to falsely portray Hyatt as a public figure. It

14 misstates the evidence in an attempt to do so. The articles it asserts about Hyatt in the early 1990s

15 all relate to his brief, but fleeting, moment of fame at that time. They were not admitted into

16 evidence.[347] The FTB's reference to the "Hard Copy" television show from the 1990s seeks to

17 mislead the Court, as there was barely a glimpse of Hyatt's house, with no reference to the

18 address.[348] As addressed below, the FTB's references to Hyatt's prior litigation matters were from

19 15 to 20 years before the trial in this matter and have no bearing on his claims against the FTB

20 stemming from its invasion of his privacy and breach of confidentiality. The fact that Hyatt was a

21

22 _____

[343] Moreover, the jury found malice based upon its verdict in Hyatt's favor on the false light claim.

23 [344] RT: May 12, 137:8-143:1; June 26, 13:19-21:13; July 11, 22:17-23:25; Whether a plaintiff is a public figure is relevant only if the plaintiff seeks to recover on a defamation or false light claim without having to
24 establish malice by the defendant. Non-public figure plaintiffs need not establish malice. Judge Walsh correctly found the issue was moot, once Hyatt agreed that he must establish malice as an underlying
25 element of his false light claim.

26 [345] RT: July 11, 23:16-21; July 17, 146:10-15.

[346] RT: July 8, 126:23-127:8.
27
[347] RT: July 11, 16:24-26:23.
28
[348] RT: May 21, 156:19-158:11.

RJN0150

1  party to lawsuits (primarily involving his patents) and that his Nevada house was flashed for a few

2  seconds on the screen during the tabloid show "Hard Copy" (without Hyatt's consent and without

3  revealing the address),[349] did not put Hyatt's confidential information into the public record, so it

4  was not fair game for the FTB to make massive disclosures of his private information.

5      The four privacy/confidentiality claims were all properly tried to the jury and their verdicts

6  and resulting judgments should be sustained.

7          a.    **"Information privacy" was properly presented to the jury as
            part of Hyatt's common law invasion of privacy claims—
8          consistent with this Court's prior ruling in this case.**

9      The FTB misconstrues and inaccurately describes "information privacy." Hyatt's common

10 law invasion of privacy claims are based in part, as previously briefed to this Court, on violations of

11 Hyatt's "information privacy." This issue was specifically presented and addressed in the first writ

12 proceeding in this case decided by this Court in 2002.[350] As part of this, Hyatt addressed the

13 information privacy aspect of the FTB's invasion of privacy claims.[351]

14     In the record of the District Court that was reviewed by this Court in 2001 and 2002, Hyatt

15 set forth the development of the law concerning the protection of "information privacy" (*e.g.,*

16 stemming from a government agency's gathering and handling of private information including

17 social security numbers and addresses).[352] As Hyatt asserted then, and as this Court reviewed, an

18 infringement of a person's information privacy resulting in widespread disclosures of his or her

19

20 [349] RT: May 21, 156:19-158:11.

21 [350] 5 AA 1063-1068; 5 AA 1183-1196.

22 [351] 5 AA 1072.

23 [352] 2 AA 274-280; *see, e.g., In re Crawford*, 194 F.3d 954 (9th Cir. 1999), *cert. denied*, 528 U.S. 1189
   (2000) ("We have observed that the relevant Supreme Court precedents delineate at least two distinct kinds
24 of constitutionally-protected privacy interests: *"One is the individual interest in avoiding disclosure of
   personal matters. . . .* [Plaintiff] argues that the disclosure of his SSN implicates the first of the two threads,
25 *sometimes referred to as the right of "informational privacy."* *See generally* Francis S. Chlapowski, Note,
   *The Constitutional Protection of Informational Privacy*, 71 B.U. L. Rev. 133 (1991); *see also Doe v. City
26 of New York*, 15 F.3d 264, 267 (2d Cir.1994) (collecting cases and concluding that "[t]here is ... a
   recognized constitutional right to privacy in personal information.") We agree with [Plaintiff] that the
27 indiscriminate public disclosure of SSNs, especially when accompanied by names and addresses, may
   implicate *the constitutional right to informational privacy. . . .* In an era of rampant identity theft, concern
28 regarding the dissemination of SSNs is no longer reserved for libertarians inveighing against the specter of
   national identity cards.") (emphasis added).

KADRMFER CROWELL RENSLAW GRONAUER & FIORENTINO

1     private information can, and does, establish common law invasion of privacy claims for intrusion

2     upon seclusion and unreasonable publication of private facts.[353]

3           This Court in 2002 ultimately confirmed the District Court's denial of summary judgment

4     on all of Hyatt's intentional tort claims, including Hyatt's common law invasion of privacy

5     claims.[354] "Information privacy", therefore, is and has been from the outset a part of Hyatt's

6     asserted invasion of privacy torts in this case.

### b. The cases cited by the FTB regarding statutory remedies and "altering" common law rights have no application to this case.

8           The FTB discusses numerous cases on page 80 of its brief holding essentially that a court

9     will not create a *new, nonexistent* common law claim when a statutory remedy exists. That

10     discussion by the FTB misses the point. "Information privacy" as asserted by Hyatt here is *not* put

11     forth as a separate or new common law claim but rather as part of his existing common law

12     invasion of privacy claims. Including this term of art in a pleading does not transform the cause of

13     action into an unrecognized and non-actionable claim.

14           In none of the cases cited by the FTB does the court dismiss a recognized common law

15     claim applied to the facts at issue. Nor do any of the cases require a party to seek relief under a

16     statute from another state when there is a viable recognized common law claim available to the

17     party. The FTB's argument is therefore inapposite to Hyatt's claims.

18           Again, Hyatt is not asserting a new or non-existent common law claim. Indeed, the FTB

19     cites the very case that disproves the FTB arguments. *People for the Ethical Treatment of Animals*

20     *v. Berosini, Ltd.,*[355] confirms that Hyatt's common law invasion of privacy "claims" (public

21     disclosure of private facts and intrusion upon seclusion) are recognized in Nevada and part of the

22     "right to privacy" which, as the Court acknowledges, is a doctrine "still suffering from the pains of

23     its birth."[356]

24

25 _____

26 [353] 2 AA 274-283; 3 AA 548-561.

27 [354] 5 AA 1183-1196.

    [355] 111 Nev. 615, 895 P.2d 1269 (1995).

28 [356] *Id.*, at 628-29.

1    The FTB misapplies the holding in *Berosini*. There, the plaintiff sued for wrongful privacy

2    invasion, and the facts at issue allowed recovery only under the statutory right to publicity. Those

3    are not the facts here. Hyatt stated and established two common law invasion of privacy claims.

4       c.    **The FTB's widespread publication, and republication, of Hyatt's**
             **private information was not protected by the "Public Records**
5            **Defense," consistent with the jury's verdicts.**

6    The FTB suggests it had no duty to keep Hyatt's private information, including his social

7    security number and private address, confidential based on a couple of unrelated and discreet

8    disclosures by Hyatt, years ago, in other contexts. The FTB had every opportunity to, and did,

9    argue that Hyatt's private information was already in the public domain, and the jury was instructed

10   that this was a defense for the FTB if it decided that Hyatt's private information was already part of

11   the public domain.[357] The jury rejected this factual assertion by the FTB, and thereby did not find

12   this was a viable defense.

13   The FTB argued that because there were references to Hyatt's social security number and

14   old obsolete addresses buried in decades old court files, this information was in the public domain

15   and any mass dissemination of this and other information by the FTB is not actionable. Hyatt

16   presented evidence and argued that matters buried in old government records, not easily accessible,

17   are not information in the public domain and that republication, indeed mass dissemination of a

18   citizen's social security number and other information by the government is not equivalent to the

19   information being buried in old inaccessible records.[358]

20   Again, here, the FTB provides no analysis of whether the jury's rejection of the FTB Public

21   Records defense was supported by substantial evidence. Its argument must be rejected on this

22   additional ground. Further, there was substantial evidence presented in support of the jury's

23   rejection of the defense, including the fact that the only alleged disclosures were buried in old hard-

24   to-access government records and the fact that the FTB engaged in a widespread dissemination of

25   the information.

26

27   _____

[357] RT: July 29, 27:12-37:19; 54 AA 13273-13275.

28   [358] RT: May 21, 81:4-82:1; July 23, 42:20-44:2.

97

1   The FTB then again raises the asserted public figure issue, claiming Hyatt sought and

2   obtained a lot of publicity and injected himself in the public realm, suggesting Hyatt's address

3   became well known to the media.  That is simply not true and not supported by the record.  The few

4   cites given by the FTB to the record merely show two articles that had a dateline of LaPalma,

5   California, the city Hyatt lived in before moving to Nevada.[359]  But it was Hyatt's confidential

6   Nevada address that the FTB unlawfully disclosed and was the subject of the claim.

7   But even more egregious, the FTB misrepresents that Judge Walsh excluded evidence

8   allegedly related to the Public Records defense by not allowing the FTB to admit into evidence

9   newspaper and magazine articles about Hyatt.  The FTB cites the District Court order denying its

10  motion to admit that evidence.[360]  But the motion the FTB filed argued only that the material was

11  relevant to the public figure/malice issue related to Hyatt's false light claim.  The FTB did not

12  argue, and never offered the material for the Public Records defense.[361]  Moreover, it would be

13  irrelevant to Hyatt's invasion of privacy claims because the material had nothing to do with the

14  FTB's disclosure of Hyatt's private information.

15  The isolated and stale examples cited by the FTB provide no defense to the FTB's

16  widespread disclosure of Hyatt's private information.  The FTB's suggestion that it was free to

17  rampantly disclose Hyatt's private information is also directly contrary to the strict requirements of

18  the statutes, rules, and regulations under which the FTB operates and the numerous promises that it

19  made to Hyatt to protect Hyatt's private and confidential information.[362]  These all evidence Hyatt's

20  reasonable expectation of privacy in this information.

21  Indeed, the FTB's own manuals state that "[t]he primary types and sources of confidential

22  information received by FTB include: tax information received from individuals such as: an

23  individual's name, social security number, addresses, exemptions, or filing status."[363]  On page 5 of

24  _____

25  [359] FTB Opening Brief, at 81.

26  [360] FTB Opening Brief, at 82:2-3.

27  [361] 48 AA 11782-11789.

28  [362] RT: May 21, 50:2-53:17, 55:9-61:11.

[363] 56 AA 13918.

98

RJN0154

1   its Disclosure Education Training Manual, the FTB has in large letters the words

2   "CONFIDENTIAL" and "TOP SECRET." The FTB continues to promise taxpayers privacy and

3   confidentiality. The FTB, however, denies its continuing promises and argues that such

4   information is not confidential or secret and that it had no duty to keep Hyatt's tax information

5   confidential or secret. But isolated examples of information being set forth many years earlier in

6   government records, while technically available to the public, do not eliminate all privacy rights

7   attached to that information.

8     Case law is clear that social security numbers and other private information are still private

9   and not in the public domain, merely because of an isolated disclosure of that information from

10  years earlier. In *Benz v. Washington Newspaper Publ. Co.*,[364] defendant argued that "because

11  plaintiff's phone numbers and addresses were already available on the internet, those facts are not

12  private facts, and thus he cannot be held liable for disclosing information already known to the

13  public."[365] However, the court held that plaintiff's phone numbers and home address are private

14  facts, "[a]lthough plaintiff's phone numbers and addresses may be available to the public on the

15  internet and in phone books that does not negate the fact that the information are nonetheless

16  private facts. Individuals have a privacy interest in their home addresses and phone numbers. . . .

17  Plaintiff's phone numbers and home address are private facts."[366]

18    Courts also have universally found that a person has a reasonable expectation of privacy in

19  their social security number even though it may have been disclosed in certain circumstances:

20     In addressing whether a person's SSN is something secret, secluded or private, we must
   determine whether a person has a reasonable expectation of privacy in the number. *See*
21     *Fischer*, 143 N.H. at 589-90, 732 A.2d 396. SSNs are available in a wide variety of

22  

23  [364] 2006 U.S. Dist. LEXIS 71827, 23 (D. D.C. 2006) (footnote omitted).

 [365] *Id.*

24  [366] *Id.*, 2006 U.S. Dist. LEXIS 71827, 26-27 (privacy interests of individuals in avoiding the unlimited

25  disclosure of names and addresses is significant, therefore individuals not only have a large measure of
 control over the disclosure of their own identities and whereabouts, but people expect to be able to

26  exercise that control); *Heights Community Congress v. Veterans Administration*, 732 F.2d 526, 529 (6th
 Cir.), *cert. denied*, 469 U.S. 1034 (1984) ("The importance of the right to privacy in one's address is

27  evidenced by the acceptance within society of unlisted telephone numbers... and postal boxes, which
 permit the receipt of mail without disclosing the location of one's residence."). *See also Diaz v.*

28  *Oakland Tribune, LLC,* 139 Cal.App.3d 118, 188 Cal.Rptr. 762 (Cal. Ct. App. 1983).

KAMPFER CROWELL RENSLAW CRONAKER & FIORENTINO

contexts. *Bodah v. Lakevile Motor Express Inc.*, 649 N.W.2d 859, 863 (Minn.Ct.App.2002). SSNs are used to identify people to track social security benefits, as well as when taxes and credit applications are filed. *See Greidinger*, 988 F.2d at 1352-53. In fact, "the widespread use of SSNs as universal identifiers in the public and private sectors is one of the most serious manifestations of privacy concerns in the Nation." *Id.* at 1353 (quotation omitted). As noted above, a person's interest in maintaining the privacy of his or her SSN has been recognized by numerous federal and state statutes. As a result, the entities to which this information is disclosed and their employees are bound 'by legal, and, perhaps, contractual constraints to hold SSNs in confidence to ensure that they remain private. See *Bodah*, 649 N.W.2d at 863. Thus, *while a SSN must be disclosed in certain circumstances, a person may reasonably expect that the number will remain private.*[367]

Indeed, the cases cited by the FTB do not hold that a social security number loses its privacy interest because it has been disclosed, particularly where disclosure was required as part of a government or court filing. Almost everyone's social security number is in some kind of public record. Nevertheless, courts have repeatedly and consistently held that social security numbers are private information. *See, e.g., Greidinger v. Davis,*[368] *Remsburg v. Docusearch, Inc.*[369] The *Remsburg* court explicitly recognized SSNs as private, notwithstanding the court's recognition that "SSNs are available in a wide variety of contexts." Thus, even if available in public records, SSNs remain private. The court based its holding on the statutory duties owed by the entities possessing people's SSNs, duties which the FTB clearly owed Hyatt.

The FTB asks the Court therefore to issue a ruling that would truly be a precedent, and will surely generate national headlines —that there is no reasonable expectation of privacy in social security numbers and that they can be disclosed by others with impunity. The FTB is wrong.

Further, the FTB has no authority to support its allegation that disclosure of Hyatt's former *California home* address to a newspaper places his current *Nevada home/office* address in the public domain. The FTB references a visit to Hyatt's California home by reporters *before* Hyatt moved to Nevada, and wrongly implies that the reporters disclosed in the press Hyatt's address.[370] The implication is that this somehow caused him to lose his privacy interest in his Nevada

---

[367] *Remsburg v. Docusearch, Inc.*, 816 A.2d 1001, 1008 (N.H. 2003) (emphasis added).

[368] 988 F.2d 1344 (4th Cir. 1993).

[369] 816 A.2d 1001 (N.H. 2003).

[370] FTB Opening Brief at 9, 10, fn. 9.

100

1    home/office address *after* his move to Nevada. This is nonsensical. Hyatt purchased his current

2    Nevada home/office in a trust in part to keep it confidential. There was never publicity or public

3    disclosure of Hyatt's Nevada home/office address.[371]

4        Most significantly, the case law cited by the FTB *does not support* its assertion that prior,

5    isolated and discreet references to Hyatt's identifying information in contexts that gave no publicity

6    to the subject information provides a defense to the FTB's indiscriminate, pervasive, and repeated

7    disclosures and dissemination of Hyatt's information. In *Montesano v. Donrey Media Group*[372], the

8    defendant newspaper had published a story about the plaintiff's criminal activity from years earlier.

9    In other words, in that case defendant gave publicity to facts that were never private and never

10   intended to be private. Defendant merely re-circulated "old news" consisting of the plaintiff's

11   criminal misdeeds. The Plaintiff therein argued that so many years had gone by that he had a

12   privacy right about his prior and admitted criminal conduct. The Court rejected the plaintiff's

13   argument because, although he was convicted while a minor, he was paroled while an adult and the

14   report of his parole was public. The plaintiff therefore had no expectation of privacy in his past

15   criminal record.

16        In addition, the FTB cites *Cox Broadcasting Corp. v Cohn*,[373] which involved the First

17   Amendment rights of the media. But the government, here the FTB, does not have First

18   Amendment rights. The FTB does not have a constitutional right to say whatever it wants to say. It

19   cannot challenge California's tax laws that guarantee taxpayer privacy on the ground that it has First

20   Amendment rights to speak its mind about taxpayers.[374] Moreover, *Cox* does not stand for the

21   proposition that the FTB asserts, namely, that disclosure of, and giving publicity to, facts that are a

22   matter of public record does not violate a party's right to privacy.

23        More relevant and on point here are a myriad of cases that hold a privacy interest is not lost

24

---

25   [371] April 24, 180:24-182:8; May 14, 163:8-17.

26   [372] 99 Nev. 644, 668 P.2d 1081 (1983), *cert. denied*, 466 U.S. 959 (1984).

    [373] 420 U.S. 469 (1975).

27   [374] The First Amendment grants rights to citizens to protect them against government. The government

28   does not have First Amendment rights against citizens. *See*, discussion and cases cited at 56 RA 013920-013921.

RJN0157

1    when an individual makes a limited disclosure of private facts that he or she does not intend or

2    expect will be more widely disseminated.  Where a party expects and intends only limited

3    disclosures of private facts told to a small group or government agency, his or her privacy rights

4    relating to the private information are not extinguished.  *See Sheets v. Salt Lake County*[375] ("to turn

5    a diary over to a limited group for what one perceives to be a limited and proper purpose is quite

6    different than inviting publication of the material"); *Times Mirror v. Superior Court* [376] (witness's

7    disclosures to friends and family did not extinguish her privacy interest in her identity when

8    disclosed subsequently by the media); *Multimedia WMAZ, Inc. v. Kubach*[377] (disclosure by HIV+

9    patient to about 60 people did not extinguish his expectation of privacy); *Y.G. v. Jewish Hospital*[378]

10   (disclosure by a couple to a number of people that they conceived via *in vitro* fertilization did not

11   extinguish their expectation of privacy in that information).

12       Prior availability of information in the public record therefore does not extinguish one's

13   expectation of privacy.  At best, the extensiveness of the prior disclosure of personal information is

14   but one factor that juries must weigh when determining whether information is private for the

15   purposes of the invasion of privacy torts.  Here, the jury weighed this evidence and obviously found

16   that Hyatt's private information was not in the public record before the FTB's massive disclosures.

17   This is an unmistakable factual question that was properly presented to the jury, i.e., whether the

18   limited disclosures placed the information in the public domain.

19       The jury found that the FTB, after promising to keep Hyatt's information confidential and

20   Hyatt not expecting or intending to have his private information disseminated, widely published

21   Hyatt's personal identifying information — information the FTB had explicitly agreed,[379] and was

22   bound by law, to keep private and confidential.[380]  Even if such information was buried in a public

23

24   _____

     [375] 45 F.3d 1383, 1388 (10th Cir.), *cert. denied*, 516 U.S. 817 (1995).

25   [376] 198 Cal.App.3d 1420, 244 Cal. Rptr. 556 (Cal. Ct. App. 1988), *cert. denied*, 489 U.S. 1094 (1989).

26   [377] 443 S.E.2d 491 (Ga. 1994).

27   [378] 795 S.W.2d 488 (Mo. Ct. App. 1990).

     [379] RT: April 29, 176:4-177:3, 179:23-181:1, 182:16-184:18; April 30, 69:3-9, 162:8-14, 163:16-164:4.

28   [380] 82 RA 020473; 56 AA 13913-13929; 60 AA 14975-14976.

                                                    102

1  or court file, there had been no widespread dissemination of this private and confidential

2  information until the FTB took it upon itself to engage in an indiscriminate, pervasive, and repeated

3  disclosure and dissemination of the information.

   **d.    Hyatt's invasion of privacy claims were not based on violations
           of "foreign" laws.**

   The FTB complains about and misconstrues the expert testimony presented by Hyatt

6  regarding "information privacy." The FTB incorrectly argues that Hyatt presented violations of

7  state and federal privacy laws and expert testimony on privacy rights in order to indirectly pursue

8  and recover for the statutory violations. Hyatt presented, and the District Court allowed Hyatt to

9  try, only common law invasion of privacy claims. But a hotly contested issue on these claims was

10  whether Hyatt had a reasonable expectation of privacy in the personal information disclosed by the

11  FTB. The evidence presented went directly to that issue.

12  The evidence Hyatt presented regarding privacy laws and FTB policies and regulations, as

13  well as FTB representations to Hyatt in which the FTB promised confidentiality, was properly

14  admitted by the District Court as it went directly to whether Hyatt had a reasonable expectation of

15  privacy in this private information. In particular, Hyatt presented expert testimony from Professor

16  Dan Solove to establish that Hyatt had a reasonable expectation of privacy in expecting that his

17  private address, social security number, and the fact that he was under a tax audit and investigation

18  would be kept private and confidential by the FTB.[381] Professor Solove did not instruct the jury on

19  the law, nor for that matter did the FTB's privacy expert Professor Deirdre Mulligan, who

20  attempted to rebut Professor Solove.[382] These experts were not instructing the jury on the law, but

21  rather presenting conflicting evidence as to whether an expectation of privacy exists in one's

22  personal information. This was a jury question, and it is clear that the jury accepted Professor

23  Solove's testimony. The jury found Hyatt did have an expectation of privacy in his personal

24  information that was widely disseminated by the FTB.

25  The FTB's failure and refusal to keep Hyatt's personal information private was properly

---

[381] RT: May 21, 42:24-50:1, 53:18-59:11.

[382] RT: May 21, 36:15-171:8; July 2, 54:23-238:11.

103

1    actionable under Hyatt's common law invasion of privacy claims. Contrary to the FTB's argument,

2    there is no statute, particularly a Nevada statute, which prohibits recovery of the relief sought by

3    Hyatt in his common law invasion of privacy claims. The cases cited by the FTB on page 83 of its

4    brief have no application as they involve an explicit attempt by the plaintiff to have recognized a

5    new common law claim or extension of a statutory right. Hyatt sought no such relief here.

6            **e.    There was substantial evidence at trial supporting Hyatt's two**

7                   **invasion of privacy claims.**

        The FTB's brief challenges two related essential elements of Hyatt's two invasions of

8    privacy claims: subjective expectation of privacy and an objectively reasonable belief in that

9    expectation. The FTB does not argue that Hyatt failed to establish any other element. As

10    addressed above, there was a multitude of evidence on these elements. Evidence of Hyatt's

11    expectation of privacy that the FTB would keep all his information confidential, and certainly not

12    widely disseminate to third parties is detailed in the "Statement of Facts" section and includes the

13    FTB's initial privacy notice, correspondence and communications regarding privacy between FTB

14    auditors and Hyatt's tax representatives, Hyatt's well-known sensitivity for privacy and

15    confidentiality, and even California law that required confidentiality of taxpayer information.[383]

16    This belief of Hyatt was subjectively reasonable as established by FTB rules, regulation, and

17    policies as well as the law.[384] As addressed above, Professor Solove testified to an expectation of

18    privacy in an individual's private information, including his social security number and home

19    address.[385]

20         Further, the FTB's argument that Hyatt had a diminished expectation of privacy because he

21    was under audit is not supported by the three cases it cites on page 84 of its brief. Two of the cases

22    cited by the FTB stand for the proposition that a plaintiff in a personal injury or workers

23    compensation case has no privacy claim against investigators hired to conduct surveillance to

24

25

26    [383] 68 AA 16789-16790; 82 RA 020471-020479; 83 RA 020521-020523, 020705-020707; 84 RA 020935-020939; April 29, 175:18-185:18; May 12, 95:10-14; May 22, 49:5-51:21; May 27, 104:6-105:25; Cal Civ.

27    Code § 1798, *et seq.*

    [384] 90 RA 022489 – 91 RA 022626; RT: May 21, 50:2-53:17, 55:9-61:11; *see also* discussion, *supra*, at 37.

28    [385] RT: May 21, 42:24-48:25; June 11, 211:9-15.

RJN0160

1 determine if the alleged injuries had incapacitated the plaintiff.[386] The third case merely held that a

2 plaintiff in a personal injury case claiming lost wages may have to produce tax records, workers

3 compensation records, medical records, etc. in discovery.[387] These cases have no application here

4 where the government initiated the investigation for its own purposes.

5        The FTB also argues that it can use or obtain identifying information without obtaining a

6 search warrant. That is also not the issue in this case. The FTB's widespread bombardment of third

7 parties with Hyatt's private information was not consistent with its own notices, policies, and legal

8 requirements. Hyatt had every reason to expect the FTB would follow its own notices and act in

9 accordance with its policies and legal requirements.[388]

10        The FTB's indiscriminate, pervasive, and repeated disclosures and dissemination of Hyatt's

11 private and confidential information, *i.e.* his "information privacy," properly established claims for

12 both unreasonable intrusion upon the seclusion of another and unreasonable publicity given to

13 private facts. Further, Hyatt's invasion of privacy claims presented to the jury were not limited to

14 the FTB sending out "Demands for Information" and disclosing his social security number and

15 address. The claims included the FTB's improper, unnecessary and bad faith disclosures to third

16 parties that Hyatt was under audit, disclosures that the FTB "convicted" Hyatt, improper contacts

17 with Hyatt's neighbors, postman, garbage collector, even trespassing on Hyatt's Nevada property,

18 including inspecting a package at his house and rummaging through his trash during an

19 unauthorized visit to Hyatt's house after the audit closed.[389]

20        The FTB has failed to demonstrate there was no substantial evidence supporting the verdict

21 for Hyatt on his privacy claims, and in particular on the single element it argues in its brief, a

22

23 ───────────────

24 [386] *McLain v. Boise Cascade Corp.*, 533 P. 2d 343, 346 (Or. 1975) and *Forster v. Manchester*, 189 A.2d 147, 150 (Pa. 1963).

25 [387] *Schlatter v. Eight Judicial District*, 93 Nev. 189, 191, 561 P.2d 1342 (1977).

26 [388] 82 RA 020471-020479; RT: May 21, 42:24-48:5; June 11, 211:9-15; *see also* discussion, *supra*, at 37, 103-104.

27 [389] *See* discussion, *supra*, at 37-40; *see also* 80 RA 019923-019925, 019928. The FTB cites criminal search and seizure principles in defense of this conduct. Those concepts do not apply to Hyatt's civil claims for invasion of privacy.

28

KAMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

1  subjective expectation of privacy that was objectively reasonable. Hyatt established this element

2  with substantial evidence.

### f. There was substantial evidence at trial supporting the jury's verdict on Hyatt's false light claim.

The FTB asserts that the evidence at trial did not support the jury's finding in favor of Hyatt on the false light claim. The FTB's brief, however, does not specify what element of the false light claim was not met. Instead, the FTB generally argues, contrary to Hyatt's evidence at trial, that its conduct did not portray Hyatt as a tax cheat in the eyes of third parties contacted by the FTB and to who it disclosed that Hyatt was under investigation. The FTB argues that Hyatt "imagined" that this happened.[390] By simply repeating its argument from trial, the FTB fails to meet its heavy burden of establishing that the jury's verdict in favor of Hyatt on the false light claim was not supported by substantial evidence and reasonable inferences drawn therefrom. The jury disagreed with the FTB's position that Hyatt was not cast in a false light.

The FTB must do more than generally re-argue its position from trial. The FTB must establish that there was not substantial evidence introduced at trial, i.e., there was insufficient evidence, to establish one or more of the elements of this claim. The FTB makes no attempt to do this. Its appeal on this point should be summarily denied.

The closest the FTB comes to specifying what element and evidence was missing is its claim that there was no testimony from third persons stating that they viewed Hyatt in a false light based on the FTB's disclosures.[391] But that is not an element, let alone a determining factor, for a false light claim. Again, the FTB was entitled to argue to the jury, and did, that Hyatt was not cast in a false light because no third person testified to this. The jury found other evidence more compelling, including almost 10 years of publication that Hyatt was a tax cheat (purportedly to have committed tax fraud) through the FTB's *Litigation Roster*, and the jury is entitled to draw inferences from that evidence that Hyatt was portrayed in a false light to third persons.

The FTB did not merely conduct an audit and investigation of Hyatt. As established at trial,

---

[390] FTB Opening Brief, at 85-86.

[391] FTB Opening Brief, at 86:8-10.

106

KAMMPFER CROWELL, RENSHAW GRONAUER & FIORENTINO

1   it conducted a biased, bad faith audit in which it sought to "get" him.[392]  In so doing, the FTB not

2   only publicized that Hyatt was under audit, it falsely broadcasted on its internet website that Hyatt

3   had committed tax fraud *before* the FTB itself had made its own final conclusion on whether to

4   assess Hyatt any taxes whatsoever.[393]  Again, the FTB's massive disclosures to third parties provide

5   substantial evidence establishing Hyatt's false light claim.  Similarly, the auditor's intrusive field

6   visits also are substantial evidence to establish the false light claim.[394]

7       The jury properly concluded that the FTB's actions would be highly offensive to a

8   reasonable person.  This finding is supported by Hyatt's own testimony as to his outrage in being

9   falsely labeled a tax cheat for 10 years, when in fact no final determination had been made.[395]  It is

10  also supported by common sense.  Any reasonable person would be highly offended if subjected to

11  such conduct.

12              **(i)    The *Litigation Roster* was not protected by any privilege.**

13      The FTB asserts two privileges are applicable to the *Litigation Roster* — the fair reporting

14  privilege and the litigation privilege — but neither privilege is applicable nor protects the FTB's

15  statements in the *Litigation Roster* that cast Hyatt in a false light.  The FTB is not privileged to say

16

17

18

---

19  [392] RT: April 23, 165:12-16; June 11, 146:20-147:12; June 12, 82:24-83:8.

20  [393] 83 AA 20694 – 89 AA 22050; RT: July 14, 70:8-74:25.  The Amicus Curiae brief of the Multistate Tax
    Commission argues on page 13 that in deciding the false light claims the jury was determining the tax issue
21  because Hyatt was not falsely portrayed if he did owe taxes.  But on this point, the Multistate Tax
    Commission ignores the key distinction that the FTB admitted that it treated Hyatt differently by publishing
22  his proposed assessments and portraying them as final assessments.  RT: July 14, 176:22-178:15.  He was
    not a tax cheat even in the FTB's eyes during the 10 years the FTB published Hyatt's proposed assessments
23  and falsely portrayed them as final.  Further, there was additional evidence supporting the false light verdict
    in Hyatt's favor as discussed immediately below.  Any and all of this evidence is substantial evidence
24  supporting the jury verdict on this claim.

