**No. 15-15296**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

GILBERT P. HYATT,

*Plaintiff-Appellant,*

v.

BETTY T. YEE, in her official capacity as California Franchise Tax
Board member and California State Board of Equalization member
DIANE L. HARKEY, in her official capacity as California State
Board of Equalization member; JEROME E. HORTON, in his
official capacity as California State Board of Equalization member;
MICHAEL COHEN, in his official capacity as California Franchise
Tax Board member; GEORGE RUNNER, in his official capacity as
California State Board of Equalization member; FIONA MA, in her
official capacity as California State Board of Equalization member
and California Franchise Tax Board member,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California
Case No. 2:14-cv-00849-GEB-DAD (Hon. Garland E. Burrell, Jr.)

APPELLANT
GILBERT P. HYATT'S
COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
VOLUME 5 OF 7
RJN1081 - RJN1278

Donald J. Kula
Oliver M. Gold
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Erwin Chemerinsky
EChemerinsky@law.uci.edu
UC IRVINE SCHOOL OF LAW
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000
Telephone: 949.824.8814
Facsimile: 949.824.7336

Malcolm Segal, Bar No. 075481
MSegal@segal-pc.com
SEGAL & ASSOCIATES, PC
400 Capitol Mall, Suite 2550
Sacramento, CA 95814
Telephone: 916.441.0886
Facsimile: 916.475.1231

Attorneys for Appellant Gilbert P. Hyatt

**APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR
JUDICIAL NOTICE DOCUMENTS
INDEX**

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| | **VOLUME 1** | |
| 1 | Decision issued by the Nevada Supreme Court dated September 18, 2014 | RJN0001-0035 |
| 2 | Respondent Gilbert P. Hyatt's Answering Brief filed January 5, 2010 | RJN0036-0256 |
| 3 | FTB Notice of Opening Audit for 1991 tax year dated June 17, 1993 | RJN0257-0262 |
| 4 | FTB Notice of Opening Audit for 1992 tax year dated January 19, 1996 | RJN0263-0264 |
| | **VOLUME 2** | |
| 5 | FTB Notice of Preliminary Determination for 1991 tax year dated August 2, 1995 | RJN0265-0305 |
| 6 | FTB Notice of Preliminary Determination for 1992 tax year dated April 1, 1996 | RJN0306-0323 |
| 7 | FTB Notice of Proposed Assessment for 1991 tax year dated April 23, 1996 | RJN0324-0328 |
| 8 | FTB Notice of Penalty Adjustment for 1992 tax year dated April 10, 1997 | RJN0329-0333 |
| 9 | FTB Notice of Proposed Assessment for 1992 tax year dated August 14, 1997 | RJN0334-0340 |

# APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR
# JUDICIAL NOTICE DOCUMENTS
# INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 10 | Nevada Tort Case Trial Transcript (RT: June 20, 147:14-148:20; 150:14-151:2; 151:3-153:5) | RJN0341-0347 |
| 11 | Nevada Tort Case Trial Transcript (RT: June 20, 175:15-177:13, 185:19-188:6) | RJN0348-0355 |
| 12 | Nevada Tort Case Trial Transcript (RT: April 25, 80:10-81:17, 84:11-24) | RJN0359-0362 |
| 13 | FTB Audit Strategy Memo dated November 18, 1994 | RJN0454-0457 |
| 14 | Nevada Tort Case Trial Transcript (RT: April 24, 132:2-23, 140:11-141:25) | RJN0458-0461 |
| 15 | Nevada Tort Case Trial Transcript (RT: April 24, 42:4-43:8, 80:22-81:11, 134:1-12; 136:23-138:2) | RJN0462-0470 |
| 16 | Nevada Tort Case Trial Transcript (RT: April 24, 76:16-77:7, 129:9-15) | RJN0471-0474 |
| 17 | Nevada Tort Case Trial Transcript (RT: April 24, 26:11-19, 74:1-75:20) | RJN0475-0478 |
| 18 | FTB internal memo dated August 21, 1995 | RJN0479-0484 |
| 19 | FTB audit reviewer's notes dated April 18, 1996 | RJN0485-0486 |
| 20 | Unsworn witness statements dated December 6, 1994, December 19, 1994, and January 18, 1995 | RJN0487-0502 |
| 21 | FTB Interrogatory Response | RJN0503-0510 |

2

## APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
### INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 22 | Nevada Tort Case Trial Transcript (RT: June 9, 97:9-16, 102:7-103:17, 108:2-110:10) | RJN0511-0517 |
| 23 | Nevada Tort Case Trial Transcript (RT: May 30, 145:4-146:17, 148:9-151:5) | RJN0518-0524 |
| 24 | FTB auditor notes dated August 14, 1995 | RJN0525-0528 |
| 25 | Letters from Hyatt tax counsel to FTB dated April 29, 1996, May 1, 1996, December 11, 1997, and March 10, 1998 | RJN0529-0535 |
| 26 | FTB audit manual excerpt | RJN0536-0537 |
| 27 | Letter from Hyatt tax counsel to FTB dated July 17, 1997 | RJN0538-0542 |
| 28 | FTB reviewer comments dated August 4, 1997 | RJN0543-0545 |
| 29 | Letter from Hyatt tax counsel to FTB protest section, dated October 10, 1997 | RJN0546-0549 |
| 30 | Email internal among FTB supervisors dated April 4, 1997 | RJN0550-0551 |
| | **VOLUME 3** | |
| 31 | Nevada Tort Case Trial Transcript (RT: April 22, 69:8-71:3, 73:3-74:23, 84:2-86:2, 88:22-90:19; RT: April 23, 88:1-89:22) | RJN0552-0566 |

3

**APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR
JUDICIAL NOTICE DOCUMENTS
INDEX**

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 32 | Hyatt Protest Letter for 1991 tax year dated June 20, 1996 | RJN0567-0629 |
| 33 | Hyatt Protest Letter for 1992 tax year dated October 10, 1997 | RJN0630-0633 |
| 34 | FTB Protest Determination Letter for both 1991 and 1992 dated November 1, 2007 | RJN0634-0635 |
| 35 | Nevada Tort Case Trial Transcript (RT: May 22, 2008, 57:20-59:6, 80:19-84:14) | RJN0636-0644 |
| 36 | Nevada Tort Case Trial Transcript (RT: May 22, 2008, 92:4 -94:11) | RJN0645-0648 |
| 37 | Nevada Tort Case Trial Transcript (RT: April 30, 2008, 149:11-24) | RJN0649-0650 |
| 38 | Nevada Tort Case Trial Transcript (RT: July 15, 2008, 3:13-16, 12:19-13:8) | RJN0651-0654 |
| 39 | Information/Document Requests (IDRs) from FTB protest officer to Hyatt tax counsel dated December 30, 1999 | RJN0655-0686 |
| 40 | Nevada Tort Case Trial Transcript (RT: May 1, 2008, 40:22-42:7) | RJN0687-0690 |
| 41 | Nevada Tort Case Trial Transcript (RT: June 16, 2008, 56:14-57:3, 58:7-60:4, 61:14-25; 72:9-13, 75:18-77:6) | RJN0691-0701 |
| 42 | Letters from former Hyatt tax counsel Eric Coffill dated June 30, 2000, July 31, 2001 and June 15, 2001 | RJN0702-0810 |

4

# APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
## INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 43 | FTB Protest Log (excerpts) dated September 27, 2000 and October 4, 2000 | RJN0811-0813 |
| **VOLUME 4** | | |
| 44 | FTB Protest Log (excerpt) dated February 20, 2002 | RJN0814-0815 |
| 45 | Email from FTB protest officer dated February 20, 2002 | RJN0816-0817 |
| 46 | Letter from former Hyatt tax counsel Eric Coffill dated March 7, 2002 | RJN0818-0819 |
| 47 | Email from FTB counsel Ben Miller dated April 5, 2002 | RJN0820-0821 |
| 48 | Letter from former Hyatt tax counsel Eric Coffill to FTB dated April 25, 2002 | RJN0822-0826 |
| 49 | FTB Protest Log (excerpt) dated April 25, 2005 | RJN0827-0828 |
| 50 | Nevada Discovery Commissioner Reports and Recommendations filed October 5, 2005 and November 10, 2005 | RJN0829-0850 |
| 51 | Nevada Tort Case Transcript of Nevada Discovery Commissioner ruling dated November 9, 1999 | RJN0851-0852 |
| 52 | Nevada Protective Order filed December 27, 1999 | RJN0853-0865 |
| 53 | Briefing filed in Nevada trial court during trial conducted in 2008 | RJN0866-1016 |

## APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
## INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 54 | Nevada Tort Case Trial Transcript (RT: May 7, 2008, 98:9-103:25, 109:7-129:3; RT: May 27, 2008, 27:6-30:10; RT: June 11, 9:7-38:21) | RJN1017-1080 |
| **VOLUME 5** | | |
| 55 | Nevada Tort Case Trial Transcript (RT: June 16, 2008, 2:11-34:15, 35:13-37:6, 117:25-132:8 | RJN1081-1133 |
| 56 | Nevada Tort Case Trial Transcript (RT: July 11, 2008, 41:5-42:23; 47:19-48:13; RT: July 15, 2008,187:3-17) | RJN1134-1140 |
| 57 | Nevada Tort Case Trial Transcript (RT: July 11, 2008, 138:23-139:14, 153:19-154:19) | RJN1141-1145 |
| 58 | Nevada Tort Case Trial Transcript (RT: July 15, 2008, 187:3-15) | RJN1146-1147 |
| 59 | Nevada Tort Case Trial Transcript (RT: July 15, 2008, 188:9-192:11) | RJN1148-1153 |
| 60 | FTB Demand Letter under the Nevada Protective Order dated June 3, 2002 | RJN1154-1156 |
| 61 | Nevada Tort Case Trial Transcript (RT: July 15, 2008, 162:21-163:5, 163:7-166:13, 187:3-188:6; RT: July 14, 2008, 174:3-175:21) | RJN1157-1167 |
| 62 | SBE Rules for Tax Appeals, Rules 5431(b)(3) and 5435 | RJN1168-1172 |

## APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
### INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 63 | Email from former Hyatt tax counsel Eric Coffill to the SBE dated June 3, 2009 | RJN1173-1175 |
| 64 | SBE letter to the Franchise Tax Board ("FTB") dated July 8, 2009 | RJN1176 |
| 65 | SBE letter to FTB dated August 21, 2009 | RJN1177 |
| 66 | Letter from former Hyatt tax counsel Eric Coffill to the SBE dated September 2, 2009 | RJN1178-1180 |
| 67 | SBE letter to FTB dated September 14, 2009 | RJN1181 |
| 68 | SBE letter to both FTB and former Hyatt tax counsel Eric Coffill dated August 2, 2012 | RJN1182 |
| 69 | Letter from SBE to both FTB and former Hyatt tax counsel Eric Coffill dated February 20, 2013 | RJN1183 |
| 70 | FTB letter to the SBE dated July 16, 2014 | RJN1184 |
| 71 | FTB letter to SBE dated August 13, 2014 | RJN1185 |
| 72 | SBE letter to the FTB and former Hyatt tax counsel Eric Coffill dated December 9, 2014 | RJN1186-1187 |
| 73 | FTB letter to the SBE dated March 17, 2015 | RJN1188-1194 |
| 74 | FTB Additional Brief, pp. 1:24-2:1; 28, fn. 152, (FTB's $24 Million Error) filed in the SBE Appeals on February 19, 2013 | RJN1195-1199 |

# APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
## INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 75 | Hyatt Additional Supplemental Briefing, Attachments 1, 3, and 4 filed in the SBE Appeals on September 28, 2016 | RJN1200-1269 |
| 76 | Hyatt Third Additional Briefing, pp. 22-23, (1991 Tax-Year Appeal) filed in the SBE Appeals on December 12, 2016 | RJN1270-1271 |
| 77 | Hyatt Third Additional Briefing, pp. 13-19, (1992 Tax-Year Appeal) filed in the SBE Appeals on December 12, 2016 | RJN1272-1278 |
| | **VOLUME 6** | |
| 78 | Hyatt Affidavit filed in the SBE Appeals on December 12, 2016 | RJN1279-1610 |
| | **VOLUME 7** | |
| 79 | Subpoenas issued by Supreme Court of the State of New York, County of Westchester, to FTB in conjunction with the SBE Appeals and dated May 26, 2011 | RJN1611-1732 |
| 80 | Temporary Restraining Order (TRO) Ruling issued by Supreme Court of the State of New York, County of Westchester, in conjunction with the SBE Appeals and dated March 16, 2015 | RJN1733-1735 |




DISTRICT COURT
CLARK COUNTY, NEVADA

**FILED**

GILBERT P. HYATT,

        Plaintiff,

    vs.

CALIFORNIA STATE FRANCHISE
TAX BOARD,

        Defendant

· · · · · · · · · · · · · · · ·

DEC 16  3 21 PM '08

CASE NO. A-382999

DEPT. NO. X

CLERK OF THE COURT

**Transcript of
Proceedings**

---

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 41**

MONDAY, JUNE 16, 2008

APPEARANCES:

FOR THE PLAINTIFF:      PETER C. BERNHARD, ESQ.
                       MARK HUTCHISON, ESQ.
                       DONALD J. KULA, ESQ.
                       JENNIFER A. CARVALHO, ESQ.

FOR THE DEFENDANT:      PAT LUNDVALL, ESQ.
                       CARLA B. HIGGINBOTHAM, ESQ.
                       JAMES BRADSHAW, ESQ.

COURT RECORDER:        TRANSCRIPTION BY:

VICTORIA BOYD            VERBATIM DIGITAL REPORTING, LLC
District Court          Littleton, CO 80120
                         (303) 798-0890

Proceedings recorded by audio-visual recording, transcript
produced by transcription service.

2

1          LAS VEGAS, NEVADA, MONDAY, JUNE 16, 2008, 9:13 A.M.

2                          (Jury not present)

3              MR. HUTCHISON:  Morning.

4              MS. LUNDVALL:  Good morning.

5              THE COURT:  Good morning, everybody.  Please be

6      seated.

7              MR. BRADSHAW:  Good morning, Your Honor.

8              MR. HUTCHISON:  Morning.

9              THE COURT:  Got this settled yet?

10             MR. HUTCHISON:  Getting close.

11             MS. LUNDVALL:  Your Honor, this morning I know that we

12     have a number of deposition transcripts that we have to go

13     through and resolve the objections so that those transcripts

14     can be prepared by which to show the jury, and it's my

15     understanding that there are at least three deposition

16     transcripts that are going to be shown to the jury today and

17     maybe even more.  One of the deposition transcripts involves

18     the protest hearing officer, a woman by the name of Cody

19     Cinnamon.

20             And since last week there have been at least from

21     FTB's perspective a little bit of a troubling kind of an

22     interpretation of a Court's order, and what I'd like to do is

23     to be able to preface that because it impacts then many of

24     these objections, many of these issues as they relate then to

25     the depo designations and whether or not that they can or can't

RJN1082

3

1  be played.  And it concerns then the FTB's defense to the

2  allegations that somehow that we were acting in bad faith

3  because of the time that it took to resolve the protest.

4          As the Court recalls, there is the allegation as far

5  as by the plaintiffs that somehow that we took too long and

6  that that is evidence of bad faith and that, in fact, then

7  that, you know, we should be liable then for that bad faith.

8          Now our defense to the length of time that it took

9  for the protest to resolve involves then the client with the

10  Court's protective order, and that has been uniform as far as

11  throughout this case ever since, in fact, that you allowed this

12  to be a part of this case back in February of 2006.

13          Last week if you call, the plaintiffs, they brought a

14  motion asking for a curative instruction, asking for additional

15  witnesses to be offered on the protective order, asked for

16  additional documents like motions, things of that nature by

17  which to be offered as exhibits then to this jury to teach them

18  as to how the protective order came about.  And the Court

19  denied that.

20          And since then, though, the plaintiffs have taken the

21  position that somehow that you also denied our defense, that

22  you wiped out our defense then to their allegation of bad

23  faith.  And so as Mr. Bradshaw goes through these issues, one

24  of the things that I think that you will see is that the

25  interpretation that the plaintiffs which to place on your order

RJN1083

4

1   is far too broad, and, in fact, amounts to striking as far as

2   our entire defense to the allegation that of bad faith, and to

3   that extent then, we've got a major dispute then concerning the

4   scope of the Court's order last week.

5            And just by which to place this just a tiny bit in

6   context, as we had as far as prefaced in our opening statement

7   and, as a matter of fact, as we discussed with Mr. Antolin on

8   cross-examination, is that part of the reason for the delay in

9   the protest dealt with the idea that there were litigation

10  documents that were being uncovered, and that those litigation

11  documents then could not be really shared with, in fact, the

12  protest hearing officer.

13           And so that there were procedures that were put in

14  place by FTB so as to comply then with the Nevada protective

15  order, and it is those procedures then that caused as far as

16  some difficulty for the FTB passing the information from one

17  side of the house to the other side of the house.  And it also

18  involved, you know, administrative subpoenas, litigation over

19  those administrative subpoenas, et cetera, all that was being

20  done in California.

21           But where you'll see this most prevalent then is in

22  Ms. Cinnamon's deposition designations.  In other words, they

23  ask her why she -- they ask her if she was working on things or

24  if at certain points in time that her work had to come to a

25  stop, and she says yes, it did, and then -- but they want to

RJN1084

5

1  cut out why did her work have to come to a stop.

2         So, in other words, they want to wipe out then our

3  defense to why her work had to come to a temporary stop on

4  occasion.  And I think it may be better as far as to set this

5  into context, but I just wanted to set the stage then for the

6  Court.

7         THE COURT:  (Indiscernible).

8         MR. KULA:  Well, Your Honor, it's nothing short of a

9  request for reconsideration and reargument on a motion the

10 Court already decided.

11        First of all, their defense, while they want to couch

12 it based -- by saying the delay in the protest we blame this

13 case, if you will, and (indiscernible) this case, their real

14 defense is that they couldn't get documents from Mr. Hyatt.

15        They want to say our delay was because Mr. Hyatt

16 wouldn't provide us documents.  We had to go through a subpoena

17 process in California.  We had to go to the Court of Appeal in

18 California to get documents turned over that we wanted.  That

19 part of the defense they can present, and that's fine.  They

20 can do that.

21        But they want to couch it in terms of blaming this

22 Court and blaming Mr. Hyatt, blaming the process that's put in

23 place, and that's all based on a misinterpretation of this

24 Court's order, a misinterpretation that we went through in that

25 motion practice where we had two judicial officers of this

RJN1085

6

1   Court tell them what the protective order meant, tell them

2   they're not limited in what they can do under California law.

3   They can employ their subpoena processes and with everything

4   they need to employ.

5           So what they're suggesting is that we go back and do

6   put the (indiscernible) in this case and do start litigating

7   litigation, so I don't think there's any misinterpretation of

8   the Court's order.

9           The Court said in ruling last week -- and I'm on

10  page 39, starting at line 15 of the June 11 transcript, the

11  Court says, "Now you tell me -- well, here's the thing.   I

12  think that this jury should not be hearing about the protective

13  order, probably should not be calling witnesses.   There

14  shouldn't be any documents examined as a result of this

15  protective order.   The Court already addressed this issue

16  titled as litigating the litigation."

17          And then it goes on to explain it's not going to give

18  a curative instruction at that point in time so the Court -- as

19  the Court said basically denied and granted the motion in part,

20  if you will, but it's clear what the Court was ruling.

21          So with that ruling, we have edited the portion of

22  Ms. Cinnamon's deposition to not include discussion of the

23  protective order, and there's also certain exhibits that we

24  would offer here except for the fact of the Court's ruling.   So

25  we have edited that out.

RJN1086

7

1          And I think that's the issue that the FTB essentially
2     wants to place most of that -- most of those sections -- so
3     that's the issue, Your Honor.  Is the Court going to reconsider
4     its ruling on the protective order because we haven't
5     misinterpreted it.  We understood the Court ruling and have
6     edited it to absolutely comply with that and not be in
7     violation.

8          The fact that some of the testimony we think is
9     favorable for us, some of the documents we think is favorable
10    for us, but that gets into litigating litigation, and that's
11    not proper here.  What we do -- if the FTB is going to seek
12    this apparent reconsideration, we need a definitive ruling
13    because again we've cut out parts of our testimony that we
14    would play.

15         We're not going to offer certain exhibits based on
16    the ruling which we think is the ruling of the Court and don't
17    expect the Court to change its mind, so to speak, but that's
18    the issue that they want to raise, Your Honor.

19         MS. LUNDVALL:  And, Your Honor, from this standpoint
20    we are not seeking reconsideration of your order.  It was a
21    motion that in fact they filed, and it was a motion that the
22    Court denied, and so that denial is one that, quite candidly,
23    that what they asked for was a curative instruction.  They
24    asked for, you know, witnesses, and they asked to introduce
25    documents.  So no, we're not seeking reconsideration of the

RJN1087

8

1 order.

2       But what we are trying to make sure that the Court

3 understands is that the scope that they are trying to apply of

4 the Court's order is far too broad, and the scope of the way

5 that they seek to apply the Court's order completely wipes out

6 our defense, entirely wipes out our defense.  It leaves us with

7 no explanation whatsoever as to why in fact that this -- the

8 resolution then of the protest took the length of time that it

9 did.

10       And in effect then what they are suggesting is that

11 your order last week directed a verdict in their favor on their

12 bad-faith delay allegation, and under no conceivable

13 circumstance can I see that as part of their motion request let

14 alone as far as what the Court's order was.  And so that's

15 where my concern is.

16       And I think that when we place this into context

17 then, and when you see Ms. Cinnamon's -- you know, the

18 transcript of Ms. Cinnamon and the things that then that they

19 wish to exclude from this, you'll understand as far as where

20 I'm going to with this point and why that we believe that their

21 interpretation of your order is far, far too broad.

22       THE COURT:  Let me ask you something and that is this.

23 How does the defense defend this issue of the subject of delay

24 without addressing the protective order?

25       MS. LUNDVALL:  This is as far as from our standpoint.

RJN1088

9

1  In 1999, the Nevada court issued a protective order, and there

2  was an obligation then for the State of California to comply

3  with that, and we did comply with that.  And across the entire

4  period of time from 1999 to now, we're here in trial, at no

5  point in time did they ever say our interpretation of the Court

6  -- of that protective order was wrong.  That's point No. 1.

7          Point No. 2 is that they knew that in fact that we

8  had put procedures in place to ensure that in fact that we did

9  not violate that protective order.

10          And what happened then across the course of the

11  protest is that our compliance with the protective order took

12  time to move documents from one side of the house -- basically

13  the protest side of the -- from the litigation side of the

14  house to the protest side of the house.

15          And so from that standpoint, as an example, when

16  Ms. Cinnamon says, okay, why in fact -- why were you waiting

17  for documents.  Well, I learned that in the litigation that

18  Mr. Hyatt had produced pieces of information that in fact that

19  I was seeking, and, therefore, we had to be able to in

20  compliance with the protective order to move those documents

21  from the litigation side over to the protest side.

22          How could they do that?  They complied with the

23  protective order by seeking Mr. Hyatt's consent.  If in fact

24  that he didn't give that consent, then what they did is they

25  served the administrative subpoena upon him.  He contested that

RJN1089

1    administrative subpoena.

2           There was litigation in the California courts, the

3    Superior Court.  He didn't like the result there.  Then in fact

4    that he appealed it to the California Court of Appeals.  He

5    didn't like that.

6           And then after the California Court of Appeals issued

7    their order and said he had an obligation to turn them over,

8    then she picks -- she's able to pick them up and starts going

9    through her work.

10          And so from that standpoint, that's the explanation

11   that the FTB has and must be able to offer so as to be able to

12   illustrate then why in fact this passage of time occurred if we

13   take this -- if in fact that the contention by the plaintiffs

14   that is being made at this point in time that there can be no

15   explanation as to how FTB then moved these documents from one

16   side the other side.

17          Like I said, that is directing a verdict then against

18   the FTB on this particular issue, and in my wildest dreams I

19   don't think that the Court envisioned that as part of the order

20   that you issued last week.

21          And the thing that troubles me the most on this is

22   this.  It was in the year 2006 that they raised this issue

23   regarding the delay and somehow that this was part of their

24   delay, their bad-faith (indiscernible).

25          We filed a motion for partial summary judgment on

RJN1090

**11**

1  that issue.  That decision was heard in this court in February

2  of '06.  And at that point in time when you denied our motion

3  and said that they could make it part of this case, you also

4  said that our defense obviously was part of this case as well

5  to that.  And that is all within the transcript.

6          Let's move forward was far as a little bit in time.

7  We had massive amounts of pretrial motion practice, and our

8  motion practice always included this explanation as to why in

9  fact that the protest took the time it did to resolve.

10          At no point in time did the plaintiffs file a motion

11  in limine.  At no point in time did they say wait a minute, you

12  can't talk about these issues; wait a minute, that that somehow

13  is foreclosed.

14          We as far as prepared our case, our defense, brought

15  -- you know, prepared witnesses, have identified exhibits.  In

16  fact, Mr. Kula and I have even worked through many of these

17  exhibits that have these references in there and have as far as

18  entered into agreement that we could put these as far as in

19  front of the jury.  All right?

20          So let's move forward then as far as my opening

21  statement that includes a discussion then as to this passage of

22  time and why the passage of time took the time that it did.

23  They did not object as far as to that.

24          During the time that Mr. Antolin was on the witness

25  stand we asked him all of these same issues.  And then in fact

RJN1091

12

1   that they introduced Mr. Jumelet.  And during the time that

2   Mr. Jumelet says yes, that they should have resolved sooner,

3   and I asked him whether or not that he's ever compared the

4   litigation documents to the protest documents, all of these

5   issues are already in front of as far as the jury.

6           And so at this late stage in the game after they're

7   into this case for almost 10 weeks of trial now to suggest that

8   the most important defense that we have is somehow just wiped

9   away with no as far as discussion as to why it is wiped away,

10  and it comes in the context of a motion that they filed but the

11  Court denied, I -- that's where I'm having a real hard time as

12  far as with this.

13          And that's in fact that why in fact that we wanted to

14  bring this to your attention as a preface then to the

15  discussions as to the objections that they have to

16  Ms. Cinnamon's testimony as it relates to her deposition

17  designations.

18          MR. KULA:  Your Honor, several points.  First of all,

19  Ms. Lundvall and I have talked about protest documents.  I'm

20  the one that's been saying (indiscernible) talk about them you

21  got to put these issues together.  We can't get ahead of

22  ourselves.  Our motion needed to be decided in order to

23  determine what documents would come in and I still feel that

24  way.

25          But let's back up.  The defense the FTB wants to make

RJN1092

13

1  and can assert and try to make is that they didn't -- they

2  couldn't get documents from Mr. Hyatt. They're handling the

3  protest. They think there's documents in the litigation. They

4  can't get (indiscernible) from him.

5        What they're trying to disguise and hide is that they

6  didn't move and seek subpoenas in a timely fashion and move for

7  this document, so they're trying to blame the protective order

8  in this case. There's nothing that prevented them from doing

9  that.

10       In fact, Ms. Lundvall mentions the protective order

11  came in late 1999, and there's internal documents showing in

12  2000 the FTB wants documents from the litigation of the

13  protest. They didn't move for two years. They didn't make a

14  request for two years for those documents.

15       So if they want to come in and say in 2002 we made a

16  request for those documents and Hyatt wouldn't give them to us,

17  so we had to go to the California court and California Court of

18  Appeals, they can do that. They can do that.

19       But they're trying to explain their delays by saying

20  -- hey, stand behind the protective order when they were either

21  misinterpreting the protective order or we think even in bad

22  faith using it as a way to delay the litigation. They did not

23  -- or delay the protest. Excuse me. They did not want to push

24  that -- push the protest along. They did not want to put out a

25  decision in the protest before this jury hears this case.

RJN1093

14

1        And they've timed it perfectly.  They put a decision

2  out in late last year after we knew the trial date was set in

3  this case knowing that the appeal Mr. Hyatt has will never be

4  heard before this jury decides this case.  So they perfectly

5  timed it.

6        And they want to try to blame all that on the

7  protective order because the real issue is their failure to

8  move timely in the California process using California

9  procedure and the tools they have there because that only gets

10  them, you know, a little bit of time here to say, well,

11  Mr. Hyatt made us go to the Court of Appeal.  That took, you

12  know, X number of months to do that.  So they wanted to cover

13  these other periods by saying we couldn't do it because the

14  protective order wouldn't let us do that.

15        Well, the fact of the matter is they're wrong what

16  the protective order allowed.  And if they're allowed to say

17  that, then that gets back to the issue we brought up.

18        Well, we're going to have to come in and show that

19  they knew they were misinterpreting the protective order.  They

20  had attorneys in court hearings when judicial officers of this

21  Court said what the protective order means and said what they

22  could do in California.

23        So they don't need the protective order.  What the

24  protective order does, it allows them to cover periods of time

25  when they weren't doing anything on the protest and that way

RJN1094

1   they can blame this -- the protective order.  Well, they

2   shouldn't be allowed to do that, Your Honor, so that's the big

3   issue in a nutshell.

4          If we go through, they can make a defense.  It just

5   doesn't cover all the periods of time they want to cover.

6          And by the way, the Court did grant the motion and

7   denied the -- denied the curative relief but granted the motion

8   relative to this litigating litigation where we have to --

9   we're the ones that have to then get into litigating litigation

10  if they're allowed to come in and say, well, here's the

11  protective order, this is how we interpret it, and so,

12  therefore, it's our defense to this.

13         MS. LUNDVALL:  There's one allegation that Mr. Kula

14  made that I cannot let stand as far as without a -- as far as,

15  you know, making our record as far as on this.

16         He contends that somehow that we intentionally timed

17  the resolution of the protest that -- so as to foreclose then

18  any appeal rights that Mr. Hyatt had so that those issues then

19  could not be brought before the attention of this jury.

20         In 2004, Mr. Hyatt sat for the first time for

21  deposition.  He sat for deposition into the year 2005 as well.

22  In 2005, Ms. Jeng sat for the first time for deposition as well

23  as many other people as far as their depositions were taken.

24         Information that was supplied during the course of

25  those depositions was different than what Mr. Hyatt had

RJN1095

**16**

1    provided to the protest hearing officer in response then to the

2    protest hearing officer's continuing requests.  And so what you

3    end up with is the exact dilemma that the FTB had under the

4    protective order.

5          Here it knows in litigation and has facts over on

6    this side from them that is coming as late as 2004, 2005, that

7    is different than what he has given to them in the protest, but

8    they can't hear it with the protest hearing officer so that the

9    protest hearing officer can come to the right conclusion.

10         What we had to do was to make the request then of

11   Mr. Hyatt to be able to share and to move that stuff to the

12   other side of the house.  In that particular circumstances, but

13   not before he says fine, go ahead and move it, that was in the

14   spring of 2006.

15         And through the spring of 2006 until the resolution

16   then on this that the original -- I'm thinking it was either

17   September or October as far as that when Ms. Cinnamon then is

18   in the process -- it's July of '07 then when Ms. Cinnamon then

19   is in the process of retiring.  She looks at volumes and

20   volumes and volumes of depositions so as to be able then to

21   come to her resolution then on the protest.  So there is no

22   intentional delay by the FTB concerning this resolution on the

23   protest.

24         And so that is the issue, Your Honor, I can't let

25   stand as far as that type of an allegation for Mr. Kula to make

RJN1096

17

1    then in front of the Court.

2            MR. KULA:  Your Honor, that is -- that's the point.

3    This Court set the protective order so that the parties

4    wouldn't be using this case to take discovery for the protest.

5    They have their means to take discovery, to do what they needed

6    to do, to call -- they call it the power of examination in

7    California.  They're supposed to be doing that.

8            Now they're saying, well, we had to wait.  We wanted

9    to see what might come up in this case.  You know, we disagree

10   that there's a difference in terms of the testimony and the

11   contradictions and so forth, but then we get into litigating

12   the protest which we certainly don't want to do in terms of

13   what the evidence is there, what the evidence is here.

14           The point is they had the means to proceed in the

15   protest and whatever manner was allowed under California law,

16   and that included subpoenaing any documents that they might

17   come out in this litigation, and they could have done that.

18   They didn't do that.

19           So -- and, by the way, we're talking about there was

20   one -- (indiscernible) 2002 was the first time they raised

21   this, and that process took some time in California, and they

22   can present that.  But if we go down that road, most of the

23   material they sought in that first opinion actually weren't

24   even under the protective order, so then we end up litigating

25   that when these documents were designated under the protective

RJN1097

1  order that were actually produced in the litigation.  So that's

2  another defense we have to present if they're going to get to

3  present whether the protective order causes delay.

4          Then years later there was another request, if you

5  will, under the protective order because there was also a

6  request under California law, so they made these handful of

7  requests.  I think they made three of them.  My point is they

8  can present that.

9          They can say three times we had to ask Mr. Hyatt for

10  information that we wanted to use in the protest.  The first

11  time we had to go through a subpoena process and a court of

12  appeal in California.  The second time we requested X date.  He

13  agreed to give it to us a couple months later.  The third time

14  we requested he, he gave it to us a month or two later.  They

15  can present that, that's what -- that issue of not getting

16  documents from Mr. Hyatt.

17          But they want to say that this case -- they had to

18  wait around for this case, and this case caused more kinds of

19  problems in the protest.  That was exactly the point that

20  Commissioner Biggar and Judge Saitta were trying to avoid in

21  this protective order.  Do what you have to do in California,

22  and we'll do what we do in Nevada and let's move forward.  And

23  they just won't separate them.

24          MS. LUNDVALL:  But this is where --

25          MR. HUTCHISON:  And, Your Honor, that's what we argued

RJN1098

19

1  last time.  We're going back to this -- what the representation

2  was of counsel ten minutes ago or twenty minutes ago.  You

3  denied our motion.  Of course, that was wrong.  You granted the

4  motion and you denied the curative instruction.

5           You granted the motion and said I don't want to hear

6  anymore about the protective motion.  It shouldn't come up in

7  front of the jury.  That's what you granted.  There was no need

8  for a curative instruction as a result of that.

9           As a result of that, I didn't have Mr. Jumelet

10 address that.  As a result of that we shouldn't now be arguing

11 again this motion again.

12           Counsel has misrepresented what your prior ruling

13 was.  It was not a denial.  It was a granting of the motion

14 after we've all argued these points already for probably an

15 hour at that time.  Now we're going on another hour arguing it

16 again.

17           And you found persuasive the fact that Commissioner

18 Biggar and Judge Saitta was in -- stated in a hearing where

19 half of the people on this side of the room were sitting there

20 listening that this protective order does not affect the rights

21 and remedies and powers that are available to the FTB in

22 California, period.  Now what they want to say is yes it did.

23           Well, you know what?  Then they can just go argue

24 with Commissioner Biggar and Judge Saitta, but the time for

25 arguing about that was long gone.  It shouldn't be argued again

RJN1099

20

1　here in front of the jury that yes, it did.  We don't care what

2　Saitta said, we don't care what Biggar said, it did cause

3　delay, it did cause us to have to wait for documents.

4　　　　They're just flat-out wrong, and so it's a matter --

5　that's why we brought this to the Court's attention.  This is a

6　matter of law in terms of whether or not they can say we had to

7　wait under the protective order before we sought documents in

8　the protest.  No, they didn't.  Two judicial officers have told

9　them that.

10　　　　And now we're spending 45 more minutes because they

11　didn't like the ruling that you got previously and characterize

12　that you actually denied it when you didn't.  You granted it,

13　and we move on.  We redact, and now we're rearguing the whole

14　issue again, Your Honor.

15　　　　As far as Cody Cinnamon is concerned, I'm real

16　interested to have you listen carefully to the clips that are

17　played.  She said she was ready to go with her decision in 2001

18　or maybe 2002.  I can't remember.  I took her deposition.  But

19　that her bosses kept saying no, we got to wait, we got to wait,

20　we got to wait, and she said I don't know why we don't use our

21　subpoena power.

22　　　　This is a made-up lawyer argument after the fact.

23　It's a made-up lawyer argument after the fact.  From 1996 to

24　1999 they did nothing, and the protective order wasn't in place

25　then.  Nothing, zero.  This is made-up lawyer talk, and they

RJN1100

21

1  are arguing against what Judge Saitta already ruled and which

2  Commissioner Biggar already ruled and, by the way, what

3  Your Honor has now ruled and granted out motion last week.

4       Now we're arguing all over again because they claim

5  their defense is taken out from under them.  It isn't.

6       Ms. Lundvall in answering your question about how

7  does this effect your response said a whole bunch of things and

8  one part of it was the protective order.  Then she talked about

9  subpoenas and (indiscernible) process and courts of appeals and

10 all that stuff.  Fine, bring that all in.

11      But you can't say that the protective order required

12 you to wait for documents during the course of the

13 investigation.  You had all the powers, all the abilities, all

14 the rights that you normally would have had under California

15 law even if this case didn't exist.

16      And now we're arguing that all over again in an

17 attempt now to -- this is clearly a motion to reconsider based

18 on what you had ruled previously.

19      It's a misconstruction of what you had said last

20 week.  It is absolutely ignoring what Biggar and Saitta said

21 already, and they just are so stubborn they don't want to

22 accept the fact that they got it wrong if they interpreted it

23 that way.

24      And secondly, I think what this is is -- I mean,

25 think about it.  They got to justify 11 years, Your Honor.

RJN1101

22

1  They got to justify 11 years of a delay.  And now they're just

2  scrambling around.  The lawyers get together and do what

3  lawyers do and think of creative solutions.

4       The problem with that is is it does not comport with

5  either the language of the protective order what two judicial

6  offices who took an awful long time evaluating this as you

7  said, and now we're back to arguing it all over again.

8       MS. LUNDVALL:  Two points in response, Your Honor, and

9  this is exactly the point that I was trying to illustrate.

10      They content that you ruled that we were wrong in our

11  interpretation of the protective order.  They say you ruled

12  last week, we got it wrong, and that is my point.  They take

13  your order from last week and they make it far, far too broad.

14      The Court made no ruling as it related to whose

15  interpretation of the protective order was right or wrong.  You

16  made no ruling on that.

17      The second point is this, is what they're trying to

18  suggest is that FTB should never have complied with the

19  protective order, and what they also want to try to -- they

20  tried to imply with you that we did nothing to resolve

21  Mr. Hyatt's protest through the protest hearing officer, and

22  all we did was to rely then upon the litigation information.

23  That's not accurate.

24      What is accurate is this.  Across this period of 11

25  years there were nine different information documents requests

RJN1102

23

1   that were sent to Mr. Hyatt, and they were sent at periodic

2   intervals across that period of time.

3           When the first document request response was given by

4   Mr. Hyatt, the protective -- and then it was compared to the

5   information that was being given in the litigation, and guess

6   what, Mr. Hyatt was giving different things in the litigation

7   than he was to the protest hearing officer.

8           And so one by one as each one of those IDRs was sent

9   to Mr. Hyatt and each one was responded to by Mr. Hyatt, it was

10  compared against information that had been received in the

11  litigation.

12          And when there were differences -- in other words,

13  when he tried to say here, protest hearing officer, you get one

14  set of facts, but through the litigation you guys get another

15  set of facts or a different set of facts, what in fact was

16  having to be done is to take and move those set of facts from

17  the litigation over to the protest hearing officer.  That's

18  where the difficulty came in.

19          So we we're continuing to use all of our California

20  processes but by which to determine if those California

21  processes were getting full and complete and truthful responses

22  from Mr. Hyatt we had the opportunity to compare it against

23  what was going on in the litigation.  And guess what?  He

24  wasn't moving everything from the litigation over here.  It was

25  a different set of facts.

RJN1103

24

1    And so that's why in fact then that the comparison

2 was being made.  And when the comparison was being made -- and

3 that's all as far as they want to suggest that somehow that we

4 made up this argument.

5    They took Bob Dunn's deposition, and they took

6 Mr. Dunn's deposition all the way back I believe it was in

7 2006, 2006 or 2005, and he explained everything that I'm

8 explaining to you right now with excruciating detail, and did

9 they move in limine to say no, can't do that?  No.  Absolutely

10 not.

11    What has happened now is that they got to last week

12 and now they're trying to take your order and making it broader

13 and to suggest that you made rulings that in fact that you

14 didn't make.  That's where our heartache lie with this and our

15 heartburn lies as far as with the way that they were trying to

16 expand then the scope of the Court's order.

17    MR. KULA:  Your Honor, Ms. Lundvall just explained how

18 she would defend this without the protective order.  She said

19 there were nine IDRs submitted and that nine times information

20 wasn't given.

21    Nothing prevents them from having someone come in and

22 say that if they have a witness that will say that.  Of course,

23 the record shows that they didn't issue nine subpoenas

24 afterwards.  They didn't believe that, but they can try to

25 assert that.

RJN1104

25

1    And there is evidence in the record that Mr. Coffill

2 disputes the idea he wasn't fighting responsive documents.  But

3 if they want to say we have nine IDRs and nine times you didn't

4 give us information -- but the problem is they can't get into

5 specifics because in Ms. Cinnamon's deposition and your court's

6 ruling, we can't into the substance of the protest.

7    We tried to ask Ms. Cinnamon, well, what is it that

8 -- these documents that we're not getting.  What is it?  What

9 do you need?  Well, I can't get into that.  It gets into the

10 analysis of the protest.  So they made this blanket statement.

11 I mean, that's all they can do.

12    MR. HUTCHISON:  (Indiscernible) instructed not to

13 answer.

14    MR. KULA:  Yeah.  Instructed not to answer on that and

15 then similar with this Court's ruling you don't get into

16 substance of the protest.  So if they want to come in and say

17 we sent nine IDRs, we compared nine times and said he didn't

18 produce in the litigation, they can try to present that.  I

19 don't think the record will show that, but that's how they can

20 defend this case because that's really what should be at issue.

21    Why didn't they issue nine subpoenas every time they

22 saw something (indiscernible).  He's not complying.  He won't

23 give it to us.  Let's go issue a subpoena.  That's what --

24 issue in the delay case, and they're trying to use the

25 protective order to cover the fact that they didn't issue

RJN1105

1    subpoenas.

2          And this idea of interpretation of the protective

3    order, I think the Court's ruling takes it out of the case.  If

4    we get into the protective order, then we have to get into who

5    was right in interpreting the protective order and were they

6    doing it in bad faith giving they had lawyers sitting in the

7    courtroom listening to the Court.

8          So I think the Court's ruling allows me to defend the

9    case and it takes away what shouldn't be in the case, that is

10   having the jury decide who interpreted the protective order

11   correctly and whether there was violations of it and abuses of

12   it as they were saying last week.

13         So, Your Honor, again, I don't want to keep arguing.

14   I think we're repeating ourselves now.

15         THE COURT:  I think you may be to a certain extent.  I

16   thought that the ruling last week was fairly narrow.  I thought

17   it was pretty clear and straightforward.

18         Obviously, I think the defense has to have the

19   ability to defend on the subject of delay, but I don't think

20   that clarification, if it is a clarification, alters anything

21   about the ruling last week with respect to the protective

22   order.

23         I think this jury need not hear all of the

24   particulars of a protective order that the parties negotiated

25   over months and even years probably.  I don't -- I wasn't even

27

1   part of that case when the parties were negotiating that

2   protective order.

3          MR. BRADSHAW:  Well, the part at issue was the

4   cramdown.  It was not a negotiation.  It was proposed by them,

5   proposed by them, vigorously opposed by us because the

6   consequence was foreseen.

7          And Biggar said this is what it is, and the Court

8   signed it, and the consequence was unknown I think at the time

9   to Commissioner Biggar and the Court, and now we're seeing it

10  now.

11         What your order was last week was parties should not

12  be calling witnesses.  Well, now they are, and they're just

13  kicking the door wide open to explain the delay, the issues.

14  Was there a bad-faith delay?

15         Well, we should be able to present -- we're following

16  a court order.  How can that be bad faith that we can haggle

17  over the interpretation of it, and I don't think Your Honor

18  wants to hear witnesses interpret it, but I think they get to

19  say the reasons why time passed.  And if it's complying with

20  the protective order and working through its procedures, then

21  that shows good faith.  To not be able to say that deprives us

22  of part of the answer.

23         The issues comes now with Charlene Woodward, a

24  protest officer, who's deposed about why it took so long and

25  whatnot, but then we really get into it with the next protest

RJN1107

28

1  officer, Cody Cinnamon, because she's working through a process

2  that's mandated by management because management knows from the

3  litigation side there's facts here that Mr. Hyatt's not

4  providing to the protest officer on the protest side.

5           And I'm trying not to repeat myself, but the point is

6  they are now calling witnesses in video deposition and there

7  are -- they want to play the parts for delay that they like or

8  that don't hurt them.

9           For instance, Your Honor saw a lengthy December 30th,

10 1999, information document request, a multipage letter from

11 Charlene Woodward to Eugene Cowan.  They asked for two- or

12 three-month extensions of time, so now we're six more months

13 into the protest because Mr. Hyatt wants more time to respond.

14 That they have in here to present or don't object to it.

15          Then there's a change of protest hearing officers as

16 the months and years go by.  We saw Ms. Jovanovich retires, and

17 then Ms. Woodward is assigned, and then she's reassigned to

18 another area and Ms. Cinnamon is put on the case, and then

19 years march by in part because of these reasons, request for

20 extension of time, change of personnel.

21          The protest hearing officers all -- you've seen it

22 from Ms. Jovanovich, you'll see it from Ms. Woodward, from

23 Ms. Cinnamon, this is not their only case.  They have a

24 workload.  There's statutes of limitations.  They do

25 litigation.  They do Board of Equalization hearings, and then

RJN1108

29

1   there's deadlines, so those cases get priority.

2          There's refusal to provide information.  It's not

3   relevant.  I don't have it.  You don't need it or they just

4   ignore it.  Meanwhile over here in litigation, we're taking

5   depositions, we're discovering documents, and we know this

6   stuff exists.  It's going to matter over there.

7          And so there's a protocol set up by FTB legal

8   management to work through the protective order and not to make

9   the decision on partial information but to work through the

10  protective order and get full information, all the facts and

11  circumstances to arrive at the (indiscernible).  Now that's the

12  part that they don't want.

13         And if we're not going to call these witnesses, we

14  don't get into the protective order.  But if we call

15  Charlene Woodward, if we call Cody Cinnamon through these video

16  depositions, the door kicked wide open and we have to show why

17  time passed, and a good part of the time passed because of the

18  effect of the protective order and the related protocol to get

19  the facts and circumstances that were relevant.

20         So if we're not going to call these witnesses like

21  the judge -- like Your Honor said, we shouldn't be calling

22  witnesses, okay.  But they want to call these witnesses, and so

23  then we have to have the truth.

24         MS. LUNDVALL:  Well, and then --

25         MR. KULA:  Your Honor --

RJN1109

30

1        MS. LUNDVALL:  -- from Your Honor, my suggestion would

2   be is I think that the Court's ruling is that we could place

3   this in proper context then when we actually go through the

4   designations that are at issue, and I think then that you will

5   see as far as where -- from that standpoint, and the Court can

6   make a ruling then upon these individual designations.

7        MR. KULA:  Well --

8        THE COURT:  I think we may have to do that, Mr. Kula.

9        MR. KULA:  Yeah.  Your Honor, I just have to address a

10  couple things Mr. Bradshaw said.  It was not a cramdown.  It's

11  language about they can request -- that was Commissioner

12  Biggar.

13       I think it made it into a draft of ours because we

14  had a telephone conference with him, and he said I think there

15  should be something like this in there.  And he's the one that

16  put a lot of this language in there, so it wasn't a cramdown.

17  I mean, it wasn't a cramdown by us.  It was something

18  Commissioner Biggar put in there.

19       But what Cody Cinnamon is going to testify to as we

20  have her designated is what she did in the protest, what was

21  she doing in the protest, not what's going on in terms of the

22  protective order.  That's the whole point.

23       Mr. Bradshaw (indiscernible) another way of trying to

24  argue that they needed the protective order, but as

25  Ms. Lundvall explained there's nine IDRs.  They have to

31

1  explain, if they're going to claim that he wasn't given

2  documents, why weren't there nine subpoena issued. That's what

3  they can't answer.

4       So they want this Court to say, well, you didn't have

5  to do that, you know. If Commissioner Biggar, even though he

6  said that, you know, you didn't have to go issue subpoenas.

7  They can't answer that question unless they have the protective

8  order. So they're trying to use the protective order to cover

9  the fact they didn't comply with it.

10      So it gets back over to arguing what the protective

11  order is, and I just think it has to be taken out of the case.

12  They can present what happened in the protest.

13      If they want to claim nine times Mr. Hyatt didn't

14  give them documents and we had to keep getting documents from

15  him, we had to go back even in '05 and '07, they can present

16  that, and we can defend that. We don't have to get into,

17  though, the protective order issue.

18      MS. LUNDVALL: Well, that's where from our perspective

19  that's why we keep trying to suggest to the Court for us to

20  take a look at the specific designations then so you could

21  place this in context rather than trying to paint with too

22  broad a brush.

23      MR. HUTCHISON: Your Honor, what they're saying is

24  we -- you know, we are following the Court order. That's what

25  their defense is or they want it to be a defense. And then

RJN1111

32

1  they say but Hyatt can't put on any evidence to say we're not

2  following the Court order.

3           So that's their defense.  We're following the Court

4  order, but we can't put on evidence, for example, Commissioner

5  Biggar, Judge Saitta, that says this is very clearly what the

6  order says and doesn't say.

7           And then we say you're not following the order.  Look

8  what the judges who crafted this and interpreted it has said.

9           That's when Your Honor said it ought to be out.  It's

10 not in for them and out for us.  I mean, it's one way or the

11 other.

12          You know, if it's in for them, then we have to go

13 explain it.  That's what Mr. Kula was talking about all last

14 week, and you said but I don't want to hear about this.  We

15 don't want to have us having to litigate litigation.  You can't

16 say we'll follow the Court order, but then we can't bring in

17 evidence to show that you're not based on what the judicial

18 officers and the record shows.

19          So that's why it should be out for everybody or not,

20 but they want it to be in and out for us.

21          THE COURT:  Let me ask you something.  Are we ready --

22 we have about five minutes before our jury is due.  We need to

23 review these --

24          MR. KULA:  My --

25          THE COURT:  -- transcripts before we can even begin?

RJN1112

33

1      MR. KULA:  No.  Ms. Woodward's deposition and

2   Ms. (Indiscernible) agree with me that we have designated about

3   an hour and five minutes.  There was a small section where she

4   talked about the protective order.  We've taken that out.  This

5   is really an issue in our mind from Ms. Cinnamon's deposition

6   of some of the documents that are -- would or would not be

7   presented as part of her deposition, so unless Mr. Bradshaw

8   disagrees with me.

9      MS. LUNDVALL:  I think as far as the answer to the

10  Court's question, Ms. Cinnamon's deposition is going to follow

11  the plane of Ms. Woodward's; is that correct?  At least that's

12  what we've been told.

13     MR. KULA:  Is going to -- excuse me?

14     MS. LUNDVALL:  That the plane of Ms. Cinnamon's

15  deposition transcript is going to follow Ms. Woodward's.

16     MR. KULA:  Yes.

17     MS. LUNDVALL:  All right.  So then that means we've

18  got to resolve on the Cinnamon designations, and that's where

19  we were trying to get to the Court then as far as by which to

20  take a look at these and so that you know then what basically

21  the dispute then is as it relates to (indiscernible) between

22  the parties.

23     THE COURT:  Are we ready to go with Woodward?

24     MR. KULA:  Yes.  Unless Mr. Bradshaw tells me

25  something I don't know (indiscernible).

RJN1113

34

1    MR. BRADSHAW:  No.  I think we are.  I think they

2  begin to opened the door once they are sitting these protest

3  officers one after another to get into the issue of passage of

4  time and resolving the protest.  But if they want to play it,

5  it's ready to go.  We resolved the objections except for the

6  issue of opening the door to a full explanation of the delay.

7    MR. KULA:  I have to address that, Your Honor.  When

8  the Court made a ruling last week it was very clear that the

9  delay issue was in the case.

10    It's not as if the fact that we'll present witnesses

11  -- the protest officers talking about not resolving a protest

12  if you will somewhat opening the door then to getting into the

13  protective order.  I mean, that was part of last week's motion.

14  This -- it's not a new issue here.

15    THE COURT:  I understand.

16    MS. LUNDVALL:  And I think that -- if I understand

17  what the Court's concern is probably, okay, how much do we have

18  ready to go to tee up in front of this jury.

19    THE COURT:  Exactly.

20    MS. LUNDVALL:  So we've got an hour with Ms. Woodward,

21  but no more.

22    THE COURT:  And hour is a start.  That's a good start.

23    MS. LUNDVALL:  That's right.

24    THE COURT:  Monday morning.

25    MR. KULA:  Does the FTB have a separate

RJN1114

35

1  (indiscernible)?  I don't recall.

2          THE COURT:  Plus, you know, I don't want to keep the

3  jury waiting.

4          MR. BRADSHAW:  May I confer with Mr. Kula on that one

5  issue or protective order (indiscernible)?

6          THE COURT:  Sure.

7                  (Off-record colloquy)

8          MS. LUNDVALL:  Okay.  So it looks like we've got about

9  an hour and 21 minutes then of teed up for this morning, so

10  that's going to take us 'til about 11:20, and then we're going

11  to have to do some work then before the jury would reconvene

12  then.

13          THE COURT:  So maybe we can send them to lunch, and we

14  can work for a half an hour or something, get some lunch

15  ourselves.

16          MR. KULA:  I will say, Your Honor, that the basic

17  issue is this protective order.  We took out about a half hour

18  of testimony which talks about the protective order, and that's

19  what they want to play.  They want to play where there's

20  discussion of the protective order, so it's -- I think it's a

21  singular issue in that sense.

22          MS. LUNDVALL:  Well, and that's where the Court

23  indicated that as far as trying to get into the meat of these

24  designations.  Then you'll understand as far as what we're

25  talking about.

RJN1115

36

1          MR. KULA:  But my point is that if the Court's allows

2    some of that in which again none of it should come in, then as

3    Mr. Hutchison said we can't be hamstrung.  We have to present

4    our full case in that regard.

5          So to me it's almost all or nothing on this

6    protective order, and again we think it should be nothing

7    because it's going to just go into all kinds of side issues not

8    only with this witness but probably with the other witnesses as

9    well.

10          THE COURT:  Are you talking about the Cinnamon --

11          MR. KULA:  The Cinnamon.  I'm saying that the half

12   hour or so of testimony, and there's not (indiscernible) but

13   it's pretty close in terms of what that covers.  I mean, we've

14   pulled out things that we otherwise would play.

15          If the Court's going to let them talk about the

16   protective order and use that as an excuse, as a defense,

17   because again we also have a defense to that.  It's just that

18   we don't think that's appropriate to get into that as part of

19   litigating the litigation.

20          MS. LUNDVALL:  Now Mr. Kula is trying to suggest to

21   you that let's not go to the designations.  Let's not look at

22   them.  The Court's already said we want to look at them

23   specifically rather than try to make some type of a blanket

24   statement.

25          MR. KULA:  I understand the Court's ruling.  I'm just

RJN1116

37

1    saying that if we take these piecemeal, you know, we're going

2    to have to bring up other issues.

3            Our interpretation was we're not to talk about the

4    protective order with witnesses and with documents. That's

5    what we've done.

6            THE COURT: I'm saying we take a five-minute break --

7            MR. HUTCHISON: Okay.

8            THE COURT: -- and bring our --

9            MR. HUTCHISON: Thank you --

10           THE COURT: -- jury in.

11           MR. HUTCHISON: -- Your Honor.

12           MS. LUNDVALL: Thank you.

13           (Court recessed at 9:58 a.m. until 10:15 a.m.)

14                          (Jury present)

15           THE COURT: Please be seated, ladies and gentlemen.

16   Good morning, ladies and gentlemen of the jury.

17           THE JURORS: Good morning.

18           THE COURT: Still smiling.

19           Counsel stipulate to their presence?

20           MR. HUTCHISON: Yes, Your.

21           MS. LUNDVALL: Yes, You Honor.

22           THE COURT: What's in store today, Mr. Kula?

23           MR. KULA: Yes. We call Charlene Woodward. She'll

24   testify via videotaped deposition. She was the third FTB

25   protest officer.

RJN1117

117

1  information had been provided or not.  Is that how you read it

2  as well?

3     A    Yes.

4     Q    And as of March 15th, 2001, and thereafter, what steps

5  did you undertake to follow up to ensure that you received the

6  information that you thought was not provided?

7     A    I believe I explained that earlier.  I made a

8  recommendation to management that we need to pursue the

9  administrative subpoena or subpoena duces tecum of either

10  Mr. Hyatt or third parties, and it was decided that I would

11  wait and receive additional documents through the protective

12  order process, and at that point then I could determine whether

13  there were still additional documents that I still needed.

14     Q    All right.  Ms. Cinnamon, would it be accurate to say

15  that in the absence of somebody at FTB management telling you

16  to wait for documentation that was going to come through the

17  protective order process that you would by now, today, have

18  concluded the protest?

19         MR. BRADSHAW:  Object.  Form.

20         THE WITNESS:  Do I answer?

21         MS. LUNDVALL:  Yes.

22         THE WITNESS:  Probably.

23         (The deposition testimony of Cody Cinnamon

24              was stopped at 1:44 p.m.)

25         MR. HUTCHISON:  Could we stop here for a second?

RJN1118

118

1  Could we stop right there for a second?  This passage gets to

2  the heart of the issue.  What is being questioned?

3       Is she saying there that I'm being told that the

4  protective order doesn't allow us to do this?  No.  She's

5  saying that she thinks she can go subpoena documents, but

6  they're telling her to hold, wait for the protective order

7  process.

8       The FTB has come to court and in opening and

9  questioning Mr. Antolin has presented the idea that they had to

10 go and ask Mr. Hyatt's permission.  They had this protective

11 order process, couldn't go subpoena.  That's what prompted our

12 motion because that's a misrepresentation of our protective

13 order and that's the issue that we don't think should be

14 debated in front of the jury.

15      And so that, you know, gets right to the heart of it

16 on this, and so this testimony (indiscernible), no.  That's

17 (indiscernible).  We designated it.  But the Court's ruling was

18 not to get into the protective order.  But if we get into the

19 protective order and we're not debating the meaning of the

20 protective order, then that's a different issue.

21      THE COURT:  I agree.  I think that's succinctly said.

22      What do you think, Ms. Lundvall?

23      MS. LUNDVALL:  This is where as far as the issue

24 becomes is this.  The protective order process -- it was an

25 interesting process because one of the things that was

RJN1119

119

1  happening was that Mr. Hyatt was producing responses to the

2  IDRs that Ms. Cinnamon was providing.  So she had one group of

3  facts from him, and then there was information that was over

4  here, and they were different facts in the other box.

5          So what do you do then?  What do you when you're a

6  government agency?  You can make decisions based upon the

7  information on one set of facts that a party is providing you

8  but you know that, in fact, there's a different set of facts in

9  the other box because that's what was happening, and so the

10  issue then became is how do we take these litigation documents,

11  and how do we move them over to the protest hearing officer.

12          The protest hearing officer had already issued her

13  IDRs for document requests to Mr. Hyatt and they had already

14  responded.  And, in fact, somebody else was doing the

15  comparison and realizing, hey, he wasn't providing everything

16  that was responsive to her.

17          But that's what we've seen over here, so how do you

18  take it from a government agency perspective then and to say,

19  all right, how do we move it over here.  And what she is saying

20  is this.  If, in fact, that I didn't know that there was

21  another set of facts out there, maybe it would have resolved it

22  by now.

23          But they knew there was another set of facts out

24  there, Your Honor.  They knew that there was additional

25  information, and they knew as far as that additional

RJN1120

120

1 information that was relevant to the inquiry that was being

2 made. But Mr. Dunn couldn't whisper as far as in her ear.

3 Why? Because the protective order process prohibited that.

4 THE COURT: Let me ask you something.

5 MS. LUNDVALL: And that's where our difficulty comes

6 into play with this, and from that standpoint we're not getting

7 into the issue as to what the interpretation is of the

8 protective order. All we're talking about is what the impact

9 was on the FTB trying to do their job. That's where it is.

10 We're not asking as far as the jury to interpret the

11 protective order. We're not asking them to resolve Mr. Hyatt's

12 position or the FTB's position.

13 All we're simply asking the jury to do is to

14 recognize that there was something that was unique to this

15 case, and Ms. Cinnamon is trying to tell the jury then what it

16 was that was unique to this case that prevented her then from

17 being able to go forward. That's all we're asking.

18 So I don't want there to be some kind of assumption

19 that we're going to give an order of the Court to the jury and

20 say here, you guys interpret it. Absolutely not. Absolutely

21 not.

22 But what the jury will be asked to do, though, is

23 this, is did in fact the FTB have something that it believed it

24 was supposed to comply with and did it do so in good faith. Or

25 did, in fact, as it's been alleged and as we've been accused of

121

1   doing, did we just sit on our hands and do nothing?  Because

2   that's what the accusation has been is that somehow that

3   somebody made a decision don't decide this case so that it

4   won't be to the Board of Equalization then before it's tried

5   before a jury.  That's the assumption that they want to present

6   to this jury.

7           And what we are simply trying to do is to let this

8   jury know that there was something that was unique in this case

9   that prevented them from doing their normal processes.  And

10  that's where we're at, Your Honor.

11          MR. KULA:  Well, Your Honor, first the answer to Ms.

12  Lundvall's question is what is Ms. Cinnamon to do?  She's to do

13  what she wanted to do, issue subpoenas.  She was told not to do

14  that by management.  I have a problem with that.  In fact, I

15  think that's very helpful to us.

16          But what I don't want to hear, we can't hear, we keep

17  getting into this issue is that the FTB was precluded from

18  doing that.  The protective order would not let us issue

19  subpoenas.  We had to go through this process.

20          That's exactly what led to this motion that we filed,

21  Your Honor.  That's what they misrepresented in opening.

22  That's what they represented in questioning Mr. Antolin.

23          So does this witness say that?  No, I don't think she

24  says it.  She actually proves our point.  She was ready to

25  issue subpoenas.

RJN1122

122

1          THE COURT:  When we discuss the language of this

2   protective order, it was my understanding that plaintiff's

3   position was that FTB could request documents directly from Mr.

4   Hyatt.  If he didn't produce them, then the FTB could subpoena

5   documents.

6          MR. KULA:  No.  They didn't have to wait.  They didn't

7   have to.  They could go to subpoena.  The protective order and

8   the discussions with Commissioner Biggar and Judge Saitta was

9   it doesn't affect California procedure.  If they have subpoena

10  power, they can go subpoena them.

11         And in fact, there's already a document that's

12  stipulated in pretrial, Exhibit 368, where Mr. Dunn talks about

13  this process.  He talks about the fact that under the

14  protective order they can request documents.  But because this

15  is in I think October of 2000.  Because -- and we can put it up

16  if Your Honor would like.

17         Because the case was stayed, because it was being

18  reviewed by the Supreme Court so that process isn't affected so

19  (indiscernible) subpoena.  And he tells (indiscernible) Ms.

20  Cinnamon (indiscernible) to go subpoena documents.  Well, that

21  doesn't happen because internally the FTB doesn't want to do it

22  that way.

23         But they didn't have to ask Mr. Hyatt's permission.

24  That's a misstatement under the protective order.

25         THE COURT:  It was an option, though.

RJN1123

123

1          MR. KULA:  It was an option.  Absolutely.

2          THE COURT:  It was one of the options, right?

3          MR. KULA:  Absolutely it was an option.

4          THE COURT:  The other option was they could just

5    subpoena the documents on their own.

6          MR. KULA:  Correct.  Correct, Your Honor.  And if they

7    want to make a point that Mr. Hyatt didn't cooperatively give

8    us the documents, they can try to make that point.  We think we

9    have rebuttals to that.

10          It's when they're trying to say Hyatt (indiscernible)

11    the protective order and say we were doing things because the

12    time delay we can show does not relate to these requests.

13    There minimal delays from these requests.

14          In fact, the first request to Mr. Hyatt was in July

15    of 2000 -- 2002, excuse me, and there was an exchange of

16    letters between Mr. Hutchison and former FTB counsel Mr.

17    Leatherwood (phonetic).  Within a month after they issued a

18    subpoena.

19          They want to say we delayed for a month, fine.  The

20    second time (indiscernible) maybe a couple months delay, so

21    there's not that much delay from this request.  That's why they

22    want to use this protective order to sort of shield the longer

23    periods of time when they weren't doing things on the case, and

24    that's when we're saying they're misrepresenting the protective

25    order, hiding behind it.

RJN1124

1    MS. LUNDVALL: Well, from this standpoint I think that

2  the Court has not been fully informed as to what the protective

3  order -- the options that were under the protective order.  Mr.

4  Kula wants to take the position that, well, the protective

5  order allowed them to do whatever they wanted to do under

6  standard California practice, all right?

7    But the second option, though, that was available to

8  the FTB was that if in fact that the FTB knew information from

9  the litigation and wanted to supply it to the protest hearing

10  officer, it could ask Mr. Hyatt's consent.  And if he refused

11  to issue his consent, then an administrative subpoena had to

12  have issued.

13    And, in fact, Mr. Kula is being very deceptive when

14  he suggests, well, that was just a little problem.  Well, in

15  fact that we issued an administrative subpoenas and they said

16  -- we asked for their consent and they said no.  We asked for

17  their consent a number of times.

18    The first time they said no.  And what happened then?

19  We issued administrative subpoenas.  And what did they do?

20  They filed a motion to quash then within the district court.

21  They initiated a whole new process.

22    And then by the time the district court then in

23  California resolves their issues, Mr. Hyatt doesn't like the

24  fact that they are ordered to turn these materials over, that

25  these are relevant pieces of information that is relevant to

RJN1125

125

1    the resolution of the protest (indiscernible).  And then what

2    happens?  They don't like that order, so they take it up on

3    appeal.

4          The idea that this is just a little problem that

5    consumes about three, three-and-a-half years of time, that's no

6    little problem.  That's no little explanation as far as for a

7    period of time.  And then this happened twice more.

8          And so to the extent that to suggest that somehow

9    that this process was not available to the FTB and that the FTB

10   -- the question that this jury's going to have to ask is

11   whether or not they genuinely believe that this was the process

12   that this was to be employed.  And they asked Ms. Cinnamon

13   those questions.

14         George McLaughlin is going to be here by which to

15   testify.  They can ask George McLaughlin those questions.  Bob

16   Dunn as far as who is also involved in the process, they can

17   ask him those questions.

18         But unless the jury hears what the explanation is for

19   this, then what Mr. Kula is now trying to do is to take away

20   our defense to this so that we can't demonstrate our good

21   faith, and all we're standing here is naked with an allegation

22   of bad faith against us.

23         That's where the issue lies, Your Honor, and that's

24   why that this is such an important issue to this portion of the

25   case then to the FTB.  And then how you can't artificially then

RJN1126

126

1  just strip it away, especially when we're not asking the jury

2  to make an interpretation of the protective order.

3       MR. KULA:  Your Honor, I think maybe I wasn't very

4  clear.  I've always said I think from the beginning once they

5  issue that administrative subpoena if they want to claim we

6  tried to oppose it and took them months or years, that's fine.

7  That's not part of the protective order process.

8       What I was saying is there was an option the Court

9  just mentioned where you ask for permission or you go to a

10  subpoena.  They did exercise that option the first time.  It

11  took about a month of a delay because they asked for

12  permission, it was denied, then they went to the subpoena

13  process.  So before they got the subpoena process it took an

14  extra month even though they didn't have to do that.  That's

15  what I'm saying it wasn't much delay.

16       But what Ms. Lundvall's saying is they're not

17  interpreting the protective order.  Well, if they're going to

18  come in here and say that they had to take certain steps on the

19  protective order and they couldn't go issue subpoenas because

20  the protective order prevented then from doing that which has

21  been said in this courtroom, then we do have to cross-examine

22  their witnesses, not Ms. Cinnamon because she wasn't the one

23  interpreting it, but the other witnesses.

24       Ms. Lundvall suggests that the protective order

25  didn't mean that.  Mr. Dunn was in the courtroom when

RJN1127

127

1  Commissioner Biggar made his statements.

2          I mean, is that fair game for cross-examination if

3  he's going to come in here and represent the protective order

4  meaning something other than what the Court said?  I mean,

5  that's what we're trying to avoid.

6          So I don't really have a problem with Ms. Cinnamon,

7  but based on the Court's ruling, we felt we couldn't get under

8  the protective order.  The problem is is when they start trying

9  to put a different meaning or interpretation as we've already

10 heard in opening statements and in questioning Mr. Antolin that

11 the protective order had certain requirements or meanings that

12 it didn't have, and that's what prompted our motion.

13         MS. LUNDVALL:  And, Your Honor, from this standpoint

14 one last comment because you know what, the more I listen to

15 this the more I realize that there's a huge, huge step that has

16 been missing from this whole discussion.

17         Mr. Kula keeps saying, well, they could have just

18 gone ahead and issued an administrative subpoena regardless of

19 what was going on in litigation.  Okay.  So you issue an IDR

20 and, in fact, you get responses back from that IDR, the

21 information document request.

22         And so he says, well, they should have just gone to

23 an administrative subpoena.  Why do they go to an

24 administrative subpoena?  Because they've got to know that

25 there's some kind of a different set of facts over here in the

RJN1128

128

1  litigation. That's the step that is missing, the missing link

2  to all of this and what we have been trying to impress upon

3  both the plaintiff as far as is now where we're at with the

4  Court is the idea that we were comparing in contrast.

5         This protest hearing officer wouldn't have had any

6  clue that she didn't get everything from Mr. Hyatt unless she

7  had this litigation process ongoing over here. And the

8  litigation process is demonstrated that when we held these

9  facts up to each other to mirror, they were not mirror images

10  of each other.

11         There were pieces of information that was shared in

12  the litigation that weren't shared in the protest. That's

13  where the difficulty lies. And it's no different than the

14  difficulty we've seen in this case where we've been trying to

15  confine our self to the audit file versus what was in the

16  protest file.

17         If these facts were mirror images of each other, no

18  issue, but they were not mirror images of each other, and

19  that's where in fact that this protest hearing officer never

20  could have independently gone off with this administrative

21  subpoena because she didn't know that there was any issue.

22  That's the problem, and that's the issue that we are trying to

23  be able to explain that both to this Court and ultimately then

24  to this jury.

25         MR. KULA: Your Honor, first of all, in the opening

RJN1129

129

1  statement, there was the representation that Mr. Hyatt was

2  preventing the FTB from moving documents from one side to the

3  other side.  That's the representation, that Mr. Hyatt somehow

4  controlled the protective order.

5          But this whole issue of, well, (indiscernible) may

6  not know about the documents.  You just saw Ms. Cinnamon being

7  told there's -- she believes there's documents missing.  She --

8  that's her belief.  Mr. Coffill disagreed with her, disagreed

9  with her on that.

10         She wants to issue a subpoena, but she's being

11  prevented from doing it by management.  So I mean, the point is

12  she knew she could issue a subpoena if she wanted to.

13         And I'd also like to pull up if we could Exhibit 368

14  which has been stipulated in pretrial.  It's a memo from Mr.

15  Dunn talking about telling the protest officer here's

16  documents, you should go subpoena them.

17         I mean, this is in October 2000, so they knew they

18  could go subpoena documents if they wanted to subpoena

19  documents.  Mr. Dunn from the litigation side could tell them

20  the kinds of documents to subpoena, so they were doing that.

21  So coming to this Court and trying to say that they couldn't do

22  that or somehow the protective order didn't mean that, they

23  just can't do that.

24         MS. LUNDVALL:  See, this is where --

25         MR. HUTCHISON:  (Indiscernible).

RJN1130

130

```
1           MS. LUNDVALL:  This is where I nearly did chuckle is
2    that there have been documents that have already been
3    stipulated into admission on these very issues, and so why is
4    it now that we are trying to artificially then put -- you know,
5    take some of these things out, especially with the key witness,
6    the key protest hearing officer, who saw this thing through
7    completion?
8           And so to the extent that's where my point is is that
9    there's already been other documents that have made reference
10   then to this process, this procedure.  The parties have
11   stipulated in and, so, therefore, that's why I think it's such
12   an artificial line of demarcation that they're now trying to
13   take with this witness.
14          MR. KULA:  It's not this witness, Your Honor.
15   Pretrial we didn't know the FTB was going to come in and
16   misrepresent what the protective order meant, and that's why
17   the motion was filed.
18          So -- but this is Exhibit 368.  It's a memo from Mr.
19   Dunn (indiscernible) supervisor and again it's October of 2000.
20          If we can just scroll down there a little bit more,
21   John.
22          If we look in the second paragraph under line -- No.
23   2, the protective order, it talks about the protective order
24   outline (indiscernible) because the case is stayed.
25          Then it says -- you go down to the last paragraph,
```

RJN1131

131

1   "Please communicate (indiscernible) she needs to request

2   directly from Hyatt her demand, and that's the section they can

3   subpoena all information and documents designated as Hyatt's

4   confidential.  (Indiscernible) says demand these documents.

5          The next page is a list of what should be requested,

6   categories 1, 2, 3.  Fact 2 and 3 are categories that they

7   eventually do subpoena almost two years later.

8          So again, our point is internally is the FTB going to

9   put people on the stand and represent that the protective order

10  prevented them from doing things like just issuing subpoenas?

11  And they can't do that.

12         THE COURT:  You know that's an argument that goes a

13  little beyond what we're talking about right here with respect

14  to this examination and this testimony, and I think that this

15  testimony can come in, and counsel can argue the issues of what

16  counsel would be permitted to argue at a later point in time.

17  I hope everybody agrees that the jury is not here to determine

18  the issues and ramifications of the protective order.

19         MR. KULA:  Absolutely, Your Honor, and I don't want

20  this to be a waiver of somehow if we play Ms. Cinnamon that, oh

21  well, now we have to get into debating what the protective

22  order means because they want to put a witness on the stand to

23  say, well, this is why we told Ms. Cinnamon that because the

24  protective order meant XYZ because then (indiscernible)

25  cross-examination (indiscernible), well, no, it didn't mean

RJN1132

132

1  that and in-house counsel knew that not to be the case.  That's

2  my concern.

3      THE COURT:  That's one of the reasons why I'm

4  addressing it.  I also realize, Mr. Kula, you may have some

5  areas that you think now are permissible, but my question is

6  given that you understand now what my thought process is, are

7  we to a point where we can que up a portion of this video and

8  bring our jury back in or --

9      MR. KULA:  Well --

10     THE COURT:  Not really.

11     MR. KULA:  We can be pretty close.  We need a few

12 minutes, but there's a couple things we need to resolve because

13 there's a couple documents that Ms. Cinnamon goes over in her

14 deposition that need to be admitted or at least we need to

15 determine if they're going to be admitted that relate to this,

16 particularly now if the Court's going to allow the kind of

17 testimony that Ms. Cinnamon's giving on the protective order.

18     One of them is the protest log that was mentioned in

19 Ms. Woodward's deposition and Ms. Lundvall and I had some

20 discussions on.  With the Court's ruling I need to go back and

21 look at that, but I think the redactions we were suggesting

22 needed to be made.  We have to take a quick look at those.

23     The other exhibit is Exhibit 411, if you could bring

24 up 411.

25     It's E-mails.  The second E-mail we looked -- the

RJN1133



COPY      FILED COPY

DISTRICT COURT
CLARK COUNTY, NEVADA
* * * * *

GILBERT P. HYATT,      .

         Plaintiff,    .     CASE NO. A-382999

     vs.           .     DEPT. NO. X

CALIFORNIA STATE FRANCHISE   .
TAX BOARD,           .
                      .     **Transcript of**
        Defendant    .     **Proceedings**
. . . . . . . . . . . . . . . . .

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 56**

FRIDAY, JULY 11, 2008

<u>APPEARANCES:</u>

FOR THE PLAINTIFF:      PETER C. BERNHARD, ESQ.
                         MARK HUTCHISON, ESQ.
                         DONALD J. KULA, ESQ.

FOR THE DEFENDANT:      PAT LUNDVALL, ESQ.
                         CARLA B. HIGGINBOTHAM, ESQ.
                         JAMES BRADSHAW, ESQ.

COURT RECORDER:        TRANSCRIPTION BY:

VICTORIA BOYD         VERBATIM DIGITAL REPORTING, LLC
District Court       Littleton, CO 80120
                     (303) 798-0890

Proceedings recorded by audio-visual recording, transcript
produced by transcription service.

RJN1134

41

1      A     That's what I read and that's what I conveyed here.

2      Q     You felt that would be the appropriate way to

3  proceed?

4      A     Yes, sir.

5      Q     And let's look at that next paragraph below that.

6  It says that in the event Hyatt refuses to consent to

7  voluntarily produce, and it says per paragraph 13, "requires

8  the use of administrative subpoena," then it says, "which

9  would also have to be prepared and served by litigation

10 attorneys."  You're talking about the litigation attorneys at

11 the FTB who were working on the Nevada litigation?

12     A     That's right, because they would be the only ones

13 who knew what needed to be produced.

14     Q     So, if they want information from the litigation to

15 be moved over to the protest and Mr. Hyatt won't do it, then

16 they are to go out an prepare and serve an administrative

17 subpoena, correct?

18     A     That's the second step in the process.  They need

19 to ask him first.

20     Q     Well, let me ask you about that.  Under the power

21 of examination that you testified yesterday --

22     A     Um-hum.

23     Q     -- (indiscernible) that's the process that has to

24 be used, is they ask for the information first, correct?

25     A     That's what we do, yes.

RJN1135

42

1  Q   And after, I think you said, multiple attempts, if
2  it doesn't happen, it's not produced, then you might issue a
3  subpoena, correct?

4  A   We have the right to issue a subpoena, yes.

5  Q   Rarely you do, but you have the right?

6  A   Yes, we have the right.

7  Q   But here you're saying that if you can't get the
8  information by asking, then litigation attorneys need to go
9  out and get a subpoena, correct, in this section we're
10 talking about?

11 A   That's what the order said to me.

12 Q   And let's look at the next paragraph below that.
13 It says, "In essence, it puts the burden on the litigation
14 attorneys to determine what confidential information would be
15 valuable to the protest cases, then to seek the consent of
16 Hyatt to voluntarily produce the information and if Hyatt
17 refuses, to issue an administrative subpoena and get it
18 enforced."

19     You're telling the litigation side, here, that the
20 protocol is the litigation attorneys, they determine the
21 documents to be valuable to the protest, they have to go out
22 and get it, use this process and go out and get it, correct?

23 A   Yes, that's what it says.

24     MR. KULA:  Now, let's go to the third page, John.
25 Second paragraph on the third page.

RJN1136

47

1     Q   And that sentence -- that second sentence says,

2  "Also to the extent that any documents or information or

3  other documents in the audit file were produced or provided

4  by the plaintiff which are not covered by the order, please

5  provide Charlene a copy of those as well." So you're trying

6  to get the file here, correct?

7     A   That's what I'm trying to do, yes.

8     Q   From your own folks?

9     A   Yes, sir.

10     MR. KULA:  Now, you can take that down, John.

11  BY MR. KULA:

12     Q   Let me just ask you a little bit about -- more

13  generally about the protective order.  You indicated that you

14  have very -- very experienced as an attorney.  And you -- I

15  think you testified that you were asked to look at this and

16  come up with a protocol because you had experience dealing

17  with protective orders?

18     A   No, because I was the supervisor.

19     Q   Okay.  I thought you testified that you had

20  experience dealing with protective orders.

21     A   I've had experience dealing with protective orders

22  primarily in the context of trade secrets.

23     Q   And so, you have an idea, as your experience as an

24  attorney, that the general or typical purpose of a protective

25  order is that when information is produced in a litigation,

RJN1137

48

1   it's used only in that litigation, not used by the other
2   party, the receiving party, for some other purpose, correct?
3        A    That's a fair statement, yes.
4        Q    You mentioned the trade secret context.  For
5   example, someone receives information in litigation, they
6   can't go use it in their business to hurt the other business
7   that they may have received it from, correct?
8        A    That's true.
9        Q    So the purpose of a protective order is to limit
10  the use in that particular legal proceeding, correct?  One of
11  the purposes?
12       A    Yes, I can understand what you're saying.  That's
13  probably correct.
14       Q    Now, I think you've testified that this particular
15  case is an unprecedented case.  Did you use that term?
16       A    It's the only case I know of that had both,
17  litigation and administrative proceedings going on at the
18  same time.
19       Q    Well, this is a tort case.  You understand that,
20  correct?
21       A    Yes, I know now it is, yes.
22       Q    And it's separate from the tax proceedings,
23  correct?
24       A    That's correct.
25       Q    And whether or not the case is considered

RJN1138

 

DISTRICT COURT
CLARK COUNTY, NEVADA
* * * * *

GILBERT P. HYATT,          .
                           .     CASE NO. A-382999
            Plaintiff,     .
     vs.                   .     DEPT. NO. X
                           .
CALIFORNIA STATE FRANCHISE .
TAX BOARD,                 .
                           .     **Transcript of**
            Defendant.     .     **Proceedings**
. . . . . . . . . . . . . . .

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 58**

TUESDAY, JULY 15, 2008

APPEARANCES:

FOR THE PLAINTIFF:          PETER C. BERNHARD, ESQ.
                            MARK HUTCHISON, ESQ.
                            DONALD J. KULA, ESQ.


FOR THE DEFENDANT:          PAT LUNDVALL, ESQ.
                            CARLA B. HIGGINBOTHAM, ESQ.
                            JAMES BRADSHAW, ESQ.






COURT RECORDER:             TRANSCRIPTION BY:

VICTORIA BOYD               VERBATIM DIGITAL REPORTING, LLC
District Court              Littleton, CO 80120
                            (303) 798-0890

Proceedings recorded by audio-visual recording, transcript
produced by transcription service.

187

1        Q.    Do you need a hard copy of that?

2        A.    No, I'm fine.  I think I can read it like this.

3        Q.    And I'd ask you to focus on that bottom paragraph.

4   You're suggesting here that Ms. Cinnamon seek the request which

5   are Page 2 which we'll take a look at in a second.  But under

6   the  under that 19504 power of examination and power of subpoena

7   you're asking her -- suggesting that she go out and obtain the

8   documents you list, correct?

9        A.    That's what I'm saying, correct.

10       Q.    And you understood that there was no limitation on

11  the protest officer doing that relative to Mr. McLaughlin's

12  protocol based on the protective order, correct?  She could go

13  do that.

14       A.    I believe Mr. McLaughlin's protocol makes a comment

15  about her using her powers, yes.

16       Q.    No limitation on that, correct?

17       A.    I believe there's a phrase like that in there.

18       Q.    That's what he says, right.  Let's go to the second

19  page.

20            MR. KULA:  Pull up those  the (indiscernible).

21  Thanks, John.

22  BY MR. KULA:

23       Q.    Now, two and three relate to Mr. Cowen and Mr.

24  Kern's transcripts of their depositions and documents, correct?

25       A.    Correct.

RJN1140




DISTRICT COURT
CLARK COUNTY, NEVADA
* * * * *

GILBERT P. HYATT,                    .

          Plaintiff,                 .      CASE NO. A-382999

     vs.                             .      DEPT. NO. X

CALIFORNIA STATE FRANCHISE           .
TAX BOARD,
                                     .      **Transcript of**
          Defendant                  .      **Proceedings**
.  .  .  .  .  .  .  .  .  .  .  .  .  .

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 56**

FRIDAY, JULY 11, 2008

<u>APPEARANCES</u>:

FOR THE PLAINTIFF:        PETER C. BERNHARD, ESQ.
                          MARK HUTCHISON, ESQ.
                          DONALD J. KULA, ESQ.


FOR THE DEFENDANT:        PAT LUNDVALL, ESQ.
                          CARLA B. HIGGINBOTHAM, ESQ.
                          JAMES BRADSHAW, ESQ.




COURT RECORDER:           TRANSCRIPTION BY:

VICTORIA BOYD             VERBATIM DIGITAL REPORTING, LLC
District Court            Littleton, CO 80120
                          (303) 798-0890

Proceedings recorded by audio-visual recording, transcript
produced by transcription service.

RJN1141

138

1   work without benefit of that factual information, did you?

2       A    We never anticipated her reaching a conclusion

3   without having as much evidence as she needed to reach the

4   right conclusion.

5       Q    Now, you could have -- Mr. Kula asked you about the

6   one document where Ms. Cinnamon was directed to review what

7   she had and make a draft writeup?

8       A    Yes.

9       Q    And that was not a problem, to make a draft, based

10  on what she had, was it?

11      A    No.  The draft would have included a summation of

12  the facts as she knew them and a recitation of what had been

13  provided by Mr. Hyatt through his counsel in response to the

14  IDRs.  That's all it would have been.

15      Q    All right.  And would it have also included the

16  fact that items had been requested by Ms. Cinnamon and not

17  provided by Mr. Hyatt?

18      A    That -- if it was going to turn into a

19  determination letter, yes, she would have gone into that

20  detail explaining the deficiencies in that and laying out an

21  argument or an assertion of failure to exhaust as a result of

22  that, yes.

23      Q    Explain that to the jury, failure to exhaust.  That

24  sounds like a consequence.

25      A    It's a judicial doctrine that applies to cases that

RJN1142

139

1  are handled by administrative agencies whereby the court

2  prefers that if a matter is going to be resolved, it be

3  resolved at the lowest possible level so that it doesn't have

4  to go on to the higher level.  And you assert failure to

5  exhaust if you don't get sufficient cooperation at the lowest

6  possible level so that the next reviewing authority can then

7  determine whether things that weren't provided at that lowest

8  level can be provided later on.  And if they determine that

9  there was a failure to exhaust, information that's later

10  brought out can be excluded under that ruling.

11      Q    And what's the consequence of that to the taxpayer?

12      A    It precludes the taxpayer from bringing in any

13  information that was not provided at the lowest possible

14  level of the administrative process.

15      Q    Let's go to 2358.

16          MR. KULA:  And, again, this is beyond the scope of

17  my cross-examination.  We did not go into these documents.

18          MR. BRADSHAW:  Well, but he went into the subject

19  matter, the wall, the frustration, what was behind it and

20  here it comes.  This is an admitted exhibit.

21          MR. KULA:  It's the same argument, Your Honor.  I

22  did not go through these documents.  He was not even involved

23  in this time period by his own testimony.  We're talking

24  February of 2007.

25          THE COURT:  Sustain the objection.

RJN1143

153

1    up?

2              MR. KULA:  Yes, I do have a few.

3              MR. BRADSHAW:  Do you want me to clean up?

4                   (Off-record colloquy)

5                   RECROSS-EXAMINATION

6    BY MR. KULA:

7        Q    Mr. McLaughlin, just briefly.  I won't bring it up,

8    but Exhibit 368 is that Mr. Dunn memo that you said you

9    hadn't seen until today.  Didn't you see it at your

10   deposition?  Weren't you asked about it at your deposition?

11   Do you recall that?

12       A    I don't recall seeing it at the deposition.

13       Q    You don't recall either way if you saw it?

14       A    I don't recall either way.

15       Q    Again, I won't bring it up, but that exhibit --

16   well, Mr. Bradshaw was asking you about Mr. Coffill being an

17   advocate.  A tax rep can be an advocate, can't he?

18       A    I expect him to be an advocate.

19       Q    Was it -- some discussion about the failure to

20   exhaust.

21       A    Yes.

22       Q    Did I state that right?

23       A    Yes.

24       Q    Nothing prevented Ms. Cinnamon from invoking that

25   if she felt it was warranted in Mr. Hyatt's case, correct?

RJN1144

154

1      A      Invoking that?

2      Q      Pursuing that.

3      A      Well, she can always assert it, yes.

4      Q      But she didn't?

5      A      Well, she wouldn't have asserted it at any of these

6  levels.  She would do that at the end of the process.  That's

7  fundamentally what you would call an affirmative defense.

8  It's not something that you allege against the taxpayer at

9  any point other than the end.

10      Q      I may be confusing terms, but you had testified

11  yesterday and I was equating it to your testimony from

12  yesterday that if there was not cooperation from a taxpayer,

13  it could go to determination and that could be adversely

14  reflected, the fact that the taxpayer did not produce

15  documents.

16      A      Yes.  When you do the final determination, if you

17  feel that the taxpayer hasn't properly cooperated and

18  provided all the documents, then you assert that we may

19  pursue a failure to exhaust, affirmative defense.

20      Q      I believe you testified to Mr. Bradshaw that Ms.

21  Cinnamon only would have had responses to the IDRs if she

22  didn't obtain the information or the FTB didn't obtain the

23  information from litigation, if she had made a determination

24  before obtaining the information from litigation, correct?

25      A      Correct.

RJN1145

 DISTRICT COURT
CLARK COUNTY, NEVADA
* * * * * 

GILBERT P. HYATT,                  .

          Plaintiff,      .     CASE NO. A-382999

    vs.                             .     DEPT. NO. X
                   .
CALIFORNIA STATE FRANCHISE         .
TAX BOARD,                         .
                   .     **Transcript of**
          Defendant.       .     **Proceedings**
. . . . . . . . . . . . . . . .

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 58**

TUESDAY, JULY 15, 2008

<u>APPEARANCES</u>:

FOR THE PLAINTIFF:        PETER C. BERNHARD, ESQ.
                        MARK HUTCHISON, ESQ.
                        DONALD J. KULA, ESQ.


FOR THE DEFENDANT:        PAT LUNDVALL, ESQ.
                        CARLA B. HIGGINBOTHAM, ESQ.
                        JAMES BRADSHAW, ESQ.


COURT RECORDER:           TRANSCRIPTION BY:

VICTORIA BOYD             VERBATIM DIGITAL REPORTING, LLC
District Court            Littleton, CO 80120
                        (303) 798-0890

Proceedings recorded by audio-visual recording, transcript
produced by transcription service.

187

1      Q.    Do you need a hard copy of that?

2      A.    No, I'm fine.  I think I can read it like this.

3      Q.    And I'd ask you to focus on that bottom paragraph.

4  You're suggesting here that Ms. Cinnamon seek the request which

5  are Page 2 which we'll take a look at in a second.  But under

6  the  under that 19504 power of examination and power of subpoena

7  you're asking her -- suggesting that she go out and obtain the

8  documents you list, correct?

9      A.    That's what I'm saying, correct.

10     Q.    And you understood that there was no limitation on

11 the protest officer doing that relative to Mr. McLaughlin's

12 protocol based on the protective order, correct?  She could go

13 do that.

14     A.    I believe Mr. McLaughlin's protocol makes a comment

15 about her using her powers, yes.

16     Q.    No limitation on that, correct?

17     A.    I believe there's a phrase like that in there.

18     Q.    That's what he says, right.  Let's go to the second

19 page.

20          MR. KULA:  Pull up those  the (indiscernible).

21 Thanks, John.

22 BY MR. KULA:

23     Q.    Now, two and three relate to Mr. Cowen and Mr.

24 Kern's transcripts of their depositions and documents, correct?

25     A.    Correct.

RJN1147

 DISTRICT COURT
CLARK COUNTY, NEVADA 
* * * * *

GILBERT P. HYATT,                   .

.        CASE NO. A-382999
           Plaintiff,              .
     vs.                            .        DEPT. NO. X

.
CALIFORNIA STATE FRANCHISE          .
TAX BOARD,                          .
.        **Transcript of**
           Defendant.              .        **Proceedings**
. . . . . . . . . . . . . . .

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 58**

TUESDAY, JULY 15, 2008

APPEARANCES:

FOR THE PLAINTIFF:        PETER C. BERNHARD, ESQ.
                          MARK HUTCHISON, ESQ.
                          DONALD J. KULA, ESQ.


FOR THE DEFENDANT:        PAT LUNDVALL, ESQ.
                          CARLA B. HIGGINBOTHAM, ESQ.
                          JAMES BRADSHAW, ESQ.




COURT RECORDER:           TRANSCRIPTION BY:

VICTORIA BOYD             VERBATIM DIGITAL REPORTING, LLC
District Court            Littleton, CO 80120
                          (303) 798-0890

Proceedings recorded by audio-visual recording, transcript
produced by transcription service.

188

1    Q.    So you were asking Ms. Cinnamon and suggesting that

2   the FTB go pursue those in October of 2000, correct?

3    A.    Yes.

4    Q.    And there wasn't a request actually made under the

5   protective order for those until June of 2002.

6    A.    That's correct.

7          MR. KULA:   Take that down, John.

8   BY MR. KULA:

9    Q.    Now, Mr. Dunn, you -- let's see.  Let's take a look

10  at that subpoena again, which is 2344.  Let's go to Page 2.

11  Looking at this -- these requests, Mr. Dunn, let's start from

12  the bottom up.  Six, of course, the court denied.  But volume

13  five, that's -- I think we've established that -- that was

14  supposed to be the 21st was supposed to in there, volume two of

15  the 21st supplemental production.  Do you recall that?

16   A.    I believe so.  I believe the intent here was to

17  encompass Mr. Hyatt's 21st and 22nd supplemental productions

18  made on the dates listed.

19   Q.    And from numbers four and five, the 21st

20  supplemental production, almost all much those document that is

21  ultimately we had the Bates numbers on, almost all of those

22  documents the protest officer already had via the audit file and

23  the protest file, correct?

24   A.    I believe some of the documents were photocopies of

25  parts of the audit file.  I don't necessarily know that that was

RJN1149

1  an exact duplicate.

2     Q.   Well, almost all, if not all the documents, already

3  were from the audit file and/or protest file, correct?

4     A.   I don't know exactly how many were or were not. I

5  know there were parts of the audit file reproduced within these

6  productions. That happened in this case many times in many

7  different files. There are files from Mr. Kern, and files from

8  Mr. Cowen that were produced that had segments or copies of the

9  audit file --

10     Q.   Right.

11     A.   -- if that's what you're getting at.

12     Q.   Numbers one and two relating to Mr. Kern and Mr.

13  Cowen's documents, almost all those documents had been produced

14  -- the protest officer had, correct?

15     A.   The PBTK production and the EC production?

16     Q.   Yes.

17     A.   Almost all of them -- I don't think that's accurate,

18  but I'm sure that some of the documents in those productions --

19  those files of those individuals were copies and obviously would

20  be copies of the audit file or the audit correspondence or such.

21

22     Q.   I'm not suggesting that they had the Bates -- same

23  bates number on them. I'm suggesting that letters that Mr.

24  Cowen sent to the protest officer that were part of his file

25  that was produced as part of this subpoena, the protest officer

RJN1150

190

1  already had.

2      A.    Quite possibly.  You're missing one of the reasons

3  that on getting these documents for the protest hearing officer.

4   What Mr. Kern had in his file and when he had it, what Mr.

5  Cowen had in his file and when he had it, could be related to

6  the issues in this case, especially the issue of cooperation

7  that's related to the fraud penalty.

8      Q.    Isn't it true that the only thing that the protest

9  officer didn't have relative to Mr. Kern's file were enclosure

10  documents where Mr. Kern would receive something and forward it

11  on to Mr. Hyatt, something that's normally privileged.  Isn't

12  that -- those are the types of documents that were not -- that

13  the protester didn't already have.

14      A.    I can't represent to you exactly what's in these

15  supplemental productions.  I'd have to page through them again.

16  But the document you just described would be very relevant to

17  the tax issues in this case, and I would want the protest

18  hearing officer, to the extent they could see the correspondence

19  back and forth between there Hyatt and his representatives

20  during the tax audit, since the auditor applied a fraud penalty,

21  and at least part of her analysis commented on cooperation, I

22  would think that those would be relatively important documents

23  for the protest hearing officer to look at.

24      Q.    Well, in regard to these requests, which you

25  drafted, correct?

RJN1151

191

1    A.    You know, I did not draft this.  I sent something to

2  house counsel, and this is what came back.

3    Q.    It was drafted with your input, then?

4    A.    Yes, it was.

5    Q.    Did you review the documents to determine what

6  documents already would have been in the protest file and what

7  documents actually were designated under the protective order

8  before you -- before this was sent out, let's say, before the

9  subpoena was sent out?

10    A.    I did review the supplemental productions, and my

11  memory is I didn't know that there was a mix of documents under

12  the protective order and documents not under the protective

13  order in those.

14    Q.    And but, of course, under Mr. McLaughlin's protocol,

15  you had access to the protest officer's files, correct?  There

16  was no limitation under Nevada, or the FTB litigation attorneys

17  looking at the protest officer's files, correct?  Information

18  flowing from protest to FTB litigation.

19    A.    Her files.  I received photocopies of what Mr. Hyatt

20  provided to the protest hearing officer in response to IDRs.  I

21  don't ever recall walking into the protest hearing officer's

22  office and going through her files.

23    Q.    No, my point is you could have.  You could have

24  compared well, let's see I have this -- these documents I can

25  look at that Mr. Hyatt's produced.  Are they over here in the

RJN1152

192

```
 1   protest?  Have they already been produced, or are they part of

 2   the file?  You could have done that.

 3        A.    I could have.  I chose not to.  I wanted these --

 4   this universe of documents to go.

 5        Q.    So the answer is you really didn't confirm what

 6   documents were essentially being reproduced as part of the

 7   subpoena process?

 8        A.    I would disagree with you as far as being

 9   reproduced.  If they're in -- a similar document is in another

10   person's file, it's a different document.  Somebody testified to

11   that earlier.  I forget who, but that's the way I viewed this.

12        Q.    Mr. Dunn, you've -- in your deposition you used the

13   term collateral attack.  That's how you viewed this case

14   relative to the protest proceedings.

15             MR. BRADSHAW:  Your Honor, that's improper use of a

16   deposition.  It's not refreshing or impeaching his testimony.

17             MR. KULA:  I'll just ask him, then, your Honor.

18             THE COURT:  Very well.

19   BY MR. KULA:

20        Q.    You were -- you believe that this case, Mr. Dunn, is

21   a collateral attack on the protest process and the tax

22   administrative process in California, correct?

23        A.    I don't know what the question in my deposition was.

24    If you asked me what motives were -- what the motives were -- I

25   may have said that.
```

RJN1153

1

IN THE SUPREME COURT OF THE STATE OF NEVADA

2

3   FRANCHISE TAX BOARD
    OF THE STATE OF CALIFORNIA,    )

4                              )    No. 53264

5        Appellant/Cross-Respondent,   )

6   vs.

7   GILBERT P. HYATT,

8        Respondent/Cross-Appellant.   )

9

10

11    APPEAL FROM JUDGMENT – EIGHTH JUDICIAL DISTRICT COURT
            STATE OF NEVADA, CLARK COUNTY
12    HONORABLE JESSIE WALSH, DISTRICT JUDGE

13                  * * * * *

14

15            APPELLANT'S APPENDIX

16              VOLUME 76

17

18

19        ROBERT L. EISENBERG (NSBN 0950)
20        LEMONS, GRUNDY, & EISENBERG
         6005 Plumas Street, Suite 300
         Reno, Nevada 89519
21        Telephone No. (775) 786-6868
         Facsimile No. (775) 786-9716
22

23        PAT LUNDVALL (NSBN 3761)
         CARLA HIGGINBOTHAM (NSBN 8495)
24        McDONALD CARANO WILSON LLP
         2300 West Sahara Avenue, Suite 1000
         Las Vegas, NV 89102
25        Telephone No. (702) 873-4100
         Facsimile No. (702) 873-9966
26

27        ATTORNEYS FOR APPELLANT/
         CROSS-RESPONDENT

28

RJN1154

*BILL LOCKYER*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*



RONALD REAGAN BUILD
300 SOUTH SPRING STREET, SUITE
LOS ANGELES, CA 90

Public: (213) 897-2
Telephone: (213) 897-2
Facsimile: (213) 897-2
E-Mail: felix.leatherwood@doj.ca.


RECEIVED
JUN 5 2002
BY:

June 3, 2002

Mark A. Hutchison, Esq.
Hutchison & Steffen
Lakes Business Park
8831 West Sahara Avenue
Las Vegas, Nevada 89117

RE:  Hyatt v. Franchise Tax Board
     Nevada District Court (Clark County) Case No. A 382999

Dear Mr. Hutchison:

The Franchise Tax Board requests your written consent to immediately release all documentation and deposition testimony designated "CONFIDENTIAL-NV PROTECTIVE ORDER" under the protective order imposed by the Clark County (Nevada) District Court in the case of *Hyatt v. Franchise Tax Board* for consideration in Mr. Hyatt's pending California tax protest. This is a formal demand for the release of this documentation and deposition testimony under the authority of *California Revenue and Taxation Code* § 19504, copy attached.

This information is currently in FTB's possession, in their Sacramento office, and your consent will result in copies of all documents and deposition testimony being given to FTB's protest hearing officer. Neither you nor your client are required to copy and produce these documents. Of course all information given to FTB's protest hearing officer will be confidential taxpayer information in accordance with California law.

We ask that you provide your client's authorization to release the requested information within 10 days of the date of this letter. If we do not receive a response by June 17, 2002 we will provide the information to the protest hearing officer for her review and consideration in your client's administrative protest.

000019

JUN-25-2002  12:04                                    FTB28820

2342-0001

AA18892

RJN1155

Mark A. Hutchison, Esq.
June 3, 2002
Page 2

Thank you for your prompt attention to this matter.

Sincerely,

FELIX E. LEATHERWOOD
Deputy Attorney General

For    BILL LOCKYER
Attorney General

cc:  Peter C. Bernhard, Esq.
     Eric Coffill, Esq.
     Donald J. Kula, Esq.
bcc:  Thomas R.C. Wilson, Esq.

FTB28821

000020

JUN-05-2002

2342-0002

AA18893

RJN1156



**DISTRICT COURT**
**CLARK COUNTY, NEVADA**
\* \* \* \* \*

GILBERT P. HYATT,               .
                                .  CASE NO. A-382999
          Plaintiff,            .
    vs.                         .  DEPT. NO. X
                                .
CALIFORNIA STATE FRANCHISE      .
TAX BOARD,                      .
                                .  **Transcript of**
          Defendant.            .  **Proceedings**
. . . . . . . . . . . . . . . .

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 57**

MONDAY, JULY 14, 2008

<u>APPEARANCES</u>:

FOR THE PLAINTIFF:        PETER C. BERNHARD, ESQ.
                          MARK HUTCHISON, ESQ.
                          DONALD J. KULA, ESQ.


FOR THE DEFENDANT:        PAT LUNDVALL, ESQ.
                          CARLA B. HIGGINBOTHAM, ESQ.
                          JAMES BRADSHAW, ESQ.


COURT RECORDER:           TRANSCRIPTION BY:

VICTORIA BOYD             VERBATIM DIGITAL REPORTING, LLC
District Court            Littleton, CO 80120
                          (303) 798-0890

Proceedings recorded by audio-visual recording, transcript
produced by transcription service.

RJN1157

174

1          (Bench conference concluded at 3:04 p.m.)

2    BY MR. KULA:

3      Q    Mr. Miller, I don't know if you had a chance to take a

4    look at what I showed you.  I'm just trying to refresh your

5    recollection here.  It's not an exhibit we're going to show to

6    the jury, but it refers to a hearing that was held in this case

7    on August 5th of 2005, and if I just have you look at page 4 of

8    the exhibit, you --

9          MR. BRADSHAW:  Your Honor, this is not an exhibit,

10   and counsel shouldn't (indiscernible) --

11         THE COURT:  Well, that's true.

12         MR. KULA:  I'm not going to read from it.

13         THE COURT:  I don't think he intended to call it an

14   exhibit.

15         MR. KULA:  Oh, did I call it an exhibit?  I'm sorry.

16         THE COURT:  You did.

17         MR. KULA:  I'm sorry.  It's not an exhibit.  It's --

18         THE WITNESS:  (Indiscernible).

19   BY MR. KULA:

20     Q    -- a document regarding a hearing that was held in

21   this case.  I'll call it that.  On page 4, if you just read to

22   yourself that paragraph that's designated No. 1 and that

23   paragraph below it --

24     A    Yes.

25     Q    -- that says request 1 and 2.  Have you read those?

RJN1158

175

1     A     Yes, I have.

2     Q     Let me refer you then to page 11, and page 11, if you

3  look at the top, lines 8 through 13.  If you take a look at

4  those.

5     A     8 through 13?

6     Q     8 through 13.

7     A     Yes.  Okay.

8     Q     Okay.  Now does reviewing this document, Mr. Miller,

9  refresh your recollection that as of August 5 of 2005 the FTB

10  had notice that Mr. Hyatt's claim that the protest was being

11  delayed in bad faith would be a part of this case at least --

12  unless and until the Court ruled otherwise?

13        MR. BRADSHAW:  Your Honor, I object.  That

14  mischaracterizes and calls for speculation and a legal

15  conclusion.

16        THE COURT:  I think it's a fair question.

17        THE WITNESS:  It certainly indicates that the Court

18  was going to allow discovery into that question.

19  BY MR. KULA:

20     Q     And the date of the hearing was August 5th, 2005?

21     A     That's correct, yes.

22     Q     So is that why Mr. Hilson was sending -- was being

23  forwarded these E-mails the next month concerning -- that

24  discussed the past -- well, I don't want to characterize what

25  they were, but was forwarding these E-mails we marked as

RJN1159

 DISTRICT COURT
CLARK COUNTY, NEVADA
* * * * *



```
GILBERT P. HYATT,              .
                              .      CASE NO. A-382999
          Plaintiff,          .
     vs.                       .      DEPT. NO. X
                              .
CALIFORNIA STATE FRANCHISE     .
TAX BOARD,                     .
                              .      Transcript of
          Defendant.          .      Proceedings
. . . . . . . . . . . . . . .  .
```

BEFORE THE HONORABLE JESSIE WALSH, DISTRICT COURT JUDGE

**JURY TRIAL - DAY 58**

TUESDAY, JULY 15, 2008

APPEARANCES:

FOR THE PLAINTIFF:        PETER C. BERNHARD, ESQ.
                          MARK HUTCHISON, ESQ.
                          DONALD J. KULA, ESQ.


FOR THE DEFENDANT:        PAT LUNDVALL, ESQ.
                          CARLA B. HIGGINBOTHAM, ESQ.
                          JAMES BRADSHAW, ESQ.




COURT RECORDER:           TRANSCRIPTION BY:

VICTORIA BOYD             VERBATIM DIGITAL REPORTING, LLC
District Court            Littleton, CO 80120
                          (303) 798-0890

Proceedings recorded by audio-visual recording, transcript
produced by transcription service.

RJN1160

162

1    Q.    Question, Page 41, line 16, "Okay.  Mr. Dunn, we

2  have heard a lot of testimony from FTB witnesses who have said

3  that they view in most instances their job to be impartial and

4  to be fair in the application of the laws to the taxpayers and

5  within the state of California.  I take it you likewise agree

6  with me that as a protest officer one of the things that you are

7  attempting to accomplish and one of the goals that you were

8  seeking was to be fair and impartial -- a fair and impartial

9  protest officer in terms of applying the law and applying the

10 facts for a given taxpayer; is that right?"

11      Answer, "I agree.  That is what I was trying to do.

12 But most importantly my job so to enforce the revenue and

13 taxation laws of the state of California," period.

14      Did I read that correctly, Mr. Dunn?

15   A.    You read it correctly.

16   Q.    Now I want to maybe cover first, just so we're clear

17 on some of the time line.  Mr. Bradshaw went over with you what

18 I guess I'll call the second and third request that you made

19 under the protective order, just so we have the time line right

20 on that.

21      First, I want to start with Mr. Miller was here

22 yesterday, and I'd asked him and he confirmed that there was a

23 hearing in August of 2005 at which the discovery commissioner

24 had ruled that the issue of the bad faith delay would be in the

25 case at least as long as the -- unless and until the court said

RJN1161

163

1   that it wasn't in the case.

2           Now, you were at that hearing, were you not, August

3   of --

4       A.   I heard you mention that, and I'm sure I was.  I was

5   at many, if not most of those hearings.

6       Q.   But let's get the time line here.

7           MR. KULA:  Exhibit 2354, John, if we could pull it

8   up.

9   BY MR. KULA:

10      Q.   This was the letter you wrote to Mr. Hutchison, and

11  I guess I've referred to it as the second request under the

12  protective order.  That's October 28th of 2005.

13      A.   Yes.

14      Q.   That's the second time you asked -- or the FTB, I

15  should say, asked for documents from the litigation to be moved

16  over to the protest via the protective order, correct?

17      A.   That's correct.

18      Q.   Okay.  And then ultimately --

19          MR. KULA:  Exhibit 2356, John, if you could bring

20  that up --

21  BY MR. KULA:

22      Q.    -- is the subpoena you issued in -- following on

23  that initial request, and that's January of 2006, correct?

24      A.   Yes, it is the subpoena, correct?

25          MR. KULA:  Down further, John.  The second half of

RJN1162

164

1  that page. January 30th date.

2  BY MR. KULA:

3      Q.    And then if we go to Exhibit 781. This was a letter

4  that you indicated I had wrote to you on February 9th, 2006.

5  And this was the response saying that -- agreeing that the

6  materials requested that Mr. Bradshaw went over with you via the

7  subpoena could be moved over to the protest side, correct?

8      A.    That's what I remember this to be, yes.

9      Q.    So the sequence of events was you had first asked in

10 October, late October of '05, issued the subpoena in late

11 January of '06, and then in early February of '06 there was the

12 response, correct?

13     A.    That's correct. I don't know if there was other

14 correspondence in between those dates or not.

15     Q.    Yeah, I'm not saying there wasn't. I'm just saying

16 that the time frame was (indiscernible).

17             MR. KULA: If we go to the second page of this

18 letter, John. And that middle paragraph right there, for these

19 reasons, if you could pull that out. I'm sorry, the paragraph

20 above that, I'm sorry.

21 BY MR. KULA:

22     Q.    That last sentence says, moreover, unlike the prior

23 subpoena, all the documents requested in the current subpoena

24 have actually been designated under the protective order. We

25 may go through this later, Mr. Dunn, but a number of the

RJN1163

165

1    documents in that first subpoena actually were not designated

2    under the protective order, correct?

3         A.    Yes, that's -- that is true.

4              MR. KULA:  Okay.  You can bring that down, John.

5    BY MR. KULA:

6         Q.    Now, let me -- the other part of the time line,

7    then, is there was what I've called the third request.  If you

8    go to Exhibit 2357.  That's your January 19th, 2007 letter to

9    Mr. Hutchison.

10        A.    Yes, it is.

11        Q.    Okay.  Mr. Bradshaw went through that with you.  I

12   just want to go, then, look at Exhibit 782.  This is a response,

13   then, given February 1st, 2007.

14        A.    Yes, that's your letter, correct.

15        Q.    And as you indicated, there were a couple of the

16   deposition transcripts, there were some -- there was an

17   objection to providing at least in an unredacted form, correct?

18        A.    My memory is yes, some transcript parts you objected

19   to produce.

20        Q.    And then except for Ms. Jeng's, that was resolved;

21   is that correct?

22        A.    My memory is that Ms. Jeng's and Mr. Lee's were

23   never resolved.  There was a third person who you did resolve,

24   and I've forgotten who that was.  It might have been Mr.

25   McCaffrey.

RJN1164

**166**

1    Q.    And as you recall, Ms. Jeng there were some issues

2  because there were -- she had some privacy concerns relative to

3  immigration status and other issues like that she was

4  comfortable releasing.  Do you recall that?

5    A.    I do recall generally what the various areas of

6  testimony were in her transcript, but I think it was broader

7  than that, Mr. Kula.

8    Q.    Yeah, one of the areas was her immigration status,

9  wasn't it?

10    A.    As I recall, it may have been.

11    Q.    And some other areas she had privacy concerns about,

12  correct, that's what was expressed to you anyway?

13    A.    That's what was represented.

14    Q.    Okay.  Anyway, I just wanted to cover that time

15  line.

16         MR. KULA:  You can take it down now.

17  BY MR. KULA:

18    Q.    Now, the first subpoena was issued in July of 2002.

19  We it pull it up, if you'd like.  Does at that sound correct?

20    A.    It was the -- the subpoena was issued?  Yes, it was

21  issued in July of --

22    Q.    July of 2002.

23    A.     -- 2002, as I recall from seeing it a little while

24  ago.

25    Q.    All right.  I'm not trying to test your memory.  I'm

RJN1165

187

1     Q.    Do you need a hard copy of that?

2     A.    No, I'm fine.  I think I can read it like this.

3     Q.    And I'd ask you to focus on that bottom paragraph.

4 You're suggesting here that Ms. Cinnamon seek the request which

5 are Page 2 which we'll take a look at in a second.  But under

6 the  under that 19504 power of examination and power of subpoena

7 you're asking her -- suggesting that she go out and obtain the

8 documents you list, correct?

9     A.    That's what I'm saying, correct.

10     Q.    And you understood that there was no limitation on

11 the protest officer doing that relative to Mr. McLaughlin's

12 protocol based on the protective order, correct?  She could go

13 do that.

14     A.    I believe Mr. McLaughlin's protocol makes a comment

15 about her using her powers, yes.

16     Q.    No limitation on that, correct?

17     A.    I believe there's a phrase like that in there.

18     Q.    That's what he says, right.  Let's go to the second

19 page.

20     MR. KULA:  Pull up those  the (indiscernible).

21 Thanks, John.

22 BY MR. KULA:

23     Q.    Now, two and three relate to Mr. Cowen and Mr.

24 Kern's transcripts of their depositions and documents, correct?

25     A.    Correct.

RJN1166

188

1      Q.    So you were asking Ms. Cinnamon and suggesting that

2   the FTB go pursue those in October of 2000, correct?

3      A.    Yes.

4      Q.    And there wasn't a request actually made under the

5   protective order for those until June of 2002.

6      A.    That's correct.

7            MR. KULA:  Take that down, John.

8   BY MR. KULA:

9      Q.    Now, Mr. Dunn, you -- let's see.  Let's take a look

10  at that subpoena again, which is 2344.  Let's go to Page 2.

11  Looking at this -- these requests, Mr. Dunn, let's start from

12  the bottom up.  Six, of course, the court denied.  But volume

13  five, that's -- I think we've established that -- that was

14  supposed to be the 21st was supposed to in there, volume two of

15  the 21st supplemental production.  Do you recall that?

16     A.    I believe so.  I believe the intent here was to

17  encompass Mr. Hyatt's 21st and 22nd supplemental productions

18  made on the dates listed.

19     Q.    And from numbers four and five, the 21st

20  supplemental production, almost all much those document that is

21  ultimately we had the Bates numbers on, almost all of those

22  documents the protest officer already had via the audit file and

23  the protest file, correct?

24     A.    I believe some of the documents were photocopies of

25  parts of the audit file.  I don't necessarily know that that was

RJN1167



CALIFORNIA
STATE BOARD
OF EQUALIZATION

**BOARD MEMBERS**
**(Names Updated 2016)**

SEN. GEORGE RUNNER (Ret.)
First District
Lancaster

FIONA MA, CPA
Second District
San Francisco

JEROME E. HORTON
Third District
Los Angeles County

DIANE L. HARKEY
Fourth District
Orange County

BETTY T. YEE
State Controller

DAVID J. GAU
Executive Director

# *Rules for Tax Appeals of the State Board of Equalization*

## *April 2016*

Publication No. 310 • LDA

RJN1168

*Board of Equalization Rules for Tax Appeals*
*Chapter 4: Appeals from Actions of the Franchise Tax Board (Continued)*

Note: Authority cited: Government Code section 15606. Reference: Revenue and Taxation Code sections 18533, 19043.5, 19045, 19047, 19048, 19084, 19085, 19087, 19104, 19324, 19331, 19333, 19334, 19335, 19343, 19345, 19346, and 20645.

History: 1. New section adopted 9-12-2007; effective 2-6-2008.

### 5431. GENERAL BRIEFING SCHEDULE.

(a) Application. The briefing schedule in this section applies to all appeals from actions of the Franchise Tax Board, unless the appeal involves an innocent spouse determination or a jeopardy determination.

(b) Opening Briefs.

(1) Appellant's Opening Brief. The perfected appeal is the Appellant's Opening Brief.

(2) Respondent's Opening Brief. The Franchise Tax Board may file an Opening Brief not later than 90 days from the date the Chief of Board Proceedings acknowledges receipt of the Appellant's Opening Brief.

(c) Reply Briefs.

(1) Appellant's Reply Brief. The appellant may file a Reply Brief not later than 30 days from the date the Chief of Board Proceedings acknowledges receipt of the Respondent's Opening Brief. The Appellant's Reply Brief, if filed, may only address points of disagreement with the Respondent's Opening Brief. Except as provided in paragraph (2), the filing of the Appellant's Reply Brief concludes the briefing schedule.

(2) Respondent's Reply Brief. The Franchise Tax Board may file a Reply Brief only upon written permission from the Chief Counsel. The Respondent's Reply Brief, if filed, may only address points of disagreement with the Appellant's Reply Brief.

(A) The Franchise Tax Board has 15 days from the date the Chief of Board Proceedings acknowledges receipt of the Appellant's Reply Brief in which to file a written request to file its Reply Brief.

(B) Upon receipt of the Franchise Tax Board's written request, the Chief Counsel will determine whether additional briefing is necessary. Factors to be considered in determining whether additional briefing is necessary include, but are not limited to:

(i) Whether the Appellant's Reply Brief raised new facts, arguments, or evidence that are essential to the resolution of the appeal;

(ii) Whether the briefing filed to date has provided sufficient information for the Board to resolve the appeal; and

(iii) Whether the facts and issues in the appeal are so complex as to require additional discussion or clarification.

(C) If the Chief Counsel determines that additional briefing is necessary, he or she will grant the Franchise Tax Board's request to file a Reply Brief. The Franchise Tax Board may file its Reply Brief not later than 30 days from the date on which its request is granted.

(D) If the Chief Counsel determines that additional briefing is not necessary, he or she will deny the Franchise Tax Board's request to file a Reply Brief. That denial concludes the briefing schedule.

(3) Appellant's Supplemental Brief. If the Franchise Tax Board files a Reply Brief, the appellant may file a Supplemental Brief not later than 30 days from the date the Chief of Board Proceedings acknowledges receipt of the Respondent's Reply Brief. The Appellant's Supplemental Brief, if filed, may only address points of disagreement with the Respondent's Reply Brief. The filing of the Appellant's Supplemental Brief concludes the briefing schedule.

Note: Authority cited: Government Code section 15606. Reference: Revenue and Taxation Code sections 18533, 19043.5, 19045, 19047, 19048, 19084, 19085, 19087, 19104, 19324, 19331, 19333, 19334, 19335, 19343, 19345, 19346, and 20645.

History: 1. New section adopted 9-12-2007; effective 2-6-2008.

### 5432. BRIEFING SCHEDULE FOR INNOCENT SPOUSE APPEALS.

(a) Application. The briefing schedule in this section applies to all appeals from notices that grant or deny, in whole or in part, innocent spouse relief pursuant to Revenue and Taxation Code sections 18533 or 19006.

(b) Definitions. For purposes of this section:

RJN1169

(1)  The "Appealing Spouse" is the individual who files an appeal from the Franchise Tax Board's grant or denial, in whole or in part, of innocent spouse relief.

(2)  The "Non-Appealing Spouse" is the individual with whom the Appealing Spouse filed a joint return for the year(s) at issue.

(3)  The "requesting spouse" is the individual who requested relief from the joint and several liability imposed by Revenue and Taxation Code section 19006. The requesting spouse may be either the Appealing or Non-Appealing Spouse, depending upon whether the Franchise Tax Board granted or denied innocent spouse relief.

(4)  The "non-requesting spouse" is the individual with whom the requesting spouse filed a joint return for the year(s) at issue. The non-requesting spouse may be either the Appealing or Non-Appealing Spouse, depending upon whether the Franchise Tax Board granted or denied innocent spouse relief.

(c)  Special Rules and Procedures.

(1)  If both spouses file timely appeals from the Franchise Tax Board's partial grant or partial denial of innocent spouse relief, then the appeals will be consolidated for briefing, hearing, and decision. Each spouse will be treated as an "Appealing Spouse" under this section and will have an equal opportunity to file briefs.

(2)  If only one spouse files a timely appeal, then upon receipt of a perfected appeal from the Appealing Spouse, the Chief of Board Proceedings will provide one copy of the perfected appeal to the Non-Appealing Spouse and notify the Non-Appealing Spouse of his or her right to participate in the appeal.

(3)  The Chief of Board Proceedings will use the best available information to contact the Non-Appealing Spouse.

(d)  Protection of confidential information. The Board Proceedings Division will take reasonable steps, including redaction where appropriate, to ensure that the personal identifying information of one spouse is not provided to the other spouse. "Personal identifying information" includes, but is not limited to, a mailing address, electronic mail address, telephone number, and social security number.

(e)  Opening Briefs.

(1)  Appealing Spouse's Opening Brief.  The Appealing Spouse's perfected appeal is the Appealing Spouse's Opening Brief.

(2)  Respondent's Opening Brief.  The Franchise Tax Board may file an Opening Brief not later than 90 days from the date the Chief of Board Proceedings acknowledges receipt of the Appealing Spouse's Opening Brief.

(3)  Non-Appealing Spouse's Opening Brief.  The Non-Appealing Spouse may file an Opening Brief not later than 90 days from the date of the notification of his or her right to participate in the appeal. The filing of the Non-Appealing Spouse's Opening Brief will join the Non-Appealing Spouse as a party to the appeal. The failure to file the Non-Appealing Spouse's Opening Brief within the time provided is a waiver of the right to participate in the appeal, unless such failure is due to reasonable cause.

(f)  Reply Briefs.

(1)  Appealing Spouse's Reply Brief.  The Appealing Spouse may file a Reply Brief not later than 30 days from the later of:

(A)  The date the Chief of Board Proceedings acknowledges receipt of the Respondent's Opening Brief;

(B)  The date the Chief of Board Proceedings acknowledges receipt of the Non-Appealing Spouse's Opening Brief, if one is filed; or

(C)  The date on which it becomes known that the Non-Appealing Spouse will not file an Opening Brief.

The Appealing Spouse's Reply Brief, if filed, may only address points of disagreement with the Respondent's Opening Brief and the Non-Appealing Spouse's Opening Brief.  Except as provided in paragraphs (2) and (3), the filing of the Appealing Spouse's Reply brief concludes the briefing schedule.

(2)  Non-Appealing Spouse's Reply Brief.  If the Appealing Spouse files a Reply Brief, the Non-Appealing Spouse may file a Reply Brief not later than 30 days from the date the Chief of Board

RJN1170

*Board of Equalization Rules for Tax Appeals*
*Chapter 4: Appeals from Actions of the Franchise Tax Board (Continued)*

Proceedings acknowledges receipt of the Appealing Spouse's Reply Brief. The Non-Appealing Spouse's Reply Brief, if filed, may only address points of disagreement with the Appealing Spouse's Reply Brief.

(3) Respondent's Reply Brief. The Franchise Tax Board may file a Reply Brief only upon written permission from the Chief Counsel. The Respondent's Reply Brief, if filed, may only address points of disagreement with the Appealing Spouse's Reply Brief and the Non-Appealing Spouse's Opening and Reply Briefs. The rules in section 5431, subdivision (c)(2), apply to this paragraph. However, the 15-day period described in section 5431, subdivision (c)(2)(A), begins on the later of:

(A) The date the Chief of Board Proceedings acknowledges receipt of the Appealing Spouse's Reply Brief;

(B) The date the Chief of Board Proceedings acknowledges receipt of the Non-Appealing Spouse's Reply Brief, if one is filed; or

(C) The date on which it becomes known that the Non-Appealing Spouse will not file a Reply Brief.

(4) If neither the Non-Appealing Spouse nor the Franchise Tax Board file a Reply Brief, the briefing schedule is concluded.

(5) Appealing Spouse's Supplemental Brief. If the Franchise Tax Board or the Non-Appealing Spouse file a Reply Brief, the Appealing Spouse may file a Supplemental Brief not later than 30 days from the later of:

(A) The date the Chief of Board Proceedings acknowledges receipt of the Non-Appealing Spouse's Reply Brief;

(B) The date the Chief of Board Proceedings acknowledges receipt of the Respondent's Reply Brief; or

(C) The date on which it becomes known that the Franchise Tax Board will not file a Reply Brief.

The Appealing Spouse's Supplemental Brief, if filed, may only address points of disagreement with the Respondent's Reply Brief and the Non-Appealing Spouse's Reply Brief. The filing of the Appealing Spouse's Supplemental Brief concludes the briefing schedule.

(g) Conformity with Federal Action. If, prior to the Board's decision on the appeal, any party to the appeal receives notification that the requesting spouse has been granted relief under Internal Revenue Code section 6015, the following procedures will apply in addition to the other procedures set forth in this section:

(1) The party who receives notification that relief has been granted under Internal Revenue Code section 6015 must submit proof of such notification to the Chief of Board Proceedings as soon as is practical.

(2) Regardless of whether the non-requesting spouse has joined the appeal, the Chief of Board Proceedings will notify the Franchise Tax Board and the non-requesting spouse of the federal grant of innocent spouse relief. Not later than 30 days from the date of the notification, the Franchise Tax Board and the non-requesting spouse may provide "information that indicates that relief should not be granted," as that phrase is defined in Revenue and Taxation Code section 18533, subdivision (i)(2).

(3) If the Franchise Tax Board and/or the non-requesting spouse provides information as permitted by paragraph (2) of this subdivision, the requesting spouse may file an additional brief. If the Franchise Tax Board did not provide information as permitted by paragraph (2), it may also file an additional brief. Additional briefs must be filed not later than 30 days from the date the Chief of Board Proceedings acknowledges receipt of the information described in paragraph (2) of this subdivision. Any brief filed pursuant to this paragraph may only address points of disagreement with the information described in paragraph (2) of this subdivision.

(4) If this subdivision becomes applicable after the briefing schedule has concluded, then briefing will be reopened for the purpose of complying with this subdivision and any hearing or decision will be postponed as appropriate.

(5) If this subdivision becomes applicable before the briefing schedule has concluded, then the briefing schedule will not be concluded until the requirements of this subdivision are satisfied.

Note:     Authority cited: Government Code section 15606. Reference: Revenue and Taxation Code sections 18533, 19006, 19043.5, 19045, 19047, 19048, 19084, 19085, 19087, 19104, 19324, 19331, 19333, 19334, 19335, 19343, 19345, 19346, and 20645.

History: 1. New section adopted 9-12-2007; effective 2-6-2008.

RJN1171

*Board of Equalization Rules for Tax Appeals*
*Chapter 4: Appeals from Actions of the Franchise Tax Board (Continued)*

**5435. ADDITIONAL BRIEFING.**

(a) Appeals Division Requests for Additional Briefing. If the Assistant Chief Counsel of the Appeals Division, or his or her designee, determines that insufficient briefing or evidence has been provided, the Appeals Division may request additional briefing or evidence from any party. The Appeals Division will determine the order, deadlines, and conditions under which any briefing or evidence must be submitted. Deadlines under this subdivision may be extended upon a showing of reasonable cause.

(b) Individual Board Member's Request for Additional Briefing. Any individual Board Member may contact the Appeals Division in order to request additional briefing or evidence from any party. The Appeals Division will determine the order, deadlines, and conditions under which any briefing or evidence must be submitted. Deadlines under this subdivision may be extended upon a showing of reasonable cause.

(c) Board Requests for Additional Briefing. If the Board determines that insufficient briefing or evidence has been provided, the Board may request additional briefing or evidence from any party. The Board will determine the order, deadlines, and conditions under which any briefing or evidence must be submitted. The Chief of Board Proceedings may extend deadlines set by the Board under this subdivision only upon a showing of extreme hardship and with the consent of the Board Chair.

(d) Timing of Request. A request under this section may be made during or after the applicable briefing schedule has concluded. Additional briefs or evidence provided in response to such a request are not subject to the requirements of the applicable briefing schedule.

(e) Notifying the Chief of Board Proceedings. The Chief of Board Proceedings must be notified promptly of any request made under this section and may postpone the scheduling or hearing of an appeal.

Note: Authority cited: Section 15606, Government Code. Reference: Sections 18533, 19043.5, 19045, 19047, 19048, 19084, 19085, 19087, 19104, 19324, 19331, 19333, 19334, 19335, 19343, 19345, 19346 and 20645, Revenue and Taxation Code.

History: 1. New section adopted 9-12-2007; effective 2-6-2008.
2. Amendments adopted November 19, 2013, effective April 1, 2014. The amendments replaced "Staff" with "Appeals Division" at the beginning of the title of subdivision (a); replaced "Notification of Board Chair" with "Notifying the Chief of Board Proceedings" as the title of subdivision (e); and replaced "Board Chair" with "Chief of Board Proceedings" in the text of subdivision (e).

## ARTICLE 4: REQUESTING AND SCHEDULING ORAL HEARINGS

**5440. RIGHT TO REQUEST AN ORAL HEARING.**

(a) Written Request Required. Every appellant has the right to an oral hearing before the Board upon written request, except as otherwise provided in any statute or regulation.

(1) In order to obtain an oral hearing, the appellant must file a written request not later than 30 days from the conclusion of briefing.

(2) Upon receipt of a timely request, the Chief of Board Proceedings will send written acknowledgment of the request to all parties pursuant to section 5522.1.

(3) An untimely request may be accepted and acknowledged if the Chief Counsel determines that the failure to make a timely request was due to reasonable cause.

(b) Innocent Spouse Appeals. Both the Appealing Spouse and the Non-Appealing Spouse, as those terms are defined in section 5432, subdivision (b), may request an oral hearing pursuant to subdivision (a) of this section. The Non-Appealing Spouse may request an oral hearing only if he or she has been joined as a party to the appeal. If such a request is made by either or both spouses, the Board typically will conduct one oral hearing and invite both spouses to appear. However, the Board will conduct separate oral hearings if:

(1) A court order would prohibit the spouses from appearing at the same hearing; or

(2) The Chief of Board Proceedings, after consulting with the Board Chair, determines that conducting one oral hearing is likely to be unsafe, disruptive, or unjust.

If the Board conducts separate oral hearings, the Board will not decide the appeal until both hearings have concluded.

RJN1172

**From:** Coffill, Eric J.
**Sent:** Wednesday, June 03, 2009 10:12 AM
**To:** 'Olson, Diane'; Roberts, Carley A.
**Cc:** Kelly, Amy
**Subject:** RE: Appeal of Hyatt - Clarification Regarding the Extended Briefing Grant per the Board's 5/29/09 Letter

Diane,

Thanks.  I will pick up this conversation since Carley is on a plane to Philadelphia at the moment.

Can you confirm that it is the Board's position there are not two "appeals" despite two case numbers (435770 and 446509) and separate Notices of Appeal, but there is only a single consolidated "appeal" for briefing purposes? (I think that is what you are saying below.)  If so, then FTB has two options under the Board's May 29, 2009 letter: (1) FTB can choose to file separate briefs for the 1991 and 1992 appeals (like we did) that together do not add up to more than 175 pages; or (2) FTB can file a single brief in the consolidated appeal, not to exceed 175 pages.  Right?

Our concern is we will NOT be happy to see a 175 page FTB brief in each "appeal" for 1991 and 1992.  We are seeking clarification not as much on the 175 page limit, but on what "appeal" it applies to.  Two separate appeals, or "the appeal" on a consolidated basis.


Eric


---

**From:** Olson, Diane [mailto:Diane.Olson@boe.ca.gov]
**Sent:** Wednesday, June 03, 2009 9:53 AM
**To:** Roberts, Carley A.
**Cc:** Coffill, Eric J.; Kelly, Amy
**Subject:** Appeal of Hyatt - Clarification Regarding the Extended Briefing Grant per the Board's 5/29/09 Letter

My letter to FTB dated 5/29/09 set a page limit and granted a time extension for the Franchise Tax Board's opening brief in the above appeal for both case id's 43570 and 435770.  The request was denied for 300 pages and granted for additional pages not to exceed 175 pages total.  The Rules for Tax Appeals (California Code of Regulations, title 18, sections 5410 et seq. (Chapter 4 concerning Franchise & Income Tax appeals specifically) and sections 5510 et seq. (Chapter 5 concerning General Board Hearing procedures)) do not authorize BOE to instruct the parties how to organize their briefs; section 5430, subdivision (e) addresses only formatting and the length of all briefs (limited to 30 pages absent an exception permitted by the Chief of Board Proceedings).

As you may recall, it was Morrison & Foerster LLP's request to file opening briefs for each tax year on appeal instead of a single brief for the consolidated appeals.  BPD granted the request for additional pages for the opening briefs at the request of the representative.

If you have any other questions or concerns please feel free to contact me.

Respectfully,

Diane Olson, Chief
Board Proceedings Division
State Board Of Equalization
450 N Street, MIC:80
Sacramento, CA 95814

1

RJN1173

Phone: (916) 322.9569
Fax:    (916) 324-3984
Email:  Diane.Olson@boe.ca.gov

---

**From:** Roberts, Carley A. [mailto:CRoberts@mofo.com]
**Sent:** Monday, June 01, 2009 1:07 PM
**To:** Olson, Diane
**Cc:** Coffill, Eric J.
**Subject:** Appeal of Hyatt - Clarification Regarding the Extended Briefing Grant per the Board's 5/29/09 Letter

Dear Diane,

As a follow up to our discussion a few minutes ago, we would like clarification regarding the additional briefing pages granted in your letter dated May 29, 2009 to the FTB in the Appeal of Gilbert P. Hyatt appeals (Case ID Nos. 435770, 446509). The letter states: "We also acknowledge your request for a page limit extension for the Franchise Tax Board's opening *brief*," i.e., singular, and you granted a request "for additional pages not to exceed 175 pages." However, your letter is captioned for both Hyatt cases, i.e., 435770, 446509. Did you order FTB to file a single, identical opening brief, in both cases, with that brief not to exceed 175 pages? Or did you allow FTB to file a 175 opening brief in each appeal that can be different from the (175 page) opening brief in the other case? Or did you allow FTB a total of 175 pages of briefing, to be allocated, as FTB chooses, between two opening briefs that are to be filed by FTB, one in each case? Or did you intend to issue the same order to FTB which you issued to Mr. Hyatt, i.e., an opening brief of 100 pages in one appeal and an opening brief of 75 pages in the other appeal (per Sharon King's letter of 11/10/08)?

Written clarification from the Board Proceedings Division to both parties would be tremendously appreciated.

Best regards,

Carley

**Carley A. Roberts**
Morrison & Foerster LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814
Telephone: (916) 325-1316
Fax: (916) 448-3222
Email: croberts@mofo.com
Web: www.mofo.com

2

RJN1174

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message. Thank you very much.

======================================================================
========

To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

For information about this legend, go to
http://www.mofo.com/Circular230.html

======================================================================
========

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message.
======================================================================
========

RJN1175



STATE OF CALIFORNIA

**STATE BOARD OF EQUALIZATION**
450 N STREET, SACRAMENTO, CALIFORNIA
PO BOX 942879, SACRAMENTO, CALIFORNIA 94279-0081
916-322-2270 • FAX 916-324-3984
www.boe.ca.gov

BETTY T. YEE
First District, San Francisco

BILL LEONARD
Second District, Ontario/Sacramento

MICHELLE STEEL
Third District, Rolling Hills Estates

JUDY CHU, Ph.D.
Fourth District, Los Angeles

JOHN CHIANG
State Controller, Sacramento

RAMON J. HIRSIG
Executive Director

July 8, 2009

**RECEIVED**

JUL 0 9 2009

**Morrison & Foerster LLP**

Eric J. Coffill
Morrison Foerster
400 Capitol Mall, Suite 2600
Sacramento, CA 95814-4428

Appeal of Gilbert P. Hyatt
Case ID No. 435770

Dear Mr. Coffill:

This is in response to your letter of June 25, 2009, in which you requested clarification on whether Mr. Hyatt's appeals had been consolidated in light of our recent correspondence addressing the briefing page limits for the appeal years.

Our review of the file confirms that the appeal years 1991 and 1992 are separate appeal years. Thus, in the Appeal of Gilbert P. Hyatt, Case ID: 435770, tax year 1991 and Case ID: 446509, tax year 1992, involve two separate appeals that have not been consolidated and are being treated as two separate and distinct appeals by the Board.

Please do not hesitate to contact me should you have any further questions.

Sincerely,

Diane G. Olson

Diane Olson, Chief
Board Proceedings Division

cc: Gilbert P. Hyatt
P.O. Box 81230
Las Vegas, NV 89180-1230

Robert W. Dunn, Tax Counsel IV
Franchise Tax Board – Legal Branch
P.O. Box 1720 – Legal (MS A2.60)
Rancho Cordova, CA 95741-1720

RJN1176



STATE OF CALIFORNIA

**STATE BOARD OF EQUALIZATION**
450 N STREET, SACRAMENTO, CALIFORNIA
PO BOX 942879, SACRAMENTO, CALIFORNIA 94279-0081
916-322-3084 • FAX 916-324-
www.boe.ca.gov

BETTY T. YEE
First District, San Francisco

BILL LEONARD
Second District, Ontario/Sacramento

MICHELLE STEEL
Third District, Rolling Hills Estates

JOHN CHIANG
State Controller

STEVE SHEA
Acting Member
Fourth District, Los Angeles

RAMON J. HIRSIG
Executive Director

August 21, 2009

**RECEIVED**

AUG 2 4 2009

**Morrison & Foerster LLP**

Robert W. Dunn
Tax Counsel IV
Franchise Tax Board
Legal Division MS A260
PO Box 1720
Rancho Cordova, CA 95741-1720

Appeals of:
Gilbert P. Hyatt, Case ID No. 435770
Gilbert P. Hyatt, Case ID No. 446509

Dear Mr. Dunn:

At this time, we are denying the Franchise Tax Board's request for the taxable years 1991 and 1992 to be consolidated as a single appeal.

California Code of Regulations, title 18 section 5522.4, subdivision (d), provides, "[if] the Chief Counsel determines that consolidation would have an adverse effect on a substantial right of any party, the matters may not be consolidated regardless of the parties' consent.

The appeals for tax year 1991 and 1992, therefore, will continue to be treated as two separate appeals by this Board.

Sincerely,

*Sharon King*

Sharon King
Appeals Analyst
Board Proceedings Division

cc: Eric J. Coffill
Morrison & Foerster LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814-4428

Gilbert P. Hyatt
P.O. Box 81230
Las Vegas, NV 89180

RJN1177

**MORRISON | FOERSTER**

400 CAPITOL MALL
SUITE 2600
SACRAMENTO
CALIFORNIA 95814-4428

TELEPHONE: 916.448.3200
FACSIMILE: 916.448.3222

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SAN DIEGO, WASHINGTON, D.C.

NORTHERN VIRGINIA, DENVER,
SACRAMENTO, WALNUT CREEK

TOKYO, LONDON, BEIJING,
SHANGHAI, HONG KONG,
SINGAPORE, BRUSSELS

September 2, 2009

Writer's Direct Contact
916.325.1324
ECoffill@mofo.com

By Fax: (916) 324-3984

Diane Olson
Chief, Board Proceedings Division
State Board of Equalization
450 N Street, MIC: 80
Sacramento, CA 95814

Re:    Appeal of Gilbert P. Hyatt
        Case ID No. 435770 (Tax Year 1991)
        Case ID No. 446509 (Tax Year 1992)
        <u>Request to Enforce RTA 5430</u>

Dear Diane:

We received yesterday afternoon a service copy of FTB's single, 173-page, opening brief captioned "Appeal Case ID Nos. 435770 & 446509." For the reasons stated below, appellant contends that the brief is in violation of the Rules for Tax Appeals and prior rulings of this Board. Consequently, pursuant to RTA 5430, FTB has waived its right to file a brief for one tax year, and the 173-page brief which FTB <u>did</u> file for one tax year either should be struck from the record or corrected and refiled within ten days to comply with your Board's clearly stated page limits.

RTA 5430 sets forth the general requirements for briefing applicable to appeals from actions of the FTB. That rule provides in pertinent part:

> 5430. GENERAL REQUIREMENTS.
>
> (a) Generally. Submissions in the forms of briefs are required in all appeals from actions of the Franchise Tax Board. The parties to an appeal must adhere to the briefing schedule and other requirements set forth in this article.
>
> ...

sa-59769

RJN1178

**MORRISON | FOERSTER**

Diane Olson
September 2, 2009
Page Two

> (e) Formatting. ... *If a brief is filed that does not comply* with the requirements of this subdivision, the Chief of Board Proceedings may, in his or her discretion, return the brief to the filing party and *grant 10 days in which to file a corrected brief.* Failure to file a corrected brief within the 10-day period is a waiver of the right to file that brief.

> (f) Failure to file a brief. The failure to file a brief within the scope of the applicable briefing schedule, including any applicable deadlines, extensions, and other requirements, *is a waiver of the right to file that brief.*

(Emphasis added.)

By letter dated July 17, 2009, regarding Case ID No. 435770 (1991) and Case ID No. 446509 (1992), Board Proceedings informed FTB of its "briefing page limits *in the two appeals* set forth above..." (emphasis added) with a page limit of 100 pages for tax year 1991 and a page limit of 75 pages for tax year 1992. By letter dated August 7, 2009, FTB requested the two appeals for taxable years 1991 and 1992 be consolidated into a single appeal, and stated, "On September 1, 2009, *FTB intends to file a single opening brief in this appeal that covers the issues or [sic] California residency, the fraud penalty, and income sourcing, among other issues.*" (8/7/09 Letter, p. 5, emphasis added.) By letter dated August 21, 2009, Board Proceedings denied the FTB's request for consolidation. Therefore, it is quite clear (1) there are two separate appeals; and (2) this Board has informed FTB of its page limits for briefing in each case.

FTB has filed a <u>single</u> brief for both appeals in disregard of this Board's rulings. Indeed, FTB has filed precisely the brief it stated it would file in its August 7, 2009 letter and has intentionally ignored this Board's August 21st ruling against consolidation, as well as this Board's July 17th ruling setting forth the applicable page limits. "'Men must turn square corners when they deal with the Government,' it is hard to see why the government should not be held to a like standard of rectangular rectitude when dealing with its citizens." (*Title Ins. Co. of Minnesota v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 730, citation omitted.)

Pursuant to RTA 5430(f), by filing a single brief for two separate appeals, FTB has failed to file a brief in one of these two appeals and has now waived its right to file a brief in one of the two appeals. Pursuant to RTA 5430(e), the brief which FTB did file in one of the appeals exceeds this Board's ruling on page limits and either should be struck from the record or

sa-59769

**MORRISON | FOERSTER**

Diane Olson
September 2, 2009
Page Three

FTB should be ordered to file a corrected brief within ten days in compliance with this
Board's rulings above.

Sincerely,

Eric

Eric J. Coffill
Counsel for Appellant


cc: Gilbert P. Hyatt
     Robert W. Dunn – by fax

sa-59769

RJN1180



STATE OF CALIFORNIA

**STATE BOARD OF EQUALIZATION**
450 N STREET, SACRAMENTO, CALIFORNIA
PO BOX 942879, SACRAMENTO, CALIFORNIA 94279-0081
916-322-9569 • FAX 916-324-3984
www.boe.ca.gov

BETTY T. YEE
First District, San Francisco

BILL LEONARD
Second District, Ontario/Sacramento

MICHELLE STEEL
Third District, Rolling Hills Estates

JOHN CHIANG
State Controller

STEVE SHEA
Acting Member
Fourth District, Los Angeles

RAMON J. HIRSIG
Executive Director

September 14, 2009

Robert W. Dunn, Tax Counsel IV
Franchise Tax Board
Legal Division MS A260
PO Box 1720
Rancho Cordova, CA 95741-1720

Appeals of:
Gilbert P. Hyatt, Case ID No. 435770
Gilbert P. Hyatt, Case ID No. 446509

Dear Mr. Dunn:

This letter acknowledges receipt of your opening brief in the above-entitled appeal. As stated in our letters of July 8, 2009 and August 21, 2009, tax years 1991 and 1992 are to be treated as two separate appeals and are not consolidated at this time. The brief we received is a consolidation of these tax years and therefore, we cannot accept it in its present form.

Pursuant to California Code of Regulations, title 18, section (Regulation) 5430, subdivision (e), which states in part:

> If a brief is filed that does not comply with the requirements of this subdivision, the Chief of Board Proceedings may, in his or her discretion, return the brief to the filing party and grant 10 days in which to file a corrected brief. Failure to file a corrected brief within the 10-day period is a waiver of the right to file that brief. Except as otherwise provided in the applicable briefing schedule, that waiver will conclude the briefing schedule.

Therefore, you will have until **September 24, 2009** to file corrected briefs. As a reminder, the page limits for your briefs in each appeal are as follows:

Case ID: 435770    (1991)    The page limit is 100 pages.
Case ID: 446509    (1992)    The page limit is 75 pages.

Sincerely,

*Diane G. Olson*

Diane G., Olson, Chief
Board Proceedings Division

cc:   Eric J. Coffill
Morrison & Foerster LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814-4428

Gilbert P. Hyatt
P.O. Box 81230
Las Vegas, NV 89180

RJN1181



STATE OF CALIFORNIA

**STATE BOARD OF EQUALIZATION**
450 N STREET, SACRAMENTO, CALIFORNIA
PO BOX 942879, SACRAMENTO, CALIFORNIA 94279-0081
916-322-3084 • FAX 916-324-3984
www.boe.ca.gov

BETTY T. YEE
First District, San Francisco

SEN. GEORGE RUNNER (RET.)
Second District, Lancaster

MICHELLE STEEL
Third District, Rolling Hills Estates

JEROME E. HORTON
Fourth District, Los Angeles

JOHN CHIANG
State Controller

KRISTINE CAZADD
Executive Director

August 2, 2012

**RECEIVED**

AUG 0 8 2012

**Morrison & Foerster LLP**

Eric J. Coffill
Morrison & Foerster LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814-4428

Appeals of Gilbert P. Hyatt
Case ID Nos. 435770 and 446509

Dear Mr. Coffill:

This letter acknowledges receipt on July 25, 2012, of your supplemental brief in the above-entitled matter. Please note that briefing is completed for this appeal.

We will schedule the appeal for oral hearing and you will receive notice of the date and time of hearing at least 75 days in advance of the hearing date. We note that you did not request a specific hearing location; therefore, your oral hearing will be scheduled in Sacramento. If you have any questions regarding your hearing, please call the Franchise and Income Taxes Appeals Hearing Analyst, Claudia Madrigal, at 916-324-8261.

Sincerely,

Jimisa Brown

Jimisa Brown
Appeals Analyst
Board Proceedings Division

cc:    Gilbert P. Hyatt
c/o Morrison & Foerster LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814-4428

Franchise Tax Board - Legal (MS A2.60)

RJN1182



STATE OF CALIFORNIA

**STATE BOARD OF EQUALIZATION**
BOARD PROCEEDINGS DIVISION (MIC:80)
450 N STREET, SACRAMENTO, CALIFORNIA
PO BOX 942879, SACRAMENTO, CALIFORNIA 94279-0080
916-324-8261 • FAX 916-324-3984
www.boe.ca.gov
claudia.madrigal@boe.ca.gov

BETTY T. YEE
First District, San Francisco

SEN. GEORGE RUNNER (RET.)
Second District, Lancaster

MICHELLE STEEL
Third District, Orange County

JEROME E. HORTON
Fourth District, Los Angeles

JOHN CHIANG
State Controller

CYNTHIA BRIDGES
Executive Director

February 20, 2013

Eric J. Coffill
Morrison & Foerster LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814-4428

Robert W. Dunn
Franchise Tax Board
Legal Department
P.O. Box 1720 (MS A 260)
Rancho Cordova, CA 95741-1720

**RECEIVED**

FEB 2 1 2013

**Morrison & Foerster LLP**

Appeal of Gilbert P. Hyatt
Case No.'s 446509, 435770

Dear Mr. Coffill and Mr. Dunn:

This will acknowledge receipt of the Franchise Tax Board's additional brief for the above-entitled matter.  Appellant now has until **March 22, 2013**, to file a reply brief as indicated in Ms. Thompson's letter dated January 17, 2013.  Briefing will thereafter be completed.

If you have any questions, I can be reached at the contact information provided above.

Sincerely,

Claudia E. Madrigal
Franchise & Income Tax Appeals Analyst
Board Proceedings Division

Enclosure – FTB's Briefing in DVD

cc:    Gilbert P. Hyatt
       c/o Morrison & Foerster LLP
       400 Capitol Mall, Suite 2600
       Sacramento, CA 95814-4428

       Franchise Tax Board – Legal (MS A260)

RJN1183

 State of California
Franchise Tax Board

chair John Chiang | member Jerome E. Horton | member Michael Cohen

LEGAL DIVISION MS A260
PO BOX 1720
RANCHO CORDOVA CA 95741-1720

07.16.14

**COPY**

CHIEF, BOARD PROCEEDINGS DIVISION
STATE BOARD OF EQUALIZATION
ATTENTION: KHAALIQ ABD'ALLAH
450 N STREET, MIC: 81
SACRAMENTO, CA 95814

Regarding:    Appeals of Gilbert P. Hyatt
Case ID Nos. 446509 and 435770
Taxable Years 1991 and 1992
FTB's Additional Brief

Dear Khaaliq:

Today we are sending you a single DVD that contains FTB's additional briefing. Please review the "Read First" document in the root directory. The DVD also contains all of FTB's prior briefing in this appeal, to include all attachments and exhibits. FTB is also providing a copy of this DVD to Mr. Hyatt's counsel.

FTB's additional briefing can be found in the "01_FTB_Briefs" file. See documents 08_FTB_Additional_Brief_1991_7-16-14.pdf and 09_FTB_Additional_Brief_1992_7-16-14.pdf. FTB's briefing is hyperlinked to attachments and evidence, also on the DVD. Those files include 04_Attachment A (Revised) (with Philips Documents).pdf; 09_Attachment E (Analysis of Hyatt's Post Reply Brief Affidavits).pdf; and 10_Attachment F (Hyatt's 91-92 Business Activity).pdf. The following new files are also on the DVD: 03_Philips Documents; 07_FTB Calendar Support Documents; 08_SBE_Subpoenas; 11_New York Litigation Record; 04_FTB Exhibits II – LL.

Earlier files are also on FTB's DVD, to include 04_FTB Exhibits (A – HH) and 09_FTB_Authorities. Copies of Hyatt's briefs and affidavits are also on the DVD.

FTB's additional briefing is hyperlinked to all the above.

FTB has redacted personal information found in the supporting documentation to conform with FTB's internal rules. Since we have located and redacted some information from documents that FTB filed earlier in this matter, we ask that SBE replace FTB's earlier electronic versions of filings in this appeal with those on this DVD. Please destroy or return to FTB all earlier disks.

If you have any questions please contact me at your convenience.

Sincerely,

Scott DePeel
Tax Counsel IV

Enclosed: DVD labeled "Appeal of Gilbert P. Hyatt, FTB Additional Briefs - July 16, 2014"

cc: Eric Coffill, counsel for Mr. Hyatt

tel 916.845.5529    fax 916.843.6030      ftb.ca.gov

RJN1184



State of California
Franchise Tax Board

Legal Division MS A260
PO BOX 1720
Rancho Cordova, CA 95741-1720

*chair* John Chiang | *member* Jerome E. Horton | *member* Michael Cohen

## RECEIVED
AUG 1 5 2014

**Morrison & Foerster LLP**

08.13.14

**COPY**

Grant Thompson, Tax Counsel IV
State Board of Equalization
450 N Street
P.O. Box 942879
Sacramento, CA 94279-0085

Regarding:   Appeals of Gilbert P. Hyatt
             Case ID Nos. 446509 and 435770
             Taxable Years 1991 and 1992
             FTB Errata to July 16, 2014 briefing: Redactions made to Attachment A
             (Revised ); Attachment F; and Exhibits

Dear Grant:

FTB submitted additional briefing to your Board on July 16, 2014. In reviewing two of the
attachments to that briefing (Attachment A (Revised) and Attachment F) we've noticed a few
phrases that inadvertently characterize redacted content in the referenced document(s).
Those phrases have been redacted on the enclosed replacement DVD (which is otherwise
identical to the DVD we filed with SBE on July 16, 2014). The redactions to Attachment A
(Revised), are found on page 56, entries for November 12 and 13, and page 60, entry for
November 24. The redactions to Attachment F are found within ¶42 and ¶51, respectively.

We've also made more redactions within "04_FTB Exhibits" to conform to FTB rules. Those
include redactions of social security numbers, credit card account numbers and bank
account numbers that appear within the exhibits.

If you have any questions please contact me at your convenience.

Sincerely,

Robert W. Dunn
Tax Counsel

Enclosed: DVD dated August 13, 2014 to replace the DVD filed with SBE on July 16, 2014

cc: Eric Coffill, counsel for Mr. Hyatt, with copy of enclosed DVD

tel 916.845.3338          fax 916.843.6041          ftb.ca.gov

RJN1185



STATE OF CALIFORNIA

**STATE BOARD OF EQUALIZATION**
450 N STREET, SACRAMENTO, CALIFORNIA
PO BOX 942879, SACRAMENTO, CALIFORNIA 94279-0085
916-205-1644 • FAX 916-324-2618
www.boe.ca.gov

BETTY T. YEE
First District, San Francisco

SEN. GEORGE RUNNER (RET.)
Second District, Lancaster

MICHELLE STEEL
Third District, Orange County

JEROME E. HORTON
Fourth District, Los Angeles

JOHN CHIANG
State Controller

CYNTHIA BRIDGES
Executive Director

December 9, 2014

Eric J. Coffill
Morrison & Foerster LLP
400 Capitol Mall, Suite 2600
Sacramento, CA 95814-4428

Robert W. Dunn
Franchise Tax Board
Legal Department
P.O. Box 1720 (MS A260)
Rancho Cordova, CA 95741-1720

Appeals of Gilbert P. Hyatt
Case ID Nos. 446509 and 435770

Gentlemen:

This letter responds to appellant's November 20, 2014 letter.

Under California Code of Regulations, title 18, section (Rule) 5435, subdivision (a), the Appeals Division determines the order, deadlines and conditions of additional briefing. Pursuant to that authority, the Appeals Division previously granted appellant's request that his December 16, 2014 due date be voided. Further, in order to allow for further redaction of Philips documents and confidential information, prior filings by the parties were returned or destroyed, and each party's request to make a replacement filing was granted.

Appellant now renews his prior objections to the FTB's returned filings and urges the Appeals Division to rule on his objections prior to the filing of the FTB's replacement brief. To the extent appellant's renewed motion seeks further redactions to, or rejection of, the FTB's as-yet-unfiled replacement submission, the request is denied.

As noted previously, appellant has an opportunity to raise any objections, including evidentiary objections and objections to respondent's sourcing arguments, in his reply briefs and concluding summaries. Pursuant to Rule 5523.6, and consistent with the Board's past practice, any relevant evidence may be submitted, and either party may raise objections to the evidence presented at the oral hearings.

The Appeals Division again urges the parties to avoid further procedural disputes and focus on completing the briefing so that these appeals can be determined by the Board at the oral hearings.

RJN1186

Appeals of Gilbert P. Hyatt                    -2-                    December 9, 2014

If either party has any questions, please feel free to call me at (916) 205-1644.

Sincerely,

Grant S. Thompson
Tax Counsel IV

GT:ekr

cc:     Gilbert P. Hyatt
        c/o Morrison & Foerster LLP
        400 Capitol Mall, Suite 2600
        Sacramento, CA  95814-4428

        Craig Scott, FTB Legal                    (MS A260)
        Theresa Bush-Chavey, FTB Legal            (MS A260)
        Khaaliq Abd'Allah, Board Proceedings Division  (MIC: 80)

RJN1187



State of California
**Franchise Tax Board**

Legal Division MS A260
PO BOX 1720
Rancho Cordova, CA 95741-1720

Betty T. Yee | Jerome E. Horton | Michael Cohen

03.17.15

Grant Thompson
Tax Counsel IV
State Board of Equalization
450 N Street
P.O. Box 942879
Sacramento, CA 94279-0085

Regarding:   Appeals of Gilbert P. Hyatt
             Case ID Nos. 446509 and 435770
             Taxable Years 1991 and 1992
             Response to SBE's March 5, 2015 Letter

Dear Grant:

Your letter of March 5, 2015 states:

> "The Appeals Division requests that, by March 17, 2015, the FTB submit a response
> to appellant's submission that includes an explanation of how the materials cited by
> appellant came to be included in its recent filings, and how it proposes that
> appellant's remaining concerns could be most quickly and effectively addressed."

For the purposes of this response FTB assumes that "materials cited by appellant" refers to
documents Mr. Hyatt has referenced in his most recent "Motion to Strike" FTB's July 2014
briefing (denied in your Board's March 5, 2015 letter) and Mr. Hyatt's subsequently filed
action in the New York courts asking that FTB be immediately ordered to withdraw its
additional briefing (denied at oral hearing on March 16, 2015 by the New York court).[1]

---

[1] On March 11, 2015, in the Supreme Court of the State of New York, Mr. Hyatt filed a petition seeking, among
other relief, to require the withdrawal of, and to preclude any refilling of, the Second Additional Briefing unless
New York counsel affirmed that the entire filing complied with the New York court's suppression orders. Mr.
Hyatt additionally sought this relief in the form of a temporary restraining order (TRO). The complete filing by
Mr. Hyatt can be viewed at the following Link:
https://iapps.courts.state.ny.us/nyscef/DocumentList?docketId=Op_PLUS_jB6T1MiMg60CpvalBoQ==&display
=all&courtType=Westchester. A hearing on the TRO was held on March 16, 2015. Mr. Hyatt's TRO request was
denied to the extent that he asked the court to immediately order the withdrawal of the Second Additional
Briefing but the court did require FTB's New York counsel to affirm compliance with the suppression orders for
future submissions to the SBE until the Court rules on Mr. Hyatt's petition (hence the affirmation attached to
this letter). See Order and Affirmation of FTB's New York counsel at **Attachment A**. FTB's opposition brief is due
April 6, 2015, Mr. Hyatt's reply on April 13, 2015, with oral argument scheduled for April 27, 2015.

7595841.2

916.845.3338          916.843.6041          ftb.ca.gov

RJN1188

The materials about which Mr. Hyatt complains are found within the certified record of the Philips subpoena enforcement proceedings held before the New York courts. That record is included with FTB's July 2014 briefing to your Board (all on a single DVD) and is within file "11_New York Litigation Record."[2]

Recall that FTB's July 16, 2014 additional briefing addresses, among other things, FTB's findings related to the Philips documents recovered by FTB after three years of litigation, litigation initiated by Mr. Hyatt.

The complete record of proceedings in New York is included in FTB's filings (minus certain removed affirmations and exhibits) and is found on FTB's February 13, 2015 submitted DVD. This is because Mr. Hyatt is claiming interest abatement in his tax appeal and attributing the passage of time in this matter to various alleged improper actions of FTB. The record of proceedings in New York shows that it was, in fact, the decisions and actions of Mr. Hyatt that delayed the processing of this appeal between 2011 and 2014.

As your Board is aware FTB has responded to Mr. Hyatt's earlier, similar complaints by removing and/or redacting some materials that are not absolutely necessary for a determination of the tax issues in this appeal. Even though the documents about which Mr. Hyatt now complains are public records that FTB believes do not violate the New York suppression orders, it is FTB's desire to get to the merits of the residency, fraud penalty, income sourcing and interest abatement issues. Therefore, FTB feels that your Board's March 5, 2015 proposal that your Board redact the documents about which Mr. Hyatt currently complains from already submitted material is a reasonable approach to moving this appeal forward.

Specifically, FTB agrees to the redaction of the below materials described on Page 6 of Mr. Hyatt's third Motion to Strike:

- FTB's letter dated September 7, 2012, entitled "Response to Mr. Hyatt's September 7, 2012 letter." Mr. Hyatt complains about the inclusion of a sentence at the bottom of a table on Page 7, and a sentence at the top of the table on Page 8. Although this document is in the public domain, and almost certainly in your Board's correspondence file, in consideration of FTB's desire to move this appeal to a determination on its merits, FTB has no objection to redacting these two sentences from the letter.

- Found in the NY litigation record, Mr. Hyatt complains that an exhibit (Exhibit 7) attached to the Affidavit of Robert Dunn, dated October 8, 2012, should be redacted (specifically, Page 601 of the Tamoshunas deposition). The document that concerns Mr. Hyatt was actually submitted to your Board by Mr. Hyatt, with his 2012 briefing, and later removed by Mr. Hyatt in his recently submitted replacement briefing. Although this document is in the public domain, and almost certainly in your Board's correspondence file, in consideration of FTB's desire to move this appeal to a

---

[2] One document, FTB's letter to your Board dated September 14, 2012 is found both within the New York record of proceedings and FTB's Exhibits, as well as being in the public domain.

03.17.15
FTB's Letter to SBE Responding to SBE Letter Dated March 5, 2015
Page 3

determination on its merits, FTB has no objection to redacting page 601 of the Tamoshunas deposition transcript.

And from Mr. Hyatt's motion in New York:

- Found in the NY litigation record, Mr. Hyatt complains that an exhibit (Exhibit C) attached to *Mr. Hyatt's attorney's* letter to the your Board dated August 29, 2012 contains a page from the deposition of Tamoshunas (Page 195) that should be redacted. Although this document is in the public domain, and almost certainly in your Board's correspondence file, in consideration of FTB's desire to move this appeal to a determination on its merits, FTB has no objection to redacting page 195 of the Tamoshunas deposition transcript.

The above examples appear to be the extent of Mr. Hyatt's specific complaints with FTB's most recent submission.

Specifically, in your Board's March 5, 2015 letter you propose: "To the extent the parties are in agreement that certain additional materials should be redacted or removed, the Appeals Division is willing to itself redact or remove materials..." FTB has no objection to your Board redacting or removing the materials mentioned above.

If you have any questions please contact me at your convenience.

Sincerely,

Robert W. Dunn
Tax Counsel

Attachments

cc: Eric Coffill, counsel for Mr. Hyatt

7595841.2

RJN1190

FILED: WESTCHESTER COUNTY CLERK 03/16/2015 04:55 PM
NYSCEF DOC. NO. 17

INDEX NO. 53655/2015
RECEIVED NYSCEF: 03/16/2015

Attachment A

the Compliance Part
At Part _____ of the Supreme Court of
the State of New York, held in and for the
County of Westchester, at the Courthouse,
111 Dr. Martin Luther King Jr. Boulevard,
White Plains, New York, on the 16th day
of March, 2015

PRESENT: JOAN B LEFKOWITZ,

Justice.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

In the Matter of:

Gilbert P. Hyatt's Petition to Suppress Disclosure
Improperly Obtained by State of California Franchise Tax
Board in Response to Three Out-of-State Subpoenas
Previously Modified and Narrowed by New York Court
Orders.

Index No. 53655/2015

**ORDER TO SHOW
CAUSE**

Upon reading the annexed Affidavit of Gilbert P. Hyatt, Affirmation of Good Faith and

Affirmation of Emergency (and the exhibits thereto), it is hereby:

**ORDERED** that respondent the State of California Franchise Tax Board (the "FTB")

show cause before this Court at the Compliance Part thereof, at the Courthouse, 111 Dr. Martin

Luther King Jr. Boulevard, White Plains, New York, on the 27th day of April , 2015, at

2:00 o'clock in the after noon, or as soon thereafter as counsel can be heard, why

an Order should not be entered (a) holding Respondent the State of California Franchise Tax

Board (the "FTB") in contempt of court for intentionally contravening the lawful Suppression

Orders of this Court (Lefkowitz, J.), dated October 7, 2013 and March 13, 2014 (collectively, the

"Suppression Orders") ; (b) enjoining the FTB to withdraw its "Second Additional Briefing"

RJN1191

submitted in the underlying public tax appeal pending before the California State Board of
Equalization (the "SBE"); (c) enjoining the FTB from re-filing any further materials in the SBE
proceeding unless its New York counsel of record submits an affirmation confirming that any
such filing fully complies with the Suppression Orders; (d) fining the FTB in the amount of
$250; (e) directing the FTB to pay costs and expenses, including attorneys' fees, incurred by
Hyatt in bringing this Special Proceeding pursuant to N.Y. Judiciary Law § 773; and (f) granting
Hyatt such other and further relief as the Court deems just and proper; and it is further

ORDERED that, sufficient reason being shown, pursuant to CPLR §§ 6301 and § 6313,
the FTB is temporarily restrained and enjoined ~~(1) to withdraw its Second Additional Briefing~~
~~submitted in the underlying public tax appeal pending before the SBE, and (2)~~ from ~~re-~~filing any
further materials in the SBE proceeding unless its New York counsel of record submits an
*Briefs, affidavits and affirmations previously filed in court*
*which are*
affirmation confirming that any such filing fully complies with the Suppression Orders; and it is *not the*
*subject of*
further
*a sealing order*
*may be*
*insofar as counsel for all parties have consented* *filed*
ORDERED that ~~service of a copy of this Order to Show Cause, together with the papers~~ *in the SBE*
*to Electronic Filing, petitioner is not required to serve the* *proceeding*
~~upon which it was entered, shall be good and sufficient if served by electronic means upon~~
*Order to Show Cause on respondent.*
~~attorneys for the FTB, Carter Ledyard & Milburn LLP, by Judith Lockhart, Esq.,~~

~~lockhart@clm.com, no later than the ___ day of March,~~ 2015; and it is further
*filed with the Court on*
ORDERED that answering papers, if any, shall be ~~served by electronic means on Hyatt's~~
*the NYSCEF website on or before April 6, 2015 at 12:00 P.M.*
~~attorneys, Pryor Cashman LLP, by Eric D. Dowell, Esq., edowell@pryorcashman.com, at or~~

~~before five o'clock pm on the ___ day of _____, 2015;~~ and it is further
*filed with the court on*
ORDERED that reply papers, if any, shall be ~~served by electronic means upon attorneys~~
*the NYSCEF website on or before April 13, 2015 at 12:00 P.M.*
~~for the FTB at or before five o'clock pm on the ___ day of _____, 2015.~~

2

RJN1192

ORDERED that no cross motions shall be accepted. **All papers shall be e-filed to the NYSCEF website.**

ORAL ARGUMENT WILL BE HEARD. APPEARANCE OF COUNSEL IS REQUIRED.

Dated: White Plains, New York
      March 16 , 2015

HON. JOAN B. LEFKOWITZ, J.S.C.

3

RJN1193

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
--------------------------------------------------------------------x
In the matter of:                 :      Index No.: 53655/2015

Gilbert P. Hyatt's Petition for an Order of Civil   :     **AFFIRMATION OF**
Contempt Against the State of California       :     **JUDITH A. LOCKHART**
Franchise Tax Board Based on its Intentional    :
Violation of This Court's Prior Suppression     :
Order                                         :
--------------------------------------------------------------------x

       JUDITH A. LOCKHART, an attorney admitted to the practice of law before the courts of

the State of New York, hereby affirms the following to be true under the penalty of perjury pursuant

to CPLR 2106:

       1.     I am a member in good standing of the Bar of New York State and a partner at the

law firm of Carter Ledyard & Milburn LLP. This firm represents the State of California Franchise

Tax Board (the "FTB") in connection with the above-captioned proceeding commenced by Gilbert

P. Hyatt on March 11, 2015.

       2.     Pursuant to this Court's March 16, 2015 Order, I submit this affirmation to confirm

that the FTB's March 17, 2015 letter submission to the California State Board of Equalization

complies with the prior Orders of this Court dated October 7, 2013 and March 13, 2014.

Dated: March 17, 2015

                                    _____
                                         Judith A. Lockhart

7481842.6

1    STATE OF CALIFORNIA
     FRANCHISE TAX BOARD
2    Legal Division
     Robert W. Dunn, Tax Counsel IV
3    P.O. Box 1720
     Rancho Cordova CA 95741-1720
4    (916) 845-3338

5    Respondent's Representative

6

7               BEFORE THE STATE BOARD OF EQUALIZATION

8                   OF THE STATE OF CALIFORNIA

9

10   In the Matter of the Appeal of:         Appeal Case ID No. 435770 & 446509

11

12   GILBERT P. HYATT

13

14      <u>Deficiency</u>

15         <u>Year</u>         <u>Amount</u>          <u>Penalty, Fraud</u>

16         1991      $1,876,471.00        $1,407,353.25

17         1992      $5,669,021.00        $4,251,765.75

18

19      <u>RESPONDENT'S ADDITIONAL BRIEFING (FEBRUARY 19, 2013)</u>

20

21

22

23

24

25

26

27

28

RJN1195

**I. INTRODUCTION**

Respondent ("FTB") provides this additional briefing in response to your Board's ("SBE") request dated January 17, 2013.[1] In that letter the SBE provides background and then asks FTB to respond to three questions. The three questions are set forth here:

(1) Please identify the documentation that respondent relies upon to support its determination of the income respondent [FTB] alleges appellant [Mr. Hyatt] received between January 1, 1992 and April 3, 1992. Please explain specifically how the identified documentation supports that determination. [Emphasis added]

For example, respondent apparently determined that Mr. Hyatt received a $48,780,951 payment from Phillips on January 15, 1992. (See 1992 Revised Proposed Adjustment Schedule II at Bates Document H 02265, as referenced in footnote 269 on page 53 of appellant's 1992 opening brief.) Please identify the documentation supporting this determination.

(2) Please explain specifically how and why the documentation provided by appellant, whether during protest or on appeal, is insufficient to establish that, as alleged by appellant, a large portion of appellant's income was received by him after April 3, 1992 on specific dates alleged by him. Please address each of the asserted deposit line items enumerated in Mr. Cowan's February 7, 1996 letter (see exhibit 38 of appellant's 1992 opening brief) and the specific evidence provided by appellant, or otherwise in respondent's possession, with regard to each of those deposit dates. [Emphasis added]

For example, appellant alleges that $16,549,433.06 of the income that respondent alleges was received prior to April 3, 1992 was wired into his Fidelity accounts on September 4, 1992, and provides in support a letter from Fidelity, dated January 31, 1996, stating that appellant received wire transfers of $9,000,000 and $7,549,433.06 (thus totaling $16,549,433.06) on September 4, 1992. Respondent should explain why this documentation is insufficient to show receipt of this income at that time. Respondent should similarly address the other deposit dates identified in Mr. Cowan's letter and the evidence in the record with regard to deposits on such dates.

(3) If and to the extent that respondent agrees with appellant as to the timing of any income, respondent should specifically identify the undisputed income. In this connection, staff requests that the FTB consider whether it can narrow the issues by making any concessions with regard to the timing of appellant's receipt of income in 1992. [Emphasis added]

The SBE comment found below SBE question (1) "... respondent *apparently* determined that Mr. Hyatt received a $48,780,951 payment from Phillips on January 15, 1992[.]" [emphasis added] actually refers to the final August 14, 1997 determination of FTB's Audit Division (for tax year 1992).[2] FTB's auditor concluded that Mr. Hyatt received $48,780,951.20 in income on January 15, 1992 (and $2,975,787.00 on

---

[1] Exhibit EE, Tab 1: See SBE letter. (Note: FTB continues the identification of Exhibits in this appeal consistent with prior filings. FTB's (Respondent's) reply brief (1992) concluded with citation to Exhibit DD, Tab 30.)

[2] Exhibit A, Tab 2: See Apportionment Factor Computations attached to 1992 NPA.

RJN1196

1  February 3, 1992) from communication sent to FTB audit by Mr. Hyatt.[3] The amount of $51,595,186.00

2  appears on the Notice of Proposed Assessment ("NPA") issued to Mr. Hyatt for tax year 1992.[4] Mr. Hyatt

3  then protested FTB audit's findings. Ultimately, the basis for California's taxation of all of Mr. Hyatt's 1992

4  income was modified by FTB's Protest Hearing Officer ("PHO") as set forth in the Notices of Action ("NOA")

5  and protest determination letter.[5] It is from the NOAs that Mr. Hyatt appeals to the SBE. Evidence considered

6  at protest established California as the source of all of Mr. Hyatt's 1992 patent licensing business income by

7  application of California Revenue and Taxation Code ("R&TC") section 17952, regulations and case law.[6]

8  Therefore, a thorough, accurate and complete answer to SBE's question (1) requires the recitation of

9  the following relevant background information.

10  **II. BACKGROUND**

11  **a. FTB audit efforts to establish the timing of Mr. Hyatt's 1992 income[7]**

12  On April 13, 1992 Mr. Hyatt filed a California Part-Year resident tax return for 1991. Mr. Hyatt did not

13  file a California tax return for 1992. FTB Audit Division determined that the nonresidency date Mr. Hyatt

14  placed on his 1991 return, October 1, 1991, was false and fraudulent.[8] The reason for this determination is

15  set forth in FTB audit's detailed tentative determination letter dated August 2, 1995.[9] FTB audit determined

16  Mr. Hyatt actually became a California nonresident on April 3, 1992. To calculate the additional tax owed by

17  _____

18  [3] Exhibit EE, Tab 12: See page 2 of Mr. Hyatt's February 7, 1996 letter. Note that throughout this brief (as with FTB's earlier briefs) FTB often refers to the communicator as "Mr. Hyatt," occasionally not referring to the various agents Mr.

19  Hyatt employs to sign his communications. FTB has discovered that Mr. Hyatt is always directly involved in this communication and is, periodically, its author. See FTB's opening brief (1991) page 69, FN 215 and the discussion of

20  Mr. Hyatt's "communication protocol" involving himself and his tax representatives. And see page 87, line 13.

21  [4] Exhibit A, Tab 2: See Apportionment Factor Computations attached to 1992 NPA.

22  [5] Exhibit A, Tab 4: See NOAs and attached DETERMINATION LETTER for taxable years 1991 and 1992.

   [6] Exhibit A, Tab 4: See FTB protest's basis for 1992 taxation set forth in great detail in the determination letter,
23  beginning on page 30 and concluding on page 49.

   [7] This BACKGROUND will only focus on FTB audit's attempts to determine the timing (and not the character) of Mr.
24  Hyatt's licensing business income, omitting a great deal of the audit history. As the SBE knows, FTB audit was looking at both residency and sourcing theories initially but was confounded by Mr. Hyatt's failure to respond to

25  Information/Document Requests ("IDRs") and by a variety of misleading representations. See FTB's opening brief (1991) page 86-90. Ultimately, Mr. Hyatt's lack of cooperation at audit was cited as one of the basis for the fraud

26  penalty proposed for tax year 1991 by FTB's auditor, and applied to tax year 1992 by FTB audit management after a review of the case.

27  [8] See FTB's opening and reply brief sections on the eleven factors that support the application of the fraud penalty in
28  this matter. FTB's opening brief (1991) page 77; FTB's reply brief (1992) page 59.

   [9] Exhibit A, Tab 1: See FTB audit's tentative determination letter dated August 2, 1995.

RJN1197

1    **(14) Kenwood:** Philips (not Mr. Hyatt) entered into a "PATENT AGREEMENT" with **Kenwood**. It is

2    signed by a representative of **Kenwood** on December 22, 1992 and by Algy Tamoshunas of Philips on

3    November 24, 1992.[149] Philips licenses rights under the Hyatt patents to **Kenwood** for $9.15 million to be

4    paid to Philips by wire transfer to Bank of New York within one week of the effective date.[150] On December

5    29, 1992 Philips informs Mr. Hyatt that they received payment from (**Nippon Columbia** and) **Kenwood** and

6    will be transferring $6,140,935.61 to his Fidelity account.[151] Therefore, FTB finds that Mr. Hyatt received

7    income of $6,140,935.61 (the combined net income, after expenses, from **Nippon Columbia** and **Kenwood**)

8    on December 29, 1992.

9           Given the above analysis of the contemporaneous documentary evidence related to Mr. Hyatt's 1992

10   income, and in response to SBE Question (3), FTB finds Mr. Hyatt received 1992 income on the dates set

11   forth below. Also, although the 1992 NOA <u>does not</u> base the taxation of Mr. Hyatt's 1992 income on

12   California residency alone, it seems clear from SBE question (3) that there is interest in the April 3, 1992

13   date and what would be, hypothetically, Mr. Hyatt's tax owed to California on a residency basis alone.

14   Therefore, FTB will set out the timing:[152]

15

16

17

18

19

20

21

22

23   [149] Exhibit FF, Tab 73: Kenwood agreement.

     [150] Exhibit FF, Tab 73: See wire transfer instructions, pages 3-4.

24   [151] Exhibit FF, Tab 71: Letter from Philips to Mr. Hyatt dated December 29, 1992 informing Mr. Hyatt of the license

25   income, expenses and the amount that will be transferred to Hyatt's account.

26   [152] FTB finds, based upon the documentation referenced in this additional briefing, that Mr. Hyatt's income earned
     before April 3, 1992, that would be used for a computation of his 1992 tax <u>only</u> if the basis for taxation is California
27   residency through April 2, 1992, would be $26,981,988.00. [Note: This is <u>not</u> the amount shown on Mr. Hyatt's
     representatives July 17, 1997 letter. That schedule does not include taxes paid on behalf of Hyatt, Philips annual
     payment, and includes a large mathematical error. Also note that this total includes an amount from the second Oki
28   payment wherein no expenses (other than the MLMC commission) were deducted as the expenses were incurred after
     April 3, 1992.]

RJN1198

1   as set forth in FTB's September 14, 2012 letter).[159] As FTB told the Appellate Division of the New York

2   Supreme Court in its briefing on October 12, 2012:[160]

3       Granting Hyatt's current stay motion will cause the FTB irreparable harm. (Id. at ¶¶ 20, 22,
        23.) The FTB submitted the Philips Documents to the SBE in order to rebut and refute
4       assertions and arguments in voluminous submissions by Hyatt to the SBE (as recently as in
        July 2012) relating to Hyatt's patent licensing business activity and other issues and to
5       provide the SBE with a more fair and complete picture of Hyatt's patent licensing business
        activity with Philips in 1991 and 1992. The Philips Documents include highly relevant
6       documents relating to issues in the tax appeal, such as, fax covers sheets sent by Hyatt from
        his California residence, draft agreements sent to Hyatt at his California residence, Federal
7       Express forms showing packages sent to Hyatt at his California residence and Hyatt's signed
        receipt for those packages, and agreements and letters signed by Hyatt which list his
8       address in California- all during 1991 and 1992 at times when Hyatt claims he was not living
        or working in California. (Id. at ¶ 17; Ex. 14.)
9

10      Indeed, Hyatt recognizes the significance of these documents as he has already submitted
        information obtained pursuant to the Subpoenas in support of his appeal. Yet he now seeks
11      to deny the FTB use of that very same information. For example, Hyatt submitted to the SBE
        portions of the transcript of the deposition of Algy Tamoshunas, which includes extensive
12      references to the Philips Documents. Issuing the stay now, after Hyatt has already relied on
        information derived from the Philips Documents, would prevent the FTB from correcting
13      factual misrepresentations by Hyatt and leave the SBE with an incomplete and inaccurate
        factual record. (See Dunn Aff. ¶¶12, 15; Ex. 11 (8/29/12 Letter from the FTB to the SBE).)

14      As the SBE knows, Mr. Hyatt was granted his stay. And, as of the date of this additional briefing, the

15  New York court has not yet issued its decision on the merits.

16      Therefore, we ask Mr. Hyatt to contact FTB so that we can discuss the immediate use of the

17  FTB_Philips documents in his appeal. We note, however, that although the SBE suggests such contact in its

18  January 17, 2013 letter, we have heard nothing from Mr. Hyatt on this issue. Absent such an agreement, we

19  ask the SBE to stay this appeal pending resolution of Mr. Hyatt's New York appeal concerning the Philips

20  documents.

21                                              Respectfully submitted,
                                                FRANCHISE TAX BOARD
22
                                        By      [signature]
23
24                                              Robert W. Dunn
                                                Tax Counsel IV
25
                                                Date: February 19, 2013
26

27  [159] Exhibit FF, Tab 75: See FTB's letter in response to Mr. Hyatt's claim the Philips documents are irrelevant.

28  [160] Exhibit FF, Tab 74: Franchise Tax Board's Memorandum of Law in Opposition to Hyatt's Motion Pursuant to CPLR
    [Section] 5519(C) to Stay Enforcement of a July 2011 Discovery Order Pending Rulings Upon the Parties Cross-Appeals:
    See page 11.

## ATTACHMENT 1

## APPELLANT'S SECOND ADDITIONAL BRIEFING

I. FTB Committed Fraud, Intentionally Inflicted Emotional Distress, And Acted With Bad Faith In Its Dealings With Mr. Hyatt .................................................................... 3

    A. FTB Fraud Against Mr. Hyatt .................................................................... 3

    B. FTB Intentionally Inflicted Emotional Distress Against Mr. Hyatt ................ 4

    C. FTB Acted In Bad Faith With Respect To Mr. Hyatt .................................... 4

II. FTB Reneged On Its Statutory Obligation To Conduct A Fair Examination Of Mr. Hyatt's 1991 And 1992 Tax Years Because The Auditor Was Intent On "Getting" Mr. Hyatt .................................................................................................................. 5

    A. FTB's Personnel Had An Improper Intent To "Get" Mr. Hyatt ...................... 5

    B. FTB's Failure To Conduct A True Audit For 1991 Evidences FTB's Bad Faith .................................................................................................... 7

    C. FTB's Failure To Conduct A True Audit For 1992 Is Evidence Of FTB's Bad Faith 7

    D. FTB's "$24 Million Error" Is Another Example Of FTB's Complete Lack Of Credibility And Bad Faith .................................................................... 10

    E. FTB's Delay In Raising The Sourcing Issue Further Reflects Bad Faith And Prejudices Mr. Hyatt .......................................................................... 11

III. FTB Trumped Up The Fraud Penalties To Coerce A Quick Settlement .................... 12

    A. FTB's Policy To Use Fraud Penalties To Coerce Improper Settlements ....... 12

        1. Thomas Rodrigue Testified That FTB Had A Policy Of Using Fraud Penalties To Coerce Settlements .................................................... 12

        2. Diane Truly Testified That FTB Had A Policy Of Using Fraud Penalties To Coerce Settlements .................................................... 13

    B. FTB Imposed Fraud Penalties Against Mr. Hyatt To Coerce A Settlement ... 14

        1. FTB Did Not Impose The Fraud Penalty For A Proper Purpose Because Even FTB's Own Audit Reviewers Doubted That There Was Clear And Convincing Evidence Of Fraud .................................................... 14

        2. FTB Imposed The Fraud Penalty Against Mr. Hyatt To Coerce A Settlement ................................................................................... 16

IV. FTB's Misconduct In These Appeals ...................................................................... 19

    A. FTB Has Repeatedly Misrepresented The Evidence To Inflict Harm On Mr. Hyatt ................................................................................................. 19

        1. FTB Falsely Stated The Philips Documents "Established" Mr. Hyatt's Presence In California .................................................................. 19

        2. FTB Mischaracterized Testimony To Mislead Your Board .................... 22

RJN1200

        a.  Mr. Stratton's Actual Testimony ............................................. 22

        b.  FTB's Mischaracterization Of Mr. Stratton's Testimony ....... 23

        c.  Mr. Neuner's Testimony ......................................................... 23

        d.  William Savage's Misrepresented The Statements Made By
            Stephanie Gines ..................................................................... 24

  B.  FTB Fabricated False Evidence ...................................................... 25

     1.  FTB's Investigators Fabricated Testimony ................................. 25

     2.  FTB Fabricated Evidence To Attempt To Impeach Witnesses ............... 27

     3.  FTB Filed An *Unsigned* Declaration As Testimony ................................. 29

  C.  FTB Engaged In Extreme Misconduct By Using Its Paid Investigators And
     Attorneys To Intimidate And Harass Witnesses And To Fabricate False
     Testimony ...................................................................................... 30

     1.  FTB Paid Investigators Intimidated Witnesses ........................................ 31

     2.  FTB Paid Investigator Savage's Prior History Of Fraud And Deceit
        Destroys His Credibility, And His Testimony Must Be Rejected ............ 34

     3.  FTB Attorney Pat Lundvall Also Intimidated And Harassed One Of Mr.
        Hyatt's Witnesses ................................................................ 38

  D.  FTB Acted In Bad Faith By Intentionally Filing Documents That A New York
     Court Had Prohibited From Disclosure ........................................... 39

  E.  FTB Improperly Used An Overbroad Subpoena ............................................. 39

  F.  FTB Ignored Your Board's Orders Regarding Briefing Procedures .............. 39

V.  Conclusion ................................................................................. 42

RJN1201

**FTB'S BAD FAITH AND EXTREME MISCONDUCT DIRECT TOWARD MR. HYATT**

Throughout the administrative process, including these two appeals, Franchise Tax Board ("FTB") has engaged in bad faith and extreme misconduct directed at Mr. Hyatt. In short, FTB has abused its power.

**I.**   **FTB Committed Fraud, Intentionally Inflicted Emotional Distress, And Acted With Bad Faith In Its Dealings With Mr. Hyatt**

It has been conclusively determined that FTB committed fraud, intentionally inflicted emotional distress, and acted in bad faith in its dealings with Mr. Hyatt. *Franchise Tax Bd. v. Hyatt*, 335 P.3d 125, 144-149 (Nev. 2014).

### A. FTB Fraud Against Mr. Hyatt

FTB committed fraud against Mr. Hyatt. The Nevada Supreme Court upheld the Nevada jury findings that FTB committed fraud in connection with his audits and protests. The jury found that FTB made specific representations to Mr. Hyatt that it intended Mr. Hyatt to rely upon, but which FTB did not intend to fully meet.

- First, the Nevada Supreme Court upheld the findings of fraud based on the FTB false representation to Mr. Hyatt that FTB would protect his confidential information. FTB failed to do so. FTB's auditor intentionally disclosed Mr. Hyatt's personal information -- his social security number, his home address, and the fact that he was under audit by FTB -- to numerous people and entities. FTB also sent letters to several doctors with the same last name, based on its belief that one of those doctors provided Hyatt treatment, but without first determining which doctor actually treated Hyatt before sending the correspondence.

- Second, the Nevada Supreme Court upheld the findings of fraud based on FTB's failure to resolve the protests of the two audits for 11 years, resulting in $8,000 in interest per day.

- Third, the Nevada Supreme Court upheld the findings of fraud based on the determination that FTB's auditor, Sheila Cox, made disparaging comments about Mr. Hyatt and his religion.

- Fourth, the Nevada Supreme Court upheld the findings of fraud based on the finding that FTB's auditor was intent on imposing an assessment against Mr. Hyatt.

- Fifth, the Nevada Supreme Court upheld the findings of fraud based on the finding that FTB promoted a culture in which tax assessments were the end goal whenever an audit was undertaken.

*Franchise Tax Bd. v. Hyatt*, 335 P.3d 125, 144-145 (Nev. 2014).

RJN1202

## B. **FTB Intentionally Inflicted Emotional Distress Against Mr. Hyatt**

FTB intentionally inflicted emotional distress against Mr. Hyatt. The Nevada Supreme Court upheld the Nevada jury findings that FTB intentionally inflicted emotional distress against Mr. Hyatt.

- First, the Nevada Supreme Court upheld the finding of intentional infliction of emotional distress by noting that Mr. Hyatt "suffered extreme treatment from FTB."

- Second, the Nevada Supreme Court upheld the finding of intentional infliction of emotional distress on the ground FTB disclosed personal information that it promised to keep confidential.

- Third, the Nevada Supreme Court upheld the finding of intentional infliction of emotional distress on the ground FTB delayed resolution of Hyatt's protests for 11 years, resulting in a daily interest charge of $8,000.

- Fourth, the Nevada Supreme Court upheld the finding of intentional infliction of emotional distress on the ground that the FTB auditor who conducted the majority of his two audits made disparaging remarks about Mr. Hyatt and his religion.

- Fifth, the Nevada Supreme Court upheld the finding of intentional infliction of emotional distress on the ground FTB's auditor was determined to impose tax assessments against him.

- Sixth, the Nevada Supreme Court upheld the finding of intentional infliction of emotional distress on the ground that FTB fostered an environment in which the imposition of tax assessments was the objective whenever an audit was undertaken.

*Id.* at 148-149.

## C. **FTB Acted In Bad Faith With Respect To Mr. Hyatt**

FTB acted in bad faith in its dealings with Mr. Hyatt. The Nevada Supreme Court affirmed the jury's finding that FTB's audit was tainted by outright bigotry. Ms. Sheila Cox, FTB's lead auditor in both of Mr. Hyatt's audits, declared to another auditor: "I am going to get that Jew bastard." Appellant's 1991 Opening Brief, Ex. 2, *Hyatt* v. *Franchise Tax Bd.,* Dist. Ct. of Clark Cty., Nevada, Case No. A382999, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/23/08, p. 165. The Nevada Supreme Court expressly noted that the FTB "auditor who conducted the majority of [Mr. Hyatt's] two audits made disparaging remarks about Hyatt and his religion, *was determined to impose tax assessments against him.*" *Hyatt, supra* at 148.

4

RJN1203

II.    **FTB Reneged On Its Statutory Obligation To Conduct A Fair Examination Of Mr. Hyatt's 1991 And 1992 Tax Years Because The Auditor Was Intent On "Getting" Mr. Hyatt.**

A.    **FTB's Personnel Had An Improper Intent To "Get" Mr. Hyatt**

FTB reneged on its statutory obligation to fairly examine Mr. Hyatt's 1991 and 1992 tax years because its auditor was determined to "get" Mr. Hyatt by issuing as large an assessment as possible. FTB auditor Sheila Cox had an irrational intent to "get" Mr. Hyatt. She declared to a fellow auditor: "I am going to get that Jew Bastard."[1] The Nevada Supreme Court affirmed Ms. Cox's outrageous statement in affirming the Nevada jury finding that "Cox essentially was intent on imposing an assessment against Hyatt, and that FTB promoted a culture in which tax assessments were the end goal whenever an audit was undertaken."[2] Thus, Ms. Cox's audits of Mr. Hyatt were never about determining the correct California tax liability.

Three additional affidavits signed by two former senior managers at FTB and a former residency auditor confirms FTB's improper conduct directed toward Mr. Hyatt. Diane Truly was a 22-year high level employee of FTB. Thomas Rodrigue was a 34-year high level employee of FTB. Candace Les was a senior residency auditor of FTB. These three former FTB employees provided powerful declarations providing yet more evidence that Mr. Hyatt has been the target of long-standing FTB animus and outright fraud.

- The primary FTB auditor (Sheila Cox) was bent on advancing her career by issuing an enormous assessment against Mr. Hyatt, whether meritorious or not. (Declaration of Candace Les, Feb. 9, 2015, ¶¶ 19, 27-28, 47; Declaration of Thomas Rodrigue, Feb. 11, 2015, ¶¶ 5-6; Declaration of Diane Truly, Feb. 13, 2015, ¶ 16.)

- Ms. Cox's racial prejudice toward Jews improperly influenced Mr. Hyatt's audits. In addition, FTB's audit group maintained a culture that tolerated racial prejudice and allowed such prejudice to unfairly affect taxpayer audits. (Declaration of Candace Les, Feb. 9, 2015, ¶¶ 63, 68, 71; Declaration of Thomas Rodrigue, Feb. 11, 2015, ¶¶ 28-32.)

---

[1] Appellant's 1991 Opening Brief, Ex. 2, *Hyatt* v. *Franchise Tax Bd.,* Dist. Ct. of Clark Cty., Nevada, Case No. A382999, Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/23/08, p. 165.

[2] *Franchise Tax Bd. v. Hyatt*, 335 P.3d at 145.

RJN1204

- Ms. Cox and others within FTB's audit residency group had an irrational obsession "to get" Mr. Hyatt by imposing a very large assessment. (Declaration of Candace Les, Feb. 9, 2015, ¶¶ 18, 28, 49-51, 58.)

- FTB committed fraud against Mr. Hyatt through Ms. Cox's improper assessment of fraud penalties against Mr. Hyatt to increase the dollar value of the assessments and coerce a settlement from Mr. Hyatt. FTB adopted an audit policy to aggressively assess fraud penalties even when not warranted and not justified by the facts. In Mr. Hyatt's case, the fraud penalty was assessed even though three FTB employees including both, the 1991 audit reviewer and 1992 audit reviewer, questioned the validity of the fraud penalty. (Declaration of Candace Les, Feb. 9, 2015, ¶¶ 27-28, 32; Declaration of Thomas Rodrigue, Feb. 11, 2015, ¶¶ 8-13; Declaration of Diane Truly, Feb. 13, 2015 ¶¶ 16, 23-25.)

- Ms. Cox understood that Mr. Hyatt was sensitive about his privacy and, because of that, she adopted a tactic of "bombarding" Mr. Hyatt and third parties with formal demands for information, called "pocket subpoenas", to attempt to force Mr. Hyatt to settle. (Declaration of Candace Les, Feb. 8, 2015, ¶¶ 57, 59.)

- Ms. Cox falsely testified about her audit of Mr. Hyatt and continually changed her testimony as documentation proved that her testimony was false. (Declaration of Candace Les, Feb. 9, 2015, ¶¶ 5-18.) The Nevada Supreme Court singled out Ms. Cox for special criticism because of her intent to "get" Mr. Hyatt and her racial prejudice toward Mr. Hyatt. (*Franchise Tax Bd. v. Hyatt,* 335 P.3d 125, 144-145, 148-149 (Nev. 2014).)

- A budget crisis and reorganization in California coinciding with the audit of Mr. Hyatt increased the pressure on FTB personnel to increase assessments. (Declaration of Diane Truly, Feb. 13, 2015, ¶¶ 9-13.)

- FTB improperly used cost benefit ratio standards for audits. (Declaration of Candace Les, Feb. 9, 2015, ¶¶ 19-21; Declaration of Thomas Rodrigue, Feb. 11, 2015, ¶¶ 6-7; Declaration of Diane Truly, Feb. 13, 2015, ¶¶ 17-22.) This is contrary to Rev. & Tax. Code § 21008.

- FTB improperly used the fraud penalty, even when not warranted by the facts, to significantly increase CBR and to coerce taxpayers into settlement. (Declaration of

6

Candace Les, Feb. 9, 2015, ¶¶ 28-39; Declaration of Thomas Rodrigue, Feb. 11, 2015, ¶¶ 20-27.)

- Racism was common among FTB auditors. (Declaration of Candace Les, Feb. 9, 2013, ¶¶ 63-72; Declaration of Thomas Rodrigue, Feb. 11, 2015, ¶¶ 28-32.)

Mr. Hyatt requests your Board to review the affidavits signed by Ms. Les, Ms. Truly, and Mr. Rodrigue to fully understand what FTB has been doing to Mr. Hyatt (and likely to other taxpayers), and to understand that FTB's most recent filing, the *fourth* DVD, is a continuation of FTB's bad faith actions directed at Mr. Hyatt. In short, throughout its dealings with Mr. Hyatt FTB has violated California law and flaunted Mr. Hyatt's statutory and constitutional rights as a taxpayer and, in these appeals before your Board, FTB has continued similar bad faith conduct aimed at getting Mr. Hyatt at all costs.

### B. FTB's Failure To Conduct A True Audit For 1991 Evidences FTB's Bad Faith

FTB's 1991 audit was clearly tainted by FTB auditor Cox's expressed intent "to get" Mr. Hyatt. Her bias made it impossible for her to do an objective audit and her audit confirms this fact. A cornerstone of her audit is interviews with three secret witnesses, who she knew were highly biased against Mr. Hyatt: Mr. Hyatt's ex-wife, brother, and daughter. Each of these persons were estranged from Mr. Hyatt well before the years at issue and therefore had no actual knowledge of Mr. Hyatt's affairs before and after he moved to Nevada. However, Ms. Cox relied on these interviews for her 1991 audit.

In addition, Ms. Cox refused to disclose the statements submitted by those witnesses to Mr. Hyatt, and she did not bother to ask Mr. Hyatt for an interview, much less consider, evidence supporting Mr. Hyatt's change of residence. She apparently believed that because of the nature of the issue (residency) and the dollars at stake, she could do a slipshod audit, slap on fraud penalties, and extort a quick settlement because Mr. Hyatt would want to avoid any adverse publicity.

### C. FTB's Failure To Conduct A True Audit For 1992 Is Evidence Of FTB's Bad Faith

FTB's failure to conduct a true audit for the 1992 tax year further evidences FTB's bad faith. The full extent of FTB's 1992 audit was a single letter requesting information about the timing of income received for 1992. (Hyatt Affidavit Regarding $24 Million Error, ¶ 2; *see also*

7

*id.* at Ex. 2.) Less than two months after Mr. Hyatt's representative responded to that letter, by letter dated April 1, 1996, FTB's auditor (Ms. Cox) issued her first audit determination letter, proposing an assessment solely based on residency, but not proposing the fraud penalty. (*Id.* at Ex. 10.) The entire residency discussion set forth in the auditor's determination letter consisted of four conclusory sentences with no residency analysis, multiple factual errors and multiple spelling errors:

> Mr. Hyatt has not shown that his ties to Nevada outweighed his tied [sic] to California prior to April 3, 1992.

> Mr. Hyatt maintained his long standing connections with California and continued deriving substantial benefits and protections from the State of California for his personal properties and his family. As such, he should contribute to the support of this State. Therefore, as [sic] assessment should be issued for tax year 1992 taxing all income sourced within this state, with the change in domicile and residency effective on or after April 3, 1991.

(*Id.* at Ex. 10.)

Amazingly, Ms. Cox criticized Mr. Hyatt for not showing that his ties to Nevada outweighed his ties to California when, in fact, she never once asked Mr. Hyatt to make such a showing or provide any evidence on such points. These four sentences contain no references to facts or analysis. Yet, this was the full basis for the auditor's "determination." Thereafter, Ms. Cox then issued a second audit determination letter (also without the fraud penalty). In her third audit determination letter, the auditor imposed the fraud penalty, without any additional audit work. All of those audit determination letters were based on the single request for information asking for information about timing of income and did not contain any additional meaningful discussion of facts or analysis. In other words, FTB's 1992 proposed assessment of over $14 million in taxes, interest and fraud penalty is based on no actual audit.

In fact, FTB's auditor was so sloppy in the 1992 "audit" that she overstated Mr. Hyatt's income by an amazing $24 million. Mr. Hyatt's representatives immediately informed FTB of the $24 million error, but FTB refused to back down from its error. In fact, FTB refused to acknowledge the error until your Board's staff demanded that FTB explain the basis for its 1992 assessment. (See discussion below.)

FTB's cursory and sloppy audit for 1992 is another example of the extreme FTB bad faith and misconduct that Mr. Hyatt has had to endure for the past 20-plus years. Although FTB's own audit manual expressly states that "[r]esidency examinations are *very fact intensive*,"

8

FTB Residency & Sourcing Technical Manual ¶ 4410, p. 8 (emphasis added), FTB's auditor did not ask a single question about Mr. Hyatt's connections with Nevada and California the during 1992 residency audit.

Plainly, the audit letter was just a formality so FTB could issue its preplanned Notice of Proposed Assessment for 1992 with fraud penalties to attempt to extort a settlement from Mr. Hyatt. The only explanation for Ms. Cox's audit determination on essentially no factual record is that she had pre-determined that she was going to assess as large a tax liability as possible based on residency. The entire 1992 audit was a sham perpetrated by FTB to extort a settlement from Mr. Hyatt. It is not based on any factual findings of Mr. Hyatt's connections with Nevada or California, and it is not based on a good faith audit.

Another example of FTB's bad faith in the 1992 audit is how FTB assessed the fraud penalty for 1992. FTB expressly admitted that after Ms. Cox completed the 1992 audit, Mr. Steve Illia, while reviewing the tax audit but without any evidence on fraud issues, simply "determined the fraudulent failure to file penalty should be applied to the 1992 year."[3] To be clear, Mr. Illia "determined" to impose the fraud penalty *before* any audit of the fraud penalty had been conducted. He did not know what the facts were for 1992 that related to any alleged fraud, but he had "determined" the fraud penalty should be imposed. Later, no actual audit for the fraud penalty was done. Instead, another auditor, Jeff McKenney, was recruited by FTB management to write up a narrative purportedly supporting a fraud penalty against Mr. Hyatt for the 1992 tax year.[4] Mr. McKenney did not make the determination that Mr. Hyatt remained a California resident during the 1992 disputed period. He simply reviewed Ms. Cox's 1991 fraud penalty write-up and the audit file as the basis for the fraud penalty for the 1992 tax year.[5] In sum, FTB itself confirms that it "determined" to impose the 1992 fraud penalty without an audit on the fraud penalty issue. The subsequent write up of the 1992 fraud penalty was a complete sham to justify Mr. Illia's pre-determined fraud penalty.

---

[3] FTB's RAB at 13.

[4] Annex XXXIII, Exhibits to Supplemental Brief Tables (Ex. 8, Partial Transcript, Depo. of Penny Bauche, 7/29/04, pp. 599-600; *see also* Ex. 9, Partial Transcript, Depo. of Jeffrey McKenney, 8/9/04, pp. 314:1-5, 317:10-21, and 321:15-19).

[5] *See* Annex XXXIII, Exhibits to Supplemental Brief Tables (Ex. 10, Partial Transcript, Depo. of Jeffrey McKenney, 7/1/99, p. 8:14-20).

9

RJN1208

**D.** **FTB's "$24 Million Error" Is Another Example Of FTB's Complete Lack Of Credibility And Bad Faith**

Ms. Cox overstated Mr. Hyatt's 1992 income by an astonishing $24 million – this is now referred to as the "$24 million error." By letter dated April 10, 1997, FTB auditor Cox first stated that she had computed an understatement of income of $48.8 million. On July 17, 1997, within three months, Mr. Hyatt's attorney notified Ms. Cox that her computation was overstated by $24 million because she had computed Mr. Hyatt's income received from Philips for all of 1992, instead of from January 1, 1992 through April 2, 1992. (Annex V, H BATES Documents (Letter from E. Cowan to FTB dated 7/17/97 (H 02257-02259).) Ms. Cox refused to correct her mistake. This error was compounded by the fact that at protest and during these appeals, FTB continued to refuse to acknowledge any error.

Over the next 16 years, Mr. Hyatt repeatedly requested that FTB correct this straightforward error, but FTB steadfastly refused to admit any error. Finally, in 2013, your Board's staff recognized the error and directed FTB to explain its auditor's computation in an Additional Brief. It was only at that time that FTB conceded, as it had to, that Mr. Hyatt had properly calculated the amount of licensing income he had received during the period January 1, 1992 to April 2, 1992. And even then, FTB staff did not even have the integrity to simply state that its auditor had made an error and overstated the assessment by ***$24 million***. (Appellant's Additional Brief, 4/10/13, Section I, "FTB *Finally* Admits It Made A $24 Million Dollar Error.") Instead, FTB blames Mr. Hyatt for FTB's own error. (FTB's RAB, pp. 4-5.) Even more astonishing, FTB continues to claim it can tax the $24 million (which was received by Mr. Hyatt after FTB concedes he became a Nevada resident).

Although FTB now concedes the $24 million error, FTB's refusal to admit this error until your Board staff demanded an explanation from FTB is very strong evidence of FTB's continued misconduct. It is plainly misconduct to continue to pursue a tax assessment that FTB admits is in error. An error of such magnitude is notable and troubling in any case. However, in this case, the $24 million error reveals FTB's true intent was never to assess the correct tax due, because FTB refused to acknowledge error much less correct it until Board staff expressly directed FTB to document the $24 million adjustment. The $24 million error confirms FTB's true intent was (and still is) to assess as large an amount as possible, even if plainly incorrect. This is truly outrageous and indefensible conduct by FTB.

To be clear, the $24 million error cannot be reasonably viewed as a simple arithmetic error. In 1997, Mr. Hyatt's representative (Eugene Cowan) explained in detail that the proposed assessment was overstated by $24 million. However, FTB refused to make any changes. An honest tax agency focused on assessing the correct tax liability would have engaged with Mr. Hyatt and his representatives to resolve the issue. If FTB did not understand its error, it had 16 years to ask for clarification. Instead, FTB dug in on the issue, forcing Mr. Hyatt to brief the issue numerous times in the audit, protest and these Appeals. FTB's refusal to correct the $24 million error evidences not only the sloppy nature of FTB's original audit, but also FTB's determination to "get" Mr. Hyatt, even if that meant allowing a ***$24 million*** erroneous assessment to be issued.

What is equally outrageous is had Board staff not pressed FTB to state and document its position on the $24 million error, FTB would have allowed it to remain in the 1992 Appeal as a contested issue all the way through the Board hearing. Indeed, even *after* it has admitted its error, FTB still continues to represent to your Board that the tax on such amount is in dispute. How can FTB pursue an assessment for over $24 million for almost 20 years, and then when someone other than Mr. Hyatt demands that FTB document its position, it simply drops the issue as if it were a minor arithmetic error? The only answer is that FTB has never focused on the correct tax liability – it is only focused on "getting" Mr. Hyatt, even if that means fraudulently arguing for a $24 million assessment to your Board. There is really no other explanation for the $24 million error and FTB's refusal to even discuss it for nearly 20 years. Allowing an error of this magnitude to continue even though FTB knew it was incorrect (and to impose fraud penalties on top of the erroneous assessment) is absolutely fraud on Mr. Hyatt and your Board.

### E.  FTB's Delay In Raising The Sourcing Issue Further Reflects Bad Faith And Prejudices Mr. Hyatt

FTB's extreme delay in raising the sourcing issue severely prejudiced Mr. Hyatt. In 2007, FTB for the first time formally asserted that Mr. Hyatt had underpaid California tax because he was a nonresident with California source income. FTB waited 11 years after the end of the audits, and 16 years after the earlier year at issue, to raise this completely new substantive issue.

FTB's extreme delay prejudiced Mr. Hyatt because by the time FTB raised the issue documentary evidence and witnesses had been lost. For example, by that time, Mahr Leonard,

11

through its normal document disposal process, had disposed of all relevant files. If FTB had acted promptly, Mr. Hyatt could have asked Mahr Leonard to preserve documents relevant to sourcing. Instead, by hiding the ball during the 11-year protest, FTB knowingly prejudiced Mr. Hyatt's ability to defend against the sourcing issue.

**III.** **FTB Trumped Up The Fraud Penalties To Coerce A Quick Settlement**

FTB's bad faith and misconduct is also evidenced by the trumped up fraud penalties to coerce Mr. Hyatt into a quick settlement. Mr. Hyatt did not commit fraud and FTB did not make an objective determination that Mr. Hyatt committed fraud in either year. Nonetheless, FTB asserted fraud penalties in these appeals to extort a quick settlement from Mr. Hyatt.

**A.** **FTB's Policy To Use Fraud Penalties To Coerce Improper Settlements**

In Appellant's 1991 Reply Brief at pages 74-75, Mr. Hyatt explained that FTB improperly used fraud penalties to coerce taxpayers into settlements. According to the testimony of Candace Les and Carol Ford cited therein, FTB trained auditors to use penalties as bargaining chips to induce taxpayers to agree to an audit or to settle an audit.[6] FTB has not denied that this was its policy at the time Mr. Hyatt was under audit. Nor could it.

As set forth below, additional testimony confirms the full scope of FTB's wrongful use of penalties to extort taxpayer settlements.

**1.** **Thomas Rodrigue Testified That FTB Had A Policy Of Using Fraud Penalties To Coerce Settlements**

Mr. Thomas Rodrigue worked at FTB for 35 years as an auditor, reviewer, assistant administrator, and a district manager from 1965 through 1988. From 1988 until his retirement in 2000, Mr. Rodrigue worked in FTB's legal department. Through his declaration, Mr. Rodrigue has testified that FTB abused its authority by assessing fraud penalties in residency cases to force settlements and to improperly inflate auditor cost benefit ratios ("CBR"), *i.e.*, the amount of an audit assessment compared with the cost of doing the audit:

> "In the mid-1990s, FTB managers began insisting that its auditors assess more penalties. In 1995, Ms. Jovanovich got the attention of FTB management on her suggestion to assess the fraud penalty in the majority

---

[6] ARB (1991) at 75 fn 455-456, citing Ex.44, *Hyatt* v. *FTB,* Partial Transcript of Trial Proceedings, Testimony of Candace Les, 4/24/08, pp. 46-49; 113-115; Ex. 45, *Hyatt* v. *FTB,* Partial Transcript of Trial Proceedings, Testimony of Carol Ford, 7/8/08, p. 84.

of residency cases regardless of whether the fraud penalties were warranted by the facts in the case." (Declaration of Thomas Rodrigue, February 11, 2015, ¶ 21.)

"auditors were taught that the fraud penalty was a way to significantly increase CBR and a way to get taxpayers to settle whether the assessments were warranted or not." (Rodrigue Declaration, February 11, 2015, ¶ 22.)

"Ms. Jovanovich told me that it did not matter if the fraud penalty was supportable because it was only leverage to get the taxpayers to settle . . ." (Rodrigue Declaration, February 11, 2015, ¶ 23.)

"[T]he assessment of the fraud penalty in the majority of residency cases was an attempt to penalize taxpayers who had moved out of California, to coerce settlement and to increase the CBR of the Residency Bureau." (Rodrigue Declaration, February 11, 2015, ¶ 24.)

"[In 1993,] an FTB auditor, Larry Moy, taught a class for auditors on the use of penalties to increase assessments and to motivate taxpayers under audit to settle their audits. He handed out training manuals which had a leering skull-and-crossbones on the cover to illustrate his theme – assess penalties to increase assessments and to motivate taxpayers to settle audits." (Rodrigue Declaration, February 11, 2015, ¶ 25.)

"Doug Dick, a high level FTB manager, taught auditors on the use of penalties to motivate taxpayers under audit to settle their audits. The objective of his training sessions was to convince auditors to assess penalties, even though the facts did not warrant the assessment of penalties, in order to increase assessments and to help settle cases." (Rodrigue Declaration, February 11, 2015, ¶ 26.)

## 2. Diane Truly Testified That FTB Had A Policy Of Using Fraud Penalties To Coerce Settlements

Diane Truly served as a senior FTB audit manager through 1995. Ms. Truly testified that an undue emphasis on CBR caused FTB to improperly assess taxes and penalties:

"The emphasis on CBR following the mid-1995 reorganization led to the atmosphere where 100% of audits were expected to be "change" audits, where CBR was expected to increase and where penalties were a tool to force settlement rather than a punishment for fraudulent behavior." (Declaration of Diane Truly, February 13, 2015, ¶ 5.)

"The FTB misused penalties by assessing penalties to increase CBR and to coerce taxpayers into settling unfair assessments. The fraud penalties were the most abusive of the improper assessments as they labeled taxpayers as tax cheats. Fraud penalties were rarely assessed prior to 1995 and assessment of fraud penalties rarely survived audit, protest and appeal because the FTB has the burden to support fraud penalties with clear and convincing evidence, which was a very heavy burden of proof. However, fraud penalties had the effect of pushing taxpayers into settling unfair

13

assessments and thus might never be tested with appeals." (Truly Declaration, February 13, 2015, ¶ 23.)

"I reviewed an email from James Smith, a FTB manager titled "Fraud Penalty" dated October 5, 1995, to a group that included FTB upper management (Carlos Zamarripa and Winston Mah), that was forwarded by FTB manager Brad LaCour to audit supervisors, and that was forwarded to an audit supervisor. Mr. Smith's email stated that the fraud penalty "affects audit policy." A copy of Mr. Smith's email is attached hereto in Exhibit 5. Mr. Smith worked for me in the 1980s and into the 1990s until I retired in 1995. I would not have permitted Mr. Smith to distribute such an email when he worked for me because it was abusive to taxpayers. It proposed the fraud penalty in the majority of residency audits without even knowing the facts of these residency much less having clear and convincing evidence of fraud." (Truly Declaration, February 13, 2015, ¶ 24.)

"Larry Moy wrote a training manual on penalties with a skull-and-crossbones on the cover. A copy of the Moy training manual is attached hereto in Exhibit 6. The manual explained use of the fraud penalty but failed to explain that the FTB had the burden to prove fraud and that fraud had to be proven by clear and convincing evidence. Instead, auditors were taught that the fraud penalty was a way to significantly increase CBR and a way to get taxpayers to settle whether the assessments were warranted or not without much effort. In 1993 Larry Moy worked for me because I was the Director of the FTB District Office Bureau. If I had known about his 1993 skull-and-crossbones training manual on penalties I would have put an end to this emphasis on assessment of unwarranted penalties, but I did not know about it at that time." (Truly Declaration, February 13, 2015, ¶ 25.)

## B. FTB Imposed Fraud Penalties Against Mr. Hyatt To Coerce A Settlement

FTB assessed the fraud penalties against Mr. Hyatt to improperly coerce him into a quick settlement. FTB had such a policy in place during Mr. Hyatt's audits, and as set forth below, FTB applied that policy with full force against Mr. Hyatt even though it did not determine by clear and convincing evidence that Mr. Hyatt had underpaid taxes and did not determine by clear and convincing evidence that there was any fraud.

### 1. FTB Did Not Impose The Fraud Penalty For A Proper Purpose Because Even FTB's Own Audit Reviewers Doubted That There Was Clear And Convincing Evidence Of Fraud

The fraud penalty requires an extremely high showing by FTB. FTB must establish (1) that there is an underpayment of tax by clear and convincing evidence, and (2) that such

14

RJN1213

underpayment was due to fraud by clear and convincing evidence. The clear and convincing evidence standard requires that the disputed facts must be "'explicit and unequivocal,' leaving 'no substantial doubt,' and 'sufficiently strong to command the unhesitating assent of *every reasonable mind.*'"[7]

First, within FTB there was not (and still is not) agreement that there is clear and convincing evidence of fraud regarding residency. We know this because FTB itself has asserted that Mr. Hyatt is taxable on California source income, an argument that can only be made if Mr. Hyatt did in fact move from California and become a nonresident. If there is clear and convincing evidence of residence, then the sourcing issue lacks merit and should not have been raised. On the other hand, if the sourcing issue has merit, then there cannot be clear and convincing evidence of residence. In short, how can there by clear and convincing evidence of fraud on the residency issue when, at the same time, FTB is claiming that Mr. Hyatt was a nonresident and taxable on California source income? FTB provides no answer to this critical inconsistency in its assessments and briefing. The real answer is that FTB made no attempt to make a correct tax determination; rather, its staff decided early on to assess as high an amount as possible (with fraud penalties) to coerce an improper settlement, even if the grounds for the assessment were legally inconsistent. That is clear evidence of extreme misconduct.

In addition, FTB's own staff openly questioned whether there was any basis to tax Mr. Hyatt at all, let alone whether there was evidence to sustain fraud penalties.

On June 6, 1995, two years into the residency audit, FTB convened a meeting of senior FTB personnel and Sheila Cox, the lead auditor, to discuss whether Mr. Hyatt could be assessed as a nonresident with California source income. AOB (1991) Ex. 69. In a memo summarizing the meeting, Ms. Embry stated:

> [A] decision had not been made at the time of the meeting as to whether there was enough substantiation to sustain a position the TP was a California resident for all of 1991. There does not appear to be any means of making the TP a resident for 1992 or later.

AOB (1991) Ex. 69.

The clear import of FTB's meeting as reflected in Ms. Embry's memo was that FTB was searching for an alternative audit theory against Mr. Hyatt because of *weakness* of the residency

---

[7] *Appeal of Adickes*, St. Bd. of Equaliz., 1990 Cal. Tax LEXIS 24, 90-SBE 012 (Nov. 27, 1990) (emphasis added), quoting *In re Jost*, 117 Cal.App.2d 379, 383 (1953).

15

case. If there had been clear and convincing evidence of residency, there would have been no need to convene a meeting of senior FTB personnel, two years into the residency audit, to weigh raising a completely new sourcing theory, one that is based on finding Mr. Hyatt was a nonresident.

FTB's lead residency reviewer for the 1991 audit, Carol Ford, confirmed the doubts about the residency audit and the fraud penalty. She questioned whether the FTB had a residency case against Mr. Hyatt, let alone sufficient evidence to assess a fraud penalty against Mr. Hyatt. In her Review Comments, she stated: "this is really a tough case" and "[w]e are assessing the FRAUD penalty - although I'm not sure it is warranted." Ms. Ford particularly questioned the auditor's almost complete reliance on three un-sworn "affidavits," from Mr. Hyatt's estranged relatives, two of whom admittedly had no personal knowledge of Mr. Hyatt's residency and all three of whom had been estranged and therefore had little if any relevant knowledge and an axe to grind against Mr. Hyatt. Ms. Ford correctly saw that a residency audit based on such limited and biased witnesses is highly suspect. *See* Carol Ford's review comments at 1991 AOB, Ex. 10, Review Comments, 4/18/96 (FTB 104118).

For the 1992 audit, Rhonda Marshall, a senior FTB auditor, also explicitly disagreed with the assessment of a fraud penalty. At a meeting in which Mr. Hyatt's 1992 audit was discussed Ms. Marshall expressly stated that she did not believe the fraud penalty should be imposed:

> Rhonda has reviewed the case and disagrees with issuing the fraud penalty. She doesn't think the penalty should be issued for failure to file a return where the taxpayer feels he was essentially a nonresident. Fraud penalty was imposed in the prior. Has anything changed in the subsequent year?

AOB (1992) at 65 fn 344 (citing Ex. 57, FTB Memorandum dated 8/12/97, p. 2).

In sum, it is undisputed that senior FTB personnel expressly disputed the imposition of fraud penalties against Mr. Hyatt for both 1991 and 1992.

## 2. FTB Imposed The Fraud Penalty Against Mr. Hyatt To Coerce A Settlement

A fraud penalty can only be imposed if there is clear and convincing evidence of fraud. The clear and convincing evidence standard requires that the disputed facts must be "'explicit

RJN1215

and unequivocal,' leaving 'no substantial doubt,' and 'sufficiently strong to command the unhesitating assent of *every reasonable mind.*'"[8]

In this case, the undisputed evidence establishes that there was open dissent within FTB regarding imposition of the fraud penalties against Mr. Hyatt. Carol Ford and Rhonda Marshall, two senior FTB audit reviewers, expressly stated that they did not believe the fraud penalty should be imposed. FTB's own fraud analysis was equivocal, it left substantial doubt among senior FTB staff, and it did not command the unhesitating assent of every reasonable mind. In short, FTB's auditors did not establish by clear and convincing evidence that there was fraud.

The open dissent of senior FTB staff should have foreclosed imposition of the fraud penalties for lack of clear and convincing evidence, but that is not what happened. Despite strong sentiment that the fraud penalties should not be imposed, FTB pressed forward with the fraud penalties. The only explanation for FTB's decision to pursue the fraud penalties is that FTB wanted to improperly use the penalties to coerce Mr. Hyatt into a settlement.

This conclusion is confirmed by Candace Les, a former FTB auditor who worked closely with Sheila Cox (FTB's primary auditor) and who actually reviewed Mr. Hyatt's audit. Ms. Les testified that Ms. Cox "assess[ed] [fraud] penalties against Mr. Hyatt to increase her CBR and to motivate Mr. Hyatt to settle his assessments when he gets into protest." (Declaration of Candace Les, February 9, 2015, ¶ 28.) Ms. Les also testified that after reviewing the audit work papers she concluded that fraud penalties should not be assessed against Mr. Hyatt and that the reviewers assigned to Mr. Hyatt's audits shared her conclusion:

> After reading Ms. Cox's workpapers, I told her that she should not assess fraud penalties against Mr. Hyatt in order to get him to settle his case, fraud penalties were not warranted based upon the facts of his case. Apparently I was not alone. The reviewers on his audits, Rhonda Marshall and Carol Ford, did not believe that the fraud penalties were warranted. See the Ford Review Notes regarding the 1991 tax year audit ("We are assessing the FRAUD penalty – although I'm not sure it is warranted"), attached hereto as Exhibit 4, and see the Legal/Residency Meeting minutes regarding the 1992 tax year audit ("Rhonda [Marshall] has reviewed the case and disagrees with issuing the fraud penalty"), attached hereto in Exhibit 5. (Les Declaration, February 9, 2015, ¶ 32.)

---

[8] *Appeal of Adickes*, St. Bd. of Equaliz., 1990 Cal. Tax LEXIS 24, 90-SBE 012 (Nov. 27, 1990) (emphasis added), quoting *In re Jost*, 117 Cal.App.2d 379, 383 (1953).

RJN1216

In addition, after reviewing the audit file, Diane Truly, another former FTB auditor, confirmed that Mr. Hyatt's audit was an extreme example of FTB over-assessment to increase CBR, which is not supported by the facts in the case:

> Since I left FTB employment in July 1995 I have learned that the most extreme example of outrageous over-assessments to increase CBR is in the audits of Mr. Hyatt. I was concerned about the audits of Mr. Hyatt so I used my skill and experience to review his audits in depth. Mr. Hyatt's audits are extreme examples of creating unsupportable assessments to get outrageous CBRs even though the assessments are not supportable on their face. This is the type of situation that I would have worked to prevent as the Director of the FTB District Office Bureau and as the chairperson of the FTB Mission and Values Team. For example, a common CBR in the mid-1990s was $800 per hour, but the 1992 tax year audit in the Hyatt case yielded over $100,000 per hour. (Truly Declaration, February 9, 2015, ¶ 16.)

In this case, the undisputed evidence shows that FTB abused its power against Mr. Hyatt by imposing unwarranted fraud penalties in the hope they would force Mr. Hyatt into a settlement of the tax assessments. Three former FTB employees (Mr. Rodrigue, Ms. Truly, and Ms. Les), two of whom served in senior management positions, have stepped forward to expose FTB's abusive and illegal audit tactics. FTB's auditor trumped up an assessment and fraud penalties to advance her career within FTB by creating an unprecedented CBR and to "get" Mr. Hyatt.

In addition, on September 18, 2014, the Nevada Supreme Court confirmed that FTB acted with the utmost bad faith, including upholding the Nevada jury's finding that FTB "was determined to impose tax assessments against him, and that FTB fostered an environment in which the imposition of tax assessments was the objective whenever an audit was undertaken." *Franchise Tax Bd. v. Hyatt*, 335 P.3d 125, 148 (Nev. 2014). The Nevada Supreme Court further concluded that "[Mr.] Hyatt suffered extreme treatment from FTB." *Id.* FTB committed fraud, it intentionally inflicted emotional distress, and it acted with racial animus toward Mr. Hyatt.

In sum, FTB has engaged in outrageous conduct for a tax agency – a jury determined that FTB engaged in extreme misconduct, its own staff have confirmed FTB's misuse of fraud penalties against taxpayers to coerce settlements and increase CBR, and its own staff have confirmed the fraud penalties should not have been imposed against Mr. Hyatt.

All Californians are undeniably harmed by FTB's corrupt activities. The harm done is intangible, but very real: the undermining of public confidence and the loss of respect for FTB as

18

RJN1217

a public institution harms all of us. FTB has betrayed the public trust, and the only way to regain that trust is to declare in unmistakable terms that FTB has acted improperly and to strike down the fraud penalties as well as the tainted assessments in these appeals.

## IV.   FTB's Misconduct In These Appeals

### A.   FTB Has Repeatedly Misrepresented The Evidence To Inflict Harm On Mr. Hyatt

As the California Supreme Court explained in a case involving prosecutorial misconduct, "mischaracterizing the evidence is misconduct." *People v. Hill*, 17 Cal. 4th 800, 823 (1998), citing *People v. Avena*, 13 Cal. 4th 394, 420 (1996), *People v. Lucas*, 12 Cal. 4th 415, 472 (1995). A prosecutor's "vigorous" presentation of facts favorable to his or her side "does not excuse either deliberate or mistaken misstatements of fact." *People v. Purvis*, 60 Cal. 2d 323, 343 (1963).

It is equally true that FTB's misstatements of evidence constitute serious misconduct. Although FTB and Mr. Hyatt are adverse in this proceeding and it can be expected that FTB will advocate for its position, FTB's conduct in these appeals is far outside the bounds of ethical advocacy. FTB has acted in bad faith in its effort to "get" Mr. Hyatt by misrepresenting the evidence in these appeals.

In FTB's briefing, FTB misstates what the evidence says. In addition, FTB intentionally misleads your Board by ignoring contrary evidence that cuts against its "story." There are literally thousands of misrepresentations.

### 1.   FTB Falsely Stated The Philips Documents "Established" Mr. Hyatt's Presence In California

FTB falsely claims that the Philips documents verify Mr. Hyatt's presence at his former California home. (1991 RSAB at 3.) That claim is a cornerstone of its day count/calendar and its assertion that Mr. Hyatt continued to live and work at the La Palma house. According to FTB, the Philips documents allegedly show Mr. Hyatt's presence in California because correspondence or other documents contain Mr. Hyatt's former California address or fax number. FTB's claim about Mr. Hyatt's location is merely an *inference* based on Philips documents that contain Mr. Hyatt's former California address or fax number.

19

However, FTB's argument reveals how far FTB will to "get" Mr. Hyatt. FTB has in its possession undisputed testimony that completely refutes any inference of Mr. Hyatt's presence that FTB draws from Philips documents addressed to Mr. Hyatt's former California address. A Philips vice president (Mr. Algy Tamoshunas) and an office manager at Mahr Leonard (Ms. Vicki Weart) stated under oath that Mr. Hyatt notified Philips and Mahr Leonard of his new address shortly after he moved to Las Vegas in October 1991 and that Philips and Mahr Leonard staff inadvertently continued to use Mr. Hyatt's old contact information on some correspondence to Mr. Hyatt. (Tamoshunas Affidavit, August 4, 2010, ¶ 25; Weart Declaration, May 21, 2012 ¶ 5.) In addition, FTB deposed Mr. Tamoshunas. Even after he was subject to cross examination by FTB's attorneys, Mr. Tamoshunas confirmed that Mr. Hyatt notified Philips of his new Las Vegas address in October 1991, that he understood that Mr. Hyatt had moved to Las Vegas prior to such notification, and that all correspondence and faxes sent by Philips to Mr. Hyatt's former California address or fax number were "inadvertent errors by Philips' support personnel." (Tamoshunas Deposition Transcript, Oct. 27, 2011, at 648:19-649:16.)

Despite having Mr. Tamoshunas' declaration and taking Mr. Tamoshunas' deposition, FTB argues to your Board that the Philips documents "verify" Mr. Hyatt's presence in California because of the address or fax number on the document. (1991 RSAB at 3.) FTB fails to mention Mr. Tamoshunas' testimony in its RSABs and attachments. Similarly, FTB also had Ms. Weart's declaration. FTB did not mention her declaration in its RSABs and it briefly addresses Ms. Weart's testimony in FTB Attachment E at page 109, but only argued that her memory must have been faulty. Her memory was not faulty; it was consistent with Mr. Tamoshunas' testimony.

Similarly, the California P.O. Box address and telephone number on Mr. Hyatt's correspondence during the period after he moved to Las Vegas are also not evidence of Mr. Hyatt's presence in California. After Mr. Hyatt moved to Las Vegas he continued to use his old letter and fax templates containing the Cerritos P.O. Box and the old telephone number. Mr. Hyatt simply did not update his correspondence templates immediately after he moved.

Critically, Mr. Hyatt did not pay for the Cerritos P.O. Box after he moved to Las Vegas. Ms. Jeng paid for the Cerritos P.O. Box after Mr. Hyatt moved. (Hyatt Affidavit, Aug. 15, 2010, at 102:4-5.) By letter dated February 2, 1992, Mr. Hyatt wrote the Post Master at the Cerritos, California post office asking that Barry Lee and Grace Jeng be added to the P.O. Box account so

they could receive mail through the P.O. Box. Even FTB acknowledged that Ms. Jeng's water bill for her La Palma home was addressed to the Cerritos P.O. Box. (FTB's 1991 Opening Brief at 59.)

Ms. Jeng also confirmed that she paid the rent on the Cerritos P.O. Box:

> At the same time that I purchased the La Palma house from Mr. Hyatt on October 1, 1991, he gave me the keys to the Cerritos post office box (P.O. Box 3357) and I accessed this post office box and I paid for the rental on the post office box when the rent was due. See my check to the "USPS" dated April 7, 1992 for payment of the rental fee (the USPS wrote "Box holder" in the "For ___ " location on the check) attached hereto as Exhibit 3.

Affidavit of Grace Jeng, December 4, 2008, ¶ 22, Annex VII, Ex. 22.

FTB also falsely claims that legal invoices issued by Mr. Roth's firm to Philips and by Mr. Cowan show Mr. Hyatt's presence in California. However, analysis of the actual documents reveals FTB plainly misstates what the invoices say and attempts to mislead your Board. For example, in support of its inference that Mr. Hyatt was in California on October 29, 1991, FTB cites to two law firm invoices: (1) Mr. Roth's invoice contains three entries for October 29, 1991 (FTB_Philips 0006617), and (2) Mr. Cowan's invoice contains two time entries for October 29, 1991 (EC 07809). *See* FTB Calendar at 1991 RSAB at 6. However, these invoices do not in any way indicate Mr. Hyatt's presence in California or in any other location. These invoices simply refer to "discussions" and "telephone conferences" with Mr. Hyatt and others. FTB offers no explanation how a telephone call by a person (Mr. Roth or Mr. Cowan) in California to Mr. Hyatt infers that Mr. Hyatt was in California. Mr. Hyatt was in fact in Las Vegas. Rebuttal to FTB Att. A/F, Section I. A., October 29, 1991. To be clear, there is absolutely nothing on the face of these invoices that shows Mr. Hyatt was present in California, yet FTB uses them to "infer" California presence by linking to them to their new calendar and arguing California presence in Attachment A (Revised). This is just one of countless examples of FTB mischaracterizing the evidence and attempting to mislead your Board as to the record in these appeals.

In sum, FTB's inference that Mr. Hyatt was in California because certain Philips documents erroneously contained his former California address or fax number is refuted by clear, undisputed evidence showing that Philips and Mahr Leonard used the wrong address for a time after Mr. Hyatt moved to Las Vegas or that Mr. Hyatt simply did not update his correspondence

RJN1220

templates immediately after he moved. FTB's inference is therefore incorrect. Yet, FTB attempts to mislead your Board by misstating the evidence. When all of the evidence is considered together, it is clear that Mr. Hyatt moved to Las Vegas, but documents were inadvertently sent to his former address and Mr. Hyatt continued to use templates with his old address.

## 2. **FTB Mischaracterized Testimony To Mislead Your Board**

FTB cites to selective statements from David Stratton's deposition testimony to mislead your Board. David Stratton unilaterally contacted FTB about concerns he had regarding Mr. Hyatt's relationship with his parents and brother. (D. Stratton Deposition Transcript 13:17-25 (FTB Ex. KK).) However, during Mr. Stratton's deposition by FTB's attorney, Mr. Stratton expressly admitted that his initial concerns about Mr. Hyatt were based on incorrect assumptions that he fabricated, and that his concerns were unfounded. (D. Stratton Deposition Transcript 37:22 (FTB Ex. KK).)

### a. **Mr. Stratton's Actual Testimony**

> Q: Then you say, "I now see that he [Mr. Hyatt] has been literally purchasing testimonies through a façade of philanthropy." What's the basis for that statement?
>
> A: That's an assumption. That was probably – probably out of line. There was no facts there. And learning what I have learned, I believe it's been 11 months or so since then, that's – that's probably inaccurate.

(D. Stratton Deposition Transcript 37:22-38:1 (FTB Ex. KK).)

Later, David Stratton again reiterated his mistaken assumptions:

> Q: Now, just following up on some information that you had given there, just to be clear, you may had some concerns about manipulation early on, but that was based on those assumptions that you already talked about that led the e-mails and the meeting [with FTB] right?
>
> A: Right.
>
> Q: After having personal discussion then with your parents and with Brian [David Stratton's brother], you don't have those same assumptions any longer?
>
> A: Right.

(D. Stratton Deposition Transcript 71:21-72:6 (FTB Ex. KK).)

22

### b. **FTB's Mischaracterization Of Mr. Stratton's Testimony**

In FTB Attachment E, however, FTB misstated David Stratton's deposition testimony to mislead your Board. FTB wrote: "Mary's son [David Stratton] thought Mr. Hyatt had an ulterior motive in reacquainting himself with the Stratton family. His parents were financially vulnerable during this time." (FTB Attachment E, p. 166.) Later in Attachment E, FTB stated: "David Stratton's genuine concern for his parents resulted in him sending unsolicited emails to FTB's Public Affairs office and FTB attorney Robert Dunn then meeting with attorney Bradshaw and investigator Savage in Las Vegas on June 2, 2010." (FTB Attachment E, p. 167.)

However, FTB **failed to acknowledge** David Stratton's express deposition testimony (see above) admitting that his concerns regarding Mr. Hyatt were not based on any facts, but were instead based on mistaken assumptions. FTB's tactic of only citing documents or statements that support its story, even when directly contrary evidence exists, is an intentional attempt to mislead your Board and create a false record in these appeals.

David Stratton's stated concerns expressed to the FTB were, in essence, just hunches. He had not spoken to his parents or brother prior to expressing those concerns. After speaking to his family members regarding his concerns, he determined that his concerns had no basis in actual fact. Nonetheless, FTB's Attachment E selectively cites David Stratton's hunches/concerns (**not facts**) to mislead this Board. As he testified in his deposition, David Stratton determined that all of his concerns were unwarranted. This Board should reject FTB's attempt to present untrue statements as actual facts and conclude that FTB cannot be trusted.

### c. **Mr. Neuner's Testimony**

Another example of FTB's misstatement of evidence and bad faith is that it cites to **uncorrected** deposition transcripts without noting the corrections made by the witness. Under California law, witnesses are permitted to review their deposition transcripts and are allowed to make any necessary corrections. FTB apparently believes it is proper to cite to your Board the uncorrected deposition transcripts when it knows that the transcripts have been corrected. For example, FTB contends that Mr. Neuner's ability to recollect facts related to Mr. Hyatt was faulty. (FTB Attachment E, pp. 128-129.) Specifically, FTB claims that Mr. Neuner stated in his deposition that he had lunch with Mr. Hyatt in 1992 at the Treasure Island Hotel and Casino, and FTB argues that statement is not true because the Treasure Island Hotel and Casino was not

23

RJN1222

open in 1992. (FTB Attachment E, pp. 128-129.) However, Mr. Neuner corrected his deposition transcript to the correct date of 1999, but FTB, in an attempt to mislead your Board, did not disclose the correction. (FTB Ex. JJ, Tab 60: 12/14/10 Neuner Depo. Transcript 103:18-104:3.)

This is another plain example of FTB's attempt to mislead this Board and create a false record.

### d. William Savage's Misrepresented The Statements Made By Stephanie Gines

Stephanie Gines, an employee of Minnesota Title during 1991 and 1992, stated in her affidavit that FTB's paid investigator William Savage and FTB misrepresented what she told Mr. Savage during a brief telephone interview. (Gines Affidavit, March 28, 2012, ¶¶ 8-12.) FTB intentionally misrepresented that Mr. Savaged had interviewed Ms. Gines in person, that he offered to show a picture of Mr. Hyatt to her (which could only happen if the two were meeting in person), and that he asked Ms. Gines if she would sign a written declaration. (FTB Attachment E, p. 217.) These were all false statements.

In fact, Ms. Gines only briefly spoke to Mr. Savage when he called her without advance notice in 2011 and out of the blue asked questions about Mr. Hyatt's escrow, which was 20 years earlier; and he did not provide any background information to refresh her memory. (Gines Affidavit, March 28, 2012, ¶ 8.) Ms. Gines testified that she stated to Mr. Savage that she simply did not recall meeting Mr. Hyatt, but FTB twisted her response into a falsely emphatic statement that Ms. Gines "could never recall having met him in person." (Gines Affidavit, March 28, 2012, ¶ 8.) In addition, Ms. Gines testified that Mr. Savage did not offer to show her a picture of Mr. Hyatt, nor could he because the interview was by phone, not person to person. Ms. Gines also testified that she did not tell Mr. Savage that he "needn't bother" showing her a picture. (Gines Affidavit, March 28, 2012, ¶ 9.) Ms. Gines testified that neither FTB nor Mr. Savage ever asked her to sign a declaration.

Ms. Gines only stated to Mr. Savage that she could not recall meeting Mr. Hyatt, which is understandable because Mr. Savage had called her without any advance notice and just posed the question without any opportunity for Ms. Savage to refresh her memory. (Gines Affidavit, March 28, 2012, ¶¶ 9, 11.) Thus, all that Ms. Gines' statement to Mr. Savage establishes is at the time of her brief telephone call with Mr. Savage, she could not recall meeting Mr. Hyatt in person 20 years earlier although she spoke with him the telephone on numerous occasions during the 1992 escrow. In fact, as Ms. Frank testified, Ms. Frank introduced Mr. Hyatt to Ms. Gines

24

RJN1223

on one occasion, and it was a brief introduction when Ms. Gines happened to drop by Ms. Frank's office while Mr. Hyatt was meeting with Ms. Frank. (Frank Affidavit, March 21, 2012, ¶ 19.) It is not surprising at all that Ms. Gines would not recall such a brief introduction to Mr. Hyatt 20 years later. (Frank Affidavit, March 21, 2012, ¶ 19.) However, Mr. Savage and FTB completely intentionally misrepresented the testimony of Ms. Gines.

### B. **FTB Fabricated False Evidence**

FTB has fabricated false evidence and presented such false evidence to your Board.

#### 1. **FTB's Investigators Fabricated Testimony**

The most glaring examples of FTB's fabrication of false evidence are the declarations signed by FTB paid investigators William Savage and Jake Dameron. (Savage Decl., May 27, 2009; Savage Decl., May 24, 2011; Savage Decl., May 28, 2011; Savage Decl., Nov. 20, 2012; Savage Decl., Mar. 24, 14; Dameron Decl., March 19, 2011; Dameron Decl., Jan. 31, 2013; Dameron Decl., Feb. 6, 2013; Dameron Decl., May 2, 2013.) Neither FTB investigator had any firsthand knowledge of any relevant facts. Instead, the investigators claim to have spoken to Mr. Hyatt's witnesses and then, in lieu of obtaining declarations from the witnesses themselves, FTB's investigators submitted their own declarations that allegedly restate what the witness said.

The witnesses have testified under oath that they did not actually make the statements attributed to them by FTB's investigators. Twelve witnesses testified that they were not interviewed about Mr. Hyatt in response to FTB's misrepresentations about their alleged statements about Mr. Hyatt, 18 witnesses testified that FTB investigators did not ask questions or show photographs that FTB investigators incorrectly testified they had done, 15 witnesses testified that FTB investigator Mr. Savage misrepresented in his declaration the answers to his questions that he had received from them, 14 witnesses testified that they did not make statements to FTB investigator Mr. Savage and that Mr. Savage testified that the witness had made, 18 witnesses testified about FTB investigator declarations misrepresenting their statements, and 31 witnesses testified that they did not make statements to FTB investigators that the FTB stated that the witness had made. (Updated Testimonial Topics, Exs. T073, T075, T076, T081, T077, T080.)

Plainly, a witness' direct testimony under oath must prevail over FTB's investigator declarations. In addition, seven witnesses discussed in the Savage declaration and Dameron

25

RJN1224

declaration were deposed and subject to cross examination under oath. Those witnesses were: Lynneta Ruth, Richard Neuner, Mary Trotter Stratton, Brian Stratton, Blanche Garnica, Melvin Hecht, and Michelina Hecht. Amazingly, FTB's investigators even claim their own hearsay declarations must prevail over these witnesses' highly credible eyewitness testimony. Your Board should reject the FTB investigator declarations as non-credible claims that have been refuted by the actual testimony of witnesses with personal knowledge and who, in many cases, have been subject to cross examination by FTB.

In addition, FTB provides no credible explanation for why the investigators failed to obtain signed declarations from the witnesses they interviewed or allegedly interviewed. Mr. Savage's response is simply that the 18 witnesses discussed in his 2012 declaration were all liars. (Savage Decl., Nov. 20, 2012.) Each of the 18 witnesses are disinterested third parties with no stake in the outcome of these appeals. They have no motive to provide anything but their honest testimony. There is no reason why one of them, let alone all 18 of them would commit perjury and risk criminal prosecution. It is far-fetched to argue that all of these witnesses committed perjury. It is even more far-fetched when Mr. Savage is the one making the claim that they were not truthful. As discussed in the declarations of Mary Savage (Mary Savage Decl., May 15, 2015 ¶¶ 4-9) and Martha Mims (Martha Mims Declaration, June 10, 2015 ¶ 4), Mr. Savage has a long history of dishonesty and fraud. He was fired from multiple jobs for dishonesty and filed a false tax return. His history of dishonesty and fraud destroys his credibility as a witness. A more complete description of Mr. Savage's fraud and dishonesty is set forth in Table of William Savage's Fraud and Dishonesty, and Savage False Statements Table, and Supplemental Savage False Statements Table.

In addition, Mr. Savage is not a disinterested party. He has been retained by FTB's Nevada counsel, and as a private investigator; he was paid to produce evidence for his client. Finally, if Mr. Savage had actually interviewed each witness and they had made the statements attributed to them, Mr. Savage provides no explanation why (except for one witness) the witnesses did not agree to sign a declaration themselves. Mr. Savage's failure to explain why he did not obtain signed declarations is extremely damaging to his credibility when the same witnesses are available and they have submitted signed declarations directly contradicting Mr. Savage's declaration. Thus, Mr. Savage's declaration is not reliable. It plainly cannot replace the actual signed declarations submitted by the witnesses with personal knowledge.

FTB's other paid investigator, Mr. Dameron, admits he did not even tried to obtain signed declarations. Mr. Dameron stated that he spoke to witnesses "for the primary purpose of determining witnesses who should have their depositions taken, additional pre-trial investigation to be conducted and identified areas where an expert witness could have been required." (Dameron Decl., Jan. 31, 2013, at 2:9-12.) Thus, by Mr. Dameron's own admission, the 1999 alleged interviews were just informal conversations to determine whether an individual could be a witness or to obtain background information. Indeed, Mr. Dameron's 2013 declaration acknowledges as much: "[The witness declarations filed by Mr. Hyatt] appear to have involved more research and lengthier interviews of witnesses than the *shorter interviews I conducted, which was about ten years or more prior to the subsequent interviews of the same witnesses.*" (Dameron Decl., Jan. 31, 2013, at 2:16-19.) There is no indication that Mr. Dameron told witnesses their statements would be used as formal testimony. The witnesses were not given an opportunity to refresh their recollections. Compared with the witnesses' actual declarations, Mr. Dameron's reports on alleged informal conversations with witnesses are not reliable and trustworthy. A summary of false statements made by Mr. Dameron is set forth in Dameron False Statements Table and Supplemental Dameron False Statements Table.

In short, FTB's investigator declarations are highly unreliable.

## 2. **FTB Fabricated Evidence To Attempt To Impeach Witnesses**

FTB fabricated evidence in an attempt to impeach one of Mr. Hyatt's witnesses, Mr. Thomas McGuire.

First, Mr. McGuire is an exceedingly credible witness because he has been interviewed by both FTB and Mr. Hyatt's representatives, and he has his own attorney to counsel him. Mr. McGuire is a Las Vegas real estate agent who assisted Mr. Hyatt with the purchase of his Tara Avenue home. (McGuire Affidavit, March 31, 2012.) The thrust of FTB's attempt to discredit Mr. McGuire's testimony is that his statements provided in his declaration signed under oath are inconsistent with alleged earlier statements he made to FTB's outside counsel, FTB personnel, and FTB's paid investigator during telephone calls. (FTB Attachment E, pp. 217-231.) As proof of the alleged inconsistent statements, FTB points to notes allegedly taken during the telephone conversations. However, none of the alleged conversations were recorded, none of the alleged statements were taken under oath, and none of the alleged notes were taken by official reporters sworn to record the true statements of the witness. Nor is there any evidence that FTB's

RJN1226

representatives told Mr. McGuire his statements would be used as testimony. In short, there is no foundation for the alleged witness statements reflected in FTB's notes of conversations with Mr. McGuire. The inherent problem with FTB's telephone notes is that there is no record of the questions asked, no indication that Mr. McGuire heard the questions clearly, and no indication that FTB's notes are accurate. The most credible evidence of Mr. McGuire's testimony is his direct testimony provided under oath.

Moreover, when FTB presented Mr. McGuire an opportunity to review notes of his alleged statements, he made it very clear to FTB that the statements were not accurate and needed to be corrected. Instead of making the necessary corrections, FTB refused to make any corrections. FTB then proceeds to attempt to impeach Mr. McGuire's sworn statements from his 2012 Affidavit with the unsworn and rejected telephone notes taken by FTB and by FTB's paid investigator.

FTB's tactic to attempt to impeach Mr. McGuire must be rejected because FTB has no credible evidence to rely on. In effect, FTB's personnel had telephone conversations with Mr. McGuire, FTB's personnel made notes of the telephone conversations with Mr. McGuire, FTB personnel then prepared a draft declaration based on what Mr. McGuire purportedly said, and Mr. McGuire reviewed the declaration and told FTB it had many errors. These events do not make FTB's draft declaration or telephone notes credible – it renders them inaccurate writings that have been rejected by the witness with personal knowledge, Mr. McGuire.

Mr. McGuire stated in his signed declaration that he dealt with Mr. Hyatt in Las Vegas, and that he did not recall dealing with Mr. Hyatt at any location in California. (McGuire Affidavit, March 31, 2012, ¶ 69.) FTB claims that these statements are not true by pointing to alleged faxes from Mr. McGuire's office to Mr. Hyatt at his Las Vegas apartment. (FTB Attachment E, pp. 226-228.) The alleged faxes are listed in Mr. McGuire's 2012 Affidavit at paragraphs 76-77. None of the alleged faxes indicate on their face that they were sent to the La Palma house, and in fact, Mr. McGuire testified that he does not recall ever sending or receiving a fax from the La Palma house. He received faxes from Mr. Hyatt's apartment and sent faxes to Mr. Hyatt's 702 area code apartment fax number. (McGuire Affidavit, March 31, 2012, ¶¶ 71-72, 76-77.) Mr. McGuire testified that none of the purchase and counter-offer documents for the Tara Avenue house had California contact information. (McGuire Affidavit, March 31, 2012, ¶ 77, Ex. 8 and 9.) Apparently, FTB just fabricated its story Mr. McGuire sent faxes to the La

28

Palma house because that would fit better with its fabricated story that Mr. Hyatt was in La Palma. However, even in Attachment E, FTB offers no explanation why it believes those faxes were sent to the La Palma house. (FTB Attachment E, pp. 226-228.) Rather, FTB just cites to its calendars. However, the calendars do not show that Mr. McGuire sent faxes to the La Palma house.

FTB's attempt to impeach Mr. McGuire's Affidavit must be rejected because FTB relies on fabricated evidence that is not credible. Virtually all of the "evidence" cited by FTB are alleged statements made by Mr. McGuire which he expressly rejected when FTB asked him to sign a declaration containing those inaccurate statements. Mr. McGuire's Affidavit is credible and should be accepted in full.

### 3.  FTB Filed An *Unsigned* Declaration As Testimony

Incredibly, FTB attempted to slip into the record an unsigned declaration as evidence. In Respondent's Opening Brief 1991, FTB cited to an *unsigned, draft declaration* prepared by one of its paid investigators for Mr. Thomas McGuire. 1991 ROB, p. 60, fn 181. As noted, Mr. McGuire reviewed this document and refused to sign it because it was not accurate. (McGuire Affidavit, March 31, 2012, ¶ 9.) This document absolutely is *not* evidence. Yet, FTB cites to it and tries to explain away the reason for it not being signed by blaming Mr. Hyatt. It is not Mr. Hyatt's fault that Mr. McGuire refused to sign a false affidavit prepared by FTB's paid investigator, Mr. William Savage. (*See* 1991 ARB at p. 16.)

*  *  *

For your Board's convenience, Mr. Hyatt has catalogued each instance of FTB's misrepresentations of evidence in a series of tables. "11_Table_of_Savage_Statements" in the 02 folder of Hyatt's folder structure -- "Table Of False Declaration Statements Made by William Savage"; "11A_Supplemental_Table_of_Savage_False_Statements" in the 02 folder of Hyatt's folder structure -- "Supplemental Table Of False Declaration Statements Made by William Savage"; "11_Table_of_Dameron_Statements" in the 02 folder of Hyatt's folder structure -- "Table Of False Declaration Statements Made by Jake Dameron"; "11A_Supplemental_Table_of_Dameron_False_Statements" in the 02 folder of Hyatt's folder structure -- "Supplemental Table Of False Declaration Statements Made by Jake Dameron"; "11_Table_of_Audit File_Statements" in the 02 folder of Hyatt's folder structure -- "Table Of

29

False Statements Made In The FTB Audit File";

"11A_Supplemental_Table_of_Audit_File_False_Statements" in the 02 folder of Hyatt's folder structure -- "Supplemental Table Of False Statements Made In The FTB Audit File"; and Mr. Hyatt's Samples of FTB Misrepresentations, Unreasonable Inferences and Unsupported Assertions, Appellant's 1991 Reply Brief, Ex. 22.[9]

FTB's misstatements of evidence is serious misconduct. It is evidence of bad faith and it demonstrates FTB's lack of credibility. As illustrated in the comprehensive tables of FTB's misrepresentations, there are thousands of examples of FTB's bad faith and misrepresentation of the evidence. Only one conclusion can be drawn from the examples above and Mr. Hyatt's extensive misrepresentation tables – FTB will stop at nothing to "get" Mr. Hyatt, even if that means distorting the evidence and misstating the record. By engaging in such conduct, FTB loses all credibility.

### C. FTB Engaged In Extreme Misconduct By Using Its Paid Investigators And Attorneys To Intimidate And Harass Witnesses And To Fabricate False Testimony

FTB used its paid investigators and attorneys to intimidate and harass witnesses and to fabricate false testimony. These investigators and attorneys used threats, intimidation and coercion to try to drum up evidence against Mr. Hyatt.

Under California law, a private investigator may not obtain evidence through deceit and fraud, and if an investigator is found to have engaged in such misconduct, the evidence cannot be considered. As the California Supreme Court declared, "an administrative agency must reject evidence inconsistent with the dignity of its proceedings and the fair administration of justice." *Patty v. Board of Medical Examiners*, 9 Cal. 3d 356, 364-365 (1973), citing *Redner v. Workmen's Comp. Appeals Bd.* 5 Cal.3d 83 (1971). In *Patty*, the Supreme Court held that an administrative agency cannot itself engage in improper conduct (in that case, entrapment) when investigating an individual.

> Although the defense of entrapment may find application in other administrative proceedings, it is particularly important when, as here, a single agency combines both investigative and adjudicative powers. If such an agency rejects entrapment as a defense, it in effect authorizes its investigators to entrap, and encourages a shift of resources from the

---

[9] See also Mr. Hyatt's Rebuttal to FTB Att. A/F, and Mr. Hyatt's Rebuttal to FTB Attachment E for a complete discussion of FTB's misrepresentation of the evidence.

RJN1229

> detection of illegal acts to the promotion of such acts. Public confidence
> in the administration of justice by such an agency cannot be sustained
> when that same agency in performing its investigative role employs
> methods contrary to "'sound public policy' and 'good morals.'" (People v.
> Benford (1959) supra, 53 Cal.2d 1, 9.)

*Patty, supra* at 365.

Likewise, in *Redner*, the Supreme Court held that an insurer could not benefit from evidence obtained by a private investigator's misconduct. The Court declared that such misconduct is counter to clear public policy:

> The [workers compensation] appeals board is not "bound by the common
> law or statutory rules of evidence and procedure, but may make inquiry in
> the manner, through oral testimony and records, which is best calculated
> to ascertain the substantial rights of the parties and carry out justly the
> spirit and provisions" of the workmen's compensation laws. (Italics
> added.) (Lab. Code, § 5708.) As this court observed in French v. Rishell
> (1953) 40 Cal.2d 477, 481 [254 P.2d 26], the board "from its early days,
> has" been "allowed to receive hearsay evidence and to proceed informally.
> . . ." (See Bland v. Workmen's Comp. App. Bd. (1970) 3 Cal.3d 324, 330
> [90 Cal.Rptr. 431, 475 P.2d 663].) Evidence obtained by fraud and deceit
> in violation of the rights of the applicant, however, is not "best calculated
> to ascertain the substantial rights of the parties and carry out justly the
> spirit and provisions" of the workmen's compensation laws. The high
> purposes of the compensation law should not be perverted by resort to
> evidence perfidiously procured. We therefore conclude that the board
> may not rely upon evidence obtained, as in the present case, by deceitful
> inducement of an applicant to engage in activities which he would not
> otherwise have undertaken.

*Redner, supra* at 94-95.

As discussed below, FTB's investigators and attorneys fraudulently created evidence. Such evidence must be rejected.

### 1. FTB Paid Investigators Intimidated Witnesses

FTB investigator William Savage intimidated Michael Fox, former Director of Operations at the Continental Hotel. Mr. Fox testified under oath that Mr. Savage ***intimidated and threatened*** him to obtain a statement. (Fox Affidavit, March 6, 2012, ¶¶ 8-14.) Mr. Fox stated that Mr. Savage misrepresented that he was connected with the IRS, that Mr. Savage was investigating Mr. Fox for unpaid tax liabilities, that Mr. Savage stalked Mr. Fox and his sister by repeatedly calling them to obtain a statement from Mr. Fox, that Mr. Savage intimidated Mr. Fox, that Mr. Fox only agreed to provide a statement to get Mr. Savage to stop aggressively

31

RJN1230

harassing him, and that Mr. Savage demanded a statement confirming that Mr. Hyatt could not have stayed at the Continental Hotel. (Fox Affidavit, March 6, 2012, ¶¶ 8-14.)

In particular, Mr. Fox testified:

> Mr. Savage told me that Mr. Hyatt could not possibly have stayed at the Continental like he said that he did. Mr. Savage sent me a packet of papers from the Michelina Hecht transcript. He told me that this transcript was the crux of the whole case. He asked me to write a letter telling him reasons why Mr. Hyatt could not have stayed at the Continental. I was very concerned that Mr. Savage would get the FTB and the IRS to audit me because I owed the IRS some money. Mr. Savage was very pushy and aggressive about asking for the letter. I was very intimidated by his aggressiveness. Thus, I agreed to do what he asked me to do. He dictated over the telephone the statements that he wanted me to make about Mr. Hyatt in the letter and I wrote them down. I then wrote the letter dated February 19, 2011 and emailed a copy and mailed a signed copy to him. The only thing that I did not do that he asked me to do is to sign the letter under penalty of perjury because I did not believe the statements that Mr. Savage pushed me into writing.

(Fox Affidavit, March 6, 2012, ¶ 10.)

Mr. Savage's strong-arm tactics to intimidate Mr. Fox and coerce a written statement is appalling. However, what is most disconcerting is FTB's reaction after Mr. Hyatt filed Mr. Fox's declaration. It has been over three years since FTB was made aware of Mr. Savage's misconduct. FTB has *condoned* Mr. Savage's extreme misconduct by continuing to rely on Mr. Savage's declarations and has permitted Mr. Savage to file a new declaration calling over twenty of Mr. Hyatt's witnesses liars when it is absolutely apparent that it is Mr. Savage who is the liar. Threatening a witness and falsifying evidence are extremely serious issues, yet FTB just ignored the issues and continued its single-minded plan to "get" Mr. Hyatt at any cost, even if that cost is using illegal strong arm tactics.

In fact, FTB fully embraced Mr. Savage and his tactics because FTB filed with its RSABs an amazing declaration signed by Mr. Savage, in which Mr. Savage (and FTB) accused the victim, Mr. Fox, of "childish, name-calling & kindergarten-like comments regarding his perceived impressions of me. . . ." (Savage Decl., Nov. 20, 2012, FTB Ex. JJ, Tab 1 p. 2.)

FTB is the tax agency charged with administering all of California's income taxes. Incredibly, its only response to these serious charges was to accuse the victim (Mr. Fox) of making "baseless ad hominem attacks concerning Mr. Savage." (FTB Attachment E, p. 150.) How does FTB *know* Mr. Fox's statements are "baseless?" FTB has no way of knowing Mr.

RJN1231

Fox's statements are baseless because it did not independently investigate Mr. Fox's very serious claims against its own private investigator. As noted, FTB did *not* conduct any investigation into Mr. Fox's statements of harassment and intimidation. Instead, FTB went on the attack. FTB claimed that Mr. Fox's fear of a trumped up tax audit was unreasonable because he was an Iowa resident. (FTB Attachment E p. 150 fn 879.) However, FTB's claim is disingenuous. Mr. Fox stated that he had IRS tax issues and that Mr. Savage led him to believe he was with the IRS and could make the IRS audit Mr. Fox. (Fox Affidavit, March 6, 2012, ¶ 2.)

In addition, rather than conduct an investigation, FTB simply stands by its paid investigator, stating that Mr. Savage "refutes such clams and stands by every statement made under in his previous declaration including receipt of Mr. Fox's February 19, 2011 unsolicited letter." (FTB Attachment E, p. 151.) The arrogance and disregard for any sense of its public role as a state tax agency that FTB demonstrates in connection with Mr. Fox and Mr. Savage is extremely troubling. To be clear, FTB's agent is accused of intimidation, harassment, and extortion of a witness. FTB cannot dismiss the claim so easily.

Similarly, David Stratton testified during his deposition that he was interviewed by FTB investigator Savage and FTB outside counsel James Bradshaw. He stated that during the interview that he felt Mr. Savage and Mr. Bradshaw wanted him to cooperate with FTB and that if he did not cooperate with FTB, there would be "some consequence" that would flow from that. (David Stratton Deposition Transcript pp. 55 (FTB Ex. KK p. 531) (discussing threats made by Mr. Savage).

> Q: After the meeting with the Franchise Tax Board with Mr. Bradshaw and Mr. Savage, did you feel a level of intimidation coming out of that meeting?
>
> A: Yes, more from Mr. Savage. . . .

*Id.* at p. 63 (FTB Ex. KK. p. 533.)

Furthermore, both FTB paid investigators William Savage and Jake Dameron indicated they had government connections to intimidate witnesses. Mr. Savage told Mr. and Mrs. Chambers that he was associated with the Nevada Gaming Control Board. (Declaration of Jack Chamber, January 9, 2012, ¶ 15; Declaration of Pam Chambers, January 9, 2012, ¶ 15; *see also* Declaration of Ira Levy, May 9, 2012, ¶ 5, Annex XXV, Ex. 47.) Mr. Dameron told Mr. and Mrs. Zuzak that if they did not tell him everything he wanted to know, he would have them

RJN1232

audited. (Supplemental Affidavit of Robert V. Zuzak, April 4, 2012, ¶ 7, Annex XXV, Ex. 94; Affidavit of Delsie Zuzak, April 4, 2012, ¶ 4, Annex XXV, Ex. 93.)

The bottom line is that a number of witnesses have come forward and stated under oath that FTB's paid investigators intimidated them and engaged in misconduct and FTB's only response is to argue the witnesses are lying. That is truly outrageous conduct by FTB.

## 2. FTB Paid Investigator Savage's Prior History Of Fraud And Deceit Destroys His Credibility, And His Testimony Must Be Rejected

FTB investigator Savage has a long history of fraud, deceit, and intimidation, and he has engaged in the same type of misconduct in these appeals. His testimony cannot be trusted and should be rejected. "Deceit, fraud, cheating or stealing are universally regarded as conduct which reflects adversely on a man's honesty and integrity." *People v. Muldrow*, 202 Cal. App. 3d 636, 644 (1988)) (internal quotations omitted).

That FTB is relying heavily on Mr. Savage's fabricated testimony implicates FTB directly in Mr. Savage's fraud, deceit and intimidation.

A total of 15 witnesses have filed affidavits under penalty of perjury stating that Mr. Savage misstated their statements or fabricated statements. Testimonial Topic Table, Ex. T076, T081. The direct testimony of these witnesses is overwhelming evidence of Mr. Savage's dishonesty. A complete list of Mr. Savage's false statements is set forth at "11_Table_of_Savage_Statements" in the 02 folder of Hyatt's folder structure -- "Table Of False Declaration Statements Made by William Savage" ; and "11A_Supplemental_Table_of_Savage_False_Statements" in the 02 folder of Hyatt's folder structure -- "Supplemental Table Of False Declaration Statements Made by William Savage."

Mr. Savage's only response is to accuse Mr. Hyatt's witnesses of lying. FTB's Exhibit JJ, Tab 52, 11/20/12 Declaration of William L. Savage. It is beyond credible to argue that unrelated witnesses with no stake in the outcome of these appeals would all agree to make false statements as Mr. Savage contends. There is simply no motive for these witnesses to do that. However, there is enormous motive for Mr. Savage to fabricate testimony.

First, he is being paid to generate evidence for FTB. To be clear, Mr. Savage is being paid by FTB or FTB's agents, and he is providing affidavit in these appeals supporting FTB. That presents a huge conflict of interest and risk of bias.

34

RJN1233

Second, Mr. Savage has a long history of fraud and deceit. Mr. Savage's former wife, Mary Gomez (formerly known as Mary Savage) and former step-daughter, Martha Mims, have submitted declarations under oath that recounts Mr. Savage's history of fraud and deceit. In Ms. Gomez's declaration she states:

- "Bill Savage was dishonest in his tax filings. This issue came to light in our divorce proceeding. Bill Savage amended his IRS tax returns to show some $95,000 in previously unreported income over a period of 1995 to 1999. The judge in the divorce proceeding made a finding of fact that Bill Savage committed tax fraud. The judge's words referencing Bill Savage were: "In either event, his acts were sufficiently intentional and fraudulent to warrant this Court finding that actual harm and injustice would be done to Plaintiff were she required to bear this additional tax burden." *Mary Savage v. William Savage*, Decision After Trial, In the Family Division in the Second Judicial District Court for the State of Nevada In and For The County of Washoe (July 17, 2001)." (Mary Gomez Declaration, September 25, 2015 ¶ 6.)
- "Bill Savage lost his job with the Nevada Gaming Commission because of his dishonesty. From 1977 until December 30, 1980, Bill Savage was employed by the Nevada Gaming Commission, a Nevada government job. From about 1965 to 1980 I was employed by United Airlines. About 1980, Bill Savage and I lost our jobs about the same time because of Bill Savage's "submittal of false and fraudulent travel claims", Letter dated December 22, 1980, to Bill Savage from Ray H. Koon, Chief of Investigations of the Nevada Gaming Commission. A copy of the December 22, 1980, Koon letter is attached hereto in Exhibit 3. Bill Savage lost his job with the Nevada Gaming Commission and I lost my job with United Airlines. Bill Savage told me in early 1981 that he had resigned from the Nevada Gaming Commission as an alternative to being potentially fired for committing fraud." (Mary Gomez Declaration, September 25, 2015 at ¶ 10.)
- "In 1980, I learned from Bill Savage that he was under investigation for fraud because he had charged the Nevada Gaming Commission for airline tickets although he had actually travelled for nearly free as my spouse because I was employed by United Airlines. He had purchased airline tickets, billed the Nevada Gaming Commission for the purchased tickets, gotten a refund on those tickets and then travelled for nearly free as my spouse because I was employed by United Airlines. Bill Savage's fraud was described in a letter dated December 22, 1980, to Bill Savage from Ray H. Koon, Chief of Investigations of the Nevada Gaming Commission. . . .

The letter continues to list three additional instances of fraud by Bill Savage in which he travelled nearly for free as my spouse and then billed the Nevada Gaming Commission for the airfare. I did not participate in

RJN1234

this scheme by Bill Savage to defraud the Nevada Gaming Commission. Nevertheless, I was fired by United Airlines because of his fraud. I gave Bill Savage access to my passes as a United Airlines employee but I did not always know when he used them and I did not know that he fraudulently charged the Gaming Commission for airline travel when he flew on a United Airlines pass. Mr. Koon's letter offers Bill Savage a chance to meet on December 30, 1980, to respond to the charges. Bill Savage resigned on December 30, 1980." (Mary Gomez Declaration, September 25, 2015 at ¶ 11.)

- Bill Savage lost his job with the Nevada State Industrial Insurance System (the "SIIS") because of his dishonesty. In 1982, after resigning from the Nevada Gaming Commission, Bill Savage was employed by the SIIS from September 1982 through January 3, 1983. In an SIIS Interoffice Memorandum dated 21 December 1982, from Jo Gray to Bill Savage, Bill Savage was terminated effective Monday, January 3, 1982 [sic: 1983]. A copy of the Gray Interoffice Memorandum is attached hereto in Exhibit 4. About 1982, when Bill Savage lost his job with the SIIS he was "moonlighting" in his private investigator business. I later learned he was tired from the SIIS for using the SIIS computers to get confidential information about persons that he was investigating for his private investigator business. I knew that this was particularly serious because the SIIS records were very confidential. (Mary Gomez Declaration, September 25, 2015 at ¶ 12.)

In addition, Ms. Mims, Mr. Savage's former step-daughter, testified that Mr. Savage used her to improperly obtain credit reports on individuals for his private investigation business. (Martha Mims Declaration, June 10, 2015 ¶ 4.) A more complete description of Mr. Savage's fraud and dishonesty is set forth in Table of William Savage's Fraud and Dishonesty.

The foregoing direct testimony shines a bright light on Mr. Savage's character and, more specifically, his propensity for dishonest behavior. He lacks professional integrity and cannot be trusted to present honest testimony in these appeals. Yet, FTB relies heavily on Mr. Savage and has the gall to claim that Mr. Hyatt and his witnesses are all liars based, in very large part, on the testimony of a discredited and dishonest investigator.

Third, Mr. Savage admitted to paying cash for witness testimony as part of his private investigator business.

"Bill Savage would use cash to pay witnesses and informants as part of his private investigation practice. See the Deposition of William Savage in Savage v. Savage, April 12, 2001, pp. 77:8 to 84. An excerpt of the testimony of Bill Savage is attached hereto in Exhibit 5. Bill explained to me that he would bill the clients for these cash expenditures and he would be paid by his clients 'no questions asked.' Bill Savage testified that he

36

RJN1235

> used cash to pay informants and that he did not keep any records of his use
> of cash ("when you buy information from sources, you don't keep records
> and you don't receive receipts" (pages 77:11-78:2, 79:3-6, 82:17-83:5))."

Mary Gomez Declaration, September 25, 2015, ¶ 14.

Even FTB's Nevada attorney admitted to paying Mr. Savage to reimburse him for paying cash for witness testimony.

> Pat Lundvall testified that she and her firm reimbursed Bill Savage's use
> of cash to pay for "information from non-public sources." See the court
> video recording in *Savage v. Savage*, April 18, 2001. A transcribed
> excerpt of Pat Lundvall' s testimony follows . . . ."

Mary Gomez Declaration, September 25, 2015, ¶ 15.

Fourth, Mr. Savage has a long history of working with FTB's Nevada counsel, in particular FTB's lead counsel Pat Lundvall. He has a strong motive to keep his regular client happy.

> Bill Savage was a business acquaintance and social friend of Pat Lundvall.
> They would dine together socially and exchange gifts that included
> flowers and stuffed animals.

Mary Gomez Declaration, September 25, 2015, ¶ 16.

Finally, Mr. Savage is prone to violence, including spousal abuse and domestic violence. This is directly relevant to the reasonableness of the many witnesses who have testified that they felt intimidated and threatened by Mr. Savage.

> Bill Savage had a violent temper, particularly when he was under the
> influence of alcohol. He committed spousal abuse and domestic violence
> against my two daughters Martha Mims and Mary Ann Mims, my son
> Mark and me.

Mary Gomez Declaration, September 25, 2015, ¶ 7.

Mr. Savage's past history of fraud and deceit and violence destroys his credibility and fully corroborates witness testimony that he mischaracterized their statements and they felt intimidated by Mr. Savage. He is a completely discredited witness. When witnesses step forward, with nothing to gain, and testify under oath that Mr. Savage misrepresented their statements, their testimony must be accepted over Mr. Savage's self-serving statements to the contrary. In sum, Mr. Savage's testimony should be given absolutely no weight.

That FTB offers Mr. Savage as a witness in these appeals raises very serious questions about FTB's credibility and integrity as well.

RJN1236

* * *

FTB reliance on declarations signed by its paid investigators is completely discredited. The investigators were nothing more than henchmen hired to intimidate witnesses and fabricate testimony. Any evidence touched by these investigators cannot be trusted and in any event, the most credible evidence of what a particular witness said is his or her actual affidavit, signed under penalty of perjury. Any claims of what these witnesses said, as stated by FTB's paid investigators, cannot be trusted.

### 3. FTB Attorney Pat Lundvall Also Intimidated And Harassed One Of Mr. Hyatt's Witnesses

FTB attorney Pat Lundvall contacted Mr. Walter Shoemaker by telephone on two occasions, in 2006 and in 2009. Each time that she called, Mr. Shoemaker was undergoing a health crisis. (Affidavit of Walter Shoemaker, December 8, 2009, ¶ 5, Annex XI, Ex. 22.) In 2006, he was recovering from a near fatal car accident, and in 2009, he had just been diagnosed as potentially having cancer and told he might require surgery. (*Id.* at ¶¶ 8, 10.) It was during these crises that Ms. Lundvall contacted Mr. Shoemaker and attempted to interview him about facts related to Mr. Hyatt. (*Id.* at ¶ 4.) On each occasion, Mr. Shoemaker notified Ms. Lundvall of his condition and made it clear that he did not wish to be bothered by her. Nonetheless, Ms. Lundvall pressed for information, and not wanting to be impolite, Mr. Shoemaker spoke to her despite his being under stress.

Ms. Lundvall's tactics of pressing a physically frail witness for information and presenting those alleged statements to your Board is outrageous. Critically, FTB did not ask Mr. Shoemaker to review a draft declaration or other document recounting his telephone calls with Ms. Lundvall. (*Id.* at ¶ 7.) If FTB had done so, Mr. Shoemaker would have asked his personal counsel to assist to ensure the facts are accurate. Instead, FTB attempts to pass off statements he denies making as credible and accurate. For example, Mr. Shoemaker states that he knew Mr. Hyatt was living in Las Vegas at his apartment but he occasionally picked up Grace Jeng and only Grace Jeng at the Las Vegas airport[10] while Ms. Lundvall falsely states Mr. Shoemaker said he picked up Mr. Hyatt at the Las Vegas airport.[11]

---

[10] Affidavit of Walter Shoemaker, December 8, 2009, ¶ 9, Annex XI, Ex. 22.
[11] Affidavit of Pat Lundvall, ¶ 4, August 28, 2009, Exhibit 1 to Affidavit of Walter Shoemaker, December 8, 2009, Annex XI, Ex. 22.

RJN1237

### D.  FTB Acted In Bad Faith By Intentionally Filing Documents That A New York Court Had Prohibited From Disclosure

FTB's lack of diligence and disregard for Mr. Hyatt's rights are also demonstrated by its repeated attempts to sneak prohibited materials into its filings. It has attempted to defend such action by intentionally misstating the scope of the New York court orders to your Board by first contending that the court's order does not apply to the Philips documents already filed. FTB's contention was frivolous, and it abandoned the position.

In its fourth DVD containing its latest submission, because FTB has described and made arguments from documents that were prohibited from disclosure by the New York court orders and FTB has not removed or asked your Board to remove the unlawful disclosure, FTB has intentionally implicated your Board in its violation of the New York court orders. FTB's redactions and deletions are admissions that those FTB documents and arguments contain prohibited material.[12]  Thus, after four successive filings of DVDs and five attempts to argue prohibited materials, FTB's submission before your Board still contains materials that was prohibited from disclosure by the New York court orders.

### E.  FTB Improperly Used An Overbroad Subpoena

FTB issuance of overbroad subpoenas to Philips and to two in-house Philips attorneys evidences bad faith. Mr. Hyatt was forced to litigate in New York court over the scope of the FTB's overbroad subpoenas, incurring unnecessary legal fees and delays in these proceedings. The New York court agreed with Mr. Hyatt that the subpoenas were overbroad and issued an order restricting the scope of FTB's subpoenas. *See Hyatt v State of Cal. Franchise Tax Bd.*, 105 A.D.3d 186, 962 N.Y.S.2d 282, 2013 N.Y. App. Div. LEXIS 1509 (N.Y. App. Div. 2d Dep't 2013) (affirming lower court's restrictions on the scope of FTB's subpoenas).

### F.  FTB Ignored Your Board's Orders Regarding Briefing Procedures

As set forth in Appellant's Motion to Strike, FTB in bad faith has not adhered to your Board staffs orders and directions regarding the filing of briefs in Mr. Hyatt's two appeals. See Appellant's Motion to Strike, originally filed on September 11, 2014 and refiled concurrently with Appellant's ASABs, ("Motion to Strike").

---

[12] See March 17, 2015, Letter from Robert Dunn to Grant Thompson, p. 2.

First, FTB improperly combined its briefing for both appeal years in violation of the directions set forth in your Board's letter dated June 13, 2014, which directed the parties to file additional briefs "one for each appeal," and to file a brief "for each appeal." See Motion to Strike, pp. 2-8.

Second, FTB's 1991 RSAB and 1992 RSAB ignored the 60-page limit for each brief, which your Board's staff set in a letter dated June 13, 2014. FTB circumvented this page limit by including additional arguments in addition to its two RSABs in tables and attachments. These additional documents contain substantial additional arguments and therefore constitute briefing. RTA 5511(g) (defining a "brief" as "a written document that contains an argument supporting a parties [sic] position . . . ."). See Motion to Strike, pp. 9-16. Therefore, FTB's Attachment A, Attachment E and Attachment F constitute improper briefing filed by FTB. In addition, FTB bypassed the page limit on briefing by adding mini-arguments on the face of numerous Philips documents. FTB in bad faith has completely circumvented the page limits set by your Board's staff and thereby imposed an enormous burden on Mr. Hyatt to respond to all of FTB's briefing arguments.

Third, FTB has improperly used its RSAB filing to re-brief its entire case in violation of your Board's rules for tax appeals. See Motion to Strike, pp. 16-22. These appeals were filed in January 2008. FTB filed its Opening Briefs on September 15, 2009, and its Reply Briefs on June 30, 2011. At that point, briefing should have been completed. However, at what should have been the end of briefing, FTB issued the Philips subpoena, 14 years after the end of the audit and 3 years after these appeals were filed. FTB could have requested these documents at any time. It has never explained why it waited so long to subpoena the documents. Then, based on the newly acquired Philips documents, FTB re-briefed its entire case. Thus, FTB's actions contributed to the substantial delays and resulted in new rounds of briefing. FTB's actions have also greatly prejudiced Mr. Hyatt because FTB's long delays have resulted in lost evidence that would have been available had FTB acted more promptly.

FTB's filing also prejudices Mr. Hyatt's Due Process rights. FTB's RSABs are based, in part, on documents that it could have requested at the time of the audit, 20 years ago, but delayed for almost two decades before doing so. In addition, Mr. Hyatt's Due Process rights are prejudiced because FTB for the first time produces and relies on non-Philips documents that it has had in its possession for years but did not produce or rely on until these RSABs – one

example is an unsigned and undated interview memo prepared by one of FTB's investigators, Ms. Boggs, in 2009. Ms. Boggs is now deceased and can no longer explain her unsigned and undated interview memo. Mr. Hyatt's Due Process rights are also prejudiced because he must respond to new FTB arguments made almost 25 years after the years at issue when many witnesses and much evidence is no longer be available. Had these FTB documents and arguments been presented in a timely manner, the rebuttal evidence could have been preserved. FTB's tactics severely prejudice Mr. Hyatt's Due Process rights and his rights under your Board's Rules for Tax Appeals. Allowing the filing of FTB's RSABs will make your Board complicit in FTB's continued fraud, intentional infliction of emotional distress, and violation of due process rights.

FTB's misconduct in its briefing also prejudices Mr. Hyatt because he has been forced to expend enormous resources to prepare a full response to FTB's RSABs and related documents. Because FTB essentially re-briefed its entire case and put into the record thousands of new documents, Mr. Hyatt has been forced to respond in kind, long after he had already expended enormous resources to file the regular briefs in his appeals.

For these additional reasons, FTB's misconduct has prejudiced Mr. Hyatt and evidences bad faith by FTB in these proceedings.

* * *

FTB cannot be trusted because it has engaged in serious misconduct against Mr. Hyatt, including fraud, intentional infliction of emotional distress, bad faith, witness intimidation, offering false testimony, and misstating the evidence.

RJN1240

**V.**    **Conclusion**

      FTB has engaged in extreme misconduct directed at Mr. Hyatt. A Nevada jury found FTB liable to Mr. Hyatt for fraud, intentional infliction of emotional distress and bad faith. In addition, as set forth above, FTB has continued to engaged in misconduct by misrepresenting the evidence and creating false evidence. There is no basis for the tax assessments when the government has engaged in such outrageous misconduct. Given all of these improper acts, FTB should have withdrawn its assessments. At a minimum, FTB's extreme misconduct destroys FTB's credibility. FTB's misconduct also invalidates the assessments because they are not based on a determination of the correct tax; rather, they are arbitrary assessments aimed at extorting money from Mr. Hyatt. Accordingly, your Board is empowered to and should reverse FTB's assessments.

RJN1241

## ATTACHMENT 3

## APPELLANT'S SECOND ADDITIONAL BRIEFS

## FTB CONTINUES ITS BAD FAITH ATTACKS ON MR. HYATT QUESTIONING THE TRUE AND CORRECT STATEMENTS IN HIS AFFIDAVITS.

## TABLE OF CONTENTS

1. INTRODUCTION.................................................................................................3

2. MR. HYATT WAS NOT PRESENT AT HIS FORMER LA PALMA HOUSE BETWEEN OCTOBER 1, 1991, WHEN HE SOLD THE HOUSE, AND LATE 1992 AS FALSELY CONTENDED BY FTB..................................................................................3

3. MR. HYATT DID NOT SEND FAXES FROM HIS FORMER LA PALMA HOUSE AFTER OCTOBER 1, 1991, AS FALSELY CONTENDED BY FTB................................5

4. MR. HYATT DID NOT ATTEND THE MEETINGS AT MR. ROTH'S OFFICE ON SEPTEMBER 24, 1991, AS FALSELY CONTENDED BY FTB........................................5

5. MR. HYATT RETURNED FROM THE EAST COAST TO LAS VEGAS ON OCTOBER 21, 1991, NOT OCTOBER 23, 1991, AS FALSELY CONTENDED BY FTB..................7

6. MR. HYATT DID NOT REMAIN IN NEW YORK ON OCTOBER 22-23, 1991, AS FALSELY CONTENDED BY FTB. ..................................................................................8

7. MR. HYATT DID NOT NEGOTIATE WITH HITACHI OR ANY PATENT AGREEMENTS DURING THE PERIOD JULY 15, 1991 (THE DATE OF THE JULY 1991 PHILIPS AGREEMENT) THROUGH THE END OF 1992.........................................8

8. MR. HYATT RESIDED IN THE CONTINENTAL HOTEL FROM SEPTEMBER 26, 1991, AND THEN RESIDED IN THE WAGON TRAILS APARTMENTS FROM OCTOBER 21, 1991. ..............................................................................................9

9. MR. HYATT DID NOT HAVE AN EXPECTATION THAT POTENTIAL LICENSEES WOULD SIGN LICENSE AGREEMENTS. ..................................................................11

10. MR. HYATT HAD NO DISCRETION OVER DISTRIBUTION OF THE LICENSE PAYMENTS FROM FUJITSU, MATSUSHITA AND OKI..............................................12

11. MR. HYATT WAS IN LAS VEGAS ON NOVEMBER 7, 1991, WHEN HE WROTE THE DRAFTS TO DISTRIBUTE THE FUJITSU LICENSE PAYMENT TO PHILIPS AND MAHR LEONARD. ..................................................................................................13

12. MR. HYATT DID NOT SEND A "MARKUP" DRAFT LETTER TO PHILIPS ON NOVEMBER 22, 1991. ..................................................................................................14

13. PHILIPS DRAFTED AND APPROVED THE FEBRUARY 3, 1992, LETTER TO TOSHIBA..................................................................................................................15

14. ON FEBRUARY 27, 1992, MR. HYATT WAS IN LAS VEGAS, NOT IN CALIFORNIA AS ALLEGED BY FTB. ..................................................................................................16

RJN1242

15.   MR. HYATT DROVE FROM LAS VEGAS TO CALIFORNIA ON MARCH 30, 1992,
        AND RETURNED TO LAS VEGAS ON MARCH 31, 1992, CONTRARY TO WHAT IS
        ALLEGED BY FTB..................................................................................................17

RJN1243

1. **Introduction.**

Each of Mr. Hyatt's affidavit statements is true and correct. In its 1991 RSAB, FTB cites 15 examples from its Attachment E where FTB alleges that Mr. Hyatt's sworn testimony was not accurate. However, in each instance Mr. Hyatt's eyewitness and documentary evidence (1992 ASAB, Section 1.5) establishes that FTB's claim is false and that FTB has misrepresented the evidence. Mr. Hyatt is an eyewitness testifying under oath. FTB has only inferences and speculation, but not a single credible witness. These attacks on Mr. Hyatt are continued bad faith acts by FTB (1991 ASAB, Sections 1.8.1, 1.8.4.3 to 1.8.4.4; 1992 ASAB, Sections 1.4.1.1, 1.5.6.3). FTB's $24 million error is a specific example (1991 ASAB, Sections 1.7.2, 1.9.10). FTB attacks eyewitnesses in bad faith (1991 ASAB, Section 1.8.6). Each of FTB's claims that Mr. Hyatt provided false testimony is wrong. In all instances Mr. Hyatt's testimony was true and correct.

2. **Mr. Hyatt Was Not Present At His Former La Palma House Between October 1, 1991, When He Sold The House, And Late 1992 As Falsely Contended By FTB.**

Mr. Hyatt truthfully testified that he sold the Jennifer Circle house on October 1, 1991, and he did not return to the house until late 1992.[1] Mr. Hyatt provided overwhelming evidence to corroborate this statement and his move to Las Vegas: 72 witnesses testified about Mr. Hyatt moving away in 1991; 28 witnesses testified about Mr. Hyatt moving away in September 1991; 22 Jennifer Circle neighbors testified about Mr. Hyatt moving away in 1991; 16 witnesses testified about the sale of Mr. Hyatt's California house in October 1991; 15 witnesses testified that an Asian woman (or Ms. Jeng) moved into the Jennifer Circle house after Mr. Hyatt moved away in 1991; 16 witnesses testified that an Asian woman (or Ms. Jeng) lived alone at the Jennifer Circle house; and 23 witnesses testified that they did not ever again see Mr. Hyatt at Jennifer Circle after he moved away in 1991.[2]

In addition, Mr. Hyatt's move to Las Vegas, sale of his Jennifer Circle house, and presence in Las Vegas is supported by overwhelming documentary evidence.[3]

In contrast, FTB's attempt to prove that Mr. Hyatt's testimony is not true is amazingly lacking in substance. FTB's 1991 RSAB at pp. 15:18-16:16 does not cite to a single piece of evidence in support of this claim; instead,

---

[1] Affidavit of Gilbert P. Hyatt, August 15, 2010, p. 120.
[2] Updated Testimonial Topics, Exs. T007, T006, T102, T124, T120, T121, and T127, respectively.
[3] Hyatt's 2012 CDE Aff., ¶¶ 7-11, 13-25; Hyatt's 2016 Supp. CDE Aff., ¶¶ 7-48; and Exhibits CDE-ST002, CDE-ST003 attached to Hyatt's 2016 Supp. CDE Aff.

RJN1244

FTB alleges that Mr. Hyatt was present at the Jennifer Circle house "working on all aspects of his licensing program" on a list of dates. Then, in a footnote, FTB simply directs your Board to its calendar and the documents linked in its calendar.[4] Without any explanation, FTB is telling your Board to look at thousands of documents linked in its calendar. Because FTB cannot be bothered to support its conclusory allegations with citations to specific evidence and explanations of how such evidence supports its position, your Board should reject the allegation out of hand. It is not your Board's job to sift through volumes of documents to seek evidence supporting the FTB allegations.[5]

In addition, FTB's list of alleged days at the Jennifer Circle house includes February 11, 12, 1992, but even FTB has acknowledged that Mr. Hyatt was not at the house on February 12, 1992, because he was in the Los Alamitos hospital recovering from cancer surgery on that day. Finally, we note that a complete analysis of Mr. Hyatt's day count is set forth in his Rebuttal to FTB Att. A/F, which also contains a comprehensive response to FTB's calendar, Attachment A-R, Attachment F, and the documents linked therein. Mr. Hyatt testifies that he was not at his former La Palma house between October 1, 1991, and the end of 1992[6] and FTB offers no credible evidence to the contrary.

The overwhelming evidence completely supports Mr. Hyatt's statement that he moved to Las Vegas and did not return to the Jennifer Circle house until late 1992.

FTB's inferences and speculation are insufficient to question *Mr. Hyatt's eyewitness testimony under oath.*

---

[4] 1991 RSAB, p. 16 fn. 20.

[5] *Mansell v. Board of Administration*, 30 Cal. App. 4th 539, 545 (1994) ("We are not required to search the record to ascertain whether it contains support for [a party's] contentions."); *Fitch v. Comm'r*, T.C. Memo 2012-358, P25 (T.C. 2012) (The Court will not sift through the voluminous documents petitioners provided to attempt to match the evidence to respondent's adjustments."); *Hale v. Comm'r*, T.C. Memo 2010-229 (T.C. 2010) ("We need not (and shall not) undertake the task of sorting through the voluminous evidence petitioner has provided in an attempt to see what is, and what is not, adequate substantiation of the items on petitioner's returns."). Even your Board has refused to sift through evidence when a taxpayer attempted to do what FTB has done here. *Appeal of Lasher*, St. Bd. of Equaliz. 2005 Cal. Tax. Lexis 22 (Case No. 260933) (Jan. 25. 2005) (not to be cited as precedent) ("This Board's statutory duty to review respondent's determination does not compel us to audit a taxpayer's books and records, something which would be an unwise use of administrative resources. Respondent's auditor and protest officer have already scrutinized appellant's records and found them lacking. The burden of proof requires appellant to do more than provide us with a pile of documents and allege that respondent's auditor got it wrong; on appeal, appellant must present specific documents that are different from those given to respondent, or else point to specific examples of evidence that respondent misinterpreted."); *see also Fox v. Erickson*, 99 C.A.2d 740, 742 (1950) ("Appellate courts will not act as counsel for either party to an appeal and will not assume the task of initiating and prosecuting a search of the record for the purpose of discovering errors not pointed out in the briefs.").

[6] Hyatt's 2016 Supp. CDE Aff., ¶¶ 4-12.

RJN1245

3. **Mr. Hyatt Did Not Send Faxes From His Former La Palma House After October 1, 1991, As Falsely Contended By FTB.**

Contrary to FTB contentions,[7] Mr. Hyatt did not send any faxes from his former La Palma house after October 1, 1991, when he sold his former house and moved his only fax machine to Las Vegas. He testified "As of October 1, 1991, my only fax machine was located in Las Vegas" and that he faxed various documents from his apartment in Las Vegas, 1991 ASAB, Sections 1.8.4.2, 1.8.4.3, 1.8.4.5, 1.8.4.6 and Mr. Hyatt's 2016 Supp. Aff., ¶¶ 101-115. It has been established by overwhelming eyewitness and documentary evidence that Mr. Hyatt moved his fax machine, computer and active files to Las Vegas (1991 ASAB, Section 1.8.4.5).[8] FTB offers no evidence that Mr. Hyatt sent any faxes from his former La Palma house after October 1, 1991.

The evidence establishes that Mr. Hyatt sent faxes from Las Vegas where his fax machine was located, not from the Jennifer Circle house, and FTB has not produced evidence to show that was not the case.

FTB's inferences and speculation are insufficient to question Mr. Hyatt's eyewitness testimony under oath.

4. **Mr. Hyatt Did Not Attend The Meetings At Mr. Roth's Office On September 24, 1991, As Falsely Contended By FTB.**

On September 24, 1991, Mr. Hyatt met for an early breakfast with Mr. McHenry and Mr. Rudestam, then later in the day he signed the September 1991 Mahr Leonard Agreement, and he traveled to Las Vegas. Mr. Hyatt was not at a meeting with Messrs. McHenry, Rudestam, Mahr, Leonard, Tamoshunas and Haken at Mr. Roth's office. Nevertheless, FTB falsely contends that documents obtained from Philips show not only that Mr. Hyatt attended the meetings but Mr. Hyatt and Mr. Roth hosted the meeting.[9] FTB cites to a McHenry & Associates invoice which includes a statement that Mr. McHenry and Mr. Rudestam met with Mr. Hyatt, Mr. Roth, Mr. Haken and Mr. Tamoshunas. From this statement, FTB fabricates a false story that Mr. Hyatt hosted a meeting.

Mr. McHenry provided undisputed testimony that FTB is misconstruing his invoice. Mr. McHenry stated that he included Mr. Hyatt's name on the invoice to Philips because the invoice was summary in nature and he had met Mr. Hyatt for breakfast on the way to the meeting at Mr. Roth's office, a meeting Mr. Hyatt did not attend.[10] Mr. Hyatt confirms Mr. McHenry's testimony that he had breakfast with Mr. McHenry and Mr. Rudestam, but did

---

[7] 1991 RSAB, pp. 16:17-17:14.
[8] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.
[9] 1991 RSAB, pp. 17:15-16:15.
[10] Declaration of Charles McHenry, October 13, 2014, ¶ 6.

RJN1246

not attend a meeting at Mr. Roth's office.[11]  Mr. Roth also testified that Mr. Hyatt did not attend the meeting in his

office with Mr. McHenry and Mr. Rudestam.[12]

Following the meeting with Mr. McHenry and Mr. Rudestam, Mr. Mahr and Mr. Leonard arrived at Mr.

Roth's office for a second meeting.[13]  Mr. Roth and Mr. Hyatt testified that Mr. Hyatt was not present at this second

meeting.[14]  FTB's claim that Mr. Hyatt attended this second meeting is again refuted by the undisputed testimony of

Mr. Roth, who attended both meetings, and Mr. Hyatt, who did not attend either meeting.

Finally, FTB blatantly mischaracterizes a letter from Fujitsu to Mr. Mahr.[15]  FTB falsely states that Fujitsu

faxed a "commitment to make a $15 million payment to Mr. Hyatt by October 31, 1991."[16]  However, the Fujitsu

letter lists many issues that are still in dispute and states that Fujitsu cannot make a payment by the end of October

unless the terms and conditions are finalized by the first week in October.  The Fujitsu letter does not make a

commitment to pay $15 million.

The fax cover sheet states "please transfer this letter to Mr. Mahr in Los Angeles,"[17] but FTB falsely states

the fax was sent "knowing Mahr and Leonard are meeting with Hyatt and Philips."  That is another of thousands of

FTB fabrications and false statements.[18]  FTB has presented no evidence to indicate the sender at Fujitsu knew who

Mr. Mahr was meeting with when he sent the fax.  The letter says nothing about Mr. Hyatt attending a meeting.

This FTB statement that Fujitsu knew Mr. Hyatt attended the meeting is another blatant FTB fabrication.  Mr. Hyatt

did not attend the meetings as FTB claims and FTB has produced no evidence that shows otherwise.

FTB's inferences and speculation are insufficient to question Mr. Hyatt's eyewitness testimony which is

corroborated by the testimony of Mr. McHenry and Mr. Roth.

---

[11] Hyatt's 2016 Supp. Aff., ¶¶ 116-120.
[12] Supplemental Affidavit of Gregory L. Roth, June 13, 2016, ¶¶ 20-23.
[13] Supplemental Affidavit of Gregory L. Roth, June 13, 2016, ¶ 21.
[14] Hyatt's 2016 Supp. Aff., ¶ 116; and Supplemental Affidavit of Gregory L. Roth, June 13, 2016, ¶¶ 20-23.
[15] FTB_Philips 0002386-0002403.
[16] 1991 RSAB, p. 18:9-10.
[17] FTB_Philips 0002386.
[18] Rebuttal to FTB Att. A/F, day by day analysis.

RJN1247

5.  **Mr. Hyatt Returned From The East Coast To Las Vegas On October 21, 1991, Not October 23, 1991, As Falsely Contended By FTB.**

Mr. Hyatt left Las Vegas on October 14, for a trip to the East Coast and returned on October 21, 1991. His original plan was to attend a Philips meeting relating to the *Hyatt v Boone* interference on October 22, 1991, and return to Las Vegas on October 23, 1991. However, Mr. Hyatt met with Mr. Tamoshunas on October 19-20, 1991, and, having done so, returned to Las Vegas on October 21, 1991.[19]

Mr. Hyatt's testimony that he returned to Las Vegas on October 21, 1991, is corroborated by eyewitness testimony and incontrovertible documentation. First, Mr. Hyatt's presence in Las Vegas on October 21, 1991, is confirmed by the express testimony of Clara Kopp, the Wagon Trails leasing agent, and other employees of Wagon Trails. It was a Wagon Trails policy that all new tenants had to sign a Security Acknowledgement and Release in person in the presence of a Wagon Trails' employee and that the employee had to counter-sign the Security Acknowledgement and Release.[20] Mr. Hyatt's Security Acknowledgement and Release is signed, witnessed, and dated October 21, 1991.[21] Mr. Hyatt and Ms. Kopp have each testified that he signed the document on October 21, 1991, at the Wagon Trails Apartments.[22] Thus, this document and the testimony of Mr. Hyatt and Ms. Kopp confirm Mr. Hyatt's presence in Las Vegas on October 21, 1991.[23] Mr. Hyatt's presence in Las Vegas on October 21, 1991, is further confirmed by the testimony of his relatives, Dr. Gorman, Yetta Farber and Hyman Farber,[24]

Second, on October 21, 1991, while present in Las Vegas, Mr. Hyatt obtained a Las Vegas P.O. Box (P.O. Box 60028),[25] and he submitted changes of address forms requesting that mail sent to his former La Palma house and his Cypress P.O. Box be forwarded to his new Las Vegas P.O. Box (1992 ASAB, Sections 1.5.6.3, 1.5.7).[26] A Post Office Box can only be rented by an individual who presents two forms of identification, http://about.usps.com/forms/ps1093.pdf.

---

[19] Hyatt's 2016 Supp. Aff., ¶ 122; Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.
[20] Declaration of Bonnie Dimbat, March 19, 2012, ¶ 10; Declaration of Penny Tourangeau, March 5, 2012, ¶ 8; Declaration of Gina Morelli, March 19, 2012, ¶ 8; and Declaration of Lisa Recina, April 19, 2012, ¶ 5.
[21] Wagon Trails Apartment Security Acknowledgement and Release (P05623).
[22] Hyatt's 2012 CDE Aff., ¶ 15; Declaration of Clara Kopp, March 9, 2012, ¶ 12.
[23] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.
[24] *Id.*
[25] U.S. Postal Service receipt for P.O. Box 60028 (H 013610).
[26] U.S. Postal Service change of address forms (H 013608-013609).

RJN1248

Third, a Tarrytown Hilton invoice shows that Mr. Hyatt was checked out on October 22, 1991, and incurred no incidental charges for that date.[27] If Mr. Hyatt had remained in New York until October 23, 1991, as FTB falsely contends, he would have had no place to sleep the night of October 22, 1991. Mr. Hyatt has explained that he was charged by the Tarrytown Hilton through October 22, 1991, even though he checked out on October 21, 1991, because of the Hilton notice requirements.[28]

FTB ignores the above evidence and claims that Mr. Hyatt attended a Philips meeting on October 22, 1991, and returned to Las Vegas on October 23, as he had originally planned.[29] FTB points to two unauthenticated documents created by third parties and neither document required that Mr. Hyatt be present to create them. None of the documents required that Mr. Hyatt sign the document, that the document be countersigned, or that Mr. Hyatt present identification to complete the transaction. Mr. Hyatt did not even have a New York hotel room on the night of October 22, 1991. These two unauthenticated documents cannot overcome the eyewitness testimony and witnessed signature showing that Mr. Hyatt absolutely returned to Las Vegas on October 21, 1991.[30]

FTB's inferences and speculation are insufficient to question the eyewitness testimony of Mr. Hyatt as corroborated by Mr. Hyatt's relatives, Ms. Kopp and other witnesses from Wagon Trails Apartments.[31]

**6.** **Mr. Hyatt Did Not Remain In New York On October 22-23, 1991, As Falsely Contended By FTB.**

As discussed above, Mr. Hyatt returned to Las Vegas on October 21, 1991, and this fact is confirmed by highly credible documents and testimony. FTB essentially repeats its contentions that are shown to be incorrect in the preceding Section 5,[32] Mr. Hyatt returned to Las Vegas from New York on October 21, 1991.

**7.** **Mr. Hyatt Did Not Negotiate With Hitachi Or Any Patent Agreements During The Period July 15, 1991 (The Date Of The July 1991 Philips Agreement) Through The End Of 1992.**

Mr. Hyatt did not negotiate any license agreements with Hitachi or with any other prospective licensees.[33] Philips had the *exclusive* licensing authority to license Mr. Hyatt's licensable patents (1991 ASAB, Section 1.7.5).[34]

---

[27] Tarrytown Hilton invoice (EC 01447).
[28] Hyatt's 2016 Supp. Aff., ¶ 127.
[29] 1991 RSAB, pp. 18:15-19:8.
[30] Rebuttal to FTB Att. A/F., Section I. A., October 21, 1991.
[31] *Id.*
[32] 1991 RSAB, pp. 19:9-20:11.
[33] Rebuttal to FTB Att. A/F., Section I. C., November 30, 1991.
[34] See the letter to Omron dated August 4, 1992, HL 02021, FTB_Philips 0003335 – 0003336; the letter to Toshiba dated February 3, 1992, FTB_Philips 0002663, 0002782; the letter to Asahi, HL 00307; the letter to Seiko,

RJN1249

Mr. Hyatt was not authorized to negotiate with prospective licensees and he would have breached the July 1991 Philips Agreement if he had done so.[35] See 1991 ASAB, Sections 1.7.6, 1.8.4.7, 1.8.5.4.3; 1992 ASAB, sections 1.4.1.3, 1.7.1.2, 1.7.3, 1.7.1.3, 1.7.2.

Mr. Hyatt testified that he did not negotiate any patent agreements from July 1991 when he signed the July 1991 Philips Agreement through the end of 1992.[36] Mr. Hyatt's testimony is corroborated by undisputed testimony. Algy Tamoshunas, the lead Philips licensing attorney, expressly testified that "[t]o the best of my knowledge, Mr. Hyatt did not negotiate the Eleven 1991-1992 Patent Agreements. Philips formed a team of licensing professionals to license the 'licensable patents.'"[37] Mr. Leonard of Mahr Leonard and Mr. Roth also confirmed that Mr. Hyatt did not engage in any license negotiations.[38]

FTB contends that Mr. Hyatt must have negotiated license agreements with Hitachi because he met with them. FTB's claim is mere speculation because there is no basis to conclude Mr. Hyatt negotiated with Hitachi simply because he met them.[39] Mr. Hyatt was contractually prohibited from negotiating with prospective licensees (1991 ASAB, Section 1.7.6).

FTB's seven examples do not support its claim.[40] FTB does not explain how these seven examples provide any evidence that Mr. Hyatt negotiated with a potential licensee.

Mr. Hyatt did not negotiate any licenses during the period from July 15, 1991 through the end of 1992, and FTB has not provided any evidence to support its claim to the contrary. FTB's inferences and speculation are insufficient to question Mr. Hyatt's eyewitness testimony.

**8.   Mr. Hyatt Resided In The Continental Hotel From September 26, 1991, And Then Resided In The Wagon Trails Apartments From October 21, 1991.**

FTB disputes Mr. Hyatt's statement that he lived at the Las Vegas Continental Hotel from September 26, 1991, until he began a trip back East on October 14, 1991, and he lived in the Las Vegas Wagon Trails Apartments

---

HL 00308; Sections 4.1 and 6.1 of the July 1991 Philips Agreement, H 01378, H 01388-01389; and the 2010 Tamoshunas Affidavit, ¶ 5; the 2010 Roth Sourcing Affidavit, §§ 4.2.1.8, 5.1.4.

[35] July 1991 Philips Agreement, FTB_Philips 0000595-0000635.
[36] Hyatt's 2016 Supp. Aff., ¶¶ 164, 169, 185; Affidavit of Gilbert P. Hyatt, August 15, 2010, page 67.
[37] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 13.
[38] Affidavit of David Leonard, May 2, 2012, ¶ 25; Affidavit of Gregory L. Roth, August 9, 2010, § 5.4.8.
[39] 1991 RSAB, pp. 20:11-21:24.
[40] 1991 RSAB, p. 22:1-21.

RJN1250

beginning October 21, 1991, until he moved into his Las Vegas house on April 3, 1992.[41] Amazingly, FTB does not even bother to cite evidence to support this claim. FTB falsely contends Mr. Hyatt was present at his former La Palma house every day from September 24, 1991 (two days before Mr. Hyatt moved to Las Vegas) through October 14, 1991, and from October 23, 1991, through April 1, 1992. FTB simply makes a general reference to its Calendar to support its contention. For its sourcing argument FTB contends that Mr. Hyatt was a resident of Nevada on these dates. Mr. Hyatt has rebutted each date in the FTB Calendar.[42] Mr. Hyatt has also provided overwhelming eyewitness testimony and documentary evidence to support his facts of Nevada presence, domicile, and residency.[43]

Mr. Hyatt correctly testified that he stayed at the Continental Hotel when he first moved to Nevada.[44] From September 26, 1991, through October 14, 1991. Mr. Hyatt's stay at the Continental Hotel is confirmed by dozens of witnesses: 37 witnesses testified about Mr. Hyatt's stay at a Las Vegas hotel in 1991 and 20 witnesses testified about telephoning Mr. Hyatt at a Las Vegas hotel in September or October 1991.[45]

Between October 21, 1991, and April 3, 1992, Mr. Hyatt lived at his Las Vegas apartment.[46] This fact is confirmed by dozens of witnesses and clear documentation: 15 witnesses testified about visiting Mr. Hyatt at his Las Vegas apartment; 2 witnesses testified about staying overnight at Mr. Hyatt's Las Vegas apartment; 39 witnesses testified about telephoning Mr. Hyatt at his Las Vegas apartment; 27 witnesses testified about Mr. Hyatt giving them the telephone number of his Las Vegas apartment in October 1991; 27 witnesses testified about telephoning Mr. Hyatt at his Las Vegas apartment or receiving telephone calls from Mr. Hyatt from his Vegas apartment in October 1991; 28 witnesses testified about being informed in October 1991 that Mr. Hyatt had moved into his Las Vegas apartment; and 4 witnesses testified about Mr. Hyatt calling them on October 21, 1991, from Las Vegas and providing them with his Las Vegas telephone number.[47] Many former employees of Wagon Trails Apartments have testified to the requirement that Mr. Hyatt personally leased his apartment.[48]

---

[41] 1991 RSAB, pp. 22:22–23:10.
[42] Rebuttal to FTB Att. A/F, Section IV., day by day.
[43] Hyatt's 2012 CDE Aff.; Hyatt's 2016 Supp. CDE Aff.; 1992 SAB, Section 1.2.
[44] Affidavit of Gilbert P. Hyatt, August 15, 2010, p. 121.
[45] Updated Testimonial Topics, Exs. T008, T009, respectively.
[46] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991, through April 3, 1992.
[47] Updated Testimonial Topics, Exs. T018, T021, T019, T096, T095, T128, T129, respectively.
[48] Rebuttal to FTB Att. A/F, Section I. A., October 8, 21, 1991.

RJN1251

Mr. Hyatt's lease of his Las Vegas apartment is also well documented by his lease agreement,[49] the Wagon Trails Apartment Security Acknowledgement and Release,[50] his cancelled checks for rent payments,[51] his notice of intent to let his lease expire,[52] and his cancelled checks for telephone and electric services at his Las Vegas apartment.[53]

FTB's inferences and speculation are insufficient to question Mr. Hyatt's eyewitness testimony.

**9.   Mr. Hyatt Did Not Have An Expectation That Potential Licensees Would Sign License Agreements.**

Mr. Hyatt correctly testified that signing of license agreements was not expected to happen so quickly during the disputed period.[54] FTB disputes this evidence.[55]

FTB falsely states that Matsushita and Fujitsu "had tendered 'Current Offers" based on an unauthenticated document[56] of unknown authorship with a hand written date of "9/25/91".[57] There is no evidence that Mr. Hyatt ever saw this document and FTB is wrong. There were no offers; significant issues were being contested by all licensees. All Japanese companies were still negotiating with Mahr Leonard. For example, a letter dated September 24, 1991, from Fujitsu to Mr. Mahr, lists many issues that were still being negotiated by Fujitsu.[58] The first license agreement with a Japanese company was the Fujitsu agreement signed on October 23, 1991,[59] nearly a month after Mr. Hyatt moved to Las Vegas. Oki signed a Patent Agreement on October 31, 1991.[60] Matsushita did not sign a Patent Agreement until November 14, 1991.[61] Sharp did not sign a Patent Agreement until November 15, 1991.[62] Mr. Tamoshunas stated, "In July 1991, Philips thought that it could be years before the patents would be licensed and might involve litigation before the patents would be licensed, if ever. The July 1991 Philips Agreement gave Philips control of such litigation, Philips committed up to $ 5 million for such litigation, and Philips committed to

---

[49] Wagon Trails Apartments Rental Agreement (H 01249-01252).
[50] Wagon Trails Apartment Security Acknowledgement and Release (P05623).
[51] Hyatt's 2012 CDE Aff., ¶ 22 and Exhibit CDE-G12 therein.
[52] EC 01482.
[53] Hyatt's 2012 CDE Aff., ¶ 22 and Exhibits CDE-G13 and CDE-G14 therein.
[54] Affidavit of Gilbert P. Hyatt, August 15, 2010, pp. 70, 170; Affidavit of Gilbert P. Hyatt, December 5, 2008, ¶ 49; Affidavit of Gilbert P. Hyatt, May 18, 2001, ¶ 9; Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 15.
[55] 1991 RSAB, pp. 23:11-24:1.
[56] FTB_Philips 0005471.
[57] 1991 RSAB, pp. 23:23-24:1.
[58] FTB_Philips 0002387-0002403.
[59] H 017209-017222.
[60] H 018732-018745.
[61] H 017236.
[62] H 018774.

RJN1252

give Mr. Hyatt up to ten years of payments if and until licensing income was received. The Licensing Program unexpectedly took off in October 1991 when prospective licensees started signing patent agreements. The first licensees received unexpectedly rapid Japanese government approval and unexpectedly rapid company management approval."[63] The testimony of Mr. Roth and Mr. Hyatt confirms that the licenses were unexpected.[64]

With no evidentiary basis whatsoever, FTB speculates that the unauthenticated document of unknown authorship with a hand written date of "9/25/91",[65] that was "likely taken back to New York by Philips" was from the meeting with Mahr Leonard in Mr. Roth's office on September 24, 1991.[66] FTB does not allege Mr. Hyatt saw the document and does not explain the logic behind the FTB speculation that a document dated "9/25/91" was presented at a meeting on September 24, 1991. In any event Mr. Hyatt did not attend the September 24, 1991, meeting and had no prior knowledge that the Japanese companies would sign license agreements.[67] Mr. Hyatt correctly stated that the signing of the license agreements was not imminent.

FTB's inferences and speculation are insufficient to question Mr. Hyatt's eyewitness testimony.

**10. Mr. Hyatt Had No Discretion Over Distribution Of The License Payments From Fujitsu, Matsushita And Oki.**

Mr. Hyatt correctly stated that he did not control the Philips Licensing Program distributions of license payments. At the request of Philips, Mr. Hyatt distributed the license payments from three companies in accordance with the July 1991 Philips Agreement and the September 1991 Mahr Leonard Agreement. Mr. Hyatt stated that he had no "discretion" over these distributions.[68]

Despite this evidence, FTB mischaracterizes Mr. Hyatt's statement and alleges Mr. Hyatt "controlled" the distribution of these license payments to Philips and Mahr Leonard.[69] However, the distribution amounts were fixed

---

[63] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 15 (internal footnotes omitted).
[64] Affidavit of Gregory L. Roth, August 9, 2010, § 4.2.5.5; Affidavit of Gilbert P. Hyatt, August 9, 2010, § 4.2.5.5.
[65] FTB_Philips 0005471.
[66] 1991 RSAB, p. 23:21-22.
[67] See Section 4, above; Rebuttal to FTB Att. A/F, Section I. D., September 24, 1991; and Hyatt's 2016 Supp. Aff., ¶¶ 56-58.
[68] Affidavit of Gilbert P. Hyatt, August 15, 2010, page 89; see also Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 13; Affidavit of Gregory L. Roth, December 4, 2008, ¶ 15; [First] Supplemental Agreement, Section 2 (H 019047-019054).
[69] 1991 RSAB, p. 24:2-9.

RJN1253

by the July 1991 Philips Agreement and the September 1991 Mahr Leonard Agreement. The final [First] Supplemental Agreement required Mr. Hyatt to promptly make the distributions, which he did.

FTB relies on a fax letter dated November 4, 1991, in which Mr. Tamoshunas asks Mr. Galama to approve the [First] Supplemental Agreement so Mr. Hyatt will remit the Philips license payment from Fujitsu.[70] However, Mr. Hyatt needed Philips written authorizations to make the distribution. However, Mr. Hyatt did not have any control over the Philips Licensing Program, including the distribution of Philips license payments. Philips had promised to indemnify Mr. Hyatt and this indemnification was recited in the [First] Supplemental Agreement. In any event Mr. Hyatt "promptly" distributed the license payment to Philips on November 7, 1991,[71] without waiting for Philips, to sign the final [First] Supplemental Agreement[72] more than a month later on December 12, 1991.[73]

FTB also falsely claims that "Hyatt calculates his own expenses and decides when to pay Philips and MLMC".[74] Under the [First] Supplemental Agreement,[75] Mr. Hyatt was required to "promptly" distribute the license payment to Philips and Mahr Leonard and he did "promptly" distribute the license payment to Philips and Mahr Leonard on November 7, 1991.[76] Mr. Hyatt correctly stated that he did not control distributions of the Philip license payments.

FTB's inferences and speculation are insufficient to question Mr. Hyatt's eyewitness testimony.

11. **Mr. Hyatt Was In Las Vegas On November 7, 1991, When He Wrote The Drafts To Distribute The Fujitsu License Payment To Philips And Mahr Leonard.**

Mr. Hyatt correctly stated he was in Las Vegas on November 7, 1991, when he wrote the drafts[77] distributing the Fujitsu license payment to Philips and Mahr Leonard.[78] Mr. Hyatt's presence in Las Vegas is corroborated by the testimony of Messrs. Connell, Moreno, Salzer and Hyatt. These witness all place Mr. Hyatt in Las Vegas on November 7, 1991.[79] See also 1992 ASAB, Section 1.5.8.

---

[70] 1991 RSAB, p. 24:2-9; FTB_Philips 2576.
[71] FTB_Philips 0004856.
[72] FTB_Philips 0000673.
[73] Rebuttal to FTB Att. A/F, Section I. B., November 7, 1991, provides a more detailed discussion.
[74] 1991 RSAB, p. 24, underline in original.
[75] H 019047-019048.
[76] FTB_Philips 0004856, FTB_Philips 0004858.
[77] FTB_Philips 0004856, 0004858.
[78] Affidavit of Gilbert P. Hyatt, August 15, 2010, page 89; and Hyatt's 2016 Supp. Aff., ¶¶ 210 to 213, 238.
[79] Rebuttal to FTB Att. A/F, Section I. A., November 7, 1991.

RJN1254

FTB contends Mr. Hyatt sent the distribution from his former La Palma house because he used the template from his Las Vegas computer with the Cerritos P.O. Box return address.[80] Mr. Hyatt provided undisputed testimony that he used a letter template with his old P.O. Box return address on correspondence he sent from Las Vegas after he moved to Las Vegas (1992 ASAB, Section 1.4.1.2). Use of a Cerritos P.O. Box return address from a template stored on Mr. Hyatt's Las Vegas computer does not mean Mr. Hyatt sent the correspondence from La Palma. Mr. Hyatt wrote the distribution drafts in Las Vegas and sent the Philips transmittal letter from Las Vegas.[81]

Mr. Hyatt could not have written the drafts while at the La Palma house because he had sold his La Palma house, his computer and fax machine were in his Las Vegas apartment,[82] and dozens of witnesses testified that he was not seen at the La Palma house during the disputed period after he moved away: 28 witnesses testified about Mr. Hyatt moving away in September 1991.[83]

Mr. Hyatt was in Las Vegas on November 7, 1991, when he wrote the drafts distributing the Fujitsu license payment.

FTB's inferences and speculation are insufficient to question Mr. Hyatt's eyewitness testimony.

**12. Mr. Hyatt Did Not Send A "Markup" Draft Letter To Philips On November 22, 1991.**

Mr. Hyatt correctly states that he did not send to Philips a draft letter[84] with the word "Markup" handwritten thereon.[85] FTB points to a different, final, signed, letter dated November 22, 1991, from Mr. Hyatt to Mr. Tamoshunas,[86] ordered protected by the New York court, as proof that Mr. Hyatt sent the unsigned draft letter labeled "Markup".[87] Mr. Hyatt did not deny sending the version that was sent to Philips, he denied sending the unsigned draft letter.

---

[80] FTB_Philips 0004853.
[81] Rebuttal to FTB Att. A/F, Section II. A., November 7, 1991; and Hyatt's 2016 Supp. Aff., ¶¶ 210 to 213, 238.
[82] Rebuttal to FTB Att. A/F., Section I. B., October 27, 1991.
[83] Rebuttal to FTB Att. A/F, Section II. A., November 7, 1991; and Hyatt's 2016 Supp. Aff., ¶¶ 25, 28. Updated Testimonial Topics, Ex. T006.
[84] HL 00131.
[85] Affidavit of Gilbert P. Hyatt, August 9, 2010, page 179; and Hyatt's 2016 Supp. Aff., ¶¶ 214-219.
[86] FTB_Philips 0001312.
[87] HL 00131.

RJN1255

13. **Philips Drafted And Approved The February 3, 1992, Letter To Toshiba.**

Mr. Hyatt correctly stated that a February 3, 1992, letter to Toshiba,[88] was drafted and approved by Philips.[89] In a fax letter dated January 31, 1992, Philips sent Mr. Hyatt a draft of the letter and asked him to send Philips an executed copy.[90] The letter, which was drafted by Philips, explained that Philips had exclusive authority to license Mr. Hyatt's patents.

FTB falsely calls Mr. Hyatt's statement that the letter was drafted and approved by Philips misleading.[91] However, FTB's allegations is based on false speculation. FTB seeks to deceive your Board into believing Mr. Hyatt placed the address of his former La Palma house on the February 3, 1992, letter he provided to Philips for delivery to Toshiba. FTB falsely states that Philips did not place Mr. Hyatt's "JC/CA home/ business" return address on the letter (implying Mr. Hyatt placed it there).[92] In fact, the letter does not have a "JC/CA home/business" return address as falsely alleged by FTB.[93]

Mr. Hyatt used his computer in his Las Vegas apartment to complete the letter, he signed it, and he sent it to Philips for delivery by Philips to Toshiba.[94] The Cerritos P.O. Box return address on the letter was not a business or home address. Furthermore, Mr. Hyatt did not have a "JC/CA" location after October 1, 1991, when he sold his former La Palma house and he did not have a home/business (1991 ASAB, Sections 1.7.6, 1.8.4.7, 1992 ASAB, Section 1.4.1.3).[95] FTB contends Mr. Hyatt sent the letter to Philips (for Philips to deliver to Toshiba) on February 1, 1992, a day when Mr. Hyatt spent the entire day in Las Vegas.[96]

Mr. Hyatt's statement that Philips drafted and approved the February 3, 1992, letter to Toshiba was true and correct.[97]

FTB's inferences and speculation are insufficient to question Mr. Hyatt's eyewitness testimony.

---

[88] FTB_Philips 0002660.
[89] Affidavit of Gilbert P. Hyatt, August 9, 2010, page 274.
[90] FTB_Philips 0002664-0002665.
[91] 1991 RSAB, p. 25:10-17.
[92] 1991 RSAB, p. 25:15-17.
[93] FTB_Philips 0002663.
[94] Hyatt's 2016 Supp. Aff., ¶ 220.
[95] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.
[96] Rebuttal to FTB Att. A/F, Section I. A., February 1, 1992.
[97] Hyatt's 2016 Supp. Aff., ¶ 220.

RJN1256

**14.  On February 27, 1992, Mr. Hyatt Was In Las Vegas, Not In California As Alleged By FTB.**

Mr. Hyatt correctly stated that he was in Las Vegas on February 27, 1992.[98] Mr. Hyatt also stated that he did not receive a 5-page fax from Mr. Haken at the former La Palma house on February 27, 1992, that Mr. Haken made a mistake and sent the 1991 "November 27, 1991" Q2 1991 Quarterly Report to the wrong address and that Mr. Hyatt notified Philips it had used the wrong address and requested that Philips use the correct address in the future (1991 ASAB, Sections 1.8.1, 1.8.4.2 to 1.8.4.4; 1992 ASAB, Section 1.5.6.3).[99] FTB falsely alleges that Mr. Hyatt was at the La Palma house on February 27, 1992, signing for a FedEx parcel delivery (1992 ASAB, Section 1.5.6.3).[100]

FTB's sole argument for placing Mr. Hyatt at his former La Palma house is a FedEx delivery on February 27, 1992.  However, misaddressed FedEx deliveries do not place Mr. Hyatt at the La Palma house (1991 ASAB, Sections 1.8.1, 1.8.4.2 to 1.8.4.4; 1992 ASAB, Section 1.5.6.3).  Mr. Hyatt gave Philips a change of address to Las Vegas in mid-October, 1991.[101] The delivery of a FedEx package to the La Palma house does not mean Mr. Hyatt was present at his former La Palma house or that he received a fax at his former La Palma house.[102] Mr. Hyatt gave many changes of address and notifications of his move to Las Vegas (1992 ASAB, Sections 1.5.6, 1.5.6.1 to 1.5.6.3, 1.5.7).  Mr. Hyatt was not present at the La Palma house on February 27, 1992, and he did not sign for the delivery of the package.[103] Furthermore, the destination fax number is not indicated on the five page document,[104] but the fax was presumably sent to Mr. Hyatt's Las Vegas apartment where his fax machine was located.[105] As noted, dozens of witnesses testified that Mr. Hyatt's fax machine was at his Las Vegas apartment.[106]

Furthermore, the February 27, 1992, Philips Quarterly Report provides no indication that it was sent by other than regular mail,[107] which the Post Office forwarded to Mr. Hyatt in Las Vegas.  Mr. Hyatt gave the Post

---

[98] Affidavit of Gilbert P. Hyatt, August 9, 2010, page 297; see also Rebuttal to FTB Att. A/F, Section I. A., February 27, 1992.

[99] Affidavit of Gilbert P. Hyatt, August 9, 2010, page 297.

[100] 1991 RSAB, pp. 25:18-26:3.

[101] Rebuttal to FTB Att. A/F, Section I. B., October 18, 1991.

[102] Rebuttal to FTB Att. A/F, Section II. D., July 12, 1991.

[103] Rebuttal to FTB Att. A/F, Section I. A., February 27, 1992.

[104] GLR 03772-03776.

[105] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.

[106] Section 3 above; Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.

[107] GLR 03773-03776.

RJN1257

Office a change of address to Las Vegas on October 21, 1991 (1992 ASAB, Sections 1.5.6.3, 1.5.7).[108] Mr. Hyatt's affidavit statements were true and correct. FTB's inferences and speculation are insufficient to question Mr. Hyatt's eyewitness testimony.

15. **Mr. Hyatt Drove From Las Vegas To California On March 30, 1992, And Returned To Las Vegas On March 31, 1992, Contrary To What Is Alleged By FTB.**

Mr. Hyatt testified that he drove his new car from Las Vegas to California on March 30, 1992, stayed overnight at the Crescent Motel in Buena Park and returned to Las Vegas on March 31, 1992, where he met with Mr. Hudson for an inspection of the Las Vegas Tara Avenue house Mr. Hyatt would purchase three days later.[109]

FTB denies that Mr. Hyatt met with Mr. Hudson on March 31, 1992.[110] FTB's claim is based on another of its thousands of fabricated stories and false statements.[111] FTB's speculation that Mr. Hyatt's one hour meeting with Mr. Roth on March 30, 1992, was to prepare for negotiations with Hitachi the next day should be ignored by your Board.[112] Based on Mr. Roth reserving the conference room for the March 31, 1992, meeting with Hitachi from 2:00 p.m. to 7:00 p.m.,[113] and Mr. Roth's March 31, 1992, billing entry indicating he had met with Mr. Hyatt on March 31, 1991,[114] FTB fabricates a story that Mr. Hyatt met with Hitachi for dinner and negotiations. Mr. Hyatt did not meet with Hitachi representatives on March 31, 1991. Reserving a conference room for Mr. Roth's meeting with Hitachi is not evidence that Mr. Hyatt met with Hitachi. Mr. Roth explained that he listed Mr. Hyatt on his billing entry because he met with Mr. Hyatt at some point during the day and that Mr. Hyatt did not attend the negotiations with Hitachi.[115] Mr. Hyatt states that he returned to Las Vegas on March 31, 1992, and met with Mr. Hudson for an inspection of the Las Vegas Tara Avenue house.[116] Mr. Hyatt had other contacts after he returned to Las Vegas as well.[117]

---

[108] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.
[109] Affidavit of Gilbert P. Hyatt, August 15, 2010, pages 112, 113; see also Rebuttal to FTB Att. A/F, Section I. A., March 30 and 31, 1992.
[110] 1991 RSAB, p. 26:4-19.
[111] Rebuttal to FTB Att. A/F, day by day.
[112] FTB_Philips 0006557.
[113] GLR 00907.
[114] Invoice dated April 30, 1992, from PSB&C to Philips for the Philips Licensing Program, FTB_Philips 0006557.
[115] Affidavit of Gregory L. Roth, June 13, 2016, ¶ 16.
[116] Hyatt's 2016 Supp. Aff., ¶¶ 225-231.
[117] Rebuttal to FTB Att. A/F, Section I. A., March 31, 1992.

RJN1258

While Mr. Roth was meeting with Hitachi, his secretary sent a March 31, 1992, letter addressed to Mr. Hyatt at the Cerritos P.O. Box which would have been delivered about April 2, 1992. FTB mischaracterizes the letter stating "Roth addresses a letter to his [Mr. Hyatt's] California address." [118] The arrival of a letter sent by Mr. Roth's secretary at the Cerritos P.O. Box about April 2, 1992 (a day Mr. Hyatt used a notary in Las Vegas),[119] does not prove Mr. Hyatt was at his former La Palma house on March 31, 1992.

FTB then falsely states that Mr. Hyatt received a parcel at his former La Palma house on April 1, 1992. However, Mr. Hyatt returned to Las Vegas on March 31, 1992, and multiple eyewitnesses and documents establish Mr. Hyatt's presence in Las Vegas on April 1, 1992.[120] FTB takes the untenable position that Mr. Hyatt had to be at his former La Palma house on April 1, 1992, because Mr. Tamoshunas misaddressed a FedEx package that arrived that day. On the FedEx Sender Activity Summary the name of Mr. Tamoshunas' secretary, Elise Smith, is typed after the word "Signed:".[121] Delivery of such a FedEx package with Ms. Smith's name in the "Signed" window does not establish Mr. Hyatt's presence at his former La Palma house (1991 ASAB, Section 1.8.4.4). Mr. Hyatt returned to Las Vegas on March 31, 1992, where he met with Mr. Hudson for a home inspection and he remained in Las Vegas on April 1, 1992.[122]

FTB's inferences and speculation are insufficient to question the eyewitness testimony of Mr. Hyatt and Mr. Roth.

---

[118] 1991 RSAB, p. 26:15.
[119] Rebuttal to FTB Att. A/F, Section I. A., April 2, 1992.
[120] Rebuttal to FTB Att. A/F, Section I. A., April 1, 1992.
[121] FTB_Philips 0005188.
[122] Hyatt's 2016 Supp. Aff., ¶¶ 225-231.

RJN1259

# ATTACHMENT 4

## APPELLANT'S SECOND ADDITIONAL BRIEFS

## REBUTTAL OF FTB'S EXAMPLES FROM FTB ATTACHMENT E REGARDING TESTIMONY OF MR. ROTH AND OTHER WITNESSES — FTB DOES NOT SHOW "FALSE TESTIMONY" VIA THE PHILIPS DOCUMENTS OR OTHERWISE.

## TABLE OF CONTENTS

1   Introduction..................................................................................................... 2

2   Mr. Roth Accurately Testified That Mr. Hyatt Did Not Meet With Mr. McHenry, Mr. Rudestam, Mr. Tamoshunas, Mr. Haken, Mr. Mahr Or Mr. Leonard At Mr. Roth's Office On September 24, 1991. ................................................................................................... 2

3   Mr. Roth Accurately Testified That Mr. Hyatt Did Not Negotiate With Hitachi.................. 2

4   Mr. Roth Accurately Testified That He Met With Mr. Hyatt On March 31, 1992, But Mr. Hyatt Did Not Negotiate With Hitachi On March 31, 1992 Or May 26, 1992. ........................... 4

5   Mr. Roth Accurately Testified That Mr. Hyatt Did Not Attend The Dinner Show With Hitachi On January 28, 1992. ..................................................................................... 5

6   Mr. Roth Accurately Testified That The Licensing Correspondence Was Primarily Between The Licensees And Philips, Mahr Leonard, PSB&C And Mr. Hyatt Was Outside The Mainstream Of The Licensing Correspondence As Shown By The Licensing Correspondence Set Forth In Exhibit 67.................................................................................................. 6

7   Rebuttal Of FTB Arguments Regarding Testimony Of Mr. Hyatt's Family Members [Mr. Hyatt's Family Members Accurately Testified That Mr. Hyatt Was In Las Vegas On October 21, 1991]. ................................................................................................................. 6

8   Rebuttal Of FTB Arguments Re Testimony Of Mr. Rudestam And McHenry [FTB Mistakes And Mischaracterizes Mr. Rudestam's Accurate Testimony]. ....................................... 7

9   FTB Mistakes And Mischaracterizes Mr. McHenry's Accurate Testimony. ......................... 8

10  XCS Witnesses Testified Accurately, And No False Testimony Was Solicited [XCS Witnesses Submitted Accurate Affidavits.] ............................................................... 9

11  Dr. Peloquin Testified Accurately, And No False Testimony Was Solicited. [Dr. Peloquin Provided Accurate Testimony.] ........................................................................... 10

RJN1260

1    **Introduction.**

　　Each of the witnesses sworn statements is true and correct.  In each instance Mr. Hyatt's eyewitness and documentary evidence (1992 ASAB, Section 1.5) establishes that FTB's claim is false and that FTB has misrepresented the evidence.  These are eyewitnesses testifying under oath or penalty of perjury.  FTB has only inferences and speculation, but not a single credible witness.  These attacks on Mr. Hyatt's witnesses are continued bad faith acts by FTB (1991 ASAB, Sections 1.8.1, 1.8.4.3 to 1.8.4.4; 1992 ASAB, Sections 1.4.1.1, 1.5.6.3).  FTB's $24 million error is a specific example (1991 ASAB, Sections 1.7.2, 1.9.10).  FTB attacks eyewitnesses in bad faith (1991 ASAB, Section 1.8.6).  Each of FTB's claims that the eyewitness provided false testimony is wrong.  In all instances the witness' testimony was true and correct.

　　After July 1991 Mr. Roth represented Philips with respect to the Philips Licensing Program and the *Hyatt v. Boone* interference.[1]  FTB again implies that its poorly defined, Hyatt California licensing business is the Philips Licensing Program, not some business at Mr. Hyatt's former La Palma house (1991 RSAB, p. 27:6-25).  However, Mr. Hyatt was not an owner of the Philips Licensing Program.[2]  FTB still does not explain what payments this California licensing business supposedly received beyond the license payment for the ordinary licensing of Mr. Hyatt Nevada situs patents by Philips.

2    **Mr. Roth Accurately Testified That Mr. Hyatt Did Not Meet With Mr. McHenry, Mr. Rudestam, Mr. Tamoshunas, Mr. Haken, Mr. Mahr Or Mr. Leonard At Mr. Roth's Office On September 24, 1991.**

　　FTB re-asserts its fabricated story previously asserted at 1991 RSAB, pp. 17:15-18:15, that Mr. Hyatt attended meetings at Mr. Roth's office on September 24, 1991 (1991 RSAB, pp. 27:25-28:18).  However, several witnesses with personal knowledge have testified that Mr. Hyatt did not attend those meetings at Mr. Roth's office (ASAB Attachment 3, Section 4).

3    **Mr. Roth Accurately Testified That Mr. Hyatt Did Not Negotiate With Hitachi.**

　　Mr. Hyatt did not negotiate with Hitachi.[3]  FTB begins by speculating that Mr. Frohwitter, a German attorney, represented Hitachi, a Japanese company (1991 RSAB, pp. 28:18-30:15).  There is no evidence indicating

---

[1] Rebuttal to FTB Att. A/F,, Section I. F., October 14, 1991.
[2] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 6, 10, Annex XII.
[3] Rebuttal to FTB Att. A/F, Section I. A., May 26, 1992.

RJN1261

Mr. Frohwitter represented Hitachi and the FTB speculation should be ignored by your Board. The reference in Mr. Frohwitter's November 12, 1991, fax letter to Mr. Hyatt to "pleasing talks that we had in the past" referred to negotiations prior to the July 1991 Philips Agreement and did not refer to negotiations with Hitachi. FTB falsely refers to the December 16, 1991, Hitachi meeting as a five hour negotiation. The meeting with Hitachi was a short "get acquainted meeting" and no licensing negotiations took place at that meeting. Mr. Hyatt had no negotiations with Hitachi before or after the November 12, 1991, letter (1991 ASAB, Section 1.7.6).[4] FTB states Mr. Roth prepared for the meeting on three different days but fails to point out that Mr. Roth billed a total of only 1.25 hours plus a telephone call for the preparation for the short meeting, FTB_Philips 0006606.

FTB emphasizes the words "our negotiation" in Mr. Akaki's December 20, 1991, letter to Mr. Hyatt, FTB_Philips 0001857, but deceptively fails to point out that Mr. Akaki was referring to future negotiations ("our negotiation will soon result"). There was no negotiation at the December 16, 1991, meeting.[5] Again, FTB is misinterpreting the document without witness support.

Referring to the dinner show at Medieval Times as a "business dinner" FTB fabricates a story that Mr. Hyatt's attendance is proven because Mr. Roth bought him a ticket several days in advance, not knowing whether or not Mr. Hyatt would attend. Mr. Hyatt did not attend. Mr. Roth's billing statement on the PSB&C Invoice to Philips confirms that only Mr. Akaki and Mr. Ogino joined Mr. Roth for dinner on January 28, 1992, and that Mr. Hyatt did not attend the negotiation meeting on January 29, 1992, FTB_Philips 0006582. FTB's fabricated story proposes seven people attended the negotiation meeting on January 29, 1992, because on January 27, 1992, two days before the meeting, and not knowing exactly who would attend or how much they would eat, Mr. Roth ordered a continental breakfast sufficient for seven people, GLR 00917. For a more detailed explanation of the two January meetings see, Rebuttal to FTB Att. A/F., Sections I. E and I. F., January 28, 1992. FTB has no evidence Mr. Hyatt attended either the dinner show or the negotiation meeting and Mr. Hyatt was in Las Vegas on January 29, 1992.[6]

---

[4] Rebuttal to FTB Att. A/F, Section II. I., December 16, 1991.
[5] Rebuttal to FTB Att. A/F, Section II. I., December 16, 1991.
[6] Rebuttal to FTB Att. A/F, Section I. A., January 29, 1992.

-3-

RJN1262

4    **Mr. Roth Accurately Testified That He Met With Mr. Hyatt On March 31, 1992, But Mr. Hyatt Did Not Negotiate With Hitachi On March 31, 1992 Or May 26, 1992.**

This rebuttal is a continuation of FTB's contention in 1991 RSAB, pp. 28:18-30:17, that Mr. Roth's statement that Mr. Hyatt attended a single negotiation session with Hitachi but did not negotiate with Hitachi is not correct (1992 RSAB, pp. 1:4-2:4).

FTB cites the following additional "evidence":
- Mr. Roth's March 31, 1992, billing entry on the April 30, 1992, PSB&C Invoice to Philips,[7] states, "Meeting with Messrs. Mike, Akaki, Oguino, Leonard and Hyatt regarding Hitachi."
- Mr. Roth's Draft April 22, 1992 letter,[8] thanking Hitachi executives for meeting on March 31, 1992 and offering a follow up meeting on May 26, 1992, saying "I would propose that you be our guests for a document exchange in the morning, licensing discussions in the afternoon, and dinner in the evening."
- Mr. Roth's May 26, 1992, billing entry on the June 30, 1992, PSB&C Invoice to Philips,[9] states, "Meeting with Messrs. Miki, Akaki, Ogino, Leonard, Mahr and Hyatt."

The issue of negotiations with Hitachi was addressed, in part, and rebutted, in Mr. Hyatt's 1991 ASAB in response to FTB's attack on Mr. Hyatt's testimony. Here FTB tries to attack Mr. Roth's testimony, instead of Mr. Hyatt's testimony. But Mr. Roth's first-hand account and rebuttal to FTB's erroneous and unsupported conclusions drawn from Mr. Roth's billing records and a letter fully answers and disposes of this issue. Mr. Hyatt did not negotiate with Hitachi.

Mr. Roth testified that he included Mr. Hyatt in the list of names on his March 31, 1992 billing entry because Mr. Roth met with Mr. Hyatt during the day but Mr. Hyatt did not attend the negotiation meeting with Hitachi.[10] Testimony by Mr. Hyatt confirms that he had a short meeting with Mr. Roth and then returned to Las Vegas on March 31, 1992, while Mr. Leonard confirms Mr. Roth's statement that Mr. Hyatt did not negotiate with Hitachi.[11] Testimony of Mr. Hyatt, Mary Stratton, Robert Huddleston, Jo Ann Frank and Eugene Cowan[12] confirms that Mr. Hyatt in fact returned to Las Vegas on March 31, 1992, and met with multiple people in Las Vegas.[13]

---

[7] FTB_Philips 0006557.
[8] FTB_Philips 0001829-0001832.
[9] FTB_Philips 0006619.
[10] Affidavit of Gregory L. Roth, June 13, 2016, ¶16; Affidavit of Gregory L. Roth, July 19, 2012, ¶ 25.
[11] Hyatt's 2016 Supp. Aff., ¶ 71; Affidavit of David Leonard, May 2, 2012, ¶ 6.
[12] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.18; Affidavit of Mary Trotter Stratton, June 21, 2010, ¶ 111; Affidavit of Robert Huddleston, November 4, 2008, ¶ 20; Affidavit of Jo Ann Frank, June 17, 2010, ¶ 34 and Affidavit of Eugene Cowan, November 14, 2008, ¶ 33.
[13] Rebuttal to FTB Att. A/F, Section I. A., March 31, 1992.

RJN1263

Nothing in the March 31, 1992 billing entry or the April 22, 1992 letter contradicts Mr. Roth's testimony, and nothing in those materials suggests that Mr. Hyatt negotiated with Hitachi on March 31, 1992.

FTB does not contend that Mr. Hyatt actually negotiated with Hitachi at the May 26, 1992, meeting but cleverly, and falsely, states "Mr. Hyatt and Mr. Roth meet with Hitachi for negotiations again."[14] But neither document supports what the FTB asserts. Mr. Hyatt did not negotiate with Hitachi, ever. He merely attended a meeting on May 26, 1992, during which he did not negotiate with Hitachi.[15]

Attending one meeting without negotiating does not constitute "negotiating". There is no evidence that Mr. Hyatt negotiated with Hitachi and Mr. Leonard, Mr. Roth and Mr. Hyatt all deny that Mr. Hyatt negotiated with Hitachi.[16] Mr. Roth's testimony that Mr. Hyatt attended only one negotiation session with Hitachi and did not negotiate with Hitachi is true and correct.

**5      Mr. Roth Accurately Testified That Mr. Hyatt Did Not Attend The Dinner Show With Hitachi On January 28, 1992.**

Citing PSB&C expense billing for tickets that were purchased for a Medieval Times dinner prior to the January 28, 1992, date of the show, FTB asserts that Mr. Hyatt attended a dinner show with Hitachi executives and that Mr. Roth testified falsely on this issue. Mr. Roth explained that he purchased a ticket for Mr. Hyatt before he knew whether or not Mr. Hyatt would attend and Mr. Hyatt did not attend the dinner show.[17] Mr. Hyatt's non-attendance at the Medieval Times dinner show on January 28, 1992 was addressed in Mr. Hyatt's 1991 ASAB in response to FTB's attack on Mr. Hyatt's testimony. While referencing a purchase of tickets several days prior to the dinner show, FTB ignores the documentary evidence listing the people who actually attended the dinner show. The PSB&C invoice for the actual dinner show specifically that only Mr. Akaki, Mr. Ogino and Mr. Roth actually attended the dinner, not Mr. Hyatt.[18] Mr. Roth therefore correctly testified that Mr. Hyatt did not attend the dinner show.[19]

---

[14] 1992 RSAB, p. 1:17.
[15] Rebuttal to FTB Att. A/F, Section I. A., May 26, 1992.
[16] Affidavit of David Leonard, May 2, 2012, ¶ 6; Affidavit of Gregory L. Roth, July 19, 2012, ¶ 25; Affidavit of Gregory L. Roth, June 13, 2016, ¶ 17; Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.18, p. 116; Hyatt's 2016 Supp. Aff., ¶ 71.
[17] Affidavit of Gregory L. Roth, June 13, 2016, ¶ 15.
[18] FTB_Philips 0006582.
[19] Rebuttal to FTB Att. A/F, Sections I. E., F., January 28, 1992.

RJN1264

Further, FTB falsely states that Mr. Hyatt negotiated with Hitachi on December 16, 1991, even though the meeting was a short, 45 minute get acquainted meet at which no negotiations took place. The FTB makes this unsupported conclusion based solely on a document stating that Mr. Hyatt attended a meeting with Hitachi executives that day.[20] As addressed in more detail in Mr. Hyatt's 1991 RSAB, this was a short 45 minute get acquainted meeting and there were no negotiations.[21]

6   **Mr. Roth Accurately Testified That The Licensing Correspondence Was Primarily Between The Licensees And Philips, Mahr Leonard, PSB&C And Mr. Hyatt Was Outside The Mainstream Of The Licensing Correspondence As Shown By The Licensing Correspondence Set Forth In Exhibit 67.**

Citing one letter dated September 14, 1992,[22] and one fax from Mr. Hyatt dated November 8, 1992,[23] FTB makes the over-the-top conclusion that this shows Mr. Hyatt's level of involvement in the licensing program and Mr. Roth's testimony is inaccurate and misleading. The letter and fax both make it clear that Philips, not Mr. Hyatt was meeting with and negotiating with Nippon Columbia ("regarding Koyama and Kobayashi's negotiations with Nippon Columbia").[24] FTB's unsupported conclusion from the two pieces of correspondence is illogical and even laughable. As Mr. Roth testified[25] and was quoted by FTB, over 140 documents in Exhibit 67, attached to his August 9, 2010 Affidavit, show the primary recipients of correspondence regarding the licensing program and they do not include Mr. Hyatt. FTB does not dispute this fact. Exhibit 11 of the Philips Documents Table, a table of Philips documents entitled, "Philips Communications That Are Not Addressed or CCed To Mr. Hyatt Or Sent By Mr. Hyatt", also lists 146 licensing documents that Mr. Hyatt was not copied on. FTB has no rebuttal to these series of documents that demonstrate Mr. Hyatt was outside the mainstream of the licensing correspondence, as Mr. Roth accurately testified.

7   **Rebuttal Of FTB Arguments Regarding Testimony Of Mr. Hyatt's Family Members [Mr. Hyatt's Family Members Accurately Testified That Mr. Hyatt Was In Las Vegas On October 21, 1991].**

FTB here again questions Mr. Hyatt's return to Las Vegas on October 21, 1991 (1992 RSAB, pp. 3:18-5:16). Mr. Hyatt thoroughly addressed and rebutted FTB assertions on this point in his 1991 ASAB in response to

---

[20] FTB_Philips 0001855.
[21] Rebuttal to FTB Att. A/F, Section II. I, December 16, 1991.
[22] FTB_Philips 00001441-0001444.
[23] FTB_Philips 0001431.
[24] FTB_Philips 0001441.
[25] Affidavit of Gregory L. Roth, August 9, 2010, p. 152.

RJN1265

FTB's attack on Mr. Hyatt's testimony. The testimony of Mr. Hyatt's family members addressed by FTB (affidavits of the Farbers and Dr. Gorman) provides even more support for the extensive evidence showing Mr. Hyatt returned to Las Vegas on October 21, 1991.[26] FTB only real attack towards the testimony of these witnesses is that it is too consistent because they all confirm that they and Mr. Hyatt attended a family reunion on the East Coast on October 20, 1991, and that Mr. Hyatt returned to Las Vegas the following day, October 21, 1991, called them from Las Vegas and gave them his Las Vegas telephone number. Consistency in testimony among multiple witnesses is confirmation that the witnesses are being truthful and honest.

**8    Rebuttal Of FTB Arguments Re Testimony Of Mr. Rudestam And McHenry [FTB Mistakes And Mischaracterizes Mr. Rudestam's Accurate Testimony].**

FTB tries to deceiver your Board with its words, quoting Mr. Rudestam's testimony regarding very specific photographs as to which he accurately stated he had no involvement and then suggesting to your Board his statements were referring to an October 6, 1991, alleged photo shoot that did not actually occur (1992 RSAB, pp. 5:16-6:5). Referring to specific "photos from news articles showing Mr. Hyatt posing at 7841 Jennifer Circle"[27] before Mr. Hyatt moved to Las Vegas, Mr. Rudestam stated, "I was not involved in and I did not give direction for the taking of **such** photographs", (emphasis added).[28] Mr. Rudestam's actual statement is true, and unrebutted.

But FTB deceptively mischaracterizes Mr. Rudestam's statement by asserting Mr. Rudestam denied involvement and direction in the taking of *all* publicity photos of Mr. Hyatt. He made no such statement. FTB then falsely states Mr. Rudestam "was in fact" involved in and gave direction in "the taking of publicity photos for Hyatt." Mr. Rudestam, who was a public relations specialist, not a "publicist" as alleged by FTB, worked for Philips, not "for Hyatt".[29] A McHenry & Associates invoice to Philips dated October 31, 1991, lists expenses for a photoshoot that occurred in late October 1991 (not on October 6, 1991).[30] Mr. Rudestam did not deny this photoshoot. He simply was not involved in the photographs referred to in prior FTB briefing that were referenced in his affidavit. Mr. Rudestam's statement was true and correct.

---

[26] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.
[27] Affidavit of Rolf Rudestam, October 12, 2011, ¶ 31.
[28] Affidavit of Rolf Rudestam, October 12, 2011, ¶ 31.
[29] Rebuttal to FTB Att. A/F, Section I. I. October 24, 1991.
[30] FTB_Philips 0007470-0007471.

RJN1266

There was no portrait photoshoot at Mr. Hyatt's former house on October 6, 1991. Mr. McHenry tried to arrange a portrait photoshoot on October 6, 1991, at Fashion Island, Newport Beach, but Mr. Hyatt declined to travel from Las Vegas to California at that time and the photoshoot took place later in October 1991.[31] Mr. Rudestam's testimony is therefore accurate, and FTB's unsupported conclusions are not.

**9 FTB Mistakes And Mischaracterizes Mr. McHenry's Accurate Testimony.**

FTB again tries to deceive your Board by mischaracterizing Mr. McHenry's affidavit statement (1992 RSAB, pp. 6:6-8:1). Referring to specific "photos from news articles showing Mr. Hyatt posing at 7841 Jennifer Circle",[32] that were taken before September 26, 1991, when Mr. Hyatt moved to Las Vegas, Mr. McHenry stated, "Neither I nor my company was involved in or directed the taking of **such** photographs", (emphasis added).[33]

But FTB deceptively mischaracterizes Mr. McHenry's statement by asserting Mr. McHenry denied involvement and direction in the taking of *all* publicity photos of Mr. Hyatt. FTB states Mr. McHenry "was in fact" involved in and gave direction in "the taking of publicity photos for Hyatt." Mr. McHenry did not deny involvement in *all* photos of Mr. Hyatt and his statement was true and correct.

In a failed attempt to further its mischaracterization of Mr. Hyatt's highly supportive evidence, FTB refers your Board to a canceled portrait photoshoot Mr. McHenry attempted to schedule on October 6, 1991, and to Mr. McHenry's billing statement for a portrait shoot that occurred later in October 1991.[34] However, the articles with the referenced photographs FTB Opening Brief (1991), p. 45, footnote 115,[35] that Mr. McHenry's Affidavit referred to have dates such as January 1991; August 30, 1990; December 31, 1990; January 21, 1991; and December 1990.[36] These articles are dated long before the alleged October 6, 1991, portrait photoshoot and long before Mr. Hyatt moved to Las Vegas. Mr. McHenry's testimony is therefore accurate and FTB's unsupported conclusions are not.

In any event there was no portrait photoshoot at Mr. Hyatt's former house on October 6, 1991. Mr. McHenry tried to arrange a portrait photoshoot at Fashion Island, Newport Beach on October 6, 1991, but Mr. Hyatt declined and the portrait shoot occurred later in the month. The testimony of FTB's witness Charles Cameron about

---

[31] Rebuttal to FTB Att. A/F, Section I. A., October 6, 1991.
[32] Footnote 115, 1991 ROB, p. 45.
[33] Affidavit of Charles McHenry, November 4, 2009, ¶ 7.
[34] FTB_Philips 0007470-0007471.
[35] Footnote 115, 1991 ROB, p. 45.
[36] FTB 14111, GLR 02213, GLR 02177, FTB 14157, and GLR 02176, respectively.

-8-

RJN1267

the alleged portrait photoshoot on October 6, 1991, has been thoroughly rebutted by nine witness and the contemporary documentation. There was no portrait photoshoot on October 6, 1991.[37] Mr. McHenry's testimony is accurate and FTB's mischaracterization of his testimony is not.

**10  XCS Witnesses Testified Accurately, And No False Testimony Was Solicited [XCS Witnesses Submitted Accurate Affidavits.]**

FTB questions the more recent and more detailed testimony of the XCS witnesses (Ms. Maldonado and Mr. Tran), but FTB fails to demonstrate that their recent testimony is inaccurate in any way (1992 RSAB, pp. 8:2-12:2). FTB also fails to establish its assertion that Mr. Hyatt solicited false testimony.

The real point of FTB's long dissertation, however, seems to be to prove that Mr. Hyatt was not in Las Vegas when he signed the XCS invoice for copier repair service on November 4, 1991.[38] FTB fails in its endeavor. The invoice from XCS shows that an unnamed person called in a complaint for Ms. Jeng's copier at 8:15 am and repairs were completed at 2:45 pm on November 4, 1991. The invoice needed to be signed by Mr. Hyatt because the copier repair service contract was in the name of his former consulting company, Digital Nutronics. Ms. Jeng traveled to Las Vegas after the repairs were completed and Mr. Hyatt signed the invoice in Las Vegas on the same day, November 4, 1991.[39] FTB nonetheless falsely alleges the XCS documents show four things:

(1)  Paying XCS in 1991 with a checking account he never revealed. Ms. Jeng, not Mr. Hyatt paid the November 4, 1991, XCS Invoice No. 34547.[40] There was no Hyatt check. FTB appears to be raising its long exhausted argument that Mr. Hyatt did not tell FTB about the DNC company checking account. However, FTB was very much aware of this DNC checking account and the auditor undertook the responsibility to obtain the desired information.[41]

(2)  Presence at "his" JC/CA home business location. Mr. Hyatt did not have a "JC/CA" location after October 1, 1991, when he sold his former La Palma house.[42] The XCS documents do not show Mr. Hyatt's presence at his

---

[37] Rebuttal to FTB Att. A/F, Section I. A., October 6, 1991.
[38] FTB 15618.
[39] Rebuttal to FTB Att. A/F, Section I. B., November 4, 1991.
[40] Rebuttal to FTB Att. A/F, Section I. B., November 4, 1991.
[41] Rebuttal to FTB Att. A/F, Section I. C., August 9, 1991; Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.18 ("I did not pay the November 4, 1991 invoice, it was paid by the owner of the photocopier at that time, Ms. Jeng, with her check").
[42] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.

RJN1268

former La Palma house after October 1, 1991, and do not show he had a home business, let alone a California licensing business. On November 4, 1991, Mr. Hyatt was in Las Vegas and entertained Mr. Kazmaier as a guest in his Las Vegas apartment.[43]

(3) Engaging in business activities "(e.g. the large number of photocopies)". The XCS documents fail to show any customers, any income to Mr. Hyatt or Mr. Hyatt's presence to established the falsely alleged business. As to the number of copies made on Ms. Jeng's copier, according to the FTB transcript of the interview with Mr. Tran, he stated, "It wasn't used that much."[44]

(4) Purchasing a new photocopier. Ms. Maldonado and Ms. Cosgrove both confirm that Mr. Hyatt purchased the new photocopier for his new Las Vegas Tara Avenue house in July 1992. The testimony of Ms. Maldonado that Mr. Hyatt purchased a new copier in 1992 that was shipped to Las Vegas is true and correct.[45]

**11    Dr. Peloquin Testified Accurately, And No False Testimony Was Solicited. [Dr. Peloquin Provided Accurate Testimony.]**

The three handwritten dates on the letter to Dr. Peloquin,[46] cannot be properly authenticated (1992 RSAB, pp. 12:3-13:14). Dr. Peloquin testified that the unauthenticated hand written dates of <u>unknown</u> authorship "are not official information from my office" and his office had a "strictly enforced policy" "to refuse to give out patient information of any kind".[47]

Yet, lead auditor Sheila Cox, primary perpetrator of the fraud committed by the FTB during the Hyatt audits and protests as found in the Nevada tort case, produced a letter with three handwritten dates of unknown origin and meaning that were purportedly from Dr. Peloquin.[48] Dr. Peloquin denies that the handwritten dates are in his handwriting or that they are official correspondence from his office. FTB offers no evidence that any statement by Dr. Peloquin is incorrect. Mr. Hyatt was in Las Vegas, not California on the only day relevant to the audit, October 31, 1991.[49]

---

[43] Rebuttal to FTB Att. A/F, Section I. A., November 4, 1991.
[44] Interview of Hoc V. Tran, FTB Exhibit LL, Tab 2, p. 7.
[45] Rebuttal to FTB Att. A/F, Section II. D., April 10, 2012; Declaration of Sandra Maldonado, March 20, 2012, ¶ 4; Affidavit of Caroline Cosgrove, July 7, 2012, ¶ 109.
[46] A 00663.
[47] Rebuttal to FTB Att. A/F, Section I. E., October 31, 1991; Declaration of Dr. William Peloquin, February 13, 2012, ¶¶ 3, 5.
[48] FTB 1955.
[49] Rebuttal to FTB Att. A/F, Section I. A., October 31, 1991.

given the apartment leasing agent the Jennifer Circle fax number because he did not remember the Continental Hotel fax number and the apartment leasing agent faxed the lease to Jennifer Circle. Ms. Jeng received the fax and brought to Mr. Hyatt in La Vegas where he signed the back side on October 13, 1991, Hyatt Dec. 2016 Affidavit, ¶ 399.

FTB false statements are addressed in Hyatt Dec. 2016 Affidavit, ¶¶ 346, 357-400.

**O. 1991 Interest Should be Abated**

The discussion of interest abatement in FTB 1991 Summary, pp. 26-29, is opposed by incorporating by reference herein 1992 ATAB, ¶ II.E., "FTB's Argument Against Interest Abatement In Its 1991 and 1992 Concluding Summaries Asserts A False Record And Fails To Rebut Mr. Hyatt's Request For Interest Abatement". False statements made by FTB are addressed in Hyatt Dec. 2016 Affidavit, ¶¶ 401-422, 461. FTB incorporates by reference the Jun 19, 2014 Declaration of Robert Dunn at FTB 1991 Summary, p. 29. False statements made in the June 19, 2014, Declaration of Robert Dunn are addressed in Hyatt Dec. 2016 Affidavit, ¶¶ 422-460.

While claiming that the Nevada litigation should be treated as independent of the tax audit and protest, FTB complains that Mr. Hyatt designated certain documents he produced in the Nevada litigation as confidential under the protective order, FTB 1991 Summary, p. 27. FTB had the capability of conducting the audit and protest independent of the Nevada litigation and delay during the audit and protest did not occur because of the Nevada litigation, Hyatt 2016 Affidavit, ¶¶ 409, 411.

FTB points out that on December 30, 1999, it issued an enormous IDR and falsely claims it contained questions Mr. Hyatt had not previously answered without identifying any such question, FTB 1991 Summary, p. 27. Mr. Hyatt had diligently responded to all prior discovery request and timely responded to the enormous December 30, 1999, discovery request. FTB does not explain how Mr. Hyatt unduly delayed the protest by timely responding to FTB's enormous IDR, Hyatt Dec. 2016 Affidavit, ¶ 410.

FTB falsely states the Nevada Supreme Court "failed to modify or limit the Nevada Protective Order" and acknowledges that FTB was able to issue an administrative subpoena for the information it wanted independently of the Nevada litigation, FTB 1991 Summary, p. 27. The Nevada Supreme Court did not "fail" to modify the order just because it left the protective order in place in the Nevada litigation, Hyatt Dec. 2016 Affidavit, ¶ 411.

FTB acknowledges that its administrative subpoena was overbroad and in 2003 the Sacramento Superior Court sustained Mr. Hyatt's challenge to the subpoena in part, FTB 1991 Summary, p. 27. Any delays resulting from the challenge to the subpoena were attributable to FTB for issuing an over broad subpoena, Hyatt Dec. 2016 Affidavit, ¶ 412.

FTB falsely alleges that Mr. Hyatt delayed the protest by designating as confidential information in the independent Nevada proceeding, FTB 1991 Summary, p. 28. However, FTB acknowledges that it independently issued its own subpoena

22

1  and Mr. Hyatt responded to the subpoena. Neither the Nevada case nor Mr. Hyatt caused delay in the protest, Hyatt Dec. 2016

2  Affidavit, ¶ 413.

3      FTB complains that Mr. Hyatt obtained a one year extension of time to reply to FTB's opening briefs, FTB 1991

4  Summary, p. 28. However, any delay in preparing Mr. Hyatt's reply briefs is attributable to FTB. The extension of time was

5  required to respond to FTB's unconventional briefing method of making thousands of false statements, mischaracterizations

6  and fabrications. Additional time was also required because FTB raised a sourcing issue for the first time in its 1991 and 1992

7  NOAs and refused to give Mr. Hyatt and adequate opportunity to respond during the protest, Hyatt Dec. 2016 Affidavit, ¶ 414.

8      FTB falsely claims that Mr. Hyatt "fought virtually every attempt" FTB made to investigate the extensive eyewitness

9  testimony Mr. Hyatt was forced to obtain to respond to the new issues and false statements in FTB's opening briefs, FTB 1991

10  Summary, p. 28. However, FTB cites not a single valid example where Mr. Hyatt interfered with its investigation. The only

11  example FTB mentions is the New York litigation where Mr. Hyatt was forced to protect his rights by obtaining a court order

12  limiting FTB's overbroad New York subpoenas, Hyatt Dec. 2016 Affidavit, ¶ 415, 416-420.

13  **III.   Conclusion**

14      Mr. Hyatt has demonstrated that he moved to Las Vegas on September 26, 1991, with the intent to live there

15  permanently, that the *Bragg* factors strongly favor a determination that he became a California non-resident, that FTB has not

16  established a sourcing theory of taxation, that Mr. Hyatt did not commit fraud and that if a tax assessment is maintained,

17  interest should be abated.

18  Dated: December 12, 2016                    Respectfully submitted,

19                                               ANTOLIN LAW GROUP

20                                               By: *Edwin P. Antolin*
21                                               EDWIN P. ANTOLIN

22                                               REED SMITH LLP
                                                 BRIAN TOMAN

23                                               SILVERSTEIN & POMERANTZ LLP
24                                               AMY L. SILVERSTEIN

25                                               *Attorneys for Appellant Gilbert P. Hyatt*

26

27

28

29

RJN1271

1      FTB cannot assess a 1992 fraud penalty because FTB has failed to follow the statutory requirements for assessing the

2  1992 fraud penalty.[103]  FTB seeks to merge the events of 1991 and 1992 in its arguments for a 1992 fraud penalty.  However,

3  events occurring in one year cannot be used to prove fraud in a different year.[104]  Furthermore, the fraud penalties for the two

4  years are based upon significantly different theories.

5      FTB presents a litany of accusations, most of which are false and are fully rebutted.[105]  Many of FTB's fraud factors

6  relate to 1991 or have nothing to do with fraud allegations in 1992.  FTB makes no showing that Mr. Hyatt failed to have an

7  honest belief that he moved to Las Vegas on September 26, 1991, and has remained a resident of Nevada to the present time.

8  During the 1992 disputed period Mr. Hyatt had 52 full days in Nevada as a resident, 20 days partly in Nevada and partly in

9  California for a specific temporary or transitory purpose and 9 nine full days in California while he was in a hospital

10  recovering from Cancer surgery.  Mr. Hyatt traveled from Las Vegas to California for his cancer surgery and immediately

11  returned to his Las Vega apartment upon being released from the hospital following his cancer surgery.[106]  Mr. Hyatt was fully

12  justified in his personal belief that he became a Nevada resident on September 26, 1991, and remained a Nevada resident

13  throughout 1992.

14      Mr. Hyatt's prior brief has previously established the inapplicability of the fraud penalties and the fact that they were

15  imposed as a means of extorting an improper settlement from Mr. Hyatt rather than a legitimate belief that Mr. Hyatt had

16  committed fraud.[107]

17     **E.**  **FTB's Argument Against Interest Abatement In Its 1991 and 1992 Concluding Summaries Asserts A False Record And Fails To Rebut Mr. Hyatt's Request For Interest Abatement**

18      FTB's delays and improper actions began with the audit and protest of Mr. Hyatt's 1991 and 1992 taxes.  The Nevada

19  Supreme Court (NSC) found that FTB committed fraud and intentional infliction of emotional distress in part because of its

20  delays[108] in processing the two protests.  FTB's extraordinary 11 year delay in the processing of the protests in

21  unconscionable.  The NSC upheld the jury finding that FTB personnel committed fraud in processing Mr. Hyatt's audits and

22  protests.

23      FTB continued its unconscionable delays with its unlawful, overbroad and belated discovery against Philips and its

24  employees.  Even though Philips was identified in Mr. Hyatt's 1991 part year California tax return and even though FTB

---

25     [103] 1991 ASAB, § 1.9.6.

26     [104]*Appeal of Castillo*, 1992 Cal. Tax LEXIS 28, 92-SBE-020, 92-SBE-020 (1992) ("proof of fraud in one year will not sustain the taxing authority's burden of proving fraud in another year").

27     [105] Affidavit of Gilbert P. Hyatt, December 12, 2016, ¶¶ 661-713.

28     [106] Rebuttal to FTB Att. A/F, Section I. A., February 11, 21, 1992.

       [107] 1991 AOB, § III.; 1992 AOB, § IV.; 1991 ARB, § III.; 1992 ARB, § IV.; 1992 ASB, § I.B.; 1991 App. Supp. Protest Letter, § II.E.; 1992 App. Supp. Protest Letter, § II.E.; and 1991 ASAB, § 1.9.

29     [108] *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 144-145, 148-149 (Nev. 2014), aff'd in part and rev'd in part on other issues 136 S. Ct. 1277 (2016).  See also ASAB Attachment 1 and Section 1991 ASAB, Section 1.5.1.

---

RJN1272

1    issued and then withdrew subpoenas from Philips in 2006, FTB delayed until 2011 to actually pursue discovery from Philips.

2    It then did so with unlawful, overbroad subpoenas that forced Mr. Hyatt to obtain a protective order from the New York courts

3    that significantly narrowed the scope of FTB's subpoenas, thus FTB imposed years of delay on these proceedings.

4        Interest on a deficiency assessment is to be abated if there is an unreasonable error or delay by the FTB that: (1) is

5    attributable to a ministerial or managerial act performed by FTB; (2) occurred after FTB contacted the taxpayer in writing

6    about the particular deficiency; and (3) is not significantly attributable to the taxpayer. Cal. Rev. & Tax Code § 19041.

7    Failure by the FTB to grant a request for interest abatement is reviewed by the Board for an abuse of discretion. *Id.* Mr. Hyatt

8    fully addressed this issue previously in Mr. Hyatt's 1991 AOB, pp. 87-94; 1992 AOB, pp., 67-74; 1991 ARB, p. 100; 1992

9    ARB, pp.82-100; and 1992 ASB, p. 100.

10       In sum, *over eleven years* passed between the time Mr. Hyatt received the NPA for the 1991 tax year on April 23,

11   1996, and FTB's issuance of the Notice of Action on December 26, 2007. Similarly, *over 10 years* passed between the time

12   Mr. Hyatt received the NPA for the 1992 tax year on October 10, 1997, and FTB's issuance of the Notice of Action on

13   December 26, 2007. These delays each lasting over a decade was due to the intentional misconduct of the FTB in which it

14   refused to perform managerial and ministerial acts as required under law and affirmatively put a "hold" on the protest process.

15       The issue of FTB's 11 year delay and FTB putting an affirmative "hold" on the protest process was determined in

16   favor of Mr. Hyatt and against the FTB in the Nevada tort case, and this finding in particular was cited as a basis for affirming

17   the fraud claim in favor of Mr. Hyatt and against the FTB. Specifically, the jury found that the FTB intentionally delayed and

18   put a hold on the protest proceedings for 11 years. The Nevada Supreme Court affirmed this factual finding in reciting

19   specific evidence against the FTB regarding its intentional delay of the protest proceedings: "Hyatt showed that FTB took 11

20   years to resolve Hyatt's protests of the two audits. Hyatt alleged that this delay resulted in $8,000 in interest per day accruing

21   against him for the outstanding taxes owed to California" and "[a]s explained above in discussing the fraud claim, FTB . . .

22   delayed resolution of Hyatt's protests for 11 years, resulting in a daily interest charge of $8,000." *See Franchise Tax Bd. of*

23   *Cal. v. Hyatt*, 335 P.3d 125, 130 Nev. Adv. Op. 71, 2014 WL 4656423 at __ (Nev. 2014) ("*2014 Nevada Ruling*").

24       FTB attempts to rebut Mr. Hyatt's request for interest abatement based on FTB's bad faith delay in the Protests.

25   (FTB 1991 Concluding Summary at pp 26-29 and FTB 1992 Concluding Summary at 18-23.) In so doing, FTB references

26   and makes bald assertions regarding a number of events that are irrelevant to and certainly do not rebut Mr. Hyatt's request for

27   interest abatement based on the 11 year delay in the Protests.

28   **1.  Mr. Hyatt's actions in the Protest and the Nevada tort case did not delay the tax proceedings**

29       In its interest abatement rebuttal section, FTB first references Mr. Hyatt's Nevada litigation counsel, Mr. Kula, and

     his 1996 consultation with Mr. Hyatt's then tax attorney Mr. Cowan (FTB 1992 Concluding Summary, at 18), which as

RJN1273

established relates only to a draft protest letter Mr. Cowan was drafting. FTB then falsely states that in 1997 Mr. Cowan was working closely with Mr. Hyatt's Nevada litigation team. (*Id.*) Again, this a false statement as Mr. Cowan's testimony has established. FTB then also falsely portrays a single communication between Mr. Cowan and Nevada litigation counsel as an attempt to delay the tax proceedings. (*Id.*, at 19.) Mr. Cowan testified that the communication related merely to one subpoena for which the action suggested by Mr. Cowan was not followed.

FTB then jumps to the 1999 timeframe and falsely states that Mr. Hyatt did not respond to FTB's Information Document Request (*Id.*) when he did in fact respond to all requests FTB made and produced substantial documents. Mr. Hyatt has exhaustively briefed his production of material in the Protests.

FTB then references the protective order issued by the Nevada court in 1999. (*Id.*) FTB has repeatedly attempted to spin the protective order as causing delay caused by Mr. Hyatt, but it is the FTB that decided to delay the tax proceedings based on the protective order. FTB's arguments are no more persuasive this time.

As set forth explicitly in the protective order, materials obtained in the Nevada case under the protective order could be used only in the Nevada case (as is typical in protective orders) unless approved by the opposing party *or* legally obtained in some other manner, *i.e.*, through the means available to the FTB in these California tax protest proceedings. The protective order therefore specifically recognized that FTB had administrative subpoena powers in California and could use those powers to obtain materials designated confidential under the protective order, if appropriate under California law.

In short, the protective order ensured that California law would determine what materials and information the FTB could obtain and use in the tax protest proceedings, the Nevada courts could not make that determination. Nothing prevented the FTB from issuing an administrative subpoena in the tax proceedings whenever it wished, which the FTB eventually did as addressed below. The FTB did not need Hyatt's permission to pursue administrative subpoenas in California if it wanted information for the tax protest proceedings.

The FTB also had the power to assert a "failure to exhaust" penalty against a taxpayer in a protest and thereby make an adverse finding if the taxpayer was not producing documents as requested. However, FTB did not assess such a penalty against Mr. Hyatt because Mr. Hyatt complied with all its requests for documents during the tax protest proceedings. FTB's purported inability to get documents, in the protests from the Nevada litigation, could therefore not have been the reason for the 11 year delay in the protests. The FTB made no request under the terms of the protective order for Mr. Hyatt to stipulate to certain material being turned over to the protest proceedings until June of 2002, which FTB argues required a court order. (*Id.*) But most of these documents were already in the protest officer's possession, and the FTB had made no effort to determine what documents the protest officer already had when it issued the subpoena.

The FTB then made no further requests under the protective order until October of 2005. The FTB later made a third request under the protective order in 2007. These requests were promptly answered by Hyatt with no delay caused to the FTB.

Much of the delay in the protest occurred when FTB placed a "hold" on the proceedings for six years.[109] This six year delay constitutes a ministerial or managerial act by FTB staff.[110] The protest officer was specifically instructed by her management to "hold" the protest indefinitely, despite the fact she had already drafted the protest determination letter, pending the Nevada litigation involving Mr. Hyatt and FTB. There is no conceivable reason for this delay. The issue of residency was not a cause of action in Hyatt v. FTB. In fact, in February 1998, a month after Mr. Hyatt filed the lawsuit against FTB in Nevada, FTB counsel Terry Collins, provided an affidavit under oath declaring that "FTB intends to continue processing, and continues to process, Mr. Hyatt's Protests within the administrative procedure set forth under California law for both tax years (1991 and 1992) despite his filing of this legal action in Nevada.[111]

In addition, unreasonable delays were caused by FTB's poor management and loss of documents from the audit files.[112] In addition to the protest officer's lost and incomplete audit files, there have been numerous admissions by the auditor that she destroyed documents directly relevant to the residency issue in this matter. For example, the auditor did not take adequate steps to secure the renter's file from Mr. Hyatt's Las Vegas Wagon Trails Apartment[113] and she consistently destroyed all of her handwritten notes.[114] Neither the Nevada litigation nor the issues of a protective order in the Nevada litigation to protect Mr. Hyatt from FTB abuses caused delay in the tax proceedings.[115]

Further FTB delay was caused by FTB's failure to assign a protest officer that could work on Mr. Hyatt's protest. Protest officer Ann Jovanovich was assigned to other cases instead of allowing her to work on Mr. Hyatt's protest, thus further

---

[109] 1991 ARB, § VII.C.1.

[110] Treas. Reg. § 301.6404.2(b)(l).

[111] Ex. 85, T. Collins affidavit, 3/18/98, ¶ 7, submitted with FTB's Motion for Judgment on the Pleadings filed in 1999 in Hyatt v. FTB.

[112] 1992 ARB, VII.C.2.

[113] After asserting in the Narrative Report that the Wagon Trails Apartments manager "provided the rental file for examination" during the auditor's visit to Nevada in March of 1995 (Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 3 (CCC 00966»), the auditor testified at trial in Hyatt v. FTB that the manager of the Wagon Trails Apartments had informed her that the auditor would need to obtain Mr. Hyatt's consent before the manager would release Mr. Hyatt's file to her. (See Ex. 5, Hyatt v. FTB, Partial Transcript of Proceedings, Testimony of Sheila Cox, 5/30/08, pp. 63-64.) However, the auditor did not obtain Mr. Hyatt's consent, nor did she "ask [Mr. Hyatt's] tax representative to provide consent," nor did she even "indicate to [Mr. Hyatt and his tax representative] [she] was interested in obtaining [Mr. Hyatt's] file." (Id.) This same file is where the auditor claims to have found and reviewed Mr. Hyatt's termination notice with its alleged statement that he was moving back to California (discussed infra) and to have found an envelope of Mr. Hyatt's that was postmarked in California and dated 12/8/91. (See Annex VI, CCC BATES Documents (FTB 1991 Narrative Report, p. 3 (CCC 00966)).

[114] See Ex. 61, Hyatt v. FTB, Partial Trial Transcript, Testimony of Sheila Cox, 5/27/08, pp. 127-128, 197-198; Ex. 35, Hyatt v. FTB, Partial Trial Transcript, Testimony of Sheila Cox, 5/28/08, pp. 105-107; Ex. 91, Hyatt v. FTB, Partial Trial Transcript, Testimony of Sheila Cox, 5/29/08, pp. 72-73; Ex. 41, Hyatt v. FTB, Partial Trial Transcript, Testimony of Sheila Cox, 6/2/08, p. 63; Ex. 92, Hyatt v. FTB, Partial Trial Transcript, Testimony of Sheila Cox, 6/6/08, p. 46.

[115] 1991 AOB, § IV.A.

1     delaying Mr. Hyatt's protest.[116] Still further delay was caused by FTB when it waited 14 months after the 1992 audit was

2     completed to issue the 1992 NPA. The 1992 audit was "closed" on June 18, 1996, but the 1992 NPA was not issued until

3     August 14, 1997, thus creating a 14 month delay by FTB.[117]

4          Contrary to FTB's assertions in its 1992 Concluding Summary, these tax proceedings were not delayed by Mr. Hyatt's

5     actions in the Protests or the Nevada tort case.

6         **2.   Mr. Hyatt's actions in the New York proceedings did not delay these tax proceedings**

7          FTB references and describes proceedings in New York regarding subpoenas it served in 2011 (some three years

8     after these appeals started). (*Id.*, at 20.) It was not Mr. Hyatt's actions in those proceedings which caused any delay in these

9     tax proceedings. Indeed, after waiting until 2011 to pursue the subject subpoenas, the FTB issued vastly overbroad requests.

10     The New York court properly found the subpoenas too broad and reduced the time period of the documents covered by the

11     subpoenas. FTB appealed that issue causing additional delay. FTB then violated the New York order by producing to the

12     Board documents the New York court ordered withheld and not to be produced by the third parties. FTB's attempted

13     improper use of those documents caused more delays in these tax proceedings when Mr. Hyatt was forced to bring successful

14     enforcement actions to enforce the New York court order.[118] The delays were not caused by anything Mr. Hyatt did in the

15     New York proceedings.

16         **3.   Hyatt's due process litigation has not delayed these tax proceedings**

17          FTB has not contended that the District Court action caused any delay in the tax proceeding and it has not. It is not

18     clear why FTB included a discussion of District Court action in the interest abatement section of its Concluding Summary.

19     Contrary to FTB's allegation, the District Court action was brought to protect Mr. Hyatt's constitutional rights because of the

20     long delays in the tax proceeding caused by FTB have resulted in the deaths of witnesses, loss of memory and loss of

21     documents.[119] The case is now on appeal to the Court of Appeals for the Ninth Circuit.

22          As FTB notes, Mr. Hyatt's appeal to the Ninth Circuit of the dismissal of the due process action is set for oral

23     argument on February 17, 2017. But again the due process action has not caused any delay here and is irrelevant to Mr.

24     Hyatt's request for interest abatement.

25         **4.   FTB's actions in these proceedings, not Mr. Hyatt, have caused these proceedings to be delayed from 2008 to the present.**

26          FTB again references the New York proceedings, falsely blaming Mr. Hyatt's actions there for causing delay in these

27     tax proceedings. (*Id.*, at 23.) Mr. Hyatt addressed and rebutted this assertion above.

---

[116] 1992 ARB, § VII.C.3.
[117] 1992 ARB, § VII.C.4.
[118] 1992 ASAB, § 1.8, p. 58.
[119] Affidavit of Gilbert P. Hyatt, December 12, 2016, ¶¶269-271.

RJN1276

1    FTB then argues that Mr. Hyatt sought and received 19 extensions in these proceedings. (*Id.*) But as the Board is

2    well aware, it is the FTB that has repeatedly sought and received additional briefing. Despite Mr. Hyatt, as the appellant,

3    being entitled to file the final briefing, on several occasions FTB sought and received permission for additional briefing and

4    submission of evidence. This then required a new briefing schedule be set with Mr. Hyatt submitting the final briefing, only

5    for FTB to seek additional briefing. This endless cycle was caused by FTB and provides no basis for rebutting Mr. Hyatt's

6    request for interest abatement.

7        Mr. Hyatt's representatives expeditiously filed the Appellant's Opening Briefs on December 9, 2008, less than a year

8    after the appeals were filed on January 22 and 23, 2008. A great effort was required to obtain testimony from the large

9    number of witnesses that had previously been identified to FTB but had not been approached by FTB. In addition, FTB for

10    the first time raised the sourcing issue in its NOAs and refused to give Mr. Hyatt's representatives an adequate opportunity to

11    respond during the protest. A considerable amount of effort was therefore required to prepare the opening briefs with respect

12    to the sourcing issue, which was being adjudicated in the first instance before your Board. Under the circumstances the time it

13    took to file Appellant's opening briefs was very reasonable.

14        The long delays caused by the Philips discovery and brief was the fault of FTB, not Mr. Hyatt. FTB was aware of

15    Philips from Mr. Hyatt's 1991 California part year tax return and even issued and then withdrew a subpoena related to Philips

16    in 2006. Nevertheless, FTB waited until April 2011 to issue its unlawful, overbroad subpoenas related to Philips. This was

17    nine months after the filing of his August 23, 2010, Reply Briefs and 18 years after FTB began its audits with knowledge of

18    Philips. FTB made numerous false statements and misrepresentations in its 1991 and 1992 opening briefs related to

19    sourcing[120] and it was necessary for Mr. Hyatt to expend considerable time and effort to rebut those numerous false statements

20    and misrepresentations in his replies.

21        The FTB statement that FTB prevailed in the New York action is another of thousands of FTB false statements,

22    mischaracterizations and fabrications. The order of the New York court significantly limited the scope of FTB's subpoenas by

23    excluding discovery in years 1993-1997 and by excluding irrelevant discovery of the *Hyatt v. Boone* interference.[121]

24    Subsequently, the court found that FTB had violated its order on multiple occasions and ordered correction of the

25    violations.[122]

---

[120] 1991 ROB, §§ I.c., I.d., IV.; 1992 ROB §§ IV.

[121] Order of the Supreme Court (Lefkowitz, J), Westchester County, July 29, 2011; *aff'd, Hyatt v. State of California FTB,* 2011-0685, (Supreme Court of New York, Second Judicial Department (March 13, 2013).

[122] Order of the Supreme Court (Lefkowitz, J), Westchester County, July 29, 2011; *aff'd, Hyatt v. State of California FTB,* 2011-06859, Supreme Court of New York, Second Judicial Department (March 13, 2013).

RJN1277

It is clear that it is the FTB, not Mr. Hyatt, that has caused the extensive delays in the audit, protest and this appeal. The delays caused by FTB in these 1991 and 1992 SBE appeals alone have been unconscionable. The extensions of time have been necessary to deal with FTB's extraordinary briefing technique of making thousands of false statements, mischaracterizations and fabrications. It has taken an enormous effort and thousands of pages of attachments and briefing to rebut these thousands of FTB false statements[123] in prior briefing, not to mention the present Affidavit. FTB is responsible for the long delays in these proceeding, bringing the time to 23 years and running.

Mr. Hyatt has previously briefed the issues of interest abatement and demonstrated that interest abatement is appropriate.[124] FTB's false statements related to interest abatement are addressed in Hyatt Dec. 2016 Affidavit, ¶¶ 714-764.

**F. FTB Has Acknowledged Its $24 Million Error But Now Denies the Error**

---

[123] For example see, (a) Rebuttal to the Facts presented by FTB in its Determination Letter, Annex VIII; (b) Rebuttal to Sourcing Statements in FTB's 1991 Opening Brief, Annex XIV; (c) Table of FTB's Misrepresentations, Unsupported Statements, and Unreasonable Inferences in FTB 1991 Opening Brief, Annex XXXVI; (d) Testimonial Responses Re FTB 1991 Opening Brief, Annex XXXI; (e) Rebuttals to Sourcing Statements in FTB's 1992 Opening Brief, Annex XV; (f) Table of Contacts With Hyatt in Nevada, Exhibit 19 to 1991 AOB; (g) Table of FTB's Misrepresentations, Unsupported Statements, and Unreasonable Inferences in FTB 1991 Opening Brief, Annex XXVI, (h) Rebuttal to Sourcing Statements in FTB's 1992 Opening Brief, Annex XV; (i) Table of Nevada Contacts, Exhibit 23 to 1992 AOB; (j) Table of FTB's Misrepresentations, Unsupported Statements, and Unreasonable Inferences in FTB 1992 Opening Brief, Annex XXVII; (k) Testimonial Responses Re FTB 1992 Opening Brief, Annex XXXI, Tab 4; (l) Table of FTB's Misrepresentations, Unsupported Statements, and Unreasonable Inferences in FTB 1991 Reply Brief, Annex XXVIII; (m) Testimonial Responses Re FTB 1991 Reply Brief, Annex XXXI, Tab 5; (n) Mr. Hyatt's Rebuttal to FTB's 17 "Examples of Mr. Hyatt's Continuing Presence in California" After April 3, 1991, Exhibit 18 to 1992 ARB; (o) Table of FTB's Misrepresentations, Unsupported Statements, and Unreasonable Inferences in FTB 1992 Reply Brief, Annex XXIX; (p) Testimonial Responses Re FTB 1992 Reply Brief, Annex XXXI, Tab 6; (q) Rebuttal to FTB's Attachment A (1991), Annex XVII; (r) Rebuttal to FTB's Attachment A (1992), Annex XVIII; (s) Testimonial Responses Re FTB 1991 Attachment A, Annex XXXI, Tab 7; (t) Testimonial Responses Re FTB 1992 Attachment A, Annex XXXI, Tab 8; (u) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, Introduction; (v) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, September 1991; (w) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, October 1991; (x) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, November 1991; (y) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, December 1991; (z) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, January 1992; (aa) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, February 1992; (ab) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, March 1992; (ac) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, April 1992; (ad) Rebuttal to FTB's Attachment B, Annex XIX; (ae) Rebuttal to FTB's Attachment C, Annex XIX; (af) Rebuttal to FTB Attachment D, Annex XXX, Tab 1; (ag) Objection and Rebuttal to FTB Attachment E; (ah) Exhibit A, Responses to FTB Attachment D Claims, Annex XXX, Tab 2; (ai) Samples of FTB's Misrepresentations, Unreasonable Inferences and Unsupported or Otherwise Erroneous Assertions, Exhibit 22; (aj) Mr. Hyatt's Rebuttal to FTB's Table 2 "Material Misrepresentations", 1991 ROB, Table 2, pp. 89-90, Exhibit 53; (ak) Table of False Statements Made In the FTB Audit File, Tab 3; (al) Table of False Statements Made by Jake Dameron, Tab 2; (am) Table of False Statements Made By William Savage, Tab 1; (an) Supplemental Table of False Statements Made in the FTB Audit File as Argued in FTB's Second Additional Briefing; (ao) Supplemental Table of False Declaration Statements Made by Jake Dameron as Argued in FTB's Second Additional Briefing; (ap) Supplemental Table of False Declaration Statements Made by William Savage as Argued in FTB's Second Additional Briefing; (aq) Table of William Savage's Fraud and Dishonesty.

[124] 1991 AOB, § VI.; 1992 AOB, § VII.; 1991 ARB, § VI.; 1992 ARB,§ VII.; 1992 ASAB, § 1.8.

RJN1278

## CERTIFICATE OF SERVICE

U.S. Court of Appeals Docket Number(s):  15-15296

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 7, 2017.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature:      *s/ Yolanda Mendez*