**No. 15-15296**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

GILBERT P. HYATT,

*Plaintiff-Appellant,*

v.

BETTY T. YEE, in her official capacity as California Franchise Tax
Board member and California State Board of Equalization member
DIANE L. HARKEY, in her official capacity as California State
Board of Equalization member; JEROME E. HORTON, in his
official capacity as California State Board of Equalization member;
MICHAEL COHEN, in his official capacity as California Franchise
Tax Board member; GEORGE RUNNER, in his official capacity as
California State Board of Equalization member; FIONA MA, in her
official capacity as California State Board of Equalization member
and California Franchise Tax Board member,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California
Case No. 2:14-cv-00849-GEB-DAD (Hon. Garland E. Burrell, Jr.)

APPELLANT
GILBERT P. HYATT'S
COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
VOLUME 6 OF 7
RJN1279 - RJN1610

Donald J. Kula
Oliver M. Gold
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Erwin Chemerinsky
EChemerinsky@law.uci.edu
UC IRVINE SCHOOL OF LAW
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000
Telephone: 949.824.8814
Facsimile: 949.824.7336

Malcolm Segal, Bar No. 075481
MSegal@segal-pc.com
SEGAL & ASSOCIATES, PC
400 Capitol Mall, Suite 2550
Sacramento, CA 95814
Telephone: 916.441.0886
Facsimile: 916.475.1231

Attorneys for Appellant Gilbert P. Hyatt

# APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
## INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| | **VOLUME 1** | |
| 1 | Decision issued by the Nevada Supreme Court dated September 18, 2014 | RJN0001-0035 |
| 2 | Respondent Gilbert P. Hyatt's Answering Brief filed January 5, 2010 | RJN0036-0256 |
| 3 | FTB Notice of Opening Audit for 1991 tax year dated June 17, 1993 | RJN0257-0262 |
| 4 | FTB Notice of Opening Audit for 1992 tax year dated January 19, 1996 | RJN0263-0264 |
| | **VOLUME 2** | |
| 5 | FTB Notice of Preliminary Determination for 1991 tax year dated August 2, 1995 | RJN0265-0305 |
| 6 | FTB Notice of Preliminary Determination for 1992 tax year dated April 1, 1996 | RJN0306-0323 |
| 7 | FTB Notice of Proposed Assessment for 1991 tax year dated April 23, 1996 | RJN0324-0328 |
| 8 | FTB Notice of Penalty Adjustment for 1992 tax year dated April 10, 1997 | RJN0329-0333 |
| 9 | FTB Notice of Proposed Assessment for 1992 tax year dated August 14, 1997 | RJN0334-0340 |

1

# APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
## INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 10 | Nevada Tort Case Trial Transcript (RT: June 20, 147:14-148:20; 150:14-151:2; 151:3-153:5) | RJN0341-0347 |
| 11 | Nevada Tort Case Trial Transcript (RT: June 20, 175:15-177:13, 185:19-188:6) | RJN0348-0355 |
| 12 | Nevada Tort Case Trial Transcript (RT: April 25, 80:10-81:17, 84:11-24) | RJN0359-0362 |
| 13 | FTB Audit Strategy Memo dated November 18, 1994 | RJN0454-0457 |
| 14 | Nevada Tort Case Trial Transcript (RT: April 24, 132:2-23, 140:11-141:25) | RJN0458-0461 |
| 15 | Nevada Tort Case Trial Transcript (RT: April 24, 42:4-43:8, 80:22-81:11, 134:1-12; 136:23-138:2) | RJN0462-0470 |
| 16 | Nevada Tort Case Trial Transcript (RT: April 24, 76:16-77:7, 129:9-15) | RJN0471-0474 |
| 17 | Nevada Tort Case Trial Transcript (RT: April 24, 26:11-19, 74:1-75:20) | RJN0475-0478 |
| 18 | FTB internal memo dated August 21, 1995 | RJN0479-0484 |
| 19 | FTB audit reviewer's notes dated April 18, 1996 | RJN0485-0486 |
| 20 | Unsworn witness statements dated December 6, 1994, December 19, 1994, and January 18, 1995 | RJN0487-0502 |
| 21 | FTB Interrogatory Response | RJN0503-0510 |

2

**APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS**
**INDEX**

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 22 | Nevada Tort Case Trial Transcript (RT: June 9, 97:9-16, 102:7-103:17, 108:2-110:10) | RJN0511-0517 |
| 23 | Nevada Tort Case Trial Transcript (RT: May 30, 145:4-146:17, 148:9-151:5) | RJN0518-0524 |
| 24 | FTB auditor notes dated August 14, 1995 | RJN0525-0528 |
| 25 | Letters from Hyatt tax counsel to FTB dated April 29, 1996, May 1, 1996, December 11, 1997, and March 10, 1998 | RJN0529-0535 |
| 26 | FTB audit manual excerpt | RJN0536-0537 |
| 27 | Letter from Hyatt tax counsel to FTB dated July 17, 1997 | RJN0538-0542 |
| 28 | FTB reviewer comments dated August 4, 1997 | RJN0543-0545 |
| 29 | Letter from Hyatt tax counsel to FTB protest section, dated October 10, 1997 | RJN0546-0549 |
| 30 | Email internal among FTB supervisors dated April 4, 1997 | RJN0550-0551 |
| | **VOLUME 3** | |
| 31 | Nevada Tort Case Trial Transcript (RT: April 22, 69:8-71:3, 73:3-74:23, 84:2-86:2, 88:22-90:19; RT: April 23, 88:1-89:22) | RJN0552-0566 |

**APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS**
**INDEX**

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 32 | Hyatt Protest Letter for 1991 tax year dated June 20, 1996 | RJN0567-0629 |
| 33 | Hyatt Protest Letter for 1992 tax year dated October 10, 1997 | RJN0630-0633 |
| 34 | FTB Protest Determination Letter for both 1991 and 1992 dated November 1, 2007 | RJN0634-0635 |
| 35 | Nevada Tort Case Trial Transcript (RT: May 22, 2008, 57:20-59:6, 80:19-84:14) | RJN0636-0644 |
| 36 | Nevada Tort Case Trial Transcript (RT: May 22, 2008, 92:4 -94:11) | RJN0645-0648 |
| 37 | Nevada Tort Case Trial Transcript (RT: April 30, 2008, 149:11-24) | RJN0649-0650 |
| 38 | Nevada Tort Case Trial Transcript (RT: July 15, 2008, 3:13-16, 12:19-13:8) | RJN0651-0654 |
| 39 | Information/Document Requests (IDRs) from FTB protest officer to Hyatt tax counsel dated December 30, 1999 | RJN0655-0686 |
| 40 | Nevada Tort Case Trial Transcript (RT: May 1, 2008, 40:22-42:7) | RJN0687-0690 |
| 41 | Nevada Tort Case Trial Transcript (RT: June 16, 2008, 56:14-57:3, 58:7-60:4, 61:14-25; 72:9-13, 75:18-77:6) | RJN0691-0701 |
| 42 | Letters from former Hyatt tax counsel Eric Coffill dated June 30, 2000, July 31, 2001 and June 15, 2001 | RJN0702-0810 |

4

# APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
## INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 43 | FTB Protest Log (excerpts) dated September 27, 2000 and October 4, 2000 | RJN0811-0813 |
| **VOLUME 4** | | |
| 44 | FTB Protest Log (excerpt) dated February 20, 2002 | RJN0814-0815 |
| 45 | Email from FTB protest officer dated February 20, 2002 | RJN0816-0817 |
| 46 | Letter from former Hyatt tax counsel Eric Coffill dated March 7, 2002 | RJN0818-0819 |
| 47 | Email from FTB counsel Ben Miller dated April 5, 2002 | RJN0820-0821 |
| 48 | Letter from former Hyatt tax counsel Eric Coffill to FTB dated April 25, 2002 | RJN0822-0826 |
| 49 | FTB Protest Log (excerpt) dated April 25, 2005 | RJN0827-0828 |
| 50 | Nevada Discovery Commissioner Reports and Recommendations filed October 5, 2005 and November 10, 2005 | RJN0829-0850 |
| 51 | Nevada Tort Case Transcript of Nevada Discovery Commissioner ruling dated November 9, 1999 | RJN0851-0852 |
| 52 | Nevada Protective Order filed December 27, 1999 | RJN0853-0865 |
| 53 | Briefing filed in Nevada trial court during trial conducted in 2008 | RJN0866-1016 |

**APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR
JUDICIAL NOTICE DOCUMENTS
INDEX**

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 54 | Nevada Tort Case Trial Transcript (RT: May 7, 2008, 98:9-103:25, 109:7-129:3; RT: May 27, 2008, 27:6-30:10; RT: June 11, 9:7-38:21) | RJN1017-1080 |
| **VOLUME 5** | | |
| 55 | Nevada Tort Case Trial Transcript (RT: June 16, 2008, 2:11-34:15, 35:13-37:6, 117:25-132:8 | RJN1081-1133 |
| 56 | Nevada Tort Case Trial Transcript (RT: July 11, 2008, 41:5-42:23; 47:19-48:13; RT: July 15, 2008,187:3-17) | RJN1134-1140 |
| 57 | Nevada Tort Case Trial Transcript (RT: July 11, 2008, 138:23-139:14, 153:19-154:19) | RJN1141-1145 |
| 58 | Nevada Tort Case Trial Transcript (RT: July 15, 2008, 187:3-15) | RJN1146-1147 |
| 59 | Nevada Tort Case Trial Transcript (RT: July 15, 2008, 188:9-192:11) | RJN1148-1153 |
| 60 | FTB Demand Letter under the Nevada Protective Order dated June 3, 2002 | RJN1154-1156 |
| 61 | Nevada Tort Case Trial Transcript (RT: July 15, 2008, 162:21-163:5, 163:7-166:13, 187:3-188:6; RT: July 14, 2008, 174:3-175:21) | RJN1157-1167 |
| 62 | SBE Rules for Tax Appeals, Rules 5431(b)(3) and 5435 | RJN1168-1172 |

**APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR
JUDICIAL NOTICE DOCUMENTS
INDEX**

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 63 | Email from former Hyatt tax counsel Eric Coffill to the SBE dated June 3, 2009 | RJN1173-1175 |
| 64 | SBE letter to the Franchise Tax Board ("FTB") dated July 8, 2009 | RJN1176 |
| 65 | SBE letter to FTB dated August 21, 2009 | RJN1177 |
| 66 | Letter from former Hyatt tax counsel Eric Coffill to the SBE dated September 2, 2009 | RJN1178-1180 |
| 67 | SBE letter to FTB dated September 14, 2009 | RJN1181 |
| 68 | SBE letter to both FTB and former Hyatt tax counsel Eric Coffill dated August 2, 2012 | RJN1182 |
| 69 | Letter from SBE to both FTB and former Hyatt tax counsel Eric Coffill dated February 20, 2013 | RJN1183 |
| 70 | FTB letter to the SBE dated July 16, 2014 | RJN1184 |
| 71 | FTB letter to SBE dated August 13, 2014 | RJN1185 |
| 72 | SBE letter to the FTB and former Hyatt tax counsel Eric Coffill dated December 9, 2014 | RJN1186-1187 |
| 73 | FTB letter to the SBE dated March 17, 2015 | RJN1188-1194 |
| 74 | FTB Additional Brief, pp. 1:24-2:1; 28, fn. 152, (FTB's $24 Million Error) filed in the SBE Appeals on February 19, 2013 | RJN1195-1199 |

# APPELLANT GILBERT P. HYATT'S COUNTER REQUEST FOR JUDICIAL NOTICE DOCUMENTS
## INDEX

| Hyatt Exhibit No. | Document | Page |
|---|---|---|
| 75 | Hyatt Additional Supplemental Briefing, Attachments 1, 3, and 4 filed in the SBE Appeals on September 28, 2016 | RJN1200-1269 |
| 76 | Hyatt Third Additional Briefing, pp. 22-23, (1991 Tax-Year Appeal) filed in the SBE Appeals on December 12, 2016 | RJN1270-1271 |
| 77 | Hyatt Third Additional Briefing, pp. 13-19, (1992 Tax-Year Appeal) filed in the SBE Appeals on December 12, 2016 | RJN1272-1278 |
| | **VOLUME 6** | |
| 78 | Hyatt Affidavit filed in the SBE Appeals on December 12, 2016 | RJN1279-1610 |
| | **VOLUME 7** | |
| 79 | Subpoenas issued by Supreme Court of the State of New York, County of Westchester, to FTB in conjunction with the SBE Appeals and dated May 26, 2011 | RJN1611-1732 |
| 80 | Temporary Restraining Order (TRO) Ruling issued by Supreme Court of the State of New York, County of Westchester, in conjunction with the SBE Appeals and dated March 16, 2015 | RJN1733-1735 |

**AFFIDAVIT OF GILBERT P. HYATT**

**REGARDING FTB'S CONCLUDING SUMMARIES**

STATE OF NEVADA                    )

                                   ) ss:

COUNTY OF CLARK                    )

GILBERT P. HYATT, being duly sworn, according to oath, deposes and states:

1.      I am a resident of the State of Nevada, I am above the age of majority and I am competent to testify to the following facts of my own personal knowledge.

2.      This is a supplemental affidavit supplementing all of my prior affidavits and it is specifically directed to correcting the incorrect statements in the FTB 1991 and 1992 Concluding Summaries.  This supplemental affidavit is arranged in the order of FTB 1991 and 1992 Concluding Summaries; first addressing the FTB 1991 Concluding Summary in sequence page by page (beginning with ¶ 13 below), then addressing the Dunn Declaration in sequence paragraph by paragraph (beginning with ¶ 422 below), and then addressing the FTB 1992 Concluding Summary in sequence page by page (beginning with ¶ 0 below).

**Introduction**

3.      My representatives stressed the need to fully comply with the SBE's orders to provide Concluding Summaries that "will merely summarize arguments and evidence presented in other briefings"[1] and I believe that they fully complied therewith.  However, FTB did not provide Concluding Summaries in that FTB's mis-characterized Concluding Summaries <u>do not</u> "merely summarize arguments and evidence presented in its other briefings."  Instead, I was very

─────────────────────

[1] Letter from Grant Thompson to Eric Coffill and Robert Dunn dated September 3, 2014.

1

RJN1279

1   concerned when I found that FTB's so-called Concluding Summaries are in effect briefings with

2   new arguments, new documents, and new positions. My concern was in part because my

3   representatives were not allowed to do so in order to comply with your Board's orders. This was

4   also in part because my representatives do not have time prior to the December 12, 2016,

5   deadline for my reply to FTB's Concluding Summaries to permit them to locate additional

6   evidence to rebut the FTB's new arguments, new documents, and new positions. Thus, it is

7   important that my testimony herein be given substantial consideration to compensate for the lack

8   of time to gather my evidence to rebut FTB's new evidence and new arguments.

9       4.      This paragraph is intentionally left blank.

10      5.      FTB based its Concluding Summaries in large part on numerous

11  misrepresentations, inferences, and speculation (discussed below) just as it based its RSABs in

12  large part on numerous misrepresentations, inferences, and speculation.[2] I produced

13  overwhelming documentary evidence and eyewitness testimony in support of my appeals before

14  your Board.[3]

15      6.      Virtually all of FTB's statements in its Concluding Summaries are false or at best

16  misrepresentations, discussed in detail herein.

17      7.      The hundreds upon hundreds of false statements by FTB in its Concluding

18  Summaries can be characterized by one example: FTB continues to assert the false mantra

19  "absence of contemporaneous documentation" (e.g., FTB 1991 Concluding Summary, p. 11:6).

20  However, this is a very compelling reason for your Board to pay particular attention to my three

---

[2] This issue is addressed, e.g., in the 1991 ASAB at §§ 1.8.1, 1.8.3, 1.8.4; 1992 ASAB, §§ 1.4, 1.5.9, 1.5.10.

[3] This issue is addressed, e.g., in the 1991 ASAB at §§ 1.3, 1.3.1-1.3.12, 1.8.2; 1992 ASAB, §§ 1.5, 1.5.1-1.5.10, 1.7, 1.7.1-1.7.5.

2

RJN1280

1  Contemporaneous Documentary Evidence (CDE) affidavits which provide thousands of very

2  relevant documents and my eyewitness testimony therein explaining and authenticating these

3  documents under oath.  For example, I produced many personal checks drawn on my Las Vegas

4  checking accounts, with my Las Vegas address printed thereon and with my banks' Las Vegas

5  addresses printed thereon, paid to Las Vegas entities, and signed by me in Las Vegas.[4]  This is

6  one example of the many hundreds of examples of FTB's false statements in its Concluding

7  Summaries.  FTB could not have given me my due process rights because FTB is essentially

8  admitting that it disregarded my thousands of pages of very relevant CDE.

9       8.     I am the victim of still another method used by FTB -- string together a group of

10  very serious but false statements without even attempting to support them.  For example, FTB

11  falsely stated the following:

12         Mr. Hyatt obtained the coveted '516 patent while a
   California domiciliary.  With the contested patent in hand, Mr.
13         Hyatt, his Los Angeles patent lawyer, and others, devised a
   business plan designed to obtain hundreds of millions of dollars
14         from Japanese companies engaged in the international sale of
   products which used Mr. Hyatt's microchip technology.  The plan,
15         among other things, was designed to extract compensation from
   the Japanese companies for their past use of the technology falling
16         under the '516 patent and other patents he owned.

17  The FTB 1991 Concluding Summary at p. 8.

18         During the disputed period in 1991, Mr. Hyatt was physically
   present in California at his La Palma home or his patent attorney's
19         Los Angeles office participating in licensing activities, involved
   with the Hyatt v. Boone interference, marketing or promotional
20         work, dining at restaurants and handling matters related to his
   mother's estate.

21  The FTB 1991 Concluding Summary at pp. 13-14.

22  —————————————————

23      [4] See, e.g., the Nevada Checks Table, Exhibit CDE-T003 in Hyatt Post-DP CDE
   Affidavit, September 6, 2016; see also the checks I signed in Las Vegas provided in my Supp.
   CDE Affidavit, September 6, 2016, ¶¶ 153-243 and Post-DP CDE Affidavit, September 6, 2016,
24  ¶¶ 546-949.

3

1  These FTB statements are false. My rebuttals to these false statements are set forth in ¶¶ 106,

2  212, respectively.

3       9.    I am the victim of still another method used by FTB -- the big lie method, select

4  an issue, in FTB's case minor issues, and repeat them over and over and over again until they

5  seem like major issues. For example, the FTB issue of the stay at the Continental Hotel and the

6  FTB issue of the Continental Hotel records is this type of method. The stay at the Continental

7  Hotel was only for a 2 ½ week period and there is no disputed income during this period, yet

8  FTB dominates the six month disputed period with its false statements about my stay at the

9  Continental Hotel. And FTB repeats this mantra issue over and over and over again. To make

10  this issue worse, FTB disregards the significant evidence that I produced to confirm my stay at

11  the Continental Hotel. Regarding the FTB issue of the Continental Hotel records, in addition to

12  the stay being for only 2 ½ weeks, FTB repeats this concealment of records mantra over and over

13  and over again. To make this issue worse, FTB disregards the significant evidence that I

14  produced to confirm that there were no records generated. Consistent with Las Vegas'

15  reputation for being fast and loose, the tour company took only case and did not give receipts and

16  the hotel did not register tour company guests (the tour company rented blocks of rooms from the

17  hotel). Numerous Continental Hotel employees, including the president and other top executives

18  in the 1991 time frame, testified that the Continental Hotel did not generate any records

19  concerning tour company guests and that the Continental Hotel did not register tour company

20  guests. I testified that I paid cash to the tour company, I received a room key from the tour

21  company, and I was not asked to register and I did not register at the Continental Hotel. Thus, a

22  very large "witch hunt" about non-existent records at the Continental Hotel is a waste of your

23  Board's time.

24

4

1        10.     FTB continues to try to make much out of a question about -- where did he

2    stay -- and documentation for my short 2 ½ week stay at the Continental Hotel.  But FTB

3    disregards the fact that ***this issue never came up during the audit***, this issue came up ***after the***

4    ***audit was over*** and FTB disregards the fact that that there never were any receipts relative to my

5    stay at the Continental Hotel.  The auditor issued a horrendous determination letter and fraud

6    penalty without warning dated August 2, 1991, my attorney told me not to worry, that we would

7    get it resolved in the protest, and we started to plan for the protest.  Then the auditor issued

8    long-belated document requests (4 years after the 1991 events and more than two years after the

9    audit began) which my representatives responded to.  My representatives were finishing off the

10    audit and preparing for the protest because the determination letter had been issued, but they

11    stepped back to address the document request which requested documents, I understood that the

12    auditor wanted documents, and my representatives produced all of the documents that I could

13    find on the subject for that period.

14            **<u>Document Request #1</u>**
               *Provide documentation*, such as hotel receipts, restaurant receipts
15               etc. to substantiate where the taxpayer resided for the period from
               September 24, 1991 through November 1, 1991.
16

17        FTB Letter dated September 26, 1995 (FTB-101891) (emphasis added).  Then, 20 years

18    later, when the trail was very cold, FTB tries to make this into a big issue.  FTB refuses to accept

19    the significant evidence that my representatives produced establishing that, consistent with Las

20    Vegas' reputation for being fast and loose, the tour company did not give receipts and the hotel

21    did not register tour company guests (the tour company rented blocks of rooms from the hotel).

22    Thus, I did not have any receipts for the Continental Hotel.  But I did have receipts for my

23    apartment rental beginning early October 1991 and continuing throughout the period of the

24

5

RJN1283

1   request and we produced these apartment receipts to the auditor.  Essentially, FTB is blaming me

2   for the audit delays in requesting documents, the unclear document requests, and its failure to

3   follow up.  See also ¶¶ 31-35, 91, 95, 96, 675 herein.

4          11.     In its Concluding Summaries, FTB claims that I remained a California resident

5   for the entire disputed period from September 26, 1991 through April 2, 1992.  This is false.  I

6   moved to Las Vegas on September 26, 1991, and I permanently resided in Las Vegas through the

7   present time.  Before I moved to Las Vegas on September 26, 1991, I lived in the Jennifer Circle

8   neighborhood.  As shown by the photograph of Jennifer Circle immediately below, Jennifer

9   Circle is a short, compact cul-de-sac with only 16 houses.  Many of my former Jennifer Circle

10  neighbors have testified about my moving away in 1991 (22 Jennifer Circle neighbors testified

11  about my moving away in 1991 and 23 witnesses testified that they did not ever again see me at

12  Jennifer Circle after I moved away in 1991).[5]  Seven of the 22 eyewitness neighbors (members

13  of the Kim family and the Neuner family) lived right next door to me.  See the Introduction to

14  my 1991 Concluding Summary.

---

[5] Updated Testimonial Topics, Exs. T102, T127.

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



7

12.     Before I moved to Las Vegas on September 26, 1991, I was part of the Neighborhood Watch program at Jennifer Circle.  Through the Neighborhood Watch program I knew most of my neighbors at Jennifer Circle and had close relationships with several of my neighbors at Jennifer Circle before I moved to Las Vegas.  The photograph below, Figure 2, shows the Jennifer Circle Neighborhood Watch bumper sticker on my 1977 Toyota Celica. Seven of my former Jennifer Circle neighbors testified about the Neighborhood Watch program at Jennifer Circle.  See Exhibit 3 attached hereto.

8

RJN1286

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Figure 2**

**Neighborhood Watch Bumper Sticker**



9

RJN1287

**My Testimony Regarding FTB's 1991 Concluding Summary.**

13.    The FTB 1991 Concluding Summary at p. 1 states that the issues include:

> Whether appellant became a nonresident of California (as defined
> by Revenue and Taxation Code § 17014) on September 26, 1991.

I permanently moved to Nevada on September 26, 1991, at which time I intended to reside in Nevada indefinitely and I have continued to reside in Nevada to the present time. I intend to reside in Nevada for the rest of my life.  During the disputed period I leased an apartment, I shopped for and purchased a house, I shopped for and purchased a new car, I obtained a Nevada driver's license, I registered to vote, I worked with several real estate agents, three of which made house purchase offers for me with large cash deposits, I engaged a Las Vegas attorney and a Las Vegas CPA, I opened utilities and I paid rent and utility bills, I signed and had notarized an affidavit of Nevada residency required for my position as executor of my mother's estate, and much much more.  These and many other facts with extensive documentation are sworn to in my two disputed period CDE affidavits.[6]  Additional documents and facts appear in my post-disputed period CDE affidavit[7] which was necessitated by FTB extending the assessments into the post-disputed period during this 1992 appeal without giving me my rights to an audit and protest related thereto.  Many witnesses have testified about me moving to and residing in Las Vegas, summarized in the Testimonial Topics Table and excerpted in the exhibits thereto.[8]  In particular, Testimonial Topics T001, T002, T003, T004, T005, T006, T007, T008, T009, T018,

---

[6] Hyatt DP CDE Affidavit, July 24, 2012; Hyatt Supp. CDE Affidavit, September 6, 2016.
[7] Hyatt Post-DP CDE Affidavit, September 6, 2016.
[8] See 1991 ASAB, § 1.3.1, Updated Testimonial Topics Table.

10

RJN1288

T019, T040, T045, T049, T102, T124, T127, T128, and T141 provide testimony about me moving to and residing in Las Vegas.[9]

14.     The FTB 1991 Concluding Summary at p. 1 states that the issues include:

> Whether appellant operated a business from California through December 31, 1991 that generated California source income under Revenue and Taxation Code §§ 17951 and 17952.

I did not operate a business from California from September 26, 1991, through December 31, 1991, as falsely alleged by FTB, and I did not have a licensing business as also alleged by FTB.[10]  All of the California source income that I received during 1991 was reported on and my taxes were paid with my 1991 part year California tax return.  All of the license payments that I received from September 26, 1991, when I moved to Nevada, through the end of 1991 and 1992 came from the ordinary course of licensing my Nevada situs patents, not from any operation of a California business.[11]  See ¶¶ 73, 89, 90, 205, 279, 376, 380 herein.

15.     In July 1991, before I moved to Las Vegas, I granted an exclusive license to Philips to sublicense my patents.  Philips also assumed responsibility for the *Hyatt v. Boone* interference.  Philips had a world-class licensing capability with a world-wide licensing organization.[12]  It is absurd to suggest that I would compete with this great capability.[13] Furthermore, Philips had to make minimum annual payment to license my patents and Philips assumed responsibility for the interference.  In the July 1991 Philips Agreement I represented that I would not compete with Philips.  I would not and I did not breach my representations and

---

[9] This issue is addressed, e.g., in the 1991 ASAB at § 1.4; Appellant's Concluding Summary (1991), § 1.4.
[10] This issue is addressed, e.g., in the 1991 ASAB at §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.4.1.3, 1.6, 1.7.1.2, 1.7.2, 1.7.3.
[11] See, e.g., 1992 ASAB, § 1.7.1.4.
[12] See, e.g., 1992 ASAB, § 1.7.3.
[13] 1992 ASAB, § 1.7.3.

11

RJN1289

warranties and my contractual obligations to Philips and I did not jeopardize my licensing

income from Philips by breaching my agreement with Philips.[14]

16.     The FTB 1991 Concluding Summary at p. 1 states that the issues include:

> Was the accuracy related fraud penalty (under Revenue and Taxation Code § 19164) properly imposed for tax year 1991.

I did not commit a fraud. I decided to move to Las Vegas in 1990 based in part on several

personal issues (e.g., the murder of my oldest son and the loss of my aerospace consulting).[15] I

prepared to move to Las Vegas, I moved to Las Vegas on September 26, 1991, I immediately

worked to get settled in Las Vegas, I continue to reside in Las Vegas to the present, and I plan to

live in Las Vegas for the rest of my life.[16]

17.     My 1991 part year California tax return accurately reflects my 1991 California

income. I moved to Nevada on September 26, 1991, I have resided in Las Vegas since then, and

I have at all times since then had an honest and firm belief that I was a resident of Nevada.

18.     The FTB 1991 Concluding Summary at p. 1 states that the issues include:

Whether interest should be abated pursuant to Revenue and Taxation Code § 19104.

The Nevada Supreme Court (NSC) found that FTB committed fraud and intentional

infliction of emotional distress in part because of its delays.[17] In upholding the Nevada jury

finding that FTB personnel committed fraud in my audits and protests, the Nevada Supreme

Court expressly highlighted FTB's extreme delay in processing my two protests.[18] I believe I am

---

[14] 1992 ASAB, § 1.7.3; July 1991 Philips Agreement, Section 8.1, FTB_Philips 0000623.
[15] Appellant's Concluding Summary (1991), § 1.4.
[16] 1991 ASAB, § 1.4.
[17] *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 144-145, 148-149 (Nev. 2014), aff'd in part and rev'd in part on other issues 136 S. Ct. 1277 (2016).
[18] *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 145 (Nev. 2014), aff'd in part and rev'd in part on other issues 136 S. Ct. 1277 (2016) ("Furthermore, Hyatt showed that FTB took

12

RJN1290

1  entitled to interest abatement for 1991 and 1992 because FTB personnel caused extreme delay in

2  processing my protests.  The delay was not in any way attributable to me.  See particularly 1991

3  AOB §VI.

4        19.    My representatives could not have limited FTB's delays.  FTB decided when to

5  make orders, FTB decided how long to give me to respond to the orders, FTB decided when to

6  generate the determination letters, the NPAs, and the NOAs, FTB decided when to schedule the

7  protest hearings, FTB decided when to make the sourcing assessments (in the protest

8  determination letters), and all other things.  My representatives could only request limited

9  extensions of time, which were sometimes granted and sometimes denied.  "When FTB finally

10  acted on the taxpayer's protest after an eleven year delay, it gave the taxpayer 30 days to respond

11  to its 50-page single spaced Determination Letter with '[n]o extension to the thirty day 10

12  response period [to] be granted.[19]

13        20.    FTB continually changed its position and made false statements,

14  mischaracterization and fabrications, necessitating much new work by my representatives and

15  the resulting need for extensions of time.  In two more recent examples are FTB subpoenaed the

16  Philips documents and its use of extensive new documents and arguments in its Concluding

17  Summaries decades after it concluded the audits.

18        21.    The FTB 1991 Concluding Summary at p. 1, note 3, cites to and links to a 13 page

19  Exhibit A entitled "FTB Citation Index for 1991 Concluding Summary".  Footnote 3 on p. 1

20  states, "From this point forward, explanation of all noted references are contained in

21  Respondent's Exhibit A attached hereto (Citation Index 1991 Respondent's Concluding

22

23  11 years to resolve Hyatt's protests of the two audits.  Hyatt alleged that this delay resulted in
   $8,000 in interest per day accruing against him for the outstanding taxes owed to California.").

24        [19] 1991 AOB p. 10:8-20.

13

RJN1291

1    Summary)". Exhibit A is an unauthorized extension of the 1991 Respondent's Concluding

2    Summary that contains the footnotes for the Summary and extends the Summary by 13 pages

3    beyond the 30 pages authorized by your Board. See also a similar issue in FTB's 1992

4    Respondent's Concluding Summary.

5         22.    The FTB 1991 Concluding Summary at p. 1 states the following:

> The Hyatt tax matter began when Mr. Hyatt, a long-time California resident, filed a 1991 California Part-Year Resident return on April 13, 1992.[4] In that return, Mr. Hyatt represented that he became a California nonresident on October 1, 1991.[5]
>
> [Exhibit A, note] 4: FTB Trial Exhibit 2001-0277-283. See 06/12/98 Hyatt First Amended Complaint, 4:21-22, para. 10.
>
> [Exhibit A, note] 5: 1991 California SI (FTB Trial Exhibit 2001-0004) and 06/12/98 Hyatt First Amended Complaint, 21:26-27, para. 60.

This FTB statement needs clarification. I described the facts of my move to my representative and I identified my exact move date in view of different facts that had to be considered in my August 15, 2010, Supplemental Affidavit:

> Initially, the date of the sale of my California house, which was also the date I had pulled a trailer load of possessions to Las Vegas, seemed to be the appropriate date. Then, when the documentation was reviewed and my memory was refreshed, my representatives and I believed that the move date was the date that I had pulled the first trailer load of my possessions to Las Vegas (the October 1, 1991 date was when I had pulled a subsequent trailer load of my possessions to Las Vegas). This date was initially believed to be September 25, 1991 because I had been house shopping in Las Vegas on September 25, 1991 and I had a real estate document for this date. I also had a real estate document for September 21 as I also had been house shopping in Las Vegas on this date. But then I recalled that I had pulled the first trailer load of possessions to Las Vegas just after an appointment with Dr. Hamer. Dr. Hamer's bill appeared to me as being dated September 24, 1991. But on later rereading the handwritten date, this turned out to be September 26, 1991, not September 24, 1991. Thus, my attempts to identify my actual move date spanned a short period of about a week, October 1, then

14

1      September 25, then September 24, and then September 26. This was only a week of uncertainty until I was able to reconstruct the

2      exact date of my move.

3      Further, regarding the October 1, 1991 date on my 1991 tax return, I did not change the fact that I was a "nonresident of California on

4      October 1, 1991".

5  Supplemental Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.2.1, p. 6, Annex XI, Ex. 13.

6      23.   The FTB 1991 Concluding Summary at p. 1 states the following:

7      As the audit and protest later revealed, this reported change of residency was contemporaneous with Mr. Hyatt receiving millions

8      of dollars in patent licensing income in 1991 as a result of agreements (essentially settlement and release agreements)

9      concerning certain patents, the key patent being the "Single Chip Integrated Circuit Computer Architecture" ("'516 patent"), which

10     was issued to him on July 17, 1990.[6]

11     [Exhibit A, note] 6:   August 29, 1990, PRNewswire, CALIFORNIA ENGINEER GRANTED PATENT ON SINGLE

12     CHIP MICROCOMPUTER ARCHITECTURE; POTENTIAL IMPACT SAID TO BE BROAD (GLR 02278-79); Table of 1991-

13     1992 Hyatt Patent License Agreements and HL12288.

14  This FTB statement is false. First, I moved to Nevada more than a month before the October 31,

15  1991, date of the first license payment, which was made by Fujitsu, GLR 03672. Mahr Leonard

16  negotiated the initial Fujitsu license pursuant to its exclusive negotiating rights granted by

17  Philips.[20] Neither Mahr Leonard nor Philips informed me that either one was close to getting a

18  license agreement signed. Philips told me that it expected years of litigation before it could

19  license my patents.[21] I would not have agreed to give Philips half of the net proceeds if I had

20

21

22

23

24

[20] September 1991 Mahr Leonard Agreement, FTB_Philips 0000145-0000151.
[21] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 15, Annex XII.

15

1  known that Mahr Leonard was close to licensing my patents. Fujitsu informed Mahr Leonard in

2  a September 24, 1991, fax that there were still many issues to be resolved in their negotiations.[22]

3       24.    Second, the Patent Agreements were not "essentially settlement and release

4  agreements". The Patent Agreements were license agreements that granted the licensee the

5  future right to make, use, sell, lease, or otherwise dispose of products covered by my licensed

6  patents. For example, see Sections 1.4 and 3.1 of the Fujitsu Patent Agreement, H 017209-

7  017222. As is typical for such agreements, the Patent Agreements included a blanket release for

8  past infringement. However, FTB has not demonstrated any analysis of past infringement or that

9  there in fact was any past infringement.

10       25.    Third, to the best of my knowledge FTB has provided no evidence of past

11  infringement of any of my patents to justify its assertion that the license payments made by

12  licensees were based on past infringement. Furthermore, I understand that in any event FTB's

13  "settlement and release" argument would not bring the license payments within California

14  Revenue and Taxation Code, section 17952, which provides that "Income from nonresidents"

15  from intellectual property such as patents "is not income from sources within the state unless the

16  property has acquired a business situs in this state". As intellectual property my patents had a

17  situs at my Nevada residence and as far as I am aware FTB has made no showing that the patents

18  had a separate "business situs" in California. All the disputed licensing payments by the

19  Japanese companies were received by Philips, either directly or through the PSB&C client trust

20  account maintained for the benefit of Philips, and all of the disputed Philips licensing payments

21  to me were wire transferred to my Nevada situs investment accounts.

22

23

24      [22] Fax letter dated September 24, 1991, from Fujitsu to Mahr Leonard, FTB_Philips
0002386-0002403.

16

RJN1294

26.     Fourth, the "Single Chip Integrated Circuit Computer Architecture" patent was only one of 24 patents that were licensed to the initial sublicensees.  See for example the list of 24 patents licensed to Fujitsu, H 017210.

27.     The FTB 1991 Concluding Summary at p. 1 states the following:

> Although Mr. Hyatt ultimately lost significant portions of his claims related to the '516 patent in an Interference action before United States Patent and Trademark Office ("USPTO"),[7] this occurred well after Mr. Hyatt had received hundreds of millions of dollars from Japanese electronics companies.[8]

> [Exhibit A, note] 7:  Hyatt v. Boone, 146 F.3d 1348 (June 17, 1998), 10/27/98 Statement of Adverse Decision and Patent, Trademark & Copyright Journal: News Archive, 1998, 06/25/1998, News, Patents, 55 PTCJ 232, "Computer on a Chip' Patent Lacks Priority Over Statutory Invention Registration".  The denial of certiorari by the U.S. Supreme Court occurred on February 2, 1999, Hyatt v. Boone, 525 U.S. 1141 (1999).

> [Exhibit A, note] 8:  HL12288, GLR04040-42, and H18631-632.

This FTB statement is false.  I did not receive any of the disputed payments from the Japanese companies.  Philips received the licensing payments from the Japanese companies, either directly or through a client trust account maintained by PSB&C for the benefit of Philips in accordance with the July 1991 Philips Agreement.  Most of the licensing payments from the Japanese companies was wire transferred directly to Philips.[23]

28.     The FTB 1991 Concluding Summary at p. 1 states the following:

> On June 2, 1993, respondent's auditor, Marc Shayer read a newspaper article about how Mr. Hyatt's ex-wife had unsuccessfully attempted to set aside their 1975 California divorce settlement and obtain a share of the multi-million dollar income generated by the '516 patent.

---

[23] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 18, 19, Annex XII; Rebuttal to FTB Att. A/F, Section I. C., October 13, 1991.

17

RJN1295

1  This FTB statement is false. The license payments resulted from Philips and Mahr Leonard

2  negotiating licenses for 23 or 24 of my patents. They were not "generated by the '516 patent".

3  The patent agreements did not single out any one patent. See for example the list of 24 patents

4  that were licensed to Fujitsu by the Fujitsu Patent Agreement, H 017210.

5        29.    The FTB 1991 Concluding Summary at p. 2 states the following:

6              Mr. Shayer then reviewed Mr. Hyatt's 1991 Part Year Tax Return
               wherein Mr. Hyatt stated under penalty of perjury that he had
7              moved to Nevada on October 1, 1991.

8  This FTB statement is false. My "1991 Part Year Tax Return" does not state "that [I] had moved

9  to Nevada on October 1, 1991", my tax return states "I left California on 10/01/91." I moved to

10 Nevada on September 26, 1991, I was a Nevada resident as of September 26, 1991, and I

11 continued to be a Nevada resident on October 1, 1991. I returned to California to complete the

12 sale of the Jennifer Circle house and for a court hearing, I emptied the house prior to the sale,

13 and I again left California on October 1, 1991. When I filed my 1991 part year tax return, my

14 tax attorney informed me and I believed that October 1, 1991, was the date to put on my tax

15 return. Later, after further investigation, my tax attorney informed me that September 26, 1991,

16 was the move date because of other facts.[24] See ¶ 22, above.

17       30.    The FTB 1991 Concluding Summary at p. 2 states the following:

18             Significantly, Mr. Hyatt claimed no moving expense deductions on
               his 1991 federal income tax return.[9]

19             [Exhibit A, note] 9: Mr. Hyatt's 1991 California Part Year
20             Resident Income Tax Return (FTB Trial Exhibit 2001-0002-0017),
               Mr. Hyatt's 1991 Schedule A (Form 1040), line 18 (FTB Trial
21             Exhibit 2001-0023), 06/16/93 FTB Audit Program Worksheet
               (FTB Trial Exhibit 2001-184-185) and FTB Trial Exhibit 2001-
22             0607. After Mr. Shayer left FTB for the private sector, Mr. Hyatt's

23 ────────────────────

24       [24] Supplemental Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.2.1, p. 6, Annex XI,
   Ex. 13.

                                           18

                                                                              RJN1296

1    tax representative attempted to hire him as "a consultant" in Mr.
2    Hyatt's audit. (09/09/99 Deposition of Marc Shayer, Vol. 1,
     73:23-78:25.)

3    This FTB statement needs clarification. I moved myself to Las Vegas and thus I did not incur

4    deductible moving expenses. See ¶ 22, above.

5        31.    The FTB 1991 Concluding Summary at p. 2 states the following.

6              At the time of the audit, the auditors considered examining
7        the extent to which the licensing income was sourced to California
         but chose not to pursue that particular examination at that time
8        because they had been led to believe (by Mr. Hyatt's taxpayer
         representative) that all of the payments from his Japanese licenses
9        were for future use of Mr. Hyatt's patents. In reality, the payments
         were for both future use of the patents, and settlement of claims of
10       prior infringement, including infringement which may have
         occurred prior to Mr. Hyatt's alleged termination of his California
11       residency.[10]

12       [Exhibit A, note] 10: FTB's Timeline concerning Mr. Hyatt's
         audit for tax years 1991 and 1992 and FTB Table of Mr. Hyatt's
13       Deliberate Concealment of Alleged Continental Hotel Stay.

14   This FTB statement needs clarification. First, the Patent Agreements were license agreements

15   that granted a licensee for the future right to make, use, sell, lease, or otherwise dispose of

16   products covered by my licensed patents. For example, see Sections 1.4 and 3.1 of the Fujitsu

17   Patent Agreement, H 017209-017222. Philips explained to me that this settlement and release

     provision was a common "boilerplate" provision to simplify the agreement.

18       32.    Second, FTB's cite to Exhibit A, note 10 regarding the Continental Hotel does not

19   support FTB's statement about prior infringement, these are totally different issues. Thus, FTB's

20   statement about prior infringement is unsupported. To the best of my knowledge FTB has not

21   provided any evidence of prior infringement or claims of prior infringement of any of my patents

22   by the sublicensees.

23

24

                                            19

                                                                              RJN1297

33.     Third, I did not conceal or suppress my stay at the Las Vegas Continental Hotel.[25] I stayed at the Continental Hotel as part of a van tour on September 24, 1991, after moving to Las Vegas on September 26, 1991.  I paid cash to the tour company operator and the tour company operator gave me the key to my room.  I was not asked to register and I did not register at the Continental Hotel.  As far as I know, there is not now and never has been any documentation reflecting my stay at the Continental Hotel.  I did not conceal or suppress any documentation of my stay at the Continental Hotel.  See ¶¶ 10, 31-35, 91, 95, 96, 675 herein.

34.     Fourth, many former Continental Hotel employees have confirmed that the Continental Hotel did not obtain or maintain records of tour company guests during 1991 when I stayed there, Updated Testimonial Topics, Exs. T010-T013, T017, and T105.[26]  During my stay at the Continental Hotel, I discussed staying at a Las Vegas hotel with many people and many people telephoned me at the Continental Hotel.  Thirty seven witnesses testified to my staying at a Las Vegas hotel in 1991 and 20 witnesses testified about telephoning me at a Las Vegas hotel in September or October 1991, Updated Testimonial Topics, Exs. T008 and T009.  See ¶¶ 10, 31-35, 91, 95, 96, 675 herein.

35.     The FTB 1991 Concluding Summary at p. 2 states the following.

> Respondent's auditor issued a lengthy, detailed preliminary determination letter on August 2, 1995, that concluded Mr. Hyatt remained a California resident through April 2, 1992 and that his 1991 California return was fraudulent; a conclusion influenced, in part, by Mr. Hyatt's failure to disclose where he was during the three weeks following his alleged departure from California.[11]. Although correspondence was exchanged with Mr. Hyatt's representatives through 1995 and into 1996, no explanation of his

---

[25] This issue is addressed, e.g., in the ASAB Attachment 2, pp. 9-23.

[26] Continental Hotel employees Michael C. Fox, Bernice Jaeger, Geri Bommarito, Louis Litwin and President Ira Levy all testified that the Continental Hotel did not register individual van tour guests so no records of individual tour guests were ever created, Rebuttal to FTB Att. A/F, Section I. F., September 29, 1991.

20

RJN1298

1   1991 whereabouts was provided until May 24, 2000, well after the
2   1991 and 1992 audits had been concluded.[12]

3   [Exhibit A, note] 11:  Hyatt Trial Exhibit 245 (08/02/95 letter from
    FTB to Mr. Kern copied to Mr. Cowan.)

4   [Exhibit A, note] 12:  FTB's Timeline concerning Mr. Hyatt's
    audit for tax years 1991 and 1992 and FTB Table of Mr. Hyatt's
5   Deliberate Concealment of Alleged Continental Hotel Stay.

6   This FTB statement is false.  The determination and fraud penalty were issued ***prior to*** the

7   auditor's issuing document requests for those "three weeks".  Essentially, the audit was finished

8   by the time that the auditor issued the document requests.  The auditor requested documentation

9   through November 1, 1991, and my representatives produced the documentation that I had.

10  After generating the determination letter with a fraud penalty, the auditor made the following

11  belated document request:

12  **Document Request #1**
    ***Provide documentation***, such as hotel receipts, restaurant receipts
13  etc. to substantiate where the taxpayer resided for the period from
    September 24, 1991 through November 1, 1991.

14  FTB Letter dated September 26, 1995 (FTB-101891) (emphasis added).  My representative

15  responded and produced the documents that I had for this period.  There was no documentation

16  of my stay at the Continental Hotel because I stayed as the guest of a tour company in a block of

17  rooms rented by the tour company from the hotel and the tour company did not provide receipts

18  or registration.[27]  Thus, I could not produce documentation that I did not have and that never

19  existed.  See ¶¶ 10, 31-35, 91, 95, 96, 675 herein.

20       36.      I did not conceal my stay at the Continental Hotel and FTB has provided no

21  evidence of any such concealment.  See ¶¶ 10, 31-35 herein.

22

23  ───────────────────

24       [27] See ASAB Attachment 2, pp. 9-23.

21

RJN1299

37.     FTB's note 12 does not link to a timeline or to an FTB Table as indicated in the note.  FTB note 12 links to a letter dated February 22, 1995, from Mr. Cowan to Sheila Cox dated February 22, 1995.

38.     FTB note 13 links to a table labeled "Hyatt' Time Line".  The table contains rows listing documents, most of which were provided by my representatives to FTB.  The second column, "Description", contains a purported description which frequently mischaracterizes the document in that row.  For example, Row 16 references an August 17, 1993, document request from Auditor Shayer asking for copies of contracts/agreements "regarding the microprocessor chip".  FTB's note falsely asserts this document request asked for license agreements.  It did not.  The license agreements do not mention any "microprocessor chip" and are not "regarding the microprocessor chip".

39.     I did not conceal my stay at the Continental Hotel.  FTB asked for documents from the time period September 24, 1991, to November 1, 1991, and I produced all of the requested documents that were in my possession.  See ¶¶ 10, 31-35, 91, 95, 96, 675 herein.  I am unable to find and thus cannot respond to the "FTB Table of Mr. Hyatt's Deliberate Concealment of Alleged Continental Hotel Stay" which is listed in FTB Exhibit A, note 12, but not linked to note 12.

40.     The FTB 1991 Concluding Summary at pp. 2-3 states the following.

> Respondent's more detailed discussion of the relevant audit history and related factual and legal issues has been previously set forth at pages 84 through 91 of Respondent's Opening Brief for Taxable Year 1991 (Case No. 435770) and further summarized in respondent's audit timeline.[13]  Due to space constraints those discussions will not be repeated here but are incorporated by reference as if set forth fully herein.
>
> [Exhibit A, note] 13:  FTB Timeline concerning Mr. Hyatt's audit for tax years 1991 and 1992.

22

RJN1300

1   The assertions made in Respondent's Opening Brief (1991), pp. 84-91, have been refuted by

2   prior briefing; i.e., 1991 ARB, pp. 83-94.

3       41.    FTB note 13 links to a table labeled "Hyatt' Time Line". The table contains rows

4   listing documents, most of which were provided by my representatives to FTB. The second

5   column, "Description", contains a purported description which frequently mischaracterizes the

6   document in a given row. For example, Row 16 references an August 17, 1993, document

7   request from Auditor Shayer asking for copies of contracts/agreements "regarding the

8   microprocessor chip". FTB's note falsely asserts this document request asked for license

9   agreements. It did not. The license agreements do not mention any "microprocessor chip" and

10  are not "regarding the microprocessor chip".

11      42.    This paragraph is intentionally left blank.

12      43.    The FTB 1991 Concluding Summary at p. 3 states the following.

13
14
15
16               Mr. Hyatt has participated in patent activities since 1969. Over time, Mr. Hyatt has drafted and filed patent applications in his name, pursued those patent applications through the USPTO, and had more than 70 patents issued to him. Around 1975, he obtained his Patent Agent registration with the USPTO (Registration No. 27,647) and remains registered in good standing.[23] Mr. Hyatt was not successful in licensing any of his patents before 1990.[24]

17
18          [Exhibit A, note] 23: November 22, 2005 Affidavit of Gilbert P. Hyatt, pp. 4-5, para. 14.

19          [Exhibit A, note] 24: 09/26/05 Deposition of Gregory L. Roth, Vol. 1, 128:18-23.

20  After I moved to Las Vegas on September 26, 1991, and during the disputed period I worked on

21  my patent applications and patent prosecution documents at my apartment in Las Vegas.

22      44.    The FTB 1991 Concluding Summary at p. 3 states the following.

23
24               Between 1975 and 1991, Mr. Hyatt spent over 60,000 hours and substantially all of his earnings to develop, prosecute, license, and litigate his patents and patent applications. Mr. Hyatt worked

directly with an estimated 200 different companies, financiers, lawyers, finders and others in attempts to license his patents, generating an estimated 500 letters and 10,000 telephone calls.[25]

[Exhibit A, note] 25:  FTB Exhibit A, Tab 8 (04/23/93 Declaration of Gilbert P. Hyatt, paras. 3, 27, and 33) and 04/26/06 Deposition of Gilbert P. Hyatt, Vol. 8, 1473:7-11.

In July 1991 Philips was granted the authority and assumed the responsibility to license my patents through the July 1991 Philips Agreement.

45.     The FTB 1991 Concluding Summary at p. 3 states the following.

Not later than June 1987, while residing in La Palma, California, Mr. Hyatt, a self-described "Inventor", communicated to the USPTO that he had appointed himself to "transact all business in the Patent and Trademark Office" connected with a pending application and directed the USPTO to deliver all future correspondence to Post Office Box 3357, Cerritos, CA 90703, and to place all telephone calls to (714) 995-1087.[26]  Mr. Hyatt repeated that instruction on numerous occasions thereafter, and throughout the disputed period.[27]

[Exhibit A, note] 26:  06/08/87 Declaration of Gilbert P. Hyatt For Patent Application (Scanner System), pp. 2-3.

[Exhibit A, note] 27:  USPTO Reference Table.

This FTB statement is misleading.  These issues are prior to my move to Las Vegas.  FTB has not explained the relevance of my use of a California address and telephone number when I was residing in California at a time prior to my move to Las Vegas.  FTB has linked to its note 27 a newly asserted so-called "Master List of Documents From USPTO Website Using Hyatt CA Address and CA Phone" (hereinafter "the Master List") that lists a "Declaration For Patent Application" signed on June 8, 1987, more than four years before I moved to Las Vegas.  The June 8, 1987, Declaration shows that more than four years before I moved to Las Vegas I designated the Cerritos U.S. Post Office Box and La Palma telephone number as the Patent Office contact information for one of my patent applications.  The FTB list merely shows that on several occasions after I moved to Las Vegas there was continued use of a previously designated

24

1  Cerritos U.S. Post Office Box address.  The list also shows that on May 11, 1992, I began

2  affirmatively changing the designated Patent Office contact information to a Las Vegas U.S. Post

3  Office Box and telephone number.  According to the so-called Master List I did not repeat the

4  1987 instruction to designate the Cerritos U.S. Post Office Box and La Palma telephone number

5  as Patent Office contact information on any occasion after I moved to Las Vegas, as falsely

6  implied by FTB.

7      46.    The FTB 1991 Concluding Summary at p. 4 states the following.

8          On December 28, 1970, Hyatt filed a 'continuation-in-part'
       (CIP) with the USPTO to a patent claim he had filed in 1969.  A
9      CIP is a modification to an original patent application (or previous
       CIP), which modifies a portion of the application to add new
10     claims, new disclosure, correct errors, or overcome previous
       rejections.[28]

11         [Exhibit A, note] 28:  GLR 02169-74.

12  This FTB statement false.  The December 28, 1970, patent application (patent application Serial

13  No. 05/101,881) was not filed as 'continuation-in-part' application.

14     47.    The FTB 1991 Concluding Summary at p. 4 states the following.

15         In   January   1991,   a   competing   inventor   (Boone)
16     commenced a formal contest of the USPTO issuing the '516 patent
       to Mr. Hyatt by filing a Request for Declaration of Interference
17     under 37 CFR 1.607.  Patent law at the time provided that Mr.
       Hyatt had the burden of proof in the USPTO challenge
18     proceeding.[31]   The consequences of not defending the Boone
       interference claim would have been an immediate adverse result
19     and the loss of opportunities to obtain licensing fees related to the
       single chip portion of the '516 patent.[32]

20         [Exhibit A, note] 31:  GB 01663, GB 01385-94.

21         [Exhibit A, note] 32:  09/26/05 Deposition of Gregory L. Roth,
22             Vol. 1, 149:9-150:23.

23     U.S. Patent No. 4, 942,516 was only one of 23 licensable patents that Philips was

24  licensing pursuant to the July 1991 Philips Agreement, FTB_Philips 0000595-0000599.

25

48.    The FTB 1991 Concluding Summary at p. 4 states the following.

> After receiving the '516 patent, and while the Boone interference was pending, Mr. Hyatt developed a patent licensing business plan and aggressively pursued lump-sum patent infringement litigation settlement agreements from Japanese electronics companies for permitted use of a portfolio of 24 of his patents, including the '516 patent.[33]
>
> [Exhibit A, note] 33:  H018636.

This FTB statement is false.  First, Philips drafted a "Licensing Plan", not a business plan.  The Philips "Licensing Plan" is attached as one of two Exhibit As to the July 1991 Philips Agreement, FTB_Philips 0000636-0000640.

49.    Second, there were no "infringement litigation settlement agreements".  See ¶¶ 23-25, above.  The Patent Agreements were license agreements that granted the licensee the future right to make, use, sell, lease, or otherwise dispose of products covered by my licensed patents.  For example, see Sections 1.4 and 3.1 of the Fujitsu Patent Agreement, H 017209-017222.  As is typical for such agreements, the Patent Agreements included a blanket release for past infringement.  However, FTB has not demonstrated any analysis of past infringement or that there in fact was any past infringement.

50.    The FTB 1991 Concluding Summary at p. 4 states the following.

> That pursuit resulted in contracts with numerous Japanese companies worth more than $350 million, $210 million[34] of which was actually received by Mr. Hyatt and/or his agents during 1991 and 1992.  Mr. Boone ultimately prevailed on his challenge in 1999.[35]
>
> [Exhibit A, note] 34:  GLR04040-42.
>
> [Exhibit A, note] 35:  Mr. Hyatt was a named party in the patent interference proceeding which was pending during the entire period in dispute, and commenced much earlier.  In July 1991, Mr. Hyatt filed preliminary motions in the proceeding pending before the Commissioner of Patents and Trademarks.  The 1996 USPTO Opinion and Order was eventually appealed, and after many years

26

1
2
3
4
5

of further proceedings, an opinion was issued on June 17, 1998 by the United States Court of Appeals for the Federal Circuit in Hyatt v. Boone (1998) 146 F.3d 1348 and certiorari denied by the United States Supreme Court in 1999. The interference proceeding established whether Mr. Hyatt or Mr. Boone had the earliest "effective filing date" for single chip related patent claims. The denial of certiorari by the U.S. Supreme Court occurred on February 2, 1999, Hyatt v. Boone, 525 U.S. 1141 (1999).

6   This FTB statement is false and deceptive. First, I did not receive any disputed payments from

7   Japanese companies and I did not have any agents that received any payments from Japanese

8   companies. The disputed licensing payments from the Japanese companies were received by

9   Philips or were received on behalf of Philips by PSB&C in accordance with the July 1991 Philips

10  Agreement. Philips was not my agent, Philips was my exclusive licensee, there is a significant

11  difference. Mahr Leonard worked under the direction of Philips, not under my direction, and

12  Mahr Leonard did not receive any licensing payments. $350 million was **not received** during

13  1991 and 1992 and I **did not receive** $210 million during 1991 and 1992. The analysis attached

14  to FTB's 1991 Concluding Summary as Exhibit A, note 34, does not support the FTB statement.

15  $350 million was received by Philips, but it was received over many years and the amount I

16  received from Philips was substantially less $210 million.

17      51.     Second, Philips was my patent licensee. I have always understood that a patent

18  licensee is different from an agent. Sections 4.1 and 4.3 of the July 1991 Philips Agreement[28]

19  granted Philips exclusive rights and a responsibility to license my patents. Philips had the

20  authority to negotiate and sign patent agreements in its own name and it in fact did so.[29] I did

21  not have the right to negotiate or sign patent agreements except with Philips' authorization.

22

23
_____

[28] FTB_Philips 0000608, 0000610.

24
[29] For example, see the Sanyo Patent Agreement, H 018813-018822.

27

RJN1305

1      52.    Third, the "effective filing date" of a patent application does not establish a date

2 of invention.

3      53.    The FTB 1991 Concluding Summary at pp. 4-5 states the following.

4                  IV. MR. HYATT'S PATENT LICENSING TEAM

5 This FTB statement false, I did not have a licensing team. I was and I am an independent

6 inventor. Philips was my licensee, I licensed Philips on my patents for its own use and to

7 sublicense my patents to others. Mahr Leonard was under contract to Philips and for a limited

8 time had exclusive negotiating rights for licensing my patents. Gregory L. Roth was a patent

9 attorney who was a stake holder in the law firm of PSB&C that was engaged by Philips. Philips

10 created, financed, and managed the Philips Licensing Program and managed the efforts of Mahr

11 Leonard and PSB&C.[30] My efforts were largely monitoring what was being done in the Philips

12 Licensing Program to protect my interests, to receive and invest my licensing income, and to

13 participate in the interference as the inventor of the '516 patent. I did not have a team, I licensed

14 Philips and Philips engaged its associates. A licensee (e.g., Philips) and its associates do not

15 become a team with the licensor (e.g., me). See also ¶¶ 69-73 herein.

16      54.    The FTB 1991 Concluding Summary at pp. 4-5 states the following.

17            Mr. Hyatt utilized the professional services of Gregory L.
      Roth, a patent law specialist with an emphasis on patents related to

18      electronic and computer technology.[36] Mr. Roth is a patent lawyer
      admitted to practice in the State of California and registered to

19      practice before the USPTO.[37] On March 4, 1990, Mr. Roth joined
      the patent law firm of Pretty, Schroeder, Brueggemann & Clark

20      ("PSBC") located in downtown Los Angeles. Mr. Roth, a partner,
      remained with PSBC through the end of 1992 when he withdrew

21      from that firm.[38] Mr. Roth worked with Mr. Hyatt and his
      prospective and/or actual licensees on numerous matters from 1970

22      through at least July 1993.[39]

23 

24      [30] See 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.

RJN1306

[Exhibit A, note] 36:  7/19/93 Declaration of Gregory L. Roth, p. 1, lines 14-16.

[Exhibit A, note] 37:  7/19/93 Declaration of Gregory L. Roth, p. 1, lines 3-4 and 4/1/93 deposition of Gregory L. Roth, p. 13, lines 12-14.

[Exhibit A, note] 38:  7/19/93 Declaration of Gregory L. Roth, p. 1, lines 9-11, 4/1/93 Deposition of Gregory L. Roth, 18:5-19:2 and 09/26/05 Deposition of Gregory L. Roth, Vol. 1, 22:11-24.

[Exhibit A, note] 39:  Id. @ p. 1, lines 21-23, GLR03291 and HL15423.

This FTB statement is deceptive.  First, PSB&C was engaged by Philips and Mr. Roth, through PSB&C, represented Philips with respect to the Philips Licensing Program and with respect to the *Hyatt v. Boone* interference after July 1991.[31]  PSB&C invoiced Philips for Mr. Roth's work on the Philips Licensing Program and on the *Hyatt v. Boone* interference and Philips paid PSB&C for Mr. Roth's work on the Philips Licensing Program and on the *Hyatt v. Boone* interference.  Philips was my licensee and Philips was PSB&C's and Mr. Roth's client.[32]

55.      Second, FTB statement that Mr. Roth worked with me on licenses from 1970 is false.  Mr. Roth drafted a patent application for me in 1970, he did not work with me on licenses "from 1970."

56.      The FTB 1991 Concluding Summary at p. 5 states the following.

Starting in late 1990, Mr. Roth, on behalf of Mr. Hyatt, was "investigating ways to license [Mr.] Hyatt's invention…" and "…talking with a number of computer companies about collecting royalties on existing products that use microprocessors."[40]

[Exhibit A, note] 40:  LT0066.

---

[31] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.
[32] PSB&C's new client form filled out for Philips and dated August 30, 1991 (GLR 02073).

29

RJN1307

1      This FTB statement is false.  FTB deceptively mis-represents articles; e.g.; FTB refers to

2  statements from a November 1990 article as "starting" in late 1990.  The article does not state

3  that I started in 1990.  Further, I engaged Mahr Leonard in late 1990, Mr. Roth was neither

4  working with Mahr Leonard nor was he competing with Mahr Leonard.

5      57.  The FTB 1991 Concluding Summary at p. 5 states the following.

6          In April 1991, Mr. Hyatt also designated Mr. Roth as his lead
           attorney in the Hyatt v. Boone interference.[41]  PSBC was Mr.
7          Hyatt's "LA law firm" which submitted invoices for professional
           services rendered to Mr. Hyatt with respect to the Boone
8          interference claim and licensing efforts with the Japanese
           companies to both Mr. Hyatt and Philips USA from and after July
9          1991.[42]

10         [Exhibit A, note] 41:  04/08/91, Paper 4, Hyatt v. Boone
           interference, Mr. Gregory L. Roth Designated Lead Attorney for
11         Mr. Hyatt (not Philips) Mr. Roth falsely contends he represented
           Philips during the Hyatt v. Boone interference (08/09/10 Affidavit
12         of Gregory L. Roth, p. 11.)

13         [Exhibit A, note] 42:  EC06183.

14  This FTB statement needs clarification.  PSB&C represented me on the interference for a short

15  time prior to execution of the July 1991 Philips Agreement.  However, contemporaneous with

16  the execution of the July 1991 Philips Agreement, Philips assumed responsibility for licensing

17  my patents and for the interference.  PSB&C was engaged by Philips, PSB&C invoiced Philips

18  for Mr. Roth's work, and Philips paid PSB&C's invoices.[33]

19      58.  FTB references a "Designation of Lead Attorney for Hyatt" dated April 5, 1991,

20  in which I, as the owner of the patent in interference, designated Mr. Roth as lead attorney

21  through a paper filed by Mr. Roth.  Three months later I signed the July 1991 Philips Agreement

22  by which Philips assumed responsibility for the *Hyatt v. Boone* interference as well as the

23  ───────────────────

24      [33] PSB&C's new client form filled out for Philips and dated August 30, 1991 (GLR
       02073).

                                              30

                                                                            RJN1308

1    licensing of my patents.  Shortly after July 1991, PSB&C and Mr. Roth represented Philips with

2    respect to the *Hyatt v Boone* interference and with respect to the Philips licensing program.[34]

3    See for example invoices from PSB&C to Philips for the interference starting as early as May

4    and June 1991[35] and invoices for the Philips Licensing Program starting as early as August

5    1991.[36]  FTB does not identify any invoice from Mr. Roth's law firm to me for the *Hyatt v.*

6    *Boone* interference or the Philips Licensing Program after July 1991.

7         59.    The FTB 1991 Concluding Summary at p. 5 states the following.

8              Mr. Roth continuously sent invoices and business correspondence
     to Mr. Hyatt via his Cerritos Post Office Box during the disputed
9              period.[43]

10             [Exhibit A, note] 43:  12/31/91 (FTB_Philips 0006599), 02/21/92
     (FTB_Philips 0005304-06), 03/12/92 (FTB_Philips 0002419-24),
11             and 03/31/92 (FTB_Philips 0003721-23).

12   This FTB statement is false.  First, neither PSB&C nor Mr. Roth "continuously" sent invoices or

13   correspondence to the Cerritos U.S. Post Office Box address.  This is another one of hundreds of

14   examples where FTB misrepresents the plain facts to your Board.

15        60.    FTB identifies only a single December 31, 1991, invoice for a patent re-

16   examination (not for licensing or the interference) that was sent to the Cerritos U.S. Post Office

17   Box, FTB_Philips 0006599.  A patent reexamination is a U.S. Patent Office proceeding that is

18   significantly different then licensing of patents or an interference for which Philips had

19   responsibility.  FTB does not explain why my using the PSB&C law firm for a patent

20   reexamination proceeding has anything to do with a licensing business or a negotiating team or

21   _____

22   [34] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.
23   [35] May and June 1991 invoices to Philips, for the *Hyatt v. Boone* interference,
     FTB_Philips 0006692-0006699 and 0006673-0006691.
24   [36] August 31, 1991 invoice to Philips for the Philips Licensing Program, FTB_Philips
     0006645.

31

RJN1309

1  anything else that FTB is using to falsely assess taxes. Furthermore, FTB identifies only two

2  letters that were sent to the Cerritos U.S. Post Office Box, a letter dated February 21, 1992,

3  FTB_Philips 0005304 and a letter dated March 12, 1992, FTB_Philips 0002419. Two letters and

4  an invoice sent over a period of six months do not represent "continuous" invoices and

5  correspondence. A third letter dated March 31, 1991, was signed by Mr. Roth's secretary, not

6  Mr. Roth, FTB_Philips 0003721.

7        61.    These are further examples of FTB's mischaracterization of facts and documents.

8  FTB is playing fast and loose with its statements. FTB calls a single invoice "continuously sent

9  invoices" (plural), FTB misrepresents that two 1992 letters were sent in 1991 (this is stated in the

10  1991 Concluding Summary), and FTB calls these two 1992 letters "continuously

11  sent . . . correspondence" regarding the 1991 tax year.

12        62.    The FTB 1991 Concluding Summary at p. 5 states the following.

13          PSBC's itemized statements evidence at least 20 meetings with
        Mr. Hyatt during the disputed period.[44]

14

15          [Exhibit A, note] 44: 09/24/91 (FTB-Philips 0006635, 7474-75),
        10/23/91 (FTB_Philips 0006628), 10/26/91 (FTB_Philips

16          0006614), 10/29/91 (FTB_Philips 0006617), 11/13/91
        (FTB_Philips 0006618), 11/26/91 (FTB_Philips 0006605),

17          11/29/91 (FTB_Philips 0006605), 12/16/91 (FTB_Philips
        0006607), 01/25/92 (FTB_Philips 0006595-96), 02/03/92

18          (FTB_Philips 0007007-11), 02/10/92 (FTB_Philips 0006583),
        02/25/92 (FTB_Philips 0006585), 03/03/92 (FTB_Philips

19          0006578), 03/23/92 (FTB_Philips 0006571), 03/28/91
        (FTB_Philips 0006562), 03/30/92 (FTB_Philips 0006557),

20          03/31/92 (FTB_Philips 0006557), 04/09/92 (FTB_Philips
        0006557), 04/13/92 (FTB_Philips 0006561), and 05/07/92
        (FTB_Philips 0006531).

21

22  This FTB statement is false. I did not meet with Mr. Roth on twenty occasions; I met with Mr.

23  Roth on ten occasions during the six month disputed period. Mr. Roth represented Philips with

24  respect to the Philips Licensing Program and with respect to the *Hyatt v. Boone* interference after

RJN1310

1    July 1991.[37]  Philips had responsibility for the interference proceeding, I was the inventor and

2    therefore the primary witness and Philips and its attorneys needed to meet with me such as  for

3    assistance for its briefings and to prepare me for trial.

4        63.    Mr. Roth testified that he did not meet with me in person on February 10, 1992, a

5    day before my cancer surgery, and he testified that he did not meet with me in person between

6    February 21, 1992, when I was released from the hospital following cancer surgery, and March

7    30, 1992.  He further testified that PSB&C invoices listed four meetings during that time period

8    that should have been listed as telephone calls instead of meetings.[38]  One of those four

9    telephone calls related to a patent re-examination, not to licensing or interference.[39]  The longest

10   of these meetings I did have with Mr. Roth lasted only 1 ½ hours. [40]

11       64.    The FTB 1991 Concluding Summary at p. 5 states the following.

12            On December 18, 1990, Mr. Hyatt entered into a
     representation agreement with Mahr Leonard Management
13   Company (MLMC) for a six-month period during which MLMC
     was authorized to negotiate, for a 15% commission, a patent
14   license agreement with Toshiba.[45]  That agreement was extended
     and modified during April 1991 so as to authorize license
15   negotiations with Matsushita, NEC, Oki, and Toshiba through
     October 15, 1991.  In addition, MLMC also agreed to provide Mr.
16   Hyatt with $40,000 as an advance against fees and costs in
     connection with the Boone interference claim.

17
     [Exhibit A, note] 45:  Deposition Exhibit 671 (12/18/90
18   Representation Agreement between MLMC and Hyatt), 12/05/05
     Deposition of Gilbert P. Hyatt, Vol. 4, 782:16-23; 09/26/05
19   Deposition of Gregory L. Roth, Vol. 1, 139:5-142:19; and Hyatt
     Trial Testimony, pp.34-35, 41-43 and Hyatt Trial Exhibit 15.

20   _____

21       [37] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.
         [38] Affidavit of Gregory L. Roth, June 13, 2016, ¶¶ 8 and 9.
22       [39] A telephone call on March 23, 1992, FTB_Philips 0006571.
         [40] On March 31, 1992, I met with Mr. Roth in a brief meeting that was part of a 12 hour
23   block of time as shown in PSB&C invoice, FTB_Philips 0006557 (see Affidavit of Gregory L.
     Roth, June 13, 2016, ¶ 16).  The PSB&C invoices do not represent the amount of time I met with
24   Mr. Roth.

33

RJN1311

This FTB statement needs clarification. As of September 26, 1991, when I moved to Las Vegas, Mahr Leonard had not succeeded in closing a single license on my patents. By that time I had granted Philips exclusive rights to license my patents and Philips had assumed a responsibility to license my patents pursuant to the July 1991 Philips Agreement.

65. The FTB 1991 Concluding Summary at p. 5 states the following.

> On September 24, 1991, Mr. Hyatt, with the assistance of his personal patent lawyer, Mr. Roth, entered into another representation agreement with MLMC, and Philips USA, for the purposes of negotiating agreements with Fujitsu, Matsushita, NEC, Oki, Sharp, Sony and Toshiba.[46]

> [Exhibit A, note] 46: FTB_Philips 0000691-698.

This FTB statement is false. First, on September 24, 1991, Mr. Roth did not represent me as my "personal patent lawyer," he represented Philips. PSB&C invoiced Philips for Mr. Roth's time on September 24, 1991, and Philips paid the PSB&C invoice.[41]

66. Second, under the July 1991 Philips Agreement, only Philips had the right and responsibility to license my patents and Philips granted Mahr Leonard the exclusive rights to negotiate licenses with seven companies through January 1, 1992.[42] After July 1991, Mr. Roth represented Philips, not me, with respect to the Philips Licensing Program and with respect to the *Hyatt v. Boone* interference.[43] The only assistance Mr. Roth gave me with respect to the September 1991 Mahr Leonard Agreement was to meet me in front of his office building so I could sign the agreement after Mr. Tamoshunas and Mr. Mahr had already signed the agreement.[44] I did not have time that day to attend any meetings with Philips or Mahr Leonard,

---

[41] FTB_Philips 0006635-0006636.
[42] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 8, Annex XII; Affidavit of David Leonard, May 2, 2012, ¶ 14, Annex XXV, Ex. 46.
[43] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.
[44] Rebuttal to FTB Att. A/F, Section I. C., September 24, 1991.

34

RJN1312

1  so Mr. Roth met me in front of his office building so I could sign the agreement. Philips wanted

2  me to sign the September 1991 Mahr Leonard Agreement because Philips wanted me to confirm

3  my verbal agreement for Philips to charge the Mahr Leonard fee to the Philips Licensing

4  Program.

5      67.    The FTB 1991 Concluding Summary at p. 6 states the following.

6          Although MLMC was well experienced in negotiating
       patent licensing agreements with the Japanese electronics
7       companies, Mr. Hyatt had embarked upon a patent licensing plan
       that contemplated rapidly producing substantial royalty income by
8       targeting companies reasonably expected to take paid up licenses
       for lump sum payments because of exposure over a wide product
9       range without the necessity of formal litigation.[47]

10     [Exhibit A, note] 47:  FTB_Philips 0000636.

11 This FTB statement is false. First, I did not embark on a patent licensing plan. Mahr Leonard

12 approached me in December 1990 with a proposal to license my patents but Mahr Leonard was

13 not able to close a single license for me. Philips then proposed a licensing program which

14 resulted in the July 1991 Philips Agreement. Philips was a world-class licensing entity. It is

15 absurd to think that I would tell Philips how to license my patents. Philips created, managed and

16 controlled the Philips Licensing Program.[45]

17     68.    Philips drafted a "Licensing Plan"[46] which is attached as Exhibit A to the Philips

18 copy of the July 1991 Philips Agreement.[47] I did not have a copy of this Philips Licensing Plan

19 in my possession until FTB produced the Philips documents in 2011. Upon signing the July

20

21

22         [45] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10, Annex XII; Affidavit of David
23 Leonard, May 2, 2012, ¶ 15, Annex XXV, Ex. 46.
           [46] FTB_Philips 0000636-0000640.
24         [47] Philips Licensing Plan, FTB_Philips 0000636-0000640.

35

RJN1313

1    1991 Philips Agreement, Philips created, managed and controlled the Philips Licensing

2    Program.[48]

3         69.    The FTB 1991 Concluding Summary at p. 6 states the following.

4              To that end, Mr. Hyatt and Mr. Roth solicited and obtained the
              additional professional assistance of Philips in their negotiating
5              endeavors with the Japanese companies.  Through a contract
              executed in July, 1991, Philips joined the existing negotiating team
6              of Hyatt, Roth and MLMC.

7    This FTB statement is false.  First, there was no "negotiating team of Hyatt, Roth and MLMC".

8    I was an independent inventor.  I engaged Mahr Leonard to attempt to license my patents and I

9    engaged PSB&C (Mr. Roth was a stake holder in PSB&C) to handle an interference proceeding

10   in the U.S. Patent Office.  I gave Mahr Leonard an exclusive right to negotiate pursuant to the

11   December 1990, Mahr Leonard Agreement[49] to license some of my patents.  Mahr Leonard

12   operated on its own covering its own expenses, making its own contacts, and negotiating on its

13   own.  Mahr Leonard attempted (unsuccessfully) to negotiate patent licenses first with Toshiba

14   and then with additional companies.[50]  Neither Mr. Roth nor I negotiated with these companies.

15   Mahr Leonard would not permit it, amateurs interfering with the exclusive rights of the

16   professionals.  Mr. Roth did not negotiate with Mahr Leonard's prospective licensees.  I was an

17   independent inventor working on my research and development and preparing for my move to

18   Las Vegas.  I did not negotiate with Mahr Lenard's prospective licensees.  ***There was no***

19   ***licensing team, there was only a licensing Texas partnership – Mahr Leonard who was***

20   ***attempting to license my patents***.  See ¶¶ 53, 70-73 herein.

21

22   _____

23        [48] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10, Annex XII; Affidavit of David
     Leonard, May 2, 2012, ¶ 15, Annex XXV, Ex. 46.
          [49] Mahr Leonard Representation Agreement, December 18, 1990, GLR 04055-04062.
24        [50] Affidavit of David Leonard, May 2, 2012, ¶ 15, Annex XXV, Ex. 46.

36

70.     Second, FTB makes the absurd statement "Philips joined the existing negotiating team of Hyatt, Roth and MLMC".  There was no team and Philips did not joint it.  To reiterate, MLMC (Mahr Leonard) was a Texas partnership engaged to negotiate licenses for a short period of time, Mr. Roth was a stake holder in the law firm of PSB&C, and I was an independent inventor.  There was no team, each worked separately on different responsibilities: Mahr Leonard contacted prospective licensees, PSB&C and Mr. Roth worked on the interference, and I did my research and development and prepared for my move.  I then licensed Philips (my only licensee) to use my patents for its own purposes and to sublicense my patents to others on an exclusive basis.  Philips alone had exclusive authority to license my patents. ***There was no licensing team***.  See ¶¶ 53, 69-73 herein.

71.     Third, Philips by itself created, managed and controlled the Philips Licensing Program.[51]  Philips did not join any existing team and I did not negotiate with any prospective licensees in 1991 or 1992 after signing the July 1991 Philips Agreement.

72.     Fourth, each of the Mahr Leonard Representation Agreements gave Mahr Leonard the "exclusive" rights to negotiate patent licenses.  Mahr Leonard did not work with outsiders as part of a negotiating team under its two exclusive Representation Agreements.[52]  Mahr Leonard paid its own expenses and followed its own plans without sharing its plans with me.

73.     Fifth, FTB is now shifting from the absurd position that I ran a world-wide licensing organization from the Jennifer Circle house to the equally absurd position that "Philips ***joined*** a pre-existing negotiating team of "Hyatt, Roth and MLMC."  Philips did not "join"

---

[51] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10, Annex XII.
[52] December 1990 Representation Agreement, p. 1, GLR 04055; September 1991 Mahr Leonard Agreement, p. 1, FTB_Philips 0000145;

37

RJN1315

1  anything, Philips took over licensing and defending my patents with exclusive authority to

2  sublicense my patents.  Philips by itself created, managed and controlled the Philips Licensing

3  Program[53] with exclusive authority to sublicense the patents.  I know of no evidence that FTB

4  has identified to support any of FTB's various positions.  I did not have a Jennifer Circle

5  licensing business.[54]  See ¶¶ 14, 73, 89, 90, 205, 279, 376, 380 herein.  I was not even present at

6  the Jennifer Circle house between October 1, 1991, when I sold the Jennifer Circle house, and

7  late 1992 when I returned to Jennifer Circle for a short visit.  FTB has no credible evidence that I

8  was present at the Jennifer Circle house during that period.  After July 1991, Philips had

9  exclusive rights and the responsibility to license my patents.  Section 8.1 of the July 1991 Philips

10 Agreement prohibited me from engaging in a licensing business.[55]  The disputed license

11 payments that I received all came from the July 1991 Philips Agreement through the ordinary

12 course of licensing of my patents by Philips and *not as part of any business or any team*.  Mr.

13 Tamoshunas has explained that Philips by itself created and managed the Philips Licensing

14 Program.[56]  See ¶¶ 53, 69-72 herein.

15     74.     The FTB 1991 Concluding Summary at p. 6 states the following.

16         That contract provided, in pertinent part, that Mr. Hyatt, Philips
           and MLMC would each be receiving substantial portions of the
17         licensing fees paid by the Japanese companies, and that Philips
           would be responsible for payment of bills for legal services and
18         related expenses rendered on behalf of Mr. Hyatt in the Hyatt v.
           Boone interference.[48]

19
20         [Exhibit A, note] 48:     FTB_Philips 0000592, FTB_Philips
           0000595-664.

21

22 _____

23  [53] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10, Annex XII.
    [54] This issue is addressed, e.g., in the 1992 ASAB at §§ 1.4.1.3, 1.7.1.2.
    [55] FTB_Philips 0000623.
24  [56] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 6, 7 and 10, Annex XII.

38

RJN1316

This FTB statement is false and mischaracterizes the July 1991 Philips Agreement. First, Mahr Leonard had no part in this agreement, it was an agreement between Philips and me. This agreement does not even mention Mahr Leonard and does not state that anyone "would **each** be receiving substantial portions of the licensing fees" (emphasis added). This agreement does not provide for Mahr Leonard to receive anything.

75. Second, this agreement does not state that there will be any licensing fees. In Sections 4.5 and 4.7,[57] this agreement states essentially that any license payments received by Philips less expenses of Philips shall be divided equally between Philips and me.

76. Third, this agreement does not provide that Philips "would be responsible for payment of bills for legal services and related expenses rendered on behalf of Mr. Hyatt in the Hyatt v. Boone interference". The legal expenses and related expenses were not rendered on behalf of me, they were rendered on behalf of Philips who had the responsibility to license and defend the patents. Philips was the licensee with certain contractual responsibilities. I was the licensor who had turned over responsibility for licensing and defending the patents to Philips. Section 5.3 of this agreement states that Philips agrees to defend and pay the costs of certain proceedings including any interference.[58] Philips was to pay its own expenses for diligently defending the *Hyatt v. Boone* interference, not my expenses and payment was conditioned on my granting Philips "control over the conduct" of the proceeding.[59]

77. The FTB 1991 Concluding Summary at p. 6 states the following.

> Additional relevant factual and legal analysis concerning the July 1991 Philips Agreement, Supplemental Philips

---

[57] July 1991 Philips Agreement, Sections 4.5 and 4.7, FTB_Philips 0000610, 0000612-0000613.
[58] July 1991 Philips Agreement, Section 5.3, FTB_Philips 0000616-0000617.
[59] July 1991 Philips Agreement, Section 5.3, FTB_Philips 0000616-0000617.

39

RJN1317

1        Agreements, and guaranteed payments from Philips has been
2        previously discussed at length in Respondent's Opening Brief for
(Case No. 435770) at page 28; Respondent's Opening Brief (Case
No. 446509) at pages 23 through 26; Respondent's Reply
3        Brief(Case No. 446509) at pages 15 through 20; and Respondent's
Additional Brief (2015, Case No. 446509) at pages 13 through 24;
4        those discussions will not be repeated here and are incorporated by
reference as if set forth fully herein.

5

6  This FTB statement is false.  First, there were no guaranteed payments from Philips.  FTB does

7  not identify any language from any Philips agreement that provides for "guaranteed" payments

8  because there is none.  For example, the minimum payments of Section 4.6 are to be paid "In

9  order to retain the sublicensing rights".[60]  These were not guaranteed payments.

10        78.    Second, each of FTB's prior arguments has been rebutted in the prior briefing.[61]

11        79.    The FTB 1991 Concluding Summary at pp. 6-7 states the following.

12        Respondent's recitation of the relevant legal, administrative
and statutory authorities has been previously and extensively
13        discussed at pages 68 through 77 of Respondent's Opening Brief
for Taxable Year 1991 (Case No. 435770) and pages 19 through 23
14        of Respondent's 2007 Determination Letter;[49] those discussions
will not be repeated here and are incorporated by reference as if set
15        forth fully herein.[50]

16        [Exhibit A, note] 49:  Respondent's 2007 Determination Letter.

17        [Exhibit A, note] 50:  Mr. Hyatt's tax administration expert
acknowledges Mr. Hyatt bears the burden of proving California
18        non-residency, must overcome the full year residency presumption
set forth in California Revenue Taxation Code section 17016 and
19        the presumption of correctness associated with FTB's Notice of
Proposed Assessments. 05/06/08 Trial Testimony, p. 169.

20  This FTB statement is false.  Each of FTB's prior arguments has been rebutted in Appellant's

21  prior briefing.[62]  Mr. Antolin's trial testimony did not acknowledge that I bear the burden to

22  ——————————————

23      [60] July 1991 Philips Agreement, Section 4.6, FTB_Philips 0000611.
      [61] See 1992 ARB, pp. 79-81; 1992 ASB, pp. 97-99; 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.7,
24  1.7.9, 1.9; 1992 ASAB, §§ 1.6, 1.7, 1.7.1, 1.7.2, 1.7.3.

RJN1318

1    overcome the California full year residency presumption of California Revenue Taxation Code

2    section 17016.  As explained at 1991 ARB, Section II. C., pp. 68-73, FTB has the burden of

3    proving that I spent (not just lived) more than nine months in California (exclusive of presence

4    for a temporary or transitory purpose) and FTB has failed to carry that burden.  Between

5    September 26, 1991, and the end of 1991 I spent only 17 part days in California, each time for a

6    temporary or transitory purpose, and zero full days in California.[63]

7        80.    The FTB 1991 Concluding Summary at p. 7 states the following.

8            Despite his contrary claims, Mr. Hyatt was a long-time
         California domiciliary (since 1954)[51] and resident for the entire
9        disputed period of September 26, 1991 through April 2, 1992.

10           [Exhibit A, note] 51:   FTB Trial Exhibit 2001-0277-282, 278
         (Hyatt Response to FTB 3805F Questionnaire).

11

12   This FTB statement is false.  I have not denied that I was a long time California domiciliary

13   before September 26, 1991, and FTB offers no evidence of such a denial.  I moved to Las Vegas

14   and became a California nonresident on September 26, 1991.

15       81.    The FTB 1991 Concluding Summary at p. 7 states the following.

16           Evidence of Mr. Hyatt's failure to sever any meaningful ties to
         California is found in contemporaneous statements he made,[52] the
17       failure to provide such things as telephone records and cancelled
         checks, items which would clearly demonstrate the cessation of
18       day-to-day living activity in one locale in favor of another, the
         conduct of a multi-million dollar patent licensing business in
19       California, and an abject refusal to cooperate with respondent's
         attempts to determine where he  was, and what he was doing,
20       during the disputed period.  That conduct includes, among other
         things, belated explanations of whereabouts and refusal to provide
21       significant  personal  and  business  records  for  review  and
         consideration.

22   _____

23   [62] See 1991 AOB, pp. 4-39.
     [63] Rebuttal to FTB's Att. A/F, Section I. A., day by day analysis, September 26, 1991,
24   through December 31, 1991 ASAB Exhibit 4.

[Exhibit A, note] 52: GLR 02191("Hyatt plans to keep his 1977 Toyota. 'It is still reliable and efficient,' he said. And he does not intend to move from the two-story tract house in La Palma, where he now lives."); FTB Exhibit HH, tab 28 ("'I'm a frugal person. I don't need money personally,' he said. His house meets his needs and he doesn't plan on moving, he noted."); and FTB Exhibit HH, Tab 52, ("'La Palma is a wonderful community to live in and I hope it is as motivating to our youth as it has been to me," Hyatt said after the [La Palma] City Council announced his selection Tuesday night....'This city gives me the sense of freedom and flexibility to work, think and live,' he said.") and see 05/18/01 Affidavit of Gilbert P. Hyatt, para. 2, 1:12-17.

These FTB statements are false. First, as is its method in its other briefings and in this briefing, FTB has strung together a list of many false statements without citations.

82. Second, I did sever my most meaningful ties with California. See particularly my two disputed period CDE Affidavits.[64] During the disputed period, I sold the Jennifer Circle house,[65] I terminated my California driver's license through the Nevada DMV,[66] I terminated the homeowner's exemption on the Jennifer Circle house,[67] I did not pay California utility bills or telephone bills,[68] I spent the majority of my days in Nevada, not California,[69] I closed multiple bank accounts in California in anticipation of my move to Las Vegas[70] I did not have California-situs credit card accounts,[71] I had no California social organization membership,[72] I did not re-register my old automobile or register my new automobile in California after my move to Las

---

[64] Hyatt DP CDE Affidavit, July 24, 2012; Hyatt Supp. CDE Affidavit, September 6, 2016.
[65] This issue is addressed, e.g., in the 1991 AOB at § II.C.1.
[66] This issue is addressed, e.g., in the 1991 AOB at § II.C.12.
[67] This issue is addressed, e.g., in the 1991 AOB at § II.C.4.
[68] This issue is addressed, e.g., in the 1991 AOB at § II.C.5.
[69] This issue is addressed, e.g., in the 1991 AOB at § II.C.6.
[70] This issue is addressed, e.g., in the 1991 AOB at § II.C.8.
[71] This issue is addressed, e.g., in the 1991 AOB at § II.C.9.
[72] This issue is addressed, e.g., in the 1991 AOB at § II.C.10.

42

Vegas,[73] I did not vote in any election in California,[74] and my use of California professionals was minimal which is limited to a law firm for preparation of my 1991 income tax return and a few medical professionals related to my cancer surgery in 1992.[75]  More importantly, I made many new connections in Nevada.  During the disputed period, I first stayed at the Continental Hotel and subsequently lived in a leased apartment and continuously searched for a house to purchase,[76] I "walked-through" many Las Vegas houses that were for sale and made many house offers and eventually purchased and moved into my Las Vegas Tara home on April 3, 1992,[77] my only telephone service was at my Las Vegas apartment,[78] I spent the majority of my days in Nevada,[79] I opened multiple bank accounts in Las Vegas,[80] I had active Nevada-situs credit card accounts,[81] I joined the Congregation Ner Tamid in Las Vegas and attended services at both Congregation Ner Tamid and Temple Beth Am,[82] I registered my old automobile and my new automobile in Nevada,[83] I obtained a Nevada driver's license,[84] I registered to vote in Nevada and voted in major elections in Nevada in 1992,[85] and I established a myriad of relationships with Nevada professionals that were situated in Las Vegas.[86]  See also my DP CDE

---

[73] This issue is addressed, e.g., in the 1991 AOB at § II.C.11.
[74] This issue is addressed, e.g., in the 1991 AOB at § II.C.13.
[75] This issue is addressed, e.g., in the 1991 AOB at § II.C.14.
[76] This issue is addressed, e.g., in the 1991 AOB at § II.C.1.
[77] This issue is addressed, e.g., in the 1991 AOB at § II.C.1.
[78] This issue is addressed, e.g., in the 1991 AOB at § II.C.5.
[79] This issue is addressed, e.g., in the 1991 AOB at § II.C.6.
[80] This issue is addressed, e.g., in the 1991 AOB at § II.C.8.
[81] This issue is addressed, e.g., in the 1991 AOB at § II.C.9.
[82] This issue is addressed, e.g., in the 1991 AOB at § II.C.10.
[83] This issue is addressed, e.g., in the 1991 AOB at § II.C.11.
[84] This issue is addressed, e.g., in the 1991 AOB at § II.C.12.
[85] This issue is addressed, e.g., in the 1991 AOB at § II.C.13.
[86] This issue is addressed, e.g., in the 1991 AOB at § II.C.14.

43

Affidavit, July 24, 2012, Supp. CDE Affidavit, September 6, 2016, and Post-DP CDE Affidavit, September 6, 2016.

83.     Third, as I stated in my 2001 Affidavit,[87] I attended Comdex in Las Vegas in November 1990 and I decided at that time to move to Las Vegas.  Upon returning to California from Comdex I began making preparations to move to Las Vegas and severing ties with California.  As stated in my 2001 Affidavit, ¶ 11, the July 1991 Philips Agreement gave me enough money that I could afford to move to Las Vegas and I moved about two months later.  My preparations to move by disposing of furniture, decorations and filing cabinets are discussed in my 2010 affidavit.[88]  As explained in the paragraph immediately above, during the disputed period, I established many meaningful Nevada connections.  As an example, I opened multiple Nevada bank accounts and provided FTB with hundreds of cancelled checks.[89]

84.     Fourth, FTB falsely states that I "refus[ed] to provide significant personal and business records." I did not refuse to provide any records, I provided what I had and I produced many personal records that I requested and obtained from prior service providers for those personal records that I did not have.  I produced thousands of pages of personal records and thousands of pages of licensing records.  See my DP CDE Affidavit, July 24, 2012, my Supp. CDE Affidavit, September 6, 2016, and my Post-DP CDE Affidavit, September 6, 2016.

85.     Fifth, FTB falsely states that I failed to provide telephone records.  However, I did provide telephone records, I provided to the auditor all of the telephone records that I could

---

[87] Affidavit of Gilbert P. Hyatt, May 18, 2001, Annex VII, Ex. 19.
[88] Affidavit of Gilbert P. Hyatt, August 15, 2010, §§ 1.2.2-1.2.3, pp. 8-9, Annex XI, Ex. 13.
[89] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶¶ 27, 153-243, pp. 17-19, 72-112; Hyatt Post-DP CDE Affidavit, September 6, 2016, ¶¶ 395-406, 546-949, pp. 148-154, 207-949; Exhibit CDE-T003.

44

RJN1322

1    find -- my cancelled checks to my Las Vegas telephone service provider.[90]  Furthermore, the

2    auditor interrupted my efforts to obtain additional telephone records.  I was pursuing obtaining

3    my telephone records from my former telephone companies when the auditor stated in a letter

4    that she would investigate and decide to request authorization to get the telephone records.

5          <u>TELEPHONE INFORMATION</u>
      Regarding the telephone information, ***I will investigate*** to determine how long
6     each company retains the billing statements. At a later date. ***I may decide to***
      ***request authorization from the taxpayer*** to determine dates that the service was
7     established, etc.

8          Thank you for your cooperation in this matter. If you have any questions, please
      feel free to call.

9        Letter from FTB auditor dated March 1, 1995, p. 3.  (Emphasis added.)  (FTB-

10   101251-101253).  See 81, 86, 226-228, 233, 249, 547-549 herein.

11       86.      Thus, I discontinued my efforts to get my telephone records from my former

12   telephone companies.  It was clear to me that the auditor decided that she did not want the

13   telephone records because she did not request the authorization.[91]

14       87.      Sixth, FTB falsely states that I failed to provide cancelled checks, but I did

15   provide hundreds of cancelled checks covering the disputed period and beyond.  See the checks

16   listed in Exhibit CDE-T003 attached to my Post-DP CDE Affidavit, September 6, 2016.  FTB

17   disregarded these cancelled checks although these cancelled checks covered my new life in Las

18   Vegas continuously from my opening of my Las Vegas checking account in October 1991

19   through the end of 1992.  See the checks I signed in Las Vegas in my Supp. CDE Affidavit,

20   September 6, 2016, ¶¶ 153-243 and Post-DP CDE Affidavit, September 6, 2016, ¶¶ 546-949.

21

22   _____

23       [90] Letter from E. Cowan to S. Cox, 2/22/95 (CCC 01633-01636).
     [91] Rebuttal to FTB Att. A/F, Section I. B., October 7, 1991; Affidavit of Gilbert P. Hyatt,
24   § 1.20, p. 130, August 15, 2010, Annex XI, Ex. 13; 1991 ARB, § II.A.5, pp. 34-36.

45

RJN1323

88.     Seventh, FTB falsely states that I failed to provide evidence that would show day-to-day living activity, but I provided overwhelming documentation and eyewitness testimony which "clearly demonstrate[d] the cessation of day-to-day living activity in one locale [California] in favor of another [Nevada]." This included extensive documentation (e.g., cancelled checks) and testimony of my friends, associates, family, and professionals. My Rebuttal to FTB Att. A/F, Section I. A., shows on a day by day basis my location and activities on virtually every day of the disputed period as supported by contemporaneous documentary evidence and eyewitness testimony. My physical presence during the disputed period and beyond are also described in detail with documentary evidence in my DP CDE Affidavit, July 24, 2012, Supp. CDE Affidavit, September 6, 2016, and Post-DP CDE Affidavit, September 6, 2016. See in particular, my Supp. CDE Affidavit, September 6, 2016, ¶¶ 153-243 and Post-DP CDE Affidavit, September 6, 2016, ¶¶ 546-949. My Updated Testimonial Topics Table contains substantial eyewitness testimony regarding my preparation for my move to Las Vegas, my move to Las Vegas, and my physical presence in Las Vegas during the disputed period and beyond.

89.     Eighth, FTB falsely states I conducted a multi-million dollar patent licensing business in California. However, I did not conduct a licensing business in California or anywhere else. Philips created, financed, and operated the licensing program while I was building my life in Las Vegas. Furthermore, Philips has exclusive authority to license my patents[92] and I would have been in breach of contract and violating my representations and warranties to Philips if I operated a licensing business anyplace.[93] See ¶¶ 14, 89, 90, 205, 279, 376, 380 herein.

---

[92] This issue is addressed, e.g., in the 1991 ASAB at § 1.7.5.
[93] This issue is addressed, e.g., in the 1992 ASAB at § 1.7.3.

46

90.     Ninth, according to the July 1991 Philips Agreement Philips had exclusive rights and fiduciary responsibility to license my patents and I did not breach that agreement by conducting my own licensing business in derogation of my representations in Section 8.1 of that agreement.[94]  See ¶¶ 67-73, above.  I did not want to negotiate licenses for my patents.  If I had wanted to negotiate patent licenses myself I would not have given Philips 50% of the net proceeds for licensing my patents.  FTB has provided no credible evidence of my presence in California conducting a licensing business.  FTB relies heavily on undisputedly mis-addressed correspondence from Philips as evidence of presence at the Jennifer Circle house on particular days, but I was not present to receive this mis-addressed correspondence and I eventually got Philips to use my correct address.[95]  See ¶¶ 14, 90, 205, 279, 376, 380 herein.

91.     Tenth, FTB falsely states that I refused to cooperate with FTB's attempts to determine where I was and what I was doing during the disputed period and FTB complains about "belated explanations of whereabouts", but I did not refuse to cooperate, I provided the documentation that I could locate that was requested.[96]  See ¶¶ 10, 31-35, 95, 96, 675 herein.  There should be no question that I resided at the Continental Hotel for a couple of weeks, that I resided at my Wagon Trails apartment until April 3, 1992, when I moved into my Las Vegas Tara home, and that I resided at my Las Vegas Tara home until the present.[97]  My

---

[94] 1992 ASAB, § 1.7.3, pp. 51-53.
[95] This issue is addressed, e.g., in the 1991 ASAB at §§ 1.8.4.1-1.8.4.4; 1992 ASAB, §§ 1.4.1.1, 1.5.6.3.
[96] 1991 ARB, § III.B.5., pp. 87-89; 1992 ARB, § V.C.9, p. 67; and 1992 ASB, § I.B.5., p. 31-32.
[97] This issue is addressed, e.g., in the 1991 AOB at § II.C.1; see, e.g., Updated Testimonial Topics, Exs. T008, T009, T018, T019, T041, T042, T044, T049, and T128.

47

RJN1325

representatives and I fully cooperated with FTB.[98]  I did not refuse to demonstrate where I was and what I was doing during the disputed period.  The Rebuttal to FTB Att. A/F, Section I. A., show on a day by day basis my location and activities on virtually every day of the disputed period.  They show that during the 1991 disputed period after I moved I had 71 full days in Nevada and zero full days in California.  I had 17 days partly in Nevada and partly in California for an identified temporary or transitory purpose.  During the 1992 disputed period I had 54 full days in Nevada and 9 full days in California while I was hospitalized for cancer surgery.  I had 20 days partly in Nevada and partly in California for an identified temporary or transitory purpose.  I have provided extraordinary cooperation with FTB, including thousands of pages of documentation[99] and the testimony of dozens of eyewitnesses that establish my Nevada residency beyond doubt.[100]

92.     Eleventh, FTB's note 52 to Exhibit A, relies in large part on irrelevant statements from January 1991, newspaper articles to imply that I did not intend to move many months later on September 26, 1991.  For example, a January 1991 article, GLR 02191, stated that I planned to keep my 1977 Toyota and I did not intend to move.  However, I did keep my 1977 Toyota for about another year.  I bought my new 1992 Toyota in Las Vegas more than a year later after my circumstances had changed considerably.  Further, the newspaper articles are not reliable, I have found that newspaper reporters often get the interview statements wrong and on some occasions

---

[98] 1991 ARB, § III.B.5., pp. 87-89; 1992 ARB, § V.C.9, p. 67; and 1992 ASB, § I.B.5., p. 31-32.

[99] My physical presence during the disputed period and beyond are described in detail with documentary evidence in my DP CDE Affidavit, July 24, 2012, Supp. CDE Affidavit, September 6, 2016, and Post-DP CDE Affidavit, September 6, 2016.

[100] 1991 AOB, § II., pp. 11-55; 1991 ASAB, § 1.3.3, p. xii and § 1.4, pp. 1-2; see also Updated Testimonial Topics, Exs. T002, T003, T005, T006, T007, T008, T009, T018, T019, T041, T042, T044, T049, T102, T116, T120, T127, and T128.

48

publish incorrect stories as if they were interview statements. The unreliability of such newspaper articles is demonstrated by an incorrect statement highlighted by FTB in the linked copy stating incorrectly that I had a laboratory in Cerritos. I have never had a laboratory in Cerritos. I had a U.S. Post Office box address in Cerritos and a laboratory in La Palma. Furthermore, I was and am a private person and I did not confide my inner thoughts and plans to newspaper reporters. Philips eventually announced my Las Vegas residence in a press release in February 1992.[101]

93. The FTB 1991 Concluding Summary at p. 7 states the following.

> Early in the audit, Mr. Hyatt's tax representative, Michael Kern, advised Mr. Hyatt to locate, preserve and protect all documents that would substantiate his move from California to Las Vegas.[53] One of the first significant issues addressed by respondent was the whereabouts of Mr. Hyatt during the period September 26, 1991, when he allegedly left California for Las Vegas, through late October 1991.[54] No explanation was provided for almost five years.

> [Exhibit A, note] 53: 01/20/06 Deposition of Michael Kern, Vol. 4, 279:1-282:8 and 283:16-20.

> [Exhibit A, note] 54: See FTB's Table concerning Mr. Hyatt's Deliberate Concealment of Alleged Continental Hotel Stay.

This FTB statement is false. **_The auditor did not make such a request early in the audit_**, she made the subject document requests after the audit was over (a determination and a fraud penalty had previously been issued).

> **Document Request #1**
> _Provide documentation_, such as hotel receipts, restaurant receipts etc. to substantiate where the taxpayer resided for the period from September 24, 1991 through November 1, 1991.

FTB Letter dated September 26, 1995 (FTB-101891) (emphasis added). It was clear to me that the response to the auditor's inquiry must be supported by documentation such as hotel

---

[101] See Exhibit 19 attached to Affidavit of Charles McHenry, May 17, 2012.

49

1 receipts to support my position. This request for specific documentation came after the audit was

2 essentially over as FTB had assessed me with a fraud penalty in its August 2, 1995,

3 determination letter and after its August 14, 1995, rejection of my representative's request for

4 one of the key pieces of evidence purportedly supporting its fraud findings, the undisclosed

5 alleged affidavits. See ¶¶ 10, 31-35, 91, 95, 96, 675 herein.

6      94. With the assessment of a fraud penalty and a demand for documentation from

7 FTB, my representatives still cooperated by producing all of the documentation that I had on the

8 subject in the requested period. Contrary to FTB's claim, my representatives did not refuse to

9 state where I moved to. During the protest proceeding, my representatives informed FTB that I

10 stayed at the Continental Hotel when I first moved to Las Vegas. See ¶¶ 10, 31-35, 91, 95, 96,

11 675 herein.

12      95. There has been no concealment of my stay at the Continental Hotel during the 2 ½

13 week period from September 26, 1991, to October 14, 1991. See ¶¶ 33-34, above. As explained

14 to FTB many times, I stayed at the Continental Hotel as the guest of a tour company and there

15 was no documentation for my stay at the hotel. I was given a room key by the tour company and

16 I was not asked to and I did not register at the hotel, I paid cash to the tour company for my stay

17 at the hotel, the Continental Hotel had no records of my stay and I had no records of my stay.

18 Nothing was concealed and no records were destroyed. There were no records to start with. On

19 the other hand there is a tremendous amount of eyewitness testimony about my moving away

20 from the Jennifer Circle house,[102] about not being seen at the Jennifer Circle house after I

21

22

23 ───────────────

24    [102] Updated Testimonial Topics, Exs. T007, T006, T102, T114, T118-122.

50

RJN1328

1    moved,[103] about my stay at the Continental Hotel,[104] and about the absence of records for tour

2    company guests staying at the Continental Hotel.[105] See ¶¶ 10, 31-35, 91, 96, 675 herein.

3        96.      As of the time that I engaged Mr. Kern, I did "locate, preserve and protect all

4    [such] documents" and this documentation has been produced to FTB.[106]  However, during the

5    prior five months in my apartment, I had not preserved many documents.  Further, there were no

6    documents to preserve relative to the Continental Hotel because no documents regarding the

7    Continental Hotel had been created.  I stayed at the Continental Hotel as a guest of a tour

8    company and the tour company did not provide receipts.  See ¶¶ 10, 31-35, 91, 95, 675 herein.

9        97.      The FTB 1991 Concluding Summary at p. 7 states the following.

> No justification for the five year delay has been provided, and, to date, no documentary evidence has ever been produced to corroborate Mr. Hyatt's purported stay at the Continental Hotel from September 26, 1991 to the commencement of his alleged stay at Wagon Trails Apartment.[55]  The reality is that neither Mr. Hyatt nor his representatives ever alleged that Mr. Hyatt stayed at the Continental Hotel until the hotel had closed, went into bankruptcy and all of its records had been destroyed pursuant to Bankruptcy Court Order.[56]

[Exhibit A, note] 55:  P00530-549, P00546.

[Exhibit A, note] 56:  Id.

This FTB statement is false.  There was no five year delay.  There were no documents relative to

the Continental Hotel because no documents regarding the Continental Hotel had been generated

and I understood that the auditor wanted documents.  See ¶¶ 10, 31-35, 91, 95, 96, 675 herein.

---

[103] Updated Testimonial Topics, Ex. T127.
[104] Updated Testimonial Topics, Exs. T008, T009.
[105] Updated Testimonial Topics, Exs. T010-T015, T017 and T105.
[106] See my Updated 1991 Pre-Disputed Period Chronological Statements of Facts, Updated 1991 Disputed Period Chronological Statements of Facts, Updated 1992 Disputed Period Chronological Statements of Facts, and Updated 1992 Post-Disputed Period Chronological Statements of Facts; see also my DP CDE Affidavit, July 24, 2012, Supp. CDE Affidavit, September 6, 2016, and Post-DP CDE Affidavit, September 6, 2016.

RJN1329

98.     The following FTB statement is false, "The reality is that neither Mr. Hyatt nor his representatives ever alleged that Mr. Hyatt stayed at the Continental Hotel until the hotel had closed, went into bankruptcy and all of its records had been destroyed pursuant to Bankruptcy Court Order." The reality is that there were no documents created relative to my stay at the Continental Hotel and I understood that the auditor wanted documents.

99.     There was no concealment of my stay at the Continental Hotel during the 2 ½ week period from September 26, 1991, to October 14, 1991, there was no five year delay. As established beyond doubt by my testimony as well as the testimony of numerous eyewitnesses who were officers, managers, and employees of the Continental Hotel, the hotel did not create or maintain records for tour company guests such as myself. No records were created to start with and nothing was concealed. See ¶¶ 10, 31-35, 91, 95, 96, 675 herein.

100.    The FTB 1991 Concluding Summary at pp. 7-8 states the following.

> Business activity records requested by respondent which were concealed for almost twenty years, and obtained after an approximate four-year effort by Mr. Hyatt to have the courts of New York deny respondent access and use of those documents, clearly reveal Mr. Hyatt's continuous presence and income-generating activities in California throughout the disputed period.

This FTB statement is false. First, I did not have "continuous presence and income-generating activities in California throughout the disputed period", I was continuously present in Las Vegas and Philips and Mahr Leonard generated the licensing income. Furthermore, the Philips documents do not reveal any "continuous presence and income-generating activities in California", they reveal only that Philips indisputably mis-addressed correspondence to the former California addresses. [107]

---

[107] This issue is addressed, e.g., in the 1991 ASAB at §§ 1.8.4.1-1.8.4.4; 1992 ASAB, §§ 1.4.1.1, 1.5.6.3.

52

RJN1330

101.    Second, FTB's statement about concealment by my representatives is false, the only concealment was by FTB.  It is FTB that concealed thousands of pages of licensing documents that my representatives produced to FTB in the early 2000s through 2005.[108]  The Philips documents, mislabeled by FTB as "Business activity records," are in large part copies or versions of these documents that my representatives produced to FTB about a decade earlier.  The relevance of hundreds of these licensing documents are described under oath in the three Sourcing Affidavits which are attached thereto as exhibits which have been disregarded by FTB.[109]  See ¶¶ 102-105, 121, 122 herein.

102.    Third, FTB delayed for decades before subpoenaing the Philips documents in 2011.  FTB knew about the relevance of Philips in 1993 when it opened the 1991 audit, my representatives produced thousands of pages of licensing documents to FTB by 2005 (see ¶ 101 herein).  FTB subpoenaed Philips in 2006 but cancelled these subpoenas, and FTB delayed another five years before again subpoenaing Philips in 2011.  FTB's 2011 subpoenas were unlawful, overbroad subpoenas that were limited in scope by order of the New York court while imposing additional delay on these proceedings.[110]  See ¶¶ 100-105, 121, 122, 417 herein.

103.    Fourth, FTB produced over-broad subpoenas for my confidential and I believe privileged documents.  These over-broad subpoenas were significantly limited in scope by court order.  FTB continually violated the court orders by producing prohibited documents requiring further court orders and a temporary restraining order to get FTB to comply with the court

---

[108] See my DP CDE Affidavit, July 24, 2012, ¶ 5 for some of the HL-Bates numbered documents.
[109] See my August 9, 2010 Sourcing Affidavit, August 9, 2010 Sourcing Affidavit of Gregory L. Roth, and August 5, 2010 Sourcing Affidavit of Danny Huntington.
[110] 1991 ASAB, § 1.7.4, p. 12; 1992 ASAB, § 1.8, pp. 58-59.

53

1  orders.[111]  FTB produced three versions of its RSAB DVDs and your Board had to further redact

2  FTB's third RSAB DVD in April 2016 before FTB's RSABs were deemed suitable by the SBE

3  for filing.[112]

4        104.    Fifth, FTB, consistent with its briefing methodology, now mis-labels the licensing

5  documents as "Business activity records."  Contrary to FTB's statement, the licensing documents

6  were not "concealed".  FTB did not request any "Business activity records."  The first auditor

7  requested information on certain specific license agreements (e.g., "[c]opies of all

8  contracts/agreements regarding the microprocessor chip between: … Hyatt and Philips.")[113] and

9  my representative gave him access to those agreements.[114]  The auditor did not complain.  Then,

10  in the protest my representatives produced thousands of pages of licensing documents.  See ¶¶

11  100-105, 121, 122, 417 herein.

12        105.    The FTB statement that documents were concealed for almost 20 years is

13  outrageous and deceitful.  At p. 28:20-21[115] FTB admitted it knew about the Philips records and

14  attempted to obtain them during audit[116] even though FTB now contends they were concealed.

15  FTB knew about my relationship with Philips by April 13, 1992, when I filed my 1991

16  California Part Year Tax Return[117] but delayed 18 years before seeking the Philips documents.

17  FTB showed it was aware of Philips when it referenced Philips in its January 1996 document

18

19

20      [111] 1991 ASAB, § 1.7.4, p. 12; 1992 ASAB, § 1.8, pp. 58-59.

    [112] Letter from Grant Thompson to Edwin Antolin dated April 21, 2016, enclosing a redacted DVD with FTB's RSABs.

21      [113] 1992 RSAB, p. 26.

    [114] See ASAB Attachment 2, pp. 25-26.

22      [115] Respondent's 1991 Concluding Summary, p. 28:20-21.

    [116] See ¶ 416, below.

23      [117] Schedule SI of my 1991 California Tax Return, A00229, lists receipt of $400,000 from "Philips Corp."  At the request of FTB a copy of Schedule SI was sent to auditor Marc

24  Shayer attached to a letter dated August 4, 1993, A00223-00224.

                                      54

1    request.[118]  FTB was also identified in the February 1996 Cowan letter to FTB.[119]  When the

2    FTB auditor asked about licensing documents, the auditor was invited to look at the licensing

3    documents at Mr. Cowan's office and he did so.  There was no concealment of documents and

4    the auditor did not complain about the document production.  See ¶¶ 100-105, 121, 122, 417

5    herein.

6        106.     The FTB 1991 Concluding Summary at p. 8 states the following.

7
8
9
10
11

> Mr. Hyatt obtained the coveted '516 patent while a California domiciliary.  With the contested patent in hand, Mr. Hyatt, his Los Angeles patent lawyer, and others, devised a business plan designed to obtain hundreds of millions of dollars from Japanese companies engaged in the international sale of products which used Mr. Hyatt's microchip technology.  The plan, among other things, was designed to extract compensation from the Japanese companies for their past use of the technology falling under the '516 patent and other patents he owned.

12    This FTB statement is false.  First, the true facts are that Philips approached me for a license on a

13    family of my patents.  Philips worked with PSB&C through its attorney Mr. Roth to create a

14    license agreement.  There was never a patent "in hand" and there was not any "others" involved

15    with me.  Later, Philips suggested that it be allowed to sublicense my family of patents as part of

16    its license agreement.  Philips proposed financing the licensing program from its division in the

17    Netherlands.[120]

18        107.     Second, *there was no business plan*.  Philips developed a Licensing Plan linked

19    to FTB's 1991 Concluding Summary as Exhibit A, note 33.  I did not even have a copy prior to

20    the production of the Philips documents in 2011.  The Philips licensing plan was not "designed

21    to extract compensation from the Japanese companies".  According to the licensing plan,

---

[118] Letter dated January 19, 1996, from Sheila Cox to Eugene Cowan, FTB-100567.
[119] Letter dated February 7, 1996, from Eugene Cowan to FTB, FTB-100568-100569
[120] See June 25, 1991, letter from Ad Huijser, Philips Consumer Electronics, to Algy Tamoshunas, FTB_Philips 0005027.

55

RJN1333

1    FTB_Philips 0000636, the "objective is broad multi-industry licensing of the patent portfolios

2    without unnecessary litigation."  Pursuant to the July 1991 Philips Agreement, Philips had

3    exclusive rights and fiduciary responsibility to license 23 of my patents, FTB_Philips 0000608-

4    610, See ¶ 48, above.

5         108.    Third, the Philips Licensing Program was not "designed to extract compensation

6    from the Japanese companies", it was designed to sublicense companies worldwide.  There are

7    no provisions in the July 1991 Philips Agreement that are specific to Japanese companies.

8         109.    Fourth, the Philips Licensing Program was not "designed to extract

9    compensation . . . for their past use of the technology", it was designed to sublicense companies

10   for their future use of the patents.  As is typical for such agreements, the Patent Agreements

11   included a blanket release for past infringement.  However, FTB has not demonstrated any

12   analysis of past infringement or that there in fact was any past infringement.  To the best of my

13   knowledge, FTB has provided no evidence of past infringement of any of my patents to justify

14   its assertion that the license payments made by licensees were based on past infringement.

15        110.    Fifth, the FTB emphasis on the '516 patent is not correct.  The license payments

16   resulted from Philips and Mahr Leonard licensing 23 or 24 of my patents.  The patent

17   agreements did not single out any one patent.  See for example the list of 24 patents that were

18   licensed to Fujitsu by the Fujitsu Patent Agreement, H 017210-017222.

19        111.    Sixth, after July 1991 Mr. Roth through PSB&C represented Philips with respect

20   to the *Hyatt v Boone* interference and with respect to the Philips licensing program.[121]  See ¶ 57,

21   above.

22        112.    The FTB 1991 Concluding Summary at p. 8 states the following.

23   _____

24   [121] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.

56

RJN1334

> Once the business plan was substantially designed, Mr. Hyatt sought the assistance of MLMC and Philips, two accomplished intellectual property entities well acquainted with negotiating licensing agreements with international companies.

This FTB statement is false. First, Philips approached me for a license on a family of my patents. Philips worked with PSB&C through its attorney Mr. Roth to create a license agreement. Later, Philips suggested that it sublicense my family of patents as part of its license agreement. Philips proposed financing the licensing program from its division in the Netherlands.[122]

113. Second, Mahr Leonard (MLMC) approached Philips with a proposal[123] and Philips negotiated the proposal with Mahr Leonard and engaged Mahr Leonard for a short period of time.[124]

114. Third, there was no "business plan", ¶ 112, above. The July 1991 Philips Agreement gave Philips the rights and responsibility to license my patents. Philips granted Mahr Leonard exclusive rights to negotiate licenses with seven companies through January 1, 1992.[125] See ¶¶ 67-73, above. Upon signing the July 1991 Philips Agreement Philips created, managed and controlled the Philips Licensing Program.[126]

115. The FTB 1991 Concluding Summary at p. 8 states the following.

> Long before he contends he left California, Mr. Hyatt had agreements in place with Philips and MLMC pursuant to which he obtained financial commitments to pay legal and related bills in

---

[122] See June 25, 1991, letter from Ad Huijser, Philips Consumer Electronics, to Algy Tamoshunas, FTB_Philips 0005027.

[123] Mahr Leonard Discussion Outline, FTB_Philips 0005488-0005489.

[124] Affidavit of Algy Tamosunas, August 4, 2010, ¶ 8, Annex XII; Affidavit of David Leonard, May 2, 2012, ¶ 14, Annex XXV, Ex. 46.

[125] Affidavit of Algy Tamosunas, August 4, 2010, ¶ 8, Annex XII; Affidavit of David Leonard, May 2, 2012, ¶ 14, Annex XXV, Ex. 46.

[126] Affidavit of Algy Tamosunas, August 4, 2010, ¶ 10, Annex XII; Affidavit of David Leonard, May 2, 2012, ¶ 15, Annex XXV, Ex. 46.

57

> defense of the challenge to his '516 patent, and expert assistance in
> his negotiations with the Japanese companies.  Philips and MLMC
> would be paid for their services from license fees actually paid by
> the Japanese companies.

These FTB statements are false.  First, the September 1991 Mahr Leonard Agreement was signed on September 24, 1991, only two days before I moved to Las Vegas.  This was not "[l]ong before he contends he left California".  The July 1991 Philips Agreement gave Philips the rights and responsibility to license my patents.  It was therefore Philips that granted Mahr Leonard the exclusive rights to negotiate licenses with seven companies through January 1, 1992.[127]  See ¶¶ 67-73, above.

116.    Second, Philips was the exclusive licensee and the creator and manager of the Philips Licensing Program.  Mahr Leonard was contracted by Philips to negotiate licenses for a short period of time on an exclusive basis.  The financial commitments by Philips and Mahr Leonard were for them to pay their own expenses in performing their responsibilities.

117.    Third, the agreements do not mention "expert assistance" and neither Philips nor Mahr Leonard gave me "expert assistance."  I was the inventor and I was forbidden by contract to license my own patents. 128  Philips performed its responsibilities as the exclusive licensee with the fiduciary responsibility to license my patents and Mahr Leonard performed its responsibilities as the exclusive negotiator to negotiate licenses under contract to Philips.  Neither had the responsibility to give me "expert assistance."

118.    Fourth, I did not pay Philips or Mahr Leonard for their services as implied by FTB.  Philips received the licensing payments from the sublicensees, either directly or through a

---

[127] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 8, Annex XII; Affidavit of David Leonard, May 2, 2012, ¶ 14, Annex XXV, Ex. 46.

[128] This issue is addressed, e.g. in the 1992 ASAB at § 1.7.3.

58

1     trust account and Philips distributed or arranged to have distributed payments to Mahr Leonard

2     and to me.129

3         119.     Fifth, FTB falsely states "Philips and MLMC would be paid for their services

4     from license fees actually paid by the Japanese companies." There are no provisions in the July

5     1991 Philips Agreement that are specific to Japanese companies.

6         120.     California Revenue and Taxation Code, Section 17952, provides that "Income

7     from nonresidents" from intellectual property such as patents "is not income from sources within

8     the state unless the property has acquired a business situs in this state". As intellectual property

9     my patents had a situs at my Nevada place of residence and as far as I am aware, FTB has made

10     no showing that the patents had a separate "business situs" in California. California activities

11     before I moved to Las Vegas did not create a California tax liability for license payments

12     received after I moved to Las Vegas.

13         121.     The FTB 1991 Concluding Summary at p. 8 states the following.

14             The concealed business records reveal that by April 1991,
            MLMC, and perhaps Mr. Hyatt, had met with representatives of

15             Matsushita in Japan.[57]

16         [Exhibit A, note] 57: FTB_Philips 0000152-154.

17     This FTB statement is false. I did not conceal any business records. See ¶¶ 100-105, 122, 417

18     herein. I produced the requested records that I had in my possession and control. The existence

19     of Philips was identified in my 1991 California part year tax return[130] and FTB demonstrated that

20

21

22

---

129 This issue is addressed, e.g. in the 1992 ASAB at § 1.7.1.4.

23     130 Schedule SI of my 1991 California Tax Return, A00229, lists receipt of $400,000
from "Philips Corp." At the request of FTB a copy of Schedule SI was sent to auditor Marc

24     Shayer attached to a letter dated August 4, 1993, A00223-00224.

RJN1337

1  it was aware of Philip by at least January 1996 when it referenced Philips in a document request.

2  [131] Philips was further identified in the February 1996 Cowan letter to FTB.[132]

3       122. My representatives produced thousands of pages of licensing documents and the

4  three Sourcing Affidavits attached as exhibits and explain hundreds of pages of licensing

5  documents.[133] See ¶¶ 100-105, 121, 417 herein.

6       123. I made a trip to Japan with Mahr Leonard in April 1991, prior to completing the

7  July 1991 Philips Agreement. As stated in my 2016 Supplemental Affidavit:

8            I met with several representatives of Matsushita on April 18, 1991,
            at their offices in Japan. George Mahr and David Leonard were

9            also present. We met for a short time at their office and then had
            dinner. The meeting and dinner were a chance for me to meet and

10           get acquainted with some of the Matsushita personnel. There were
            no licensing negotiations at either the short meeting or the dinner

11           and I did not negotiate with Matsushita for a patent license on
            April 18, 1991, or at any other time.[134]

12

13       124. Mahr Leonard did not have authority to negotiate a patent license for my patents

14  on April 18, 1991, when Mr. Mahr and Mr. Leonard apparently met with Matsushita

15  executives.[135] Mahr Leonard was given authority to negotiate with Matsushita thereafter on

16  April 29, 1991.[136]

17       125. The FTB 1991 Concluding Summary at p. 8 states the following.

18           MLMC continued monthly meetings with prospective licensees,
            including Fujitsu, Matsushita, Sony, NEC, Sharp, Oki, Toshiba and

19           Hitachi. By the end of August 1991, MLMC had met at least 31

20  ────────────────

21  [131] Letter dated January 19, 1996, from Sheila Cox to Eugene Cowan, FTB-100567.

    [132] Letter dated February 7, 1996, from Eugene Cowan to FTB, FTB-100568-100569

22  [133] See my August 9, 2010 Sourcing Affidavit, August 9, 2010 Sourcing Affidavit of
Gregory L. Roth, and August 5, 2010 Sourcing Affidavit of Danny Huntington.

23  [134] Supplemental Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶ 11.

    [135] Letter dated April 9, 1991, from Matsushita to Mahr Leonard, FTB_Philips 0000154.

24  [136] First Amendment to Agreement, GLR 04064.

1    times with these companies.[58]

2    [Exhibit A, note] 58:  FTB_Philips 0005503, 5518-5547.

3    This FTB statement is false.  Mahr Leonard had multiple clients for which it was negotiating

4    patent licenses in Japan and elsewhere.  Mahr Leonard did not have authority to meet with

5    Fujitsu to negotiate a patent license for my patents until September 24, 1991, when the

6    September 1991 Mahr Leonard Agreement was signed, FTB_Philips 0000145-0000151.  Mahr

7    Leonard did not have authority to meet with Hitachi to negotiate a patent license for my patents

8    until January 17, 1992, when Mr. Galama of Philips The Netherlands authorized negotiation with

9    Hitachi, GLR 00940.

10    126.    FTB references an undated unauthenticated document of unknown authorship,

11    FTB_Philips 0005503, that indicates meetings by unknown people with various companies on

12    dates that Mahr Leonard was not authorized to negotiate for my patents.  For example the

13    document indicates meetings by unknown persons with Fujitsu, Matsushita, NEC, Oki, Sharp

14    and Hitachi at times when Mahr Leonard did not have authority to negotiate a patent license for

15    my patents with those companies.  For example, the document shows meetings in March with

16    Fujitsu, Matsushita, NEC, Oki, and Sharp but Mahr Leonard was not authorized to meet on my

17    behalf with any company but Toshiba until April 29, 1991.[137]  Thus, the meetings with Fujitsu,

18    Matsushita, NEC, Oki, and Sharp would not be to license my patents.

19    127.    The FTB 1991 Concluding Summary at p. 8 states the following.

20    By September 25, 1991, the Hyatt team expected receipt of
      licensing contracts totaling $80.5 million (i.e., Fujitsu-$15 million,
21    Matsushita-$22.5 million, NEC-$18 million, Oki-$10 million, and
      Sharp-$15 million).[59]

22

23    _____

24    [137] First Amendment to Agreement of December 18, 1990, signed April 29, 1991, GLR
      04064.

61

RJN1339

1    [Exhibit A, note] 59:  FTB_Philips 0005471.

2    This FTB statement is false.  There was no Hyatt team.  See ¶¶ 53, 69-73 herein.  Mahr Leonard

3    was granted the exclusive rights to negotiate with seven companies by the September 1991 Mahr

4    Leonard Agreement.  Mahr Leonard, not some non-existing "Hyatt team" had the exclusive

5    rights to negotiate with Fujitsu, Matsushita, NEC and Sharp.  Upon signing the July 1991 Philips

6    Agreement Philips created, managed and controlled the Philips Licensing Program.[138]  The July

7    1991 Philips Agreement gave Philips the rights and responsibility to license my patents.  It was

8    therefore Philips that granted Mahr Leonard the exclusive rights to negotiate licenses with seven

9    companies through January 1, 1992.[139] See ¶¶ 112-113, above.

10    128.    There was no such expectation by September 25, 1991.  FTB references an

11    unauthenticated document, FTB_Philips 0005471, of unknown authorship with a handwritten

12    date of "9/25/91" of unknown authorship.  On September 25, 1991, significant outstanding issues

13    were still being negotiated with all of the prospective licensees.  The first actual Patent

14    Agreement was the Fujitsu Patent Agreement that was not signed by Fujitsu until October 23,

15    1991, H 017209-017222.[140]  There were still many outstanding issues to be negotiated with

16    Fujitsu.[141]

17    129.    The FTB 1991 Concluding Summary at p. 8 states the following.

18         By September 30, 1991, MLMC sent final draft agreements to Mr.
         Hyatt at his Jennifer Circle address, and Philips.[60]  This baseline
19         agreement uses Mr. Hyatt's Cerritos Post Office Box as his
         mailing address, an address that would be utilized in five 1991
20    

21    [138] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10, Annex XII; Affidavit of David
    Leonard, May 2, 2012, ¶ 15, Annex XXV, Ex. 46.

22    [139] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 8, Annex XII; Affidavit of David
    Leonard, May 2, 2012, ¶ 14, Annex XXV, Ex. 46.

23    [140] Rebuttal to FTB Att. A/F, Section I. D, September 25, 1991.

24    [141] Fax letter dated September 24, 1991, from Fujitsu to Mr. Mahr, FTB_Philips
    0002386-0002403.

RJN1340

1    agreements executed after his alleged departure from California.[61]

2        [Exhibit A, note] 60:  FTB_Philips 0005672-5695.

3        [Exhibit A, note] 61:  FTB_Philips 0005675.

4    This FTB statement is false.  The September 30, 1991, drafts, FTB_Philips 0005672-0005695,

5    were still being negotiated and were not final drafts.  The first actual Patent Agreement was the

6    Fujitsu Patent Agreement that was not signed by Fujitsu until October 23, 1991, H 17209-

7    017222.  This correspondence from Mr. Mahr was sent 4 days after I moved to Las Vegas and

8    Mahr Leonard had not yet incorporated a change of address.[142]  I gave Mahr Leonard changes of

9    address to Las Vegas on multiple occasions, including October 18, 1991.[143]  This issue is

10   addressed, e.g., in the 1991 ASAB at §§ 1.8.1, 1.8.4.1-1.8.4.4; 1992 ASAB, §§ 1.4.1.1, 1.5.6.3.

11   Mahr Leonard began implementing my change of address on Patent Agreements with the NEC

12   and Sony Agreements, H 018797, H 018784.  The NEC and Sony Patent Agreements identified

13   my Las Vegas apartment as my residence while prior agreements had identified the Cerritos U.S.

14   Post Office Box as a mailing address.

15       130.    The FTB 1991 Concluding Summary at p. 9 states the following.

16           Financial expectations quickly became reality as contracts
     were executed, and millions of dollars were sent to Mr. Hyatt, in
17   California by, [sic] the Japanese companies.  Upon receipt of those
     monies, Mr. Hyatt reviewed expense accountings submitted to him
18   and distributed millions of dollars to Philips and MLMC, from
     California, through a mutual fund account he had opened and
19   maintained in California.

20   This FTB statement is false.  First, these fabricated false statements do not cite to a single

21   reference for support.

22       131.    Second, all of the disputed license payments were wire transferred from the

23   _____

24   [142] Rebuttal to FTB Att. A/F, Section I. B, September 30, 1991.
     [143] Rebuttal to FTB Att. A/F, Section I. B, October 18, 1991.

63

1   Japanese companies to Philips, either directly or through the Philips client trust account

2   maintained for the benefit of Philips by PSB&C.  Not a single one of the disputed license

3   payments was wire transferred from a Japanese company to me.

4        132.    Third, FTB falsely addresses all Japanese companies that signed Patent

5   Agreements "***the*** Japanese companies" (emphasis added).  However, these statements apply only

6   to Fujitsu, Oki, and Matsushita as these are the only companies that I agreed (reluctantly) to

7   distribute license payments for Philips at Philips' request.

8        133.    Fourth, FTB falsely states "millions of dollars were sent to Mr. Hyatt, in

9   California by, the Japanese companies."  These three Japanese companies (Fujitsu, Oki, and

10   Matsushita) sent the license payments to the PSB&C client trust account which was maintained

11   for the benefit of Philips.[144]  Philips, through the [First] Supplemental Agreement, authorized

12   PSB&C to wire transfer the payments to my Nevada situs investment account and directed me to

13   distribute the payments from Fujitsu, Oki, and Matsushita with specific instructions through the

14   [First] Supplemental Agreement.[145]

15        134.    Fifth, regarding my distributing of payments to Philips and MLMC, Philips

16   directed me to distribute the payments from Fujitsu, Oki, and Matsushita with specific

17   instructions through the [First] Supplemental Agreement.[146]  I did not distribute the payments

18   from the other sublicensees.  See 1992 ASAB, § 1.7.1.4.

19

20

21

---

22      [144] This issue is addressed, e.g., in the 1992 ASAB at § 1.7.1.4.  See Affidavit of Algy
Tamoshunas, August 4, 2010, ¶ 18, Annex XII.

23      [145] [First] Supplemental Agreement, FTB_Philips 0000666-0000673.

      [146] Philips authorized me to distribute the Fujitsu, Oki and Matsushita license payments

24   through the [First] Supplemental Agreement, FTB_Philips 0000666-0000673.

RJN1342

135.    Sixth, FTB falsely states "Mr. Hyatt . . . distributed millions of dollars to Philips and MLMC, from California." However, I made this distribution from Las Vegas where I resided. FTB has not and cannot provide any evidence to the contrary.

136.    Seventh, FTB falsely states "Mr. Hyatt . . . distributed millions of dollars . . . through a mutual fund account he had opened and maintained in California." However, this mutual fund account was a Nevada situs investment account because I was a Nevada resident (admitted to by FTB for sourcing purposes) and I am informed that investment accounts have the situs of the owner. See 1992 ASAB, § 1.7.1.4, p. 47. Furthermore, the license payments from Sharp, NEC and Sony were transferred from the client trust account maintained by PSB&C for the benefit of Philips directly to Philips except that Philips authorized PSB&C to make a direct transfer of the Mahr Leonard payment to Mahr Leonard.[147] In accordance with the July 1991 Philips Agreement, Philips notified me by a letter dated January 14, 1992, sent to my Las Vegas apartment address[148] that my license payments relative to the Sharp, NEC, and Sony Patent Agreements were being sent by Philips by wire transfer. The license payments were wire transferred to my Nevada situs investment accounts by Philips.[149]

137.    Eighth, the Hitachi license payments were distributed by PSB&C from the client trust account maintained by PSB&C for the benefit of Philips as authorized by Philips in Section 4 of the Third Supplemental Agreement.[150] The payments to me from the Hitachi license

---

[147] Letter dated December 18, 1991, from Mr. Haken to Mr. Roth, FTB_Philips 0005323.
[148] FTB_Philips 0005414.
[149] FTB_Philips 0006151, FTB_Philips 0006152 (State Street), FTB_Philips 0006155 (Janus Group), FTB_Philips 0006158 (Fidelity Group), FTB_Philips 0006161 (JP Morgan).
[150] FTB_Philips 0000679-0000682.

65

RJN1343

1  payments were made to my Nevada situs investment accounts.[151]  I did not distribute the Hitachi

2  license payments for Philips.

3  　　　138.　Ninth, the Sanyo, Kenwood, Omron and Nippon Columbia Patent Agreements

4  were signed by Philips in the second half of 1992 long after the 1992 disputed period.  these

5  license payments were wire transferred by Sanyo, Kenwood, Omron and Nippon Columbia

6  directly to a Philips account at the Bank of New York.  Philips then made distributions by wire

7  transfer to my Nevada situs investment accounts.[152]

8  　　　139.　Tenth, all of the 1991 and 1992 license payments based on Philips sublicensing of

9  my patents after September 26, 1991, when I moved to Las Vegas, were thus transferred from a

10  Philips controlled account to Nevada situs investment accounts owned by me personally.  No

11  payment was made to an account of any California business.  There was therefore no taxable

12  income to any California business that could be attributed to me.[153]

13  　　　140.　The FTB 1991 Concluding Summary at p. 9 states the following.

14  　　　　　The concealed business records further reveal that countless letters and
　　　other writings were authored, delivered to, and exchanged by and among Mr.

15  　　　Hyatt, Philips, MLMC, and the Japanese companies both before and after the time
　　　the licensing agreements were executed.

16  _____

17  　　　[151] Letter from Mr. Hyatt to PSB&C dated September 2, 1992, GLR 00814; letter from
Mr. Brueggemann of PSB&C to Union Bank dated September 4, 1992, GLR 00810-00811.

18  Letters from Mr. Brueggemann of PSB&C to Union Bank, GLR 03702-03704.

19  　　　[152] The Philips license payment to Mr. Hyatt derived from the Sanyo Patent Agreement
was distributed by Philips on July 31, 1992, to Mr. Hyatt's Benham Group, Federated Funds and
Fidelity Funds investment accounts, letter dated July 31, 1992, from Philips to Mr. Hyatt,

20  FTB_Philips 0004633-0004638.  The Philips license payment to Mr. Hyatt derived from the
Omron Patent Agreement was distributed by Philips on October 1, 1992, to Mr. Hyatt's BNF

21  Capital Preservation investment account, letter dated October 1, 1992, from Philips to Mr. Hyatt,
H 018065-018066.  The Philips license payment to Mr. Hyatt derived from the Nippon Columbia

22  and Kenwood Patent Agreements was distributed by Philips on December 29, 1992, to Mr.
Hyatt's Fidelity Group investment account, letter dated December 29, 1992, from Anthony

23  Hermann to Philips, FTB_Philips 0007361; Letter dated December 29, 1992, from Mr. Haken to
Mr. Hyatt, FTB_Philips 0007362-0007363.

24  　　　[153] 1992 ASAB, § 1.7.1.4, pp. 46-48.

66

RJN1344

This FTB statement is false.  First, there were no concealed business records.  See ¶¶ 100-105, 121, 122, 417 herein.

141.    Second, FTB falsely groups me with Philips and Mahr Leonard.  However, Philips and Mahr Leonard performed the licensing, I did not.  I did not send a single correspondence to a prospective licensee during the disputed period.  I did sign a few patent agreements and a few letters at Philips' request, but I sent these documents to Philips or to Mahr Leonard to be forwarded to the prospective licensees.  For example, Philips prepared two letters for me to sign in my position as the inventor confirming that Philips had exclusive authorization to license my patents, [154] but I did not send these letters to the Japanese companies.

142.    Third, FTB falsely indicates that I was part of a "countless letters and other writings" process.  I was instructed by Philips and Mahr Leonard not to communicate directly with prospective licensees and I did not communicate directly with prospective licensees during the disputed period.

143.    Fourth, FTB has no citation to authority for its false assertion that "countless" letters were exchanged by and among various entities (including me).  It is correct that Philips and Mahr Leonard had extensive communications with potential licensees.  I signed some Patent Agreements with licensees at the request and with the express authorization of Philips.  Some of these Patent Agreements included "side letters" drafted by Philips or Mahr Leonard in conjunction with a Patent Agreement in which I made certain representations to the licensee.  However, I sent these letters to Philips or Mahr Leonard for their use in the licensing program.

144.    The FTB 1991 Concluding Summary at p. 9 states the following.

---

[154] FTB_Philips 0003275; HL 02022; HL 11760-11761.

67

Volumes of correspondence ultimately procured from Philips reveal that virtually every written communication directed to Mr. Hyatt by Philips during 1991 was sent to Mr. Hyatt at his Jennifer Circle residence, be it by use of the Jennifer Circle street address, Mr. Hyatt's Cerritos Post Office Box, or via the facsimile machine situated within his Jennifer Circle home.

This FTB statement is misleading. First, FTB cites no authority for its statement. I gave Philips and Mahr Leonard changes of address to Las Vegas by October 18, 1991.[155] See the 1991 ASAB §§ 1.8.1, 1.8.4.2-1.8.4.4; 1992 ASAB §§ 1.4.1.1, 1.5.6.3. I filed a change of address with the U.S. Postal Service from the Jennifer Circle address to my Las Vegas mailing address on October 21, 1991.[156] It is undisputed that the correspondence and faxes sent to the Jennifer Circle house or the Cerritos U.S. Post Office Box by Philips were mis-addressed and admittedly errors of the Philips staff because I had given Philips a change of address in October 1991. See the 1991 ASAB §§ 1.8.4.2-1.8.4.5.

145.    Regarding faxes, I received all of the faxes at my Las Vegas apartment during the disputed period after October 21, 1991. My only fax machine during this period was located in my Las Vegas apartment (1991 ASAB § 1.8.4.5).

146.    I received virtually all of my mail in Las Vegas during the disputed period and thereafter (1992 ASAB § 1.5.7). I notified many people and entities that I had moved to Las Vegas and gave them my Las Vegas contact information (1992 ASAB § 1.5.6). I gave numerous changes of address to my Las Vegas location and I gave numerous people my Las Vegas contact information shortly after I moved to Las Vegas (1992 ASAB § 1.5.6.1). Immediately after I moved into my Las Vegas apartment on October 21, 1991, I notified many people and entities of

---

[155] Rebuttal to FTB Att. A/F, Section I. B., October 18, 1991.
[156] Hyatt's 2012 CDE Aff., ¶ 34 and Exhibit CDE-G21 attached therein.

68

RJN1346

1  my change of address and my Las Vegas contact information (1992 ASAB § 1.5.6.2). The U.S.

2  Postal Service forwarded Philips and Mahr Leonard misaddressed U.S. Mail and much other

3  correspondence to my Las Vegas address because of my change of address (1992 ASAB

4  § 1.5.6.3).

5      147.    On October 21, 1991, I personally went to the Las Vegas Post Office upon

6  returning from New York on October 21, 1991, where I opened a Las Vegas U.S. Post Office

7  Box and submitted changes of address for the Jennifer Circle house and my Cypress U.S. Post

8  Office Box.[157] Thereafter, any mail sent to the Jennifer Circle house was actually delivered to

9  me in Las Vegas. I gave Mr. Tamoshunas, the lead licensing attorney on the Philips Licensing

10 Program, a change of address in October 1991 and he said that any correspondence sent to

11 California thereafter was inadvertently misaddressed by Philips support personnel.[158] An

12 extensive list of early Philips documents using my Las Vegas address is provided in the

13 Tamoshunas Affidavit.[159] I provided many changes of address upon moving to Las Vegas and I

14 received virtually all of my mail at my Las Vegas addresses during the disputed period.[160]

15     148.    The FTB 1991 Concluding Summary at p. 9 states the following.

16              The same is true with respect to written communications
                addressed to Mr. Hyatt by the Japanese companies.

17 This FTB statement is false. FTB cites to no reference to support its statement. The Japanese

18 companies communicated with Philips and Mahr Leonard and should not have corresponded

19 directly with me. The address for official communications under the seven patent agreements

20

21 _____

22      [157] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.
        [158] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 18, Annex XII.
        [159] Affidavit of Algy Tamoshunas, August 4, 2010, Footnote 34, Annex XII.

23      [160] Supplemental Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶¶ 89-91; Hyatt DP
    CDE Affidavit, July 24, 2012, ¶¶ 41-44; Hyatt Supp. CDE Affidavit, September 6, 2016, ¶¶ 32-

24  44; 1992 ASAB §§ 1.5.6, 1.5.6.1-1.5.6.3, 1.5.7.

                                    69

1  signed in 1991 was Philips' law firm, PSB&C.[161]  I had no reason to give the Japanese

2  companies my change of address to Las Vegas since we were not communicating and they

3  should not have been sending correspondence to me.  Nevertheless, in one rare exception, Oki

4  addressed the original Oki Patent Agreement to the Jennifer Circle house on October 31, 1991,

5  Philips 7/31/2011 000499.  Because I had previously submitted a change of address to the Post

6  Office on October 21, 1991, the Oki correspondence was forwarded and delivered to me in Las

7  Vegas and I forwarded it to Philips.

8         149.    The FTB 1991 Concluding Summary at p. 9 states the following.

9         Similarly, the correspondence sent by Mr. Hyatt to Phillips during this time period

10  uniformly states his return contact information was some combination of the Cerritos Post Office

11  Box, the Jennifer Circle phone number or the Jennifer Circle fax machine number (213- 809-

12  1087).

13         This FTB statement needs clarification.  These return addresses were legacy forms.  See

14  1991 ASAB, § 1.8.4.6, p. 25.  For example, upon moving to Las Vegas I pre-printed fax forms

15  and a template in my computer with a prior address thereon.  After I moved to Las Vegas I

16  continued to use up the pre-printed forms and I did not immediately update the template on my

17  computer but I did not send faxes or correspondence from the Jennifer Circle house.[162]  In fact,

18  my only fax machine was located in Las Vegas after October 1, 1991.  See 1991 ASAB, §

19  1.8.4.5.  After October 1, 1991, when I sold the Jennifer Circle house, I moved my fax machine

20  to Las Vegas and I did not ever again send a fax or other correspondence from the Jennifer Circle

21  house and I did not return to the Jennifer Circle house during the disputed period.  I did return for

22  _____

23         [161] For example, see the Fujitsu Patent Agreement, H 017220.

24         [162] Supplemental Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶¶ 84-85, 94, 103,
        108, 112, 204, 246.

70

RJN1348

1   a brief visit in late 1992. All mail that were sent to the Jennifer Circle address was forwarded to

2   me at my Las Vegas mailing address by the U.S. Postal Service because of the change of address

3   that I filed with the U.S. Postal Service. I did not personally receive any correspondence at the

4   Jennifer Circle house after October 1, 1991.

5       150. The FTB 1991 Concluding Summary at p. 9 states the following.

6            Invoices from his California patent lawyer and other service
           providers were sent to him at the Cerritos Post Office Box, press
7            releases uniformly stated he was in or of La Palma, and his limited
           Las Vegas house hunting activity was conducted via the Jennifer
8            Circle fax machine.[62]

9            [Exhibit A, note] 62: FTB's Attachment A (Revised), pp.28-81
           and FTB's Attachment F, pp. 1-8, and FTB Table of USPTO
10           records referencing Mr. Hyatt's California POB and California
           phone number, pp. 12-17.

11

12   These FTB statements are false. First, I conducted all of my house hunting from Las Vegas after

13   my September 26, 1991, move to Las Vegas. My only fax machine was located in Las Vegas as

14   of October 1, 1991, I did not conduct any of my house hunting "via the Jennifer Circle fax

15   machine". See 1991 ASAB, § 1.8.4.5. During the disputed period, I worked with many real

16   estate professionals in Las Vegas to locate and to purchase my Las Vegas Tara home.[163]

17       151. Second, my Las Vegas house hunting was not "limited". During the disputed

18   period, I reviewed more than 150 house listings, I "walked through" more than 30 houses, I

19   made purchase offers with large cash deposits on ten houses through three different realtors, I

20   had a short escrow (2 ½ weeks) on my dream home (which is still my residence after 25

21   years).[164]

22 _____

23     [163] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 45-51.
    [164] See Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 45-51 and the exhibits attached
24   therein.

71

RJN1349

152. Third, Mr. Roth represented Philips, not me, with respect to the *Hyatt v. Boone* interference and with respect to the Philips Licensing Program after July 1991. The PSB&C law firm sent its invoices to Philips, ¶ 57, above. FTB has identified only a single December 31, 1991, invoice for a specialized patent re-examination that was sent to the Cerritos U.S. Post Office Box, FTB_Philips 0006599, ¶ 59, above.

153. Fourth, the FTB statement that press releases uniformly stated that I was "in or of La Palma" is another FTB fabrication and is false. The first press release, which was issued for me on August 19, 1990, more than a year before I moved to Las Vegas, correctly stated that I was a resident of La Palma. The second press release, which was issued by Philips on November 6, 1991, stated incorrectly that I was of La Palma. I did not approve this statement[165] and it was not correct. The third press release, which was issued by Philips on February 24, 1992, referred to "Hyatt, who resides in Las Vegas".[166]

154. Fifth, FTB's so-called Master List linked at Exhibit A, note 62, shows that I identified the Cerritos U.S. Post Office Box as a contact address to the PTO in 1987, more than four years before I moved to Las Vegas. According to FTB's so-called Master List, I did not repeat the 1987 instruction to designate the Cerritos U.S. Post Office Box and La Palma telephone number as Patent Office contact information on any occasion after I moved to Las Vegas, as falsely stated by FTB, ¶ 45, above.

155. The FTB 1991 Concluding Summary at p. 9 states the following.

> Mr. Hyatt executes seven licensing contracts with the Japanese companies having an aggregate dollar value exceeding $106 million. Every one of them is executed by Mr. Hyatt after his alleged departure from California on September 26, 1991. In the

---

[165] Declaration of Charles McHenry, October 13, 2014, ¶ 98
[166] See Exhibit 19 attached to Affidavit of Charles McHenry, May 17, 2012.

72

RJN1350

1
2
3
4

first five of those agreements, signed by Mr. Hyatt between October 14th and November 29th, 1991, he states that his mailing address is Cerritos, CA. The latter two, executed on December 10, 1991, state his mailing address is his Las Vegas low-income apartment, but the business correspondence surrounding the execution of those contracts reveals that Mr. Hyatt was in Orange County, CA.[63]

5

[Exhibit A, note] 63: FTB Table of Hyatt Patent Licensing Agreements in 1991 and 1992.

6

7

This FTB statement is false. First, my Las Vegas apartment was not a "low-income apartment", it was a mid-range two bedroom apartment with very nice, well maintained grounds.[167]

8

9

156. Second, I did not make any statements about my mailing address in the Patent

10

Agreement. The first four Patent Agreements[168] were drafted by Mahr Leonard and provided

11

that I had a mailing address at the Cerritos U.S. Post Office Box. I complained about the use of

12

this obsolete address and I was told that the address was not important because the official

13

address was PSB&C[169] and that I should sign the Patent Agreements.[170] The first two Patent

14

Agreements I executed for Philips, the Fujitsu and Oki Patent Agreements, were executed in

15

Virginia on October 14, 1991. The other Patent Agreements that I executed for Philips were all

16

executed in Las Vegas. Contrary to the FTB statement, the NEC and Sony Patent Agreements

17

identified my Las Vegas apartment address as *my residence*, not a mailing address.[171] The

18

Hitachi Patent Agreement identified my Las Vegas U.S. Post Office Box address as my

19

address.[172]

20

21

22

23

24

---

[167] 1991 ARB, § II.A.1.d, pp. 29-32.
[168] A relatively small Sharp PCT Patent Agreement used language similar to the other Patent Agreements, FTB_Philips 0000757-0000766.
[169] For example, see the Fujitsu Patent Agreement, H 017220.
[170] Supplemental Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶¶ 138-143; 1991 ASAB, § 1.7.8, p. 14.
[171] Sony Patent Agreement, H 018784; NEC Patent Agreement, H 018797.
[172] Hitachi Patent Agreement, H 18823.

73

RJN1351

157.   Fourth, the Patent Agreements I executed during the disputed period were executed at the request of Philips after approval of each agreement by Philips.  Philips had the authority to sign each of these patent agreements pursuant to the July 1991 Philips Agreement, but asked me to sign certain agreements and gave me authority to sign them through the [First], Second and Third Supplemental Agreements and Philips indemnified me for signing the patent agreements.[173]

158.   Fifth, I was in Las Vegas, not Orange County, California on December 10, 1991, when I executed the NEC and Sony Patent Agreements.[174]

159.   The FTB 1991 Concluding Summary at p. 10 states the following.

> During this time period, Mr. Hyatt signs multiple Superior Court documents confirming his presence in Orange County, engages in several conversations with his attorneys pertaining to that matter, performs personal banking and makes several visits to safe deposit boxes in a La Palma bank, serves as the Grand Marshall of the La Palma Day parade, attends medical appointments with Los Angeles and Orange County doctors, engages in round-trip air travel which begins and ends at Los Angeles International Airport (LAX), and either sends or is the addressee on multiple pieces of patent-related correspondence with the USPTO.

> [Exhibit A, note] 64:  See FTB's Attachment A (Revised), pp. 28-81 and FTB Table of USPTO documents referencing Mr. Hyatt's California address and California phone number.

This FTB statement is false.  As executor of my mother's estate I made several visits to California for the temporary or transitory purpose of fulfilling my duties as executor, not because I was a resident of California.

---

[173] [First] Supplemental Agreement, FTB_Philips 0000666-0000673; Second Supplemental Agreement, FTB_Philips 0000674-0000677; Third Supplemental Agreement, FTB_Philips 0000679-0000682.
[174] Rebuttal to FTB Att. A/F, Section I. A., December 10, 1991.

74

160.     FTB does not identify what personal banking I allegedly performed in Orange County.  An associate occasionally deposited or cashed a check for me in Orange County. I had two certificate investment accounts that I opened long before my move and that were inactive, which I closed immediately after they matured.  I had several money market investment accounts that I opened long before my move and that were depleted and then closed shortly after my move.  However, I did not perform any personal banking in Orange County.

161.     The two safe deposit boxes I maintained at an Orange County bank were for my mother's estate and were maintained as executor of my mother's estate.  FTB has made false assertions that I accessed these safe deposit boxes on certain dates.  It has only a list of unauthenticated dates and no evidence that I was actually present on those dates.  Two of the listed dates are December 5, 1991, and December10, 1991.[175]  I was present in Las Vegas in each of those days and did not access the safe deposit boxes on those dates.[176]     I had cancer surgery in California and was hospitalized in California from February 11, 1992, to February 21, 1992, for a temporary or transitory purpose and I visited California for the temporary or transitory purpose of preparing for the cancer surgery.  See 1992 ASAB, § 1.5.5 and ASAB Exhibit 4, Table of "Mr. Hyatt's Temporary or Transitory Purposes Outside of Nevada".

162.     After September 26, 1991, my trips outside of Nevada began and ended in Las Vegas.  I had no trips that began or ended at LAX and FTB offers no evidence of its false assertion.

163.     FTB has linked to its note 64 the newly asserted so-called Master List that lists a "Declaration For Patent Application" signed on June 8, 1987, more than four years before I

---

[175] FTB 01982-01983.
[176] Rebuttal to FTB Att. A/F, Section I. A., December 5, 10, 1991.

75

1   moved to Las Vegas. The June 8, 1987, Declaration shows that more than four years before I

2   moved to Las Vegas I designed the Cerritos U.S. Post Office Box and La Palma telephone

3   number as the Patent Office contact information for one of my patent applications.

4         164.    The FTB 1991 Concluding Summary at p. 10 states the following.

> Against this overwhelming evidence of uninterrupted domicile, continuous presence and conduct of personal and professional business, Mr. Hyatt offers the self-serving rebuke that he left California on September 26, 1991, which he contends is proven by his alleged sale of the Jennifer Circle property to a close friend and business colleague, the rental of a low-rent ($540 each month) one-bedroom apartment, and the grossly-belated revelation of an alleged long-term stay in a long-defunct Nevada hotel. Respondent submits that this explanation is simply devoid of credibility and trustworthy contemporaneous objective documentation.

This FTB statement is false. First, there is no uninterrupted domicile presence. Each of my 17 part day visits to California during the 1991 disputed period was for a specific temporary or transitory purpose. See 1992 ASAB, § 1.5.5 and ASAB Exhibit 4, "Table of Mr. Hyatt's Temporary or Transitory Purposes Outside of Nevada." I did not spend a full day in California during the 1991 disputed period.

      165.    Second, FTB does not offer one shred of evidence that I conducted any business in California during the 1991 disputed period. FTB seems to be relying on mis-addressed documents by Philips to my former addresses. See ¶¶ 14, 89, 90, 205, 279, 376, 380 herein.

      166.    Third, with no evidence whatsoever, FTB mischaracterizes my statements about the sale of the Jennifer Circle house. I have never stated that the sale of the house proves I moved on September 26, 1991. I do contend that the sale of the house five days after I moved and the subsequent purchase of my much larger Las Vegas Tara home (5400 square feet) strongly supports my many reductions of ties to California and increases in ties to Nevada. Dozens of witnesses have testified to my absence from California or my almost continuous

76

RJN1354

presence in Las Vegas.  See, e.g., Updated Testimonial Topics, Exs. T002, T003, T005, T006, T007, T008, T009, T018, T019, T041, T042, T044, T049, T102, T116, T120, T127, and T128.

167.     Fourth, the FTB statement that the apartment I lived in for six months in Las Vegas while I searched for and bought a Las Vegas house is false.  The apartment was a two bedroom apartment, not one bedroom as falsely stated by FTB, and it was in a very nice apartment community, see ¶ 155, above.

168.     Fifth, I have never alleged a long-term stay in a long-defunct Nevada hotel.  I stayed for about 2 ½ weeks at the Continental Hotel, which was not defunct.

169.     Sixth, overwhelming eyewitness and documentary evidence establishes (1) that I moved away from the Jennifer Circle house in 1991, (2) that I moved to Las Vegas and became a Nevada residence in 1991, (3) that I sold the Jennifer Circle house on October 1, 1991, and had no other abode in California, (4) that I stayed at a Las Vegas hotel for a short time, (5) that I moved into my Las Vegas apartment on October 21, 1991, and (6) that I moved into my Las Vegas Tara home on April 3, 1992.[177]

170.     The FTB 1991 Concluding Summary at p. 10 states the following.

> Mr. Hyatt's original explanation as to how he severed his ties to California, rested heavily upon the assertion that he sold his long-standing Jennifer Circle home/office to Ms. Jeng on October 1, 1991, in favor of a one-bedroom unit in a low-income apartment complex in Las Vegas.

This FTB statement is false.  I sold my old house in California in favor of a beautiful 5400 square foot Tara Avenue Las Vegas home I bought on April 3, 1992,[178] not an apartment as

---

[177] Hyatt DP CDE Affidavit, July 24, 2012; Hyatt Supp. CDE Affidavit, September 6, 2012; Hyatt Post-DP CDE Affidavit, September 6, 2016; Updated Testimonial Topics Table, Exs. T006, T007, T102, T123, T124, T008-T009, T018, T128, T019, T049; 1991 ASAB, § 1.4, pp. 1-2.

[178] Affidavit of Caroline Cosgrove, July 7, 2012, ¶ 182, Annex XXV, Ex. 12.

77

RJN1355

1  falsely stated by FTB.  I lived in a mid-range apartment for six months while I looked for my Las

2  Vegas Tara home.  The apartment had two bedrooms, not one as falsely stated by FTB, it was a

3  mid-range apartment, not a low income apartment as falsely stated by FTB, and it was in a very

4  nice well cared for apartment complex, ¶ 155, above.

5      171.    The FTB 1991 Concluding Summary at p. 10 states the following.

6          The lease agreement pertaining to that unit revealed, however, that
   Mr. Hyatt could not have taken possession of that unit any time

7          prior to October 20, 1991.

8      The lease on my apartment ran from October 20, 1991, through the end of April 1992[179]

9  I moved into and stayed in my apartment on October 21, 1991, upon returning from a trip to New

10  York.[180]

11      172.    The FTB 1991 Concluding Summary at p. 10 states the following.

12          Once these facts were revealed, respondent, on multiple occasions
   commencing in 1995, asked Mr. Hyatt to account for his

13          whereabouts during the 26 day gap between September 24th and
   October 20th.  No answer was provided for almost 5 years.  The

14          explanation that Mr. Hyatt stayed at the Continental Hotel did not
   come until such time as records actually maintained and retained

15          by the hotel were destroyed pursuant to a Bankruptcy Court order.

16  This FTB statement is false.  There was no concealment of my 2 ½ week stay at the Continental

17  Hotel and no records of my stay were destroyed. I stayed at the hotel as a guest of a tour

18  company so there were no hotel records of my stay.  See ¶¶ 10, 31-35, 91, 95, 96, 675 herein.

19  Further, many witnesses have testified about my stay at the Continental Hotel.

20      173.    The FTB 1991 Concluding Summary at p. 10 states the following.

21          Continental Hotel management personnel have explained
   that Las Vegas hotel law at the time required all hotel guests to

22          check in and for hotels to maintain guest records.

23

24  [179] Declaration of Clara Kopp, January 14, 2015, ¶ 7.
   [180] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.

78

RJN1356

1  This FTB statement is false. First, I was a guest of the tour company which rented a block of

2  rooms for its guests. The tour company got paid cash for the tour and the tour company handed

3  out hotel room keys to his guests. Second, the statement about Las Vegas laws was made by

4  William Savage, a paid investigator who was twice fired for dishonesty, not by hotel

5  management. Those and additional acts of dishonesty by Mr. Savage are set forth in Appellants

6  Motion to Strike and Objections to FTB Private Investigator and FTB Attorney Declarations.[181]

7  See ASAB Attachment 1, pp. 25-38; Table of William Savage's Fraud and Dishonesty, Savage

8  False Statements Table, and Supplemental Savage False Statements Table. Mr. Savage falsely

9  attributed the statement about hotel law to Ira Levy, President of the Continental Hotel.[182]

10  However, Mr. Levy, president of the Continental Hotel during the relevant period, has

11  specifically denied making such statements to Mr. Savage.[183] To the contrary, Mr. Levy and

12  many other Continental Hotel personnel have testified that in 1991 the Continental Hotel did not

13  individually register tour company guests and no individual records of tour company guests were

14  created or maintained by the Continental Hotel.[184] Many other Continental Hotel employees

15  confirmed hotel President Levy's statement that no hotel records were created for tour company

16  guests in 1991.[185] See Updated Testimonial Topics, Exs. T010, T011, T017, and T105. See ¶¶

17  10, 31-35, 91, 95, 96, 675 herein.

18

19  _____

20  [181] See particularly, Section III.B.5., "The Testimony of Mr. Savage Has Been Expressly
Refuted by 15 Witnesses", Appellant's Motion to Strike and Objections to FTB Private
21  Investigator and FTB Attorney Declarations.
[182] Declaration of William L. Savage, May 27, 2009, ¶ 8, Exhibit 1 to the Declaration of
22  Ira Levy, May 9, 2012, Annex XXV, Ex. 47.
[183] Declaration of Ira Levy, May 9, 2012, ¶¶ 5-8, Annex XXV, Ex. 47.
23  [184] Declaration of Ira Levy, May 9, 2012, ¶¶ 6-11, Annex XXV, Ex. 47.
[185] Continental Hotel employees Michael C. Fox, Bernice Jaeger, Geri Bommarito, Louis
24  Litwin and President Ira Levy all testified that the Continental Hotel did not register individual

79

RJN1357

174.   The FTB 1991 Concluding Summary at p. 10-11 states the following.

> Hotel personnel have also explained no requests for verification of stay were presented by or on behalf of Mr. Hyatt and that Mr. Hyatt's purported explanation that a tour bus guide had given him a room key without the need to formally check-in was contrary to Las Vegas law, and long term stays required the personal approval of a certain Mr. Fox, who has no recollection of any such request or stay.   Moreover, the claimed stay is not substantiated by receipts, credit card statements or any other objective indicia of Mr. Hyatt's presence at that hotel.[65]

> [Exhibit A, note] 65:   FTB's Table re Mr. Hyatt's Deliberate Concealment of alleged Continental Hotel stay and FTB's Attachment E, pp. 144-161 (Continental Hotel witnesses).

This FTB statement is false.  The FTB story about tour company guests at the Continental Hotel being required to register is a fabrication by FTB's paid investigator, William Savage, who is proven dishonest and entitled to no credibility, ¶ 173, above.  Continental Hotel employees have explained that tour company guests did not register at the hotel and no records of tour company guests were created in 1991.[186]

175.   Mr. Fox's testimony that he did not remember me out of tens of thousands of hotel guests is meaningless, I did not meet Mr. Fox.[187]

176.   My stay at the Continental Hotel was not a long term stay.  I stayed at the hotel for about 2 ½ weeks.  I understand that the Continental Hotel advertised in newspapers for one month stays.[188]

---

van tour guests so no records of individual tour guests were ever created, Rebuttal to FTB Att. A/F, Section I. F., September 29, 1991.

[186] Continental Hotel employees Michael C. Fox, Bernice Jaeger, Geri Bommarito, Louis Litwin and President Ira Levy all testified that the Continental Hotel did not register individual van tour guests so no records of individual tour guests were ever created, Rebuttal to FTB Att. A/F, Section I. F., September 29, 1991.

[187] Affidavit of Michael C. Fox, February 14, 2012, ¶¶ 19, 26.

80

177.    I stayed at the Continental Hotel as a tour company guest and paid cash to the tour company for my stay.  Thus there could not be and there were not any records of my stay at the hotel.  See ¶¶ 10, 31-35, 91, 95, 96, 675 herein.  However, many eyewitnesses have testified about my stay at the Continental Hotel.  I discussed staying at a Las Vegas Hotel with many people and many people called me at the Continental Hotel (37 witnesses testified about my stay at a Las Vegas hotel in 1991 and 20 witnesses testified about telephoning me at a Las Vegas hotel in September or October 1991, Updated Testimonial Topics, Exs. T008 and T009).

178.    The FTB 1991 Concluding Summary at p. 11 states the following.

> Furthermore, in an attempt to deflect attention from the absence of contemporaneous documentation of the alleged wholesale change of residence and business locales, Mr. Hyatt offers a variety of declarations and affidavits, many of which are from people who could have, and should have, been disclosed many years earlier, who purport to speak about events which occurred during 1991 and/or 1992, events which cannot be independently verified.  Respondent submits, among other things, that the belated nature of the disclosure of the identities of these individuals, coupled with the lack of contemporaneous, objective verification of the accounts they have presented, renders the declarations and affidavits they have submitted in this matter to be without merit or credibility.[66]
>
> [Exhibit A, note] 66:  See ROB (1991), pp. 11-13, ROB (1992), pp. 60-67, RRB (1991) (all), RRB (1992), pp. 1-6, RAB (1991), pp. 13-30, RAB (1992), pp. 1-13 and FTB Attachments B, D and E.

This FTB statement is false.  First, there is no absence of contemporaneous documentation; my representatives produced thousands of pages of relevant contemporaneous documentation.  See my three CDE affidavits describing this documentation.[189]

---

[188] See, e.g., Declaration of Tory Castellano, June 27, 2016, ¶ 9 and Exhibit 1 attached therein.

[189] Hyatt DP CDE Affidavit, July 24, 2012, Hyatt Supp. CDE Affidavit, September 6, 2016, and Hyatt Post-DP CDE Affidavit, September 6, 2016.

81

RJN1359

179.    Second, the affidavits and declarations have over 10,000 pages of exhibits described and attached for documentary support for the testimony.  However, these exhibits have been disregarded by FTB.  See, e.g., 1991 ASAB, § 1.8.6.4.

180.    Third, all of this testimony can be independently verified.  The witnesses are reinforced by the many other witnesses testifying to the same facts.  See the Testimonial Topics Table.  For example, 72 witnesses testified that I moved away in 1991, 28 witnesses testified that I moved away in September 1991, 22 Jennifer Circle neighbors testified that I moved away in 1991.[190]  Thus, the testimony has been "independently verified".  See 1991 ASAB § 1.8.6.4.

181.    Fourth, FTB falsely states that these "people who could have, and should have, been disclosed many years earlier".  My representatives formally disclosed more than 100 witnesses and their relevance but FTB totally disregarded them.[191]  Further, FTB significantly developed its allegations in these appeals, so my representatives had to develop new evidence to rebut FTB's new allegations.

182.    Fifth, FTB's false speculation about why I provided testimony from so many eyewitnesses that verify my stay at the Continental Hotel in September and October 1991 should be ignored by your Board (37 witnesses testified about my stay at a Las Vegas hotel in 1991 and 20 witnesses testified about telephoning me at a Las Vegas hotel in September or October 1991, Updated Testimonial Topics, Exs. T008 and T009).  The true reason why I provided testimony from so many eyewitnesses is that my representatives found many eyewitnesses who were willing to testify to the true facts when informed of FTB's false facts.  These witnesses confirm

---

[190] Updated Testimonial Topics, Exs. T007, T006, and T102, respectively.
[191] See the excerpts from my 1992 Supplemental Protest Letter in Exhibit CDE-P037 to my 2016 Post-Disputed Period CDE Affidavit and the excerpts from my 1991 Supplemental Protest Letter in Exhibit CDE-P038 to my 2016 Post-Disputed Period CDE Affidavit.

82

RJN1360

1  my statement that I stayed at the Continental Hotel for a couple of weeks between late September

2  through mid-October 1991.  The statements are verified by the overlapping consistent testimony

3  of many witnesses with each witness supporting my testimony as well as the testimony of the

4  other witnesses.

5      183.    The FTB 1991 Concluding Summary at p. 11 states the following.

6              Respondent acknowledges that a taxpayer's ownership and
        occupancy of residential real property is one of several factors
7       considered by your Board in determining whether a taxpayer has,
        in fact, established residency outside California.[67]  An analysis of
8       additional relevant Bragg factors follows.

9      [Exhibit A, note] 67:  Appeal of Stephen D. Bragg, 2003-SBE-002.

10  I began looking for houses to buy in Las Vegas even before I moved there.  I sold the Jennifer

11  Circle house on October 1, 1991, five days after I moved to Las Vegas.  Then on April 3, 1992,

12  after an intensive search during which I personally walked through many Las Vegas houses and

    personally made many purchase offers through Las Vegas real estate agents, I purchased my

13  beautiful 5400 square foot Las Vegas Tara home, which was much nicer and much larger than

14  the house I had sold in La Palma.  This residential real property Bragg factor demonstrates that I

15  severed ties to California and established ties to Nevada.  This Bragg factor strongly favors my

16  Nevada residency.

17      184.    The FTB 1991 Concluding Summary at p.11 states the following.

18              In addition to Mr. Hyatt's alleged, unsubstantiated stay at
        the Continental Hotel, the following two real estate and leasing
19      transactions are worthy of consideration in this matter.

20  This FTB statement is false.  My stay at the Continental Hotel is not "unsubstantiated".  Many

21  eyewitnesses verified to my stay at the Continental Hotel in September and October 1991 (37

22  witnesses testified about my stay at a Las Vegas hotel in 1991 and 20 witnesses testified about

23  telephoning me at a Las Vegas hotel in September or October 1991, Updated Testimonial

24  Topics, Exs. T008 and T009).  These witnesses confirm my statement that I stayed at the

83

RJN1361

Continental Hotel from September 26, 1991, through October 14, 1991. The statements are verified by the overlapping consistent testimony of many witness with each witness supporting my testimony as well as the testimony of the other witnesses.

185. The FTB 1991 Concluding Summary at p. 11 states the following.

> Mr. Hyatt originally acquired the Jennifer Circle property from Gary and Sandra Finn in 1986.[68] Mr. Hyatt contends that he sold the Jennifer Circle residence to his friend and colleague, Grace Jeng, on October 1, 1991. As substantiation of that sale, Mr. Hyatt produced a non-recorded copy of a grant deed he contends effectuated that transaction.

[Exhibit A, note] 68: P11364-69.

This FTB statement needs clarification. I sold the Jennifer Circle house on October 1, 1991, five days after I moved to Las Vegas.[192] I have significant support for this sale which has been disregarded or misrepresented by FTB. For example, in addition to the delivery of the grant deed, which I have been informed was sufficient to effect the sale, I have also produced substantial documentation including the home loan payoff on the Jennifer Circle house, the reconveyance on the Jennifer Circle house, the monthly loan payments and the balloon payment on the Jennifer Circle house from the purchaser, my 1991 tax returns that disclosed my sale of the Jennifer Circle house, and the Homeowners' Exemption Termination Notice for the Jennifer Circle house.[193] Furthermore, various witnesses testified to my decision to move to Las Vegas, the sale of the Jennifer Circle house in October 1991, the documentation for the sale of the Jennifer Circle house satisfied the requirements of the Orange County Assessor's Office for sale of a house in 1991, the Jennifer Circle house having little furniture and/or packed boxes before I

---

[192] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 7-11; Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.

[193] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 7-11; Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 7.

84

1    moved to Las Vegas in 1991, the Jennifer Circle house being nearly empty of furniture and

2    furnishings before I moved to Las Vegas in 1991, helping me packed my belongings for my

3    move to Las Vegas in 1991.[194]

4       186.    The FTB 1991 Concluding Summary at p. 12 states the following.

> Inquiry into that transaction reveals, however, that the grant deed contains a fraudulent notary acknowledgement which is back-dated by almost two years. Review of the official notary journal Darlene Beer was required to maintain by law, reveals that Mr. Hyatt appeared before her on June 10, 1993, not October 1, 1991.[69] In a 1999 interview, Darlene Beer stated that the Grant Deed dated October 1, 1991 was actually notarized on June 10, 1993 and backdated to October 1, 1991.[70] On February 10, 1992, when provided an opportunity to disclose the alleged unrecorded sale to Ms. Jeng, Mr. Hyatt did not do so.[71]

> [Exhibit A, note] 69: Deposition Exhibit 354 to Darlene Beer's 4/9/04 deposition (FTB 13735-36) and FTB 13701 (marked as Exhibit 351 to Ms. Beer's 4/9/04 deposition).

> [Exhibit A, note] 70: Exhibit LL, Tab 1: 02/16/13 Declaration of Jake Dameron, 2:6-9.

> [Exhibit A, note] 71: EC06161-62.

This FTB statement is false. There was no fraud in the sale of Jennifer Circle house or in the

notarization of the deed. FTB disingenuously contends there was a "fraudulent notary

acknowledgement" without indicating who committed the fraud. No one committed fraud. FTB

has confirmed that the deed I produced to FTB was a non-record, non-notarized copy I had in my

possession.

      187.    Notwithstanding the fact that the notarized deed was not fraudulent, I did not

produce a notarized deed. Thus, the notarization issue does not appear to be relevant. FTB has

---

[194] Updated Testimonial Topics, Exs. T001, T124, T123, T003, T004, and T117.

85

acknowledged that its own private investigator, Jake Dameron, obtained the copy of the Grant Deed with the incorrect date of notarization from the Recorder's office.[195]

188.   I signed the Grant Deed for the sale of the Jennifer Circle house on October 1, 1991, and delivered a copy to the buyer on that date.  On June 10, 1993, I had my signature notarized by Darlene Beer by acknowledgment, which means I had previously signed the document and I acknowledged the signature to be mine.  FTB offers no evidence that I have ever stated otherwise and I did not commit fraud.

189.   Darlene Beer did not commit fraud.  Darlene Beer testified that she "inadvertently" used the date of signature rather than the current date of June 10, 1993, when she notarized the Grant Deed by which I sold the Jennifer Circle house.  She stated no one asked her to make a false notarization.[196]  A simple mistake by a notary is not fraud.  Again, I did not produce the notarized grant deed to FTB so the notarization issue is irrelevant.

190.   The FTB 1991 Concluding Summary at p. 12 states the following.

As late as April 8, 1993, Mr. Hyatt continued to claim record ownership of the Jennifer Circle home.[72]

[Exhibit A, note] 72: See Gilbert P. Hyatt's 4/08/93 deposition, Vol. 1, page 24, lines 8-19 in the matter *Priscilla Maystead v. Gilbert P. Hyatt*, LASC Case No. NWD 55911.

This FTB statement is false and deceitful.  In a deposition in Las Vegas years later, I said that I did not own a home in Los Angeles County but that "I think that I'm owner of record with the recorder in Orange County".[197]  Even though I sold the Jennifer Circle house on October 1, 1991, by signing the Grant Deed and delivering it to the buyer, the deed was not recorded until

---

[195] Declaration of Jake Dameron, February 6, 2013, p. 1:9-12.
[196] Declaration of Darlene Beer, August 29, 2012, ¶ 27.
[197] Deposition of Gilbert P. Hyatt, April 8, 1993, p. I-24:5-13.

86

RJN1364

1  June 16, 1993,[198] and I was still on record in the recorder's office as owner of the house at the

2  time of the April 1993 deposition. My testimony was my way of explaining the facts. It was not

3  a claim of record ownership.

4      191.   The FTB 1991 Concluding Summary at p. 12 states the following.

> Mr. Hyatt's tax counsel also misrepresented that a questioned
> "…$15,000 down payment from [Ms.] Jeng was deposited by
> [Mr.] Hyatt into his Las Vegas California Federal Bank account on
> December 14, 1991. (See California Federal Bank Account
> Statements)…[73]  Respondent's protest hearing officer noted,
> however, "…[t] he front of the [Franklin Federal Money Fund]
> draft [No. 17] shows that Mr. Hyatt wrote himself a $15,000 draft
> from his own [Hyatt's] account." Without ever explaining the
> initial mischaracterization, Mr. Hyatt's tax counsel asked for more
> time "to research this [unanswered] request.[74]

> [Exhibit A, note] 73: P00526.

> [Exhibit A, note] 74: (FTB Trial Exhibit 2670) On March 23,
> 2007, Ms. Cinnamon sends Mr. Coffill her 12th IDR following up
> on previous requests for substantiation of Grace Jeng's alleged
> $15,000 down payment to Mr. Hyatt for the alleged purchase of
> the 7841 Jennifer Circle house. Ms. Cinnamon advises Coffill that
> Hyatt's check to himself does not evidence that Ms. Jeng made a
> $15,000 down payment out of her own funds. Ms. Cinnamon
> renews request for all written documents relating to the alleged
> sale of Hyatt's Jennifer Circle house within the next 14 days. (On
> May 8, 2007, Mr. Coffill responded to Ms. Cinnamon's 3/23/07
> supplemental document request seeking "substantiation" of Grace
> Jeng's alleged $15,000 down payment on the Jennifer Circle
> property. Mr. Coffill responds in part: "... the documentation you
> have requested is very old- 16 years- and locating the enclosed
> documentation and any other documentation has been difficult.
> We are continuing to research this request." (FTB Trial Exhibit
> 2671.)

Because of FTB's long delay in seeking this evidence, my representatives and I have so far been

unable to locate a statement showing deposit of the $15,000 down payment for sale for the

---

[198] Recorded Grant Deed, Attachment 1 to Declaration of Jake Dameron, February 6, 2013.

87

RJN1365

1   purchase of the Jennifer Circle house. Some of my investment account statements for the 1991

2   period are missing. However, there is other evidence of the payment of the deposit. The

3   Preliminary Change of Ownership Report for the Jennifer Circle house which was properly

4   recorded on June 16, 1993, states that the "cash down payment" was $15,000.[199]

5         192.   The FTB 1991 Concluding Summary at p. 12 states the following.

> Other abnormalities with this alleged transaction include the fact that the deed was not recorded in 1991 (or 1992), no contract exists memorializing the terms of the sale, and the Orange County Assessor has confirmed that no "change of ownership statement" was filed with their office during the 1990-1996 time frame[75] despite a legal requirement to do so within 45 days of purported transfers of real property,[76] and a Ticor "Property Profile" report acquired from Mr. Hyatt's tax counsel indicates Grace Jeng acquired the La Palma house on August 12, 1993 not October 1, 1991.[77]

> [Exhibit A, note] 75: Orange County Office of Assessor's 3/05/07 letter to FTB re 7841 Jennifer Circle, La Palma, California property.

> [Exhibit A, note] 76: Following a change in ownership of taxable real property in California, the transferee must report the transfer to the county assessor of the county in which the property is located. See Rev. & Tax. Code § 480, subdivisions (a) and (c).

> [Exhibit A, note] 77: EC 06376-81.

17   This FTB statement is false. There were no abnormalities with the sale of the Jennifer Circle

18   house on October 1, 1991. I signed a Grant Deed and delivered it to the buyer on October 1,

19   1991 under advice of an attorney.[200] The validity of the sale on October 1, 1991, has been

---

[199] See the Preliminary Change of Ownership Report at Part III:A attached as Exhibit 10 to Declaration of Bradley L. Jacobs, November 2, 2012.

[200] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.

confirmed by two former elected Orange Counter assessors, Bradley Jacobs and Webster Guillory.[201]

193.    The Grant Deed transferring title to the Jennifer Circle house was properly recorded on June 16, 1993.  There was no requirement to record the deed in 1991 or 1992 as falsely implied by FTB and FTB cites to no "abnormality" from recording the Grant Deed on June 16, 1993.

194.    The FTB statement that "no contract exists memorializing the terms of the sale" is false.  The Grant Deed and the Short Form Deed of Trust and Assignment of Rents, both signed on October 1, 1991, and recorded in Orange County on June 16, 1993, are contracts that memorialize the terms of the sale of the Jennifer Circle house.  The regular payments on the Deed of Trust for six years and the balloon payment paying off the loan are confirmation of the sale.[202]

195.    Furthermore, I understand that there is no requirement for a "contract memorializing the terms of the sale" and the sale of the Jennifer Circle house was complete on October 1, 1991, when I signed the Grant Deed and delivered the signed Grant Deed to the buyer.[203]

196.    There was no legal requirement to file a change of ownership statement within 45 days of purported transfers of real property.  Ms. Jeng timely filed a Preliminary Change of

---

[201] Declaration of Bradley Jacobs, November 2, 2012, ¶¶ 5, 6, 13, 14, 32, 33, 89; Declaration of Webster Guillory, October 8, 2015, ¶¶ 7, 8, 10, 11, 15-18, 22-25, 34 and 35.
[202] Hyatt DP CDE Affidavit, July 24, 2012, ¶ 10 and Exhibit CDE-G4 attached therein.
[203] Declaration of Bradley Jacobs, November 2, 2012, ¶ 5.

89

1   Ownership Report at the time she recorded the Grant Deed and having done so there was no need

2   for her to file a Change of Ownership Report.[204]

3       197.    Regardless of what is stated in an unauthenticated Ticor Property Report, I sold

4   the Jennifer Circle house on October 1, 1991, as stated in the Grant Deed recorded on June 16,

5   1993, and the purchaser still owns the property.

6       198.    The FTB 1991 Concluding Summary at p. 12 states the following.

> Mr. Hyatt maintained homeowner's insurance on the property long after the alleged sale, for which he has no documents. In addition, Ms. Jeng has testified both that she did not acquire homeowner's insurance on the property and that she insured the property under an unknown someone else's name. Like Mr. Hyatt, Ms. Jeng has no documents memorializing the terms of her purported acquisition of the La Palma property from Mr. Hyatt.[78]
>
> [Exhibit A, note] 78:  Grace Jeng's 5/18/06 deposition (Vol. 4), 965:1-968:8 and Deposition Exhibit 900 (no. 21.)

This FTB statement is false. FTB provides no reference for its homeowner's insurance statement but apparently refers to a Nevada Homeowner's Application I completed on December 12, 1991, when I applied for homeowner's insurance with State Farm insurance company for my Las Vegas apartment. This was shortly after I sold the Jennifer Circle house, not "long after" as incorrectly alleged by FTB. On the application, under the box for "Other coverage with State Farm:" I checked boxes for "auto" and "fire".[205] The application for insurance on my Las Vegas apartment reminded me that I had not cancelled the homeowners insurance after selling the Jennifer Circle house on October 1, 1991, and I let it expire. I did maintain my Las Vegas renter's or homeowner's insurance policy and my auto insurance policy with the same Las Vegas

---

[204] Declaration of Bradley Jacobs, November 2, 2012, ¶¶ 4, 18; Declaration of Webster Guillory, October 8, 2015, ¶¶ 10, 13, 29, 30.

[205] EC 000802, FTB Exhibit F, Tab 28.

90

RJN1368

1    insurance agency for the past 25 years, since December 12, 1991, when I purchased my initial

2    Las Vegas renter's policy and automobile policy.

3        199.    I have not paid for any homeowner's or auto insurance policy with any California

4    agency or on any California property during the disputed period or thereafter.  The FTB

5    statement that there are no documents for the October 1, 1991, sale of the Jennifer Circle is false.

6    The Grant Deed and the Short Form Deed of Trust and Assignment of Rents, both recorded in

7    Orange County on June 16, 1993, are contracts that memorialize the terms of the sale of the

8    Jennifer Circle house.  Furthermore, I understand that there is no requirement for a "contract

9    memorializing the terms of the sale" and the sale of the Jennifer Circle house was complete on

10   October 1, 1991, when I signed the Grant Deed and delivered the signed Grant Deed to the

11   buyer.[206]

12       200.    The Jeng testimony referenced by FTB at pp. 965:1-968:8 of Ms. Jeng's May 18,

13   2006, deposition has no bearing on the insurance question raised by FTB and I am therefore

14   unable to comment on Ms. Jeng's testimony about home insurance.  Aside from providing an

15   unrelated reference for its statement, FTB states that Ms. Jeng testified inconsistently that she

16   both did insure the property and that she did not insure the property.  The referenced Jeng

17   testimony cited by FTB does not support either alternative.

18       201.    The FTB 1991 Concluding Summary at p. 13 states the following.

19           As with the purported sale of Mr. Hyatt's Jennifer Circle
             home/office, Ms. Jeng was heavily involved with the procurement
20           of this lease.  According to a former apartment complex leasing
             agent who both lived and worked at the facility, Ms. Jeng sought to
21           lease an apartment for Mr. Hyatt on October 8, 1991.  In response
             to being told that he would have to apply for himself, Ms. Jeng
22           responded that Mr. Hyatt was "packing and moving" and traveled

23   _____

24       [206] Declaration of Bradley Jacobs, November 2, 2012, ¶ 5.

91

RJN1369

1         a lot as he was involved in the oil industry in Alaska.[79]

2         [Exhibit A, note] 79: Declaration of Bill Savage dated May 27, 2009, p. 4.

3 This FTB statement is false. Ms. Jeng had no involvement with rental of my Wagon Trails

4 apartment and I was not involved in the oil industry in Alaska. I personally went to Wagon

5 Trails Apartments on October 8, 1991, leasing agent Clara. Kopp photocopied my driver's

6 license and showed me several apartments. On October 8, 1991, I personally signed a Wagon

7 Trails Apartments Rental Agreement in the presence of Ms. Kopp, H 01249-01252, and I paid a

8 $150 security deposit. Ms. Kopp witnessed my signature and signed the Rental Agreement the

9 same day. Ms. Kopp and other employees of Wagon Trails Apartments have testified that it was

10 necessary for an applicant to show and have copied a photo identification in order to be shown

11 apartments and to lease an apartment and that an applicant had to sign the Rental Agreement in

12 person.[207] Ms. Kopp confirmed my recollections:

13         [6.] I recall Mr. Hyatt and his residency with the Wagon Trails

14         Apartments. It is clear to me from these documents and from my recollections that Mr. Hyatt resided at the Wagon Trails

15         Apartments during about a six month period in the fall and winter months in the 1991/1992 timeframe. I was the rental agent that

16         assisted Mr. Hyatt. I personally photocopied Mr. Hyatt's driver's license, I personally showed him several apartments, I personally

17         took his credit application, I personally filled out, signed, and I personally took his rental application.[208]

18 See Updated Testimonial Topics, Exs. T131 and T132, where 15 Wagon Trails former

19 employees or former residents testified that potential residents had to show the leasing agent

20 their driver's license before being shown an apartment and 16 Wagon Trails former employees or

22 [207] See Rebuttal to FTB Att. A/F, Section I. A., October 8, 1991, for testimony by leasing agent Clara Kopp and other Wagon Trails Apartments employee confirming that it was
23 necessary for me to appear in person and personally sign the Wagon Trails Apartments Rental Agreement, H 01249-01252.
24 [208] Declaration of Clara Kopp, January 14, 2015, ¶ 6.

92

RJN1370

1   former residents testified that potential residents had to appear in person to fill out and sign an

2   application or leasing papers for an apartment.

3        202.    The Wagon Trails Apartments leasing agent, Clara Kopp, did not make the

4   statements that Ms. Jeng sought to lease an apartment for me and that I was in the Alaska oil

5   industry.  William Savage, not Ms. Kopp, made these statements referring to an alleged

6   interview of Ms. Kopp on April 14, 2009, which interview did not occur.[209] Mr. Savage, a paid

7   investigator, was twice fired for dishonesty, see ¶ 173, above.  See also ASAB Attachment 1, pp.

8   25-38; Table of William Savage's Fraud and Dishonesty, Savage False Statements Table, and

9   Supplemental Savage False Statements Table.  Ms. Kopp testified that prior to the time of her

10  1999 deposition she did not remember the name Grace Jeng, however an FTB investigator told

11  her about Ms. Jeng just prior to her 1999 deposition.[210] Ms. Kopp testified that the FTB

12  investigator told her that Ms. Jeng went to the Wagon Trails Apartments for me, looked at an

13  apartment for me, and filled out a rental application for me and that this information was on her

14  mind when she testified about Ms. Jeng in her deposition.[211] Ms. Kopp further testified that in

15  October 1991, that I would have had to apply in person and show photo ID to be shown an

16  apartment and to have a rental application accepted.  Ms. Kopp testified that on October 21,

17  1991, I signed the Apartment Security Acknowledgement and Release, attached as Exhibit 2 to

18  her 2012 Declaration.[212] Ms. Kopp's statements are confirmed by the statements of other Wagon

19

20

21

22

23

24

[209] Declaration of William L. Savage, May 27, 2009, pp. 3-4.
[210] Declaration of Clara Kopp, March 9, 2012, ¶ 7, Annex XXV, Ex 43.
[211] Declaration of Clara Kopp, March 9, 2012, ¶ 7, Annex XXV, Ex 43.
[212] Declaration of Clara Kopp, March 9, 2012, ¶¶ 8 and 12, Annex XXV, Ex 43.

RJN1371

Trails Apartments employees, Penny Tourangeau, Bonnie Dimbat and Sherri Lewis.[213]  I

previous explained how I personally leased my Las Vegas apartment in my 2010 Affidavit.[214]

Ms. Jeng had no part in leasing my apartment.

203.    Ms. Kopp testified that the statements of William Savage (which are relied on by

FTB in its 1991 Concluding Summary) are false and that she did not meet with Mr. Savage on

April 14, 2009, to make the statements attributed to her or at any other time after her October 18,

1999, deposition.[215]  In her 2014 Declaration Ms. Kopp stated that she recalled me and my

residency at Wagon Trails Apartments and that I did reside at Wagon Trails Apartments during

the fall and winter of 1991/1992.[216]  Ms. Kopp also confirmed her statement in her 2012

Declaration that she did not meet with Mr. Savage on April 14, 2009, or at any other time after

her 1999 deposition.[217]

204.    William Savage is a paid investigator who was twice fired for dishonesty.  Those

and additional acts of dishonesty by Mr. Savage are set forth in Appellants Motion to Strike and

Objections to FTB Private Investigator and FTB Attorney Declarations.[218]  See also ASAB

Attachment 1, pp. 25-38; Table of William Savage's Fraud and Dishonesty, Savage False

Statements Table, and Supplemental Savage False Statements Table.  The statements of Mr.

Savage are entitled to no credibility.

---

[213] Declaration of Penny Tourangeau, March 5, 2012, ¶ 37, Annex XXV, Ex. 81;
Declaration of Bonnie Dimbat, March 19, 2012, ¶ 39, Annex XXV, Ex. 15; and Declaration of
Sherri Lewis, March 23, 2012, ¶¶ 4-5, Annex XXV, Ex. 48.
[214] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.4, Annex XI, Ex. 13.
[215] Declaration of Clara Kopp, March 9, 2012, ¶ 9, Annex XXV, Ex 43.
[216] Declaration of Clara Kopp, January 14, 2015, ¶¶ 4, 6, 7, 8 and 22.
[217] Declaration of Clara Kopp, January 14, 2015, ¶¶ 25 and 26.
[218] See particularly, Section III.B.5., "The Testimony of Mr. Savage Has Been Expressly
Refuted by 15 Witnesses", Appellant's Motion to Strike and Objections to FTB Private
Investigator and FTB Attorney Declarations.

94

205.    The FTB 1991 Concluding Summary at p. 13 states the following.

> On October 9, 1991, a Wagon Trails employee faxed a partially completed rental agreement to Mr. Hyatt's Jennifer Circle home/business fax number (213) 809-1087 at 5:57 P.M.[80]    Mr. Hyatt signs, dates and faxes the rental agreement to Wagon Trails Apartments four days later, on October 13, 1991.[81]    The lease began on November 1, 1991, but also provided for a prorated rental period from October 20, 1991 through October 31, 1991, for $228.[82]    The regular monthly rent was initially $570, but eventually was reduced $30 per month for the term of the lease. The first cancelled check for rent is dated October 28, 1991[83]

> [Exhibit A, note] 80:  FTB Trial Exhibit 2001-0303.

> [Exhibit A, note] 81:  FTB Trial Exhibit 2001-299, 2001-0303.

> [Exhibit A, note] 82:  FTB Trial Exhibit 2001-0297-301 and 303.

> [Exhibit A, note] 83:  FTB Trial Exhibit 2001-0345 (10/28/91 Franklin Federal Money Fund draft from Hyatt to Wagon Trails for November rent in the amount of $540, discounted $30 from $570 each month.)

This FTB statement is false.  I personally delivered the signed lease agreement to Ms. Kopp on October 13, 1991, I did not fax this signed lease agreement.  Ms. Kopp had previously informed me that I had to take care of all leasing matters in person.  I explained in my Supplemental Affidavit,[219] that on October 8, 1991, I personally met with leasing agent Clara Kopp at Wagon Trails Apartments and signed the front side of a Rental Agreement but overlooked signing the back side.  I did not remember the fax number at the Continental Hotel so I gave Wagon Trails Apartments the fax number at the Jennifer Circle house.  On October 9, 1991, when Wagon Trails Apartments discovered the back side was not signed, they faxed the rental agreement to the number I had given them.  This number belonged to Ms. Jeng and was not my "home/business fax number" as falsely stated by FTB.  Ms. Jeng brought the faxed

---

[219] Supplemental Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶ 43; Affidavit of Gilbert P. Hyatt, August 15, 2010, §§ 1.4-1.5.

RJN1373

1  agreement to me in Las Vegas on October 13, 1991.  I signed the back side of the rental

2  agreement, lining through the three blank lines (inadvertently including the Landlord signature

3  line).  I then had the Rental Agreement, document H 01249-01250, copied and I personally took

4  the Rental Agreement with my October 8, 1991, signature on the first page and my October 13,

5  1991, signature on the second (back) page to Wagon Trails Apartments.  Clara Kopp verified my

6  October 13, 1991, signature and added her October 13, 1991, signature, which appears on the H

7  01251-01252 version of the Rental Agreement.

8       206.    The FTB 1991 Concluding Summary at p. 13 states the following.

9          Ms. Clara Kopp, who worked as a leasing agent at the
10  Wagon Trail Apartments from November 1988 until sometime
   after March 3, 1995, and lived in the complex, (i.e., Apartment No.
11  243) had no memory of seeing Mr. Hyatt at the Wagon Trails
   Apartment complex even though she lived there and would come
   and go from her apartment to the nearby rental office.[84]

12  [Exhibit A, note] 84:  Exhibit JJ, Tab 38: "Clara [Kopp] said that
13  she had thought about it overnight and she did not remember
   seeing Gilbert Hyatt at the apartment." (03/07/95 Notes-FTB Field
14  Trip to Las Vegas, FTB Trial Exhibit 2001-1454); 10/18/99
   Deposition of Clara Kopp, 23:4-17 (lived at Wagon Trails from
15  9/88 to 5/94) and 51:22-52:8; Exhibit JJ, Tab 39: 04/18/09
   Memorandum of Interview (Clara Kopp); Exhibit JJ, Tab 39:
16  05/27/09 Declaration of Bill Savage, ¶4, pp. 3-4 (Clara Kopp);
   Exhibit JJ, Tab 25: Deposition Exhibit 4 (H06972).

17      This FTB statement needs explanation.  I personally dealt with Ms. Kopp when I signed

18  papers for renting my Las Vegas apartment on October 8, 13 and 21, 1991.  The statement about

19  not remembering seeing me was made not by Ms. Kopp but by an unidentified FTB auditor.  The

20  auditor was presumably Ms. Cox, who was found to have conducted a fraudulent audit and is

21  entitled to zero credibility, Franchise Tax Board v. Hyatt, 130 Nev. Adv. Op. No. 71; 335 P.3d

22  125 (53264 Nev. 9-18-2014).  Contrary to the statement of Ms. Cox, Ms. Kopp clearly recalled

23  seeing me at Wagon Trails Apartments and stated:

24

RJN1374

[6.] I recall Mr. Hyatt and his residency with the Wagon Trails Apartments. It is clear to me from these documents and from my recollections that Mr. Hyatt resided at the Wagon Trails Apartments during about a six month period in the fall and winter months in the 1991/1992 timeframe. I was the rental agent that assisted Mr. Hyatt. I personally photocopied Mr. Hyatt's driver's license, I personally showed him several apartments, I personally took his credit application, I personally filled out, signed, and I personally took his rental application.[220]

207.    Ms. Kopp testimony is supported by a huge number of other eyewitnesses who have testified about my activities at my Las Vegas apartment.[221] For example, 39 witnesses have testified about telephoning me at my Las Vegas apartment, 15 witnesses testified about visiting with me at my Las Vegas apartment, and 2 witnesses testified about staying with me at my Las Vegas apartment.[222]

208.    The FTB 1991 Concluding Summary at p. 13 states the following.

Ms. Kopp knew Ms. Jeng, but she could not definitively recognize Mr. Hyatt either in person or by photograph.[85]

[Exhibit A, note] 85: Exhibit JJ, Tab 39: 05/27/09 Declaration of William L. Savage, ¶4, p. 3 and 04/18/09 Memorandum of Interview (Clara Kopp), p. 1; Exhibit JJ, Tab 25: Deposition Exhibit 4 (H06972); and Exhibit JJ, Tab 36: 10/18/99 Deposition of Clara Kopp, 6:13-7:1 and 12:5-11.

This FTB statement is false. I remember Ms. Kopp. I personally dealt with Ms. Kopp when I signed papers for renting my Las Vegas apartment on October 8, 13 and 21, 1991. In her 2015 Declaration, Ms. Kopp clearly recalled seeing me at Wagon Trails Apartments.[223] Further, in her 2012 Declaration Ms. Kopp stated, "Prior to the time of my 1999 deposition, I did not remember

---

[220] Declaration of Clara Kopp, January 14, 2015, ¶ 6.
[221] Updated Testimonial Topics, T019, T095, T096, T022, T023, T024, T025, T026, T057 and T100.
[222] Updated Testimonial Topics, Exs. T019, T018, T021, respectively.
[223] Declaration of Clara Kopp, January 14, 2015, ¶ 6.

97

RJN1375

the name Grace Jeng."[224]  However, an FTB investigator interviewed Ms. Kopp and told her

about Ms. Jeng just prior to her 1999 deposition.[225]  Ms. Kopp testified that the FTB investigator

told her that Ms. Jeng went to the Wagon Trails Apartments for me, looked at an apartment for

me, and filled out a rental application for me and that this information was on her mind when she

testified about Ms. Jeng in her deposition.[226]

209.    The FTB 1991 Concluding Summary at p. 13 states the following.

> Mr. Hyatt concedes, through his representative, that he did not visit
> the Wagon Trails rental office or speak with any manager when
> allegedly living there.[86]

> [Exhibit A, note]: 86: Exhibit JJ, Tab 40: Hyatt Trial Exhibit 252-
> 00017 (08/29/95 letter from E. Cowan to S. Cox, p. 17: "Mr. Hyatt
> had no reason to visit the rental office or to talk with the manager
> after he moved in.  Mr. Hyatt is private person who tries not to
> attract attention.")

This FTB statement mischaracterizes Mr. Cowan's letter to Ms. Cox.  The letter says I had "no

reason to visit the rental office or to talk with the manager".  It does not say I did not visit the

Wagon Trails rental office or speak with any manager.  The Wagons Trails Apartments was a

very nice, well maintained apartment complex and I had no complaints about the apartment

complex.  I normally dropped my monthly rent check in person in a drop box that was provided

for that purpose.  However, on November 27, 1991, the day before Thanksgiving, I took my rent

check into the apartment office and wished the staff "Happy Thanksgiving".  Because I gave the

rent check to the apartment staff instead of dropping it in the drop box, Ms. Kopp gave me a

receipt, P 05630.[227]

210.    The FTB 1991 Concluding Summary at p. 13 states the following.

---

[224] Declaration of Clara Kopp, March 9, 2012, ¶ 7, Annex XXV, Ex 43.
[225] Declaration of Clara Kopp, March 9, 2012, ¶ 7, Annex XXV, Ex 43.
[226] Declaration of Clara Kopp, March 9, 2012, ¶ 7, Annex XXV, Ex 43.
[227] See 2016 Supplemental Affidavit of Gilbert P. Hyatt, ¶ 48.

RJN1376

1
2
3

> With respect to Mr. Hyatt's physical presence between September 24, 1991 and April 3, 1992, respondent's revised findings can be summarized as follows: Mr. Hyatt is physically present in California for 169 days, in Nevada for 19 days, and 23 days in other states.[87]

4

> [Exhibit A, note] 87:  See FTB's Additional Brief filed February 12, 2015, pp. 3-12 and FTB's Attachment A (Revised).

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

This FTB statement is false.  I was present 71 full days in Nevada as a resident of Nevada and zero full days in California during the 1991 disputed period following the day I moved.  I also had 17 days partly in Nevada as a resident and partly in California for a temporary or transitory purpose, such as celebrating the birthday of my girlfriend Caroline Cosgrove on October 11-12, 1991.[228]  Whereas the FTB Calendar is based on illogical inferences such as my alleged location two days later or a mis-addressed letter, the day counts in my Rebuttal to FTB Att. A/F, Section I. A., are based on my actual physical location as established by eyewitness testimony or documentation showing my actual location, such as my applications for a Nevada driver's license and Nevada voter registration on November 27, 1991,[229] when I was present at the Nevada DMV office in Las Vegas.  I described the temporary or transitory purposes of my visits to California in the 1992 ASAB § 1.5.5.  However, FTB does not support its calendar or Attachment A (Revised) in its RSABs whether my occasional visits to California were for a temporary or transitory purpose, likely because all of my visits to California during the disputed period and thereafter were for temporary or transitory purposes.  See my temporary or transitory table[230] identifying the purpose of each of my visits to California during the disputed period.

21

---

22
23
24

[228] Rebuttal to FTB Att. A/F, Section I. A., day by day, September 26, 1991, through December 31, 1991.
[229] Rebuttal to FTB Att. A/F., Section I. A., November 27, 1991.
[230] See 1992 ASAB, § 1.5.5 and ASAB Exhibit 4, "Table of Mr. Hyatt's Temporary or Transitory Purposes Outside of Nevada."

99

211.    I moved to Las Vegas on September 26, 1991, not September 24, 1991, as alleged by FTB.

212.    The FTB 1991 Concluding Summary at p. 13-14 states the following.

> During the disputed period in 1991, Mr. Hyatt was physically present in California at his La Palma home or his patent attorney's Los Angeles office participating in licensing activities, involved with the Hyatt v. Boone interference, marketing or promotional work, dining at restaurants and handling matters related to his mother's estate.

This FTB statement is false. FTB makes broad statements with no support, no dates and no time durations. I was occasionally present in California, but my California presence was for temporary or transitory purposes (e.g., a required court hearing for my mother's estate). I identified all of my visits to California during the disputed period in my temporary or transitory table. See 1992 ASAB, § 1.5.5 and ASAB Exhibit 4, "Table of Mr. Hyatt's Temporary or Transitory Purposes Outside of Nevada." For example, I was physically present at the Jennifer Circle house on October 1, 1991, the day I sold it and on September 30, 1991, the day before I sold it to remove the last of my possessions, among other things. After October 1, 1991, I was not physically present at the Jennifer Circle house until late 1992, well after the disputed period.

213.    FTB's reference to "his patent attorney" presumably refers to Mr. Roth, who represented Philips with respect to the Philips Licensing Program and with respect to the *Hyatt v. Boone* interference after July 1991.[231] I had very few meetings with Mr. Roth. The documents produced by FTB show that I had only ten meetings with Mr. Roth during the 1991-1992 disputed period that related to licensing and the interference, ¶¶ 62-63, above.

214.    I did not engage in license negotiations during 1991 or 1992 after signing the July 1991 Philips Agreement, which granted Philips exclusive rights and the responsibility to license

---

[231] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.

RJN1378

1   my patents.  Under the July 1991 Philips Agreement, Philips had exclusive rights and the

2   responsibility to license my patents and Philips granted Mahr Leonard the exclusive rights to

3   negotiate licenses with seven companies through January 1, 1992.[232]

4        215.    The FTB 1991 Concluding Summary at p. 14 states the following.

5                 For example, despite claims Mr. Hyatt had no access to the
             Jennifer Circle home after October 1, 1991, Mr. Hyatt was present
6             inside the home for a composite portrait shoot with Mr. Cameron a
             mere five days later.[88]

7             [Exhibit A, note] 88:  04/07/16 Deposition of Charles T. Cameron,
8             5:21-6:17, 26:3-32:13, 48:7-64:9, 58:2-24, 68:22-70:2, 74:3-17,
             75:10-24, 76:12-16, 77:13-78:8, 87:1-88:13, 151:3-157:15, 161:7-
9             169:2, 178:1-22, 202:18-205:23, and Exhibits 3, 5, 8 and 17
             attached thereto.

10

11  This FTB statement is false.  I was not at the Jennifer Circle house on October 6, 1991.  Mr.

12  McHenry asked me to attend a portrait photoshoot at Fashion Island, Newport Beach, on October

13  6, 1991, but I declined and remained in Las Vegas.  I toured Red Rock Canyon, which is near

14  Las Vegas on October 6, 1991.

15       216.    Nine eyewitnesses have established that the statements in Mr. Cameron's

16  deposition and declarations are not correct.  The person Mr. Cameron described as the subject of

17  his alleged portrait photographs was not me.  The house Mr. Cameron described as the location

18  of the photoshoot was not the Jennifer Circle house.  The Asian "housekeeper" Mr. Cameron

19  described as meeting at the location of the alleged portrait photoshoot was not Ms. Jeng, who

20  owned the Jennifer Circle house on October 6, 1991.  The furniture Mr. Cameron described

21  seeing inside the house where the alleged photoshoot occurred did not match the nearly empty

22  conditions of the Jennifer Circle house on October 6, 1991.  The number of pictures Mr.

23  _____

24       [232] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 8, Annex XII; Affidavit of David
    Leonard, May 2, 2012, ¶ 14, Annex XXV, Ex. 46.

1  Cameron described as having developed did not match a professional portrait photoshoot.[233]  See

2  my Supplemental Affidavit[234] for additional detail and discussion demonstrating that Mr.

3  Cameron did not perform a portrait photoshoot of me at the Jennifer Circle house on October 6,

4  1991.

5      217.    The FTB 1991 Concluding Summary at p. 14 states the following.

6          On October 23, 1991, Mr. Hyatt has a telephone conference, then
           meets with his California attorney, Gregory L. Roth, in his Los
7          Angeles office concerning the Sharp license.[89]

8          [Exhibit A, note] 89:  FTB_Philips 0006628.

9  This FTB statement is false.  Mr. Roth represented Philips as Philips' attorney regarding the

10  Sharp license.  On October 23, 1991, I made a round trip visit to California where I met with Mr.

11  Roth, who represented Philips with respect to the Philips Licensing Program.  I did not meet with

12  Mr. Roth as my attorney.  FTB speculation about where the meeting occurred should be ignored

13  by your Board.  The Rebuttal to FTB Att. A/F and the corresponding day count reflects this

14  meeting and my round trip visit to California on October 23, 1991.[235]

15      218.    The FTB 1991 Concluding Summary at p. 14 states the following.

16          On October 31, 1991, Mr. Hyatt also visits his ophthalmologist,
           Dr. William H. Peloquin, in Fullerton, California which followed a
17          previous visit on September 13, 1991.[90]

18          [Exhibit A, note] 90:  H017833-34.

19  This FTB statement is false.  I did not visit Dr. Peloquin on October 13, 1991.  I was in Las

20  Vegas on October 31, 1991.  FTB erroneously links to a purported invoice from ophthalmologist

21  Dr. Peloquin for "Contact Lens Service".  However, I did not and I do not wear contact lenses.

22  _____

23  [233] Rebuttal to FTB Att. A/F, Section I.  A., October 6, 1991.
    [234] Supplemental Affidavit of Gilbert P. Hyatt, September 6, 2016, ¶¶ 26-39.

24  [235] Rebuttal to FTB Att. A/F, Section I. A., October 23, 1991.

1    Furthermore, there is nothing on the invoice that indicates I was present in California on October

2    31, 1991.

3         219.    The FTB 1991 Concluding Summary at p. 14 states the following.

4                     In addition, Mr. Hyatt's California physical presence
                 continued into the next month [from October 31, 1991] when Mr.
5                Hyatt participated as the Grand Marshall in the La Palma Day
                 Parade (November 9, 1991), sharing a vehicle with his California
6                patent attorney, Gregory L. Roth.[91]

7                 [Exhibit A, note] 91:  La Palma Day Parade Exhibit.

8    This FTB statement is false.  This FTB statement is another example of FTB's illogical

9    inferences.  I was not in California on October 31, 1991, and I did not "remain" in California for

10   10 days to attend the La Palma Day Parade.[236]  I note that the "Script" linked to this FTB

11   statement lists Gregory Roth under "PARTICIPANTS".  As far as I know Mr. Roth did not

12   participate in the parade.

13        220.    After July 1991 Mr. Roth was Philips' attorney and he represented Philips with

14   respect to the *Hyatt v. Boone* interference and with respect to the Philips Licensing Program, ¶

15   54, above.

16        221.    The FTB 1991 Concluding Summary at p. 14 states the following.

17                 In all, during the disputed period from September 26, 1991 to
                 December 31, 1991, Mr. Hyatt spent 80 days in California, 5.5
18               days in Nevada and 10.5 days in other states.

19   This FTB statement is false.  I spent 71 full days in Nevada as a resident, zero full days in

20   California and 17 days partly in Nevada as a resident and partly in California for a specific

21   temporary or transitory purpose during the 1991 disputed period,[237] ¶ 210, above.

22   _____

23        [236] Rebuttal to FTB Att. A/F, Section I. A., November 1-8, 1991.
          [237] Rebuttal to FTB Att. A/F, Section I. A., day by day, September 26, 1991, through
24   December 31, 1991.

                                        103

                                                                              RJN1381

222. The FTB 1991 Concluding Summary at p. 14 states the following.

> Altogether, considering his admission that he lived in California for 273 days through September 30, 1991,[92] the overwhelming documentary evidence and relevant testimony places Mr. Hyatt in California for nearly all of the 1991 calendar year and less than 6 days in Nevada.[93]
>
> [Exhibit A, note] 92: FTB Trial Exhibit 2001-0002-17, 2001-0004.
>
> [Exhibit A, note] 93: The detailed support for FTB's day-to-day analysis can be found Respondent's Revised Attachment A (1991-1992), at pages 28-81 (09/26/91-12/31/91) and pages 81-137 (01/01/92-04/29/92), Respondent's 1991 Additional Brief (filed in February 2015) at pages 2-12, and Respondent's Attachment F.

This FTB statement is false. I moved to Las Vegas on September 26, 1991. FTB has not established on what days I was actually present in California from January 1, 1991, through September 26, 1991.[238] After September 26, 1991 I had only 17 part days in California in 1991, all of which were for a temporary or transitory purpose. After September 26, 1991, the day I moved, I had 71 full days in Nevada and 18 part days in Nevada.[239] See ¶ 210, above.

223. The FTB 1991 Concluding Summary at p. 14 states the following.

> Long before he began his pursuit of patent licensing monies from the Japanese companies, Mr. Hyatt acquired and utilized telephone and telefax phone numbers at his Jennifer Circle home. Those numbers, (i.e., (714) 995-1087 and (213) 809-1087) remained in use long after his alleged departure from California.[94]
>
> [Exhibit A, note] 94: 08/17/05 Deposition of Gilbert P. Hyatt, Vol. 3, 556:11-13 and 558:3-559:1 and 12/06/05, Vol. 5, 850:9-852:14, Deposition Exhibit 586, FTB Table concerning Mr. Hyatt's Use of California Facsimile number (213 809-1087) and FTB's Table of Documents from USPTO with Mr. Hyatt Using California Address and California Phone Number.

---

[238] 1991 ARB,§ II.C., The Presumption of California Residency Under Section 17016 Does Not Apply to Mr. Hyatt.

[239] Rebuttal to FTB Att. A/F, Section I. A., day by day analysis, September 26, 1991, through December 31, 1991.

104

RJN1382

1

2     This FTB statement needs clarification. Through the July 1991 Philips Agreement I granted

3 Philips exclusive rights and the responsibility to license my patents. Philips by itself created and

4 managed the Philips licensing program, ¶¶ 67-73, above. On October 1, 1991, when I sold the

5 Jennifer Circle house, the buyer took possession of the telephone numbers and began paying the

6 telephone bills. I did not return to the Jennifer Circle house during the disputed period. I

7 returned for a visit in late 1992. I did not use a telephone or fax machine at the Jennifer Circle

8 house after October 1, 1991. When I cleared out the Jennifer Circle house on October 1, 1991, I

9 removed from the house everything that was mine. I took my only fax machine and my

10 computer to Las Vegas with me. I did not use a telephone or send any faxes from the Jennifer

11 Circle house after October 1, 1991, when I sold the Jennifer Circle house.[240]

12     224.     The FTB 1991 Concluding Summary at pp. 14-15 states the following.

13            The concealed, contemporaneous business records respondent
ultimately obtained from Philips reveal that Mr. Hyatt did not

14            discontinue the retention or use of either of those telephone
numbers as those numbers are included in numerous items of

15            correspondence sent to and by Mr. Hyatt during 1991 and 1992, a
usage which extends well beyond April 2, 1992.

16

17     This FTB statement is false. I did not ever again use a fax or telephone at the Jennifer

18 Circle house after October 1, 1991, when I sold the Jennifer Circle house. I did not return to the

19 Jennifer Circle house until late 1992, ¶ 223, above.

20     225.     There were no concealed business records and FTB provides no foundation or

21 evidence for its statement. See ¶¶ 100-105, 121, 122, 417 herein. I identified Philips in my 1991

22 California part year tax return I signed on April 13, 1992, ¶ 102, above. I did continue for a short

23 _____

24     [240] Rebuttal to FTB Att. A/F., Section I. B., October 27, 1991.

105

RJN1383

time to use a template on my computer that had the former fax number even though I was

sending the correspondence from Las Vegas.[241]

226.    The FTB 1991 Concluding Summary at p. 15 states the following.

> Early in the audit, respondent made a specific written request for records pertaining to Mr. Hyatt's telephone use, including records pertaining to the discontinuance of phone service at Jennifer Circle.[95]  No such records have ever been provided, and Mr. Hyatt's assertion that he routinely destroyed, did not have any 1991 to 1992 phone bills in his possession, and was unable to obtain them from the appropriate telephone companies is, at best, questionable.

This FTB statement is false.  I did produce telephone records that I had available.  In addition, I was obtaining old telephone records from my former telephone providers when the FTB auditor took charge and stopped me from proceeding.  The FTB auditor then decided not to obtain my old telephone records.  The auditor told my representative in a letter dated March 1, 1995, that she would assume responsibility for obtaining the telephone records.  With the power of subpoena at its disposal, FTB could have but did not follow up with the old telephone companies to obtain the telephone records.[242]  See 81, 85, 86, 227, 228, 233, 249, 547-549 herein.

227.    I provided to the auditor all of the telephone records that I could find -- my cancelled checks to my Las Vegas telephone service provider.[243]  Furthermore, the auditor interrupted my efforts to obtain old telephone records.  I was trying to get copies of my old telephone records from my former telephone companies when the auditor interrupted my efforts with a letter stating that she would investigate and decide if she wanted to get my old telephone records.

---

[241] Affidavit of Gilbert P. Hyatt, August 15, 2010, §1.16, p. 69, Annex XI, Ex. 13; Supplemental Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶¶ 84, 94, 103, 114.
[242] Rebuttal to FTB Att. A/F, Section I. B., October 7, 1991; Affidavit of Gilbert P. Hyatt, § 1.20, p. 130, August 15, 2010, Annex XI, Ex. 13; 1991 ARB, § II.A.5, pp. 34-36.
[243] Letter from E. Cowan to S. Cox, 2/22/95 (CCC 01633-01636).

106

RJN1384

1

<u>TELEPHONE INFORMATION</u>
Regarding the telephone information, ***I will investigate*** to determine how long
2    each company retains the billing statements. At a later date. ***I may decide to
request authorization from the taxpayer*** to determine dates that the service was
3    established, etc.

Thank you for your cooperation in this matter. If you have any questions, please
4    feel free to call.

5    Letter from FTB auditor dated March 1, 1995, p. 3.  (Emphasis added.)  (FTB-101251-101253)

6    See 81, 85, 86, 226, 228, 233, 249, 547-549 herein.

7         228.    So as not to interfere with the FTB auditor's investigation, I discontinued my

8    efforts to get my telephone records from my former telephone companies.  It was clear to me that

9    the auditor decided that she did not want the telephone records because she did not request the

10   "authorization" that she stated that she "may request" from me.[244]

11        229.    The FTB 1991 Concluding Summary at p. 15 states the following.

12             A self-employed patent pursuer, Mr. Hyatt relied very heavily
               upon the use of a telephone and telefax machine (i.e., the Philips
13             records), the expenses for which were tax deductible.  In addition,
               Mr. Hyatt's own conduct contradicts his lack of records
14             explanation as Mr. Hyatt in 1990 offered a partial phone bill
               statement as proof that he spoke with a certain Ralph Cole during
15             1977.[96]

16             [Exhibit A, note] 96:  07/05/90 Declaration of Gilbert P. Hyatt
               under 37 CFR 1.131, pp. 3-4, para. 7 and Exhibit III (pdf page 20)
17             attached thereto.

18   This FTB statement is false.  I did produce telephone records and I was obtaining my telephone

19   records from my former telephone providers when the auditor took charge and stopped me from

20   proceeding.  See 81, 85, 86, 226-228, 233, 249, 547-549 herein.  The FTB statement that "Mr.

21   Hyatt relied very heavily upon the use of a telephone and telefax machine" is false, ***I did not rely***

22

23   _____

[244] Rebuttal to FTB Att. A/F, Section I. B., October 7, 1991; Affidavit of Gilbert P. Hyatt,
24   § 1.20, p. 130, August 15, 2010, Annex XI, Ex. 13; 1991 ARB, § II.A.5, pp. 34-36.

107

RJN1385

1   *very heavily* on the use of a telephone and a telefax machine," I worked at my desk and at my

2   computer.

3       230.    I was not a "self-employed patent pursuer" as falsely stated by FTB.  I was a self-

4   employed consultant in the electronics industry until opportunities for consulting declined in the

5   early 1990's.  I did not work on patents for others, I worked only on my own patents.

6       231.    As explained in ¶¶ 226-228, above, in a March 1, 1995, letter the auditor

7   cancelled the prior January 6, 1995, request, stating that the auditor would assume responsibility

8   for obtaining telephone records.  With the power of subpoena at its disposal, FTB did not follow-

9   up with the telephone companies and obtain the telephone records.

10      232.    The FTB 1991 Concluding Summary at p. 15 states the following.

> Similarly, Mr. Hyatt also produced select phone bills he retained after paying them on behalf of his mother and submitted them as reimbursable expenses in her California estate proceeding.[97]  Respondent submits that Mr. Hyatt's phone bills were not produced because they would have confirmed Mr. Hyatt's continuous, heavy use of the Jennifer Circle telephone and telefax machine lines during the disputed time period on accounts standing in Mr. Hyatt's name.  As stated in Coleman Psychological, "the failure to provide evidence which is within appellant's control gives rise to the presumption that, if provided, the evidence would be unfavorable.[98]

[Exhibit A, note] 97:  FTB Exhibit II, Tab 33.

[Exhibit A, note] 98:   See Appeal of James P. Coleman Psychological Corporation, 85-SBE-028, April 9, 1985; ROB (1991), p. 77; ROB (1992), p. 62; RRB (1991), pp. 16-17, 44; and Attachment A (Revised) to FTB's Additional Briefing, pp. 32, 37, 47 and 48.

21  This FTB statement is false.  I did produce telephone records that I had available.  In

22  addition, I was obtaining old telephone records from my former telephone providers when the

23  auditor took charge and stopped me from proceeding.  See 81, 85, 86, 226-228, 233, 249,

24  547-549 herein.

108

233.    The fact that I produced my Las Vegas phone records for the disputed period, the fact that my only fax machine was located in my Las Vegas apartment, and the fact **I was not present** at the Jennifer Circle house shows that FTB's speculation is based upon false facts.  See 81, 85, 86, 226-228, 249, 547-549 herein.  Regarding faxes, I received all of the faxes at my Las Vegas apartment during the disputed period after October 21, 1991.  My only fax machine during this period was located in my Las Vegas apartment (1991 ASAB § 1.8.4.5).  FTB relies heavily on undisputedly mis-addressed correspondence from Philips as evidence of presence at the Jennifer Circle house on particular days, but I was not present to receive this mis-addressed correspondence and I eventually got Philips to use my correct address.[245]

234.    The FTB 1991 Concluding Summary at p. 15 states the following.

> Mr. Hyatt has also failed to establish that he actually opened and activated telephone service in his Wagon Trails Apartment in Las Vegas, Nevada at any time before November 1991.  Mr. Hyatt's first check to a Nevada telephone provider was not processed until November 11, 1991.[99]  Having no documentary evidence, Mr. Hyatt simply asserts that he opened new Las Vegas phone service with Centel and the Nevada phone company activated a telephone line at his Las Vegas apartment on October 22, 1991.[100]

[Exhibit A, note] 99:  FTB Exhibit HH, Tab 15.

[Exhibit A, note] 100:  08/15/10 Supplemental Affidavit of Gilbert P. Hyatt, § 1.19.3, p. 123.

This FTB statement is false.  I arranged for service and obtained a telephone number on October 21, 1991, the day I returned to Las Vegas from New York.[246]  I had good credit and I did not need to make a payment on my telephone bill until November 7, 1991, H 013635, 013632.

---

[245] This issue is addressed, e.g., in the 1991 ASAB at §§ 1.8.4.1-1.8.4.4; 1992 ASAB, §§ 1.4.1.1, 1.5.6.3.

[246] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.19.3, pp. 122-123, Annex XI, Ex. 13; Supplemental Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶ 46.

109

Testimony of 4 witnesses establishes that I called them on October 21, 1991, and gave them my Las Vegas apartment telephone number[247] while 39 witnesses have testified about telephoning me at my Las Vegas apartment[248] and 10 witnesses have testified about actually seeing a telephone in my Las Vegas apartment.[249]

235.   The FTB 1991 Concluding Summary at p. 15 states the following.

> In truth, Mr. Hyatt neither opened phone or electrical service on October 21 or 22, 1991 because he remained in New York on a business trip then returned to California on October 23, 1991 to meet with his California patent attorney.[101]

> [Exhibit A, note] 101:   FTB_Philips 0007579-81, FTB_Philips 0007536, FTB_Philips 0006628, FTB_Philips 0006723.

This FTB statement is false. I did not remain in New York until October 23, 1991, I returned to Las Vegas from New York on October 21, 1991.  On October 21, 1991 I personally opened a Las Vegas U.S. Post Office box, I submitted changes of address for the Jennifer Circle house and the Cypress U.S. Post Office box, and I had my signature witnessed by leasing agent Clara Kopp on a Las Vegas Wagon Trails Apartments Security Agreement.[250]  See, e.g., 1992 ASAB, §§ 1.5.6.1, 1.5.6.2.

236.   I made a round trip temporary or transitory visit from Las Vegas to California where I met with Mr. Roth on October 23, 1991.  Mr. Roth represented Philips with respect to the Philips Licensing Program and with respect to the *Hyatt v. Boone* interference after July 1991.[251]

237.   The FTB 1991 Concluding Summary at p. 16 states the following.

---

[247] Updated Testimonial Topics, Ex. T129.
[248] Updated Testimonial Topics, Ex. T019.
[249] Updated Testimonial Topics, Ex. T026.
[250] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.
[251] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.

110

1
2
3
4

        Mr. Hyatt further contends that he "moved [his] fax machine from [his] former La Palma house … on October 1, 1991 and [he] set it up at [his] Las Vegas apartment, after [he] moved in and got telephone service in late October 1991.[102]  But yet Mr. Hyatt received a confirmed facsimile from Philips to his California fax number on October 24, 1991, four days after his prorated rental began at Wagon Trails, and numerous business facsimiles were sent to and from that same number in the following months.[103]

5
6

        [Exhibit A, note] 102:  08/15/10 Supplemental Affidavit of Gilbert P. Hyatt, §1.16.1, p. 69.

7
8

        [Exhibit A, note] 103:  FTB_Philips 0003373-80, 78-79, FTB Exhibit II, Tabs 25 and 26, FTB Reference Table Concerning Mr. Hyatt's Use of California Facsimile number, (213) or (310) 809-1087, and FTB's 1991 Opening Brief, p. 66.

9

10  This FTB statement is false. I moved my fax machine out of the Jennifer Circle house on the day

11  I sold it, October 1, 1991.  I received telephone service in my Las Vegas apartment on October

12  22, 1991.  I did not send any faxes from the Jennifer Circle house after I sold it on October 1,

13  1991.  See my 2016 Supp. Affidavit, September 8, 2016, ¶¶ 101-115.  It has been clearly

14  established that I moved my fax machine to Las Vegas.[252]  Testimony from 19 witnesses

15  establishes that I had a fax machine at my Las Vegas apartment while 11 witnesses testified

16  about seeing a fax machine in my Las Vegas apartment and 12 witnesses testified about sending

    faxes to or receiving faxes from my Las Vegas apartment.[253]

17
18          238.    FTB's statement regarding the October 24, 1991 fax from Philips, FTB_Philips

    0003778-3779, is false.  The fax was sent to Ms. Jeng's fax number at the Jennifer Circle house.

19  I did not have a home at the Jennifer Circle house after I sold the house on October 1, 1991.  It is

20  undisputed that the correspondence and faxes sent to the Jennifer Circle house or the Cerritos

21  U.S. Post Office Box by Philips were mis-addressed and were admittedly errors of the Philips

22  ─────────────────

23      [252] Rebuttal to FTB Att. A, Section I. A., October 27, 1991; 1991 ASAB, §§ 1.8.4.3-1.8.4.6.

24      [253] Updated Testimonial Topics, Exs. T025, T100 and T057.

111

RJN1389

1   staff because I had given Philips a change of address in October 1991.  See the 1991 ASAB

2   §§ 1.8.4.2-1.8.4.5.

3        239.    The FTB 1991 Concluding Summary at p. 16 states the following.

4            Notably, Mr. Cowan's "Schedule 4" fails to include any reference
             to Mr. Hyatt's use of a telephone at the Continental Hotel in
5            1991.[104]

6            [Exhibit A, note] 104:  FTB Trial Exhibit 2001-0612 (enclosure to
             02/22/95 letter from Cowan to Cox).

7   This FTB statement is misleading.  Ms. Cox requested telephone numbers, but in 1995 (four

8   years after my stay at the Continental Hotel) I did not remember the telephone number for the

9   Continental Hotel.  Mr. Cowan's Schedule 4 to his February 22, 1995, letter to Sheila Cox

10  related to telephone numbers, not to use of a telephone.

11       240.    The FTB 1991 Concluding Summary at p. 16 states the following.

12           Mr. Hyatt's continued use of his California telephone and facsimile
13           numbers for licensing and business communications long after his
             alleged move to Nevada simply cannot be disputed.[105]

14           [Exhibit A, note] 105:  See Exhibit GG_38:  Hyatt trial testimony,
15           05/08/08, Trial Transcript, p. 98 ("Q. And you saw Mr. Bradshaw
             asking questions of Mr. Kern about certain fax communications
16           going to an area code 310 fax number.  One of those was the
             power of attorney, if you recall.  Can you explain why
17           communications to you were being sent to the 310 area code in
             1993, 1994 and 1995?  A. Yes.  I wasn't always available to my
18           reps and my attorneys.  So I would have them, if they couldn't
             reach me, send it to my contact point, which was Ms. Jeng in La
19           Palma, California.  She would -- I would keep in touch with her as
             to where I was traveling to and such and if important, she {Ms.
20           Jeng} would get me the messages or the documents.  Q. Did she
             always know where you were?  A.  No, not always, but often.  Q.
21           She [Ms. Jeng] knew how to get a hold of you?  A. Yes. Or I
             would touch base with her to see if there were any messages or
22           such. Q.  Who had a better idea of where you were; Ms. Jeng or
             Mr. Cowan and Mr. Kern?  A.  Oh, Ms. Jeng.  I don't bother my
23           attorneys and CPAs with the minutia about my travels and such.")
             and FTB Reference Table Concerning Mr. Hyatt's Use of
24           California Facsimile number, (213) or (310) 809-1087.

                                        112

1

2  This FTB statement is misleading.  I did not use a Jennifer Circle telephone or fax after I sold the

3  Jennifer Circle house on October 1, 1991.  I did not use a Jennifer Circle telephone or fax for

4  licensing or business communications.  I did not use a Jennifer Circle telephone or fax after I

5  sold the Jennifer Circle house on October 1, 1991.  My only fax machine was located in my Las

6  Vegas apartment.  See ¶¶ 234 and 237, above.

7  　　　241.　　I did not return to the Jennifer Circle house from October 1, 1991, when I sold it

8  until late 1992.  See ¶ 149, above.

9  　　　242.　　The FTB 1991 Concluding Summary at p. 16 states the following.

10  　　　　　　There is no question that Mr. Hyatt had multiple accounts
     with financial institutions in California, including Safe Deposit
11     Box accounts, prior to his pursuit of patent licensing fees from the
     Japanese companies.

12  This FTB statement is misleading.  Shortly after my move to Las Vegas, I opened new accounts

13  in Las Vegas and proceeded to empty and close my prior accounts with financial institutions.[254]

14  I had remnant investment accounts in California which I had opened while I was a resident of

15  California and which I closed shortly after my move to Las Vegas.[255]  I understand that my

16  investment accounts are intangible property that take on the situs of my residency and I was a

17  Nevada resident as of my September 26, 1991, move to Las Vegas.  See 1992 ASAB, § 1.7.1.4,

18  p. 47.

19

20

21

22

23

24

---

[254]Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 64-74.
[255]Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 62-63.

113

RJN1391

1    243.    I opened checking accounts and a savings account with Las Vegas banks shortly

2    after my move to Las Vegas and I opened numerous Nevada situs investment accounts shortly

3    after my move to Las Vegas.[256]

4    244.    I closed California bank accounts as I prepared to move to Las Vegas.[257]  I

5    maintained two safe deposit boxes at Capital Bank as executor for my mother's estate that was

6    being probated in California.  I had a first certificate of deposit account at Irvine City Bank and a

7    second a certificate of deposit at First Fidelity Thrift & Loan that I had purchase long before my

8    move to Las Vegas and which I closed when they matured shortly after my move to Las

9    Vegas.[258]

10    245.    I opened a Las Vegas checking account on October 25, 1991, at a California

11    Federal Branch in Las Vegas and produced the documentation to FTB, H 005878, 00591.[259]  I

12    opened a second Las Vegas checking account in Las Vegas at Valley Bank of Nevada about

13    December 12, 1991, and I produced the documentation to FTB, H 00911, 00912.[260]  I opened

14    many investment accounts with a Nevada situs using my Las Vegas address.[261]  I was fully

15    cooperative with FTB and provided my available documents relating to banking and investments

16    as well as thousands of other requested documents.[262]

17

18    _____

19
       [256]Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 64-74.
20        [257] Affidavit of Gilbert P. Hyatt, May 18, 2001, ¶ 29, Annex VII, Ex. 20; 1991 Protest
     Supplement Letter, 5/31/01, pp. 48-49, Annex III.
21        [258]Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 62-63.
          [259]Hyatt DP CDE Affidavit, July 24, 2012, ¶ 64.
22        [260] Hyatt DP CDE Affidavit, July 24, 2012, ¶ 65.
          [261] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 66-74; Hyatt Supp. CDE Affidavit,
23    September 6, 2016, ¶¶ 42, 43.
          [262] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 60-74; 1991 AOB, § II.C.8.; 1991 ASAB,
24    § 1.8.1.1; 1991 ARB, §§ III.B.4, 5.

114

RJN1392

246.     Regarding FTB's false statement about "his pursuit of patent licensing fees from the Japanese companies," Philips had both exclusive rights and the fiduciary responsibility to license my patents upon execution of the July 1991 Philips Agreement.  It was Philips and Philips' contractor Mahr Leonard, not me, that pursued patent licensing fees from the Japanese companies.  I did not have a licensing business in California or elsewhere as falsely alleged by FTB.  See 1992 ASAB, §§ 1.4.1.3, 1.7.1.2.  See ¶¶ 14, 89, 90, 205, 279, 376, 380 herein.

247.     The FTB 1991 Concluding Summary at p. 16 states the following.

> There is likewise no dispute that respondent's attempts to obtain information regarding these accounts was met with the same level of cooperation provided to its inquiries into Mr. Hyatt's whereabouts after September 26, 1991, his phone records and records pertaining to his patent licensing efforts after his receipt of the '516 patent.

This FTB statement is false.  My representatives cooperated fully with FTB to produce the requested documents, see ¶¶ 242, 35, 226-228, 81-88, above.  My representatives produced the statements from my financial institutions during the audit.[263]

248.     As stated in ¶ 35, above, my representatives responded to FTB regarding my location after September 26, 1991, when I permanently moved to Las Vegas.  There was no documentation of my stay at the Continental Hotel because I stayed as a guest of a tour company which did not provide receipts or registration.[264]  Thus, I could not produce documentation that I did not have and that never existed.  My location starting September 26, 1991, is documented

_____

[263] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 60-74; 1991 AOB, § II.C.8.; 1991 ASAB, § 1.8.1.1; 1991 ARB, §§ III.B.4, 5.

[264] See ASAB Attachment 2, pp. 9-23.

115

RJN1393

1  fully in my Rebuttal to FTB Att. A/F with actual evidence of my location, not just illogical

2  inferences as relied on by FTB.[265]

3      249.   As previously stated, I cooperated fully with respect to my telephone records. I

4  was in the process of obtaining my telephone records when a letter from the auditor dated March

5  1, 1995, informed my representative that the auditor would assume responsibility for obtaining

6  my phone records. With the power of subpoena at its disposal, FTB did not follow-up with the

7  telephone companies and obtain the telephone records.[266] See 81, 85, 86, 226-228, 233, 249,

8  547-549 herein.

9      250.   After issuance of the '516 patent I entered into a patent licensing arrangement by

10  which Philips was granted exclusive rights and the fiduciary responsibility to license my patents.

11  Philips was identified in my April 13, 1992 California part year 1991 Tax Return. There was no

12  concealment of licensing records. See ¶¶ 100-105, 121, 122, 417 herein.

13      251.   The FTB 1991 Concluding Summary at p. 16 states the following.

14  > Respondent made requests for checking account
> information and copies of cancelled checks pertaining to those
15  > accounts for 1991 and 1992. Those requests were both general
> and, on occasion, specific to certain transactions. Mr. Hyatt's
16  > response to those inquires was quite lacking. For example,
> respondent has determined that as many as 340 checks written by
17  > Mr. Hyatt throughout 1991 (and, deduced through check number
> analysis, a similar number in 1992) were not provided as requested
18  > during audit or protest.[106]

19  > [Exhibit A, note] 106: Exhibit E, tab 31 FTB Analysis of Mr.
> Hyatt's undisclosed Bank of America '314 checking account.

20

21

22

23  [265] Rebuttal to FTB Att. A/F, Section I. A., day by day analysis, September 26, 1991, through April 2, 1992.

24  [266] Rebuttal to FTB Att. A/F, Section I. B., October 7, 1991; Affidavit of Gilbert P. Hyatt, § 1.20, p. 130, August 15, 2010, Annex XI, Ex. 13; 1991 ARB, § II.A.5.

116

RJN1394

1   This FTB statement is false.  My representatives produced all of my statements and cancelled

2   checks from my 1991 and 1992 financial institution accounts.[267]

3       252.    My representatives produced all of my statements and cancelled checks from my

4   only Bank of America account.[268]  I opened a checking account with Valley Bank in Las Vegas

5   in December 1991.  Valley Bank was acquired by Bank of America in 1992.  Bank of America

6   changed my checks and statements from Las Vegas Valley Bank checks and statements to Las

7   Vegas Bank of America checks and statements.  See Exhibit CDE-P113 in my 2016 Post-DP

8   CDE Affidavit for copies of my Bank of America checks and statements with my Las Vegas

9   address printed thereon and with the Bank of America Las Vegas address printed thereon.

10      253.    I did not have an undisclosed Bank of America '314 checking account.  This is a

11  corporate account for Digital Nutronics Corporation (DNC).  FTB secretly audited DNC but FTB

12  did not inform me of that audit and FTB did not request any information on DNC from my

13  representatives.  Years later when my representatives learned about FTB's interest in DNC, the

14  DNC records were no longer available through what I understand was a record retention

15  policy.[269]

16      254.    In its Concluding Summary FTB does not explain when and how it requested

17  DNC checking account information.  FTB only states that it made unspecified general and, on

18  occasion, specific requests.  However, this is another false statement, FTB did not request DNC

19

20  ───────────────

21      [267] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 60-74; see, e.g., the Nevada Checks Table,
    Exhibit CDE-T003 in Hyatt Post-DP CDE Affidavit, September 6, 2016; see also the checks I
22  signed in Las Vegas provided in my Supp. CDE Affidavit, September 6, 2016, ¶¶ 153-243 and
    Post-DP CDE Affidavit, September 6, 2016, ¶¶ 546-949.
23      [268] Hyatt Post-DP CDE Affidavit, September 6, 2016, ¶ 401 and Exhibit CDE-P113
    attached therein.
24      [269] Rebuttal to FTB Att. A/F, Section I. C., August 9, 1991.

117

RJN1395

checking account information.  FTB now falsely complains that I did not provide information that was not asked for.[270]

255.    The FTB 1991 Concluding Summary at p. 16 states the following.

> Found within California court records, respondent recovered checks from an account used by Mr. Hyatt for personal expenses in years prior to 1991.[107]  Mr. Hyatt testified that he used this undisclosed checking account for personal expenses until the date the account was closed (a date not provided), and that these checks are now unavailable.[108]  Once again, based on Coleman Psychological, "the failure to provide evidence which is within appellant's control gives rise to the presumption that, if provided, the evidence would be unfavorable."[109]

[Exhibit A, note] 107:  Exhibit C, Tab 23.

[Exhibit A, note] 108:  Exhibit C, Tab 24.

[Exhibit A, note] 109:  Appeal of James P. Coleman Psychological Corporation, 85-SBE-028, April 9, 1985.

This FTB statement is false.  There was no failure to produce evidence.  Such "years prior to 1991" is not relevant to the audit of the disputed period.  This was a corporate account for Digital Nutronics Corporation (DNC).  FTB secretly audited DNC but FTB did not inform me of that audit and FTB did not request any information on DNC from my representatives.  Years later when my representatives learned about FTB's interest in DNC, the DNC records had been destroyed through what I understand was a record retention policy.[271]

256.    It was FTB's "failure to provide evidence" because FTB had audited DNC and kept that audit of DNC and any relevance of DNC secret.

257.    The FTB 1991 Concluding Summary at p. 17 states the following.

> Mr. Hyatt continued his banking activities in California after September 26, 1991.  During October and December 1991,

---

[270] Rebuttal to FTB Att. A/F, Section I. C., August 9, 1991.
[271] Rebuttal to FTB Att. A/F, Section I. C., August 9, 1991.

118

RJN1396

> Mr. Hyatt engaged in personal banking at the California Federal Bank branches at Lakewood and Los Cerritos Center.[110]
>
> [Exhibit A, note] 110: FTB's Attachment A (Revised), pp. 66 (12/5/91), 72 (12/14/91), 80 (12/28/91), 81 (12/31/91), and 84 (01/08/92).

This FTB statement is false. I did not have "banking activities in California" on these dates and I was not in California on these dates. These accounts were Nevada situs investment accounts, a mutual fund investment account or money market investment accounts, not California bank accounts. These are dates that checks were cashed or deposited by my associate. It is misleading to state to your Board that investment account activities are banking activities, that Nevada situs investment accounts are California bank accounts, and that cashing or depositing of checks are "banking activities in California."

258. FTB Att. A-R, p. 66 (12/5/91): I was in Las Vegas, not in California, on December 5, 1991,[272] and I did not cash the referenced check, FTB Exhibit L, Tab 2, in person. My associate cashed the December 5, 1991, check for me.[273] FTB produced no evidence that I personally cashed the check. This CalFed account was a Nevada situs investment account, not a bank account.

259. FTB Att. A-R, p. 72 (12/14/91): I was in Las Vegas, not in California, on December 14, 1991,[274] and I did not deposit the referenced check, H 00671, in person. My associate deposited the December 14, 1991, check for me.[275] FTB produced no evidence that I personally deposited the check. This Franklin mutual fund account was a Nevada situs investment account, not a bank account.

---

[272] Rebuttal to FTB Att. A/F, Section I. A., December 5, 1991.
[273] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.18, p. 93, Annex XI, Ex. 13.
[274] Rebuttal to FTB Att. A/F, Section I. A., December 14, 1991.
[275] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.18, p. 96, Annex XI, Ex. 13; Affidavit of Grace Jeng, May 18, 2001, ¶ 21, Annex VII, Ex. 21.

119

260.    FTB Att. A-R, p. 80 (12/28/91): I was in Las Vegas, not in California, on December 28, 1991,[276] and I did not deposit the referenced check, H 00685, in person. My associate deposited the December 28, 1991, check for me.[277] FTB produced no evidence that I personally deposited the check. This CalFed account was a Nevada situs investment account, not a bank account.

261.    FTB Att. A-R, p. 81 (12/31/91): I was in Las Vegas, not in California, on December 31, 1991,[278] and I did not deposit the referenced check, H 00685, in person. My associate deposited the December 31, 1991, check for me.[279] FTB produced no evidence that I personally deposited the check. This CalFed account was a Nevada situs investment account, not a bank account.

262.    FTB Att. A-R, p. 84 (01/08/92): I was not in California, on January 8, 1992. On January 8, 1992, I started the day in Las Vegas and flew to the East Coast without passing through California[280] and I did not deposit the referenced check, H 00685, in person. While in Las Vegas I wrote the January 8, 1992, check and gave it to my associate to deposit. The bank statement shows my associate deposited the January 8, 1992, check for me at Los Cerritos Center.[281] FTB produced no evidence that I personally deposited the check. This CalFed account was a Nevada situs investment account, not a bank account.

263.    The FTB 1991 Concluding Summary at p. 17 states the following.

---

[276] Rebuttal to FTB Att. A/F, Section I. A., December 28, 1991.
[277] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.18, p. 96, Annex XI, Ex. 13; Affidavit of Grace Jeng, May 18, 2001, ¶ 21, Annex VII, Ex. 21.
[278] Rebuttal to FTB Att. A/F, Section I. A., December 31, 1991.
[279] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.18, p. 97, Annex XI, Ex. 13; Affidavit of Grace Jeng, May 18, 2001, ¶ 21, Annex VII, Ex. 21.
[280] Rebuttal to FTB Att. A/F, Section I. A., January 8, 1992.
[281] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.18, p. 98, Annex XI, Ex. 13; Affidavit of Grace Jeng, May 18, 2001, ¶ 21, Annex VII, Ex. 21.

120

On December 5, 1991 and again on December 10, 1991, Mr. Hyatt also made visits to his two safe deposit boxes in La Palma, California. Notably, Mr. Hyatt does not close but renews his rental of the boxes, and then waits until July 21, 1992 to change his address on his account for these La Palma bank services.[111]

[Exhibit A, note] 111: FTB Trial Exhibit 2001-670-673 and FTB's Attachment A (Revised), p. 31 (09/27/91).

This FTB statement is false. I did not visit the safe deposit boxes on December 5, 1991 or on December 10, 1991. The two safety deposit boxes were maintained for the California probate of my mother's estate of which I was the executor. I remained in Las Vegas on December 5, 1991, and did not visit the two safe deposit boxes[282] and I remained in Las Vegas on December 10, 1991, and did not visit the two safe deposit boxes.[283] The FTB list, A00662, is not based on personal knowledge, provides no sign-in signature for the alleged visit and does not indicate who visited the safe deposit boxes.

264. The FTB 1991 Concluding Summary at p. 17 states the following.

About the only verifiable "act" Mr. Hyatt points to as evidence of severing his California banking connections revealed in contemporaneous documentation concerns the closing of a few California bank accounts, allegedly in anticipation of his later move to Nevada.[112]

[Exhibit A, note] 112: 05/18/01 Affidavit of Gilbert P. Hyatt, para. 29, 7:24-25.

This FTB statement is false. This is far from "About the only verifiable 'act'" of my severing "California banking connections." I did not have "California banking connections" during the disputed period and thereafter, I had only Nevada situs bank accounts in Nevada banks and

---

[282] Rebuttal to FTB Att. A/F, Sections I. A., I. B., December 5, 1991.
[283] Rebuttal to FTB Att. A/F, Sections I. A., I. E., December 10, 1991; Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.9, p. 43, Annex XI, Ex. 13; Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 173.

121

RJN1399

1  Nevada situs investment accounts nationwide during the disputed period and thereafter. My

2  representatives produced over one thousand pages of "contemporaneous documentation" of my

3  Nevada situs bank accounts in Nevada banks and my Nevada situs investment accounts

4  nationwide.[284]

5      265.    In addition to closing bank accounts, I did much more as part of my preparation to

6  move to Las Vegas.[285]

7      266.    For example, I visited Las Vegas and shopped for houses to purchase, I disposed

8  of decorations, furnishings, furniture and file cabinets at the Jennifer Circle house.[286]  I also told

9  numerous people I was planning to move to Las Vegas and that I did move to Las Vegas, and I

10  provided numerous changes of address.  See 1992 ASAB, §§ 1.5.6, 1.5.6.1, 1.5.6.2.  A total of 26

11  witnesses testified about my decision to move to Las Vegas and 32 witnesses testified about my

12  preparations to move in 1991.[287]  In addition, 17 witnesses testified that the Jennifer Circle house

13  had little furniture or packed boxes before I moved to Las Vegas in 1991, 14 witness testified

14  about the Jennifer Circle house being nearly empty of furniture and furnishing before I moved to

15  Las Vegas in 1991, 15 witnesses testified about my possessions being carted off for storage or

16  being given away, or disposed of, or donated to charity, and 3 witnesses testified about helping

17  to move my belongings to storage before I moved.[288]

18      267.    The FTB 1991 Concluding Summary at p. 17 states the following.

19  _____

20  [284] See, e.g., Exhibits CDE-F1 to CDE-F19 attached to Hyatt DP CDE Affidavit, July 24,
   2012; Exhibits CDE-P113 to CDE-P122 attached to Hyatt Post-DP CDE Affidavit, September 6,
21  2016.
   [285] Affidavit of Gilbert P. Hyatt, May 18, 2001, ¶ 29, Annex VII, Ex. 20; 1991 Protest
22  Supplement Letter, 5/31/01, pp. 48-49, Annex III.
   [286] Affidavit of Gilbert P. Hyatt, May 18, 2001, ¶ 3, Annex VII, Ex. 19; Affidavit of
23  Gilbert P. Hyatt, August 15, 2010, § 1.2.2, Annex XI, Ex. 13.
   [287] Updated Testimonial Topics Table, Exs. T001 and T002.
24  [288] Updated Testimonial Topics Table, Exs. T003, T004, T005 and T016.

122

RJN1400

1
2

Many of the so called "closed accounts" were, by June 1991, largely inactive, some with small balances and accumulating recurring service fees.[113]

3
4

[Exhibit A, note] 113: Exhibit E, Tab 26, Hyatt Trial Exhibit 245-00011-16, and FTB Summary of Hyatt Banking Activity.

5 In June 1991 I was still in the process of preparing to move, which I began after deciding to

6 move to Las Vegas in December 1990. See Appellant's Concluding Summary (1991), § 1.4. I

7 closed the California bank accounts as I was preparing to move to Las Vegas.[289] The closing of

8 the California bank accounts severed ties with California. I also severed many other ties with

9 California before and soon after my move to Las Vegas.[290]

10     268.    The FTB 1991 Concluding Summary at p. 17 states the following.

11
12

Although not a "bank account", Mr. Hyatt opened a Franklin Federal Money Fund on August 6, 1991 (retaining his Jennifer Circle home address for the mutual fund account) with $400,000 he received from Philips in late July 1991.

13

14 This FTB statement is misleading. I had not yet moved to Las Vegas on August 6, 1991, so of

15 course I had only my Jennifer Circle then-home address for my Franklin account. I did not

16 "retain" the Jennifer Circle home address when I opened the Franklin Fund investment account.

17 That was my address when I opened the account.

18     269.    The fact that the Franklin Fund was not a "bank account" is significant. Because

19 the Franklin Fund was an investment account, not a bank account, the situs of the Franklin Fund

20 investment account automatically followed my change of residence to Nevada on September 26,

21 1991. Furthermore, I submitted a change of address to the U.S. Post Office for the Jennifer

22

23 [289] Affidavit of Gilbert P. Hyatt, May 18, 2001, ¶ 29, Annex VII, Ex. 20; Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 48-49.

24 [290] See my severing of California ties and establishing Nevada connections in the Bragg factors discussion in 1991 AOB, § II.C., pp. 15-38.

123

1    Circle house and my Cypress U.S. Post Office box on October 21, 1991, the day I moved into

2    my Las Vegas apartment.[291]  Thereafter, any correspondence for my Las Vegas situs Franklin

3    Fund investment account was sent to me in Las Vegas.  I received the monthly Franklin Fund

4    investment account statements at my Las Vegas mailing address.[292]

5              270.    The FTB 1991 Concluding Summary at p. 17 states the following.

6                      Mr. Hyatt also caused the $40 million received from Fujitsu and
                       Matsushita to be transferred from his attorney's trust account into
7                      the Franklin Federal Money Fund account.  He then paid MLMC
                       and Philips with checks drawn on that account which state he was
8                      residing at Jennifer Circle in La Palma, California and disbursed
                       his remaining money into various investments.[114]
9
                       [Exhibit A, note] 114:  FTB Trial Exhibit 2001-3259-60, 3261 and
10                     Franklin Federal Money Fund Account Timeline.

11   This FTB statement is false.  Philips caused the $40 million received from Fujitsu and

12   Matsushita to be transferred from Philips' attorney's trust account into the Franklin Federal

13   Money Fund account.  The Fujitsu and Matsushita license payments were made to a client trust

14   account maintained by the law firm of PSB&C for the benefit of Philips, not to my attorney's

15   trust account.  The law firm of PSB&C and Mr. Roth represented Philips with respect to the

16   Philips Licensing Program and with respect to the *Hyatt v. Boone* interference after July 1991.[293]

17             271.    Through the [First] Supplemental Agreement, FTB_Philips 0000666-0000673,

18   Philips authorized me to distribute the Fujitsu and Matsushita license payments to Philips and

19   Mahr Leonard.[294]  The account from which I distributed the Fujitsu and Matsushita license

20

21

22   _____

23   [291] Hyatt DP CDE Affidavit, July 24, 2012, ¶ 17.
     [292] Hyatt DP CDE Affidavit, July 24, 2012, ¶ 61.
     [293] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.
24   [294] 1992 ASAB, § 1.7.1.4.

124

RJN1402

1  payments, which FTB disingenuously declines to identify, was my Nevada situs Franklin Fund

2  investment account.[295]

3      272.    FTB incorrectly calls the drafts drawn on the Franklin Federal Money Fund

4  account "checks."  Franklin was not a checking account and it did not issue checks.

5      273.    FTB incorrectly states that "checks drawn on that account which state he was

6  residing at Jennifer Circle in La Palma, California."  These so-called "checks" do not state where

7  I resided.  In fact, I resided in Las Vegas at the time and I submitted a change of address with the

8  U.S. Postal Service to forward my mail to my Las Vegas mailing address that was addressed to

9  the Jennifer Circle address.  In fact, I received the Franklin statements at my Las Vegas mailing

10  address.[296]

11      274.    The FTB 1991 Concluding Summary at p. 17 states the following.

12          About a month after he allegedly moved, Mr. Hyatt opened
        his first Nevada bank account on October 25, 1991 at the Maryland
13      Parkway branch, coinciding with the annual Comdex show.[115]  He
        later opened a second Nevada bank account on or about December
14      12, 1991 with a $200 deposit.[116]  A Nevada money market savings
        account was also opened on or about January 27, 1992 with a
15      $2,000 deposit but Mr. Hyatt closed the account in less than a year
        without any additional use or activity.[117]

16      [Exhibit A, note] 115:  FTB Trial Exhibit 2001-2070 (bank), 2001-
17      1173 (Comdex) and 07/24/12 Affidavit of Gilbert P. Hyatt, 4:12-
        14.

18      [Exhibit A, note] 116:  FTB's Attachment A (Revised), pp. 70-71
19      (12/12/91) and 07/24/12 Affidavit of Gilbert P. Hyatt, 4:12-14.

20      [Exhibit A, note] 117:  FTB's Attachment A (Revised), p. 92
        (01/27/92) and 07/24/12 Affidavit of Gilbert P. Hyatt, 4:12-14.

21

22

23
      [295] FTB_Philips 0004856, 0004858, 0006166, 0000061.
24      [296] Hyatt DP CDE Affidavit, July 24, 2012, ¶ 61.

                                    125

RJN1403

1   This FTB statement is misleading.  The most important facts here, which are disregarded by

2   FTB, are that the two so-called "bank account[s]" were in fact checking accounts upon which I

3   wrote  many personal checks having my Las Vegas address printed thereon and with my banks'

4   Las Vegas addresses printed Theron, paid to Las Vegas entities, and signed by me in Las Vegas.

5   These check provide part of the scenario of my getting settled in Las Vegas.  They include rent

6   checks on my Las Vegas apartment, Las Vegas utility checks, Las Vegas telephone checks, Las

7   Vegas insurance checks, and hundreds more.[297]

8       275.    Additional facts, which are disregarded by FTB, are that I opened the first Nevada

9   checking account four days after October 21, 1991, when I moved into my Las Vegas

10  apartment.[298]

11      276.    Regarding the FTB statement "Mr. Hyatt closed the [savings] account in less than

12  a year without any additional use or activity" is misleading. First, maintaining savings for a year

13  is a use or activity of a savings account.  Second, FTB disregards the fact that over that year, I

14  opened numerous other Nevada situs investment accounts that had better returns than this

15  savings account.

16      277.    The FTB 1991 Concluding Summary at p. 18 states the following.

17              However, his California banking activity continued with
        Mr. Hyatt receiving bank statements from California Federal Bank,
18          Lakewood and Cerritos branches, at his Cerritos Post Office Box
        for nearly all of the disputed period.[118]

19
        [Exhibit A, note] 118:  E.g., H00722-727, FTB Trial Exhibit 2001-
20      3150-3157and FTB Trial Exhibit 2001-3111-3119.  See FTB's
        Attachment A (Revised), p. 131 (4/12/92), concerning change of

21  _____

22      [297] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 64, 65; see also the Nevada Checks Table,
    Exhibit CDE-T003 in Hyatt Post-DP CDE Affidavit, September 6, 2016; see also the checks I
23  signed in Las Vegas provided in my Supp. CDE Affidavit, September 6, 2016, ¶¶ 153-243 and
    Post-DP CDE Affidavit, September 6, 2016, ¶¶ 546-949.
24      [298] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.

126

RJN1404

1    address from Cerritos to Nevada Post Office Box for MasterCard
2    statements with Bank of New York.

3    This FTB statement is false. I did not have any banking activity in California after my move on

4    September 26, 1991. I did have various legacy investment accounts in California that I had

5    opened when I resided in California, but I emptied and closed these accounts. I received the

6    so-called "bank statements" at my mailing address in Las Vegas because the U.S. Post Office

7    forwarded correspondence from California Federal Bank to my mailing address in Las Vegas.

8    See 1992 ASAB, § 1.5.6.3. I was not even present at the Jennifer Circle house between October

9    1, 1991, and late 1992, at which time I returned to Jennifer Circle for a short visit.

10    278.    FTB falsely states that these constitute "California banking activity". These

11   accounts were Nevada situs money market investment accounts, not California bank accounts. It

12   is misleading to state to your Board that investment account activities are banking activities and

13   that Nevada situs investment accounts are California bank accounts.

14    279.    FTB Att. A-R, p. 131 (4/12/92): FTB falsely states that the Cerritos U.S. Post

15   Office box served as a Jennifer Circle home/business. I did not have a "Jennifer Circle

16   home/business" and the Cerritos U.S. Post Office box did not serve a non-existing

17   home/business.[299] See 1992 ASAB, §§ 1.4.1.3, 1.7.1.2. I was not even present at the Jennifer

18   Circle house between October 1, 1991, and late 1992, when I returned to Jennifer Circle for a

19   short visit. See also ¶¶ 14, 89, 90, 205, 279, 376, 380 herein.

20    280.    The FTB 1991 Concluding Summary at p. 18 states the following.

21       New Nevada residents who drive are required to obtain a
         Nevada driver's license and to register any vehicles they own
22       within 45 days of moving to Nevada.[119] Mr. Hyatt's 1977 Toyota

23   _____

24    [299] Rebuttal to FTB Att. A/F, Section I. A., April 12, 1992.

127

RJN1405

Celica was purportedly kept in Nevada from September 1991 through 1992 and beyond.[120] Notwithstanding his alleged occupancy of the low-income apartment complex unit, Mr. Hyatt waited until May 6, 1992, a month after he purchased the Tara home, to register his 1977 Toyota in Nevada.[121] Mr. Hyatt purchased a new vehicle in Nevada in 1992.

[Exhibit A, note] 119: H07130.

[Exhibit A, note] 120: P01557.

[Exhibit A, note] 121: H 07072 – 07073.

This FTB statement is false. The Wagon Trails apartment complex was not a "low-income apartment complex." It was a very nice, clean, well maintained mid-range two bedroom apartment. I did not live in a low income apartment complex.[300] See ¶ 155, above.

281. I obtained a Nevada driver's license, surrendered my California driver's license, and registered to vote in Nevada on November 27, 1991.[301]

282. I also attempted to register my 1977 Toyota Celica on November 27, 1991, but it did not pass a smog test. The 1977 Toyota passed a smog test on April 17, 1992, H 07068-07070, I applied for registration on April 21, 1992, and the registration issued on May 6, 1992, H 07072. I occupied a very nice, clean, well maintained mid-range two bedroom apartment from October 21, 1991, to April 3, 1992, when I moved into my beautiful 5400 square foot Las Vegas Tara house. I did not live in a low income apartment complex.[302] See 1991 ARB, § II.A.11.

283. I purchased insurance for my 1977 Toyota on December 12, 1991, from a Las Vegas State Farm agency and I continue to use this Las Vegas agency uninterrupted for my automobile insurance to the present. See ¶ 198, above.

---

[300] Rebuttal to FTB Att. A/F., Section II. B., October 8, 1991; 1991 AOB, § II.C.11.
[301] Rebuttal to FTB Att. A/F, Section I. A., November 27, 1991; 1991 AOB, §§ II.C.12, 13.
[302] Rebuttal to FTB Att. A/F., Section II. B., October 8, 1991; 1991 AOB, § II.C.11.

RJN1406

284.    I bought a new 1992 Toyota in Las Vegas on March 19, 1992, H 07058, and registered the vehicle on that date in Nevada.  I purchased insurance for my 1992 Toyota on March 20, 1992, H 07067, from my then-current Las Vegas State Farm agency and I continue to use this Las Vegas agency uninterrupted for my automobile insurance to the present.  See ¶ 198, above.  My 1992 Toyota is my only vehicle and I continue to insure it with this Las Vegas agency and I continue to register it in Las Vegas to the present.

285.    The FTB 1991 Concluding Summary at p. 18 states the following.

> During the audit, Mr. Hyatt asserted that he had registered to vote in Nevada in 1991 but did not register in California between 1986 and 1992.[122]  In actuality, Mr. Hyatt was a registered voter in California from September 12, 1990 to September 18, 1992 (registration no. 300755064).[123]  It was not until 2005 that Mr. Hyatt initially revealed that he had registered to vote in California.[124]

> [Exhibit A, note] 122:  FTB Trial Exhibit 2001-0277-278.

> [Exhibit A, note] 123:  FTB Exhibit DD, Tab 5.

> [Exhibit A, note] 124:  08/17/05 Deposition of Gilbert Hyatt, Vol. III, 549:5-19.

This FTB statement needs clarification.  I registered to vote in Nevada on November 27, 1991, and I voted in the next major elections, which were in 1992.[303]  I did not vote in California after September 26, 1991, when I moved to Nevada.

286.    I do not remember having registered to vote in California in 1990, which is more than 25 years ago.

287.    The FTB 1991 Concluding Summary at p. 18 states the following.

> In Nevada, you are qualified to vote if you have resided continuously in the state and county for 30 days and in the precinct for 10 days.[125]

---

[303] Rebuttal to FTB Att. A/F., Section I. A., November 27, 1991; 1991 AOB, § II.C.13.

129

RJN1407

1          [Exhibit A, note] 125: Nev. Rev. Stat. Ann. § 293.485.

2  I registered to vote on November 27, 1991, soon after I was eligible to register to vote in Nevada,

3  ¶ 285, above.

4          288.    The FTB 1991 Concluding Summary at p. 18 states the following.

5          On November 26, 1991, Mr. Hyatt purchased two airline tickets on
           his credit card.[126]

6          [Exhibit A, note] 126: FTB Trial Exhibit 2001-2468 and FTB's
           Attachment A (Revised), pp. 61-62.

7

8  This FTB statement is false. I did not purchase the two airline tickets listed on my credit card

9  statement for November 26, 1991, A02177.624. Ms. Jeng purchased the two tickets for my son

10  Dan and a friend of his. Dan flew to Las Vegas to visit with me on November 26, 1991, but his

11  friend decided not to come.[304]

12          289.    The FTB 1991 Concluding Summary at p. 18 states the following.

13          The next day, Mr. Hyatt obtained a Nevada driver's license[127] and
           registered to vote in Nevada using the Wagon Trails address.[128]

14          [Exhibit A, note] 127: FTB Trial Exhibit 2001-0273.

15          [Exhibit A, note] 128: FTB Trial Exhibits 2001-0327 and 2800-
           0016 and 07/24/12 Affidavit of Gilbert P. Hyatt, 2:19-21, and
           Exhibit CDE-G-18.

16

17  The FTB statement needs clarification. On November 27, 1991, my son Dan (who was visiting

18  me) and I went to the Nevada DMV. I obtained a Nevada driver's license, I surrendered my

19  California driver's license at the Las Vegas DMV, and I registered to vote in Nevada. I used the

20  address of my Wagon Trails Apartment where I was residing and had resided for over a month. I

21

22

23  [304] Rebuttal to FTB Att. A/F, Section I. G., November 26, 1991; Affidavit of Daniel
    Hyatt, July 18, 2012, ¶¶ 138, 141, Annex XXV, Ex. 35; Affidavit of Daniel Hyatt, November 11,
    2008, ¶ 6, 7, Annex VII, Ex. 18; Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.18, p. 90,
24  Annex XI, Ex. 13.

                                          130

                                                                              RJN1408

1    also attempted to register my 1977 Toyota in Nevada but it did not pass a smog test, ¶ 282,

2    above.

3    　　　　290.　　The FTB 1991 Concluding Summary at p. 18 states the following.

4    　　　　　　　But by November 29, 1991, Mr. Hyatt had returned to California
     　　　　　　　and signed an agreement with Sharp using his Cerritos, California

5    　　　　　　　address, and signed for two Federal Express parcels at his Jennifer
     　　　　　　　Circle home/business location.[129]

6
     　　　　　　　[Exhibit A, note] 129:　　FTB_Philips 0000765, FTB_Philips

7    　　　　　　　0005178-79, FTB_Philips 0006605, and FTB's Attachment A
     　　　　　　　(Revised), p. 64.

8

9    This FTB statement is false.  First, I signed the Sharp Patent PCT Agreement in Las Vegas, not

10   in California.  This was a small follow-on agreement that generally followed the format of the

11   prior main Sharp Patent Agreement, H 018761-018783.  I had given Philips and Mahr Leonard a

12   change of address to Las Vegas by October 18, 1991, but Mahr Leonard had not yet

13   implemented the change of address by November 29, 1991, when I signed the Sharp PCT Patent

14   Agreement.  The Sharp PCT Patent Agreement identified the Cerritos U.S. Post Office box as a

15   mailing address,[305] but I was told that I should sign the agreement because it was a draft

16   agreement and the mailing address was not important.  I was told the important address was the

17   address of the law firm of PSB&C for official correspondence under the agreement.[306]

18   　　　　291.　　On November 29, 1991, I made a round trip visit from Las Vegas to California

19   where I met with Mr. Roth for 1.5 hours.[307]  A FedEx Sender Activity Summary states that two

20   packages from Philips were delivered to the Jennifer Circle house, but I was not present at the

21

22   _____

23   　　[305] FTB_Philips 0000757.
     　　[306] FTB_Philips 0000765.

24   　　[307] FTB_Philips 0006605.

　　　　　　　　　　　　　　　　　131

RJN1409

1   house and I did not receive the delivery.[308]  The typed name "G.Hyatt" appears in the signed

2   field but there is no signature, I was not present and I did not sign for delivery of either package.

3           292.    Mr. Steve Foster, Senior Paralegal at FedEx testified that FedEx provides a door

4   to door service, not a person to person service and the name of a person in the signed block does

5   not mean the person actually was present at the time of delivery and signed for the package.[309]

6           293.    The FTB 1991 Concluding Summary at p. 19 states the following.

7               Mr. Hyatt utilized various legal, accounting and other
                professional services, including medical consultation and treatment
8               services in California during the relevant period.  In 1991 and
                1992, Mr. Hyatt consulted five California doctors, remained
9               hospitalized for 10 days at the Los Alamitos Medical Center in
                February 1992, and visited one California medical clinic.

10
11              [Exhibit A, note] 130:  FTB Narrative Report, TYE 1992, p. 19
                (CCC 00021) and 05/31/01 Supplemental Protest Letter (1991), pp.
                62-63.
12

13  This FTB statement is misleading.  It disregards the many professionals that I used in Las Vegas

14  and nationwide[310] and mentions a few professionals in California while disregarding the

15  underlying facts.  My representatives produced information on over 100 non-California

16  professionals that I used but FTB totally disregarded this information.[311]  See ¶¶ 293-297,

17  316-219, 327, 566, 574-579, 581, 584, 666 herein.

18          294.    FTB fails to mention that I terminated the services of several California attorneys

19  and a California CPA contemporaneously with moving to Las Vegas.

20  _____

21          [308] Rebuttal to FTB Att. A/F, Section I. A., November 29, 1991.
            [309] Affidavit of Steve Foster, February 17, 2015, ¶¶ 5-12; Rebuttal to FTB Att. A/F.,
22  Section I. B., November 22, 29, 1991.
            [310] Hyatt Post-DP CDE Affidavit, September 6, 2016, ¶¶ 146-147; see also 1992 ASAB,
23  § 1.5.3.
            [311] Hyatt Post-DP CDE Affidavit, September 6, 2016, ¶¶ 146-147; see also 1992 ASAB,
24  § 1.5.3.

132

RJN1410

295.     FTB also fails to mention that I used California attorneys for California issues, e.g., cases in California courts, the sale of the Jennifer Circle house, and the part year California tax return.

296.     Contemporaneous with my move to Las Vegas, I learned that I had cancer.  I was informed that Nevada did not have the best medical care for cancer and that I should be treated in California.  I had cancer surgery in a California hospital.  The California doctors, hospitalization, and the medical clinic are not identified by FTB but are related to the services for the cancer surgery.  I listed these medical services on my temporary or transitory table.[312]

297.     I did not enter the hospital for the purpose of residing there, it was a temporary or transitory purpose.  I traveled from my home in Las Vegas to California on February 11, 1991, for cancer surgery, and I returned to Las Vegas on February 21, 1991, immediately after being released from the hospital following my cancer surgery.

298.     The FTB 1991 Concluding Summary at p. 19 states the following.

> Mr. Hyatt was initially seen by Dr. Peloquin in Fullerton on September 13, 1991 (and then subsequently on October 31, 1991).[131]
>
> [Exhibit A, note] 131:  H017833-34 and FTB Trial Exhibit 2001-0643-644.

This FTB statement is false.  I was in Las Vegas on October 31, 1991.  I did not meet with Dr. Peloquin on that day, ¶ 218, above.  The October 31, 1991, invoice is clearly in error because it is for contact lens service but I have never work contact lenses.

299.     The FTB 1991 Concluding Summary at p. 19 states the following.

> After a referral, Mr. Hyatt consulted Dr. Gerald M. Isenberg in

---

[312]  See 1992 ASAB, § 1.5.5 and ASAB Exhibit 4, Table of "Mr. Hyatt's Temporary or Transitory Purposes Outside of Nevada".

133

RJN1411

1        Long Beach on October 9, 1991 who later performed Mr. Hyatt's
surgery in February 1992.[132]

2

3        [Exhibit A, note] 132:  FTB Trial Exhibit 2001-0785-786.

4  This FTB statement is false.  I did not consult with Dr. Gerald M. Isenberg on October 9, 1991.  I

5  remained in Las Vegas from October 7, 1991, through October 11, 1991, at which time I drove

6  to California to celebrate the birthday of my girlfriend Caroline Cosgrove.[313]

7      300.    The FTB 1991 Concluding Summary at p. 19 states the following.

8        In the interim, Mr. Hyatt received a second opinion from Dr.
Melvin Shapiro on February 3, 1992 in Encino.[133]

9

10        [Exhibit A, note] 133:  FTB Trial Exhibit 2001-0659-660 and
05/31/01 Supplemental Protest Letter (1991), pp. 62-63.

11  Unauthenticated hand written notes list a date of February 3, 1992.  The author is unknown, the

12  basis for the note is unknown and the notes should be disregarded by your Board.[314]

13      301.    The FTB 1991 Concluding Summary at p. 19 states the following.

14        Eight days later, Mr. Hyatt was admitted to the Los Alamitos
Medical Center where he underwent surgery and thereafter
15        remained hospitalized until discharged on February 21, 1992.[134]

16        [Exhibit A, note] 134:  05/31/01 Supplemental Protest Letter
(1991), pp. 62-63 and FTB Trial Exhibit 2001-0658.

17  This FTB statement needs clarification.  I traveled from Las Vegas to California on February 11,

18  1992, and on February 21, 1992, I returned to Las Vegas immediately after being released from

19

20

21

22

23     [313] Rebuttal to FTB Att. A/F, Section I. C., October 9, 1991; 2016 Supplemental Affidavit of Gilbert P. Hyatt, ¶ 40; Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.18, p. 79, Annex XI, Ex. 13.

24     [314] Rebuttal to FTB Att. A/F, Section I. B., February 3, 1992.

134

RJN1412

1  the hospital following my surgery.  My stay in the Los Alamitos hospital for cancer surgery was

2  for a temporary or transitory purpose.[315]

3

4       302.    The FTB 1991 Concluding Summary at p. 19 states the following.

5           Mr. Hyatt did not consult any medical or dental provider(s) in
            Nevada during the disputed period.[135]

6           [Exhibit A, note] 135:  FTB Trial Exhibit 2001-0656-657.

7  On April 6 and 7, 1992, I was treated by Las Vegas dentist Dr. Stephen Hall.[316]

8       303.    The FTB 1991 Concluding Summary at p. 19 states the following.

9           Mr. Hyatt consulted with and obtained professional and/or
            support services from numerous individuals in California with

10          respect to the Hyatt v. Boone interference who "were paid by
            Philips on behalf of Mr. Hyatt."[136]  California professionals utilized

11          by Mr. Hyatt for these matters in 1991 and 1992 included: Barry
            Lee[137] (Sunland), Gregory L. Roth[138] of PSBC, Los Angeles

12          (including attorneys Lee Mandell,[139] Gary A. Clark,[140] Steven J.
            Kirschner,[141] Wendy A. Whiteford,[142]  and assistant Linda

13          Wetsch), Caroline Cosgrove[143] (Placentia), Grace Jeng,[144] Helene
            Schlindwein[145](Cerritos), Rolf Rudestam, The Rudestam Group[146]

14          (Newport Beach), Dr. Henry Huey,[147] John N. Harman, III[148]
            (Placentia), Dr. Harry L. Stover[149] (Thousand Oaks), Dr. John M.

15          Salzer[150] (Santa Monica), NE Moyer[151] (Newport Beach),and Else
            Kooi[152] (Los Altos).

16          [Exhibit A, note] 136:  05/31/01 Supplemental Protest Letter
            (1991), p. 66.

17

18          [Exhibit A, note] 137:  FTB_Philips 0006614, 05/09/08 Trial
            Testimony of Gilbert P. Hyatt, p. 104 and GB00437-457.

19          [Exhibit A, note] 138:  FTB Trial Exhibit 2001-0849-51.

20          [Exhibit A, note] 139:  FTB_Philips 0006396-97, 6400, 6411,
            6416-17, 6432, 6454, 6460, 6463, 6473, 6477, 6479, 6491-92,

21

22

23  [315] See 1992 ASAB, § 1.5.5 and ASAB Exhibit 4, Table of "Mr. Hyatt's Temporary or
    Transitory Purposes Outside of Nevada".

24  [316] Rebuttal to FTB Att. A/F, Sections I. A., II. C., April 6, 1992; Hyatt Post-DP CDE
    Affidavit, September 6, 2016, ¶¶ 555-560.

135

1    6500-03, 6518, 6524, 6531-32, 6538-44, 6547-48, 6554-57.

2    [Exhibit A, note] 140:  FTB_Philips 0006531.

3    [Exhibit A, note] 141:  FTB_Philips 0006696-98.

4    [Exhibit A, note] 142:  FTB_Philips 0006603, 6618.

5    [Exhibit A, note] 143:  Philips 7/31/2011 00603-607, FTB_Philips
     0006393, 6419, 6439, 6457, 6470, 6538, 6542, 6577, 6591, 6974,
6    7024, and 7032, 08/16/05 Deposition of Gilbert P. Hyatt, Vol. 2,
     302:19-304:4 and 08/17/05 Deposition of Gilbert P. Hyatt, Vol. 3,
7    pp. 469-470 and Deposition Exhibit 620 and 622.

8    [Exhibit A, note] 144:  FTB's Opening Brief (1991), pp. 24-27, 29-
     31, 96-98, FTB's Reply Brief (1992), pp. 26-29 and Hyatt Trial
9    Testimony, 05/08/08 Trial Transcript, pp. 80-81 and Hyatt Trial
     Exhibit 29.

10   [Exhibit A, note] 145:  FTB_Trial Exhibit 2001-914-918,
     FTB_Philips 0006689, 2/19/00 Deposition of Helene Christine
11   Schlindwein, H 00667-68, FTB 102505, and ROB (1991), pp. 98-
     99.
12
     [Exhibit A, note] 146:  FTB Additional Brief (1992), pp. 5-8 and
13   FTB Exhibit 17-3, 6, 9, 10, and 11-14 to the 04/07/16 Deposition
     of Charles T. Cameron.
14
     [Exhibit A, note] 147:  01/17/06 Deposition of Gilbert P. Hyatt,
15   Vol. 6, pp. 1059-1063 and 05/27/09 Examination of Henry Huey,
     Phd.
16
     [Exhibit A, note] 148:  FTB_Philips 0006690.
17
     [Exhibit A, note] 149:  FTB_Philips 0006649, 6686.
18
     [Exhibit A, note] 150:  FTB_Philips 0006651.
19
     [Exhibit A, note] 151:  FTB_Philips 0006669-70.
20
     [Exhibit A, note] 152:  FTB_Philips 0006657.
21
     These FTB statements are false.  First, Philips, not I, "obtained professional and/or support

22   services from numerous individuals in California with respect to the Hyatt v. Boone

23

24
                                        136


                                                                              RJN1414

1   interference." I consulted with them as the main witness (the inventor of the patented invention)

2   to support Philips on the interference process.

3       304.    Second, these professionals were not paid on behalf of me, they were paid by

4   Philips because Philips had the responsibility to defend the patents.

5       305.    Third, these California professionals were not utilized by me, they were utilized

6   by Philips because Philips had the responsibility to defend the patents.

7       306.    Fourth, the July 1991 Philips Agreement gave control and financial responsibility

8   for the interference to Philips.[317]  In addition, Philips was given exclusive rights and the

9   responsibility to license my patents.  Philips by itself created and managed the Philips licensing

10  program, ¶¶ 67-73, above.  See 1991 ASAB, §§ 1.7.3, 1.7.5.  Furthermore, experts who

11  contributed to the interference came from across the country and were chosen for their expertise,

12  not for their state of residence.[318]

13      307.    The FTB 1991 Concluding Summary at p. 19 states the following.

14          Other California attorneys and professionals consulted by Mr.
            Hyatt in 1991 and 1992 time period include Roger McCaffrey[153]
15          (Anaheim), Dale Fiola (Anaheim), the law firm of Goldberg &
            Andrus (Studio City), Gerald Traumueller,[154] James R. Traut,[155]
16          Loeb & Loeb (Los Angeles),[156] Steven G. Hammer (Santa
            Barbara),[157] and Will Connell.[158]

17          [Exhibit A, note] 153:  FTB Trial Exhibit 2001-0922-923.

18          [Exhibit A, note] 154:  H00667-68.

19          [Exhibit A, note] 155:  08/06/10 Affidavit of James R. Traut.

20          [Exhibit A, note] 156:  FTB Trial Exhibit 2001 0807-809.

21          [Exhibit A, note] 157:  12/17/12 Affidavit of Steven G. Hammer,
            pp. 1-8 (California Financial Advisor, Santa Barbara, CA).

22

23  _____

24      [317] July 1991 Philips Agreement, Section 5.3(c).
        [318] 1991 AOB, §II.C.14.a.

                                    137

[Exhibit A, note] 158: 07/10/12 Affidavit of Will Connell, ¶8, 3:13-16 and FTB's Attachment E, pp. 184-186.

These FTB statements are false. Mr. McCaffrey did not represent me during the disputed period, he represented my mother's estate in which I was the executor.

308.   I do not recall any occasion when Dale Fiola represented me during the disputed period and FTB identifies no such occasion.

309.   Goldberg & Andrus did not represent me during the disputed period.

310.   I do not recall any occasion when Gerald Traumueller represented me during the disputed period and FTB identifies no such occasions. The Las Vegas check I wrote to him on December 18, 1991, H 00667, was for services performed before September 26, 1991, when I moved to Las Vegas.

311.   As stated in Mr. Traut's Affidavit,[319] Mr. Traut worked on a wrongful death suit that ended about 1990. Mr. Traut did not represent me during the disputed period, long before the disputed period he represented my mother's estate in which I was the executor.

312.   Loeb and Loeb answered the FTB March 31, 1995, Demand letter by stating that Loeb and Loeb "never did work for" me, A00797. Loeb and Loeb did perform some services for me long before the disputed period, and I made a final payment for that long past service during the disputed period and terminated the engagement. I did not use Loeb and Loeb during the disputed period or thereafter.

313.   Steve Hammer became my investment adviser during the disputed period. He advised me on the acquisition of many Nevada situs investment accounts and came to visit me in Las Vegas on multiple occasions. FTB has not contended that use of an investment advisor who lives in California is evidence of California residency. I met with Mr. Hammer at my Las Vegas

---

[319] Affidavit of James R. Traut, August 6, 2010, ¶5, Annex XI, Ex. 27.

138

RJN1416

1    apartment on November 4, 1991.[320]  On November 25, 1991, I again met with Mr. Hammer at

2    my Las Vegas apartment.[321]  On April 25, 1992, I met with Mr. Hamer at my Las Vegas Tara

3    house.[322]

4         314.    Will Connell is a former college roommate and longtime friend.  Mr. Connell was

5    not a paid professional consultant as falsely alleged by FTB.  Mr. Connell visited me at my Las

6    Vegas Tara home in May 1992.[323]

7         315.    The FTB 1991 Concluding Summary at p. 20 states the following.

> Mr. Hyatt did not have a business license to work from either his Wagon Trails apartment or his Tara home.[159]  He did not even apply for a business license from the City of Las Vegas until December 10, 1992.[160]

> [Exhibit A, note] 159:  08/15/05 Deposition of Gilbert P. Hyatt, Vol. 1, 100:19-101:2.

> [Exhibit A, note] 160:  FTB Trial Exhibit 2001-1210-1218 and 05/23/00 Deposition of Michael Kern, Vol. 1, pp. 134-135.

This FTB statement is misleading.  I did not operate a business from either my Las Vegas Wagon Trails Apartment or my Las Vegas Tara home.  I had no need for a business license.  I had no employees or customers or other characteristics of a business.

16        316.    The FTB 1991 Concluding Summary at p. 20 states the following.

> Mr. Hyatt's conduct of business and associations with Nevada professionals was limited to his search for, and eventual purchase of, the Tara home which did not begin until mid-December 1991. Mr. Hyatt did not meet or consult with his Nevada accountant until mid-March 1992 and did not lease or rent any commercial office space in Nevada during the disputed period.[161]  Mr. Hyatt has no recollection of Mr. Roth of PSBC visiting his Wagon Trails

---

[320] Rebuttal to FTB Att. A/F, Section I. A, November 4, 1991; Affidavit of Steven G. Hammer, December 17, 2012, ¶ 7.

[321] Rebuttal to FTB Att. A/F, Section I. A, November 25, 1991; Affidavit of Steven G. Hammer, December 17, 2012, ¶¶15-16.

[322] Affidavit of Steven G. Hammer, December 17, 2012, ¶¶23-24.

[323] Affidavit of Will Connell, July 12, 2012, ¶ 11, Annex XXV, Ex. 11.

139

apartment.[162]

[Exhibit A, note] 161:  05/24/00 Deposition of Michael Kern, Vol. 2, pp. 312-320 and FTB Exhibit N, Tab 42 (H015833).

[Exhibit A, note] 162:  08/15/05 Deposition of Gilbert P. Hyatt, Vol. 1, 178:25-179:2.

These FTB statements are false.  First, my associations with Nevada professionals was not limited to my search and purchase of my Tara home.  See ¶¶ 293-297, 316-219, 327, 566, 574-579, 581, 584, 666 herein.

317.    I worked with the Nevada Development Association (NDA) from October 1991.[324]  I engaged Nevada attorney, Kenneth Woloson, during the disputed period and I still use his services now more than 25 years later.[325]  I purchased an automobile insurance policy and a renter's insurance policy from a Las Vegas State Farm insurance agent, Bob Huddleston, in December 1991 and I continued to purchase my automobile and a homeowner's insurance from him for more than 25 years.[326]  I worked with an escrow officer, Joann Frank, in 1991 during the disputed period through the close of escrow on my Tara house in April 1992.[327]  I worked with a homebuilder and philanthropist, Bob Shulman, regarding bringing Japanese factories to Nevada from about November 1991.[328]  I worked with computer specialist and president of a Las Vegas computer club, Trent Eyler, from October 1991.[329]  I prayed with Rabbi Hecht of Temple Beth

---

[324] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 106.
[325] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 86.
[326] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 84.
[327] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 85.
[328] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 77; Hyatt Post-DP CDE Affidavit, September 6, 2016, ¶ 149.
[329] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 14.

140

1    Am as of October 1991 and with Rabbi Akselrad of Congregation Ner Tamid as of November

2    1991.[330]

3          318.    Second, my search for a Las Vegas house to purchase began long before

4    December 1991. I worked with many real estate professionals in Las Vegas to locate a house to

5    purchase.[331] I began to search for a Las Vegas house to purchase in November 1990 when I

6    decided to move to Las Vegas. I was present in Las Vegas for the Comdex trade show in which

7    I was a special speaker and I spent effort with realtors looking at houses for sale. While

8    preparing for my move in 1991, I travelled to Las Vegas several times and looked at houses to

9    purchase.[332] In September 1991, just before my move to Las Vegas, I travelled to Las Vegas and

10    looked at houses to purchase.[333] Soon after my move to Las Vegas, I spent much time with

11    realtors looking at houses to purchase. I met realtor Walt Shoemaker in October 1991, shortly

12    after I moved to Las Vegas.[334] Mr. Shoemaker showed me numerous houses to purchase and

13    made purchase offers with large cash deposits on several houses.[335] During the 1991 disputed

14    period, I met realtor Ron Stephenson who showed me numerous houses and made purchase

15    offers with large cash deposits on several houses.[336] About October 1991 I met realtor Tom

16    McGuire who showed me many houses and made purchase offers with a large cash deposit on

17    the Tara house which he purchased for me and which I still reside in now 25 years later.[337] Mr.

18    McGuire counseled me on "many" other properties before I made an offer on the Tara house on

19    _____

20    [330] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶¶ 17, 80.
   [331] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 45-51.

21    [332] Affidavit of Gilbert P. Hyatt, May 18, 2001, ¶ 3.
   [333] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.8, p. 38.

22    [334] Affidavit of Walter Shoemaker, July 22, 1998, ¶ 3.
   [335] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 78.

23    [336] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 83.
   [337] Affidavit of Thomas McGuire, March 31, 2012, ¶ 95, Annex XXV, Ex. 55; Hyatt

24    Supp. CDE Affidavit, September 6, 2016, ¶ 82.

RJN1419

1  December 16, 1991.[338]  I made hand written notes while "walking through" several houses with

2  Mr. McGuire.[339]  Mr. McGuire made a representation on my purchase offer for the Las Vegas

3  Tara house that "[he] has counsiled [sic] buyer on many properties".[340]

4        319.    Third, I had been looking for a house to purchase for more than a year by

5  mid-December 1991; I did not just begin house hunting in mid-December 1991 as falsely alleged

6  by FTB.  I had worked with many real estate professionals in Las Vegas to locate a house to

7  purchase by December 1991.[341]  I had reviewed and "walked-through" many houses and,

8  through my realtors, started to make purchase offers on houses by December 1991.  Shortly

9  thereafter, Mr. McGuire's offer on the Tara house was accepted, a short 2 ½ week escrow

10  followed, escrow closed on April 3, 1992, I moved into my Las Vegas Tara home on April 3,

11  1992, and I still reside in my Las Vegas Tara home today.

12        320.    Fourth, I have no idea why FTB would state that "Mr. Hyatt has no recollection of

13  Mr. Roth of PSBC visiting his Wagon Trails apartment," there was no reason for Mr. Roth to

14  visit me in my Nevada apartment.  Mr. Roth did not live in Las Vegas.  However, many of my

15  friends and associates did visit me at my Las Vegas apartment, 15 eyewitnesses testified that

16  they visited me at my Las Vegas apartment, and two eyewitnesses testified that they stayed with

17  me at my Las Vegas apartment.[342]

18        321.    The FTB 1991 Concluding Summary at p. 20 states the following.

19             Moreover, the Wagon Trails lease, signed by Mr. Hyatt,

20  _____

21  [338] Affidavit of Thomas McGuire, March 31, 2012, ¶ 58, Annex XXV, Ex. 55; P05650.

22  [339] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 174; Affidavit of Thomas McGuire, March 31, 2012, ¶ 48, Annex XXV, Ex. 55;

23  [340] Hyatt DP CDE Affidavit, July 24, 2012, ¶ 47; Affidavit of Thomas McGuire, March 31, 2012, ¶ 19, Annex XXV, Ex. 55;

[341] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 45-51.

24  [342] Updated Testimonial Topics, Exs. T018, T021.

RJN1420

states in pertinent part: "Use of Premises by Tenant: The said premises are to be used and occupied by Tenant and those designated herein for residential purposes only and for no other purposes, and no trade, business or occupation shall be carried on therein.[163]  Even Mr. Hyatt concedes he did not operate a business in his Wagon Trails apartment but maintained a "small home office" for his "own personal work"[164]

[Exhibit A, note] 163:  03/19/12 Declaration of Dimbat, Exhibit 1 (Hyatt's Wagon Trails Lease), section 16 (H01250).

[Exhibit A, note] 164:  08/15/10 Supplemental Affidavit of Gilbert P. Hyatt, Section 1.4, 22:2-3.

I did not carry on a "trade, business or occupation" in my Las Vegas apartment.[343]

322.   The FTB 1991 Concluding Summary at p. 20 states the following.

Mr. Hyatt received a Bachelor of Science degree in electrical engineering from the University of California at Berkeley in 1959 and a Master of Science degree in electrical engineering from the University of Southern California at Los Angeles in 1965. He has worked in the electronics field continuously since 1959. Mr. Hyatt was a licensed and/or registered Professional Engineer in the State of California from March 14, 1979 to September 30, 1995.  Mr. Hyatt's last address of record filed with the Board for Professional Engineers and Land Surveyors was P.O. Box 3357, Cerritos, California, 90703.[165]  Mr. Hyatt has not offered any evidence of a professional engineering license or registration from Nevada or elsewhere.

[Exhibit A, note] 165:  12/18/89 Affidavit of Gilbert P. Hyatt, p. 1, para. 1 and FTB Exhibit T, tab 10.

This FTB statement is misleading.  I did not need and I did not use a professional engineer license.  I consulted for large aerospace companies such as Hughes and TRW.  I was given the professional engineer license as a result of grandfathering of engineers by California.  FTB has not offered any documents signed by me regarding a professional engineer license.

---

[343] Supplemental Affidavit of Gilbert P. Hyatt, August 15, 2010, p. 22, Annex XI, Ex. 13; 1991 AOB, §§ II.C.15-17, pp. 36-37.

143

RJN1421

323.    My aerospace consulting work terminated well before September 26, 1991, when I moved to Las Vegas and I had no reason to use a professional engineering license in California, Nevada or elsewhere.[344]

324.    The FTB 1991 Concluding Summary at p. 21 states the following.

> In 1991, the La Palma Kiwanis nominated, and the City of La Palma honored Mr. Hyatt as a resident inventor of the microprocessor through a bronze plaque placed on the City's new Wall of Fame. In accepting the honor, Mr. Hyatt was quoted as saying "[t]his city gives me the sense of freedom and flexibility to work, think and live [.]"[166] Mr. Hyatt subsequently appeared as the Grand Marshall in the November 9, 1991 annual La Palma Day Parade.[167]

> [Exhibit A, note] 166:  FTB Exhibit DD, Tab 1.

> [Exhibit A, note] 167:  FTB Exhibit DD, Tab 2 and 1991 La Palma Day Parade Script and List of Grand Marshall honorees.

I made the statement about La Palma "giv[ing] me the sense of freedom and flexibility to work, think and live" for a newspaper article published on June 6, 1991. FTB failed to inform your Board that the article was published more than three months before I moved to Las Vegas.[345] The La Palma City Council's consideration of my name for a La Palma wall of fame occurred on March 5, 1991, six months before I moved to Las Vegas.[346] On November 9, 1991, I made a round trip visit from Las Vegas to California to participate in the La Palma parade.

325.    The FTB 1991 Concluding Summary at p. 21 states the following.

> Despite efforts to confirm Mr. Hyatt's representations concerning his alleged Nevada connections, respondent could not verify Mr. Hyatt's claimed Nevada civic and social affiliations

---

[344] 1991 AOB, § II.C.17.

[345] Frank, Robert, "La Palma honors inventor in New Wall of Fame", Orange County Register, June 6, 1991, FTB 1991 Concluding Summary, Exhibit A, note 166.

[346] Agenda Item, La Palma City Council, March 5, 1991, FTB 1991 Concluding Summary, Exhibit A, note 166.

144

RJN1422

started before April 1992. Respondent's letters to a Las Vegas computer group and temple via addresses that Mr. Hyatt's representatives provided were returned as undeliverable/forward expired, or were met with failure to respond.[168] Mr. Hyatt's attorney later informed respondent that Mr. Hyatt provided an incorrect temple in the initial response, and gave the name of another temple.[169] The second temple did not respond to respondent's inquiry.[170]

[Exhibit A, note] 168: FTB Trial Exhibit 2001-590-594(01/26/95, Temple Beth Am), 2001-601-602 (02/17/95, Temple Beth Am, no response received), and 2001-0985 Personal Computers Users Group of Las Vegas (forward expired).

[Exhibit A, note] 169: FTB Trial Exhibit 2001-1325, p. 4, fn. 3 ("It appears that Mr. Hyatt inadvertently listed Temple Beth Am rather than Congregation Ner Tamid on his Form 3850F.")

[Exhibit A, note] 170: FTB Trial Exhibit 2001-736-737 (03/23/95, Congregation Ner Tamid, no response received.)

This FTB statement is misleading. First, it is not my fault that FTB could not verify my connections. FTB waited years from when the connections occurred (1991) until it sent out its demand letters. Locations change in a fast growing city like Las Vegas in four years. However, my representatives provided significant documentary and eyewitness testimonial evidence to support my many civic and social connections in Las Vegas beginning in October 1991.[347]

326. Second, there is substantial evidence that the auditor, Sheila Cox, who was found by the Nevada jury and confirmed by the Nevada Supreme Court to have committed fraud in the Hyatt audits, falsified the audit file. Any statement by Ms. Cox in the audit file should be disregarded by your Board. Ms. Cox in bad faith overstated the 1992 tax assessments by $24 million. See 1991 ASAB, §§ 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10; 1992 ASAB, § 1.7.5. Ms. Cox also fabricated many false statements regarding my stay at the Wagon Trails Apartments. These

---

[347] Hyatt Protest Letter, June 20, 1996, p. 25, "G. Mr. Hyatt has Enjoyed His Life in Las Vegas Since his Move There in September 1991"; Hyatt Supp. CDE Affidavit, September 6, 2016, ¶¶ 9-17; Updated Testimonial Topics, Exs. T040, T041, T042, T043.

145

RJN1423

1  false statements of Ms. Cox are rebutted by the testimony of the Wagon Trails Apartments

2  employees at Section II.B., October 8, 1991, in my Rebuttals to FTB's Att. A/F.  Third, my

3  representatives got evidence to support my connections.  For example, I met with Rabbi and

4  Rebbetzin Hecht on October 3, 1991, and started attending temple services on October 4, 1991,

5  almost immediately after moving to Las Vegas.  The meetings are verified by the affidavits of

6  Rabbi Hecht and Rebbetzin Hecht.[348]  I joined Congregation Ner Tamid on November 15, 1991,

7  by submitting an application, H 09679, and a check, CCC 02623-02624.[349]  My membership in

8  Congregation Ner Tamid is confirmed by Rabbi Akselrad.[350]  My participation in the Las Vegas

9  computer group is well supported and started during 1991 COMDEX about October 22 or 23,

10  1991.[351]

11        327.    Fourth, my use of non-California professionals and my Nevada close connections

12  are discussed in 1991 AOB.[352]  See ¶¶ 293-297, 316-219, 327, 566, 574-579, 581, 584, 666

13  herein.

14        328.    The FTB 1991 Concluding Summary at p. 21 states the following.

15               Mr. Hyatt subsequently provided information including an
       out of sequence, cancelled check not cashed until December 17,
16     1991 purporting to establish new membership with the
       Congregation Ner Tamid.[171]  Rabbi Akeslrad [sic] of Congregation
17     Ner Tamid, later told an investigator that he did not remember the
       name Gilbert Peter Hyatt.[172]  Mr. Hyatt's son testified that he had
18     not attended any temple services with his father from 1991 to
       2005.[173]  Mr. Cowan subsequently represented that Mr. Hyatt

19

20  _____

21  [348] Rebuttal to FTB Att. A/F, Section I. A., October 3, 1991; Affidavit of Dr. Mel Hecht,
     August 6, 2010, ¶¶ 4, 18, Annex XI, Ex. 9; Affidavit of Michelina Hecht, August 6, 2010, ¶¶ 4,
     15, Annex XI, Ex. 9.

22  [349] Rebuttal to FTB Att. A/F, Section I. A., November 15, 1991.
     [350] Affidavit of Rabbi Sanford Akselrad, June 27, 2013, ¶¶ 6, 9-11.

23  [351] Las Vegas Computer Group:  Rebuttal to FTB Att. A/F, Section I. A., October 22,
     1991; Affidavit of Trent Eyler, May 25, 2010, ¶¶ 18, 20-22, Annex XI, Ex. 2.

24  [352] 1991 AOB, § II.C.14.b.-c; § II.C.20.

146

RJN1424

1         joined the Las Vegas PC User's Group in May 1992.[174]

2         [Exhibit A, note] 171: FTB Trial Exhibits 2001-1333 and 2001-2066.

3         [Exhibit A, note] 172: 05/22/09 Interview of Rabbi Akselrad.

4         [Exhibit A, note] 173: 11/18/05 Deposition of Daniel Hyatt, Vol.

5         1, 204:16-18.

6         [Exhibit A, note] 174: Hyatt Trial Exhibit 296-00027 (06/20/96 Hyatt Protest Letter for TY 1991, p. 25.)

7 This FTB statement is false. Rabbi Akeslrad in his affidavit testified that I applied for

8 membership at Congregation Ner Tamid on November 15, 1991, as both my membership

9 application and check was dated that day and he explained why my check was not cashed until

10 December 17, 1991. Rabbi Akselrad has explained that the first meeting of the Board of

11 Directors after that date was December 10, 1991, at which meeting my membership application

12 was approved.[353] Rabbi Akselrad wrote a welcoming letter to me shortly thereafter on

13 December 16, 1991, H 08912, and my check, CCC 02623-02624, was cashed on December 17,

14 1991. William Savage,[354] a paid FTB investigator, who was twice fired by the State of Nevada

15 for dishonesty and has no credibility, [355] not Rabbi Akselrad, stated in May 22, 2009, that the

16 Rabbi did not remember my name. Rabbi Akselrad remembers meeting me in November 1991

17 and remembers that I asked him about Operation Exodus in December 1991 and that I made a

18

19

20

21 [353] Affidavit of Rabbi Sanford Akselrad, June 27, 2013, ¶¶ 9-11.
[354] Memorandum of Interview of William Savage, May 22, 2009, Exhibit A, note 172, FTB 1991 Concluding Summary.

22 [355] See particularly, Section III.B.5., "The Testimony of Mr. Savage Has Been Expressly Refuted by 15 Witnesses", Appellants Motion to Strike and Objections to FTB Private

23 Investigator and FTB Attorney Declarations; see also ASAB Attachment 1, pp. 25-38; Table of William Savage's Fraud and Dishonesty, Savage False Statements Table, and Supplemental

24 Savage False Statements Table.

1    donation to the charity.[356]  According to Mr. Savage, Rabbi Akselrad found records "that would

2    substantiate" my membership in Congregation Ner Tamid.[357]

3         329.    My son Dan attended worship services with me at Temple Beth Am on November

4    29, 1991, the day after Thanksgiving while he visited me in Las Vegas.[358]

5         330.    I became affiliated with the Las Vegas Personal Computer Users Group in

6    October 1991.  My affiliation continued into 1992 and thereafter.  I continued to attend meetings

7    and speak at meetings of the Las Vegas Personal Computer Users Group in 1991, 1992, and

8    thereafter.[359]

9         331.    The FTB 1991 Concluding Summary at p. 21 states the following.

10              Contradicting assertions of civic involvement made by or
                on behalf of Mr. Hyatt, the Nevada Development Authority had no
11              record of his membership;[175] the Nevada Governor's office had no
                record of any contact with Mr. Hyatt;[176] and the Nevada school
12              tutoring program that Mr. Hyatt claimed to have assisted beginning
                in April 1992 could not verify his alleged volunteer activity.[177]

13              [Exhibit A, note] 175:  FTB Trial Exhibit 2001-0570-572.

14              [Exhibit A, note] 176:  FTB Trial Exhibit 2001-0997-998.

15              [Exhibit A, note] 177:  FTB Trial Exhibit 2001-1008-1009.

16    These FTB statements are false.  Documentary evidence and eyewitness testimony support my

17    "civic involvement".

18

19

20    _____

[356] Affidavit of Rabbi Sanford Akselrad, June 27, 2013, ¶¶ 6, 7.
21    [357] Memorandum of Interview of William Savage, May 22, 2009, Exhibit A, note 172,
      FTB 1991 Concluding Summary.
22    [358] Rebuttal to FTB Att. A/F., Section I. A., November 29, 1991; Affidavit of Michelina
      Hecht, November 16, 2008, ¶ 18, Annex VII, Ex. 13. Affidavit of Dr. Mel Hecht, November 12,
23    2008, ¶ 18, Annex VII, Ex. 12; Affidavit of Helene Behring, August 16, 2012, ¶ 10.
      [359] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 14; Affidavit of Trent Eyler,
24    November 13, 2008, ¶ 10; Affidavit of Trent Eyler, May 25, 2010, ¶¶ 18, 24.

148

RJN1426

332.    There is substantial evidence that the auditor, Sheila Cox, who was found by the Nevada jury and confirmed by the Nevada Supreme Court to have committed fraud in the Hyatt audits, falsified the audit file.  Any statement by Ms. Cox in the audit file should be disregarded by your Board.  Ms. Cox in bad faith overstated the 1992 tax assessments by $24 million.  See 1991 ASAB, §§ 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10; 1992 ASAB, § 1.7.5.  Ms. Cox also fabricated many false statements regarding my stay at the Wagon Trails Apartments.  These false statements of Ms. Cox are rebutted by the testimony of the Wagon Trails Apartments employees at Section II.B., October 8, 1991, in my Rebuttals to FTB's Att. A/F. Shortly after I moved to Las Vegas on September 26, 1991, I contacted the Nevada Development Authority.  I had a vision of attracting Japanese businesses to build factories in Nevada in part because of the Nevada International Trade Zones.  I worked with the Nevada Development Authority from October 1991 and through 1992, with Nevada Governor Robert Miller in 1992, with the Nevada Commission on Economic Development in 1992, and with Las Vegas developer and businessman, Robert Schulman, in 1991 and 1992 to develop this vision.  I put in a considerable amount of time working in Las Vegas on this project and having meetings in Las Vegas on this project.[360]

333.    FTB disingenuously states that "the Nevada Development Authority ["NDA"] had no record of his membership."  I did not state that I was a member of the NDA, I worked with the NDA on projects.  It is my understanding that membership in the NDA was for Nevada corporations.

---

[360] Hyatt Post-DP CDE Affidavit, September 6, 2016, ¶¶ 171-185; Affidavit of Robert Schulman, April 3, 2012, ¶¶ 6, 7.

149

RJN1427

334.    I met with Governor Miller several times, he authorized me to use his conference room for meetings, and he gave me an introduction to Cecelia Colling, Acting Director of the Commission on Economic Development (H 06040-H06042). I had meetings with company executives in Governor Miller's conference room in Las Vegas with the support of his secretaries in 1992.[361]

335.    I met with the superintendent of Clark County schools Brian Cram and his business manager, Ronald Jones, in Las Vegas on various occasions in 1992. I was a *pro bono* consultant to Superintendent Cram and Mr. Jones regarding technological education for students and regarding Information Technology for the Clark County school system.[362]

336.    The FTB 1991 Concluding Summary at p. 21 states the following.

> Mr. Hyatt did not terminate his California homeowner's exemption in 1991. Mr. Hyatt's termination notice was sent to the Orange County Assessor on or about February 10, 1992.[178]

[Exhibit A, note] 178: Exhibit LL, Tab 9: See PBTK01188-89.

This FTB statement is misleading. I timely filed my termination notice for my California homeowner's exemption.

337.    Having sold the Jennifer Circle house on October 1, 1991, I timely filed the Homeowner's Exemption Termination Notice on or about February 10, 1992, and stated that I moved in October 1991, PBTK 01188-01189. Former Orange County Assessors Bradley Jacobs and Webster Guillory have confirmed my homeowner's exemption was properly and timely terminated following the sale of the Jennifer Circle house on October 1, 1991.[363]

---

[361] Hyatt Post-DP CDE Affidavit, September 6, 2016, ¶¶ 168, 177-179.
[362] Hyatt Post-DP CDE Affidavit, September 6, 2016, ¶ 170; H 020367, H 020389.
[363] Declaration of Bradley L. Jacobs, November 2, 2012, ¶ 89; Declaration of Webster Guillory, October 8, 2015, ¶ 22; Rebuttal to FTB Att. A/F, Section I. E., February 10, 1992.

150

RJN1428

338. The FTB 1991 Concluding Summary at p. 22 states the following.

> On April 13, 1992, Mr. Hyatt signed and filed a 1991 California Nonresident/Part Year Resident Tax Return asserting he became a nonresident of California on October 1, 1991 and "lived" for 273 days in California.[179]  By his own admission, Mr. Hyatt triggered California's full year residency presumption for tax year 1991.[180]

[Exhibit A, note] 179:  FTB Trial Exhibit 2001-00002, 00004.

[Exhibit A, note] 180:  California Revenue and Taxation Code, section 17016.

This FTB statement is false.  I did move to Las Vegas before October 1, 1991.  I moved to Las Vegas on September 26, 1991, and I had absences from California during 1991 prior to October 1, 1991.  The tax code refers to time spent in California, not time lived in California.[364]  I spent less than 9 months in California in 1991 and that did not trigger the California full year residency presumption of California Revenue Taxation Code section 17016.  As explained at 1991 ARB, Section II. C., pp. 68-73, FTB has the burden of proving I spent (not just lived) **more** than nine months in California (exclusive of presence for a temporary or transitory purpose) and FTB has failed to carry that burden.  Between September 26, 1991, and the end of 1991 I spent only 17 part days in California, each time for a temporary or transitory purpose, and zero full days in California.[365]

339. The FTB 1991 Concluding Summary at p. 22 states the following.

> Mr. Hyatt's 1991 federal income tax return also fails to disclose any moving related expenses.[181]  Mr. Hyatt did not file a California personal income tax return for 1992.

[Exhibit A, note] 181:  FTB Exhibit E, tab 44, Schedule A, no. 18 (A02177.23).

---

[364] California Revenue and Taxation Code, section 17016.
[365] Rebuttal to FTB's Att. A/F, Section I. A., day by day analysis, September 26, 1991, through December 31, 1991.

151

RJN1429

1  These FTB statements need clarification. The absence of a moving expense on my 1991 part

2  year California tax return is not significant because I did not incur significant moving expenses.

3  See ¶ 22, above.

4      340.   I did not file a California personal income tax return for 1992 because I was a

5  Nevada resident for all of 1992, as indicated by my 1991 part-year California tax return.

6      341.   The FTB 1991 Concluding Summary at p. 22 states the following.

7          Mr. Hyatt continued to maintain at least two P.O. boxes in
         California. The P.O. Box application (Form1093) shows that
8          Gilbert P. Hyatt and Grace Jeng were listed as the box users of
         P.O. Box 3357 in Cerritos, CA. This post office box rental was
9          renewed by Mr. Hyatt on April 16, 1992, well after the date of Mr.
         Hyatt's alleged move to Nevada. On February 2, 1992, Mr. Hyatt
10         sent a letter to the Postmaster so as to add Grace Jeng and Barry
         Lee as authorized users of Cerritos P.O. Box. 3357.[182]

11         [Exhibit A, note] 182: FTB Trial Exhibit 2001-0328-331.

12

13  This FTB statement is false. I did not maintain two P.O. boxes in California and I did not renew

14  the Cerritos P.O. box on April 16, 1992.

15     342.   On October 21, 1991, I returned from New York, moved into my Las Vegas

16  apartment and submitted a change of address to Las Vegas for the Cypress U.S. Post Office box

17  and the Jennifer Circle house and then I let the Cerritos U.S. Post Office box expire.[366] Because

18  U.S. Post Office boxes were in short supply and there was a waiting list at the Cerritos Post

19  Office, the Cerritos Post Office would not let me transfer the Cerritos U.S. Post Office box to

20  anyone else. I therefore added Ms. Jeng and Barry Lee to the people who could access the U.S.

21  Post Office box, A 00280, but I could not take my name off because I would lose the P.O. box

22  rental. I gave the keys to the Cerritos U.S. Post Office box to Ms. Jeng at the time I sold the

23  _____

24     [366] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.

152

RJN1430

1   Jennifer Circle house to her on October 1, 1991, and thereafter Ms. Jeng accessed the Cerritos

2   U.S. Post Office box Box.[367]

3        343.    Ms. Jeng paid the fee to renew the Cerritos U.S. Post Office box on April 16,

4   1992, as shown by the receipt, A 00279, and as shown by Ms. Jeng's check.[368]  The FTB

5   statement that I paid for renewal of the Cerritos U.S. Post Office box on April 16, 1992, is

6   another FTB fabrication and is false.

7        344.    The FTB 1991 Concluding Summary at p. 22 states the following.

8            Mr. Hyatt's Jennifer Circle home is only 1.3 miles from the
             Cerritos Post Office.[183]
9
             [Exhibit A, note] 183:  Google Maps Exhibit.
10

11  This FTB statement is false.  I have not had a "Jennifer Circle home" since October 1, 1991,

12  when I sold my former Jennifer Circle house.[369]  I did not return to the Jennifer Circle house

13  between October 1, 1991, when I sold it, and late 1992 when I returned to Jennifer Circle for a

14  short visit.

15       345.    The FTB 1991 Concluding Summary at p. 22 states the following.

16            Based on the relevant factors in Bragg, and as more fully
             explained in the following Accuracy Related Fraud Penalty
17           discussion, Mr. Hyatt's closest connections were clearly to
             California during 1991.
18

19

20

21

22
            _____

23          [367] Affidavit of Grace Jeng, December 4, 2008, ¶ 22, Annex VII, Ex. 22.
            [368] Jeng check for payment of Cerritos P.O. Box, Exhibit 3, Affidavit of Grace Jeng,
            December 4, 2008, ¶ 22, Annex VII, Ex. 22.
24          [369] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.

                                        153

1    This FTB statement is false.  As clearly demonstrated in the above paragraphs as well as 1991

2    AOB, § II.C., pp. 15-38, the Bragg factors strongly favor my Nevada residency starting

3    September 26, 1991.[370]

4         346.    The fraud penalties were assessed to improperly coerce a settlement, not because I

5    committed fraud, 1991 AOB, § III., pp. 56-63.[371]  I decided to move to Las Vegas in 1990, I

6    prepared to move and I did move to Las Vegas in September 1991, and I have resided in Las

7    Vegas for the 25 years since that time.  I have provided overwhelming documentary and

8    eyewitness evidence of my leaving California and my continued residence in Las Vegas.  My

9    Rebuttal to FTB Att. A/F, Section I. A., shows on a day by day basis my location and activities

10   on virtually every day of the disputed period as supported by contemporaneous documentary

11   evidence and eyewitness testimony.  My physical presence during the disputed period and

12   beyond are also described in detail with extensive documentary evidence in my DP CDE

13   Affidavit, July 24, 2012, Supp. CDE Affidavit, September 6, 2016, and Post-DP CDE Affidavit,

14   September 6, 2016.  See in particular, my Supp. CDE Affidavit, September 6, 2016, ¶¶ 153-243

15   and Post-DP CDE Affidavit, September 6, 2016, ¶¶ 546-949.  My Updated Testimonial Topics

16   Table contains substantial eyewitness testimony regarding my preparation for my move to Las

17   Vegas, my move to Las Vegas, and my physical presence in Las Vegas during the disputed

18   period and continuously to the present.

19        347.    The FTB 1991 Concluding Summary at p. 22-23 states the following.

20            California may properly tax Mr. Hyatt on his 1991
              California source income.  (Rev. & Tax. Code, § 17041.)  Income

21            from intangibles such as patents is California source income and

22   _____

23   [370] 1992 ASAB, § 1.5, pp. 3-36; Hyatt 1991 Concluding Summary, §§ 1.6.1, 1.6.1.1-
     1.6.1.10.

24   [371] 1991 ASAB, § 1.9, pp. 47-59.

                                    154

                                                                              RJN1432

taxable in California if the intangibles acquired a business situs in this state. (Rev. & Tax. Code section 17952 and Cal. Code Regs, tit. 18, section 17952 (a).) The patents that formed the basis for the licensing agreements and income at issue were all researched, developed, applied for and issued while Hyatt admits he was a California resident.[184]

[Exhibit A, note] 184: ROB 1992, 16:1.

This FTB statement is false. My patents had a Nevada situs were I resided as of September 26, 1991. The situs of my patents became Nevada when I permanently moved to Nevada on September 26, 1991.

348.    I understand that patents are intellectual property having a situs that follows the owner. Thus, when I moved to Las Vegas on September 26, 1991, the situs of my patents became Nevada. I have never pledged, assigned or otherwise done anything that would cause my patents at issue to have a business situs separate from the Nevada situs of my patents. FTB has not identified a single document that purports to transfer the business situs of my Nevada situs patents to a California entity. The requirement for transferring the business situs of intangible personal property, such as a patent, is explained by the Code of Regulations.[372] To establish California sourcing income, the regulations require the "substantial use and value" of my patents to attach to and become an asset of the alleged California business (which must be separate from me personally because I am deemed under the statute to be a California *nonresident*). However, I did not and could not transfer the "substantial use and value" of my patents to an alleged California business because the July 1991 Philips Agreement granted Philips an exclusive license and thus the "substantial use and value" of my patents. At the same

---

[372] Intangible personal property has a business situs in this State if it is employed as capital in this State or the **possession and control** of the property has been localized in connection with a business . . . so that its **substantial use and value** attach to and become an asset of the business. . . ." Cal. Cod Regs., tit. 18, § 17952(c) (emphasis added).

155

1   time, Section 8.1 precluded me from making any commitments "in derogation of the rights and

2   licenses granted to Philips".[373]  FTB points out that my patents were "researched, developed,

3   applied for and issued" while I lived in California.  That makes no difference because the situs of

4   my patents moved with me to Nevada and the patents had no business situs separate from the

5   Nevada situs.

6       349.   The FTB 1991 Concluding Summary at p. 23 states the following.

7           The 1991 income at issue is from the Fujitsu and
        Matsushita license agreements effective as of October 24, 1991

8       and November 14, 1991, respectively.[185]  During the period that
        Hyatt admits he was a California resident, negotiations with Fujitsu

9       and Matsushita were virtually completed as 94% of the aggregate
        value of those contracts, paid on October 31, 1991 and November

10      15, 1991, respectively, had already been offered.[186]

11          [Exhibit A, note] 185:  See Respondent's Briefing, Attachment A,
        p. 46 and 57.

12          [Exhibit A, note] 186:  See Respondent's Briefing, Attachment A.

13      p. 29.

14  This FTB statement is false.  FTB contends that the Fujitsu and Matsushita patent licenses were

15  partly negotiated by September 26, 1991, when I moved to Nevada.  However, as David Leonard

16  told me in 1991, there is no such thing as a near patent agreement.  You either have an agreement

17  or you do not.  I was told by Mahr Leonard that the signing of the Fujitsu Patent Agreement was

18  uncertain as some of Fujitsu management did not want to take a license.  See the Fujitsu letter

19  dated December 5, 1991 (GLR00567-00568).

20

21

22

23  _____

24      [373] FTB_Philips 0000623.

156

RJN1434

350.   The Fujitsu Patent Agreement was signed on October 23, 1991,[374] and the Matsushita Patent Agreement was signed on November 14, 1991.[375]  Thus both Patent Agreements were signed long after September 26, 1991, when I moved to Las Vegas.

351.   I understand that I am a cash basis tax payer and taxation is based on the date of payment to me, not on the date a license agreement is signed.  The Fujitsu license payment was made to the benefit of Philips on October 31, 1991,[376] and the Matsushita license payment was made to the benefit of Philips on November 15, 1991.[377]  Both dates are long past the September 26, 1991, date on which I moved to Las Vegas and I thus understand that the license payments for my Nevada situs patents are taxable in Nevada, not California.  These two license payments were made to Philips in accordance with the July 1991 Philips Agreement and were initially deposited into the client trust account maintained for the benefit of Philips at the PSB&C law firm.[378]  The license payments were transferred from this trust account to my Nevada situs Franklin Fund investment account.  The sublicense payments in dispute were thus transferred to my Nevada situs personal account and had no contact with any California business entity that would provide a basis for California taxation.

352.   The July 1991 Philips Agreement[379] gave Philips exclusive rights and a fiduciary responsibility to license 23 of my patents.  I thus transferred the "substantial use and value" of my patents to Philips and I no longer had the right to license my own patents.  The law on

---

[374] H 017209-017222.
[375] H 017223-017237.
[376] GLR 03672.
[377] GLR 03785.
[378] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 18, Annex XII; Rebuttal to FTB Att. A/F, Section I. C., October 13, 1991.
[379] FTB_Philips 0000595-0000635.

157

RJN1435

1   "substantial use and value" is addressed in the 1991 ASAB § 1.8.5.4.2 and the

2   1992 ASAB § 1.7.1, 1.7.1.3, 1.7.2. See also ¶ 348 herein.

3       353.    I did not attempt to license my own patents because that would have breached

4   Section 8.1[380] of the July 1991 Philips Agreement. When I signed license agreements (which

5   was at the request of Philips) it was necessary for Philips to grant to me the authority to sign each

6   of those patent agreements through the [First], Second and Third Supplemental Agreements[381]

7   because Philips had the exclusive authority to license my patents (see 1991 ASAB 1.7.5). In

8   each case Philips retained a right of prior approval and indemnified me and held me harmless for

9   my signing the agreements. All of the disputed license payments were from sublicensing the

10  patents in issue, came from the ordinary course of licensing through the Philips Licensing

11  Program, but did not come from licensing by any California business entity.

12      354.    The FTB 1991 Concluding Summary at p. 23 states the following.

13          In addition, as set forth infra, the objective contemporaneous
            evidence acquired by respondent reveals that Mr. Hyatt
14          continuously conducted his patent-related business affairs from his
            Jennifer Circle residence throughout the contested time period.
15          Therefore, the patents that generated the income at issue in this
            appeal acquired a business situs in California which did not change
16          during the contested time.

17  This FTB statement is false. I did not return to the Jennifer Circle house between October 1,

18  1991, when I sold the house and late 1992, when I returned to Jennifer Circle for a short visit. I

19  did not conduct any "patent-related business affairs" at the Jennifer Circle house and FTB has

20  provided no credible evidence of such conduct. See ¶¶ 14, 89, 90, 205, 279, 376, 380 herein.

---

[380] FTB_Philips 0000623; 1992 ASAB, § 1.7.3, pp. 51-53.
[381] [First]Supplemental Agreement, FTB_Philips 0000666-0000673; Second
Supplemental Agreement, FTB_Philips 0000675-0000677; and Third Supplemental Agreement,
FTB_Philips 0000679-0000682.

158

355.     I understand that for sourcing to apply California law requires the "possession and control" of the patents to be localized in connection with a business in California "so that its "substantial use and value" attach to and become an asset of the business . . . ."[382] FTB has not identified a single document transferring the possession and control from me, who by definition must be a California nonresident sourcing to apply, to a taxable California entity.  Furthermore, the July 1991 Philips Agreement transferred the "substantial use and value" of my patents to Philips by giving Philips an exclusive right to license the patents and by prohibiting me from licensing the patents under Section 8.1.[383]  The situs of my patents remained with me in Nevada and did not reside with any California entity.[384]  The law on "substantial use and value" is addressed in the 1991 ASAB § 1.8.5.4.2 and the 1992 ASAB § 1.7.1, 1.7.1.3, 1.7.2.  See also ¶ 348 herein.

356.     The FTB 1991 Concluding Summary at p. 23 states the following.

> Respondent's more detailed discussion of the relevant sourcing factual and legal issues includes pages 23 to 45 and 92 to 95 of Respondent's Opening Brief for Taxable Year 1991(Case No. 435770); pages 1 to 30 of Respondent's Opening Brief for Taxable Year 1992,(Case No. 446509); pages 1 to 37 of Respondent's Reply Brief for Taxable Year 1992(Case No. 446509); Respondent's Additional Brief dated February 19, 2013, pages 1 to 13;and 15 to 30 of Respondent Additional Brief for Taxable Year 1992 dated July 16, 2014 (Case No. 446509).  Due to space constraints those discussions will not be repeated here but are incorporated by reference as if set forth fully herein.

FTB's assertions with respect to sourcing have been responded to and fully rebutted.[385]

---

[382] Cal. Code Regs., tit. 18, §17952(c).
[383] 1992 ASAB, § 1.7.3, pp. 51-53.
[384] 1992 ASAB, § 1.7.1.3, pp. 44-46.
[385] 1991 AOB, § IV; 1992 AOB, § V.; 1991 ARB, § IV.; 1992 ARB, § V.; 1992 ASB, § II.; AAB, § IV.; 1991 ASAB, §§ 1.7, 1.7.1, 1.7.3, 1.7.5, 1.7.6, 1.7.7, 1.7.9, 1.8.4.2, 1.8.4.3, 1.8.4.4, 1.8.4.5, 1.8.4.6, 1.8.4.7, 1.8.5; 1992 ASAB, §§ 1.6, 1.7; Appellant's Concluding Summary (1991), § 1.10; Appellant's Concluding Summary (1992), §§ 1.7, 1.10.

RJN1437

357.    The FTB 1991 Concluding Summary at p. 23 states the following.

> The evidence establishes that Mr. Hyatt's steadfast assertion that he permanently and unequivocally terminated his admitted multi-decade California domicile and residency and established residency in Nevada not later than October 1, 1991, remains devoid of merit and objective substantiation.

This FTB statement is false. FTB offers no evidence to support its incorrect conclusion. I permanently moved to Las Vegas on September 26, 1991, and a multitude of eyewitness testimony and documentary evidence supports my permanent residence in Las Vegas thereafter.[386] For example, 220 affidavits and declarations signed by more than 150 eyewitness attest to the facts in this case while 72 eyewitnesses testified about me moving away in 1991.[387] See ¶ 11, above; see also 1991 ASAB, § 1.4. The affidavits and declarations include more than 10,000 pages of exhibits.[388] I have also provided three comprehensive affidavits describing, authenticating, and attaching as exhibits thousands of pages of contemporaneous documentary evidence (CDE).[389]

358.    The FTB 1991 Concluding Summary at p. 23-24 states the following.

> Over time, Mr. Hyatt has changed his alleged departure from California to four different dates: October 1, 1991, September 25, 1991, September 24, 1991, and September 26, 1991.[187]

> [Exhibit A, note] 187: 08/15/10 Supplemental Affidavit of Gilbert P. Hyatt, section 1.2.1, pp. 4-7 and FTB's Attachment A (Revised), pp. 28-30 and 32-33.

This FTB statement needs clarification. My representatives and I worked to develop the facts of my move to find the correct date. See ¶ 22, above. The day I moved to Las Vegas I saw Dr.

---

[386] Appellant's Concluding Summary (1991), §§ 1.4, 1.5, 1.6, 1.7.
[387] Updated Testimonial Topics, Ex. T007.
[388] See 1991 ASAB, § 1.3.3, Updated Comprehensive List of Mr. Hyatt Witnesses.
[389] (1) Hyatt DP CDE Affidavit, July 24, 2012; (2) Hyatt Supp. CDE Affidavit, September 6, 2016; and (3) Hyatt Post-DP CDE Affidavit, September 6, 2016.

160

RJN1438

1  Hamer and then pulled a trailer load of my belongings to Las Vegas with my 1977 Toyota.  I

2  made several attempts to identify the exact date I moved within a short one week period from

3  September 24, 1991, to October 1, 1991.  I was able to identify a date of September 26, 1991, on

4  Dr. Hamer's bill and confirmed that I moved on that date.  A more detailed explanation is

5  provided in my 2010 Supplemental Affidavit.[390]

6       359.    The FTB 1991 Concluding Summary at p. 24 states the following.

7       During the more than 20 year life of this dispute, Mr. Hyatt has
   failed to provide any objective documentation of expenses incurred

8  with his alleged 273 mile (one direction) relocation or where he
   stayed once he allegedly arrived in Las Vegas.[188]

9       [Exhibit A, note] 188:  Google Maps, La Palma, California to Las

10  Vegas, Nevada via I-15, with no traffic, 3 hours and 53 minutes.

11  This FTB statement is false.  FTB is well aware that I did not incur moving expenses because I

12  moved to Las Vegas on September 26, 991, by pulling a trailer behind my 1977 Toyota.  I have

13  provided substantial evidence that I moved to Las Vegas in September 1991.[391]  See Hyatt DP

14  CDE Affidavit, July 24, 2012; Hyatt Supp. CDE Affidavit, September 6, 2016.

15       360.    The FTB 1991 Concluding Summary at p. 24 states the following.

16       Mr. Hyatt presents no objective, contemporaneous
   documentary proof which substantiates, in any way, the contention

17  that he moved to Las Vegas on or about September 26, 1991.
   There are no receipts for gasoline, food or other amenities typically

18  associated with multiple 546 mile round trips.  There are no
   receipts documenting a stay at the Continental Hotel for a period

19  exceeding two weeks, an explanation concealed for more than five
   years and the particulars of which, as explained above, contradict

20  established Continental Hotel practices and Las Vegas hotel
   ordinances and laws.

21

22

23  [390] Supplemental Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.2.1, pp. 4-8, Annex
   XI, Ex. 13.

24  [391] Updated Testimonial Topics, Exs. T008, T009, T010, T018, T021, T128, T019, T095,
   T022, T023, and T025.

1    This FTB statement is false.  FTB is well aware that I did not incur moving expenses because I

2    moved to Las Vegas on September 26, 991, by pulling a trailer behind my 1977 Toyota as stated

3    in ¶ 359, above,.  Further, I stayed at the Continental Hotel as a guest of a tour company and

4    there was no documentation with the hotel.  See ¶¶ 10, 31-35, 91, 95, 96, 675 herein.  However, I

5    have provided significant evidence that I moved to Las Vegas in September 1991.[392]  See Hyatt

6    DP CDE Affidavit, July 24, 2012; Hyatt Supp. CDE Affidavit, September 6, 2016.  See the

7    Updated Testimonial Topics: 28-witnesses testified about Mr. Hyatt's move away in September

8    1991; 22-Jennifer Circle neighbors testified about Mr. Hyatt moving away in 1991; 32-witnesses

9    testified about Mr. Hyatt's preparations to move to Las Vegas in 1991; 17-witnesses testified

10   about Mr. Hyatt's former Jennifer Circle house having little furniture and/or having packed boxes

11   before he moved to Las Vegas in 1991; 14-witnesses testified about Mr. Hyatt's former Jennifer

12   Circle house being nearly empty of furniture and furnishings before he moved to Las Vegas in

13   1991; 15-witnesses testified about Mr. Hyatt's possessions being carted off for storage or being

14   given away, or disposed of, or donated to charity; 3-witnesses testified that they helped Mr.

15   Hyatt move his belongings to storage prior to his move to Las Vegas in 1991; 4-witnesses

16   testified that they helped Mr. Hyatt pack his belongings for his move to Las Vegas in 1991; and

17   72-witnesses testified about Mr. Hyatt's move away in 1991.[393]

18        361.    I did not conceal my stay at the Continental Hotel.  I stayed at the Continental

19   Hotel as a guest of a tour company and there was no documentation for my stay with the hotel.  I

20   was given a room key by the tour company without registering at the hotel, I paid cash to the tour

---

22   [392] Updated Testimonial Topics, Exs. T008, T009, T010, T018, T021, T128, T019, T095,
23   T022, T023, and T025.
     [393] Updated Testimonial Topics: T006, T102, T002, T003, T004, T005, T116, T117,
24   T007, respectively.

162

RJN1440

1   company for my stay at the hotel, the Continental Hotel had no records of my stay and I had no

2   records of my stay. Nothing was concealed and no records were destroyed. There were no

3   records generated by the hotel. See ¶¶ 10, 31-35, 91, 95, 96, 675 herein. Testimony from 12

4   witnesses confirms that the Continental Hotel and other hotels in Las Vegas did not register tour

5   company guests[394] while 7 witnesses testified about the lack of tour company guest record

6   keeping by the Continental Hotel and other Las Vegas hotels.[395]

7       362.    The FTB 1991 Concluding Summary at p. 24 states the following.

8       On his part-year tax return for 1991, Mr. Hyatt stated,
under penalty of perjury, that he left California on October 1, 1991.

9   Mr. Hyatt himself later contradicts the accuracy of the statement
contained in his tax return. As evidence of his departure from

10   California, however, Mr. Hyatt points to two other documents
dated October 1, 1991. Those documents are a deed and a deed of

11   trust Mr. Hyatt contends memorialize his sale of a house located at
7841 Jennifer Circle, La Palma, California.

12

13   This FTB statement is false. I moved to Las Vegas on September 26, 1991. FTB offers no

14   evidence for its statement that I used the October 1, 1991, sale of my former La Palma house to

15   prove I moved on September 26, 1991. I used the Grant Deed dated October 1, 1991, and the

16   Trust Deed dated October 1, 1991, to prove I sold the Jennifer Circle house on October 1, 1991,

17   not to prove I moved on September 26, 1991. Two former Orange County Assessors have

18   testified that the sale of the Jennifer Circle house on October 1, 1991, was a legal sale, ¶¶ 192-

19   197, above.

20       363.    The FTB 1991 Concluding Summary at p. 24 states the following.

21       The timing and reality of that transaction is, at best, highly suspect.
Among other things, the transaction is between Mr. Hyatt and a

22

23   _____

   [394] Updated Testimonial Topics, Ex. T010.

24      [395] Updated Testimonial Topics, Ex. T011.

RJN1441

1   long-time friend and associate Grace Jeng, devoid of supporting
2   contractual documents or proof that a required $15,000 initial
    payment was made, and evidenced by a deed not recorded until
3   June 16, 1993, and which contains a fraudulent, back-dated notary
    acknowledgement.

4   This FTB statement is false. There is nothing suspicious about the sale of the Jennifer Circle

5   house. I was free to sell it to whomever I chose. The sale was legal and complete when I

6   delivered the signed Grant Deed to the buyer, ¶¶ 192-197, above. There was no fraudulent

7   notary acknowledgement on the recorded deed. The notary simply made a mistake and filled in

8   the wrong date. A simple mistake does not mean the notary committed fraud, ¶¶ 186-189,

9   above.

10      364. The FTB 1991 Concluding Summary at p. 24 states the following.

11          Moreover, objective contemporaneous evidence acquired
12      by respondent, often over the strenuous objection of Mr. Hyatt,
        reveals that Mr. Hyatt continuously conducted his personal and
13      patent-related business affairs from the Jennifer Circle residence
        throughout the contested time period.

14  This FTB statement is false. After I sold the Jennifer Circle house on October 1, 1991, I did not

15  return again until late 1992. FTB has no credible evidence that I was present at the Jennifer

16  Circle house between October 1, 1991, and late 1992, when I returned to Jennifer Circle for a

17  short visit. During the 1991 disputed period I had zero full days in California and only 17 days

18  partly in Nevada and partly in California for a specific temporary or transitory purpose.[396]

19      365. The FTB 1991 Concluding Summary at p. 24 states the following.

20          That evidence includes, but is not limited to, Mr. Hyatt signing
21      multiple contracts with Japanese companies representing that his
        mailing address is Cerritos, CA, sending and receiving numerous
22      pieces of correspondence through the United States mail, FedEx

23  _____

24  [396] Rebuttal to FTB Att. A/F, Section I. A., day by day analysis, September 26, 1991
    through December 31, 1991.

164

RJN1442

1
2
3
4

> courier service, and by telefax with Philips, MLMC, his patent lawyer, the Japanese companies, the Japanese government, the USPTO, and other service providers, with directional or return addresses of Jennifer Circle, the Cerritos PO Box, and/or the fax machine installed and operating at Mr. Hyatt's Jennifer Circle home.

5  This FTB statement is false. After I sold the Jennifer Circle house on October 1, 1991, I did not

6  return again until late 1992. All of the patent agreements I signed for Japanese companies were

7  signed in Virginia or Las Vegas. Even though I gave Mahr Leonard and Philips a change of

8  address by October 18, 1991,[397] they were slow to update the address on the patent agreements

9  with the first four sublicensees. Neither the slowness of Mahr Leonard and Philips in updating

10  my address nor a statement that I had a mailing address at a Cerritos U.S. Post Office box is

11  evidence that I was continuously present at the Jennifer Circle house during the disputed period.

12  I signed the patent agreements listing the Cerritos U.S. Post Office box mailing address because I

13  was told that it was not an important address and that the official address in the patent

14  agreements was the PSB&C law office.[398]  Mahr Leonard and Philips began identifying my Las

15  Vegas apartment address as my residence starting with Sony and NEC Patent Agreements.[399]

16  366. Without identifying any evidence FTB contends I sent and received

17  correspondence through the United States mail. Any mail I sent after September 26, 1991, was

18  sent from Las Vegas and FTB offers no contrary evidence. On October 21, 1991, I submitted a

19  change of address from the Jennifer Circle house and the Cypress U.S. Post Office box to Las

20  Vegas.[400]  Thus any mail sent to the Jennifer Circle house was automatically forwarded to Las

21
22
23
24

---

[397] Rebuttal to FTB Att. A/F, Section I. B., October 18, 1991.
[398] For example, see the Fujitsu Patent Agreement, H 017220.
[399] Sony Patent Agreement: H 018784; NEC Patent Agreement: H 018797.
[400] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991; H 013608, H 013609.

165

RJN1443

1   Vegas. Although I had some old fax cover sheets and a template on my computer with the

2   Cerritos U.S. Post Office box return address, that correspondence was sent from Las Vegas, not

3   California after October 1, 1991.[401]

4        367.     Any FedEx packages I sent during the disputed period were sent from Las Vegas,

5   not California. Although, Philips misdirected some FedEx deliveries to the Jennifer Circle

6   house, such deliveries were inadvertent errors by Philips support personnel.[402] I did not receive

7   any FedEx deliveries at the Jennifer Circle house because I was not there. FedEx expert Steve

8   Foster has testified that even if my typed name appeared after the word "Signed" on a FedEx

9   Summary Activity Report, it did not mean a package was actually delivered to that person.[403]

10       368.     Any faxes I sent to Philips, Mahr Leonard or anyone else during the disputed

11   period were sent from Las Vegas using the fax machine I took with me to Las Vegas on October

12   1, 1991,[404] after I sold the Jennifer Circle house. FTB has no evidence to the contrary.

13       369.     FTB makes a reference to "his patent lawyer". If that is intended to refer to Mr.

14   Roth, Mr. Roth represented Philips with respect to the *Hyatt v. Boone* interference and with

15   respect to the Philips Licensing Program after July 1991.[405]

16       370.     I did not correspond with Japanese companies after signing the July 1991 Philips

17   Agreement. The documents I signed were communicated to Japanese companies by Mahr

18   Leonard or Philips. Fujitsu sent me a copy of the signed Fujitsu Patent Agreement, H 017256,

19

20

---

21     [401] Supplemental Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶¶ 84, 103, 114.

22     [402] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25, Annex XII.

    [403] Affidavit of Steve Foster, February 17, 2015, ¶ 12; Rebuttal to FTB Att. A/F., Section

23   I. B., November 22, 1991.

    [404] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.

24     [405] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.

RJN1444

1  but they should have sent it to Mahr Leonard not to me.  I had no control over their decision to

2  send it directly to me.

3       371.    The FTB statement that I corresponded with the Japanese Government is a

4  complete fabrication.  I know of no correspondence I had with the Japanese Government.

5       372.    I had correspondence with the U.S. Patent and Trademark Office that I sent from

6  Las Vegas after September 26, 1991.  I had previously established the Cerritos U.S. Post Office

7  box as a return address for some of my patents and patent applications and in some cases that

8  was not changed until I moved into my Las Vegas Tara home.  However, the correspondence I

9  sent to the PTO was from Las Vegas.  Correspondence with the PTO had nothing to do with

10  licensing or license payments received from licensees.

11       373.    FTB does not identify any correspondence with service providers that use the

12  Jennifer Circle house address or how such unidentified correspondence had anything to do with

13  the alleged licensing business or license payments received from licensees.

14       374.    I did not have a Jennifer Circle home after October 1, 1991.  I sold the Jennifer

15  Circle house on October 1, 1991.[406]  I did not have a fax machine at the Jennifer Circle house

16  after October 1, 1991.  I moved my fax machine to Las Vegas and I did not send any faxes from

17  California after October 1, 1991.[407]

18       375.    The FTB 1991 Concluding Summary at p. 25 states the following.

19           The use of this directional and return address information is
             systemic, beginning long before September 26, 1991, and
20           extending well beyond April 2, 1992.

21  This FTB statement is false.  FTB fails to identify any "directional and return address

22  information" or explain how it relates to FTB's alleged California licensing business or license

23

24
       [406] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.
       [407] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.

                                        167

RJN1445

1   payments received from licensees. Although I had a template on my computer with the Cerritos

2   U.S. Post Office box return address, that correspondence was sent from Las Vegas, not

3   California after October 1, 1991.[408]

4        376.   The FTB 1991 Concluding Summary at p. 25 states the following.

5             Mr. Hyatt's business conduct in California during the disputed
              time period is not limited to the use of the mails and the telephone.

6

7   This FTB statement is false. FTB does not identify any "business conduct" in California or how

8   it relates to FTB's alleged California licensing business or license payments received from

9   licensees. Any correspondence that I sent after September 26, 1991, was sent from Las Vegas. I

10   had moved my telephone and my only fax machine to Las Vegas on October 1, 1991.[409]

11        377.   The FTB 1991 Concluding Summary at p. 25 states the following.

12             All of Mr. Hyatt's 1991 licensing fee income was sent to him in
              California, typically by wire-transfer to his Los Angeles patent
13             lawyer's trust account.

14       This FTB statement is false. This FTB statement is another FTB fabrication. All of the

15   1991 disputed license payments to me from sublicensing my patents went first to a PSB&C

16   client trust account maintained for the benefit of Philips[410] and then to one of my Nevada situs

17   investment accounts.[411] None of the sublicense payments I received in 1991 or 1992 were sent

18   to me in California. Philips distributed the Sharp, NEC and Sony license payments to my

19   Nevada situs investment accounts about January 14, 1992.[412]

20        378.   The FTB 1991 Concluding Summary at p. 25 states the following.

21

22   [408] Supplemental Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶¶ 84, 103, 114.
   [409] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991; Rebuttal to FTB Att. A/F.,
   Section I. F., October 28, 1991.
23   [410] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 18, Annex XII.
   [411] 1992 ASAB, § 1.7.1.4.
24   [412] FTB_Philips 0005414.

1

> Pursuant to contracts executed while Mr. Hyatt was admittedly in
> California, those monies had to be divided between Mr. Hyatt,
> Phillips, and MLMC, divisions which, during 1991, were
> performed by Mr. Hyatt and consummated by his writing multi-
> million dollar checks on a California financial account which
> represented he was residing at Jennifer Circle.

2

3

4

5  This FTB statement is false. The July 1991 Philips Agreement granted Philips exclusive rights

6  and fiduciary responsibility to license my patents.[413] Through the September 1991 Mahr

7  Leonard Agreement Philips granted Mahr Leonard the exclusive rights to negotiate patent

8  agreements with seven sublicensees subject to approval by Philips.[414] After I moved to Las

9  Vegas Philips asked me to sign (subject to prior written approval by Philips) and distribute the

10 license payments from three of the patent agreements that were being negotiated by Mahr

11 Leonard. Philips agreed to indemnify me for doing so.[415] After the Fujitsu and Matsushita

12 license payments were transferred to the PSB&C client trust account maintained for the benefit

13 of Philips the license payments were transferred to my Nevada situs Franklin Fund investment

14 account. I then distributed the proper amounts to Philips an Mahr Leonard by writing drafts on

15 my Nevada situs Franklin Fund investment account.[416]

16       379.   After previously admitting that my Franklin Fund account was an investment

17 account (p. 17, FTB 1991 Concluding Summary) having a situs at my Nevada residence, FTB

18 now disingenuously refers to my Nevada situs Franklin Fund account as a "California financial

19 account" and falsely states it represented I was residing at Jennifer Circle. There was no such

20 representation. I had not used up all of the prior drafts with my former Jennifer Circle address

21 _____

22       [413] FTB_Philips 0000608, 0000610.
      [414] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 8, Annex XII; FTB_Philips

23 0000145-0000151.
      [415] [First] Supplemental Agreement, FTB_Philips 0000666-0000673.

24       [416] 1992 ASAB, § 1.7.1.4.

169

RJN1447

1  thereon but the drafts I used to make distributions to Philips and Mahr Leonard[417] said nothing

2  about Jennifer Circle being my residence.  Furthermore, I had previously submitted a change of

3  address to Las Vegas for the Jennifer Circle house to the U.S. Post Office on October 21,

4  1991,[418] so the obsolete address on the old drafts did not matter.

5      380.    The FTB 1991 Concluding Summary at p. 25 states the following.

6
> Other aspects of Mr. Hyatt's patent licensing business were also conducted from California well after his alleged departure from Orange County.

7

8  This FTB statement is false.  I did not have a patent licensing business in Orange County,

9  California or elsewhere and there were no aspects or "other aspects" of the non-existing "patent

10  licensing business".  See ¶¶ 14, 89, 90, 205, 279, 376, 380 herein.  The July 1991 Philips

11  Agreement gave Philips exclusive rights and fiduciary responsibility to license my patents.[419]  In

12  accordance with the July 1991 Philips Agreement, Philips created, managed and controlled the

13  Philips Licensing Program.[420]  Section 8.1 of the agreement prohibited me from licensing the

14  patents.[421]

15      381.    The FTB 1991 Concluding Summary at p. 25 states the following.

16
> For example, many business promotional activities were conducted in California, such as Mr. Hyatt appearing for a photo shoot at his La Palma home, appearing as the Grand Marshall at the La Palma Day parade, releasing press releases from La Palma which reported on the success of Mr. Hyatt's pursuit of patent licensing fees with the Japanese companies, attending meetings with representatives of the Japanese companies in California, and conducting round-trip business travel via flights which began and ended at Los Angeles International Airport (LAX).

17
18
19
20

---

[417] For example, FTB_Philips 0006166, 0000067.

[418] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.

[419] FTB_Philips 0000608, 0000610.

[420] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10, Annex XII; Affidavit of David Leonard, May 2, 2012, ¶ 15, Annex XXV, Ex. 46.

[421] FTB_Philips 0000623; 1992 ASAB, § 1.7.3.

170

1  This FTB statement is false.  FTB does not allege who conducted the so-called "many business

2  promotional activities" in California, what those activities were or how they could possibly relate

3  to the alleged California patent licensing business or to license payment by licensees.  However,

4  after September 26, 1991, when I moved to Las Vegas I did not conduct any "business

5  promotional activities" in California or elsewhere.

6      382.   I did not have a La Palma home after October 1, 1991,[422] and I did not appear for

7  a photoshoot at any La Palma house after October 1, 1991, as a promotional activity or

8  otherwise.  The FTB assertion is another FTB fabrication.  FTB apparently refers to a photo

9  shoot that Mr. McHenry attempted to arrange on behalf of Philips at Fashion Island, Newport

10  Beach on October 6, 1991.  However, I declined to travel from Las Vegas to California on that

11  date and the portrait photo shoot did not take place.[423]

12      383.   Regarding the La Palma Day parade on November 9, 1991, I made a round trip

13  visit to California that day and returned to Las Vegas the same day.[424]  The arrangements for the

14  parade were made before I moved to Las Vegas and the parade had nothing to do with any

15  business or promotional activities by me.

16      384.   Philips not me, issued two press releases after I moved to Las Vegas.  A

17  November 6, 1991, Philips press release announced my relationship with Philips.  This Philips

18  press release used a dateline of "New York".  Another Philip press release dated February 24,

19  1992, stated that Philips was assisting me with the licensing of my patents and Mahr Leonard

20

21

22  _____

23  [422] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.
   [423] Rebuttal to FTB Att. A/F, Section I. A., October 6, 1991.

24  [424] Rebuttal to FTB Att. A/F, Section I. A., November 9, 1991.

RJN1449

1    had negotiated licenses with six Japanese companies. The February 24, 1992, press release

2    stated that I resided in Las Vegas.[425]

3         385.     I attended only two meetings in California with Japanese companies that were

4    potential licensees during the 1991 and 1992 disputed period. I attended as the inventor of the

5    patented technologies, not as a negotiator. I did not negotiate with a potential licensee at either

6    meeting or at any other meeting during the disputed period. On December 16, 1991, I attended a

7    45 minute get acquainted meeting with Hitachi personnel at the request of Philips. Philips had

8    not authorized anyone to negotiate with Hitachi at that time and there were no negotiations at

9    that meeting.[426] On November 21, 1991, I made a round trip visit from Las Vegas to San

10    Francisco for a short meeting with Sony representatives at the request of Mahr Leonard and

11    Philips.[427] Mr. Mahr, Mr. Leonard, Mr. Tamoshunas, Mr. Haken and Mr. Roth conducted the

12    discussions with the Sony representatives. I did not negotiate with Sony. Mahr Leonard had

13    exclusive right to negotiate with Sony through the September 1991 Mahr Leonard Agreement.[428]

14    FTB misrepresents these two short meetings at the request of Philips and Mahr Leonard

15    "promotional business meetings." The company executives wanted to meet "the inventor" so

16    Philips and Mahr Leonard arranged to have me meet them.

17         386.     After September 26, 1991, I did not conduct any round trip travel from LAX. All

18    of my travel after September 26, 1991, originated and ended in Las Vegas. FTB offers no

19    evidence that I had any "round trip travel" that originated at LAX after September 26, 1991.

20         387.     The FTB 1991 Concluding Summary at p. 25 states the following.

---

[425] Affidavit of Charles McHenry, May 17, 2012, ¶¶ 43-51 and Ex. 18 and Ex. 19.
[426] Rebuttal to FTB Att. A/F, Section I. A., December 16, 1991.
[427] Rebuttal to FTB Att. A/F, Section I. A., November 21, 1991.
[428] FTB_Philips 0000145.

172

1
2

> Objective contemporaneous evidence also reveals Mr. Hyatt continuing to conduct his personal affairs in California long after his alleged departure to Nevada.

3
4
5

This FTB statement is false. After moving to Las Vegas on September 26, 1991, I conducted my personal affairs from Las Vegas, not California. FTB offers no evidence I conducted my personal affairs from California after September 26, 1991.

6    388.   The FTB 1991 Concluding Summary at p. 25 states the following.

7
8

> Mr. Hyatt maintained and used personal safe deposit boxes in La Palma during 1991 and 1992, and never changed his address with respect to those accounts until July 1992.

9
10
11
12
13

This FTB statement is false and disingenuous. I maintained two safe deposit boxes for the administration of my mother's estate. FTB is well aware that the safe deposit boxes were maintained for the estate and not for personal use but knowingly makes a false accusation.[429] FTB offers no evidence that the safe deposit boxes were for my personal use rather than for my mother's estate.

14    389.   The FTB 1991 Concluding Summary at p. 25 states the following.

15
16
17

> Mr. Hyatt continued to engage in personal banking at California Federal Bank, and other California financial institutions during 1991 and 1992, institutions which continued to send statements to Mr. Hyatt at Jennifer Circle and/or the Cerritos Post Office Box.

18
19
20
21

This FTB statement is false. FTB offers no evidence to support its false statements. I closed five California bank accounts before I moved to Las Vegas and I opened bank accounts in Las Vegas.[430] I submitted changes of address to Las Vegas for the Jennifer Circle house and the Cypress U.S. Post Office box to the U.S. Post Office on October 21, 1991,[431] so any mail sent to

22

23
24

[429] Supplemental Affidavit of Gilbert P. Hyatt, July 23, 2012, ¶ 12, Annex XXXV.
[430] 1991 AOB, II.C.8.
[431] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.

173

1  those addresses would have been forwarded to me in Las Vegas. I did not have a personal

2  checking account in California at the time I moved to Las Vegas on September 26, 1991, and I

3  did not have a personal checking account in California after I moved to Las Vegas.

4      390. I opened a checking account at a Las Vegas branch of California Federal Bank on

5  October 25, 1991. The account used my Las Vegas address. Just because the name of the bank

6  was California Federal it does not convert my Las Vegas checking account to a California bank

7  account.[432] I wrote a large number of checks using this Las Vegas bank account.[433]

8      391. I also opened a checking account at Valley Bank in Las Vegas using my Las

9  Vegas address.[434] I wrote checks on this Las Vegas checking account during the disputed period

10  and thereafter.[435]

11      392. The FTB 1991 Concluding Summary at p. 26 states the following.

12
13
14
15
16
> The evidence shows that Mr. Hyatt wrote personal checks
> to pay taxes on the Jennifer Circle residence after it was
> purportedly sold, that Mr. Hyatt, as executor, was heavily involved
> in the Orange County probate of his mother's estate, a proceeding
> in which several documents were filed representing Mr. Hyatt's
> presence in California, that Mr. Hyatt incurred charges at
> California restaurants, attended medical appointments in
> California, and sought legal advice from California lawyers.

17  I paid the 1991-1992 property taxes on the Jennifer Circle house on October 14, 1991, in

18  accordance with an agreement with the buyer at the time I sold the house.[436] I paid the property

19  taxes with an October 14, 1991, draft, not a bank check, written on my Nevada situs Franklin

20

21

22  [432] Hyatt DP CDE Affidavit, July 24, 2012, ¶ 64.
    [433] H 00591-00698.

23  [434] Hyatt DP CDE Affidavit, July 24, 2012, ¶ 65.
    [435] H 00911-00916.

24  [436] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.18, Annex XI, Ex. 13.; Rebuttal to
FTB Att. A/F., Section I. E., October 14, 1991.

1   Fund investment account.[437] I wrote the draft for the property tax while present in Las Vegas. I

2   then flew from Las Vegas to Washington D.C/Virginia, where I signed the Fujitsu and Oki

3   Patent Agreements on October 14, 1991.[438] I was not in California on October 14, 1991.

4         393.   I was executor of my mother's estate, which was probated in Orange County. As

5   executor I was on occasion required to travel to California for activities related to the probate of

6   my mother's estate. Each such trip to California for the probate of my mother's estate was for a

7   temporary or transitory purpose and not to change my state of residency from Nevada to

8   California.

9         394.   As a Nevada resident I obtained legal advice from California lawyers to properly

10   file my California part year 1991 income tax return. Surely, FTB does not fault me for obtaining

11   legal advice from California lawyers when filing my California part year 1991 income tax return.

12         395.   I also returned to California from February 11-21, 1991, for the temporary and

13   transitory purpose of cancer surgery at Los Alamitos Medical Center. I traveled from Las Vegas

14   to California the day of the surgery and I returned to my apartment in Las Vegas the day I was

15   released from the hospital following my surgery. I received advice from multiple sources that

16   the skills of California surgeons exceeded those of Nevada surgeons and that I should have this

17   major cancer surgery performed in California. I went to California for the temporary and

18   transitory purpose of major cancer surgery, not to change my state of residency from Nevada to

19   California.

20         396.   The FTB 1991 Concluding Summary at p. 26 states the following.

21              The evidence also reveals that respondent also discovered

22   ————————————

23   [437] EC 03924-03925.

24   [438] Fujitsu Patent Agreement: H 017209-017221; Oki Patent Agreement: H 018732-018745.

the presence of a checking account standing in the name of DNC which Mr. Hyatt admittedly used for personal expenses, records pertaining to which have not been produced. Based upon the information that was produced relative to that account, respondent has determined that some 340 checks were not produced for review and inspection.

FTB disingenuously complains about checks from the DNC checking account not being produced even though it did not ask for production of DNC checks. DNC was indebted to me and I sometimes made payments on that debt by writing checks on the DNC checking account. FTB asked for only my personal checking account records and I was under no obligation to provide DNC checking account records.[439] In any event, the FTB auditor undertook the responsibility to obtain desired information from the banks.[440]

397.    FTB knew about DNC even though FTB did not ask for DNC checks. FTB conducted a secret audit of DNC that came to light only during the Nevada litigation.[441] FTB also had two large secret files on DNC. A first secret DNC file (designated as a "Digital Nutronics audit file (F 05053-05176)") surfaced in a document production in March 1999.[442] A second secret DNC file surfaced in a Sacramento document inspection (Bates numbered "SAC") in 1999 under court order. The FTB maintained an approximately 250 page file on DNC, Bates-numbered SAC 04770 to SAC 05019.

---

[439] 1991 ARB, pp. 43-44.

[440] Letter dated January 6, 1995, from Sheila Cox, Tax Auditor, to Michael Kern (which was sent to the wrong address and not delivered to Mr. Kern), A 00536-00537. The January 6, 1995, letter was resent on January 20, 1995, document FTB-101181-11182, PBTK 01851. This January 20, 1995, letter was sent to the correct address.

[441] *Hyatt v. FTB, District Court of Clark Cty., Nevada*, Case No. A382999, FTB 05053-05176.

[442] FTB transmittal letter and the first page of a 123 page "Digital Nutronics audit file", Bates-numbered FTB 05053-FTB 05176, produced as Exhibit 172 to the deposition of Sheila Cox

176

RJN1454

398.    In addition, all three auditors knew about DNC starting as early as August 9, 1993, the very beginning of the audit.[443]  Even though FTB knew about DNC from the beginning of my audit, secretly audited DNC, failed to ask for production of DNC checks and stated that FTB would take responsibility for obtaining checks, FTB now seeks to blame me for not producing DNC checks.

399.    The FTB 1991 Concluding Summary at p. 26 states the following.

> Finally, the objective contemporaneous evidence reveals that Mr. Hyatt's procurement of the low-income apartment unit lease, Nevada house search and ultimate procurement of the Tara residence, shows numerous communications regarding those endeavors were effectuated through the use of Mr. Hyatt's Jennifer Circle fax machine.

This FTB statement is false.  I did not have a Jennifer Circle fax machine.  I moved my fax machine to La Palma on October 1, 1991.[444]  On October 8, 1991, I personally went to the Las Vegas Wagon Trails Apartments where I signed a lease for my very nice, middle income, two bedroom Las Vegas apartment in a well maintained Wagon Trails Apartment complex. However, I overlooked signing the back side of the lease.  I could not remember the fax number at the Continental Hotel where I was staying so I had given Clara Kopp, the leasing agent, Ms. Jeng's fax number at the Jennifer Circle house.  On October 9, 1991, Wagon Trails Apartment faxed the lease to Ms. Jeng's fax number because I had overlooked signing the back side.  On October 13, 1991, Ms. Jeng came to Las Vegas and brought the previously faxed lease to me in Las Vegas.  I signed the back side of the lease in Las Vegas on October 13, 1991, and personally took the lease to Wagon Trails Apartments where Clara Kopp verified my October 13, 1991,

---

[443] Rebuttal to FTB Att. A/F, Section I. C., August 9, 1991.
[444] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.

177

RJN1455

1  signature and added her own October 13, 1991, signature to the rental agreement, H 01251-

2  01252.[445]  More complete explanations are provided in my 2016 and 2010 affidavits.[446]

3       400.    The FTB 1991 Concluding Summary at p. 26 states the following.

4            Moreover, the relevant factual and legal analysis has been
     previously discussed at length in Respondent's Opening Brief
5       (Case No. 435770) at pages 13-16, 46-48, 50-52, 55-56, and 77-91;
     Respondent's Opening Brief (Case No. 446509) at pages 7, 35-37,
6       55-57, and 59-71; Respondent's Reply Brief (Case No. 446509) at
     pages 59 through 71; Respondent's Additional Brief (03/28/13,
7       Case Nos. 435770 and 446509) at pages 7 through 13;
     Respondent's Additional Brief (2015, Case No. 435770) at pages
8       15-23 and 26-29; Respondent's Additional Brief (2015, Case No.
     446509) at pages 5-8 and 28-30; and Respondent's Attachments A
9       (Revised) at pages 11 through 80; and those discussions will not be
     repeated here and are incorporated by reference as if set forth fully
10      herein.

11  This section of FTB's 1991 Concluding Summary was identified as an accuracy related fraud

12  section although the Summary fails to establish any fraud.  My prior briefing has clearly

13  established that no fraud penalty should be assessed.[447]

14       401.    The FTB 1991 Concluding Summary at pp. 26-29 makes various false statements

15  about interest abatement that are addressed in ¶¶ 402-421 immediately below and the FTB 1992

16  Concluding Summary at pp. 18-23 makes various false statements about Interest Abatement that

17  are addressed in ¶¶ 715-764 below.

18       402.    FTB'S argument against interest abatement in its 1992 Concluding Summary

19  asserts a false record and does not rebut my request for interest abatement.

20       403.    My representatives confirmed that interest on a deficiency assessment is to be

21  _____

22       [445] Rebuttal to FTB Att. A/F, Section I. A., October 13, 1991.
     [446] Supplemental Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶ 43; Affidavit of
23  Gilbert P. Hyatt, August 15, 2010, § 1.4, pp. 20-21, Annex XI, Exhibit 13.
     [447] 1991 AOB, § III; 1992 AOB, §§ III., IV.; 1991 ARB, § III.; 1992 ARB, §§ III., IV.;
24  1991 ASAB, § 1.9; Appellant's Concluding Summary (1992), § 1.9.

178

RJN1456

1      abated if there is an unreasonable error or delay by FTB that: (1) is attributable to a ministerial or

2      managerial act performed by FTB; (2) occurred after FTB contacted the taxpayer in writing

3      about the particular deficiency; and (3) is not significantly attributable to the taxpayer. Cal. Rev.

4      & Tax Code § 19041. Failure by FTB to grant a request for interest abatement is reviewed by

5      your Board for an abuse of discretion. *Id.* My representatives fully addressed this issue

6      previously in my 1991 AOB, pp. 87-94; 1992 AOB, pp., 67-74; 1991 ARB, p. 100; 1992 ARB,

7      pp.82-100; and 1992 ASB, p. 100.

8      404.     In sum, ***over eleven years*** passed between the time that I received the NPA for the

9      1991 tax year on April 23, 1996, and FTB's issuance of the Notice of Action on December 26,

10      2007. Similarly, ***over 10 years*** passed between the time I received the NPA for the 1992 tax year

11      on October 10, 1997, and FTB's issuance of the Notice of Action on December 26, 2007. These

12      delays each lasting over a decade was due to the intentional misconduct of FTB in which it

13      refused to perform managerial and ministerial acts as required under law. Instead, FTB

14      affirmatively put a "hold" on the protest process. See ¶¶ 405, 406, 428, 717, 737 herein.

15      405.     The disputed issue of FTB's 11 year delay and whether FTB put an affirmative

16      "hold" on the protest process was determined in my favor and against FTB in the Nevada tort

17      case, and this finding in particular was cited as a basis for affirming the fraud claim in my favor

18      and against FTB. Specifically, the jury found that FTB intentionally delayed and put a hold on

19      the protest proceedings for 11 years. The Nevada Supreme Court affirmed this factual finding in

20      reciting specific evidence against FTB regarding its intentional delay of the protest proceedings:

21      "Hyatt showed that FTB took 11 years to resolve Hyatt's protests of the two audits. Hyatt

22      alleged that this delay resulted in $8,000 in interest per day accruing against him for the

23      outstanding taxes owed to California" and "[a]s explained above in discussing the fraud claim,

24

179

RJN1457

1  FTB . . . delayed resolution of Hyatt's protests for 11 years, resulting in a daily interest charge of

2  $8,000." *See Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 130 Nev. Adv. Op. 71, 2014 WL

3  4656423 at __ (Nev. 2014) ("*2014 Nevada Ruling*"). See ¶¶ 404, 406, 428, 717, 737 herein.

4        406.    FTB attempts to rebut my requests for interest abatement based on FTB's bad

5  faith delay in the Protests.  (FTB 1991 Concluding Summary at pp 26-29 and FTB 1992

6  Concluding Summary at 18-23.) In so doing, FTB references and makes bald assertions

7  regarding a number of events that are irrelevant to and certainly do not rebut my request for

8  interest abatement based on the 11 year delay in the Protests.  See ¶¶ 404-405, 428, 717, 737

9  herein.

10        407.    The FTB 1991 Concluding Summary at pp. 26-27 states the following.

> Respondent acknowledges that this appeal has been pending for several years.  Respondent also acknowledges that Mr. Hyatt accuses respondent of being the cause of those delays.  To the contrary, responsibility for the delay lies squarely with Mr. Hyatt.  Mr. Hyatt's delaying tactics commenced early in the protest.  In 1999, the Nevada District Court issued a protective order with language (requested by Mr. Hyatt) that allowed Mr. Hyatt to unilaterally designate as confidential discovery in the Nevada litigation that could not be shared with respondent's protest hearing officer.  The Nevada Protective Order also directed respondent to follow a specific process involving Mr. Hyatt's initial review and consent before issuing an administrative subpoena.

18  This FTB statement is false.  It is ridiculous to suggest that I am responsible for the enormous

19  delays in these 1991 and 1992 audits, protests and appeals because a court found it necessary to

20  issue a protective order to protect me against the unlawful acts of FTB.  To the contrary, FTB is

21  responsible for the inordinate delays in these cases.[448]  FTB's failure to abate interest under

22  section 19104 was an abuse of discretion and your Board should abate interest.  Interest

---

[448] 1991 AOB, § VI.; 1992 AOB, § VII.; 1991 ARB, § VI; 1992 ARB, § VII.; 1992 ASAB, § 1.8; Appellant's Concluding Summary (1991), § 1.12.

180

RJN1458

abatement is appropriate if there is an error or delay that (1) is attributable to a ministerial or managerial act performed by FTB; (2) that occurred after FTB contacted the taxpayer in writing about the particular deficiency; and (3) is not significantly attributable to the taxpayer.[449] See ¶¶ 408-413, 432-436, 733-743 herein regarding the protective order issue.

408. FTB's managerial or ministerial acts include the following: (1) FTB intentionally placed a hold on my protest for over six years after the protest hearing;[450] (2) FTB lost, destroyed, or withheld numerous documents from the audit files that would have aided in more timely resolution of the protest;[451] (3) FTB management delayed in assigning a reviewer to the protest;[452] (4) FTB failed to expeditiously issue the 1992 NPA;[453] and (5) FTB's $24 million error constitutes an unreasonable error caused by a ministerial act.[454] Your Board should grant interest abatement for the entire period because the cumulative effect of all of the delays is unreasonable.[455] See ¶¶ 407-413, 432-436, 733-743 herein regarding the protective order issue.

409. The FTB 1991 Concluding Summary at p. 27 states the following.

> Mr. Hyatt subsequently designated as confidential discovery under the Nevada Protective Order that included the answer to the earlier asked (at audit and protest) question: "Where/when did you move?" Similarly Mr. Hyatt also ascribed that designation to details about the timing and amount of his 1991 and 1992 income among many other things.[189]
>
> [Exhibit A, note] 189: Nevada Protective Order.

---

[449] 1991 AOB, § VI., p. 87.
[450] 1991 AOB, pp. 88-90.
[451] 1991 AOB, pp. 90-92.
[452] 1991 AOB, p. 92.
[453] 1992 ARB, § VII.C.4.
[454] 1992 ARB, § VII.C.5.
[455] 1991 AOB, pp. 93-94.

181

RJN1459

1    This FTB statement is false.  It is ridiculous to suggest that I am responsible for the enormous

2    delays in these 1991 and 1992 audits, protests and appeals because a court found it necessary to

3    issue a protective order.  Protective orders are common where the litigation involves confidential

4    or sensitive information.  The issue with the question "Where/when did you move?" was not a

5    protective order issue, it was an issue that there was no documentation regarding my stay at the

6    Continental Hotel.  See ¶¶ 10, 31-35, 91, 95, 96, 675 herein regarding the issue of the response to

7    the 1995 document request.  See ¶¶ 407-413, 432-436, 733-743 herein regarding the protective

8    order issue.

9        410.    The FTB 1991 Concluding Summary at p. 27 states the following.

10               In late 1999, respondent's protest hearing officer issued a
                 comprehensive Information Document Request (IDR).[190]  The
11               protest hearing officer repeated many of the questions Mr. Hyatt
                 never answered at audit and requested additional documentation
12               including his whereabouts from September 26, 1991 to October 14,
                 1991 ("…tell FTB on a day-by-day basis where you were…").[191]
13               Mr. Hyatt requested six months to respond.[192]  In mid-2000 (while
                 discovery in his Nevada litigation was ongoing), Mr. Hyatt
14               responded to the protest hearing officer's IDR.[193]

15           [Exhibit A, note] 190:  FTB Trial Exhibit 2330 (12/30/99 Letter
             from Charlene Woodward to Eugene Cowan re:  document request
16           letter, Item 1 and 88).

17           [Exhibit A, note] 191:  Id.

18           [Exhibit A, note] 192:  FTB Trial Exhibit 2331 (IDR) and FTB
             Trial Exhibit 2332 (FTB Response, extension granted to June 30,
19           2000).

20           [Exhibit A, note] 193:  06/16/00 Hyatt Response to FTB 12_30_99
             IDR.

21   This FTB statement is false.  As usual, FTB misquotes and mischaracterizes the December 30,

22   1999 FTB information request, P00137, 00148.  The information request asked for "information

23   and documentation on a day by day basis", P00148.  It did not state "tell FTB on a day-by-day

24

                                        182

                                                                          RJN1460

1    basis where you were".  FTB makes an assertion that questions were not answered at audit but

2    fails to identify a single unanswered question.  My representatives and I diligently responded to

3    questions and information requests at audit.  We timely responded to the extensive December 30,

4    1999, information request on June 30, 2000, P00052-00053, by stating that I stayed at the

5    Continental Hotel from September 26, 1991, to October 14, 1991; that I traveled from October

6    14, 1991, to October 21, 1991; and that I resided at my Las Vegas apartment from October 21,

7    1991, through the end of the disputed period, P00053.  See e.g., our rebuttal to this issue in

8    Annex XXVI, Table of FTB's Misrepresentations in FTB 1991 Opening Brief, pp. 206-207.  See

9    ¶¶ 407-413, 432-436, 733-743 herein regarding the protective order issue.

10         411.    The FTB 1991 Concluding Summary at p. 27 states the following.

11              In mid-2002 the Nevada Supreme Court failed to modify or
             limit the Nevada Protective Order.  Respondent immediately
12           followed the strictures of that protective order and asked Mr. Hyatt
             to release the designated information to the hearing officer for
13           consideration in the California tax matter.[194]  Mr. Hyatt refused.
             Thereafter, respondent issued an administrative subpoena for the
14           information.[195]

15           [Exhibit A, note] 194:  FTB Trial Exhibits 2333 and 2342.

16           [Exhibit A, note] 195:  FTB Trial Exhibit 2342 (06/03/2002 Letter
             from Felix Leatherwood to Mark Hutchison requesting documents
17           and deposition testimony stamped "Confidential-NV Protective
             Order.") and FTB Trial Exhibit 2344 (07/07/2002 FTB's First
18           Administrative Subpoena Duces Tecum).

19

20         The Nevada Supreme Court did not "fail".  My protection against the abuses of FTB

21   provided by the Protective Order stayed in place.  The protective order did nothing to preclude

22   FTB from conducting proper audits and protests independent of the court action.  See

23   ¶¶ 407-413, 432-436, 733-743 herein regarding the protective order issue.

24
                                   183

412.    The FTB 1991 Concluding Summary at p. 27-28 states the following.

In February 2003, the Sacramento County Superior Court issued an Order compelling Mr. Hyatt to comply with respondent's administrative subpoena as to all, but one, of the requests.[196] Mr. Hyatt's response to that order was to file an appeal of the Order with the California Third District Court of Appeal. The Third District Court of Appeal eventually held that there was no reason why respondent's personnel working on the protest should not have access to evidence produced by Mr. Hyatt in his Nevada litigation. Mr. Hyatt's actions in opposing respondent's subpoenas impeded the progress of the administrative tax proceedings and contradict Mr. Hyatt's statements that despite the Nevada litigation, the California tax proceeding continued without interruption.[197]

[Exhibit A, note] 196: FTB Trial Exhibit 2348 (02/28/2003 Court's Ruling on Order to Show Cause filed in Sacramento County Superior Court, Case No. 02CS01582, directing Mr. Hyatt to produce documents response to FTB's administrative subpoena.) and FTB Trial Exhibit 2349.

[Exhibit A, note] 197: FTB Trial Exhibit 2351 (03/20/03 Notice of Appeal re: order to comply with FTB's administrative subpoena, filed in Sacramento County Superior Court, Case No. 02CS01582) and 12/31/2003 California's Third District Court of Appeals unpublished decision – State Franchise Tax Board v. Gilbert P. Hyatt, 2003 Cal. App. Unpub. LEXIS 12227.

There was nothing in the Protective Order that precluded FTB from conducting proper audits and protests independent of the court action. FTB's years of delay in deciding the protests, ¶ 401, above, are not justified by the appeal of the California Superior Court's Ruling. See ¶¶ 407-413, 432-436, 733-743 herein regarding the protective order issue.

413.    The FTB 1991 Concluding Summary at p. 28 states the following.

Despite the 2003 California appellate court holding, Mr. Hyatt continued to designate as confidential evidence relevant to his California tax protest under the Nevada Protective Order. In late 2005, respondent issued a second administrative subpoena for this information. Mr. Hyatt at first refused to produce this information, relenting only upon threat of respondent beginning formal California judicial enforcement of its second subpoena.[198] Subsequently, the protest hearing officer issued five additional

184

IDRs. In 2006, Mr. Hyatt designated yet more relevant information under the Nevada Protective Order. Respondent made an additional request for information to Mr. Hyatt's litigation counsel and received further objections and resultant delays in receipt of relevant documents.[199]

[Exhibit A, note] 198: FTB Trial Exhibit 2354 (10/28/2005 Letter from Robert Dunn to Mark Hutchison re: request consent to release deposition transcripts and documents to FTB's protest hearing officer) and FTB Trial Exhibit 2355 (12/06/2005 Letter from Robert Dunn to Mark Hutchison re: second request) and FTB Trial Exhibit 2356 (01/30/2006 FTB's Second Administrative Subpoena Duces Tecum).

[Exhibit A, note] 199: FTB Trial Exhibits 2357, 2358, and 2359.

There was nothing in the Protective Order that precluded FTB from conducting proper audits and protests independent of the court action. My representative did consent to use of the requested court litigation documents in the protests and FTB's years of delays in deciding the protests, ¶ 401, above, are not justified by my representative's consent to use documents from the court litigation in the protests. See ¶¶ 407-413, 432-436, 733-743 herein regarding the protective order issue.

414. The FTB 1991 Concluding Summary at p. 28 states the following.

Shortly after this appeal was filed, Mr. Hyatt sought, and obtained, an extension of one year to file his opening brief in this matter.

After 15 years of audit and protest FTB asserted a sourcing issue into its 1991 and 1992 NOAs for the first time without giving me an adequate opportunity to respond. An extension of time was necessary to respond to FTB's new sourcing issue among other issues. "When FTB finally acted on the taxpayer's protest after an eleven year delay, it gave the taxpayer 30 days to respond

185

1   to its 50-page single spaced Determination Letter with '[n]o extension to the thirty day 10

2   response period [to] be granted.[456]

3       415.   The FTB 1991 Concluding Summary at p. 28 states the following.

> After submitting numerous, voluminous declarations from individuals purporting to have knowledge of his whereabouts and activities during 1991 and 1992, many of whom had not been identified during audit, protest, or in connection with the Clark County lawsuit, Mr. Hyatt fought virtually every attempt respondent made to investigate the accuracy of the information provided.

8   This FTB statement is false.  FTB identifies not a single instance where I opposed a legitimate

9   attempt by FTB to investigate the accuracy of information.  FTB took more than 20 depositions

10  of witnesses and obtained thousands of documents from Philips after the New York court

11  narrowed FTB's unlawful, overbroad subpoenas to legally acceptable parameters.  These

12  depositions are very supportive of my contentions and demonstrate that the statements witnesses

13  made in their affidavits and declarations were true and correct.  Twenty-seven tables having

14  more than 800 testimonial excerpts that are very supportive of my contentions are listed and

15  briefly described in ASAB Exhibit 17 (Index of Deposition Excerpts Tables).

16      416.   The FTB 1991 Concluding Summary at p. 28 states the following.

> One such example is respondent's attempt to obtain and examine the Philips business records, records which were requested during audit.  That inquiry resulted in an approximate four year legal battle in New York during which Mr. Hyatt sought to have the courts of a sister state issue orders precluding respondent from access to, or use of, documents which are clearly relevant to the residency and sourcing issues in this appeal.

21  This FTB statement is false.  FTB states that it requested the Philips document during audit, but

22  offers no evidence to support its statement.[457]  At p. 7:26-27, FTB 1991 Concluding Summary,

23  _____

24      [456] 1991 AOB p. 10:8-20.

1   FTB deceitfully told your Board that I had concealed the Philips documents for 20 years even

2   though FTB now states that it knew about the documents during audit. In any event, the Philips

3   documents were under the custody and control of Philips not me. I produced the licensing

4   documents that were under my custody and control and those that were under the custody and

5   control of Mr. Roth during the audit and protest. Many of these documents that I produced were

6   substantial duplicates of the Philips documents. See ¶¶ 100-105, 121, 122, 417 herein.

7          417.    Furthermore, the Philips documents were not relevant until after December 26,

8   2007, when FTB belatedly raised the sourcing issue in its 1991 and 1992 NOAs. If FTB were

9   really interested in obtaining the Philips documents expeditiously it should have issued

10  reasonable subpoenas instead of unlawfully overbroad subpoenas and it should not have

11  withdrawn the subpoena it issued for those documents in 2006. See ¶¶ 100-105, 121, 122, 417

12  herein.

13         418.    The FTB 1991 Concluding Summary at p. 28 states the following.

14              The New York Courts upheld the propriety of respondent's resort
                to legal process so as to make inquiry into documentary evidence
15              which should have been produced almost twenty years ago.

16  This FTB statement is false. FTB offers no evidence that it requested the Philips documents 20

17  years ago. Besides the Philips documents were not relevant until FTB belatedly raised a

18  sourcing issue in its December 26, 2007 1991 and 1992 NOAs. Furthermore, I did not have

19  custody or control of the Philips documents and could not have produced them even if requested

20  to do so. I did produce the licensing documents that were under my custody and control and Mr.

21  Roth's custody and control during the audit and protest. Many of these documents I did produce

22  were substantial duplicates of the Philips documents. If FTB were really interested in obtaining

23

24          [457] Philips was identified in Mr. Hyatt's 1991 part year tax return and Philips was
        referenced in a Letter dated January 19, 1996, from Sheila Cox to Eugene Cowan, FTB-100567.

187

RJN1465

1    the Philips documents it should not have withdrawn the subpoena it issued for those documents

2    in 2006, ¶ 102, above.

3          419.    The New York courts found that FTB's 2011 subpoenas were unlawful because

4    they were overbroad and the courts significantly limited the scope of the subpoenas.  The New

5    York courts further found that FTB violated its orders as to the scope of the documents FTB

6    could seek and use.[458]

7          420.    The FTB 1991 Concluding Summary at p. 28 states the following.

8                Most recently, this matter has seen a multi-month delay in the
                 submission of this summary due to Mr. Hyatt's change of lawyers.

9

10   The small delay was necessary and was insignificant compared to the years of delay intentionally

11   imposed on these cases by FTB, ¶ 401, above.

12         421.    The FTB 1991 Concluding Summary at p. 29 states the following.

13               There have been numerous other delays occasioned  by the
                 conduct of Mr. Hyatt and his representatives, many of which are
14               described in the June 19, 2014 Declaration of Robert Dunn filed
                 in opposition to a lawsuit commenced by Mr. Hyatt against the
15               individual sitting Members of the California Board of
                 Equalization and the Franchise Tax Board in the United States
16               District Court for the Eastern District of California, and entitled
                 *Gilbert P. Hyatt* v. *Betty T. Yee, et al.,* USDC, ED of CA, Case
17               No. 2:14-cv-00849-GEB-DAD.   A true and correct copy of that
                 Declaration is attached hereto, the content of which is incorporated
18               by reference as if set forth fully herein.[200]

19               [Exhibit A, note] 200:  06/19/14 Declaration of Robert W. Dunn,
                 Hyatt v. Yee, et al., USDC, ED CA, Case No. 2:14-cv-00849-
20               GEB-DAD.

21   This FTB statement is false.  The vast majority of the delays in this case have been occasioned

22   by the intentional delays and negligence handling of documents by FTB personnel, ¶ 401, above.

23   _____

24         [458] 1991 ASAB, § 1.7.4; 1992 ASAB, § 1.8, pp. 58-59.

188

RJN1466

**My Testimony Regarding The Dunn Declaration.**

422.  The June 19, 2014 Dunn Declaration contains many false statements that need correcting and false implications that need clarification, discussed below in ¶¶ 423-560.

423.  The June 19, 2014, Dunn Declaration at p. 3 states the following:

> [7.]  As the audit later revealed, this purported change of residency was contemporaneous with Hyatt receiving millions of dollars from his patent licensing business.

This Dunn statement is false.  I did not have a "patent licensing business".  Sections 4.1 and 4.3 of the July 1991 Philips Agreement granted Philips exclusive rights and fiduciary responsibility to license my patents while Section 8.1 prohibited me from engaging in a licensing business.[459] Upon signing the July 1991 Philips Agreement Philips created, managed and controlled the Philips Licensing Program.[460]  See ¶¶ 67-73, above.  Philips has exclusive authority to license my patents[461] and I would have been in breach of contract and violating my representations and warranties to Philips if I operated a licensing business anyplace.[462]  See ¶¶ 14, 89, 90, 205, 279, 376, 380 herein.

424.  My change of residence on September 26, 1991, was not contemporaneous with the payment of license fees.  Philips' first license was to Fujitsu signed on October 31, 1991.[463] The license payment was made to a PSB&C client trust account maintained for the benefit of Philips.[464]

425.  The June 19, 2014, Dunn Declaration at p. 3 states the following:

---

[459] FTB_Philips 0000608, 0000610, 0000623.
[460] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10, Annex XII; Affidavit of David Leonard, May 2, 2012, ¶ 15, Annex XXV, Ex. 46.
[461] This issue is addressed, e.g., in the 1991 ASAB at § 1.7.5.
[462] This issue is addressed, e.g., in the 1992 ASAB at § 1.7.3.
[463] Fujitsu:  GLR 03672.
[464] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 18, Annex XII.

189

RJN1467

8.  Hyatt received many millions of dollars in income in 1991 and 1992 as a result of licensing agreements (essentially settlement and release agreements) concerning certain patents, the key patent being the '516 patent or for the microchip processor. The subsequent audit indicated that Hyatt performed the work that resulted in the patents and licensing fees while he resided in California.

This Dunn statement is false. First, the disputed license payments I received during 1991 and 1992 came from sublicensing 23 or 24 patents by Philips through license agreements entitled Patent Agreement. Second, the licensing agreements were not "essentially settlement and release agreements" and they were not "concerning certain patents" each was a license for the term of the agreement, which term was looking forward, not backward. Typical of these forward looking license agreements, the Fujitsu Patent Agreement provided, "hereby transfers and grants *during the term of this Agreement* a nonexclusive, worldwide, irrevocable license to COMPANY" (emphasis added). These licenses were not "concerning certain patents", they covered all of the 23 or 24 patents equally. Third, the '516 patent was only one of 23 or 24 of my patents that were licensed. There was no "key" patent. Fourth, regarding the statement "Hyatt performed the work that resulted in the patents and licensing fees while he resided in California", I reported on my part year 1991 tax return and *I paid all of the taxes on the "licensing fees"* that I received before I moved to Las Vegas (I received $200,000 from Pioneer for an option agreement and $400,000 from Philips as a license payment). Those payments were reported on my 1991 California part year tax return and are not in issue regarding the disputed license payments. Fifth, I understand that under Cal. Rev. & Tax Code § 17952 patents are intellectual property and thus have a situs that follows the owner. Thus, when I moved to Las Vegas on September 26, 1991, the situs of my patents moved with me, ¶ 347, above.[465]

---

[465] 1992 ASAB, § 1.7.1.1, pp. 41-42.

190

426.  The June 19, 2014, Dunn Declaration at p. 3 states the following:

> 9. Although Hyatt ultimately lost his patent claims related to the microchip processor in an interference action, this was not until Hyatt had received hundreds of millions of dollars from Japanese electronics companies.

This Dunn statement is false.  First, the patent survived for the balance of its full 17 year term.  Second, the license payments during the disputed period resulted from the licensing of a portfolio of 23 or 24 of my patents, not from licensing of a single patent.  For example, the Fujitsu Patent Agreement licensed 24 of my patents, H 017210.

427.  The June 19, 2014, Dunn Declaration at p. 3 states the following:

> 11. The FTB continued the correspondence inquiring into Hyatt's claimed nonresidency, business activities and the source of his income.

428.  This Dunn statement is false.  Rather than continuing the inquiry, FTB delayed the protest for 11 years, such as by putting the protest on hold.  See ¶¶ 404-406, 717, 737 herein.  FTB belatedly waited until its 1991-1992 NOA's on December 26, 2007, to raise sourcing as an issue.[466]

429.  The June 19, 2014, Dunn Declaration at p. 4 states the following:

> 12. Cox issued a lengthy and detailed tentative determination letter in July 1995 that concluded Hyatt remained a California resident through April 2, 1992 and that his 1991 California return was fraudulent.  Cox gave Hyatt time to respond to the tentative conclusions, answer unanswered questions, and provide documentation to support his position.  There was correspondence with Hyatt through 1995 and into 1996.  After a review of FTB audit's work by Los Angeles supervisors, Sacramento supervisors, and FTB's Technical Resources and Review Section, a Notice of Proposed Assessment (" NPA") was issued for the 1991 year on April 23, 1996.

---

[466] 1991 ASAB, § 1.8.5, pp. 30-41.

191

RJN1469

1    A jury found that Sheila Cox conducted a fraudulent audit and the Nevada Supreme Court has

2    now affirmed that decision, *Franchise Tax Board of the State of California v. Hyatt*, 130 Nev.

3    Adv. Op. 71 (2014).

4         430.    The June 19, 2014, Dunn Declaration at p. 4 states the following:

5              13.    Based on Cox's findings, an NPA for 1992 was required.
        Hyatt did not file a 1992 California return.  Sacramento reviewers
6       determined that Hyatt's presence and business activity in California
        in 1992 (as set out in Cox's determination letter and supported by
7       the audit file) warranted the fraud penalty.    After more
        correspondence with Hyatt's representatives, and case development
8       in Sacramento, FTB issued an NPA for 1992 on August 14, 1997.

9    There really was no 1992 audit.[467]  FTB did not conduct a full and fair audit for 1992.

10   1991 ASAB § 1.8.4.10 and 1992 ASAB §1.7.1.  With a few exceptions, the 1992 audit findings

11   were primarily a repetition of the 1991 findings with minimal additional factual investigation or

12   legal analysis.  The facts for 1992 were significantly different from the facts in 1991.  In its zeal

13   to close out the 1992 audit with minimal effort, FTB ignored the substantial factual differences

14   between 1991 and 1992.  As stated in ¶ 429, above, a jury found that Sheila Cox conducted a

15   fraudulent audit and the Nevada Supreme Court has now affirmed that decision, *Franchise Tax

16   Board of the State of California v. Hyatt*, 130 Nev. Adv. Op. 71 (2014).

17        431.    The June 19, 2014, Dunn Declaration at p. 4 states the following:

18            15.  In late 1999, FTB issued a comprehensive Information and
        Document Request ("IDR").    FTB asked (again) many of the
19      questions Hyatt never answered at audit and again requested
        documentation.  Hyatt requested six months to respond.

20

21   This Dunn statement is false.  On December 30, 1999, six years after the audit began, FTB

22   issued a draconian information request with 187 parts, each having up to 50 subparts.  I timely

23   _____

24        [467] 1992 AOB, § I., pp. 4-6; 1992 ARB, § II., pp. 2-3.

192

RJN1470

1  responded on June 30, 2000.[468]  I had fully cooperated with FTB during the audit and protest

2  pursuant to FTB's request for information.  The reason that the new request asked questions that

3  had not been previously answered is because the questions had not been previously asked, ¶ 409,

4  above.

5        432.  The June 19, 2014, Dunn Declaration at p. 5 states the following:

6          In mid-2000 (while discovery in his Nevada litigation was
        ongoing) Hyatt responded to the FTB's IDR.  Hyatt also filed two

7          lengthy narrative protest letters.  The PHO held an oral protest
        hearing on two dates and informed Hyatt that his argument and

8          documentation was insufficient and unresponsive.  At
        approximately this time the Nevada court issued a protective order

9          with language, requested by Hyatt, which allowed Hyatt to
        unilaterally designate discovery in the Nevada litigation that could

10          not be shared with FTB's PHO.  The protective order also directed
        how FTB could use its administrative subpoena process.  Hyatt

11          then designated discovery under the protective order that included
        the answer to the earlier asked (at audit and protest) question:

12          "Where/when did you move?"  Hyatt also designated details about
        the timing and amount of his 1991 and 1992 income under the

13          protective order, among many other facts.  This served to bar
        highly relevant evidence needed by the PHO and greatly delayed

14          the protest proceedings.

15  This Dunn statement needs clarification.  The 1991 and 1992 protest hearings did not have any

16  identified requirement to be sufficient or responsive and had no specific document requirement.

17  My representative's arguments at the protest hearings were not found to be "insufficient and

18  unresponsive".  Mr. Dunn provides no evidence to support his false claim.  See ¶¶ 407-413,

19  432-436, 733-743 herein regarding the protective order issue.  See ¶¶ 10, 31-35, 91, 95, 96, 675

20  herein regarding the issue of the response to the 1995 document request.

21        433.  My counsel requested and obtained a protective order from the Nevada court to

22  protect my confidential information.  The protective order did not prevent FTB from conducting

23  ─────────────────────

24  [468] P00052-00053.

the protests independent of the court proceeding and did not interfere with the progress of the protests. However, FTB chose to delay the protests and attempt to obtain documents covered by the protective order rather than conduct proper 1991 and 1992 independent protests. The circumstances were in FTB's control. FTB's own action fueled the protective order-related events. It was FTB that requested the documents during the Nevada litigation. FTB was fully aware that I was under no obligation to provide FTB· unfettered access to my Nevada tort litigation documents in the wholly separate California administrative protest proceeding. A more complete discussion of the Nevada Protective Order is set forth in 1992 ARB pp. 85-87 and 97-99. See ¶¶ 407-413, 432-436, 733-743 herein regarding the protective order issue.

434. Mr. Dunn's statement that FTB had earlier asked at audit and protest "Where/when did you move?" needs clarification. The protective order did not bar highly relevant evidence needed by the PHO (protest hearing officer). FTB was free to seek relevant evidence through the protest proceedings independent of the court proceeding. See ¶¶ 407-413, 432-436, 733-743 herein regarding the protective order issue. See ¶¶ 10, 31-35, 91, 95, 96, 675 herein regarding the issue of the response to the 1995 document request.

435. The June 19, 2014, Dunn Declaration at p. 5 states the following:

> 17. In 2000, FTB appealed the validity of the Nevada protective order (and other decisions of the lower court) to the Nevada Supreme Court. The Nevada Supreme Court issued an order staying the protective order pending its decision. In mid-2002 the Nevada Supreme Court decided all the issues in FTB's appeal and let the protective order stand. FTB immediately followed the procedures set forth in the protective order and asked Hyatt to release the designated information to the PHO for consideration in the California tax matter. Hyatt refused. FTB issued an administrative subpoena for the information. Hyatt filed a motion to quash in California Superior Court, lost, and then filed an appeal. Hyatt lost the appeal and FTB's PHO received the documentation in early 2004. The California appellate court held that there was no reason why FTB personnel working on the

194

RJN1472

> protest should not have access to evidence produced by Hyatt in
> his Nevada litigation. Subsequently FTB's PHO issued additional
> IDR's and continued to engage Hyatt's representatives in
> correspondence.

This Dunn statement is false. As stated in ¶¶ 432-434, above, FTB was in control of the circumstances in the protest proceeding. Irrespective of any stay of the protective order, the protective order itself stated FTB was not limited in any way under California law by the protective order. Further, there was no stay of the entire protective order by the Nevada Supreme Court as claimed by FTB.[469] It was FTB that requested the documents during the Nevada litigation. FTB was fully aware that I was under no obligation to provide FTB· unfettered access to my Nevada tort litigation documents in the wholly separate California administrative protest proceeding. A more detailed discussion of the Nevada Protective Order is set forth in 1992 ARB pp. 85-87 and 97-99. See also ¶¶ 407-413, 432-436, 733-743 herein regarding the protective order issue.

436. The June 19, 2014, Dunn Declaration at p. 6 states the following:

> 18. Toward the end of 2004, Hyatt was ordered by the Nevada
> court to produce documentation to FTB and FTB was allowed to
> continue deposition discovery. Despite the 2003 California
> appellate court holding, Hyatt continued to designate evidence
> relevant to his California tax protest under the Nevada protective
> order. In late 2005 FTB issued a second administrative subpoena
> for this information. Hyatt at first refused to produce this
> information, relenting only upon threat of FTB beginning
> California judicial enforcement of its second subpoena. Hyatt
> provided the PHO with documentation from the second subpoena
> in early 2006. Subsequently the PHO issued additional IDRs. In
> 2006 Hyatt designated yet more relevant information under the
> protective order. FTB issued a third demand. Finally, in mid-
> 2007, the PHO had received enough information to conclude the
> protest. In November 2007 FTB issued NOAs upholding the audit

---

[469] 1992 ARB, p. 85, fn. 550.

195

1    assessments and fraud penalties in their entirety.

2    This Dunn statement needs clarification.  FTB's delays and errors throughout the protest

3    proceeding were numerous and successive.  FTB refuses to recognize the unreasonable delays

4    and errors it caused and instead, repeatedly attempts to shift the blame to me.  A detailed

5    discussion of FTB's delays and errors during the protest proceeding is set forth in 1992 ARB,

6    § VII, pp. 82-100.  See ¶¶ 407-413, 432-436, 733-743 herein regarding the protective order issue.

7        437.    The June 19, 2014, Dunn Declaration at p. 6 states the following:

8            19.  Throughout this tax matter, Hyatt has alternatively complained
             that the tax process violates his California and US Constitution due

9            process rights either due to too much time passing, or because he is
             not given enough time to submit his briefs.  See, Exhibit 1, a

10           November 20, 2007 letter from Hyatt's tax attorney complaining
             about the passage of time, but insisting that Hyatt be allowed six

11           months to respond to the PHO's November 1, 2007 determination
             letter.  The PHO's November 26, 2007 response, Exhibit 2 hereto,

12           addressed Hyatt's inconsistent positions of urging the process on
             while at the same time impeding it.

13

14   This Dunn statement is false.  I was not impeding and could not impede the progress of the 1991

15   and 1992 protests.  FTB's November 1, 2007, determination letter raised for the first time after

16   14 years of audit and protest proceedings the extremely complex issue of sourcing and my

17   representatives merely asked for sufficient time to prepare a response to this new and belatedly

18   raised issue.  FTB represented to my representatives during protest that I would have "ample

19   time" to respond should sourcing be raised as an issue; and which FTB then raised for the first

20   time in its November 1, 2007, determination letter and then refused my request for time beyond

21   30 days to respond.  The requested time to respond was the result of FTB waiting 14 years to

22   raise the issue, not the result of my seeking a fair opportunity to respond to the FTB belatedly

23   raised issue.  I was indeed denied a fair opportunity to respond to the belatedly raised highly

24   complex issue of sourcing.

196

RJN1474

438.    The June 19, 2014, Dunn Declaration at p. 6 states the following:

> 20. The FTB is still waiting for the Nevada Supreme Court decision in its appeal of the Las Vegas District Court's judgment in the litigation brought by Hyatt. The FTB took the matter of Nevada's jurisdiction to the U.S. Supreme Court in 2002 on a writ action, defended a trial in Las Vegas in 2008, filed briefing with the Nevada Supreme Court through 2010, and held oral arguments before the Nevada Supreme Court in 2012. The Nevada Supreme Court could issue a decision in the appeal at any time. The matter has been fully briefed, argued and submitted for two years.

The Nevada Supreme Court and the U.S. Supreme Court have now ruled and left intact the jury decision that FTB committed fraud against me and intentionally caused me emotional distress in the 1991 and 1992 tax audit, *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 144-145, 148-149 (Nev. 2014), aff'd in part and rev'd in part on other issues 136 S. Ct. 1277 (2016).

439.    The June 19, 2014, Dunn Declaration at p. 7 states the following:

> 21. That Hyatt used the Nevada litigation to impede the California tax proceedings became apparent when FTB discovered a March 17, 1998 memo from his California tax attorney, Eugene Cowan, to his Nevada and California litigation attorneys of record in the Nevada case. The memo reveals that it would be the deliberate strategy of Hyatt to attempt to quash information subpoenas. See, Exhibit 3 ("While there are no "pure" tax reasons to quash ... , there may be tactical reasons to do so (such as making the FTB work for its requests from now on or taking this opportunity to file the motion in the Nevada courts or otherwise").

This Dunn statement is false. This Dunn statement is another of many attempts by FTB to deceive your Board. Mr. Cowan did not impede the tax proceedings and he did not attempt to impede the tax proceedings. My representatives did not attempt to quash the subpoena discussed in Mr. Cowan's March 17, 1998, memo. Mr. Cowan's memo[470] merely complied with his duty as a lawyer to advise me on my available options, one of which was to attempt to quash the FTB

---

[470] Memo dated March 17, 1998, from Eugene Cowan, to Mark Hutchison et. al., PBTK 00014.

197

1  subpoena. As pointed out in the memo, the FTB subpoena, like the subpoenas limited by the

2  New York court, was overbroad. My representatives did not attempt to quash the subpoena. The

3  Dunn statement that the "memo reveals that it would be the deliberate strategy of Hyatt to

4  attempt to quash the information subpoenas" is a fabricated mischaracterization of Mr. Cowan's

5  memo and is false. There was no strategy to attempt to quash the information subpoenas or

6  delay the protests. To the contrary, we were trying to expedite the protests.

7     440.     The June 19, 2014, Dunn Declaration at p. 7 states the following:

> 22. Hyatt timely appealed the NOAs by filing a notice of appeal
> with the SBE in January 2008. The SBE granted Hyatt several
> opening briefing extension requests throughout 2008 (the period of
> Hyatt's Las Vegas, Nevada trial with FTB). In delaying his
> briefing, Hyatt tied the administrative appeal to the Nevada
> litigation, indicating to SBE that relevant evidence would come
> from discovery and trial in the Nevada litigation. See, Exhibits 4
> and 5, Hyatt' January 22 and 23, 2008 Notice of Appeal and June
> 9, 2008 Letter tying the Nevada litigation to the tax proceedings
> (pages SBE000024-25 and SBE000037-38). Again, Hyatt
> complains in this correspondence about the passage of time while
> at the same time demanding more time.

This FTB statement is false. My representatives did not delay briefing of this appeal. FTB

belatedly raised the issue of sourcing in its November protest determination letter and NOAs

without giving me a fair opportunity to respond during the protest. See ¶ 437, above. It was

therefore necessary to address the very complex issue of sourcing for the first time before your

Board and it took time to develop the case.

441.     My attorney filed a Notice of Appeal for the 1991 tax year that included a

Request to Supplement Notice of Appeal which pointed out to your Board at pp. 4-5 that Nevada

tort case was pending and that a six week trial was scheduled to begin on April 4, 2008.[471] The

Notice of Appeal indicated that an additional extension of time in the future was anticipated. It

_____

[471] 1991 Notice of Appeal dated January 22, 2008, SBE 000021-000025, at 000024.

198

RJN1476

1    did not "tie" the Nevada litigation to the tax proceeding.  A Notice of Appeal for 1992 dated

2    January 23, 2008, contained similar language.[472]

3        442.    The June 19, 2014, Dunn Declaration at p. 7 states the following:

4            23.    After Hyatt requested and obtained from SBE multiple
             extensions of time he filed his opening briefs with SBE in
5            December 2008.   Hyatt's briefing totaled 175 pages, with
             voluminous attachments and exhibits.    As support for his
6            nonresidency claim Hyatt appended 26 new affidavits, including
             affidavits from witnesses never identified by Hyatt before.  During
7            the audit and protest, Hyatt elected not to provide these 26
             affidavits although he had the right to do so.  Even though he was
8            obligated to do so by virtue of FTB's formal discovery requests,
             Nevada Court orders, and Nevada rules, Hyatt failed to identify as
9            witnesses many of these affiants.

10   This Dunn statement is false.  I did not delay briefing of this appeal.  FTB belatedly raised the

11   issue of sourcing in its November protest determination letter and NOAs without giving me a fair

12   opportunity to respond during the protest.  See ¶ 437, above.  It was therefore necessary to

13   address the very complex issue of sourcing for the first time before your Board and it took time

14   to develop the case.

15       443.    I did not "elect" not to provide affidavits during the audit and protest.  FTB raised

16   many new issues and made many false statements in the protest determination letter and NOAs

17   and I provided the additional evidence that was appropriate to respond.  I diligently responded to

18   all of the FTB information requests during audit and protest.  The Dunn declaration provides no

19   evidence to the contrary.  I did not fail to identify any witnesses.  I identified witnesses as asked

20   for in the FTB information requests.  Many of the witnesses I did identify were disregarded by

21   FTB.[473]  For example, my representatives formally disclosed more than 100 witnesses and their

22

23   ───────────────────

24   [472] 1992 Notice of Appeal dated January 23, 2008, SBE 000034-000038, at 000037.
     [473] See, e.g., Annex III, 1991 Protest Supplement Letter, 5/31/01, pp. 64-72, 75-81.

199

RJN1477

1  relevance but FTB totally disregarded them.[474]  Further, FTB significantly changed its

2  allegations in these appeals, so my representatives had to develop new evidence to rebut FTB's

3  new allegations.

4      444.    The June 19, 2014, Dunn Declaration at p. 7 states the following:

5            Over Hyatt's objection, and without Hyatt's cooperation to assist
          locating or scheduling his affiant's depositions, FTB issued

6            administrative subpoenas in California and Nevada and, soon
          thereafter, took depositions of several of Hyatt's new witnesses.

7            FTB filed its opening briefing on September 15, 2009.

8  This Dunn statement is false.  My representatives cooperated in FTB's deposing the witnesses.

9  My representatives had no say in FTB's selection of witnesses or the locating of witnesses and

10  neither objected to nor condoned the selection of witnesses.  My representatives cooperated fully

11  with FTB attorneys in the scheduling of witness depositions.  FTB has taken 20 depositions of

12  my witnesses in this proceeding and all of my witnesses have stood by their written testimony

13  (see 1991 ASAB, § 1.8.6.5).  These depositions are very supportive of my contentions and

14  demonstrated that the statements that witnesses had made in their affidavits and declarations

15  were true and correct.  Twenty-seven tables having more than 800 testimonial excerpts that are

16  very supportive of my contentions are listed and briefly described in ASAB Exhibit 17 (Index of

17  Deposition Excerpts Tables).

18      445.    The June 19, 2014, Dunn Declaration at p. 8 states the following:

19            25.  On August 23, 2010 Hyatt filed his reply briefing, totaling 200
          pages and appending 34 new affidavits.  Two years later, on

20            August 15, 2012, Hyatt filed voluminous supplemental briefing in
          the SBE tax appeal and appended 93 additional affidavits and

21            declarations.

22  _____

23     [474] See the excerpts from my 1992 Supplemental Protest Letter in Exhibit CDE-P037 to
my 2016 Post-Disputed Period CDE Affidavit and the excerpts from my 1991 Supplemental

24  Protest Letter in Exhibit CDE-P038 to my 2016 Post-Disputed Period CDE Affidavit.

1   This Dunn statement needs clarification.  The additional evidence was provided to respond to the

2   new issues and false statements raised by FTB.  At that time my representatives explained that

3   FTB makes "repeated bold untrue statements without citations" and cites to evidence that does

4   not support its statements.[475]  The many affidavits and declarations I have submitted as well as

5   the huge amount of documentary evidence I have submitted establish that I moved to Las Vegas

6   in September 1991, that the sublicensing payments in dispute resulted from the ordinary course

7   of licensing my Nevada situs patents, and that the sublicensing payments in dispute did not

8   represent California source income.

9           446.    The June 19, 2014, Dunn Declaration at p. 8 states the following:

10              26.   Among Hyatt's new 2010 affidavits was one from Algy
            Tamoshunas a former employee of Hyatt's licensing agent in New
11          York, Philips.  In 2010 Hyatt also submitted other lengthy and self-
            serving new affidavits attempting to recast the Hyatt/Philips 1991
12          and 1992 written agreements.  In 2011, FTB issued subpoenas to
            obtain Hyatt/Philips licensing business documents from Philips
13          and to take depositions of Mr. Tamoshunas and one other former
            Philips employee, all in New York.  Philips did not object to this
14          discovery, but Hyatt immediately began efforts to block production
            of this highly relevant evidence.

15

16  These Dunn statements are false.  First, the declarations and affidavits are not self serving and do

17  not recast the Philips agreements, the declarations and affidavits provide true and correct

18  statements of eyewitnesses with significant support from consistent testimony from other

19  witnesses.  FTB deposed 20 of my witnesses and established for me that the witnesses statements

20  were true and correct.  Second, Mr. Tamoshunas was not just an employee of Philips, he was the

21  lead licensing attorney on the Philips Licensing Program for my patents.  He helped create and

22  manage the Philips Licensing Program and he was one of several attorneys that negotiated the

23  _____

24      [475] 1991 ASB, p. 2:3-8.

201

RJN1479

1  license agreements. Third, Philips was not my licensing agent. Sections 4.1 and 4.3 of the July

2  1991 Philips Agreement[476] granted Philips exclusive rights and fiduciary responsibility to license

3  my patents. Philips had the authority to negotiate and sign patent agreements in its own name

4  and it in fact did so.[477]

5      447.   Fourth, FTB falsely states that I submitted affidavits that attempted to recast the

6  July 1991 Philips Agreement, but identifies not a single instance to support its false statement.

7  To the contrary, it is FTB that has attempted to mischaracterize the July 1991 Philips Agreement.

8  For example, in its Attachment A (Revised), p. 139, FTB falsely states, "July 9, 1992—Hyatt

9  receives second guaranteed payment". FTB is referring to the second payment to me for the

10  Philips patent license under Section 3.1, which does not provide a "guarantee".

11     448.   There was no "Hyatt/Philips licensing business" but Mr. Dunn falsely states that

12  FTB issued subpoenas to obtain "Hyatt/Philips licensing business documents" from Philips.

13  Under Sections 4.1 and 4.3 of the July 1991 Philips Agreement Philips[478] by itself was granted

14  exclusive rights and fiduciary responsibility to license my patents. Mr. Tamoshunas, a Philips

15  licensing executive, has acknowledged that Philips by itself created and managed the Philips

16  licensing program.[479] I had no ownership or management control of the Philips Licensing

17  Program.

18     449.   Mr. Dunn falsely states that FTB sought highly relevant evidence from Philips.

19  To the contrary, FTB issued overbroad subpoenas to seek irrelevant evidence and I protected my

20  rights to prevent discovery of irrelevant evidence by the unlawful, overbroad subpoenas issued

---

[476] FTB_Philips 0000608, 0000610.
[477] For example, see the Sanyo Patent Agreement, H 018813-018822.
[478] FTB_Philips 0000608, 0000610.
[479] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10, Annex XII.

RJN1480

1    by FTB. The New York courts significantly limited the scope of discovery FTB could obtain

2    through its subpoenas. Even after the court ruled on the permissible scope of discovery FTB

3    violated the court order and I had to seek enforcement of the court order.[480] I produced

4    thousands of the most important licensing documents to FTB by 2005 which the Philips

5    document production merely duplicated.

6       450.    The June 19, 2014, Dunn Declaration at p. 8 states the following:

> 27. In July 2011 Hyatt hired New York counsel and filed a motion
> to quash FTB's subpoenas, requesting a hearing on an emergency
> basis. FTB quickly briefed the issues and appeared in New York
> with New York counsel. Hyatt's motion to quash failed, but the
> New York court limited the scope of FTB's subpoenas. Hyatt
> timely appealed the decision to a New York appellate court and
> requested that document production be stayed. Hyatt's stay request
> was denied. In August 2011 FTB received, in large part, the
> Hyatt/Philips licensing business files from 1991 and 1992,
> approximately 8,000 pages. FTB deposed one New York
> witnesses in 2011 and (because Hyatt's motion caused a long
> scheduling delay) the second in 2012.

14    This Dunn statement is false. Again, Mr. Dunn has piled false statement on top of false

15    statement. My motion to quash did not fail. It resulted in the New York court significantly

16    limiting the scope of FTB's unlawful, overbroad subpoenas.[481] FTB attempts to leave your

17    Board with the false impression that I caused the appeal delays because I appealed the lower

18    court decision to limit the overbroad scope of the FTB subpoenas. However, FTB also appealed

19    the lower court decision.

20       451.    Mr. Dunn once again makes a false reference to a "Hyatt/Philips licensing

21    business". There was no "Hyatt/Philips licensing business" but Mr. Dunn falsely states that FTB

---

[480] 1991 ASAB, § 1.7.4.
[481] 1991 ASAB, § 1.7.4.

203

RJN1481

obtained "Hyatt/Philips licensing business files" from Philips.  Under Sections 4.1 and 4.3 of the July 1991 Philips Agreement Philips[482] by itself was granted exclusive rights and fiduciary responsibility to license my patents.  Mr. Tamoshunas, a Philips licensing executive, has acknowledged that Philips by itself created and managed the Philips licensing program.[483]  I had no ownership or management control of the Philips Licensing Program.

452.    Mr. Dunn falsely states that the second New York witness (Mr. Haken) was not deposed until 2012 because I created a long scheduling delay.  To the contrary, Mr. Haken's deposition was postponed to 2012 because Mr. Haken was out of the country for an extended period of time.

453.    The June 19, 2014, Dunn Declaration at pp. 8-9 states the following:

> 28.  On October 5, 2012, on Hyatt's emergency motion, the New York appellate court issued an order blocking FTB's submission of the Hyatt/Philips licensing business files to the SBE pending the outcome of Hyatt's appeal.  Not until February 3, 2013 did the New York appellate court rule, upholding the trial court.  Hyatt then filed a motion to suppress approximately 300 documents produced to FTB by Philips.  On October 7, 2013 the trial court ruled that some documents received by FTB should be suppressed, and some should be redacted.  Hyatt moved to reargue parts of the decision in December 2013.  Concurrently, FTB asked the court to correct its decision as to 10 documents.  On March 13, 2014 the trial court issued its final order granting most of FTB's requests, and denying Hyatt's December 2013 motion.  In April 2014 (just before Hyatt filed this federal litigation) the New York court decisions became final and FTB was free to submit the Philips documents to the SBE in Hyatt's appeal.

This Dunn statement is false.  Mr. Dunn once again makes a reference to a "Hyatt/Philips licensing business".  There was no "Hyatt/Philips licensing business" but Mr. Dunn falsely states

---

[482] FTB_Philips 0000608, 0000610.
[483] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10, Annex XII.

204

that FTB obtained "Hyatt/Philips licensing business files" from Philips. Under Sections 4.1 and

4.3 of the July 1991 Philips Agreement Philips[484] by itself was granted exclusive rights and

fiduciary responsibility to license my patents. Mr. Tamoshunas, a Philips licensing executive,

has acknowledged that Philips by itself created and managed the Philips licensing program.[485] I

had no ownership or management control of the Philips Licensing Program.

454. Even after the New York court order limiting the unlawful scope of FTB

subpoenas became final FTB continued to violate the court order. It became necessary for my

representatives to obtain further orders correcting FTB's violation of the previously issued court

order.[486] My representatives obtained a temporary restraining order that forced FTB to refile its

briefs to comply with the New York court's orders.[487]

455. The June 19, 2014, Dunn Declaration at p. 9 states the following:

> 29. The New York litigation over the documents resolved, the
> SBE requested briefing by FTB (in an-April 23, 2014 letter) of the
> Hyatt/Philips licensing business files and the now more that 100
> new affidavits and declaration Hyatt filed with and after his
> supplemental briefing. FTB's additional briefing was due June 23,
> 2013, Hyatt's responsive additional briefing was due July 23, 2014.
> The parties were granted 60 total pages. The SBE proposed an
> oral hearing date of October 14, 2014.

This Dunn statement is false. Mr. Dunn once again makes a false reference to a "Hyatt/Philips

licensing business". There was no "Hyatt/Philips licensing business." However, Mr. Dunn

states that FTB obtained "Hyatt/Philips licensing business files" from Philips. Under Sections

---

[484] FTB_Philips 0000608, 0000610.

[485] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10, Annex XII.

[486] ASAB Exhibit 12, Mr. Hyatt's Motion for an Order of Civil Contempt and Injunctive Relief dated March 11, 2015 filed with Supreme Court of the State of New York, County of Westchester.

[487] ASAB Exhibit 13, Temporary Restraining Order of Supreme Court of the State of New York, Appellate Division.

205

RJN1483

4.1 and 4.3 of the July 1991 Philips Agreement Philips[488] by itself was granted exclusive rights and fiduciary responsibility to license my patents. Mr. Tamoshunas, a Philips licensing executive, has acknowledged that Philips by itself created and managed the Philips licensing program.[489] I had no ownership or management control of the Philips Licensing Program.

456.    My representatives have filed more than 220 affidavits/declarations from more than 150 witnesses and thousands of pages of documents that establish beyond a doubt that I moved to Las Vegas in 1991, and that I had no California source income after my move to Las Vegas.[490] I have also provided three affidavits listing, describing and authenticating thousands of pages of contemporaneous documentary evidence.[491]

457.    The June 19, 2014, Dunn Declaration at p. 9 states the following:

> 30.   In response to the SBE's briefing schedule and proposed hearing date, Hyatt objected to the time and page restraints. Hyatt requested twice the time given to FTB to brief (120 days) and twice the page limit given to FTB. See, Exhibit 6, Hyatt's tax attorney's May 7, 2014 letter to SBE. On June 13, 2014 the SBE responded, by requiring FTB to file its additional briefing on July 16, 2014, and Hyatt to file his responsive additional briefing on December 16, 2014. The parties were granted 120 total pages. The SBE also tentatively notified the parties that oral argument in this appeal will be scheduled in Sacramento "in or after" March 2015.

This Dunn statement needs clarification. FTB violated the orders by the New York court with its Second Additional Briefings (RSABs) three different times causing years of delay and eventually requiring your Board to take charge, redact FTB's RSABs, and submit to my representatives redacted versions of the RSABs that they were permitted to respond to.

---

[488] FTB_Philips 0000608, 0000610.
[489] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10, Annex XII.
[490] See 1991 ASAB, § 1.3.3, Updated Comprehensive List of Mr. Hyatt Witnesses.
[491] (1) Hyatt DP CDE Affidavit, July 24, 2012; (2) Hyatt Supp. CDE Affidavit, September 6, 2016; and (3) Hyatt Post-DP CDE Affidavit, September 6, 2016.

206

RJN1484

458.    The June 19, 2014, Dunn Declaration at pp. 9-10 states the following:

> 31.  Hyatt's allegations of FTB's alleged personal bias towards him have been extensively briefed and argued in multiple forums over the years.  See, Exhibit 7.  The allegations of bias and misconduct arise entirely from the testimony of one witness, Candace Les.  Ms. Les is a former FTB tax auditor who was fired by FTB for cause in 1998 based upon 12 charges of misconduct, which included accepting gifts and favors, dishonesty, and intentionally misplacing audit records.  Ms. Les was coached extensively by Hyatt's attorneys in the Nevada litigation.  She worked with Hyatt and Hyatt's attorneys for hundreds of hours under the expectation of remuneration for her assistance.  Ms. Les accused her former friend and colleague Sheila Cox (the third auditor assigned to the Hyatt audit) of privately referring to Hyatt as a "Jew bastard," wanting "to get" him, rifling through his mail, and going through his trash.  These allegations were vehemently denied by Ms. Cox and not corroborated by a single other witness.  Ms. Cox was not a management level FTB employee or a final decision maker.  Her findings and conclusions were in the nature of recommendations reviewed by many layers of supervisors, management and FTB tax attorneys before a final decision was reached concerning Hyatt's tax liability.  Ms. Cox left the FTB many years ago and does not have any involvement or decision making authority in the protest or appeal processes.

This Dunn statement is false.  First, the allegations of bias and misconduct arise from dozens of FTB employees who were deposed by my attorneys and from secret FTB archives obtained through court ordered discovery.  For example, the reviewers for the 1991 and the 1992 audits both questioned the assessments of fraud penalties but were over-ridden by FTB management and the fraud penalties were assessed against me (1991 ASAB § 1.9.2).  The fraud penalties perpetrate a fraud on me (1991 ASAB § 1.9).  Ms. Cox created the $24 million error and FTB perpetrated it for decades and caused me severe emotional distress before your Board ordered FTB to brief its position.  Now, FTB admitted to its $24 million error but has left the tens of millions of dollars of assessments in place to continue its intentional infliction of emotional distress toward me.  This briefing (RAB and AAB) confirmed FTB's fraud on me with its $24 million error.  See my First Additional Brief (AAB) and see my three affidavits regarding this

207

RJN1485

1   issue.[492]  See also 1991 ASAB §§ 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10 and 1992 ASAB § 1.7.5.  See

2   my six tables of FTB's bad faith acts testified to by independent third party eyewitnesses and my

3   ASAB Attachment 1 which describes more of FTB's bad faith acts against me.[493]  FTB then

4   turned loose its investigators to falsely attempt to discredit many of my third party eyewitnesses

5   with false declarations signed under penalty of perjury.[494]  Furthermore, the Nevada Supreme

6   Court and the U.S. Supreme Court have now ruled and left intact the jury decision that FTB

7   committed fraud against me and intentionally caused me emotional distress in the 1991 and 1992

8   tax audit, *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 144-145, 148-149 (Nev. 2014), aff'd

9   in part and rev'd in part on other issues 136 S. Ct. 1277 (2016).  See also my ASAB Attachment

10   1 regarding FTB's bad faith acts against me.

11        459.   The June 19, 2014, Dunn Declaration at p. 10 states the following:

12            32.  The current litigation to enjoin the California tax proceedings
              is consistent with Hyatt's pattern of strategic litigation.  Hyatt has
13            used the courts to interfere with the FTB's routine processes
              through litigation in Nevada, California, and New York.

14

15   This Dunn statement is false.  I have used the Nevada and New York courts to protect myself

16   against FTB's illegal and fraudulent activities directed at me.  Mr. Dunn seems to be admitting

17

18   ―――――――――――――

19       [492] See my Affidavit Regarding FTB's $24 Million Error, my Supplemental Affidavit
   Regarding FTB's $24 Million Error, and my Second Supplemental Affidavit Regarding FTB's
   $24 Million Error.
20       [493] Table of False Statements Made in the FTB Audit File, Supp. Table of False
   Statements Made in the FTB Audit File, Table of False Statements Made by William Savage,
21   Supp. Table of False Statements Made by William Savage, Table of False Statements Made by
   Jake Dameron, and Supp. Table of False Statements Made by Jake Dameron; ASAB Attachment
22   1.
       [494] Table of False Statements Made by William Savage, Supp. Table of False Statements
23   Made by William Savage, Table of False Statements Made by Jake Dameron, and Supp. Table of
   False Statements Made by Jake Dameron; Appellants Motion to Strike and Objections to FTB
24   Private Investigator and FTB Attorney Declarations.

1  that these illegal and fraudulent FTB activities are "FTB's routine processes".  I brought the

2  Nevada tort action in response to torts that were committed against me during the 1991 and 1992

3  audits and protests.  The U.S. Supreme Court has now let stand a Nevada jury determination that

4  FTB committed fraud in the auditing of my 1991 and 1992 tax liabilities, *Franchise Tax Board*

5  *of California v. Hyatt*, 136 S. Ct. 1277 (2016).  I brought the New York court proceeding to

6  protect myself against the unlawful, overbroad subpoenas issued by FTB with no oversight by

7  any court.  The New York courts found the FTB subpoenas were in fact overbroad and

8  significantly limited the scope of the FTB subpoenas.  Even after the New York court ordered

9  limitations on the scope of the FTB subpoenas FTB violated the order and I was forced to bring

10  enforcement action against FTB to obtain compliance with the New York court order.[495]  My

11  representatives obtained a temporary restraining order and FTB was required to refile its briefs to

12  comply with the New York court's orders.[496]  FTB continues to make thousands of false

13  statements and mischaracterizations of documents that have required enormous time and effort to

14  rebut and that have unnecessarily delayed these proceedings.

15      460.    The June 19, 2014, Dunn Declaration at p. 11 states the following:

16      33.  Even after filing his Complaint in this present action, Hyatt
   requested substantially more time to file his briefs beyond the

17  October 14, 2014 hearing date SBE scheduled.  This caused the
   hearing to be put out even further, now to some time in or after

18  March 2015.  Before this recent request Hyatt requested and
   received many, many extensions of time to file his briefs.  This

19  gave him years to obtain more than one hundred affidavits and
   declarations from witnesses more than 15 years after the fact.  This

20  activity has caused the appeal proceedings to span the years 2008

---

22  [495] ASAB Exhibit 12, Mr. Hyatt's Motion for an Order of Civil Contempt and Injunctive
   Relief dated March 11, 2015 filed with Supreme Court of the State of New York, County of

23  Westchester.
   [496] ASAB Exhibit 13, Temporary Restraining Order of Supreme Court of the State of

24  New York, Appellate Division.

> through the present date, and, as currently scheduled in response to
> Hyatt's most recent request, now into 2015.

This Dunn statement is false. FTB continues to make thousands of false statements and mischaracterizations of documents that have required enormous time and effort to rebut and that have unnecessarily delayed these proceedings. Extensions of time have been requested because they are required to acquire evidence and prepare rebuttals to the thousands of false statements and mischaracterizations that continue to be made by FTB. My representatives filed more than 220 affidavits/declarations from more than 150 witness and thousands of pages of documents that establish beyond a doubt that I moved to Las Vegas in 1991 and that I had no California source income after my move to Las Vegas.[497] I have also provided three affidavits listing, describing, and authenticating thousands of pages of contemporaneous documentary evidence.[498]

461. The FTB 1991 Concluding Summary at p. 29 states the following.

> The many unreasonable delays are attributable to Mr. Hyatt
> and have been discussed at length in Respondent's Opening Brief
> (Case No. 446509) at pages 30 through 57 and Respondent's
> Concluding Summary (1992) and those discussions will not be
> repeated here and are incorporated by reference as if set forth fully
> herein.

This FTB statement is false. FTB's delays and errors throughout the protest proceeding were numerous and successive. FTB refuses to accept the unreasonable delays and errors it caused and instead, repeatedly attempts to shift the blame to me. A detailed discussion of FTB's delays and errors during the protest proceeding is set forth in 1992 ARB, § VII, pp. 82-100.

**My Testimony Regarding FTB's 1992 Concluding Summary.**

462. The FTB 1992 Concluding Summary at p. 1 states the following.

> Whether appellant became a nonresident of California (as defined
> by Revenue and taxation Code § 17014) on September 26, 1991, or
> at any other time prior to January 1, 1992?

---

[497] See 1991 ASAB, § 1.3.3, Updated Comprehensive List of Mr. Hyatt Witnesses.
[498] (1) Hyatt DP CDE Affidavit, July 24, 2012; (2) Hyatt Supp. CDE Affidavit, September 6, 2016; and (3) Hyatt Post-DP CDE Affidavit, September 6, 2016.

210

1  See ¶ 13, above.

2       463.   The FTB 1992 Concluding Summary at p. 1 states the following.

3            Whether appellant operated a business from California through
             December 31, 1992 that generated California source income under
4            Revenue and Taxation Code §§ 17951 and 17952.

5  I did not operate a business from California through December 31, 1992, as falsely alleged by

6  FTB.  I did not have a licensing business as also falsely alleged by FTB.  All of the license

7  payments that I received between September 26, 1991, when I moved to Nevada, and the end of

8  1992 came from the ordinary course of licensing my Nevada situs patents, not from any

   operation of a California business.  See ¶¶ 14, 89, 90, 205, 279, 376, 380 herein.

9       464.   In July 1991, before I moved to Las Vegas, I granted Philips an exclusive right to

10 sublicense them and Philips assumed the responsibility for an interference proceeding on one of

11 my patents.  Philips had a world-class licensing capability with a world-wide licensing

12 organization. [499]  It is absurd to suggest that I would compete with this great capability. [500]

13 Furthermore, Philips had to make minimum annual payments to keep the rights to license my

14 patents.  and Philips assumed responsibility for the interference.  In the July 1991 Philips

15 Agreement I represented that I would not compete with Philips.  I would not and I did not breach

16 my representations and warranties and my contractual obligations to Philips and I did not

   jeopardize my licensing income from Philips by breaching my agreement with Philips. [501]  I fully

17 complied with my contractual obligations and my representations and warranties to Philips by

18 not operating a licensing business.

19      465.   The FTB 1992 Concluding Summary at p. 1 states the following.

20           Was a fraud penalty (under Revenue and Taxation Code § 19131)
             properly imposed for tax year 1992.

21

22  _____

23  [499] See, e.g., 1992 ASAB, § 1.7.3.
    [500] See 1992 ASAB, § 1.7.3.
24  [501] See 1992 ASAB, § 1.7.3.

                                 211

1    I did not commit a fraud. I decided to move to Las Vegas in 1990 based in part on several

2    personal issues (e.g., the murder of my oldest son and the loss of my aerospace consulting).[502] I

3    prepared for my move to Las Vegas, I moved to Las Vegas on September 26, 1991, I

4    immediately worked to get settled in Las Vegas, I continue to reside in Las Vegas to the present,

     and I plan to live in Las Vegas for the rest of my life.[503]

5         466.   My 1991 part year California tax return accurately reflects my 1991 California

6    income. I moved to Nevada on September 26, 1991, I resided in Las Vegas since then, and I

7    have at all times since then had an honest and firm belief that I was a resident of Nevada.[504]

8         467.   The FTB 1992 Concluding Summary at p. 1 states the following.

9              Mr. Hyatt's appeal of the tax and penalty assessments
          respondent proposes be made against him relative to tax year 1992

10        is a companion appeal to Mr. Hyatt's appeal of the tax and penalty
          assessments respondent proposes with respect to tax year 1991.

11        While the years and assessments are different, both disputes arise
          from the questions of when did Mr. Hyatt sever his multi-decade

12        California domicile and establish residence in Nevada, and how
          much of the income he received during 1992 (and/or 1991) may

13        properly be taxed by California as California sourced income.

14             The first question ultimately turns upon the accuracy of Mr.
          Hyatt's contention that he left California on September 26, 1991,

15        or at any other time prior to January 1, 1992. The second requires
          an analysis of income received during 1992 and how it was

16        obtained, including the timing and location of efforts expended to
          generate that income. Respondent has provided a summary of its

17        arguments for 1991 and will endeavor not to duplicate that effort
          here, except where the contentions and evidence, or lack thereof,

18        overlap.

19   I moved to Las Vegas on September 26, 1991,[505] ¶ 22, above. I did not have any California

20   source income after September 26, 1991. All of the disputed license payments that I received

21   during 1992 were from Philips' sublicensing of my patents. All of the disputed license payments

---

22

23   [502] See Appellant's Concluding Summary (1991), § 1.4.
     [503] See 1991 ASAB, § 1.4.
     [504] See 1991 ASAB, § 1.9.8.
24   [505] Appellant's Concluding Summary (1991), §§ 1.4, 1.6

                              212

1  that I received during 1992 were wire transferred to my personal Nevada situs investment

2  accounts. None of the license payments I received went to any California situs account or to any

3  California business.[506]

4      468.    The two tax years have significantly different facts. Regarding my Nevada

   residency, I spent most of the 1991 disputed period in large part shopping for a house to purchase

5  and getting settled in Las Vegas and I spent the 1992 disputed period in large part making

6  purchase offers on houses and working to get the Las Vegas Tara house into escrow and getting

7  escrow closed. My two disputed period CDE affidavits[507] and the two disputed period

8  chronologies[508] illustrate the significant differences between the two disputed periods.

9      469.    Regarding the Philips Licensing Program, the 1991 disputed period had

   significant licensing activity in large part by Mahr Leonard while the 1992 disputed period had

10 very little licensing activity because the September 1991 Mahr Leonard contract with Philips had

11 expired and Philips was slow in getting its licensing program started.[509]

12     470.    The FTB 1992 Concluding Summary at p. 2 states the following.

13          Respondent's recitation of the relevant legal, administrative
            and statutory authorities has been previously and extensively
14          discussed at pages 68 through 77 of Respondent's Opening Brief
            for Taxable Year 1991 (Case No. 435770) and pages 19 through 23
15          of Respondent's 2007 Determination Letter,[4] that discussion will
            not be repeated here and is incorporated by reference as if set forth
16          fully herein.[5]

17          [Exhibit A, note] 4: Respondent's 2007 Determination Letter.

18          [Exhibit A, note] 5: Mr. Hyatt's tax administration expert
            acknowledges Mr. Hyatt bears the burden of proving California
19          non-residency, must overcome the full year residency presumption
            set forth in California Revenue Taxation Code section 17016 and

20

21  _____

22     [506] App. Reply to 1991 FTB Concluding Summary, § &&&&II. J.
       [507] Hyatt DP CDE Affidavit, July 24, 2012; Hyatt Supp. CDE Affidavit, September 6,
    2016.
23     [508] See my Updated 1991 Disputed Period Chronological Statements of Facts and
    Updated 1992 Disputed Period Chronological Statements of Facts.
24     [509] See 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9.

                                    213

the presumption of correctness associated with FTB's Notice of Proposed Assessments. 05/06/08 Trial Testimony (Antolin), p. 169.

This FTB statement is false. First, FTB has the initial burden of establishing that its assessments were reasonable and rational, but its assessments were not reasonable or rational. See 1991 ASAB, § 1.5.1.

471. Second, FTB has the burden of proving fraud, but I did not commit fraud. See 1991 ASAB, § 1.5.3. I moved to Las Vegas on September 26, 1991, and I have resided continuously in Las Vegas since then to the present with no intent to move anyplace else. It is FTB that committed a fraud on me, as determined by the Nevada jury and as confirmed by the Nevada Supreme Court. See 1991 ASAB, § 1.5.1. Furthermore, FTB fraudulently assessed taxes and even fraud penalties on its own $24 million error. See 1991 ASAB, § 1.5.1, § 1.7.2, § 1.8.5.4.4, § 1.8.5.4.5, and § 1.9.10 and 1992 ASAB, § 1.7.5. This caused me extreme emotional distress over a very long period of time, FTB was finally required to correct its income timing errors by your Board, but FTB still maintains its false assessments for tens of millions of dollars based on its fraudulent $24 million error.

472. Third, FTB has the burden of proving California source income. See 1991 ASAB, § 1.5.2.

473. Fourth, FTB has the burden of proving that I spent (not just lived) more than nine months in California (exclusive of presence for a temporary or transitory purpose) and FTB has failed to carry that burden. See ¶ 79, above.

474. Fifth, each of FTB's prior arguments has been rebutted in my prior briefing.[510] The full year residency presumption does not apply and Mr. Antolin did not say it applies. See ¶ 79, above.

475. The FTB 1992 Concluding Summary at p. 2 states the following.

---

[510] See 1991 AOB, pp. 4-39; 1992 AOB, pp. 4-34; 1991 ARB, pp. 68-72; 1992 ASB, p. 41; 1991 ASAB, § 1.5.1; Appellant's Concluding Summary (1991), § 1.6, p. 9.

214

RJN1492

Respondent contends that Mr. Hyatt was a long-time California domiciliary (since 1954)[6] and resident for the entire disputed period of September 26, 1991 through April 2, 1992. Objective, contemporaneous documents confirm Mr. Hyatt remained in California throughout the disputed period and that he did not move to Nevada, with an intent to remain in Nevada, on September 26, 1991, or at any time thereafter, until escrow closed on his Tara home on April 3, 1992. Contemporaneous statements by Mr. Hyatt[7] contradict his contention that he decided to permanently relocate to Las Vegas in November 1990.[8] More importantly, the objective, contemporaneous documentation demonstrates that Mr. Hyatt exercised a continuous personal and business presence in California, including access to his Jennifer Circle residence, throughout the contested period.

[Exhibit A, note] 6: FTB Trial Exhibit 2001-0277-282, 2001-0278.

[Exhibit A, note] 7: GLR 02191("Hyatt plans to keep his 1977 Toyota. 'It is still reliable and efficient,' he said. And he does not intend to move from the two-story tract house in La Palma, where he now lives."); FTB Exhibit HH, tab 28 ("'I'm a frugal person. I don't need money personally,' he said. His house meets his needs and he doesn't plan on moving, he noted."); and FTB Exhibit HH, Tab 52, ("'La Palma is a wonderful community to live in and I hope it is as motivating to our youth as it has been to me," Hyatt said after the [La Palma] City Council announced his selection Tuesday night.…'This city gives me the sense of freedom and flexibility to work, think and live,' he said.")

[Exhibit A, note] 8: 05/18/01 Affidavit of Gilbert P. Hyatt, para. 2, 1:12-17.

These FTB statements are false or need clarification. First, FTB makes false statements about "contemporaneous" documents without citing to any documents in particular in support of these statements. FTB is most likely referring to mis-addressed documents inadvertently sent to legacy California addresses after I had moved. I informed Philips that I had moved to Las Vegas early in October 1991 and I gave Philips a change of address to my Las Vegas address later in October 1991. Philips mis-addressed communications to my former California addresses. The lead licensing attorney at Philips, Algy Tamoshunas, testified to these facts. See 1991 ASAB, § 1.8.4.2, § 1.8.4.3, § 1.8.4.4, and § 1.8.4.6 and 1992 ASAB, § 1.4.1.1 and § 1.4.1.2. I entered a

215

RJN1493

change of address from the Jennifer Circle house with the U.S. Postal Service, I gave changes of address and my Las Vegas contact information to many persons and entities, and I received virtually all of my mail in Las Vegas during the disputed period. See 1991 ASAB, § 1.5.6.1, § 1.5.6.2, § 1.5.6.3, and § 1.5.7.

476. Second, FTB falsely states "Contemporaneous statements by Mr. Hyatt contradict his contention that he decided to permanently relocate to Las Vegas in November 1990." However, the newspaper articles are casual comments by reporters, they are not statements by me. My statements are made under oath in my affidavits. I decided to move to Las Vegas in November 1990, I prepared for my move for about ten months, I moved to Las Vegas on September 26, 1991, and I have resided in Las Vegas for more than 25 years with no intent to leave Las Vegas. Furthermore, I confided in many others that I decided to move to Las Vegas, others helped me to prepare for my move, I told my Jennifer Circle neighbors that I was moving to Las Vegas, and I met with many persons in Las Vegas shortly after I moved. Many of my friends, relatives, and associates testified to these facts. See the Updated Testimonial Topics, particularly T001, T002, T003, T004, T005, T006, T007, T008, T009, T018, T019, T040, T045, T049, T102, T124, T127, T128, and T141.

477. Third, regarding the Exhibit A, note 7 excerpt, I responded to similar statements in detail in ¶ 92, above. Regarding the Jennifer Circle house, see ¶ 16, above.

478. Fourth, I did not have continuous personal or business presence in California during the disputed period. During the 1991 disputed period, I had 71 full days in Nevada, zero full days in California and 17 days partly in Nevada as a resident and partly in California.[511] During the 1992 disputed period, I had 54 full days in Nevada and 9 full days in California (I was hospitalized for cancer surgery). I had 20 days partly in Nevada as a resident and partly in California. Two of these part days were for hospitalization for my cancer surgery. All of the

---

[511] Rebuttal to FTB Att. A/F, Section I. A., day by day analysis, September 26, 1991, through December 31, 1991; not counting the day I moved.

216

part or full days in California were for a specific temporary or transitory purpose.[512]  I detailed all of the temporary or transitory purposes for my occasional presences in California.  See 1992 ASAB, § 1.5.5 and ASAB Exhibit 4, Table of "Mr. Hyatt's Temporary or Transitory Purposes Outside of Nevada".

479.    The FTB 1992 Concluding Summary at p. 2 states the following.

> Mr. Hyatt's presence in California is demonstrated by his ongoing use of the Jennifer Circle street address, Cerritos Post Office Box, and Jennifer Circle fax machine for the purpose of receiving and sending business correspondence, meetings with his California patent attorney,[9] meetings with prospective licensees in California,[10] the continued utilization of California professionals including medical providers and hospital facilities during February 1992,[11] speeches and interviews,[12] utilization of California banking services,[13] and meals at several Orange County restaurants.[14]

> [Exhibit A, note] 9:  Hyatt and Roth Los Angeles meetings during disputed period.

> [Exhibit A, note] 10:  Mr. Hyatt attends a dinner with two Hitachi representatives (Akaki and Ogino), George Mahr and David Leonard of MLMC and Gregory L. Roth at the Medieval Times in Buena Park.  Mr. Roth records and bills for his time at the event as "MEETING" and "REGARDING HITACHI."  He records and bills a total of four (4) hours.  Recovered within the Philips documents, Roth submitted an expense claim for the dinner at Medieval Times this date, reporting in attendance Hitoshi Akaki, Ogino, Gil Hyatt and Greg Roth.  FTB Exhibit M, Tab 32 and FTB_Philips 0006596.

> [Exhibit A, note] 11:  See FTB's Concluding Summary (1991), page 19 and FTB's Attachment A (Revised) pp., 90-91, 94, 96, 100-103, and 109.

> [Exhibit A, note] 12:  P00767, P00804, EC01502, H 08325, H 08338, H 08341, H 01123-24, H 01131-32.

> [Exhibit A, note] 13:  FTB 13891-92.

> [Exhibit A, note] 14:  FTB Trial Exhibit 2001-1870-74, BNY Master Card (FTB Trial Exhibit 2001-2411-2433), Chase Manhattan Visa (FTB Trial Exhibit 2001-2434-2464) and MBNA

---

[512] Rebuttal to FTB Att. A/F, Section I. A., January 1, 1992, through April 2, 1992.

RJN1495

1     Gold Card (FTB Trial Exhibit 2001-2465-2476).

2 This FTB statement is false. I was rarely present in California during the disputed period, ¶ 478,

3 above. I have repeatedly stated that I was not at the Jennifer Circle house between October 1,

4 1991, and late 1992 when I returned to Jennifer Circle for a short visit. I note that FTB no longer

5 alleges my presence at the house but now falsely alleges "ongoing use" of the Jennifer Circle

6 house. I was not present at the Jennifer Circle house and I did not have "ongoing use" of the

7 Jennifer Circle house after I sold it on October 1, 1991. Philips inadvertently directed some

8 correspondence to the Jennifer Circle house,[513] but that does not mean I had "ongoing use" of the

9 house. I did not. FTB offers no evidence that I had "ongoing use" of the Jennifer Circle house.

10    480. I did not have "ongoing use" of the Jennifer Circle street address, I filed a change

11 of address with the U.S. Postal Service and my mail was forwarded to me at my Las Vegas

12 mailing address. See 1992 ASAB, §§ 1.5.6.2, 1.5.6.3, 1.5.7. FTB falsely states I had on going

13 use of the Cerritos P.O. Box. I gave Ms. Jeng the key to the Cerritos P.O. Box when I sold the

14 Jennifer Circle house. Although I continued to use forms and a template on my computer with

15 the Cerritos P.O. Box address, I sent the faxes and correspondence from Las Vegas, not

16 California.[514]

17    481. I did not have "ongoing use" of the Jennifer Circle fax machine. See ¶¶ 149 and

18 237 above. I received all of the faxes at my Las Vegas apartment during the disputed period

19 after October 21, 1991. My only fax machine during this period was located in my Las Vegas

20 apartment (1991 ASAB § 1.8.4.5). After October 1, 1991, when I sold the Jennifer Circle house,

21 I moved my fax machine to Las Vegas and I did not ever again send a fax or other

22 correspondence from the Jennifer Circle house and I did not return to the Jennifer Circle house

23 during the disputed period. See 1991 ASAB § 1.8.4.5. Many witnesses have confirmed that I

24 moved my fax machine to Las Vegas.[515]

---

[513] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25, Annex XII.
[514] Rebuttal to FTB Att. A/F, Section I. B., January 26, 1992.
[515] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.

218

482.   The FTB statement that I had "ongoing use" of the Jennifer Circle fax machine for sending and receiving faxes is false.  I neither sent nor received any faxes at the Jennifer Circle house after September 26, 1991, when I moved to Las Vegas.  My fax machine was located in my Las Vegas apartment and then my Las Vegas Tara home during the disputed period and thereafter.

483.   I did not have "ongoing use" of the Jennifer Circle house for meetings with attorneys.  The FTB statement that I used the Jennifer Circle house for meetings with my patent attorney is another of thousands of FTB false statements and is without evidentiary support.  I presume FTB means Mr. Roth when it refers to my patent attorney.  After July 1991 Mr. Roth represented Philips with respect to the *Hyatt v. Boone* interference and the Philips licensing program.[516]  While I had some meetings with Mr. Roth during the disputed period, none of the meetings took place at the Jennifer Circle house.  See ¶ 62, above.

484.   I had no "ongoing use" of the Jennifer Circle house for meetings with prospective licensees.  Philips had exclusive rights and the fiduciary responsibility to license my patents and I was prohibited from licensing my patents by Section 8.1 of the July 1991 Philips Agreement, ¶¶ 69-73, above.  FTB 1992 Concluding Summary Exhibit A, note 10 attaches a letter from Mr. Roth to Mr. Akaki dated January 15, 1992, GLR 00942, that invited "everyone" to a dinner at a dinner theater on January 28, 1992.  FTB also attaches a PSB&C expense voucher, FTB_Philips 0006596, that shows a ticket purchase for me to the Medieval Times dinner theater.  While I considered myself "invited", I did attend the dinner.  Mr. Roth purchased a ticket for me in advance of the dinner before he knew whether or not I would attend.  I did not attend.[517]  FTB also attaches a letter dated January 24, 1992, from Mr. Roth to Mr. Akaki, GLR 00938, that acknowledges a meeting with Hitachi on January 29, 1992.  Nothing in the letter suggests my attendance at the January 29, 1992, meeting.  I was in Las Vegas on January 29, 1992, and I did

[516] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.
[517] Rebuttal to FTB Att. A/F, Section I. A., January 28, 1992.

219

RJN1497

not meet with Hitachi that day.[518]  A PSB&C invoice lists the people who actually attended the January 28 and 29, 1992, meetings with Hitachi as Mr. Akaki, Mr. Ogino and Mr. Roth, FTB Philips 0006582.  See 1992 ASAB, § 1.7.3.

485.    I used very few California professionals after September 26, 1991, when I moved to Las Vegas but used many non-California professionals.[519]  See ¶¶ 293-297, 316-219, 327, 566, 574-579, 581, 584, 666 herein.  I had no "ongoing use" of the Jennifer Circle house for use of California professionals.

486.    FTB even references my cancer surgery as "ongoing use" of the Jennifer Circle house.  The surgery was at Los Alamitos Medical Center, not the Jennifer Circle house.  I traveled from Las Vegas to California the day of the surgery and returned to my Las Vegas apartment immediately upon being released from the hospital following the surgery.[520]  I had the surgery in California because many Nevada friends recommended that I use a California doctor rather than a Las Vegas doctor for a serious cancer surgery.  I did not have the surgery in California to change my state of residence from Nevada to California.

487.    I closed several bank accounts in California as I prepared to move to Las Vegas.  I opened several new bank accounts in Las Vegas after my move.[521]  See ¶¶ 242-245, above.

488.    I did not have "ongoing use" of the Jennifer Circle house to give a speech in California.  On March 9, 1992, I was a speaker at an NCGA conference in Anaheim.  I traveled from Las Vegas and stayed at the Crescent Motel the night before and returned to Las Vegas immediately after giving the speech.[522]

489.    I did not have "ongoing use" of the Jennifer Circle house for interviews in California.  FTB mischaracterizes the Los Angeles Times article dated February 25, 1992

---

[518] Rebuttal to FTB Att. A/F, Section I. A., January 29, 1992.
[519] 1991 AOB, § II.C.14.
[520] Rebuttal to FTB Att. A/F, Section I. A., February 11 and 21, 1992.
[521] 1991 AOB, § II.C.8; ¶¶ 242-245, above.
[522] Rebuttal to FTB Att. A/F, Section I. A., March 8, 9, 1992; Letter dated February 2, 2001, from Morrison & Foerster to FTB, P00767.

RJN1498

(H01123-01124). Nothing in the Takahashi article indicates I was in La Palma. To the contrary, I called Mr. Takahashi from Las Vegas and the February 24, 1992, interview was conducted with me in Las Vegas.[523] On April 22, 1992, I made a round trip visit from Las Vegas to San Francisco (H 02034-02035) for an interview with Dr. Gunn (EC01502).[524]

490.    I did not have "ongoing use" of the Jennifer Circle house for my visit for a temporary or transitory purpose in California in early December 1992. In early December 1992, I was in California entertaining Mr. Yuri Koptev, head of the Russian Space Agency (H 08303, H 08312-08325, H 08338, H 020432).[525] I stayed at the Crescent Motel near Knott's Berry Farm (H 020432) which had sentimental memories for me.

491.    FTB disingenuously refers to use of a Notary of February 7, 1992, as use of California banking services. My banking services were in Las Vegas after my move. I closed several California bank accounts as I prepared to move. I opened several new bank accounts in Las Vegas shortly after my move.[526] See ¶¶ 242-245, above.

492.    FTB states that I ate at Orange County restaurants but provides a link that does not work. However, Ms. Jeng was authorized to use my credit card for my benefit and sometimes took guests to California restaurants on my behalf and used my credit card.[527]

493.    The FTB 1992 Concluding Summary at p. 3 states the following.

> That presence is underscored by Mr. Hyatt concealing his whereabouts from September 26, 1991 to October 14, 1991 for five years, revealing it only after documents which could have confirmed or contradicted his claim of a long-term stay at the Continental Hotel in Las Vegas had been destroyed; obtaining a back-dated notary acknowledgment on a deed to try to create the appearance of a sale of his Jennifer Circle home to a friend on October 1, 1991; leasing a one bedroom unit in a low-income Las Vegas apartment complex which prohibited conducting a trade or

---

[523] Rebuttal to FTB Att. A/F, Section II. E., February 25, 1992.
[524] Rebuttal to FTB Att. A/F, Section I. A., April 22, 1992.
[525] Rebuttal to FTB Att. A/F, Section I. A., December 1, 1992.
[526] 1991 AOB, § II.C.8; ¶¶ 242-245, above.
[527] Affidavit of Grace Jeng, May 18, 2001, ¶ 19, Annex VII, Ex. 21.

221

RJN1499

business in his unit; the non-filing of a "change of ownership statement" as required by California Revenue and Taxation Code § 480, subdivisions (a) and (c); and the use of business flights that originated and terminated in Los Angeles.[15]

[Exhibit A, note] 15:  P07491.

These FTB statements are false and are typical of FTB's thousands of fabricated false statements and mischaracterizations.

494.    I did not conceal my 2 ½ week stay at the Continental Hotel.  There was no documentation of my stay at the Continental Hotel and no documents were lost.  See ¶¶ 10, 31-35, 91, 95, 96, 675 herein.

495.    I did not obtain a backdated notary acknowledgement on a deed.  The notary testified that she simply made a mistake and placed an incorrect date on the notary acknowledgement, ¶ 189, above.  I did not try to create the appearance of a sale, I sold the Jennifer Circle house on October 1, 1991, which was confirmed by the FTB auditor (1992 ASAB § 1.5.2). Two former Orange County elected assessors (Webster Guillory and Bradley Jacobs) confirmed that the sale of the Jennifer Circle house on October 1, 1991, was a valid, legal sale of the house.[528]

496.    My apartment had two bedrooms, it was not a one bedroom apartment as FTB falsely states.  My apartment was in a very nice, well maintained apartment complex.  I had a six month lease while I looked for and purchased my 5400 square foot Las Vegas Tara home, ¶ 167, above.

497.    I did not conduct a trade or business in my apartment.  I did not have any employees, or any customers, or any stock.  I had a small home office with a personal computer, a fax machine, and a telephone.  I did not receive a single complaint about a trade or business.

498.    There was no "non-filing" of a change of ownership statement.  This statement is another FTB fabrication.  A Preliminary Change of Ownership Report was timely filed on June

---

[528] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.

222

16, 1993.  When a Preliminary Change of Ownership Report is filed there is no requirement to file a Change of Ownership Report.[529]

499.     After September 26, 1991, when I moved to Las Vegas, I did not have any business flights that originated and terminated in Los Angeles, all of my travel originated and terminated in Las Vegas where I resided.  FTB does not identify a single trip that originated or terminated at a location other than Las Vegas after September 26, 1991.

500.     The FTB 1992 Concluding Summary at p. 3 states the following.

> In an attempt to deflect attention from the absence of contemporaneous documentation of the alleged wholesale change of residence and business locales, Mr. Hyatt offers a variety of declarations and affidavits, many of which are from people who could have, and should have, been disclosed many years earlier, who purport to speak about events which occurred during 1991 and/or 1992, providing accounts which cannot be independently verified.

This FTB statement is false.  I produced thousands of pages of relevant contemporaneous documentation and I have explained and authenticated these documents under oath.  See my three CDE affidavits.[530]  There is no "absence of contemporaneous documentation", FTB falsely disregarded or misrepresented my CDE evidence and then disingenuously claims that there is no documentation.

501.     FTB foolishly states that the "declarations and affidavits" are an "attempt to deflect attention" from a lack of documentation.  Notwithstanding the fact that there is no lack of documentation, the "declarations and affidavits" are not a deflection, they are overwhelming testimonial evidence from eyewitnesses.  1991 ASAB § 1.8.6.4.  My representatives filed more than 220 affidavits or declarations from more than 150 witnesses and thousands of pages of documents that establish beyond a doubt that I moved to Las Vegas in September 1991 and that I

---

[529] Declaration of Bradley Jacobs, November 2, 2012, ¶¶ 3, 11, 18-30, Exhibit 10 (2656-0001, 2656-0002); Declaration of Webster Guillory, October 8, 2015, ¶¶ 10, 12.e.

[530] Hyatt DP CDE Affidavit, July 24, 2012; Hyatt Supp. CDE Affidavit, September 6, 2016; Hyatt Post-DP CDE Affidavit, September 6, 2016.

223

1   had no California source income after my move to Las Vegas.[531]  It has been necessary to

2   provide additional testimony to rebut the thousands of false statements and mischaracterizations

3   made by FTB in its briefings and attachments thereto.  See ¶¶ 178-180, above.

4        502.   The FTB 1992 Concluding Summary at p. 3 states the following.

> Mr. Hyatt submitted approximately 10 declarations/affidavits in support of his positions in these cases through the conclusion of the administrative protest.  Since the close of the administrative protest, Mr. Hyatt has submitted approximately 160 additional declarations/affidavits, many of which purport to provide recollections of specific events during the disputed period.  Many of the more than 15 year old "recollections" are contradicted by contemporaneous documentation.

9 This FTB statement is false.  FTB had totally disregarded the more than 10,000 pages of exhibits

10 attached to the more than 220 affidavits/declarations (not just 160 as falsely alleged by FTB)

11 which the more than 150 eyewitnesses used to refresh their memories.[532]  Furthermore, these

12 eyewitnesses have significant corroboration from many other eyewitnesses (e.g., 72-witnesses

13 testified about Mr. Hyatt's move away in 1991).[533]  1991 ASAB § 1.8.6.4.  The testimony is

14 supported by my thousands of pages of documents that establish that I moved to Las Vegas in

15 September 1991 and that I had no California source income after that date.  It has been necessary

16 to provide additional testimony to rebut the thousands of false statements and

17 mischaracterizations made by FTB.  See ¶¶ 178-180, above.  The testimony of the witnesses is

18 not only consistent with my documentation, it is consistent with testimony of the other witnesses.

19       503.   The FTB 1992 Concluding Summary at p. 3 states the following.

> Several of these individuals candidly admit the declaration/affidavit bearing his/her signature was prepared by Mr. Hyatt's attorney.  Many others were instructed by lawyers to not answer questions presented to them during formal, sworn deposition proceedings; questions which sought information

---

[531] See 1991 ASAB, § 1.3.3, Updated Comprehensive List of Mr. Hyatt Witnesses.
[532] See 1991 ASAB, § 1.3.3, Updated Comprehensive List of Mr. Hyatt Witnesses.
[533] Updated Testimonial Topics, Ex. T007.  See the more than 150 other Testimonial Topics.

RJN1502

pertaining to the drafting of those declarations/affidavits, and who was paying for the lawyers representing them during their individual depositions.[16]

[Exhibit A, note] 16: FTB Deposition Taken During SBE Appeal (Instructions Not to Answer).

This FTB statement is false. I am not aware of any witness who testified that his/her affidavit was prepared by my attorney. Some of the witnesses testified that they worked with their own attorney to prepare their affidavit or declaration. They testified that they read their affidavit/declaration carefully and made any appropriate corrections to be sure the document was true and correct before signing. FTB deposed approximately 20 witnesses, each of which steadfastly confirmed the statements they had made in their affidavits and declarations. These depositions are very supportive of my contentions and demonstrate that the statements witnesses made in their affidavits and declarations were true and correct. Twenty-seven tables having more than 800 testimonial excerpts that are very supportive of my contentions are listed and briefly described in ASAB, Exhibit 17 (Index of Deposition Excerpts Tables). For example, Lynetta Ruth, my former next door Jennifer Circle neighbor, testified that near the end of September 1991, Mr. Hyatt said goodbye and pulled a trailer load of possessions with his old brown car to Las Vegas (1991 ASAB, § 1.8.6.5). See ¶ 415, above.

504.    Regarding FTB's statement "Many others were instructed by lawyers to not answer questions …." However, I understand that witnesses have a constitutional right to counsel and as well as a right to assert the attorney client privilege as to communications between themselves and their attorneys. For example, John Keller testified at his deposition that he changed a draft of his Affidavit by crossing out a few things that he did not agree with.[534] Mr. Keller's attorney,[535] Mr. McCaffrey (during Mr. Keller's deposition), allowed questions about changes to a draft Mr. McCaffrey provided to Mr. Keller as an attorney client privilege communication, but instructed Mr. Keller not to answer a question as to the subject matter of the

---

[534] Deposition of John Keller, May 20, 2009, p. 43:19-23.
[535] Deposition of John Keller, May 20, 2009, p. 46:10-11.

225

changes.[536] I understand that witnesses who testified on my behalf have the same rights to

representation by an attorney and confidential communications with their attorney as other U.S.

citizens.

505.    The FTB 1992 Concluding Summary at p. 3-4 states the following.

> The lawyers issuing those instructions include Gregory Roth, Mr. Hyatt's long-term patent lawyer, and Roger McCaffrey, Mr. Hyatt's probate estate lawyer.  Respondent submits, among other things, that the belated nature of the disclosure of the identities of these declarants/affiants, coupled with the lack of contemporaneous, objective verification of the accounts they have presented, and the coincidence of the declarants/affiants being represented by Mr. Hyatt's attorneys, renders the declarations and affidavits submitted on their behalves to be without merit or credibility.[17]

> [Exhibit A, note] 17:  See ROB (1991), pp. 11-13, ROB (1992), pp. 60-67, RRB (1991) (all), RRB (1992), pp. 1-6, RAB (1991), pp. 13-30, RAB (1992), pp. 1-13 and FTB Attachments B, D and E.

This FTB statement is false.  The attorneys asserting the attorney client privilege on behalf of

their clients were representing the witnesses, not me.[537]  Nothing in the FTB statements reduces

the merit or credibility of the more than 220 affidavits/declarations with more than 10,000 pages

of exhibits from more than 150 witnesses and thousands of pages of documents that establish

that I moved to Las Vegas on September 1991, and that I had no California source income after

that date.[538]  1991 ASAB § 1.8.6.4.

506.    There was no "belated nature of the disclosure of the identities of these

declarants/affiants".  I submitted the names with brief descriptions of more than 100 relevant

witnesses but FTB did not interview those witnesses.  1992 ASAB § 1.5.3.  Many of the

witnesses were contacted after my representatives learned that they had been interviewed by

FTB.  Many of these witnesses are in the FTB records.  More than 20 of these witnesses were my

---

[536] Deposition of John Keller, May 20, 2009, p. 44:14-21.
[537] Deposition of John Keller, May 20, 2009, p. 46:10-11.
[538] See 1991 ASAB, § 1.3.3, Updated Comprehensive List of Mr. Hyatt Witnesses.

226

close neighbors at Jennifer Circle who I found out were well known to and many claimed to be interviewed by FTB.  Furthermore, it has been necessary to continually obtain additional witness testimony to rebut the thousands of false statements and mischaracterizations that have continually been made by FTB in its briefings to your Board, ¶¶ 178-180, above.

507.    The consistent testimony as to the same subject by multiple witnesses supports the credibility of the witness testimony.  1991 ASAB § 1.8.6.4.

508.    There is no lack of contemporaneous documentation.  Thousands of pages of contemporaneous documentary evidence are discussed and in and attached to my CDE Affidavits.[539]

509.    Regarding FTB's false statement on "the lack of contemporaneous, objective verification of the accounts they have presented", there is significant "contemporaneous, objective verification."  For example, the witnesses attached over 10,000 pages of exhibits to their declarations/affidavits and the witnesses have significant reinforcement from other witnesses on the facts (e.g., 72-witnesses testified about Mr. Hyatt's move away in 1991).[540] 1991 ASAB § 1.8.6.4.

510.    The FTB 1992 Concluding Summary at p. 4 states the following.

> Respondent acknowledges that your Board considers several factors in determining whether a taxpayer has, in fact, established residency outside California.[18]  An analysis of relevant Bragg factors follows.
>
> [Exhibit A, note] 18:  Appeal of Stephen D. Bragg, 2003-SBE-002.

---

[539] Hyatt DP CDE Affidavit, July 24, 2012; Hyatt Supp. CDE Affidavit, September 6, 2016; Hyatt Post-DP CDE Affidavit, September 6, 2016.
[540] Updated Testimonial Topics, Ex. T007.  See the more than 150 other Testimonial Topics.

227

RJN1505

An analysis of the *Bragg* factors strongly favors my Nevada residency.  Not one *Bragg* factor favors a California connection.[541]

511.    The FTB 1992 Concluding Summary at p. 4 states the following.

> Mr. Hyatt's alleged sale of the La Palma house in October 1991 has been extensively discussed in respondent's earlier briefing, including Respondent's Concluding Summary for Taxable Year 1991(Case No. 435770) at pages 12 through 13; that discussion is incorporated by reference as if set forth fully herein so as to avoid repeating the entire discussion.

FTB's briefings on the sale of the Jennifer Circle house are false.  I arranged to sell the Jennifer Circle house prior to my September 26, 1991, move and I sold the Jennifer Circle house on October 1, 1991, about a week after my move to Las Vegas.  My sale of the Jennifer Circle house is described in detail in my December 5, 2008, Affidavit, ¶¶ 26-39, my DP CDE Affidavit, July 24, 2012, ¶¶ 7-11 and my Supp. CDE Affidavit, September 6, 2016, ¶¶ 7-8.  The sale of the Jennifer Circle house on October 1, 1991, was legal and fully legitimate as confirmed to me by the FTB auditor, Sheila Cox;[542] as confirmed to me by my real estate attorney, Del Bailey;[543]as confirmed to me by my real estate attorney's associate, Roger McCaffrey;[544] and as confirmed to my representatives by two former elected Orange County tax assessors, Bradley Jacobs and Webster Guillory.[545]  See ¶¶ 185-197, above.  I understood that all that was needed to complete the sale of the Jennifer Circle house was for me to sign the grant deed and to deliver the signed grant deed to the new owner, which I did on October 1, 1991, I signed the grant deed and delivered the signed grant deed to the new owner on October 1, 1991.  However, much more was

---

[541] 1991 AOB, § II.; 1992 AOB, § II.; 1991 ARB, § II., pp. 21-67; 1992 ARB, § II.; 1992 ASAB § 1.5; Hyatt 1991 Concluding Summary, §§ 1.4, 1.5, 1.6, 1.7; Hyatt 1992 Concluding Summary, §§ 1.4, 1.5.

[542] 1992 ASAB § 1.5.1.

[543] Affidavit of Gilbert P. Hyatt, December 5, 2008, ¶¶ 28-30.

[544] Affidavit of Gilbert P. Hyatt, December 5, 2008, ¶¶ 28-29.

[545] Declaration of Bradley Jacobs, November 2, 2012, ¶¶ 5, 6, 13, 14, 32, 33, 89; Declaration of Webster Guillory, October 8, 2015, ¶¶ 7, 8, 10, 11, 15-18, 22-25, 34 and 35.

228

done, I received a signed deed of trust and the Note secured by the deed of trust (Note); [546] I received a deposit of $15,000; I received monthly payments on the Note; [547] I received a balloon payment fully paying off the Note on September 30, 1996; [548] I disclosed the sale of the Jennifer Circle house in my 1991 tax returns; [549] a Preliminary Change of Ownership Report was timely filed by the purchaser (no Change of Ownership Report was required when a Preliminary Change of Ownership Report was filed); [550] I timely filed a Homeowner's Exemption Termination Notice; [551] I gave the keys to the Jennifer Circle house to the purchaser on October 1, 1991, I moved out of the Jennifer Circle house on October 1, 1991, and the new owner took possession of the Jennifer Circle house on October 1, 1991. I understand that the new owner paid the 1992 property taxes on the Jennifer Circle house and that the new owner still owns the Jennifer Circle house and pays property taxes on the Jennifer Circle house in 2016.

512. The FTB 1992 Concluding Summary at p. 4 states the following.

> The belated recording of the grant deed through which Mr. Hyatt contends he effectuated the "sale" of that property to Ms. Jeng, and its back-dated fraudulent notary acknowledgement cannot be disputed. Respondent asked the Recorder's office in Orange County for recorded documents concerning the property transfer, and the Recorder's office confirmed that the only evidence of a transfer of the property to Ms. Jeng was the grant deed recorded on June 16, 1993.[19]

> Darlene Beer, the California Notary, has confirmed that neither Mr. Hyatt nor Ms. Jeng appeared before her on October 1, 1991.[20] Ms. Beer's official notary journal confirms that the actual appearance occurred on June 10, 1993. In fact, Ms. Beer's California notary seal, stamped on the Jennifer Circle grant deed[21] did not even exist on October 1, 1991, but was obtained by her after her prior notary commission, and seal, expired on November

---

[546] See Exhibit CDE-G1 to my DP CDE Affidavit, July 24, 2012.
[547] See Exhibit CDE-G4 to my DP CDE Affidavit, July 24, 2012.
[548] See Exhibit CDE-G4 to my DP CDE Affidavit, July 24, 2012.
[549] See Exhibit CDE-G35 to my DP CDE Affidavit, July 24, 2012.
[550] See Exhibit 10 attached to Declaration of Bradley Jacobs, November 2, 2012; see also Declaration of Bradley Jacobs, November 2, 2012, ¶¶ 4, 18; Declaration of Webster Guillory, October 8, 2015, ¶¶ 10, 13, 29, 30.
[551] See Exhibit CDE-S001 to my Supp. CDE Affidavit, September 6, 2016.

229

1      20, 1991.[22]

2      [Exhibit A, note] 19: FTB Trial Exhibit 2001-0523-26, 2001-524-525.

3

4      [Exhibit A, note] 20: FTB Trial Exhibit 2654 (08/26/99 Examination of Darlene Beer by Deputy Attorney General, Exhibits 1 -9) and FTB Trial Exhibit 2653 (Selected pages of Darlene Beer's Notarial Log Book).

5

6      [Exhibit A, note] 21: FTB Trial Exhibit 2001-0524 (Recorded Grant Deed).

7      [Exhibit A, note] 22: 09/25/91 Deed of Trust (notarized by Darlene Beer) and FTB Trial Exhibit 2657 (11/08/91 Darlene Beer renewed Notary Public Application).

8

9 This FTB statement is false. There is no "back-dated fraudulent notary acknowledgement". The

10 notary testified that she inadvertently used the date on the grant deed that I signed on October 1,

11 1991, when she notarized the grant deed on June 10, 1993.[552] Ms. Jeng and I appeared before

12 the notary on June 10, 1993, the notary acknowledged the grant deed on June 10, 1993, and I

13 signed the notary log on June 10, 1993. I have always confirmed these facts.

14      513. I did not notice the date that the notary put on the jurat because Ms. Jeng took the

15 notarized grant deed with her on June 10, 1993, to have it recorded and because I was not in the

16 habit of reviewing notary jurats. Because I was not skilled in notary procedures, I would not

have realized FTB's argument on "back dating" of a notarization if I had seen the notarized jurat.

17      514. I produced an un-notarized version of the grant deed to FTB because I did not

18 have a copy of the notarized grant deed. I did not review the notarized jurat until FTB produced

19 a copy of the recorded version of the notarized grant deed years later. I did not ever state to FTB

20 that the grant deed was notarized on October 1, 1991, I always stated that the grant deed was

notarized on June 10, 1993. Thus, there was no purpose for me to have the grant back-dated.

21      515. Furthermore, I did not know that FTB was going to audit me until after the June

22 10, 1993, notarization of the grant deed.

23 _____

24      [552] Declaration of Darlene Beer, August 29, 2012, ¶¶ 7-8.

516.    Initially, the new owner asked that I not record the sale of the house because she did not want the public to know that a single woman owned the house. However, in later years she changed her mind, she told me that she wanted to record the sale, I accompanied her to a notary on June 10, 1993, and I signed the notary log on June 10, 1993.

517.    The recording on June 16, 1993, could not have been "belated," as alleged by FTB, since there is no requirement for recording a deed and there is no time limit for recording a deed. The simple mistake by Ms. Beer when she dated the notary acknowledgement was neither back dating of the notary acknowledgement nor fraud.[553]  See ¶¶ 186-189 and 192-197, above.

518.    The FTB 1992 Concluding Summary at p. 4 states the following.

> The Orange County Assessor further confirms no "change of ownership statement" was filed with their office during the 1990-1996 time frame[23] despite a legal requirement to do so within 45 days of any purported transfer of real property.[24]
>
> [Exhibit A, note] 23:  Orange County Office of Assessor's 3/05/07 letter to FTB re 7841 Jennifer Circle, La Palma, California property.
>
> [Exhibit A, note] 24:  Following a change in ownership of taxable real property in California, the transferee must report the transfer to the county assessor of the county in which the property is located. See Rev. & Tax. Code § 480, subdivisions (a) and (c).

This FTB statement is false. The change of ownership statement was filed in the form of a "preliminary" change of ownership statement. Filing of a ***duplicate*** change of ownership statement with a different name (different from the name "preliminary change of ownership statement") is not required. I understand that the preliminary change of ownership statement satisfied the requirement. Nevertheless, my sale of the Jennifer Circle house was consummated on October 1, 1991, and was not dependent on filing of a change of ownership statement and it was not my responsibility to file a change of ownership statement, it was the obligation of the buyer.

---

[553] Declaration of Darlene Beer, August 29, 2012, ¶ 27.

231

519.   It is my understanding that the responsibility was on the buyer, not on me, to file a change of ownership report and California law allows a buyer the option of filing a Change of Ownership Report or filing a Preliminary Change of Ownership Report when the deed is recorded.  In this case the buyer chose the option of filing a Preliminary Change of Ownership Report at the time of recording the deed and fully complied with California law.[554]  See ¶ 196, above.

520.   Thus, FTB's argument goes to whatever penalty it can get regarding the buyer's action, if any, but it has no effect on the legitimacy of my sale of the Jennifer Circle house.

521.   The FTB 1992 Concluding Summary at p. 5 states the following.

> Mr. Hyatt's lease and purported occupancy of a Wagon Trails Apartment unit allegedly commencing in late October 1991 has been extensively discussed in Respondent's earlier briefing, including Respondent's Concluding Summary for Taxable Year 1991 (Case No. 435770) at pages 13 through 14; that discussion is incorporated by reference as if set forth fully herein so as to avoid repeating the entire discussion.

FTB's prior briefings are false.  I leased, moved into, and resided in my Las Vegas apartment from October 21, 1991, through April 3, 1992 when I moved into my purchased Las Vegas home.  My occupancy of my Las Vegas apartment was not "purported", it was actual.  I rented the apartment on October 8, 1991, moved in on October 21, 1991, and continuously resided there until I moved into my Las Vegas Tara home on April 3, 1992.  Many friends and associates visited me at my Las Vegas apartment, a couple of my friends and associates stayed overnight with me for a couple of nights at my Las Vegas apartment, many of my friends, associates, and family members telephoned me and sent faxes to me at my Las Vegas apartment, and I and

---

[554] Declaration of Bradley Jacobs, November 2, 2012, ¶¶ 5, 6, 13, 14, 32, 33, 89; Declaration of Webster Guillory, October 8, 2015, ¶¶ 7, 8, 10, 11, 15-18, 22-25, 34 and 35.

232

several of my friends and associates sent faxes from my fax machine at my Las Vegas apartment. My residence at my Las Vegas apartment has been discussed in prior briefing. [555]

522.    Another false statement that FTB uses several times in its Concluding Summaries is that my Las Vegas apartment was a one bedroom apartment in a low income apartment complex. See ¶¶ 164, 170, 493, 668.  However, my Las Vegas apartment was a two bedroom apartment with many nice features and located in a medium-range apartment complex that was very nicely maintained, landscaped, and secure. [556]

523.    The FTB 1992 Concluding Summary at p. 5 states the following.

> In addition to the absence of any meaningful substantiation that Mr. Hyatt truly took occupancy of the apartment unit, similar difficulties exist with respect to the question of when he moved out of the unit.  A purported March 22, 1992 "move out" letter was not produced until seven years after respondent commenced Mr. Hyatt's audit (i.e., June 2000).[25]  The Wagon Trails' records custodian could not determine the disposition of Mr. Hyatt's rental file other than it was discovered missing after a thorough search.[26] Nor did the records custodian produce or authenticate Mr. Hyatt's purported "move out" letter.[27]  In addition, during the relevant period, Wagon Trails used a "form" to terminate leases, a form typically signed and dated by both a Wagon Trails employee and the tenant.[28] No such form has been produced.

> [Exhibit A, note] 25:  06/30/00 letter from Coffill to FTB's PHO, pp. 3, 22-23 and Tab 38 (P01475, P01497-98, and P01980-85).

> [Exhibit A, note] 26:  01/11/99 Deposition of Cynthia Fox, 14:19-21 and 31:23-32:23.

> [Exhibit A, note] 27:  See FTB Attachment E, p. 113.

> [Exhibit A, note] 28:  10/18/99 Deposition of Clara Kopp, 19:8-20:12.

---

[555] 1991 AOB, § II.E.3.e.; 1992 AOB, § II.E.3.e.; 1991 ARB, § II.A.1.d; 1992 ARB, § II.B.1.b; 1992 ASAB, § 1.5.6.2; Updated Testimonial Topics, Exs. T018, T019, T021, T022, T023, T024, T025, T026, T028, T029, T057 T095, T096, T100, T128, T129.

[556] 1991 ARB, § II.A.1.d, pp. 29-32.

233

This FTB statement is false. First, FTB did not request the move-out letter so there was no reason to produce the letter until after the FTB fabricated false statements about the letter as part of the fraudulent audit of my 1991 and 1992 taxes.[557]

524. Second, this issue establishes the falsity of FTB's audit file. The audit file states a foolish position that "[I] had bought a house and that [I] was moving back to California" but FTB produces no documentation in support thereof.[558] I produced a copy of my actual move-out letter, which states a totally different and reasonable position. In fact, my Las Vegas dream house was in escrow when I wrote my move-out letter, so it is foolish for FTB to state that the move-out letter stated that "[I] was moving back to California."[559] Also, FTB itself confirmed my Nevada residency as of the time that I moved into my Las Vegas Tara home so it is doubly foolish for FTB to state that the move-out letter stated that "[I] was moving back to California."

525. Third, FTB disingenuously complains because a "form" for termination of the apartment lease was not produced. However, I do not know of any such form and I know of no evidence that FTB produced about any such form. However, the termination documentation included my actual move-out letter dated March 22, 1992, the statement of deposit accounts for my apartment and the receipt for my apartment key was produced to FTB.[560] Yet FTB again disingenuously disregards this documentation. I have found that this is a recurring procedure of FTB – disregarding my documentation and then complaining that there is no documentation. See my CDE affidavits for a more detailed discussion of this FTB procedure.[561]

526. Fourth, FTB was responsible for the loss of the Wagon Trails rental file. The audit file purports that Wagon Trails offered to produce the rental file if I consented,[562] but FTB

---

[557] See P01497-01498. Ms. Cox was found to have conducted a fraudulent audit and is entitled to zero credibility, *Franchise Tax Board v. Hyatt*, 136 S. Ct. 1277 (2016).
[558] See P01497-01498.
[559] See P01981, P01983.
[560] See P01981, P05634, P05636.
[561] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 2-5, Hyatt Supp. CDE Affidavit, September 6, 2016, ¶¶ 2-5, and Hyatt Post-DP CDE Affidavit, September 6, 2016, ¶¶ 2-8.
[562] Supp. Affidavit of Gilbert P. Hyatt re FTB $24 Million Error, May 20, 2014, ¶ 543.

234

kept the fact that there was a rental file from me and FTB kept this offer regarding my consent from me so that my representatives did not get a copy of the rental file. As a result of FTB's actions or inactions the rental file was lost or destroyed. If FTB wanted to get the rental file it should have asked for my consent or at least notified me that there was a rental file. I thus conclude that, because FTB did not ask for my consent and because FTB did not notify me that there was a rental file, FTB did not want to get the rental file and FTB intentionally let it be lost or destroyed. This is not surprising because the rental file would have further established that the FTB audit was fraudulent and would have further established that I continuously resided at my Las Vegas apartment through April 3, 1992, when I moved from my Las Vegas apartment into my Las Vegas Tara home. I have developed this issue about FTB's failure to seek my consent and FTB's failure to notify me that there was a rental file in more detail in my 2014 Supp. Affidavit re FTB $24 Million Error, §§ 2.6.7.1-2.6.7.6.

527.    Fifth, FTB disingenuously states "[t]he Wagon Trails' records custodian could not determine the disposition of Mr. Hyatt's rental file other than it was discovered missing after a thorough search." However, FTB caused the rental file to be missing by withholding the Wagon Trails offer from me and from withholding the information that there was a rental file from me.

528.    Sixth, FTB refused to produce the audit file to me during the audit, thus I could not defend myself against the false facts and assessments and against the fraudulent fraud penalty.[563] When FTB finally produced an audit file, it was grossly incomplete, and when I finally learned about the bad faith acts that FTB had perpetrated against me, the rental file had been lost or destroyed.

529.    Seventh, FTB disingenuously states "[n]or did the records custodian produce or authenticate Mr. Hyatt's purported 'move out' letter." However, in the records custodian's deposition, FTB did not ask her to authenticate my "move out" letter. Nevertheless, I hereby authenticate my "move-out" letter and the check cited to therein and I hereby certify that the

---

[563] Supp. Affidavit of Gilbert P. Hyatt re FTB $24 Million Error, May 20, 2014, ¶¶ 287-288.

235

"move-out" letter and the check cited to therein are true and correct copies of the "move-out" letter and the check that I submitted to Wagon Trails, true copies thereof are attached hereto in Exhibit 2 (P01981, H00618).

530.    I produced much "meaningful substantiation [that I] truly took occupancy of the apartment unit". [564]  See ¶ 521, above.  There is overwhelming evidence that I moved into and resided in my Las Vegas apartment from October 21, 1991, through April 3, 1992.[565]  Testimony from 15 witnesses relates to visiting my Las Vegas apartment[566] while 2 witnesses testified about staying overnight,[567] 39 witnesses testified about telephoning me at my Las Vegas apartment,[568] 21 witnesses testified about the furniture and furnishings in my Las Vegas apartment,[569] 12 witnesses testified about the computer in my Las Vegas apartment[570] and 19 witnesses testified about the fax machine in my Las Vegas apartment.[571]  Similarly, there is no question but that I moved into my 5400 square foot Las Vegas Tara Avenue home on April 3, 1992.[572]

531.    The FTB 1992 Concluding Summary at p. 5 states the following.

> Concerned about what respondent's auditors may have seen in the Wagon Trails rental file, Mr. Hyatt's tax counsel requested that respondent provide him with "a copy of the post-marked envelope (and any contents)" and the "move-out documentation Ms. Jeng signed at the Wagon Trails".[29]  Because Mr. Hyatt never gave permission to Wagon Trails' management to release copies of his rental file, respondent had no copies to give him.[30]  The Wagon Trails site manager had no memory of anyone contacting her on behalf of Mr. Hyatt during the time period 1995-1999.[31]

[Exhibit A, note] 29:  Exhibit JJ, Tab 29: FTB Trial Exhibit 2001-

---

[564] 1991 AOB, § II.E.3.e.; 1992 AOB, § II.E.3.e.; 1991 ARB, § II.A.1.d; 1992 ARB, § II.B.1.b; 1992 ASAB, § 1.5.6.2; Updated Testimonial Topics, Exs. T018, T019, T021, T022, T023, T024, T025, T026, T028, T029, T057 T095, T096, T100, T128, T129.
[565] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991;
[566] Updated Testimonial Topics, Ex. T018.
[567] Updated Testimonial Topics, Ex. T021.
[568] Updated Testimonial Topics, Ex. T019.
[569] Updated Testimonial Topics, Ex. T022.
[570] Updated Testimonial Topics, Ex. T024.
[571] Updated Testimonial Topics, Ex. T025.
[572] Rebuttal to FTB Att. A/F, Section I. A., April 3, 1992.

1300 (FTB audit file-10/13/95 letter from Cowan to FTB, p. 3 and fn.2.)

[Exhibit A, note] 30: Exhibit JJ, Tab 30: 05/14/08 Trial Testimony (Gilbert Hyatt), 85:9-86:5; 06/05/08 Trial Testimony (Sheila Cox), 114:16-22.

[Exhibit A, note] 31: Exhibit JJ, Tab 27: 10/18/99 Deposition of Sherri Lewis (Wagon Trails), 13:9-11.

This FTB statement is false. First, there was no concern about what the "auditors may have seen in the Wagon Trails rental file," there was concern that the auditors falsely stated that what they had seen in the rental file because I told my representatives that the audit file contained many false statements. Thus, my tax counsel requested copies of the documents which FTB was basing its false statements on.

532. Second, Ms. Jeng did not sign any "move-out" documentation, I wrote a "move-out" letter and I included a check for the rent for my last month of the lease.[573] I understood that Wagon Trails would not accept a "move-out" letter from anyone but the lessee, I was the lessee, and there was no reason for Ms. Jeng to get involved and she did not get involved.

533. Third, Mr. Cowan's letter asking for a copy of the information that FTB reviewed from the Wagon Trails Apartments file stated the information was requested "in order to fully address the information". Mr. Cowan knew there was no letter in the file from Ms. Jeng and did not ask for any letter from Ms. Jeng. FTB again mischaracterizes the document. In footnote 2, Mr. Cowan asked for the documentation FTB had falsely stated Ms. Jeng had signed:

Please provide a copy of the move-out documentation **you indicate** that Ms. Jeng signed at the Wagon Trails Apartments, as well.

534. Letter dated October 13, 1995, from Riordan & McKinzie to Franchise Tax Board, p. 3 (emphasis added). No such Jeng letter has ever existed and the FTB fraud was exposed when I produced my actual March 22, 1992, move out letter, EC 01482. FTB

---

[573] P01981, H00618.

237

RJN1515

deceptively states that FTB had no files to give Mr. Cowan because I had not given permission to Wagon Trails to release the files. However, FTB fails to point out that I had no knowledge of FTB's secret visit to Wagon Trails Apartments and I could not give permission to release the files because the auditor did not ask me to do so.[574] The auditor withheld the information that there was a rental file, the auditor withheld Wagon Trails' request for my consent, and FTB withheld the audit file so that I was not able to determine the basis for its determination and assessments. See ¶¶ 527-528, above.

535. The FTB 1992 Concluding Summary at p. 5-6 states the following.

> Respondent acknowledges that Mr. Hyatt consummated a purchase of residential real property in Las Vegas on April 3, 1992. However, like the Wagon Trails low-income apartment lease, the details of that acquisition reveal that Mr. Hyatt engineered the purchase of that property from and while he was in California. The offers and counter-offers which ultimately resulted in a purchase contract were transmitted to and from Mr. Hyatt and his Las Vegas realtor by means of telefax transmission via the Jennifer Circle fax machine.

This FTB statement is false. First, I purchased the Las Vegas Tara house in person. I did not ever communicate with my Las Vegas real estate agent, Tom McGuire, from California and I did not ever meet with Mr. McGuire in California. I personally "walked-through" the Las Vegas Tara house several times in person. I met with Mr. McGuire in his office and in my apartment in Las Vegas numerous times in person. I signed the several offers and counter offers for the Las Vegas Tara house in Mr. McGuire's office or in my apartment in Las Vegas. I received numerous faxes from and I sent numerous faxes to Mr. McGuire with my fax machine in my Las Vegas apartment. I know of no evidence that FTB has produced that establishes that I had any contacts from or meetings with Mr. McGuire in California.[575] See ¶¶ 574-576, below.

---

[574] Trial testimony of Sheila Cox, June 5, 2008, p. 00114:24-25.
[575] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 45-48 and the exhibits attached therein.

238

536.    Second, I did not have use of a "Jennifer Circle fax machine', my fax communications with Mr. McGuire were with the only fax machine that I had which was located in my Las Vegas apartment.  See 1991 ASAB, § 1.8.4.5.

537.    Third, FTB makes the false statement "like the Wagon Trails low-income apartment lease . . . . Mr. Hyatt engineered the purchase of that property from and while he was in California." However, I did not engineer either the Wagon Trails lease or the purchase of my Las Vegas Tara property from California.  I leased my apartment in person in and from Las Vegas and I purchased my Las Vegas Tara house in person in and from Las Vegas.  See ¶¶ 201-202 and 535, above.  Fourth, I personally looked for houses to buy in Las Vegas and I personally "walked through" many houses in Las Vegas, including the Las Vegas Tara house that I purchased, throughout the 1991 and 1992 disputed periods.[576]  I did not "engineer" the purchase of my Las Vegas Tara home from California.  FTB offers no creditable evidence of its statement that I "engineered" the purchase of my Tara home from California.  I visited the Las Vegas Tara house many times before escrow closed on it and I made offers and received counter offers on the Las Vegas Tara house through my Las Vegas real estate agent, Tom McGuire.  Any faxes that were sent to me or from me for purchase of the Las Vegas Tara house were sent to or from my Las Vegas apartment, not from California.  FTB offers no creditable evidence to support its false claim that faxes for the purchase of my Las Vegas Tara home were sent to or from California.  I moved my fax machine to Las Vegas and had no fax machine in California after October 1, 1991.[577]

538.    The FTB 1992 Concluding Summary at p. 6 states the following.

> Mr. Hyatt ultimately assigns his contractual rights to purchase the Tara property to a trust standing in the name of his accountant, the written instructions for which were telefaxed to Nevada by Mr. Hyatt.  Mr. Hyatt's absence from Nevada prior to the actual consummation of the transaction is demonstrated by his realtor sending a telefax to Mr. Hyatt via the Jennifer Circle fax

---

[576] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 45-51.
[577] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.

239

RJN1517

machine and inquiring as to where he should pick up his client, followed by Mr. Hyatt renting a car in Las Vegas.

These FTB statements are false. FTB offers no evidence to support any of its statements.

539.  There was no "assign[ment of] contractual rights to purchase the Tara property". The purchase of the Las Vegas Tara house was made in the name of my trust. I found that there were tens of thousands of properties in Nevada held in trust.

540.  I began the day of March 30, 1992, in Las Vegas and visited escrow agent Jo Ann Frank where the sellers of the Tara house and I signed an Amendment to Escrow Instructions, H 09889. While present in Ms. Frank's Las Vegas office, I also signed Assignee Instructions,[578] which directed Minnesota Title to place title to my Tara home in the name of "Michael W. Kern as Trustee of the Kern Trust Dated April 2, 1992".[579] FTB does not identify what "written instructions" it is referring to. The original "Assignee Instructions", H 09898, were not faxed to Nevada by me. They were signed by me in Ms. Frank's Las Vegas office on March 30, 1992, and do not contain a fax header.

541.  FTB falsely contends I was absent from Nevada prior to the transaction, presumably referring to the purchase of my 5400 square foot Las Vegas Tara home. I made an overnight trip to California on March 30-31, 1992, and then remained in Las Vegas through April 3, 1992, when escrow closed on my Las Vegas Tara house. With no evidence, no date, no identification of a document, no identification of a real estate agent, FTB then assert some unknown realtor sent a fax to the Jennifer Circle fax machine. FTB has not identified any such fax. I cannot respond further about this fax because of the lack of information. FTB further states with absolutely no evidence that the unidentified realtor inquired about where he should pick up his client and that I then rented a car. However, my Las Vegas realtors often picked me up at my Las Vegas apartment such as for house shopping, house inspections, and signing

---

[578] H 09898 (H 013693, KT 00010), Rebuttal to FTB Att. A/F, Section I.F., March 30, 1992.

[579] Rebuttal to FTB Att. A/F, Section I A., March 30, 1992.

240

RJN1518

purchase offers. Further, prior to purchasing my new car in Las Vegas on March 19, 1992, I occasionally rented a car when I needed more reliable transportation because my 1977 Toyota was about 15 years old. Therefore, it was not unusual for a realtor to pick me up at my Las Vegas apartment. Further, it was not unusual for me to rent a car prior to purchasing my new car on March 19, 1992.

542. FTB makes the patently false statement "followed by Mr. Hyatt renting a car in Las Vegas." Again, there is too little information to respond to except to say that at the time of closing escrow on my Las Vegas Tara home I had a brand new 1992 Toyota purchased in Las Vegas that was less than a month old as well as my old 1977 Toyota and I have no recollection of needing a rental car or of renting a car at that time. This appears to be another of the thousands of FTB false statements, fabricated stories, and mischaracterizations.

543. The FTB 1992 Concluding Summary at p. 6 states the following.

> Moreover, it is not until shortly after April 2, 1992, that any evidence of Mr. Hyatt purchasing common household items in Las Vegas appears.[32] The contemporaneous objective evidence of Mr. Hyatt maintaining a continuous physical presence in California throughout the disputed period simply has not, and cannot be refuted.[33]

[Exhibit A, note] 32: See FTB Attachment A (Revised), pp. 126-130 (April 3-7, 1992).

[Exhibit A, note] 33: Id. @ pp. 30-126 (September 26, 1991 to April 3, 1992).

This FTB statement is false. FTB's statement is false and can be and is "refuted." My Las Vegas apartment was fully furnished with everything I needed to live there between October 21, 1991, and April 3, 1992, when I moved into my much larger 5400 square foot Las Vegas Tara home. My Las Vegas apartment was fully furnished, as confirmed by many witnesses who visited me at my Las Vegas apartment. The furniture and furnishings of my Las Vegas apartment have been testified to by 21 witnesses,[580] while 14 witnesses testified about the office

---

[580] Updated Testimonial Topics, Ex. T022.

241

1  in my Las Vegas apartment,[581] and 19 witnesses testified about the fax machine in my Las Vegas

2  apartment.[582]

3      544.    FTB offers no "objective evidence" of my presence in California.  FTB offers

4  only illogical inferences drawn from correspondence that was inadvertently misdirected to

5  California by Philips support staff[583] and faxes that I sent from my Las Vegas apartment fax

6  machine using a Cerritos P.O. Box return address that does nothing to place me at the Jennifer

7  Circle house.[584]  Overwhelming documentary and eyewitness evidence establishes that I was

8  almost always present in Las Vegas during the 1991 and 1992 disputed periods with only

9  occasional visits to California for specific temporary or transitory purposes.[585]  See the table for

10  my reasons for each temporary or transitory visit to California in ASAB Exhibit 4.  An actual

11  evidence based analysis demonstrates that during the 1991 and 1992 disputed periods I had 125

12  full days in Nevada as a resident and 37 days partly in Nevada and partly in California for a

13  specific temporary or transitory purpose.  I also had 9 full days in a California hospital while I

14  recovered from cancer surgery.[586]

15      545.    The FTB 1992 Concluding Summary at p. 6 states the following.

> Mr. Hyatt's continued and pervasive physical presence in California throughout the entire disputed period has been extensively discussed in respondent's earlier briefing and attachments, including, but not limited to, Respondent's Concluding Summary for Taxable Year 1991(Case No. 435770) at pages 14 and 15 and Respondent's Attachment A (Revised), pages 81 to 126; that discussion will not be repeated here and is incorporated by reference as if set forth fully herein.  From the

---

[581] Updated Testimonial Topics, Ex. T023.
[582] Updated Testimonial Topics, Ex. T025.
[583] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 25, Annex XII; 1991 ASAB § 1.7.8; 1992 ASAB § 1.4.1.1.
[584] 1991 ASAB, §§ 1.8.4.1, 1.8.4.2, 1.8.4.3, 1.8.4.4, 1.8.4.5, 1.8.4.6; 1992 ASAB, §§ 1.4, 1.4.1, 1.4.1.1, 1.4.1.2.
[585] Rebuttal to FTB Att. A/F, Section I. A., day by day analysis, September 26, 1991, through April 2, 1992; 1992 ASAB §§ 1.5.5, 1.5.8.
[586] Rebuttal to FTB Att. A/F, Section I. A., day by day analysis, September 26, 1991, through April 2, 1992.

RJN1520

beginning of January 1992 to April 2, 1992, Mr. Hyatt spent 79.5 days in California, 4.5 days in Nevada, and 9 days in other states.[34]

[Exhibit A, note] 34: The detailed support for FTB's day-to-day analysis can be found Respondent's Revised Attachment A (1991-1992), at pages 81-126 (01/01/92-04/02/92), Respondent's 1991 Additional Brief (refiled in February 2015) at pages 9-12, and at pages 8-12 of Respondent's Attachment F.

The FTB's prior arguments regarding physical presence in California are false. I was not in California more than the limited number of times listed in the temporary and transitory table and for the specific reasons addressed in the temporary and transitory table (e.g., a court appearance in my mother's estate in which I was the executer (ASAB Exhibit 4).

546.    The many false statements in FTB 1991 Concluding Summary, pp. 13-15 have been fully rebutted by ¶¶ 210-235, above. FTB's Attachment A (Revised), pp. 81-126, has been fully rebutted and discredited by the Rebuttal to FTB Att. A/F, Sections I and II, January 1, 1992 through April 3, 1992. FTB's Second Additional Brief (refiled February 2015), pp. 9-12 (FTB's Calendar from January to April 1992, has been fully rebutted by 1992 ASAB, § 1.5.8, pp. 15-25 and particularly, my updated Calendar at pp. 22-25. FTB's Attachment F, pp. 8-12, has been fully rebutted by Rebuttal to FTB Att. A/F, Section III., December 24, 1991, through May 9, 1992.

547.    The FTB 1992 Concluding Summary at p. 6-7 states the following.

> Mr. Hyatt's failure to produce telephone records is not limited to 1991 as he has failed to produce them for either 1991 or 1992. In light of the continued use of the Jennifer Circle telephone and telefax lines during 1992 (clearly a continuation of conduct pre-dating any alleged relocation to Nevada), the negative inference therefrom is well deserved and has been extensively discussed in Respondent's 1991 Concluding Summary at pages 15 through 16 as well as in its earlier briefing and attachments; those discussions will not be repeated here and are incorporated by reference as if set forth fully herein.

This FTB statement is false. I produced the telephone records that I had. They were for the telephone service that I had in my Las Vegas apartment. I did not receive any telephone bills for the Jennifer Circle house after October 1, 1991, because I did not have telephone service there

243

RJN1521

1  and because the purchaser did not have any reason to send me copies of her telephone bills.  See

2  81, 85, 86, 226-228, 233, 249, 548, 549 herein.

3       548.  As FTB well knows, I did not fail to produce telephone records.  The FTB auditor

4  decided not to obtain my telephone records.  I was attempting to obtain my telephone records

   when the auditor told me in a letter dated March 1, 1995, that she would assume responsibility

5  for obtaining any and all telephone records.  With the power of subpoena at its disposal, FTB did

6  not follow up with the telephone companies and obtain the telephone records.[587]  See 81, 85, 86,

7  226-228, 233, 249, 547, 549 herein.

8       549.  I did not use the telephone at the Jennifer Circle house after October 1, 1991,

9  when I sold the house and cleared out the remainder of my belongings, ¶ 365, above.  FTB's

   suggestion that a negative inference should be drawn because I did not produce telephone

10 records from the Jennifer Circle house after I sold the house and moved away is ridiculous.  See

11 81, 85, 86, 226-228, 233, 249, 547 herein.

12      550.  The FTB 1992 Concluding Summary at p. 7 states the following.

13         Mr. Hyatt's ongoing California banking and other financial
         activities have been extensively discussed in respondent's earlier
14       briefing and attachments, including Respondent's Concluding
         Summary for Taxable Year 1991(Case No. 435770) at pages 16
15       through 18; those discussions will not be repeated here and are
         incorporated by reference as if set forth fully herein.
16

17 This FTB statement is false.  I did not have any "ongoing California banking" after I moved to

18 Las Vegas.  The only accounts that I had in financial institutions located in California were

   investment accounts, e.g., certificate of deposit accounts, money market accounts, and a mutual

19 fund account.  Shortly after moving to Las Vegas, I opened two checking accounts and a savings

20 account in Nevada banks.  I produced numerous bank statements to FTB, all with my banks' Las

21 Vegas address thereon and all with my Las Vegas address thereon.[588]  I also produced numerous

22 ─────────────────

23 [587] Rebuttal to FTB Att. A/F, Section I. B., October 7, 1991; Affidavit of Gilbert P. Hyatt,
   § 1.20, p. 130, August 15, 2010, Annex XI, Ex. 13; 1991 ARB, § II.A.5, pp. 34-36.
24 [588] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 64-74 and the exhibits attached therein.

RJN1522

1  cancelled checks to FTB, all with my banks' Las Vegas address printed thereon and all but a few

2  counter checks with my Las Vegas address printed thereon.[589]  I opened my first new Las Vegas

3  bank checking account on October 25, 1991, a few days after I moved into my Las  Vegas

4  apartment. [590]  See ¶¶ 242-245, above.

5      551.    Prior to moving to Las Vegas on September 26, 1991, I closed several California

   bank accounts.  The banking related statements in FTB's 1991 Concluding Summary are

6  rebutted at ¶¶ 242-277.

7      552.    The FTB 1992 Concluding Summary at p. 7 states the following.

8      In addition, Mr. Hyatt's California banking activity
   continued with Mr. Hyatt receiving bank statements from
9  California Federal Bank, Lakewood and Cerritos branches, at his
   Cerritos Post Office box for nearly all of the disputed period.[35] On
10 February 7, 1992, Mr. Hyatt personally appeared before a
   California notary at Capitol/Landmark Bank in La Palma,
11 California, concerning "safe dep box,"[36] obtained notary services
   at the bank on February 11, 1992, and obtained a signature
12 guarantee from the same institution for a document instructing
   the Benham Group to wire transfer $346,300 for the Tara house
13 purchase on March 24, 1992.[37]

14 [Exhibit A, note] 35:  E.g., H00722-727, FTB Trial Exhibit 2001-
   3150-3157and FTB Trial Exhibit 2001-3111- 3119.  See FTB's
15 Attachment A (Revised), p. 131 (4/12/92), concerning change of
   address from Cerritos to Nevada Post Office Box for MasterCard
16 statements with Bank of New York.

17 [Exhibit A, note] 36:  FTB's Attachment A (Revised), p. 99
   (2/7/92).

18 [Exhibit A, note] 37:  Id. @ p. 119 (3/24/92).

19 This FTB statement is false.  I did not have any continuing California banking activity after I

20 moved to Las Vegas.  See ¶ 550, above.  The accounts at California Federal Bank, Lakewood

21 and Cerritos branches were money market investment accounts that had a Nevada situs because I

22  

23 [589] See, e.g., Exhibits CDE-F5 and F6 attached to Hyatt DP CDE Affidavit, July 24,
   2012.

24 [590] 1991 AOB, § II.C.8; 1992 ASAB, § 1.5.4

was a Nevada resident as of September 26, 1991. See ¶ 257, above. FTB misrepresents use of a notary as California banking activity. The safe deposit boxes were for my mother's estate being probated in a California court of which I was the executor. The signature guarantee for the Las Vegas Tara house purchase on March 24, 1992, is a significant Nevada connection.

553. FTB references and links CalFed statements from the Lakewood branch. The statements show that I added nothing to the account after September 25, 1991, and the account was inactive except that I withdrew most of the funds from the account on December 12, 13, 1991 (H00724) and subsequently closed this account in 1992 (CCC 00542).

554. FTB references and links CalFed statements from the Cerritos branch. FTB did not links to CalFed statements from the Cerritos branch. It links only to statements from Lakewood branch which are addressed above. It only cites to FTB Trial Exhibit 2001-3150-3157and FTB Trial Exhibit 2001-3111- 3119 which I could not determine whether they are the Cerritos branch statements since I have no access to these FTB exhibits.

555. FTB mischaracterizes the February 7, 1992, notary log, FTB 13703, FTB 13891-13892. This is another of FTB's false statements, fabrications and mischaracterizations. The notary log says nothing about "concerning 'safe dep box,'". The log lists the safe deposit box for my mother's estate under "Identification of Person". The notary log lists my Nevada P.O. Box address and lists the type of document as "Revocation". The notary log for February 11, 1992, FTB 13893 -13894, also lists my Nevada P.O. Box address. My Las Vegas P.O. Box address is also listed on the wire transfer instruction from my Nevada situs Benham account for the purchase of my Las Vegas Tara home that was signature guaranteed by Capital Bank.[591] I was in California on February 7, 11, and March 24, 1992 for a temporary or transitory purpose.[592] Notarization of a document is not a banking activity under the *Bragg* factors. Similarly, a

_____

[591] A copy of the wire transfer instruction for the purchase of my Las Vegas Tara home is linked to FTB Attachment A (Revised), March 24, 1992, p. 119.

[592] Rebuttal to FTB Att. A/F, Section I. A., February 7, 11, and March 24, 1992.

246

RJN1524

signature guarantee for a wire transfer from a Nevada situs account to purchase a Las Vegas home is not a California contact.

556.    The FTB 1992 Concluding Summary at p. 7 states the following.

> New Nevada residents who drive must acquire a Nevada driver's license and register any vehicles they own within 45 days.[38] Mr. Hyatt's 1977 Toyota Celica was purportedly kept in Nevada from September 1991 through 1992 and beyond.[39] Notwithstanding his alleged occupancy of the low-income apartment complex unit, Mr. Hyatt waited until May 6, 1992, a month after he purchased the Tara home to register his 1977 Toyota in Nevada.[40]  Mr. Hyatt also purchased another vehicle in Nevada in 1992.

[Exhibit A, note] 38:  H07130.

[Exhibit A, note] 39:  P01557.

[Exhibit A, note] 40:  H 07072 – 07073.

These FTB statements are false or misleading.  The apartment complex was not a low-income apartment complex, I had a medium priced two bedroom apartment in a very nice, well maintained middle income apartment complex.[593]  See ¶ 280, above.

557.    The simple statement "Mr. Hyatt also purchased another vehicle in Nevada in 1992" following the 1977 Toyota statements is misleading.  The more complete facts are that I purchased my 1992 Toyota in March 1992, I registered it in Nevada in March 1992, and I insured it with my Las Vegas insurance agency in March 1992.[594]  I turned in my California driver's license and obtained a Nevada driver's license at the Nevada DMV on November 27, 1991, and I registered to vote at the same time.[595]  I also attempted to register my 1977 Toyota in Nevada on November 27, 1991, but it did not pass a smog test.[596]  My son during a visit to Las Vegas got my old 1977 Toyota to pass the smog test on April 17, 1992, H 07068-07070, I

---

[593] 1991 ARB, § II.A.1.d, pp. 29-32; Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.

[594] Rebuttal to FTB Att. A/F, Section I. A., March 19, 1992.

[595] Rebuttal to FTB Att. A/F, Section I. A., November 27, 1991.

[596] Rebuttal to FTB Att. A/F, Section I. A., November 27, 1991.

247

RJN1525

applied for Nevada registration on April 21, 1992, and received the registration for the 1977 Toyota on May 6, 1992, H 07072.

558.     The FTB 1992 Concluding Summary at pp. 7-8 states the following.

> Mr. Hyatt's California and Nevada voting registration has been extensively discussed in respondent's earlier briefing and attachments, including Respondent's Concluding Summary for Taxable Year 1991 (Case No. 435770) at pages 18 through 19; those discussions will not be repeated here and are incorporated by reference as if set forth fully herein.

The prior FTB statements are false.  I properly registered to vote in Nevada on November 27, 1991.[597]  I voted in the next major election in Nevada.  I did not vote in California after September 26, 1991, when I moved to Las Vegas.  FTB comments on my voter registration and voting have been addressed in prior briefing.[598]

559.     The FTB 1992 Concluding Summary at p. 8 states the following.

> Clark County Election Department records reveal that Mr. Hyatt amended his Nevada voter registration in July 1994 to represent that he was living at a Sandpiper Lane residence in Las Vegas, a property then owned by Mr. Hyatt's Nevada accountant. Respondent also determined that Mr. Kern had purchased a different home in June 1994 and sold his Sandpiper Lane address to someone other than Mr. Hyatt in October 1994.[41]  Through that revised registration, Mr. Hyatt affirmed, under penalty of perjury, that his actual physical residence was 5441 Sandpiper Lane:

> > I further swear or affirm under penalty of perjury that the present address listed herein is my sole legal place of residence and that claim no other place as my legal residence....

> > Warning

> > Willingly giving a false answer to any question on this application is felony and civil penalty of up to $20000 fine![42]

> [Exhibit A, note] 41:   FTB Trial Exhibit 2001-83 (FTB 1991

---

[597] Rebuttal to FTB Att. A/F, Section I. A., November 27, 1991.
[598] 1991 AOB, § II.C.13; 1992 AOB, § II.C.13; 1991 ARB, II.A.13; 1992 ARB, § II.B.13; 1992 ASB, § I.E.11.

248

RJN1526

Narrative Report, p. 5) and 2001-0155-156 (July 13, 1994 FTB Progress Report).

[Exhibit A, note] 42: Deposition Exhibit 547 (07/05/94 Mail In Voter Registration for Gilbert Hyatt, Las Vegas, Nevada and 09/27/99 Affidavit of John E. Mayers).

This FTB statement is false. FTB's statements should be disregarded by your Board because FTB misstates the issue and because this issue occurred years after the 1991/1992 years at issue here.

My statement was that the Sandpiper address was my "legal address," which is misquoted by FTB as my "actual physical residence." I was informed by my Las Vegas attorney that the Sandpiper address was in fact my "legal address" because of the wording of the Nevada statute.

560. FTB raises the issue that occurred in 1994 and is irrelevant to FTB's 1991 and 1992 audits. Further, my change in voter registration was done with advice of legal counsel and the change of voter registration was previously explained to FTB.[599] It is disingenuous for FTB to raise this issue knowing that it is unrelated to my establishment of Nevada residency on September 26, 1991, and knowing that my change of voter registration was proper, legal and done with advice of counsel. I had the permission of the owner, Michael Kern, to use his address for my voter registration and use of Mr. Kern's address was believed to be consistent with the voter instructions.[600]

561. FTB submits still another document mischaracterization to your Board. The change of voter registration that I signed declared that the Sandpiper Lane address was my "sole legal place of residence"[601] but FTB falsely stated to your Board that the change of voter registration declared the Sandpiper Lane address to be my "actual physical residence".[602]

_____

[599] 1991 ARB, § III.B.9, p. 95 and Ex. 54, Partial Transcript, Depo. of Michael Kern, Vol. II, 5/24/00, 343:9-344:5; Ex. 55, Partial Transcript, Depo. of Gilbert P. Hyatt, Vol. III, 8/17/05, 543:24-544:24.
[600] Supplemental Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.7, Annex XI, Ex. 13.
[601] Mail-In Voter Registration Application, July 5, 1994, FTB15013.
[602] 1992 FTB Concluding Summary, p. 8.

249

RJN1527

562.    The FTB 1992 Concluding Summary at p. 8 states the following.

> Through additional investigation, respondent discovered that Mr. Hyatt never lived at Sandpiper Lane or had permission from the actual owners to use the Sandpiper Lane property as his voter registration address[43] Mr. Kern admitted that Mr. Hyatt never lived at 5441 Sandpiper Lane address but allowed Mr. Hyatt to use the address, knowing the voter registration was signed under penalty of perjury.[44]

> [Exhibit A, note] 43:  Deposition Exhibit 547 (09/27/99 Affidavit of John E. Mayers, 1:4-17).

> [Exhibit A, note] 44:  05/24/00 Deposition of Michael W. Kern, Vol. 2, pp. 340-345.

This FTB statement is false.  On July 5, 1994, when I submitted the change of voter registration Mr. Kern owned 5441 Sandpiper Lane and Mr. Kern gave me permission to use that address for my voter registration with advice of counsel.[603]  The FTB statement -- that I did not have permission of the owner of the Sandpiper address to use that address as his voter registration address -- is false and is another of the thousands of FTB's false statements, fabrications and mischaracterizations.

563.    Furthermore, this July 5, 1994, change of voter registration is irrelevant to the audit of my 1991 and 1992 taxes.

564.    The FTB 1992 Concluding Summary at p. 8 states the following.

> Mr. Hyatt also confirmed that he never resided at the Sandpiper Lane address and knowingly represented to the Clark County Election Department that his "sole residence" was "5441 Sandpiper Lane" in the July 05, 1994 Mail-In Nevada voter registration.  Mr. Hyatt also confirmed that he further failed to make any additional address change(s) and end his use of the Sandpiper Lane address in six subsequent Nevada elections.[45]

> [Exhibit A, note] 45:  05/13/08 Trial Transcript, 113:16-18 and 05/15/08 Trial Transcript, pp. 163-165 and 171-173 and FTB Trial Exhibit 2800-12, 21-22 (09/06/94), 23-24 (11/08/94), 25-26 (09/03/96), 27-28 (11/05/96), 29-30 (09/01/98), and 31-32 (11/03/98).

---

[603] Deposition of Michael Kern, May 24, 2000, p. 343:5-23.

250

1   This FTB statement is false.  FTB again mischaracterizes the voter change of address document,

2   which states that my "sole legal place of residence" [604] was Sandpiper Lane.  FTB intentionally

3   and deceitfully contends the document asserts that Sandpiper Lanes was my "sole residence". [605]

4   That is not what the document stated.  FTB then disingenuously contends that I "failed" to make

5   additional changes in my voter registration knowing full well that there was no requirement for

6   me to make any additional changes in my voter registration.  According to Harvard Lomax,

7   Clark County Nevada Registrar of Voters, "There is no legal requirement and there was no

8   requirement in the early 1990s for a voter to file a change of address for his or her voter

    registration." [606]

9       565.    Furthermore, a change of address for voter registration filed in 1994 is irrelevant

10  to an audit of my 1991 and 1992 taxes.

        566.    The FTB 1992 Concluding Summary at p. 9 states the following.

11
                Mr. Hyatt's extensive use of California professionals
12              during the relevant period has been extensively discussed in
                respondent's earlier briefing and attachments, including
13              Respondent's Concluding Summary for Taxable Year 1991 (Case
                No. 435770) at pages 19 through 20; those discussions will not be
14              repeated here and are incorporated by reference as if set forth fully
                herein.

15  This FTB statement is false.  During the disputed period and thereafter I had very little use of

16  California professionals and substantial use of **non-**California professionals as demonstrated by

17  prior briefing. [607]  I had more than 100 non-California professionals. [608]  See ¶¶ 293-297, 316-219,

18  327, 574-579, 581, 584, 666 herein.  See also Hyatt Post-DP CDE Affidavit, September 6, 2016,

19  ¶¶ 146-147.

        567.    The FTB 1992 Concluding Summary at p. 9 states the following.
20

21
        [604] Mail-In Voter Registration Application, July 5, 1994, FTB15013.
22      [605] 1992 FTB Concluding Summary, p. 8.
        [606] Declaration of Harvard Lomax, June 20, 2012, ¶ 6,
23      [607] 1991 AOB, § II.C.14; 1992 AOB, § II.C.14; 1991 ARB, § II.A.14; 1992 ARB, §
    II.B.14; 1992 ASB, § I.A.12; 1991 ASAB, § 1.8.2, p. 19:9-10; 1992 ASAB, § 1.5.3.
24      [608] Exhibit CDE-ST004. attached to Hyatt Supp. CDE Affidavit, September 6, 2016.

                                            251

1         During the disputed period in 1992, Mr. Hyatt sought and
obtained professional medical services from Dr. Melvin Shapiro on
2    February 3, 1992 in Encino.[46]  Eight days later, Mr. Hyatt was
admitted to the Los Alamitos Medical Center where Dr. Isenberg
3    performed surgery and Mr. Hyatt remained hospitalized until
discharged on February 21, 1992.[47]  Mr. Hyatt did not consult any
4    medical or dental provider(s) in Nevada during this time frame.[48]

5    [Exhibit A, note] 46:   FTB Trial Exhibit 2001-0659-660 and
05/31/01 Supplemental Protest Letter (1991), pp. 62-63.

6
[Exhibit A, note] 47:  05/31/01 Supplemental Protest Letter (1991),
7    pp. 62-63 and FTB Trial Exhibit 2001-0658.

8    [Exhibit A, note] 48:  FTB Trial Exhibit 2001-0656-657.

9    This FTB statement is false.  I did not meet with Dr. Shapiro in Encino on February 3, 1992.[609]

10   FTB points to an undated, unauthenticated handwritten note of unknown authorship with a date

"2/3/92", FTB 101265.  This unauthenticated date should be disregarded by your Board.

11
12       568.   I traveled to California for the temporary or transitory purpose of cancer surgery

from February 11, 1992, to February 21, 1992.  My Rabbi in Las Vegas had advised me to  use a
13
California doctor for this serious medical procedure and I chose to follow his advice and have
14
my surgery in California.

15       21. Regarding Gil's cancer operation, my wife and I strongly suggested
that he go to a California hospital rather that have the operation performed in Las
16   Vegas. We told him that Las Vegas medical services were far less developed than
California medical services, California medical providers cater to out of state
17   patients, and Las Vegas residents traditionally go to California for serious medical
services. I told him that I have advised other congregants to have their serious
18   medical needs taken care of in California. My wife told him that she had gone to
the Santa Barbara Sansum Clinic in California and that other prominent Nevadans
19   also went to this clinic for their medical needs. Later, Gil told me and my wife
that he had arranged to have his surgery done in a California hospital by a
20   California surgeon.

21   Affidavit of my Rabbi Dr. Mel Hecht, November 12, 2008, paragraph 21.

22

23   _____

24   [609] Rebuttal to FTB Att. A/F, Section I. B., February 3, 1992.

252

RJN1530

569.    I traveled to California on February 11, 1992, for the surgery and I immediately returned to my Las Vegas apartment to continue my recuperation following my release from the hospital on February 21, 1992.[610]  I did not have my cancer surgery in California to surrender my Nevada residency.

570.    Having had cancer surgery in February 1992, I had no need to consult other medical professionals in Nevada during the disputed period.  However, I did consult with a Nevada dentist, Dr. Steven Hall, on April 6, 1992, immediately after moving into my 5400 square foot Las Vegas Tara home.[611]

571.    The FTB 1992 Concluding Summary at p. 9 states the following.

> Upon referral of Steven Hammer (Santa Barbara), Mr. Hyatt, consulted Gerald Block, CPA, twice during 1992 in Encino, California. On the first visit, February 3, 1992, Mr. Hyatt informed Mr. Block that he had come into some money like $10 million and was about to earn another $30 million.  Mr. Hyatt asked him how to establish residency in Nevada.  On the second visit, February 25, 1992, Mr. Block advised Mr. Hyatt that to become a nonresident of California Mr. Hyatt needed to dispose of his residence in California and had to establish a Nevada address.[49]

> [Exhibit A, note] 49:    FTB Exhibit M, Tab 39, 08/20/09 Declaration of Gerald S. Block, CPA.

These FTB statements are false.  Mr. Block stated that his statements were made upon his "best recollection" but his recollection was very poor.[612]  Mr. Hammer did not refer me to Mr. Block.  Mr. Hammer referred me to Mr. Gormley who in turn referred me to Mr. Block.  During my meeting with Mr. Block I determined that he had no advice that I was interested in and I did not see him a second time on February 25, 1992.[613]  In fact, I was recovering from cancer surgery on February 25, 1992, and I was not interested in discussing taxes with Mr. Block at that time.  I remained in Nevada on February 25, 1992, recovering from cancer surgery and did not meet with

---

[610] Rebuttal to FTB Att. A/F, Section I. A., February 11 and 21, 1992.
[611] Rebuttal to FTB Att. A/F, Section I. A., April 6, 1992.
[612] Rebuttal to FTB Att. A/F, Section I. E., February 3, 1992.
[613] Rebuttal to FTB Att. A/F, Sections I. A and I. B., February 25, 1992.

253

RJN1531

Mr. Block on that date.[614]  Mr. Block had previously told FTB that he had only one meeting with me in February 1992,[615] which was the undisputed February 3, 1992, meeting.

572.    Mr. Block's statement that I told him I had come into $10 million is false.  I did not tell Mr. Block how much money I had received or how much I might receive in the future and Mr. Block's guess is not even close.

573.    I did not ask Mr. Block how to become a Nevada resident.  I had already become a Nevada resident on September 26, 1991.  I did not meet with Mr. Block on February 25, 1992, and Mr. Block did not tell me on that date I had to dispose of my California residence to become a Nevada resident.  As your Board is well aware, it is not necessary to dispose of a California residence to become a resident of another state.  In any event, I had already sold the Jennifer Circle house on October 1, 1991,[616] and I told Mr. Block I had already sold the Jennifer Circle house.

574.    The FTB 1992 Concluding Summary at p. 9 states the following.

> In contrast, other than realtors and escrow agents related to his eventual purchase of a new home in early April 1992,[50] Mr. Hyatt did not consult any Nevada professionals until he and Grace Jeng initially met with his Nevada accountant, Michael Kern, on or about March 18, 1992.[51]  Even as to his contacts with Nevada realtors, most were by phone and not in person.  In fact, Mr. Hyatt frequently had contacts with Nevada realtor, Tom McGuire, by facsimile and telephone from his 7841 Jennifer Circle home/business location.  Mr. McGuire later disclosed that he did not meet Mr. Hyatt personally until about a month before the April 1992 closing on the Tara Avenue home, and most of his dealings were with Grace Jeng.[52]

> [Exhibit A, note] 50:  05/31/01 Supplemental Protest Letter (1991), pp. 64-66.

> [Exhibit A, note] 51:  05/24/00 Deposition of Michael Kern, Vol. 2, pp. 312:18-22 and FTB Exhibit N, Tab 42 (H015833).

---

[614] Rebuttal to FTB Att. A/F, Section I. A, February 25, 1992.
[615] Letter dated April 5, 1995, from Block to FTB, EC 04063.
[616] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.

254

[Exhibit A, note] 52:  FTB Exhibit LL, Tabs 3 and 4 (06/26/14 Affidavit of Pat Lundvall and 06/12/14 Declaration of Robert Dunn).

This FTB statement is false.  I had many contacts with Nevada professionals in addition to realtors and escrow agents prior to March 18, 1992.  See ¶¶ 293-297, 316-219, 327, 566, 574-579, 581, 584, 666 herein.

575.    I had contact with many Nevada real estate agents in person as well as by telephone from my Las Vegas apartment in addition to Mr. McGuire, who represented me in the purchase of my Las Vegas Tara home.[617]  I personally "walked through" many Las Vegas houses while looking for a home to purchase.  Mr. McGuire himself showed me "many" properties. [618] I made hand written notes while personally "walking through" several houses with Mr. McGuire,[619] H 013694.  FTB presents no evidence that "most were by phone and not in person" and it is a false statement.  The telephone calls and faxes I had with a real estate agent were to or from my Las Vegas apartment where my telephone and my fax machine were located (I did not have a mobile phone).  I did not visit the Jennifer Circle house between October 1, 1991, when I sold it and late 1992 when I returned to Jennifer Circle for a short visit.

576.    Contrary to FTB's false statement, I did not have any contact with Mr. McGuire by facsimile or telephone from the Jennifer Circle house.  Mr. McGuire has confirmed that he dealt with me in person and he sent and received faxes from me in Las Vegas, not California.[620] FTB proposed a declaration of Thomas McGuire for Mr. McGuire to sign, but Mr. McGuire refused to sign it and Mr. McGuire crossed out much of the proposed declaration because it was not correct.[621]

---

[617] 1991 Supplemental Protest Letter, May 31, 2001, pp. 64-66, P01233-01235.
[618] Affidavit of Thomas McGuire, March 31, 2012, ¶ 58, Annex XXV, Ex. 55; P05650; Rebuttal to FTB Att. A/F, Section I. C., December 11, 1991.
[619] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 48, 50, 58, Annex XXV, Ex. 55; Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 174.
[620] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 69-73, Annex XXV, Ex. 55; Rebuttal to FTB Att. A/F, Section I. D., December 11, 1991.
[621] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 8-9, Annex XXV, Ex. 55.

RJN1533

577.    The FTB statement that Mr. McGuire did not meet me personally until about a month before the April closing of my Las Vegas Tara home and dealt mostly with Ms. Jeng is false and has been denied by Mr. McGuire as well as myself.[622]  Mr. McGuire testified that he dealt only with me and did not deal with Ms. Jeng with respect to the purchase of my Las Vegas Tara home.[623]  Mr. McGuire further testified that he met me one or two months prior to the December 16, 1991, purchase offer on the Las Vegas Tara home, not a month before the April 1992 closing as falsely stated by FTB.[624]  Mr. McGuire further testified that his statement on the December 16, 1991, Tara purchase agreement that he had shown me "many properties" was correct.[625]

578.    The Nevada real estate agents that I worked with during the disputed period included Walter Shoemaker, Cyndy Barrett, Marilyn Squitieri, Mark McKee, Old West Realty, Earl Barbeau, Shirley Rappaport, and Craig Williams.  Other Nevada professionals included Rabbi Akselrad, Rabbi Hecht, Rebbetzin Hecht, Robert Huddleston, Sally Lezcano, Jo Ann Frank, Stephanie Gines, Bob Schulman, John Kuminecz, the managers of CalFed Bank, Sheldon Addelson, David Kaniner, Robert Lively, Pete Young, Michael Kern.[626]  I also had associations with more than 100 non-California professional.[627]  My use of Nevada and non-California professionals is discussed in ¶ 566, above.  The FTB statement that I did not consult a Nevada professional prior to March 18, 1992, is another of FTB's thousands of false statements, fabrications and mischaracterizations.

579.    I met Mr. McGuire shortly after I moved to Las Vegas and we "walked through" many properties until he showed me the Tara property which I liked very much.  He made a purchase offer with a large cash deposit which represented to the parties that he had shown me

---

[622] Rebuttal to FTB Att. A/F, Section I. E., December 11, 1991.
[623] Affidavit of Thomas McGuire, March 31, 2012, ¶ 58, Annex XXV, Ex. 55.
[624] Affidavit of Thomas McGuire, March 31, 2012, ¶ 6, Annex XXV, Ex. 55.
[625] Affidavit of Thomas McGuire, March 31, 2012, ¶ 19, Annex XXV, Ex. 55.
[626] 1991 Supplemental Protest Letter, May 31, 2001, pp. 64-66, P01233-01235.
[627] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶¶ 75-87; Exhibit CDE-ST004 attached to Hyatt Supp. CDE Affidavit, September 6, 2016.

256

RJN1534

"many" properties on the purchase offer.[628] He proceeded to negotiated the purchase through counter offers and he got the purchase into escrow in March.

580. The FTB 1992 Concluding Summary at p. 9-10 states the following.

> Mr. Hyatt did not have a business license to work from either his Wagon Trails Apartment or his Tara home.[53] He did not apply for a business license from the City of Las Vegas until December 10, 1992.[54] And, as mentioned earlier, Mr. Hyatt's connection with Nevada professionals was limited to his eventual purchase of the Tara home. Mr. Hyatt did not meet or consult with his Nevada accountant until mid-March 1992 and did not lease or rent any commercial office space in Nevada during the disputed period.[55] In fact, Caroline Cosgrove, his California market researcher, did not visit Mr. Hyatt at his Las Vegas apartment between October 1991 and early April 1992.[56] Similarly, Mr. Hyatt has no recollection of Mr. Roth ever visiting his Wagon Trails apartment.[57]
>
> [Exhibit A, note] 53: 08/15/05 Deposition of Gilbert P. Hyatt, Vol. 1, 100:19-101:2.
>
> [Exhibit A, note] 54: FTB Trial Exhibit 2001-1210-1218 and 05/23/00 Deposition of Michael Kern, Vol. 1, pp. 134-135
>
> [Exhibit A, note] 55: 05/24/00 Deposition of Michael Kern, Vol. 2, pp. 312-320 and FTB Exhibit N, Tab 42 (H015833).
>
> [Exhibit A, note] 56: 11/16/05 Deposition of Flora Caroline Cosgrove, pp. 205 and 221.
>
> [Exhibit A, note] 57: 08/15/05 Deposition of Gilbert P. Hyatt, Vol. 1, 178:25-179:2.

This FTB statement is misleading. First, I did not need a business license because I did not operate a business from my apartment or from my Tara home. I did not have any employees, or any customers, or any stock. I had a small home office with a personal computer, a fax machine, and a telephone in my apartment and I had a home office and a research laboratory in my Las Vegas Tara home. I did not receive a single complaint about operating a business at either of my Las Vegas homes.

---

[628] Hyatt DP CDE Affidavit, July 24, 2012, ¶ 47.

257

RJN1535

581.     Second, FTB's false statement "Mr. Hyatt's connection with Nevada professionals was limited to his eventual purchase of the Tara home" is addressed in ¶¶ 316-319 above.  I had over 100 non-California professionals[629] and numerous Las Vegas professionals.  See 1992 ASAB § 1.5.3.  See also ¶¶ 293-297, 327, 566, 574-579, 581, 584, 666 herein.

582.     Third, FTB's statement "Mr. Hyatt . . . did not lease or rent any commercial office space in Nevada during the disputed period", is false.  I had an office at PBTK.[630]  However, I did not have and I did not need commercial office space in California.

583.      In late 1992 I obtained a Nevada  business license because I was considering forming a research and development company in Las Vegas.  Several years later I did incorporate a company for this purpose among others.

584.     FTB's statement regarding my use of Nevada professionals is false.  I used very few California professionals after September 26, 1991, when I moved to Las Vegas but I used many non-California professionals.[631]  I had over 100 non-California professionals.  See ¶¶ 293-297, 316-219, 327, 566, 574-579, 581, 584, 666 herein.  See also Hyatt Post-DP CDE Affidavit, September 6, 2016, ¶¶ 146-147. My use of Nevada professionals was not limited to Mr. McGuire, who represented me in the purchase of my 5400 square foot Las Vegas Tara home.  My representatives notified FTB during the audit that I had relationships with more than 40 Nevada and other non-California professionals from Las Vegas during the disputed period and thereafter.  A table of 40 representative non-California professionals that my representatives identified in a September 1995 letter to the auditor, is provided in Exhibit CDE-P002 to my 2016 Post-Disputed Period CDE Affidavit.  These 40 non-California professionals include attorneys from Philips, patent attorneys and professionals, investment managers, insurance professionals, CPA professionals and medical providers.  My representatives produced this list to FTB.  However, FTB did not request information about my relationships with these non-California

---

[629] Exhibit CDE-ST004. attached to Hyatt Supp. CDE Affidavit, September 6, 2016.
[630] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 15.
[631] 1991 AOB, § II.C.14.

258

professionals from my representatives during the audit. My use of Las Vegas professionals has been testified to by 24 witnesses.[632]

585.    The FTB statement that Ms. Cosgrove was my "market researcher" is false. Ms. Cosgrove did some technical research for me in 1991 without pay and was paid by Leetronics and PSB&C in 1992 for work she did for Leetronics and PSB&C, not for work she did for me.[633] There was no reason for her to visit my Las Vegas apartment and nothing unusual about her not visiting my Las Vegas apartment.

586.    Mr. Roth represented Philips with respect to the *Hyatt v. Boone* interference and the Philips Licensing Program. There was no reason for him to visit my Las Vegas apartment and nothing unusual about him not visiting my Las Vegas apartment.[634]

587.    The FTB 1992 Concluding Summary at p. 10 states the following.

> Mr. Hyatt was a licensed and/or registered Professional Engineer in the State of California from March 14, 1979 to September 30, 1995. Mr. Hyatt's last address of record filed with the Board for Professional Engineers and Land Surveyors was P. 0. Box 3357, Cerritos, California, 90703.[58] Mr. Hyatt has not offered any evidence of a professional engineering license or registration from Nevada or elsewhere.
>
> [Exhibit A, note] 58:  12/18/89 Affidavit of Gilbert P. Hyatt, p. 1, para. 1 and FTB Exhibit T, tab 10.

This FTB statement needs clarification. I did not need or use a professional license during the 1991-1992 disputed period and I let the Professional Engineers License I obtained in 1979 expire.[635] I was given the professional engineer license as a result of grandfathering of engineers by California. FTB has not offered any professional documents signed by me regarding a

---

[632] Updated Testimonial Topics, Ex. T048.
[633] Declaration of Caroline Cosgrove, July 21, 2016, ¶¶ 70-73.
[634] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.
[635] 1991 AOB, § II.C.17; 1992 AOB, § II.C.17; 1991 ARB, § II.A.17; 1992 ARB, § II.B.17.

259

RJN1537

1  professional engineer license and there are none.  FTB has not offered any checks or other

2  documents signed by me regarding a professional engineer license and I know of none.

3      588.    The FTB 1992 Concluding Summary at p. 10 states the following.

4          Mr. Hyatt's failure to prove any Nevada affiliations other
           than membership in Congregation Ner Tamid during the disputed
5          period has been extensively discussed in respondent's earlier
           briefing and attachments, including Respondent's Concluding
6          Summary for Taxable Year 1991 (Case No. 435770) at pages 21
           through 22; those discussions will not be repeated here and are
7          incorporated by reference as if set forth fully herein.

8  This FTB statement is false.  I established numerous Nevada affiliations during the disputed

9  period.  I worked with the Nevada Development Association (NDA) from October 1991.[636]  I

10 engaged Nevada attorney, Kenneth Woloson, during the disputed period and I still use his

   services now more than 25 years later.[637]  I purchased an automobile insurance policy and a

11 renter's insurance policy from a Las Vegas State Farm insurance agent, Bob Huddleston, in

12 December 1991 and I continued to purchase my automobile and a homeowner's insurance from

13 his Las Vegas State Farm insurance agency for more than 25 years.[638]  I worked with an escrow

14 officer, Joann Frank, in 1991 during the disputed period through the close of escrow on my Las

   Vegas Tara house in April 1992.[639]  I worked with a homebuilder and philanthropist, Bob

15 Shulman, regarding bringing Japanese factories to Nevada from about November 1991.[640]  I

16 worked with computer specialist and president of a Las Vegas computer club, Trent Eyler, from

17 October 1991.[641]  I prayed with Rabbi Hecht of Temple Beth Am as of October 1991 and with

18 Rabbi Akselrad of Congregation Ner Tamid as of November 1991.[642]  I submitted my

19

20     [636] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 106.
21     [637] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 86.
       [638] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 84.
22     [639] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 85.
       [640] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 77; Hyatt Post-DP CDE Affidavit,
23 September 6, 2016, ¶ 149.
       [641] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶ 14.
24     [642] Hyatt Supp. CDE Affidavit, September 6, 2016, ¶¶ 17, 80.

260

RJN1538

application to join Congregation Ner Tamid on November 15, 1991, and I joined Congregation Ner Tamid.[643]  In addition, I frequently attended services at Temple Beth Am throughout the 1991-1992 disputed period starting on October 4, 1991.  I also had an affiliation with the Las Vegas PC Users Group.  I frequently attended meetings of the users group but on advice of Mr. Trent I delayed becoming a member and thus kept my name off of the public records for privacy reasons.[644]

589.    A rebuttal of FTB's discussion of memberships in its 1991 Concluding Summary, p. 21, is provided at ¶¶ 325-331.

590.    The FTB 1992 Concluding Summary at p. 10 states the following.

> Mr. Hyatt's exemption termination notice sent to the Orange County Assessor in February 1992 has been extensively discussed in respondent's earlier briefing and attachments, including Respondent's Concluding Summary for Taxable Year 1991 (Case No. 435770) at page 22; those discussions will not be repeated here and are incorporated by reference as if set forth fully herein.

The FTB's statements regarding my termination of my California Homeowner's Exemption are false.  I properly and timely terminated my California Homeowner's Exemption following the sale of the Jennifer Circle house on October 1, 1991, five days after I moved to Las Vegas.

591.    Having sold the Jennifer Circle house on October 1, 1991, I timely filed the Homeowner's Exemption Termination Notice on or about February 10, 1992, and stated that I moved in October 1991, PBTK 01188-01189.  Former Orange County Assessors Bradley Jacobs and Webster Guillory have confirmed my homeowner's exemption was properly and timely terminated following the sale of the Jennifer Circle house on October 1, 1991.[645]

592.    The FTB 1992 Concluding Summary at pp. 10-11 states the following.

> The Orange County Assessor further confirms no "change

---

[643] Rebuttal to FTB Att. A/F, Section I. A., November 15, 1991.
[644] Supp. Affidavit of Trent Eyler, May 25, 2010, ¶¶ 18, 23, 24, 25,
[645] Declaration of Bradley L. Jacobs, November 2, 2012, ¶ 89; Declaration of Webster Guillory, October 8, 2015, ¶ 22; Rebuttal to FTB Att. A/F, Section I. E., February 10, 1992.

RJN1539

of ownership statement" was ever filed with their office from 1990 to 1996[59] or within 45 days of the purported sale to Ms. Jeng.[60] This filing requirement emanates from Cal. Const., Art. XIIIA, which provides in part that the taxable value of real property may be increased to fair market value when a change in ownership occurs.[61] The Orange County Assessor's Office has no record indicating the purported buyer or transferee of the 7841 Jennifer Circle property requesting an extension of the 45-day statutory requirement in 1991 or 1992.[62]

[Exhibit A, note] 59: 1333 Exhibit LL, Tab 21: Orange County Office of Assessor's 3/05/07 letter to FTB re 7841 Jennifer Circle, La Palma, California property.

[Exhibit A, note] 60: 1334 Following a change in ownership of taxable real property in California, the transferee must report the transfer to the county assessor of the county in which the property is located. See Rev. & Tax. Code § 480, subdivisions (a) and (c).

[Exhibit A, note] 61: 1335 See Cal. Const., Art. XIIIA, §2; see also Cal. Const., Art. XIII; Rev. & Tax. Code §50 et seq. (implementing art. XIIIA) A "change in ownership" is a transfer of a present interest in real property, including the beneficial use of the property, the value of which is substantially equal to the value of the fee interest. See Rev. & Tax. Code §60. The transfer may be voluntary, involuntary, by operation of law, or by grant, gift, devise, inheritance, trust, contract of sale, addition or deletion of an owner, property settlement, or any other means. See 18 Cal. Code Reg. §462.001.

[Exhibit A, note] 62: Exhibit LL, Tab 5: 05/02/13 Declaration of Jake Dameron, 3:12-14.

This FTB statement is false. First, FTB disingenuously withholds the facts that the purchaser of the Jennifer Circle house filed a preliminary change of ownership statement and that preliminary change of ownership statement satisfies the requirement for filing a change of ownership statement.[646]

---

[646] See the Preliminary Change of Ownership Report at Part III:A attached as Exhibit 10 to Declaration of Bradley L. Jacobs, November 2, 2012; Declaration of Bradley Jacobs, November 2, 2012, ¶¶ 4, 18; Declaration of Webster Guillory, October 8, 2015, ¶¶ 10, 13, 29, 30.

262

RJN1540

593.    Second, there was no legal requirement to file a change of ownership statement within 45 days of transfers of real property.  Ms. Jeng timely filed the Preliminary Change of Ownership Report at the time she recorded the Grant Deed and having done so there was no need for her to file a Change of Ownership Report.[647]

594.    FTB continues its attempt to mislead your Board.  FTB is fully aware that Ms. Jeng timely filed a Preliminary Change of Ownership Report and that having done so she was not required to file a "Change of Ownership Report".  Former elected Orange County Assessors Bradley Jacobs and Webster Guillory have testified that Ms. Jeng fully complied with California law by timely filing a Preliminary Change of Ownership Report.[648]

595.    The FTB 1992 Concluding Summary at p. 11 states the following.

> As late as April 8, 1993, Mr. Hyatt continued to claim record ownership of the Jennifer Circle home.[63]  The Orange County Assessor's Office, through Ms. Cota, has stated the property at 7841 Jennifer Circle was not reassessed by the Orange County Assessor's Office in either 1991 or 1992, but there was a reassessment as of June 1993.[64]

> [Exhibit A, note] 63:  Exhibit LL, Tab 25: See Gilbert P. Hyatt's 4/08/93 deposition, Vol. 1, page 24, lines 8-19 in the matter Priscilla Maystead v. Gilbert P. Hyatt, LASC Case No. NWD 55911.

> [Exhibit A, note] 64:  Exhibit LL, Tab 5: 05/02/13 Declaration of Jake Dameron, 4:9-11.

This FTB statement is false.  I did not "claim" record ownership of the Jennifer Circle house on April 8, 1993, and I did not "continue" to claim record ownership.  On April 8, 1993, at a deposition I was asked about the record title of the Jennifer Circle house I sold on October 1, 1991.[649]  Because the deed was not recorded until two months later on June 16, 1993,[650] I

---

[647] Declaration of Bradley Jacobs, November 2, 2012, ¶¶ 4, 18; Declaration of Webster Guillory, October 8, 2015, ¶¶ 10, 13, 29, 30.
[648] Declaration of Bradley Jacobs, November 2, 2012, ¶¶ 4, 18; Declaration of Webster Guillory, October 8, 2015, ¶¶ 10, 13, 29, 30.
[649] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.
[650] Grant Deed, FTB 13945, recorded June 16, 1993.

263

1   correctly answered that I thought I was the owner of record with the Orange County Recorder's

2   Office. The Grant Deed and related documents were properly filed with the Orange County

3   Recorder.[651]

    596.    FTB relies on the declaration of its private investigator, Jake Dameron. However,

4   dozens of witnesses testified under penalty of perjury that the FTB private investigators

5   including Mr. Dameron either falsely stated that the witnesses were interviewed when they were

6   not interviewed or falsely stated what the witnesses said in their interviews.[652]

7   597.    It is my understanding that the later re-assessment of the Jennifer Circle property

8   covered the prior re-assessment issues.

9   598.    The FTB 1992 Concluding Summary at p. 11 states the following.

10          Mr. Hyatt did not file a California personal income tax return for
            1992.

11  I had no California income in 1992 and on advice of counsel I did not file a 1992 California

12  Income Tax Return.

13  599.    The FTB 1992 Concluding Summary at p. 11 states the following.

14          Mr. Hyatt's continued receipt of important business
            correspondence and licensing documents at his Cerritos Post
15          Office Box and Jennifer Circle home has been extensively
            discussed in respondent's earlier briefing and attachments,
16          including Respondent's Concluding Summary for Taxable Year
            1991 (Case No. 435770) at page 21; those discussions will not be
17          repeated here and are incorporated by reference as if set forth fully
            herein.

18  This FTB statement is false. I did not receive important business correspondence at the Jennifer

19  Circle house or the Cerritos U.S. Post Office box during the disputed period. I did not have a

20  business and I did not receive any correspondence much less "business correspondence" at the

21

22

23  ───────────────────

        [651] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.
24      [652] 1991 ASAB, § 1.8.4.8.

                                    264

RJN1542

California addresses as falsely alleged by FTB.[653] I provided many changes of address upon moving to Las Vegas and I received virtually all of my mail at my Las Vegas addresses during the disputed period.[654] See ¶¶ 144-146, above. I was not present at those locations to receive any correspondence. FTB relies heavily on undisputedly mis-addressed correspondence from Philips and Mahr Leonard as evidence of presence at the Jennifer Circle house on particular days, but I was not present to receive this mis-addressed correspondence and I eventually got Philips and Mahr Leonard to use my correct address.[655]

600. I have been unable to find any reference to "business correspondence at FTB's 1991 Concluding Summary, p. 21, and therefore I cannot comment further on statements therein and your Board should disregard this FTB statement as being unsupported and rebutted. FTB's reference to the Cerritos U.S. Post Office box at FTB's 1991 Concluding Summary, p. 22, has been addressed at ¶¶ 341-344, above.

601. The FTB 1992 Concluding Summary at p. 11 states the following.

> Solidly supported by objective evidence and based on the foregoing and respondent's earlier factual and legal analyses, the only reasonable conclusion is that Mr. Hyatt remained a California domiciliary and resident for the entire disputed period from September 26, 1991 through April 2, 1992.

This FTB statement is false. FTB presents no objective evidence. It relies on illogical inferences, fabrications and false statements[656] by its third party paid investigators, including Mr.

---

[653] This issue is addressed, e.g., in the 1991 ASAB at §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.4.1.3, 1.6, 1.7.1.2, 1.7.2, 1.7.3.

[654] Supplemental Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶¶ 89-91; Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 41-44; Hyatt Supp. CDE Affidavit, September 6, 2016, ¶¶ 32-44; 1992 ASAB §§ 1.5.6, 1.5.7.

[655] This issue is addressed, e.g., in the 1991 ASAB at §§ 1.8.4.1-1.8.4.4; 1992 ASAB, §§ 1.4.1.1, 1.5.6.3.

[656] This issue is addressed, e.g., in the 1991 ASAB at §§ 1.8.1, 1.8.3, 1.8.4; 1992 ASAB, §§ 1.4, 1.5.9, 1.5.10.

265

Savage who was twice fired for dishonesty.[657]  In contrast, my briefing and rebuttals are based on actual documentary evidence and eyewitness testimony, not third party hearsay testimony that falsely reports what someone else purportedly told them.  I produced overwhelming direct documentary evidence and eyewitness testimony in support of these appeals before your Board.[658]

602.    FTB claims that I remained a California domiciliary and resident for the entire disputed period from September 26, 1991 through April 2, 1992.  This is false.  I permanently moved to Nevada on September 26, 1991, at which time I intended to reside in Nevada indefinitely, I did remain in Nevada indefinitely, I continued to reside in Nevada to the present time, and I intend to reside in Nevada for the rest of my life.  During the disputed period, I leased an apartment, I shopped for and purchased a house, I shopped for and purchased a new car, I got a Nevada driver's license, I registered to vote, I worked with several real estate agents, three of which made house purchase offers for me with large cash deposits, I engaged a Las Vegas attorney and a Las Vegas CPA, I opened utilities and I paid rent and utility bills, I signed and had notarized an affidavit of Nevada residency required for my position as executor of my mother's estate, and much much more.  These and many other facts with extensive documentation are sworn to in my two disputed period CDE affidavits.[659]  See also my post-disputed period CDE affidavit[660] which is necessitated by FTB extending the assessments into the post-disputed period during this 1992 appeal without giving me my rights to an audit and protest related thereto.  Many witnesses have testified to the facts of my move and residence in Las Vegas, summarized

---

[657] See particularly, Section III.B.5., "The Testimony of Mr. Savage Has Been Expressly Refuted by 15 Witnesses", Appellant's Motion to Strike and Objections to FTB Private Investigator and FTB Attorney Declarations.  See ¶ 173 above.

[658] This issue is addressed, e.g., in the 1991 ASAB at §§ 1.3, 1.3.1-1.3.12, 1.8.2; 1992 ASAB, §§ 1.5, 1.5.1-1.5.10, 1.7, 1.7.1-1.7.5.

[659] Hyatt DP CDE Affidavit, July 24, 2012; Hyatt Supp. CDE Affidavit, September 6, 2016.

[660] Hyatt Post-DP CDE Affidavit, September 6, 2016.

266

in the Testimonial Topics Table and excerpted in the exhibits thereto.[661]  In particular,

Testimonial Topics T001, T002, T003, T004, T005, T006, T007, T008, T009, T018, T019,

T040, T045, T049, T102, T124, T127, T128, and T141 are particularly relevant to my move to

and residence in Las Vegas.[662]

603.    The FTB 1992 Concluding Summary at p. 11-12 states the following.

> California may properly tax Mr. Hyatt on income sourced
> to California.   (Rev. & Tax. Code, § 17041.)   Income from
> intangibles such as patents is California source income and taxable
> in California if the intangibles acquired a business situs in this
> state.  (Rev. & Tax. Code section 17952 and Cal. Code Regs, tit.
> 18, section 17952 (a).)  Intangible personal property has a business
> situs in California if:

> I …[I]t is employed as capital in this State or the
> possession and control of the property has been
> localized in connection with a business, trade or
> profession in this State so that its substantial use
> and value attach to and become an asset of the
> business, trade or profession in this State.

> If intangible personal property of a nonresident has
> acquired a business situs here, the entire income
> from the property … is income from sources within
> this State, taxable to the nonresident.

[Cal. Code Regs., tit. 18, section 17952.]

This FTB statement is misleading, California cannot tax me on income sourced to California

because I did not have any California source income during the disputed period and thereafter.

See 1991 ASAB §§ 1.5.3, 1.8.3; 1992 ASAB §§ 1.7, 1.7.1, 1.7.1.1-1.7.1.5, 1.7.2, 1.7.3.

604.    As demonstrated by the California code and regulations, intellectual property such

as patents have a situs that follows the owner.  Thus when I moved to Las Vegas on September

26, 1991, the situs of my patents followed me to Las Vegas.  I understand that the fact that I

lived in California before moving to Las Vegas does not change the Nevada situs of my patents

---

[661] See 1991 ASAB, § 1.3.1, Updated Testimonial Topics Table.
[662] This issue is addressed, e.g., in the 1991 ASAB at § 1.4; Appellant's Concluding
Summary (1991), § 1.4.

267

after I moved. Under the California statutes and regulations the license payments from the licensing of my patents by Philips is not taxable in California unless FTB can establish a "business situs" in California that is separate from the Nevada situs of my patents. FTB cannot and did not establish a "business situs" in California that is separate from the Nevada situs of my patents. See 1992 ASAB § 1.7.1.3.

605. I have not pledged or otherwise transferred my patents to a California trade or business and FTB has not offered any document to the contrary. The "possession and control" of my patents *was not localized in a California business* such that the "substantial use and value" of my patents became an asset of a California business and FTB has not shown that it was. To the contrary, the July 1991 Philips Agreement[663] granted Philips exclusive rights to license my patents. At the same time, Section 8.1 precluded me from making any commitments "in derogation of the rights and licenses granted to Philips".[664] For a more detailed discussion see ¶¶ 347-356, above, the 1991 ASAB § 1.8.5.4.2, and the 1992 ASAB § 1.7.1, 1.7.1.3, 1.7.2.

606. The FTB 1992 Concluding Summary at p. 12 states the following.

> There is no question that Mr. Hyatt devoted himself to the pursuit of patents, and income which could be derived from patents, long before his alleged departure from California. Mr. Hyatt sought and obtained collegiate and post-graduate degrees in California, and the patents that generated the income at issue in this appeal were all researched, developed, applied for and issued while Mr. Hyatt admits he was a California resident.[65]

[Exhibit A, note] 65: ROB 1992, 16:1.

FTB's discussion of my efforts to obtain my patents while I lived in California is irrelevant. I understand that, under California law, patents are intellectual property having a situs that went with me when I moved to Las Vegas. FTB has not and cannot show that my patents had California "business situs" separate from the Nevada situs they attained when I moved to Las Vegas. See ¶¶ 347-356 and 603-605, above. See also 1992 ASAB § 1.7.1.3. All of the income I

---

[663] FTB_Philips 0000595-0000635.
[664] FTB_Philips 0000623.

268

1  derived from my patents before moving to Las Vegas was reported on my 1991 California part

2  year tax return and I properly paid the taxes on that income.

3      607.    Very little of my effort was devoted to licensing of my patents.  In July 1991 I

4  granted Philips exclusive rights and the responsibility to license my patents and Philips did in

   fact take over the licensing of my patents by creating, financing, and managing the Philips

5  Licensing Program.[665]

6      608.    The FTB 1992 Concluding Summary at p. 12 states the following.

7           The patent which led to Mr. Hyatt finally realizing income
            from his efforts was the '516 patent or the "Single Chip Integrated
8           Circuit Computer Architecture" which Mr. Hyatt applied for
            around 1969.  Sought by both Mr. Hyatt and a certain Gary Boone,
9           that patent was formally awarded to Mr. Hyatt on July 17, 1990.[66]
            Shortly thereafter, Mr. Boone timely filed with the USPTO a
10          contest of the award of the '516 patent to Mr. Hyatt.

11          [Exhibit A, note] 66:    August 29, 1990, PRNewswire,
            CALIFORNIA ENGINEER GRANTED PATENT ON SINGLE
12          CHIP MICROCOMPUTER ARCHITECTURE; POTENTIAL
            IMPACT SAID TO BE BROAD (GLR 02278-79); Table of Hyatt
13          Patent License Agreements in 1991 and 1992 and HL12288.

14  This FTB statement is false.  Philips and other companies licensed by Philips took licenses under

15  23 or more of my patents.[666]  No single patent resulted in any of the Patent Agreements that

16  licensed my patents.  FTB cites to a press release indicating the '516 patent issued.  FTB offers

17  no evidence that the '516 patent "led to Mr. Hyatt finally realizing income" as falsely stated by

    FTB.  The issuance of the '516 patent is irrelevant to FTB's requirement under California law.

18  The '516 patent does not change situs of my patents, which was in Nevada, not in California, and

19  the '516 patent does not show that any California business had the "substantial use and value" of

20  my patents or received income from my patents.  The situs of my patents was in Nevada, not in

21  California, and there was no California business that had the "substantial use and value" of my

22
23      [665] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 6, 7 and 10, Annex XII; see also
    1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.
        [666] For example, the July 1991 Philips Agreement, FTB_Philips 0000595-0000635 and
24  Fujitsu Patent Agreement, H 017209-017222.

269

RJN1547

patents or received income from my patents, ¶¶ 347-356, above, the 1991 ASAB § 1.8.5.4.2, and the 1992 ASAB § 1.7.1, 1.7.1.3, 1.7.2.

609. The FTB 1992 Concluding Summary at p. 12 states the following.

> In addition to his California acquisition of the education and residence/place of business necessary to conduct this business, Mr. Hyatt also surrounded himself with retained California professionals to assist him with his patent and patent-related endeavors. Gregory L. Roth is a patent lawyer admitted to practice in the State of California and registered to practice before the USPTO with whom Mr. Hyatt had a professional relationship covering the time period of 1970 through at least July 1993.[67]
>
> [Exhibit A, note] 67: 7/19/93 Declaration of Gregory L. Roth, p. 1, lines 3-4, 21-23 and 4/1/93 deposition of Gregory L. Roth, p. 13, lines 12-14 and GLR03291 and HL15423.

This FTB statement is false. I did not acquire a "residence/place of business necessary to conduct this business". FTB does not explain what it means by "this business", but I did not conduct any business at the Jennifer Circle house and FTB presents no evidence of any such business. I properly and legally sold the Jennifer Circle house on October 1, 1991, five days after I moved to Las Vegas.[667] FTB makes no attempt to show my patents had a California "business" situs separate from the Nevada situs based on my Nevada residence.

610. FTB mischaracterizes Mr. Roth's July 19, 1993, Declaration, which FTB links to its 1992 Concluding Summary as purported support for its statement. Mr. Roth's Declaration, ¶ 2, states that he has "worked with [Mr. Hyatt] or his licensees" from 1970 to the present. It did not state that Mr. Roth and I "had a professional relationship" from 1970 to the present. PSB&C was engaged by Philips and Mr. Roth through PSB&C represented Philips with respect to the Philips Licensing Program and with respect to the *Hyatt v. Boone* interference after July 1991.[668] PSB&C invoiced Philips for Mr. Roth's work on the Philips Licensing Program and on the *Hyatt v. Boone* interference and Philips paid PSB&C for Mr. Roth's work on the Philips Licensing

---

[667] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.
[668] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.

270

RJN1548

Program and on the *Hyatt v. Boone* interference. Philips was my licensee and Philips was PSB&C's and Mr. Roth's client.[669]

611.    The FTB 1992 Concluding Summary at pp. 12-13 states the following.

> Mr. Hyatt was also assisted in his patent licensing endeavors by the following persons who were located and performed their work in California and/or at Jennifer Circle: 1) Barry Lee, who attempted to create a working prototype of the microprocessor and assisted with other activities;[68] 2) Grace Jeng, who performed a variety of tasks;[69] 3) Caroline Cosgrove, who did research[70] and 4) Leni Schlendwin [sic], who provided patent application editing, typing and picking up supplies services.[71] In addition, Hyatt engaged other marketing professionals, such as publicists, who were located in and outside of California.[72]

[Exhibit A, note] 68:  ROB 1991, 62:9 et seq.

[Exhibit A, note] 69:  ROB 1991, 24:8 et seq.

[Exhibit A, note] 70:  ROB 1991, 99:5 et seq.

[Exhibit A, note] 71:  ROB 1991, 30:14 and ROB 1992, 7:1 and Respondent's Briefing, Exhibit G. p. 1 et seq.

[Exhibit A, note] 72:  ROB 1992, 1:7 et seq.

This FTB statement is false. I did not have any "patent licensing endeavors" after July 1991 when I signed the July 1991 Philips Agreement. The Agreement granted Philips the exclusive rights and fiduciary responsibility to license my patents while precluding me from licensing my own patents.[670]

612.    Leetronics created a working prototype of the microprocessor chip described in the '516 patent for Philips and at the expense of Philips, not for me. Philips had the responsibility to conduct of the *Hyatt v. Boone* interference[671] and the microprocessor chip was built by Philips in conjunction with the interference. As purported proof of its false statement,

---

[669] PSB&C's new client form filled out for Philips and dated August 30, 1991 (GLR 02073).

[670] FTB_Philips 0000595-0000635; see also 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.

[671] July 1991 Philips Agreement, Section 5.3 (c), FTB_Philips 0000616.

271

RJN1549

FTB cites to a check to Leetronics[672] for research and development that had nothing to do with the interference or the successful building of the microprocessor chip by Philips. FTB's statements about Mr. Lee are rebutted at 1991 ARB, p. 51.

613.    FTB asserts that Grace Jeng performed a variety of tasks. FTB makes no assertion that Ms. Jeng performed the tasks for me. FTB merely cites to its 1991 ROB, p. 24:8 et seq. FTB's false statements about Ms. Jeng were rebutted by 1991 ARB, pp. 22-27. Ms. Jeng was working for and paid by Leetronics on Bendix and LLL projects and not for me during the disputed period.[673]

614.    Citing to its 1991 ROB, p. 99:5 et seq, FTB makes a general allegation that my girlfriend, Caroline Cosgrove, did research. During 1991 Ms. Cosgrove did some research for which she was not paid relating to my research and development efforts. Ms. Cosgrove researched apartments for me to help me when I moved to Las Vegas.[674] Ms. Cosgrove was also paid to do part-time research for Leetronics, the Philips Licensing Program and PSB&C while she worked full time for California State University Fullerton.[675] Ms. Cosgrove was not paid for the research she did for me. FTB's false statements about Ms. Cosgrove are rebutted at 1992 ARB, pp. 50:16-51:8.

615.    Citing to 1991 ROB, p. 30:14 and 1992 ROB, p. 7:1, FTB asserts, without providing any time reference that Ms. Schlindwein did "editing, typing and picking up supplies". FTB's false statements about Ms. Schlindwein are rebutted at 1992 ARB, p. 50. After I moved to Las Vegas Ms. Schlindwein performed a few clerical services from her home such as editing documents she received from me by mail.[676]

616.    I did not at any time engage any marketing professionals or publicists. Nevertheless, citing to 1992 ROB, p. 1:7 et seq., FTB falsely states, with no time reference, that I

---

[672] 1991 ROB, p. 62:9 et seq.
[673] Affidavit of Barry Lee, February 2, 2012, ¶ 66, Annex XXV, Ex. 44.
[674] Declaration of Caroline Cosgrove, July 21, 2016, ¶¶ 26, 67, 68.
[675] Declaration of Caroline Cosgrove, July 21, 2016, ¶¶ 67-69.
[676] Dep. of Helene Schlindwein, 2/12/00, 18:25-19:4, 77:15-78:5, 104:4-24, 116:5-21.

272

RJN1550

engaged marketing professionals such as publicists located outside California. FTB cites to a discussion of Mr. McHenry, who was a public relations specialist, not a marketing professional or a publicist.[677] After July 1991 Mr. McHenry and McHenry &Associates worked for Philips, not for me. Mr. Rudestam worked for McHenry & Associates and did not work for me.[678]

617. The FTB 1992 Concluding Summary at p. 13 states the following.

> After the microprocessor patent was issued to him, Mr. Hyatt retained expert assistance in his efforts to retain the '516 patent and to obtain patent licensing fees from companies engaged in retail sales of consumer electronic products, including Japanese companies. Mr. Hyatt entered into an agreement with Mahr Leonard Management Company (MLMC) for such services during November, 1990, which resulted in MLMC's immediate initiation of contacts with Japanese electronics companies.

This FTB statement is false. First, these fabricated false statements do not cite to a single reference for support. The Mahr Leonard agreement does not mention "expert assistance" and I did not obtain "expert assistance" from Mahr Leonard. Mahr Leonard was granted the "exclusive" rights to negotiate a patent license with Toshiba.[679] Mahr Leonard had exclusive rights to negotiate and operated on their own. They did not "assist" me. Mahr Leonard negotiated to license 14 of my patents, not just the '516 patent. Mahr Leonard was granted the rights to negotiate with a single company, not multiple companies as falsely stated by FTB. I signed the Mahr Leonard agreement on December 20, 1990, not in November 1990 as falsely stated by FTB. Mahr Leonard was not successful in its attempt to negotiate a patent agreement with Toshiba.

618. The FTB 1992 Concluding Summary at p. 13 states the following.

> The purpose of those contacts was to negotiate lump sum patent licensing payments to Mr. Hyatt in exchange for a waiver of formal claims, including potential litigation, of patent infringement.[73] By August, 1991, MLMC had met approximately 30 times with various Japanese companies, companies which

---

[677] Declaration of Charles McHenry, October 13, 2014, ¶ 25.
[678] Declaration of Charles McHenry, October 13, 2014, ¶ 27.
[679] Mahr Leonard Agreement, December 20, 1990, GLR 04055-04062.

273

RJN1551

ultimately entered into licensing agreements with Mr. Hyatt.[74]  In addition, during April, 1991, MLMC agreed to provide Mr. Hyatt with financing so as to enable him to defend Mr. Boone's challenge of the USPTO awarding the '516 patent to Mr. Hyatt.[75]

[Exhibit A, note] 73:  See Exhibit F to Respondent's Briefing, p. 196 and Exhibit BB to Respondent's Briefing, Tab 15.

[Exhibit A, note] 74:  FTB Philips 0005503.

[Exhibit A, note] 75:  FTB Philips 0164 to 0167.

This FTB statement is false.  Mahr Leonard was authorized by the December 20, 1990, Mahr Leonard Agreement to negotiate a patent license only with Toshiba and was not authorized to make "those contacts".  The agreement authorized Mahr Leonard to represent me in "patent license negotiations", not "waiver of formal claims" as falsely stated by FTB. [680]  As purported proof of its false statement, FTB cites to a letter from Mr. Mahr to Toshiba[681] that states nothing about "those [multiple] those contacts" or negotiating a "waiver of formal claims".  The letter references "patent licensing negotiations".  FTB also cites to two letters dated December 21, 1990, from me to NEC and Hewlett Packard that have nothing to do with Mahr Leonard "contacts".[682]  The documents cited by FTB do not support its false statements.

619.    As purported support for its claim, that Mahr Leonard met over 30 times with prospective licensees FTB cites to a document of unknown date and unknown authorship.[683] The meaning of the chart is unknown.  The chart includes multiple companies with whom Mahr Leonard was not authorized to negotiate with on my behalf.  It might refer to negotiations on behalf of other Mahr Leonard clients.  A more detailed discussion of this document is provided at ¶¶ 125-126, above.

---

[680] Mahr Leonard Agreement, December 20, 1990, GLR 04055.
[681] Letter dated December 26, 1990, from Mr. Leonard to Toshiba, GLR 01857.
[682] GLR 01299 and HL 07222.
[683] FTB_Philips 0005503.

274

RJN1552

620.     Mahr Leonard made a loan to me, it did not provide limited financing of the *Hyatt v. Boone* interference in April 1991[684] as FTB falsely states.  I repaid the loan made by Mahr Leonard.  Philips assumed full responsibility for the interference shortly thereafter in July 1991.[685]

621.     The FTB 1992 Concluding Summary at p. 13 states the following.

> In addition to MLMC, Mr. Hyatt, with the assistance of Mr. Roth, sought, and, during July, 1991, obtained the professional assistance of Philips North America Corporation (Philips) in his patent licensing endeavors.  As with MLMC, Mr. Hyatt obtained the services of another very capable intellectual property firm well experienced in negotiating licensing agreements for patents such as those Mr. Hyatt had researched, applied for, developed and obtained while an admitted domiciliary of California, and another pledge of assistance with the defense of Mr. Boone's interference claim.[76]
>
> [Exhibit A, note] 76:  See Respondent's Briefing, Attachment A, p. 10 and Exhibit G to Respondent's Briefing, page 60 et seq.

This FTB statement is false.  I did not obtain the "professional assistance" of Philips.  Philips wanted a license on a family of my patents.  Philips then proposed obtaining the rights to sublicense the family of my patents.  I turned over the licensing of the family of my patents to Philips.  I did not have any "patent licensing endeavors" after July 1991 when I signed the July 1991 Philips Agreement.  Through the July 1991 Philips Agreement, I granted Philips the exclusive authority and Philip assumed a fiduciary responsibility to license my patents.  I was precluded from licensing my own patents.[686]  Philips by itself created, financed, and managed the Philips Licensing Program.[687]  Philips was not an "intellectual property firm" as falsely

---

[684] FTB_Philips 0000164-0000167.
[685] July 1991 Philips Agreement, Section 5.3(c), FTB_Philips 0000616.
[686] July 1991 Philips Agreement, Sections 4.1, 4.3 and 8.1, FTB_Philips 000608, 0000610, 0000623; see also 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.
[687] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 6, 7 and 10, Annex XII; see also 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.

275

RJN1553

alleged by FTB. Philips was and is a world renowned electronics company with an excellent intellectual property capability.

622. The fact that I applied for and obtained some of my patents before I moved to Las Vegas is irrelevant under California law because patents are intellectual property having a situs that follows the residence of the owner.[688]

623. Philips assumed complete responsibility for the conduct of the *Hyatt v. Boone* interference.[689] Philips did not provide a "pledge of assistance" for the interference as falsely alleged by FTB. As purported evidence of FTB's false statements, FTB cites to my May 20, 1991, interview that occurred two months before the July 1991 Philips Agreement was signed and said nothing about the terms of that agreement. FTB also cites at its Exhibit G, p. 60, to the July 1991 Philips Agreement under which Philips undertook full responsibility for both the licensing of my patents and the *Hyatt v. Boone* interference. The evidence cited by FTB does not support its false statements.

624. The FTB 1992 Concluding Summary at pp. 13-14 states the following.

> The patent marketing and licensing strategy that lead to the receipt of the licensing fees was designed and put into action by Mr. Hyatt and his team prior to September, 1991. That plan reflected the reality that a potential consequence of Mr. Boone's interference claim was that Mr. Hyatt could lose the microprocessor patent. Therefore, the plan focused on obtaining agreements for "paid-up royalties" in which the payment consideration was largely for past use (i.e. Hyatt's promise not sue for past infringement) and was to be made either concurrently with, or shortly after, the effective/signatory dates of the agreements.[77] In Mr. Hyatt's August 15, 2005, deposition he states that no new information or technology was transferred pursuant to the licensing agreements and that in exchange for payment the companies were getting freedom from being sued for patent infringement.[78]
>
> [Exhibit A, note] 77: Mr. Hyatt told Philips in the summer of 1991

---

[688] Rev. & Tax. Code section 17952, Cal. Code Regs. Tit. 18, section 17952.
[689] July 1991 Philips Agreement, Section 5.3(c), FTB_Philips 0000616; Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 10, Annex XII.

276

that he and Greg Roth had made "good progress" with this strategy and it was adopted in the Philips/Hyatt agreement. (Philips Agreement, Article IV – Sublicensing Rights, Section 4.2.) See Respondent's Supplemental Brief, 2 19 93 for effective, signatory and payment dates for all license agreements at issue in this appeal.

[Exhibit A, note] 78: 08/15/05 Deposition of Gilbert P. Hyatt, Vol. 1, p. 112 – 113.

This FTB statement is false. There was no "patent marking and licensing strategy that led to the receipt of the licensing fees" and FTB provides no evidence of such a strategy. Philips was granted the exclusive authority and assumed a fiduciary responsibility to license my patents [690] FTB's unidentified reference to "that plan" apparently refers to a "Licensing Plan" attached as Exhibit A to the July 1991 Philips Agreement.[691] Contrary to false assertions by FTB, this plan says nothing about the *Hyatt v. Boone* interference or the possibility of losing the interference.

625. The "Licensing Plan" did not focus on obtaining agreements for "paid-up royalties" as falsely alleged by FTB. The "Licensing Plan" proposed "offering to initial licensees attractive paid up **licenses** or alternatively attractive running royalty rates".[692] The plan thus proposed both paid up and running royalty licenses and proposed "licenses" not payment "for past use" as falsely alleged by FTB.

626. There was no "Mr. Hyatt and his team". I was and I am an independent inventor. Philips was my *licensee*, I licensed Philips on my patents for its own use and to sublicense my patents to others. Mahr Leonard was under contract to Philips and for a limited time was granted by Philips exclusive negotiating rights for licensing my patents. Gregory L. Roth was a patent

---

[690] July 1991 Philips Agreement, Sections 4.1, 4.3 and 8.1, FTB_Philips 000608, 0000610, 0000623; see also 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.
[691] FTB_Philips 0000636-0000640.
[692] Licensing Plan, Exhibit A to July 1991 Philips Agreement, p. 1, FTB_Philips 0000636 (emphasis added).

277

1  attorney who was a stake holder in the law firm of PSB&C that was engaged by Philips.  Philips

2  created, financed, and managed the Philips Licensing Program and managed the efforts of Mahr

3  Leonard and PSB&C.[693]  My efforts were largely monitoring what was being done in the Philips

4  Licensing Program to protect my interests, to receive and invest my licensing income, and to

5  participate in the interference as the inventor of the '516 patent.  I did not have a team, I licensed

6  Philips and Philips engaged its associates.  A See ¶¶ 53, 69-73 herein.  and its associates do not

7  become a team with the ***licensor***.  It is an arms length licensee/licensor relationship.  See ¶¶ 53,

8  69-73 herein.

9     627. Citing my August 2005 deposition testimony, FTB asserts that a company taking

10  a license received freedom from being sued.  I stated in my August 15, 2005, deposition that the

11  explanation that licensed companies received freedom from being sued was an over

12  simplification.[694]  In addition to freedom from being sued, the granting of a license to a company

13  meant that any product they manufactured or sold that was covered by one or more of my patents

14  was a licensed product and the buyer received a licensed product.

15     628. The FTB 1992 Concluding Summary at p. 14 states the following.

16      By September 25, 1991 (one day prior to Mr. Hyatt's
   alleged termination of his California residency), MLMC, Mr. Hyatt

17     and Philips knew that their marketing and licensing program was
   proving to be a huge success as they had "current offers" from five

18     Japanese companies totaling $80,500,000.[79]  A comparison of the
   offers with the licensing fees actually paid by these companies,

19     reveals that virtually all of the negotiations were completed by
   September 25, 1991 as 96% of the aggregate value of those

20     contracts had already been offered.

21     [Exhibit A, note] 79:  Respondent's Additional Brief 1991 7-16-14,
   Page, 5, Entry for September 24, 1991.

22

23     [693] See 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.

24     [694] Deposition of Gilbert P. Hyatt, August 15, 2005, p. 112:5-11.

            278

1    This FTB statement is false. On September 25, 1991, there were no offers for licenses and I was

2    not informed about any such expectations. When I enquired about status of its efforts earlier in

3    1991, Mahr Leonard told me that a patent agreement could not be expected to be signed until it

4    was actually signed. Thus, I was skeptical about optimistic projections. Mahr Leonard told me

5    that it did not give status reports because it could not predict the status of a licensing negotiation

6    until a license agreement was signed.

7         629.    Similarly, Mahr Leonard and Philips could not have had knowledge of "current

8    offers" because there were no current offer. The first patent agreement was not signed until

9    almost a month later on October 23, 1991.[695] As of September 25, 1991, substantial outstanding

10   issues were still being negotiated with each of the potential licensees.

11        630.    There was no Mahr Leonard, Hyatt and Philips "marketing and licensing

12   program" as falsely alleged by FTB with no evidentiary basis. Philips by itself created, financed

13   and managed the Philips licensing program.[696] No products were being "marketed". Philips was

14   granted the exclusive rights to **license** my patents and I was prohibited from licensing my patents

15   in derogation of the rights granted to Philips.[697]

16        631.    FTB's statement that 96% of the value of "those contracts" had already been

17   offered by September 25, 1991, is another of FTB's thousands of false statements, fabrications

18   and mischaracterizations. There were no offers on September 25, 1991, and FTB has not

19   identified a single offer. Many outstanding issues were still being negotiated and the first

20

21

22        [695] Fujitsu Patent Agreement, H 017209-H 017222, H 017220.

23        [696] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 6, 7 and 10, Annex XII.

         [697] July 1991 Philips Agreement, Sections 4.1, 4.3 and 8.1, FTB_Philips 0000608,

24   0000610 and 0000623; 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.

279

RJN1557

1  agreement was not signed until October 23, 1991.[698]  Furthermore, the amount of the license fees

2  was only one part of the licenses.  Other terms and conditions continued to be negotiated on a

3  license by license basis.  I don't know if there were any two of Philips licenses that were the

4  same.  For example. the requirement for patent marking was a continuing issue for Philips

5  because the prospective licensees did not want to patent mark their products and each

6  prospective licensee had its own issues with patent marking.  There were no "offers" before that

7  date.

8       632.    For further explanation see ¶¶ 125-128, above.

9       633.    As purported support for its false statements FTB cites to its Calendar at page 5 of

10  its July 16, 2014 Additional Brief, September 24, 1991.  This entry falsely states that there were

11  "$80.5 million 'Current Offers'".  On September 24, 1991, there were no current offers for

12  licenses and I was not informed about any such expectations.

13       634.    The FTB 1992 Concluding Summary at p. 14 states the following.

14       These expectations soon became reality as Mr. Hyatt and
        his team quickly began executing formal contracts with the

15       Japanese companies, starting as early as October 14, 1991, and
        began receiving monies on October 31, 1991.  The same strategy

16       (and portfolio of patents) was also used with six other Japanese
        licensees for whom agreements were executed in both 1991 and

17       1992.

18  This FTB statement is false.  I did not have a "team".  Philips had exclusive rights and fiduciary

19  responsibility to license my patents.  I was precluded from licensing by patents by Section 8.1 of

20  the July 1991 Philips Agreement.[699]  Philips by itself created, financed and managed the Philips

21

22  _____

23       [698] Fujitsu Patent Agreement, H 017209-H 017222, H 017220.

24       [699] July 1991 Philips Agreement, Sections 4.1, 4.3 and 8.1, FTB_Philips 0000608,
    0000610 and 0000623; 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.

RJN1558

1  Licensing Program.[700]  I had an exclusive licensee with fiduciary responsibilities, I was not on a

2  team.  See ¶¶ 53, 69-73 herein.

3      635.  There was no "expectation" on September 25, 1991.  Significant issues were still

4  being negotiated with each of the potential licensees, ¶ 628, above.

5      636.  FTB states "the same strategy" was used for six other Japanese licensees.  I do not

6  know what this statement means.  Philips granted Mahr Leonard exclusive rights to negotiate

7  with seven potential licensees and six patent agreements were separately and individually

8  negotiated in 1991 with six licensees.  Each patent agreement was separately negotiated with

9  different issues being raised and separately negotiated by each of the six licensees.  See 1991

10  ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.  There was no strategy, Philips created

11  and managed a licensing program to meet its contractual obligations to me.

12      637.  The FTB 1992 Concluding Summary at p. 14 states the following.

13          The center of activity undertaken to bring those contracts to
    fruition, and distribute the monies received, was California.  Mr.

14      Hyatt set up his Jennifer Circle home with the equipment necessary
    to conduct a patent acquisition, marketing and licensing business,

15      which included: a commercial grade photocopy machine, fax
    machine, storage files, computer(s), commercial grade steel

16      shelving, and an office or laboratory.[80]  Mr. Hyatt signed invoices
    for repairs on the copy machine at Jennifer Circle throughout 1991

17      and as late as May 7, 1992.[81]

18      [Exhibit A, note] 80:  See ROB 1991, 29:9 et seq. and ROB 1992,
    6:1.

19
    [Exhibit A, note] 81:  Respondent's Briefing, Exhibit B, Tab 30, p.

20      224 et seq.

21  This FTB statement is false.  The "center of activity" for the licensing program was at Philips in

22  New York, not California as FTB falsely alleged.  After I sold the Jennifer Circle house on

23  _____

24      [700] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 6, 7 and 10, Annex XII.

September 26, 1991, Ms. Jeng was the only person who spent much time at the Jennifer Circle house. I spent no time at the Jennifer Circle house and Philips and Mahr Leonard spent no time at the house. I understand that Barry Lee, Caroline Cosgrove, and Leni Schlindwein occasionally visited their friend Ms. Jeng at the Jennifer Circle house.

638. The Philips documents establish that Philips was the "center of activity" for the licensing program. See the Philips Document Tables, 1991 ASAB §§ 1.3.5; Folder Structure, folder 12, Exhibits 1 to 15. Philips had exclusive rights and the fiduciary responsibility to license my patents. I was precluded from licensing by patents by Section 8.1 of the July 1991 Philips Agreement.[701] Philips by itself created, financed and managed the Philips Licensing Program.[702]

639. I did not negotiate a single patent agreement during the disputed period, the Jennifer Circle house was not a "center of activity," and FTB offers no evidence to support its false statement. I was not present at the Jennifer Circle house between October 1, 1991, when I sold it and late 1992 when I returned to Jennifer Circle for a short visit.[703] FTB has provided no credible evidence that I was present at the Jennifer Circle house between October 1, 1991, and late 1992. A total of 72 eyewitnesses testified about me moving away from La Palma in 1991[704] and 23 witnesses testified about me not being seen again at Jennifer Circle after I moved away in 1991.[705]

---

[701] July 1991 Philips Agreement, Sections 4.1, 4.3 and 8.1, FTB_Philips 0000608, 0000610 and 0000623; 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.
[702] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 6, 7 and 10, Annex XII.
[703] 1991 ASAB, §§ 1.4, 18.4.
[704] Updated Testimonial Topics, Ex. T007.
[705] Updated Testimonial Topics, Ex. T127.

282

RJN1560

640. I did not distribute the received license payments from California as falsely alleged by FTB with no evidentiary support. The only license payment I distributed in 1992 was a single license payment from Oki and that payment was distributed from my Nevada situs Franklin fund investment account using drafts I wrote while physically present in Las Vegas. On January 31, 1992, Oki made a license payment to the PSB&C client trust fund maintained for the benefit of Philips.[706] On February 4, 1992, I made distributions to Philips and Mahr Leonard using drafts written on my Nevada situs Franklin Fund investment account.[707] The Oki payment had no association with me in California. Philips requested me to distribute the payments from its Oki license and Philips granted me the authority to distribute the Oki payment through the [First] Supplemental Amendment and indemnified me for doing so.[708]

641. I did not have a licensing business in California or elsewhere as falsely alleged by FTB. See 1992 ASAB, §§ 1.4.1.3, 1.7.1.2. There was no "patent acquisition, marketing and licensing business". I did not "acquire" any patents. All of the patents I owned were my own patents on which I was the inventor and I did not "market" any patents or any products. FTB does not describe what it thinks that I marketed, but I was not involved in any "marketing" business whatever that might be. I did not have a "licensing" business, I granted Philips an exclusive license[709] and Philips licensed my patents to others through the Philips Licensing Program which Philips by itself created, financed and managed.[710] I left none of my personal

---

[706] GLR 03838.
[707] H 015388.
[708] [First] Supplemental Amendment, FTB_Philips 0000666-0000674.
[709] July 1991 Philips Agreement, Sections 4.1, 4.3 and 8.1, FTB_Philips 0000608, 0000610 and 0000623; 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.
[710] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 6, 7 and 10, Annex XII.

283

1 possessions at the Jennifer Circle house when I sold it on October 1, 1991.[711] I sold the copier

2 that was located at the Jennifer Circle house to the buyer along with the house on October 1,

3 1991.[712] It has been confirmed by an overwhelming number of witnesses that I moved my fax

4 machine, computer and active files to Las Vegas.[713] I had no photocopier, fax machine, storage

5 files, computer or laboratory at the Jennifer Circle house after October 1, 1991, and FTB has

6 provided no evidence to the contrary.

7      642.    I did not sign invoices for Ms. Jeng's copier through May 7, 1992, and the FTB

8 statement to the contrary is false. The invoices cited by FTB at its Exhibit B, Tab 30 show that

9 most of the invoices after October 1, 1991, for Ms. Jeng's La Palma copier were signed by Ms.

10 Jeng. I signed an Invoice No. 34547 on November 4, 1991, while present in Las Vegas. Ms.

11 Jeng had the copier repaired in La Palma and, when she traveled to Las Vegas, she presented me

12 with the invoice and I signed the invoice in Las Vegas.[714] The invoices listed by FTB show that

13 I signed a second invoice on May 7, 1992. I was in Las Vegas all day on May 7, 1992, and

14 signed the invoice in Las Vegas.[715]

15     643.    The FTB 1992 Concluding Summary at pp. 14-15 states the following.

16         In addition, this activity is memorialized by numerous
communications being sent to or from Mr. Hyatt through his
17     Jennifer Circle street address, the Cerritos, CA Post Office Box
and/or the Jennifer Circle facsimile machine through the end of
18     1992,[82] and as late as May, 1994.[83] Furthermore, in the first five
licensing agreements, signed by Mr. Hyatt between October 14th
19     and November 29th, 1991, he states that his mailing address is
Cerritos, CA. The Sony and NEC agreements, executed on
20

21

[711] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.
22 [712] Supplemental Affidavit of Gilbert Hyatt, September 8, 2016, ¶ 31; Affidavit of Grace
Jeng, December 4, 2008, ¶ 4, Annex VII, Ex. 22.
23 [713] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.
[714] Rebuttal to FTB Att. A/F, Section I. A., November 4, 1991.
24 [715] Rebuttal to FTB Att. A/F, Section I. A., May 7, 1992.

RJN1562

December 10, 1991, state his mailing address is his Las Vegas low-income apartment, but the business correspondence surrounding the execution of those contracts reveals that Mr. Hyatt was in Orange County, CA.[84] Mr. Hyatt also attends meetings in California regarding licensing activity and negotiations throughout 1991 and 1992.[85]

[Exhibit A, note] 82: See Respondent's Briefing, Attachments A and F.

[Exhibit A, note] 83: HL 15012.

[Exhibit A, note] 84: See Respondent's Briefing, Attachments A and F.

[Exhibit A, note] 85: See Respondent's Briefing, Attachments A and F.

This FTB statement is false. With only a general reference to its briefing and no evidence FTB states that numerous communications were sent to or from me through the Jennifer Circle house, the Cerritos U.S. Post Office box or the Jennifer Circle house fax machine.

644. Philips has acknowledged that its support personnel inadvertently directed some correspondence to the Jennifer Circle house.[716] However, mis-addressed correspondence inadvertently sent to the Jennifer Circle house while I was in Las Vegas does not create a business at the Jennifer Circle house. Similarly, I used an old template with the Cerritos U.S. Post Office box return address, but I sent the correspondence from Las Vegas, not California. See 1991 ASAB, §§ 1.8.4.1-1.8.4.4; 1992 ASAB, §§ 1.4.1.1, 1.5.6.3. Inadvertently mis-addressed correspondence and correspondence sent from Las Vegas does not establish a licensing business in California.[717]

---

[716] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 18, Annex XII; See 1991 ASAB, §§ 1.8.4.1-1.8.4.4; 1992 ASAB, §§ 1.4.1.1, 1.5.6.3.

[717] 1991 ASAB, § 1.8.7; see also 1992 ASAB, §§ 1.4.1.3, 1.7.1.2.

285

RJN1563

645.    The NEC and Sony patent agreements stated that I had a **residence** at my Las Vegas apartment address.[718]  The FTB false assertion that these patent agreements stated my apartment was a mailing address is another FTB mischaracterization of the documents, these patent agreements stated my apartment was my residence.

646.    My Las Vegas apartment was not a "low-income apartment", it was a mid-range two bedroom apartment with very nice, well maintained grounds.[719]  See ¶ 155, above.

647.    I was in Las Vegas on December 10, 1991, when I signed the NEC and Sony Patent Agreements,[720] not in Orange County as falsely alleged by FTB.

648.    FTB falsely claims I attended meetings in California regarding licensing activity and negotiations "throughout 1991 and 1992".  After moving to Las Vegas I joined Mahr Leonard and others at two meetings in California in 1991 and I attended one meeting in California in 1992.  I did not negotiate at any of these meetings and none of these meetings occurred at the Jennifer Circle house.  Attending two meetings in 1991 and one meeting in 1992 does not constitute "throughout 1991 and 1992".

649.    I did not negotiate with any prospective licensees during the 1991 disputed period or during 1992.  See 1992 ASAB, § 1.7.3.

650.    The FTB 1992 Concluding Summary at p. 15 states the following.

> Furthermore, the objective evidence in this appeal demonstrates that Mr. Hyatt's patent marketing and licensing business continued to be located in California through at least the end of 1992.  The purchase of a fax machine for use in Nevada is not demonstrated until April 5, 1992 and it is not until this date that a telefax identification spray with a Nevada area-code telephone

---

[718] Sony Patent Agreement:  H 018784-018796; NEC Patent Agreement:  H 018797-018811.
[719] 1991 ARB, § II.A.1.d, pp. 29-32.
[720] Rebuttal to FTB Att. A/F, Section I. A., December 10, 1991.

286

1        number starts to appear on documents.[86]  It was not until July 30,
2        1992 that Mr. Hyatt acquired a new commercial grade copier
       which is placed in Mr. Hyatt's Jennifer Circle home/business and
3        coincides with the old one being moved to his property on Tara
       Avenue in Las Vegas.[87]

4        [Exhibit A, note] 86:  ROB 1991, 64:12.

5        [Exhibit A, note] 87:  FTB Opening Brief, 41:1, et seq.

6 These FTB statements are false.  I did not have a "patent marketing and licensing business" to

7 the end of 1992 or at any other time.  See ¶ 641, above.  There was no marketing of my patents

8 by anyone and Philips licensed my patents, it did not market them.  I could not have marketed or

9 licensed my own patents after July 1991 because that would have violated my obligations under

10 Section 8.1 of the July 1991 Philips Agreement.[721]  Philips by itself created, financed and

11 managed the Philips Licensing Program.[722]  See 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB,

12 §§ 1.6, 1.7.3.

13        651.     FTB deceitfully states that I purchased my first fax machine for use in Nevada on

14 April 5, 1992, knowing full well that I moved my existing fax machine from California to Las

15 Vegas on October 1, 1991, upon selling the Jennifer Circle house and clearing all of my

16 belongings out of the Jennifer Circle house.[723]  I have previously explained that I used old

17 templates and pre-printed fax cover sheets with the Cerritos U.S. Post Office box return address

18 even though I was sending the correspondence from Las Vegas.[724]  I submitted changes of

19

20

21 ――――――――――

22    [721] FTB_Philips 0000623.
   [722] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 6, 7 and 10, Annex XII.
23    [723] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991.
   [724] Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.20, p. 134, Annex XI, Ex. 13; 2016
24 Supplemental Affidavit of Gilbert P. Hyatt, ¶ 94.

RJN1565

1    address to Las Vegas to the U.S. Post Office for the Jennifer Circle house and the Cypress P.O.

2    Box on October 21, 1991.[725]  See the 1991 ASAB §§ 1.8.4.2-1.8.4.5.

3         652.    On or about July 30, 1992, shortly after moving into my much larger 5400 square

4    foot Las Vegas Tara house my girlfriend, Caroline Cosgrove, arranged to purchase a new copier

5    for delivery to my Tara home in Las Vegas.[726]  I did not move Ms. Jeng's La Palma copier to

6    Las Vegas.  I did not have a "Jennifer Circle home/business".  See 1992 ASAB, § 1.4.1.3.  See

7    also ¶¶ 14, 89, 90, 205, 279, 376, 380 herein.

8         653.    The FTB 1992 Concluding Summary at p. 15 states the following.

9               In addition, there is no objective evidence establishing the
               date that Mr. Hyatt's patent files were moved to Nevada or that the
10              Continental Hotel room or Wagon Trails unit had the space or
               office equipment necessary to perform the tasks routinely
11              associated with this paper-intensive business.  Mr. Hyatt does not
               meet his Nevada accountant until March of 1992, and, therefore,
12              there is no objective evidence that he had access to business
               facilities in Nevada which would have provided him with the
13              office equipment required to conduct his patent marketing and
               licensing business for almost six months after his alleged departure
14              from California.[88]  Finally, Mr. Hyatt did not sign an application
               for a Nevada business license until the middle of December, 1992
15              which would have permitted him to legally conduct a business in
               Nevada.

16              [Exhibit A, note] 88:  ROB 1991, Page 39, Entry for March 18,
17              1992.

18   This FTB statement is false.  I did not have a licensing business and thus it is irrelevant whether

19   or not I had the facilities or a business license for a paper intensive licensing business.  I do not

20   know if a licensing business is paper intensive, but if it is I believe that Philips, who created,

21   financed, and managed the Philips Licensing Program would have had the facilities for a paper

22   _____

23       [725] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.
24       [726] Supplemental Affidavit of Caroline Cosgrove, July 7, 2012, ¶ 109 and Exhibit 26,
     XCS Invoice 39850 attached therein.

288

RJN1566

1    intensive licensing program. FTB's admission that I did not have the facilities or a license for a

2    licensing business is further confirmation that I did not have a licensing program, which would

3    have been in violation of my contractual obligations to Philips. It is absurd for FTB to allege

4    that I alone working in a small Jennifer Circle house ran the world-wide licensing program and

5    that Philips, who was experienced in licensing, who had enormous financial exposure, and who

6    had world-wide facilities, operated its licensing program through an inexperienced person in a

7    small house in California. See 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.

8    See also ¶¶ 14, 89, 90, 205, 279, 376, 380 herein.

9        654.    I cleared out the Jennifer Circle house and moved my computer, fax machine and

10   active files to Las Vegas by October 1, 1991, when I sold the Jennifer Circle house.[727] There is

11   overwhelming evidence demonstrating that I moved my computer, fax machine and active files

12   to my spacious, two bedroom Las Vegas apartment.[728] I did not have a licensing business either

13   before or after I moved to Las Vegas, paper intensive or otherwise, and FTB presents no

14   evidence that I had a "paper intensive business". See 1992 ASAB, §§ 1.4.1.3, 1.7.1.2.

15        655.    I did not have a "patent marketing and licensing business" and the FTB

16   statements to the contrary are false. See ¶ 641, above. There was no marketing of my patents by

17   anyone. Philips licensed my patents, it did not market them. I could not have marketed or

18   licensed my own patents after July 1991 because that would have violated my obligations under

19   Section 8.1 of the July 1991 Philips Agreement.[729] Philips by itself created, financed and

20

21

22

23        [727] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991.
       [728] Rebuttal to FTB Att. A/F, Section I. B., October 27, 1991; 1991 ASAB §§ 1.8.4.5,
1.8.4.6.

24        [729] FTB_Philips 0000623.

1   managed the Philips Licensing Program.[730]  See 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB,

2   §§ 1.6, 1.7.3.  See also ¶¶ 14, 89, 90, 205, 279, 376, 380 herein.

3        656.    I did not operate a business from either my Las Vegas Wagon Trails Apartment or

4   my Las Vegas Tara home.  I had no need for a business license.  I had no employees or

5   customers or other characteristics of a business.

6        657.    The FTB 1992 Concluding Summary at p. 15 states the following.

7                Therefore, the patents that generated the income at issue in
        this appeal acquired a business situs in California which did not
8       change at any time during 1991 and 1992.  Furthermore, the
        relevant sourcing factual and legal issues have further been
9       extensively discussed in respondent's earlier briefing and
        attachments, including Respondent's Concluding Summary for
10      Taxable Year 1991 (Case No. 435770) at pages 23 through 24;
        those discussions will not be repeated here and are incorporated by
11      reference as if set forth fully herein.

12  This FTB statement is false.  The fact that I did not operate a licensing business has nothing to do

13  with the business situs of my patents.  My intellectual property assets were not physical and did

14  not need paper intensive facilities, they were "intellectual."  FTB created the straw man of a

15  licensing business and then knocks it down to falsely build a California business presence.  But I

16  did not have a licensing business and I did not have a California business presence.  See 1992

    ASAB, §§ 1.4.1.3, 1.7.1.2.

17       658.    FTB misstates California law just as it has made thousands of false statements,

18  fabrications and mischaracterizations in other contexts.  For the California sourcing statute to

19  apply, FTB has the burden and must prove that I moved to Las Vegas because the statute applies

20  only to nonresidents of California.[731]  Because patents are intellectual property, the situs of my

21  patents moved to Nevada when I moved to Nevada on September 26, 1991.  Under the sourcing

22  statute, FTB must prove that my patents has a "business situs" separate from the Nevada situs of

23

24      [730] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 6, 7 and 10, Annex XII.
        [731] Rev. & Tax. Code section 17952 and Cal. Code Regs, tit. 18, section 17952 (a).

                                    290

                                                                        RJN1568

my patents. To prove the business situs, FTB must prove that possession and control of the patents was displaced from my Nevada situs ownership and localized with a California business so that the "substantial use and value" attach to and become an asset of the business. Since I am deemed a Nevada resident, this California business must be separate from my ownership of the patents. However, I personally maintained full ownership of my licensed patents and have never sold them, pledged them, used them as collateral in a business or otherwise done anything to transfer the "substantial use and value to a California business. See also ¶ 348 herein. FTB has never attempted to offer evidence of such a transaction. FTB simply ignores this requirement that it must prove that I made a transfer of my patent rights such that a California business separate from my Nevada situs personal ownership has the "substantial use and value" of my patents attached to it and that my patent rights became an asset of the California business that is separate from my personal Nevada situs. FTB further ignores the fact that Philips had the "substantial use and value" of my patents and thus a California business could not have the "substantial use and value" of my patents. The law on "substantial use and value" is addressed in the 1991 ASAB § 1.8.5.4.2 and the 1992 ASAB § 1.7.1, 1.7.1.3, 1.7.2.

659. To the contrary, I granted Philips exclusive rights to license my patents and Philips assumed a fiduciary responsibility to license my patents. In addition I was prohibited from licensing my patent or doing anything in derogations of the licensing right granted to Philips. [732] See 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3. The exclusive licensing right I granted Philips localized the substantial use and value of my patents in Philips. I could not have and did not transfer the substantial use and value of my patents to any California business. For further discussion of FTB's failure to establish that any California business had the substantial use and value of my patents, see 1991 ASAB, § 1.8.5.4.2 and ¶ 348 herein.

660. FTB's false assertion of California source income in its 1991 Concluding Summary, pp. 22-23, has been fully addressed at ¶¶ 347-356, above.

---

[732] July 1991 Philips Agreement, Sections 4.1, 4.3 and 8.1, FTB_Philips 0000608, 0000610 and 0000623.

291

RJN1569

661.  The FTB 1992 Concluding Summary at p. 16 states the following.

> Mr. Hyatt vehemently argues that 1992 is a year different and distinct from 1991, and that respondent simply should not be able to repeat for 1992 any of the arguments it raises with respect to the 1991 assessments.[89]  Mr. Hyatt's argument is contradicted by the fact that his own briefs contain discussion of 1991 events in the 1992 tax year.[90]  When 1992 commences, Mr. Hyatt continues to pursue his business plan to extract patent licensing income from the Japanese companies, and conducts that pursuit, and every other significant aspect of his life, from the Orange County area of California.

[Exhibit A, note] 89:  09/02/16 letter from Antolin to SBE.

[Exhibit A, note] 90:  See Appellant's Opening Brief (1992), pp. 19, 25 and 38-52.

This FTB statement regarding the fraud penalty is false.  I did not fraudulently fail to file a 1992 California tax return, I was and I fully believed that I was a Nevada resident in all of 1992 and thus I did not need to file a 1992 tax return.

662.  FTB seeks to merge the years 1991 and 1992 in its attempt to carry its burden to prove fraud in 1992 by clear and convincing evidence because the 1992 facts are very weak. However, it is absurd to attempt to use alleged facts from 1991 when I filed a California tax return to support the fraud penalty for 1992 when I did not file a California tax return.  It is also absurd to allege that I fraudulently failed to file a 1992 California tax return when I filed a ***part year*** California tax return for 1991.

663.  Further, I understand that FTB must prove fraud separately for each year.[733]  The fact that my briefing may have discussed events of one year in a brief for a different year does not change the requirement of California law that FTB prove fraud for each separate year by clear and convincing evidence.  In any event my 1992 ARB, § IV., explained that my 1991 and

---

[733] *See Appeal of Duane H Laude,* 76-SBE-096, Oct. 6, 1976; *Appeal of Swift* & *Co.,* 70-SBE-013, Apr. 7, 1970; *Appeal of Allied Properties,* 64-SBE-026, Mar. 17, 1964.

292

1992 AOBs treated the fraud penalties for the two years separately but because FTB combined the two years in its 1991 ROB my 1991 ARB also combined the two years in order to provide a true reply. Being forced to combine the two years because FTB improperly combined the two years does not change the law that the two years must be evaluated and proven separately.

664.    Furthermore, the fact that my briefing may have discussed other facts (e.g., residency facts) of one year in a brief for a different year also does not change the requirement of California law that FTB prove fraud for each separate year by clear and convincing evidence.

665.    I did not pursue a business plan during 1991 and I did not "continue" to pursue a business plan during 1992 as falsely alleged by FTB. I did not conduct a pursuit of a business plan or conduct every significant aspect of my life from Orange County as falsely alleged by FTB. As established by an evidence based analysis (as opposed to FTB's illogical inferences), I had 54 full days in Las Vegas as a resident and 20 days partly in Las Vegas as a resident and partly in California for a specifically identified temporary or transitory purpose in addition to my 11 days of hospitalization for cancer surgery.[734]

666.    The FTB statement that I pursued a plan to extract patent licensing payments from Japanese companies is false. I did not pursue any such plan, I spent the 1992 disputed period in Las Vegas shopping for and purchasing a Las Vegas house through Las Vegas professionals (real estate agents, escrow officers, a home inspector, a lawyer, and a CPA), shopping for and purchasing a new car from a Las Vegas automobile agency, inventing and monitoring my investments, and much more. See my DP CDE Affidavit, ¶¶ 30-31, 45-51, 60-74 and my Supp. CDE Affidavit, ¶¶ 9-87.

667.    The July 1991 Philips Agreement[735] granted Philips exclusive rights to license my patents. Philips by itself created, financed and managed the Philips Licensing Program.[736] At

---

[734] Rebuttal to FTB Att. A/F, Section I. A., day by day analysis, January 1, 992, through April 2, 1992; see also 1992 ASAB, § 1.5.5 and ASAB Exhibit 4, Table of "Mr. Hyatt's Temporary or Transitory Purposes Outside of Nevada".
[735] FTB_Philips 0000595-0000635.

RJN1571

the same time Section 8.1 precluded me from making any commitments "in derogation of the rights and licenses granted to Philips".[737]  The July 1991 Philips Agreement precluded me from licensing my own patents.  See 1991 ASAB, §§ 1.7.3, 1.7.5, 1.7.9; 1992 ASAB, §§ 1.6, 1.7.3.

668.    The FTB 1992 Concluding Summary at p. 16 states the following.

> Nevertheless, Mr. Hyatt has steadfastly adhered to the position that he was not a resident of California at any time during 1992.  That position inevitably leads to the questions of, (1) when did you leave California? and (2) where did you go?  The answers to those questions are, according to Mr. Hyatt, (1) September 26, 1991, and, (2) to Las Vegas.  This, in turn leads to Mr. Hyatt's mystery whereabouts for the three weeks commencing September 26, the five years of waiting for the Continental Hotel explanation, the highly suspicious sale of the Jennifer Circle property and alleged occupancy of a one-bedroom unit in a low-income housing facility, and the contradictions of the change of residency assertions by contemporaneous objective documents which clearly demonstrate the manner in which Mr. Hyatt conducted his business and personal affairs, and how California is the center of those activities.

These FTB statements are false.  First, what happened during 2 ½ weeks bridging September and October 1991 and my sale of the Jennifer Circle house on October 1, 1991, has nothing to do with the 1992 penalty for not filing a California tax return for 1992.  I moved into my Las Vegas apartment on October 21, 1991, and I resided there until April 3, 1992, at which time I moved into my newly purchased Las Vegas Tara home.

669.    Second, I responded to FTB's false statements about FTB's alleged mystery about the three weeks and the alleged five years of waiting.  I stayed at the Continental Hotel for 2 ½ weeks prior to moving into my Las Vegas apartment which I leased.  See ¶¶ 10, 31-35, 91, 95, 96, 675 herein.  This issue has nothing to do with any need to file a 1992 California tax return, which is the issue in the 1992 fraud penalty.

670.    Third, I responded to FTB's false statements about the sale of the Jennifer Circle house.  In addition to all of my other house acts, I signed the grant deed and delivered it to the

---

[736] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 6, 7 and 10, Annex XII.
[737] FTB_Philips 0000623.

294

purchaser which was all that was needed to consummate the sale (see ¶ 511, above). This issue has nothing to do with any need to file a 1992 California tax return.

671. Fourth, I occupied a two bedroom apartment (not a one bedroom apartment as FTB falsely states) in a very nice medium-income apartment complex (not a low-income apartment complex as FTB falsely states).[738] This issue has nothing to do with any need to file a 1992 California tax return.

672. Fifth, FTB's statement of "contradictions of the change of residency assertions by contemporaneous objective documents" is not explained, but FTB's documents do not contradict my thousands of pages of relevant contemporaneous documents explained and authenticated under oath in my three CDE affidavits that support my change in residency.[739] This issue overwhelmingly supports the fact that there was none need to file a 1992 California tax return.

673. Sixth, FTB's false statement that "California is the center of those activities" is contradicted by the overwhelming documentary and testimonial evidence of my Nevada residency.[740] This issue overwhelmingly supports the fact that there was no need to file a 1992 California tax return.

674. Seventh, FTB again raises issues about my 2 ½ week stay at the Las Vegas Continental Hotel from September 26, 1991, through October 14, 1991. My stay at the Las Vegas Continental Hotel in September and October 1991 has no bearing on FTBs alleged fraud in 1992. There was no documentation of my stay at the Continental Hotel because I stayed as a guest of a tour company which did not provide receipts or registration.[741] Thus, I could not produce documentation that I did not have and that never existed, ¶ 31, above.

---

[738] 1991 ARB, § II.A.1.d, pp. 29-32.
[739] Hyatt DP CDE Affidavit, July 24, 2012; Hyatt Supp. CDE Affidavit, September 6, 2012; Hyatt Post-DP CDE Affidavit, September 6, 2016.
[740] Hyatt DP CDE Affidavit, July 24, 2012; Hyatt Supp. CDE Affidavit, September 6, 2012; Hyatt Post-DP CDE Affidavit, September 6, 2016; Updated Testimonial Topics Table, Exs. T006, T007, T102, T123, T124, T008-T009, T018, T128, T019, T049; 1991 ASAB, § 1.4, pp. 1-2.
[741] See ASAB Attachment 2, pp. 9-23.

675.     Seventh, there is no mystery about my stay at the Las Vegas Continental Hotel.  I did not conceal or suppress any documentation of my stay at the Continental Hotel.  Many former Continental Hotel employees have confirmed that the Continental Hotel did not maintain records of tour company guests during 1991 when I stayed there, Updated Testimonial Topics, Exs. T105, T010, T011, T012, T013, and T017.[742]  I discussed my stay at a Las Vegas hotel with many people and many people called me at the Continental Hotel (37 witnesses testified about my stay at a Las Vegas hotel in 1991 and 20 witnesses testified about telephoning me at a Las Vegas hotel in September or October 1991, Updated Testimonial Topics, Exs. T008 and T009). See ¶¶ 10, 31-35, 91, 95, 96, 675 herein.

676.     Eighth, there was nothing suspicious about the October 1, 1991, sale of the Jennifer Circle house, which has no bearing on 1992 fraud penalties.  As established by former elected Orange County Assessors Bradley Jacobs and Webster Guillory, the sale of the Jennifer Circle house was completed when I delivered the signed Grant Deed to the buyer on October 1, 1991.[743]

677.     Ninth, on October 8, 1991, I rented a spacious two bedroom apartment in a very nice well maintained middle income apartment complex in Las Vegas and I moved in on October 21, 1991.[744]  FTB's false statement, made with no evidentiary basis, that the apartment was a one bedroom apartment in a low-income housing facility is another of FTB's thousands of false statements, fabrications and mischaracterizations.  My stay in my Las Vegas apartment was actual, not just alleged.  A total of 15 witness have testified about visiting me at my Las Vegas apartment while 28 witnesses testified about being informed I had moved to my Las Vegas

---

[742] Continental Hotel employees Michael C. Fox, Bernice Jaeger, Geri Bommarito, Louis Litwin and President Ira Levy all testified that the Continental Hotel did not register individual van tour guests so no records of individual tour guests were ever created, Rebuttal to FTB Att. A/F, Section I. F., September 29, 1991.
[743] Rebuttal to FTB Att. A/F, Section I. A., October 1, 1991; ¶ 192, above.
[744] Rebuttal to FTB Att. A/F, Section I. A., October 8, 21, 1991.

RJN1574

apartment and 39 witnesses testified about telephoning me at my Las Vegas apartment.[745]  In addition, 21 witnesses testified about the furniture and furnishings in my Las Vegas apartment, 14 witnesses testified about an office in my Las Vegas apartment, 12 witnesses testified about a computer in my Las Vegas apartment and 19 witnesses testified about a fax machine in my Las Vegas apartment.[746]

678.    Tenth, I did not have a business and California was not the center of my personal affairs after September 26, 1991.  FTB makes false statements about alleged "business and personal affairs" with no evidentiary support.

679.    The FTB 1992 Concluding Summary at p. 16 states the following.

> These patterns continue throughout the first quarter of 1992, and beyond.  Examples of such continuing conduct during January include Mr. Hyatt authoring and sending business correspondence utilizing the Cerritos Post Office Box and Jennifer Circle telephone number as return contact information, personal and USPTO correspondence being sent to Mr. Hyatt via the Cerritos Post Office Box, personally attending court proceedings and executing court documents attesting to his presence in Orange County, conducting a house purchase in Nevada by means of telefax transmissions to and from the Jennifer Circle fax machine, and business documents being sent to Mr. Hyatt by MLMC and Oki via the Jennifer Circle street address.

This FTB statement is false.  The FTB statement does not explain what is meant by "these patterns".

680.    Any faxes I sent that used the pre-printed cover sheets or templates on my computer with the Cerritos U.S. Post Office box address were sent from Las Vegas, ¶ 237, above. [747]  See 1991 ASAB, §§ 1.8.4.5-1.8.4.6; 1992 ASAB, § 1.4.1.2.  I did not receive mail at the Jennifer Circle house during the disputed period and thereafter because I submitted a change

---

[745] Updated Testimonial Topics, Exs. T018, T128 and T019.
[746] Updated Testimonial Topics, Exs. T022, T023, T024 and T025.
[747] Supplemental Affidavit of Gilbert Hyatt, August 15, 2010, § 1.16.1, p. 69; Supplemental Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶¶ 41, 45, 46, 72.

297

RJN1575

of address to Las Vegas on October 21, 1991.[748] Very little mail went to the Cerritos U.S. Post Office box and FTB does not identify a single example. In contrast, a huge amount of mail, including monthly statements for my investment funds went to my Las Vegas addresses.[749] See 1992 ASAB, §§ 1.5.6, 1.5.6.1-1.5.6.3, 1.5.7.

681. My only fax machine was located at my Las Vegas apartment as of October 21, 1991, and all of the faxes were received at and sent from my Las Vegas apartment. See 1991 ASAB § 1.8.4.5. The California court proceedings I attended in California were for the probate of my mother's estate of which I was the executor. The proceedings were in California because my mother resided and died in California. Any attendance at a probate hearing was for a specific temporary or transitory purpose, not to establish California residency. It is disingenuous for FTB to refer to attendance at a probate hearing as California residency contact or an indicia of fraud.

682. The FTB statement that I purchased my Las Vegas Tara house by means of fax transmissions to and from a Jennifer Circle fax machine is false. FTB presents no evidence of any such fax. I conducted all of my house hunting from Las Vegas after my September 26, 1991, move to Las Vegas. My only fax machine was located in Las Vegas as of October 1, 1991, I did not conduct any of my house hunting via "the Jennifer Circle fax machine". See 1991 ASAB, § 1.8.4.5. During the disputed period, I worked with many real estate professionals in Las Vegas to locate and to purchase my Las Vegas Tara home.[750] I reviewed more than 150 house listings, I "walked through" more than 30 houses, I made purchase offers with large cash deposits on ten houses by three different realtors, I had a short escrow (2 ½ weeks) on my dream home (which is still my residence after 25 years).[751]

---

[748] Rebuttal to Att. A/F, Section I. A., October 21, 1991.
[749] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 32-44; Hyatt Supp. CDE Affidavit, September 6, 2016, ¶¶ 40-47, 141-150, 151; Hyatt Post-DP CDE Affidavit, September 6, 2016, ¶¶ 144, 282-312, 390-394, 395-402, 403-404, 405-406, 407-408, 409-464, 465-473, and 509-515.
[750] Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 45-51.
[751] See Hyatt DP CDE Affidavit, July 24, 2012, ¶¶ 45-51 and the exhibits attached therein.

298

RJN1576

683.    FTB falsely states that during January 1992 "business documents [were] being sent to Mr. Hyatt by MLMC . . . via the Jennifer Circle street address" without any evidentiary support.  Nonetheless, I gave Mahr Leonard changes of address to Las Vegas on multiple occasions, including October 18, 1991.[752]  See 1991 ASAB §§ 1.8.1, 1.8.4.1-1.8.4.4; 1992 ASAB, §§ 1.4.1.1, 1.5.6.3.

684.    FTB falsely states that an Oki "business document" was sent to the Jennifer Circle house.  For unknown reasons Oki addressed the First Amendment to the Oki Patent Agreement to the Jennifer Circle house when it should have been sent to Mahr Leonard.  However, since I had submitted a change of address to Las Vegas on October 21, 1991,[753] the package was actually delivered to me in Las Vegas.  See 1992 ASAB §§ 1.5.6, 1.5.6.1-1.5.6.3, 1.5.7.  FTB does not explain how a January 14, 1992, letter (FTB_Philips 0005619) that should have been sent to Mahr Leonard[754] but was forwarded to me in Las Vegas has any bearing on FTB's 1992 fraud allegation.

685.    The FTB 1992 Concluding Summary at p. 17 states the following.

> California activities during January also include Mr. Hyatt performing personal banking, attending medical appointments, meetings with his lawyers and representatives of Hitachi corporation, and a business flight with departing and return flights from/to LAX.  The month concludes with Mr. Hyatt's long-time patent lawyer sending an invoice for professional services and Philips sending significant business correspondence to Mr. Hyatt at the Cerritos Post Office Box.[91]

> [Exhibit A, note] 91:  FTB's Attachment A (Revised), pp. 81-95.

These FTB statements are false or need clarification.  FTB provides a list of alleged activities supported only by a general reference to 15 pages in its Attachment A (Revised), all of which have been fully rebutted by my Rebuttal to FTB Att. A/F for January 1-31, 1992.  No specific date or event is identified.  During January 1992 I had 15 full days in Nevada as a resident, 6

---

[752] Rebuttal to FTB Att. A/F, Section I. B, October 18, 1991.
[753] Rebuttal to FTB Att. A/F, Section I. A., October 21, 1991.
[754] FTB_Philips 0000720.

299

1  days partly in Nevada as a resident and partly in California for a specific temporary or transitory

2  purpose such as visiting the Los Alamitos Medical Center to prepare for my upcoming cancer

3  surgery[755] and 10 days partly or entirely in a third state.[756]

4  686.  FTB falsely states that I had "meetings with his lawyers and representatives of

   Hitachi corporation" during January 1992.  FTB does not identify any specific date(s) or event(s)

5  nor does it provide any evidentiary support.  I did not have any meetings with "his lawyers and

6  representatives of Hitachi corporation" during January 1992.  From January 8-17, 1992, I

7  traveled to the East Coast where I, among other things, met with Philips attorneys in New York.

8  I did not have any meetings with any representatives of Hitachi as alleged by FTB.[757]

9  687.  FTB also falsely states that I had "a business flight with departing and return

10  flights from/to LAX".  I did not go through LAX for my travel to the East Coast in January 1992.

   I flew from Las Vegas and returned to Las Vegas without going through LAX or California.[758]

11
   688.  I did not do personal banking in California during January 1992.  My banking was

12  done in Las Vegas.  I did not have a California checking account after September 26, 1991, when

13  I moved to Las Vegas.  I opened checking accounts at Las Vegas banks on October 25, 1991,

14  and on November 22, 1991, and I wrote numerous personal checks each having my bank's Las

15  Vegas address printed thereon and all but a few counter checks having my Las Vegas address

16  printed thereon.  I opened a savings account at a Las Vegas bank on January 27, 1992.[759]  I also

17  opened several Nevada situs investment accounts.  See ¶¶ 242-245, above.

18  689.  I made a round trip visit to Los Alamitos Medical Center to prepare for my cancer

   surgery, which was for a temporary or transitory purpose.[760]

19

20
   _____

21  [755] Rebuttal to FTB Att. A/F, Section I. "A., January 23, 1992.
   [756] Rebuttal to FTB Att. A/F, Section I. A., day by day analysis, January 1 - 31, 1992; see

22  also 1992 ASAB, § 1.5.5 and ASAB Exhibit 4, Table of "Mr. Hyatt's Temporary or Transitory
   Purposes Outside of Nevada".

23  [757] Rebuttal to FTB Att. A/F, Section I. A., January 8-17, 1992.
   [758] Supplemental Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶ 59.
   [759] 1991 AOB, § II.C.8.

24  [760] Rebuttal to FTB Att. A/F, Section I. A., January 23-24, 1992.

RJN1578

690.     FTB alleges that on January 31, 1992, two documents were sent to the Cerritos U.S. Post Office box, which was being accessed by Ms. Jeng.[761]  I was in Las Vegas the entire day of January 31, 1992.[762]  As for Philips sending correspondence to the Cerritos U.S. Post Office box after I gave Philips a change of address in October 1991,[763] Mr. Tamoshunas has testified that any documents sent to my former address were inadvertent errors by Philips personnel.[764]

691.     If FTB's reference to my "patent lawyer" means Mr. Roth, Mr. Roth was a stake holder at the law firm of PSB&C which represented Philips with respect to the *Hyatt v. Boone* interference and the Philips Licensing Program after April 1991.[765]

692.     The FTB 1992 Concluding Summary at p. 17 states the following.

> February 1992 commences with Mr. Hyatt expanding the permitted use of his Cerritos Post Office Box to include Grace Jeng and Barry Lee as designated users, and crafting Gilbert Hyatt stationary designating the Cerritos Post Office Box as his return contact information, a representation he reaffirms throughout the month, and thereafter.  As with prior occasions, Mr. Hyatt issues $2.2 million in checks to Philips and MLMC this month on checks stating he resides at Jennifer Circle, and telefaxes written instructions to Philips regarding what is to be done with his share of certain SHARP monies, instructions which incorporate the Cerritos Post Office Box and Jennifer Circle telephone and telefax numbers.  Mr. Hyatt's California activities this month also include personal banking, visiting his La Palma safe deposit boxes, seeking and obtaining notary services, attending meetings with his patent lawyer and Encino CPA, attending multiple medical appointments, and an extended in-patient stay at the Los Alamitos Medical Center.[92]
>
> [Exhibit A, note] 92:  FTB's Attachment A (Revised), pp. 95-107.

---

[761] Affidavit of Grace Jeng, December 4, 2008, ¶ 22, Annex VII, Ex. 22.
[762] Rebuttal to FTB Att. A/F, Section I. A., January 31, 1992.
[763] Rebuttal to FTB Att. A/F, Section I. B, October 18, 1991.
[764] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 18, Annex XII; 1991 ASAB §§ 1.8.4.1-1.8.4.4; 1992 ASAB, §§ 1.4.1.1, 1.5.6.3.
[765] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.

301

RJN1579

This FTB statement is false. FTB provides a list of alleged activities supported only by a general reference to 13 pages in its Attachment A (Revised) (no specific date or event is identified), all of these 13 pages have been fully rebutted by my Rebuttal to FTB Att. A/F for February 1-29, 1992. During February 1992 I had 14 full days in Nevada as a resident, 4 days partly in Nevada as a resident and partly in California for a specific temporary or transitory purpose such as visiting the Los Alamitos Medical Center to prepare for my upcoming cancer surgery,[766] 2 part days in California traveling to and from California for my cancer surgery and 9 full days in a California hospital for my cancer surgery.[767]

693. I added Ms. Jeng and Mr. Lee to the Cerritos U.S. Post Office box because the Post Office would not let me take my name off of the Box to transfer it to my associates. I turned over the P.O. Box to Ms. Jeng and gave her the key when I sold the Jennifer Circle house on October 1, 1991.[768] However, because there was a wait list of people wanting P.O. Boxes I could not just transfer possession of the P.O. Box to Ms. Jeng. I had to keep my name on the box but I was able to add the names of Ms. Jeng and Mr. Lee to the people who could use the box, H 01275. Ms. Jeng paid for and accessed the P.O. Box after October 1, 1991.[769]

694. I do not know what FTB means by "crafting" stationary. As previously explained I had preprinted fax cover sheets and a template on my computer with the Cerritos U.S. Post Office box return address. However, I sent the correspondence from Las Vegas and faxes from my Las Vegas apartment fax machine even though the correspondence had the prior P.O. Box return address thereon. In some cases my girlfriend Caroline Cosgrove sent these preprinted fax

---

[766] Rebuttal to FTB Att. A/F, Section I. A., February 4, 1992.
[767] Rebuttal to FTB Att. A/F, Section I. A., day by day analysis, February 1 - 29, 1992; see also 1992 ASAB, § 1.5.5 and ASAB Exhibit 4, Table of "Mr. Hyatt's Temporary or Transitory Purposes Outside of Nevada".
[768] Affidavit of Grace Jeng, December 4, 2008, ¶ 22, Annex VII, Ex. 22.
[769] Affidavit of Gilbert P. Hyatt, August 15, 2010, ¶ 10, p. 100, Annex XI, Ex. 13; Supp. Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶ 63; Affidavit of Grace Jeng, December 4, 2008, ¶ 22, Annex VII, Ex. 22.

302

RJN1580

1   cover sheets from her house in Placentia.[770]  I did not return to the Jennifer Circle house and I

2   did not send any faxes from the Jennifer Circle house after October 1, 1991.

3        695.    During February 1992 or on prior occasions I did not issue checks to Philips and

4   Mahr Leonard that stated I resided at Jennifer Circle as falsely claimed by FTB.  I did issue

5   drafts from my Nevada situs mutual fund investment account to Philips and to Mahr Leonard as

6   distribution of an Oki license payment because Philips had asked me to do so and under authority

7   granted to me by Philips through the [First] Supplemental Agreement.[771]  The drafts were written

8   on my Nevada situs Franklin Fund investment account.  I had not used up all of the drafts

9   initially issued to me when I opened the account so the drafts had my former Jennifer Circle

10  address thereon.  The drafts did not state that this address was my residence as falsely stated by

11  FTB.[772]

12       696.    I did not do personal banking in California during February 1992.  My banking

13  was done in Las Vegas.  I did not have a California checking account after September 26, 1991,

14  when I moved to Las Vegas.  I opened checking accounts at Las Vegas banks on October 25,

15  1991, and on November 22, 1991, and I wrote numerous personal checks each having my bank's

16  Las Vegas address printed thereon and all but a few counter checks having my Las Vegas

17  address printed thereon.  I opened a savings account at a Las Vegas bank on January 27, 1992.[773]

18  I also opened several Nevada situs investment accounts.  See ¶¶ 242-245, above.

19       697.    I rented two safe deposit boxes for my mother's estate, not for my personal use,

20  and I did not visit these safe deposit boxes on the dates FTB alleges I did.[774]

21       698.    I stayed at a hospital for 11 days (the Los Alamitos Medical Center) for cancer

22  surgery and I had an attendant visit to prepare for the surgery, which were for temporary or

---

[770] Supp. Affidavit of Gilbert P. Hyatt, September 8, 2016, ¶¶ 64, 84, 94, 103; Supp.
Affidavit of Gilbert P. Hyatt, August 15, 2010, § 1.20, p. 134, Annex XI, Ex. 13.
[771] [First] Supplemental Agreement, FTB_Philips 0000666-0000673.
[772] Drafts to U.S. Philips Corp. and Mahr Leonard Mgt Co., H 015388.
[773] 1991 AOB, § II.C.8.
[774] Affidavit of Gilbert P. Hyatt, July 23, 2012, ¶ 12, Annex XXXV.

303

1  transitory purposes. I did not undergo cancer surgery for the purpose of changing my residence

2  from Nevada to California as FTB implies by its calendar. I traveled from Nevada to California

3  on the day of my surgery and I returned to my Las Vegas apartment the day I was released from

4  the hospital following my surgery, February 21, 1991.[775] I then remained in Las Vegas through

   the end of February while I recuperated from the cancer surgery.[776]

5      699.     The FTB 1992 Concluding Summary at p. 17 states the following.

6
7         February also includes Mr. Hyatt's patent lawyer
   addressing correspondence to Mr. Hyatt pertinent to income tax
   obligations of NEC and Mr. Hyatt via the Cerritos Post Office

8  Box, and concludes with the USPTO utilizing the Post Office Box,
   Mr. Hyatt signing for a Fed EX delivery from Philips at his

9  Jennifer Circle home, and Philips sending FUJITSU contract
   correspondence and the quarterly financial report for the period

10 ending December 31, 1991, to Mr. Hyatt at his Jennifer Circle
   home.[93]

11     [Exhibit A, note] 93: *Id*.

12 This FTB statement is false. FTB again makes a list of general allegations with no specific

13 support, but only a general reference to 13 pages of its Attachment A (Revised) (no specific date

14 or event is identified). If FTB's reference to my "patent lawyer" means Mr. Tamoshunas, Mr.

   Tamoshunas was an executive of Philips and was not my patent lawyer. If the reference refers to

15 Mr. Roth, Mr. Roth was a stake holder at the law firm of PSB&C which represented Philips with

16 respect to the *Hyatt v. Boone* interference and the Philips Licensing Program after April 1991.[777]

17     700.     At the conclusion of February from February 21, 1992, when I was released from

18 the hospital following my cancer surgery, through February 29, 1992, I was in Las Vegas the

19 entire time recuperating from the cancer surgery.[778]

20     701.     The FTB's allegation that I signed for a FedEx delivery to the Jennifer Circle

21 house is false. I was not at the Jennifer Circle house between October 1, 1991, when I sold the

22

23 [775] Rebuttal to FTB Att. A/F, Section I. A., February 11, 21, 1992.
   [776] Rebuttal to FTB Att. A/F, Section I. A., February 21 - 29, 1992.
   [777] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.

24 [778] Rebuttal to FTB Att. A/F, Section I. A., February 21-29, 1992.

304

RJN1582

Jennifer Circle house and late December 1992, when I returned to Jennifer Circle for a short visit. FTB has not produced a single FedEx document showing my signature for a delivery to the Jennifer Circle house. FedEx expert Steve Foster has testified that even when a typed name appears in a signature box it does not mean that person actually singed or was even present when a package was delivered.[779] As for Philips sending correspondence to the Jennifer Circle house after I gave Philips a change of address in October 1991,[780] Mr. Tamoshunas has testified that any documents sent to my former address were inadvertent errors by Philips personnel.[781]

702. The FTB 1992 Concluding Summary at pp. 17-18 states the following.

> Mr. Hyatt's conduct remains the same in March, 1992. Philips continues to send business documents to him by FedEx to his Jennifer Circle address, and by telefax to the Jennifer Circle fax machine, and Mr. Hyatt signs for such FedEx deliveries and faxes correspondence to Philips utilizing the Cerritos Post Office Box and Jennifer Circle phone and telephone numbers as return contact information. Mr. Hyatt continues to attend meetings with his patent lawyer and doctor. Mr. Hyatt speaks at a convention in Anaheim, obtains a signature guarantee from his La Palma bank, and opens an IRA through an investment advisor in San Francisco. Mr. Hyatt is the addressee on correspondence from his medical insurer regarding his stay at the Los Alamitos Medical Center, correspondence addressed to him via the Cerritos Post Office Box. Mr. Hyatt also requests a tax filing extension on behalf of DNC, a request which likewise advises he can be contacted through the Cerritos Post Office Box.[94]

> [Exhibit A, note] 94: FTB's Attachment A (Revised), pp.107-125.

This FTB statement is false. FTB provides a list of alleged activities supported only by a general reference to 18 pages in its Attachment A (Revised), all of which have been fully rebutted by my Rebuttal to FTB Att. A/F for March 1-31, 1992. No specific date or event is identified. During March 1992 I had 23 full days in Nevada as a resident, 8 days partly in Nevada as a resident and partly in California for a specific temporary or transitory purpose such as a meeting with Russian

---

[779] Rebuttal to FTB Att. A/F, Section II. D, July 12, 1991.
[780] Rebuttal to FTB Att. A/F, Section I. B, October 18, 1991.
[781] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 18, Annex XII; 1991 ASAB §§ 1.8.4.1-1.8.4.4; 1992 ASAB, §§ 1.4.1.1, 1.5.6.3.

305

RJN1583

scientists,[782] and zero full days in California.[783] Thus, during March I was in Las Vegas during at least part of every single day.

703. Contrary to FTB's assertion, Philips did not send me any "business" documents and I did not sign for any FedEx documents at the Jennifer Circle house.[784] Philips assumed a fiduciary obligation to license my patents and did so through its Philips Licensing Program. Any documents Philips sent to me were licensing related documents, not "business documents". As for Philips sending correspondence to the Jennifer Circle house after I gave Philips a change of address to Nevada in October 1992,[785] Mr. Tamoshunas has testified that any documents sent to my former address were inadvertent errors by Philips personnel.[786] See 1991 ASAB §§ 1.8.4.1-1.8.4.4; 1992 ASAB, §§ 1.4.1.1, 1.5.6.3.

704. FTB alleges that I attended meetings with my patent lawyer and doctor but fails to identify any such meetings or who my alleged patent lawyer or doctor are. Each of FTB's allegations has been fully rebutted.[787] If the "patent lawyer" reference refers to Mr. Roth, Mr. Roth was a stake holder at the law firm of PSB&C which represented Philips with respect to the *Hyatt v. Boone* interference and the Philips Licensing Program after April 1991.[788]

705. As noted by FTB, two of my part days in California were for my speech a National Computer Graphics Association (NCGA) conference in Anaheim. On March 8, 1992, I traveled from Las Vegas to California and stayed at the Buena Park Crescent Motel.[789] The next day I gave my speech and then immediately returned to Las Vegas.[790] FTB does not contend

---

[782] Rebuttal to FTB Att. A/F, Section I. A., March 16, 1992.
[783] Rebuttal to FTB Att. A/F, Section I. A., day by day analysis, March 1 - 31, 1992; see also 1992 ASAB, § 1.5.5 and ASAB Exhibit 4, Table of "Mr. Hyatt's Temporary or Transitory Purposes Outside of Nevada".
[784] See ¶ 701, above.
[785] Rebuttal to FTB Att. A/F, Section I. B, October 18, 1991.
[786] Affidavit of Algy Tamoshunas, August 4, 2010, ¶ 18, Annex XII.
[787] Rebuttal to FTB Att. A/F, March 1-31, 1992.
[788] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.
[789] Rebuttal to FTB Att. A/F, Section I. A., March 8, 1992.
[790] Rebuttal to FTB Att. A/F, Section I. A., March 9, 1992.

306

that my travel to California for a speaking engagement and immediate return to Las Vegas was for other than a temporary or transitory purpose. See 1992 ASAB, § 1.5.5 and ASAB Exhibit 4, Table of "Mr. Hyatt's Temporary or Transitory Purposes Outside of Nevada".

706.    As pointed out by FTB, I obtained a signature guarantee from a bank. However, FTB deceitfully fails to point out that the signature guarantee was for the wire transfer of funds to purchase my Las Vegas Tara house. FTB has not contended that my obtaining a signature guarantee to purchase my Las Vegas house was other than a temporary or transitory purpose.[791]

707.    FTB mentions my IRA application but disingenuously fails to mention that the IRA used my Las Vegas address, H 012393-012394, and was for a Nevada situs Benham Group investment account.[792]

708.    FTB mentions that DNC used the Cerritos U.S. Post Office box address for a tax extension request. DNC was a California corporation with a California address. DNC did not move to Las Vegas with me. The FTB statement that the request, EC 05472, states that I "can be contacted through the Cerritos Post Office Box" is another of many mischaracterizations by FTB. The Application for Automatic Extension makes no such statement. Retention of a California address by DNC has no bearing on the fact that I moved to Las Vegas on September 26, 1991.[793]

709.    The FTB 1992 Concluding Summary at p. 18 states the following.

> Activity occurs during March 1992, with respect to Mr. Hyatt's pursuit of the Tara property, with numerous documents being exchanged between Mr. Hyatt and his Las Vegas realtor. Those exchanges are made through the use of Mr. Hyatt's Jennifer Circle fax machine. March concludes with Mr. Hyatt's patent lawyers sending him correspondence addressed to the Cerritos Post Office Box and his Las Vegas Realtor faxing him a copy of a home inspection report regarding the Tara property via the Jennifer Circle fax machine.[95]

---

[791] Rebuttal to FTB Att. A/F, Section I. A., March 24, 1992.
[792] Rebuttal to FTB Att. A/F, Section I. A., March 25, 1992.
[793] Rebuttal to FTB Att. A/F, Section I. B, March 17, 1992.

RJN1585

1     [Exhibit A, note] 95: *Id.*

2 This FTB statement is false. No documents were exchanged with my Las Vegas real estate agent

3 through the use of the Jennifer Circle fax machine. My only fax machine was located in my Las

4 Vegas apartment and the faxes that I sent and received was to and from my Las Vegas apartment

5 (1991 ASAB § 1.8.4.5). See ¶ 150 herein. FTB presents no evidence that a Jennifer Circle fax

6 machine was used in the purchase of the Las Vegas Tara house. Mr. McGuire, the Las Vegas

7 real estate agent for the Tara house, testified that he neither sent faxes to, nor received faxes

from, California.[794]

8     710.    I did put a lot of effort into purchasing my Las Vegas Tara home. I personally

9 visited the Tara property many times and I exchanged many offers and counter offers with the

10 buyer. I worked with Mr. McGuire and looked at many properties with him for one or two

11 months before we made the first offer on the Tara house on December 16, 1991.[795] See ¶¶ 535

and 574-579 herein.

12    711.    FTB falsely states that March concludes with my patent lawyers sending me

13 correspondence at the Cerritos U.S. Post Office box. To the contrary, Mr. Roth's secretary, sent

14 a mis-addressed letter dated March 31, 1992, to the Cerritos U.S. Post Office box.[796]

15 Furthermore, Mr. Roth represented Philips with respect to the *Hyatt v. Boone* interference and

16 the Philips Licensing Program after July 1991.[797]

17    712.    The FTB statement that Mr. McGuire, my real estate agent, faxed a home

18 inspection report, H 09949, to the Jennifer Circle fax machine is also false.[798] The document

19 was sent to my Las Vegas fax machine. I returned to Las Vegas from California on March 31,

20 ────────────────

21    [794] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 69-73, 107, Annex XXV, Ex. 55.
   [795] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 56-57, 95-98, 103-104, Annex
22 XXV, Ex. 55.
   [796] Letter dated March 31, 1991, from Mr. Roth's secretary to Mr. Hyatt, FTB_Philips
23 0003721.
   [797] Rebuttal to FTB Att. A/F, Section I. B., November 1, 1991.
24    [798] Rebuttal to FTB Att. A/F, Section I. E., March 31, 1991.

RJN1586

1991,[799] so there would have been no reason to fax the report to California.  Mr. McGuire

testified that he did not fax documents to me in California.[800]

713.    I have been and I remained a resident of Nevada to the present time since my

move to Las Vegas on September 26, 1991.

714.    The FTB 1992 Concluding Summary at pp. 18-23 makes various false statements

about Interest Abatement that are addressed in ¶¶ 715-764 below and in ¶¶ 402-421 above.  See

particularly ¶¶ 402-406 above.

715.    The FTB 1992 Concluding Summary at p. 18 states the following.

> The many delays in this case are attributable to Mr. Hyatt
> and have been discussed at length in Respondent's Opening Brief
> (Case No. 446509) at pages 30 through 57 and Respondent's
> Additional Brief (03/28/13, Appeal Case Nos. 435770 & 446509)
> at pages 1 through 14 and those discussions will not be repeated
> here and are incorporated by reference as if set forth fully herein.

This FTB statement is false.  The delays in this case are attributable to FTB not to me.  I cannot

delay.  During the audits and protests, FTB set the requirements that my representative had to

comply with and FTB set the times that my representative had to respond.  FTB made these into

audits and protests into very complex cases and kept changing the issues so my representative

had to request extensions of time, which FTB sometimes granted and sometimes denied.

716.    FTB's continually changing the issues and complicating the issues made the

briefings before your Board very complex and necessitated requests for extension of time.  FTB

further caused delays by requesting reply briefing (RRBs and the need for ARBs), necessitated

the RAB and the AAB by its fraudulent $24 million error, requested and obtained the SABs for

its very late Philips subpoenas, and necessitated Appellant's Third Additional Briefing by

violating your Board's orders with its Concluding Summaries.

717.    FTB's delays and improper actions began with the audit and protest of my 1991

and 1992 taxes.  The Nevada Supreme Court (NSC) found that FTB committed fraud and

---

[799] Rebuttal to FTB Att. A/F, Section I. A., March 31, 1991.
[800] Affidavit of Thomas McGuire, March 31, 2012, ¶¶ 69-73, 107, Annex XXV, Ex. 55.

309

intentional infliction of emotional distress in part because of its delays[801] in processing the two protests. FTB's extraordinary 11 year delay in the processing of the two protests is unconscionable. The Nevada Supreme Court upheld the jury finding that FTB personnel committed fraud in processing my audits and protests. See ¶¶ 404-406, 428, 737 herein.

718.    FTB continued its unconscionable delays with its unlawful, overbroad and belated discovery against Philips and its employees. Even though Philips was identified in my 1991 part year California tax return and even though FTB issued and then withdrew subpoenas served on Philips in 2006, FTB waited until 2011 to actually pursue discovery from Philips. It then did so with unlawful, overbroad subpoenas that forced me protect my rights by obtaining a protective order from the New York courts that significantly narrowed the scope of FTB's subpoenas, thus imposing years of additional delay on these proceedings.

719.    The prior briefing of issues of interest abatement has demonstrated that interest abatement is appropriate.[802]

720.    The FTB 1992 Concluding Summary at p. 18 states the following.

> In contemplation of his suit against respondent and before the administrative protests even commenced, Mr. Hyatt's litigation counsel, Donald Kula, initially appears and provides legal services to Mr. Hyatt in his California tax matter on June 4, 1996.[96] Shortly after his June 12, 1997, conversation with respondent's Protest Hearing Officer, Mr. Cowan, Mr. Hyatt's then tax representative, was working closely with attorney Donald Kula on Mr. Hyatt's pending Nevada litigation against respondent.[97] Those efforts, with the support and concurrence of Mr. Hyatt, lead to the adoption of a strategy designed to delay the California tax proceedings by intertwining those proceedings with the Nevada litigation.

This FTB statement is false. There was no "strategy designed to delay the California tax proceedings", my representative kept the litigation and the FTB proceedings separate. It was

---

[801] *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 144-145, 148-149 (Nev. 2014), aff'd in part and rev'd in part on other issues 136 S. Ct. 1277 (2016). See also ASAB Attachment 1 and Section 1991 ASAB, Section 1.5.1.

[802] 1991 AOB, § VI.; 1992 AOB, § VII.; 1991 ARB, § VI.; 1992 ARB,§ VII.; 1992 ASAB, § 1.8.

310

FTB who intentionally delayed the protest. My representatives could not possibly have delayed as they had to respond to the requirements set by FTB in the times set by FTB. FTB could have concluded the protests at any time that it wanted to but it chose to delay for years.

721. FTB's speculation that Mr. Cowan was working closely with Mr. Kula should be ignored by your Board. The FTB's cited reference of testimony by Mr. Cowan does not support FTB's statement. Mr. Cowan stated "but I don't' know that I was or wasn't" consulting with Mr. Kula.[803]

722. My counsel and I were trying to keep separate the tort litigation against FTB and the administrative proceeding and we were trying to expedite, not delay, the administrative proceeding.

723. With no evidentiary support, FTB fabricates the false statement that efforts of my counsel were designed to delay the California tax proceeding by intertwining the tax proceedings with the Nevada litigation. That is false. We were trying to keep the two proceeding separate and expedite the administrative proceeding in the face of continual delays by FTB.

724. My representatives' actions in the Protest and the Nevada tort case did not delay the tax proceedings. In its interest abatement rebuttal section, FTB first references my Nevada litigation counsel, Mr. Kula, and his 1996 consultation with my then tax attorney Mr. Cowan, which relates only to a draft protest letter that Mr. Cowan was drafting. FTB then falsely states that in 1997 Mr. Cowan was working closely with my Nevada litigation team. Again, this a false statement, Mr. Cowan's was my tax attorney, he was not a litigator. Occasional contacts between attorneys working for the same client does not mean that they were working close together.

725. The FTB 1992 Concluding Summary at p. 19 states the following.

Confirmation of that strategy was revealed in a memo

---

[803] Trial testimony of Eugene Cowan, May 5, 2008, p. 164:

311

RJN1589

circulated among Mr. Hyatt, Mr. Cowan and Mr. Hyatt's Nevada litigation counsel. That memorandum confirms an intent to make respondent "work" for everything they got.[98] The memorandum further confirms that Mr. Hyatt had no intention of cooperating with respondent and deliberately tied the protest proceedings to the Nevada litigation in order to impede the flow of evidence. Mr. Cowan even acknowledged to respondent's Supervising Counsel, Terry Collins, that the litigation would have an effect on the protest.[99]

[Exhibit A, note] 98: FTB Trial Exhibit 2326, p.1.

[Exhibit A, note] 99: See FTB Trial Exhibit 2353-9, PASS entry of 9/16/99. (T/C Collins to Cowan re FTB Notice 99-1 discussed "only guidelines." "He agreed with me that the litigation has a spillover effect on the protest".)

This FTB statement is false. FTB is grossly misrepresenting this memo. This memo was specifically directed to a broad FTB subpoena of Cal Fed Bank records in the protest proceeding, discussing whether or not to attempt to quash this particular subpoena. My representatives chose ***not to attempt to quash this subpoena***. That was all. This memo had nothing to do with "strategy", it had nothing to do with "cooperating", and it had nothing to do with evidence in the Nevada proceeding. This FTB subpoena was overbroad and asked for more than FTB was entitled to discover. This was like the later Philips subpoenas that were narrowed by order of the New York courts. Mr. Cowan's comment related to a motion to quash, which was not filed.

726.    In this memo dated March 17, 1998,[804] Mr. Cowan pointed out that the subpoena was overbroad and noted that we had valid grounds to object to it if we wanted to make "the FTB work for its request". The memo said nothing about delaying the tax proceedings. To the contrary, the memo demonstrates the opposite of what FTB contends. My counsel and I made a decision not to oppose the overbroad subpoena event though we had valid grounds for doing so. The fact that we determined there were valid grounds for opposing the overbroad subpoena but chose not to do so demonstrated that my counsel and I were attempting to expedite, not delay, the tax proceeding.

---

[804] Memo dated March 17, 1998, from Mr. Cowan to Mr. Hyatt et al., PBTK 00014.

312

727. An acknowledgement by Mr. Cowan that "the litigation has a spillover effect on the protest" does not mean that my counsel and I were attempting to delay the protest. He was merely agreeing with FTB's T/C Collins that it would have an effect. My counsel and I were attempting to expedite the tax proceeding, however FTB was imposing interminable delay.

728. Mr. Cowan testified that the memorandum related merely to one subpoena for which the action suggested by Mr. Cowan (a motion to quash) was not followed.

729. The FTB 1992 Concluding Summary at p. 19 states the following.

> In late 1999, respondent's protest hearing officer issued a comprehensive Information Document Request (IDR). The protest hearing officer repeated many of the questions Mr. Hyatt never answered at audit and requested additional documentation.[100] Mr. Hyatt's counsel requested six months to respond.

On December 30, 1999, after a six year delay by FTB, FTB issued an enormous request for information, P 000137-000167, with 187 parts, each with as many as 50 subparts. My counsel asked for and obtained an extension of time of six months to respond and we did timely respond on June 30, 2000, P 00052-00053. Because FTB granted the extra time, FTB apparently considered six months a reasonable time to respond considering the enormous burden imposed by the request. Any delay resulting from the request came from FTB waiting six years to issue the enormous request, not from the very reasonable six months that it took to respond to the request.

730. FTB's statement that I did not respond to FTB's Information Document Request is false, my representatives in fact responded to all requests FTB made and produced substantial documents.

731. My representatives and I diligently answered all of FTB's discovery and FTB did not complain about the adequacy of our responses.

732. It is disingenuous for FTB to refer to "questions Mr. Hyatt never answered". This enormous request for information dealt in very large part to questions the auditor never asked.

733. The FTB 1992 Concluding Summary at p. 19 states the following.

> On December 27, 1999, Mr. Hyatt obtained from a Las

313

Vegas Court a Protective Order.[101] The Nevada Protective Order allowed Mr. Hyatt to unilaterally designate documents and other information revealed in the Nevada litigation that could not be shared with respondent's protest hearing officer. The Nevada Protective Order also directed respondent to follow a specific process involving Mr. Hyatt's initial review and consent before issuing an administrative subpoena. Mr. Hyatt used this Protective Order to keep relevant evidence from respondent's protest hearing officer, including the testimony of his Nevada accountant revealing Mr. Hyatt's alleged stay at the Continental Hotel. All Mr. Hyatt had to do to impede the exchange of evidence was to stamp or otherwise designate documents or deposition transcripts as confidential.[102] Having been issued by a Court, respondent's protest hearing officer endeavored to comply with that order.[103]

[Exhibit A, note] 101: 1999 Nevada Protective Order.

[Exhibit A, note] 102: 1999 Nevada Protective Order, FTB Trial Exhibit 2333 and 06/19/14 Declaration of Robert W. Dunn, ¶ 16, p. 5.

[Exhibit A, note] 103: P01165.

This FTB statement is false. The 1991 and 1992 protests should have been conducted independently of the Nevada litigation. The fact that it was necessary for my representatives to obtain a court order to protect my rights regarding my confidential material should not have had any impact on the protest proceedings. Protective orders are common where confidential material is involved. The protest hearing officer was fully capable of obtaining needed information independent of the Nevada litigation and FTB did in fact issue an enormous information request on December 30, 1999.[805] Because FTB was fully capable of proceeding with the protest independent of the Nevada litigation, I could not and I did not impede the protest by marking Nevada litigation documents as confidential. See ¶¶ 407-408, above for further discussion of the protective order. See ¶¶ 407-413, 432-436, 733-743 herein regarding the protective order issue.

---

[805] P 000137-000167.

314

734.    FTB has repeatedly attempted to spin the protective order as causing delay, but it is FTB that decided to delay the tax proceedings based on the protective order.

735.    The protective order specifically recognized that FTB had administrative subpoena powers in California and could use those powers to obtain materials designated confidential under the protective order, if appropriate under California law.

736.    The protective order ensured that California law would determine what materials and information FTB could obtain and use in the tax protest proceedings, the Nevada courts could not make that determination.  Nothing prevented FTB from issuing an administrative subpoena in the tax proceedings whenever it wished, which FTB eventually did as addressed below.  The FTB did not need Hyatt's permission to pursue administrative subpoenas in California if it wanted information for the tax protest proceedings.

737.    The FTB also had the power to assert a "failure to exhaust" penalty against a taxpayer in a protest and thereby make an adverse finding if the taxpayer was not producing documents as requested.  However, FTB did not assess such a penalty against me because my representatives complied with all its requests for documents during the tax protest proceedings. FTB's purported inability to get documents, in the protests from the Nevada litigation, could therefore not have been the reason for the 11 year delay in the protests.  See ¶¶ 407-413, 432-436, 733-743 herein regarding the protective order issue.  The FTB made no request under the terms of the protective order for me to stipulate to certain material being turned over to the protest proceedings until June of 2002, which FTB argues required a court order.  But most of these documents were already in the protest officer's possession, and FTB had made no effort to determine what documents the protest officer already had when it issued the subpoena.

738.    The FTB did not make any further requests under the protective order until October of 2005.  The FTB later made a third request under the protective order in 2007.  These requests were promptly answered by Hyatt with no delay caused to FTB.

315

739.     Contrary to FTB's assertions in its 1992 Concluding Summary, these tax proceedings have not been delayed by my representative's actions in the Protests or the Nevada tort case.

740.     The FTB 1992 Concluding Summary at pp. 19-20 states the following.

> In mid-2002 the Nevada Supreme Court failed to modify or limit the Nevada Protective Order.  Respondent immediately followed the strictures of that protective order and asked Mr. Hyatt to release designated information to the protest hearing officer for consideration in the California tax matter.  Mr. Hyatt refused.  Thereafter, respondent issued an administrative subpoena for the information.  In February 2003, the Sacramento County Superior Court issued an Order compelling Mr. Hyatt to comply with all but one of the requests contained within respondent's administrative subpoena.  Mr. Hyatt's response was to file an appeal of the Superior Court Order with the California Third District Court of Appeal.

This FTB statement is false.  The Nevada Supreme Court did not "fail".  My protection provided by the protective order stayed in place.  The protective order did nothing to preclude FTB from conducting proper audits and protests independent of the court action.  Apparently FTB would fault me for protecting my rights through the courts and the process of appeal.  FTB acknowledges that its requests were too broad and I was justified in challenging them.  Any delays should be attributed to FTB's overbroad requests, not my legitimate challenge of the improper requests.  See ¶¶ 407-413, 432-436, 733-743 herein regarding the protective order issue.

741.     The FTB 1992 Concluding Summary at p. 20 states the following.

> The Third District Court of Appeal eventually held that there was no reason why respondent's personnel working on the protest should not have access to evidence produced by Mr. Hyatt in his Nevada litigation.  Mr. Hyatt's actions in opposing the respondent's subpoenas impeded the progress of the administrative tax proceedings and contradict Mr. Hyatt's statements that despite the Nevada litigation, the California tax proceeding continued without interruption.

316

RJN1594

This FTB statement is false. There was nothing in the Protective Order that precluded FTB from conducting proper audits and protests independent of the court action. FTB's years of delay in deciding the protests, ¶ 401, above, are not justified by the appeal of the California Superior Court's Ruling.

742. The FTB 1992 Concluding Summary at p. 20 states the following.

> Toward the end of 2004, Mr. Hyatt was ordered by the Nevada District Court to produce documentation to respondent, and respondent was allowed to continue deposition discovery. Despite the 2003 California appellate court holding, Mr. Hyatt continued to designate as confidential, evidence relevant to his California tax protest under the Nevada Protective Order. In late 2005, respondent issued a second administrative subpoena for this information. Mr. Hyatt at first refused to produce this information, relenting only upon threat of respondent beginning California judicial enforcement of its second subpoena. Mr. Hyatt finally complied and the hearing officer received documentation from the second subpoena in early 2006.

My "early 2006" response to a "late 2005" subpoena did not cause the many years of delay imposed on the tax proceedings by FTB. FTB was not prevented from continuing with the tax proceedings independent of the Nevada litigation.

743. The FTB 1992 Concluding Summary at p. 20 states the following.

> Subsequently, the protest hearing officer issued five additional IDRs. In 2006, Mr. Hyatt designated as confidential yet more relevant information under the Nevada Protective Order. Respondent issued a third demand. In November 2007, respondent issued notices of action affirming the audit assessments and fraud penalties in their entirety regarding residency and civil tax fraud, and found that Mr. Hyatt had significant California-source income for 1991 and 1992.[104]
>
> [Exhibit A, note] 104: 06/19/14 Declaration of Robert W. Dunn, ¶¶ 18 and 19, p. 6.

There was no reason for FTB to delay13 year until 2006 to issue its "five additional IDRs". The long delays in issuing the NOAs were the direct result of FTB delaying tactics.

744. The FTB 1992 Concluding Summary at p. 20 states the following.

> In March 2011 respondent issued subpoenas to people and

317

1
2
3

entities who were not parties to this Income Tax Appeal, including Philips and two of its in-house attorneys. Respondent sought discovery from Philips and the two employees in response to the evidence introduced in Mr. Hyatt's August 2010 submission to the SBE.

4

This FTB statement is misleading. FTB knew about Philips from the very beginning but ***FTB***

5

***waited 18 years*** until 2011 to seek discovery from Philips and its two executives. Philips issued

6

Philips subpoenas in 2006, but then withdrew those subpoenas[806] and, after delaying for another

7

five years, issued new subpoenas to Philips. FTB offers no reason why an August 2010

8

submission caused FTB to seek discovery it could not have obtained more than a decade earlier.

9

745. The FTB 1992 Concluding Summary at p. 20-21 states the following.

10
11
12
13

Those subpoenas sought documents and testimony that reflected the nature of Mr. Hyatt's patent-licensing business, his role and Philips's role in that business, where the business activity was located, where other participants were located and the activities they were engaged in, and how payments were distributed and disbursed. The subpoenas sought information not only for the two-year audit period, but also for the seven-year period of the Hyatt-Philips relationship (1991 through 1997).[105]

14

[Exhibit A, note] 105: Id. @ ¶¶ 25-28, pp. 8-9.

15

This FTB statement is false. I did not have a patent licensing business and the subpoenas did not

16

seek documents and testimony that reflected a non-existing patent licensing business. The July

17

1991 Philips Agreement granted Philips the exclusive rights to license may patents and Philips

18

assumed a fiduciary responsibility to do so.[807] Section 8.1 barred me from licensing my own

19

patents.[808] I could not have had a patent licensing business even if I had wanted one and I

20

neither had nor wanted a patent licensing business. See also ¶¶ 14, 89, 90, 205, 279, 376, 380

21

herein.

22

746. The roles of the parties were clear and FTB produced no information that was

inconsistent with what had already been made clear to FTB. Philips by itself created and

23
24

[806] 1992 ASAB, § 1.8, p. 58.
[807] July 1991 Philips Agreement, Sections 4.1 and 4.3, FTB_Philips 0000608, 0000610.
[808] July 1991 Philips Agreement, Section 8.1, FTB_Philips 0000623.

318

RJN1596

managed the Philips Licensing Program.[809]  Through the September 1991 Mahr Leonard

Agreement Philips, who had the rights to license my patents, granted Mahr Leonard the

exclusive rights to negotiate with seven companies.[810]  I occasionally provided assistance to

Philips when requested by Philips to do so.  I did not receive any compensation for providing

assistance to Philips and I did not have a business of providing assistance to Philips.

747.    As pointed out by FTB, the Philips subpoenas were unlawful overbroad

subpoenas that sought information well beyond the 1991 and 1992 years that were subject of

audit.  They also sought irrelevant information related to the *Hyatt v. Boone* interference.  The

time required for my representatives to obtain a court order limiting FTB's overbroad subpoenas

and the attendant appeals added even more delay, caused by FTB's overbroad subpoenas, to the

18 year FTB delay before FTB even issued its overbroad subpoenas.  Even after the court order

was issued and appealed, addition delays were required for multiple enforcement actions as FTB

repeatedly violated the New York court order.[811]  In April 2016, your Board took charge and

redacted FTB's RSABs to attempt to make FTB's RSABs comply with the court orders, finally

giving my representatives suitable RSABs that my representatives were able to work with.

748.    The FTB 1992 Concluding Summary at p. 21 states the following.

> In April 2011, the clerk of the California Superior Court
> issued commissions to take the deposition of Philips' custodian of
> records and the two New York attorneys.  Mr. Hyatt then
> commenced a proceeding to quash the subpoenas served on Philips
> and the two attorneys.  In July 2011, Mr. Hyatt sought an
> emergency motion in New York Supreme Court to quash or
> alternatively limit respondent's subpoenas.

As pointed out by FTB, due to the interrelationship of California and New York law, FTB was

able to obtain unlawful, overbroad subpoenas issued by a clerk of the California Superior Court

with no court review or supervision.  The overreaching nature of the subpoenas forced my

---

[809] Affidavit of Algy Tamoshunas, August 4, 2010, ¶¶ 6, 7 and 10, Annex XII.
[810] September 1991 Mahr Leonard Agreement, FTB_Philips 0000145-0000151.
[811] 1992 ASAB, § 1.8, p. 58.

319

RJN1597

1    attorneys to challenge the subpoenas in the New York courts and obtain an order significantly

2    limiting the scope of the subpoenas.

3        749.    The FTB 1992 Concluding Summary at p. 21 states the following.

4                On July 27, 2011, New York Judge Lefkowitz issued an order
                 rejecting Mr. Hyatt's contention that production of the requested
5                information was barred because it was privileged communication
                 and because respondent lacked authority to issue the subpoenas.
6                Judge Lefkowitz also ruled that Mr. Hyatt had failed to
                 demonstrate that the material regarding his residency or U.S.
7                Philips' licensing of his patents for its own use and/or to other
                 companies during 1991 and 1992 was irrelevant to the issues in the
8                administrative tax appeals. Judge Lefkowitz ultimately modified
                 respondent's subpoenas duces tecum to only include material
9                related to tax years 1991 and 1992 with respect to the issues of
                 Hyatt's residency and income received in those years, his
10               relationship with U.S. Philips, and the licensing of his patents and
                 any revenue in 1991 and 1992.[106]

11               [Exhibit A, note] 106:  Id. @ ¶¶ 25-28, pp. 8-9.

12   This FTB statement requires clarification.  FTB withholds the fact that the order of Judge

13   Lefkowitz significantly limited the FTB overbroad subpoenas by barring FTB from discovery for

14   the years 1993 to 1997 and barring discovery of the irrelevant *Hyatt v. Boone* interference.

15       750.    It was not my representatives' actions in those proceedings which caused any

16   delay in these tax proceedings.  Indeed, after waiting until 2011 to pursue the subject subpoenas

17   and then issuing vastly overbroad requests, the New York court properly found the subpoenas

18   too broad and reduced the coverage of the subpoenas.  FTB appealed that issue causing

19   additional delay.  While FTB later withdrew its appeal, it then violated the New York court order

20   by producing to your Board documents the New York court ordered withheld and not to be

21   produced.  FTB's attempted improper use of those documents caused more delays in these tax

22   proceedings, the delays were not caused by anything that I did in the New York proceedings.

23       751.    The FTB 1992 Concluding Summary at p. 21 states the following.

24               As in California, Mr. Hyatt's response to this adverse Order was to
                 file an appeal to a higher court.  In connection therewith, on
                 October 11, 2012, the New York Appellate Court issued an order
                 staying respondent from filing the Philips Documents with the

                                        320

1
2
3

> SBE pending the Appellate Court's decision on the appeal of Judge Lefkowitz' order. On March 13, 2013, the Appellate Court rendered its Decision on the appeal, affirming Judge Lefkowitz' order regarding the Philips Documents.

This FTB statement needs clarification. FTB disingenuously fails to inform your Board that FTB also appealed the order of Judge Lefkowitz. The appellate court affirmed the order of Judge Lefkowitz that limited FTB's overbroad subpoenas to 1991 and 1992 and prohibited irrelevant discovery related to the *Hyatt v. Boone* interference that FTB had previously sought.

752.    The FTB 1992 Concluding Summary at p. 21 states the following.

> Mr. Hyatt thereafter twice renewed the court battle seeking to suppress the use of certain Philips documents, but lost. Undeterred, Mr. Hyatt brought a contempt petition in New York relative to respondent's use of the Philips documents in this proceeding, for which Judge Lefkowitz gave him no relief.[107]

753.    This FTB statement is false. On multiple occasions my attorneys were force to bring enforcement proceedings against FTB for violation of the court order. On each occasion the court ordered FTB to remove documents that it had included in its briefing in violation of the court order.

754.    The FTB 1992 Concluding Summary at p. 22 states the following.

> Mr. Hyatt's zeal to pursue collateral actions to delay the California tax proceedings did not end with the New York litigation. In April 2014, Mr. Hyatt filed a lawsuit in the United States District Court, Eastern District of California against the standing individual board members of the FTB and BE, asking the court to permanently enjoin the individual board members from proceeding with the administrative process, and from making any assessment or collection of State income taxes against Mr. Hyatt for the 1991 and 1992 tax years, or any subsequent years based on any of the theories that respondent has asserted against him in the currently pending administrative proceeding.

This FTB statement is false. I did not bring the New York action or the U.S. Court action out of zeal for collateral actions as falsely alleged by FTB. I successfully brought the New York actions to protect my rights against the unlawful, overbroad subpoenas obtained by FTB and FTB's subsequent violations of the order of the New York court. Regarding the U.S. Court

321

RJN1599

1   action, because of the endless delays imposed on the 1991 and 1992 audits by FTB protest and

2   now appeals, I have sustained irreparable harm from the loss of witnesses and documents. Thus,

3   I brought the U.S. Court action to protect my rights against further harm. The U.S. Court action

4   is now pending on appeal to the Court of Appeals for the Ninth Circuit and has caused no delay

    in these tax proceedings.

5
        755.    FTB has not explained how the action in the U.S. courts has any bearing on

6   interest abatement in the SBE appeal. FTB does not contend the U.S. Court action caused any

7   delay in the SBE appeal and it has caused no delay in the SBE appeal.

8       756.    The FTB 1992 Concluding Summary at p. 22 states the following.

9               Mr. Hyatt claims that the delay in bringing the
            administrative proceeding to a close has violated his constitutional
10          due process and equal protection rights under the U.S. Constitution
            because he contends he will not be able to obtain a fair and full
11          adjudication before the trial court in the event he seeks to
            challenge an SBE decision in favor of respondent. Mr. Hyatt also
12          asserts, in part, that critical witnesses and documents no longer
            exist and memories have faded, thereby making it impossible for
13          him to successfully argue for an overturn of respondent's proposed
            assessments.[108]

14          [Exhibit A, note] 108:  Complaint in the matter Gilbert P. Hyatt v.
            Betty T. Yee, et al., (DC. Case No. 2:14-cv-0849-GEB-DAD.
15
16   This FTB statement is false. FTB once again mischaracterizes the document. The complaint

17   does not "also" assert that critical witnesses and documents no longer exist as falsely contended

     by FTB. The complaint asserts that I can no longer receive a fair trial "because" many witnesses

18   have died and documents have been lost as a result of the inordinate delays imposed on these

19   proceedings by FTB.[812]

20       757.    FTB has not explained how the action in the California courts has any bearing on

21   interest abatement in the SBE appeal. FTB does not contend the California action caused any

22   delay in the SBE appeal and it has caused no delay in the SBE appeal.

23   _____

     [812] *Hyatt v. Chiang et al.*, Complaint for Injunctive Relief Under 42 U.S.C. § 1983,
24   U.S.D.C. E.D. CA, Case 2:14-cv-00849-GEB-DAD, Document 2 Filed 04/04/14.

                                           322

758.    My due process litigation has not delayed these tax proceedings. FTB makes another bald and erroneous statement asserting that my action based on violation of due process (and unequal protection) filed in federal court in California in 2014 somehow delayed these tax proceedings.  Your Board knows this assertion is false as your Board did not stop or do anything to delay these proceedings based on that action.  As FTB notes, my appeal to the Ninth Circuit of the dismissal of the due process action is set for oral argument on February 17, 2017.  But again the due process action has not caused any delay here and is irrelevant to my request for interest abatement.

759.    The FTB 1992 Concluding Summary at p. 22 states the following.

> On February 10, 2015, Mr. Hyatt's federal suit was dismissed with prejudice.  Mr. Hyatt's response was to file an appeal of that Judgment with the United States Ninth Circuit Court of Appeals.  That appeal was filed on February 18, 2015.  No oral argument has been scheduled, and the case has not been submitted on the briefs.[109]

> [Exhibit A, note] 109:  FTB requests that the SBE take Judicial Notice of the court dockets and select pleadings, motions, orders and decision in the matter Gilbert P. Hyatt v. Betty T. Yee, et al., (DC. Case No. 2:14-cv-0849-GEB-DAD and 9th Circuit Case No. 15-15296) of the United States District Court for Eastern California, Sacramento and the Ninth Circuit Court of Appeal pursuant to California Evidence Code section 452, subdivision (d) which authorizes judicial notice of court records.

FTB has not explained how the action in the California courts has any bearing on interest abatement in the SBE appeal.  FTB does not contend the California action caused any delay in the SBE appeal and it has caused no delay in the SBE appeal.

760.    The FTB 1992 Concluding Summary at p. 22 states the following.

> On January 22, 2008 and January 23, 2008, Mr. Hyatt filed the current Appeals now pending before the California State Board of Equalization (the "SBE").    After multiple extensions, on December 9, 2008, Mr. Hyatt filed his Opening Briefs before the SBE for each of the tax years 1991 and 1992.[110]

> [Exhibit A, note] 110:  08/21/14 Declaration of Eric Coffill, ¶¶ 2 and 4, page 1 and 06/19/14 Declaration of Robert W. Dunn, ¶23,

323

1      p.7.

2   My representatives filed the Appellant's Opening Briefs on December 9, 2008, less than a year

3   after the appeals were filed on January 22, 23, 2008.  A great effort was required to obtain

4   testimony from the large number of witnesses that had previously been identified to FTB but had

5   not been approached by FTB.  In addition, FTB for the first time raised the sourcing issue in its

6   NOAs and refused to give my representatives an adequate opportunity to respond during the

7   protest.  A considerable amount of effort was therefore required to prepare the opening briefs

8   with respect to the sourcing issue, which was being adjudicated in the first instance before your

9   Board.  Under the circumstances the time it took to file my opening briefs was very reasonable.

10  "When FTB finally acted on the taxpayer's protest after an eleven year delay, it gave the taxpayer

11  30 days to respond to its 50-page single spaced Determination Letter with '[n]o extension to the

12  thirty day 10 response period [to] be granted.[813]

        761.   The FTB 1992 Concluding Summary at pp. 22-23 states the following.

                As part of the SBE appeal, in August 2010, Mr. Hyatt
13          submitted a reply brief that included new affidavits made by
            witnesses who had never before been identified or testified in the
14          dispute, including an affidavit from an individual in Philips' New
            York in-house patent or executive offices describing the patent
15          negotiations with the Japanese companies during the disputed
            California residency period and Hyatt's purported lack of
16          involvement in those negotiations.[111]   As a result of these new
            affidavits, in March 2011, respondent issued subpoenas as
17          previously described.[112]

18          [Exhibit A, note] 111:  06/19/14 Declaration of Robert W. Dunn,
            ¶¶ 25 and 26, p. 8.

19          [Exhibit A, note] 112:  Id. @ ¶¶ 26 and 27, p. 8.

20  FTB was aware of Philips from my 1991 California part year tax return and even issued and then

21  withdrew a subpoena related to Philips in 2006.  Nevertheless FTB waited until April 2011 to

22  issue its unlawful, overbroad subpoenas related to Philips.  This was nine months after the filing

23  _____

24      [813] 1991 AOB p. 10:8-20.

                            324

of my August 23, 2010, Reply Briefs and 18 years after FTB began its audits with knowledge of Philips. FTB made numerous false statements and misrepresentations in its 1991 and 1992 opening briefs related to sourcing[814] and it was necessary for me expend considerable time and effort to rebut those numerous false statements and misrepresentations.

762.    The FTB 1992 Concluding Summary at p. 23 states the following.

> Respondent prevailed in three suppression actions filed by Hyatt in New York with the limited exception of having the scope of the production to documents that pertain to the two tax years on appeal, i.e. 1991 and 1992. The third New York proceeding concluded in April of 2015, and it was not until April of 2016 that SBE staff issued its decision allowing respondent's briefing on the Philips documents to be considered on the merits in the pending tax proceedings, despite Mr. Hyatt's objections and motions to strike respondent's briefing (all denied) to the contrary.[113]

[Exhibit A, note] 113: *Id.* ¶28, pp. 8-9.

This FTB statement is false. This FTB statement that FTB prevailed in the New York action is another of thousands of FTB false statements, mischaracterizations and fabrications. The order of the New York court significantly limited the scope of FTB's subpoenas by excluding discovery in years 1993-1997 and by excluding irrelevant discovery of the *Hyatt v. Boone* interference.[815] Subsequently, the court found that FTB had violated its order on multiple occasions and ordered correction of the violations.[816]

763.    The FTB 1992 Concluding Summary at p. 23 states the following.

> Overall, Mr. Hyatt's representatives have requested and received 19 extensions to file various briefs covering more than four and a half years of additional time. This year alone, Mr. Hyatt has made three extension requests related to his change of counsel and that counsel's establishment of a new law firm then relocation

---

[814] 1991 ROB, §§ I.c., I.d., IV.; 1992 ROB § IV.

[815] See October 7, 2013 and March 13, 2014 Orders, Supreme Court of the State of New York, County of Westchester.

[816] Order of the Supreme Court (Lefkowitz, J), Westchester County, July 29, 2011; *aff'd*, *Hyatt v. State of California FTB*, 2011-06859, Supreme Court of New York, Second Judicial Department (March 13, 2013)

RJN1603

1
2
3

to new offices. All of the summarized delays result from Mr. Hyatt's conscious strategy to prolong the SBE proceedings then blame respondent (and SBE) for these delays. In reality, Mr. Hyatt remains completely responsible for the protracted nature of these proceedings.[114]

4
5

[Exhibit A, note] 114: FTB Table of Hyatt requests to SBE for extensions on briefing deadlines and Mr. Hyatt's recent extension requests.

6

It is clear that it is FTB, not myself, that has caused the extensive delays in the audit, protest and

7

this appeal. The delays caused by FTB in these 1991 and 1992 SBE appeals alone have been

8

unconscionable. The extensions of time have been necessary to deal with FTB's extraordinary

9

briefing technique of making thousands of false statements, mischaracterizations and

10

fabrications. It has taken an enormous effort and thousands of pages of attachments and briefing

11

to rebut these thousands of FTB false statements[817] in prior briefing, not to mention the present

12
13
14
15
16
17
18
19
20
21
22
23
24

[817] For example see, (a) Rebuttal to the Facts presented by FTB in its Determination Letter, Annex VIII; (b) Rebuttal to Sourcing Statements in FTB's 1991 Opening Brief, Annex XIV; (c) Table of FTB's Misrepresentations, Unsupported Statements, and Unreasonable Inferences in FTB 1991 Opening Brief, Annex XXXVI; (d) Testimonial Responses Re FTB 1991 Opening Brief, Annex XXXI; (e) Rebuttals to Sourcing Statements in FTB's 1992 Opening Brief, Annex XV; (f) Table of Contacts With Hyatt in Nevada, Exhibit 19 to 1991 AOB; (g) Table of FTB's Misrepresentations, Unsupported Statements, and Unreasonable Inferences in FTB 1991 Opening Brief, Annex XXVI, (h) Rebuttal to Sourcing Statements in FTB's 1992 Opening Brief, Annex XV; (i) Table of Nevada Contacts, Exhibit 23 to 1992 AOB; (j) Table of FTB's Misrepresentations, Unsupported Statements, and Unreasonable Inferences in FTB 1992 Opening Brief, Annex XXVII; (k) Testimonial Responses Re FTB 1992 Opening Brief, Annex XXXI, Tab 4; (l) Table of FTB's Misrepresentations, Unsupported Statements, and Unreasonable Inferences in FTB 1991 Reply Brief, Annex XXVIII; (m) Testimonial Responses Re FTB 1991 Reply Brief, Annex XXXI, Tab 5; (n) Mr. Hyatt's Rebuttal to FTB's 17 "Examples of Mr. Hyatt's Continuing Presence in California" After April 3, 1991, Exhibit 18 to 1992 ARB; (o) Table of FTB's Misrepresentations, Unsupported Statements, and Unreasonable Inferences in FTB 1992 Reply Brief, Annex XXIX; (p) Testimonial Responses Re FTB 1992 Reply Brief, Annex XXXI, Tab 6; (q) Rebuttal to FTB's Attachment A (1991), Annex XVII; (r) Rebuttal to FTB's Attachment A (1992), Annex XVIII; (s) Testimonial Responses Re FTB 1991 Attachment A, Annex XXXI, Tab 7; (t) Testimonial Responses Re FTB 1992 Attachment A, Annex XXXI, Tab 8; (u) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, Introduction; (v) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, September 1991; (w) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, October 1991; (x) Mr. Hyatt's Rebuttal to FTB's

326

RJN1604

1 Affidavit. FTB is responsible for the long delays in these proceeding, bring the time to 23 years

2 and running.

3      764.    FTB then argues that I sought and receive 19 extensions in these proceedings.

4 (*Id.*) But as your Board is well aware, it is FTB that has repeatedly sought and received

additional briefing. Despite the fact that I am entitled to file the final briefing, on several

5 occasions FTB sought and received permission for additional briefing and submission of

6 evidence. This then required a new briefing schedule be set with my representatives submitting

7 the final briefing, only for FTB to seek additional briefing. This endless cycle was caused by

8 FTB and provides no basis for rebutting Mr. Hyatt's request for interest abatement.

9     765.    The FTB 1992 Concluding Summary at p. 23 states the following.

> Mr. Hyatt's concealment of his 1991 income[115] and failure
> to establish a purported $24 million error has been extensively
> discussed in Respondent's earlier briefing, including, but not
> limited to, Respondent's Opening Brief for Taxable Year 1992
> (Case No. 446509) at pages 46-47 and Respondent's Additional
> Brief (2/19/13) at pages 2-19; those discussions will not be
> repeated here and are incorporated by reference as if set forth fully
> herein.

15 Calendar, Attachment A (Revised), and Attachment F, November 1991; (y) Mr. Hyatt's Rebuttal
to FTB's Calendar, Attachment A (Revised), and Attachment F, December 1991; (z) Mr. Hyatt's
16 Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, January 1992; (aa) Mr.
Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, February 1992;
17 (ab) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F, March
1992; (ac) Mr. Hyatt's Rebuttal to FTB's Calendar, Attachment A (Revised), and Attachment F,
18 April 1992; (ad) Rebuttal to FTB's Attachment B, Annex XIX; (ae) Rebuttal to FTB's
Attachment C, Annex XIX; (af) Rebuttal to FTB Attachment D, Annex XXX, Tab 1; (ag)
19 Objection and Rebuttal to FTB Attachment E; (ah) Exhibit A, Responses to FTB Attachment D
Claims, Annex XXX, Tab 2; (ai) Samples of FTB's Misrepresentations, Unreasonable Inferences
20 and Unsupported or Otherwise Erroneous Assertions, Exhibit 22; (aj) Mr. Hyatt's Rebuttal to
FTB's Table 2 "Material Misrepresentations", 1991 ROB, Table 2, pp. 89-90, Exhibit 53; (ak)
21 Table of False Statements Made In the FTB Audit File, Tab 3; (al) Table of False Statements
Made by Jake Dameron, Tab 2; (am) Table of False Statements Made By William Savage, Tab
22 1; (an) Supplemental Table of False Statements Made in the FTB Audit File as Argued in FTB's
Second Additional Briefing; (ao) Supplemental Table of False Declaration Statements Made by
23 Jake Dameron as Argued in FTB's Second Additional Briefing; (ap) Supplemental Table of
False Declaration Statements Made by William Savage as Argued in FTB's Second Additional
24 Briefing; (aq) Table of William Savage's Fraud and Dishonesty.

1    [Exhibit A, note] 115:  FTB_Philips 0005949-5950.

2  This FTB statement is false.  I did not conceal l991 income.  I declared all of my 1991 income on

3  my Federal tax return, which was attached to my California 1991 part year tax return, and I paid

4  all taxes that were due.

5    766.    FTB falsely alleges I concealed 1991 income but none of the references cited by

6  FTB even relate to the false allegation of concealment.  Footnote 115 cites to an "estimate" of

7  license payments while the cited reference to 1992 ROB, pp. 46-47 deals with FTB's $24 million

8  error.

9    767.    FTB does not explain how my disclosure of my 1991 income relates to FTB's $24

10  million error, which occurred in 1992.  The summary of license payments which FTB references

11  in its footnote as FTB_Philips 0005950 is described in the accompanying letter as estimates with

12  the actual numbers to be provided later.[818]

13    768.    Contrary to FTB allegations, the briefing in this case has demonstrated a $24

14  million income error by FTB[819] and FTB has acknowledged it made a $24 million error.[820]  FTB

15  has admitted that the license payments from Sanyo, Omron, Kenwood and Nippon Columbia

16  were made in the second half of 1992 and not in January 1992 during the 1992 disputed period as

17  previously falsely contended by FTB.  See the details of FTB's $24 million income error at 1991

18  ASAB, §§ 1.7.2, 1.8.5.4.4, 1.8.5.4.5, 1.9.10; 1992 ASAB, § 1.7.5.

19

20

21

22  [818] Memorandum dated February 21, 1992, from Mr. Goldberg to Mr. Speijcken, FTB_Philips 0005949.

23  [819] 1992 AOB, § III.; 1992 ARB, § III; 1992 Protest Supplement Letter, Feb. 2, 2001, § II.E., Annex IV; App. Add. Brief, Regarding $24 Million Error in 1992 Assessment, entire document; 1991 ASAB, § 1.9.10; and 1992 ASAB § 1.7.5.

24  [820] Respondent's Additional Briefing (February 19, 2013), §§ III.d.(8), (12)-(14).

328

RJN1606

769. The FTB 1992 Concluding Summary at pp. 23-24 makes various false statements about its $24 million error, which are addressed in the Second Supplemental Affidavit of Gilbert P. Hyatt Regarding FTB's $24 Million Error, ¶¶ 4-7, which is incorporated by reference herein.

770. The FTB 1992 Concluding Summary at pp. 24-25 states the following.

On April 19, 2016, the United States Supreme Court issued its decision in Franchise Tax Bd. Of Calif. V. Hyatt (Hyatt II), 578 U.S. __, 136 S.Ct. 1277, 1283 (2016). The United States Supreme Court vacated the Nevada Supreme Court's judgment as unconstitutionally discriminatory against a sister State. Id. The Supreme Court held: "[t]he Nevada Supreme Court has ignored both Nevada's typical rules of immunity and California's immunity-related statutes . . . Instead, it has applied a special rule of law that evinces a 'policy of hostility' toward California . . . Doing so violates the Constitution's requirement that 'Full Faith and Credit shall be given in each State to the public Acts, Records and judicial Proceedings of every other State.'[121]

[Exhibit A, note] 121: 578 U.S. __, 136 S. Ct. 1277, 1281 (2016) (citing Franchise Tax Bd. Of Calif. v. Hyatt ("Hyatt I"), 538 U.S. 488, 499 (2003) and U.S. Const. Art. IV §1).

The Supreme Court did not overturn the decision of the Nevada courts that FTB had committed fraud against me. It only limited the award of damages.

771. The FTB 1992 Concluding Summary at p. 25 states the following.

The Supreme Court took issue with the Nevada Supreme Court's stated rationale for its discriminatory treatment of the Franchise Tax Board of California: "Such an explanation, which amounts to little more than a conclusory statement disparaging California's own legislative, judicial, and administrative controls, cannot justify the application of a special and discriminatory rule."[122] In his briefing in the tax dispute, Mr. Hyatt relied on the now-vacated Nevada Supreme Court opinion, Franchise Tax Bd. Of Cal. V. Hyatt, 335 P.3d 125, 130 Nev. Adv. Op. 71, 2014 WL 4656423 (Nev. 2014), for its putative confirmation of certain facts and asserting that the underlying "verdict controls how (seemingly) conflicting evidence from trial must be interpreted."[123]

[Exhibit A, note] 122: Id. at 1282.

[Exhibit A, note] 123: Appellant's Opening Brief (1991), p. 6, fn.

329

RJN1607

1          18 and p. 11, lines 3-12 and Appellant's Opening Brief (1992), p.
2          7, fn. 22.

3    The U.S. Supreme Court did not overturn the decision of the Nevada courts that FTB had

4    committed fraud against me. It only limited the award of damages.

5          772.    The FTB 1992 Concluding Summary at p. 25 states the following.

6                    Because the Supreme Court vacated the Nevada Supreme
7          Court's opinion that affirmed in part and reversed in part the
           previous judgment, Mr. Hyatt can no longer rely on the opinion or
8          judgment, in any way, to advance his arguments. Mr. Hyatt's
           previous arguments also ignore representations of his own counsel
9          that the Nevada litigation has no relevance to the Mr. Hyatt's
           California tax dispute:[124]

10                   Contrary to FTB's assertions, if the Nevada
11                   Supreme Court were to reverse the lower court's
                     decision in its entirety, such action would have
12                   little, if any, effect upon Mr. Hyatt's case in these
                     appeals.[125]

13         [Exhibit A, note] 124:  FTB 28852-54 (07/22/02 letter from Coffill
14         to Miller, p. 2 "However, I understand the Nevada court
           specifically ruled, on defendant FTB 's motion, that Mr. Hyatt's
15         residency for California state tax purposes during 1991 and 1992 is
           not in issue in the Nevada case.")

16         [Exhibit A, note] 125:  Appellant's Reply Brief (1991), p. 20, lines
           17-18 (fn. 118).

17   This FTB statement is false. Mr. Coffill's July 22, 2002, letter did not say the Nevada litigation

18   had no relevance to the tax dispute. FTB again mischaracterizes the document. Mr. Coffill

19   stated that residency had not been an issue in the Nevada litigation since April 19, 1999. That

20   does not mean the Nevada court finding that FTB committed fraud and intentionally inflicted

21   emotional distress on me, findings that were not reversed by the U.S. Supreme Court decision,

22   are not relevant to this proceeding. The Nevada litigation was about the "conduct" of FTB

23   during the audit.

24

                                            330

773. The FTB 1992 Concluding Summary at p. 25 states the following.

Even the Nevada District Court repeatedly instructed the empaneled jury that it was not to decide the residency or tax issues pending in California.[126]  For all these reasons, and others referenced in earlier briefing, the now vacated Nevada judgment and subsequent 2014 decision of the Nevada Supreme Court have no bearing on the present tax case.

[Exhibit A, note] 126:  04/15/08 Nevada Trial Transcript, 29:25-30:4 ("THE COURT: Well, we did hear about some issues about residency which is not an issue in this case.  And we heard about the issue of the amount of the tax audit, whether it was valid or not.  That's also not an issue.  Let's proceed."); 04/16/08 Nevada Trial Transcript, 64:20-22 (MR. HUTCHISON "They're not going to decide, and you'll hear this from the Judge, whether Mr. Hyatt was a resident of California or Nevada.   That's not for this proceeding."); 04/21/08 Nevada Trial Transcript, p. 6 ("MR. HUTCHINSON: Sure.  Judge, we don't ask the jury to determine how much taxes Mr. Hyatt owes or whether he was a resident of the State of Nevada, but we certainly -- this is case entirely about the FTB's conduct during the course of that audit, during the course of their investigation."); 04/21/08 Trial Transcript, pp. 14-15 (Mr. Hutchison reads opening statement for jury"  Thus, although you may hear evidence during the course of the trial that may be related to the determination and conclusions reached by the FTB regarding Mr. Hyatt's residency and tax assessment, you're not permitted to make any determinations regarding Mr. Hyatt's residency, such as when he did or did not become a resident of Nevada.  Likewise, you're not permitted to make a determination that led to the propriety of the tax assessment issued by the FTB against Mr. Hyatt including, but not limited to, the correctness or incorrectness of the amount of the tax assessed, or to the determination of the FTB to assess Mr. Hyatt penalties and/or interest on those tax assessments."); 04/21/08 Trial Transcript, pp. 42-43 (Court: " Thus, although you may hear evidence during the course of this trial that may be related to the determinations and conclusions reached by FTB regarding Mr. Hyatt's residency and tax assessments, you are not permitted to make any determinations regarding Mr. Hyatt's residency, such as when he became or did not become a resident of Nevada. Likewise, you are not permitted to make any determinations related to the propriety of the tax assessments issued by the FTB against Mr. Hyatt, including, but not limited to, the correctness or incorrectness of the amount of taxes assessed, or the determinations of FTB to assess Mr. Hyatt penalties and/or interest on those tax assessments.  The residency and tax assessment determinations and all factual and legal issues

331

RJN1609

1  related thereto are the subject matter of a separate, administrative
   process between Mr. Hyatt and FTB in the State of California and
2  will be resolved in that administrative process. You are not to
   concern yourself with those issues. Would counsel agree that that's
3  a general introductory statement? MR. HUTCHINSON: Yes, Your
   Honor, thank you. MS. LUNDVALL: Yes, Your Honor, thank
4  you.")

5  This FTB statement is false. Even though residency was not an issue in the Nevada litigation,

6  the conduct of FTB in my audit of 1991 and 1992 taxes was very much an issue in the Nevada

7  litigation. The U.S. Supreme Court reduced the damages awarded but did not change the

8  determination of the Nevada courts that FTB had conducted a fraudulent audit. The

9  determination is very relevant to your Boards determination in these 1991 and 1992 tax

10  proceedings.

11

12  Further your affiant sayeth naught.

13                                        _Gilbert P. Hyatt_
                                          GILBERT P. HYATT
14

15  State of Nevada
    County of Clark
16
    Subscribed and sworn to (or affirmed) before me on
17  this 12th day of December 2016

18  by _Gilbert P. Hyatt_
    proved to me on the basis of satisfactory evidence
19  to be the person who appeared before me.

20  Signature _Brenda L. McCarthy_
              Notary Public
21
                                    ┌─────────────────────────────┐
22                                  │  BRENDA L. MCCARTHY          │
                                    │  NOTARY PUBLIC               │
23                                  │  STATE OF NEVADA             │
                                    │  My Commission Expires: 4-1-17│
24                                  │  Certificate No: 01-68440-1  │
                                    └─────────────────────────────┘

                                332

RJN1610

CERTIFICATE OF SERVICE

U.S. Court of Appeals Docket Number(s): 15-15296

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 7, 2017.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature:     *s/ Yolanda Mendez*