No. 15-15296

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GILBERT P. HYATT

*Plaintiff-Appellant*,

*v.*

BETTY T. YEE, ET AL.

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California, No. 2:14-cv-00849-GEB-DAD (Burrell, J.)

## APPELLEE CALIFORNIA FRANCHISE TAX BOARD'S
## JUDICIAL NOTICE DOCUMENTS

### VOLUME 13 OF 14
### RJN 2305 – RJN 2448

JAMES BRADSHAW
DEBBIE LEONARD
ADAM HOSMER-HENNER
MCDONALD CARANO WILSON LLP
100 West Liberty Street, 10th Floor
Reno, NV 89501
(775) 788-2000

CYNTHIA J. LARSEN
KATIE DEWITT
DAVID W. SPENCER
ORRICK, HERRINGTON & SUTCLIFFE
400 Capitol Mall, Suite 3000
Sacramento, CA 95814
(916) 329-7970

SETH P. WAXMAN
PAUL R.Q. WOLFSON
DANIEL WINIK
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
(202) 663-6000

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| | | **VOLUME ONE** | | | | |
| 1 | 6/17/1993 | Letter from Marc Shayer to Gilbert Hyatt | 10 | 1 - 5 | NV Trial Ex. 0112* | 1, 3 |
| 2 | 7/15/1993 | Letter from Marc Shayer to Michael Kern, and response - Information Concerning Resident Status (Form FTB 3805F) | 10 | 6 - 14 | NV Trial Ex. 2174 | 1, 3 |
| 3 | 8/4/1993 | Letter from Michael Kern to Marc Shayer | 10 | 15 - 16 | NV Trial Ex. 2173 | 1, 3 |
| 4 | 5/24/1994 | Letter from Soriano to Michael Kern | 10 | 17 - 20 | NV Trial Ex. 2503 | 1, 3 |
| 5 | 8/2/1995 | Letter from Sheila Cox to Michael Kern - determination letter | 12 | 21 - 48 | NV Trial Ex. 2821 | 1, 3 |
| 6 | 8/29/1995 | Fraud Penalty | 13 | 49 - 62 | NV Trial Ex. 2199 | 1, 3 |
| 7 | 4/23/1996 | Fax from Michael Kern to Hyatt re 1991 NPA, and from Michael Kern to Cowan | 12 | 63 - 74 | NV Trial Ex. 2592 | 1, 3 |
| 8 | 6/20/1996 | Letter from Cowan to FTB re 1991 Protest Letter | 14 | 75 - 136 | NV Trial Ex. 296 | 2, 3 |
| 9 | 8/18/1997 | Fax from Hyatt to Eugene Cowan with Notice of Proposed Assessment 1992 | 13 | 137 - 141 | NV Trial Ex. 2609 | 1, 3 |
| 10 | 10/10/1997 | Letter from Cowan to FTB re 1992 Protest Letter 10-10-97 | 14 | 142 - 144 | NV Trial Ex. 319 | 2, 3 |
| 11 | 1/6/1998 | Complaint, *Gilbert P. Hyatt v. Franchise Tax Board of California* | 14 | 145 - 166 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |

* All references to "NV Trial Ex." are documents that were submitted into evidence at the jury trial in Hyatt's Nevada litigation, Case No. 98A382999, Eighth Judicial District Court, Clark County, Nevada.

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|---------------------------------------|----------|
| | | **VOLUME TWO** | | | | |
| 12 | 1/6/1998 | Case docket - *Gilbert P.  Hyatt v. Franchise Tax Board of California* | 32 | 167 - 257 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |
| 13 | 3/17/1998 | Fax from Donald Kula to Hutchison and Hyatt re response tactics to Subpoena Duces Tecum to be issued to Cal Fed Bank | 21 | 258 | Ex. 3 to Dunn Decl., SER 23; NV Trial Ex. 2326 | 2, 3 |
| 14 | 5/28/1998 | Letter from Sheila Cox to Eugene Cowan attaching 4/24/98 Declaration for Subpoena Duces Tecum signed by Sheila Cox, Subpoena Duces Tecum to Cal Fed Bank | 21 | 259 - 262 | Ex. 3 to Dunn Decl., SER 24-27; NV Trial Ex. 2326 | 2 |
| 15 | 12/27/1999 | Protective Order on Report and Recommendation from Discovery Commissioner Biggar | 16 | 263 - 274 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |
| 16 | 12/30/1999 | Letter from Woodward to Cowan re document request letter | 15 | 275 - 305 | NV Trial Ex. 2330 | 2, 3 |
| 17 | 1/27/2000 | Docket | 17, 32 | 306 - 315 | Nevada Supreme Court, Case No. 35549 | 3 |
| 18 | 3/7/2000 | Memo from McLaughlin to Terry Collins | 16 | 316 - 319 | NV Trial Ex. 2333 | 2, 3 |
| 19 | 4/16/2000 | Letter from FTB to Cowan and Eric Coffill re request for delay | 15, 16 | 320 - 322 | NV Trial Ex. 2332 | 2, 3 |
| 20 | 6/7/2000 | Order Staying District Court Proceedings | 17 | 323 - 324 | Nevada Supreme Court, Case No. 35549 | 3 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|----------------------------------------|----------|
| | | **VOLUME THREE** | | | | |
| 21 | 6/30/2000 | Letter to Cody Cinnamon from Coffill responding to IDR | 16 | 325 - 425 | NV Trial Ex. 356 | 2, 3 |
| 22 | 7/7/2000 | Docket | 17, 32 | 426 - 434 | Nevada Supreme Court, Case No. 36390 | 3 |
| 23 | 10/3/2000 | Hearing Officer Report | 16 | 435 - 437 | NV Trial Ex. 2335 | 2, 3 |
| 24 | 6/13/2001 | Order Granting Petition (Docket No. 36390), and Dismissing Petition (Docket No. 35549) | 17 | 438 - 443 | Nevada Supreme Court, Case No. 36390, 35549 | 3 |
| 25 | 3/4/2002 | Docket | 32 | 444 - 445 | Nevada Supreme Court, Case No. 39274 | 3 |
| 26 | 3/8/2002 | Docket | 32 | 446 - 447 | Nevada Supreme Court, Case No. 39312 | 3 |
| 27 | 4/4/2002 | Order Denying Petition for Writ of Mandamus or Prohibition and Dismissing Appeal | 17 | 448 - 450 | Nevada Supreme Court, Case No. 39312, 39274 | 3 |
| 28 | 4/4/2002 | Order Granting Petition for Rehearing, Vacating Previous Order, Granting Petition for a Writ of Mandamus in Part in Docket no. 36390, and Granting Petition for a Writ of Prohibition in Part in Docket No. 35549 | 17 | 451 - 464 | Nevada Supreme Court, Case No. 35549, 36390 | 3 |
| 29 | 6/3/2002 | Letter from Felix Leatherwood to Mark Hutchison requesting documents and deposition testimony stamped "Confidential-NV Protective Order" | 17 | 465 - 466 | NV Trial Ex. 2342 | 2, 3 |
| 30 | 7/7/2002 | FTB Administrative Subpoena Duces Tecum | 17 | 467 - 470 | NV Trial Ex. 2344 | 2, 3 |

# INDEX
## FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 31 | 2/28/2003 | Court's Ruling on Order to Show Cause filed in Superior Court of California, Sacramento County , Case No. 02CS01582 | 17 | 471 - 472 | NV Trial Ex. 2348 | 3, 5 |
| 32 | 3/17/2003 | Fax Cover and letter from Donald Kula to Molly Mosley, DAG | 17 | 473 - 475 | NV Trial Ex. 2349 | 2, 3, 5 |
| 33 | 12/31/2003 | *State Franchise Tax Board v Gilbert P. Hyatt* , Decision (unpublished) | 17 | 476 - 500 | California Court of Appeal, Third Appellate District - Sacramento, Case No. C043627 | 2, 3, 5 |
| **VOLUME FOUR** | | | | | | |
| 34 | 9/7/2005 | Protest Event Log for Case Unit: Hyatt, Gilbert - 1992 | | 501 - 604 | NV Trial Ex. 2353 | 2, 3 |
| 35 | 10/28/2005 | Letter from Robert Dunn to Mark Hutchison re: request consent to release deposition transcripts and documents to FTB's protest hearing officer | 18 | 605 - 607 | NV Trial Ex. 2354 | 2, 3 |
| 36 | 12/6/2005 | Letter from Robert Dunn to Mark Hutchison re: second request | 18 | 608 | NV Trial Ex. 2355 | 2, 3 |
| 37 | 1/30/2006 | FTB Administrative Subpoena Duces Tecum and Exhibits A, C-E | 18 | 609 - 627 | NV Trial Ex. 2356 | 2, 3 |
| 38 | 1/19/2007 | Letter from Robert Dunn to Mark Hutchison requests production of documents and testimony from 2006 | 18 | 628 - 632 | NV Trial Ex. 2357 | 2, 3 |
| 39 | 2/14/2007 | Letter from Donald Kula to Robert Dunn | 18 | 633 - 638 | NV Trial Ex. 2358 | 2, 3 |
| 40 | 5/17/2007 | Letter from Donald Kula to Robert Dunn | 18 | 639 - 640 | NV Trial Ex. 2359 | 2, 3 |

# INDEX

# FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 41 | 11/1/2007 | Determination Letter from George W. McLaughlin to Eric Coffill | 18 | 641 - 690 | NV Trial Ex. 2320 | 2, 3 |
| 42 | 11/20/2007 | Letter from Eric Coffill to George W. McLaughlin | 19 | 691 - 695 | Ex. 1 to Dunn Decl., SER 13-17 | 6 |
| 43 | 11/26/2007 | Letter from George W. McLaughlin to Eric Coffill | 19 | 696 - 698 | Ex. 2 to Dunn Decl., SER 19-21 | 2 |
| 44 | 1/22/2008 | Letter from Eric Coffill to SBE enclosing Notice of Appeal for 1991, Request for Abatement of Interest | 22 | 699 - 711 | Ex. 4 to Dunn Decl., SER 29-41 | 6 |
| 45 | 1/23/2008 | Letter from Eric Coffill to SBE enclosing Notice of Appeal for 1992, Request for Abatement of Interest | 22 | 712 - 724 | Ex. 5 to Dunn Decl., SER 43-55 | 6 |
| 46 | 7/1/2008 | Letter from SBE to Eric Coffill re extension | 23 | 725 - 726 | SBE | 6 |
| 47 | 7/3/2008 | Letter from SBE to Eric Coffill re extension | 23 | 727 | SBE | 6 |
| 48 | 11/18/2008 | Letter from SBE to Eric Coffill re extension | 23 | 728 - 729 | SBE | 6 |
| **VOLUME FIVE** | | | | | | |
| 49 | 12/9/2008 | Hyatt Opening Brief 1991 | 23 | 730 - 836 | SBE | 6 |
| 50 | 12/9/2008 | Hyatt Opening Brief 1992 | 23 | 837 - 922 | SBE | 6 |
| 51 | 1/27/2009 | Letter from Robert Dunn to SBE re Hyatt's filing | 23 | 923 - 924 | SBE | 6 |
| 52 | 2/13/2009 | Docket | 32 | 925 - 928 | Nevada Supreme Court, Case No. 53264 | 3 |
| 53 | 3/16/2009 | Letter from Robert Dunn to Eric Coffill re scheduling depositions of affiants | 23 | 929 - 930 | SBE | 3 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 54 | 6/26/2009 | Request for Foreign Deposition Subpoena - Melvin R. Hecht | | 931 - 953 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-09-593462-C | 3, 5, 6 |
| **VOLUME SIX** | | | | | | |
| 55 | 6/26/2009 | Request for Foreign Deposition Subpoena - Michelina Hecht | | 954 - 975 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-09-593462-C | 3, 5, 6 |
| 56 | 9/15/2009 | FTB Opening Brief 1991 | 24 | 976 - 1081 | SBE | 6 |
| 57 | 9/15/2009 | FTB Opening Brief 1992 | 24, 31 | 1082 - 1160 | SBE; Ex. 7 to Dunn Decl., SER 61 -70 | 6 |
| 58 | 9/29/2009 | Letter from Eric Coffill to SBE requesting extension of time for filing | 25 | 1161 - 1172 | SBE | 6 |
| 59 | 10/1/2009 | Letter from Robert Dunn to SBE replying to Hyatt's request for time | 25 | 1173 - 1176 | SBE | 6 |
| 60 | 5/20/2010 | Letter from SBE to Eric Coffill re extension and new due date | 25 | 1177 | SBE | 6 |
| 61 | 8/11/2010 | Letter from SBE to Eric Coffill granting extension and email exchange | 25 | 1178 - 1180 | SBE | 6 |
| **VOLUME SEVEN** | | | | | | |
| 62 | 8/23/2010 | Hyatt 1991 Reply Brief | 25 | 1181 - 1289 | SBE | 6 |
| 63 | 8/23/2010 | Hyatt 1992 Reply Brief | 25 | 1290 - 1398 | SBE | 6 |
| 64 | 8/23/2010 | Hyatt Index of Affidavits | 25 | 1399 - 1403 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|----------------|----------------------------------------|----------|
| 65 | 2/4/2011 | *State of California Franchise Tax Board v. Mary Troter Stratton, et al.,* Petition by FTB for Issuance of Out-of-State Deposition Commissions (for Stratton depositions) | 24 | 1404 - 1410 | Superior Court of California, Sacramento, Case No. 34-2011-00096505 | 5, 6 |
| 66 | 5/3/2011 | *State of California Franchise Tax Board v. Gilbert P. Hyatt,* Nevada District Court Order Denying Strattons' Motion to Quash Subpoenas for a Pending Administrative Tax Appeal in California | 24 | 1411 - 1413 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-II-635345-C | 3, 5, 6 |
| **VOLUME EIGHT** | | | | | | |
| 67 | 6/30/2011 | FTB Reply Brief 1992 (Excerpts re Delays in Protest and Nevada litigation) | | 1414 - 1426 | SBE | 6 |
| 68 | 7/20/2011 | Dkt. No. 1 - Hyatt's Petition for Protective Order or Quash subpoenas | 27 | 1427 - 1429 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 6, 7 |
| 69 | 7/20/2011 | Docket | 32 | 1430 - 1431 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 7 |
| 70 | 7/29/2011 | Dkt. No. 17 - Decision & Order re Philips discovery | 27 | 1432 - 1444 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 6, 7 |

# INDEX

## FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|----------------------------------------|----------|
| 71 | 8/1/2011 | Docket | 32 | 1445 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 72 | 8/2/2011 | Dkt. No. 19 - Hyatt's Notice of Appeal | 27 | 1446 - 1465 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 7 |
| 73 | 8/15/2012 | Hyatt 1991 Supplemental Brief | 25 | 1466 - 1570 | SBE | 6 |
| **VOLUME NINE** | | | | | | |
| 74 | 8/15/2012 | Hyatt 1992 Supplemental Brief | 25 | 1571 - 1678 | SBE | 6 |
| 75 | 8/15/2012 | Exh A Hyatt 1991 Supplemental Brief | 25 | 1679 - 1680 | SBE | 6 |
| 76 | 8/15/2012 | Exh B Hyatt 1991 Supplemental Brief | 25 | 1681 - 1683 | SBE | 6 |
| 77 | 10/5/2012 | Dkt. No. 24 - Order to Show Cause | 28 | 1684 - 1687 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 78 | 2/19/2013 | FTB Supplemental Briefing re Tax Year 1991 and 1992, Exhibit H Tab 1-47_Protest and Litigation timeline (Tab 36) | | 1688 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|--------------------------------------|----------|
| 79 | 3/13/2013 | Dkt. No. 29 - Opinion and Order | 28 | 1689 - 1705 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 80 | 3/28/2013 | FTB Additional Brief Philips Documents and NY litigation | | 1706 - 1721 | SBE | 6, 7 |
| 81 | 4/29/2013 | FTB Additional Brief re Philips documents to SBE | | 1722 - 1726 | SBE | 6, 7 |
| 82 | 5/14/2013 | Docket | 32 | 1727 - 1730 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 83 | 10/7/2013 | Dkt. No. 23- Decision and Order | 28 | 1731 - 1747 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 84 | 3/13/2014 | Dkt. No. 74 - Decision and Order | 28 | 1748 - 1758 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 85 | 4/23/2014 | Letter from SBE to Eric Coffill and Robert Dunn requesting additional briefing | 29 | 1759 - 1761 | SBE | 6 |
| 86 | 5/7/2014 | Letter from Eric Coffill to SBE | 30 | 1762 - 1764 | Ex. 6 to Dunn Decl., SER 57-59 | 6 |
| 87 | 6/13/2014 | Letter from SBE to Eric Coffill and Robert Dunn re due dates and reluctance to grant more extensions | 30, 33 | 1765 - 1767 | SBE | 6 |
| 88 | 9/26/2014 | Letter from Eric Coffill to SBE re Request to Vacate | 33 | 1768 - 1769 | SBE | 6 |

# INDEX
# FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|-----------|---------------|----------------------------------------|----------|
| 89 | 10/13/2014 | Letter from Eric Coffill to SBE responding to FTB letter (enclosing letter from Hyatt's New York counsel to FTB's New York counsel re U.S. Philips documents dispute) | 33 | 1770 - 1778 | SBE | 6, 7 |
| 90 | 11/3/2014 | Letter from Eric Coffill to SBE requesting, *inter alia*, that SBE vacate briefing deadline | 33 | 1779 - 1780 | SBE | 6 |
| **VOLUME TEN** | | | | | | |
| 91 | 2/4/2015 | Letter from Eric Coffill to SBE submitting motions and requesting, *inter alia,* delay in briefing ending decision on motions | 33 | 1781 - 1847 | SBE | 6 |
| 92 | 2/23/2015 | Letter from Eric Coffill to SBE requesting, *inter alia,* delay on briefing until SBE rules on motions to strike | 33 | 1848 - 1849 | SBE | 6 |
| 93 | 3/11/2015 | Docket | 32 | 1850 - 1852 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 94 | 4/6/2015 | Affidavit of Robert Dunn in Opposition to Gilbert Hyatt's Motion Seeking an Order of Civil Contempt and Permanent Injunctive Relief | 32 | 1853 - 2000 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 95 | 6/3/2015 | Letter from Eric Coffill to the SBE requesting extension of time to file reply briefs | 33 | 2001 - 2003 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 96 | 9/10/2015 | Amended Judgment Decision & Order | 32 | 2004 - 2016 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 97 | 9/19/2016 | Letter from Edwin Antolin to SBE requesting extension for filing additional briefs | 33 | 2017 - 2018 | SBE | 6 |
| **VOLUME ELEVEN** | | | | | | |
| 98 | 9/28/2016 | Appellant's Concluding Summary (1991); Errata filed 11/4/16 | 33 | 2019 - 2057 | SBE | 6 |
| 99 | 9/28/2016 | Appellant's Concluding Summary (1992); Errata filed 11/4/16 | 33 | 2058 - 2092 | SBE | 6 |
| 100 | 9/28/2016 | Appellant's Second Additional Briefing (1991); Errata filed 11/4/16 | 33 | 2093 - 2165 | SBE | 6 |
| 101 | 9/28/2016 | Appellant's Second Additional Briefing (1992); Errata filed 11/4/16 | 33 | 2166 - 2236 | SBE | 6 |
| **VOLUME TWELVE** | | | | | | |
| 102 | 9/28/2016 | Attachment 1, Appellant's Second Additional Briefing (1992); Errata filed 11/4/16 | 33 | 2237 - 2278 | SBE | 6 |
| 103 | 10/20/2016 | Letter from SBE to Edwin Antolin re, *inter alia,* delays | 33 | 2279 - 2282 | SBE | 6 |
| 104 | 11/4/2016 | Letter from Edwin Antolin to Joann Richmond with errata table | 33 | 2283 - 2297 | SBE | 6 |
| 105 | 11/16/2016 | Letter from FTB to SBE re Hyatt's request for additional time | 33 | 2298 - 2299 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 106 | 1/6/2017 | Letter from SBE to Edwin Antolin re rescheduing the hearing from March 2017 to May 2017 | 33 | 2300 | SBE | 6 |
| 107 | 3/3/2017 | Notice of Board Hearing for Case No. 446509 on 5/23/17 | 33 | 2301 - 2302 | SBE | 6 |
| 108 | 3/3/2017 | Notice of Board Hearing for Case No. 435770 on 5/23/17 | 33 | 2303 - 2304 | SBE | 6 |
| **VOLUME THIRTEEN** | | | | | | |
| 109 | 8/7/2009 | Appellant's Opening Brief | | 2305 - 2448 | Nevada Supreme Court, Case No. 53264 | 3 |
| **VOLUME FOURTEEN** | | | | | | |
| 110 | 6/11/2010 | Appellant's Reply Brief | | 2449 - 2634 | Nevada Supreme Court, Case No. 53264 | 3 |

ORIGINAL

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | | |
|---|---|---|
| FRANCHISE TAX BOARD OF THE STATE OF CALIFORNIA, | ) ) | |
| Appellant/Cross-Respondent, | ) ) | No. 53264 |
| vs. | ) ) | |
| GILBERT P. HYATT, | ) ) | FILED |
| Respondent/Cross-Appellant. | ) ) ) | AUG 0 7 2009 |

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY S. Young
DEPUTY CLERK

APPEAL FROM JUDGMENT – EIGHTH JUDICIAL DISTRICT COURT
STATE OF NEVADA, CLARK COUNTY
HONORABLE JESSIE WALSH, DISTRICT JUDGE

* * * * *

APPELLANT'S OPENING BRIEF

ROBERT L. EISENBERG (NSBN 0950)
LEMONS, GRUNDY, & EISENBERG
6005 Plumas Street, Suite 300
Reno, Nevada 89519
Telephone No. (775) 786-6868
Facsimile No. (775) 786-9716

PAT LUNDVALL (NSBN 3761)
CARLA HIGGINBOTHAM (NSBN 8495)
McDONALD CARANO WILSON LLP
2300 West Sahara Avenue, Suite 1000
Las Vegas, NV 89102
Telephone No. (702) 873-4100
Facsimile No. (702) 873-9966

ATTORNEYS FOR APPELLANT/
CROSS-RESPONDENT

RECEIVED
JUL 2 0 2009
TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
DEPUTY CLERK

09- 17736

MCDONALD·CARANO·WILSON<sup>3</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002305



IN THE SUPREME COURT OF THE STATE OF NEVADA

FRANCHISE TAX BOARD
OF THE STATE OF CALIFORNIA,          )
                                     )
       Appellant/Cross-Respondent,   )        No. 53264
                                     )
vs.                                  )
                                     )
GILBERT P. HYATT,                    )
                                     )
       Respondent/Cross-Appellant.   )
                                     )

APPEAL FROM JUDGMENT – EIGHTH JUDICIAL DISTRICT COURT
STATE OF NEVADA, CLARK COUNTY
HONORABLE JESSIE WALSH, DISTRICT JUDGE

* * * * *

APPELLANT'S OPENING BRIEF

ROBERT L. EISENBERG (NSBN 0950)
LEMONS, GRUNDY, & EISENBERG
6005 Plumas Street, Suite 300
Reno, Nevada 89519
Telephone No. (775) 786-6868
Facsimile No. (775) 786-9716

PAT LUNDVALL (NSBN 3761)
CARLA HIGGINBOTHAM (NSBN 8495)
McDONALD CARANO WILSON LLP
2300 West Sahara Avenue, Suite 1000
Las Vegas, NV 89102
Telephone No. (702) 873-4100
Facsimile No. (702) 873-9966

ATTORNEYS FOR APPELLANT/
CROSS-RESPONDENT

RJN002306

**TABLE OF CONTENTS**

I.   SUMMARY OF LITIGATION AND ARGUMENTS ...........................................1

     A.   Summary Of Litigation.................................................................1

     B.   Summary Of Argument ...............................................................2

II.  STATEMENT OF ISSUES ...........................................................................4

III. STATEMENT OF THE CASE ......................................................................4

     A.   Statement of Facts ......................................................................4

          1.   General Background: Hyatt's Tax Audit Begins .................4

          2.   FTB Auditors Decide to Verify Information Provided by Hyatt ...................................................................................6

          3.   FTB's Third-Party Contacts...............................................9

               a.   FTB's Mail Requests ............................................10

               b.   FTB Field Visits and In-person Interviews............12

          4.   FTB Supervision and Review of Auditors ........................16

          5.   Results of FTB Audit: FTB Proposed Increased Tax, Interest, and Penalty Assessments Against Hyatt ...........................17

          6.   Hyatt's Responses to FTB's Proposed Assessments.........20

               a.   Hyatt's California Administrative Protest Proceedings.........20

               b.   Hyatt's Nevada Litigation.....................................21

               c.   Inter-relationship between California Administrative Protest Proceedings and Nevada Litigation .........................23

               d.   Hyatt's Appeal to the California State Board of Equalization..........................................................27

          7.   FTB's Litigation Rosters .................................................27

          8.   California's Tax Amnesty Legislation...............................28

     B.   District Court Resolution Of The Nevada Litigation ..................28

IV.  LEGAL ARGUMENT ...............................................................................29

     A.   Standard Of Review ..................................................................29

     B.   The Doctrine Of Comity Applies To This Case..........................29

          1.   Nevada Supreme Court Proceedings.................................29

i

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002307

2.    United States Supreme Court Proceedings.....................................31

3.    Comity Has Been Similarly Applied in Other Cases ....................32

4.    Other Legal Doctrines Also Require That Comity Apply Here ....................................................................................................33

C.   Hyatt's Claims, As Tried, Are Precluded By The Discretionary Function Immunity Doctrine ........................................................34

   1.    Nevada's New Test Governing Discretionary Function Immunity ........................................................................................35

     a.    This New Test Applies to FTB's Conduct ..........................37

   2.    Based on Nevada's New Test, and the Case As Tried by Hyatt, FTB Is Entitled to Complete Immunity................................38

     a.    FTB's Statutory Obligations and Discretionary Powers ..............................................................................................38

     b.    First Element of *Berkovitz-Gaubert*: Each FTB Act Was Discretionary ..............................................................................40

       i.    Alleged Improper Gathering of Evidence................41

       ii.    Alleged Improper Analysis of Evidence...................44

       iii.    Alleged Improper Delay in Resolution of Protest Proceedings ....................................................................46

       iv.    Alleged Improper Organizational Conduct..............46

         a.    Litigation Rosters............................................47

         b.    California Tax Amnesty Program..................48

         c.    Cost/Benefit Ratios ........................................49

     c.    Second Element of *Berkovitz-Gaubert*: Each FTB Act Was Based Upon Policy Determinations ............................49

   3.    Hyatt's Continuous Label That FTB's Conduct Constituted Bad Faith Is No Longer Material ....................................................52

D.   District Judge Walsh Failed To Follow This Court's 2002 Ruling Which Allowed The Trial To Significantly Exceed The Jurisdictional Boundaries Previously Established For This Case ..............55

E.   District Judge Walsh Also Failed To Follow Jurisdictional Limits Previously Recognized By Then-District Judge Saitta ...............................58

   1.    The District Court Improperly Allowed the Jury to be an Appellate Court Regarding FTB's Administrative Conclusions ......................................................................................59

ii

     2.     The Jury, Acting as an Appellate Court, Did Not Have All Necessary Information To Perform Its Function Accurately ..........63

F.     The District Court Impermissively Permitted Hyatt's Common Law Claims To Be Tried To A Jury ................................................................68

     1.     Hyatt's "Bad Faith Fraud" Claim Based on Alleged Promises of Fair and Impartial Treatment or Promises of Confidentiality for Public Facts Failed as a Matter of Law ............70

          a.     Implied Statements of Fair and Impartial Treatment Are Not Actionable Representations.....................................70

          b.     The Promises of Confidentiality Were Not Actionable .......73

          c.     There Was No Evidence of Fraudulent Intent......................76

          d.     There Was No Reasonable Reliance .....................................77

          e.     Government Agents Cannot Make Promises Beyond the Scope of the Law.............................................................77

     2.     Hyatt's Claims for Invasion of Privacy Failed As A Matter of Law ..................................................................................................78

          a.     Nevada Does Not Recognize a Legal Claim for "Breach of Information Privacy" ...........................................79

          b.     The Public Record Defense Prohibited Hyatt's Invasions of Privacy Claims.................................................81

          c.     Hyatt Was Impermissively Permitted to Assert Traditional Common Law Claims Alleging Breach of Information Privacy by Claiming FTB Breached Foreign Laws........................................................................82

          d.     Hyatt's Evidence Did Not Support the Essential Elements of His Invasion of Privacy Claims .......................84

               i.     The Evidence Did Not Support a False Light Claim .......................................................................85

          e.     The Litigation Rosters Were Absolutely Privileged ...........86

          f.     Hyatt's Claim for "Breach of Confidentiality" ....................88

     3.     Hyatt's Abuse of Process Claim Failed as a Matter of Law............90

     4.     Hyatt's Claim for Intentional Infliction of Emotional Distress Failed as a Matter of Law.....................................................93

     5.     The District Court Erred in Handling FTB's Statute of Limitations Defense Which Was Dispositive of All Hyatt's Claims Except for Fraud.................................................................96

iii

RJN002309

6. District Judge Walsh Erred by Transmuting a Rebuttable Presumption to An Irrebutable Presumption Related to Electronic Discovery ...................................................98

G. The Compensatory Damage Awards Were Improper ..............................100

1. At Minimum, All Compensatory Damages Should Have Been Capped...................................................................100

2. There Was No Evidence of Invasion of Privacy Damages ...........102

3. The Emotional Distress Damages Cannot Stand...........................103

a. The Garden Variety Emotional Distress Hyatt Claimed He Experienced Does Not Support an $85 Million Award ...................................................103

b. The District Judge Erred by Failing to Allow FTB to Introduce Evidence of Alternative Causes of Hyatt's Emotional Distress .............................................106

H. The Punitive Damages Award Cannot Be Upheld...................................108

1. Comity Requires the Punitive Damages Award to Be Vacated ...................................................................108

2. Punitive Damages Are Not Recoverable Against a Government Entity Under the Common Law ................................109

3. Legal Excessiveness ...................................................111

a. The Degree of Reprehensibility .........................................112

b. The Ratio of Punitive Damages to the Actual Harm Inflicted ...........................................................113

c. Comparison to Other Criminal and Civil Penalties............114

I. No Prejudgment Interest Should Have Been Allowed..............................116

V. CONCLUSION ...................................................118

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE: 775-788-2000 • FAX 775-788-2020

iv

# TABLE OF AUTHORITIES

## CASES

Ainsworth v. Combined Ins. Co.,
   104 Nev. 587, 763 P.2d 673 (1988)........................................................................115

Ace Truck v. Kahn,
   103 Nev. 503, 746 P.2d 132 (1987)..............................................................113, 115

Alam v. Reno Hilton Corp.,
   819 F. Supp. 905 (D. Nev. 1993)...........................................................................94

Albert H. Wohlers & Co. v. Bartgis,
   114 Nev. 1249, 969 P.2d 949 (1998)...........................................................105, 115

Alden v. Maine,
   527 U.S. 706 (1999) ...............................................................................................101

Allstate Ins. Co. v. Thorpe,
   123 Nev. 565, 170 P.3d 989 (2007)..........................................................................58

Amy's Enters. v. Sorrell,
   817 A.2d 612 (Vt. 2002)..........................................................................................43

Arndt v. First Union Nat. Bank,
   613 S.E.2d 274 (N.C. Ct. App. 2005)....................................................................100

Badillo v. Am. Brands, Inc.,
   117 Nev. 34, 16 P.3d 435 (2001).............................................................................80

Baker v. Echostar Communications Corp., CIV.A.,
   06-CV-01103PS, 2007 WL 4287494 (D. Colo. Dec. 4, 2007) ...............................93

Barmettler v. Reno Air, Inc.,
   114 Nev. 441, 956 P.2d 1382 (1998).................................................................94, 95

Bass-Davis v. Davis,
   122 Nev. 442, 134 P.3d 103 (2006)..................................................................99, 100

Bemis v. Estate of Bemis,
   114 Nev. 1021, 967 P.2d 437 (1998).......................................................................98

MCDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

v

Berg v. Obama,
    574 F. Supp. 2d 509 (E.D. Pa. 2008)..................................................73

Blinzler v. Marriott Intern., Inc.,
    81 F.3d 1148 (1st Cir. 1996).........................................................99

BMW of N. Am., Inc. v. Gore,
    517 U.S. 559 (1996) ..............................................................112

Bolen v. Dengel,
    CIV.A., 00-783, 2004 WL 2984330 (E.D. La. Dec. 16, 2004) ............................53

Bomar v. United Resort Hotels, Inc.,
    88 Nev. 344, 497 P.2d 898 (1972)......................................................67

Bongiovi v. Sullivan,
    122 Nev. 556, 138 P.3d 433 (2006)................................... 29, 111, 113-115

Brooks v. Celeste,
    39 F.3d 125 (6th Cir. 1994) ...........................................................57

Bulbman Inc. v. Nevada Bell,
    108 Nev. 105, 825 P.2d 588 (1992)...........................................57, 71, 72

Butler ex. rel. Biller v. Bayer,
    123 Nev. 450, 168 P.3d 1055 (2007)........................... 34-36, 50, 52, 58

Berkovitz v. United States,
    486 U.S. 531 (1988) ..................................................................34

California v. Greenwood,
    486 U.S. 35 (1988) ...................................................................85

Callie v. Bowling,
    123 Nev. 181, 160 P.3d 878 (2007).....................................................29

Carroll v. Lanza,
    349 U.S. 408 (1955) .................................................................101

Chapp v. Peterson,
    80 Nev. 555, 397 P.2d 5 (1964).......................................................76

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

vi

RJN002312

Chavez v. Sievers,
  118 Nev. 288, 43 P.3d 1022 (2002)......................................................................80

Circus Circus Hotels, Inc. v. Witherspoon,
  99 Nev. 56, 657 P.2d 101 (1983)...........................................................................87

City of Boulder City v. Boulder Excavating, Inc.,
  124 Nev. ___, 191 P.3d 1175 (2008)..................................................34, 35, 51, 52

City of Newport v. Fact Concerts, Inc.,
  453 U.S. 247 (1981) .......................................................................109, 110, 111

Clark Sanitation, Inc. v. Sun Valley Disposal Co.,
  87 Nev. 338, 487 P.2d 337 (1971)..............................................................72, 73, 74

ComputerXpress, Inc. v. Jackson,
  113 Cal. Rptr. 2d 625 (Ct. App. 2001) ................................................................91

Connecticut Gen. Life Ins. Co. v. Jones,
  764 So. 2d 677 (Fla. Dist. Ct. App. 2000)...........................................................71

Conway v. Circus Circus Casinos, Inc.,
  116 Nev. 870, 8 P.3d 837 (2000)..........................................................................93

Cordeiro v. Brock,
  698 F. Supp. 373 (D. Mass. 1988).......................................................................43

Cox Broad. Corp. v. Cohn,
  420 U.S. 469 (1975) .................................................................................75, 81

Cortinas v. State,
  124 Nev. ___, 195 P.3d 315 (2008)......................................................................29

Couch v. United States,
  409 U.S. 322 (1973) .............................................................................................85

Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP,
  440 F. Supp. 2d 1184 (D. Nev. 2006) .................................................................87

Davel Comm., Inc., v. Qwest Corp.,
  460 F.3d 1075 (9th Cir. 2006) .............................................................................96

McDONALD·CARANO·WILSON⏎
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

vii

RJN002313

Dawson v. Genovese,
    180 So. 2d 806 (La. Ct. App. 1965) ....................................................... 95

DeJesus v. Flick,
    116 Nev. 812, 7 P.3d 459 (2000), <u>overruled on other grounds by</u>,
    <u>Lioce v. Cohen</u>, 124 Nev. 999, 174 P.3d 970 (2008), ......................................... 105

Dillard Dept. Stores, Inc. v. Beckwith,
    115 Nev. 372, 989 P.2d 882 (1999)..................................................... 105

Consumer Prod. Div. v. Morgan,
    874 A.2d 919 (Md. 2005) ..................................................................... 58

Doe v. County of Ctr, PA.,
    242 F.3d 437 (3d Cir. 2001) ............................................................. 109

Driscoll v. Erreguible,
    87 Nev. 97, 482 P.2d 291 (1971)........................................................ 56

Evans v. Dean Witter Reynolds, Inc.,
    116 Nev. 598, 5 P.3d 1043 (2000)..................................................... 115

Fair Assessment In Real Estate Ass'n, Inc. v. McNary,
    454 U.S. 100 (1981) ........................................................................... 32

Farmers Home Mut. Ins. Co. v. Fiscus,
    102 Nev. 371, 725 P.2d 234 (1986)................................................... 106

Fed. Mar. Comm'n v. S. Carolina State Ports Auth.,
    535 U.S. 743 (2002) ......................................................................... 101

Fink v. Oshins,
    118 Nev. 428, 49 P.3d 640 (2002)...................................................... 87

Ford v. State,
    122 Nev. 796, 138 P.3d 500 (2006)..................................................... 85

Forster v. Manchester,
    189 A.2d 147 (Pa. 1963).................................................................... 84

Foss v. Maine Tpk. Auth.,
    309 A.2d 339 (Me. 1973) ................................................................. 109

viii

RJN002314

Foster v. Washoe County,
        114 Nev. 936, 964 P.2d 788 (1998)...................................................................42

Franchise Tax Board v. Hyatt,
        538 U.S. 488 (2003) ...................................................................................passim

Franklin Sav. Corp. v. United States,
        180 F.3d 1124 (10th Cir. 1999)...........................................................52, 53, 54, 55

Giles v. Gen. Motors Acceptance Corp.,
        494 F.3d 865 (9th Cir. 2007)..................................................................................89

Glen Holly Entm't, Inc. v. Tektronix Inc.,
        343 F.3d 1000 (9th Cir. 2003)................................................................................71

Gordon v. Cmty. First State Bank,
        587 N.W.2d 343 (Neb. 1998)..........................................................................91, 92

Gramanz v. Gramanz,
        113 Nev. 1, 930 P.2d 753 (1997)...........................................................................76

Granfinanciera S.A. v. Nordberg,
        492 U.S. 33 n.4 (1982) ...........................................................................................58

Guar. Nat. Ins. Co. v. Potter,
        112 Nev. 199, 912 P.2d 267 (1996).....................................................................115

Hall v. SSF, Inc.,
        112 Nev. 1384, 930 P.2d 94 (1996)......................................................................114

Hansen v. Scott,
        687 N.W.2d 247 (N.D. 2004) .................................................................................32

Hanson v. New Tech., Inc.,
        594 So. 2d 96 (Ala. 1992)......................................................................................73

Harris v. Zee,
        87 Nev. 309, 486 P.2d 490 (1971)........................................................................103

Hay v. Shell Oil Co.,
        986 S.W.2d 772 (Tex. App. 1999) .........................................................................95

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

ix

Hazelwood v. Harrah's,

    109 Nev. 1005, 862 P.2d 1189 (1993), <u>overruled in part on other grounds by,</u>

    <u>Vinci v. Las Vegas Sands, Inc.</u>, 115 Nev. 243, 984 P.2d 750 (1999) .................116

Hillside Associates v. Stravato,

    642 A.2d 664 (R.I. 1994).......................................................................................92

Hooters of Am., Inc. v. Phillips,

    39 F. Supp. 2d 582 (D.S.C. 1998) ........................................................................73

Hsu v. County of Clark,

    123 Nev. 625, 173 P.3d 724 (2007)...........................................................33, 37, 38

Hyatt v. Boone,

    146 F.3d 1348 (Fed. Cir. 1998) .............................................78, 107, 108, 114, 116

In re Consol. RNC Cases,

    2009 WL 130178 (S.D.N.Y. Jan. 8, 2009) ...........................................................93

In re Orthopedic Bone Screw Prod. Liab. Litig.,

    264 F.3d 344 (3d Cir. 2001) ...........................................................................43, 45

In re Sunshine Suites, Inc.,

    56 Fed. App'x 776 (9th Cir. 2003) .......................................................................89

Jessamy v. Ehren,

    153 F. Supp. 2d 398 (S.D.N.Y. 2001) ..................................................................94

Johnson v. Sawyer,

    47 F.3d 716 (5th Cir. 1995)......................................................................80, 81, 90

Johnson v. Sawyer,

    760 F.Supp. 1216 (S.D. Tex. 1991).....................................................................90

Kahn v. Orme,

    108 Nev. 510, 835 P.2d 790 (1992)....................................................................114

KAPL, Inc. v. Meacham,

    544 U.S. 957 (2005) ............................................................................................94

Kawaauhau v. Geiger,

    523 U.S. 57 (1998) ..............................................................................................57

x

Keystone Realty v. Osterhus,
    107 Nev. 173, 807 P.2d 1385 (1991).................................................. 117

Kieffer v. Weston Land, Inc.,
    90 F.3d 1496 (10th Cir. 1996) ...........................................................100

LaMantia v. Redisi,
    118 Nev. 27, 38 P.3d 877 (2002)..........................................................91

Las Vegas Sun, Inc. v. Franklin,
    74 Nev. 282, 329 P.2d 867 (1958).........................................................83

Las Vegas-Tonopah-Reno Stage Line, Inc. v. Gray Line Tours of S. Nevada,
    106 Nev. 283, 792 P.2d 386 (1990)............................................116, 117

Leslie v. Jones Chem. Co., Inc.,
    92 Nev. 391, 551 P.2d 234 (1976).......................................................103

Liles v. Am. Corrective Counseling Services, Inc.,
    131 F. Supp. 2d 1114 (S.D. Iowa 2001)...........................................91, 92

Long v. City of Charlotte,
    293 S.E.2d 101 (N.C. 1982) ...............................................................109

Luciano v. Olsten Corp.,
    912 F. Supp. 663 (E.D.N.Y. 1996).....................................................103

Mainor v. Nault,
    120 Nev. 750, 101 P.3d 308 (2004).....................................................102

Mannelin v. DMV,
    31 P.3d 438 (Or. App. 2001) ................................................................77

Marcuse v. Del Webb Communities, Inc.,
    123 Nev. 278, 163 P.3d 462 (2007).......................................................33

Martinez v. Maruszczak,
    123 Nev. 433, 168 P.3d 720 (2007).................................2, 29, 34, 35, 36, 40, 52, 53

Massey v. Litton,
    99 Nev. 723, 669 P.2d 248 (1983)....................................................96, 98

MCDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

xi

Matter of TPI Intern. Airways, Inc.,

    141 B.R. 512 (Bankr. S.D. Ga. 1992).............................................................53, 55

McDonnell v. State of Ill.,

    748 A.2d 1105 (N.J. 2000) .....................................................................................32

McLain v. Boise Cascade Corp.,

    533 P.2d 343 (Or. 1975) ........................................................................................84

Meacham v. Knolls Atomic Power Lab.,

    185 F.Supp.2d 193 (N.D.N.Y. 2002), cert. granted and op. vacated on other

    grounds by, KAPL, Inc. v. Meacham, 544 U.S. 957 (2005) ..................................94

Med. Lab. Mgmt. Consultants v. Am. Broad. Companies, Inc.,

    306 F.3d 806 (9th Cir. 2002) .................................................................................84

Mesgate HOA v. City of Fernley,

    124 Nev. ___, 194 P.3d 1248 (2008).......................................................................58

Miller v. Jones,

    114 Nev. 1291, 970 P.2d 571 (1998)................................................................93, 95

Miller v. Lewis,

    80 Nev. 402, 395 P.2d 386 (1964), overruled in part on other grounds,

    Ace Truck v. Kahn, 103 Nev. 503, 746 P.2d 132 (1987)......................................73

Miller v. Schnitzer,

    78 Nev. 301, 371 P.2d 824 (1962).......................................................................103

Minehan v. United States,

    75 Fed. Cl. 249 (2007)...........................................................................................72

Montesano v. Donrey Media Group,

    99 Nev. 644, 668 P.2d 1081 (1983).......................................................75, 78, 81, 84

Moore v. W. Forge Corp.,

    192 P.3d 427 (Colo. App. 2007).............................................................................91

Morris v. Bank of Am. Nevada,

    110 Nev. 1274, 886 P.2d 454 (1994)......................................................................71

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

xii

Nelson v. City of Las Vegas,
  99 Nev. 548, 665 P.2d 1141 (1983)...........................................................94

Nelson v. Heer,
  123 Nev. 26, 163 P.3d 420 (2007)......................................................29, 98

Nevada Power Co. v. Monsanto Co.,
  891 F. Supp. 1406 (D. Nev. 1995).........................................................72

Nevada v. Hall,
  440 U.S. 410 (1979) ..............................................................................101

Nevada Indep. Broad. Corp. v. Allen,
  99 Nev. 404, 664 P.2d 337 (1983).........................................................106

Nev-Tex Oil & Gas v. Precision Rolled Products,
  105 Nev. 685, 782 P.2d 1311 (1989)......................................................114

New York Times Co. v. Sullivan,
  376 U.S. 254 (1964) ...............................................................................78

Oh v. Wilson,
  112 Nev. 38, 910 P.2d 276 (1996)...........................................................76

Olivero v. Lowe,
  116 Nev. 395, 995 P.2d 1023 (2000)...............................................105, 114

Pac. Employers Ins. Co. v. Indus. Accident Comm'n,
  306 U.S. 493 (1939) ...............................................................................68

Pauly v. U.S. Dept. of Agri.,
  348 F.3d 1143 (9th Cir. 2003) ................................................................77

People for the Ethical Treatment of Animals v. Berosini,
  111 Nev. 615, 895 P.2d 1269 (1995)..........................................80, 84, 85

Perry v. Jordan,
  111 Nev. 943, 900 P.2d 335 (1995).................................................88, 89

Petchem, Inc. v. Canaveral Port Auth.,
  368 F. Supp. 2d 1292 (M.D. Fla. 2005) ................................................109

xiii

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

Petersen v. Bruen,
    106 Nev. 271, 792 P.2d 18 (1990)..........................................................................96

Phillips Petroleum Co. v. Shutts,
    472 U.S. 797 (1985) ..............................................................................................68

Pina v. Com.,
    510 N.E.2d 253 (Mass. 1987)..............................................................................52

Potter v. W. Side Transp., Inc.,
    188 F.R.D. 362 (D. Nev. 1999) ............................................................................93

Powers v. United Services Auto. Ass'n.,
    114 Nev. 690, 962 P.2d 596 (1998).....................................................................115

Public Service Commission v. District Court,
    107 Nev. 680, 818 P.2d 396 (1991)................................................................58, 59

Pulawa v. GTE Hawaiian Tel,
    143 P.3d 1205 (Haw. 2006)..................................................................................83

Purdy v. Fleming,
    655 N.W.2d 424 (S.D. 2002)...............................................................................90

Quill Corp. v. North Dakota,
    504 U.S. 298 (1992) ............................................................................................101

Quinby v. WestLB AG,
    04 CIV.7406, 2008 WL 3826695 (S.D.N.Y. Aug. 15, 2008) .............................104

Rainone v. Potter,
    388 F. Supp. 2d 120 (E.D.N.Y. 2005)........................................................103, 104

Ramada Inns, Inc. v. Sharp,
    101 Nev. 824, 711 P.2d 1 (1985)........................................................................106

Ramey v. United States,
    559 F. Supp. 837 (D.D.C. 1982)...........................................................................77

Ransdell v. Clark County,
    124 Nev. ___, 192 P.3d 756 (2008).....................................................35, 36, 43, 51

MCDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

xiv

Reiter v. Metro. Transp. Auth. of New York,
    01 CIV. 2762, 2003 WL 22271223 (S.D.N.Y. Sept. 30, 2003) ..........................104

Republic Ins. Co. v. Hires,
    107 Nev. 317, 810 P.2d 790 (1991).....................................................................115

Rocky Mt. Produce v. Johnson,
    78 Nev. 44, 369 P.2d 198 (1962).........................................................................57

Rogers v. United States,
    187 F.Supp.2d 626 (N.D.Miss. 2001) ................................................36, 53, 54, 55

Rourke v. United States.,
    744 F.Supp. 100 (E.D. Pa. 1989).....................................................................43, 53

Ruhlmann v. Ulster County Dept. of Soc. Services,
    194 F.R.D. 445 (N.D.N.Y. 2000) ........................................................................94

S.J. Amoroso Const. Co. v. Lazovich & Lazovich,
    107 Nev. 294, 810 P.2d 775 (1991).....................................................................115

Sahara Gaming Corp. v. Culinary Workers Union Local 226,
    115 Nev. 212, 984 P.2d 164 (1999)................................................................86, 87

Sam v. Sam,
    134 P.3d 761 (N.M. 2006)....................................................................................32

Sands Regent v. Valgardson,
    105 Nev. 436, 777 P.2d 898 (1989).....................................................................80

Schaut v. First Fed. Sav. & Loan Ass'n of Chicago,
    560 F. Supp. 245 (N.D. Ill. 1983).........................................................................90

Schlatter v. Eighth Judicial Dist. Court,
    93 Nev. 189, 561 P.2d 1342 (1977)...........................................................78, 84, 93

Schoeberlein v. Purdue University,
    544 N.E.2d 283 (Ill. 1989)....................................................................................32

Schueler v. Martin,
    674 A.2d 882 (Del. Super. Ct. 1996)..................................................................111

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

xv

Sellers v. Henman,
    41 F.3d 1100 (7th Cir. 1994) ................................................................................57

Seminole Tribe of Florida v. Florida,
    517 U.S. 44 (1996) ..............................................................................................101

Shoshone Coca-Cola Bottling Co. v. Dolinski,
    82 Nev. 439, 420 P.2d 855 (1966)........................................................................106

Shuette v. Beazer Homes Holdings Corp.,
    121 Nev. 837, 124 P.3d 530 (2005)......................................................................116

Sloan v. U.S. Dept. of Hous. & Urban Dev.,
    236 F.3d 756 (D.C. Cir. 2001)........................................................................42, 45

Smith v. Allstate Ins. Co.,
    160 F. Supp. 2d 1150 (S.D. Cal. 2001) ................................................................73

Solomon v. Supreme Court of Florida,
    816 A.2d 788 (D.C. 2002) .............................................................................32, 54

Stalk v. Mushkin,
    125 Nev. ___, 199 P.3d 838 (2009)......................................................................29

Stapp v. Hilton Hotels Corp.,
    108 Nev. 209, 826 P.2d 954 (1992)......................................................................106

State ex rel. Dept. of Transp. v. Hill,
    114 Nev. 810, 963 P.2d 480 (1998), abrogated on other grounds by,
    Grotts v. Zahner, 115 Nev. 339, 989 P.2d 415 (1999) .........................................105

State Farm Mut. Auto. Ins. Co. v. Campbell,
    538 U.S. 408 (2003) .........................................................................111, 112, 113

State Franchise Tax Bd. v. Hyatt,
    C043627, 2003 WL 23100266 (Cal. Ct. App. Dec. 31, 2003)........................24, 88

State v. Fisher,
    154 P.3d 455 (Kan. 2007).....................................................................................85

State v. Harnisch,
    113 Nev. 214, 931 P.2d 1359 (1997).....................................................................85

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

xvi

State v. Lisenbee,
  116 Nev. 1124, 13 P.3d 947 (2000)........................................................85

Stickler v. Quilici,
  98 Nev. 595, 655 P.2d 527 (1982).......................................................116

Stolz v. Wong Communications Ltd. P'ship,
  31 Cal. Rptr. 2d 229 (Ct. App. 1994) ...................................................91

Tallman v. First Nat. Bank of Nev.,
  66 Nev. 248, 208 P.2d 302 (1949)..................................................57, 77

Taylor v. State,
  109 Nev. 849, 858 P.2d 843 (1993)................................................67, 68

Taylor v. Thunder,
  116 Nev. 968, 13 P.3d 43 (2000).........................................................114

Terbush v. United States,
  516 F.3d 1125 (9th Cir. 2008) ...................................................35, 36, 52

Testa v. Wal-Mart Stores, Inc.,
  144 F.3d 173 (1st Cir. 1998)..................................................................99

Thompson v. Powning,
  15 Nev. 195 (1880)................................................................................86

Topaz Mut. Co., Inc. v. Marsh,
  108 Nev. 845, 839 P.2d 606 (1992).....................................................114

Ullmo ex rel. Ullmo v. Gilmour Acad.,
  273 F.3d 671 (6th Cir. 2001) ................................................................73

United Fire Ins. Co. v. McClelland,
  105 Nev. 504, 780 P.2d 193 (1989)...............................................83, 115

United States v. Gaubert,
  499 U.S. 315 (1991) ...............................................34, 36, 50, 51, 52, 54

United States v. Miller,
  425 U.S. 435 (1976) ..............................................................................85

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

xvii

United States v. Traynor,

    990 F.2d 1153 (9th Cir. 1993), <u>overruled on other grounds by,</u>

    <u>United States v. Johnson</u>, 256 F.3d 895 (9th Cir. 2001) ........................85

Watson v. Las Vegas Valley Water Dist.,

    378 F. Supp. 2d 1269 (D. Nev. 2005) ..........................................95, 106

Wells, Inc., v. Shoemake,

    64 Nev. 57, 177 P.2d 451 (1947)..........................................................104

Wheeler Springs Plaza, LLC v. Beemon,

    119 Nev. 260, 71 P.3d 1258 (2003)........................................................37

Whittell v. Franchise Tax Bd.,

    41 Cal. Rptr. 673 (Ct. App. 1964) ....................................................39, 50

Wynn v. Smith,

    117 Nev. 6, 16 P.3d 424 (2001)..............................................................87

Yerington Ford Inc. v. Gen. Motors Acceptance Corp.,

    359 F.Supp.2d 1075(D.Nev. 2004), <u>reversed on other grounds in,</u>

    <u>Giles v. Gen. Motors Acceptance Corp.</u>, 494 F.3d 865 (9th Cir. 2007)................89

**STATUTES**

5 U.S.C. § 552a............................................................................74, 80

42 U.S.C. § 1983....................................................................109, 110

Ala. Code § 6-11-26 ..........................................................................111

Ark. Code Ann. § 21.9.301................................................................111

Cal. Civ. Code § 1798......................................................................74, 80

Cal. Civ. Code § 1798.24(p)................................................................77

Cal. Gov't Code § 818......................................................................108

Cal. Gov't Code § 860.2..............................................................29, 37

Cal. Gov't Code § 6252(e)..................................................................28

Cal. Gov't Code §§ 11180........................................................39, 40, 50

Cal. Gov't Code § 11182................................................................40, 50

Cal. Rev. & Tax Code § 17014............................................................40

xviii

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

Cal. Rev. & Tax Code § 17015 .................................................................. 40
Cal. Rev. & Tax Code § 17015.5 ............................................................... 40
Cal. Rev. & Tax. Code § 17016 .............................................................. 5, 40
Cal. Rev. & Tax Code § 17041(a)(1) ......................................................... 39
Cal. Rev. & Tax Code § 17041(a)(1) & (2) ................................................ 40
Cal. Rev. & Tax Code § 19041 ........................................................... 20, 46
Cal. Rev. & Tax Code § 19045(b)(1) ......................................................... 59
Cal. Rev. & Tax Code § 19254 (1993) ....................................................... 39
Cal. Rev. & Tax Code § 19381 .................................................................. 59
Cal. Rev. & Tax Code § 19501 .................................................................. 39
Cal. Rev. & Tax Code § 19503(a) .............................................................. 39
Cal. Rev. & Tax Code § 19504 ......................................... 39, 40, 50, 77
Cal. Rev. & Tax Code § 19504(a)-(c) ........................................................ 39
Cal. Rev. & Tax Code § 19504(d) .............................................................. 39
Cal. Rev. & Tax Code § 21013 .................................................................. 59
Cal. Rev. & Tax Code § 26423 (1993) ....................................................... 39
Co. Rev. Stat. § 24-10-114(4)(a) ............................................................. 111
F.S.A. § 768.28(5) .................................................................................. 111
Ga. Code. Ann. § 36-33-1 ....................................................................... 111
I.C. § 34-13-3-4(b) ................................................................................. 111
MCLA § 691.1407 .................................................................................. 111
Md. Code § 5-303(c)(1) .......................................................................... 111
Mont. C. Ann. § 2-9-105 ......................................................................... 111
M.S.A. § 466.04(b) ................................................................................. 111
N.J.S.A. § 59:9-2(c) ................................................................................ 111
NRS 17.130 ............................................................................................ 117
NRS 17.130(2) ........................................................................................ 116
NRS. 41.032(2) ........................................................................... 30, 34, 35
NRS 41.035(1) .............................................................................. 100, 108

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

xix

NRS 48.025(1) ............................................................................................67

NRS 205.372 ............................................................................................114

NRS 205.380 ............................................................................................114

NRS 293.558 ..............................................................................................74

NRS 293.558(2) ..........................................................................................74

NRS 293.558(3) ..........................................................................................75

NRS 372.670 ..............................................................................................59

O.R.C. § 2744.05(A) ................................................................................111

Pa. C.S.A. § 8553 ....................................................................................111

Rhode Island Gen. Law § 9-31-3 ............................................................111

U.C.A. § 63-30d-603(1)(a) (Utah) ..........................................................111

V.T.C.A. § 101.024 ..................................................................................111

W.S.A. § 893.80(3) ..................................................................................111

W.Va. Code § 29-12A-7(a) ......................................................................111

10 Del. C. §§ 4010, 4011 ........................................................................111

745 I.L.C.S. 10/2-102 ..............................................................................111

**ADMINSTRATIVE DECISIONS**

Appeal of Michael T. and Patricia C. Gabrik,

    86-SBE-014, 1986 WL 22686, *2 (Cal. St. Bd. Eq., Feb. 4, 1986). ......................45

In re Bragg,

    2003 WL 21403264, *6 (Cal. St. Bd. Equal. May 28, 2003) ................................45

Appeal of James C. Coleman Psychological Corp.,

    85-SBE-028, 1985 WL 15801 (Cal. St. Bd. Eq., April 9, 1985). .........................77

**REGULATIONS**

18 Cal. Admin. Code § 5412 ......................................................................59

18 Cal. Admin. Code § 17014 ....................................................................40

18 Cal. Admin. Code § 17014(d) ..........................................................40, 45

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002326

## RESTATEMENTS

Restatement (Second) Torts § 46 cmt. j (1977) ................................................................. 94

Restatement (Second) Torts § 611 (1977) ......................................................................... 86

Restatement (Second) Torts § 611 cmt. c (1977) ............................................................. 87

Restatement (Second) Torts § 652B (1977) ...................................................................... 84

Restatement (Second) Torts § 652D cmt. b (1977) .......................................................... 81

Restatement (Second) Torts § 652E (1977) ...................................................................... 85

## OTHER AUTHORITIES

Am. Jur.2d Fraud and Deceit § 61 (2001) ......................................................................... 71

Benjamin Baldwin,

    A. Jackson v. Housing Authority: The Availability of Punitive Damages in

    Wrongful Death Actions Against Municipal Corporations,

    65 N.C. L. Rev. 1441 (1987) ................................................................................... 111

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

xxi

RJN002327

1  I.    SUMMARY OF LITIGATION AND ARGUMENTS[1]

2      This is an appeal from a $490 million judgment in favor of Gilbert Hyatt, an

3  individual, against the California Franchise Tax Board (FTB). The judgment includes,

4  among other awards, $52 million for invasion of privacy damages, $85 million for

5  emotional distress damages, and $250 million in punitive damages.

6      A.    Summary Of Litigation

7      FTB is a state agency responsible for administering and enforcing California's

8  personal income tax laws. This lawsuit arose out of an investigation of Hyatt by FTB for

9  the 1991 and 1992 tax years, FTB's tax and penalty assessments made at the conclusion

10  of that investigation, and the administrative appeal of those assessments. Hyatt put those

11  tax years at issue when he claimed that he changed residency from California to Nevada

12  in 1991 shortly before he received millions of dollars of income. Ultimately, FTB

13  determined that Hyatt remained a California resident – as defined by California law –

14  until April 1992, and he simply pretended to move earlier than that, to avoid tax liability.

15  Accordingly, FTB assessed Hyatt additional income taxes and civil fraud penalties. Not

16  liking that result, Hyatt filed an administrative appeal in California and a lawsuit against

17  FTB in Nevada.

18      California statutes provide FTB with complete government immunity. Early on,

19  FTB requested application of those statutes. When the district court declined to dismiss,

20  FTB sought extraordinary relief in this court. On April 4, 2002, the court issued a writ of

21  mandamus, requiring the district court to apply the doctrine of comity and to dismiss

22  Hyatt's negligence-based claims. The court determined that FTB should be afforded the

23  same discretionary function immunity as a similarly situated Nevada government

24  agency. The United States Supreme Court affirmed in Franchise Tax Board v. Hyatt, 538

25  U.S. 488 (2003). Hyatt's remaining claims were those alleging intentional torts.

26      A four-month jury trial was held in 2008. The jury awarded Hyatt $52 million for

27

28  [1] For ease of reading, appendix citations are omitted in this overview, but will be provided as required herein.

1

McDONALD·CARANO·WILSON<br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>PO BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

1    invasion of privacy damages, $85 million for emotional distress, over $1 million in
2    attorneys fees as special damages, and $250 million in punitive damages. The district
3    court added another $102 million in prejudgment interest and denied all post-trial relief
4    sought by FTB from these staggering awards.[2]

5    B.    Summary Of Argument

6    This extraordinary judgment is the result of a series of fundamental errors. First, a
7    newly assigned District Judge, Jessie Walsh, repeatedly refused to apply the doctrine of
8    comity in a manner that was consistent with this court's April 2002 order, as affirmed by
9    the United States Supreme Court. Those decisions required the district court to treat FTB
10   no worse than a Nevada government agency in similar circumstances, but she failed to
11   provide FTB with any of the protections and limitations to which a similarly situated
12   Nevada government agency would have been afforded. More important, since 2002 this
13   court adopted a new test, that has been applied and refined in a series of new cases, to
14   determine the scope of government discretionary function immunity. The policy behind
15   this new rule is "to prevent judicial 'second guessing' of the legislative and
16   administrative decisions grounded in social, economic, and political policy through the
17   medium of an action in tort." Martinez v. Maruszczak, 123 Nev. 433, 168 P.3d 720, 728
18   (2007). FTB's conduct, as presented by Hyatt to the jury, met the two-part test, but the
19   district court refused to apply it.

20   Instead, the district court permitted Hyatt to ask the jury to re-analyze and re-
21   evaluate purely discretionary decisions made by FTB. In fact, Hyatt's case at trial was
22   nothing more than an attack on discretionary decisions made by California government
23   employees on a regular basis, e.g., decisions concerning what personnel to assign to
24   Hyatt's audit, whether to seek additional information, the manner in which to seek
25   information, the weight to be given to information, what California legal principles

26

27   [2] The district court also denied FTB's post-trial motion for a stay of execution of the judgment
28   without a bond, pending this appeal. On April 8, 2009, this court reviewed the district court's
     decision and ordered a stay without a bond, essentially determining that the district court erred
     by requiring a bond.

2

McDONALD·CARANO·WILSON<br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>PO. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

1    applied, conclusions reached using those principles, and deciding if and when they had

2    sufficient information to resolve Hyatt's protests. In sum, a Las Vegas jury was allowed

3    to impose its judgment on California's vitally important tax collection policies and

4    procedures, reviewing the analysis of evidence made by FTB, and then questioning

5    whether those decisions were "fair and impartial." This was error of the highest

6    magnitude, with nationwide consequences, as emphasized by the numerous amici from

7    around the country, who are urging a reversal of the judgment.

8         The district court also erroneously allowed Hyatt's sundry claims to survive,

9    despite the absence of law and evidence supporting such claims. For example, Hyatt's

10   fraud claim was based primarily on his contention that FTB breached an implied promise

11   to be "fair and impartial." Case law provides no basis for such a vague and nebulous

12   claim, yet the district court refused to dismiss it. The district court allowed Hyatt's

13   multiple breach of information privacy claims to proceed, despite the fact that all of the

14   "confidential information" used by FTB as they gathered evidence to ensure they were

15   getting information about the right Gilbert Hyatt, i.e. name, address and social security

16   number, was already in the public realm. The district court allowed a claim for abuse of

17   process to survive, despite the fact that FTB never used, let alone abused, any legal

18   process, and she allowed Hyatt to advance a claim for intentional infliction of emotional

19   distress without the required proof of severe emotional distress after Hyatt had been

20   limited to recovery for "garden variety" emotional distress as a discovery sanction for

21   refusing to produce his medical records. In addition, the district court committed

22   numerous other reversible errors – too many to list here or fully brief within.

23        On issues dealing with damages, the district court erroneously refused to provide

24   any relief from the jury's compensatory damage verdicts which were obviously products

25   of passion and prejudice, and had no support in evidence. And after the jury returned its

26   award of $250 million in punitive damages, an award which could not possibly have

27   withstood scrutiny under any standard, the district court once again did nothing –

28   allowing the entire award to stand.

3

1    Based upon the errors described herein, the judgment in this case must be

2  reversed.

3  II.    STATEMENT OF ISSUES

4        1.    Should all of Hyatt's claims, as tried, have been dismissed under the
             doctrines of comity, discretionary function immunity, and applicable
5             United States Constitutional provisions?

6        2.    Did the district court impermissively allow the jury to impose liability on
             FTB based exclusively upon its discretionary functions of gathering,
7             weighing and evaluating of evidence to reach administrative conclusions,
             which effectively allowed the jury to sit as a "court of appeal" for FTB's
8             tax assessments, after jurisdictional limitations placed on this case by an
             earlier and now-final district court decision, this court, the United States
9             Supreme Court and United States Constitutional provisions prohibited the
             imposition of such liability?

10
       3.    Should Hyatt's individual tort claims have been dismissed, when there was
11             no law or evidence to support essential elements of each claim?

12       4.    Did the district court make erroneous evidentiary and procedural rulings?

13       5.    Are the compensatory damage awards of $52 million for invasion of
             privacy and $85 million for emotional distress unsupported by evidence,
14             and do these awards violate government damage caps, excessiveness
             standards and applicable United States Constitutional provisions?

15
       6.    Must the punitive damages award against a government entity be reversed
16             under the common law, standards of excessiveness in Nevada law, and
             applicable United States Constitutional provisions?

17
       7.    Did the prejudgment interest award violate Nevada law?

18

19  III.   STATEMENT OF THE CASE

20       A.    Statement of Facts

21            1.    General Background: Hyatt's Tax Audit Begins

22      In 1990, Hyatt obtained a patent, which resulted in over $350 million in income

23  beginning in 1991. 37 AA 9186 (155).[3] Substantial publicity, originally generated by

24  Hyatt and his publicist, surrounded his 1990 patent and, ultimately, his loss of that patent

25  in 1995. 89 AA 22068-137.

26      In June 1993, two FTB employees read a newspaper article discussing Hyatt and

27

28  [3] The trial transcript consists of four-to-one condensed pages. Trial transcripts appendix
    citations will include the specific condensed page number, in parentheses.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

4

1   his patent; they decided to determine if he filed California tax returns. 93 AA 23090; 45

2   AA 11210 (116-17). They reviewed and noted three concerns with his 1991 return,

3   which represented that he moved to Nevada on October 1, 1991. 63 AA 15528-29. First,

4   even though Hyatt admitted being a California resident for at least 75% of the year, he

5   only declared 3.57% of his income taxable to California.[4] Id. Second, they questioned

6   whether all of his income should have been sourced to California.[5] 63 AA 15528-29.

7   Finally, they noted that Hyatt deducted no moving expenses on his 1991 return. 63 AA

8   15528-29; 45 AA 11210-12 (117-124).

9       FTB decided to open a tax and residency audit, focusing on the origin of Hyatt's

10  income and the specific date he terminated his California residency. 63 AA 15605. Tax

11  professionals, like Hyatt's, know and advise their clients of the type of information FTB

12  will gather and evaluate during a residency audit: business contacts, physical presence

13  information, financial accounts, ownership of property, voter registrations, car

14  registrations, drivers licenses, use of licensed professionals, and membership in

15  organizations. 77 AA 19081-86.

16      Pursuant to its standard practice, FTB began by sending Hyatt a letter informing

17  him of the audit, and a standard FTB form which requested certain basic information. 63

18  AA 15605, 15621-23. Included with the letter was FTB's standard privacy notice. 54 AA

19  13401. In relevant part, that notice stated:

20          The Information Practices Act of 1977 and the Federal Privacy Act require
            the Franchise Tax Board to tell you why we ask you for information.
21          [FTB's] Operations and Compliance Divisions ask for tax return
            information to carry out the Personal Income Tax Law of the State of
22          California.

23  54 AA 13401. Hyatt hired a Nevada accountant and a California attorney to represent

24  _____

25  [4] Under California law, taxpayers are presumed to have lived in California for the full year if
    they lived in California for any aggregate of nine months. Cal. Rev. & Tax. Code § 17016. If, as
26  reported on his 1991 tax return, Hyatt met the legal presumption for a full-year residency by
    living nine months in California, then all of Hyatt's income reported on his 1991 tax return was
27  taxable to California. Id.

    [5] Sourcing is an important legal theory to FTB, and many other states with state income taxes. It
28  is best explained by example: If an author writes a book in California, but moves before it is
    published, the income earned from the book may be "sourced" to California and is taxable.

5

MCDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002332

1    him during the audit.[6] 63 AA 15607-14. They conducted no investigation into the

2    accuracy or honesty or completeness of the information Hyatt supplied them; rather, they

3    simply passed on Hyatt's information, given to them by Hyatt, in response to FTB's

4    multiple requests for information. 34 AA 8393 (11-13). The accountant was expressly

5    told by one of FTB's auditors, after he complained about FTB's multiple requests for

6    information, that FTB was particularly looking for the specific date Hyatt terminated his

7    California residency. 64 AA 15886; 68 AA 16967. In response to FTB's initial request

8    for information, Hyatt changed his story to claim he actually departed California on

9    September 24, 1991, rather than October 1, 1991, as sworn on his tax return. 62 AA

10   15348; 63 AA 15623.

2.    <u>FTB Auditors Decide to Verify Information Provided by Hyatt</u>

12        FTB auditors began investigating information provided by Hyatt, and obtaining

13   relevant information available from public sources and third parties. 62 AA 15429-33.

14   Over time, three FTB auditors were assigned to perform this task. 93 AA 23090-126; 72

15   AA 17964-70. Their work was subjected to continuing supervision and review by a

16   multitude of FTB employees. 41 AA 10217 (128-29); 62 AA 15489 – 63 AA 15526; 72

17   AA 17964-70.

18        FTB tried to verify Hyatt's first personal and business address that he claimed in

19   Las Vegas – the Wagon Trails Apartment. 63 AA 15628-29. The lease given to FTB

20   revealed the lease period began on November 1, 1991, over a month after Hyatt's

21   claimed move date. 63 AA 15641. The lease had been faxed to Hyatt at his home in La

22   Palma, California on October 9, 1991 – almost two weeks after Hyatt claimed that he

23   had sold this property. 63 AA 15645-47. Hyatt offered no evidence that he actually

24   resided in the Wagon Trails apartment, other than the lease itself. One question became –

25   a question which continued throughout the entire audit – where did Hyatt and his

26   belongings reside in Nevada, at the very minimum, from September 24, 1991, the new

27   date Hyatt alleged that he moved to Nevada, until the date Hyatt's Wagon Trails

28

---

[6] There was no evidence that Hyatt, himself, had personal dealings with any FTB representative.

MCDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

apartment lease began? 63 AA 15438, 15500; 66 AA 16396, 16456; 67 AA 16729-31; 72 AA 17866; 73 AA 18017. This question was repeatedly raised by FTB, but never answered by Hyatt during the audit.[7] Id.

Hyatt claimed he was self-employed, but conducting business in Nevada. 54 AA 13365. FTB tried to verify a claimed business lease at "6600 W. Charleston, Suite 118, Las Vegas, Nevada." 68 AA 16776. Hyatt never provided any proof that a lease ever existed. 63 AA 15619. It was eventually learned this was the address of Hyatt's tax accountant, who was acting as Hyatt's taxpayer representative during the audit. 66 AA 16449-50. FTB researched public records to determine whether Hyatt obtained a business license in Las Vegas or Clark County or owned real property. 93 AA 23090-91. FTB learned that Hyatt was not issued a business license until December 10, 1992 – over a year after Hyatt alleged he moved. 67 AA 16557; 78 AA 19426. From multiple Nevada public records, FTB learned Hyatt was not an owner of any real property in Nevada. 63 AA 15724-28. In contrast, FTB learned from public records in Orange County that Hyatt remained a California homeowner until June 1993. 68 AA 16973-74.

FTB then decided to verify the information provided by Hyatt regarding business and social connections in Nevada, which he claimed could support his alleged move date of September 24, 1991. 63 AA 15621-27. None supported his claim. 62 AA 15429-33.

FTB investigated Hyatt's assertions that he sold his home in La Palma, California, on October 1, 1991, and never spent another night there. 66 AA 16388. Hyatt did not record a deed evidencing a transfer until June 1993 – over eighteen months after the sale allegedly took place. 64 AA 15868-69. He did not list the home for sale with a licensed real estate agent. 63 AA 15631. He never provided FTB with documents evidencing a sale or an escrow. Id. Rather, he told FTB he sold his La Palma home to his personal assistant and close confident, Grace Jeng, who paid a $15,000 down payment; but he never provided any documentation of the payment. 66 AA 16388. Neighbors and

---

[7] FTB believed Hyatt's non-answers on this issue deeply impugned his credibility and did not allow him to overcome the nine-month presumption of residency. 54 AA 13412-42; 66 AA 15438; 66 AA 16396, 16456; 67 AA 16731.

7

1    repairmen placed him living at the house (68 AA 16816; 69 AA 17017; 70 AA 17372),
2    he was served with a summons and complaint (in another lawsuit) coming out of the
3    house in the early morning hours (68 AA 16907-12; 76 AA 18802), and he continued to
4    receive mail and faxes at the house, all <u>after</u> October 1, 1991. 70 AA 17465, 17481; 71
5    AA 17507; 72 AA 17790, 17793, 17824; 77 AA 19048-60, 19068-71.

6         Further evidence gathered by FTB contradicted Hyatt's assertion that he sold the
7    La Palma property on October 1, 1991. For example, the City of La Palma Water service
8    remained in Hyatt's name, long after he allegedly sold the property to Jeng. 63 AA
9    15736-38. He paid property taxes on the home into 1992. 63 AA 15706-07. He paid for
10   repairs to the home in 1992, and the handyman informed FTB that Hyatt was living in
11   the house in Spring 1992. 69 AA 17017; 70 AA 17372. Hyatt did not submit a
12   homeowner's exemption termination (a public document required by California law)
13   until 1992. 54 AA 13310-11.

14        FTB requested from Hyatt a list of professional service providers, but it was
15   incomplete. 64 AA 15952. After reviewing cancelled checks and credit card statements
16   provided by Hyatt, FTB discovered Hyatt had utilized doctors, lawyers and accountants
17   in California long after he allegedly moved to Nevada; FTB decided to contact them
18   about dates and locations of service. 69 AA 17205-06; 70 AA 17272-73, 17404-05; 71
19   AA 17617-18; 74 AA 18316-17, 18355. When FTB disclosed to Hyatt information
20   received from these professionals, which placed Hyatt in their offices for appointments
21   long after his claimed move date, Hyatt again changed the date, this time to September
22   26, 1991. 63 AA 15623; 66 AA 16486-88.

23        Further information undermined Hyatt's claim that he moved to Las Vegas in
24   September 1991. For example, he continued to use his California post office box long
25   after he alleged that he moved. 63 AA 15675. He signed two multimillion dollar
26   licensing agreements in mid-October and mid-November 1991. 63 AA 15743-50; 64 AA
27   15756-62. Although each agreement was signed after Hyatt allegedly moved to Nevada,
28   each listed Hyatt's California address and required the application of California law. 63

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

8

1    AA 15743-50; 64 AA 15756-62. Important business associates continued to send letters

2    to Hyatt in California after his alleged move. 63 AA 15659, 15742. He continued to

3    receive faxes from many sources at his California home well after its alleged sale date.

4    63 AA 15643; 77 AA 19048-60, 19068-71. Hyatt did not claim any moving expenses in

5    1991 as tax deductions. 62 AA 15346-61. Newspaper articles, in which he was

6    interviewed by reporters, placed him living in California, not Nevada, during the

7    disputed six month period. 69 AA 17022; 79 AA 19732-38. Travel documents revealed

8    origination and completion of flights out of LAX, not Las Vegas. 67 AA 16577, 16586;

9    72 AA 17772. Credit card and bank statements were addressed to his California home;

10    none were addressed to an address in Nevada. 70 AA 17465, 17481; 71 AA 17507; 72

11    AA 17790, 17793, 17824. Credit card statements had him buying meals in California. 72

12    AA 17792, 17797, 17813.

13              3.    FTB's Third-Party Contacts

14        FTB employed common investigative techniques to gather the information

15    described above and other information found during the audit. 51 AA 12750 (136) –

16    12755 (156). FTB training manuals instructed on the use of those investigative

17    techniques. 59 AA 14644-51. These manuals and other training aids provided general

18    guidance outlining the multitude of ways an auditor could obtain information, but

19    advised that since each residency audit is unique, it was up to each auditor's discretion to

20    determine how best to gather relevant information. 56 AA 13913 – 60; 60 AA 14884,

21    14970; 61 AA 15107.

22        In addition to a review of public records, FTB auditors elected to use three

23    investigatory methods: mail requests, telephone calls, and field visits including in-person

24    interviews of third parties. 76 AA 18817-41; 93 AA 23090-126. In compliance with

25    California law, each third-party contact was informed of the purpose for the inquiry:

26    "For the purpose of administering the Personal Income Tax Law of the State of

27    California, we would appreciate your cooperation in …." See e.g., 59 AA 14644, 63 AA

28    15615, 15723, 15731, 15734; 64 AA 15867, 15879, 15883, 15898.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

9

a.    FTB's Mail Requests

FTB's mail requests were made in one of three ways: (1) by a letter requesting information; (2) by a letter accompanied by a "Demand to Furnish Information," a standard FTB form; or (3) by a letter accompanied by an FTB questionnaire.

FTB's letter-only correspondence was sent to the third parties in both Nevada[8] and California.[9] Each letter was tailored to the recipient regardless of whether the letter was sent to California or Nevada; and each letter was customized to obtain only that information which would reasonably be expected to be in the possession of the specific recipient. 42 AA 10317 (182) – 10320 (196); 42 AA 10363 (32) – 10385 (120). For example, FTB's letter to the Orange County Tax Collector specifically requested information related to the property tax payments made on Hyatt's California residence (63 AA 15701), whereas FTB's letter sent to the Clark County Department of Elections requested documentation related to Hyatt's voter registration. 63 AA 15668. FTB's letter to the Nevada DMV requested specific information about Hyatt that would be in the possession of the DMV, and provided necessary identifying information to ensure that the information provided related to the specific Gilbert Hyatt at issue, i.e. Hyatt's name, social security number, date of birth, and Hyatt's post office box address – information that would have been in the possession of the DMV if Hyatt had actually obtained a driver's license in Nevada. 63 AA 15615.

Letters sent to the Clark County and Orange County Recorders requested copies

---

[8] Department of Motor Vehicles (two letters) 63 AA 15615; 65 AA 16079, Las Vegas Postmaster (three letters) 63 AA 15676, 15679; 65 AA 16034, Clark County Department of Elections (2 letters) 63 AA 15668; 65 AA 16109, Clark County Assessor 63 AA 15723, Clark County Treasurer, Clark County Recorder 64 AA 15879, Clark County School District 65 AA 16108, Nevada Governor Robert Miller 64 AA 16191, Nevada Senator Richard Bryan 65 AA 16192, Dr. Steven Hall (Hyatt's dentist beginning May 1992) 64 AA 15968, University Medical Center 64 AA 15970, KB Plumbing 64 AA 15999, Harold Pryor (a resident in Hyatt's claimed Las Vegas neighborhood) 64 AA 15995-96, G.C. Eggers (another neighborhood resident) 64 AA 15997-98, and Allstate Sand and Gravel 65 AA 16174.

[9] Orange County Voter Registration Department 63 AA 15694, Orange County Tax Collector 63 AA 15701, Orange County Recorder 64 AA 15867, Orange County Registrar 66 AA 16386, several of Hyatt's treating physicians and medical providers (eleven letters) 64 AA 15957-70, Jerry Hicks (a reporter for the LA Times who interviewed Hyatt for an article published during the disputed time period) 66 AA 16281, Chris Woodyard (same) 66 AA 16282, Ron's Repair (a handyman service) 65 AA 16107, and the La Palma Postmaster. 66 AA 16469.

10

1  of deeds recorded on certain properties in California and Nevada. 64 AA 15867, 15879.

2  In this case, however, FTB did not provide personal identifying information about Hyatt

3  – not even his name.[10] 64 AA 15867, 15879. Rather, FTB only provided the property

4  addresses to be searched. 64 AA 15867, 15879. This was similarly the case with FTB's

5  letter to KB Plumbing, a business that allegedly provided plumbing work at Hyatt's

6  Nevada house, 7335 Tara Avenue, purchased in April 1992. 64 AA 15999.

7      The various letters FTB sent to Hyatt's doctors were similarly customized. 64 AA

8  15957-70. FTB requested information regarding the dates these professionals provided

9  Hyatt treatment. Id. Not one of these letters referenced any personal or identifying

10  information related to Hyatt – beyond his name. Id.

11      In addition to the above letters, FTB also sent correspondence by cover letter

12  accompanied by a "Demand to Furnish Information" form ("letters with demand") to

13  Nevada third parties[11] and California third parties.[12] Each letter with demand sent by

14  FTB requested the recipient's cooperation and was sent with an FTB form which

15  included Hyatt's name and social security number in the caption as an indentifier. 63 AA

16  [10] In fact, none of the third-party contacts made by FTB disclosed that Hyatt purchased the Las
17  Vegas home on Tara Avenue. 63 AA 15723, 15717; 64 AA 15879, 15995-99; 65 AA 16233, 16143, 16154, 16174.

18  [11] U.S. Postmaster 63 AA 15673, Clark County Assessor 63 AA 15723, Temple Beth Am (two
19  letters requesting membership information) 63 AA 15896-97; 64 AA 15945-46, Sports Authority (believed to be a health club, therefore requesting membership information) 64 AA
20  15904-05, 15939-40, Nevada Development Authority (requesting membership information) 64 AA 15910-11, Personal Computer Users Group (same) 64 AA 15912-13, Bizmart (same) 64 AA
21  15941-42, Sam's Club (same) 64 AA 15943-44, 15973-74, Congregation Ner Tamid (same) 65 AA 16080-81, Las Vegas Valley Water District 65 AA 16095-96, Silver State Disposal Service
22  65 AA 16097-97, Southwest Gas Corp. 65 AA 16099-16100, Las Vegas Sun (two letters requesting subscription information) 65 AA 16093-94; 66 AA 16382-83, and Wagon Trails
   Apartments (requesting rental information). 64 AA 15990-93.

23  [12] The Post Master (three letters) 63 AA 15673, 65 AA 16077-78, Orange County Tax
24  Collector/Treasurer (2 letters) 63 AA 15697, 15701-02, Southern California Edison (the power company) 63 AA 15731-32, Great Expectations (a social club Hyatt belonged to requesting
25  membership information) 64 AA 15906-09, La Palma City Water Service 63 AA 15733-35, Sam's Club 64 AA 15973-74, Commerce National Bank 64 AA 15971-72, Copley Conley (the
26  cable company) 65 AA 16023-24, Orange County Registrar (a local newspaper requesting subscription information) 66 AA 16386-87, Orange County Times (same), Hyatt's attorneys
27  Dale Fiola 65 AA 16123-24, Loeb and Loeb 65 AA 16121-22, Roger McCaffrey 65 AA 16125-26, Greg Roth 65 AA 16139-40, and Lesley Anne Andres (all requesting dates and locations of
28  service) 65 AA 16141-42, and Block, Plant & Eglin (an accounting firm requesting same) 65 AA 16127-28.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

11

1   15896-97; 64 AA 15904-05, 15945-46, 15910-13, 15943-44, 15973-74, 15990-93; 65

2   AA 16080-81, 16093-100; 66 AA 16382-83. These letters with demand were also

3   narrowly tailored to seek only information reasonably likely to be in the possession of

4   the recipients. Id.

5       Hyatt was well apprised of these third-party requests. By March 1995, some of

6   the recipients advised Hyatt personally that FTB was soliciting information in such a

7   fashion about him. 78 AA 19338-42. Hyatt did not complain to FTB about any of these

8   requests. 42 AA 10379 (96-97). Nor was there evidence that any of the attorneys or other

9   professionals receiving these letters with demands ever complained about FTB's

10  requests for information, suggesting somehow that Hyatt's "privacy" was being invaded,

11  as he later claimed at trial. One of Hyatt's attorneys receiving a letter with demand

12  claimed an expertise in privacy laws, but even he did not complain of an invasion of

13  Hyatt's privacy. 48 AA 11881 (15-16); 49 AA 12054 (35-37).

14      Finally, FTB sent letters that were accompanied by a questionnaire. 63 AA

15  16227; 65 AA 16163-82. These questionnaires asked a series of questions seeking

16  information regarding Hyatt's residency claim. 65 AA 16164-68. The questionnaires

17  were customized depending on the specific recipient. For example, FTB sent

18  questionnaires to Hyatt's neighbors at his La Palma, California home, asking innocuous

19  questions such as: "Do you know the owners of 7841 La Palma Circle?" Id. Of particular

20  significance, there was no reference to Hyatt in any one of these questionnaires – not

21  even his name. 65 AA 16163-68; 66 AA 16198-227. FTB sent two questionnaires to

22  Hyatt's friends, asking questions such as: "To the best of your knowledge, where does

23  Mr. Hyatt reside and how long has he resided there?" 65 AA 16169-73; 66 AA 16362-

24  65. By August 1995, Hyatt was fully apprised of all such requests sent out by FTB and

25  the full scope of FTB's investigation. 66 AA 16388-16416.

26              b.    FTB Field Visits and In-person Interviews

27      FTB employees decided to conduct interviews of members of Hyatt's family, and

28

12

1  took affidavits from three individuals believed to have relevant knowledge.[13] 76 AA

2  18802-16. FTB began with Hyatt's ex-wife, who had been referenced in many news

3  articles published about Hyatt; she then gave FTB the names and numbers of other

4  family members believed to have information about Hyatt's living arrangements. 93 AA

5  23104.

6      FTB was able to interview some of Hyatt's neighbors in both La Palma and Las

7  Vegas. 68 AA 16796-800, 16984-85. Some individuals refused to speak to FTB. Id.

8  Others were not at home or not available during FTB's field visits or gave vague and

9  inconclusive information. Id. As expected, FTB employees used their discretion to gauge

10 the accuracy or credibility of the information received from the neighbors in deciding to

11 ask further questions. 40 AA 9884 (67) – 9885 (70), 9911 (175), 9978 (56-57); 41 AA

12 10082 (99-100).

13     FTB auditors made two field visits to Nevada. First, in March 1995 Sheila Cox

14 and Sheila Semana spent three days trying to confirm Hyatt's change of residency claim.

15 68 AA 16796. They made decisions, based on their training, concerning where to look

16 for relevant information. For example, they went to a local library looking for articles

17 about Hyatt in local newspapers and to the location of Hyatt's post office box to see if

18 Hyatt received mail there. 68 AA 16796. They drove to the neighborhood where Hyatt

19 allegedly lived, to look at the Tara Avenue house that he bought in April 1992. 68 AA

20 16796-800. During a visit to Hyatt's neighborhood, the auditors spoke to a mail carrier

21 (68 AA 16797), some construction workers (68 AA 16799), and the trash man. 68 AA

22 16800. They saw a package on the house's front porch, walked up to the porch, and

23 looked at the address that was in plain view, noting it was not addressed to Hyatt. 68 AA

24 16799. The auditors also talked to a total of five people in surrounding homes, without

25 identifying Hyatt, to see if they had seen anyone living at the house. 68 AA 16796-801.

26     The rest of the FTB's March 1995 field visit involved visits to the apartment

---

27 [13] FTB did not take an affidavit from the fourth relative, who although she had disparaging
28 opinions of Hyatt, did not appear to have relevant evidence of his living arrangements. 40 AA
9908 (165) – 9909 (166).

13

1    complex where Hyatt claimed to have lived when he first moved to Las Vegas, a Sam's

2    Club membership store, and the office of Hyatt's accountant, which Hyatt claimed was

3    his Nevada business address. 68 AA 16796-801. At the apartment, the auditors looked at

4    the low-income apartment complex, asked the managers for their memory of Hyatt,

5    spoke with one woman who lived just across from Hyatt's rented unit, and reviewed the

6    items in Hyatt's rental file. 68 AA 16798-99; 76 AA 18817-41. At the Sam's Club, the

7    auditors met with the manager to determine if he could provide membership information.

8    Id. At the office of Hyatt's accountant, the auditors asked the receptionist if Hyatt's

9    accountant or Hyatt himself was there; the receptionist indicated she did not know Hyatt.

10   66 AA 16409; 68 AA 16801.

11       During late November 1995, Sheila Cox accompanied another FTB auditor,

12   Candace Les, to Las Vegas to assist on Les' cases. 41 AA 10143 (94-96). During this

13   visit Cox made an observation of the Tara Avenue residence to evaluate recent

14   information provided by Hyatt's representatives (i.e. that a privacy berm that had been

15   recently constructed) and took a photograph of the Tara Avenue house. Id.

16       While FTB was requesting information from third parties, FTB was also making

17   information requests from Hyatt himself. 64 AA 15886-87, 15975-77. FTB believed

18   Hyatt displayed a lack of cooperation in responding to these requests. 66 AA 16426.

19   FTB requested telephone records (64 AA 15887) (Hyatt claimed he had none, 66 AA

20   16426), credit card statements, banking statements, and receipt of income information.

21   64 AA 15886-87. FTB never received all banking account information no matter how

22   many times requested. 63 AA 15680-81; 64 AA 15884, 15886-87, 15891-92; 65 AA

23   16177-79; 66 AA 16349, 16366. FTB asked for the specific date of income received

24   from two contracts Hyatt executed in October and November 1991, respectively (63 AA

25   15628) and when Hyatt refused to give that information, FTB had to seek it directly from

26   Matsushita and Fujitsu. 65 AA 16187, 16189.

27       At trial, Hyatt was very critical of FTB's auditors and their investigative efforts,

28   claiming that they should have done their jobs better. Hyatt's criticism included nit-

14

1 picking instances like not noticing from new stationery that his representative (Kern)
2 changed office locations, and thus a letter was sent to an old address (37 AA 9016 (155-
3 56)); and when the letter requesting information was re-sent, the time to respond was not
4 changed (37 AA 9001 (97)); FTB made improper assumptions about lifestyles of the rich
5 and famous in evaluating Hyatt's residence (43 AA 10661 (63-64)); FTB did not follow
6 up on potentially favorable-to-Hyatt witnesses and other leads (40 AA 9898-900; 43 AA
7 10776 (204)); FTB should have taped-recorded interviews, rather than taken notes (46
8 AA 11464 (91-93)); FTB should have kept copies of the handwritten notes after they
9 were typed up, rather than discard them (53 AA 13189 (113)); FTB failed to properly
10 maintain Hyatt's audit file since the photograph taken in November 1995 was not found
11 in the audit file. See 41 AA 10143 (94) – 10147 (110).

12     At trial Hyatt was particularly critical of Sheila Cox, the third auditor assigned to
13 investigate his claims. Hyatt criticized FTB for: (1) selecting her in the first place (40
14 AA 9881 (57) – 9882 (58)); (2) allowing her to be tenacious in pursuing evidence (see
15 40 AA 9880 (27) (characterizing Cox as "obsessed")); (3) allowing her to consult with
16 other more experienced members of FTB's residency unit (52 AA 12838 (96) – 12839
17 (101)); (4) allowing her to rely on third-party information rather than Hyatt's
18 unsupported explanations (52 AA 12925 (152-53)); and (5) assisting her with her
19 deposition and trial testimony by giving her access to Hyatt's audit file after she had left
20 FTB's employ (52 AA 12892 (21) – 12893 (22)). At trial Cox endured nine days of
21 examination on topics such as why she gathered certain evidence, but not other; why she
22 weighed certain evidence more heavily than other; why she used past tense versus
23 present tense of verbs in preparing reports; why she recommended a fraud penalty for
24 1991, but not for 1992. 40 AA 9878 (42) – 43 AA 10524 (156).

25     Hyatt's primary criticism, however, was that FTB sought information about him
26 through independent, third-party sources rather than ask him for that same information.
27 37 AA 9239 (77) – 9240 (79). At trial, Hyatt claimed that he would have readily given
28 FTB the information they obtained from independent, third-party sources, "if FTB had

15

1   only asked." Id. At trial Hyatt further claimed that rather than adhere to methods in FTB
2   training manuals, the auditors should have employed other methods of conducting its
3   audit that Hyatt believed were more fair. For example Hyatt suggested: FTB should have
4   provided Hyatt with witness affidavits, when he requested copies, rather than waiting
5   until the conclusion of the audit as the manuals suggest (35 AA 8553 (42)); an auditor
6   should not have utilized proposed edits from an FTB Legal staff member in drafting a
7   fraud memorandum (41 AA 10199 (57) – 10202 (68)); FTB should not have used
8   Hyatt's social security number as an identifier (44 AA 10777 (208-09), 10778 (211)), as
9   was commonplace and allowed at the time (1993 to 1997) (48 AA 11802 (99)).

### 4.    FTB Supervision and Review of Auditors

Although the three auditors were the primary employees working on Hyatt's
audits, their work was regularly supervised, reviewed and approved by FTB
management and other experienced FTB employees. 72 AA 17964-70; 93 AA 23090-
126. Supervision and review for the 1991 audit began immediately upon the opening of
the audit investigation. 93 AA 23090. If new auditors were assigned to the case, their
work was also supervised and reviewed. 93 AA 23101, 23103, 23105, 23111. FTB
records show extensive supervisory and review oversight of the auditors' work. 72 AA
17964-70; 93 AA 23090-126.

In addition to supervision and review, the auditors also regularly consulted and
relied upon the guidance of other more experienced auditors and employees as specific
issues arose. For example: A sourcing issue required the consultation and assistance of a
"technical review team" that engaged to conduct a review of the facts then-gathered by
the auditors and California income source tax rules. 89 AA 22138-42; 93 AA 23122-23.
Horace Pitts, an investigator in FTB's Special Investigations Unit, was consulted to
determine whether Hyatt should be turned over for criminal investigation. 42 AA 10448
(59-60); 93 AA 23111.

27   ///
28   ///

16

1

2

### 5. Results of FTB Audit: FTB Proposed Increased Tax, Interest, and Penalty Assessments Against Hyatt

3      Upon completion of the audits, FTB weighed and analyzed the available evidence

4   in accord with applicable California legal standards concerning both sourcing and

5   residency. FTB preliminarily concluded that sourcing theories, i.e. federal earned income

6   theory and the evidence then-available, did not apply to Hyatt's income. 89 AA 22138-

7   42. Concerning residency, however, that analysis revealed Hyatt remained a California

8   resident until April 1992 (six months after the date asserted by Hyatt). 72 AA 17895.

9   Their analysis also concluded that Hyatt simply pretended to move earlier than he

10  actually did, by renting an apartment but never living there, and getting a Nevada driver

11  license, a post office box, bank account, and registering to vote at DMV, to create a

12  façade of Nevada residency. 72 AA 17894.

13      In August 1995, FTB sent Hyatt and his representatives a detailed 39-page notice

14  of FTB's audit activities and its initial conclusions, and gave Hyatt ample opportunity to

15  rebut those tentative findings. 66 AA 16388-427. Thereafter, many letters were

16  exchanged between FTB and Hyatt's representatives. 66 AA 16433-64, 16481-83, 16499

17  – 67 AA 16511, 16638-75, 16690-16741. Each FTB letter invited Hyatt to offer

18  additional evidence or explanation addressing FTB's preliminary conclusions. 66 AA

19  16456-59; 67 AA 16638-41. Hyatt did offer some additional evidence, but even that

20  evidence further supported FTB's initial conclusions on residency and imposition of the

21  fraud penalty. 66 AA 16499 - 67 AA 16727. At trial Hyatt was highly critical of how

22  FTB auditors weighed and evaluated the evidence they relied upon in forming their

23  conclusions; Hyatt offered his own interpretation of how FTB should have weighed and

24  evaluated the evidence it had gathered. 66 AA 16433-54.

25      Before an official notice of proposed assessment[14] could be issued, formally

26  concluding an audit, the preliminary determinations reached by FTB auditors were

27

28  [14] The notice of proposed assessment is the document that ends the audit period, and triggers various administrative appeal rights. 54 AA 13326-29.

17

RJN002344

1  subject to three separate levels of internal review. 41 AA 10217 (128-129). A notice of
2  proposed assessment is issued only if all levels of review are convinced that the
3  determinations reached in the audit are correct. Id. In this case, the first level of review
4  was a supervisor, who agreed with the determinations and sent the results on to its
5  second level of review, an "on-line" reviewer, who, like the supervisors, agreed with the
6  determinations reached by audit; and then the audit file was forwarded to the Sacramento
7  Residency Unit. 93 AA 23117 – 226. Based on their uniqueness, all residency cases are
8  reviewed by the Sacramento Residency Unit, which conducts an in-depth review of these
9  files. 46 AA 11296 (77) – 11297 (78); 72 AA 17964 – 970. That unit is a specialized
10 group of auditors and FTB managers with experience and expertise in residency audits.
11 Id. In this case, Carol Ford was the Sacramento Residency Unit reviewer for Hyatt's
12 1991 and 1992 audits. 48 AA 11919 (167-169); 54 AA 13392; 54 AA 13409, 72 AA
13 17964 – 970. Ford had years of experience performing residency audits. Id. Upon
14 completion of her review, Ford discussed the audits with her supervisor, who was
15 ultimately responsible for signing off on the case after all levels of review were
16 completed; they both agreed with the audit determinations.[15] 48 AA 11891 (55) – 11893
17 (64).

18     At trial, Hyatt was critical of FTB's supervisors and reviewers, claiming they too
19 should have performed their jobs better. Particularly, Hyatt claimed that the supervisors
20 and reviewers did not spend enough time doing their jobs; did not adequately supervise
21 the auditors; should not have recommended a fraud penalty for tax year 1992; and
22 generally contending the quality of their work did not meet "reasonable professional
23 standards." 44 AA 10823 (40) – 10825 (46).

24     At the completion of the audits, FTB sent Hyatt two notices of proposed

---

[15] At the conclusion of the 1991 audit, Ford recommended that FTB open an audit for the 1992
26 tax year based on audit's determination that Hyatt had become a California non-resident on
April 3, 1992. 48 AA 11922 (181) – 11923 (182). Hyatt had not filed a 1992 California tax
27 return. 48 AA 11893 (65) – 11895 (71). The same general audit steps, supervision and review
were applied to the 1992 audit that had been applied to the 1991 audit. The 1992 audit was
28 significantly abbreviated since most of the evidence had been gathered during the 1991 audit. 72
AA 17963 – 70; 72 AA 17862 – 95.

18

MCDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002345

1   assessments, informing him that FTB proposed increased tax amounts, penalties, and

2   interest. 54 AA 13326-29, 13398-403; 73 AA 18075, 18078 – 82. At trial, Hyatt claimed

3   that the Las Vegas jury was empowered to act as a "check and balance" against those

4   administrative actions taken by FTB in California.[16] 52 AA 12837 (90). The following

5   questioning of Hyatt's key expert, Malcolm Jumelet, sums up Hyatt's focus at trial:

6   Q: Now, tell the jury what is was that you were asked to do specifically once you
7   got the assignment and you said, okay, I understand what my role is now?

8   A: I was asked to review the file pertaining to the assessments of Mr. Hyatt for the
    years 1991 and 1992. And form an opinion on the practices, procedures, actions,
9   methodology and conclusions used by the Franchise Tax Board in reaching those
    assessments. And also to include my conclusions on the actions of the protest
    that was not yet final.

10                                          . . .
11  Q: **[O]n the whole are your opinions critical of the way in which information
    was gathered or the way in which information was analyzed and weighed?**

12  A: **It was the way the information was analyzed and weighed.**

13  44 AA 10760 (138-39), 10943 (65) (emphasis added). Notably Jumelet, who was Hyatt's

14  lead expert, acknowledged he found no evidence of Hyatt's extortion allegations (which

15  were the foundation to Hyatt's bad faith allegations). 44 AA 10846 (130). Instead, he

16  opined that one of FTB's auditors got overly ambitious with her conclusions to gain a

17  promotion, and the many supervisors and reviewers assigned to Hyatt's audit simply

18  went along with her conclusions. 44 AA 10834 (83).

19          Hyatt's expert witnesses at trial attacked, in one form or another, the discretionary

20  decisions made by FTB's audit staff in gathering, evaluating and weighing the evidence

21  concerning Hyatt's residency. 36 AA 8785 - 76 (Antolin's testimony); 43 AA 1064 –

22  724, 10729 (14) – 778 (212) (testimony of Jumelet and Schervish). Hyatt was permitted

23  to ask the jurors to look at the evidence in the audit file and determine for themselves

24  whether they believed FTB's proposed assessments were fair. 52 AA 12827 (51).

25  Implicit in that question, Hyatt was asking the jury to determine if FTB made the "right"

26  _____
    [16] Hyatt's closing argument included a traditional separation of powers argument, but with a
27  twist. Hyatt's counsel described California's Legislature enacting tax laws, with FTB as a
    component of the Executive Branch enforcing those laws, and then the Las Vegas jury was the
28  appropriate Judicial Branch acting as a "check and balance" on the exercise of those California
    powers. 52 AA 12837 (90).

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

19

RJN002346

1  decision.[17] Id. The district judge herself informed the jury they were entitled to analyze
2  whether FTB's analysis and conclusions were correct. 53 AA 13242-43.

3  ### 6.  Hyatt's Responses to FTB's Proposed Assessments

4  A notice of proposed assessment becomes final and enforceable in 60 days, unless
5  the taxpayer files a written challenge or protest, which triggers a protest proceeding. Cal.
6  Rev. & Tax Code § 19041. This is an internal administrative review or appeal of the
7  determinations reached during the audit. 54 AA 13329. Once a protest is filed, a Protest
8  Hearing Officer (PHO) is assigned to the case, to further develop the facts, conduct
9  additional research, and consider whether the conclusions reached on the notice of
10  proposed assessment were accurate. 49 AA 12083 (151-152). PHOs describe this
11  process as taking a "fresh look" at an audit's recommendations. 34 AA 8325 (77). Upon
12  completion of that fresh look, the PHO can withdraw the assessments, modify the
13  assessment, or sustain the assessments. 50 AA 12286 (32-33).

14  ### a.  Hyatt's California Administrative Protest Proceedings

15  Hyatt made two responses to FTB's notices of proposed assessments. First, on
16  June 20, 1996, he filed a protest for the 1991 audit. 54 AA 13330-91. At that time, the
17  1992 tax audit was still ongoing. 72 AA 17964 - 970. As a result, Hyatt's attorney
18  requested that the 1991 Protest Proceedings be put on hold until the conclusion of the
19  1992 audit, so that the two protests could be consolidated. 72 AA 17967. FTB complied
20  with Hyatt's request, which consumed over 17 months. 54 AA 13398-403.

21  Ultimately the district court allowed Hyatt to introduce his Protest Proceedings
22  into the trial as well. 12 AA 2998-99; e.g. 34 AA 8325 (76-77). She allowed Hyatt to
23  argue that the amount of time it took FTB to resolve his Protest Proceedings was "bad
24  faith" on the part of FTB, but she would not allow FTB to mention the substantive issues
25  contributing to the length of time it took to resolve Hyatt's Protest Proceedings. For

---

26  [17] While Hyatt was allowed the opportunity to present witnesses opining that FTB had not made
27  the right conclusion at the audit level (34 AA 8259 (149) – 8260 (150)), during FTB's case in
    chief, District Judge Walsh prohibited any FTB witness from opining, after their own review of
28  the evidence, whether FTB properly weighed and evaluated the evidence to reach the right
    conclusion. 45 AA 11233 (208) – 11237 (222); 46 AA 11304 (108-09).

20

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1  example, FTB was foreclosed from introducing its requests for information sent to Hyatt,

2  or to examine the incomplete evidence Hyatt was sending in response. E.g., 76 AA

3  18886-891. Also, FTB was prohibited from introducing the masses of evidence

4  concerning Hyatt's residence gathered during the litigation, to compare and contrast to

5  the evidence Hyatt was supplying to the PHO (it was different), so the jury could

6  understand the additional analysis being undertaken by FTB across the span of the

7  Protest Proceedings. 27 AA 6507-08. And, FTB was prohibited from introducing as

8  evidence the Nevada Protective Order (to be explained shortly) (36 AA 8899 (96) – 8901

9  (104)), which had a significant impact on the timeliness of FTB's resolution of the

10  Protest Proceedings

11      Anna Jovanovich, an FTB in-house attorney, was assigned as the first PHO, and

12  once the two protests were consolidated, Jovanovich began processing Hyatt's protests.

13  50 AA 12368 (11). When Jovanovich retired, Robert Dunn was assigned as the second

14  PHO, who served until his workload required reassignment to another PHO, Charlene

15  Woodward. 50 AA 12368 (11-13). After she requested transfer to another department,

16  Hyatt's Protest Proceedings were assigned to Cody Cinnamon, who served until their

17  conclusion.45 AA 11077 (41). FTB is compelled to recite these mundane reassignments

18  because at trial Hyatt criticized FTB's choice of personnel assigned to resolve his Protest

19  Proceedings, contending that FTB did not choose a PHO who might side with him and

20  that was bad faith too. 52 AA 12891 (17) – 12892 (19). And then across trial, Hyatt was

21  permitted to contend that the PHO's decision was made in bad faith as well. 37 AA 9167

22  (80-81); 52 AA 12834 (81); 53 AA 13181 (78-79).

23              b.      Hyatt's Nevada Litigation

24      Hyatt also responded to the assessments by filing this litigation on January 6,

25  1998, in the Eighth Judicial District Court. 1 AA 1-16. The first claim of a First

26  Amended Complaint, and ultimately his Second (and final) Amended Complaint, sought

27  declaratory relief, requesting the district court, among other things, declare that he was a

28  Nevada resident as of September 26, 1991. 14 AA 3257-3300. The balance of his

21

1   complaint sought a declaration that FTB's demands for information (the requests sent to
2   third parties) were illegal. Id. And he asserted multiple tort claims, all of which were
3   predicated upon extortion allegations, i.e. Hyatt alleged FTB had no evidence to support
4   its tax and penalty conclusions and every action taken toward him was designed to extort
5   a settlement out of him. Id. Before trial Hyatt relied extensively upon his extortion
6   allegations, but at trial, he presented no evidence of extortion, and even his two experts
7   admitted they found no evidence of extortion practiced by FTB.[18] During closing
8   argument, after FTB pointed out the complete lack of evidence supporting Hyatt's
9   critical extortion allegation, Hyatt responded by asserting that FTB's counsel gave a mis-
10  impression to the jury by claiming that "we have to prove everything in the complaint."
11  53 AA 13167 (24).

12      Hyatt hired a consultant for the Nevada litigation, Candace Les, a former FTB
13  employee who had been terminated. 33 AA 8234 (46); 34 AA 8257. Les testified (at trial
14  via deposition) that she was a former friend of Sheila Cox, one of the auditors assigned
15  to Hyatt's audit. 33 AA 8178 (163-65). Initially, Les claimed that in private moments
16  Cox referred to Hyatt as a "Jew bastard." Id. In subsequent testimony, Les backtracked
17  on her anti-Semitic allegations after she read some of Hyatt's briefs that made Les and
18  her original testimony the centerpiece of those submissions. 34 AA 8256 (135-36). Cox
19  vehemently denied making any anti-Semitic remarks (41 AA 10151 (128-29)), and her

20

21  [18] Hyatt's lead expert, Malcolm Jumelet, testified as follows:

22      Q   And from your review of the audit file or the protest file, did you find evidence
            of extortion on behalf of the FTB?

23      A   **No, I did not.**

24  44 AA 10846 (130) (emphasis added).

        In addition, Hyatt called the former State Auditor for California, Kurt Sjoberg. 33 AA
25  8060 (67). As the State Auditor, Sjoberg was responsible for auditing California's various state
    agencies, including FTB. Id. (68-69). Sjoberg further testified that he conducted audits of FTB
26  between 1993 and 1997, the years during which Hyatt's audits and tax assessments were
    proceeding. Id. (69). When auditing FTB, Sjoberg indicated that he would review a sampling of
27  tax assessments and audits conducted by FTB. 33 AA 8060 (69) – 8061 (73). In the sampling of
    audits he reviewed during these years, Sjoberg specifically testified that he saw **"no instances"**
28  in which the "auditors artificially inflated assessments, fabricated assessments, made bogus or
    phony assessments." 33 AA 8161 (95-96) (emphasis added).

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

22

1  friends and co-workers testified that they never heard her make any such remarks. 46
2  AA 11390 (138); 11461 (78).

         c.     Inter-relationship between California Administrative Protest
                    Proceedings and Nevada Litigation

5      In September 1999, Hyatt began to erect a wall between the California Protest
6  Proceedings and the Nevada litigation, even though both proceedings were doing
7  discovery into Hyatt's residency. Hyatt sought and received a protective order from the
8  Nevada court (the Nevada Protective Order) which "prevent[ed] the viewing of
9  information produced in the litigation by the Protest Hearing Officer." 94 AA 23166-
10  177. Specifically, the Nevada Protective Order prevented the PHO, without Hyatt's
11  consent, from obtaining or viewing any documents Hyatt designated as off-limits or
12  confidential in the litigation. Id. Thereafter Hyatt designated nearly everything
13  confidential. 50 AA 12315 (146-47). At trial, the district judge prohibited FTB from
14  discussing the Nevada Protective Order. 36 AA 8899 (96) – 8901 (104).

15      FTB believes its compliance with the Nevada Protective Order and Hyatt's use of
16  the order significantly delayed its resolution of the Protest Proceedings. To comply with
17  the Nevada Protective Order and at the same time ensure that both sides of FTB (the
18  litigation attorneys and the PHOs) were aware of and getting the same information from
19  Hyatt during both the Nevada litigation and the Protest Proceedings, FTB put in place an
20  internal one-way system of communication. 76 AA 18880-83. This ensured compliance
21  with the Nevada Protective Order, and also ensured that the answers being provided by
22  Hyatt in the Protest Proceedings were complete, and the same as information Hyatt was
23  providing in the Nevada litigation. Id. Dunn, FTB's in-house counsel working with
24  FTB's trial counsel, was tasked with reviewing the discovery responses provided by
25  Hyatt in the Protest Proceedings and comparing them to Hyatt's litigation responses. 50
26  AA 12369 (14-16). If they were deficient, Dunn was merely permitted to say that they
27  were, but not how or why they were deficient, without violating the Nevada Protective
28  Order. Id. For example: In June of 2000, Hyatt provided two boxes of documents to the

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

23

1 PHO in response to a request made six months earlier. 54 AA 13443 – 55 AA 13543.

2 Dunn reviewed Hyatt's documents and discovered that they were grossly incomplete,

3 based upon the information that Hyatt had previously disclosed in the Nevada litigation.

4 50 AA 12380 (58) – 12381 (62). To comply with the Nevada Protective Order, Dunn

5 could only tell the PHO that the responses were inadequate, but not how or why. 50 AA

6 12369 (14-16). This drill happened numerous times. 50 AA 12307 (116) - 50 AA 12311

7 (132). FTB's PHO would review and process Hyatt's protests, and Dunn continued to

8 review Hyatt's documents to ensure that they were complete, and in compliance with the

9 Nevada Protective Order; each time such a review took place, however, it was

10 discovered that Hyatt had not given complete information, which necessitated additional

11 requests for information. 50 AA 12380 (58); 55 AA 13544-45, 13552-62. At trial, FTB

12 was prohibited from giving examples of how or why they were defective, thus

13 preventing FTB was fully defending itself against Hyatt's charge of bad faith delay. 27

14 AA 6509-10 (order granting motion to exclude after-acquired evidence).

15     After Hyatt's repeated failure to provide complete information, FTB's PHO could

16 go no further; thus, FTB then made numerous requests of Hyatt and his counsel to

17 consent, as allowed by the Nevada Protective Order, to giving the PHO information

18 which had previously been disclosed to FTB during the Nevada litigation. 76 AA 18892-

19 93; 77 AA 19025-28. Hyatt steadfastly refused. 49 AA 12073 (110-111). As a result,

20 FTB issued a California administrative subpoena. 76 AA 18894-97. The administrative

21 subpoena simply requested that the information FTB had gathered in the Nevada

22 litigation be shared with the PHO. Id. This literally meant moving documents across the

23 hall from one FTB attorney to another. 49 AA 12240 (130). Hyatt refused to consent and

24 forced FTB to engage in costly and time-consuming litigation to enforce the

25 administrative subpoena, first before the California Superior Court and then on appeal to

26 the California Court of Appeal. 76 AA 18901-10; State Franchise Tax Bd. v. Hyatt,

27 C043627, 2003 WL 23100266 (Cal. Ct. App. Dec. 31, 2003) (unpublished disposition).

28 Before those courts, Hyatt claimed that the documents were confidential, the disclosure

24

1   of which would invade his privacy, and that FTB was pursuing him in bad faith. Id. The

2   California Court of Appeals found that the disclosure of documents would not invade his

3   privacy, and that FTB was not acting in bad faith in pursuing the subpoena as part of the

4   Protest Proceedings.[19] Id. Hyatt's tactics consumed almost two years.[20] Id.

5       At the completion of the subpoena litigation, FTB spent months copying,

6   organizing and analyzing the voluminous litigation documents. 50 AA 12393 (112-113)

7   – 12394 (114). The PHO then discovered that these documents still did not provide her

8   with specific information relating to a schedule of 1992 payments received by Hyatt

9   from his patents and about which Hyatt had complained bitterly, suggesting that FTB

10  had made an error concerning $24 million in income. 54 AA 13404-06; 55 AA 13564-

11  65. In June 2005, the PHO made additional requests for this necessary information. 77

12  AA 19006.[21]

13      Throughout 2005, the PHO continued to work on Hyatt's Protest Proceedings and

14  make requests for additional necessary information and documents from Hyatt. 76 AA

15  18920 – 77 AA 19024. Hyatt either sought additional time to respond, or simply refused

16  to comply with the requests outright. 77 AA 19025-28; 19030-32. In October 2005, FTB

17  again requested – actually twice – that Hyatt consent to the release of additional

18  documents and deposition testimony that accumulated in the Nevada litigation since the

19  first disclosure. 77 AA 19025-27. Hyatt flatly refused. 77 AA 19028. FTB was once

20  again forced to issue a second administrative subpoena. 77 AA 19028-47. And FTB was

21  forced to go through that same drill again in the Spring 2007. 50 AA 12398 (130-132).

22  The PHO finally received most of the requested documents and continued the arduous

23

24  [19] Before trial FTB requested that the district judge apply the doctrine of collateral estoppel to

25  prevent Hyatt from re-litigating the bad faith protest issue in Nevada, that had already been
    decided in California against Hyatt. 8 AA 1879-84. The district court refused. 12 AA 298-99.

26  [20] Obviously, the PHO was unable to proceed with the protest proceedings until the subpoena
    litigation was completed.

27  [21] About the same time, Hyatt engaged in another stall tactic. He requested that FTB copy and

28  produce all of the documents that were disclosed to the PHO pursuant to the subpoena – in spite
    of the fact that all of these documents were already in Hyatt's possession. 17 AA 19006.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

25

1 process of analyzing and reviewing thousands of documents.[22] 49 AA 12241 (137) – 42

2 (138).

3     Eventually, the PHO was able to analyze all of the information, and in November

4 2007, the PHO affirmed, in all respects, the determinations made during the audit –

5 including the determinations that Hyatt did not become a non-resident of California until

6 April 1992, the tax assessments for both the 1991 and 1992 tax years, and the imposition

7 of the fraud penalties for each tax year. 93 AA 23182-231. Because evidence was

8 discovered during the protest supporting a sourcing theory, that finding was also made

9 against Hyatt.[23] 93 AA 23211-30.

10     The amount of additional information gathered by FTB during the Protest

11 Proceeding was massive. 49 AA 12155 (159-160) (explaining audit file consisted of two

12 bankers boxes, but by conclusion of protest, FTB had a file consisting of 48 bankers

13 boxes). Analysis of that information bolstered the proposed assessments originally

14 reached by FTB's auditors concerning Hyatt's residency, and provided the foundation

15 for a sourcing theory. 93 AA 23211-30. For example: FTB discovered additional flight

16 records concerning Hyatt during the disputed six month period, all originating (in the

17 early morning hours) and concluding out of LAX, not Las Vegas; FTB discovered

18 equipment repair records for equipment that Hyatt had in his California home, where

19 Hyatt's actual presence in the home was noted on the dates of service after his alleged

20 move to Nevada; FTB discovered mortgage documents concerning Hyatt's California

21 home that further showed that his claimed sale in October 1, 1991 to his personal

22 assistant was a sham; FTB discovered that Hyatt falsified notary documents to support

23 that sham transaction; extensive income documents and business records in support of

24

25 [22] In this case 155 depositions were taken and over 168,000 documents were exchanged. FTB
26 turned over all that information, so not to be accused later of cherry-picking the evidence favorable-to-FTB. 18 AA 4328.

27 [23] At trial Hyatt claimed it was bad faith for FTB to revisit its earlier sourcing decision after it
28 uncovered evidence in support of that theory. See 49 AA 12234 (107-08). At trial FTB was forced to defend against that allegation, but was prohibited from offering the evidence gathered during the protests to explain why it revisited the issue. 27 AA 6509-10.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

26

1  the sourcing theory were found. 93 AA 23182-231.

2      Before trial Hyatt moved to exclude all evidence FTB gathered during the Protest

3  Proceedings. 20 AA 4983-96. Such evidence, at the very minimum, would have been

4  powerful impeachment material against Hyatt. 22 AA 5349-56. Additionally, at trial

5  Hyatt extensively challenged, as bad faith, FTB's conclusion that Hyatt failed to fully

6  cooperate during the audit; the evidence gathered during the Protest Proceedings

7  unequivocally demonstrated that Hyatt had truly not fully cooperated by failing to

8  disclose all requested documents in his possession. However, the district judge granted

9  Hyatt's motion in limine, excluding that evidence as irrelevant. 27 AA 6509-10.

10      d.      Hyatt's Appeal to the California State Board of Equalization

11      Hyatt has now moved to his next stage of his administrative appeal. He filed an

12  appeal to the California State Board of Equalization. 92 AA 22908, 22939-45. His

13  appeal is still pending as of the time of this opening brief. Hyatt's briefs to the California

14  State Board of Equalization contend that the Board is bound by the jury's findings in the

15  Nevada litigation. Id. Before his briefs were filed, Hyatt requested multiple extensions of

16  time to ensure that the briefs were not filed until after the jury's verdict – all the while

17  complaining to the jury that delays were causing him additional emotional distress. 92

18  AA 22908. If the Board of Equalization decides the administrative appeal against him,

19  Hyatt has even more remedies. He can file suit in California courts challenging that

20  decision, with the potential for even more appeals and delays.

21      7.      FTB's Litigation Rosters

22      Shortly after Hyatt filed this litigation, FTB listed this case on its Litigation

23  Rosters. 83 AA 20694 – 89 AA 22050. Litigation Rosters are a monthly summarization

24  of litigation in which FTB is involved.[24] 50 AA 12296 (70). Numerous cases are listed at

25  any given time, including all cases involving residency. 83 AA 20694 – 89 AA 22050.

26  Information is drawn from documents filed in each case. See 13 AA 3109. When FTB

27  first began compiling Litigation Rosters, they were only available on paper, but in 2000,

28  ---
[24] The Litigation Rosters are quite similar to the docket sheets maintained by Nevada's courts.

27

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1   FTB received a formal request from a member of the public to publish the Litigation
2   Rosters on FTB's website; FTB was then legally required to do so.[25] 50 AA 12296 (71-
3   73), 12297 (74-75).

4           8.      California's Tax Amnesty Legislation

5           On August 16, 2004, the Governor of California signed a tax amnesty bill enacted
6   by California's Legislature which applied to any taxpayer who had a pending tax dispute
7   with the FTB. 89 AA 22051-67. At that time, Hyatt had two pending protests. Hyatt,
8   along with thousands of other taxpayers, received an application notifying him that he
9   "may be eligible to participate in California's tax amnesty program on any or all tax
10  years beginning before January 1, 2003." 55 AA 13567. The district court allowed Hyatt
11  to introduce the application as evidence at trial and discuss the amnesty program with the
12  jury. 55 AA 13566-70. Hyatt did not return the application, but instead claimed it was
13  further evidence of FTB's bad faith. 37 AA 9167 (78-81).

14          B.      District Court Resolution Of The Nevada Litigation

15          A four-month jury trial was held in 2008. The jury found in Hyatt's favor,
16  awarding $52 million for invasion of privacy damages, $85 million for emotional
17  distress damages, more than $1 million in attorney fees (the sum Hyatt expended during
18  FTB's audit and protest), and $250 million, after phase 3 of the trial, in punitive
19  damages. 90 AA 22359-66; 54 AA 13308-09. The district court added over $102 million
20  in prejudgment interest bringing the total judgment to over $490 million. 90 AA 22359-
21  66. The district court denied FTB's motions for new trial, for judgment as a matter of
22  law, and to alter or amend the judgment. 93 AA 23032-36. This timely appeal followed.
23  93 AA 23037-41.

24  ///

25  ///

26  ---
   [25] Like any state agency, FTB must follow certain statutory mandates which require openness in
27  FTB's activities and its conduct on behalf of the citizens of California. "Public Records" are
    defined under California's Public Records Act as "any writing containing information relating
28  to the conduct of the public's business prepared . . . or retained by any state or local agency...".
    Cal. Gov't Code § 6252(e). FTB's Litigation Rosters fall squarely within this definition. Id.

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

28

IV.  LEGAL ARGUMENT

A.  Standard Of Review

Almost every issue in this appeal is a legal issue, for which this court applies a de novo standard of review. See Nelson v. Heer, 123 Nev. 26, 163 P.3d 420, 424-25 (2007) (de novo standard of review for JNOV or motion for judgment as a matter of law); Stalk v. Mushkin, 125 Nev. ___, 199 P.3d 838, 840 (2009) (de novo review of orders on motions for summary judgment); Bongiovi v. Sullivan, 122 Nev. 556, 580-83, 138 P.3d 433 (2006) (de novo review of punitive damages guideposts); Martinez v. Maruszczak, 168 P.3d at 724 (de novo of legal questions involving application of sovereign immunity); Callie v. Bowling, 123 Nev. 181, 160 P.3d 878, 879 (2007) (de novo review of constitutional challenges); Cortinas v. State, 124 Nev. ___, 195 P.3d 315, 319 (2008) (de novo review of whether jury instruction was correct statement of law).

B.  The Doctrine Of Comity Applies To This Case

1.  Nevada Supreme Court Proceedings

One of the early issues in this case was whether Hyatt's complaint should have been dismissed under a California statute that provides full sovereign immunity from suit to FTB. Cal. Gov't Code § 860.2. In 2000, FTB filed a motion asserting, among other grounds, that the district court should dismiss Hyatt's complaint because FTB was immune from liability. 2 AA 500; 3 AA 501-08. The district court (then District Judge Saitta) denied the motion, without prejudice, based upon the belief that additional discovery was needed on Hyatt's tort claims. 3 AA 649-50 (50-51).

FTB filed a writ of petition with this court. 2 AA 422-63; 3 AA 657-710. The writ was based entirely upon the FTB's contention that the district court should have dismissed this case based upon the doctrines of Full Faith and Credit, sovereign immunity, choice of laws and comity. 3 AA 657-710. On April 4, 2002, this court entered an order holding that parts of the case would survive, but that Hyatt's negligence-based claims must be dismissed. 5 AA 1183-93. This court considered the doctrine of comity. 5 AA 1189. Comity is an accommodation policy under which the

29

1  courts of one state voluntarily give effect to the laws of another state out of deference

2  and respect, "to promote harmonious interstate relations."[26] Id. In considering the scope

3  of immunity to grant to FTB, the court examined whether granting comity to the

4  California statute would "contravene Nevada's policies and interests" Id. To make this

5  determination, the court compared the governmental immunities that would be extended

6  to a Nevada state agency under the allegations of this case, in contrast to the complete

7  immunity extended to FTB under California law. 5 AA 1187-90.

8      This court noted that "Nevada provides its agencies with immunity for the

9  performance of a discretionary function even if the discretion is abused." 5 AA 1187; see

10  also NRS. 41.032(2). This court held that conducting an investigation is generally a

11  discretionary act. Therefore, under Nevada law, a Nevada agency could not be held

12  liable for its discretionary investigative acts or for claims sounding in negligence, even if

13  the agency abused its discretion. 5 AA 1189-90. Conversely, this court concluded that

14  Nevada law did not grant Nevada state agencies immunity for intentional torts or bad

15  faith committed by its employees.[27] Id. Based on this comparison, this court concluded

16  that both California and Nevada each provided their respective state agencies with

17  immunity from suit for abuse of discretionary acts or negligent actions. Id. The court

18  held Nevada's policies or interests would not be contravened by applying California's

19  sovereign immunity statute to the extent that statute provided FTB immunity for its

20  discretionary conduct or negligent acts. Id.

21      This court then turned to Hyatt's intentional tort claims. The court noted that

22

---

23  [26] There can be no serious debate over the importance of promoting harmonious relations
24  between the residents of California and Nevada. These are not merely two sister states; they are
   immediate neighbors, with a common border of more than 600 miles, sharing important
25  common goals and interest relating to natural resources, forest fire suppression, roads, interstate
   border problems, economic issues, law enforcement, and a multitude of other common interests
26  and concerns. In this context, where a solitary plaintiff obtained a half-billion dollar judgment
   against a California government agency, including $250 million in punitive damages, comity's
27  goal of promoting harmonious interstate relations must be given great weight.

[27] The court offered no explanation or analysis for its bad faith exception to discretionary act
28  immunity found within NRS 41.032(2). A review of the legislative history of that statute does
   not reveal any intent to create a bad faith exception for discretionary acts.

30

RJN002357

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1  California's complete immunity statute encompassed such claims, but under Nevada

2  statutes, there is no immunity for such claims. 5 AA 1190. Thus, the court allowed the

3  intentional tort claims to avoid dismissal. By dismissing the negligence claims, but

4  allowing the intentional tort claims to survive, this court treated FTB the same as a

5  Nevada government agency would be treated in similar circumstances.

6          2.    United States Supreme Court Proceedings

7       FTB appealed this decision to the United States Supreme Court, which affirmed

8  in Franchise Tax Board v. Hyatt, 538 U.S. 488 (2003). At oral argument, Hyatt argued

9  this court properly applied comity to this case because:

10         [A]n important principle emerging – emerging principle of comity, is
          [states] have tended to look at their own immunity to see what kinds of
11        suits could be brought against them and to try, then, to grant to the – to the
          outside sovereign that same type of immunity.
12

13  6 AA 1467 (Oral Argument, United States Supreme Court). Based on this principle,

14  Hyatt asserted that Nevada must treat FTB the same as it would treat a Nevada state

15  agency.

16         THE COURT: – do I understand – your comity argument basically is – it's
          kind [of] a self-executing thing, because each time a state has to answer the
17        comity question, it asks the question, "What would I do if the tables were
          reversed?" And as history teaches us, they generally treat the other sovereign
18        the way they would want to be treated themselves.

19         MR. FARR: That's correct, Justice Stevens. And, in fact, they have become
          more specific as – (inaudible) – comity, I believe, in saying we want to treat
20        the other sovereign as we do treat ourselves, not just as we want to be treated.
          **We are treating the other sovereign the way we treat ourselves.**
21

22  6 AA 1480 (emphasis added). According to Hyatt, Nevada properly applied the doctrine

23  of comity because this court treated FTB in the same way it would treat its own state

24  agencies under the same circumstances. Id.

25       Hyatt took the same position in his written briefs. Hyatt noted that "state courts

26  are fully capable of recognizing the sovereign interests of other States, using their own

27  sovereign interests as a benchmark." 6 AA 1360. Hyatt further recognized that this

28

                                             31

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1  court's "reference point was not the liability of private individuals for tortious conduct,
2  but the liability *of the State[of Nevada] itself*." 6 AA 1341 (emphasis in original). Hyatt
3  cited numerous state cases in support of the proposition that forum courts have "often
4  done what this court did below: looked to the immunity of the forum State in
5  determining what acts of the defendant State would be subject to suit." 6 AA 1359.

6      Ultimately, Hyatt's position prevailed. Franchise Tax Board, 538 U.S. at 499. The
7  United States Supreme Court concluded that, "[t]he Nevada Supreme Court sensitively
8  applied principles of comity with a healthy regard for California's sovereign status,
9  **relying on the contours of Nevada's own sovereign immunity from suit as a**
10 **benchmark for its analysis.**" Id. at 499 (emphasis added).

        3.    Comity Has Been Similarly Applied in Other Cases

12     Comity has been applied in numerous cases where a sister state defendant's own
13 laws did not contravene the policies of the forum state. Where one state agency has been
14 sued in another state, the forum state looks to the manner in which its own state agencies
15 would be treated under similar circumstances, and the forum state provides that same
16 treatment to the sister state agency defendant. See e.g., Sam v. Sam, 134 P.3d 761, 768
17 (N.M. 2006) (applying comity treating sister state defendant same as forum state, citing
18 FTB v. Hyatt); Hansen v. Scott, 687 N.W.2d 247, 251 (N.D. 2004) (giving foreign state
19 agency sued in sister state same level of sovereign immunity that would be accorded to
20 forum state agency); Solomon v. Supreme Court of Florida, 816 A.2d 788, 789-90 (D.C.
21 2002) (same); McDonnell v. State of Ill., 748 A.2d 1105, 1107-08 (N.J. 2000) (same);
22 Schoeberlein v. Purdue University, 544 N.E.2d 283, 288 (Ill. 1989) (same). [28]

---

24 [28] In Fair Assessment In Real Estate Ass'n, Inc. v. McNary, 454 U.S. 100 (1981), the Court held
that tort claims based upon administration of state taxes are barred in federal court due to the
25 principle of comity. The McNary Court recognized that the administration of state taxes is
complex and highly rule-oriented. Id. at 108, n.6. The Court identified numerous evils that
26 would result from tort litigation testing state tax assessments, including the fact that "state tax
administration might be thrown into disarray," taxpayers might escape ordinary state procedural
27 requirements, collection of necessary revenue would be obstructed, and there would be
"consequent damage to the State's budget." Id. Such tort suits "would cause disruption of the
28 states' revenue collection systems," and would improperly result in civil courts "being a source
of appellate review" of tax agency decisions. Id. at 114.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

32

1    The present case is an example of application of these principles. This court held

2    that comity applies to California's immunity statute, regarding Hyatt's negligence

3    claims. In doing so, this court compared Nevada governmental immunity to the

4    immunity enjoyed by FTB under California law. This court then concluded that FTB

5    could be subject to liability in Nevada but only to the same extent that a similarly

6    situated Nevada agency could be held liable under Nevada law.

7    FTB asked the district court, and Hyatt objected, to similarly apply comity to

8    other protections routinely afforded to Nevada state agencies. The district court refused,

9    and instead took actions exhibiting hostility toward FTB and the State of California. See

10   section IV(C) (discretionary function immunity), section IV(G)(1) (statutory caps on

11   government liability), and section IV(H)(1) (punitive damages).

4.    Other Legal Doctrines Also Require That Comity Apply Here

13   An appellate court's decision becomes the law of the case and must be adhered to

14   throughout the subsequent progress of the case, both in the district court and upon any

15   subsequent appeal. Hsu v. County of Clark, 123 Nev. 625, 173 P.3d 724, 728 (2007).

16   While there are exceptions to the law of the case doctrine (Hsu, 173 P.3d at 729-30),

17   none apply to the court's conclusion that comity must be applied to FTB, with FTB

18   being treated no worse than a Nevada state agency.

19   In addition, judicial estoppel prevents a party from taking inconsistent positions in

20   litigation, thereby guarding the judiciary's integrity. Marcuse v. Del Webb Communities,

21   Inc., 123 Nev. 278, 163 P.3d 462, 468-69 (2007). Judicial estoppel applies when the

22   same party has taken different positions in two judicial proceedings, the party was

23   successful in the first proceeding, the two positions are totally inconsistent, and the first

24   position was not taken as a result of ignorance, fraud, or mistake. Id.

25   In the present case, Hyatt contended in this court and the United States Supreme

26   Court that FTB's request for complete immunity under California law should be

27   rejected. In doing so, Hyatt took the position that because a Nevada government agency

28   would not have complete immunity in a Nevada lawsuit, so too should California be

33

1 denied complete immunity. He claimed both states should be treated the same. As noted
2 above, during oral argument at the United States Supreme Court, Hyatt's counsel
3 responded affirmatively when asked whether one state should treat another state "the
4 way they would want to be treated themselves." Hyatt's counsel took the position that
5 "we [Nevada] want to treat the other sovereign [California] as we do treat ourselves, . . ."
6 He also took the position: "We [Nevada] are treating the other sovereign [California] the
7 way we treat ourselves." 6 AA 1480.

8      Hyatt was successful in convincing both this court and the United States Supreme
9 Court that complete immunity should be rejected for FTB, based on the understanding
10 that California would not be treated worse than Nevada agencies themselves would be
11 treated. Having prevailed in his position, Hyatt should now be judicially estopped from
12 changing his position that California is not entitled to the same fundamental protections
13 as a similarly situated Nevada state agency.

14     C.   Hyatt's Claims, As Tried, Are Precluded By The Discretionary Function
15         Immunity Doctrine

16      Nevada government entities and agencies are immune from lawsuits for
17 discretionary conduct taken by government employees. NRS 41.032(2). This court's
18 April 2002 order allowed Hyatt to proceed with his intentional tort claims, based on this
19 court's application of the law as it existed at that time, i.e. discretionary immunity under
20 NRS 41.032(2) did not extend to such claims. At the time this court rendered its 2002
21 decision, it had created two separate tests for examining the scope of government
22 discretionary function immunity – the "planning-versus-operational test" and the
23 "discretionary-versus-ministerial test." Martinez, 168 P.3d at 726-27. After the 2002
24 order, however, the court adopted an entirely new test governing Nevada's
25 "discretionary function immunity" doctrine. See Martinez, 168 P.3d at 729 (adopting test
26 created by Berkovitz v. United States, 486 U.S. 531 (1988) and United States v. Gaubert,
27 499 U.S. 315 (1991) (hereinafter the "Berkovitz-Gaubert test")); see also Butler ex. rel.
28 Butler v. Bayer, 123 Nev. 450, 168 P.3d 1055, 1066-67 (2007); City of Boulder City v.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

34

1  Boulder Excavating, 124 Nev. ___, 191 P.3d 1175 (2008); Ransdell v. Clark County,
2  124 Nev. ___, 192 P.3d 756 (2008). This court expressly overruled and abandoned its
3  previous tests after concluding that they led to inconsistent results, and adopted its new
4  test. Martinez, 168 P.3d at 727-729.

      1.    Nevada's New Test Governing Discretionary Function Immunity

6      In fashioning its new test, this court noted that Nevada's discretionary function
7  immunity statute, NRS 41.032(2), "mirrors the Federal Tort Claims Act." Id. at 732.
8  Based on these parallels, this court turned to federal decisions interpreting the Federal
9  Torts Claims Act ("FTCA") to aid it formulating a new test. Id. at 727. After analyzing
10 the federal cases, this court expressly adopted the discretionary function immunity test
11 applied by the United States Supreme Court and the federal courts when analyzing
12 claims under the FCTA. See Martinez, 168 P.3d at 729.[29]

13     The Berkovitz-Gaubert test is intended "to prevent judicial 'second guessing' of
14 the legislative and administrative decisions grounded in social, economic, and political
15 policy through the medium of an action in tort." Martinez, 168 P.3d. at 729. Government
16 actions are entitled to discretionary function immunity if two elements are satisfied: (1)
17 the actions at issue are discretionary; and (2) the actions are based upon considerations
18 of social, economic, or political policy. Martinez, 168 P.3d at 729; Butler, 168 P.3d at
19 1066.

20     As to the first element, an act is discretionary if it involves "an element of
21 judgment or choice." Martinez, 168 P.3d at 728 (internal quotations and citations
22 omitted). According to the federal courts interpreting this rule, if an act involves
23 mandatory compliance with a specific statute, regulation, or policy, however, this
24 element will not be satisfied because the government actor did not have a "rightful
25 option but to adhere to the directive." See Terbush v. United States, 516 F.3d 1125, 1129

26

27 [29] This court has noted that federal case law addressing the Berkovitz-Gaubert test will be
considered when analyzing immunity claims pursuant to Nevada's discretionary function
28 immunity test. See Butler, 168 P.3d at 1066 n.50. Therefore, to the extent necessary, FTB has
relied upon and cited to analogous federal case law interpreting the this test.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

35

1    (9th Cir. 2008); <u>Rogers v. United States</u>, 187 F.Supp.2d 626, 630 (N.D.Miss. 2001).

2        If the act is deemed "discretionary," the court must then turn to the second

3    element and "determine if 'the judgment is of the kind that the discretionary function

4    exception was designed to shield' i.e., actions 'based on considerations of social,

5    economic, or political policy.'" <u>Butler</u>, 168 P.3d at 1066 (quoting <u>Martinez</u>, 168 P.3d at

6    729). The focus on the second element is not on the government employee's **"subjective**

7    **intent in exercising the discretion conferred . . . but on the nature of the actions**

8    **taken and on whether they are susceptible to policy analysis.**" <u>Id</u>. (internal quotations

9    omitted) (emphasis added). In making this determination, the government is not required

10   to produce any affirmative evidence that the government employee made a conscious

11   decision regarding policy factors. <u>See Martinez</u>, 168 P.3d at 728. The inquiry related to

12   this element looks specifically at the nature of the conduct at issue. <u>Terbush</u>, 516 F.3d at

13   1129. Therefore, this test applies to all levels of government decisions – including

14   frequent or routine decisions. <u>Ransdell</u>, 192 P.3d at 762.[30]

15       Based on this new test, the **scope** of the immunities that are required to be

16   extended to FTB as a matter of comity have been completely changed. Application of

17   this new test reveals Hyatt's claims as presented at trial must be dismissed. FTB

18   expressly requested that the district court analyze FTB's conduct applying the court's

19   new test, but the district court refused. 90 AA 22369-500; 91 AA 22501-559. In fact, the

20   district court adopted a policy of outright hostility to FTB and the public acts of the State

21

22   [30] Where the legislative branch has specifically delegated authority to an executive branch
     agency to implement or enforce the "general provisions of a regulatory statute and to issue

23   regulations to that end, there is no doubt that planning-level decisions establishing programs are
     protected by the discretionary function exception." <u>Gaubert</u>, 499 U.S. at 323. "If a regulation

24   allows the employee discretion, the very existence of the regulation creates a strong
     presumption that a discretionary act authorized by the regulation involves consideration of the

25   same policies which led to the promulgation of the regulations." <u>Id</u>. In other words, "[w]hen
     established Governmental policy, as expressed or implied by statute, regulation, or agency

26   guidelines, allows a government agent to exercise discretion, it must be presumed that the
     agent's acts are grounded in the policy when exercising that discretion." <u>Id</u>.

27   Therefore, if the actions at issue were "an integral part of governmental policy-making or
     planning, if the imposition of liability might jeopardize the quality of the process, or if the

28   legislative or executive branch's power or responsibility would be usurped," this element is
     satisfied. <u>Martinez</u>, 168 P.3d at 729 (internal citations and quotations omitted).

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

36

1  of California. This was error. Had the district court applied the law of the case and

2  comity to California's Government Code § 860.2, using Nevada's new rule regarding

3  discretionary function immunity as the benchmark for its analysis, all of Hyatt's claims,

4  as tried to the jury, should have been dismissed in their entirety.

a.  This New Test Applies to FTB's Conduct

6  Preliminarily, Hyatt will undoubtedly argue that this court already decided the

7  scope of the immunities FTB is entitled to in this litigation. It is expected Hyatt will

8  assert that FTB is not entitled to have the scope of its immunity revisited based on the

9  application of Nevada's new discretionary function immunity rules because that scope

10  was determined by this court's 2002 decision, which is now the "law of the case." Hyatt

11  will be wrong.

12  This court's ruling in 2002 had two component parts: (1) this court determined

13  that the doctrine of comity must be applied and defined how that doctrine was to be

14  applied to FTB's sovereign immunity statute as this case proceeded; and (2) the court

15  determined the scope of the immunity to be accorded to FTB by utilizing old tests

16  examining the scope of immunities extended to Nevada state agencies. 5 AA 1187-90.

17  The first determination regarding the application of comity and the manner in

18  which this doctrine was required to be applied is the law of the case. In Nevada, "[t]he

19  doctrine of the law of the case provides that the law or ruling of a first appeal must be

20  followed in all subsequent proceedings, both in the lower court and on any later appeal."

21  Hsu, 173 P.3d at 728; see e.g., Wheeler Springs Plaza, LLC v. Beemon, 119 Nev. 260,

22  266, 71 P.3d 1258 (2003). Accordingly, the district court, and now this court is required

23  to apply "principles of comity [to California's sovereign immunity statute] with a

24  healthy regard for California's sovereign status" and to rely "o[n] Nevada's own

25  sovereign immunity from suit as a benchmark for its analysis." Franchise Tax Board,

26  538 U.S. at 499. There has been no change in the law related to this issue or the

27  application of comity; the law of the case doctrine applies to this issue.

28  The second part of this court's decision related to the **scope** of immunity to be

37

1 extended to FTB, is **not** the law of the case. In this instance, controlling law applicable
2 to this issue has changed dramatically. Therefore, under Nevada law, the law of the case
3 doctrine does not apply to this component of the court's 2002 decision. Hsu, 173 P.3d at
4 730. In Hsu, landowners asserted an inverse condemnation claim based on an air height
5 restriction above their property. The district court held that the restriction constituted a
6 per se taking of the property. This court reversed, holding that the restriction was not a
7 taking. After the remand, and during a second appeal, this court issued an opinion in
8 another case, changing the law and holding that an air height restriction does constitute a
9 per se taking. Based on this change in the controlling law, the landowners argued that
10 this court should apply the new law. This court agreed, holding that the law of the case
11 doctrine should not be applied where there has been a change in the controlling rule of
12 law. Id. at 729-730. The same result applies here.

13         2.     Based on Nevada's New Test, and the Case As Tried by Hyatt, FTB
14               Is Entitled to Complete Immunity

15     Here, each and every action taken by FTB that Hyatt complained of at trial
16 satisfies both elements of this court's new test for discretionary function immunity. FTB
17 cannot be held liable for the acts complained of by Hyatt since any similarly situated
18 Nevada agency could **not** have been held liable under these same circumstances.

19     The gravamen of Hyatt's case was his contention that FTB engaged in improper
20 conduct while conducting and deciding its audits and administrative protests. The
21 alleged improper conduct fell into the following broad categories: (1) improper gathering
22 of evidence; (2) improper analysis of evidence; (3) improper delay resolving his
23 administrative protests; and (4) improper organizational conduct. Each of these
24 categories, however, relates exclusively to purely discretionary acts that are immune.

25               a.    FTB's Statutory Obligations and Discretionary Powers

26     To fully appreciate the application of the Berkovitz-Gaubert test to FTB's
27 conduct, it is helpful to first understand the statutory provisions that govern FTB.

28     California, unlike Nevada, imposes a state personal income tax on "the entire

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

38

1  taxable income of **every resident** of this state who is not a part-year resident." Cal. Rev.

2  & Tax Code § 17041(a)(1) (emphasis added). This statute embodies the public policy of

3  the State of California to impose and collect personal income taxes from all individuals

4  who are in California for anything other than a temporary or transitory purpose enjoying

5  the benefits and protections of the state. See Whittell v. Franchise Tax Bd., 41 Cal. Rptr.

6  673, 677 (Ct. App. 1964).

7        FTB is the agency delegated the duty to administer and enforce California's

8  personal income tax statutes. See Cal. Rev. & Tax Code § 19501. In this capacity, FTB

9  is provided broad statutory authority to "prescribe all rules and regulations necessary for

10  the enforcement" of those personal income tax statutes. Cal. Rev. & Tax Code §

11  19503(a). FTB has authority to conduct investigations in order to fulfill its obligations.

12  Cal. Rev. & Tax Code § 19504; Cal. Gov't Code § 11180 *et al.* In fact, FTB may initiate

13  an investigation, "merely upon suspicion that the law is being violated, or even just

14  because it wants assurance that it is not." State Franchise Tax Board v. Hyatt, 2003 WL

15  23100266 *5 (Cal. App. Ct. Dec. 31, 2003) (internal citations and quotations omitted).

16  These statutes incorporate the agency investigations permitted by California's

17  Government Code, which provides all state agencies, including FTB, the power to

18  conduct investigations both inside and outside of California. See Cal. Rev. & Tax Code

19  § 19504(d).

20        FTB has the power to require "by demand" that certain information be provided

21  to it during an investigation or audit. Cal. Rev. & Tax Code § 19504(a)-(c). These

22  statutory provisions do not mandate what information FTB must obtain or request during

23  an investigation. Rather, these provisions provide FTB the discretion to determine what

24  information is pertinent to its investigations and to demand that information. In addition,

25  at the time FTB audited Hyatt, FTB was also permitted to contact and demand that third

26  parties provide relevant information to FTB, without first notifying the taxpayer. See

27  Cal. Rev. & Tax Code §§ 19254, 26423 (1993).

28        FTB also has the duty to determine who is a "resident" of California. See Cal.

39

1   Rev. & Tax Code §§ 19501, 19504; Cal. Gov't Code §§ 11180, 11182. California's

2   Revenue and Taxation Code defines the terms "resident" and "non-resident," and creates

3   a statutory presumption of residency for personal income tax purposes if an individual

4   resides in the state for over nine months in a calendar year. See Cal. Rev. & Tax Code §§

5   17014, 17015, 17015.5, 17016. California law defines a resident as:

6           (1) Every individual who is in [California] for other than a
            temporary or transitory purpose.
7
            (2) Every individual domiciled in [California] who is outside the
8           state for a temporary or transitory purpose.

9   Cal. Rev. & Tax Code § 17041(a)(1) & (2); See also 18 Cal. Admin. Code § 17014. No

10  California statute or regulation provides any further definition or explanation of what

11  factors determine whether an individual is a resident, or requires FTB to gather any

12  specific information or evidence to make a residency determination, or mandates how

13  FTB must weigh or analyze specific factors related to residency. In fact, the regulations

14  make it perfectly clear that "[t]he type and amount of proof that will be required in all

15  cases to rebut or overcome the presumption of residence and to establish that an

16  individual is a nonresident cannot be specified by a general regulation, but will depend

17  largely on the circumstances of each particular case." 18 Cal. Admin. Code § 17014(d).

18  Thus, the determination of an individual's residency status, as well as any potential

19  personal income tax liability, is left to FTB's discretion, subject to review in California

20  courts. It is based on this broad discretionary authority that Hyatt's allegations must be

21  assessed.

22              b.    First Element of _Berkovitz-Gaubert_: Each FTB Act Was
                     Discretionary
23

24          The first factor in analyzing whether discretionary function immunity applies

25  requires the court to determine whether the contested government actions were

26  discretionary in nature. Martinez, 168 P.3d at 728. Hyatt has repeatedly asserted that **all**

27  conduct at issue in this case related directly to FTB's actions during his audits. 28 AA

28  6845 ("Hyatt has pled that the FTB acted in bad faith in conducting the audits of Hyatt

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

40

and in particular assessing Hyatt for taxes and the imposing penalties . . ."). Hyatt had not disputed that his claims were based upon FTB's discretionary conduct. 16 AA 3758 ("the issue of bad faith discretionary conduct in this case is at issue."). At trial, Hyatt's own questioning of witnesses definitively established this point:

> Q  As a residency auditor, you had the discretion to investigate the facts as you saw fit, correct?
>
> A  As a residency auditor, I followed the guidelines of the residency program of the Franchise Tax Board and my work was supervised by my supervisor.
>
> Q  Ms. Cox, as a residency auditor, you had the discretion to investigate the facts as you saw fit, correct?
>
> A  Well, I did use my discretion in doing the audit.
>
> Q  To investigate the facts as you saw fit, correct?
>
> A  Yes, sir.

40 AA 9884 (67). In fact, Hyatt underscored this point:

> Q  And again, you had the right as the primary residency auditor to exercise discretion to investigate the facts as you saw fit, correct?
>
> A  It was my training and my experience of what I learned at the Franchise Tax Board, that it was my discretion to investigate the cases I saw fit, and develop the facts of the case.

43 AA 10518 (130). Hyatt also established that auditors are entitled to rely upon their discretion, mental impressions, and intuition while conducting an investigation and analyzing the facts they obtain. 40 AA 9884 (67-68).

i.  Alleged Improper Gathering of Evidence

Hyatt asserted several instances of improper gathering of evidence by FTB during the audit, including the following: (1) FTB obtained and relied on affidavits from three of Hyatt's estranged relatives unfavorable to Hyatt;[31] (2) FTB failed to interview Hyatt or any witnesses believed-to-be-favorable to him during the audit;[32] (3) FTB failed to

---

[31] 32 AA 7944 (11-12); 37 AA 9100 (169) – 9103 (179), 9151 (17); 52 AA 12837 (93); 68 AA 16896 – 912.

[32] See e.g., 32 AA 7959 (71-72) (FTB failed to interview Hyatt); 52 AA 12837 (92), 12841 (109).

41

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1    obtain an affidavit from one of Hyatt's former California neighbors, known at trial only

2    as "Stacy's Mom";[33] (4) FTB improperly sent letters and questionnaires to third parties

3    during the audit without Hyatt's permission and improperly disclosed Hyatt's so-called

4    "confidential information" in the process;[34] (5) FTB employees improperly made field

5    visits to Hyatt's Las Vegas home and former apartment and engaged in other invasions

6    of privacy;[35] (6) FTB improperly conducted in-person interviews with his neighbors;[36]

7    (7) FTB sent out various requests for information and documents to third parties asking

8    for the same information he previously provided;[37] and (8) FTB did not change the date

9    for Hyatt to respond to an information request after it was sent to the wrong address.[38]

10   All of these actions were discretionary. FTB and its employees were required to

11   use their own judgment and choice when deciding what evidence to gather, how to

12   gather it, and from whom to gather it from. In dismissing Hyatt's negligence claim, this

13   court expressly noted that "an investigation is generally a discretionary function." 5 AA

14   1189. In fact, the court has indicated that "the nature of an investigation is… inherently

15   discretionary." See Foster v. Washoe County, 114 Nev. 936, 941-42, 964 P.2d 788, 792

16   (1998).

17   Other states and federal courts agree – investigations conducted by governmental

18   entities are discretionary functions. Sloan v. U.S. Dept. of Hous. & Urban Dev., 236

19   F.3d 756, 762-63 (D.C. Cir. 2001) (audit investigation conducted by HUD is a

20

21   [33] See e.g., 41 AA 10082 (98-100); 52 AA 12817 (12-13).

22   [34] See e.g., 32 AA 7949 (33) – 7951 (39) (detailing Hyatt's version of third party contacts and
     "invasions" of privacy); 40 AA 9911 (176) – 9917 (198); 41 AA 10141 (89) – 10142 (90); 63
23   AA 15615, 15643, 15668, 15676, 15701, 15723, 15896-97; 64 AA 15829, 15957-70, 15968,
     15995-96, 15999; 65 AA 15970, 16099-16100, 16107-08, 16191-92; 66 AA 16281; 67 AA
24   16163-73.

25   [35] See e.g., 32 AA 7953 (49); 52 AA 12904 (66) ("Cox was acting like Columbo"); 68 AA
     16796-801 (FTB Narrative Report Las Vegas Field Visit)

26   [36] See e.g., 52 AA 12905 (71); 68 AA 16796 – 801 (FTB Narrative Report Las Vegas Field
     Visit); 68 AA 16804 – 05; 68 AA 16815 (FTB Narrative Report La Palma Field Visit); 32 AA
27   7953 (49).

     [37] See e.g., 32 AA 7956 (59); 36 AA 8802 (66-67).
28
     [38] See e.g., 34 AA 8329 (92); 54 AA 13313-14; 77 AA 19061-67.

42

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1  discretionary act); Cordeiro v. Brock, 698 F. Supp. 373, 375 (D. Mass. 1988)

2  (compliance inspection by OSHA is a discretionary function); Amy's Enters. v. Sorrell,

3  817 A.2d 612, 617 (Vt. 2002) (investigation by liquor control agents discretionary

4  function).[39] Thus, as aptly explained by one court, determining "what data and other

5  information is relevant, what is reliable, and how much is sufficient" during an

6  investigation is a discretionary function. In re Orthopedic Bone Screw Prod. Liab. Litig.,

7  264 F.3d 344, 364 (3d Cir. 2001).

8      FTB's discretion in gathering evidence is further underscored by FTB's

9  Residency Audit Training Manual, which was the operative manual in effect during

10  Hyatt's audits. 59 AA 14610 – 60 AA 14884. This manual encouraged auditors to

11  contact independent third-party sources in order to verify information provided by

12  taxpayers. 59 AA 14644. In fact, the manual provided interview techniques, guidance on

13  how to send letters to third parties, and what third-party sources auditors should review.

14  59 AA 14644-48. The manual made it abundantly clear "that the extent of information

15  that the auditor can obtain from [third party] sources **is only limited by his or her**

16  **initiative, ingenuity, tact, and perseverance**" – underscoring the discretion given to

17  FTB. 59 AA 14715 (emphasis added).

18      The analysis provided in Ransdell v. Clark County is particularly instructive on

19  this issue. In Ransdell, this court determined that county inspectors satisfied the first

20  element of the Berkovitz-Gaubert test because: "Investigation of nuisance property

21  involves an element of judgment or choice." 192 P.3d at 762. In reaching this

22  conclusion, this court determined that a Clark County Code Section defined a dangerous

23  condition, but did not define how the county employees were to determine whether a

24  particular property constituted a dangerous condition. Id. at 763. Rather, this

25

26  [39]Decisions made during an investigation related to what evidence to gather and what sources to gather that evidence from are analogous to the prosecutorial decisions related to "whether,

27  when, and against whom to initiate a prosecution." Rourke v. United States., 744 F.Supp. 100, 103 (E.D. Pa. 1989), (quoting Gray v. Bell, 712, F.2d 490, 513 (D.C. Cir. 1983)). These

28  decisions have deemed to be the "quintessential examples of governmental discretion in enforcing the criminal laws." Id.

43

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1    determination was left entirely to the discretion of the county employees.

2        Here, there is no question that the determination of what evidence, how much

3    evidence, and from what source such evidence should be collected was left entirely to

4    the FTB's judgment and choice under the applicable California laws, FTB policies, and

5    manuals – satisfying the first element of the Berkovitz-Gaubert test.

                ii.    Alleged Improper Analysis of Evidence

7        Next, Hyatt asserted that FTB failed to properly analyze the evidence, thereby

8    reaching the wrong conclusions related to his residency and its tax, interest and fraud

9    penalty assessments. As noted, Hyatt's primary expert, Malcolm Jumelet, testified that

10   his opinions were not particularly critical of the way FTB gathered the evidence during

11   the audit, but of the way FTB **"analyzed and weighed the evidence"** to reach its audit

12   conclusions. 44 AA 10943 (165).

13       Hyatt pointed to several actions he alleged were examples of FTB improperly

14   weighing and analyzing evidence: (1) FTB's failure to give sufficient weight to Hyatt's

15   Nevada contacts and evidence supporting his alleged Nevada residency;[40] (2) giving too

16   much weight to Hyatt's California contacts and evidence unfavorable to Hyatt;[41] (3)

17   improperly imposing fraud penalties when the evidence collected was insufficient to

18   support a fraud penalty determination;[42] (4) improperly drafting narrative reports and

19   other documents in audit file (i.e., use of the wrong words or verb tenses);[43] (5)

20   improperly incorporating edits from an FTB attorney into tentative determination letter

21   sent during audit;[44](6) improper determination that Hyatt's Franklin Money Market

22   account was a bank account that was not disclosed during audit and use of that account

---

[40] See, e.g., 32 AA 7969 (112) – 7970 (117); 33 AA 8230 (33) – 8231 (34); 38 AA 9400 (95); 40 AA 9884 (69) – 9885 (72); 43 AA 10754 (114) – 44 AA 10946 (174) [all of Jumelet's testimony]; 52 AA 12843 (116) – 12845 (123).

[41] 32 AA 7961 (80) – 7962 (82); 41 AA 10127 (30-31).

[42] E.g., 36 AA 8792 (27) et. seq. (cooperation); 52 AA 12833 (77) – 12834 (78), 12847 (133) – 12850 (144), 12888 (3) – 12891 (16).

[43] 41 AA 10004 (161) – 10005 (163), 10069 (47), 10072 (60).

[44] E.g., 52 AA 12820 (24-25), 12838 (97); 61 AA 15241-50; 62 AA 15251-52; 66 AA 16367-77.

44

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1    as California connection;[45] and (7) failure of FTB to conduct independent analysis of
2    1992 fraud penalties.[46]

3         As with Hyatt's claims that FTB improperly gathered information, FTB's analysis
4    in reaching its audit conclusions cannot be classified as anything but a discretionary
5    function. An investigation not only involves the gathering of evidence, but it also
6    includes the weighing and analyzing of that evidence. For example, in Sloan, the court
7    noted that, "[t]he sifting of evidence, the weighing of its significance, and the myriad
8    other decisions made during investigations plainly involve elements of judgment and
9    choice." Sloan, 236 F.3d at 762 (emphasis added); see also In re Orthopedic, 264 F.3d at
10   364 ("[c]ertainly in weighing evidence and comparing [information] in this manner [the
11   government agency] utilizes judgment and choice.")

12        As noted, there is no statute, regulation, or policy in California, that **required**
13   FTB to weigh or analyze evidence in a particular manner. Rather, residency
14   determinations are inherently factual and discretionary. See 18 Cal. Admin. Code §
15   17014(d); see also Appeal of Michael T. and Patricia C. Gabrik, 86-SBE-014, 1986 WL
16   22686, *2 (Cal. St. Bd. Eq., Feb. 4, 1986). California case law and administrative
17   decisions provide objective factors to be considered in making a residency
18   determination, but it is ultimately up to FTB to decide how to weigh and analyze those
19   factors using its discretion. See In re Bragg, 2003 WL 21403264, *6 (Cal. St. Bd. Equal.
20   May 28, 2003) (providing non-exhaustive list of factors that have been considered by
21   past decisions in reaching residency determinations). Therefore, any of FTB's alleged
22   misconduct based upon improper analysis engaged in by FTB employees was entirely
23   discretionary pursuant to the Berkovitz-Gaubert test.

24   ///

25   ///

26

27   [45]E.g., 32 AA 7962 (85); 34 AA 8349 (170-71); 35 AA 8550 (31-32); 44 AA 10769 (174-75);
     52 AA 12849 (138), 12888 (3-4).
28   [46] 43 AA 10601 (97); 44 AA 10773 (193) – 10774 (196); 52 AA 12847 (133) – 12848 (135).

45

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

iii. Alleged Improper Delay in Resolution of Protest Proceedings

Hyatt also alleged that FTB improperly delayed the resolution of his Protest Proceedings. Deciding when and if FTB has sufficient information to resolve a protest is inherently discretionary. Here again, there is no statute, regulation, or policy that mandated a specific timeframe in which FTB was required to conclude its Protest Proceedings.

Upon the completion of an audit, a taxpayer can file an administrative protest with FTB. Cal. Rev. & Tax Code § 19041. Such a protest is effectively an appeal of the audit determinations and is conducted by a protest hearing officer, who is generally an internal FTB tax attorney. The protest hearing officer is not limited to only the evidence obtained during the audit. Rather, the protest hearing officer may gather and request additional information in conducting a review. 44 AA 10995 (72) – 10996 (74).

It is entirely within the discretion of the protest hearing officer to determine when sufficient information has been gathered. The only exhibit that suggested any time considerations was FTB Notice 99-1 dated March 3, 1999, which indicated that FTB would attempt to complete all protests within "33 months or less of the date of filing." 61 AA 15109-11. It did not create a mandatory completion date. Rather, it indicated that it is the "goal" of the department to complete review of administrative protests within a 33-month timeframe, and expressly noted that some protests will take longer to process because of many variables. 61 AA 15109. In fact, Notice 99-1 lists a series of exceptions that would not be subject to this time requirement, including litigation such as Hyatt's. 61 AA 15109-11.

It was discretionary with FTB and its protest hearing officers to determine the necessary amount of information and time required to properly complete an administrative protest – also satisfying the first prong of the <u>Berkovitz-Gaubert</u> test.

iv. Alleged Improper Organizational Conduct

Hyatt asserted that FTB and/or the State of California engaged in organizational

46

RJN002373

1  conduct he claimed was improper. Hyatt complained of: (1) FTB's listing this litigation
2  on its Litigation Roster; (2) California's Tax Amnesty Program; and (3) FTB's use of
3  cost/benefit ratios. This conduct is also discretionary.

a.    Litigation Rosters

5  Hyatt claimed that FTB improperly listed his case on its Litigation Rosters. 37
6  AA 9166 (74) – 9167 (78); 38 AA 9409 (133) – 9410 (135). FTB's creation and
7  summarization of cases on the Litigation Rosters – including the determination of what
8  cases to include and what information to provide – was entirely discretionary.

9  FTB's Litigation Rosters are quite similar to the docket sheets maintained by
10  Nevada's courts. The purpose to FTB of the Litigation Rosters is to provide a means of
11  keeping track of important pieces of litigation that could impact the interpretation given
12  to personal income and corporate tax laws in California. 50 AA 12296 (70) – 12298
13  (79). As explained at trial, it was important for FTB to track these cases because once tax
14  cases made it into the court system, these decisions would "typically wind up having
15  precedential significance" for substantive California tax law. 50 AA 12296 (70). In
16  addition, the Litigation Rosters were created to make the public aware of, and to allow it
17  to follow, the progress of these cases. 50 AA 12296 (70) – 12298 (79). Numerous cases
18  are listed on the Litigation Rosters at any given time, including all cases involving
19  residency.  55 AA 13571-692; 83 AA 20694 – 89 AA 22050 (1998 – 2007 Litigation
20  Rosters).

21  FTB's determination of the contents of the Litigation Rosters is a discretionary
22  function. No statute, law, regulation, or policy mandates that FTB maintain the
23  Litigation Rosters, to include or exclude specific cases, or dictates the public record
24  information that must be included or excluded about those cases. It is entirely within
25  FTB's discretion to determine what cases to include on the Litigation Rosters and what
26  public record information to include about those cases.

27  Here, FTB determined, in its discretion, that this case was significant and
28  warranted placement on the Litigation Rosters. 50 AA 12296 (73). This is obviously an

MCDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

47

1  extremely unusual case, because it involves a tort action, filed in Nevada, attacking the
2  propriety of FTB's conduct during a residency tax audit. Id. After concluding that this
3  case should be included on the Litigation Rosters, FTB determined that it should
4  summarize this case in the exact same fashion it had summarized every other case. These
5  determinations were entirely discretionary.

6                          b.      California Tax Amnesty Program

7        Hyatt claimed that the application of California's Tax Amnesty Program sent to
8  him was improper. 37 AA 9167 (78-81). It is important to underscore that the creation of
9  the Tax Amnesty Program and the parameters of that program were created and
10 implemented entirely by California's Legislature. Creation of the Tax Amnesty Program
11 by the California Legislature was a purely discretionary act. There is no evidence that
12 the California Legislature knew about or considered Hyatt or this litigation in creating
13 the Tax Amnesty Program. In addition, FTB had no part in determining which taxpayers
14 would be eligible for relief. Nor did FTB have any hand in determining what penalties
15 should be assessed upon non-participating taxpayers. 89 AA 22051-67.

16       The Tax Amnesty Program was to apply, without exception, to **every** taxpayer
17 who had a pending Notice of Proposed Assessment, protest, administrative appeal,
18 litigation case or settlement request with the Franchise Tax Board. Id. At that time, Hyatt
19 had two pending protests. 55 AA 13566-70. Hyatt, along with thousands of other
20 taxpayers, received an Income Tax Amnesty Application notifying him that he "may be
21 eligible to participate in California's Tax Amnesty Program on any or all tax years
22 beginning before January 1, 2003." 55 AA 13567.

23       Creation and implementation of the Tax Amnesty Program was entirely within
24 the judgment and choice of the California Legislature. It was the Legislature's
25 prerogative to decide whether or not it would be willing to accept tax payments from
26 delinquent taxpayers that were significantly less than the amounts owed. Moreover, it
27 was entirely within the state's judgment and choice to determine whether or not it would
28 impose additional penalties on those taxpayers who failed to participate. No statute, rule,

48

1  regulation, or policy prohibited the Legislature from implementing a Tax Amnesty
2  Program or determining eligibility for the program or imposing an additional tax penalty
3  upon non-participating taxpayers. These activities and determinations were purely
4  discretionary.

c.    Cost/Benefit Ratios

6  Finally, Hyatt asserted at trial that FTB's use and consideration of cost/benefit
7  ratios (CBR) when making organizational decisions was wrongful. See e.g., 52 AA
8  12828 (54) – 12832 (70). Generally speaking, "cost/benefit ratios" or "cost/benefit
9  analysis" is defined as "[a]n analytical technique that weighs the costs of a proposed
10  decision, holding or project against expected advantages, economic or otherwise."
11  Black's Law Dictionary 350 (7th Ed. 1999). As an example, when FTB assesses the costs
12  associated with conducting an audit against the potential taxes that may be collected, it is
13  engaging in a cost-benefit analysis. FTB would also use CBR as a budgeting tool when
14  seeking funds from the California Legislature. 33 AA 8064 (83-85). CBR was utilized
15  by FTB management as a budgeting concept to determine the costs associated with
16  certain departments and workloads, as opposed to the possible revenue projections in
17  order to determine where to allocate budget dollars. 46 AA 11317 (159-61). The
18  auditors, on the other hand, used CBR in the audit selection process to determine
19  whether the cost of conducting an audit outweighed the potential revenues that may be
20  received. 43 AA 10578 (104).

21  FTB does not have unlimited resources in order to fulfill its statutory obligations.
22  It was entirely within FTB's judgment and choice to determine how it could use its
23  limited resources in the best and most effective manner. No statute or regulation
24  mandated those decisions.

c.    Second Element of *Berkovitz-Gaubert*: Each FTB Act Was
Based Upon Policy Determinations

27  All of the allegedly improper conduct presented to the jury also satisfies the
28  second element of the Berkovitz-Gaubert test. In reviewing this element, the court must

49

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1   "determine if the judgment is of the kind that the discretionary function exception was

2   designed to shield, i.e., actions based on considerations of social, economic, or political

3   policy." Butler, 168 P.3d at 1066 (internal quotations omitted). As previously noted, the

4   focus on the second element is not on the government employee's "subjective intent in

5   exercising the discretion conferred . . . but on the nature of the actions taken and on

6   whether they are susceptible to a policy analysis." Id.

7       Where, as here, the legislative branch has specifically delegated authority to an

8   executive branch agency to implement or enforce the "general provisions of a regulatory

9   statute and to issue regulations to that end, there is no doubt that planning-level decisions

10  establishing programs are protected by the discretionary function exception." Gaubert,

11  499 U.S. at 323. If a regulation allows the employee discretion, "the very existence of

12  the regulation creates **a strong presumption** that a discretionary act authorized by the

13  regulation involves consideration of the same policies which led to the promulgation of

14  the regulations." Id. at 324 (emphasis added).

15      Here, it is the economic and social public policy of California to impose personal

16  income tax on all residents, so people who have enjoyed the benefits and protections of

17  California pay their fair share. See Whittell, 41 Cal. Rptr. at 677. FTB is charged with

18  "ascertaining the correctness of any return," "determining or collecting" any tax

19  deficiency from a taxpayer, and conducting investigations to further these purposes. Cal.

20  Rev. & Tax. Code § 19504; Cal. Gov't Code §§ 11180, 11182. FTB engaged in a

21  residency investigation of Hyatt and an analysis of the information gathered to determine

22  whether or not his alleged date of California non-residence – October 1, 1991 – was

23  correct. 46 AA 11300 (91-92) (describing generally purpose of residency audit). Thus,

24  the ultimate purpose of FTB's actions was to further the important economic policy of

25  collecting taxes from all residents. Based on the presumption described above, all of

26  FTB's actions were based upon the economic public policies contained within

27  California's Revenue and Tax Code and its corresponding regulations. Gaubert, 499 U.S.

28  at 323.

50

1    Even without the presumption, it is readily apparent that FTB's conduct at all

2  levels was grounded in the economic public policy of the State of California's Revenue

3  and Taxation Code. Every act Hyatt complained of was admittedly taken by an FTB

4  employee during the course and scope of employment (62 AA 15304-05), while

5  engaging in a residency and tax audit. If this court allows the judgment to stand, based

6  upon the jury's apparent determination that FTB did not perform its discretionary acts

7  correctly, this would constitute the exact type of improper judicial second guessing

8  prohibited by <u>Martinez</u> and the <u>Berkovitz-Gaubert</u> test.[47]

9    The actions of FTB are no different than actions this court ruled were subject to

10  discretionary function immunity in <u>Ransdell</u>, where government employees made

11  nuisance abatement decisions based on considerations of "adverse economic

12  consequences." 192 P.3d at 763-64. Similarly, in <u>Boulder City</u>, the employee's conduct

13  was in furtherance of the economic public policy to "save public funds;" as such, the

14  conduct was immune. <u>Boulder City</u>, 191 P.3d at 1191. As in <u>Ransdell</u> and <u>Boulder City</u>,

15  the determinations made by FTB were grounded in economic and social public policies

16  of collecting taxes from all residents. Thus, the second prong of the <u>Berkovitz-Gaubert</u>

17  test is satisfied.

18    The <u>Gaubert</u> Court granted discretionary function immunity to lower level

19  employees of the Federal Home Loan Bank Board, which established general day-to-day

20  oversight of a troubled savings and loan. 499 U.S. at 319-322. The Court determined that

21  statutes gave the employees latitude in determining when and how to exercise their

22  authority. <u>Id</u>. at 331. Decisions made by the employees were related to broad policy

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

23

24  ---

[47] The error in allowing this second-guessing is compounded by the fact that the jury was not
provided all of the facts relevant to Hyatt's residency. The district court improperly excluded

25  evidence related to Hyatt's residency, that proved he had **not** established Nevada residency in
September or October of 1991 as he claimed. 27 AA 6509-10. Worse, the jury was not provided

26  California statutory, regulatory, and case law required to determine, if in fact, FTB properly
analyzed and weighed the evidence consistent with that jurisprudence. 46 AA 11297 (79) –

27  11299 (87); 53 AA 13218-50; 54 AA 13251-87. Allowing the jury to second guess FTB's
discretionary conduct was improper in and of itself, but to permit the jury to do this without the

28  benefit of all the evidence or any of the law applicable to these actions was severely prejudicial
to FTB.

51

RJN002378

1    considerations, and were therefore found to be immune. Id. at 332; see also, Terbush,

2    516 F.3d at 1130 (National Park Service's failure to warn of rockfall was grounded in

3    policy considerations of health and safety); Franklin Sav. Corp. v. United States, 180

4    F.3d 1124 (10th Cir. 1999) (actions of court-appointed conservator were susceptible to

5    policy analysis); Pina v. Com., 510 N.E.2d 253 (Mass. 1987) (evaluating social security

6    claims by executive branch employees entitled to discretionary function immunity).

7        In the present case, each and every action of FTB's employees were grounded in

8    California's economic and public policies of collecting taxes from all residents.

9    Therefore, every action was within this court's new test for discretionary function

10   immunity. Treating FTB the same as a similarly situated Nevada agency under the

11   principles of comity requires that Hyatt's claims be dismissed in their entirety.

        3.    Hyatt's Continuous Label That FTB's Conduct Constituted Bad
              Faith Is No Longer Material

14       Hyatt will probably argue that the new discretionary function immunity test does

15   not apply to FTB's conduct because he believes **all** of FTB's actions were taken in bad

16   faith. Hyatt has consistently labeled virtually every action engaged in by FTB as bad

17   faith, in order to avoid the jurisdictional limitations established by this court in 2002.

18   See, e.g., 45 AA 11190 (35) – 11203 (36) (explaining all evidence of bad faith and intent

19   relied upon by Hyatt to prove his claims.) Hyatt's labels, however, do not prohibit the

20   application of discretionary function immunity, because based on the adoption of the

21   Berkovitz-Gaubert test, FTB's subjective intent no longer has a bearing on the

22   application of discretionary function immunity. Butler, 168 P.3d at 1066 (quoting

23   Martinez, 168 P.3d at 729). There is no longer any distinction between "abuse of

24   discretionary acts" and "discretionary acts taken in bad faith." See id.[48] Therefore,

25

26   [48] In questioning whether the bad faith exception created by Falline was still good law, former
     Justice Maupin noted that finding a distinction between an abuse of discretion and a

27   discretionary act taken in bad faith, required the Nevada Supreme Court to dance "on the head
     of a pin" because all so-called discretionary acts taken in bad faith would necessarily involve an

28   abuse of discretion. See Oral Argument Hearing CD dated 3/3/08, City of Boulder City v.
     Boulder Excavating, No. 47761 at 35 minutes to 38 minutes.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

52

1  regardless of Hyatt's claims or labels that FTB acted in bad faith and/or engaged in
2  intentional torts, all of FTB's actions that Hyatt complains of in this case remain subject
3  to discretionary function immunity.[49]

4      As originally noted, this court looks for guidance from federal courts in
5  determining the scope of Nevada's discretionary function immunity. Martinez, 168 P.3d
6  at 727. In several federal cases, plaintiffs asserted that discretionary function immunity
7  does not apply to their claims because the governmental agent acted in bad faith or
8  engaged in intentional misconduct. See Franklin Savings, *supra*; Rogers v. United
9  States, 187 F. Supp. 2d 626 (N.D. Miss. 2001); Matter of TPI Intern. Airways, Inc., 141
10  B.R. 512, 519-20 (Bankr. S.D. Ga. 1992); Bolen v. Dengel, CIV.A. 00-783, 2004 WL
11  2984330 (E.D. La. Dec. 16, 2004) (unpublished disposition). The federal courts have
12  universally rejected attempts to side-step discretionary function immunity by assertions
13  of governmental bad faith or intentional misconduct. Id. The basis for these decisions is
14  that in order to make a determination of bad faith or intentional misconduct, the courts
15  would be required to consider the government actor's subjective intent – which is
16  prohibited by the Berkovitz-Gaubert test. Id.

17      A leading case on this issue is Franklin Savings, where the plaintiffs sued the
18  United States and a government agency, alleging intentional torts and bad faith conduct.
19  180 F.3d at 1126-27. The defendants moved to dismiss, arguing that their actions were
20  immune pursuant to discretionary function immunity. In response, the plaintiffs argued
21  that the defendants acted intentionally and in bad faith. The district court granted the
22  motion to dismiss. On appeal, the Tenth Circuit rejected the plaintiffs' argument that the
23  defendants' actions fell outside the scope of discretionary function immunity because the

24

25  [49] In making this argument, FTB is in no way suggesting that the application of discretionary
function immunity in this case would automatically afford FTB complete immunity in Nevada
26  based on the application of comity. For example, falling asleep while driving would not be
immune. Martinez, 168 P.3d at 729. Therefore, the application of comity to FTB's immunity
27  statute to the extent that immunity aligns with Nevada's own immunity provisions, would not
protect FTB from liability if any of its actions: (1) were not discretionary; or (2) did not involve
28  any plausible policy objectives of the agency. Id. It is simply the case here that all of FTB's
actions were discretionary and based on policy determinations and thus subject to immunity.

MCDONALD·CARANO·WILSON℠<br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>PO BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

53

1  actions taken were in bad faith or were intentional. 180 F.3d at 1134-42. The court held

2  that allegations or assertions that a government entity acted in bad faith and/or engaged

3  in intentional misconduct did not bar the application of discretionary function immunity.

4  Id. In reaching this conclusion, the court explained that Gaubert prohibited inquiry "into

5  the **actual state of mind or decision making process of [government] officials**

6  **charged with performing discretionary functions.**" Id. at 1135 (internal citations

7  omitted) (emphasis added). Courts cannot consider the subjective motives or intent of

8  the governmental agent, or the governmental agent's personal animus towards a plaintiff,

9  when determining whether discretionary function immunity applies. Id.

10     As Franklin Savings explained, allowing courts to inquire into the intent of

11  governmental agents could lead to: (1) large tort judgments against the government; (2)

12  demands on the time and attention of the agency's most valuable human resources when

13  plaintiffs conduct discovery into the bases for officials' decision making; and (3) the cost

14  of having an official skew their exercise of discretion by a desire to avoid the first two

15  costs. Id. at 1136 (internal citations and quotations omitted). "Immunity doctrines cannot

16  function well if mere allegations of bad faith will penetrate them and require trial, or at

17  least sufficient discovery to allow summary judgment, rather than dismissal" at the

18  pleading stage. Id. at 1141. Based on these considerations, the court concluded that

19  inquiry into bad faith or intent would require the type of judicial second-guessing

20  prohibited by Gaubert. Id. at 1141. Discretionary function immunity bars "all suits

21  dependant on allegations of subjective bad faith" or state of mind of the government

22  after performing facially authorized acts. Id. at 1140.

23     Other courts have followed Franklin Savings. For example, in Rogers, the

24  plaintiffs sued a government agency, asserting that the agency was guilty of "willful

25  misconduct." 187 F. Supp.2d at 630. The Rogers court rejected the plaintiffs' contention

26  that the agency's willful misconduct was not immune, holding:

27

28

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

54

> Judicial inquiry into the motivation of government actions would entail a detailed examination of the mental processes of the decision-making which formed the basis for such decisions. Thus, the Court is not to inquire whether the decision or action actually was a result of policy-driven determination. Such an inquiry constitutes precisely the "second guessing" of executive branch decisions which Congress sought to preclude [in the FTCA].

Id. at 631 (internal citations omitted). The Rogers court concluded that "an allegation of subjective bad faith will not save the plaintiff's claims...." Id. at 633; see also, Matter of TPI Intern. Airways, Inc., 141 B.R. at 519-20 (plaintiffs brought claims for intentional torts and bad faith; court rejected exception to discretionary function immunity).

The analysis and rationale of these cases applies equally in Nevada. See Butler, 168 P.3d at 1066 n.50 (analysis of federal courts interpreting the Berkovitz-Gaubert test will be relied upon by when interpreting Nevada's discretionary function immunity). Judicial inquiry into the subjective motivations of a government actor would "entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind [would] be particularly disruptive of effective government."[50] Franklin Savings, 180 F.3d at 1138. Therefore, based on the adoption of the Berkovitz-Gaubert test in conjunction with the analysis and application of this rule by the federal courts, allegations of subjective bad faith and intentional misconduct do not prohibit the application of discretionary function immunity.

D.    District Judge Walsh Failed To Follow This Court's 2002 Ruling Which Allowed The Trial To Significantly Exceed The Jurisdictional Boundaries Previously Established For This Case

This court's April 2002 order, as affirmed by the United States Supreme Court, established clear jurisdictional limits, requiring dismissal of all negligence-based claims, and leaving only intentional torts as potential bases of liability. 55 AA 1183-1193. The

---

[50] This case is a perfect example of such disruption. FTB has been required to defend itself in Nevada against Hyatt's claims for more than ten years. During this lawsuit, hundreds of depositions were taken of FTB employees, hundreds of thousands of documents were exchanged, and innumerable hours were spent by FTB and its employees defending this case. In addition to the numerous FTB employees that were deposed and required to miss valuable work days, FTB was also forced to employ several full-time FTB tax attorneys to this litigation in order to deal with the many discovery requests and needs of this litigation. Trial of this matter involved, nearly exclusively, an examination into the subjective intent of each FTB employee who was even remotely connected to Hyatt's audits.

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002382

1   next question for review, assuming the court does not extend immunity to FTB's actions

2   tried by Hyatt, is whether FTB's conduct examined at trial constituted intentional

3   wrongdoing, or whether the conduct was merely negligence, at worst, and thereby

4   outside the jurisdictional limits of this case.

5       Hyatt attempted to sidestep this court's jurisdictional limitation by contending

6   that FTB's various acts of negligence taken together, raised an inference of bad faith or

7   intentional misconduct.[51] 45 AA 11190 (35) – 11203 (86). Hyatt cited actions such as

8   using cost-benefit evaluations, failing to gather evidence properly (talking to some

9   witnesses but not others), improperly weighing evidence (giving too little or too much

10  weight to witnesses), improperly determining that there was enough evidence to support

11  a tax fraud assessment, using improper verb tense in reports, failing to complete the

12  administrative protest process in a time that Hyatt deemed reasonable. Id. To the district

13  court Hyatt successfully argued that if he had enough instances of negligence the jury

14  could reasonably infer from that conduct FTB intended wrongdoing toward Hyatt. Id.

15      This evidence, however, only establishes that, at the very worst, FTB acted

16  negligently. Negligence is the "failure to exercise that degree of care in a given situation

17  which a reasonable man under similar circumstances would exercise." Driscoll v.

18  Erreguible, 87 Nev. 97, 101, 482 P.2d 291, 294 (1971). Even accepting Hyatt's spin on

19  the evidence, FTB's actions cannot be described as anything more than failures to use

20  the degree of care that a reasonable person would employ under similar circumstances,

21  i.e., negligence. In fact, that was the conclusion of Hyatt's lead expert. See, e.g., 44 AA

22  10823 (40) – 10825 (40) (expert opines that FTB staff did not perform in accord with

23  "reasonable professional standards").[52]

24

25  [51] Before trial Hyatt continually claimed that his bad faith allegations only related to his fraud
    claim. 17 AA 4049-83. In opposition to FTB's Rule 50 Motion, however, Hyatt claimed that the

26  evidence of FTB's bad faith and FTB's failure to treat him fairly and impartially also
    established the intent elements of each of his other common law intentional torts. 45 AA 11190

27  (35) – 11203 (86).

28  [52] FTB's motions in limine repeatedly sought to preclude Hyatt from relying on evidence of
    FTB's alleged negligent conduct. For example, FTB moved to exclude Hyatt's expert witnesses,
    Malcolm Jumelet and Diane Truly, because their expert opinions related exclusively to FTB's
    Continued...

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

56

Negligence, by definition, is not intentional conduct. An intentional act requires that the actor intend the **consequences** of an act, not simply the act itself. <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 62 (1998). In fact, this court has held: "Willfulness and negligence are contradictory terms. If conduct is negligent, it is not willful; if it is willful, it is not negligent." <u>Rocky Mt. Produce v. Johnson</u>, 78 Nev. 44, 51, 369 P.2d 198, 201 (1962). Cumulative acts of negligence do not prove bad faith or intentional misconduct. <u>See e.g.</u>, <u>Brooks v. Celeste</u>, 39 F.3d 125 (6th Cir. 1994) (rejecting claim that intentional misconduct was proved by repeated acts of negligence by government employees); <u>Sellers v. Henman</u>, 41 F.3d 1100, 1103 (7th Cir. 1994) (it would be a "great mistake" to infer that a series of negligent acts equates to deliberate misconduct). Similarly, this court has held that no inference of fraudulent intent arises from non-performance of a promise. <u>See</u> <u>Bulbman Inc. v. Nevada Bell</u>, 108 Nev. 105, 112, 825 P.2d 588, 592 (1992); <u>Tallman v. First Nat. Bank of Nev.</u>, 66 Nev. 248, 259, 208 P.2d 302 (1949). That same rationale applies perforce here. In other words, no matter how many acts of negligence or failures to perform promises Hyatt could point to, no inference of fraudulent intent or bad faith arises therefrom. Accordingly, there is no validity to Hyatt's cumulative-negligence theory, which he used in his desperate attempt to establish bad faith or intentional misconduct.

At trial, Hyatt was required to **prove** intentional misconduct. Even giving Hyatt's evidence the benefit of the doubt, FTB's conduct merely constituted negligence, at worst. Thus, the conduct used by Hyatt to prove his claims was outside of the jurisdictional limits of the case, the conduct was immune, and the district court erred by failing to dismiss all of Hyatt's intentional tort claims.

///

---

alleged negligent conduct and improper discretionary analysis. Jumelet, for example, repeatedly opined that FTB's conduct in analyzing Hyatt's evidence was not "in accordance with reasonable professional standards." <u>E.g.</u> 14 AA 3344, 3352. Moreover, Jumelet opined that FTB had improperly weighed evidence in reaching its audit and tax assessment conclusions. 14 AA 3345. FTB raised analogous arguments related to the expert opinions of Truly. 18 AA 4346-60. The district court, however, denied these motions. 27 AA 6519-20, 6525-26.

RJN002384

E.   District Judge Walsh Also Failed To Follow Jurisdictional Limits Previously Recognized By Then-District Judge Saitta

Jurisdictional limits established by this court prohibited Hyatt from relying on FTB's negligence. But there was another jurisdictional limit recognized by former District Judge Saitta early in the case, a limit that was never challenged by Hyatt. Judge Saitta's 1999 Order required that any issues that were the subject matter of the administrative tax proceedings between FTB and Hyatt in California were to be left for resolution in that forum. 2 AA 00409, 00411-12 (relying upon Public Service Commission v. District Court, 107 Nev. 680, 818 P.2d 396 (1991)). "Courts should not adjudicate when administrative decision is still pending and where a statute exists to provide an administrative remedy." 2 AA 00409. This prohibition was mandated by Nevada law. Courts are prohibited from entertaining claims if, at the time the claim is filed, there is another action or proceeding in which the same parties and issues will be adjudicated. See Public Service, 107 Nev. at 684.

This rule applies to ongoing administrative proceedings, prohibiting a party from attempting to receive interlocutory judicial review of an administrative agency's determinations. Id. at 683; see also Allstate Ins. Co. v. Thorpe, 123 Nev. 565, 170 P.3d 989, 993-95 (2007) ("the exhaustion doctrine gives administrative agencies an opportunity to correct mistakes and conserves judicial resources, so its purpose is valuable"); Mesgate HOA v. City of Fernley, 124 Nev. ___, 194 P.3d 1248 (2008) (pendency of administrative proceedings renders the matter "non-justiciable"). Thus, under Nevada law, all administrative proceedings must be concluded before a claim becomes ripe for review by the courts. Allstate, 170 P.3d at 993-95. Generally there is no right to a jury trial to review the actions of an administrative agency. See e.g., Granfinanciera S.A. v. Nordberg, 492 U.S. 33, 42 n.4 (1982). In fact, a private litigant is not entitled to have a jury sit as a court of appeal of an administrative agency's decision when a statute provides the administrative agency the initial decision making power over the dispute. See Consumer Protection Div. v. Morgan, 874 A.2d 919, 958 (Md. 2005).

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

58

1    Administrative proceedings are presently ongoing before the California State
2   Board of Equalization (BOE), and were ongoing at the time of trial. 43 AA 11294 (66),
3   (69). The BOE will review FTB's administrative record and essentially determine
4   whether FTB fairly and impartially analyzed the evidence, and whether FTB reached the
5   proper legal conclusions. Cal. Rev. & Tax Code § 19045(b)(1) (taxpayer may appeal
6   decision of FTB to State Board of Equalization following administrative protest); 18 Cal.
7   Admin. Code. Reg. § 5412 (defining BOE's jurisdiction regarding administrative
8   appeals.) Specifically, BOE will consider the evidence collected, whether FTB applied
9   California law correctly, and whether FTB reached the right conclusions. See e.g., Cal.
10   Rev. & Tax Code §§ 19045(b)(1); § 21013. Because these issues are still under
11   consideration in California, they were prohibited from being considered in this case. 2
12   AA 409-12, 420-421; see also Public Service, 107 Nev. at 683-84.[53]

13    Since Hyatt's declaratory relief claims were dismissed, so too was any review of
14   the accuracy or correctness of FTB's conclusions related to residency, tax assessments
15   and fraud penalties were dismissed from the case. 2 AA 421. In other words, the jury
16   should not have been allowed to second-guess these conclusions. But Judge Walsh, the
17   successor judge, eviscerated this limitation by allowing the entire trial to be a platform
18   for Hyatt's attack on FTB's conclusions concerning residency, tax assessments and fraud
19   penalties.

20         1.    The District Court Improperly Allowed the Jury to be an Appellate
                 Court Regarding FTB's Administrative Conclusions
21

22    Before the district court, Hyatt claimed that his cause of action for fraud was
23

24   [53] As suspected, Hyatt is using this litigation to prevent the collection of tax in California. As
     noted, before the BOE, Hyatt is contending that the BOE is bound by the jury's findings.
25   However, NRS 372.670, which is nearly identical to Cal. Rev. & Tax Code § 19381, prevents
     Hyatt from doing so. Compare NRS 372.670 ("No injunction, writ of mandate or other legal or
26   equitable process may issue in any suit, action or proceeding in any court against this state or
     against any officer of the state to prevent or enjoin the collection under this chapter of any tax or
27   any amount of tax required to be collected.") with Cal. Rev. & Tax Code § 19381 ("No
     injunction or writ of mandate or other legal or equitable process shall issue in any suit, action or
28   proceeding in any court against this state or against any officer of this state to prevent or enjoin
     the assessment or collection of any tax[.]").

McDONALD·CARANO·WILSON⸹
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

59

1  based upon FTB's alleged promise to treat him fairly and impartially, including and most

2  particularly its conclusions concerning his residency and the imposition of fraud

3  penalties. 17 AA 4049-4083; 45 AA 11190 (35) – 11230 (86). In short, Hyatt attempted

4  to disguise his direct attack on FTB's residency, tax and fraud conclusions, by

5  contending that FTB failed to act fairly and impartially concerning those conclusions. 17

6  AA 4049-4083. Hyatt asserted that this amounted to fraud. This label, however, did not

7  change the fact that the case presented to the jury was an attack on the sufficiency of

8  evidence supporting FTB's conclusions.[54] Id.

9      Hyatt's contentions focused on FTB's alleged improper analysis and conclusions,

10  i.e., testimony that FTB did not have sufficient evidence to assess fraud penalties, that

11  FTB improperly weighed evidence to reach its residency conclusions, and the like.

12  According to Hyatt, this amounted to a failure on FTB's part to be fair and impartial.

13  After hearing all such testimony, Judge Walsh instructed the jury as follows:

14      There is nothing . . . that would prevent you during your deliberations from
15  considering the appropriateness or correctness of the analysis conducted by FTB
    employees in reaching its residency determinations and conclusions. There is
16  nothing . . . that would prevent Malcolm Jumelet [Hyatt's expert witness] from
    rendering an opinion about the appropriateness or correctness of the analysis
17  conducted by FTB employees in reaching its residency determinations and
    conclusions.

18  53 AA 13054 (22), 13242-43.

19      As a result, Judge Walsh permitted – even invited – the jury to evaluate "the

20  appropriateness or correctness" of FTB's conclusions regarding residency, tax

21  assessments and Hyatt's fraud, despite Judge Saitta's earlier order. Judge Walsh created

22  a scenario in which the jury sat as an appellate court, performing the traditional appellate

23  task of evaluating the sufficiency of evidence supporting a fact-finder's determinations.

24  In this scenario, FTB was the fact-finder, and the jury was the appellate court. Indeed,

25  during Hyatt's counsel's opening statement and closing arguments, he specifically told

26

27  [54] Hyatt's Second Amended Complaint never pleaded a separate bad faith claim. 14 AA 3257-
3300. Rather, Hyatt pleaded allegations of bad faith as part of each claim for relief, by alleging
28  that FTB's improper conduct was motivated entirely upon FTB's improper attempts to extort a
settlement from him.

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

60

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1   the jury that it was their job to act as a "check and balance" on California's Legislative

2   and Executive branches. 32 AA 07974 (131) (citizens of Nevada get to say that FTB's

3   acts were not right); 52 AA 12837 (90) ("You're the Nevada citizens who get to be the

4   check and balance on this power of government.")[55]

5       Hyatt's presentation to the jury focused largely on attempting to undermine

6   FTB's conclusions, particularly the fraud penalty, by attacking the fairness and

7   impartiality of the evidentiary analysis supporting those conclusions. For example,

8   FTB's fraud conclusion was based, in part, on FTB's finding that there was a lack of

9   cooperation, intimidation tactics used by Hyatt and his representatives, implausible

10  behavior and intent to defraud. 66 AA 16418-427. At trial, Hyatt attempted to convince

11  the appellate-court jury that FTB had insufficient evidence to support these findings.

12  Michael Kern, Hyatt's tax accountant, testified almost exclusively on two of these

13  factors, i.e., that he really did cooperate with FTB during the audits, and that he did not

14  attempt to intimidate FTB personnel during the audit. E.g., 34 AA 08333 (108), 08338

15  (128), 08349 (173), 08351 (180). The testimony of Eugene Cowan, Hyatt's tax attorney,

16  was similar. Cowan's testimony largely focused on his claimed cooperation with FTB

17  during the audit. E.g., 35 AA 08509 (185) – 08510 (186), 08546 (14-15). Edwin Antolin,

18  a tax attorney, exclusively focused on Hyatt's cooperation.[56] 36 AA 08787 (9). The only

19

20  [55] FTB tried hard to maintain the jurisdictional limitations of this case. 14 AA 3338-3424; 17
    AA 4084-4093; 17 AA 4240-4249; 18 AA 4346-4360; 20 AA 4904-4941; 20 AA 4973-4982.

21  Of particular significance, FTB filed a motion entitled, "Motion in Limine re: Hyatt's Bad Faith
    Analysis Claim." See 20 AA 4904-4941 ("Bad Faith Motion"). Hyatt responded by arguing that

22  FTB's discretionary analysis was not outside the jurisdictional limits of this case. 20 AA 5075.
    Thus, according to Hyatt, **all** of FTB's conduct – including its pure discretionary conduct,

23  analysis, and allegedly negligent actions – were within the jurisdictional limits of this case. Id.
    The district court agreed with Hyatt. 23 AA 5715.

24  [56] Before trial, FTB sought to limit Antolin's testimony on the basis that the only issue that
    Antolin's testimony related to – cooperation – was not an issue for the jury to determine based

25  on the court's prior dismissal of the declaratory relief claim. 32 AA 07915 (7) – 07917 (16).
    FTB argued that the court had previously precluded FTB from admitting certain after-acquired

26  evidence (i.e., the "XCS documents" and "Youngmart" Travel documents) to show Hyatt's lack
    of cooperation during the audit, after concluding that this evidence related **only** to Hyatt's

27  residency and tax assessments. Id. Based on this prior ruling, FTB argued that Antolin's
    testimony, which related only to whether Hyatt and his representatives cooperated during the

28  audit, must likewise be excluded because it, too, related only to FTB's tax assessment
    determinations. Id. In spite of FTB's objection, the district court allowed Antolin to testify.

RJN002388

1    purpose of all this testimony was to convince the jury that FTB had insufficient evidence
2    to support its decision that Hyatt did not cooperate or engage in intimidation tactics, as
3    factors in evaluating Hyatt's fraud.

4       Another example of the district judge allowing Hyatt to use the jury as an
5    appellate court dealt with a rather obvious factor in determining whether a taxpayer has
6    committed fraud – "implausible behavior." This is a taxpayer's assertion of behavior that
7    is far-fetched or simply contrary to common sense. FTB personnel believed that Hyatt's
8    claimed behavior did not make sense, such as his rather dubious assertion that when he
9    first moved to Nevada in September of 1991, he lived in a low-income HUD apartment
10    building that had no security gates or privacy systems. Knowing that Hyatt was a
11    millionaire, FTB personnel were understandably skeptical of Hyatt's explanation. This
12    was a factor (only one factor, not the only factor) in determining that Hyatt committed
13    tax fraud. 66 AA 16421 (Hyatt's explanation "does not make sense").

14       Hyatt was allowed to call witness Paul Schervish, the director of the "Center on
15    Wealth and Philanthropy" at Boston College. 43 AA 10654 (35). His only expert opinion
16    was that wealthy people do not necessarily live opulent lifestyles. 43 AA 10658 (53) –
17    10659 (54). This testimony was intended to convince the jury (acting as the appellate
18    court) that FTB (the fact-finder) had insufficient evidence to make the "implausible
19    behavior" finding.

20       Malcolm Jumelet, Hyatt's primary expert witness, focused primarily upon "the
21    way the information was analyzed and weighed" by FTB. 44 AA 10943 (165). To this
22    end, Jumelet opined that FTB did not give proper consideration to, or properly weigh,
23    evidence regarding a drivers license and voters registration, a Nevada bank account, the
24    lack of analysis comparing Hyatt's California and against his Nevada apartment, failing
25    to consider home purchase offers, and the like. E.g., 44 AA 10817 (14) – 10818 (18).
26    FTB had found that these limited contacts, examined in context, were indicia of Hyatt
27    pretending to live in Nevada, thereby demonstrating his fraud; but Jumelet believed them
28    to show Hyatt's Nevada residency. Id. Thus, Jumelet's testimony was an attempt to

62

1    prove to the jury that FTB had insufficient evidence to support its fraud determination.

2         A particularly flagrant violation of the jurisdictional limitation prohibiting the

3    jury from determining the merits of FTB's tax assessment conclusions concerned FTB's

4    alleged "$24 million error" in calculating Hyatt's 1992 tax assessments. Hyatt asserted

5    that FTB erred in calculating his 1992 taxable income by improperly including $24

6    million in its calculation, and that FTB's failure to correct that error was bad faith. 21

7    AA 5081-5082. FTB steadfastly disagreed with this contention.[57] But the district court

8    allowed this tax-calculation issue to go to the jury, once again allowing the jury to act as

9    an appellate court on the issue. 52 AA 12890 (11-13). The question of whether FTB

10   committed any error in calculating Hyatt's tax assessments, or in weighing the evidence

11   associated with this issue, went to the heart of the propriety of FTB's tax determinations

12   which was supposed to be outside the jurisdiction of Nevada's courts. 2 AA 420-421.[58]

                    2.    The Jury, Acting as an Appellate Court, Did Not Have All
                          Necessary Information To Perform Its Function Accurately

15        Another egregious aspect of allowing the jury to second-guess FTB's factual

---

[57] In fact, it has always been FTB's position that no error occurred in the calculation of Hyatt's 1992 income. This was based upon the extensive evidence received by FTB during the administrative protest proceedings. Thus, after reviewing and weighing all the evidence associated with this issue, FTB determined that no error had occurred. See 93 AA 23182-23231.

[58] Based on the clear jurisdictional limit recognized by Judge Saitta, FTB filed a motion in limine seeking to exclude all evidence related to the alleged error. 20 AA 04973-82. At that time the district court agreed:

    THE COURT: Well, I don't see how we can address the $24 million error without going to the very heart of the validity of the tax assessment. So I think Mr. Hyatt is not precluded, of course, from addressing the issue of the delay. But I think the motion is well-taken and it ought to be granted.

23 AA 05726. At trial, however, the district court eviscerated this ruling and allowed Hyatt, over FTB's objections, to present evidence related to FTB's alleged "$24 million error." 35 AA 08567 (99-101); 44 AA 10830 (69) – 32 (75). Hyatt was permitted to argue that FTB erred in calculating Hyatt's income and that FTB refused to correct the error, constituting bad faith. 52 AA 12890 (11-13). Worse still, the jury was allowed to make factual determinations related to this analysis without even having the benefit of all the evidence related to the issue. Based on other pretrial rulings excluding after-acquired evidence, the district court excluded FTB's evidence proving that FTB never made any error in calculating Hyatt's 1992 income. 24 AA 5794. Therefore, because the district court allowed Hyatt to present this evidence and to make these arguments, the jury was allowed to second-guess whether FTB's analysis relating to the 1992 tax calculation was proper, although the jury did not have all the evidence needed to make this determination accurately.

RJN002390

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1    conclusions was the district court's exclusion of relevant evidence explaining the

2    grounds for FTB's conclusions. 24 AA 5794. In other words, the judge allowed the jury

3    to act as an appellate court and to determine the sufficiency of FTB's evidence, but

4    without all the evidence on which FTB relied in reaching its conclusions.

5         Specifically, the district court excluded all "after-acquired evidence" from the

6    trial. 27 AA 6509-6510. This was a label coined by Hyatt, to refer to all evidence that

7    FTB uncovered in the Protest Proceedings, which was more than 20 times the amount of

8    evidence obtained during the audit phase. 49 AA 12155 (159-60). The jury was only

9    permitted to see a small fraction of the evidence FTB relied on in reaching its residency

10   conclusions. For example, the district court precluded all evidence related to: Hyatt's

11   Continental Hotel story;[59] the Youngmart documents;[60] the XCS documents;[61] Hyatt's

12   IRS audit evidence;[62] the back-dated deed and the notary log related to the sham transfer

13   of Hyatt's La Palma home;[63] and an entire host of other critical evidence utilized by FTB

14   in its residency and fraud penalty analysis. 21 AA 5024-25; 33 AA 08047 (15) (court's

15   denial of IRS evidence at trial even after Hyatt opened door on this issue during opening

16   statements.)

17        To put this evidence in context, Hyatt's criticisms of FTB involved two separate

18   timeframes: actions during the audit phase, and actions during the Protest Proceedings.

19   As noted above, the protest hearing officer or PHO was not restricted to evidence

20   gathered during the audits; instead, the PHO was free to obtain additional evidence

21   during the Protest Proceedings. 49 AA 12083 (151-152).

22

23   [59] A story casting significant doubt over Hyatt's claimed move date of September 26, 1991. 93 AA 23194-95.

24   [60] Airline documents revealing flights by Hyatt out of LAX in the early morning hours, and returning back to LAX during the disputed six-month period. 22 AA 05353-54.

25   [61] Equipment repair documents that continuously placed Hyatt physically in his California home after its alleged sale to his assistant. 93 AA 23213-14.

26

27   [62] Similar issues to those raised by FTB were raised by the IRS, with Hyatt settling those issues for $5 million. 34 AA 08467 (14) – 08469 (22).

28   [63] Hyatt presented a back-dated deed to FTB; the notary logs acquired during the protest conclusively established such. 93 AA 23192-93.

64

MCDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1       Before trial, Hyatt's contention regarding the Protest Proceedings was limited: he

2   only contended that FTB delayed resolution of the protests. 11 AA 02747-48. Shortly

3   before trial, Hyatt moved to exclude all evidence that he termed "after-acquired"

4   evidence; this was evidence obtained by the PHO during the Protest Proceedings after

5   the audits concluded. 20 AA 04983-96. Hyatt argued that the after-acquired evidence

6   was irrelevant, despite his bad faith contention regarding the Protest Proceedings time

7   frame. Id. The district court agreed and excluded this evidence. 27 AA 06509.

8       At trial, however, Hyatt expanded his claim by asserting that the PHO reached a

9   bad faith **conclusion**, i.e., rubber stamping the original conclusions of the FTB auditors

10  and adding a sourcing theory. E.g., 52 AA 12834 (80-81). This expanded theory was a

11  critical difference. Despite the fact that Hyatt had expanded his theory and was attacking

12  the PHO's ultimate conclusion as being in bad faith, the after-acquired evidence ruling

13  prevented FTB from defending itself and from explaining **why** the PHO reached her

14  ultimate conclusion.

15      As one example, in reaching her conclusions, the PHO weighed and evaluated the

16  believability of Hyatt's contentions regarding his residency during the key time frame

17  between September 26, 1991 (the last date he utilized in claiming he moved to Las

18  Vegas) and the date of his apartment lease in Las Vegas. 93 AA 23194-95. This time

19  frame was important because of the full-year residency presumption that is triggered by

20  nine month residence, as explained above, and because of Hyatt's credibility. During the

21  audit, FTB repeatedly asked Hyatt for information regarding where he lived during this

22  time frame, but as noted by the PHO he never answered this simple question. The

23  question was not answered until 2000 (four years into the time frame of the Protest

24  Proceedings), when Hyatt's tax accountant revealed Hyatt's Continental Hotel story

25  during deposition. Id.; 16 AA 3900-3936. Hyatt's story was:

26  1. In mid-September 1991, Hyatt rode on an unidentified Asian tour van from Los
        Angeles to Las Vegas; he received a room key for the Continental Hotel (located
27      at Paradise and Flamingo) from an unidentified van driver as he stepped off the
        van; he did not register at the hotel; he paid for the room by giving the
28      unidentified van driver an undisclosed amount of cash, even though he did not
        know how long he would stay.

65

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002392

2. A day or two later, Hyatt returned to Southern California on the van; he did not check out of the hotel; he still had his room key.

3. On September 26, 1991, he and his so-called "personal assistant", Grace Jeng, packed up Hyatt's personal belongings, loaded them onto a homemade trailer, attached to Hyatt's 1977 Toyota Corolla, and drove back to the Continental Hotel in Las Vegas.

4. Hyatt and Jeng then unloaded the trailer and hauled more than 100 boxes and suitcases directly past the front desk to Hyatt's room; he resided at the Continental Hotel for about three weeks, although he was not registered as a guest at the hotel; during that time he made repeated trips back and forth to California, and when he did so he left his trailer in the hotel parking lot and his belongings in the room.

5. At no time did the Continental Hotel require him to register.

(16 AA 03785, 03795-97).

Hyatt had no receipts or other paperwork for the alleged payment to the unidentified van driver; he had no receipts or other paperwork for meals or other expenses during this time frame; he had no plausible explanation for the Continental Hotel's violation of city and county code provisions, which require hotels to register all persons who rent or occupy hotel rooms; and he had no plausible explanation as to how he determined the amount of cash to give the unidentified van driver when he first stepped off the bus, for the indeterminate amount of time Hyatt would be staying at the hotel as an unregistered guest. 93 AA 23194-95.

In a sworn affidavit tendered in this case, Hyatt previously claimed that "**immediately** after moving to Las Vegas, I sold my California house, leased and moved into a Las Vegas **apartment**, . . ." 16 AA 3821 (emphasis added). Hyatt's Continental Hotel story flatly contradicted this affidavit. Equally important, the story was bizarre, inherently unbelievable, not supported by a shred of documentation, and not disclosed to FTB until seven years after the onset of the audit. Notably, Hyatt only proffered his Continental Hotel story after the hotel destroyed its occupancy records pursuant to a bankruptcy court order. 93 AA 23194-95. The PHO knew of this story, and legitimately questioned Hyatt's credibility. Id. Yet when Hyatt was allowed to attack the PHO's conclusion as being in bad faith, and as rubber stamping the audit conclusions; the

66

RJN002393

1  district court's after-acquired evidence ruling precluded FTB from explaining the PHO's

2  reasons for the conclusion.

3     The district court erred by excluding the after-acquired evidence in the first place,

4  because the evidence was relevant in explaining the reasons why the protest proceedings

5  took so long, and was therefore relevant to FTB's defense against Hyatt's bad faith delay

6  contention. It was also relevant to prove Hyatt's lack of cooperation during the audit – an

7  issue for which Hyatt presented multiple witnesses at trial. The after-acquired evidence

8  gained even more relevance and importance after Hyatt expanded his bad faith theory

9  and attacked the **conclusion** reached by the PHO as being in bad faith. The district

10  court's after-acquired evidence ruling therefore allowed the jury (acting as an appellate

11  court in reviewing FTB's conclusions) to hear only Hyatt's version of the Protest

12  Proceedings, while precluding FTB (the fact-finder) from explaining all the evidence on

13  which FTB relied in reaching its conclusions. This was prejudicial error. See NRS

14  48.025(1) (all relevant evidence is generally admissible); Bomar v. United Resort Hotels,

15  Inc., 88 Nev. 344, 346, 497 P.2d 898 (1972) (if party opens door to evidence, other party

16  must be allowed to pursue the issue); Taylor v. State, 109 Nev. 849, 856, 858 P.2d 843

17  (1993) (once party opens door to evidence, "basic fairness" mandates allowing other side

18  to present rebuttal evidence).

19     Simply put, the district court permitted the jury to review the factual bases for

20  FTB's conclusions, to second-guess FTB's analysis, and to substitute its own judgment

21  for FTB's determinations, but with a one-sided version of the necessary facts to guide its

22  decisions. The jury was not only an improper body to do so, but was in no position to

23  determine whether FTB had fairly weighed the evidence related to Hyatt's residency and

24  the tax and fraud penalty. [64]

25

26  [64] As demonstrated in the foregoing arguments, the district court through numerous rulings
before, during and after trial, arbitrarily and unfairly exceeded the law-making authority of
Nevada in a manner that directly interfered with FTB's actions performed, and lawful, in
27  California. Article VI, Section 1, of the United States Constitution, the Full Faith and Credit
Clause, prohibits such intrusions and protects FTB's expectations that California law applies to
28  the performance of its responsibilities to the people of California. Even while allowing this
matter to proceed, the United States Supreme Court recognized that the Full Faith and Credit
Continued...

67

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1

2

### F.  The District Court Impermissively Permitted Hyatt's Common Law Claims To Be Tried To A Jury

3

4

5

6

7

8

9

10

11

This court originally decided FTB's writ petition on grounds not raised by the parties, namely, "that there [was] no probative evidence to support Hyatt's claims." 5 AA 1065. As such, the court originally held that "Hyatt failed to meet his burden of proving probative evidence to generate issues of material fact on each of his claims, [and therefore] the district court erred in denying [FTB's] motion for summary judgment." Id. Hyatt filed a petition for rehearing. 5 AA 1070-88. He advanced two arguments: (1) that this court misapprehended substantial evidence that created material issues of fact as to each of Hyatt's intentional torts; and (2) that the court improperly decided the writ petition upon "issues not raised, briefed, or argued." Id. at 1072-1080.

12

13

14

15

This court granted the rehearing and vacated its earlier order. 5 AA 1183-96. The court did not state which of Hyatt's two arguments was the basis of the order granting rehearing. Nevertheless, on rehearing, this court limited itself to **only** those matters presented by the initial petition. Id.

16

17

18

19

20

21

Following remand, and after extensive further discovery, FTB filed several motions for partial summary judgment. Each motion sought dismissal of a claim for relief contending that either: (1) Hyatt had no evidence to support an essential element(s) of his claim; or (2) an affirmative defense precluded the claim. 6 AA 1496-1500; 7 AA 1501-16; 8 AA 1867-88; 12 AA 2836-42; 13 AA 3002-29; 14 AA 3462-75; 15 AA 3504-63, 3650-71, 3569-80, 3581-3649; 17 AA 4021-48.

22

Hyatt's oppositions claimed that **this court** had "affirmed" the district court's

23

24

25

26

27

28

Clause places limits on the discretionary application of comity. ("State sovereignty interests are not foreign to the Full Faith and Credit Command." Franchise Tax Board, 538 U.S. at 499). There are three principles that limit a forum state's authority to disregard the laws of a sister state: (1) a forum state may not act with hostility to the acts of a sister state by refusing to recognize laws that are not antagonistic to the polices of the forum state, Id.; (2) a state may not project its laws into a sister state, Pacific Employers Ins. Co. v. Indus. Accident Comm'n, 306 U.S. 493, 504-05 (1939); and (3) arbitrary and unfair application of forum law, at least to the extent that its application is contrary to the expectations of the parties at the time the challenged actions were taken. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 822 (1985). All of these principles were disregarded by the district court. The district court stripped FTB of its sovereign status and applied Nevada law applicable to private parties or non-sovereigns.

68

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1    order denying FTB summary judgment, and did so on the basis that that he had presented

2    a genuine issue of fact justifying denial of summary judgment on each of his tort claims.

3    See e.g., 13 AA 3044-68; 15 AA 3708-50; 16 AA 3751-56, 3943-4000; 17 AA 4001-18,

4    4021-48, 4049-83, 4094-4124. Hyatt's oppositions also argued that the law of the case

5    doctrine precluded the district court from revisiting the sufficiency of his claims, and this

6    court mandated that his claims proceed to trial. 15 AA 3711.

7        To support his contention, Hyatt repeatedly mischaracterized the 2002 rehearing

8    order as holding "that Hyatt had presented sufficient facts supporting his tort claims . . .

9    thereby creating 'the existence of a genuine dispute justifying denial of the summary

10   judgment motion.'" 7 AA 1517-43; 13 AA 3044-68; 15 AA 3716; 16 AA 3943-4000; 17

11   AA 4001-18, 4049-83, 4250; 18 AA 4251-75. In truth, this court was merely restating

12   the ruling it had previously entered, which was then **vacated** on rehearing:

> On June 13, 2001, we granted the petition in Docket No. 36390 on the basis that Hyatt did not produce sufficient facts to establish the existence of a genuine dispute justifying the denial of the summary judgment motion. Because our decision rendered the petition in Docket No. 35549 moot, we dismissed it. Hyatt petitioned for rehearing in Docket No. 36390 on July 5, 2001, and in response to our July 13, 2001 order, Franchise Tax Board answered on August 7, 2001. Having considered the parties' documents and the entire record before us, we grant Hyatt's petition for rehearing, vacate our June 13, 2001 order and issue this Order in its place.

18   5 AA 1184.

19       However, Judge Walsh accepted Hyatt's argument and denied **all** of FTB's

20   motions for partial summary judgment. See e.g., 12 AA 2996-97, 2998-99; 14 AA 3301-

21   02; 19 AA 4733-34; 21 AA 5020-23; 25 AA 6283-84, 6491-92. Although the vast

22   majority of her orders did not provide any reasoning, at the last hearing on the motions,

23   she finally provided her rationale:

> It seems to me that the Nevada Supreme Court specifically held that Mr. Hyatt has established that there are genuine issues of material fact regarding his intentional tort claims. The FTB points to no exception within that order with respect to these particular claims. The motion is denied.

27   22 AA 5491. This was factually and legally incorrect. Judge Walsh erroneously

28   determined that she could not grant FTB's motions for summary judgment without

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

69

1  violating the previous order of this court, and therefore all his claims advanced to trial. A

2  review of those motions, which FTB repeated in its Rule 50(a) motion at the close of

3  Hyatt's case in chief, and again post-trial, reveals that all of Hyatt's common law claims

4  were legally deficient and never should have been tried or presented to the jury.

5            1.    Hyatt's "Bad Faith Fraud" Claim Based on Alleged Promises of

6                 Fair and Impartial Treatment or Promises of Confidentiality for
               Public Facts Failed as a Matter of Law

7         Hyatt was required to establish the following elements of his fraud claim by clear

8  and convincing evidence: (1) FTB made a false representation to Hyatt; (2) FTB knew,

9  at the time the representation was made, that the representation was false or that the FTB

10 had an insufficient basis for making the representation; (3) at the time FTB made the

11 alleged statements, FTB intended not to perform so as to induce Hyatt to act or refrain

12 from acting in reliance on the statement; (4) Hyatt justifiably relied upon the

13 misrepresentation; and (5) Hyatt was damaged as a result of his reliance. Bulbman, Inc.,

14 108 Nev. at 111.

15           a.    Implied Statements of Fair and Impartial Treatment Are Not

16                Actionable Representations

17        The primary predicate for Hyatt's bad faith fraud claim was that FTB allegedly

18 promised that it would treat him "fairly and impartially." Before trial, Hyatt claimed that

19 FTB made this promise in its mission statement. 3 AA 569, 573; 28 AA 6854. The

20 mission statement Hyatt relied upon before trial for this alleged promise was FTB's 1998

21 mission statement that FTB provided to Hyatt's attorneys during discovery and therefore

22 could not have been relied upon by Hyatt in 1993 as alleged. See 38 AA 9300 (3-5).

23 When this was pointed out during trial, Hyatt disassembled and then claimed it was

24 actually FTB's 1992 mission statement that was applicable. 93 AA 23181. However the

25 1992 mission statement made no such promises. Id. Additionally, there was no evidence

26 that Hyatt himself had even received, reviewed or relied upon FTB's 1992 Mission

27 Statement. Therefore, Hyatt could not possibly prove that FTB made the claimed

28 promise to him, or that he relied upon FTB's mission statement for the basis of any

McDONALD·CARANO·WILSON⸱
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

70

1  promise to act fairly and impartially.

2      As a result, Hyatt changed his theory again, and claimed that FTB's promises

3  were contained in a privacy notice sent to him at the beginning of the audit. 52 AA

4  12896 (36-37), 12915 (113). That privacy notice, however, merely stated that a taxpayer

5  could expect "courteous treatment by FTB employees" during an audit. 54 AA 13401. In

6  taking this claim to the jury, Hyatt argued that FTB's statement that it would be

7  courteous was **impliedly** saying that FTB was going to treat him fairly and impartially.

8  Id. This was the only evidence presented at trial to support the essential element of a

9  false representation for his fraud claim.

10      To be actionable, a representation must be clear, specific, and unambiguous;

11  where the statement is so vague that a plaintiff could not reasonably have relied upon it,

12  an action for fraud will not lie. Morris v. Bank of Am. Nevada, 110 Nev. 1274, 1276,

13  886 P.2d 454 (1994) (district court properly dismissed counterclaim for fraud because

14  claim was insufficiently vague); Glen Holly Entm't, Inc. v. Tektronix Inc., 343 F.3d

15  1000, 1015 (9th Cir. 2003) (applying Nevada law noting it is not reasonable to rely on

16  statements that are "generalized, vague and unspecific assertions" and they are legally

17  insufficient to support a fraud claim); Connecticut Gen. Life Ins. Co. v. Jones, 764 So.

18  2d 677, 684 (Fla. Dist. Ct. App. 2000); Am. Jur.2d Fraud and Deceit § 61 (2001).

19      Hyatt's fraud claim was premised on FTB's implied promise to treat him fairly

20  and impartially. 14 AA 3286-91; 62 AA 15332-37. However obvious or apparent that

21  implication may be, there was **no evidence** that FTB ever **promised** Hyatt or his agents

22  that it would treat him fairly and impartially. Rather, he contended that the privacy

23  notice, which stated that FTB would be courteous, **implied** that FTB would treat him

24  fairly and impartially.[65] 52 AA 12896 (36-37), 12915 (113). There is no authority in

25  Nevada supporting the contention that an implied representation can satisfy the

26

27  [65] Even assuming that either FTB's mission statement or privacy notice which set forth FTB's
aspirations could be construed as a promise to treat him fairly and impartially, there was no

28  evidence that FTB knew that its statement was false when it was made – an essential element of
this claim. Bulbman, 108 Nev. at 111.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10ᵗʰ FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

71

1  representation element for fraud under the clear and convincing standard. See Nevada

2  Power Co. v. Monsanto Co., 891 F. Supp. 1406, 1414-15 (D. Nev. 1995) (rejecting

3  implied meaning of statement that product was safe).

4  Moreover a promise to treat Hyatt fairly and impartially is not an actionable

5  promise for fraud, because it was, at most, merely an expression of opinion. Clark

6  Sanitation, Inc. v. Sun Valley Disposal Co., 87 Nev. 338, 341, 487 P.2d 337 (1971)

7  (statement of opinion); Bulbman, 108 Nev. 105 at 111 (opinions and puffing); cf.

8  Minehan v. United States, 75 Fed. Cl. 249, 260-262 (2007). In Minehan, a taxpayer

9  alleged that a quasi-contract was created between her and the federal government based

10 upon alleged promises made by the IRS in its mission statement. Id. at 260. The mission

11 statement indicated that it was the IRS's mission to "provide America's taxpayers top

12 quality service by helping them understand and meet their tax responsibilities and by

13 applying the tax law with integrity and fairness to all." Id. The court summarily rejected

14 the taxpayer's claim that this statement was a "promise." Id. at 261. Specifically, the

15 court held:

16      the language on which plaintiff relies, which is found in a widely
        distributed IRS publication, does not evince a clear intent to contract on
17      the part of the government, nor is it unambiguous in its purported character
        as an offer to create a contractual relationship. To the contrary, **the IRS's**
18      **mission statement is aspirational, and it makes no specific promise or**
        **offer . . .**

19

20 Id. at 260 (emphasis added). Thus, the taxpayers claim was dismissed. Id. at 262.

21 The Minehan case is almost identical to the case at bar. First, the statement in

22 Minehan is indistinguishable from the statement relied upon by Hyatt. Hyatt claimed that

23 FTB made a promise to conduct a fair and impartial audit. Compare 28 AA 6854, with

24 52 AA 12896 (36-37), 12915 (113). Likewise, the statement in Minehan was that the

25 IRS would apply the tax law with "integrity and fairness." Minehan, 75 Fed. Cl. at 260.

26 These statements were each contained in documents that were widely distributed

27 publications available to countless taxpayers. Finally, each plaintiff claimed these

28 statements created enforceable or actionable promises that provided a basis for liability

72

MCDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002399

1  against the respective agencies.

2  Similarly, aspirational or policy goals found in handbooks or manuals are not

3  actionable. See e.g. Ullmo ex rel. Ullmo v. Gilmour Acad., 273 F.3d 671, 677-678 (6th

4  Cir. 2001) (philosophy in school handbook not enforceable); Smith v. Allstate Ins. Co.,

5  160 F. Supp. 2d 1150, 1154 (S.D. Cal. 2001) ("good hands" slogan not actionable);

6  Hanson v. New Tech., Inc., 594 So. 2d 96, 102 (Ala. 1992) (employment handbook

7  statement that discipline will be "objective" and "constructive" not actionable); Hooters

8  of Am., Inc. v. Phillips, 39 F. Supp. 2d 582, 606-607 (D.S.C. 1998) (handbook statement

9  of "fair" arbitration not actionable); Berg v. Obama, 574 F. Supp. 2d 509 (E.D. Pa. 2008)

10  (DNC's national platform setting forth statements of principle and intent were

11  insufficiently vague to form predicate for fraud claim).

12  There is no dispute that Hyatt was required to present clear and convincing proof

13  to support a claim of fraud. Miller v. Lewis, 80 Nev. 402, 403, 395 P.2d 386 (1964).

14  "Although this is primarily a trial court standard, its view of the matter is not necessarily

15  conclusive since, upon review, we must consider the sufficiency of the evidence in light

16  of that standard . . . and where there exists no more than a paucity of evidence to support

17  the charge of fraud, we will not hesitate to reverse." Clark Sanitation, 87 Nev. at 341.

18  That Hyatt was forced to rely on an implied representation reveals "there exists no more

19  than a paucity of evidence to support the charge of fraud." Id.

20  The court should not hesitate to reverse this claim. Public policy dictates this

21  result. Otherwise, any statements in a government agency's mission statement, slogans,

22  or other public materials would be actionable promises. For example, the police slogan

23  "we will protect and serve" could result in an action for fraud if a police officer is

24  perceived to not be living up to the promise to "protect and serve." This would be the

25  absurd result of an affirmance here.

26  b.  The Promises of Confidentiality Were Not Actionable

27  The same result applies to Hyatt's bad faith fraud claim, to the extent it is

28  premised on FTB's alleged promises of confidentiality. At trial, Hyatt contended that

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

73

McDONALD·CARANO·WILSON<sup>LLP</sup>

100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1    FTB promised to maintain his personal information – consisting of his name, address

2    and social security number – confidential. This promise too was never express, only

3    **implied**.

4        According to Hyatt, FTB made its promise of confidentiality when it sent him

5    initial audit contact letter enclosing a privacy notice. 37 AA 9010 (133) – 9011 (134); 54

6    AA 13401. The notice merely informed Hyatt that FTB would comply with the

7    California Information Practices Act and the Federal Privacy Act – which it did.[66] Id.

8    Hyatt also claimed that FTB made other promises of confidentiality to his

9    representatives as the audit progressed primarily as to documents concerning patents

10   Hyatt was disclosing in response to FTB's requests. 35 AA 8507 (176-77), 8509 (182-

11   84); 63 AA 15653-55 (memorializing meeting and transmitting documents). Hyatt

12   contended that FTB breached these promises by making disclosures of his personal

13   information consisting of his name, social security, and Las Vegas home address in

14   letters, letters with demands, and other third-party contacts during the audit

15   investigation. 37 AA 9171 (95) – 9172 (100); 52 AA 12899 (48-49). Yet there was no

16   such broad promise of confidentiality.

17       Moreover, when FTB allegedly disclosed this information, Hyatt's name, social

18   security number, and his Las Vegas home address were already matters of public record.

19   For example, his name and social security number were already part of the public record

20   in numerous court filings. 78 AA 19346-48, 19369-78, 19393, 19405, 19425. His name,

21   social security number, birth date and address also became a public record when he

22   registered to vote in Nevada on November 1, 1991, and when he filed a second voter

23   registration form on July 5, 1994. 77 AA 19100-02.[67] Hyatt's name, social security

24

25   [66] Each of those statutes permits a private right of action for its breach. Cal.Civ.Code § 1798 *et. seq*; 5 USC § 552a *et. al*. Hyatt did not assert such a claim.

26   [67] Until 1995, a county clerk in Nevada could readily provide a registered voter's social security
27   number in response to an inquiry requesting voter information as such information is a matter of
     public record. In 1995, NRS 293.558 was amended to specifically preclude the county clerk
     from providing a registered voter's social security number, driver's license number or
28   identification number under any circumstance. NRS 293.558(2). Under the amended statute,
     however, a voter's address and telephone number, is still a public record open to public
     Continued...

RJN002401

1    number, and address also appeared on a Nevada public record business license

2    application in December 1992. 78 AA 19429. Hyatt's name and other personal

3    information about him appeared in various magazine articles in the early 1990's, prior to

4    FTB's investigation. 48 AA 11984 (99) – 11992 (133) (testimony of Hyatt's publicist

5    and extensive efforts Hyatt engaged in to create publicity for himself); 79 AA 19732-38.

6        In addition, Hyatt's connection to his Las Vegas address was also a matter of

7    public record.[68] For example, he paid property taxes on his Las Vegas home by personal

8    check. 63 AA 15717-21. This payment was a matter of public record that could be

9    obtained by any person who called the Clark County Treasurer's Office. 47 AA 11626

10   (75) – 11628 (85). Hyatt's connection to this home was made a matter of public

11   information when the nationally syndicated television program "Hard Copy" displayed a

12   photo of the Tara home on national television and described it as his home. 39 AA 9726

13   (114). And Hyatt had voluntarily disclosed his Las Vegas address to many contractors

14   and subcontractors. See 79 AA 19739 – 80 AA 19753. Therefore, Hyatt's name, social

15   security number, and connection to the Las Vegas address were all matters of public

16   record or public disclosure. 63 AA 15717-21.

17       FTB cannot be liable for publishing information that is already a matter of public

18   record. See Montesano v. Donrey Media Group, 99 Nev. 644, 649, 668 P.2d 1081

19   (1983); relying upon Cox Broad. Corp. v. Cohn, 420 U.S. 469 (1975). Every item of

20   personal information that Hyatt alleged FTB improperly disclosed was already a matter

21   of public record when FTB used it for identification purposes. Thus, Hyatt's bad faith

22   fraud claim based upon alleged promises of confidentiality failed as a matter of law.

23       Moreover, as noted above, Hyatt was requested to provide information regarding

24   _____

25   disclosure unless the voter specifically requests that such information is withheld from public
     access. NRS 293.558(3). There was no evidence that Hyatt made such a request.

26   [68] Hyatt asserted that he held his Las Vegas home in the name of a trust in order to maintain his
     privacy. 37 AA 9172 (98-99). Yet Hyatt regularly disclosed his personal address to various

27   individuals and vendors without any condition of confidentiality. 79 AA 19739 – 80 AA 19753.
     And, in fact, FTB made no disclosure of Hyatt's Las Vegas address to any third party,

28   contending or claiming either he lived there or that it was his home. 63 AA 15723, 15717; 64
     AA 15879, 15597-99; 65 AA 16233, 16143, 16154, 16174.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

75

1   his business activities and relationships that resulted in his multi-million dollar income in

2   1991 and 1992. It was in this context that Hyatt's representatives asked for

3   confidentiality, and that FTB employees informed him of their standards for

4   confidentiality for things such as business documents and patent-related information. 63

5   AA 15653-55. There was absolutely no evidence that FTB ever disclosed this

6   information to third parties.

7       As also noted above, Hyatt contended that when FTB employees promised

8   confidentiality, they impliedly meant to include other information, such as Hyatt's name,

9   address and social security number. But there was no evidence that any FTB employee

10  ever actually promised not to disclose this necessary identifying information, or that they

11  believed that their confidentiality promises included such information. At worst, there

12  was a misunderstanding between FTB employees and Hyatt's representatives regarding

13  the scope of FTB's statements dealing with confidentiality. In the absence of a meeting

14  of the minds as to what the parties meant on this point, Hyatt could not prove by clear

15  and convincing evidence that FTB knew its statements concerning confidentiality were

16  false, or that FTB had no intent to perform, at the time the statements were made. Cf.

17  Gramanz v. Gramanz, 113 Nev. 1, 8, 930 P.2d 753 (1997) (mutual mistake is when

18  parties share misconception about fact on which contract was based; contract voidable if

19  mutual mistake exists); Oh v. Wilson, 112 Nev. 38, 39-40, 910 P.2d 276 (1996) (contract

20  not enforceable if based on mutual mistake concerning promises made); Chapp v.

21  Peterson, 80 Nev. 555, 397 P.2d 5 (1964) (no agreed-upon enforceable promises where

22  no meeting of the minds).

23          c.      There Was No Evidence of Fraudulent Intent

24      In trying to prove that FTB never intended to perform its alleged promises, Hyatt

25  relied exclusively on the argument that FTB failed to fulfill the promises. E.g., 52 AA

26  12896 (35-36) (arguing that actions after the alleged promises proved "what their

27  intentions were at the time"). This was insufficient. "The mere failure to fulfill a promise

28  or perform in the future, however, will not give rise to a fraud claim absent evidence that

76

RJN002403

1    the promisor had no intention to perform at the time the promise was made." <u>Bulbman</u>,

2    108 Nev. at 112. Indeed, FTB's alleged failure to perform did not even allow an

3    inference of fraudulent intent. <u>Tallman</u>, 66 Nev. at 259, (no inference of fraudulent intent

4    from mere fact of promise not subsequently performed). Thus, there was no such

5    evidence at all, let alone clear and convincing evidence, of such fraudulent intent.

6           d.     There Was No Reasonable Reliance

7    Hyatt was legally required to give FTB the information requested or else adverse

8    findings would be made against him. Cal. Rev. & Tax. Code § 19504; <u>Appeal of James</u>

9    <u>C. Coleman Psychological Corp.</u>, 85-SBE-028, 1985 WL 15801 (Cal. St. Bd. Eq., April

10    9, 1985). Hyatt contended that he agreed to disclose information in reliance on promises

11    of confidentiality. Since Hyatt was legally required to give the information anyway, his

12    claimed reliance was illusory.

13           e.     Government Agents Cannot Make Promises Beyond the
14               Scope of the Law

15    Government agents cannot bind the government beyond the scope of a statute

16    giving them authority. <u>Pauly v. U.S. Dept. of Agri.</u>, 348 F.3d 1143, 1150 (9th Cir. 2003);

17    <u>Ramey v. United States</u>, 559 F. Supp. 837, 840 (D.D.C. 1982). "[S]tatements by a state

18    agent may not bind the state to any arrangement that contravenes the statutes." <u>Mannelin</u>

19    <u>v. DMV</u>, 31 P.3d 438, 442 (Or. App. 2001). Rather, "those who deal with the

20    Government are expected to know the law and may not rely on the conduct of

21    Government agents contrary to law." <u>Pauly</u>, 348 F.3d at 1150 (quoting <u>Heckler v. Cmty.</u>

22    <u>Health Services of Crawford County, Inc.</u>, 467 U.S. 51, 63 (1984)). The rationale for this

23    rule is that "the harm to functioning government which could flow from imposing

24    specific performance or statutorily invalid promises made by lower authority

25    government employees must outweigh the interest of individuals who may have been

26    deceived by these oral misrepresentations." <u>Ramey</u>, 559 F. Supp. at 840. Pursuant to the

27    California Information Practices Act, FTB was permitted to make disclosures of third

28    party information "as necessary for an investigation." Cal. Civ. Code § 1798.24(p); 48

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

77

1 AA 11807 (118-21). Thus, FTB's employees could not promise Hyatt that FTB would

2 not take certain actions which were expressly authorized by law.

3         2.    Hyatt's Claims for Invasion of Privacy Failed As A Matter of Law

4      The privacy interests of those who have interjected themselves into the public

5 realm, New York Times Co. v. Sullivan, 376 U.S. 254 (1964), who have invited

6 investigations into their conduct, Schlatter v. Eighth Judicial Dist. Court, 93 Nev. 189,

7 192, 561 P.2d 1342, 1343 (1977), or who have allowed or permitted private

8 information concerning themselves to become matters of public record, Montesano, 99

9 Nev. at 649, are diminished, if not entirely eviscerated.

10      Yet, Hyatt, a famous inventor who injected himself into the public realm and

11 was the subject of hundreds of newspaper and magazine articles during the early to

12 mid-1990's (see e.g., 89 AA 22068-137), whose divorce and the location of his Las

13 Vegas home were the subject of a nationally televised program "Hard Copy," (39 AA

14 9726 (114)) and who was a party to dozens of pieces of public record litigation

15 throughout his adult life,[69] claims that FTB invaded his privacy by revealing

16 information about him, particularly his name, address and social security number. 14

17 AA 3270-78, 3293-95. Hyatt advanced four invasion of privacy claims – intrusion upon

18 seclusion, publicity to private facts, false light and breach of confidentiality – which all

19 alleged the same thing: FTB breached his information privacy. 14 AA 3270-78, 3293-

20 95; 62 AA 15303-44.

21      The factual predicate for these claims was the same: FTB improperly disclosed

22 his name, address and social security number to third parties during the audit

23 investigation. Hyatt relied upon two primary categories of evidence. First, he pointed to

24 the third party contacts made by FTB seeking information about him. See pages 9-12,

25

26 [69] These lawsuits ranged from Hyatt's lawsuits against the manufacturer of a defective toaster
to patent interference litigation that led to the loss of Hyatt's most prized possession – his
27 patent to the single chip microprocessor. 78 AA 19343 – 79 AA 19731; 80 AA 19754 – 83 AA
20693; Hyatt v. Boone, 146 F.3d 1348 (Fed. Cir. 1998) (patent interference case). In many of
28 these cases, Hyatt's name, address, social security number, other personal information became
a matter of public record. E.g., 78 AA 19346 (social security number).

McDONALD·CARANO·WILSON<br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>P.O. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

78

1   *supra.* Second, Hyatt claimed his privacy was invaded by inclusion of this case on the

2   Litigation Rosters.[70] 52 AA 12898 (44-45).

3       Hyatt's invasion of privacy claims should have been dismissed. Nevada does not

4   recognize a claim for breach of information privacy. Hyatt's claims were all predicated

5   on the notion that FTB could not use his personal identifiers to verify information he

6   had provided to FTB. Hyatt claimed that if FTB had questions, it was required to go to

7   him for answers. The net result of his position was that the agency was bound to accept

8   the information provided by him as true – without any verification from a third party

9   source. In short, FTB was required to take his word for it.

10       If this court accepts Hyatt's argument, it would be endorsing the bizarre

11   assertion that when a government agency attempts to investigate and/or verify facts in a

12   lawful investigation – be it a criminal, tax, child welfare or gaming enforcement – the

13   agency can not seek information from third-party sources without subjecting itself to

14   civil liability. Rather, the agency must accept the version of facts provided by the target

15   of the investigation, or face tort liability for invasion of privacy. Imagine if a law

16   enforcement agency had to take a suspected murderer's "word for it" regarding an alibi,

17   and was prohibited from verifying the alibi through independent investigation. Under

18   Hyatt's theory, if law enforcement **did** attempt to conduct any independent

19   investigation, officers could not identify themselves or ask questions related to the

20   suspect or confirm they were obtaining information about the right individual, because

21   they would invade the suspect's privacy.

22          a.    Nevada Does Not Recognize a Legal Claim for ''Breach of
23               Information Privacy''

24       All of Hyatt's invasion of privacy claims were based upon his assertion that

25   FTB "breached his information privacy." 14 AA 3270-78; 62 AA 15316-24. Protection

26   for information privacy has historically been the subject of statutory protection. E.g.,

27
28   [70] To permit Hyatt to advance his privacy claims based on the Litigation Rosters, which is substantially identical to public docket sheets and public web sites maintained by Nevada courts, could pose problems for our own courts.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

California's Information Privacy Act; Federal Privacy Act. There was no Nevada statute that provides a remedy for breach of informational privacy claims. With no statutory remedy in Nevada, Hyatt could only proceed on this theory if there is a Nevada common law remedy available. This court has never recognized a common law claim for breach of informational privacy. In fact, this court has held that "altering common law rights, creating new causes of action, and providing new remedies for wrongs **is generally a legislative, not a judicial function**." <u>See</u>, <u>e.g.</u>, <u>Badillo v. Am. Brands, Inc.</u>, 117 Nev. 34, 42, 16 P.3d 435 (2001) (emphasis added).

Moreover, this court has often held that when a party has a statutory remedy available, even in another jurisdiction, the court will refuse to create a new common law claim. <u>See</u> <u>e.g.</u>, People for the Ethical Treatment of Animals v. <u>Berosini</u>, 111 Nev. 615, 639, 895 P.2d 1269 (1995) (statutory privacy claim existed, thus common law privacy claim foreclosed); <u>Sands Regent v. Valgardson</u>, 105 Nev. 436, 440, 777 P.2d 898 (1989) (federal statutory remedy; no common law remedy); <u>Chavez v. Sievers</u>, 118 Nev. 288, 294-96, 43 P.3d 1022 (2002) (same). Simply put, if a statutory remedy is available to a party, Nevada will **not** create a common law remedy to redress the alleged injury. This principle was fully addressed in <u>Johnson v. Sawyer</u>, 47 F.3d 716 (5th Cir. 1995), where the court rejected attempts of a taxpayer to bring a Texas common law claim for disclosure of information in his tax return. <u>Id</u>. at 729. The court noted that there was a federal statutory remedy addressing the taxpayer's claims, therefore no reason existed to believe that Texas courts would create a common law cause of action. <u>Id</u>.

The same analysis applies here. Hyatt had available statutory remedies under California's Information Practices Act (IPA) and the Federal Privacy Act (FPA) for alleged improper disclosures by FTB. Cal. Civ. Code § 1798 *et. seq.*; 5 U.S.C. § 552a *et al.* Hyatt choose not to plead claims under either statute. He was precluded from proceeding on this unrecognized legal theory by merely labeling his claims as common law invasion of privacy claims. <u>Berosini</u>, 111 Nev. at 638-39 (rejecting attempt to label

80

1  statutory claim by common law label in order to avoid dismissal); <u>Johnson</u>, 47 F.3d at

2  729. For this reason alone, Hyatt's invasion of privacy claims fail.

3              b.      The Public Record Defense Prohibited Hyatt's Invasions of
                      Privacy Claims
4

5      Moreover, there is no liability for invasion of privacy for giving "further publicity

6  to information about the plaintiff that is already public." <u>Montesano</u>, 99 Nev. at 649

7  (quoting Restatement (Second) Torts 652D cmt. b (1977)). This holding is supported by

8  Comment b of the Second Restatement, which states:

9      [t]here is no liability when the defendant merely gives further publicity to
       information about the plaintiff that is already public. **Thus there is no**
10     **liability for giving publicity to facts about the plaintiff's life that are**
       **matters of public record, such as the date of his birth, the facts of his**
11     **marriage, . . . or the pleadings that he has filed in a lawsuit.**

12 Restatement (Second) of Torts 652D cmt. b (1977) (emphasis added); <u>see</u> <u>also</u> <u>Cox</u>

13 <u>Broad.</u>, 420 U.S. at 491.

14     With the exception of the fact FTB was investigating compliance with its statutes,

15 all the information that FTB disclosed to third parties was a matter of public record at the

16 time the disclosure was made. As explained above, Hyatt has been involved in several

17 lawsuits over the years revealing his name, address, and social security number. Several

18 of these cases were ongoing **at the time of FTB's audit**. 78 AA 19346-53, 19369-78,

19 19379, 19425. Additionally, Hyatt's name, social security number, birth date, and

20 address information were matters of public record in numerous other contexts. <u>See</u> pages

21 74-75, *supra*.

22     Hyatt had been given enormous publicity following the patent of his microchip

23 processor, both before, during and after FTB's audit. 48 AA 11984 (99) – 11992 (133).

24 In fact, Hyatt sought that publicity by intentionally injecting himself into the public

25 realm. He hired a publicist and made efforts to create publicity for himself. 48 AA 11984

26 (99) – 11992 (133). He invited journalists to his home to conduct extensive personal

27 interviews, and members of the press learned of Hyatt's name and address. This

28 information was reported in the press and was widely available for public view. 79 AA

19732-38; 89 AA 22068-69. FTB offered hundreds of newspaper and magazine articles

81

1  that were published nationally and internationally relating to Hyatt. 89 AA 22068-137.

2  The district court, however, excluded these documents.[71] 27 AA 6517-18. This is yet

3  another example of the one-sided evidence the district court filtered to the jury.

       c.     <u>Hyatt Was Impermissively Permitted to Assert Traditional Common Law Claims Alleging Breach of Information Privacy by Claiming FTB Breached Foreign Laws</u>

6      The error in allowing the informational privacy components of Hyatt's invasion

7  of privacy claims to survive was compounded by the district court's evidentiary ruling

8  taking judicial notice of several California and federal laws. <u>See</u> 32 AA 7909 (86). These

9  laws included provisions of the IPA and the FPA. 28 AA 6832-40. As a result of this

10  order, Hyatt was improperly permitted to rely upon, display, and effectively introduce

11  into evidence portions of these laws. The district court allowed Hyatt's witnesses to

12  testify that FTB violated these statutory provisions. <u>E.g.</u>, 37 AA 9008 (125) – 9009

13  (126); 39 AA 9710 (51) – 9711 (55). FTB was forced to rebut that evidence with opinion

14  testimony of its own. 48 AA 11805 (112) – 11807 (121). The jury, however, was never

15  given jury instructions setting forth what the law actually required under these statutes,

16  thus closing argument on this case was akin to a no-holds-barred cage fight.

17      Before trial, Hyatt took the position that he was **not** pleading an IPA claim. 7 AA

18  1566, 1574 (Hyatt's counsel: "I will repeat myself. The Information Practices Act is not

19  being pursued at this time.") Based on this position, Hyatt was successful in defeating

20  FTB's motion to dismiss his perceived IPA claims. 7 AA 1577.[72]

21      Also, when FTB originally removed this case to federal court, Hyatt sought

22  remand, asserting that no federal question or issue was presented in this case. Hyatt

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

---

[71] Exhibits showing worldwide publicity about Hyatt consisted of approximately 635 pages in the district court record. Only a few such exhibits have been provided as examples in the appendix. 89 AA 22068-137.

[72] Incidentally, by allowing Hyatt to prove his invasion of privacy claims in this manner, the district court was required to take inconsistent positions in its own rulings. Before trial, the district court ruled that California law was not at issue in this case; a ruling relied upon by FTB. 23 AA 5682-83; 27 AA 6527-28. And yet, it allowed Hyatt to use evidence of California law to prove his Nevada common law tort claims. <u>E.g.</u>, 37 AA 9008 (125) – 9009 (126); 39 AA 9710 (51) – 9711 (55).

RJN002409

1  repeatedly stated:

2  ▪ The action is based **entirely on Nevada law**. 1 AA 42 (emphasis added).

3  ▪ Plaintiff has clearly pleaded causes of action that are recognized **under
4  Nevada law**. 1 AA 42 (emphasis added).

5  ▪ His causes of action are grounded **in the law of the State of Nevada**. His **tort
   claims** speak for themselves as causes of action **recognized under Nevada
6  law**. 1 AA 45 (emphasis added).

7  ▪ Plaintiff has sought the **protections and remedies** afforded Nevada residents
   **under Nevada law**... 1 AA 46 (emphasis added).

8  The Federal District Court of Nevada agreed and granted Hyatt's motion to remand –

9  thus, he was successful in his position. 1 AA 112. Hyatt should have been judicially

10 estopped from relying upon or asserting that either the IPA or the FPA had any

11 application to this litigation.

12     Moreover, by allowing Hyatt to present evidence that FTB allegedly violated

13 these statutes, Hyatt and his witnesses were improperly permitted to instruct the jury on

14 what law controlled this case, the meaning of those laws, and to testify and argue that

15 based on the facts of this case (as determined by Hyatt and his witnesses – not the jury)

16 FTB violated those provisions. Determining questions of law is the exclusive province of

17 the trial judge, while determining issues of fact is for the jury. See Las Vegas Sun, Inc. v.

18 Franklin, 74 Nev. 282, 294, 329 P.2d 867, 873 (1958); United Fire Ins. Co. v.

19 McClelland, 105 Nev. 504, 508-9, 780 P.2d 193, 196 (1989). These principles apply

20 equally to all witnesses – including expert and lay witnesses: Any "expert or nonexpert

21 opinion that amounts to a conclusion of law cannot be properly received in evidence,

22 since the determination of such questions is exclusively within the province of the

23 court." Pulawa v. GTE Hawaiian Tel, 143 P.3d 1205, 1217 (Haw. 2006). The district

24 court allowed Hyatt's witnesses to usurp the court's function of instructing the jury on

25 the law and to usurp the jury's function of determining the facts of this case.

26 ///

27 ///

28

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002410

1

        d.    Hyatt's Evidence Did Not Support the Essential Elements of
            His Invasion of Privacy Claims

2

3        To prevail on his invasion of privacy claims, Hyatt was required to establish that

4 he had a reasonable expectation of privacy in the information that FTB disclosed. This

5 required a showing that Hyatt had an actual, subjective expectation of privacy in this

6 information and that his expectation was objectively reasonable when measured by a

7 reasonable person standard. Berosini, 111 Nev. at 630; Med. Lab. Mgmt. Consultants v.

8 Am. Broad. Companies, Inc., 306 F.3d 806, 812 (9th Cir. 2002); Restatement (Second)

9 of Torts §§ 652B, 652D cmt. c (1977); Montesano, 99 Nev. at 649.

10        Even assuming that Hyatt had a subjective expectation of privacy in this

11 information, Hyatt did not have an objective expectation of privacy in his name, address,

12 social security number, or the fact that he was under audit. An expectation of privacy is

13 diminished when someone is under investigation or has made claims that require another

14 to investigate the truth or veracity of their claims. Schlatter, 93 Nev. at 192; see also

15 McLain v. Boise Cascade Corp., 533 P.2d 343, 346 (Or. 1975); Forster v. Manchester,

16 189 A.2d 147, 150 (Pa. 1963).

17        When a question arises as to the accuracy of a tax return, the taxpayer must

18 expect that an investigation or audit may be opened. It is simply not objectively

19 reasonable for a person like Hyatt, who is the subject to a tax audit, to expect that the

20 taxing authority will not seek to verify the accuracy of the information provided to him,

21 or to conduct some independent investigation of the facts. Id. This type of verification or

22 investigation would necessarily include contact with third parties, wherein the taxpayer's

23 name or other identifying information must be revealed in order to gather information

24 specific to that person. Moreover, the taxing authority would also be required to identify

25 itself and the purpose of its inquiries.

26        There is also no reasonable expectation of privacy in the identifying information

27 provided to a third party. The government can access personal information or obtain

28 personal information from a third-party business without first obtaining a search warrant

84

1    and without violating the individual's right to privacy. Couch v. United States, 409 U.S.

2    322, 335-36 (1973); United States v. Miller, 425 U.S. 435 (1976). In this case, to the

3    extent that FTB made disclosures of Hyatt's name, address, and social security number,

4    to businesses or government entities that were already in possession of his personal

5    information, he had no reasonable expectation of privacy in that information.[73]

6                    i.    The Evidence Did Not Support a False Light Claim

7        Hyatt also asserted a claim for false light invasion of privacy. 62 AA 15303-44.

8    The gist of his claim was that when FTB contacted third parties to obtain information,

9    and when FTB identified itself as an agency performing an investigation or audit of

10   Hyatt, FTB was impliedly suggesting that Hyatt was a "tax cheat." 13 AA 3044, 3055-

11   57. Hyatt also contended that when FTB included this case on the Litigation Roster, FTB

12   was also impliedly suggesting that Hyatt was a tax cheat. Id.

13       A false light invasion of privacy occurs when the defendant publicizes a matter

14   that places the plaintiff in a false light before the public, where the false light would be

15   highly offensive to a reasonable person, and where the defendant had knowledge of, or

16   acted in reckless disregard to, the falsity of the publicized matter and the false light in

17   which the plaintiff would be placed. Restatement (Second) of Torts §652E (1977); see

18   Berosini, 111 Nev. at 615, n.4 (recognizing privacy torts in restatement).

19

20   [73] Hyatt might assert that FTB also invaded his privacy by visiting his home, walking around his
     property, looking through the trash, or looking at the mail that was left on his doorstep. This was
21   information provided by Hyatt's trial consultant, Candace Les. 33 AA 8238 (62), 8243 (85) –
     8244 (86-87). However, even assuming that all of these facts were true, Hyatt lacked an
22   objective expectation of privacy in these matters. First, Hyatt had no reasonable expectation of
     privacy in the curtilage of his home. State v. Harnisch, 113 Nev. 214, 219-20, 931 P.2d 1359,
23   1363 (1997); United States v. Traynor, 990 F.2d 1153, 1156-57 (9th Cir. 1993), overruled on
     other grounds by, United States v. Johnson, 256 F.3d 895 (9th Cir. 2001). Hyatt had no
24   expectation of privacy in the items that were in plain view for FTB or auditors to see. State v.
     Fisher, 154 P.3d 455, 472-73 (Kan. 2007); see also Ford v. State, 122 Nev. 796, 138 P.3d 500,
25   505 (2006) (describing elements of plain view doctrine). And finally, Hyatt had no reasonable
     expectation of privacy in his trash. California v. Greenwood, 486 U.S. 35, 41 (1988); State v.
26   Lisenbee, 116 Nev. 1124, 1130, 13 P.3d 947, 950 (2000) (no expectation of privacy in discarded
     property). Therefore, anyone, including FTB, could view his home, his front yard, and other
27   areas that were open to public view or access without invading Hyatt's privacy. Although FTB
     requested the district court to provide the jury with instructions outlining these legal limitations
28   on Hyatt's invasion of privacy claims, she refused. 24 AA 5854-58; 51 AA 12669 (150) –
     12673 (166).

85

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

When FTB employees told third parties that an investigation of Hyatt was being conducted, this was undeniably true. Hyatt apparently imagined that third parties would leap to the conclusion that he was a tax cheat, merely because FTB informed third parties of the existence of an investigation. Hyatt contended that when FTB investigators simply identified themselves to third parties and "disclosed or implied to them that Hyatt was under investigation in California," FTB "inferred Hyatt was a tax cheat." 13 AA 3055-57. This far-fetched inference was completely unsupported by evidence. Not a single recipient of an FTB communication testified that the recipient actually inferred Hyatt was a tax cheat, simply as a result of a communication from FTB. In fact, the opposite was true. E.g., 47 AA 11617 (38), 11622 (60).

Nor did the Litigation Rosters refer to Hyatt as a tax cheat. The Litigation Roster merely summarized this litigation in a truthful manner, noting the existence of the litigation and the amount of the tax assessment (which was absolutely true). Accordingly, Hyatt had no evidence supporting his false light claim.[74]

### e. The Litigation Rosters Were Absolutely Privileged

Hyatt's invasion of privacy claims predicated on the Litigation Rosters also fail because the rosters are privileged. Pursuant to the Fair Report Privilege:

> [T]he publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is an accurate and complete or a fair abridgement of the occurrence reported.

Restatement (Second) Torts § 611 (1977); see Thompson v. Powning, 15 Nev. 195, 203 (1880) (adopting first form of fair reporting privilege). This court adopted the privilege as absolute in Sahara Gaming Corp. v. Culinary Workers Union Local 226, 115 Nev.

---

[74] It is not difficult to foresee the far-reaching implications of this claim on government investigators. If a government investigator commits a false light tort simply by disclosing the fact that there is an investigation regarding a person, government investigators will be severely hampered in performing necessary investigations. For example, if a police detective is interviewing a witness in a homicide investigation, and if the detective identifies the suspect being investigated (in an attempt to obtain information from the witness), Hyatt's false light theory would mean that the detective improperly implied that the suspect was a criminal or murderer, therefore creating liability for a false light tort. As absurd as this result would be, it is the result Hyatt's theory would allow.

86

1  212, 219, 984 P.2d 164, 168 (1999), holding that if statements made about a judicial

2  proceeding

> were a fair and accurate report of a judicial proceeding, they are absolutely
> privileged, and the material recited will not support a defamation suit even
> if the statements were made maliciously and with knowledge of their
> falsity.

6  <u>Sahara</u>, 115 Nev. at 219. The <u>Sahara</u> court made clear that the privilege is not limited to

7  media publishers, but extends to "any person who makes a republication of a judicial

8  proceeding." <u>Id</u>. at 215 (citing Restatement (Second) Torts § 611 cmt. c (1977)). All

9  judicial proceedings are presumed to be matters of public concern, because "members of

10  the public have a manifest interest in observing and being made aware of public

11  proceedings and actions." <u>Wynn v. Smith</u>, 117 Nev. 6, 14-15, 16 P.3d 424 (2001). Hyatt

12  filed this case. It was he that injected himself and his tax dispute into the public realm.

13      Additionally, Nevada recognizes the "long standing common law rule that

14  communications uttered or published in the course of judicial proceedings are absolutely

15  privileged." <u>Fink v. Oshins</u>, 118 Nev. 428, 432-33, 49 P.3d 640, 643-44 (2002).

16  Complete immunity from suit extends to statements uttered or published during the

17  course of judicial proceedings, whether they be made during actual proceedings or in a

18  related manner. <u>Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP</u>, 440 F.

19  Supp. 2d 1184, 1195 (D. Nev. 2006). The statements do not need to be strictly relevant

20  in the "evidentiary sense, but need have only 'some relation' to the proceedings: so long

21  as the material has some bearing on the subject matter of the proceeding, it is absolutely

22  privileged." <u>Circus Circus Hotels, Inc. v. Witherspoon</u>, 99 Nev. 56, 61, 657 P.2d 101

23  (1983). The litigation privilege is applied liberally, with any doubt resolved in favor of

24  application of the privilege. <u>Id</u>. at 433-34.

25      Here, the Litigation Rosters deal with judicial proceedings – specifically, it is a

26  publication summarizing these very proceedings. 50 AA 12296 (70). They merely

27  summarize the overall litigation, i.e., the parties, the attorneys, the issues presented, the

28

McDONALD·CARANO·WILSON<br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>P.O. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

RJN002414

1  amounts in controversy, and a summary of the issues presented.[75] They are a fair report,

2  about matters related to this litigation, which are absolutely privileged.

3       f.    Hyatt's Claim for "Breach of Confidentiality"

4       In 2006, Hyatt was granted leave to assert a new claim he titled "breach of

5  confidentiality." The gravamen of that claim too was that FTB impermissively breached

6  his information privacy. 14 AA 3293; 62 AA 15339. Hyatt described this claim as

7  requiring two essential elements:

> (i) The FTB had, and still has a duty of confidence and loyalty to keep confidential and not disclose to third parties personal and confidential information from and concerning Hyatt that the FTB obtained due to its position as the auditor of Hyatt's state income tax return and (ii) The FTB breached its duty not to disclose this personal and confidential information to third parties.

12  13 AA 3036.[76]

13       Nevada does not recognize this claim. Although Nevada does recognize a tort

14  referred to as a "breach of confidential relationship," this was not the new tort Hyatt was

15  asserting here. 13 AA 3033-34, 3036. Although Hyatt cleverly labeled his new tort

16  "breach of confidentiality," which sounded similar to the "breach of confidential

17  relationship" claim recognized by this court in Perry v. Jordan, 111 Nev. 943, 900 P.2d

18  335 (1995), this was not the claim being asserted by Hyatt. If Hyatt asserts that Nevada

---

[75] In the district court, Hyatt falsely contended that the amount of the proposed tax assessments and penalties was not a matter of public record and therefore FTB had no right to publish this information. The amount of Hyatt's proposed tax assessment was contained in an opinion of the California Court of Appeals, wherein the court noted that the amount of Hyatt's proposed taxes, penalties and interest equal approximately $18 million. See State Franchise Tax Bd., 2003 WL 23100266 *1 n.2 (Cal. Ct. App. Dec. 31, 2003). Moreover, Hyatt published the amount of his proposed tax assessments, penalties and interest in his unsealed opposition to FTB's Petition for Writ of Certiorari to the United States Supreme Court. 5 AA 1229. There, Hyatt announced, in this public document, that the amount of the proposed assessments was $17,727,743.00. In addition, the amounts of the proposed assessments were also listed in the Joint Appendix filed in the United States Supreme Court, which is also a public record, even available on the internet (Westlaw). Franchise Tax Board v. Hyatt, 2002 WL 32127282 at *192-221 (Dec. 9, 2002). There, Eugene Cowan's March 20, 2000 Affidavit announced the amounts of the proposed assessments, down to the penny, for tax years 1991 and 1992. Id. at ¶¶ 29, 34. Therefore, Hyatt cannot possibly claim that these amounts were private and not open to public inspection; nor can he argue that these proposed tax amounts are not at issue in this litigation.

[76] Once again, the "highly personal and confidential information" claimed by Hyatt was the same as under his other invasions of privacy torts.

MCDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

88

1  should adopt the new tort, Hyatt's arguments fail for the same reasons articulated in

2  Section IV(F)(2)(a), pages 79-80.

3      If Hyatt argues that, in fact, his claim falls within the purview of Perry v. Jordan,

4  he is wrong. In Perry, the plaintiff purchased a store from defendant. 111 Nev. at 945.

5  Plaintiff was uneducated, while defendant was a very educated and an experienced

6  businesswoman. Plaintiff and defendant had been longtime close, personal friends and

7  neighbors. Plaintiff described the defendant as "like a sister." Id. Defendant was aware:

8  (1) plaintiff was inexperienced in business; (2) she was purchasing the store to provide

9  for her daughters; and (3) plaintiff and her daughters would be unable to run the store

10  due to their inexperience. After the sale, plaintiff and defendant entered into a

11  management contract. The contract allowed for a very high salary to defendant, who quit

12  managing the store before the management contract ended and left plaintiff with no

13  resources or ability to run the store. Id. at 945-946. The plaintiff in Perry sued on several

14  theories. The jury returned a verdict in favor of plaintiff for breach of confidential

15  relationship. This court upheld the verdict, finding that there was evidence in the record

16  that established a "special relationship" between the parties, akin to a fiduciary

17  relationship. Id. at 946-47.

18      The court mandated two essential elements to create a "special, confidential

19  relationship" for a breach of confidential relationship tort. First, there must be a special

20  confidential relationship, akin to the fiduciary relationship existent between

21  attorney/clients, business partners, family members or longtime relationships. Id.

22  Second, one party must gain the confidence of the other and must purport to act and

23  advise the other party, with the other party's interests in mind, and the other party must

24  know of this confidence. Id.; see also Yerington Ford Inc. v. Gen. Motors Acceptance

25  Corp., 359 F.Supp.2d 1075, 1093 (D.Nev. 2004) (interpreting Perry, and finding no

26  proof that defendant purported to act on behalf of plaintiff; summary judgment granted),

27  reversed on other grounds in Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865 (9th

28  Cir. 2007); In re Sunshine Suites, Inc. 56 Fed. App'x 776, 778-79 (9th Cir. 2003) (same).

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

89

1   It is obvious that no personal, familial, or other type of relationship akin to a

2   fiduciary relationship existed between FTB and Hyatt. If anything, Hyatt and his team of

3   representatives took an **adversarial** position toward FTB. There was no proof at trial

4   that FTB gave Hyatt any advice, that FTB worked on behalf of Hyatt or that FTB was

5   acting on behalf of Hyatt with only his interests in mind.

6   Moreover, an actionable confidential or special relationship cannot exist between

7   a government agency and a private citizen, as a matter of law. See, e.g., Johnson v.

8   Sawyer, 760 F.Supp. 1216, 1233 (S.D. Tex. 1991). Johnson is analogous here. In

9   Johnson, the plaintiff brought a civil action against employees of the IRS for issuing

10  press releases concerning the taxpayer's plea bargain on tax-related charges. Plaintiff

11  alleged a claim for breach of confidential relationship, which the court rejected, holding

12  that the type of special relationship necessary for liability under this tort could not apply

13  between a citizen and the government agency. Id. This aspect of the decision was upheld

14  on appeal. Johnson v. Sawyer, 47 F.3d at 726 (en banc); see also, Schaut v. First Fed.

15  Sav. & Loan Ass'n of Chicago, 560 F. Supp. 245 (N.D. Ill. 1983) (IRS investigator

16  whose duty it was to investigate tax liabilities did not have any fiduciary relationship

17  with taxpayer; claim dismissed); Purdy v. Fleming, 655 N.W.2d 424, 431 (S.D. 2002)

18  (fiduciary relationship did not exist between employees of government agency and

19  mother of abused child, because employees' duty was to investigate child abuse).

20  To the best FTB can determine, no court has ever recognized such a relationship

21  between a citizen against a government agency. If this court were to accept Hyatt's

22  theory that FTB owed a fiduciary-like duty to him personally, the court would be

23  requiring the FTB to operate under an irreconcilable conflict of interest. FTB cannot

24  both comply with its obligations to act only in the best interests of the State of

25  California, while at the same time act only in the best interests of Hyatt.

26          3.     Hyatt's Abuse of Process Claim Failed as a Matter of Law

27  Hyatt was required to prove two essential elements for his abuse of process claim:

28  "(1) an ulterior purpose by the defendants other than resolving a legal dispute; and (2) a

90

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1  willful act in the use of the **legal process** not proper in the regular conduct of the

2  proceeding." <u>LaMantia v. Redisi</u>, 118 Nev. 27, 30, 38 P.3d 877, 879 (2002) (emphasis

3  added). Because the purpose of this tort **is to preserve the integrity of the court**, the

4  tort requires misuse of a **judicial process**. <u>ComputerXpress, Inc. v. Jackson</u>, 113 Cal.

5  Rptr. 2d 625, 644 (Ct. App. 2001). Nevada has never recognized this tort in any context

6  other than judicial proceedings.

7      It is undisputed that FTB did not employ any judicial or legal process. 17 AA

8  4160. Hyatt's abuse of process claim centered on letters accompanied by a "Demand to

9  Furnish Information" which were nothing more than administrative forms used by FTB.

10  52 AA 12911 (95-97). Notably, each letter requested the "cooperation" of the recipient,

11  and none stated adverse action would result from non-compliance. <u>E.g.</u>, 63 AA 15731-

12  32; 64 AA 15904-05.[77]

13      "The vast majority of jurisdictions decline to recognize abuse of process in

14  nonjudicial proceedings." <u>Moore v. W. Forge Corp.</u>, 192 P.3d 427, 439 (Colo. App.

15  2007). For example, in <u>Stolz v. Wong Communications Ltd. P'ship</u>, 31 Cal. Rptr. 2d 229

16  (Ct. App. 1994), the court held that allegations of misuse of the FCC licensing process

17  failed, because no actionable abuse of **judicial** process was alleged, rejecting an

18  invitation to extend the tort of abuse of process to administrative proceedings. <u>Id.</u> at 236;

19  <u>see also</u> <u>Gordon v. Cmty. First State Bank</u>, 587 N.W.2d 343 (Neb. 1998) (abuse of

20  administrative process failed to state a cause of action). Likewise, in <u>Liles v. Am.</u>

21  <u>Corrective Counseling Services, Inc.</u>, 131 F. Supp. 2d 1114, 1117-18 (S.D. Iowa 2001),

22  the defendant sent the plaintiff a document entitled "Official Notice" for the purposes of

23  private debt collection. The document contained a seal with a "scales of justice" emblem

24  and the words "County Attorney Bad Check Restitution Program." The court found that

25  the plaintiff could not state a claim for abuse of process even though the notice falsely

26  implied it came from the county attorney's office, and falsely stated that a criminal

27  _____

28  [77] Moreover, there was no evidence the FTB had any motive in sending these letters other than the collection of information in furtherance of the residency audit.

91

RJN002418

1   complaint was being processed.[78] Id. at 1118.

2   Given the legal insufficiency of Hyatt's abuse of process claim, the evidentiary

3   base he alleged in support of this tort need not be considered to dispose of this cause of

4   action. However, since Hyatt included allegations pertaining to the use of the demand

5   letters in his litany of allegations of FTB's bad faith, some discussion of the topic is

6   warranted. The following excerpt from Hyatt's Opposition to FTB's Motion for Partial

7   Summary Judgment re: Abuse of Process captures Hyatt's theory advanced at trial:

> Hyatt does not contend that the demands issued in California were illegal
> or a part of his claims for abuse of process. The claim is based on the
> demands sent to Nevada residents. The wording of the demands, in
> particular, was deceitful and coerced Nevada residents to comply, when
> they otherwise had no obligation to supply information or documents. The
> FTB's use of these demands in Nevada was unlawful.... On their face, the
> demands sent to Nevada residents are deceitful. This is an abuse of
> process. (18 AA 4253).

13  Setting aside the misstatement of the law, no evidence was presented that the letters had

14  the coercive effect on residents alleged here. In fact, the evidence at trial was to the

15  contrary. 47 AA 11623 (63), 11624 (68) (recipient viewed document as a "request").

16  There simply was no evidence that anyone who received these letters perceived them as

17  legal instruments or was coerced or intimidated by them. In fact, FTB questioned four

18  witnesses who received these letters, and none of them perceived the letters as anything

19  other than routine inquiries, containing only information relevant to the specific

20  questions asked. E.g., 47 AA 11620 (52), 11622 (58-61), 11623 (64), 11627 (78-79).

21  ///

22  ///

23

24  [78] At least one case has expanded the tort to include a "misuse of an administrative proceeding"
25  (Hillside Associates v. Stravato, 642 A.2d 664, 669 (R.I. 1994)), but the court limited its
    holding to "quasi-judicial contested administrative determinations or proceedings that establish
26  the legal rights, duties, or privileges of a party" following notice and "an evidentiary hearing
    resulting in a recorded decision." The investigative letters sent by FTB do not fall anywhere
27  near even this most expansive view of the tort. Hillside is discussed in the case Gordon, 587
    N.W.2d at 352-53, where it is clear the Nebraska court considered Hillside an outlier and
28  declined to follow the decision. The court noted that where Hillside had been cited favorably, it
    was in the context of expanding malicious prosecution claims to administrative proceedings, but
    that it had not been followed in the context of abuse of process claims. Id.

92

4. <u>Hyatt's Claim for Intentional Infliction of Emotional Distress Failed as a Matter of Law</u>

Hyatt's Second Amended Complaint pleaded a tort captioned as "outrage," also referred to in Nevada as intentional infliction of emotional distress (IIED). 14 AA 3278-80. The tort of "outrage" and "intentional infliction of emotional distress" are synonymous. <u>Conway v. Circus Circus Casinos, Inc.</u>, 116 Nev. 870, 873, 8 P.3d 837, 839 (2000). To prevail on this claim, a plaintiff must show: (1) extreme and outrageous conduct on the part of the defendant; (2) intent to cause emotional distress or reckless disregard for causing emotional distress; (3) the plaintiff actually suffered extreme or severe emotional distress; and (4) causation. <u>Miller v. Jones</u>, 114 Nev. 1291, 1300, 970 P.2d 571 (1998).

Where a plaintiff seeking to recover for emotional distress takes the position that medical records should not be admitted at trial, that position is appropriately construed as a judicial admission that the plaintiff did not actually suffer severe emotional distress. <u>See</u> <u>Baker v. Echostar Communications Corp.</u>, CIV.A. 06-CV-01103PS, 2007 WL 4287494, *14-15 (D. Colo. Dec. 4, 2007) (unpublished). Dismissal of an IIED claim is appropriate where a plaintiff refuses to produce medical records during discovery. <u>In re</u> <u>Consol. RNC Cases</u>, 2009 WL 130178, *6 (S.D.N.Y. Jan. 8, 2009) (emotional distress claims dismissed where plaintiffs refused discovery of medical records). Failing to produce medical records impedes the defendant from disputing whether the plaintiff suffered severe emotional distress. <u>Echostar</u>, 2007 WL 4287494 at *15. As a result, once a plaintiff puts his emotional health at issue, the opposing party is entitled to discovery of his medical records. <u>See</u> <u>Schlatter</u>, 93 Nev. at 192; <u>Potter v. W. Side Transp., Inc.</u>, 188 F.R.D. 362, 365 (D. Nev. 1999).

During discovery, Hyatt refused to disclose any medical treatment he may have received; and he refused to disclose his medical records, which could have shown alternative sources of emotional distress, or a lack of complaint of physical symptoms. FTB challenged Hyatt's refusal to produce this important information. The Discovery

1   Commissioner ruled that if Hyatt failed to produce medical records, he would be limited
2   to seeking only "garden variety" emotional distress at trial. 15 AA 3536-47. Hyatt never
3   produced the records. Thus, Hyatt's emotional distress claim was limited to garden
4   variety emotional distress.[79]

5   Garden variety emotional distress is defined as "ordinary and commonplace" or
6   "simple or usual." Jessamy v. Ehren, 153 F. Supp. 2d 398, 401 (S.D.N.Y. 2001) (citing
7   Ruhlmann v. Ulster County Dept. of Soc. Services, 194 F.R.D. 445, 449 (N.D.N.Y.
8   2000)). Such distress is not severe enough to require medical attention, and it is based on
9   generalized allegations of emotions such as humiliation, anger, shock, and the like.
10  Meacham v. Knolls Atomic Power Lab., 185 F.Supp.2d 193, 220 (N.D.N.Y. 2002), cert.
11  granted and opinion vacated on other grounds by, KAPL, Inc. v. Meacham, 544 U.S. 957
12  (2005). Ordinary and common place (i.e. "garden variety") emotions do not satisfy the
13  rigorous "severe emotional distress" requirement needed to make a prima facie showing
14  of IIED. See e.g., Nelson v. City of Las Vegas, 99 Nev. 548, 555, 665 P.2d 1141, 1145
15  (1983). In contrast, severe emotional distress is of such substantial quantity "that no
16  reasonable man could be expected to endure it." Restatement (Second) of Torts, § 46,
17  cmt. j (1995); see also Alam v. Reno Hilton Corp., 819 F. Supp. 905, 911 (D. Nev.
18  1993).

19  In Barmettler v. Reno Air, Inc., 114 Nev. 441, 956 P.2d 1382 (1998), the court
20  carefully distinguished between what it termed "emotional overlay" claims, i.e.,
21  emotional distress claims brought in the context of physical injury claims arising from a
22  physical impact, and emotional distress claims such as those asserted here, where there is
23  **no** physical impact or injury, leaving nothing to validate the claim except the plaintiff's
24  inherently self-interested testimony:

25  > We therefore hold that, in cases where emotional distress damages are not
26  > secondary to physical injuries, but rather precipitate physical symptoms,
    > either a physical impact must have occurred or, in the absence of physical

---

27  [79] Being limited to garden variety emotional distress, FTB sought dismissal of Hyatt's IIED
28  because of his failure to prove extreme or severe emotional distress. 15 AA 3504-63. The
    district court denied the pretrial motion and FTB's Rule 50(a) motion. 45 AA 11207.

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002421

1  impact, proof of serious emotional distress causing physical injury or
2  illness must be presented.

3  Barmettler, 114 Nev. at 447-48. As a result of his discovery sanction, Hyatt had none of
4  the validating requirements mandated by Barmettler.

5    When the plaintiff presents no objective evidence of "medical or psychiatric
6  assistance arising from the alleged incidents," his IIED claim cannot survive. Miller, 114
7  Nev. at 1300 (plaintiff who testified that he was depressed, but failed to seek any
8  medical or psychiatric assistance, "presented no objectively verifiable indicia of the
9  severity of his emotional distress" could not overcome summary judgment); Watson v.
10  Las Vegas Valley Water Dist., 378 F. Supp. 2d 1269, 1279 (D. Nev. 2005).

11    In the present case, Hyatt merely indicated that he "suffered anger, anxiety,
12  embarrassment, humiliation, and other related symptoms" due to FTB's audit. 15 AA
13  3521. This is precisely the general emotional and physical discomfort that cannot, as a
14  matter of law, establish severe emotional distress giving rise to an IIED claim. See
15  Watson, 378 F. Supp. 2d at 1279. Hyatt had no objective or verifiable evidence of severe
16  emotional distress; his own testimony was not objective, as Nevada's standard requires.
17  See Miller, 114 Nev. at 1300; Dawson v. Genovese, 180 So. 2d 806, 807 (La. Ct. App.
18  1965) (plaintiff's own testimony was subjective). Similarly, testimony of his friends and
19  family did not satisfy his burden, because that testimony was not based upon personal
20  knowledge. Since it was Hyatt who told them about his dispute with FTB and the alleged
21  effect on his psyche. E.g., 39 AA 9536 (4) – 9543 (33) (friend Thompson; Hyatt told him
22  that FTB dispute caused problems); 45 AA 11144 (45) – 11145 (47) (friend Turner;
23  Hyatt told Turner that physical/emotional problems stemmed from FTB); 45 AA 11140
24  (26-27) (son Dan Hyatt; father talked to him about being upset over FTB). Because
25  Hyatt's perception of the source and extent of his emotional problems was entirely
26  subjective, witness testimony that relied upon that subjective perception – in the absence
27  of any medical records or other objective evidence – was not objectively verified. Hay v.
28

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

95

1  Shell Oil Co., 986 S.W.2d 772, 777 (Tex. App. 1999). Without evidence of severe
2  emotional distress, this claim failed as a matter or law.

3       5.   The District Court Erred in Handling FTB's Statute of Limitations
            Defense Which Was Dispositive of All Hyatt's Claims Except for
4            Fraud

5       FTB filed motions for partial summary judgment, based on the two-year statute of
6  limitations, applicable to each of Hyatt's claims except the fraud claim. The applicable
7  time limit starts when "the injured party discovers or reasonably should have discovered
8  facts supporting a cause of action." Petersen v. Bruen, 106 Nev. 271, 274, 792 P.2d 18
9  (1990). The focus is on the injured party's knowledge of or access to facts. Massey v.
10 Litton, 99 Nev. 723, 728, 669 P.2d 248 (1983). The time limit is triggered when the
11 plaintiff has enough facts from which a reasonable person would be on inquiry notice of
12 a possible cause of action. Massey, 99 Nev. at 727-28. The statutory period "does not
13 wait until the injured party has access to or constructive knowledge of all the facts
14 required to support its claim." Davel Comm., Inc., v. Qwest Corp., 460 F.3d 1075, 1092
15 (9th Cir. 2006).

16      FTB's motions argued that Hyatt had sufficient knowledge to trigger the statute of
17 limitations by August of 1995, at the latest, more than two years before he filed his
18 complaint. See e.g., 14 AA 3449-52; 15 AA 3606-10. Hyatt's opposition argued that
19 there were questions of fact for the jury regarding the date of his knowledge. 15 AA
20 3717-24; 19 AA 4672-73. The district court accepted Hyatt's argument and denied
21 summary judgment. 19 AA 4672-78, 4700.

22      Evidence at trial was virtually identical to the evidence in FTB's motions for
23 summary judgment, showing what Hyatt learned of FTB's audit and when. In March
24 1995 his bank sent him a copy of a letter with demand, and his attorneys sent him their
25 own FTB letters with demands. 77 AA 19072-74, 19119-21. All of these letters listed his
26 name and social security number. Id. In April of 1995, Hyatt sent a memorandum to his
27 accountant and one of his attorneys, stating: "The FTB appears to be sending out
28 demand letters to many entities to whom I wrote checks in late 1991 and 1992. Attached

96

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

is a copy of one such letter." 77 AA 19119 – 121 (letter with demand containing name and social security number). Thus, by the Spring of 1995, Hyatt was well aware that FTB was telling third parties of the fact that he was being investigated/audited, and FTB was sending letters to third parties containing his name and social security number. Then, in August of 1995, FTB sent Hyatt's accountant and attorneys a 39-page preliminary determination letter, which fully described the entire scope of FTB's investigation and detailing information gathered from all third-party sources contacted by FTB as of that time. 66 AA 16388 - 427. FTB's letter identified the numerous businesses, organizations and individuals that FTB had contacted, including individuals and entities in Nevada, California and Japan, and the letter described detailed activities of FTB auditors in Nevada. Id. On August 30, 1995, Hyatt's representative responded to the FTB's letter, acknowledging the various contacts and activities of FTB, and even expressing suspicions that FTB had failed to maintain confidentiality. 66 AA 16433 – 454. (Hyatt is concerned that "confidentiality may have been compromised").

Therefore, by August of 1995, at the latest, Hyatt was fully aware of the scope of the audit; he was aware that FTB had contacted numerous third parties, disclosing the fact that Hyatt was being audited/investigated; he was aware that FTB sent numerous letters with demands, containing information such as his name, address and social security number; his representatives had received the FTB letter fully describing FTB's audit activities; and his representatives had even voiced suspicion that FTB breached confidentiality. This was all more than two years before Hyatt filed his complaint.

At the conclusion of the defense case at trial, Hyatt moved for judgment as a matter of law on FTB's statute of limitations defense. 50 AA 12452. Amazingly, although Hyatt had successfully argued before trial that this same evidence created a question of fact for the jury, Hyatt reversed his position and argued that there actually was no question of fact. 50 AA 12485 (10-11). The district court accepted Hyatt's new position, granted Hyatt's motion for judgment as a matter of law, and dismissed FTB's statute of limitations affirmative defense. 50 AA 12489 (26).

97

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

The district court should have granted FTB's motions for summary judgment in the first place. The evidence established, without question, that Hyatt and his team of savvy representatives had more than enough information to be on inquiry notice of Hyatt's causes of his non-fraud causes of action. Inquiry notice is all that was required. Massey, 99 Nev. at 727-28. The non-fraud causes of action were barred by the two-year statute of limitations and should have been dismissed on FTB's summary judgment motions.

To compound this error, the district court's ruling at trial – dismissing FTB's defenses as a matter of law – shows another fundamental misunderstanding of the standard of review. On a motion for judgment as a matter of law, "the district court must view the evidence and all inferences in favor of the nonmoving party." Nelson, 163 P.3d at 424. Here, trial evidence established sufficient knowledge to trigger the statute of limitations in mid-1995. At the very least, trial evidence was enough to raise an inference of sufficient knowledge or inquiry notice, thereby creating an issue of fact (just as Hyatt had argued in opposing summary judgment). As such, the district court erred by granting Hyatt's motion for judgment as a matter of law on the statute of limitations defense. See Bemis v. Estate of Bemis, 114 Nev. 1021, 1025, 967 P.2d 437 (1998) (where factual question exists regarding plaintiff's discovery of claim, statute of limitations is a question of fact to be determined by the jury).

6.  District Judge Walsh Erred by Transmuting a Rebuttable Presumption to An Irrebutable Presumption Related to Electronic Discovery

Until the late 1990s, FTB used an antiquated email system called EMC. 25 AA 6289-6490. In 1999, EMC was replaced with a modern email system, and disaster-recovery backup tapes of the old system were created. 25 AA 6289-6490. Before this occurred FTB had made extensive efforts to ensure that all emails were captured and preserved, and produced to Hyatt in response to his then-discovery demands. 25 AA 6289-6490. These tapes were held until 2002, when they were overwritten pursuant to FTB's standard policy. 25 AA 6289-6490. Only after Hyatt learned of that overwriting

RJN002425

1   did he make a discovery request for the disaster-recovery tapes. 25 AA 6289-6490. The

2   district court determined that FTB's conduct in overwriting the tapes constituted

3   negligent spoliation of evidence, and based on <u>Bass-Davis v. Davis</u>, 122 Nev. 442, 134

4   P.3d 103 (2006), the district court gave an adverse-inference jury instruction, which

5   stated that the jury "may draw an inference" that the tapes would have been unfavorable

6   to FTB. 54 AA 13278. Although the inference should have been permissive, the district

7   court transmuted it into a mandatory presumption by excluding FTB's evidence and

8   argument explaining why and how the tapes were overwritten. 50 AA 12398 (133) –

9   12403 (150); 53 AA 13131 (97) – 13133 (105). This was particularly prejudicial because

10   Hyatt's counsel contended during closing argument, **not** that the backup tapes were

11   destroyed, but **emails** were destroyed. 52 AA 12825 (44) – 12826 (47). FTB's evidence

12   and argument went particularly to the extensive efforts taken by FTB to **preserve** all

13   emails. 54 AA 13394, 13396-97, 13407. FTB believes the sanction was improper. Due to

14   page limitations, however, FTB does not raise the spoliation sanction instruction as a

15   discrete issue.

16         Nonetheless, we do contend that the district court prejudicially erred by refusing

17   to allow FTB to rebut the inference. FTB should have been allowed to explain the

18   circumstances for preserving the emails but overwriting the backup tapes. A <u>Bass-Davis</u>

19   instruction merely permits the jury to draw an **inference** from the destruction of

20   evidence. <u>Bass-Davis</u>, 122 Nev. at 452. <u>Bass-Davis</u> relied on <u>Blinzler v. Marriott Intern.,</u>

21   <u>Inc.</u>, 81 F.3d 1148 (1st Cir. 1996), where the court dealt with the spoliator's right to

22   rebut the adverse inference. The court recognized that the adverse inference is

23   permissive, not mandatory, and that the jury is free to reject the inference: "If, for

24   example, the factfinder believes that the documents were destroyed accidentally or for an

25   innocent reason, then the factfinder is free to reject the inference." 81 F.3d at 1159. In

26   <u>Blinzler</u>, the trial court allowed evidence of the defendant's destruction of a report,

27   "leaving the defendant's explanation to the jury." <u>Id.</u> at 1158. <u>Bass-Davis</u> also agreed

28   with <u>Testa v. Wal-Mart Stores, Inc.</u>, 144 F.3d 173 (1st Cir. 1998), where the trial court

McDONALD·CARANO·WILSON<sup>LLP</sup><br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>P.O. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

99

1    gave an adverse inference instruction, but where the jury was free to determine whether

2    to draw the inference, based on the defendant's explanation of circumstances

3    surrounding the destruction of company records. Bass-Davis, 122 Nev. at 450-51; see

4    also Arndt v. First Union Nat. Bank, 613 S.E.2d 274, 281 (N.C. Ct. App. 2005) ("The

5    factfinder is free to determine 'the documents were destroyed accidentally or for an

6    innocent reason' and reject the inference"); Kieffer v. Weston Land, Inc., 90 F.3d 1496

7    (10th Cir. 1996) (defendant was allowed to offer explanation, at trial, for why evidence

8    was lost; jury had right to accept or reject explanation, in deciding whether to draw

9    adverse inference).

10   Here, the district court excluded FTB's effort to explain extensive efforts by FTB

11   to preserve and produce all Hyatt-related EMC emails, and to explain the circumstances

12   involving the backup tapes. 50 AA 12399 (134) – 12403 (150).The effect of this ruling

13   was to transmute the adverse inference into a mandatory presumption. This was error.

14   The district court's error was compounded during closing arguments, when FTB's

15   counsel was attempting to explain the circumstances, using **stipulated** and **admitted**

16   exhibits offered by Hyatt at trial. 53 AA 13131 (97) – 33 (105).The district court forbade

17   FTB's counsel from even using these admitted exhibits to argue that the jury should not

18   draw the adverse inference. Id.

19       G.    The Compensatory Damage Awards Were Improper

20             1.    At Minimum, All Compensatory Damages Should Have Been

21                 Capped

22   The district court denied FTB's request to apply comity and to limit

23   compensatory damages to $75,000 per claim, which would be the limit for a Nevada

24   government entity. 92 AA 22965; NRS 41.035(1). Instead, the district court allowed the

25   entire $138 million compensatory damages verdict to remain. This was error. As

26   explained in Section IV(B), above, this court and the United States Supreme Court

27   previously determined that comity **must** be applied to California's complete sovereign

28   immunity statute for FTB, to the extent that such immunity aligns with immunity

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

100

1  extended to Nevada government entities. The district court should have "sensitively

2  applied principles of comity with a healthy regard for California's sovereign status,

3  relying on the contours of Nevada's own sovereign immunity from suit as a benchmark

4  for its analysis." Franchise Tax Board, 538 U.S. at 499 (emphasis added). The district

5  court should have also avoided hostility to California's public acts.[80]

6      The analysis in this court's April 2002 order was essentially as follows: (1)

7  comity requires California's immunity statute for FTB to be applied, to the extent that

8  such immunity does not contravene Nevada policies; (2) California's statute provides

9  complete immunity for all of FTB's acts, discretionary or otherwise, but Nevada's

10  statute only provides immunity for discretionary acts; (3) California's immunity statute

11  must be applied, to the same extent that a Nevada entity would receive immunity, and as

12  such, Hyatt's claims based on discretionary acts are dismissed; and (4) FTB is treated no

13  worse than a similarly situated Nevada government entity, and Hyatt is treated no better

14  than if he sued a Nevada government entity.

15      The very same analysis must apply to the damages cap issue: (1) comity requires

16

17  [80] The district court's actions in this context violated FTB's constitutional rights. A state cannot adopt a "policy of hostility" to the public acts of another state. See Franchise Tax Board, 538 U.S. at 499, citing Carroll v. Lanza, 349 U.S. 408, 413 (1955). In 2003 the United States

18  Supreme Court found no violation of the Full Faith and Credit Clause here, but only because this court's April 2002 order did not exhibit hostility to California, and because this court had

19  given "healthy regard" for California's sovereign status, "relying on the contours of Nevada's own sovereign immunity for suit as a benchmark for its analysis" of FTB's immunity. Franchise

20  Tax Board, 538 U.S. at 499. The district court's refusal to apply Nevada's statutory cap was an act of all-out hostility to California, ignoring the benchmark of Nevada's own sovereign

21  immunity, imposing liability far beyond that which would be imposed against a Nevada government agency, and thereby ignoring California's status as a sovereign state. This violated

22  the Full Faith and Credit Clause. Additionally, it is questionable whether there is still validity to the United States Supreme Court's holding in Nevada v. Hall, 440 U.S. 410 (1979), which

23  allowed one state to be sued in another state's courts. Revisiting Hall was not before the United States Supreme Court in Franchise Tax Board, 538 U.S. at 497. But Hall's continuing viability

24  is questionable, in light of more recent decisions; and FTB contends that Hall would most likely be overruled. See Fed. Mar. Comm'n v. S. Carolina State Ports Auth., 535 U.S. 743 (2002);

25  Alden v. Maine, 527 U.S. 706 (1999); Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996). This court may evaluate the continuing viability of an old United States Supreme Court opinion,

26  in light of more recent changes in the economy or the law. E.g. Quill Corp. v. North Dakota, 504 U.S. 298 (1992) (state court ruled that 25-year-old Supreme Court decision was no longer

27  good law; although Supreme Court reversed on merits, Court did not hold that state court lacked authority to question continued validity of U.S. Supreme Court case).

28

101

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR · RENO, NEVADA 89501
P.O. BOX 2670 · RENO, NEVADA 89505-2670
PHONE: 775-788-2000 · FAX 775-788-2020

1  California's immunity statute for FTB to be applied, to the extent that such immunity
2  does not contravene Nevada policies; (2) California's statute provides complete
3  immunity, i.e., zero damages, but Nevada's statute allows damages against a government
4  entity up to $75,000; (3) California's immunity statute must be applied, to the same
5  extent that a Nevada entity would receive immunity, and as such, Hyatt's damages are
6  capped at $75,000; and (4) FTB is treated no worse than a similarly situated Nevada
7  entity, and Hyatt is treated no better than if he sued a Nevada government entity.

8      Accordingly, if the court allows any of his claims to stand, the compensatory
9  damages portion of the judgment must be reversed and remanded for entry of a new
10 judgment using the $75,000 cap.

## 2.    There Was No Evidence of Invasion of Privacy Damages

12     The jury awarded $52 million for invasion of privacy damages. Hyatt contended
13 that he feared identity theft as a result of disclosures of his name, address and social
14 security number. 37 AA 9171 (96-97). At trial, however, there was absolutely no
15 evidence that in all the years since FTB's communications with third parties, Hyatt had
16 ever been targeted for identity theft. Nor was there any evidence that he suffered any
17 damage whatsoever as a result of the disclosure of this information. FTB brought this to
18 the district court's attention in post-trial motions, but she allowed the verdict to stand. 90
19 AA 22417-18. Where there is no evidence of damages at trial, an award of damages by
20 the jury is improper and must be set aside. See Mainor v. Nault, 120 Nev. 750, 773-76,
21 101 P.3d 308 (2004) ($3.25 million verdict reversed due to lack of evidence that plaintiff
22 suffered damage). The $52 million award must therefore be set aside in its entirety.[81]
23 Furthermore, under any standard of review, the award was grossly excessive as a matter

24 _____

[81] The court should note two additional points. First, the award for invasion of privacy did **not**
25 include emotional distress damages Hyatt allegedly suffered from FTB's disclosures. The jury
awarded emotional distress damages as a separate element of damages on the verdict form. 54
26 AA 13309. Second, it is no coincidence that the invasion of privacy award was $52 million.
This was the approximate amount of Hyatt's total tax assessment, fraud penalty and accrued
27 interest, as of the time of trial. The jury knew those exact amounts because the district court
permitted Hyatt to introduce expert testimony by an economist, over FTB's objection,
28 calculating those amounts. 45 AA 11134 (2) – 11135 (7). The verdict obviously reflects an
attempt by the jury to nullify the FTB's assessments against Hyatt.

MCDONALD·CARANO·WILSON᠁
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

102

1  of law, and the award must be reduced to a reasonable amount. See Miller v. Schnitzer,

2  78 Nev. 301, 309, 371 P.2d 824 (1962), overruled in part on other grounds, Ace Truck v.

3  Kahn, 103 Nev. 503, 746 P.2d 132 (1987) (appellate court will disallow or reduce

4  verdict if judicial conscience is shocked).

3.    The Emotional Distress Damages Cannot Stand

a.    The Garden Variety Emotional Distress Hyatt Claimed He Experienced Does Not Support an $85 Million Award

8      If not vacated in its entirety or capped for the foregoing reasons, the $85 million

9  emotional distress award must be remitted to the maximum amount that the law allows

10  for the compensation of garden variety emotional distress. Where garden variety

11  emotional distress is proven at trial, only a minimal damage award is warranted in a

12  "sum that would be reasonable compensation for the emotional injuries." Rainone v.

13  Potter, 388 F. Supp. 2d 120, 126 (E.D.N.Y. 2005). For example, where a plaintiff was

14  hurt, shocked, overcome with sadness and depression, cried, worried, had trouble

15  sleeping and eating and felt purposeless and offered no medical evidence, a jury awarded

16  $11,400 in emotional distress damages. Luciano v. Olsten Corp., 912 F. Supp. 663, 673-

17  74 (E.D.N.Y. 1996).

18      When faced with excessive emotional distress damage awards, courts have not

19  hesitated to remit the verdict to an appropriate amount. A court can "disallow or reduce

20  the award if its judicial conscience is shocked." Miller, 78 Nev. at 309; Leslie v. Jones

21  Chem. Co., Inc., 92 Nev. 391, 395, 551 P.2d 234, 236 (1976) (when an award is

22  unsupportable and shocks the judicial conscience, the court should intervene to strike the

23  award or require the plaintiff to choose between remittitur and a new trial); Harris v.

24  Zee, 87 Nev. 309, 311-12, 486 P.2d 490, 491-92 (1971) (a remittitur is appropriate when

25  the amount awarded by the jury is unreasonable given the evidence or "so excessive as

26  to suggest the intrusion of passion and prejudice upon [the jury's] deliberations"). In

27  deciding whether to grant a remittitur, the court should consider whether the award is

28  fair and reasonable under the facts and circumstances established at trial. See, e.g.,

McDONALD·CARANO·WILSON<sup>llp</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

103

1 | Wells, Inc., v. Shoemake, 64 Nev. 57, 74, 177 P.2d 451, 460 (1947). An award must be

2 | deemed unreasonable and excessive if "the amount of the damages is obviously so

3 | disproportionate to the injury proved as to justify the conclusion that the verdict is not

4 | the result of the cool and dispassionate discretion of the jury." Id. at 75.

5 | In the context of garden variety emotional distress damage awards, where trial

6 | testimony revealed that a plaintiff felt "stressed," "nervous," "on edge" and "clammy"

7 | but never sought medical or psychological help for his purported emotional distress, a

8 | court reduced an emotional distress damage award to $10,000 finding that "[t]he jury

9 | award of $140,000 [was] plainly based on sympathy or speculation rather than

10 | dispassionate common sense." Reiter v. Metro. Transp. Auth. of New York, 01 CIV.

11 | 2762, 2003 WL 22271223, *11 (S.D.N.Y. Sept. 30, 2003). In another case, where the

12 | evidence only proved garden variety emotional distress, the court reduced a jury award

13 | to $50,000 where the $175,000 in emotional distress damages initially awarded was so

14 | high as to "shock the conscience of the Court." Rainone, 388 F.Supp.2d at 126. Where a

15 | plaintiff's evidence of emotional distress was limited to testimony that she felt "stressed,

16 | crushed, shocked and devastated," "was subjected to an extreme level of public scrutiny"

17 | and "suffered from headaches and developed hives and welts," the court concluded that

18 | these were symptoms of garden variety emotional distress and reduced a $500,000

19 | compensatory damage award to $300,000. Quinby v. WestLB AG, 04 CIV.7406, 2008

20 | WL 3826695, *3-4 (S.D.N.Y. Aug. 15, 2008). According to the court, even $300,000

21 | was "at or above the upper range of reasonableness." Id. at *4. In fact, courts have

22 | specifically considered and identified an appropriate range of values for garden variety

23 | emotional distress awards. Garden variety emotional distress claims that are unsupported

24 | by medical corroboration "generally merit $30,000 to $125,000 awards." Quinby, 2008

25 | WL 3826695 at *3. Another court, when surveying appropriate jury awards for garden

26 | variety emotional distress claims, found the range to be even lower: from $5,000 to

27 | $35,000. Rainone, 388 F. Supp. 2d at 122.

28 | Even Hyatt's counsel conceded that the jury's $85 million award is excessive. At

104

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1  closing argument, counsel made a clear distinction between emotional distress damages

2  that he thought could be warranted by the evidence and those that would clearly be

3  **absurd**. Hyatt's counsel argued:

> So you look at this and we're not saying, yes you should take 51 million and
> subtract 7.5 million and that's Mr. Hyatt's emotional distress. I'm not saying that
> and **I think that's absurd**. I think it is fair to say, if the amount of money Mr.
> Hyatt is being asked to pay increased by almost $9,000 a day, there's some
> number short of that that might be reflective of Mr. Hyatt's damages. I throw out
> a number again within your complete discretion, but just to show how the
> numbers work and why we think at least there's some basis to it in your
> deliberations. Let's say it's less than half the $9,000 a day, $4,000 a day, 365 days
> a year, 1.46 million a year. We're almost to 13 years. Multiply that out, you get
> $18,980,000. I say that without gasping or without shock. It's a big number

10  52 AA 12931 (176) (emphasis added).

11      Rather than award Hyatt the "big number" of $18,980,000 or the "absurd"

12  number of $43,500,000, instead the jury awarded emotional distress damages of

13  $85,000,000. That award is more than four times the amount that Hyatt claimed was a

14  "big number" and almost double the "absurd" number. It is more than a big number. It is

15  shocking, particularly given the evidentiary issues previously raised above. This alone

16  warrants a new trial on the issue of damages. Cf. DeJesus v. Flick, 116 Nev. 812, 7 P.3d

17  459 (2000), overruled on other grounds by, Lioce v. Cohen, 124 Nev. 999, 174 P.3d 970

18  (2008), (Nevada Supreme Court ordered new trial based on attorney misconduct

19  resulting in passion or prejudice, where verdict was more than counsel requested).

20      The jury's award is unprecedented in Nevada, especially when Hyatt presented no

21  medical evidence of his claimed distress and no physical injury or physical impact. See

22  Olivero v. Lowe, 116 Nev. 395, 401, 995 P.2d 1023, 1027 (2000) (**$10,000** emotional

23  distress award for assault victim with no medical treatment); Dillard Dept. Stores, Inc. v.

24  Beckwith, 115 Nev. 372, 375-76, 989 P.2d 882, 884 (1999) (**$200,000** for major

25  depressive disorder and embarrassment); Albert H. Wohlers & Co. v. Bartgis, 114 Nev.

26  1249, 1253, 969 P.2d 949, 952 (1998) (**$275,000** emotional distress award for loss of

27  sleep, bladder infections, upper-respiratory infection, and dramatic weight loss); State ex

28  rel. Dept. of Transp. v. Hill, 114 Nev. 810, 812, 963 P.2d 480, 481 (1998) abrogated on

McDONALD·CARANO·WILSON⸗
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002432

1  other grounds by Grotts v. Zahner, 115 Nev. 339, 989 P.2d 415 (1999) (**$35,000** for

2  witnessing death of wife and **$10,000** for witnessing death of sister); Stapp v. Hilton

3  Hotels Corp., 108 Nev. 209, 210, 826 P.2d 954, 955 (1992) (**$20,000** for witnessing wife

4  being hit by a car); Farmers Home Mut. Ins. Co. v. Fiscus, 102 Nev. 371, 374, 725 P.2d

5  234, 236 (1986) (**$5,000** and **$15,000** for total emotional breakdown); Ramada Inns, Inc.

6  v. Sharp, 101 Nev. 824, 825, 711 P.2d 1, 2 (1985) (**$15,000** emotional distress award for

7  shoving plaintiff down a stairwell); Nevada Indep. Broad. Corp. v. Allen, 99 Nev. 404,

8  419, 664 P.2d 337 (1983) (reducing compensatory damages for candidate's

9  embarrassment on local television to **$50,000**); Shoshone Coca-Cola Bottling Co. v.

10  Dolinski, 82 Nev. 439, 446, 420 P.2d 855, 859 (1966) (upholding **$2,500** emotional

11  distress award for person who drank soda with decomposing rat inside, became ill,

12  underwent treatment, and lost 20 pounds).

13       Clearly, the $85 million emotional distress verdict was far outside any reasonable

14  range for garden variety emotional distress. The jury was obviously influenced by

15  emotion, speculation and erroneous instructions of the law. The $85 million is beyond

16  reason, shocks the judicial conscience, and must be vacated entirely, capped, or remitted

17  to a reasonable amount.

              b.    **The District Judge Erred by Failing to Allow FTB to Introduce Evidence of Alternative Causes of Hyatt's Emotional Distress**

20       In the absence of medical evidence, "the Court cannot speculate as to the nature

21  and extent of [a plaintiff's] emotional distress as well as determine any issues of

22  causation." Watson, 378 F. Supp. 2d at 1279. Because Hyatt failed to produce his

23  medical records, Hyatt could not prove, as a matter of law, that FTB's conduct – rather

24  than something else – was the cause of his alleged emotional distress. Commissioner

25  Biggar – as affirmed by District Judge Walsh – recognized this evidentiary limitation

26  when he required Hyatt to make the choice between producing his medical records, or

27  protecting them and suffering the consequent evidentiary bar. 15 AA 3544-47. Hyatt

28  chose not to produce any medical records at all. 15 AA 3509. Yet, at trial, rather than

McDONALD·CARANO·WILSON<br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>PO BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

RJN002433

1    requiring Hyatt to bear the consequence of that decision, the district judge erroneously

2    precluded FTB from showing other possible causes of emotional distress.

3        Other significant events occurred in Hyatt's life during the time period of FTB's

4    audit, which most likely caused him emotional distress. Yet, evidence of all was

5    excluded. For example, Hyatt was the subject of a patent interference action, that in

6    March 1995, stripped him of any ownership interest in the patent that had earned him

7    hundreds of millions of dollars. 93 AA 23127-64. The action challenged whether Hyatt

8    was the true inventor of the patented technology. 49 AA 12116 (3) – 12122 (28). The

9    U.S. Patent and Trademark Office determined he was not. 49 AA 12122 (26); 93 AA

10   23163. This decision was upheld on appeal and the Supreme Court denied Hyatt's writ

11   petition. Hyatt v. Boone, 146 F.3d 1348 (Fed. Cir. 1998), cert. denied, 525 U.S. 1141

12   (1999). As a result, not only did Hyatt lose a patent that had provided him with a multi-

13   million dollar licensing program, but losing the patent interference action went to the

14   core of his identity as an inventor. It is impossible to imagine that this event did not

15   impact Hyatt emotionally. Yet, the district court excluded evidence of the patent

16   interference action. 52 AA 12759 (170) – 12763 (187) (striking testimony).

17       The district judge's ruling barring evidence of the patent interference action was

18   particularly egregious in the context of Hyatt's representations during pretrial motion

19   practice. When Hyatt filed a motion in limine to prevent FTB from introducing evidence

20   of other litigation that he was involved in, he did not mention the patent interference

21   action. 19 AA 4504-41. As a result, the scope of the district judge's order on that motion

22   did not prevent FTB from introducing evidence to show that Hyatt lost his multi-million

23   dollar patent at the same time that the FTB was conducting its audit. And during

24   argument on FTB's summary judgment motion concerning Hyatt's IIED claim, his

25   counsel expressly admitted that evidence of the loss of his patent was both relevant and

26   admissible on the issue of the cause of Hyatt's emotional distress. 18 AA 4457. Yet,

27   later, during trial, Hyatt's counsel convinced the district judge, after the fact, to exclude

28   evidence of the patent interference action. 52 AA 12759 (170) – 12766 (199).

107

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

McDONALD·CARANO·WILSON⸱
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1      As another example, at the same time as FTB's audit, Hyatt was also being

2 audited by the Internal Revenue Service. 34 AA 8467 (14) – 8469 (22). The IRS audit

3 ultimately led to a settlement for $5 million in disputed taxes. Id. The jury may have

4 inferred that Hyatt – like most of us – was upset by the IRS's audit and outcome. Yet,

5 the district judge – after allowing Hyatt's counsel to claim in opening statement that

6 Hyatt "paid every dime that was due to the federal government on that income"

7 suggesting that the IRS was never after him – prohibited FTB from mentioning Hyatt's

8 IRS audits. 32 AA 7945 (17); 34 AA 8469 (22). Likewise, Hyatt was involved in a

9 number of lawsuits during the time of FTB's audit. See e.g., 82 AA 20272 – 83 AA

10 20578. Conflicts giving rise to these other lawsuits and the proceedings themselves

11 likely affected Hyatt emotionally. Yet, evidence of these other lawsuits to prove

12 emotional distress was improperly excluded too. 23 AA 5661-62.

13      H.    The Punitive Damages Award Cannot Be Upheld

14         1.    Comity Requires the Punitive Damages Award to Be Vacated

15      FTB repeatedly asked the district court to reject Hyatt's claim for punitive

16 damages, but the district court repeatedly denied FTB's requests. 12 AA 2836-42. The

17 comity analysis here is similar to the straightforward analysis found in other portions of

18 this brief. As explained in Section IV(B) of this brief, comity requires Nevada courts to

19 apply California's laws to FTB, unless doing so would violate Nevada's interests and

20 policies. FTB should be treated no worse than a Nevada government agency would be

21 treated in similar circumstances. Comparing the interests of both states, Nevada policies

22 are not offended by a denial of punitive damages.

23      Like virtually every other state, Nevada and California both have statutes

24 prohibiting awards of punitive damages against government entities. NRS 41.035(1);

25 Cal. Gov't Code § 818. Thus, the interests and policies of both states are identical, and

26 applying California's law to FTB would not contravene any Nevada interest or policy.

27 By doing so, this court would again be applying comity "with a healthy regard for

28 California's sovereign status, relying on the contours of Nevada's own sovereign

RJN002435

immunity from suit as a benchmark for its analysis." <u>Franchise Tax Board</u>, 538 U.S. at 499. Equally important, FTB would be treated no better than a Nevada government agency, and Hyatt would be treated no worse than if he had sued a Nevada entity.

The district court erred by rejecting comity, by allowing the jury to award punitive damages, and by refusing to set aside the award after trial. The judgment imposes $250 million in punitive damages against the citizens of California. It is difficult to imagine a judicial ruling more hostile to a sister state. The award must be vacated in its entirety.

      2.    <u>Punitive Damages Are Not Recoverable Against a Government Entity Under the Common Law</u>

Punitive damages are prohibited for multiple reasons against a government agency. The prohibition is deeply rooted in the common law and is recognized by virtually every jurisdiction. Simply put, the common law does not permit punitive damages to be assessed against a government entity or agency, unless statutory authorization exists. <u>See</u> <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 260-61 (1981); <u>Foss v. Maine Tpk. Auth.</u>, 309 A.2d 339, 345-346 (Me. 1973); <u>Long v. City of Charlotte</u>, 293 S.E.2d 101, 113-115 (N.C. 1982).

The prohibition of punitive damages against government agencies is best explained by <u>City of Newport</u>, where the United States Supreme Court examined whether a municipality was subject to punitive damages under common law, in order to determine whether such damages were permissible based on a claim pursuant to 42 U.S.C. § 1983. The Court determined that "the considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials." <u>City of Newport</u>, 453 U.S. at 271.[82] The Court engaged in a complete

---

[82] <u>See</u> <u>Doe v. County of Ctr, PA.</u>, 242 F.3d 437, 455 (3d Cir. 2001) ("[Newport] stands for the proposition that municipalities, and more broadly state and local government entities, are immune from punitive damages."); <u>Petchem, Inc. v. Canaveral Port Auth.</u>, 368 F. Supp. 2d 1292, 1295 (M.D. Fla. 2005) ("governmental entities – municipalities or otherwise – should be immune from punitive damages claims so long as the cost of such claims would likely be passed onto taxpayers").

RJN002436

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1   historical review of punitive damages, concluding that it was universally understood that

2   governments are immune from punitive damages at common law.

3       **By the time Congress passed what is now Section 1983, the immunity
        of a municipal corporation from punitive damages at common law was
4       not open to serious discussion.** It was generally understood by 1871 that a
        municipality, like a private corporation, was to be treated as a natural
5       person subject to suit for a wide range of tortuous activity, **but this
        understanding did not extend to the award of punitive or exemplary
6       damages**. Indeed, the courts that had considered the issue prior to 1871
        were virtually unanimous in denying such damages against a municipal
7       corporation. Judicial disinclination to award punitive damages against a
        municipality has persisted to this day in the vast majority of jurisdictions.

8

9   Id. at 259-260 (emphasis added).

10      The <u>City of Newport</u> Court found that municipal immunity from punitive

11  damages was well established at common law and "the general rule today is that no

12  punitive damages are allowed [against government entities] unless expressly authorized

13  by statute." <u>Id.</u> at 261 n.21. This rule exists for several reasons. First, "[p]unitive

14  damages by definition are not intended to compensate an injured party, but rather to

15  punish the tortfeasor . . . and to deter him and others from similar extreme conduct." <u>Id.</u>

16  at 266-67. But an award of such damages against a governmental agency only punishes

17  the "taxpayers, who took no part in the commission of the tort." <u>Id.</u> at 267. Indeed,

18  punitive damages imposed on a municipality are in effect a windfall to a fully

19  compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction

20  of public services for the citizens footing the bill. <u>Id.</u> at 267. "Neither reason nor justice

21  suggests that such retribution should be visited upon the shoulders of blameless or

22  unknowing taxpayers." <u>Id.</u> The Court also noted that a danger of allowing punitive

23  damages against a government agency would be that "the unlimited taxing power of a

24  municipality may have a prejudicial impact on the jury, in effect encouraging it to

25  impose a sizable award."[83] <u>Id.</u> at 270-271.

26  _____

27  [83] This prejudice consideration is particularly applicable here, where the district court allowed
    Nevada jurors to consider punishment for a tax-collection agency from another state. The
    Nevada jurors obviously knew that an award of punitive damages would have no effect
28  whatsoever on Nevada taxpayers, and that an award to Hyatt would be paid only by California
    taxpayers.

110

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1    Based on these considerations, the <u>City of Newport</u> Court concluded that the

2  purposes of imposing punitive damages – punishment and deterrence – were not

3  furthered by awarding such damages against a government agency, concluding that, at

4  common law, punitive damages could not be assessed against a government agency

5  unless a statute expressly provided otherwise.[84] <u>Id</u>.

6    Virtually all state courts agree that punitive damages cannot be assessed against a

7  government entity or agency unless a statute expressly provides otherwise. Benjamin W.

8  Baldwin, <u>A. Jackson v. Housing Authority: The Availability of Punitive Damages in</u>

9  <u>Wrongful Death Actions Against Municipal Corporations</u>, 65 N.C. L. Rev. 1441, 1447

10  (1987) (collecting cases from various jurisdictions). There is no reason why this court

11  should take a position different from virtually every other state court in rejecting such

12  awards.[85]

13          3.    Legal Excessiveness

14    Awards of punitive damages are subject to the Due Process Clause of the

15  Fourteenth Amendment. <u>Bongiovi v. Sullivan</u>, 122 Nev. 556, 582, 138 P.3d 433 (2006).

16  The <u>Bongiovi</u> court adopted the United States Supreme Court's standard for

17  excessiveness of punitive damages, as set forth <u>State Farm Mut. Auto. Ins. Co. v.</u>

18  <u>Campbell</u>, 538 U.S. 408, 416-18 (2003). <u>Bongiovi</u>, 122 Nev. at 582. This court now

19  considers three guideposts when determining whether an award is excessive:

20

---

21  [84] No express statute exists that would allow punitive damages against FTB. Rather, as
22  explained above, both Nevada and California have each adopted statutes **prohibiting** such
    awards. Other states have statutes similar to Nevada and California, and likewise prohibit
23  punitive damages against government agencies. <u>See e.g.</u>, Ala. Code § 6-11-26 (Alabama); Ark.
    Code Ann. § 21.9.301 (Arkansas); Co. Rev. Stat. § 24-10-114(4)(a) (Colorado); 10 Del. C. §§
24  4010, 4011 (Delaware) (as interpreted by <u>Schueler v. Martin</u>, 674 A.2d 882 (Del. Super. Ct.
    1996); F.S.A. § 768.28(5) (Florida); Ga. Code. Ann. § 36-33-1 (Georgia); 745 I.L.C.S. 10/2-102
25  (Illinois); I.C. § 34-13-3-4(b) (Indiana); Md. Code § 5-303(c)(1) (Maryland); MCLA §
    691.1407 (Michigan); M.S.A § 466.04(b) (Minnesota); Mont. C. Ann. § 2-9-105 (Montana);
26  N.J.S.A. § 59:9-2(c) (New Jersey); O.R.C. § 2744.05(A) (Ohio); Pa. C.S.A. § 8553
    (Pennsylvania); Gen. Law. 1956 § 9-31-3 (Rhode Island); V.T.C.A. § 101.024 (Texas); U.C.A.
27  § 63-30d-603(1)(a) (Utah); W.Va. Code § 29-12A-7(a) (West Virginia); W.S.A. § 893.80(3)
    (Wisconsin); W.S. 1977 § 1-39-118 (Wyoming).

28  [85] There were many additional reasons raised below addressing the impropriety of the district
    court's handling of the issue of punitive damages. 90 AA 22423-56.

111

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10th FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1.     The degree of reprehensibility of the defendant's conduct;
2.     The ratio of the punitive damage award to the actual harm inflicted on the plaintiff; and
3.     How the punitive damages award compares to other civil or criminal penalties that could be imposed for comparable conduct.

### a.    The Degree of Reprehensibility

First, the award of $250 million in punitive damages is not justified by FTB's conduct, which was not reprehensible in the first place, and which did not lead to any verifiable damage. Hyatt's counsel himself admitted that "[s]omeday, somewhere in California he may be ordered to pay all [the California taxes and penalties]." 52 AA 12931 (174). Hyatt nevertheless contended that even if FTB's conclusions on taxes and fraud penalties are upheld in California, he is still entitled to punitive damages on the analysis that led to those correct conclusions. In other words, if FTB's tax and penalty determinations are ultimately upheld in California, then Hyatt will be left with a windfall of punitive damages based on FTB's legitimate decisions.

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Campbell, 538 U.S at 419. An award of punitive damages must reflect "'the enormity of the offense.'" BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996). The Campbell Court ruled:

> **We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.** The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

Campbell, 538 U.S. at 419 (internal citations omitted; emphasis added).

Applying these considerations, FTB's reprehensibility, if any, cannot justify $250 million in punitive damages. Hyatt experienced no physical harm and as of yet, no

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002439

1  financial harm. At worst, FTB's conduct might be characterized as a zealous effort to

2  collect taxes. Before trial, Hyatt repeatedly contended that FTB attempted to extort a

3  settlement, but his own expert testified that he saw no evidence of extortion throughout

4  the audit or protest process. 44 AA 10846 (130). Also, FTB's conduct did not evince an

5  indifference to or reckless regard to the health and safety of others. Despite repeatedly

6  intimating that FTB needed to be prevented from beating people with rubber hoses and

7  from "thumbscrewing" people, there was no evidence of such draconian activities. 5AA

8  1033; 12 AA 2982. At worst Hyatt's experts criticized the manner in which FTB

9  **analyzed and weighed** the evidence it gathered and suggested FTB's auditors were

10 motivated to get a raise or promotion. In sum, FTB conducted an audit, nothing more.[86]

11     Additionally, Hyatt was anything but financially vulnerable. He received

12 hundreds of millions of dollars in income. He was represented by a team of savvy

13 professionals throughout the audit and the litigation, and there was no evidence he ever

14 once had personal contact with FTB's representatives. The conduct that Hyatt

15 complained about was fairly isolated, and the harm (to the extent there was any) was not

16 the result of malice, trickery, or deceit. FTB was simply doing its statutorily mandated

17 job of conducting an audit and determining whether Hyatt owed taxes.

18     Accordingly, all of the "reprehensibility" considerations identified in Campbell

19 weigh heavily against the award of punitive damages in this case.

20          b.     The Ratio of Punitive Damages to the Actual Harm Inflicted

21     The second excessiveness guidepost does **not** compare the punitive damages

22 award to the compensatory damages awarded by the jury. Rather, the punitive damages

23 award is compared to the "**actual harm** inflicted on the plaintiff." Bongiovi, 122 Nev. at

24 582 (emphasis added). Here, the jury awarded $138 million in compensatory damages,

25 but this does not, and cannot, reflect Hyatt's "actual harm."

26

27 [86] See Ace Truck, 103 Nev. at 511, where the defendant committed multiple acts of intentional
    fraud; the court held that such conduct was "not extravagant," and that the defendants' fraud
28 "can probably be said to be toward the lower end of the spectrum of malevolence found in
    punitive damages cases."

McDONALD·CARANO·WILSON⁻²
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

113

1    As detailed above, the jury awarded damages for both privacy damages and for
2  emotional distress. Regarding the alleged privacy damages, there was no "actual harm"
3  whatsoever. As described above, information disclosed by FTB was already a matter of
4  public record. Although Hyatt expressed a fear of possible identity theft, this fear never
5  became a reality in all the years since the audit. Regarding emotional distress, Hyatt's
6  pretrial refusal to disclose his medical records precluded him from claiming anything
7  more than "garden variety" emotional distress. There was no evidence that he ever
8  sought medical or psychological care for his alleged emotional distress. And no expert
9  witness testified at trial that Hyatt actually suffered any emotional distress, or that any of
10  his alleged subjective symptoms were caused by FTB. In short, the "actual harm" here
11  was minimal, and the $250 million award of punitive damages is grossly excessive under
12  the second Bongiovi guidepost.

c.    Comparison to Other Criminal and Civil Penalties

14    Considering the third guidepost, the punitive award here was grossly excessive
15  when compared to other "civil or criminal" penalties for comparable conduct. Bongiovi,
16  122 Nev. at 582. To the extent that Hyatt's claim was based on alleged fraud, the
17  maximum criminal statutory fine is $10,000. NRS 205.380. There is a special statute
18  dealing with fraud by commercial lenders, but even if a lender commits a pattern of
19  fraud with multiple victims, the maximum fine is only $50,000. NRS 205.372.

20    A review of Nevada published decisions vividly demonstrates the excessiveness
21  of this punitive damage award. Most punitive damages awards are less than six figures.
22  See e.g., Taylor v. Thunder, 116 Nev. 968, 972, 13 P.3d 43, 46 (2000) (**$25,000** for
23  sexual seduction of fourteen year old girl); Olivero, 116 Nev. at 404 (**$45,000** for assault
24  and threatening plaintiff's life with gun); Hall v. SSF, Inc., 112 Nev. 1384, 1389, 930
25  P.2d 94, 97 (1996) (**$5,000** for vicious physical assault); Topaz Mut. Co., Inc. v. Marsh,
26  108 Nev. 845, 850, 839 P.2d 606, 609 (1992) (**$35,000** for fraud); Kahn v. Orme, 108
27  Nev. 510, 512, 835 P.2d 790 (1992) (**$50,000** for unprovoked vicious physical attack);
28  Nev-Tex Oil & Gas v. Precision Rolled Products, 105 Nev. 685, 686, 782 P.2d 1311,

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

114

1312 (1989) (**$5,000** for misrepresentations).

Some punitive damages awards have been in six figures, including cases involving intentional torts and fraud. See e.g, <u>Bongiovi v. Sullivan</u>, 122 Nev. at 584 (**$250,000** for egregious defamation); <u>Guar. Nat. Ins. Co. v. Potter</u>, 112 Nev. 199, 209, 912 P.2d 267, 274 (1996) (insurance bad faith; reducing excessive punitive damage award from $1,000,000 to **$250,000**); <u>S.J. Amoroso Const. Co. v. Lazovich & Lazovich</u>, 107 Nev. 294, 299, 810 P.2d 775, 778 (1991) (reducing punitive damage award from $1,000,000 to **$500,000** in fraud case); <u>United Fire</u>, 105 Nev. at 514 (**$500,000** in insurance bad faith case); <u>Ace Trucking</u>, supra (reducing $800,000 punitive damages award to **$400,000**, where defendants' committed multiple acts of intentional fraud).

This court has upheld a handful of punitive damages awards in excess of $1 million. See e.g., <u>Albert H. Wohlers & Co. v. Bartgis</u>, 114 Nev. at 1253 (reducing punitive damage award from $8,000,000 to **$3,900,000** for insurance bad faith resulting in medically-documented distress, loss of sleep, bladder infections, upper-respiratory infection, and dramatic weight loss); <u>Powers v. United Services Auto. Ass'n.</u>, 114 Nev. 690, 704, 962 P.2d 596, 605 (1998) (upholding **$5,000,000** punitive damage award for insurance company's bad faith, including company's instigation of criminal charges against insured); <u>Republic Ins. Co. v. Hires</u>, 107 Nev. 317, 321, 810 P.2d 790, 793 (1991) (reducing punitive damage award from $22,500,000 to **$5,000,000** for insurance bad faith); <u>Ainsworth v. Combined Ins. Co.</u>, 104 Nev. 587, 593-94, 763 P.2d 673 (1988) (upholding approximately **$6,000,000** punitive damage award for insurance bad faith).

Research has revealed that the highest punitive damage award to date this court ever upheld in a published opinion was <u>Evans v. Dean Witter Reynolds, Inc.</u>, 116 Nev. 598, 615, 5 P.3d 1043, 1054 (2000), where the award was **$6,050,000** for intentional misconduct involving an elderly couple's trust. The award in the present case is more than 41 times larger than <u>Evans</u>.

Accordingly, all three <u>Bongiovi</u> guideposts overwhelmingly compel a conclusion that the award in the present case was constitutionally excessive and must be vacated.

115

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

I.    No Prejudgment Interest Should Have Been Allowed

The district court awarded more than $100 million in prejudgment interest. Prejudgment interest is only allowed on past damages, not future damages. NRS 17.130(2). Prejudgment interest "may not be awarded on an entire verdict when it is impossible to determine what part of the verdict represented past damages." Shuette v. Beazer Homes Holdings Corp., 121 Nev. 837, 865, 124 P.3d 530, 549-550 (2005); Las Vegas-Tonopah-Reno Stage Line, Inc. v. Gray Line Tours of S. Nevada, 106 Nev. 283, 289, 792 P.2d 386 (1990). When a general verdict form does not distinguish between past and present damages, a trial court cannot award prejudgment interest. See Stickler v. Quilici, 98 Nev. 595, 597, 655 P.2d 527, 528 (1982).

The only exception to this general rule is where "there is **nothing** in the record to suggest that future damages were included in the award." Hazelwood v. Harrah's, 109 Nev. 1005, 1011, 862 P.2d 1189, 1193 (1993), overruled in part on other grounds in Vinci v. Las Vegas Sands, Inc., 115 Nev. 243, 984 P.2d 750 (1999) (emphasis added). In determining whether an award may have included future damages, this court will determine whether there was a "reference to future damages in evidence," upon which the jury could have found future damages. Bongiovi, 122 Nev. at 579. The court will also consider whether future damages were requested during closing argument. Id.

In the present case, the Hazelwood exception does not apply. Evidence was presented at trial upon which the jury could have found future damages. For example, Hyatt testified at trial: "[t]here were just a whole range of problems that developed **that I still have to this day** that get worse when the FTB has another way of tormenting me." 37 AA 9171 (96) (emphasis added). Hyatt testified that he suffered emotional distress after learning of Candace Les' testimony in 2000 – after the filing of his 1998 complaint. 37 AA 9175 (110-112). During closing argument, Hyatt's counsel argued that Hyatt was incurably damaged: "Medicine doesn't provide a cure or a pill for emotional distress of the kind suffered by Mr. Hyatt. This goes to the very core of his existence and his nature. How he views what other people view him to be. He knows FTB has called him a fraud.

116

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR · RENO, NEVADA 89501
P.O. BOX 2670 · RENO, NEVADA 89505-2670
PHONE 775-788-2000 · FAX 775-788-2020

He thinks a lot of other people believe he's a fraud.[87] That is devastating to him." 52 AA 12929 (168). Hyatt's counsel also argued: "We're talking about his heart and his soul and how do you put a dollar amount on that." 52 AA 12931 (175). Counsel further argued that Hyatt had a concern about identity theft and the dissemination of his private information. Hyatt's counsel stated: "once you lose control of your private information, who knows what would happen with it? . . . Each and every day Mr. Hyatt would wake up internally and he had that concern, that fear. That is the type of thing we're talking about for emotional distress." 52 AA 12906 (75). Counsel also argued that Hyatt could never be made whole for the damage that he suffered, and stated: "How much is it worth to this man for this information to be out there on the World Wide Web, never to be got back again? You can never put the toothpaste back in the tube." 52 AA 12907 (80).

By insinuating that Hyatt's heart and soul had been "incurably" damaged, by asking the jury to award emotional distress damages for the continuing fear of possible identity theft, and by stating that FTB's conduct is devastating to Hyatt in the present tense, it is obvious that the jury could have relied upon such evidence and arguments to find that Hyatt would continue to suffer these damages into the future. Because the jury did not make any specific findings about future damages on the general verdict form, Hyatt was not entitled to an award of prejudgment interest.[88]

---

[87] Hyatt presented no evidence that anyone believed him to be a fraud or a tax cheat. Hyatt himself, however, testified to the harm to his reputation that he believed he sustained because of FTB. 37 AA 9015 (151), 9167 (80-81). During FTB's case in chief, when FTB intended to call multiple witnesses to testify to their poor opinions of Hyatt which had nothing to do with FTB, Hyatt abruptly withdrew his claim for injury to his reputation. 49 AA 12129 (55).

[88] There is another reason why prejudgment interest was precluded here. Prejudgment interest is awarded from the date of service of the complaint. NRS 17.130. Where a plaintiff suffers some damages **after** service of the complaint, the Legislature did not want such damages to accrue interest from the date of service of the complaint. Las Vegas-Tonopah, 106 Nev. at 289-90; Keystone Realty v. Osterhus, 107 Nev. 173, 807 P.2d 1385 (1991). Instead, prejudgment interest on damages sustained after service of the complaint is only allowed "from the date the damages were actually sustained." Keystone, 107 Nev. at 178. In the present case, a large part of Hyatt's alleged damages were sustained after service of his complaint in January 1998. E.g., damages flowing from FTB's references to Hyatt in the Litigation Roster, which occurred after service of the complaint (55 AA 13571-692); damages when Hyatt learned of FTB's audit activities, after service of the complaint (37 AA 9175 (110-12)); and damages claimed as a result of FTB's alleged delay in the protest administrative proceedings, which occurred up until November of 2007. 93 AA 23182. With no effort by Hyatt to segregate these damages, the Continued...

117

V.    CONCLUSION

"Everyone hates the tax man."[89] For governments to function, however, somebody must collect taxes. In California, that responsibility falls on the shoulders of FTB employees. With the verdict in this case, one wealthy former California resident will wreak havoc on the ability of tax department employees to perform their jobs – not just in California, but everywhere. And the scope of this judgment goes far beyond tax collectors. It could detrimentally affect all government agencies – those in Nevada as well as any out-of-state agency that investigates in Nevada – that perform investigatory functions (e.g., police and fire departments, gaming control agencies, health departments, professional licensing boards, and many others), opening a floodgate of tort litigation by plaintiffs who are unhappy with the results of investigations. This judgment, if affirmed, could also have devastating, long-lasting affect on the relationship between the citizens of Nevada and California. FTB respectfully urges the court to set the judgment aside and dismiss this case.

Dated this 20th day of July, 2009.

By:    _____
       ROBERT L. EISENBERG (NSBN 0950)
       LEMONS, GRUNDY, & EISENBERG

By:    _____
       PAT LUNDVALL (NSBN 3761)
       McDONALD CARANO WILSON LLP

By:    _____
       CARLA HIGGINBOTHAM (NSBN 8495)
       McDONALD CARANO WILSON LLP

---

district court erred by allowing prejudgment interest on the entire amount of compensatory damages. 93 AA 23032 – 36 (order denying motion to alter or amend judgment).

[89] A Google search reveals more than 5,700 web sites using this phrase.

118

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1

CERTIFICATE OF COMPLIANCE

2   I hereby certify that I have read this appellate brief, and to the best of my

3  knowledge, information and belief, it is not frivolous or interposed for any improper

4  purpose. I further certify that this brief complies with all applicable Nevada Rules of

5  Appellate Procedure, in particular NRAP 28(e), which requires every assertion in the

6  brief regarding matters in the record to be supported by appropriate references to the

7  record on appeal. I understand that I may be subject to sanctions in the event that the

8  accompanying brief is not in conformity with the requirement of the Nevada Rules of

9  Appellate Procedure.

10   Dated this 20th day of July, 2009.

11

12   By: _____

13   ROBERT L. EISENBERG (NSBN 0950)
     LEMONS, GRUNDY, & EISENBERG

14

15   By: _____

16   PAT LUNDVALL (NSBN 3761)
     McDONALD CARANO WILSON LLP

17

18   By: _____

19   CARLA HIGGINBOTHAM (NSBN 8495)
     McDONALD CARANO WILSON LLP

20

21

22

23

24

25

26

27

28

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

i

**CERTIFICATE OF SERVICE**

Pursuant to NRAP 25, I hereby certify that I am an employee of McDonald Carano Wilson LLP, and that I served true and correct copies of the foregoing **APPELLANT'S OPENING BRIEF** on this 20th day of July, 2009 by depositing said copies with Federal Express for overnight delivery, upon the following:

> Peter C. Bernhard, Esq.
> Kummer Kaempfer Bonner Renshaw & Ferrario
> 3800 Howard Hughes Parkway
> Seventh Floor
> Las Vegas, Nevada 89169
> Facsimile: (702) 796-7181
>
> Mark A. Hutchison, Esq.
> Hutchison & Steffen
> Peccole Professional Park
> 10080 West Alta Drive, Suite 200
> Las Vegas, NV 89145
> Facsimile: (702) 385-2086

NOTE: Appendices have been sent to Peter Bernhard only.

_____
An Employee of McDonald Carano Wilson LLP

ii

RJN002447

RJN002448

Dated this 14TH day of April, 2017.

/s/  Debbie Leonard

JAMES BRADSHAW                          SETH P. WAXMAN
DEBBIE LEONARD                          PAUL R.Q. WOLFSON
ADAM HOSMER-HENNER                      DANIEL WINIK
MCDONALD CARANO WILSON LLP              WILMER CUTLER PICKERING
100 West Liberty Street, 10th Floor        HALE AND DORR LLP
P.O. Box 2670                           1875 Pennsylvania Ave. NW
Reno, NV  89505                         Washington, D.C.  20006
(775) 788-2000                          (202) 663-6000


CYNTHIA J. LARSEN
KATIE DEWITT
DAVID W. SPENCER
ORRICK, HERRINGTON & SUTCLIFFE
400 Capitol Mall, Suite 3000
Sacramento, CA 95814
(916) 329-7970


*Attorneys for Appellees Betty T. Yee,
Diane L. Harkey, and Michael Cohen in
their official capacities as members of the
California Franchise Tax Board*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

 /s/Pam Miller
An Employee of McDonald Carano Wilson LLP