No. 15-15296

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GILBERT P. HYATT

*Plaintiff-Appellant*,

*v.*

BETTY T. YEE, ET AL.

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California, No. 2:14-cv-00849-GEB-DAD (Burrell, J.)

## APPELLEE CALIFORNIA FRANCHISE TAX BOARD'S
## JUDICIAL NOTICE DOCUMENTS

### VOLUME 14 OF 14
### RJN 2449 – RJN 2634

JAMES BRADSHAW
DEBBIE LEONARD
ADAM HOSMER-HENNER
MCDONALD CARANO WILSON LLP
100 West Liberty Street, 10th Floor
Reno, NV 89501
(775) 788-2000

CYNTHIA J. LARSEN
KATIE DEWITT
DAVID W. SPENCER
ORRICK, HERRINGTON & SUTCLIFFE
400 Capitol Mall, Suite 3000
Sacramento, CA 95814
(916) 329-7970

SETH P. WAXMAN
PAUL R.Q. WOLFSON
DANIEL WINIK
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
(202) 663-6000

# INDEX

# FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|----------------------------------------|----------|
| | | **VOLUME ONE** | | | | |
| 1 | 6/17/1993 | Letter from Marc Shayer to Gilbert Hyatt | 10 | 1 - 5 | NV Trial Ex. 0112* | 1, 3 |
| 2 | 7/15/1993 | Letter from Marc Shayer to Michael Kern, and response - Information Concerning Resident Status (Form FTB 3805F) | 10 | 6 - 14 | NV Trial Ex. 2174 | 1, 3 |
| 3 | 8/4/1993 | Letter from Michael Kern to Marc Shayer | 10 | 15 - 16 | NV Trial Ex. 2173 | 1, 3 |
| 4 | 5/24/1994 | Letter from Soriano to Michael Kern | 10 | 17 - 20 | NV Trial Ex. 2503 | 1, 3 |
| 5 | 8/2/1995 | Letter from Sheila Cox to Michael Kern - determination letter | 12 | 21 - 48 | NV Trial Ex. 2821 | 1, 3 |
| 6 | 8/29/1995 | Fraud Penalty | 13 | 49 - 62 | NV Trial Ex. 2199 | 1, 3 |
| 7 | 4/23/1996 | Fax from Michael Kern to Hyatt re 1991 NPA, and from Michael Kern to Cowan | 12 | 63 - 74 | NV Trial Ex. 2592 | 1, 3 |
| 8 | 6/20/1996 | Letter from Cowan to FTB re 1991 Protest Letter | 14 | 75 - 136 | NV Trial Ex. 296 | 2, 3 |
| 9 | 8/18/1997 | Fax from Hyatt to Eugene Cowan with Notice of Proposed Assessment 1992 | 13 | 137 - 141 | NV Trial Ex. 2609 | 1, 3 |
| 10 | 10/10/1997 | Letter from Cowan to FTB re 1992 Protest Letter 10-10-97 | 14 | 142 - 144 | NV Trial Ex. 319 | 2, 3 |
| 11 | 1/6/1998 | Complaint, *Gilbert P. Hyatt v. Franchise Tax Board of California* | 14 | 145 - 166 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |

* All references to "NV Trial Ex." are documents that were submitted into evidence at the jury trial in Hyatt's Nevada litigation, Case No. 98A382999, Eighth Judicial District Court, Clark County, Nevada.

# INDEX

# FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| | | **VOLUME TWO** | | | | |
| 12 | 1/6/1998 | Case docket - *Gilbert P. Hyatt v. Franchise Tax Board of California* | 32 | 167 - 257 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |
| 13 | 3/17/1998 | Fax from Donald Kula to Hutchison and Hyatt re response tactics to Subpoena Duces Tecum to be issued to Cal Fed Bank | 21 | 258 | Ex. 3 to Dunn Decl., SER 23; NV Trial Ex. 2326 | 2, 3 |
| 14 | 5/28/1998 | Letter from Sheila Cox to Eugene Cowan attaching 4/24/98 Declaration for Subpoena Duces Tecum signed by Sheila Cox, Subpoena Duces Tecum to Cal Fed Bank | 21 | 259 - 262 | Ex. 3 to Dunn Decl., SER 24-27; NV Trial Ex. 2326 | 2 |
| 15 | 12/27/1999 | Protective Order on Report and Recommendation from Discovery Commissioner Biggar | 16 | 263 - 274 | Eighth Judicial District Court, Clark County, Nevada, Case No. 98A382999 | 3 |
| 16 | 12/30/1999 | Letter from Woodward to Cowan re document request letter | 15 | 275 - 305 | NV Trial Ex. 2330 | 2, 3 |
| 17 | 1/27/2000 | Docket | 17, 32 | 306 - 315 | Nevada Supreme Court, Case No. 35549 | 3 |
| 18 | 3/7/2000 | Memo from McLaughlin to Terry Collins | 16 | 316 - 319 | NV Trial Ex. 2333 | 2, 3 |
| 19 | 4/16/2000 | Letter from FTB to Cowan and Eric Coffill re request for delay | 15, 16 | 320 - 322 | NV Trial Ex. 2332 | 2, 3 |
| 20 | 6/7/2000 | Order Staying District Court Proceedings | 17 | 323 - 324 | Nevada Supreme Court, Case No. 35549 | 3 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|-----------|---------------|----------------------------------------|----------|
| | | | | | **VOLUME THREE** | |
| 21 | 6/30/2000 | Letter to Cody Cinnamon from Coffill responding to IDR | 16 | 325 - 425 | NV Trial Ex. 356 | 2, 3 |
| 22 | 7/7/2000 | Docket | 17, 32 | 426 - 434 | Nevada Supreme Court, Case No. 36390 | 3 |
| 23 | 10/3/2000 | Hearing Officer Report | 16 | 435 - 437 | NV Trial Ex. 2335 | 2, 3 |
| 24 | 6/13/2001 | Order Granting Petition (Docket No. 36390), and Dismissing Petition (Docket No. 35549) | 17 | 438 - 443 | Nevada Supreme Court, Case No. 36390, 35549 | 3 |
| 25 | 3/4/2002 | Docket | 32 | 444 - 445 | Nevada Supreme Court, Case No. 39274 | 3 |
| 26 | 3/8/2002 | Docket | 32 | 446 - 447 | Nevada Supreme Court, Case No. 39312 | 3 |
| 27 | 4/4/2002 | Order Denying Petition for Writ of Mandamus or Prohibition and Dismissing Appeal | 17 | 448 - 450 | Nevada Supreme Court, Case No. 39312, 39274 | 3 |
| 28 | 4/4/2002 | Order Granting Petition for Rehearing, Vacating Previous Order, Granting Petition for a Writ of Mandamus in Part in Docket no. 36390, and Granting Petition for a Writ of Prohibition in Part in Docket No. 35549 | 17 | 451 - 464 | Nevada Supreme Court, Case No. 35549, 36390 | 3 |
| 29 | 6/3/2002 | Letter from Felix Leatherwood to Mark Hutchison requesting documents and deposition testimony stamped "Confidential-NV Protective Order" | 17 | 465 - 466 | NV Trial Ex. 2342 | 2, 3 |
| 30 | 7/7/2002 | FTB Administrative Subpoena Duces Tecum | 17 | 467 - 470 | NV Trial Ex. 2344 | 2, 3 |

# INDEX

## FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|--------------------------------------|----------|
| 31 | 2/28/2003 | Court's Ruling on Order to Show Cause filed in Superior Court of California, Sacramento County , Case No. 02CS01582 | 17 | 471 - 472 | NV Trial Ex. 2348 | 3, 5 |
| 32 | 3/17/2003 | Fax Cover and letter from Donald Kula to Molly Mosley, DAG | 17 | 473 - 475 | NV Trial Ex. 2349 | 2, 3, 5 |
| 33 | 12/31/2003 | *State Franchise Tax Board v Gilbert P. Hyatt* , Decision (unpublished) | 17 | 476 - 500 | California Court of Appeal, Third Appellate District - Sacramento, Case No. C043627 | 2, 3, 5 |
| **VOLUME FOUR** | | | | | | |
| 34 | 9/7/2005 | Protest Event Log for Case Unit: Hyatt, Gilbert - 1992 | | 501 - 604 | NV Trial Ex. 2353 | 2, 3 |
| 35 | 10/28/2005 | Letter from Robert Dunn to Mark Hutchison re: request consent to release deposition transcripts and documents to FTB's protest hearing officer | 18 | 605 - 607 | NV Trial Ex. 2354 | 2, 3 |
| 36 | 12/6/2005 | Letter from Robert Dunn to Mark Hutchison re: second request | 18 | 608 | NV Trial Ex. 2355 | 2, 3 |
| 37 | 1/30/2006 | FTB Administrative Subpoena Duces Tecum and Exhibits A, C-E | 18 | 609 - 627 | NV Trial Ex. 2356 | 2, 3 |
| 38 | 1/19/2007 | Letter from Robert Dunn to Mark Hutchison requests production of documents and testimony from 2006 | 18 | 628 - 632 | NV Trial Ex. 2357 | 2, 3 |
| 39 | 2/14/2007 | Letter from Donald Kula to Robert Dunn | 18 | 633 - 638 | NV Trial Ex. 2358 | 2, 3 |
| 40 | 5/17/2007 | Letter from Donald Kula to Robert Dunn | 18 | 639 - 640 | NV Trial Ex. 2359 | 2, 3 |

## INDEX
## FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 41 | 11/1/2007 | Determination Letter from George W. McLaughlin to Eric Coffill | 18 | 641 - 690 | NV Trial Ex. 2320 | 2, 3 |
| 42 | 11/20/2007 | Letter from Eric Coffill to George W. McLaughlin | 19 | 691 - 695 | Ex. 1 to Dunn Decl., SER 13-17 | 6 |
| 43 | 11/26/2007 | Letter from George W. McLaughlin to Eric Coffill | 19 | 696 - 698 | Ex. 2 to Dunn Decl., SER 19-21 | 2 |
| 44 | 1/22/2008 | Letter from Eric Coffill to SBE enclosing Notice of Appeal for 1991, Request for Abatement of Interest | 22 | 699 - 711 | Ex. 4 to Dunn Decl., SER 29-41 | 6 |
| 45 | 1/23/2008 | Letter from Eric Coffill to SBE enclosing Notice of Appeal for 1992, Request for Abatement of Interest | 22 | 712 - 724 | Ex. 5 to Dunn Decl., SER 43-55 | 6 |
| 46 | 7/1/2008 | Letter from SBE to Eric Coffill re extension | 23 | 725 - 726 | SBE | 6 |
| 47 | 7/3/2008 | Letter from SBE to Eric Coffill re extension | 23 | 727 | SBE | 6 |
| 48 | 11/18/2008 | Letter from SBE to Eric Coffill re extension | 23 | 728 - 729 | SBE | 6 |
| **VOLUME FIVE** | | | | | | |
| 49 | 12/9/2008 | Hyatt Opening Brief 1991 | 23 | 730 - 836 | SBE | 6 |
| 50 | 12/9/2008 | Hyatt Opening Brief 1992 | 23 | 837 - 922 | SBE | 6 |
| 51 | 1/27/2009 | Letter from Robert Dunn to SBE re Hyatt's filing | 23 | 923 - 924 | SBE | 6 |
| 52 | 2/13/2009 | Docket | 32 | 925 - 928 | Nevada Supreme Court, Case No. 53264 | 3 |
| 53 | 3/16/2009 | Letter from Robert Dunn to Eric Coffill re scheduling depositions of affiants | 23 | 929 - 930 | SBE | 3 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|-----------|---------------|----------------------------------------|----------|
| 54 | 6/26/2009 | Request for Foreign Deposition Subpoena - Melvin R. Hecht | | 931 - 953 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-09-593462-C | 3, 5, 6 |
| **VOLUME SIX** | | | | | | |
| 55 | 6/26/2009 | Request for Foreign Deposition Subpoena - Michelina Hecht | | 954 - 975 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-09-593462-C | 3, 5, 6 |
| 56 | 9/15/2009 | FTB Opening Brief 1991 | 24 | 976 - 1081 | SBE | 6 |
| 57 | 9/15/2009 | FTB Opening Brief 1992 | 24, 31 | 1082 - 1160 | SBE; Ex. 7 to Dunn Decl., SER 61 -70 | 6 |
| 58 | 9/29/2009 | Letter from Eric Coffill to SBE requesting extension of time for filing | 25 | 1161 - 1172 | SBE | 6 |
| 59 | 10/1/2009 | Letter from Robert Dunn to SBE replying to Hyatt's request for time | 25 | 1173 - 1176 | SBE | 6 |
| 60 | 5/20/2010 | Letter from SBE to Eric Coffill re extension and new due date | 25 | 1177 | SBE | 6 |
| 61 | 8/11/2010 | Letter from SBE to Eric Coffill granting extension and email exchange | 25 | 1178 - 1180 | SBE | 6 |
| **VOLUME SEVEN** | | | | | | |
| 62 | 8/23/2010 | Hyatt 1991 Reply Brief | 25 | 1181 - 1289 | SBE | 6 |
| 63 | 8/23/2010 | Hyatt 1992 Reply Brief | 25 | 1290 - 1398 | SBE | 6 |
| 64 | 8/23/2010 | Hyatt Index of Affidavits | 25 | 1399 - 1403 | SBE | 6 |

# INDEX

## FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|---------------------------------------|----------|
| 65 | 2/4/2011 | *State of California Franchise Tax Board v. Mary Troter Stratton, et al.,* Petition by FTB for Issuance of Out-of-State Deposition Commissions (for Stratton depositions) | 24 | 1404 - 1410 | Superior Court of California, Sacramento, Case No. 34-2011-00096505 | 5, 6 |
| 66 | 5/3/2011 | *State of California Franchise Tax Board v. Gilbert P. Hyatt,* Nevada District Court Order Denying Strattons' Motion to Quash Subpoenas for a Pending Administrative Tax Appeal in California | 24 | 1411 - 1413 | Eighth Judicial District Court, Clark County, Nevada, Case No. A-II-635345-C | 3, 5, 6 |
| | | **VOLUME EIGHT** | | | | |
| 67 | 6/30/2011 | FTB Reply Brief 1992 (Excerpts re Delays in Protest and Nevada litigation) | | 1414 - 1426 | SBE | 6 |
| 68 | 7/20/2011 | Dkt. No. 1 - Hyatt's Petition for Protective Order or Quash subpoenas | 27 | 1427 - 1429 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 6, 7 |
| 69 | 7/20/2011 | Docket | 32 | 1430 - 1431 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 7 |
| 70 | 7/29/2011 | Dkt. No. 17 - Decision & Order re Philips discovery | 27 | 1432 - 1444 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 6, 7 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|---------------------------------------|----------|
| 71 | 8/1/2011 | Docket | 32 | 1445 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 72 | 8/2/2011 | Dkt. No. 19 - Hyatt's Notice of Appeal | 27 | 1446 - 1465 | New York Supreme Court, Westchester County, Case No. 52961/2011 | 7 |
| 73 | 8/15/2012 | Hyatt 1991 Supplemental Brief | 25 | 1466 - 1570 | SBE | 6 |
| **VOLUME NINE** | | | | | | |
| 74 | 8/15/2012 | Hyatt 1992 Supplemental Brief | 25 | 1571 - 1678 | SBE | 6 |
| 75 | 8/15/2012 | Exh A Hyatt 1991 Supplemental Brief | 25 | 1679 - 1680 | SBE | 6 |
| 76 | 8/15/2012 | Exh B Hyatt 1991 Supplemental Brief | 25 | 1681 - 1683 | SBE | 6 |
| 77 | 10/5/2012 | Dkt. No. 24 - Order to Show Cause | 28 | 1684 - 1687 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 78 | 2/19/2013 | FTB Supplemental Briefing re Tax Year 1991 and 1992, Exhibit H Tab 1-47_Protest and Litigation timeline (Tab 36) | | 1688 | SBE | 6 |

# INDEX

# FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|---------------------------------------|----------|
| 79 | 3/13/2013 | Dkt. No. 29 - Opinion and Order | 28 | 1689 - 1705 | New York Appellate Division, Second Judicial Department, Case No. 2011-6859 | 7 |
| 80 | 3/28/2013 | FTB Additional Brief Philips Documents and NY litigation | | 1706 - 1721 | SBE | 6, 7 |
| 81 | 4/29/2013 | FTB Additional Brief re Philips documents to SBE | | 1722 - 1726 | SBE | 6, 7 |
| 82 | 5/14/2013 | Docket | 32 | 1727 - 1730 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 83 | 10/7/2013 | Dkt. No. 23- Decision and Order | 28 | 1731 - 1747 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 84 | 3/13/2014 | Dkt. No. 74 - Decision and Order | 28 | 1748 - 1758 | New York Supreme Court, Westchester County, Case No. 57751-2013 | 7 |
| 85 | 4/23/2014 | Letter from SBE to Eric Coffill and Robert Dunn requesting additional briefing | 29 | 1759 - 1761 | SBE | 6 |
| 86 | 5/7/2014 | Letter from Eric Coffill to SBE | 30 | 1762 - 1764 | Ex. 6 to Dunn Decl., SER 57-59 | 6 |
| 87 | 6/13/2014 | Letter from SBE to Eric Coffill and Robert Dunn re due dates and reluctance to grant more extensions | 30, 33 | 1765 - 1767 | SBE | 6 |
| 88 | 9/26/2014 | Letter from Eric Coffill to SBE re Request to Vacate | 33 | 1768 - 1769 | SBE | 6 |

# INDEX

# FTB'S MOTION FOR JUDICIAL NOTICE

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|-------|------|---------------|------------|---------------|---------------------------------------|----------|
| 89 | 10/13/2014 | Letter from Eric Coffill to SBE responding to FTB letter (enclosing letter from Hyatt's New York counsel to FTB's New York counsel re U.S. Philips documents dispute) | 33 | 1770 - 1778 | SBE | 6, 7 |
| 90 | 11/3/2014 | Letter from Eric Coffill to SBE requesting, *inter alia*, that SBE vacate briefing deadline | 33 | 1779 - 1780 | SBE | 6 |
| **VOLUME TEN** | | | | | | |
| 91 | 2/4/2015 | Letter from Eric Coffill to SBE submitting motions and requesting, *inter alia,* delay in briefing ending decision on motions | 33 | 1781 - 1847 | SBE | 6 |
| 92 | 2/23/2015 | Letter from Eric Coffill to SBE requesting, *inter alia,* delay on briefing until SBE rules on motions to strike | 33 | 1848 - 1849 | SBE | 6 |
| 93 | 3/11/2015 | Docket | 32 | 1850 - 1852 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 94 | 4/6/2015 | Affidavit of Robert Dunn in Opposition to Gilbert Hyatt's Motion Seeking an Order of Civil Contempt and Permanent Injunctive Relief | 32 | 1853 - 2000 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 95 | 6/3/2015 | Letter from Eric Coffill to the SBE requesting extension of time to file reply briefs | 33 | 2001 - 2003 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 96 | 9/10/2015 | Amended Judgment Decision & Order | 32 | 2004 - 2016 | New York Supreme Court, Westchester County, Case No. 53655-2015 | 6, 7 |
| 97 | 9/19/2016 | Letter from Edwin Antolin to SBE requesting extension for filing additional briefs | 33 | 2017 - 2018 | SBE | 6 |
| **VOLUME ELEVEN** | | | | | | |
| 98 | 9/28/2016 | Appellant's Concluding Summary (1991); Errata filed 11/4/16 | 33 | 2019 - 2057 | SBE | 6 |
| 99 | 9/28/2016 | Appellant's Concluding Summary (1992); Errata filed 11/4/16 | 33 | 2058 - 2092 | SBE | 6 |
| 100 | 9/28/2016 | Appellant's Second Additional Briefing (1991); Errata filed 11/4/16 | 33 | 2093 - 2165 | SBE | 6 |
| 101 | 9/28/2016 | Appellant's Second Additional Briefing (1992); Errata filed 11/4/16 | 33 | 2166 - 2236 | SBE | 6 |
| **VOLUME TWELVE** | | | | | | |
| 102 | 9/28/2016 | Attachment 1, Appellant's Second Additional Briefing (1992); Errata filed 11/4/16 | 33 | 2237 - 2278 | SBE | 6 |
| 103 | 10/20/2016 | Letter from SBE to Edwin Antolin re, *inter alia,* delays | 33 | 2279 - 2282 | SBE | 6 |
| 104 | 11/4/2016 | Letter from Edwin Antolin to Joann Richmond with errata table | 33 | 2283 - 2297 | SBE | 6 |
| 105 | 11/16/2016 | Letter from FTB to SBE re Hyatt's request for additional time | 33 | 2298 - 2299 | SBE | 6 |

**INDEX**

**FTB'S MOTION FOR JUDICIAL NOTICE**

| Doc # | Date | Document Name | Dunn Par # | Bates # - RJN | Judicial or Administrative Proceeding | Category |
|---|---|---|---|---|---|---|
| 106 | 1/6/2017 | Letter from SBE to Edwin Antolin re rescheduing the hearing from March 2017 to May 2017 | 33 | 2300 | SBE | 6 |
| 107 | 3/3/2017 | Notice of Board Hearing for Case No. 446509 on 5/23/17 | 33 | 2301 - 2302 | SBE | 6 |
| 108 | 3/3/2017 | Notice of Board Hearing for Case No. 435770 on 5/23/17 | 33 | 2303 - 2304 | SBE | 6 |
| **VOLUME THIRTEEN** | | | | | | |
| 109 | 8/7/2009 | Appellant's Opening Brief | | 2305 - 2448 | Nevada Supreme Court, Case No. 53264 | 3 |
| **VOLUME FOURTEEN** | | | | | | |
| 110 | 6/11/2010 | Appellant's Reply Brief | | 2449 - 2634 | Nevada Supreme Court, Case No. 53264 | 3 |

ORIGINAL

IN THE SUPREME COURT OF THE STATE OF NEVADA

FRANCHISE TAX BOARD
OF THE STATE OF CALIFORNIA,

    Appellant/Cross-Respondent,

vs.

GILBERT P. HYATT,

    Respondent/Cross-Appellant

Supreme Court Case No. 53264

**FILED**

JUN 11 2010

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY S. Young
    DEPUTY CLERK

**APPELLANT'S REPLY BRIEF AND**

**CROSS-RESPONDENT'S ANSWERING BRIEF**

*****

APPEAL FROM JUDGMENT – EIGHTH JUDICAL DISTRICT COURT
STATE OF NEVADA, CLARK COUNTY
HONORABLE JESSIE WALSH, DISTRICT JUDGE

Robert L. Eisenberg (NSBN 0950)
LEMONS, GRUNDY & EISENBERG
6005 Plumas Street, Third Floor
Reno, Nevada 89519
Telephone: (775) 786-6868
Facsimile: (775) 786-9716
rle@lge.net

Pat Lundvall (NSBN 3761)
Megan Starich (NSBN 11284)
McDONALD CARANO WILSON LLP
100 W. Liberty Street, 10th Floor
Reno, Nevada 89505
Telephone: (775) 788-2000
Facsimile: (775) 788-2020
lundvall@mcdonaldcarano.com

*Attorneys for Appellant/Cross-Respondent*


RECEIVED
JUN 01 2010
TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
DEPUTY CLERK

16 - 14031

RJN002449

IN THE SUPREME COURT OF THE STATE OF NEVADA

FRANCHISE TAX BOARD
OF THE STATE OF CALIFORNIA,

    Appellant/Cross-Respondent,

vs.

GILBERT P. HYATT,

    Respondent/Cross-Appellant

Supreme Court Case No. 53264

**APPELLANT'S REPLY BRIEF AND**

**CROSS-RESPONDENT'S ANSWERING BRIEF**

\*\*\*\*\*

APPEAL FROM JUDGMENT – EIGHTH JUDICAL DISTRICT COURT
STATE OF NEVADA, CLARK COUNTY
HONORABLE JESSIE WALSH, DISTRICT JUDGE

Robert L. Eisenberg (NSBN 0950)
LEMONS, GRUNDY & EISENBERG
6005 Plumas Street, Third Floor
Reno, Nevada 89519
Telephone: (775) 786-6868
Facsimile: (775) 786-9716
rle@lge.net

Pat Lundvall (NSBN 3761)
Megan Starich (NSBN 11284)
McDONALD CARANO WILSON LLP
100 W. Liberty Street, 10th Floor
Reno, Nevada 89505
Telephone: (775) 788-2000
Facsimile: (775) 788-2020
lundvall@mcdonaldcarano.com

*Attorneys for Appellant/Cross-Respondent*

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL RESPONSE ...................................................................................... 3

      A.    Preface .................................................................................................. 3

      B.    The Jury's Verdict and The Material Issues Related to that Verdict. .......... 5

      C.    The Relationship Between Sheila Cox, Candace Les, and FTB. ................. 8

      D.    Evidence Relied Upon by FTB's Auditors in Reaching Their Initial
            Audit Determinations. ........................................................................ 10

      E.    FTB Policies and Practices, and FTB's Compliance Therewith ................ 17

      F.    Hyatt's Abuse of the Nevada Protective Order and How That
            Contributed to the Amount of Time it Took to Finalize the Protest ......... 21

III.  LEGAL ARGUMENT ...................................................................................... 27

      A.    Standard Of Review .......................................................................... 27

      B.    Nevada's Recent Jurisprudence Examining Discretionary Function
            Immunity Applies To FTB And This Case .......................................... 28

            1.    Standard of Review Regarding Discretionary Function
                  Immunity ................................................................................ 29

            2.    The *Berkovitz-Gaubert* Test Adopted in *Martinez* Does Not
                  Apply Solely To Negligence Claims As Argued by Hyatt ............. 30

            3.    There Is Not A Bad Faith Or Intentional Torts Exception To
                  Discretionary Function Immunity As Argued by Hyatt ................. 32

                  a.    *Falline* And Its Progeny Were Overruled With The
                        Adoption Of The *Berkovitz-Gaubert* Test in *Martinez* ......... 32

                  b.    Post-*Martinez* Cases Do Not Change This Result ................ 34

                  c.    Hyatt's Reliance On Out-of-State Authorities Is
                        Misplaced Since None Utilize the *Berkovitz-Gaubert*
                        Test ................................................................................ 35

                  d.    Government Conduct Remains Subject to Scrutiny ............. 37

            4.    There Was No Bad Faith Finding In This Case And It Is
                  Impermissible to Infer Such a Finding ....................................... 38

            5.    Based Upon The Application Of Discretionary Function
                  Immunity, Each Of Hyatt's Claims, As Tried To The Jury,
                  Must Be Dismissed .................................................................. 39

McDONALD·CARANO·WILSON⠇⠇⠏
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

i

|  |  | a. | Part One of *Berkovitz-Gaubert:* All Of FTB's Alleged Improper Conduct Was Discretionary | 39 |
|  |  | b. | Part Two Of *Berkovitz-Gaubert*: All Of FTB's Actions Were Based Upon Policy Determinations | 44 |
|  | C. |  | Contrary To Hyatt's Arguments, District Judge Walsh Allowed Trial To Exceed The Jurisdictional Scope Of This Case | 46 |
|  |  | 1. | Hyatt's Arguments Illustrate That All Of FTB's Conduct At Issue Was Nothing More Than Mere Negligence, Which Was Immune Under the Court's 2002 Decision | 46 |
|  | D. |  | No Matter What Labels Hyatt May Use, Hyatt's Entire Case Tried To The Jury Concerned Whether FTB's Residency, Tax, And Fraud Assessments Conclusions Were Correct | 48 |
|  |  | 1. | In Order To Rule In Hyatt's Favor, The Jury Was Necessarily Required To Determine That FTB Improperly Reached The Wrong Result In Its Administrative Conclusions | 49 |
|  |  | 2. | The District Court's Corrective Jury Instruction 24 Informed The Jury That It Was Permitted To Determine The Correctness Of FTB's Administrative Conclusions And Hyatt Argued They Reached the Wrong Conclusion | 51 |
|  |  | 3. | To Compound The Error, The District Court Permitted Only A One-Sided Presentation Of The Facts Underlying FTB's Administrative Conclusions | 52 |
|  | E. |  | Common Law Claims | 54 |
|  |  | 1. | Hyatt Misrepresents The Scope Of This Court's 2002 Decision Concerning His Common Law Claims And The Standard of Review | 54 |
|  |  |  | a. The Petition and This Court's June 13, 2001 Order; Rehearing Proceedings | 54 |
|  |  |  | b. The April 4, 2002 Decision. | 55 |
|  |  |  | c. The Legal Effect of the April 4, 2002 Decision. | 56 |
|  |  | 2. | The Applicable Standard of Review | 57 |
|  |  | 3. | Hyatt's Fraud Claim Fails As A Matter Of Law | 59 |
|  |  |  | a. Hyatt's Contention That The Elements Of Common Law Fraud Are Less Exacting When A Government Agency Is Accused Is Unsupported In The Law And Without Merit | 59 |

McDONALD·CARANO·WILSON ᴸᴸᴾ
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

ii

RJN002452

b.    Implied Promises Are Legally Insufficient To Support A Fraud Claim ........................................................................... 61

     i.    FTB Did Not Explicitly Or Implicitly Promise Hyatt It Would Treat Him Fairly And Impartially ..... 61

     ii.    FTB Did Not Promise Hyatt To Keep His Name, Address, Social Security Number Or The Fact He Was Under Audit Confidential ................................... 63

c.    There Was No Fraudulent Intent, Nor Could Such Be Legally Inferred ..................................................................... 64

d.    There Was No Justifiable Reliance ................................. 65

4.    Hyatt's Invasion of Privacy Claims Fail As A Matter Of Law ........ 66

a.    FTB's Disclosures Of Hyatt's Identity Information Was Made Strictly In The Context Of FTB's Investigation ......... 66

     i.    Credit Card Number .................................................. 67

     ii.    Tara Address ............................................................. 67

     iii.    Social Security Number ............................................ 69

     iv.    Hyatt's Name Only .................................................. 71

     v.    Purpose Of The Third-Party Contacts ...................... 72

b.    Nevada Does Not Recognize A Common Law Claim For Breach of Information Privacy; Such Claims Have Been Created By Legislatures or Congress ......................... 73

c.    There Was No Objective Expectation Of Privacy In The Information Disclosed By FTB As Part Of Its Audit ........... 74

d.    Since All Information Disclosed Was A Public Record, Hyatt's Claims Were Precluded By The Public Records Defense ............................................................................. 79

e.    There Was No Evidence Presented to Support The False Light Claim ...................................................................... 82

f.    FTB's Litigation Rosters Were Privileged ..................... 83

     i.    Litigation Privilege .................................................. 83

     ii.    Fair Report Privilege ................................................ 84

g.    Without the Litigation Rosters, There Was No Evidence of the Required Element of Publicity for the Invasion of Privacy Claims .................................................................. 86

RJN002453

        h.     The Breach Of Confidential Relationship Claim Failed As A Matter Of Law ...................................................... 87

   5.     Hyatt's Abuse of Process Claim Fails As A Matter of Law ........... 89

        a.     The Demand Letters Were Neither Improper Nor Illegal ..... 89

        b.     FTB Did Not Issue Administrative Subpoenas During Its Audits .................................................................................... 90

        c.     An Abuse of Process Claim Cannot be Based on the Mere Issuance of a Subpoena ................................................. 91

        d.     "Official Looking" Papers Are Not Enough For Abuse Of Process .............................................................................. 92

   6.     Hyatt's Intentional Infliction Of Emotional Distress Claim Fails As A Matter Of Law ............................................................... 94

        a.     The District Court's Sanction Limiting Hyatt To Garden Variety Emotional Distress Precluded Hyatt From Recovery For His IIED Claim ........................................... 94

        b.     Hyatt Asks This Court To Presume Severe Emotional Distress ................................................................................. 98

        c.     Nevada Law Requires Objectively Verifiable Indicia, But Hyatt Offered None ...................................................... 100

   7.     The District Court Erred In Her Treatment Of FTB's Statute Of Limitations Defense Both Before And During Trial ...................... 101

        a.     Hyatt's Legal Contentions Related To The Statute Of Limitations Are Inaccurate .................................................. 102

        b.     The Uncontroverted Evidence Placed Hyatt On Notice Of His Claims in 1995 ......................................................... 104

   8.     The District Court Erred By Effectively Creating An Irrebuttable Presumption Against FTB ..................................... 107

F.    The Compensatory Damages Were Legally Improper .............................. 109

   1.     Standard of Review Regarding Compensatory Damages .............. 110

   2.     All Compensatory Damages Should Have Been Statutorily Capped .......................................................................................... 110

        a.     Hyatt's Arguments Against the Application of Comity Fail ...................................................................................... 111

             i.     Hyatt's General Arguments and His "Special Immunity" Argument .............................................. 111

McDONALD·CARANO·WILSON™

100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

iv

RJN002454

    ii. Hyatt's Arguments Regarding Compensatory Damages Used for Deterrence and Punishment ....... 112

    iii. Hyatt's Argument Regarding Equal Treatment ....... 113

    iv. Hyatt's Full Faith and Credit Argument ................. 116

    v. Hyatt's Law of the Case Argument ......................... 117

    vi. Hyatt's Judicial Estoppel Argument ....................... 119

  3. There Was No Evidence Of Invasion Of Privacy Damages .......... 121

  4. The Emotional Distress Damages Cannot Stand ........................... 124

   a. Hyatt's Limited Garden Variety Emotional Distress Imposed As A Discovery Sanction Can Not Support An $85 Million Award .............................................................. 125

   b. The Trial Judge Erred By Prohibiting FTB From Introducing Evidence Of Alternative Causes Of Emotional Distress ................................................................ 128

 G. The Punitive Damages Award Cannot Be Upheld ..................................... 130

  1. Comity Requires The Punitive Damages Award To Be Vacated .. 130

  2. Hyatt's Reference To Punitive Damages Against The IRS Is Irrelevant Since A Statute Permits Such An Award Against The IRS ...................................................................................................... 135

  3. Legal Excessiveness ....................................................................... 137

   a. Degree of Reprehensibility ................................................... 137

   b. Ratio of Punitive Damages to Actual Harm ....................... 138

   c. Comparison to Other Criminal and Civil Penalties ............ 140

 H. No Prejudgment Interest Should Have Been Allowed .............................. 141

  1. It Is Impossible To Determine What Part Of The Verdict Represented Past Damages .............................................................. 141

  2. There Is No Recovery For Prejudgment Interest For Damages Suffered After Service Of The Complaint ....................................... 142

IV. CONCLUSION ON APPEAL ............................................................................... 145

McDONALD·CARANO·WILSON<sup>llp</sup>
100 WEST LIBERTY STREET, 10th FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

v

RJN002455

I.    INTRODUCTION TO ANSWERING BRIEF ON CROSS-APPEAL ............... 145

II.   STATEMENT OF FACTS ON CROSS-APPEAL ............................................. 145

      A.    Background Facts ........................................................................... 145

      B.    The District Court's Ruling ............................................................ 150

      C.    District Court Explained A Second Time That Hyatt's Proffered
            Evidence Was Speculative ............................................................. 150

      D.    The District Court Repeated Its Ruling A Third Time............................... 151

III.  LEGAL ARGUMENT ON CROSS-APPEAL ...................................................... 151

      A.    Standard of Review ........................................................................ 151

            1.    Evidentiary Decisions are Entitled to Review Under an Abuse
                  of Discretion Standard................................................................ 151

            2.    The District Court Properly Applied *Wood v. Safeway, Inc.* ......... 152

      B.    The District Court Properly Found That Hyatt's Proffered Proof of
            Actual Causation Was Based Only Upon Speculation and Therefore
            Inadmissible .................................................................................... 152

      C.    Hyatt's Reliance on *Frantz v. Johnson* is Unavailing ............................... 155

      D.    Causation Standards ....................................................................... 156

IV.   CONCLUSION ON CROSS-APPEAL ............................................................... 158

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

vi

1

2 Cases

3 1996 Nev. Op. Att'y Gen. No. 26 (Sept. 13, 1996) .......................................................70, 78

4 Ace Truck & Equip. Rentals, Inc. v. Kahn,

5    103 Nev. 503 , 746 P. 2d 132 (1987).........................................92, 112, 113, 138

6 Ainsworth v. Combined Ins. Co.,

7    105 Nev. 237, 774 P. 2d 1003 (1989)...........................................112, 113, 139

8 Alam v. Reno Hilton Corp.,

9    819 F. Supp. 905 (D. Nev. 1993)..............................................................99

10 Albios v. Horizon Communities, Inc.,

11    122 Nev. 409, 132 P.3d 1022 (2006) ........................................................142

12 Alex Novack & Sons v. Hoppin,

13    77 Nev. 33, 359 P.2d 390 (1961)...............................................................6

14 Allstate Ins. Co. v. Thorpe,

15    123 Nev. 565, 170 P.3d 989 (2007)...........................................................52

16 Argentina Consol. Min. Co. v. Jolly Urga Wirth Woodbury & Standish,

17    125 Nev. ___, 216 P.3d 779 (2009)............................................................34

18 ASAP Storage, Inc. v. City of Sparks,

19    123 Nev. 639, 173 P.3d 734 (2007)........................................................34, 35

20 Bartmettler v. Reno Air, Inc.,

21    114 Nev. 441 , 956 P.2d 1382 (1998).............................................57, 95, 100

22 Barrett v. United States,

23    100 F.3d 35 (5th Cir. 1996) .................................................................135

24 Bass-Davis v. Davis,

25    122 Nev. 442, 134 P.3d 103 (2006)..........................................................107

26 Beightler v. Suntrust Banks, Inc.,

27    2:07-CV-02532-DV, 2008 WL 1984508  (W.D. Tenn. Apr. 30, 2008)............................97

28 Bemis v. Estate of Bemis,

   114 Nev. 1021, 967 P.2d 437 (1998)..........................................................103

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002457

Berkovitz by Berkovitz v. United States,
    486 U.S. 531 (1988)..............................................................................39

Bernhardt v. Los Angeles County,
    339 F.3d 920 (9th Cir. 2003) ............................................................119

Betsinger v. D.R. Horton, Inc.,
    126 Nev. ___, ___ P.3d ___ (Adv. Opn. 17, May 27, 2010).........................95, 98

Blackburn v. United States,
    100 F.3d 1426 (9th Cir. 1996) ...........................................................41

BMW of North America, Inc. v. Gore,
    517 U.S. 559 (1996)............................................................................138

Bogley's Estate v. United States,
    514 F.2d 1027 (Ct. Cl. Apr. 16, 1975)..................................................40

Bolen v. Dengel, CIV.A. ,
    00-783, 2004 WL 2984330 (E.D. La. Dec. 16, 2004) ..........................36

Bolt v. United States
    509 F.3d 1028 (9th Cir. 2007) ........................................................40, 41

Bongiovi v. Sullivan,
    122 Nev. 556, 138 P.3d 433 (2006).............................112, 130, 137, 138, 140, 141

Bowden v. Lincoln County Health Sys.,
    08-10855, 2009 WL 323082 (11th Cir. Feb. 10, 2009) ..................135

Bower v. Harrah's Laughlin, Inc.,
    125 Nev. ___, 215 P.3d 709 (2009) .......................................................4

Bulbman, Inc. v. Nevada Bell,
    108 Nev. 105 , 825 P.2d 588 (1992)....................................41, 62, 64

Bull v. McCuskey,
    96 Nev. 706, 615 P.2d 957 (1980) ....................................................92

Butler ex rel. Biller v. Bayer,
    123 Nev. 450, 168 P.3d 1055 (2007)........................33, 36, 39, 44, 60

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

viii

Buzz Stew, LLC v. City of N. Las Vegas,
   ___ Nev. ___, 181 P.3d 670 (2008) ................................................................98

Catalina v. Crawford,
   483 N.E.2d 486 (Ohio Ct. App. 1984) ....................................................35, 36

Chowdhry v. NLVH, Inc.,
   109 Nev. 478 , 851 P.2d 459 (1993) ...............................................................95

City of Boulder City v. Boulder Excavation
   124 Nev. ___, 191 P.3d 1175 ...............................................................30, 34

City of Newport v. Fact Concerts, Inc.,
   453 U.S. 247 (1981) ...............................................130, 131, 132, 133, 134

Clark Sanitation, Inc. v. Sun Valley Disposal Co.,
   87 Nev. 338, 487 P.2d 337 (1971) ..................................................................66

Clear Channel Outdoor, Inc. v. Adver. Display Sys.,
   A102492, 2004 WL 2181793 (Cal. Ct. App. Sept. 29, 2004) ...............138, 139

Coffin v. Bridges,
   72 F.3d 126 (4th Cir. 1995) ............................................................................96

Combe v. Cinemark USA, Inc,
   1:08-CV-142 TS, 2009 WL 3584883  (D. Utah Oct. 26, 2009) ...............97-98

ComputerXpress Inc. v. Jackson,
   113 Cal. Rptr. 2d 625 (Cal. Ct. App. 2001) ...................................................91

Cox Broad. Corp. v. Cohn,
   420 U.S. 469 (1975) .......................................................................................79

Couch v. United States,
   409 U.S. 322 (1973) .......................................................................................77

Coulthurst v. United States,
   214 F.3d 106 (2d Cir. 2000) ...........................................................................45

Davel Communications, Inc. v. Qwest Corp.,
   460 F.3d 1075 (9th Cir. 2006) .......................................................................103

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002459

Davis v. City of Las Vegas,
478 F.3d 1048 (9th Cir. 2007) ....................................................................35

Dep't of Revenue of Ky v. Davis,
553 U.S. 328 (2008)................................................................................115

Dictor v. Creative Mgmt. Services, LLC,
126 Nev. __, 223 P.3d 332 (2010).............................................48, 57, 117, 119

Doe v. Kaiser,
CIVA 6:06-CV-1045DEP, 2007 WL 2027824 (N.D.N.Y. July 9, 2007)...................98, 99

E.E.O.C. v. California Psychiatric Transitions,
258 F.R.D. 391 (E.D. Cal. 2009) .................................................................97

Ellis v. SmithKline Beecham Corp.,
C07-5302RJB, 2008 WL 3166385 (W.D. Wash. Aug. 5, 2008).......................................96

Evans v. Dean Witter Reynolds, Inc.,
116 Nev. 598 , 5 P.3d 1043 (2000) .................................................................140

Falline v. GNLV Corp.,
107 Nev. 1004, 823 P.2d 888 (1991) ............................................................32, 33

Fernandez-Wells v. Beauvais,
983 P.2d 1006 (N.M. 1999) .......................................................................87

Fink v. Oshins,
118 Nev. 428, 49 P.3d 640 (2002) ................................................................84

Flax v. United States,
847 F.Supp. 1183 (D.N.J. 1994) .................................................................52

Flowers v. Carville,
310 F.3d 1118 (9th Cir. 2002) ..............................................................82, 102

Ford v. Zalco Realty, Inc.,
CIV.A 1:08-CV-1318, 2010 WL 378521 (E.D. Va. Feb. 1, 2010) ...............................96

Foreman & Clark Corp. v. Fallon,
479 P.2d 362 (Cal. 1971) ........................................................................28

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

x

Forster v. Manchester,
189 A.2d 147 (Pa. 1963) .................................................................. 76

Fotiades v. Hi-Tech Auto Collision Painting Services, Inc.,
E029854, 2001 WL 1239716 (Cal. Ct. App. Oct. 17, 2001) ........................... 122

Franchise Tax Bd. of California v. Hyatt,
538 U.S. 488 (2003) ..................................................... 111, 113, 116, 120

Franklin Sav. Corp. v. United States,
180 F.3d 1124 (10th Cir. 1999) ............................................ 31, 33, 36, 37, 38

Frantz v. Johnson,
116 Nev. 455, 999 P.2d 351 (2000) ............................................ 155, 156

Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia,
812 F.2d 105 (3d Cir. 1987) .............................................................. 75

Fritz v. Wright,
907 A.2d 1083 (Pa. 2006) ................................................................. 6

G & H Associates v. Ernest W. Hahn, Inc.,
113 Nev. 265, 934 P.2d 229 (1997) ..................................................... 103

Geragos v. Borer,
B208827, 2010 WL 60639 (Cal. Ct. App. Jan. 11, 2010) ........................... 122

Gilbert v. Warren,
95 Nev. 296, 594 P.2d 696 (1979) ...................................................... 109

Greidinger v. Davis,
988 F.2d 1344 (4th Cir. 1993) ........................................................ 80, 81

Greywolf v. Carroll,
151 P.3d 1234 (Alaska 2007) ............................................................. 75

Guar. Nat. Ins. Co. v. Potter,
112 Nev. 199, 912 P.2d 267 (1996) ..................................................... 126

Hallmark v. Eldridge,
124 Nev. ___, 189 P.3d 646 (2008) .................................................... 152

RJN002461

Hawkins v. Holloway,
   316 F.3d 777 (8th Cir. 2003) ................................................................... 35

Hay v. Shell Oil Co.,
   986 S.W.2d 772 (Tex. App. 1999) ......................................................... 101

Hazelwood v. Harrah's,
   109 Nev. 1005, 862 P.2d 1189 (1993) ......................................... 110, 124

Hedges v. Rawley,
   419 N.E.2d 224 (Ind. Ct. App. 1981) ........................................................ 8

Heights Cmty. Cong. v. Veterans Admin.,
   732 F.2d 526 (6th Cir. 1984) ................................................................... 80

Hess v. United States,
   361 U.S. 314 n. 7, (1960) ......................................................................... 60

Higgs v. State,
   ___ Nev. ___, 222 P.3d 648 (2010) ....................................................... 152

Holland Livestock Ranch v. B & C Enterprises,
   92 Nev. 473, 553 P.2d 950 (1976) ......................................................... 109

Horgan v. Indart,
   41 Nev. 228, 168 P. 953 (1917) ............................................................. 153

Horvath v. Burt,
   98 Nev. 186, 643 P.2d 1229 (1982) ........................................................... 4

Hsu v. County of Clark,
   123 Nev. 625, 173 P.3d 724 (2007) ............................................... 117, 118

Hurn v. Woods,
   183 Cal.Rptr. 495 (Cal. Ct. App. 1982) .................................................... 4

Hyatt v. Boone,
   146 F.3d 1348 (Fed. Cir. 1998) ....................................... 129, 156, 158

Hyatt v. Boone,
   525 U.S. 1141 (1999) .............................................................................. 129

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002462

In re Consol. RNC Cases,

    127, 2009 WL 130178  (S.D.N.Y. Jan. 8, 2009) ............................................96

In re NTL, Inc. Sec. Litig.,

    244 F.R.D. 179 (S.D.N.Y. 2007) ..................................................................108

In re Subpoenas Duces Tecum Nos. A99-0001, A99-0002, A99-0003 and A99-0004,

    51 F. Supp. 2d 726 (W.D. Va. 1999) ..............................................................90

J.J. Indus., LLC v. Bennett,

    119 Nev. 269, 71 P.3d 1264 (2003) ..................................................................4

Jackson v. Harvard Univ.,

    900 F.2d 464 (1st Cir. 1990) .........................................................................109

Javeed v. Covenant Med. Ctr., Inc.,

    218 F.R.D. 178 (N.D. Iowa 2001) ..................................................................97

Jessamy v. Ehren,

    153 F. Supp. 2d 398 (S.D.N.Y. 2001) .............................................................96

Johnson v. Am. Airlines, Inc.,

    834 F.2d 721 (9th Cir. 1987) .........................................................................157

Johnson v. Sawyer,

    47 F.3d 716 (5th Cir. 1995) .................................................68, 73, 78, 81, 88

Johnson v. Sawyer,

    760 F. Supp. 1216 (S.D. Tex. 1991) ...............................................................88

Jones v. United States,

    9 F. Supp. 2d 1119 (D. Neb. 1998) ...............................................................156

Jordan v. State ex rel. Dep't. of Motor Vehicles & Pub. Safety,

    121 Nev. 44, 110 P.3d 30 (2005) ....................................................................98

Kalantar v. Lufthansa German Airlines

    402 F.Supp.2d 130 (D.D.C. 2005) ................................................................101

Kelly v. United States,

    241 F.3d 755 (9th Cir. 2001) ....................................................................40, 41

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

xiii

Keystone Realty v. Osterhus,
107 Nev. 173, 807 P.2d 1385 (1991) ............................................................... 143

Kidron v. Movie Acquisition Corp.,
47 Cal.Rptr.2d 752 (Cal. Ct. App. 1995) ............................................................ 4

Koch v. Cox,
489 F.3d 384 (D.C. Cir. 2007) ........................................................................ 97

Kovacs v. Acosta,
106 Nev. 57, 787 P.2d 368 (1990) .................................................................. 92

LaMantia v. Redisi,
118 Nev. 27, 38 P.3d 877 (2002) ............................................................... 89, 92

Las Vegas-Tonopah-Reno Stage Line, Inc. v. Gray Line Tours of S. Nevada,
106 Nev. 283 , 792 P.2d 386 (1990) .......................................................... 143, 144

Lee v. Ball,
121 Nev. 391, 116 P.3d 64 (2005) ................................................................. 144

Libertatia Assoc., Inc. v. U.S.,
46 Fed. Cl. 702 (2000) ................................................................................. 35

Liles v. Am. Corrective Counseling Services, Inc.,
131 F. Supp. 2d 1114 (S.D. Iowa 2001) ........................................................... 92

Limone v. U.S.,
497 F.Supp.2d 143 (D. Mass. 2007) .......................................... 37, 45, 126, 127

Lindstrom v. Hunt Enterprises, Inc.,
B189275, 2007 WL 4127191 (Cal. Ct. App. Nov. 21, 2007) ............................... 96

Lubbe v. Barba,
91 Nev. 596, 540 P.2d 115 (1975) .................................................................. 65

Lubin v. Kunin,
117 Nev. 107, 17 P.3d 422 (2001) .................................................................. 86

Madajski v. Bay County Dep't of Public Works,
297 N.W.2d 642 (Mich. Ct. App. 1980) ........................................................... 60

McDONALD·CARANO·WILSON<sup>LLP</sup><br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>P.O. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775/788-2000 • FAX 775/788-2020

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RJN002464

Mainor v. Nault,
   120 Nev. 750, 101 P.3d 308 (2004) ..................................................58, 110

Marcuse v. Del Webb Communities, Inc.,
   123 Nev. 278, 163 P.3d 462 (2007) ...........................................................119

Marleau v. Truck Ins. Exch.,
   37 P.3d 148 (Or. 2001) ...............................................................................87

Marre v. United States,
   38 F.3d 823 (5th Cir. 1994) .......................................................................136

Martin v. Sears, Roebuck & Co.,
   111 Nev. 923, 899 P.2d 551 (1995) ...............................................................4

Martinez v. Maruszczak,
   123 Nev. 433, 168 P.3d 720 (2007) .................................28, 29, 32, 33, 35, 39

Maryland Environmental Trust v. Gaynor,
   803 A.2d 512 (Md. 2002) .....................................................................60, 88

Masonry & Tile Contractors Ass'n of S. Nevada v. Jolley, Urga & Wirth, Ltd.,
   113 Nev. 737 , 941 P.2d 486 (1997) ............................................................57

Massey v. Litton,
   99 Nev. 723 , 669 P.2d 248 (1983) ............................................................103

Matter of Sheffield,
   465 So. 2d 350 (Ala. 1984) .........................................................................35

Matter of TPI Int'l Airways, Inc.,
   141 B.R. 512 (Bankr. S.D. Ga. 1992) .....................................................36, 37

McCray v. City of Dothan,
   169 F.Supp. 2d 1260 (M.D. Ala. 2001) .......................................................35

McLain v. Boise Cascade Corp.,
   533 P.2d 343 (Or. 1975) .............................................................................76

McNutt v. New Mexico State Tribune Co.,
   538 P.2d 804 (N.M. Ct. App. 1975) .............................................................77

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775/788-2000 • FAX 775/788-2020

xv

Melendez v. Illinois Bell Tel. Co.,
  79 F.3d 661 (7th Cir. 1996) ...................................................................8

Memphis Cmty. Sch. Dist. v. Stachura,
  477 U.S. 299 (1986)..........................................................................113

Mesgate Homeowners' Ass'n v. City of Fernley,
  124 Nev. ___, 194 P.3d 1248 (2008)....................................................52

Mianecki v. Second Judicial Dist. Court, In & For Washoe County,
  99 Nev. 93, 658 P.2d 422 (1983) .......................................................112

Miller v. Jones,
  114 Nev. 1291 , 970 P.2d 571 (1998)...........................95, 96, 98, 99, 100

Miller v. Schnitzer,
  78 Nev. 301 , 371 P.2d 824 (1962).....................................................110

Minehan v. United States,
  75 Fed. Cl. 249 (2007) ........................................................................40

Montesano v. Donrey Media Group,
  99 Nev. 644 , 668 P.2d 1081 (1983).........................................79, 80, 81

Morris v. Bank of Am. Nevada,
  110 Nev. 1274 , 886 P.2d 454 (1994)...................................................59

Morsicato v. Sav-On Drug Stores, Inc.,
  121 Nev. 153, 111 P.3d 1112 (2005)..................................................155

Mugavero v. Arms Acres, Inc.,
  680 F. Supp. 2d 544 (S.D.N.Y. 2010) ..................................................97

Multimedia WMAZ, Inc. v. Kubach,
  443 S.E.2d 491 (Ga. Ct. App. 1994)....................................................81

Myers v. Bennett Law Offices,
  238 F. Supp. 2d 1196 (D. Nev. 2002)..................................................100

Nelson v. City of Las Vegas,
  99 Nev. 548, 665 P.2d 1141 (1983)................................................95, 99

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

xvi

Nelson v. Heer,
   123 Nev. 217, 163 P.3d 420 (2007) ...................................................157

Nevada Credit Rating Bureau, Inc. v. Williams,
   88 Nev. 601 , 503 P.2d 9 (1972) .......................................................92

Nevada Power Co. v. Monsanto Co.,
   955 F.2d 1304 (9th Cir. 1992) .........................................................105

Nevada v. Hall,
   440 U.S. 410 (1979)..............................................................115, 116

Nittinger v. Holman,
   119 Nev. 192 , 69 P.3d 688 (2003) ...................................................132

Olivero v. Lowe,
   116 Nev. 395, 995 P.2d 1023 (2000) ..................................................96

Ortiz v. Los Angeles Police Relief Ass'n,
   120 Cal. Rptr. 2d 670 (Cal. Ct. App. 2002) .....................................75, 76

Owens v. Treder,
   873 F.2d 604 (2d Cir. 1989)...............................................................7

Pac. Maxon, Inc. v. Wilson,
   96 Nev. 867, 619 P.2d 816 (1980) .....................................................65

Pacheco v. Rogers & Breece, Inc.,
   579 S.E.2d 505 (N.C. App. 2003) ......................................................97

Page v. United States,
   729 F. 2d 818 (D.C. Cir. 1984) ........................................................103

People for the Ethical Treatment of Animals v. Berosini,
   111 Nev. 615 , 895 P.2d 1269 (1995)...........................................75, 76, 79

Peoples Bank & Trust Co. of Mountain Home v. Globe Int'l Pub., Inc.,
   978 F.2d 1065 (8th Cir. 1992) .........................................................123

Perry v. Jordan,
   111 Nev. 943, 900 P.2d 335 (1995) ...............................................87, 88

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

xvii

Peters v. Vinatieri,
9 P.3d 909 (Wash. Ct. App. 2000)................................................................75

Petersen v. Bruen,
106 Nev. 271 , 792 P.2d 18 (1990)..............................................................103

Pooler v. United States,
787 F.2d 868 (3d Cir. 1986)..........................................................................52

Posadas v. City of Reno,
109 Nev. 448, 851 P.2d 438 (1993)........................................................60, 92

Powers v. United Services Auto. Ass'n.,
114 Nev. 690, 962 P. 2d 596 (1998)............................................................143

Pure Power Boot Camp v. Warrior Fitness Boot Camp,
587 F. Supp. 2d 548 (S.D.N.Y. 2008) ........................................................109

Ramada Inns, Inc. v. Sharp,
101 Nev. 824 , 711 P.2d 1 (1985).................................................................143

Ransdell v. Clark County,
124 Nev.____, 192 P.3d 756 (2008)..............................29, 30, 31, 40

Reata Const. Corp. v. City of Dallas,
197 S.W.3d 371 (Tex. 2006)..........................................................................60

Reisman v. Caplin,
375 U.S. 440 (1964).......................................................................................91

Reynolds v. United States,
549 F.3d 1108 (7th Cir. 2008) ......................................................................31

Robbiano v. Bovet,
24 P.2d 466 (Cal. 1933)...............................................................................153

Rogers v. United States,
187 F.Supp.2d 626 (N.D. Miss. 2001)..............................................33, 36, 37

Ruhlmann v. Ulster County Dept. of Soc. Services,
194 F.R.D. 445 (N.D.N.Y. 2000)...................................................................95

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

xviii

Runion v. State,
  116 Nev. 1041 , 13 P.3d 52 (2000) .................................................76, 90

Sahara Gaming Corp. v. Culinary Workers Union Local 226,
  115 Nev. 212, 984 P.2d 164 (1999) ...........................................................84

San Paolo U.S. Holding Co., Inc. v. Simon,
  538 U.S. 974 (2003) ( ..............................................................................139

Sands Regent v. Valgardson,
  105 Nev. 436 , 777 P.2d 898 (1989) ..........................................................73

Schlatter v. Eighth Judicial Dist. Court In & For Clark County,
  93 Nev. 189, 561 P.2d 1342 (1977) ......................................................76, 85

SEC v. ESM Gov't Sec., Inc.,
  645 F.2d 310 (5th Cir. 1981) ..............................................................60, 92

Shea v. Office of Thrift Supervision,
  934 F.2d 41 (3d Cir. 1991)..........................................................................91

Sheets v. Salt Lake County,
  45 F.3d 1383 (10th Cir. 1995) ...................................................................80

Shuette v. Beazer Homes Holdings Corp.,
  121 Nev. 837 , 124 P.3d 530 (2005) .................................................141, 142

Shutt v. State,
  117 N.E.2d 892 (Ind. 1954) .....................................................................153

Siggelkow v. Phoenix Ins. Co.,
  109 Nev. 42 , 846 P.2d 303 (1993) ...........................................................113

Simon v. San Paolo U.S. Holding Co., Inc.,
  B121917, 2001 WL 1380836 (Cal. Ct. App. 2001)...................................139

Skender v. Brunsonbuilt Const. & Dev. Co., LLC,
  122 Nev. 1430, 148 P.3d 710 (2006) ...........................................................6

Slack v. Schwartz,
  63 Nev. 47 , 161 P.2d 345 (1945) .....................................................109, 124

McDONALD·CARANO·WILSON<sup>LL</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002469

Smith v. Timm,

    96 Nev. 197, 606 P.2d 530 (1980) .................................................................. 109

Snyder v. Viani,

    112 Nev. 568, 916 P.2d 170 (1996) ................................................................. 4

State Farm Mut. Auto. Ins. Co. v. Campbell,

    538 U.S. 408 (2003) ............................................................... 113, 126, 137, 139, 140

State Franchise Tax Bd. v. Hyatt,

    C043627, 2003 WL 23100266 (Cal. Ct. App. Dec. 31, 2003) ......................... 23

State Indus. Ins. Sys. v. Buckley,

    100 Nev. 376 , 682 P.2d 1387 (1984) .............................................................. 109

State of Ga. v. City of E. Ridge, Tenn.,

    949 F. Supp. 1571 (N.D. Ga. 1996) ............................................................... 134

State v. Eaton,

    101 Nev. 705, 710 P.2d 1370 (1985) .......................................................... 144, 157

State v. Eighth Judicial Dist. Court ex rel. County of Clark,

    118 Nev. 140, 42 P.3d 233 (2002) ................................................................. 60

State v. Engesser,

    661 N.W.2d 739 (S.D. 2003) ......................................................................... 109

Stickler v. Quilici,

    98 Nev. 595 , 655 P.2d 527 (1982) ................................................................. 141

Stryker Corp. v. U.S. Dept. of Justice,

    CIV.A. 08-4111 (WJM), 2009 WL 424323 (D.N.J. Feb. 18, 2009) ............ 91, 92

Talley v. Family Dollar Stores of Ohio, Inc.,

    542 F.3d 1099 (6th Cir. 2008) ....................................................................... 100

Tallman v. First Nat. Bank of Nev.,

    66 Nev. 248, 208 P.2d 302 (1949) ................................................................. 64

Tanzini v. Marine Midland Bank,

    978 F. Supp. 70 (N.D.N.Y. 1997) ................................................................. 99

McDONALD·CARANO·WILSON℠

100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002470

Taus v. Loftus,

    151 P.3d 1185 , (Cal. 2007) ...............................................................79

Terbush v. United States,

    516 F.3d 1125 (9th Cir. 2008) .......................................................31, 40

Tippett v. United States,

    108 F.3d 1194 (10th Cir. 1997) .........................................................41

Tobias v. Phelps,

    375 N.W.2d 365 (Mich. Ct. App. 1985) .............................................35

Torrealba v. Kesmetis,

    124 Nev. __, 178 P.3d 716 (2008) ....................................................152

Tuck Beckstoffer Wines LLC v. Ultimate Distributors, Inc.,

    682 F. Supp. 2d 1003 (N.D. Cal. 2010) .............................................92

Turic v. Holland Hospitality, Inc.,

    85 F.3d 1211 (6th Cir. 1996) ............................................................99

United Exposition Serv. Co. v. State Indus. Ins. Sys.,

    109 Nev. 421, 851 P.2d 423 (1993) ..................................................155

United States v. Gaubert,

    499 U.S. 315 (1991) ....................................................................44, 45

United States v. Miller,

    425 U.S. 435 (1976) .........................................................................77

United States v. Mitchell,

    763 F. Supp. 1262(D. Vt. 1991) ........................................................88

United States v. Powell,

    379 U.S. 48 (1964) ...........................................................................93

Univ. of Nevada, Reno v. Stacey,

    116 Nev. 428 , 997 P.2d 812 (2000) ..................................................58

Vallinoto v. DiSandro,

    688 A.2d 830 (R.I. 1997) ................................................................100

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002471

Veney v. Ojeda,
   321 F. Supp. 2d 733 (E.D. Va. 2004) ............................................................. 101

Virgil v. Time, Inc.,
   527 F.2d 1122 (9th Cir. 1975) ........................................................................ 87

Wallace v. State,
   77 Nev. 123, 359 P.2d 749 (1961) ................................................................... 6

Watson v. Las Vegas Valley Water Dist.,
   378 F. Supp. 2d 1269(D. Nev. 2005) ........................................................ 99, 100

Whalen v. Roe,
   429 U.S. 589 (1977) ....................................................................................... 75

Wickliffe v. Sunrise Hosp., Inc.,
   104 Nev. 777, 766 P.2d 1322 (1988) ............................................................. 118

Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,
   810 F.2d 243 (D.C. Cir. 1987) ...................................................................... 119

Wood v. Safeway, Inc.,
   121 Nev. 724, 121 P.3d 1026 (2005) ............................................................. 152

Wooten v. Certainteed Corp.,
   08-2508-CM, 2009 WL 2407715  (D. Kan. Aug. 4, 2009) ............................. 98

Wrenn v. State,
   89 Nev. 71 , 506 P.2d 418 (1973) .................................................................. 155

Wynn v. Smith,
   117 Nev. 6 , 16 P.3d 424 (2001) ..................................................................... 86

Y.G. v. Jewish Hosp. of St. Louis,
   795 S.W.2d 488 ............................................................................................. 80

Yamaha Motor Co., U.S.A. v. Arnoult,
   114 Nev. 233, 955 P.2d 661 (1998) ................................................................. 4

Zabin v. Picciotto,
   896 N.E.2d 937 (Mass. App. Ct. 2008) .......................................................... 96

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002472

Zinda v. Louisiana-Pac. Corp.,

    409 N.W.2d 436 (Wis. Ct. App. 1987) ................................................ 123, 141

Statutes

5 U.S.C. § 522a et. seq. ....................................................................... 73

5 U.S.C. § 552a .................................................................................. 42

Cal Rev. & Tax. Code § 17014(a) ...................................................... 72

Cal. Civ. Code § 1798 et. seq. ............................................................ 73

Cal. Civ. Code § 1798.24(p) ............................................................... 42

Cal. Gov't Code § 818 ...................................................................... 131

Cal. Gov't Code §§ 11185(d) .............................................................. 90

Cal. Gov't Code §§ 11187(c) .............................................................. 90

Cal. Gov't Code §§ 11189 ................................................................... 90

Cal. Rev. & Tax Code § 19442 ........................................................... 21

Cal. Rev. & Tax Code § 19504(a) ....................................................... 90

Cal. Rev. & Tax Code §§ 19254 .................................................. 90, 146

Cal. Rev. & Tax Code §§ 19254, 26423 (1993) ................................... 17

Cal. Rev. & Tax. Code § 17016 .......................................................... 11

Cal. Rev. & Tax. Code § 19504(d) ...................................................... 90

NRS 11.190(4)(e) ............................................................................. 101

NRS 205.372 .................................................................................... 140

NRS 239B.030 ................................................................................... 73

NRS 239B.040 ................................................................................... 73

NRS 41.032 ....................................................................................... 32

NRS 41.032(2) ................................................................................... 32

NRS 41.035(1) .......................................................................... 111, 131

NRS 414.110 ..................................................................................... 34

NRS 42.005(1) ................................................................................. 139

NRS 42.007(1) ................................................................................. 132

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

xxiii

RJN002473

NRS 47.060 .................................................................................152

NRS 483.345 (1996) ...............................................................71, 78

NRS 50.275 ...............................................................................156

Rules

NRAP 28(a)(6) ...............................................................................3

NRAP 28(e) ............................................................................1,3,5

NRAP 28(e)(2) .........................................................................109

NRAP 28(j) ...................................................................................28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002474

1    I.      INTRODUCTION

2       Hyatt's view of this appeal is simple. He characterizes FTB's conduct as "bad faith"

3 no less than 218 times in his brief. He contends that the "jury was repeatedly instructed that

4 it was to evaluate FTB's conduct during its audits, and specifically whether, among other

5 things, the FTB conducted the audits in bad faith to support a predetermined conclusion that

6 Hyatt owed taxes." RAB 7:11-14 (Hyatt's brief does not include any citation to the record

7 for this proposition). He further contends that the jury made express findings of bad faith

8 against FTB after receiving that repeated instruction. <u>See, e.g.</u> RAB 1, 7, 9 (this contention

9 from Hyatt is not supported by citation to the record either). He then argues that the jury's

10 findings of bad faith were supported by substantial evidence (RAB 7, 9, 35), and therefore

11 the liability components of the judgment must be upheld. RAB 52-53.

12       In truth, the jury made *no* finding of bad faith, and they were *never* instructed to

13 determine if "the FTB conducted the audits in bad faith to support a predetermined

14 conclusion that Hyatt owed taxes," as falsely claimed by Hyatt. The verdict forms contain

15 no finding of bad faith. 54 AA 13308-09. The jury instructions describing the essential

16 elements of Hyatt's claims reveal that bad faith was not among those elements (53 AA

17 13218-50; 54 AA 251-87), therefore, no inference of bad faith can even be drawn from the

18 verdict. Moreover, Hyatt conceded during trial that "bad faith is not an element of any of

19 the causes of action." 51 AA 12502 (79); 12507 (99) (100); 12511 (110-111). His position

20 was crystal clear: "We have the burden of proof to prove the elements of our causes of

21 action, and *bad faith is not one of the elements of our causes of action*." (emphasis added).

22 51 AA 12508 (105). Hyatt conceded that he was not pursuing a bad faith claim (50 AA

23 12500 (70)) and he repeatedly objected to any instruction concerning bad faith, i.e. "We

24 don't believe that separate bad faith instructions should be given at all." 51 AA 12501 (77).

25 Against the record facts, Hyatt's bad faith emphasis in his opposition brief is egregiously

26 misleading.

27       Other aspects of Hyatt's brief are equally troubling and much of the length

28 necessitated by this reply stems from Hyatt's misleading factual contentions, misleading

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1

1   recitation of procedural history and misleading legal arguments. A particularly shocking

2   example concerns Hyatt's representations concerning jury instruction 24. In response to

3   FTB's argument that the jury was invited to second-guess FTB's residency and tax

4   conclusions, Hyatt denied that claim arguing that the jury was given instruction 24 which

5   advised:

6       [Y]ou are not permitted to make any determinations related to the propriety
        of the tax assessments issued by FTB against Hyatt, including, but not
7       limited to, the correctness or incorrectness of the amount of taxes assessed, or
        the determinations of FTB to assess Mr. Hyatt's penalties, or interest on
8       those tax assessments.

9

10  RAB 76:10-20. However, Hyatt fails to advise that the day after that instruction was given

11  he objected to that very language, the district court withdrew that very language telling the

12  jury it was given in error, and then she corrected that instruction with the following:

13      There is nothing in corrected instruction 24 that would prevent you during
        your deliberations from considering the inappropriateness or correctness of
14      the analysis conducted by FTB employees in reaching its residency
        determinations and conclusions. There is nothing in corrected instruction 24
15      that would prevent Malcolm Jumelet [Hyatt's expert witness] from rendering
        an opinion about the appropriateness or correctness of the analysis conducted
16      by FTB employees in reaching its residency determinations and conclusions.

17

18  53 AA 13013 (28-29); 13053 (20) – 13054 (22). Simply put, Hyatt's advocacy has

19  compounded the difficulty of determining this appeal.

20      There are three basic questions that this court must resolve to address the liability

21  component of the judgment. First, was any FTB conduct not immune under the new test for

22  discretionary function immunity? If none, this court need go no further, and dismissal is

23  mandated. Second, did Judge Walsh comply with jurisdictional limits placed on this case

24  by prior courts? If no, then dismissal is mandated on this independent ground under the

25  court's 2002 decision. Third, using only non-immune conduct, were any of Hyatt's common

26  law claims legally viable? If no, dismissal is again required. Hyatt has not answered any of

27  these three basic questions to his favor.

28      As to Hyatt's arguments supporting the jury's shocking damage awards, Hyatt urges

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

2

1   this court to expand permissible damages far beyond those allowed in any other case. Faced

2   with the fact that he offered no evidence of invasion of privacy damages, Hyatt argues that

3   $52 million is a just award for his "visceral" loss of privacy. See RAB 132. Forced to

4   acknowledge the discovery sanction which limited his compensable emotional distress to

5   garden variety, Hyatt argues severe emotional distress can be "presumed," $85 million

6   represents a fair sum for his general discomfort, and the other causes of his emotional

7   distress were irrelevant simply because he said so. RAB 134-137. Refusing to acknowledge

8   multiple limitations against imposition of punitive damages against government agencies,

9   Hyatt also argues it is fair to impose upon the citizens of California punitive damages in the

10  amount of $250 million. RAB 167-174. These are but a few of Hyatt's outlandish claims.

11  II.     FACTUAL RESPONSE

12          A.      Preface

13          FTB was obliged to file an opening brief which included "a statement of facts

14  relevant to the issues submitted for review with appropriate references to the record."

15  NRAP 28(a)(6). FTB complied, stating facts without characterization or inference and

16  supporting each fact with a reference to the appendix. NRAP 28(e).[1]  In response, Hyatt

17  contends, without citing any Nevada rule or case, that FTB must accept all factual findings

18  as drawn or described by Hyatt -- but not by the jury -- and that "FTB has now waived its

19  right to challenge these factual findings." RAB 54:6-7. Hyatt's contention is unsupported by

20  Nevada law.

21  _____

22  [1]While Hyatt accuses FTB of not complying with NRAP 28(e) (RAB 4:6-9), he fails to
    offer instances of which FTB's factual assertions were either not supported by citation to
23  the appendix, or that the appendix cite does not support the assertion. See RAB 4:6-9 To be
    submitted for the court's use is an electronic version of FTB's Opening Brief and this Reply
24  Brief/Cross-Appeal Answering Brief which contains embedded links or hyperlinks to both
25  the appendix citations and legal citations made therein. Once an electronic brief is opened a
    reader need only click on the link to have the reference to the appendix citation appear on
26  screen or the cited legal authority appear on screen. A review of FTB's briefs, either
    manually or through this expedited process, reveals that FTB fully complied with NRAP
27  28(e). The same cannot be said for Hyatt's brief.

28

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

3

1    As the prevailing party Hyatt is entitled to all favorable or reasonable inferences

2    when conflicting evidence exists on a material issue. <u>Yamaha Motor Co., U.S.A. v. Arnoult</u>,

3    114 Nev. 233, 238, 955 P.2d 661, 664 (1998).  However, it is up to the court, not the

4    prevailing party, to determine whether an inference is reasonable. <u>See</u> <u>Hurn v. Woods</u>, 183

5    Cal.Rptr. 495, 497 (Cal. Ct. App. 1982).  "Since an inference may not be illogically or

6    unreasonably drawn, nor can an inference be based on mere possibility or flow from

7    suspicion, imagination, speculation, supposition, surmise, conjecture or guesswork,"

8    decisions concerning permissible inferences are questions of law for the appellate court.

9    <u>Kidron v. Movie Acquisition Corp.</u>, 47 Cal.Rptr.2d 752, 757 (Cal. Ct. App. 1995).

10    This court has repeatedly determined, as a matter of law, whether a particular

11    inference *can* reasonably be drawn from the evidence. <u>See, e.g.</u>, <u>Bower v. Harrah's</u>

12    <u>Laughlin, Inc.</u> 125 Nev. ___, 215 P.3d 709, 725 (2009) (de novo determination of whether

13    reasonable inferences could be drawn); <u>J.J. Indus., LLC v. Bennett</u>, 119 Nev. 269, 276, 71

14    P.3d 1264, 1268 (2003) (determining de novo that evidence did not support reasonable

15    inference); <u>Snyder v. Viani</u>, 112 Nev. 568, 576, 916 P.2d 170, 175 (1996) (finding as matter

16    of law that evidence did not support inference); <u>Martin v. Sears, Roebuck & Co.</u>, 111 Nev.

17    923, 930, 899 P.2d 551, 556 (1995) (finding as a matter of law that no reasonable inference

18    of age discrimination could be drawn from evidence); <u>Horvath v. Burt</u>, 98 Nev. 186, 187,

19    643 P.2d 1229, 1230-31 (1982) (de novo review of whether evidence supported reasonable

20    inference).

21    If Hyatt disagreed with FTB's statement of facts, he was obligated to cite record

22    facts, not simply offer suggested inferences or conclusions he believes can be drawn from

23    the evidence. Offering the record facts would have permitted the court the opportunity to

24    determine whether his inferences were reasonable or not. By failing to identify the evidence

25    underlying Hyatt's stated inferences, he deprives the court of the foundation for his

26    inferences and conclusions, and instead impermissively asks the court to accept his

27    interpretation at face value.

28    FTB found it impossible to address all of Hyatt's misrepresentations and still present

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR · RENO, NEVADA 89501
P.O. BOX 2670 · RENO, NEVADA 89505-2670
PHONE 775-788-2000 · FAX 775-788-2020

4

1  a brief manageable in length.  FTB does, however, address key factual points and does so

2  principally in the context of the legal discussion to which they pertain. A few issues,

3  however, are addressed immediately below.[2]

B.  The Jury's Verdict and The Material Issues Related to that Verdict

Because Hyatt materially misrepresented the jury's verdict, it is set out in full.



McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR · RENO, NEVADA 89501
P.O. BOX 2670 · RENO, NEVADA 89505-2670
PHONE 775/788-2000 · FAX 775/788-2020

[2]In addition, Hyatt was obligated to comply with NRAP 28(e), supporting each claimed factual assertion with a record cite, but he failed to do so, further complicating this court's task. A great portion of Hyatt's answering brief lacks citation to the record, and his method of identifying record citations in a single footnote (see RAB 10:23-26, footnote 12) was a mere ruse.

5

RJN002479

5. On Gilbert P. Hyatt's sixth cause of action for abuse of process against FTB, we find in favor of *GILBERT P. HYATT* [insert Gilbert P. Hyatt or FTB].

6. On Gilbert P. Hyatt's seventh cause of action for fraud against FTB, we find in favor of *GILBERT P. HYATT* [insert Gilbert P. Hyatt or FTB].

7. On Gilbert P. Hyatt's eighth cause of action for breach of confidential relationship against FTB, we find in favor of *GILBERT P. HYATT* [insert Gilbert P. Hyatt or FTB].

If you found in favor of FTB on all seven questions above, then proceed no further. If you found in favor of Gilbert P. Hyatt on any of the above questions, then proceed to the next question.

8. We the jury award damages in favor of Gilbert P. Hyatt, and against FTB, in the following amounts:

   a. The amount of money that will fully and fairly compensate Gilbert P. Hyatt for the emotional distress he suffered is $ *85,000,000.00*

   b. The amount of money that will fully and fairly compensate Gilbert P. Hyatt for the FTB's invasion of privacy interest $ *52,000,000.00*

9. If you found in favor of Gilbert P. Hyatt, and against FTB on Gilbert P. Hyatt's seventh cause of action for Fraud, we the jury award damages in favor of Gilbert P. Hyatt, and against FTB, in the following amount of money that will fully and fairly compensate Gilbert P. Hyatt for attorneys fees as special damages he suffered $ *1,085,281.56*

Dated this *6 TH* day of *AUGUST*, 2008.

*[signature]*
FOREPERSON

54 AA 13308-09.[3] The jury instructions describing the essential elements of those claims are found at 53 AA 13218-50, 54 AA 13251-87.

A general verdict "is to be construed as responsive to any and all material issues in the case." Alex Novack & Sons v. Hoppin, 77 Nev. 33, 42, 359 P.2d 390, 395 (1961). A material issue is one that relates to the essential elements of a claim. Wallace v. State, 77

---

[3]Although titled a "special verdict," it is apparent the verdict was a general verdict, which is a finding by the jury of the issue or issues referred to them and is, either wholly or in part, for the plaintiff or for the defendant. Fritz v. Wright, 907 A.2d 1083, 1091 (Pa. 2006). A special verdict is one in which the jury finds all material facts, leaving the ultimate decision on those facts to the court. Id. In Nevada, litigants may also use a "general verdict form with interrogatories" where there are multiple theories of liability. See Skender v. Brunsonbuilt Const. & Dev. Co., LLC, 122 Nev. 1430, 1439, 148 P.3d 710, 717 (2006). The verdict form in this case was nothing more than a general verdict with interrogatories, since it merely asked the jury a series of questions seeking the jury's conclusions regarding liability , i.e., which party prevailed on each claim FTB or Hyatt. See 54 AA 13308-09.

6

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

Nev. 123, 126, 359 P.2d 749, 750 (1961); Owens v. Treder, 873 F.2d 604, 609-10 (2d Cir. 1989) (in civil rights case where plaintiff alleged that he was beaten into confessing involuntarily, jury's general verdict convicting him of robbery and felony murder in criminal case did not preclude him from litigating the voluntariness of his confession in civil case).

Assuming the jury in this case applied the evidence to the essential elements of each claim upon which it was instructed, and its verdict was not a product of passion or prejudice, it can be said the jury arrived at its verdict by addressing only those essential elements. Notably, the presence or absence of "bad faith" was *not* an element of *any* claim on which the jury was instructed (53 AA 13218-50; 54 AA 13251-87), nor was bad faith one of Hyatt's asserted claims for relief. See 14 AA 3257-3300; 50 AA 12500 (70).

Hyatt expressly conceded during trial that bad faith was not an element of any of his claims. 51 AA 12502 (79); 12507 (99-100); 12511 (110-108). His counsel further stated that an instruction regarding the plaintiff's burden of proof on bad faith would confuse the jury because "bad faith is not an element of any of the causes of action." 51 AA 12507 (99-100); 51 AA 12510 (108). He specifically stated that "the problem is it becomes this confusion about whether or not [bad faith is] an element of a cause of action, and it's not. It's not an element of a cause of action." 51 AA 12510 (111). Hyatt also conceded that he was not pursuing a bad faith claim (50 AA 12500 (70)) and he repeatedly objected to any instruction concerning bad faith, i.e. "We don't believe that separate bad faith instructions should be given at all." 50 AA 12501 (79)-502 (99), 12507 (99-100), 12511 (110-111). Because bad faith was not a material issue, and the jury made no such finding, the court cannot simply assume that the jury found that FTB acted in bad faith[4]

Where, as here, a finding of bad faith was not necessary for the jury to reach its verdict, it is inappropriate to read the jury's general verdict as including a finding that FTB

---

[4]This also applies to many other findings Hyatt claims the jury made, but in truth they did not. See RAB 9:15-21; 9:22-10:2; 35:11-12; 54:2-7.

McDONALD·CARANO·WILSON™

100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

7

1    acted in bad faith. See, Hedges v. Rawley, 419 N.E.2d 224, 228 (Ind. Ct. App. 1981)

2    ("[a]bsent a specific finding of bad faith, it is inappropriate to infer such a finding."); see

3    also, Melendez v. Illinois Bell Tel. Co., 79 F.3d 661, 670 (7th Cir. 1996) (court declined to

4    infer from a jury's general verdict that a particular finding had been made, where such a

5    finding was not necessary based on the elements of the claim).

6        Simply put, Hyatt cannot ask this court to accept that the jury found something that

7    they did not, and then contend that a substantial evidence standard of review applies.

8        C.    The Relationship Between Sheila Cox, Candace Les and FTB

9        Hyatt repeatedly argues that FTB's misconduct toward him was evidenced by alleged

10   anti-Semitic comments made by FTB employees. RAB 15-16, 169. A former FTB

11   employee, Candace Les, was the only witness who attributed such comments, and to only

12   one employee, Sheila Cox.  See 33 AA 8178 (163-65) (Les' testimony regarding Cox's

13   alleged remark); 41 AA 10151 (128-129) (Cox denied making remarks); 46 AA 11390

14   (138), 11461 (78) (Cox's co-workers testify they never heard her make such remarks). Les

15   claimed Cox made these statements to her off duty, away from the workplace. 47 ARA

16   11792. Les and Cox had been co-workers and best friends at FTB, but they became

17   estranged after Cox received a competitive promotion in 1996 to a position also sought by

18   Les.[5] 41 AA 10145 (102), 43 AA 10512 (109) – 10513 (110).  While Les testified that she

19   complained to FTB about Cox's alleged anti-Semitic comments, (33 AA 8179 (167)) none

20   of Les' written complaints support such a contention. 39 ARA 9635-41; 9646-50. The

21   district court foreclosed the jury from seeing those written complaints but allowed Les' oral

22   testimony about the contents of those complaints. 33 AA 08142 (18). And contrary to

23   Hyatt's representation (RAB 29-30), none of Les' complaints contained any complaint

24   about Cox' handling or involvement in Hyatt's audits. 39 ARA 9635-41, 9646-50.[6]

---

25

26   [5]At RAB 17:13-16, Hyatt alleges Cox was "rewarded" with a promotion for her work on
     Hyatt's audit. In truth, Cox received her promotion after competitive exam. 43 AA 10512

27   (109).
     [6]The charge against Cox arose during discovery in the litigation, with FTB immediately

28   Continued . . .

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

8

1    The comments attributed to Cox were not corroborated by any other witnesses during
2    the entire four-month trial. See, e.g., 34 AA 11994 (140), 46 AA 11390 (138), 47 AA
3    11737 (189). Cox vehemently denied making any anti-Semitic comments. 41 AA 10151
4    (128-29). Cox also testified that Les had been a close friend of hers and she could not
5    imagine offending her then-friend, Les, who actively and openly practiced the Jewish faith,
6    with anti-Semitic remarks. 40 AA 9922 (219).

7    In 1998 FTB terminated Les for misconduct, which included taking gifts from a
8    taxpayer being audited by the FTB. 39 ARA 9651-52, 9660; 39 ARA 9672-79. Prior to her
9    dismissal, Les alleged that Cox was responsible for the misconduct investigation of Les. 39
10   ARA 9644-45.[7] Shortly after her termination from FTB, Les began meeting with Hyatt and
11   his attorneys. Les met with one Hyatt attorney approximately 70 times, for over 500 hours.
12   48 AA 11786 (36). Les also had personal meetings and approximately 20 phone calls with
13   Hyatt himself. 48 AA 11787 (39). Les believed she would be paid by Hyatt for her so-
14   called consulting services. 48 AA 11788 (44-45). It was during these meetings with Hyatt
15   and his attorneys that Les claimed she heard Cox make anti-Semitic comments and so
16   testified in the early portion of her deposition. 33 AA 8178 (163-65). And then Les had a
17   falling out with Hyatt over whether she would be paid for her consulting services. 48 AA
18   11788 (45) - 11789 (48). After that falling out, Les learned that Hyatt and his attorneys
19   were using her anti-Semitic allegations in motion papers filed in the Nevada litigation. 34
20   AA 8256 (135-136). At her continued deposition a few months later, Les asked to make a
21   statement on the record, testifying that Hyatt's motions had misrepresented Les' comments
22   regarding Cox and she backtracked on her anti-Semitic allegations against Cox. Id. Les did
23   not testify live at trial; her testimony was presented via deposition. 33 AA 8178 (162).

24   Hyatt did not present any evidence that such comments were made by any other FTB

25   conducting a thorough investigation, including interviews of more than a dozen of Cox's
26   co-workers and supervisors; all of these people reported that they never heard Cox use such
     language and that such language would be completely out of character for Cox. See, e.g.,
27   47 AA 11737 (189); 48 AA 11994 (140-41).
28   [7]Les' complaint against Cox was found to be baseless. 39 ARA 9643-45.

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

9

employees at any level. Yet in his brief Hyatt goes so far as to state that FTB employees generally "demonstrated hostility toward Hyatt because of his religion." RAB 57:6-8. In truth, Cox was a low-level auditor at FTB, with no authority to make final decisions concerning Hyatt's audit results, and the only person accused of anti-Semitic remarks. 42 AA 10303 (126)-(127). Cox's audit recommendations were subject to four separate levels of review before they became audit conclusions, and then those audit conclusions were subject to multiple layers of review at the protest level. 41 AA 10217 (128)-(129). A total of forty two (42) employees had varying involvement with Hyatt's audits and protests. 19 AA 4746. Hyatt introduced no evidence to suggest that any of these many FTB employees harbored animosity, or acted upon such animosity because of his religious faith. In fact, no evidence presented by Hyatt contradicted FTB's evidence that Cox's work was reviewed by numerous other auditors and supervisors, and that the ultimate decisions to impose taxes and penalties for the 1991 and 1992 tax years were made by FTB supervisors, not by Cox. 37 AA 9091 (131, 133), 37 AA 9165 (70). Therefore, Hyatt's suggested inference that all FTB employees involved in his audits/protest "openly demonstrated hostility toward Hyatt because of his religion," is patently unreasonable.

> D. Evidence Relied Upon by FTB's Auditors in Reaching Their Initial Audit Determinations

Hyatt forcefully contends that FTB's audit recommendations were based "primarily" or "exclusively" on three affidavits[8] from members of Hyatt's family. RAB 125. Hyatt's contentions are not true. FTB based its audit recommendations on a plethora of evidence, primarily gathered from multiple third-party sources. See 66 AA 16388-427; 62 AA 15423-

---

[8] Internally at FTB, statements given under oath by witnesses, and witnessed by an FTB auditor, are referred to as "affidavits," even though auditors are not notaries. 42 AA 10453 (81) – 454 (82). Such statements in this case were prepared and signed after the witness had shown identification to the auditor. 42 AA 10453 (81)-454 (82). This was standard practice at FTB, and not something specific or particular to the Hyatt audit. 42 AA 10453 (81) – 454 (82). Also, pursuant to policy, in an effort to protect third-party witnesses, FTB does not release the names or identities of such witnesses until completion of its audit activities. 42 AA 10311 (160-61).

10

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1   87; 72 AA 17862-95.

2   • On his 1991 state tax return, Hyatt represented, under penalty of perjury, that he

3   moved to Nevada October 1, 1991. 62 AA 15348. After auditing Hyatt, FTB concluded that

4   he remained a California resident until April 3, 1992. 62 AA 15423-87. Thus, the disputed

5   period between Hyatt and FTB ran from October 1, 1991, to April 3, 1992.

6   • After researching California's nine-month presumption,[9] Hyatt changed his move

7   date to September 26 (63 AA 15622-23), and again to September 26, 1991 (67 AA 16501).

8   • Hyatt represented to FTB that he sold his California home to his long-time friend

9   and companion, Grace Jeng, on October 1, 1991, and never returned to that home again. 66

10  AA 16440. Even though requested, Hyatt could not produce any evidence of the down

11  payment allegedly paid by Ms. Jeng, monthly payments from Ms. Jeng until May 1992,

12  notice to his mortgage holder, escrow or closing documents, purchase/sale agreements, or

13  notice to the Orange County Assessor or Recorders Offices regarding a change in

14  ownership. 66 AA 16287; 34 AA 8397. From the Orange County Assessor, FTB learned

15  that Hyatt continued to pay the property taxes on his California home into 1992. 63 AA

16  15706. From the utility companies, FTB learned that Hyatt continued to pay the utilities on

17  that home into 1992. 63 AA 15736-38. Documents from the Orange County Recorder

18  revealed no recorded deed dated October 1, 1991 was filed, and, in fact, no transfer deed

---

[9] Under California law, taxpayers are presumed to have lived in California for the full year if they lived in California for any aggregate of nine months. Cal. Rev. & Tax. Code § 17016. If, as reported on his 1991 tax return, Hyatt met the legal presumption for a full-year residency by living nine months in California, then all of Hyatt's income reported on his 1991 tax return was taxable to California. Id. While Hyatt suggests that determining where he lived between September 26 and October 20, 1991 was unimportant since he earned no significant income during that time (RAB 81-82), Hyatt is wrong since he had to offer an explanation of his whereabouts to overcome the 9-month presumption. Since Hyatt offered no explanation at all of his whereabouts from September 26 to October 20, 1991, the 9-month presumption applied, and his credibility concerning his move date was deeply impugned.

11

1  was recorded until June 1993.[10] 64 AA 15868.

2      • Hyatt claimed he leased an apartment at Wagon Trails, a low-income (HUD)

3  apartment complex, beginning October 20, 1991. 66 AA 16450. But Hyatt offered no

4  explanation of his living arrangements, or where he kept his belongings, between September

5  26 and October 20, 1991. Hyatt was repeatedly asked by FTB where he lived during that

6  timeframe, but was silent in response. 66 AA 16396, 16455-56; 67 AA 16638, 16728-29.

7      • From the Wagon Trails apartment manager, FTB learned that Grace Jeng, not Hyatt,

8  actually made the lease arrangements at Wagon Trails. 66 AA 16393. The written lease was

9  faxed to Hyatt at his California home on October 9, 1991 (63 AA 15647); Hyatt signed it

10  and faxed it back from that home on October 13, 1991. 63 AA 15643-47. From a review of

11  Hyatt's rental file, FTB learned that he claimed he had a California employer; he listed

12  Grace Jeng residing elsewhere than the house he allegedly sold to her; it was Grace Jeng,

13  not Hyatt, that signed the move-out notification; and he paid rent with checks which were

14  mailed from California. 64 AA 15991-92.

15      • Hyatt offered no evidence that he ever moved into the Wagon Trails apartment, i.e.

16  no groceries, gasoline, meals, prescriptions, linens, furniture, etc. were purchased from

17  Nevada. Instead, from his credit card statements FTB learned he was paying for meals,

18  filling prescriptions, purchasing airline tickets (which were later confirmed from and to

19  LAX) and making many purchases in California. 72 AA 17767; 67 AA 16566, 16575; 72

20  AA 17813; 66 AA 16458.

21      • Under one lease agreement given to FTB, Hyatt was obligated to make rent

22  payments beginning October 20, 1991 (63 AA 15647), but Hyatt offered no evidence of a

23  payment for October 1991, and no utility or phone payments were made during that time.

24  According to the Wagon Trail's apartment manager, Hyatt was never at the apartment. 64

25

26  [10]Contrary to Hyatt's brief (RAB 80 n. 301), from the notary logs FTB acquired during the

27  protest period, FTB learned that Hyatt had backdated the deed he ultimately recorded in June

28  1993. 34 ARA 8452, 8478-79.

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

12

RJN002486

1  AA 15991-92. Adjacent tenants were interviewed, and they did not see Hyatt at Wagon

2  Trails either. Id.

3     • From a review of his checks, FTB learned that Hyatt was working with a number of

4  professionals, i.e. accountants, attorneys, investment advisors, and business people between

5  October 1991 and April 1992. 62 AA 15442-43; 67 AA 16510-11. From a review of

6  correspondence, FTB learned their letters, as directed, were sent to Hyatt's California

7  address. 64 AA 15756, 15762; 63 AA 15742-44; 64 AA 15820. Hyatt held numerous

8  meetings or appointments with them in California. 62 AA 15442. Bank statements, credit

9  card statements and other important correspondence were also being sent to his California

10  home. 71 AA 17523; 63 AA 15742; 64 AA 15820; 72 AA 17790, 17793, 17814, 17824,

11  17771; 70 AA 17461, 17466.

12     • From his physicians and dentists, FTB learned that from September 1991 to April

13  1992, Hyatt took all his appointments in California. 64 AA 15987; 62 AA 15443.

14     • From the California DMV, FTB learned that Hyatt had a vehicle registered to him

15  through March 18, 1993, and from the Nevada DMV, FTB learned that no vehicle was

16  registered to Hyatt until March of 1992. 66 AA 16389; 72 AA 17878.

17     • From his credit card statements, FTB learned of only a few dates when he was in

18  Nevada, i.e. to attend Comdex and open a bank account on October 25, 1991 (70 AA

19  17415; 67 AA 16518), and on November 27, 1991, to obtain a driver license and register to

20  vote through Nevada's motor/voter laws (63 AA 15617, 15671). From California's registrar

21  of voters, FTB learned there was no record of Hyatt ever voting, or even registering to vote

22  in California. 63 AA 15695. On the few days in Nevada, Hyatt immediately returned to

23  California where he incurred meal charges (72 AA 17792) and on one day after he signed

24  an agreement with Sharp Corporation giving his California address and agreeing to apply

25  California's law to any dispute (46 ARA 11329, 11337). From his credit card statements,

26  FTB learned that during the times in Nevada, Hyatt incurred rental car charges. 72 AA

27  17818, 17772. From the Clark County Registrar of Voters, FTB learned that Hyatt once

28  registered as living at 5441 Sandpiper Lane, the address of his accountant, at which Hyatt

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

13

admittedly never resided. 62 AA 15427. A review of the checks drawn on the Nevada bank account revealed they were largely cashed by individuals or businesses located in California. 62 AA 15454-56.

- From documents received from Hyatt, FTB learned that on October 24, 1991, Hyatt signed an agreement with Fujitsu using his California address and agreeing to apply California law (64 AA 15756, 15762) and Fujitsu then began sending him letters at his California address (64 AA 15820). From Fujitsu, FTB learned that $15 million was wire-transferred to Hyatt to a bank in California on October 31, 1991. 66 AA 16276; 67 AA 16639.

- From documents received from Hyatt, FTB learned that on November 4, 1991, Hyatt signed an agreement with Matsushita using his California address and agreeing to apply California law (63 AA 15743, 15750) and Matsushita then began sending him letters at his California address (63 AA 15742). During that same time, he issued a press release from California. 69 AA 17022. A news article was written thereafter in which Hyatt is described as being from California. 69 AA 17023. From Matsushita, FTB learned that $25 million was wire-transferred to Hyatt at a bank in California on November 15, 1991.[11] 63 AA 15742-47; 66 AA 16392.

- From information obtained from his bank, FTB learned that in December 1991, Hyatt made multiple visits to his safety deposit box located in California. 65 AA 16014. Notably, he did not change the contact address on those boxes until July 21, 1992, and he continued to make bank deposits in California during the seven-month disputed period. 65 AA 16014; 66 AA 16401.

- From the U.S. Postal Service, FTB learned that Hyatt maintained two California-based post office boxes, which were renewed April 16, 1992, and he added Jeng's name on February 2, 1992. 62 AA 15444.

---

[11]Hyatt complains that FTB contacted Fujitsu notwithstanding the fact they had a confidentiality agreement which contained an exception for sharing information with government agencies. 64 AA 15753.

McDONALD · CARANO · WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002488

- From credit card and travel documents, FTB learned that in January 1992, Hyatt travelled on business in and out of LAX, (62 AA 15485) right before making a deposit into a California bank. 70 AA 17395. Hyatt also had multiple doctor appointments in California throughout January and February 1992, before being hospitalized in California for an extended period; this information was learned directly from the doctors and the hospital. 62 AA 15443; 65 AA 16010.

- From a review of newspaper articles, FTB learned that once Hyatt was released from the hospital in February 1992, he issued press releases from California. 69 AA 17022.

- From his credit card statements, FTB learned that in March 1992, Hyatt incurred many charges in California after returning to LAX from a vacation in Colorado. 67 AA 16586; 72 AA 17772, 17797.

- From documents obtained from Clark County Business License Department, FTB learned that even though Hyatt claimed to be conducting business in Nevada, he did not apply for a business license until late 1992. 67 AA 16557; 78 AA 19426. During the disputed period, Hyatt offered no evidence of meetings, photocopier use or services, fax or telephone use, etc., and of all the business contacts he gave to FTB for verification, none of them were able to support his claim of Nevada residency. 62 AA 15429-33. From interviews and a review of checks drawn on his California bank account, FTB learned that across that same period, Hyatt was paying for California secretarial services (66 AA 16458), photocopier services, and employing a handyman to make repairs and modifications to his California home for business uses (69 AA 17017; 65 AA 16149). From an interview with the handyman, FTB learned that Hyatt was physically in the California home during those repairs/modifications. Id

- From the Clark County Recorder's office, FTB learned that on April 3, 1992, Hyatt purchased a home in Las Vegas. 62 AA 15426. The auditor noted evidence of "nesting" or moving into that home beginning then, 42 AA 10287 (62-63) (sundry household purchases from Sam's Club); 70 AA 17354, 17355 (2 beds purchased). FTB, therefore, determined that April 3, 1992, was a reasonable change in residency date for Hyatt. 72 AA 17862-95.

15

- Notably, the evidence from the 1991/1992 timeframe that would have conclusively shown Hyatt's whereabouts -- his telephone records -- were never produced by Hyatt. 34 AA 8416 (103); 44 AA 10771 (183). He claimed he had destroyed them. Id.

A further review of FTB's comprehensive reports reveals that the three affidavits played a minor role in audit's recommendations.[12] See 66 AA 16388-427, 62 AA 15423-87; 72 AA 17862-95.

On appeal, Hyatt claims that FTB never assessed fraud penalties in residency cases, but he was singled out for adverse treatment. RAB 25:2-6. Hyatt is wrong. In fact, Hyatt's case is remarkably similar to Appeal of Robert F. and Helen R. Adickes, 90-SBE-012, (1990), a case in which fraud penalties in a residency case were upheld by the State Board of Equalization, just a short time before Hyatt's audit began. As to the FTB's fraud analysis, Hyatt materially misrepresents the foundation for its conclusions. Compare RAB 25-26 with 62 AA 15462-87.

FTB opened an audit for the 1992 tax year based upon the determination that Hyatt remained a California resident until April 3, 1992. 48 AA 11922 (181)-1192 (182). The 1992 audit was significantly abbreviated since most of the evidence had been gathered during the 1991 audit.[13] 72 AA 17963-70; 72 AA 17862-95. The only thing lacking was discovery of the amount of income earned by Hyatt in 1992 and when it was earned. 72 AA 17977. FTB requested that information from Hyatt. Id. Like it did for the 1991 audit, FTB sent Hyatt a detailed notice, and invited Hyatt to rebut FTB's tentative findings. 73 AA

---

[12]Beth Hyatt, Hyatt's daughter, printed on her affidavit "except that I cannot be sued or have recourse taken for my statement." 68 AA 16912. At trial she testified she placed that language there to prevent someone from suing her for telling the truth and to keep the information confidential. 46 AA 11493 (209).

[13]Hyatt is critical of the fact that FTB used the same evidence gathered during its investigation of tax year 1991, for its audit of tax year 1992. RAB 30-31. Hyatt's criticism is unfounded. At the core of FTB's audit is a seven month disputed period of time that overlaps two calendar years, i.e. September, 1991 to April, 1992. 41 AA 10219 (135)-(137), 10233 (192); 62 AA 15477-78, 87. Under California authority applicable to FTB, since there were virtually no facts that were relevant to one calendar year, but not the other, FTB was well within its rights to use the 1991 audit facts for its 1992 audit. 41 AA 10219 (134).

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

16

18015-31. And once again, after ample opportunity for Hyatt to refute FTB's recommendation, FTB weighed and analyzed all available evidence to finalize its audit recommendations for tax year 1992. 73 AA 18092-97. And once again, an internal report was prepared outlining audit's factual findings and legal authorities supporting audit's recommendations. 72 AA 17862-95. As before, those findings were based on far more than three affidavits from Hyatt's family members. Id. Recall also that FTB collected tens of thousands of documents more from Hyatt and third-parties during the protest, which FTB believed confirmed, and further established, the correctness of its initial audit recommendations. 49 AA 12155 (159)-(160).

E.   FTB Policies and Practices, and FTB's Compliance Therewith

Response to Hyatt's misleading presentations about FTB's compliance with its standard policies and practices during Hyatt's audit is made largely in the specific sections relevant to that compliance. A few noteworthy corrections immediately follow.

A common theme runs through Hyatt's statement of facts. He contends that FTB should have asked him first for the information needed to conduct its audit, and only failing receipt of the requested information from him, was FTB permitted to ask third-parties. See, e.g. RAB 37:11-15. Hyatt even contends that during his audits, which were conducted from 1993 to 1995, "the California Information Practices Act stated that the FTB should seek information needed for the audit 'to the greatest extent practicable directly from the individual[,]" and that FTB "violated this policy with impunity, knowing of Hyatt's heightened and extreme sensitivity for privacy and confidentiality." RAB 37:13-19. This is a misrepresentation. At the time FTB audited Hyatt (1993-1995), FTB was permitted to contact and request that third-parties provide any relevant information without first notifying the taxpayer.[14] See Cal. Rev. & Tax Code §§ 19254, 26423 (1993).

Hyatt claims "FTB audited Hyatt upon learning how much money he made." RAB

_____

[14] In determining the appropriateness of FTB's conduct, the court must look to the statutes that were in effect at the time his audit was proceeding. See Runion v. State, 116 Nev. 1041, 1049, 13 P.3d 52 (2000) (court improperly used prior version of statute rather than statute in effect at the time of the offense).

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR · RENO, NEVADA 89501
P.O. BOX 2670 · RENO, NEVADA 89505-2670
PHONE 775-788-2000 · FAX 775-788-2020

RJN002491

14:8. To the contrary, FTB initial auditor, Marc Shayer, testified "[Hyatt's] wealth had nothing to do with opening the audit…The audit was opened up because of the way the tax return was prepared." 45 AA 11219 (152). Shayer "was more interested in making sure that [Hyatt] reported his income correctly to California." 45 AA 11225 (177); 45 AA 11231 (200). For the specific reasons described at AOB 5:1-9, FTB opened Hyatt's audit (9 month presumption, sourcing issues, no moving expenses claimed in 1991).

Hyatt claims the third auditor "intentionally avoided formally documenting exculpatory statements from neighbors, who point blank told her that Hyatt moved to Nevada during the very timeframe Hyatt claimed." RAB 18:13-16. In truth, Hyatt learned of all the neighbor interviews and what they told FTB because, pursuant to policy, they all were memorialized in the audit file. 68 AA 16796-800, 16804-05, 16984-85. FTB went to Hyatt's neighborhoods in both California and Nevada, interviewing available neighbors. 68 AA 16796-800; 16804-05; 16984-85. Generally, FTB learned, as Hyatt has described himself, that he was a recluse and he did not interact much with his neighbors, and therefore the information they supplied varied greatly. 62 AA 15438; 68 AA 16796-800, 16804-05, 16984-85. For example: information mentioned at RAB 18:16-18, from the neighbor who suggested Hyatt had moved six months after receiving his patent, did not make sense since he received the patent in 1990 and she had him moving in 1990. 68 AA 16804. Other neighbors, in contrast, were less helpful to Hyatt, some placing him at his California home as late as 1994. 68 AA 16804-05. Because of the varying information from the neighbors, FTB did not place great weight on their information, and instead FTB looked to more objective evidence informing their conclusions. 62 AA 15438 (briefly noting statements from neighbors); 62 AA 15438-46 (examining other criteria such as home ownership, bank accounts, safe deposit boxes, use of professionals, etc.).

Hyatt criticizes FTB for not trying to interview him during the audit. RAB 20:3-5. It is FTB practice that once the taxpayer under audit, retains a representative, they only communicate with the representative. 40 AA 9882 (61)-9883 (62). In Hyatt's circumstance,

18

1    he retained both an attorney and an accountant. 40 AA 9883 (62). If Hyatt's representatives

2    wanted Hyatt to be interviewed, that choice was theirs. 40 AA 9883 (62).

3         Hyatt suggests FTB "mislead" his representatives. RAB 22-23. However, FTB

4    auditors are trained to collect all information and to present their questions or conclusions

5    through tentative determination letters. 41 AA 10142 (90-91).

6         Hyatt suggests FTB ignored evidence from "real estate agents, escrow officers,

7    insurance agents, a home inspector, a security provider." RAB 20:7-9. To the contrary, FTB

8    gathered and analyzed information from them concluding it supported a move date in April

9    1992 when he purchased the Tara house, not in September 1991. 72 AA 17894.

10        Hyatt next complains about the "Embry memo." RAB 26-28. Leave it to Hyatt to

11   find fault in something favorable to him. FTB taxes its residents under multiple legal

12   theories, and individuals employed by FTB develop expertise in these different theories. 89

13   AA 22142. Those with an expertise in "sourcing" met and evaluated the preliminary

14   information they had received from Hyatt, concluding that theory did not apply in early

15   June 1995. 89 AA 22138-41. The specific purpose of their meeting was to evaluate sourcing

16   as a theory, not a physical residency theory. Id. They resolved the sourcing issue in Hyatt's

17   favor at that time. Id. Thereafter, FTB gathered a significant amount of physical residency

18   evidence (72 AA 17867-87), weighed and evaluated that evidence (72 AA 17887-95),

19   informed Hyatt of their preliminary conclusions, (73 AA 18078-82) and then gave Hyatt an

20   opportunity to respond and rebut those preliminary conclusions (72 AA 17901-04). When

21   his rebuttal offered additional evidence which was actually supportive of a move date in

22   April 1992, FTB's auditor closed her file and transferred it to Sacramento for review by her

23   supervisors and reviewers. 72 AA 17909, 17969.

24        Hyatt claims its auditors were trained to use fraud penalties as bargaining chips for

25   settlement. RAB 26:1-12. In truth, FTB forbids its auditors or protest hearing officers from

26   attempting to settle cases. 33 AA 8172 (138). FTB has a Settlement Bureau that handles

27   settlement opportunities. FTB Notice 92-3, 92-8, 97-3, 98-11, 99-7, 2000-06, 2001-03,

28   2003-2, 2006-2. The process is only invoked when a taxpayer requests it. Id.

RJN002493

As to Hyatt's CBR discussion and Kurt Sjoberg's testimony (RAB 32-35), at trial Sjoberg made clear that his criticism of FTB only extended to its legislative use of CBR. 33 AA 8172 (138). Moreover, Sjoberg testified that he conducted audits of FTB between 1993 and 1997, the years of Hyatt's proceedings. 33 AA 8060 (69). When auditing FTB, Sjoberg indicated that he reviewed tax assessments and audits conducted by FTB. 33 AA 8060 (69) – 8061 (73). Sjoberg specifically testified that he saw "**no instances**" in which "**auditors artificially inflated assessments, fabricated assessments, made bogus or phony assessments.**" 33 AA 8161 (95-96) (emphasis added).

Hyatt also complains about FTB's lead residency reviewer, Carol Ford. RAB 28-29. There was testimony at trial that it was Ms. Ford's style to review an auditor's file in the style of "the Devil's advocate." 48 AA 11889 (47-48). She would then take her observations and review them with her supervisors.[15] 48 AA 11889 (47). She applied that same style to Hyatt's audit. 48 AA 11893 (63) – 11894 (67). After conferring with her supervisor, both agreed to issue Hyatt's Notices of Proposed Assessments. 48 AA 11893 (64-65), 11918 (165). In fact, contrary to Hyatt's suggestion, Ms. Ford (the lead reviewer) believed that the auditors had reached the right conclusions, and it was Ms. Ford that instructed that the 1992 audit should open because they had concluded Hyatt did not sever his California residency until April 1992, when he purchased the house in Las Vegas and evidence demonstrated he began moving in. 41 AA 10146 (106); 48 AA 11922 (181)-11923 (182).

Hyatt contends that the "jury determined that the FTB unsuccessfully sought to extort a settlement from Hyatt" (RAB 9:22-73), and suggests that finding was based upon Hyatt's representatives believing they had been "threatened" by Anna Jovanovich (RAB:40-41). In truth, even Hyatt's lead expert admitted he found no evidence of extortion. 44 AA 10846 (130). As to the conversation between Hyatt's representative (Eugene Cowan) and Ms. Jovanovich, Mr. Cowan testified that he did <u>not</u> construe this conversation, in which he

---

[15]It is standard FTB policy that reviewers' notes are not released to taxpayers since they are reflective of FTB's deliberative process. 48 AA 11891 (57)-11892 (58); 11921 (174-175).

RJN002494

1    asked many questions about FTB's process since this was his first audit, as a threat. 35 AA

2    8581 (155). Moreover, if Hyatt had invoked FTB's Settlement Program, any settlement

3    reached would have been a matter of public record requiring disclosure of Hyatt's name,

4    total amount in dispute, amount of settlement, explanation why settlement was in best

5    interest of State of California, and an opinion from California Attorney General as to

6    reasonableness of settlement. Cal. Rev. & Tax Code § 19442.

7    These are but a few of Hyatt's mischaracterizations. The balance of those relevant to

8    this appeal were discussed in the opening brief and discussed in the appropriate legal

9    sections herein.

10   F.    Hyatt's Abuse of the Nevada Protective Order and How That Contributed to

11         the Amount of Time it Took to Finalize the Protest

12   In response to FTB's presentation concerning the reasons for the length of time

13   needed to resolve Hyatt's protest, Hyatt claims that "what the FTB actually attempted to

14   do, and what the District Court would not allow, was to misrepresent the terms of the

15   protective order to the jury by seeking to present and argue its tortured interpretation of the

16   protective order to the jury." RAB 48:7-9. In truth, Hyatt's own legal expert who testified

17   at trial agreed with FTB's interpretation of the Nevada Protective Order ("NPO"). 36 AA

18   8899 (97). After the expert agreed with FTB, Hyatt began his re-direct by arguing with his

19   own expert. 36 AA 8899 (96-97). Thereafter, a dispute ensued, and rather than resolve the

20   parties' differing interpretations, the district court refused to resolve the dispute and instead

21   forbade either party from mentioning the NPO again. 36 AA 8899 (96)-8901 (102).

22   At trial, FTB did not try to "blame the District Court for issuing the protective order

23   in this case," as falsely claimed by Hyatt. RAB 48:3-4. Instead, FTB primarily blamed

24   Hyatt's brazen abuse of the NPO. AOB 23-25. Recall that Hyatt sought and received the

25   NPO which prevented the Protest Hearing Officer ("PHO"), without Hyatt's consent, from

26   obtaining or viewing any documents Hyatt designated as off-limits or confidential in the

27   litigation. 94 AA 23166-77. After the NPO was entered, Hyatt designated nearly every

28   piece of discovery in the litigation as confidential. 50 AA 12315 (146-47). At the same

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

21

RJN002495

1     time, Hyatt continued to produce certain information in response to the PHO's multiple

2     requests for information – but he produced different information than what FTB uncovered

3     in the Nevada litigation! To comply with the NPO, yet ensure that both sides of FTB (the

4     litigation attorneys and the PHOs) were getting the same information from Hyatt, FTB put

5     in place an internal, one-way system of communication. 76 AA 18880-83. Dunn, FTB's in-

6     house counsel working with FTB's trial counsel, was tasked with reviewing the responses

7     provided by Hyatt in the Protest Proceedings and comparing them to Hyatt's litigation

8     responses. 50 AA 12369 (14-16). If they were deficient, Dunn was merely permitted to say

9     that they were deficient, but not describe how or why they were deficient, without violating

10     the NPO. Id. For example: In June of 2000, Hyatt provided two boxes of documents to the

11     PHO in response to a request made six months earlier. 54 AA 13443-543. Dunn reviewed

12     Hyatt's documents and discovered that they were grossly incomplete, based upon the

13     information that Hyatt had previously disclosed in the Nevada litigation. 50 AA 12380 (58)

14     – 12381 (62). To comply with the NPO, Dunn could only tell the PHO that Hyatt's

15     responses were inadequate, but not how or why. 50 AA 12369 (14-16). This drill happened

16     numerous times and consumed significant time. 50 AA 12307 (116) – 50 AA 12311 (132).

17     However, given the district court's multiple orders, FTB was prohibited from giving the

18     jury examples of how Hyatt failed to disclose to the PHO the same thing FTB learned in the

19     litigation. 27 AA 6509-10 (order granting motion to exclude after acquired evidence).

20          What resulted were two different versions of Hyatt's residency: One version based

21     upon evidence uncovered in the Nevada litigation and another version based upon selective

22     information revealed by Hyatt to the PHO. But because of the NPO, the FTB litigation

23     attorneys could not share the information they had gathered with the PHO, or even advise

24     her how to request such information through the use of administrative subpoenas to third

25     parties because of the limitation imposed by the NPO. 50 AA 12369 (14-16). FTB

26     suspected Hyatt had two purposes for this brazen strategy: First to trap FTB into violating

27     the NPO, and second to mislead the PHO. FTB finally established a way to get information

28     from the litigation attorneys to the PHO. FTB issued an administrative subpoena to Hyatt

McDONALD·CARANO·WILSON℠<br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>P.O. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

RJN002496

1  directly to force his hand. 77 AA 18892-93; 19025-28; 76 AA 18894-97. Via administrative

2  subpoena to Hyatt, FTB requested that Hyatt share all discovery gathered to date from the

3  litigation with the PHO. 76 AA 18894-97. Of course, Hyatt resisted FTB's California

4  administrative subpoena first at the district court level and then on appeal, and it took years

5  for the California courts to sort out FTB's entitlement to sharing the same information that

6  had been accumulated between the litigation attorneys and the PHO. State Franchise Tax

7  Bd. v. Hyatt, C043627, 2003 WL 23100266 (Cal. Ct. App. Dec. 31, 2003) (unpublished

8  opinion). Notably, even after the decision from the California appellate court allowing

9  FTB's litigation attorneys to share Hyatt's information with the PHO, Hyatt resisted twice

10  more FTB's updated administrative subpoenas, further delaying resolution of his protests.[16]

11  77 AA 19028-47; 50 AA 12398 (130-132). These activities were the primary reason for the

12  delay in resolving Hyatt's protests. There were others, as outlined below.

13    For example: Hyatt argues that there was a 14-month delay in issuing the notice of

14  proposed assessment ("NPA") for the 1992 tax year. RAB 35. He incorrectly asserts that the

15  audit was "closed" on June 17, 1996. (RAB 47) Rather, on or about June 18, 1996, FTB's

16  auditor, Sheila Cox, recommended closure of the audit for the 1992 tax year.[17] 37 AA

---

[16]Hyatt claims he "promptly" responded to FTB's second and third administrative subpoenas. RAB 50:12. He promptly responded "no." 77 AA 19028.

[17]At the conclusion of FTB's audit for 1991, just prior to Hyatt receiving his NPA for the 1991 tax year, Hyatt (through his tax attorney Eugene Cowan) asked FTB to delay processing the protest until the ongoing 1992 audit could be consolidated with the 1991 protest. 44 ARA 10785. Combining audit years is a common request where the same audit issues cross over two or more calendar years under audit, especially in residency cases. 46 AA 11313 (145) – 11314 (147). At about this same time, mid-1996, unbeknownst to FTB, Hyatt began consulting with his Riorden & McKenzie litigation attorney Donald Kula. Months later, before the 1992 NPA was issued, Hyatt's tax attorney Eugene Cowan contacted FTB's protest hearing officer and said that Hyatt had changed his mind, he now wanted the 1991 protest worked as soon as possible. 44 ARA 10784. FTB's protest hearing officer carefully memorialized this request and many other conversations with Cowan, taking time to carefully explain the protest process, the time it would require, and her intention to begin work on the file just as soon as workloads would permit. 44 ARA 10776-10785. While this dialogue between Cowan and FTB's protest hearing officer was ongoing, Hyatt received the 1992 NPA and filed a timely protest on October 10, 1997. 54 AA 13404-
Continued . . .

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002497

1    9164(67-68); 72 AA 17967. After review by her supervisor in Los Angeles, the case was

2    sent to FTB's Central Office in Sacramento on June 21, 1996 for final review. 72 AA

3    17967. Upon review by audit division supervisors, the case was reassigned to a Sacramento

4    auditor, Jeff McKenney, to determine whether the fraud penalty should be applied to the

5    1992 tax year. 73 AA 18194.  The reassignment was made in August 1996 because Cox

6    (just assigned to FTB special investigations) was no longer available to work on the audit.

7    41 AA 10154 (140). After reviewing the audit file and conducting further research, Mr.

8    McKenney determined that the fraud penalty was warranted on the 1992 tax year. 73 AA

9    18199. On November 25, 1996, he submitted that recommendation for supervisorial review.

10   72 AA 17968. On December 12, 1996, after approval, the case was forwarded to FTB's

11   Technical Review Section for further review. 72 AA 17968. At this point Hyatt had not

12   been notified about the pending fraud penalty.  See 72 AA 17901-04.  As was FTB practice,

13   the case was returned to audit to inform Hyatt of the findings in support of the penalty. 72

14   AA 17968. Cox had returned to audit by early 1997. Id. 72 AA 17969. Because Cox was the

15   _____

16   07. Then, just 86 days later, on January 6, 1998, Hyatt sued FTB in Nevada. 1 AA 1-16.
     Hyatt's innovative Nevada lawsuit, among other things, asked the Nevada court to apply
17   California tax law and find that Hyatt was a nonresident of California for income tax
     purposes. 14 AA 3257-300.
18
         On March 17, 1998, unknown to FTB at the time, Hyatt's strategy in the protest was
19   set forth in a fax communication authored by Hyatt's tax lawyer in California, Eugene
     Cowan. 31 ARA 7697. Cowan's memo was sent to Hyatt, Mark Hutchison and Thomas
20   Steffen, Hyatt's lead Nevada counsel. Cowan states that Hyatt and his team, as a deliberate
     strategy, should consider making FTB work harder to obtain information from Hyatt:
21
         "Attached is a copy of the subpoena duces tecum to be issued to Cal Fed bank by
22       the FTB regarding the taxpayer's 1991 and 1992 Cal Fed bank account
         information.  We have until Friday to file a motion to quash if we so desire. **While**
23       **there are no "pure" tax reasons to quash the motion, there may be tactical**
         **reasons to do so (such as making the FTB work for its requests for [sic] now**
24       **on or taking this opportunity to file the motion in the Nevada courts or**
         **otherwise)."**
25
     Id. (emphasis added). For Hyatt and his attorneys to contend that they did not contribute the
26   length of the protest is astounding, in light of this fax. Bear in mind that during that time,
27   Hyatt had not paid any amount of the proposed tax, interest or penalty. 45 AA 11153 (81).
     In fact, to date, Hyatt had not paid any such sums.
28

RJN002498

McDONALD·CARANO·WILSON⸻
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1   most logical choice to complete the audit she was reassigned the case on April 4, 1997. 48
2   AA 11899 (87-88). On April 10, 1997, Cox wrote a letter to Hyatt's representative
3   explaining the determination to impose the fraud penalty on the 1992 tax year and gave him
4   30 days to respond. 72 AA 17901-04. Hyatt failed to respond within the 30-day period. 72
5   AA 17909; 73 AA 18099-18101. On May 12, 1997, Cox sent a follow up letter to Hyatt's
6   representative explaining that the case was closed and was being sent to Sacramento for
7   issuance of the 1992 Notice of Proposed Assessment. 72 AA 17909.  In that letter, Cox
8   explained that if Hyatt disagreed with the NPA, he must now send a written response to
9   FTB's Central Office in Sacramento. 72 AA 17909. Cox forwarded the audit file to her
10  supervisor for review on May 12, 1997. 72 AA 17969. Once approved by her supervisor,
11  the case was sent to Sacramento for final review. 72 AA 17969. In a letter dated July 17,
12  1997, (approximately three months after FTB's April 10, 1997 letter offering Hyatt a chance
13  to rebut) Hyatt's representative disputed the imposition of the fraud penalty. 73 AA 18099-
14  18101. By this time the case was in Sacramento proceeding through its final review. 72 AA
15  17969. The Sacramento reviewer determined that the fraud penalty issue should be resolved
16  at protest. 43 AA 10686 (164). The finalization of the audit for the 1992 tax year was
17  approved by management on August 12, 1997. 72 AA 17969. After the clerical process of
18  finalizing the assessment was complete, FTB issued the NPA for the 1992 tax year on
19  August 12, 1997.  50 AA 12367 (8-9).

20    Next, Hyatt argues that FTB "intentionally placed a hold" on his protest for both tax
21  years that lasted six and seven years for the 1992 and 1991 tax years, respectively. RAB 45-
22  46. The "hold" that Hyatt refers to is, in fact, a short deferral in processing the protest,
23  directed by FTB management and was caused by Hyatt's actions. 50 AA 12323 (180-181).
24  Hyatt implies that the hold lasted for six and seven years and implies that FTB made a
25  determination to not work on the protest for those periods. That argument is directly
26  contradicted by FTB's records which clearly show that FTB employees spent vast amounts
27  of time on Hyatt's protest throughout the time period. 76 AA 18920-19011. Thus, Hyatt's
28  claimed "hold" for six and seven years is false.

1    Hyatt argues that he was informed at his protest hearing, held on September 27, 2000
2    and October 4, 2000 that a protest determination would be made within six months. RAB
3    45-46. Hyatt refers to an entry in FTB's computerized event log made by George
4    McLaughlin dated April 3, 2000. 76 AA 18939. Mr. McLaughlin's comment that he
5    expected the protest to be closed by March 31, 2001, (76 AA 18939) was based on the
6    premise that FTB would have obtained sufficient information to make a determination by
7    that date. At the time he made this comment, McLaughlin did not foresee the impending
8    significant deferral period caused by Hyatt's use of the NPO to keep information from the
9    protest hearing officer (information actually requested by FTB auditors years earlier), the
10   decisions of the Nevada court to stay that order, Hyatt's direct refusal to produce
11   information, and Hyatt's resistance to and litigation of FTB subpoenas. 49 AA 12236 (116)-
12   (117).

13   Hyatt also refers to a computerized event log entry from FTB's protest hearing
14   officer, Cody Cinnamon, to her supervisor, George McLaughlin, dated February 20, 2002
15   (76 AA 18980), which indicates Hyatt's representative called Ms. Cinnamon and inquired
16   as to the status of the case. 76 AA 18980. Ms. Cinnamon replied that she was instructed not
17   to work on the case due to pending Nevada litigation. 76 AA 18980. What Hyatt does not
18   mention here is that by this date he had placed a significant amount of highly relevant
19   information under the NPO, thus preventing its consideration by FTB's protest hearing
20   officer. 76 AA 18966, 18969. This information related to the issues of residency, income
21   timing, business situs and fraud, among other things. 76 AA 18966, 18969. This court had
22   subsequently issued an order (3 AA 00655-56) staying the litigation. Following advice of its
23   attorney in the Nevada litigation, FTB complied with the stay and awaited this court's
24   decision before acting to acquire the information for the PHO. 76 AA 18982. When the stay
25   was lifted (April 2002), FTB immediately invoked the provision contained in the NPO and
26   requested that Hyatt produce the information voluntarily. 77 AA 19025-28. He refused. 49
27   AA 12073 (110-111).
28

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002500

Finally, for the 1992 tax year, Hyatt implies that FTB chose to ignore an allegedly blatant $24,000,000 income error made in calculating the tax on the 1992 NPA. RAB 30-31. Hyatt's argument appears to be that his alleged error is indisputable. Not only is Hyatt incorrect, the genesis of this issue is illustrative of Hyatt's consistent failure to cooperate during the entire audit and protest process. In calculating the amount of tax owed by Hyatt for 1992, FTB's auditor, reviewing supervisor and Sacramento reviewers, relied on documentation that shows Hyatt receiving a large amount of income in January 1992. 72 AA 17862-95. Long after the 1992 NPA amounts were proposed and sent to Hyatt by FTB auditors, FTB received correspondence from Hyatt objecting to the calculation, contending that the large number was made up of smaller amounts of income received periodically during the 1992 tax year. 64 AA 13405-06. In support, Hyatt provided some documentation that shows various 1992 deposits into his personal accounts. Id. However, because the documentation was factually and legally insufficient to prove earned income, it was rejected, and Hyatt failed to follow up with any actual proof of the receipt and timing of his 1992 income. 85 RA 021126-28. In other words, the alleged $24,000,000 "error" Hyatt claims was bad faith continues to be part of the tax dispute in this matter.

As before, FTB remains perplexed how these issues arriving from discovery in this case and orders from this court were to be resolved by the jury without guidance or direction from the district court, who refused to give any.

III.    LEGAL ARGUMENT

A.    Standard Of Review

Hyatt argues that this is a "substantial evidence" appeal. RAB 51-53. Hyatt is wrong. Except as to certain discreet elements of certain causes of action, FTB is not making sufficiency-of-evidence contentions. Rather, FTB's opening brief consistently argues that Hyatt's various claims failed as a matter of law, even accepting Hyatt's evidence as true.

Hyatt also argues that FTB's statement of facts is deficient and therefore FTB waived any challenge to the sufficiency of the evidence. RAB 53-54. Citing only one case from another jurisdiction, Hyatt argues that an appellant who does not "fairly summarize" all of

RJN002501

the facts in an appeal waives any challenge to the sufficiency of the evidence. RAB 53. This court has never adopted such a doctrine. Moreover, the case on which Hyatt relies, Foreman & Clark Corp. v. Fallon, 479 P.2d 362 (Cal. 1971), held that an appellant cannot merely recite its own evidence, ignoring contrary evidence in the record. Id. at 366. In the present case, FTB's opening brief did not merely rely on its own evidence, ignoring Hyatt's evidence. FTB frequently cited to Hyatt's witnesses and exhibits, even citing to testimony by Hyatt himself and his experts.[18]

### B. Nevada's Recent Jurisprudence Examining Discretionary Function Immunity Applies To FTB And This Case

FTB's opening brief explained that, as a matter of comity, Nevada's new test for discretionary function immunity, the Berkovitz-Gaubert test, applied to FTB's actions at issue in this case (AOB 34-55) because (1) the actions at issue are discretionary; and (2) the actions were based upon considerations of social, economic, and political policy. Martinez v. Maruszczak, 123 Nev. 433, 168 P.3d 720 (2007). FTB also asserted that under this new test, allegations of bad faith and/or intentional misconduct no longer preclude the application of immunity to disputed governmental conduct. AOB 52-55. Finally, FTB asserted that even if bad faith or intentional misconduct exceptions to Berkovitz-Gaubert would be recognized by this court, at trial, Hyatt only presented acts of negligence from which no inference of bad faith or intentional misconduct is permitted, and the jury did not find bad faith. AOB 55-57.

Hyatt's answering brief does not dispute that Nevada's new test for discretionary function immunity applies to FTB's sovereign immunity statute as a matter of comity.[19]

---

[18]The trial in this case lasted four months, with dozens of witnesses and thousands of pages of exhibits. No appellate rule or case required FTB to summarize the testimony of every witness or to describe every exhibit. See NRAP 28(j) (briefs must be free of irrelevant and immaterial matters).

[19]Hyatt's brief does not contest that the "law of the case" requires the application of comity to FTB's sovereign immunity statute to the extent the immunity contained in that provision aligns with Nevada's new test for discretionary function immunity. Instead, Hyatt claims that the "'law of the case' is entirely consistent with the current state of the law" in Nevada. RAB 54.

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002502

Instead, Hyatt argues that the application of this new test makes no difference to the scope of the immunities that must be extended to FTB pursuant to this court's 2002 decision. See RAB 54-69. According to Hyatt, this court's recent jurisprudence "reaffirmed, not changed or contradicted" this court's previous determination that FTB did not have immunity from "discretionary acts taken in bad faith, or for intentional torts." RAB 54-55. Hyatt is wrong.

        1.   Standard of Review Regarding Discretionary Function Immunity

Hyatt contends that FTB is wrong by asserting that the immunity issues in this appeal should be reviewed *de novo* and instead claims they present mixed questions of law and fact. RAB 52. Yet Hyatt identifies no question of fact requiring resolution regarding FTB's claimed immunity.

In Ransdell v. Clark County, 124 Nev.____, 192 P.3d 756 (2008) and Martinez v. Maruszczak, 123 Nev. 433, 168 P.3d 720 (2007), this court did indicate issues of sovereign immunity can involve mixed questions of law and fact. Nevertheless, this court applied *de novo* review to questions involving Nevada's immunity law, including questions regarding the scope of immunity statutes and whether exceptions were available. Ransdell, 192 P.3d at 761; Martinez, 123 Nev. at 438. In each case this court applied *de novo* review on the question of whether the government agency's conduct satisfied the two-prong Berkovitz-Gaubert test. Ransdell, 192 P.3d at 762-64 (court decided whether County's actions involved "an element of judgment or choice," and whether the actions were based on considerations of social, economic and political policy); Martinez, 123 Nev. at 447-48 (court determined Berkovitz-Gaubert immunity issue as matter of law).

Here, FTB is not asking this court to overturn factual determinations made by the jury or to evaluate the sufficiency of evidence regarding immunity. In fact, the jury made no such findings and the district judge refused to evaluate this issue. Rather, FTB is arguing that immunity under the Berkovitz-Gaubert test applies as a matter of law, even accepting Hyatt's evidence as true. Therefore, *de novo* review should apply.

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002503

2. The *Berkovitz-Gaubert* Test Adopted in *Martinez* Does Not Apply Solely To Negligence Claims As Argued by Hyatt

Hyatt's first argument contends that the Berkovitz-Gaubert test does not apply to intentional torts, but only applies to negligence claims. RAB 55-56; 60. Hyatt cites to the court's decision in Martinez v. Maruszczak to support this contention. See id. Hyatt's argument is entirely rebutted by subsequent Nevada case law, relying upon Martinez, which applied the Berkovitz-Gaubert test to intentional tort claims.

In Ransdell v. Clark County, this court applied the Berkovitz-Gaubert test to actions taken by government agents that the plaintiff alleged constituted intentional tort claims. 192 P.3d at 756. Clark County inspectors abated Ransdell's property, seizing various items from the property which the inspectors determined were a nuisance. Id. In response to Clark County's abatement activities, Ransdell filed a civil complaint alleging several causes of action, including intentional tort claims, such as: (1) trespass to land; (2) trespass to chattels; and (3) conversion. Id. at 760. In resolving the appeal, this court applied the Berkovitz-Gaubert test to the conduct of the Clark County inspectors. Id. at 761-762. This court did not distinguish between Ransdell's intentional tort or negligence based claims. Id. at 762-764. Rather, the court applied the test to all of the complained of government conduct, irrespective of causes of action pled, to determine if the acts were protected by discretionary function immunity. Id. Ultimately, the court determined that Clark County was entitled to complete discretionary function immunity – **for all claims, including the intentional tort causes of action**. Id. at 764.

In City of Boulder City v. Boulder Excavation, the court applied Berkovitz-Gaubert to the City's conduct, despite the fact that all of the plaintiff's claims were based upon "alleged intentional, arbitrary, and capricious conduct." 124 Nev. ___, 191 P.3d 1175, 1180 (2008). Specifically, the plaintiff pled the claim of "intentional interference with contractual relationship" against the government agency. Id. At trial, the district court found the plaintiff's favor on the intentional tort claim. Id. at 1178. This court, however, applied the Berkovitz-Gaubert test to the actions taken by the City and concluded that it was entitled to discretionary function immunity because the acts at issue were discretionary and

30

RJN002504

1    based upon policy determinations. Id. at 1181-82. Here again, the labels (intentional tort vs.

2    negligence) placed on the City's conduct by the plaintiff were not determinative of whether

3    the new test applied. See also, Reynolds v. United States, 549 F.3d 1108, 1112 (7th Cir.

4    2008) (label of "bad faith" has no bearing on the analysis required pursuant to Berkovitz-

5    Gaubert test).

6        Pursuant to the Berkovitz-Gaubert test, government actions are entitled to

7    discretionary function immunity when the requisite two elements are satisfied. Ransdell,

8    192 P.3d at 762. The reviewing court does not consider the names or labels placed on the

9    government's conduct by the parties. See Ransdell, 192 P.3d at 764. The court reviews each

10    action taken by the government, objectively, to determine whether or not the conduct is

11    entitled to immunity. See Terbush v. United States, 516 F.3d 1125, 1129 (9th Cir. 2008).  In

12    other words, it is the nature of the conduct that is at issue, not the names of the claims or the

13    characterizations drawn by the plaintiff in describing the conduct. Reynolds, 549 F.3d at

14    1112.

15        This rule makes sense from a public policy perspective. If the names or "labels"

16    placed on the government's actions by plaintiffs were determinative of whether the conduct

17    would be entitled to immunity, plaintiffs would always be able to sidestep the application of

18    discretionary function immunity by merely pleading their claims as intentional torts. This

19    would entirely defeat the purpose of discretionary function immunity and likely eviscerate

20    any instance in which immunity would be applicable. If the creativity of a plaintiff's

21    counsel in pleading intentional torts were all that is sufficient to sidestep these basic

22    principles, "immunity doctrines cannot function." Franklin Sav. Corp. v. United States, 180

23    F.3d 1124, 1136 (10th Cir. 1999). Under Hyatt's view, immunity would never apply if an

24    intentional tort were pled in a complaint. In fact, this is exactly what happened in this

25    litigation. By merely pleading intentional torts, Hyatt was able to avoid dismissal of this

26    case at the early stages of this litigation – in spite of the fact that when the conduct Hyatt

27    complains of is examined, it is apparent that all conduct entailed discretionary acts taken by

28    FTB. See pages 39-43, below. This litigation has proceeded for over twelve years. See 1 AA

31

1-16. During this time period, the parties have expended millions of dollars litigating this case, hundreds of depositions were taken, thousands of documents were exchanged, mountains of motions were filed, multiple writs have been filed, and extremely excessive damages were awarded against FTB. See AOB 26, n. 22. In addition, countless hours of employee time were spent addressing the issues presented in this litigation. In other words, all of the dangers the Berkovitz-Gaubert test protects against have come to pass.

### 3. There Is Not A Bad Faith Or Intentional Torts Exception To Discretionary Function Immunity As Argued by Hyatt

FTB's opening brief explained in detail that mere allegations of government bad faith are insufficient to avoid application of the Berkovitz-Gaubert test. AOB 52-55. In order to avoid dismissal of his claims on this basis, Hyatt argues that the court's adoption of the Berkovitz-Gaubert test did not alter or change the fact that bad faith conduct is not entitled to discretionary function immunity. RAB 55-58. Hyatt is, once again, mistaken.

### a. *Falline* And Its Progeny Were Overruled With The Adoption Of The *Berkovitz-Gaubert* Test in *Martinez*

Hyatt's primary basis for claiming that a bad faith exception survived the adoption of the new test is his reliance upon Falline v. GNLV Corp., 107 Nev. 1004, 823 P.2d 888 (1991), the case that adopted the so-called "bad faith exception" in Nevada.[20] RAB 56-57. Hyatt claims that Falline was neither distinguished nor overruled by Martinez. Id.

As a starting point, contrary to Hyatt's arguments, the adoption of the Berkowitz-Gaubert test entirely changed the existing law in Nevada related to discretionary function immunity. In Martinez, this court expressly overruled and abandoned **all** of the previous tests applied under Nevada law for the application of discretionary function immunity pursuant to NRS 41.032(2), because those tests lead to inconsistent results. 168 P.3d at 727-29. As a result, each and every case that relied upon, or applied, these old tests are no longer good law. Id. at 726 n. 28.

---

[20]Falline created a distinction between an abuse of discretion which is entitled to immunity (NRS 41.032) and bad faith conduct – a distinction that was unsupported by any legal authority and was discussed largely in a footnote. 107 Nev. at 1009 n.3.

32

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1   Although Martinez did not specifically reference Falline, the court did expressly
2   overrule the "operational-versus-planning test" that was relied upon and referenced in
3   Falline in adopting the bad faith exception. See Martinez, 168 P.3d at 727. On this basis
4   alone, it appears that Falline, as it relates to the so-called bad faith exception, has now been
5   overruled. Even if Falline was not expressly overruled by Martinez, its holding that
6   "discretionary acts taken in bad faith" are outside the scope of Nevada's discretionary
7   function immunity is called into serious question and, at a minimum, implicitly overruled.
8   The new Nevada jurisprudence in this area has made it abundantly clear that courts are **not**
9   to consider the "**subjective intent**" of the particular government actor – a point entirely
10  ignored by Hyatt's brief. Martinez, 168 P.3d at 728; Butler ex rel. Biller v. Bayer, 123 Nev.
11  450, 168 P.3d 1055, 1066 (2007). The only question is whether **objectively** the conduct at
12  issue is susceptible to a policy analysis and thus satisfies the two elements of the new test.
13  Id.; Franklin, 180 F.3d at 1135; Rogers v. United States, 187 F.Supp.2d 626, 631 (N.D.
14  Miss. 2001).

15       A review of Falline reveals that the analysis of whether an act was conducted in bad
16  faith depends entirely upon the subjective intent of the individual government agent. Falline
17  defines bad faith as "the absence of a reasonable basis for denying benefits . . . and the
18  defendant's **knowledge** or **reckless disregard** of the lack of a reasonable basis for denying
19  the claim." Falline, 107 Nev. at 1009 (emphasis added). The opinion further explains that
20  bad faith is "an implemented **attitude** that completely transcends the circumference of
21  authority . . .". Id. at 1009 n.3 (emphasis added). As an illustration, the Falline court
22  provides an example of bad faith as occurring when "an administrator decides to delay or
23  deny a claimant's benefits because of a **personal dislike** for the claimant." Id. (emphasis
24  added).

25       It is apparent that pursuant to Falline and its progeny, bad faith is determined entirely
26  by looking to the subjective intent or attitudes of the government agent, which is now
27  expressly prohibited. Martinez, 168 P.3d at 728; Butler, 168 P.3d at 1067. Therefore,
28  contrary to Hyatt's assertions, Falline's bad faith exception to discretionary function

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

33

1    immunity did not survive the adoption of the Berkovitz-Gaubert test.

2         b.    Post-*Martinez* Cases Do Not Change This Result

3    Hyatt argues that subsequent Nevada cases cite to Falline, thus showing the bad faith

4    exception to discretionary function immunity survived the adoption of the Berkovitz-

5    Gaubert test. RAB 57-60. However, none of these decisions were required to pass on the

6    issue of whether the bad faith exception survived the adoption of the new discretionary

7    function immunity test. Moreover, the references to the bad faith exception in these cases

8    are found in dicta.

9    Hyatt claims that this court's decision in City of Boulder City v. Boulder Excavation,

10   Inc. supports the conclusion that bad faith remains an exception to discretionary function

11   immunity. RAB 56-57. This opinion did cite to Falline and referenced the bad faith

12   exception. Boulder City, 191 P.3d at 1182. But the reference to Falline was made in passing

13   in dicta and is not the holding of the case. See id. "A statement in a case is dictum when it is

14   unnecessary to a determination of the questions involved." Argentina Consol. Min. Co. v.

15   Jolly Urga Wirth Woodbury & Standish, 125 Nev. ___, 216 P.3d 779, 785 (2009) (internal

16   citations and quotations omitted). Dicta is not controlling authority. Id. More importantly,

17   however, in Boulder City, this court was not asked to consider the question of whether the

18   bad faith exception survived the adoption of Berkovitz-Gaubert. Boulder City, 191 P.3d at

19   1182. Rather, the parties and the court merely assumed that Falline was still good law,

20   without actually analyzing the impact of the adoption of Berkovitz-Gaubert test. See id.

21   Hyatt's citation to ASAP Storage, Inc. v. City of Sparks, 123 Nev. 639, 173 P.3d 734

22   (2007) also does not support his conclusion. In ASAP, this court was required to determine

23   whether a government agency was entitled to immunity pursuant to NRS 414.110, a specific

24   statute that relates expressly to governmental immunities in the context of emergency

25   response activities. Id. at 742-43. This statute expressly exempts willful misconduct, gross

26   negligence, and other acts from immunity. Id. In ASAP, the district court never analyzed or

27   considered the application of discretionary function immunity to the city's conduct. Rather,

28   the court remanded this issue to the district court – without any further discussion. Id. at

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

34

745-46. Although the court noted that the city could be vicariously liable for the "willful misconduct of its employees," the court did not consider whether the bad faith exception survived the adoption of the Berkovitz-Gaubert test. Id. Therefore, ASAP, like Boulder City, does not support Hyatt's conclusion that the bad faith exception survived the adoption of the new test since these courts were never asked to consider, nor did they consider, this issue.[21]

        c.      Hyatt's Reliance On Out-of-State Authorities Is Misplaced Since None Utilize the Berkovitz-Gaubert Test

In an effort to convince the court that bad faith remains an exception to discretionary function immunity, Hyatt cites to cases from other jurisdictions. See RAB 60-61. These cases, however, apply to specific state laws of certain individual states – none of which apply the Berkovitz-Gaubert test to their state's version of discretionary function immunity. In fact, none of these decisions reference, or analyze the Berkovitz-Gaubert test. See Matter of Sheffield, 465 So. 2d 350 (Ala. 1984) (no reference to the Berkovitz-Gaubert test); McCray v. City of Dothan, 169 F.Supp. 2d 1260 (M.D. Ala. 2001) (same); Hawkins v. Holloway, 316 F.3d 777 (8th Cir. 2003) (same – applying Missouri law); Catalina v. Crawford, 483 N.E.2d 486 (Ohio Ct. App. 1984) (applying Ohio law before adoption of Berkovitz-Gaubert test by federal courts); Tobias v. Phelps, 375 N.W.2d 365 (Mich. Ct. App. 1985) (same – applying Michigan law).[22]

In addition, Hyatt's brief fails to mention that several of these cases were decided **before** the United States Supreme Court even adopted the Berkovitz-Gaubert test in 1988

---

[21] Hyatt's citation and reliance upon Jordon v. State ex. rel. DMV & Pub. Safety, 121 Nev. 44, 110 P.3d 30 (2005) [RAB 59] has no bearing on this case or this issue. Jordon was decided over two years before this court decided Martinez and therein adopted the Berkovitz-Gaubert test; Jordon applied the prior tests for discretionary function immunity which have since been abandoned. Similarly, Hyatt's reliance on Davis v. City of Las Vegas, 478 F.3d 1048 (9th Cir. 2007) [RAB 56-57] is unavailing. Davis, like Jordon, was decided before Martinez and before this court adopted the Berkovitz-Gaubert Test.

[22] Hyatt also cites to The Libertatia Assoc., Inc. v. U.S., 46 Fed. Cl. 702 (2000). RAB 60. This case has absolutely nothing to do with the application of discretionary function immunity or governmental torts assessed under the Federal Torts Claim Act. Rather, the case involves a contract action between the United States government and a private company and whether the government terminated the contract in "bad faith." Id.

McDONALD·CARANO·WILSON<br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>P.O. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

RJN002509

and 1991. See Tobias, 375 N.W.2d at 365; Catalina, 483 N.E.2d at 486. Thus, the fact that these jurisdictions recognize, or more accurately recognized, a bad faith exception to discretionary function immunity prior to the adoption of Berkovitz-Gaubert has absolutely no bearing on whether such an exception applies in jurisdictions, like Nevada, that have since adopted the Berkovitz-Gaubert test.

**Hyatt also fails to cite any case applying the Berkovitz-Gaubert test recognizing a bad faith exception**. FTB has conducted an extensive search and has been unable to locate any such case. Thus, the case law from other jurisdictions does not support Hyatt's argument that bad faith remains an exception to discretionary function immunity under the Berkovitz-Gaubert test.

FTB's opening brief cited cases applying the Berkovitz-Gaubert test expressly rejecting a bad faith exception in Federal Tort Claims Act suits.[23] AOB 52-55. Hyatt's brief attempts to distinguish these cases by incorrectly stating that "the plaintiff[s] [in these cases were] suing for recovery of damages stemming from a discretionary decision of the government, typically a regulatory action." RAB 67. Hyatt's characterization of these cases is completely inaccurate. All of these cases, like the case at bar, were lawsuits alleging intentional or bad faith torts against the government seeking money damages. See Franklin, 180 F.3d at 1124; Rogers, 187 F.Supp.2d at 626; Matter of TPI Int'l Airways, Inc., 141 B.R. 512 (Bankr. S.D. Ga. 1992); Bolen v. Dengel, CIV.A. 00-783, 2004 WL 2984330 (E.D. La. Dec. 16, 2004). None of these cases were based upon administrative challenges to governmental decision making. Id.

For example, in Franklin, the plaintiffs brought civil tort claims based upon the government's alleged improper acts as the conservator of a business. 180 F.3d at 1127. Like Hyatt, the plaintiffs claimed that the acts constituted bad faith or intentional misconduct and were therefore not immune. Id. In Rogers., a case highly analogous to this case, the

---

[23]Federal jurisprudence is useful in analyzing Nevada immunity claims. Butler, 123 Nev. at 466 n.50.

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002510

1    plaintiffs filed tort claims against the government for damages they allegedly sustained from

2    improper government "field audits" that plaintiffs alleged were "targeted" in order to "make

3    an example" out of them and to "allay political pressure." 187 F. Supp. 2d at 629. Likewise,

4    in TPI International, the plaintiffs in a bankruptcy adversary proceeding alleged a tort claim

5    of "intentional misrepresentation" or "fraud" as well as other intentional tort claims against

6    a government agency. 141 B.R. at 514-15. All plaintiffs, like Hyatt, attempted to avoid the

7    application of discretionary function immunity by alleging the government engaged in bad

8    faith or intentional misconduct. Franklin, 180 F.3d at 1125; Rogers, 187 F. Supp. 2d at 629;

9    TPI, 141 B.R. at 514-15. Yet, all of courts properly rejected the plaintiffs' attempts to avoid

10   application of immunity based upon allegations of bad faith or intentional misconduct.

11   Franklin, 180 F.3d at 1140; Rogers, 187 F. Supp. 2d at 631-33; TPI, 141 B.R. at 519-20.

12   The courts held that the subjective intent of the government agent was irrelevant, and

13   reviewed the conduct of the government entities only through the prism of the Berkovitz-

14   Gaubert test to determine whether, objectively, the government was entitled to immunity.

15   Franklin, 180 F.3d at 1140; Rogers, 187 F.Supp.2d at 630-31; TPI, 141 B.R. at 519-20.

### d.    Government Conduct Remains Subject to Scrutiny

17          FTB is not contending that the lack of a bad faith exception means that government

18   agents can engage in any type of egregious conduct and still be entitled to immunity. That is

19   not FTB's position, nor does it conform to the application of Berkovitz-Gaubert. For

20   example, if a government agent engaged in torture (i.e. thumb screws) to obtain information

21   from a citizen, this would not fall within the confines of the discretionary function

22   immunity. This is so because such activities would violate clear legal mandates – such as

23   constitutional protections – that expressly prohibit such actions. See Franklin Sav. Corp. v.

24   United States, 180 F.3d 1124 (10th Cir. 1999) (discretionary function exception will not

25   apply when a federal statute, regulation or policy specifically prescribes a course of action

26   for the agent to follow); Limone v. U.S., 497 F.Supp.2d 143, 203-4 (D. Mass. 2007) (no

27   discretion to violate constitutional provisions).

28          It is important to underscore that Hyatt offered no evidence that FTB violated clear,

37

RJN002511

legal mandates or policies, and there were NO allegations in this case that FTB suborned perjury, used any type of physical violence to coerce testimony, fabricated evidence, engaged in torture or any other type of egregious conduct that would be clearly unlawful and unconstitutional. At worst, Hyatt claims FTB conducted an investigation which it was lawfully authorized to do but did so incorrectly – i.e., it gathered the wrong evidence, it analyzed the evidence wrong, it was "biased" in favor of FTB in its determinations, it improperly utilized cost-benefit ratios to determine its budgets, it published a "Litigation Roster," FTB spoke to Hyatt's relatives that did not like him, it went "after wealthy taxpayers," etc. See, e.g., RAB 18-35, 41-42, 54-69. As previously explained, these types of "bad faith" allegations are exactly the types of claims that cannot be reviewed under the discretionary function immunity test. Reviewing these claims necessarily requires this court to decide whether FTB, the government agency with the expertise in tax audit investigations, did its job "correctly" by the standards decided by the Nevada district court, or, in this case, the lay Nevada jury with no expertise in California tax law, audit procedures, or the like. This is exactly the type of judicial second-guessing into the subjective intent of government agents that the Berkovitz-Gaubert test is intended to prohibit. See Franklin Sav. Corp. v. United States, 180 F.3d 1124 (10th Cir. 1999).

4. There Was No Bad Faith Finding In This Case And It Is Impermissible to Infer Such a Finding

Hyatt's unfounded claim that the jury made a finding of "bad faith" permeates every aspect of his answering brief. See, e.g., RAB 4 ("The jury determined that the FTB abused its enormous power in bad faith...."); RAB 14 ("The jury heard and accepted substantial evidence of...bad faith conduct by the FTB"). Yet, as mentioned above, the jury made no finding of bad faith. Bad faith was neither a claim, nor an element of any claim, presented to the jury. Any such claim by Hyatt is wholly without merit. See pages 5-8.

The following claims were presented to the jury: (1) intrusion upon seclusion; (2) publicity of private facts; (3) false light; (4) abuse of process; (5) intentional infliction of emotional distress; (6) fraud; and (7) breach of confidential relationships. 14 AA 3257-3300. The jury instructions reveal that none of these claims contained an essential element

38

RJN002512

1    of bad faith. See 53 AA 13218-50; 54 AA 13251-87. The jury verdict form did not seek or

2    request the jury to make any factual findings regarding bad faith. See 54 AA 13308-09. The

3    verdict form merely asked the jury to determine whether Hyatt or FTB prevailed on each

4    claim in a conclusory fashion. Id. "Bad faith" was not pleaded separately as an independent

5    cause of action. 14 AA 3257-3300. Hyatt's counsel admitted that they had not pled as a

6    separate claim bad faith. 50 AA 12500 (70).  Hyatt's counsel also admitted that "bad faith"

7    was "not an element of any of the cases of action."  See 51 AA 12509 (108).  Contrary to

8    Hyatt's claims, there was no specific "finding" of bad faith made in this case, nor is there

9    any inference that can be drawn from the jury's verdict and, therefore, even if bad faith

10   remains an exception to discretionary function immunity, no such finding was made in this

11   case.

        5.     <u>Based Upon The Application Of Discretionary Function Immunity, Each Of Hyatt's Claims, As Tried To The Jury, Must Be Dismissed</u>

13   Finally, Hyatt argues that, even if the two-part <u>Berkovitz-Gaubert</u> test were applied

14   to FTB's conduct, it is not entitled to discretionary function immunity. See RAB 61-64.

15   Hyatt's arguments on these points are flawed.

        a.     <u>Part One of *Berkovitz-Gaubert*: All Of FTB's Alleged Improper Conduct Was Discretionary</u>

18   The opening brief explained that all of FTB's actions were discretionary acts entitled

19   to immunity. AOB 40-49. In fact, this point was made through Hyatt's own examinations at

20   trial. See AOB 40-41. Hyatt now, however, contends that FTB's investigative conduct was

21   not discretionary, "it ha[d] no discretion to conduct the investigation in an unfair and partial

22   manner or to unlawfully disclose confidential information given to it during the

23   investigation." RAB 61-62.

24   An act is discretionary if it involves "an element of judgment or choice." <u>Martinez</u>,

25   168 P.3d at 728; <u>Butler</u>, 168 P.3d at 1066. On the other hand, as Hyatt points out, an act is

26   not discretionary if it involves the mandatory compliance with a specific statute, regulation,

27   or policy. <u>Berkovitz by Berkovitz v. United States</u>, 486 U.S. 531, 536 (1988).  Hyatt

28   contends that none of FTB's conduct was discretionary because FTB was required to: (1)

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

39

RJN002513

1  treat him fairly and impartially; and (2) maintain the confidentiality of his personal

2  information. RAB 61-62.

3      In order for an act or decision to be non-discretionary pursuant to the Berkovitz-

4  Gaubert test, the statute or policy must direct a mandatory and specific course of conduct

5  for the government actor. Terbush v. United States, 516 F.3d 1125, 1129 (9th Cir. 2008).

6  The cases cited by Hyatt's brief clarify this requirement. For example, in Bolt v. United

7  States, the Ninth Circuit determined that removal of snow and ice from a parking lot was

8  not discretionary because a written policy mandated specific times when snow and ice were

9  to be removed.  509 F.3d 1028, 1032 (9th Cir. 2007).

10      Hyatt cites no statute, regulation or FTB policy that imposed a specific course of

11  conduct on how FTB was to be fair and impartial. RAB 61. Rather, Hyatt merely cites to

12  other pages of his own brief. See RAB 61 n. 241 (referring reader to various other sections

13  of the brief). When these other sections are reviewed, however, Hyatt still has not identified

14  any specific statute, policy, regulation or directive that FTB allegedly failed to follow or

15  that mandated a specific course of conduct for FTB.

16      If the statute, regulation or policy does not mandate a specific course of conduct, the

17  agency retains discretion to make its own decisions on how to fulfill the agency's policy.

18  See Ransdell, 192 P.3d at 762-63 (Nevada statutes did not specify how Clark County

19  inspectors reached conclusion that area constituted a "dangerous condition"). In order for a

20  governmental policy to be deemed non-discretionary, the policy must be a specific and

21  mandatory directive. Id.  Here, the aspirational goal to treat taxpayers fairly and impartially

22  was not such a specific and mandatory directive. See Kelly v. United States, 241 F.3d 755,

23  760 (9th Cir. 2001). Rather, it was nothing more than a "gratuitous and unsolicited

24  statement[s] of policy or of intention," which was neither an enforceable promise nor a

25  specific and mandatory directive of policy to FTB's employees. See Bogley's Estate v.

26  United States, 514 F.2d 1027, 1032-33 (Ct. Cl. Apr. 16, 1975); cf. Minehan v. United

27  States, 75 Fed. Cl. 249, 260-262 (2007) (no actionable promise where IRS's mission to

28  "provide America's taxpayers top quality service by helping them understand and meet their

McDONALD·CARANO·WILSON<br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>P.O. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

RJN002514

1  tax responsibilities and by applying the tax law with integrity and fairness to all;" deemed

2  policy aspirational only).

3      Here, any internal goal to treat taxpayers fairly and impartially was no different from

4  the similar goal in the IRS's mission statement in Minehan. This broad goal did not specify

5  any particular course of conduct for FTB's employees. A general regulation or policy does

6  not remove discretion from governmental agencies "unless it specifically prescribes a

7  course of conduct." Kelly, 241 F.3d at 761. For example, in Blackburn v. United States, the

8  Ninth Circuit rejected assertions that general policy goals regarding warning signs removed

9  discretion from government employees, because this general policy did not specify **how** the

10  government agency was supposed to meet these goals or how or when to warn the public.

11  100 F.3d 1426, 1431 (9th Cir. 1996). See also, Tippett v. United States, 108 F.3d 1194 (10th

12  Cir. 1997) (park safety policy that protecting human life takes precedence over all other

13  considerations in national park did not remove discretion to determine how to implement

14  this policy.)

15      Here, there was no specific policy or regulation that dictated the way FTB employees

16  must conduct audits in order to satisfy the aspirational goal of fairness and impartiality.

17  There was no specific requirement directing how FTB should gather evidence, when FTB

18  could send third-party demands, what evidence FTB could consider, or how FTB should

19  analyze the evidence. See AOB 38-40. A goal to be fair and impartial cannot be deemed a

20  mandatory directive because it would be impossible to determine whether the goal was

21  fulfilled. Fairness and impartiality, like beauty, differ dependent upon the eye of the

22  beholder, and are therefore, entirely subjective concepts. Under Berkovitz-Gaubert, there

23  must be some objective means to determine whether the directive was fulfilled. See Bolt,

24  509 F.3d at 1032. Whether a government employee acted fairly or impartially is simply too

25  subjective to be amendable to specific quantifications. See Bulbman, Inc. v. Nevada Bell,

26  108 Nev. 105, 111, 825 P.2d 588 (1992) (vague promises that a phone system would be

27  good for a particular business deemed only "commentary sales talk" and mere "puffery,"

28  not an enforceable promise that could be quantified).

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

41

1  Hyatt next argues that FTB did not have discretion to disclose his identity

2  information, based upon California and federal laws. RAB 61-62. Hyatt then cites to pages

3  35-36 of his own brief, but again he does not identify what statute, policy, or regulation

4  prohibited these actions. There is, in fact, no statute, regulation, or policy that prohibited

5  FTB from sending necessary disclosures of Hyatt's identity information when making third-

6  party requests for information. Specifically, the California Information Practices Act

7  ("IPA") did not prohibit FTB from disclosing Hyatt's identity information in order to ensure

8  that the information it received from third parties was specific to Hyatt.

> No agency may disclose any personal information in a manner that would
> link the information disclosed to the individual to whom it pertains **unless
> the information is disclosed, as follows:**
>
> (p) To another person or governmental organization **to the extent necessary**
> to obtain information from the person or governmental organization as
> necessary **for an investigation by the agency of a failure to comply with a
> specific state law that the agency is responsible for enforcing.**

Cal. Civ. Code § 1798.24(p) (emphasis added). The IPA did not prohibit FTB from making

necessary disclosures of Hyatt's identity information to third parties because each disclosure

was made to obtain information that was necessary for FTB's investigation of Hyatt's

failure to comply with state tax laws.[24]

FTB's own internal policies and training manuals also refute Hyatt's argument. FTB

policy allowed FTB to make disclosures of identity information in order to obtain relevant

information related to an audit. See 48 AA 11902 (99)–(100); 47 AA 11738 (191)–(192); 42

AA 10307 (142)–(144) (FTB could reveal personal information if necessary to collect or

assess personal income tax.) FTB's Security and Disclosures Manual specifically indicates

that personal information including social security numbers, can be disclosed if the

disclosure was authorized by law. See 60 AA 14976; 61 AA 15034. Contrary to Hyatt's

repeated contention that FTB made massive and illegal disclosures of his identity

information, a review of FTB's communications reveals that FTB employees narrowly and

---

[24]In addition, no federal laws prohibited FTB from disclosing Hyatt's personal information
when conducting its audit investigation. The Federal Privacy Act has absolutely no
application to FTB's audit conduct. See 5 U.S.C. § 552a.

McDONALD·CARANO·WILSON⸱ᴸᴸᴾ
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002516

1  specifically tailored each communication to obtain only information which would

2  reasonably be expected to be in the possession of the specific recipient – consistent with the

3  IPA and FTB's manuals and policies. Therefore, FTB did not violate any statute, regulation,

4  or internal policy by making these limited disclosures, therefore, this conduct remains

5  "discretionary" within the Berkovitz-Gaubert test.

6      For example, FTB sent a letter to the Nevada DMV. 62 AA 15615-16. This letter

7  provided necessary identifying information such as Hyatt's name, social security number,

8  date of birth, and post office box address – all of which was already in the possession of the

9  DMV. Id. The letter sent to the Clark County Assessor only sought information regarding

10  Hyatt's Nevada house – 7335 Tara Avenue. 63 AA 15724. This letter asked for information

11  regarding who the present owner was, who the previous owner was, and the date the

12  property was transferred. Id. Likewise, the letters sent to the power companies Southwest

13  Gas Corp. (65 AA 16099-100; 16154-55) and Southern California Edison (63 AA 15731-

14  32)) asked only for information related to the power bills at Hyatt's California and Nevada

15  houses. This was the identical case with letters sent to water companies, cable companies,

16  trash collectors and all other third-parties. See 63 AA 15733-35; 65 AA 16095-96; 16233-

17  243; 65 AA 16097-98; 16143-146. Despite Hyatt's unsubstantiated assertion that FTB made

18  massive illegal disclosures of his confidential information, see, e.g., RAB 9, 57, 58, there is

19  no statute, regulation or policy that prohibited FTB or its employees from making these

20  necessary disclosures for the purpose of facilitating the audit. Rather, such disclosures were

21  left to the discretion, judgment and choice of the auditor.[25]

22  _____

23  [25]Hyatt does claim that FTB attempted to extort a settlement from him because it sent him,
along with thousands and thousands of other taxpayers, a form notifying him of the

24  California Legislature's decision to offer a tax amnesty program. FTB **did not** create the
Tax Amnesty legislation, did not decide who was eligible for the program, or what the

25  penalties would be for eligible taxpayers who failed to participate. See 89 AA 22051-67.
Thus, Hyatt's claim (which is unsupported by any record citation) that FTB "imposed" an

26  amnesty penalty of "nearly $10 million" on Hyatt is blatantly false. See RAB 67. It remains

27  unclear how FTB attempted to "extort" a settlement from Hyatt by sending him a form
related to this program mandated by California's Legislature. Imagine if FTB had not sent

28     Continued . . .

McDONALD·CARANO·WILSON℠<br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>P.O. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

RJN002517

b.  Part Two Of *Berkovitz-Gaubert*: All Of FTB's Actions Were Based Upon Policy Determinations

FTB's opening brief established that each of FTB's discretionary acts was taken to further the economic policy of imposing personal income tax on all California residents. AOB 50-49-52. In response, Hyatt argues that the second element of the Berkovitz-Gaubert test cannot be satisfied because "not every purportedly discretionary act of FTB . . . is automatically in furtherance of a plausible policy objective." RAB 62. Hyatt makes no attempt to explain what actions were not based upon economic objectives. Rather, Hyatt merely claims actions taken by FTB in bad faith or "outside the circumference of the authority granted to FTB are not protected by any form of immunity" and "fall outside the ambit of a plausible policy objective." Id. These arguments fail for several reasons.

Hyatt misstates this second element of the Berkovitz-Gaubert test, which requires the court to determine if the judgment is the kind that the discretionary function exception was designed to shield i.e., actions based on considerations of social, economic, or political policy. Butler, 168 P.3d at 1066. As explained in FTB's opening brief, see AOB 50-52, the focus of the second element is not on the government employee's "subjective intent in exercising the discretion conferred . . . but on the nature of the actions taken and on whether they are susceptible to a policy analysis." Id.  Hyatt's brief entirely ignores this key aspect of the policy element.

Hyatt also fails to rebut the presumption that FTB's conduct was based upon economic policy considerations because it was charged with administrating and enforcing California's tax laws. See AOB 50-51. "If a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves considerations of the same policies which led to the promulgation of the regulations." United States v. Gaubert, 499 U.S. 315, 323 (1991). It is

---

Hyatt the Tax Amnesty Form: He would surely be arguing that FTB treated him different from other taxpayers, he was deprived of an opportunity for amnesty, and this would have been evidence of FTB's alleged bad faith or nefarious conduct.

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

44

RJN002518

1  the policy of California to collect personal income tax from its residents. See AOB 50-51.

2  FTB enforces this policy. A legitimate purpose of Hyatt's audit was to determine the

3  correctness of his tax returns, i.e., whether his alleged date of California non-residence –

4  October 1, 1991 – was correct. See, e.g., 46 AA 11300 (91)-(92) (describing purpose of

5  residency audit). Based on the unrebutted presumption, all of FTB's actions – as claimed by

6  Hyatt and tried to the jury – were in furtherance of the economic policies of tax collection.

7  Gaubert, 499 U.S. at 323.

8      Hyatt cites a few cases suggesting they support his claim that bad faith overcomes

9  any policy basis for FTB's conduct. See RAB 62-64. However, these cases do not support

10  Hyatt's argument. First, Hyatt cites Coulthurst v. United States, 214 F.3d 106 (2d Cir.

11  2000). There is no reference in Coulthurst to bad faith or intentional misconduct on the part

12  of the government employees. Next, Hyatt relies upon Limone v. U.S., 497 F.Supp.2d 143

13  (D.Mass. 2007). The Limone court determined that the government agents' conduct in

14  framing innocent men and suborning perjury were not discretionary acts. Id. at 203-204.

15  The government's conduct at issue was prohibited by the U.S. Constitution and other

16  specific and direct legal requirements placed on law enforcement agents. Id.  As these acts

17  were not discretionary in the first instance, the court did not reach the second Berkovitz-

18  Gaubert element.

19      In sum, Hyatt failed to establish that the Berkovitz-Gaubert test is not satisfied in this

20  case. He has failed to establish that any of FTB's conduct was "non-discretionary" or that

21  FTB violated any express constitutional provision, statute, regulation or directive when it:

22  (1) gathered evidence; (2) analyzed evidence; (3) conducted its administrative protests; or

23  (4) engaged in other organizational conduct. Hyatt has also failed to rebut the fact that all of

24  FTB's discretionary conduct was taken for an important economic policy purpose -- i.e., to

25  administer California's tax laws. Consequently, discretionary function immunity applies to

26  all of FTB's conduct. As such, the judgment must be reversed and Hyatt's entire case must

27  be dismissed. With the dismissal of this case on these grounds, this court need not consider

28  any other issues or go any further with its review.

RJN002519

C.     **Contrary To Hyatt's Arguments, District Judge Walsh Allowed Trial To Exceed The Jurisdictional Scope Of This Case**

FTB's opening brief explained that even if this court's April 4, 2002 order was left entirely undisturbed by this court's recent case law related to discretionary function immunity, Hyatt's case, as tried to the jury, must still be dismissed because all of FTB's conduct at issue was nothing more than alleged negligence. See AOB 55-57. As a result, the trial exceeded the jurisdictional scope placed by the court's 2002 order which expressly dismissed Hyatt's negligence claim pursuant to discretionary function immunity. On this alternative basis, this entire case must be dismissed. In an effort to avoid this result, Hyatt asserts that evidence of negligence was admissible at trial; the negligence evidence constituted substantial evidence to support his intentional tort claims; and the inclusion of this evidence conformed to the prior rulings of this court. RAB 69-75.

FTB is not asserting that the district court made an evidentiary error by admitting the negligence evidence at trial. See AOB 55-57. To the contrary, FTB's argument is simply that evidence of mere negligence cannot be sufficient as a matter of law to support liability for intentional tort claims and the only evidence of alleged wrongdoing by FTB was mere negligence, as admitted by Hyatt's own expert. Id. Thus, even if this court assumes that all of the negligence evidence presented by Hyatt was true, this evidence alone cannot establish FTB's liability for intentional misconduct, as a matter of law.

1.     **Hyatt's Arguments Illustrate That All Of FTB's Conduct At Issue Was Nothing More Than Mere Negligence, Which Was Immune Under the Court's 2002 Decision**

Hyatt's brief does not cite to any record evidence that supports his contention that FTB engaged in intentional conduct. RAB 70-71. Although Hyatt claims FTB "labels" the trial evidence as negligence, it is really Hyatt who is using his own labels to assert that evidence of negligence alone can be transmuted into intentional conduct based upon the quantity of the so-called negligence. Id. at 70-72.

For example, Hyatt claims (without a record citation) that FTB engaged in intentional conduct because FTB discounted evidence in favor of Hyatt's residency claim. Id. at 70.  The conduct Hyatt complains of was FTB not doing its job properly, according to

RJN002520

Hyatt. See AOB 55-57. Hyatt's argument in response to FTB's Rule 50(a) motion summarized the evidence Hyatt claimed equated to intentional misconduct. See 45 AA 11190 (35) – 11203 (86). When each act described by Hyatt's counsel is analyzed, one concludes it is nothing more than mere negligence – i.e., FTB improperly gathered evidence, improperly weighed evidence, and improperly engaged in organizational conduct and the like. See 45 AA 11190(35) – 11203 (86) (Hyatt's counsel arguing in opposition to FTB's Rule 50(a) motion that Hyatt presented no evidence of intent to defraud). Hyatt's primary expert witness testified that what FTB and its employees did wrong was not adhere to "reasonable professional standards" while conducting the audit. See 44 AA 10754 (114)-10778 (212); 10814(3)-34 (84); 10938 (144)-45 (170) (Jumelet's direct examination). Failing to adhere to "reasonable professional standards" is a negligence standard.

Hyatt then argues that cumulative acts of negligence can be submitted to the jury as evidence of intentional wrongdoing. RAB 71-72. The truth is that cumulative acts of negligence, and nothing more, *cannot* support a finding of liability for an *intentional* tort. AOB 57. Hyatt's brief appears to acknowledge this point when he admits that case law holds that "**repeated acts of negligence are insufficient in themselves to prove intentional conduct . . . .**" RAB 71 (emphasis added). Yet Hyatt goes on to argue, in the same sentence, that "multiple acts of negligence can be evidence of deliberate or intentional acts." Id. Hyatt's brief does not cite any legal authority to support the proposition that evidence of negligence only can support a liability finding against a party for an intentional tort, especially in the absence of any evidence actually proving intentional misconduct. See RAB at 69-72.

FTB specifically moved to dismiss Hyatt's case in its motions for judgment as a matter of law on this very basis -- all of Hyatt's evidence proved nothing more than negligence and was therefore outside the jurisdictional limitations of this case. 45 AA 11181(2)-192(35). Although Hyatt's counsel did not present any evidence that FTB engaged in intentional misconduct, (see 45 AA 11192(35)-11203(86)), the court denied FTB's motion during trial and post-trial (45 AA 11206(101)-207(102)), adopting instead

McDONALD·CARANO·WILSON<br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>P.O. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

RJN002521

1  Hyatt's theory that intentional misconduct could be "inferred" from multiple negligent

2  acts.[26]

3      On this basis alone, Hyatt's case, as tried to the jury, clearly exceeded the

4  jurisdictional scope of this court's 2002 order which dismissed Hyatt's negligence-based

5  claims as immune. Once again, on this basis alone this case requires dismissal and the court

6  need go no further with its review.

7      D.   No Matter What Labels Hyatt May Use, Hyatt's Entire Case Tried To The Jury Concerned Whether FTB's Residency, Tax, And Fraud Assessments

8          Conclusions Were Correct

9      In addition to allowing Hyatt's negligence-based claims to be presented to the jury,

10  the trial judge also exceeded jurisdictional boundaries that prohibited the jury from deciding

11  the propriety of FTB's administrative determinations. See AOB 58-67. FTB's opening brief

12  explained that the manner in which Hyatt was allowed to present this case – which was

13  nothing more than a collateral attack upon FTB's underlying administrative conclusions –

14  impermissibly exceeded the scope of the jurisdictional limitations created by Judge Saitta's

15  1999 order dismissing Hyatt's declaratory relief claim. Id.

16      Although Hyatt does not dispute that the propriety of FTB's administrative decisions

17  were squarely outside of the jurisdictional scope of this case, Hyatt asserts that the jury was

18  never asked to decide the tax and residency issues. RAB 75-80. In fact, Hyatt expressly

19  concedes "[t]he law of the case prohibited Hyatt from trying the residency issue and tax

20  case." RAB 5:2-4. Against this concession, Hyatt goes on to claim the jury was not asked to

21  act as a reviewing court for FTB's administrative determinations. Id. Hyatt then claims that

22

23  [26]The district court's failure to properly review these additional issues was error, and does

24  not insulate the jury's verdict that exceeded the jurisdictional scope of this case. See Dictor v. Creative Management Services, LLC, 126 Nev. ___, 223 P.3d 332 (2010) (court's ruling

25  in first appeal, allowing case to proceed on one ground, did not preclude summary judgment on other grounds after first remand). Thus, like Dictor, the mere fact that this court allowed

26  Hyatt's intentional tort claims as alleged in his complaint to proceed in 2002, does not mean

27  that the district court properly refused to dismiss these claims in 2008 based upon alternate theories, and given the district court's obligation to ensure that this court's 2002 order was

28  properly adhered to throughout this litigation.

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR · RENO, NEVADA 89501
P.O. BOX 2670 · RENO, NEVADA 89505-2670
PHONE 775-788-2000 · FAX 775-788-2020

RJN002522

because the jury was not asked to decide the residency case, the district court did not err in excluding extensive evidence that rebutted Hyatt's claims that FTB improperly determined his residency or improperly assessed taxes or fraud penalties. RAB 79-80. Hyatt's arguments are contradicted by the evidence, his own brief and contradictory jury instructions provided to the jury.

        1.       <u>In Order To Rule In Hyatt's Favor, The Jury Was Necessarily Required To Determine That FTB Improperly Reached The Wrong Result In Its Administrative Conclusions</u>

The evidence Hyatt presented at trial related almost exclusively to his general claim that FTB improperly determined he remained a resident of California until April 1992 and then improperly imposed fraud penalties against him. For example: A key finding to FTB's fraud determination was that Hyatt did not cooperate during the audits, which is an indicia of fraud under California law. See 66 AA 16425-27. The only topic Edwin Antolin testified to was his opinion that Hyatt did cooperate with FTB. 36 AA 8787 (9); see also, 36 AA 8786 (2)-8821 (143); 8910 (140)-8919 (176) (Antolin's entire direct examination). Hyatt also presented the testimony of Paul Schervish, a professor at Boston College, who testified that "wealth holders," like Hyatt, do not necessarily live opulent lifestyles. 43 AA 10658 (53) – 10659 (54); see 43 AA 10654(35)-62(63) (Schervish's entire direct examination). This evidence was intended to negate FTB's determination that Hyatt engaged in implausible behavior -- another indicia of fraud under California law. Id. Hyatt's primary expert, Malcolm Jumelet, was permitted to testify that FTB improperly weighed and analyzed the evidence it gathered when reaching its residency and fraud penalty conclusions. 44 AA 10943 (165); see also, 44 AA 10754(114) – 78 (212), 10814(3)-34(84), 10938(144)-45(170) (Jumelet's direct examination). Nearly every witness Hyatt presented critiqued the administrative conclusions reached by FTB. See, e.g., Eugene Cowan (35 AA 8542, 8558-61, 8570-71, 8576-78, 8629); Candace Les (33 AA 8228-29); Michael Kern (34 AA 8346-52, 8353-540); Gilbert Hyatt (37 AA 9005-21, 9079-87, 9094-105, 9150-59, 9163-65, 9172). Although Hyatt claims that this evidence was admitted to prove FTB's "fraud claim," there is no question that in order for the jury to agree that FTB failed to act

49

1   fairly and impartially during the audit, the jury necessarily had to determine that FTB

2   reached the wrong administrative conclusions. Finally, recall that during Hyatt's closing

3   argument he described California's Legislature enacting tax laws, with FTB enforcing those

4   laws, and the Las Vegas jury being empowered to act as a "check and balance" on the

5   exercise of those California powers. 52 AA 12837 (90). As such, Hyatt's contention that the

6   jury was not asked to review the propriety of FTB's administrative decisions is wrong. See

7   AOB 55-67.

8        Hyatt's brief is replete with statements that he is, and has always been, challenging

9   FTB's ultimate conclusions related to his residency and the tax and fraud penalty

10  assessments. For example, Hyatt's brief repeatedly states that he was challenging the "one-

11  sided" and "predetermined" audit conclusions finding that he was a resident of California

12  until April 1992 and assessing him taxes and fraud penalties. See, e.g., RAB 7, 18, 20, 22,

13  24, 40, 64, 77, n. 292, 166 n.610, 181. There is no way to prove that the audit itself was

14  "one-sided" or "predetermined" without explicitly or, at a minimum, implicitly concluding

15  that FTB's ultimate residency and tax assessment conclusions were wrong. Hyatt's brief

16  repeatedly indicates that FTB "trumped up a tax case". See, e.g., RAB 62, 73, 80 n.301, 90.

17  Once again, in order to accept that FTB "trumped up a tax case" against Hyatt, the jury was

18  required to accept that FTB had no basis to determine that he was resident of California

19  until April 1992 – i.e., its residency and subsequent tax assessments were wrong. Since the

20  jury was permitted -- even encouraged to do so -- FTB at minimum should have been

21  permitted to put all evidence before the jurors and they should have been instructed on

22  California law applicable to tax determinations.

23       The jury simply could not have accepted that Hyatt was a tax cheat who did not

24  move to Nevada when he claimed he did, but at the same time conclude that FTB treated

25  him unfairly and impartially when it concluded he only pretended to move to Nevada in

26  1991 and subsequently assessed him taxes and fraud penalties. To accept Hyatt's fraud

27  theory, the jury necessarily had to determine that FTB's administrative determinations were

28  wrong. As a result, Hyatt's attempts to claim that the jury was not asked to review the

50

RJN002524

1   priority of the tax and residency determinations is rebutted by the evidence and Hyatt's own

2   arguments on appeal.[27]

3       2.   The District Court's Corrective Jury Instruction 24 Informed The Jury That It Was Permitted To Determine The Correctness Of FTB's Administrative Conclusions And Hyatt Argued They Reached the Wrong Conclusion

5       As noted in the introduction, Hyatt materially misstates what happened at trial

6   concerning jury instruction 24, and he ignores any discussion of **corrected** jury instruction

7   24. Compare 53 AA 13013 (28-29); 13053 (20)-13054 (22) with RAB 75-80.

8       Corrected instruction 24, which was given over FTB's vehement objection, entirely

9   negated any jurisdictional limits that may have been placed on the jury on this issue. Id.

> There is nothing in corrected instruction 24 that would prevent you during your deliberations from considering the inappropriateness or correctness of the analysis conducted by FTB employees in reaching its residency determinations and conclusions. There is nothing in corrected instruction 24 that would prevent Malcolm Jumelet [Hyatt's expert witness] from rendering an opinion about the appropriateness or correctness of the analysis conducted by FTB employees in reaching its residency determinations and conclusions.

15  53 AA 13054 (22). It could not be more plain from this instruction that Judge Walsh

16  permitted – actually *invited* – the jury to evaluate "the appropriateness or correctness" of

17  FTB's conclusions regarding residency, tax assessments and Hyatt's fraud, despite Judge

18  Saitta's earlier order to the contrary. Id. The instruction also improperly highlighted

19  testimony by Hyatt's expert regarding the "appropriateness or correctness" of FTB's

20  residency determinations and conclusion. Hyatt's counsel used this instruction to argue that

21  FTB came to the wrong conclusions when it evaluated the evidence gathered during the

22  audit and the protest. 52 AA 12827 (51). Regardless of any other instructions that were

23  given to the jury, corrected instruction 24 told the jury to evaluate the appropriateness or

24  correctness of FTB's administrative conclusions. There can be no serious debate that the

[27]Hyatt's brief claims that his counsel did not argue to the jury that the protest hearing officer simply rubberstamped the audit recommendations. RAB 79. The record reveals otherwise. 52 AA 12834 (80-81).

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002525

1  jury was impermissibly allowed to act as a reviewing court regarding FTB's administrative

2  conclusions.

3      As explained in FTB's opening brief, this violated Judge Saitta's unchallenged 1999

4  order, which was predicated upon the fact that FTB's administrative determinations were

5  not within the subject matter jurisdiction of the district court. See AOB 59-60. The

6  administrative tax proceedings between Hyatt and FTB remain ongoing in California.

7  Therefore, allowing the jury to review FTB's administrative decisions was a blatant

8  violation of the exhaustion-of-remedies doctrine. Id.; Allstate Ins. Co. v. Thorpe, 123 Nev.

9  565, 170 P.3d 989, 993-95 (2007) (describing purpose of exhaustion of administrative

10  remedies); Mesgate Homeowners' Ass'n v. City of Fernley, 124 Nev. ___, 194 P.3d 1248

11  (2008).

12      In addition, as various courts that apply Berkovitz-Gaubert have concluded, "when

13  the sole complaint is addressed, as here, **to the quality of the investigation as judged by**

14  **its outcome,** the discretionary function immunity should … and does apply. Congress [and

15  the State of Nevada] did not intend to provide for **judicial review** of the quality of

16  investigative efforts." Pooler v. United States, 787 F.2d 868, 871 (3d Cir. 1986) (emphasis

17  added); see also, Flax v. United States, 847 F.Supp. 1183, 1189-90 (D.N.J. 1994).

18          3.    To Compound Her Error, The District Court Permitted Only A One-
   Sided Presentation Of The Facts Underlying FTB's Administrative

19  Conclusions

20      Hyatt's brief claims that FTB "wants it both" ways on this issue. RAB 80. Hyatt

21  claims that FTB alleges that, although the propriety and correctness of FTB's residency and

22  tax assessment determinations should not have been tried to the jury, FTB still wants this

23  court to determine FTB's residency evidence should have been admitted at trial. See RAB

24  80. Hyatt is confused. Simply put, it is FTB's contention that its administrative

25  determinations were outside the jurisdictional scope of this case. AOB 63. Nevertheless, if

26  this court finds that Hyatt was properly permitted to open the door at trial and to attack the

27  appropriateness and correctness of FTB's administrative determinations, then it was

28  prejudicial error for the district court to exclude the substantial evidence that **supported**

RJN002526

McDONALD·CARANO·WILSON<sub>LLP</sub>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1   FTB's administrative conclusions and applicable California legal principles guiding FTB's

2   auditors. <u>See</u> AOB 63-67.

3       Hyatt's brief argues that the district court's exclusion of evidence was proper

4   because the evidence only related to Hyatt's residency determinations. RAB 79-80.

5   However, as already noted, once Hyatt was allowed to present his residency evidence to the

6   jury and offer his experts' opinions addressing the propriety of FTB's administrative

7   conclusions, FTB had the right to rebut his theories with its evidence refuting Hyatt's

8   contentions. For example, Hyatt (over FTB's objection) presented expert and lay witnesses

9   testimony that he cooperated during the audits, to rebut FTB's fraud determination. <u>See,</u>

10  <u>e.g.</u>, 34 AA 8333 (108); 8338 (128), 8349 (173); 35 AA 8509 (185)-(186); 36 AA 8787 (9).

11  Yet FTB was precluded from presenting evidence that Hyatt **did not** cooperate during the

12  audit. <u>See</u> AOB 64. For example, the district court prevented FTB from introducing

13  evidence of Hyatt's IRS audit and the fact that they experienced similar lack of cooperation.

14  33 AA 8047 (14)-8049 (22). In addition, evidence related to where Hyatt maintained his

15  residence in Nevada between September 1991 and November 1991 was relevant to rebut

16  Hyatt's testimony that he became a resident of Nevada in September 1991. AOB 63-67. The

17  district court improperly excluded evidence of Hyatt's ridiculous Continental Hotel story

18  (AOB 65-66), evidence related to Hyatt's travel arrangements out of LAX not McCarran

19  during the disputed timeframe, evidence of Hyatt's back-dated deed on his California home,

20  and an entire host of additional evidence. <u>See</u> AOB 63-67. Suffice it to say, it is **Hyatt** who

21  cannot have it both ways in this regard. Equally important, if Hyatt was properly permitted

22  to challenge the propriety or the correctness of FTB's administrative conclusions, then

23  evidence of the legal principles guiding FTB's determinations should have been admitted,

24  but Judge Walsh declared them inadmissible. 24 AA 5794.

25      In sum, the district court incorrectly permitted the jury to review the factual bases for

26  FTB's conclusions, to second-guess FTB's analysis for reaching those conclusions, and to

27  substitute its own judgment for FTB's determinations, but with a one-sided version of the

28  evidence and no legal guideposts. This eviscerated the jurisdictional boundaries that were

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002527

1    placed on this litigation from the inception.

2         This case must be dismissed in its entirety based upon the district court's failure to

3    adhere to the jurisdictional limitations in this case. All of the evidence Hyatt presented at

4    trial was based exclusively upon alleged negligence by FTB and related to FTB's

5    administrative conclusions. Even under this court's previous standard for discretionary

6    function immunity, and without considering the Berkovitz-Gaubert test, FTB could not be

7    held liable for its negligence or its administrative conclusions. With such a ruling, the court

8    need not consider any of FTB's additional arguments and contentions.

9         E.    Common Law Claims

10             1.    Hyatt Misrepresents The Scope Of This Court's 2002 Decision
                     Concerning His Common Law Claims And The Standard of Review

12        Hyatt's brief consistently misinterprets this court's April 4, 2002 order. He argues

13   that the order upheld the denial of summary judgment on his common law claims "based on

14   genuine issues as to material facts." RAB 83, lines 16-17. He argues that the order

15   effectively determined the question of "whether there was sufficient evidence to create a

16   material issue of fact for each claim asserted." RAB 83, lines 21-22. He also argues that

17   the factual and legal legitimacy of each common law cause of action was reviewed and

18   given the stamp of approval by this court in 2002, falsely suggesting that this court's April

19   2002 order was based on a review of evidence rather than a review of the allegations in

20   Hyatt's complaint. RAB 95, lines 11-12; RAB 86, lines 10-11; RAB 74, lines 3-4.

21        Hyatt made similar arguments in the district court, contending that this court's April

22   2002 order resolved the validity of common law causes of action, thereby precluding FTB's

23   various motions attacking these causes of action. See AOB 68-69. Judge Walsh agreed. 22

24   AA 5491. Because Hyatt's argument in the district court and in this court mischaracterized

25   the nature, scope and impact of the April 4, 2002 order, FTB will set the record straight.

26             a.    The Petition and This Court's June 13, 2001 Order; Rehearing
                     Proceedings

27        After the district court denied a motion for summary judgment that was based on

28   multiple grounds, including lack of jurisdiction, FTB filed a petition for a writ. This court

54

issued a dispositional order on June 13, 2001, noting that FTB's petition presented a jurisdictional issue based upon comity. 5 AA 1063. Although the court noted the existence of this comity issue, the court did not decide that issue because the court perceived another independent basis for dismissal of Hyatt's claims, i.e., the absence of probative evidence on each claim. 5 AA 1065. In doing so, the court expressly recognized that its decision to grant the petition was based "on grounds other than those alleged in the petition." 5 AA 1063.

Hyatt petitioned for rehearing. He pointed out that "the Court decided the Writ Petition on issues not raised, briefed or argued" in the writ petition, and that FTB's writ petition did not challenge the sufficiency of evidence regarding the summary judgment rulings. 5 AA 1072. He argued: "First, the Court's order violates Hyatt's due process rights by denying Hyatt his day in court without even a hearing before this Court on an issue never raised in the FTB's writ petition." 5 AA 1081. Next he argued that this court did not follow the correct standard of review in evaluating evidence on the summary judgment motion. Id. Finally, he argued that summary judgment was premature because discovery was not yet complete. Id. As part of the rehearing process, Hyatt moved for permission to file extra pages; he argued that this court's June 13, 2001 order was "based upon grounds that were neither raised in the Writ Petition nor addressed by Hyatt." 5 AA 1089, 1103.

b.    The April 4, 2002 Decision

Hyatt's petition for rehearing convinced this court that the June 13, 2001 order was wrong, and on April 4, 2002, the court granted rehearing and vacated the order. 5 AA 1183-1193. The court did not identify which of Hyatt's grounds was the basis for granting rehearing. The court merely recited the factual background and concluded:

> On June 13, 2001, we granted the petition in Docket No. 36390 on the basis that Hyatt did not produce sufficient facts to establish the existence of a genuine dispute justifying the denial of the summary judgment motion. . . . Hyatt petitioned for rehearing in Docket No. 36390 on July 5, 2001, and in response to our July 13, 2001 order, Franchise Tax Board answered on August 7, 2001. Having considered the parties' documents and the entire record before us, we grant Hyatt's petition for rehearing, vacate our June 13, 2001 order and issue this Order in its place.

5 AA 1184. The court then decided the writ petition on the ground actually raised in the

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002529

1  petition, i.e., the jurisdictional ground based on comity.  5 AA 1184-90.

2      In summary, this court's June 13, 2001 order granted a writ based on a review of the
3  evidence on Hyatt's common law claims; Hyatt petitioned for rehearing on the ground that
4  the issue of insufficient evidence had not been raised in the writ petition; and this court
5  granted rehearing, vacated the June 13, 2001 order, and decided the case based on the
6  ground raised in the petition (comity).  Although Hyatt's petition for rehearing asserted the
7  alternative ground that his evidence was sufficient to survive summary judgment, it is
8  obvious that this was not the ground on which rehearing was granted. There was not a single
9  word in the April 4, 2002 order indicating that the court was determining the sufficiency of
10  Hyatt's evidence on his common law claims, that the court was evaluating whether Hyatt
11  satisfied all mandatory elements of each cause of action, or that the court was deciding the
12  propriety of FTB's legal defenses to those claims.  In fact, the April 4, 2002, order vacated
13  the June 13, 2001, order, and the new order was completely silent on the sufficiency of
14  evidence on Hyatt's common law claims. If the April 4, 2002 order was intended as this
15  court's evaluation of evidence on Hyatt's common law claims, surely this court would have
16  included an analysis of the evidence, just as the court had previously done in the June 13,
17  2001 order.  5 AA 1066-68.  Even as to Hyatt's intentional tort theories, which this court
18  allowed to survive the comity challenge, the court's analysis in the April 4, 2002 order was
19  not based on a review of Hyatt's evidence.  Rather, the court's analysis was based solely on
20  allegations in Hyatt's complaint.  5 AA 1190 ("Hyatt's complaint alleges" bad faith and
21  intentional torts).

22      Accordingly, Hyatt is wrong in his assertions that the April 4, 2002 order was based
23  on this court's evaluation of the sufficiency of evidence and the viability of his common law
24  causes of action.

25          c.   The Legal Effect of the April 4, 2002 Decision

26      The April 4, 2002 order dealt with one issue -- comity.  The order did not approve the
27  common law claims, disapprove FTB's defenses, or otherwise preclude subsequent review
28  of the claims.  Because the order did not deal with these other issues, the order simply had

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002530

1   no impact on these issues when the case was remanded for further district court proceedings.

2   The law of the case doctrine, which precludes re-litigation of an issue after an appellate

3   court's ruling in the same case, only applies if the appellate court actually addressed and

4   decided the issue explicitly or by necessary implication. <u>Dictor v. Creative Mgmt. Services,</u>

5   <u>LLC</u>, 126 Nev. __, 223 P.3d 332, 334 (2010).  Here, the April 4, 2002 order did not

6   explicitly decide any issue other than comity (and other jurisdictional issues mentioned only

7   summarily, such as full faith and credit, 5 AA 1188).  Also, there is certainly no "necessary

8   implication" that the court evaluated Hyatt's evidence or FTB's defenses on each of the

9   common law claims, or that the court precluded subsequent legal challenges to the claims.

10      Here, FTB's motions for summary judgment after the 2002 remand were based on

11  legal contentions and evidence different from those previously raised in FTB's motion for

12  summary judgment that led to the April 4, 2002 order.  <u>Compare</u> 2 AA 464-500; 3 AA 501

13  12 <u>with</u> 14 AA 3440-58; 14 AA 3462-75; 15 AA 3504-63; 15 AA 3581-49; 17 AA 4021-

14  48; 17 AA 4049-83. <u>Masonry & Tile Contractors Ass'n of S. Nevada v. Jolley, Urga &</u>

15  <u>Wirth, Ltd.</u>, 113 Nev. 737, 741, 941 P.2d 486 (1997) (trial court can reconsider denial of

16  summary judgment if different evidence is introduced or first decision was clearly

17  erroneous); <u>Bartmettler v. Reno Air, Inc.</u>, 114 Nev. 441, 446, 956 P.2d 1382 (1998) (trial

18  court can reconsider summary judgment denial at any time, particularly if case has been

19  more fully developed). Contrary to Hyatt's contention, the mere fact that this court allowed

20  Hyatt's intentional tort claims to proceed in 2002 does not automatically mean that the

21  district court properly refused to dismiss these claims later.  Nor does the April 4, 2002

22  order preclude FTB from raising, or this court from considering, appellate legal attacks on

23  Hyatt's common law claims.

24          2.      The Applicable Standard of Review

25      Hyatt observes that many of FTB's legal arguments on appeal were raised in

26  motions for summary judgment. Hyatt states that FTB "suggests that Judge Walsh erred in

27  denying the FTB's numerous summary judgment motions because Hyatt failed to establish

28  facts supporting one or more elements of each claim." RAB 82:10-12. Hyatt then contends

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002531

that appellate courts should not "step back in time" to review pretrial summary judgment denials, and "it makes no sense whatsoever" to reverse a judgment on a jury verdict due to an erroneous pretrial denial of summary judgment. RAB 82-83.

Hyatt ignores the fact that all of FTB's motions for summary judgment were based on *legal* grounds establishing that the various causes of action were barred as a matter of law. We contended that even if Hyatt's evidence was accepted, there were legal impediments to his recovery on each cause of action. Contrary to Hyatt's assertion that appellate review of a pretrial denial of summary judgment "makes no sense whatsoever" in this context, this court has itself reviewed the propriety of pretrial summary judgment denials that were followed by trials and verdicts, particularly when the summary judgment motions were based on purely legal grounds. See, e.g. Mainor v. Nault, 120 Nev. 750, 762-65, 101 P.3d 308, 316-18 (2004) (summary judgment denied, followed by jury trial; verdict for plaintiff; summary judgment denial reviewed de novo on appeal from judgment; judgment for plaintiff reversed); Univ. of Nevada, Reno v. Stacey, 116 Nev. 428, 430-31, 435, 997 P.2d 812 (2000) (appeal from judgment on jury verdict; sole issue on appeal was whether district court erred by denying defendant's pretrial motion for summary judgment; judgment on jury verdict reversed because district court erred in denying the motion for summary judgment).

FTB's arguments for reversal do not rely solely on the district court's errors in denying the numerous motions for summary judgment. These motions illustrate just one of many contexts in which FTB made and preserved its legal arguments in the district court – in pretrial motions for summary judgment; in motions for judgment as a matter of law after Hyatt's case in chief; in motions for judgment as a matter of law at the close of evidence; and in post-trial motions.

Finally, contrary to Hyatt's claims, the proper standard of review related to these claims is *de novo*. As indicated in the opening brief, FTB contends that each of Hyatt's claims failed as a matter of law. AOB 68-96. With limited exception, as to each such claim FTB presented purely legal arguments defeating the claim. AOB 70-93. Almost all of FTB's

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775/788-2000 • FAX 775/788-2020

RJN002532

1   attacks on Hyatt's causes of action involved purely legal challenges, not challenges based
2   upon sufficiency of evidence. As to all of these legal challenges, *de novo* review is
3   appropriate. E.g. Morris v. Bank of Am. Nevada, 110 Nev. 1274, 1276-78, 886 P.2d 454
4   (1994) (court made independent *de novo* determination of whether defendant's alleged
5   statements could constitute fraud or bad faith).

6               3.      Hyatt's Fraud Claim Fails As A Matter Of Law

7           Hyatt's fraud claim was predicated upon two alleged promises: (1) to treat Hyatt
8   "fairly and impartially"; and (2) to keep certain information confidential. 14 AA 03286-93;
9   45 AA 11200 (76). FTB's opening brief explained that Hyatt's fraud claim failed, as a
10  matter of law. AOB 70-78. FTB established that the district court erred when it failed to
11  dismiss the fraud claim prior to submission to the jury. Hyatt's answering brief has not
12  responded to or rebutted these arguments. Rather, Hyatt  attempts to sidestep FTB's
13  arguments.

14               a.      Hyatt's Contention That The Elements Of Common Law Fraud
                        Are Less Exacting When A Government Agency Is Accused Is
15                      Unsupported In The Law And Without Merit

16          Hyatt asserts that some lesser standard applies to his fraud claim because FTB is a
17  government agency. RAB 86-88. Hyatt claims that every government investigation carries
18  with it an implicit promise of fairness and impartiality, and that this implied promise is
19  sufficient to support a fraud claim. Id. Hyatt argues that "[e]very citizen would understand"
20  that a government agency always impliedly promises to be fair and impartial when
21  conducting an investigation. Id. Based on this position, Hyatt argues that a plaintiff should
22  be able to base an actionable fraud claim against a government agency on such a vague,
23  ambiguous implied promise simply because the defendant is a government agency. Id. Hyatt
24  cites no Nevada case law to support his contention. Indeed, the weight of authority points to
25  the opposite conclusion. While this court has never explicitly held that ordinary tort
26  elements apply in actions against government agencies or officials, it has confirmed such a
27  result in a litany of cases. See, e.g., Clark County School Dist. v. Virtual Educ. Software,
28  ___Nev.___, 213 P.3d 496, 503-4 (2009) (applying ordinary common law elements of

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

59

RJN002533

business disparagement against school district); <u>Butler</u>, 168 P.3d at 1067 (applying ordinary elements of negligence to determine liability against state); <u>State v. Eighth Judicial Dist. Court ex rel. County of Clark</u>, 118 Nev. 140, 148, 42 P.3d 233, 239 (2002) (applying ordinary common law elements of defamation and privilege against state); <u>Posadas v. City of Reno</u>, 109 Nev. 448, 851 P.2d 438 (1993) (applying ordinary common law elements of defamation, intentional infliction of emotional distress and abuse of process to suit against city government).

Other courts agree. <u>See</u> <u>Hess v. United States</u>, 361 U.S. 314, 319 n. 7, (1960) (under the Federal Tort Claims Act, the law of the state where the action accrued shall govern "in the same manner and to the same extent as a private individual under like circumstances"). <u>Maryland Environmental Trust v. Gaynor</u>, 803 A.2d 512, 517 (Md. 2002) (court squarely rejected the plaintiffs' argument that some higher duty was owed to the landowners by a governmental agency in the context of a fraud claim); <u>Reata Const. Corp. v. City of Dallas</u>, 197 S.W.3d 371 (Tex. 2006) (once the city waives its sovereign immunity, it "must participate in the litigation process as an ordinary litigant"); <u>Madajski v. Bay County Dep't of Public Works</u>, 297 N.W.2d 642 (Mich. Ct. App. 1980) (applying ordinary elements of nuisance claim to suit against county road commission).

Hyatt relies heavily on <u>SEC v. ESM Gov't Sec., Inc.</u>, 645 F.2d 310 (5th Cir. 1981), a case that addresses vastly different legal principles and public policies from those at issue here. <u>See</u> RAB 88. Unlike this case, <u>SEC</u> involved an application by the SEC to a federal court to enforce an administrative subpoena. <u>SEC</u> did not involve a civil cause of action for an intentional tort. Rather, the standards discussed in <u>SEC</u> apply only where the government forces a private citizen to provide access to materials that would not otherwise be constitutionally permissible, and then attempts to use those materials to support criminal or administrative charges. This is far different from the present case, where a private citizen sued a government agency, alleging that the agency represented that he would be treated courteously, and then allegedly failed to do so.

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

60

RJN002534

1    This court should reject Hyatt's assertion that there should be some *per se* rule that a

2    promise of fairness and impartiality can be implied in every government investigation, and

3    that such a promise can form the basis for a fraud claim. Regardless of Hyatt's speculation

4    as to what "[e]very citizen would understand," and regardless of whether the claim involves

5    allegations of the government's bad faith, when the government is a defendant in a common

6    law tort claim, the plaintiff must still prove the same common law elements of that tort .

b.    <u>Implied Promises Are Legally Insufficient To Support A Fraud</u>
      <u>Claim</u>

FTB's opening brief established that implied promises to treat a person fairly and

impartially are not actionable representations for purposes of fraud. AOB 70-73. FTB's

opening brief also established that alleged promises of confidentiality to Hyatt were also not

actionable because FTB never made an express promise to maintain the confidentiality of

Hyatt's name, address or social security number. AOB 73-76. Hyatt's brief contends that

FTB did not raise these issues in the district court. RAB 84. Hyatt is wrong. 45 AA 11186

(20-21); 45 AA 11187 (22). Hyatt's brief also concludes, without a citation to the record or

legal authority, that "[t]here was nothing implied or uncertain about FTB's representations

in this case." RAB 86. Once again, he is wrong.

i.    <u>FTB Did Not Explicitly Or Implicitly Promise Hyatt It</u>
      <u>Would Treat Him Fairly And Impartially</u>

Hyatt's brief contains an internal inconsistency. At one point he acknowledges he is

relying upon an implied promise (RAB 14:2-4), and at another he contends he is relying

upon express promise (RAB:89). As discussed in detail in the FTB's opening brief, the

**ONLY** evidence Hyatt presented at trial to establish that FTB "promised" him that it would

treat him fairly and impartially during the audit, was a copy of a standardized, widely

distributed privacy notice that indicated "what you [the taxpayer] should expect from the

Franchise Tax Board" during the course of the audit. <u>See</u> 1 SAA 00001-5. This notice

indicated that a taxpayer can expect "courteous treatment by the FTB employees." <u>See id.</u>

At trial, Hyatt argued from that promise of courtesy there was implied a promise of fairness

and impartiality. ABB 70-71. Hyatt's brief does not identify any evidence that supports his

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

61

1  contention that FTB **explicitly** promised him it would treat him fairly and impartially during

2  the audit. See RAB 89-90. In fact, at RAB 14:2-4, Hyatt acknowledges he was relying upon

3  an implied promise: "the initial privacy notice states that FTB will treat the taxpayer with

4  courtesy, and this was intended to convey to Hyatt that the FTB would conduct a fair and

5  unbiased audit." Such an inference or implied promise is insufficient as a matter of law to

6  support the jury's verdict for fraud, which must be proven by clear and convincing

7  evidence. Bulbman, 108 Nev.at 110-111. Evidence that FTB sent Hyatt a form notification

8  that indicated that it would treat Hyatt with courtesy is not clear and convincing evidence to

9  support Hyatt's claim that FTB promised – either implicitly or explicitly – to treat him fairly

10  and impartially during the audit.

11      To support his new argument that FTB made an express promise of fairness and

12  impartiality, Hyatt relies on the testimony of Marc Shayer, who was the first auditor

13  assigned to Hyatt's case, and who sent the privacy notice described above. RAB 89.

14  However, Shayer's testimony does not support Hyatt's contention. See id. Rather, Shayer

15  merely testified that the statements to treat Hyatt with courtesy, as contained in the privacy

16  notice, were generally things that auditors "were supposed to do when performing an audit."

17  See 45 AA 11221 (159:6-11). Shayer never testified that he expressly promised or intended

18  to promise that FTB would treat Hyatt fairly and impartially by sending out its privacy

19  notice. Id. Shayer's testimony reveals that these statements were little more than

20  aspirational goals – as contained in FTB's Mission Statement – that FTB employees were

21  supposed to strive to achieve. Id.[28] As explained in FTB's opening brief, it is well-settled

22  that aspirational goals found in standardized and widely distributed handbooks, manuals, or

23  policy statements are insufficiently vague to form the factual predicate for a fraud claim.

24  See AOB 73.

25

26

27  [28] The meaning of courteousness and impartiality are matters upon which individual judgments can be expected to differ, and are therefore improper statements on which to base a fraud claim. See Restatement (Second) of Torts §538A (1977).

28

McDONALD·CARANO·WILSON  
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501  
P.O. BOX 2670 • RENO, NEVADA 89505-2670  
PHONE 775-788-2000 • FAX 775-788-2020

RJN002536

1    Hyatt's brief claims there was additional evidence to support this promise. RAB 89-
2    90. For example, Hyatt claims that "FTB holds itself out to taxpayers in its Privacy Notice,
3    Mission Statement, Strategic Plan, manuals, and in communications with the public to be
4    fair and impartial and that 'FTB's internal Audit Standards require that auditors act with
5    objectivity and in a fair and unbiased manner.'" RAB 13. Hyatt's brief fails to point to any
6    evidence that Hyatt actually saw or received any of these publications at the beginning of
7    the audit. Hyatt's brief fails to establish or explain how any of these statements in these
8    various publications are evidence that any FTB employee **expressly promised Hyatt** to
9    treat him fairly and impartially. Hyatt also claims that "[e]very FTB audit witness at trial
10   testified he or she must act in a fair and impartial manner." RAB at 14; <u>see also</u>, 90. But
11   here again, **none of these witnesses testified they promised Hyatt, spoke to Hyatt, or**
12   **otherwise communicated to Hyatt or his representatives** – either implicitly or explicitly
13   – that they would treat Hyatt fairly and impartially during the audit.

ii.     <u>FTB Did Not Promise Hyatt To Keep His Name,
        Address, Social Security Number Or The Fact He Was
        Under Audit Confidential</u>

16   Here again, FTB's brief established that Hyatt's fraud claim also fails, to the extent it
17   is predicated upon FTB's alleged promises to maintain the confidentiality of his name,
18   address and social security, because FTB never promised it would keep this information
19   confidential. AOB 73-75. In response, Hyatt attempts to broaden the nature of the
20   confidentiality promise by referencing various documents wherein FTB and Hyatt did
21   discuss the confidentiality of certain information. RAB 91. However, these documents do
22   not establish that FTB **specifically promised** Hyatt it would maintain his name, address and
23   social security number confidential.

24   As previously explained by FTB, the representations of confidentiality were made in
25   the context of the parties' discussions of a very narrow group of Hyatt's business documents
26   and patent-related information. <u>See</u> AOB 74. Hyatt attempts to tie disclosures regarding his
27   name, address and social security number to the promises made with respect to his business
28   documents. <u>See</u> RAB 91. Because there were no broad promises of confidentiality

63

RJN002537

concerning his name, address and social security number, and because FTB did not violate the promises of confidentiality with respect to Hyatt's business documents, there was no fraud.

c.     There Was No Fraudulent Intent, Nor Could Such Be Legally Inferred

As discussed at length in the FTB's opening brief, Hyatt presented absolutely **no evidence** at trial that FTB had the requisite intent; i.e. that it knew its statements were false **at the time they were made** and deliberately intended to induce Hyatt to act or refrain from acting. AOB 76-77. Where a plaintiff bases his claim for fraud on a statement of future intentions, the plaintiff must provide evidence that, at the time the statement was made, the defendant never intended to honor or act on his statement; evidence that the promisor failed to fulfill a promise is insufficient, by itself, to show that the promisor had the requisite fraudulent intent. Tallman v. First Nat. Bank of Nev., 66 Nev. 248, 261, 208 P.2d 302, 308 (1949). Fraudulent intent may not be inferred from a subsequent failure to perform a promise. Id.; Bulbman, 108 Nev. at 112.

Throughout his answering brief, Hyatt attempts to avoid the absence of fraudulent intent by making conclusory statements that FTB acted in bad faith. See RAB 91-92. He goes so far as to suggest that the intent element of fraud can be established by simply accepting his factual and legal conclusion that the FTB acted in bad faith. See RAB 91-92. Notably, Hyatt offers no authority to support this claimed legal principle. Id.

Hyatt's argument to support the intent element of his fraud claim is based entirely on FTB's alleged **subsequent** failure to perform on its alleged promises of fairness and confidentiality. See, e.g., RAB 15-37 (detailing evidence of so-called "bad faith" based upon conduct of third FTB auditor to work on Hyatt's case over a year and a half after the audit was initiated and alleged promises were made). Hyatt baldly asserts, without citing to anything in the record, that the FTB "conducted a goal-oriented audit" and later assessed a fraud penalty against Hyatt "to better bargain for and position the case to settle." See RAB

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775/788-2000 • FAX 775/788-2020

64

91.[29]   With these broad and unsupported statements, Hyatt attempts to equate fraudulent intent with various events that occurred well after the alleged promises of fairness and impartiality in 1993.  To the extent Hyatt's "bad faith" term of art refers to his allegations that Anna Javonovich threatened him to force a settlement in 1995, see RAB 40-41, Hyatt has not shown how or why this allegation bears any relationship to Marc Shayer's alleged promises in 1993. To the extent Hyatt is referring to his characterizations of FTB's amnesty program, see RAB 51, Hyatt has not shown how or why this program originated in 2004 relates to Marc Shayer's alleged promises in 1993. Finally, to the extent that Hyatt is referring to his allegations that Shelia Cox made an anti-Semitic remark in 1995, see RAB 15-16, or a boast to Hyatt's ex-wife in 1995, see RAB 15-16, or a boast to Hyatt's ex-wife in 1995, see RAB 92:3-4, he has not shown how or why this allegation bears any relationship, temporal or otherwise, to Marc Shayer's alleged promises made in 1993.

Even accepting Hyatt's allegations and gross mischaracterizations as true, all of FTB's alleged bad faith actions took place well after the alleged promises of future conduct made in 1993. Because Hyatt has failed to present anything other than FTB's alleged subsequent failure to perform on its promises, as a matter of law, he cannot establish the requisite intent element of his fraud claim.

            d.      There Was No Justifiable Reliance

To establish justifiable or reasonable reliance, this court requires the following:

> The false representation must have played a material and substantial part in leading the plaintiff to adopt his particular course; and **when he was unaware of it at the time that he acted, or it is clear that he was not in any way influenced by it, and would have done the same thing without it or for other reasons, his loss is not attributed to the defendant.**

Lubbe v. Barba, 91 Nev. 596, 600, 540 P.2d 115, 118 (1975) (emphasis added).  Lack of justifiable reliance bars recovery in an action for fraud.  Pac. Maxon, Inc. v. Wilson, 96 Nev. 867, 870, 619 P.2d 816, 818 (1980). Where the defendant's alleged misrepresentations could not have been material to the plaintiff's decision to act, no justifiable reliance exists.

---

[29]The court should also note that Hyatt does not contest that the events he says prove fraudulent intent all occurred after 1993. RAB 91-92.

McDONALD·CARANO·WILSON ℠
100 WEST LIBERTY STREET, 10ᵗʰ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002539

1  <u>See</u> <u>Clark Sanitation, Inc. v. Sun Valley Disposal Co.</u>, 87 Nev. 338, 342, 487 P.2d 337, 339

2  (1971). Here, contrary to Hyatt's assertions, he could not and did not justifiably rely to his

3  detriment on any of FTB's alleged promises.

4  Regardless of any representations or promises FTB made, Hyatt was required by law

5  to comply with the audit. Indeed, the very same letter in which he claims FTB made the

6  promises (FTB will treat you with courtesy and will comply with California's Information

7  Practices Act and Federal Privacy Act) which induced him to cooperate contains the

8  following language:

9  It is **mandatory** to furnish all information requested when you are required to
   file a return or statement. If you do not file a return, or do not provide the

10  information we ask for, or provide fraudulent information, the law says you
   may be charged with penalties and interest and, in certain cases, you may be

11  subject to criminal prosecution. We also may disallow claimed exemptions,
   exclusions, credits, deductions or adjustments. This could make the tax

12  higher or delay or reduce any refund.

13  <u>See</u> 1 SAA 00003 (emphasis added). Hyatt's contention that his only reason for cooperating

14  with the audit was based on his belief that the FTB would treat him courteously and keep

15  his information private (RAB 92:13-16) is disingenuous because he knew his failure to

16  cooperate would result in severe financial or criminal penalties. <u>See id.</u>

17  In addition, Hyatt contends that his reliance is proven by the alleged special damages

18  (professional fees he incurred during the audit) he sustained. RAB 92-93. For the reasons

19  discussed above, he would have incurred those sums anyway.

20  4.  <u>Hyatt's Invasion of Privacy Claims Fail As A Matter Of Law</u>

21  Hyatt's brief erroneously contends that FTB's various invasion of privacy arguments

22  must be rejected because there was substantial evidence presented to the jury to support

23  these claims. RAB 97; 104-107. Hyatt misses the point. This is not a substantial evidence

24  issue. Rather, FTB contends that **none** of Hyatt's invasion of privacy claims should have

25  been submitted to the jury because these claims should have been dismissed as a matter of

26  law. AOB 78-79.

27  a.  <u>FTB's Disclosures Of Hyatt's Identity Information Was Made
        Strictly In The Context Of FTB's Investigation</u>

28  Throughout his brief, Hyatt claims that FTB made "massive disclosures of his

66

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1  personal information." See, e.g., RAB 37, 95, 102, 107, 124. Hyatt claims that these "mass

2  disseminations" were "unprecedented" disclosures of his personal information – i.e., his

3  name, social security number, address ("the Tara address"),[30] credit card information, and

4  "other personal information."[31] Id. at 37-38, 133, 181:8.

5            i.     Credit Card Number

6       In truth, there was only 1 disclosure of Hyatt's credit card number and that was to a

7  third-party who already possessed the number.

| NAME OF RECIPIENT | RECORD CITES |
|---|---|
| Federal Express | 66 AA 16279-80 |

11  In reviewing Hyatt's credit card statements, FTB discovered that Hyatt used his card for

12  payment to Federal Express, 42 AA 10384 (115)-(117), and FTB requested information

13  about origination and drop-off of his packages. 66 AA 16279-80. FTB provided Hyatt's

14  credit card number, which Hyatt himself had already given to Federal Express to pay for

15  these shipments. Id.

16            ii.    Tara Address

17       In truth, only 11 letters referenced Hyatt's Tara address.

| NAME OF RECIPIENT | RECORD CITES |
|---|---|
| Allstate Sand and Gravel | 65 AA 16174 |
| CG Eggers | 64 AA 15997-98 |
| Clark County Recorder | 64 AA 15879 |
| Clark County Treasurer | 63 AA 15717 |
| Harold Pryor | 64 AA 15995-96 |

---

[30] Hyatt's challenged disclosure of his address was limited to his Las Vegas Home on Tara Avenue. See 14 AA 03281. Thus, when FTB refers to the disclosures of Hyatt's address, it is referring only to FTB's disclosure of the Tara address.
[31] Hyatt does not identify what "other personal information" FTB allegedly disclosed other than the information listed. FTB cannot and will not attempt to address this new unsubstantiated category of "other personal information" in this reply brief.

67

| | |
|---|---|
| KB Plumbing | 64 AA 15999 |
| Las Vegas Sun | 66 AA 16382-83 |
| LV Valley Water Dist. | 65 AA 16095-96 |
| Orange County Treasurer/Tax Collector | 63 AA 15697 |
| Silver State Disposal | 65 AA 16097-98 |
| Southwest Gas Co. | 65 AA 16099-100 |

Every recipient was already in possession of his address. Over half were sent to government agencies or public utilities, already in possession of the information. (Clark County Recorder) 64 AA 15879; (Clark County Treasurer) 63 AA 15717; (Las Vegas Valley Water District) 65 AA 16095-96; (Orange County Treasurer/Tax Collector) 63 AA 15697; (Silver State Disposal) 65 AA 16097-98; (Southwest Gas Company) 65 AA 16099-100.

Of the 5 remaining contacts: two were sent to Hyatt's neighbors – each of whom lived on the same street as Hyatt and were clearly aware of the Tara address, (CG Eggers) 64 AA 15997-98; (Harold Pryor) 64 AA 15995-96; two were sent to companies that had performed work and/or services at the Tara address, and obviously had the address, (Allstate Land and Gravel) 65 AA 16174; (KB Plumbing) 64 AA 15999; and one was sent to the subscription department of the newspaper to determine whether the newspaper was being delivered to Hyatt's home, 66 AA 16382-83.[32]

Of the third-party disclosures that used Hyatt's Tara address, only 6 referenced Hyatt's name somewhere on the correspondence in conjunction with the address. In other words, although FTB may have disclosed the Tara address, FTB did not connect Hyatt's name to that address in such way that it would reveal Hyatt lived there. (Allstate Sand and Gravel) 65 AA 16174; (Clark County Assessor) 63 AA 15723; (Las Vegas Sun) 66 AA

---

[32] An individual "must expect the more or less casual observation of his neighbors and the passing public as to what he is and does and thus there is no liability for publicizing that he has returned home from a visit, or gone camping in the woods, or given a party at his house for his friends." Johnson v. Sawyer, 47 F.3d 716, 733 (5th Cir. 1995) citing Restatement (Second) of Torts, § 652 D, comment b.

RJN002542

1  16382-83; (Las Vegas Valley Water District) 65 AA 16095-96; (Silver State Disposal) 65

2  AA 16097-98; (Southwest Gas Company) 65 AA 16099-100.

3       Thus, FTB's so-called "massive disclosures" of Hyatt's Tara address were in reality

4  11 third-party contacts, over half of which did not reference Hyatt's name, and all of which

5  were sent to individuals or entities that already had the Tara address in their possession at

6  the time of the disclosure.

7                    iii.    Social Security Number

8       Hyatt also claims that FTB made "massive disclosures" of his social security

9  number to third parties. RAB 37-38, 133, 188. In this instance, 43 of the contacts contained

10 Hyatt's social security number which was used as an identifier, common at the time, to

11 ensure that they were requesting and receiving information about the right Gilbert Hyatt.

| NAME OF RECIPIENT | AA CITES |
|---|---|
| Association of Computing Machinery | 64 AA 15900-01 |
| Bizmart | 64 AA 15941-42 |
| Block, Plant & Eiser | 65 AA 16127-28 |
| City Water Service -- La Palma | 63 AA 15734-35 |
| Clark County Assessor | 63 AA 15723 |
| Clark County Department Election | 63 AA 15668 |
| Clark County Department Elections | 65 AA 16109 |
| Commerce Bank | 64 AA 15971-972 |
| Congregation Ner Tamid | 65 AA 16080-81 |
| Copley Colony | 65 AA 16023-24 |
| Dale Fiola | 65 AA 16123-24 |
| Great Expectations | 64 AA 15906-09 |
| Greg Roth | 65 AA 16139-40 |
| Institute Electrical & Electronic Engineers | 64 AA 15902-03 |
| Las Vegas Sun | 65 AA 16093-94 |
| Las Vegas Sun | 66 AA 16382-83 |
| Las Vegas Valley Water District | 65 AA 16095-96 |
| Lesley Anne Andrus | 65 AA 16141-42 |
| Licensing Executives Society | 64 AA 15898-99 |
| Loeb and Loeb | 65 AA 16121-22 |
| Nevada Development Authority | 64 AA 15910-11 |
| Nevada DMV | 63 AA 15615 |
| Orange County Register | 66 AA 16386-87 |

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

69

| Orange County Times | 66 AA 16384-85 |
|---|---|
| Orange County Treasurer/Tax Collector | 63 AA 15701-02 |
| Orange County Treasurer/Tax Collector | 63 AA 15697 |
| Orange County Voter Registration | 63 AA 15694 |
| Personal Computer Users Group | 64 AA 15912-13 |
| Post Office Cerritos | 63 AA 15673 |
| Roger McCaffrey | 65 AA 16125-26 |
| Sam's Club | 64 AA 15943-44 |
| Sam's Club | 64 AA 15973-74 |
| Silver State Disposal | 65 AA 16097-98 |
| Southern California Edison | 63 AA 15731-32 |
| Southwest Co. Club | 65 AA 16024-26 |
| Southwest Gas Co. | 65 AA 16099-100 |
| Sports Authority | 64 AA 15904-05 |
| Sports Authority | 64 AA 15939-40 |
| Temple Beth Am | 64 AA 15896-97 |
| Temple Beth Am | 64 AA 15945-46 |
| US Postmaster -- CA | 65 AA 16078 |
| US Postmaster -- CA | 65 AA 16077 |
| Wagon Trails Apartment Complex | 64 AA 15990-94 |

In fact there were two Gilbert Hyatts that resided in Las Vegas at the time of FTB's audits. 39 AA 09716 (75)-(76).

At trial, it was undisputed that one's social security number was the most commonly and regularly used identifier in the mid-1990's. See 39 AA 09726 (117) – 27 (119), 9728 (125-26) (testimony of Hyatt's privacy expert, Daniel Solove); 48 AA 11801 (96-97), 11802 (99), 11817 (160) - 11818 (164) (testimony of FTB's privacy expert, Deidre Mulligan). For example, during that timeframe, social security numbers were used as driver's license numbers in Nevada. 1996 Nev. Op. Att'y Gen. No. 26 (Sept. 13, 1996); NRS 483.345 (1996).[33] Colleges and universities in Nevada used social security numbers as

---

[33]At trial, several examples were discussed concerning the use of a driver's license as identification. E.g. Before ATM's, when one paid for groceries with a check, the cashier would ask to see the payor's driver's license and note the social security number on the
Continued . . .

1    student identification numbers. 48 AA 11800 (90). Social security numbers were required

2    on voter registration forms--like Hyatt's--which are public documents. 77 AA 19098 –

3    19102. Hyatt, himself, freely disclosed his social security number to many government

4    agencies, individuals and business without requesting confidentiality. 47 AA 11626 (75) –

5    11628 (85); 77 AA 19100 – 02; 78 AA 19429. Hyatt also placed his social security number

6    into the public record in numerous litigations ongoing at the time of FTB's audit. 78 AA

7    19346-48; 19369-78, 19393, 19405, 19425.

8                   iv.    <u>Hyatt's Name Only</u>

9         To begin, Hyatt offers no argument or case law explaining how disclosure of simply

10   his name invaded his privacy. Moreover, can one imagine conducting any government

11   investigation without ever disclosing the identity of these individual under investigation?

12        The letters that Hyatt complains of were sent to Hyatt's own professionals, business

13   contacts or government agencies.[34] Many of the entities and individuals were provided by

14   Hyatt as his own Nevada contacts.[35] Others were either friends or knew of Hyatt.[36] Both

15   Chris Woodward and Jerry Hicks had interviewed Hyatt for newspaper articles. 66 AA

16   16281-2. All of these individuals clearly knew Hyatt's name when they received FTB's

---

18   check. 30 AA 7437 (192)-(193); 48 AA 11800 (90); 11801 (94)-(95). Grades at colleges and universities were publicly posted using social security numbers. <u>Id.</u>

[34](Association of Colo-Rectal Surgery) 65 AA 16022; (Dr. Edgar Hamer) 64 AA 15957; (Dr. Gerald Isenberg) 64 AA 15967; (Dr. Steven Hall) 64 AA 15968; (Dr. William Peloquin) 64 AA 15969; (Las Alamitos Imaging) 64 AA 15965-66; (University Medical Center) 64 AA 15970; (Association of Colo-Rectal Surgery) 65 AA 16022; (Clark County School District) 65 AA 16108; (Dr. Edgar Hamer) 64 AA 15957; (Dr. Eric Shapiro) 64 AA 15958; (Dr. Gerald Isenberg) 64 AA 15967; (Dr. Melvin Shapiro) 64 AA 15959; (Dr. Nathan Shapiro) 64 AA 15960; (Dr. Norman Shapiro) 64 AA 15961; (Dr. Richard Shapiro) 64 AA 15962; (Dr. Shapiro) 64 AA 15964; (Fujitsu) 65 AA 16187-88; (Gov. Robert Miller) 65 AA 16191; (Helene Schlindwein) 65 AA 16169-173; (LA Times, Chris Woodyard) 66 AA 16282; (LA Times, Jerry Hicks) 66 AA 16281; (Las Alamitos Imaging) 64 AA 15965-66; (Linda Wetsch) 66 AA 16362-65; (Matsushita) 65 AA 16189-90; (Sen. Richard Bryan) 65 AA 16192; (University Medical Center) 64 AA 15970.

[35](Clark County School District) 65 AA 16108; (Gov. Robert Miller) 65 AA 16191; (Sen. Richard Bryan) 65 AA 16192.

[36]38 AA 9339 (159) (Helene Schlindwien).

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002545

1   correspondence.

2                   v.   Purpose Of The Third-Party Contacts

3       In addition to creating an impression of "massive" disclosures, Hyatt's brief also

4   attempts to create the impression that FTB had no legitimate business purpose for sending

5   the correspondence. See generally RAB 37-40. This, too, is false.

6       As explained in FTB's opening brief, each of its third-party contacts was sent for the

7   purpose of investigating Hyatt's claim that he severed his California residency, which also

8   included verifying information that Hyatt had provided FTB to support this claim[37]. See

9   AOB 6-16. The undisputed testimony at trial established unequivocally that all of these

10  documents were sent for the purpose of conducting a legitimate residency audit of Hyatt and

11  for no other purpose. 42 AA 10313 (167)-10320 (196); 10363 (32)-10394 (156). This same

12  undisputed evidence, explained in detail in FTB's brief, reveals that each third-party contact

13  was individually tailored to each recipient in order to receive only the specific information

14  believed to be in the possession of that entity or person. Id.; see AOB 9-12.

15      With each of these documents FTB was attempting to determine, objectively, the

16  state in which Hyatt maintained the closest connections – such as where he maintained his

17  bank accounts; where he belonged to professional groups and organizations; where he saw a

18  doctor or dentist; where he got his daily newspaper; where he was registered to vote; where

19  he owned property; where he purchased groceries, filled prescriptions, got his hair cut;

---

[37]California law defines a "resident" as an individual who is in California for other than a
temporary or transitory purpose or who is domiciled in California but who is outside the
state for a temporary or transitory purpose. Cal Rev. & Tax. Code § 17014(a). This is
determined by examining the objective facts surrounding the taxpayer's residency – not the
taxpayer's subjective intent. In the Matter of the Appeal of Constance L. Maples, 2009 WL
532503 at *5 (Cal. St. Bd. Eq. Jan. 21, 2009). Where an individual has significant contacts
with more than one state, the state in which the individual maintains the closest connections
during the taxable year is deemed to be the state of residence. Id. To determine which state
has the closest connections, FTB must consider objective factors and connections that a
taxpayer may have with a specific state – such as the location of the taxpayer's real
property, telephone records, the number of days the taxpayer spent in California versus the
number of days spent in other states during the disputed time period, and other like
information. Maples, 2009 WL 532503 at *4-5.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

72

1   where he maintained utilities; etc. 42 AA 10313 (167)-10320 (196); 10363 (32)-10394

2   (156). FTB did not just send out third-party correspondence randomly. Rather, it sent

3   requests to those government agencies, public utilities, companies, individuals, and

4   neighbors, which either knew, or should have known, information related to Hyatt's

5   connections in either California or Nevada during the disputed time period. See id.

6           b.      Nevada Does Not Recognize A Common Law Claim For
                    Breach of Information Privacy; Such Claims Have Been
7                   Created By Legislatures or Congress

8       As previously argued in FTB's opening brief, Nevada does not recognize a cause of

9   action for breach of informational privacy. See AOB 79-81. Nevada has made clear that it

10  will not create a new common law claim when a statutory remedy already exists. [38]See, e.g.

11  Sands Regent v. Valgardson, 105 Nev. 436, 440, 777 P.2d 898 (1989). Hyatt's primary

12  response is that this issue was addressed by this court's 2002 order. RAB 95-96. As already

13  indicated at pages 54-57, this court's 2002 order did not address this issue.

14      In this case, Hyatt relied principally upon alleged violations of California's

15  Information Privacy Act and the Federal Privacy Act in support of his invasion of privacy

16  claims. 52 AA 12824 (39)-(40); 12896 (37)-12897 (41). Both those statutes have

17  comprehensive remedies for violations thereof. Cal. Civ. Code § 1798 et. seq.; 5 U.S.C. §

18  522a et. seq. Under Nevada law, Hyatt cannot create a new common law claim, instead of

19  invoking those available statutory remedies. Hyatt baldly claims that the cases cited by FTB

20  on this issue have no application to this case. See RAB 96. To the contrary, and on this issue

21  FTB's point is best described by the court in Johnson v. Sawyer, 47 F.3d 716 (5th Cir.

22  1995), a case with remarkably similar facts:

23          Even apart from the foregoing, there is no showing that Texas would
            create a common law cause of action for violation of section 6103(a)(1),
24          inasmuch as section 7217 provided for a comprehensive private cause of
            action for any such violation. While Texas generally recognizes the doctrine
25          of negligence per se, no Texas decision has been found applying the doctrine
26

27  [38]Nevada's Legislature did not recognize any protection for information privacy until 2005.
    See NRS 239B.030; NRS 239B.040.
28

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

73

to create a common law cause of action for a statutory violation *where* there is a comprehensive and express statutory private cause of action for the statutory violation. Moreover, in this instance both the statute violated and the statute creating the cause of action for that violation are federal. We can think of no reason for a Texas court to create a common law cause of action for the statutory violation in such a circumstance. We have long followed the principle that we will not create "innovative theories of recovery or defense" under local law, but will rather merely apply it "as it currently exists." As there is currently no Texas law creating a common law cause of action for a statutory violation for which violation there is an express and comprehensive statutory cause of action, we will not undertake to ourselves create such a Texas common law cause of action.

Id. at 729 (citations and footnotes omitted).

c.  There Was No Objective Expectation Of Privacy In The Information Disclosed By FTB As Part Of Its Audit

Hyatt's brief seems to ignore the requirement that he must have a reasonable expectation of privacy in the challenged disclosures. Hyatt has confused this requirement throughout this litigation – as he does now on appeal. Hyatt suggests it was appropriate for his invasion of privacy claims to be submitted to the jury merely because he had a "subjective expectation of privacy" in his name, home address and social security number. RAB 104-105. To this end, Hyatt claims that there is no relevance to whether he was a "public figure";[39] whether he hired a publicist and sought out and received substantial publicity; or whether the claimed "confidential" information was already a matter of public record when it was disclosed. See generally RAB 105-106. These arguments, however, are legally incorrect.

With an invasion of privacy claim there are two required expectations: (1) subjective expectation of privacy, and (2) this expectation must be objectively reasonable under the circumstances of the case. People for the Ethical Treatment of Animals v. Berosini, 111

---

[39]FTB is asserting that given Hyatt's public persona, the substantial publicity he personally generated for himself during the time the audit was being conducted (including conducting dozens of press interviews in his California home and having news organizations photograph his Tara address), Hyatt's objective expectation of privacy in his personal information was seriously, if not completely, diminished under the circumstances.

RJN002548

1  Nev. 615, 632-33, 895 P.2d 1269 (1995); see also, Peters v. Vinatieri, 9 P.3d 909, 914-

2  15 (Wash. Ct. App. 2000).

3      Whether an objective expectation of privacy exists in a particular context is a

4  question of law for the court to decide. See, e.g., PETA v. Berosini, 111 Nev. at 633 n.20;

5  Greywolf v. Carroll, 151 P.3d 1234, 1246 (Alaska 2007); Peters, 9 P.3d at 914-15.  The

6  issue here is not whether there was substantial evidence for the jury to determine that an

7  objective expectation of privacy existed in this information, but whether the court should

8  have permitted these claims to proceed to the jury in the first instance.

9      When objectively evaluating the scope of a privacy interest, the court must consider

10  the circumstances surrounding the alleged invasion of privacy. PETA v. Berosini, 111 Nev.

11  at 634; Ortiz v. Los Angeles Police Relief Ass'n, 120 Cal. Rptr. 2d 670, 679-80 (Cal. Ct.

12  App. 2002) ("reasonable' expectation of privacy is an objective entitlement founded on

13  broadly based and widely accepted community norms...."). Community norms are

14  determined by evaluating the customs of the time and place, the occupation of the plaintiff

15  and the habits of his neighbors and fellow citizens. Restatement (Second) Torts § 652D,

16  cmt. c. (1965). The customs, practices, and physical settings surrounding particular

17  activities has effected whether a reasonable expectation of privacy may be present under

18  certain circumstances. See, e.g., Whalen v. Roe, 429 U.S. 589, 602 (1977) (reporting of

19  drug prescriptions to government was supported by established law and "not meaningfully

20  distinguishable from a host of other unpleasant invasions of privacy that are associated with

21  many facets of health care"); Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia,

22  812 F.2d 105, 114 (3d Cir. 1987) (no invasion of privacy in requirement that applicants for

23  promotion to special police unit disclose medical and financial information in part because

24  of applicant awareness that such disclosure "has historically been required by those in

25  similar positions").

26      Whether Hyatt had a protectable, objective expectation of privacy in his name,

27  address, or social security number, must be determined in light of the facts and

28  circumstances that surround this case as well as the customs and norms in Nevada between

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

75

1    1993 to 1995 – the period of time when FTB allegedly invaded his privacy. <u>Runion v. State</u>,

2    116 Nev. 1041, 1049, 13 P.3d 52 (2000). This requires the court to consider: the context of

3    the disclosures, the nature and extent of the disclosures, Hyatt's own publicity, Hyatt's own

4    disclosures of information, and the like. <u>See</u> <u>PETA</u>, 111 Nev. at 633 n.20; <u>Ortiz</u>, 98 Cal.

5    App. 4th at 1304-05. When these factors are considered objectively, there is no question that

6    Hyatt did not have an objectively reasonable expectation of privacy in the information

7    disclosed.

8        The undisputed evidence revealed that all of the challenged disclosures of Hyatt's

9    identity information were made during the course of a lawful audit investigation regarding

10   Hyatt's residency. 42 AA 10313 (167)-10320 (196); 10363 (32)-10394 (156). As explained

11   in FTB's brief, an expectation of privacy is diminished when someone is under

12   investigation. AOB 84. Hyatt claims that the cases relied upon by FTB for this proposition

13   do not apply to this case "because the government initiated the investigation of its own

14   purposes." RAB 105-106. It is unclear what Hyatt means with argument. There is, however,

15   no distinguishing these cases. Hyatt, like the plaintiffs in the cases relied upon by FTB,

16   made a claim to a third-party about a fact pertaining to him. For example, in each of these

17   cases, the plaintiffs made claims to their insurance companies or employers that they were

18   entitled to worker's compensation or filed personal injury claims. <u>See</u>, for example,

19   <u>Schlatter v. Eighth Judicial Dist. Court In & For Clark County</u>, 93 Nev. 189, 561 P.2d 1342

20   (1977); <u>McLain v. Boise Cascade Corp.</u>, 533 P.2d 343, 346 (Or. 1975); <u>Forster v.</u>

21   <u>Manchester</u>, 189 A.2d 147, 150 (Pa. 1963). In this case, Hyatt claimed to FTB that he was

22   no longer a resident of California as of October 1, 1991 – shortly before he received 40

23   millions of dollar in taxable income. 63 AA 15528-29. FTB, like the investigating agencies

24   in the above cases, investigated the accuracy of Hyatt's claim. 63 AA 15605. The context of

25   these disclosures – during a lawful investigation – diminished, if not eliminated, Hyatt's

26   expectation of privacy in this information.

27       Second, the nature and extent of the disclosures during the investigation further

28   undermines any objectively reasonable expectation of privacy in this information. As

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

76

1  explained above, virtually all of the challenged disclosures were made to businesses,

2  government entities, Hyatt's own professionals, or entities and persons that Hyatt identified

3  as possessing knowledge about his residency. See pages 66-68 above. Obviously,

4  disclosures of information to someone that already has the information cannot be an

5  invasion of privacy. Moreover, the vast majority of the disclosures were made to businesses

6  or government entities. Id. As explained in FTB's opening brief, there is no expectation of

7  privacy in business records. Couch v. United States, 409 U.S. 322, 335-36 (1973); United

8  States v. Miller, 425 U.S. 435 (1976). In addition, it is a well accepted point that the

9  disclosure of one's home address and name is not an invasion of privacy. See McNutt v.

10  New Mexico State Tribune Co., 538 P.2d 804, 808 (N.M. Ct. App. 1975) (publication of

11  names and addresses of police officers and wives was not an invasion of privacy); see also,

12  62A Am. Jur.2d Privacy § 172.

13  Third, contrary to Hyatt's claim that he is a private person who has actively sought

14  privacy in his life, Hyatt enjoyed widespread publicity throughout the time FTB was

15  allegedly disclosing his identity information – in particular his name. In fact, Hyatt was the

16  subject of hundreds of newspaper and magazine articles. 40 ARA 9977–10002; 41 ARA

17  10188; 44 ARA 10751; 89 AA 22070-137. And, it was Hyatt who engaged the publicist that

18  generated this very publicity. 48 AA 11986 (107)-11989 (121). Hyatt offered no argument

19  in response to FTB's claim of prejudicial error by Judge Walsh's refusal to admit the

20  massive publicity surrounding Hyatt. See RAB 97. If, as Hyatt contends, it was an issue for

21  the jury concerning the reasonableness of his privacy expectation, then surely the jury was

22  entitled to review all the relevant evidence. 48 AA 11984 (99)-1192 (133). By engaging in

23  this type of publicity, Hyatt regularly and personally disclosed his name and significant

24  information about his personal life to the public at large – without any concern for his

25  personal privacy. Moreover, Hyatt was freely disclosing his social security number, Tara

26  address and other information to various vendors and others without seeking any promises

27  of confidentiality – at the exact same time that FTB was using the same identity information

28  to ensure it was getting information about the correct Gilbert Hyatt. 38 ARA 9430 – 39

77

1  ARA 9559; 79 AA 19732 – 80 AA 19753. These disclosures by Hyatt were made to such

2  entities as piano delivery men, Sam's Club, Sears, a Toyota dealership, Allstate Sand and

3  Gravel, State Farm, an air conditioning company, an appliance repair company, construction

4  companies and others. Id.

5      Fourth, Hyatt's name, social security number and address were a matter of public

6  record during the same period that FTB allegedly disclosed this information. See pages 79-

7  80 below. Therefore, Hyatt's own actions and behaviors reveal that there could hardly be an

8  objective expectation of privacy in his name, Tara address, and social security number

9  between 1993 and 1995 when FTB used his identity information.

10     Finally, the undisputed evidence at trial revealed that in Nevada between 1993 and

11  1995 this identity information was routinely and widely disclosed.[40] See 1996 Nev. Op.

12  Att'y Gen. No. 26 (Sept. 13, 1996); NRS 483.345 (1996); 48 AA 11801 (94-97); 47 AA

13  11614 (27), 11623 (64). The customs and practices in Nevada between 1993 and 1995

14  reveal that Hyatt's name, address and social security number were not considered highly

15  confidential information at that time. See Johnson v. Sawyer, 47 F.3d at 736 n. 40.

16     Taking all of these facts and issues into consideration, Hyatt had no objective

17  expectation of privacy in his identity information during FTB's audit investigation. The

18  disclosures were made during a lawful investigation; they were narrowly tailored to third

19  parties that were expected to have information related to Hyatt's residency; the disclosures

20  were made to entities and individuals that either had, or were likely to have, the information

21  disclosed; Hyatt received significant publicity, based upon his own efforts, during the time

22  of the audit; Hyatt regularly disclosed this same information during the timeframe; the

23  information disclosed was already a matter of public record; and the customs and actions in

24  Nevada during the relevant timeframe did not support a finding of privacy in this

---

26
27  [40] The court cannot review FTB's conduct under today's standards. Rather, the court must
consider the customs and practices related to the disclosure of this information between
1993 and 1995 – when the disclosures were actually made. See, Ortiz, 98 Cal. App. 4th at
28  1304-05; Restatement (Second) Torts § 652D, cmt. c. (1965).

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002552

information.[41] Based upon all of these facts, the district court erred when it did not determine, as a matter of law, that there was no objective expectation of privacy in the matters disclosed.

    d.   <u>Since All Information Disclosed Was A Public Record, Hyatt's Claims Were Precluded By The Public Records Defense</u>

  Hyatt's brief did not provide any legal or evidentiary basis to overcome the fact that the identity information disclosed by FTB was a matter of public record at the time it was disclosed during the audit. In fact, Hyatt does not dispute that his name, address and social security number (the claimed "personal" or identity information alleged to have been impermissively disclosed by FTB) were a matter of public record at the time of the disclosures. See RAB 97-103. Contrary to Hyatt's advocacy, the question here is whether liability under an invasion of privacy theory can be imposed for the disclosure of identity information, including social security numbers, when that information is already found in public records.

  This court, the United States Supreme Court and the Restatement of Torts have answered this question by unequivocally holding that information contained in public records, including old public records, cannot form the basis for liability for common law invasion of privacy claims. <u>Montesano v. Donrey Media Group</u>, 99 Nev. 644, 649, 668 P.2d 1081 (1983); <u>Cox Broad. Corp. v. Cohn</u>, 420 U.S. 469 (1975); Restatement (Second) of Torts   652D cmt. b (1977). In fact, comment b of the restatement specifically notes that, "[t]here is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public . . . [including] facts about the plaintiff's life that are matters of public record, such as the date of his birth, the facts of his marriage, . . . or the

---

[41]Under each of the invasion of privacy torts, the plaintiff must establish that the alleged invasion of privacy would be highly offensive to a reasonable person. <u>PETA</u>, 111 Nev. at 634. The factors that are applied to determine whether conduct is highly offensive are analogous to the factors that are used to determine whether the expectation of privacy is objectively reasonable. <u>Id.</u>; <u>See also</u>, <u>Taus v. Loftus</u>, 151 P.3d 1185, 1222, (Cal. 2007) (considering same factors to conclude that both reasonable expectation of privacy and highly offensive intrusion existed).

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002553

1    pleadings that he has filed in a lawsuit."

2    Hyatt attempts to sidestep this clear, binding authority by arguing that <u>Montesano</u>

3    and <u>Cox</u> are not controlling and are distinguishable from this case. Hyatt argues that

4    <u>Montesano</u> does not apply because the public records at issue in that case are different from

5    the public records at issue here since the information disclosed was "never private" and

6    never "intended to be private." RAB 101. <u>Montesano</u> makes no such distinction.

7    <u>Montesano</u>, 99 Nev. at 649. Rather, <u>Montesano</u>, like <u>Cox</u> before it, held that disclosing

8    information that is already available to the public or is a matter of public record cannot

9    provide the basis for common law invasion of privacy claims in Nevada. <u>Id</u>. Hyatt also

10   argues that information contained in "isolated and stale" public records is not subject to the

11   public records defense or the holding of <u>Montesano</u>. RAB 97, 98. <u>Montesano</u> expressly

12   rejected Hyatt's argument. This court held that information relating to an arrest of the

13   plaintiff which occurred in 1955, when plaintiff was a minor, and which was contained in a

14   public record could not form the basis of an invasion of privacy claim following the

15   republication of this information 24 years later in 1979. <u>Montesanto</u>, 99 Nev. at 649. As this

16   court stated, courts have "universally recognized" that "materials properly contained in a

17   court's official records are public facts." <u>Id</u>. Thus, regardless of Hyatt's attempts to

18   distinguish <u>Montesano</u>, Nevada law is clear – information that is a matter of public record

19   cannot form the basis for an invasion of privacy claim in this State. <u>Id</u>. [42]

_____

21   "Several cases cited by Hyatt have no application to the question of whether disclosure of information such as a person's name, address, or social security number, that is already a matter of public record, can ever provide the basis for a common law invasion of privacy claim. For example, some citations only address the issue of whether lists of certain people, which include this type of information, should be disclosed under Freedom of Information Act requests. <u>Heights Cmty. Cong. v. Veterans Admin.</u>, 732 F.2d 526 (6th Cir. 1984). Other cases cited by Hyatt address liability for federal constitutional violations – not under common law claims in Nevada. <u>See, Sheets v. Salt Lake County</u>, 45 F.3d 1383 (10th Cir. 1995) (constitutional claims). Others address core privacy interests related to procreation and medical records. <u>Multimedia WMAZ, Inc. v. Kubach</u>, 443 S.E.2d 491 (Ga. Ct. App. 1994) (disclosure of HIV status); <u>Y.G. v. Jewish Hosp. of St. Louis</u>, 795 S.W.2d 488 (Mo. Ct. App. 1990) (right to privacy in procreation). Incidentally, neither of these cases involved the disclosure of information that was already contained in the public record. In other instances, Hyatt's citations highlight the public nature of the very facts Hyatt claims are contained in obscure and stale public records. For example, <u>Greidinger v. Davis</u>, 988 F.2d
     Continued . . .

80

RJN002554

1    Also, Hyatt's contention is also factually inaccurate. Contrary to Hyatt's arguments,

2    his name, social security number and Tara address were disclosed in various public records

3    that were created or given publicity during the exact same time frame that FTB used this

4    information. Hyatt's social security number appeared in public documents related to Hyatt's

5    divorce proceedings. 80 AA 19811-38; 82 AA 20308-83, 20564; 83 AA 20599-693. These

6    re-opened proceedings were ongoing in the early 1990s when FTB began its audit, and were

7    the subject of newspaper articles during this timeframe. 83 AA 20565-78; 43 ARA 10623-

8    10632. Hyatt's name and social security number were listed in Hyatt's voter's registration

9    forms, which were filled out and filed in Nevada in 1991 and 1995, respectively. 77 AA

10   19087-118. Hyatt's social security number was voluntarily disclosed on his business license

11   form that was filed in 1992. 78 AA 19429; 78 AA 19426-28. In 1993 and 1994, Hyatt paid

12   the property taxes on the Tara address, which created a public record of Hyatt's connection

13   to the Tara address. 47 AA 11626(76) – 628(85).

14   Finally, Hyatt argues that <u>Montesano</u> and <u>Cox Broadcasting</u> are limited to media

15   defendants. RAB 101. However, nothing in those decisions creates such a limitation. And

16   other courts have expressly rejected Hyatt's contention, noting that <u>Cox Broadcasting</u> was

17   not limited to media publications and nor was it the rationale of that opinion. <u>Johnson v.</u>

18   <u>Sawyer</u>, 47 F.3d at 732 n. 33. FTB is not asserting a First Amendment defense. Rather, FTB

19   is asserting that, as a matter of Nevada law, Hyatt's claims for invasion of privacy were

20   precluded because all of the information disclosed was a matter of public record at the time

21   of the disclosure. Therefore, the district court erred, as a matter of law, when it failed to

22   dismiss Hyatt's invasion of privacy claims pretrial based upon the clear application of the

23   public records defense. <u>Montesano</u>, 99 Nev. at 649.

24

25   _____
     1344 (4th Cir. 1993), which is not premised on invasion of privacy claims, highlights the
26   public nature of voter registration forms. Recall, Hyatt's name and social security were
     listed on Hyatt's voter registrations, which, as noted by <u>Greidinger</u>, are public documents.
27   Thus, Hyatt's out-of-state authority does not advance his argument that this court should
     ignore controlling Nevada authority related to this issue.
28

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002555

e.     There Was No Evidence Presented to Support The False Light Claim

As explained in FTB's opening brief, in order to prevail on his false light claim, Hyatt was required to prove that FTB's statements were false. AOB 85-86. In order to establish the falsity, Hyatt was required to establish that FTB made at least an implicit false statement of objective fact. Restatement (Second) of Torts § 652E(b) (1977) (referencing the "falsity of the publicized matter"); Flowers v. Carville, 310 F.3d 1118, 1132 (9th Cir. 2002) (applying Nevada law).[43] As the restatement clarifies, "it is essential to the rule stated in this Section that the matter published concerning the plaintiff is not true." Restatement (Second) Torts § 652E cmt. a (1977). The very name of the tort "false light" indicates that the matter publicized must be false before it becomes actionable.

Hyatt claims that he presented substantial evidence to support this element. RAB 106-107. Hyatt does not dispute that he presented no evidence that any third-party who received FTB's demands construed them as implying Hyatt was a tax cheat, but he claims that the jury could simply draw the inferences from the evidence that FTB portrayed Hyatt as a "tax cheat for 10 years." RAB 106-107. Hyatt presented absolutely no evidence – not one witness, not one document –establishing that any person or entity either construed FTB's communications as implying he was a tax cheat or believed Hyatt was a tax cheat after receiving one of FTB's third-party contacts or reviewing FTB's Litigation Roster.

The undisputed evidence reveals that FTB made no false statements of fact or inferences related to Hyatt during the audit investigations or at any time thereafter. Clearly FTB's third-party correspondence did not state or infer that Hyatt was a tax cheat. See, e.g.,

---

[43]Hyatt claims FTB published false statements that implied he was a "tax cheat." RAB 107. In order for the jury to determine that FTB had made the "false" statement that Hyatt was a "tax cheat," the jury was necessarily required to determine the propriety of the underlying tax and fraud penalty assessments. Yet Hyatt alleges they were repeatedly told they could not do so and were not asked to do. RAB 75-79. Now Hyatt takes a contrary view admitting that in order for Hyatt to prove that FTB's implied statement was false, he was necessarily required to prove that he was **not** a tax cheat – which required the jury to review and determine whether the tax and fraud assessments were correct.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

82

63 AA 15723; 65 AA 16099-100; 64 AA 15910-11. Rather, this correspondence, at most, inferred that Hyatt was under investigation. See id. This was undeniably true.

As to the Litigation Roster, FTB made no false statement of fact or inference related to Hyatt. FTB merely listed this litigation, a general description of the dispute between the parties, and the amount in controversy. 83 AA 20694-22050. Hyatt contends that FTB created a false inference that Hyatt was a tax cheat because the amount of the tax assessments and fraud penalties were listed on the Litigation Roster. RAB 107. This inference is illogical and unreasonable. All of the cases on the Litigation Roster were cases in which the taxpayers and FTB were currently litigating (i.e., disputing) tax assessments made by FTB. 83 AA 20694-22050. The only reasonable inference that could be drawn from the Litigation Roster and the listing of the tax assessments was that Hyatt disputed these amounts and he was litigating these conclusions with FTB. 54 AA 13626-29; 54 AA 13398-403. Therefore, the inference was not false. No matter how this issue is reviewed, it is plain that FTB never published any false statement or inference related to Hyatt either during the audits or with the publication of the Litigation Rosters. This is fatal to Hyatt's false light claim.

f.    FTB's Litigation Rosters Were Privileged

i.    Litigation Privilege

Hyatt contends that the litigation privilege applies only to communications between counsel in the course of judicial proceedings, and he argues that, because the Litigation Rosters allegedly did not "function as a necessary or useful step in the litigation process," they are not protected by the litigation privilege. See RAB 108. Hyatt's attempt to narrow the scope of the litigation privilege is clearly contrary to Nevada law as recently articulated by this court in Clark County Sch. Dist. v. Virtual Educ. Software Inc., 126 Nev.___, 213 P.3d 496, 502 (2009).[44] The "scope of the absolute [litigation] privilege is broad," and "a

_____

[44] Hyatt does not cite to Virtual in the section in his answering brief that discusses the litigation privilege, even though that opinion was published nearly five months before Hyatt

Continued . . .

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1    court determining whether the privilege applies should resolve any doubt in favor of a broad

2    application." Virtual, 213 P.3d at 502 (citing Fink v. Oshins, 118 Nev. 428, 432, 49 P.3d

3    640, 643 (2002)). This court held that the litigation privilege applies even to

4    communications made by a party even before any litigation has commenced. Id.

5       Here, the Litigation Rosters were published by FTB in response to the litigation filed

6    against FTB, during the course of the litigation, by a party to the litigation, FTB. See 50

7    AA 12297 (76-77). As noted in FTB's opening brief, communications are "related to" the

8    litigation where they have "some bearing on the subject matter of the proceeding." See

9    AOB 87. Hyatt attempts to narrow the scope of the privilege by citing inapplicable case law

10    from other jurisdictions. See RAB 108. He then formulates his own test, stating that the

11    communications at issue must be "a necessary or useful step in the litigation process." See

12    id. As this court recognized in Virtual, however, the litigation privilege is broad, and it

13    extends even to letters written by parties outside the course of any judicial proceeding. See

14    Virtual, 213 P.3d at 503. Indeed, so long as communication is "connected with, or relevant

15    or material to, the cause in hand or subject of inquiry," the communication is absolutely

16    privileged, and "no action will lie therefore, however false or malicious [it] may in fact be."

17    See Sahara Gaming Corp. v. Culinary Workers Union Local 226, 115 Nev. 212, 218, 984

18    P.2d 164, 168 (1999) (citations omitted). Here, the Litigation Rosters were simply

19    summaries of the lawsuit Hyatt filed against the FTB in Nevada—much like judicial

20    dockets-- and as such, they bear a direct relationship not only to the subject matter of this

21    proceeding, but to the actual proceeding itself. See 83 AA 20694- 89 AA 22050 (Complete

22    Copies Of All Litigation Rosters).

23             ii.      Fair Report Privilege

24       Hyatt contends that the fair report privilege only protects "[q]uoting from a court

25    file," and that the Litigation Rosters are not protected because they somehow implied that

26    Hyatt was a tax cheat or that he was guilty of tax fraud. RAB 109. From that, Hyatt argues

27

filed his answering brief, see RAB 108, and even though Hyatt was well aware of Virtual.

28    RAB 52 n. 206.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1   FTB's inclusion of the amount of the tax assessments on the Litigation Roster, between
2   April 1998 to March 2000 (when the amount of the tax assessments was placed in the case
3   file by Hyatt himself), was not a "fair report" of the litigation because this information was
4   not related to the litigation at that time. See RAB 108-109. Hyatt's arguments are factually
5   inaccurate, and he attempts to narrow the scope of the fair report privilege in a manner that
6   is inconsistent with Nevada law.

7        Contrary to Hyatt's assertions, against the allegation of his complaint, the amount of
8   the tax assessments *was* at issue from the onset of this litigation. Hyatt filed his Complaint
9   in 1998, which included his First Cause of Action for "Declaratory Relief." 1 AA 1-16.
10  Hyatt sought a determination that he terminated his California residency on September 26,
11  1991. Id. As such, Hyatt challenged FTB's determination regarding his residency, and he
12  sought to invalidate the tax assessments and penalties. See id. Although his claim was
13  dismissed in April 1998, Hyatt re-pled this claim in his First Amended Complaint, filed in
14  June 1998, 1 AA 114-43, as well as his Second Amended Complaint filed in April 2006,
15  expressly stating he was doing so to preserve the issue for appeal. 14 AA 3257-3300.
16  Therefore, Hyatt's contention that his tax assessments were not at issue in this litigation is
17  simply not supported by his own pleadings. Moreover, by placing the propriety of the tax
18  assessments at issue, Hyatt waived any right to confidentiality or privacy in the information
19  contained on the Litigation Roster. Schlatter, 93 Nev. at 192 (when a litigant places an issue
20  before the court he cannot claim privilege surrounding that issue).

21       Hyatt does not contend that the amounts of proposed assessments listed on the
22  Litigation Roster were inaccurate.  It is, therefore, unclear how the inclusion of these
23  specific figures, which are undisputedly accurate, makes the Litigation Roster an "unfair"
24  report. Contrary to Hyatt's brief (RAB 109, n. 402), the record in this case reveals that these
25  amounts were placed in the court file in March 2000, by Hyatt, when his own attorney,
26  Eugene Cowan, submitted an affidavit in support of one of Hyatt's own filings. See 3 RA
27  593, 595. This occurred long before this case was appealed to the United States Supreme
28

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002559

1    Court. In addition, the Litigation Roster was not published on FTB's website until 2000. <u>See</u>

2    50 AA 12296(70)-12297(74).

3         Nevada law does not require the information reported to be specifically included in a

4    court file at all in order for this privilege to apply. <u>Wynn v. Smith</u>, 117 Nev. 6, 14, 16 P.3d

5    424 (2001); <u>Lubin v. Kunin</u>, 117 Nev. 107, 17 P.3d 422 (2001). In fact, contrary to Hyatt's

6    arguments, Nevada law does not even require 100 percent accuracy in order for this

7    privilege to apply. <u>Id.</u>  Rather, the report need only be a "fair abridgment of the occurrence

8    reported" or an otherwise "fair and accurate" report. <u>Id.</u> at 14 (citing Restatement (Second)

9    Torts § 611 (1965)). Even if more accurate information is included in the report than is

10   present in the court file, it is baffling for Hyatt to claim that such a report is  "inaccurate"

11   and not subject to this privilege.

12        Here, the Litigation Rosters presented a fair and accurate report of the judicial

13   proceeding in Nevada initiated by Hyatt. 85 AA 21178-79. The rosters accurately noted the

14   existence of the litigation, the issues involved, and the amount in controversy between the

15   parties, i.e., the amounts of Hyatt's tax assessments. <u>Id.</u> Hyatt speculates from these simple

16   statements that the general public would somehow understand these statements to imply that

17   he was a tax cheat or that he "had been found guilty of fraud." <u>See</u> RAB 109. As before,

18   Hyatt offered no evidence in support of his speculation. Hyatt's speculation is therefore

19   baseless and cannot defeat the fair report privilege.

20              g.  <u>Without the Litigation Rosters, There Was No Evidence of the
                    Required Element of Publicity for the Invasion of Privacy Claims</u>

21

22        In arguing that the invasion of privacy claims were supported by substantial

23   evidence, Hyatt relies heavily on the Litigation Rosters. <u>E.g.</u>, RAB 106 (publication of

     Litigation Roster allowed inference that Hyatt was portrayed in false light to third parties);

24   107 (FTB "falsely broadcasted on its internet website that Hyatt wad committed tax fraud")

25   Without the Litigation Rosters he has no other evidence satisfying the essential element of

26   "publicity," for purposes of his invasion of privacy claims.

27        Publicity, which is a required element for Hyatt's claims alleging false light and

28   publication of private facts, requires that "the matter is made public, by communicating it to

MCDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

86

*the public at large*, or to so many persons that the matter must be regarded as substantially certain to become one of *public knowledge*." Restatement (Second) of Torts § 652D cmt. a (1977) (emphasis added). The publicity standard is far greater than the publication requirement associated with defamation, which requires simply that the matter be communicated to a third person. See id. Rather, to establish publicity under Hyatt's two claims, the information or statement must actually be disseminated to the public at large or to a large number of persons so as to make the statement either widely known to the public or likely to become known. Id.; see, e.g., Virgil v. Time, Inc., 527 F.2d 1122, 1126 (9th Cir. 1975) (indicating that the difference between "publication" and "publicity" is not the means of communication, but rather the difference is to whom the communication reaches); Marleau v. Truck Ins. Exch., 37 P.3d 148, 154 (Or. 2001); Fernandez-Wells v. Beauvais, 983 P.2d 1006, 1008 (N.M. 1999). Without the Litigation Roster, Hyatt cannot establish the necessary element of publicity because none of FTB's other alleged disclosures of identity information and the so-called false statements were publicized to the *public at large* or to so many persons that the matter of FTB's audit would be considered *public knowledge*.

h. The Breach Of Confidential Relationship Claim Failed As A Matter Of Law

Hyatt confuses the issue by arguing two separate torts (one recognized in Nevada and one not) should be melded together to form a new tort that Hyatt has termed "breach of confidentiality." See RAB 111. Specifically, Hyatt cites authority from a limited number of jurisdictions that recognize the tort of "breach of confidentiality," and argues that the alleged disclosure of confidential information by a government agency fits within Perry v. Jordan. RAB 111-112. The torts of breach of confidentiality and breach of confidential relationship are entirely separate theories. Nevada law has never recognized a tort for "breach of confidentiality."

The tort recognized in Nevada, breach of confidential relationship, requires the plaintiff to prove that "a confidential or fiduciary relationship" exists between the parties. Perry v. Jordan, 111 Nev. 943, 947, 900 P.2d 335, 337 (1995). While this relationship does not necessarily equate to a fiduciary relationship, it "exists when one party gains the

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

87

1 confidence of the other and purports to act or advise with the other's interests in mind." Id.

2 at 947. "When such a special relationship exists, the person in whom the special trust is

3 placed owes a duty to the other party similar to the duty of a fiduciary, requiring the person

4 to act in good faith and with due regard to the interests of the other party."[45] Id.

5 Hyatt suggests that a confidential or special relationship existed between him and

6 FTB. RAB 111-114. As noted in FTB's opening brief (AOB 90), an actionable special

7 relationship cannot exist as a matter of law between a government agency and a private

8 citizen, especially where the government agency is conducting an investigation of that

9 citizen. Other jurisdictions unanimously have reached this conclusion. See, for example,

10 Johnson v. Sawyer, 760 F. Supp. 1216, 1233 (S.D. Tex. 1991), issue upheld on appeal, 47

11 F.3d 716 (5th Cir. 1995). Maryland Envtl. Trust v. Gaynor, 803 A.2d 512, 517 (Md. 2002).

12 Indeed, "a taxpayer knows that the relationship between the taxpayer and the IRS is

13 inherently an adversarial one." United States v. Mitchell, 763 F. Supp. 1262, 1267 (D. Vt.

14 1991) rev'd on other grounds in 966 F.2d 92 (2nd Cir. 1992). As a result of this adversarial

15 relationship, "the taxpayer is well aware that in dealing with the IRS and its agents, he or

16 she is well-advised to have the assistance of an accountant or a tax lawyer." Id. FTB is

17 aware of no case holding that a "special relationship" exists between a citizen and a

18 governmental taxing agency in the context of the tort of breach of confidential relationship

19 as articulated in Perry v. Jordan, or even under the breach of confidentiality tort recognized

20 by a few jurisdictions. Hyatt's brief, likewise, cites to no such case. Because no special

---

[45] Hyatt argues that a jury instruction on Perry was offered by FTB, and "FTB therefore cannot allege the [district] Court erred in instructing the jury." RAB 110. FTB always contended that there were legal obstacles barring Hyatt's "breach of confidentiality" claim. E.g. 13 AA 3073-77 (opposing amended to complaint); 14 AA 3461 (motion for summary judgment). When the district court allowed the claim to go to the jury, FTB wanted to make sure the instruction on the claim was accurate. FTB therefore offered an instruction correctly setting forth the Perry requirements; and the judge gave the instruction. 51 AA 12560-62; 52 AA 12751. FTB's contention on appeal, however, is not that the district court gave an erroneously phrased instruction. Our contention is the same as it has always been, i.e., that the claim should have never gone to the jury because the claim did not fit within the Perry framework or any other recognized Nevada theory. AOB 88-90.

McDONALD·CARANO·WILSON<br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>P.O. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

RJN002562

relationship exists between a citizen and a government taxing agency, particularly where a taxing authority has commenced an adversarial audit investigation against that citizen, Hyatt's claim for breach of confidential relationship fails as a matter of law.

### 5. Hyatt's Abuse of Process Claim Fails As A Matter of Law

Hyatt had to prove two essential elements for his abuse of process claim: (1) an ulterior purpose by the defendants other than resolving a legal dispute; and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding. LaMantia v. Redisi, 118 Nev. 27, 30, 38 P.3d 877, 879 (2002). Hyatt argues that his claim is based solely on FTB's alleged "improper and illegal use of administrative subpoenas." RAB 115.

### a. The Demand Letters Were Neither Improper Nor Illegal

FTB filed a motion in limine seeking a ruling that:

(1)   FTB was statutorily authorized to conduct investigations inside Nevada;
(2)   It was not illegal or improper for FTB to conduct its investigations in Nevada;
(3)   There is no Nevada law that prohibits FTB from conducting its investigations in Nevada;
(4)   FTB was authorized to issue "Demands to Furnish Information";
**(5)   These "Demands to Furnish Information" were not subpoenas and were not unlawful; and**
(6)   FTB was not required by Nevada law to obtain permission from any Nevada state court or agency prior to sending its "Demands to Furnish Information" into Nevada.

19 AA 4556-79 (emphasis added). The district court granted FTB's motion. 27 AA 6533-34. There should not have been, therefore, any issue at trial as to whether the Demand Letters were subpoenas or unlawful. Nevertheless, over FTB's objection, Hyatt continued to argue at trial that the Demand Letters were unlawful or inappropriate. 45 AA 11199 (73) (Hyatt's counsel stating that the FTB was "not entitled to... demand that information from any non-California resident or entity"). Before this court, Hyatt continues to argue that the Demand Letters were subpoenas, illegal and improper. RAB 115-118. Hyatt's arguments are both contrary to the law of the case, and fundamentally inaccurate.

FTB has statutory authority to conduct investigations and to "require by demand" information relevant to the investigation. Cal. Rev. & Tax Code § 19504(a). At the time FTB audited Hyatt, FTB was permitted to contact third parties without first notifying the

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002563

taxpayer. See Cal. Rev. & Tax Code §§ 19254; 26423 (1993).[46] All California state agencies, including FTB, have the power to conduct investigations outside of California. See Cal. Rev. & Tax. Code § 19504(d); see also, Cal. Gov't Code §§ 11185(d); 11187(c); 11189. Thus, FTB was within its statutory authority when it sent Demand Letters to Nevada residents seeking information relevant to its tax audit investigation of Hyatt.

> **b.** FTB Did Not Issue Administrative Subpoenas During Its Audits

There is no basis for Hyatt's characterization of the Demand Letters as administrative subpoenas.[47] The Demand Letters were merely investigative tools accompanied by cover letters that stated they sought the "cooperation" of the recipient. See, e.g., 64 AA 15898-905. Administrative subpoenas typically are issued by an agency which is seeking information from an individual or entity which the agency regulates to confirm compliance with its regulations. See In re Subpoenas Duces Tecum Nos. A99-0001, A99-0002, A99-0003 and A99-0004, 51 F. Supp. 2d 726 (W.D. Va. 1999). A subpoena is a "writ commanding a person to appear before a court or tribunal, subject to a penalty for failing to comply." Black's Law Dictionary 1440 (7th ed. 1999).

There is a significant distinction between a subpoena and an FTB Demand Letter. Here, the FTB issued form letters, accompanied by demands seeking information. E.g. 64 AA 15898-99. The Demand Letters were not subpoenas and had none of the legal affects of such a tool.[48] Id. The word "subpoena" was not used anywhere in any of the Demand Letters. Id. Additionally, there was no indication by the language of these demands that the

---

[46]In determining the scope of FTB's investigative authority during Hyatt's residency audit, the court must look to the statutes that were in effect at the time his audit was proceeding. See Runion v. State, 116 Nev. at 1049 (court improperly used prior version of statute rather than statute in effect at the time of the offense).

[47]The only process Hyatt alleged was abused was FTB's Demand Letters. 14 AA 3262 -63.

[48]Hyatt's argument that the FTB called the Demands Letters "pocket subpoenas" is misleading. There was testimony that one person, a witness for Hyatt who previously worked at FTB, called these documents "pocket subpoenas." 44 AA 10777 (209); 44 AA 10815 (6). No other person who worked at FTB testified that the Demand Letters were called pocket subpoenas. And no one receiving the letters considered them as subpoenas. Nevertheless, whatever nickname was or was not given to the documents by one individual does not change their legal effect.

90

RJN002564

1  recipient would be the subject of any repercussions or penalties for failing to respond. Id.

2  And contrary to Hyatt's argument, no one receiving the Demand Letters construed them as

3  subpoenas. E.g., 47 AA 11623 (64). The Demand Letters, in short, are not subpoenas at all.

       c.    <u>An Abuse of Process Claim Cannot be Based on the Mere Issuance of a Subpoena</u>

As explained in the opening brief, the tort of abuse of process requires *judicial* or *legal* process. AOB 90-91. Hyatt cites no precedent to the contrary. Instead, Hyatt cites to irrelevant case law in which courts found an abuse of process by a government agency that fraudulently issued administrative subpoenas and clearly invoked the judicial process by attempted enforcement of the same. RAB 115-16. These cases make clear that the mere *issuance* of an administrative subpoena cannot form the basis for an abuse of process claim. Only when those subpoenas are *enforced* by a court can a claim for abuse of process arise. The actions complained of by Hyatt—the mailing of Demand Letters by FTB—simply cannot, as a matter of law, be construed as invoking the judicial process.

Even if FTB had issued administrative subpoenas, which it did not, administrative subpoenas were not self-enforcing and therefore cannot be considered final until the issuing agency has sought and obtained *judicial enforcement*. <u>See</u> <u>Shea v. Office of Thrift Supervision</u>, 934 F.2d 41, 45 (3d Cir. 1991); <u>see also</u>, <u>Stryker Corp. v. U.S. Dept. of Justice</u>, CIV.A. 08-4111 (WJM), 2009 WL 424323 at *3 (D.N.J. Feb. 18, 2009). The Supreme Court has refused to consider pre-enforcement disputes arising out of agency subpoenas on the grounds that such claims are not yet ripe. <u>See</u> <u>Reisman v. Caplin</u>, 375 U.S. 440, 450 (1964) (declining to grant equitable relief to the recipient of an administrative summons that had not been judicially enforced).

An abuse of process claim arises only when an agency has turned to judicial enforcement of an administrative subpoena, because the purpose of the tort is to preserve the integrity of the court, the tort requires misuse of a *judicial process*. <u>ComputerXpress Inc. v. Jackson</u>, 113 Cal. Rptr. 2d 625, 644 (Cal. Ct. App. 2001). Abuse of process "refers to an abuse of judicial process, and **it is not until the government files an enforcement action that it has begun to use the court's process.**" <u>Stryker Corp.</u>, 2009 WL 424323 at *4

RJN002565

McDONALD·CARANO·WILSON<sup>llp</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1  (emphasis added); see also, Tuck Beckstoffer Wines LLC v. Ultimate Distributors, Inc., 682

2  F. Supp. 2d 1003 (N.D. Cal. 2010) (the mere issuance of subpoenas is not considered to be

3  an abuse of process); SEC v. ESM Gov't Sec., Inc., 645 F.2d 310, 316-17 (5th Cir. 1981)

4  (only when a government agency invokes the power of a court to enforce a misbegotten

5  administrative subpoena can there can be an abuse of process). "Without having used the

6  judicial process, [FTB] could not have abused it." See Stryker Corp., 2009 WL 424323 at

7  *4.

8      Nevada is in accord with these jurisdictions. Abuse of process requires abuse of

9  "legal process." LaMantia v. Redisi, 118 Nev. at 30. This court has characterized the

10 requirement as hinging on misuse of "regularly issued process." Nevada Credit Rating

11 Bureau, Inc. v. Williams, 88 Nev. 601, 606, 503 P.2d 9 (1972) (filing lawsuit in court and

12 obtaining court-issued attachment); LaMantia, 118 Nev. at 30 (civil lawsuit filed in court);

13 Posadas v. City of Reno, 109 Nev. 448, 851 P.2d 438 (1993) (criminal complaint filed in

14 court); Kovacs v. Acosta, 106 Nev. 57, 787 P.2d 368 (1990) (partition suit filed in court);

15 Bull v. McCuskey, 96 Nev. 706, 615 P.2d 957 (1980) (filing lawsuit in court and obtaining

16 court-issued summons), overruled in part on other grounds in Ace Truck v. Kahn, 103 Nev.

17 503, 746 P.2d 132 (1987).

18          d.  "Official Looking" Papers Are Not Enough For Abuse Of Process

19      Hyatt argues that his claim "is, and always has been, based on the FTB's improper

20 use of administrative subpoenas." RAB 115. But after asserting that he is relying solely on

21 "administrative subpoenas," Hyatt is then faced with the reality that FTB's demands were

22 not actually administrative subpoenas. To deal with this reality, he is forced to argue that

23 FTB's demands for information "appeared" to be subpoenas. RAB 116, lines 9-10

24 (demands "appeared" to be legal summons or subpoenas).

25      There is no basis for Hyatt's argument that a non-judicial paper can somehow be

26 transmuted into forbidden judicial process, merely because the non-judicial paper might be

27 "official looking." RAB 116, line 9. Hyatt cites no authority supporting such a contention.

28 On the other hand, FTB's opening brief cited and discussed Liles v. Am. Corrective

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY • 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

92

1  Counseling Services, Inc., 131 F. Supp. 2d 1114, 1117-18 (S.D. Iowa 2001) (AOB 91-92),

2  where a private collection company processed claims from merchants who received unpaid

3  checks. The company sent a notice to the plaintiff stating that it was an "Official Notice."

4  It contained a seal with a "scales of justice" emblem; it falsely implied that it was from the

5  county attorney's office; and it falsely implied that a criminal complaint had been generated

6  and was being processed. There was nothing to indicate that the official looking notice was

7  issued by a court, and in fact, the notice was not issued as part of any court case. The

8  plaintiff sued the collection company for abuse of process. The court dismissed the claim,

9  holding that the essential element of judicial process failed as a matter of law because the

10  notice, despite its official appearance, did not actually result from any court process.

11  "Without the involvement of a court, the threat of criminal prosecution is insufficient to

12  constitute 'legal process' as required by this tort." Id. at 1117-18.

13      Hyatt's brief fails to cite, distinguish or even recognize the existence of Liles. And

14  he cites no legal authority contrary to Liles or supporting his theory that a paper that was

15  never issued in a judicial proceeding can constitute "legal process" merely because the

16  paper is official looking. Hyatt's theory, if accepted by this court, would create an entirely

17  new tort: "abuse of official-looking process."

18      Hyatt's brief states that there is "ample case law" supporting his position (RAB 115,

19  line 6), but he primarily relies on only one case, United States v. Powell, 379 U.S. 48

20  (1964). RAB 115, lines 7-18. Hyatt proffers Powell as an abuse of process case involving

21  administrative subpoenas, arguing that Powell would allow an abuse of process claim based

22  on "the specter of enforcement" by a court, or the "threat of enforcement" of administrative

23  subpoenas. Id. Powell says no such thing. The question before the United States Supreme

24  Court was the standard the IRS had to meet to obtain judicial enforcement of a summons in

25  a fraud investigation. Powell, 379 U.S. at 50-51. Powell was not an abuse of process tort

26  case. The Court said nothing even remotely suggesting that an abuse of process claim could

27  rely on an administrative summons for which no judicial enforcement was ever sought. Nor

28  did the Court say a word about the "specter of enforcement" or the "threat of enforcement"

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

93

1   in the context of an abuse of process claim (or in any other context, for that matter).[49]

2   Finally, FTB's opening brief established that none of the few Nevada recipients of

3   demands for information perceived them as legal instruments, or that any recipient felt

4   coerced or intimidated by a demand.  AOB 92.  Hyatt's only response is that "the jury did

5   not accept that assertion," and that "the jury found" the demands to be illegal and

6   unenforceable.  RAB 118, lines 3-4.  Once again, Hyatt relies on his perceived "specter of

7   court enforcement" as a substitute for actual evidence of the effect of the demands for

8   information.  RAB 118, lines 7-10.  The undeniable fact is that no Nevada recipient of a

9   demand for information testified the paper was perceived as legal process, judicial process,

10  coercive process, or anything other than a routine inquiry.  See AA citations at AOB 92,

11  lines 13-20.  Moreover, the jury did not make the findings on which Hyatt relies.

12  Accordingly, Hyatt's abuse of process claim failed as a matter of law and should

13  never have been submitted to the jury.

14          6.      Hyatt's Intentional Infliction Of Emotional Distress Claim Fails As A
                    Matter Of Law

15  Hyatt's claim for intentional infliction of emotional distress ("IIED") failed as a

16  matter of law because: (1) as a discovery sanction, Hyatt was limited to "garden variety"

17  emotional distress, precluding him from establishing IIED as a matter of law; (2) Hyatt's

18  evidence did not establish that his emotional distress was sufficiently severe to support this

19  claim; and (3) Hyatt had no physical manifestation or objectively verifiable evidence of

20  severe emotional distress. AOB 93-96. Hyatt's responses are meritless.

21          a.      The District Court's Sanction Limiting Hyatt To Garden
                    Variety Emotional Distress Precluded Hyatt From Recovery
22                  For His IIED Claim

23  Hyatt argues that the district court's order limiting him to recovery for garden variety

24

25  [49]Hyatt cites three other cases at RAB 116, n. 427.  None of those cases dealt with the abuse
26  of process tort; none of the cases dealt with the judicial process prerequisite for the tort; and
    certainly none of the cases dealt with whether an administrative paper (such as a letter or a
27  demand for information) can be characterized as legal process, for purposes of abuse of
    process tort liability, merely because the paper is official looking.
28

McDONALD·CARANO·WILSON<br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>P.O. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

94

1   emotional distress did not affect his ability to recover on his IIED claim. RAB 122-24.

2   There is no dispute that the district court limited Hyatt to only garden variety emotional

3   distress. 15 AA 3547. It is also undisputed that this sanction was imposed against Hyatt

4   after he unilaterally refused to provide his medical records during discovery.[50] 15 AA 3544-

5   47. By limiting Hyatt's evidence to only garden variety emotional distress, the district court

6   effectively precluded Hyatt from being able to establish the necessary and essential element

7   of his IIED claim – i.e., that he suffered "severe or extreme emotional distress." Therefore,

8   the district court erred by failing to dismiss this claim.

9       A plaintiff claiming IIED must show that he or she "actually suffered **severe** or

10  **extreme** emotional distress." <u>Nelson v. City of Las Vegas</u>, 99 Nev. 548, 555, 665 P.2d

11  1141, 1145 (1983) (emphasis added); <u>see</u> <u>Miller v. Jones</u>, 114 Nev. 1291, 1300, 970 P.2d

12  571 (1998). Garden variety emotional distress is distress that is not severe. <u>See</u> <u>Ruhlmann v.</u>

13  <u>Ulster County Dept. of Soc. Services</u>, 194 F.R.D. 445, 449 (N.D.N.Y. 2000).

14      Other jurisdictions routinely hold that when a plaintiff asserts a claim for IIED but

15  refuses to provide access to medical records, sanctions are appropriate,[51] including

16  _____

17  [50]Many of the medical records sought overlapped in time with the disputed timeframe in

18  which Hyatt's residency was questioned. In addition to likely providing alternative causes
    of emotional distress, they may also have revealed representations from Hyatt concerning

19  his address. Hyatt has never produced these records, even in redacted form.

    [51]Hyatt argues that his alleged physical symptoms (e.g., sick to his stomach, sleeplessness,

20  tightness in his chest) were sufficient to satisfy legal requirements for emotional distress

21  recovery, despite his failure to seek treatment for these alleged ailments. RAB 125-28.
    Where emotional distress damages are not secondary to physical injuries, either a physical

22  impact must have occurred, or there must be proof of serious emotional distress "causing
    physical injury or illness." <u>Betsinger v. D.R. Horton, Inc.</u>, 126 Nev. ___, ___ P.3d ___

23  (Adv. Opn. 17, May 27, 2010) (quoting <u>Bartmettler</u>, 114 Nev. at 448). "We have
    previously required a plaintiff to demonstrate that he or she has suffered some physical

24  manifestations of emotional distress in order to support an award of emotional [distress]

25  damages." <u>Id.</u> Insomnia and general physical or emotional discomfort are insufficient to
    satisfy the physical impact requirement. <u>Chowdhry v. NLVH, Inc.</u>, 109 Nev. 478, 483, 851

26  P.2d 459 (1993). Even contemplating suicide and seeking additional psychotherapy do not

27  satisfy the requirement. <u>Bartmettler</u>, 114 Nev. at 443, 448. This court recognizes the need
    to impose safeguards against the "illusory recoveries" sought in <u>Chowdhry</u> and <u>Bartmettler</u>.

28  Continued . . .

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002569

1   dismissal. See, e.g., Ford v. Zalco Realty, Inc., CIV.A 1:08-CV-1318, 2010 WL 378521 at

2   *6 (E.D. Va. Feb. 1, 2010) (plaintiff failed to supply requested documentation to support

3   claim for emotional distress; court granted motion to strike emotional distress claim); Coffin

4   v. Bridges, 72 F.3d 126 (4th Cir. 1995) (affirming dismissal of complaint because plaintiff

5   refused to provide mental health care records); In re Consol. RNC Cases, 127, 2009 WL

6   130178 at *12 (S.D.N.Y. Jan. 8, 2009) (emotional distress claims dismissed where plaintiffs

7   refused discovery of medical records); Zabin v. Picciotto, 896 N.E.2d 937 (Mass. App. Ct.

8   2008) (dismissal of claim for emotional distress for refusal to comply with order requiring

9   release of medical records); Ellis v. SmithKline Beecham Corp., C07-5302RJB, 2008 WL

10  3166385 (W.D. Wash. Aug. 5, 2008) (plaintiff refused to provide medical records during

11  discovery; summary judgment granted on claim for IIED); Lindstrom v. Hunt Enterprises,

12  Inc., B189275, 2007 WL 4127191 (Cal. Ct. App. Nov. 21, 2007) (granting motion to

13  dismiss or strike claims for emotional distress as sanction for failing to comply with order

14  requiring release of medical records).[52]

15      Hyatt attempts to avoid the district court's sanction, claiming that the phrase "garden

16  variety," does not actually mean "garden variety" as the term has been defined by numerous

17  courts throughout the country, (RAB 122-24), even though the discovery commissioner

18  expressly stated that Hyatt was limited to recovery of garden variety emotional distress "as

19  many courts have referred to it." 15 AA 3547. Garden variety emotional distress claims are

20  defined as "ordinary and commonplace" or "simple or usual." Jessamy v. Ehren, 153 F.

22  Betsinger, 126 Nev. at __ (quoting Olivero v. Lowe, 116 Nev. 395, 995 P.2d 1023 (2000)).
23  One safeguard is the additional requirement of objectively verifiable indicia of severe
    emotional distress, such as seeking medical care. Miller, 114 Nev. at 1294. Here, Hyatt
24  failed to seek treatment; his general complaints were not objectively verified; he
    experienced no physical impact or physical manifestation; and he presented no medical
25  testimony that his alleged physical symptoms were caused by FTB's audit activities. Thus,
    he failed to establish recoverable emotional distress damages.
26  [52]This issue often arises in the context of discovery orders, which are generally not
27  published as a matter of course. Therefore, these orders are generally contained in
    unpublished decisions.

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002570

1   Supp. 2d 398, 401 (S.D.N.Y. 2001). Such claims do not require medical attention and are

2   based on generalized allegations of insult, hurt feelings, and lingering resentment. Javeed v.

3   Covenant Med. Ctr., Inc., 218 F.R.D. 178, 178-79 (N.D. Iowa 2001) (finding that claims

4   including loss of self-respect, loss of self-esteem, medical anguish, grief, anxiety, dread,

5   sorrow, and despondency are not garden variety emotional distress).

6        In contrast, seeking extensive damages and claiming severe injury pursuant to a

7   claim for IIED "elevates a case **above** that of a garden variety emotional distress case." See

8   Beightler v. Suntrust Banks, Inc., 2:07-CV-02532-DV, 2008 WL 1984508 at *3 (W.D.

9   Tenn. Apr. 30, 2008) (emphasis added); see also, Pacheco v. Rogers & Breece, Inc., 579

10  S.E.2d 505, 507-08 (N.C. App. 2003) (plaintiff does not have a remedy for IIED where he

11  only establishes garden variety anxiety or concern); E.E.O.C. v. California Psychiatric

12  Transitions, 258 F.R.D. 391 (E.D. Cal. 2009) (garden variety emotional distress claim does

13  not involve a separate claim of IIED). Koch v. Cox, 489 F.3d 384, 390 (D.C. Cir. 2007)

14  (distinguishing garden variety emotional distress from "any specific psychiatric injury or

15  disorder, or unusually severe distress"); Mugavero v. Arms Acres, Inc., 680 F. Supp. 2d

16  544, 578 (S.D.N.Y. 2010) (severe emotional distress claims "differ from the garden variety

17  claims in that they are based on more substantial harm or more offensive conduct, are

18  sometimes supported by medical testimony and evidence, evidence of treatment by a

19  healthcare professional and/or medication, and testimony from other, corroborating

20  witnesses"). Contrary to Hyatt's contentions, garden variety emotional distress is not a term

21  of art without meaning, and it certainly was intended to have significance in this case.

22        By limiting Hyatt to solely garden variety distress, the discovery commissioner

23  recognized the fundamental unfairness of allowing Hyatt to make a claim for severe

24  emotional distress, but concurrently allowing him to shield vital medical records from FTB.

25  15 AA 3553-58; See also, E.E.O.C. v. California Psychiatric Transitions, 258 F.R.D. At 400

26  (E.D. Cal. 2009) (noting the fundamental unfairness of allowing a plaintiff to make a claim

27  for emotional distress but shielding discovery of information related to that claim); Combe

28  v. Cinemark USA, Inc, 1:08-CV-142 TS, 2009 WL 3584883 at *2 (D. Utah Oct. 26, 2009)

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

97

RJN002571

1  ("Medical records are also relevant to the preparation of defendant's defenses against the

2  emotional distress claims because the records may reveal another sources of stress unrelated

3  to defendant which may have affected a plaintiff's emotional distress"); Wooten v.

4  Certainteed Corp., 08-2508-CM, 2009 WL 2407715 at *1 (D. Kan. Aug. 4, 2009) (medical

5  records are relevant to defenses against emotional distress claims because records "may

6  reveal stressors unrelated to Defendant that may have affected Plaintiff's emotional well

7  being.").

8      If the court were to construe the sanction order as Hyatt claims, it would render the

9  penalty meaningless and instead reward Hyatt for hiding his records from FTB. Garden

10  variety distress is not severe distress, and cannot as a matter of law establish the severity

11  element necessary for a claim of IIED.

12             b.    Hyatt Asks This Court To Presume Severe Emotional Distress

13      Hyatt argues that severe emotional distress can be presumed under Nevada law. RAB

14  119-122. Nevada has never presumed the existence of severe distress, and Hyatt cites no

15  Nevada cases in support of this unfounded proposition. RAB 119-121. Emotional distress is

16  not presumed, even in cases involving intentional torts. See Betsinger v. D.R. Horton, Inc.,

17  126 Nev. ___, ___ P.3d ___ (Adv. Opn. 17, May 27, 2010) (fraud and deceptive trade

18  practices). A plaintiff must present affirmative and objective evidence of severe emotional

19  distress to succeed on a claim for IIED. See, e.g., Miller, 114 Nev. at 1300 (a plaintiff must

20  present "objectively verifiable indicia of the severity of his emotional distress"); Jordan v.

21  State ex rel. Dep't. of Motor Vehicles & Pub. Safety, 121 Nev. 44, 110 P.3d 30 (2005)

22  (plaintiff failed to state a claim for IIED where he did not allege that he suffered any severe

23  emotional distress), overruled on other grounds by Buzz Stew, LLC v. City of N. Las

24  Vegas, ___ Nev. ___, 181 P.3d 670 (2008).

25      Other courts have held that emotional distress may not be presumed and is not

26  established simply by evidence of defendant's extreme or outrageous conduct. See, e.g.,

27  Doe v. Kaiser, CIVA 6:06-CV-1045DEP, 2007 WL 2027824 at *5 (N.D.N.Y. July 9, 2007)

28  ("It should be noted that damages for emotional distress may not be presumed, and are not

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

98

1   established simply by evidence of a defendant's egregious conduct"); Tanzini v. Marine

2   Midland Bank, 978 F. Supp. 70, 78 (N.D.N.Y. 1997) (damages for emotional distress may

3   not be presumed because of the nature of the defendant's actions alone); Turic v. Holland

4   Hospitality, Inc., 85 F.3d 1211, 1215 (6th Cir. 1996) ("damages for mental and emotional

5   distress will not be presumed, and must be proved by competent evidence").

6          Without his so-called presumption, Hyatt's evidence did not overcome Nevada's

7   high burden to show that he "actually suffered **severe** or **extreme** emotional distress."

8   Nelson v. City of Las Vegas, 99 Nev. at 555 (emphasis added). General emotional or

9   physical discomfort such as anger, embarrassment, humiliation, or other similar symptoms,

10  such as migraines and stress, are insufficient to establish severe emotional distress. Miller,

11  114 Nev. at 1300; Watson v. Las Vegas Valley Water Dist., 378 F. Supp. 2d 1269, 1279 (D.

12  Nev. 2005) aff'd, 268 F. App'x. 624 (9th Cir. 2008). Ordinary emotions do not satisfy the

13  rigorous "severe emotional distress" requirement needed to make a showing of IIED. See,

14  e.g., Nelson, 99 Nev. at 548. Severe emotional distress is such that no reasonable person

15  could be expected to endure it. Alam v. Reno Hilton Corp., 819 F. Supp. 905, 911 (D. Nev.

16  1993) (citing Restatement (Second) of Torts, § 46, cmt. j (1995) ("It is only where

17  [emotional distress] is extreme that the liability arises. Complete emotional tranquility is

18  seldom attainable in this world, and some degree of transient and trivial emotional distress

19  is a part of the price of living among people. The law intervenes only where the distress

20  inflicted is so severe that no reasonable man could be expected to endure it.").

21         Here, Hyatt claimed that he "suffered anger, anxiety, embarrassment, humiliation,

22  and other related symptoms" due to FTB's audit. 15 AA 3521. He testified to humiliation,

23  frustration, fear, and embarrassment 37 AA 9162 (59), 9172 (99-101), 9173 (105). Hyatt

24  and his friends and family also testified to some related symptoms such as trouble sleeping,

25  crying and headaches. 39 AA 9541 (23); 45 AA 11140 (26-27). General feelings of

26  embarrassment, anger, or anxiety are not so severe that they were unendurable. See Miller,

27  114 Nev. at 1300. Thus, Hyatt did not meet his burden of establishing that he suffered stress

28  so severe and of such intensity that no reasonable person could be expected to endure it.

McDONALD·CARANO·WILSON⸺
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

99

RJN002573

c.   Nevada Law Requires Objectively Verifiable Indicia, But Hyatt Offered None

A plaintiff alleging IIED must present "objectively verifiable indicia of the severity of his emotional distress." Miller, 114 Nev. at 1294. Contrary to Hyatt's contention at RAB 127, when the plaintiff presents no objective evidence of "medical or psychiatric assistance arising from the alleging incidents," his IIED claim cannot survive. Id.   (plaintiff who testified that he was depressed, but failed to seek any medical or psychiatric assistance, presented no objectively verifiable evidence); Watson, 378 F. Supp. 2d at 1279 (plaintiff failed to prove severe distress where he presented no medical or psychiatric evidence).[53]

Hyatt's own testimony that he suffered severe emotional distress is obviously not objective evidence. See, e.g., Vallinoto v. DiSandro, 688 A.2d 830, 839 (R.I. 1997) (self-serving uncorroborated statements of plaintiff were insufficient without supporting, medical evidence); Myers v. Bennett Law Offices, 238 F. Supp. 2d 1196, 1206 (D. Nev. 2002) ("[A] plaintiff must support a claim for damages based on emotional distress with something more than his or her own conclusory allegations").

Self-serving statements, corroborated only by a plaintiff's friends and family, are similarly not sufficient objective evidence of serious emotional distress.   See Talley v. Family Dollar Stores of Ohio, Inc., 542 F.3d 1099 (6th Cir. 2008) (plaintiff must provide some evidence beyond his or her own testimony or the self-serving testimony of that person's family member; rejecting plaintiff's and plaintiff's sister's affidavits as sufficient evidence of serious emotional distress). The testimony of Hyatt's friends and family was also not based upon personal knowledge of the alleged conduct by FTB, or of Hyatt's distress, but rather, was based upon what Hyatt had told those friends and family members about his dispute with FTB and the alleged effect of that dispute. 39 AA 9541 (22) – 9543 (33); 45 AA 11140 (26-27); 45 AA 11144 (45) – 11145 (47).   Therefore, such testimony

---

[53]The only Nevada case cited by Hyatt in support of his contention that medical evidence is unnecessary to establish IIED is Bartmettler, 114 Nev. at 448, which is not applicable, as that discussion related to the separate tort of negligent infliction of emotional distress.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002574

was based on Hyatt's self-serving account. Because Hyatt's perception of the source and extent of his emotional problems was entirely subjective, similarly, witness testimony that relied upon his subjective perception—in the absence of any medical records or other objective evidence—cannot meet Nevada's standard. Hay v. Shell Oil Co., 986 S.W.2d 772, 777 (Tex. App. 1999).

Hyatt cites no case for the position that the testimony of friends and family is objective verification of his emotional distress. Instead, he cites Kalantar v. Lufthansa German Airlines, suggesting that the court allowed the testimony of friends or family to support the claim. RAB 128. In that case, however, the court concluded that the plaintiff failed to offer a "sufficient evidentiary basis for him to reach a jury…on his allegations of severe emotional distress." 402 F.Supp.2d 130, 146 (D.D.C. 2005). In fact, one court interpreting Dixon held that the plaintiff's testimony—in conjunction with that of his father—could not, as a matter of law, satisfy the objectively verifiable standard. Veney v. Ojeda, 321 F. Supp. 2d 733, 748-49 (E.D. Va. 2004). Without objectively verifiable evidence of severe emotional distress, the IIED claim failed as a matter of law.

7.    The District Court Erred In Her Treatment Of FTB's Statute Of Limitations Defense Both Before And During Trial

Hyatt's brief inaccurately states both the facts and the law related to the statute of limitations issues. RAB 137-144. FTB filed several motions for partial summary judgment on each of Hyatt's "non-fraud" claims,[54] based on the statute of limitations. See, e.g., 14 AA 3440; 15 AA 3581; 17 AA 4021. The district court denied these motions after concluding, at Hyatt's urging, that material issues of fact existed with respect to when the limitations period began to run. See, e.g., 15 AA 3717-22; 19 AA 4672-73 (Hyatt argues issues of fact related to discovery of cause of action is for jury to decide); 19 AA 4672-78; 4700 (court's pretrial rulings).

---

[54]There is no dispute that each of Hyatt's causes of action, with the exception of his fraud claim, is subject to a two-year limitations period. See NRS 11.190(4)(e).

101

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1    At trial FTB presented the exact same evidence to the jury related to the statute of

2  limitations defense. See 66 AA 16388-427; 77 AA 19072-74, 19119-21. Inexplicably,

3  however, the district court granted Hyatt's motion for judgment as a matter of law,

4  dismissing FTB's statute of limitations defense, after concluding, again at Hyatt's urging,

5  that the identical evidence did not create an issue of fact, and that the same evidence now

6  showed as a matter of law that the limitations period had not expired. 55 AA 12489 (26).

7    The district court's inconsistent and diametrically opposite rulings were wrong. The

8  opening brief presented two straightforward arguments. First, the district court erred when it

9  accepted Hyatt's argument that material issues of fact existed, and when it denied FTB's

10  pretrial motions for summary judgment, because the uncontroverted evidence established

11  that the limitations period expired before Hyatt filed his claims in January 1998. AOB 96-

12  98. Second, even if the district court did not err in denying the pretrial motions, the district

13  court certainly erred at trial when it accepted Hyatt's changed argument that no material

14  issues of fact existed, and that, as a matter of law, the identical evidence established that the

15  limitations period had not expired. Id.

      a.    **Hyatt's Legal Contentions Related To The Statute Of**
16              **Limitations Are Inaccurate**

17    Hyatt essentially claims that in order for the limitations period to be triggered, the

18  plaintiff must: (1) be aware of every single fact related to a defendant's actions that may

19  give rise to the plaintiff's claims; (2) know the specific causes of action that may be based

20  upon those facts; and (3) know the full extent of the damages. See generally, RAB 138-144.

21  Based upon these erroneous legal contentions, Hyatt claims the statute of limitations was

22  not triggered until he received the complete audit file from FTB in September 1996. [55] Id.

23

24  [55]Hyatt makes reference to the "continuing tort doctrine." See RAB 139. Although Hyatt
25  never attempts to analyze or tie this doctrine to the facts, FTB is compelled to explain why
   the "continuing tort doctrine" has no application to this case. As a starting point, FTB has
26  been unable to locate any Nevada Supreme Court case adopting this doctrine and, for this
   reason alone, it does not apply. However, even if this court recognized the doctrine, the
27  continuing tort doctrine only applies "when a tort involves a continuing wrongful conduct."
   Flowers v. Carville, 310 F.3d at 1126. Thus, "the doctrine applies where there is 'no single
28  incident' that can 'fairly or realistically be identified as the cause of significant harm." Id.
   Continued . . .

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002576

1    First, a cause of action accrues when the wrong occurs and the party sustains injury.

2  Petersen v. Bruen, 106 Nev. 271, 274, 792 P.2d 18 (1990).  An exception to this general

3  rule is the discovery rule, where the limitations period is "tolled until the injured party

4  discovers or reasonably should have discovered facts supporting a cause of action." Id.; see

5  also, G & H Associates v. Ernest W. Hahn, Inc., 113 Nev. 265, 934 P.2d 229 (1997). Thus,

6  the statute of limitations commences once a plaintiff has sufficient facts to put him on

7  "inquiry notice" – or has constructive knowledge – of his claims. Massey v. Litton, 99 Nev.

8  723, 728, 669 P.2d 248 (1983). Once a plaintiff has inquiry notice, he must use due

9  diligence to discover the facts related to the claim. Bemis v. Estate of Bemis, 114 Nev.

10  1021, 1025, 967 P.2d 437, 441 (1998).

11    The main focus of the discovery rule is on the injured party's "knowledge of or

12  access to facts rather than on her discovery of legal theories." Massey, 99 Nev. at 727-28.

13  Therefore, "[a]ccrual does not wait until the injured party has access to or constructive

14  knowledge of all the facts required to support its claim. Nor is accrual deferred until the

15  injured party has enough information to calculate its damages." Davel Communications,

16  Inc. v. Qwest Corp., 460 F.3d 1075, 1092 (9th Cir. 2006) (internal quotations omitted).

17    Based upon the uncontroverted evidence, Hyatt knew of sufficient facts to put him on

18  notice of his claims in spring of 1995 and no later than, August 1995 – more than two years

19  before Hyatt filed his complaint in January 1998. Therefore, the district court erred in

20  (quoting Page v. United States, 729 F. 2d 818, 821-22 (D.C. Cir. 1984). When the
continuing tort doctrine is applied, the statute of limitation begins to run only from time the
21  tortious conduct ceases – or when the last act of the continuing tort occurs. Page, 729 F.2d
at 821.
22    Here, Hyatt has not identified what, if any, continuing wrongful conduct existed that
would trigger the application of this principle of law. Moreover, each of the torts that are
23  subject to the two-year limitations period (i.e., privacy torts, abuse of process and the like)
are based upon conduct that occurred between 1993 and 1995. For example: Hyatt claims
24  FTB's inquiries to third parties for information about him invaded his privacy (3 different
ways), breached a confidential relationship, constituted an abuse of process and was
25  intended to cause him severe emotional distress. All such inquiries and audit activities
occurred between 1993 and 1995. The only "continuing acts" alleged by Hyatt relate to his
26  fraud claim, which was expressly acknowledged as timely. Thus, there is no basis for the
application of the continuing tort doctrine to the claims subject to FTB's statue of limitation
27  defense.

28

McDONALD·CARANO·WILSON⌐
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002577

1  denying FTB's pretrial motions based upon the statute of limitations.

2          b.    <u>The Uncontroverted Evidence Placed Hyatt On Notice Of His</u>
3              <u>Claims in 1995</u>

4         Hyatt does not dispute that in the Spring of 1995 he was aware that FTB was sending

5  demand letters to various third parties that included his name, social security number, and

the fact that he was under audit. See RAB 139-40; 77 AA 19072-74, 19119-21. In addition,

6  Hyatt does not dispute that after discovering this information he sent a fax to his tax

7  representatives telling them that "FTB appears to be sending out demand letters to many

8  entities to whom I wrote checks in late 1991 and 1992." 77 AA 19119. This uncontroverted

9  evidence demonstrates that Hyatt discovered FTB's alleged invasions of his privacy, and the

10  like, in the spring of 1995 – two years and six months before he filed his complaint. Hyatt's

11  only argument is that these facts were insufficient to put him on notice because these letters

12  and demands were only sent to his California "bank and his attorneys" who "had

13  independent obligations to safeguard and not disclose his confidential information." RAB

14  139. In addition, Hyatt contends that he did not know that demands were being sent to

15  Nevada entities or that information was being sent to others until he received the complete

16  audit file. See id. at 139-140. Hyatt misstates the evidence.

17         Hyatt's own fax indicated that he knew, as of the Spring of 1995, that FTB was

18  sending demand letters to "many entities" to whom he sent checks in 1991 and 1992. 77 AA

19  19119. Therefore, by Hyatt's own statements, he knew that these demands (which he also

20  knew contained his social security number and other identity information) were being sent

21  to a multitude of individuals – not just his banks and attorneys.  See 77 AA 19122-50.

22  Checks written by Hyatt in late 1991 and early 1992 included checks to Nevada entities,

23  including: the Nevada DMV, Congregation Ner Tamid, Centel Telephone, Wagon Trails

24  Apartments, and Nevada Power Company. See 77 AA 19166-76.

25         The determination of whether a plaintiff knew or should have known facts supporting

26  a cause of action is generally a question of fact. Nevada Power Co. v. Monsanto Co., 955

27  F.2d 1304, 1307 (9th Cir. 1992).  However, such an issue may be decided as a matter of law

28  when "uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have

McDONALD·CARANO·WILSON<sup>LLP</sup><br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>P.O. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

RJN002578

1  discovered" the alleged wrongdoing. Id. Moreover, Hyatt was fully aware of virtually every

2  fact necessary to support his case by August 1995, when FTB sent him the detailed, 39-page

3  preliminary determination letter. 66 AA 16388-427. Hyatt's brief baldly claims that this

4  letter "did not otherwise provide sufficient information to Hyatt to put things together and

5  figure out that his privacy was violated" and the basis for his other claims. RAB 140.

6        Hyatt misrepresents the facts related to information in the letter – especially when

7  that information is coupled with Hyatt's previous undisputed knowledge of FTB's use of

8  Demand Letters to third parties. For example, Hyatt claims that the August 1995 letter did

9  not disclose FTB's use of Demand Letters or the fact that his address and social security

10  number were disclosed by those demands. See RAB 140-41. However, the August 1995

11  letter specifically indicated that FTB sent letters to numerous individuals and entities. 66

12  AA 16410-12. In March 1995, Hyatt knew FTB was contacting third parties using Demand

13  Letters and he knew that at least some of these included his social security number. 77 AA

14  19119-21. In addition, contrary to Hyatt's contentions, the August 1995 letter provided

15  Hyatt sufficient information of the scope of FTB's investigation. In fact, the August 1995

16  letter made Hyatt aware of virtually all of FTB's third-party contacts – more than a year

17  before he received the audit file. 66 AA 16388-427. The letter repeatedly referenced

18  information FTB obtained from third parties – located both in Nevada and California –

19  related to Hyatt's audit. Id. Examples from this letter include the following verbatim

20  statements:

- **"Information was obtained** from the bank that the taxpayer did have safe deposit boxes in California." 66 AA 16389. (emphasis added).

- **"Information obtained from** the Clark County Treasurer's Office showed that a parcel of land is in name of Kern Trust." 66 AA 16394. (emphasis added).

- "The Clark County Department of Elections **informed us** that taxpayer voted once . . . ." Id. (emphasis added).

- **"information obtained** from Nevada Department of Motor Vehicles . . . ." 66 AA 16406. (emphasis added).

28  The letter also explained in great detail that auditor Sheila Cox made a visit to Las Vegas, in

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002579

March 1995; she visited the Wagon Trails Apartments, interviewed the property manager and reviewed his file. 66 AA 16393. The letter also explained that Cox visited Hyatt's home and spoke with his trash collector and the mailman, and spoke with the receptionist at his alleged place of business. 66 AA 16396-97. Of particular note, Hyatt was also put on notice of FTB's third-party contacts due to the letter's reference to specific information that Hyatt had not given to FTB. For example, the August 1995 letter referenced specific dates related to when Hyatt had obtained medical attention from certain physicians. 66 AA 16391. In particular, the letter referenced two dates Hyatt visited a "Dr. Shapiro," along with Dr. Shapiro's address. Id. However, Hyatt never told the auditor which Dr. Shapiro he saw or the dates services were provided. FTB could only have obtained this information by contacting the doctor directly. The letter specifically referenced the amounts and dates that wire transfers were made to Hyatt by Matsushita and Fujitsu. 66 AA 16392. During the audit, Hyatt never provided this information to FTB and, in fact, had told FTB he did not have any of this information because the wire transfers were made to his attorneys' trust account. 34 AA 08481 (72-73); 66 AA 16312-13. The letter also made clear that FTB obtained information related to Hyatt's home that could only have been obtained by disclosing his address to third parties – "Southwest Gas Corporation has provided information that Gilbert Hyatt is not the customer of record for 7335 Tara"; "The Las Vegas Valley Water District has provided information that the account for 7335 Tara was established on 4/1/92"; "Silver State Disposal Service in Las Vegas has provided information that the account at 7335 Tara was opened on 4/1/92 in the name of Michael Kern." 66 AA 16396.

In sum, it was FTB's August 1995 letter – not the audit file – that put Hyatt on notice of the extent of FTB's audit. The contents of this letter, coupled with Hyatt's previous knowledge of FTB's third-parties contacts, is undisputed and uncontroverted. This information gave notice to Hyatt that: (1) FTB contacted a variety of third parties, without his permission; (2) FTB sent Demand Letters to various entities to whom Hyatt wrote checks in 1991 and 1992; (3) these Demand Letters included Hyatt's social security number

106

and the fact he was under audit; (4) FTB disclosed his address to third parties in an effort to obtain information; (5) these Demand Letters and other contacts were sent to entities in both California and Nevada, many of which had no independent obligation to maintain his privacy, and a variety of other information that Hyatt now claims he only learned through the receipt of the audit file in 1996. The district court erred by not dismissing the 2-year statute of limitation claims, or at very minimum, erred by not allowing FTB to argue the issue to the jury. If this court agrees with FTB that all non-fraud claims were barred by the statute of limitations, and that the fraud claim was insufficient as a matter of law, Hyatt's entire case must be dismissed, and this court therefore does not need to address any other issues in the appeal or the cross-appeal.

8.     <u>The District Court Erred By Effectively Creating An Irrebuttable Presumption Against FTB</u>

The opening brief established that the district court erred by effectively creating an irrebuttable presumption related to alleged negligent spoliation of evidence. AOB 98-100. This stemmed from FTB's replacement of an antiquated email system (EMC) with a modern system in the late 1990s. FTB made an exhaustive effort to ensure that all emails were preserved and printed before the replacement occurred. 25 AA 6293-305. When EMC was removed from FTB's mainframe computer, emergency backup tapes were created; but these tapes were overwritten approximately three years later pursuant to FTB's standard policy. 25 AA 6300-01. Hyatt only requested the backup tapes after he discovered they were overwritten. 25 AA 6308.

The district court determined that FTB committed negligent spoliation regarding the tapes, and the district court instructed jurors that they could draw an inference that the tapes would have been unfavorable to FTB. 54 AA 13278. This permissible inference was based upon <u>Bass-Davis v. Davis</u>, 122 Nev. 442, 134 P.3d 103 (2006). But the district court then made rulings far beyond anything allowed by <u>Bass-Davis</u>, barring FTB from offering any evidence explaining the circumstances surrounding the tapes, and preventing defense counsel from using admitted exhibits to argue that the jury should not draw the inference.

RJN002581

1  This had the effect of erroneously transmuting the permissible inference into an irrebuttable

2  presumption against FTB.

3      FTB's opening brief noted that Bass-Davis itself relied on two cases holding that the

4  inference is permissible; that the affected party can explain the circumstances; and that a

5  jury is free to reject the inference if the jury believes the documents were destroyed

6  accidentally or for an innocent reason. AOB 99-100. FTB also cited additional similar

7  cases that were not relied upon in Bass-Davis, but standing for the same proposition. AOB

8  100. Hyatt's brief offers virtually no response. His sole effort to deal with these cases is

9  the following: "The FTB's citations to certain other cases where a court provided other

10  remedies for the spoliation have no application here." RAB 145. Hyatt fails to cite, or even

11  mention any of the cases discussed in the opening brief, even the two cases on which this

12  court relied in Bass-Davis. Hyatt completely ignores these cases because he has to – the

13  cases are sound, applicable and show that the district court erred.

14      Hyatt also makes the following conclusory argument: "Under Bass-Davis and a

15  wealth of consistent authority from other jurisdictions, once spoliation is found by the court,

16  the court can order that the spoliating party is not allowed to reargue this issue to the jury."

17  RAB 145, lines 8-10. Bass-Davis says no such thing, and Hyatt fails to identify a single

18  case within the "wealth of consistent authority from other jurisdictions." Id. Instead, his

19  only citation is to a few pages in one of his own district court papers. RAB 145, line 26, fn

20  538. Although his district court paper cited some cases from foreign jurisdictions dealing

21  with other issues, none of those cases stand for the proposition asserted in his answering

22  brief.[56] 39 RA 9744-49.

23      The effect of an adverse inference jury instruction can be outcome-determinative if

24  the jury decides to draw an inference that the missing information would have been adverse

25  to a party. In re NTL, Inc. Sec. Litig., 244 F.R.D. 179, 192 (S.D.N.Y. 2007) (an adverse

---

[56]Hyatt's reliance on his district court paper violates NRAP 28(e)(2), which prohibits a party from incorporating by reference or referring the supreme court to a memorandum of law submitted to the district court, for an argument on the merits of an appeal.

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

108

1    inference instruction is a severe sanction "that often has the effect of ending litigation
2    because it is too difficult a hurdle for the spoliator to overcome"). This is why a trial judge
3    must use caution when considering such an instruction. See State v. Engesser, 661 N.W.2d
4    739, 755 (S.D. 2003) (adverse inference spoliation instruction should be applied with
5    caution); Pure Power Boot Camp v. Warrior Fitness Boot Camp, 587 F. Supp. 2d 548, 567
6    (S.D.N.Y. 2008) (characterizing adverse inference instruction as "severe"); Jackson v.
7    Harvard Univ., 900 F.2d 464, 469 (1st Cir. 1990) (characterizing adverse inference as a
8    "grave step").

9        The party affected by the permissive adverse inference instruction must be able to
10   offer evidence explaining the circumstances of the lost or destroyed evidence. This does
11   two things. First, it gives the jury a complete picture with which to evaluate the party's
12   culpability and to determine whether the inference should be drawn or rejected. Second, the
13   explanation may itself be relevant to the jury's decision on whether the lost or destroyed
14   evidence was probably adverse to the affected party. Hyatt ignores these principles; he
15   ignores applicable case law; and he cites no law supporting the district court's ruling. This
16   court has consistently held that it will not consider conclusory arguments lacking
17   substantive citations to relevant legal authority. See State Indus. Ins. Sys. v. Buckley, 100
18   Nev. 376, 382, 682 P.2d 1387 (1984) (citing Smith v. Timm, 96 Nev. 197, 606 P.2d 530
19   (1980), Gilbert v. Warren, 95 Nev. 296, 594 P.2d 696 (1979) and Holland Livestock Ranch
20   v. B & C Enterprises, 92 Nev. 473, 553 P.2d 950 (1976)). In the present case, the court
21   should reject Hyatt's conclusory arguments, which lack any citation to relevant legal
22   authority.

23       F.    The Compensatory Damages Were Legally Improper

24       Compensatory damages in this case should have been capped at $75,000 per claim.
25   Hyatt's answering brief fails to provide any legitimate arguments against imposition of the
26   cap. If the damages are not capped, the damages are excessive as a matter of law. A verdict
27   is excessive when the amount indicates prejudice or passion on the part of the jury, or when
28   the amount is so clearly beyond reason as to shock the judicial conscience. Slack v.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002583

1  Schwartz, 63 Nev. 47, 58-59, 161 P.2d 345 (1945). In such a case this court "would not

2  hesitate to disturb the judgment." Id. at 59. See also, Hazelwood v. Harrah's, 109 Nev.

3  1005, 1010, 862 P.2d 1189 (1993) overruled on other grounds by Vinci v. Las Vegas Sands,

4  Inc., 115 Nev. 243, 984 P.2d 750 (1999) (new trial can be granted where verdict is "so

5  flagrantly improper as to indicate passion, prejudice or corruption in the jury"). In the

6  present case the jury awarded compensatory damages of $52 million for invasion of privacy

7  and $85 million for emotional distress. The district court granted no relief from these

8  astronomical awards. Hyatt's answering brief fails to provide any justification for the

9  awards. They must be set aside.

10          1.      Standard of Review Regarding Compensatory Damages

11          FTB contends that the district court erred by denying FTB's request to apply comity

12  and to limit compensatory damages to $75,000 per claim. AOB 100-02. This is a purely

13  legal issue, which this court should review de novo, just as this court reviewed the comity

14  issue de novo in its April 2002 order. 5 AA 1183-93. FTB also contends that there was no

15  evidence of invasion of privacy damages. AOB 102-103. On such an issue, this court

16  conducts its own independent review of the record; if there is no evidence of damages, an

17  award of damages by the jury is improper and must be set aside, as a matter of law. E.g.,

18  Mainor v. Nault, 120 Nev. 750, 773-76, 101 P.3d 308 (2004). Finally, FTB contends that

19  the emotional distress damages cannot stand because the district court erred by refusing

20  FTB's evidence of alternative causes of emotional distress, and because the $85 million

21  award was excessive. These contentions raise legal issues that should be reviewed de novo.

22  E.g., Miller v. Schnitzer, 78 Nev. 301, 307, 371 P.2d 824 (1962) (special damages reduced

23  by Supreme Court).

24          2.      All Compensatory Damages Should Have Been Statutorily Capped

25          For the reasons articulated at pages 100-101 of the opening brief, all compensatory

26  damages should have been capped at $75,000 per claim. This court has already ruled that

27  FTB's complete immunity statute should be applied to the extent that the statute does not

28  offend a comparable Nevada policy. 5 AA 1189-90. Regarding compensatory damages,

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002584

California allows no recovery against FTB, but Nevada allows tort plaintiffs to recover up to $75,000 per claim against government entities. See NRS 41.035(1). Therefore, California's complete immunity statute for FTB would only offend Nevada's policy to the extent that plaintiffs are deprived of the ability to recover up to $75,000 per claim. Denial of recovery beyond that limit offends no Nevada policy. The cap should therefore apply.

### a. Hyatt's Arguments Against the Application of Comity Fail

#### i. Hyatt's General Arguments and His "Special Immunity" Argument

Hyatt argues that comity should be rejected because unlimited compensatory damages are necessary to protect Nevada citizens from out-of-state government tortfeasors. RAB 146-50. The Nevada Legislature has established a policy of protecting Nevada citizens from government tortfeasors by waiving sovereign immunity and allowing compensatory damages, but only up to $75,000. In its 2002 decision, this court held Nevada's statute applied to FTB. 5 AA 1189-90. Thus, Hyatt's argument ignores the fact that allowing recovery against FTB up to $75,000 would give Nevada citizens protection against out-of-state government tortfeasors, to the full extent that such protection is given to Nevada citizens who make claims against Nevada government entities.

Hyatt next argues that this court "is not obligated to grant special immunity to the FTB." RAB 147. We are not demanding "special" immunity. We are merely requesting that this court fully apply its April 2002 comity ruling to the present comity issue regarding the limit on compensatory damages. And we are merely requesting this court to do what the United States Supreme Court said in its 2003 opinion, i.e., "sensitively appl[y] principles of comity with a healthy regard for California's sovereign status, relying on the contours of Nevada's own sovereign immunity from suit as a benchmark for its analysis." Franchise Tax Bd. of California v. Hyatt, 538 U.S. 488, 499 (2003).[57]

---

[57] We do contend that the district court's refusal to recognize any immunity for compensatory and punitive damages violated FTB's constitutional rights under the Full Faith and Credit Clause, as explained at AOB 101, fn. 80.

RJN002585

1    Hyatt argues that comity is a voluntary doctrine that should not be applied in this
2    case, similar to the denial of comity in <u>Mianecki v. Second Judicial Dist. Court, In & For</u>
3    <u>Washoe County</u>, 99 Nev. 93, 658 P.2d 422 (1983). RAB 148-49. Hyatt's argument ignores
4    the fact that this court has already decided that issue in this very case. 5 AA 1189-90. In
5    April 2002 this court rejected Hyatt's argument and decided that comity <u>would</u> be applied
6    regarding FTB's immunity. <u>Id.</u> Indeed, this court ruled that application of comity was
7    mandatory with regard to FTB's immunity, to the extent that such immunity did not offend
8    Nevada policies; and the court issued a writ of mandamus commanding the district court to
9    comply with its mandatory duty to apply immunity to the discretionary/negligence claims.

  ii.  <u>Hyatt's Arguments Regarding Compensatory Damages</u>
     <u>Used for Deterrence and Punishment</u>

11      Hyatt's next contention is that substantial compensatory damages are necessary "to
12    sanction and deter" misconduct by government employees from other states. RAB 149,
13    lines 10-11. Hyatt contends that the $75,000 limit on compensatory damages should not
14    apply because Nevada needs a "means of deterring and punishing" government employees
15    from other states. RAB 150, lines 11-12. Hyatt's argument blurs the distinction between
16    compensatory and punitive damages. Compensatory damages are only intended to
17    "compensate a wronged party" for damages actually suffered. <u>Ainsworth v. Combined Ins.</u>
18    <u>Co.</u>, 105 Nev. 237, 244, 774 P. 2d 1003 (1989), <u>modified on other grounds in</u> <u>Powers v.</u>
19    <u>United Servs. Auto. Ass'n</u>, 114 Nev. 690, 706, 962 P. 2d 596 (1998). On the other hand,
20    punitive damages are designed to punish and deter wrongful conduct. <u>Id.</u>; <u>see also</u>, <u>Ace</u>
21    <u>Truck & Equip. Rentals, Inc. v. Kahn</u>, 103 Nev. 503, 506, 746 P. 2d 132 (1987) (although
22    focus of punitive damages is on punishing and deterring culpable conduct, focus of
23    compensatory damages is on "the injury suffered by the plaintiff"), <u>abrogated on other</u>
24    <u>grounds in</u> <u>Bongiovi v. Sullivan</u>, 122 Nev. 556, 138 P.3d 433 (2006).

25      Hyatt contends that unlimited compensatory damages "provide a penalty for those
26    [wrongful] actions and a strong dose of deterrence against repeated offenses." RAB 153,
27    lines 8-9. Hyatt contends that deterrence is a "critical goal" of compensatory damages. <u>Id.</u>
28    at lines 10-11. Hyatt's only citation for this contention is part of a sentence taken out of

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10™ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

112

1   context from <u>Memphis Cmty. Sch. Dist. v. Stachura</u>, 477 U.S. 299, 306 (1986).  RAB 153,

2   fn 567.  In <u>Stachura</u> the Supreme Court dealt with an unrelated issue regarding the measure

3   of damages in a federal civil rights case.  Despite the vague sentence in <u>Stachura</u> on which

4   Hyatt relies, more recent Supreme Court pronouncements are to the contrary.  In <u>State Farm</u>

5   <u>Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408 (2003), the Court recognized that although

6   compensatory and punitive damages are usually awarded at the same time by the same

7   decision-maker, compensatory and punitive damages "serve different purposes."  <u>Id.</u> at 416.

8   Specifically, compensatory damages are "intended to redress the concrete loss that the

9   plaintiff has suffered...."  <u>Id.</u>  "By contrast, punitive damages serve a broader function;

10  they are aimed at deterrence and retribution."  <u>Id.</u>  Furthermore, in Nevada punitive

11  damages are awarded in addition to compensatory damages, for the purpose of punishing

12  and deterring conduct.  Those punishment and deterrent purposes are "unrelated to the

13  compensatory entitlements of the injured party."  <u>Siggelkow v. Phoenix Ins. Co.</u>, 109 Nev.

14  42, 45, 846 P.2d 303 (1993); <u>Ainsworth</u>, 105 Nev. at 244; <u>Ace Truck</u>, 103 Nev. at 506.

15      Hyatt's arguments for refusing to apply this court's April 2002 comity holding are

16  not persuasive. Hyatt has failed to provide any legitimate argument for rejecting a result that

17  sensitively applies principles of comity with a healthy regard for California's sovereign

18  status, relying on the contours of Nevada's own sovereign immunity as a benchmark for the

19  analysis. <u>Franchise Tax Board</u>, 538 U.S. at 499.

20                  iii.    Hyatt's Argument Regarding Equal Treatment

21      In a five-page section of the answering brief, Hyatt attempts to rebut an argument

22  that FTB never made.  The first sentence of this section in Hyatt's brief states:  "The FTB

23  argues that the doctrine of comity has been understood to require complete equality among

24  States."  RAB 154, lines 12-13.  Later in this section, Hyatt states that "FTB suggests" that

25  comity requires "equal treatment between States under all circumstances."  RAB 155, lines

26  16-17.  Hyatt cites FTB's opening brief at pages 32-33 for his characterization of FTB's

27  argument.  RAB 154 fn. 570.

28

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

113

1   FTB is not arguing that comity requires "complete equality" among states, or that

2   comity requires "equal treatment between States under all circumstances." Rather, FTB has

3   consistently argued that FTB, as a California government entity, should be treated <u>no worse</u>

4   <u>than</u> a similarly situated Nevada government entity in a Nevada court case. AOB 101, lines

5   12-14 (FTB should be "treated no worse than a similarly situated Nevada government

6   entity"); 102, lines 6-7 (same); 108, lines 20-21 (same). FTB's arguments were largely

7   based upon this court's April 2002 holding that California's complete immunity statute for

8   FTB should be applied under the doctrine of comity, but only to the extent that the

9   immunity statute did not contravene Nevada policies. 5 AA 1189-90. Because the statutes in

10  both states provided immunity from claims based on discretionary acts, those claims were

11  mandatorily dismissed. 5 AA 1189-90. Yet other claims, which would have survived against

12  a Nevada government entity in a Nevada court based on immunity law as it existed at that

13  time, were allowed to proceed. In this result, FTB was treated no worse than a Nevada

14  government agency would have been treated in a Nevada court, and Hyatt was treated no

15  better than if he sued a Nevada government entity.

16      If anything, it is <u>Hyatt</u> who argued that states should be given "equal treatment."

17  Hyatt made this argument attempting to convince the United States Supreme Court that this

18  court's April 2002 decision was sound. Hyatt's brief in the Supreme Court argued that

19  states can recognize the sovereign interests of other states, "using their own sovereign

20  interests as a benchmark." 6 AA 1360. His brief also argued that in the present case the

21  "reference point" for FTB's liability is "the liability *of the State [of Nevada] itself*." 6 AA

22  1341 (italics emphasis in original). At oral argument at the Supreme Court, when asked by

23  Justice Stevens whether states should treat each other "the way they would want to be

24  treated themselves," Hyatt's counsel answered affirmatively, arguing that "we want to treat

25  the other sovereign as we do treat ourselves," and further arguing: "We <u>are</u> treating the

26  other sovereign [California] the way we treat ourselves." 6 AA 1480 (emphasis added).

27  Thus, it was Hyatt who successfully argued to the Supreme Court that this court's April

28  2002 order should be affirmed because this court treated the two sovereigns equally.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

114

1    Hyatt relies on a municipal bond case, Dep't of Revenue of Ky v. Davis, 553 U.S.

2    328 (2008). RAB 154-155, n. 571. That case involved the Commerce Clause, with nothing

3    to do with issue of comity. Hyatt also relies on property tax law, arguing that it is

4    permissible for states to exempt their own property from taxes, while imposing taxes on in-

5    state property owned by another state. RAB 155. Again, the cases on which Hyatt relies

6    have nothing to do with whether comity should be applied in a tort case in which an out-of-

7    state government entity has been sued in a Nevada court.

8    Finally, Hyatt argues that Nevada v. Hall, 440 U.S. 410 (1979) compels a denial of

9    comity here. RAB 157. Hyatt notes that the State of Nevada was held liable for unlimited

10   damages for a traffic accident in California, even though there was a cap on damages under

11   Nevada law. Id. Hyatt argues that "if California were involved in an identical accident in

12   Nevada, the FTB's theory would mean that California could claim the benefit of the Nevada

13   statutory cap, thereby limiting its own out-of-state exposure to a modest level of damages."

14   RAB 157, lines 10-13.

15   Hyatt entirely misconstrues FTB's comity argument. FTB does not contend that an

16   out-of-state government defendant should enjoy *more* protection than the forum state would

17   enjoy in the forum state's own courts. We merely contend that an out-of-state sovereign

18   should be treated no *worse* than the forum state would be treated in its own courts. In

19   Nevada v. Hall, the Nevada government entity that caused the accident in California was

20   treated no worse than a similarly situated California agency would have been treated in that

21   state; and the injured California citizens received no greater benefit against the Nevada

22   government entity than they would have received in a lawsuit against their own state

23   government if the accident had been caused by a California government employee. Hall,

24   440 U.S. at 424.

25   The comity analysis applied in this court's April 2002 order is the same analysis that

26   FTB is seeking here. California has immunity laws. We are requesting this court to

27   recognize and apply comity to those laws, to the extent that those laws do not offend

28   important Nevada public policies. We are not asking this court to apply Nevada's immunity

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002589

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1    laws to any greater extent than the FTB would be entitled to immunity under California

2    laws. Accordingly, the compensatory damages award against FTB, if allowed to stand at

3    all, should be capped at $75,000 per claim.[58]

4            iv.    Hyatt's Full Faith and Credit Argument

5        FTB's opening brief demonstrated that the Full Faith and Credit Clause places limits

6    on the discretionary application of comity. AOB 67-68, fn 64. States cannot act with

7    outright hostility to sister states by refusing to recognize laws that are not antagonistic to

8    their own policies. Id.; AOB 101, fn 80. This court's April 2002 ruling survived a Full

9    Faith and Credit Clause analysis because this court had given "healthy regard" for

10    California's sovereign status, relying on Nevada's own sovereign immunity as a benchmark

11    for this court's analysis.[59] Franchise Tax Board, 538 U.S. at 499.

12        In response, Hyatt argues that the judgment in this case, if affirmed, would not be

13    unduly hostile to the sovereign State of California -- even if Nevada courts refuse to give

14    any recognition to California's laws granting immunity to FTB for compensatory and

15    punitive damages, and even if Nevada courts give no regard whatsoever to California's

16    sovereign status or to the contours of Nevada's own sovereign immunity. RAB 147-49, 158-

17    60. Hyatt's arguments ignore reality. Short of a military attack by one state against

18    another, it is difficult to imagine an act more hostile than one state's courts imposing a half

19    billion dollar judgment against another state, including $250 million in damages intended to

20    punish the citizens of the other state, all in a case involving a solitary multimillionaire

21    plaintiff who moved from a taxing state to a non-taxing state, and who did not like the

---

23   [58]As such, in Hyatt's hypothetical example in which a California government employee

24   causes an accident in Nevada, if the California government agency did not have immunity or a cap on damages under California law, the agency would not be able to claim some type of Nevada statutory immunity or cap applicable to Nevada government entities. In the

25   present case, however, FTB enjoys complete immunity under California law. We are only requesting this court to recognize FTB's immunity to the extent that it does not offend

26   important Nevada public policies. Limiting FTB's damages to $75,000 per claim offends no such Nevada public policy.

27   [59]As originally noted, the continuing vitality of Nevada v. Hall, 440 U.S. 410 (1979) is

28   extremely questionable in light of more recent Supreme Court opinions. AOB 101, fn 80.

116

1 decisions of the taxing state. This Nevada judgment, if affirmed, will fall on the shoulders
2 of California taxpayers, even though Hyatt's compensatory damages would have been
3 capped and punitive damages would have been barred if he had sued a Nevada government
4 entity. It is difficult to perceive a more hostile economic act by one sovereign state against
5 another. This is precisely what the Full Faith and Credit Clause avoids.

6           v.     <u>Hyatt's Law of the Case Argument</u>

7      Hyatt's brief claims that this court is not obligated to treat FTB the same as it would
8 treat a similarly situated Nevada state agency as a matter of comity. RAB 146-62. This court
9 already determined the manner and application of comity to California's sovereign
10 immunity statute in this case. Therefore, the application of comity to California's sovereign
11 immunity statute in this case is the law of the case. Hyatt argues, however, that the court's
12 comity ruling is not the law of the case with respect to the issues related to compensatory
13 and punitive damages. <u>See</u> RAB 158-60. He draws a narrow construction of the law of the
14 case doctrine, claiming that this court must re-decide and re-review the application of
15 comity to California's sovereign immunity statute on every issue that may arise in this case
16 that requires the application of this rule of law. <u>See</u> RAB 160-61.

17      In Nevada, "when an appellate court decides a principle or rule of law, that decision
18 governs the same issues in subsequent proceedings in the case." <u>Dictor v. Creative Mgmt.</u>
19 <u>Servs., LLC</u>, 126 Nev. ___, 223 P.3d 332, 334 (2010); <u>see also</u>, <u>Hsu v. County of Clark</u>,
20 123 Nev. 625, 173 P.3d 724, 728 (2007). It is the "principle" or "rule of law" not its narrow
21 application, that is the law of the case and must be applied to in all subsequent proceedings
22 in this litigation. <u>Hsu</u>, 173 P.3d at 728.

23      Hyatt cites no case limiting the law of the case doctrine to only those specific factual
24 contexts in which a particular principle or rule of law is announced in a previous appeal. To
25 the contrary, by determining that the law of the case doctrine applies to either principles or
26 rules of law, Nevada's legal authorities have determined the exact opposite – that the rule of
27 law or principle determined by decision will be applied to different factual contexts that
28 may arise in a case involving the same legal issues or principles. <u>See Hsu</u>, 173 P.3d at 728

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

117

1   (describing that principle or rule of law must be applied in all subsequent proceedings).

2   Here, this court's 2002 decision determined two things. First, the doctrine of comity

3   should be applied to FTB, out of deference and respect, and to promote harmonious

4   interstate relations between Nevada and California. 5 AA 1189-1190. Second, California's

5   complete immunity statute must be applied to the extent application of the immunities

6   contained in that statute did not violate Nevada's policies or interests. Id. Based upon the

7   application of this rule of law, this court determined that the district court erred in failing to:

8   (1) apply the doctrine of comity in the manner described by the court's decision; and (2)

9   dismiss Hyatt's negligence claim. Id. This court issued a writ of mandamus ordering the

10  district court to apply the doctrine of comity. Id. This decision was affirmed by the United

11  States Supreme Court. 6 AA 1486-92. As a result, the district court was required to apply

12  comity, throughout all of the subsequent proceedings, to California's sovereign immunity

13  statute in a manner consistent with this court's 2002 decision. Wickliffe v. Sunrise Hosp.,

14  Inc., 104 Nev. 777, 781, 766 P.2d 1322, 1325 (1988) (a trial court has no authority to

15  deviate from the mandate issued by an appellate court).

16  Nothing in this court's 2002 decision limited the rule of law announced in that

17  decision to only the specific factual context raised in the initial writ. In fact, such a limited

18  application of the law of case doctrine makes no sense. The law of the case doctrine "is

19  designed to ensure judicial consistency and to prevent the reconsideration, during the course

20  of a single continuous lawsuit, of those decisions which are intended to put a particular

21  matter to rest." Hsu, 173 P.3d at 728. If the law of the case doctrine applied in the narrow

22  manner that Hyatt claims, every legal principle announced by the appellate court could be

23  re-evaluated every time a new factual issue arose in the litigation that related to the

24  particular issue. No legal issue could ever be settled because each new factual issue or

25  scenario would require the reconsideration of the legal principles or rules of law already

26  announced. This is exactly what the law of the case doctrine is intended to prohibit. Hsu,

27  173 P.3d at 728.

28

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

118

1   Moreover, this narrow interpretation would allow district courts, like the district
2   court in this case, to avoid the law of the case doctrine at their own whims. Simply by
3   claiming that a new factual context is at issue, the district courts would be permitted to re-
4   evaluate and consider what legal principle or rule of law to apply – in spite of previous
5   mandates from the court expressly announcing the principle or rule of law at issue.

6   Finally, Hyatt's narrow interpretation of the law of the case doctrine is not supported
7   by <u>Dictor</u>, *supra*, in which this court held the law of the case doctrine applies to any issue
8   decided by the appellate court "explicitly or by necessary implication." <u>See also</u>, <u>Bernhardt</u>
9   <u>v. Los Angeles County</u>, 339 F.3d 920, 924 (9th Cir. 2003) (noting that law of the case
10  doctrine applies to explicit as well as implicit determinations by court); <u>Williamsburg Wax</u>
11  <u>Museum, Inc. v. Historic Figures, Inc.</u>, 810 F.2d 243, 249 (D.C. Cir. 1987) (same).

12  Therefore, contrary to Hyatt's arguments, the principle and rule of law previously
13  announced by this court's 2002 decision is the law of the case and requires that the doctrine
14  of comity be applied to California's sovereign immunity statute in the same manner
15  previously announced by this court. Comity must be extended to California's sovereign
16  immunity statute, requiring that FTB be treated no worse than a similarly situated Nevada
17  state agency.

18          vi.     <u>Hyatt's Judicial Estoppel Argument</u>

19  The judiciary's integrity is protected by the doctrine of judicial estoppel, which
20  prevents a party from taking inconsistent positions in litigation. <u>Marcuse v. Del Webb</u>
21  <u>Communities, Inc.</u>, 123 Nev. 278, 163 P.3d 462 (2007). The doctrine applies when (1) the
22  same party has taken two positions; (2) the positions were taken in a judicial proceeding; (3)
23  the party was successful in asserting the first position (i.e., the court adopted the position or
24  accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position
25  was not taken as a result of ignorance, fraud or mistake. <u>Id.</u> In the present case, all of these
26  requirements are satisfied.

27  Although Hyatt's brief provides quotations to some of his statements to the Supreme
28  Court (RAB 162, fn 597), he ignores the statements on which judicial estoppel is based.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002593

1  This court's April 2002 order applied comity and treated FTB no worse than a Nevada
2  government entity would be treated in Nevada courts. 5 AA 1189-90. This result left some
3  claims against FTB intact. 5 AA 1190. FTB believed the entire case should have been
4  dismissed; and when FTB challenged this court's decision in the United States Supreme
5  Court, Hyatt's counsel argued for affirmance by attempting to show the Supreme Court that
6  this court's decision gave appropriate constitutional respect to the sovereign State of
7  California. 6 AA 1341, 1467. Hyatt's counsel recognized the need to convince the Supreme
8  Court that California was being treated no worse than Nevada would be treated in its own
9  courts. Hyatt's brief in the Supreme Court argued that states are capable of recognizing the
10 sovereign interests of other states by "using their own sovereign interests as a benchmark."
11 6 AA 1360. Hyatt argued that the "reference point" for California's liability in this case is
12 "the liability *of the State [of Nevada] itself*." 6 AA 1341 (italics emphasis in original).
13 Hyatt's brief relied upon case law in which forum courts looked to the scope of government
14 immunity for their own states in determining the scope of a sister state's liability. 6 AA
15 1359. At oral argument, Hyatt again argued that states "look at their own immunity to see
16 what kinds of suits could be brought against them," and states try to grant "the outside
17 sovereign that same type of immunity." 6 AA 1467 (emphasis added). When Justice
18 Stevens asked whether states should treat other sovereign states the way they would want to
19 be treated themselves, Hyatt's counsel answered affirmatively, assuring the Supreme Court:
20 "We are treating the other sovereign [California] the way we treat ourselves." 6 AA 1480.

21  Hyatt prevailed in the Supreme Court. Franchise Tax Bd., 538 U.S. at 499. Indeed,
22 the Supreme Court expressly adopted Hyatt's catch-phrase "benchmark" argument,
23 upholding this court's decision because this court "sensitively applied principles of comity
24 with a healthy regard for California's sovereign status, relying on the contours of Nevada's
25 own sovereign immunity from suit as a benchmark for its analysis." Franchise Tax Board,
26 538 U.S. at 499.

27  Now, of course, Hyatt pretends that he did not take this position in the Supreme
28 Court. In truth he took his position in his written and oral arguments to the Supreme Court;

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002594

1  his position at that time was successful in convincing the Supreme Court to affirm this

2  court's April 2002 ruling; his position at that time is totally inconsistent with his present

3  position that comity should be rejected and that a California agency can be treated far worse

4  than a Nevada agency would be treated in a Nevada court; and his position was not taken as

5  a result of ignorance, fraud or mistake.  Consequently, every factor for judicial estoppel is

6  satisfied in this case.

7          3.    <u>There Was No Evidence Of Invasion Of Privacy Damages</u>

8        As pointed out in the opening brief, there was absolutely no evidence that in all the

9  years since FTB's alleged disclosures of Hyatt's name, address and social security number,

10  he had ever been targeted for identity theft, or industrial espionage or had he ever suffered

11  any actual damage whatsoever as a result of the disclosures.  AOB 102.  Despite the lack of

12  any actual damage from the alleged invasion of privacy, the jury awarded $52 million for

13  such damages. 54 AA 13309. Coincidentally, the amount of Hyatt's tax liability at the time

14  was approximately $52 million. 45 AA 11134 (2)-11135 (7); 11152 (74). Hyatt concedes

15  that the $52 million for invasion of privacy damages was "different and separate from

16  emotional distress damages." RAB 132, lines 17-19.  Hyatt argues, on the other hand, that

17  loss of privacy damages "compensate for the visceral loss of the privacy interest that is gone

18  forever."  <u>Id.</u> at lines 19-20.  Hyatt's legal citations for this proposition (at RAB 132, fn

19  498) provide no support for his position.  Indeed, legal research has revealed no reported

20  case, from any state or federal jurisdiction, allowing compensation for a "visceral loss" of

21  <u>anything.</u>[60]

22  _____

23  [60]Hyatt cites to the Restatement (Second) of Torts §652H (1977).  RAB 132, fn 498.  This
Restatement section provides no support for recovery of privacy damages to compensate for

24  a visceral loss.   The Restatement section only allows invasion of privacy damages for (a)
the harm to the plaintiff's interest in privacy resulting from the invasion [here, Hyatt

25  showed no actual harm, no incident in which someone attempted to use the information
against him, no attempt to steal his identity, and no other actual harm resulting from the

26  alleged disclosures]; (b) mental distress [this was awarded in the other portion of the verdict
($85 million)]; and (c) special damage caused by the invasion [here, Hyatt offered no

27  evidence of any special damages caused by the disclosures].

28

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775.788.2000 • FAX 775.788.2020

RJN002595

1    Hyatt argues that his astronomical award of invasion of privacy damages is justified

2    because he "strives hard to maintain a private, low key, and unassuming lifestyle." RAB

3    134, line 1. This assertion is belied by the record, which shows that Hyatt and his retained

4    publicist actively sought publicity for Hyatt regarding his computer chip patent. 48 AA

5    11984-92. Media went to his home and conducted extensive personal interviews, there

6    were hundreds of newspaper and magazine articles published throughout the world, and

7    Hyatt was even the subject of an episode of the nationally syndicated television show "Hard

8    Copy." 39 AA 9726 (114); 79 AA 19732-38; 89 AA 22068-137; 28 AA 6993.

9    Hyatt argues that the huge invasion of privacy award can be justified because FTB

10    allegedly "put Hyatt in front of his circle of friends, family members, business associates,

11    and patent sub-licensees as a purported tax cheat and a fraud." RAB 134, lines 1-3. Hyatt

12    provides no appendix citation for this statement. At trial, Hyatt was asked by *his own*

13    *counsel* whether he knew of any people, businesses, associations or other entities that

14    thought any less of him as a result of receiving notices that he was being audited. Hyatt's

15    answer was: "No. I don't know for certain, but I'm very concerned that they would have."

16    37 AA 9172 (100). Thus, although he was "concerned" about possible harm from the

17    disclosures, he had no knowledge of any such harm that may have actually occurred.

18    Additionally, Hyatt failed to call a single witness who testified that he or she thought less of

19    Hyatt as a result of FTB's disclosures.

20    Courts have not hesitated to reduce excessive compensatory damages in invasion of

21    privacy cases. For example, in Geragos v. Borer, B208827, 2010 WL 60639 (Cal. Ct. App.

22    Jan. 11, 2010), the defendant surreptitiously videotaped prominent attorneys and their

23    famous client. The plaintiffs suffered distress, embarrassment, humiliation and paranoia for

24    which they sought treatment from the invasion of their privacy; nevertheless, an award of

25    $2.25 million for compensatory damages was reduced to $150,000. In Fotiades v. Hi-Tech

26    Auto Collision Painting Services, Inc., E029854, 2001 WL 1239716 (Cal. Ct. App. Oct. 17,

27    2001), the plaintiff's supervisors at his workplace photographed the plaintiff while he was

28    urinating in a restroom. They distributed the photograph of the plaintiff's penis to numerous

McDONALD·CARANO·WILSON<sup>LLP</sup><br>100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501<br>P.O. BOX 2670 • RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 • FAX 775-788-2020

RJN002596

1    employees and customers. The plaintiff suffered extreme humiliation and severe emotional

2    distress, but his award of $1 million for invasion of privacy was reduced to $350,000.

3        In Zinda v. Louisiana-Pac. Corp., 409 N.W.2d 436 (Wis. Ct. App. 1987) aff'd in

4    part, rev'd in part in 440 N.W.2d 548 (Wis. 1989), an employee was terminated due to

5    alleged inconsistencies between his work application and his medical history. The director

6    of personnel published a notice in a company newspaper, indicating that the employee was

7    terminated for falsification of employment forms. The plaintiff sued for invasion of

8    privacy. His evidence showed that the newspaper reached the business where his wife

9    worked; he was embarrassed and humiliated; he wondered if his friends thought he was a

10   liar; and he acted like he was "shot down." Id. at 442. The jury awarded him $50,000 for

11   invasion of privacy, but the appellate court determined that the award was excessive and

12   unsupported by the evidence. Among other things, the court noted that he suffered no

13   "actual damages," with no medical treatment, no counseling, and no out-of-pocket losses

14   (like Hyatt). Id.

15       In Peoples Bank & Trust Co. of Mountain Home v. Globe Int'l Pub., Inc., 978 F.2d

16   1065 (8th Cir. 1992), the plaintiff was a 97-year-old woman who was a "local legend" in

17   her community. The defendant published the plaintiff's photograph on the cover of a

18   tabloid magazine, with the headline "Pregnancy forces granny to quit work at age 101." Id.

19   at 1067. A story inside the tabloid had a second photograph of the plaintiff, with a fictitious

20   story about a woman who quit work at age 101 because she was pregnant as a result of an

21   extramarital affair. The plaintiff sued for various theories, including invasion of privacy.

22   The jury returned a verdict of $650,000 in compensatory damages. Id. Despite the trial

23   court's findings that the defendant's conduct damaged the plaintiff's "very being" and that

24   the photographs had the effect of burying the plaintiff in mock, mire and slime, the appellate

25   court determined that the damages were so great as to shock the judicial conscience. Id. at

26   1071. The court noted that although the plaintiff was angry, upset, humiliated, embarrassed,

27   depressed and disturbed, there was no evidence of significant adverse effects on her health,

28

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

123

1    and no evidence of lost earnings, medical expenses and the like.  Id.    The case was

2    remanded to the trial court for a "substantial" reduction of compensatory damages.  Id.

3        It bears repeating that Hyatt's $52 million award for invasion of privacy was not

4    based upon emotional distress he suffered due to the alleged disclosures of private

5    information. The jury awarded emotional distress ($85 million) separately. 54 AA 13309.

6    There was simply no evidence that Hyatt suffered any actual harm from the alleged invasion

7    of privacy, and certainly no harm justifying the ridiculous $52 million award.  Hyatt's brief

8    fails to identify any standard of review under which this award could possibly be upheld.

9    Nor does he cite any case from any jurisdiction approving such an astronomical award.  The

10   award has no evidentiary basis, it is shocking and unsupportable under any standard of

11   review, and there was no rationale basis for the district court's refusal to grant relief from

12   this ridiculous award.

13           4.    The Emotional Distress Damages Cannot Stand

14       As noted above, a verdict is excessive as a matter of law when the amount is so

15   clearly beyond reason as to shock the judicial conscience, or where the verdict indicates

16   passion, prejudice or corruption in the jury.  Slack v. Schwartz, 63 Nev. at 58-59;

17   Hazelwood v. Harrah's, 109 Nev. at 1010.  For example, in Hazelwood a retired law

18   enforcement officer was awarded $425,000 for humiliation, disgrace, emotional distress and

19   worry resulting from false imprisonment and defamation, after he was wrongfully arrested

20   and falsely accused of fraud.  The excessive award was reduced to $200,000, because the

21   verdict was likely influenced by passion and prejudice.  This was evidenced by the fact that

22   the plaintiff was not physically injured in the incident, and by the fact that he was an

23   individual facing a large corporate adversary.  109 Nev. at 1010-11. In the present case, the

24   jury awarded $85 million for emotional distress compensatory damages, and the district

25   court refused to grant any relief from this ludicrous award.  Like the plaintiff in Hazelwood,

26   Hyatt was not physically injured, and he was an individual facing an out-of-state

27   government tax agency. The verdict was certainly influenced by passion and prejudice, as in

28   Hazelwood.

McDONALD·CARANO·WILSON⁵⁵
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

124

1    At trial, after explaining Hyatt's claimed emotional distress evidence in excruciating
2    detail, Hyatt's counsel asked the jury to award approximately $19 million, admitting that
3    even this was "a big number." 52 AA 12931 (176). In his argument to the jury, counsel
4    also expressly conceded that an award of approximately $43 million would be "absurd." Id.
5    Yet the jury awarded more than four times the amount counsel conceded was a "big
6    number," and nearly double the amount counsel conceded was "absurd." Hyatt argues that
7    there is no law prohibiting a jury from awarding more money than counsel referenced in
8    closing argument. RAB 136, lines 17-18. This may be true, but there is no rational
9    justification for a trial judge's refusal to reduce a verdict of nearly double an amount that
10   the plaintiff's counsel has expressly conceded, in open court on the record, is "absurd."

        a.   Hyatt's Limited Garden Variety Emotional Distress Imposed
             As A Discovery Sanction Can Not Support An $85 Million
             Award

13   Having refused to disclose any medical records during discovery, and having made
14   the choice to limit his damages to "garden variety" emotional distress, it is astonishing that
15   Hyatt can now contend that the $85 million award was not excessive. It is even more
16   astonishing that the trial judge, who approved the Discovery Commissioner's decision
17   limiting the damages to "garden variety" emotional distress, did not grant any relief from
18   the verdict.

19   FTB's opening brief provided an exhaustive analysis of case law in Nevada and
20   other jurisdictions, clearly establishing that the jury's award is entirely unprecedented in
21   Nevada and elsewhere. AOB 104-106. Hyatt fails to provide any analysis of these
22   numerous cases. RAB 134-36. His only argument is based upon a novel mathematical
23   approach involving three cases. Hyatt contends that he was subjected to 11 years of
24   pressure and misconduct from FTB. RAB 135. He then argues that in Bartgis, this court
25   did not disturb a compensatory damage award of $275,000 for emotional distress, where the
26   defendant's conduct lasted only about six months. RAB 135. Hyatt conveniently ignores the
27   fact that the plaintiff in Bartgis suffered documented bladder infections, upper-respiratory
28   infections, and a dramatic weight loss as a result of her emotional distress. If the award in

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002599

1    Bartgis for six months of infliction of emotional distress is calculated out to Hyatt's alleged

2    eleven-year time frame, the Bartgis emotional distress award would equate to approximately

3    $6 million.

4       Similarly, Hyatt argues that in Guar. Nat. Ins. Co. v. Potter, 112 Nev. 199, 912 P.2d

5    267 (1996), this court did not disturb a $150,000 compensatory award for emotional distress

6    for the defendant's conduct lasting approximately 18 months. RAB 135. Once again, if the

7    damages in Potter are calculated for an eleven-year time frame, the damages would total

8    approximately $1.1 million.

9       Hyatt also relies on State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408

10   (2003). RAB 135. Hyatt argues that the United States Supreme Court did not question a $1

11   million compensatory award for a year and a half of emotional distress. Id. Yet once again,

12   if the award in Campbell is calculated for an eleven-year time frame, the total compensatory

13   damages would be $7 million, which is approximately twelve times less than Hyatt's award.

14      Actually, a case cited in the Hyatt's answering brief for another proposition provides

15   strong support for FTB's contention that the emotional distress award in the present case

16   was excessive. In the section of his brief dealing with immunity, Hyatt cites Limone v.

17   United States, 497 F. Supp. 2d 143 (D. Mass. 2007). RAB 63, fn. 247. That case involved

18   two FBI agents who wanted to protect a high-priority confidential informant in a mafia

19   investigation on the 1960s. The informant committed a murder. To protect him, the FBI

20   agents intentionally and knowingly framed four innocent men for the murder. The innocent

21   men were convicted. Three were sentenced to die in the electric chair, but their sentences

22   which were later reduced to life sentences when the death penalty was vacated; the fourth

23   was given a life sentence. Knowing that the men were innocent and had been falsely and

24   fraudulently convicted of the murder, the FBI agents spent years after the trial successfully

25   supporting the convictions during post-conviction proceedings. Two of the innocent men

26   eventually died in prison after serving 17 and 27 years, respectively; the other two spent 29

27   and 33 years in prison, respectively, until they were freed after the FBI agents' conduct was

28   discovered.

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002600

1　　　　The innocent men and their estates and families sued on various theories, seeking

2　damages resulting from loss of liberty and their pain, suffering and emotional distress

3　caused by the FBI agents. The trial judge, sitting without a jury, observed the horrendous

4　physical and emotional distress suffered by all the plaintiffs, which the judge characterized

5　as "beyond imagining." Id. at 229. Three of the innocent men had spent years on death row

6　before their sentences were reduced; two died in prison; the two who survived spent 29 and

7　33 years in prison; each of the four innocent men "literally lost a lifetime"; wives were

8　deprived of their husbands; children were deprived of their fathers; and the innocent men

9　and their families were devastated and destroyed. Id. at 229-50.

10　　　　The judge carefully evaluated the damages necessary to provide full compensation

11　for the unimaginable loss of liberty and destruction of lives; and the judge considered

12　damages award amounts in other cases. Id. Taking everything into consideration, the judge

13　awarded two of the innocent men $1 million per year for their loss of liberty and their

14　physical and emotional damages; the other two were awarded less than $800,000 per year.

15　Id. at 250. Wives were awarded less than $35,000 per year for their 30 years of damages.

16　Id. And awards to children and other family members for 30 years of suffering were

17　approximately $8,000 per year. Id. Hyatt measures his own alleged emotional suffering at

18　11 years, and he asks this court to find that $85 million—which equates to nearly $8 million

19　per year—is a reasonable amount of compensation. RAB 135-36. Comparing this award to

20　Limone, the verdict here was undeniably excessive.[61]

21　　　　No amount of debating skill by Hyatt can establish that his $85 million emotional

22　distress award was within a reasonable range for garden variety emotional distress. Even if

23

24　[61]In attempting to show that his case is worse than all others, thereby justifying $85 million

25　in emotional distress damages, Hyatt tells this court: "Hyatt has located no case of 11 plus years of continual financial pressure and combined with and caused by outrageous bad faith

26　governmental misconduct and the resulting severe emotional distress." RAB 135, lines 3-5. This is not true. Actually, his attorneys found just such a case, indeed, a case far worse—

27　Limone—which involved more than 30 years of loss of liberty, loss of life, economic and personal destruction of the innocent victims of the FBI agents' outrageous misconduct, and

28　resulting severe emotional distress. RAB 63, fn. 247. Hyatt ignores the damages awards in Limone, which were mere fractions of the jury's award in the present case.

RJN002601

1    this court somehow discards the garden variety limitation imposed by the trial judge and the

2    Discovery Commissioner, the award is still beyond all reason, shocking the judicial

3    conscience and there is no logical explanation for the district court's approval of this absurd

4    award. The award must therefore be vacated entirely, capped, or remitted to a reasonable

5    amount.

6                 b.     The Trial Judge Erred By Prohibiting FTB From Introducing
                         Evidence Of Alternative Causes Of Emotional Distress

7            Having barred FTB from obtaining Hyatt's medical records, which would have been

8    fertile ground for information as to alternative causes of Hyatt's alleged emotional distress,

9    the district court went much further, also barring FTB from introducing evidence of other

10   known events that clearly could have caused emotional distress. AOB 106-108. FTB's

11   opening brief pointed out that the district court excluded all evidence of Hyatt's

12   involvement in a patent interference lawsuit, which stripped him of any ownership interest

13   in his coveted patent that had earned him hundreds of millions of dollars, effectively taking

14   away his very identity as an inventor. AOB 107. This patent decision occurred in March

15   1995, four years after he moved to Nevada to avoid California taxes, two years after FTB's

16   audit was commenced, and at virtually the same time when Hyatt was dealing with the

17   FTB's audit. See AOB 4-6. Before trial, Hyatt conceded that it was a jury question as to

18   whether his alleged FTB-related emotional distress was actually caused by alternative

19   events in his life. 18 AA 4457 (Hyatt's counsel states that patent dispute and FTB dispute

20   "occurred about the same time," and that whether patent dispute caused distress was for "the

21   jury to decide"). Yet during trial, Hyatt's counsel changed his position and convinced the

22   judge to exclude evidence of the patent interference action. 52 AA 12759-66.

23           Hyatt's only response on appeal is a single sentence in his brief representing to this

24   court that the patent litigation was "short-lived" and does not explain objectively-verified

25   manifestations of FTB-related distress that occurred "many years after" the patent litigation.

26   RAB 136, lines 23-26. Hyatt's representation to this court that the patent litigation was

27   "short-lived" is false. The patent interference action was commenced in the U.S. Patent and

28   Trademark Office in 1991. 69 AA 17098-102. The Board of Patent Appeals and

128

1    Interferences rendered its decision against Hyatt in September 1995. Id. at 23127. Hyatt

2    appealed to the United States Court of Appeals, Federal Circuit, which rendered its decision

3    against him in June 1998. Hyatt v. Boone, 146 F.3d 1348 (Fed. Cir. 1998). Hyatt

4    petitioned for review by the United States Supreme Court, which rendered its decision

5    against him by denying his petition in February 1999. Hyatt v. Boone, 525 U.S. 1141

6    (1999). Thus, Hyatt's eight-year losing patent litigation was anything but "short-lived," as

7    Hyatt tells this court.

8        Likewise, Hyatt's representation to this court that his emotional distress from

9    dealings with FTB was "many years after" his patent litigation is also false. His counsel

10   conceded in the district court that the two potential causes of Hyatt's emotional distress (i.e.,

11   the patent litigation and FTB's conduct) occurred "about the same time." 18 AA 4457, line

12   22. His concession was factually correct. The patent litigation took place from 1991 until

13   1999, during the very time of FTB's audits. 49 AA 12116(3)-12122(28). In fact, the patent

14   litigation was still ongoing in federal courts when Hyatt filed his suit against FTB in

15   January of 1998, and the patent litigation was not resolved until months later, while the

16   Clark County suit was in full progress. Hyatt v. Boone, 146 F.3d 1348 (Fed. Cir. 1998);

17   Hyatt v. Boone, 525 U.S. 1141 (1999). As Hyatt's counsel conceded in the district court,

18   whether the patent litigation and the loss of his coveted patent was a cause of emotional

19   distress was a question for the jury to decide. 18 AA 4457.

20       Hyatt also had serious trouble with the IRS, which also may have caused emotional

21   distress. He was being audited by the IRS at virtually the same time as he was being

22   audited by FTB, involving the same huge income he had earned from his patent. 34 AA

23   8467-69. Hyatt attempts to downplay the significance of the IRS audit, contending that the

24   dispute merely involved an accounting interpretation, and contending that he negotiated a

25   "favorable settlement" with the IRS. RAB 137. Hyatt's characterization of the IRS audit is

26   misleading. Although the IRS audit was settled, Hyatt had to pay $5 million to the IRS. 34

27   AA 8467(14). In opening statement, Hyatt's counsel told the jury that Hyatt "paid every

28   dime that was due to the federal government," falsely suggesting that he had never had a

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002603

dispute with the IRS and that he paid all his federal taxes willingly and voluntarily. 32 AA 7945 (17). Fundamental fairness required FTB to be allowed to cross-examine Hyatt regarding his dealings with the IRS in the audit, and regarding the extent to which he became emotionally distressed as a result of the IRS audit and the $5 million payment, especially after Hyatt opened the door. Yet Hyatt now contends that the IRS audit does not explain his emotional distress. RAB 136, lines 23-24. He apparently wants this court to make the factual determination on his point by taking his word for it. But it was for the jury to decide whether the IRS audit and the multimillion dollar payment of additional federal taxes was an alternative source of emotional distress.

FTB's opening brief also noted Hyatt's involvement in a number of other lawsuits during the very time of FTB's audit. AOB 108. These litigation conflicts easily could have affected Hyatt's emotional state, yet the district court precluded the jury from hearing this evidence. Id. Hyatt's answering brief ignores FTB's contention regarding the exclusion of this evidence. RAB 136-37.

In sum, Hyatt was allowed to present a completely one-sided picture to the jury, leading the jury to believe that there were no other sources of emotional distress for Hyatt, other than FTB's audit activities. This picture was false, undeniably having a significant impact in the jury's decision to award $85 million in emotional distress damages.

G. The Punitive Damages Award Cannot Be Upheld.

FTB makes two contentions regarding punitive damages. First, such damages cannot be awarded against FTB, as a matter of law. This is a purely legal issue requiring *de novo* review. E.g., City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981). Second, FTB contends that the $250 million award was excessive as a matter of law. This court applies *de novo* review to such contentions. Bongiovi, 122 Nev. at 580-83 (*de novo* review of punitive damages standards).

1. Comity Requires The Punitive Damages Award To Be Vacated

The opening brief established that comity requires Nevada courts to apply California's laws to FTB, unless doing so would violate Nevada's interests and policies.

McDONALD·CARANO·WILSON™
1100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002604

1    AOB 29-34, 108-109. In other words, the California government agency should be treated

2    no worse than a Nevada agency would be treated in similar circumstances. Hyatt's

3    answering brief provides no meaningful response to the fundamental question in this

4    punitive damages issue: What important Nevada public policy is violated by application of

5    California's statute prohibiting awards of punitive damages against government entities?

6    Cal. Gov't Code § 818. Hyatt identifies no such Nevada public policy. In fact, the interests

7    and policies of both states are identical, because Nevada also prohibits punitive damages

8    awards against government entities. NRS 41.035(1).

9        Instead, Hyatt proffers a red herring argument on this issue. He contends that

10   comity should be denied because FTB needs to be deterred and punished, and the only

11   mechanism for deterring and punishing out-of-state entities is through punitive damages.[62]

12   He attempts to distinguish out-of-state government entities from Nevada entities,

13   contending that punishment and deterrence are not necessary against Nevada government

14   agencies because Nevada agencies are controlled by Nevada executive and legislative

15   branches. Id.

16       Hyatt's argument naively assumes that out-of-state government agencies lack any

17   motivation to act responsibly if they are not subject to punitive awards. Hyatt's assumption

18   has been rejected by the United States Supreme Court. In City of Newport v. Fact Concerts,

19   Inc., 453 U.S. 247 (1981), the Supreme Court examined American history and public

20   policies regarding punitive damages, to determine whether punitive damages against public

21   entities should be allowed in federal civil rights claims. A jury had assessed punitive

22   damages against a city and various city employees and officials, for their violation of the

23   plaintiff's civil rights. The question for the Court was whether the punitive damages against

24   the city were appropriate. The Court noted that the common law only allowed punishment

25   against "the actual wrongdoers," i.e., a municipality's officers and agents, not the

26   _____

27   [62] Hyatt's argument in this section runs counter to that presented in the compensatory award
     section in which he argued that the compensatory damages were supposed to punish and
28   deter the out-of-state tax agency. Compare RAB 149 with RAB 163.

McDONALD·CARANO·WILSON℠

100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002605

municipality itself. Id. at 263. If punitive damages were to be allowed against a government entity, "innocent tax payers would be unfairly punished for the deeds of persons over whom they had neither knowledge nor control." Id. at 266. Punitive damages against a government agency would punish "only the taxpayers, who took no part in the commission of the tort." Id. at 267. Such awards are "in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill." Id. "Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers." Id.

With respect to the argument that punitive damages are needed to deter government entities from wrongful conduct (similar to Hyatt's argument here), the Court also held: "A municipality, however, can have no malice independent of the malice of its officials. Damages awarded for punitive purposes, therefore, are not sensibly assessed against the government entity itself."[63] Id.

Hyatt's deterrence argument assumes that if the innocent citizens of California are required to pay a huge punitive award, these citizens will somehow take action to prevent misconduct in the future. An analogous argument was rejected in City of Newport, where the court held that "it is far from clear that municipal officials, including those at the policymaking level, would be deterred from wrongdoing by the knowledge that large punitive awards could be assessed based on the wealth of their municipality." Id. Thus, the deterrent effect in this context "is at best uncertain." Id. at 269.

---

[63]Nevada law also recognizes that an entity can have no malice independent of the malice of its officials, for purposes of punitive damages. For example, NRS 42.007(1) prohibits punitive damages against a corporation for the wrongful acts of an employee, unless there was personal involvement of a corporate officer, director or managing agent. See also, Nittinger v. Holman, 119 Nev. 192, 197-98, 69 P.3d 688 (2003) (security shift supervisor in charge of all hotel/casino security at time of incident observed misconduct by security guards but failed to stop it; punitive award against corporate entity reversed, because shift supervisor was not managerial agent within corporation). In the present case FTB requested a jury instruction regarding this limitation on punitive liability, because no officers, directors or managerial agents of FTB committed or ratified any misconduct that would have justified punitive damages, but the trial court refused the instruction. See 89 AA 22149-57; 89 AA 22186

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10™ FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002606

1   Hyatt's argument also assumes that out-of-state government entities will not take
2   corrective action in the absence of punitive awards. The City of Newport Court rejected
3   this cynical view of public officials. The Court held that there is no reason to suppose that
4   corrective action will not occur unless punitive damages are awarded against the public
5   entity. Id. To the contrary, the "more reasonable assumption is that responsible superiors
6   are motivated not only by concern for the public fisc but also by concern for the
7   Government's integrity." Id. These observations by the United States Supreme Court were
8   made in a case in which a municipality was sued in federal court. These observations are no
9   less applicable to the present case, where a state agency was sued in another state. The City
10  of Newport Court rejected punitive damages against government entities for federal civil
11  rights violations, holding that punitive damages awards against public entities impose a
12  burden on the taxpayers for malicious conduct of individual government employees, and
13  this burden "may create a serious risk to the financial integrity of these governmental
14  entities." Id. at 270. Such reasoning is applicable in the present case.

15  Accordingly, Hyatt's argument—that comity should be denied because there is a
16  distinction between deterring conduct of out-of-state government entities and Nevada
17  entities—is based upon faulty reasoning. The argument should be rejected.

18  Moreover, if Hyatt's argument for the distinction had any validity, this court and the
19  United States Supreme Court would have drawn the same distinction when the comity issue
20  was first decided by these courts in 2002 and 2003. One question at that time was whether
21  Nevada courts should grant comity to California regarding immunity for discretionary or
22  negligence conduct of the California agency. If Hyatt's argument had validity, these courts
23  would have held that Nevada can control the negligent and discretionary conduct of its own
24  state employees through the Nevada executive branch and the legislature, but Nevada
25  cannot exercise similar control over out-of-state government entities; thus, comity should be
26  denied.  Yet these courts drew no such distinction. Comity for FTB's immunity for
27  discretionary or negligent conduct was granted to the full extent that immunity would have
28  been available to a Nevada entity.

133

Other courts have extended immunity from punitive damages to out-of-state foreign entities. For example, in <u>State of Ga. v. City of E. Ridge, Tenn.</u>, 949 F. Supp. 1571 (N.D. Ga. 1996), a city in Tennessee allowed raw sewage to flow into a nearby city in Georgia. Georgia homeowners sued the Tennessee city in Georgia, seeking an award of punitive damages under state law claims. In rejecting punitive damages, the Georgia federal court noted that the defendant was a governmental entity and punitive damages are not available against governmental entities in Georgia. <u>Id.</u> at 1581. The plaintiffs argued that the defendant city and its taxpayers/citizens benefitted financially from the city's conduct, and that punitive damages were appropriate in light of the willful and malicious conduct perpetrated by the Tennessee city. The court rejected this argument, relying on <u>City of Newport</u>, and holding that punitive damages against the out-of-state governmental entity were inappropriate. <u>Id.</u> There was no showing that the taxpayers of the defendant Tennessee city played a role in the violations of the laws underlying the plaintiffs' causes of action, and equally important, the allegations of malicious conduct were more appropriately directed at city officials, not the city itself.

Here, Hyatt did not sue any of the individuals who committed the alleged torts against him. 14 AA 3257. Instead, he only sued the FTB, which is the government entity public employer of these individuals. <u>Id.</u> Punitive damages against the FTB, if upheld, will need to be paid by California taxpayers. There is no sound logical or public policy reason to conclude that punitive damages against the FTB, an out-of-state government agency, are necessary to deter tortuous acts in Nevada, when a Nevada agency itself would be immune from such punitive damages.[64]

_____

[64]Hyatt argues that an "important aspect" of <u>City of Newport</u> is the fact that the Supreme Court did not disturb an award of punitive damages under state law. RAB 165. Hyatt argues that the decision in <u>City of Newport</u> "does nothing to discredit" awards of punitive damages against government agencies authorized by state law. RAB 165. Hyatt's argument relies entirely on a single footnote in <u>City of Newport</u>, in which the Court noted the fact that the jury assessed 25 percent of the punitive damages award on a state-law claim. The Court merely noted the existence of this fact, with the following observation: "We do not address the propriety of the punitive damages awarded against petitioner under Rhode Island law." <u>City of Newport</u>, 453 U.S. at 253 n 6. In other words, the issue of
Continued . . .

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002608

2. Hyatt's Reference To Punitive Damages Against The IRS Is Irrelevant Since A Statute Permits Such An Award Against The IRS

Hyatt's brief notes that punitive damages may be imposed against the IRS for willful or grossly negligent disclosure of tax return information. RAB 166-67. The fact that Congress decided to waive sovereign immunity for a federal agency is irrelevant in this appeal. Here, the states of California and Nevada have both declined to waive sovereign immunity for punitive damages.

Hyatt relies on U.S. Code §7431(c)(1)(B)(ii). RAB 166. Importantly, two federal cases cited in the annotations to this statute are very helpful to FTB's position in this appeal. The first case, Barrett v. United States, 100 F.3d 35 (5th Cir. 1996), is quite similar to many of Hyatt's contentions the present case. In Barrett an IRS agent audited a doctor's personal and business tax returns. The agent sent a letter to 386 of the doctor's patients, disclosing the doctor's name and address, and informing the patients that the doctor was being investigated by the Criminal Investigation Division of the IRS. The agent requested information about the fees paid to the doctor, and the agent identified himself in the signature block as a Special Agent with the Criminal Investigation Division. Barrett, 100 F.3d at 37. The doctor sued for unlawful disclosure of his tax information, seeking more than $8 million in compensatory damages for income loss to his surgery practice, and seeking punitive damages pursuant to the federal statute on which Hyatt's answering brief relies.

---

whether a Rhode Island government entity would be subject to punitive damages under state law that permitted such was simply not before the Court, and the Court expressed no opinion on the issue. This non-opinion certainly does not constitute a stamp of approval for punitive damages against government agencies, as Hyatt suggests.

Additionally, Hyatt cites Bowden v. Lincoln County Health Sys., 08-10855, 2009 WL 323082 (11th Cir. Feb. 10, 2009) for the proposition that states do not limit punitive damages imposed against a sister state because "that is the only manner in which a state may regulate and control the conduct of a sister state." RAB 166. The unpublished decision in Bowden says no such thing. Bowden was a slip opinion with a summary affirmance of a lower court ruling. There was no discussion of comity, no discussion of the rationale or basis for the decision, and no discussion whatsoever regarding the inability to regulate or control conduct of a sister state. In fact, the Bowden court specifically refused to address arguments based upon the Full Faith and Credit clause and the principles of comity, because these arguments were raised for the first time on appeal. Id. at fn. 1.

135

RJN002609

The trial court rejected the punitive damages claim, and the Fifth Circuit affirmed. The court noted that the doctor was obligated to prove that his patients thought he was a "tax cheat" because of the disclosure of the criminal investigation, but the doctor failed to meet this burden. Id. at 39-40. Additionally, the doctor never identified a single patient who stopped seeing the doctor as a result of privacy concerns; and the doctor did not offer the testimony of any other doctor who stopped referring patients to him. Id. at 40. Even the doctor's expert witness, a certified public accountant, failed to distinguish among different possible causes for the loss that the doctor allegedly suffered. Id. Moreover, the IRS agent admitted that he knew his letters to the doctor's patients would cause "embarrassment, humiliation, or emotional distress," and he was unable to explain his "complete failure" to obey the mandates of a handbook for IRS agents. Id. at 40-41. Nevertheless, as a matter of law, this evidence was "insufficient to support an award of punitive damages" (under the statute on which Hyatt relies in the present case). Id. at 40.

In the second case, Marre v. United States, 38 F.3d 823 (5th Cir. 1994), an IRS agent conducted a criminal investigation of a taxpayer for aiding and assisting with false tax returns related to tax shelters. The agent sent form letters to numerous investors and suppliers of the taxpayer, disclosing that the taxpayer was under investigation by the Criminal Investigation Division of the IRS for aiding and assisting with false tax returns. Id. at 824-25. An attachment with the form letters stated that the taxpayer had been dishonest with investors, and that any deductions taken for the tax shelters would be fraudulent. Id. at 825. The trial court found that the IRS agent made 215 unauthorized disclosures of tax information to people doing business with the taxpayer. The trial court described the agent's conduct as a "rampage through the IRS regulations." Id. at 826. Despite these facts, the trial court denied punitive damages, and the Fifth Circuit affirmed, holding that "the record does not support a punitive damage award" (under the same statute on which Hyatt relies here). Id. at 827.

Accordingly, the federal statute on which Hyatt relies provides no basis for affirming the award of punitive damages, and cases applying the statute support FTB's

RJN002610

1  contention that the punitive award must be vacated.

2          3.     Legal Excessiveness

3      The answering brief fails to establish that the $250 million award of punitive

4  damages was consistent with constitutional standards adopted by the United States Supreme

5  Court in State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003) and by this court

6  in Bongiovi v. Sullivan, 122 Nev. 556, 138 P.3d 433 (2006).  Three guideposts must be

7  considered, as follows.

8          a.     Degree of Reprehensibility

9      Campbell holds that the degree of reprehensibility of the defendant's conduct is the

10  "most important indicium" of the reasonableness of a punitive damages award.  Campbell,

11  538 U.S. at 419.  Campbell instructed courts to evaluate certain considerations:

12      A.     Whether the harm caused was physical as opposed to economic:  As noted in

13  the opening brief, Hyatt experienced no physical harm and as of yet, no financial harm from

14  FTB's conduct.  AOB 112-13.  Hyatt's brief does not dispute this, except for an assertion

15  that Hyatt's physical well-being "deteriorated" from stress caused by the FTB.  RAB 169.

16      B.     Whether the conduct showed indifference to or reckless disregard of the

17  health or safety of others:  This was not a class action case.  Hyatt's brief does not contend

18  that the FTB's conduct in Hyatt's audit was widespread or was directed toward any other

19  taxpayers. RAB 168-71.

20      C.     Whether the target of the conduct had financial vulnerability:  Hyatt received

21  hundreds of millions of dollars in income from his patent, and he does not suggest that he

22  was in any way financially vulnerable.  Id.

23      D.     Whether the conduct involved repeated actions or was an isolated incident:

24  On this point Hyatt does contend that the conduct was repeated and lasted more than a

25  decade. RAB 168-69.  Nevertheless, the FTB's activities all related to a single audit and a

26  single question of whether Hyatt owed taxes on the hundreds of millions of dollars he

27  earned from his patent.  Moreover, although the protest proceedings took several years to

28  resolve, the jury was never given the full explanation for the delay, because the judge

MCDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

137

1　excluded this important explanatory evidence (as discussed in detail above).

2　　　　E.　　Whether the harm was a result of intentional malice, trickery or deceit:　On

3　this point Hyatt argues that one of the FTB's auditors acted maliciously and in bad faith.

4　RAB 169.　But Hyatt did not sue this auditor, and his award of $250 million in punitive

5　damages is against the FTB, a government agency.　Hyatt's complaints of trickery and

6　deceit relate primarily to his so-called bad faith fraud claim, which in turn is based upon the

7　alleged promise to treat him fairly and impartially.　This is all explained in greater detail

8　earlier in this brief.　Any such "fraud" cannot be deemed the type of reprehensibility to

9　support an award of $250 million in punitive damages.[65]

10　　　　Based upon these considerations, FTB's reprehensibility, if any, simply cannot

11　justify $250 million in punitive damages.

12　　　　　　　　b.　　Ratio of Punitive Damages to Actual Harm

13　　　　As pointed out in the opening brief, *Bongiovi* does not compare the punitive

14　damages to the compensatory damages awarded by the jury.　Rather, punitive damages are

15　compared to the "actual harm inflicted on the plaintiff."　AOB 113 (emphasis added), citing

16　*Bongiovi*, 122 Nev. at 582.　FTB argued that the jury's award of $138 million in

17　compensatory damages does not reflect Hyatt's "actual harm," if any.　AOB 113-14.

18　　　　In response, Hyatt characterizes this argument as "strange" and "far-fetched."　RAB

19　171, line 20, and 172, line 2.　It is neither strange nor far-fetched to rely on the actual

20　language in published appellate opinions. The phrase "actual harm inflicted on the plaintiff"

21　is the exact language used by this court in *Bongiovi* and by the United States Supreme

22　Court in BMW of North America, Inc. v. Gore, 517 U.S. 559, 580 (1996).　These courts did

23　not limit the punitive damages comparison merely to the award of compensatory damages.[66]

---

24

25　[65]As noted in the opening brief, this court has held that multiple acts of intentional fraud
are "toward the lower end of the spectrum of malevolence found in punitive damages

26　cases."　AOB 13, fn 86, citing Ace Truck, 103 Nev. at 511.　Hyatt ignores this holding in
Ace Truck on this point. RAB 169-70.

27　[66]The fact that FTB's argument is neither "strange" nor "far-fetched" is also shown by the
existence of appellate decisions that have similarly accepted the argument.　See Clear

28　Channel Outdoor, Inc. v. Adver. Display Sys., A102492, 2004 WL 2181793 (Cal. Ct. App.
Continued . . .

McDONALD·CARANO·WILSON™
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002612

1   Hyatt argues that the ratio in this case is "less than 2 to 1," and that this is

2 "significantly less than the 3 to 1 ratio allowed under Nevada law." RAB 171, lines 14-15.

3 The 3-to-1 ratio to which Hyatt refers is statutory. NRS 42.005(1). This ratio, however, is

4 superseded by constitutional Due Process considerations. The United States Supreme Court

5 has ruled that "few awards exceeding a single-digit ratio between punitive and

6 compensatory damages, to a significant degree, will satisfy due process." Campbell, 538

7 U.S. at 425. "When compensatory damages are substantial, then a lesser ratio, perhaps only

8 equal to compensatory damages, can reach the outermost limit of the due process

9 guarantee." Id. In Campbell, the jury awarded $1 million in compensatory damages for a

10 year and a half of emotional distress, and the Supreme Court characterized this award as

11 "substantial" for purposes of the ratio comparison. Id. at 426. The compensatory damages

12 award in the present case is 138 times larger than the award that the Supreme Court

13 characterized as "substantial" in Campbell. [67]

14

15 Sept. 29, 2004) (actual harm suffered by the plaintiff "may not always be reflected in the
amount of compensatory damages awarded"); Simon v. San Paolo U.S. Holding Co., Inc.,

16 B121917, 2001 WL 1380836 (Cal. Ct. App. 2001) (although the compensatory damage
award is usually a convenient measure, "it may or may not reflect the actual harm

17 suffered"), judgment vacated by San Paolo U.S. Holding Co., Inc. v. Simon, 538 U.S. 974
(2003) (judgment vacated for further consideration in light of subsequently decided

18 Campbell decision). Although Clear Channel and Simon were unpublished decisions, and
although Simon was vacated for reconsideration in light of the later Campbell opinion,

19 Clear Channel and Simon show that appellate judges have also drawn a distinction between
"actual damages" and "compensatory damages," for purposes of ration comparisons. Thus,

20 FTB's argument is neither strange nor far-fetched.
[67]The Campbell court also acknowledged that the large compensatory damages award for

21 emotional distress in that case likely included a punitive component. Id. at 426. Much of
the emotional distress suffered by the plaintiffs in Campbell was caused by the outrage and

22 humiliation resulting from the insurance company's actions; and the Court recognized that
the jury's award of compensatory damages ($1 million) probably already contained a

23 punitive element. Id. Similarly, the $138 million compensatory damages award in the
present case most likely already included a punitive component. Hyatt essentially concedes

24 this. In contending that Nevada's cap on compensatory damages should not apply to FTB,
Hyatt argues that in a case involving alleged intentional torts by an out-of-state government

25 entity, a "significant" compensatory damage award, such as the jury's award to Hyatt, is a
necessary way of "deterring such behavior in the future." RAB 146, lines 19-20. Hyatt

26 forgets that compensatory damages in Nevada are not intended to punish or deter conduct;
this is the role of punitive damages. Ainsworth v. Combined Ins. Co., 105 Nev. at 244

27 (compensatory damages are intended to compensate plaintiff; punitive damages are solely
designed to punish and deter wrongful conduct), modified on other grounds in Powers v.

28 United Services Auto. Ass'n., 114 Nev. 690, 706, 962 P.2d 596 (1998).

McDONALD·CARANO·WILSON<sub>LLP</sub>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002613

c.   Comparison to Other Criminal and Civil Penalties

FTB's opening brief contained an extensive analysis of this important factor.  AOB 114-15.  We first showed that the criminal penalty for fraud, even with multiple victims, has a maximum fine of only $50,000. NRS 205.372. The punitive award against FTB was 5,000 times greater than the maximum criminal fine. Hyatt ignores this.

With respect to civil penalties, the opening brief provided 16 examples of this court's published opinions on punitive damages, showing that most punitive awards have been less than $100,000; some awards have been in six figures; and only a handful have been in excess of $1 million. AOB 114-15. We also pointed out that the highest punitive damage award this court has ever upheld in a published opinion was $6,050,000 for intentional misconduct involving an elderly couple's trust. Evans v. Dean Witter Reynolds, Inc., 116 Nev. 598, 615, 5 P.3d 1043 (2000).  The award in the present case was more than 41 times larger than Evans.

With regard to this mandatory comparison guidepost in Bongiovi, Hyatt completely ignores this court's published opinions on punitive damages.  RAB 174.  Hyatt cites no Nevada case (or, for that matter, any case from any other jurisdiction) with which he can favorably compare a punitive award to his award.  Instead, he offers the conclusory arguments that this court's prior cases "do not involve comparable conduct," and that the "jury has spoken in this case." RAB 174.  These statements constitute no legitimate analysis of the mandatory comparison with other criminal and civil penalties. Cf. Zinda v. Louisiana-Pac. Corp., 409 N.W.2d 436 (Wis. Ct. App. 1987) aff'd in part, rev'd in part in 440 N.W.2d 439 (Wis. 1989) (extraordinarily large awards cannot be supported by conclusory contentions on appeal).

Accordingly, the three Bongiovi guideposts mandated by the Due Process Clause overwhelmingly require a conclusion that the punitive award was constitutionally excessive. For the reasons set forth above and in the opening brief, the punitive damages award must be vacated.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002614

H.    No Prejudgment Interest Should Have Been Allowed

FTB's opening brief demonstrated that the award of more than $102 million in prejudgment interest must be vacated. Hyatt's response fails to provide legal and factual bases for the award.

1.    It Is Impossible To Determine What Part Of The Verdict Represented Past Damages

The general verdict form did not distinguish between past and future damages. 54 AA 13308-09. When it is impossible to determine what part of the verdict represented past damages, a district court errs by awarding prejudgment interest. See Shuette v. Beazer Homes Holdings Corp., 121 Nev. 837, 865, 124 P.3d 530 (2005); Stickler v. Quilici, 98 Nev. 595, 597, 655 P.2d 527 (1982). Prejudgment interest is allowed only when there is "nothing in the record" to show that the verdict may have included future damages; where there is "no reference" to future damages; and where the record "does not indicate any reference to future damages in evidence." Bongiovi v. Sullivan, 122 Nev. at 579 (emphasis added).

Hyatt's primary argument is that "no future damages were sought or awarded in this case." RAB 175, line 2. This argument is contrary to the record. Hyatt's testimony consistently attempted to establish permanent emotional distress, with no suggestion that Hyatt's alleged problems would magically cease on the last day of trial. See, e.g. 37 AA 9171 (96-97); 37 AA 9172 (100); 37 AA 9173 (103); 37 AA 9174 (109). Thus, Hyatt's alleged permanent damages, if accepted by the jury, clearly would have continued after the trial and into the future.

For example, Hyatt testified at trial that as a result of FTB's conduct, he gets "tightness and breathing problems in my chest that I still have to this day." 37 AA 9171 (96) (emphasis added). He testified that there is "a whole range of problems that developed that I still have to this day." Id. (emphasis added). He also testified that his emotional distress causes teeth grinding, requiring him to use a night guard, "which I still use to this day." 37 AA 9174 (106) (emphasis added). When asked about the fraud penalty assessment, he testified: "It causes me deep depression and anger for what they've done to

141

RJN002615

1  me, and for what they can do and what they <u>are likely to do to me in the future</u>." 37 AA

2  9174 (109) (emphasis added). Finally, when asked how the accrual of interest on the tax

3  assessment affects Hyatt's everyday life, he testified: "I wake up every morning realizing

4  [present tense] that there's about another $10,000 that is added to their assessments because

5  of that interest." <u>Id.</u> This accrual of interest, of course, would also continue to exist after

6  the trial and into the future. This could have allowed the jury to draw an inference that

7  Hyatt's alleged distress caused by the accrual of interest would also continue into the future,

8  thereby justifying future emotional distress damages.

9      Now, amazingly, Hyatt argues that there was no evidence of any future damages, he

10  did not seek future damages, and the jury did not award future damages. RAB 174-75. His

11  argument necessarily assumes that even if the jury accepted his testimony that he suffered

12  permanent privacy damages and permanent emotional distress, with myriad physical and

13  emotional problems lasting "to this day" (i.e., the time of trial), the jury nevertheless must

14  have cut off all damages on the date the complaint was filed. The argument defies common

15  sense and is belied by the record.[68]

     2.    There Is No Recovery For Prejudgment Interest For Damages
          Suffered After Service Of The Complaint

17  Hyatt's answering brief takes issue with FTB's contention that prejudgment interest

18  was improper on damages suffered after the date of service of the complaint. RAB 176-79.

19  FTB's contention relied on <u>Las Vegas-Tonopah-Reno Stage Line, Inc. v. Gray Line Tours

20  of S. Nevada</u>, 106 Nev. 283, 289, 792 P.2d 386 (1990), which held that "interest should

---

[68]Hyatt argues that the present case is similar to <u>Albios v. Horizon Communities, Inc.</u>, 122 Nev. 409, 132 P.3d 1022 (2006), which was a construction defect case where repair damages were considered past damages, even though the repairs had not yet been made by the time of trial. RAB 179. <u>Albios</u> relied on <u>Shuette</u>, which dealt with a unique form of damages recognized in construction defect cases as "abatement" damages. <u>Shuette</u>, 121 Nev. at 865-66. Abatement damages include expenses for repairs yet to be undertaken for existing construction defects in buildings (i.e., for building defect damage that already occurred before trial). <u>Id.</u> Nothing in Nevada construction defect jurisprudence suggests that the unique concept of "abatement" damages would be extended to other contexts, such as tort actions seeking damages for invasion of privacy and emotional distress.

142

RJN002616

1   begin to accrue from the time damages actually occur if they are sustained after the

2   complaint is served but before judgment, rather than from the date of serving the complaint

3   or from the date of judgment." Id.   The court held that to carry interest, "damages must be

4   sustained and specifically quantified." Id. at 289-90. And the court concluded: "Thus,

5   interest should be awarded on damages suffered after serving the complaint but prior to

6   judgment once the time when incurred and the amount of these damages have been proven

7   by a preponderance of the evidence." Id. at 290. See also, Keystone Realty v. Osterhus,

8   107 Nev. 173, 807 P.2d 1385 (1991); Powers v. United Services Auto. Ass'n., 114 Nev.

9   690, 962 P. 2d 596 (1998) (interest on damages not incurred until after complaint was

10  served accrues as of date damages were actually sustained).

11      This interpretation is consistent with the purpose of prejudgment interest, which is to

12  make the plaintiff whole by including the loss of use of money for the plaintiff's damages.

13  Ramada Inns, Inc. v. Sharp, 101 Nev. 824, 826, 711 P.2d 1 (1985). Prejudgment interest is

14  not designed as a penalty. Id.   In short, awarding a plaintiff interest for damages before

15  such damages were incurred does more than make a plaintiff whole, and thus equates with

16  an inappropriate penalty.

17      Las Vegas-Tonopah was a tort case, as is Hyatt's case, and Las Vegas-Tonopah

18  makes no distinction between different types of torts or damages.   Hyatt offers no

19  justification for a retreat from Las Vegas-Tonopah.  Nonetheless, Hyatt argues that a burden

20  to prove damages for different time frames is impossible in a case involving unliquidated

21  damages such as pain and suffering or emotional distress. RAB 177. Hyatt contends that a

22  plaintiff "cannot prove emotional distress or invasion of privacy damages on a month by

23  month basis, even if one can prove the dates of specific events." RAB 117. To the contrary,

24  jurors are capable of distinguishing damages during different time frames.   In tort cases,

25  such as personal injury cases, experienced plaintiffs' attorneys frequently make per diem

26  arguments to juries based on daily assessments of pain and suffering.  Juries are asked to

27  award different amounts during different time frames, such as higher daily amounts of pain

28  and suffering immediately after an accident or a surgery, and lower daily amounts for pain

RJN002617

1   and suffering as recovery progresses. That such damages are unliquidated does not impose
2   an impossible burden or justify changing the Las Vegas-Tonopah court's holding.

3   Hyatt relies on State v. Eaton, 101 Nev. 705, 710 P.2d 1370 (1985) overruled by
4   State ex rel. Dept. of Transp. v. Hill, 114 Nev. 810, 963 P.2d 480 (1998)and Lee v. Ball,
5   121 Nev. 391, 116 P.3d 64 (2005). RAB 177-78. Neither case addressed how to calculate
6   prejudgment interest according to when damages were actually incurred. Indeed, there is
7   not a word in either case indicating that the Las Vegas-Tonopah issue was ever raised in the
8   district court, ever briefed on appeal, or ever considered by the Eaton and Lee courts. Hyatt
9   also relies on Bongiovi and Albios. Bongiovi contains no limitation on Las Vegas-Tonopah
10  and contains no discussion of this issue.

11  Application of Las Vegas-Tonopah is particularly appropriate here. Hyatt concedes:
12  "Events that happened during the time the matter was pending, from beginning of the audit
13  until verdict, contributed to and increased Hyatt's emotional distress and loss of privacy. . ."
14  RAB 177, lines 18-20. One of Hyatt's primary criticisms of FTB relates to the alleged
15  delay in the protest proceedings. Hyatt complains that the protest started in 1996, "but the
16  FTB did not decide and conclude the protest for over 11 years (closely approximating the
17  time this case was pending before the trial)." RAB 13, lines 4-5 (italics and parenthesis in
18  original). Hyatt filed his lawsuit in 1998. Thus, nine of the eleven years of the alleged
19  delay damages occurred after Hyatt filed his complaint.[69]

20  Hyatt's attack on Las Vegas-Tonopah is addressed to the wrong forum. It has now
21  been 20 years since the Las Vegas-Tonopah court issued its decision interpreting the interest
22  statute, and the legislature has never amended the statute. This shows that the legislature
23  does not disagree with the Las Vegas-Tonopah holding. If Hyatt wants a change in the

---

[69]Hyatt's brief contains a heading: "Hyatt's emotional distress was severe and occurred over
a long period of time." RAB 124, line 2. The next three pages catalog Hyatt's contentions
regarding activities by FTB that allegedly caused emotional distress. RAB 124-26. The
activities include listing this case in FTB's litigation roster, bringing Hyatt into California's
tax amnesty program, and assessing taxes and penalties against him. Id. The vast majority
of activities catalogued in Hyatt's brief occurred after he filed his complaint against FTB.

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002618

1  statute, he should propose his change to the legislature, not this court.

2      In conclusion, Hyatt has failed to offer persuasive arguments based upon legal

3  authority supporting the district court's award of more than $102 million in prejudgment

4  interest. The award should be reversed.

5  IV.    CONCLUSION ON APPEAL

6      Based upon the foregoing, and the arguments contained in its opening brief, FTB

7  urges the court to set aside the judgment and dismiss this case.

8

9

10              **CROSS-RESPONDENT'S ANSWERING BRIEF**

11  I.    INTRODUCTION TO ANSWERING BRIEF ON CROSS-APPEAL

12      Hyatt alleged that two letters sent by FTB to two of Hyatt's licensees in Japan

13  caused the downfall of his entire patent licensing business. In opposing summary judgment,

14  on his economic damage theory, Hyatt relied on rank speculation to support his allegations,

15  claiming entitlement to over $1 billion.   The district court correctly ruled that Hyatt's

16  speculative evidence was inadmissible, and summary judgment was appropriate to dismiss

17  his claim for economic damages.

18

19  II.    STATEMENT OF FACTS ON CROSS-APPEAL

20      A.    <u>Background Facts</u>

21      Hyatt obtained a patent for computer technology in July 1990, and he immediately

22  began seeking agreements from companies that had made prior use of this technology. <u>See</u>

23  7 AA 1609. All but one of his licensees were Japanese companies, and the license

24  agreements required lump sum payments as settlement for the past use of Hyatt's patents.

25  <u>See, e.g.</u>, 8 AA 1852-66. Hyatt represented to the FTB that he moved to Nevada on

26  September 26, 1991, just before receiving millions of dollars in income under these

27  agreements. <u>See</u> 7 AA 1668. FTB wanted to verify when Hyatt actually received the money,

28  but Hyatt and his representatives did not provide the information. 7 AA 1742.  Therefore,

McDONALD·CARANO·WILSON<sup>LLP</sup>
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

145

1  FTB sought information directly from two Japanese licensees, namely, Fujitsu and

2  Matsushita. 8 AA 1761-70. FTB's two letters, which included identifying attachments that

3  were already been in the possession of the Japanese companies, stated, in full, the

4  following:

5      Dear Sir:

6      For the purpose of administering the California Personal Income Tax Law,
       and for that purpose only, the following information is requested under
7      authorization of California's Personal Income Law Section 19254.

8      Please indicate which dates wire transfers were made to Gilbert P. Hyatt.
       Please refer to copy of letter enclosed.
9
       For your own convenience, you may make marginal notations on this copy of
10     this letter and return it in the enclosed envelope.

11 See 8 AA 1762, 1767. Representatives from both companies provided the dates of the wire

12 transfers, which happened to be within six weeks after Hyatt allegedly moved to Nevada. 8

13 AA 1765 (Matsushita made wire transfer to Hyatt on November 15, 1991), 1770 (Fujitsu

14 made wire transfer to Hyatt on October 31, 1991). The responses contained no other

15 information. Id.

16     Hyatt provided discovery responses, contending that FTB's two letters caused

17 Japanese companies to cease doing business with him. See 8 AA 1780-81. After review,

18 FTB filed a motion for partial summary judgment on Hyatt's alleged economic damages,

19 setting forth Hyatt's own chain of alleged facts constituting his causation theory on his

20 claim for economic damages:

21     1.   At the time of FTB's audit of him, Hyatt consummated license agreements
            with numerous Japanese companies, including Fujitsu and Matsushita.
22
       2.   As part of its audit and after Hyatt had failed to produce the dates of wire
23          transfers of money from these licensees, FTB auditor Sheila Cox sent letters
            to Fujitsu and Matsushita requesting same.
24
       3.   Fujitsu and Matsushita allegedly notified the Japanese Department of
25          Ministry of Finance of these contacts.

26     4.   The Ministry of Finance allegedly spread the word that FTB was inquiring
            about Hyatt's licensing program.
27
       5.   Potential additional licensees, upon allegedly receiving the word of FTB's
28          inquiries, allegedly refused to do business with Hyatt.

146

RJN002620

6.  As a result, Hyatt's license program allegedly fell apart–i.e. he lost existing licenses, failed to attract potential licensees, and his agency relationship with Philips terminated.

7 AA 1586-87; see also, 8 AA 1810-47. Hyatt did not dispute FTB's summarization of his chain of facts (thereby admitting that chain of facts). 8 AA 1909-26; DCR 13 (3).

The first two links in Hyatt's chain of facts were undisputed by FTB; the next four were pure speculation. When asked in his deposition how he knew that Fujitsu and Matsushita had contacted the Ministry of Finance (point 3 in the chain of facts), Hyatt replied: "From my knowledge of the Japanese business community. I've been working with them and observing them for almost 40 years now, and I have a good understanding of the Japanese business community." 8 AA 1830 (138:13-18). Similarly, his theory that other Japanese companies would have entered into license agreements but for the fact that they were allegedly being contacted by the Ministry of Finance (point 5 in the chain of facts) was also pure speculation: "[T]he last thing that the Japanese companies wanted was problems with the Franchise Tax Board, and Gil Hyatt, according to the letters, was going to cause them problems." 8 AA 1832 (140:13-16). Hyatt could not, and did not, name a single prospective licensee that was contacted regarding the auditor's inquiry (point 4 in the chain of facts). 8 AA 1834 (142:1-4).

Likewise, Gregory Roth, Hyatt's patent attorney, had no evidence proving the alleged causal relationship between FTB's letters and the demise of Hyatt's patent program. In his deposition testimony, Roth testified:

Q:  Did the FTB audit have any effect on Mr. Hyatt's licensing program?

A:  It appears to have.

Q:  What information do you have about that effect?

A:  The information I have is that approximately the time those two letters were sent to Japanese companies the licensing effectively ground to a halt and the inference of the timing would seem to suggest that they had an effect. In addition, I believe that the Japanese would have been particularly sensitive to such a letter based on their culture . . .

7 AA 1618-19 (299:25-300:10) (emphasis added). Roth conceded that he had no special knowledge of Japanese culture. 7 AA 1602 (68:10-15). FTB also offered evidence that

147

1    Roth's testimony about the license business grinding to a halt was not accurate. 12 AA

2    2870-72.

3         Hyatt did not depose or get affidavits from witnesses who would have had personal

4    knowledge of facts supporting his theory, such as people at Fujitsu, Matsushita, the

5    Japanese government, or other companies in the Japanese business community that

6    allegedly decided not to do business with him as a result of the FTB's letters, or from his

7    agent in New York, Philips. Hyatt claimed that getting such testimony was "difficult," and

8    he should be relieved of his burden of producing such evidence. See, e.g., 12 AA 2894

9    (44:5–15). Hyatt's argument was specious. See NRCP 28(b) (allowing litigant to take

10   foreign country depositions). Hyatt had ample resources to pursue discovery in Japan. Two

11   of his attorneys were partners in law firms that had offices in Japan; and one of his proposed

12   experts resided in Japan and was licensed to practice law there. 9 AA 2226-27; 12 AA

13   2863-2864 (13:24–14:8). Nothing foreclosed Hyatt from obtaining evidence from Japanese

14   witnesses. Moreover, the Philip's representatives, who would have possessed knowledge

15   concerning Hyatt's allegation that his relationship with them terminated because of FTB's

16   letter (point 6 in the chain of facts), were located in New York. 67 AA 16510; 10 AA 2381;

17   35 AA 8712 (14); 39 AA 9561 (104). Hyatt acknowledged in deposition that he spoke to

18   and met with the Philips' representatives in New York on a regular basis. 7 AA 1747.

19        Hyatt admitted that he had no percipient witnesses in support of the final four

20   elements of his causal chain of facts.[70] See 8 AA 1937-40. Hyatt claimed, however, that he

21   intended to establish his causal chain of facts through experts who would opine that, based

22   on their knowledge of Japanese culture, each of the elements in Hyatt's causal chain of facts

23   **was likely to have occurred**. 8 AA 1919-21.

24        It was undisputed that neither Hyatt nor his experts had any personal knowledge of

25   what actually happened regarding Hyatt's causal chain of facts; instead, Hyatt and his

26   _____

27   [70]In his cross-appeal, Hyatt admits that he had "no direct evidence in the form of testimony
     of potential customers who refused to do business with him to support his theory of

28   causation." RAB 190.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

148

experts were opining merely on what they understood of Japanese culture, and their assumptions as to what they believed probably happened as a result of FTB's two letters.

For example, witness Keegan testified:

**In the context of the unique Japanese business culture, it is likely** that FTB's letters caused material concern among executives at Fujitsu and Matsushita . . . [and] a concern about Hyatt **would have** prompted executives at these two companies to share the information about the FTB's letters with the Ministry of Finance ("MF") or the Ministry of International Trade & Industry ("MITI"). When these agencies learned of the FTB's investigation, **it is reasonable to assume** that the MF or MITI **would have** communicated such information to the wider Japanese community in an effort to promote the best interests of Japanese industry.

8 AA 1941-42 (emphasis added). From these assumptions, Keegan also opined that the content of the letters and sharing of the content with other Japanese businesses "**would have had** an impact on the licensing of Hyatt's patents in Japan" and that the FTB letters **likely affected** Hyatt as a licensor. 8 AA 1942.

Witness Unkovic testified:

[S]enior executives at Matsushita and Fujitsu **could reasonably have** experienced concerns that the FTB letters would result in charges being filed specifying that Matsushita and Fujitsu had violated U.S. tax laws. . . [I]nformation such as what was in the FTB letters **would be** shared not just within the corporations. . . Japanese companies **would be** reluctant for a variety of reasons to have an ongoing or future business relationship with Hyatt.

8 AA 1942-43 (emphasis added).

Witness Toyama testified:

the License Program **would have been** well disseminated among the Japanese electronics, automotive and information technology companies. . . It is also my opinion that when the FTB's investigation was known to the potential licensees of Mr. Hyatt patents, they **would have** suspected that Mr. Hyatt had problems with the government and as a consequence his credibility **would have** been damaged.

8 AA 1944 (emphasis added).

Witness Woo-Cumings testified:

Thus when the FTB letters were received, their contents **would have been** shared with officials in relevant government bureaus and other company officials. . . .The FTB letters **would have** raised red flags immediately . . . and the alleged bad news about Mr. Hyatt **would have** traveled around with the speed of light. . . . Japanese companies **would have** instantly jettisoned business relationships with Mr. Hyatt.

8 AA 1944-45 (emphasis added).

149

RJN002623

1    Witnesses existed who would have had personal knowledge whether: (1) Fujitsu and

2    Matsushita notified the Japanese Ministry of Finance of FTB's letters; (2) the Ministry of

3    Finance spread the word that FTB was inquiring about Hyatt's licensing program; (3)

4    potential additional licensees, upon learning of FTB's inquiries, refused to do business with

5    Hyatt; and (4) as a result, Hyatt's patent program fell apart–i.e. he lost existing licenses,

6    failed to attract potential licensees, and his agency relationship with Philips terminated.

7    Hyatt did not try to get testimony from those witnesses, but instead suggested that his

8    opinions and the experts' opinions constituted admissible circumstantial evidence of those

9    facts. RAB 191-92.

10       B.    The District Court's Ruling

11       The district court granted partial summary judgment, noting that the experts "have

12   no actual knowledge of anything that occurred" and, "while it is true that plaintiff's counsel

13   can argue circumstantial evidence that plaintiffs ought to have some witness or some

14   evidence with direct knowledge of the economic damages." 12 AA 2905 (55:3–7). The

15   district court stated that the motion was granted "because Plaintiff failed to come forward

16   with admissible evidence to demonstrate Defendant's actions were a cause in fact of

17   Plaintiff's alleged economic damages." 12 AA 3000-01.

18       Hyatt now tells this court that "[t]he District Court held that Hyatt cannot rely on

19   circumstantial evidence, . . . ." RAB 183 (without citing to appendix). This is absolutely

20   false.  In fact, the district court expressly stated that Hyatt could argue circumstantial

21   evidence. 12 AA 2905. (judge observing on the record that "it is true that plaintiff's counsel

22   can argue circumstantial evidence"). The district court simply concluded that Hyatt's

23   "evidence" did not amount to circumstantial evidence because it was based on speculation.

24   13 ARA 3074.

25       C.    District Court Explained A Second Time That Hyatt's Proffered Evidence
             Was Speculative
26
         Hyatt attempted to circumvent the district court's ruling by seeking the admission of
27
     expert opinion trial testimony from attorney Dennis Unkovic.  The FTB filed a motion in
28
     limine, arguing that the order granting partial summary judgment on the economic damages

150

RJN002624

1  issue made such testimony irrelevant. 12 ARA 2928. After briefing and argument, the

2  district court granted the FTB's motion in limine, stating that:

> In a previous hearing, this court granted partial summary judgment with respect to the economic-damage claim *because the only evidence to substantiate that claim was based on speculation.* It appears to the Court despite what counsel argues, that Mr. Unkovic would be called for the purposes of establishing economic damages. And based on the Court's previous ruling and all of the papers and pleadings and argument the Court's heard today, it would be appropriate for the Court to grant defendant's motion.

13 ARA 3074 (emphasis added).

### D. The District Court Repeated Its Ruling A Third Time

Finally, in the context of Hyatt's motion to stay proceedings,[71] the district court reiterated the basis for the ruling:

> This Court granted defendant's motion for partial summary judgment with respect to the economic-damages claim *because this Court viewed that claim to be speculative.* Petitioner argued in his writ to the Supreme Court that it ought to be able to argue to the jury circumstantial evidence. I would venture to say that *there's a big difference between circumstantial evidence and speculative evidence.*

17 ARA 4027-28 (emphasis added).

## III. LEGAL ARGUMENT ON CROSS-APPEAL

### A. Standard of Review

#### 1. Evidentiary Decisions Are Reviewed Under an Abuse of Discretion Standard

Hyatt identified the incorrect standard of review for this issue. RAB 189. The district court's decision was an evidentiary ruling: Hyatt's proffered evidence of causation was speculation, and therefore inadmissible to support his claim for economic damages. NRS 47.060 ("Preliminary questions concerning... the admissibility of evidence shall be determined by the judge"). As a result of that preliminary decision, the district court granted partial summary judgment because "Plaintiff failed to come forward with admissible evidence to demonstrate that Plaintiff's actions were a cause in fact of Plaintiff's

---

[71]Hyatt requested and received a stay of proceedings pending this court's determination of his petition for writ of mandamus. 21 RA 5134-39.

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

151

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1   alleged economic damages." 13 AA 3001. In evaluating that decision, this court must first

2   review the district court's evidentiary ruling (pursuant to an abuse of discretion standard),

3   then review whether the grant of summary judgment was proper in light of that evidentiary

4   ruling (pursuant to a *de novo* standard).

5   The district court has discretion to determine the admissibility of expert testimony,

6   and such decisions shall not be disturbed unless a clear abuse of the court's discretion is

7   shown. See Higgs v. State, ___ Nev. ___, 222 P.3d 648, 658 (2010) (trial judges have

8   "wide discretion" as gatekeepers regarding expert testimony); Hallmark v. Eldridge, 124

9   Nev. ___, 189 P.3d 646, 650 (2008) ("This court reviews a district court's decision to allow

10  expert testimony for abuse of discretion."). Here, the district court found that there was no

11  admissible expert evidence on Hyatt's claim for economic damages. 12 AA 3000-13 AA

12  3001. Thus, the abuse of discretion standard applies.

13  2.   The District Court Properly Applied *Wood v. Safeway, Inc.*

14  Hyatt contends that the district court applied an incorrect view of Wood v. Safeway,

15  Inc., 121 Nev. 724, 121 P.3d 1026 (2005). See RAB 185. Hyatt is incorrect. In Wood, this

16  court confirmed that opposition to summary judgment cannot be built "on the gossamer

17  threads of whimsy, speculation and conjecture." Wood, 121 Nev. at 732. To defeat

18  summary judgment, the nonmoving party must offer "admissible evidence" to show a

19  genuine issue of material fact. Id; see also, Torrealba v. Kesmetis, 124 Nev. __, 178 P.3d

20  716, 720 (2008).

21  B.   The District Court Properly Found That Hyatt's Proffered Proof of Actual
    Causation Was Based Only Upon Speculation and Therefore Inadmissible

22  Hyatt mistakenly equates speculative opinions with circumstantial evidence.

23  Nevada's Standard Jury Instruction 2.00, however, states that "Circumstantial evidence is

24  indirect, that is, ***proof of a chain of facts*** from which you could find that another fact exists,

25  even though it has not been proved directly." (Emphasis added). The key aspect of this

26  instruction is that circumstantial evidence is proven through a chain of ***facts***, not a chain of

27  inferences based upon inferences. FTB does not contend that circumstantial evidence can

28  never be used to establish actual causation; nor did the district court make such a ruling.

152

RJN002626

1   Hyatt offered up his own chain of facts in an effort to support his proposed inference that

2   there was a connection between FTB's audit and the demise of his patent licensing program

3   – but Hyatt had no proof of any individual fact in that chain of facts to reach that inference.

4           "It is a rule of law that when circumstantial evidence is relied upon to prove a fact,

5   the circumstances must be proved, and not themselves be presumed." Horgan v. Indart, 41

6   Nev. 228, 168 P. 953 (1917). Every element in the chain of facts must be based on *fact*, and

7   not left to inference, in order to presume the ultimate fact. Id. at 953. Here, the ultimate

8   fact Hyatt sought to prove was that FTB's audit caused the demise of Hyatt's patent

9   licensing program. Hyatt himself offered the chain of facts he needed to prove for that

10  inference. But the inference could not be based upon another inference or speculation; the

11  inference could only be based upon actual fact. Id.; see also, Robbiano v. Bovet, 24 P.2d

12  466, 471 (Cal. 1933); Shutt v. State, 117 N.E.2d 892, 894 (Ind. 1954) ("an inference cannot

13  be based upon evidence which is uncertain or speculative or which raises merely a

14  conjecture or possibility"). The proven facts in the chain of facts relied upon cannot merely

15  be consistent with a theory of causation; the conclusion must be the only one that can be

16  reasonably deduced from the facts. Horgan, 168 P. at 954.

17          It was undisputed that the chain of facts from which Hyatt and his experts based their

18  ultimate conclusion – i.e. letters from FTB to Fujitsu and Matsushita caused the "wider

19  Japanese business communities" not to do business with Hyatt – were not actually proven.

20  Hyatt admitted that he had no such proof. And his experts' opinions were merely

21  assumptions that the circumstances or chain of facts occurred.

22          First, Hyatt's experts assumed that FTB's letters addressed to Fujitsu and Matsushita

23  were forwarded by those companies to the Japanese government, because, as witness

24  Keegan stated, "it is **likely**" to have occurred. 8 AA 1941-42 (emphasis added). There was

25  no evidence that Fujitsu's or Matsushita's executives actually were concerned about FTB's

26  inquiries, or that those companies had policies of sending information to the government.

27  Thus, there was no evidence supporting Hyatt's assumed fact that Fujitsu and Matsushita

28  actually sent the letters to the Japanese government.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002627

After assuming that FTB's letters were sent by Hyatt's licensees to the Japanese government, Hyatt's expert's then assumed that the letters were somehow communicated by the Japanese government to the "wider Japanese business community," based on the expert's statement that this "was **reasonable to assume** that the Ministry of Finance or the Ministry of International Trade and Industry **would have** communicated such information to the wider Japanese business community in an effort to promote the best interests of the Japanese industry." 8 AA 1941-42 (emphasis added). Keegan's premise for this assumption is the previous unsupported assumption that Fujitsu and Matsushita actually forwarded the letters to the Japanese government. There was simply no admissible evidence regarding the actual conduct of the Japanese government (i.e., their actual official policy on sharing information, who they share it with, under what circumstances they share it) from which anyone could find that this link in Hyatt's chain existed – that the Japanese government actually sent the letters to the broader Japanese business community.

After assuming that Hyatt's licensees forwarded FTB's letters to the Japanese government, and after assuming that the Japanese government forwarded the letters to the broader Japanese business community, Hyatt's experts then made yet another assumption. This time they assumed that the broader Japanese business community, after receiving the letters, made an affirmative decision to stop doing business with Hyatt because "the FTB letters **likely affected** the Japanese companies perception of Hyatt as a licensor," 8 AA 1942 (emphasis added), and because "Japanese companies **would be** reluctant for a variety of reasons to have an ongoing or future business relationship with Hyatt." 8 AA 1943 (emphasis added). Hyatt admits that he had no testimony from customers who stopped doing business with him. RAB 192. Thus, there was absolutely no proof of this link in Hyatt's chain of facts regarding the actual conduct of the "wider Japanese business community" (e.g., which companies received the communication; their internal policies regarding such information; what other information the companies already knew about Hyatt; whether the companies were contemplating business with Hyatt; and why the companies did not do business with Hyatt).

154

RJN002628

1     It is clear that every link in Hyatt's alleged chain of facts was nothing but
2  speculation. Hyatt argues, however, that expert testimony can prove causation, particularly
3  where the connection between the injury and the alleged cause would not be obvious to a
4  lay juror. RAB 194-96. Even though expert testimony might be allowed to prove causation
5  in some cases, the testimony must still have a solid evidentiary foundation for admissibility.
6  None of Hyatt's legal authorities at RAB 194-96 support the proposition that expert
7  testimony on causation can be based on speculation or cumulative assumptions. Expert
8  opinion testimony must be based on a reliable methodology and a reliable factual basis.
9  Higgs, 222 P. 3d at ___. Hallmark, 189 P. 3d at ___. "[O]pinion testimony should not be
10 received [into evidence] if shown to rest upon assumptions rather than facts. And, such
11 expert opinion may not be the result of guesswork or conjecture." Wrenn v. State, 89 Nev.
12 71, 73, 506 P.2d 418 (1973) (internal citations omitted). This is particularly true regarding
13 damages. An "award of compensation cannot be based solely upon possibilities and
14 speculative testimony." United Exposition Serv. Co. v. State Indus. Ins. Sys., 109 Nev. 421,
15 424, 851 P.2d 423, 425 (1993); see also, Morsicato v. Sav-On Drug Stores, Inc., 121 Nev.
16 153, 157, 111 P.3d 1112, 1115 (2005) (court rejected expert testimony that was "speculation
17 and conjecture that failed to meet the requisite standard for expert testimony [set forth in
18 NRS 50.275].").

19     C.     Hyatt's Reliance on *Frantz v. Johnson* is Unavailing

20     Hyatt relies on Frantz v. Johnson, 116 Nev. 455, 467-68, 999 P.2d 351, 359 (2000)
21 to support his contention that causation of damages may be shown by circumstantial
22 evidence. RAB 190. While FTB does not dispute that causation can be established by
23 circumstantial evidence, Frantz does not support Hyatt's suggestion that causation can be
24 established by speculation. The issue in Frantz was whether a former employee of the
25 plaintiff had misappropriated trade secrets. The employee claimed that there was
26 insufficient evidence at the trial to support a finding that she misappropriated trade secrets.
27 This court concluded that a finding of misappropriation need not be supported by direct
28 evidence (i.e., testimony from customers), but could be supported by circumstantial

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002629

1    evidence of the same. <u>Frantz</u>, 116 Nev. at 468.

2        The plaintiff employer in <u>Frantz</u> proved a solid chain of facts supporting a strong

3    inference that the former employee and competitors misappropriated trade secrets. Pricing

4    lists were discovered to be missing shortly after the employee left; the employee made

5    admissions tending to prove that she misappropriated trade secrets; phone records showed

6    hundreds of contacts with competitors, in violation of a temporary restraining order; and a

7    purchasing agent testified that the employee contacted her directly about her business needs.

8    <u>Id.</u> at 468. Other testimony confirmed that a competitor was working directly with the

9    employee to solicit customers and to use information taken from the plaintiff. <u>Id.</u> at 469. In

10   holding that there was sufficient circumstantial evidence of misappropriation, this court

11   found that each element leading to the inferred fact was based upon actual proven fact,

12   rather than a prior inference.

13       Hyatt's case is entirely different. There was only speculation and conjecture as to the

14   steps in his chain of facts. This was insufficient to defeat summary judgment. None of

15   Hyatt's other cited case law supports the proposition that speculation can substitute for real

16   evidence in opposition to a motion for summary judgment.[72]

17       D.    Causation Standards

18       Hyatt attempts to sidestep his lack of evidence by arguing that a lesser standard of

19   causation applies to intentional torts. RAB 192-93. Nevada has never adopted a lower

20   [72]Hyatt's reliance on <u>Jones v. United States</u>, 9 F. Supp. 2d 1119 (D. Neb. 1998), at RAB
21   195, is also misplaced. In <u>Jones</u>, the plaintiff had direct evidence in the form of testimony
     from the plaintiff's business affiliates that they had refused to do business with the plaintiff
22   because of the IRS' investigation. <u>Id.</u> at 1142. Moreover, the plaintiff presented an expert
     witness who had carefully studied the plaintiff's business and the related market; and,
23   following accepted methodologies, the expert was able to rule out other potential causes for
     the plaintiff's decline in business. <u>Id.</u> Hyatt had no similar evidence. Particularly, Hyatt
24   offered no expert analysis that the loss of his coveted patent in 1995 did not cause his
25   claimed economic losses, (see <u>Hyatt v. Boone</u> 146 F.3d 1348 (Fed. Cir. 1998), <u>cert. denied</u>
     525 U.S. 1141 (1991), or that his lawsuit against the U.S. Patent and Trademark Office (<u>see</u>
26   <u>Gilbert P. Hyatt v. U.S. Patent and Trademark Office</u>, USDC-NV, Case No. CV-S-00-874-
27   PMP), in which he alleges similar injuries arising from the same timeframe, did not cause
     his claimed economic losses. As such, <u>Jones</u> is not applicable here.
28

McDONALD·CARANO·WILSON<br>100 WEST LIBERTY STREET, 10TH FLOOR · RENO, NEVADA 89501<br>P.O. BOX 2670 · RENO, NEVADA 89505-2670<br>PHONE 775-788-2000 · FAX 775-788-2020

156

1   standard for causation in intentional tort cases.  In fact, this court has made clear that "[t]he

2   doctrine of proximate cause, as a limit on liability, applies to *every tort action*."  Eaton, 101

3   Nev. at 714; see also, Johnson v. Am. Airlines, Inc., 834 F.2d 721, 724 (9th Cir. 1987).

4   This court recently applied the stringent standard of causation required to provide economic

5   damages in a business disparagement claim (an intentional tort).  See Clark County Sch.

6   Dist. v. Virtual, 213 P.3d at 504 (plaintiff required to show his pecuniary losses were

7   actually and proximately caused by the defendant's alleged intentional tort).[73]

8            Moreover, contrary to Hyatt's argument that a relaxed standard of proximate

9   causation should apply in a fraud case, this court has applied the same stringent standard of

10  proximate causation to a claim for damages resulting from fraud.  See, e.g. Nelson v. Heer,

11  123 Nev. 217, 225-26, 163 P.3d 420, 426 (2007) (stating "damages alleged must be

12  proximately caused by reliance on the original misrepresentation or omission" and holding

13  that where there was no evidence that damages were "reasonably connected" to the

14  defendant's misrepresentation or omission, the plaintiff was not entitled to those damages);

15  Foster v. Dingwall, 126 Nev. Adv. Op. 6, 227, P. 3d  (Feb. 25, 2010) (rejecting plaintiffs'

16  claim for intentional misrepresentation damages where plaintiffs did not present sufficient

17  evidence to show claimed damages were caused by the alleged misrepresentations

18           Applying the correct standard of causation to the present case, the district court

19  appropriately concluded that Hyatt failed, as a matter of law, to establish an essential

20  element of his claim for economic damages, i.e. causation.  Hyatt provided no admissible

---

22  [73]In Virtual, this court discussed in detail the evidence required to show causation of
23  economic damages, stating that "a plaintiff must prove specifically that the defendant's
    [actions] are the proximate cause of the economic loss." Virtual, 213 P.3d at 505 (emphasis
24  added). Where the plaintiff cannot show the loss of specific sales attributable to the
25  defendant's actions, and the plaintiff attempts to rely on a general decline of business, the
    plaintiff must show that the decline of business is the result of the defendant's actions only,
26  and not other potential causes. Id. In Virtual, as in this case, the plaintiff had shown only
27  that there was a temporal proximity of the two events: i.e. that its sales had declined after the
    alleged wrongful actions were taken. Id. This was insufficient to establish proximate
28  causation in Virtual and it is insufficient in this case.

157

1  evidence that FTB's letters were forwarded to the Japanese government, that the
2  government then forwarded the letters to the Japanese business community in general, or
3  that the business community declined to deal with Hyatt as a result of the letters. Nor did
4  Hyatt rule out other real potential causes for the failure of Japanese companies to do
5  business with him, such as the stagnation of the Japanese economy in the 1990s, or the
6  revocation of his patent in 1995.[74]

7  IV.     CONCLUSION ON CROSS-APPEAL

8          For the foregoing reasons, the district court did not err by granting partial summary
9  judgment on Hyatt's claim for economic damages.

10         Dated this *1st* of June, 2010

12     By:  *Robert L. Eisenberg*
              ROBERT L. EISENBERG (NSBN 0950)
13            LEMONS, GRUNDY & EISENBERG

15     By:  *Pat Lundvall*
              PAT LUNDVALL (NSBN 3761)
16            McDONALD CARANO WILSON LLP

17            ATTORNEYS FOR APPELLANT/CROSS-RESPONDENT

---

[74] See Hyatt v. Boone, 146 F.3d 1348, 1357 (Fed. Cir. 1998).

158

RJN002632

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF COMPLIANCE

I hereby certify that I have read this reply brief and answering brief on cross-appeal, and to the best of my knowledge, information and belief, it is not frivolous or interposed for any improper purpose. I further certify that this brief complies with all applicable Nevada Rules of Appellate Procedure, in particular NRAP 28(e), which requires every assertion in the brief regarding matters in the record to be supported by appropriate references to the record on appeal. I understand that I may be subject to sanctions in the event that the accompanying brief is not in conformity with the requirement of the Nevada Rules of Appellate Procedure.

Dated this _1st_ of June, 2010

By: _Robert L. Eisenberg_
ROBERT L. EISENBERG (NSBN 0950)
LEMONS, GRUNDY & EISENBERG

By: _Pat Lundvall_
PAT LUNDVALL (NSBN 3761)
McDONALD CARANO WILSON LLP

ATTORNEYS FOR APPELLANT/CROSS-RESPONDENT

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

RJN002633

1

**CERTIFICATE OF SERVICE**

2       Pursuant to NRAP 25, I hereby certify that I am an employee of McDonald Carano

3  Wilson LLP and that on this date I served true copies of the foregoing Appellant's Reply

4  Brief and Cross-Respondent's Answering Brief by depositing said copies with Federal

5  Express for overnight delivery upon the following:

6

7     Peter C. Bernhard, Esq.         Mark A. Hutchison, Esq.
        Kaempfer Crowell Renshaw       Hutchison & Steffen

8     Gronauer Fiorentino             Peccole Professional Park
        8345 West Sunset Road, Suite 250   10080 West Alta Drive, Suite 200

9     Las Vegas, NV 89113           Las Vegas, NV 89145
        *Attorneys for Gilbert P. Hyatt*     *Attorneys for Gilbert P. Hyatt*

10

11    C. Wayne Howle            Clark L. Snelson
        Solicitor General, State of Nevada   Utah Assistant Attorney General

12    Local Counsel              160 East 300 South 5th Floor
        100 North Carson Street       Salt Lake City, UT 84114

13    Carson City, NV 89701

14

15    Bruce J. Fort, Counsel
        Multistate Tax Commission

16    444 N. Capitol Street, N.W.
        Suite 425

16    Washington, D.C. 20001-8699

17

18     DATED:  June 1, 2010

19

20

21

22

23

24

25

26

27

28

RJN002634

Dated this 14TH day of April, 2017.

/s/  Debbie Leonard
JAMES BRADSHAW
DEBBIE LEONARD
ADAM HOSMER-HENNER
MCDONALD CARANO WILSON LLP
100 West Liberty Street, 10th Floor
P.O. Box 2670
Reno, NV  89505
(775) 788-2000

SETH P. WAXMAN
PAUL R.Q. WOLFSON
DANIEL WINIK
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C.  20006
(202) 663-6000

CYNTHIA J. LARSEN
KATIE DEWITT
DAVID W. SPENCER
ORRICK, HERRINGTON & SUTCLIFFE
400 Capitol Mall, Suite 3000
Sacramento, CA 95814
(916) 329-7970

*Attorneys for Appellees Betty T. Yee,*
*Diane L. Harkey, and Michael Cohen in*
*their official capacities as members of the*
*California Franchise Tax Board*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

 /s/Pam Miller
An Employee of McDonald Carano Wilson LLP