25  [394] The FTB suggests "far-reaching implications" if it is liable for a false light tort.  FTB Opening Brief, at
    86, n. 74.  The FTB gives examples that are silly and not analogous to the extreme, decade-long misconduct
26  of the FTB.  The case involves extreme facts as found by the jury.  Any future case would also have to
    allege and then demonstrate the type of extreme and outrageous bad faith conduct as found by the jury in
27  this case.  The fact that a government agency can be held liable for this extreme conduct is the best
    insurance that government agencies will not act in this fashion in the future.

28  [395] RT: May 12, 77:22-78:11, 79:4-82:10.

107

RJN0163

1   whatever it wants in published materials just because a case is pending.[396]

2                **(a)    Litigation privilege.**

3       In order for the litigation privilege to apply, the communication must be published *in the*

4   *course of* the judicial proceeding. "The policy behind the absolute privilege, as it applies to

5   attorneys participating in judicial proceedings, is to grant them 'as officers of the court the utmost

6   freedom in their efforts to obtain justice for their clients.'"[397] The communicative act — be it a

7   document filed with the court, a letter between counsel or an oral statement — *must function as a*

8   *necessary or useful step* in the litigation process.[398] The policy considerations supporting the

9   privilege are inapplicable where extra-judicial statements are made to the media and under

10   circumstances where the need for unbridled advocacy is diminished and the need to protect the

11   intrusion upon a person's reputation is enhanced.[399]

12       The FTB's *Litigation Roster* is not a necessary step in the litigation process. It is not a

13   useful step in the litigation process, and it is not published in the course of this Nevada litigation.

14   Rather, the FTB voluntarily publishes, and chooses what to put on, the *Litigation Roster*.[400]

15   Publishing misleading and confidential information about Hyatt in the *Litigation Roster* is not

16   protected by the litigation privilege.

17                **(b)    Fair reporting privilege.**

18       The fair reporting privilege does not apply because the FTB started publicizing the "facts"

19   about the case, and in particular Hyatt's confidential "taxpayer" information in *April of 1998,*[401]

20   well before any of the asserted references to Hyatt's information in the judicial proceedings cited by

21   the FTB. The litigation records cited in footnote 75 of the FTB's brief reference litigation decisions

22

---

23 [396] If the FTB was correct that it could make whatever public statements it desired about an adversary

24 simply because litigation was pending, it seemingly could violate court protective orders with impunity. The FTB overreaches in asserting all of its published statements concerning Hyatt are privileged.

25 [397] *Fink v. Oshins,* 118 Nev. 428, 433, 49 P.3d 640 (2002).

26 [398] *Rothman v. Jackson*, 49 Cal.App.4th 1134, 57 Cal.Rptr.2d 284 (Cal. Ct.App. 1996).

27 [399] *Med. Informatics Eng'g, Inc. v. Orthopaedics Ne.*, 458 F. Supp.2d 716 (N.D. Ind. 2006).

[400] RT: July 14, 70:8-73:20.

28 [401] 83 AA 20694 – 89 AA 22050.

KAMMFER CROWELL RENSHAW GRONAUER & FIORENTINO

1    no earlier than 2003.[402] The FTB cannot rely on later litigation filings to assert the privilege to

2    protect disclosures made years earlier.

3        The privilege does not apply because on their face the FTB's repeated references to the

4    Hyatt litigation and taxpayer information are not merely "reporting" what is in the court files.

5    Quoting from a court file is protected, but that is not what the FTB did. In *Wynn v. Smith*,[403] the

6    Court addressed the limited application of the fair reporting privilege, "this privilege should not be

7    extended to allow the spread of common innuendo that is not afforded the protection accorded to

8    official or judicial proceedings." What the FTB stated in the *Litigation Roster* is not what is stated

9    in the court records it cites. Nor does the *Litigation Roster* purport to quote or cite the court

10    records.[404]

11        Further, in order for the privilege to apply, a report must be a fair, accurate and impartial

12    report.[405] A party may not don itself with a judge's mantle, crack the gavel, and publish a verdict

13    through its "fair report."[406] The *Litigation Roster* was merely a summary that unfairly portrayed the

14    gist of the report that Hyatt was a tax cheat. The general public would not understand that the

15    FTB's statement of the amount of tax and penalty was only an amount "proposed" by the FTB

16    during the audit, because it sounds final. Similarly, the general public would understand that

17    imposition of such a penalty must mean that Hyatt had been found guilty of fraud. As such, the fair

18    reporting privilege does not apply.

19

20    [402] The litigation filings cited by the FTB stem from the FTB's bad faith audit. One is a filing with the
United States Supreme Court, which was compelled by Hyatt having to address the FTB's opening brief in

21    that proceeding in which the FTB disclosed Hyatt's income for the world to see. FTB in-house attorney
Bob Dunn testified that the FTB publicly disclosed Hyatt's income in that proceeding before Hyatt's filing

22    (RT: July 15, 194:25-197:6), which was in response thereto. The other litigation filing was the decision of
the California Court of Appeal regarding the administrative subpoena served by the FTB as part of the

23    protest. The California trial court had narrowed the subpoena in accord with certain of Hyatt's objections
(17 RA 004136; July 15, 103:6-104:2), and while the FTB did not challenge that ruling, Hyatt challenged

24    the remaining portion of the ruling. In issuing its unpublished decision, the court referenced certain taxes
and penalties Hyatt was facing. The appellate record was sealed in that case, as noted in the court's

25    decision.

26    [403] 117 Nev. 6, 16, 16 P.3d 424, 430 (2001).

27    [404] RT: July 14, 70:8-24, 75:13-79:17.

    [405] *Lubin v. Kunin*, 117 Nev. 107, 17 P.3d 422 (2001).

28    [406] *Id.* (citing *Sahara Gaming v. Culinary Workers*, 115 Nev. 212, 215, 984 P.2d 164 (1999)).

KAMPPER, CROWELL, RENSHAW, GRONAUER & FIORENTINO

g.  **Hyatt's breach of confidentiality claim.**

  (i)  **The jury was properly instructed on Hyatt's breach of confidentiality claim.**

The FTB argues that Hyatt described this claim — in pre-trial briefing never seen by the jury — in a manner inconsistent with the tort recognized by this Court in *Perry v. Jordan*.[407] Hyatt disagrees with the characterization of his pre-trial briefing,[408] but his prior briefing has no relevance here.

Most significant is that the jury was instructed in regard on this tort claim in strict accordance with this Court's holding in *Perry*, and that instruction *was offered by the FTB* and accepted by the Court.[409] Consistent with *Perry*, the jury was therefore instructed that the following three elements must be established by a preponderance of the evidence:

  1.  There existed a special, confidential relationship between FTB and Mr. Hyatt such that the parties owed a duty to protect one another;

  2.  The FTB breached that duty; and

  3.  Mr. Hyatt sustained damages proximately caused by this breach.[410]

The FTB therefore cannot allege the Court erred in instructing the jury.[411] Further, the FTB makes no argument, and certainly no showing, that the jury's verdict is not supported by substantial evidence. The FTB's complaint is that Hyatt purportedly inaccurately described the claim in pre-trial briefing. The FTB therefore raises no appealable issue and is entitled to no relief in regard to this claim.

---

[407] 111 Nev. 943, 900 P.2d 335 (1995).

[408] The FTB cites to Hyatt's summary of this claim in his memorandum of points and authorities seeking to amend his complaint to add the claim. In the very briefing cited by the FTB, Hyatt specifically cited to the holding in *Perry* as the basis for the claim. 13 AA 3036. Hyatt's summary of the claim merely applied the facts of this case to the elements of the claim set forth in *Perry*.

[409] RT: July 17, 52:10-56:21, July 21, 140:24-141:23.

[410] RT: July 21, 141:1-7.

[411] *See Eikelberger v. Tolotti*, 96 Nev. 525, 528, 611 P.2d 1086, 1088-1089 (1980) (holding that a party must object to the giving or failure to give a jury instruction to later claim error in that regard); NRCP 51 (to preserve the issue for review, a party must object if an offered instruction is not given); *see also HWCC-Tunica, Inc. v Jenkins*, 907 So.2d 941 (Miss. 2005) (holding a party cannot complain about a jury instruction it offered).

110

KAMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

1  2

   **(ii)  Hyatt's breach of confidentiality claim fits squarely within *Perry*.**

3  4  5  6  7  8

  The FTB argues that this tort has nothing to do with keeping information confidential. What the FTB ignores is that the special relationship that is needed to establish the tort need not be one involving an obligation to keep information confidential, but it can and does *in this case*. The "special relationship" was created by the FTB's repeated promises and representations of confidentiality and its position of power and authority over Hyatt, in which it could command Hyatt to produce private and confidential information. Hyatt therefore placed his confidence in the FTB not to violate that special relationship by disclosing his information to third parties.

9  10  11  12  13

  Contrary to the FTB's suggestion, *Perry* did not limit the types of circumstances in which a special relationship creating a duty of confidentiality may arise. The Court's language in *Perry* states: "[a] confidential relationship *may arise* . . ." thereby prefacing that these are only examples that are given by the Court.[412] The breach of confidentiality claim under Nevada law is therefore broader than what the FTB describes.

14  15  16  17

  There are hundreds of breach of confidentiality cases.[413] The basis for and the necessary elements of this tort, as well as how it differs from the invasion of privacy torts, are best summarized in a 1982 *Columbia Law Review* Note:

18  19  20  21

   Every member of society engages in relationships of trust and confidence. We turn to doctors, lawyers, counselors, teachers, bankers, accountants, and others for assistance in matters beyond our individual knowledge or capacities. [FN omitted] Relationships of this kind require us to lower our defenses and permit some intrusion into our personal lives. . . . *Such self-exposure is not always voluntary. To function in modern society, for example, we must file tax returns* and write checks, and *those who process these documents incidentally have access to details of our private lives.* [FN omitted]

22

   . . .

23  24  25

   These two elements – the assurance of secrecy and the reliance it evokes – are the essential ingredients of what can be termed a "confidential relationship." [FN omitted] The giver of information places himself in a vulnerable position in reliance on the assurance of secrecy and thus has a legitimate expectation of confidentiality. The receiver of the information, by implicitly holding out the assurance associated with his

26

27 [412] *Perry*, 111 Nev. at 947.

28 [413] *See* G. Michael Harvey, Comment, *Confidentiality: A Measured Response to the Failure of Privacy*, 140 U. PA. L. Rev. 2385, 2396 (1992).

RJN0167

occupation, invites the reliance and thus has an obligation not to disappoint the giver's expectation.[414]

Nevada is in accord with other states. For example, California recognizes that a duty of confidentiality exists when a party "reposed such trust and confidence in the other," and the other "accepted the relationship."[415] In the District of Columbia, "[t]he tort of breach of confidential relationship is generally described as consisting of the unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship. . . . The tort arises from a duty that 'attaches to nonpersonal relationships [such as hospital-patient] customarily understood to carry an obligation of confidence.' . . . This duty imposes an obligation – stricter than the reasonable person test – to 'scrupulously honor the trust and confidence reposed in them because of that special relationship . . . .'"[416]

In short, the tort of breach of confidentiality is well established. It can protect a party who receives assurances of confidentiality arising out of a special relationship.

### h. There was a special relationship between the FTB and Hyatt limited to protecting Hyatt's private and confidential information.

The FTB argues there can be no special relationship on which to base a claim for breach of confidentiality between parties adversarial to each other or between a government agency and private citizen. The FTB misstates and overstates the law on this point. Indeed, the relationship that creates the duty of confidentiality may be involuntary and certainly may exist where there is no fiduciary relationship.

Indeed, one of the cases cited by the FTB, *Yerington Ford, Inc. v. General Motors Acceptance Corp.,*[417] demonstrates that, like fiduciary relationships, a confidential relationship can

---

[414] Alan Vickery, Note, *Breach of Confidence: An Emerging Tort*, 82 Colum. L. Rev. 1426, 1427-28, 1434, 1441, 1455 (1982) (emphasis added).

[415] *Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1161, 23 Cal.Rptr.3d 335 (Cal. Ct. App. 2005).

[416] *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 942-944, 950-951 (D.C. 2003). *See also Tower v. Hirschhorn*, 397 Mass. 581, 585, 492 N.E.2d 728 (Mass. 1986); *Humphers v. First Interstate Bank*, 298 Or. 706, 717, 696 P.2d 527 (Or. 1985).

[417] 359 F. Supp.2d 1075 (D.Nev. 2004), *reversed on other grounds*, 494 F.3d 865 (9th Cir. 2007).

112

1  exist in certain circumstances where the parties are otherwise adversarial.

2  "A confidential relation exists between two persons, whether their relations be such as
3  are technically fiduciary or merely informal, whenever one trusts in and relies on the
   other.  The question in such case is always whether or not trust is reposed.". . . .
4  However, the question for the Court is whether, under the circumstances of this case, a
   reasonable jury could conclude that a *reasonable person* would impart special
5  confidence in the other party and whether that other party would *reasonably* know of this
   confidence.

6  Confidential relationships not rising to the level of fiduciary relationships, yet still giving
   rise to legally enforceable duties, have been found between *a purchaser and the*
7  *seller/lender of property where the seller/lender failed to disclose a known flooding*
   *problem, . . . In another case between a purchaser and a seller of real property*, the
8  Nevada Supreme Court declined to find a fiduciary relationship, but *remanded the case*
   *for further fact-finding as to whether a relationship of "special confidence"* would still
9  support a claim for constructive fraud.[418]

10  *Yerington* also cites cases outside Nevada that discuss under what circumstances a special

11  relationship may exist but for which a fiduciary duty does not ordinarily exist, including one

12  involving a creditor and a debtor.[419]

13  Here, the FTB need not act in Hyatt's interests relative to its determination as to whether

14  Hyatt owes taxes, and certainly has no fiduciary duty to Hyatt in that context.  But the FTB does

15  have a special relationship with Hyatt relative to the non-public information from and concerning

16  Hyatt that it acquired in its special position as tax auditor — a position in which it made repeated

17  representations promising confidentiality.  It therefore owed, and continues to owe, Hyatt a duty not

18  to publicly disclose such information and must act in Hyatt's interests in protecting and not

19  disclosing the non-public information.

20  The FTB argues that a government agency does not owe a fiduciary duty in the contexts of

21  the various cases cited by the FTB on page 90 of its brief.  But the cases cited by the FTB are not

22  on point.  Most significantly, the cases cited by the FTB do not involve one party obtaining non-

23  public information from the other party under the expectation or explicit promise of confidentiality.

24  None of them, in particular *Johnson v. Sawyer*,[420] involve a party using its position and promises of

25

26

27  [418] *Id.*, 359 F. Supp.2d at 1088 (internal citations omitted and emphasis added).

    [419] *Id.*, 359 F. Supp.2d at 1090 (emphasis added).

28  [420] 760 F. Supp. 1216 (S.D. Tex. 1991), *reversed and remanded*, 47 F. 3d 716 (5th Cir. 1995).

113

1  confidentiality to gain possession of the other party's non-public information and then publicly

2  disclosing and threatening in bad faith to further disclose such information.[421]

3      The FTB completely ignores the substantial authorities that demonstrate the evolution of

4  this tort and its current application by courts.  The FTB wrongly asserts that the breach of

5  confidentiality tort depends upon the existence of a relationship "akin to a fiduciary relationship."

6  Again, a "special" or "confidential" relationship is *not the same thing* as a fiduciary relationship;

7  nor need it be akin to a fiduciary relationship.  Contrary to the FTB's assertion, a special

8  relationship, as required for a claim of breach of confidential relationship, can exist in many

9  circumstances.  Courts have found that government entities can have a "special or confidential

10 relationship" with a citizen relative to maintaining the confidentiality and privacy of information

11 the government entity has concerning the individual.[422]  There are seemingly countless situations in

12 which a government entity has a special relationship with an individual that gives rise to a duty to

13 keep information concerning the individual confidential.  For example, a public hospital owes a

14 duty of confidentiality to its patients relative to the patient's records and treatment.  Any

15 governmental investigatory agency that uses its position and power to obtain confidential personal

16 information or proprietary business information is obligated to protect and not publicly disclose that

17 information.

18      **4.      The jury's verdict and resulting judgment on Hyatt's abuse of process
            claim should be affirmed.**

19

20      The FTB argues that as a matter of law Hyatt's abuse of process claim is defective.  The

21 FTB is wrong on the law.[423]  The FTB confuses administrative process with administrative

---

22 [421] The two other "government" cases cited by the FTB on page 90 are not on point.  They are breach of
23 fiduciary duty cases.  They do not involve alleged breach of confidentiality and the circumstances in which
24 non-public information is entrusted to a government agency or agent and there are repeated promises of
confidentiality.

25 [422] *See, e.g., Blair v. Union Free School District*, 67 Misc.2d 248, 324 N.Y.S.2d 222, 228 (N.Y. Dist. 1971)
26 ("Although the relationship between a student and a student's family with a school and its professional
employees probably does not constitute a fiduciary relationship, it is certainly a special or confidential
relationship.").

27 [423] Under the law of the case doctrine, the FTB appeal here must also be denied in regard to Hyatt's abuse of
28 process claim.  The FTB made the same argument regarding administrative process to this Court in 2001 in
opposition to Hyatt's Petition for Rehearing.  5 AA 1142.  The Court ruled against the FTB.

114

1    subpoenas. It cites several cases on page 91 of its brief in which the institution of an administrative

2    process or misuse of an administrative process is rejected as a basis for an abuse of process claim.

3    Hyatt's abuse of process claim is not based on an alleged abuse of administrative process. Hyatt's

4    claim is, and always has been, based on the FTB's improper and illegal use of administrative

5    subpoenas.

6        There is ample case law, emanating from the United States Supreme Court's holding in

7    *United States v. Powell*, [424] that a government agency's fraudulent, deceitful use of an

8    administrative subpoena is an abuse of process because "*[i]t is the court's process which is invoked*

9    *to enforce the administrative summons and a court may not permit its process to be abused.*"[425] In

10   other words, the specter of enforcement by the court gives an administrative subpoena power and

11   authority, and that threat of enforcement must not be abused. This distinguishes an administrative

12   subpoena, for which court process must be invoked, from an administrative process that does not

13   involve any court process.

14       In the context of an administrative subpoena, the United States Supreme Court described

15   what would constitute an abuse of process:

> Such an abuse would take place if the summons had been issued for an improper
> purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral
> dispute, or for any other purpose reflecting on the good faith of the particular
> investigation.[426]

19       The description could not be more on point in regard to the FTB's conduct directed at Hyatt.

20       Government agencies therefore commit an abuse of process when their "Demands To

21   Furnish Information" are motivated by an improper purpose, such as to harass the taxpayer or to

22   attempt to bolster a case against a taxpayer, knowing that it is not conducting the audit/investigation

23   in good faith. Improper purposes include an attempt to develop a colorable basis to make an over-

24   assessment of taxes, in the hope of then settling the matter quickly with an anxious taxpayer,

25   without any actual, good faith, unbiased determination whether and what amount of taxes are owed.

---

[424] 379 U.S. 48, 85 S.Ct. 248 (1964).

[425] *Id.* at 58 (addressing challenge to Internal Revenue Service administrative subpoena) (emphasis added).

[426] *Id.* at 59.

115

1  and any other illicit purpose reflecting that the particular investigation is not conducted in good

2  faith. And, an agency that acquires information in such a bad faith investigation by fraud, deceit, or

3  trickery commits an abuse of process.[427]

4        Nevada has never said its law is different from the abundant federal law as to what

5  constitutes an abuse of process. As the FTB argues, the two elements for an abuse of process claim

6  are: (1) an ulterior purpose and (2) willful use of the legal process.[428] The FTB had an ulterior

7  purpose in the bad faith audit. It also willfully used the legal process when it bombarded Nevada

8  recipients with some connection to Hyatt with its illegal, but official looking, "pocket" subpoenas.

9        Specifically, the FTB, through Sheila Cox, issued official looking "Demands" that appeared

10  on their face to be legal summons or subpoenas to over 14 Nevada citizens, businesses or

11  organizations.[429] The seal of the great state of California appears in the upper right corner, and

12  right underneath in large font, all capital letters it states, "**DEMAND TO FURNISH**

13  **INFORMATION.**"

14        Just below that, the Demand informs the recipient, "Authorized by California Revenue &

15  Taxation Code Section 19504." Printed in the upper left corner of the Demand, in all capital letters

16  is the term "STATE OF CALIFORNIA" and just underneath that "FRANCHISE TAX BOARD."

17        The Demand then has a legal-page caption that says "The People of the State of California

18  to:" with the name and address of the recipient filled in. It then proclaims, as if a court proceeding

19  is pending, "*In the Matter of:* Gilbert P. Hyatt." It provides a space for a Social Security number,

20  filling in Hyatt's social security number. It then instructs the recipient:

21          ***This Demand requires you to furnish the Franchise Tax Board with*** information

22          specified below from records in your possession, under your control, or from your

23

24

---

25  [427] *See SEC v. ESM Government Securities, Inc.*, 645 F.2d at 317; *United States v. Tweel*, 550 F.2d 297, 299
(5th Cir. 1977); *see also United States v. LaSalle National Bank*, 437 U.S. 298, 318, n. 20 (1978) ("Future

26  cases may well reveal the need to prevent other forms of agency abuse of congressional authority and
judicial process.").

27  [428] FTB Opening Brief, at 90-91, citing *LaMantia v. Redisi*, 118 Nev. 27, 30, 38 P.3d 877, 879 (2002).

28  [429] 83 RA 020641, 020648, 020652, 020654, 020663, 020665, 020667, 020669, 020723, 020736, 020745,
020747, 020749; 84 RA 020751.

116

knowledge. The information will be used by this department for investigation, audit or collection purposes pertaining to the above-named taxpayer for the years indicated.[430]

The FTB admits the Demands were not in fact enforceable against any Nevada recipient.[431] The FTB neither sought nor obtained permission to submit quasi-subpoenas to Nevada residents without permission of the Nevada court. The FTB even called these Demands "pocket subpoenas."[432] It was the issuance to and the false representations to Nevada recipients that constitute the abuse of process, along with the fact those Nevada recipients responded to them, showing that the FTB used an admittedly unenforceable process, under false pretenses, to get personal and private information about Hyatt.

Each FTB "Demand" cites to California law for its authority, but when sent to Nevada recipients, the demands falsely portray that the recipient must reply and produce the documents. This representation to each Nevada recipient was false and deceitful. Indeed, the audit file confirms, that the FTB sent simple letters to certain Nevada contacts (e.g., Nevada Governor Bob Miller), who appear to be those that the FTB knew not to offend and would know California had no authority to enforce demands in Nevada.[433] To others, who happened to be those less sophisticated or knowledgeable about California's authority, the FTB sent demands, expecting to get responses based on the color of authority represented by the FTB.[434]

The Demands also included Hyatt's social security number, and in many instances, his actual, confidential home/office address, making this sensitive and confidential information a part of readily-accessible databases. The FTB intentionally sent these demands, knowing that

_____

[430] *Id.* (emphasis in quotation added).

[431] Section 11189 of the California Government Code authorizes the FTB to send its so-called "Demands." This, however, merely authorizes the FTB to conduct a proceeding similar to a deposition, but only after petitioning for, and obtaining an order from the Superior Court in the County of Sacramento. No such order was ever obtained, nor would such an order be enforceable in Nevada — unless on motion a Nevada court issued a Nevada subpoena. The FTB did not do this.

[432] RT: June 11, 208:22-209:15; June 12, 6:2-10.

[433] 83 RA 020531, 020534, 020540; 020546, 020612-020613, 020696, 020699, 020724, 020728, 020737-020738, 020741; 84 RA 020753-020754, 020794, 020796-020797.

[434] 83 RA 020641, 020648, 020652, 020654, 020663, 020665, 020667, 020669, 020723, 020736, 020745, 020747, 020749; 84 RA 020751.

117

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

1  disclosing this information was in direct violation of its commitments of confidentiality to Hyatt.

2  The FTB claims no one was tricked by the FTB's Demands, based on certain witnesses'

3  testimony. The jury did not accept that assertion. The weight of the evidence, as the jury found, is

4  that the Demands were illegal and unenforceable in Nevada, and Nevada recipients did respond and

5  produce information.[435] It is a reasonable inference for the jury to conclude that Nevada recipients

6  were tricked and coerced into responding.

7  Moreover, the abuse of process did occur. The FTB used the specter of court enforcement

8  inherent with its "pocket" subpoenas to bombard Nevada recipients, who had some connection to

9  Hyatt, with notice that he was under a tax investigation, and for which the recipients were

10  "required" to produce information. Part of Hyatt's damages included his emotional distress from

11  learning of the FTB's widespread "Demands" seeking to coerce information about him from almost

12  everyone in Nevada with a connection to him.

13  As discussed below, this also was part of his damages for loss of privacy. Hyatt can never

14  regain this loss of privacy. Hyatt also experienced severe emotional distress from the FTB's bad

15  faith actions. The FTB's actions in sending Demands under false pretenses to Nevada recipients,

16  along with the FTB's bad faith in conducting the audit, do establish an abuse of process.

17  **5.  The jury's verdict and resulting judgment on Hyatt's intentional infliction of emotional distress claim should be affirmed.**

18
19  The FTB argues that as a matter of law Hyatt did not suffer severe emotional distress, and

20  was limited to recovering what the FTB calls garden variety emotional distress, due to the lack of

21  medical evidence. But FTB misstates the law generally and misconstrues the ruling of the

22  Discovery Commissioner (approved by the District Court) that referenced garden variety

23  emotional distress damages. Also, contrary to facts in the cases cited by the FTB, Hyatt put forth

24  multiple witnesses and more than enough objectively verifiable evidence of the severity of his

25  distress to meet the substantial evidence test, including physical ailments stemming from the

26  distress.

27

28  [435] 83 RA 020642; 64 AA 15948; 65 AA 16143-16146, 16154-16155, 16233-16243.

KAMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0174

1       None of the cases cited by the FTB, or even those that Hyatt has found, contain the

2 extreme and outrageous conduct perpetrated in this case by a government actor over an extended

3 period of time. More than a decade of increasingly severe emotional distress, in which the

4 government actor continues to increase the economic stakes to the point of shattering the

5 plaintiff's life-long, hard-earned financial success and financial security is unheard of (or

6 certainly unreported) in American jurisprudence; and it warranted the significant award of

7 emotional distress damages issued by the jury in this case. The evidence of Hyatt's emotional

8 distress is discussed below.

9           **a.**      **The more extreme and outrageous the conduct, the lesser the**

10                 **standard of proof for demonstrating severe emotional distress.**

11       In *Barmettler v. Reno Air, Inc.*, this Court explained that a claim for outrage requires: (1)

12 extreme and outrageous conduct with either intent of, or reckless disregard for, causing

13 emotional distress, (2) the suffering of severe emotional distress,[436] and (3) actual or proximate

14 causation.[437] Under Nevada law, the first two elements are closely related. The more extreme

15 and outrageous the conduct of the defendant, the lesser the showing of evidence required to

16 establish severe emotional distress. "The less extreme the outrage, the more appropriate it is to

17 require evidence of physical injury or illness from the emotional distress (internal quotation

18 omitted)."[438]

19       Other jurisdictions and the *Restatement (Second) of Torts* are in accord. The Seventh

20 Circuit, applying Illinois law, held that the magnitude of the defendant's tortious conduct and the

21 testimonial evidence of plaintiff's emotional distress "could allow a jury to find that he suffered

22 severe emotional distress in this case."[439] The court observed that for this intentional infliction of

---

23 [436] Severe emotional distress is not a necessary element for the other tort claims, *e.g.*, invasion of privacy,

24 abuse of process, fraud, etc., when emotional distress is sought as part of the damages for those claims.
*Olivero v. Lowe*, 116 Nev. 395, 400, 995 P.2d 1023 (2000). As a result, the jury's award of emotional

25 distress damages can also be sustained independently on those claims.

26 [437] 114 Nev. 441, 447, 956 P.2d 1382 (1998).

[438] *Chowdhry v. NLVH, Inc.*, 109 Nev. 478, 483, 851 P.2d 459 (1993) (quoting *Nelson v. City of Las Vegas,*

27 99 Nev. 548, 555, 665 P.2d 1141, 1145 (1983)(citing Prosser, *Handbook of the Law of Torts* § 12 at 60 (4th
ed. 1971)); *see also Hirschhorn v. Sizzler Restaurants Intern, Inc.*, 913 F. Supp. 1393, 1401 (D. Nev. 1995).

28 [439] *Honaker v. Smith*, 256 F.3d 477, 497 (7th Cir. 2001).

119

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

emotional distress tort, Illinois courts have followed the principle, stated in the Restatement (Second) of Torts, that "the extreme and outrageous character of the defendant's conduct is in itself important evidence that the [emotional] distress took place."[440] The court noted that Illinois courts have presumed the existence of severe emotional distress when the defendant's conduct was extreme and outrageous. *These cases have acknowledged that, even when significant evidence was not presented as to the severity of distress, the very nature of the conduct involved may be evidence of its impact on the victim.*"[441]

The Washington Supreme Court has also indicated that severe emotional distress may be presumed when defendant's conduct was extreme and outrageous. "[A] plaintiff claiming intentional infliction of emotional distress must show extreme and outrageous conduct intended to cause emotional distress to the plaintiff. *Once these have been shown, it can be fairly presumed that severe emotional distress was suffered.*"[442] The Tenth Circuit, applying Oklahoma law, also held that severe emotional distress may be inferred when the defendant's conduct was extreme and outrageous. The court concluded that "jurors from their own experience could easily infer that severe emotional distress would be likely to follow from defendant's conduct" and "the extreme and outrageous character of the defendant's conduct is in itself important evidence that the [emotional] distress took place."[443]

---

[440] *Id.* (citing *Wall v. Pecaro*, 204 Ill.App.3d 362, 561 N.E.2d 1084, 1088 (Ill. App. Ct. 1990) and *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 213 (Ill. 1992)); *see also Restatement (Second) of Torts* § 46, cmt. j.

[441] *Id.*, at 496 (emphasis added) (citing and quoting *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 213 (Ill. 1992) (when radio station knew plaintiffs had neurofibromatosis and nevertheless made false and highly offensive comments regarding the effects of the disease upon their personal appearance, severe distress presumed); *Wall v. Pecaro*, 561 N.E.2d 1084, 1088 (Ill. App. Ct. 1990) (when plaintiff alleged that physician harassed her to have surgery removing part of her head's internal structures and tissues and to abort her fetus, all to cover up previous medical malpractice on his part, severe distress presumed)) (emphasis added).

[442] *Kloepfel v. Bokor*, 149 Wash.2d 192, 202, 66 P.3d 630 (Wash. 2003) (emphasis added).

[443] *Macsenti v. Becker*, 237 F.3d 1223, 1242 (10th Cir. 2001). Other courts which have indicated that severe emotional distress may be presumed from defendant's extreme and outrageous conduct include the federal district court in *Limone v. United* States, 336 F. Supp.2d 18, 43 (D.Mass. 2004) ("If the defendant's conduct reached that level of malevolence [ *i.e.*, extreme and outrageous], plaintiff's pain could almost be presumed."); and the bankruptcy court in *In re Baker*, 18 B.R. 243, 245 (Bankr. D.N.Y. 1982) ("The nature of a defendant's conduct is the focal point in an action for the intentional infliction of emotional distress.

120

RJN0176

The Kansas Supreme Court, citing the *Restatement*, held that if the conduct is extreme and outrageous enough, there will be liability for the emotional distress, even without any bodily harm:

> The rule stated is not, however, limited to cases where there has been bodily harm; and if the conduct is sufficiently extreme and outrageous there may be liability for the emotional distress alone, without such harm. In such cases the court may perhaps tend to look for more in the way of outrage as a guarantee that the claim is genuine; but *if the enormity of the outrage carries conviction that there has in fact been severe emotional distress, bodily harm is not required.*"[444]

The Federal District Court in Connecticut similarly held that "[j]ust as the fact of treatment is not sufficient to prove the existence of severe emotional distress, the absence of treatment does not preclude proof of severe emotional distress."[445]

The FTB's citations on page 93 of its brief to two unpublished cases from outside Nevada, in which an emotional distress claim was dismissed after medical records were not produced, are limited by the facts of those cases, and certainly not controlling here or even consistent with established law. The two Nevada cases cited do not dismiss an emotional distress claim simply because medical records were not produced.[446]

Moreover, the primary form of emotional distress in this case was long-term, financial pressure from a party in a position of authority and is most analogous to insurance bad faith cases, where emotional distress damages are awarded for the financial pressures suffered by the victim, without evidence presented in the form of medical records or medical experts.[447]

---

For if the conduct is found to be outrageous, intentional, then causation and damage are virtually presumed.").

[444] *Sawyer v. Southwest Airlines Co.*, 243 F.Supp.2d 125, 1275-1276 (D. Kan., 2003) (quoting from the *Restatement (Second) of Torts* § 46 cmt., k (emphasis added).

[445] *Birdsall v. City of Hartford*, 249 F. Supp.2d 163, 175 (D. Conn., 2003).

[446] *Schlatter v. Eighth Judicial Dist. Court*, 93 Nev. 189, 192, 561 P.2d 1342 (1977), held that medical records "may" be ordered produced if a plaintiff puts his physical condition at issue, but in that case the Court actually reversed the discovery order finding it too broad. In *Potter v. W. Side Transp., Inc.*, 188 F.R.D. 362, 365 (D. Nev. 1999), the court issued a discovery order requiring production of therapy records. Both discovery rulings were specific to the facts of those cases.

[447] Nevada provides that a victim of insurance bad faith may recover damages for emotional distress caused by financial pressure. *See Albert H. Wohlers & Co. v. Bartgis*, 114 Nev. 1249, 1261-62, 969 P.2d 949, 958 (1998) (holding that plaintiff was entitled to a compensatory damages award for emotional distress because insurer's and policy administrator's actions deprived plaintiff of peace of mind, sense of security, health, and

121

KARMATTEN CROWELL RENSHAW CRONAUER & FIORENTINO

1  Particularly in the context of financial pressures being imposed, the length of time, *i.e.* duration

2  of the distress, is a significant factor in determining an appropriate award for the emotional

3  distress.[448]  Moreover, the jurors in this case were properly instructed that duration, along with

4  the severity and outrageousness of the FTB's conduct, are to be considered in determining what

5  amount of damages are to be awarded for the emotional distress endured by the plaintiff.[449]

6       Bad faith insurance cases demonstrate that severe emotional distress can and does result

7  from severe financial pressure imposed on a party, particularly when imposed over an

8  extraordinary period of time.  Here, the financial pressure was extreme, given the tens of millions

9  the FTB sought from Hyatt, and the amount of time the FTB held the threat over Hyatt's head,

10  which grew, with interest, to over $50 million.  Given the nature of the misconduct (financial

11  pressure over a long period of time stemming from governmental bad faith conduct), jurors can

12  use their own experiences to determine the nature and severity of the distress.[450]

13  **b.    The FTB misconstrues the Discovery Commissioner's ruling**
**regarding garden-variety emotional distress.**

14  The Discovery Commissioner's ruling referencing garden-variety emotional distress was

15

16  ─────────────────────────────

*financial well-being* based on plaintiff's own testimony without medical records or experts); *see also*

17  *Guaranty Nat. Ins. Co. v. Potter*, 112 Nev. 199, 912 P.2d 267, (1996) (holding award for compensatory
damages for emotional distress for plaintiff was proper due to dealing with two years of threats and the

18  corresponding anxiety and concern, damage to plaintiff's credit reputation during that time, and anxiety and
concerns caused by litigation expenses); *see also Farmers Home Mut. Ins. Co. v. Fiscus*, 102 Nev. 371,

19  374-375, 725 P.2d 234, 236 (1986) (holding that plaintiff was entitled to award of compensatory damages
for emotional distress due to destruction of family assets and corresponding financial pressure).

20  [448] *Id.*; *see generally Boston Public Health Com'n v. Massachusetts Com'n Against Discrimination*, 67 Mass.

21  App. Ct. 404, 411, 854 N.E.2d 111, 117 (2006) (holding that the length of time the plaintiff has suffered and
reasonably expects to suffer is a factor that must be considered in determining an award for emotional

22  distress).

23  [449] RT: July 21, 143:3-20.

24  [450] This is a long-standing policy in Nevada.  *Powell v. Nevada, C. & O. Ry.*, 28 Nev. 40, 78 P. 978, 979
(1904), *aff'd.*, 28 Nev. 305, 82 P. 96 (1905) (holding that there is no fixed rule for the measure of damages,

25  especially for mental anguish apart from physical suffering, except that it is to be left to the jury under
proper instructions from the court).  It is also a well-recognized principle in other jurisdictions.  *See e.g.*,

26  *Merlo v. Standard Life & Acc. Ins. Co.*, 59 Cal.App.3d 5, 17, 130 Cal.Rptr. 416, 424 (Cal. Ct. App. 1976)
(holding there is no fixed or absolute standard by which to compute the monetary value of emotional

27  distress and that a reviewing court must give considerable deference in matters relating to damages to the
jury); *Pearson ex rel. Latta v. Interstate Power and Light Co.*, 700 N.W.2d 333, 347 (Iowa 2005) (holding

28  that emotional distress damages cannot be measured by any exact or mathematical standard and must be left
to the sound judgment of the jury).

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0178

1  not intended to, and did not prevent Hyatt from establishing the severity element of his

2  intentional infliction of emotional distress claim.  Further, contrary to the FTB's arguments, the

3  Discovery Commissioner's ruling protecting Hyatt's privacy in his medical records is entirely

4  consistent with the law.  The relevant hearing transcript shows that the Discovery Commissioner

5  was simply balancing Hyatt's right to privacy in his medical records with fairness in discovery.[451]

6  Because Hyatt exercised his right to privacy in his medical records, the Discovery Commissioner

7  forbade him from using his medical records to support his claim for emotional distress, and

8  allowed the FTB *to argue* that Hyatt's emotional distress was not so severe as to require that he

9  seek medical attention.[452]  In other words, the FTB could and did argue that Hyatt did not suffer

10  severe emotional distress, because he did not seek or need medical help.  But the Discovery

11  Commissioner was clear that Hyatt could still seek emotional distress damages.

> Hyatt nonetheless *will not be prevented* from making a claim of emotional distress, *of the garden variety nature*, as many courts have referred to it, based on having some kind of stressful situation.  But *Hyatt will not be allowed to allege that his distress*, however he may characterize it, *was severe enough in any way that he needed to seek any kind of medical care.*  Any testimony by Hyatt to the contrary, prior to the designation given on December 12, 2005, will be stricken and cannot be used.  (December 9, 2005 hearing transcript, 19: 13-19).[453]

16  The Discovery Commissioner viewed the lack of medical evidence as an additional

17  hurdle for Hyatt, but certainly not a bar.  The Discovery Commissioner was not intending to set a

18  limit on the emotional distress damages Hyatt may recover, and certainly did not intend to

19  prohibit Hyatt from pursuing his outrage claim as the FTB suggests.  Indeed, that certainly was

20  not the District Court's interpretation, as the FTB notes the District Court rejected the very same

21  argument by the FTB in a pretrial motion.[454]

22  Given the obvious intent of the Discovery Commissioner's ruling, the "garden-variety"

23  cases the FTB cites on page 94 of its brief use that term as a term of art, but it has no application

24  to the Discovery Commissioner's use of the term.  Moreover those cases are factually inapposite

---

[451] 15 AA 3538-3539.

[452] *Id.*

[453] 12 AA 2959 (emphasis added).

[454] FTB Opening Brief, at 94, n. 79.

123

to the present case.[455]

### c. Hyatt's emotional distress was severe and occurred over a long period of time.

Hyatt provided extensive and explicit testimony to the jury as to the severity of his distress. Hyatt testified to his initial concern upon receiving the August 2, 1995, Determination Letter from the FTB and Cox. He not only was being assessed taxes but he was being accused of fraud based on secret affidavits he was not entitled to see. But he thought it was all a big mistake and would be corrected.[456] But then, as he testified, he became depressed and upset, and started experiencing emotional and physical problems after receiving the FTB's audit file in October of 1996. He began to comprehend the conduct the FTB had engaged in, particularly the massive disclosures to all who seemingly had any connection to him, and the depths to which the FTB was apparently willing to go to get him. It was distressing and humiliating for him that virtually all of his professional and social contacts may view him as a tax dodger. Hyatt was very embarrassed and humiliated upon learning that seemingly all of his past and present neighbors learned he was under investigation. The FTB even contacted a dating service and learned that no one wanted to date Hyatt. Further, his past experiences with industrial espionage heightened his distress from the massive disclosures, since he previously had valuable technology misappropriated.[457] As time went on and he learned more about the FTB's disclosures, he became more depressed.[458]

---

[455] *Jessamy v. Ehren*, 153 F. Supp.2d 398 (S.D.N.Y. 2001), was a Section 1983 case brought by prison inmates, and the court found that the plaintiffs were "not limited to nominal damages for their humiliation, embarrassment, and injury to reputation, should they prove defendants' liability at trial." *Ruhlmann v. Ulster County Depts. of Soc. Services*, 194 F.R.D. 445 (N.D. N.Y. 2000), held that medical records can be protected and not disclosed; while not holding there is any type of limit to recovery for emotional distress claim with no medical record support. *Meacham v. Knolls Atomic Power Lab.*, 185 F. Supp.2d 193 (N.D.N.Y. 2002), holds that plaintiff's testimony alone would be sufficient to "establish shock, sleepless nights, nightmares, moodiness, humiliation, upset and the like" as part of a claim for severe emotional distress. *Nelson v. City of Las Vegas*, 99 Nev. 548, 665 P. 2d 1141 (1983), involved a third party bystander claim rejected by this Court. *Alam v. Reno Hilton Corp*, 819 F. Supp. 905 (D. Nev. 1993), involved a class action claim.

[456] RT: May 12, 101:7-102:5.

[457] RT: May 12, 22:17-24:9, 59:5-25, 97:13-100:16, 145:14-146:6.

[458] RT: May 12, 100:17-101:6.

124

1   The audit file also revealed to Hyatt that the secret affidavits upon which the FTB relied

2   were from estranged family members who had no personal knowledge of his move to and

3   residency in Nevada. He felt sick to his stomach and became fearful of what the FTB was doing

4   when he learned this was the evidence against him, and that the FTB had in fact boasted of his

5   conviction to his ex wife.[459] His fear of what the FTB was doing to him grew over time, as he

6   saw the FTB could make-up its own evidence and draw conclusions, realizing that their promises

7   of fairness, impartiality, and confidentiality meant nothing.[460]

8   As the protest proceeded, Hyatt learned of Jovanovich's threat that if he did not settle like

9   other wealthy people, he would face an even more invasive investigation.[461] This caused him

10  great distress, frustration, and fear because he was realizing he would not obtain a "fair shake,"

11  as the FTB was creating a case against him and the same individuals involved in the audit were

12  involved in the protest.[462]

13  He also testified to how upset he was when he later learned the FTB tried to bury internal

14  FTB evidence questioning the proposed assessments against Hyatt (i.e., the Ford review notes for

15  the 1991 audit) and that it ignored other dissents within the FTB (the 1992 audit reviewer

16  Rhonda Marshall), as he realized he was being railroaded and there was nothing he could do

17  about it.[463] He testified as to his distress from learning that the FTB was instructing auditors to

18  use penalties as bargaining chips and that penalties were represented in a menacing way with a

19  skull-and-cross-bones,[464] seemingly regardless of whether there was any basis to assert a penalty.

20  Hyatt also testified to his embarrassment and humiliation in regard to the FTB's

21  *Litigation Roster* publicizing that he was assessed a fraud penalty, even though no final

22

23

24  _____

    [459] RT: May 12, 12:6-14, 15:15-17:21

25  [460] RT: May 12, 103:2-104:6.

26  [461] RT: May 12, 102:17-103:10.

27  [462] RT: May 12, 60:1-15, 73:23-74:23, 104:7-106:3.

    [463] RT: May 12, 44:11-49:21, 62:12-63:17, 106:4-107:1.

28  [464] RT: May 12, 105:14-106:20.

125

KAMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

1  assessment had been made.[465]  He also testified about the FTB amnesty offer, in which he would

2  have had to drop his lawsuit against the FTB and admit that its tax assessment was correct, or

3  face a 50% additional penalty.[466]

4  　　　　　Hyatt testified as to his increasing distress when he later learned that Cox called him a

5  "freak" in response to learning one of Hyatt's sons had been murdered years ago, as well as

6  learning that this auditor was "obsessed" with Hyatt.  It did not matter as much to Hyatt that Cox

7  called him a "cheap bastard", but it greatly disturbed him that she made anti-Semitic comments

8  about him, particularly in light of Hyatt having lost family members during the Holocaust.[467]

9  　　　　　Hyatt also testified as to the deep depression, fear, and anger he experienced as the FTB's

10  proposed assessment of taxes and fraud penalties hung over his head during the protest.  He

11  testified he would wake up every morning realizing about $10,000 was being added to his tax bill

12  each day.[468]

13  　　　　　Hyatt testified to not only the deep depression that ensued over the 11 year experience,

14  but also the resulting physical problems and manifestations he experienced.  He testified as to the

15  sick feeling in his stomach, tightness and breathing problems in his chest, even as he reads the

16  audit file.  He testified as to how over time the physical symptoms he experienced built over the

17  decade.  He developed back spasms, had reflux and heartburn, sleeplessness, and other

18  symptoms.  He also developed nightmares during sleep and developed a nervous reaction of

19  grinding his teeth at night.[469]  All of these symptoms became "worse and worse" over the

20  decade.[470]

21  　　　　　This is just a sampling of Hyatt's testimony concerning his emotional distress.  His

22

23

24  [465] RT: May 12, 76:23-78:16.

25  [466] RT: May 12, 78:17-81:12.

26  [467] RT: May 12, 110:23-113:8.

27  [468] RT: May 12, 108:16-109:13.

28  [469] RT: May 12, 96:2-:15-97:12, 103:19-104:4,105:23-106:3.

[470] RT: May 12, 96:17-21.

126

1  testimony in this regard took the better part of a day during trial.[471]

2  **d.  Lack of medical treatment does not bar Hyatt's claim, as other**
3  **evidence provides objectively verifiable indicia of severity of the**
   **emotional distress.**

4  The FTB argues that Hyatt has no medical evidence of the severity of his emotional

5  distress, so his outrage claims should have been dismissed. However, testimony of third party

6  witnesses can meet the required level of proof needed to establish severe emotional distress.

7  Here, Hyatt put forth multiple witnesses and more than enough evidence of objectively verifiable

8  evidence of the severity of his distress to meet the substantial evidence test.

9  Specifically, in Nevada, contrary to the FTB's focus on medical records and bodily harm,

10  this Court has set no bar to establishing severe emotional distress where there was an absence of

11  a physical impact injury and medical treatment for the emotional distress. In *Barmettler*, this

12  Court held, addressing a claim for negligent infliction of emotional distress, that "where

13  emotional distress damages . . . precipitate physical symptoms either a physical impact must have

14  occurred or, in the absence of physical impact, proof of 'serious emotional distress' causing

15  physical injury or illness must be present."[472]

16  In *Miller v. Jones*,[473] on which the FTB so heavily relies, the plaintiff sought emotional

17  distress damages based on an allegedly defamatory statement published about him during a

18  mayoral campaign. But the opponent retracted and apologized for the statement *one week* after it

19  was published. Under these circumstances, the plaintiff made no showing of severe emotional

20  distress. The lack of medical treatment was simply one factor.[474]

21  The facts in *Miller* did not lend themselves to analyze whether severe emotional distress

22  could be presumed or inferred from extreme and outrageous conduct over a long period of time,

23  or whether less proof of physical injury is required from the plaintiff when defendant's conduct is

24  extreme and outrageous. In *Miller*, the court plainly indicated that the plaintiff simply presented

25

26  [471] *See* RT: May 12, 2:4-113:8.

27  [472] 114 Nev. at 448.
   [473] 114 Nev. 1291, 1330, 970 P.2d 571 (1998).

28  [474] *Id.*, at 1294, 1300.

127

RJN0183

1  no "objectively verifiable indicia of the severity of his emotional distress."[475] While the Court

2  referenced the lack of medical records, it did not hold that they are an absolute requirement.

3  Thus, sufficient support for severe emotional distress can, but does not need to include, medical

4  or psychiatric assistance.

5      Objectively verifiable evidence, in the absence of any medical evidence, may be provided

6  instead by third party witnesses.  In lieu of medical records, *"'the testimony of friends or family'"*

7  *to corroborate [] allegations of severe emotional distress"* can provide objectively verifiable

8  evidence.[476]  In this context, the United States Supreme Court held that *"genuine injury in this*

9  *respect may be evidenced by one's conduct and observed by others."*[477]

10     At trial, Hyatt presented specific details of the severity of the emotional distress he

11  suffered as a result of the FTB's extreme and outrageous conduct.[478]  But Hyatt also provided

12  testimony from third party witnesses who knew him before and during the decade-long ordeal.

13  These witnesses observed his emotional state deteriorate and attested to the physical ailments

14  that manifested themselves over this time.  These witnesses testified to their observations of

15  Hyatt, and along with Hyatt's own testimony, establish the severity of Hyatt's emotional distress

16  over a long period of time.[479]

17          **(i)    Dr. Thompson.**

18     Hyatt's boyhood friend, Dr. William Thompson, has known Hyatt since approximately

19  1945 and their days growing up in Queens on Long Island, had stayed in regular contact and

20  vacationed with Hyatt on a regular basis.  Thompson testified as to the man he knew before the

21  ordeal and the changes he saw over the course of a decade.  He testified how beginning in the

22  late 1990's he started noticing a change in Hyatt, to the point he did not want to be around Hyatt

23

24  [475] *Id.*

25  [476] *Kalantar v. Lufthansa German Airlines*, 402 F. Supp.2d 130, 146 (D. D.C. 2005) (discussing and citing authority that provides alternatives to medical records) (emphasis added) (*quoting Dixon v. Denny's, Inc.*,

26  957 F. Supp. 792, 796 (E.D. Va. 1996)).

27  [477] *Carey v. Piphus,* 435 U.S. 247, 264, n.20 (1978).

28  [478] RT: May 12, 59:7-60:15, 95:15-109:13.

[479] RT: May 19, 22:17-32:1; June 18, 25:9-28:14, 45:3-48:4.

KAMMETER, CROWELL, RENSHAW, CAROVALBER & FORMENTINO

1  anymore, despite their lifelong friendship. He described Hyatt as getting "more and more

2  uptight, more pre-occupied . . . with legal stuff." He saw Hyatt, whom Thompson never knew to

3  be a drinker, taking Scotch at night to get to sleep, about which Thompson warned him to work

4  out his sleep problems another way.[480]

5       Thompson recalled he started hearing about the FTB from Hyatt in the late 1990's, and

6  Hyatt would go round and round about the legal battles he was having, and how he was feeling

7  harassed, feeling threatened and that inappropriate surveillance may have been taking place.

8  Thompson did not know that Hyatt was under audit in the mid 1990's, but recalls the changes in

9  Hyatt and his references to the FTB started in the late 1990's.[481]

10      Thereafter, Thompson noticed that over time Hyatt's intellect and broader interest "started

11  closing down." His sense of humor was going away. He was preoccupied and talking "over and

12  over again about the same things [the FTB]" and that it was no longer fun for Thompson to

13  vacation with Hyatt as they had done for years. On one occasion, Hyatt had to cancel a meeting

14  with Thompson, and Thompson was glad because he would not have to listen to "this stuff

15  [regarding the FTB]."[482]

16      In the early 2000's, Hyatt's preoccupation with the FTB and the change in his personality

17  was getting hard for Thompson to take. He recalls one dinner in which Hyatt took five cell

18  phone calls. He also recalls a hike he took with Hyatt in Red Rock Canyon in 2000 in which

19  even more intensely Hyatt "kept going round and round and round in circles about legal issues

20  that were going on and about the California Franchise Tax Board." Thompson found it no fun to

21  be around Hyatt any longer; there was no freedom of speech because Hyatt was concerned about

22  being under surveillance.[483]

23      Thompson also testified to Hyatt's sensitivities concerning his Jewish faith. Thompson

24

25  [480] RT: May 19, 22:17-24:4.

26  [481] RT: May 19, 24:14-25:13.

27  [482] RT: May 19, 25:14-26:9.

28  [483] RT: May 19, 26:10-29:2. Hyatt also testified to distress upon learning of Cox's comments, recalling that he lost family members in the holocaust. RT: May 12, 112:17-113:6.

129

1   recalled that as boys growing up in a "very Jewish neighborhood" there were a lot of people that

2   had escaped from Germany, even those who had been in concentration camps and had tattoo

3   marks from that ordeal. Thompson remembers Hyatt's reaction to this.[484]

              **(ii)**    **Dan Hyatt.**

5        Another witness to Hyatt's severe emotional distress was his son, Dan. He testified that

6   before the FTB audits and protests, Hyatt was happy and joyful. He had talked Dan into taking

7   scuba diving classes and was planning diving trips. He went hiking and skiing with Dan. Dan

8   described his father as optimistic and planning for the future, and planning to spend lots of time

9   with his grandkids.[485]

10       Dan testified to how his father started to change. Since moving to Nevada, Hyatt had

11   been regularly trying to convince Dan to join him in Nevada. But during a hike in Red Rock

12   Canyon shortly after finishing his schooling Dan tried to bring up the subject of joining his

13   father. But Hyatt did not want to talk about it. Hyatt stopped and sat on a rock and broke down

14   crying. He mentioned fraud penalties and the FTB not leaving him alone. He had never seen his

15   father break down like that.[486]

16       Before that incident, Hyatt would talk with Dan on his visits about Hyatt's inventions and

17   patents and they would discuss and plan trips. But after that, Hyatt would not stop talking about

18   the FTB, saying that they would not believe anything he told them, and he was scared. Dan saw

19   his father as completely changed. He saw his father was obsessed with the situation with the

20   FTB.[487] Dan saw that his father was depressed. He also saw physical symptoms and ailments in

21   Hyatt, including Hyatt asking for Advil when they went for a walk or drive. Hyatt also asked for

22   antacids and would run to the bathroom frequently due to gastrointestinal problems. Hyatt also

23   cut their visits short.[488]

24

25   [484] RT: May 19, 32:18-33:16.

26   [485] RT: June 18, 23:22-25:8.

27   [486] RT: June 18, 25:9-26:15.

    [487] RT: June 18, 26:16-27:12.

28   [488] RT: June 18, 27:13-23.

RJN0186

1    Dan would have to try and talk Hyatt into doing things like skiing or hiking, but Hyatt

2    was not interested "in much of anything." He no longer called Dan and asked him to visit. The

3    changed in Hyatt affected Dan's relationship with his dad.[489]

4         **(iii)    Vince Turner.**

5         Vince Turner is a former Administrator for the International Division in the United States

6    Patent and Trademark Office and a former administrative patent judge. He has known Hyatt

7    since 1982. Hyatt would regularly visit Turner on trips to Washington D.C. Their visits would

8    consist of dinners, vigorous walks, and discussions. He found Hyatt to be extremely friendly,

9    mild mannered, easy going, extremely intelligent and very kind.[490]

10        In 1996, when Turner was planning to retire from his position as a patent judge, Hyatt

11   offered him a position to work for a company Hyatt started in Las Vegas that prepares and

12   prosecutes patent applications. Turner accepted and moved to Nevada.[491] During his first year

13   or so in Las Vegas, Turner enjoyed recreational activities with Hyatt, including hiking and

14   rollerblading, something they took up together at his age of 55.[492]

15        In the 1997 timeframe, Hyatt began sharing with Turner what was happening with the

16   FTB, in particular that he was being assessed taxes that he did not owe. Turner then started

17   noticing changes in Hyatt, in his activities and emotional state. Hyatt started having migraine

18   headaches and would sit in Turner's office unable to function. Hyatt was unable to communicate

19   with Turner during these bouts and would simply leave Turner's office. Turner recalls times

20   when Hyatt would walk very peculiarly because his back and neck were bothering him. The

21   only subject Hyatt would talk about, other than patents, was the FTB.[493]

22        Turner began noticing that Hyatt was not as well kept. Hyatt had always been a very neat

23   person. His hair was impeccably in place, as was his beard. Turner began noticing red bumps on

24   _____

25   [489] RT: June 18, 27:24-28:14.

26   [490] RT: June 18, 39:9-23, 40:24-43:22.

27   [491] RT: June 18, 39:24-40:20.

     [492] RT: June 18, 44:2-11.

28   [493] RT: June 18, 45:3-46:22.

1  Hyatt's face. Turner could tell something was bothering Hyatt "pretty significantly." Over the

2  years, this has substantially affected the relationship between Turner and Hyatt. Their outside

3  activities diminished quite a bit. Since 2005, Hyatt and Turner had gone hiking only a couple of

4  times, and during these times Hyatt was not the same type of person as he was prior to when the

5  FTB matter surfaced.[494]

6      This third party evidence, combined with Hyatt's detailed and personal testimony of his

7  ordeal,[495] and the magnitude and duration of the FTB's extreme and outrageous conduct,

8  establish substantial evidence to support the jury's verdict on Hyatt's outrage claim, and the

9  emotional distress damages the jury awarded.

10      **6.      The jury's awards to Hyatt for loss of privacy damages and emotional**
          **distress damages were appropriate, supported by substantial evidence,**
11          **and should be upheld.[496]**

12          **a.      The damages for loss of privacy were not excessive.**

13      The FTB summarily argues that Hyatt presented no evidence "for invasion of privacy

14  damages."[497] The FTB's one-page argument is that Hyatt's identity was never stolen, so therefore

15  no harm, no foul. The FTB misunderstands the nature of the loss of privacy damages that Hyatt

16  suffered, and that the jury determined. Hyatt sought and obtained damages for the loss of

17  privacy, something he will never regain. This is different and separate from emotional distress

18  damages. Emotional distress damages compensate for what happened to Hyatt relative to his

19  well being. Loss of privacy damages compensate for the visceral loss of the privacy interest that

20  is gone forever.[498]

21  

---

22  [494] RT: June 18, 46:23-48:4.

23  [495] *See* discussion, *supra* at 124-130.

24  [496] The FTB addressed this issue after arguing for a damages cap. FTB Opening Brief, at 102-107. Hyatt addresses the issue here following discussion of the tort claims. Hyatt addresses separately below the damage cap issue asserted by the FTB. *See* discussion, *infra*, at 146-162.

25  [497] FTB Opening Brief, at 102.

26  [498] *See Restatement (Second) of Torts* § 652H (1977); *Alderson v. Bonner,* 142 Idaho 733, 132 P.3d 1261

27  (App. 2006); *Doe v. Chao,* 540 U.S. 614, 621 (2004) ("Traditionally, the common law has provided [victims of privacy torts] with a claim for 'general' damages, which for privacy and defamation torts are presumed damages: a monetary award calculated without reference to specific harm."); *see PETA v.*

28  *Berosini*, 110 Nev. 78, 100-01, 867 P.2d 1121, 1134-35 (Nev. 1994) (noting that "general damages" are

132

RJN0188

1    Once there was mass dissemination, a "bombardment" as expressed by senior auditor

2    Les,[499] Hyatt lost his privacy and his confidentiality, not only in his personal information

3    disclosed to the third parties, but even more so the very fact he was under investigation and audit.

4    He no longer had privacy in this aspect of his life. This included not only friends and family

5    members, but those he did business with, professional associations, his synagogue, *etc.*[500]

6    Similarly, when his tax obligation, although not actually owing and not even final, was

7    posted continuously for almost ten years on the internet in the FTB's *Litigation Roster*, his

8    privacy was further lost. When the FTB posted he was assessed a fraud penalty, thereby

9    communicating this for all to see, he lost further privacy. He was publicly called out as a fraud,

10   even though there had been no final assessment. Again, once a privacy interest is lost, the bell

11   cannot be unrung.

12   Moreover, in this regard, Hyatt was treated differently than others under audit, who are

13   not subject to a bombardment of their personal information and wide dissemination that they are

14   under investigation and audit. He was also treated differently when for almost a decade he was

15   listed in the *Litigation Roster* as owing taxes, even though no final determination had been made.

16   The FTB did not do this to others under audit.

17   Some may value their privacy interest more than others, but it has been undisputed that

18   Hyatt has always placed extreme value on his privacy. The FTB even made special note of

19   Hyatt's sensitivity for privacy,[501] and tried to take advantage of it. The jury also heard evidence

20   of Hyatt's special interest in privacy, and in particular how someone from the depression era (as

21   was Hyatt) who attains great success and wealth through lifelong hard work (as did Hyatt),

22

23   recoverable for invasion of privacy torts); *see also Hetter v. Eighth Judicial Dist. Court*, 110 Nev. 513, 517-18, 874 P.2d 762, 764-65 (1994).

24   [499] One of the many misstatements of the record was the FTB calling Les a consultant for Hyatt. FTB

25   Opening Brief at 45. Les was not a consultant, she was a witness. She was a former FTB insider who, once discovered, felt compelled to tell the truth. She did agree to spend time with Hyatt's counsel giving

26   background on the FTB. She obviously felt strongly about what happened to Hyatt. As referenced above, she had complained to the FTB concerning the FTB's treatment of Hyatt and felt her complaint was not

27   adequately investigated. RT: April 23, 167:6-168:21.

     [500] *See* discussion, *supra*, at 37-40, 41-43.

28   [501] *See* discussion, *supra*, at 35-36.

133

KADISH CROWELL RENSHAW CRONAUER & FIORENTINO

RJN0189

1  strives hard to maintain a private, low key, and unassuming lifestyle.[502]  But here, the FTB put

2  Hyatt in front of his circle of friends, family members, business associates, and patent

3  sublicensees as a purported tax cheat and a fraud.

4      The jury weighed the substantial evidence in this regard, including that Hyatt had an

5  extremely high privacy interest that was lost because of the FTB actions.  There is no reason for

6  the Court to substitute its judgment for the jury's in regard to the value of the privacy interest that

7  Hyatt lost from the FTB's intentional invasions of privacy.

8          **b.     The emotional distress damages were not excessive.**

9      The FTB argues that Hyatt was not entitled to recover the amount of emotional distress

10  damages awarded because of (i) the Discovery Commissioner's "garden-variety" language in his

11  order and (ii) the District Court not allowing evidence of other possible stressful events.

12          **(i)     Hyatt's emotional distress damages were not limited by**
                       **the Discovery Commissioner's ruling.**

13      The FTB's reference to "garden-variety" emotional distress cases and those in which no

14  medical evidence was presented do not limit Hyatt's recovery in this case, just as the Discovery

15  Commissioner was not intending to cap Hyatt's emotional distress damages.  There is no such

16  limitation.  The proper award is dependent on the facts of each case, within the province of the

17  jury.[503]

18      Here, Hyatt meets virtually every factor considered as a basis for large emotional distress

19  damages.  As discussed and cited above, severity, duration, and outrageousness of the conduct

20  are the appropriate factors for the jury to weigh in awarding emotional distress damages.

21  Moreover, financial pressure was exerted over a long period of time by a government agency.

22  As stated above, emotional distress can be assumed by jurors, even without medical evidence

23  when one's financial well being is at stake.  Similarly, when the defendant's actions amount to

24  bad faith conduct, they are often considered so extreme and outrageous that emotional distress is

25

26  [502] RT: June 10, 56:4-57:9, 61:1-62:17, 68:4-20.

27  [503] This has long been the law in Nevada.  *Powell v. Nevada, C. & O. Ry.*, 28 Nev. 40, 78 P. 978, 979
    (1904), *aff'd.*, 28 Nev. 305, 82 P. 96 (1905) (holding that there is no fixed rule for the measure of damages,

28  especially for mental anguish apart from physical suffering, except that it is to be left to the jury under
    proper instructions from the court).

                                                 134

1  presumed and no need of medical evidence is necessary.

2  　　　　In that regard, the bad faith cases involving financial pressure and delays are analogous

3  and provide for a significant award of emotional distress damages. Hyatt has located no case of

4  11 plus years of continual financial pressure and combined with and caused by outrageous bad

5  faith governmental misconduct and the resulting severe emotional distress. But awards for

6  financial pressure, for shorter periods of time are comparable when adjusted for an "apples to

7  apples" comparison in regard to the time and money involved. In *Albert H. Wohlers & Co. v.*

8  *Bartgis*,[504] this Court did not disturb a compensatory award of $275,000 for emotional distress,

9  where the financial distress from the carrier's failure to pay a $9,000 medical bill lasted

10 approximately six months.[505] In *Guaranty Nat. Ins. Co. v. Potter*,[506] this Court did not disturb a

11 $150,000 compensatory award for emotional distress where the carrier delayed paying the bills

12 for medical exams totaling $6,500 subjecting the insureds to collections notices and eventually a

13 lawsuit over approximately 18 months.[507]

14 　　　　In *State Farm Mutual Automobile Insur. Co. v. Campbell*[508] the United States Supreme

15 Court did not question a $1 million compensatory award for a year and half of emotional distress.

16 The Court explained: "The compensatory award in this case was substantial; the Campbells were

17 awarded $1 million for a year and a half of emotional distress. This was complete compensation.

18 The harm arose from a transaction in the economic realm, not from some physical assault or

19 trauma; there were no physical injuries; and State Farm paid the excess verdict before the

20 complaint was filed, so the Campbells suffered only minor economic injuries for the 18-month

21 period in which State Farm refused to resolve the claim against them." The minor economic

22 injury referred to by the Court was the carrier's delay in paying its policy limit of $50,000.

23

---

24 [504] 114 Nev. 1249, 969 P.2d 949 (1998).

25 [505] *Id.* at 1256 (plaintiff became upset and frustrated in January 1993, filed suit in July 1993, and carrier offered to pay entire amount right after complaint filed).

26 [506] 112 Nev. 199, 912 P.2d 267 (1996).

27 [507] *Id.* at 203-205 (formal demand for payment sent to insureds in October 1992, threat of litigation in November 1992, action filed and served in March 1993, and carrier made payment March 1994).

28 [508] 538 U.S. 408, 426 (2003).

135

KARP FISHER CROWELL RENSHAW GRONAUER & FIORENTINO

1    In Hyatt's case, the financial pressure was extreme, growing to over $51 million dollars

2 (increasing at the rate of $8,000 per day, which is approximately $3,000,000 per year), and the

3 delay and duration of 11 years was unheard of and never justified by the FTB. The jury's

4 verdicts reflect that it concluded that the delay was intended to pressure Hyatt. If $1 million

5 dollars is appropriate for 18 months of relatively minor economic pressure, the jury in this case

6 was well within reason in awarding $85 million for Hyatt's 11 year ordeal. The increase in

7 distress over 11 years can properly be viewed as exponential. The FTB kept Hyatt under its

8 proverbial thumb for 11 years, not letting him proceed through the administrative process — in

9 fact Hyatt's only alternative would have been to skip the administrative process, but to do that *he*

10 *would have had to pay all taxes, penalties and interest* before seeking a refund.[509] That was the

11 very result the FTB wanted.

12    The garden-variety cases cited by the FTB are therefore not factually analogous. The

13 bad faith cases involving financial pressure and delays are similar and provide for a significant

14 award of emotional distress damages.

15    The FTB also complains that the jury arguably awarded more emotional distress damages

16 than Hyatt's counsel suggested in closing argument. In fact, Hyatt's counsel left it to the sound

17 discretion of the jury. Even so, there is no law prohibiting a jury from awarding more in

18 emotional distress damages than counsel may have referenced in closing argument. Under the

19 facts and circumstances of this case, the jury award of emotional distress damage was justified

20 and should not be upset.

21    (ii)    **The District Court did not err in not allowing prejudicial**

22                **evidence offered by the FTB.**

23    The FTB argues that the District Court should have allowed evidence relating to other

24 possible sources of stress. Both the patent litigation and the IRS proceeding were short-lived and

25 do not explain the objectively-verified manifestations of distress to which Hyatt's witnesses

26 testified occurred many years after these events. As Hyatt's counsel argued in the District Court,

27

28 [509] Cal. Tax & Rev. Code §§ 19381, 19382.

136

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

1  this evidence was properly excluded as it was being offered simply to prejudice the jury against

2  Hyatt. The FTB wanted to argue Hyatt was a discredited inventor simply to bias the jury.[510]

3  Similarly, the FTB argues that Hyatt had undergone an IRS audit, which the FTB argues

4  it should have been able to put into evidence to argue as an alternative source of distress. But as

5  addressed with the District Court, Hyatt had actually sought a refund from the IRS on an

6  accounting interpretation. Although the IRS disagreed with his interpretation, he negotiated a

7  favorable settlement with the IRS. Moreover, the matter was unrelated to Hyatt's residency

8  dispute with the FTB.[511] The District Court recognized these markedly-different factual

9  circumstances and properly refused to allow the FTB to try and prejudice the jury by arguing that

10  Hyatt was also under an IRS audit.

### 7. The District Court did not err in rejecting the FTB's statute of limitations defense.

Judge Walsh properly denied the FTB's partial summary judgment motions that argued that

Hyatt's intentional tort claims for invasion of privacy, false light, breach of confidentiality, and

abuse of process were not timely filed.[512] At trial, after the close of evidence, Judge Walsh also

correctly ruled that the FTB had not as a matter of law established that Hyatt's claims were barred

by the statute of limitations.

In regard to Judge Walsh's pretrial rulings, the FTB argued that the FTB's correspondence

during the audits with two of Hyatt's California attorneys and one of his banks put him on inquiry

notice, at least, of the FTB's massive invasion of privacy. The FTB also cites to the auditor's

August 2, 1995, Determination Letter as notice to Hyatt of the massive invasion of privacy. But

those documents provided no clue as to the nature, depth, and invasiveness of the FTB's violations

of Hyatt's privacy.

---

[510] *See* argument of Hyatt's counsel in District Court. RT: July 9, 6:15-30:13; 80 RA 019788-019853; RT: July 21, 170:2-199:22.

[511] *See* arguments of Hyatt's counsel in the District Court. RT: April 22, 5:5-28:10; April 29, 9:25-22:25; May 14, 5:13-24:20.

[512] The FTB's brief suggests that it moved to dismiss all but Hyatt's fraud claim on this ground. But the record demonstrates that the FTB also failed to raise this issue as to Hyatt's claim for intentional infliction of emotional distress.

KARNMYER CROWELL RENSLAW GRONAUER & FIORENTINO

1    The FTB actively prevented Hyatt from discovering in 1995 the FTB's massive invasion of

2    his privacy and other intentionally tortious misconduct.  Upon receipt of the August 2, 1995,

3    Determination Letter, Hyatt requested the FTB's audit file, in an attempt to make sense of the FTB's

4    stated position.[513]  But the FTB refused to produce its audit file until September 30, 1996, after

5    Hyatt formally protested the FTB's proposed assessment.[514]  This was the first that Hyatt knew (or

6    should have known) facts sufficient to alert him to the FTB's intentionally tortious misconduct.

7    Hyatt then timely filed his original complaint in January 1998, well within the two-year statute of

8    limitations.

9        The FTB's second statute of limitations argument is based on the premise that whether a

10   party is on notice sufficient to trigger the statute of limitations is an issue of law for the court to

11   decide.  The trial court properly addressed and resolved that issue, ruling in favor of Hyatt that the

12   FTB had not as a matter of law established a statute of limitations defense.

**a.    The FTB does not accurately state the law relative to the triggering of the statute of limitations.**

15       The statute of limitations for an invasion of privacy claim is two years from when a party

16   has notice of such claim.[515]  But the two years do not begin to run until the party has notice of the

17   wrong and incurs damage.  Where the wrong and the damage are not immediately discovered, the

18   statute of limitations is tolled.[516]  The cases cited by the FTB are in accord; the statute begins to run

19   only when a reasonable person would be on notice and has sufficient facts that, if true, would

20   support a claim.

21       Further, in "a discovery based cause of action, a plaintiff must use due diligence in

22   determining the existence of a cause of action . . ." and whether "plaintiffs exercised reasonable

23   diligence in discovering their causes of action *'is a question of fact to be determined by the jury or*

---

[513] RT: April 28, 17:13-15; April 30, 83:13-86:19; May 8, 145:8-24; May 9, 116:13-117:3, 118:15-18, 142:13-30.

[514] RT: April 30, 83:13-86:19, May 9, 116:13-117:3, 118:15-18, 142:13-20; May 28, 109:21-110:11, June 2, 102:12-103:21, 108:24-109:4.

[515] *See Turner v. County of Washoe*, 759 F. Supp. 630, 637 (Nev. 1991) ("[T]he limitations period for slander and invasion of privacy is two years (§11.190(4)(c) . . .").

[516] *Bemis v. Estate of Bemis*, 114 Nev. 1021, 1024, 967 P.2d 437, 440 (1998).

138

KARNSPYER CROWELL RENSHAW GRONAUER & FIORENTINO

1  *trial court after a full hearing.'* . . . Dismissal on statute of limitations grounds is only appropriate

2  'when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have

3  discovered' the facts giving rise to the cause of action. . . . "[517]

4        Moreover, the continuing wrong doctrine tolls the statute of limitations when the plaintiff is

5  repeatedly harmed. Under this doctrine, "'where a tort involves a continuing or repeated injury, the

6  cause of action accrues at, and limitations begin to run from, the date of the last injury.' In other

7  words, 'the statute of limitations does not begin to run until the wrong is over and done with.' "[518]

8        The Ninth Circuit, in applying Nevada law, noted that the continuing wrong doctrine is

9  applicable "where there is 'no single incident' that can 'fairly or realistically be identified as the

10  cause of significant harm."[519] "[T]he 'continuing wrong' doctrine, a doctrine ... involving 'repeated

11  instances or continuing acts of the same nature, as for instance, repeated acts of sexual harassment

12  or repeated discriminatory employment practices.'"[520]

13        **b.    The statute of limitations did not begin to run, at the earliest,**
14                  **until Hyatt received the FTB's audit file in late 1996.**

15        Hyatt's invasion of privacy claims, false light claim, breach of confidentiality claim, and

16  abuse of process claim were not based on the FTB disclosures to one of Hyatt's banks during the

17  FTB audit. Nor were these claims based upon two of his California attorneys receiving Demands

18  for Information from the FTB. The fact that his bank and his attorneys received inquiries from the

19  FTB did not provide notice of the FTB's widespread disclosures during the audit, nor of the

20  Demands for Information sent to Nevada entities and individuals, nor the scope and magnitude of

21  the FTB's outrageous conduct. Both Hyatt's bank and his attorneys had independent obligations to

22  safeguard and not disclose his confidential information, including his social security number.

23        The fact that trusted confidants received Demands from the FTB would not and did not alert

24  Hyatt to the fact the FTB was making indiscriminate, pervasive, repeated and unnecessary

25

26  [517] *Id.* at 1025. (emphasis added).

27  [518] *Tiberi v. Cigna Corp.,* 89 F.3d 1423, 1430-1431 (10th Cir. 1996).

    [519] *Flowers v. Carville,* 310 F.3d 1118, 1126 (9th Cir. 2002).

28  [520] *Nesovic v. U.S.,* 71 F.3d 776, 778 (9th Cir. 1995).

KAMPPER CROWELL RENSLAW CROSAUER & FIORENTINO

RJN0195

1  disclosures of his private and confidential information to third-party individuals and businesses that

2  had little or no relationship with Hyatt and no professional or legal obligation to keep such

3  information confidential. Nor would it have alerted Hyatt to the scope of abuses revealed upon

4  production of the audit file. There is simply nothing about disclosures to Hyatt's long-time

5  attorneys and financial institution that would have alerted Hyatt that the FTB was mishandling and

6  widely disseminating Hyatt's private and confidential information or engaging in other bad faith

7  acts and committing intentional torts.[521]

8       Similarly, the information contained in the August 2, 1995, Determination Letter did not

9  provide the identities of those whom the FTB had contacted, particularly the "affiants" on whom

10  Cox placed such reliance. It did not disclose the Demands for Information or the fact that his

11  address and social security number had been disclosed in those Demands. It did not otherwise

12  provide sufficient information for Hyatt to put things together and figure out that his privacy had

13  been violated, that his trust in FTB's confidentiality pledges had been violated, or that the FTB had

14  abused the legal process. Also, the Determination Letter and subsequent correspondence from Cox

15  invited Hyatt to submit responding information, misleading him to believe that the FTB was being

16  fair, that errors would be corrected, and that the additional information he provided would be

17  evaluated correctly to overturn the conclusions in that letter. Until Hyatt received the audit file in

18  late 1996, he could not and did not comprehend the scope of FTB misconduct, and it was the audit

19  file revelations that dramatically exacerbated his emotional distress.

20       Hyatt's first notice of the FTB's indiscriminate, pervasive, repeated and unnecessary

21  disclosures of Hyatt's private and confidential information to third parties was not until, at the

22  earliest, his receipt of the FTB "audit file" in late 1996 that revealed for the first time that the FTB

23  was widely disclosing his private and confidential information.[522] Moreover, the FTB affirmatively

24  prevented Hyatt from obtaining the audit file until late 1996, after completion of the FTB's audit

25

26

27

28

[521] RT: May 14, 154:20-155:2.

[522] RT: May 8, 121:2-122:11; May 12, 103:2-18.

140

RJN0196

1  and his filing of the protest for the 1991 tax-year.[523]

2       Additionally, not all the Demands contained the same disclosures, so merely seeing a few

3  Demands would not have informed Hyatt of the nature of all of the letters. For example, these few

4  Demands did not contain Hyatt's confidential home/office address, nor reveal that these Demands

5  were being sent to Nevada entities. Hyatt had no idea that his social security number and

6  confidential home/office address had been disclosed to newspapers and utility companies and that

7  Demands with his social security number were sent to a litany of businesses and others, particularly

8  in Nevada, until he saw the actual Demands in the audit file.[524]

9       Further, as evidenced by the fact that Hyatt did not have the audit file until late 1996, Hyatt

10  did not know that certain Demands were sent to Nevada entities unlawfully making demands under

11  California law, or disclosing his confidential office/home address, or being sent to his Jewish

12  temples seeking private religious information, or being sent to Las Vegas newspapers. The fact that

13  a defendant makes a disclosure to a third party with a privileged professional relationship to the

14  plaintiff does not put the plaintiff on notice that the defendant has or will make unfettered

15  disclosures to over 100 other unrelated third parties that do not have a close or privileged

16  professional relationship with the plaintiff.[525]

17       Indeed, as the jury was instructed in this case, a party cannot establish a claim for invasion

18  of privacy based on publication of private facts or a false light claim unless there has been

19  dissemination of the information by the defendant.[526] As a result, the few disclosures known to

20  Hyatt before he received the FTB audit file in late 1996 did not provide a basis, by themselves, to

21

---

22  [523] RT: April 30, 83:13-86:19; May 9, 116:13-117:3, 118:15-18, 142:13-20; 84 RA 020913-020933,
23  020946-020947; 85 RA 021063, 02176-021078.

24  [524] 83 RA 020531-020533, 020537, 020540-020546, 020548-020551, 020636-020654, 020662-020669,
    020676-020703, 020719- 84 RA 020794, 020796-020797, 020802-020836, 020839-020840, 020905-
25  020911.

26  [525] See the voluminous Demands and requests the FTB made to third parties that were not served on Hyatt
    during the audits and that he therefore did not know about until he reviewed the audit file at the earliest in
27  late 1996. 83 RA 020531-020534, 020537, 020540-020546, 020548-020573, 020612-020613, 020636-
    020654, 020662-020669, 020676-020703, 020719 – 84 RA 020794, 020796-020797, 020802-020836,
28  020839-020840, 020905-020911.

    [526] RT: July 21, 46:18-47:24.

141

KAMMYER CHIPWELL RENSHAW GRONAUER & FIORENTINO

1    assert those claims, especially since he did not know the form of the Demands and what

2    information they conveyed to the many recipients. The first time Hyatt could discover what the

3    FTB had done was when he received and reviewed the audit file.

4        In addition, the FTB's violations of Hyatt's rights were amplified by its crossing into Nevada

5    under the guise of California law, as articulated on its correspondence demanding that Nevada

6    citizens comply with California law. This was not shown by the early Demands sent to Hyatt's

7    California attorneys and bank. Hyatt could not have known anything about nor the extent of the

8    Nevada intrusions until he saw the audit file.[527]

9        Before he received and reviewed the FTB's audit file, Hyatt had not suspected how

10   extensively the FTB had disseminated his private information. After he received the audit file, he

11   began to learn of the FTB's widespread disclosures and other abuses. But he did not know the full

12   extent of the FTB's abuses until years later, when he learned additional information from Candace

13   Les (the former senior FTB residency auditor who met with him and his counsel), from the

14   Reviewer's notes and other material that had been withheld from the audit file that contradicted the

15   auditor's stated conclusions, and from FTB witnesses. It therefore took Hyatt years after receiving

16   the audit file before fully *realizing* how significantly the FTB had violated his rights.[528]

17       Hyatt made repeated attempts to obtain the audit file, starting in August 1995, but the FTB

18   refused to produce it until September, 1996.[529] The FTB treats the process not unlike a grand jury

19   proceeding, in which the target has no right to see the evidence while the process is taking place.

20   The FTB provided a copy only when the audit was complete, and the taxpayer filed a formal

21   protest.[530]

22       Here, the FTB cannot credibly argue that Hyatt could have discovered the abuses he alleges

23   prior to receiving the FTB's audit file in late 1996. Hyatt first requested his audit file in August

24   _____

25   [527] RT: May 9, 164:24-165:25.

26   [528] RT: May 9, 165:11-166:9; May 12, 100:17-101:6, 103:2-104:23, 106:4-108:5, 110:23-112:21.

27   [529] RT: April 25, 110:5-13;April 30, 83:13-86:19; May 9, 116:13-117:3, 118:15-18, 142:13-20; May 28,
     109:21-110:11; June 2, 102:12-103:21, 108:24-109:4; 84 RA 020913-020933, 020946-020947; 85 RA
     021063, 021076-021078.

28   [530] *Id.*

142

KADNPPER CROWELL RENSHAW GRONAUER & FIORENTINO

1   1995.  Hyatt again requested the audit file in April, 1996, when the FTB finished the audit.  After

2   Hyatt filed his formal protest to the 1991 tax-year audit determination in June of 1996, he again

3   requested a copy of the audit file.  The FTB finally mailed the file to Hyatt's tax attorney on

4   September 30, 1996.[531]

5       At best, therefore, the earliest date the statute of limitations could have commenced running

6   against Hyatt for any claim was when he received the audit file for the first time some time *after*

7   *September 30, 1996.*  Hyatt filed his complaint in January of 1998, well within the statute of

8   limitations for the intentional tort claims.  The statute of limitations therefore provides no defense,

9   and Judge Walsh properly denied the FTB's requests to dismiss Hyatt's claims.

    **c.    The FTB's statute of limitations defense was correctly dismissed
            as a matter of law after the close of evidence at trial.**

11      Judge Walsh's decision to grant Hyatt's motion to dismiss the FTB's statute of limitations

12   defense after the close of evidence at trial was an issue of law for the court to decide.  Hyatt's

13   motion to the court argued that the only evidence that the FTB presented and which the FTB argued

14   put Hyatt on notice relative to the statute of limitations were the few Demands that were sent to

15   Hyatt's bank and two of his attorneys, a single letter to a social acquaintance of Hyatt, and the

16   Determination Letter.  These initial inquiries were in California.  Again, the Determination Letter

17   may have referenced some of the FTB's contacts and activities, but it clearly did not include the

18   complete record of FTB abuses.  There was no dispute over these facts, and these were the only

19   facts upon which the FTB asserted its statute of limitations defense.  Hyatt argued to the District

20   Court that where the facts upon which a statute of limitations defense is based are not in dispute,

21   when the statute of limitations began to run is a matter of law for the court to decide.[532]  *See Day v.*

22   *Zubel,*[533] where the facts upon which the statute of limitation defense are not in dispute, the date

23   upon which a plaintiff was on notice for the purpose of commencing the statute of limitations is a

24   question of law for the court.  It was not the province of the jury to determine this issue of law.

---

[531] 84 RA 020865-020904, 020913-020933, 020946-020947; 85 RA 021063, 021076-02178; 54 AA 13330.

[532] 50 AA 12452-12481.

[533] 112 Nev. 972, 977, 922 P.2d 536, 539 (1996).

143

The same concept applies to each of the claims the FTB attacked on the statute of limitations ground. Hyatt did not know his privacy was invaded or his confidential relationship breached until he received the audit file and could understand the scope and breadth of disclosures by the FTB. In regard to the abuse-of-process claim, Hyatt did not know, and could not possibly have known, until he received the audit file in late 1996 about the Demands and the form of the Demands that had been sent to Nevada residents. Also in regard to his intentional infliction of emotional distress claim, Hyatt did not know the FTB was making massive disclosures contrary to his sensitivity for privacy and confidentiality, again, until he saw the FTB's audit file in the fall of 1996.[534] The limited basis of the FTB's asserted statute of limitations defense was therefore refuted with this uncontroverted fact.

Judge Walsh therefore properly decided and dismissed the FTB's statute of limitation defense as a matter of law.[535]

### 8. The District Court properly sanctioned the FTB for its spoliation of electronic data.

The FTB devotes two pages of its brief to argue that Judge Walsh misapplied her own sanction order to the FTB after finding that the FTB destroyed key electronic data *after* the District Court had specifically ordered this data preserved. The spoliation motion was extensively briefed, argued and supported with evidence.[536] Not surprisingly, the FTB does not challenge the ruling against it, as it cannot explain why it destroyed electronic data after it had been requested in discovery and after the District Court had ordered it preserved. Instead, the FTB challenges Judge Walsh's application of her own ruling, suggesting that the adverse inference ordered by the District Court morphed into an irrebuttable presumption. But what the FTB actually complains about is Judge Walsh's refusal to allow the FTB to avoid the sanction ruling by making an attempted end-run around the ruling.

The FTB sought at trial to re-argue to the jury that it had not failed to preserve the electronic

---

[534] *See* discussion, *supra*, at 124-131.

[535] RT: July 16, 26:22; 41: 2-4.

[536] 39 RA 009704 – 44 RA 010754; 58 RA 014364-014446.

144

1    data and that no data was actually lost. Of course, no one knows what was lost, because the

2    evidence was destroyed. Judge Walsh therefore did not err in issuing an instruction to the jury

3    consistent with *Bass-Davis v. Davis* that prohibited the FTB from re-arguing whether evidence was

4    destroyed.[537] Instead, the FTB was limited to presenting and arguing that the lost data was not

5    adverse to its position in this case. The FTB had no witness to attest to this, so it instead attempted

6    to re-argue that no electronic data was lost. It was not allowed to do this, as the court had already

7    decided that spoliation took place.

8          Under *Bass-Davis*, and a wealth of consistent authority from other jurisdictions, once

9    spoliation is found by the court, the court can order that the spoliating party is not allowed to re-

10   argue this issue to the jury.[538] The court can issue an irrebuttable presumption that the lost

11   evidence was harmful to the offending party's position. Here, despite the overwhelming evidence

12   that the FTB's spoliation was intentional, Judge Walsh issued a less harsh instruction that the jury

13   may draw an inference that the lost evidence was adverse to the FTB's position in this case.[539] Yet

14   the FTB sought at trial to re-argue to the jury the circumstances regarding the spoliation, as

15   opposed to overcoming the inference that the lost evidence was adverse.

16         The FTB was not entitled to re-argue the circumstances of its spoliation. The District

17   Court's ruling, instruction, and evidentiary limitations at trial were entirely consistent with *Bass-*

18   *Davis*. The FTB's citations to certain other cases where a court provided other remedies for the

19   spoliation have no application here. Sanctions for spoliation are dependent on the facts of each

20   particular case. Indeed, the overwhelming record supported the issuing of an irrebuttable

21   presumption against the FTB.[540] The FTB does not discuss or elaborate on the facts surrounding its

22   spoliation of electronic data. Hyatt's motion set forth the egregious nature of the spoliation in vivid

23   detail.[541] The FTB had no excuse to justify what it did.

24

25   [537] 122 Nev. 442, 454, 134 P.3d 103 (2006).

26   [538] 39 RA 9744-9749.

27   [539] 54 AA 13278.

     [540] *Id.*

28   [541] 39 RA 9717-9744.

145

RJN0201

1    There was no error by Judge Walsh in issuing the sanction ruling, nor in her application of

2 the ruling. Further, the FTB does not even argue, as it must in regard to a sanction ruling, that

3 Judge Walsh abused her discretion in issuing and/or applying its sanction ruling.[542] The FTB

4 therefore raises no issue for which it is entitled to relief in regard to the issuance and application of

5 the spoliation sanction imposed against it by Judge Walsh.

6 **F.    Nevada's statutory cap on damages does not apply to the FTB.**

7        **1.    This Court need not, and should not, grant "equal immunity" to
             California officials who commit intentional torts against Nevada
8             citizens.**

9        The FTB's principal argument regarding damages is that the compensatory award must be

10 reduced to $75,000 per occurrence, and the punitive award eliminated entirely, to conform to the

11 permissible limits on damages against the State of Nevada under Nevada law. Although the FTB

12 seemingly concedes that the relevant Nevada statutes, by their terms, do not contain limitations on

13 damage awards against other States, it insists that this Court should create equivalent immunity as a

14 matter of comity. But this "equal immunity" argument suffers from several serious flaws. To

15 begin with, the case for extending comity is at its weakest when, as here, the State asking for

16 immunity has repeatedly engaged in deliberate cross-boundary efforts to harm a citizen of the home

17 State, ignoring the sovereign interest of the home State in protecting its citizens from purposeful

18 attacks. Moreover, the FTB ignores the fact that significant damage awards are the only means of

19 shielding Nevada citizens from harm inflicted by officials from other States – and of deterring such

20 behavior in the future – whereas Nevada officials, by contrast, are subject to the full legislative and

21 executive authority of the State of Nevada itself. When foreign-State officials have committed

22 intentional torts, therefore, it would severely diminish Nevada's sovereign capacity to protect those

23 within its borders, if Nevada courts gave those officials the benefit of damage limits intended for

24 Nevada officials, regardless of the nature of their conduct and the extent of harm that they caused.

25 Indeed, given the potential exposure of Nevada officials to unlimited damages in other States, *see*

26

27 ─────────────────────

28 [542] In reviewing a sanction ruling, the standard of review is abuse of discretion. *Bass-Davis*, 122 Nev. at 447-448.

146

KARNOFER CROWELL, RENSHAW CROMARTIE & FIORENTINO

1   *Nevada v. Hall*,[543] the extension of such immunity would actually create inequalities that are

2   directly contrary to Nevada's sovereign interests.

3       **2.    This Court is not obliged to grant special immunity to the FTB.**

4       The FTB takes the position, not just that this Court *should* grant partial immunity to the

5   FTB as a matter of comity, but that this Court *must* do so. *See* FTB Br. 101-02, 108. But, insofar

6   as the doctrine of comity is concerned, that argument is plainly incorrect.[544] The extension of

7   immunity by one State to another – whether total or partial – is always a matter of grace, not

8   obligation. Indeed, to grant such immunity would clearly be inappropriate when, as here, it would

9   conflict with Nevada's own interests.

10      The case law is unmistakable on this point. Beginning with the early Nineteenth Century,

11   the United States Supreme Court has made clear that a sovereign need not grant immunity to other

12   sovereigns in its own courts. In *The Schooner Exchange v. McFaddon*,[545] the Court, speaking

13   through Chief Justice Marshall, declared that "the jurisdiction of the nation within its own territory

14   is necessarily exclusive and absolute," stressing that "[i]t is susceptible of no limitation not imposed

15   by itself."[546] Since the decision in *Schooner Exchange,* the Court has consistently followed the

16   guiding principle that "foreign sovereign immunity is a matter of grace and comity on the part of

17   the United States, and not a restriction imposed by the Constitution."[547]

18      That same principle applies to relations between the individual States. In *Nevada v. Hall,*

19   *supra,* the Court rejected a claim that Nevada had inherent sovereign immunity in California,

20   noting that, unlike a sovereign's assertion of immunity in its own courts, "[s]uch a claim necessarily

21   implicates the power and authority of a second sovereign . . . "[548] The Court thus concluded that

22

23   [543] 440 U.S. 410 (1979).

24   [544] To the extent that the FTB bases its immunity argument on the doctrines of law of the case and judicial estoppel, Hyatt addresses these contentions, *infra,* at 160-163.

25   [545] *See The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116 (1812).

26   [546] *Id.* at 136,

27   [547] *Verlinden B.V. v. Central Bank of Nigeria*, 460 U.S. 480, 486 (1983).

  [548] 440 U.S. at 416. *See also Alden v. Maine,* 527 U.S. 706, 738 (1999) (quoting *Hall*). Citing *Alden* among

28   other cases, the FTB says that "it is questionable whether there is still validity" to the decision in *Hall*. FTB Opening Brief, at 101 n.80. But the decision in *Alden* not only raised no doubts about *Hall,* it quoted *Hall*

147

KAMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

1    the source of any immunity for a State in the courts of another State "must be found either in an

2    agreement, express or implied, between the two sovereigns, or in the *voluntary decision* of the

3    second to respect the dignity of the first as a matter of comity."[549] Because "the Constitution did

4    not reflect an agreement between the States to respect the sovereign immunity of one another,"[550] it

5    is for each State to decide, in its discretion, whether it would be consistent with its own sovereign

6    interests to grant immunity to a sister State.[551]

7        This Court likewise has recognized that the granting of immunity to another State is entirely

8    voluntary. In *Mianecki v. Second Judicial District Court,*[552] the Court observed that "[i]n general,

9    comity is a principle whereby the courts of one jurisdiction may give effect to the laws and judicial

10   decisions of another jurisdiction out of deference and respect," adding that "[t]he principle is

11   appropriately invoked according to the sound discretion of the court acting without obligation...."[553]

12   Furthermore, the Court emphasized that "'[i]n considering comity, there should be due regard by

13   the court to the duties, obligations, rights and convenience of its own citizens and of persons who

14   are within the protection of its jurisdiction.'"[554] In *Mianecki,* the Court ultimately rejected the State

15   of Wisconsin's request to be accorded immunity as a matter of comity, finding a paramount interest

16   in "protecting [Nevada's] citizens from injurious operational acts committed within its borders by

17   employees of sister states."[555]

18       It is striking that, in its discussion of comity, the FTB pays no attention whatsoever to

19   ─────────────────────────────────────────

20   precisely to explain why a State has no immunity in the courts of another State. *See* 527 U.S. at 738. In addition, the FTB is simply wrong in suggesting this Court "may evaluate the continuing viability" of a Supreme Court holding. Rather, lower courts must "leav[e] to [the Supreme] Court the prerogative of

21   overruling its own decisions." *Tenet v. Doe,* 544 U.S. 1, 11 (2005), quoting *Rodriguez de Quijas v.*

22   *Shearson/American Express, Inc.,* 490 U.S. 477, 484 (1989).

     [549] *Id.* (emphasis added).

23   [550] Alden, 527 U.S. at 738.

24   [551] *See Hall,* 440 U.S. at 424-27.

25   [552] 99 Nev. 93, 658 P.2d 422 (1983).

26   [553] *Id.* at 96-98. *See also Oberson v. Federated Mut. Ins. Co.,* 126 P.3d 459, 462 (Mont. 2005) (comity is not a "rule of law" but rather "an expression of one state's entirely voluntary decision to defer to the policy

27   of another").

     [554] 99 Nev. at 98, quoting *State ex rel. Speer v. Haynes,* 392 So.2d 1187 (Ala. 1980).

28   [555] 99 Nev. at 98.

                                           148

1    Nevada's need to give "due regard" to the welfare of its citizens. But the well-being of a State's

2    citizens is necessarily a critical element of the comity analysis. "The Constitution . . . contemplates

3    that a State's government will represent and remain accountable to its own citizens,"[556] and it is

4    essential that a State has the power to protect those citizens from hostile acts committed by officials

5    of other States. If California is free to cross state boundaries and commit deliberate torts against

6    Nevada citizens with little concern about effective sanctions, then Nevada's authority to control acts

7    within its borders will be seriously eroded. As we discuss next, the prospect of significant damages

8    is the only effective means of sanction and deterrence that Nevada can exercise against out-of-state

9    officials like those in the FTB.

10       **3.      Substantial damages are necessary to sanction and deter deliberate
             misconduct by officials from other states.**

11       We begin with a simple point: A State's claim for comity is particularly weak when the

12   State is seeking to avoid liability for continued intentional conduct directed at a citizen of another

13   State.[557] Unlike acts of negligence – which are, by definition, unplanned and inadvertent – State

14   acts that are meant to cause harm are a particular affront to the sovereignty of a sister State and

15   require the strongest measures for deterrence. Although the FTB gives little weight to – in fact,

16   largely denies – the egregious nature of its conduct, the facts of this case show that the FTB

17   officials repeatedly invaded Hyatt's privacy, sought to use his concerns about privacy to force a

18   settlement of the California tax claim, and subjected him to a series of bad faith administrative

19   actions, all without any concern for propriety of their behavior under Nevada law. Having shown

20   so little respect for the sovereignty of Nevada, the FTB stands on particularly shaky ground in now

21   claiming that this Court must respect its sovereignty by granting immunity under the doctrine of

22   comity.[558]

23

24

25   [556] *Printz v. United States*, 527 U.S. 898, 920 (1997).

26   [557] Although there is a dispute between the parties about when Hyatt moved to Nevada, there is no question
      that the tortious acts at issue in this suit occurred after Hyatt became a Nevada resident.

27   [558] It is also clear that the "interstate" nature of the torts was anything but accidental. The FTB chose to go
      after Hyatt precisely because he had established residence in a state without an income tax, a circumstance
28   that prompted California to initiate an aggressive campaign to challenge the legitimacy of that move.

1    The FTB nevertheless argues that, under principles of comity, Nevada must give California

2  officials exactly the same immunity that it gives Nevada officials. But there is no such absolute

3  rule of comity, nor should there be.[559]  While equivalent treatment may sometimes be appropriate,

4  it is not appropriate in every case, and certainly not appropriate for the kind of sustained,

5  intentional misconduct at issue here. Indeed, if this Court granted California officials the identical

6  immunity that Nevada officials are accorded by statute – even though Nevada has no other effective

7  way to control the behavior of California officials – it would greatly lessen Nevada's ability to

8  protect its citizens against calculated attacks.

9    In arguing that California and Nevada officials should be subject to the same limitations on

10  damages, the FTB neglects a critical point: that is, in addition to damage awards, Nevada has direct

11  means of deterring and punishing wrongful behavior by Nevada employees – means that it lacks

12  with respect to employees of other States. For example, the Nevada Legislature has enacted a

13  broad range of measures to regulate the conduct of state employees, including provisions that

14  authorize dismissal of employees that abuse their positions. "An appointing authority may . . .

15  [d]ismiss or demote any permanent classified employee when he considers that the good of the

16  public service will be served thereby."[560]  A Nevada employee engaging in serious improper

17  behavior towards Nevada citizens thus would have to be concerned that, as a consequence, he or

18  she could be fired, not just made subject to a lawsuit. In addition, the Legislature has specified that

19  Nevada employees may be disciplined, with increasing degrees of severity, for other kinds of

20  unacceptable conduct.[561]

21    These legislative provisions have been supplemented by an extensive body of implementing

22  regulations. Those regulations subject Nevada employees to discipline for a wide-ranging series of

23  offenses, including "[a]ctivity which is incompatible with an employee's conditions of

24

25  _____

26  Indeed, there was evidence that the FTB has had a practice of targeting high-income, former California residents. *See* RT: April 24, 44:20-45:6, 141:5-13.

[559] *See* discussion, *infra*, at 154-58.

27  [560] *See, e.g.*, NRS 284.385.

28  [561] *See* NRS 284.383.

150

KARNUTZER CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0206

1  employment," "disgraceful personal conduct which impairs the performance of a job or causes

2  discredit to the agency," and "[d]iscourteous treatment of the public . . . while on duty."[562]  These

3  provisions, in turn, are enforced by Nevada officials exercising specific supervisory authority over

4  their subordinates.  Again, therefore, any Nevada employee necessarily carries out his or her job

5  with full awareness that any misconduct can be dealt with head-on by sanctions administered

6  within the Nevada personnel system.

7          These Nevada statutory and regulatory provisions give Nevada officials broad authority to

8  assure that proceedings against Nevada citizens are carried out responsibly, and in good faith,

9  without the sort of discriminatory targeting exemplified by this case.  For example, if employees of

10  a Nevada agency had sought to exact a settlement from Hyatt by grossly improper means – such as

11  threatening him with a further loss of privacy if he did not agree to their demands – their immediate

12  supervisors could have promptly intervened to prevent an abuse of government power.  Moreover,

13  if they found evidence of discriminatory animus by employees assigned to the case, more senior

14  Nevada officials could have undertaken a thorough review of the underlying dispute, ultimately

15  making their own determination about the merits of the government's claim and prohibiting any

16  efforts to prosecute a claim in bad faith.  These powers, reinforced by the disciplinary measures

17  discussed above, would give Nevada full sovereign capacity to correct ongoing misconduct and to

18  inhibit similar misconduct in the future.

19          The damage limits in NRS 41.035 do not stand alone, therefore, but must be seen in the

20  context of these other provisions.[563]  While the limits plainly safeguard the Nevada state treasury,

21  they also serve the broader purpose of helping Nevada to develop an honest and capable

22  workforce.[564]  All in all, therefore, the State of Nevada has sought to prevent improper behavior by

23

24

---

[562] *See* Nev. Admin. Code § 284.650.

[563] The legislative limitation on damages is, by its nature, a condition on Nevada's waiver of sovereign immunity in its own courts.  Not surprisingly, it does not apply to other States, which do not have sovereign immunity in Nevada courts.  *See Hall*, 440 U.S. at 414-21.

[564] *See Martinez v. Maruszczak*, 123 Nev. 433, 168 P.3d 720, 731 (2007) (limits "advanc[e] a legitimate state interest in encouraging qualified professionals to accept state employment to serve the people of Nevada").

151

RJN0207

1   Nevada employees through a number of complementary mechanisms: by attracting qualified

2   employees in the first place, by subjecting those employees to continuing oversight in the course of

3   their duties, by providing for discipline (including termination of employment) for wrongful acts,

4   and, finally, by limiting the damages awarded for their misconduct. No one method is intended to

5   be effective in and of itself; rather, the system is meant to operate as an integrated whole.

6        The relation of Nevada to officials of other States is very different. Because Nevada is

7   generally able to exercise sovereign powers only within its borders,[565] it has no legislative or

8   executive authority over employees of other States. As a consequence, although the FTB acted in a

9   lawless fashion for a number of years, the State of Nevada had no opportunity to review the FTB's

10   activities, much less to stop them before they caused greater harm. At all times, the FTB's

11   employees were under the sovereign authority of California, and all executive and legislative

12   oversight was exercised by California alone.

13        The authority of the State of California over the FTB certainly did little to shield Hyatt from

14   wrongful conduct. Far from condemning the behavior of FTB officials, and taking strong

15   corrective action, the State seems to have endorsed that behavior. Thus, while the jury in this case

16   plainly regarded the actions of the FTB as well beyond the bounds of legitimate government

17   conduct – indeed, so far beyond those bounds as to merit the strong sanction of punitive damages –

18   the FTB is still insisting that "[a]t worst, the FTB's conduct might be characterized as a zealous

19   effort to collect taxes."[566] This is a telling assertion. If the FTB sees nothing wrong with its

20   "zealous" conduct in Nevada, it presumably will have no incentive to avoid repeating that conduct,

21   especially if it can anticipate that, by virtue of comity, it will face only modest damages for doing

22   so.

23        We also note that the FTB's argument for limited damages is by no means restricted to its

24   conduct in this case, offensive as that conduct was. If accepted, it would mean that, no matter what

25   the FTB (or any other foreign State's agency) chose to do in Nevada, the damages to be paid could

26

27

28

---

[565] *See generally, Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 733 (1838).

[566] FTB Opening Brief, at 113.

never be more than $75,000 per occurrence. For example, California officials could intentionally disseminate false statements about Nevada citizens in Nevada newspapers, or freely distribute private confidential material to anyone of their choosing, all the while knowing that their conduct could be subject to only that relatively minimal restraint. Having purposefully abused its sovereign power, the State could nonetheless retreat behind the wall of that same sovereign power, insisting that it should not be seriously sanctioned because of principles of comity.

Full damages offer at least a partial defense to that kind of unrestrained misconduct. While damages are necessarily awarded after wrongful actions have taken place, they nevertheless provide a penalty for those actions and a strong dose of deterrence against repeated offenses. Thus, the Supreme Court has recognized that even compensatory damages serve to advance the critical goal of deterring tortious behavior. "Deterrence is also an important purpose of [the tort] system, but it operates through the mechanism of damages that are *compensatory* – damages grounded in determinations of plaintiffs' actual losses."[567] Especially where intentional torts are at issue, a potential wrongdoer is far more likely to refrain from unlawful conduct if he knows that he will be subject to full liability for the harm that he causes, rather than excused for just a fractional amount. And, of course, punitive damages can be awarded both to punish and to deter particularly extreme misbehavior. "Punitive damages are designed to punish and deter a defendant's culpable conduct and act as a means for the community to express outrage and distaste for such conduct."[568]

Under the FTB's "equal immunity" theory, however, these disciplining effects would largely be lost, even in cases of deliberate pervasive misconduct and severe harm. No foreign-State agency determined to extort a multi-million dollar tax settlement from a Nevada resident will be significantly discouraged by the prospect of paying a small damage award in the event that its efforts are successfully challenged. That is particularly true of an agency like the FTB, which has become accustomed to operating with complete immunity in its home state.[569] In the absence of

---

[567] *See, Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306 (1986).

[568] *See, e.g., Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 252 (Nev. 2008).

[569] *See* California Govt. Code § 860.2.

KAMZ FER CROWELL RENSHAW GRONAUER & FIORENTINO

1    direct legislative and executive authority over FTB officials, therefore, the threat of sizeable

2    damage awards is the only effective means of deterrence available to the State of Nevada.

3         In short, the problem with the FTB's "equal immunity" theory is that the State of Nevada

4    stands in a different position with respect to FTB officials than it does with respect to Nevada

5    officials. Whereas a certain level of immunity may be justified for intentional torts committed by

6    Nevada officials, it would be directly contrary to Nevada's sovereign interest in protecting its

7    citizens to apply the same limitations to intentional torts by officials from other States, when

8    Nevada has no authority to correct and deter their deliberate misconduct by other means. Nothing

9    in the comity doctrine compels Nevada to act in a manner that would subordinate its own legitimate

10   interests.

11        **4.    A sovereign is not required to give "equal treatment" to other
               sovereigns.**

12        The FTB argues that the doctrine of comity has been understood to require complete

13   equality among States.[570] But that assertion is insupportable. Many courts, including the Supreme

14   Court, have expressly acknowledged that there is a distinction between the absolute sovereignty of

15   a State within its own territory and the non-sovereign status of a State outside of that territory. That

16   fundamental distinction means that States are generally entitled to treat themselves more favorably

17   than other States within their borders, and States, in fact, often provide advantages for themselves

18   that they do not extend to foreign States.

19        To take one example: States commonly provide that interest from their state debt

20   obligations will be exempt from their own state taxes, although they provide no exemption for

21   bonds issued by other States. That taxation scheme plainly does not follow a principle of equal

22   treatment, but the Supreme Court nevertheless has upheld such favoritism, finding that it was

23   justified by the fact that the taxing State is sovereign within its borders, whereas other States are

24   not. In *Department of Revenue of Kentucky v. Davis,*[571] the Court noted that it had drawn that same

---

[570] *See* FTB Opening Brief, at 32-33.

[571] 128 S.Ct. 1801 (2008).

154

KARNEZER CROWELL RENSHAW CRONAUER & FIORENTINO

1    distinction between States in a much earlier case,[572] determining "that a foreign State is properly

2    treated *as a private entity* with respect to state-issued bonds that have traveled outside its

3    borders."[573]  Consequently, it concluded that the differential tax policy was permissible because the

4    taxing State was not in a "substantially similar" position to other States with respect to the bond

5    obligations held by its citizens.[574]

6           Likewise, it has long been recognized that a State need not exempt real or personal property

7    owned by another State from taxation, even though it has chosen to exempt its own property.[575]

8    Dismissing a claim that other States should be entitled to a comparable exemption, the Kansas

9    Supreme Court in *Holcomb*, like the Supreme Court in *Bonaparte*, reasoned that, "[w]hen a state . .

10   . comes within the boundaries of another state, it does not carry with it any of the attributes of

11   sovereignty and is subject to the laws of such other state the same as any other proprietor." *Id.*

12   Indeed, following that principle, the Nevada Legislature has itself drawn a distinction between

13   taxation of Nevada's own property and property owned by other States, specifying that "[a]ll lands

14   and other property owned by the State are exempt from taxation [except certain lands assigned to

15   the Department of Wildlife],"[576] without establishing an equivalent exemption for other States'

16   lands and property.  If comity required equal treatment between States under all circumstances,

17   however, as the FTB suggests, Nevada would be forced to exempt any property owned by

18   California within the State, despite the fact that California has no sovereign standing in Nevada.

---

[572] *See Bonaparte v. Tax Court*, 104 U.S. 592 (1892).

[573] 128 S.Ct at 1811 (emphasis added).  The Court in *Bonaparte* reached that conclusion even though it acknowledged that the denial of a tax exemption for bonds issued by a foreign State could raise the rate at which it was forced to borrow.  *See* 104 U.S. at 595.

[574] Finding that the Constitution – in particular, the Full Faith and Credit Clause – did not require States to exempt foreign States' bonds, the Court in *Bonaparte* stated plainly that "the [taxing] States are left free to extend the comity which is sought, or not, *as they please.*" 104 U.S. at 595 (emphasis added).  As it has turned out, comity has not, in fact, been the norm:  as we have noted, most States exempt their own bonds, but not bonds of other States, from taxation.

[575] *See, e.g., State v. Holcomb*, 116 P. 251 (Kan. 1911); *State v. City of Hudson*, 42 N.W. 2d 546, 548 (Minn. 1950); *Warren County, Miss. v. Hester*, 54 So.2d 12 (La.1951).  *See also Hall v. Nevada*, 8 Cal.3d 522, 524, 105 Cal. Rptr. 355, 357 (Cal. Ct. App. 1972) (endorsing *Holcomb*).

[576] *See*, NRS 361.055 (1).

155

KADNER CROWELL RENSHAW GRONAUER & FIORENTINO

The cases cited by the FTB are not to the contrary.[577]  None of those cases holds that equal treatment between the host State and a foreign State is mandatory.  At most, they conclude that, under the particular circumstances in question, it would not be contrary to the interests of the host State to grant equivalent treatment.  Indeed, far from saying that equal treatment is required as a matter of comity, the various State courts typically make a point of declaring that there is no obligation to extend comity at all if it would conflict with home-state interests.[578]

It is also significant that none of the cases relied on by the FTB involved the kind of sustained intentional misconduct at issue in this case, where the need for enhanced deterrence is especially pronounced.  To the contrary, both *Hansen* and *Sam* involved claims of mere negligence, while a third cited case involved only a garden-variety product liability suit.[579]  Even the two cases that do raise charges of intentional behavior involve allegations that fall well short of the widespread abuse of government power found by the jury here.[580]

Even more importantly, the FTB neglects cases that have expressly rejected the "equal immunity" argument.  Most notably, the Alabama Supreme Court declined to grant immunity to the University of Tennessee as a matter of comity, noting, as this Court did in *Mianecki*, that "[i]n determining whether to apply comity, we must remain sensitive to the rights of our own citizens and our duties and obligations to them.[581]  Although the University of Tennessee had argued that it should receive the same immunity enjoyed by Alabama universities, the Alabama court found that the agencies of the two States were not in the same relative position vis-à-vis the State of Alabama:

---

[577] *See* FTB Opening Brief, at 32.

[578] *See, e.g., Hansen v. Scott*, 687 N.W.2d 247, 250 (N.D. 2004) ("[a] primary concern is whether the forum state's public policies will be compromised if comity is applied"); *Sam v. Sam*, 134 P.3d 761, 767 (N.M. 2006) (extending comity not appropriate "if doing so would undermine New Mexico's own public policy").

[579] *See Schoeberlein v. Purdue University*, 544 N.E.2d 283, 288 (Ill. 1989).

[580] *See Solomon v. Supreme Court of Florida*, 816 A.2d 788 (D.C. 2002) (defamatory statements at a single meeting, causing no harm in the forum State); *McDonnell v. State of Illinois*, 748 A.2d 1105 (N.J. 2000) (discrimination on the basis of age).We note that, in *McDonnell*, the New Jersey court ultimately *declined* to extend comity to Illinois, concluding that it would be contrary to the public policy of New Jersey.  *See* 748 A.2d at 1108.

[581] *Faulkner v. University of Tennessee*, 627 So.2d 362, 366 (Ala. 1992), *cert. denied*, 510 U.S. 1101 (1994).

RJN0212

1   "Agencies of the State of Alabama are subject to legislative control, administrative oversight, and

2   public accountability in Alabama; UT is not."[582]  The court concluded by emphasizing that,

3   whereas "[a]ctions taken by an agency or instrumentality of this state are subject always to the will

4   of the democratic process in Alabama," the University of Tennessee "operates outside such controls

5   in this State."[583]

6          Finally, the FTB fails to note that a strict "equal immunity" rule would often result in very

7   *unequal* treatment for States beyond their own borders, as the decision in *Nevada v. Hall* readily

8   demonstrates.  There, the State of Nevada was held to be subject to unlimited damages for a traffic

9   accident in California – even though there was a cap on damages under Nevada law – because it

10  was treated just as California would have been under the uncapped California law.[584]  Yet if

11  California were involved in an identical accident in Nevada, the FTB's theory would mean that

12  California could claim the benefit of the Nevada statutory cap, thereby limiting its own out-of-state

13  exposure to a modest level of damages.  As the FTB sees "equality," therefore, Nevada would be

14  subject to much greater liability for accidents in California than California would face for accidents

15  in Nevada.

16         There is, of course, a pronounced irony in the fact that the FTB now seeks to take advantage

17  of a Nevada damages limitation that the California courts refused to apply to Nevada officials, even

18  though the statute was specifically written to protect the latter and not the former.  And, while this

19  odd turnabout is said to be in aid of comity between the two States, it is not at all clear that the

20  California courts would demonstrate the same degree of comity if the positions were reversed – that

21  is, if the question were whether the California courts should apply California immunity statutes to

22  officials of other States.  The FTB cites no case in which the California courts have ever done so,

23  and the language of the various California immunity statutes applies solely to California officials.

24  Indeed, the only basis for positing equal treatment by California seems to be the *Hall* case, where

25

26  _____

27  [582] *Id.* at 366.

    [583] *Id.  See also Bowden v. Lincoln County Health System*, 2009 WL 323082 (11th Cir. 2009).

28  [584] *See* 440 U.S. at 426.

1   the result of such treatment was not a grant of immunity for Nevada, but rather the exposure of

2   Nevada to unlimited liability.[585]

3        At bottom, our position is not that Nevada should never extend equal immunity to a sister

4   State as a matter of comity, only that the decision necessarily depends upon the particular

5   circumstances.  Here the circumstances argue strongly against such treatment.  The facts show,

6   *first,* that the FTB engaged in a long and calculated campaign against a Nevada citizen, with little

7   regard for the boundaries established by Nevada law, and, *second,* that Nevada has no ready means

8   – other than significant damage awards – of sanctioning that behavior or of deterring its repetition

9   in the future.  Nevada cannot take direct action against the offending employees, and the FTB's

10  resolute position – even in the face of the jury's verdict – is that its conduct amounted to nothing

11  more than "zealous" tax collection, indicating that California itself is unlikely to take any direct

12  action, either now or later.  To allow the FTB to escape the full consequences of its actions,

13  therefore, would be contrary to Nevada's legitimate interest in protecting its own citizens, and the

14  FTB's request for comity should be denied.

15       **5.    The FTB's other immunity arguments are without merit.**

16       Quite apart from comity, the FTB makes several other "equal immunity" arguments,

17  claiming that the extension of such immunity is required by the Full Faith and Credit Clause, the

18  law of the case doctrine, and the judicial estoppel doctrine.  None of these arguments is correct.

19       **a.    Full Faith and Credit.**

20       The FTB and its amici try to revive their previously unsuccessful Full Faith and Credit

21  argument by contending that, if this Court declines to extend equal immunity to the FTB, it would

22  be exhibiting impermissible "hostility" to California law.[586]  But there is nothing hostile about a

23  _____

24  [585] If the States wish to accord each other equivalent immunity, the doctrine of comity is not the only avenue
     to do so.  Most directly, they can arrange by agreement to provide a specified measure of immunity, on a

25   reciprocal basis, as States are free to do so.  *See, e.g., New Hampshire v. Maine,* 532 U.S. 742 (2001)
     (upholding agreement regarding boundaries).  That approach would have the added benefit of assuring

26   legislative and executive involvement within the two States.

27  [586] It is not clear just what California law the FTB is talking about.  Nothing in California law caps damages
     awarded against the FTB at a specific amount.  California does have a statute giving the FTB total

28   immunity for certain actions (in effect, a cap of zero), *see* Cal. Govt. Code § 860.2, but this Court rejected
     the FTB's attempt to claim the shield of that statute for its intentional torts, and the U.S. Supreme Court

RJN0214

1  decision by a forum State to apply its own law, provided that it has the requisite legislative

2  jurisdiction over the parties.  The Supreme Court has set forth the basic rule that "[t]he Full Faith

3  and Credit Clause does not compel a state to substitute the statutes of other states for its own

4  statutes dealing with a subject matter concerning which it is competent to legislate."[587]  And, in the

5  earlier appeal of this case, the Court already found that "[t]he State of Nevada is undoubtedly

6  'competent to legislate' with respect to the subject matter of the alleged intentional torts here,

7  which, it is claimed, injured one of its citizens within its borders."  538 U.S. at 494.  In electing to

8  apply Nevada law, therefore, this Court would be doing no more than it is constitutionally entitled

9  to do.

10      Moreover, even if legislative jurisdiction alone were not enough to justify a State's choice of

11  its own law, the FTB's argument would still fail.  For it is absolutely clear that "the Full Faith and

12  Credit Clause does not require a State to apply another State's law in violation of its own legitimate

13  public policy."[588]  Put another way, nothing in the Full Faith and Credit Clause mandates a

14  presumption that, when two States have overlapping legislative jurisdiction, the forum State must

15  defer to the law of the other State, even if that course of action would be adverse to its own

16  interests.  As Chief Justice Stone once observed, a contrary rule "would lead to the absurd result

17  that, whenever the conflict [between the laws of two States] arises, the statute of each state must be

18  enforced in the courts of the other, but cannot be in its own."[589]

19      Here, as we have discussed,[590] it would be harmful to Nevada's sovereign interests to apply

20  the Nevada damages cap to out-of-state officials.  Thus, even if this Court were somehow to treat

21

22

23  affirmed.  In effect, therefore, the FTB is really arguing that Nevada should apply *its* law capping damages to California as well as to Nevada.  That is not comity – comity is when the forum state applies a sister state's own laws to the sister state – instead of applying the forum state's law.  Here, California wants the same protection Nevada gives itself.

24

25  [587] *Baker v. General Motors Corp.*, 522 U.S. 222, 232 (1998), quoting *Pacific Employers Ins. Co. Industrial Accident Comm'n*, 306 U.S. 493, 501 (1939); *see also Sun Oil v. Wortman*, 486 U.S. 717, 722 (1988) (same).

26

27  [588] *Hall*, 440 U.S. at 422.

[589] *Alaska Packers Ass'n v. Industrial Accident Comm'n*, 294 U.S. 532, 547 (1935).

28  [590] *See* discussion, *supra*, at 146-154.

159

KARNOPP CROWELL RENSHAW GRONAUER & FIORENTINO

RJN0215

1  that cap as part of California law, *but see* footnote 586 *supra*, it would not be a hostile act for

2  Nevada to decline to apply it.

### b.    Law of the Case.

4  The FTB also contends that the applicability of the Nevada damage limits has been settled

5  by the prior decision of this Court and is now law of the case. But that assertion rests on both a

6  misunderstanding of the law of the case doctrine and a misreading of the prior history of the case.

7  The law of the case standard is a demanding one. As this Court recently pointed out,

8  "[u]nder the law of the case doctrine, when an appellate court decides a rule of law, that decision

9  governs the same issue in subsequent proceedings. . . . The doctrine *only applies to issues*

10  *previously determined*, not to matters left open by the appellate court."[591]  It is not enough,

11  therefore, that a prior decision may have addressed related, but different, questions, or that an issue

12  could have been addressed at that earlier time. Rather, "[a]bsent the necessary implication that an

13  issue was presented, considered, and deliberately decided, it does not become law of the case and

14  therefore does not bind the lower court on remand."[592]

15  The FTB cannot come close to meeting this test. With respect to the specific legal question

16  at issue here -- that is, whether California officials are entitled to partial immunity, measured by the

17  Nevada damage caps -- it is utterly clear that the FTB did not present the issue, that this Court did

18  not consider it, and that this Court did not decide it. This lack of attention is hardly surprising, of

19  course, because, in the earlier appeal, the FTB was claiming that this Court had to apply

20  California's *total* immunity statute. Having chosen to press that legal issue, the FTB can hardly

21  argue now that the Court really decided some other issue not before it.

22  The FTB's argument would be equally off-base, even if the "law" at issue is thought to be

23  the more general law of comity. With respect to the intentional tort claims that were the basis of

24  the judgment below, this Court's prior decision said only that comity did not require their dismissal,

26  [591] *Wheeler Springs Plaza, LLC v. Beemon*, 119 Nev. 260, 266, 71 P.3d 1258, 1262 (2008) (emphasis added).

27  [592] *Sherman Gardens Co. v. Longley*, 87 Nev. 558, 565, 491 P.2d 48, 53 (1971). *See also Breliant v.*
28  *Preferred Equities Corp.*, 112 Nev. 663, 667, 918 P.2d 314, 317 (1996) ("[a] principle or rule of law becomes the law of the case only if it is necessary to the appellate court's decision.")

160

without addressing in any way whether comity might somehow justify a limitation on damages. As for a binding requirement of "equal immunity": while it is true that the Court did refer to the immunity of Nevada officials in deciding how to deal with the various claims against the FTB, it is equally true that the Court never made any legal determination that equal immunity would be mandatory in all circumstances, even if such immunity would be adverse to Nevada's sovereign interests. Rather, it simply made a broad determination about each category of claims, deciding only whether allowance or dismissal of the claims as a whole would be consistent with Nevada's state policy. That is precisely the kind of balancing that the Court now must undertake with respect to the distinct issue of whether to apply Nevada's damage caps to the FTB, and it remains an open question that has not been previously "presented, considered, and deliberately decided" by this Court.[593]

There is likewise nothing in the prior United States Supreme Court opinion that would lock this Court into any particular view of how to apply the doctrine of comity to claims of partial immunity. Most of the opinion was devoted, not to comity at all, but to the FTB's argument that the Full Faith and Credit Clause required Nevada to honor California's statutory immunity. The only reference to comity came at the end, when the Court merely observed that it was "not presented here with a case in which a State has exhibited a "policy of hostility to the public Acts" of a sister State,"[594] pointing out that "[t]he Nevada Supreme Court sensitively applied principles of comity with a healthy regard for California's sovereign status, relying on the contours of Nevada's own sovereign immunity from suit as a benchmark for its analysis."[595]

Plainly enough, the Court was not, just by noting what this Court had already done, ordering Nevada to give California equal immunity in the future, or even suggesting that it would be "hostile" for the State not to do so. Nor would it have made any sense for the Court to create such a fixed rule: because the granting of comity is entirely voluntary,[596] a State must always be able to

---

[593] *Sherman Gardens Co.*, 87 Nev. at 565, 491 P.2d at 53.

[594] 538 U.S. at 499.

[595] *Id.*

[596] *See* discussions, *supra*, at 146-149.

161

KAMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

take into account the potential harm to its citizens that would result from extending comity in any particular situation. It is thus entirely reasonable for a forum State to recognize that, while equal treatment between States may sometimes be called for, that kind of treatment may, at other times, be a serious disservice to its own public policy. The Supreme Court did not say otherwise in its opinion.

### c. Judicial Estoppel.

Finally, the FTB makes a judicial estoppel argument, saying that Hyatt cannot now argue against equal immunity for the FTB because he previously said that it was required. But, to establish the necessary grounds for estoppel, the FTB would have to show an argument by Hyatt to the effect that an enforceable rule of comity obligated States to give the same immunity to other States as they do to themselves, regardless of whether it was in their interests to do so. In fact, Hyatt repeatedly argued that no such obligation exists. There is thus no basis for judicial estoppel.

The record is unequivocal on this point. Although Hyatt pointed out that this Court had first looked to Nevada's own immunity in deciding what immunity initially to accord the FTB, he did not say – and the FTB conspicuously does not cite any evidence of him saying – that Nevada was required to do so. To the contrary, before the United States Supreme Court, Hyatt's counsel stated no less than five times that any such decision was entirely up to the Nevada courts in the exercise of their discretion and was not in any way a matter of federal obligation, constitutional or otherwise.[597] In short, Hyatt argued again and again just what he is arguing now: that it is entirely up to the Nevada courts to decide how much, if any, immunity to give to the FTB as a matter of comity. The FTB's estoppel argument, therefore, is baseless.

### G. Punitive damages were properly allowed.

Punitive damages play an important role in sanctioning egregiously wrongful conduct and

---

[597] *See* 6 AA 1458 ("I don't think that there is a federally enforceable law of state comity"); 6 AA 1469] ("comity is . . . not federal [sic] enforceable"); 6 AA 1475 ("there's no federally enforceable state law of comity"); 6 AA 1476 ("Q. Is – is the question of comity one that has a federal component so that this Court should weigh in on when it has to be exercised? A. I don't believe so. It's state versus state, Justice O'Connor"); 6 AA 1476 ("there is a jurisprudence of this Court with respect to federal and state relations which does depend on comity, and that is, of course, federally enforceable. I don't believe that there is a concomitant enforceable doctrine . . . state to state")

1   in assuring that it is not repeated.  As this Court has observed, "[p]unitive damages provide a means

2   by which the community, usually through a jury, can express community outrage or distaste for the

3   misconduct of an oppressive, fraudulent or malicious defendant and by which others may be

4   deterred and warned that such conduct will not be tolerated."[598]  Consequently, the Nevada

5   Legislature has expressly provided for awards of punitive damages in especially serious cases.

6   Pursuant to NRS 42.005, a jury may choose to award punitive damages whenever the plaintiff has

7   proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or

8   malice, whether express or implied.

9       The FTB argues however, that it must be given immunity from punitive damage awards

10  because Nevada state agencies (though not foreign State agencies) have been granted such

11  immunity by statute.[599]  As we have previously discussed, however, the FTB does not stand in the

12  same position as Nevada state agencies.[600]  The only mechanism available to Nevada for deterring

13  and punishing rogue out-of-state agencies – when they have engaged in bad-faith conduct and

14  committed intentional torts that injure Nevada residents – is through damages awards, both

15  compensatory and punitive.  By contrast, Nevada need not impose damages on its own agencies in

16  this fashion, because Nevada agencies are subject to, and controlled by, the Nevada executive and

17  legislative branches.[601]  Here, the jury determined, based on proper instructions from the District

18

19  [598] *Ace Truck & Equip. Rentals, Inc. v. Kahn*, 103 Nev. 503, 506, 746 P.2d 132, 134 (1987).  *See also*
20  *Countrywide Home Loans, supra*, 192 P.3d at 252; *Bongiovi v. Sullivan*, 122 Nev. 556, 580, 138 P.3d 433,
    450 (2006); *Siggelkow v. Phoenix Ins. Co.*, 109 Nev. 42, 45, 846 P.2d 303, 305 (1993).

21  [599] *See* NRS 41.035(1).

22  [600] *See* discussion, *supra*, at 149-158.

23  [601] The *Amicus Curiae* brief of the Multistate Tax Commission argues on page 22, citing *BMW of North
    America, Inc. v. Gore*, 517 U.S. 559 (1996), that punitive damages are not allowed because the FTB's
24  conduct was legal under California law.  Also, the State of Utah's *amicus* argues that Nevada cannot apply
    its tort law "to lawful activities taken by FTB pursuant to California law and engaged in within the State of
25  California."  Utah et al. Amicus Br. at 8.  But nothing in *Gore* bars Nevada from applying its law to the
    tortious conduct at issue here.  In *Gore*, the Supreme Court simply noted that "Alabama does not have the
26  power . . . to punish BMW for conduct that was lawful where it occurred *and that had no impact on
    Alabama or its residents*," 517 U.S. at 572-73 (emphasis added), further noting that "Alabama [may not]
27  impose sanctions on BMW in order to deter conduct that is lawful in other jurisdictions."  *Id.* at 573.  Here,
    the jury did not attempt to punish or deter FTB activities having no effect beyond California's borders:
28  rather, it imposed a sanction solely for conduct having a direct (and fully intended) impact on a Nevada
    resident and sought to deter a repetition of such conduct against Nevada residents in the future, both of

163

KAMSTETER CROWELL RENSHAW GRONLARKE & FIORENTINO

1    Court, that the extraordinary deliberate misbehavior of the FTB warranted punitive damages.

2         The FTB also argues that it is exempt from punitive damages awards because "the common

3    law does not permit punitive damages to be assessed against a government agency or entity, unless

4    statutory authorization exists."[602]  But this argument is faulty for a number of reasons.  To begin

5    with, "statutory authorization" *does* exist for the award in this case.  NRS 42.005 authorizes

6    punitive damage awards against any "defendant" in specified actions, without making an exception

7    for government defendants.  And while NRS 41.035 provides that Nevada state agencies are not

8    liable for punitive damage awards, that statutory provision does not apply to agencies of foreign

9    States.  Indeed, the exemption for Nevada state defendants in NRS 41.035 would be unnecessary if

10   the provisions of NRS 42.005 permitted punitive damages only against individual defendants.

11        The various immunity statutes from other States are likewise beside the point.[603]  None of

12   the cited statutes expressly exempts officials of *foreign* States from punitive damage awards.

13   Rather, they explicitly, or by logical implication, provide immunity only to officials of the *home*

14   State, just as the Nevada statutes do.[604]  That distinction between domestic and foreign state

15   officials, of course, is fully in keeping with the fundamental principle that a State has full sovereign

16   powers within its own borders, but does not carry attributes of sovereignty into another State.[605]

17

18

19

---

20   which it was fully entitled to do under the principles established in *Gore*.  In addition, *Gore* was addressing
     a state's power or supervision over another state when "the welfare and health of its own citizens may be
21   affected when they travel to that State." *Id.*, at 572.  In this case, it was the FTB's tortious conduct that took
     place in, or that was directed into, Nevada.  This case has nothing to do with Hyatt traveling to California.
22   Moreover, it is irrelevant that the FTB's conduct is purportedly "legal" in California.  In point of fact, the
     FTB conduct is not so much legal but rather the FTB has immunity in California to engage in bad faith acts
23   and commit intentional torts.  The key distinction is that in California, citizens can seek the aid of the
     legislative and executive branches to reign in a rogue agency.  Punitive damage awards are the only
24   measure of control Nevada has to address and seek change in out of state agencies that engage in bad faith
     conduct directed into Nevada against a Nevada resident.
25
     [602] FTB Opening Brief, at 109.
26
     [603] *See* FTB Opening Brief, at 111 n. 84 (citing statutes).
27
     [604] *See, e.g.*, Ala. Code § 6-11-26; Mont. Code Ann. § 2-9-105; N.J. Stat. Ann. § 59:9-2(c); Texas Code
     Ann. § 101.024.
28
     [605] *See* discussion, *supra*, at 149-158.

                                                     164

KARNUTER LIDDALL RENSHAW CAROMAUER & FORRETTINO

RJN0220

1.   **The federal common law cited by the FTB does not govern this case nor address Nevada's public policy interests in assessing punitive damages in this case.**

To support its claim for immunity from punitive damages, the FTB relies heavily on *City of Newport v. Fact Concerts, Inc.,*[606] a case involving a claim under Section 1983 of the federal civil rights law.[607] But that case is of little help to the FTB. First of all, the decision in *City of Newport* turned solely on a question of congressional intent: that is, whether Section 1983 is properly interpreted to authorize punitive damages against a municipality. In holding that Congress did not intend that outcome, the Court had no reason to consider – and did not consider – whether a State, applying its own state law, could allow punitive damages for bad-faith, oppressive, fraudulent, or malicious conduct directed at one of its citizens by a sister State.

The FTB also ignores an important aspect of *City of Newport*: that the Court, while overturning the punitive damages awarded under *federal* law, did not disturb a related award of punitive damages under *state* law. As the Court made clear, the plaintiff in that case had "sought compensatory and punitive damages against the city and its officials under 42 U.S.C. § 1983 and under two pendant state-law counts . . . ," and "[t]he jury assessed 75% of the punitive damages upon the § 1983 claim and 25% upon the state-law claim."[608] The Court expressly declared that it was "not address[ing] the propriety of the punitive damages awarded against [the City] under Rhode Island law."[609] Thus, the decision in *City of Newport* does nothing to discredit the essential understanding that state courts may award punitive damages against government agencies and officials, provided that they are authorized by state law.[610]

_____

[606] 453 U.S. 247 (1981).

[607] *See* 42 U.S.C. § 1983.

[608] 453 U.S. at 252-53 n.6.

[609] *Id.*

[610] The *Amicus Curiae* brief of the Multistate Tax Commission argues on page 19 that Nevada law requires allegations that a particular employee acted in a manner supporting an award of punitive damages and that the employer must have knowledge of the employee's unfitness to sustain an award of punitive damages. First, the Multistate Tax Commission cites to law not applicable here. This is not a vicarious liability case. This is a direct liability case in which the FTB's actions as a whole, as engaged in by multiple employees and supervisors, was found to warrant punitive damages. Secondly, even if the Multistate Tax Commission's view of the law is applied, there was substantial evidence that the FTB was well aware of the

165

KAMFFER CROWELL RENSHAW CRONAUER & FIORENTINO

The FTB asserts that the decision in *City of Newport* stands for the twin propositions that punitive damages are an ineffective means of deterring government employees from engaging in misconduct and taxpayers should not have to pay for punishment intended for the misbehaving government agency. But, in the end, these issues are questions of policy that, under our federal system, each State is free to answer for itself. No principle of federal law restricts the State of Nevada from deciding that punitive damages are a necessary deterrent to extreme misconduct by out-of-state tax officials, especially considering the lack of available alternatives. Furthermore, it is notable the decision in *City of Newport* involved misconduct by a municipality, a governmental entity that is subject to the State and its legislative and executive branches, and thus can be reigned in by its sovereign without the additional sanction of punitive damages. That is not the case when one State commits torts in a sister State or intentionally directs tortious activity into that State.

### 2. Other states do not limit damages against out of state agencies.

As discussed above, the *Faulkner* case and the *Bowden* case stand for the proposition that states do not limit damages imposed against a sister state as that is the only manner in which a state may regulate and control the conduct of a sister state.[611] The same principle applies to punitive damages.

### 3. Federal law provides for an award of punitive damages under the circumstances of this case.

Finally, we note that the very conduct in this case would be the basis for an award of punitive damages under federal law. Under Section 7431(c)(1)(B)(ii) of the United States Code,

---

misconduct of the most significant perpetrator of the bad faith acts at issue in the case. By way of example, Candace Les testified that she complained to FTB supervisors about lead auditor Cox's treatment of Hyatt — an "obsession" according to Les — and that no adequate investigation was conducted of this complaint. (RT: April 23, 167:6-17; April 24, 134:1-12) Also, documentary evidence established that Cox's supervisor, Paul Lou, praised her one-sided audit and directed her to emphasize the "California ties" (93 AA 23122), and thereby disregarding any evidence contrary to the predetermined conclusion expected by the FTB. Further, high ranking members of FTB management received the Embry memo questioning whether there "enough substantiation" to assess Hyatt on a residency theory *within weeks* of the FTB nonetheless assessing Hyatt millions dollars in taxes and penalties on that very same residency theory. (54 AA 13315-13319; 84 RA 020865-020904) Large, record setting proposed assessments were not issued without significant layers of review within the FTB. Even this sample of evidence from trial established that the FTB was on notice of the very conduct for which the jury awarded punitive damages.

[611] *See Faulkner*, 627 So.2d at 366; *Bowden*, 2009 WL at *3-*4.

166

the Internal Revenue Service may be liable for punitive damages when it acts willfully or with gross negligence in disclosing taxpayer information.[612]  In other words, the same repugnant conduct engaged in by the FTB, if it were engaged in by the IRS, would expose the IRS to punitive damages.  Given that fact, it is hardly unreasonable for Nevada to allow punitive damages to be assessed against a foreign tax agency under Nevada's own punitive damages statute.

## H.  The jury's award of punitive damages was not excessive and should not be reduced.

The FTB's argument that the jury's award of punitive damages should be reduced because it was excessive is a request for the Court to substitute its judgment for that of the jury.  There is no basis for the Court to do so.  The FTB cites to the three guideposts specified by the United States Supreme Court in *State Farm Mutual Automobile Insur. Co. v. Campbell*[613] for determining whether a jury's award of punitive damages was constitutionally excessive:  (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of the punitive damage award to the actual harm inflicted on the plaintiff; and (3) how the punitive damages award compares to other civil or criminal penalties.[614]  This Court adopted the same test in *Bongiovi v. Sullivan,*[615] thereby replacing a similar but not identical test to conform Nevada law to federal law.[616]  Applying those standards, the jury's verdict should be upheld.

### 1.  Reprehensibility.

The reprehensibility of the defendant's conduct is the "most important indicium of the reasonableness" of a punitive damages award.[617]  In evaluating this factor, courts are to consider, among other things, whether the conduct involved repeated (i.e., ongoing) actions or an isolated

---

[612] *See* IRS Code § 7431(c)(1)(B)(ii); *Ward v. United States*, 973 F. Supp. 996, 1002 (D. Colo. 1997); *Malis v. United States*, 87-1 USTC § 9212 (C.D. Cal. 1986); *see, e.g., Mallas v. United States*, 993 F.2d 1111, 1126 (4th Cir. 1993) (allowing award of punitive damages against IRS even if taxpayer's actual damages were zero).

[613] 538 U.S. 408 (2003).

[614] *Id.*, at 409-11 (*citing BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996).

[615] 122 Nev. 556, 138 P.3d 433 (2006).

[616] *Id.*, at 451-52.

[617] *Gore*, 517 U.S. at 575.

167

RJN0223

1  incident and whether the harm resulted from "intentional malice, trickery, or deceit, or mere

2  accident."[618]

3      The reprehensibility of the FTB's conduct — explained in detail in the Statement of Facts

4  section above — shows that a strong penalty is warranted.  Moreover, it is notable that, having

5  engaged in extraordinarily offensive behavior, the FTB nonetheless has repeatedly refused to accept

6  that its actions were wrong and should not be repeated.  To the contrary, the FTB continues to insist

7  that its behavior was not so bad ("[a]t worst, FTB's conduct might be characterized as a zealous

8  effort to collect taxes")[619] and that it did not lead to any "verifiable damage to Hyatt."[620]  That is not

9  at all what the jury found, however, and the evidence overwhelmingly supports the jury's verdict.

10      **a.    The offending conduct lasted over a decade.**

11      First of all, the misconduct engaged in by the FTB was not just a one-time incident.  Rather,

12  the FTB engaged in a long-running, deceitful bad faith audit and protest process that it deliberately

13  refused to end so that Hyatt could pursue an appeal with due process rights, which he sought in

14  order to clear his name.  During this time, the FTB sought to take advantage of Hyatt's

15  acknowledged sensitivities to privacy and confidentiality by bombarding persons with any remote

16  connection to Hyatt with his private information, hoping, even offering, to induce settlement.

17  Then, for almost a decade, its *Litigation Roster* disseminated the false representation that Hyatt had

18  been adjudged a tax cheat, and even asserted that he committed tax fraud, when in fact the FTB

19  itself had made no final determination on these issues.

20      Hyatt lived with this ordeal for over a decade, in fact for 15 years if the audit period is

21  included.  As the evidence of multiple witnesses demonstrated, Hyatt suffered over a decade of

22  emotional distress that increased seemingly exponentially over that time.  He was called a fraud and

23  has had to live with that embarrassment while fighting to clear his name – a fight that the FTB

24  would not let him pursue for over a decade by its withholding of a final action.  The FTB destroyed

25  Hyatt's creative and scientific determination when he had been at the peak of his profession.  It

---

[618] *State Farm* 538 U.S. at 409.

[619] FTB Opening Brief, at 113; *see also Id.* ("[i]n sum, FTB conducted an audit, nothing more").

[620] FTB Opening Brief, at 112.

KARNSTEIN CROWELL RENSHAW GRONAJER & FIORENTINO

1  irreparably harmed his personal relations with friends and adversely affected relations with family

2  members. His physical well-being substantially deteriorated from the constant stress of being

3  under the FTB's thumb. He saw the proposed assessment growing to more than $50 million,

4  increasing at a rate of more than $8,000 per day, plus the 50% interest penalties for refusing the

5  FTB's so-called amnesty offer, when in fact the alleged original taxes assessed were *only* $7 million

6  (including the taxes assessed on income earned after Hyatt moved to Nevada, by even the FTB's

7  own reckoning).[621]

8      **b.**    **The offending conduct was deceitful bad faith.**

9      Further, the FTB's conduct was intentionally malicious and deceitful bad faith conduct by

10  government actors. FTB's lead auditor said she was going to "get" Hyatt and called him "a Jew

11  Bastard."[622] She told Hyatt's bitter ex-wife, just prior to writing the Determination Letter, that he

12  "was convicted."[623] The evidence also established that the FTB's lead reviewer of the audit

13  disagreed with the FTB's residency case against Hyatt, even stating *in writing* that she did not know

14  how the FTB could maintain a case against Hyatt for the entirety of 1991 or at all for 1992.[624]

15  Other FTB internal documents established that the FTB's reviewers and supervisors were well

16  aware of the weakness of the FTB's tax assessment against Hyatt on a residency theory and openly

17  pursued other bases to tax Hyatt's wealth, though they could not find any.[625] While the weakness of

18  the FTB's case was being documented in an internal memo, the lead auditor was simultaneously

19  preparing, and then sending to Hyatt, a letter asserting not only that taxes were owed, but that there

20  was "clear and convincing" evidence so a fraud penalty would also be assessed.[626]

21      The FTB argues that, if California (i.e., the California Board of Equalization and then

22  possibly the California judicial system) ultimately finds that Hyatt owes taxes, then the FTB's

23

---

24  [621] RT: May 12, 59:7-60:15, 95:15-109:13; May 19, 22:17-32:1; June 18, 25:9-28:4, 45:3-48:4, 74:10-75:6; 54 AA 13326-13329, 13404-13406.

25  [622] RT: April 23, 165:12-17.

26  [623] RT: May 20, 140:14-17.

27  [624] 54 AA 13325.

    [625] 84 RA 020842-020847, 020949-020953.

28  [626] 84 RA 020865-020904; 54 AA 13315-13319.

169

KAMMETZER CROWELL RENSHAW CROMARIE & FIORENTINO

1   actions were not taken in bad faith.[627] In other words, the FTB concludes that if, after a legitimate,

2   unbiased, review with due process rights is conducted by the California Board of Equalization, it is

3   determined that Hyatt owes some taxes, that conclusion justifies the FTB's bad faith fraudulent and

4   malicious actions during the audits and protests. Nothing could be further from the truth. What the

5   jury found was that the FTB had engaged in 15 years of fraudulent bad faith government conduct

6   and unnecessarily invaded Hyatt's privacy in order to exploit his sensitivities, privacy and security.

7        Most telling and most significant to the need to punish the FTB with ample punitive

8   damages is the reaction of FTB supervisors and high level managers when confronted with the

9   actions that the FTB took in its pursuit of a claim against Hyatt. They unhesitatingly told the jury

10   that they were proud of, not embarrassed by, the FTB's work on the Hyatt audits and protests, and

11   that they would not change a thing, thereby showing no remorse or intent to reform. Steve Illia, the

12   head of the Residency Program during the time of the Hyatt audits testified he was "quite proud of

13   the [residency] program" and not embarrassed to defend the auditors, supervisors, and reviewers.[628]

14   The head of the reviewers, Ms. Bauche, also said she was not embarrassed by her role in the Hyatt

15   audits or the FTB's recommendations.[629] Ford, the lead reviewer, was not embarrassed by her role

16   or the audit recommendations, but in fact was "more emphatic" at trial about the audit

17   recommendations she ultimately made in 1996 and 1997.[630]

18        Cox, the FTB's lead auditor in the audit, was also proud of her work. When asked if she

19   made mistakes or would have done anything different, she attempted to avoid answering the

20   questions, but was then impeached with her deposition testimony in which she said she did not

21   make any mistakes and would not do anything differently.[631] Numerous other FTB witnesses

22

23

24

_____

25   [627] *Id.*

26   [628] RT: June 23, 25:13-26:7.

27   [629] RT: July 7, 39:9-12.

  [630] RT: July 7, 166:3-9.

28   [631] RT: May 27, 59:10-61:19.

RJN0226

1   denied they intended to harm Hyatt and denied they were part of a conspiracy,[632] suggesting that

2   they too did not believe that the FTB treatment of Hyatt was wrongful and in need of reform. The

3   jury disagreed, clearly finding that the FTB needed to be punished for its conduct.

4          The jury determined that the FTB waged an eleven-plus year campaign to delay the protest

5   and not allow Hyatt to pursue an administrative appeal of the FTB's assessments — this long delay

6   coming after Hyatt refused to settle the matter early in the protest. It is more than a reasonable

7   inference that the jury concluded that the FTB attempted to extort a settlement and – when that

8   failed – ratcheted up the pressure by simply not allowing the protest to end for over 11 years. This

9   by itself is reprehensible conduct which would support the award of substantial punitive damages.

10  The first guidepost is therefore easily met.

11         **2.     Ratio to compensatory damages.**

12         The FTB also attacks the amount of punitive damages as disproportionate to the harm

13  suffered by Hyatt. Of course, if one compares the amount of punitive damages to the amount of

14  compensatory damages awarded by the jury, the less than 2 to 1 ratio (250 million to $138 million)

15  is significantly less than the 3 to 1 ratio allowed under Nevada law.[633] The fact that the jury

16  returned a punitive damage award well within the limits of Nevada law strongly favors upholding

17  the award. When a state legislature sets statutory limits on a punitive damages award, and a

18  properly instructed jury returns an award within the statutory limits, the award is not excessive

19  under either state or federal law.

20         Citing to the decision in *Bongiovi*, however, the FTB makes a strange argument that the

21  punitive damages award should not be compared to the compensatory damages award because the

22  latter does not reflect "actual harm inflicted on the plaintiff."[634] According to the FTB, the loss of

23  privacy and emotional distress suffered by Hyatt do not rise to the level of "actual harm,"[635] even

24

25  _____

    [632] RT: June 20, 144:12-145:4; June 24, 103:24-105:1; July 10, 171:25-172:18; July 14, 101:7-18; July 15,
26  154:20-155:23.

27  [633] NRS 42.005(1).

    [634] FTB Opening Brief, 113, *quoting Bongiovi*, 122 Nev. at 582 (internal quotation marks omitted).
28  [635] FTB Opening Brief, at 114.

                                        171

1   though the jury awarded significant compensatory damages for just those injuries. But *Bongiovi*

2   itself makes clear that this argument is far-fetched. There, this Court, in analyzing the punitive

3   damages award, specifically compared the punitive award to the compensatory award (*not* to some

4   other invented indicia of "actual harm"),[636] despite the fact that the defendant in *Bongiovi* had

5   characterized the injury to the slandered plaintiff as "little more than wounded feelings and

6   embarrassment."[637] Thus, just as in *Bongiovi*, the compensatory damages award in this case

7   provides the proper measure of "actual harm."

8      So long as the award falls within Nevada's statutory 3 to 1 ratio, there is no sound basis for

9   the Court to replace the jury's judgment on what amount of punitive damages is necessary to punish

10   the defendant tortfeasor. Here, the jury heard and evaluated testimony regarding the economic size

11   and strength of the defendant, the state of California. It heard that California has $35 billion in

12   liquid assets and a net worth of $47 billion, that it has a budget of $144 billion, and that it is the

13   eighth largest economy in the world. The FTB itself, as an agency of the State of California,

14   generates $52 billion a year in revenue from personal income taxes (equal to $143 million a day).[638]

15   Given those figures and the nature of the FTB's actions against Hyatt, the jury reasonably

16   concluded that it was proper to award $250 million in punitive damages to punish the FTB for its

17   conduct and to get the FTB to take notice and reform its ways.

18      In addition, the ratio is more than acceptable based on recent United States Supreme Court

19   precedents. In addressing the ratio, the FTB fails to cite and discuss the most recent ruling on this

20   issue from the United States Supreme Court, *Exxon Shipping Co. v. Baker*.[639] The Court

21   commented that although a punitive damages ratio of 1 to 1 ratio is typically appropriate, a larger

22   ratio can also be supported,[640] and emphasized that the conduct at issue in *Exxon Shipping* was at

23

24

---

25   [636] 122 Nev. at 583.

26   [637] 122 Nev. at 577.

27   [638] RT: August 11, 85:15-98:20.

     [639] 128 S. Ct. 2605 (2008).

28   [640] 128 S.Ct. at 2626.

172

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

most reckless, not deliberate and malicious.[641]  Furthermore, *Exxon Shipping* focused not on the federal due process clause but upon the requirements of maritime law or federal common law with respect to punitive damages.  Thus, as the Court explained, it "was acting . . . in the position of a common law court of last review."[642]  In that capacity, the Court's decision to set the 1:1 ratio as a standard in "such maritime cases"[643] was essentially a policy decision similar to the Nevada Legislature's decision to set a ratio of 3:1 by statute,[644] and not a bright line constitutional limit on punitive damages.

The Court in *Exxon Shipping* further qualified the constitutional parameters for punitive awards by noting that, "[r]egardless of culpability . . . heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect (increasing chances of getting away with it)."[645]  Here, there is no question that the FTB thought that it would never be caught.  It had complete immunity in California for its actions and tried to import that immunity to Nevada.

In addition, the FTB also withheld some of the most significant documents demonstrating that it knew it had no tax case against Hyatt, but nonetheless assessed him massive taxes and penalties.[646]  At the same time that Cox's supervisor was encouraging her in the summer of 1995 to analyze the facts of the Hyatt case in a manner that allowed the FTB to assess Hyatt, Cox participated in a meeting and received a follow-up memo clearly acknowledging the FTB had no residency case against Hyatt.[647]  The FTB never thought that anyone would see the memo stating that it had no residency or sourcing case against Hyatt, or the notes of lead reviewer Carol Ford questioning the tax case that the FTB had against Hyatt,[648] both of which were produced only after

---

[641] 128 S. Ct. at 2631-32.

[642] 128 S.Ct. at 2629.

[643] 128 S.Ct. at 2633.

[644] *See* NRS 42.005(1).

[645] 128 S.Ct. at 2605.

[646] *See* discussion, *supra*, at 26-31.

[647] 93 AA 23122; 54 AA 13316.

[648] 54 AA 13325.

KARNOFFEN CROWELL RENSHAW GRONAUER & FIORENTINO

173

RJN0229

1　an order of this Court.

2　　　**3.　Comparison to other penalties.**

3　　　The third factor the FTB attempts to rely on is civil or criminal penalties imposed for

4　comparable conduct.  To support its argument on that factor, the FTB purports to review published

5　opinions by the Nevada Supreme Court and claims that there has never been an approved punitive

6　damage award as large as the award in this case.  But the cases cited do not involve comparable

7　conduct.  None of the cases demonstrates repeated intentional misconduct by a sovereign State

8　against a citizen of another State, where a strong punitive damages award is needed to sanction and

9　prevent serious ongoing abuse of government power.  In this rare situation, Nevada is able to

10　exercise its sovereign jurisdiction over the targeted behavior and thus can address a wrong that the

11　FTB never thought it would have to confront.

12　　　The jury has spoken in this case.  There is no basis for the Court to replace the jury's

13　judgment with its own.  The jury's award of punitive damages should not be altered, amended, or

14　reduced.

15　**I.　Prejudgment interest was properly allowed.**

16　　　The applicable statute sets forth a simple method for calculating prejudgment interest on a

17　judgment – interest runs from the time of service of the summons and complaint until the judgment

18　is satisfied.[649]  The statute says nothing about calculating interest from the time the damages were

19　actually sustained.  The statute has been applied by the Court in cases involving personal injuries.

20　The award of damages for emotional distress, breach of privacy and attorney's fees incurred

21　because of a fraud – all being premised on tort rather than contract – should be governed by the

22　statute.

23　　　The FTB argues that the jury's verdict included future damages.  The FTB cites a

24　construction defect case, *Shuette v. Beazer Homes Holdings Corp.*,[650] which held that

25　"[p]rejudgment interest may not be awarded on an entire verdict 'when it is impossible to determine

---

[649] NRS 17.130(2).

[650] 121 Nev. 837, 865, 124 P.3d 530, 549 (2005) (citation omitted).

174

RJN0230

1  what part of the verdict represented past damages.'"

2       No future damages were sought or awarded in this case. Rather, the damages sought and

3  awarded were incurred before and after the filing of the complaint, but the damages had all been

4  incurred as of the time the case was presented to the jury. Damages that predate the judgment are

5  past damages, and damages that post-date the judgment are future damages.

6       The FTB erroneously argues that Hyatt sought future damages, citing statements by Hyatt's

7  counsel during closing. One example the FTB gives relates to Hyatt's claim for emotional distress

8  arguing there is no "cure or a pill" to his damage. But Hyatt's testimony and his counsel's

9  arguments linked the severity of the emotional distress to the length of time the FTB failed and

10  refused to decide the protests.[651] The FTB decided the protests on November 1, 2007, four-and-a-

11  half months before the trial commenced.

12       The FTB also quotes an argument referencing Hyatt's "heart and soul" and then references

13  his emotional distress from losing control of his private information. But again, Hyatt's request

14  regarding emotional distress damages was specifically tied to the FTB's long-time refusal to decide

15  the protests. No damages were requested beyond that. Any assertion by the FTB to the contrary is

16  belied by the trial record. Hyatt neither sought nor argued for emotional distress damages for any

17  future period.

18       Lastly, the FTB references Hyatt's argument that his information is on the "World Wide

19  Web" and that it never can be returned whole. But this reference to invasion of privacy damages is

20  different from emotional distress. The damage occurs when the disclosure(s) take place. It is not a

21  future damage. Hyatt was not seeking, and was not awarded, any damages for future violations of

22  his privacy. Indeed, the dates of the invasions of privacy asserted by Hyatt all occurred before the

23  trial and verdict in this case.[652] These were past, not future, damages.

24       It was in this same context that the Nevada Supreme Court declared in *Shuette* that all the

25  damages were considered past damages, even the costs of future repairs, because the construction

26

27  [651] RT: May 12, 81-82, 95-96; July 23, 104:6-13; 167:7-17.

28  [652] 83 AA 20694 – 89 AA 22050; 93 AA 23104-23124; *see also* evidence discussed, *supra*, at 37-40 and
    cited in fns. 524 and 525, *supra*, at 141.

175

KAMAHUDA CROWELL RENSLAW CRONAKER & FORENTINO

1  defect damages were incurred when the faulty construction occurred. The same is true for Hyatt's
2  invasion of privacy damages.

3      This line of demarcation is expressly recognized by this Court in *Las Vegas-Tonopah-Reno*
4  *Stage Line, Inc. v. Gray Line.*[653] There, the Court discussed past damages that predated service of
5  the complaint, past damages that predated the judgment, and future damages that would post-date
6  the judgment.

7      This case is analogous to *Bongiovi v. Sullivan,*[654] a defamation case where the Nevada
8  Supreme Court declared that "when there is nothing in the record to suggest that future damages
9  were included in the award, prejudgment interest on the verdict is allowed. 'The jury is presumed
10  to have based its verdict solely on the evidence presented,' and when there is no reference to future
11  damages in evidence, 'it is logical to conclude that the jury did not base its verdict on future
12  damages.'"[655]

13      Contrary to the FTB's argument, therefore, its so-called "*Hazelwood*" exception is
14  inapplicable to the judgment in this case.[656] There is no "reference to future damages in evidence"
15  upon which the jury could have based its verdict. Thus, the entire compensatory award is for past
16  damages and should draw interest "from the time of service of the summons and complaint until
17  satisfied.[657]

18      Then the FTB argues in footnote 88, based on *Las Vegas-Tonopah-Reno Stage Line, Inc. v.*
19  *Gray Line,*[658] that Hyatt is not entitled to prejudgment interest because some of Hyatt's damages
20  were incurred after service of the complaint, and there is no breakdown in the verdict of which
21  damages were incurred based on the various tortious acts of the FTB. *Las Vegas-Tonopah-Reno*
22  considered interest on damages that post-dated the complaint, but predated the judgment, and held

---

[653] 106 Nev. 283, 792 P.2d 386 (1990).
[654] 122 Nev. 556, 138 P.3d 433 (2006).
[655] 138 P.3d at 449-450 (citations omitted).
[656] *Hazelwood v. Harrah's,* 109 Nev. 1005, 1011, 862 P.2d 1189 (1993).
[657] *Bongiovi,* 138 P.3d at 449.
[658] 106 Nev. 283, 792 P.2d 386 (1990).

176

KARNITZER CROWELL RENSHAW GRONAUER & FIORENTINO

1  that specific damages incurred after the filing of the complaint accrued prejudgment interest only

2  from the date the damages were actually incurred, not from the date of service of the complaint.

3  Nevertheless, the FTB's reliance on *Las Vegas-Tonopah-Reno* is misplaced.

4      *Las Vegas-Tonopah-Reno* involved claims of intentional interference with a prospective

5  business relationship. The damages suffered by the plaintiff were for lost revenues. Prejudgment

6  interest was awarded back to the date of service of the complaint, even though most of the damages

7  from the interference occurred after service of the complaint. The damage was the specific

8  business the plaintiff lost from specific contracts that were essentially stolen from plaintiff by

9  defendant's misconduct. Thus, the amounts were specific and liquid, and could be proven from

10  invoices. The damages were not the less specific, unliquidated type damages involved in cases

11  awarding damages for pain and suffering or for emotional distress. Such damages cannot be

12  proven by reference to invoices and documents, and are not determinable prior to the entry of a jury

13  verdict. One cannot prove emotional distress or invasion of privacy damages on a month by month

14  basis, even if one can prove the dates of specific events. That is why the statute relates

15  prejudgment interest back to the date of the complaint in cases involving tort damages where

16  calculating an exact date is impossible.

17      The damage to Hyatt began when the fraudulent conduct occurred and when his privacy

18  was invaded, and continued uninterrupted until the FTB's belated decision on the Protest. Events

19  that happened during the time the matter was pending, from beginning of the audit until verdict,

20  contributed to and increased Hyatt's emotional distress and loss of privacy, but these acts resulted in

21  unliquidated damages that are an inseparable part of the whole, all of which dates back to and

22  before service of the complaint. The FTB even stepped up its tortious actions after it received the

23  complaint (e.g., posting Hyatt's private information on its web site). That is why it is fair and

24  equitable to impose prejudgment interest on the entire compensatory amount of the verdict back to

25  service of the complaint, in accordance with the statute.

26      The Court has held that damages awarded by a jury to compensate a plaintiff for his or her

27  medical expenses and pain and suffering incurred to the date of the verdict are past damages, and

28

177

1   the entire amount is subject to prejudgment interest.[659]  The plaintiffs in *Eaton* were a married

2   couple traveling with their infant daughter on Interstate 80, when their vehicle struck a patch of

3   black ice.  The Nevada Highway Patrol had been made aware of the black ice earlier that evening

4   when two other cars slid off the road in the same area.  The trooper who reported the two other

5   accidents failed to warn oncoming traffic of the hazard by placing cones or flares alongside the

6   road.  The State of Nevada was held liable for plaintiffs' injuries which included the wrongful death

7   of their daughter.

8        The trial court awarded Mrs. Eaton prejudgment interest on the amount of past medical bills

9   alone rather than on the entire personal injury award, which included medical expenses and past

10  pain and suffering (up to the date of the judgment).  The Court found the trial court to be in error

11  and held that the entire amount was subject to prejudgment interest.[660]

12       Recently, the Court ruled that the interest rate to be applied in calculating prejudgment

13  interest is the rate in effect at the time the judgment was entered, disapproving the method used by

14  lower courts of computing prejudgment interest based on the interest rate from year-to-year prior to

15  the entry of the judgment, which was the common practice.  *See Lee v. Ball.*[661]  The Court went on

16  to find that the District Court erred in calculating the period prejudgment interest accrued because

17  NRS 17.130(2) explicitly provides that the judgment draws interest from the time of service of the

18  summons and complaint until satisfied.[662]

19       The issue was prejudgment interest for pain and suffering from an automobile accident.

20  The prejudgment award of pain and suffering presumably included pain and suffering to the date of

21  the judgment, much of which occurred after the date of the filing of the complaint.  Still,

22  prejudgment interest was awarded and affirmed back to the filing of the complaint.  If the Court

23  had desired to adopt a different method of calculating interest on past damages in tort cases, an

---

25  [659] *State v. Eaton,* 101 Nev. 705, 710 P.2d 1370 (1985) (overruled on other grounds by *State ex rel. DOT v.*
26  *Hill,* 114 Nev. 810, 963 P.2d 480 (1998); *see also, Grotts v. Zahner,* 115 Nev. 339, 341, 989 P.2d 415, 416
    (1999).

27  [660] *Id.* at 711.

    [661] 121 Nev. 391, 116 P.3d 64 (2005).

28  [662] *Id.* at 395.

178

KÆMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

1  opportune time would have been in deciding *Lee v. Ball*. The Court did not do so. *Lee* is more

2  analogous to this case than is *Las Vegas-Tonopah-Reno*.

3     Similarly, in *Bongiovi v. Sullivan*,[663] prejudgment interest based on a claim of defamation

4  that related back to the filing of the complaint was affirmed on appeal, even though the damage

5  clearly continued after service of the complaint. Although *Bongiovi* can be distinguished from

6  Hyatt's case on any number of superficial levels, damages for defamation and for pain and suffering

7  are more analogous to emotional distress and invasion of privacy damages than are damages for

8  interference with a contract. Hyatt is entitled to prejudgment interest back to the filing of the

9  complaint on all of the damages, even though the harm continued after the complaint was filed.

10    In awarding prejudgment interest, it would be proper for the District Court to employ the

11  same rationale this Court employed in *Albios v. Horizon Communities*.[664] There, the Court opined

12  that an award of prejudgment interest on an entire verdict is proper, because "the award

13  represent[ed] only past damages[] . . . because the damages occurred when the homes were built;

14  regardless of when the homeowners actually made or will make necessary repairs."[665] Although

15  *Albios* was a construction defect case, it is distinguishable from a business lost profits case and is

16  similar to a tort case in that the damages occur from the defendant's initial act *(i.e,* building a home

17  or causing the tort-based damage) regardless of when the plaintiff actually pays for or suffers the

18  damages caused by the act. Like the plaintiffs in *Albios*, Hyatt's damages began at the time of the

19  fraudulent audit and continued until the belated conclusion of the protest. Indeed, the delay in the

20  protest increased the damages on a daily basis, as did all of the other fraudulent acts of the FTB, but

21  still the judgment amount is a single award representing all of the damages that cannot be severed

22  and attributed to individual wrongful acts with individual, provable impact. There are no specific

23  times to which specific damages may be tied; therefore, the statute applies to run prejudgment

24  interest on the entire award from the date of the filing of the complaint.

25

26  ―――――――――――

27  [663] 122 Nev. 556, 138 P.3d 433 (2006).

28  [664] 122 Nev. 409, 132 P.3d 1022 (2006).

[665] *Id.* at 1035.

179

Finally, there should be no question that Hyatt is entitled to prejudgment interest on the attorney fees awarded as special damages because the date each payment was made is known and interest was calculated in Hyatt's proposed judgment based on those dates. That calculation is properly reflected in the District Court's judgment.[666]

## VI. CONCLUSION.

The FTB attempted to characterize this appeal as based on issues of law. But it cannot escape the factual findings of the jury. The FTB's asserted view of the facts, that it was conducting a routine audit, are not the facts upon which its appeal must be adjudicated. The FTB conducted a bad faith audit. It proceeded during the audit, through three auditors, with the singular intent to find a way, any way, to tax Hyatt. As outrageous as that might be for a government agency that is charged with impartiality and equal treatment, the FTB's conduct was much worse. Its lead auditor was openly anti-Semitic and became obsessed with getting Hyatt. The FTB was alerted to Cox's behavior towards Hyatt by a senior auditor, but failed to adequately investigate these claims. It is a reasonable inference that the FTB simply did not want to investigate these claims. Indeed, the FTB ignored and swept under the proverbial rug documentary evidence that it had no real case against Hyatt, but it proceeded to assess him anyway and attempted to use its authority to issue penalties to bargain for a settlement, just as its manuals teach. The FTB had too much to gain to not assess Hyatt to the highest amount possible. By doing so, it met its "numbers" and then some. Each proposed assessment issued against Hyatt was the largest assessment in the Residency Program the respective years they were issued. The dollar signs that popped into the first auditor's head when he read about Hyatt's wealth came to fruition. There was never a question that Hyatt would be assessed a significant tax once the first auditor read the article about Hyatt. It was just a matter of what theory and what amount would be assessed. This was outrageous bad faith conduct by a government agency.

But the facts are even worse for the FTB. It knew of and took advantage of Hyatt's particular need for privacy and confidentiality. It used Hyatt's sensitivities against him, even

---

[666] 90 AA 22364-22365.

180

explicitly suggesting he settle the matter like other wealthy or famous individuals who do not want

their private information to be subjected to an even more in-depth investigation and did not want

their private information made public. But when Hyatt stood up to the FTB and would not settle,

the FTB took him through more than a decade of delay and stonewalling so that he could not appeal

its determinations in an actual administrative appeal before an independent board. This conduct by

the FTB was outrageous and utterly unacceptable conduct by a government agency, starting with

the predetermined bad faith audit focused from the beginning on "how much money" Hyatt made,

continuing with the unprecedented bombardment of his personal information and the very fact that

he was under audit to virtually anyone and everyone with even tenuous connections to Hyatt, and

then refusing to conclude its investigation and relinquish control of the process to an independent

administrative tribunal where Hyatt would have due process rights.

These are the facts upon which the FTB's appeal must be evaluated. Under these facts, the

FTB is not entitled to discretionary function immunity. Bad faith acts and intentional torts by

government actors are not accorded immunity under Nevada law. That was the law in 2002 when

this Court first reviewed this case, and it is still the law now.

Each claim is supported by substantial evidence. And, the FTB's outrageous conduct

supports the damages awarded against it. The outrageousness, along with the severity and duration,

of the ordeal the FTB put Hyatt through is truly unprecedented. The emotional distress damages

awarded Hyatt are fair recompense for destroying the life of a then-55-year-old man in the prime of

his life with extraordinary accomplishments. The damages for Hyatt's loss of privacy compensate

him for something he will never have again and valued in a way dollars cannot address. Hyatt was

a low key, very private person. Privacy meant everything to him, no doubt more to him than most

people. The FTB took that from him. Additionally, the special damages awarded for the

professional fees incurred in the audits and protests compensate him for going through what were

wasted procedures. While the tax issue will be decided in California, Hyatt had to expend this sum

in defending the bad faith audits and bad faith delay in the protests.

The damages cap asserted by the FTB has no application here. The FTB misstates the

1    Court's prior ruling and the concept of comity in general. Further, punitive damages were properly

2    awarded for all the reasons set forth above. In sum, punitive damages are the only means Nevada

3    has to control a rogue out of state agency. Unlike a Nevada agency, a Nevada citizen cannot seek

4    redress with the Nevada legislature or executive branch. Prejudgment interest was also

5    appropriately awarded as described above.

6           Hyatt cannot here review and summarize every issued raised by the FTB. Further, to the

7    extent the FTB has, or believes it has, raised an issue in a footnote or sentence somewhere in its

8    brief that Hyatt did not address, Hyatt does not concede any issue raised. Many of the FTB's issues

9    are simply not material and not a basis to reverse or alter the verdicts and judgment.

10          Hyatt therefore respectively requests that the Court deny the FTB's appeal in its entirety.

182

# OPENING BRIEF ON CROSS APPEAL

## I.     STATEMENT OF ISSUE.

Did the District Court err in granting summary judgment against Hyatt on his claim for economic damages stemming from the FTB intentional torts on grounds that Hyatt presented only circumstantial evidence of causation?

## II.     SUMMARY OF ARGUMENT.

Hyatt cross-appeals from the District Court's pretrial dismissal of his claim for recovery of economic damages stemming from the intentional bad faith tortious conduct of the FTB. Hyatt sought these economic damages in the District Court proceeding, and continues to seek them, independent and separate from the damages Hyatt was allowed to present to the jury during the trial in the District Court, i.e., emotional distress damages, loss of privacy damages, and attorneys' fees as special damages.

The legal basis on which the District Court entered its order was contrary to established and unambiguous legal precedent in Nevada. The District Court held that Hyatt cannot rely on circumstantial evidence, but must present direct evidence to establish his economic damages. The law in Nevada is to the contrary. Circumstantial evidence by itself is sufficient to sustain a jury's verdict awarding economic damages, and in particular circumstantial evidence of causation along with expert testimony often provides the sole evidentiary support for an award of economic damages.

A summary of the pertinent facts necessary to this cross-appeal, as Hyatt presented in the District Court and which were required to be presumed as true, are as follows:

(1) The FTB's invasions of Hyatt's privacy and breaches of confidentiality as found by the jury; (2) these invasions of privacy and breaches of confidentiality include disclosures made by the FTB to at least Hyatt's two earliest and most significant sublicensees in Japan, where his exclusive sublicensor, Philips Electronics, had developed a successful Licensing Program for Hyatt's patented technology; (3) the Licensing Program in Japan came to an abrupt stop after the FTB's unlawful

183

1  disclosures in Japan; (4) Hyatt has at this time no testimony of potential customers who will testify

2  that they refused to do business with him, to support his theory of causation relative to the

3  downfall; (5) Hyatt has, and presented to the District Court, substantial circumstantial evidence to

4  support his causation theory; (6) Hyatt also has extensive expert testimony to support his causation

5  theory; and (7) the District Court excluded causation and expert testimony of causation solely

6  because of the lack of direct testimony.[667]

7  **III.    STATEMENT OF THE CASE.**

8        On January 23, 2006, the District Court granted the FTB's motion for partial summary

9  judgment, ruling that in the absence of direct evidence, Hyatt's theory of causation could not

10  support a jury's verdict awarding damages relative to the Licensing Program in Japan:

11        The Court's view of it is this.

12        That the plaintiff has no real evidence that the letters sent by defendant caused any
        economic damage. The plaintiff has circumstantial evidence, since the business went

13        downhill after the letters were sent, this must have been the reason. And plaintiff seeks to
        prove this by bringing in experts on Japanese culture to offer their opinion that the

14        Japanese would've shared this information. Plaintiff counsel argues that this is a
        reasonable inference to make, that it may very well be a reasonable inference to make, I

15        don't know.

16        However, these particular experts, it's the Court's understanding have no actual
        knowledge of anything that occurred.  It seems to me that while it is true that plaintiff's

17        counsel can argue circumstantial evidence *that plaintiffs ought to have some witness or*
        *some evidence with direct knowledge of the economic damages.*

18
        So I'm inclined to grant the motion for partial summary judgment as it relates to

19        economic damages.[668]

20        Further, the District Court explained that it would have ruled to the contrary and in Hyatt's

21  favor, except for the *Wood v. Safeway*[669] decision from this Court in October of 2005:

22        I will say that had this motion been brought to the Court before October of 2005 when
        the Wood v. Safeway case came out, I doubt that the result would've been as it is today.

23

24

25  ───────────────

26  [667]At no time did the District Court suggest or rule that Hyatt's circumstantial and expert testimony was
   being excluded on any basis other than the District Court's stated opinion that direct evidence was required.

27  12 AA 02904-02905 (court requires actual knowledge to support causation theory).

   [668] 12 AA 02904-02905 (emphasis added).

28  [669] 121 Nev. 724, 121 P.3d 1026 (2005).

RJN0240

But my view of the Wood v. Safeway case is that it essentially shifts the burden to the plaintiff in this particular case.[670]

Yet, this Court explained in *Wood v. Safeway* that the decision does not represent any significant change in summary judgment procedure or analysis.[671] This Court merely clarified the summary judgment standard as established in prior decisions, rejecting cases with inconsistent language suggesting that summary judgment is precluded if there is the slightest doubt as to any material fact.

As the Court is aware, the bad faith intentional tort claims in this action were tried to a jury during 2008. The jury found in favor of Hyatt on all claims, including three invasion of privacy claims and a breach of confidentiality claim. The jury awarded Hyatt compensatory damages consisting of $85 million for emotional distress; $52 million for invasion of privacy, and $1,085,281.56 in special damages consisting of attorneys fees incurred in defending the FTB's bad faith audit.[672] But the jury was not presented and did not consider Hyatt's economic damages stemming from the destruction of the previously well-established patent licensing program in Japan.

## IV. STATEMENT OF FACTS.

### A. Hyatt's invasion of privacy and breach of confidentiality claims included improper disclosures by the FTB to Hyatt's key sublicensees in Japan.

As presented at trial and found by the jury, Hyatt's invasion of privacy claims and breach of confidentially claim encompassed a decade long pattern of misconduct by the FTB in which Hyatt's confidential information was freely disclosed with no concern for Hyatt's privacy or the promises of confidentially made by the FTB. Hyatt will not repeat here the totality of the FTB's bad faith intentionally tortious conduct, which is addressed in detail in the Statement of Facts section in Hyatt's response to the FTB's brief.

In this case, the FTB announced in its first contact letter with Hyatt that he could expect

---

[670] 12 AA 02906.

[671] 121 P.3d at 1030-31.

[672] 90 AA 22363.

185

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

confidential treatment of all of his personal information.[673]  Subsequently, the FTB auditors explicitly promised Hyatt confidential treatment both orally and in writing.[674]  The FTB's own internal policies, notices, regulations, handbooks, guidelines—all of which were ignored by the FTB in this case—also promise the right to privacy.[675]  Hyatt was particularly concerned about the privacy and confidentiality of his sensitive information and the FTB made specific promises to Hyatt to satisfy his concerns.

More specifically, after assurances of strict confidentiality, Hyatt reluctantly agreed to disclose to the FTB the agreements with his Japanese patent licensees, Fujitsu and Matsushita, and information about his membership in the Licensing Executives Society.[676]  Hyatt specifically committed in writing to his Japanese licensees that the agreements would remain confidential. [677]

The FTB nonetheless directly contacted two of Hyatt's key sublicensees in Japan, Fujitsu and Matsushita, after failing to first request the information from Hyatt as the FTB is required to do before seeking information from third parties.  The FTB did not even notify Hyatt of these communications until 18 months later, after the trail was too cold to attempt to correct the damage.  Further, the FTB was in litigation with an American affiliate of Fujitsu and was periodically auditing both companies.[678]

As presented at trial, the FTB had no need and should not have made contact with or disclosures to Fujitsu and Matsushita in Japan.[679]  Hyatt knew that his Japanese sublicensees were very sensitive to and fearful of the FTB.[680]  He produced his confidential licensing documents to the FTB in reliance on the FTB's promises of confidentiality, which promises were violated when

---

[673] 82 RA 020471-020475.

[674] 3 RA 000585-000593.

[675] 82 RA 020471-020475; 55 AA 13705; 56 AA 13913-13929, 13939-13940; 93 AA 23181.

[676] 81 RA 020194-020207, 020234-020248; 93 RA 023004.

[677] RT: May 8, 52:9-53:9, 78:17-80:4; May 16, 104:7-107:16.

[678] 8 AA 01925-01927.

[679] 84 RA 020788-020793.

[680] 9 AA 02032.

186

1  the FTB provided the Japanese sublicensees with confidential licensing documents, copies of which

2  could only have been obtained from Hyatt.[681]

3      The letters sent to Fujitsu and Matsushita gave the impression that Hyatt was under

4  investigation by the FTB and that Hyatt had disclosed confidential licensing documents, in defiance

5  of the Japanese companies' desire that the information remain private.[682]  The sublicense

6  agreements with Fujitsu and Matsushita expressly stated, "HYATT and his agent … shall keep

7  strictly in confidence the identity of COMPANY as a licensee" and required that various other

8  information be kept confidential.[683]  Moreover, the FTB directed its letters to the President of the

9  Company and a Director of another, as opposed to the finance or accounting department that would

10  have been able to provide the financial information sought – that Hyatt could and would have

11  provided if asked by the FTB.[684]

12      The FTB had attached confidential licensing information to each of its two letters to the

13  Japanese companies that violated both the spirit and intent of the confidentiality clause in the two

14  sublicense agreements.[685]  The FTB's letter to Fujitsu attached the signature page of the confidential

15  license agreement.[686]  The FTB's letter to Matsushita attached a confidential private letter from an

16  executive of Matsushita to Hyatt.[687]  There is no dispute that the Japanese companies received and

17  reacted to the FTB's communications.[688]  Both Fujitsu and Matsushita responded to the FTB's

18  inquiry in writing.[689]  This is direct, documentary evidence.

19

20

---

[681] 84 RA 020788-020793.

21  [682] 9 AA 02030-02031.

22  [683] 81 RA 020203-020204, 020245.

23  [684] 84 RA 020788, 020791.

24  [685] 84 RA 020788-020793.

[686] *Id.*

25  [687] *Id*

26  [688] Indeed, the Japanese companies needed government approval to take a license from Philips on Hyatt's patents. (10 AA 02436, 02275-02281).  Given the Japanese government regulation of the sublicensing

27  agreements entered into by these Japanese companies, these companies would no doubt take notice of and react to an inquiry from an agency of a foreign government concerning these same agreements.

28  [689] 84 RA 020790, 020793.

KARNÜPER, CROWELL, RENSLAW, CRONALKER & FIORENTINO

1    Until the FTB's disclosures about Hyatt in Japan in April of 1995, the licensing program had

2    been successful in sublicensing Hyatt's patents in the three and one half years predating the FTB's

3    disclosures in Japan (the "Licensing Program").[690]

4    Philips' success in Japan, in the early 1990s was no coincidence. In the early 1990s,

5    preceding the FTB's tortious invasions of Hyatt's privacy and fraudulent breaches of its promises of

6    confidentiality through disclosures to two key Japanese sublicensees, Hyatt and his patents had

7    become a *cause-celebre* throughout the Japanese electronics industry, a hundred-billion dollar per

8    year industry. As Philips proceeded to sublicense Hyatt's patents to some of the largest Japanese

9    electronics firms (e.g., Hitachi, Sony, Toshiba, NEC, and Matsushita), Hyatt became even more

10   well-known, he was called a "legendary inventor" and a "computer legend and folk hero." He was

11   compared to Thomas A. Edison and to Alexander Graham Bell.[691]

12   As discussed below, once the FTB made this disclosure in Japan, Philips' licensing

13   successes immediately and permanently and completely stopped.

14
     **B.     Hyatt incurred economic damages in Japan resulting from the FTB's**
15   **        disclosures.**

16   The effect of the disclosures by the FTB in Japan in breach of its commitment to Hyatt was

17   significant. Since the time of the FTB's unlawful disclosures, the Licensing Program obtained no

18   new sublicensees at all, and Hyatt's revenue from new sublicensees dropped to zero immediately

19   thereafter.[692]

20   Specifically, in July 1991, Hyatt signed an Agreement with a major multi-national Dutch

21   company, N.V. Philips, through its U.S. subsidiary, U.S. Philips, ("Philips") for Patent Portfolio of

22   23 of Hyatt's patents.[693] This Agreement included the obligation for Philips to sublicense the Patent

23   Portfolio for the mutual benefit of Philips and Hyatt, who were to share equally in the net proceeds

24

25
     _____

26   [690] 9 AA 02021-02022, 02075-02077.

27   [691] 10 AA 02428-02430, 02433.

     [692] 10 AA 02391, 02403.
28   [693] 9 AA 02021; 81 RA 020138-020178.

KARDUTTER CROWELL RENSLAW GROMAKER & FORNETINO

1   (the "Licensing Program").[694]  Philips took this obligation on as a "fiduciary responsibility."

2   Philips then obtained over $350 million in royalties by sublicensing major Japanese companies in

3   the early 1990's:[695]

4          Something obviously happened *after March of 1995* that caused the Japanese market to

5   close tightly against the Licensing Program. Again, the FTB's disclosures about Hyatt in Japan—in

6   violation of the FTB's professed commitments to keep such information confidential—occurred in

7   *April of 1995*. This was a classical cause and effect issue that should have been presented to the

8   jury.

9   **V.    ARGUMENT.**

10     **A.   Standard of Review.**

11         This Court's appellate review of a summary judgment order is de novo.[696] Summary

12   judgment is appropriate only when a case presents no genuine issue of material fact *and* the moving

13   party is entitled to judgment as a matter of law.[697]

14         But the District Court did not apply a summary judgment standard regarding the existence

15   of a triable fact at all. Instead, the District Court focused on and addressed whether the FTB was

16   entitled to judgment as a matter of law. Most specifically, the transcript reveals the judge

17   erroneously believed a finding of a material fact would have to be based on direct evidence, rather

18   than circumstantial evidence. The District Court did not find the expert evidence was somehow

19   incompetent or did not meet the requisite standard of professional probability. The District Court

20   did not find the fact in issue—causation—was not material or was not in dispute.[698]

21         The District Court rested its decision on only one basis: The District Court stated that the

22   circumstantial evidence—no matter how solid or convincing—could never be sufficient to create a

23

24   [694] *Id.*

25   [695] 9 AA 02021-02022, 02075-02077.

26   [696]*Yeager v. Harrah's Club, Inc.* 111 Nev. 830, 833, 897 P.2d 1093-1094 (1995).

    [697]NRCP 56(c).

27   [698]At no time did the District Court suggest or rule that Hyatt's circumstantial and expert testimony was

28   being excluded on any basis other than the District Court's stated opinion that direct evidence was required.
  12 AA 02904-02905.

1 triable issue unless it was supported by direct evidence (which the judge seemed to say required

2 that the proffered experts have actual knowledge of Hyatt's damages). In the absence of direct

3 evidence of causation, the District Court ruled that the FTB was entitled to judgment as a matter of

4 law.[699] In other words, the decision focuses on the type of evidence required to reach the jury, not

5 on the materiality of the facts in dispute.

6 Thus, the only legal issue in this appeal is whether, as a matter of Nevada law,

7 circumstantial evidence alone could *ever* be sufficient to support a jury award finding causation of

8 damages.

9

**B. Contrary to the District Court's ruling, causation may be proved by**
10 **circumstantial and expert evidence.**

11 Eighth Judicial District Court Standard Jury Instruction 2.00 contradicts the District Court's

12 order. It states:

13 There are two kinds of evidence; direct and circumstantial. Direct evidence is direct
proof of a fact, such as testimony of an eyewitness. Circumstantial evidence is indirect,
14 that is, proof of a chain of facts from which you could find that another fact exists,
even though it has not been proved directly. You are entitled to consider both kinds of
15 evidence. The law permits you to give equal weight to both, but it is for you to decide
how much weight to give any evidence. It is for you to decide whether a fact has been
16 proved by circumstantial evidence.

17 Although the Standard Jury Instruction does not carry the weight of law, Hyatt submits that

18 the form instruction is an accurate statement of the law in Nevada. The District Court ignored the

19 circumstantial evidence in this case, and the expert testimony, and determined that Hyatt could not

20 present his evidence of economic damages to the jury because he had no direct evidence of

21 causation linking the FTB's actions and the destruction of the Licensing Program. Again, the entire

22 ruling of the District Court on this issue was quoted above.[700]

23 In *Frantz v. Johnson*,[701] a case analogous to this case, this Court directly held that causation

24 of damages may be proven by circumstantial evidence *alone*, in the complete absence of direct

25 evidence. *Frantz* involved claims of trade secret theft and other intentional torts. There was no

26

27 [699] 12 AA 02904-02905.

[700] *See* quotation, *supra*, at 184.
28 [701] 116 Nev. 455, 467-68, 999 P.2d 351, 359 (2000).

190

1  direct evidence of respondent's damages because "not one lost customer testified that it ceased

2  doing business with JBM because of appellants' conduct."[702]  Like this case, but for different

3  reasons, respondent in *Frantz* was not in a position to prove by direct evidence that it had lost the

4  business of customers, because the lost customers were doing business with the competitor and

5  would not come forward with such testimony.

6      In rejecting the claim that causation of economic damages cannot be proved on

7  circumstantial evidence alone, this Court stated:  "We disagree that such direct evidence is

8  necessary and conclude that there was sufficient circumstantial evidence that appellants

9  misappropriated trade secrets.  Causation is a question for the finder of fact that will not be

10  overturned unless clearly erroneous.  Causation may be inferred from the circumstantial evidence

11  presented at trial."[703]  This statement was supported by a footnote where this Court elaborated:

12      In so concluding, we recognize that there is legal support holding to the contrary that
13      requires direct evidence of causation, such as testimony of clients lost, to establish
        causation in employee disloyalty cases. *See McCallister Co. v. Kastella*, 170 Ariz. 455,
14      825 P.2d 980, 984 (Ct.App.1992; *Bancroft-Whitney Co. v. Glen*, 64 Cal.2d 327, 49
        Cal.Rptr. 825, 411 P.2d 921 (1966.  However, we explicitly disapprove of such a
15      requirement based on our belief that an existing business is entitled to compensation in
        instances where indirect circumstantial evidence shows that its competitors harmed it
16      through unfair and illegal business tactics.[704]

17      Notably, almost all aspects of plaintiffs' case in *Frantz* were proved by circumstantial

18  evidence only, and this Court expressly found that evidence to be sufficient to support the verdict.

19      Although the instant case does not involve a situation where a competitor has harmed Hyatt

20  through unfair and illegal business tactics, this case is certainly analogous to *Frantz*.  Here, the

21  FTB, in order to gain an advantage in litigation against Hyatt, to apply pressure to Hyatt regarding

22  his sensitivities his privacy and the Licensing Program, and to coerce a settlement of dubious tax

23  claims, engaged in unfair and illegal tactics intended to hurt Hyatt, and which had the end effect of

24  completely destroying the Licensing Program.  Yet, the FTB shielded itself from liability for its

25  wrongdoing based on the slender reed that — despite the undeniable circumstance that the business

26

27  [702] *Id.* at 467, 999 P.2d at 359.

    [703] *Frantz v. Johnson*, 116 Nev. 455, 467-68, 999 P.2d 351, 359 (2000) (numerous citations omitted).
28  [704] *Id.*, n. 7.

                                        191

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

died immediately after the date of the FTB's illegal action and the expert testimony to a reasonable degree of professional probability that the FTB's action was the direct cause of that demise — no one can be compelled to come from Japan and testify against a powerful, potential adversary, the FTB, particularly since the FTB was continuing to audit these large Japanese companies. There is simply no basis in law for the District Court's denigration of circumstantial and expert evidence.

Similarly, in *Nevada Contract Services, Inc. v. Squirrel Companies, Inc.*,[705] in a products liability suit, a plaintiff was allowed to show through circumstantial evidence alone a defective liquor dispensing system it had purchased was the cause of its economic damages. After noting that economic damages caused by a product's malfunction can be recovered, this Court ruled:

> "Circumstantial evidence may be resorted to . . . if there can be drawn therefrom a rational inference that [a defect in the defendant's product] was the source of the trouble. There must be created in the minds of the jurors something more, of course, than a possibility, suspicion or surmise, but the requirements of the law are satisfied if the existence of this fact is made the more probable hypothesis, when considered with reference to the possibility of other hypotheses."[706]

Similarly, in this case, Hyatt is allowed to use circumstantial evidence, which supports the rational inference that the FTB's outrageous disclosure of confidential information was the source of the damage. Indeed, the evidence is clear that immediately after the disclosure, Hyatt's revenue from new licenses dropped to zero overnight, and this circumstance certainly admits of the rational inference of cause and effect. Further, when buttressed by the expert testimony regarding the business practices and culture of Japanese companies, this circumstantial evidence cannot be described as "a possibility, suspicion or surmise."

**C.    "Causation" in the context of intentional tort claims is different from the standard applicable generally for negligence claims.**

The issue of causation may, and typically is, proven in intentional tort cases through circumstantial evidence presented to the jury at trial. Rarely does the tortfeasor explicitly acknowledge his or her intention to defraud, harass, invade the privacy, etc. of the plaintiff. In this

---

[705] 119 Nev. 157, 68 P.3d 896 (2003).

[706] *Nevada Contract Services, Inc. v. Squirrel Companies, Inc.*, 119 Nev. 157, 161, 68 P.3d 896, 899 (2003) (quoting *Hershenson v. Lake Champlain Motors, Inc.*, 139 Vt. 219, 424 A.2d 1075, 1078 (1981) (quoting *Patton v. Ballam*, 115 Vt. 308, 58 A.2d 817, 821 (1948)).

192

regard, the Nevada Supreme Court squarely held in *Frantz v. Johnson* that:

> Causation is a question for the finder of fact that will not be overturned unless clearly erroneous . . . . Causation may be inferred from the circumstantial evidence presented at trial.[707]

In negligence cases, the proximate cause limitations on the damages recoverable by the plaintiff are generally limited to the "foreseeable consequences" of the negligence.[708] But "proximate cause" in intentional torts cases, particularly as here where bad faith and fraud are established, is given a broader scope allowing a broader recovery to fully compensate the victim of the intentional misconduct.

The Alabama Supreme Court set forth an extensive analysis of this issue in *Shades Ridge Holding Co., Inc. v. Cobbs, Allen & Hall Mortg. Co., Inc.*[709]

> [I]n cases of intentional or aggravated acts there is an extended liability and the rules of proximate causation are more liberally applied than would be justified in negligence cases. This is especially true in cases of fraud where proximate cause is often articulated as a requirement of reasonable reliance where but for the misrepresentation or concealment it is likely the plaintiff would not have acted in the transaction in question. In those instances where the defendant is found to have acted intentionally it is proper that a more remote causation result in liability than would be true in negligence cases. The policy to be followed is that liability should fall on the wrongdoer rather than to permit the victim to go uncompensated.[710]
>
> . . .
>
> In the context of fraud or other intentional torts the cases mention proximate cause as a necessary element for liability rather casually but provide little or no guidance regarding standards for determining causation. Often, courts do not even use the word "proximate" in connection with causation.[711]
>
> . . .
>
> This trend is dictated by the policy that liability even though potentially tremendous should be imposed on the wrongdoer rather than the victim be uncompensated. Hence, even very remote causation may be found where the defendant acted intentionally.[712]

Other jurisdictions are in accord. The Fifth Circuit explained:

---

[707] *Frantz v. Johnson*, 116 Nev. 455, 468 (2000) (per curiam, citations omitted).

[708] *Dow Chem. Co. v. Mahlum*, 114 Nev. 1468, 1481, 970 P.2d 98 (1988).

[709] 390 So. 2d 601 (Ala. 1980).

[710] *Id.* at 607.

[711] *Id.* at 609.

[712] *Id.*

193

[T]he courts have generally held that where the acts of a defendant constitute an intentional tort or reckless misconduct, as distinguished from mere negligence, the aggravated nature of his action is a matter which should be taken into account in determining whether there is a sufficient relationship between the wrong and plaintiff's harm to render the actor liable. Specifically, the factors to be taken into account are the tortfeasor's intention to commit a wrongful act, the degree of his moral wrong in so acting, and the seriousness of the harm intended.[713]

Indeed, the Eleventh Circuit confirmed the universal application of the distinction between negligence claims and intentional tort claims relative to causation:

[T]his relaxation does not appear peculiar to Alabama law; the usual common law rule seems to be that the strictures of proximate cause are applied more loosely in intentional tort cases.[714]

This standard must be applied here where Hyatt asserted only intentional torts against the FTB and where the jury and the court found the FTB to be guilty of all tort claims asserted, including bad faith and fraud.

## D. Expert testimony is appropriate and not uncommon in establishing causation.

Under NRS 50.275 expert testimony must be based on underlying factual evidence, and Hyatt's expert testimony was based on facts.[715] As explained more fully below, Hyatt's experts have set forth the facts upon which their opinions are based. Their experiences with Japanese companies and the Japanese government are facts. The FTB's sending of the letters to the Japanese companies are undisputed facts. The FTB's litigating against Japanese companies is an undisputed fact. The FTB's continuous auditing of Japanese companies is an undisputed fact. The manner in

---

[713] *Johnson v. Greer*, 477 F.2d 101, 106-07 (5th Cir. 1973), as quoted in *Shades Ridge*, 390 So. 2d at 609-10 (alteration in original); *see also Seidel v. Greenberg*, 108 N.J. Super. 248, 261-262, 260 A. 2d 863, 871 (1969) ("A different matter is presented where intentional acts are involved and it is clear that the rules of causation are more liberally applied to hold a defendant responsible for the consequences of his acts. It is well settled that where the acts of a defendant constitute an intentional tort or reckless misconduct, as distinguished from mere negligence, the aggravated nature of his acts is a matter to be taken into account in determining whether there is a sufficient causal relation to plaintiff's harm to make the actor liable therefore."), as quoted in *Shades Ridge*, 390 So. 2d at 610 (emphasis added); *Mayer v. Town of Hampton*, 497 A.2d 1206, 1209 (N.H. 1985) ("The law of torts recognizes that a defendant who intentionally causes harm has greater culpability than one who negligently does so.").

[714] *See UFCW v. Philip Morris, Inc.*, 223 F.3d 1271, 1274 (11th Cir 2000) (*quoting* Prosser & Keeton on the Law of Torts § 8, at 37 n. 27 (5th ed.1984).

[715] 7 AA 01593.

194

RJN0250

1   which Japanese companies and the Japanese government operate are facts, or at least disputed facts

2   which must be presumed in Hyatt's favor in opposing summary judgment. Hyatt's concern for the

3   privacy and confidentiality of his licensing information and the FTB's many promises to protect the

4   privacy and confidentiality of these documents are established facts. The Licensing Program went

5   from the highest point to absolute zero, immediately after the FTB sent out the letters to the

6   Japanese companies. These constitute compelling facts relative to causation that should be tried to

7   a jury. The FTB's desire to "get" Hyatt, as the lead auditor said, are established facts. Reasonable

8   inferences can and are drawn from these facts, establishing the causation link required in intentional

9   tort cases.

10      That is precisely the analysis used and accepted in *Jones v. United States*,[716] a case in which

11   a federal court in Nebraska entered a significant judgment against the IRS for damage to the

12   taxpayers' business stemming from improper disclosure of the fact that the taxpayers were under

13   investigation by the taxing authority. The court in *Jones* explained the causation evidence as

14   follows:

15          In response to the government's "*Daubert*-like" causation objection to this testimony, the
           court found that: "Before-and-after economic analysis, using the rule[-out] hypothesis, is
16          customarily employed in economic fields to endeavor to establish causation." (Tr.
           240:16-19) Therefore, the court found that the approach used by Chapin was generally
17          sound.[717]

18      This Court has also recognized the use of experts in proving causation. In *Yamaha Motor*

19   *Co., U.S.A. v. Arnoult*,[718] this Court upheld a jury verdict for the plaintiff upon finding the

20   plaintiff's "warning" expert established the proximate cause of the plaintiff's injury.[719]

21      The concept of using expert testimony to prove causation was recently, and most succinctly,

22   described by the Second Circuit:

23

24   ───────────────────

25   [716] 9 F. Supp.2d 1119 (D. Neb. 1998).

26   [717] *Jones v. United States*, 9 F.Supp.2d 1119, 1130 (D.Nev. 1998).

     [718] 114 Nev. 233, 955 P.2d 661 (1998).

27   [719] *Id.* at 243-44; *See Dow Chem. Co. v. Mahlum*, 114 Nev. 1468, 1482 (1998); *Banks ex rel. Banks v.*
     *Sunrise Hosp.*, 120 Nev. 822, 102 P.3d 52, 64 (2004) (*en banc*; footnote omitted; emphasis added); and
28   *Prabhu v. Levine*, 112 Nev. 1538, 1544, 930 P.2d 103 (1996), relative to causation.

195

1    Where, however, the nexus between the injury and the alleged cause would not be
2    obvious to the lay juror, "expert evidence is often required to establish the causal
     connection between the accident and some item of physical or mental injury."[720]

3    Expert testimony is therefore entirely appropriate in this case where the cause of Hyatt's

4    economic damages involves an understanding of Japanese business culture and the role of the

5    Japanese government relative to Japanese businesses.

6    **VI.     CONCLUSION.**

7    Hyatt presented evidence in the District Court in opposition to the FTB motion that included

8    proof of the following factors, which is strong evidence of causation: (1) the nature of the FTB's

9    intentional, wrongful activity; (2) the geographical proximity between the FTB actions in Japan and

10   licensing in Japan; (3) the instantaneous proximity in time between the FTB's intrusive letters and

11   the destruction of the Licensing Program in Japan; (4) the manner in which the Japanese business

12   community disseminates and reacts to adverse news; (5) the delicacy of license negotiations in

13   Japan which are influenced by clouds on integrity; (6) the long period of time that the Licensing

14   Program in Japan had previously been immensely successful in operation; (7) all new revenues

15   went to zero immediately after the FTB's conduct; and (8) the lack of any evidence in the moving

16   papers of some other cause, other than the conduct of the FTB, for the destruction of the Licensing

17   Program.

18   The effect of the FTB's disclosures about Hyatt in Japan *in April 1995* was, and is, a

19   disputed material fact. Hyatt presented to the District Court, and would have presented at trial,

20   expert testimony confirming *to a reasonable degree of professional certainty* (as described in each

21   expert affidavit) that the information the FTB improperly disclosed about Hyatt in Japan would

22   have been widely disseminated in Japan and would have negatively affected the sublicensing of the

23   Hyatt patents to Japanese companies. Hyatt's proffered evidence of the cause of the economic

24

25   ──────────────

26   [720] *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004), *cert. denied*, 546 U.S. 822 (2005)
     (*quoting Moody v. Maine Cent. R.R. Co.*, 823 F.2d 693, 695 (1st Cir. 1987)); *see also McKinney v.*
27   *Keumper*, 2005 WL 2046003 (D.S.D. 2005) ("A causal connection between an event and an injury may be
     inferred in cases in which a visible injury or a sudden onset of an injury occurs. However, when the injury
28   is a "sophisticated" one . . . proof of causation is not within the realm of lay understanding and must be
     established through expert testimony." (citations omitted)).

196

KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO

1   damages in Japan more than meets the applicable standard for causation used for intentional tort

2   claims.

3          Based on the evidence presented, the issue of the proximate cause of the damage to the

4   Licensing Program in Japan was a question of fact for a jury. Genuine issues of material fact

5   precluded granting partial summary judgment in favor of the FTB. The District Court erred in

6   ruling otherwise.

7          The District Court's March 14, 2006 order should be reversed, and this case should be

8   remanded to the District Court for a limited trial on the issue of whether the FTB's already proven

9   bad faith intentional tortious conduct caused Hyatt to suffer economic damages in the form of the

10  destruction of the patent Licensing Program in Japan. The evidence presented should be limited to

11  the events relating to the disclosures in Japan by the FTB, the outrageous acts perpetrated on Hyatt

12  by the FTB as found by the first jury, the findings of fraud, breach of privacy, and breach of

13  confidentiality by the first jury, and expert testimony concerning the likely consequences of those

14  events.

15  \ \ \

16  \ \ \

17  \ \ \

18  \ \ \

19  \ \ \

20  \ \ \

21  \ \ \

22  \ \ \

23  \ \ \

24  \ \ \

25  \ \ \

26  \ \ \

27  \ \ \

28

197

1    Hyatt therefore respectfully requests that the Court reverse the District Court's order of

2  March 14, 2006 and remand the matter to the District Court for limited proceedings as described

3  above.

4    DATED: January 5, 2010

5                                    MARK A. HUTCHISON, Nevada Bar No. 4639
                                     MICHAEL K. WALL, Nevada Bar No. 2098
6                                    HUTCHISON & STEFFEN, LTD.
                                     10080 Alta Drive, Suite 200
7                                    Las Vegas, NV 89145
                                     Telephone: (702) 385-2500
8                                    Facsimile: (702) 385-2086

9

10                                   PETER C. BERNHARD, Nevada Bar No. 734
                                     KAEMPFER CROWELL RENSHAW GRONAUER
11                                   & FIORENTINO
                                     8345 W. Sunset Road, Suite 250
12                                   Las Vegas, NV 89113
                                     Telephone: (702) 792-7000
13                                   Facsimile: (702) 796-7181

14

15                                   DONALD J. KULA, California Bar No. 144342
                                     PERKINS COIE LLP
16                                   1888 Century Park East, Suite 1700
                                     Los Angeles, CA 90067-1721
17                                   Telephone: (310) 788-9900
                                     Facsimile: (310) 788-3399

18

19                                   *Attorneys for Respondent/Cross-Appellant Gilbert P.*
                                     *Hyatt*

20

21                                        *****

22

23

24

25

26

27

28

RJN0254

## CERTIFICATE OF COMPLIANCE

I hereby certify that I have read this Respondent's Answering Brief and Opening Cross-Appeal Brief, and to the best of my knowledge, information, and belief, it is not frivolous or interposed for any improper purpose. I further certify that this brief complies with all applicable Nevada Rules of Appellate Procedure, and in particular NRAP 28(e), which requires every assertion in the brief regarding matters in the record to be supported by a reference to the page of the transcript or appendix where the matter relied on is to be found. I understand that I may be subject to sanctions in the event that the accompanying brief is not in conformity with the requirements of the Nevada Rules of Appellate Procedure.

DATED: January 5, 2010.

MARK A. HUTCHISON, Nevada Bar No. 4639
MICHAEL K. WALL, Nevada Bar No. 2098
HUTCHISON & STEFFEN, LTD.
10080 Alta Drive, Suite 200
Las Vegas, NV 89145
Telephone: (702) 385-2500
Facsimile: (702) 385-2086

PETER C. BERNHARD, Nevada Bar No. 734
KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Road, Suite 250
Las Vegas, NV 89113
Telephone: (702) 792-7000
Facsimile: (702) 796-7181

DONALD J. KULA, California Bar No. 144342
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone: (310) 788-9900
Facsimile: (310) 788-3399

*Attorneys for Respondent/Cross-Appellant Gilbert P. Hyatt*

199

RJN0255

# CERTIFICATE OF SERVICE

Pursuant to NRAP 25, I certify that I am an employee of KAEMPFER CROWELL

RENSHAW GRONAUER& FIORENTINO and that on this ____ day of January, 2010, I caused

the above and foregoing document entitled **RESPONDENT'S ANSWERING BRIEF AND**

**OPENING CROSS-APPEAL BRIEF** to be served by the method(s) indicated below:

| | |
|---|---|
| _____ | via U.S. mail, postage prepaid; |
| X | via Federal Express; |
| _____ | via hand-delivery; |
| _____ | via Facsimile; |

upon the following person(s):

James A. Bradshaw, Esq.
MCDONALD CARANO WILSON LLP
100 West Liberty Street, 10th Floor
Reno, NV 89501

*Attorneys for Appellant*
*Franchise Tax Board of the State of California*

Patricia K. Lundvall, Esq.
MCDONALD CARANO WILSON LLP
2300 West Sahara Avenue, Suite 1000
Las Vegas, NV 89102

*Attorneys for Appellant*
*Franchise Tax Board of the State of California*

Robert L. Eisenberg, Esq.
LEMONS, GRUNDY & EISENBERG
6005 Plumas Street, Suite 300
Reno, NV 89519

*Attorneys for Appellant*
*Franchise Tax Board of the State of California*

C. Wayne Howle, Solicitor General, State of
Nevada
Local Counsel
100 North Carson Street
Carson City, NV 89701

Clark L. Snelson
Utah Assistant Attorney General
160 East 300 South 5th Floor
Salt Lake City, Utah 84114

Bruce J. Fort, Counsel
Multistate Tax Commission
444 N. Capitol Street, N.W.
Suite 425
Washington, D.C. 20001-8699

An employee of KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO

200

RJN0256

**IN THE SUPREME COURT OF THE STATE OF NEVADA**

FRANCHISE TAX BOARD OF THE STATE
OF CALIFORNIA,

    Appellant,

v.

GILBERT P. HYATT,

    Respondent

Supreme Court Case No. 53264

**APPEAL FROM JUDGMENT – EIGHTH JUDICIAL DISTRICT COURT
STATE OF NEVADA, CLARK COUNTY
HONORABLE JESSIE WALSH, DISTRICT JUDGE**

**RESPONDENT'S APPENDIX**

**VOLUME 82**

Mark A. Hutchison, Nevada Bar No. 4639
Michael K. Wall, Nevada Bar No. 2098
Hutchison & Steffen
10080 Alta Drive, Suite 200
Las Vegas, NV 89145
Telephone: (702) 385-2500
Facsimile: (702) 385-2086

Peter C. Bernhard, Nevada Bar No. 734
Kaempfer Crowell Renshaw
Gronauer & Fiorentino
8345 West Sunset Rd.
Suite 250
Las Vegas, Nevada 89113
Telephone: (702) 792-7000
Facsimile: (702) 796-7181

Donald J. Kula, California Bar No. 144342
Perkins Coie
1888 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 788-9900
Facsimile: (310) 788-3399

*Attorneys for Respondent*

– 1 –

RJN0257

KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
8345 West Sunset Rd., Suite 250
Las Vegas NV 89113
Telephone (702) 792-7000
Facsimile (702) 796-7181



STATE OF CALIFORNIA

**FRANCHISE TAX BOARD**
6150 VAN NUYS BLVD., ROOM 100
VAN NUYS, CA 91401-3381
TELEPHONE: (818) 901-5225

For Privacy Act Notice, See Form FTB 1131

Date: June 17, 1993

Gilbert P. Hyatt
P.O. Box 60028
Las Vegas, NV 89160

Years: 1989 & 1990 & 1991

Your returns have been assigned to this office for examination. We hope to complete the examination as soon as possible, but our workload sometimes requires that our audits be delayed for some time. Answers to the questionnaire on the reverse side will assist us in scheduling an appointment on a mutually convenient date, and in expediting the examination of your returns.

Please complete the questionnaire and return it to our office within 10 days. If additional information is needed, you or your designated representative will be contacted.

Your cooperation is appreciated.

*Marc Shayer*
Marc Shayer
Tax Auditor

H 014905

FTB 4891-39 (REV 12-86) PAGE 1

0112-00001
RA020471

RJN0258

MS

**AUDIT SCHEDULING INFORMATION**  ☐ Personal Income Tax  ☐ Franchise Tax

| INCOME YEARS |
|---|

| TAXPAYER |
|---|

| TAXPAYER ADDRESS | ADDRESS LOCATION WHERE RECORDS CAN BE EXAMINED |
|---|---|
| | ☐ Same as Taxpayer address |
| | ☐ |

**Individual to contact to conduct this audit**

| NAME | TITLE | TELEPHONE & EXTENSION |
|---|---|---|
| ADDRESS | | |

Have you signed a consent to extend the federal statute of limitations for any of the years involved or any prior year?  ☐ Yes  ☐ No   If Yes, list each year and application expiration date:

| Year | | | | | | |
|---|---|---|---|---|---|---|
| Expiration Date | | | | | | |

Has the Federal Government examined any of the returns for the year(s) involved? . . . . . . . . . ☐ Yes  ☐ No
Is an examination in progress? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes  ☐ No
    If Yes, years under examination: _____
To your knowledge, is an examination planned? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes  ☐ No

*If an examination has been completed, a copy of the report should be forwarded to this office in accordance with Section 25432 of the Bank and Corporation Law or Section 18451 of the Personal Income Tax Law. This may make our independent examination unnecessary.*

| CORPORATE TAXPAYERS COMPLETE THE FOLLOWING | | | | |
|---|---|---|---|---|
| Name of corporate affiliates (subsidiary or parent) | Percent of Ownership | Files California Returns | | If Yes, California Identification No. |
| | | Yes | No | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*Please enclose reports to stockholders for each reference year (if available) in order that we may study them beforehand.*

| This questionnaire completed by: | SIGNATURE | TITLE | DATE |
|---|---|---|---|

FTB 4591-39 (REV 12-86) PAGE 2

0112-00002
RA020472

RJN0259



STATE OF CALIFORNIA

**FRANCHISE TAX BOARD**

Your tax return has been selected for audit by the California Franchise Tax Board (FTB).

What should you expect from a Franchise Tax Board audit?

- Courteous treatment by FTB employees
- Clear and concise requests for information from the auditor assigned to your case
- Confidential treatment of any personal and financial information that you provide to us
- Completion of the audit within a reasonable amount of time

FTB 1015 (REV 3-89) PAGE 1

At the close of the audit, you will be told in writing that:

- We are accepting the return as you filed it, or
- You have additional tax due, or
- You have overpaid your tax and are entitled to a refund, or -
- We have not changed your tax amount, but you may be entitled to a refund if you correctly recompute your tax and file a claim for a refund before the Statute of Limitation expires

*Please see reverse side for additional information.*

**PRIVACY NOTICE**

The Information Practices Act of 1977 and the federal Privacy Act require the Franchise Tax Board to tell you why we ask you for information. The Operations and Compliance Divisions ask for tax return information to carry out the Personal Income Tax Law of the State of California. We may request additional information if we audit your return or take collection action.

If you meet the income requirements, the Revenue and Taxation Code requires you to file a return or statement in the form we prescribe (Sections 18401 and 18431). When you file these or other documents, you must include your social security number for identification and return processing (Section 18934).

1131 (REV 5-89/6-91)

It is mandatory to furnish all information requested when you are required to file a return or statement. If you do not file a return, or do not provide the information we ask for, or provide fraudulent information, the law says you may be charged penalties and interest and, in certain cases, you may be subject to criminal prosecution. We also may disallow claimed exemptions, exclusions, credits, deductions or adjustments. This could make the tax higher or delay or reduce any refund.

We may give the information you furnish us to the United States Internal Revenue Service, the proper official of any state imposing an income tax or a tax measured by income, the Multistate Tax Commission and to California government

agencies and officials, as provided by law. If you owe any monies, we may disclose the amount due to employers, financial institutions, County Recorders, vacation trust funds, process agents and other payers.

You have a right to access records containing your personal information maintained by the Franchise Tax Board. The officials responsible for maintaining the information are: 1) Filing of returns – Director, Document Processing Bureau; 2) Auditing of returns – Director, Personal Income Tax Audit Bureau; and 3) Collection of monies – Director, Enforcement Bureau. The address is: Franchise Tax Board, P.O. Box 942840, Sacramento, CA 94240-1040; telephone: (800) 852-5711.

H 014907

0112-00003
RA020473

RJN0260



1741

Place stamp here.
Post Office will
not deliver mail
without postage.

FRANCHISE TAX BOARD
6150 VAN NUYS BLVD ROOM 100
VAN NUYS CA 91401-3381
ATTN: MARC SHAYER

0112-00004
RA020474

H 014908

RJN0261

1721

STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**
6150 VAN NUYS BLVD., ROOM 100
VAN NUYS, CA 91401-3381

FORWARDING AND
ADDRESS CORRECTION REQUESTED





89168-8828

HYAT028   891L02019 1A92 06/21/93
FORM 3547
HYATT
4012 S RAINBOW BLVD #469
LAS VEGAS NV 89103-2010

H 014909

0112-00005
RA020475

RJN0262

1

## IN THE SUPREME COURT OF THE STATE OF NEVADA

2

FRANCHISE TAX BOARD OF THE STATE
3   OF CALIFORNIA,               Supreme Court Case No. 53264

4       Appellant,

5       v.

6   GILBERT P. HYATT,

7       Respondent

8

## APPEAL FROM JUDGMENT – EIGHTH JUDICIAL DISTRICT COURT
9
## STATE OF NEVADA, CLARK COUNTY
## HONORABLE JESSIE WALSH, DISTRICT JUDGE

10

11

## RESPONDENT'S APPENDIX
12

### VOLUME 85
13

14

15   Mark A. Hutchison, Nevada Bar No. 4639
Michael K. Wall, Nevada Bar No. 2098
16   Hutchison & Steffen
10080 Alta Drive, Suite 200
Las Vegas, NV 89145
17   Telephone: (702) 385-2500
Facsimile: (702) 385-2086

18

19   Peter C. Bernhard, Nevada Bar No. 734
Kaempfer Crowell Renshaw
20   Gronauer & Fiorentino
8345 West Sunset Rd.
21   Suite 250
Las Vegas, Nevada 89113
22   Telephone: (702) 792-7000
Facsimile: (702) 796-7181

23

24   Donald J. Kula, California Bar No. 144342
Perkins Coie
25   1888 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 788-9900
26   Facsimile: (310) 788-3399

27   *Attorneys for Respondent*

28

– 1 –

RJN0263

STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**

~~3 N. GLENOAKS BLVD., SUITE 200
RBANK, CA 91502-1170
.ELEPHONE: (818)  556-2942

1/19/96

Mr. Eugene G. Cowan
c/o Riordan & McKinzie
300 S. Grand Avenue 29th Floor
Los Angeles, CA 90071

Re:  FTB audit of Gilbert P. Hyatt for 1992

Dear Mr. Cowan:

Based upon the findings of the audit of Mr. Hyatt for 1991, we
have decided to formally open an audit for tax year 1992.  A
part year return (540NR) may be required for 1992.

Based upon information obtained from the 1992 1040, Mr. Hyatt
received the following Schedule C gross receipts:

|         |             |
|---------|-------------|
| Phillips | $48,880,582 |
| Oki      | 2,975,000 |
| Hitachi  | 32,914,542 |
| TOTAL    | $84,770,124 |

DOCUMENT REQUEST:

1. Provide documentation supporting the above Schedule C
   receipts, such as contracts, royalty reports, bank
   statements, and documentation of wire transfers, to
   verify when the payments were received by Mr. Hyatt.

Please send this documentation to my office by February 9, 1996.

Call me if you have any questions or if you need any additional
information.

Sheila Cox
Tax Auditor

Page 1

H 02333

0279-00001
RA021033

RJN0264

## CERTIFICATE OF SERVICE

U.S. Court of Appeals Docket Number(s): 15-15296

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 7, 2017.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature:     *s/ Yolanda Mendez*